IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 06-259-KAJ |
| v. | ) ) | |
| ARIAD PHARMACEUTICALS, INC., | ) ) | |
| Defendant. | ) ) | |

### DECLARATION OF LAURIE A. ALLEN

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE  19899
Telephone:  (302) 654-1888
Facsimile:  (302) 654-2067
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Counsel for Defendant*

*Of Counsel:*

David I. Gindler
Morgan Chu
Amir A. Naini
Christopher M. Newman
Irell & Manella LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, CA  90067-4276
Telephone:  (310) 277-1010
Facsimile:   (310) 203-7199

Dated:  June 14, 2006

## DECLARATION OF LAURIE A. ALLEN

I, Laurie A. Allen, declare as follows:

1.    I am the Senior Vice President and Chief Legal Officer of ARIAD Pharmaceuticals, Inc. ("ARIAD").    I was employed by ARIAD from January 1, 1999 to December 31, 1999, and was re-employed by ARIAD from March 4, 2002 to the present.    I currently have primary responsibility for management of the legal and business development functions at ARIAD.    I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.    Pursuant to an agreement entered into on August 19, 1991, and amended on November 20, 1991 and January 2, 2002, ARIAD is the exclusive licensee of U.S. Patent No. 6,410,516 (the "'516 patent"), which is assigned to the Whitehead Institute, the Massachusetts Institute of Technology, and Harvard University.    Attached hereto as Exhibit A is a true and correct copy of portions of this agreement that was appended to ARIAD's quarterly report on Form 10-Q for the quarter ended March 31, 2006.    ARIAD is based in Cambridge, Massachusetts, and the assignees of the '516 patent are also all based in Massachusetts.

3.    On June 25, 2002, ARIAD filed suit against Eli Lilly and Company ("Lilly") in the United States District Court for the District of Massachusetts, alleging that Lilly had infringed certain claims of the '516 patent by making, using, and selling the drugs Evista and Xigris.    The assignees of the patent were co-plaintiffs in this suit.    The case is captioned *Ariad Pharmaceuticals, Inc. et al., v. Eli Lilly & Co.*, No. 1:02-cv-11280-RWZ (D. Mass.) (J. Zobel). Lilly counterclaimed, alleging that the asserted claims of the '516 patent were not infringed and were invalid and unenforceable.    On May 4, 2006, the jury returned a verdict finding that the '516 patent was valid and infringed by Lilly and awarded damages to the co-plaintiffs in the

amount of approximately $65.2 million, based on the jury's determination of a reasonable royalty rate of 2.3% to be paid by Lilly to the co-plaintiffs based on U.S. sales of Evista and Xigris from filing of the lawsuit on June 25, 2002, through February 28, 2006. The jury awarded further damages on an ongoing basis, in amounts to be determined, equal to 2.3% of U.S. sales of Evista and Xigris through the year 2019, when the '516 patent expires. The district court has scheduled a second phase of the trial for August 7-9, 2006, which will address Lilly's equitable defenses. This is the only action in which ARIAD has asserted the '516 patent.

4.      The jury trial in the Lilly litigation commenced on April 10, 2006. I attended portions of the Lilly trial and was present during the testimony of ARIAD's founder and Chief Executive Officer, Harvey J. Berger. M.D. I observed that Amgen in-house counsel, Siegmund Gutman, Esq., was present in the courtroom during the testimony of Dr. Berger. Attached hereto as Exhibit B is a true and correct copy of excerpts from the reporter's transcript of Dr. Berger's testimony. Attached hereto as Exhibit C is a true and correct copy of one of the exhibits referred to in Dr. Berger's testimony, a presentation made at ARIAD's Board of Directors' meeting in December 2001 concerning the prospects for licensing the NF-$\kappa$B technology. This presentation had been kept confidential within ARIAD up until the time it was produced as part of confidential discovery in the Lilly litigation.

5.      To date, the only products that ARIAD has analyzed to determine whether they potentially infringe the claims of the '516 patent are Evista and Xigris, the drugs at issue in ARIAD's litigation with Lilly. ARIAD has not analyzed any products of Amgen Inc. ("Amgen"), or of any of the related companies joined in the present action, to determine whether they infringe the '516 patent.

6.    ARIAD has only communicated with Amgen specifically concerning the '516 patent on one occasion, when Amgen was included in a mass mailing along with approximately 50 other pharmaceutical companies upon issuance of the '516 patent on June 25, 2002. Each of the companies included in this mailing received the same form letter, which announced the issuance of the '516 patent, generally described the technology, and attached a term sheet for a non-exclusive license for research purposes only. A true and correct copy of the version of this letter sent to Amgen is attached hereto as Exhibit D. ARIAD has never received any response to this letter from Amgen.

7.    ARIAD has never engaged in discussions with Amgen regarding a possible license to the '516 patent. ARIAD has never threatened to sue Amgen for infringement of the '516 patent or stated any belief that any of Amgen's products, or those of its related entities, are covered by the '516 patent.

8.    All 203 claims of the '516 patent are at issue in two pending reexamination proceedings before the Patent and Trademark Office (one initiated by Eli Lilly & Company, the other by Bawa Biotechnology Consulting, LLC). The PTO has merged these reexaminations, which will be handled as a single proceeding. No office action on the merits has yet occurred. Ariad filed a request for reexamination of a single claim of the '516 patent on April 7, 2006, which was denied on May 5, 2006.

Executed on June 14, 2006, at Cambridge, Massachusetts.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Laurie A. Allen, Esq.

1509991.2 05

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of June, 2006, the attached **DECLARATION OF**

**LAURIE A. ALLEN** was served upon the below-named counsel of record at the address and in

the manner indicated:

Melanie K. Sharp, Esquire                                HAND DELIVERY
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

Marcus E. Sernel, Esquire                                VIA FEDERAL EXPRESS
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601-6636

J. Drew Diamond, Esquire                                VIA FEDERAL EXPRESS
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA  90017-5800


                                        /s/ John G. Day
                                        _____
                                        John G. Day

170258.1

# EXHIBIT A

Exhibit 10.1

**LICENSE AGREEMENT**

DATED AUGUST 19, 1991

BY AND AMONG

THE MASSACHUSETTS INSTITUTE OF TECHNOLOGY,

THE WHITEHEAD INSTITUTE

AND

ARIAD PHARMACEUTICALS, INC.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.

WHI Vers -1/28/91

LLN/#4: 4167ariad.agt
Date: August 8, 1991

LICENSE AGREEMENT

TABLE OF CONTENTS

PREAMBLE

ARTICLES:

| | | |
|---|---|---|
| ARTICLE I - | DEFINITIONS | 3 |
| ARTICLE II - | GRANT | 5 |
| ARTICLE III - | DUE DILIGENCE | 7 |
| ARTICLE IV - | ROYALTIES | 7 |
| ARTICLE V - | REPORTS AND RECORDS | 9 |
| ARTICLE VI - | PATENT PROSECUTION | 10 |
| ARTICLE VII - | INFRINGEMENT | 10 |
| ARTICLE VIII - | PRODUCT LIABILITY | 12 |
| ARTICLE IX - | EXPORT CONTROLS | 12 |
| ARTICLE X - | NON-USE OF NAMES | 12 |
| ARTICLE XI - | ASSIGNMENT | 13 |
| ARTICLE XII - | ARBITRATION | 13 |
| ARTICLE XIII - | TERMINATION | 13 |
| ARTICLE XIV - | PAYMENTS NOTICES AND OTHER COMMUNICATIONS | 14 |
| ARTICLE XV - | MISCELLANEOUS PROVISIONS | 15 |
| | APPENDIX A | 17 |
| | APPENDIX B | 19 |
| | APPENDIX C | 20 |
| | APPENDIX D | 24 |

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.

2

This Agreement is made and entered into this 19th day of August, 1991, (the Effective Date) by and between MASSACHUSETTS INSTITUTE OF TECHNOLOGY, a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts and having its principal office at 77 Massachusetts Avenue, Cambridge, Massachusetts 02139, U.S.A. (hereinafter referred to as M.I.T.), and the WHITEHEAD INSTITUTE, a corporation organized and existing under the laws of Delaware and having its principal office at Nine Cambridge Center, Cambridge, Massachusetts 02142, U.S.A., (hereinafter referred to as Whitehead) and ARIAD PHARMACEUTICALS, INC., a corporation duly organized under the laws of Delaware and having its principal office at 687 Wetherby Lane, Devon, Pennsylvania 19333 (hereinafter referred to as LICENSEE).

<u>WITNESSETH</u>

WHEREAS, M.I.T. and Whitehead are the owners of certain "Patent Rights" (as later defined herein) relating to M.I.T. Case No. [***] by [***]; M.I.T. Case No. [***] (Whitehead No. [***]) "[***]" by [***]; M.I.T. Case No. [***] (Whitehead No. [***]) "[***]" by [***]; M.I.T. Case No. [***] (Whitehead [***]) "[***]" by [***] et al.; M.I.T. Case No. [***] (Whitehead No. [***]) "[***]" by [***] and has the right to grant licenses under said Patent Rights, subject only to a royalty-free, nonexclusive license heretofore granted to the United States Government;

WHEREAS, Whitehead has authorized M.I.T. to act as its sole and exclusive agent for the purposes of licensing Whitehead's rights in the Patent Rights and has authorized M.I.T. to enter into this licensing agreement on its own and Whitehead's behalf;

WHEREAS, M.I.T. and Whitehead desire to have the Patent Rights utilized in the public interest and is willing to grant a license thereunder;

WHEREAS, LICENSEE has represented to M.I.T., to induce M.I.T. to enter into this Agreement, that LICENSEE is committed to the development and commercialization of "Licensed Product(s)" (as later defined herein) and/or the use of the "Licensed Process(es)" (as later defined herein) and that it shall commit itself to a thorough, vigorous and diligent program of exploiting the Patent Rights so that public utilization shall result therefrom; and

WHEREAS, LICENSEE desires to obtain a license under the Patent Rights upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein the parties hereto agree as follows:

<u>ARTICLE I - DEFINITIONS</u>

For the purposes of this Agreement, the following words and phrases shall have the following meanings:

1.1      "LICENSEE" shall include a related company of LICENSEE, the voting stock of which is directly or indirectly at least Fifty Percent (50%) owned or controlled by LICENSEE, an organization which directly or indirectly controls more than Fifty Percent (50%) of the voting

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

3

stock of LICENSEE and an organization, the majority ownership of which is directly or indirectly common to the ownership of LICENSEE.

1.2    "Patent Rights" shall mean all of the following Whitehead and M.I.T. intellectual property:

    (a)    the United States and foreign patents and/or patent applications listed in Appendix A;

    (b)    United States and foreign patents issued from the applications listed in Appendix A and from divisionals and continuations of these applications;

    (c)    claims of U.S. and foreign continuation-in-part applications, and of the resulting patents, which are directed to subject matter specifically described in the U.S. and foreign applications listed in Appendix A;

    (d)    claims of all foreign patent applications, and of the resulting patents, which are directed to subject matter specifically described in the United States patents and/or patent applications described in (a), (b), or (c) above;

    (e)    any reissues of United States patents described in (a), (b), (c), or (d) above.

1.3    A "Licensed Product" shall mean any product or part thereof which:

    (a)    is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the Patent Rights in the country in which any Licensed Product is made, used or sold;

    (b)    is manufactured by using a process which is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the Patent Rights in the country in which any Licensed Process is used or in which such product or part thereof is used or sold;

    (c)    contains the Tangible Property,

    subject to the limitations in Paragraph 4.4.

1.4    A "Licensed Process" shall mean any process which is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the Patent Rights or which uses the Tangible Property, subject to the limitations in Paragraph 4.4.

1.5    "Net Sales" shall mean LICENSEE's (and its sublicensees' where appropriate) billings for Licensed Products and Licensed Processes produced hereunder less the sum of the following:

    (a)    discounts allowed in amounts customary in the trade;

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

    (b)       sales, tariff duties and/or use taxes directly imposed and with reference to particular sales;

    (c)       outbound transportation prepaid or allowed; and

    (d)       amounts allowed or credited on returns.

No deductions shall be made for commissions paid to individuals whether they be with independent sales agencies or regularly employed by LICENSEE and on its payroll, or for cost of collections. Licensed Products shall be considered "sold" when billed out or invoiced.

    1.6     "Tangible Property" shall mean cell lines containing [***] obtained directly or indirectly from M.I.T. or Whitehead, and any progeny and derivatives thereof.

## ARTICLE II - GRANT

    2.1     M.I.T. hereby grants to LICENSEE the right and license to make, have made, use, lease and sell the Licensed Products, and to practice the Licensed Processes to the end of the term for which the Patent Rights are granted unless sooner terminated according to the terms hereof.

    2.2     This license shall be subject to the research license and to the option granted to Centocor to acquire a license to the Patent Rights of M.I.T. Case 4167 for use with certain hybridomas, under the Collaborative Research Agreement between Centocor and M.I.T. dated November 14, 1988 as attached hereto as Appendix C. M.I.T. agrees that it will not renew the Collaboration Research Agreement as provided in Paragraph 2 thereof.

    2.3     In order to establish a period of exclusivity for LICENSEE, M.I.T. hereby agrees that with the exception of the rights granted or optioned to Centocor, it shall not grant any other license to make, have made, use, lease and sell Licensed Products or to utilize Licensed Processes during the period of time commencing with the Effective Date of this Agreement and terminating with the first to occur of:

    (a)       for each type of Licensed Product the expiration of Twelve (12) years after the first commercial sale of that Licensed Product; or

    (b)       the expiration of Sixteen (16) years after the Effective Date of this Agreement;

provided, however, that for any Licensed Product for which an application for premarket approval has been submitted to the U.S. FDA prior to July 1, 2007, the time spent by the FDA reviewing said application(s) for that Licensed Product shall be added to the period of exclusivity which would otherwise apply.

    2.4     At the end of the exclusive period, the license granted hereunder shall become nonexclusive and shall extend to the end of the term or terms for which any Patent Rights are issued, unless sooner terminated as hereinafter provided, or unless the parties agree to extend the period of exclusivity.

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

2.5     M.I.T. and Whitehead also agree to bring to the attention of LICENSEE any inventions which relate to [***] which arise prior to December 31, 1994 from the M.I.T. or Whitehead laboratories of any of the inventors of the Patent Rights listed in Appendix A. LICENSEE shall have a three month option, dating from the date at which any such invention is revealed to LICENSEE, to begin negotiations with M.I.T. for an exclusive license to such invention. If such negotiations are begun at LICENSEE's request, LICENSEE shall have an additional three month option to negotiate in good faith for an exclusive license to the invention. LICENSEE's options under this Paragraph 2.5 shall, however, be subject to any options or licenses granted under a research agreement with sponsors of the research leading to such invention, and the terms of such research agreements shall not be limited by the provisions of this Paragraph 2.5. M.I.T. and Whitehead shall use their best reasonable efforts to notify LICENSEE of any planned or completed sponsorship agreements, other than those involving U.S. Government sponsorship, in the field of [***], subject, however, to any confidentiality provisions with sponsors that might limit such notification.

2.6     LICENSEE agrees that Licensed Products leased or sold in the United States shall be manufactured substantially in the United States.

2.7     Whitehead and M.I.T. reserve the right to practice under the Patent Rights and to use and distribute the Tangible Property for their noncommercial research purposes under a Materials Transfer agreement similar to that in Appendix D. M.I.T. and Whitehead shall use their best reasonable efforts to notify LICENSEE of any Tangible Property distributed to third parties.

2.8     LICENSEE shall have the right to enter into sublicensing agreements for the rights, privileges and licenses granted hereunder only during the exclusive period of this Agreement. Such sublicenses may extend past the expiration date of the exclusive period of this Agreement, but any exclusivity of such sublicenses will expire upon the expiration of LICENSEE's exclusivity.

2.9     LICENSEE hereby agrees that every sublicensing agreement to which it shall be a party and which shall relate to the rights, privileges and license granted hereunder shall contain a statement setting forth the date upon which LICENSEE's exclusive rights, privileges and license hereunder shall terminate.

2.10    LICENSEE agrees that any sublicenses granted by it shall provide that the obligations to M.I.T. and Whitehead of Articles II, V, VII, VIII, IX, X, XII, XIII, and XV of this Agreement shall be binding upon the sublicensee as if it were a party to this Agreement. LICENSEE further agrees to attach copies of these Articles to sublicense agreements.

2.11    LICENSEE agrees to forward to M.I.T. a copy of any and all fully executed sublicense agreements, and further agrees to forward to M.I.T. annually a copy of such reports received by LICENSEE from its sublicensees during the preceding twelve (12) month period under the sublicense as shall be pertinent to a royalty accounting under said sublicense agreements.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.

2.12     LICENSEE shall not receive from sublicensees anything of value in lieu of cash payments in consideration for any sublicense under this Agreement, without the express prior written permission of M.I.T..

2.13     The license granted hereunder shall not be construed to confer any rights upon LICENSEE by implication, estoppel or otherwise as to any technology not specifically set forth in Appendix A hereof and Paragraph 2.5.

ARTICLE III - DUE DILIGENCE

3.1     LICENSEE shall use its best efforts to bring one or more Licensed Products or Licensed Processes to market through a thorough, vigorous and diligent program for exploitation of the Patent Rights.

3.2     In addition, LICENSEE shall adhere to the following milestones:

    (a)     LICENSEE shall deliver to M.I.T. on or before [***] on or before the ninetieth (90th) day following the close of LICENSEE's fiscal year.

    (b)     ARIAD PHARMACEUTICALS, INC. (LICENSEE) shall have received at least [***].

    (c)     ARIAD PHARMACEUTICALS, INC. (LICENSEE) shall have received a cumulative total of at least [***].

    (d)     LICENSEE shall, within six (6) months of a request by a suitable sublicensee willing to take a sublicense upon reasonable business terms, grant at least one sublicense to the Patent Rights and Tangible Property for sale of Licensed Products as research reagents with appropriate protection of LICENSEE's commercial interests. Failure to reach such an agreement within six (6) months after a bona fide request shall allow M.I.T. to grant a license to the Patent Rights to the requestor for sale of research reagents on terms no more favorable than those of paragraph 4.1(d) below.

    (e)     In any calendar year after [***] that LICENSEE has not made at least [***] in Net Sales of Licensed Product, LICENSEE shall have invested a minimum of [***].

3.3     LICENSEE's failure to perform in accordance with Paragraphs 3.1 and 3.2 above shall be grounds for M.I.T. to terminate this Agreement pursuant to Paragraph 13.3 hereof.

ARTICLE IV - ROYALTIES

4.1     For the rights, privileges and license granted hereunder, LICENSEE shall pay royalties to M.I.T. in the manner hereinafter provided to the end of the term of the Patent Rights or until this Agreement shall be terminated as hereinafter provided:

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

7

(a)      License Issue Fee of [***], which said License Issue Fee shall be deemed earned and due thirty days after the execution of this Agreement.

(b)      License Maintenance Fees of [***]per year payable on [***]and on January 1 of each year thereafter until the [***]. Following the submission of such [***], the License Maintenance Fees shall be [***] per year beginning January 1 of the year following the submission. However, beginning [***], the License Maintenance Fees shall be [***] per year [***] has been submitted by LICENSEE. The License Maintenance Fee for a given year shall be fully creditable against any Running Royalties subsequently due.

(c)      A one-time Milestone Fee of [***] payable within ninety (90) days after LICENSEE receives approval to [***] on a Licensed Product based upon its [***].

(d)      Running Royalties in an amount equal to [***] of the Net Sales of Licensed Products and Licensed Processes used, leased or sold by and/or for LICENSEE which are covered [***] of the Patent Rights in any country in which the Licensed Products and/or Licensed Processes are made, used, leased or sold; and Running Royalties in an amount equal to [***] of the Net Sales of Licensed Products and Licensed Processes used, leased or sold by and/or for LICENSFF which are covered [***] of the Patent Rights in any country in which the Licensed Products and/or Licensed Processes are made, used, leased or sold. The provisions of this paragraph shall not apply to any Licensed Products leased or sold by LICENSEE or its sublicensees for use as research reagents.

(e)      Running Royalties in an amount equal to [***] of the Net Sales price of Licensed Products sold by or for LICENSER, or its sublicensees for use as research reagents.

(f)      [***] of any payments made to LICENSEE for sublicensing of the Patent Rights and/or Tangible Property. This subparagraph 4.1(f) shall not apply, however, to royalties paid to LICENSEE by sublicensee(s) on the Net Sales of Licensed Products sold by sublicensee (s) for use as research reagents, which shall fall under subparagraph 4.1(e) above.

4.2     The License Issue Fee, Milestone Fee and all License Maintenance Fees shall be cumulatively creditable against Running Royalties.

4.3     All patent costs incurred prior to July 1, 1991 and reimbursed by LICENSEE under Article VI shall be creditable against Running Royalties except for Running royalties on research reagents. [***] of patent costs incurred after July 1, 1991 shall be creditable against Running Royalties except for Running Royalties on research reagents.

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

8

4.4     The definitions of Paragraphs 1.3 and 1.4 notwithstanding, after [***] Running Royalties shall be due on the Net Sales of a Licensed Product only if the Licensed Product is covered [***].

4.5     LICENSEE shall be entitled to credit [***] of the royalties paid to third parties for the use, lease or sale of a Licensed Product or Licensed Process by LICENSEE against the Running Royalties for that Licensed Product or Licensed Process due under subparagraph 4.1(d) above; provided, however that the amount credited shall not reduce the Running Royalty paid below [***] for the Licensed Product or Licensed Process covered [***], and [***] if the Licensed Product or Licensed Process is covered [***].

4.6     In no instance shall the amount paid to M.I.T. in total in a given year be less than the License Maintenance Fee for that year.

4.7     All payments due hereunder shall be paid in full, without deduction of taxes or other fees which may be imposed by any government and which shall be paid by LICENSEE.

4.8     No multiple royalties shall be payable because any Licensed Product, its manufacture, use, lease or sale are or shall be covered by more than one patent application or patent licensed under this Agreement.

4.9     Royalty payments shall be paid in United States dollars in Cambridge, Massachusetts, or at such other place as M.I.T. may reasonably designate consistent with the laws and regulations controlling in any foreign country. If any currency conversion shall be required in connection wish the payment of royalties hereunder, such conversion shall be made by using the exchange rate prevailing at the Chase Manhattan Bank (N.A.) on the last business day of the calendar quarterly reporting period to which such royalty payments relate.

## ARTICLE V - REPORTS AND RECORDS

5.1     LICENSEE, within sixty (60) days after March 31, June 30, September 30 and December 31, of each year, shall deliver to M.I.T. true and accurate reports, giving such particulars of the business conducted by LICENSEE and its sublicensees during the preceding three-month period under this Agreement as shall be pertinent to a royalty accounting hereunder. These shall include at least the following:

    (a)     number of Licensed Products manufactured and sold.

    (b)     total billings for Licensed Products sold.

    (c)     accounting for all Licensed Processes used or sold.

    (d)     deductions applicable as provided in Paragraph 1.5.

    (e)     total royalties due.

    (f)     names and addresses of all sublicensees of LICENSEE.

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

5.2    With each such report submitted, LICENSEE shall pay to M.I.T. the royalties due and payable under this Agreement. If no royalties shall be due, LICENSEE shall so report.

5.3    On or before the ninetieth (90th) day following the close of LICENSEE's fiscal year, LICENSEE shall provide M.I.T. with LICENSEE's certified financial statements for the preceding fiscal year including, at a minimum, a Balance Sheet and an Operating Statement.

5.4    The royalty payments set forth in this Agreement shall, if overdue, bear interest until payment at a per annum rate two percent (2%) above the prime rate in effect at the Chase Manhattan Bank (N.A.) on the due date. The payment of such interest shall not foreclose M.I.T. from exercising any other rights it may have as a consequence of the lateness of any payment.

## ARTICLE VI - PATENT PROSECUTION

6.1    M.I.T. (and/or Whitehead, as appropriate, depending on ownership of the individual Patent Rights) shall apply for, seek prompt issuance of, and maintain during the term of this Agreement the Patent Rights in the United States and in the foreign countries listed in Appendix B hereto. Appendix B may be amended by verbal agreement of both parties, such agreement to be confirmed in writing within ten (10) days. The prosecution, filing and maintenance of all Patent Rights patents and applications shall be the primary responsibility of M.I.T. (and/or Whitehead); provided, however, LICENSEE shall have reasonable opportunities to advise M.I.T. (and/or Whitehead) and shall cooperate with M.I.T. (and/or Whitehead) in such prosecution, filing and maintenance.

6.2    Payment of all fees and costs relating to the filing, prosecution, and maintenance of the Patent Rights shall be the responsibility of LICENSEE, whether such fees and costs were incurred before or after the date of this Agreement. Such payments shall be creditable as specified in Paragraphs 4.2 and 4.3. For fees and costs incurred prior to July 1, 1991, LICENSEE shall reimburse M.I.T. and Whitehead on the following schedule:

| 25% of total: | 30 days after billing |
| 25% of total: | January 15, 1992 |
| 25% of total: | July 15, 1992 |
| 25% of total: | January 15, 1993 |

Fees and costs incurred after July 1, 1991 shall be reimbursed within 30 days after billing.

## ARTICLE VII - INFRINGEMENT

7.1    LICENSEE, M.I.T. and Whitehead shall promptly inform each other of any alleged infringement of the Patent Rights by a third party and of any available evidence thereof.

7.2    During the term of this Agreement, LICENSEE shall have the right, but shall not be obligated, to prosecute at its own expense any such infringements of the Patent Rights and in furtherance of such right, M.I.T. and Whitehead hereby agree that LICENSEE may include

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

10

M.I.T. or Whitehead as party plaintiffs in any such suit without expense to M.I.T. or Whitehead. The total cost of any such infringement action commenced or defended solely by LICENSEE shall be borne by LICENSEE. LICENSEE may, for such purposes, use the name of M.I.T. or Whitehead as party plaintiffs provided, however, that such right to bring an infringement action shall remain in effect only for so long as the license granted herein remains exclusive. No settlement, consent judgment or other voluntary final disposition of the suit may be entered into without the consent of M.I.T. and Whitehead, which consent shall not unreasonably be withheld. LICENSEE shall indemnify M.I.T. and Whitehead against any order for costs associated with the litigation that may be made against M.I.T. or Whitehead in such proceedings.

7.3     In the event that LICENSEE shall undertake the enforcement and/or defense of the Patent Rights by litigation, LICENSEE may withhold up to [***] of the royalties otherwise thereafter due M.I.T. hereunder and apply the same toward reimbursement of up to [***] of LICENSEE's expenses, including reasonable attorney's fees, in connection therewith. Any recovery of damages by LICENSEE for any such suit shall be applied pro rata in satisfaction of (i) any unreimbursed expenses and legal fees of LICENSEE relating to the suit; and (ii) any royalties due M.I.T. and withheld by LICENSEE and applied pursuant to this Paragraph 7.3. The balance remaining from any such recovery shall be divided between LICENSEE and M.I.T. in the proportion of [***].

7.4     If within six (6) months after having been notified of any alleged infringement, LICENSEE shall have been unsuccessful in persuading the alleged infringer to desist and shall not have brought and shall not be diligently prosecuting an infringement action, or if LICENSEE shall notify M.I.T. at any time prior thereto of its intention not to bring suit against any alleged infringer, then, in those events only, M.I.T. or Whitehead, as appropriate) shall have the right, but shall not be obligated, to prosecute at its own expense any infringement of the Patent Rights, and, in furtherance of such right, LICENSEE hereby agrees that M.I.T. (or Whitehead) may include LICENSEE as a party plaintiff in any such suit, without expense to LICENSEE. The total cost of any such infringement action commenced or defended solely by M.I.T. (or Whitehead) shall be borne by M.I.T. (or Whitehead), and M.I.T. (or Whitehead) shall keep any recovery or damages for past infringement derived therefrom. No settlement, consent judgment or other voluntary final disposition of the suit maybe entered into without the consent of LICENSEE, which consent shall not unreasonable be withheld.

