# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation; IMMUNEX
CORPORATION, a Washington corporation;
AMGEN USA INC., a Delaware corporation;
AMGEN MANUFACTURING, LIMITED, a
Bermuda Corporation, and IMMUNEX RHODE
ISLAND CORPORATION, a Delaware corporation,

Plaintiffs,

vs.

ARIAD PHARMACEUTICALS, INC., a Delaware
corporation,

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Civil Action No. 06-259**

**ORAL ARGUMENT REQUESTED**

---

### PLAINTIFFS' OPPOSITION TO ARIAD'S MOTION TO DISMISS FOR
### LACK OF SUBJECT MATTER JURISDICTION, FAILURE TO STATE A CLAIM,
### AND FAILURE TO JOIN INDISPENSABLE PARTIES

---

YOUNG CONAWAY STARGATT
& TAYLOR, LLP
Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6681
msharp@ycst.com

KIRKLAND & ELLIS LLP
Mark A. Pals
Marcus E. Sernel
Jamie H. McDole
200 East Randolph Drive
Chicago, IL 60601-6636
(312)861-2000

Drew Diamond
777 South Figueroa Street
Los Angeles, CA 90017-5800
(213)680-8400

*Attorneys for Plaintiffs Amgen, Inc., Immunex Corporation, Amgen USA, Inc., Amgen
Manufacturing, Limited, and Immunex Rhode Island Corporation*

Dated: June 28, 2006

**TABLE OF CONTENTS**

NATURE AND STAGE OF PROCEEDING     1

SUMMARY OF THE ARGUMENT     1

FACTUAL BACKGROUND     3

     I.     AMGEN AND ITS ENBREL AND KINERET PRODUCTS WERE CONFIRMED TO BE ON ARIAD'S LIST OF PATENT INFRINGEMENT LITIGATION TARGETS.........................................................3

     II.     ARIAD'S PRIOR CONDUCT HAD ALREADY MADE THE AMGEN ENTITIES AWARE THAT THEY WERE ON ARIAD'S LIST OF LITIGATION TARGETS.................................................................6

     III.     ARIAD SPECIFICALLY CONTACTED THE AMGEN ENTITIES TO SEND THE MESSAGE THAT THEY MUST TAKE A LICENSE TO THE '516 PATENT. ................................................................6

     IV.     ARIAD BROUGHT ITS NF-κB PORTFOLIO, INCLUDING THE '516 PATENT, TO THE ATTENTION OF THE AMGEN ENTITIES ON MULTIPLE OCCASIONS. ...............................................8

     V.     DEVELOPMENTS AFTER THE FILING OF AMGEN'S COMPLAINT CONFIRM THAT ITS APPREHENSION WAS NOT ONLY REASONABLE, BUT JUSTIFIED .........................................10

     VI.     ARIAD'S ABILITY AND DESIRE TO ENFORCE THE '516 PATENT STEMS FROM ITS EXCLUSIVE PATENT LICENSE FROM THE THREE INSTITUTIONS.......................................................11

ARGUMENT     13

     I.     THIS COURT HAS PROPER DECLARATORY JUDGMENT JURISDICTION. ...............................................................13

         A.     ARIAD's Explicit Threat Created an Actual Controversy .................14

         B.     ARIAD's Conduct in the Totality of the Circumstances Has Created in the Amgen Entities an Objectively Reasonable Apprehension of Suit ..........................................15

         C.     This Court Should Reject ARIAD's Unsupported Request That It Decline Declaratory Judgment Jurisdiction Over Amgen's Properly Brought Claims.........................................21

     II.     THE COMPLAINT STATES A CLAIM ON WHICH RELIEF CAN BE GRANTED. ..............................................................22

i

III.    THE THREE INSTITUTIONS ARE NEITHER NECESSARY PARTIES
        TO THIS ACTION NOR INDISPENSABLE PARTIES THAT CANNOT
        BE JOINED. ...................................................................................................23

        A.    The Institutions Are Not Necessary Parties Under Rule
              19(a), As They Have Transferred All Substantial Rights in
              the '516 Patent to ARIAD. .......................................................................24

        B.    The Institutions Do Not Need to Be Joined Even If They
              Are Necessary, Because Their Presence Is Not
              Indispensable Under Rule 19(b)..............................................................28

        C.    Even In The Event The Court Were To Find That The
              Institutions Retained Substantial Rights in the '516 Patent
              and Are Thus Necessary Parties, The Institutions Would
              Then Be Subject to Personal Jurisdiction in Delaware.........................30

CONCLUSION.............................................................................................................34

DB02:5398556.1                                                                                    065028.1001

<u>**TABLE OF AUTHORITIES**</u>

Page

**Cases**

*Abbott Labs. v. Diamedix Corp.*,
    47 F.3d 1128 (Fed. Cir. 1995).............................................................................. 27

*Akro Corp. v. Luker*,
    45 F.3d 1541 (Fed. Cir. 1995).............................................................................. 32

*Alston v. Parker*,
    363 F.3d 229 n.6 (3d Cir. 2004).................................................................... 22, 23

*ARIAD Pharmaceuticals, Inc. et al. v. Jon W. Dudas, Undersecretary of*
    *Commerce for Intellectual Property and Director of the United States*
    *Patent and Trademark Office,*
    E.D. Va., Civil Action No. 1:06 CV 679 ............................................................ 18

*Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*,
    846 F.2d 731 (Fed. Cir. 1988)...................................................................... passim

*Aspex Eyewear, Inc. v. Miracle Optics, Inc.*,
    434 F.3d 1336 (Fed. Cir. 2006).................................................................... 25, 27

*BP Chems. Ltd. v. Union Carbide Corp.*,
    4 F.3d 975 (Fed. Cir. 1993)......................................................................... 19, 20

*Breckenridge Pharma., Inc. v. Metabolite Lab., Inc.*,
    444 F.3d 1356 (Fed. Cir. 2006).................................................................... 32, 33

*Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*,
    1996 WL 71492 (S.D.N.Y. 1996)....................................................................... 16

*C.R. Bard, Inc. v. Schwartz*,
    716 F.2d 874 (Fed. Cir. 1983)......................................................... 17, 19, 20, 21

*Capo, Inc. v. Dioptics Medical Products, Inc.*,
    387 F.3d 1352 (Fed. Cir. 2004)....................................................... 13, 20, 21, 22

*Conley v. Gibson*,
    355 U.S. 41 (1957).............................................................................................. 23

*Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.*,
    142 F.3d 1266 (Fed. Cir. 1998).................................................................... 28, 29

*Electronics for Imaging, Inc. v. Coyle,*
    394 F.3d 1341 (Fed. Cir. 2005)..................................................................... 13, 21

*EMC Corp. v. Norand Corp.,*
    89 F.3d 807 (Fed. Cir. 1996)..................................................................... 17, 18, 21

*Erbamont Inc. v. Cetus Corp.,*
    720 F. Supp. 387 (D. Del. 1989)........................................................................ 29

*Gardiner v. Virgin Islands Water & Power Auth.,*
    145 F.3d 635 (3d Cir. 1998)......................................................................... 28, 30

*Genentech v. Eli Lilly & Co.,*
    998 F.2d 931 (Fed. Cir. 1993)............................................................................ 22

*Goodyear Tire and Rubber Co. v. Releasomers, Inc.,*
    824 F.2d 953 (Fed. Cir. 1987)............................................................................ 21

*Graves v. Lowery,*
    117 F.3d 723 (3d Cir. 1997)............................................................................... 23

*In re Cambridge Biotech Corp.,*
    186 F.3d 1356 (Fed. Cir. 1999).......................................................................... 29

*Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.,*
    248 F.3d 1333 (Fed. Cir. 2001).......................................................................... 27

*Intuitive Surgical, Inc. v. Computer Motion, Inc.,*
    214 F. Supp.2d 433 (D. Del. 2002)..................................................................... 26

*Minnesota Mining and Mfg. Co. v. Norton Co.,*
    929 F.2d 670 (Fed. Cir. 1991)............................................................................ 22

*Morse v. Lower Merion School Dist.,*
    132 F.3d 902 (3d Cir. 1997)............................................................................... 23

*Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha,*
    57 F.3d 1051 (Fed. Cir. 1995)...................................................................... 16, 18

*Prima Tek II, L.L.C. v. A-Roo Co.,*
    222 F.3d 1372 (Fed. Cir. 2000).......................................................................... 24

*Reach & Associates, P.C. v. Dencer,*
    269 F. Supp 2d 497 (D. Del. 2003)..................................................................... 31

*Rossman v. State Farm Mutual Automobile Ins. Co.,*
    832 F.2d 282 (4th Cir. 1987) ......................................................................... 31, 32

DB02:5398556.1
065028.1001

*Shell Oil Co. v. Amoco Corp.*,
   970 F.2d 885 (Fed. Cir. 1992)................................................................. 18

*Sicom Tech Ltd. v. Agilent Tech., Inc.*,
   427 F.3d 971 (Fed. Cir. 2005)................................................................. 24

*Speedplay Inc. v. Bebop, Inc.*,
   211 F.3d 1245 (Fed. Cir. 2000)............................................................... 27

*Super Sack Mfg. Corp. v. Chase Packaging Corp.*,
   57 F.3d 1054 (Fed. Cir. 1995)................................................................. 20

*Suprex Corp. v. Lee Scientific, Inc.*,
   660 F. Supp. 89 (W. D. Pa. 1987)............................................................ 30

*Symbol Technologies, Inc. v. Hand Held Products, Inc.*,
   2003 WL 22750145 (D. Del. 2003) ......................................................... 19

*Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.*,
   395 F.3d 1324 (Fed. Cir. 2005)......................................................... 13, 22

*The Capital Group Cos., Inc. v. Armour*,
   2004 WL 2521295 (Del. Ch. 2004) ......................................................... 31

*Third Wave Tech., Inc. v. Digene Corp.*,
   2006 WL 83340 (W.D. Wis. 2006)........................................................... 15

*Vanguard Research, Inc. v. Peat, Inc.*,
   304 F.3d 1249 (Fed. Cir. 2002)......................................................... 14, 21

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*,
   944 F.2d 870 (Fed. Cir. 1991)......................................................... 24, 25

*West Interactive Corp. v. First Data Resources*,
   972 F.2d 1295 (Fed. Cir. 1992).............................................................. 15

**Treatises**

*Moore's Federal Practice*, § 132.01[1].......................................................... 30

## NATURE AND STAGE OF PROCEEDING

Plaintiffs (collectively referred to as the "Amgen Entities" or "Amgen") filed a Complaint for Declaratory Judgment of Patent Invalidity and Non-Infringement on April 20, 2006. Amgen assented to ARIAD's request for a 30-day extension to answer or otherwise plead, and ARIAD thus filed, on June 14, 2006, the instant Motion to Dismiss for Lack of Subject Matter Jurisdiction, Failure to State a Claim for which Relief May Be Granted, and Failure to Join Indispensable Parties. In a letter dated June 16, 2006, the Court requested the parties to confer regarding the case schedule and contact the Court to schedule a telephone conference, and the parties have complied with this request. The Court has recently set a telephone scheduling conference for July 12, 2006 at 2:00 PM.

## SUMMARY OF THE ARGUMENT

While ARIAD attempts to tell a good story through its motion to dismiss, it simply ignores the key facts that have given Amgen a more-than-reasonable apprehension of suit under the '516 patent and justify this lawsuit against ARIAD to clear the air once and for all. ARIAD is wrong when it argues that it has "said next to nothing about the '516 patent to Amgen." To the contrary, ARIAD has had numerous oral and written communications with Amgen, its counsel has said Amgen is next on its list of litigation targets, and its CEO recently stated that companies such as Amgen will be forced to "pay rent" for this patented technology. Having threatened Amgen, ARIAD now self-servingly retreats to say that it has "no current plans" to sue. But that is not enough – the Declaratory Judgment Act is specifically designed to address situations just like this, where a party has threatened future litigation but refuses to promptly adjudicate the issues. Amgen has a right to clear its name, and should not be forced to bear the albatross of a pending future lawsuit while ARIAD strategically waits to sue Amgen at the time and place of its choosing.

Amgen details *infra* ARIAD's express and implied threats to sue Amgen for infringement of the '516 patent. The totality of the facts and circumstances – not just the select handful of facts

that ARIAD cites (and mischaracterizes) in its brief – paints a compelling picture of ARIAD's intent to sue Amgen for infringement of the '516 patent, and the reasonableness of Amgen's apprehension of such a suit. If on the other hand, as ARIAD now suggests, that after years of having Amgen's products on its list of targets, that it has no plans to sue Amgen, then apparently ARIAD has had a change of heart and must agree that Amgen's products do not infringe the '516 patent. If that is truly ARIAD's position, rather than seeking dismissal of this action, ARIAD should be willing to grant Amgen a covenant not to sue for Amgen's products.

With respect to *pleading* facts establishing Amgen's reasonable apprehension of suit, neither the Court of Appeals for the Third nor Federal Circuit has ever found that one must plead specific facts required for declaratory judgment jurisdiction to satisfy the notice pleading requirements of Rule 8 of the Federal Rules of Civil Procedure. ARIAD's secondary argument that Amgen's complaint fails to state a claim is simply an improper attempt to graft Rule 9(b)'s particularity requirement onto Amgen's jurisdictional allegations.

Finally, ARIAD improperly argues that Harvard, MIT and the Whitehead Institute ("the Institutions") are indispensable parties that cannot be joined in this action. This is incorrect on many levels. *First,* although the Institutions are listed on the face of the '516 patent as its joint legal owners, their exclusive license agreement with ARIAD transferred all substantial rights in the patent to ARIAD. Since governing Federal Circuit case law dictates that a patent owner that has transferred all substantial rights to a licensee is no longer a necessary party to an action relating to the patent, this lawsuit can appropriately proceed in the absence of the Institutions. *Second,* even if they are deemed necessary, the Institutions are not indispensable parties to this action under Rule 19(b), as the interests of the Institutions are fully aligned with, and sufficiently represented by, ARIAD alone. *Third*, it would in any event be inappropriate for this Court to dismiss this suit because the Institutions can be added if necessary. Contrary to ARIAD's contention, the Whitehead Institute is irrefutably subject to personal jurisdiction in Delaware because it is incorporated here. Moreover, to the extent ARIAD is successful in arguing that the

2

Institutions retain substantial rights in the '516 patent, then it necessarily follows that this Court would have jurisdiction over all of the Institutions in a suit that implicates their continuing obligations pursuant to their exclusive license with ARIAD. Indeed, the Institutions have consented in their agreement with ARIAD to submit themselves to the jurisdiction of this Court.

Amgen has properly brought a declaratory judgment action against a Delaware company that has made multiple threats that Amgen is next on its list of lawsuits under the '516 patent. This case should be allowed to proceed, and Amgen respectfully requests that ARIAD's motion to dismiss be denied.

**FACTUAL BACKGROUND**

**I.    AMGEN AND ITS ENBREL AND KINERET PRODUCTS WERE CONFIRMED TO BE ON ARIAD'S LIST OF PATENT INFRINGEMENT LITIGATION TARGETS.**

Amgen markets two human therapeutics that ARIAD contends infringe the '516 patent: Enbrel® (etanercept)[1] and Kineret® (anakinra)[2] ("ENBREL" and "KINERET" respectively). Both of these products were listed on a slide shown as an ARIAD trial exhibit in April 2006 in litigation on the '516 patent between Ariad and Lilly ("the *Lilly* litigation"). Each of the Amgen Entities is involved with the manufacture and/or promotion of at least one of these products.

Having sued Eli Lilly for infringement of the '516 patent on the day the patent issued in June 2002, ARIAD pursued that case through trial in April 2006. While ARIAD was trying its patent infringement case against Lilly – culminating in a jury finding of infringement against two Lilly products – a message was being sent that although Lilly may be the first, it is certainly not ARIAD's only litigation target with respect to the '516 patent. Indeed, ARIAD, which has no

---

[1]    Developed through research at Immunex and first marketed in 1998, ENBREL is approved to treat a number of inflammatory conditions, including rheumatoid arthritis. (Ungemach Decl. ¶ 4.) In mid-2002, Amgen acquired Immunex and ENBREL. (*Id.* ¶ 17.)

[2]    Developed through research at Synergen, Inc. (later acquired by Amgen) and first marketed in 2001, KINERET is a synthetic IL-1 receptor antagonist approved for treatment of some types of rheumatoid arthritis. (Ungemach Decl. ¶ 3.)

3

commercial products of its own, published a set of slides for the jury and public to see that name Amgen, other companies Amgen has since acquired (such as Immunex and Tularik), and Amgen's ENBREL and KINERET on its list of litigation targets.[3]  That ENBREL and KINERET were targets for litigation was underscored by repeated references to litigation.   The slides questioned whether the royalty rates being discussed with a potential licensee would be a "ceiling or floor on litigation recovery"[4] and referenced the "[s]elect[ion] of litigation counsel" and the "[c]omplet[ion of an] enforcement analysis and action plan."[5]  In the context of ARIAD's prior saber-rattling over its '516 patent and Amgen's products (discussed in detail *infra*), the reality of Amgen and its products being specifically called out in open court, particularly given the litigation focus of the slides, left little doubt about ARIAD's future intentions.  Amgen filed this suit days later.

The trial exhibit was originally an internal slide presentation on "NF-κB Patent Licensing" assembled by Mr. Fritz Casselman (then ARIAD's Senior Vice President and Chief Business Officer) and given to ARIAD's Board of Directors in December of 2001 – two months after the '516 patent claims were allowed but seven months before the '516 patent issued.

Contrary to ARIAD's assertion that the slides presented at the board meeting only made "passing mention" of ENBREL and KINERET, Amgen's products were specifically called out from a much larger potential list.  By ARIAD's own admission, forty letters regarding ARIAD's earlier-issued '090 patent had been sent to prospective litigation targets in February of 2001.[6]  However, Mr. Casselman narrowed ARIAD's targeting focus in December 2001 by identifying in

---

[3]    (Def.'s Br., Ex. C [ARIAD internal presentation - 12/2001] at slides 32-39.)

[4]    (*Id.*)

[5]    (*Id.* at slide 41.)

[6]    (Def.'s Br., Ex. C at slide 34.)

his slides twenty-one "lead players," including Amgen, Immunex, and Tularik, and then further

zeroed in on eleven "marketed and late stage products," including ENBREL and KINERET:[7]

| Lead Players | | | |
|---|---|---|---|
| Abbott | AHP | Amgen | Athersys |
| Aventis | Biogen | BMS | Celgene |
| Genentech | GSK | Isis | Immunex |
| J & J | Lilly | Merck | Millennium |
| Novartis | Pharmacia | Roche | Serono |
| Tularik | | | |

Marketed and Late-Stage Products

- TNF-α anti-inflammatories
  - Enbrel (Immunex): 2001 sales est. > $750M
  - Remicade (J&J): 2001 sales est. ~$500M
  - D2E7 (Abbott): NDA projected 2Q02
  - CDP-870 (Pharmacia): Projected launch 2004
- COX-2 anti-inflammatories
  - Vioxx (Merck): 2001 sales est. $1B
  - Celebrex (Pharmacia): 2001 sales est. $3B
- Other anti-inflammatories
  - Kineret (Amgen): Just launched

ARIAD's CEO Harvey Berger (in his *Lilly* trial testimony) and Chief Legal Officer

Laurie Allen (in ¶ 5 of her Declaration attached to ARIAD's motion) now seek to back away from

their threats, stating that ARIAD has not analyzed the potential infringement of the '516 patent

with respect to any of Amgen's products. But Mr. Casselman's slides on their face contradict Dr.

Berger's and Ms. Allen's assertions. In any event, Dr. Berger's testimony supports that these

slides at least attempted to identify those classes of drugs generally believed by ARIAD to fall

within the '516 patent claims.[8] As can be seen in the slides, ARIAD had already determined that

various classes of anti-inflammatories (including those affecting TNF-α, COX-2, and "Other")

fell within the likely confines of the newly allowed patent claims, and that Amgen's ENBREL

and KINERET were specifically targeted.[9]

Amgen in-house counsel Mr. Siegmund Gutman was present in the courtroom during the

*Lilly* trial when ARIAD's "list" of targeted companies and products was published to the world.

---

[7]    (*Id.* at slides 35-37.)

[8]    (Sharp Decl., Ex. A [Lilly Trial Tr. (Berger - 4/11/06)] at p. 71, lines 8-16.)

[9]    (Def.'s Br., Ex. C at slide 37.)

5

Though this threat was the last that immediately preceded the filing of Amgen's Complaint, it was not the first time Amgen had heard it was on ARIAD's target list.

## II.    ARIAD'S PRIOR CONDUCT HAD ALREADY MADE THE AMGEN ENTITIES AWARE THAT THEY WERE ON ARIAD'S LIST OF LITIGATION TARGETS.

While ARIAD's list of targeted companies and products was only laid open for all to see during the recent *Lilly* trial, Amgen had previously become aware that such a list existed and that Amgen's ENBREL product was on it.