7.5     In the event that a declaratory judgment action alleging invalidity or noninfringement of any of the Patent Rights shall be brought against LICENSEE, M.I.T. at its option, shall have the right, within thirty (30) days after commencement of such action, to intervene and take over the sole defense of the action at its own expense.

7.6     In any infringement suit as any party may institute to enforce the Patent Rights pursuant to this Agreement, the other parties hereto shall, at the request and expense of the party initiating such suit, cooperate in all respects and, to the extent possible, have its employees testify when requested and make available relevant records, papers, information, samples, specimens, and the like.

7.7     LICENSEE, during the exclusive period of this Agreement, shall have the sole right in accordance with the terms and conditions herein to sublicense any alleged infringer for

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

future use of the Patent Rights. Any upfront fees paid to LICENSEE as part of such sublicense shall be handled in accordance with subparagraph 4.1(f).

## ARTICLE VIII - PRODUCT LIABILITY

8.1    LICENSEE shall at all times during the term of this Agreement and thereafter, indemnify, defend and hold M.I.T. and Whitehead, their trustees, officers, employees and affiliates, harmless against all claims and expenses, including legal expenses and reasonable attorneys' fees, arising out of the death of or injury to any person or persons or out of any damage to property and against any other claim, proceeding, demand, expense and liability of any kind whatsoever resulting from the production, manufacture, sale, use, lease, consumption or advertisement of the Licensed Product(s) and/or Licensed Process(es) or arising from any obligation of LICENSEE hereunder.

8.2    LICENSEE shall obtain prior to the first use of a Licensed Product or Licensed Process on humans and carry in full force and effect liability insurance which shall protect LICENSEE, M.I.T. and Whitehead in regard to events covered by Paragraph 8.1 above.

8.3    EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, M.I.T. AND WHITEHEAD MAKE NO REPRESENTATIONS AND EXTEND NO WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND VALIDITY OF PATENT RIGHTS CLAIMS, ISSUED OR PENDING.

## ARTICLE IX - EXPORT CONTROLS

It is understood that M.I.T. and Whitehead are subject to United States laws and regulations controlling the export of technical data, computer software, laboratory prototypes and other commodities (including the Arms Export Control Act, as amended and the Export Administration Act of 1979), and that its obligations hereunder are contingent on compliance with applicable United States export laws and regulations. The transfer of certain technical data and commodities may require a license from the cognizant agency of the United States Government and/or written assurances by LICENSEE that LICENSEE shall not export data or commodities to certain foreign countries without prior approval of such agency. M.I.T. neither represents that a license shall not be required nor that, if required, it shall be issued.

## ARTICLE X - NON-USE OF NAMES

LICENSEE shall not use the names of the Massachusetts Institute of Technology nor of the Whitehead Institute nor any of their employees, nor any adaptation thereof, in any advertising, promotional or sales literature without prior written consent obtained from M.I.T. in each case, except that LICENSEE may state that it is licensed by Whitehead or M.I.T. under one or more of the patents and/or applications comprising the Patent Rights.

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

12

ARTICLE XI - ASSIGNMENT

The rights of ARIAD under this Agreement may not be assigned and the duties of ARIAD under this Agreement may not be delegated without the prior written consent of M.I.T. and Whitehead, except that ARIAD may assign this Agreement to an entity, acceptable to M.I.T. and Whitehead, with which it merges or consolidates or which ARIAD controls, or to which substantially all of its assets relating to the Patent Rights are sold or otherwise transferred or to a partnership of which ARIAD or any of its affiliates in the general partner.

ARTICLE XII - ARBITRATION

12.1      Any and all claims, disputes or controversies arising under, out of, or in connection with this Agreement, including any dispute relating to patent validity or infringement, which have not been resolved by good faith negotiations between the parties, shall be resolved by final and binding arbitration in Boston, Massachusetts under the rules of the American Arbitration Association, or the Patent Arbitration Rules if applicable, then obtaining. The arbitrators shall have no power to add to, subtract from or modify any of the terms or conditions of this Agreement. Any award rendered in such arbitration may be enforced by either party in either the courts of the Commonwealth of Massachusetts or in the United States District Court for the District of Massachusetts, to whose jurisdiction for such purposes M.I.T., Whitehead and LICENSEE each hereby irrevocably consents and submits.

12.2      Notwithstanding the foregoing, nothing in this Article shall be construed to waive any rights or timely performance of any obligations existing under this Agreement.

ARTICLE XIII - TERMINATION

13.1      If LICENSEE shall cease to carry on its business, this Agreement shall terminate upon notice by M.I.T.

13.2      Should LICENSEE fail to pay M.I.T. royalties due and payable hereunder, M.I.T. shall have the right to terminate this Agreement on thirty (30) days' notice, unless LICENSEE shall pay M.I.T. within the thirty (30) day period, all such royalties and interest due and payable. Upon the expiration of the thirty (30) day period, if LICENSEE shall not have paid all such royalties and interest due and payable, the rights, privileges and license granted hereunder shall terminate.

13.3      Upon any material breach or default of this Agreement by LICENSEE, other than those occurrences set out in Paragraphs 13.1 and 13.2 hereinabove, which shall always take precedence in that order over any material breach or default referred to in this Paragraph 13.3, M.I.T. shall have the right to terminate this Agreement and the rights, privileges and license granted hereunder by ninety (90) days' notice to LICENSEE. Such termination shall become effective unless LICENSEE shall have cured any such breach or default prior to the expiration of the ninety (90) day period.

13.4      LICENSEE shall have the right to terminate this Agreement at any time on six (6) months' notice to M.I.T., and upon payment of all amounts due M.I.T. through the effective date of the termination.

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

13

13.5     Upon termination of this Agreement for any reason, nothing herein shall be construed to release either party from any obligation that matured prior to the effective date of such termination. LICENSEE and any sublicensee thereof may, however, after the effective date of such termination, sell all Licensed Products, and complete Licensed Products in the process of manufacture at the time of such termination and sell the same, provided that LICENSEE shall pay to M.I.T. the royalties thereon as required by Article IV of this Agreement and shall submit the reports required by Article V hereof on the sales of Licensed Products.

13.6     Upon termination of this Agreement for any reason, any sublicensee not then in default shall have the right to seek a license from M.I.T.

13.7     LICENSEE shall have the right, upon written notice to M.I.T., to separately terminate its license to any independent patent application or patent of the Patent Rights.

## ARTICLE XIV - PAYMENTS NOTICES AND OTHER COMMUNICATIONS

Any payment, notice or other communication pursuant to this Agreement shall be sufficiently made or given on the date of mailing if sent to such party by certified first class mail, postage prepaid, addressed to it at its address below or as it shall designate by written notice given to the other party:

In the case of M.I.T.:

> Director
> Technology Licensing Office
> Massachusetts Institute of Technology
> Room E32-300
> Cambridge, Massachusetts 02139

In the case of WHITEHEAD:

> Vice President
> Whitehead Institute
> Nine Cambridge Center
> Cambridge, MA 02142

In the case of LICENSEE:

> Harvey J. Berger, M.D.
> Chairman and Chief Executive Officer
> ARIAD Pharmaceuticals, Inc.
> 687 Wetherby Lane
> Devon, PA 19333

or as amended in writing from time to time by any party.

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

14

<u>ARTICLE XV - MISCELLANEOUS PROVISIONS</u>

15.1    This Agreement shall be construed, governed, interpreted and applied in accordance with the laws of the Commonwealth of Massachusetts, U.S.A., except that questions affecting the construction and effect of any patent shall be determined by the law of the country in which the patent was granted.

15.2    The parties hereto acknowledge that this Agreement sets forth the entire Agreement and understanding of the parties hereto as to the subject matter hereof, and shall not be subject to any change or modification except by the execution of a written instrument subscribed to by the parties hereto.

15.3    The provisions of this Agreement are severable, and in the event that any provisions of this Agreement shall be determined to be invalid or unenforceable under any controlling body of the Law, such invalidity or unenforceability shall not in any way affect the validity or enforceability of the remaining provisions hereof.

15.4    LICENSEE agrees to mark the Licensed Products sold in the United States with all applicable United States patent numbers. All Licensed Products shipped to or sold in other countries shall be marked in such a manner as to conform with the patent laws and practice of the country of manufacture or sale.

15.5    The failure of any party to assert a right hereunder or to insist upon compliance with any term or condition of this Agreement shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition by the other parties.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals and duly executed this Agreement the day and year set forth below.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY

| | |
|---|---|
| By | /s/ John T. PrestoN |
| Name | John T. Preston |
| Title | Director, Technology Licensing Office |
| Date | 8-26-91 |

WHITEHEAD INSTITUTE

| | |
|---|---|
| By | /s/ John Pratt |
| Name | John Pratt |
| Title | Vice President |
| Date | 8/28/91 |

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

ARIAD PHARMACEUTICALS, INC.

| By | /s/ Harvey Berger, M.D. |
| Name | Harvey J. Berger, M.D. |
| Title | Chairman & Chief Executive Officer |
| Date | 8/19/91 |

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

16

APPENDIX A

**M.I.T. Case No. [\*\*\*]**
U.S.S.N. [\*\*\*] (Filed [\*\*\*])
(Owned by M.I.T. and the Whitehead Institute, jointly)

FOREIGN FILING(S)

M.I.T. Case No. [\*\*\*]:

      European Application No. [\*\*\*] (Filed [\*\*\*])
        *(Claiming Austria, Belgium, Switzerland/Liechtenstein, Germany, France, Great Britain, Italy, Luxembourg, Netherlands, Sweden)*

      Japanese Application No. PCT/[\*\*\*] (Filed [\*\*\*])

M.I.T. Case No. [\*\*\*]:

      Canadian Application No. [\*\*\*] (Filed [\*\*\*])
      European Application No. [\*\*\*] (Filed [\*\*\*])
        *(Claiming Austria, Belgium, Switzerland/Liechtenstein, Germany, France, Great Britain, Italy, Luxembourg, Netherlands, Sweden)*
      Japanese Application No. PCT/[\*\*\*] (Filed [\*\*\*])

**M.I.T. Case No. [\*\*\*] (Whitehead No. [\*\*\*])**
[\*\*\*]
U.S.S.N. [\*\*\*] (Filed [\*\*\*])
(Owned by The Whitehead Institute)

FOREIGN FILING(S)

    [\*\*\*]

**M.I.T. Case No. [\*\*\*] (Whitehead No. [\*\*\*])**
[\*\*\*]
U.S.S.N. [\*\*\*] (Filed [\*\*\*])
(Owned by The Whitehead Institute)

FOREIGN FILING(S)

      European Application No. PCT/[\*\*\*] (Filed [\*\*\*])
        *(Claiming Austria, Belgium, Switzerland/Liechtenstein, Germany, France, Great Britain, Italy, Luxembourg, Netherlands, Sweden)*

**M.I.T. Case No. [\*\*\*] (Whitehead No. [\*\*\*])**

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.

17

[\*\*\*]

U.S.S.N. [\*\*\*] (Filed [\*\*\*])

(Owned by The Whitehead Institute and Harvard University, jointly. Harvard University has given M.I.T. the authority to license Harvard's rights on Harvard's behalf and has given Whitehead full rights to prosecute and defend the Patent Rights.)

FOREIGN FILING (S)

[\*\*\*]

**M.I.T. Case [\*\*\*] (Whitehead [\*\*\*])**

[\*\*\*]

(Owned by The Whitehead Institute)

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

18

APPENDIX B

Foreign countries in which Patent Rights shall be filed, prosecuted and maintained in accordance with Article VI where legally possible:

[***]

[***]

[***]

[***]

[***]

[***]

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

19

<u>APPENDIX C</u>

#I/LLN111/14/88
CentCollabResAgt

### COLLABORATIVE RESEARCH AGREEMENT

This Agreement between Centocor, Inc. and the Massachusetts Institute of Technology ("M.I.T.") defines the terms and conditions under which Centocor scientists will collaborate with Prof Phillip A. Sharp and colleagues in the Cancer Center at M.I.T. in the area of antibody gene expression ("The Collaboration").

Centocor and M.I.T. hereby agree as follows:

1.      FIELD: The Field of the Collaboration is defined by the Work Statement attached hereto as Appendix A.

2.      DURATION: The Collaboration shall begin on December 1, 1988 and terminate on November 30, 1991, unless sooner terminated by either party notifying the other, in writing, that it wishes to terminate the Collaboration. The Collaboration may be extended by written mutual consent.

3.      EXCHANGE OF INFORMATION: During the Collaboration, each party shall provide the other with all data and other information that it develops under the Collaboration.

4.      M.I.T. TANGIBLE PROPERTY: M.I.T. shall provide to Centocor certain biological materials ("M.I.T.") developed before the Collaboration, for Centocor's use in the Collaboration. Centocor shall not give samples, progeny, or derivatives of such M.I.T. Tangible Property to any third party except with the written permission of M.I.T.

5.      BIOLOGICAL MATERIAL DEVELOPED UNDER THE COLLABORATION: Any biological material developed by one party under the Collaboration shall be provided to the other for its use under the Collaboration. Samples, progeny or derivatives of any biological materials developed under the Collaboration shall not be delivered to any third party without the written permission of the developing party, except as specified in Paragraph 8(c) below. Notwithstanding the foregoing, for hybridomas developed under this Collaboration which are of commercial value to Centocor and which are derived from hybridomas developed or obtained by Centocor outside of this Collaboration, Centocor shall not be required to provide said hybridomas to MIT unless provision is specifically requested by MIT for specific purposes and, unless suitable cell line transfer agreements in the form of those contained in Appendix C are executed between the parties hereto."

6.      PUBLICATION: Either party shall be free to publish any of the results it obtains under the Collaboration, and shall acknowledge the contribution of the other party, or include the other

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

20

party as co-author, as appropriate. The publishing party shall provide the other party with a copy of manuscripts submitted for publication at least thirty days prior to publication, in order to allow the other party to identify potentially patentable material and request that a patent application be filed.

7.        INVENTIONS: Any inventions made by Centocor personnel shall belong to Centocor, inventions made by M.I.T. personnel shall be owned by M.I.T. Inventions made jointly by M.I.T. and Centocor personnel shall belong jointly to M.I.T. and Centocor. Each party shall promptly notify the other if it makes an invention during the Collaboration, and if it intends to file a patent application on any such inventions. Copies of any such patent applications which are filed by one party shall be promptly provided to the other party.

8.        PATENT AND LICENSING RIGHTS:

(a)        During the Collaboration, M.I.T. shall grant to Centocor a royalty-free nonexclusive license to the Patent Rights of the M.I.T. Cases listed in Appendix B and to the M.I.T. Tangible Property for internal research and development use in the field of use of "Expression of Antibodies". If Centocor does not terminate this Agreement at any time prior to October 31, 1991, the internal research and development use license to the Patent Rights and the M.I.T. Tangible Property shall be in perpetuity.

(b)        M.I.T. shall have the right to use any biological property and inventions developed by Centocor under the Collaboration for its own internal uses, royalty-free in perpetuity.

(c)        "Transferrable Property" is defined as any biological property developed by Centocor under the Collaboration, but excluding hybridomas developed by Centocor which produce antibody of commercial value to Centocor. "Licensable Centocor Patent .Rights" shall mean patent rights to inventions made by Centocor under the Collaboration, but excluding claims to hybridomas producing antibody of commercial value to Centocor. M.I.T. shall have the right to license to third parties, only in conjunction with the Patent Rights to Appendix B, any Transferrable Property and Licensable Centocor Inventions. M.I.T. shall pay to Centocor twenty-five percent (25%) of the Net Royalties it receives from such licenses. ("Net Royalties" is defined as Gross Royalties minus 15% for administration and marketing, and minus any unreimbursed out-of-pocket patenting costs.)

(d)        Centocor shall have a first option to an exclusive royalty-bearing license with suitable due diligence provisions, for certain Applications, to the M.I.T. Tangible Property, the Patent Rights of Appendix B, and any M.I.T. inventions or biological property developed under the Collaboration. An "Application" is defined as all hybridomas producing antibodies to a single antigen or directed to detection of a single disease state if all tests for that disease are based on the same antigen or set of antigens operating by the same basic mechanism in the disease state. The terms of Centocor's option are as follows:

        (i)        Centocor shall have a first option for an exclusive license to all Applications for one year following the beginning of the Collaboration and an option for a non-exclusive license until one year following the end of the Collaboration. Thereafter, Centocor's option shall be only to Applications for which M.I.T. has not previously granted a license to a third party.

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

21

(ii)    Centocor may exercise its option to an exclusive license for an Application only after Centocor demonstrates that it has developed a suitable hybridoma for that Application, or that it has an intensive development program in place specifically devoted to development of a hybridoma for that Application. In the latter event, Centocor's license to the hybridoma shall terminate if a functional hybridoma is not developed by Centocor within two years of the effective date of the license.

(iii)    If Centocor exercises its option to an exclusive license to an Application, the royalties shall be as follows:

((a))    For Applications using known hybridomas whose efficiency of production of antibody is increased by use of the Patent Rights of Appendix B or the M.I.T. Tangible Property and/or M.I.T. patents or M.I.T. biological property developed under the Collaboration (together defined as "M.I.T. Intellectual and Material Property"), royalties shall include a License Issue Fee of $10,000 per Application, and a Running Royalty of one-half of one percent (0.5%) of Centocor's sales of product produced and sold using the M.I.T. Intellectual and Material Property.

((b))    For Applications using new hybridomas which could not be practically developed without use of the M.I.T. Intellectual and Material Property, a License Issue Fee of $25,000 per Application, and a Running Royalty of 2.5% of product sales.

AGREED TO FOR:

| MASSACHUSETTS INSTITUTE OF TECHNOLOGY | | CENTOCOR, INC. | |
|---|---|---|---|
| By: | /s/ John T. Preston | By: | By: /s/ [Chairman of Board of Centocor] |
| Title: | Director, Technology Licensing Office | Title: | Title: Chairman of the Board |
| Date: | Nov. 14, 1998 | Date: | Date: Nov. , 1998 |

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.

APPENDIX A

WORK STATEMENT

As part of a continuing collaboration between MIT scientists (represented by Dr. Phillip Sharp and Centocor), the MIT scientists will isolate and characterize cDNA clones representing cellular factors involved .in the regulation of immunoglobulin gene expression. Said cDNA clones will then be sent to Centocor where they will be used in one or more of the following ways:

a)      The cDNA clones will be used as probes to determine the level of expression of said factors in hybridoma and other cell lines.

b)      the cDNA clones will be expressed in hybridoma or other mammalian cells in order to study their effects on immunoglobulin production.

c)      the cDNA clones will be expressed in E. coli in order to obtain large quantities for study and for production of antisera.

d)      Recombinants of the cDNAs and otter activator genes may also be tested in the course of these experiments.

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

23

APPENDIX D

MASSACHUSETTS INSTITUTE OF TECHNOLOGY    *Cambridge, Massachusetts 02139*

Date: _____

Biomaterials Coordinator
Technology Licensing Office                    Biology Department
Massachusetts Institute of Technology          Massachusetts Institute of Technology
Building E32-300                               Building
77 Massachusetts Ave.                          77 Massachusetts Ave.
Cambridge, MA 02139                            Cambridge, MA 02139

Subject:      BIOLOGICAL MATERIAL TRANSFER AGREEMENT

Dear

This is to acknowledge your request for _____ _____, which is owned by
MASSACHUSETTS INSTITUTE OF TECHNOLOGY (M.I.T.). M.I.T. will provide this material to you, for your use in noncommercial scientific research only, under
the following conditions:

1.      The Material covered by this Agreement includes_____, any additional progeny or derivatives which could not have been
        made but for the_____ and any related information and know-how which will be received under this agreement.

2.      The Material will be used only by you and by individuals working under your direct supervision in your Institution, and will not be transferred,
        distributed or released to any other person.

3.      The Material will be used only for noncommercial, publishable research purposes. It will not be used on any research to be used for the
        development of any commercial product, including drug screening or development for commercial purposes or on behalf of any commercial
        entity.

4.      You will be free to publish any research results using the Material. We would appreciate your acknowledging in such publication(s) MIT and its
        personnel as scientifically appropriate, and providing MIT with copies of such publication(s).

5.      The Material is made available for investigational use only in laboratory animals or in *in vitro*, experiments and will not be used in humans or for
        any other purpose.

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting
confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

24

6.  All characteristics of the Material are not fully understood and its use may involve risks or dangers that are not known or fully appreciated. The Material is being provided without warranty of any sort, express or implied.

7.  You and your Institution will use the Material in compliance with all laws and governmental regulations and guidelines applicable to the Material and will comply with all NIH guidelines and other relevant NIH instructions. In particular:

   A)  Your laboratory has been reviewed by its institutional biohazards committee (IBC) which has certified that facilities, procedures, and the training and expertise of the personnel involved are adequate;

   B)  Your laboratory has received the appropriate approvals and has registered its rDNA program with the IBC; and

   C)  A copy of this letter is on file with your laboratory's IBC.

8.  You will hold **MASSACHUSETTS INSTITUTE OF TECHNOLOGY (M.I.T.)** and its employees harmless from any loss, claim, damage or liability, of any kind, which may arise from or in connection with this Agreement or the use, handling or storage of the Material. In no case shall M.I.T, or Professor _____ be liable for any use by you, by individuals working under your direct supervision, or by your Institution, of the Material or any loss, claim, damage or liability, of any kind, which may arise from or in connection with this Agreement or the use, handling or storage of the Material.

9.  You understand that no other right or license to this Material or to its use is granted or implied as a result of our sending the Material to you.

10.  At the request of **MASSACHUSETTS INSTITUTE OF TECHNOLOGY**, unused Material will be returned to M.I.T. or destroyed.

Research Project: Studies on the activation and differentiation of monocytic cells.

If you agree to accept the Material under the above conditions, please sign the Agreement, have it signed by an authorized representative of your Institution and return it to:

_____
_____
_____
_____
_____

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.

The Material will be sent to you as soon as possible after the receipt of the signed agreement.

Sincerely,


Accepted:

REQUESTER
INSTITUTION _____


By: _____          By:_____
(Signature)                              (Signature)


By:_____           By:_____
(Printed Name)                           (Authorized Representative's
                                         Printed Name)


Date:_____         Date:_____


**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

26

### FIRST AMENDMENT

This amendment, dated November 20, 1991, is to the License Agreement dated August 19, 1991 between MASSACHUSETTS INSTITUTE OF TECHNOLOGY, the WHITEHEAD INSTITUTE, and ARIAD PHARMACEUTICALS, INC.

The parties agree that the License Agreement shall be amended as follows in order to acknowledge Harvard University's ownership of certain Patent Rights:

1.   The following paragraph shall be added to the WITNESSETH section:

"WHEREAS, M.I.T. Case No. [***] (Whitehead No. [***]) "[***] is jointly owned by Harvard University, and Harvard University (Harvard) has authorized M.I.T. to act as its sole and exclusive agent for the purposes of licensing Harvard's rights in the Patent Rights and has authorized M.I.T. to enter into this licensing agreement on Harvard's behalf;

2.   The word "Harvard" shall be added after "Whitehead," in the first sentence of Paragraph 1.2.

3.   The words "and Harvard" shall be added after "Whitehead and M.I.T." and "M.I.T. and Whithead" in Paragraph 2.7.

4.   The words "and/or Harvard" shall be added after the words "and/or Whitehead" in all instances in Paragraph 6.1.

5.   The words "and Harvard" shall be added after the words "M.I.T. and Whitehead" in Paragraphs 7.1 and 7.2. The words "or Harvard shall be added after the words "M.I.T. or Harvard" in Paragraph 7.2.

6.   The words "and Harvard" shall be added after the words "M.I.T. and Whitehead" in all instances in Paragraphs 8.1, 8.2 and 8.3.

7.   The words "nor of Harvard University" shall be added after "nor of the Whitehead Institute", and the words "or Harvard" shall be added after the words "Whitehead or M.I.T. in Section X.

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.

27

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals and duly executed this Agreement the day and year set forth below.


MASSACHUSETTS INSTITUTE OF TECHNOLOGY

| | |
|---|---|
| By | /s/ John T. Preston |
| Name | John T. Preston |
| Title | Director, Technology Licensing Office |
| Date | 11-11-91 |

WHITEHEAD INSTITUTE

| | |
|---|---|
| By | /s/ John Pratt |
| Name | John Pratt |
| Title | Vice President |
| Date | 11/20/91 |


ARIAD PHARMACEUTICALS, INC.

| | |
|---|---|
| By | /s/ Harvey Berger |
| Name | Harvey J. Berger |
| Title | Chairman & CEO |
| Date | 11/20/91 |

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.

28

## SECOND AMENDMENT TO LICENSE AGREEMENT

This Second Amendment to License Agreement ("Second Amendment to License Agreement") is made and entered into as of this 2nd day of January, 2002, (the "Effective Date") by and between MASSACHUSETTS INSTITUTE OF TECHNOLOGY, a corporation organized and existing under the laws of the Commonwealth of Massachusetts and having its principal offices at 77 Massachusetts Avenue, Cambridge, Massachusetts (hereinafter referred to as "M.I.T."), and the WHITEHEAD INSTITUTE, a corporation organized and existing under the laws of Delaware and having its principal offices at Nine Cambridge Center, Cambridge, Massachusetts (hereinafter referred to as "Whitehead") and ARIAD PHARMACEUTICALS, INC., a corporation duly organized under the laws of Delaware and having its principal offices at 20 Landsdowne Street, Cambridge, Massachusetts (hereinafter referred to as "LICENSEE").

WHEREAS, M.I.T., WHITEHEAD and LICENSEE entered into that certain License Agreement dated August 19, 1991, and amended same effective November 20, 1991 (collectively, the "Agreement"); and

WHEREAS, the parties to the Agreement desire to amend certain terms of the Agreement, to add certain terms to the Agreement and to confirm the validity and effectiveness of the remaining terms and conditions set forth in the Agreement, all as further set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and obligations set forth herein, the parties hereby agree as follows.

### ARTICLE 1

1. **Definitions.** Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Agreement.

### ARTICLE 2

2. **Amendment of the Agreement.** The Agreement is hereby amended as set forth in this Article 2.

    2.1    **Amendment of Article II – Grant.** Article II of the Agreement is hereby amended as set forth herein.

        2.1.1    **Amendment of Paragraph 2.2.** Paragraph 2.2 of the Agreement is hereby deleted and replaced with the following text:

"2.2 [RESERVED]"

        2.1.3    **Amendment of Paragraph 2.3.** Paragraph 2.3 of the Agreement is hereby deleted and replaced with the following text:

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

"2.3 Except as otherwise specifically set forth herein, the rights granted under Paragraph 2.1 hereof shall be and remain exclusively granted to LICENSEE and shall continue until the end of the term or terms for which any Patent Rights are issued, unless sooner terminated as provided herein. Without limiting the generality of the foregoing, upon a failure of LICENSEE to pay the License Maintenance Fees due hereunder, the rights granted under Paragraph 2.1 hereunder shall convert to non-exclusive upon written notice from M.I.T. to LICENSEE. The right to convert the rights granted hereunder to non-exclusive shall not be in limitation of any other rights that M.I.T. may have hereunder or at law upon such a failure by LICENSEE to pay the License Maintenance Fees hereunder."

2.1.3    **Amendment of Paragraph 2.4.** Paragraph 2.4 of the Agreement is hereby deleted and replaced with the following text:

"2.4 [RESERVED]"

2.1.4    **Amendment of Paragraph 2.8.** Paragraph 2.8 of the Agreement is hereby deleted and replaced with the following text:

"2.8 LICENSEE shall have the right to enter into sublicenses for the rights, privileges and licenses granted hereunder. Such sublicenses shall contain provisions enabling LICENSEE to fulfill its obligations to M.I.T. hereunder."

2.1.5    **Amendment of Paragraphs 2.9 and 2.10.** Paragraphs 2.9 and 2.10 of the Agreement are hereby deleted and replaced with the following text:

"2.9 [RESERVED]

2.10 [RESERVED]"

2.2    **Amendment of Article III - DUE DILIGENCE.** Article III of the Agreement is hereby amended as set forth herein.