In September 2004, Mr. Paul Cantrell, in-house litigation counsel at Lilly, called Amgen regarding the scheduling of a deposition of an Amgen employee and relayed to Ms. Monique Cordray, an Amgen attorney, the substance of a conversation he had with Ms. Patricia Carson, one of ARIAD's outside litigation attorneys at Kaye Scholer LLP.[10]    As set forth in his accompanying declaration, in that conversation, Mr. Cantrell expressed surprise to Ms. Carson that ARIAD had chosen Lilly's Evista® and Xigris® products as its first '516 patent litigation targets.[11]    When he asked Ms. Carson why ARIAD had not chosen to target other products instead, Ms. Carson assured him that Lilly's products were not ARIAD's only litigation targets, responding to the effect that "Enbrel is on the list."[12]    Mr. Cantrell understood by this statement that sometime either during or after the *Lilly* litigation, ARIAD was planning on suing Amgen for infringement based on its activities related to the ENBREL product and he conveyed this position to Ms. Cordray.[13]    ARIAD's threat was all-the-more real in light of prior direct communications between ARIAD and Amgen regarding the '516 patent and Amgen's products.

## III.    ARIAD SPECIFICALLY CONTACTED THE AMGEN ENTITIES TO SEND THE MESSAGE THAT THEY MUST TAKE A LICENSE TO THE '516 PATENT.

---

[10]    (Cantrell Decl. ¶¶ 6-7.)

[11]    (*Id* ¶ 4.)

[12]    (*Id.*)

[13]    (*Id.* ¶ 5.)

065028.1001

In addition to ARIAD's threats regarding litigation and its "list," ARIAD had previously contacted Amgen relating to the '516 patent and ARIAD's belief that Amgen must take a license to that patent.

In the late 2002-2003 time period following ARIAD's June 2002 letter referenced in its Motion to Dismiss, Amgen in-house counsel Mr. Frank Ungemach received an out-of-the-blue phone call from Mr. Casselman.[14] Mr. Casselman began the call by asking Mr. Ungemach if Amgen had decided whether it was going to take a license to ARIAD's NF-κB patents.[15] Ungemach told Casselman that Amgen was still in the process of evaluating its interest in ARIAD's patents and had not yet made a decision.[16]

Mr. Casselman responded by pointing out that, though many companies had been sent letters regarding licensing ARIAD's patents, he thought Amgen should be interested in taking a license for its KINERET product.[17] When Mr. Ungemach asked why ARIAD's patents would have any implications for KINERET, a commercial product, Casselman explained that ARIAD's newest "NF-κB" patent, the '516 patent, was not limited to the same types of laboratory technique claims as in ARIAD's earlier NF-κB patents.[18] He also pointed out that this '516 patent was the same patent that ARIAD had recently asserted in its patent infringement action against Lilly.[19]

When pressed for a definitive statement as to whether ARIAD believed that Amgen's KINERET product infringed the '516 patent, Mr. Casselman simply reiterated that he thought Amgen should be interested in taking a license for KINERET.[20] Mr. Casselman further indicated

---

[14]  (Ungemach Decl. ¶ 13.)

[15]  (*Id.*)

[16]  (*Id.*)

[17]  (*Id.* ¶ 14.)

[18]  (*Id.*)

[19]  (*Id.*)

[20]  (Ungemach Decl. ¶ 15.)

that while some companies were going to wait for the outcome of the *Lilly* litigation before deciding, others had decided to take a license already.[21]  ARIAD had made its position clear – Mr. Ungemach concluded the call by telling Mr. Casselman that if Amgen had an interest in licensing the '516 patent, he would let him know.[22]  ARIAD never contacted Amgen directly again with respect to its "licensing" efforts.

## IV.    ARIAD BROUGHT ITS NF-κB PORTFOLIO, INCLUDING THE '516 PATENT, TO THE ATTENTION OF THE AMGEN ENTITIES ON MULTIPLE OCCASIONS.

As already shown above (and contrary to ARIAD's brief and Ms. Allen's declaration), ARIAD's dealings with the Amgen Entities over the '516 patent did not begin and end with its June 25, 2002 letter to Amgen.  Indeed, ARIAD has an extensive history of written and oral communications with the Amgen Entities relating to its NF-κB patent portfolio.  From as early as May 2000 for Amgen and February 2001 for Immunex, ARIAD actively sought to coerce the Amgen Entities to license not only its then-issued NF-κB laboratory technique patents, but also its then-pending '516 patent.[23]

ARIAD first provided Amgen with information on its purported "NF-κB Project" in a May 11, 2000 presentation.[24]  Asserting that the "[b]inding of inflammatory molecules to specific receptors...activates signal transduction pathways" that "converge on the transcription factor, NF-κB," ARIAD put up a diagram called "NF-κB Activation Pathway in Cells," identifying a number of alleged "NF-κB pathway targets...for drug discovery."[25]  The target listed at the top was the "IL-1 Receptor."[26]  (Note from above that KINERET is a synthetic IL-1 receptor antagonist).

---

[21]  (*Id.*)

[22]  (*Id.* ¶ 16.)

[23]  (Ungemach Decl., Ex. A [5/11/00 slide presentation to Amgen]; Ex. B [5/15/00 letter to Amgen]; and Ex. F [2/8/01 letter to Immunex].)

[24]  (Ungemach Decl., Ex. A.)

[25]  (*Id.* at 57-60.)

[26]  (*Id.* at 60.)

In later correspondence, ARIAD asserted that each of Amgen and Immunex (still a separate company at the time) was engaged in activities that would require a license to ARIAD's NF-κB patents. In a May 15, 2000 letter to Amgen, ARIAD alleged that Amgen was "working on the development and/or commercialization of drugs that are based on the NF-κB signaling pathway" and that "[ARIAD's NF-κB] patents and patent applications cover various non-steroidal anti-inflammatory drugs in development...."[27] In February 8, 2001 letters sent to both Amgen and Immunex, ARIAD alleged that each of the companies "has an active research interest in this signaling pathway and in the characterization of drugs targeting key points in the pathway" and that each of the companies' R&D programs "likely utilizes methodologies claimed in [ARIAD's] patents and is directed to the development of products likely to be covered by claims in [ARIAD's] patents and thus would require a license from ARIAD."[28]

On June 25, 2002, ARIAD's '516 patent issued. This patent differed from its earlier sister patents in that it purported to cover methods of modulating the NF-κB pathway.[29] Armed with these new claims, ARIAD became much more aggressive in its patent licensing and enforcement efforts, sending on that very day non-exclusive license offers with onerous terms[30] to many

---

[27]  (Ungemach Decl., Ex. B. at 1.) ARIAD's May 15, 2000 letter, in combination with the May 11, 2000 slides' explicit identification of drugs affecting the "IL-1 Receptor" as "NF-κB pathway targets," confirmed that ARIAD even then had its sights set on Amgen's KINERET.

[28]  (Ungemach Decl., Ex. C [2/8/01 letter to Amgen] and Ex. F [2/8/01 letter to Immunex].)

[29]  In a May 4, 2001 email to Immunex, ARIAD asserted that its pre-'516 patents cover "assays useful for identifying and developing compounds capable of modulating the function of NF-kB," (Ungemach Decl., Ex. G [5/4/01 email to Immunex].)

[30]  Under the term sheet enclosed with the June 25, 2002 letter regarding the '516 patent, ARIAD required that a licensee pay a royalty of 1% on worldwide net sales of Derived Products (*i.e.*, products developed using claims of the laboratory technique patents), plus about $1 to $3 million prepayments (or, in the alternative, similar total amounts of initial license fee, annual maintenance fee and milestone payments). (Ungemach Decl., Ex. E [6/25/02 letter to Amgen] at enclosed term sheet.). While the proposed license did not include information as to the terms that ARIAD would seek for Covered Products (*i.e.* those covered by the '516 patent), an earlier email from ARIAD to Immunex indicates that ARIAD intended to extract the exorbitant rate of 5% on products purportedly covered under the then-pending method claims of the '516 patent. (Ungemach Decl., Ex. G.). Neither Amgen nor
(Continued...)

companies in the pharmaceutical and biotechnology fields (including Amgen and Immunex).[31] On that same day ARIAD also initiated a patent infringement suit against Lilly in Massachusetts, alleging that Lilly had infringed ARIAD's '516 patent through activities related to Lilly's Evista® and Xigris® products.[32]

These communications between ARIAD and the Amgen Entities culminated in Mr. Casselman's direct dialogue with Mr. Ungemach regarding the '516 patent and set the stage for the revelations about ARIAD's "list" both before and at the *Lilly* trial. Despite ARIAD's attempts to soften the impact of its "list" and what its current intentions are given the pendency of its motion, ARIAD's conduct following the filing of Amgen's Complaint confirms that Amgen had (and still has) an objectively reasonable fear that it will be subject to suit under the '516 patent.

## V.    DEVELOPMENTS AFTER THE FILING OF AMGEN'S COMPLAINT CONFIRM THAT ITS APPREHENSION WAS NOT ONLY REASONABLE, BUT JUSTIFIED

The objective reasonableness of Amgen's apprehension of a patent infringement lawsuit by ARIAD is borne out by further evidence that came to light after Amgen filed this case. During the last week of the *Lilly* trial, Amgen learned of an exchange that Lilly's Mr. Cantrell had witnessed between Mr. Gutman and ARIAD's counsel Patricia Carson during the first week of the *Lilly* trial and *before* the Amgen Entities had filed suit. According to Mr. Cantrell, as Ms. Carson was walking away from Mr. Gutman, she stated *"and you guys at Amgen are next."*[33]  Ms.

---

Immunex took a license to ARIAD's NF-κB patent portfolio.  (Ungemach Decl. ¶ 9 and 21 and Ex. D [3/7/01 letter to ARIAD].).

[31]  (Ungemach Decl., Ex. E and Ex. H [6/25/02 letter to Immunex]; Cantrell Decl. ¶ 7.).

[32]  In accordance with its rights under the ARIAD Exclusive License to opt to join the Institutions in its actions, (Sharp Decl., Ex. F [ARIAD Exclusive License] ¶ 7.4), ARIAD named the Institutions as parties to the *Lilly* litigation.  Both ARIAD and the Institutions are represented in the still-ongoing *Lilly* action by common counsel from the New York office of Kaye Scholer LLP.

[33]  (Cantrell Decl. ¶¶ 9-10.)

Carson's statement further confirms that Amgen's apprehension at the time it filed suit was not only objectively reasonable, but was absolutely justified.

Any doubts as to ARIAD's intentions to continue enforcement of its '516 patent were also put to rest when ARIAD's CEO, Dr. Berger, on the very day the verdict was announced in the *Lilly* trial, confirmed his company's plans in an interview with CNBC. In this interview, Dr. Berger was asked, "[a]nd Dr. Berger, you're not done yet. You think you can get royalties from other drug companies as well, correct?" Berger responded, "[w]ell, there's no question that NF-(kappa)B cell-signaling pathway plays an important role in many different diseases, not only...osteoporosis, but as well as cancer and inflammation....***pharmaceutical and biotech companies need to pay rent for the use of the intellectual property***."[34] Putting it all together leads to the reasonable conclusion that the companies on ARIAD's "list" would need to "pay rent" to ARIAD for the '516 patent or they would risk ARIAD taking the same action it took against Lilly – a lawsuit without further warning.

## VI.    ARIAD'S ABILITY AND DESIRE TO ENFORCE THE '516 PATENT STEMS FROM ITS EXCLUSIVE PATENT LICENSE FROM THE THREE INSTITUTIONS.

ARIAD, a Delaware corporation and exclusive licensee of the '516 patent,[35] is primarily in the business of enforcing its intellectual property rights. ARIAD explains in SEC filings that its "current business strategy is to...license [ARIAD's] NF-κB...technologies to pharmaceutical and biotechnology companies...."[36] On the "NF-κB Highlights" page of its corporate website, ARIAD states that "[t]he use of many currently marketed drugs and products in development, in addition to the two highlighted in the *Lilly* litigation, are examples of NF-kB treatment methods which may be covered by our NF-kB patents."[37]

---

[34]    (Sharp Decl., Ex. L [5/4/06 CNBC Transcript] at p.2 (emphasis added).)

[35]    (Sharp Decl., Ex. B [Lilly Complaint, 02-cv-11280 (RWZ), 6/25/02] ¶¶ 3 and 18.)

[36]    (Sharp Decl., Ex. C [ARIAD SEC 2006 10-K] at p. 3.)

[37]    (Sharp Decl., Ex. D [http://library.corporate-ir.net/library/11/118/118422/items/198959/NF-
(Continued...)

The '516 patent is assigned to the Institutions, one of which -- the Whitehead Institute --

is a Delaware-incorporated research institute affiliated with MIT. On August 19, 1991 ARIAD

entered into a license agreement with MIT and the Whitehead regarding intellectual property

rights in the "NF-κB" technology that ultimately included the '516 patent.[38] ARIAD itself has

consistently described its rights under its license agreement with the Institutions as "exclusive."[39]

Indeed, the license agreement as amended is not only exclusive to ARIAD, but also confers upon

ARIAD all substantial rights in the '516 patent, including the rights "to make, have made, use,

lease and sell the Licensed Products, and to practice the Licensed Processes," to enforce or defend

any resultant patents on its own, and to have sole control over the sublicensing of rights to alleged

infringers.[40]

While the initial agreement contemplated that ARIAD would develop a viable

commercial product for modulation of NF-κB, ARIAD was incapable of doing so.[41] The parties

consequently revised the agreement to allow ARIAD to demonstrate its contractually required

efforts to commercialize by allowing attempts to license and/or enforce its NF-κB patent portfolio

to suffice.[42] As discussed more fully below, enforcing the '516 patent is precisely what ARIAD

---

kBHighlights.pdf].)

[38]  (Sharp Decl., Ex. F [ARIAD Exclusive License] § 2.1.)  This agreement was amended a few
months later to recognize Harvard's interest in the same subject matter and included Harvard's
authorization for MIT to act as its sole and exclusive agent with respect to the agreement.
(Sharp Decl., Ex. G [First Amendment to ARIAD Exclusive License] § 1.)    Another
amendment in 2002 eliminated rights originally reserved for another company, Centocor.
(Sharp Decl., Ex. H [Second Amendment to ARIAD Exclusive License].)

[39]  (Sharp Decl., Ex. C at p. 2; Ex. I [ARIAD 5/13/2003 Press Release] at p. 1; Ex. J [ARIAD
4/28/2004 Press Release] at p. 2; Ex. K [ARIAD 10/1/2005 Press Release] at p. 2.)

[40]  (Sharp Decl., Ex. F §§ 2.1 (use rights), 7.2 (enforcement rights); Ex. H §§ 2.1.3 (exclusive
grant; amending § 2.3), 2.1.4 (sublicensing rights; amending § 2.8), 2.3.1 (declaratory
judgment actions; amending § 7.5).)

[41]  (Sharp Decl., Ex. F § 3.1.)

[42]  (Sharp Decl., Ex. A at page 72, ln. 4 to page 73, ln. 8; Ex. F § 3.1 (original clause).).

12

chose to do.  ARIAD's licensing and enforcement efforts thus have been its sole NF-κB-related activity to date.

## ARGUMENT

### I.     THIS COURT HAS PROPER DECLARATORY JUDGMENT JURISDICTION.

In patent cases, the Declaratory Judgment Act "provide[s] the allegedly infringing party relief from uncertainty and delay regarding its legal rights." *Electronics for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1346 (Fed. Cir. 2005).  Patent litigation "is particularly adapted to declaratory resolution." *Capo, Inc. v. Dioptics Medical Products, Inc.*, 387 F.3d 1352, 1357 (Fed. Cir. 2004).  In the context of patent disputes, the Federal Circuit has denounced the "guerilla tactics" employed by some patent holders in threatening infringement litigation, but never quite pulling the trigger by filing suit. *See Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 734-35 (Fed. Cir. 1988) (patent holders cannot "brandish a Damoclean threat with a sheathed sword" without exposing themselves to declaratory judgment jurisdiction).  To prevent alleged infringers from having to wait to be sued, the Federal Circuit applies a two-part test to determine whether there is an "actual controversy" in declaratory judgment actions.[43]     *Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1332 (Fed. Cir. 2005) "There must be both (1) an explicit threat or other action by the patentee which creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit; and (2) present activity by the declaratory judgment plaintiff which could constitute infringement, or concrete steps taken with the intent to conduct such activity." *Id.*

The second prong of the test as applied here is met – ARIAD does not contest that Plaintiffs are presently engaged in making, using, and selling ENBREL and KINERET.  Thus, to evaluate subject matter jurisdiction, this Court need only examine the first prong – whether

---

[43]    In determining whether an actual controversy exists, the district court should look to the law of the Federal Circuit. *See Coyle*, 394 F.3d at 1345-46.

ARIAD's conduct has created a reasonable apprehension by the Plaintiffs that ARIAD will ultimately initiate a patent infringement suit against them based on those activities. "The reasonableness of a party's apprehension is judged using an objective standard" and the district court must examine "the totality of the circumstances." *Vanguard Research, Inc. v. Peat, Inc.*, 304 F.3d 1249, 1254 (Fed. Cir. 2002) (reversing district court's order dismissing declaratory judgment action for lack of an actual controversy).

The totality of the circumstances, including explicit and implicit threats by ARIAD's counsel and business people, placed the Amgen Entities in reasonable apprehension of suit for patent infringement. The slide deck shown at the *Lilly* trial confirmed for the Amgen Entities that their products had been targeted for litigation under the '516 patent. These slides confirmed the prior statement of ARIAD counsel Ms. Carson that "Enbrel is on the list," which had already made clear that ARIAD believed Amgen infringed its '516 patent and that ARIAD intended to file suit. ARIAD also contacted Amgen and specifically identified the '516 patent and the products in question through other oral and written communications. When viewed against the backdrop of ARIAD's proven willingness to enforce its '516 patent through litigation with no further warning, there is no doubt that the Amgen Entities' apprehension of suit was objectively reasonable.

### A.    ARIAD's Explicit Threat Created an Actual Controversy

Where the patent holder expressly charges patent infringement, the test for declaratory judgment jurisdiction is met, and the plaintiff need not prove an objectively reasonable apprehension. *See Arrowhead*, 846 F.2d at 736 ("If defendant has expressly charged a current activity of the plaintiff as an infringement, there is clearly an actual controversy, certainty has rendered apprehension irrelevant, and one need say no more.") Here, ARIAD expressly charged the Plaintiffs' activities with respect to the ENBREL product as a patent infringement for which suit would follow.

ARIAD counsel Patricia Carson expressly charged Amgen's ENBREL with infringement when she revealed to Lilly counsel Paul Cantrell that ENBREL was on ARIAD's "list" of

14

litigation targets. Indeed, how much more explicitly could ARIAD have articulated the threat of suit than by identifying ENBREL by name as being on its target list? Mr. Cantrell then conveyed Carson's express threat to Amgen in-house patent litigator Ms. Cordray. It is irrelevant that the threat was made to another party, or whether the threat was true or not. An objectively reasonable apprehension of suit may lie even "in the absence of *any* communication from defendant to plaintiff." *Arrowhead*, 846 F.2d at 736. It does not matter how Amgen learned of ARIAD's plans to sue, *see id.* at 738, or even whether Carson's threat was true. *West Interactive Corp. v. First Data Resources*, 972 F.2d 1295, 1298 (Fed. Cir. 1992) (plaintiff "need not prove the truth of [the] statements to [a third party]" but they may nonetheless help form a reasonable basis for plaintiff's fear of being sued by defendant). Nor is Amgen required to show that Carson was actually authorized to make this threat. *See Third Wave Tech., Inc. v. Digene Corp.*, 2006 WL 83340 at *4 (W.D. Wis. 2006) (finding that *apparent* authority to threaten litigation is the key consideration, and explaining that "who would have more *apparent* authority than a party's legal counsel?" (emphasis in original)). In any event, Ms. Carson's threat was ultimately verified at trial, where the "list" that included ENBREL was laid open for all to see. This Court need look no further to find that it has jurisdiction to deal with this actual controversy. *See Arrowhead*, 846 F.2d at 736.

**B.    ARIAD's Conduct in the Totality of the Circumstances Has Created in the Amgen Entities an Objectively Reasonable Apprehension of Suit**

Even if viewed as falling short of an express charge of patent infringement, ARIAD's counsel Patricia Carson's statement that "Enbrel is on the list" certainly supports a reasonable apprehension that ARIAD would file suit for activities related to ENBREL. In view of the fact that ARIAD has demonstrated its willingness to enforce the '516 patent against Lilly, a statement in the context of that litigation that Amgen's product is on the list could only lead Amgen to believe that suit was inescapable. *See id.* at 737.

The fact that ARIAD's "list" was published at the *Lilly* trial, and that Amgen and ENBREL and KINERET were prominently included on it, confirmed and heightened Amgen's reasonable apprehension of suit. And not only were Amgen and its products listed, but the slides themselves dictate that ARIAD was considering its "list" in the context of future litigation. The slides reference a comprehensive "enforcement analysis and action plan" and use the word "litigation" on multiple occasions. This is not just a random list of products in which ARIAD had a scientific interest; the context of the slides make clear that it is exactly what ARIAD's counsel referred to when issuing her threat – a list of future targets for patent infringement lawsuits under the '516 patent. *See Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 1996 WL 71492 at *6 (S.D.N.Y. 1996) (finding patentee's reference to litigation supported finding of reasonable apprehension).