2.2.1    **Amendment of Paragraph 3.1.** Paragraph 3.1 of the Agreement is hereby deleted and replaced with the following text:

"3.1 LICENSEE shall use reasonable commercial efforts to bring one or more Licensed Products to market through a thorough, vigorous and diligent program for exploitation of the Patent Rights. Commercially reasonable efforts by LICENSEE to grant sublicenses to companies that LICENSEE reasonably believes are engaged or will engage in such activities shall be sufficient to satisfy LICENSEE's obligations hereunder."

2.2.2    **Amendment of Paragraph 3.2.** Paragraph 3.2 of the Agreement is hereby deleted and replaced with the following text:

**Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.**

30

"3.2 [RESERVED]"

**2.3**     **Amendment of Article VII - INFRINGEMENT.** Article VII of the Agreement is hereby amended as set forth herein.

**2.3.1**     **Amendment of Paragraph 7.5.** Paragraph 7.5 of the Agreement is hereby deleted and replaced with the following text:

"7.5 In the event that a declaratory action alleging invalidity or noninfringement of any of the Patent Rights shall be brought against LICENSEE, and LICENSEE fails to take reasonable steps to defend such action in a timely manner, M.I.T. (or Whitehead), at its option, shall have the right to intervene and take over sole defense of such action at its own expense."

**ARTICLE 3**
**CONFIRMATION OF VALIDITY AND EFFECTIVENESS**

**3.**     **Confirmation of Validity and Effectiveness.** Except as otherwise specifically set forth herein, the parties hereby confirm the validity and continued effectiveness of the Agreement.

IN WITNESS WHEREOF, the parties have hereunto set their hands and duly executed this Second Amendment to License Agreement as of the Effective Date.

**MASSACHUSETTS INSTITUTE OF TECHNOLOGY**

| | |
|---|---|
| **By:** | /s/ Lita L. Nelsen |
| **Name:** | Lita L. Nelsen |
| **Title:** | Director, Technology Office |

**WHITEHEAD INSTITUTE**

| | |
|---|---|
| **By:** | /s/ John Pratt |
| **Name:** | John Pratt |
| **Title:** | Vice President |

**ARIAD PHARMACEUTICALS, INC.**

/s/ Fritz Casselman

| | |
|---|---|
| **By:** | Fritz Casselman |
| | Senior Vice President and |
| | Chief Business Officer |

Portions of this Exhibit were omitted and have been filed separately with the Secretary of the Commission pursuant to the Company's application requesting confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934.

31

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No.:1:02-cv-11280-RWZ

ARIAD PHARMACEUTICALS, INC.      )
MASSACHUSETTS INSTITUTE OF       )
TECHNOLOGY, THE WHITEHEAD        )
INSTITUTE FOR BIOMEDICAL RESEARCH)
and THE PRESIDENT AND FELLOWS OF )
HARVARD COLLEGE,                 )
              Plaintiffs,        )
                                 )
    - vs. -                      )
                                 )
ELI LILLY & COMPANY,             )
              Defendants         )

              **********

          JURY TRIAL
      DAY 2, First Session

  BEFORE THE HONORABLE RYA W. ZOBEL
  UNITED STATES DISTRICT COURT JUDGE


      United States District Court
    John J. Moakley U.S. Courthouse
          1 Courthouse Way
      Boston, Massachusetts  02210
            April 11, 2006

              **********




      REPORTER:  LISA W. STARR, RPR,CRR,CSR
            Tel:  617.771.8336

Ariad v. Eli Lilly                    Day 2, Session 1

4-11-06

---

### Page 2

1  APPEARANCES:
2  FOR THE PLAINTIFFS:
     KAYE SCHOLER, LLP
3    BY: Leora Ben-Ami, Esq.
         Patricia A. Carson, Esq.
4        Thomas F. Fleming, Esq.
     Pan Am Building
5    425 Park Avenue
     New York, New York 10022
6    Tel: (212) 836-8000
     e-mail: Lbenami@kayescholer.com
7  -and-
     BROMBERG & SUNSTEIN, LLP
8    BY: Lee C. Bromberg, Esq.
         Kerry L. Timbers, Esq.
9    125 Summer Street
     Boston, Massachusetts 02110-1618
10   e-mail: ldiaz@bromsun.com
11 FOR THE DEFENDANT:
     McDONNELL, BOEHNEN, HULBERT & BERGHOFF
12   BY: Paul H. Berghoff, Esq.
         Granland G. Drutchas, Esq.
13       David M. Frischkorn, Esq.
     300 South Wacker Drive
14   Chicago, Illinois 60606-6709
     Tel: (312) 913-0001
15   e-mail: Drutchas@mbhb.com
16 FOR ELI LILLY & COMPANY
     BY: Paul R. Cantrell, Esq.
17   Associate General Patent Counsel
     Lilly Corporate Center
18   Indianapolis, Indiana 46285
19
20
21
22
23
24
25

---

### Page 3

1               INDEX
2  OPENING STATEMENTS              PAGE
   By Mr. Berghoff              3
3
4
5  WITNESS    DIRECT CROSS REDIRECT RECROSS
   HARVEY BERGER
6    By Ms. Ben-Ami   24
     By Mr. Berghoff   62
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

### Page 4

1               PROCEEDINGS
2        (The following proceedings were held i open court
3  before The Honorable Rya W. Zobel, United States District
4  Judge, District of Massachusetts, at the John J. Moakley
5  United States Courthouse, 1 Courthouse Way, Boston,
6  Massachusetts, on April 11, 2006.)
7        THE CLERK:  All rise for the Court.  Please be
8  seated.  Court is now in session.
9        THE COURT:  May I please see Ms. Ben-Ami and Mr.
10 Berghoff?
11       (Sidebar conference off the record).
12       THE CLERK:  All rise for the jury.
13       (Jury entered the courtroom).
14       THE COURT:  Members of the jury, we will continue
15 with Mr. Berghoff's opening, which will finish soon.
16       MR. BERGHOFF:  And, your Honor, I'm about halfway
17 through.  So I will do my best to speed up, but I had asked
18 for, I said it would be about ninety minutes, and I'm about
19 halfway through.  I'll move as quickly as I can.
20       Let's start just very briefly where we left off.
21 Good morning.  I feel much better today, thank you.  It was a
22 24-hour bug.  Everyone says my color is much better today.  I
23 think it's a little easier to see this up on the board than it
24 was on the screen.
25       THE COURT:  You need to move it back some because

---

### Page 5

1  even if I don't see what's on there, I do wish to see the
2  jury.
3        MR. BERGHOFF:  I'm sorry, your Honor.  Just to recap
4  on Lilly's development of Evista —
5        THE COURT:  Let's not recap, please.
6        MR. BERGHOFF:  Yesterday, Plaintiffs' counsel had
7  said that Lilly put Raloxifene on the shelf, was I believe the
8  word.  And the evidence will show that prior to 1992, Larry
9  Black was doing work with Raloxifene.  Of course, we know that
10 because he filed an application in 1992.  Of course he was
11 working on it.  It wasn't completely on the shelf, and the
12 evidence will show that.
13       I'd like to turn to the second drug now, Xigris.
14 This is the drug for treating severe sepsis with high risk of
15 death.  You may or may not have heard of severe sepsis.  It's
16 actually very common.  There are about 750,000 cases of it in
17 the United States each year.  Five hundred patients die of it
18 each day.  It's the leading cause of death in intensive care
19 units that are not specializing in coronary or heart attacks.
20 And it's believed to be the eleventh leading cause of death in
21 total in the United States.
22       If we could see the next slide, 1485.  Sepsis is the
23 body's overreaction to infection.  And the body's overreaction
24 to infection completely undoes the balance of the blood's
25 coagulation.  You want the blood to be clotting when it should

---

956f542b-f6f9-4460-8956-62e7e35bdd32

Ariad v. Eli Lilly                          Day 2, Session 1
                        4-11-06

---

Page 6

1  clot and flowing naturally when it should flow, and that
2  balance gets out of whack.  In fact, it gets out of whack so
3  much that one or more of your organs can fail, your heart,
4  your lung, your liver.  And this leads to dangerously low
5  blood pressure.  We may all think low blood pressure is a good
6  thing, but it can be too low so that the blood doesn't even
7  move properly through the body.
8       Severe sepsis with high risk of death is the most
9  dangerous form of sepsis.  It can be caused by any number of
10  types of infections.  It's not just one type of infection that
11  can lead to severe sepsis.  It can be caused by two types of
12  bacterial infections.
13       This is the type that produces something called LPS.
14  You heard that mentioned yesterday.  This is a different type
15  of bacterial infection that does not produce LPS, but it can
16  also be caused by infections from fungus or from viruses.
17       What starts it going is a variety of different
18  things, but it all leads to the same very dangerous condition.
19  Until Lilly developed Xigris, there was no effective treatment
20  for severe sepsis, none.
21       Now, Lilly's research began looking at a natural
22  protein in the body, in the blood, called activated protein C.
23  You're going to hear that referred to as APC throughout this
24  trial.  It's a natural protein.  It's in everybody's blood,
25  and it acts as an anticoagulant in the blood.  It keeps the

---

Page 7

1  blood from clotting when it shouldn't be clotting.
2       Now, one problem that Lilly faced is that there isn't
3  much natural APC in our blood.  So even if you wanted to use
4  natural APC, you couldn't get enough of it from purifying
5  blood.  You really don't want to purify things from blood
6  anyway with the risk of hepatitis or HIV.  So Lilly found a
7  way to make APC synthetically.  This effort was headed by Dr.
8  Bang, an esteemed scientist at Lilly, and he led a team of
9  researchers, and they filed a patent application in 1989 on
10  how to synthetically make activated protein C, how to make
11  Xigris.  That application was reviewed by the Patent Office
12  and issued in 1988.
13       So before the guidepost that Plaintiffs' counsel gave
14  you yesterday, before 1989, Lilly had already invented
15  synthetic APC, already invented Xigris.  They had filed a
16  patent application on it, and they had gotten a patent issued.
17       And before 1989, Lilly had already, in conjunction
18  with some other researchers, given recombinant and natural
19  APC, both of them, to mammals in experiments to see how it
20  might treat severe sepsis.  This is always a step along the
21  way in drug research.  You give it to animals first to see
22  what happens before you take the risk of giving it to humans.
23       This research in animals with both synthetic, you'll
24  often hear this word, recombinant, that's a fancy word for
25  synthetic, but recombinant and synthetic and natural APC were

---

Page 8

1  given to mammals all before 1989, all before the guidepost
2  date of Plaintiffs' counsel.  Lilly had the drug and was
3  working on seeing if it would treat sepsis in animals.
4       Lilly continued its efforts throughout the '91 to '94
5  time frame with a large number of scientists and, based on
6  those efforts, filed an application with the FDA to seek
7  approval to start testing it in humans.  Again, you need
8  approval from the FDA before you put any new drug into a
9  human.
10       They asked for that approval in late 1994, and it was
11  granted in December of 1994.
12       Lilly then began a series of clinical trials, first
13  Phase I, just looking at safety.  Those trials, there were a
14  number of them, went on for three or four years, beginning in
15  1995.
16       They did then a Phase II trial, which I believe began
17  in 1997.  That was the trial looking at both safety and
18  effectiveness in humans:  Is the synthetic APC, Xigris, going
19  to help actual human patients with sepsis?  And the results
20  were quite promising from this Phase II trial.  It looked like
21  there was a strong trend towards helping severe sepsis
22  patients, letting them live.  That's what we're talking about
23  with sepsis.
24       And this led to a considerably larger than Phase III
25  clinical study, involved 1,600 patients with sepsis.  That

---

Page 9

1  began in the '98-99 time frame, and this Phase III study was
2  actually discontinued.  Usually, that sounds like that's a bad
3  thing, but in this case it was a very good thing because an
4  independent panel of scientific experts who were monitoring
5  the Phase III clinical trial being conducted by Eli Lilly
6  decided that the results were so clear that Xigris was saving
7  the lives of at least some severe sepsis patients that it
8  would no longer be right to continue giving placebos to some
9  patients.  Of course, that's how they do these clinical
10  trials, some patients get placebos, some patients get the real
11  drug, and you compare the two groups.
12       The independent panel of experts decided that Xigris
13  was so effective, it was so clear it was saving lives, that it
14  could no longer ethically rightly be given to patients — you
15  could no longer ethically give placebos to patients who had
16  severe sepsis; you had to give Xigris to all of them.
17       So this led then to a very short review by the FDA as
18  these things go because the FDA realized that this was a
19  life-saving drug, the only drug in the class, the only drug
20  available to doctors.  And it led to approval of Xigris in
21  November 2001.
22       Lilly immediately began marketing it to doctors so
23  that they could use it to save patients' lives.  Then we had
24  the same date on the Evista chart, 2002, Lilly finally learns
25  about the Plaintiffs' patent in this case.

---

956f542b-f6f9-4460-8956-62e7e35bdd33

Ariad v. Eli Lilly                                    Day 2, Session 1
4-11-06

**Page 10**

1    So, I think this chart clearly shows, and the
2  evidence will support it as it comes in, that Lilly had
3  already invented APC, had a patent on it before 1989. They
4  had already done experiments in animals directed to sepsis.
5  They were working on getting it approved for human use
6  throughout this period, including a whole series of clinical
7  trials, finally leading to its approval in 2001, all before
8  Plaintiffs' patent issued.
9    Xigris really is an amazing drug. Without Xigris,
10  three out of eight patients with severe sepsis with high risk
11  of death die.
12    THE COURT:  Mr. Berghoff, can we stick to the issues
13  in the case, please?
14    MR. BERGHOFF:  I believe this is important to the
15  issues.
16    THE COURT:  No, it isn't.
17    MR. BERGHOFF:  So although not a complete cure,
18  although not a complete cure, at least one of those three
19  patients will live with Xigris.
20    And Lilly, throughout its efforts on Xigris, spent
21  one billion dollars in today's money, in today's dollars.
22    THE COURT:  That is also irrelevant to the issues in
23  the case.
24    MR. BERGHOFF:  I disagree, your Honor, respectfully,
25  on damages.

**Page 11**

1    THE COURT:  Well, since I have the last word on
2  this, I think it would behoove you to listen to what I say.
3  Thank you.
4    MR. BERGHOFF:  Of course, your Honor.
5    The product label for Xigris, like Evista, says
6  nothing about NF-kappaB.  In fact, it says that the specific
7  mechanisms by which Xigris works are not completely
8  understood.  And that's true of many drugs that are on the
9  market today.
10    It indicates that there is a serious side effect with
11  Xigris.  Xigris can in some patients cause bleeding, and
12  that's not surprising because it is an anticoagulant
13  naturally, but it does save one out of eight, the lives of one
14  out of eight patients, one out of three that would have died
15  otherwise.
16    And why is there no mention of NF-kappaB?  Because
17  it's irrelevant.
18    MS. BEN-AMI:  Objection, your Honor.  One, we've
19  been over this ad nauseam yesterday; and two, it is
20  irrelevant.
21    THE COURT:  I agree.  And your objection is noted.
22    MR. BERGHOFF:  Thank you, your Honor.
23    Let's talk a little bit about Plaintiffs' patent, if
24  we could, and what's involved in that.  Plaintiffs' patent
25  describes the inventor's work involving a natural process.

**Page 12**

1  NF-kappaB is a natural protein.  Its inhibitor, IkB, is a
2  natural protein.  They worked in cells for millions of years.
3  And what Plaintiffs did was discover that natural process.
4    Plaintiffs, the evidence will show, as it comes in
5  with patients.  They weren't looking to discover new drugs,
6  and they didn't.  They weren't looking for treatments for
7  osteoporosis, and they didn't find any.  They were not looking
8  for treatments for severe sepsis, and they didn't find any.
9  And that's fine because what they were doing is basic
10  scientific research.  They were trying to figure out how cells
11  work, how nature designed cells.
12    But in this case, Ariad is asking Lilly to
13  essentially pay for the basic scientific research that the
14  Plaintiffs did, even though Lilly didn't benefit from that
15  basic scientific research.  It did its own work in developing
16  both of these drugs.
17    And, the evidence will show that the government paid
18  for Plaintiffs' research.  All of Plaintiffs' basic scientific
19  research was funded by the U.S. government.  They received
20  grants from the National Institutes of Health.
21    Now, there is nothing wrong with basic scientific
22  research, nothing at all.  Lilly does some basic scientific
23  research.  Lilly is mostly focused on doing practical research
24  in discovering drugs and new treatments for patients.  And
25  it's entirely possible that Plaintiffs' discovery of the

**Page 13**

1  NF-kappaB pathway and how it works in nature will some day
2  help somebody develop a new drug or a new treatment for
3  patients, and at that point I think it would be very fair to
4  say that that development would have value for patients, for
5  doctors.  But that's not what happened with Evista or Xigris.
6  Neither of those drugs were invented by Lilly because of
7  NF-kappaB or in reliance on the patent.
8    Now, Ariad, one of the Plaintiffs, has had a license
9  to the NF-kappaB technology since 1991.  So that's about
10  fifteen years.  And Ariad is a pharmaceutical research
11  company.  And the evidence will show that Ariad has never
12  performed any research using NF-kappaB.  None.  Here's the
13  company that holds the rights to the Plaintiffs' patent, to
14  the Plaintiffs' work with NF-kappaB.  They've had those rights
15  for fifteen years, and they've never done any research with
16  it.  And we believe actions speak louder than words.
17    Plaintiffs' patent teaches nothing about
18  osteoporosis, teaches nothing about severe sepsis, teaches
19  nothing about bone, which would be a pretty important thing to
20  have in the patent if you're going to try and help somebody
21  treat osteoporosis.  So you could give Plaintiffs' patent to a
22  doctor trying to treat a woman for post-menopausal
23  osteoporosis, and it would be of no help.
24    THE COURT:  That's a misstatement of what the case
25  is about, Mr. Berghoff.

4 (Pages 10 to 13)

Ariad v. Eli Lilly                           Day 2, Session 1

4-11-06

| Page 14 | Page 16 |
|---|---|

**Page 14**

1　　MR. BERGHOFF:  Well, I respectfully disagree, your
2　Honor.
3　　THE COURT:  The issue in the case is whether the
4　Defendant's drugs in some way use the invention of the Ariad
5　patent, and that they didn't do research on sepsis or
6　osteoporosis is wholly irrelevant.
7　　MR. BERGHOFF:  In contrast, if you give the product
8　label for Evista to a doctor, it will teach the doctor, it
9　will tell the doctor exactly how to treat osteoporosis.  And
10　the same is true for sepsis and Xigris.  This contains helpful
11　information for a doctor, nothing about NF-kappaB.
12　　Now, the Patent Office examination of this
13　patent-in-suit was done in secret.  It just involves the
14　Patent Office examiners, and there's a whole series of them
15　involved, one at a time, and Plaintiffs.  Members of the
16　public are not permitted into that process.  And this is the
17　first time that anyone has been able to address the validity
18　of the patent-in-suit, and the Patent Office makes mistakes
19　from time to time and issues patents that are invalid.  And
20　you are the front line defense representing the public
21　interest to be sure that if this patent is invalid it is
22　removed from the books, and so it does not restrict further
23　research in any area.
24　　We believe the evidence will show that the
25　patent-in-suit is invalid for two reasons.  It covers the use

**Page 15**

1　of old drugs, drugs that reduce NF-kappaB activity but were in
2　use long before Plaintiffs' patent issued and long before any
3　guidepost of when they discovered NF-kappaB.  And I'll discuss
4　that in a little more detail.
5　　We also believe that it is invalid because it does
6　not adequately describe how to practice the claimed invention.
7　And you may recall that the claims are what describe the
8　invention.  And we believe the evidence will show these are
9　very broad claims because they cover any way of reducing
10　NF-kappaB activity, any way at all.  And in order to get a
11　claim that broad, you have to have a very full disclosure of
12　not just one way but many, many different ways of reducing
13　NF-kappaB activity.  And the evidence will show that the
14　patent does not contain a detailed explanation of many
15　different ways to reduce NF-kappaB activity.
16　　Now, how do we know that old drugs reduce NF-kappaB
17　activity?  How do we know that?  Well, we know that in a
18　variety of ways.  We believe the evidence will show that some
19　of the inventors have stated that that is the case.  We
20　believe the evidence will show that at least one of
21　Plaintiffs' experts has said that is the case.  And we believe
22　that reliable publications by scientists who know what they're
23　talking about working in the field will show that old drugs
24　reduce NF-kappaB activity.
25　　And because old drugs reduce NF-kappaB activity,

**Page 16**

1　Plaintiffs' patent claims cover old things.  I think it's just
2　common sense that you can't get a patent properly that covers
3　things that were used decades ago.  You can't get a patent
4　today that covers things that were in use in the seventies, in
5　the sixties, and before that.  That takes something from the
6　public, and that's not right.
7　　Now, Plaintiffs refer to 1989 as the guidepost date
8　for their patent.  We believe the evidence will show it's
9　actually 1991.  That is the earliest application filed for a
10　patent by Plaintiffs that even begins to describe their
11　claimed invention.  It doesn't do it in enough detail, but
12　that's the only one that even gets close.
13　　Now, what old compounds reduce NF-kappaB activity?
14　Aspirin, cyclosporin-A, which is a drug used to prevent
15　rejection of organs in transplant surgery, and it's been used
16　well before the 1989 or '91 date.  Something called
17　calcitriol, which is related to vitamin D in milk.  That's
18　been used well before 1989, and it reduces NF-kappaB activity.
19　Steroids, a type that's called glucocorticoids.  They've been
20　used to treat rheumatoid arthritis since the fifties.  They
21　reduce NF-kappaB activity.  Red wine, ingredients in red wine
22　reduce NF-kappaB activity.  Antibiotics reduce NF-kappaB
23　activity.
24　　Just common sense.  Plaintiffs' patent, which claims
25　anything that reduces NF-kappaB activity and its use, just

**Page 17**

1　can't be valid if it's covering the use of these old drugs.
2　You can't charge somebody a royalty today for taking aspirin
3　or red wine or taking antibiotics.
4　　Let's look at what one of the inventors told the
5　Patent Office.  This is a declaration by Dr. Baltimore, one of
6　the inventors.  This was filed with the Patent Office in
7　Plaintiffs' application.  Let's look at paragraph 9, please.
8　　Right here he says:  "Treatment of cells with such
9　compounds as 5-aminosalicylic acid inhibits NF-kappaB mediated
10　gene expression."  What Dr. Baltimore is representing to the
11　Patent Office in his declaration, it's a sworn declaration, is
12　that 5-aminosalicylic acid, you'll see it referred to as ASA,
13　inhibits NF-kappaB activity; it reduces it.  The evidence will
14　make this clear to you.
15　　Well, what is 5-ASA?  It's an old drug.  It's a drug
16　that's been around since the 1970s and has been used for
17　treating something called irritable bowel syndrome.  And right
18　here Dr. Baltimore represents to the Patent Office that it
19　inhibits NF-kappaB gene expression.  It inhibits making
20　proteins.  It inhibits NF-kappaB activity.
21　　It's a blanket statement.  There are no
22　qualifications on it.
23　　THE COURT:  You know, now you're switching into
24　argument, rather than an opening statement.  But let us take a
25　moment to stretch.

5 (Pages 14 to 17)

956f542b-f6f9-4460-8956-62e7e35bdd32

Ariad v. Eli Lilly                          Day 2, Session 1

4-11-06

## Page 18

1    MR. BERGHOFF:  I apologize, your Honor.
2         (Pause.)
3    MR. BERGHOFF:  But the evidence will also show that
4 Dr. Baltimore, or anybody connected with Plaintiffs, never
5 told the Patent Office that 5-ASA was --
6    MS. BEN-AMI:  Objection.
7    THE COURT:  I don't know what the objection is.
8    MS. BEN-AMI:  You excluded this issue previously.
9    MR. BERGHOFF:  Not as to disclosure.  It's not
10 cumulative.
11   THE COURT:  Why don't we just finish with this,
12 please.
13   MR. BERGHOFF:  Thank you, your Honor.  Plaintiffs
14 say Eli Lilly infringes the patent, both patents.  They say
15 Lilly has admitted that, and we disagree.  We disagree.  I
16 just want to outline for you briefly why Lilly has not
17 admitted infringement of this patent.
18        The only way there can be infringement of this patent
19 is when a doctor prescribes Evista, for example, to a woman
20 either who needs to have osteoporosis prevented or treated,
21 and in her body, in her cells, NF-kappaB activity is reduced.
22 That's the only way infringement can exist.  That's what
23 they're charging with infringement.
24        And so, the focus of the entire infringement issue is
25 what happens in patients' bodies when they take Evista

## Page 19

1 according to the FDA's product label or when Xigris is given
2 to a patient who has severe sepsis, according to the FDA
3 label.
4         Unless there is evidence that in patients' bodies who
5 take the drugs according to the instructions in the label,
6 unless there is evidence that shows that in those patients
7 NF-kappaB activity is reduced, Plaintiffs, we believe, have
8 not met their burden of proof on this issue.  You may recall,
9 they have the burden of proof on the infringement issue.
10        So that's the issue that we believe you should focus
11 on when you're considering infringement:  What happens in
12 patients' bodies.  And the evidence will show that the
13 supposed admissions by Eli Lilly are not relevant to what
14 happens in patients' bodies.  The Berg tests and the Smith
15 data that you'll hear about weren't in patients' bodies.  They
16 weren't even in bone cells.  They weren't even on cells in a
17 test tube that related to osteoporosis.
18        Instead, they were tests on cells in a test tube, and
19 they were liver cancer cells.  That is not evidence of what
20 happens when Evista is given to a woman to treat or prevent
21 her osteoporosis.  And we believe there is no evidence that
22 shows that NF-kappaB activity is reduced in women who take
23 Evista to treat or prevent osteoporosis.
24        Plaintiffs' evidence on Xigris is similarly lacking.
25 The evidence they will present either doesn't measure

## Page 20

1 NF-kappaB activity or it's not measurements taken in patients
2 with severe sepsis.  And most of their evidence will be on
3 cells in a test tube, not in patients, and it will be where
4 Xigris was administered to those cells at doses two hundred to
5 three hundred times higher than the product label approved by
6 the FDA says.  Two hundred to three hundred times higher.
7 That's as if your doctor told you to take two aspirin and call
8 him or her in the morning and, instead, somebody suggests you
9 take four hundred aspirin.  I think common sense is you're
10 going to get a much different reaction from taking two hundred
11 times the recommended dose of the drug than you would from the
12 real dose.
13        We believe there is no evidence, you will hear none,
14 that Xigris reduces NF-kappaB activity in severe sepsis
15 patients who take it.
16        Just a little bit on damages.  Plaintiffs want over a
17 hundred million dollars from Lilly.  Now, Plaintiffs have
18 charged a number of companies with infringement asking them to
19 take a license, and none have to date under this patent.  And
20 when I say Plaintiffs have asked for that, the evidence will
21 show that it's really Ariad who is driving this litigation.
22 They will keep 75 percent of any amount of damages that
23 they're seeking from Lilly.  Only 25 percent will go back to
24 the universities.
25        We believe the evidence shows that Plaintiffs' patent

## Page 21

1 is not infringed, and if it's not infringed they shouldn't
2 have any royalties for either product.  And we believe that
3 the evidence will show that Plaintiffs' patent is invalid for
4 covering old drugs, the use of old drugs, and for failing to
5 describe an adequate description of the invention.  And if the
6 Plaintiffs' patent is invalid, there are no royalties, none.
7         If NF-kappaB had never been discovered, we'd still
8 have both Lilly drugs.  But if NF-kappaB had been discovered
9 and Lilly had not done its work, the public wouldn't have
10 either drug.  It wouldn't have Evista for treating
11 osteoporosis, it wouldn't have Xigris for treating severe
12 sepsis, the only option the doctors have.
13        Both of these drugs were invented before 1989 by
14 Lilly.  Plaintiffs had no role in that; NF-kappaB had no role
15 in that.  We believe the evidence will show that Plaintiffs'
16 patent is not infringed, that it's invalid, and that
17 Plaintiffs are not entitled to any damages in this case.
18        Thank you very much.
19   THE COURT:  Call your first witness, please.
20   MS. BEN-AMI:  Thank you, your Honor.  May I read an
21 admission?
22   THE COURT:  Yes.  Members of the jury, there is a
23 lengthy process before we ever get to trial after a lawsuit is
24 filed.  And much of -- well, two things happen, maybe three
25 in a patent case.  One is there is usually a flurry of