ARIAD communicated with Amgen regarding the '516 patent on other occasions as well. Fritz Casselman's phone call to Frank Ungemach was similarly a thinly-veiled threat of infringement litigation. Mr. Casselman called Mr. Ungemach and specifically pressed Ungemach on whether Amgen intended to take a license to ARIAD's NF-κB patents. Mr. Casselman directed Ungemach's attention to the recently-issued '516 patent, and relayed to Ungemach ARIAD's belief that Amgen's activities with respect to KINERET were "implicated" by the '516 patent. Mr. Casselman also was sure to make Mr. Ungemach aware of the *Lilly* lawsuit and the fact that the '516 patent differed from the prior NF-κB patents in that it covered commercial products like KINERET. It is not necessary that Casselman explicitly threaten suit since "one who may become liable for infringement should not be subject to manipulation by a patentee who uses careful phrases to avoid explicit threats." *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*, 57 F.3d 1051, 1053 (Fed. Cir. 1995). Indeed, raising the specter of infringement without going the next step constitutes exactly the type of "guerilla tactics" that the Federal Circuit has indicated cannot be employed by patentees without opening themselves up to declaratory judgment actions. *See Arrowhead*, 846 F.2d at 734-35.

In the history of the license negotiations between ARIAD and the Amgen Entities regarding ARIAD's NF-κB portfolio[44], ARIAD always approached the Amgen Entities to initiate talks, a fact that has been found to justify reasonable apprehension of suit. *See EMC Corp. v. Norand Corp.*, 89 F.3d 807, 812 (Fed. Cir. 1996) (where the patentee initiates licensing negotiations, reasonable apprehension is more likely). For example, ARIAD sent a letter regarding its NF-κB patent portfolio to Amgen on May 15, 2000. ARIAD sent letters to both Amgen and Immunex on February 8, 2001, informing each about the issuance of the '090 patent. ARIAD sent letters to Amgen and Immunex on June 25, 2002, offering a license under the '516 patent and others. And Fritz Casselman called Frank Ungemach in the late 2002-2003 time period to relay the fact that ARIAD had sued Lilly for infringement of the '516 patent and to express that Amgen should be taking a license to the '516 patent in light of KINERET.

ARIAD's demonstrated willingness to enforce the '516 patent in suing Lilly also supports Plaintiffs' reasonable apprehension. *See Arrowhead*, 846 F.2d at 737. The fact that ARIAD sued Lilly first is of no moment. "The law does not require enterprises to keep their heads in the sand while a patentee picks them off one by one and at its leisure." *Id.* at 738; *see also C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874, 881 n.6 (Fed. Cir. 1983) ("lawsuits against other manufacturers of similar products" weighs in favor of finding a reasonable apprehension). Also, ARIAD took the Lilly suit all the way to trial, rather than pursuing an early settlement, thus demonstrating that it has both the will and the resources to enforce its patent aggressively. And ARIAD has even recently filed suit against the United States Patent and Trademark Office relating to a reexamination of the '516 patent.[45] ARIAD noted the existence of the reexamination proceedings

---

[44]  In this context, ARIAD's "license offers" to Amgen and Immunex under the '516 patent can hardly be viewed as sincere considering the fact that they were made on the same day as when ARIAD sued Lilly, and that ARIAD has not even attempted to pursue licensing negotiations with Amgen or Immunex during the pendency of the *Lilly* case.

[45] *See ARIAD Pharmaceuticals, Inc. et al. v. Jon W. Dudas, Undersecretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office*, E.D. (Continued...)

in its brief (at 1, fn. 1), but did not inform the Court that it is suing the USPTO to enjoin those very proceedings. It is eminently reasonable for Amgen to expect further litigation regarding the '516 patent given ARIAD's history with litigation to date.

The licensing terms being discussed can likewise shed light upon whether the plaintiff reasonably feared suit. *See EMC Corp.*, 89 F.3d at 813 (a license offer of $1.5 million plus 2% of sales for a non-exclusive license "was sufficiently large to make the prospect of ultimate litigation even more realistic"). This law further supports the reasonableness of Amgen's apprehension of suit. While ARIAD has argued that it was engaging in good faith licensing negotiations,[46] its attempts to extract significant amounts of money from the Amgen Entities for non-exclusive licenses raised the specter of future litigation if its demands were not met. Having set the bar high with its June 25, 2002 letters to both Amgen and Immunex, and having specifically called out KINERET as implicating the '516 patent, ARIAD then neglected the pursuit of any further licensing negotiations during the *Lilly* case, thus underscoring the Amgen Entities' reasonable fear that the alleged "license offer" was really just a prelude to infringement litigation.

The statements by ARIAD's counsel ("And you guys at Amgen are next"), and ARIAD's CEO, during and after the trial further confirm a plan to sue other pharmaceutical companies

---

Va., Civil Action No. 1:06 CV 679.

[46] ARIAD cites to the *Shell Oil Co.* and *Phillips Plastics* cases for the proposition that even fairly aggressive statements made during licensing negotiations do not give rise to declaratory judgment jurisdiction. (Def.'s Br. at 8-10.) However, in *Shell Oil*, the declaratory judgment plaintiff had initiated licensing negotiations and the Federal Circuit noted that no express threats had been made by the defendant. *See Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 888-89 (Fed. Cir. 1992). In contrast, ARIAD has not only approached Plaintiffs with "license offers," but has expressly and impliedly threatened Plaintiffs with infringement litigation. *Phillips Plastics* is also inapposite because the court in that case largely predicated its finding of no subject matter jurisdiction on the fact that licensing negotiations between the parties had not broken down. *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*, 57 F.3d 1051, 1052 (Fed. Cir. 1995) (no jurisdiction because plaintiff filed suit instead of responding to defendant's request for data on which to base licensing proposal). Here, ARIAD has not engaged in any serious licensing negotiations with Plaintiffs regarding the '516 patent. Instead, ARIAD filed suit against Lilly on the same day that it sent its threatening letters to Plaintiffs and followed-up with four years of silence.

18

(including Amgen) in the future. The comment by Ms. Carson was intended for the ears of Amgen's counsel and could hardly have been more clear – Amgen was ARIAD's next litigation target. And the intentions of ARIAD to continue pursuing others it believes to infringe the '516 patent was confirmed on national television, when ARIAD's CEO confidently stated that other pharmaceutical and biotech companies would be forced to "pay rent" for rights to the patent. Given that ARIAD had not carried on any recent licensing negotiations with Amgen regarding the '516 patent, its aggressive statements to Amgen and the world confirm that Amgen's apprehension of suit was reasonable and justified.

In light of the surrounding facts, ARIAD's statement that "it has no current plans to assert the '516 patent against Amgen" is self-serving and legally insufficient in any event to divest the court of subject matter jurisdiction. If ARIAD truly does not intend to sue Amgen under the '516 patent, then it should grant it a covenant not to sue to remove the apprehension it has created. But ARIAD has not squarely denied that it will seek to enforce the '516 patent against Amgen, apparently hoping to keep its options open. Courts have considered a patentee's failure to deny that it would bring suit as important in the consideration of reasonable apprehension of suit. *See BP Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 980 (Fed. Cir. 1993) (a patentee's refusal to give assurances that it will not enforce the patent is relevant to the determination of reasonable apprehension); *Symbol Technologies, Inc. v. Hand Held Products, Inc.*, 2003 WL 22750145, *4 (D. Del. 2003) (*citing C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874, 881 (Fed. Cir. 1983)) ("it is relevant under Federal Circuit precedent that at oral argument [patentee] did not affirmatively state that it would not bring suit"). Under this case law, ARIAD must do far better than assert that it has "no current plans" to sue Plaintiffs. ARIAD must either affirmatively covenant that it will not sue the Amgen Entities for infringement of the '516 patent or accept that this Court has subject matter jurisdiction over Plaintiffs' declaratory judgment claim.

Moreover, a patentee's stated "intentions" while fighting declaratory judgment jurisdiction are far from dispositive of the question of reasonable apprehension because

19

"[i]ntentions...may change over time." *C.R. Bard*, 716 F.2d at 881 (finding reasonable apprehension of suit despite submission by patentee, as declaratory judgment defendant, of affidavit stating that it had no intention of suing for infringement). ARIAD's careful statements as to its "current intentions" cannot trump its prior statements and actions or remove Amgen's reasonable apprehension.

Likewise, the supposed failure of ARIAD to conduct a rigorous infringement analysis for ENBREL and KINERET, as stated in the Allen declaration and Berger testimony, does not support ARIAD's motion and only further justifies this declaratory judgment action by Amgen.[47] The Federal Circuit has recently made very clear that whether or not the accuser has made an adequate investigation to back up its threats is wholly irrelevant to the question of whether a reasonable apprehension exists.[48] *See Capo*, 387 F.3d at 1356 ("It is irrelevant whether Dioptics had adequately investigated the basis of its threats, if they created the requisite objective apprehension."). ARIAD cannot avoid litigating its '516 patent while it is leveling threats that Amgen is "next" on the "list" of companies that it will force to "pay rent" for the '516 patent by

---

[47]    In any event, it is clear that ARIAD had indeed engaged in just such an analysis. (ARIAD Br., Ex. C at slides 32-39.) Mr. Casselman's 2001 presentation shows that some kind of analysis had already been done to conclude that ENBREL and KINERET are specifically implicated by the '516 patent. (*Id.*)

[48]    ARIAD cites *Super Sack* and *BP Chemicals* to imply that there can be no reasonable apprehension of suit where the defendant has not performed a full "coverage analysis" by "assess[ing] the products . . . to determine whether they fall within the scope of the claims." (Def.'s Br. at 8, 10-11 – arguing that "federal courts lack jurisdiction when litigation is 'prospective and uncertain of occurrence'".) What ARIAD ignores is that the need for court review in those cases was found "prospective and uncertain of occurrence" not based on a lack of a comprehensive infringement analysis by the defendant, but on a lack of "infringing activity" by the plaintiff. *See Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059-60 (Fed. Cir. 1995) (possibility of future infringement suit based on possible future infringing acts too speculative); *BP Chems.*, 4 F.3d at 980 (affirmance of district court ruling buttressed by "undisputed fact of the absence of infringing activity"). Here, ARIAD does not contest that Amgen is presently engaged in activities relating to ENBREL and KINERET.

saying it has not done a detailed analysis in support of those threats. This only underscores the need for Amgen to clear the air and its name through this lawsuit.

Nor is the suggestion that ARIAD might wait to sue Amgen a proper basis upon which to deny declaratory judgment jurisdiction. Stated differently, ARIAD is wrong when it argues that Amgen must apprehend "imminent" suit. According to the Federal Circuit, "[i]t would obviously be unrealistic to limit the required apprehension to one of imminent suit against plaintiff when defendant is exhibiting an intent to delay that suit until...a trial date more convenient for defendant has arrived." *Arrowhead*, 846 F.2d 731, 736-37, citing *Goodyear Tire and Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953, 956 (Fed. Cir. 1987). Thus, all that is required is that there be a reasonable threat of an infringement suit by the patentee. *Arrowhead*, 846 F.2d at 737, quoting *C.R. Bard*, 716 F.2d at 879; *Vanguard Research*, 304 F.3d at 1255 (holding that, "a patentee's present intentions do not control whether a case or controversy exists"). Accordingly, the Amgen Entities did not have to wait until such time as ARIAD was poised at the courthouse, complaint in hand, before initiating this declaratory judgment action. *See EMC Corp.*, 89 F.3d at 811 ("When the patentee takes steps that create a reasonable apprehension that he will seek redress through the courts, the alleged infringer is not required to wait for the patentee to decide when and where to sue....")

While certain of the facts standing on their own create a reasonable apprehension, there is no question that, under the totality of the facts and circumstances, the Amgen Entities possessed an objectively reasonable apprehension at the time they filed suit.

### C.    This Court Should Reject ARIAD's Unsupported Request That It Decline Declaratory Judgment Jurisdiction Over Amgen's Properly Brought Claims.

While district courts have discretion to dismiss declaratory judgment actions, they must provide "well-founded reasons for declining to entertain a declaratory judgment action." *Coyle*, 394 F.3d at 1345. When there has been a direct charge of infringement by the patentee and an actual controversy exists, discretionary dismissal is "rarely proper." *Capo*, 387 F.3d at 1355; *see*

21

*also Genentech v. Eli Lilly & Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993) ("When there is an actual controversy and a declaratory judgment would settle the legal relations in dispute and afford relief from uncertainty or insecurity, in the usual circumstance the declaratory judgment is not subject to dismissal."). "The refusal to exercise jurisdiction leaves [plaintiff] 'helpless and immobile so long as the patent owner refuses to grasp the nettle and sue.' In patent cases the court's refusal to accept a declaratory action also raises issues of public interest...." *Capo*, 387 F.3d at 1358. The Federal Circuit, in holding that Declaratory Judgment jurisdiction existed, recognized the alleged infringer's entitlement to business certainty: "As 3M continues to sell products it believes do not infringe, its potential liability grows. These are among the problems the Declaratory Judgment Act sought to alleviate." *Minnesota Mining and Mfg. Co. v. Norton Co.*, 929 F.2d 670, 673 (Fed. Cir. 1991). Similarly, Amgen is entitled to a judicial resolution of its liability under the '516 patent and should not be forced to wait for ARIAD to take action as Amgen's potential liability grows. Both the facts and the law support the exercise of jurisdiction here.

## II.    THE COMPLAINT STATES A CLAIM ON WHICH RELIEF CAN BE GRANTED.

In its complaint, Amgen sufficiently pled the basis on which it is entitled to declaratory relief. Under the liberal notice pleading standard of Rule 8, "[t]o withstand a 12(b)(6) motion, a plaintiff need only make out a claim upon which relief can be granted." *Alston v. Parker*, 363 F.3d 229, 233 n.6 (3d Cir. 2004) (noting that "a plaintiff need not plead facts."). To establish an action for patent infringement, a declaratory judgment plaintiff need only claim "an explicit threat or other action" and "present activity by the declaratory plaintiff which could constitute infringement." *See Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1332 (Fed. Cir. 2005). Amgen alleged both elements in its complaint by reference to ARIAD's actions and Amgen's present activities relating to its ENBREL and KINERET products. *See* Complaint ¶ 18. Therefore, Amgen has sufficiently pled a claim upon which relief can be granted in its complaint.

The Third Circuit has held that a court should not dismiss a complaint "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would

entitle him to relief." *Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir. 1997) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).[49] Indeed, in the case ARIAD cites (at 13 of its brief) to support its proposition that the instant complaint should be dismissed, *Morse v. Lower Merion School Dist.,* 132 F.3d 902, 910 (3d Cir. 1997), the court dismissed the pleadings under 12(b)(6) only after finding that the plaintiffs could have not alleged ***any set of facts*** that would support their claim. *Id.* ("Based on a review of the complaint, we find that plaintiff can prove no set of facts which will entitle him to relief."). This is clearly not the case here. In fact, this pleading provided adequate notice to ARIAD, as evidenced by ARIAD's lengthy response in its opening brief. *Cf. Alston,* 363 F.3d at 234 (upholding the sufficiency of pleadings, noting that defendant's "12(b)(6) motion was replete with defenses that responded to claims they discerned in [plaintiff] Alston's complaint."). There is no requirement to plead jurisdictional facts with particularity, and thus ARIAD's motion fails on this argument as well.

## III.    THE THREE INSTITUTIONS ARE NEITHER NECESSARY PARTIES TO THIS ACTION NOR INDISPENSABLE PARTIES THAT CANNOT BE JOINED.

ARIAD finally, and erroneously, argues that this action cannot go forward in the absence of the Institutions that were originally assigned the '516 patent. As an initial matter, this argument ignores the fact that the Institutions have granted ARIAD broad and nearly unfettered rights in the patent. The Institutions are thus neither necessary nor indispensable parties because they have granted ARIAD all substantial rights in the '516 patent, and ARIAD can appropriately protect any limited interests the Institutions might have in this action. But even if ARIAD could argue that the handful of rights retained by the Institutions would make them necessary parties, that would simply mean that the Institutions have a continuing and ongoing relationship with a

---

[49]    Additionally, the Third Circuit has held that a district court "must permit a curative amendment, unless an amendment would be inequitable or futile" before dismissing under 12(b)(6). *Alston,* 363 F.3d at 235-36. To the extent that this Court determines that further factual allegations should be pled to support the allegations in the complaint as filed, Amgen requests leave to amend the complaint to include the assertions contained in this brief.

Delaware company (ARIAD) relating to the subject matter of this lawsuit (the '516 patent). That

relationship, and the language defining it, would subject the Institutions to personal jurisdiction in

Delaware in the event they are found to have retained substantial rights in the patent.

### A.     The Institutions Are Not Necessary Parties Under Rule 19(a), As They Have Transferred All Substantial Rights in the '516 Patent to ARIAD.

When a patent holder transfers "all substantial rights" in a patent to an exclusive licensee,

courts consider this to be an effective assignment, making the patent holder's presence in any

infringement suit unnecessary. *Sicom Tech Ltd. v. Agilent Tech., Inc.*, 427 F.3d 971, 977 (Fed.

Cir. 2005). To determine whether a license amounts to an assignment, courts look to the intent of

the parties, as indicated by the terms of their agreement. In assessing this intent, courts have

found it instructive to compare the rights retained by the patent holder to the rights that have been

transferred. *See Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 875

(Fed. Cir. 1991) ("In determining whether a grant of *all* substantial rights was intended, it is

helpful to look at what rights have been retained by the grantor, not only what was granted.").

ARIAD has been granted an exclusive license under the '516 patent that includes, *inter alia*, the

right to prosecute and defend lawsuits, including the right to sue on its own and/or include the

Institutions as parties to an action. It is thus entirely appropriate for Amgen to proceed with this

suit against ARIAD alone.

One important factor in determining whether a transfer of rights is an effective

assignment is the exclusivity of the transfer. *Sicom*, 427 F.3d at 976. Under the amended Section

2.3, ARIAD received an exclusive license, which weighs in favor of finding that there has been

an effective assignment of rights. *Id.* at 976.

In assessing the question of whether all substantial rights have been transferred, courts

particularly focus on the extent to which the patent holder transfers the right to sublicense the

patent. *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1380 (Fed. Cir. 2000) ("A licensee's

right to sub-license is an important consideration in evaluating whether a license agreement

24

transfers all substantial rights"); *see also Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1342 (Fed. Cir. 2006) (noting the importance of a "virtually unrestricted" right to sublicense). ARIAD has a virtually unfettered right to further transfer its rights in the '516 patent through sublicensing.[50]   So long as ARIAD's sublicense contains certain routine provisions respecting, for example, indemnification of the Institutions for product liability,[51] ARIAD is free to sublicense anyone it chooses. *Cf. Vaupel*, 944 F.2d at 875 (noting that "[t]he sublicensing *veto* was a minor derogation from the grant of rights") (emphasis added).

Another important factor in assessing whether all substantial rights have been transferred is the right to enforce the patent. *See id.* at 875 (the right to enforce patents is "particularly dispositive"). ARIAD also has broad rights to enforce the '516 patent. Not only can ARIAD bring and defend infringement suits on its own ("[t]he total cost of any such infringement action commenced or defended *solely by [ARIAD]*" shall be borne by [ARIAD]"),[52] but it has the sole right to offer a sublicense to alleged infringers[53] and it has the right to use the Institutions' names and join them in the litigation if ARIAD so desires, at its own expense.[54]   *See Aspex*, 434 F.3d at 1342 (noting that the patent holder's residual right to sue if licensee had not brought suit after thirty days was rendered minimal by licensee's right to sublicense, over which the patent holder "retained no supervisory or veto power") (internal quotations omitted). These factors, combined with the fact that ARIAD can bring or defend litigation under the '516 patent on its own, strongly indicate that all substantial rights to the '516 patent have been transferred.

In arguing that all substantial rights were not transferred, ARIAD places special emphasis in its brief (at 15) on the fact that Section 7.5 of the agreement permits the Institutions to take

---

[50]   (Sharp Decl., Ex. F § 7.7 and Ex. H [Second Amend.] § 2.1.4.)

[51]   (Sharp Decl., Ex. F at Art. VIII and Ex. H § 2.1.4)

[52]   (Sharp. Decl., Ex. F § 7.2 (emphasis added).)

[53]   (*Id.* §§ 7.4, 7.7.)