956f542b-f6f9-4460-8956-62e7e35bdd32

Ariad v. Eli Lilly                          Day 2, Session 1
4-11-06

| Page 22 | Page 24 |
|---|---|
| 1 requests to the Court to dismiss the case or dismiss the | 1 theory that sometimes our memory or perception of events may |
| 2 defenses or whatever. So we went through that. | 2 be colored by hearing somebody else testify about the same |
| 3     There is a further process called a Markman hearing. | 3 events. So we want you to be able to hear the witnesses |
| 4 The Supreme Court not so long ago decided that if there is a | 4 unaffected by what other witnesses are saying. So anybody who |
| 5 dispute of the language of the claims in the patent, and you | 5 is going to testify will wait outside until such time as they |
| 6 will see when you get the patent, the patents are not written | 6 testify. |
| 7 in English, they are written in "patentese," if there is a | 7     HARVEY BERGER, sworn |
| 8 dispute about the meaning of the claims, then there has to be | 8     MS. BEN-AMI: May I proceed, your Honor? |
| 9 a decision by the judge as to what the meaning of the claims | 9     THE COURT: Yes. Could you please tell us your |
| 10 is. | 10 name? |
| 11     In this case, I did in fact interpret the claims that | 11     THE WITNESS: My name is Harvey Berger. I'm the |
| 12 are in issue in the case, and I will explain to you what | 12 chairman, founder and chief executive officer of Ariad |
| 13 meaning I gave certain terms, and you will need to accept that | 13 Pharmaceuticals. |
| 14 meaning. You can't make your own. | 14     MS. BEN-AMI: With the Court's permission, I have |
| 15     The third thing that happens before trial and that | 15 binders of the exhibits, your Honor. |
| 16 really takes time is what is called discovery. It is really a | 16     THE COURT: Are you giving those to the jury, too, |
| 17 process of gathering information from each other and from | 17 now? |
| 18 everywhere else. And they do that, the lawyers do that in a | 18     MS. BEN-AMI: No. These are just broad exhibits. |
| 19 number of different ways. One of them is that they can put | 19 We do have jury notebooks if now is the correct time. |
| 20 questions to each other. They are called interrogatories, and | 20     THE COURT: Well, it is, if we're going to look at |
| 21 they have to be answered by the other side under oath. | 21 exhibits. |
| 22     They can take depositions; that is, they can call | 22 DIRECT EXAMINATION |
| 23 witnesses either from the other side or from anywhere, put | 23 BY MS. BEN-AMI: |
| 24 them under oath, and a reporter is present, questions are put | 24 Q. Let me just ask you, Dr. Berger, to clear up something |
| 25 to the witness, and they are then answered by the witness. | 25 that was just said. Well, I'd like to make a brief |

| Page 23 | Page 25 |
|---|---|
| 1     They can ask, and this is what Ms. Ben-Ami is talking | 1 introductory statement. |
| 2 about now, they can ask the other side to admit certain facts. | 2     THE COURT: Let me explain that to the jury as well. |
| 3 They will make a statement, and the other side has to say | 3 Would you have one more notebook with the stuff that the jury |
| 4 admitted or denied or I can't answer it as you put it. | 4 has? |
| 5     What else? They can ask for documents and things | 5     MS. BEN-AMI: Yes, your Honor. |
| 6 from the other side. And this is a very long process, and | 6     THE COURT: Do you have one more? Members of the |
| 7 particularly in a complicated case like this it takes awhile | 7 jury, we have also agreed that counsel will have the |
| 8 and produces a great deal of information. One of the jobs the | 8 opportunity to introduce to you the witness, both to tell you |
| 9 lawyers have for the trial is to cut all that information down | 9 who the witness is and how the witness fits into the trial and |
| 10 to manageable size, and they have done that. I think they | 10 a very brief statement as to the purpose of the witness' |
| 11 probably have done it very well because we've managed to put | 11 testimony, again, to assist you in what is likely to be fairly |
| 12 this trial into a three-week time frame when in fact it's way | 12 complicated stuff. |
| 13 out there. | 13     MS. BEN-AMI: Thank you. Good morning, ladies and |
| 14     So an admission is an agreement by the other side | 14 gentlemen. Now we actually get to put on the evidence |
| 15 that the statement that was given to it states the truth. | 15 because, as you know, you have to decide based on the evidence |
| 16     MS. BEN-AMI: Thank you, your Honor. I'd like to | 16 in the case. And Dr. Berger is here to tell you just very |
| 17 read Admission No. 26: "The named inventors of the '516 | 17 briefly a few things. |
| 18 patent coined the term NF-kappaB." That is admitted. | 18     They include just a little bit of history of Ariad so |
| 19     With that, I'd like to call our first witness, your | 19 you know who the Plaintiff is. I think you probably know |
| 20 Honor, Dr. Berger. | 20 Harvard and M.I.T. and Whitehead, but you may not have heard |
| 21     MR. BERGHOFF: Your Honor, there's a sequestration | 21 of Ariad. |
| 22 order. | 22     He is here to talk to you about how Ariad licensed |
| 23     THE COURT: Members of the jury, a sequestration | 23 the '516 patent and why. And he's here to talk to you about |
| 24 order simply means that any witnesses who are going to testify | 24 how it came to Ariad's attention that Eli Lilly was |
| 25 will wait outside the courtroom until they do testify on the | 25 infringing. And then, remember at the beginning of the case |

956f542b-f6f9-4460-8956-62e7e35bdd3

Ariad v. Eli Lilly                                    Day 2, Session 1

4-11-06

Page 26

1  yesterday, it seems like a long time ago, I got to open, and I
2  talked to you about how we have different phases of the case.
3  The last issue is from 2002 on. If there is infringement,
4  what are the damages. And we talked about there being a
5  hypothetical negotiation, where you have to make believe
6  there's a negotiation.
7      Dr. Berger will tell you what was Ariad's position as
8  of 2002 so that if you get to that point where you need to
9  consider the hypothetical negotiation you would have some
10  understanding of how Ariad was viewing the patent and what its
11  licensing procedure was.
12      So that's something that is something to consider
13  later, but we have to put the witness on for all issues now,
14  so that's why we're doing that. So he's going to talk about
15  how he learned of the patent, the licensing of the patent, and
16  how he was going to license after the patent, basically.
17  Q. Dr. Berger, let me just ask you one question as we start
18  here. Counsel for Lilly ended his opening by saying that you
19  have charged many companies with infringement. Is that true?
20  A. No, not at all.
21  Q. What have you done?
22  A. We've provided a series of letters to various companies
23  putting them on notice, letting them know from an information
24  point of view that we have our patent, inquiring whether or
25  not they have products or programs that might be relevant to

Page 27

1  this. But we have never charged anyone other than Lilly with
2  infringement.
3  Q. Have you sued any doctors?
4  A. No, we haven't sued any physicians.
5  Q. Sued any patients?
6  A. No.
7  Q. So then, let's get into what you have done.
8  A. Okay.
9  Q. Just very briefly, could you tell us a bit about your
10  educational background?
11  A. Certainly. I'm a physician by training. I have an
12  undergraduate degree in biology from Colgate University. I
13  went on to get my medical training at Yale University where I
14  received my M.D. degree. Subsequent to that, I did
15  post-graduate research and medical training at Yale-New Haven
16  Hospital, as well as some training here in Boston at
17  Massachusetts General Hospital.
18  Q. Prior to Ariad, have you worked at industry?
19  A. Yes. For about seven or eight years before founding
20  Ariad, I was a senior executive at Centocor, one of the
21  earlier or first generation biotechnology companies, and I was
22  president of the research and development division of
23  Centocor.
24  Q. What were your responsibilities?
25  A. I was responsible for all of research and development,

Page 28

1  for all of our product development, for all of our basic
2  discovery, research, as well as having complete responsibility
3  for licensing of technologies and products.
4  Q. Why did you leave Centocor?
5  A. I left Centocor to start Ariad. In the early nineties,
6  there were some great opportunities that I saw. And so, I
7  left to be the founder of Ariad.
8  Q. When did you found Ariad?
9  A. Started Ariad in 1991. We became fully operational in
10  1992.
11  Q. Where is Ariad?
12  A. Ariad is located in Cambridge, just down the block from
13  M.I.T., was founded with close relationships with those
14  universities and others.
15  Q. And who were the first employees?
16  A. I was the first employee. Then about eight or nine
17  months into our history, we hired another senior executive
18  from Hofmann-LaRoche, a career chemist, scientist, and for the
19  first year it was really just the two of us creating what is
20  now Ariad.
21  Q. Now, at the time you founded Ariad, how did you go about
22  getting technology for the company?
23  A. Well, we started, quite honestly, with a blank sheet of
24  paper. It was an idea that I had that one could build a new
25  biotechnology company, really starting from the latest

Page 29

1  discoveries and developments in academia and in basic research
2  and convert those from research in the university setting into
3  pharmaceutical products that could help patients in various
4  different diseases.
5      So I spent the better part of a year meeting with
6  professors, academics, some were colleagues of mine from my
7  former academic life, some were people that I met in this
8  process, but to develop a technology and a focus around an
9  area of science called cell signaling. And cell signaling is
10  a particularly important area of biology, and it's taught us a
11  great deal about how cells work and, in general, how we can
12  treat disease.
13  Q. And just when you talk about cell signaling, what do you
14  mean?
15  A. Well, we thought of cell signaling in the early nineties
16  in the context of what cell biologists said. Cell biologists
17  at the time thought of the cell as a black box. We knew a
18  little bit of what happened on the outside. We knew there was
19  structures. But the communication mechanisms, the processes
20  by which cells communicated with their outside environment,
21  was really barely known in the early nineties.
22      And what we were learning at that time when I founded
23  Ariad was that our growing understanding of the underlying
24  processes in cells, that is, how cells communicated, how
25  signals on the outside, good or bad signals, got translated

956f542b-f6f9-4460-8956-62e7e35bdd3:

Ariad v. Eli Lilly                     Day 2, Session 1

4-11-06

## Page 30

1  into, effects inside the cell. We were understanding that,
2  and we were learning that you could interfere or block those
3  pathways, those cell signals, like NF-kappaB, and in turn
4  develop drugs.
5  Q. Can you tell us what this is?
6  A. This is something I'm very proud of. When I started
7  Ariad, one of the things you get to do is when you start a
8  company you get to name it. If you don't name it after
9  yourself, and I had no plans of doing that, you name it after
10  something that tells a story.
11      And as I just described, our technology was trying to
12  decipher the labyrinth of the cell and the pathways out of the
13  cell. So if you go back to Greek mythology, Ariadne is really
14  the story of the labyrinth, and Ariadne gave {unintelligible}
15  a spool of thread to find its way into the labyrinth to kill
16  the minotaur, a multi-headed monster in mythical times, and to
17  retrace his path back out of the labyrinth using the spool of
18  thread that had been the actual pathway in and out of the
19  cell.
20      And so, Ariad is a shortened version of Ariadne, and
21  the logo that you see there is really the spool of thread
22  that's really signifying cell signaling, pathways in and out
23  of a cell and ways of interfering with them.
24  Q. So in the context of considering cell signaling back in
25  the early nineties, how did you come upon NF-kappaB?

## Page 31

1  A. Well, in the early nineties, we knew very little about
2  cell signaling. There were relatively few well-validated,
3  well-studied cell signaling pathways or molecules. And as
4  part of the process I described earlier, I met with many
5  academics, one of whom was Dr. Baltimore, who at the time was
6  president of Rockefeller University in New York. He had been
7  at M.I.T. for much of his career, and he told me about
8  NF-kappaB and its importance to our strategy of developing
9  drugs to block cell signaling.
10  Q. Now, at the time, did you know anything about the awards
11  and achievement of Dr. Baltimore?
12  A. Certainly. Dr. Baltimore, who has been a collaborator of
13  Ariad from the beginning, is one of the most well-known
14  molecular biologists. At the age of 32 or 33 he won the Nobel
15  Prize for work that really changed our understanding of
16  fundamental molecular biology, discoveries that led to the
17  development of many of the first-generation drugs for AIDS
18  called reverse transcriptase inhibitors. And he was
19  recognized with the Nobvel Prize for that discovery.
20  Q. Do you know what he does for a living now?
21  A. Yes. After a time at Rockefeller and M.I.T.,
22  Dr. Baltimore became president of Cal Tech in Pasadena, where
23  he has been for the last seven or eight years.
24  Q. Now, when did you first speak to Dr. Baltimore about
25  NF-kappaB?

## Page 32

1  A. Well, it was early in 1991, really at the beginning of my
2  effort to put Ariad together, to build the foundation for the
3  company. So I met with him at his office and lab in New York
4  at Rockefeller.
5  Q. And at the time, did he give you any idea of who the
6  colleagues were that he was working with on NF-kappaB?
7  A. Well, he mentioned to me his long-standing collaboration
8  with Professor Phil Sharp, who was a professor of molecular
9  biology at M.I.T., who subsequently also has won the Nobel
10  Prize for his work in the area of biology, and Dr. Tom
11  Maniatis, who is a professor at Harvard, and their three labs
12  had worked closely together for much of the eighties in really
13  trying to understand NF-kappaB and cell signaling.
14  Q. Now, at the time, in early 1991, I imagine, when you were
15  talking to Dr. Baltimore, did you understand that there had
16  been any patents filed or issued?
17  A. Well, at the time nothing had been issued. Dr.
18  Baltimore, after extensive discussions about our strategy,
19  the spool of thread strategy, you can call it, to really
20  understand cell signaling and think of and identify ways of
21  selecting targets like NF-kappaB and others that are important
22  to this process, this fundamental process in cells, and
23  looking at ways of developing drugs because Ariad was going to
24  be a drug company, although it was going to take us time, and
25  we were going to need to start from our blank sheet of paper

## Page 33

1  and one employee.
2      Our goal was to make drugs, to have products that
3  helped patients with various difficult-to-treat diseases.
4      So we talked about NF-kappaB, and he indicated to me
5  that his former institution, M.I.T., had filed patents on
6  behalf of the inventors. And there were a total of thirteen
7  inventors working in the three laboratories that I described,
8  those headed by him, Dr. Sharp, and Dr. Maniatis.
9      MS. BEN-AMI: Can we have Exhibit PTX 328, please.
10  Q. That's in your binder, Doctor.
11  A. Which one, please?
12  Q. 328.
13      MS. BEN-AMI: Ladies and gentlemen, you don't have
14  all of the exhibits that the witnesses are going to use.
15  They'll be put up on the screen for you so you don't have to
16  handle so much paper.
17  Q. Can you tell us what this is?
18  A. So this is a letter I received from the head of the
19  Technology Licensing Office at M.I.T. in March of 1991. I had
20  met with David Baltimore not long before this. The person who
21  sent this material to me is Lita Nelsen, the head of licensing
22  at M.I.T.
23      MR. BERGHOFF: Your Honor, I hate to interrupt, but
24  we don't seem to have a copy that we received from Plaintiffs
25  on this. I just want to be able to follow it.

9 (Pages 30 to 33)

Ariad v. Eli Lilly                                    Day 2, Session 1

4-11-06

---

**Page 34**

1    Could we have copies as we go along?
2         MS. BEN-AMI: I believe we had agreed that we would
3    make a list of exhibits, and they would make their own exhibit
4    binders.
5         THE COURT: You may continue with the witness.
6    A.  So to go back to where I was, Lita Nelson was the head of
7    the licensing office of M.I.T. in 1991. I had interacted with
8    her and worked with her on licenses in the past when I was at
9    Centocor, so this was a very easy transition for me to go and
10   visit her.
11        I talked with her, and as you can see from this
12   letter, she basically sent me a pile of paper which was many
13   different patents and disclosures and descriptions of the
14   NF-kappaB-related science, as well as some other things.
15        As you can see, I was talking to her about various
16   technologies. Most of this related to NF-kappaB and to the
17   work that had been done already long prior to 1991. At the
18   end, she referred me to Dr. Sharp, whose one of the senior
19   inventors in this technology, and suggested I chat with him
20   more about it.
21        THE COURT: Let's stop for a moment and stretch.
22        (Pause.)
23   Q.  Can you tell us, this is the last page of the document,
24   what is this?
25   A.  This is the third page. It describes one of the cases

---

**Page 35**

1    from the pile of papers I was sent. The way universities
2    provide technology is in the form of cases, not like a case
3    here, but they had different disclosures, different
4    information, and they bundle it together. It may turn out to
5    be one patent, more than one patent, that's a different issue.
6    But as they get disclosures or details about inventions, they
7    put it all together.
8         And here some of the last description is some of the
9    work that Tom Maniatis and David Baltimore and their groups
10   had disclosed to the M.I.T. office on regulating NF-kappaB
11   expression. As well, there is the note to Jack with Professor
12   Sharp.
13   Q.  Did you obtain a license to this work?
14   A.  Yes, we did, a number of months later.
15        MS. BEN-AMI: Could I have PTX 460, please.
16   Q.  Can you tell us what PTX 460 is, Dr. Berger?
17   A.  Yes. This is the License Agreement that I signed on
18   behalf of Ariad on August 8, 1991. So about four or five
19   months after I met with M.I.T. originally and after I met with
20   Dr. Baltimore, based on my review of what the patent filing
21   showed, the disclosure showed, my discussions with Dr. Sharp
22   and Dr. Baltimore, Ariad signed a license with M.I.T. for this
23   technology.
24   Q.  Now, you see here that it says there is a right here to
25   the United States government?

---

**Page 36**

1    A.  Yes, I can see it.
2    Q.  Can you explain that to the jury?
3    A.  Well, this is what's called a march-in right that the
4    government retains really in virtually all of the licenses for
5    technologies where they helped fund part of the research.
6    It's important to put this into perspective in the times.
7         In the early -- up until the early 1980s, there was
8    very little licensing of government funding, NIH-funded
9    research coming to companies. It was a long and arduous
10   process.
11        In the 1980s, the Bayh-Dole Act was put in place, and
12   it was really put there to foster innovation in the United
13   States. Senators Bayh from Indiana and Dole felt, as the
14   Congress did in the eighties, that the U.S. was falling behind
15   in innovation because it was so difficult to —
16        MR. BERGHOFF: Your Honor, objection. Hearsay.
17        THE COURT: Well, I don't know that it's being
18   offered for the truth of it.
19        MS. BEN-AMI: I think it's being offered to explain
20   the license.
21        THE COURT: I'll allow it.
22   A.  So the objective of the Bayh-Dole Act was to encourage
23   licensing of government-funded research to companies. And as
24   well, it fostered the filing of patents and the licensing
25   processes that we've described.

---

**Page 37**

1         And so, in turn, one of the things that the act
2    required was that in case of national emergency or crisis that
3    the government could step in and use those technologies in an
4    unusual or rare circumstance.
5         So I knew exactly what these march-in rights were for
6    the government. They didn't bother me. They had no impact on
7    our signing the license. They were absolutely routine at the
8    time, as I think they still are today, and it's standard
9    procedure.
10   Q.  Well, you heard counsel in his opening make a point of
11   the fact that the government paid for some of the research
12   that's in the patent. You were here in the courtroom, weren't
13   you?
14   A.  Yes, I was.
15   Q.  And under the rules as you understood them in 1991, was
16   the government encouraging universities and small businesses
17   to patent their discoveries?
18   A.  Without question. That was really the purpose of the
19   Bayh-Dole Act and congressional action. They wanted to be
20   sure that NIH-funded, government-funded research was
21   commercialized and developed to insure a competitive position
22   for the United States. And we fit right into that.
23   Q.  In 1991, when you were licensing this, was it your
24   understanding that the government of the United States was
25   encouraging taking university research into the industrial

---

956f542b-f6f9-4460-8956-62e7e35bdd3:

Ariad v. Eli Lilly                    Day 2, Session 1
4-11-06

---

Page 38

1  field?
2  A.  Yes.  No question that was my understanding then and that
3  was accepted throughout the licensing community.  And that's
4  what -- the opportunities that the Bayh-Dole Act and
5  congressional action created fostered the development of
6  licensing offices, such as the one at M.I.T., but today
7  probably almost, I would suspect, every university today has a
8  licensing office.  This is standard practice for big and small
9  universities to take research and discoveries and inventions,
10  just like the NF-kappaB inventions from Dr. Baltimore, Dr.
11  Sharp, Dr. Maniatis, and others, take that research and make
12  sure it's brought into, for the public good, into
13  commercialization.
14  Q.  Now, in his opening, counsel talked about the academic
15  world versus the practical world.  Does that distinction truly
16  exist?
17  A.  No.  There really is no distinction anymore, especially
18  in our industry, in the biotechnology and pharmaceutical
19  industries, between the practical and the real world.  Basic
20  research, whether conducted in a university or conducted in a
21  biotech company like Ariad or a pharmaceutical, big
22  pharmaceutical company like Lilly, the basic research and the
23  basic discoveries become the foundation for discovering new
24  drugs.
25        And so, from one perspective, you can't really

---

Page 39

1  separate them because those discoveries really become so
2  critically important to our ability to develop new drugs.
3        But, as well, virtually every major biotechnology
4  company you can think of, Genentech, Amgen, Biogen, all of the
5  ones you've probably heard of, they were all founded by
6  academic scientists.  They all were created out of the
7  academic scientific world using those discoveries to then make
8  drugs, just like what we're trying to do.
9  Q.  So Ariad was founded in 1991?
10  A.  '91.
11  Q.  And in 1991, it was just --
12  A.  Me.
13  Q.  You.  So today, how many employees are there?
14  A.  Got about 110 employees today.
15  Q.  And that didn't happen overnight, did it?
16  A.  No, it didn't.
17  Q.  So tell us what types of technology Ariad has worked on
18  in recent years or as it was progressing to make products.
19  A.  Well, really, throughout our history, from the day we
20  came up with the idea of the spiral and the labyrinth,
21  essentially everything we've done is focused on cell
22  signaling.  It's been developing intellectual property,
23  patents.  It's been developing methods and tests and research
24  approaches, broadening our understanding of the underlying
25  biology of cell signaling so that we have a scientific

---

Page 40

1  understanding to make drugs.
2        Importantly, most of the last six or seven years of
3  our history has been spent actually working on making drugs.
4  And I think it's important, you know, to just take a second to
5  talk about what we've done with 110 people over a relatively
6  short period of time --
7        MR. BERGHOFF:  Your Honor, objection.
8        MS. BEN-AMI:  I could ask a question.
9  Q.  You have to answer my question.
10  A.  Sorry.
11  Q.  I would like you to talk about what products you give to
12  the academic world.  Can you tell us what you've developed for
13  the academic world?
14  A.  Okay.  We have a technology that we've developed in
15  collaboration with professors at various universities called
16  Argent Gene Regulation Technology.  It's a technology that's
17  used now by well over a thousand scientists all over the
18  world.  We think it's such an important technology that we
19  give it away to them at no cost whatsoever.  We provide them
20  with kits to facilitate their research, and that allows them
21  to do experimentation in the academic world.
22        We've also licensed that commercially to companies.
23  But to the academic scientists, they don't require a license.
24  They don't -- they receive those kits at no cost.
25  Q.  And now, can you tell the jury what Ariad has been

---

Page 41

1  working on in terms of products for patients?
2  A.  Okay.  We have several products that the company has
3  developed that are working their way through the FDA process.
4  First, a drug we call Ariad 573.  It's a drug that is about to
5  enter the last stage of clinical trials called Phase III.
6  It's a drug that has received fast track designation from the
7  FDA for the treatment of advanced sarcomas.  These are cancers
8  that affect the organs and tissues that hold the body
9  together, like bone and muscle and things of that sort.
10        We've also studied that in many other cancers and
11  will be developing it further past sarcoma.  So our sarcoma
12  drug is first, most advanced.
13        That same drug is now being used in little devices
14  called stents that are put into the vessels of arteries in
15  patients with coronary disease; for example, patients who
16  might develop heart attacks, who in turn have procedures to
17  expand out the vessel.  These stents, these little wire mesh
18  structures, have our drug covered on the outer surface.  And
19  we're about to start human trials over the next year of that
20  product.
21        As well, we've recently presented at some of the
22  important cancer research meetings our next products, which
23  will be what are called enzyme inhibitors for the treatment of
24  various types of leukemia where all other treatments have
25  failed, as well as to prevent the spread of cancer from the

---

956f542b-f6f9-4460-8956-62e7e35bdd3

Ariad v. Eli Lilly                                    Day 2, Session 1

4-11-06

---

**Page 42**

1  main site to distant sites, and we expect as well one of those
2  products to go into human studies, and that's here.
3       MS. BEN-AMI:  Could you bring up DTX 1481, the
4  opening slide.
5  Q.  While we're bringing up the exhibit, what is the status
6  of your cancer drug?
7  A.  Ariad 573 has been studied in eleven clinical trials,
8  close to 600 patients around the world, and will start a
9  large, probably 750 to 1000-patient Phase III clinical trial,
10 the last stage of development, later this year.
11 Q.  Now, counsel for Lilly raised this as a general time line
12 in his opening.  Could you explain to the jury where you are
13 in your process and how long it's taken you?
14 A.  Certainly.  Well, I found this time line interesting
15 relative to what I've been through both at Centocor --
16      THE COURT:  Where on this are you?
17      THE WITNESS:  I'll describe it, your Honor.
18 A.  So today, I'm pointing at Phase III because our lead
19 drug, Ariad 573, should be entering Phase III clinical trials
20 later this year.
21      THE COURT:  With respect to both purposes?
22      THE WITNESS:  No, with respect to the sarcoma, the
23 cancer application, which is our main focus.  Today, we mainly
24 are developing cancer drugs.
25 A.  We have a partner, a medical device company, that's

---

**Page 43**

1  developing with us, but they're responsible for the heart
2  disease application.  The heart disease application will start
3  Phase I trials that I'm pointing to here, we expect, within
4  the next year.
5  Q.  So, Dr. Berger, counsel said it takes this long to make a
6  drug.  You were here during his opening when he talked about
7  that?
8  A.  Yes.
9  Q.  Is Ariad on track?
10 A.  It appears to be based on this schedule.  If you just add
11 up the number of years that are shown there, Ariad was found,
12 became operational about fourteen years ago, which would have
13 us right on this schedule.
14 Q.  Now, does that drug have to do with cell signaling?
15 A.  Absolutely.
16 Q.  And can you very briefly explain why?
17 A.  Sure.  Ariad 573, a drug that we discovered, our
18 scientists discovered, spent years doing the basic research to
19 understand the target, the cell signaling target, which in
20 this case is a target called mTOR.  mTOR is the target, just
21 like NF-kappaB describes another cell signaling pathway.  And
22 our drug, Ariad 573, selectively and potently stops mTOR,
23 which has beneficial effects in cancer because mTOR plays a
24 key role as a cell signaling pathway in cancer cells.
25 Q.  Now, in the opening counsel said that Ariad does not have

---

**Page 44**

1  an NF-kappaB drug.  True?
2  A.  Yes.
3  Q.  Can you explain why?
4  A.  Sure.  There really are two reasons.  Probably the most
5  important reason we don't yet have an NF-kappaB program or a
6  drug is because we have to focus with 110 people, which is not
7  that big, with 110 people doing everything from basic research
8  to finance to running the building to running clinical trials,
9  we've got to focus.
10 I've learned over the last twenty years and at two
11 companies that focus is what is critically important.
12 So we'll get there.  We've successfully, I believe,
13 developed a series of products, cancer and otherwise, and an
14 NF-kappaB inhibitor as part of our plans.  Clearly, it's next.
15 Secondly, from a technical point of view, if you look
16 at the slide that's up there, it talks a lot about on the left
17 10,000 compounds, and it's at least that.  When Ariad started,
18 we didn't have any compounds.  So we had to develop other
19 methods of coming up with drugs.
20 And so, we've developed and optimized other ways of
21 developing drugs, but as that slide points out, in order to
22 make an NF-kappaB inhibitor, say, like Evista, you need to
23 start with lots of compounds.  And we just didn't have those.
24 So now, as we've made progress on our other programs,
25 we have the contents, we have the methods.  We can now pursue

---

**Page 45**

1  NF-kappaB inhibitors, among other targets.
2  Q.  Now, I'd like to talk to you about the period from 2000
3  through 2002 as the patents were coming out and as you were
4  beginning to work on licensing.
5  A.  Okay.
6  Q.  Now, how many patents have the universities and Ariad
7  received based on the NF-kappaB technology in the United
8  States?
9  A.  Three of them.
10 Q.  And do you know when the first patent issued, when it
11 came out to the public?  Do you have an idea?
12      THE COURT:  Excuse me one moment.  The licensing
13 agreement was only with M.I.T. and Whitehead, right?
14      THE WITNESS:  Harvard was included under it.
15      THE COURT:  So Harvard?  Because I didn't see the
16 president and fellows in the part that was there.  Was it
17 there?
18      MS. BEN-AMI:  I'll ask a question to clear that up,
19 if you want, your Honor.  Harvard agreed with M.I.T. and
20 Whitehead that M.I.T. would be the licensing --
21      THE COURT:  Okay.  You now referred to the
22 universities.
23      MS. BEN-AMI:  Yes.  It wouldn't be a conflict among
24 the universities handling this.  They just agreed M.I.T. would
25 handle it.