[54]   (*Id.* § 7.2.)

over defense of a declaratory judgment action at their option.[55]  While this might help support

ARIAD's argument if it were true, it is not.  In fact, ***ARIAD has cited to a superseded (and thus***

***inapplicable) version of its own agreement!***  The current version of Section 7.5 confirms that

ARIAD and the Institutions specifically contemplated that ARIAD would be named as the only

defendant in a declaratory judgment action and could defend that action on its own.[56]  The

amendment to Section 7.5 makes clear that the Institutions are no longer permitted to intervene in

declaratory judgment actions at their option.  In fact, they can intervene in such a suit ***only if***

ARIAD takes no action at all:

> In the event that a declaratory action alleging invalidity or
> noninfringement of any of the Patent Rights shall be brought
> against [ARIAD], and ***[ARIAD] fails to take reasonable steps to***
> ***defend such action in a timely manner***, [the Institutes], at [their]
> option shall have the right to intervene and take over sole
> defense of such action at [their] own expense.[57]

Based on the governing principles set forth by the Federal Circuit, it must be concluded that

ARIAD has obtained all substantial rights to the '516 patent through its exclusive license.

In contrast to the important rights that have been transferred to ARIAD, the handful of

rights retained by the Institutions do not weigh against a finding that all substantial rights have

been transferred.  The rights cited by ARIAD in its brief have all been found to fall short of rising

to the level of substantial rights for this purpose:

- The right to practice the invention non-commercially (§ 2.7) is not a substantial right.
  *See Intuitive Surgical, Inc. v. Computer Motion, Inc.*, 214 F. Supp.2d 433, 440 (D.
  Del. 2002) (licensee had standing to sue alone where, *inter alia*, the patent holders
  retained a right to practice the patent "for research and development purposes");

- The right to consent to an assignment of the patent to a third party, where such
  consent shall not be unreasonably withheld (Article XI.[58]), is not a substantial right,
  particularly in light of an unrestricted right to sublicense.  *See Aspex*, 434 F.3d at

---

[55]  (*Id.* § 7.5.)

[56]  (Sharp. Decl., Ex. H § 2.3.1 (replacing the previous § 7.5).)

[57]  (*Id.* § 2.3.1.)

[58]  Assignment to a successor institution only requires the approval of the Institutions.

1342 ("given [exclusive licensee's] virtually unfettered right to sublicense, [its] limited ability to assign its rights to unaffiliated third parties is not controlling"); *Speedplay Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1252 (Fed. Cir. 2000) (examining a similar reservation on a right to assign, and concluding that it "does not significantly restrict the scope of the [licensee's] rights in the [] patent."); and

- The right to consent to the settlement of an ARIAD-initiated lawsuit, where such consent should not be unreasonably withheld (§ 7.2.), also is not a substantial right. *See Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333, 1344 n. 12 (Fed. Cir. 2001) (examining a similar settlement requirement, and finding that its effect on this analysis was "neutral").

A final right cited by ARIAD – a residual right to bring an enforcement suit if ARIAD has taken no action after six months[59] – likewise falls short of precluding a transfer of all substantial rights. In *Speedplay*, the Federal Circuit examined a similar residual right to enforce and concluded that its impact on a transfer of all substantial rights was minimal because the licensee retained the right to grant a royalty-free sublicense to an alleged infringer. *See* 211 F.3d at 1251. The ARIAD Exclusive License likewise gives ARIAD the sole right to sublicense, and in particular, specifically acknowledges that only ARIAD can sublicense to an accused infringer:

> [ARIAD]...shall have the ***sole right*** in accordance with the terms and conditions herein to sublicense any alleged infringer for future use of the Patent Rights.[60]

Such a sublicense, requiring no consent from the Institutions as per § 7.7, allows ARIAD to effectively veto any legal action the Institutions may take. The fact that ARIAD can bring and defend suit on its own, and can sublicense the '516 patent without any input from the Institutions, means that ARIAD has the sole power to "indulge" infringement – another key right that indicates all substantial rights have been transferred. *See Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1132 (Fed. Cir. 1995) (noting that the right to indulge infringements "normally accompanies a complete conveyance of the right to sue."). Indeed, ARIAD has already exercised this right, by publicly announcing on its website that it will indulge any non-commercial

---

[59]  (Sharp Decl., Ex. F § 7.4.)

[60]  (*Id.* § 7.7 (emphasis added).)

27

practicing of the '516 patent: "We permit broad use of our NF-κB intellectual property at no cost by investigators at academic and not-for-profit institutions to conduct non-commercial research."[61]  The rights retained by the Institutions are thus insubstantial, and the Institutions are not necessary parties to this lawsuit.

> **B.      The Institutions Do Not Need to Be Joined Even If They Are Necessary, Because Their Presence Is Not Indispensable Under Rule 19(b).**

Even if the Institutions are found to be necessary parties under Rule 19(a), they are not indispensable parties to this litigation under Rule 19(b).[62]  This rule provides that if a person as described in Rule 19(a) cannot be joined, "the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable."  In making that determination, courts consider, *inter alia*, whether that party's absence would be prejudicial to that person or current parties to the suit and whether judgment rendered without that party would be adequate.  *See Gardiner v. Virgin Islands Water & Power Auth.*, 145 F.3d 635, 640 (3d Cir. 1998).[63]

The Institutions would not be prejudiced if they are not joined.  An absent party suffers no prejudice if it has previously indicated that it entrusts another party to handle its litigation.  *See Erbamont Inc. v. Cetus Corp.*, 720 F. Supp. 387, 394 (D. Del. 1989).  In *Erbamont*, an Italian

---

[61]  (Sharp Decl., Ex. D.)

[62]  Amgen contends, alternatively in III(C) below, that this Court would have jurisdiction over the Institutions, although Amgen would request further discovery into this issue.  Amgen contends, however, that regardless of personal jurisdiction, the parties are not indispensable such that the personal jurisdiction question does not need to be reached.

[63]  This list of factors, however, is not exhaustive.  *See Gardiner*, 145 F.3d at 640.  Courts also consider whether prejudice can be lessened by the shaping of relief, but this factor carries little weight in the context of patent litigation.  *Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.*, 142 F.3d 1266, 1272-73 (Fed. Cir. 1998) (characterizing this factor as "of little relevance in the context of a patent declaratory judgment suit because the relief sought in such a suit does not depend upon the patentee's presence in court.").  Courts in the Third Circuit also consider whether plaintiffs would have an adequate remedy for non-joinder, a point not addressed by ARIAD.  (*Id.*)  The determination under Rule 19 is a matter of regional, rather than Federal Circuit, law.  *See Dainippon.*, 142 F.3d at 1269 (appealing from the District of Delaware and applying Third Circuit law).

28

company, Farmitalia, had exclusively licensed its patent to an American company, Erbamont, and in the parties' exclusive license had granted Erbamont the right to bring infringement suits. *Id.* The *Erbamont* court flatly rejected the argument that Farmitalia would be prejudiced if it were not joined as a party to infringement litigation in the U.S.:

> Farmitalia can hardly be said to suffer prejudice from a judgment of invalidity when it has entrusted its licensee, Erbamont, with the right to protect its interests by suing for infringement.

*Id.*

Likewise in this case, the Institutions have repeatedly indicated that they entrust ARIAD with the right to enforce and defend the '516 patent. The ARIAD Exclusive License permits ARIAD to file or defend suits relating to the '516 patent without joining the Institutions, indicating, as in *Erbamont*, that the Institutions believed that ARIAD would sufficiently represent their interests in the '516 patent.[64] The Institutions and ARIAD shared common counsel in the *Lilly* litigation, further confirming that the Institutions felt no need to seek alternate counsel to protect any divergent interests. *Cf. In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1373 (Fed. Cir. 1999) (no prejudice suffered when the interests of present and absent parties were aligned).

Moreover, the Institutions do not need to be joined as parties to this lawsuit because any relief this Court would grant in their absence would be adequate under Rule 19(b). Relief may not be adequate if there are strong indications that a ruling in this case would not preclude future litigation on the same issues, which could occur if absent parties are not bound to this Court's judgment. However, when absent parties are in privity with parties to the lawsuit, they would be bound by this Court's judgment. *See Gardiner*, 145 F.3d at 642 n.6 (citing *Moore's Federal*

---

[64] Also similarly to *Erbamount*, the Institutions have the right to intervene into a suit maintained by ARIAD if the Institutions should ever feel that ARIAD no longer represents their interests. *Erbamont*, 720 F. Supp. at 394 ("If either company thought it would be prejudiced, it could voluntarily join this action."); *see also Dainippon*, 142 F.3d at 1272 (appealing from the District of Delaware and applying Third Circuit law) ("Moreover, to the extent it would be prejudiced if the suit were to proceed in its absence, CFMT may intervene in the suit, and this 'opportunity to intervene may be considered in calculating [any] prejudicial effect.'").

*Practice*, § 132.01[1]). In this case, the Institutions would be bound by any ruling issued by this

Court because they are in privity with ARIAD under their Exclusive License. ARIAD confuses

this issue by simultaneously arguing that the Institutions would be prejudiced because they ***would***

***be bound*** by this judgment under principles of collateral estoppel and that any judgment rendered

by this Court would not be adequate because the Institutions ***would not be bound*** by collateral

estoppel.[65] But ARIAD cannot have this argument both ways. In fact, the Institutions would be

bound by any judgment issued by this Court, and the issue of undue prejudice, as discussed

above, does not require the joining of the Institutions to this suit.[66]

>    **C.    Even In The Event The Court Were To Find That The Institutions Retained
>    Substantial Rights in the '516 Patent and Are Thus Necessary Parties, The
>    Institutions Would Then Be Subject to Personal Jurisdiction in Delaware.**

Even if this Court finds that all substantial rights have not been transferred to ARIAD

such that the Institutions are necessary parties, this Court would have personal jurisdiction over

the Institutions.[67] ARIAD cannot have it both ways. If ARIAD can convince the Court that the

Institutions maintain substantial rights in the '516 patent, then it must follow that this Court has

---

[65]   (Def.'s Br. at 16-17.)

[66]   ARIAD's citation and heavy reliance on the Western District of Pennsylvania opinion in
*Suprex Corp. v. Lee Scientific, Inc.*, 660 F. Supp. 89 (W. D. Pa. 1987) at pages 16-17 of its
brief is misplaced. Not only does this opinion pre-date (and has thus been implicitly
overruled by) the controlling appellate authority cited by Amgen on this issue, but the key
fact in the case was that the patent at issue had been recently declared invalid by the United
States Patent and Trademark Office. *Id.* at 93-94.

[67]   Harvard is not a necessary party even if MIT and Whitehead are, as Harvard transferred an
even greater number of rights in the ARIAD Exclusive License than did the other two
Institutions. (Sharp Decl., Ex. G). Under the First Set of Amendments to the ARIAD
Exclusive License, which altered the license to reflect Harvard's participation in the
underlying research, Harvard notably did not retain *any* right to bring an infringement action
or to intervene in a declaratory judgment action on its own, and Harvard possesses no right to
consent to an assignment of ARIAD's exclusive license to a third party. (*Id.*) Thus, even if
this court determines that MIT and Whitehead are necessary and indispensable parties, the
same conclusion does not apply to Harvard, which has retained none of the indicia of
ownership that would necessitate its presence as a party to this case.

personal jurisdiction over the Institutions due to their ongoing relationship with ARIAD (and thus Delaware) pursuant to these rights under the patent.

As an initial matter, although ARIAD states in its brief that "[n]one of the [Institutions] is subject to personal jurisdiction in Delaware,"[68] the Whitehead Institute is, in fact, incorporated in Delaware and consequently subject to personal jurisdiction here. *See Reach & Associates, P.C. v. Dencer*, 269 F. Supp 2d 497, 502 (D. Del. 2003). Further, though Harvard and MIT are not Delaware corporations, they have entered into an exclusive license with a Delaware corporation that subjects them to personal jurisdiction here as well.

All three Institutions, including specifically MIT and Harvard, have consented to jurisdiction in Delaware. Exercising jurisdiction over a party is proper if they have consented to suit in a forum. *See The Capital Group Cos., Inc. v. Armour*, 2004 WL 2521295, *2 (Del. Ch. 2004). Under the provisions of the ARIAD Exclusive License, the Institutions have manifested their consent to suit anywhere, and cannot complain about being subject to suit in Delaware – the state of incorporation for both ARIAD and the Whitehead Institute. Courts presented with very similar facts have found jurisdiction to be proper. In *Rossman v. State Farm Mutual Automobile Ins. Co.*, 832 F.2d 282, 286 (4th Cir. 1987), defendant Consolidated, which was incorporated, headquartered and conducted all of its business in Illinois, was hailed into a Virginia court on the basis that it "specifically promised to defend its policyholders from any claim or suit arising from a loss or accident within its policy territory, which included the *entire United States*." *Id.* at 286-87 (emphasis added). The *Rossman* court also indicated that being hailed into a foreign forum was eminently foreseeable due to the nature of the agreement between Consolidated and its policyholders. *See id.* at 286 (noting that the "policy is typically sued upon where the accident takes place.").

---

[68]   (Def.'s Br. at 3.)

The Institutions have similarly given their advance consent to jurisdiction under Section 7 of the ARIAD Exclusive License, in which they agreed to be joined in litigation in *any* forum in which ARIAD brings suit, and to cooperate with ARIAD in any infringement litigation, regardless of the suit's location.[69]   Delaware was an eminently foreseeable forum in which ARIAD would be sued for an action relating to the '516 patent – ARIAD and Whitehead are Delaware corporations – and the Institutions must have foreseen this possibility when they entered into the license.  They cannot now complain that they must participate in litigation here. Indeed, if ARIAD's position were upheld, it would create the inequitable result that all suits involving the '516 patent would necessarily take place in the Institutions' backyard if ARIAD strategically decided that to be its preference.

That the Institutions have consented to personal jurisdiction in this forum, and that such jurisdiction is reasonable, is underscored by recent Federal Circuit case law finding, under facts similar to those here, that non-resident companies can submit themselves to personal jurisdiction within a forum by virtue of the relationship created through a license agreement with a forum resident. *Breckenridge Pharma., Inc. v. Metabolite Lab., Inc.*, 444 F.3d 1356, 1366 (Fed. Cir. 2006) ("[T]he defendant is subject to personal jurisdiction in the forum state by virtue of its relationship with its exclusive forum state licensee if the license agreement, for example, requires the defendant-licensor, and grants the licensee the right, to litigate infringement claims," *citing Akro Corp. v. Luker*, 45 F.3d 1541, 1546 (Fed. Cir. 1995).).  The *Breckenridge* court explained that jurisdiction will be proper where "the license agreement contemplate[s] a relationship beyond royalty or cross-licensing payment, *such as granting both parties the right to litigate infringement cases*...."  444 F.3d at 1366 (emphasis added.)  ARIAD relies, *inter alia*, on the Institutions' purported ability to sue infringers to argue that substantial rights have not been

---

[69]   (Sharp Decl., Ex. F §§ 7.2 and 7.6.)

transferred to ARIAD.[70]  Under the analysis set forth in *Breckenridge*, however, it is these very types of retained rights that subject the Institutions to personal jurisdiction and makes such jurisdiction reasonable.

In the end, either the Institutions are subject to personal jurisdiction in Delaware or all substantial rights have been transferred to ARIAD from the Institutions, in which case this action may proceed in the Institutions' absence.

---

[70]   (Def.'s Br. at 15.)

## CONCLUSION

For the foregoing reasons, ARIAD's motion to dismiss this complaint for lack of subject matter jurisdiction, failure to state a claim for which relief may be granted, and failure to join indispensable parties should be denied.

Respectfully,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_Melanie K. Sharp_

Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6681
msharp@ycst.com

Mark A. Pals
Marcus E. Sernel
Jamie H. McDole
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601-6636
(312)861-2000

Drew Diamond
KIRKLAND & ELLIS LLP
South Figueroa Street
Los Angeles, CA 900017-5800
(213)680-8400

*Attorneys for Plaintiffs Amgen, Inc., Immunex Corporation, Amgen USA Inc., Amgen Manufacturing, Limited, and Immunex Rhode Island Corporation.*

DATED: June 28, 2006

34

**CERTIFICATE OF SERVICE**

I, Melanie K. Sharp, Esquire, hereby certify that on June 28, 2006, I caused to be electronically filed a true and correct copy of the foregoing, Plaintiffs' Opposition to Ariad's Motion to Dismiss for Lack of Subject Matter Jurisdiction, Failure to State a Claim, and Failure to Join Indispensable Parties, with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> John G. Day, Esquire
> Ashby & Geddes
> 222 Delaware Avenue, 17th Floor
> Wilmington, DE 19801

I further certify that on June 28, 2006, I caused a copy of the foregoing, Plaintiffs' Opposition to Ariad's Motion to Dismiss for Lack of Subject Matter Jurisdiction, Failure to State a Claim, and Failure to Join Indispensable Parties, to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

> BY E-MAIL (by agreement of counsel)
> Morgan Chu, Esquire
> David I. Gindler, Esquire
> Amir A. Naini, Esquire
> Christopher M. Newman, Esquire
> Irell & Manella LLP
> 1800 Avenue of the Stars
> Suite 900
> Los Angeles, CA 90067-4276
>
>
> Melanie K. Sharp (No. 2501)
> YOUNG CONAWAY STARGATT & TAYLOR, LLP
> The Brandywine Building, 17th Floor
> 1000 West Street
> P.O. Box 391
> Wilmington, Delaware 19899-0391
> (302) 571-6681
> msharp@ycst.com
>
> *Attorneys for Plaintiffs*

# EXHIBIT A



Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 71492 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
BRISTOL-MYERS SQUIBB COMPANY, Plaintiff,
v.
RHÔNE-POULENC RORER, INC., Centre National De La
Recherche Scientifique, and Rhône-Poulenc Rorer, S.A.,
Defendants.
**No. 95 Civ. 8833 (RPP).**

Feb. 20, 1996.

Fitzpatrick, Cella, Harper & Scinto by Robert L. Baechtold,
Nicholas Kallas, New York City, for plaintiff.
Morgan & Finnegan, L.L.P. by William Feiler, Dick Downing,
Cindy Zelson, New York City, for defendants.

OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge:

*1 Defendant, Rhône-Poulenc Rorer, S.A. ("RPRSA"),
moves pursuant to the Declaratory Judgment Act, 28 U.S.C.
§2201, and Rules 12(b)(1) and 12(b)(6) of the Federal Rules
of Civil Procedure (Fed. R. Civ. P.) to dismiss this declarat-
ory judgment action brought by plaintiff, Bristol-Myers
Squibb Company ("BMS"), on the grounds that this Court
lacks subject matter jurisdiction under the Declaratory Judg-
ment Act, 28 U.S.C. §2201, and that BMS' complaint does
not state a claim upon which relief can be granted. In the al-
ternative, RPRSA requests that this Court exercise its dis-
cretion and dismiss this action in favor an action filed in the
District of Delaware, *Rhône-Poulenc Rorer, S.A. v. Bristol-
Myers Squibb Company,* Civil Action 95-636 (Robinson,
J.). Defendants, Rhône-Poulenc Rorer, Inc. ("RPRI") and
Centre National de la Recherche Scientifique ("Centre Na-
tional") have joined RPRSA's motions to dismiss this ac-
tion.FN1

For the following reasons, defendants' motions are denied.

*BACKGROUND*

BMS is a Delaware corporation with its corporate headquar-
ters, corporate management, offices of general counsel and
office of patent counsel located in New York City.

(Affidavit of Dominic M. Mezzapelle, Esq. dated December
15, 1995 ("Mezzapelle Aff.") at ¶2.)

Movant, RPRSA, is a French corporation located in Cedex,
France; RPRI is a Pennsylvania corporation located in Col-
legeville, Pennsylvania; and Centre National is a French
government/municipal establishment located in Paris,
France. (First Amended Complaint filed October 20, 1995
("Complaint") at ¶2.)

BMS commenced this action on October 17, 1995 seeking a
declaratory judgment of "non-infringement, invalidity and
unenforceability of certain patents controlled by Rhône-
Poulenc, and specifically United States Reissue Patent No.
34,277, entitled "Process for Preparing Taxol", which issued
on June 8, 1993 (the '277 patent)."FN2 (Id. at ¶3.) Taxol is
the trademark under which BMS sells paclitaxel, an anti-
tumor drug that is currently used for the treatment of ovari-
an and breast cancer. (Id. at ¶6.) BMS introduced Taxol in
early 1993 (Mezzapelle Aff. at ¶4) and is the only supplier
of paclitaxel in the United States (Complaint at ¶6).

Until recently, all of the paclitaxel supplied to patients in the
United States was extracted from the bark of Pacific yew
trees, a process which killed the trees. Thus, paclitaxel was a
limited resource. (Id. at ¶10; Mezzapelle Aff. at ¶4.) BMS
developed for commercial sale a semi-synthetic (or hemi-
synthetic) process, based partly on a natural product and in
part on a synthetic scheme, for making paclitaxel by chem-
ical reactions carried out on material that can be obtained
from parts of the yew tree without killing the tree.
(Complaint at ¶11.) BMS now manufacturers paclitaxel by
use of its semi-synthetic process in a manufacturing faculty
in Ireland and imports it for sale in the United States. (Id. at
¶13.)