---

956f542b-f6f9-4460-8956-62e7e35bdd32

Ariad v. Eli Lilly                                    Day 2, Session 1

4-11-06

Page 46

1    THE COURT:  Sorry.
2         MS. BEN-AMI:  Obviously, your Honor, all three are
3    Plaintiffs.
4    Q.  Dr. Berger, can you tell us, to the best of your
5    recollection, during which time period the patents for
6    NF-kappaB were coming out?  When was the first one?
7    A.  I think the first one appeared in the late nineties.  I
8    don't remember the exact date.
9    Q.  So, when a patent appears, do you know whether it becomes
10   public to the world?
11   A.  Yes.  In the United States, when a patent issues, becomes
12   official, that's when it becomes readily available and
13   available to everyone.
14   Q.  And the first patent that issued has all the description
15   in it as the same as the '516 patent?
16   A.  To the best of my knowledge, yes.
17   Q.  And so, was that patent available to companies to look at
18   if they wanted information on NF-kappaB?
19   A.  Right.  Once a patent becomes official, it's available to
20   everyone.  And the description of the basic work is available
21   because it's fully laid out in those patents.
22   Q.  Now, in the early nineties, after you had licensed the
23   NF-kappaB portfolio, were you aware whether or not after
24   patents were filed that the inventors were publishing their
25   work in the scientific journals?

Page 47

1    A.  Certainly.  You know, I think you have to look at this in
2    parallel.  The discovery is made, and then there are two paths
3    filing patents.  But as soon as those patents are filed,
4    especially given the preeminence of the scientists we're
5    talking about, they're out publishing, presenting, going to
6    meetings, and there have been dozens, I don't know the exact
7    number, but certainly the inventors have many papers that have
8    been published describing the research that's in the patents,
9    including the work that's ultimately come out in the '516
10   patent.
11   Q.  So once the papers are put out there for the public to
12   read, are they available to the scientific and industrial
13   community?
14   A.  Sure.  They're available in scientific libraries, and in
15   the late nineties everything became available on-line to
16   scientists.  All these journals would be available to
17   scientists in universities and companies everywhere.  It's the
18   whole purpose of the publication process.
19   Q.  Did there ever come a time when you wrote letters to
20   companies informing them of any of the NF-kappaB patents?
21   A.  Yes.  We did that twice.
22   Q.  When was the first time, to the best of your
23   recollection?
24   A.  First time was in the year 2000, early 2000.
25   Q.  And can you tell us whether you wrote a letter to Lilly?

Page 48

1    A.  Yes, I did.
2    Q.  And who did you write it to?
3    A.  I wrote it to the senior executive in licensing that I
4    knew at Lilly, David Thompson.
5    Q.  And how did you know him?
6    A.  We had met at prior licensing meetings, professional
7    meetings, and he was quite well known in the pharmaceutical
8    community.
9         MS. BEN-AMI:  Can I have PTX 327, please.
10   Q.  Can you, without reading the entire thing, tell us what
11   you were telling Lilly?
12   A.  This was really our first effort at taking the message
13   broadly public to companies.  And we tried to identify
14   companies that we thought from what we had read had programs
15   that might be developing drugs that worked through NF-kappaB
16   cell signaling.
17        So we were providing them with information about the
18   first of our patents and the availability of that patent and
19   if they issued subsequent patents, availability for licensing
20   so that they could have a license and be able to use those
21   patents broadly.
22        MS. BEN-AMI:  Can I have PTX 461, please.
23   Q.  Can you tell us what this is?
24   A.  Yes.  This is what's called a term sheet.  This is a
25   simple two- or three-page outline or summary that says we'd

Page 49

1    like to license some of our patents, some of our technology,
2    and it lays out sort of the structure of what that might look
3    like, what's the field, what can you use it in, and what our
4    expectations would be at the time for the payments we would
5    like you as a potential licensee to make if you conclude that
6    you need the license.
7    Q.  What was Lilly's response?
8    A.  I got a total of I think it's three letters back.  The
9    first one was a letter from Mr. Thompson saying that he
10   referred it to Dr. Wold, who worked in the research group, who
11   then sent me a letter saying that he was going to give it to
12   the scientists to look at.
13        Then he sent me another form letter a few months
14   later, after the summer, saying something like if and when I
15   decide we want to talk to you, we'll get back to you.  I don't
16   know the exact words, but that's basically it.
17        That's the last time we heard from lily.
18   Q.  Now, did there come another time when you sent Lilly a
19   letter?
20   A.  Well, again, this letter to Lilly was not selecting Lilly
21   out.  I mean, this was one of many letters we send just to put
22   folks on notice that these patents had issued in case they
23   hadn't seen them.  We did the same thing again roughly a year
24   later.  And this was when the second of the three patents had
25   issued.  Then we sent letters out more broadly again.

13  (Pages 46 to 49)

Ariad v. Eli Lilly                                Day 2, Session 1

4-11-06

---

Page 50

1  Q.  Now, just going with this document, at this time in the
2  year 2000, can you tell the jury what you were considering as
3  a fair royalty for the patents?
4  A.  Okay.  In the year 2000, the first patent had issued.
5  The first patent largely dealt with ways of discovering,
6  finding a drug, that affected NF-kappaB, this important cell
7  signaling target.  But there were also, if you look at all the
8  patents and where we were headed, there was also the
9  possibility that there would be patents that would cover the
10  use of the product itself, the method of treating with
11  inhibition or inhibitors of NF-kappaB.
12      So we proposed to Lilly and to others in 2000 a one
13  percent royalty if you just discovered the product, and a
14  5 percent royalty if the use of the product was covered by a
15  method, such as the method of treatment claims that are the
16  basis of our discussions today.
17  Q.  Now, at the time you sent this document out in 2000,
18  under your license agreement with the universities, if Ariad
19  makes a product that inhibits NF-kappaB, what does Ariad have
20  to give the universities, if anything?
21  A.  Right.  If we made a product that was an NF-kappaB
22  inhibitor, then we would owe the universities a 3 percent
23  royalty.
24  Q.  So how did you arrive at the 5 percent figure?
25  A.  Well, the 5 percent figure was first based on an estimate

---

Page 51

1  of what we thought was a fair, reasonable royalty, especially
2  given that the patent that would have covered this
3  circumstance hadn't issued yet.  The '516 patent hadn't
4  issued, and we didn't know if it would or wouldn't.
5      My experience in having done licensing for over a
6  decade at that point, probably a little longer, a 5 percent
7  royalty made sense from other examples, from my experience.
8  And clearly, we thought that if we owed M.I.T. a 3 percent
9  royalty, a royalty to someone else should be greater than that
10  because we felt that was what was reasonable and fair.
11  Q.  And besides giving the universities a 3 percent royalty
12  on product, did you undertake other financial obligations to
13  the university?
14  A.  Yes.  We had many obligations under the license
15  agreement.  We assumed full responsibility for prosecuting the
16  patents, meaning filing them, updating them, working to get
17  them approved.  We had other obligations called milestones.
18  We had to pay some things to the university when certain
19  progress took place.
20      So we had other obligations in addition to the
21  royalties.
22  Q.  Now, at the time in the year 2000-2001, when you were
23  working on this licensing program, did you have an
24  understanding of the type of patents that you were ultimately
25  going to get?

---

Page 52

1  A.  As we moved closer and closer to 2002, when the '516
2  patent issued, we gained confidence that method of treatment
3  patents, method of treatment claims such as the ones that have
4  issued as the '516 patent would be what we would ultimately
5  get.  Back in 2000, we weren't sure.  We thought we might get
6  that, but we weren't sure.  But as we got closer, based on
7  what the Patent Office was telling our patent lawyer, we
8  thought there was a good likelihood, and we were aiming for
9  these method patents because those had the greatest value.
10  Q.  Now, at the time when you were doing this licensing, did
11  you have an understanding of how common method patents were or
12  were not in the industry?
13  A.  It's an important point.  Method patents, process
14  patents, such as the method of treatment patents, are
15  commonplace.  Without question, these are types of patents
16  that pharmaceutical companies, biotechnology companies,
17  routinely file for and routinely get.  There is nothing out of
18  the ordinary from my experience in method patents.
19  Q.  And were you aware of what type of companies, named
20  companies, that had method patents at that time?
21  A.  We had really looked a bit at that issue because I wanted
22  to be sure that I was right, that my impressions were right.
23  And so, it was easy to find many different patents from big
24  pharmaceutical companies, Pfizer, Merck, Lilly, and
25  biotechnology companies, big ones, Genentech, others.  These

---

Page 53

1  are very common patents, and although I don't remember them
2  today, but going back then we found lots of examples that were
3  this type of a patent.
4      We weren't doing anything -- and that was important
5  to me -- that was out of the ordinary in asking for a royalty
6  on a method patent.
7  Q.  Looking at Exhibit 332, can you tell us what this is?
8  A.  This is a letter that was sent to me in September 2000.
9  This was the last of the series of letters that I got in
10  response to my first letter from David Wold at Lilly, vice
11  president-research acquisition.
12  Q.  And can you read the last line for the jury, please,
13  because it's a little bit far away?
14  A.  Yes.  "I have forwarded this information," that's
15  referring to the NF-kappaB information I had sent them, "to
16  the appropriate group in Lilly, and they will contact you if
17  and when they decide further discussion is necessary."
18  Q.  Now, in 2005, did you contact Lilly, among others, again?
19  I'm sorry, 2001.
20  A.  In 2001, yes.
21      MS. BEN-AMI:  And DTX 69, please.
22  Q.  Can you tell us what things?
23  A.  Yes.  This is a summary of terms that we sent out in May
24  of 2001 and we provided to many companies as an update to the
25  types of terms that we were looking for for the NF-kappaB

---

14 (Pages 50 to 53)

Ariad v. Eli Lilly                          Day 2, Session 1
4-11-06

## Page 54

1  technologies and patents.
2  Q.  Now, can you see the date on this document?
3  A.  Yes, I can. It's May 1, 2001.
4  Q.  Now, did you send this to Lilly?
5  A.  Yes.
6  Q.  And did they respond?
7  A.  No.
8  Q.  Did you at any point then find out through public means
9  whether or not Lilly was using NF-kappaB technology?
10  A.  Well, what was becoming clear from looking at the
11  scientific literature in early 2001 is that Lilly had done a
12  great deal of work, quite honestly, much more work than we
13  thought, on NF-kappaB and, in fact, the work was specifically
14  about Xigris, the product you've heard about. This is the
15  product for sepsis.
16      MS. BEN-AMI:  Would you please pull up PTX 314.
17  Q.  Can you tell us what this is?
18  A.  Yes. This is one of the articles I was referring to.
19  This is a scientific paper in a well-known journal called The
20  journal of Biological Chemistry. It's a paper on NF-kappaB
21  activity in response to activated protein C, which is Xigris.
22  But, most importantly, the authors are senior researchers at
23  Lilly's Research Laboratories, in particular, Brian
24  Grinnell -- the senior author and the senior person on papers
25  go all the way to the right. Brian Grinnell is a very senior

## Page 55

1  research fellow whose work I had read before at Lilly Research
2  Labs.
3      So this was a striking example of the effect of
4  Lilly's drug, Xigris, on NF-kappaB activity published in April
5  2001, just before the letter went out.
6  Q.  And now over here it says "Using Broad Transcriptional
7  Profiling." Can you tell us what you understood by that?
8  A.  Putting aside the technical terminology that's up there,
9  but human recombinant activated protein C is Xigris. What
10  this paper shows me is that Lilly clearly had ongoing research
11  on Xigris and its effects on NF-kappaB cell signaling, but as
12  well in particular that Xigris or recombinant human APC
13  affected NF-kappaB activity, suppressed expression, that means
14  dampened or blocked the activity of NF-kappaB, and that's
15  exactly what we had been talking about throughout this
16  process. That's what the patents cover.
17  Q.  Now, looking at the line above, do you see where it has a
18  parentheses? Now, that does not say Xigris, does it?
19  A.  No, it doesn't.
20  Q.  How do you know it is Xigris?
21  A.  Well, based on what I knew at the time, what I think
22  we've heard today, recombinant activated human protein C is
23  the active ingredient in Xigris, and what makes me think that
24  this is directly relevant to the clinical patient-used form of
25  the drug is that the very first sentence says "Recombinant

## Page 56

1  activated form of the molecule is completing clinical
2  evaluation for treatment of severe sepsis."
3      As a scientist or physician, my only conclusion is
4  that this paper is about Xigris and its clinical importance.
5  Q.  Now, during this time period, 2001-2002, when Lilly was
6  not responding to you, did you find out whether Lilly was
7  doing any other type of work on NF-kappaB?
8  A.  We also found -- with this in hand, we went and looked a
9  little further, not just about Lilly. We were trying to
10  understand the value of our patents, the technology, how
11  broadly it might be used and by which companies. So, we
12  started to look a little bit. This was really a glaring clue
13  to us that companies were doing work in this area.
14      So we found a patent that related to Evista,
15  Raloxifene, the other drug we're talking about today, Lilly's
16  second product, and we found a patent that showed that
17  Raloxifene worked by inhibiting NF-kappaB. This was a patent
18  that was filed, again, by Lilly scientists and by Lilly
19  itself.
20      MS. BEN-AMI:  DTX 904, please. Your Honor, with the
21  Court's permission, I would like to read into evidence two
22  admissions. One is from the pre-trial order, number 12, which
23  says: "David Berg, David Calnek, and Brian Grinnell were
24  named as applicants on the World Intellectual Property
25  Organization patent application entitled "Methods of

## Page 57

1  Modulating NF-kB Transcription Factor" bearing Publication
2  Number WO96/40137.
3      The second one is 13, WO96/40137, was filed by Lilly.
4  Q.  With that in mind, when you saw this, what did it tell
5  you?
6  A.  Well, as you point out, this is, again, a patent by Lilly
7  scientists, the lead scientists, Brian Grinnell and David
8  Berg. Just look at the title, "Methods of Modulating NF-kB
9  Transcription Factor," and you look down below at the
10  substance that's shown, and that sure looks like Raloxifene.
11      What this tells us, and then if you read more
12  carefully the rest of the patent, that here is Lilly filing a
13  patent on Raloxifene or Evista, and its regulation of
14  NF-kappaB. That sounds like what we've been talking about.
15  Q.  Now, looking at page 3 of the document, what did that
16  tell you?
17  A.  What you've highlighted here is that this patent deals
18  with Raloxifene, which is the chemical name for Evista.
19  Q.  Now, looking at the first page of the patent, then, again,
20  looking at this, can you tell the jury what the priority
21  filing date of this patent application is, the earliest date?
22  Do you see where it says priority?
23  A.  Right. The priority date would be June 7, 1995.
24  Q.  Now, I believe counsel for Lilly said that there was no
25  work done on NF-kappaB during the period when they were

Ariad v. Eli Lilly                    Day 2, Session 1

4-11-06

| Page 58 | Page 60 |
|---|---|

**Page 58**

1  developing Evista. Were you in court for that?

2  A. Yes, I was.

3  Q. Can you tell us how this date compares to the date when

4  Evista was approved?

5  A. Well, Evista was approved several years after this, but

6  it's clear that if you filed a patent on June 7, 1995, the

7  research, the work that led to it must have been done even

8  before that.

9      So it certainly suggests in the period 1994, 1995, at

10  least, there was ongoing work at Lilly on NF-kappaB and

11  Raloxifene or Evista.

12  Q. And just we'll connect this up later with another

13  witness, but could you look where it says "Agent" on the

14  second column and tell the jury who the agent was?

15  A. Yes. The agent was James Sales, who I guess is a patent

16  lawyer at Eli Lilly.

17  Q. Now, did there come a point in time when you negotiated

18  on the issue of the portfolio of patents with another company?

19  A. Yes.

20  Q. What company was that?

21  A. Bristol-Myers-Squibb.

22  Q. And what was the result of that negotiation?

23  A. Late in 2002, Bristol-Myers-Squibb, another large

24  pharmaceutical company, signed a license, it was largely to

25  the first two patents that had issued; did not include any of

**Page 59**

1  the method of treatment claims that are in the '516 patent.

2  So it was a license to the drug discovery claims and the

3  portions of the patent portfolio that related to finding an

4  NF-kappa inhibitor rather than its use.

5  Q. And so, for that use, what was the royalty rate?

6  A. The royalty rate for that use was one percent.

7  Q. And did they offer you any royalty rate for claims to a

8  method of treatment should it come out?

9  A. Yes. We had asked for 5 percent; they offered two and a

10  half percent.

11  Q. And what was your response?

12  A. We were not prepared to accept a two and a half percent

13  royalty. We did not think that was fair or appropriate. And

14  so, we turned that down.

15  Q. Now, does Ariad require academic scientists to take a

16  license under the '516 patent?

17  A. No. We made a policy decision early on, years ago, that

18  academic scientists can conduct research, experimentation in

19  universities, they absolutely would not require any license to

20  any of our NF-kappaB patents, the first, the second, or '516.

21  And not only did they not require a license, we didn't even

22  require them to negotiate a free license. We just said in the

23  universities, and Ariad agreed to this, that we would just let

24  everybody use the technology as broadly as they wanted.

25  Q. And so, at what point does someone from your view need a

**Page 60**

1  license?

2  A. They really need a license if they have a commercial

3  benefit. If they're using the technology or the patents for

4  commercial use, for commercial application, they've got to pay

5  rent. It's a simple concept.

6  Q. Now, in the beginning, we talked a little bit about what

7  the sales numbers were for Lilly's products. Do you recall

8  that?

9  A. Yes.

10  Q. And counsel talked about what he's going to prove the

11  costs were?

12  A. Yes.

13  Q. So, just so we're clear, the number we put up was roughly

14  two and a half billion dollars in sales for Evista. But does

15  that number include sales of Evista prior to the issuance of

16  the patent?

17  A. No, not at all.

18  Q. Are you seeking any royalty on sales of Evista prior to

19  the issuance of the patent?

20  A. No, just from the day the patent issued in 2002.

21  Q. The same for Xigris?

22  A. Same for Xigris.

23  Q. And are you seeking any royalty payments for sales

24  outside the United States?

25  A. No, we're not, only in the U.S.

**Page 61**

1  Q. Now, do you have any understanding based on your market

2  evaluation of how many sales we're talking about that we're

3  not asking for a royalty on?

4      MR. BERGHOFF:  Objection. Irrelevant, your Honor.

5      MS. BEN-AMI:  If he can talk about that —

6      THE COURT:  Well, it isn't irrelevant in light of

7  your opening, although I thought that the part of the opening

8  was irrelevant. So maybe you're compounding irrelevance.

9      MS. BEN-AMI:  Unfortunately, he went on for an hour

10  and a half.

11  Q. Can you answer?

12  A. Just a brief answer. From what I know, it's billions of

13  dollars.

14  Q. And you're not seeking any royalty on those?

15  A. No, we're not. Only U.S. sales since the patent issued.

16      MS. BEN-AMI:  Your Honor, I believe all these

17  exhibits are already admitted into evidence based on our

18  agreement prior to the beginning of the trial.

19      THE COURT:  Okay. Who will cross examine?

20      MR. BERGHOFF:  I will, your Honor.

21      Your Honor, were you planning on a break, just so I

22  can appropriately plan my questions?

23      THE COURT:  We'll have a break

24              * * * * *

25

16 (Pages 58 to 61)

956f542b-f6f9-4460-8956-62e7e35bdd32

Ariad v. Eli Lilly                          Day 2, Session 1

4-11-06

---

Page 62

1  CROSS EXAMINATION
2  BY MR. BERGHOFF:
3  Q.  Dr. Berger, good morning.  My name is Paul Berghoff.
4  A.  Good morning.
5  Q.  So my understanding is that Ariad has no products on the
6  market currently?
7  A.  No pharmaceutical products, yes, that's right.
8  Q.  And the one pharmaceutical product that's furthest along
9  is still in Phase II clinical trials; is that correct?
10  A.  Right.  We expect it to be in Phase III trials later this
11  year.
12  Q.  So is it in Phase II clinical trials at this point?
13  A.  Yes, it is.
14  Q.  And you did not use NF-kappaB technology in any way to
15  identify that drug, Ariad 537?
16  A.  573, no, we didn't.
17  Q.  And that drug may or may not make it to the market?
18  A.  As is the case with all pharmaceuticals.  Some make it,
19  some don't.  Yes, that's right.
20  Q.  It's a high risk business?
21  A.  Yes, it is.
22  Q.  And even best case, that drug, you expect, will not be on
23  the market before 2008?
24  A.  That's right.
25  Q.  And it could be later than that, depending on how the

---

Page 63

1  clinical trials go?
2  A.  Certainly could be.
3  Q.  And it may never make it?
4  A.  That's right.
5  Q.  And so, am I right that Ariad has no revenue from
6  pharmaceutical products at the current time?
7  A.  We have some licensing revenues, but no revenues today
8  from sales of pharmaceutical products, not yet.
9  Q.  And as the CEO, I assume you own a substantial amount of
10  shares in Ariad?
11  A.  I have a very modest position in the company.
12  Q.  And how many shares is that?
13  A.  I own about one and a half percent of the company.
14  Q.  And the approximate value of that, based on today's stock
15  price?
16  A.  It's, a lot of that stock options, it's impossible to
17  value that, so I really done know the value today.
18  Q.  How many shares of unrestricted stock do you own?
19  A.  I honestly don't remember the number of shares.
20  Q.  350,000, does that sound about right?
21  A.  It is certainly a reasonable number.  I just don't
22  remember the numbers.  I don't focus on this very much.
23  Q.  And the stock price, it's about $6.00 a share at the
24  current time?
25  A.  Yes, it is.

---

Page 64

1  Q.  You wouldn't disagree that you may own two million
2  dollars worth of unrestricted shares?
3  A.  Yes.
4  Q.  And you have a greater number of restricted shares that
5  you own; is that correct?
6  A.  I have some restricted shares, yes, that's right.
7  Q.  And do you know how many?
8  A.  I don't remember the latest numbers.  I really don't
9  focus on this.
10  Q.  You wouldn't disagree with me if I told you it was over
11  750,000 shares?
12  A.  Yes, I would disagree.  That number is not correct.
13  Q.  But you don't know what the correct number is?
14  A.  That's way off.
15  Q.  And you don't know the value of your options, your stock
16  options?
17  A.  As I said, I really don't focus on it.  I own -- I was
18  the founder of the company.  I've been there for fifteen
19  years.  I have obviously a financial stake in Ariad's success;
20  I don't deny that.  But I have a modest ownership in the
21  company.  When our new proxy comes out in a month or so, then
22  all the numbers will be available.  It hasn't been put
23  together yet.
24      THE COURT:  Are you about to go into another topic?
25      MR. BERGHOFF:  I am, yes, your Honor.

---

Page 65

1      THE COURT:  We'll take the morning recess now,
2  members of the jury.
3      THE CLERK:  All rise.
4      (Jury was dismissed from the courtroom.
5      (Whereupon, the Court recessed at 11:00 a.m.)

---

956f542b-f6f9-4460-8956-62e7e35bdd32

Ariad v. Eli Lilly                          Day 2, Session 1

4-11-06

Page 66

1
2
3              CERTIFICATE
4      I, Lisa W. Starr, Registered Professional Reporter and
5   Certified Realtime Reporter, do hereby certify that the
6   foregoing transcript, from Page 1 Page 65, constitutes to the
7   best of my skill and ability a true and accurate transcription
8   of my stenographic notes taken in the matter of Civil Action
9   No. 1:02-CV-11280-RWZ, Ariad Pharmaceuticals, et al, vs. Eli
10  Lilly & Company.
11
12
13      _____
14      Lisa W. Starr, RPR,CRR,CSR
15
16
17
18
19
20
21
22
23
24
25

956f542b-f6f9-4460-8956-62e7e35bdd32

Ariad v. Eli Lilly                          Day 2, Session 2

4-11-06

Page 66

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 1:02-cv-11280-RWZ

ARIAD PHARMACEUTICALS, et al.,
            Plaintiffs

        vs.