*2 On February 17, 1993, RPRI issued a press release in
which RPRI said it wanted "to make sure Bristol-Myers
Squibb's processes don't infringe on its patent for Taxotere."
(Mezzapelle Aff., Ex. 1.)FN3FN4 On February 25, 1993,
Dominic M. Mezzapelle, vice-president and associate gener-
al counsel, patents, of BMS, wrote to Jacques Savina, vice-
president patents of RPRSA, referred to the press release of
February 17, 1993, and expressed an interest in meeting
with Mr. Savina to discuss this matter. (Id. at ¶7, Ex. 1.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 71492 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Subsequently, BMS and defendants began discussions regarding the applicability of the '277 patent to BMS' semi-synthetic process.

In July 1993, Mr. Mezzapelle received a letter dated July 26, 1993 from Martin Savitzky, vice-president, patents, of RPRI, which stated in pertinent part:
From publicly available information, RPR is aware the BMS is developing Professor Robert Holton's semi-synthetic process disclosed in U.S. Patent No. 5,015,074 issued May 14, 1991 and licensed by BMS from Florida State University. RPR believes that the Holton process and intermediates used therein are covered by the claims of Re 34,277 [the '277 patent]. Consequently, RPR has reason to believe that BMS is in the course of developing a process that is covered by the claims of Re 34,277.
In view of the large number of patents making up RPR's taxane-related patent estate and our companies' good business relations, we believe that a meeting would be very useful to examine the applicability of these properties to BMS' activities. RPR is particularly interested in reviewing information, such as might be disclosed in BMS' supplemental hemi-synthetic process FDA filings, that would tend to confirm or dispel RPR's beliefs relating to the Holton process.

(Mezzapelle Aff., Ex. 2.)

On November 22, 1993, Josef Bossart, executive director, worldwide business development and licensing, of RPRI, and Mr. Savitzky met with BMS. On December 6, 1993, Gary King, director, of licensing, Europe, for BMS, wrote to Mr. Bossart. The letter stated in pertinent part:
...[A]s we stated at our meeting, to the best of our knowledge, BMS is not infringing RPR's patents, including any claims of Reissue Patent 34,277 [t he '277 patent].
...[W]e are pleased that RPR is willing to license BMS under its '277 patent should the need arise. Furthermore, your stated preference to compete with us in the marketplace, and not in the courts, reflects our desires as well.

(Defendants' Exhibits in Support of Motion to Dismiss ("Defs.' Ex.") 6.)

On February 3, 1994, Mr. Savitzky wrote to Mr. Mezzapelle stating in pertinent part:

...We have not deemed it prudent to accept BMS' representations respecting the coverage of the BMS semi-synthetic process work by RPR's patent claims. As you can appreciate, reasonable men can differ on complex issues of law and especially on matters of patent law. And as we presented at our meeting, the publicly available facts of which we are presently aware do not support BMS' position.
*3 ... [T]o put any appearance of anti-competitive behavior to rest, we believe it is important that we agree not to agree on the patent issue and structure our future discussions in terms of settlement of possible future patent litigation.

(Mezzapelle Aff., Ex. 5.) Mr. Savitzky's February 3, 1994 letter also included an outline of the terms of RPRI's potential license, but noted that RPRI did not have enough information from BMS to actually structure a license. (Id.)

On June 17, 1994, Mr. Mezzapelle received a letter from Eugene Moroz, Esq., outside patent counsel to RPRI and RPRSA, discussing Mr. Savitzky's suggestion that "...under confidentiality, RPR should be permitted to review the processes associated with BMS' semisynthetic procedure(s) for making Taxol paclitaxel in order for RPR to determine relevant licensing terms."[FN5] (Id., Ex. 6.) Mr. Moroz suggested that the parties meet and noted that the offices of his law firm and those of BMS were only "separated by a few floors in the same building." (Id.)

On June 23, 1994, Mr. Mezzapelle wrote to Mr. Moroz in response to his June 17, 1994 letter and stated: "...Bristol's commercial or prospective commercial plans and process information are very valuable and highly confidential. Agreeing to disclose them to a major competitor, or even to outside counsel of that competitor, would require *truly compelling justification.*" (Id., Ex. 7 (emphasis added).) Subsequently, Mr. Mezzapelle met with Mr. Moroz on at least two occasions in July and August 1994. During a July 14, 1994 meeting Mr. Moroz claimed that Bristol would be infringing the '277 patent, stated that a license at 3% would be appropriate, and making reference to Mr. Mezzapelle's letter of June 23, 1994 asked if a lawsuit would constitute a "compelling justification." (Id. at ¶22.)

On September 7, 1994, Mr. Mezzapelle wrote to Mr. Moroz with a proposal of the essential terms for an arbitration

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                    Page 3
Not Reported in F.Supp., 1996 WL 71492 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

between RPRI and BMS. (*Id.* at ¶23, Ex. 8.) Mr. Mezzapelle avers that he was told by Mr. Savitzky that RPRI would not arbitrate the dispute because arbitration would not give him the same discovery he would get in a litigation. (*Id.* at ¶23.)

In late 1994, BMS received FDA approval to use its semi-synthetic process to make paclitaxel. (*Id.* at ¶11.) According to Mr. Mezzapelle, BMS' imminent marketing and dependence on its new process (due to a shrinking supply of bark-derived paclitaxel) made it necessary to bring its discussions with RPRI which had stretched out over two years to a conclusion. (*Id.* at ¶12.)

On July 19, 1995, a meeting was held at BMS' offices which was attended by Mr. Mezzapelle; Mr. Savitzky; Kenneth Weg, chief executive officer of BMS; and Robert Cawthorn, chief executive officer of RPRI. (*Id.* at ¶13.) Mr. Mezzapelle avers that at this meeting he stated that RPRI's prior demand for a 3% royalty was not acceptable and offered a royalty of 0.5%. (*Id.* at ¶15.) RPRI rejected BMS' offer of a 0.5% royalty and rescinded its previous offer of a 3% royalty. Subsequently, Mr. Cawthorn told Mr. Weg that RPRI would require a royalty of at least 5%. (*Id.*)

*4 After the general meeting, Mr. Cawthorn and Mr. Weg had a private meeting at Mr. Cawthorn's office. (*Id.* at ¶16.) Mr. Weg informed Mr. Mezzapelle that although both chief executive officers expressed a desire to find a business solution before embarking on litigation during this private meeting, Mr. Cawthorn asserted that a royalty of 5% was the minimum RPRI could accept. (*Id.*)

On September 8, 1995, Mr. Mezzapelle wrote to Mr. Savitzky stating in pertinent part:
To provide you with assurance that our conclusion of non-infringement is correct, we have reconsidered our earlier position and would now be willing to disclose our semi-synthetic process to Mr. Morosz[sic] for his evaluation, on the conditions that he will not disclose it to anyone else, he will not use it for any purpose other than evaluating whether it infringes any RPR patent, he will not advise RPR or anyone else on filing or amending any patent application claims and, if he disagrees with our conclusion, he will explain to our outside counsel why he believes there is infringement.
... [W]e wish to confirm our willingness to pay an ongoing

royalty on all of our sales of paclitaxel or other taxanes produced by semi-synthetic process... in return for a full immunity from suit under all patents owned or controlled of RPR that claim processes or intermediates. During our meeting in July we offered to pay a royalty of 0.5% of net sales price of paclitaxel and we wish to confirm said offer.

(*Id.*, Ex. 3; Defs.' Ex. 7.)

On October 11, 1995 Mr. Savitzky responded stating in pertinent part:
(1) Your offer to disclose to Mr. Moroz information relating to BMS' semi-synthetic manufacture of paclitaxel is appreciated but we don't believe that it could serve to dissuade us from our position regarding RPR's patent rights....
(2) Not unexpectedly, RPR's view of its patents rights, as it relates to BMS' semi-synthetic manufacture of paclitaxel, differs markedly from your own. This is, in part only, due to our differing applications of the Doctrine of Equivalents, recently invigorated by the outcome of the Hilton-Davis case.... That reasonable men disagree on the Doctrine's application to the same evidence should not be surprising: that is why juries are convened. Nonetheless, our views on these legal issues underscore our disappointment in your licensing proposal.
... You must understand that as competitors in this field such a broad license is a non-starter. Consequently, instead of moving the discussion forward as we had hoped, it is our view that your proposal takes a step backward.

(Mezzapelle Aff., Ex. 4; Defs.' Ex. 8.)

On October 17, 1995, BMS initiated this action. On October 18, 1995, RPRSA filed suit against BMS in the District of Delaware for patent infringement. (Defs.' Ex. 1; Complaint dated October 18, 1995 ("Delaware Complaint") at ¶4.)

On October 18, 1995, two wire news reports concerning the suit filed by BMS were issued by Dow Jones News Service. (Affidavit of Tracy E. Furey dated December 13, 1995 ("Furey Aff.") at ¶3, Exs. A, B.) One report stated that "...although negotiations did not break down, Bristol-Myers filed suit based on the strength of its position." (*Id.*, Ex. A.)

*DISCUSSION*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                                                    Page 4
Not Reported in F.Supp., 1996 WL 71492 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

### I. *Declaratory Judgment Act*

**\*5** Defendants' principal motion is that subject matter jurisdiction does not exist under the Declaratory Judgment Act, 28 U.S.C. §2201. The purpose of the Declaratory Judgement Act is to protect threatened parties from the uncertainty and anxiety resulting from a looming lawsuit. *Shell Oil Co. v. Amoco Corp.* 970 F.2d 885, 889 (Fed. Cir. 1992); *Oce-Office Systems, Inc. v. Eastman Kodak Co.*, 805 F. Supp. 642, 646 (N.D. Ill. 1992). Section 2201(a) states:

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights... of any interested party seeking such declaration.... Any such declaration shall have the force and effect of a final judgment or decree shall be reviewable as such.

28 U.S.C. §2201(a). An actual controversy is a jurisdictional prerequisite and must be present before a declaratory judgment action is ripe for adjudication. *Shell Oil Co.*, 970 F.2d at 887.

The standard for determining whether an actual controversy is present in a declaratory judgment action concerning a patent has two elements:

First, the defendant's conduct must have 'created on the part of the declaratory plaintiff a reasonable apprehension that it will face an infringement suit if it commences or continues the activity in question.' Second, 'plaintiff must be engaged in an actual making, selling, or using activity subject to an infringement charge or must have made meaningful preparation for such activity.'

*BP Chemicals Ltd. v. Union Carbide Corp.*, 757 F. Supp. 303, 304 (S.D.N.Y. 1991) (citations omitted). In order to demonstrate the presence of an actual controversy, "the plaintiff has the burden of establishing by a preponderance of the evidence, inter alia, that it has a reasonable apprehension that it will be sued." *Shell Oil Co.*, 970 F.2d at 887.

The test used to determine whether a plaintiff's apprehension of a lawsuit is reasonable is an objective one which focuses on whether the defendant's "...conduct rose to a level sufficient to indicate an intent to enforce its patent." *Id.* at 888. An explicit charge of infringement would give rise to

the reasonable apprehension necessary to demonstrate the presence of an actual controversy, however, an express charge of infringement is not essential. *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 735 (Fed. Cir. 1988). If no clear charge of infringement exists, courts must consider the totality of the circumstances and determine whether the plaintiff has shown that objective circumstances support his apprehension of an impending lawsuit. *See Shell Oil Co.*, 970 F.2d at 888; *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*, 57 F.3d 1051, 1053-1054 (Fed. Cir. 1995).

In deciding a motion to dismiss for lack of subject matter jurisdiction, a court may consider evidentiary matters outside the pleadings. *Indium Corp. of America v. Semi-Alloys, Inc.* 781 F.2d 879, 884 (Fed. Cir. 1985). In this case, an examination of the pleadings, the affidavits, and the correspondence between BMS, RPRI and RPRSA, submitted as exhibits by both parties, shows that the plaintiff's apprehension of a lawsuit was objectively reasonable.

**\*6** Defendants contend that the parties were seeking a business solution and toward that end were involved in negotiations which were unilaterally terminated by the plaintiff when this suit was filed. The fact that BMS terminated negotiations does not negate its reasonable apprehension of a lawsuit, however, especially when viewed in light of defendants' repeated charges that BMS' semi-synthetic process was covered by the '277 patent, defendants' references to litigation in the correspondence between the parties, and the negotiating positions taken by defendants which widened the gap between the parties' positions. Defendants' initial offer of a royalty of 3% was "taken off the table" and replaced by a minimum offer of 5% which RPRI's chief executive officer stated was the minimum RPRI would accept. (Mezzapelle Aff. at ¶15.) Defendants stress that the licensing negotiations were terminated by plaintiffs, but Mr. Savitzky's letter of October 11, 1995 makes it clear that defendants did not see much promise in the future of the negotiations. The refusal to evaluate its patent rights based on plaintiff's offer of disclosure of its process, the reference to recent patent litigation and the convening of juries, as well as the description of plaintiff's proposed license terms as "a non-starter" and "a step backward" provided the plaintiff

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                              Page 5
Not Reported in F.Supp., 1996 WL 71492 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

with reasonable grounds to believe that a lawsuit was likely to occur. (*Id.*, Ex. 4; Defs.' Ex. 8.)

Defendants' contention that plaintiff unilaterally terminated defendants' good faith efforts to negotiate and its claim that plaintiff did not have reasonable apprehension of an impending lawsuit in which defendants would seek to enforce its patent, are severely undermined by the fact that one day after this declaratory judgment action was initiated, RPRSA filed a complaint alleging infringement of its '277 patent in the District of Delaware. The subject matter of this dispute is complex, and a complaint could not have been drafted in a single day. Apparently, plaintiff was not alone in its belief that a lawsuit was imminent.

Plaintiff has shown objective circumstances which support its reasonable apprehension of a lawsuit, thereby satisfying the first requirement of demonstrating that an actual controversy existed at the time this declaratory judgment action was commenced. Plaintiff's efforts in obtaining FDA approval of its semi-synthetic process, manufacturing Taxol produced by the use of this process, and selling this product in the United States are unquestionably activities which meet the second requirement. Therefore, subject matter jurisdiction exists over this dispute under the Declaratory Judgment Act, and RPRSA's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) is denied.

Plaintiff's pleadings include allegations of a present and actual controversy with respect to the validity, infringement, and enforceability of the '277 patent. (Complaint at ¶21.) Such allegations state a cause of action for which the requested relief, a declaratory judgment, could be granted. Accordingly, defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is denied.

II. *Discretionary Dismissal in Favor of Delaware Action*

*7 In a declaratory judgment action, even if federal jurisdiction exists and all requirements of 28 U.S.C. §2201 have been met, it is within the court's discretion to decline to hear the action, particularly when there is a proceeding pending in another court in which the dispute between the parties could be resolved. *Sturge v. Diversified Transport Corporation, 772 F. Supp. 183, 186 (S.D.N.Y. 1991).* Defendants request that this Court exercise its discretion and dismiss this action in favor of the action filed in the District of Delaware on October 18, 1995 by RPRSA.

The Court of Appeals for the Federal Circuit held in *Genentech, Inc. v. Eli Lilly and Co., 998 F.2d 931 (Fed. Cir. 1993),* that although the general rule favors the forum of the first-filed action, whether or not it is a declaratory action, exceptions are made when justice or expediency requires. *Genentech, 998 F.2d at 937.* In order to overcome the preference for the forum of the first-filed suit, however, there must be "... sound reason that would make it unjust or inefficient to continue the first-filed action." *Id. at 937.* Such reasons include: "convenience and availability of witnesses, or absence of jurisdiction over all necessary or desirable parties, or the possibility of consolidation with related litigation, or considerations relating to the real party in interest." *Id.*

Defendants contend that plaintiff used the guise of settlement efforts to win a race to the courthouse and argue that RPRSA's choice of forum should be given deference (Defendants' Memorandum in Support of Motion to Dismiss ("Defs.' Mem.") at p. 17), however, defendants have not shown that this forum is inconvenient, ineffective or unjust. RPRSA has provided no grounds which compel this Court to make an exception to the general rule favoring the forum of the first-filed action. Therefore, RPRSA's motion to dismiss this action in favor of the suit brought by RPRSA in the District of Delaware is denied.

*CONCLUSION*

Defendants' motions pursuant to Fed. R. Civ. P. 12(b)(1) to dismiss for lack of subject matter jurisdiction and Fed. R. Civ. P. 12(b)(6) to dismiss for failure to state a claim are denied. The jurisdictional prerequisites of the Declaratory Judgment Act, 28 U.S.C. §2201, were satisfied because the plaintiff had an objectively reasonable apprehension of a lawsuit at the time it commenced this declaratory judgment action.

Defendants' motion to dismiss this action in favor of the action filed by RPRSA in the District of Delaware is also denied.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                          Page 6
Not Reported in F.Supp., 1996 WL 71492 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

IT IS SO ORDERED.

> FN1. Defendants also moved pursuant to Rule
> 12(b)(2) to dismiss for lack of personal jurisdiction
> and moved to strike allegations in plaintiff's com-
> plaint. On November 22, 1995, at the request of de-
> fendant, the Court ordered that the motion to dis-
> miss for lack of personal jurisdiction and the mo-
> tion to strike be stayed pending resolution of de-
> fendant's motion to dismiss for lack of subject mat-
> ter jurisdiction.

> FN2. When BMS filed its original complaint
> against RPRI and Centre National, BMS stated that
> Centre National was the owner of the '277 patent
> and RPRI was the exclusive licensee of the '277
> patent. (Complaint dated October 17, 1995 at ¶5.)
> In the first amended complaint filed on October 20,
> 1995, BMS states that "Centre National is and has
> been since 1993 the record owner of the '277 patent
> as reflected in the official assignment records of
> the United States Patent and Trademark office",
> and that subsequent to the filing of the original
> complaint RPRSA filed suit in Delaware asserting
> that RPRSA "is the owner of the '277 patent by vir-
> tue of a mesne assignment from the inventors."
> (Complaint at ¶5.)

> FN3. Taxotere is a cancer drug derived from the
> needles of yew trees which is being developed by
> RPRI.

> FN4. At all times from July, 1993 to the present
> BMS has replied to defendants that BMS's semi
> synthetic process for paclitaxel does not fall within
> the valid scope of any claim of the '277 patent.
> (Complaint at ¶15.)

> FN5. Mr. Moroz suggested that "if for some reason
> BMS is reluctant to make any such disclosure, per-
> haps the license could be structured based on total
> sales of Taxol paclitaxel at a certain rate irrespect-
> ive of the mode of preparation." (*Id.*)

S.D.N.Y.,1996.
Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.

Not Reported in F.Supp., 1996 WL 71492 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2001 WL 34935970 () (Transcript) (Nov. 14, 2001) Ori-
ginal Image of this Document (PDF)
• 2001 WL 34935971 () (Transcript) (Nov. 14, 2001) Ori-
ginal Image of this Document (PDF)
• 2001 WL 34935952 () (Partial Testimony) (Jan. 5, 2001)
Original Image of this Document (PDF)
• 2001 WL 34935953 () (Partial Testimony) (Jan. 5, 2001)
Original Image of this Document (PDF)
• 2000 WL 34742996 () (Partial Testimony) (Jul. 28, 2000)
Original Image of this Document (PDF)
• 2000 WL 34742998 () (Partial Testimony) (Jul. 28, 2000)
Original Image of this Document (PDF)
• 2000 WL 34743002 () (Partial Testimony) (Jul. 28, 2000)
Original Image of this Document (PDF)
• 2000 WL 34743245 () (Partial Testimony) (Jul. 28, 2000)
Original Image of this Document (PDF)
• 2000 WL 35249708 () (Report or Affidavit) (Jul. 28, 2000)
• 2000 WL 34745437 () Declaration of Elias J. Corey, Ph.D.
(Jul. 20, 2000) Original Image of this Document (PDF)
• 2000 WL 34742999 () (Partial Testimony) (Mar. 24, 2000)
Original Image of this Document (PDF)
• 1999 WL 34239084 () (Partial Testimony) (Oct. 29, 1999)
Original Image of this Document (PDF)
• 1999 WL 34571668 () (Report or Affidavit) (Jun. 9, 1999)
• 1998 WL 34778140 () (Partial Testimony) (May 26, 1998)
Original Image of this Document (PDF)
• 1998 WL 34778275 () (Partial Testimony) (May 26, 1998)
Original Image of this Document (PDF)
• 1998 WL 34778142 () (Partial Testimony) (May 7, 1998)
Original Image of this Document (PDF)
• 1998 WL 34778143 () (Partial Testimony) (May 7, 1998)
Original Image of this Document (PDF)
• 1998 WL 34778144 () (Partial Testimony) (May 7, 1998)
Original Image of this Document (PDF)
• 1998 WL 34780860 () Affidavit of Daniel Hangard Direc-
teur general of the Institut National de la Propri%21et%21e
Industrielle (Commissioner of Patents) (May 5, 1998) Ori-
ginal Image of this Document (PDF)
• 1997 WL 34392098 () (Partial Testimony) (Oct. 30, 1997)
Original Image of this Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 71492 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 7

• <u>1997 WL 34392099</u> () (Partial Testimony) (Oct. 22, 1997) Original Image of this Document (PDF)
• <u>1997 WL 34392097</u> () (Partial Testimony) (Sep. 8, 1997) Original Image of this Document (PDF)
• <u>1996 WL 34303066</u> (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Plaintiff Bristol-Myers Squibb Company's Motion to Compel and Motion to Bifurcate and Stay Damages Issues (May 28, 1996) Original Image of this Document (PDF)
• <u>1995 WL 17778531</u> (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Motion by Rhone-Poulenc Rorer, S.A. to Dismiss the Action for Lack of Subject Matter Jurisdiction and Lack of in Personam Jurisdiction and to Strike Allegations of Fraud (Oct. 27, 1995) Original Image of this Document (PDF)
• <u>1995 WL 17778530</u> (Trial Pleading) First Amended Complaint (Oct. 20, 1995) Original Image of this Document (PDF)
• <u>1:95cv08833</u> (Docket) (Oct. 17, 1995)
• <u>1995 WL 17761559</u> () (Partial Testimony) (1995) Original Image of this Document (PDF)
• <u>1995 WL 17761560</u> () (Report or Affidavit) (1995) Original Image of this Document (PDF)
• <u>1995 WL 17761561</u> () (Partial Testimony) (1995) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B



Not Reported in A.2d                                                                 Page 1
Not Reported in A.2d, 2004 WL 2521295 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BE-
FORE CITING.
Court of Chancery of Delaware.
THE CAPITAL GROUP COMPANIES, INC., a Delaware
corporation, Plaintiff,
v.
TIMOTHY D. ARMOUR and Nina L. Ritter, individually
and as Trustees of the Ritter-Armour Trust, dated August 6,
1991, as amended, Defendants.
**No. Civ.A. 422-N.**

Submitted Oct. 4, 2004.
Oct. 29, 2004.
Decided Oct. 29, 2004.
Revised Nov. 3, 2004.