ELI LILLY & COMPANY,
            Defendant

            *********************

            JURY TRIAL

        Day  2, Second Session

    BEFORE THE HONORABLE RYA W. ZOBEL
    UNITED STATES DISTRICT COURT JUDGE

        United States District Court
        John J. Moakley U.S. Courthouse
            1 Courthouse Way
        Boston, Massachusetts 02210
            April 11, 2006

            *******************

    REPORTER:  Loretta Hennessey, RPR, RMR
            Tel:  617-771-8336

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                    Day 2, Session 2
4-11-06

Page 67

1  APPEARANCES:
2  For the Plaintiff:
   Bromberg & Sunstein, LLP
3  (By Lee C. Bromberg, Esq., and
   Kerry L. Timbers, Esq.)
4  125 Summer Street
   Boston, Massachusetts 02110-1618
5
   -AND-
6
   Kay Scholer, LLP
7  (By Leora Ben-Ami, Esq.,
   Patricia A. Carson, Esq., and
8  Thomas F. Fleming, Esq.)
   425 Park Avenue
9  New York, New York 10022
10
11 For the Defendant:
   McDonnell Boehnen Hulbert & Berghoff LLP
12 (By Paul H. Berghoff, Esq.,
   Grantland G. Drutchas, Esq., and
13 David J. Frischkorn, Esq.)
   300 South Wacker Drive
14 Chicago, Illinois 60606-6709
15
16 Eli Lilly and Company
   (By Paul R. Cantrell, Esq.)
17 Associate General Patent Counsel
   Lilly Corporate Center
18 Indianapolis, IN 46285
19
20
21
22
23
24
25

Page 68

1          INDEX
2
       WITNESS    DIRECT CROSS REDIRECT RECROSS
3
4  Harvery Berger
5  (By Mr. Berghoff)        70          114
   (By Ms. Ben-Ami)              112
6
7  Phillip A. Sharp
   (By Ms. Carson)    115
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 69

1       P R O C E E D I N G S
2       (The following proceedings were held in open court
3  before The Honorable Rya W. Zobel, United States District
4  Judge, District of Massachusetts, at the John J. Moakley
5  United States Courthouse, 1 Courthouse Way, Boston,
6  Massachusetts, on April 11, 2006.)
7       THE CLERK:  Please be seated.
8       THE COURT:  May I ask counsel, when you get to
9  experts, would there be objection if I polled the jury if they
10 don't understand something, to raise their hand and ask, or
11 just tell us they didn't understand something.
12      MS. BEN-AMI:  Just to say "I didn't understand" so
13 they'll repeat it?
14      THE COURT:  Yes.
15      MS. BEN-AMI:  I think that's okay.
16      MR. BERGHOFF:  I see no problem with it.
17      MS. BEN-AMI:  Your Honor, I have --
18      THE COURT:  They probably won't.
19      MS. BEN-AMI:  I understand.  For the next witness,
20 for the next witness, your Honor, we're concerned about
21 something they may potentially be crossed-examined about.
22      THE COURT:  That's okay, we'll deal with it on the
23 record.  Isn't this an issue we dealt with before?
24      MS. BEN-AMI:  You gave some general rules and said
25 you'd deal with it as it came up.  It might come up, but I

Page 70

1  don't know.
2       THE COURT:  Please be seated.
3       (Jury arrives.)
4       THE COURT:  Mr. Berghoff, you may proceed.
5       MR. BERGHOFF:  Thank you, your Honor.
6       HARVEY BERGER, Continued Cross Examination
7  BY MR. BERGHOFF:
8  Q.  Dr. Berger, your salary at ARIAD?
9  A.  It's a little bit over $500,000 a year.
10 Q.  And you testified that you obtained a license under the
11 NF-kappaB patent applications from MIT in 1991 during your
12 direct testimony; is that correct?
13 A.  Yes.
14 Q.  And that was shortly after the company was founded, ARIAD
15 was founded?
16 A.  Yes.
17 Q.  Let's look, if we could, at the License Agreement.  Could
18 I have DTX 16, although I believe you have a different copy in
19 your binder.  Let's just use your copy, it's PTX 460, excuse
20 me.  This License Agreement contains what's called a "best
21 efforts" clause, does it not?
22 A.  Which clause are you looking at?
23 Q.  You can't remember whether it contains a best efforts
24 clause?
25 A.  Not exactly.  Would you refer me to what you're --

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                                    Day 2, Session 2
                              4-11-06

Page 71

1  Q. I will. Paragraph 3.1, which is on Page 6 of the
2  agreement.
3  A. Yes, I see.
4  Q. And if we could look at Paragraph 3.1.
5      This paragraph refers to "licensee," and am I correct
6  that that's ARIAD?
7  A. Yes, sir.
8  Q. And it says that "Licensee," or ARIAD, "shall use its
9  best efforts to bring one or more licensed products or
10 licensed processes to market through a thorough, vigorous and
11 diligent program for exploitation of the patent rights."  Do
12 you see that?
13 A. Yes, I do.
14 Q. And the patent rights that are being discussed here are
15 the NF-kappaB patent rights?
16 A. Yes, they are.
17 Q. And licensed products would be what, in your
18 understanding, Dr. Berger?
19 A. They would be products either discovered using the
20 technology or products whose use was covered by the technology
21 and patents.
22 Q. So products discovered using NF-kappaB, correct, would be
23 one part of licensed products?
24 A. Yes, sir.
25 Q. And the other part would be products that use NF-kappaB

Page 72

1  when they are administered to patients?
2  A. Yes, the method of treatment, applications that we've
3  discussed.
4  Q. And so this paragraph in your License Agreement with MIT
5  and the other universities imposed an obligation of ARIAD to
6  use its best efforts to bring NF-kappaB discovered products or
7  products that use NF-kappaB to market, correct?
8  A. Yes, sir.
9  Q. And ARIAD was under an obligation to bring those patents
10 to market through a thorough, vigorous and diligent program
11 for exploitation of the patent rights; am I right?
12 A. Yes. But it does not require ARIAD to be the only one to
13 do that.
14 Q. And, in fact, ARIAD has taken no steps, including through
15 today in 2006, to bring a licensed NF-kappaB product to
16 market, correct?
17 A. We have not done research to develop NF-kappaB
18 inhibitors, as I said earlier, and explained why, and we've
19 discussed that with the universities over many years, and the
20 reasons why, and have plans to do so, but also have plans to
21 license the technology broadly, which the universities were
22 quite pleased with that approach.
23 Q. And ARIAD, if I understand it, has never had, to date,
24 any type of research program in the NF-kappaB area?
25 A. Never to develop NF-kappaB inhibitors.

Page 73

1  Q. ARIAD has never done any research focused on identifying
2  compounds or drugs based on their effect on NF-kappaB,
3  correct?
4  A. Right, that's the same thing.
5  Q. And you've done no research at ARIAD to identify
6  compounds or drugs that might help patients by using NF-kappaB
7  technology?
8  A. We have not, as I've said, we have not had a program to
9  date on developing NF-kappaB inhibitors.
10 Q. And decisions about ARIAD's research programs from the
11 very beginning through today have been made at ARIAD in
12 conjunction with a Scientific Advisory Board; is that correct?
13 A. No, sir, that's wrong.
14 Q. And how is it wrong?
15 A. The Scientific Advisory Board is a group of advisors that
16 have worked with us individually, at times; as a group, at
17 times. In the past about five or six years, really since
18 1999, we have largely used the scientific advisors on an
19 individual basis, particularly to give advice on specific
20 scientific questions. But the Scientific Advisory Board has
21 absolutely no role in setting our policies, our direction or
22 the focus of our R&D activities.
23 Q. And never has, is your testimony?
24 A. And never has, yes.
25 Q. And Dr. Baltimore is currently a member of your

Page 74

1  Scientific Advisory Board?
2  A. Yes, he is.
3  Q. And he has always been a member of your Scientific
4  Advisory Board?
5  A. Yes.
6  Q. So you have always at ARIAD had access to Dr. Baltimore
7  to ask any questions —
8  A. Certainly.
9  Q. — about proceeding with an NF-kappaB research program,
10 correct?
11 A. Yes.
12 Q. And is it my understanding that since 1991 when ARIAD was
13 founded, that ARIAD has never conducted a single test on
14 anything for NF-kappaB activity?
15 A. We have done no experiments on trying to develop
16 NF-kappaB inhibitors, although we have had work for many years
17 that involves NF-kappaB itself, and NF-kappaB is an important
18 part of some of our other technology, such as our Argent gene
19 regulation therapy. So we have done experimentation and
20 research on NF-kappaB, just not the discovery of drugs that
21 are NF-kappaB inhibitors.
22 Q. So it's your testimony that ARIAD has done NF-kappaB
23 tests?
24 A. We have done work with NF-kappaB because NF-kappaB is
25 included as part of our technology, one of our other

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                          Day 2, Session 2
4-11-06

---

Page 75

1  technologies, but we have never done assays or tests per se as
2  you're describing them on NF-kappaB.
3  Q.  Okay.  Now, you talked during your direct testimony about
4  the purpose of the Bayh-Doyle Act.  Do you recall that
5  testimony?
6  A.  Yes.
7  Q.  And I believe the gist of your testimony was that under
8  the Bayh-Doyle Act, the government wants to encourage the
9  commercialization of technology developed by universities?
10 A.  Yes, in general terms, yes.
11 Q.  And you have not, at ARIAD, commercialized the NF-kappaB
12 technology in any way?
13 A.  What we've done is completely consistent with the goals
14 of the Bayh-Doyle Act, which is to move towards
15 commercialization of that technology:  That can be through
16 further licensing, that can be through collaboration, or that
17 can be through our own internal research.  All of those,
18 really -- and the universities agree -- are fully consistent
19 both with their, the universities' objectives, as well as the
20 Bayh-Doyle Act.
21 Q.  And is this lawsuit furthering the interests of the
22 Bayh-Doyle Act?
23 A.  I don't think I would say it's directly furthering the
24 Bayh-Doyle Act, but certainly it is certainly fully supportive
25 of the objectives of the universities and ARIAD to broadly

---

Page 76

1  license the technology and to be sure that value is created
2  and that innovation is fostered.
3  Q.  Now, you said that when you started up ARIAD in 1991,
4  that ARIAD didn't have any drugs.  Do you recall that
5  testimony?
6  A.  Yes.
7  Q.  And that was one of the reasons that you didn't start an
8  NF-kappaB research program?
9  A.  No, I think you've misrepresented what I said.
10 Q.  Well, I certainly didn't mean to, so please clarify.
11 A.  By the example you gave, the illustration that you put
12 up, you showed examples of large libraries, tens of thousands
13 of compounds, that could be screened to potentially find lead
14 molecules that might turn into drugs, and whether it's 20,000
15 or 2 million compounds is a matter of debate, and the
16 evolution of technology.  But what I said is when we started
17 the company, and in our early years, we didn't have large
18 chemical libraries, those were largely the purview of major
19 pharmaceutical companies that had made libraries for screening
20 for many decades.
21         When we were starting, we needed to come up with
22 alternative ways of either, through chemistry, sophisticated
23 chemistry or other strategies to develop our drugs, but large
24 libraries which would have been amenable to discovering
25 NF-kappaB inhibitors like Evista might have, we didn't have at

---

Page 77

1  that time.
2  Q.  And so, just so I'm clear, it's your testimony that you
3  need to start with a large library of compounds in order to
4  find a single NF-kappaB inhibitor?
5  A.  No, that's also not correct.  Our focus at ARIAD is the
6  development of chemicals, small molecule drugs.  That's been a
7  theme throughout our history.
8         There are different types of drugs, as you know, from
9  small molecule to proteins such as Xigris, to monoclonal
10 antibodies.  And our selection in that portfolio of options
11 was small molecules because we were a company that was very
12 built on chemistry.  So the relevant example would be Evista,
13 not Xigris.
14        We weren't experts, and never have been, in the
15 development of proteins like insulin or Xigris or antibodies,
16 that's another way to make an NF-kappaB inhibitor.  That
17 wasn't in any way part of our business plan or our technical
18 capabilities.
19 Q.  So to find a small molecule drug like Evista or
20 raloxifene, you want the jury to understand that you need to
21 start with a large chemical library to find even that one?
22 A.  Well, that's the most common way of finding small
23 molecule drugs throughout the pharmaceutical industry.  There
24 are other ways, some of which we have pursued, but generally
25 to find small molecule, to find inhibitors of targets, one of

---

Page 78

1  the most common ways of doing that is with large libraries
2  that would have been relevant to the discovery of an NF-kappaB
3  inhibitor.
4  Q.  In 1991 when you founded the company, you did have access
5  to the NF-kappaB patent applications of plaintiffs, did you
6  not?
7  A.  Yes.
8  Q.  And those applications did not identify any small
9  molecule inhibitors of NF-kappaB that you could have started
10 your research with?
11 A.  They identify other NF-kappaB inhibitors that were very
12 well defined, and those were things that we considered.  When
13 I licensed the technology in August of 1991, ARIAD had been in
14 business for about three or four months.  So over the ensuing
15 12 to 18 months, we put together and crystallized the strategy
16 for how we were going to develop our drugs, and it has evolved
17 and changed over time.  But certainly at the time we licensed
18 the technology, we were still determining how we were going to
19 go, whether it was going to be limited to small molecules,
20 whether we were going to make proteins.  We didn't know that,
21 because at that point I was the only employee.
22 Q.  And so in 1991 and thereafter, there were no small
23 molecules identified in plaintiffs' patent applications that
24 you could have used in an NF-kappaB research program; is that
25 correct?

---

4  (Pages 75 to 78)

Ariad v. Eli Lilly                                    Day 2, Session 2

4-11-06

---

Page 79

1  A.  Well, there were molecules identified that we could use
2  to model.  There were what are called NF-kappaB decoys.
3  Q.  Is that a small molecule?
4  A.  No, but it's something that you can use based on
5  evolving, growing technology that's been developed, you could
6  use that to model as the basis for developing drugs that mimic
7  or look like parts of it, and our understanding of how to do
8  that evolved.
9      Keep in mind that in 1991, this was the infancy of
10  the small, of the cell signaling field for companies, and
11  NF-kappaB was the first, among the first of the new cell
12  signaling targets for which new therapeutic interventions had
13  been proposed.  And the original patents taught us that you
14  could block NF-kappaB, they taught us that there were various
15  different ways of doing it, various places to do it.
16      It then took time over the years to look at what were
17  the best ways of doing it, and it was not just limited to us.
18  Lilly had ways of doing it, other companies have ways of doing
19  it.
20      We were very limited in terms of funding, in terms of
21  research capabilities, so we had to pick things that we
22  thought we could reasonably easily.
23  Q.  Dr. Berger, it's a simple question.  Your research was
24  focusing on small molecules, raloxifene being an example of a
25  small molecule.  And the patent applications of plaintiffs

---

Page 80

1  didn't identify a single small molecule that's an NF-kappaB
2  inhibitor, did it?
3  A.  I don't remember if it did a single example, but what it
4  had was many examples of NF-kappaB inhibitors --
5  Q.  None of which are small molecules?
6  A.  -- that could be used to develop both small molecule
7  drugs as well as proteins.
8  Q.  But you at ARIAD did not use any of the inhibitors
9  disclosed in the patent applications to start a research
10  program?
11  A.  We did not, that's right, because we had to prioritize to
12  other things that we thought we could do faster.
13  Q.  And you gave top priority to everything about NF-kappaB,
14  correct?
15  A.  No, we gave a great deal of thought and evaluation to
16  using the NF-kappaB technology and have on many instances.
17  And now that our technology has evolved, and we have libraries
18  and a greater understanding of how to develop drugs based on
19  our successes and experience over the last decade, we're now
20  positioned to do that, but we weren't early on because we were
21  just a start-up.
22  Q.  And early on during this entire 15-year period from 1991
23  when you obtained the license to today, you have had access to
24  Dr. Baltimore, one of the inventors, to help you identify
25  NF-kappaB inhibitors that you could have used in a research

---

Page 81

1  program, correct?
2  A.  That's not the way research is done.
3  Q.  But you did have access to him to ask him --
4  A.  Certainly.
5  Q.  -- "What NF-kappaB inhibitor should we use, Dr.
6  Baltimore?"
7  A.  That's not the right question to ask.  That has nothing
8  to do --
9      THE COURT:  I think you've answered it.
10  Q.  And you didn't ask that question of Dr. Baltimore?
11  A.  We had lots of discussions with Dr. Baltimore about how
12  to pursue NF-kappaB and when and which and using which
13  technologies, and we're now in a position to do that going
14  forward, but we haven't done it in the past.
15  Q.  And ARIAD has never paid royalties to MIT based on any
16  product of ARIAD's?
17  A.  Not based on product sales.  We've made payments to MIT
18  and the universities under the license, but not for product
19  sales.
20  Q.  And you haven't made any milestone payments to MIT under
21  the License Agreement.
22  A.  I don't believe so, no.
23  Q.  And you haven't paid any royalties to MIT under the
24  NF-kappaB patents or patent applications?
25  A.  We've made payments, I don't know how I would

---

Page 82

1  characterize them because I would have to go back and look,
2  but we've made multiple payments to the universities as parts
3  of the successful licenses with Bristol Myers Squibb, so that
4  part of those funds have gone to MIT.  Whether they're
5  characterized as royalties or license payments, I just don't
6  recall, but payments have been made.
7  Q.  And the Bristol Myers Squibb license does not include
8  rights to the patent in suit, correct?
9  A.  That's correct.
10  Q.  So ARIAD has not paid any royalties to MIT under the
11  patent in suit?
12  A.  Not royalties, yes, that's correct.
13  Q.  And you haven't paid any royalties to MIT under the
14  patent in suit because you believe you have no obligation to
15  do so at ARIAD, correct?
16  A.  No, we have obligations to pay royalties for products
17  that are covered by the patents or through our licensing
18  effort, which as you know, in the amendments to this agreement
19  the university has supported completely as meeting our
20  diligence obligations.
21  Q.  But you don't owe them any royalties as of today because
22  you haven't used the NF-kappaB technology?
23  A.  We don't owe them royalties, correct.
24  Q.  Now, your hope is that the compound that's in Phase II
25  clinical trials at ARIAD will be successful; is that correct?

---

5  (Pages 79 to 82)

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                          Day 2, Session 2

4-11-06

## Page 83

1  A.  Certainly.
2  Q.  And you're hoping it will be on the market in the coming
3  years and will have a successful run of sales for you,
4  correct?
5  A.  Yes.
6  Q.  And, yet, because ARIAD has never done a single test for
7  NF-kappaB activity, you don't know whether that compound has
8  any effect on NF-kappaB activity or not, do you?
9  A.  That's correct.  If it does --
10     THE COURT:  You've answered the question.
11     THE WITNESS:  Okay.
12  Q.  And you haven't bothered to test it to date?
13  A.  We don't have NF-kappaB assays at ARIAD that would allow
14  us to evaluate whether or not it does or does not block
15  NF-kappaB activity.
16  Q.  You don't even have a way -- you don't even have a test
17  at ARIAD for NF-kappaB in the whole company?
18  A.  That's correct.  We have experiments with NF-kappaB that
19  we have done, but not assays that will let you test the
20  compound because that's not what we have been doing.
21  Q.  Now, ARIAD sent a whole series of letters out to
22  pharmaceutical companies relating to the NF-kappaB technology;
23  is that correct?
24  A.  Yes.
25  Q.  And you basically got the list of companies you sent

## Page 84

1  letters to by just looking at pharmaceutical companies in
2  general and seeing who was working in the NF-kappaB area?
3  A.  We looked at the scientific literature.  We did, you
4  know, essentially looked at that, looked at some public
5  information from companies, but to really determine who was
6  working on NF-kappaB inhibitors would require access to
7  information we just plain didn't have.
8  Q.  Let's look at what we've marked as DTX 58.
9     MR. BERGHOFF:  May I approach?
10     THE COURT:  Yes.
11     MR. BERGHOFF:  Your Honor, just a protocol for
12  exhibits.  This is really the first new one with the witness.
13  I should give a copy to Dr. Berger and then two to your clerk
14  or hand one up to you directly?
15     THE COURT:  You can give them to my clerk, she
16  decides if I need to read them, she'll hand them to me.
17     MR. BERGHOFF:  Very good.
18  Q.  Do you recognize this document, Dr. Berger?
19  A.  Yes, I do.
20  Q.  And this document relates to a board of directors meeting
21  at ARIAD --
22  A.  Yes.
23  Q.  -- in December of 2001?
24  A.  Yes.
25  Q.  And you attended this meeting, did you not?

## Page 85

1  A.  Yes.
2  Q.  And if we could go up just a little higher on the first
3  page.  That's your handwriting on the first page, "Berger"?
4  A.  Yes, it is.
5  Q.  So this is your copy of the document?
6  A.  Yes, it is.
7  Q.  Could you turn with me -- and the document does not have
8  easy page numbers on it, but it's the long number at the
9  bottom that starts 460.
10  A.  Yes.
11  Q.  We'll just wait for a moment for that to come up.
12     If we could look at the top portion of the page.
13  This portion of the document from the board of directors
14  meeting is about licensing and partnering, correct?
15  A.  Yes, it is.
16  Q.  Who is Fritz Casselman?
17  A.  He was at the time our head of business development.
18  Q.  Can we look at the next page of the document, Dr. Berger.
19  This is 461 on the bottom.  And the bottom section.
20     Do you see the word "redacted" there?
21  A.  Yes.
22  Q.  Do you know what was there before your lawyers hid it?
23  A.  Yes --
24     MS. BEN-AMI:  Objection, your Honor.
25     THE COURT:  Members of the jury, there were

## Page 86

1  agreements between the parties that certain highly
2  confidential stuff would be taken out.  There are other
3  reasons why it may be taken out.  But in any event, both
4  parties did this to each other, so it's not a hiding of
5  things, it's just -- well, in a sense it is, but it's just
6  ensuring that only relative information that is not
7  confidential is before you.
8     MR. BERGHOFF:  Yes, and I agree with that entirely.
9  Q.  Do you know what was there?
10  A.  I have no recollection.  I have no idea.
11  Q.  This summarizes, this page summarizes the letters that
12  ARIAD wrote to various companies; is that your understanding,
13  Dr. Berger?
14  A.  These are the words of Fritz Casselman, it wasn't my
15  presentation.  In general terms it certainly appears largely
16  correct.
17  Q.  And is it your recollection that ARIAD sent about 25
18  letters in May 2000 to various pharmaceutical companies based
19  on the 1998 NF-kappaB patent?
20  A.  Yes.
21  Q.  And that's not the patent in suit; is that correct?
22  A.  That's correct.
23  Q.  And one of those letters was sent to Lilly?
24  A.  That's right.
25  Q.  And the comment below that is that ARIAD received

6 (Pages 83 to 86)

Ariad v. Eli Lilly                          Day 2, Session 2

4-11-06

## Page 87

1  virtually no response to these 25 letters; is that your
2  recollection?
3  A.  We received a variety of different responses at that
4  time, ranging from brief responses to more comprehensive
5  responses.  It was all over the map.
6  Q.  So you don't disagree with the characterization here that
7  ARIAD received virtually no response to its letters in May of
8  2000?
9  A.  I'm not sure I would characterize it with those words
10 since I wrote the letter and got the responses, but it was a
11 broad range of different responses.
12 Q.  And then the document goes on to indicate that another 40
13 letters were sent in February, 2001 based on the 2000 patent?
14 A.  Yes.
15     THE COURT:  Is this a patent having to do with
16 nuclear factor kappa B?
17     THE WITNESS:  Yes, it's probably the second of the
18 three patents, it's not the '516 patent.
19     MR. BERGHOFF:  And that was my next question.
20 Q.  These letters did not address the patent in suit?
21 A.  They addressed many of the claims that ultimately became
22 the '516 patent.  They included specific reference to those
23 claims.
24 Q.  And during your testimony, I didn't notice a copy of a
25 letter to Lilly in February, 2001; is that correct?

## Page 88

1  A.  We clearly sent a letter to Lilly at this time in the
2  group.  I know because I was involved in sending it out.  And
3  what I suspect happened was we had a list of companies to whom
4  the letters went, didn't keep copies of each and every one of
5  the letters.  But I'm sure a letter was sent to Mr. Thompson
6  at Lilly.
7  Q.  Though you don't have a copy of it today?
8  A.  As I said, I don't have copies of any of the letters,
9  because I think we only kept one sample letter, which I think
10 has been provided.
11 Q.  Could we look at DTX 69.  This was something referred to
12 during your direct testimony, Dr. Berger, so you should have
13 it there.
14 A.  What is the number of this?
15 Q.  DTX 69, it's a single page.  Do you have that in front of
16 you?
17 A.  Yes, I do.
18 Q.  I believe your testimony on direct was that this document
19 had been sent to Lilly.  Do you recall that?
20 A.  Yes, I believe it has.
21 Q.  But there's no indication anywhere on this exhibit that
22 it was sent to Lilly, is there?
23 A.  This is a term sheet summary of terms that was provided
24 broadly to many different companies.  None of the companies
25 had one specifically with their name on it, so I can't from

## Page 89

1  this document be a hundred percent sure that this, that this
2  was what was sent to Lilly, but certainly I recall that we
3  sent the exact same letter to all the companies.
4  Q.  Well, this isn't a letter, is it?
5  A.  No, I meant it was an attachment to the letter.
6  Q.  But there's no evidence on this exhibit itself that this
7  was ever sent to Lilly?
8  A.  That's correct.
9     THE COURT:  Let's stretch.
10     (Pause.)
11 Q.  Could we go back to where we were in this Exhibit DTX 58,
12 to Page 461, at the bottom portion.
13     Is it fair to characterize the response reported in
14 this document to your February, 2001 letters as mixed?
15 A.  Yes.
16 Q.  And, again, this patent, the 2000 patent is not the one
17 that you've sued Lilly on?
18 A.  That's correct.
19 Q.  Let's go to the next page of this document at the top.
20 What was your understanding at the time of the meeting as to
21 the term "lead players" referred to on this page?
22 A.  These were companies that we had identified that had done
23 research on NF-kappaB, in some instances might have NF-kappaB
24 products.
25     It was a mix really to show, as I recall, the board

## Page 90

1  that some of the major companies in the industry were working
2  in the area of NF-kappaB in one way, shape or form.  Not that
3  they all had NF-kappaB products, but these were companies that
4  had done research in NF-kappaB.
5  Q.  How many of these companies do you remember thinking had
6  NF-kappaB products at the time?
7  A.  We never did that analysis.  You know, in order do that
8  analysis, you have to look specifically at the individual
9  products and how the use of that product relates to the claims
10 of a patent, and we hadn't then done it nor have we done it
11 since.  We have focused on Eli Lilly.
12 Q.  And you would need to test those products to see if they
13 in fact produce NF-kappaB activity, wouldn't you, Dr. Berger?
14 A.  No, I don't think we would.  I think it really depends on
15 analysis of what the companies have said about the products
16 and what research the company has done and published about
17 their products.
18 Q.  Let's go to the bottom section of this page.
19     What do you understand the reference to "marketed and
20 late-stage products" to be.
21 A.  These were marketed and late-stage products, that means
22 products either being sold someplace, U.S. or Europe, or were
23 in the later stages of clinical development, and they had been
24 identified as products that might fit within the group of
25 those that had, for which there were publications on

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                                    Day 2, Session 2

4-11-06

Page 91

1  NF-kappaB; but we had not done an analysis then and we still
2  haven't done that analysis on whether any or all of these
3  products are actually covered by our patents.
4  Q.  Well, let's look at the first bullet, "Sepsis." That
5  identifies Xigris, and Eli Lilly and notes it was "just
6  launched" and gives a sales estimate range from one billion to
7  two and a half billion?
8  A.  Right.
9  Q.  And so ARIAD, as of 2001, as of this board meeting in
10  December, 2001, was quite interested in the amount of sales of
11  these drugs that might or might not use NF-kappaB?
12  A.  That was largely to provide some context to our board of
13  directors.  Not every member of our board has experience in
14  pharmaceuticals.  They vary from professors and scientists to
15  financial folks to those who understand pharmaceutical
16  marketing and sales.  So it's of no value to provide to the
17  board the name of a product without what is known in the
18  public about it.  Those were the public, publicly available
19  estimates of what Xigris's sales were estimated to be, either
20  from analysts or from Lilly's own publications and statements.
21  I don't recall which it was based on.  But it's to frame the
22  product, to give it some perspective.
23     You know, Gleevec and Novartis, that's not a lot of
24  sales for the first half a year.  So it's not all big numbers.
25  It varies all over to give a benchmark for directors who don't

Page 92

1  have a breadth of experience to, in all areas that they deal
2  with to be able to understand these products.
3  Q.  And the purpose was to give a perspective to the board of
4  directors so they knew how much money ARIAD could ask for from
5  all of these companies --
6  A.  No.
7  Q.  -- as an infringement of this patent, correct?
8  A.  No, these were estimates.  These were publicly available
9  estimates.
10    When you present to a board of directors as a small
11  company, you need to be sure that the directors understand
12  what's known publicly about a topic, about what you're doing,
13  and Xigris as an example, was a product that both analysts and
14  Lilly were putting forth as a blockbuster, multibillion-dollar
15  drug.  That was known to some directors, not to others.  We
16  needed to level the playing field among the board.
17    There are no statements with respect to
18  Osteoprotegrin and bone disease, Amgen's product.  By all
19  accounts that may be a much bigger product, but we didn't say
20  anything because it wasn't relevant to what we needed to
21  explain to the directors.
22  Q.  And the Amgen product wasn't on the market yet as of this
23  time, was it?
24  A.  No.
25  Q.  So it didn't have any sales?