Catherine G. Dearlove, James H. McMackin, III, Richards,
Layton & Finger, P.A., Wilmington, Delaware; William J.
Meeske, Latham & Watkins LLP, Los Angeles, California,
for the Plaintiff.
David C. McBride, Adam W. Poff, Young, Conaway, Star-
gatt & Taylor LLP, Wilmington, Delaware; John Gaims,
Amy L. Rice, Gaims, Weil, West & Epstein, LLP, Los
Angeles, California, for Nina L. Ritter and Nina L. Ritter as
Trustee of the Ritter-Armour Trust.
William M. Lafferty, Morris Nichols Arsht & Tunnell,
Wilmington, Delaware, for Timothy D. Armour.

*MEMORANDUM OPINION AND ORDER*
LAMB, Vice Chancellor.

I.

*1 A Delaware corporation brought this suit against the two
trustees of a trust, who are husband and wife, seeking a de-
claration as to the validity and enforceability of certain con-
tractual stock transfer restrictions alleged to apply to shares
of its Class A common stock owned by the trust.[FN1] The
two defendants are parties to a divorce proceeding pending
in the Superior Court of California and, in connection with
that proceeding, the wife has claimed an interest in the stock
now owned by the trust. The corporation seeks to litigate

that claim by its complaint in this court.

    FN1. All references to "stock" refer to CGC's Class
    A common stock, unless otherwise noted.

The contract containing the transfer restrictions at issue stip-
ulates to Delaware as the forum for the resolution of all dis-
putes based on or relating to the contract and expresses the
parties' consent to the jurisdiction of this court for the pur-
pose of such suits. The wife has moved to dismiss the com-
plaint, claiming a lack of personal jurisdiction over her. The
court concludes that the objecting trustee is bound by the
consent to jurisdiction clause in the contract and must de-
fend the action in Delaware. The court also concludes that it
may properly exercise jurisdiction with respect to closely re-
lated claims asserted against her in her individual capacity.

II.

The Capital Group Companies, Inc. ("CGC") is a privately-
held Delaware corporation with its principal place of busi-
ness in Los Angeles, California. The defendants are
Timothy Armour and Nina Ritter, husband and wife, who
are the trustees of the Ritter-Armour Revocable Trust dated
August 6, 1991, as amended (the "Trust"). Armour is an Ex-
ecutive Vice President of Capital Research and Management
Company, a subsidiary of CGC, and a director of CGC.
Ritter is a resident of California and has no substantial con-
tacts with Delaware, beyond the stock at issue in this suit.

CGC requires all persons purchasing shares of its common
stock to become parties to a Stock Restriction Agreement
("SRA") that contains several provisions relevant to this
case, including a general restriction on transfer,[FN2] and a
right to redeem[FN3] that allows the stock to be repurchased
at a formula price[FN4] upon its transfer to a non-authorized
transferee.[FN5] In general, the SRA precludes the transfer of
stock to any non-employee of CGC (such as Ritter) and al-
lows CGC the right to repurchase shares if they are trans-
ferred to a non-employee. The SRA also contains a govern-
ing law and jurisdiction provision, essentially a forum selec-
tion/consent to jurisdiction clause, stating that all actions re-
lating to the SRA shall be brought in the state courts of
Delaware or the district court of Delaware, and that CGC
and each stockholder irrevocably submit to the jurisdiction

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2004 WL 2521295 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 2

of those courts for those purposes.[FN6]

FN2. Section 2.1 of the SRA provides, in pertinent part:
No Stockholder shall sell, assign, transfer (whether by merger, operation of law or otherwise), dispose of any of the Stockholder's Shares or any interest therein except as specifically provided in this Agreement. Any purported or attempted sale, assignment, transfer, disposition or encumbrance of Shares or any interest therein not in strict compliance with this Agreement shall be void and have no force or effect.

FN3. SRA § 4.8.1.

FN4. SRA § 6. The Formula Price would allow the stock held in the Trust to be repurchased at a substantial discount from its estimated value of over $30 million.

FN5. SRA § 4.2.

FN6. Section 10.8 of the SRA provides, in pertinent part:
.... CGC and each Stockholder agree that any action or proceeding based upon or relating to this Agreement shall be brought and maintained exclusively in the courts of the State of Delaware or in the United States District Court of Delaware. CGC and each of the Stockholders hereby irrevocably submit to the jurisdiction of the Courts of Delaware ... for the purposes of any such action or proceeding....

In 1984, Armour and Ritter were married and, in 1989, began buying CGC common stock. All stock purchased between 1989 through mid-1998 was purchased in Armour's name. In October 1998, for tax planning purposes, and with CGC's consent, the defendants placed the stock owned by Armour into the Trust. In order to comply with the SRA, and to gain CGC's consent to the transfer, the defendants amended the Trust (the "Trust Amendment"), several provisions of which are relevant to the disposition of this case. The Trust Amendment provides that the Trust may not dis-

tribute any stock held in the trust without the consent of CGC.[FN7] The Trust Amendment also makes reference to the SRA and provides that, upon revocation of the Trust, if the stock is not immediately transferred to Armour, then CGC has the right to repurchase.[FN8]

FN7. Trust Amendment Art. IV, § E states, in pertinent part:
Notwithstanding any trust provision that requires or permits a distribution of trust assets to me made by the Trustee to any trust beneficiary, the Trustee shall not distribute any [stock] to any trust beneficiary without the prior written consent of CGC, which consent may be granted or withheld in CGC's sole and absolute discretion. If CGC gives prior written consent to a transfer, each such Permitted Transferee shall execute and deliver to CGC a Joinder Agreement as a condition of any transfer. Any Transfer of [stock] other than to a Permitted Transferee who has executed and delivered to CGC the required Joinder Agreement shall be a "Non-Authorized Transferee" (as that term is defined in the [SRA] ).

FN8. Trust Amendment Art. IV, § F states, in pertinent part:
Upon revocation or termination of the trust, or in the event the trust is amended in a manner inconsistent with the [SRA] as determined by CGC, the Trustee shall promptly either transfer all [stock] to [Armour], if he is living and if such transfer is authorized by the terms of the trust. If such transfer is not so authorized or if [Armour] is not then living, the Trustee shall offer to sell, pursuant to the requirements and procedures set forth in the [SRA], all [stock] held by the Trustee. If [stock is] to be transferred by the Trustee to [Armour], he shall execute and deliver to CGC a Joinder Agreement as a condition of any transfer. The Trustee shall not distribute or otherwise transfer [stock] to any "Person" (as that term is defined in the [SRA] ) (including a trust beneficiary) without the prior written consent of CGC, which consent may be granted or withheld in CGC's sole and absolute dis-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



cretion.

*2 In connection with transferring the stock to the Trust, in their capacities as trustees, Armour and Ritter signed a so-called Joinder Agreement,[FN9] agreeing to be bound by the SRA. Thereafter, through 2002, again with the consent of CGC, the parties continued to purchase stock in the name of the Trust. In connection with those purchases, the defendants signed so-called Purchaser Representation Letters,[FN10] again agreeing to be bound by the SRA.[FN11] The Trust, as amended, provides that either Ritter or Armour may act on behalf of the Trust, but that only Armour can vote the stock held by the Trust.[FN12]

> FN9. The Joinder Agreement states, in pertinent part:
> We hereby agree and state that by signing this Joinder Agreement, the trust and each of us individually, in our capacity as trustees of the trust, are parties to, accept all of the obligations of, and are bound by all of the terms of the [SRA] and all of the provisions with respect to A Shares set forth in the trust * * * We understand that all stock certificates that we are acquiring as trustees have a restrictive legend and may not be sold, assigned, pledged or otherwise transferred except in accordance with the provisions of the [SRA] and state and federal securities laws.

> FN10. The Purchaser Representation Letter states, in pertinent part:
> The Purchaser has read and understood all of the terms of the [SRA] and agrees to accept all of the obligations of, and to be bound by all of the terms of such Agreement with respect to all Stock of the Company presently being purchased or now owned by the Purchaser[.]

> FN11. There is considerable dispute as to whether Ritter signed the Joinder Agreement and the Purchaser Representation Letters in her individual capacity, or only as a trustee. This issue is discussed more fully, *infra*.

> FN12. Trust Amendment Art. IV, § H.

In June 2003, Armour filed for divorce in California. The stock held in the Trust represents the bulk of the value of the community property from the marriage. In connection with the divorce action, Ritter has asked for an award of a direct or indirect interest in the stock held in the Trust[FN13] and sought, unsuccessfully, to join CGC as a party to the divorce proceeding.[FN14]

> FN13. "Ritter believes that continued ownership of the stock is so valuable and beneficial that to receive anything less than an in-kind division would result in an unequal division of the community estate." Br. in Support of Mot. and Decl. for Joinder, dated May 27, 2004, filed by Nina L. Ritter in *Armour v. Ritter*, Case No. 390510 (Super. Ct., Los Angeles County, CA June 24, 2004) at 10.

> FN14. *Id.* at 4.

On May 5, 2004, CGC filed this action, against the defendants in their capacities as trustee, seeking the following judgment:
a. declaring that the SRA is valid and enforceable;
b. declaring that the award of a record, beneficial or other interest to Ms. Ritter in connection with the California Divorce Action would constitute an unauthorized transfer, such that CGC would be entitled to repurchase or redeem any CGC stock transferred to Ms. Ritter (directly, beneficially or otherwise) in accordance with the SRA and CGC's Certificate of Incorporation.[FN15]

> FN15. Compl. p. 9.

After Ritter moved to dismiss the original complaint, the court granted CGC's motion for leave to file an amended complaint. In the amended complaint, CGC sought the same declaratory relief against the defendants in their capacity as trustees and added claims against Ritter individually. On September 9, 2004, pursuant to Court of Chancery Rule 12(b)(2), Ritter renewed her motion to dismiss for lack of personal jurisdiction.

III.

When a defendant moves to dismiss for lack of personal jur-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                          Page 4
Not Reported in A.2d, 2004 WL 2521295 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

isdiction, the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the nonresident defendant.[FN16] In determining whether it has personal jurisdiction over a nonresident defendant, the court will generally engage in a two-step analysis. First, was service of process on the nonresident authorized by statute? Second, does the exercise of jurisdiction, in the context presented, comport with due process?[FN17] However, a party may expressly consent to jurisdiction by contract.[FN18] If a party properly consents to personal jurisdiction by contract, a minimum contacts analysis is not required.[FN19] Therefore, if the court concludes that Ritter is bound by the forum selection/consent to jurisdiction clause, then the court can exercise personal jurisdiction over her.

> FN16. *See Plummer & Co. Realtors v. Crisafi,* 533 A.2d 1242, 1244 (Del.Super.1987); *see also Finkbiner v. Mullins,* 532 A.2d 609, 617 (Del.Super.1987) (stating that, on a Rule 12(b)(2) motion, "the burden is on the plaintiff to make a specific showing that this Court has jurisdiction under a long-arm statute.") (citing *Greenly v. Davis,* 486 A.2d 669 (Del.1984)).

> FN17. *LaNuova D & B, S.P.A. v. Bowe Co.,* 513 A.2d 764, 768 (Del.1986).

> FN18. *Hornberger Mgmt. Co. v. Haws & Tingle Gen. Contrs.,* 768 A.2d 983, 987 (Del.Super.2000); *see also Sternberg v. O'Neil,* 550 A.2d 1105, 1109 n. 4 (Del.1988) ("A party may submit to a given court's jurisdiction by contractual consent."); *cf. Del Pharm., Inc. v. Access Pharm., Inc.,* 2004 WL 1631355, at *1 (Del. Ch. July 16, 2004) (enforcing a forum selection clause, which designated New York as the exclusive forum for adjudication, to dismiss suit).

> FN19. *Hornberger,* 768 A.2d at 987; *USH Ventures v. Global Telesystems Group, Inc.,* 1998 WL 281250, at *8 (Del.Super. May 21, 1998) (Letter Op.).

In addition, CGC contends that this court has ancillary jurisdiction over Ritter in her personal capacity. Alternatively,

CGC argues that Ritter is equitably estopped from disclaiming the burden of the forum selection clause after receiving the benefit of the contract for stock purchases.[FN20]

> FN20. CGC also makes two additional arguments that Ritter is bound by the SRA, neither of which is persuasive.

First, CGC argues that § 1100 of the California Family Code gave Armour the power to consent to personal jurisdiction over Ritter in Delaware. Cal. Fam. C. § 1100(a) states, in pertinent part: "[E]ither spouse has the management and control of the community personal property ... with like absolute power of disposition...." In essence, CGC argues that Section 1100 makes Armour the agent for Ritter by statute. CGC does not, however, cite a single case in which a California court invoked the California statute to allow one spouse to consent to personal jurisdiction for another spouse. The court finds it unnecessary to address this novel issue under California law.

Second, CGC makes the corollary common law argument that Ritter is subject to suit in Delaware because Armour, acting as her agent, consented to jurisdiction in Delaware in suits relating or arising out of the SRA. Delaware law does not, however, recognize a presumption of agency in a marital relationship. *Facciolo v. State, Div. of Revenue,* 358 A.2d 880, 881 (Del.1976). Furthermore, simply because a fiduciary relationship exists between two people does not mean that one may bind the other to contracts with third persons. *William M. Young Co. v. Bacon,* 1991 WL 89817, at *5 (Del.Super. May 1, 1991). Instead, the party asserting the existence of agency has the burden of proving consent by the principal. *Facciolo,* 358 A.2d at 881.

CGC alleges that Armour acted as Ritter's agent in purchasing the stock. CGC further alleges that Armour's status as agent was evidenced by Ritter's consent to the stock purchases and by her regular execution of documents relating to the couple's investment in stock. Even assuming the truth of these allegations, they are insufficient to establish that Armour had the authority to consent to this court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2004 WL 2521295 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 5

having personal jurisdiction over Ritter. Binding Ritter in such a way would go beyond the scope of Ritter's authority. *See, e.g., Facciolo,* 358 A.2d at 881 (holding that, even though husband had authority to a prepare tax return for wife, he did not have authority to sign the tax return and she was, therefore, not liable for it).

**\*3** In response, Ritter argues that CGC's dispute is with her personally, and that she never personally consented to the jurisdiction of this court. She asserts that she never read the SRA, the Joinder Agreement, or the Purchaser Representation Letters and that she was completely unaware that she was consenting to jurisdiction by this court. Furthermore, she argues that it would be so burdensome as to be inequitable to force her to litigate this case in Delaware.

   A. Consent To The Jurisdiction Of This Court

CGC alleges that Ritter has consented to the jurisdiction of this court in suits against the Trust because she is bound by the forum selection/consent to jurisdiction clause contained in the SRA. Forum selection/consent to jurisdiction clauses are "presumptively valid" and should be "specifically" enforced unless the resisting party "could clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud and overreaching."[FN21]

> FN21. *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15 (U.S.1972); *accord Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 473 n. 14 (U.S.1985).

The Joinder Agreement and Purchaser Representation Letters state that the signatory "carefully read" the SRA and agreed to be bound by its terms. The Trust Amendment also refers to the SRA and provides that the signatory will be bound by its terms. It is not disputed that Ritter signed all these documents in her capacity as trustee. CGC is clearly correct in arguing that, if the court concludes that the amended complaint states a claim for relief against the Trust, this court has jurisdiction over Ritter as trustee.

Ritter argues, however, that she is not bound by the SRA in her individual capacity and that it is only with her individu-

ally that CGC has a dispute.

   1. A Claim Against The Trust

The amended complaint alleges the existence of a dispute concerning the transfer restrictions of the SRA arising out of the divorce; namely, that Ritter intends to seek an in-kind distribution of the CGC stock in the divorce. The amended complaint sues both Ritter and Armour in their capacities as trustees and seeks a declaration that, as trustees, they cannot transfer the stock, or any interest in the stock, to Ritter individually because such a transfer would violate the SRA. There is no question that the Trust is bound by the Joinder Agreement, the Purchaser Representation Letters and, through these, the SRA. It was the Trust that was party to the contract purchasing the stock, and the stock is held in the name of the Trust. Thus, if the amended complaint states a claim for relief against the Trust, the court has the power to exercise jurisdiction over Ritter as trustee.[FN22]

> FN22. Ritter's claim that she did not read the SRA does not mean that the Trust is not bound by it. It is undisputed that Armour signed and knew the contents of the Joinder Agreement, the Purchaser Representation Letters, and the SRA. Nor is it disputed that his signature alone was sufficient to bind the Trust. Ritter also does not dispute that her signature on the documents was sufficient to bind the Trust, whether she read it or not. She only argues that her failure to read the SRA means that it cannot bind her in her individual capacity. Thus, Ritter's contention that she did not read the documents is immaterial to the issue of whether the Trust is bound by the SRA, and equally immaterial as to whether she is bound by the SRA as trustee and properly subject to the jurisdiction of this court.
> It should also be noted that Ritter does not claim fraud or collusion by CGC in obtaining Ritter's written consent. Nor does she argue that CGC did not reasonably rely upon evidence of her consent. For these reasons, as between CGC and Ritter in her capacity as trustee, there is no reason to conclude that Ritter has not effectively consented to suit in this jurisdiction in her capacity as trustee.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                    Page 6
Not Reported in A.2d, 2004 WL 2521295 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Ritter argues, however, that CGC has no real dispute with the Trust and that the Trust is not a proper party to this suit, because no meaningful relief can be entered against the Trust that will affect the disposition of the CGC stock in the divorce. This is so, she claims, because the Trust will be revoked as a result of the divorce and the community property contained therein will be distributed to Ritter and Armour without any action on the part of the trustees. In support of this argument, Ritter filed a declaration of her divorce attorney, Bruce Cooperman.

\*4 The Cooperman Declaration does not adequately support Ritter's position. Instead, it only states that one of the *possible* outcomes of the divorce is an in-kind distribution of the stock held by the Trust.[FN23] The Cooperman Declaration goes on to state that "[i]f the CGC stock was divided in-kind" then "either or both of the parties would revoke the trust." [FN24] He does not say that the Trust will necessarily be revoked, nor does he say that an in-kind distribution is the most likely outcome, only that its revocation is one of the *possible* dispositions of the divorce proceeding. Ritter herself does not say that she would revoke the Trust. On the contrary, she has said that she would favor maintaining the Trust and her beneficial interest in it.[FN25]

> FN23. Cooperman Decl. ¶ 7.

> FN24. Cooperman Decl. ¶ 9.

> FN25. "I am agreeable to continuing the status quo with respect to our stock through such a trust arrangement." Decl. of Nina Ritter ¶ 10.

Thus, the court concludes that the amended complaint properly states a claim for relief against the Trust. The Trust is a party to the SRA and the amended complaint alleges that Ritter is seeking to obtain rights in CGC shares owned by the Trust that are allegedly inconsistent with the terms of the SRA. That claim, although advanced by Ritter in her individual capacity, gives rise to a ripe controversy between CGC and the Trust as owner of the stock. Ritter is properly named as a defendant on that claim in her trustee capacity.