Page 93

1  A.  Excuse me?
2  Q.  It didn't have any sales?
3  A.  The Lilly product didn't have much sales at that time
4  either, it had just been launched, if I recall correctly.
5  Q.  Under "Oncology," the first item has an estimated peak
6  sales of one billion dollars, is that correct, the first
7  product?
8  A.  Yes.
9  Q.  And under "Bone Disease," there's an Amgen product that's
10  not listed as being on the market.  Evista's not listed here,
11  is it?
12  A.  No, it's not.
13  Q.  And Evista is certainly a drug for bone disease?
14  A.  Right.  But the third category was really focused in on
15  Amgen much more as an example.  That was not meant to be all
16  examples or comprehensive, it was merely examples to help
17  educate our directors on what the potential of NF-kappaB was
18  in terms of its utility, its role in different products.  It
19  was not meant to lay out our estimates of sales, our estimates
20  of royalties, that's not what this was aimed at.
21  Q.  ARIAD had an osteoporosis drug that it was working on at
22  one time, didn't it?
23  A.  We had an osteoporosis program, yes.
24  Q.  And what happened to that program?
25  A.  We, we didn't succeed at getting the compound that we

Page 94

1  wanted that had just the right profile, so we in early 2000 we
2  made the decision to focus all of our research activities,
3  virtually all of them in the cancer area, and our osteoporosis
4  product and work then got shifted over to bone metastases, the
5  same technology that has utility in both metastases, that's
6  the spread of cancer to bone, so we used that technology in
7  various programs that are still ongoing.
8  Q.  And that drug was not identified using NF-kappaB?
9  A.  No, it wasn't.
10  Q.  And you never tested to see if it reduces NF-kappaB
11  activity?
12  A.  No, we didn't.
13  Q.  Even though it was originally the focus of your research
14  to use it for osteoporosis?
15  A.  Not all of osteoporosis equals NF-kappaB.
16  Q.  Let's look at the next page of this document, the top
17  portion.  The first category on this page is "TNF-alpha
18  anti-inflammatories."  Do you see that?
19  A.  Yes, I do.
20  Q.  The purpose of this part of the presentation to the board
21  of directors was to convey to them that these kind of drugs
22  may use NF-kappaB, correct?
23  A.  Just as in the prior slides, a continuation of the prior
24  slide, these are other categories of drugs that were being
25  developed or marketed by different companies that may work by

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                                    Day 2, Session 2
4-11-06

---

**Page 95**

1  NF-kappaB --
2  Q.  May?
3  A.  May.
4      -- merely to give examples of the classes of drugs
5  that if we went further to assess that, we would look at
6  those.
7  Q.  And so TNF anti-inflammatories may reduce NF-kappaB
8  activity; is that your testimony?
9  A.  No.  No, that's not what I said.  I said that TNF
10 anti-inflammatories, these examples, may or may not be
11 NF-kappaB inhibitors.  We have not done the analysis or
12 evaluation of any of the products on this list, because you
13 have to look at the claims, look at the specifications and
14 look at the actual drug.
15 Q.  The sales listed here of the top two TNF-alpha
16 anti-inflammatories are over a billion dollars; correct?
17 A.  Yes, that's correct.
18 Q.  And the next category are COX-2 anti-inflammatories?
19 A.  Yes.
20 Q.  Vioxx and Celebrex being on the list?
21 A.  Yes.
22 Q.  And Vioxx is listed as having estimated sales of one
23 billion dollars?
24 A.  Yes.
25 Q.  And Celebrex having three billion dollars?

---

**Page 96**

1  A.  Yes.
2  Q.  And this information was given to your board of directors
3  to let them know just how big a pot of gold you were planning
4  to go after, correct?
5  A.  I can't --
6      THE COURT:  I think you can keep asking the same
7  question and the witness keeps giving you the same answer,
8  which is not the one you're looking for, so maybe we can just
9  skip over the next one.
10 Q.  Is Ibuprofen a COX-2 anti-inflammatory?
11     MS. BEN-AMI:  I think we're getting into expert
12 testimony, your Honor, on some other topics.
13     MR. BERGHOFF:  Dr. Berger can say he doesn't know.
14 A.  I don't know.
15 Q.  Before you sent the letters out to all of these companies
16 that we've seen in this document, and you didn't test any of
17 their products --
18 A.  No, we didn't.
19 Q.  -- to see if they reduce NF-kappaB activity?
20 A.  No, we didn't.
21 Q.  And that includes Lilly's products in suit here, correct?
22 A.  That's correct.
23 Q.  You never tested either of the products before you filed
24 suit to see if they reduced NF-kappaB activity in fact?
25 A.  We were relying on Lilly's own research, Lilly's

---

**Page 97**

1  representation to the scientific community and to the Patent
2  Office.  There's a big difference between Lilly's scientists
3  putting it out there and saying the drugs inhibit NF-kappaB
4  and some random academic who might do an experiment on a drug
5  and publish it but isn't representing the company that
6  developed the drug.  So the Lilly circumstance was different.
7  Q.  And when you filed suit against Lilly in this case, you
8  didn't know how Lilly's drugs had been invented by them or
9  developed; is that correct?
10 A.  I don't think it's germane to the question of whether or
11 not they infringe --
12     THE COURT:  I think, Mr. Berger, if you were just to
13 answer the question yes or no or you can't answer it, we might
14 progress faster.
15     THE WITNESS:  Okay.  Could you repeat the question?
16 Q.  At the time ARIAD sued Lilly in this case charging Evista
17 and Xigris with infringement, you didn't know how Lilly had
18 invented either of those drugs or developed them; is that
19 correct?
20 A.  No, we knew what was published in the literature.
21 Q.  But you didn't know how Lilly had first discovered those
22 drugs, correct?
23 A.  Only to the extent --
24     THE COURT:  The answer is either yes or no or that
25 you can't answer it.  Among other things, consider if you do

---

**Page 98**

1  that, you will stymie Mr. Berghoff.
2  A.  So I don't know.
3  Q.  Let's look at the letter you sent to Lilly in May of
4  2000, if we could.  It's DTX 944.  Oh, it's your PTX 327.
5  There are many exhibits that are marked by both sides, so they
6  have duplicate numbers.
7      We have DTX 944 up on the screen here.  I represent
8  to you it's the same document, Dr. Berger.  Now we have PTX,
9  through the miracle of technology.
10     This letter to Mr. Thompson, who you say you were
11 acquainted with?
12 A.  Yes.
13 Q.  Never specifically identifies either Evista or Xigris,
14 correct?
15 A.  Correct.
16 Q.  Could we look at the top of Page 2 of this exhibit and
17 that very first partial paragraph.
18     Your letter to Mr. Thompson states that "these
19 patents and patent applications," and these were the NF-kappaB
20 patent applications and patents that existed at that time?
21 A.  Yes.
22 Q.  It doesn't include the patent in suit yet, of course,
23 right?
24 A.  Right.
25 Q.  "These patents cover various nonsteroidal

---

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                                    Day 2, Session 2

4-11-06

---

**Page 99**

1  anti-inflammatory drugs in development such as COX inhibitors,
2  prostaglandins and IkB kinase inhibitors." Now, neither Lilly
3  drug in suit here, Evista or Xigris, is a COX inhibitor, is
4  it?
5  A.  That's correct.
6  Q.  And neither of the drugs in suit are prostaglandins, are
7  they?
8  A.  That's right.
9  Q.  And neither are I-kappaB inhibitors?
10 A.  That's right.
11 Q.  So this letter didn't say: We're looking at Evista or
12 Xigris, right?
13 A.  This was in 2000, before the Joyce Grinnell paper came
14 out, which is what really led us specifically to focus on
15 Evista, excuse me, Xigris, excuse me.
16        And I would also add --
17        THE COURT: No, no, don't add.
18        MR. BERGHOFF: Thank you, your Honor.
19 Q.  So from this letter, Lilly would have no idea that you
20 were considering Xigris or Evista to be infringing on
21 anything?
22 A.  We were not alleging infringement of any particular
23 product.  We were offering a license and left it up to the
24 individual companies to evaluate and decide whether they need
25 a license.

---

**Page 100**

1  Q.  Dr. Berger, I'd like to show you a copy of the complaint
2  that ARIAD filed against Eli Lilly in this case.
3        THE COURT: I think we have a copy.
4        MR. BERGHOFF: Yes, your Honor.
5  Q.  Can we look at Page 6 of the complaint. Well, first --
6        MS. BEN-AMI: Your Honor, I would ask that at this
7  point, your Honor, I believe that there's a 403 issue.
8        THE COURT: I'm sorry?
9        MS. BEN-AMI: There may be a 403 issue at this point.
10       MR. BERGHOFF: I'm going to point to specific factual
11 allegations in the complaint. I can't imagine.
12       MS. BEN-AMI: If that's all that he does. We'll see,
13 your Honor.
14       THE COURT: The complaint, members of the jury, is
15 the way a lawsuit is started. In it the lawyers on behalf of
16 a client usually, although sometimes the client himself does
17 it, sets out the names of the parties, what the lawsuit is
18 about in a very short way, the names of all the parties, the
19 plaintiffs, defendants. It has a statement of the
20 jurisdiction of the court saying why the case belongs into
21 this court, and then it has a series of facts; and eventually
22 it says, it gives various specific legal claims, therefore the
23 defendant violated claim 1, therefore the defendant committed
24 defamation, or whatever the claim is, and there's also then a
25 claim for money, usually gazillions, in every case.

---

**Page 101**

1  Q.  Dr. Berger, you recognize this as the complaint for
2  patent infringement that ARIAD filed against Eli Lilly?
3  A.  Yes, I do.
4  Q.  Let's look at Paragraph 26 of the complaint, which is on
5  Page 6.
6        And in this Paragraph 26, ARIAD's complaint states
7  that "Plaintiffs have previously sought to initiate
8  discussions with Lilly concerning a license to plaintiffs'
9  NF-kappaB patent estate.  Defendant Lilly has failed to
10 respond to these efforts."  Do you see that statement?
11 A.  Yes, I do.
12 Q.  And, in fact, Lilly sent you three letters in response to
13 your May, 2000 letter; isn't that correct?
14 A.  Yes.
15 Q.  So this is not an accurate statement in the complaint?
16 A.  No, sir, you're wrong.  It is an accurate statement.
17       THE COURT: Is this a verified complaint?
18       MR. BERGHOFF: I don't believe so, your Honor. I'm
19 not sure, complaints --
20       THE COURT: A verified complaint is one to which a
21 party swears that the statements are true.  Most of the
22 complaints are prepared by lawyers and set out what the lawyer
23 understands the issues to be or the facts to be.
24 Q.  Now, Dr. Berger, ARIAD never sent a letter to Lilly
25 specifically about the '516 patent that's in suit here, did

---

**Page 102**

1  it?
2  A.  That's correct.
3  Q.  And ARIAD never sent Lilly a copy of the claims from that
4  patent application when they were allowed by the Patent
5  Office, did they?
6  A.  We did not sent them to Lilly or to anyone else.
7  Q.  And those claims were allowed in October of 2000?
8  A.  No, that's much earlier, I think they were allowed late
9  in 2001.
10 Q.  Oh, excuse me, I misspoke.  Yes.  I was thinking 2001 and
11 I said 2000.  Thank you.
12       They were allowed in October of 2001?
13 A.  I don't recall the exact month, but it was late in 2001.
14 Q.  And the reason that you didn't send the allowed claims to
15 Lilly at that point in late 2001 was that it was part of your
16 litigation strategy, correct?
17 A.  No, sir, that's wrong.  We had not decided --
18       THE COURT: Hup.
19       THE WITNESS: I'm sorry.
20 Q.  So the reason you didn't send Lilly a copy of the allowed
21 claims had nothing to do with the fact that you had already
22 decided to sue Lilly?
23 A.  That's correct.
24 Q.  Why did ARIAD not send a letter about the '516 patent to
25 Lilly after it was allowed?

---

10 (Pages 99 to 102)

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                          Day 2, Session 2
                          4-11-06

---

Page 103

1  A.  We didn't send a letter to anyone until after the claims
2  issued.  We had made the decision -- excuse me, I didn't say
3  that correctly.
4      We didn't send a letter to Lilly at that time because
5  we had made a decision, once the claims were issued, at that
6  time we had already made the decision to file a lawsuit
7  against Lilly.  We were worried what Lilly might do, Lilly
8  being a very large company, we're being a small company, if
9  they had an opportunity to look at the patent or to look at
10 the claims before the patent had issued.  We just had no idea
11 what Lilly might do, and so we had made the decision, based on
12 many factors, but not the least of which is the publications
13 and the patents from Lilly's research labs, that our best
14 approach at the time was to initiate a lawsuit.
15 Q.  So it was part of your litigation strategy not to send
16 Eli Lilly a copy of the allowed claims before the patent
17 issued, correct?
18 A.  You're mixing up the timing.  You asked me about the
19 prior year.
20      As we got very close to the issuance of the patent,
21 and we didn't know when it was going to issue, yes, at that
22 time, just before it issued, we had made the decision to file
23 a lawsuit.  But earlier when the claims were allowed back in
24 the prior year and in the early months, we didn't provide the
25 claims to anyone, including Lilly, and we hadn't decided to

---

Page 104

1  sue Lilly.
2  Q.  So at the point that the claims were allowed by the
3  Patent Office in late 2001, you had not made the decision to
4  initiate the lawsuit; is that your testimony?
5  A.  To the best of my recollection.  I don't think we had
6  made it by that time.
7  Q.  Do you recall being deposed in this case, Dr. Berger?
8  A.  Yes, I do.
9  Q.  On two occasions.
10 A.  Yes.
11 Q.  One of which was in September of 2004?
12     MR. BERGHOFF:  Your Honor, we have video clips of
13 depositions, and should I also give the witness a copy of the
14 transcript or should we just watch the video?
15     MS. BEN-AMI:  Your Honor, I think both the witness
16 and I need a copy of the transcript.
17     MR. BERGHOFF:  Fine.
18     THE COURT:  Members of the jury, I told you earlier
19 about depositions being part of the process of getting
20 information about the case.  Once the deposition is taken, it
21 may be used in the trial for a number of different things.
22 You will hear some witnesses give testimony by having their
23 deposition testimony read back.  Witnesses are sometimes not
24 available and then counsel, under certain circumstances, have
25 the right to offer the testimony of the witness by reading the

---

Page 105

1  deposition.  As best as I can tell so far from having reviewed
2  three of these, they're not going to inundate you with those,
3  because they really are difficult to listen to, but counsel
4  have been very sparse in that.
5      Another way in which depositions can be used is by
6  pointing you to testimony given during the deposition that
7  they say is different from the testimony that the witness has
8  given here to you directly.
9      Now, one of the major functions that you will perform
10 as you deliberate on your verdict is to determine whether you
11 believe what the witness has told you.  And you will do that
12 based on a number of factors that you know has to be taken
13 into account when someone tells you a story and you decide
14 whether you believe it or not, and one of the ways in which
15 counsel wish to effect your determination of the believability
16 of the witness is by pointing out that the witness has given
17 inconsistent answers at different times.
18      Now, when they do that, you have two functions:  One
19 is to determine whether there is indeed an inconsistency, did
20 the witness give a different answer on an earlier occasion
21 from the answer that the witness gave now.  And then the
22 second job you have with respect to that is if there was a
23 different answer the first time, does it affect your judgment
24 of the believability of the witness.  So just keep that in
25 mind as you are pointed to these earlier snippets of

---

Page 106

1  testimony.
2      MR. BERGHOFF:  Thank you, your Honor.
3  Q.  Just so we have the question framed again, Dr. Berger --
4      THE COURT:  I didn't mean to do interrupt.
5      MR. BERGHOFF:  No, your instructions were very good,
6  and this is the first time we've had that.
7      THE COURT:  Thank you.
8  Q.  ARIAD did not send a letter about the allowed claims of
9  the '516 patent to Lilly because at that point it had made the
10 decision to sue Lilly; isn't that correct?
11 A.  When?  I don't understand when you're talking about.
12 Q.  When the claims were allowed in late 2001, as you recall.
13 A.  To the best of my recollection, in late 2001 when the
14 claims were allowed, meaning that we were given a set of the
15 claims that were likely to ultimately become official at that
16 point in time, we had not made the final decision as to how,
17 what to do with that patent and whether we would sue Lilly.
18 Q.  And you recall being deposed in this case on September
19 10, 2004?
20 A.  Yes, I do.
21 Q.  And you recall that your testimony was under oath at that
22 point?
23 A.  Yes, I do.
24 Q.  Could you turn to Page 228 of the deposition transcript,
25 starting at lines 15, and then we will play now for the jury

---

11 (Pages 103 to 106)

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                                    Day 2, Session 2
                        4-11-06

| Page 107 | Page 109 |
|---|---|

**Page 107**

1  with your Honor's permission, the video version of that
2  testimony.
3      (Video played.)
4  Q.  Were you asked that question and did you give that answer
5  under oath, Dr. Berger, at your deposition?
6  A.  Yes, I did.
7  Q.  Now, ARIAD has never licensed the '516 patent; is that
8  correct?
9  A.  That's correct.
10  Q.  And it issued in June of 2002?
11  A.  Yes.
12  Q.  And nobody has taken a license under it in the almost
13  four years since then?
14  A.  Yes, that's true.
15  Q.  And in this case you are asking that Lilly pay ARIAD over
16  $100 million in damages; is that correct?
17  A.  What we ask, what we have asked is a four percent royalty
18  on Lilly sales in the United States since the date of issuance
19  of the patent, which is June of 2002.
20  Q.  And my question was, are you asking Lilly for more than
21  $100 million in damages in this case?
22  A.  Yes, we are.
23  Q.  Dr. Berger, I'm going to hand you what we have marked as
24  DTX 2186, and I'll ask if you can identify what this document
25  is?

**Page 108**

1  A.  This document is our most recent annual report filed with
2  the SEC.
3  Q.  And it's headed on the first page, if we can have the
4  first page, it's headed "Form 10-K." What does that refer to?
5  A.  That's the SEC form number that's used for filing an
6  annual report.
7  Q.  And this was filed in March of this year?
8  A.  Yes, it was.
9  Q.  And you signed this report to the SEC on behalf of ARIAD?
10  A.  Along with our chief financial officer, yes.
11  Q.  And this form 10-K is, by law, supposed to be accurate?
12  A.  Yes, it is.
13  Q.  And the SEC is what?
14  A.  It's part of the government that's called the Securities
15  and Exchange Commission.
16  Q.  And they're in charge of being sure that the financial
17  statements about publicly-traded companies are accurate?
18  A.  Among other things, yes.
19  Q.  And ARIAD is a publicly-traded company?
20  A.  Yes, we are.
21  Q.  I think you had mentioned you have stock in ARIAD.
22      Let's turn to page 27 of this exhibit, if we could.
23  And let's look in the second paragraph towards the bottom of
24  that paragraph. If we could blow that up without losing the
25  edges. Just a little smaller, I think. Whoops. A little

**Page 109**

1  smaller. We'll just have to -- I'm pretty sure we can read
2  it.
3      Do you see the second paragraph on this page, Dr.
4  Berger?
5  A.  Yes, I do.
6  Q.  Do you see the next to the last sentence on this page, if
7  we could highlight that, the "net book value." This page
8  reports to the SEC that the "net book value as of December 31,
9  2005 of intangible assets related to our NF-kappaB technology
10  is $456,000." Do you see that --
11  A.  Yes, I do.
12  Q.  -- Dr. Berger?
13      And the NF-kappaB technology being referred to are
14  the patents that you're licensed under from MIT?
15  A.  Yes.
16  Q.  And could we look at the next sentence. Nick will have
17  to go back to that.
18      After stating that "the net book value of the
19  intangible assets related to our NF-kappaB technology is
20  $456,000," ARIAD's annual report to the SEC goes on to note
21  that, "If the patentability of our NF-kappaB patents is
22  successfully challenged and such patents are subsequently
23  narrowed, invalidated or circumvented, we may be required to
24  write off some or all of the net book value related to such
25  technology." Do you see that?

**Page 110**

1  A.  Yes, I do.
2  Q.  And the intangible assets related to "our NF-kappaB
3  technology" referred to in this report to the SEC are the
4  patents and patent applications licensed to you from MIT, are
5  they not?
6  A.  I'm not sure how the net book value is calculated, so I
7  can't really speak to that, to exactly what that term means.
8  Q.  So you have no understanding in this document that you
9  signed as CEO of ARIAD, you have no understanding what's being
10  referred to by "the intangible assets related to our NF-kappaB
11  technology"?
12  A.  That's not what I said. The intangible assets I'm sure
13  are the NF-kappaB patents. What I did say, what I said is I
14  didn't know exactly how the net book value is calculated.
15  Q.  But it's stated to be $456,000?
16  A.  I'm sure it's correct.
17  Q.  So ARIAD's been the exclusive licensee under these
18  patents since 1991, correct?
19  A.  Yes.
20  Q.  ARIAD's never used the technology related to NF-kappaB,
21  correct?
22  A.  We haven't done experiments internally, yes.
23  Q.  Never even a single test to see if anything reduced
24  NF-kappaB activity?
25  A.  That's correct.

12  (Pages 107 to 110)

Ariad v. Eli Lilly                          Day 2, Session 2

4-11-06

---

Page 111

1  Q.  Even though Dr. Baltimore has always been on your
2  Scientific Advisory Board, correct?
3  A.  Yes.
4  Q.  You told the SEC that the net book value of the NF-kappaB
5  patents and patent applications was --
6      THE COURT:  It's not clear to me why you need to
7  repeat all that.
8  Q.  -- was just a little bit over $450,000; is that
9  correct?
10 A.  I just made that statement, yes.
11 Q.  And, yet, you want more than $100 million from Eli Lilly
12 in this case?
13 A.  We want what we think is fair based on royalties that are
14 industry standard for this type of intellectual property that
15 we have fairly licensed from the universities.
16     MR. BERGHOFF:  Your Honor, if I could offer into
17 evidence at this point the exhibits, the new exhibits that I
18 used.
19     THE COURT:  They are not agreed exhibits?
20     MR. BERGHOFF:  I don't know if these are agreed or
21 not.  Why don't we check with counsel.
22     THE COURT:  Thank you.
23     MR. BERGHOFF:  We'll do that as housekeeping at the
24 end of the day.  No further questions at this time.
25     THE COURT:  Do you have redirect?

---

Page 112

1      MS. BEN-AMI:  Two.
2          REDIRECT EXAMINATION
3  BY MS. BEN-AMI:
4  Q.  Dr. Berger -- can I do that from here to save time -- Dr.
5  Berger, you have the '516 patent PTX Exhibit 1?
6  A.  Yes, I do, somewhere in here.  Yes.
7  Q.  I just wanted to clarify something.  There was a
8  discussion about screening.  And does the patent talk about
9  screening for drugs?
10     THE COURT:  What's the question?
11 Q.  I'd like to ask you to look at column 18.
12 A.  Yes, I have it.
13 Q.  Can you read to the jury the title of the section
14 starting at 52?
15 A.  "Improved DNA binding assay with enhanced sensitivity
16 for identification of regulatory factors."
17 Q.  Did you, in the two patents -- it's going to be more than
18 two questions, your Honor, it may be five.
19     The related patents to the '516 --
20 A.  Yes.
21 Q.  -- do they share a lot of the language that's in the
22 '516?
23 A.  Yes, a great deal.
24 Q.  And without getting into details, what are those patents
25 on?

---

Page 113

1  A.  The first two patents that predated the '516 patent are
2  about assays, tests that can be done to screen compounds to
3  identify NF-kappaB inhibitors.
4  Q.  Would you look at the license that was PTX 460.
5  A.  Yes.
6  Q.  I'd like you to look at the second -- there is an
7  amendment that is -- if you look at the little numbers on the
8  bottom, they end in 189?
9  A.  Yes, I have that.
10 Q.  Would you look at amendment to section 3.1.
11 A.  Yes.
12     MS. BEN-AMI:  Could you blow that up, please.
13 Q.  Would you explain that section for the jury, please.
14 A.  This is an amendment, meaning an update to the original
15 license that was signed in 1991, signed by the university, MIT
16 in particular, with ARIAD, to make it clear that commercially
17 reasonable efforts, due diligence, best efforts, as it has
18 been described earlier, by licensee, that's us, to grant
19 sublicenses to companies that licensee reasonably believes are
20 engaged or will engage in such activities shall be adequate to
21 meet our obligations under the license.
22     So our efforts on behalf of the universities to
23 license the technology to many different companies, to pursue
24 those licenses, meets our diligent obligations under the
25 license.  So we've met the obligations that we've signed up

---

Page 114

1  to.
2  Q.  Now, finally, there was cross-examination about whether
3  you in fact contacted Lilly in 2001?
4  A.  Yes.
5  Q.  And counsel said that there was no evidence.  But you're
6  testifying, your recollection -- what is your evidence?
7  A.  My clear recollection is that we sent a letter to Lilly
8  at the time the second batch of letters went out, and that
9  because I knew Dave Thompson, the head of licensing, had met
10 him in the past, that I followed up, as we did with many
11 companies, but I followed up specifically, placed the call to
12 his office, left a message that it was following up on the
13 letter, never heard back from him.
14 Q.  And in the three years plus since the case has started,
15 has Mr. Thompson ever called you up and said, "Gee, Harvey,
16 I've heard you said this, you know, you never called me?"
17 A.  Never.
18     MS. BEN-AMI:  No further questions.
19     THE COURT:  Any recross?
20     MR. BERGHOFF:  Just on this last new point.
21         RECROSS EXAMINATION
22 BY MR. BERGHOFF:
23 Q.  You never picked up the phone before you sued Lilly and
24 called your friend Mr. Thompson at Lilly to say, "Just a heads
25 up, we're going to be suing you," did you?

---

13  (Pages 111 to 114)

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                                    Day 2, Session 2

4-11-06

---

Page 115

1    A.  Why should I do that?  No.
2         THE COURT:  The answer is no?
3         THE WITNESS:  No.
4         MR. BERGHOFF:  Thank you.
5         THE COURT:  Thank you, Mr. Berger.  You're excused.
6    Who is next?
7         MS. BEN-AMI:  Dr. Sharp is next, and we're going to
8    switch lawyers.
9         THE COURT:  Okay, and we stretch.
10        THE CLERK:  Please be stated and spell your full name
11   for the record.
12        THE WITNESS:  Phillip A. Sharp, S-H-A-R-P.
13             PHILLIP A. SHARP, Sworn
14             DIRECT EXAMINATION
15   BY MS. CARSON:
16   Q.  Ladies and gentlemen of the jury --
17        THE COURT:  Hold it.  Phillip, how many L's?
18        THE WITNESS:  One L.
19        THE COURT:  S-H-A-R-P, no E?
20        THE WITNESS:  No E.
21   BY MS. CARSON:
22   Q.  Ladies and gentlemen of the jury, before we start with
23   Dr. Sharp's testimony, I just wanted to give you an overview
24   of what Dr. Sharp is going to be talking about today.
25        As you've heard, the '516 invention arose from a

---

Page 116

1    collaboration among a number of scientists, and at Harvard,
2    MIT and the Whitehead Institute.  Dr. Sharp is one of the
3    scientists that was involved in that collaboration from MIT.
4    And what Dr. Sharp's going to do today is review some general
5    biological concepts that are going to help you understand the
6    case going forward.  He's also going to describe the
7    pioneering science that gave rise to the invention that's
8    claimed in the '516 patent.
9         Now, Dr. Sharp is not going to get into a detailed
10   explanation of the invention, another one of the inventors,
11   Dr. Manlaitis from Harvard will be here tomorrow to tell you
12   about that.
13        THE COURT:  Members of the jury, if in the course of
14   these explanations by not only Mr. Sharp but any other witness
15   you find yourself at sea and don't understand, raise your
16   hand, and then we can ask the witness to explain again what it
17   is that isn't clear.
18   Q.  Dr. Sharp, could you please introduce yourself to the
19   jury?
20   A.  As I said, Phillip A. Sharp, and I'm a professor at MIT.
21   Q.  Dr. Sharp, if you could turn to PTX 001, and that's the
22   first document that's in your binder.  Can you identify this
23   document for the jury?
24   A.  This is patent '516, which has inventors of myself, Dave
25   Baltimore, Tom Manlaitis and a number of colleagues.