### 2. Ancillary Jurisdiction

This court also has discretion to exercise jurisdiction over

Ritter personally under principles of ancillary jurisdiction. The court may exercise its discretion to litigate a claim for which personal jurisdiction would not otherwise exist where the claim is brought along with other claims for which jurisdiction does exist that are sufficiently related to that claim to warrant prosecution before a single tribunal.[FN26] This exercise of such discretion is consistent with a policy of maximizing judicial economy and efficiency where the substantive due process rights of the parties are not affected.[FN27]

> FN26. *Fitzgerald v. Chandler,* 1999 WL 1022065, at \*4 (Del. Ch. Oct. 14, 1999) (asserting jurisdiction over a tort claim, for which personal jurisdiction would not otherwise exist, where the claim was brought along with a contract claim, and the tort claim was sufficiently related to warrant prosecution before a single tribunal); *Technicorp Int'l II, Inc. v. Johnson,* 1997 WL 538671, at \*19 (Del Ch. Aug. 25, 1997) (asserting personal jurisdiction over corporate director defendants for non-fiduciary type claims that are merely factually related to other claims alleging breaches of fiduciary duties); *Baldwin v. Russell,* 1990 WL 13484, at \*1 (Del. Ch. Feb. 7, 1990) (same); *Manchester v. Narragansett Capital, Inc.,* 1989 WL 125190, at \*7 (Del. Ch. Oct. 19, 1989) ("The issue is whether plaintiff's contract claims are sufficiently related to the claims alleging breach of fiduciary duty by the nonresident director defendants so as to require them to appear and defend the contract claims in Delaware.").

> FN27. *Fitzgerald,* 1999 WL 1022065, at \*4.

As explained earlier in this opinion, this court can exercise jurisdiction over Ritter in her capacity as trustee. In addition, to the extent that the claims affect Ritter in her individual capacity, they are sufficiently related to the claim against her as trustee. All of these claims involve the same alleged facts and seek the same relief, namely a declaration that the SRA is valid and that the Trust cannot transfer the stock to Ritter "directly, beneficially, or otherwise." [FN28] Thus, the factual and legal disputes involved in litigating the claims against Ritter individually will be the same as, or very similar to, the suit against Ritter as a trustee.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2004 WL 2521295 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 7

FN28. Compl. p. 9.

Moreover, exercise of jurisdiction over Ritter in her person-
al capacity comports with due process. Since Ritter is sub-
ject to this court's jurisdiction on the claim brought against
her as trustee, it is not necessary to engage in a comprehens-
ive personal jurisdiction review "from scratch." [FN29] In-
stead, the inquiry is whether Ritter would be substantively
or unfairly prejudiced by this court's exercise of jurisdiction
over her personally and, if not, whether judicial economy
warrants such an exercise. [FN30]

FN29. *Fitzgerald*, 1999 WL 1022065, at *4.

FN30. *Id.*

*5 Ritter would suffer no prejudice if this court were to ex-
ercise jurisdiction over her personally in this matter. This
court would be deciding whether the Trust can distribute the
stock, or an interest in the stock, to her. Any personal in-
terest she has in the stock is closely related to her interest as
a trustee, since the Trust is the owner of the stock. Obvi-
ously, all claims will be adjudicated together. The exercise
of jurisdiction would also not impose any additional burdens
upon Ritter than already flow from the suit against her as a
trustee.

The adjudication of CGC's claims by this court will also not
offend notions of comity. This court is, of course, mindful
that a divorce proceeding is pending in another State's court.
However, all this court has been asked to decide is the scope
of the property interest that the Trust has in the CGC stock
under the terms of the SRA. The SRA is governed by
Delaware law and specifically chooses Delaware as the for-
um to resolve all disputes relating to that agreement. This
court sees no likelihood that its decision will interfere with
the ability of the California court to resolve the matters at is-
sue in the divorce. On the contrary, this court expects that
its judgment will aid the California court in awarding a fair
and equitable distribution of property that is also protective
of CGC's rights under the SRA, whatever they may prove to
be.

B. Equitable Estoppel

As an alternative ground for this court to assert jurisdiction

over Ritter, CGC argues that Ritter is equitably estopped
from disclaiming the forum selection clause. Specifically,
CGC argues that Ritter is trying to assert a contractual right,
namely, an ownership interest in the stock held in the Trust,
while disclaiming a contractual burden, namely, the forum
selection clause contained in the SRA.

In order to find that Ritter is bound by the forum selection
clause, it is not necessary to find that she was a party to the
SRA. Contractual forum selection clauses are en-
forced against third-party beneficiaries and those closely re-
lated to the contract. In *Coastal Steel Corp. v. Tilghman
Wheelabrator, Ltd.,*[FN31] the Third Circuit disregarded the
argument that a forum selection clause was not binding
against a non-signatory to the underlying contract. The
Court first noted that forum selection clauses are
"presumptively valid" and have generally been enforced be-
cause "those clauses promote stable and dependable trade
relations." [FN32] The Court also stated that "the law of con-
tracts ... has long recognized that third-party beneficiary
status does not permit the avoidance of contractual provi-
sions otherwise enforceable ." [FN33] The Third Circuit con-
cluded that introducing into the common law a third-party
beneficiary exception, allowing third-party beneficiaries to
reap the benefits of a contract while avoiding its burdens,
would be inconsistent with these principles. [FN34]

FN31. 709 F.2d 190, 202 (3d Cir.1983).

FN32. *Id.* at 202-03.

FN33. *Id.* at 203; accord *Dayhoff Inc. v. H.J. Heinz
Co.*, 86 F.3d 1287, 1296 (3d Cir.1996) (stating that
third-party beneficiary status does not permit the
avoidance of contractual provisions that are other-
wise enforceable).

FN34. *Coastal Steel*, 709 F.2d at 203.

Similarly, in *Hadley v. Shaffer,*[FN35] the District Court of
Delaware enforced a forum selection clause against a non-
signatory to the contract. In reaching its conclusion, the
court followed a three-part inquiry in determining whether a
party who does not sign a contract, can be bound by a forum
selection clause contained therein. First, is the forum selec-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 2521295 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 8

tion clause valid? Second, are the defendants third-party beneficiaries, or closely related to, the contract? Third, does the claim arise from their standing relating to the merger agreement?[FN36]

> FN35. 2003 WL 21960406. (D.Del. Aug. 12, 2003)

> FN36. *Id.* at *4.

### 1. Is The Forum Selection Clause Valid?

*6 Forum selection clauses are presumptively valid and have been regularly enforced.[FN37] Generally, forum selection clauses should be enforced so long as enforcement would not place any of the parties at a substantial and unfair disadvantage or otherwise deny a litigant her day in court.[FN38] Therefore, the defendant bears a heavy burden in claiming that forum selection clause is invalid. As the United States Supreme Court noted in *M/S Bremen,* "it is difficult to see why any such claim of inconvenience should be heard to render [a] forum clause unenforceable" when it is the product of "a freely negotiated private ... commercial agreement [which] contemplated the claimed inconvenience."[FN39]

> FN37. *See, e.g., Dayhoff, 86 F.3d at 1303; Coastal Steel, 709 F.2d at 202.*

> FN38. In *M/S Bremen, 407 U.S. at 18,* the United States Supreme Court stated:
> [I]t should be incumbent on the party seeking to escape his contract to show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court. Absent that, there is no basis for concluding that it would be unfair, unjust, or unreasonable to hold that party to his bargain.

> FN39. *Id.* at 16.

Ritter has alleged that she will be inconvenienced if she is forced to litigate in this court due to the necessity of hiring local counsel, of traveling back and forth from her home in California, and of being unable to care for her three young children. While the court is not blind to these considerations, they are no greater than any party would face in litig-

ating a case in any non-local forum. Moreover, there is nothing in the record that suggests that these burdens would deny Ritter her "day in court." Because Ritter has not alleged any burden sufficient to overcome the presumption in favor of validity, the court concludes that the forum selection clause is valid.

### 2. Is Ritter Closely Related To The SRA?

CGC does not allege that Ritter is a third-party beneficiary of the SRA. Instead, CGC argues that she is closely related to the SRA. This is a subtle, but important, distinction.[FN40] CGC does not argue that Ritter is a third-party beneficiary because, as Ritter rightfully points out, the SRA expressly excludes third-party beneficiaries.[FN41] Ritter also argues that that she is not closely related to the SRA because she derived no direct benefit from the SRA.

> FN40. The Third Circuit defined the difference this way:
> Under the third party beneficiary theory, a court must look to the intentions of the parties at the time the contract was executed. Under the equitable estoppel theory, a court looks to the parties' conduct after the contract was executed. Thus, the snapshot this Court examines under equitable estoppel is much later in time than the snapshot for third-party beneficiary analysis.
> *E.I. Dupont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 200 (3d Cir.2001); cf. Hadley, 2003 WL 21960406, at *6* (holding that the defendant was "closely related" for the same reasons they were third-party beneficiaries); *Jordan v. SEI Corp., 1996 WL 296540 (D. Pa. June 4, 1996)* (same).

> FN41. Section 10.17 of the SRA provides, in pertinent part:
> *No Third Party Beneficiaries.* This Agreement shall not be construed in any manner to constitute a contract for the benefit of or provide any rights to, any Person who is not a Stockholder, any third parties, or any prior creditors of, or any claimants of, the parties hereto.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                    Page 9
Not Reported in A.2d, 2004 WL 2521295 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

The doctrine of equitable estoppel prevents a non-signatory to a contract from embracing the contract, and then turning her back on the portions of the contract, such as a forum selection clause, that she finds distasteful.[FN42] As the Fourth Circuit explained:

> FN42. *Dupont,* 269 F.3d at 200; *see also Am. Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (3d Cir.1999) (holding non-signatory bound by contract under which it received the direct benefits of lower insurance and the ability to sail under the French flag).

In the arbitration context, the doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him. "To allow [a plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would ... disregard equity."[FN43]

> FN43. *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 418 (4th Cir.2000) (internal citation omitted); *see also Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 519 (U.S.1974) ("An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause.").

Generally, cases applying this doctrine involve non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the forum selection clause in the contract.[FN44] In general, a non-signatory is estopped from refusing to comply with a forum selection clause when she receives a "direct benefit" from a contract containing a forum selection clause.[FN45]

> FN44. *See, e.g., Tencara Shipyard,* 170 F.3d at 353 (non-signatory derived benefit from contract and could not avoid the arbitration clause contained therein).

> FN45. *Int'l Paper,* 206 F.3d at 418; *Tencara*

*Shipyard,* 170 F.3d at 353.

*7 Ritter contends that she derived no direct benefit from the SRA. This is incorrect. Originally, the stock was held individually in Armour's name. While Ritter had a community property interest in the stock, she did not have a direct, beneficial interest in the stock. By putting the stock in trust, Ritter gained just such a beneficial interest. Because CGC would not have allowed these transfers without the Trust and Armour agreeing to the SRA, the SRA provided Ritter with a direct benefit. Furthermore, the subsequent purchases of stock were made by the Trust, of which she is a trustee. These subsequent purchases would also not have been allowed without the SRA. Ritter's claim to a community property interest in the stock held in Trust derives from this transfer and these purchases. Therefore, she received a direct benefit from the SRA and the court finds that she is closely related to the SRA.

**3. Do The Present Claims Arise From Ritter's Standing Relating To The SRA?**

In order for Ritter to be bound by the terms of the forum selection clause, the claims asserted must arise from the SRA.[FN46] They clearly do. This is a suit to enforce the SRA with respect to stock held in the Trust. Therefore, the claims clearly arise from Ritter's standing relating to the SRA.

> FN46. *Hadley,* 2003 WL 21960406, at *6; *see also DuPont,* 269 F.3d at 197.

The court concludes, from this analysis, that Ritter is equitably estopped from asserting that the SRA does not apply to her.

IV.

For all the foregoing reasons, Ritter's motion to dismiss is DENIED. IT IS SO ORDERED.

Del.Ch.,2004.
Capital Group Companies, Inc. v. Armour
Not Reported in A.2d, 2004 WL 2521295 (Del.Ch.)

Briefs and Other Related Documents (Back to top)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                    Page 10
Not Reported in A.2d, 2004 WL 2521295 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**


• 2004 WL 3267341 (Trial Motion, Memorandum and Affi-
davit) Plaintiff's Motion for Summary Judgment (Nov. 16,
2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2003 WL 22750145 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
SYMBOL TECHNOLOGIES, INC., Plaintiff,
v.
HAND HELD PRODUCTS, INC. and HHP-NC, Inc., Defendants.
**No. Civ.A. 03-102-SLR.**

Nov. 14, 2003.

Arthur G. Connolly, III, Connolly, Bove, Lodge & Hutz, Andre G. Bouchard, Bouchard, Margules & Friedlander, Wilmington, DE, for Plaintiff.
Donald F. Parsons, Jr., Mary B. Graham, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Defendants.

MEMORANDUM ORDER

ROBINSON, J.

I. INTRODUCTION

*1 Currently before the court are the following motions of the defendants Hand Held Products, Inc. and HHP-NC, Inc. (collectively "HHP"): 1) motion to dismiss U.S. Patent No. 5,591,956 of Count II for lack of subject matter jurisdiction; 2) motion to dismiss U.S. Patent No. 5,130,520 of Count I from the action because HHP holds a valid license; 3) motion to dismiss plaintiff's infringement and noninfringement claims from Counts I and II pursuant to Fed.R.Civ.P. 8 and 12(b)(6) for failure to state a claim; 4) motion to dismiss Count II of the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction for failure to satisfy the jurisdictional requirements of 18 U.S.C. § 2201; 5) motion to dismiss plaintiff's invalidity and unenforceability claims from Count II pursuant to Fed.R.Civ.P. 8 and 12(b)(6) for failure to give notice of the bases for claims of invalidity and unenforceability; 6) motion to strike plaintiff's unenforceability allegations pursuant to Fed.R.Civ.P. 12(b)(6) for failure to plead fraud with particularity; and 7) motion for a more definite statement as to Counts I and II. (D.I.10) For the reasons and to the extent stated below, the court grants in part and denies in part

HHP's motions.

II. BACKGROUND

Plaintiff Symbol Technologies, Inc. ("Symbol") and HHP are competitors in the hand-held optical scanner industry, each holding patents and manufacturing a variety of products. Symbol is the owner of U.S. Patent Nos. 5,029,183; 5,130,520; 5,157,687; 5,479,441; 5,521,366; 5,646,390; 5,702,059; 5,783,811; 5,818,028; 6,00,612; 6,019,286; and 6,105,871 (collectively, the "Symbol Patents"). HHP is the owner of U.S. Patent Nos. 5,286,960; 5,291,008; 5,391,182; 5,420,409; 5,463,214; 5,569,902; 5,591,956; 5,723,853; 5,723,868; 5,773,806; 5,773,810; 5,780,834; 5,784,102; 5,786,586; 5,793,967; 5,801,918; 5,825,006; 5,831,254; 5,837,985; 5,838,495; 5,900,613; 5,914,476; 5,929,418; 5,932,862; 5,942,741; 5,949,052; 5,949,054; 5,965,863; 6,015,088; 6,060,722; 6,161,760; 6,298,176; 6,491,223; D392,282; D400,199, and D400,872 (collectively the "HHP Patents").

In September 1999, HHP was acquired by Welch Allyn, Inc. ("Welch Allyn"), a direct competitor of Symbol. Later that fall, Welch Allyn announced that it intended to acquire another competitor of Symbol's, PSC, Inc., with whom Symbol was engaged in patent litigation.

On March 13, 2000, Welch Allyn's in-house counsel sent an email to Symbol's in-house patent counsel indicating that certain Welch Allyn patents might "present problems" to Symbol's Golden Eye product line. (D.I.19)

On June 6, 2000, Welch Allyn began negotiating with Symbol on behalf of Welch Allyn's newly acquired subsidiary, PSC, Inc. (*Id.*) Later that month, a meeting was held between Symbol and Welch Allyn to discuss the licensing of certain patents held by HHP relating to the Golden Eye product line. At that meeting, a list of twenty-three (23) patents was presented to Symbol which Welch Allyn viewed as relevant. (*Id.*)

*2 On June 28, 2000, a second list was provided to Symbol by HHP in response to a request made at the earlier meeting. This second list contained only ten (10) patents, eight of which were previously listed on the first list, and two of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



which were new additions. The June 28 letter indicated that these patents should be the topic of further licensing discussions between the parties. (*Id.*)

On November 30, 2000, Symbol acquired Telxon, a Texas company that was at the time engaged in patent-related disputes with Welch Allyn. Previously that year, Welch Allyn had sent a list of patents to Telxon, identical to the first list sent to Symbol, and suggested that Telxon's products might be infringing. Welch Allyn had also previously raised infringement issues with Metanetics, a Telxon subsidiary. (*Id.*)

Relations between Symbol and Welch Allyn deteriorated completely when Welch Allyn filed a lawsuit against Symbol in North Carolina regarding a certain contract that they shared to provide products to the United States Postal Service. (*Id.*)

On January 21, 2003, Symbol filed a two-count complaint alleging that HHP has infringed the Symbol Patents and seeking declaratory judgment that the HHP Patents are not infringed, invalid and/or unenforceable. (D.I.1)

In Count I of the complaint, Symbol alleges that "HHP infringed and continues to infringe, has induced and continues to induce others to infringe, and/or has committed and continues to commit acts of contributory infringement of, one or more claims of each of the Symbol Patents." (D.I. 1 at 6) In Count II of the complaint, Symbol seeks a declaratory judgment that the HHP Patents are noninfringed, invalid, and unenforceable. (*Id.*)

### III. DISCUSSION

A. HHP's Motion to Dismiss U.S. Patent No. 5,591,956

HHP contends that the court is without subject-matter jurisdiction as to U.S. Patent No. 5,591,956 (" '956 patent"). (D.I.11) At oral arguments before the court on October 28, 2003, HHP's counsel affirmatively stated that the '956 patent is dedicated to the public; therefore, this patent will be dismissed from the complaint.

B. HHP's Motion to Dismiss U.S. Patent No. 5,130,520

HHP contends that U.S. Patent No. 5,130,520 (" '520 patent") should be dismissed because it is the subject of a valid license from Symbol. Symbol contends that there is a license for the '520 patent, but that it pertains to a narrow field of use. It is established law that a licensee that exceeds the scope of its license may be held liable for infringement. See *General Talking Pictures Co., 304 U.S. 175, 58 S.Ct. 849, 82 L.Ed. 1273 (1938); Eli Lily & Co. v. Genentech Inc., 17 U.S.P.Q.2d 1531, 1534 (S.D.Ind.1990)*. Consequently, HHP's motion to dismiss the '520 patent will be denied.

C. HHP's Motion to Dismiss Infringement and Noninfringement Claims from Count I and II for Failure to State a Claim, Motion to Dismiss Symbol's Claims of Invalidity and Unenforceability, and Motion for a More Definite Statement

\*3 HHP contends that Symbol's complaint is facially defective under Fed.R.Civ.P. 8(a), as it fails to provide sufficient notice of which of HHP's products infringe claims under the Symbol Patents and which of Symbol's products may infringe HHP Patents. (D.I. 11 at 16) HHP, however, has failed to cite any precedent binding upon this court that requires a complaint to identify the basis of an infringement claim with such particularity.[FN1] It is established law that liberal pleading requirements are designed to put the parties on notice generally as to the nature of the cause of action. *Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Weston v. Pennsylvania, 251 F.3d 420, 429 (3d Cir.2001)*. Particularly in complex litigation, it is through the discovery process that the parties refine and focus their claims. At this stage in the litigation, the court declines to dismiss Symbol's claims until adequate discovery has been completed.

> FN1. The court notes that HHP attempts to bootstrap Fed.R.Civ.P. 11 requirements into Rule 8, without actually alleging that Symbol's complaint is frivolous. (D.I. 11 at 9-10) In the absence of an actual motion by HHP to the contrary, the court will assume that Symbol's counsel has complied with their ethical obligations under Fed.R.Civ.P. 11.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d, 2003 WL 22750145 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

In the alternative, HHP moves the court to require Symbol to provide a more definite statement pursuant to Fed.R.Civ.P. 12(e). A motion under Rule 12(e) is to correct a pleading that is "so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." The purpose, however, of Rule 12(e) is not to make it easier for the moving party to prepare its case. Fed.R.Civ.P. 12 advisory committee's note. In this case, the crux of HHP's motion is that Symbol's complaint is simply too large. There are, however, a finite number of claims and a finite number of infringing products. Consequently, the court finds that traditional mechanisms of discovery are the proper tools to refine the scope of this litigation. HHP's motions in this regard will be denied.

D. HHP's Motions to Dismiss Count II for Lack of Subject Matter Jurisdiction

HHP contends that the court is without subject matter jurisdiction as to the HHP Patents, as there is not an actual controversy within the meaning of § 2201. (Id.) See Vectra Fitness, Inc. v. TNWK Corp., 162 F.3d 1379, 1383 (Fed.Cir.1998).

Declaratory judgment pursuant to 28 U.S.C. § 2201 requires that there be "(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." BP Chemicals Ltd. v. Union Carbide Corp., 4 F.3d 975, 978 (Fed.Cir.1993). In reaching its conclusion, the court must apply a totality of the circumstances standard. See C.R.Bard, Inc. v. Schwartz, 716 F.2d 874, 880 (Fed.Cir.1983).