---

Page 117

1    Q.  Before we go any further and talk about the '516 patent
2    and the science, I'd like to give the jury a little bit of
3    background about you.
4         Where did you grow up?
5    A.  I grew up in Kentucky on a farm.
6    Q.  And how did you become interested in science?
7    A.  Well, I was interested in science and math as a kid in
8    high school there, and then as I went to a small college in
9    the mountains of Kentucky, I continued my interest in math and
10   science and then discovered in college that I thought I could
11   go to graduate school, and launched on into graduate school.
12        It was while I was in graduate school and as an
13   undergrad that I read Jim Watson's book about molecular
14   biology and DNA and became fascinated about this field, and
15   continued to evolve my research interest into molecular
16   biology.
17   Q.  Can you tell the jury who Jim Watson is?
18   A.  Jim Watson is of the fame of Watson and Crick.  They
19   discovered the structure of DNA in 1953, and that really
20   launched what is modern cell biology and molecular biology.
21   Q.  Now, Dr. Sharp -- could you please put up PTX 1001,
22   please.
23        Dr. Sharp, could you please explain what's shown on
24   the board to the jury?
25   A.  Well, this is an electron micrograph of DNA.  You see

---

Page 118

1    this long linear -- I think I have a laser here.  You see this
2    long linear line?  That's a micrograph of the DNA.  It's
3    magnified about a million-fold.
4         This particular micrograph is one I'm very fond of
5    because it's these three loops here that taught me that we
6    have an unusual gene structure in our cells and was the basis
7    of the Nobel Prize I received.
8    Q.  Is this how DNA is found in the body?
9    A.  No, DNA in the body is found in a very compact form in
10   the nucleus of the cell, so it is not extended in that form.
11   Q.  And can you tell the jury what they're looking at now?
12   A.  This is a picture of a single cell.  It has been
13   sectioned through the middle of the cell so you can see the
14   interior of it.  This cell is too small to see by your own
15   eye.  And if I point out, this is the surface of the cell, and
16   it's covered with an oily membrane that keeps water out and
17   water and salts in.  And then there's the cytoplasm of the
18   cell here where metabolism occurs and lots of other
19   activities.  And then this is the nucleus of the cell which
20   again has a membrane around it, but the membrane has holes in
21   it, and it's in the nucleus of the cell that the DNA exists.
22   Q.  Now, how much DNA is actually found in the nucleus of a
23   cell?
24   A.  It's surprising.  Even though that cell is so small that
25   you can't see it with your naked eye, if I take the DNA from

---

14  (Pages 115 to 118)

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                          Day 2, Session 2
                    4-11-06

| Page 119 | Page 121 |
|---|---|

**Page 119**

1 one of those cells and put it end to end, it's about that
2 long. (Indicating.) So it's a very long, very thin
3 substance.
4 Q. And, Dr. Sharp, how many cells make up the human body?
5 A. Oh, trillions and trillions, and many of them just too
6 vast to actually talk about. They're too small to be seen.
7 Q. Dr. Sharp, could you please explain to the jury what
8 they're looking at here?
9 A. Well, we've just made a schematic of the cell, and to
10 make it a little simpler to point out a few issues, this outer
11 surface is that membrane I mentioned. Again, it's an oily
12 impermeable membrane to water and salt. And then in the
13 interior of the membrane is the cytoplasm of the cell, that's
14 that area there where metabolism occurs. And there's the
15 nucleus of the cell here. And the graphics should shoot up
16 something in the nucleus.
17     THE COURT: Can you tell us what you mean by
18 metabolism occurs?
19     THE WITNESS: Metabolism is where glucose is utilized
20 by proteins and other factors to make energy. So the
21 energy-generating portion of the cell is the cytoplasm of the
22 cell. And the nucleus is basically where the genetic material
23 is stored and copied when the cell divides and used to make
24 proteins.
25 Q. Now, I see that you have three colored items in there

**Page 120**

1 labeled "genes." How many genes are actually present in the
2 nucleus?
3 A. Well, it's somewhat debated, but for humans it's
4 somewhere between 20 and 30,000 genes as we now picture our
5 genetic material. So different genes code for different
6 proteins, so 20 or 30,000 different functional activities.
7 Q. Now, how do genes code for different proteins?
8 A. Well, in this case, as illustrated, these three genes are
9 making a linear protein, a Y-shaped protein and a Pac-Man-type
10 protein, and they're functional proteins that have different
11 activities in the cell.
12     The information to make these different proteins is
13 the sequence of the DNA that's of four letters that I think is
14 shown on the next graphic.
15 Q. Before we move to the next graphic, can you just tell me
16 whether or not the genes that are present in the cell are
17 always making proteins?
18 A. No. Genes are turned on and off. If you think about it,
19 every cell in your body essentially has the same set of genes,
20 and yet when you look at your skin cells, they differ from
21 your blood cells, your red blood cells. And the difference
22 between those two cells is that even though they have the same
23 set of genes, different genes are being turned on and off in
24 those two cells.
25     The same thing can be true when something assaults a

**Page 121**

1 cell: The cell can then turn on a gene if it needs to use
2 that gene product to survive. So the genes are regulated.
3 Q. And if we could just go back, you were going to explain
4 how the cell knows what protein to make from the DNA?
5 A. I would like the next addition to that graphic.
6     So as I pointed out before, these wavy lines are
7 indications of DNA. What's shown down here at the bottom is
8 the actual structure of DNA. You see these two strands,
9 they're interwoven, they run in opposite directions, and
10 they're connected like your two hands with a hand and glove by
11 four chemical entities. This is T, G, C and A, and it's those
12 four letters that actually, their order determines the
13 information in the gene. You read them three at a time.
14     So the functional different proteins here are
15 specified in these different genes by different orders of
16 these four bases. And it's that order read three at a time
17 and translated into protein that make these different proteins
18 and different functions in the cell.
19 Q. Now, I believe you said that the genes are not always
20 turned on in a given cell, correct?
21 A. That's right.
22 Q. Can you explain how that process works?
23 A. Well, there's specific switches that regulate genes,
24 illustrated here by a light switch. And there are sequences
25 near genes that control where they are expressed. And these

**Page 122**

1 sequences are recognized by factors, which we'll discuss
2 later, and they can turn on and off genes.
3     In this case, a bacteria touches a cell, a signal is
4 sent to turn on the gene. The gene in this case is making an
5 antibody, which is what circulates in our body to protect us
6 against bacteria, and in this case the antibody is secreted or
7 exits from the cell and would attack the bacteria and
8 therefore neutralize or destroy the bacteria.
9     So the bacteria sends a signal, turns on the gene,
10 the gene makes the antibody, the antibody destroys the
11 bacteria. Genes are responsive to, can be responsive to
12 external stimuli.
13     THE COURT: How do the antibodies get through the
14 membrane without poking a hole in it?
15     THE WITNESS: They have a very sophisticated
16 biochemical mechanism that recognizes one end of the antibody
17 protein as being made and secretes it across a pore in this
18 membrane out to the exterior of the cell. So that's a very
19 complicated machinery, but basically transports it across that
20 oily membrane to the exterior of the cell.
21 Q. Now, Dr. Sharp, before we go any further with the
22 science, if you could turn to PTX 415 that's in your book.
23 And can you tell me if that's a copy of your CV?
24 A. Yes, it is.
25 Q. Now, is this a current CV?

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                          Day 2, Session 2

4-11-06

## Page 123

1  A.  Well, there may be a few recent papers, but by and large
2  it's a current copy of my CV.
3  Q.  Based on your CV, I see in the early 1970s you worked at
4  Cold Spring Harbor Laboratories.  What is Cold Spring Harbor
5  Laboratories?
6  A.  Cold Spring Harbor Laboratories is a research laboratory
7  on the North Shore of Long Island, it was started about a
8  hundred years ago, and it is seen as one of the birth places
9  of molecular biology.  Jim Watson worked at Cold Spring Harbor
10  in the summer, went for courses and meetings that are held
11  every summer there, so it's one of the great institutes of
12  research in the country.
13  Q.  And why did you decide to go to Cold Spring Harbor to do
14  research?
15  A.  When I was at Cal Tech as a post-doctoral fellow, I
16  wanted to further my understanding and training in the
17  structure of genes that are expressed in human cells, and I
18  contacted two laboratories, one was Dave Baltimore's, who was
19  at MIT at that time, and the other was Jim Watson, who was at
20  Cold Spring Harbor.  They both -- Baltimore's lab was full.
21  Jim called me the next day and asked me if I could come, so I
22  went to Cold Spring Harbor as a post-doctoral fellow, and then
23  went on staff there one year later and became a staff member.
24  Q.  When did you leave Cold Spring Harbor?
25  A.  I left Cold Spring Harbor in 1974, three years after I

## Page 124

1  went there.
2  Q.  Why did you decide to leave Cold Spring Harbor
3  Laboratories?
4  A.  Well, I had a great deal of fun and was very productive
5  there, but I wanted to get back to a university environment
6  with students and have the sort of mix of things that happen
7  at universities like MIT; and I also wanted to be close to
8  chemists and physicists, which Cold Spring Harbor did not
9  have, primarily it was biologists.
10  Q.  So there came a time when you left Cold Spring Harbor and
11  went to MIT, correct?
12  A.  I went to MIT in 1974.  The Center for Cancer Research at
13  MIT had just been built, and I was offered a position down the
14  hall from Dave Baltimore's lab.  So I was able to, again --
15  well, not again -- join an environment in which Dave Baltimore
16  was part of, and I've been there ever since.
17  Q.  Now, did you work with David Baltimore when you started
18  at MIT?
19  A.  Our labs, as I just mentioned, were close to one another,
20  and we've had common interests since the time I moved there.
21  So over a number of years, I've collaborated with Dave,
22  starting shortly after I went there, and then throughout the
23  twenty years that we were at MIT together.
24  Q.  Dr. Sharp, could you please tell the jury what this
25  picture is of?

## Page 125

1  A.  This is a picture of myself and Dave Baltimore over here
2  to the left and Bob Weinberg, about 1984, '85, it's in the
3  lobby of the Whitehead, cause that's a Stella painting behind
4  it, and you can tell I'm considerably younger because my beard
5  is dark there, and it's not quite like it is now.  So this is
6  twenty years ago, and David and I and Bob Weinberg were
7  talking.
8  Q.  How did you come to collaborate with Dr. Baltimore on the
9  work that lead to the '516 patent?
10  A.  I was particularly interested in how genes were turned on
11  and turned off.  I wanted to understand the biochemistry and
12  the chemistry of that process.  And David was interested in
13  the B cell activity of how antibodies were made.  They were of
14  great medical importance, they protect us against viruses and
15  other things and cause disease in some states.
16         So I started to develop the science of analysis of
17  factors that control genes, and I used the antibody gene for
18  that study.  And David was specifically interested in the
19  regulation of the antibody gene in B cells.
20  Q.  Before we discuss the scientific work that you performed
21  in that collaboration, were there any other scientists that
22  were involved at the time?
23  A.  Yes.  Two young colleagues just joined our labs.
24  Harinder Singh was a post-doctoral fellow in my lab and Ranjan
25  Sin a post-doctoral fellow in Dave's lab, so they really were

## Page 126

1  critical investigators in the early labs.
2  Q.  Let's go back to the substance of the collaboration.
3         Can you tell the jury what the collaboration set out
4  to learn?
5  A.  Well, it's illustrated here, we've seen this before, but
6  again the cell, and this is the nucleus and this is the
7  antibody gene.  And what we were interested in in the
8  collaboration was identifying the nature of the switch that
9  turned on and controlled whether the antibody gene was being
10  expressed to make these antibodies.  So we were interested in
11  identifying the nature of the factors that bound to DNA and
12  activate the gene.
13  Q.  And before we get into the specifics, generally what did
14  you learn?
15  A.  We generally learned that an important component of the
16  regulation of the antibody gene was a factor called NF-kappaB,
17  which Dave Baltimore named, nuclear factor, because it's a
18  nuclear factor, factor in the nucleus; kappa, because this
19  antibody gene, there are many of them, but the kappa was the
20  one we were studying; and B for B cells.  So it's nuclear
21  factor kappa B.
22  Q.  Dr. Sharp, if you could just explain the mechanism that's
23  depicted in these next few slides for the jury, please.
24  A.  Well, this is how nuclear factor kappa B is regulated.
25  Again I show here the membrane of the cell, but in this case

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                                  Day 2, Session 2

4-11-06

---

Page 127

1  there's a receptor that spans that membrane. And when there
2  is, as I picture here, a threat to the cell, a bacteria, for
3  example, interacts with this receptor, there's an induction
4  signal that's sent into the cell.
5      Here's the NF-kappaB activity, these two green balls,
6  and then this yellow oblong ball is I-kappaB, inhibitor of
7  kappa B. And the signal is sent into the cell and there it
8  induces the release of I-kappaB from NF-kappaB. And when
9  I-kappaB, inhibitor of kappa B, is released, NF-kappaB moves
10 to the nucleus and binds to a specific set of DNA sequencers.
11     I pointed out those Gs, As, Ts and Cs. Well, this is
12 a very specific example of those. It's near the antibody
13 gene, and by nuclear factor, NF-kappaB binding there, what is
14 called recognition sequences, it then activates expression of
15 the antibody gene, and that turns the gene on by its binding
16 and other components. That makes a message, which is just a
17 blueprint of the gene, a copy of the gene, and that then is
18 used to make the protein that's exited from the cell and would
19 neutralize the bacteria.
20 Q. And what you've just shown here, is this the information
21 that was derived as a result of the collaboration that you had
22 with Dr. Baltimore?
23 A. Yes, in essence that's the information that came out of
24 that collaboration.
25     MS. CARSON: Your Honor, with your permission, we

Page 128

1  have a board prepared that I'd like Dr. Sharp to use to walk
2  the jury through this.
3  Q. Dr. Sharp, if you could just take the jury through that
4  discovery of the light switch mechanism again that you just
5  described?
6  A. So it's the same mechanism I just outlined. There's
7  actually three different steps: There is one step in which a
8  component interacts with a receptor on the cell, it's in this
9  membrane. There are many receptors. This is a specific
10 receptor, different for different components. That receptor,
11 when it's bound, will undergo a change, and that will send a
12 signal into the cell that then causes the dissociation of this
13 inhibitor of NF-kappaB protein as a component of three
14 proteins, as pictured here, small, large, small unit of
15 NF-kappaB and I-kappaB.
16     The I-kappaB is released, then the two proteins that
17 are the NF-kappaB would move to the nucleus. Because they're
18 held in the cytoplasm by I-kappaB, they move into the nucleus
19 of the cell. There they find the DNA, specifically the DNA
20 for the gene -- there are many thousands and thousands of
21 genes -- but they find the DNA for this gene using that DNA
22 sequence. And that DNA sequence only occurs at a few places,
23 and where it occurs, NF-kappaB will bind to it. And by
24 binding to that specific sequence, again much like a hand and
25 glove, two chemical complementary surfaces, it will then

Page 129

1  activate the gene, meaning the gene will be copied because
2  this is bound into these blueprints, and many blueprints will
3  be made from the gene, so one gene will make thousands of
4  blueprints.
5      Then you get the blueprint coming out to the
6  cytoplasm where it makes, in this case it would be the
7  antibody gene, and that antibody gene would be secreted from
8  the cell as it's made and then come back and neutralize the
9  bacteria. So there's an induction step, there's the
10 translocation to the nucleus, there's the activation of the
11 gene. That is all part of how NF-kappaB, how the research
12 that David and I and others were involved in identified
13 NF-kappaB as a factor that regulates genes, in this case the
14 antibody gene.
15     THE COURT: How long does it take from the time that
16 there's the threat to the cell to the escape of the antibody
17 from the cell?
18     THE WITNESS: To actually get the translocation of
19 the NF-kappaB to the nucleus can occur in seconds.
20     To build up enough copies of the gene as a blueprint
21 to make enough antibody requires a few hours to get a full,
22 fully developed secretion of antibodies from the cell.
23     MS. BEN-AMI: Your Honor, I'm not sure that all the
24 jurors can see the board. Perhaps he can move.
25     THE COURT: He's finished explaining, I think.

Page 130

1      MS. BEN-AMI: Okay. Too late.
2  Q. Dr. Sharp, the pathway -- you may be seated. The pathway
3  that you just described, is that anywhere found in the '516
4  patent?
5  A. Yes, it's described in '516 in column 15. This shows the
6  patent, the column 15 is this yellow, and that's blown up
7  here, and as you see in column 15, it says "nuclear factor B
8  acts as an intracellular messenger." "Intracellular" means
9  it's within a cell, it doesn't move outside the cell. And the
10 model which ties together these observations is that NF-kappaB
11 is initially located in the cytoplasm in a form unable to bind
12 DNA because it is complexed with I-kappaB. Various inducers
13 then cause an alteration in I-kappaB allowing NF-kappaB to be
14 released from the complex. Free NF-kappaB then travels to the
15 nucleus and interacts with its DNA recognition sites, that's
16 that specific sequence that I pointed out there, to facilitate
17 gene transcription. And that's the word we use to describe
18 turning on the gene. So this is a description of that
19 schematic and those steps.
20     THE COURT: I think we will elaborate tomorrow.
21     Members of the jury, thank you very much, you're
22 excused until nine o'clock tomorrow morning, and I really do
23 thank you for having been on time this morning.
24     (Adjourned, 1:00 p.m.)
25     CERTIFICATE.

17 (Pages 127 to 130)

Ariad v. Eli Lilly                    Day 2, Session 2
                        4-11-06

Page 131

1          I, Loretta Hennessey, Registered Merit Reporter and
2    Certified Realtime Reporter, do hereby certify that the
3    foregoing transcript, from page 66 to page 131, constitutes to
4    the best of my skill and ability a true and accurate
5    transcription of my stenotype notes taken in the matter of
6    C.A. 1:02-cv-11280-RWZ, Ariad Pharmaceuticals, et al., vs Eli
7    Lilly Company.
8
9
10   April 11, 2006
11                Loretta Hennessey, RMR, CRR
12
13
14
15
16
17
18
19
20
21
22
23
24
25

c12758ab-360b-4054-8a87-fa07a78ebed0

# EXHIBIT C

*Berger*



# ARIAD PHARMACEUTICALS, INC.

## BOARD OF DIRECTORS MEETING

December 18, 2001

**ARIAD Pharmaceuticals, Inc.**
26 Landsdowne Street
Cambridge, Massachusetts 02139

***CONFIDENTIAL***

NO FURTHER DISTRIBUTION





Confidential Information Under Protective Order

ADL 0032454

**Agenda for ARIAD Board of Directors Meeting**

**Tuesday, December 18, 2001**

9:30 am        Coffee and Refreshments

10:00 am      Board of Directors Meeting

- Approval of minutes of prior meeting

- Resignation of Tamar Howson from the Board   *tab 10*
  *John D ( + Ray/Vaughn )*

- Review of recent milestones in lead product development
  programs   *tab 3*

- Presentation on intellectual property portfolio and patent
  enforcement strategy – David Berstein   *tab 4*

12:30 pm      Working Lunch with Senior Management

- Update on technology licensing and product partnering
  opportunities – Fritz Casselman

- Discussion and approval of 2002 Operating Plan – Brian Lajoie
  *tab 5*

2:45 pm        Break

3:00 pm        Executive Session (Directors only)

- Discussion and approval of stock option awards and bonuses

- Special awards for 10-year employees and directors

- Renewal of D&O insurance

- Reg FD Policy

- Other matters

3:45 pm        Adjourn

*Carmel – phone*
*Vaughn*
*Sandy*
*Ray – phone*
*Jay*
*Ralph*
*Ha*
*Jo*
*FC*
*DB*
*DM*
*MAC*

Confidential Information Under Protective Order          ADL 0032455



Confidential Information Under Protective Order     ADL 0032456

Redacted

12-18-01                                                            19

Redacted

12-18-01                                                            20

Confidential Information Under Protective Order          ADL 0032457

**Redacted**

12-10-01                                                      21

**Redacted**

12-18-01                                                      22

Redacted

12-18-01                                                                    23

Redacted

12-18-01                                                                    24

Confidential Information Under Protective Order          ADL 0032459

LICENSING AND PARTNERING

*Board of Directors Meeting*
*December 18, 2001*

Fritz Casselman

---

## Basic Elements

- Regulation Technology (RegTech) Licensing

- Product Partnering

- NF-κB Patent Licensing

12-18-01                                                                    32

Confidential Information Under Protective Order            ADL 0032460

**Redacted**

- Assay claims issued in 1998 and 2000

- Notice of allowance for product (use) claims

- Product claims warrant substantially higher royalties

- Near-term revenues possible from Lilly, Millennium

12-18-01                                                                                          33

**Redacted**

- ~ 25 letters sent in May 2000 based on 1998 patent
    - Virtually no response

- ~ 40 letters sent in February 2001 based on 2000 patent
    - Only BMS and Millennium expressed serious interest
    - Others (e.g., AHP and Tularik) made unacceptable proposals
    - Others profess no interest but are probably active
    - Others are probably inactive

12-18-01                                                                                          34

Confidential Information Under Protective Order                    ADL 0032461

## Lead Players

| | | | |
|---|---|---|---|
| Abbott | AHP | Amgen | Athersys |
| Aventis | Biogen | BMS | Celgene |
| Genentech | GSK | Isis | Immunex |
| J & J | Lilly | Merck | Millennium |
| Novartis | Pharmacia | Roche | Serono |
| Tularik | | | |

12-18-01                                                                 35

## Marketed and Late-Stage Products

- Sepsis
  - Xigris (Lilly):  Just launched. Sales estimates range from $1 to 2.5B
- Oncology
  - LDP-341 (Millennium):  Projected 2004 launch. Est. peak sales > $1B
  - Gleevec (Novartis) $86M in first five months
- Bone Disease
  - Osteoprotegerin (Amgen):  Bone metastases, osteoporosis in Phase II

12-18-01                                                                 36

Confidential Information Under Protective Order                    ADL 0032462

## Marketed and Late-Stage Products

- TNF-α anti-inflammatories
  - Enbrel (Immunex): 2001 sales est. > $750M
  - Remicade (J&J): 2001 sales est. ~$500M
  - D2E7 (Abbott): NDA projected 2Q02
  - CDP-870 (Pharmacia): Projected launch 2004
- COX-2 anti-inflammatories
  - Vioxx (Merck): 2001 sales est. $1B
  - Celebrex (Pharmacia): 2001 sales est. $3B
- Other anti-inflammatories
  - Kineret (Amgen): Just launched

12-18-01                                                         37

## Status of Negotiations

- BMS could close soon
  - Need to decide if economic terms are still acceptable
  - Royalty rates: ceiling or floor on litigation recovery?
  - Strategic field limitation may be issue
- Millennium wants a license but won't pay royalties on LDP-341 without seeing the product claims
  - Royalty buy-out possible after product claims issue
- Other parties on hold until product claims issue (1Q02)
- Strategic field restrictions

12-18-01                                                         38

Confidential Information Under Protective Order                    ADL 0032463

## Royalty Buy-Out Calculations – MLNM

|  | Downside | Mid | Upside |
|---|---|---|---|
| Peak Sales ($MM) | 539 | 802 | 1001 |
| Likelihood of success |  |  |  |
| Multiple Myeloma | 40% | 50% | 70% |
| CLL | 30% | 35% | 50% |
| Pancreatic | 20% | 25% | 35% |
| Other | 15% | 20% | 25% |
| Discount rate | 18% | 15% | 12% |
| Patent risk discount | 50% | 30% | 20% |
| Risk-adjusted NPV ($MM) | $5 | $15 | $38 |

12-18-01                                                                39

**Redacted**

12-18-01                                                                40

Confidential Information Under Protective Order

ADL 0032464

## 1Q02 Goals

- Select litigation counsel

- Complete enforcement analysis and action plan

- Patent issuance and associated press activity

12-18-01                                                          41

Confidential Information Under Protective Order          ADL 0032465

# EXHIBIT D



ARIAD

**BY FEDERAL EXPRESS**

June 25, 2002

Frank Ungemach
Senior Corporate Counsel
Amgen, Inc.
One Amgen Center Drive
Thousand Oaks, CA 91320-1799

Re:    Availability of Research License to Patents on Nuclear Factors Associated with
       Transcriptional Regulation (NF-κB)


Dear Frank:

We are pleased to announce the issuance by the United States Patent and Trademark
Office of our latest patent relating to NF-κB and IκB. This patent covers methods of
treating human disease by regulating NF-kB cell-signaling activity.

The newly issued patent contains more than 200 claims, and Claim 1, for example, reads
as follows:

> "A method for inhibiting expression, in a eukaryotic cell, of a gene whose
> transcription is regulated by NF-κB, the method comprising reducing NF-kB
> activity in the cell such that expression of said gene is inhibited."

A copy of the patent, No. 6,410,516, is available on the websites of the U.S.P.T.O.
(http://164.195.100.11/netahtml/srchnum.htm) and ARIAD
(http://www.ariad.com/patents). The patent was issued today and expires in 2019.
The '516 patent is issued to Massachusetts Institute of Technology, the Whitehead
Institute for Biomedical Research and Harvard University, and is exclusively licensed to
ARIAD (see enclosed press releases). It is from the same family of U.S. patents as Nos.
5,804,374 and 6,150,090, which cover methods of identifying and testing drugs that
modulate signal transduction through the NF-κB/IκB pathway, and is closely related to
European patents relating to the same methods. We have previously offered licenses to
these and related patents and patent applications (including '516) on terms that
reflected the status of our NF-κB patent portfolio at that time. In light of the issuance of

NF-κB Research License
June 25, 2002
Page 2

the '516 patent, previously offered terms and conditions for licenses to these patents are no longer appropriate and are accordingly withdrawn.

Attached is a term sheet for a non-exclusive research license enabling your company to use the methods covered by these patents for internal pharmaceutical research. The term sheet provides that, in the event you develop or have a product covered by the claims of our '516 patent (or foreign equivalents), we agree to negotiate a further agreement enabling the use and sale of that product under these patents on terms and conditions to be determined at that time. We have provided a sliding scale of license fees based on the research expenditures of potential licensees so that the fees reasonably relate to the relevant activity of each licensee and are affordable for all companies active in the field.

Please contact me if you are interested in obtaining a license or if you have any questions. We look forward to working with you and enabling your research.

Sincerely,

Fritz Casselman
Senior Vice President and
Chief Business Officer

617-494-0400 ext. 208
fritz.casselman@ariad.com

Enc:   Term sheet
       Press releases

FedEx | Ship Manager | Label7918 7057 1020                                    Page 1 of 1

From: Fritz Casselman (617)451-9900
ARIAD PHARMACEUTICALS
26 LANDSDOWNE STREET

CAMBRIDGE, MA, 02139

REVENUE BARCODE



**To: Frank Ungemach (805)447-2234**
**Amgen, Inc.**
**One Amgen Center Drive**

**Thousand Oaks, CA, 91320**

Ref: 205

SHIP DATE: 25JUN02
WEIGHT: 1 LBS



DELIVERY ADDRESS BARCODE(FEDEX-EDR)

TRK # 7918 7057 1020  FORM
0201

91320-CA-US

FedEx  STANDARD OVERNIGHT
BUR

XP JSNA

WED
A2
Deliver by:
26JUN02



---

## Shipping Label



1. Use the "Print" feature from your browser to send this page to your laser printer.
2. Fold the printed page along the horizontal line.
3. Place label in air waybill pouch and affix it to your shipment so that the barcode portion of the label can be read and sc

### Shipment Details

To print a copy of the shipment information for your records, please click "Shipment Details".



### Ship a New Package

Use of this system constitutes your agreement to the service conditions in the current FedEx service Guide, available upon request.
FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation,
unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide
apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other
forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual
documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide.
Written claims must be filed within strict time limits, see current FedEx Service Guide.

**Megan Rossetta**

| | |
|---|---|
| **From:** | sysdeliv@fn3a.prod.fedex.com |
| **Sent:** | Wednesday, June 26, 2002 1:03 PM |
| **To:** | Megan Rossetta |
| **Subject:** | FedEx shipment 791870571020 |

Our records indicate that the shipment sent from Fritz Casselman/ARIAD PHARMACEUTICALS
to Frank Ungemach/Amgen, Inc. has been delivered.
The package was delivered on 06/26/2002 at 9:52 AM and signed for
or released by S.SALGADO.

The ship date of the shipment was  06/25/2002.

The tracking number of this shipment was 791870571020.

Thank you for shipping with FedEx Ship Manager at FedEx.com. https://www.fedex.com/cgi-
bin/ship_it/interNetShip/

To track the status of this shipment on line click on the following:
http://www.fedex.com/cgi-bin/tracking?tracknumbers=791870571020
&action=track&language=english&cntry_code=us

Disclaimer
------------------------------------------------------------
FedEx has not validated the authenticity of any email address.