The recent contentious and litigious history between the parties weighs in favor of a finding that Symbol has a reasonable apprehension of suit. In EMC Corp. v. Norand Corp., 89 F.3d 807 (Fed.Cir.1996), the Federal Circuit stated that the "test for finding a 'controversy' for jurisdictional purposes is a pragmatic one and cannot turn on whether the parties use polite terms in dealing with one another or engage in more bellicose saber rattling." Id. at 811. The Court of Appeals continued and emphasized that "the

question is whether the relationship between the parties can be considered a 'controversy,' and that inquiry does not turn on whether the parties have used particular 'magic words' in communicating with one another." Id. at 812. Therefore, the absence of an explicit threat of suit, while a factor, is not dispositive. See BP Chemicals Ltd. v. Union Carbide Corp., 4 F.3d 975, 979 (Fed.Cir.1993) ( "Declaratory judgment jurisdiction does not require direct threats.").

*4 Further, it is relevant under Federal Circuit precedent that at oral argument HHP did not affirmatively state that it would not sue. In C.R. Bard Inc., the Court of Appeals held that a plaintiff had a reasonable apprehension of suit when the defendant in a declaratory judgment declined to affirmatively state at oral arguments that he would not bring a suit for infringement against the plaintiff.[FN2] 716 F.2d at 881.

> FN2. The court is not entirely comfortable with the notion that a plaintiff might bring a declaratory judgment against a defendant for the purpose of forcing an admission of the defendant's intent to enforce its patent rights. The court is also uncomfortable with the notion that a defendant might plead that the plaintiff has no reasonable apprehension of suit, and then file in another forum once the declaratory judgment has been dismissed for want of subject matter jurisdiction. Nonetheless, the Federal Circuit in C.R. Bard made it clear that the failure to deny an intent to sue for infringement is a factor to be considered.

Having concluded that the totality of circumstances sufficiently demonstrates a reasonable apprehension of suit, nonetheless, Symbol has not established a reasonable apprehension of suit with respect to each of the named HHP Patents. At most, the affidavit and accompanying documents filed to support the complaint suggest that only those patents referenced in the June 28, 2000 correspondence from Welch Allyn are proper subjects of a declaratory judgment suit.[FN3] Consequently, the court will dismiss without prejudice those HHP Patents which were not the subject of the June 28, 2000 correspondence.

> FN3. Those patents are: U.S. Patent Nos.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Page 4

Not Reported in F.Supp.2d, 2003 WL 22750145 (D.Del.)

**(Cite as: Not Reported in F.Supp.2d)**

; 5.900.613; 5.723.868; 5.780.834; 5.784.102; 5.825.006; 5.831.254; 6.060.722; 5.929.418; and 5.965.863.

With respect to the remaining HHP Patents, the court finds that Symbol satisfies the "present activity" requirement of § 2201. It is sufficient that Symbol engages in the manufacture and production of products sufficiently similar to HHP's patents. *See Millipore Corp. v. Univ. Patents, Inc.,* 682 F.Supp. 227, 232 (D.Del.1987). Moreover, the fact that HHP's own correspondence to Symbol suggests that licensing of its patents may be needed is sufficient for the court to conclude that there is "present activity" as required under § 2201.

E. HHP's Motion to Strike Symbol's Allegations of Unenforceability for Failure to Plead with Particularity

The court will dismiss Symbol's claims for unenforceability without prejudice. Fraud is a clear exception to the otherwise broad notice-pleading standards under Fed.R.Civ.P. 9. A claim of patent unenforceability is premised upon inequitable conduct before the Patent & Trademark Office ("PTO"), which is a claim sounding in fraud. A plaintiff alleging unenforceability, therefore, must plead with particularity those facts which support the claim the patent holder acted fraudulently before the PTO. As Symbol has failed to adequately plead its bases for unenforceability of the remaining HHP Patents, that portion of Count II will be dismissed without prejudice.

IV. CONCLUSION

At Wilmington this 14th day of November, 2003, having held oral argument and reviewed HHP's motion to dismiss pursuant to Fed.R.Civ.P. 8(a), 9, 12(b)(1), 12(b)(6) and 12(f), or in the alternative for a more definite statement pursuant to Rule 12(e) (D.I.10), and Symbol's response thereto;

IT IS ORDERED that:

1. HHP's motion to dismiss Count II of Symbol's complaint with respect to U.S. Patent No. 5.591.956 is granted. (D.I.10-1)

2. HHP's motion to dismiss U.S. Patent No. 5.130.520 of

Count I is denied. (D.I.10-2)

3. HHP's motion to dismiss infringement and noninfringement claims from Counts I and II of the complaint pursuant to Fed.R.Civ.P. 8 and 12(b)(6) is denied. (D.I.10-3)

*5 4. HHP's motion to dismiss Count II of the complaint pursuant to Fed. R. Civ P. 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction is granted with respect to U.S. Patent Nos. 5.291.008; 5.391.182; 5.420.409; 5.463.214; 5,5697,902; 5.723.853; 5.773.806; 5.773.810; 5.786.586; 5.793.967; 5.801.918; 5.837.985; 5.838.495; 5.914.476; 5.932.862; 5.942.741; 5.949.052; 5.949.054; 6.015.088; 6.161.760; 6.298.176; 6.491.223; D392, 282; D400,199; and D400,872, and is denied with respect to U.S. Patent Nos. 5.286.960; 5.900.613; 5.723.868; 5.780.834; 5.784.102; 5.825.006; 5.831.254; 6.060.722; 5.929.418; and 5.965.863. (D.I.10-4)

5. HHP's motion pursuant to Fed.R.Civ.P. 8 and 12(b)(6) to dismiss Symbol's invalidity and unenforceability claims from Count II is denied. (D.I.10-5)

6. HHP's motion to strike Symbol's allegations of unenforceability pursuant to Fed.R.Civ.P. 12(b)(6) or 12(f) is granted. (D.I.10-6)

7. HHP's motion for a more definite statement is denied. (D.I.10-7)

D.Del.,2003.

Symbol Technologies, Inc. v. Hand Held Products, Inc.

Not Reported in F.Supp.2d, 2003 WL 22750145 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:03CV00102 (Docket) (Jan. 21, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2006 WL 83340 (W.D.Wis.)
**(Cite as: Slip Copy)**

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,W.D. Wisconsin.
THIRD WAVE TECHNOLOGIES, INC., Plaintiff,
v.
DIGENE CORPORATION, Defendant.
**No. 05-C-0594-C.**

Jan. 10, 2006.

J. Donald Best, Michael Best & Friedrich, LLP, Peter G. Carroll, Medlen & Carroll, LLP, Madison, WI, for Plaintiff. Catherine Cetrangolo, Boardman, Suhr, Curry & Field, Madison, WI, Robert Koch, Milbank Tweed Hadley & Mc-Cloy, Washington, DC, for Defendant.

OPINION AND ORDER

CRABB, J.
*1 Plaintiff Third Wave Technologies filed this suit for declaratory judgment, contending that a justiciable controversy exists between it and defendant Digene Corporation, pertaining to United States Patents Nos. 4,489,332, 4,908,306, 5,643,715 and 5,057,411. Defendant denies that any actual controversy exists and has moved to dismiss the action for lack of subject matter jurisdiction. The case is a close one but on balance, I conclude that plaintiff has shown both that it has a reasonable apprehension that defendant will sue for infringement of one or more of its patents and that it is engaged in activity that could constitute infringement. I conclude, therefore, that an actual controversy exists that gives this court jurisdiction over the suit. I see no reason to exercise my discretion not to hear the case.

From the complaint and the parties' briefs, I find that the parties do not dispute the following matters, which I find as fact solely for the purpose of deciding defendant's motion to dismiss for lack of subject matter jurisdiction.

UNDISPUTED FACTS

Defendant owns United States Patents Nos. 4,489,332 and 4,908,306 and is the exclusive licensee of United States Patents Nos. 5,643,715 and 5,057,411, all of which relate to detection of Human Papillomavirus or HPV, which is a sexu-

ally transmitted virus. The potential market for HPV diagnostic testing products is estimated at $1,000,000,000, because it includes all women over 30 who are or have ever been sexually active.

Defendant is the only company currently offering FDA-approved clinical diagnostic tools for detecting HPV. It purports to own, license or otherwise have rights to patents related to all 13 of the high risk types of HPV that are associated with the development of cervical cancer and are the ones commonly tested. It has spent significant sums to acquire the patents it owns and it has brought suit against Ventana Medical Systems, Inc. and Beckman Coulter, Inc. for alleged infringement of the '332 patent that is one of the patents at issue in this case.

In 2005, plaintiff introduced its HPV analyte specific reagents that may be used to detect the presence of a number of strains of HPV. It has announced publicly that it is seeking FDA approval to market its own clinical diagnostic test for HPV detection. In addition, it has given public presentations of its HPV technology at industry conferences. Its current analyte specific reagents compete with defendant's products; its clinical diagnostic test will do so if it is approved by the FDA.

In the course of discovery for a suit brought by plaintiff against Stratagene Corporation, involving a wholly different invention, counsel for Stratagene took a deposition of plaintiff's president, John Puisis. He asked Puisis questions about the functionality of plaintiff's HPV products, although technical information about these products had no relevance to the suit against Stratagene, which concerned the probe based detection of target nucleic acid molecules.

*2 Suspicious that the questions by Stratagene's counsel indicated an effort by defendant to learn technical information about plaintiff's HPV products, plaintiff's counsel asked Stratagene's counsel whether his firm represented defendant Digene as well as Stratagene and was told it did. Shortly thereafter, on July 1, 2005, plaintiff's counsel wrote defendant's counsel, saying that plaintiff had learned that defendant's counsel was representing defendant Digene and raising ethical concerns about defendant's counsel and their firm having access to plaintiff's confidential information when

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                  Page 2
Slip Copy, 2006 WL 83340 (W.D.Wis.)
**(Cite as: Slip Copy)**

they were advising a competitor of plaintiff. Plaintiff's counsel ended the letter by saying, "[t]his letter serves as notice that Third Wave reserves all of its rights and options to address this situation, including all options with respect to any litigation which later may be brought against it by Digene."

Stratagene's counsel responded on July 6, 2005, with a letter that started with two paragraphs objecting to plaintiff's allegations that it was unethical for counsel to represent both Stratagene and defendant Digene and defending the relevance of the questions asked of John Puisis at his deposition. Counsel went on to say:

I can personally assure you that no information which has been received from Third Wave under the Protective Order of this case has been communicated to Digene, directly or indirectly, in any way, shape or form. As such, the only way Digene will ever learn that fact is if they seek to take action against Third Wave for its publicly noted willful infringement of Digene's intellectual property. [fn. 1]

I. So there is no question later, Digene's decision not to take action at this point cannot be construed as the basis for a laches or estoppel defense since Digene is not privy to the information in question.

Finally, with respect to your reservation of "rights and options," we suspect you will advise your client as you believe necessary under the circumstances.... This letter serves as notice that we reserve all of our rights and options to address this situation, including all options with respect to any litigation which later may be brought against [plaintiff] by [defendant].

In a declaration filed in this suit, defendant's president has averred that defendant did not authorize its counsel to act on its behalf with respect to any patents, that defendant was not informed of the July 2005 correspondence between counsel in the Stratagene case, that at this time, defendant has not studied whether any of plaintiff's patents infringe any of defendant's patents and that it has no present intention to sue plaintiff for patent infringement.

Plaintiff filed this suit on October 7, 2005.

OPINION

Two considerations guide the determination of this motion. The first is the case or controversy requirement for federal jurisdiction. Federal courts are not permitted to give advisory opinions. They may hear only cases that present actual controversies. The Declaratory Judgment Act, _28 U.S.C. § 2201_, makes the existence of an actual controversy a condition of the authority it gives to the federal courts to "declare the rights and other legal relations of any interested party seeking such declaration." To be justiciable, a case must present an "actual controversy," that is, one in which "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." _Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 278, 61 S.Ct. 510, 85 L.Ed. 826 (1941)._

*3 The second consideration is the desirability of preventing patent owners from trying to enforce their patents outside of court with "scare-the-customer-and-run tactics that infect the competitive environment of the business community with uncertainty and insecurity." _Arrowhead Industrial Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 735 (Fed.Cir.1988)_ (citing E. Borchard, _Declaratory Judgments_ 803-04 (2d ed.1941)). This is the consideration that led to the enactment of _§ 2201_. The Declaratory Judgment Act gives competitors the option of suing for declaratory judgment of non-infringement or invalidity when they have objective reasons to feel threatened by allegations or innuendos of infringement. _Goodyear Tire & Rubber Company v. Releasomers, 824 F.2d 953, 956 (Fed.Cir.1987)_ (holding that defendant's innuendos could reasonably have led plaintiff to believe that defendant would bring infringement action). Under _§ 2201_, entities feeling threatened with suit do not have to sit back and wait for the patent owner to bring an infringement suit.

It is not always easy to determine what makes an alleged infringer's apprehension of a possible infringement suit objectively reasonable. Although generalized fear or a nervous state of mind is not enough, a plaintiff "does not have to show that the patentee is 'poised on the courthouse steps.' " _Vanguard Research, Inc. v. Peat, Inc., 304 F.3d 1249, 1255 (Fed.Cir.2002)_ (quoting _Phillips Plastics Corp. v. Kato Hat-_

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                    Page 3
Slip Copy, 2006 WL 83340 (W.D.Wis.)
**(Cite as: Slip Copy)**

*sujou Kabushiki Kaisha,* 57 F.3d 1051, 1053-54 (Fed.Cir.1995).

Courts have identified two questions that help to define the inquiry. First, is there an explicit threat or other action by the patentee that creates a reasonable apprehension on the part of the plaintiff that it will face an infringement suit? *Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.,* 395 F.3d 1324, 1332 (Fed.Cir.2005). Second, is the alleged infringer engaged in activity that could constitute infringement or has it taken concrete steps with the intent to conduct such activity? *Id.*

The second question is not in dispute. Plaintiff has not started production of the clinical diagnostic test for which it is seeking FDA approval, but it is selling HPV analyte specific reagents that can be used with other components to detect the presence of a number of strains of HPV. These reagents compete directly with defendant's products. Therefore, the only question is the reasonableness of plaintiff's fear that defendant will file an infringement suit against it.

Plaintiff can point to only a few indications of defendant's intent to sue it for infringement. Three are contained in the July 6, 2005 letter from defendant's counsel: the description of plaintiff's *"publicly noted willful infringement* of defendant's intellectual property"; the warning that defendant's decision not to take action *at this time* cannot be construed as a basis for a laches or estoppel defense; and the additional warning that defendant reserves all its rights and options to address the situation, "including all options with respect to any litigation which later may be brought against" plaintiff by defendant. (Emphasis added.) A fourth is the very peculiar questioning of John Puisis at his deposition in the Stratagene suit about plaintiff's work with the HPV virus. It is not surprising that this questioning raised suspicions in plaintiff's counsel's mind. It had nothing to do with any issue raised in the Stratagene case. (Defendant argues that the questions went to damages, apparently because it would have shown that plaintiff's success was not tied solely to the diagnostic process at issue in the Stratagene process, but that makes no sense. Its questions focused on the exact nature of the way plaintiff was developing its HPV technology, rather than on the size of the market for such technology or estimates of how much money plaintiff expected to

earn from the sale of its technology and related products.) The fifth indication of defendant's intent to sue is defendant's ongoing litigation with another company that is alleged to have infringed one of the patents at issue in this case. The litigation demonstrates defendant's willingness to go to court to protect its patents. (Plaintiff has also stated that industry rumors have led it to believe that defendant is planning to bring suit against it. I have disregarded this unsubstantiated allegation.)

*4 Defendant downplays the import of these statements and actions. It points out that its president has averred in a declaration that it did not authorize the statements its counsel made in the July 6, 2005 letter, that it has no present intention to sue plaintiff for patent infringement, that it has not studied whether any of plaintiff's products infringe its patents and that no employee or representative of defendant has been in direct contact with plaintiff regarding the patents. Further, defendant argues that this case lacks a critical component: the existence of ongoing litigation against plaintiff over the same subject matter covered by the patents.

As to the lack of authorization of defendant's counsel's statements, the test with respect to any statement is not whether the person making the statements speaking was authorized to do so, or whether the person had a legitimate ground for making the statement or even whether the statement is true, but whether the statements would have produced an objectively reasonable apprehension of suit in the listener. *Capo, Inc. v. Dioptics Medical Products,* 387 F.3d 1352, 1356 (Fed.Cir.2004) (rejecting defendant's argument that it should not find that plaintiff had reasonable apprehension of suit because defendant had not studied the accused product and therefore could not have meant its threats; declaratory judgment plaintiff "is not required to verify the extent to which the accuser has studied the accused product before acting to declare its commercial rights"). If the question is whether the speaker is authorized to say what he does, it is the speaker's apparent authority that will determine the effect of his words upon the person hearing them.

As in *Capo,* plaintiff is not required to verify the basis for the patent holder's statements, which in this case would be counsel's authority to speak on its client's behalf. In any event, the speaker in this case was defendant's counsel. Who

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                      Page 4
Slip Copy, 2006 WL 83340 (W.D.Wis.)
**(Cite as: Slip Copy)**

would have more *apparent* authority than a party's legal counsel? In that respect, this case is unlike *West Interactive Corp. v. First Data Resources, 972 F.2d 1295 (Fed.Cir.1992)*, in which a third party told the plaintiff about statements about infringement made by a representative of joint venture between AT & T and defendant's wholly owned subsidiary during a business negotiation. The court of appeals agreed with the defendant that these statements would not have created a reasonable apprehension in the plaintiff that the defendant parent company would sue it for patent infringement. *Id. at 1297.* The speaker "was not an owner, officer, agent, or even an employee" of defendant or "even an officer of the joint venture of [defendant's] subsidiary, but merely one of its employees" (albeit an inventor of the patented devices). *Id.* He was not the defendant's counsel.

Defendant's counsel's statement in the July 6 letter that defendant was not going to bring suit *at this time* would have done little or nothing to allay plaintiff's apprehensions. As the Federal Circuit has noted, the mere fact that a defendant has not authorized infringement suit against plaintiff at the present time is not dispositive of its intentions for future; "a patentee's intentions 'may change over time.' " *Goodyear Tire, 824 F.2d at 956* (quoting *C.R. Bard, Inc. v. Schwartz, 716 F.2d 874, 881 (Fed.Cir.1983)*).

*5 Plaintiff argues that the July 6, 2005 letter stated that defendant had considered but had decided against suing plaintiff at this time. This is not an unreasonable inference to be drawn from the letter but it is not something the letter states explicitly. Nevertheless, the letter does suggest that litigation is a possibility for the future. Were it otherwise, defendant's counsel could have said something to the effect that defendant had never considered bringing suit against plaintiff. Instead, he referred to "the publicly noted willful infringement of defendant's intellectual property," suggesting strongly that defendant believes that plaintiff has infringed its patents relating to HPV testing.

Defendant suggests that ongoing litigation between the parties is necessary to a court's finding that a plaintiff has a reasonable apprehension of suit. It is true that ongoing litigation between the parties is a factor in a number of cases in which the Court of Appeals for the Federal Circuit has re-

versed the lower court's dismissal of declaratory judgment actions. However, it does not appear to be critical to jurisdiction. What does seem to be important is an actual indication that the patentee has demonstrated that it will resort to litigation to protect its patent rights. In *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc., 846 F.2d 731 (Fed.Cir.1988)*, as in this case, the defendant had commenced suit against a third party. In addition, Ecolochem had demanded that Arrowhead cease any practice of Ecolochem's patented process immediately and had warned Arrowhead that Ecolochem had not hesitated to protect its patent rights in the past. *Id. at 733.* In light of these indications of an intent to sue, the court of appeals took strong issue with the district court for dismissing the case for lack of an actual case or controversy. See also *C.R. Bard, Inc., 716 F.2d at 881 n. 6* (lawsuits against other manufacturers of similar products can be factor giving rise to reasonable apprehension of infringement suit).

In this case, defendant has filed suit against Ventana Medical Systems, Inc. and Beckman Coulter, Inc. for alleged infringement of defendant's '332 patent, one of the four patents at issue in this suit. Clearly, defendant is prepared to sue to protect its patent rights from infringing competitors.

In sum, I am persuaded that plaintiff has an objectively reasonable fear that it will be subject to an infringement suit by defendant, preventing it from developing and selling its own clinical diagnostic test for HPV detection and selling its analyte specific reagents. It should not have to sit back while defendant "engages in a *danse macabre*, brandishing a Damoclean threat with a sheathed sword." *Arrowhead Industrial Water, 846 F.2d at 735.*

### ORDER

IT IS ORDERED that defendant Digene Corporation's motion to dismiss plaintiff Third Wave Technologies' suit for declaratory judgment is DENIED.

W.D.Wis.,2006.
Third Wave Technologies, Inc. v. Digene Corp.
Slip Copy, 2006 WL 83340 (W.D.Wis.)

Briefs and Other Related Documents (Back to top)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                    Page 5
Slip Copy, 2006 WL 83340 (W.D.Wis.)
**(Cite as: Slip Copy)**

• 3:05C00594 (Docket) (Oct. 07, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.