## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN, INC., a Delaware corporation; IMMUNEX CORPORATION, a Washington corporation; AMGEN USA INC., a Delaware corporation; AMGEN MANUFACTURING, LIMITED, a Bermuda Corporation, and IMMUNEX RHODE ISLAND CORPORATION, a Delaware corporation, | ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) Civil Action No. 1:06-cv-259 (KAJ) ) |
| vs. | ) ) |
| ARIAD PHARMACEUTICALS, INC., a Delaware corporation, | ) ) ) |
| Defendant. | ) ) |

### DECLARATION OF MELANIE K. SHARP

I, Melanie K. Sharp, hereby declare as follows:

1.      I am a partner at the law firm of Young, Conaway, Stargatt & Taylor LLP in Wilmington, Delaware, counsel for Plaintiffs in the above-captioned matter. I submit this Declaration in connection with Plaintiffs' opposition to ARIAD's motion to dismiss in this matter. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would competently testify thereto.

2.      Attached hereto as Exhibit A is a true and correct copy of an excerpt of the trial transcript from ARIAD's litigation against Eli Lilly and Company, 02-cv-11280 (RWZ), United States District Court for the District of Massachusetts. The excerpt attached as Exhibit A includes portions of the trial testimony of Dr. Harvey Berger of ARIAD, given on April 11, 2006.

3.    Attached hereto as Exhibit B is a true and correct copy of the Complaint in ARIAD's litigation against Eli Lilly and Company, 02-cv-11280 (RWZ), United States District Court for the District of Massachusetts, June 25, 2002.

2.    Attached hereto as Exhibit C is a true and correct copy of ARIAD's 2006 Form 10-K filing with the United States Securities and Exchange Commission.

3.    Attached hereto as Exhibit D is a true and correct copy of an excerpt from ARIAD's website, found at (http://library.corporate-ir.net/library/11/118/118422/items/198959/NF-kBHighlights.pdf).

4.    Attached hereto as Exhibit E is a true and correct copy of United States Patent No. 6,410,516.

5.    Attached hereto as Exhibit F is a true and correct copy of ARIAD's August 19, 1991 Exclusive License Agreement.

6.    Attached hereto as Exhibit G is a true and correct copy of the November 20, 1991 Amendment to ARIAD's August 19, 1991 Exclusive License Agreement.

7.    Attached hereto as Exhibit H is a true and correct copy of the January 2, 2002 Amendment to ARIAD's August 19, 1991 Exclusive License Agreement.

8.    Attached hereto as Exhibit I is a true and correct copy of ARIAD's 5/13/2003 Press Release.

9.    Attached hereto as Exhibit J is a true and correct copy of ARIAD's 4/28/2004 Press Release as reported by Biotech Week.

10.    Attached hereto as Exhibit K is a true and correct copy of ARIAD's 10/1/2005 Press Release as reported by Biotech Business.

11.    Attached hereto as Exhibit L is a true and correct copy of a CNBC interview transcript with Dr. Harvery Berger of ARIAD, dated May 4, 2006.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.  Executed this _28_th day of June, 2006.

Melanie K. Sharp, Esq.

3

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on June 28, 2006, I caused to be electronically filed a true and correct copy of the foregoing, Declaration of Melanie K. Sharp, Esq., with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

John G. Day, Esquire
Ashby & Geddes
222 Delaware Avenue, 17th Floor
Wilmington, DE 19801

I further certify that on June 28, 2006, I caused a copy of the foregoing Declaration of Melanie K. Sharp, Esq., to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

BY E-MAIL (by agreement of counsel)
Morgan Chu, Esquire
David I. Gindler, Esquire
Amir A. Naini, Esquire
Christopher M. Newman, Esquire
Irell & Manella LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067-4276

Melanie K. Sharp (No. 2501)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street

P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6681
msharp@ycst.com

*Attorneys for Plaintiffs*

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 1:02-cv-11280-RWZ


ARIAD PHARMACEUTICALS, et al.,
                Plaintiffs

        vs.

ELI LILLY & COMPANY,
                Defendant

        ********************


              JURY TRIAL

        Day  2, Second Session


        BEFORE THE HONORABLE RYA W. ZOBEL
    UNITED STATES DISTRICT COURT JUDGE



            United States District Court
          John J. Moakley U.S. Courthouse
              1 Courthouse Way
          Boston, Massachusetts 02210
              April 11, 2006


            *******************


    REPORTER:  Loretta Hennessey, RPR, RMR
              Tel:  617-771-8336

c12758ab-360b-4054-8a87-fa07a78ebed0

Page 67

```
 1   APPEARANCES:
 2   For the Plaintiff:
     Bromberg & Sunstein, LLP
 3   (By Lee C. Bromberg, Esq., and
     Kerry L. Timbers, Esq.)
 4   125 Summer Street
     Boston, Massachusetts 02110-1618
 5
     -AND-
 6
     Kay Scholer, LLP
 7   (By Leora Ben-Ami, Esq.,
     Patricia A. Carson, Esq. and
 8   Thomas F. Fleming, Esq.)
     425 Park Avenue
 9   New York, New York 10022
10
11   For the Defendant:
     McDonnell Boehnen Hulbert & Berghoff LLP
12   (By Paul H. Berghoff, Esq.,
     Grantland G. Drutchas, Esq., and
13   David M. Frischkorn, Esq.)
     300 South Wacker Drive
14   Chicago, Illinois 60606-6709
15
16   Eli Lilly and Company
     (By Paul R. Cantrell, Esq.)
17   Associate General Patent Counsel
     Lilly Corporate Center
18   Indianapolis, IN 46285
19
20
21
22
23
24
25
```

Page 68

```
 1              INDEX
 2
        WITNESS    DIRECT CROSS REDIRECT RECROSS
 3
 4   Harvery Berger
 5   (By Mr. Berghoff)      70            114
     (By Ms. Ben-Ami)            112
 6
 7   Phillip A. Sharp
     (By Ms. Carson)      115
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 69

```
 1              P R O C E E D I N G S
 2        (The following proceedings were held in open court
 3   before The Honorable Rya W. Zobel, United States District
 4   Judge, District of Massachusetts, at the John J. Moakley
 5   United States Courthouse, 1 Courthouse Way, Boston,
 6   Massachusetts, on April 11, 2006.)
 7        THE CLERK: Please be seated.
 8        THE COURT: May I ask counsel, when you get to
 9   experts, would there be objection if I polled the jury if they
10   don't understand something, to raise their hand and ask, or
11   just tell us they didn't understand something.
12        MS. BEN-AMI: Just to say "I didn't understand" so
13   they'll repeat it?
14        THE COURT: Yes.
15        MS. BEN-AMI: I think that's okay.
16        MR. BERGHOFF: I see no problem with it.
17        MS. BEN-AMI: Your Honor, I have --
18        THE COURT: They probably won't.
19        MS. BEN-AMI: I understand. For the next witness,
20   for the next witness, your Honor, we're concerned about
21   something they may potentially be crossed-examined about.
22        THE COURT: That's okay, we'll deal with it on the
23   record. Isn't this an issue we dealt with before?
24        MS. BEN-AMI: You gave some general rules and said
25   you'd deal with it as it came up. It might come up, but I
```

Page 70

```
 1   don't know.
 2        THE COURT: Please be seated.
 3        (Jury arrives.)
 4        THE COURT: Mr. Berghoff, you may proceed.
 5        MR. BERGHOFF: Thank you, your Honor.
 6        HARVEY BERGER, Continued Cross Examination
 7   BY MR. BERGHOFF:
 8   Q.  Dr. Berger, your salary at ARIAD?
 9   A.  It's a little bit over $500,000 a year.
10   Q.  And you testified that you obtained a license under the
11   NF-kappaB patent applications from MIT in 1991 during your
12   direct testimony; is that correct?
13   A.  Yes.
14   Q.  And that was shortly after the company was founded, ARIAD
15   was founded?
16   A.  Yes.
17   Q.  Let's look, if we could, at the License Agreement. Could
18   I have DTX 16, although I believe you have a different copy in
19   your binder. Let's just use your copy, it's PTX 460, excuse
20   me. This License Agreement contains what's called a "best
21   efforts" clause, does it not?
22   A.  Which clause are you looking at?
23   Q.  You can't remember whether it contains a best efforts
24   clause?
25   A.  Not exactly. Would you refer me to what you're --
```

Ariad v. Eli Lilly                                Day 2, Session 2

4-11-06

## Page 71

1  Q.  I will.  Paragraph 3.1, which is on Page 6 of the
2  agreement.
3  A.  Yes, I see.
4  Q.  And if we could look at Paragraph 3.1.
5       This paragraph refers to "licensee," and am I correct
6  that that's ARIAD?
7  A.  Yes, sir.
8  Q.  And it says that "Licensee," or ARIAD, "shall use its
9  best efforts to bring one or more licensed products or
10 licensed processes to market through a thorough, vigorous and
11 diligent program for exploitation of the patent rights."  Do
12 you see that?
13 A.  Yes, I do.
14 Q.  And the patent rights that are being discussed here are
15 the NF-kappaB patent rights?
16 A.  Yes, they are.
17 Q.  And licensed products would be what, in your
18 understanding, Dr. Berger?
19 A.  They would be products either discovered using the
20 technology or products whose use was covered by the technology
21 and patents.
22 Q.  So products discovered using NF-kappaB, correct, would be
23 one part of licensed products?
24 A.  Yes, sir.
25 Q.  And the other part would be products that use NF-kappaB

## Page 72

1  when they are administered to patients?
2  A.  Yes, the method of treatment, applications that we've
3  discussed.
4  Q.  And so this paragraph in your License Agreement with MIT
5  and the other universities imposed an obligation of ARIAD to
6  use its best efforts to bring NF-kappaB discovered products or
7  products that use NF-kappaB to market, correct?
8  A.  Yes, sir.
9  Q.  And ARIAD was under an obligation to bring those patents
10 to market through a thorough, vigorous and diligent program
11 for exploitation of the patent rights; am I right?
12 A.  Yes.  But it does not require ARIAD to be the only one to
13 do that.
14 Q.  And, in fact, ARIAD has taken no steps, including through
15 today in 2006, to bring a licensed NF-kappaB product to
16 market, correct?
17 A.  We have not done research to develop NF-kappaB
18 inhibitors, as I said earlier, and explained why, and we've
19 discussed that with the universities over many years, and the
20 reasons why, and have plans to do so, but also have plans to
21 license the technology broadly, which the universities were
22 quite pleased with that approach.
23 Q.  And ARIAD, if I understand it, has never had, to date,
24 any type of research program in the NF-kappaB area?
25 A.  Never to develop NF-kappaB inhibitors.

## Page 73

1  Q.  ARIAD has never done any research focused on identifying
2  compounds or drugs based on their effect on NF-kappaB,
3  correct?
4  A.  Right, that's the same thing.
5  Q.  And you've done no research at ARIAD to identify
6  compounds or drugs that might help patients by using NF-kappaB
7  technology?
8  A.  We have not, as I've said, we have not had a program to
9  date on developing NF-kappaB inhibitors.
10 Q.  And decisions about ARIAD's research programs from the
11 very beginning through today have been made at ARIAD in
12 conjunction with a Scientific Advisory Board; is that correct?
13 A.  No, sir, that's wrong.
14 Q.  And how is it wrong?
15 A.  The Scientific Advisory Board is a group of advisors that
16 have worked with us individually, at times; as a group, at
17 times.  In the past about five or six years, really since
18 1999, we have largely used the scientific advisors on an
19 individual basis, particularly to gain advice on specific
20 scientific questions.  But the Scientific Advisory Board has
21 absolutely no role in setting our policies, our direction or
22 the focus of our R&D activities.
23 Q.  And never has, is your testimony?
24 A.  And never has, yes.
25 Q.  And Dr. Baltimore is currently a member of your

## Page 74

1  Scientific Advisory Board?
2  A.  Yes, he is.
3  Q.  And he has always been a member of your Scientific
4  Advisory Board?
5  A.  Yes.
6  Q.  So you have always at ARIAD had access to Dr. Baltimore
7  to ask any questions --
8  A.  Certainly.
9  Q.  -- about proceeding with an NF-kappaB research program,
10 correct?
11 A.  Yes.
12 Q.  And is it my understanding that since 1991 when ARIAD was
13 founded, that ARIAD has never conducted a single test on
14 anything for NF-kappaB activity?
15 A.  We have done no experiments on trying to develop
16 NF-kappaB inhibitors, although we have had work for many years
17 that involves NF-kappaB itself, and NF-kappaB is an important
18 part of some of our other technology, such as our Argent gene
19 regulation therapy.  So we have done experimentation and
20 research on NF-kappaB, just not the discovery of drugs that
21 are NF-kappaB inhibitors.
22 Q.  So it's your testimony that ARIAD has done NF-kappaB
23 tests?
24 A.  We have done work with NF-kappaB because NF-kappaB is
25 included as part of our technology, one of our other

3  (Pages 71 to 74)

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

02 CV 1 1 2 8 0 RWZ

|  |  |  |
|---|---|---|
| ARIAD PHARMACEUTICALS, INC.,<br>MASSACHUSETTS INSTITUTE OF<br>TECHNOLOGY, THE WHITEHEAD INSTITUTE<br>FOR BIOMEDICAL RESEARCH, and THE<br>PRESIDENT AND FELLOWS OF HARVARD<br>COLLEGE | )<br>)<br>)<br>)<br>)<br>)<br>) | No. _____ |
|  | ) | **Jury Trial Demanded** |
| Plaintiffs, | ) |  |
| v. | ) |  |
| ELI LILLY & CO., | ) |  |
| Defendant. | ) |  |

RECEIPT # 40085
AMOUNT $ 150 · 00
SUMMONS ISS. 442
LOCAL RULE 4.1
WAIVER OF SERV.
MCF ISSUED
AO 120 OR 121
BY DPTY CLK
DATE 6/25/02

FILED
IN CLERKS OFFICE
U.S. DISTRICT COURT
DISTRICT OF MASS.
'02 JUN 25 P 3: 24

### COMPLAINT

Plaintiffs ARIAD Pharmaceuticals, Inc. ("ARIAD"), Massachusetts Institute of Technology ("M.I.T."), the Whitehead Institute for Biomedical Research ("THE WHITEHEAD INSTITUTE"), and the President and Fellows of Harvard College ("HARVARD") (hereinafter collectively referred to as "Plaintiffs"), through their attorneys, for their Complaint against Defendant Eli Lilly & Co. ("Lilly"), allege as follows:

### NATURE OF THE ACTION

1.      This is a patent infringement action against Lilly based on Lilly's activity in connection with its Xigris® and Evista® products covered by claims of Plaintiffs' United States Patent No. 6,410,516 ("the '516 patent"), entitled "Nuclear Factors Associated With Transcriptional Regulation." A copy of the patent is attached as Exhibit 1.



2.      Plaintiffs seek monetary damages, including but not limited to a reasonable royalty for Defendant Lilly's current and future infringement of the '516 patent.

## PARTIES, JURISDICTION AND VENUE

3.      ARIAD is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 26 Landsdowne Street, Cambridge, Massachusetts.

4.      M.I.T is a co-educational, privately endowed research university located at 77 Massachusetts Avenue, Cambridge, Massachusetts.

5.      THE WHITEHEAD INSTITUTE is a non-profit research and education institute located at Nine Cambridge Center, Cambridge, Massachusetts. It is affiliated with M.I.T in its teaching activities, but is wholly responsible for its own research programs, governance, and finance.

6.      HARVARD is a co-educational, privately endowed research university located at Massachusetts Hall, Cambridge, Massachusetts.

7.      Upon information and belief, Defendant Lilly is a corporation organized and existing under the laws of the State of Indiana with its principal place of business located at Lilly Corporate Center, Indianapolis, Indiana. Lilly does substantial business in this judicial district.

8.      This is an action for patent infringement under the Patent Act of the United States, 35 U.S.C. § 100 *et seq.*, including §§ 271 and 281. This Court has subject matter jurisdiction over this patent infringement action pursuant to 28 U.S.C. § 1338(a).

9.      Venue is proper in this judicial district pursuant to §§ 1400(b) and 1391(c).

## FACTUAL BACKGROUND

10.    Living cells respond to a vast array of different signals in their environment, including natural regulatory factors (e.g. hormones) and harmful factors (e.g. toxins). A primary way that cells respond to such signals is through intricate networks of signaling proteins inside the cell, which act as "messengers" to regulate expression of genes that are critical for normal cell function. Normal cell signaling and gene regulation are both controlled at a molecular level by specific interactions of these "messenger" proteins with other proteins and DNA. Identifying these "messenger" proteins and how they function is a crucial step in developing drugs for treating diseases associated with abnormal cell signaling and gene regulation.

11.    The invention of the '516 patent arose from a collaboration between research groups at three of the world's leading biomedical research institutions, M.I.T., THE WHITEHEAD INSTITUTE, and HARVARD. The collaboration was directed by three distinguished scientists, Dr. David Baltimore, Nobel Laureate and former director of THE WHITEHEAD INSTITUTE, Dr. Phillip Sharp, also a Nobel Laureate and now Institute Professor at M.I.T., and Dr. Thomas Maniatis, Thomas H. Lee Professor of Molecular and Cellular Biology at HARVARD.

12.    In the mid 1980s, Dr. Baltimore and his colleagues identified a "messenger" protein, which they named "NF-KB." As discussed in the '516 patent specification, Dr. Baltimore and his colleagues initially believed that NF-KB was only found in certain cells known as "B cells" and, therefore, had a limited role in cell signaling and gene regulation.

13.    Extensive studies on NF-KB carried out by the named inventors in Dr. Baltimore's laboratory at THE WHITEHEAD INSTITUTE and the other co-inventors in Dr. Sharp's laboratory at M.I.T. and Dr. Maniatis' laboratory at HARVARD led to the surprising discovery, described in the '516 patent, that NF-KB is found in "many, if not all, cell types and that it acts as an intracellular messenger capable of playing a broad role in gene regulation as a mediator of inducible signal transduction." ('516 patent col. 2, lines

29-31.) Most significantly, through the work disclosed in the '516 patent, the inventors also showed how the NF-KB cell-signaling pathway could be regulated and used for medical and therapeutic applications.

14.     ARIAD, since its founding in 1991, has been engaged in research and development of pharmaceutical products that regulate cell signaling pathways and gene function. ARIAD's drug discovery program is aimed at developing small-molecule drugs to inhibit or block disease-related abnormal cell-signaling and to control gene function and cell-signaling.

15.     In part for his preeminent contribution to the cell-signaling field and the relevance of this expertise to ARIAD's research and development program, ARIAD invited, and Dr. Baltimore agreed, to join ARIAD's board of scientific and medical advisors as a founding member.

16.     In 1986, the first of a series of U.S. patent applications relating to the NF-KB research spearheaded by Dr. Baltimore and various of his co-inventors was filed.  Through extensive prosecution, during which the Patent Office carefully scrutinized the claimed subject matter for compliance with the statutory requirements for patentability, the Patent Office awarded the inventors several patents claiming various, separate aspects of this pioneering technology.  The '516 patent asserted herein, is the most recent patent to issue of this family of patents.

## THE PATENT-IN-SUIT

17.     On June 25, 2002, the '516 patent, entitled "Nuclear Factors Associated With Transcriptional Regulation," with claims that cover methods of treating human disease by regulating NF-KB activity, was duly and legally issued to Baltimore *et al.* and assigned to M.I.T. THE WHITEHEAD INSTITUTE, and HARVARD.

18.     Based on a license agreement executed in 1991, ARIAD is the exclusive licensee from M.I.T., THE WHITEHEAD INSTITUTE, and HARVARD of the '516 patent, which presents claims directed to

one aspect of the pioneering technology discovered by the inventors, i.e., the use of drugs that regulate NF-KB cell signaling.

## LILLY'S INFRINGEMENT OF THE '516 PATENT

19.    Upon information and belief, Lilly is engaged in the manufacture, importation, use, sale and/or offers of sale, and promotion of pharmaceutical products marketed under the brandname Evista®.

20.    Upon information and belief, Evista® is a form of the selective estrogen receptor modulator raloxifene hydrochloride, and was approved for sale by the United States Food and Drug Administration on or about December 10, 1997, for the prevention and treatment of osteoporosis in postmenopausal women.

21.    Upon information and belief, a molecular basis for the action of Evista® in treating osteoporosis has been demonstrated to occur through the modulation of NF-KB activity.  Some of these findings were published by Lilly scientists in a World Intellectual Property Organization Patent Application entitled "Methods of Modulating NF-KB Transcription Factor" and bearing publication number WO 96/40137.  A copy of this patent application is attached as Exhibit 2.

22.    Upon information and belief Lilly is engaged in the manufacture, importation, use, sale and/or offers of sale and promotion of pharmaceutical products marketed under the brandname Xigris®.

23.    Upon information and belief, Xigris® is a form of recombinant human activated protein C, and was approved for sale by the United States Food and Drug Administration on or about November 21, 2001, for the reduction of mortality in human adult patients with severe sepsis who have a high risk of death.

24.    Upon information and belief, a molecular basis for the action of Xigris® in treating septic shock has been demonstrated to occur through the inhibition of NF-KB activity.  These findings were published

by Lilly scientists in papers by Joyce *et al.*, J. Biol. Chem., 276: 11199-11203, 2001 and Crit. Care Med. 30:S288-S293, 2002. Copies of these papers are attached as Exhibits 3 and 4.

25.     Plaintiffs have suffered and will continue to suffer damages as a result of Lilly's infringing activities.

26.     Plaintiffs have previously sought to initiate discussions with Lilly concerning a license to Plaintiffs' NF-KB patent estate.  Defendant Lilly has failed to respond to these efforts.

## COUNTS

### Count 1 – Patent Infringement of the '516 Patent

27.     Paragraphs 1-26 of this Complaint are incorporated by reference as if stated fully herein.

28.     Defendant Lilly, by engaging in the unauthorized manufacture, importation, use, sale and/or offers for sale of raloxifene hydrochloride in the United States, including pharmaceutical products marketed as Evista®, has committed acts of direct, contributory and/or induced infringement of claims 69-72, 80, 82, 84, 85 and 93-96 of the '516 patent.

29.     Defendant Lilly, by engaging in the unauthorized manufacture, importation, use, sale and/or offers for sale of recombinant human activated protein C in the United States, including pharmaceutical products marketed as Xigris®, has committed acts of direct, contributory and/or induced infringement of claims 14, 15, 144-146, and 154-156 of the '516 patent.

30.     Defendant Lilly has offered for sale, sold and/or imported raloxifene hydrochloride into the United States, including pharmaceutical products marketed as Evista®, with knowledge that such products have a molecular basis of action through the modulation of NF-KB activity and are especially made or adapted for use in an infringment of the '516 patent.  Evista®, which constitutes a material part of the invention, is not a staple article or commodity of commerce suitable for substantial non-infringing

use. By its actions, Defendant Lilly is actively and knowingly inducing infringement of claims 69-72, 80, 82, 84, 85 and 93-96 of the '516 patent.

31.     Defendant Lilly has offered for sale, sold and/or imported recombinant human activated protein C into the United States, including pharmaceutical products marketed as Xigris®, with knowledge that such products have a molecular basis of action through the inhibition of NF-KB activity and are especially made or adapted for use in an infringement of the '516 patent. Xigris® which constitutes a material part of the invention, is not a staple article or commodity of commerce suitable for substantial non-infringing use. By its actions, Defendant Lilly is actively and knowingly inducing infringement of claims 14, 15, 144-146, and 154-156 of the '516 patent.

32.     Plaintiffs have suffered and will continue to suffer damages as a result of Defendant's infringing activities.

        WHEREFORE, Plaintiff respectfully request that the Court:

A.      Award to Plaintiffs damages adequate to compensate Plaintiffs for infringement of the '516 patent, but in no event less than a reasonable royalty, together with interest and costs.

B.      Enter an order declaring this an exceptional case pursuant to 25 U.S.C. § 285 and award to Plaintiffs reasonable attorney fees;

and,

C.      Grant to Plaintiffs such other and further relief as may be just and appropriate.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs respectfully demand a trial by jury on all issues that are

properly triable to a jury in this action.

BROMBERG & SUNSTEIN LLP

By: *Lee Carl Bromberg*

Lee Carl Bromberg, BBO# 058480
Kerry L. Timbers, BBO# 552293
Anne Marie Longobucco, BBO#649299
125 Summer Street
Boston, MA 02110-1618
Tel: (617) 443-9292

CLIFFORD CHANCE ROGERS & WELLS LLP

Leora Ben-Ami
Thomas F. Fleming
Patricia A. Carson
200 Park Avenue
New York, NY, 10166
(212) 878-8000

Attorneys for Plaintiffs ARIAD Pharmaceuticals,
Inc., Massachusetts Institute of Technology, the
Whitehead Institute for Biomedical Research, and
the President and Fellows of Harvard College

02695/00501 206781.1

# EXHIBIT C

10-K 1 a5100014.htm ARIAD PHARMACEUTICALS, INC.

<div align="center">

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 10-K**

**(Mark One)**
**[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2005**
**OR**
**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from_____ to _____
**Commission file number 0-21696**

**ARIAD Pharmaceuticals, Inc.**
(Exact name of registrant as specified in its charter)

</div>

| | |
|---|---|
| **Delaware** | **22-3106987** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

<div align="center">

**26 Landsdowne Street, Cambridge, Massachusetts    02139-4234**
(Address of principal executive offices)    (Zip Code)

**Registrant's telephone number, including area code: (617) 494-0400**

**Securities registered pursuant to Section 12(b) of the Act: None**

**Securities registered pursuant to Section 12(g) of the Act:**

**Common Stock, $.001 Par Value**

**Rights to Purchase Series A Preferred Stock**

</div>

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
<div align="center">Yes [ ] No [ X ]</div>

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.
<div align="center">Yes [ ] No [ X ]</div>

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

<div align="center">Yes [ X ] No [ ]</div>

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "accelerated filer" and "large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):
<div align="center">Large accelerated filer [ ] Accelerated filer [ X ] Non-accelerated filer [ ]</div>

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
<div align="center">Yes [ ] No [ X ]</div>

The aggregate market value of the registrant's common stock held by nonaffiliates of the registrant (without admitting that any person whose shares

are not included in such calculation is an affiliate), computed by reference to the price at which the common stock was last sold, as of the last business day of the registrant's most recently completed second fiscal quarter was $338 million.

As of February 28, 2006, the registrant had 61,840,329 shares of common stock outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

The following documents (or parts thereof) are incorporated by reference into the following parts of this Form 10-K: Certain information required in Part III of this Annual Report on Form 10-K is incorporated from the Registrant's Proxy Statement for the Annual Meeting of Stockholders to be held on June 14, 2006.

# TABLE OF CONTENTS

**PART I**

| | | |
|---|---|---|
| Item 1: | Business | 1 |
| Item 1A: | Risk Factors | 11 |
| Item 1B: | Unresolved Staff Comments | 21 |
| Item 2: | Properties | 22 |
| Item 3: | Legal Proceedings | 22 |
| Item 4: | Submission of Matters to a Vote of Security Holders | 23 |

**PART II**

| | | |
|---|---|---|
| Item 5: | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 24 |
| Item 6: | Selected Financial Data | 25 |
| Item 7: | Management's Discussion and Analysis of Financial Condition and Results of Operations | 26 |
| Item 7A: | Quantitative and Qualitative Disclosures About Market Risk | 36 |
| Item 8: | Financial Statements and Supplementary Data | 38 |
| Item 9: | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 56 |
| Item 9A: | Controls and Procedures | 56 |
| Item 9B: | Other Information | 58 |

**PART III**

| | | |
|---|---|---|
| Item 10: | Directors and Executive Officers of the Registrant | 59 |
| Item 11: | Executive Compensation | 59 |
| Item 12: | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 59 |
| Item 13: | Certain Relationships and Related Transactions | 59 |
| Item 14: | Principal Accounting Fees and Services | 59 |

**PART IV**

| | | |
|---|---|---|
| Item 15: | Exhibits, Financial Statement Schedules | 60 |

**PART I**

**ITEM 1:  BUSINESS**

The following Business Section contains forward-looking statements, which involve risks and uncertainties. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of certain factors (see Part I, Item 1A: Risk Factors). Unless the content requires otherwise, references to "ARIAD," "we," "our," and "us," in this Annual Report on Form 10-K refers to ARIAD Pharmaceuticals, Inc. and our subsidiaries.

**Overview**

We are engaged in the discovery and development of breakthrough medicines to treat cancers by regulating cell signaling with small molecules. We are developing a comprehensive approach to patients with cancer that addresses the greatest medical need - aggressive and advanced-stage cancers for which current treatments are inadequate. Our goal is to build a fully integrated oncology company focused on novel, molecularly targeted therapies to treat solid tumors and hematologic cancers, as well as the spread of primary tumors to distant sites.

Human cells - both healthy and malignant - share an elaborate system of molecular pathways that carry signals back and forth from the cell surface to the nucleus and within the cell. Such signaling is essential to cell functioning and viability. When disrupted or over-stimulated, such pathways may trigger diseases such as cancer. For example, growth and proliferation of cancer cells are dependent on signals from external growth factors, as well as signals indicating the availability of sufficient nutrients and blood supply. These signals are conveyed along well-defined pathways, several of which are regulated by a protein called the mammalian target of rapamycin, or mTOR.

Our lead cancer product candidate, AP23573, is an internally discovered, potent mTOR inhibitor. The protein, mTOR, serves as a "master switch" and appears to have a central function in cancer cells. Blocking mTOR creates a starvation-like effect in cancer cells by interfering with cell growth, division, metabolism and angiogenesis.

As part of our global clinical development plan and registration strategy, AP23573 has been studied in multiple Phase 2 and 1b clinical trials in the U.S. and Europe as a single agent in patients with solid tumors, including sarcomas, hormone refractory prostate cancer and endometrial cancer. In addition, three multi-center Phase 1b trials of AP23573 in combination with other anti-cancer therapies are underway, which are focused primarily on patients with various types of solid tumors, especially breast, ovarian, non-small-cell lung, and prostate cancers, as well as sarcomas. Further combination studies are planned. In addition, we have concluded enrollment in Phase 1b and Phase 2 clinical trials in patients with brain cancer and leukemias and lymphomas, respectively. Eleven clinical trials of AP23573 are ongoing or completed. Intravenous and oral formulations of AP23573 have been studied in these trials.

In November 2005, at the AACR-NCI-EORTC International Conference on "Molecular Targets and Cancer Therapeutics," investigators presented preliminary Phase 2 clinical data on AP23573 in advanced sarcoma patients, which showed that 27% (51/188) of patients treated with AP23573 and evaluable for at least four months demonstrated sustained anti-tumor responses. Enrollment in this trial has been completed and, based on these positive data, we expect to start our initial registration trial for AP23573 in patients with sarcomas. The U.S. Food and Drug Administration, or FDA, and the European Medicines Agency, or EMEA, have designated AP23573 as an orphan drug for treatment of soft-tissue and bone sarcomas. The FDA has also designated AP23573 as a fast-track product for the same indications.

In clinical trials to date, AP23573 has been well tolerated at the fixed doses administered, and adverse events were generally mild to moderate in severity and readily reversible. The most common treatment-related adverse events were oral mucositis, rash, fatigue, nausea and lipid abnormalities.

Two clinical trials of AP23573 that have concluded enrollment provide important insights that may be useful in planning follow-up studies. In patients with brain cancer, AP23573 was shown to cross the blood-brain barrier and inhibit brain tumor mTOR activity, while being well tolerated in severely ill patients. In heavily pretreated patients with leukemias and lymphomas, 40% of evaluable patients had AP23573 anti-cancer activity, providing a basis for further studies in selected hematologic malignancies.

The oral dosage form of AP23573 is being studied in a multi-center Phase 1b clinical trial of patients with various solid tumors. Initial results from this trial indicate that the oral dosage form can be administered safely using several daily and intermittent dosing schedules and achieves blood levels over time and mTOR inhibition generally consistent with those observed with intravenous administration.

As an mTOR inhibitor, AP23573 has also been shown to potently block the growth, proliferation and migration of vascular smooth muscle cells, the primary cause of narrowing and blockage of injured vessels. In 2005, we entered into a partnership with Medinol Ltd., one of the leading cardiovascular medical device companies, to develop and commercialize stents and other medical devices to deliver AP23573 to prevent reblockage of injured vessels following stent-assisted angioplasty, a common non-surgical procedure for dilating or opening narrowed arteries.

Inhibition of the mTOR pathway may be useful for additional indications beyond oncology and drug-delivery stents, and we are evaluating such indications as part of the broader clinical development plan for AP23573.

In addition to our lead clinical development program, we have a focused drug discovery program centered on small-molecule, molecularly targeted therapies and cell-signaling pathways implicated in cancer. Currently, our preclinical pipeline includes: inhibitors of mutant oncogenic or cancer-causing proteins (kinases) that regulate cell signaling (*e.g.,* Bcr-Abl - the target of imatinib, which becomes resistant to further treatment through various mutations, including one called T315I); single compounds that target multiple cancer pathways (*e.g.,* cell survival, metastases and angiogenesis); and new mTOR inhibitors (*i.e.,* bone-targeted compounds to treat primary bone cancers and cancers that have spread to bone).

We have an exclusive license to pioneering technology and patents related to methods of treating human disease through regulation of the cell-signaling activity of a protein called NF-κB, and the discovery, development and use of drugs to regulate NF-κB cell-signaling activity. NF-κB can be generally thought of as a "biological switch" that can be turned off using these treatment methods to treat disorders such as inflammation, cancer, sepsis and osteoporosis. We permit broad use of our NF-κB intellectual property, at no cost, by investigators at academic and not-for-profit institutions to conduct non-commercial research. Our goal is to license our NF-κB technology to pharmaceutical and biotechnology companies that are conducting research to discover and develop drugs that modulate NF-κB cell signaling and/or that are marketing such drugs.

We have also developed a proprietary portfolio of cell-signaling regulation technologies, our ARGENT technology, to control intracellular processes with small molecules, which may be useful in the development of therapeutic vaccines and gene and cell therapy products, and which provide versatile tools for applications in cell biology, functional genomics and drug discovery research. We distribute our ARGENT technologies at no cost to academic investigators in the form of our Regulation Kits to use in various research applications in an academic setting. Over 1,000 academic investigators worldwide are using or have used this technology in diverse areas of research, and over 250 scientific papers describing their use have been published. In addition, we are seeking opportunities to license our ARGENT technology to pharmaceutical and biotechnology companies to accelerate their drug discovery. To date, we have entered into several research and development licenses for use of our ARGENT technology.

-2-

Our current business strategy is to:

- build a fully integrated oncology company - a leader in the discovery, development and commercialization of molecularly targeted oncology therapies;

- establish a U.S. commercial platform;

- enter into partnerships with major pharmaceutical or biotechnology companies, after obtaining definitive clinical data, to assist in developing our cancer product candidates and commercializing them outside the U.S.;

- broadly develop our lead oncology product, AP23573, and build a pipeline of innovative follow-on product candidates;

- license our NF-κB and ARGENT cell-signaling regulation technologies to pharmaceutical and biotechnology companies; and

- develop and commercialize through medical device companies AP23573 drug-delivery stents and other medical devices to decrease reblockage of injured vessels following stent-assisted angioplasty .

We conduct research and development programs on behalf of our 80%-owned subsidiary, ARIAD Gene Therapeutics, Inc., hereinafter referred to as AGTI, relating to our product candidates which are small-molecule mTOR inhibitors. These product candidates include our lead product candidate, AP23573, and compounds in our bone-targeted mTOR inhibitor program. AGTI owns the intellectual property relating to these product candidates and related ARGENT technology. We also seek opportunities on behalf of AGTI to license the ARGENT cell-signaling regulation technology to develop and commercialize products and for research applications.

ARIAD was organized as a Delaware corporation in April 1991. Our principal executive offices are located at 26 Landsdowne Street, Cambridge, Massachusetts 02139-4234, and our telephone number is (617) 494-0400. We maintain an internet website at http://www.ariad.com, the contents of which are not incorporated herein. Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K and all amendments to such reports are made available free of charge through the Investor Relations section of our website as soon as reasonably practicable after they have been electronically filed with or furnished to the United States Securities and Exchange Commission, or SEC.

ARIAD and the ARIAD logo are our registered trademarks. ARGENT is our trademark. Other service marks, trademarks and trade names appearing in this report are the property of their respective owners.

## Our Lead Development Programs

### Oncology Indications of our mTOR Inhibitor, AP23573

Human cells - both healthy and malignant - share an elaborate system of molecular pathways that carry signals back and forth from the cell surface to the nucleus and within the cell. Such signaling is essential to cell functioning and viability. When disrupted or over-stimulated, such pathways may trigger diseases such as cancer. For example, growth and proliferation of cancer cells are dependent on signals from external growth factors, as well as signals indicating the availability of sufficient nutrients and blood supply. These signals are conveyed along well-defined pathways, several of which are regulated by the protein mTOR.

-3-

Our lead cancer product candidate, AP23573, is an internally discovered, potent mTOR inhibitor. The protein, mTOR, serves as a "master switch" and has a central function in cancer cells. Blocking mTOR creates a starvation-like effect in cancer cells by interfering with cell growth, division, metabolism and angiogenesis.

As part of our global clinical development plan and registration strategy, AP23573 has been studied in multiple Phase 2 and 1b clinical trials in the U. S. and/or Europe as a single agent in patients with solid tumors, including sarcomas, hormone refractory prostate cancer and endometrial cancer. In addition, three multi-center Phase 1b trials of AP23573 in combination with other anti-cancer therapies are underway, which are focused primarily on patients with various types of solid tumors, especially breast, ovarian, non-small-cell lung, and prostate cancers, as well as sarcomas. Further combination studies are planned. In addition, we concluded enrollment in Phase 1b and Phase 2 clinical trials in patients with brain cancer and leukemias and lymphomas, respectively. Eleven clinical trials of AP23573 are ongoing or completed. Intravenous and oral formulations of AP23573 have been studied in these trials.

Our most advanced Phase 2 trial of AP23573 is in sarcoma patients. In November 2005, at the AACR-NCI-EORTC International Conference on "Molecular Targets and Cancer Therapeutics," investigators presented preliminary Phase 2 clinical data on AP23573 in advanced sarcoma patients, who had generally failed alternative anti-cancer treatments and had progressive disease upon entering the trial. This trial includes four subgroups of bone and soft-tissue sarcoma patients. Based on these preliminary data, 27% (51/188) of patients treated with AP23573 and evaluable for at least four months demonstrated sustained anti-tumor responses as defined by RECIST (Response Evaluation Criteria in Solid Tumors), including four patients with partial responses (confirmed tumor regression >30%) and 47 patients with stable disease for at least four months. In addition, the preliminary six-month progression free survival (PFS) rate in the patients in the first stage of the trial was 22%. Enrollment in this trial has been completed. Based on these positive data from our Phase 2 trial, we expect to start our initial registration trial for AP23573 in patients with sarcomas.

In clinical trials to date, AP23573 has been well tolerated at the fixed doses administered, and adverse events were generally mild to moderate in severity and readily reversible. The most common treatment-related adverse events were oral mucositis, rash, fatigue, nausea and lipid abnormalities.

Two clinical trials of AP23573 that have concluded enrollment provide important insights that may be useful in planning follow-up studies. In patients with brain cancer, AP23573 was shown to cross the blood-brain barrier and inhibit brain tumor mTOR activity, while being well tolerated in severely ill patients. In heavily pretreated patients with leukemias and lymphomas, 40% of evaluable patients had AP23573 anti-cancer activity, providing a basis for further combination studies in selected hematologic malignancies.

The oral dosage form of AP23573 is being studied in a multi-center Phase 1b clinical trial of patients with various solid tumors. Initial results from this trial indicate that the oral dosage form can be administered safely using several daily and intermittent dosing schedules and achieves blood levels over time and mTOR inhibition generally consistent with those observed with intravenous administration.

The FDA and the EMEA have designated AP23573 as an orphan drug for treatment of soft-tissue and bone sarcomas. The FDA has also designated AP23573 as a fast-track product for the same indications. Our goal is to initiate the first global registration trial of AP23573 in patients with advanced sarcomas. Beforehand, we expect to finalize selection of the dosing regimen to be used in the Phase 3 clinical trial and finalize the design of the protocol for the pivotal trial with the FDA and EMEA.

-4-

In the malignant cells of many of the cancers that we are studying in the AP23573 clinical trials, signaling in the mTOR pathway may be abnormal due to genetic mutations and/or alterations in the activity of key proteins upstream or downstream of mTOR itself. We believe that some of these patients may be particularly responsive to mTOR inhibition. Our scientists and other investigators are leading the identification and development of biomarker assays to identify patients with tumors that harbor such alterations in the mTOR pathway. In addition, our clinical development strategy includes extensive use of biomarkers and functional imaging technologies, such as positron emission tomography, to augment the assessment of the efficacy and safety of AP23573 in patients enrolled in our trials.

### Cardiovascular Indications of our mTOR Inhibitor, AP23573

As an mTOR inhibitor, AP23573 has also been shown to potently block the growth, proliferation and migration of vascular smooth muscle cells, the primary cause of narrowing and blockage of injured vessels. In 2005, we entered into a partnership with Medinol Ltd., hereafter referred to as Medinol, one of the leading cardiovascular medical device companies, to develop and commercialize stents and other medical devices to deliver AP23573 to prevent reblockage of injured vessels following stent-assisted angioplasty, a common non-surgical procedure for dilating or opening narrowed arteries.

Cardiovascular disease afflicts more than a quarter of the U.S. population and causes more than five million hospitalizations, over $300 billion in healthcare expenditures, and one million deaths annually. Products expected to have the most profound impact on coronary artery and myocardial disorders - including drug-eluting stents - have only recently been introduced into clinical practice. By 2008, the growing drug-eluting stent market is expected to exceed $6 billion.

Numerous drugs, including many antiplatelet agents, anticoagulants, ACE inhibitors, and cytotoxic agents, administered to patients following coronary angioplasty have failed to significantly reduce the overall incidence of vascular reblockage, which runs as high as 30% in the first few months, depending on the configuration and location of the vascular lesion and other clinical factors, such as diabetes. Recent clinical studies have found lower reblockage rates in patients treated with stents that deliver small-molecule drugs, such as sirolimus, an mTOR inhibitor, or paclitaxel, a cytotoxic agent, locally to the site of vascular injury. Such stents have become the standard-of-care for patients undergoing interventional procedures to open narrowed coronary arteries.

We may grant up to two additional licenses, under our rights to AP23573, to medical device companies for their use in developing and commercializing drug-delivery stents and other medical devices to reduce reblockage of injured vessels following stent-assisted angioplasty.

### Additional Non-Oncology Indications of our mTOR Inhibitor, AP23573

Inhibition of the mTOR pathway may be useful for additional indications beyond oncology and drug-delivery stents, and we are evaluating such indications as part of the broader clinical development plan for AP23573.

### Our Preclinical Programs

Our research and development programs are focused on discovering and developing small-molecule drugs that regulate cell signaling. Many of the critical functions of cells, such as cell growth, differentiation, gene transcription, metabolism, motility and survival, are dependent on signals carried back and forth from the cell surface to the nucleus and within the cell through a system of molecular pathways. When disrupted or over-stimulated, such pathways may trigger diseases such as cancer. From our inception, our research has focused on exploring cell-signaling pathways, identifying their role in specific diseases, and discovering drug candidates to treat those diseases by interfering with the aberrant signaling pathways of cells. The specific cellular proteins blocked by our product candidates have been well characterized and validated as targets. All of our product candidates are developed in-house through the integrated use of structure-based drug design and computational chemistry, and their targets have been validated with techniques such as functional genomics, proteomics, and chemical genetics.

-5-

We have a focused drug discovery program centered on small-molecule, molecularly targeted therapies and cell-signaling pathways implicated in cancer. Currently, our preclinical pipeline includes: inhibitors of mutant oncogenic, or cancer-causing, proteins (kinases) that regulate cell signaling (e.g., Bcr-Abl - the target of imatinib, which becomes resistant to further treatment through various mutations, including one called T315I); single compounds that target multiple cancer pathways (e.g., cell survival, metastases and angiogenesis); and new mTOR inhibitors (i.e., bone-targeted compounds to treat primary bone cancers and cancers that have spread to bone).

**Our Proprietary Technologies**

*NF-κB Cell-signaling Technology*

Dr. David Baltimore, formerly director of the Whitehead Institute for Biomedical Research, Dr. Phillip Sharp of the Massachusetts Institute of Technology, and Dr. Thomas Maniatis of Harvard University, together with a team of scientists in their respective laboratories, discovered a family of genes that encode proteins they called NF-κB and I-κB, its inhibitor; the critical role played by NF-κB cell-signaling in regulating cellular processes involved in various difficult-to-treat diseases; methods to identify compounds to regulate NF-κB cell-signaling activity; and methods of treating disease by inhibiting NF-κB. NF-κB can be generally thought of as a "biological switch" that can be turned off using these methods to treat disorders, such as inflammation, cancer, sepsis and osteoporosis.

We have an exclusive license from these academic institutions to pioneering technology and patents related to methods of treating human disease through modulation of NF-κB cell-signaling activity, and the discovery and development of drugs to regulate NF-κB cell-signaling activity. We have a program to license this technology and these treatment methods to pharmaceutical and biotechnology companies that are conducting research to discover and develop drugs that modulate NF-κB cell-signaling and/or that are marketing such drugs. One of the NF-κB patents is the subject of reexamination proceedings in the U.S. Patent and Trademark Office, or PTO, and a patent infringement lawsuit filed in 2002 by us and the academic institutions against Eli Lilly and Company, hereinafter referred to as Lilly, alleging infringement based on sales of Lilly's osteoporosis drug, Evista®, and Lilly's septic shock drug, Xigris®, and seeking monetary damages. This trial is scheduled to commence in the United States District Court for the District of Massachusetts on April 10, 2006. See Part I, Item 3: Legal Proceedings.

*ARGENT Cell-signaling Regulation Technology*

Our proprietary portfolio of cell-signaling regulation technologies includes the ARGENT signaling and transcription technologies. Our ARGENT technologies allow intracellular processes to be controlled with small molecules, which may be useful in the development of therapeutic vaccines and gene and cell therapy products, and which provide versatile tools for applications in cell biology, functional genomics and drug-discovery research, including three-hybrid screening approaches to discover and characterize targets and lead molecules. To maximize their use by the scientific community, we distribute our technologies at no cost to academic investigators in the form of our Regulation Kits. Over 1,000 investigators worldwide are using or have used our Regulation Kits in diverse areas of research, and over 250 scientific papers describing their use have been published. For researchers in pharmaceutical and biotechnology companies, we have established a licensing program to provide them with access to our ARGENT cell-signaling regulation technologies on commercial terms.

-6-

**Our Business Strategy**

Our business strategy is to:

- build a fully integrated oncology company - a leader in the discovery, development and commercialization of molecularly targeted oncology therapies;

- establish a U.S. commercial platform;

- enter into partnerships with major pharmaceutical or biotechnology companies, after obtaining definitive clinical data, to assist in developing our cancer product candidates and commercializing them outside the United States;

- broadly develop our lead oncology product, AP23573, and build a pipeline of innovative follow-on product candidates;

- license our NF-κB and ARGENT cell-signaling regulation technologies to pharmaceutical and biotechnology companies; and

- develop and commercialize through medical device companies AP23573 in drug-delivery stents and other medical devices to decrease reblockage of injured vessels following stent-assisted angioplasty.

**Our Intellectual Property**

Patents and other intellectual property rights are essential to our business. We file patent applications to protect our technology, inventions and improvements to our inventions that are considered important to the development of our business.

As of February 28, 2006 we have 93 patents and pending patent applications in the United States, which are owned, co-owned or exclusively licensed by us or by our subsidiary, AGTI. In addition, we have filed foreign counterparts, as appropriate. We also have several nonexclusive technology licenses from certain institutions in support of our research programs. We anticipate that we will continue to seek licenses from universities and others where applicable technology complements our research and development efforts.

Approximately one third of the patents and patent applications in our portfolio relate generally to our mTOR inhibitor, AP23573, or to our preclinical drug discovery programs. The former cover AP23573, various analogs and uses thereof, as well as the related use of biomarkers, related therapies and inventions involving the mTOR gene. The latter include various families of kinase inhibitor compounds, as well as our bone-targeted mTOR inhibitors. The remainder of the portfolio is primarily focused on ARGENT cell-signaling regulation technologies. These patents and pending applications cover regulatory technologies, specialized variants of the technologies, critical nucleic acid components, small-molecule drugs, the identification and use of dimerizer hormone mimetics, and various uses of the technologies in health care and drug discovery. Patents issued to date include 30 patents covering our cell-signaling regulation technologies.

We also rely on unpatented trade secrets and proprietary know-how. However, trade secrets are difficult to protect. We enter into confidentiality agreements with our employees, consultants, investigators, contractors, collaborators and other third parties to whom we disclose confidential information. In addition, we believe that certain technologies utilized in our research and development programs are in the public domain. Accordingly, we do not believe that patent or other protection is available for these technologies.

-7-

**Our Licenses to Third Parties**

We have a program to license our NF-κB cell-signaling technology and treatment methods to pharmaceutical and biotechnology companies conducting research to discover and develop drugs that modulate NF-κB cell-signaling and/or marketing such drugs. To date, we have entered into several licenses for this technology with pharmaceutical companies and companies manufacturing and commercializing kits, technologies and tools for research applications.

We also have a program to license our ARGENT cell-signaling regulation technologies to pharmaceutical and biotechnology companies to develop and commercialize innovative therapeutic products and to conduct drug discovery research. To date, we have entered into licenses for use of our ARGENT cell-signaling regulation technologies for a variety of applications. In addition, several biotechnology companies are conducting collaborative studies of these technologies for use in gene and cell therapy applications.

In January 2005, we and our subsidiary, AGTI, entered into non-exclusive license and supply agreements with Medinol for the development and commercialization of stents and other medical devices to deliver our mTOR inhibitor, AP23573, to prevent reblockage of injured vessels following stent-assisted angioplasty. The license agreement provides for the payment by Medinol to us of an upfront license fee, payments based on achievement of development, regulatory, and commercial milestones, and royalties based on commercial sales of products, if any, developed by Medinol. We are required to provide Medinol, and Medinol is required to purchase from us, agreed upon quantities of AP23573.

**Our Licenses from Third Parties**

In 1991, we entered into an exclusive license agreement with Massachusetts Institute of Technology and the Whitehead Institute (on behalf of themselves and Harvard University) to the rights to our NF-κB cell-signaling technologies and treatment methods. This license agreement was amended in 1995 and provides for the payment by us to these academic institutions of an upfront fee, license maintenance fees, a milestone payment, sublicense fees, and royalties based on commercial sales of products and processes developed using the NF-κB cell-signaling technologies and treatment methods. The license agreement also grants us the right to undertake the enforcement and/or defense of these patent rights at our sole expense, subject to our right to withhold a percentage of the royalties otherwise due the academic institutions to be applied toward reimbursement of our fees and expenses in connection with any such litigation, including our litigation against Lilly. The license agreement also provides that we will share a percentage of any damages, net of fees and expenses, awarded in such litigation with the academic institutions.

We and, in some instances AGTI, our 80% owned subsidiary, have entered into license agreements with various academic institutions pursuant to which we and/or AGTI are the licensees of certain technologies relating to our research and development programs for our product candidates which are small-molecule mTOR inhibitors and our ARGENT cell-signaling regulation technologies. In particular, in 1997, AGTI entered into an amended and restated exclusive license agreement with Stanford University (on behalf of itself and Harvard University) to rights to certain of our ARGENT cell-signaling regulation technologies. This license agreement was amended in 2003 and provides for the payment by AGTI of an upfront fee, license maintenance fees, milestone payments based on achievement of development and commercial milestones, royalties on commercial sales of products, including therapies and research reagents, by AGTI, its co-venturers and partners, and the issuance of 180,000 shares of common stock, or 3% of the initial capitalization, of AGTI.

In some instances, our third party licenses also impose insurance, development, sublicensing and other obligations. Failure by us to comply with these requirements could result in the termination of the applicable agreement, which, depending upon the technologies which are the subject of the applicable agreement, could have a material adverse effect on our business, financial condition, and results of operations.

**Research and Development Spending**

During each of the three years ended December 31, 2005, 2004, and 2003, we spent approximately $45.9 million, $27.7 million, and $14.9 million respectively, on our research and development activities.

-8-

## Manufacturing

Our drug candidates and preclinical compounds are small molecules that can be readily synthesized by processes that we have developed. We are able to manufacture in-house the quantities of our product candidates necessary for certain preclinical studies. We contract with third party manufacturers to assist in the development and optimization of our manufacturing processes and methods and to supply sufficient quantities of our lead product candidate in bulk quantities and in suitable dosage forms for use in our clinical trials. We also expect to depend on third-party manufacturers for the supply of our products upon commercialization.

Our lead product candidate, AP23573, is produced by an established manufacturing process using conventional synthetic and natural-product fermentation techniques. The production of AP23573 is based in part on technology that we believe is proprietary to us. We may license this technology to contract manufacturers to enable them to manufacture AP23573 for us. In addition, a contract manufacturer may develop process technology related to the manufacture of our drug candidate that the manufacturer owns either independently or jointly with us. This would increase our reliance on that manufacturer or require us to obtain a license from that manufacturer in order to have our product manufactured. We are currently discussing with our existing suppliers and other third-party manufacturers the long-term supply and manufacture of AP23573 to ensure we have provided for sufficient supply of our product at commercially reasonable costs with appropriate redundancy upon commercialization.

Contract manufacturers are subject to extensive governmental regulation and we depend on them to manufacture our product candidates in accordance with the FDA's current good manufacturing practices, or cGMP. We have established a quality assurance program intended to ensure that third-party manufacturers under contract produce our compounds in accordance with cGMP, and other applicable domestic and foreign regulations. We believe that our current contractors comply with such regulations.

## Competition

The pharmaceutical and biotechnology industries are intensely competitive. We compete directly and indirectly with other pharmaceutical companies, biotechnology companies and academic and research organizations, many of whom have greater resources than us. We compete with companies who have products on the market or in development for the same indications as our product candidates. We may also complete with organizations that are developing similar technology platforms.

In the area of oncology, pharmaceutical and biotechnology companies such as Amgen Inc., AstraZeneca PLC, Bristol-Myers Squibb Company, Eli Lilly and Company, Genentech, Inc., GlaxoSmithKline plc, Hoffmann LaRoche & Co., Johnson & Johnson, Merck KGaA, Novartis AG, Pfizer, Inc., and Wyeth Corp. are developing and marketing drugs to treat cancer, including mTOR inhibitors. Biotechnology companies such as Amgen Inc., Biogen-Idec, Inc., ImClone Systems, Inc., Millennium Pharmaceuticals, Inc., Onyx Pharmaceuticals, Inc., OSI Pharmaceuticals, Inc., Telik, Inc., and Vertex Pharmaceuticals, Inc. are developing drugs to treat various diseases, including cancer, by inhibiting cell-signaling pathways. Other companies have products on the market or in development against which our drug candidates, if approved, may have to compete. We may also experience competition from companies that have acquired or may acquire technology from companies, universities, and other research institutions. As these companies develop their technologies, they may develop proprietary positions that may materially and adversely affect us.

-9-

**Government Regulation**

Our ongoing research and development activities, our clinical trials, the manufacturing and testing procedures and the marketing of our product candidates, if they are approved, all are subject to extensive regulation by numerous governmental authorities in the United States and other countries. Any drug or device developed by us and/or a partner must undergo rigorous preclinical studies and clinical testing and extensive regulatory review administered by the FDA under the federal Food, Drug and Cosmetic Act prior to marketing in the United States. Satisfaction of such regulatory requirements, which includes demonstrating that a product is both safe and effective for its intended indications for use, typically takes several years or more depending upon the type, complexity and novelty of the product and requires the expenditure of substantial resources. Preclinical studies must be conducted in conformance with FDA regulations, including its current Good Laboratory Practices, or cGLP, regulations. Before commencing clinical trials in the United States, we must submit extensive information about the results of preclinical studies, toxicity, manufacturing and control procedures and our proposed clinical research protocol to the FDA in an Investigational New Drug, or IND, application, or an Investigational Device Exemption, or IDE, as the case may be. If the FDA does not respond with any questions on the IND, we can commence clinical trials thirty days after the submission. In addition, an independent institutional review board, or IRB, at each institution at which any clinical trial is being performed, must review and approve the clinical protocol before clinical testing may begin, and it will have ongoing overview of the clinical trial at that institution. With respect to an IDE for certain medical devices, such as drug-delivery stents, clinical trials may not begin until both the FDA and an IRB approve. There can be no assurance that submission of an IND or IDE will result in the commencement of such clinical trials.

We have a limited history of conducting preclinical studies and the clinical trials necessary to obtain regulatory approval. Furthermore, we, the FDA or an IRB may suspend clinical trials at any time if we or they believe that the subjects participating in such trials are being exposed to unacceptable risks or if the FDA finds deficiencies in the conduct of the trials or other problems with our product under development.

Before receiving FDA approval to market a product, we will have to demonstrate that the product is safe and effective in the patients for whom the product is indicated. Data obtained from preclinical studies and clinical trials are susceptible to varying interpretations that could delay, limit or prevent regulatory clearances. In addition, delays or rejections may be encountered based upon additional government regulation from future legislation or administrative action or changes in FDA policy during the period of product development, clinical trials and FDA regulatory review. Similar or even more extensive delays also may be encountered in foreign countries. There can be no assurance that even after such time and expenditures, regulatory approval will be obtained for any product candidates developed by us, or, even if approval is obtained, that the approved indication and related labeling for such products will not limit the product's condition of use, which could materially impact the marketability and profitability of the product. If regulatory approval of a product is granted, such approval will be limited to those disease states and conditions for which the product has been shown useful, as demonstrated by clinical trials. Even if such regulatory approval is obtained, a marketed product, its manufacturer and its manufacturing facilities and procedures are subject to continual review and periodic inspections by the FDA. Discovery of previously unknown problems with a product, manufacturer, manufacturing procedures or facility may result in restrictions on such product or manufacturer, including costly recalls, an injunction against continued marketing and manufacturing until the problems have been adequately addressed to the FDA's satisfaction or even withdrawal of the product from the market.

There can be no assurance that any compound developed by us alone or in conjunction with others will prove to be safe and efficacious in clinical trials and will meet all of the applicable regulatory requirements needed to receive and maintain marketing approval. Additionally, the marketing, labeling and advertising for an approved product is subject to ongoing FDA scrutiny and the failure to adhere to applicable requirements can result in regulatory action that could have a material adverse impact on the profitability of the product.

-10-

Outside the United States, our ability to market a product will be contingent upon receiving a marketing authorization from the appropriate regulatory authorities. The requirements governing the conduct of clinical trials, obtaining marketing authorization, and pricing and reimbursement vary widely from country to country. At present, foreign marketing authorizations are applied for at a national level, although within the European Union, or EU, certain centralized and mutual recognition registration procedures are available to companies wishing to market a product in more than one Member State. These procedures alleviate the need to file a separate application in each EU country. If the regulatory authority is satisfied that adequate evidence of safety, quality and efficacy has been presented, a marketing authorization will be granted. This foreign regulatory approval process includes all of the risks associated with FDA clearance set forth above.

## Our Employees

As of February 28, 2006, we had 108 employees, 50 of whom hold post-graduate degrees, including 35 with a Ph.D., M.D. or J.D. Most of our employees are engaged directly in research and development. We have entered into confidentiality, assignment of inventions and non-competition agreements with all of our employees. None of our employees are covered by a collective bargaining agreement, and we consider relations with our employees to be good.

## ITEM 1A:  RISK FACTORS

*THE RISKS AND UNCERTAINTIES DESCRIBED BELOW ARE THOSE THAT WE CURRENTLY BELIEVE MAY MATERIALLY AFFECT OUR COMPANY. ADDITIONAL RISKS AND UNCERTAINTIES THAT WE ARE UNAWARE OF ALSO MAY BECOME IMPORTANT FACTORS THAT AFFECT OUR COMPANY. IF ANY OF THE FOLLOWING RISKS ACTUALLY OCCUR, THEY MAY MATERIALLY HARM OUR BUSINESS, OUR FINANCIAL CONDITION AND OUR RESULTS OF OPERATIONS.*

## Risks Relating to Our Business

*We and our partners may never succeed in developing marketable products or generating product revenues.*

We are a biopharmaceutical company focused on the discovery and development of drugs to provide therapeutic intervention in treating human diseases at the cellular level. As with all science, we face much trial and error, and we may fail at numerous stages along the way, which would inhibit us from successfully developing, manufacturing and marketing our drug candidates. Our lead product candidate, AP23573, is currently in Phase 2 clinical trials for certain cancers, and we do not currently have any products on the market and have no product revenues. Factors which would affect our ability to obtain regulatory approval and to achieve market acceptance and gain market share for our product candidates include, among other factors, product formulation, dose, dosage regimen, our ability to obtain timely and sufficient patient enrollment in our clinical trials, our ability to manufacture, directly or indirectly, sufficient and cost-effective quantities of our product candidates, and our ability to sell, market and distribute, directly or indirectly, such product candidates. We and our medical device partner have limited experience in designing, conducting and managing the clinical testing necessary to obtain such regulatory approval. Additionally, we do not currently have any partners to assist in developing and commercializing our cancer product candidates and expect to be dependent upon such partners to successfully develop and commercialize such cancer products outside the United States. In particular, failure to secure one or more partners to assist in development and commercialization of AP23573 would have a material adverse effect on our ability to generate significant product revenues for AP23573 for cancer indications outside the United States.

-11-

We are also dependent upon the success of Medinol and any future medical device partners (collectively, our partners) to develop, manufacture and market stents or other medical devices to deliver AP23573 to reduce reblockage of injured arteries following stent-assisted angioplasty. To date, we have entered into only one such agreement, with Medinol. If Medinol is not successful and/or if we are not able to enter into agreements with additional medical device companies experienced in the development, manufacture, and marketing of medical devices to deliver AP23573, we will not be able to generate revenues from the marketing of stents or other medical devices that deliver AP23573.

Other than AP23573, we do not have any product candidates in clinical development, and we have not designated any clinical candidates from our existing preclinical programs. We do not expect to have any products on the market before 2008, at the earliest, and, ultimately, we and our partners may not have any products on the market for several years, if at all. We and our partners may not succeed in developing or commercializing any products which will generate product revenues for our company. If we and our partners are not successful in developing or marketing AP23573 or other product candidates, we will not be profitable.

*We have incurred significant losses to date and may never be profitable.*

We have incurred significant operating losses in each year since our formation in 1991 and have an accumulated deficit of $247.1 million from our operations through December 31, 2005. Losses have resulted principally from costs incurred in research and development of our product candidates, including clinical development of AP23573, our lead product candidate, and from general and administrative costs associated with our operations. It is likely that we will incur significant operating losses for the foreseeable future. We currently have no product revenues, limited license revenues and limited commitments for future licensing revenues, and may not be able to generate such revenues in the future. If our losses continue and we and our partners are unable to successfully develop, commercialize, manufacture and market our product candidates and/or we are unable to enter into agreements and licenses of our intellectual property, we may never generate sufficient revenues to achieve profitability. Even if we and our partners are able to commercialize products and we are able to enter into agreements or licenses in the future, we may never generate sufficient revenues to have profitable operations.

*Insufficient funding may jeopardize our research and development programs and may prevent commercialization of our products and technologies.*

We have funded our operations to date through sales of equity securities, debt and operating revenue. Most of our operating revenue to date has been generated through previous collaborative research and development agreements and existing licenses. We currently do not have any committed funding from any pharmaceutical or biotechnology company to advance any of our product development programs. Although we believe that our current available funds will be adequate to satisfy our capital and operating requirements into mid 2007, we will require substantial additional funding for our research and development programs (including pre-clinical development and clinical trials), for operating expenses (including intellectual property protection and enforcement), for the pursuit of regulatory approvals and for establishing manufacturing, marketing and sales capabilities. We received net proceeds of $57.9 million from the sale of 8,625,000 shares of our common stock in August 2005. We have effective shelf registration statements on file with the SEC under which we can sell up to 2,815,000 shares of our common stock. We may sell part or all of these shares at our discretion, and may be able to increase the number of shares to be sold in connection with an offering of these shares, subject to certain limitations under federal securities laws and the rules of the Nasdaq National Market. While we intend to seek additional funding from product-based collaborations, technology licensing, and public or private financings, such additional funding may not be available on terms acceptable to us, or at all. Accordingly, we may not be able to secure the significant funding which is required to maintain and continue each of our research and development programs at their current levels or at levels that may be required in the future. If we cannot secure adequate financing, we may be required to delay, scale back, eliminate or terminate clinical trials and/or seeking marketing approval for AP23573 for one or more indications, to delay, scale back or eliminate one or more of our research and development programs, or to enter into license or other arrangements with third parties to purchase, commercialize or otherwise obtain rights in products or technologies that we would otherwise seek to develop ourselves.

-12-

***We have limited manufacturing experience and are dependent upon the ability of third parties to manufacture our product candidates, which raises uncertainty as to our ability to develop and commercialize our product candidates.***

We have no experience in manufacturing any of our product candidates on a large scale and have contracted with third party manufacturers to provide material for clinical trials and to assist in the development and optimization of our manufacturing processes and methods. Our ability to conduct clinical trials and commercialize our product candidates will depend on the ability of such third parties to manufacture our products on a large scale at a competitive cost and in accordance with cGMP and other regulatory requirements. If we are not able to obtain contract manufacturing on commercially reasonable terms, obtain or develop the necessary materials and technologies for manufacturing, or obtain intellectual property rights necessary for manufacturing, we may not be able to conduct or complete clinical trials or commercialize our product candidates. There can be no assurance that we will be able to obtain such requisite terms, materials, technologies and intellectual property necessary to successfully manufacture our product candidates for clinical trials or commercialization.

***The loss of key members of our scientific and management staff could delay and may prevent the achievement of our research, development and business objectives.***

Our performance as a specialized scientific business is substantially dependent on our key officers and members of our scientific staff responsible for areas such as drug development, clinical trials, regulatory affairs, drug discovery, manufacturing, marketing, business development and intellectual property protection and licensing. We also are dependent upon a few of our scientific advisors to assist in formulating our research and development strategy. While we have entered into employment agreements with all of our executive officers, these officers may terminate their employment with us at any time. The loss of, and failure to promptly replace, any member of our management team could significantly delay and may prevent the achievement of our research, development and business objectives.

***We are dependent upon the ability of our medical device partner and potential additional partners to develop, manufacture, test and market stents or other medical devices to deliver AP23573.***

We have no experience in the development of medical devices and will not ourselves develop stents or other medical devices to deliver AP23573. Instead, we have granted one license, and may grant up to two additional licenses, under our rights to AP23573 to medical device companies for their use in developing and commercializing such medical devices to reduce blockage of injured vessels following stent-assisted angioplasty.

While we expect to supply AP23573 to our medical device partner and any additional partners (collectively, our partners), we will be otherwise dependent upon them to develop and commercialize stents or other medical devices to deliver AP23573. Such medical device partners will have various degrees of scientific, technical, medical and regulatory experience and resources to, directly or through third parties, develop, manufacture, test or market stents or other medical devices to deliver AP23573. Their ability to conduct clinical trials and commercialize such medical devices will be dependent on the safety profile of AP23573 and our ability to manufacture and supply AP23573, either directly or through third parties, at a competitive cost and in accordance with cGMP and other regulatory requirements. We depend upon third-party manufacturers or collaborative partners for the production of AP23573 for clinical trials and intend to use third-party manufacturers to produce AP23573 on commercial scale. Our reliance on third-party manufacturers and their potential inability to meet our supply commitments to one or more of our partners could adversely impact the ability of our partners to commercialize stents or other medical devices to deliver AP23573.

-13-

We anticipate that our partners will seek to develop and commercialize stents or other medical devices to deliver AP23573 that do not infringe third-party patents. However, there can be no assurance that the devices delivering AP23573 marketed by our partners will not be subject to third-party claims. Furthermore, the patents issued to us or our partners covering AP23573 and/or medical devices, including stents, may be subject to challenge and may be subsequently narrowed, invalidated or circumvented. Either such event would adversely impact the ability of one or more of our partners to market their stents or other medical devices to deliver AP23573.

Our existing license agreement with Medinol allows either party to terminate under certain circumstances, including Medinol's reasonable business judgment that development of a medical device to deliver AP23573 is not feasible. Accordingly, Medinol may be unable to develop a medical device to deliver AP23573 and we may also not be able to enter into any additional licensing agreements with any other medical device companies to develop such devices on terms which are acceptable to us, or at all. Our inability to enter into such transactions, or the inability of one or more of our partners to develop or commercialize stents or other medical devices to deliver AP23573 for any reason, will adversely impact our ability to generate revenues from any licenses of AP23573.

***We will continue to expend significant resources on the enforcement and licensing of our NF-κB patent portfolio and may be unable to generate material revenues from these efforts, if we are unable to enforce against, or license our NF-κB patents to, pharmaceutical and biotechnology companies.***

We are the exclusive licensee of a family of patents, three in the U.S. and one in Europe, including a pioneering U.S. patent covering methods of treating human disease by regulating NF-κB cell-signaling activity, hereinafter referred to as the '516 Patent, awarded to a team of inventors from The Whitehead Institute for Biomedical Research, Massachusetts Institute of Technology and Harvard University. We have initiated a licensing program to generate revenues from the discovery, development, manufacture and sale of products covered by our NF-κB patent portfolio. These patents have been, and in the future may be, challenged and may be subsequently narrowed, invalidated, declared unenforceable or circumvented, any of which could materially impact our ability to generate licensing revenues from them.

On June 25, 2002, we, together with these academic institutions, filed a lawsuit in the United States District Court for the District of Massachusetts, or the U.S. District Court, against Eli Lilly and Company, hereinafter referred to as Lilly, alleging infringement upon of certain claims of the '516 Patent through sales of Lilly's osteoporosis drug, Evista®, and its septic shock drug, Xigris®. Several cases have been decided by the U.S. Court of Appeals and the Supreme Court addressing issues pertinent to this litigation since its inception. The trial in this case is scheduled to commence on April 10, 2006 in the U.S. District Court.

On April 4, 2005, Lilly filed an *ex parte* request in the United States Patent and Trademark Office, or PTO, to reexamine the patentability of certain claims of the '516 Patent. In addition, a third party filed an *ex parte* request in the PTO on December 2, 2005 to reexamine the patentability of certain claims of the '516 Patent.

-14-

As exclusive licensee of this patent, we are obligated for the costs expended for its prosecution in the PTO, for its enforcement in this litigation and otherwise. Therefore, we will continue to expend significant capital and management resources pursuing this litigation through trial and subsequent appeals and in the reexamination process in the PTO, and the outcome is uncertain.

If the claims of the '516 Patent which are at issue in this litigation are invalidated by the PTO or in the courts or found not to be infringed in this litigation, we will not realize any revenues on sales of Evista or Xigris, and could be liable under certain limited circumstances for Lilly's litigation costs and potentially attorneys' fees. If we prevail at trial in our litigation against Lilly, any damages we may be awarded by the jury could be subsequently eliminated or limited by an adverse finding upon appeal or in the event that the claims of the '516 patent are invalidated by the PTO. Invalidation of these or other claims of the '516 Patent in the litigation or by the PTO would have a significant adverse impact on our ability to generate revenues from our NF-κB licensing program. Moreover, significant expenditures to enforce these patent rights without generating revenues or accessing additional capital could adversely impact our ability to further our clinical programs and our research and development programs at the current levels or at levels that may be required in the future.

***Because we do not own all of the outstanding stock of our subsidiary, AGTI, we may not realize all of the potential future economic benefit from products developed based on technology licensed to or owned by our subsidiary.***

Our majority-owned subsidiary, AGTI, holds licenses from Harvard University, Stanford University and other universities relating to our ARGENT cell-signaling regulation technology, and owns the intellectual property on our mTOR inhibitors derived from our ARGENT programs, including AP23573. The two directors of AGTI are also members of the Board of Directors of ARIAD. Minority stockholders of AGTI, including Harvard University, Stanford University, several of our scientific advisors, and several current and former members of our management and Board of Directors, own 20% of the issued and outstanding common stock of AGTI. We own the remaining 80% of the issued and outstanding common stock of AGTI.

We do not currently have a license agreement with AGTI that provides us with rights to commercialize product candidates, based on our ARGENT cell-signaling regulation technology or mTOR inhibitors derived from our ARGENT programs, solely for our own benefit, as opposed to for the benefit of AGTI. If we determine it to be in the best interests of our stockholders to commercialize these product candidates solely for our own benefit, we may negotiate with AGTI to obtain a license, on terms to be determined, granting us the sole rights to commercialize such product candidates. If we enter into such a license, the future economic benefit to our stockholders from our commercialization of such products, if any, will be diminished by any royalties or other payments paid under a future agreement with AGTI. If we do not enter into such a license, then the future economic benefit to our stockholders from our commercialization of such products on behalf of AGTI would be in the form of a dividend or other payments received in respect of our 80% interest in AGTI.

Alternatively, if we determine it to be in the best interests of our stockholders, we may seek to acquire some or all of the interests of the minority stockholders in AGTI for cash, shares of our common stock or other securities in a merger, exchange offer or other transaction. If we acquire all of the interests of the minority stockholders in AGTI, then our stockholders will receive all of the future economic benefit from our commercialization of such products on our own behalf. If we acquire these minority interests, we anticipate that this transaction will result in dilution to our stockholders and will require our incurrence of significant transaction costs, which are currently unknown. On January 13, 2004, we acquired an additional 351,909 shares of AGTI common stock, representing approximately 6% of AGTI's outstanding common stock, for a total purchase price of approximately $8.8 million, effected through the reduction of inter-company debt, subject to adjustment in certain circumstances, in order to maintain our 80% interest in AGTI. While such valuation was based on a good-faith determination made by the independent and disinterested members of our Board of Directors as of that date, the economic value of the minority stockholders' interests is difficult to quantify in the absence of a public market. If we acquire all of the interests of the minority stockholders in AGTI, a variety of valuation methodologies may be employed to determine the value per share of AGTI common stock. Factors impacting this valuation would include the progress, likelihood and cost of development and commercialization of product candidates, potential future income streams there from, availability of funding and other factors. If we acquire the minority interests for consideration valued in excess of the value implicitly attributed to such AGTI shares by the market, this could result in a decline in our stock price. If we choose to acquire some or all of these minority interests through a merger in which we do not solicit the consent of the minority stockholders of AGTI, we could become subject to litigation or an appraisal procedure, which would result in additional expense and diversion of management resources.

-15-

There can be no assurance that we will, at any time, enter into a license with AGTI or acquire some or all of the interests of the minority stockholders in AGTI. If we pursue either of these alternatives, there can be no assurance as to the timing of any such transaction, the form of such transaction, the particular transaction terms such as the form or amount of consideration offered or provided by us, or the consequences of any such proposed or completed transaction to us or the AGTI minority stockholders.

***Because members of our management team and/or Board of Directors beneficially own a material percentage of the capital stock of our subsidiary, AGTI, and we have agreements with AGTI, there are conflicts of interest present in dealings between ARIAD and AGTI.***

Four members of our management team and/or Board of Directors own approximately 5.6% of the outstanding capital stock of AGTI. Harvey J. Berger, M.D., our Chairman, and Chief Executive Officer, owns 3.2%, David L. Berstein, Esq., our Senior Vice President and Chief Patent Counsel, owns 0.2%, John D. Iuliucci, Ph.D., our Senior Vice President and Chief Development Officer, owns 0.6% and Jay R. LaMarche, one of our directors, owns 1.6%. These same individuals beneficially own an aggregate of approximately 3.1% of our outstanding common stock. Dr. Stuart L. Schreiber, a Harvard professor who is one of our scientific founders, owns approximately 3.2% of the outstanding capital stock of AGTI. Additionally, Dr. Berger and Mr. LaMarche are the two members comprising the Board of Directors of AGTI. As part of the formation of AGTI, we entered into certain agreements with AGTI to provide for the operations of AGTI. As a result, conflicts of interest exist in dealings between AGTI and us. AGTI is the exclusive licensee of the ARGENT cell-signaling intellectual property from Harvard University and Stanford University and of related technologies from other universities, and owns the intellectual property on our mTOR inhibitors derived from our ARGENT programs, including AP23573, which is in Phase 2 clinical trials for use in cancer and in development for use in drug delivery stents and other medical devices, and our bone-targeted mTOR inhibitors. Because of the apparent conflicts of interest, the market may be more inclined to perceive the terms of any transaction between us and AGTI as being unfair to us.

***We may not be able to protect our intellectual property relating to our research programs, technologies and products.***

We and our licensors have issued patents and pending patent applications covering research methods useful in drug discovery, new chemical compounds discovered in our drug discovery programs including, among others, AP23573, certain components, configurations and uses of our cell-signaling regulation technologies and products-in-development, methods and materials for manufacturing our products-in-development and other pharmaceutical products and methods and materials for conducting pharmaceutical research. We have a licensing program to generate revenues from the use of our ARGENT cell-signaling regulation technologies and our NF-κB intellectual property. Pending patent applications may not issue as patents and may not issue in all countries in which we develop, manufacture or sell our products or in countries where others develop, manufacture and sell products using our technologies. In addition, patents issued to us or our licensors may be challenged, as is the case with the Lilly litigation and related PTO proceedings regarding the NF-κB '516 Patent, and they may be subsequently narrowed, invalidated or circumvented. In that event, such patents may not afford meaningful protection for our technologies or product candidates, which would materially impact our ability to develop and market our product candidates and to generate licensing revenues from our patent portfolio. Certain technologies utilized in our research and development programs are already in the public domain. Moreover, a number of our competitors have developed technologies, filed patent applications or obtained patents on technologies, compositions and methods of use that are related to our business and may cover or conflict with our patent applications, technologies or product candidates. Such conflicts could limit the scope of the patents that we may be able to obtain or may result in the denial of our patent applications. If a third party were to obtain intellectual proprietary protection for any of the foregoing, we may be required to challenge such protection, terminate or modify our programs impacted by such protection or obtain licenses from such third parties, which might not be available or acceptable terms or at all.

-16-

***We may be unable to develop or commercialize our product candidates, if we are unable to obtain or maintain certain licenses on commercial terms or at all.***

We have entered, and will continue to enter, into agreements, either directly or through AGTI, with third parties to test compounds, blood and tissue samples, to perform gene expression analysis and to develop biological tests for use with our product candidates, which testing may yield new inventions and discoveries requiring us to obtain licenses in order to exclusively develop or market new products, alone or in combination with our product candidates, or to develop or market our product candidates for new indications. We have also entered into license agreements for some of our technologies, either directly or through AGTI. We use third parties to test blood and tissue samples and other biological materials in our clinical programs and to develop biological tests, with respect to which we may be required to obtain licenses or pay royalties or other fees in order to commercialize such tests for use with our product candidates. We also use gene sequences or proteins encoded by those sequences and other biological materials in each of our research programs which are, or may become, patented by others and to which we would be required to obtain licenses in order to develop or market our product candidates. Manufacturing of our products may also require licensing biological materials, technologies and intellectual property from third parties. Our inability to obtain any one or more of these licenses, on commercially reasonable terms, or at all, or to circumvent the need for any such license, could cause significant delays and cost increases and materially affect our ability to develop and commercialize our product candidates. Obtaining licenses for these discoveries, materials and technologies may require us to make cumulative royalty payments or other payments to several third parties, potentially reducing amounts paid to us or making the cost of our products commercially prohibitive.

Some of our licenses obligate us to exercise diligence in pursuing the development of product candidates, to make specified milestone payments and to pay royalties. In some instances, we are responsible for the costs of filing and prosecuting patent applications. These licenses generally expire upon the earlier of a fixed term of years after the date of the license or the expiration of the applicable patents, but each license is also terminable by the other party upon default by us of our obligations. Our inability or failure to meet our diligence requirements or make any payments required under these licenses would result in a reversion to the licensor of the rights granted which, with respect to the licenses pursuant to which we have obtained exclusive rights, would materially and adversely affect our ability to develop and market products based on our licensed technologies.

-17-

***Competing technologies may render some or all of our programs or future products noncompetitive or obsolete.***

Many well-known pharmaceutical, healthcare and biotechnology companies, academic and research institutions and government agencies, which have substantially greater capital, research and development capabilities and experience than us or our potential partners, are presently engaged in one or more of the following activities:

• developing products based on cell signaling, genomics, proteomics, and computational chemistry;

• conducting research and development programs for the treatment of the various disease indications in which we are focused; and

• manufacturing, promoting, marketing and selling pharmaceutical or medical device products for treatment of diseases in all of the various disease indications in which we or our current or possible future partners are focused.

Some of these entities already have competitive products on the market or product candidates in clinical trials or in more advanced preclinical studies than we do. By virtue of having or introducing competitive products on the market before us, these entities may gain a competitive advantage. Competing technologies may render some or all of our programs or future products noncompetitive or obsolete, and we may not be able to make the enhancements to our technology necessary to compete successfully with newly emerging technologies. If we are unable to successfully compete in our chosen markets, we will not become profitable.

***If our product candidates are not accepted by patients, physicians and insurers, we will not be successful.***

Our success is dependent on the acceptance of any approved products. Our product candidates may not achieve market acceptance among patients, physicians or third-party payors, even if we obtain necessary regulatory and reimbursement approvals. Physicians and health care payors may conclude that any of our product candidates are not as safe and/or effective as competing therapies or are not as attractive based on a cost/benefit analysis as alternative treatments. Failure to achieve significant market acceptance of our product candidates will harm our business. We believe that recommendations by physicians and health care payors will be essential for market acceptance of any product candidates.

***If we are unable to establish sales, marketing and distribution capabilities or to enter into agreements with third parties to do so, we may be unable to successfully market and sell any products.***

We are currently establishing a commercial oncology organization, but we have no experience in marketing or selling any products. While we intend to commercialize our product candidates in the United States and to enter into agreements with partner(s) to commercialize our product candidates elsewhere, we may be unable to successfully, directly or indirectly, sell any products that we obtain marketing approval to sell. If we are unable to effectively sell our products, our ability to generate revenues will be materially adversely affected. We may not be able to hire, in a timely manner, the qualified sales and marketing personnel we need, if at all. In addition, we may not be able to enter into any marketing or distribution agreements on acceptable terms, if at all. If we cannot establish sales, marketing and distribution capabilities as we intend, either by developing our own capabilities or entering into agreements with third parties, sales of future products, if any, may be harmed.

-18-

*If we develop a product for commercial use, a subsequent product liability-related claim or recall could have an adverse effect on our business.*

Our business exposes us to potential product liability risks inherent in the testing, manufacturing and marketing of pharmaceutical products. Prior to obtaining regulatory approval to market our products, we are required to test such products in human clinical trials at health care institutions pursuant to agreements which indemnify such institutions in case of harm caused to patients by our products. We may not be able to avoid significant product liability exposure resulting from use of our products. A product liability-related claim or recall could be detrimental to our business. In addition, except for insurance covering product use in our clinical trials, we do not currently have any product liability insurance, and we may not be able to obtain or maintain such insurance on acceptable terms, or we may not be able to obtain any insurance to provide adequate coverage against potential liabilities. Our inability to obtain sufficient insurance coverage at an acceptable cost or otherwise to protect against potential product liability claims could prevent or limit the commercialization of any products that we develop.

*Significant additional losses or insufficient funding may cause us to default on certain covenants of our loan documents.*

At December 31, 2005, we had $7.7 million outstanding under a term loan agreement with a bank, pursuant to which we are required to maintain certain financial and non-financial covenants, including minimum cash, cash equivalents and investments of $13 million, a default of any of which would allow the bank to demand payment of its loan. We currently maintain sufficient liquidity to fund payment of this loan if demand for payment were made. However, if we are unable to raise adequate financing to fund continuing operations or otherwise to refinance our loan, we may not be able to maintain compliance with loan covenants, may be required to pay off the loan and may be required to reduce our spending on operations.

**Risks Relating to Governmental Approvals**

*We have limited experience in conducting clinical trials, which may cause delays in commencing and completing clinical trials of our product candidates.*

Clinical trials must meet FDA and foreign regulatory requirements. We have limited experience in designing, conducting and managing the preclinical studies and clinical trials necessary to obtain regulatory approval for our product candidates in any country. We or our collaborative partners may encounter problems in clinical trials that may cause us or the FDA or foreign regulatory agencies to delay, suspend or terminate our clinical trials at any phase. These problems could include the possibility that we may not be able to manufacture sufficient quantities of cGMP materials for use in our clinical trials, conduct clinical trials at our preferred sites, enroll a sufficient number of patients for our clinical trials at one or more sites, or begin or successfully complete clinical trials in a timely fashion, if at all. Furthermore, we, the FDA or foreign regulatory agencies may suspend clinical trials of our product candidates at any time if we or they believe the subjects participating in the trials are being exposed to unacceptable health risks as a result of adverse events occurring in our trials or if we or they find deficiencies in the clinical trial process or conduct of the investigation. With respect to AP23573, the FDA or foreign regulatory agencies may also suspend our clinical trials if we or they believe the subjects participating in the trials are being exposed to unacceptable health risks as a result of adverse events occurring in the trials of medical devices delivering AP23573 sponsored by our medical device partner or future partners. If clinical trials of any of our product candidates fail, we will not be able to market the product candidate which is the subject of the failed clinical trials. The FDA and foreign regulatory agencies could also require additional clinical trials before or after granting of marketing approval for any of our products, which would result in increased costs and significant delays in the development and commercialization of our products and could result in the withdrawal of our products from the market after obtaining marketing approval. Our failure to adequately demonstrate the safety and efficacy of a product candidate in clinical development could delay or prevent obtaining marketing approval of the product candidate and, after obtaining marketing approval, data from post-approval studies could result in the product being withdrawn from the market, either of which would likely have a material adverse effect on our business.

-19-

***We may not be able to obtain government regulatory approval to market our product candidates.***

To date, we have not submitted a marketing application for any product candidate to the FDA or any foreign regulatory agency, and none of our product candidates has been approved for commercialization in any country. Prior to commercialization, each product candidate would be subject to an extensive and lengthy governmental regulatory approval process in the United States and in other countries. We or any prospective partners or our medical device partners may not be able to obtain regulatory approval for any product candidates, or even if approval is obtained, the labeling for such products may place restrictions on their use that could materially impact the marketability and profitability of the product subject to such restrictions. Satisfaction of these regulatory requirements, which includes satisfying the FDA and foreign regulatory authorities that the product is both safe and effective for its intended uses, typically takes several years or more depending upon the type, complexity and novelty of the product and requires the expenditure of substantial resources. Uncertainty with respect to meeting the regulatory requirements governing our product candidates may result in excessive costs or extensive delays in the regulatory approval process, adding to the already lengthy review process. If regulatory approval of a product is granted, such approval will be limited to those disease states and conditions for which the product is proven safe and effective, as demonstrated by clinical trials, and may not include all of the indications necessary to successfully market the product. Even though we have obtained orphan drug designation by the FDA and EMEA for AP23573 in bone and soft-tissue sarcomas, this designation may be challenged by others or may prove to be of no practical benefit.

***We will not be able to sell our product candidates if we or our third-party manufacturers fail to comply with FDA manufacturing regulations.***

Before we can begin to commercially manufacture our product candidates, we must either secure manufacturing in an FDA approved manufacturing facility or obtain regulatory approval of our own manufacturing facility and processes. In addition, the manufacturing of our product candidates must comply with cGMP requirements of the FDA and similar requirements of regulatory agencies in other countries. These requirements govern, among other things, quality control and documentation procedures. We, or any third-party manufacturer of our product candidates, may not be able to comply with these requirements, which would prevent us from selling such products. Material changes to the manufacturing processes of our products after approvals have been granted are also subject to review and approval by the FDA or other regulatory agencies. Post approval, such facilities are subject to continuing FDA and foreign regulatory inspections and failure to comply with cGMPs or similar regulations can result in regulatory action up to and including cessation of shipment of product.

***Even if we bring products to market, we may be unable to effectively price our products or obtain adequate reimbursement for sales of our products, which would prevent our products from becoming profitable.***

If we succeed in bringing any product candidates to the market, they may not be considered cost-effective, and coverage and adequate payments may not be available or may not be sufficient to allow us to sell our products on a competitive basis. In both the United States and elsewhere, sales of medical products and treatments are dependent, in part, on the availability of reimbursement from third-party payors, such as health maintenance organizations and other private insurance plans and governmental programs such as Medicare. Third-party payors are increasingly challenging the prices charged for pharmaceutical products and services. Our business is affected by the efforts of government and third-party payors to contain or reduce the cost of health care through various means. In the United States, there have been and will continue to be a number of federal and state proposals to implement government controls on pricing. Similar government pricing controls exist in varying degrees in other countries. In addition, the emphasis on managed care in the United States has increased and will continue to increase the pressure on the pricing of pharmaceutical products. We cannot predict whether any legislative or regulatory proposals will be adopted or the effect these proposals or managed care efforts may have on our business.

-20-

### Risks Relating to Our Common Stock

*Results of our operations, general market conditions for biotechnology stocks and other factors could result in the sudden change in the value of our stock.*

As a biopharmaceutical company, we have experienced significant volatility in our common stock. In 2005, our stock price ranged from a high of $8.75 to a low of $5.23. Factors that can contribute to such volatility may include: results and timing of preclinical studies and clinical trials; evidence of the safety or efficacy of pharmaceutical products; decisions by regulatory agencies that impact or may impact our product candidates; the results and timing of efforts by our partner or future partners to develop stents or other medical devices to deliver AP23573; announcements of new collaborations; announcements of new equity or debt financings; failure to enter into collaborations; our funding requirements; announcements of technological innovations or new therapeutic products; developments relating to intellectual property rights, including licensing, litigation and governmental regulation and, in particular, our litigation with Lilly in the U.S. District Court and reexamination proceedings in the PTO with respect to the '516 Patent; healthcare or cost-containment legislation; general market trends for the biotechnology industry and related high-technology industries; the impact of exchange rates for the U.S. dollar; the impact of changing interest rates and policies of the Federal Reserve; and public policy pronouncements. These and other factors could have a significant impact on the value and volatility of our common stock in future periods.

*Raising additional capital by issuing securities or through collaboration and licensing arrangements may cause dilution to existing stockholders, restrict our operations or require us to relinquish proprietary rights.*

We may seek the additional capital necessary to fund our operations through public or private equity offerings, debt financings, and collaboration and licensing arrangements. To the extent that we raise additional capital through the sale of equity or convertible debt securities, our stockholders' ownership interest will be diluted, and the terms of such securities may include liquidation or other preferences that adversely affect our stockholders' rights. Under an existing loan agreement with a bank, we are required to maintain certain financial and non-financial covenants, including covenants limiting or restricting our ability to incur additional debt or declare dividends. If we raise additional funds through collaboration and licensing arrangements with third parties, we may have to relinquish valuable rights to our technologies or product candidates, or grant licenses on terms that are not favorable to us.

### ITEM 1B:  UNRESOLVED STAFF COMMENTS

We have received no written comments from the SEC staff regarding our periodic or current reports under the Securities Exchange Act of 1934, as amended, which comments remain unresolved.

## ITEM 2:  PROPERTIES

We have leased approximately 100,000 square feet (approximately 34,000 square feet currently under sublease to a third party) of laboratory and office space at 26 Landsdowne Street, Cambridge, Massachusetts. The lease originally had a ten-year term, which ended in July of 2002, with two consecutive five-year renewal options. We have extended the lease for the first five-year option period through July 2007. We believe that our currently leased facility will, in large part, be adequate for our research and development activities at least through the year 2007. We believe that any additional space we may require will be available on commercially reasonable terms.

## ITEM 3:  LEGAL PROCEEDINGS

### NF-κB Patent Infringement Litigation and Reexamination

In 2002, we, together with Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research and Harvard University (collectively, the Plaintiffs) filed a lawsuit in the United States District Court for the District of Massachusetts, or the U.S. District Court, against Eli Lilly and Company, hereinafter referred to as Lilly, alleging infringement of certain claims, or the NF-κB '516 Claims, of the Plaintiffs' U.S. Patent No. 6,410,516, or the '516 Patent covering methods of treating human disease by regulating NF-κB cell-signaling activity through sales of Lilly's osteoporosis drug, Evista®, and Lilly's septic shock drug, Xigris®, and seeking monetary damages from Lilly.

*Re-examination Proceedings in PTO*

On April 4, 2005, Lilly filed an *ex parte* request in the United States Patent and Trademark Office, or PTO, to reexamine the patentability of certain claims of the '516 Patent. On June 8, 2005, the PTO mailed to counsel for the patentees of the '516 Patent its Order granting a reexamination of all of the claims of the '516 Patent. On August 4, 2005, counsel for the patentees of the '516 Patent filed a Petition requesting the PTO to vacate its Order granting reexamination of the '516 Patent and a Petition requesting the PTO to stay its reexamination, or Patentees' Petitions. On October 6, 2005, the PTO mailed to counsel for the patentees of the '516 Patent its Decision denying Patentees' Petitions, or PTO's October 6 Decision, whereupon, on November 25, 2005, counsel for the patentees filed a Request for Reconsideration of the PTO's October 6 Decision. On February 8, 2006, the PTO mailed to counsel for the patentees of the '516 Patent its Decision granting patentees' Request for Reconsideration and denying the relief sought by patentees thereunder.

In addition, an unrelated third party filed an *ex parte* request in the PTO on December 2, 2005 to reexamine the patentability of certain claims of the '516 Patent, or the Second Request. On December 12, 2005, the PTO mailed to counsel for the patentees of the '516 Patent its Order granting a reexamination based on this Second Request. On February 13, 2006, counsel for the patentees of the '516 Patent filed Petitions requesting the PTO to vacate its Order granting reexamination of the '516 Patent based on this Second Request and requesting the PTO to stay this reexamination.

*Motions to Stay Litigation*

In connection with its request for reexamination of the '516 Patent, Lilly filed a motion in the U.S. District Court on April 4, 2005 requesting a stay of the NF-κB patent infringement litigation by the Court pending reexamination of the '516 Patent by the PTO. On June 6, 2005, the U.S. District Court denied Lilly's motion. On January 17, 2006, Lilly filed a renewed motion to stay pending reexamination of the '516 Patent by the PTO, which was denied by the U.S. District Court on February 13, 2006.

-22-

*Trial and Pre-Trial Motions*

On December 23, 2005, Lilly filed two motions for summary judgment of invalidity. At a status conference held on March 9, 2006, the U.S. District Court confirmed that the trial would begin on April 10, 2006 and gave no indication as to when it would rule on the pending summary judgment motions. A pre-trial conference in this case is scheduled for April 5, 2006, with trial scheduled to commence on April 10, 2006.

The ultimate outcome of the request for reexamination and the litigation cannot be determined at this time, and, as a result, no determination can be made with respect to whether the PTO will allow the claims of the '516 Patent in the reexamination proceeding, nor can any determination be made with respect to the validity or infringement of the claims of the '516 Patent in the Lilly litigation, nor can an estimate of a damage award or range of awards in the Lilly litigation, if any, be made. If we prevail at trial in the Lilly litigation, any damages we may be awarded by the jury could be subsequently eliminated or limited by an adverse finding upon appeal or in the event that the claims of the '516 Patent are invalidated by the PTO.

## ITEM 4:    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

No matters were submitted to a vote of security holders during the quarter ended December 31, 2005.

-23-

**PART II**

**ITEM 5:**  **MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**Market Information**

Our common stock is traded on the Nasdaq National Market under the symbol "ARIA". The following table sets forth the high and low sales prices of our common stock as quoted on the Nasdaq National Market for the periods indicated.

| 2005: | High | Low |
|---|---|---|
| First Quarter | $ 8.05 | $ 5.42 |
| Second Quarter | 7.40 | 5.23 |
| Third Quarter | 8.75 | 6.45 |
| Fourth Quarter | 7.73 | 5.52 |

| 2004: | High | Low |
|---|---|---|
| First Quarter | $11.32 | $6.96 |
| Second Quarter | 13.74 | 6.75 |
| Third Quarter | 7.50 | 3.70 |
| Fourth Quarter | 7.63 | 5.25 |

On February 28, 2006, the last reported sale price of our common stock was $6.71.

**Stockholders**

The approximate number of holders of record of our common stock as of February 28, 2006 was 480, and the approximate total number of beneficial holders of our common stock as of February 28, 2006 was 39,000.

**Dividends**

We have not declared or paid dividends on our common stock in the past and do not intend to declare or pay such dividends in the foreseeable future. Our long-term debt agreement prohibits the payment of cash dividends.

**Unregistered Sales of Securities**

Not applicable.

**Issuer Purchases of Equity Securities**

Not applicable.

-24-

## ITEM 6:    SELECTED FINANCIAL DATA

The selected financial data set forth below as of December 31, 2005, 2004, 2003, 2002 and 2001 and for each of the years then ended have been derived from the audited consolidated financial statements of the Company, of which the financial statements as of December 31, 2005 and 2004 and for the years ended December 31, 2005, 2004 and 2003 are included elsewhere in this Annual Report on Form 10-K, and are qualified by reference to such financial statements. The information set forth below should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the audited consolidated financial statements, and the notes thereto, and other financial information included herein.

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| *In thousands, except share and per share data* | **2005** | **2004** | **2003** | **2002** | **2001** |
| **Consolidated Statements of Operations Data:** | | | | | |
| Revenue | $ 1,217 | $ 742 | $ 660 | $ 67 | $ 4 |
| Operating expenses: | | | | | |
| Research and development | 45,916 | 27,711 | 14,889 | 23,018 | 16,587 |
| General and administrative | 12,261 | 9,442 | 5,547 | 5,718 | 4,469 |
| Operating expenses | 58,177 | 37,153 | 20,436 | 28,736 | 21,056 |
| Loss from operations | (56,960) | (36,411) | (19,776) | (28,669) | (21,052) |
| Other income (expense): | | | | | |
| Interest income | 1,900 | 1,110 | 353 | 615 | 1,578 |
| Interest expense | (422) | (272) | (303) | (323) | (285) |
| Other income - tax refund | | | | 534 | |
| Other income (expense), net | 1,478 | 838 | 50 | 826 | 1,293 |
| Net loss | $ (55,482) | $ (35,573) | $ (19,726) | $ (27,843) | $ (19,759) |
| Net loss per share | $ (0.99) | $ (0.69) | $ (0.51) | $ (0.86) | $ (0.68) |
| Weighted average number of shares of common stock outstanding | 56,283,948 | 51,294,160 | 39,036,073 | 32,475,083 | 29,256,767 |

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| *In thousands* | **2005** | **2004** | **2003** | **2002** | **2001** |
| **Consolidated Balance Sheet Data:** | | | | | |
| Cash, cash equivalents and marketable securities | $ 81,516 | $ 75,506 | $ 66,740 | $ 26,850 | $ 47,186 |
| Working capital | 65,971 | 68,874 | 61,587 | 21,126 | 43,249 |
| Total assets | 96,174 | 87,189 | 74,284 | 35,104 | 55,361 |
| Long-term debt | 5,735 | 7,655 | 6,575 | 5,437 | 6,847 |
| Accumulated deficit | (247,098) | (191,616) | (156,043) | (136,317) | (108,474) |
| Stockholders' equity | 71,378 | 67,440 | 59,326 | 21,852 | 43,093 |

-25-

**ITEM 7:  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read the following discussion and analysis in conjunction with "Selected Financial Data" and our consolidated financial statements and the related notes included elsewhere in this report.*

**Overview**

We are engaged in the discovery and development of breakthrough medicines to treat cancers by regulating cell signaling with small molecules. We are developing a comprehensive approach to patients with cancer that addresses the greatest medical need - aggressive and advanced-stage cancers for which current treatments are inadequate. Our goal is to build a fully integrated oncology company focused on novel, molecularly targeted therapies to treat solid tumors and hematologic cancers, as well as the spread of primary tumors to distant sites.

Our lead cancer product candidate, AP23573, has been or is being studied in multiple clinical trials in patients with various types of cancers, including sarcomas, hormone refractory prostate cancer, endometrial cancer, brain cancer and leukemias and lymphomas. Medinol Ltd. is also developing stents to deliver AP23573 to prevent reblockage at sites of vascular injury following stent-assisted angioplasty.

We have a focused drug discovery program centered on small-molecule, molecularly targeted therapies and cell-signaling pathways implicated in cancer. We also have an exclusive license to pioneering technology and patents related to certain NF-κB cell-signaling activity, which may be useful in treating certain diseases. Additionally, we have developed a proprietary portfolio of cell-signaling regulation technologies, our ARGENT technology, to control intracellular processes with small molecules, which may be useful in the development of therapeutic vaccines and gene and cell therapy products, and which provide versatile tools for applications in cell biology, functional genomics and drug discovery research.

Since our inception in 1991, we have devoted substantially all of our resources to our research and development programs. We receive no revenue from the sale of pharmaceutical products, and most of our revenue to date was received in connection with a joint venture we had with a major pharmaceutical company from 1997 to 1999. Except for the gain on the sale of our fifty percent interest in that joint venture in December 1999, which resulted in net income for fiscal 1999, we have not been profitable since inception. We expect to incur substantial and increasing operating losses for the foreseeable future, primarily due to costs associated with our pharmaceutical product development programs, including costs for clinical trials and product manufacturing, personnel and our intellectual property. We expect that losses will fluctuate from quarter to quarter and that these fluctuations may be substantial. As of December 31, 2005, we had an accumulated deficit of $247.1 million and cash, cash equivalents and marketable securities of $81.5 million and working capital of $66.0 million.

**General**

Our operating losses are primarily due to the costs associated with our pharmaceutical product development programs, personnel and intellectual property protection and enforcement. As our product development programs progress, we incur significant costs for toxicology and pharmacology studies, product development, manufacturing, clinical trials and regulatory support. These costs can vary significantly from quarter to quarter depending on the number of product candidates in development, the stage of development of each product candidate, the number of patients enrolled in and complexity of clinical trials and other factors. Costs associated with our intellectual property include legal fees and other costs to prosecute, maintain, protect and enforce our intellectual property, which can fluctuate from quarter to quarter depending on the status of patent issues being pursued.

Because we currently receive no revenue from the sale of pharmaceutical products and receive only limited license revenue, we have relied primarily on the capital markets as our source of funding. In March 2004 and August 2005, we raised approximately $40.0 million and $57.9 million, respectively, through underwritten public offerings of our common stock. We also utilize long-term debt to supplement our funding, particularly as a means to fund investment in property and equipment and infrastructure needs. In addition, we may seek funding from collaborations with pharmaceutical, biotechnology and/or medical device companies for development and commercialization of our product candidates. These collaborations may take the form of licensing arrangements, co-development or joint venture arrangements or other structures. If funding from these various sources is unavailable on reasonable terms, we may be required to reduce our operating expenses in order to conserve cash and capital by delaying, scaling back or eliminating one or more of our product development programs.

**Critical Accounting Policies and Estimates**

Our financial position and results of operations are affected by subjective and complex judgments, particularly in the areas of the carrying value of intangible assets, deferred compensation benefits for executives, and stock-based compensation to consultants.

At December 31, 2005, we reported $4.6 million of intangible assets consisting of capitalized costs related primarily to purchased and issued patents, patent applications and licenses, net of accumulated amortization. These costs are being amortized over the estimated useful lives of the underlying patents or licenses. Changes in these lives or a decision to discontinue using the technologies could result in material changes to our balance sheet and statements of operations. For example, during 2005 and 2004, we expensed $43,000 and $87,000, respectively, of unamortized costs related to certain intangible assets which we are not actively pursuing any longer. We have concluded that the carrying value of our remaining intangible assets is not currently impaired because such assets are utilized in our product development programs and/or continue to be viable technologies for collaborations or licensing efforts which we continue to pursue. If we were to abandon the underlying technologies or terminate our efforts to pursue collaborations or license agreements, we may be required to write off a portion of the carrying value of our intangible assets. The net book value as of December 31, 2005 of intangible assets related to our NF-κB technology is $456,000. If the patentability of our NF-κB patents is successfully challenged and such patents are subsequently narrowed, invalidated or circumvented, we may be required to write off some or all of the net book value related to such technology.

In determining expense related to stock-based compensation to consultants, recorded balances are adjusted at each reporting period to reflect fair value utilizing the Black-Scholes option pricing model that takes into account, among other things, the price and volatility of our common stock, a risk-free discount rate, and an estimate of the life of the option contract. In addition, under our deferred executive compensation plans, we are required to adjust our recorded obligations to our employees on a periodic basis to reflect fair value based on the value of certain underlying mutual funds. Fluctuations in those factors can result in uneven expense charges or credits to our statements of operations. If, for example, the market prices of the underlying securities in our deferred executive compensation plans were 10% higher at December 31, 2005, we would have recognized an additional $133,000 in compensation expense in 2005. Similarly, if the price and volatility of our common stock were 10% greater as of December 31, 2005, we would have recognized an increase of $4,000 in stock-based compensation to consultants in 2005.

**Results of Operations**

*Years Ended December 31, 2005 and 2004*

*Revenue*

We recognized license revenue of $1.2 million for the year ended December 31, 2005 compared to $742,000 for the year ended December 31, 2004. The increase in license revenue was due primarily to a license agreement we signed in January 2005 with Medinol to develop and commercialize stents and other medical devices to deliver our lead product candidate, AP23573, to prevent reblockage of injured vessels following stent-assisted angioplasty.

*Operating Expenses*

*Research and Development Expenses*

Research and development expenses increased by $18.2 million, or 66%, from $27.7 million in 2004 to $45.9 million in 2005. The research and development process necessary to develop a pharmaceutical product for commercialization is subject to extensive regulation by numerous governmental authorities in the United States and other countries. This process typically takes years to complete and requires the expenditure of substantial resources. Current requirements include:

- preclinical toxicology, pharmacology and metabolism studies, as well as *in vivo* efficacy studies in relevant animal models of disease;

- manufacturing of drug product for preclinical studies and clinical trials and ultimately for commercial supply;

- submission of the results of preclinical studies and information regarding manufacturing and control and proposed clinical protocol to the FDA in an Investigational New Drug application, or IND, (or similar filings with regulatory agencies outside the United States);

- conduct of clinical trials designed to provide data and information regarding the safety and efficacy of the product candidate in humans; and

- submission of all the results of testing to the FDA in a New Drug Application, or NDA, (or similar filings with regulatory agencies outside the United States).

Upon approval by the appropriate regulatory authorities, including in some countries approval of product pricing, we may commence commercial marketing and distribution of the product.

We group our research and development, or R&D, expenses into two major categories: direct external expenses and all other R&D expenses. Direct external expenses consist of costs of outside parties to conduct laboratory studies, to develop manufacturing processes and manufacture product candidates, to conduct and manage clinical trials and similar costs related to our clinical and preclinical studies. These costs are accumulated and tracked by product candidate. All other R&D expenses consist of costs to compensate personnel, to purchase lab supplies and services, to lease, operate and maintain our facility, equipment and overhead and similar costs of our research and development efforts. These costs apply to work on our clinical and preclinical candidates as well as our discovery research efforts. These costs are not tracked by product candidate because the number of product candidates and projects in R&D may vary from time to time and because we utilize internal resources across multiple projects at the same time.

Direct external expenses are further categorized as costs for clinical programs and costs for preclinical programs. Preclinical programs include product candidates undergoing toxicology, pharmacology, metabolism and efficacy studies and manufacturing process development required before testing in humans can begin. Product candidates are designated as clinical programs once we have filed an IND with the FDA, or a similar filing with regulatory agencies outside the United States, for the purpose of commencing clinical trials in humans.

-28-

Our R&D expenses for 2005 as compared to 2004 were as follows:

| In thousands | Year ended December 31, | | Increase/ (decrease) |
|---|---|---|---|
| | 2005 | 2004 | |
| Direct external expenses: | | | |
| Clinical programs | $ 26,311 | $ 11,542 | $ 14,769 |
| Preclinical programs | 1,142 | 3,494 | (2,352) |
| All other R&D expenses | 18,463 | 12,675 | 5,788 |
| | $ 45,916 | $ 27,711 | $ 18,205 |

AP23573, our lead product candidate which is in Phase 2 clinical trials, was our only clinical program in 2005 and 2004. Direct external expenses for AP23573 increased by $14.8 million in 2005 as compared to 2004 due primarily to increases in clinical trial costs ($10.9 million) and manufacturing-related costs ($3.5 million). In 2005, we continued to enroll patients in our existing clinical trials of AP23573 and initiated new clinical trials in additional disease indications, including prostate and endometrial cancer. The increase in clinical trial costs is directly related to the increased enrollment, the costs of evaluating enrolled patients, the costs of managing the trials, laboratory costs and the costs of compiling and analyzing results obtained in the trials. Manufacturing costs include product and process development work, as well as the costs to produce drug product. Manufacturing costs for AP23573 increased in 2005 as compared to 2004 due to an increase in the quantities of drug product manufactured for the clinical trials and investments in manufacturing process development. Through December 31, 2005, we have incurred a total of approximately $40.4 million in direct external expenses for AP23573 from the date it became a clinical program. We expect that our direct external costs for AP23573 will increase in 2006 as we continue to manage our clinical trials and incur the related costs of manufacturing and other costs to support such trials for this product candidate.

Preclinical programs consist primarily of our oncogenic kinase inhibitor program and our bone-targeted mTOR inhibitor program. Direct external expenses on preclinical programs will increase or decrease over time depending on the status and number of programs in this stage of development and the mix between external and internal efforts applied to such programs. Direct external expenses for preclinical programs decreased by $2.4 million in 2005 as compared to 2004 due primarily to the completion of certain pharmacology and toxicology studies conducted by outside contract laboratories in 2004, as well as expansion of internal efforts on these programs in 2005. We expect that our direct external expenses for preclinical programs will increase in 2006, as resources allow, as we continue to move these programs forward in development.

All other R&D expenses increased by $5.8 million in 2005 as compared to 2004 due to higher personnel and related costs ($2.6 million) as a result of an increase in the number of personnel and salary adjustments, an increase in depreciation and amortization costs related to our property and equipment ($1.9 million) due to the impact of capital improvements and purchases in 2004 and 2005, an increase in laboratory supplies and services ($506,000) related to ongoing development of our clinical and preclinical programs and miscellaneous increases in costs related to our facility, including maintenance and utility costs. We expect that all other R&D expenses will increase in 2006 in support of the expanding activity in our clinical and preclinical programs.

The successful development of our products is uncertain and subject to a number of risks. We cannot be certain that any of our product candidates will prove to be safe and effective or will meet all of the applicable regulatory requirements needed to receive and maintain marketing approval. Data from preclinical studies and clinical trials are susceptible to varying interpretations that could delay, limit or prevent regulatory clearance. We, the FDA or other regulatory authorities may suspend clinical trials at any time if we or they believe that the subjects participating in such trials are being exposed to unacceptable risks or if such regulatory agencies find deficiencies in the conduct of the trials or other problems with our products under development. Delays or rejections may be encountered based on additional governmental regulation, legislation, administrative action or changes in FDA or other regulatory policy during development or the review process. Other risks associated with our product development programs are described in Part I, Item 1A: Risk Factors. Due to these uncertainties, accurate and meaningful estimates of the ultimate cost to bring a product to market, the timing of completion of any of our drug development programs and the period in which material net cash inflows from any of our drug development programs will commence are unavailable.

*General and Administrative Expenses*

General and administrative expenses increased by $2.8 million, or 30%, from $9.4 million in 2004 to $12.3 million in 2005. Professional fees increased by $3.2 million to $7.4 million in 2005 as compared to $4.2 million in 2004 due primarily to costs related to expansion of business and commercial development initiatives and to our patent infringement litigation with Lilly. This increase was offset in part by a decrease in expenses related to a restricted stock grant to our chief executive officer in January 2004 which was fully amortized by December 31, 2004. We expect that our general and administrative expenses will increase in 2006 as necessary to support our research and development programs.

We expect that our operating expenses in total will increase in 2006 for the reasons described above, and such increase could be substantial. In addition, we expect that our R&D expenses and our general and administrative expenses will increase in 2006 due to the adoption of SFAS No. 123 (R), *Share-Based Payment*, pursuant to which we will begin to recognize expenses in 2006 related to stock options and other share-based payments to employees. Operating expenses may fluctuate from quarter to quarter. The actual amount of any increase in operating expenses will depend on the progress of our product development programs, including preclinical and clinical studies and product manufacturing, the status of our patent infringement litigation with Lilly and our ability to raise funding through equity offerings, collaborations, licensing, joint ventures or other sources.

*Interest Income/Expense*

Interest income increased by 71% to $1.9 million in 2005 from $1.1 million in 2004, as a result of higher interest yields from our securities, offset in part by a lower average balance of funds invested in 2005.

Interest expense increased by 55% to $422,000 in 2005 from $272,000 in 2004, as a result of higher interest rates and higher average loan balances in 2005.

*Operating Results*

We reported a loss from operations of $57.0 million in 2005 compared to a loss from operations of $36.4 million in 2004, an increase in loss of $20.5 million, or 56%. We expect that our loss from operations will increase in 2006 due to the expected increases in R&D expenses and general and administrative expenses described above. Losses may fluctuate depending on the extent to which, if at all, we enter into collaborations or partnerships for one or more of our product candidates or licenses for our technologies. The extent of operating losses will also depend on our ability to raise funds from other sources, such as the capital markets, which will influence the amount we will spend on research and development and the development timelines for our product candidates.

-30-

We reported a net loss of $55.5 million in 2005 compared to a net loss of $35.6 million in 2004, an increase in net loss of $19.9 million or 56%, and a net loss per share of $0.99 and $0.69 in 2005 and 2004, respectively.

***Years Ended December 31, 2004 and 2003***

***Revenue***

We recognized license revenue of $742,000 for the year ended December 31, 2004 compared to $660,000 for the year ended December 31, 2003. The increase in license revenue was due to license agreements into which we entered during this period related to our NF-κB technology and our ARGENT cell-signaling regulation technology.

***Operating Expenses***

***Research and Development Expenses***

R&D expenses increased by $12.8 million, or 86%, from $14.9 million in 2003 to $27.7 million in 2004. Our R&D expenses for 2004 as compared to 2003 were as follows:

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| *In thousands* | **2004** | **2003** | **Increase/ (decrease)** |
| Direct external expenses: | | | |
| Clinical programs | $ 11,542 | $ 2,540 | $ 9,002 |
| Preclinical programs | 3,494 | 1,246 | 2,248 |
| All other R&D expenses | 12,675 | 11,103 | 1,572 |
| | $ 27,711 | $ 14,889 | $ 12,822 |

AP23573 was our only clinical program in 2004 and 2003. Direct external expenses for AP23573 increased by $9.0 million in 2004 as compared to 2003 due primarily to increases in clinical trial costs ($3.3 million) and manufacturing-related costs ($4.6 million). In 2004, we continued to manage our ongoing Phase 1 trials of AP23573, initiated additional Phase 1 trials and commenced enrollment of patients in Phase 2 trials. The increase in clinical trial costs is directly related to the initiation of trials, increased enrollment, the costs of evaluating enrolled patients, the costs of managing the trials, laboratory costs and the costs of compiling and analyzing results obtained in the trials. Manufacturing costs include product and process development work, as well as the costs to produce drug product. Manufacturing costs for AP23573 increased significantly in 2004 due to an increase in the quantities of drug product manufactured for the clinical trials and investments in manufacturing process development.

Preclinical programs consist primarily of our oncogenic kinase inhibitor program and our bone-targeted mTOR inhibitor program. Direct external expenses on preclinical programs will increase or decrease over time depending on the status and number of programs in this stage of development. Direct external expenses for preclinical programs increased by $2.2 million in 2004 as compared to 2003 due to pharmacology and toxicology studies conducted by outside contract laboratories, particularly in the first half of 2004, as well as product and process development efforts for these product candidates.

All other R&D expenses increased by $1.6 million in 2004 as compared to 2003 due to higher personnel and related costs ($1.4 million) as a result of an increase in the number of personnel and salary adjustments, and miscellaneous increases in supplies, consulting fees, equipment maintenance costs and travel-related expenses in support of our research and development programs. Increases in these expenses were partially offset by decreases in write-offs of capitalized license and patent costs ($433,000) and termination or buy-out of equipment leases in 2003 ($229,000).

-31-

*General and Administrative Expenses*

General and administrative expenses increased 70% to $9.4 million in 2004 from $5.5 million in 2003. Professional fees increased by $2.3 million to $4.2 million in 2004 as compared to $1.9 million in 2003 due primarily to costs related to our patent infringement litigation with Lilly and to business development and other corporate initiatives, including compliance with the internal control requirements of the Sarbanes-Oxley Act of 2002. The increase in general and administrative expenses was also due to the awarding in January 2004 of restricted stock grants, to our chief executive officer and each of the other members of our Board of Directors. In 2004, we recorded an expense of $1.3 million related to these awards. Other increases in general and administrative expenses included salary adjustments, the cost of awards under our deferred executive compensation plan, and miscellaneous increases in insurance, state taxes and travel-related expenses.

*Interest Income/Expense*

Interest income increased by 214% to $1.1 million in 2004 from $353,000 in 2003, primarily as a result of a higher level of funds invested in 2004.

Interest expense decreased by 10% to $272,000 in 2004 from $303,000 in 2003, primarily as a result of lower average loan balances in 2004.

*Operating Results*

We reported a loss from operations of $36.4 million in 2004 compared to a loss from operations of $19.8 million in 2003, an increase in loss of $16.6 million, or 84%.

We reported a net loss of $35.6 million in 2004 compared to a net loss of $19.7 million in 2003, an increase in net loss of $15.9 million or 80%, and a net loss per share of $0.69 and $0.51 in 2004 and 2003, respectively.

**Selected Quarterly Financial Data**

Summarized unaudited quarterly financial data are as follows:

*In thousands, except per share amounts*

| | 2005 Quarters | | | |
| --- | --- | --- | --- | --- |
| | First | Second | Third | Fourth |
| Total license revenue | $        304 | $        350 | $        321 | $        242 |
| Net loss | (12,346) | (14,083) | (14,594) | (14,459) |
| Net loss per share | (0.23) | (0.27) | (0.25) | (0.23) |

| | 2004 Quarters | | | |
| --- | --- | --- | --- | --- |
| | First | Second | Third | Fourth |
| Total license revenue | $        190 | $        188 | $        185 | $        179 |
| Net loss | (6,235) | (9,245) | (9,379) | (10,714) |
| Net loss per share | (0.13) | (0.18) | (0.18) | (0.20) |

-32-

## Liquidity and Capital Resources

We have financed our operations and investments primarily through offerings of our common stock and, to a lesser extent, through issuances of our common stock pursuant to our stock option and employee stock purchase plans, supplemented by the issuance of long-term debt. We sell securities and incur debt when the terms of such transactions are deemed favorable by us and as necessary to fund our current and projected cash needs. We seek to balance the level of cash, cash equivalents and marketable securities on hand with our projected needs and to allow us to withstand periods of uncertainty relative to the availability of funding on favorable terms.

### Sources of Funds

During the years ended December 31, 2005, 2004 and 2003, our sources of funds were as follows:

| In thousands | Year ended December 31, | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| Sales/issuances of common stock: | | | |
| In common stock offerings | $ 57,860 | $ 40,001 | $ 56,180 |
| Pursuant to stock option and employee stock purchase plans | 970 | 2,382 | 964 |
| Proceeds from long-term borrowings | - | 3,000 | 9,500 |
| | $ 58,830 | $ 45,383 | $ 66,644 |

The amount of funding we raise through sales of our common stock depends on many factors, including, but not limited to, the status and progress of our product development programs, projected cash needs, availability of funding from other sources, our stock price and the status of the capital markets. In 2003, we completed three offerings of our common stock and realized net proceeds of $56.2 million. In 2004 and 2005, we completed underwritten offerings of our common stock for net proceeds of $40.0 million and $57.9 million, respectively. The following table details our common stock offerings in 2003, 2004 and 2005:

| | Number of Shares | Price Per Share | Net Cash Proceeds |
|---|---|---|---|
| | | | In thousands |
| 2003 | | | |
| May | 4,000,000 | $ 2.50 | $ 9,338 |
| October | 6,438,113 | 6.35 | 38,094 |
| December | 1,175,375 | 8.00 | 8,748 |
| | 11,613,488 | | $ 56,180 |
| 2004 | | | |
| March | 5,060,000 | 8.50 | $ 40,001 |
| 2005 | | | |
| August | 8,625,000 | 7.20 | $ 57,860 |

We have filed shelf registration statements with the SEC, from time to time, to ensure that we have registered shares of our common stock available for sale, giving us the opportunity to raise funding when terms are favorable. On December 19, 2003, we filed a shelf registration statement with the SEC for the issuance of up to 7,000,000 shares of our common stock, which was declared effective on January 9, 2004. As of December 31, 2005, after selling 5,060,000 of these shares in our March 2004 offering, we have 1,940,000 shares available for issuance under this shelf registration. On February 18, 2005, we filed another shelf registration statement with the SEC which was amended on March 11, 2005 for the issuance of up to 9,500,000 shares of our common stock. This filing was declared effective on March 14, 2005. As of December 31, 2005, after selling 8,625,000 of these shares in our August 2005 offering, we have 875,000 shares available for issuance under this shelf registration.

file:///l|/Amgen/Exhibits%20to%20MTD/FINAL%20Sh...%20-%20Ariad%20SEC%20filing%20-%20FY%202005.htm (36 of 72)6/28/2006 9:58:13 AM

In March 2003, we entered into a term loan agreement with a bank for $7.5 million, the proceeds of which were used to repay existing long-term debt, to pay off our obligations under certain operating leases for equipment and for general working capital purposes. The loan is secured by all of our assets excluding intellectual property, which we have agreed not to pledge to any other party. The loan carries interest at the bank's prime rate or LIBOR plus 2%. We amended the terms of the loan on December 31, 2003 and December 31, 2004, receiving another $2.0 million and $3.0 million, respectively, in loan proceeds. The amended loan is payable in monthly installments of $160,000 plus interest beginning in January 2005 with a final payment of $3.5 million due in March 2008. The terms of the loan require us to maintain at least $13.0 million in unrestricted cash, cash equivalents and investments. The agreement also contains certain covenants that restrict additional indebtedness, additional liens, and sales of assets, and dividends, distributions or repurchases of common stock. The balance outstanding as of December 31, 2005 was $7,655,000.

## Uses of Funds

The primary uses of our cash are to fund our operations and working capital requirements and, to a lesser degree, to repay our long-term borrowings and invest in intellectual property and property and equipment as needed for our business. Our uses of cash during the years ended December 31, 2005, 2004 and 2003 were as follows:

|  | Year ended December 31, | | |
| In thousands | 2005 | 2004 | 2003 |
| --- | --- | --- | --- |
| Net cash used in operating activities | $ 44,556 | $ 31,559 | $ 18,014 |
| Repayment of long-term borrowings | 1,920 | 1,800 | 8,040 |
| Investment in intangible assets | 675 | 730 | 507 |
| Investment in property and equipment | 6,538 | 2,743 | 307 |
|  | $ 53,689 | $ 36,832 | $ 26,868 |

The net cash used in operating activities is comprised of our net losses and working capital requirements. As noted above, our net loss increased in 2004 and 2005 due primarily to the increased costs of advancing our product candidates through preclinical and clinical phases of development. Also as noted above, we expect that our loss from operations will increase in 2006 due to continued progress in development of our product candidates, and we expect that our net cash used in operations will increase accordingly. We expect that our investment in intangible assets, consisting of our intellectual property, will increase in 2006 in support of our product development activities. Our investment in property and equipment increased in 2005 primarily due to a renovation project to create more useable space in our facility and an upgrade to our information technology infrastructure. We expect that our investment in property and equipment will decrease in 2006.

-34-

## Contractual Obligations

We have substantial fixed contractual obligations under various research and licensing agreements, consulting and employment agreements, lease agreements and long-term debt instruments. These contractual obligations were comprised of the following as of December 31, 2005:

| *In thousands* | | Payments Due By Period | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | | In 2006 | | 2007 through 2009 | | 2010 through 2011 | After 2011 |
| Long-term debt | $ | 7,655 | $ | 1,920 | $ | 5,735 | $ | $ | |
| Operating leases | | 871 | | 550 | | 321 | | | |
| Other long-term obligations | | 14,948 | | 4,800 | | 8,527 | | 1,226 | 395 |
| | $ | 23,474 | $ | 7,270 | $ | 14,583 | $ | 1,226 $ | 395 |

Long-term debt consists of scheduled principal payments on such debt. Interest on our long-term debt is based on variable interest rates. Assuming a constant interest rate of 6.28%, our average interest rate on our debt at December 31, 2005, over the remaining term of the debt, our interest expense would total approximately $420,000 in 2006 and $357,000 in the period 2007 through 2009.

Other long-term obligations are comprised primarily of employment agreements, obligations under our deferred executive compensation plans and license agreements. The license agreements generally provide for payment by us of annual license fees, milestone payments and royalties upon successful commercialization of products. All license agreements are cancelable by us. The above table reflects remaining license fees for the lives of the agreements but excludes milestone and royalty payments, as such amounts are not probable or estimable at this time.

## Liquidity

At December 31, 2005, we had cash, cash equivalents and marketable securities totaling $81.5 million and working capital of $66.0 million, compared to cash, cash equivalents and marketable securities totaling $75.5 million and working capital of $68.9 million at December 31, 2004.

We will require substantial additional funding for our research and development programs, including preclinical development and clinical trials, for operating expenses including intellectual property protection and enforcement, for the pursuit of regulatory approvals, and for establishing manufacturing, marketing and sales capabilities. In order to fund our needs, we may (1) sell common stock through public or private offerings as market conditions permit, (2) enter into partnerships for our product candidates, and/or (3) license our cell-signaling technologies, including our ARGENT and NF-κB intellectual property. We have available 2,815,000 shares of our common stock under currently effective shelf registration statements, which may be sold to raise funding.

We believe that our cash, cash equivalents and marketable securities should be sufficient to satisfy our capital and operating requirements into mid 2007. However, there are numerous factors that are likely to affect our spending levels, including the timing of the start of the initial registration trial for AP23573, the timing of product and process development work for AP23573, the manufacture of drug product for clinical trials and potential product launch, if approved, developments in our ongoing clinical trials, the timing and terms of a partnership, if any, to commercialize AP23573 outside of the U.S., the status of our in-house efforts to prepare for the potential launch of AP23573 in the U.S., the progress of our preclinical programs, and developments in our NF-κB litigation, among other factors. These variables could result in earlier depletion of our current funds. In any event, we expect to need additional funding in order to pursue our business plan, which we will seek to raise through the sale of additional securities, collaborative partnerships, and possible additional credit arrangements. There can be no assurance, however, that adequate resources will be available when needed or on terms acceptable to us.

**Recently Issued Accounting Pronouncements**

In December 2004, the Financial Accounting Standards Board, or FASB, issued SFAS No. 123(R), *Share-Based Payment*, which revised SFAS No. 123 and superseded APB Opinion No. 25, *Accounting for Stock Issued to Employees*. SFAS No. 123(R) requires that companies recognize compensation expense associated with grants of stock options and other equity instruments to employees in the financial statements, effective as of the first annual reporting period that begins after June 15, 2005. Compensation cost will be measured based on the fair value of the instrument on the grant date and will be recognized over the vesting period. This pronouncement applies to all grants after the effective date and to the unvested portion of stock options outstanding as of the effective date. SFAS No. 123(R) eliminates the ability to account for such transactions using the intrinsic method currently used by us. We are required to adopt SFAS No. 123(R) as of January 1, 2006. We expect to adopt SFAS 123(R) using the modified prospective application method. Assuming the continuation of current programs, our estimate of stock compensation expense for 2006 is in the range of $4.5 million to $5.0 million. SFAS No. 123(R) also requires that companies recognize compensation expense associated with purchases of shares of common stock by employees at a discount to market value under employee stock purchase plans that meet certain criteria. The impact of this requirement on the Company's consolidated financial statements is not expected to be material.

## ITEM 7A:  QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We invest our available funds in accordance with our investment policy to preserve principal, maintain proper liquidity to meet operating needs and maximize yields. Our investment policy specifies credit quality standards for our investments and limits the amount of credit exposure to any single issue, issuer or type of investment.

We invest cash balances in excess of operating requirements first in short-term, highly liquid securities, with original maturities of 90 days or less, and money market accounts. Depending on our level of available funds and our expected cash requirements, we may invest a portion of our funds in marketable securities, consisting generally of corporate debt and U.S. government and agency securities. Maturities of our marketable securities are generally limited to periods necessary to fund our liquidity needs and may not in any case exceed three years. These securities are classified as available-for-sale. Available-for-sale securities are recorded on the balance sheet at fair market value with unrealized gains or losses reported as a separate component of stockholders' equity (accumulated other comprehensive income or loss). Realized gains and losses on marketable security transactions are reported on the specific-identification method. Interest income is recognized when earned. A decline in the market value of any available-for-sale security below cost that is deemed other than temporary results in a charge to earnings and establishes a new cost basis for the security.

Our investments are sensitive to interest rate risk. We believe, however, that the effect, if any, of reasonably possible near-term changes in interest rates on our financial position, results of operations and cash flows generally would not be material due to the current short-term nature of these investments. In particular, at December 31, 2005, because our available funds were invested solely in cash equivalents and short-term marketable securities with maturities of 12 months or less, our risk of loss due to changes in interest rates is not material.

-36-

We have an executive compensation plan which provides participants an option to purchase certain designated mutual funds at a discount. These deferred compensation arrangements are accounted for as derivatives under SFAS No. 133. The fair value of the derivatives is reflected as a liability on our balance sheet. Effective October 1, 2005, we adopted a new executive compensation plan that defers the payment of annual bonus awards to future periods as specified in each award. We accrue a liability based on the fair value of the awards ratably over the vesting period. The fair value of such awards is increased or decreased based on the actual total return of certain underlying mutual funds. As of December 31, 2005, in the event of a hypothetical 10% increase (decrease) in the fair market value of the underlying mutual funds, we would incur approximately $133,000 of additional (reduced) compensation expense.

At December 31, 2005, we had $7.7 million outstanding under a bank term note which bears interest at prime or, alternatively, LIBOR +2%. This note is sensitive to changes in interest rates. In the event of a hypothetical 10% increase in the interest rate on which the loan is based (63 basis points at December 31, 2005), we would incur approximately $42,000 of additional interest expense in 2006.

### Certain Factors That May Affect Future Results of Operations

The SEC encourages companies to disclose forward-looking information so that investors can better understand a company's future prospects and make informed investment decisions. This Annual Report on Form 10-K contains such "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These statements may be made directly in this Annual Report, and they may also be made a part of this Annual Report by reference to other documents filed with the SEC, which is known as "incorporation by reference."

Such statements in connection with any discussion of future operating or financial performance may be identified by use of words such as "may," "anticipate," "estimate," "expect," "project," "intend," "plan," "believe," and other words and terms of similar meaning. Such statements are based on management's expectations and are subject to certain factors, risks and uncertainties that may cause actual results, outcome of events, timing and performance to differ materially from those expressed or implied by such forward-looking statements. These risks include, but are not limited to, risks and uncertainties regarding our ability to accurately estimate the timing and actual R&D expenses and other costs associated with the preclinical and clinical development and manufacture of our product candidates, the adequacy of our capital resources and the availability of additional funding, risks and uncertainties regarding our ability to manufacture or have manufactured our product candidates on a commercial scale, risks and uncertainties regarding our ability to successfully enroll and conduct clinical studies of product candidates, risks and uncertainties that clinical trial results at any phase of development may be adverse or may not be predictive of future results or lead to regulatory approval of any of our or any partner's product candidates, risks and uncertainties of third-party intellectual property claims relating to our and any partner's product candidates, and risks and uncertainties relating to regulatory oversight, the timing, scope, cost and outcome of legal proceedings, including litigation concerning our NF-κB patent portfolio, future capital needs, key employees, dependence on collaborators and manufacturers, markets, economic conditions, products, services, prices, reimbursement rates, competition and other factors. Please also see the discussion under Part I, Item 1A: Risk Factors appearing elsewhere in this Annual Report for more details regarding these and other risks.

In light of these assumptions, risks and uncertainties, the results and events discussed in the forward-looking statements contained in this Annual Report or in any document incorporated by reference might not occur. Stockholders are cautioned not to place undue reliance on the forward-looking statements, which speak only as of the date of this report or the date of the document incorporated by reference in this Annual Report. We are not under any obligation, and we expressly disclaim any obligation, to update or alter any forward-looking statements, whether as a result of new information, future events or otherwise. All subsequent forward-looking statements attributable to us or to any person acting on our behalf are expressly qualified in their entirety by the cautionary statements contained or referred to in this section.

-37-

## ITEM 8:  FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of
ARIAD Pharmaceuticals, Inc.:

We have audited the accompanying consolidated balance sheets of ARIAD Pharmaceuticals, Inc. and subsidiaries (the "Company") as of December 31, 2005 and 2004, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2005. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of ARIAD Pharmaceuticals, Inc. and subsidiaries as of December 31, 2005 and 2004, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2005, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of the Company's internal control over financial reporting as of December 31, 2005, based on the criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission, and our report dated March 13, 2006 expressed an unqualified opinion on management's assessment of the effectiveness of the Company's internal control over financial reporting and an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.


/s/ DELOITTE & TOUCHE LLP


Boston, Massachusetts
March 13, 2006

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

| | December 31, | |
|---|---|---|
| *In thousands, except share and per share data* | **2005** | **2004** |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 25,453 | $ 18,556 |
| Marketable securities | 56,063 | 56,950 |
| Inventory and other current assets | 2,225 | 1,965 |
| Total current assets | 83,741 | 77,471 |
| Property and equipment: | | |
| Leasehold improvements | 17,840 | 12,693 |
| Equipment and furniture | 9,908 | 6,525 |
| Construction in progress | | 2,049 |
| Total | 27,748 | 21,267 |
| Less accumulated depreciation and amortization | (20,022) | (18,031) |
| Property and equipment, net | 7,726 | 3,236 |
| Intangible and other assets, net | 4,707 | 6,482 |
| Total assets | $ 96,174 | $ 87,189 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 3,961 | $ 2,129 |
| Current portion of long-term debt | 1,920 | 1,920 |
| Accrued compensation and benefits | 497 | 310 |
| Accrued product development expenses | 8,444 | 2,934 |
| Other accrued expenses | 2,097 | 591 |
| Current portion of deferred revenue | 851 | 713 |
| Total current liabilities | 17,770 | 8,597 |
| Long-term debt | 5,735 | 7,655 |
| Deferred revenue | 24 | 404 |
| Deferred executive compensation | 1,267 | 3,093 |
| Commitments, contingent liabilities and minority interest (Note 1, 6, 7, 10) | | |
| Stockholders' equity: | | |
| Preferred stock, authorized, 10,000,000 shares, none issued and outstanding | | |
| Common stock, $.001 par value, authorized, 145,000,000 shares, issued and outstanding, 61,698,129 shares in 2005, 52,688,673 shares in 2004 | 62 | 53 |
| Additional paid-in capital | 318,684 | 259,122 |
| Deferred compensation | (246) | (58) |
| Accumulated other comprehensive loss | (24) | (61) |
| Accumulated deficit | (247,098) | (191,616) |
| Total stockholders' equity | 71,378 | 67,440 |
| Total liabilities and stockholders' equity | $ 96,174 | $ 87,189 |

See notes to consolidated financial statements.

ARIAD Pharmaceuticals, Inc.

-39-

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| In thousands, except share and per share data | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2005 | 2004 | 2003 |
| License revenue | $ 1,217 | $ 742 | $ 660 |
| Operating expenses: | | | |
| Research and development | 45,916 | 27,711 | 14,889 |
| General and administrative | 12,261 | 9,442 | 5,547 |
| Operating expenses | 58,177 | 37,153 | 20,436 |
| Loss from operations | (56,960) | (36,411) | (19,776) |
| Other income (expense): | | | |
| Interest income | 1,900 | 1,110 | 353 |
| Interest expense | (422) | (272) | (303) |
| Other income, net | 1,478 | 838 | 50 |
| Net loss | $ (55,482) | $ (35,573) | $ (19,726) |
| Net loss per share | $ (0.99) | $ (0.69) | $ (0.51) |
| Weighted average number of shares of common stock outstanding | 56,283,948 | 51,294,160 | 39,036,073 |

See notes to consolidated financial statements.

-40-

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**For the Years Ended December 31, 2003, 2004 and 2005**

| In thousands, except share data | Common Stock Shares | Amount | Additional Paid-in Capital | Deferred Compensation | Accumulated Other Comprehensive Income (Loss) | Accumulated Deficit | Shareholders' Equity |
|---|---|---|---|---|---|---|---|
| Balance, December 31, 2002 | 34,828,689 | $ 35 | $ 158,147 | $ (13) | $ — | (136,317) | $ 21,852 |
| Issuance of common stock, net of issuance costs | 11,613,488 | 12 | 56,168 | | | | 56,180 |
| Issuance of shares pursuant to ARIAD stock plans | 374,855 | | 964 | | | | 964 |
| Stock-based compensation to consultants | | | 64 | (64) | | | |
| Amortization of stock-based compensation | | | | 55 | | | 55 |
| Comprehensive loss: | | | | | | | |
| Net loss | | | | | | (19,726) | (19,726) |
| Other comprehensive income (loss) | | | | | | | |
| Net unrealized losses on marketable securities | | | | | 1 | | 1 |
| Comprehensive loss | | | | | | | (19,725) |
| Balance, December 31, 2003 | 46,817,032 | 47 | 215,343 | (22) | 1 | (156,043) | 59,326 |
| Issuance of common stock, net of issuance costs | 5,060,000 | 5 | 39,996 | | | | 40,001 |
| Issuance of shares pursuant to ARIAD stock plans | 811,641 | 1 | 3,689 | | | | 3,690 |
| Stock-based compensation to consultants | | | 94 | (94) | | | |
| Amortization of stock-based compensation | | | | 58 | | | 58 |
| Comprehensive loss: | | | | | | | |
| Net loss | | | | | | (35,573) | (35,573) |
| Other comprehensive income (loss) | | | | | | | |
| Net unrealized gains on marketable securities | | | | | (62) | | (62) |
| Comprehensive loss | | | | | | | (35,635) |
| Balance, December 31, 2004 | 52,688,673 | 53 | 259,122 | (58) | (61) | (191,616) | 67,440 |
| Issuance of common stock, net of issuance costs | 8,625,000 | 9 | 57,851 | | | | 57,860 |
| Issuance of shares pursuant to ARIAD stock plans | 384,456 | | 1,512 | | | | 1,512 |
| Stock-based compensation to consultants | | | 213 | (213) | | | |
| Amortization of stock-based compensation | | | (14) | 25 | | | 11 |
| Comprehensive loss: | | | | | | | |
| Net loss | | | | | | (55,482) | (55,482) |
| Other comprehensive income (loss) | | | | | | | |
| Net unrealized losses on marketable securities | | | | | 37 | | 37 |
| Comprehensive loss | | | | | | | (55,445) |
| Balance, December 31, 2005 | 61,698,129 | $ 62 | $ 318,684 | $ (246) | $ (24) | $ (247,098) | $ 71,378 |

See notes to consolidated financial statements.

-41-

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| In thousands | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2005 | 2004 | 2003 |
| **Cash flows from operating activities:** | | | |
| Net loss | $ (55,482) | $ (35,573) | $ (19,726) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization | 1,970 | 911 | 1,602 |
| Stock-based compensation | 554 | 1,366 | 55 |
| Deferred executive compensation expense | 374 | 800 | 444 |
| Increase (decrease) from: | | | |
| Inventory and other current assets | (260) | (1,431) | 313 |
| Other assets | 6 | 15 | 21 |
| Accounts payable | 1,832 | 1,376 | (1,391) |
| Accrued compensation and benefits | 187 | (156) | 67 |
| Accrued product development expenses | 5,510 | 2,054 | (126) |
| Other accrued expenses | 1,506 | (454) | (265) |
| Deferred revenue | (242) | (216) | 1,100 |
| Deferred executive compensation paid | (511) | (251) | (108) |
| Net cash used in operating activities | (44,556) | (31,559) | (18,014) |
| **Cash flows from investing activities:** | | | |
| Acquisitions of marketable securities | (58,888) | (58,259) | (32,296) |
| Proceeds from sales and maturities of marketable securities | 60,644 | 16,590 | 17,344 |
| Investment in property and equipment | (6,538) | (2,743) | (307) |
| Investment in intangible assets | (675) | (730) | (507) |
| Net cash used in investing activities | (5,457) | (45,142) | (15,766) |
| **Cash flows from financing activities:** | | | |
| Proceeds from long-term debt borrowings | | 3,000 | 9,500 |
| Repayment of long-term debt borrowings | (1,920) | (1,800) | (8,040) |
| Proceeds from issuance of common stock, net of issuance costs | 57,860 | 40,001 | 56,180 |
| Proceeds from issuance of common stock pursuant to stock option and purchase plans | 970 | 2,382 | 964 |
| Net cash provided by financing activities | 56,910 | 43,583 | 58,604 |
| Net increase (decrease) in cash and cash equivalents | 6,897 | (33,118) | 24,824 |
| Cash and cash equivalents, beginning of year | 18,556 | 51,674 | 26,850 |
| Cash and cash equivalents, end of year | $ 25,453 | $ 18,556 | $ 51,674 |
| Interest paid, net of amounts capitalized | $ 333 | $ 273 | $ 256 |

See notes to consolidated financial statements.

-42-

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. Nature of Business and Summary of Significant Accounting Policies**

*Nature of Business*

The Company is engaged in the discovery and development of breakthrough medicines to treat cancers by regulating cell signaling with small molecules. The Company is developing a comprehensive approach to patients with cancer that addresses the greatest medical need - aggressive and advanced-stage cancers for which current treatments are inadequate. The Company's goal is to build a fully integrated oncology company focused on novel, molecularly targeted therapies to treat solid tumors and hematologic cancers, as well as the spread of primary tumors to distant sites. The Company's lead cancer product candidate, AP23573, has been or is being studied in multiple clinical trials in patients with various types of cancers, including sarcomas, hormone refractory prostate cancer, endometrial cancer, brain cancer and leukemias and lymphomas. Medinol Ltd. is also developing stents to deliver AP23573 to prevent reblockage at sites of vascular injury following stent-assisted angioplasty.

The Company has a focused drug discovery program centered on small molecule, molecularly targeted therapies and cell-signaling pathways implicated in cancer. The Company also has an exclusive license to pioneering technology and patents related to certain NF-$\kappa$B cell-signaling activity, which may be useful in treating certain diseases. Additionally, the Company has developed a proprietary portfolio of cell-signaling regulation technologies, the Company's ARGENT technology, to control intracellular processes with small molecules, which may be useful in the development of therapeutic vaccines and gene and cell therapy products, and which provide versatile tools for use in cell biology, functional genomics and drug discovery research.

*Principles of Consolidation*

The consolidated financial statements include the accounts of ARIAD Pharmaceuticals, Inc., its wholly-owned subsidiaries, ARIAD Corporation and ARIAD Pharma S.A., and its 80%-owned subsidiary ARIAD Gene Therapeutics, Inc. ("AGTI") (Note 7). The Company's research and development relating to product candidates based on its ARGENT cell-signaling regulation technology and its small molecule mTOR inhibitors derived from the ARGENT programs are conducted on behalf of AGTI. Intercompany accounts and transactions have been eliminated in consolidation. AGTI is a research and development company and its accumulated deficit exceeds its total paid-in capital at December 31, 2005. Because the Company funds all losses of AGTI and the minority interest holders of AGTI common stock are not obligated to fund such losses, no minority interest income/gain or asset is recorded in the Company's consolidated financial statements.

*Fair Value of Financial Instruments*

The carrying amounts of cash, cash equivalents, accounts payable and accrued liabilities approximate fair value because of their short-term nature. Marketable securities are recorded in the consolidated financial statements at aggregate fair value (Note 2). The carrying amount of the Company's bank term note of $7.7 million at December 31, 2005 approximates fair value due to its variable interest rate (Note 4). The Company's obligation under its executive compensation plans (Note 5) is based in part on the current fair market value of underlying securities, which is therefore stated at its estimated current fair value.

-43-

*Accounting Estimates*

The preparation of the consolidated financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts and disclosure of assets and liabilities at the date of the consolidated financial statements and the reported amounts and disclosure of revenue and expenses during the reporting period. Actual results could differ from those estimates.

*Cash Equivalents*

Cash equivalents include short-term, highly liquid investments, which consist principally of United States government and agency securities, purchased with remaining maturities of 90 days or less, and money market accounts.

*Marketable Securities*

The Company has classified its marketable securities as "available-for-sale" and, accordingly, carries such securities at aggregate fair value. The difference between fair value and original cost is reflected as a component of accumulated other comprehensive income (loss). Fair value has been determined based on quoted market prices, in a dealer market, at the closing bid for each individual security held.

*Inventory*

Inventory consists of bulk pharmaceutical material to be used for multiple development programs. Inventories are carried at cost using the first-in, first-out method and are charged to research and development expense when consumed. The carrying value of inventory amounted to $1.7 million and $1.3 million at December 31, 2005 and 2004, respectively.

*Property and Equipment*

Property and equipment are recorded at cost. Depreciation is recorded using the straight-line method over the estimated useful lives of the assets (3 to 10 years). Leasehold improvements are amortized over the shorter of their useful lives or lease term using the straight-line method (4 to 10 years). Costs classified as construction in progress are accumulated and are not amortized or depreciated until placed in service. The Company capitalized approximately $42,000 of interest costs related to construction in progress in 2005. No interest was capitalized in 2004 or 2003.

*Intangible and Other Assets*

Intangible and other assets consist primarily of capitalized patent and license costs, deposits and the unvested portion of the fair value of certain outstanding grants under the Company's executive compensation plan (Note 5). The cost of purchased patents and patent applications, costs incurred in filing patents and certain license fees are capitalized. Capitalized costs related to issued patents are amortized over a period not to exceed seventeen years or the remaining life of the patent, whichever is shorter, using the straight-line method. Capitalized license fees are amortized over the periods to which they relate. In addition, capitalized costs are expensed when it becomes determinable that such patent applications or technology will not be pursued.

-44-

*Impairment of Long-Lived Assets*

The Company reviews its long-lived assets, including the above-mentioned intangible assets, for impairment when events or changes in circumstances indicate that the carrying amount of a long-lived asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to future net cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets.

*Revenue Recognition*

The Company recognizes revenue in accordance with the Securities and Exchange Commission ("SEC") Staff Accounting Bulletin ("SAB") No. 101, *Revenue Recognition in Financial Statements,* SAB No. 104, *Revenue Recognition*, and Emerging Issues Task Force ("EITF"), No. 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables*. Revenue is principally comprised of license fees received under agreements that provide the licensee with access to and/or the right to review and evaluate certain technology owned or controlled by the Company. Upfront and annual license fees are recorded as deferred revenue upon receipt and recognized as revenue on a systematic basis over the period of time they are earned in accordance with the terms of the agreements. Such agreements may also include milestone and royalty payments. Such payments are recognized as revenue when earned in accordance with the terms of the related agreements.

*Income Taxes*

The Company accounts for income taxes in accordance with Statement of Financial Accounting Standard ("SFAS") No. 109, *Accounting for Income Taxes,* which requires an asset and liability approach to financial accounting and reporting for income taxes. Deferred income tax assets and liabilities are computed annually for differences between financial statement basis and the income tax basis of assets and liabilities that will result in taxable or deductible amounts in the future. Such deferred income tax computations are based on enacted tax laws and rates applicable to the years in which the differences are expected to affect taxable income. A valuation allowance is established when it is necessary to reduce deferred income tax assets to the expected realized amounts (Note 9).

*Segment Reporting*

The Company organizes itself into one segment reporting to the chief executive officer. No significant revenues from product sales or services occurred in 2005, 2004 or 2003.

*Stock-Based Compensation*

SFAS No. 123, *Accounting for Stock-Based Compensation*, addresses the financial accounting and reporting standards for stock or other equity-based compensation arrangements. The Company accounts for stock or other equity-based compensation for non-employees under the fair value-based method as required by SFAS No. 123 and EITF No. 96-18, *Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services* and other related interpretations. Under this method, the equity-based instrument is valued at either the fair value of the consideration received or the equity instrument issued on the date of grant. The resulting compensation cost is recognized and charged to operations over the service period, which is usually the vesting period. The unearned portion of these awards is classified as a component of stockholders' equity and is listed as "deferred compensation" on the consolidated balance sheet.

The Company uses the intrinsic value method to measure compensation expense associated with grants of stock options to employees. Since options are granted to employees with exercise prices equal to the fair market value of the Company's common stock on the date of grant, there was no expense included in the statement of operations for the years ended December 31, 2005, 2004 and 2003 related to employee stock options. On a *pro forma* basis, had the Company used the fair value method to measure compensation, the net loss and net loss per share would have been reported as follows:

-45-

| In thousands (except per share data) | Years ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2005 | | 2004 | | 2003 | |
| Net loss, as reported | $ | (55,482) | $ | (35,573) | $ | (19,726) |
| Effect of stock options if valued at fair value | | (4,159) | | (4,026) | | (3,564) |
| Pro forma net loss | $ | (59,641) | $ | (39,599) | $ | (23,290) |
| | | | | | | |
| Net loss per share, as reported | $ | (0.99) | $ | (0.69) | $ | (0.51) |
| Effect of stock options if valued at fair value | | (.07) | | (0.08) | | (0.09) |
| Pro forma net loss per share | $ | (1.06) | $ | (0.77) | $ | (0.60) |

The above disclosure, required by SFAS No. 123, includes only the effect of grants made subsequent to January 1, 1996. For purposes of calculating the above disclosure, the fair value of options on their grant date was measured using the Black-Scholes option pricing model. Key assumptions used to apply this pricing model included a risk-free interest rate of 4.17% for 2005, 3.71% for 2004 and 3.42% for 2003, expected lives of the option grants ranging from one to eight years and expected rates of volatility for the underlying stock of 101% for 2005, 112% for 2004 and 115% for 2003. Using this model, the weighted average fair value per option for all options granted to employees in 2005, 2004 and 2003 was $5.46, $6.02 and $2.88, respectively.

### Earnings Per Share

Basic earnings per common share are computed using the weighted average number of common shares outstanding during each year. Diluted earnings per common share reflect the effect of the Company's outstanding options using the treasury stock method, except where such items would be anti-dilutive. In years in which a net loss is reported, basic and diluted per share amounts are the same. In 2005, 2004 and 2003, options amounting to 6,826,644, 5,889,532 and 5,647,839 shares of common stock, respectively, were not included in the computation of dilutive earnings per share, because the effect would be anti-dilutive. There were no warrants or convertible securities outstanding at December 31, 2005, 2004 or 2003.

### Executive Compensation Plan

The Company maintains a deferred executive compensation plan, established in 1997 (the "1997 Plan"), which provides participants, in lieu of a cash bonus, an option to purchase certain designated mutual funds at a discount. EITF No. 02-8, *Accounting for Options Granted to Employees in Unrestricted, Publicly Traded Shares of an Unrelated Party*, and SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities* require that the Company account for such benefits as derivatives. Under these pronouncements, the Company records the fair value of the awards as an asset and a liability and amortizes the asset to expense over the vesting period of the awards. Subsequent changes in the fair value of the liability are included in the determination of net income or loss.

Effective October 1, 2005, the Company adopted a new deferred executive compensation plan (the "2005 Plan") that defers the payment of annual bonus awards to future periods as specified in each award. The Company accrues a liability based on the fair value of the awards ratably over the vesting period. The recorded balances of such awards are increased or decreased based on the actual total return of specified mutual funds.

-46-

*Recently Issued Accounting Pronouncements*

In December 2004, the Financial Accounting Standards Board ("FASB") issued SFAS No. 123(R), *Share-Based Payment*, which revised SFAS No. 123 and superseded Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees*. SFAS No. 123(R) requires that companies recognize compensation expense associated with grants of stock options and other equity instruments to employees in the financial statements, effective as of the first annual reporting period that begins after June 15, 2005. Compensation cost will be measured based on the fair value of the instrument on the grant date and will be recognized over the vesting period. This pronouncement applies to all grants after the effective date and to the unvested portion of stock options outstanding as of the effective date. SFAS No. 123(R) eliminates the ability to account for such transactions using the intrinsic method currently used by the Company. The Company will be required to adopt SFAS No. 123(R) as of January 1, 2006. The Company expects to adopt SFAS No. 123(R) using the modified prospective application method. Assuming the continuation of current programs, the preliminary estimate of stock compensation expense for 2006 is in the range of $4.5 million to $5.0 million.

SFAS No. 123(R) also requires that companies recognize compensation expense associated with purchases of shares of common stock by employees at a discount to market value under employee stock purchase plans that meet certain criteria. The impact of this requirement on the Company's consolidated financial statements is not expected to be material.

## 2. Marketable Securities

The Company has classified its marketable securities as available-for-sale and, accordingly, carries such securities at aggregate fair value. At December 31, 2005 and 2004, all of the Company's marketable securities consisted of United States Treasury or agency securities.

At December 31, 2005, the aggregate fair value and amortized cost of the Company's marketable securities were $56,063,000 and $56,087,000, respectively. Gross unrealized gains and losses were $9,000 and $33,000, respectively, at December 31, 2005. The gross unrealized losses of $33,000 pertain to fourteen marketable securities with an aggregate fair value of $35.6 million, all of which have been in a continuous loss position for less than twelve months.

At December 31, 2004, the aggregate fair value and amortized cost of the Company's marketable securities were $56,950,000 and $57,011,000, respectively. Gross unrealized gains and losses were $0 and $61,000, respectively, at December 31, 2004. The gross unrealized losses of $61,000 pertain to eighteen marketable securities with an aggregate fair value of $51.5 million, all of which have been in a continuous loss position for less than twelve months.

The Company's marketable securities with unrealized losses consist of U.S. Treasury and agency securities that are guaranteed by the U.S. government or an agency thereof. The unrealized losses were caused by increased interest rates. Because the Company has the intent and ability to hold the securities to maturity which should result in a recovery of the fair value, the Company does not consider the investments to be other-than-temporarily impaired.

Realized gains and losses on investment security transactions are reported on the specific-identification method. Realized gains and losses on sales of marketable securities were not material in 2005, 2004 and 2003. Changes in market values resulted in a decrease (increase) in net unrealized losses of $37,000, ($62,000) and $1,000 in 2005, 2004 and 2003, respectively.

-47-

### 3. Intangible and Other Assets, Net

Intangible and other assets, net, were comprised of the following at December 31:

| In thousands | | 2005 | | 2004 |
|---|---|---|---|---|
| Capitalized patent and license costs | $ | 9,433 | $ | 8,796 |
| Less accumulated amortization | | (4,784) | | (4,067) |
| | | 4,649 | | 4,729 |
| Unvested deferred executive compensation (Note 5) | | 0 | | 1,690 |
| Other | | 58 | | 63 |
| | $ | 4,707 | $ | 6,482 |

Amortization expense for intangible assets amounted to $717,000, $697,000 and $692,000 in 2005, 2004 and 2003 respectively. In addition, the Company expensed unamortized patent and license costs of $43,000, $87,000 and $520,000 in 2005, 2004 and 2003, respectively, related to patent applications or technology no longer being pursued. The estimated future amortization expenses for capitalized patent and license costs are $720,000 for 2006, $690,000 for 2007, $444,000 for 2008, $354,000 for 2009 and $349,000 for 2010.

### 4. Long-Term Debt

Long-term debt was comprised of the following at December 31:

| In thousands | | 2005 | | 2004 |
|---|---|---|---|---|
| Bank term note at prime rate or LIBOR +2% (average interest rate of 6.28% at December 31, 2005) payable in monthly installments of $160,000 plus interest, through March 2008 | $ | 7,655 | $ | 9,575 |
| Less current portion | | (1,920) | | (1,920) |
| | $ | 5,735 | $ | 7,655 |

In March 2003, the Company entered into a term loan agreement with a bank for $7.5 million, the proceeds of which were used to pay off then outstanding loans as well as remaining obligations under certain operating leases. Such repayments totaled $6.9 million in the aggregate. The loan is secured by a lien on all assets of the Company excluding intellectual property, which the Company has agreed not to pledge to any other party. This term loan agreement was amended on December 31, 2003 and on December 31, 2004 pursuant to which the Company received another $5.0 million in loan proceeds in the aggregate. The loan, as amended, is repayable in monthly installments of $160,000 plus interest with a balloon payment of $3.5 million in March 2008. The loan, as amended, requires the Company to maintain a minimum of $13.0 million in unrestricted cash, cash equivalents and investments. The agreement also contains certain covenants that restrict additional indebtedness, additional liens and sales of assets, and dividends, distributions or repurchases of common stock.

The annual aggregate future principal payments of the above loan, as amended, are $1.9 million in each of 2006 and 2007, and $3.8 million in 2008.

-48-

## 5. Executive Compensation Plans

Under the Company's deferred executive compensation plan established in 1997 (the "1997 Plan"), the Company recorded an asset and a liability on the date of grant equal to the fair value of awards granted under the 1997 Plan. The fair value of awards made in 2004 and 2003 under the 1997 Plan were $1.0 million and $930,000, respectively. The asset is amortized to expense over the vesting period and the liability is revalued and adjusted to fair value at each reporting period. Under the Company's 2005 Plan, the Company accrues a liability for the fair value of awards ratably over the vesting period. The value of awards made in 2005 under the 2005 Plan was $962,000.

Pursuant to an amendment to the 1997 Plan in 2005, the unvested balances as of December 31, 2004 of awards under the 1997 Plan were cancelled. The value of such unvested balances was transferred to the 2005 Plan and will be accounted for accordingly. The recorded asset and liability balances attributable to the 1997 Plan were adjusted to reflect the cancellation and transfer of unvested awards. The net expense for these plans was $374,000, $800,000 and $440,000 in 2005, 2004 and 2003, respectively. The estimated future expenses for awards made through December 31, 2005 are $858,000, $637,000, $372,000 and $183,000 for 2006, 2007, 2008 and 2009, respectively.

## 6. Leases, Licensed Technology and Other Commitments

*Facility Lease*

The Company conducts its operations in a 100,000 square foot office and laboratory facility under a non-cancelable operating lease. The original ten-year term of the lease expired in July 2002, and the Company has extended the lease for the first of two five-year extension periods. The Company currently subleases approximately 34,000 square feet of space to one tenant. Rent expense, net of sublease income of $1.3 million, $1.4 million and $1.4 million in 2005, 2004 and 2003 respectively, amounted to $620,000, $509,000 and $446,000 respectively. Future minimum annual rental payments through July 2007, the expiration of the first extension period, are $550,000 in 2006 and $321,000 in 2007, which are net of expected sublease income of $1.1 million in 2006 and $654,000 in 2007.

*Licensed Technology*

The Company and AGTI have entered into agreements with several universities under the terms of which the Company and/or AGTI have received exclusive licenses to technology and intellectual property. The agreements, which are generally cancelable by the Company and/or AGTI, provide for the payment of license fees and/or minimum payments, which are generally creditable against future royalties. Fees paid by the Company on behalf of the Company and/or AGTI amounted to $145,000, $238,000 and $165,000 in 2005, 2004 and 2003, respectively, and are expected to amount to approximately $145,000 annually in 2006 through 2010. In addition, the agreements provide for payments upon the achievement of certain milestones in product development. The agreements also require the Company to fund certain costs associated with the filing and prosecution of patent applications.

*Other Commitments*

The Company has entered into various employment agreements with 15 senior officers. The agreements provide for aggregate annual base salaries of $10.4 million and remaining terms of employment of up to three years.

## 7. Stockholders' Equity

*Preferred Stock*

The Company has authorized 10,000,000 shares of preferred stock which the Board of Directors is empowered to designate and issue in different series. At December 31, 2005, the Board of Directors had designated 500,000 shares as series A preferred stock, and 9,500,000 shares remained undesignated.

-49-

*Common Stock*

On May 19, 2003, the Company sold 4,000,000 registered shares of its common stock to institutional investors at a price of $2.50 per share and received gross proceeds of $10.0 million before commissions and expenses of $662,000. These shares were sold pursuant to previously filed shelf registration statements and under a related registration statement pursuant to SEC rules. No shares remain available for sale under those shelf registrations.

On July 3, 2003, the Company filed a shelf registration statement with the SEC for the issuance of up to 7,500,000 shares of its common stock. On October 8, 2003, the Company sold 6,438,113 registered shares of its common stock, registered pursuant to this shelf registration, to institutional investors at a price of $6.35 per share and received gross proceeds of $40.9 million before commissions and expenses of $2.8 million. On December 3, 2003, the Company sold 1,175,375 registered shares of its common stock, including 113,489 shares registered under a related registration statement pursuant to SEC rules, to institutional investors at a price of $8.00 per share and received gross proceeds of $9.4 million before commissions and expenses of $652,000. Following this sale, no shares remain available for sale under this shelf registration.

On December 19, 2003, the Company filed a shelf registration statement with the SEC for the issuance of up to 7,000,000 shares of its common stock. This filing was declared effective on January 9, 2004. On March 29, 2004, the Company sold 5,060,000 of these registered shares in an underwritten public offering at a price of $8.50 per share for net proceeds of $40.0 million. As of December 31, 2005, the Company has 1,940,000 shares available for issuance under this shelf registration.

On February 18, 2005, the Company filed a shelf registration statement with the SEC, which was amended on March 11, 2005, registering 9,500,000 shares of common stock. The filing was declared effective on March 14, 2005. On August 10, 2005 and August 18, 2005, the Company sold an aggregate of 8,625,000 of these registered shares in an underwritten public offering at a price of $7.20 per share for net proceeds of approximately $57.9 million. At December 31, 2005, the Company had 875,000 shares that remain available for issuance under this shelf registration.

*Stockholder Rights Plan*

The Board of Directors of the Company adopted a Rights Agreement, dated as of June 8, 2000 (the "2000 Rights Agreement"), between the Company and State Street Bank and Trust Company, as Rights Agent, and approved the declaration of a dividend distribution of one Preferred Share Purchase Right (a "Right") on each outstanding share of its Common Stock. In general, the Rights become exercisable if a person or group hereafter acquires 15% or more of the Common Stock of the Company or announces a tender offer for 15% or more of the Common Stock. The Board of Directors will, in general, be entitled to redeem the Rights at one cent per Right at any time before any such person hereafter acquires 15% or more of the outstanding Common Stock. The plan is designed to protect the Company's stockholders in the event that an attempt is made to acquire the Company without an offer of fair value.

If a person hereafter acquires 15% or more of the outstanding Common Stock of the Company (the "Acquiring Person"), each Right will entitle its holder to purchase, for an initial exercise price of $65, a number of shares of Common Stock having a market value at that time of twice the Right's exercise price. Rights held by the Acquiring Person will become void. If the Company is acquired in a merger or other business combination transaction after a person acquires 15% or more of the Company's Common Stock, each Right will entitle its holder to purchase, at the Right's then-current exercise price, a number of the acquiring company's common shares having a market value at that time of twice the Right's exercise price.

-50-

The dividend distribution of Rights was payable on July 19, 2000 to shareholders of record on June 19, 2000. The Rights will expire in ten years. The Rights distribution is not taxable to the Company's stockholders.

The Board of Directors also adopted two amendments to the Rights Agreement dated December 15, 1994, (the "1994 Rights Agreement"), between the Company and State Street Bank and Trust Company, as Rights Agent. As a result of these amendments, the adoption of the 2000 Rights Agreement and the setting of a record date to distribute new Rights, the 1994 Rights Agreement is no longer in effect.

*Minority Interest in Subsidiary*

At December 31, 2003, AGTI had 5,195,779 shares of its common stock outstanding. Of this amount, the Company owned 4,157,143 shares or 80%, which allows it to consolidate for tax purposes the results of operations of AGTI with those of the Company. On January 17, 2004, stock options for a total of 87,428 shares of AGTI common stock held by minority interest holders were exercised prior to their expiration on that date. In order to maintain its 80% ownership interest in AGTI, the Company acquired an additional 351,909 shares of AGTI common stock on January 13, 2004. The purchase price of such shares was approximately $8.8 million, effected through the reduction of intercompany debt representing the estimated fair value of such shares, subject to adjustment in certain circumstances.

After taking into account the above transactions, AGTI has a total of 5,635,116 shares of its common stock outstanding of which 80% are owned by ARIAD, 14% are owned by Stanford University, Harvard University, consultants and inventors, and 6% are owned by certain current members of the Company's management and Board of Directors. Approximately 75% of the shares of common stock owned by the minority interest holders are subject to restrictions on transfer and a right of first refusal held by AGTI to repurchase such shares of AGTI common stock before sale of such shares to another purchaser. There are currently no outstanding options to purchase AGTI common stock and no shares available for grant of additional options.

## 8.   Stock Plans

*ARIAD Stock Option and Stock Plans*

The Company's 1991, 1994 and 2001 stock option and stock plans (the "Plans") provide for the awarding of nonqualified and incentive stock options, stock grants and restricted stock units to officers, directors, employees and consultants of the Company. Stock options become exercisable as specified in the related option certificate, typically over a four-year period, and expire ten years from the date of grant. Stock grants and restricted stock units provide the recipient with ownership of common stock subject to any rights the Company may have to repurchase the shares granted or other restrictions. The 1991 and 1994 Plans have expired according to their terms, although existing stock options granted under these Plans remain outstanding. As of December 31, 2005, there are 696,046 shares available awards under the 2001 Plan.

Stock option transactions under the Plans for the years ended December 31, 2003, 2004 and 2005 are as follows:

-51-

|  | Number Of Shares | Weighted Average Exercise Price Per Share |
|---|---|---|
| Options outstanding, January 1, 2003 | 5,392,311 | $ 4.51 |
| Granted | 781,220 | 3.90 |
| Forfeited | (239,473) | 5.16 |
| Exercised | (286,219) | 2.94 |
| Options outstanding, December 31, 2003 | 5,647,839 | 4.48 |
| Granted | 1,192,150 | 6.02 |
| Forfeited | (320,114) | 6.17 |
| Exercised | (630,343) | 3.62 |
| Options outstanding, December 31, 2004 | 5,889,532 | 4.80 |
| Granted | 1,310,875 | 7.30 |
| Forfeited | (132,444) | 7.16 |
| Exercised | (241,319) | 3.52 |
| Options outstanding, December 31, 2005 | 6,826,644 | $ 5.28 |
| Options exercisable,   December 31, 2003 | 3,605,255 | $ 4.27 |
| December 31, 2004 | 4,078,371 | $ 4.65 |
| December 31, 2005 | 4,345,848 | $ 4.70 |

In addition to the above stock option transactions, in 2005 and 2004, the Company awarded grants of its common stock totaling 120,000 and 170,000 shares, respectively, to its directors and chief executive officer. The 2005 stock grant to the chief executive officer remains subject to the right of the Company to repurchase the shares in certain circumstances until January 2007. The Company recognized expense of $548,000 and $1.3 million in 2005 and 2004, respectively, related to these grants, based on the fair market value of the common stock on the date of grant.

The following table sets forth information regarding options outstanding at December 31, 2005:

| Range of Exercise Prices | Number of Shares | Weighted Average Exercise Price | Weighted Average Remaining Life (years) | Number of Option Shares Currently Exercisable | Weighted Average Exercise Price for Currently Exercisable |
|---|---|---|---|---|---|
| $.75 - 1.25 | 392,396 | $ 0.78 | 3.8 | 392,396 | $ 0.78 |
| 1.34 - 2.31 | 624,308 | 1.59 | 4.5 | 528,942 | 1.62 |
| 2.68 - 4.88 | 2,149,875 | 4.14 | 5.3 | 1,968,312 | 4.13 |
| 4.89 - 8.00 | 3,345,565 | 6.46 | 8.0 | 1,144,886 | 6.07 |
| 9.65 - 14.63 | 314,500 | 13.40 | 4.6 | 311,312 | 13.44 |
|  | 6,826,644 | $ 5.28 | 6.4 | 4,345,848 | $ 4.70 |

*ARIAD Gene Therapeutics, Inc. Stock Option Plan*

The Company's subsidiary, AGTI, adopted a stock option plan in 1993, which was approved by the Company's stockholders and which has now expired according to its terms. At December 31, 2003, there were 87,428 options outstanding all of which were exercised on January 17, 2004 for proceeds to AGTI of approximately $37,000 (Note 7). There were no other options exercised nor any options granted under this plan in 2005, 2004 or 2003. At December 31, 2005, there are no outstanding options to purchase AGTI common stock under this plan.

-52-

# EXHIBIT D



## NF-κB Highlights

We have an exclusive license to pioneering technology and patents related to certain NF-κB treatment methods, and the discovery and development of drugs that regulate NF-κB cell-signaling activity.  Regulation of NF-κB cell-signaling activity may be useful in treating certain medically important disorders.

- **The Science.** Dr. David Baltimore, formerly director of the Whitehead Institute for Biomedical Research, Dr. Phillip Sharp of the Massachusetts Institute of Technology, and Dr. Thomas Maniatis of Harvard University, together with a team of scientists in their respective laboratories, discovered a family of genes that encode proteins they called NF-κB and I-κB, its inhibitor; the critical role played by NF-κB cell signaling in regulating cellular processes involved in various difficult-to-treat diseases; methods to identify compounds to regulate NF-κB cell-signaling activity; and methods of treating disease by inhibiting NF-κB. NF-κB can be generally thought of as a "biological switch" that can be turned off using these methods to treat disorders, such as inflammation, cancer, sepsis and osteoporosis.

- **The Patents.** We have an exclusive license to a portfolio of four issued patents relating to NF-κB, three in the United States and one in Europe. The most recent U.S. patent, issued in June 2002, contains a range of focused claims to methods useful for treating various disease conditions through modulation of NF-κB activity. In June 2002, we and our inventors' academic institutions filed a lawsuit against Eli Lilly and Company alleging infringement of certain claims of this patent by Lilly through sales of its osteoporosis drug, Evista®, and its septic shock drug, Xigris®.

- **The Licensing Program.** We permit broad use of our NF-κB intellectual property at no cost by investigators at academic and not-for-profit institutions to conduct non-commercial research. Our goal is to license our NF-κB technology to pharmaceutical and biotechnology companies conducting research on the discovery of drugs that modulate NF-κB cell signaling and/or marketing such drugs. Bristol-Myers Squibb Company and DiscoveRx Corporation, a high-throughput screening company, have entered into research and development licenses for our NF-κB intellectual property.

- **The Business Implications.** The use of many currently marketed drugs and products in development, in addition to the two highlighted in the Lilly litigation, are examples of NF-κB treatment methods which may be covered by our NF-κB patents. While we cannot predict today the revenue stream that may ultimately result from its NF-κB patent portfolio, our share of any proceeds from Lilly or any other company that licenses our intellectual property portfolio will be used to fund the development of our innovative treatments for cancer and other life-threatening diseases – supporting our efforts to build a science-driven, product development company focused primarily on cancer.

For updated information about the proceedings in our case against Lilly, see our most recent filings with the Securities and Exchange Commission (including reports on Forms 8-K, 10-K, and 10-Q).

**(Last updated: March 10, 2004)**

# EXHIBIT E

US006410516B1

(12) **United States Patent**
    Baltimore et al.

(10) **Patent No.:    US 6,410,516 B1**
(45) **Date of Patent:    Jun. 25, 2002**

(54) **NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL REGULATION**

(75) Inventors: **David Baltimore**, New York, NY (US); **Ranjan Sen**, Cambridge; **Phillip A. Sharp**, Newton, both of MA (US); **Harinder Singh**, Chicago, IL (US); **Louis Staudt**, Silver Springs, MD (US); **Jonathan H. Lebowitz**, Zionsville, IN (US); **Albert S. Baldwin, Jr.**, Chapel Hill, NC (US); **Roger G. Clerc**, Binningen (CH); **Lynn M. Corcoran**, Port Melbourne (AU); **Patrick A. Baeuerle**, Eichenau (DE); **Michael J. Lenardo**, Potomac, MD (US); **Chen-Ming Fan**, San Francisco; **Thomas P. Maniatis**, Belmont, both of MA (US)

(73) Assignees: **President & Fellows of Harvard College; Massachusetts Institute of Technology; Whitehead Institiue for Biomedical Research**, all of Cambridge, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **08/464,364**

(22) Filed: **Jun. 5, 1995**

**Related U.S. Application Data**

(60) Division of application No. 08/418,266, filed on Apr. 6, 1995, now Pat. No. 5,804,374, which is a continuation of application No. 07/791,898, filed on Nov. 13, 1991, now abandoned, which is a continuation-in-part of application No. 06/946,365, filed on Dec. 24, 1986, now abandoned, application No. 08/418,266, which is a continuation-in-part of application No. 07/341,436, filed on Apr. 21, 1989, now abandoned, and a continuation-in-part of application No. 07/318,901, filed on Mar. 3, 1989, now abandoned, and a continuation-in-part of application No. 07/280,173, filed on Dec. 5, 1988, now abandoned, and a continuation-in-part of application No. 07/162,680, filed on Mar. 1, 1988, now abandoned, and a continuation-in-part of application No. 07/155,207, filed on Feb. 12, 1988, now abandoned, and a continuation-in-part of application No. 06/817,441, filed on Jan. 9, 1986, now abandoned.

(51) **Int. Cl.**[7] ...................... **A61K 31/711**; C12N 5/10; C12N 15/10

(52) **U.S. Cl.** ............................ **514/44**; 435/6; 435/455; 435/325; 435/366; 435/370; 435/372; 435/372.2; 435/372.3

(58) **Field of Search** ......................... 435/6, 172.3, 455, 435/325, 366, 370, 372, 372.2, 372.3; 514/2, 44; 935/34, 36

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

WO            87/04170        7/1987

OTHER PUBLICATIONS

Gosh, S. and Baltimore, D., "Activation in vitro of NF–kB by phosphorylation of its inhibitor IkB," Nature, 344(6267): 678–682 (1990).

Zabel, U. and Baeurle, P., "Purified Human IkB Can Rapidly Dissociate the Complex of the NF kB Transcription Factor with it Cognate DNA," Cell, 61:255–265 (1990).

Haskill, S., et al., "Characterization of an Immediate–Early Gene Induced in Adherent Monocytes That Encodes IkB–like Activity," Cell, 65:1281–1289 (1991).

Baldwin, Jr., A.S., and Sharp, P.A., "Two transcription factors, NF–kB and H2TF1, interact with a single regulatory sequence in the class I major histocompatability complex promotor," Proc. Natl. Acad. Sci, USA, 85:723–727 (1988).

Böhnlein, E.,, et al., "The Same Inducible Nuclear Proteins Regulates Mitogen Activation of Both the Interleukin–2 Receptor–Alpha Gene and Type 1 HIV," Cell, 53:827–836 (1988).

Leung, K. and Nable, G.J., "HTLV–1 transactivator induces interleukin–2 receptor expression through an NF–kB–like factor," Nature, 333:776–778 (1988).

Ruben, S., et al., "Cellular Transcription Factors and Regulation of IL–2 Receptor Gene Expression by HTLV–1 tax Gene Product," Science, 241:89–92 (1988).

Lenardo, J.J., et al., "NF–kB protein purification from bovine spleen: Nucleotide stimulation and binding site specificity," Prod. Natl. Acad. Sci. USA, 85:8825–8829 (1988).

Wirth, T. and Baltimore, D., "Nuclear factor NF–kB can interact functionally with its cognate binding site to provide lymphoid–specific promotor function," The EMBO Journal, 7 (10):3109–3113 (1988).

Nelsen, B., et al., "The NF–kB–Binding Site Mediates Phorbol Ester–Inducible Transcription in Nonlymphoid Cells," Mol. & Cell Biol., 8:3526–3531 (1988).

Ballard, D.W., et al., "HTLV–I Tax Induces Cellular Proteins That Activate the kB Element in the IL–2 Receptor a Gene," Science, 241:1652–1657 (1988).

Blanar, M.A., et al., "Nf–kB Binds within a Region Required for B–Cell–Specific Expression of the Major Histocompatibility Complex Class II Gene Ead," Mol. & Cell. Biol., 9 (2):844–846.

Karin, M., et al., "Activation of a Heterologous Promoter in Response to Dexamethasone and Cadmium by Metallothionein Gene 5'Flanking DNA," Cell, 36:371–379 (1984).

(List continued on next page.)

*Primary Examiner*—David Guzo
(74) *Attorney, Agent, or Firm*—David L. Berstein; Matthew P. Vincent; Ropes & Gray

(57) **ABSTRACT**

Constitutive and tissue-specific protein factors which bind to transcriptional regulatory elements of Ig genes (promoter and enhancer) are described. The factors were identified and isolated by an improved assay for protein-DNA binding. Genes encoding factors which positively regulate transcription can be isolated and employed to enhance transription of Ig genes. In particular, NF-kB, the gene encoding NF-kB, IkB and the gene encoding IkB and uses therefor.

**203 Claims, 58 Drawing Sheets**

# US 6,410,516 B1

Page 2

## OTHER PUBLICATIONS

Davis, N., et al., "Rel–Associated pp40: An Inhibitor of the Rel Family of Transcription Factors," *Science* 253:1268–1271 (1991).

Treisman, R., "Transient Accumulation of c–fos RNA Following Serum Stimulation Requires a Conserved 5'Element and c–fos 3' Sequences," *Cell, 42*:889–902 (1985).

Queen, C. and Stafford, J., "Fine Mapping of an Immunoglobulin Gene Activator," *Mol. Cel. Biol., 4*(6):1042–1049 (1984).

Nelson, K. J., et al., "Inducible transcription of the unrearranged κ constant region locus is a common feature of pre–B cells and does not require DNA or protein synthesis," *Proc. Natl. Acad. Sci. USA, 82*:5305–5309 (1985).

Foster, J., et al., "An immunoglobulin promoter displays cell–type specificity independently of the enhancer," *Nature, 315*:423–425 (1985).

Ko, H.–S., et al., "A Human Protein Specific for the Immunoglobulin Octamer DNA Motif Contains a Functional Homeobox Domain," *Cell, 55*:135–144 (1988).

Sen, R. and Baltimore, D., "Multiple Nuclear Factors Interact with the Immunoglobulin Enhancer Sequences," *Cell, 46*:705–716 (1986).

Nabel, G. and Baltimore, D., An inducible transcription factor activates expression of human immunodeficiency virus in T cells, *Nature, 326*:711–713 (1987).

Baeuerle, P.A and Baltimore, D., "IκB: A Specific Inhibitor of the NF–κB Transcription Factor," *Science, 242*:540–546 (1988).

Baeuerle, P.A. and Baltimore, D., "Activation of DNA–Binding Activity in an Apparently Cytoplasmic Precursor of the NF–κB Transcription Factor," *Cell, 53*:211–217 (1988).

Baeuerle, P.A. and Baltimore, D., "Activation of NF–κB: A Transcription Factor Controlling Expression of the Immunoglobuli κ Light–chain Gene and of HIV," *The Control of Human Retrovirus Gene Expression*, Banbury Conference, Cold Spring Harbor, NY, pp.: 217–226 (1988).

Sen, R. and Baltimore, D., Inducibility of κ Immunoglobulin Enhancer–Binding Protein NF–κB by a Posttranslational Mechanism, *Cell, 47*:921–928 (1986).

Wall, R., et al., "A labile inhibitor blocks immunoglobulin κ–light–chain–gene transcription in a pre–B leukemic cell line," *Proc. Natl. Acad. Sci. USA, 83*:295–298 (1986).

Lenardo, M., et al., "Protein–Binding Sites in Ig Gene Enhancers Determine Transcriptional Activity and Inducibility," *Science, 236*:1573–1577 (1987).

Cross, S. L., et al., "Functionally Distinct NF–κB Binding Sites in the Immunoglobulin κ and IL–2 Receptor α Chain Genes," *Science, 244*:466–469 (1989).

Kawakami, K., et al., "Identification and purification of a human immunoglobulin–enhancer–binding protein (NF–κB) that activates transcription from a human immunodeficiency virus type 1 promoter in vitro," *Proc. Natl. Acad. Sci. USA, 85*:4700–4704 (1988).

Goodbourn, S., et al., "Human β–Interferon Gene Expression Is Regulated by an Inducible Enhancer Element," *Cell, 41*:509–520 (1985).

Bergman, Y., et al., "Two regulatory elements for immunoglobulin κ light chain gene expression," *Proc. Natl. Acad. Sci. USA, 81*:7041–7045 (1984).

Mason, J. O., et al., "Transcription Cell Type Specificity Is Conferred by an Immunoglobulin $V_H$ Gene Promoter That Includes a Functional Consensus Sequence," *Cell, 41*:479–487 (1985).

Fried, M. and Crothers, D. M., "Equilibria and kinetics of lac repressor–operator interactions by polyacrylamide gel electrophoresis," *Nucleic Acids Research, 9*(23):6505–6524 (1981).

Garner, M. M. and Revzin, A., "A gel electrophoresis method for quantifying the binding of proteins to specific DNA regions: application to components of the *Escherichia coli* lactose operon regulatory system," *Nucleic Acids Research, 9*(13):3047–3060 (1981).

Strauss, F. and Varshavsky, A., "A Protein Binds to a Satellite DNA Repeat at Three Specific Sites That Would be Brought into Mutualy Proximity by DNA Folding in the Nucleosome," *Cell, 37*:889–901 (1984).

Grosschedl, R. and Baltimore, D., "Cell–Type Specificity of Immunoglobulin Gene Expression is Regulated by at Least Three DNA Sequence Elements," *Cell, 41*:885–897 (1985).

Banerji, J., et al., "A Lymphocyte–Specific Cellular Enhancer Is Located Downstream of the Joining Region in Immunoglobulin Heavy Chain Genes," *Cell, 33*:729–740 (1983).

Queen, C. and Baltimore, D., "Immunoglobulin Gene Transcription Is Activated by Downstream Sequence Elements," *Cell, 33*:741–748 (1983).

Church, G. M., et al., "Cell–type–specific contacts to immunoglobulin enhancers in nuclei," *Nature, 313*:798–801 (1985).

Gerster, T., et al., "Cell type–specificity elements of the immunoglobulin heavy chain gene enhancer," *EMBO Journal, 6*(5):1323–1330 (1987).

Landolfi, N. F., et al., "Interaction of cell–type–specific nuclear proteins with immunoglobulin $V_H$ promoter region sequences," *Nature, 323*:548–551 (1986).

Staudt, L. M., et al., "A Lymphoid–specific protein binding to the octamer motif of immunoglobulin genes," *Nature, 323*:640–643 (1986).

Fletcher, C., et al., "Purification and Characterizaiton of OTF–1, a Transcription Factor Regulating Cell Cycle Expression of a Human Histone H2b Gene," *Cell, 51*:773–781 (1987).

Scheidereit, C., et al., "Identification and Purification of a Human Lymphoid–Specific Octamer–Binding Protein (OTF–2) That Activates Transcription of an Immunoglobulin Promoter In Vitro," *Cell, 51*:783–793 (1987).

Sassone–Corsi, P, et al., "A trans–acting factor is responsible for the simian virus 40 enhancer activity in vitro," *Nature, 313*:458–463 (1985).

Singh, H., et al., "A nuclear factor that binds to a conserved sequence motif in transcriptional control elements of immunoglobulin genes," *Nature, 319*:154–158 (1986).

Baldwin, A. and Sharp, P., et al., "Binding of a Nuclear Factor to a Regulatory Sequence in the Promoter of the Mouse H–2K^b Class I Major Histocompatibility Gene," *Mol. & Cell. Biol., 7*(1):305–313 (1987).

Mercola, M., et al., "Transcriptional Enhancer Elements in the Mouse Immunoglobulin Heavy Chain Locus," *Science, 221*:663–665 (1983).

Picard, D. and Schaffner, W., "A lymphocyte–specific enhancer in the mouse immunoglobulin κ gene," *Nature, 307*:80–82 (1984).

Mercola, M., et al., "Immunoglobulin Heavy–Chain Enhancer Requires One or More Tissue–Specific Factors," *Science, 227*:266–270 (1985).

US 6,410,516 B1

Page 3

Staudt, L., et al., "Cloning of a Lymphoid–Specific cDNA Encoding a Protein Binding the Regulatory Octamer DNA Motif," *Science, 241*:577–580 (1988).

Wu et al. (1988) Purification of the human immunodeficiency virus type 1 enhancer and TAR binding protiens EBP–1 and UBP–1, EMBO J. 7:2117–2129.*

Leonard et al. (1985) Interleukin 2 receptor gene expression in normal human T lymphocytes. Proc. Natl. Acad. Sci. USA 82:6281–6285.*

Johnston et al. (1993) Present Status and future prospects for HIV therapies. Science 260:1286–1293.*

* cited by examiner



MOPC-41 κ CHAIN GENE

## Fig. 1A



## Fig. 1B



Fig. 1C





## Fig. 2A



## Fig. 2B



Fig. 3



Fig. 4A

Fig. 4B



Fig. 5A



Fig. 5B



Fig. 6



Fig. 7





Fig. 8

# Figure 9A







# Figure 9B

# Figure 10A



# Figure 10B





Fig. 10C



Fig. 10D

# Figure 10E



# Figure 11A

# Figure 11B







Fig. 11C

# Figure 12A



Fragment: μ50
Extract (9-11μgm)

HAFTL
PD
38B9
70Z
EW
WEHI 231
AJ9
SP2-0
KR-I2
8226
RLd II
W7
EL4
BW

COS
3T3
MEL
HeLa

# Figure 12B



Fragment: μ70
Extract (9-11μg)

--
EW
C5
38B9
70Z
WEHI
SP2-0
COS
3T3
MEL
PCC4
HeLa

## Figure 13A



## Figure 13B



# Figure 13C



Extract EW/c 1 μL
Fragment Comp

| κ2 | κ2 | κ2 | κ2 | κ2 | κ2 | κ2 | κ2 | κ2 | κ2 |

- | - | M70 10ng | M70 30ng | (M60)₂ 10 | (M60)₂ 30 | (M70)₂ 20 | (M170) 60 | SV40E 50 | SV40 150

1   2   3   4   5   6   7   8   9   10

# Figure 13D



Figure 14



Fragment: κ-3 /Dde*
Extract

MPCII    —    WEHI 231    —

1    2    3    4

Figure 15A





FIGURE 15b



Fig. 16

MHC          T̄ḠḠḠḠATTCCCCA
mhc1         TGcGGATTCCCaA

κ EN         aGGGGACTttCCg
κ en         aaattAcTttCCg
                  a

SVEN         TGGGGAcTttCCA
HIV          TGGGGAcTttCCA
             aaGGGAcTttCCg

Fig. 17



```
      CTGGGGCCCCCAGAGAGGGTGGGGAGATGACACAGTTGTTCCCCCAGCCCTGGCGGGGCG
  1   ---------+---------+---------+---------+---------+---------+

      GGCAGCATGGTTCACTCCAGCATGGGGGCTCCAGAAATAAGAATGTCTAAGCCCCTGGAG
 61   ---------+---------+---------+---------+---------+---------+
                M   V   H   S   S   M   G   A   P   E   I   R   M   S   K   P   L   E

      GCCGAGAAGCAAGGTCTGGACTCCCCATCAGAGCACACAGACACCGAAAGAAATGGACCA
121   ---------+---------+---------+---------+---------+---------+
      A   E   K   Q   G   L   D   S   P   S   E   M   T   D   T   E   R   N   G   P

      GACACTAATCATCAGAACCCCCAAAATAAGACCTCCCCATTCTCCGTGTCCCCAACTGGC
181   ---------+---------+---------+---------+---------+---------+
      D   T   N   H   Q   N   P   Q   N   R   T   S   P   F   S   V   S   P   T   G

      CCCAGTACAAAGATCAAGGCTGAAGACCCCAGTGGCGATTCAGCCCCAGCAGCACCCCTG
241   ---------+---------+---------+---------+---------+---------+
      P   S   T   K   I   K   A   E   D   P   S   G   D   S   A   P   A   A   P   L

      CCCCCTCAGCCGGCCCAGCCTCATCTGCCCCAGGCCCAACTCATGTTGACGGGCAGCCAG
301   ---------+---------+---------+---------+---------+---------+
      P   P   Q   P   A   Q   P   N   L   P   Q   A   Q   L   M   L   T   G   S   Q

      CTAGCTGGGGACATACAGCAGCTCCTCCAGCTCCAGCAGCTGGTGCTTGTGCCAGGCCAC
361   ---------+---------+---------+---------+---------+---------+
      L   A   G   D   I   Q   Q   L   L   Q   L   Q   Q   L   V   L   V   P   G   H

      CACCTCCAGCCACCTGCTCAGTTCCTGCTACCGCAGGCCCAGCAGAGCCAGCCAGGCCTG
421   ---------+---------+---------+---------+---------+---------+
      H   L   Q   P   P   A   Q   F   L   L   P   Q   A   Q   Q   S   Q   P   G   L

      CTACCGACACCAAATCTATTCCAGCTACCTCAGCAAACCCAGGGAGCTCTTCTGACCTCC
481   ---------+---------+---------+---------+---------+---------+
      L   P   T   P   H   L   F   Q   L   P   Q   Q   T   Q   G   A   L   L   T   S

      CAGCCCCGGGCCGGGCTTCCCACACAGGCCGTGACCCGCCCTACGCTGCCCGACCCGCAC
541   ---------+---------+---------+---------+---------+---------+
      Q   P   R   A   G   L   P   T   Q   A   V   T   R   P   T   L   P   D   P   H

      CTCTCGCACCCGCAGCCCCCAAATGCTTGGAGCCACCATCCCACCCCGAGGAGCCCAGT
601   ---------+---------+---------+---------+---------+---------+
      L   S   H   P   Q   P   P   K   C   L   E   `P   P   S   H   P   E   E   P   S

      GATCTGGAGGAGCTGGAGCAATTGGCCCGCACCTTCAAGCAACGCCGCATCAAGCTGGGC
661   ---------+---------+---------+---------+---------+---------+
      D   L   E   E   L   E   Q   F   A   R   T   F   K   Q   R   R   I   K   L   G

      TTCACGCAGGGTGATGTGGGCCTGGCCATGGGCAAGCTCTACGCCAACGACTTCAGCCAG
721   ---------+---------+---------+---------+---------+---------+
      F   T   Q   G   D   V   G   L   A   M   G   K   L   Y   G   N   D   F   S   Q
                      C   G   P   G   H   G   Q   A   L   R   Q   R   L   Q   P   D
```

## Fig. 18A



```
      ACGACCATTTCCCGCTTCGAGGCCCTCAACCTGAGCTTCAAGAACATGTGCAAACTCAAG
781   ---------+---------+---------+---------+---------+---------+
        T  T  I  S  R  F  E  A  L  N  L  S  F  K  N  M  C  K  L  K
         D  H  F  P  L  R  G  P  Q  P  E  L  Q  E  H  V  Q  T  Q  A

      CCCCTCCTGGAGAAGTGGCTCAACGATGCAGAGACTATGTCTGTGGACTCAAGCCTGCCC
841   ---------+---------+---------+---------+---------+---------+
        P  L  L  E  K  W  L  N  D  A  E  T  M  S  V  D  S  S  L  P
         P  P  G  E  V  A  Q  R  C  R  D  Y  V  C  G  L  K  P  A  Q

      AGCCCCAACCAGCTGAGCAGCCCCAGCCTGGGTTTCGAGCCTGCCGGCCGGAGACGCAAG
901   ---------+---------+---------+---------+---------+---------+
        S  P  N  Q  L  S  S  P  S  L  G  F  E  P  A  G  R  R  R  K
         P  Q  P  A  E  Q  P  Q  P  G  F  R  A  C  M  P  E  T  Q  E

      AAGAGGACCAGCATCGAGACAAACGTCCGCTTCGCCTTAGAGAAGAGTTTTCTAGCGAAC
961   ---------+---------+---------+---------+---------+---------+
        K  R  T  S  I  E  T  N  V  R  F  A  L  E  K  S  F  L  A  N
         E  D  Q  M  R  D  K  R  P  L  R  L  R  E  E  F  S  S  E  P

      CAGAAGCCTACCTCAGAGGAGATCCTGCTGATCGCCGAGCAGCTGCACATGGAGAAGGAA
1021  ---------+---------+--------->---------+<--------+---------+
        Q  K  P  T  S  E  E  I  L  L  I  A  E  Q  L  H  M  E  K  E
         E  A  Y  L  R  G  D  P  A  D  R  R  A  A  A  H  G  E  G  S

      GTGATCCGCGTCTGGTTCTGCAACCGGCCCCAGAAGGACAAACGCATCAACCCCTGCAGT
1081  ---------+---------+--------->---------+---------+---------+
        V  I  R  V  W  F  C  N  R  R  Q  K  E  K  R  I  H  P  C  S
         D  P  R  L  V  L  Q  P  A  P  E  G  E  T  H  Q  P  L  Q  C

      GCGGCCCCCATGCTGCCCAGCCCAGGGAAGCCGGCCAGCTACAGCCCCCATATGGTCACA
1141  ---------+---------+---------+---------+---------+---------+
        A  A  P  M  L  P  S  P  G  K  P  A  S  Y  S  P  H  H  V  T
         G  P  H  A  A  Q  P  R  E  A  G  Q  L  Q  P  P  Y  G  H  T

      CCCCAAGGCGGCGCGGGGACCTTACCGTTGTCCCAAGCTTCCAGCAGTCTGAGCACAACA
1201  ---------+---------+---------+---------+---------+---------+
        P  Q  G  G  A  G  T  L  P [L] S  Q  A  S  S  S [L] S  T  T
         P  A  G  R  G  D  L  T  V  V  P  S  F  Q  Q  S  E  H  N  S
```

# Fig. 18A
## (CONTINUED)



## Fig. 18A
### (CONTINUED)



```
                                                                    ↓
     CCTCAAGGCAGCCACTCGGCTATCGGCTTGTCAGGCCTGAACCCCAGCACGGGCCCTGGC
1411 ---------+---------+---------+---------+---------+---------+
      P  Q  G  S  H  S  A  I  G  L  S  G  L  N  P  S  T  G  P  G
       S  A  Q  P  L  G  Y  R  L  V  M  P  E  P  Q  M  G  P  N  P

     CTCTGGTGGAACCCTGCCCCTTACCAGCCTTGATGGCAGCGGGAATCTGGTGCTGGGGGC
1471 ---------+---------+---------+---------+---------+---------+
      L  W  W  N  P  A  P  Y  Q  P  .
       L  V  E  P  C  P  L  P  A  L  M  A  A  G  I  W  C  W  G  Q

     AGCCGGTGCAGCCCCGGGGAGCCCTGGCCTGGTGACCTCGCCGCTCTTCTTGAATCATGC
1531 ---------+---------+---------+---------+---------+---------+
       P  V  Q  P  R  G  A  L  A  W  .

     TGGGCTGCCCCTGCTCAGCACCCCGCCTGGTGTGGGCCTGGTCTCAGCAGCGGCTGCGGG
1591 ---------+---------+---------+---------+---------+---------+

     TGTGGCAGCCTCCATCTCCAGCAAGTCTCCTGGCCTCTCCTCCTCATCCTCTTCATCCTC
1651 ---------+---------+---------+---------+---------+---------+

     ATCCTCCTCCTCCTCCACTTGCAGCGAGACGGCAGCACAGACCCTGGAGGTCCAGGGGGG
1711 ---------+---------+---------+---------+---------+---------+

     CCCGAGGCAGGGTCCAAACCTGAGTGAGGGCCAGCCATGCCTCCCCTCCCATTCCTCTGG
1771 ---------+---------+---------+---------+---------+---------+

     TCCCTGCCCCGGAATTC
1831 ---------+-------
```

Fig. 18B



Fig. 18C



Fig. 19

```
                                                 helix      turn   helix
                                               <------->       <------->
Oct-2   RRKKRTSIETNVRFALEKSFLANQKPTSEEILLIAEQLHMEKEVIRVWFCNRRQKEKRINPC
                                          *         *
a1      SPKGKSSISPQARAFLEQVFRRKQSLNSKEKEEVAKKCGITPLQVRVWFINKRMRSK
                                          *   *     *
α2      KPYRGHRFTKENVRILESWFAKNPYLDTKGLENLMKNTSLSRIQIKNWVSNRRRKEKTIT
                                                    *
pho2    QRPKRTRAKGEALDVLKRKFEINPTPSLVERKKISDLIGMPEKNVRIWFQNRRAKLRKKQ
                                              *     *
mec-3   RRGPRTTIKQNQLDVLNEMFSNTPKPSKHARAKLALETGLSMRVIQVWFQNRRSKERRLK
                                          *   *     *

cut     SKKQRVLFSEEQKEALRLAFALDPYPNVGTIEFLANELGLATRTITNWFHNHRMRLKQQV
                                          *   *     *
en      EKRPRTAFSSEQLARLKREFNENRYLTERRRQQLSSELGLNEAQIKIWFQNKRAKIKKST
                                              *     *
Antp    RKRGRQTYTRYQTLELEKEFHFNRYLTRRRRIEIAHALCLTERQIKIWFQNRRMKWKKEN
                                           *        *

            R      Q   L        Y                L       WF N R   (conserved
                                                                  residues in
                                                                  homeo-box
                                                                  family)
```

Fig. 20

# Figure 21A



## Figure 21B



# Figure 22A



## Figure 22B



# Figure 23A



# Figure 23B





Figure 24A

Figure 24B

# Figure 24C



1    2    3    4    5    6    7    8    9



Fig. 25



Fig. 26A



Fig. 26B



Fig. 27A



Fig. 27B



Fig. 27C



Fig. 28



Fig. 29



Fig. 30



## Fig. 31A



## Fig. 31B



Fig. 32



Fig. 33



Fig. 34A



Fig. 34B



Fig. 35A

Fig. 35B



Fig. 35C



Fig. 36A



Fig. 36B



Fig. 37A



Fig. 37B



## Fig. 38A



## Fig. 38B



Fig. 39



Fig. 40A

Fig. 40B



Fig. 41A                    Fig. 41B



Fig. 42A



Fig. 42B

Fig. 42C

U.S. Patent

Jun. 25, 2002

Sheet 56 of 58

US 6,410,516 B1

# Figure 43

```
AACATTGCAACCTTATAAAAAATTAACTATTTCGACAATGCCGCAGAAGGAAATTCTGTGTTTAGGTGCTGGTGGG
AAAACACTATCTCCAGCTTGTAGGTTTGAGCATCACCAGAACCACTTGATGAAATCACACACAGAACAAGTAGAGG
AGGCAACTGTGAATCGTGGGGCTATAAAGCCATCAAGGGATCTGATGAAAGAACCCGCGAGACGAACCCCCCCACC
CCCCACAACAGGATCGGCACCCCAGAGTTCAACAAGTGGCTGACTTTGTTAAAACACTACGTGGGAACCCATAGTC
CCGGATCAGTAGTTGCACAGCCCCCTCCCCGACAGACTACACCGCTGTTTGCTGATCCTTGCCCACCCCATGCTCT
CCTCCCAGGCCCCCGTTCTGCTCCTCTGTCCTGCGGCGCTGGATTGAACCGCACACAAGTCTGCATCTGGCACGAA
TTCTCATGGGAGCCACGTCATGAGGTACGTGGTTGCACACCTATCACAAGAAGTCTTGCAGTTCTGACTCTCCTGA
GCTCGGTGGGAAAGTCTGGATAGTACCTCCCCTCTCCTGCCACAAAAGCAGCCCTCACATTCACAAGTTTCCAAAG
CAGGTCTATTGAGTTTCTCTTCAGAGCGAGCCTTTGTCAAACACACCTGGAGGGGGGAGTCTCACCTCTCCCCAGC
AACTCAGATCAGTGCCTTATTTTTAATGCTCCGGCCCAATCCTGAGGTGCTGCTGGGTTTGTGGGCTGCGTTTTGT
TGAACCTCCCCCCTCCCCTCCCAACGCCCTGGCATTTGCAATTAAAACTGGGATTCAAGGGCCAAATTCAAGCCCA
GAGTGAGCAGTAGGATGTGGAGCTCAAAGCAGAGTTGCACCTGCTGACCCCCAGCCTGAATTTGGTTCACCCAGAG
ACTACAAGTCAGAAAGGCATGTTTAGAAAGAGGCATGCTAAGGACTGATGGTGGAACGGCCAATTTGTCCCCACCA
GCACAGTGGGGAAGGCTGGACAGAGAAGGAAGAGAAGGATCCATAGAGATGTGAACCAGAATCAGTCGTGTTGAGC
TCTGGGTATATCACTACATGTTTAACTCTTGCAAGACCGTTTGCCCAGGGCTTTGGTACCACAGGGTTAGAGTTAC
ATTAACCACAACCACCAGAGAGGAACTGAGGTTTATGACCCCCCCCCCCCCCAAAGGTTAGATTTCTGCCGAGTATA
                                        M  T  P  P  P  K  V  R  F  L  P  S  I

AAGGGGGGGAAGGGGGGGGTCCTTGGTTCATTTCCCTTCACTGTGTGACCGAAGTTTTGCTTTTATTTGTAAACA
K  G  G  E  G  G  G  P  W  F  I  S  L  H  C  V  T  E  V  L  L  L  F  V  N  I

TCTTGAATTACCCGTCGTTTTCCAGTCTTCATCGTGCTGTTGTCAGGCCACTGGAGGGAATTCCCCGTCTCGGAAC
   L  N  Y  P  S  F  S  S  L  H  R  A  V  V  R  P  L  E  G  I  P  R  L  G  T

GCCGCCGCCAGCACCAGCAGCCGCGCCGCGCCGCCCCGCCAGCTCCGCCGCCATGCTCAGCGCCCACCGCCCCGCC
   P  P  P  A  P  A  A  A  P  R  R  P  A  S  S  A  A  M  L  S  A  H  R  P  A
```

# Figure 43 (continued)

```
GAGCCGCCCGCCGTGGAGGGCTGCGAGCCGCCGCGCAAGGAACGGCAAGGCGGGCTGCTGCCGCCCGACGACCGCC
 E  P  P  A  V  E  G  C  E  P  P  R  K  E  R  Q  G  G  L  L  P  P  D  D  R  H

ACGACAGCGGGCTGGACTCCATGAAGGAGGAGGAGTACAGGCAGCTGGTGCGGGAGCTGGAGGACATCCGCCTGCA
  D  S  G  L  D  S  M  K  E  E  E  Y  R  Q  L  V  R  E  L  E  D  I  R  L  Q
                        ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

GCCCCGCGAGCCGCCCGCCCGGCCGCACGCCTGGGCCCAGCAGCTCACCGAGGACGGCGACACTTTTCTCCACTTG
  P  R  E  P  P  A  R  P  H  A  W  A  Q  Q  L  T  E  D  G  D  T  F  L  H  L
                                                 ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

GCGATCATTCACGAGGAAAAGGCCCTGAGCCTGGAGGTGATCCGGCAGGCCGCTGGGGACGCCGCCTTCCTGAACT
A  I  I  H  E  E  K  A  L  S  L  E  V  I  R  Q  A  A  G  D  A  A  F  L  N  F
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
        Ank. I
TCCAGAACAACCTCAGCCAGACTCCGCTCCACCTGGCGGTGATCACGGACCAGGCCGAAATCGCCGAGCACCTGCT
  Q  N  N  L  S  Q  T  P  L  H  L  A  V  I  T  D  Q  A  E  I  A  E  H  L  L
           ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                                    Ank. II
GAAGGCTGGCTGCGACCTGGATGTCAGGGACTTCCGTGGGAACACCCCGCTCCACATCGCCTGCCAGCAGGGCTCG
  K  A  G  C  D  L  D  V  R  D  F  R  G  N  T  P  L  H  I  A  C  Q  Q  G  S
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾  ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                              Ank. III
CTCCGCAGCGTCAGTGTCCTCACGCAGCACTGCCAGCCCCACCACCTCCTCGCCGTCCTGCAGGCCACCAACTACA
L  R  S  V  S  V  L  T  Q  H  C  Q  P  H  H  L  L  A  V  L  Q  A  T  N  Y  N
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾  ‾

ACGGCCATACATGTCTCCATTTGGCATCTATTCAAGGATACCTGGCTGTTGTCGAATACCTGCTGTCCTTAGGAGC
  G  H  T  C  L  H  L  A  S  I  Q  G  Y  L  A  V  V  E  Y  L  L  S  L  G  A
   ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                              Ank. IV
AGATGTAAATGCTCAGGAGCCATGCAATGGGAGAACAGCACTACACTTGGCCGTAGACCTTCAGAACTCAGACCTG
 D  V  N  A  Q  E  P  C  N  G  R  T  A  L  H  L  A  V  D  L  Q  N  S  D  L
‾                        ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                              Ank. V
```

U.S. Patent    Jun. 25, 2002    Sheet 57 of 58    US 6,410,516 B1

U.S. Patent

Jun. 25, 2002

Sheet 58 of 58

US 6,410,516 B1

## Figure 43 (continued)

```
GTGTCACTTCTGGTGAAACACGGGCCAGATGTGAACAAAGTGACCTACCAGGGCTACTCCCCATACCAGCTTACAT
 V   S   L   L   V   K   H   G   P   D   V   N   K   V   T   Y   Q   G   Y   S   P   Y   Q   L   T   W

GGGCAGAGACAACGCCAGCATACAGGAGCAGCTGAAGCTGCTGACCACAGCTGACCTGCAGATACTGCCCGAAAGT
  A   E   T   T   P   A   Y   R   S   S       354

GAGGATGAGGAGAGCAGTGAATCAGAGCCAGAGTTCACAGAGGATGAACTTATGTATGATGACTGCTGTATTGGAG
GAAGACAGCTGACATTTTAAAGCAGAGGTTTCTGTGAGAAGTGACTGTGTACATATGTATAGGAAAAAAAGCCTGA
CTTTCTTCATTTAAAAAGAAAGTCTATACTCGAAGGAGAAAAAAGTACTGAGATACTACACTGCCCAGCCAGGAGC
ACATCATGCTAACAGGTTCCATGCTCTGACCTGTACTTAAGTAACGGGATGGGATGTGTAACATCGTTAAGAGATC
AGTGAACATGCACACCATCTGATAAAGAGCCACGTTATCTAATTTCTCTGCCACATGAGGATAACGGACTGCACGT
CCAATGTGCTGTTGTCAGAAATGCGTTTGAGAGCTGCCTTGTGACACTAAGTGCTGTGAGGAGTGCTCATCCCCCT
CGGTGGCAAGACAGGCTTGCACAAACGTCCCATCTGCTTGAAGACTGTGAGGTTGGCATTAGGTTGAGGCACTGCT
GTGCCCTGCTCCCTGACCCTGGCTGCTCAGGGTTGAGGAGTCCGACCATGGGAGAGGTGACCTGGCTGCTGGGAGG
AAGGTAGCAATGATGTTAACTGTGGGCATTTGGAAACTGTGTGTTTCACACCATGTGTGTCATAATTGCTACACTT
TTTAGCAACTGTATAGAATGTAAATACTGTACATCTTTGTTTATAATTATTTTGGTACCTGTGAGATATGTATTTA
TTAAAAAAGGCAGATTTCTGTAAAAAA
```

US 6,410,516 B1

1

# NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL REGULATION

## Related Applications

This application is a division of application Ser. No. 08/418,266 filed Apr. 6, 1995, U.S. Pat. No. 5,804,374 which is a continuation of U.S. Ser. No. 07/791,898, filed Nov. 13, 1991, abandoned which is a continuation-in-part of U.S. Ser. No. 06/946,365, filed Dec. 24, 1986, abandoned and of U.S. Ser. No. 07/318,901, filed Mar. 3, 1989, abandoned and of U.S. Ser. No. 07/162,680, filed Mar. 1, 1988, abandoned and of U.S. Ser. No. 07/341,436, filed Apr. 21, 1989, abandoned and of U.S. Ser. No. 06/817,441, filed Jan. 9, 1986, abandoned and of U.S. Ser. No. 07/155,207, filed Feb. 12, 1988, abandoned and of U.S. Ser. No. 07/280,173, filed Dec. 5, 1988, abandoned. All of the above applications are incorporated herein by reference in their entirety.

## GOVERNMENT SUPPORT

The work leading to this invention was supported in part by a grant from the National Cancer Institute. The Government has certain rights in this invention.

## BACKGROUND OF THE INVENTION

Trans-acting factors that mediate B cell specific transcription of immunoglobulin (Ig) genes have been postulated based on an analysis of the expression of exogenously introduced Ig gene recombinants in lymphoid and non-lymphoid cells. Two B cell-specific, cis-acting transcriptional regulatory elements have been identified. One element is located in the intron between the variable and constant regions of both heavy and kappa light chain genes and acts as a transcriptional enhancer. The second element is found upstream of both heavy chain and kappa light chain gene promoters. This element directs lymphoid-specific transcription even in the presence of viral enhancers.

Mouse and human light chain promoters contain the octamer sequence ATTTGCAT approximately 70 base pairs upstream from the site of initiation. Heavy chain gene promoters contain the identical sequence in inverted orientation, ATGCAAAT, at the same position. This element appears to be required for the efficient utilization of Ig promoters in B cells. The high degree of sequence and positional conservation of this element as well as its apparent functional requirement suggests its interaction with a sequence-specific transcription factor but no such factor has been identified.

## DISCLOSURE OF THE INVENTION

This invention pertains to human lymphoid-cell nuclear factors which bind to gene elements associated with regulation of the transcription of Ig genes and to methods for identification and for isolation of such factors. The factors are involved in the regulation of transcription of Ig genes. The invention also pertains to the nucleic acid encoding the regulatory factors, to methods of cloning factor-encoding genes and to methods of altering transcription of Ig genes in lymphoid cells or lymphoid derived cells, such as hybridoma cells, by transfecting or infecting cells with nucleic acid encoding the factors.

Four different factors which bind to transcriptional regulatory DNA elements of Ig genes were identified and isolated in nuclear extracts of lymphoid cells. Two of the factors, IgNF-A and E, are constitutive; two IgNF-B and κ-3 (hereinafter NF-κB) are lymphoid cell specific. Each factor is described below.

2

IgNF-A (NF-A1)

IgNF-A binds to DNA sequences in the upstream regions of both the murine heavy and kappa light chain gene promoters and also to the murine heavy chain gene enhancer. The binding is sequence specific and is probably mediated by a highly conserved sequence motif, ATTTGCAT, present in all three transcriptional elements. A factor with binding specificity similar to IgNF-A is also present in human HeLa cells indicating that IgNF-A may not be tissue specific.

E Factors

The E factors are expressed in all cell types and bind to the light and heavy chain enhancers.

IgNF-B (NF-A2)

IgNF-B exhibits the same sequence-specificity as IgNF-A; it binds to upstream regions of murine heavy and kappa light chain gene promoters and to murine heavy chain gene enhancer. This factor, however, is lymphoid specific; it is restricted to B and T cells.

NF-κB (Previously Kappa-3)

NF-κB binds exclusively to the kappa light chain gene enhancer (the sequence TGGGGATTCCCA). Initial work provided evidence that NF-kB is specific to B-lymphocytes (B-cells) and also to be B-cell stage specific. NF-kB was originally defected because it stimulates transcription of genes encoding kappa immunoglobulins in B lymphocytes. As described herein, it has subsequently been shown that transcription factor NF-kB, previously thought to be limited in its cellular distribution, is, in fact, present and inducible in many, if not all, cell types and that it acts as an intracellular messenger capable of playing a broad role in gene regulation as a mediator of inducible signal transduction. It has now been demonstrated that NF-kB has a central role in regulation of intercellular signals in many cell types. For example, NF-kB has not been shown to positively regulate the human β-interferon (β-IFN) gene in many, if not all, cell types. As described below, it is now clear not only that NF-kB is not tissue specific in nature, but also that in the wide number of types of cells in which it is present, it serves the important function of acting as an intracellular transducer of external influences. NF-kB has been shown to interact with a virus inducible element, called PRDII, in the β-IFN gene and to be highly induced by virus infection or treatment of cells with double-stranded RNA. In addition, NF-kB controls expression of the human immunodeficiency virus (HIV).

As further described, it has been shown that a precursor of NF-kB is present in a variety of cells, that the NF-KB precursor in cytosolic fractions is inhibited in its DNA binding activity and that inhibition can be removed by appropriate stimulation, which also results in translocation of NF-KB to the nucleus. A protein inhibitor of NF-KB, designated IkB, has been shown to be present in the cytosol and to convert NF-KB into an inactive form in a reversible, saturable and specific reaction. Release of active NF-kB from the IkB-NF-kB complex has been shown to result from stimulation of cells by a variety of agents, such as bacterial lipopolysaccharide, extracellular polypeptides and chemical agents, such as phorbel esters, which stimulate intracellular phosphokinases. IkB and NF-KB appear to be present in a stoichiometric complex and dissociation of the two complex components results in two events: activation (appearance of NF-KB binding activity) and translocation of NF-KB to the nucleus.

Identification and Isolation of the Transcriptional Regulatory Factors

The transcription regulatory factors of the present invention were identified and isolated by means of a modified

3
4

DNA binding assay. The assay has general applicability for analysis of protein DNA interactions in eukaryotic cells. In performing the assay, DNA probes embodying the relevant DNA elements or segments thereof are incubated with cellular nuclear extracts. The incubation is performed under conditions which allows the formation of protein-DNA complexes. Protein-DNA complexes are resolved from uncomplexed DNA by electrophoresis through polyacrylamide gels in low ionic strength buffers. In order to minimize binding of protein in a sequence nonspecific fashion, a competitor DNA species can be added to the incubation mixture of the extract and DNA probe. In the present work with eukaryotic cells the addition of alternating copolymer duplex poly(dI-dC)-poly(dI-dC) as a competitor DNA species provided for an enhancement of sensitivity in the detection of specific protein-DNA complexes and facilitated detection of the regulatory factors described herein.

This invention pertains to the transcriptional regulatory factors, the genes encoding the four factors associated with transcriptional regulation, reagents (e.g., oligonucleotide probes, antibodies) which include or are reactive with the genes or the encoded factors and uses for the genes, factors and reagents. It further relates to NF-KB inhibitors, including isolated IkB, the gene encoding IkB and agents or drugs which enhance or block the activity of NF-KB or of the NF-KB inhibitor (e.g., IkB).

The invention also pertains to a method of cloning DNA encoding the transcriptional regulatory factors or other related transcriptional regulatory factors. The method involves screening for expression of the part of the binding protein with binding-site DNA probes. Identification and cloning of the genes can also be accomplished by conventional techniques. For example, the desired factor can be purified from crude cellular nuclear extracts. A portion of the protein can then be sequenced and with the sequence information, oligonucleotide probes can be constructed and used to identify the gene coding the factor in a cDNA library. Alternatively, the polymerase chain reaction (PCR) can be used to identify genes encoding transcriptional regulatory factors.

The present invention further relates to a method of inducing expression of a gene in a cell. In the method, a gene of interest (i.e., one to be expressed) is linked to the enhancer sequence containing the NF-KB binding site in such a manner that expression of the gene of interest is under the influence of the enhancer sequence. The resulting construct includes the kappa enhancer or a kappa enhancer portion containing at least the NF-KB binding site, the gene of interest, and a promoter appropriate for the gene of interest. Cells are transfected with the construct and, at an appropriate time, exposed to an appropriate inducer of NF-KB, resulting in induction of NF-KB and expression of the gene of interest.

The subject invention further relates to methods of regulating (inducing or preventing) activation of NF-KB, controlling expression of the immunoglobulin kappa light chain gene and of other genes whose expression is controlled by NF-KB (e.g., HIV).

As a result of this finding, it is now possible to alter or modify the activity of NF-κB as an intracellular messenger and, as a result, to alter or modify the effect of a variety of external influences, referred to as inducing substances, whose messages are transduced within cells through NF-κB activity. Alteration or modification, whether to enhance or reduce NF-κB activity or to change its binding activity (e.g., affinity, specificity), is referred to herein as regulation of NF-κB activity. The present invention relates to a method of

regulating or influencing transduction, by NF-κB, of extracellular signals into specific patterns of gene expression and, thus, of regulating NF-κB-mediated gene expression in the cells and systems in which it occurs.

In particular, the present invention relates to a method of regulating (enhancing or diminishing) the activity of NF-κB in cells in which it is present and capable of acting as an intracellular messenger, as well as to substances or compositions useful in such a method. Such methods and compositions are designed to make use of the role of NF-κB as a mediator in the expression of genes in a variety of cell types. The expression of a gene having a NF-κB binding recognition sequence can be regulated, either positively or negatively, to provide for increased or decreased production of the protein whose expression is mediated by NF-κB. NF-κB-mediated gene expression can also be selectively regulated by altering the binding domain of NF-κB in such a manner that binding specificity and/or affinity are modified. In addition, genes which do not normally possess NF-κB binding recognition sequences can be placed under the control of NF-κB by inserting an NF-κB binding site in an appropriate position, to produce a construct which is then regulated by NF-κB. As a result of the present invention, cellular interactions between NF-κB and a gene or genes whose expression is mediated by NF-κB activity and which have, for example, medical implications (e.g., NF-κB/ cytokine interactions; NF-κB/HTLV-I tax gene product interactions) can be altered or modified.

Genes encoding the regulatory factors can be used to alter cellular transcription. For example, positive acting lymphoid specific factors involved in Ig gene transcription can be inserted into Ig-producing cells in multiple copies to enhance Ig production. Genes encoding tissue specific factors can be used in conjunction with genes encoding constitutive factors, where such combinations are determined necessary or desirable. Modified genes, created by, for example, mutagenesis techniques, may also be used. Further, the sequence-specific DNA binding domain of the factors can be used to direct a hybrid or altered protein to the specific binding site.

DNA sequences complementary to regions of the factor-encoding genes can be used as DNA probes to determine the presence of DNA encoding the factors for diagnostic purposes and to help identify other genes encoding transcriptional regulatory factors. Antibodies can be raised against the factors and used as probes for factor expression. In addition, the cloned genes permit development of assays to screen for agonists or antagonists of gene expression and/or of the factors themselves. Further, because the binding site for NF-κB in the kappa gene is clearly defined, an assay for blockers or inhibitors of binding is available, as is an assay to determine whether active NF-κB is present.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1A is a schematic depiction of the 5' region of the MOPC 41 $V_\kappa$ gene segment; FIG. 1B is an autoradiograph of gel electrophoresis DNA binding assays with the SfaNI-SfaNI κ promoter fragment of the MOPC 41 $V_\kappa$ gene; and FIG. 1C is an autoradiograph of gel electrophoresis DNA binding assay with overlapping κ promoter fragments.

FIGS. 2A–2B show autoradiographs of binding competition analysis in nuclear extracts of human (a) EW and (b) HeLa nuclear extracts.

FIG. 3 shows the results of DNase I foot printing analysis of factor-DNA complexes.

FIG. 4A shows the nucleotide sequences of actual and putative binding sites of IgNF-A; FIG. 4B is an autoradio-

5

graph of binding assays with various DNA probes of three Ig transcriptional control elements.

FIG. 5A shows the DNA sequence of the promoter region of MODC41; FIG. 5B shows an autoradiograph of RNA transcript generalized in whole cell extracts made from human B lymphoma cell lines RAMOS and EW and from HeLa cells from the indicated templates.

FIG. 6 shows an autoradiograph of RNA transcripts from templates containing an upstream deletion.

FIG. 7 is a radioautograph of the binding of B cell nuclear extract to the MOPC-41 κ promoter region showing the IgNF-A and IgNF-B complexes.

FIG. 8 shows the binding of T cell and nonlymphoid cell nuclear extracts to the MOPC-41 κ promoter region.

FIG. 9A shows a restriction map of the μ-enhancer; FIG. 9B shows an autoradiograph binding assay carried out with μ-enhancer fragments.

FIG. 10A shows a restriction map of the μ300 fragment; FIG. 10B shows complexes formed by various subfragments of μ300; FIG. 10C is a restriction map of the relevant region; FIG. 10E and 10D show competition binding assays with the subfragment μ70.

FIG. 11A and 11B show location of binding sites in μ50 and μ70 by the methylation interference technique; FIG. 11C provides a summary of these results.

FIG. 12A and 12B show an autoradiograph of binding complexes formed with μ50 and μ70 in B-cell and non B-cell extracts.

FIG. 13A is a restriction map of κ enhancer; FIG. 13B shows an autoradiograph of binding assays with κ-enhancer fragments; FIGS. 13C and 13D show an autoradiograph of competition assays with κ-enhancer fragments.

FIG. 14 shows location of NK-κB binding by methylation interference experiments.

FIG. 15A shows binding analysis of NK-κB in various lymphoid and non-lymphoid cells; FIG. 15B shows the binding analysis of NK-κB in cells at various stages of B-cell differentiation.

FIG. 16 shows the λgt11-EBNA-1 (λEB) recombinant and the oriP probe.

FIG. 17 shows the sequence of the DNA probe used to screen for an H2TF1 and NF-κB expression.

FIG. 18A shows the nucleotide sequence of the oct-2 gene derived from cDNA and the predicted amino acid sequence of encoded proteins.

FIG. 18B shows the nucleotide sequence of the 3' terminus and predicted the amino acid sequence of the C-terminus derived from clone pass-3.

FIG. 18C is a schematic representation of the amino acid sequence deduced from oct-2 gene derived cDNA.

FIG. 19 is a schematic representation of expression plasmid pBS-ATG-oct-2.

FIG. 20 shows amino acid sequence alignment of the DNA binding domain of oct-2 factor with homeo-boxes of several other genes.

FIGS. 21A–21B show the electrophoretic mobility shift analysis of (A) extracts derived from 10Z/3 cells before and after stimulation with bacterial lipopolysaccharide (LPS) and (B) extracts derived from PD, an Abelson murine leukemia virus transformed pre-B cell line before and after stimulation with LPS.

FIGS. 22A–22B show the effect (A) of cycloheximide on LPS stimulation of 70Z/3 cells and (B) of anisomycin on LPS stimulation of 70Z/3 cells.

6

FIGS. 23A–23B show the effect of phorbol 12-myristate-13-acetate (PMA) on NF-B in 70Z/3 cells.

FIGS. 24A–24C shows the induction of NFKB in a human lymphoma and in HeLa cells.

FIG. 25 is a representation of binding sites for the NF-kB transcription factor in the immunoglobulin kappa light chain enhancer and the HIV enhancer. Boxes indicate the binding sites for NF-kB (B); other regulatory sites are referred to as E1, E2 and E3 and Spl. Dots indicate guanosine residues in the kappa enhancer whose methylation interfered with binding of NF-kB.

FIGS. 26A–26B are a characterization of the NF-kB protein. FIG. 26A represents determination of the molecular weight of NF-kB. Nuclear extract (300 ug of protein) from TPA-stimulated 70Z/3 pre-B cells was denatured and subjected to reducing SDS-polyacrylamide gel electrophoresis (SDS-PAGE). Protein in the molecular weight fractions indicated by dashed lines was eluted and renatured prior to mobility shift assays as described. A fluorogram of a native gel is shown. The filled arrowhead indicates the position of a specific protein DNA-complex only detected in the 62–55 kDa fraction with a wild type (wt) but not with a mutant (mu) kappa enhancer fragment. The open arrowhead indicates the position of unbound DNA-fragments. FIG. 26B is a representation of glycerol gradient centrifugation of NF-kB. Nuclear extract (400 ug of protein) from TPA-stimulated 70Z/3 cells was subjected to ultracentrifugation on a continuous 10–30% glycerol gradient for 20 hours at 150,000×g in buffer D(+). Co-sedimented molecular weight standards (ovalbumin, 45 kDa; bovine serum albumin, 67 kDa; immunoglobulin G, 158 kDa; thyroglobulin monomer, 330 kDa and dimer 660 kDa) were detected in the fractions by SDS-PAGE, followed by Coomassie Blue staining. The distribution of NF-kB activity was determined by electrophoretic mobility shift assays using an end-labelled kappa enhancer fragment. Fluorograms of native gels are shown. The specificity of binding was tested using a kappa enhancer fragment with a mutation in the NF-kB binding site.

FIGS 27A–27C represent detection of a cytosolic precursor of NF-kB. FIG. 27A represents analysis of subcellular fractions for NF-kB DNA-binding activity. Nuclear extracts (N), cytosolic (C) and postnuclear membrane fractions (P) from control and TPA-stimulated 70Z/3 pre-B cells were analyzed by gel-shift assays. The filled arrowhead indicates the position of the specific protein-DNA complex seen only with a wild type but not with a mutant kappa enhancer fragment. FIG. 27B represents activation of a cytosolic NF-kB precursor after treatment with dissociating agents. Subcellular fractions were treated with 25% formamide followed by dilution and addition of 0.2% sodium desoxycholate as described. FIG. 27C represents detection of a cytosolic NF-kB precursor after denaturation, SDS-PAGE and renaturation of protein. Nuclear extract (N) and cytosolic fraction (C) from unstimulated (control) 70Z/3 cells was subjected to the treatment outlined in FIG. 26A. For details of illustration, see FIG. 27A.

FIG. 28 represents analysis of subcellular fractions for DNA-binding activity of the TPA-inducible transcription factor AP-1. Equal cell-equivalents of nuclear extracts (N) and cytosolic fractions (C) from 70Z/3 and HeLa cells were used in mobility shift assays. AP-1 specific DNA-binding activity was detected using an end-labeled EcoRI-HindIII fragment from the yeast HIS 4 promoter containing three binding sites for GCN4 recognized by mammalian AP-1. The three protein-DNA complexes seen on shorter exposures of the fluorogram are indicated by filled arrowheads and the position of unbound DNA-fragment by an open arrowhead.

7                                                                          8

FIG. 29 represents results of electrophoretic mobility shift analysis of subcellular fraction of 70Z/3 cells.

FIG. 30 shows the effect of denaturation and renaturation of kB-specific DNA-binding activity in nuclear extracts and cytosolic fractions of 70Z/3 cells.

FIGS. 31A–31B show the effects of dissociating agents on the activity of NF-kB in subcellular fractions of 70Z/3 cells. FIG. 31A: cell-free activation of a NF-kB precursor in the cytosolic fraction by desoxycholate. FIG. 31B: cell-free activation of a NF-kB precursor in the cytosolic fraction by formamide and by a combined treatment with formamide and desoxycholate.

FIG. 32 shows the effect of TPA stimulation on the subcellular distribution of NF-kB in 70Z/3 cells.

FIG. 33 shows the effect of TPA stimulation on the subcellular distribution of NF-kB in HeLa cells.

FIGS. 34A–34B show results of DNA-cellulose chromatography of DOC-treated cytosol. Cytosol was prepared from unstimulated 70Z/3 pre-B cells and protein concentrations determined. In the fluorograms of native gels shown, the filled arrowheads indicate the position of the NF-kB-k enhancer fragment complex and the open arrowheads the position of unbound NF-kB. FIG. 34A: Release of DOC-independent NF-kB activity. Equal proportions of load, flow-through (FT), washings, and eluates were analyzed by EMSA, with (+) or without (−) excess DOC. The $^{32}$P-radioactivity in the NF-kB-DNA complexes was counted by liquid scintillation and the percentage of NF-kB activity recovered in the various fractions was calculated. FIG. 34B: Release of an inhibitory activity. NF-kB contained in the 0.2M NaCl fraction (31 ng of protein) or NF-kB in a nuclear extract from TPA-treated 70Z/3 cells (1.1 μg of protein) was incubated under non dissociating conditions with the indicated amounts (in microliters) of either cytosol which was DOC-treated but not passed over DNA-cellulose (lanes 4 to 6 and 13 to 15) or the flow-through fraction (referred to as NF-kB-depleted cytosol; lanes 7 to 9 and 16 to 18).

FIGS. 35A–35C shows-characterization of IkB and its complex with NF-kB. In the fluorograms shown, the filled arrowheads indicate the position of the NF-kB-DNA complex and the open arrowheads the position of free DNA probe. FIG. 35A: For size determination of IkB, the flow-through from the DNA-cellulose column was passed over a G-200 Sephadex column. Portions of fractions were incubated with NF-kB contained in nuclear extracts from TPA-stimulated 70Z/3 cells (N TPA), and analyzed by EMSA. v, void volume; P, fraction where remaining NF-kB precursor (FIG. 34A, lane 4) peaked after gel filtration as assayed with excess DOC in the absence of added NF-kB; I, fraction where the inhibiting activity peaked. FIG. 35B: The effect of trypsin treatment on the inhibiting activity of IkB. NF-kB in a nuclear extract (lane 1) was incubated with a fraction containing inhibitor (lane 2) without any addition (−; lane 3) or with bovine pancreas trypsin inhibitor (TI; lane 4), trypsin that had been incubated with BPTI (T+TI; lane 5), or with trypsin alone (T; lane 6). Samples were then used in the inhibitor assay. FIG. 35C: Glycerol gradient sedimentation of NF-kB and its complex with IkB. Nuclear extract from TPA-stimulated 70Z/3 cells (N TPA) and cytosol from unstimulated cells (C Co) were subjected to sedimentation through a glycerol gradient. Cosedimented size markers were ovalbumin (45 kD), BSA (67 kD), immunoglobulin G (158 kD) and thyroglobulin (330 and 660 kD). NF-kB activity was detected in the fractions by EMSA with a wild type k enhancer fragment (kB wt, left panels). The speci-

ficity was tested with a mutant fragment (kB mu, right panels). The inactive cytosolic NF-κB precursor (lower panel) was activated by formamide treatment (Fa; middle panel).

FIGS. 36A–36B show the reversibility and kinetics of the inactivation of NF-kB. FIG. 36A: The effect of DOC treatment on in vitro inactivated NF-kB. NF-kB contained in nuclear extracts from TPA-stimulated 70Z/3 cells (N TPA; 1.1 μg of protein) was inactivated by addition of a gel filtration fraction containing IkB (2.5 μg of protein). A duplicate sample was treated after the inhibition reaction with 0.8% DOC followed by addition of DNA binding reaction mixture containing 0.7% NP-40. Samples were analyzed by EMSA. In the fluorograms shown, the filled arrowhead indicates the position of the NF-kB-DNA complex and the open arrowhead the position of unbound DNA probe. FIG. 36B: A titration and kinetic analysis of the in vitro inactivation of NF-kB. NF-kB contained in nuclear extracts from TPA-treated 70Z/3 cells (2.2 μg of protein) was incubated with increasing amounts (0.25 to 2.25 μg of protein) of a gel filtration fraction containing IkB. After the DNA binding reaction, samples were analyzed by EMSA. The $^{32}$P-radioactivity in the NF-kB-DNA complexes visualized by fluorography was determined by liquid scintillation counting. All reactions were performed in triplicates. The bars represent standard deviations.

FIGS. 37A–37B show the specificity of IkB. Nuclear extracts from unstimulated (Co) or TPA-treated cells were incubated with 5 μl of buffer G (−) or with 5 μl of a gel filtration fraction containing IkB (+) (A, in the presence of 150 mM NaCl). After DNA binding reactions, samples were analyzed by EMSA. FIG. 37A: Influence of IkB on the DNA binding activity of various nuclear factors. The probes were: NF-kB; H2TF1, an oligonucleotide subcloned into pUC containing the H2TF1 binding site from the H-2 promoter; OCTA, an oligonucleotide subcloned into pUC containing the common binding site for the ubiquitous (upper filled arrowhead) and lymphoid-specific (lower filled arrowhead) octamer-binding proteins; NF-μE1; NF-kE2; and AP-1, EcoRI-HindIII fragment of the yeast HIS4 promoter containing three binding sites recognized by mammalian AP-1/jun. In the fluorograms shown, filled arrowheads indicate the positions of specific protein-DNA complexes. Open arrowheads indicate the positions of uncomplexed DNA fragments. FIG. 37B: Interaction of IkB with NF-kB from different cell lines. The filled arrowheads indicate the positions of the NF-kB-DNA complexes from the various cell lines and the open arrowhead indicates the position of uncomplexed DNA probe.

FIGS. 38A–38B show the presence of NF-kB in enucleated cells. FIG. 38A: Phase contrast and fluorescence microscopy of enucleated HeLa cells. From 612 cells counted on photographic prints, 63 showed nuclear staining. A representative micrograph is shown. The arrow indicates a cell that retained its nucleus. FIG. 38B: Analysis of complete and enucleated cells for NF-kB activity. Total cell extracts (1.2 μg of protein) from control (Co) and TPA-treated complete and enucleated cells were analyzed by EMSA with a labeled k enhancer fragment (kB) or HIS4 promoter fragment (AP-1), 3 μg of poly(dI-dC), 1 μg of BSA, 1.2% NP-40 and the binding buffer in a final volume of 20 μl. In lanes 5 to 8, extracts were treated with DOC followed by the addition of the DNA binding mixture to give final concentrations of 0.8% DOC and 1.2% NP-40. Samples were analyzed by EMSA. In the fluorograms shown, the filled arrowheads indicate the positions of specific protein-DNA complexes and the open arrowheads the positions of uncomplexed DNA probe.

9

FIG. **39** is a diagram showing the location of positive regulatory domain II (PRDII) within the interferon gene regulatory element (IRE) and a comparison of the nucleotide sequences of the PRDII site, κB site, and the H2TF1 site.

FIGS. **40A–40B** show the results of assays demonstrating that NF-κB binds to PRDII in vitro.

FIG. **40A** shows the results of mobility shift electrophoresis assays using as radiolabelled probe an IRE DNA fragment (IRE, lanes 1–3, 10–14, 20–24, 30 and 31), an oligonucleotide containing two copies of the PRDII sequence (PRDII$_2$, lanes 4–6) or a κB site oligonucleotide (κB, lanes 7–9, 15–19, 25–29, 32 and 33). Assays contained either no protein (φ, lanes 1, 4 and 7); 5 μg of unstimulated Jurkat nuclear extract (–, lanes 2, 5 and 8) or 5 μg of nuclear extract from Jurkat cells stimulated with PHA and PMA (+, lanes 3, 6, 9 and 10–29). Competitions used either the κB oligonucleotide (κB; lanes 10–19) or the PRDII oligonucleotide (PRD II$_2$, lanes 20–29) in the ng amounts shown above each lane. Cytosol (8 μg) from unstimulated Jurkat cells was tested either before (–, lanes 30 and 32) or following treatment with 0.8% deoxycholate (DC, lanes 31 and 33).

FIG. **40B** shows that mutations within PRDII that reduce β-IFN induction in vivo decrease the affinity of NF-κB for PRDII in vitro. IRE sequences bearing the mutations indicated (for positions refer to FIG. **39**) were tested. The mutations were previously shown to have either high (+) or low (−) inducibility. Goodbourn and Maniatis, *Proc. Natl. Acad. Sci. USA,* 85:1447–1451 (1988). Binding and competition were carried out, as described for FIG. **2A,** using 5 μg of nuclear extract from virus infected 70Z/3 cells. Competitor was 10 ng of either the wild-type (WT) or mutant (MUT) κB oligonucleotide (lanes 7,8).

FIGS. **41A–41B** demonstrate the functional interchangeability of PRDII and NF-κB in vivo.

FIG. **41A** is an autoradiogram showing the results of CAT assays of extracts prepared from L929 and S194 myeloma cells transfected with the reporter genes illustrated in FIG. **41B.**

FIG. **41B** is a diagram of the reporter genes containing multiple copies of PRDII or κB. Two or four PRDII sites [(P)$_2$ and (P)$_4$, respectively] were inserted upstream of the truncated −41 human β-globin promoter/CAT fusion gene (−41β) using an oligonucleotide containing two copies of PRDII (PRDII×2, as described in the Exemplification). Two copies of a synthetic wild-type KB site, or mutant κB site (B⁺ and B⁻, respectively) were inserted upstream of the mouse c-fos promoter/CAT fusion gene in which the promoter was truncated to nucleotide −56 (Δ56).

FIGS. **42A–42C** demonstrate that virus infection activates binding of NF-κB and gene expression in B lymphocytes and fibroblasts.

FIG. **42A** represents the results of a binding assay which shows complexes formed with the Ig κB site using 5 μg of nuclear extract from unstimulated cells (lanes 1, 9 and 17) and 5 μg (lanes 2–6, 10–14 and 18–22) or 1 μg (lanes 7, 8, 15, 16, 23 and 24) of nuclear extract from cells after virus infection. Extracts were prepared from Namalwa cells (lanes 1–8), 70Z/3 cells (lanes 7–16), and L929 cells (lanes 17–28). Competitions used either 5 or 20 ng of the wild-type (WT) or mutant (MUT)κB oligonucleotide. GTP stimulation was tested by addition directly to the binding assay to a final concentration of 3 mM. Cytosol was obtained from L929 cells either prior to (lanes 25, 26) or after (lanes 27, 28) viral treatment and tested before (−) and after (DC) treatment with deoxycholate.

FIG. **42B** presents a comparison of methylation interference footprints of virus-induced complexes from Namalwa

10

and L929 cell extracts with NF-κB complexes derived from PHA/PMA-stimulated Jurkat cells. The cleavage pattern resulting from methylation of guanine or adenine residues is shown for DNA extracted from the free probe (F) and the DNA-protein complex (B) observed following mobility shift electrophoresis. The sequence of the κB site presented at the sides and methylated residues that interfere with binding are indicated by a solid circle.

FIG. **42C** presents results of Northern blot analyses of 70Z/3 cells treated with various inducers. The upper panel shows the induction (from 0 to 20 hr as indicated) of κ (κ) mRNA by treatment with 50 ng/ml PMA (PMA, lanes 1–4), 15 μg/ml LPS (LPS, lanes 5–8) or Sendai virus (V, lanes 9–12). The lower panel shows the same blot hybridized to a β-IFN DNA fragment.

FIG. **43** is the nucleotide sequence and the amino acid sequence of IkB-α.

## CLONE DEPOSITS

Clones λ.h3 and λ.3-1 were deposited (Feb. 12, 1988) at the AMerican Type Culture Collection (12301 Parklawn Drive; Rockville, Md. 20852), under the terms of the Budapest Treaty. They were assigned ATCC Designationals 67629 and 67630, respectively. Upon issue of a U.S. patent from the subject application, all restrictions upon the availability of these clones will be irrevocably removed.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention relates to the identification, isolation and characterization of human transcriptional regulatory factors, to genes encoding the factors, methods of isolating DNA encoding transcriptional regulatory factors and the encoded factors, uses of the DNA, encoded factors, and antibodies against the encoded factors, inhibitors of the transcriptional regulatory factors. In particular, it relates to the transcriptional regulatory factor NF-kB (previously designated Kappa-3); its inhibitor; IkB, DNA encoding each, methods of altering interactions of NF-kB and IkB and methods of regulating the activity of NF-kB. As described herein, NF-kB, was initially thought to be a B-cell specific factor involved in immunoglobulin gene regulation and has since been shown to be inducible in many, if not all, cell types and to act as an intracellular transducer or mediator of a variety of external influences. The following is a description of the discovery and characterization of four transcriptional regulatory factors, assessment of the function of NF-kB and its role, in many cell types, as an intracellular mediator or transducer of a variety of external influences, discovery of the NF-kB inhibitor IkB and demonstration that NF-kB and IkB exist in the cytoplasm as a NF-kB-IkB complex whose dissociation results in activation of NF-kB and its translocation to the nucleus. The following is also a description of the uses of the genes, regulatory factors and related products and reagents.

The transcriptional regulatory factors described herein can be broadly classified as constitutive (non-lymphoid) or tissue (lymphoid) specific. All factors are believed to play a role in transcription of immunoglobulin (Ig) genes. Constitutive factors, which are present in non-lymphoid cells, may have a role in regulating transcription of genes other than Ig genes; lymphoid-specific factors might also play a role in regulating transcription of genes in addition to Ig genes.

Four transcriptional regulatory factors were identified, as described below and in the Examples. The presence of constitutive factors rendered the detection of tissue specific

US 6,410,516 B1

11

12

factors more difficult. A sensitive DNA binding assay, described below, was employed in all studies to facilitate detection of tissue specific factors.

The characteristics of the transcriptional regulatory factors IgNF-A, E, IgNFB and Kappa-3 (or NF-κB) are summarized in Table 1 below.

TABLE 1

CHARACTERISTICS OF FOUR
TRANSCRIPTIONAL REGULATORY FACTORS

| Factor Designation | Promoter | | Enhancer | | | |
|---|---|---|---|---|---|---|
| | $V_H$ | $V_k$ | $U_E$ | $K_E$ | Lymphoid | Nonlymphoid |
| IgNF-A (NF-A1) | + | + | + | − | + | + |
| E factors | − | − | + | + | + | + |
| IgNF-B (NF-A2) | + | + | + | − | + | − |
| Kappa-3 (NF-κB) | − | − | − | + | + | + |

(Column header row above: "Ig Regulatory Sequence" spans Promoter and Enhancer columns.)

Factor Ig NF-A

As indicated in Table 1, IgNF-A binds to Ig regulatory DNA elements in the region of mouse heavy and kappa light chain gene promoters and also to mouse heavy chain gene enhancer. DNAase I footprint analysis indicates that the binding is mediated by the octamer sequence (ATTTGCAT) which occurs in mouse and human light chain gene promoters approximately 70 base pairs upstream from the site of initation and in heavy chain gene promoters at about the same position (in inverted sequence).

Deletion or disruption of the IgNF-A binding site in Ig promoters significantly reduces the level of accurately initiated transcripts in vivo. See, e.g., Bergman, Y. et al. PNAS USA 81 7041–7045 (1984); Mason, J. O. et al. Cell 41 479–487 (1985). As demonstrated in Example 2, this also occurs in an in vitro transcription system. IgNF-A appears to be a positive transacting factor.

The IgNF-A binding site appears to be a functional component of the B-cell-specific Ig promoter. For example, sequences from this promoter containing the IgNF-A binding site specify accurate transcription in B-cells but not in Hela cells. IgNF-A however, may not be restricted to B-cells because a factor was detected in Hela cell extracts which generated complexes with similar mobilities and sequence specificity (as tested by competition analysis). Interestingly, the Ig octamer motif in the IgNF-A binding site has recently been shown to be present in the upstream region (about 225 bp) of vertebrate U1 and U2 snRNA genes. More importantly, this element dramatically stimulates (20 to 50 fold) transcription of U2 snRNA genes in Xenopus oocytes. Therefore, IgNF-A may be a constitutive activator protein that also functions in the high level expression of U1 and U2 snRNA genes in vertebrate cells.

The presence of an IgNF-A binding site in the mouse heavy chain enhancer suggests the additional involvement of IgNF-A in an enhancer function. It is known that deletion of an 80 bp region of the enhancer containing the putative binding site reduces activity approximately tenfold. The occupation of the binding site, in vivo, has been inferred from the fact that the G residue in the enhancer octamer is protected from dimethyl sulfate modification only in cell of the B lineage. Furthermore, IgNF-A also binds in a sequence-specific manner to the SV40 enhancer (J. Weinberger, personal communication), which contains the Ig octamer motif,

thereby strengthening the notion that the factor participates in enhancer function.

E Factors

The E factors are constitutive factors which bind to the Ig light and heavy chain enhancer.

Factor Ig NF-B

Factor IgNF-B binds to the same regulatory elements as IgNF-A. Indeed, the binding site for IgNF-B appears to be the octamer motif. In contrast to IgNF-A, IgNF-B is lymphoid cell specific. It was. found in nuclear extracts from pre-B, mature B and myeloma cell lines and in nuclear extracts from some T cell lymphomas. IgNF-B was undetectable in nuclear extracts of several non-lymphoid cells. The gene encoding Ig NF-B has been cloned (oct-2 clone below) and its nucleotide sequence has been determined (See FIG. 18a).

Factor NF-κB

NF-κB (previously referred to as Kappa-3) binds only to the Ig light chain enhancer. The binding is mediated by the sequence TGGGGATTCCCCA. The factor initially was characterized as lymphoid cell specific and also as lymphoid stage specific; that is, work showed that it is expressed only by mature B-cells. Thus, it is a marker of B cell maturation (e.g. the factor can be used to type B cell lymphomas). Additional work, described in Examples 8–15 in particular, has shown that NF-kB is an inducible factor in cells, both pre-B and non pre-B, in which it is not constitutively present (Example 8), that it is present in the cytoplasm as an inactive precursor (Examples 10 and 11), and that the inactive precursor is a complex of NF-kB and an inhibitor, referred to as IkB, which converts NF-kB to an inactive form in a reversible saturable and specific reaction. Dissociation of the complex results in activation of type B cell lymphomas). appearance of NF-kB binding activity) and translocation of the NF-kB into the nucleus.

As discussed below, it is now evident that this DNA binding protein, initially thought to be a B-cell specific factor and subsequently implicated in gene regulation in T lymphocytes, is present in many, if not all, cell types and that it acts as an important intracellular transducer or mediator of a variety of external influences. That is, NF-κB is now known to be involved in a variety of induction processes in essentially all types of cells and is thought to participate in a system through which multiple induction pathways work, in much the same manner as "second messengers" (e.g., cAMP, $IP_3$) act, resulting in transduction of a variety of extra-cellular signals into specific patterns of gene expression. Different cell types and different genes respond to this one signal, which serves as a central "control", whose activity can be altered by means of the present invention. As used, the terms altering and modifying mean changing the activity or function of NF-κB in such a manner that it differs from the naturally-occurring activity of NF-κB under the same conditions (e.g., is greater than or less than, including no activity, the naturally-occurring NF-κB activity; is of different specificity in terms of binding, etc.).

It has been shown that NF-κB participates in gene expression (e.g., cytokine gene expression) which is activated by a specific influence or extracellular signal (e.g., infection by a virus) in many, if not all types of cells. In particular, it has now been demonstrated that NF-κB has a central role in virus induction of human β-interferon (β-IFN) gene expression. Virus infection has been shown to potently activate the binding and nuclear localization of NF-κB and, in pre-B lymphocytes, to result in expression of both the β-IFN gene and the Ig kappa gene. The wide variety of cell types in which β-interferon can be induced and the divergent set of

US 6,410,516 B1

13

14

gene induction processes which involve NF-κB provide evidence that NF-κB plays a broad role in gene regulation as a mediator of inducible signal transduction.

The following is a description and exemplification of work (Example 15) which clearly demonstrates the role of NF-κB in virus-induced human β-IFN gene expression; of the evidence that there is a single NF-κB which serves many roles in many different cell types and how it acts as an intracellular messenger in a variety of different gene induction processes, particularly several which have important effects on cell physiology in health and disease; and of the use of methods and compositions of the present invention. Role of NF-κB in Cytokine Gene Regulation

The role of NFκB as a mediator or messenger in cytokine gene regulation has been demonstrated, as explained in greater detail in the Exemplification, through assessment of the viral induction of human β-IFN gene expression. The human β-IFN gene has been shown to be positively regulated by NF-κB, which was, in turn, shown to interact with a virus inducible element, called PRDII, in the β-IFN gene. As described below, NF-κB has been shown to be highly induced in lymphoid and non-lymphoid cells by either virus infection or treatment of cells with double-stranded RNA [poly (rI:rC)]. It has also been shown to bind specifically to PRDII, which is one of two positive regulatory domains of the interferon gene regulatory element (IRE) which, together with the release of a negative influence over a site called NRDI, are necessary and sufficient for virus induction of the β-IFN gene.

It is known that the human β-interferon (β-IFN) gene is highly inducible by virus or synthetic double-stranded RNA poly(rI:rC) in many, if not all, cell types. DeMaeyer, E. and J. DeMaeyer-Guignard, "Interferons and Other Regulatory Cytokines", John Wiley and Sons, New York (1988). Extensive characterization of the β-IFN gene promoter has revealed a complex arrangement of positive and negative regulatory elements. Taniguchi, T., *Ann. Rev. Immunol.,* 6:439–464 (1988). A 40 base pair DNA sequence designated the IRE (Interferon gene Regulatory Element) is both necessary and sufficient for virus induction. Goodbourn et al., *Cell,* 41: 509–520 (1985). The IRE contains two distinct positive regulatory domains (PRDI and PRDII) and one negative regulatory domain (NRDI). Goodbourn et al., *Cell,* 45:601–610 (1986); Goodbourn, S. and T. Maniatis, *Proc. Natl. Acad. Sci. USA,* 85:1447–1451 (1988). Virus induction apparently requires cooperative interactions between PRDI and PRDII. Goodbourn, S. and T. Maniatis, *Proc. Natl. Acad. Sci. USA,* 85:1447–1451 (1988). Single copies of PRDI or PRDII alone are not sufficient for virus or poly (rI:rC) induction, but two or more copies of PRDI (Fujita et al., *Cell,* 49:357–367 (1987)) or PRDII (Fan, C. M. and T. Maniatis, *EMBO J.,* 8:101–110 (1989)) confer inducibility on heterologous promoters.

The PRDII sequence binds a nuclear factor, designated PRDII-BF, that is present in extracts from both uninduced and induced MG63 cells. Keller, A. and T. Maniatis, *Proc. Natl. Acad. Sci. USA,* 85:3309–3313 (1988). A cDNA clone encoding a PRDII binding factor (designated PRDII-BF1) was isolated. DNA sequence analysis revealed that PRDII-BF1 is similar, if not identical, to a cDNA clone encoding a protein that binds to related sites in both the MHC class I H-2K[b] and the Ig κ enhancer. Singh et al., *Cell* 52:415–423 (1988). This observation suggested that PDRII might be functionally related to the H2-K[b] and κ enhancer sites.

The site in the H-2K[b] promoter is required for its constitutive and interferon-induced expression and binds a factor designated H2TF1 and possibly similar factors KBF1 and EBP-1 which are constitutively expressed in most cell types. (Baldwin, A. S. and P. A. Sharp, *Proc. Natl. Acad. Sci. USA,* 85:723–727 (1988); Yano et al., *EMBO J.,* 6:3317–3324 (1988); Clark et al., *Genes & Dev.,* 2:991–1002 (1988)). The Ig κ enhancer site, termed κB, binds NF-κB , which is required for κ enhancer function. Sen, R. and D. Baltimore, *Cell,* 46:705–716 (1986); Atchison, M. and R. P. Perry, *Cell,* 48:121–128 (1987); Lenardo, M. et al., *Science,* 236:1573–1577 (1987). The transcriptional activities and in vitro binding of the κB site and PRDII were compared and results showed that the two regulatory sequences are interchangeable in vivo, and that PRDII specifically binds NF-κB in vitro. A binding activity indistinguishable from NF-κB in nuclear extracts from virus-infected cells was also identified. Viral treatment of 70Z/3 pre-B lymphocytes induced κ gene expression as well as β-IFN gene expression. These results show that NF-κB plays an important role in the virus induction of the β-IFN gene and indicate that NF-κB acts similarly to second messenger systems in that it transduces a variety of extracellular signals into specific patterns of gene expression.

It has been shown, by all available criteria, that the κB and the PRDII DNA elements—one from the Ig κ light chain gene and one from the β-IFN gene—are interchangeable. They drive transcription of reporter genes in response to the same set of inducers, cross-compete for binding in vitro and have closely-related DNA sequences. Another indication of the identity of the two elements is that release of NF-κB from a complex with its inhibitor, I-κB, correlates with the induction of β-IFN in L929 cells and that, conversely, a β-IFN inducer (Sendai virus) induces κ gene transcription in 70Z/3 cells. This relationship is strengthened by the correlation between the ability of mutations in PRDII to decrease β-IFN gene inducibility in vivo and reduce binding to NF-κB in vitro. Evidence that double-stranded RNA induces a factor resembling NF-κB has also been recently obtained by Visvanathan, K. V. and S. Goodbourn, *EMBO J.,* 8:1129–1138 (1989).

Results described in the Exemplification strongly imply that β-IFN gene expression is activated, at least in part, by induction of NF-κB. The ability of NF-κB to be activated by a protein synthesis-independent pathway is consistent with the fact that induction of β-IFN is not blocked by cycloheximide. In fact, the β-IFN gene, like the κ gene, can be induced by cycloheximide. Ringold et al., *Proc. Natl. Acad. Sci. USA,* 81:3964–3968 (1984); Enoch et al., *Mol. Cell Biol.,* 6:801–810 (1987); and Wall et al., *Proc. Natl. Acad. Sci. USA,* 83:295–298 (1986). In addition to the interaction between NF-κB and PRDII, virus induction of β-IFN involves activation through PRDI and the release of repression at NRDI. The present data revealing a role for NF-κB in β-IFN regulation is a striking example of how it is used in many, if not all, cell types.

Evidence for the Existence of a Single NF-κB

As shown in Table 1, sites present in a variety of genes form a mobility shift electrophoretic complex which resembles NF-κB , as reported by Sen, and Baltimore, upon incubation of the Ig κ enhancer with B-cell extracts, Sen, R. and D. Baltimore, (*Cell* 46:705–716 (1986)). The biochemical evidence suggests the involvement of a single NF-κB in all cell types and not a family of factors in which individual members are specifically inducible in particular cell types.

This evidence includes the fact that purification of NF-κB to homogeneity from both human and bovine sources yields a single polypeptide chain of approximately 44 to 50 kD (although this could be a fragment of a larger protein).

US 6,410,516 B1

**15**

Kawakami et al., *Proc. Natl. Acad. Sci. USA* 85:4700–4704 (1988); and Lenardo et al., *Proc. Natl. Acad. Sci. USA,* 85:8825–8829 (1988). NF-κB adopts an oligomeric structure in solution; based on the size of the complex, it exists either as a homodimer or associates with a heterologous subunit of approximately equal molecular weight. Baeuerle, P. et al., *Cold Spring Harbor Symposium,* 53:789–798 (1988); Lenardo et al., *Proc. Natl. Acad. Sci. USA,* 85:8825–8829 (1988). NF-κB has the unique property that nucleoside triphosphates dramatically stimulate its ability to bind DNA in vitro. Lenardo et al., *Proc. Natl. Acad. Sci. USA,* 85:8825–8829 (1988). NF-κB is further distinguished by the fact that it can be released as an active binding species from an inactive cytosolic form that is completed with IκB. Baeuerle, P. and D. Baltimore, *Cell,* 53:211–217 (1988); Baeuerle, P. and D. Baltimore, *Science,* 242:540–545 (1988). All of these features are shared by the NF-κB complex irrespective of the cell-type from which it is derived.

More importantly, no differences in binding specificity have been detected between the NF-κB complexes from different cell types. That is, the NF-κB complex induced in T cells has no preference for sites from genes activated in T cells rather than those from genes activated in B cells and vice-versa. Lenardo et al., *Proc. Natl. Acad. Sci. USA,* 85:8825–8829 (1988). An identical pattern of base contacts is characteristic of complexes between DNA and NF-κB from different cell types, further decreasing the possibility that the NF-κB complex in different cell types is due to heterogeneous proteins.

It is clear that NF-κB binding sites are recognized by other obviously distinct transcription factors. The best examples are the H2-TF1 and KBF-1 proteins, which bind to an NF-κB-like site in the H2-K$^b$ MHC class I gene (Baldwin, A. S. and P. A. Sharp, *Mol. Cell. Biol.,* 7:305–313 (1987); and Yano et al., *EMBO J.,* 6:3317–3324 (1987)). However, these factors are constitutively active nuclear binding proteins in many different cell types and no evidence implicates them in inducible gene expression. Other examples include the factor EBP-1 which binds to the SV40 κB site but has a different molecular size than NF-κB and is also not inducible (Clark et al., *Genes & Development,* 2:991–1002 (1988); HIVEN86A, an 86 kD factor identified in activated T cell extracts by DNA affinity chromatography (Franza et al., *Nature,* 330:391–395 (1987)); and finally, a protein encoded by a cDNA (λh3 or PRDII-BF1) selected from λgt11 expression libraries (Singh et al., *Cell,* 52:415–523 (1988)). Recent evidence has made it unlikely that the λh3 clone encodes NF-κB because several cell types that have abundant expression of NF-κB lack the transcript for λh3. Taken together these findings indicate that there is only one NF-κB that serves multiple roles in many different cell types.

NF-κB Acts as an Intracellular Messenger

A salient feature of the induction of NF-κB is that it takes place in the absence of new protein synthesis. Sen, R. and D. Baltimore, *Cell,* 47:921–928 (1986). In fact, the protein synthesis inhibitor cycloheximide can alone activate NF-κB. Sen, R. and D. Baltimore, *Cell,* 47:921–928 (1986). It appears, therefore, that NF-κB induction involves the conversion of a pre-existing precursor into an active form.

Inactive NF-κB is complexed with a labile inhibitor protein, I-κB. Cytosolic extracts from uninduced cells can be treated in vitro with dissociating agents such as formamide and deoxycholate to unmask very high levels of NF-κB activity. Baeuerle, P. and D. Baltimore, *Cell,* 53:211–217 (1988). These treatments by and large do not

**16**

work on nuclear extracts from uninduced cells. Conversely, NF-κB activated normally in the cell is detected in nuclear but not cytosolic extracts implying a nuclear translocation step following activation in vivo. The inhibitory activity has been shown to be due to a protein of 68 kD that can be separated chromatographically from NF-κB. Baeuerle, P. and D. Baltimore, *Science,* 242:540–545 (1988). This protein is able to inhibit the binding of NF-κB but not other DNA-binding proteins and has therefore been named "I-κB" (Inhibitor-κB).

Notably, crude preparations of I-κB efficiently inhibit binding of NF-κB derived from mature B cells or other cell-types that have been induced. Baeuerle, P. and D. Baltimore, *Science,* 242:540–545 (1988). The implicaton is that activation of NF-κB involves a modification of I-κB and not NF-κB. This distinguishes NF-κB activation from a similar phenomenon involving the glucocorticoid receptor. In the latter, a direct interaction of glucocorticoid with the receptor is required to release it from a cytoplasmic complex with the heat shock protein, hsp90. Picard, D. and K. R. Yamamoto, *EMBO J.,* 6:3333–3340 (1987).

The model which ties together these observations is that NF-κB is initially located in the cytoplasm in a form unable to bind DNA because it is complexed with I-κB. Various inducers then cause an alteration in I-κB allowing NF-κB to be released from the complex. Free NF-κB then travels to the nucleus and interacts with its DNA recognition sites to facilitate gene transcription. The complex formation of NF-κB with I-κB appears to be rapidly and efficiently reversible in vitro which lends itself well to the shut-off as well as turn-on of NF-κB binding. Moreover, this model resolves a major question in signal transduction: NF-κB, like the glucocorticoid receptor, acts as a messenger to transmit the gene induction signal from the plasma membrane to the nucleus.

The model presented above is not unlike the well known role of cAMP as a second messenger in the action of many hormones; in the case of cAMP, the first messenger is the hormone itself. (see, e.g., Pastan, *Sci. Amer.,* 227:97–105 (1972)). The essential features of the cAMP model are that cells contain receptors for hormones in the plasma membrane. The combination of a hormone with its specific membrane receptor stimulates the enzyme adenylate cyclase which is also bound to the plasma membrane. The concomitant increase in adenylate cyclase activity increases the amount of cAMP inside the cell which serves to alter the rate of one or more cellular processes. An important feature of this second messenger or mediator model is that the hormone (the first messenger) need not enter the cell.

The participation of NF-κB in gene expression that is activated in specific cells by specific influences calls for a level of regulation in addition to the inducibility of NF-κB binding. How is "cross-talk" between the various paths employing NF-κB avoided? Factors acting upon other sequences within a transcriptional control element appear to govern the response to the NF-κB signal, as described herein for β-IFN. Studies of β-IFN expression have shown that virus induction works through three events: two virus-inducible positive signals, one of which is NF-κB, and the release of a single negative regulator. The two positive signals work through distinct DNA sites (PRDI and PRDII), but must act together to facilitate transcription. Either site alone is not inducible.

The theme of multiple signals that generate specificity is further supported by studies of the Ig κ gene and the IL-2 receptor gene. The NF-κB site from the κ light chain enhancer alone on a short oligonucleotide will stimulate

US 6,410,516 B1

17
18

transcription in B and T lymphocytes as well as in non-lymphoid cells. Pierce, J. W. et al., *Proc. Natl. Acad. Sci. USA,* 85:1482–1486 (1988). Its function depends solely on the presence of NF-κB. By contrast, the entire κ enhancer is inducible only in B lymphocytes and is unresponsive to NF-κB in other cell types. The restricted response to NF-κB by the κ enhancer has now been attributed to a repressor sequence. The repressor sequence resides in the enhancer some distance away from the NF-κB binding site and acts to suppress transcriptional effects of NF-κB in non-B cell types. The activation of the IL-2 receptor gene specifically in T lymphocytes is attained by a slightly different means. Full induction of this gene depends on NF-κB as well as a positively-acting sequence immediately downstream. The downstream element has now been found to bind a T cell specific protein called NF-ILT. Though NF-ILT is not itself inducible, its presence only in T cells seems to contribute to T cell specific induction of the IL-2 receptor gene.

Role of NF-κB in Other Inducible Systems

Recently, NF-κB has been implicated in several other inducible systems. For example, NF-κB is induced in T-cells by a trans-activator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-2 receptor α gene and possibly the IL-2 gene. Bohnlein et al., *Cell,* 53:827–836 (1988); Leung, K. and G. Nabel, *Nature,* 333:776–778 (1988); Ruben et al., *Science,* 241:89–92 (1988); Cross et al., *Science,* (1989); and Lenardo et al., *Proc. Natl. Acad. Sci. USA,* 85:8825–8829 (1988). NF-κB also appears to take part in gene activation during the acute phase response of the liver. Edbrooke et al., (1989). Results described here suggest that inducibility of NF-κB plays a prominent role in interactions between cytokines. IL-1 and TNF-α activate NF-κB binding and both have been shown known to induce β-IFN. Osborn et al., *Proc. Natl. Acad. Sci. USA,* 86:2336–2340 (1989); and DeMaeyer, E. and J. DeMaeyer-Guignard, "Interferons and Other Regulatory Cytokines", John Wiley and Sons, New York (1988). Finally, NF-κB has been shown to play a role in the transcription of human immunodeficiency virus (HIV). Nabel, G. and D. Baltimore, *Nature,* 326:711–713 (1987). Significantly, herpes simplex virus has recently been shown to increase HIV LTR transcription through NF-κB/core sequences. Gimble et al., *J. Virol.,* 62:4104–4112 (1988). Thus, NF-κB induction may lead to the propagation of HIV in cells infected with other viruses.

NF-κB is unique among transcription regulatory proteins in its role as a major intracellular transducer of a variety of external influences in many cell types. In the cases studied thus far, it appears that the actual target of induction is I-κB, which becomes modified to a form that no longer binds to NF-κB. Baeuerle, P. and D. Baltimore, *Science,* 242:540–545 (1988). The released NF-κB then displays DNA binding activity and translocates to the nucleus.

Role of NF-κB in HIV Expression

Treatment of latently HIV-infected T-cells with phorbol ester (12-O-tetradecanoylphorbol 13-acetate; TPA) and with phytohaemaglutinin (PHA) results in the onset of virus production. Harada, S. et al., *Virology,* 154:249–258 (1986); Zagury, D. J. et al., *Science,* 232:755–759 (1986). The same treatments induce NF-kB activity in the human T-lymphoma cell line Jurkat. Sen, R. and D. Baltimore, *Cell,* 47:921–928 (1896). This correlation and the finding that two NF-kB binding sites are present upstream of the transcriptional start site in the HIV enhancer, (FIG. 25) suggested a direct role for NF-kB in the activation of the viral enhancer, an event ultimately leading to the production of virus. Nabel, G. and D. Baltimore, *Nature,* 326:711–713 (1987). This possibility was tested by transient transfection of a plasmid containing

an HIV LTR-controlled CAT gene into a human T-lymphoma cell line. Nabel, G. and D. Baltimore, *Nature,* 326:711–713 (1987). The viral cis-acting elements rendered the transcriptional activity of the CAT gene responsive to TPA/PHA treatment of cells. This inducible transcriptional stimulation of the CAT gene was completely dependent on intact binding sites for NF-kB in the HIV enhancer because mutation of the two binding sites abolished inducibility. A protein-DNA complex with a fragment of the HIV enhancer containing the two NF-kB binding sites was observed in mobility shift assays only with nuclear extracts from TPA/PHA-stimulated T-cells and not with control extracts. These observations provided strong evidence that HIV expression in latently infected T-cells is induced by the same transcription factor that regulates kappa gene expression, NF-kB. A precursor of NF-kB is constitutively present in T-cells. Its activity can be induced by a treatment that mimicks antigenic T-cell activation and, after induction, NF-kB is able to bind to and subsequently enhance the activity of HIV transcriptional control elements. Thus, it is reasonable to conclude that NF-kB is the physiological transactivator responsible for initial expression of dormant HIV-DNA following stimulation of T-lymphocytes.

Other factors have also been implicated in the control of HIV expression including the HIV-encoded tat-III protein, the cellular transcription factor Spl, and viral proteins encoded by the ElA gene of adenovirus and the ICPO gene of the Herpes Simplex Virus. Muesing, M. A. et al., *Cell,* 48:691–701 (1987); Jones, K. A. et al., *Science,* 232:755–759 (1986); Gendelman, H. E. et al., *Proc. of the Natl. Acad. of Sc., USA,* 83:9759–9763 (1986); Nabel, G. J. et al., *Science* (1988); Rando, R. F. et al., *Oncogene,* 1:13–19 (1987); Mosca, J. D. et al., *Nature,* 325:67–70 (1987). It is doubtful whether the tat-III and Spl proteins are responsible for an initial induction of HIV expression. Although the tat-III protein functions as a strong positive feedback regulator of HIV expression, full expression of the tat-III protein appears to depend on NF-kB. Muesing, M. A. et al., *Cell,* 48:691–701 (1987); Nabel, G. and D. Baltimore, *Nature,* 326:711–713 (1987). It is unlikely that Spl initiates HIV expression because it is constitutively active. Dynan, W. S. and R. Tjian, *Cell,* 32:669–680 (1983). The viral ElA and ICPO gene products might lead to induction of HIV expression. This, however, is independent of T-cell activation by antigenic stimulation and of NF-kB, as shown by cotransfection experiments into human T-lymphoma cells of plasmids with an HIV enhancer-controlled CAT gene and plasmids encoding the viral genes. The increase in CAT activity induced by the viral gene products was unchanged when the NF-kB binding sites in the HIV enhancer were inactivated by mutation.

Improved DNA Binding Assay with Enhanced Sensitivity for Identification of Regulatory Factors

The transcriptional regulatory factors described above were identified in extracts of cellular nuclear protein by means of an improved gel electrophoresis DNA binding assay with enhanced sensitivity. This improved assay is a modification of an original assay based on the altered mobility of protein-DNA complexes during gel electrophoresis. In the improved assay of this invention, the simple alternating copolymer, duplex poly(dI-dC)-poly(dI-dC) was used as the competitor DNA species. The use of this copolymer as competitor resulted in an enhancement of sensitivity for detection of specific protein-DNA complexes. The original assay has been extensively employed in equilibrium and kinetic analyses of purified prokaryotic gene regulatory proteins. See, e.g., Fried, M. and Crothers, D. M.,

US 6,410,516 B1

19

*Nucleic Acid Res.* 9 6505–6525 (1981); Garner, M. M. and Revzin A., *Nucleic Acids Res.* 9 3047–3060 (1981). More recently it has been used to identify and isolate a protein that binds to satellite DNA from a nuclear extract of eukaryotic cells (monkey cells). See Strauss, R. and Varshavsky, A., *Cell* 37 889–901 (1984). In the latter study an excess of heterologous competitor DNA (*E. coli*) was included with the specific probe fragment to bind the more abundant, sequence non-specific DNA binding proteins in the extract.

The assay is performed essentially as described by Strauss and Varshavky, supra, except for the addition of the poly (dI-dC)-poly(dI-dC). An extract of nuclear protein is prepared, for example, by the method of Dingnam, J. D. et al., *Nucleic Acids Research* 11:1475–1489 (1983). The extract is incubated with a radiolabeled DNA probe (such as an end-labeled DNA probe) that is to be tested for binding to nuclear protein present in the extract. Incubation is carried out in the presence of the poly(dI-dC)-poly(dI-dC) competitor in a pysiological buffer. DNA protein complexes are resolved from (separated from) free DNA probes by electrophoresis through a polyacrylamide gel in a low ionic strength buffer and visualized by autoradiography.

In a preferred embodiment of the method, protein samples (about 10 $\mu$g protein) are incubated with approximately 10,000 cpm (about 0.5 ng ) of an end-labeled $^{32}$P double-stranded DNA probe fragment in the presence of about 0.8–4 ng poly(dI-dC)-poly(dI-dC) (Pharmacia) in a final volume of about 25 $\mu$l. Incubations are carried out at 30° for 30–60 minutes in 10 mM Tris HCl (pH 7.5), 50 mM NaCl, 1 mM DTT, 1 mM EDTA. Protein-DNA complexes are resolved on low-ionic strength polyacrylamide gels. Samples are layered onto low ionic-strength 4% polyacrylamide gels (0.15×16 cm; acrylamide:bisacrylamide weight ratio of 30:1). Gels are pre-electrophoresed for about 30 min at 11 V/cm in buffer consisting of 6.7 mM TrisHCl, (pH 7.5), 3.3 mM NaOAc, and 1 mM EDTA. Buffer is recirculated between compartments. Gels are electrophoresed at the same voltage at room temperature, transferred to Whatman 3MM, dried and autoradiographed.

The enhanced sensitivity of the assay of the present invention is evident in the initial work which led to identification of the factor IgNF-A. A radiolabelled SfaNI-SfaNI DNA fragment derived from the upstream region of the MOPC 41 κ light chain gene (FIG. 1*a*) was incubated with a nuclear extract of a human B cell line, in the absence or in the presence of *E. coli* chromosomal DNA or poly(dI-dC)-poly(dI-dC). The resulting complexes were resolved from the free fragment by electrophoresis through a low ionic strength, non-denaturing polyacrylamide gel and visualized by autoradiography (FIG. 1*b*). In the absence of competitor DNA, all of the labeled fragment was retained at the top of the gel (lane 1), probably due to the binding of an excess of non sequence-specific proteins. With addition of increasing amounts of either poly(dI-dC)-poly(dI-dC) (lanes 2–6) or *E. coli* chromosomal DNA (lanes 7–11) as competitors, puta-tive protein-DNA complexes which migrated slower than the free fragment were detected. The relative abundance of the major species of complex (B) as well as that of minor species was significantly greater in the presence of the alternating copolymer competitor DNA.

The use of a sensitive gel electrophoresis DNA binding assay in conjunction with the copolymer competitor poly (dI-dC)-poly(dI-dC) facilitated the identification of the regu-latory factors described herein. The simple alternating copolymer probably competes less effectively than heterolo-gous DNA sequences for binding of a sequence-specific factor, thereby significantly increasing the sensitivity of the

20

assay. The assay has general applicability for elucidation of mammalian gene regulatory proteins.

A further increase in sensitivity in this assay is obtained by the use of small DNA probes (about 100 bp or less) which minimize non-specific binding interactions in a crude extract. (See Example 1).

Employing this assay, binding competition tests can be performed to analyze the sequence specificity of protein-DNA interactions. For this purpose, an unlabeled DNA fragment to be examined for competitive binding to the protein factor can be added to the incubation mixture of protein extract and labeled DNA probe (along with the poly(dI-dC)-poly(dI-dC)). The disappearance of protein-DNA probe complex, or its diminishment, indicates that the unlabeled fragments compete for binding of the protein factor. In addition, relative binding affinity of the protein to a probe sequence can be assessed by examining the ability of a competitor to displace the protein at varying concen-trations.

In conjunction with the competition assays, DNase I footprint analysis (see Galas, D. and Schmitz A., *Nucl. Acids Res.* 5 3157–3170 (1978) and Example 1) and methy-lation interference experiments (See, e.g., Ephrussi, A. et al., *Science* 227:134–140 (1985) can be used to refine analysis of the binding domain of the protein factors.

Assessment of the Functional Role of Factors Described Herein in Regulation of Transcription

The functional role of the factors in the regulation of the transcription can be assessed in several ways. A preferred technique for lymphoid cell factors entails the use of the in vitro transcription system developed from cells of lymphoid cell lineage. This system is described in detail in the Example 2. The function of a factor can be indirectly assessed in this system by employing as templates for transcription, nucleotide sequences from which the binding domain of the factor has been deleted. As has been noted above, deletion of the upstream sequence located between −44 and −79 bp from the cap site of the MOPC41 κ gene disrupts transcriptions in this system (This has also been noted in in vivo systems). The deleted region includes the IgNF-A binding site. This indicates that transcription of the template is dependent upon the factor—binding site and, inferentially, upon the factor itself.

A direct way to assess the function of the factors is to show that transcription can be modulated by removal and replacement of the factor in the in vitro transcription system with an appropriate template. For example, the intact MOPC41 κ promoter gene can be used as a template in the in vitro system described and transcription of this template can be assessed in the presence and absence of a factor (for instance, NF-κB, a lymphoid specific factor). The factor can be removed from the lymphoid cell extract by chromato-graphic fractionation and then replaced. If the level of transcription is diminished in the absence and restored by replacement of the factor, a direct indication of the factors involvement in transcription is provided.

In an alternative approach, antisera or monoclonal anti-body can be raised against a purified or enriched preparation of the factor. The antibody can be used to probe for expres-sion of the factor in a library of cDNA of cells known to express the factor.

Cloning of Genes Encoding Sequence-Specific DNA Bind-ing Proteins, Particularly Genes Encoding Transcriptional Regulatory Factors

Genes encoding transcriptional regulatory factors can be isolated by a novel method for cloning genes that encode sequence-specific DNA binding proteins. The method

US 6,410,516 B1

21

involves screening a library of recombinant expression vectors for expression of the factor with a DNA probe comprising the recognition (binding) site for the factor. Expression of the factor is identified by the presence of complex between the DNA probe and the expressed binding protein. The approach has general applicability to the cloning of sequence-specific DNA binding proteins.

According to the method, an expression library is created by inserting DNA (e.g., cDNA from a cell which expresses the sequence specific binding protein) into an appropriate expression vector to establish an expression library. A preferred expression vector is the bacteriophage λgt11 which is capable of expressing foreign DNA inserts within E. coli. See e.g., Young, R. A. and Davis, R. W. in Genetic Engineering: Principles and Techniques, vol 7 (eds Setlow, J. & Hollaender, A.) 29–41 (Plenum, New York 1985). Alternatively, plasmid vectors may be used.

The expression library is screened with a binding-site DNA probe. The probe comprises the DNA sequence recognized by the binding protein, such as an appropriate transcriptional regulatory element (e.g., the octamer or κ-element). In preferred embodiments, the probe is less than 150 bp in length, to reduce nonspecific binding. The probe can be an oligomer of the binding site. Multiple copies of the site provide for multiple protein binding to the probe. The DNA probe is generally detectably labeled DNA. A particularly useful label is $^{32}P$.

In the present method, the binding site probe is incubated with host cell protein under conditions which allow the probe to complex with the any cognate binding protein expressed in the cell. The formation of such complexes is determined by detecting label associated with the protein. In a preferred mode, the screening is performed by generating a replica of host cell lysates and by screening the replicated protein with the probe. For example, when the bacteriophage λgt11 is used, recombinant viruses are plated in arrays onto a lawn of E. coli and a replica of the resulting viral plaques is made by transferring plaque protein onto an appropriate adsorbtive surface (e.g. protein replica filters). The adsorbed plaque protein is contacted with the probe under conditions which permit the formation of complexes between adsorbed protein and the probe. The replica is then washed to remove unbound probe and then examined for associated label. The protein can be examined autoradioghraghically for the presence of label.

In other embodiments, a nonspecific competitor DNA can be used along with the recognition site probe, to reduce nonspecific binding to the probe. Examples of such nonspecific competitor DNA include poly (dI-dC)·poly(dI-dC) and denatured calf thymus DNA. In addition, the protein-probe complexes can be stabilized covalently for detection, for example, by uv irradiation.

This method of screening for sequence specific binding proteins is dependent, inter alia, upon:

i) the functional expression of the binding domain of the desired binding protein in the host cell;

ii) a strong and selective interaction between the binding domain and the DNA probe; and

iii) a sufficiently high level of expression of the binding protein.

These parameters can be optimimized for different proteins by routine experimentation. Some factors relevant to such optimization are discussed in detail in the exemplification of the cloning of transcriptional regulatory factor NF-κB given below.

Other modes of cloning genes encoding sequence-specific DNA binding proteins, such as genes encoding transcrip-

22

tional regulatory factors, may be used. For example, the factor can be purified chromatographically by, for example, ion exchange, gel filtration and affinity chromatography or combinations thereof. Once the factor is sufficiently purified, it can be partially sequenced and from the sequence information, oligodeoxy-nucleotide probes can be made and used to identify the gene encoding the factor in a cDNA library.

Occurrence and Activation of NF-kB and Demonstration of the Role of an NF-kB Inhibitor (IkB)

The following is a description of the occurrence and activation of NF-kB in cells which do not express k immunoglobulin light chain genes (and, in which NF-kB is not evident in either cytoplasmic or nuclear fractions). In particular, the following is a description of localization of NF-kB in the cytosolic fraction; of activation of NF-kB in cytosolic fractions by dissociating agents; of redistribution of NF-kB into the nuclear fraction upon TPA stimulation; of demonstration of the appearance of NF-kB binding ability; and of the occurrence and characterization of an NF-kB inhibitor.

NF-kB Occurrence and Activation in 70Z/3 Cells

NF-kB is Virtually Undetectable in Unstimulated 70Z/3 Cells

To determine where in the cell NF-kB or its inactive precursor are located, subcellular fractions from control and TPA-stimulated 70Z/3 cells were analyzed for kB-specific DNA-binding activity. Nuclear extracts, cytosolic and postnuclear membrane fractions were analyzed at equal amounts of protein in an electrophoretic mobility shift assay, described in Example 1, followed by fluorography. (Sen, R. and D. Baltimore, Cell, 46:705–716 (1986). The specificity of protein-binding to a fragment of the kappa light chain enhancer was controlled by using a fragment with a mutation in the binding motif for NF-kB. This mutation has been shown to prevent binding of NF-kB. Lenardo, M. et al., Science, 236:1573–1577 (1987). Thus, any complexes formed on the wild type, but not on the mutant fragment, are considered specific for the NF-kB site.

Nuclear extracts from control cells contained very little kB-specific binding activity (FIG. 29, compare lanes 1 and 7). This is in agreement with results reported previously by Sen and Baltimore. Sen, R. and D. Baltimore, Cell, 46:705–716 (1986); Sen, R. and D. Baltimore, Cell, 47:921–928 (1986). Similarly, the ctyosolic fraction produced only a faint, but specific and reproducible, signal co-migrating with the signal from the nuclear extract (FIG. 29, compare lanes 2 and 8). The fraction containing postnuclear membranes did not exhibit any detectable DNA-binding activity (FIG. 29, lane 3).

Upon treatment of cells with TPA for 30 minutes, the nuclear NF-kB activity was dramatically increased (FIG. 8, compare lanes 4 and 10). Almost no increase of the specific signal in the cytosolic fraction was observed (FIG. 29, compare lanes 5 and 11). The post-nuclear membrane fraction gave raise to an apparently kB-specific complex with a mobility higher than that formed by nuclear NF-kB (FIG. 29, compare lanes 6 and 12). None of the fractions had inhibitors of binding because added authentic NF-kB was fully recovered in all fractions, indicating that the results reflect a true activation of binding specificity.

NF-kB is Detectable in the Cytosolic Fraction after Denaturation and Renaturation

To examine whether active NF-kB might be present but masked in fractions from unstimulated 70Z/3 cells, proteins from nuclear extracts and cytosolic fractions of control and TPA-stimulated cells were precipitated, denatured by boil-

US 6,410,516 B1

23

ing in SDS plus 2-mercaptoethanol and fractionated by electrophoresis through SDS-polyacrylamide gels. 300 ug of protein of nuclear extracts (N) and cytosolic fractions (C) from control (Co) and TPA-stimulated cells (TPA) were subjected to reducing SDS-polyacrylamide gel electrophoresis. Proteins eluted from different molecular weight fractions of the gel (i.e., corresponding to approximately 70–62 kDa (gel slice No. 6), 62–55 kDa (gel slice No. 7) and 55–48 kDa (gel slice No. 8)) were subjected to a renaturation protocol after removal of SDS. Hager, D. A. and R. R. Burgess, *Anal. Biochem.,* 109:76–86 (1980) and Example 10. Renatured fractions were tested for kB-specific DNA-binding activity in mobility shift assays using wild type and mutant kappa light chain enhancer fragments. DNA-binding reactions were performed with 11 ul of the renatured fractions in the presence of 80 ng poly(d[I-c]) in a final volume of 15 ul. Assays with wild type (WT) and mutant (mu) k enhancer fragments were loaded in adjacent lanes.

In nuclear extracts from TPA-stimulated cells, NF-kB activity was exclusively found in a molecular weight region of 62–55 kDa. The efficiency of renaturation of the nuclear NF-kB activity was about one percent. In FIG. **30**, the active and two adjacent fractions are shown for the nuclear extract from TPA-stimulated cells (lanes 13 to 18). In nuclear extracts from control cells, much less NF-kB activity was found in the same molecular weight fraction after renaturation (FIG. **30**, lanes 3 and 4). Both the cytosolic fractions from control and TPA-stimulated cells, however, gave rise to a strong NF-kB-specific signal (FIG. **30**, lanes 9, 10 and 21, 22). The specificity of the signal was shown by several criteria. First, it was only present when the wild type, but not the mutant, DNA fragment was used in mobility shift assays (FIG. **30**, lanes 9, 10 and 21, 22). Second, it was generated with protein eluted from the same molecular weight fraction that contained authentic nuclear NF-kB. Third, upon mixing, the complex formed by the putative cytoplasmic NF-kB co-migrated exactly in native polyacrylamide gels with the complex formed by interaction of the nuclear form of NF-kB with its cognate DNA.

Assuming that NF-kB from the various fractions had a similar recovery and efficiency of renaturation, the data suggest that significant amounts of NF-kB can be activated in unstimulated 70Z/3 cells by denaturation, followed by fractionation and renaturation. Furthermore, in unstimulated cells, the in vitro activated NF-kB activity was almost exclusively recovered in the cytosolic fraction.

The subcellular distribution of two noninducible DNA-binding proteins, NF-uE3 and the octamer-binding protein were also examined in mobility shift assays, in order to determine whether other DNA-binding factors also partition into cytoplasmic fractions. Sen, R. and D. Baltimore, *Cell,* 46:705–716 (1986); Singh, H. et al., *Nature,* 319:154–158 (1986); and Staudt, L. M. et al., *Nature,* 323:640–643 (1986). The vast majority of both DNA-binding activities was found in nuclear extracts; cytosolic and postnuclear membrane fractions contained only very little activities (FIG. **29**, lanes 13 to 24). No significant change in the complex formation by the two factors was observed when fractions from control and TPA-stimulated cells were compared. Thus, although subcellular fractionation can produce artificial redistribution of proteins, the fractions used in this study do well reflect nuclear localization of a number of DNA-binding proteins.

NF-kB in the Cytosolic Fraction Can be Activated by Dissociating Agents

The ability to reveal cytosolic NF-kB by simply denaturation and renaturation suggested that NF-kB might be bound

24

to an inhibitor and therefore several compounds that might dissociate protein complexes were tested for their ability to directly activate kB-specific DNA-binding activity in fractions of 70Z/3 cells. The cytosolic fraction from unstimulated cells and, as a control, the nuclear extract from TPA-treated cells were incubated with the compounds prior to electrophoretic separation of the protein-DNA complexes. Incubation of the cytosolic fraction with 0.2% sodium desoxycholate (DOC) (in the presence of 0.2% NP-40) resulted in the activation of DNA-binding activity (FIG. **31**, lane 2). The induced complex had the same mobility in native gels as the one formed by nuclear NF-kB. It appeared to be specific for the kB site of the kappa light chain enhancer because it was not formed when the mutant fragment was used in the mobility shift assay (FIG. **31**, lane 21). Higher concentrations of DOC led to the inactivation of the newly activated kB-binding activity (FIG. **31**, lanes 3 to 5) as well as of the authentic nuclear factor (FIG. **31**, lanes 13 to 15).

DOC can be sequestered out of a solution by the addition of excess nonionic detergent, presumably by inclusion of the DOC into micelles formed by the nonionic detergent. When treatment of the cytosolic fraction with up to 0.8% DOC was followed by the addition of 1% of the nonionic detergent NP-40, a quite efficient activation of the cytosolic kB-binding activity was achieved (FIG. **31**, lanes 7 to 9). The DNA-binding activity of in vivo activated NF-kB from nuclear extracts was not significantly increased at low concentrations of DOC (FIG. **31**, lanes 11, 12 and 16, 17). Elevated concentrations of DOC showed inhibitory effects on the DNA-binding activity of TPA-activated NF-kB that paralleled those observed for the in vitro activated kB-binding activity (FIG. **31**, compare lanes 3, 4, 5 with lanes 13, 14, 15 and lanes 9, 10 with lanes 19, 20).

A partial activation of the cytosolic kB-binding activity was observed after treatment of the cytosolic fraction with 27% formamide followed by dilution (FIG. **31**, lane 7). With the further addition of 0.2% DOC—a condition that alone also leads only to partial activation (FIG. **31**, lane 3)—a very potent activation was observed (FIG. **31**, lane 11). A titration showed that formamide and DOC activated in a synergistic manner (FIG. **31**, lanes 2 to 11). The DNA-binding activity of in vivo activated NF-kB from nuclear extracts was not enhanced by any of the treatments (FIG. **31**, lanes 13 to 22). On the contrary, partial inhibition of DNA-binding of NF-kB was observed under some conditions.

No in vitro activation of NF-kB was achieved by treatment with guanidinium hydrochloride (between 0.3 and 3M), urea (between 0.5 and 5M), and SDS (between 0.1 and 1%), in the presence of 0.2% NP-40). Exhaustive dialysis of the cytosolic fraction using dialysis membranes with a cut-off of 25 kDa did not lead to an activation of DNA-binding activity. In the dialyzed fraction, NF-kB-activity could still be efficiently induced by formamide/DOC treatment, suggesting that no freely diffusible cofactors smaller than 25 kDa were required for the in vitro activation.

TPA Stimulation Causes Redistribution of NF-kB into the Nuclear Fraction

To examine whether the form of NF-kB detected after in vitro activation in the cytosolic fraction could quantitatively account for the NF-kB found in nuclear extracts after TPA stimulation of cells, subcellular fractions of 70Z/3 cells were reinvestigated in mobility shift assays after treatment with formamide and DOC using equal cell-equivalents of subcellular fractions. Equal cell-equivalents of nuclear extracts (N) and cytosolic (C) and post-nuclear membrane fractions (P) from control (Co) and TPA-stimulated cells (TPA) were

US 6,410,516 B1

25

left untreated (lanes 1–6 and 13–18) or subjected to a formamide/desoxycholate treatment (Fa+DOC; lanes 7–12 and 19–24; for conditions see FIG. 31, lane 11). This treatment was preferred over the DOC/NP-40 chase treatment because it gave a higher resolution of bands in mobility shift assays. DNA-binding reactions were performed in the presence of 3.2 ug poly(d[I-C]) using 4.4 ug of protein from nuclear extracts, 8.8 ug of protein from cytosolic fractions or 2.2 ug of protein from postnuclear membrane fractions (all in 4 ul buffer D(+)). Fluorograms of native gels are shown. The specificity of protein-DNA complexes was controlled using wild type (kB wt) and mutant kappa enhancer fragments (kB mutant; see legend to FIG. 29). The filled arrowhead indicates the position of kB-specific protein-DNA complexes and the open arrowhead the positions of unbound DNA-fragments.

Densitometric scanning of fluorograms showed that in control cells, more than 92% of the total cellular kB-specific DNA-binding activity was recovered in the cytosolic fraction following treatment with formamide and COD (FIG. 32, lanes 7 to 9). In TPA-stimulated cells, 80% of the kB-specific DNA-binding activity was found in nuclear extracts (FIG. 32, lanes 10 to 12). The remaining activity was largely recovered in the cytosolic fraction (FIG. 32, lane 11). All DNA-binding activities described were specific for the kB site, as shown by their absence when the mutant kappa enhancer fragment was used in the mobility shift assays (FIG. 32, lanes 13 to 24).

When the total cellular NF-kB activity that was activated in vitro in control cells was compared to the total cellular activity found in TPA-stimulated cells after the same treatment, virtually identical amounts of activity were observed. The equal amounts of NF-kB activity found in control and TPA-treated cells suggest that the treatment with formamide and DOC resulted in the complete conversion of an inactive precursor of NF-kB into a form of NF-kB with high DNA-binding affinity. Furthermore, these results provide evidence for a TPA-inducible translocation of NF-kB from the cytosol into the nucleus.

NF-kB Occurrence and Activation in HeLa Cells

NF-kB activity can also be induced in HeLa cells after TPA treatment, as shown by the appearance of a kB-specific DNA-binding activity in nuclear extracts. Sen, R. and D. Baltimore, Cell, 47:921–928 (1986). Therefore, induction of NF-kB in the cytosolic fraction of HeLa cells was tested by treatment with formamide and DOC. To equal cell-equivalents of fractions, 17% formamide was added and diluted to 10% by the addition of the DNA-binding reaction mixture containing 4 ug poly(d[I-C]). DOC was then added to a final concentration of 0.6% to give a reaction volume of 20 ul. Assays contained either 1.35 ug of protein from nuclear extracts, 9 ug of protein from the cytosolic fractions of 0.9 ug of protein from the postnuclear membrane fractions (all in 10 ul buffer D(+)).

Redistribution of NF-kB activity in the subcellular fractions upon TPA stimulation of cells, was also assessed, using the procedure described for 70Z/3 cells. Mobility shift assays were performed with equal cell-equivalents of the subcellular fractions. Because HeLa cells had about ten times as much cytosolic protein as nuclear protein—as opposed to the 2:1 ratio in 70Z/3 cells—the use of equal cell-equivalents of fractions gave very different quantitative results from those obtained with equal amounts of protein. Without any treatment, only traces of a kB-specific DNA-binding activity were detected in the nuclear and cytosolic fractions of HeLa cells and no activity was observed in the postnuclear membrane fraction (FIG. 33, lanes 1 to 3). Upon

26

TPA stimulation of cells under the same conditions as for 70Z/3 cells, NF-kB activity was strongly increased in the nuclear extract (FIG. 33, lane 4). Also, in the cytosolic fraction, a significant increase of NF-kB activity was found (FIG. 33, lane 5). This was not an artifact of fractionation because the activity of AP-1, another nuclear factor (Lee, W. et al., Cell, 49:741–752 (1987), was highly enriched in nuclear extracts and almost not detectable in the cytosolic fraction of HeLa cells before and after TPA stimulation.

The treatment of control fractions of HeLa cells with formamide and DOC revealed large amounts of kB-specific DNA-binding activity in the cytosolic fraction (FIG. 33, compare lanes 8 and 20). The concentrations of formamide and DOC required for an optimal in vitro activation of NF-kB in HeLa cells were different from those required for 70Z/3 cells; less formamide and more DOC was needed. All DNA-binding activities described were specific for the kB-binding site in the kappa enhancer fragment (FIG. 33, lanes 13 to 24).

Almost no activity was detected in the HeLa nuclear extract and the postnuclear membrane fraction after in vitro activation (FIG. 33, lanes 7 and 9). Large amounts of NF-kB activity could still be activated in the cytosolic fraction of TPA-stimulated HeLa cells (FIG. 33, lane 11). This suggests that in vivo in HeLa cells—as contrasted to 70Z/3 cells—only a minor portion of the total cellular NF-kB is activated upon a TPA stimulus. The NF-kB activity in formamide/DOC-treated nuclear extracts of TPA-stimulated cells was less, compared to untreated nuclear extracts (FIG. 33, compare lanes 4 and 10), reflecting a partial inhibition of the DNA-binding activity of in vivo activated NF-kB. As in 70Z/3 cells, the total cellular NF-kB activity in HeLa cells, as revealed after in vitro activation, remained constant before and after TPA treatment of cells. These data imply that NF-kB is activated by the same mechanism in HeLa cells as it is in the pre-B cell line 70Z/3. However, in HeLa cells, TPA is much less complete in its activation than it is in 70Z/3 cells.

NF-kB Occurrence and Activation in Other Cell Types

NF-kB occurrence and activation in several additional cell types, including two T cell lines (H9, Jurkat) and fibroblasts, and in tissues, including human placenta and mice kidney, liver, spleen, lung, muscle and brain, were also assessed, as described above. In each case, NF-kB in a DOC-activatable form was shown to be present in the cytosolic fraction.

Appearance of Binding Activity

Results described above suggested that the appearance of binding activity may be due to separation of NF-kB from an inhibitor. Size fractionation and denaturing agents were both shown to be capable of separating NF-kB from such an inhibitor, which was apparently of low molecular weight. This provides a reasonable explanation for how NF-kB is induced in pre-B cells, HeLa cells and other inducible cells, such as T cells.

Whether the DOC-dependence of cytosolic NF-kB results from its association with an inhibitor, was investigated by probing for activity in cytosolic fractions that would specifically prevent DNA binding to NF-kB in electrophoretic mobility shift assays (EMSA). This work demonstrated the existence of a protein inhibitor, called IkB, in cytosolic fractions of unstimulated pre-B cells, that can convert NF-kB into an inactive DOC-dependent form by a reversible, saturable, and specific reaction. The inhibitory activity becomes evident after selective removal of the endogenous cytosolic NF-kB under dissociating conditions, suggesting that NF-kB and IkB were present in a stoichiometric complex. Enucleation experiments showed that the

US 6,410,516 B1

27

28

complex of NF-kB and IkB is truly cytoplasmic. The data are consistent with a molecular mechanism of inducible gene expression by which a cytoplasmic transcription factor-inhibitor complex is dissociated by the action of TPA, presumably through activation of protein kinase C. The dissociation event results in activation and apparent nuclear translocation of the transcription factor. It would appear that IkB is the target for the TPA-induced dissociation reaction. The following is a description of this investigation, which is described in greater detail in Example 12.

Separation of an Inhibitor from NF-kB

Cytosolic fractions from unstimulated 70Z/3 pre-B cells were examined for an activity that would impair the DNA binding activity of added NF-kB in an EMSA. Baeuerle, P. A., and D. Baltimore, Cell 53: 211 (1988). Increasing amounts of cytosol from unstimulated cells did not significantly influence the formation of a protein-DNA complex between NF-kB and a k enhancer fragment (FIG. 34, lanes 13 to 15). This indicated the absence of free inhibitor, presumably because all of it is complexed with endogenous NF-kB. DNA-cellulose was used to selectively remove the endogenous NF-kB from DOC-treated cytosol, in an attempt to liberate the inhibitor. Almost all NF-kB was present in a DOC-dependent form, prior to DOC activation and chromatography (FIG. 34A, lanes 1 and 2). In the presence of excess DOC, about 80% of the NF-kB activity was retained by DNA-cellulose (FIG. 34A, compare lanes 2 and 4), most of which eluted from the DNA-cellulose between 0.15 and 0.35M NaCl (FIG. 34A, lanes 8 to 10 and 16 to 18). The NF-kB activity eluting at high salt was detectable in mobility shift assays in the absence of excess DOC (FIG. 34A, lanes 8 to 11), indicating that NF-kB had been separated from an activity that caused its DOC-dependent DNA binding activity. In contrast, the small percentage of NF-kB activity contained in the washings was still dependent on DOC (FIG. 34A, compare lanes 5 to 7 and 13 to 15). These results show that affinity chromatography is sufficient to convert DOC-dependent NF-kB precursor into DOC-independent active NF-kB, similar to that found in nuclear extracts from TPA-stimulated cells.

The flow-through fraction from the DNA-cellulose was assayed for an activity that, after neutralization of DOC by non-ionic detergent, would inactivate added NF-kB from the 0.2M NaCl-fraction from nuclear extracts of TPA-stimulated cells. Increasing amounts of cytosol from which the endogenous NF-kB was removed inhibited the formation of an NF-kB—DNA complex as monitored by EMSA (FIG. 34B, lanes 7 to 9 and 16 to 18). DOC-treated cytosol that was not passed over DNA-cellulose had no effect (FIG. 34B, lanes 4 to 6 and 13 to 15), even if cells had been treated with TPA. The fact that, after DNA-cellulose chromatography of DOC-treated cytosol, both DOC-independent NF-kB and an inhibitory activity were observed made it reasonable to believe that NF-kB had been separated from an inhibitor. This inhibitor is referred to as IkB.

IkB Characterization

IkB fractionates as a 60 to 70 kD protein. The flow-through fraction from the DNA-cellulose column was subjected to gel filtration through G-200 Sephadex and the fractions were assayed for an activity that would interfere with the DNA binding activity of added NF-kB contained in a nuclear extract of TPA-stimulated 70Z/3 cells (FIG. 35A). The 67 kD fraction had the highest activity: it virtually completely prevented interaction of NF-kB and DNA (FIG. 35A, lanes 6). In fractions from a G-75 Sephadex column, no additional inhibitor of low molecular size was detectable indicating that NF-kB was inactivated by a macromolecule

of defined size. No significant inhibitory activity could be demonstrated after gel filtration of a DNA-cellulose flow-through of DOC-treated cytosol from TPA-stimulated 70Z/3 cells, implying that TPA treatment of cells inactivated IkB.

The inhibitor fraction was treated with trypsin to test whether IkB is a protein (FIG. 35B). Tryptic digestion was stopped by the addition of bovine pancreas trypsin inhibitor (BPTI) and samples were analyzed for NF-kB inhibition. Trypsin treatment interfered with the activity of IkB, as shown by the complete inability of the treated sample to inhibit NF-kB activity (FIG. 35B, compare lanes 1 and 6). Trypsin that had been treated with BPTI had no effect (FIG. 35B, lane 5), demonstrating that the inactivation of IkB was specifically caused by the proteolytic activity of trypsin. It appears that IkB requires an intact polypeptide structure for its activity. The nucleotide sequence of the IkB-α gene and the amino acid sequence of IkB-α are shown in FIG. 43.

The cytosolic complex of IkB and NF-kB showed an apparent size of about 120 to 130 kD, both after gel filtration (FIG. 35A, lane 3) and after sedimentation through a glycerol gradient (FIG. 35C, lanes 6 and 7). For both methods, cytosol from unstimulated cells was analyzed under non-dissociating conditions. NF-kB was activated in fractions by either DOC (FIG. 35A) or formamide (FIG. 35C, middle panel) prior to analysis by EMSA. Baeuerle, P. A. and D. Baltimore, Cell, 53:211 (1988). The specificity of complexes was tested with a mutant DNA probe (FIG. 35C, right panels). Lenardo, M. et al., Science, 236:1573 (1987). The apparent release of a 60 to 70 kD inhibitory protein from the cytosolic NF-kB precursor, its sedimentation velocity in glycerol gradients, and its size seen by gel filtration suggest that the inactive NF-kB precursor is a heterodimer composed of a 55 to 62 kD NF-kB molecule and a 60 to 70 kD IkB molecule. Nuclear NF-kB was found to cosediment with the cytosolic complex of IkB and NF-kB (FIG. 35C, upper panel). Native gel electrophoresis, a method that allows resolution of size differences of protein-DNA complexes, provided evidence that the 120 kD form of nuclear NF-kB seen in glycerol gradients comes from the formation of a homodimer. Hope, I. A. and K. Struhl, EMBO J., 6:2781 (1987). By these interpretations, activation of NF-kB would include an additional step (i.e., formation of a NF-kB homodimer). This is consistent with the observation that the protein-DNA complexes formed with in vitro-activated NF-kB have the same mobility in native gels as those formed with nuclear NF-kB. Baeuerle, P. A. and D. Baltimore, Cell, 53:211 (1988).

The inactivation of NF-kB by IkB is reversible, saturable and specific. Incubation with the inhibitor fraction can inhibit the DNA binding activity of NF-kB by more than 90% (FIG. 36A, lanes 1 and 3). Treatment of a duplicate sample with DOC after the inhibition reaction reactivated 66% of the added NF-kB activity (FIG. 36A; compare lanes 3, 4 and 6). This showed that a DOC-dependent form of NF-kB can be reconstituted in vitro by the addition of a fraction containing IkB to nuclear NF-kB. The incomplete activation of NF-kB by DOC might be due to the DOC-neutralizing effect of non-ionic detergent which was still present in the sample from the preceding inhibition reaction.

A titration and kinetic analysis showed that IkB stoichiometrically interacts with NF-kB (FIG. 36B). Increasing amounts of inhibitor fraction were added to an excess amount of NF-kB and incubated for 20 or 60 minutes. After the DNA binding reaction, NF-kB-DNA complexes were separated on native gels and quantified by liquid scintillation counting. The relationship between amount of IkB fraction added and extent of inhibition was linear. The amount of

29

30

NF-kB inactivated after 20 minutes of incubation was not increased after 60 minutes (FIG. 36B). These kinetics were probably not the result of a rapid decay of a catalytically active inhibitor because the fractions were incubated prior to the reaction. The data are consistent with rapid formation of an inactive complex by addition of IkB to NF-kB. The fraction containing IkB does not appear to catalytically or covalently inactivate NF-kB: neither the reversibility nor the kinetics support such a model.

IkB was tested for its influence on the DNA binding activity of other defined nuclear factors (FIG. 13A). These factors were contained in nuclear extracts that had essentially no active NF-kB, which otherwise could have inactivated IkB by complex formation. The DNA binding activity of H2TF1, a transcription factor thought to be related to NF-kB, was not affected by the inhibitor fraction. Baeuerle, P. A. et al., unpublished observation). Ubiquituous and lymphoid-specific octamer-binding proteins (OCTA) (Sive, H. L. and R. G. Roeder, Proc. Natl. Acad. Sci. USA, 83:6382 (1986) and Staudt, L. M. et al., Nature, 323:640 (1986)) were unaffected in their DNA binding activities, as were two E-box binding factor, NF-$\mu$E1 (Weinberger, J. et al., Nature, 322:846 (1986)) and NF-kE2 (Lenardo, M. et al., Science, 236:1573 (1987)), interacting with $\mu$ heavy chain and k light chain enhancers, respectively. AP-1, another TPA-inducible transcription factor (Lee, W. et al., Cell, 49:741 (1987); Angel, P. et al., Cell, 49:729 (1987)), also showed equal complex formation after incubation in the presence and absence of the inhibitor fraction. Furthermore, none of the undefined DNA binding activities seen in the EMSA showed any inactivation by IkB. These results show that IkB is a specific inhibitor of the DNA binding activity of NF-kB.

In vivo activated NF-kB is responsive to IkB. IkB prepared from the mouse pre-B cell line 70Z/3 was tested for inactivation of NF-kB contained in nuclear extracts from other cell lines. Human NF-kB contained in nuclear extracts from TPA-stimulated HeLa cells and H-9 T-lymphoma cells was efficiently inactivated (FIG. 37B). When excess amounts of the various NF-kB activities were used in the inhibitor assay, the extent of reduction of NF-kB activities by a fixed amount of IkB was very similar, as quantified by liquid scintillation counting. NF-kB from nuclear extracts of TPA-stimulated Madin-Darby bovine kidney (MDBK) cells was also inactivated suggesting that the control of NF-kB activity by IkB is conserved among different mammalian species.

NF-kB is constitutively active in cell lines derived from mature B cells. Sen, R. and D. Baltimore, Cell, 46:705 (1986). Nuclear extracts from the mouse B cell line WEHI 231 were tested in the inhibitor assay to examine whether NF-kB has undergone a modification in those cell lines that prevented its inactivation by IkB. NF-kB from B cells was as efficiently inactivated as NF-kB from pre-B cells (FIG. 37B), suggesting that NF-kB is not stably modified in B cells (or in other cells after TPA stimulation) in such a way that it cannot respond to inactivation by IkB.

The NF-kB—IkB complex is present in enucleated cells. The NF-kB—IkB complex shows a cytosolic localization on subcellular fractionation (FIG. 38A). This procedure may, however, cause artifacts. Hypotonic lysis of cells may result in partitioning of nuclear proteins into the cytosol, especially, when they are not tightly associated with nuclear components. Li, J. J. and T. J. Kelly, Proc. Natl. Acad. Sci, USA, 81:6973 (1984). Detection of the complex of IkB and NF-kB in enucleated cells was attempted. Enucleation is performed with living cells at 37° C. and should therefore not interfere with active nuclear import of proteins, which is

ATP-dependent and blocked at low temperature. Prescott, D. M. and J. B. Kirkpatrick, In: Methods Cell Biol., D. M. Prescott, ed. (Academic Press, New York, 1973), p. 189; Newmeyer, D. D. and D. J. Forbes, Cell, 52:641 (1987); Richardson, W. D. et al., Cell, 52:655 (1988).

Using cytochalasin B-treated HeLa cells, an enucleation efficiency of about 90% was obtained (FIG. 38A). Enucleated and cytochalasin B-treated complete cells were incubated in the absence and presence of TPA, solubilized by detergent and proteins were extracted with high salt. Because of the small number of cells analyzed, this procedure is different from the standard one. Total cell extracts were analyzed for NF-kB specific DNA binding activity by EMSA (FIG. 38B). In both enucleated and complete cells, similar amounts of NF-kB activity were found after TPA stimulation (FIG. 38B, lanes 1 to 4). The activity was specific for NF-kB because it was not observed with a mutant k enhancer fragment. Lenardo, M. et al., Science, 236:1573 (1987); These results suggest that TPA-inducible NF-kB in HeLa cells is predominantly cytoplasmic because it was still present in enucleated cells. The NF-kB activity seen under control conditions (FIG. 38B, lanes 1 and 3) was most likely activated by the lysis conditions used because it was also observed in extracts from HeLa cells that were not treated with cytochalasin B, but not in fractions obtained after hypotonic lysis. Baeuerle, P. A. and D. Baltimore, Cell, 53:211 (1988). It was still evident, however, that TPA could activate NF-kB in enucleated cells (FIG. 38B, lanes 3 and 4).

After treatment with DOC, total extracts from complete and enucleated control cells showed about a 2-fold increase in the amount of NF-kB activity (FIG. 38B, compare lanes 1 and 3 with 5 and 7). The demonstration of DOC-activatable NF-kB in enucleated cells, as well as the presence of similar amounts of total NF-kB in enucleated and complete cells (FIG. 38B, compare lanes 5 to 8), shows that a substantial amount of the total cellular NF-kB—IkB complex was cytoplasmic. In contrast to NF-kB, most of the DNA binding activity of AP-1, a bona fide nuclear protein, was apparently lost by enucleation of cells (FIG. 38B, lanes 9 to 12). Lee, W. et al., Cell, 49:741 (1987); Angel, P. et al., Cell, 49:729 (1987).

Mechanism of NF-kB Activation

Thus, it has been shown that the NF-kB nuclear transcription factor exists in unstimulated pre-B cells in a cytoplasmic complex with a specific inhibitory protein, IkB. In this complex, NF-kB does not exhibit DNA binding activity in EMSA and partitions upon subcellular fractionation into the cytosol. The complex is apparently a heterodimer consisting of about a 60 kD NF-kB molecule and a 60 to 70 kD IkB molecule. Upon TPA stimulation of cells, or after treatment with dissociating agents in vitro, the NF-kB—IkB complex dissociates. This releases NF-kB, which appears now to form a homodimer and can translocate into the nucleus. Whether dimerization is required for activation of NF-kB is not known.

The inhibitory effect of IkB on the DNA binding activity and nuclear localization properties of NF-kB appears to arise from a simple physical affinity of the two proteins. The complex freely dissociates and the components readily associate under in vitro conditions. Even in vivo, dissociation by short-term TPA treatment and reassociation after long-term TPA treatment is evident. The latter presumably results from the degradation of protein kinase C after TPA activation and implies that NF-kB can move back to the cytoplasm after being active in the nucleus.

The effect of TPA appears to involve an alteration of IkB, but not of NF-kB. After TPA stimulation, no active IkB was

31

found—implying its alteration—while the nuclear NF-κB remained sensitive to unmodified IkB when tested in vitro. Whether inactive IkB can be regenerated is unclear; in experiments using cycloheximide (Baeuerle, P. A. et al., *Cold Spring Harbor Symp. Quant. Biol.,* 53, In Press), irreversible loss of IkB activity was the only demonstrable effect after 8 hours of TPA treatment. Given the ability of TPA to activate protein kinase C, it is a reasonable hypothesis that direct or indirect phosphorylation of IkB results in its dissociation from NF-kB.

It had previously been found that the NF-kB—IkB complex is recovered in the cytosol. It is now shown directly that the complex is not removed from the cell by enucleation and, therefore, is truly cytoplasmic. Welshons, W. V. et al., *Nature,* 307:747 (1984). Because active protein kinase C is bound to the plasma membrane (Kraft, A. S. et al., *J. Biol. Chem.,* 257:13193 (1983); Wolf, M. et al., *Nature,* 317:546 (1985); Kikkawa, U. and Y. Nishizuka, *Ann. Rev. Cell. Biol.,* 2:149 (1986)), it becomes increasingly attractive to suggest that the cytoplasmic complex interacts in the cytoplasm (maybe near the plasma membrane) with protein kinase C and the liberated NF-kB carries the signal from cytoplasm to nucleus. Under a number of conditions, active NF-kB is found in the cytoplasm. This fact and the reversibility of NF-kB activation in vivo suggests that the protein may freely move in and out of the nucleus, bringing to the nucleus information reflecting the cytoplasmic activation state of protein kinase C and possibly of other signalling systems.

The response of NF-kB to activated protein kinase C occurs apparently indirectly through modification and subsequent release of associated IkB. The inducibility of NF-kB by TPA is thus dependent on the presence and state of activity of IkB. Changes in amount or activity of IkB should therefore influence the TPA inducibility of NF-kB. NF-kB can indeed exist not only in TPA-inducible but also in constitutively active form (e.g., in mature B cells; Sen, R. and D. Baltimore, *Cell,* 46:705 (1986). Because constitutive NF-kB from B cells is still responsive to IkB in vitro, it is thought that IkB, and not NF-kB, is altered during differentiation of pre-B into B cells.

IkB is apparently unstable when not complexed with NF-kB. This is suggested by the absence of excess active inhibitor in the cytosol from unstimulated cells. In a situation where the production of new inhibitor is impaired, the decay of occasionally released inhibitor could activate NF-kB. This would explain the partial activation of NF-kB seen after treatment with the protein synthesis inhibitors cycloheximide and anisomycin. Sen R. and D. Baltimore, *Cell,* 47:921 (1987). The demonstration of a specific inhibitory protein of NF-kB and the interpretation that cycloheximide treatment can activate NF-kB, presumably because cells become depleted of inhibitor, suggest that IkB is the putative labile repressor of k gene expression (Wall, R. et al., *Proc. Natl. Acad. Sci. USA,* 83:295 (1986)) and of NF-kB activity. Sen, R. and D. Baltimore, *Cell,* 47:921 (1987).

As a result of the work described herein, the IkB gene is now available, as is IkB itself, antibodies specific for the IkB gene-encoded product, and probes which include all or a portion of the IkB gene sequence. Also available are methods of using the IkB gene, the encoded protein and IkB-specific antibodies for such purposes as identifying and isolating other IkB genes, IkB "like" genes, and IkB-encoded products. Altering IkB activity and altering NF-κB-mediated gene expression. In particular, it is now possible, through the method of the present invention, to block or inhibit NF-κB passage into the nucleus of cells in

32

which it occurs and, thus, block (partially or totally) binding of NF-κB to NF-κB binding sites on genes which include such recognition sites. Such a method is useful for altering expression of genes which is mediated by NF-κB; such genes include cellular genes (e.g., cytokine genes) and genes introduced into host cells (e.g., viral genes, such as cytomegalovirus gene, HIV-1 genes (e.g., the tax gene), and the SV40 gene). This method of altering NF-κB-mediated gene expression is useful, for example, for inhibiting viral gene expression in infected cells, such as in an individual infected with the HIV-1 or cytomegalovirus.

The IkB gene and the encoded IκB protein can be used to negatively regulate NF-κB activity in cells. For example, the IkB gene can be incorporated into an appropriate vector (e.g., a retroviral vector or capable of expressing the IκB gene and introduced into cells in which NF-κB activity is to be inhibited (partially or totally). For example, a vector capable of expressing IκB can be introduced into HIV-1 infected cells (e.g, T cells) in order to inhibit HIV-1 gene expression and activity in the cells. IκB expressed in the cells binds NF-κB (e.g., free NF-κB such as that released from its inactive complex with Iκ-β) and limits its ability to act as a messenger by inhibiting its translocation into the nucleus. For this purpose, all or a portion of the IκB-encoding DNA or DNA encoding an IκB-like protein is used. If a portion is used, it must encode at least that region of the IκB (or other rel-associated protein) molecule sufficient to bind NF-κB and prevent it from passing into the cell nucleus. The IκB-encoding DNA or DNA encoding an IκB-like protein used can be obtained from a source in which it naturally occurs, can be produced by genetic engineering or recombinant techniques or can be synthesized using known chemical methods. For convenience, DNA from all three types of sources is referred to herein as "essentially pure". The DNA used can have all or a portion of the DNA sequence of clone MAD-3, all or a portion of pp40 or all or a portion of another sequence which encodes a rel-associated or IκB-like protein capable of inhibiting NF-κB. In a similar manner, DNA encoding a rel-associated or IκB-like protein can be introduced into cells to inhibit a rel-related protein other than NF-κB.

Cells in which IκB (or other rel-associated protein) is to be expressed in this manner to inhibit NF-κB (or other rel-related protein) can be removed from the body, the IκB-expressing vector can be introduced, using known methods, and the resulting cells, which contain the IκB-expressing vector, then reintroduced into the body. For example, T-cells or bone marrow cells can be removed from an HIV-1 infected individual, IκB-expressing vectors can be introduced into them, and they can then be replaced in the individual. Alternatively, the expression vector containing IκB-encoding DNA can be introduced into an individual, using known techniques, by any of a variety of routes, such as intramuscular, intravenous, intraperitoneal administration. IκB itself (or other rel-associated protein) can also be introduced into cells to inhibit NF-κB (or other rel-related protein). The entire IκB molecule or a portion sufficient to bind NF-κB and prevent its passage into the nucleus can be used for this purpose. IκB or an appropriate IκB portion can be obtained from naturally-occurring sources, can be produced using known genetic engineering methods or, particularly in the case of an IκB portion, can be synthesized chemically. For convenience, proteins (or portions thereof) of all three types are referred to herein as "essentially pure".

Uses of Genes Encoding Transcriptional Regulatory Factors, the Encoded Factors and Related Products

The genes encoding positive transcriptional regulatory factors provide a means for enhancing gene expression.

US 6,410,516 B1

33

Lymphoid-specific factors involved in positive regulation of Ig gene transcription provide a method for enhancing immunoglobulin production in lymphoid cells. Lymphoid cells, such as monoclonal antibody-producing hybridomas or myelomas, can be transfected with multiple copies of a gene encoding a regulatory factory to induce greater production of Ig. For this purpose, the gene encoding a regulatory factor can be linked to a strong promoter. In addition, the construct can include DNA encoding a selectable marker. Multiple copies of the contruct can be inserted into the cell, using known transfection procedures, such as electroporation. The cell can be transfected with multiple regulatory factors, including constitutive factors; this is particularly useful in the case of factors determined to act in conjunction, possibly synergistically. Amplification of genes encoding transcriptional regulatory factors in this manner results in enhanced or increased production of the regulatory factors and, consequently, production of immunoglobulin is enhanced in these cells.

The present invention also relates to a method for transiently expressing a gene product in a eukaryotic cell, in which the inducibility of the NF-kB factor is used to advantage. This phenomenon can be exploited to provide for the transient overexpression of a gene product produced by a transfected gene in a eukaryotic cell at a chosen time.

According to the method of this invention, a gene of interest is placed under influence of the κ enhancer sequence containing the binding site for NF-kB (i.e., the entire enhancer sequence or a portion containing at least the NF-κB site). The κ-enhancer sequence is linked to a structural gene of interest to provide a gene inducible by NF-kB. A gene construct is thus provided comprising 1) a κ-enhancer sequence or a portion of the κ enhancer sequence containing at least the sequence to which the factor NF-kB binds; 2) a promoter; and in 3) structural gene of interest.

Conventional recombinant DNA techniques can be used to prepare the construct. The κ enhancer sequence can be obtained from lymphoid cells which express the κ-light chain. The κ enhancer can also be obtained from clones containing the sequence. The construct can be prepared in or inserted into a transfection vehicle such as a plasmid.

The structural gene can be any gene or gene segment which encodes a useful protein for which transient overexpression is desired. Such proteins are, for example, those that are damaging to cells when produced constitutively. The structural gene can be used with its endogenous promoter or other eukaryotic promoter.

Cells for transfection can be any eukaryotic cells used for the expression of eukaryotic proteins. Transfection procedures, such as the calcium precipitation technique are well known in the art.

As the desired time, the transfected cells can be stimulated with the appropriate inducer in an amount sufficient to induce production of NF-kB. The preferred inducer is a phorbol ester which acts rapidly and directly to activate protein kinase C and induces production of NF-kB. If the transfected cell is a lymphoid cell (e.g., B cell) responsive to a mitogen such as LPS or PHA the mitogen may be used alone or in combination with phorbol ester.

Genes encoding transcriptional regulatory factors can be modified for a variety of purposes, such as to encode factors with activity equivalent to the naturally-occurring factor, factors with enhanced ability to regulate transcription (e.g., to cause enhanced transcription of genes, relative to transcription resulting from regulation by or the effects of the normal/unmodified factor), or factors with decreased ability to regulate transcription. This can be carried out, for

34

example, by mutagenesis of factor-encoding DNA or by producing DNA (e.g., by recombinant DNA methods or synthetic techniques) which encodes a modified or mutant transcriptional regulatory factor (i.e., a transcriptional regulatory factor with an amino acid sequence different from the normal or naturally-occurring transcription factor amino acid sequence). These modified DNA sequences and encoded modified factors are intended to be encompassed by the present invention.

The gene encoding IgNF-b, for example, has been cloned and sequenced and the nucleotide sequence is shown in FIG. 18A. For the various utilities discussed below, the modified nucleotide sequence can be obtained either naturally (e.g., polymorphic variants) or by mutagenesis to yield substantially complementary sequences having comparable or improved biological activity. Fragments of the sequence may also be used. This invention encompasses nucleic acid sequences to which the sequence of FIG. 18A hybridizes in a specific fashion.

In addition, the DNA binding domain of the factors, which is responsible for the binding sequence-specificity, can be combined with different "activators" (responsible for the effect on transcription) to provide modified or hybrid proteins for transcriptional regulation. For example, with recombinant DNA techniques, DNA sequences encoding the binding domain can be linked to DNA sequences encoding the activator to form a gene encoding a hybrid protein. The activator portion can be derived from one of the factors or from other molecules. The DNA binding region of the hybrid protein serves to direct the protein to the cognate DNA sequence. For example, in this way, stronger activators of RNA polymerases can be designed and linked to the appropriate DNA binding domain to provide for stronger enhancement of transcription.

DNA probes for the genes encoding the regulatory factors can be used to determine the presence, absence or copy number of regulatory factor-encoding genes or to identify related genes, by hybridization techniques or a polymerase chain amplification method (e.g., PCR). The ability to detect and quantify genes encoding transcriptional regulatory factors can be used in diagnostic applications, such as to assess conditions relating to aberrant expression of a regulatory factor. Cells can be typed as positive or negative for the occurrence of a particular gene and, in addition, can be analyzed for the copy number of the gene. The DNA probes are labeled DNA sequences complementary to at least a portion of a nucleic acid encoding a transcriptional regulatory factor. The labeled probe is contacted with a sample to be tested (e.g., a cell lysate) and incubated under stringent hybridization conditions which permit the labeled probe to hybridize with only DNA or RNA containing the sequence to which the probe is substantially complementary. The unhybridized probe is then removed and the sample is analyzed for hybridized probe.

The DNA probes can also be used to identify genes encoding related transcriptional regulatory factors. For this purpose, hybridization conditions may be relaxed in order to make it possible to detect related DNA sequences which are not completely homologous to the probe.

Antibodies can be raised against the transcriptional regulatory factors of this invention. The antibodies can be polyclonal or monoclonal and they can be used as diagnostic reagents in assays to determine whether a factor is expressed by particular cells or to quantitate expression levels of a factor.

A gene encoding a transcriptional regulatory factors can also be used to develop in vivo or in vitro assays to screen

US 6,410,516 B1

35

36

for agonists or antagonists of a factor-encoding gene or of the factor encoded by the gene. For example, genetic constructs can be created in which a reporter gene (e.g., the CAT gene) is made dependent upon the activity of a factor-encoding gene. These constructs introduced into host cells provide a means to screen for agonists or antagonists of the factor-encoding gene. The antagonists may be used to decrease the activity of the factors and thus may be useful in the therapy of diseases associated with overactivity of a transcriptional regulatory factor. Such agonists or antagonists identified by assays employing the factor-encoding genes of this invention are within the scope of this invention.

The present invention is useful as a means of controlling activation in a host cell of an NF-kB precursor, which results in formation of activated NF-kB, which, in turn, plays a key role in transcriptional activation of other sequences, such as the k light chain enhancer, the HIV enhancer and the interleukin-2 receptor α-chain gene. NF-kB has been shown to be a ubiquitous inducible transcription factor; it has been shown, as described herein, to be present in many types of cells (i.e., all cell types assessed to date). It serves to make immediate early responses which it is capable of effecting because it is post-translationally activated. As a result, the method and composition of the present invention can be used to control transcriptional activation of genes encoding a selected cellular protein. Changes in expression of genes transcribed by RNA polymerase II in response to agents, such as steroid hormones, growth factors, interferon, tumor promoters, heavy metal ions and heat shock are mediated through cis-acting DNA sequence elements such as enhancers. Binding of NF-kB transcription factor has been shown to confer transcriptional activity on several genes. Expression of these genes and others similarly affected can be controlled by the present method. For example, it has been shown that expression of one of the two elements of the cell surface receptor specific for IL-2 is controlled by NF-kB. Thus, in T cells, which produce IL-2, production can be controlled (enhanced, reduced) by controlling activation of NF-kB. In a similar manner, the method of the present invention can be used to control expression of human immunodeficiency virus in infected host cells.

Methods and compositions of the present invention are based on use of the role of NF-κB as a second messenger, or mediator, in the expression of genes in a wide variety of cell types. The expression of a gene having an NF-κB binding recognition sequence can be positively or negatively regulated to provide, respectively, for increased or decreased production of the protein whose expression is mediated by NF-κB . Furthermore, genes which do not, in their wild type form, have NF-κB,recognition sequences can be placed under the control of NF-κB by inserting NF-κB binding site in an appropriate position, using techniques known to those skilled in the art.

DNA sequences known to contain NF-κB binding domains are shown in Table 2. According to the methods described herein, the expression of genes under the control of one of these elements is subject to modulation by alteration of the concentration or availability of NF-κB. This can also be carried out, according to the present method, for any gene which contains an NF-κB binding site. Furthermore, genes which do not naturally contain NF-κB binding sites can be modified, using known techniques, to subject these genes to NF-κB modulation. First, an appropriate expression vector is selected for use in a biological system of interest, the vector having a gene of interest and restriction enzyme recognition sequences to facilitate the insertion of a DNA fragment carrying the NF-κB binding sites.

For example, the sequences of the κ immunoglobulin enhancer, the SV40 70 base pair repeat, the HIV long terminal repeat, the MHC class I H2-kb gene and the interferon β PRDII gene, all possess NF-κB binding sites (Table 2). By comparing sequences to which NF-κB binds specifically, a consensus sequence has been determined:

$$\begin{array}{c} \text{C} \quad\text{C} \\ \text{GGGRATYYAC.} \\ \text{T} \quad\text{T} \end{array}$$

DNA sequences which flank the binding site are scanned for convenient restriction enzyme recognition sequences to facilitate removal of the fragment from the longer sequence in which occurs and its subsequent insertion into the expression vector. If such sequences are present, the transfer of the fragment carrying the binding site, to the expression vector, is straight forward. If convenient sites do not exist, fragment transfer is facilitated through the introduction of such restriction enzyme recognition sequences using well known, site-directed mutagenic techniques. The construct, prepared as described, can then be introduced into a biological system of interest.

The expression of such constructs in a biological system is subject to modulation by NF-κB. For example, purified NF-κB could be introduced into the system in an effective amount such that any inhibitory molecule present in the system would be titrated out and uninhibited NF-κB could interact with its binding recognition sequence, thereby increasing the rate of transcription. This is an example of positive regulation.

Similarly, a copy of the NF-κB gene, cloned in an appropriate expression vector, could be introduced into the biological system, thereby providing for internal expression of the NF-κB molecule, preferably at relatively high levels. Again, high levels of NF-κB would function to titrate out any inhibitor molecule present, and also to increase the rate of transcription from a gene possessing a NF-κB binding site.

A level of discrimination among members of a related family of NF-κB binding sites, by a modified NF-κB molecule, can also be introduced. Referring to Table 1, for example, there are apparent differences among the various NF-κB binding sites from various genes. A copy of a cloned NF-κB gene can be mutagenized to alter the binding domain by well known techniques, such as site or region directed mutagenesis. Alternatively, DNA fragments encoding a modified NF-κB binding domain can be made synthetically, having appropriate cohesive or blunt termini to facilitate insertion into the NF-κB gene to replace the existing sequences encoding the corresponding portion of the binding domain. Such restriction fragments can be synthesized having any desired nucleotide changes. Mutated proteins encoded by such genes can be expressed and assayed for preferential binding to, for example, one of the 10 different DNA binding sites shown in Table 1 or related members of the family of NF-κB binding sites. An example of an assay which can be used to screen large numbers of recombinant clones in order to identify binding domain mutants is that described by Singh et al., (Cell, 52:415–423 (1988)). Once such a mutant is identified, a DNA expression vector encoding this mutant protein can be introduced into a cell. The mutant protein will preferentially bind to the selected member or members of the family of DNA binding sites, such as those shown in Table 2, thereby preferentially enhancing transcription from only those genes which contain that particular binding site.

US 6,410,516 B1

37

38

TABLE 2

Sequences recognized by NF-κB.

| Gene | Sequence |
|------|----------|
| Ig κ enhancer – mouse<br>SV40 enhancer<br>HIV-1 (−91)<br>CMV (4)[1,2] | GGGGACTTTCC |
| HIV-1 (−105)<br>HIV-2<br>CMV (1)[1]<br>β2-microglobulin<br>serum amyloid A −g9 | AGGGACTTTCC |
| Ig κ enhancer – human<br>CMV (3)[1] | GGGGATTTCC |
| Interferon-β- PRDII | GGGAAATTCC |
| CMV(2)[1] | GGGACTTTCC |
| MHC class II-E$_\alpha$[d] | GGGACTTCCC |
| IL-2 lymphokine | GGGATTTCAC |
| mouse IL-2Rα | GGGGATTCCT |
| human IL-2Rα | GGGAATCTCC |
| MHC class I – H2 – K[b]<br>HLA – A2, A11, B7<br>B27, B51 | GGGATTCCCC |
| CONSENSUS[3]: |       C C<br>GGGRATYYAC<br>      T T |

[1]In this particular element, the sequence has not been tested in a binding assay. All others have been proven by direct binding and usually by inhibition of binding to the Ig κ sequence.
[2]Since there are four putative NF-κB recognition sites in the cytomegalovirus enhancer, these have been numbered 1–4 as they are found from 5' to 3' on the coding strand.
[3]Consensus is based on all sequences though the assignments of the sixth and tenth positions ignore one deviant.

Negative regulation can be effected in an analogous manner. For example, a specific inhibitor molecule which is able to block (reduce or eliminate) NF-κB binding can be added to the biological system in an effective amount. Preferably, this inhibitor is specific for NF-κB and does not interact with other cell constituents. An example of such a molecule is I-κB.

Alternatively, negative regulation can be effected using "decoy" molecules, which are designed to mimic a region of the gene whose expression would normally be induced by NF-κB. In this case, NF-κB would bind the decoy and, thus, not be available to bind its natural target.

Furthermore, in the case of an inhibitor molecule which is also a protein, the gene encoding the inhibitor molecule can be identified, isolated, and cloned into an appropriate expression vector using common methodology. When introduced into an appropriate biological system, the inhibitor molecule is synthesized and functions to interact with NF-κB with its binding site and as a consequence reducing the level of transcription of the gene containing the NF-κB binding site.

Yet another method for negatively regulating the expression of a gene containing an NF-κB binding domain involves the introduction of an effective amount of a decoy sequence encoding the NF-κB binding domain. The decoy sequence serves as an unproductive binding domain with which the NF-κB molecule binds. As the finite number of NF-κB molecules bind to the decoy sequences, the number which bind productively (result in increased transcription) with an intact gene, decreases.

Negative regulation can also be effected by the introduction of "dominantly interfering" molecules (see e.g., Friedman et al., *Nature,* 335:452–454 (1988). For example, if the DNA binding domain and the DNA polymerase activating domain of NF-κB are spatially distinct in the molecule, a truncated form of the NF-κB molecule can be synthesized, using well known techniques. A preferred embodiment would be a truncated molecule retaining the DNA binding domain, but lacking the RNA polymerase activating domain. Such a "dominantly interfering" molecule would recognize and bind to the NF-κB binding site, however, the binding would be non-productive. Because the activation portion of NF-κB would be required for enhanced transcription, the truncated molecule would exert no positive effect. Furthermore, its occupation of the NF-κB binding site effectively blocks access to any intact NF-κB molecule which may be present in the cell.

The invention is further illustrated by the following examples, which are not intended to be limiting in any way.

EXAMPLES

Example 1

Identification of Nuclear Factor IgNF-A

Methods

1. Gel Electrophoresis DNA Binding Assays with the SfaNI-SfaNI X Promoter Fragment

The SfaNI fragment was subcloned into the SmaI site of pS64 (pSPIgV$_\kappa$, provided by N. Speck). For binding analysis this fragment was excised from pSPIgV$_\kappa$ by digesting with Hind III and Eco RI. These latter sites flank the Sma I site in the polylinker of pSP64. After end-labeling with [α-$^{32}$P]dATP and the large fragment of *E. coli* DNA polymerase I, the radiolabeled fragment was isolated by polyacrylamide gel electrophoresis. Binding reactions were performed and the reaction mixtures resolved by electrophoresis (FIG. 1b). The $^{32}$Plabeled fragment (about 0.5 ng, 10,000 cpm) was incubated with a nuclear extract of a human B lymphoma cell line (EW)(prepared by the method of Dignam, J. D. et al. *Nucl. Acids Res.* 11 1475–1489 (1983)) in the absence (lane 1) or presence of two different non-specific competitor DNAs (lanes 2–11). Binding reactions (25 μl) contained 10 mM Tris.HCl (pH 7.5), 50 mM NaCl, 1 mM DTT, 1 mM EDTA, 5% glycerol and 8 μg EW nuclear extract protein. Reactions 2–6 additionally contained 800, 1600, 2400, 3200 and 4000 ng, respectively, of poly(dI-dC)-poly(dI-dC). Reactions 7–11 contained 300, 600, 900, 1200 and 1500 ng, respectively, of Hinf I digested *E. coli* chromosomal DNA. After a 30 min incubation at room temperature, the resulting complexes were resolved in a low ionic strength 4% polyacrylamide gel (acrylamide:bisacrylamide weight ratio of 30:1) containing 6.7 mM Tris.HCl (pH 7.5), 3.3 mM Na-acetate and 1 mM Na-EDTA. See Strauss, F. and Varshavsky, A. Cell 37 889–901 (1984). The gel was preelectrophoresed for 30 min at 11V/cm. Electrophoresis was carried out at the same voltage gradient for 90 min at room temperature with buffer recirculation. The gel was then dried and auto-radiographed at −70° C. with a screen. In FIG. 1b, F and B indicate positions of free and bound fragments respectively.

Binding assays were performed as detailed above using 2400 ng poly(dI-dC)-poly(dI-dC) and the following DNA

US 6,410,516 B1

**39**

fragments: κ SfaNI-SfaNI (~0.5 ng, 10,000 cpm, lane 1), κ PvuII-KpnI (~0.5 ng, 10,000 cpm, lane 2), κ PvuII-SfaNI (~0.1 ng, 5000 cpm, lane 3) and pSP64 PvuII-EcoRI (~0.2 ng, 5000 cpm, lane 4). The κ PvuII-SfaNI fragment was derived from the plasmid pSPIgVκ by digesting with PvuII and EcoRI. The EcoRI site is in the polylinker and therefore this fragment contains 16 bp of polylinker sequence.

2. Binding Competition Analysis in Nuclear Extracts of Human EW and HeLa Cells

EW nuclear extract, FIG. 2a. Binding assays were performed as detailed above using radiolabeled κ PvuII-SfaNI fragment (~0.1 ng, 5000 cpm) and 2400 ng poly(dI-dC)-poly(dI-dC). Reactions 2–4 additionally contained 50, 100 and 200 ng, respectively, of the bacterial plasmid pSP64 whereas 5–7 contained 50, 100 and 200 ng, respectively, of the recombinant plasmid pSPIgVκ. Assuming that a molecule of pSPIgVκ contains a single high affinity site whereas a molecule of pSP64 (3000 bp) contains 6000 non-specific sites, the apparent affinity ratio of the factor for these two types of sites is greater than $6000 \times 200/50 = 12.4 \times 10^4$ Hela nuclear extract, FIG. 2b. Binding assays were performed as detailed above using radiolabeled κ PvuII-SfaNI fragment (about 0.1 ng, 5000 cpm), 2400 ng poly(dI-dC)-poly(dI-dC) and 6 μg Hela nuclear extract protein (provided by P. Grabowski). Reactions 1 and 2 additionally contained 100 ng of pSP64 and pSPIgVκ, respectively.

3. DNase Footprinting of Factor-DNA Complexes. (FIG. 3)

The B cell nuclear extract was applied to a heparin-sepharose column equilibrated with 10 mM Hepes pH 7.9, 20% glycerol, 1 mM DTT, 1 mM EDTA, 5 mM MgCl₂ and 0.1 M KCl. The κ-promoter binding factor was eluted with a 0.25 M KCl step. Binding reactions with this fraction (30 μl) contained 2.5 mM MgCl₂, κ PvuII-SfaNI (~1 ng, 100, 000 cpm) and 4800 ng poly(dI-dC)-poly(dI-dC) in addition to components detailed above. The coding strand of the κ promoter probe was 3'-end-labeled (Eco RI site) with [α-³²P] dATP using the large fragment of E. coli DNA polymerase. Reaction 1 was digested with DNase I (5 μg/ml) for 2.5 min at room temperature in the absence of B cell nuclear extract. Reaction 2 was initially incubated with the heparin Sepharose fraction of the EW nuclear factor (14 μg protein) for 15 min at room temperature and then digested with DNase I as above. Each reaction was stopped with EDTA(5 mM) and the products separated by native polyacrylamide gel electrophoresis as detailed above. After autoradiography to visualize the various species, DNA was eluted from the free (reaction 1) and bound (B1 and B2, reaction 2) fragment bands by incubating gel slices in 0.5 M ammonium acetate (ph 7.5), 0.1% SDS and 1 mM EDTA with shaking at 37° C. overnight. The supernatants were extracted sequentially with phenol-chloroformisoamylalcohol (25:24:1 v/v) and chloroform-isoamylalcohol (24:1 v/v) and precipitated with 2 volumes of ethanol in the presence of carrier tRNA. After a reprecipitation step the products were analyzed by separation in a 10% polyacrylamide gel (20:1) in the presence of 8M urea followed by autoradiography at −70° C. with a screen. Lane 1 contains products of free fragment digestion from reaction 1. Lanes 2 and 3 contain digestion products eluted from bound bands B1 and B2, respectively, from reaction 1. Lanes 1', 2' and 3' corresponds to 1, 2 and 3, respectively, with the exception that the former set was digested with DNase .1 for 5 min. A-G chemical cleavage ladders of the K promoter probe were coelectrophoresed to map the binding domain. See Maxam, A. and Gilbert, W. Meth. Enzymol. 65, 499–525 (1980).

**40**

4. Binding of a Common Nuclear Factor to Three Ig Transcriptional Control Elements

Nucleotide sequences of actual and putative binding sites, FIG. 4a. The $V_L$ binding site is defined by the DNase I protection assay (* indicates boundaries of the protected region). The $V_H$ and $J_H$-$C_U$ sequences are putative binding sites in the $V_{17.2.25}$ promoter and the mouse heavy chain enhancer, respectively. Numbers in brackets indicate start coordinated of octamer motif. Binding competitions. Binding assays (10 μl) were performed as detailed above using 1600 ng poly(dI-dC)-poly(dI-dC) and the heparin Sepharose fraction of the EW nuclear factor (1.5 μg protein). $V_L$ probe (about 0.1 ng, 5000 cpm) lanes 1–3, 10, 11. $V_H$ probe (~0.2 ng, 5000 cpm) lanes 4–6, 12—12. $J_H$-$C_U$ probe (~0.2 ng, 5000 cpm), lanes 7–9, 14, 15. Lanes 2, 5, 8 additionally contained 5 ng of a $V_L$ promoter oligomer (36 bp, spanning positions −81 to −44 of the MOPC-41 Vκ gene segment) whereas lanes 3, 6, 9 contained 50 ng of the same oligomer. Lanes 11, 13, 15 additionally contained 50 ng of a $J_H$-$C_H$ oligomer (41 bp, spanning positions −1 to 40 of the heavy chain enhancer). Complementary single-stranded synthetic oligonucleotides were kindly made by Dr. Ronald Mertz, Genzentrum der Universitat Munchen and Dr. E. L. Winnacker, Institut fur Biochemie der Universitat Munchen. They were annealed prior to use as competition substrates in the binding assay.

Results

A radiolabeled SfaNI-SfaNI DNA fragment derived from the upstream region of the MOPC 41 κ light chain gene (FIG. 1a) was incubated with a nuclear extract of a human B cell line in the absence or-presence of two different competitor DNAs. The resulting complexes were resolved from the free fragment by electrophoresis through a low ionic strength, non-denaturing polyacrylamide gel and visualized by autoradiography (FIG. 1b). In the absence of competitor DNA all of the labeled fragment was retained at the top of the gel (lane 1) probably due to the binding of an excess of non sequence-specific proteins. With addition of increasing amounts of either poly(dI-dC)-poly(dI-dC) (lanes 2–6) or E. coli chromosomal DNA (lanes 7–11) as competitors, putative protein-DNA complexes which migrated more slowly than the free fragment were detected. The relative abundance of the major species of complex (B) as well as that of minor species was significantly greater in the presence of the alternating copolymer competitor DNA. Because substitution of the simple copolymer considerably increased the sensitivity of the assay, it was used in all subsequent binding analyses.

To test the sequence-specificity of the major species detected in the binding assay, a set of mutually overlapping Kappa promoter fragments (See FIG. 1a, SfaNI-SfaNI, PvuII-KpnI and PvuII-SfaNI) and a similar length fragment derived from the bacterial plasmid SP64 (EcoRI-PvuII) were individually assayed (FIG. 1c). Whereas the bacterial DNA fragment showed no appreciable binding (lane 4) all of the κ promoter fragments yielded major discrete complexes of similar mobilities (lanes 1–3). The mobilities of a series of complexes formed with different length fragment probes (75–300 bp) are approximately the same (data not shown). These data therefore suggested the binding of a specific nuclear factor within the region of overlap of the Kappa promoter fragments. This region includes the conserved octameric sequence but not the TATA element. Note that with the smallest 75 bp Kappa promoter fragment (lane 3) no appreciable label was retained at the top of the gel. Thus, as has been noted recently, the use of small probe fragments

US 6,410,516 B1

41

further enhances the sensitivity of detection of specific protein-DNA complexes.

The sensitivity gained by use of both the copolymer and a small fragment probe permitted the detection of two complexes, B1 and B2 (FIG. 2a, lane 1). The major species B1 corresponds to complex B in the earlier figure. The relative affinity of the factor(s) for κ promoter DNA was estimated by a competition assay (FIG. 2a). Whereas a control plasmid (pSP64), when added in the same incubation, failed to compete for binding in the concentration range tested (lanes 2–4), the recombinant plasmid (pSPIgVκ) effectively reduced the formation of both species B1 and B2 in the same range (lanes 5–7). The latter plasmid was constructed by insertion of the upstream region of the Kappa promoter into pSP64. Assuming that the pSPIgVκ plasmid contains a single high affinity binding site these results suggest that the nuclear factor(s) responsible for B1 and B2 has at least a $10^4$-fold higher affinity for its cognate sequence than for heterologous plasmid DNA (see Methods section 2 above).

To determine if the factor(s) responsible for formation of B1 and B2 was specific to B lymphocytes, a nuclear extract derived from human HeLa cells was assayed for binding to the κ promoter probe (FIG. 2b). Both species B1 and B2 were generated at similar levels as that observed with B cell extracts, by the HeLa extract (lane 1). Furthermore, both were specifically competed by the pSPIgVκ plasmid (lane 2). Thus HeLa cells also contain a factor(s) which binds specifically to the κ promoter upstream region.

DNase I footprint analysis was used to delineate at a higher resolution the binding domain(s) of factor(s) present in complexes B1 and B2. To facilitate these studies, the binding factor(s) from B cells was partially purified by chromatography of nuclear extract protein on a heparin sepharose column. Most of the binding activity eluted in a 0.25 M KCl step fraction, giving a purification of approximately 5-fold (data not shown; see legend to FIG. 3). For footprint analysis, DNase I was added for a partial digestion after incubation of the partially purified factor(s) with the κ promoter probe B1 and B2 species were then resolved from free fragment by polyacrylamide gel electrophoresis. Bound DNA was eluted from both B1 and B2 bands and examined by denaturing polyacrylamide gel electrophoresis (FIG. 3, lanes 2, 3 and 2', 3'). DNase I digests of the κ promoter probe in the absence of B cell protein (lanes 1 and 1') and A+C chemical cleavage ladders were coelectrophoresed to map the binding domain. Factor(s) in the B1 complexes (lanes 2 and 2') appeared to protect a 19 nucleotide region on the coding strand. The 5' and 3' boundaries of the protected region map to positions −72 and −52, respectively, from the site of transcriptional initiation. The region of DNase I protection was centered about the conserved octanucleotide sequence ATTTGCAT suggesting its importance in the recognition of the Ig promoter by the nuclear factor. B2 complexes showed a virtually identical DNase I protection pattern as B1 complexes and therefore do not appear to involve additional DNA contacts (lanes 3 and 3'). The simplest interpretation of this observation is that the B2 complex is generated by dimerization through protein-protein interactions of the factor responsible for the B1 complex. Alternatively, the B2 complex could be formed either by the binding of another protein to the factor responsible for the B1 complex or by recognition of the same set of sequences by a distinct DNA binding protein.

Because the octamer sequence motif is present in both light and heavy chain gene promoters as well as in the enhancer elements of both mouse and human heavy chain

42

genes, assays were performed for factor binding to fragments from a mouse heavy chain promoter ($V_H$) and the mouse heavy chain enhancer. The $V_H$ promoter fragment was derived from the 5' region of the $V_{17.2.25}$ gene and included nucleotides between positions −154 and +57 relative to the transcriptional start site. Grosscheal, R. and Baltimore, D. Cell 41 885–897 (1985). In this promoter the conserved octanucleotide spans positions −57 to −50 (FIG. 4a). The heavy chain enhancer fragment was derived from the germline $J_H$ $C_H$ region and spanned positions 81 to 251 within a 313 bp region implicated in enhancer function. Banerji, T. and E. Cell 33 729–740 (1983). The conserved octanucleotide is positioned between coordinates 166 to 173 in the above fragment (FIG. 4a). The B-cell heparin sepharose fraction (purified on the basis of binding to the Kappa promoter sequence, FIG. 4b, lane 1) evidenced binding to both the $V_H$ promoter fragment (lane 4) and to the enhancer fragment (lane 7). The mobilities of the complexes formed with the three fragments were very similar consistent with the binding of a common factor. Furthermore, binding to these fragments was specifically competed by a synthetic duplex 40-mer that spanned the octanucleotide motif of the MOPC 41 κ light chain gene promoter (lanes 1–9). An oligomer of equivalent size containing a sequence from a region of the mouse heavy chain enhancer lacking the octanucleotide motif (FIG. 4b) failed to compete for binding in the same concentration range (lanes 10–15). This competition analysis further strengthens the suggestion that a common nuclear factor (IgNF-A) binds to all three Ig transcriptional elements. As has been mentioned previously, these three transcriptional elements share an identical sequence motif ATTTGCAT (FIG. 4a). Thus, the binding of a common nuclear factor is almost certainly mediated by this motif.

Example 2

Dependency of in Vitro Transcription of Ig Genes on an Upstream Sequence

Methods

FIG. 5a: Templates. The deletions 5'Δ5 and 5'Δ7 have been described before. See Bergman Y. et al PNAS USA 81:7041 (1981). The highly conserved octanucleotide sequence which is found upstream of all sequenced heavy and light chain variable region genes is boxed (labelled "OCTA"). It is located approximately 30 base pairs upstream from the "TATA" box. The plasmids pκ and pΔκ were constructed by converting the 5'-ends of 5'Δ5 and 5'Δ7 into a Hind III site by means of synthetic linkers followed by cloning the fragment up to the Bgl II site in the $J_κ$-$C_κ$ major intron into Hind III, Bam HI digested pUC-13. pκEκ and pκEκ represent plasmids containing either the kappa enhancer of the heavy chain enhaner cloned into the unique Hind III site of pK. The segments used as the enhancers are an 800 bp Hind III-Mbo II fragment from the $J_κ$-$C_κ$ intron (Max, E. E. et al. (1981) J. Biol. Chem. 2565116) and a 700 bp Xba I-Eco RI fragment from the $J_H$-$C_H$ intron. Gillies, S. D. et al. Cell 33:717 (1983); Banerji, J. et al. Cell 33:729 (1983). FIG. 5b; transcription in whole cell extracts made from the human B lymphoma cell lines RAMOS (lanes 1,2) and EW (lanes 3,4); transcription in a HeLa whole cell extract (from A Fire (lanes 5,6)). The expected 2.3 kb run off transcript is indicated.

The cell lines RAMOS and EW were grown in RPMI medium containing 10% inactivated fetal calf serum to a density of $5–8×10^5$ cells per ml. Whole cell extracts were

43

generated according to the procedure of Manley et al., PNAS USA 77:3855 (1980), and had a final protein concentration of approximately 18 mg/ml. Run off transcription reactions were carried out at 30° for 60' in a reaction volume of 20 $\mu$l. A typical reaction mix contained 9 ul (160 $\mu$g) of whole cell extract, 50 uM each of ATP, CTP and GTP, 0.5 uM UTP, 10 $\mu$Ci of $\alpha$-$^{32}$P UTP (NEG 007x, 7600 Ci/mM) 5 mM creatine phosphate, 0.3 mg/ml creatine phosphokinase (Sigma), 12 mM Hepes 7.9, 12% glycerol, 60 mM KC1, 5 mM MG$^{++}$, 1 mM EDTA, 0.6 mM DTT, linearized template (about 50 $\eta$g) and poly (dI-dC)-poly(dI-dc) as a non-specific carrier (about 400 $\eta$g). The reactions were terminated by adding 200 $\mu$l of stop buffer (7M urea, 100 mM LiCl, 0.5% SDS, 10 mM EDTA, 250 $\mu$g/ml tRNA, 10 mM Tris (pH 7.9), followed by two extractions with phenol: chloroform: isoamyl alcohol (1:1:0.05), one with chloroform and precipitation with ethanol. The RNA's were treated with glyoxal and analyzed by electrophoresis through a 1.4% agarose gel in 10 mM sodium phosphate (pH 6.8), 1 mM EDTA. See Manley et al. supra. The gel was then dried for autoradiography with an intensifying screen at $-70$° C.

FIG. 6: Effect of the upstream deletion 5'$\Delta$7 on in vitro transcription in B cell extracts utilizing a pre-incubation pulse chase protocol. Run off transcripts obtained utilizing templates containing either the wild type promoter (lane 1) or the truncated Kappa promoter (lanes 2,3). Lanes 4–6: In vitro transcription using closed circular templates containing the wild type promoter (lane 4) or the truncated $\kappa$ promoter (lanes 5–6). In these reactions 50 $\eta$g of a closed circular template containing the adenovirus major late promoter (MLP) was included as an internal control. The transcripts specific to the $\kappa$ template or the adenovirus template are indicated as $\kappa$ and MLP, respectively. For a template containing the major late promoter the plasmid pFLBH was used. The plasmid contains sequences from 14.7 to 17.0 map units of adenovirus inserted between the Bam HI and Hind III sites of pBR322 and was the kind gift of A. Fire and M. Samuels.

Either the linearized or the supercoiled template (50 $\eta$g) was incubated in a volume of 20 $\mu$l with 9 $\mu$l (about 150 $\mu$g) of EW extract, 6% (wt/vol) polyethylene glycerol 20,000 and all other components described for FIG. 5b except the nucleotides for a period of 60 minutes at 30° C. Transcription was initiated by the addition of nucleotides and radioactive UTP to the following final concentrations: 60 uM each of ATP, CTP and GTP and 1 $\mu$M UTP and 10 $\mu$Ci $\alpha$-$^{32}$P UTP (NEG 007x, 600 Ci/mM). The initiating pulse was maintained for 10' at 30° followed by a 10' chase with a vast excess of non-radioactive nucleotides. Final concentrations during the chase were as follows: 330 $\mu$M ATP, CTP, GTP and 1 mM UTP. The reactions were quenched, worked up and the run off transcripts analyzed as described above. Mapping of the initiation site of the transcript was conducted as follows: Transcripts generated from closed circular templates were taken up in 20 $\mu$l of HE (50 mM Hepes, pH 0.7, 1 mM EDTA) and 10 $\mu$l was used for hybridization selection. A hybridization template complementary to the $\kappa$ RNA was constructed by cloning the Pva II-Sau 3A fragment which contains the cap site of the MOPC41 gene (Queen and Baltimore, Cell 33:741 (1983)) into the M13 phage MP9. Single stranded phage DNA was prepared and purified by density gradient centrifugation through cesium chloride. MLP specific transcripts were detected using the M13 clone XH11 provided by A. Fire and M. Samuels. Hybridizations were done in a final volume of 15 $\mu$l in the presence of 750 mM NaCl and 100–200 ug of single stranded complementary DNA at 50° C. for 2 hrs. The reactions were then diluted

44

with 200 $\mu$l of cold quench solution (0.2 M NaCl, 10 mM Hepes pH 7.5, 1 mM EDTA) and 2 U of ribonuclease T1 added. Digestion of single stranded RNA was allowed to proceed for 30' at 30° C. after which the reactions were extracted once with phenol chloroform isoamyl alcohol (1:1:0.05) and precipitated with carrier tRNA. The pellet was washed once with cold 70% ETOH, dried and resuspended in 80% v/v formamide, 50 mM Tris borate, pH 8.3 and 1 mM EDTA. The RNA was denatured at 95° C. for 3 min and then electrophoresed through a 6% polyacrylamide 8.3 M urea sequencing gel. The upper of 2 bands ($\kappa$) derived form the immunoglobulin promoter represent the correct start for $\kappa$ transcription. The lower band is seen at variable intensities and probably does not represent a different cap site, as explained below.

Results

Whole cell extracts were made from two human Burkitt lymphoma lines, EW and RAMOS, by the procedure of Manley et al. supra. The templates used for in vitro transcription reactions are diagrammed in FIG. 5a. The template representing the wild type gene (pK) was derived from the MOPC41 $\kappa$ gene and contained sequences from approximately 100 bp upstream from the transcription initiation site (end point 5'$\Delta$5, FIG. 5a) to the Bgl II site in the major $J_\kappa$–$C_\kappa$ intron Max, E. E. J. Biol. Chem. 256:5116. This fragment retains the complete variable region which is rearranged to $J_\kappa$ l, but not the $\kappa$ enhancer which is further downstream of the Bgl II site. See, e.g., Queen and Stafford, Mol. Cell. Biol. 4:1042 (1984). This short 5' flank has been shown to be sufficient for accurate initiation and high level of transcription in a transient transfection assay. Bergman, Y. et al. PNAS USA 81:7041 (1984). Deletion analysis of the $\kappa$ promoter showed previously that important regulatory sequences are present between nucleotides $-79$ and $-44$ because deletion 5'$\Delta$7 completely abolished transcriptional competence of the gene while deletion 5'$\Delta$5 had no effect. See Bergman et al. supra. The template representing an inactive promoter mutant (p$\Delta$k) was constructed by engineering a Hind III site into the 5' -end of 5'$\Delta$7 and cloning the segment of the gene up to the Bgl II site into pUC13 cut with Hind III and Bam HI.

To examine transcriptional activity in B cell extracts, a linear template truncated at the Sac I site in the polylinker was used and transcripts ending at this site (run off transcripts) were examined by electrophoretic separation. A run off transcript of 2.3 kb was evident when RAMOS, EW or HeLa cell extracts were used (FIG. 5b, lanes 2, 4 and 6). When a $\kappa$ chain enhancer sequence was added to the construct, no effect was evident implying that transcription in these extracts is enhancer independent (FIG. 5b lanes 1, 3 and 5). (In EW and HeLa, the enhancer appears to cause a slight increase in the background radioactivity but not in the 2.3 kb band.) The band at 2.3 kb could be abolished by not adding the template or by transcribing in the presence of 0.5 $\mu$g/ml amanitin. Thus it represents a template-specific, RNA polymerase II transcript. The band just below 2.3 kb is not decreased by $\alpha$-amanitin and presumably reflects endlabeling of endogenous 18S rRNA.

To assess whether initiation of transcription occurred at the natural cap site, a second assay was used. See Hansen, U. and P. A. Sharp (1983) EMBOJ 2:2293. For this assay, the uniformly labeled RNA was hybridized to a single stranded DNA probe spanning the transcription initiation site (generated by cloning the Pvu II-Sau 3A fragment of the $\kappa$ gene into phage M13). The resulting complex was digested with ribonuclease T1 and the ribonuclease-resistant RNA

45

fragments were analyzed by electrophoresis through a 6% polyacrylamide gel with 8.3 M urea. Analysis of in vitro synthesized RNA by this method is shown in FIG. 6 (lane4). The upper band (labeled κ) represents the correct cap site. The band just below it was seen at variable intensities and probably does not represent a different cap site but rather arises from cleavage with ribonuclease T1 at the next G residue from the 3'-end of the protected region. (Examination of the sequence near the Sau 3A1 site shows that the second set of G residues on the RNA lies 19 bp upstream from the end of the region of homology with the single stranded DNA probe). Thus the extracts generated from B cells were capable of correctly initiating and transcribing the immunoglobulin promoter in vitro with approximately the same efficiency as a HeLa cell extract.

To analyze the effect of 5' flanking sequences in vitro, we examined the transcription of the deleted gene, pΔK. Because many regulatory effects act upon the rate of initiation of transcription, we chose to use a preincubation, pulse-chase protocol which measures the initiation rates. See Fire, A. et al. J. Biol. Chem. 259:2509 (1984). The template DNA was first preincubated with the extract to form a pre-initiation complex. Transcription was then initiated by the addition of nucleotides and radiolabeled UTP. The initiated transcripts were completed during a chase period with unlabelled nucleotides and analyzed by electrophoretic separation. Incorporated radioactivity in this assay is proportional to the number of correct initiations occurring during the pulse.

In FIG. 6, comparison of lanes 2 and 3 with lane 1 shows that the template pκ, which contains about 100 bp upstream of the initiation site, initiated approximately 10-fold more efficiently than did the deletion mutant, pK. Again, the presence of the heavy chain enhancer placed at −44 bp to the truncated promoter did not alter the level of transcription. When closed circular templates were used, a similar effect of the promoter truncation was observed (FIG. 6, lanes 4–6). In these reactions a template containing the major late promoter of adenovirus was included as an internal control; the expected protected RNA fragment of 180 bp is labeled MLP. Comparison of lanes 5 and 6 with lane 4 shows that there was a 10-fold decrease in the efficiency of transcription from the mutant promoter, whereas the transcript of the major late promoter remained constant. The reason for the apparent decrease in the amount of transcription from the supercoiled template containing the heavy chain enhancer has not been further addressed. It is evident, however, that the dependence of transcription on an upstream sequence between −44 and −79 is observed whether the effect described above was specific to B cell extracts, the same templates were transcribed in the heterologous HeLa whole cell extract. A 4- to 5-fold decrease in transcription was seen with the deleted template when compared with the wild type template (data not shown). Thus, the effect of the deletion is at best, only modestly tissue-specific.

We have reported here the development of transcriptionally competent whole cell and nuclear extracts from two independent human B cell lymphomas. In such extracts, transcription from the promoter of the MOPC41 κ gene was correctly initiated and a promoter deletion significantly reduced the level of initiated RNA. In vitro, the effect of the deletion used here is several hundredfold when analyzed by a transient transfection assay. However, the effect observed in vitro is only about 10- to 15-fold. Although there are now several examples of upstream sequence requirements for in vitro transcriptions, See, e.g., Groschedl R. and Birsteil M. L. (1982) PNAS USA 79:297; Hen, R. et al. (1982) PNAS

46

USA 79:7132, the effects have been smaller than the corresponding one in vivo. This is possibly due to the dominance of the TATA box and associated factors in determining the level of transcription in vitro Miyamoto, N. G. et al., Nucl. Acids Res. 12:8779 (1984).

### Example 3

#### Discovery and Characterization of IgNF-B

The mobility shift gel electrophoresis assay was used to screen nuclear extracts from a variety of cell lines for octamer binding proteins. The band corresponding to IgNF-A was found in all extracts but a second band with distinct mobility from IgNF-A was found only in nuclear extracts from lymphoid cells. This lymphoid-specific octamer binding protein, termed IgNF-B, was found in nuclear extracts from all pre-B, mature B and myeloma cell lines tested and in nuclear extracts from some T cell lymphomas (see FIG. 7 and 8). IgNFB was not detected in nuclear extracts from the non-lymphoid cell lines, Hela, ψ2, Cos and Mel (see FIG. 8). IgNF-B was shown to be specific for the same octamer sequence as IgNF-A by competition experiments n which the IgNFB band was selectively competed by unlabelled DNA fragments sharing only the octamer sequence and not by DNA fragments lacking the octamer sequence.

The octamer sequence is found at approximately position −70 upstream of the transcription start site of all immunoglobulin (Ig) variable genes which is in the region that has been shown to control the lymphoid specificity of the Ig promoter. Thus, IgNF-B binds to the upstream octamer sequence in lymphoid cells and activate transcription.

### Example 4

#### Factors Binding to μ-Enhancer: E Factor

The fully functional μ enhancer has been localized to a 700 bp XbaI EcoRI fragment from the major intron between $J_H$ and $C_μ$. This fragment can be further sub-divided by cleaving at the PstI site to generate a 400 bp Xbal-PstI fragment (μ400) and a 300 bp PstI-EcoRI fragment (μ300). It has been shown by transient transfections that 30–50% of the tissue specific enhancer activity is retained in μ300, whereas there is no detectable activity of μ400. The gel binding assay was employed to investigate what protein factors may interact with the u-enhancer. Briefly, end-labelled DNA fragments were incubated with nuclear extracts made from tissue culture cells. After 20 min at room temperature the mixture was loaded on a low ionic strength polyacrylamide gel and electrophoresis carried out at 120V for 2 hrs. The gels were then dried for autoradiography. When the functional 300 bp (μ300) enhancer fragment was used in such an assay a DNA-protein complex was observed in extracts derived from the human B lymphoma cell line EW (FIG. 9b, lane 2). To show that this new band represented a specific complex binding reactions were carried out in the presence of varying amounts of non-radioactive competitor fragments (FIG. 9b, lanes 3–11). It is easily seen that when μ300 is added as the competitor fragment, the complex band is completely lost. In contrast, the adjacent u400 fragment (lanes 6,7,8) or a 450 bp fragment containing the κ light chain enhancer (lanes 9,10,11), cause only a minor effect even at the highest concentrations used. It is interesting to note that there appears to be a slight increase in the amount of specific complex in the presence of the κ enhancer fragment (compare lanes 9 and 2). As demon-

US 6,410,516 B1

47 48

strated below, both the $\mu$ and the $\kappa$ enhancers interact with at least one common protein and this is not the factor being detected by binding the u300 fragment. The increase in the specific complex in the presence of the $\kappa$ enhancer is probably due to the removal of factors common to both the enhancers from the reaction mix, thus leaving more of the labelled fragment available to bind to the $\mu$ specific factor being detected by it.

In order to be able to detect binding sites for less abundant proteins and also to more precisely define the complex detected with $\mu300$, this fragment was further dissected. Each of the smaller fragments generated were analyzed for their ability to serve as binding sites for nuclear proteins. FIG. 10A shows a partial restriction map of the relevant region of the $\mu$ enhancer. $\mu300$ was digested with AluI, HinfI and DdeI to generate a number of 50–70 bp fragments labelled $\mu50$, $\mu(60)_2$ (a mixture of AluI-DdeI and HinfI to AluI) and $\mu70$ (AluI-AluI). Binding reactions were carried out with each of these fragments with nuclear extracts of EW lymphoma cells in the presence of increasing amounts of the non-specific competitor poly (dI-dC)-poly(dI-dC). The results are shown in FIG. 10B.

Fragment $\mu50$ forms a major complex band (lanes 2,3,4) that is barely decreased even in the presence of 4 ug of poly(dI-dC)-poly(dI-dC) (lane 4). The mixture of the two 60 bp fragments does not give rise to a discrete complex band (lanes 6,7,8). Finally the $\mu70$ fragment gave 2 faint, but discrete, nucleoprotein complex bands (lanes 10,11,12) of which the lower one is again barely affected by 3 ugm of non-specific carrier poly(dI-C)-(dI-C) (lane 12).

Specificity of the complexes observed were shown by competition experiments using a variety of DNA fragments, FIG. 10C. Thus, the complex generated with $\mu50$ is specifically competed away in the presence of $\mu300$ (of which $\mu50$ is a part), or a $\kappa$ promoter fragment, but not by corresponding amounts of $\mu400$ or a $\kappa$ enhancer fragment, consistent with the complex being generated by the interaction of the previously described factor IgNF-A with its cognate sequence. (This factor recognizes a conserved octanucleotide, ATTTGCAT, found in the promoters of all sequenced immunoglobulin genes and within this subfragment of the heavy chain enhancer.)

The complex observed with $\mu70$ was specifically competed away by itself (lane 9) and to some extent with the $\kappa$ enhancer (lanes 5,6 FIG. 10C) but not at all by either the Moloney murine leukemia virus enhancer (lanes 3,4) or by $\mu400$ (lanes 7,8, FIG. 10D). Further competition analysis showed that this complex could not be competed away by either $(\mu60)_2$ (FIG. 2D, lanes 7,8), $\mu50$ (FIG. 2D, lanes 5,6) or $\mu170$ (central AluI-AluI fragment) (FIG. 10D, lanes 11,12). The binding we have observed is therefore specific to this small fragment and was detected only upon further dissecting $\mu300$ which separated the major observable interaction of IgNF-A with the enhancer sequence to another fragment ($\mu50$).

Ephrussi et al. and Church et al. have used methylation protection experiments to define a set of G residues within the heavy chain enhancer that are specifically resistant to methylation by DMS in B cells. This result lead to the proposal that tissue-specific DNA binding proteins were responsible for this decreased accessibility of the reagent to DNA. The protection was observed in 4 clusters, the DNA sequences of which were sufficiently homologous to derive a consensus sequence for the binding site of a putative factor. All four postulated binding sites (E1–E4) are found within the 700 bp fragment; however $\mu300$ retains only 2

complete binding domains (E3 and E4) for this factor and the octamer (0) sequence. The Alu-Alu fragment that shows that specific nucleoprotein complex described above contains the complete E3 domain and the factor we detect in vitro presumably is the same as that detected in vivo. Thus, it was unexpected that the HinfI-Dde fragment ($\mu50$) containing E4 and 0 should not compete for binding to $\mu70$ (FIG. 10D, lanes 5,6).

In case this was due to the fragment predominantly binding IgNF-A at the octamer site and thus making it unavailable as a competitor for $\mu70$, binding reactions and competition assay were done for a fraction generated by chromatography of the crude extract over a heparin-sepharose column, that contained $\mu70$ binding activity and was significantly depleted of IgNF-A. When $\mu50$ or $\mu170$ was endlabeled and incubated with the column fraction, no specific nucleoprotein complexes were seen upon electrophoretic analysis. Even in this fraction, $\mu50$ and $\mu170$ failed to compete successfully for the interaction between $\mu70$ and its binding protein (data not shown), thus implying strongly that the binding site defined as E4 perhaps does not bind the same factor that binds at E3. Similarly, the El domain (isolated as a Hinf-PstI fragment) does not compete as effectively as $\mu70$ itself for the binding of the factor to $\mu70$.

To determine the location of the binding sites within individual fragments ($\mu70$ and $\mu50$), the technique of methylation interference was employed. End-labelled DNA fragments were partially methylated on guanines and adenines using dimethyl sulfate (DMS). Methylated DNA was then used for binding reactions with crude extracts and the complex was resolved from the free fragment by electrophoresis. Both complex and free fragment bands were then excised from the gel, and the DNA was recovered by electroelution. Piperidine cleavage of the recovered fragments was followed by electrophoresis through 12% polyacylamide urea sequencing gels. In principle, if any of methyl groups introduced by reaction with DMS interfere with the binding of a specific protein then that molecule of DNA will be selectively missing in the complex formed and subsequently the corresponding ladder. The method therefore allows identification of G residues making intimate contacts with the protein. [We have found that the use of DNaseI footprinting via the gel binding assay to be complicated in the case of some of these less abundant factors because of the short half lives of the complexes themselves. Thus, if a binding incubation is followed by partial DNaseI digestion, it is possible that in the course of time required to load the sample and have the complex enter the gel, DNA fragments that were in complex form may exchange with the larger amounts of free fragment in the binding reaction. Thus not leading to any distinction in the DNase patterns seen with wither the complex or the free DNA (e.g. the half life of the nucleoprotein complex in $\mu70$ is less than 1 minute,)].

The result of carrying out such an interference experiment using nuclear extracts and on the u50 DNA fragment shows that the complex observed arises via interaction of the IgNF-A protein at the conserved octameric sequence (FIG. 3A). The free fragment generates a characteristic G ladder (FIG. 11A), lane 2,3) and the complex form (lane 1) is specifically depleted in DNA molecules carrying a methyl group at the G residue indicated by the asterisk which lies in the middle of the conserved octamer. Presumably, modification at this residue seriously impedes the formation of a stable complex between the protein and its cognate sequence. This residue was also shown to be protected against methylation of DMS in vivo. Interestingly, however, none of the other G residues observed to be protected in vivo

US 6,410,516 B1

49                                                              50

in this region of the $\mu$ enhancers appear to be affected in our in vitro interference experiment. Therefore, if these protections in vivo are due to the binding of a protein, this factor is different from IgNF-A or B and is not binding to fragment in vitro.

On the $\mu$70 fragment several G residues were identified as being important in forming intimate contacts with the binding protein (E) (FIG. 11B). On the coding strand bands the 3 G's are significantly reduced in intensity in the complex as compared to the free DNA fragment (FIG. 11B, compare lanes 1,2), and on the non-coding strand 2, G's are significantly affected (FIG. 11B, compare lanes 3 and 4).

The results of both the in vivo DMS protection experiment and the in vitro methylation interference experiments are summarized in FIG. 3C. The open and closed circles above the sequence were the residues identified by Ephrussi et al. to be protected against methylation in vivo whereas the encircled G's are the ones identified by us in vitro. The pattern of protection and interference on the $\mu$70 fragment over the consensus sequence is strikingly similar in vivo and in vitro, which indicated strongly that the protein identified here by means of the gel bind assay is the one that interacts with this sequence in vivo. Analogous to $\mu$50, however, the second set of protections seen in this region in vivo was not observed in vitro. Tissue specificity of the factors detected: In order to determined whether the proteins identified are limited to expression only in B cells, a large number of extracts made from B cells and non-B cells were screened (FIG. 12). Complexes that co-migrate with the ones generated and characterized (by competition and methylation interference experiments) in the B cell line EW, were observed on both the fragments $\mu$50 and $\mu$70 (FIG. 12; $\mu$70) in all the cell lines examined. Although the complex generated in each extract has not been further characterized, we interpret this data as indicating that both these factors are non-tissue specific. A second complex (NF-$\kappa$B) was observed with the $\mu$50 fragment that was restricted to B and T cells only.

A point to note is that although the amount of protein in each lane has been held constant at between 9 and 11 $\mu$g, the extent of complex generated was found to vary considerably from extract to extract. Thus, showing that quantitive estimations of the abundance of proteins in different cell lines using this assay is not very meaningful at this stage. (This is presumably due to subtle variations in the state of the cells and the extraction conditions for the different cell lines).

In summary, analysis of the functional 300 bp PstI-EcoRI fragment of the $\mu$ enhancer reveals that:

(i) at least 2 different proteins bind within this DNA sequence. One protein (IgNF-A) interacts with an octamer sequence (ATTTGCAT) that is highly conserved upstream of all heavy and light chain variable region genes and is also found in the u enhancer. The second protein interacts with a sequence shown by Ephrussi and Church to be protected in a tissue specific manner against methylation by DMS in whole cells;

(ii) both factors can be detected in nuclear extracts from a variety of cell lines and are therefore not B-cell specific;

(iii) both E1 and E4 sequences hardly compete for the binding of the factor to $\mu$70 (which corresponds to E3), thus implying that these sequences do not interact with the same factor, although the sequence homology amongst the sites would have lead one to expect that they should.

Example 5

Identification of Factors Binding to Kappa-light Chain Enhancer

An enhancer element has also been identified in the major intron of the $\kappa$ light chain gene. Picard and Schaffner showed

that the enhancement activity can be localized to a ~500 bp AluI-AluI fragment and Queen and Stafford have further refined the 5' and 3' boundaries so that the enhancer may be considered restricted to 275 base pairs within the larger fragment. We have dissected this region into a number of smaller fragments and assayed each of these by means of the gel binding assay for the location of protein binding sites.

A restriction map of the relevant region of the $\kappa$ enhancer is shown in FIG. 13$a$. The black boxes represent sequences identified by Church et al. to be homologous to the putative protein binding domains detected in the $\mu$ enhancer in vivo.

Fragments generated by cutting with Dde and HaeIII ($\kappa$1, $\kappa$2, $\kappa$3, $\kappa$4 and $\kappa$5; FIG. 13$a$) were assayed for binding in the presence of increasing amounts of poly(dI-dC)-(dI-dc) as a non-specific carrier, $\kappa$4 and $\kappa$5 appeared to be strongly negative (FIG. 13$b$, lanes 1–8) while $\kappa$3 and $\kappa$2 appeared to be positive (FIG. 13$b$, lanes 10–12 and 14–16). Preliminary results show that the internal fragment does not contain any specific binding sites either. The nucleoprotein complex bands generated with 0.5–1 ng of radiolabelled probe could be detected even in the presence of 3 $\mu$g of the carrier (lanes 12, 16, FIG. 13$b$).

To show that the bands detected represented a specific interaction between a protein and DNA, we carried out competition experiments (FIG. 13$c$ and 13$d$). The competition pattern for $\kappa$2 was strikingly similar to what had been earlier observed with the $\mu$70 fragment; relatively large amounts of u400, the Moloney leukemia virus enhancer, the SV40 enhancer or the $\kappa$ promoter (containing the conserved octa) to $\kappa$2 did not compete for binding, although u300 and the $\kappa$ enhancer did. Since $\kappa$2 contains a putative E box we competed its binding with smaller fragments from $\mu$300 (FIG. 5C). The complex is specifically competed away by the addition of unlabelled $\mu$70 during the incubation (compare lanes 3 and 4 with lane 2), but not by $\mu$60 (lanes 5,6), $\mu$170 (lanes 7,8) or the SV40 enhancer (lanes 9,10). Further, the protein that binds to this sequence co-fractionates with the $\mu$70 binding activity through two sequential chromatographic steps (Heparin agarose and DEAE Sepharose). Thus, we conclude that the same sequence specific protein binds to both the fragments $\mu$70 and $\kappa$2 and that there is at least one common protein interacting with both the $\mu$ and the $\kappa$ enhancers.

The $\kappa$3 complex (indicated by the arrowhead, FIG. 13$d$) failed to be competed away by u300 (compare lanes 3 and 4 with lane 2), $\mu$400 (compare lanes 5 and 6 with lane 2) as a $\kappa$ promoter containing fragment (compare lanes 7 and 8 with lane 2). However, the complex was specifically competed away with both the complete $\kappa$ enhancer (lanes 9,10) and the SV40 enhancer (lanes 11,12). The band below the major $\kappa$3 complex was seen at variable intensities in different experiments and failed to compete even with the complete $\kappa$ enhancer in this experiment and has not been further investigated at this stage. The observation that the SV40 enhancer specifically competes for binding of this factor is not altogether surprising, since this fragment and the SV40 enhancer share an identical stretch of 11 nucleotides.

The binding site of this factor on the $\kappa$3 fragment was localized by methylation interference experiments. In two different extracts, methylation at three of a stretch of 4 residues within this sequence completely abolished binding (FIG. 14, compare lane 1 [complex] and 2 [free]; and lanes 3 [complex] and 4 [free]). This stretch of G's forms a part of the conserved region (GGGGACTTTCC) between the SV40 enhancer and $\kappa$3. Thus, the binding site was localized

US 6,410,516 B1

51

towards one end of the κ3 fragment. The results also served to explain the specific competition observed earlier with the SV40 Enhancer. Interestingly, deletion mapping of the κ enhancer shows that sequences within the κ3 fragment are extremely important for enhancer function.

The tissue range of this factor was examined by carrying out binding analysis with κ3 in extracts from a variety of cell lines. Nucleoprotein complex formation κ3 was detected in a mouse B cell line (FIG. 15a, lane 2), but not in 5 other non-B cell lines (FIG. 15a, odd numbered lanes from 5–11). Even numbered lanes show that the ubiquitous factor detected by μ50 is present in all these cell lines and served as a positive control for the experiment. The factor κ3 therefore appears to be restricted to expression to B lymphoid cells.

We then examined extracts made from cells at various stages of B cell differentiation (FIG. 15B). Interestingly κ3 binding protein can be detected in the Abelson murine leukemia virus transformed pre-B cell line PD, in two mouse B cell lines (WEH1231 and AJ9, FIG. 15B, lanes 12,14), one human B cell line (EW, FIG. 15B, lane 16) mouse myeloma line (MPC22, FIG. 15B, lane 18) and 2 human myelomas (KR12 and 8226, FIG. 15B, lanes 20,22). However, it does not appear to be present in a pre-preB cell line (C5, FIG. 15B, lane 4) and in mouse pre-B cell lines (HAlFL, 38B9, 70Z, FIG. 15B, lanes 6,8,10). Thus, this factor appears to be not only tissue-specific, i.e., limited to cells of the B lymphoid lineage, but also stage-specific within that lineage. In the series of extracts examined, the presence of this factor bears a striking correlation with κ expression.

The results with the Kappa enhancer can be summarized as follows: Dissection of the κ enhancer enabled detection of two distinct binding proteins with this DNA. One of these proteins appears to be ubiquitous and interacts with the u heavy chain enhancer as well. The second protein appears to be highly expressed in a stage-specific manner within the B cell lineage and can be detected only in those cell lines where the endogenous κ gene is active. There does not appear to be a binding site for this factor in the heavy chain enhancer, although there is one in the SV40 enhancer. Examples 6 and 7 describe cloning of two transcriptional factors: NF-κB and IgNFB.

Example 6

Cloning of Putative NF-κB

Experimental Procedures

λ.gt11-EBNA-1 Recombinant

A HinfiI-AhaII DNA fragment of the EBV genome (coordinates 107,946–109,843), that contains the EBNA-1 open reading frame, was subcloned using BamHI linkers into the BamHI site of pUC13 (pUCEBNA-1). The λ.gt11-EBNA-1 recombinant was constructed by inserting the 600 bp SamI-BamHI fragment of pUCEBNA-l (EBV coordinates 109,298-109,893) into the EcoRI site of λ.gt11 using an EcoRI linker (GGAATTCC). A phage recombinant containing the EBNA-1 insert in the sense orientation was isolated by immunoscreening with EBNA-1 antibodies (see below). In this recombinant, the carboxy-terminal region of EBNA-1 (191 amino acids) is fused in frame to the carboxy-terminus of β-galactosidase.

λ.gt11 cDNA Expression Library

The human B cells (RPMI 4265) cDNA library constructed in the expression vector λ.gt11 was purchased from Clontech Laboratories, Inc. The library contains approximately 9×10⁵ independent clones and has an average insert size of 1.2 kb.

52

E. Coli Strains

The standard pair of λ.gt11 host strains, Y1090 and Y1098, were employed. The former was used to screen λ.gt11 recombinants and the latter to generate λ.lysogens for the analysis of β-gal fusion proteins.

Plasmids

The plasmid pUCoriP1 was constructed by subcloning the EcoRI-Ncol fragment from the oriP region of the EBV genome into the SmaI site of pUC13. This fragment contains 20 high affinity binding sites for EBNA-1. pUCoriP2 was derived from pUCoriP1 by subcloning of an oriP fragment (EcoRI-BstXI) of the latter into the SmaI site of pUC13. pUCoriP2 contains 11 high affinity binding sites for EBNA-1. pUCORIλ2 was made by insertion of a synthetic binding site for the bacteriophage λO protein (AAATCCCCTAAAACGAGGGATAAA) into the SmaI site of pUC13. The complementary oligonucleotides were a gift of R. MacMacken. pUCMHCI and pUCmhcI were constructed by insertion of the following oligonucleotides: GATCCGGCTGGGGATTCCCCATCT GATCCGGCT-GcGGATTCCCaATCT GCCGACCCCTAAGGGGTAGACTAG GCCGACgC-CTAAGGGgTAGACTAG into the BamHI site of pUC13. The wild type sequence is a binding site for H2TF1 and NF-κB. pUCOCTA is a similarly constructed pUC18 derivative that contains a synthetic recognition site (ATGCAAAT) for the mammalian octamer binding protein(s). The plasmids p190H2KCAT (−190 to +5) and p138H2KCAT (−138 to +5) contain 5'-deletions of the H-2K^b gene promoter fused to the coding sequence for chloramphenicol acetyl transferase. All plasmid DNAs were purified by an alkaline lysis protocol followed by two bandings in CsCl-EtBr gradients.

Binding Site Probes Competitor DNAs

The MHC, mhc1, ori and OCTA probes were generated by digesting the corresponding pUC plasmids with EcoRI and HindIII. The resulting products were end-labeled with [α-³²P]dATP using the large fragment of E. coli DNA polymerase I. dCTP, dGTP and dTTP were included in these reactions so as to fill in the ends of the restriction fragments. The labeled fragments were separated by native polyacrylamide gel electrophoresis. The binding site fragments (60–75 bp) were eluted from the gel and purified by ELUTIP™ (Schleicher and Schuell) chromatography. Using high specific activity [α-³²P]dATP (5000 Ci/mmol), typical labelings yielded DNA probes with specific activities of 2–4×10⁷ cpm/pmol.

To generate the oriP probe, pUCoriP2 was digested with EcoRI and HindIII, and the oriP fragment (~400 bp) isolated by low melt agarose gel electrophoresis. This DNA fragment was then digested with HpaII and the products labeled as detailed above. The smaller of the two HpaII fragments (~90 bp) was isolated for use as the oriP probe. The MHCg probe was prepared by digesting p190H2KCAT with XhoI was labeling as before. The labeled DNA was then digested with HincII and the 90 bp probe fragment purified as before. This probe contains sequence from −190 to −100 of the upstream region of the H−2K^b gene.

The Δ6MHCg (−190 to +270) and Δ11MHCg (−138 to +270) competitor DNAs were prepared by digesting the plasmids, p190H2KCAT and p138H2KCAT, with XhoI and EcoRI. The H2KCAT fragments were isolated by low melt agarose gel electrophoresis.

RESULTS

Specific Detection of a λ. Recombinant Expressing EBNA-1

A model system was used to test the notion that a recombinant clone encoding a sequence-specific DNA bind-

53

ing protein could be specifically detected with a recognition site probe. The Epstein-Barr virus nuclear antigen (EBNA-1) was selected as the model protein. EBNA-1 is required for maintenance of the EBV genome as an autonomously replicating plasmid in human cell lines. It is also a transactivator of viral gene expression. The carboxy-terminal region of EBNA-1 (191 amino acids) has been expressed in *E. coli* as a fusion protein and shown to encode a sequence-specific DNA binding domain. The fusion protein binds to multiple high affinity sites at three different loci in the EBV genome. Two of these loci consitute a cis-acting element required for maintenance of the plasmid state (oriP). In the λgt11-EBNA-1 (λEB) recombinant the carboxy-terminal region of ENBA-1 was fused in frame to the carboxy-terminus of β-galactosidase (FIG. 16). A lysogen harboring the λEB phage conditionally expressed a βgal-EBNA-1 fusion protein of expected size (approximately M.W. 145,000) that accumulated to a level of about 1%. The DNA binding activity of the fusion protein was assayed with a segment of oriP DNA that contained two high affinity sites for EBNA-1 (FIG. 16). Extracts of λgt11 and λEB-lysogens were incubated with labeled oriP DNA and the products resolved by native polyacrylamide gel electrophoresis. With the λEB extract, a distinct set of protein-DNA complexes was observed. The formation of these complexes was specifically competed by an excess of plasmid DNA containing EBNA-1 binding sites. Thus, the β-gal-ENBA-1 fusion protein has the expected sequence-specific DNA binding activity.

To establish conditions for detection of EB plaques with probes of oriP DNA, protein replica filters were generated from platings of the phage. These filters were screened with a variety of protocols using oriP or control DNAs. Under a defined set of conditions (see Experimental Procedures), λEB plaques can be specifically detected using radiolabeled oriP DNA. The control probe (ori) contains a high affinity binding site for the bacteriophage λO protein. The specific array of spots generated by the oriP probe corresponded to plaques on the master plate as well as to spots that reacted with antiserum to β-gal on the replica filter. Furthermore, in a similar experiment the oriP probe did not detect control λgt11 plaques. From a series of such experiments the following conclusions were drawn; (i) the specific detection of λEB plaques requires a DNA probe with at least one binding site for EBNA-1 (a duplex 30-mer with a consensus binding site sequence gave a signal comparable to a probe containing two or more binding sites), (ii) DNA probes longer than 150 bp yield higher non-specific signals, (iii) the addition of an excess of non-specific competitor DNA [poly(dI-dC)-poly(dI-dC)] to the binding solution reduces the non-specific signal, and (iv) both specific and non-specific interactions of the DNA probe with proteins on the replica filter are reversible. In view of this latter point and the fact that non-specific interactions typically have much shorter half-lives than the specific interactions, sequence-specific binding proteins can be detected after a suitable wash time.

Given the ability to specifically detect λEB plaques with oriP DNA, reconstruction experiments were carried out to test the sensitivity of the screen. In these experiments the λEB phage was mixed with an excess of control λgt11 recombinants. Relica filters generated from such mixed platings were screened initially with oriP DNA and subsequently with antibodies to EBNA-1. In an experiment where approximately 5,000 phage were plated, with λEB being present at a frequency of $10^{-2}$, a identical number of positives (approximately 50) were detected with both oriP

54

DNA and antibody probes. In fact, the two patterns are superimposable. Furthermore the signal to noise ratio of the DNA binding site probe was better than that of the antibody probe. Thus it is possible to screen for the λEB phage with an oriP DNA probe.

Screening for Mammalian Clones Encoding Sequence-Specific DNA Binding Proteins

A λgt11 library of cDNAs prepared with mRNA from human B cells was screened using the conditions developed with λEB. The DNA probe used in the screen contained a regulatory element from a mouse MHC class I gene (H-2K$^b$. FIG. 17). This sequence (MHC) was synthesized and cloned into the pUC polylinker. The mammalian transcriptional regulatory factors H2TF1 and NF-κB bind with high affinity to this MHC element. In a screen of $2.5\times10^5$ recombinants, two positive phage, designated λh3 and λh4, were isolated. In an autoradiogram of a filter from the primary screen, a positive spot resulted in the isolation of λh3. Partially purified λh3 and λh4 phage were challenged with other DNA probes to determine if their detection was specific for the MHC probe. λh3 and λh4 were not detected by the ori probe. These phage were also not detected by labeled pUC polylinker DNA or by a related probe (OCTA) containing a recognition site for the immunoglobulin octamer binding protein(s). A mutant MHC binding site probe (mhcl FIG. 17) was used to more stringently test the sequence-specificity of the presumptive fusion proteins. The mhcl probe did not detect either λh3 or λh4 plaques. These data strongly suggested that the two phage express proteins that bind specifically to the MHC element.

Characterization of the DNA Binding Proteins Encoded by λh3 and λh4

Direct evidence that the β-gal fusion proteins encoded by λh3 and λh4 are responsible for the sequence-specific DNA binding activities was obtained by screening Western blots with DNA and antibody probes. Lysogens of λgt11, λh3 and λh4 were isolated and induced to generate high levels of their respective β-gal proteins. Western blots of proteins from induced lysogens were prepared and the immobilized proteins were briefly denatured with 6M guanidine and then allowed to renature (see Experimental Procedures above). This treatment increased the recovery of active molecules. Two equivalent transfers were initially probed with either the MHC element or the OCTA control DNA. A set of four bands specific to the MHC probe and the λh3, λh4 tracks was observed. The two largest species of this set are labeled P1 and P2. The same transfers were then probed with antibodies to β-gal. A pair of novel fusion protein bands was observed with each of the two recombinant lysogens. These bands corresponded to the species P1 and P2 detected with the MHC probe. This shows that λh3 and λh4 encode β-gal fusion proteins which bind specifically to the MHC element DNA. The two phage may be identical since they encode the same size fusion proteins. P1 (approximate m.w. 160,000) probably represents the full length fusion protein whereas P2 is a presumptive proteolytic cleavage product. Since the β-gal portion of this fusion polypeptide has a molecular weight of approximately 120,000, the cDNA encoded portion must have a molecular weight of 40,000.

A gel electrophoresis DNA binding assay was used to confirm the sequence specificity of the λh3 and λh4 fusion proteins as well as to better define their recognition properties. Extracts derived from the λgt11, λh3 and λh4 lysogens were assayed, with the MHC probe. A novel DNA binding activity was detected specifically in extracts of the λh3 and λh4 lysogens. This activity was IPTG inducible indicating that it was a product of the lacZ fusion gene. A

55                                                              56

competition assay indicated that the activity represented a sequence-specific DNA binding protein. Two 5' deletion mutants of the H–2K$^b$ genomic sequence was used as competitor DNAs. The segment 6MHCg extends to 190 nucleotides upstream of the transcription start site and contains the MHC sequence element. The segment Δ11MHCg, on the other hand, only contains 138 nucleotides of sequences upstream of the initiation site and therefore lacks the MHC element. Increasing amounts of Δ6MHCg specifically competed for the binding of the λh3 fusion protein to the MHC element oligonucleotide probe while the control Δ11MHCg did not compete. It should be noted that the sequences flanking the MHC element in the probe used for the initial screening, the cloned oligonucleotide, are totally difference from the sequences flanking the same element in the genomic probe, Δ6MHCg. Therefore, the fusion protein appears to exclusively recognize the common MHC element. This was confirmed by a direct DNA binding assay with a genomic sequence probe (MHCg) containing the MHC element. Both the oligonucleotide (MHC) and genomic (MHCg) probes gave rise to similarly migrating complexes. Furthermore, a double base substitution mutant (mhc1, FIG. **17**) abolished recognition by the fusion protein. The mutant sequence contains a transverion in each half of the symmetric MHC element. These changes destroy the symmetry of the element and abolish binding by either H2TF1 or NF-κB.

The immunoglobulin κ chain gene enhancer contains a binding site ( EN) for NF-κB. This site is related in sequence to the MHC element but is recognized by H2TF1 with a 10 to 20 fold lower affinity (FIG. **17**). A mutant κ enhancer (κEN) has been characterized both in vivo and in vitro. This mutant sequence has no B cell specific enhancer activity and is not bound by NF-κB. The mutant contains clustered base substitutions and an insertion of a base pair in one of the two symmetric half sites (FIG. **17**). The binding of the λh3 fusion protein to the wild type κ-element and the mutant version was tested. The κEN probe generated a complex with a mobility similar to those obtained with the MHC probes. No specific complex was formed with the mutant κ-enhancer DNA. Experiments in which the MHC and κ-enhancer binding sites were tested for competition with binding of the MHC probe showed that the fusion protein bind with 2–5 fold higher affinity to the MHC site (data not shown). The κEN site differs, in part, from the MHC site by the substitution of two adenine residues for guanine residues. As discussed below, these guanine residues are probably contacted by the fusion.

The contacts of the fusion protein with the MHC element were probed chemically by modification of the DNA with dimethylsulfate. After partial methylation at purine residues, the modified probe was used in the gel electrophoresis DNA binding assay. Free (F) and bound (B) probe DNA was recovered, subjected to chemical cleavage at methylated interference experiment. On both the coding and non-coding strands strong interference was detected when any of central guanine residues of each putative half site was modified at the N-7 position in the major groove. Weaker interference was observed when the external guanine residue in either putative half site was similarly modified. Thus the fusion protein appears to symmetrically contact the MHC element in a manner similar to both H2TF1 and NF-κB.

Hybridization Analysis with the cDNA Segment of the Recombinant Phage

The recombinant phage λh3 and λh4 contain cross-hybridizing and equivalent size (approximately 1 b) cDNA segments. The inserts also have indistinguishable restriction

maps and therefore appear to be identical. Southern blot hybridization confirmed that these cDNA segments are homologous to sequences in the human genome. The patterns of hybridization to restriction digests of genomic DNAs of various human cell lines are identical. Furthermore, the fact that restriction digests with Bam HI (no site in cDNA) and Pst I (on site in cDNA) both generate two prominent bands suggests that the cDNAs are derived from a single copy gene. A similarly simple hybridization pattern is observed on probing the mouse and rat genomes.

The expression of the human gene was analyzed by Northern blot hybridization. A single, large transcript (approximately 10 kb) was observed with polyA(+) RNA from both B (X50-7) and non-B human cells (HeLa). This transcript is moderately abundant in both cell types. Since the cDNA library was constructed by oligo dT priming, we were probably fortunate to obtain the coding region for the DNA binding domain within the 1 kb segments of the recombinant phage. However, this only illustrates the power of the screening strategy for the isolation of clones encoding sequence-specific DNA binding domains.

Discussion

A novel strategy is disclosed for the molecular cloning of genes encoding sequence-specific DNA binding proteins. This strategy can be used to isolate genes specifying mammalian transcription regulatory proteins. An important step in this approach is the detection of bacterial clones synthesizing significant levels of a sequence-specific DNA binding protein by screening with a labeled DNA binding site probe. This approach is similar to that previously developed for the isolation of genes by screening recombinant libraries with antibodies specific for a given protein. In fact, the phage expression vector, λgt11, developed previously for immunological screening can in this approach.

The feasibility of the strategy was established by the specific detection of a phage recombinant, λEB, encoding a β-gal-EBNA-1 fusion polypeptide with oriP DNA. Conditions have also been developed for the selective detection of E. coli colonies expressing high levels of EBNA-1 or the bacteriophage λO protein with their respective binding site DNAs. In these cases, a plasmid expression vector was employed. Using the conditions developed with λEB, we have screened phage cDNA libraries with three different DNA probes. Screening with a probe containing the H2TF1 site in the MHC class I gene H-2K$^b$ led to the isolation of two identical clones that specify a putative transcription regulatory protein (properties discussed below). In similar screens with two other DNA probes, positive recombinant phage were also isolated at a frequency of approximately 1/100,000. However, the DNA binding proteins encoded by these phage do not appear to recognize specific sequence elements but rather to bind sequence nonspecifically to either single strand or double strand DNA. Although detection of these types of clones represented a troublesome background in this study their isolation suggests that recombinants encoding different types of DNA binding proteins can be detected by such functional screens of expression libraries. In future screens for recombinants encoding site-specific DNA binding proteins, the detection of these other types of clones might be selectively suppressed by inclusion of a non-specific competitor DNA that is structurally more similar to the probe than poly(dI-dC)·poly(dI-dC).

The prospects for the isolation of other cDNAs encoding sequence-specific binding protein by this strategy can be assessed by examining the three assumptions on which it is based: (i) functional expression of the DNA binding domain of the desired protein in E. coli, (ii) a strong and selective

US 6,410,516 B1

57

interaction of the binding domain and its recognition site, and (iii) high level expression of the DNA binding domain. A number of eukaryotic sequence-specific DNA binding proteins have been functionally expressed in $E.$ $coli.$ These include the proteins GAL4, GCN4 and MAT 2 of yeast, ftz of Drosophila, TFIIIA of Xenopus, E2 of the bovine papilloma virus and EBNA-1 of the Epstein Barr Virus. In most cases, the functional DNA binding domain is contained within a short tract of amino acids. Thus, it is reasonable to expect the functional expression in $E.$ $coli$ of the sequence-specific DNA binding domain of most eukaryotic regulatory proteins. The equilibrium association constants of site-specific DNA binding proteins range over many orders of magnitude ($10^7$–$10^{12}$ M). The following analysis suggests that successful screening may be restricted to proteins with relatively high binding constants. If a regulatory protein has an association constant of $10^{10}$ M, then under the screening conditions (the DNA probe is in excess and at a concentration of (~$10^{10}$ M) approximately half of the active molecules on the filter will have DNA bound. Since the filters are subsequently washed for 30 minutes, the fraction of protein-DNA complexes that remain will be determined by their dissociation rate constant. Assuming a diffusion limited association rate constant of $10^7$ $M^{-1}$ $S^{-1}$, the dissociation rate constant will be $10^{-3}$ $S^{-1}$. Such a protein-DNA complex will have a half life of approximately 15 minutes. Thus only a quarter of the protein-DNA complexes will survive the 30 minute wash. For a binding constant of $10^9$ M, only about a tenth of the active protein molecules will have DNA bound and much of this signal will be lost, since the half-life of these complexes is approximately 1.5 minutes. Isolation of recombinants encoding proteins with binding constants of $10^9$ or lower may be possible given that the binding of probe to less than 1% of the total fusion protein within a plaque can be detected. The sensitivity of the current methodology for low affinity proteins could be significantly enhanced by covalent stabilization of protein-DNA complexes. This might be accomplished by procedures such as UV-irradiation of pre-formed complexes. Since the binding constants of regulatory proteins are dependent on ionic strength, temperature and pH, these factors might also be manipulated to enhance detection.

The successful detection of λEB and λh3 recombinants with DNA binding site probes required high level expression of their fusion proteins. In both cases, the fusion proteins accumulate, after induction, to a level of about 1% of total cellular protein. This level of recombinant protein expression is typical of λ.gt11 as well as other $E.$ $coli$ vectors. The strategy of cloning a gene on the basis of specific detection of its functional recombinant product in $E.$ $coli$ has considered potential. Indeed, while our work was in progress, this approach was used by other to isolate clones encoding a peptide acetyltransferase and a calmodulin-binding protein. Direct screening of clones encoding recombinant protein products has also been used to isolate ras GTP-binding mutants.

The λh3 recombinant expresses a β-gal fusion protein that recognizes related transcription control elements in the enhancers of the MHC class I and immunoglobulin κ-chain genes (see FIG. 17 for sequences). This protein also binds a similar element in the SV40 enhancer 72 bp repeat. Furthermore, there are two putative binding sites in the long terminal repeat (LRT) of the HIV genome (FIG. 17). One of these is identical to the site in the SV40 enhancer and therefore should be recognized by the fusion protein. The existence of a clone such as λh3 was anticipated since it had previously been shown that a common factor, NF-κB, binds

58

to the three related elements in the enhancer, the SV40 72 bp repeat an the HIV-LTR. Interestingly, these three binding sites are more closely related to one another than they are to the MHC site (FIG. 17). The former set can be viewed as variants of the MHC site which exhibits perfect two-fold symmetry. It should be noted that the pUC polylinker contains the sequence, CGGGGA, which is a variant of one of the symmetric halves (TGGGGA) of the MHC element. The fusion protein does not bind with detectably affinity to the pUC polylinker. Thus, a high affinity interacter appears to require both symmetric halves.

Even though the above control elements represent quite similar sequences, they function in very different regulatory capacities. The MHC element is a component of an enhancer that functions in a variety of cell types that express MHC class I genes. The κ-element, on the other hand, is a component of a cell-type specific enhancer that functions only in B cells. The activity of this enhancer is induced in pre-B cells upon their differentiation into mature B lymphocytes. Such differentiation, in vitro, is accompanied by transcriptional activation of the chain gene. The κ-element appears to dictate the B cell specificity of the κ-enhancer. The different modes of functioning of the MHC and κ-elements are correlated with the properties of their corresponding recognition factors, H2TF1 and NF-κB. H2TF1 activity is detected in a variety of differentiated cell types and this protein appears to stimulate MHC class I gene transcription approximately 10-fold. On the other hand, NF-κB activity is detected only a mature B cells. In addition, this activity is induced during differentiation of pre-B cells to mature lymphocytes. Finally, NF-κB activity is also induced by phorbol ester treatment of non-B cell lines (HeLa, Jurkat). In the case of Jurkat cells, a T4+ human T cell line, NF-κB appears to stimulate the transcriptional activity of the HIV-LTR. It should be noted that induction of NF-κB in non-B cells does not require new protein synthesis. Thus the protein for NF-κB must exist in cells before induction and the activated by a post-translational modification.

The DNA binding properties of the fusion protein encoded by the recombinant λh3 overlap those of H2TF1 or NF-κB. Mutants of the MHC and κ-elements that are not recognized by H2TF1 or NF-κB are also not bound by the fusion protein. The recombinant protein binds the MHC element DNA with 2–5 fold higher affinity than the κ-element. In this regard, the fusion protein has relative affinities intermediate between those of H2TF1 and NF-κB. H2TF1 binds the MHC element with 10- to 20-fold higher affinity than the κ-element while NF-κB recognizes both elements with roughly equivalent affinity. This intermediate relationship is also observed in the comparison of the methylation interference patterns of the three DNA binding activities. Methylation of any of the central six guanine residues in the MHC site strongly interfers with the binding of all three activities. Methylation at either of the two external guanines partially interferes with recognition by the fusion protein. In contrast, H2TF1 binding is strongly suppressed upon methylation of either of these residues while NF-κB binding shows little perturbation upon this modification. This analysis of the three DNA binding activities is limited by the use of cell extracts and not purified proteins. Furthermore, the properties of a recombinant protein may be different from those of its native counterpart. Thus, it is not possible to be definitively relate the protein encoded by λh3 to either H2TF1 or NF-κB.

Antibodies raised against the λh3 fusion protein will be useful in clarifying its structural relationship with H2TF1

US 6,410,516 B1

59

and NF-κB. A definitive relationship will emerge from a comparison of the deduced amino acid sequence of the cDNA and the protein sequences of H2TF1 and NF-κB. It should be noted that in terms of protein expression, both H2TF1 and NF-κB are present in a wide variety of mammalian cells. Furthermore, the DNA binding specificities of these two factors are remarkably similar. These facts as well as the observations that the cDNA in λh3 hybridizes to a single copy gene and to a single mRNA in both B and non-B cells suggest that all three binding activities may be products of the same gene. This hypothesis would imply that H2TF1 and NF-κB represent alternative modifications of a common protein.

Example 7

Cloning of the IgNFB Gene

Methods

DNA Sequencing

DNA sequencing was performed on double stranded plasmid DNA templates according to the Sanger dideoxy-nucleotide protocol as modified by United States Biochemical for use with bacteriophage T7 DNA polymerase (Sequenase). The entire sequence was confirmed by sequencing the opposite strand and in the GC-rich regions by sequencing according to Maxam and Gilbert (*Methods Enzymol.,* 65: 449–560, (1980).

Plasmid Constructions

cDNA's were subcloned from λgt11 to pGEM4 (Promega), and these plasmids were used for DNA sequence analysis and in vitro transcription. Plasmid pBS-ATG was kindly provided by H. Singh and K. LeClair and was constructed by ligating a 27 bp long oligonucleotide containing an ATG codon surrounded by the appropriate boxes for efficient initiation, TGCACACCATGGCCATCGATATCGATC, into the PstI site of pBS−/+Bluescropt plasmid (Stratagene). The expression vector pBS-ATG-oct-2 depicted in FIG. **19A** was designed for transcription and translation in vitro and was constructed by cleaving pBS-ATG with SmaI and ligating the blunt-ended EcoRI 1.2 kb cDNA fragment from plasmid 3-1 (position 655 to 1710 in FIG. **18A**).

In Vitro Transcription/Translation

In vitro transcription and translation reactoins were performed as recommended by the manufacturer (Promega).

DNA Binding Assay

The EcoRI/HindIII 50 bp fragment containing the wild type octanucleotide sequence ATGCAAAT in the BamHI site of pUC18 polylinker was $^{32}$P-labeled (50,000 cpm/ng) and 1 ng DNA probe was incubated with 1 μl of the reacted/unreacted reticulocyte lysate. The binding reactions were incubated at room temperature for 30 min. and contained 10 mM Tris HCl pH7.5, 50 mM NaCl, 1 mM DTT, 1 mM EDTA pH8, 5% glycerol, 25 μl/ml sonicated denatured calf thymus DNA in 2.5 μl/ml sonicated native calf thymus DNA as nonspecific competitors. The complexes were resolved by electrophoresis in 4% polyacrylamide gel (acrylamide: bisacrylamide weight ratio of 30:1) containing as buffer 25 mM Tris HCl pH8.5, 190 mM glycine, 1 mM EDTA buffer as previouly described (Singh et al., Nature 319: 154–158 (1986)).

Purification of NF-A2

NF-A2 was purified to >90% homogeneity from nuclear extracts derived from the human Burkett's lymphoma cell line, BJAB. Purification was accomplished by sequential fractionation on Zetachrom QAE discs (Cuno Inc.), heparin sepharose (Pharmacia), ssDNA cellulose (Pharmacia), and on a DNA affinity column which contained an immobilized

60

double straded (ds) segment containing the octanucleotide sequence. In vitro translated, $^{35}$S-methionine-labeled, oct-2 protein was purified by chromatography on dsDNA cellulose followed by affinity chromatography on the octanucleotide DNA affinity column.

Tryptic Digestions of NF-A1 and oct-2 Protein

Tryptic digests were performed at room temperature in a buffer consisting of 20 mM Hepes,KOH, pH 7.9, 20% glycerol, 0.5 M KCl, 0.2 mM EDTA, 0.5 mM DTT. Aliquots of purified NF-A2 (~250 ng) or of affinity purified oct-2 protein (90,000 cpm) were incubated with varying amounts of trypsin (affinity incubated with varying amounts of trypsin (affinity purified trypsin was a gift of Dan Doering). After 60 minutes, reactions were terminated by the addition of 2.5 volumes of SDS-PAGE sample buffer and were boiled for 5 minutes. The tryptic digests were resolved on 10% polyacrylamide gels. Tryptic fragments of NF-A2 were visualized by silver-staining. Tryptic fragments of $^{35}$S-methionine labeled oct-2 protein were visualized by auto-radiography after treatment of the gel with En$^3$hance (Dupont).

To clone the gene encoding the lymphoid-specific octamer binding protein, IgNF-B (NF-A2), a randomly primed, non-size selected cDNA library in λgt11 was constructed using cytoplasmic poly (A)-containing mRNA from a human B cell lymphoma cell line, BJAB. We had previously observed that this cell line contained a particularly large amount of NF-A2 when 28 lymphoid cell lines were surveyed. By randomly priming the cDNA synthesis we expected to obtain recombinant phage encoding the octamer motif binding domain even if that domain was encoded by the 5' end of a long mRNA. The randomly primed cDNA library in λgt11 was generated by standard methods (Gubler, U. and Hoffman, B. J., Genes 25:263–269 (1983)). Random hexamers (Pharmacia) were used to prime the first strand cDNA synthesis. The unamplified library contained 500,000 recombinants. This library was screened by the method described above using a radiolabelled DNA probe consisting of four copies, in direct orientation, of a 26 bp oligonucleotide derived from the Vk41 promoter. The probe was constructed by cloning four copies of the oligonucleotide in direct orientation into the BamH1 site of the pUC polylinker and radiolabelling the 112 bp Sma1-Xba1 fragment. The library was screened with the tetramer probe (at 1×10$^6$ cpm/ml) as described above for the cloning of NF-κB with the following modification. Previous screens using poly(dI-dC)-poly(dI-dC) as the nonspecific competitor DNA yielded recombinant phage encoding single stranded DNA binding proteins. The signal from these phage but not phage encoding sequence-specific DNA binding proteins could be efficiently competed with denatured calf thymas DNA (5 μg/ml) and therefore this nonspecific competitor was substituted for poly(dI-dC)-poly(dI-dC) in all subsequent screens.

From a primary screen of 450,000 phage plaques, three plaques were isolated which bound this tetramer probe. Two of these phage, phage 3 and phage 5, were found to give plaques that bound specifically to the tetramer probe in that they did not bind DNA probes which lacked the octamer motif. These two phage bound probes containing one copy of the κ promoter octamer motif with a much lower affinity than they bound the tetramer probe. Even when four-fold more monomer probe was used then tetramer probe, the tetramer probe still gave a greater signal suggesting that the better binding of the tetramer probe was not merely a result of increasing the molar concentration of binding sites in the screen. Certainly in the case of phage 5, which showed dramatically better binding to the tetramer probe, it seems

US 6,410,516 B1

61
62

most likely that the tetramer probe was able to bind simultaneously to multiple phage fusion proteins on the filter. This multipoint attachment would be expected to dramatically decrease the dissociation rate and thus, increase the avidity of the interaction. Genes encoding DNA binding proteins with relatively low binding affinities could be cloned by screening λgt11 expression libraries with such multimer probes.

The specificity of the DNA binding proteins encoded by the recombinant phage was investigated by preparing extracts of induced phage lysogens. Lysogen extracts from both phages bound to the tetramer probe in a mobility shift assay whereas lysogen extracts from non-recombinant λgt11 showed no binding to this probe. Only the phage 3 extract bound strongly to the κ promoter probe. Because the inserts of phage 3 and phage 5 (1.2 kb and 0.45 kb in size, respectively) were found to cross-hybridize by Southern blotting analysis, phage 3 was chosen for further analysis.

Phage 3 encoded an octamer binding protein as demonstrated by a competition mobility shift assay in which the lysogen extract was bound to the κ promoter probe in the presence of competing unlabelled DNA fragments containing either the wild type or mutant octamer motifs. Phage lysogen extracts were prepared as described above for NK-κB cloning. The extracts were assayed in a mobility shift assay as described above using the octamer-containing PvuII-EcoR1 fragment from pSPIgVk as the radiolabelled probe. Binding reactions were carried out in the absence or presence of 24 ng of cold competitor DNA containing no octamer motif, the wild type octamer motif or mutant octamer motifs as described.

The wild type octamer motif competed efficiently for binding but the octamer motifs containing point mutations either did not compete or competed less well than the wild type motif. In fact, the two mutants which showed slight competition for binding of the lysogen protein, TCATTT CCAT and ATATTGCAT, were the only mutants which somewhat competed the binding of NF-A1 and NF-A2 in a WEHI 231 nuclear extract.

The phage-encoded octamer binding protein was further compared to NF-A1 and NF-A2 using a methylation interference footprinting assay. Methylation interference was performed as described using the non-coding strand of the octamer-containing PvuII-EcoR1 fragment of pSPIgVk as radiolabelled probes. The probes were partially methylated and used in preparative mobility shift DNA binding assays. DNA present in the bound bands (NF-A1 and NF-A2 bands from a nuclear extract from the BJAB cell line (or phage 3 lysogen extract bound band or free bands) was isolated, cleaved at the modified purine residues and subjected to denaturing polyacrylamide gel electrophoresis. The footprint obtained using the lysogen extract was centered over the octamer motif and was very similar to the footprints of NF-A1 and NF-A2 from a BJAB nuclear extract and from a WEHI 231 nuclear extract (see above). Minor differences were seen between the footprints of the lysogen and nuclear extract proteins which could reflect changes in affinity and/or specificity of DNA binding as a result of fusion of the insert-encoded octamer binding protein with β-galactosidase. Alternatively, the phage insert could encode an octamer binding protein distinct from NF-A1 and NF-A2.

The phage-encoded β-galactosidase fusion protein was directly shown to be the octamer binding protein in the phage lysogen extracts. Phage lysogen extracts were subjected to SDS polyacrylamide gel electrophoresis and transferred to nitrocellulose filters. After a denaturation/renaturation procedure (Celenza, J. L. and Carlson, M.

Science 233:1175–1180 (1986)), the filters were probed with either the radiolabelled octamer-containing tetramer probe (OCTA) or a non-specific DNA probe (pUC). The OCTA probe specifically bound to the β-galactosidase fusion proteins of phage 3 and phage 5 to a much greater extent than the pUC probe, thus formally showing that the octamer binding activity was encoded by the phage inserts. The apparent molecular weights of the largest fusion proteins of phage 3 and phage 5 lysogens are consistent with the entire phage inserts contributing coding sequences to the fusion proteins. Prototeolysis was presumed to account for the heterogeneity in apparent molecular weight of the fusion proteins.

The insert of phage 3, which defines what we term the OCT-2 gene, was used in a Southern blot analysis to probe human and mouse genomic DNA digested with several restriction enzymes. Restriction enzyme digested genomic DNA was electrophoresed through a 1% agarose gel and transferred to Zetabind (CUNO Laboratory, Inc.) by standard techniques (Maniatis, T., Frisch, E. F. and Sambrook, J. Molecular Cloning. A Laboratory Manual. Cold Spring Harbor Laboratory Press, NY. (1982)). The phage 3 insert was radiolabeled by randomly primed synthesis using hexanucleotides (Pharmacia). Following standard prehybridization high-stringency hybridization (Maniatis, supra.) with the OCT-2 probe the filters were washed with 0.2×SSC, 0.1% SDS or 2×SSC, 0.1% SDS.

One or two bands were observed in each restriction enzyme digest which is consistent with OCT-2 being a single genetic locus. No rearrangements or amplifications of the gene were observed in a survey of 8 lymphoid and non-lymphoid cells lines including BJAB. The strength of the signal on the mouse Southern blot at high stringency suggested that the gene is highly conserved between human and mouse.

The oct-2 cDNA segment (1.2 kb) of phage 3 was used to identify additional overlapping recombinants in the same library. One of these phage (pass-3) contained a 1.8 kb DNA insert. Sequence analysis of the cDNA segment in the original λgt11 phage (3-1) revealed a long open reading frame (ORF) which was ended with multiple nonsense codons at its 3' terminus. Sequence analysis of the pass-3 segment yielded an identical sequence through the open reading frame but an abrupt transition to a novel sequence occurred at the C-terminue (FIG. 18B; see below). The N terminus of the open reading frame in both of these cDNA segments was not represented in the cDNA insets. Additional recombinants from the λgt11 library were identified by screening with a probe from the N0terminal portion of the pass-3 segment. This resulted in the isolation of a 0.75 kb cDNA segment (pass-5.5) whose sequence extended the N-terminal portion o the previously identified open readign frame. In this cDNA segment, a nonsense codon is found 36 pb upstream of the first AUG in the open frame. The sequence context of this AUG conforms well to that expected for an initiation codon (Kozak, Cell 44: 283–292 (1986)). Two other AUG codons occur at positions 6 and 13 in the reading frame. Each of these also has an excellent context for initiation. The N terminus of the protein has been arbitrarily assigned to the 5'-most AUG codon. The cDNA sequence extends 66 bases 5' from this position but the total length of the 5' untranslated region has not been determined.

The sequences of pass-5.5, pass-3 and 3-1 were combined to form an open reading frame encoding a protein of 466 amino acids in length as shown in FIG. 46 amino acids in length as shown in FIG. 18. FIG. 18 shows the amino-acid sequence of oct-2 protein depicted in plain capital letters.

US 6,410,516 B1

63

cDNA-clone pass-5.5 spans from position 1 (5' end) to position 750 (3' end). cDNA clone pass-3 5' end and 3' end are respectively at position 92 in FIG. 18a and 1847 in FIG. 18b. cDNA clone 3-1 starts at position 650 and ends at position 1710. The nucleotide sequence shown in panel A was reconstructed by merging the DNA sequences from clone pass-5.5 from position 1 to 100, from clone pass-3 from 100 to 660 and from clone 3-1 from position 660–1710. Extensive nucleotide sequence overlaps were available to allow unequivocal merges. Sequence of protein encoded by the long overlappingopen reading frame (LORF, 277aa) is shown in italic letters. Wavy arrows delimit the glutamine (Q)-rich, glutamic and aspartic (E/D)-rich and glycine (G)-rich regions, respectively. Solid arrows delimit the helix-turn-helix motif. Boxed leucine (L) residues are spaced exactly by seven residues. Vertical arrow indicates the position where the nucleotide sequence diverges with that shown in panel B. Stars indicate stop codons.

FIG. 18b shows the nucleotide sequence of the 3' terminus and redicted amino acid sequence of the C-terminus derived from clone pass-3. The code is the same as in A and the vertical arrow denote sthe divergence point.

FIG. 18c is a schematic representation of the amino acid sequence deduced from oct-2 gene derived cDNA. The code is as in panel A. The DNA binding domain is depicted as DNA and the region containing the four regularly spaced L residues is boxed-in. LORF stands for long open reading frame, N stands for N-terminus and C for COOH-terminus.

Data presented below suggests that this ORF encodes one form of NF-A2 (oct-2). The amino acid sequence of oct-2 has several interesting features (FIG. 18C). It contains three glutamine (Q) rich blocks (ranging from 50% of Q content) in the N-terminal part of the polypeptide, beginning at nucleotide positions 376, 448 and 502, and a comparably acidic region [aspartic (E) or glutamic (D) amino acids] between positions 648 and 678. Clusters of Q resideus as well as E or D amino acids have been described previously in many transcription factors. Such acidic regions in other factors have been shown to be important in activation of transcription (Gill and Ptashne, Cell 51: 121–126 1987; Hope et al., Nature 333: 635–640 (1988)).

The region of oct-2 responsible for sequence-specific DNA binding, depicted "DNA", is discussed below. Downstream of this position is a series of four leucine residues separated by exactly seven amino acids (position 1227 to 1293 in FIG. 18A). A similar configuration of leucine residues in the transcription factor C/EBP has been suggested to form an amphipathic α-helical structure where the leucine residues are arranged along one side of the helix. Two such helices are thought to interact by a "leucine zipper" mechanism generating a dimeric protein (Handschultz et al., Science 240: 1759–1764 (1988); Landschultz et al., Genes & Development 2: 786–800 (1988)).

Consistent with this suggestion, no helix disrupting proline residue is present in oct-2 in the 22 amino acid tract defined by the four leucines. However, unlike the first example of a leucine zipper", protein C/EBP, the potential α-helical region in oct-2 does not possess a high density of paried charged residues which could stabilize the structure. Also, unlike the C/EBP protein, which binds DNA specifically as a homodimer probably by pairing through the "leucine zipper", the oct-2 protein appears to specifically bind DNA as a monomer. It is interesting to speculate that the "leucine zipper" region of oct-2 might be important for interaction with other proteins as there is no obvious reason to restrict the binding of such a structure to self-recognition.

Searches for sequence similarities in the GenBank library revealed that a region of the oct-2 protein from position 952

64

to 1135 was distantly related to a family of proteins containing homeoboxes. The 60-residue homeobox domain is highly conserved among 16 examples in different Drosophila genes (Gehering, Science 236: 1245–1252 (1987)). This level of conservation extends to homeobox sequences found in vertebrates and worms. Among this total family, nine of the 60 residues are invariant. The oct-2 protein only contains six of these nine residues and four of these six sites are clustered in the sub-region of the homeobox thought to be related to the helix-turn-helix structure (see FIG. 20). As shown in FIG. 20A, a 60 amino acid region of oct-2 contains 30% identity with the prototype homeobox sequence in the Antennapedia (Antp) protein.

FIG. 20 shows the amino acid sequence alignment of the DNA binding domain of oct-2 factor with homeoboxes from Antp. (Schneuwly et al., EMBO J. 5: 733–739 (1986), cut (Blochlinger, Nature 333:629–635 (1988), en (Poole et al., Cell 40: 37–43 (1985), proteins (boxed-in amino acid sequences from the S. cerevisiae proteins Matal (Miller, EMBO J. #: 1061–1065 (1984), Matα2 (Astell et al., Cell 53: 339–340 (1988) and C. elegans protein mec-3 (Way and Chalfie, Cell 54: 5–16 (1988). THe nine invariant residues in canonical homeobox sequences Atnp, cut, and en are listed below the boxed-in amino acid sequences and shown in bold print if present in the amino acid sequences. The stars indicate the hydrophobic amino acids that are critical for the protein to maintain the helix-turn-helix structure (Pabo and Sauer, 1984). Solid arrows delimit the helix-turn-helix domain.

That the homeobox specifies a sequence-specific DNA binding domain is most strongly argued by its homology with the DNA binding domain of the yeast mating regulatory protein, MATα (Astell et al., Cell 27: 15–23 (1981); Scott and Weiner, Proc. Natl. Acad. Sci. USA 81: 4115–4119 (1984), which also has homology through this. subregion of the homeobox but does not conserve the other invariant of the homeobox. The homologous regions in these proteins can be folded into a helix-turn-helix-structure similar to that first identified in the structural analysis of phage λ repressor (for a review see Pabo and Sauer, Ann. Rev. Biochem. 53: 293–321 (1984). A prediction of the most probable secondary structure of oct-2 also revealed a helix-turn-helix structure between the residues of isoleucine (position 1041) and cysteine (position 1090). Thus, by analogy, we propose that this region of oct-2 specifies the sequence-specified binding of the protein.

As mentioned above, sequences at the 3' end of the pass-3 recombinant abruptly diverged from that of recombinant 3-1 at the position (1463) of its termination codon (see vertical arrow in FIG. 18B). The substituted sequences in the second recombinant, pass-3, extended the reading frame of the oct-2 realted protein by an additional 16 amino acids. To rule out a possible artifactual sequence generated by the insertion of fragment during construction of the cDNA library, total polyA(+) RNA from the BJAB cell line was analyzed by Northern blot with a DNA fragment from the novel 3' terminal portion of the pass-3 cDNA. This specific probe hydribized only to the two fastest migrating mRNAs of the total family of six mRNAs which were detected by hybridization with the total 3-1 cDNA. A similar specific probe was excised from the 3' terminus of the 3-1 cDNA. In contracts, this probe only hybridized to the two slowest migrating mRNAs in the total family of six. This suggests that the two cDNA segments correspond to different populations of oct-2 mRNAs.

The proteins encoded by the two cDNAs should only differ at their C terminus by 16 amino acids or approxi-

US 6,410,516 B1

65

66

mately 1.5 kD. In vitro transcription/translation of subfragments of the 3′ portions of the 3-1 and pass-3 recombinants was used to confirm this prediction. Fragments representing the 3′ portions of 3-1 and pass-3 were subcloned into the expression plasmid PBS-ATG. The resulting plasmid DNAs were transcribed with bacteriophage T7 RNApolymerase and were subsequently translated in a reticulocyte system. The resulting polypeptides migrated with the mobilities of the anticipated molecular weights 34 kD and 32.4 kD. the polypeptide from the pass-3 cDNA was 1.6 kD larger than that from the 3-1 cDNA. Both polypeptides specifically bound a probe containing the octanucleotide sequence, producing a readily detectable DNA-protein complex in the gel mobility assay. This suggests that the oct-2 gene is expressed as a family of polypeptides in B-cells.

The potential significance of these additional 16 amino acids is unclear. These two cDNAs almost certainly differ by alternative splicing patterns of RNA transcribed from the oct-2 gene. Furthermore, it is likely that the oct-2 gene encodes a more diverse set of mRNAs than those partially defined by these two cDNAs. Six different length mRNAs are produced at significant levels in mature B cells. The relative amounts of these mRNAs vary between pre-B, B and plasma cell lines (Staudt et al., Science 241: 577–580 (1988). This population could reflect variations in sites of initiation of transcription and of polyadenylation as well as further differences in splicing patterns.

The expression of the OCT-2 gene was assessed by Northern blot analysis of mRNA from 13 lymphoid and non-lymphoid cell lines and was found to be predominantly restricted to lymphoid cells. Poly(A)-containing mRNA (3 μg, or 20 μg) or total mRNA (30 μg) was analyzed from the following cell lines. 1. NIH 3T3: mouse fibroblast; 2. 38B9: mouse pre-B cell line; 3. WEHI 231: mouse mature B cell line; 4. A431: human epidermal cell line; 5. U1242: human glioma cell line; 6. RB27: human retinoblastoma cell line; 7. Jurkat: human T cell line; 8. Namalwa: human mature B cell line; 9. BJAB: human mature B cell line (poly(A)-containing mRNA); 10. BJAB (total mRNA); 11. Hut78: human T cell line; 12. HeLa: human cervical carcinoma cell line; 13. EL4: mouse T cell line. mRNAs was electrophoresed through a formaldehyde-containing 1.3% agarose gel and transferred to a nitrocellulose filter by standard techniques (Maniatis, supra.). Following prehybridization, the filter was hybridized at high stringency with radio-labelled OCT-2 probe (above). The filter was washed in 0.2×SSC, 0.1% SDS at 68° C. and autoradiographed with an intensifying screen at −70° C. for 24 hrs. The filter was stripped by washing in 50% formamide, 10 mM Tris (pH 7.4), 1 mM EDTA at 68° C. for 1 hr. and rehybridized with a radiolabelled rat alpha tubulin cDNA probe (Lemischka, I. R., Farmer, S., Racaniello, V. R. and Sharp, P. A.,J. Mol. Biol. 151:101–120 (1981)) to control for the amount of mRNA loaded.

All five B lymphoma cell lines, including pre-B and mature B cell lines, and one of three T lymphoma cell lines expressed a family of 6 transcripts. Of the five non-lymphoid cell lines tested, only a glioma cell line, U1242( ), showed detectable expression of this gene. Even at low stringency we were unable to detect a transcript present in all cell lines which might correspond to NF-A1. The various transcripts, estimated to be 7.2 kb, 5.8 kb, 5.4 kb, 3.7 kb, 3.1 kb and 1.2 kb long, were expressed in somewhat varying amounts relative to each other in the positive cell lines. Whether these transcripts represent alternative mRNA splicing or highly specific mRNA degradation remains to be determined. In this regard, it is interesting that highly purified preparations of NF-A2 consist of three or more major polypeptides with distinct molecular weights which could be the products of the family of transcripts that we have observed.

Previously, we and others (See above and Gerster, T. et al. EMBO J. 6:1323–1330 (1987); Landolfi et al., Nature 323:548–51 (1986)) showed that the octamer binding protein NF-A2 varied considerably in expression among lymphoid cell lines. We therefore investigated the relationship between levels of expression of the OCT-2 gene and levels of NF-A2 as judged by mobility shift analysis. BJAB, the cell line which expressed the largest amount of transcript showed the largest amount of NF-A2. Nuclear extracts from the pre-B cell lines, 38B9 and 70Z, showed very little NF-A2 and, correspondingly, expressed very little transcript (more poly(A)-containing mRNA from these two cell lines was loaded to see a readily detectable signal). Of the three T lymphoma cell lines tested, Jurkat, HUT78 and EL4, EL4 was the only line that showed large amounts of NF-A2. Although NF-A2 was previously believed to be expressed only in lymphoid cells we found that nuclear extracts from the glioma cell line that expressed the OCT-2 gene contained an octamer binding protein which comigrated with NF-A2 in the mobility shift assay. Nuclear extracts from two glioma cell lines which were negative for OCT-2 expression did not contain NF-A2. We have at present no explanation for this apparent non-lymphoid expression of NF-A2 and the cloned octamer binding protein gene. Previously, we had shown that NF-A2 but not NF-A1 was inducible in pre-B cells by treatment of the cells with bacterial lipopolysaccharide (LPS) and that this induction required new protein synthesis. Therefore, we prepared poly(A)-containing mRNA from the pre-B cell line 70Z/3 before and after LPS treatment and observed that LPS increased the expression of the OCT-2 gene. Thus, in every instance, the expression of the OCT-2 gene correlated with the presence of NF-A2 and is thus a good candidate for the gene which encodes NF-A2.

Further evidence that the oct-2 gene encodes NF-A2 was discovered when the NF-A2 factor was purified from nuclear extracts of BJAB cells by conventional chromatography followed by multiple passages over an affinity column containing immobilized oligomers of the octanucleotide sequence. The purified NF-A2 consisted of three bands, as resolved by gel electrophoresis: a major band and two minor bands with deduced molecular weights of 61 kD and 58 kD, and 63 kD, respectively. A cDNA (pass-3) for the oct-2 gene was inserted into the polylinker of the pGEM (Promega) expression vector. Translation of RNA transcribed from the SP6 promoter-pass-3 cDNA construct yielded a major polypeptide from the purified sample of NF-A2.

The nobility of a DNA-protein complex in the gel assay is primarily determined by the molecular weight of the protein. Complexes were generated with the affinity purified NF-A2 and the products of translational in vitro of RNA from the oct-2 cDNA. These complexes co-migrated during electrophoresis in a native gel, again suggesting that the oct-2 cDNA encodes the major form of the NF-A2 factor.

The affinity purified NF-A2 protein and the polypeptide translated in vitro from the oct-2 cDNA were also compared by partial tryptic digestion. Samples from different digestion times of NF-A2 were resolved by denaturing gel electrophoresis and detected by staining with silver. The mobility of these partial fragments was compared with those observed after a parallel analysis of [35]S-methionine labelled polypeptide from transcription/translation of the pass-3 cDNA in vitro. The two samples generated a similar set of digestion fragments, again suggesting that NF-A2 is encoded by the oct-2 cDNA.

Protein sequence comparisons suggested that the DNA binding domain of oct-2 was specified by a domain

US 6,410,516 B1

67

(positions 952–1135) that was distantly related to both the helix-turn-helix structure of bacterial repressors and the homeobox-proteins. To directly test this analogy a fragment of the cDNA encompassing this region (655 to 1710) was inserted into the expression vector pBS-ATG so that RNA could be transcribed from the truncated templates by bacteriophage T7 RNA polymerase as indicated in FIG. 19A. The polypeptides translated in vitro from these RNAs were tested for specific DNA binding by addition of the total translation mix to the DNA-protein gel assay. Polypeptides produced from RNAs terminating at positions 1710 (Kpnl), 1443 (Stul), and 1134 (Pstl) specifically bound the octanucleotide containing probe, while the polypeptide translated from RNA terminating at the 945 (Eagl) site did not specifically bind. The region containing the helix-turn-helix portion of oct-2 is deleted in the latter protein. Since the truncated polypeptide encoded by RNA from the latter template was efficiently translated in the reticulocyte reaction, this suggests that the specific binding of the oct-2-protein requires the helix-turn-helix structure.

Two distinct but similarly migrating protein-DNA complexes were detected in the sample generated by translation of RNA from the Stul cleaved template. Faint slower migrating complex comigrated with the complex generated with templates cleaved by Kpnl. The presence of the two complexes in the Stul-sample is due to a partial digestion of the plasmid DNA. The slower migrating complex is probably produced by protein terminated at the stop codon TAA located at position 1465. The faster migrating complex probably results from molecules terminated at the Stul site. This interpretation was supported by the resolution of two [35]S-labeled polypeptides during gel electrophoresis of the Stul sample and confirms the position of the termination codon of oct-2.

Many sequence-specific binding proteins have an oligomeric structure. For example, bacterial repressor proteins typically bind sites with two-fold rotational symmetry by forming a similarly symmetric dimer (Ptashne, Cell Press and Blackwell Scientific Publications, (1986)). It should be noted that the binding site sequence of the oct-2 protein is not symmetric but oligomeric proteins could bind to non-symmetric sites. Other examples of oligomerization of sequence-specific bindingprotiens are the GCN4 protein of yeast (Hope and Struhl, EMBO J. 6: 2781–2784, (1987)) and the C/EBP protein of mammals. In the latter case, an α-helical region with an amphipathic character reflected in the spacing of four leucine residues is thought to be responsible for dimer formation (Landschultz et al., Science 240: 1759–1764 (1988); Landschultz et al., Genes & Development 2: 786–800 (1988)). A convenient assay for detection of dimerization of sequence-specific bindingprotiens is to co-translate RNAs encoding two different size forms of the protein and test whether protein-DNA complexes with novel mobilities are generated (Hope and Struhl, EMBO J. 6: 2781–2784 (1987). If only monomers bind to the probe, the sample containing the co-translated polypeptides will generated only the complexes detected when either RNA is assayed singularly. This was the case with combinations of different length RNAs transcribed from the oct-2 cDNA segment. Specifically, cotranslation of RNAs from templates cleaved at Stul (1443) and Pstl (1134) did not generate novel bands in the gel mobility assay. Thus, on the basis of this negative evidence, we suggest that a single molecule of the oct-2 protein is present in the resolved DNA-protein complexes and that it does not require dimerization for binding to DNA.

Anti-sera raised in rabbits against a bacterial fusion protein containing oct-2 encoded sequence (prepared

68

employing the vestor pRIT2T (Pharmacia)) recognized the native oct-2 protein in metabolically labeled ([35]S-methionine) human B cells.

The molecular cloning of a lymphoid-restricted octamer binding protein gene demonstrates that higher eukaryotes have adopted a strategy of genetic diversification of transcriptional regulatory proteins which bind a common regulatory motif. The ubiquitous and lymphoid-specific octamer binding proteins have indistinguishable DNA binding sites, yet appear to have distinct functional properties (Staudt, L. M. et al, Nature 323:640–643 (1986)). Structure-function analysis of cloned yeast transcription factors (Petkovich, M. et al., Cell 330:444–450 (1987); Giguere, V. et al., Nature 330:625–629 (1987)) and steroid receptor related transcription regulatory activity of a transcription factor often reside in discrete protein domains that can be experimentally interchanged. The present findings suggest that similar diversification of function among proteins which bind the octamer motif has occurred during evolution. The octamer motif has been shown to be necessary and sufficient for lymphoid-specific promoter activity (Fletcher, C. et al., Cell 51:773–781 (1987)) and NF-A2 has been shown to function as a transcription factor using octamer containing templates in vitro (Scheidereit, C. et al., Cell 51:783–793 (1987)). A further understanding of the lymphoid-specific activity of immunoglobulin promoters may now come from an understanding of the mechanisms underlying the lymphoid-specific expression of the OCT-2 gene.

Example 8

Induction of NF-KB in Cells in which it is not Constitutively Present

The following work demonstrates that NF-KB is inducible in cells other than B (lymphoid) cells. As described below, it has now been shown that NF-KB is inducible in pre-B cells and in non-lymphoid cells. In particular, the following work demonstrates that: 1) NF-kB factor can be induced by the mitogen lipopolysaccharide (LPS) in two cell lines representing a pre-B stage of B cell differentiation; 2) induction of this factor involves a post-translational modification of a pre-existing protein because the induction takes place even in the presence of translational inhibitors like cycloheximide and anisomycin; 3) these translational inhibitors by themselves can at least partially induce NF-kB and synergize with LPS to produce a superinduction; 4) an active phorbol ester like PMA can induce NF-kB by itself, and the time-course of this activation is more rapid than that with LPS alone; and 5) it is also possible to induce this factor in cell lines other than those having a pre-B phenotype by means of an appropriate stimulus (e.g., in the human T cell line, Jurkat, by PHA and/or PMA or in HeLa cells with PMA). Thus, B cells and plasma cells appear to support constitutive presence of this factor whereas in other cell types it can be induced transiently by an appropriate stimulus.

Experimental Procedures

Cell lines and Extracts: 70Z/3 and PD cells were grown in RPMI 1640 medium supplemented with 10% inactivated fetal calf serum, 50 μM β-mercaptoethanol and penicillin and streptomycin sulfate (pen-strep) antibiotics. LPS (GIBCO) stimulation was carried out with 10–15 μg/ml. For experiments using protein synthesis inhibitors and LPS, cell cultures were treated with inhibitors approximately 20 min prior to addition of LPS. Cycloheximide (Sigma) was used to 10 μg/mo which causes greater than 95% inhibition of protein synthesis in 70Z/3 cells (Wall, R., et al., Proc. Natl.

US 6,410,516 B1

69

*Acad. Sci. USA* 83:295–298, (1986). Anisomycin (Sigma) was used at 10 which causes approximately 99% inhibition of protein synthesis in HeLa cells (Grollman, A. P., *J. Biol. Chem.* 242:3226–3233, 1967). Phorbol ester activation of 70Z/3 cells was carried out using the active ester phorbol 12-myristate-13-acetate (PMA) or the inactive ester phorbol 12,13-didecanoate at a concentration of 25 ng/ml for the times indicated in the text. All treatments were carried out at cell densities varying between 5×10⁵–10⁶ cells/ml. Jurkat cells were grown in RPMI 1640 medium with 10% inactivated fetal calf serum and pen-strep antibiotics. Phytohemmagglutinin (PHA) treatment was done at 5 μg/ml and PMA treatment at 50 μ/ml. HeLa cells were grown in MEM medium with 5% horse serum and pen-strep antibiotics. Phorbol ester (PMA treatment was at 50 μg/ml with cell density varying between 7×10⁵–10⁶ cells/ml.

Nuclear extracts were generated essentially according to the protocol of Dignam, J. D. et al., *Nucl. Acids Res.* 11:1475–1489 (1983) and protein concentration were determined using a Bradford assay with serum albumin standards.

Gel Binding Analysis: Gel binding analyses were carried out as described earlier using a radioactive DdeI to HaeIII fragment (k3) derived from the enhancer (Sen and Baltimore, 1986). Levels of NF-KB induced by various stimuli were normalized to total protein present in the extracts. Further, analysis with a different fragment that contains a binding site for the ubiquitous factor NF-A, shows that this nuclear protein remains at approximately constant levels in all of the extracts reported here. Thus, the modulation of NF-KB activity is not a reflection of variability of nuclear factors in general under these conditions. For competition experiments, the specific and non-specific competitors DNA's were included in the mixture (in amounts shown in FIG. 24C) prior to addition of the protein. The competitor fragments μ300, μ400, KE and SV40E which have been described earlier (Sen and Balitmore, 1986) were isolated from low melting point agarose gels and quantitated by spotting onto ethidium bromide-containing agarose plates.

NF-KB can be Induced in Pre-B Cell Lines with Bacterial Lipopolysaccharide

To examine whether NF-KB might be inducible in 70Z/3 cells, cells were stimulated with LPS for 20 hr and nuclear extracts derived from these cells were assayed for the presence of NF-KB using the electrophoretic mobility shift assay described previously. Singh, H. et al., *Nature*, 319:154–158 (1986). U.S. patent application Ser. No. 817, 441, To assay for NF-KB, a DNA fragment containing its binding site (K3 fragment; Sen and Baltimore, supra,) was end-labelled and incubated with extracts derived from either unstimulated 70Z/3 (11 s (FIG. 21A, lanes 2,3) or LPS-stimulated 70Z/3 cells (FIG. 21A, lanes 4,5) in the presence of increasing amounts of the carrier poly d(IC). Binding reactions were carried out for 15–30 minutes at room temperature in a final volume of 15 μl containing 9 μg of total protein 3.5 μg (lanes 2,4) or 4.5 μg (lanes 3,5) of nonspecific carrier DNA poly d(IC) and 0.2–0.5 μg of probe. Reaction products were fractionated by electrophoresis through low ionic strength polyacrylamide gels and visualized by autoradiography. Lane 1: free DNA fragments; lane 6: nucleoprotein complex generated by interaction of NF KB with the fragment 3 in a nuclear extract derived from the B cell line WEHI 231.

Unstimulated 70Z/3 cell extracts lacked a major band evident with B cell extracts (FIG. 21A, lane 6; arrow). This nucleoprotein complex band was induced in the 70Z/3 cells

70

after LPS treatment for 20 hr. The band was not competed away even with 4.5 ugm of poly d(IC) (lane 5). This induction phenomenon was not restricted to the 70Z/3 cell line; another pre-B cell line, PD (Lewis S., et al., Cell 30:807–816 (1982)), was weakly positive for the factor prior to induction (FIG. 21B, lane 3; Sen and Baltimore, 1986) but was strongly induced by LPS (FIG. 21B lanes 5,6). A number of other minor bands could be seen in the binding assay, some of which were inducible and others not. The major inducible band comigrated with the major band produced by B cell and plasma cell extracts (typified by WEHI 231 extracts in FIG. 21A, lane 6 and FIG. 21B, lane 2). We have earlier characterized this band by competition experiments and localized the binding site of the factor by methylation interference experiments defining the band as one produced by interaction of the NF-KB factor with the B site within the enhancer (a site containing the sequence GGGGACTTTCC). Thus two pre-B cell lines, one with a rearranged K gene (70Z/3) and the other in the process of undergoing rearrangement (PD), are clearly inducible by LPS for NF-KB activity.

Induction of NF-KB by LPS does not Require Protein Synthesis

Recently it has been reported that induction of transcription in 70Z/3 does not require new protein synthesis. Nelson, K. J. et al., *Proc. Nat. Acad. Sci.* USA 82:5305–5309 (1985). Thus, induction of gene expression was evident in cells pretreated (10 min) with the translation inhibitors cycloheximide or anisomysin followed by stimulation with LPS. Further, Wall et al. reported that expression could be induced in the presence of cycloheximide alone which led them to argue in favor of a labile repressor blocking the activation of genes in this cell line. See Wall, R. et al. *Proc. Nat. Acad. Sci. USA* 83:295–298 (1986). To determine if these characteristics of transcriptional activation were paralleled by changes in the levels of NF-KB, we analyzed extracts derived from 70Z/3 cells which had been treated either with LPS alone, or with a translation inhibitor alone or with both together. To be able to make direct correlations with the published reports concerning the effects of translational inhibitors on expression in pre-B cells, we examined a 4 hr time point in these experiments, although maximal stimulation of expression by LPS takes 14–20 hr. Binding reactions were carried out as detailed in FIG. 21A legend and contained 2.5, 3.5 or 4.5 μg poly dIG) with each set of extracts. End-labelled K3 fragment was the proble lane 1) and was incubated with 9–11 μg or protein from extracts derived from: untreated 70Z/3 cells (lanes 2,3,4), 70Z/3 cells treated for 4 hr with 10 μg/ml of LPS (lanes 5,6,7), 70Z/3 cells treated for 4 hr with 10 μg/ml of LPS and 10 μg/ml cycloheximide (lanes 8,9,10); 70Z/3 cells treated with 10 μg/ml of cyclheximide alone (lanes 11,12,13) and WEHI 231 cells (lane 14). The characteristic nucleoprotein complex is indicated by the arrow. In accord with the transcriptional analyses, uninduced 70Z/3 cells were negative for NF-KB (FIG. 22A, lanes 2–4), and treatment with either LPS alone (FIG. 22A, lanes 5–7) or with cycloheximide alone (FIG. 22A, lanes 11–13) for 4 hrs induced the factor. Unexpectedly, treatment of 70Z/3 with LPS in the presence of cycloheximide for 4 hr gave a superinduction of NF-KB (FIG. 22A, lanes 8–10), increasing it to a level above that seen after a 20 hr induction.

Qualitatively, the same result was observed when anisomycin was used as a translation inhibitor (FIG. 22B). Binding reactions were as detailed in FIG. 21A legend using 2.5 and 3.5 μg of poly d(IC) and protein from untreated 70Z/3 cells (lanes 2,3); 70Z/3 cells after induction with LPS

US 6,410,516 B1

71

72

alone (lanes 4,5); 70Z/3 cells with LPS induction in the presence of anisomycin (lanes 6,7); 70Z/3 cells treated with anisomycin by itself (lanes 8,9) and the B cell WEHI 231 as a positive control (lane 10). The characteristic nucleoprotein complex is indicated by the arrow. Thus, the presence of anisomycin (10 uM) during a 4 hr stimulation with LPS gave a superinduction of NF-KB (FIG. 22B, lanes 6,7) relative to either LPS alone (FIG. 22B, lanes 4,5) or anisomycin alone (FIG. 22B lanes 8–9). Once again, prior to LPS treatment there was no detectable NF-KB activity in 70Z/3 (FIG. 22B lanes 2,3). Although treatment of 70Z/3 with cycloheximide alone or with LPS alone gave approximately equivalent amounts of NF-KB (FIG. 22A compare lanes 5–7 with lanes 11–13), the level of NF-KB induced with anisomycin alone appeared to be much less (FIG. 22B, compare lanes 8,9 with lanes 4,5). This is probably due to drug toxicity because, even after a short exposure to anisomycin, the cells looked quite unhealthy. Presumably this also accounts for lesser degree of superinduction seen with LPS and anisomycin. Thus the enhancer binding factor NF-KB appears to be inducible in 70Z/3 cells in the absence of protein synthesis. Further, it appears to be inducible by either of 2 different translation inhibitors alone and is superinduced when the cells are stimulated with LPS and the inhibitor.

Phorbol Ester can Induce NF-KB in 70Z/3

The tumor promoting phorbol ester, phorbol 12-myristate-13-acetate (PMA), has been shown to induce surface immunoglobulin in 70Z/3, presumably via activation of K transcription and transport of complete immunoglobulin to the cell surface (Rosoff P. M. et al., *J. Biol. Chem.* 259:7056–7060 1984; Rosoff, P. M. and Cantley, L. C., *J. Biol. Chem.* 260 9209–9215, (1985). To determine if this activation is reflected in an increase of NF-KB we analyzed extracts derived from 70Z/3 cells after a 4 hr stimulation with PMA at 50 ng/ml. Binding reactions using K3 as a problem (lane 1) were carried out as detailed in FIG. 21A legend with protein from untreated 70Z/3 cells (lane 2) or 70Z/3 cells that had been treated with PMA at 50 ng/ml for 4 hr (lanes 3,4). Lane 5 is the positive control for NF-KB in extracts from WEHI 231. There was a striking induction of NF-KB activity in these extracts (FIG. 23A, compare lanes 3,4 with lane 2). Thus an active phorbol ester by itself is capable of inducing NF-B activity in 70Z/3 cells, implicating protein kinase C as a possible intermediate in the post-translational modification reaction that produces NF-B in these cells [(Bell, R. M. *Cell* 45:631–632 (1986); Nishizuka, Y. *Nature* 308:693–697, (1984)]. An inactive phorbol ester (phorbol 12, 13 didecanoate) did not cause induction of NF-KB under similar conditions (data not shown).

Time Course of Activation of NF-B by LPS and PMA are Different

LPS-mediated stimulation of surface Ig expression of mRNA accumulation reaches a maximum after at least one cell cycle, i.e., in 14–18 hr. Recent work has shown that LPS stimulation of RNA synthesis, as measured by nuclear run on assays [Nelson, K. J., et al., *Proc. Natl. Acad. Sci USA* 82:5305–5309 (1985), Wall et al. supra, (1986)] can be seen as early as 4 hr after stimulation and that the DNAse I hypersensitive site associated with the enhancer can be detected as early as 1 hr post-stimulation. To examine the time-course of NF-KB induction, we generated 70Z/3 cell extracts after stimulation either by LPS or PMA for varying lengths of time. Analysis for NF-KB activity using the binding assay showed that the time course of activation of NF-KB by these two agents was quite different (FIG. 23B). Binding reactions were carried out with extracts derived

from 70Z/3 cells that had been treated with LPS at 10 μg/ml (lanes 3–7) or PMA at 25 ng/ml (lanes 8–12) for various lengths of time as shown above each lane in the figure. Lane 2 is a positive control for NF-KB in WEHI 231 extracts. With LPS alone, a nucleoprotein complex band reflecting the presence of NF-KB increased until 2 hr post-stimulation after which a slight decrease occurred and then the level remained constant. By contrast, in PMA-stimulated cells, NF-KB was detected at maximal levels within 0.5 hr after stimulation, remained at this level for 2–3 hours and then began to drop off rapidly, such that by 8 hr it was barely detectable. Because prolonged exposure of cells to phorbol esters is known to result in desensitization of endogenous protein kinase C (Rodriquez-Pena, A. and Rozengurt, E., *Biochem Biophys. Res. Comm.* 120:1053–1009, 1984; *EMBO J,* 5:77–83 1986), a possible explanation for the rapid decline of NF-KB may be that its maintenance as a binding factor requires continuous activity of protein kinase C. A similar phenomenon has been described recently by Blemis and Erikson where S6 kinase activity assayed by phosphorylation of S6 protein) first rises and then falls during prolonged exposure to PMA. See Blemis, J. and Erikson, R. L. *Proc. Natl. Acad. Sci. USA* 83:1733–1737 (1986). Although it has been reported that LPS may directly activate protein kinase C (Wightman, P. D. and Raetz, C. R. H., *J. Biol. Chem.* 259:10048–10052, 1984) the different kinetics of induction of NF-KB by LPS and PMA implies that these activators feed into a common pathway through distinguishable sites of activation.

Non Pre-B Cell Lines can also Be Activated to Produce NF-KB

In our previous analysis we have shown that NF-KB is present only in cell lines representing the B cell or plasma cell stages of B lymphoid differentiation, but was undetectable in a variety of non B cells, pre-B cells and T cells (Sen and Baltimore, 1986). However, as shown above, this factor may be induced to high levels in pre-B cells upon stimulation with LPS. To check if this inducibility was restricted to cells having a pre-B pheno-type only or was a general characteristic of the other constitutively negative cell lines we have taken representative examples of cell types (T cells and non lymphoid cells) and examined then for induction of NF-KB after appropriate stimulation.

The human T leukemia cell line, Jurkat, can be stimulated to produce interleukin-2 (IL.-2) by the combined influence of phytohemagglutinin (PHA) and phorbol ester (PMA) (Gillis, S. and Watson, J., *J. Exp. Med.,* 152:1709–1719, 1980; Weiss et al., *J. Immunol.* 133:123–128, 1984). Nuclear extracts were prepared from Jurkat cells that had been stimulated with either PHA or PMA alone or both together and analyzed for the presence of NF-KB (FIG. 24A). The human T lymphoma Jurkat was stimulated with phytohemagglutinin (PHA) and phorbol 12-myristate-13-acetate (PMA) individually or together for 20 hr. Nuclear extracts made after treatment were analyzed by the mobility shift assay using K-3 fragment as the labelled probe. Binding reactions typically contained 6 μg of protein, 2.5–3.5 g of poly d(IC) and 0.3–0.5 ng of end-labelled DNA probe. Lane 1: no protein added; lane 2: WEHI 231 extract (positive control); lane 3: extract from uninduced Jurkat cells: lane 4: Jurkat cells stimulated with PHA alone; lane 5: Jurkat cells stimulated with phA and PMA; Lane 6: Jurkat cells stimulated with PMA alone. The arrow shows the position of the expected nucleoprotein complex generated by interaction of NF-KB with K-3 fragment. As originally observed, extracts derived from uninduced Jurkat cells were negative for NF-KB activity (FIG. 24A, lane 3). However, extracts made

US 6,410,516 B1

73                                                                                  74

from Jurkat cells which had been stimulated either with PHA or PMA contained detectable levels of NF-KB (FIG. 24A, lanes 4,6) and the extracts from the co-stimulated cells showed higher levels of the factor (FIG. 24A, lane 5). Thus a factor with the properties of NF-KB can be induced in a T cell lines after appropriate activation.

As an example of a non-lymphoid line we used the human HeLa cell lines which is constitutively negative for NF-KB (Sen and Baltimore, 1986). These cells were induced with PMA for 2 hr and extracts derived from treated and untreated cells were analyzed for NF-KB activity (FIG. 24B). HeLa cells were treated with PMA (50 ng/ml) for 2 hrs. and the extracts derived thereafter were analyzed for induction of NF-KB. Binding reactions contained 15–18 $\mu$g of protein, 3.5 $\mu$g of poly d(IC) and 0.3–0.5 $\mu$g of end-labelled DNA probe. Lane 1: 3 fragment/no protein added; lane 2: 3 fragment incubated with extracts derived from the human B lymphoma EW; lane 3: K3 fragment incubated with unin-duced HeLa cell nuclear extract; lane 4: p50 fragment (derived from the $\mu$-heavy chain enhancer and containing a copy of the conserved octamer sequence ATTTGCAT) incu-bated with uninduced HeLa cell extracts; lane 5: K3 frag-ment incubated with induced HeLa cell extracts. The untreated HeLa extract (FIG. 24B, lane 3) did not show a nucleoprotein complex which comigrated with the complex generated in B cell extracts. However treatment with PMA induced a factor that generated the characteristic DNA-protein complex produced by NF-KB (FIG. 24B, lane 5). As a control, both the uninduced and induced extracts showed equivalent levels of the ubiquitous NF-A1 DNA binding protein when analyzed using a probe containing the sequence ATTTGCAT (FIG. 24B, lanes 4,6; Singh, H. et al., Nature 319:154–158, 1986). Therefore treatment of HeLa cells with PMA induces a factor that can form a nucleopro-tein complex with the K3 fragment.

To further characterize the DNA-protein complex formed in the PMA-treated HeLa cell extracts, we carried out competition experiments. Binding reactions were carried out using end-labelled K3 fragment, 3.5 $\mu$g of poly d(IC) and 15–18 $\mu$g of nuclear extract in the present of 50 ng of unlabelled competitor DNA derived from various immuno-globulin and viral regulatory sequences (lanes 5–9). The complex generated in PMA-induced HeLa cell extracts (FIG. 24C, lane 4) was specifically competed away by the inclusion of 50 ng of unlabelled DNA in the binding reaction containing either the enhanced (FIG. 24C, lane 7) or the SV40 enhanced (FIG. 24c, lane 8) but was unaffected by two DNA fragments that together span the K enhancer (FIG. 24C, lane 5,6), or by a 250 bp fragment containing the K promoter (FIG. 24C, lane 9). This pattern of competition exactly parallels the pattern observed earlier using the K3 fragment in binding experiments with B cell derived extracts (Sen and Baltimore, 1986). These results further strengthen the conclusion that the NF-KB factor can be induced in non-lymphoid cells as well as lymphoid cells following appropriate stimulation.

### Example 9

#### Characterization of the NF-kB Protein and Electrophoretic Mobility Shift Analysis of Subcellular Fractions of 70Z/3 Cells

Characterization of the NF-kB protein

Mouse NF-kB is a polypeptide with a molecular weight around 60 kDa. This has been determined by a DNA-binding renaturation experiment using eluates from different molecular weight fractions of a reducing SDS-gel (FIG.

26A). The size of the native NF-kB protein was determined in the following manner: Nuclear extract from TPA-stimulated cells was subjected to ultracentrifugation on a continuous glycerol gradient. The fractions were assayed for DNA-binding activity of NF-kB by electrophoretic mobility shift assays (FIG. 26B). NF-kB activity was found highest between the co-sedimented bovine serum albumin (67 kDa) and IgG (158 kDa) standards (FIG. 26B, lanes 6 to 8). The specificity of binding was shown by the absence of a complex when a DNA probe with a mutation in the NF-kB binding sequence was used to assay the fractions (FIG. 26B, right lanes 4 to 10). Lenardo, M. et al., Science, 236:1573–1577 (1987). Little NF-KB activity was contained in the fractions where a 60 kDa protein would be expected to sediment (FIG. 26B, lanes 4 and 5). If the sedimentation of NF-kB is not highly abnormal, the results from the glycerol gradient centrifugation suggest that NF-kB is asso-ciated with another protein of approximately the same size. Presumably NF-kB forms a homodimer because the protein-DNA complex formed in native gels using whole nuclear extract is of the same mobility as the complex formed with renatured NF-kB protein from a single spot of a two-dimensional gel.

70Z/3 cell cultures were incubated in the absence (Co) and presence of phorbol ester (TPA), followed by subcellu-lar fractionation of cells. In the DNA-binding reactions, 8.8 ug of protein of nuclear extracts (N), cytosolic fractions (C), and post-nuclear membrane fractions (P) in 4 ul buffer D(+) were used. The end-labeled DNA-fragments were incubated in the presence of 3.2 ug poly(d[I-C]) with the subcellular fractions in a final volume of 20 ul for 15 to 30 minutes followed by separation of protein-DNA complexes and unbound DNA on native 4% polyacrylamide gels. Fluoro-grams of native gels are shown. To detect kB-specific DNA-binding activity a DdeI-HaeIII wild type fragment of the kappa light chain enhancer (kB wt; lanes 1–6) was used. Sen, R. and D. Baltimore, Cell, 46:705–716 (1986). kB-unspecific activities binding to the kappa enhancer frag-ment were detected using a fragment mutated in NF-kB binding site that was otherwise identical to the wild type fragment (lanes 7–12). Lenardo, M. et al., Science, 236:1573–1577 (1987). NF-uE3-binding activity and octamer binding protein activity were assayed with a HaeIII-DdeI kappa enhancer fragment (uE3; lanes 13–18) and a PvuII-EcoRI kappa heavy chain promoter fragment (OCTA; lanes 19–24), respectively. Sen, R. and D. Baltimore, Cell, 46:705–716 (1986); Singh, H. et al., Nature, 319:154–158 (1986,). Specific protein-DNA complexes are indicated by filled arrowheads and the positions of unbound DNA-fragments by open arrowheads.

### Example 10

#### Renaturation of NF-kB

70Z/3 cells were grown in spinner cultures with RPMI 1640 medium supplemented with 10% newborn calf serum and 50 uM 2-mercaptoethanol. HeLa cells were also grown in spinner cultures with MEM medium supplemented with 10% horse serum. Cell cultures were treated with 25 ng/ml 12-O-tetradecanoylphorbol 13-acetate (TPA; Sigma) for 30 minutes at cell densities between $7 \times 10^5$ and $2 \times 10^6$/ml.

Subcellular Fractionation

Cells were collected by centrifugation for 10 minutes at 150×g. Cell pellets were resuspended in ice-cold phosphate-buffered saline and collected again by centrifugation. All following steps were carried out at 4° C.. Washed cells were

US 6,410,516 B1

75

resuspended in four packed cell volumes of a hypotonic lysis buffer (buffer A; Dignam, J. P. et al., *Nucleic Acid Research,* 11:1475–1489 (1983)). After 20 minutes, cells were homogenized by 15 (HeLa) or 20 strokes (70Z/3 cells) with a loose fitting Dounce homogenizer. Nuclei were collected by centrifugation for 6 minutes at 4300×g, resuspended in five volumes of buffer A and washed once by centrifugation. Proteins were extracted from washed nuclei by high salt, followed by centrifugation of the nuclear extracts and dialysis against buffer D as described. Dignam, J. P. et al., *Nucleic Acids Research,* 11:1475–1489 (1983). One percent NP-40 (v/v) was added to the dialyzed nuclear extracts. The postnuclear supernatant was centrifuged for 6 minutes at 4300×g and the resulting supernatant ultracentrifuged for 1 hour at 150,000×g. The pellet after ultracentrifugation containing postnuclear membranes was dissolved in buffer D containing 1% (v/v) NP-40 (referred to as buffer D(+)). Insoluble material was removed by centrifugation for 10 minutes in a Microfuge. The supernatant after ultracentrifugation (referred to as cytosolic fraction) was adjusted to buffer D(+) conditions by the addition of stock solutions. Fractions were stored at −70° C.

Protein concentrations were determined by an assay using bicinchoninic acid. Smith, P. K. et al., *Anals of Biochemistry,* 150:76–85 (1985). The ratio of the total protein recovered during a fractionation experiment in nuclear extracts, cytosolic fractions and postnuclear membrane fractions was 2:4:1 for 70Z/3 cells and 1:10:1.5 for HeLa cells. These ratios were used to adjust the fractions to protein concentrations reflecting equal cell-equivalents of subcellular fractions.

Electrophoretic Mobility Shift Assays and Treatments with Dissociating Agents

DNA-binding reactions were carried out as described above. The DNA-binding reaction mixture contained poly (d[I-C]) (Pharmacia), 3000–6000 cpm of [32P]end-labeled DNA-fragments and a buffer composed of 10 mM Tris-HCl, pH 7.5, 50 mM NaCl, 1 mM dithiothreitol (DTT), 1 mM EDTA and 5% glycerol. Binding reactions and subsequent analysis on native 4% polyacrylamide gels were performed at room temperature as described. Sen, R. and D. Baltimore, *Cell,* 46:705–716 (1986). Subcellular fractions were treated with formamide (DNA grade; American Bioanalytical) prior to the addition of the DNA-binding reaction mixture. Sodium desoxycholate (Fisher Scientific Company) was added after the DNA-binding reaction.

Renaturation of NF-kB

Protein in the subcellular fractions was precipitated at −20° C. by the addition of four volumes of acetone. Pellets were dissolved in SDS-sample buffer containing 3.3% 2-mercaptoethanol and boiled for 5 minutes. Laemmli, U. K., *Nature.,* 227:680–685 (1970). After SDS-polyacrylamide gel electrophoresis, gel pieces from different molecular weight regions were cut out, ground, and proteins eluted overnight at 4 ° C. in 500 ul of a buffer containing 50 mM Tris-HCl, pH 7.9, 0.1% SDS, 0.1 mg/ml bovine serum albumin, 1 mM DTT, 0.2 mM EDTA, 0.1 mM phenylmethylsulfonyl fluoride (PMSF) and 2.5% glycerol. After centrifugation for 2 minutes in a Microfuge, the supernatant was removed and recentrifuged for 10 minutes to remove gel debris.

To 200 ul of the supernatant four volumes of acetone were added and proteins were allowed to precipitate for 2 hours at −20° C. The precipitate was collected by centrifugation for 10 minutes in a Microfuge, washed once with 1 ml methanol at −20° C. and dried for 30 minutes in the inverted

76

tube. The dried pellet was dissolved in 2.5 ul of a saturated solution of urea (ultrapure; American Bioanalytical) and diluted with 125 ul of a buffer containing 20 mM Tris-HCl, pH 7.6, 10 mM KCl, 2 mM DTT and 10 uM PMSF. Renaturation was allowed for a minimum of 18 hours at 4° C. kB-specific DNA-binding activity was detectable in mobility shift assays for at least 48 hours after storage of renatured fractions at 4° C. without appreciable loss of activity.

Example 11

Subcellular Localization of the NF-kB Precursor

Because NF-kB is a DNA-binding protein, it is expected to reside in the nucleus. This is certainly true for NF-kB of phorbol ester-treated cells and mature B-cells where the activity is detectable in nuclear extracts. It is however not mandatory for a precursor of NF-kB especially, in view of the fact that the precursor is activated by protein kinase C, a cytosolic protein that is associated in its active state with the plasma membrane.

The precursor of NF-kB was analyzed by an investigation of subcellular fractions of unstimulated pre-B cells for the presence of NF-kB activity, using electrophoretic mobility shift assays (FIG. 27A). Little DNA-binding activity was detected in the subcellular fractions, indicating that the precursor must exist in a form of low affinity for its cognate DNA (FIG. 27A, lanes 1 to 3). In fractions from TPA-stimulated cells, the newly activated NF-kB was almost exclusively contained in the nuclear extract (FIG. 27A, lanes 4 to 6).

In an attempt to activate the DNA-binding activity of the NF-kB precursor, the various subcellular fractions were treated with agents known to gently dissociate protein-protein interactions. Low concentrations of desoxycholate, formamide or a combination of both included in the mobility shift assay mixture led to the activation of an NF-kB-specific DNA-binding activity (FIG. 27B). The fraction containing the bulk of the in vitro activatable NF-kB precursor was the cytosol (FIG. 27B, lanes 1 to 3). When fractions from TPA-stimulated cells were subjected to the same treatment, the amount of precursor in the cytosolic fraction was found strongly reduced, apparently because of redistribution of activated NF-kB into the nuclear extract fraction (FIG. 27B, lanes 4 and 5). In both control and TPA-stimulated cells, the amount of total cellular NF-kB activity revealed after treatment with dissociating agents was equal, suggesting a complete conversion of the NF-kB precursor into active NF-kB. Cytosolic fractions from HeLa cells and from calf spleen also contained NF-kB precursor which could be demonstrated after activation with dissociating agents. These observations strongly suggest that NF-kB is localized as an inactive precursor in the cytosol. Activation of protein kinase C by phorbol ester then would result in two events: induction of DNA-binding activity and nuclear translocation of NF-kB.

Using subcellular fractions from HeLa cells, another TPA-inducible transcription factor, AP-1, was tested to determine whether it also exhibits activation and subcellular redistribution upon TPA-stimulation. As detected by mobility shift assays, AP-1 from nuclear extracts did not show an increase in DNA-binding activity after TPA-stimulation nor were there significant amounts of AP-1 activity present in the cytosolic fractions from control and stimulated cells (FIG. 28). This showed that the mechanism by which the transcription factor activity of NF-kB is

US 6,410,516 B1

77

induced is fundamentally different from that of AP-1 although the initial signal—activation of protein kinase C by phorbol ester—is the same.

Example 12

Investigation of the DOC-dependence of Cytosolic NF-kB

Cytosol from unstimulated 70Z/3 pre-B cells in buffer A (Dignam, J. P. et al., *Nucl. Acids. Res.,* 11:1475 (1983); Baeuerle, P. A. and D. Baltimore, *Cell,* 53:211 (1988)) was adjusted to a final concentration of 50 mM NaCl, 20 mM (HEPES (pH 7.9), 1.5 mM EDTA, 5% glycerol and 0.2% NP-40. Cytosolic protein (45 mg) was mixed to a final volume of 4 ml with 0.6% DOC, 0.75 g calf thymus (wet weight) DNA-cellulose [Sigma; equilibrated in buffer G: 10 mM Tris-HCl (pH 7.5), 5 mM NaCl, 1 mM EDTA, 1 mM dithiothreitol (DTT), 5% glycerol, 0.2% DOC, 0.2% NP-40, and 0.5 mM phenylmethyl sulfonylflfuoride (PMSF)] and 1.2% NP-40. The suspension was incubated in a mini column for 1 hour at room temperature on a rotary shaker. The flow-through fraction was used for gel filtration. DNA-cellulose was washed with buffer G and eluted with a NaCl step gradient in buffer G. Equal proportions of fractions were assayed by EMSA (Sen, R. and D. Baltimore, *Cell,* 46:705 (1986); Baeuerle, P. A. and D. Baltimore, *Cell,* 53:211 (1988)) at a final concentration of 1.2% NP-40 in the presence of either 0.03% DOC (non dissociating condition) or 0.6% DOC (dissociating condition) and with 10 μg of bovine serum albumin (BSA) as carrier. Results of this investigation are represented in FIG. **34** and described above.

Example 13

Characterization of IkB and its Complex with NF-kB

The flow-through fraction from the DNA-cellulose column (1.55 ml in fraction in 250 μl described in Example 4) was subjected to a G-200 Sephadex column (280 by 7 mm) with a flow rate of 0.15 ml/min in buffer G at room temperature. A mix of size markers (dextran blue; immunoglobulin G, 158 kDa, BSA, 67 kDa, ovalbumin, 45 kDa, myoglobin, 17 kDa; Biorad) was run separately on the column prior to sample runs. Markers were detected in fractions by their color and using SDS-polyacrylamide gel electrophoresis (SDS-PAGE) followed by Coomassie Blue staining.

To detect inhibiting activity, portions of fractions (5 μl; in buffer G) were mixed with 1 μl of nuclear extracts [in buffer D(+)] and 0.5 μl 10% NP-40. Dignam, J. P. et al., *Nucl. Acids. Res.,* 11:1475 (1983). After 30 minutes at room temperature, the reaction volume was brought to 20 μl by the addition of a DNA binding reaction mixture containing 3.2 μg of poly(dI-dC) (Pharmacia), 5 to 20 fmoles of $^{32}$P-end labeled k enhancer fragment, 75 mM NaCl, 15 mM Tris-HCl (pH 7.5), 1.5 mM EDTA, 1.5 mM DTT, 7.5% glycerol, 0.3% NP-40 and 20 μg BSA. After a 20-minute DNA binding reaction, samples were analyzed by EMSA.

Gel filtration fractions containing IkB (25 μg of protein) were incubated for 1 hour at room temperature in buffer G without any addition or with 2 μg of TPCK-treated trypsin (Sigma), 8 μg of BPTI (Sigma), or with 2 μg of trypsin that had been incubated with 8 μg of BPTI. Tryptic digestion was stopped by a 10-minute incubation with 8 μg of BPTI and samples analyzed as described above.

78

Nuclear extract from TPA-stimulated 70Z/3 cells and cytosol from untreated cells (both 220 μg of protein) were sedimented through 5 ml of a continuous 10 to 30% glycerol gradient in buffer D(+) and 150,000 g (SW 50.1 rotor; Beckman) for 20 hours at 4° C. Cosedimented size markers were detected in fractions by SDS-PAGE and Coomassie Blue staining. Portions of glycerol gradient fractions (4 μl) were analyzed by EMSA with 10 μg of BSA as carrier and 0.5 μg of poly(dI-dC). NF-kB precursor was activated by treating 4 μl of fractions with 1.5 μl of formamide before the DNA binding reaction mixture was added.

Example 14

Demonstration of the Presence of the NF-kB—IkB Complex in Enucleated Cells

HeLa cells were grown in Eagle's Minimum Essential Medium supplemented with 10% horse serum, penicillin (50 I.U./ml) and streptomycin (50 μg/ml) (referred to as MEM-medium) on discs (1.8 cm in diameter) cut from cell culture plastic ware. For enucleation, discs were placed upside down into centrifuge tubes filled with 10 ml of MEM-medium of 37° C. containing cytochalasin B (10 μg/ml) and held for the same time in the incubator. To estimate the enucleation efficiency, enucleated cells on one disc were fixed with formaldehyde (3.7%) in phosphate-buffered saline (PBS) for 20 minutes, stained for 4 minutes with 4',6-diamidino-2-phenylindole (DAPI, 1 μg/ml; Sigma) in PBS, and washed in PBS. Fluorescence microscopy under UV light and phase contrast microscopy were performed with a Zeiss Photomicroscope III. Control and enucleated cells were allowed to recover in cytochalasin B-free MEM-medium for 30 minutes before a 2-hour incubation in the absence or presence of TPA (50 ng/ml). Cells were then washed in ice-cold PBS, scraped off the discs in 100 μl of a buffer containing 20 mM HEPES (pH 7.9), 0.35M NaCl, 20% glycerol, 1% NP-40, 1 mM MgCl₂, 1 mM DTT, 0.5 mM EDTA, 0.1 mM EGTA, 1% aprotinin (Sigma) and 1 mM PMSF. After lysis and extraction for 10 minutes on ice, particulate material was removed by centrifugation (Microfuge) for 15 minutes at 4° C. and the resulting supernatants were analyzed by EMSA.

Example 15

Demonstration of the Role of NF-KB as Mediator in Regulation of a Gene in Non-Lymphoid Cells

The following demonstrates that NF-κB has the role of mediator in cytokine gene regulation (in this case, positive regulation of β-IFN gene expression). NF-κB has been shown to interact with a virus-inducible element (PRDII) in the β-IFN gene and to be highly induced by either virus infection or treatment of cells with double-standard RNA.

A. Experimental Procedure

Cell Culture and Transfection

Mouse L929 fibroblasts were maintained in MEM medium (Gibco) with 5% serum (Gibco). Jurkat (human T lymphocytes), Namalwa (human Burkitt lymphoma), S194 (mouse myeloma), and 70Z/3 (mouse pre-B lymphocyte) cells were grown in RPMI 1640 medium supplemented with 10% fetal calf serum (Life Science) and 50 μM β-mercaptoethanol. Sendai virus (SPAFAS) or poly(rI:rC) (Pharmacia) inductions were either 6 hours in length for protein extracts (Zinn et al., *Cell,* 34:865–879 (1983)) or 12 hours for transfections. Phorbol myristate acetate (Sigma) and phytohemagglutinin (PHA) induction was carried out as described by Sen, R. and D. Baltimore (*Cell,* 47:921–928 (1986)).

US 6,410,516 B1

79

Transient transfections of L929 cells were performed according to Kuhl et al., *Cell*, 50:1057–1069 (1987); and for S194 cells, according to Pierce et al., *Proc. Natl. Acad. Sci. USA*, 85:1482–1486 (1988). A β-galactosidse (β-gal) expression plasmid (Edlund et al., *Science*, 230:912–916 (1985)) was co-transfected to monitor the transfection efficiency. CAT assays were described by Gorman et al., *Mol. Cell. Biol.*, 2:1044–1051 (1982), and the amount of protein assayed was normalized to a constant amount of β-gal activity. An et al., *Mol. Cell. Biol.*, 2:1628–1632 (1982).

Plasmid Constructions

The plasmids p-41βCAT (-41β), p-41PII4r (-41β(P)$_4$), and p-41PII2r (-41β(P)$_2$) were constructed as follows: in Fan, C. M. and T. Maniatis, *EMBO J.*, in press (1989). The nucleotide sequence of the PRDII×2 (PRDII$_2$) is 5'-GATCTGTGGGAAATTCCGTGGGAAATTCCGGATC-3'. The construction of Δ56 (c-fosCAT), Δ56(B)$_2$ (J16), and Δ56(B$^-$) (J32) were described by Pierce et al., *Proc. Natl. Acad. Sci. USA*, 85:1482–1486 (1988). The κB oligonucleotides were: Wild-type: 5'-TCGACAGAGGGGACTTTCCGAGAGGCTCGA-3' and mutant: 5'-TCGACAGAATTCACTTTCCAGGAGGCTCGA-3'. The IRE was isolated as a BglII-BamHI fragment (Goodbourn et al., *Cell*, 45:601–610 (1986)) and cloned into pSP73. Mutant PRDII sites were described in Goodbourn, S. and T. Maniatis, *Proc. Natl. Acad. Sci. USA*, 85:1447–1451 (1988).

Preparation of Subcellular Protein Fractions and Mobility Shift Electrophoresis

Buffers A, C and D are those described by Dignam et al., *Nucl. Acids Res.*, 11:1475–1489 (1983). Frozen pellets containing from $1\times10^6$ to $1\times10^7$ cells were thawed in the presence of an equal volume of buffer A. The suspension was mixed using 10 strokes of a Dounce homogenizer and the nuclei were pelleted for 20 minutes at 4° in a microcentrifuge. The supernatant, termed cytosol, was ultracentrifuged for 1 hour at 100,000×g and adjusted to 20% glycerol, 10 mM HEPES, pH 7.9, 1 mM EDTA, and 0.1 M KCl. The nuclei were extracted with 2 volumes of the buffer C for 20 minutes and the nuclear extract was cleared by centrifugation and dialyzed against buffer D. To minimize proteolysis, all buffers included 0.5 mM PMSF, 0.3 μg/ml leupeptin, and 0.3 μg/ml antipain and buffers A and C included 0.3 TIU/ml aprotinin, 0.5 mg/ml benzamidine, 0.1 μg/ml chymostatin, and 0.7 μg/ml pepstatin.

Binding assays were carried out as described in Lenardo et al., *Science*, 236:1573–1577 (1987) and Lenardo et al., *Proc. Natl. Acad. Sci. USA*, 85:8825–8829 (1988). Assay samples of 20 μl contained nuclear extract incubated with 0.25 ng $^{32}$P-labeled DNA fragment (5,000 CPM), 10 mM Tris/Cl, pH 7.5, 1 mM dithiothreitol, 1 mM EDTA, 0.5 mM MgCl$_2$, 3 mM GTP (omitted in experiments varying amounts of added GTP), 2 μg poly(dI-dC), and 5% glycerol for 20 minutes at room temperature. Cytosol was activated in vitro using 0.8% sodium deoxycholate followed by addition of the binding mixture including 0.75% NP-40. Methylation interference assays were performed using the procedure of Gilman et al., *Mol. Cell. Biol.*, 6:4305–4316 (1986).

RNA Analysis

RNA preparation and Northern blot analysis were carried out as previously described by Zinn et al., *Cell*, 34, 865–879 (1983).

B. Results

NF-κB binds specifically to PRDII

The protein encoded by the PRDII-BF1 cDNA binds to the PRDII site and to the H2-K$^b$ and κB binding sites (FIG.

80

39, Singh et al., *Cell*, 52:415–423 (1988); Fan and Maniatis, unpublished). Thus, the ability of NF-κB to bind to PRDII and to the κB site was compared, using an electrophoretic mobility shift assay. Fried, M. and Crothers, D. M., *Nucleic Acid Res.*, 9:6505–6525 (1981). NF-κB is present in the human T lymphocytic line Jurkat in an inactive form, but its binding is inducible by phorbol myristate acetate (PMA) and phytohemagglutinin (PHA). Sen, R. and D. Baltimore, *Cell*, 47:921–928 (1986); and Nabel, G. and D. Baltimore, *Nature*, 326:711–713 (1987). The entire interferon gene regulatory element (IRE) or an oligonucleotide comprised of two copies of the PRDII sequences (PRDII$_2$ or (P)$_2$) was used. A complex with PMA/PHA-induced Jurkat nuclear extracts that migrated identically to that formed with the κB site was detected. It was assumed that the additional slower migrating complex observed with the PRDII$_2$ oligonucleotide corresponds to DNA molecules in which both of the PRDII sites are bound to protein. Specific κB complexes were undetectable in extracts from unstimulated Jurkat cells.

To determine whether the same protein binds to PRDII and κB, competition experiments were carried out. Increasing amounts of unlabeled κB oligonucleotide inhibited complex formation with either the IRE or the κB site. The ability of PRDII and κB to compete for NF-κB binding was also reciprocal; an unlabeled fragment prevented complex formation with either labeled fragment. Quantitatively, both sites competed equally for NF-κB. Furthermore, the IRE and the κB sites both formed an identical complex using cytosol from unstimulated Jurkat cells after treatment with the detergent deoxycholate. This observation is in agreement with the finding that NF-κB binding activity can be unmasked in cytosolic extracts by deoxycholate. Baeuerle, P. and D. Baltimore, *Cell*, 53:211–217 (1988).

A number of single base mutations in PRDII decrease the level of virus induction of the β-IFN gene. Goodbourn, S. and T. Maniatis, *Proc. Natl. Acad. Sci. USA*, 85:1447–1451 (1988). Therefore, these mutations were examined to assess whether they also affect in vitro binding to NF-κB. Four point mutations that impair inducibility of the β-IFN gene were shown to reduce binding of NF-κB. (64G→A, 62G→A, 60A→G and 56C→T). A single point mutation that has no effect on inducibility allows specific NF-κB binding (65T→C). Taken together, these results strongly suggest the NF-κB plays a direct role in β-IFN gene regulation.

The in Vivo Activities of PRDIII and the κB Site are Indistinguishable

To determine whether the PRDIII and κB sites function similarly in vivo, we compared their transcriptional activities were compared, using chloramphenicol acetyltransferase gene (CAT) reporter plasmids in virus-induced mouse L929 fibroblasts and in S194 mouse myeloma cells. The structures of the reporter genes are illustrated in FIG. **41B**. The -41 β-globin/CAT gene was not expressed in L929 cells before or after induction by inactivated Sendai virus or poly(rI:rC) (FIG. **41A**, lanes 1–3). However, the reporter gene linked to four copies of PRDII (-41β(P)$_4$) was highly inducible (FIG. **41A**, lanes 4–6). Remarkably, two tandemly-repeated κB sites also conferred virus and poly (rI:rC) inducibility on a c-fos promoter/CAT fusion gene in L929 cells (FIG. **41A**, compare lanes 7–9 to 10–12). Mutations in the κB site that eliminated binding of NF-κB also abolished virus inducibility. Thus, in L929 cells, the same inducible factor may interact with PRDIII and the κB site to stimulate transcription.

The B-cell specific activities of PRDII and the κB site were compared by transfecting the reporter enes into S194

mouse myeloma cells. As previously demonstrated, wild-type, but not mutant, κB sites were highly active in mature B-cells which constitutively express NF-κB (FIG. **40A**, lanes 13–15; Pierce et al., *Proc. Natl. Acad. Sci. USA,* 85:1482–1486 (1988)). Significantly, multiple PRDII elements were also highly active in S194 cells (lanes 16–18). These results further suggest that the same factor, NF-κB, interacts productively with PRDII and the κB site.

Virus Induction Stimulates NF-κB Binding in Lymphoid and Non-lymphoid Cells

The ability of PRDII to bind NF-κB suggested that virus infection might activate NF-κB. Therefore, nuclear extracts prepared from cells before and after virus induction were analyzed. NF-κB binding activity was virus-inducible in Namalwa human mature B lymphocytes, 70Z/3 murine pre-B lymphocytes, and murine L929 fibroblasts. Virus Induction of NF-κB in Namalwa cells was unexpected because these cells display significant constitutive NF-κB binding activity in the nucleus. Thus, only a fraction of the NF-κB in Namalwa cells is in the active state, and the remaining molecules can be activated by virus. Virus-induced complexes in all three cell types appeared to contain NF-κB because they could be eliminated by competition with wild-type (WT) but not mutant (MUT) κB sites. Moreover, complex formation could be stimulated by GTP, a biochemical property of NF-κB. Lenardo et al., *Proc. Natl. Acad. Sci. USA,* 85:8825–8829 (1988). The NF-κB complex was also induced by poly(rI:rC) in 70Z/3 cells, but the effect was less dramatic.

Additional evidence that the virus-induced complexes contain NF-κB was provided by comparisons of the methylation interference patterns of the virus-induced complexes from Namalwa and L929 cells with the PMA/PHA-induced complex in Jurkat cells. All of the interference patterns were identical and exhibited the close base contacts that are distinctive of the interaction between NF-κB and its cognate binding site in the κ enhancer. Sen, R. and D. Baltimore, *Cell,* 46:705–716 (1986); and Baldwin, A. S. and P. A. Sharp, *Mol. Cell. Biol.,* 7:305–313 (1988). Finally, the level of NF-κB revealed by deoxycholate in the cytosol of L929 cells was diminished after virus induction. Therefore, like phorbol ester treatment, virus infection apparently releases NF-κB from an active cytosolic form and allows translocation to the nucleus. Baeuerle, P. and D. Baltimore, *Cell,* 53:211–217 (1988).

Endogenous β-IFN and Ig Kappa Gene Expression are Activated by Virus in Pre-B Lymphocytes

As shown above, virus infection dramatically increased the levels of nuclear NF-κB and induced reporter genes containing PRDII or κB sites. Therefore, the ability of virus to induce the transcription of an endogenous κ gene was assessed. The pre-B cell line 70Z/3, which produces cytoplasmic Ig μ heavy chains, but not light chains, was used for this purpose. Paige et al., *J. Immunol.,* 121:641–647 (1978). The κ gene in 70Z/3 cells is functionally rearranged and can be transcriptionally induced by lipopolysaccharide (LPS) and phorbol myristate acetate (PMA), conditions which powerfully induce NF-κB. Nelson et al., *Nucl. Acids Res.,* 12: 1911–1923 (1984); Rosoff and Cantley, *J. Biol. Chem.,* 259:7056–7060 (1985); and Sen, R. and D. Baltimore, *Cell,* 47:921–928 (1986). As expected, treatment of 70Z/3 cells with phorbol esters or, more strikingly, with LPS resulted in the activation of the endogenous κ gene. Surprisingly, virus infection also induced κ gene expression to a level comparable to that observed with PMA induction. Under the same conditions, endogenous β-IFN mRNA was induced by virus, but not by PMA or LPS. Thus, NF-κB is necessary and

sufficient for expression of the endogenous κ gene in 70Z/3 cells, but not for the β-IFN gene. These results indicate the virus-induced complex has all the in vitro binding properties and in vivo transcriptional properties of NF-κB.

EQUIVALENTS

Those skilled in the art will recognize or be able to ascertain, using no more than routine experimentation, many equivalents of the specific embodiments of the invention described therein. Such equivalents are intended to be encompassed by the following claims.

What is claimed is:

1. A method for inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-κKB, the method comprising reducing NF-κKB activity in the cell such that expression of said gene is inhibited.

2. A method for selectively inhibiting expression, in a eukaryotic cell, of genes whose transcription is regulated by NF-κB, the method comprising reducing NF-κB activity in the cell such that expression of said genes is inhibited.

3. A method for reducing the level of expression of a viral gene whose transcription is regulated by NF-κB in a eukaryotic cell, the method comprising reducing NF-κB activity in the cell such that expression of said viral gene is reduced.

4. The method of claim 3, wherein the viral gene is a cytomegalovirus (CMV), human immunodeficiency virus (HIV) or simian virus 40 (SV40) gene.

5. A method for reducing the level of expression of a cytokine gene whose transcription is regulated by NF-κB in a eukaryotic cell comprising reducing NF-κB activity in the cell such that expression of said cytokine gene is reduced.

6. A method for diminishing induced NF-κB-mediated intracellular signaling comprising reducing NF-κB activity in cells such that NF-κB-mediated intracellular signaling is diminished.

7. A method for modifying effects of external influences on a eukaryotic cell, which external influences induce NF-κB-mediated intracellular signaling, the method comprising altering NF-κB activity in the cells such that NF-κB-mediated effects of external influences are modified.

8. The method of claim 7, wherein NF-κB activity in the cell is reduced.

9. A method for reducing, in eukaryotic cells, the level of expression of genes which are activated by extracellular influences which induce NF-κB-mediated intracellular signaling, the method comprising reducing NF-κB activity in the cells such that expression of said genes is reduced.

10. A method for reducing the effects of bacterial infection on mammalian cells comprising reducing NF-κB activity in mammalian cells so as to reduce bacterial lipopolysaccharide-induced gene expression in the mammalian cells.

11. A method for reducing the effects of viral infection on mammalian cells comprising reducing NF-κB activity in mammalian cells so as to reduce virus-mediated gene expression in the mammalian cells.

12. A method for reducing the effects of bacterial infection on mammalian immune cells comprising reducing NF-κB activity in mammalian immune cells so as to reduce bacterial lipopolysaccharide-mediated stimulation of the immune cells.

13. A method for reducing the effects of bacterial lipopolysaccharide on mammalian cells comprising reducing NF-κB activity in the cells so as to reduce bacterial lipopolysaccharide-induced gene expression in the cells.

14. A method for reducing bacterial lipopolysaccharide-induced expression of cytokines in mammalian cells, which

US 6,410,516 B1

83

method comprises reducing NF-κB activity in the cells so as to reduce bacterial lipopolysaccharide-induced expression of said cytokines in the cells.

15. A method for reducing bacterial lipopolysaccharide-induced expression of Tumor Necrosis Factor-α in mammalian cells, which method comprises reducing NF-κB activity in the cells so as to reduce bacterial lipopolysaccharide-induced expression of Tumor Necrosis Factor-α in the cells.

16. A method for reducing bacterial lipopolysaccharide-mediated stimulation of immune cells, which method comprises reducing NF-κB activity in the cells so as to reduce bacterial lipopolysaccharide-mediated stimulation of the immune cells.

17. A method for reducing bacterial-induced NF-κB signaling in cells, which method comprises reducing NF-κB activity in the cells so as to reduce bacterial-induced NF-κB signaling in the cells.

18. A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity in mammalian cells comprising reducing NF-κB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells.

19. A method for reducing bacterial lipopolysaccharide-induced nuclear translocation of NF-κB in eukaryotic cells comprising inhibiting one or more of: (a) modification of an IκB protein which reduces binding to NF-κB, (b) degradation of an IκB protein, or (c) dissociation of NF-κB-IκB complexes so as to reduce nuclear translocation of NF-κB in the cells.

20. The method of claim 1 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

21. The method of claim 1 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

22. The method of claim 1, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

23. The method of claim 1, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

24. The method of claim 1, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

25. The method of claim 1 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

26. The method of claim 1, carried out on mammalian cells.

27. The method of claim 1, carried out on human cells.

28. The method of claim 26 or 27, carried out on immune cells.

29. The method of claim 26 or 27 carried out on lymphoid cells.

30. The method of claim 26 or 27, carried out on liver cells.

31. The method of claim 2 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

32. The method of claim 2 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

33. The method of claim 2, wherein NF-κB activity is reduced by inhibiting modification of an I-κB protein, which modification otherwise reduces IκB binding to NF-κB.

34. The method of claim 2, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

84

35. The method of claim 2, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

36. The method of claim 2 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

37. The method of claim 2, carried out on mammalian cells.

38. The method of claim 2, carried out on human cells.

39. The method of claim 37 or 38, carried out on immune cells.

40. The method of claim 37 or 38, carried out on lymphoid cells.

41. The method of claim 37 or 38, carried out on liver cells.

42. The method of claim 3 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

43. The method of claim 3 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

44. The method of claim 3, wherein NF-κB activity is reduced by inhibiting modification of an I-κB protein, which modification otherwise reduces IκB binding to NF-κB.

45. The method of claim 3, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

46. The method of claim 3, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

47. The method of claim 3 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

48. The method of claim 3, carried out on mammalian cells.

49. The method of claim 3, carried out on human cells.

50. The method of claim 48 or 49, carried out on immune cells.

51. The method of claim 48 or 49, carried out on lymphoid cells.

52. The method of claim 48 or 49, carried out on liver cells.

53. The method of claim 5 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

54. The method of claim 5 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

55. The method of claim 5, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

56. The method of claim 5, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

57. The method of claim 5, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

58. The method of claim 5 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

59. The method of claim 5, carried out on mammalian cells.

60. The method of claim 5, carried out on human cells.

61. The method of claim 59 or 60, carried out on immune cells.

62. The method of claim 59 or 60, carried out on lymphoid cells.

US 6,410,516 B1

85 86

**63**. The method of claim **59** or **60**, carried out on liver cells.

**64**. The method of claim **6** wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

**65**. The method of claim **6** wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

**66**. The method of claim **6**, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

**67**. The method of claim **6**, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

**68**. The method of claim **6**, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

**69**. The method of claim **6** wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

**70**. The method of claim **6**, carried out on mammalian cells.

**71**. The method of claim **6**, carried out on human cells.

**72**. The method of claim **70** or **71**, carried out on immune cells.

**73**. The method of claim **70** or **71**, carried out on lymphoid cells.

**74**. The method of claim **70** or **71**, carried out on liver cells.

**75**. The method of claim **8** wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

**76**. The method of claim **8** wherein NF-κKB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

**77**. The method of claim **8**, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

**78**. The method of claim **8**, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

**79**. The method of claim **8**, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

**80**. The method of claim **8** wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

**81**. The method of claim **7**, carried out on mammalian cells.

**82**. The method of claim **8**, carried out on mammalian cells.

**83**. The method of claim **7**, carried out on human cells.

**84**. The method of claim **8**, carried out on human cells.

**85**. The method of any of claims **81–84**, carried out on immune cells.

**86**. The method of any of claims **81–84**, carried out on lymphoid cells.

**87**. The method of any of claims **81–84**, carried out on liver cells.

**88**. The method of claim **9** wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

**89**. The method of claim **9** wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

**90**. The method of claim **9**, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

**91**. The method of claim **9**, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

**92**. The method of claim **9**, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

**93**. The method of claim **9** wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

**94**. The method of claim **9**, carried out on mammalian cells.

**95**. The method of claim **9**, carried out on human cells.

**96**. The method of claim **94** or **95**, carried out on immune cells.

**97**. The method of claim **94** or **95**, carried out on lymphoid cells.

**98**. The method of claim **94** or **95**, carried out on liver cells.

**99**. The method of claim **10** wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

**100**. The method of claim **10** wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

**101**. The method of claim **10**, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

**102**. The method of claim **10**, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

**103**. The method of claim **10**, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

**104**. The method of claim **10** wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

**105**. The method of claim **10**, carried out on human cells.

**106**. The method of claim **11**, carried out on immune cells.

**107**. The method of claim **11**, carried out on lymphoid cells.

**108**. The method of claim **11**, carried out on liver cells.

**109**. The method of claim **11** wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

**110**. The method of claim **11** wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

**111**. The method of claim **11**, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

**112**. The method of claim **11**, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

**113**. The method of claim **11**, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

**114**. The method of claim **11** wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

**115**. The method of claim **11**, carried out on human cells.

**116**. The method of claim **11** or **115**, carried out on immune cells.

**117**. The method of claim **11** or **115**, carried out on lymphoid cells.

**118**. The method of claim **11** or **115**, carried out on liver cells.

**119**. The method of claim **12** wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

US 6,410,516 B1

87

**120**. The method of claim **12** wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

**121**. The method of claim **12**, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

**122**. The method of claim **12**, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

**123**. The method of claim **12**, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

**124**. The method of claim **12** wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

**125**. The method of claim **12**, carried out on human immune cells.

**126**. The method of claim **12**, carried out on lymphoid cells.

**127**. The method of claim **125**, carried out on lymphoid cells.

**128**. The method of claim **13** wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

**129**. The method of claim **13** wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

**130**. The method of claim **13**, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

**131**. the method of claim **13**, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

**132**. The method of claim **13**, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

**133**. The method of claim **13** wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

**134**. The method of claim **13**, carried out on human cells.

**135**. The method of claim **13**, carried out on immune cells.

**136**. The method of claim **134**, carried out on immune cells.

**137**. The method of claim **13** or **134**, carried out on lymphoid cells.

**138**. The method of claim **13** or **134**, carried out on liver cells.

**139**. The method of claim **14** wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

**140**. The method of claim **14** wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

**141**. The method of claim **14**, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

**142**. The method of claim **14**, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

**143**. The method of claim **14**, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

**144**. The method of claim **14** wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

**145**. The method of claim **14**, carried out on human cells.

**146**. The method of claim **14** or **145**, carried out on immune cells.

88

**147**. The method of claim **14** or **145**, carried out on lymphoid cells.

**148**. The method of claim **14** or **145**, carried out on liver cells.

**149**. The method of claim **15** wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

**150**. The method of claim **15** wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

**151**. The method of claim **15**, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

**152**. The method of claim **15**, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

**153**. The method of claim **15**, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

**154**. The method of claim **15** wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

**155**. The method of claim **15**, carried out on human cells.

**156**. The method of claim **15** of **155**, carried out on immune cells.

**157**. The method of claim **15** or **155**, carried out on lymphoid cells.

**158**. The method of claim **15** or **155**, carried out on liver cells.

**159**. The method of claim **16** wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

**160**. The method of claim **16** wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

**161**. The method of claim **16**, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

**162**. The method of claim **16**, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

**163**. The method of claim **16**, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

**164**. The method of claim **16** wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

**165**. The method of claim **16**, carried out on human cells.

**166**. The method of claim **16** or **165**, carried out on lymphoid cells.

**167**. The method of claim **17** wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

**168**. The method of claim **17** wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

**169**. The method of claim **17**, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

**170**. The method of claim **17**, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

**171**. The method of claim **17**, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

**172**. The method of claim **17** wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

US 6,410,516 B1

89

173. The method of claim 17, carried out on human cells.

174. The method of claim 17 or 173, carried out on immune cells.

175. The method of claim 17 or 173, carried out on lymphoid cells.

176. The method of claim 17 or 173, carried out on liver cells.

177. The method of claim 18 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

178. The method of claim 18 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

179. The method of claim 18, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

180. The method of claim 18, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

181. The method of claim 18, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

182. The method of claim 18 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

183. The method of claim 18, carried out on human cells.

184. The method of claim 18 or 183, carried out on immune cells.

185. The method of claim 18 or 183, carried out on lymphoid cells.

186. The method of claim 18 or 183, carried out on liver cells.

187. The method of claim 19, carried out on mammalian cells.

188. The method of claim 19, carried out on human cells.

189. The method of claim 187 or 188, carried out on immune cells.

190. The method of claim 187 or 188, carried out on lymphoid cells.

90

191. The method of claim 193 or 194, carried out on liver cells.

192. The method of claim 4 wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:IκB complex.

193. The method of claim 4 wherein NF-κB activity is reduced by inhibiting the passage of NF-κB into the nucleus of cells.

194. The method of claim 4, wherein NF-κB activity is reduced by inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB.

195. The method of claim 4, wherein NF-κB activity is reduced by inhibiting degradation of an IκB protein.

196. The method of claim 4, wherein NF-κB activity is reduced by inhibiting dissociation of NF-κB:IκB complexes.

197. The method of claim 4 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

198. The method of claim 4, carried out on mammalian cells.

199. The method of claim 4, carried out on human cells.

200. The method of claim 198 or 199, carried out on immune cells.

201. The method of claim 198 or 199, carried out on lymphoid cells.

202. The method of claim 198 or 199, carried out on liver cells.

203. A method of inhibiting expression, in a mammalian cell, of a gene whose transcriptional activity is activated by binding of NF-κB to said gene, comprising introducing a nucleic acid decoy molecule into the cell in an amount sufficient to inhibit expression of the gene, which decoy includes a NF-κB binding site that binds to NF-κB.

* * * * *

# EXHIBIT F

04/27/2004  09:33  3104767639            LAURIE ALLEN                    PAGE  02

WHI Vers -1/28/91

LLN/#4: 4167ariad.agt
Date: August 8, 1991

## LICENSE AGREEMENT

### TABLE OF CONTENTS

PREAMBLE

ARTICLES:

I      DEFINITIONS
II     GRANT
III    DUE DILIGENCE
IV     ROYALTIES
V      REPORTS AND RECORDS
VI     PATENT PROSECUTION
VII    INFRINGEMENT
VIII   PRODUCT LIABILITY
IX     EXPORT CONTROLS
X      NON-USE OF NAMES
XI     ASSIGNMENTS
XII    ARBITRATION
XIII   TERMINATION
XIV    PAYMENTS, NOTICES AND OTHER COMMUNICATIONS
XV     MISCELLANEOUS PROVISIONS
       APPENDICES
       A    Patent Rights
       B    Foreign Filings
       C    Centocor Collaborative Research Agt.
       D    Materials Transfer Agreement

This Agreement is made and entered into this *19th* day of *August*, 199*1*, (the Effective Date) by and between MASSACHUSETTS INSTITUTE OF TECHNOLOGY, a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts and having its principal office at 77 Massachusetts Avenue, Cambridge, Massachusetts 02139, U.S.A. (hereinafter referred to as M.I.T.), and the WHITEHEAD INSTITUTE, a corporation organized and existing under the laws of Delaware and having its principal office at Nine Cambridge Center, Cambridge, Massachusetts 02142, U.S.A., (hereinafter referred to as Whitehead) and ARIAD PHARMACEUTICALS, INC., a corporation duly organized under the laws of Delaware and having its principal office at 687 Wetherby Lane, Devon, Pennsylvania 19333 (hereinafter referred to as LICENSEE).





PTX 0460
02 CV 11280 RWZ

Confidential Information Under Protective Order

ADL 0029159

04/27/2004  09:33    3104767639              LAURIE ALLEN                    PAGE 03

-2-

## WITNESSETH

WHEREAS, M.I.T. and Whitehead are the owners of certain "Patent Rights" (as later defined herein) relating to M.I.T. Case No. 4167, "Nuclear Factors Associated With Transcriptional Regulation" by David Baltimore, Ranjan Sen, Phillip A. Sharp, Harinder Singh, Louis Staudt, Jonathan LeBowitz, Albert S. Baldwin, Jr., Roger Clerc, and Lynn M. Corcoran; M.I.T. Case No. 4442W (Whitehead No. 86-10) "Method of Inducible Gene Expression" by Ranjan Sen and David Baltimore; M.I.T. Case No. 4695W (Whitehead No. 87-11) "Activation of NF-kB Precursor" by Patrick Baeuerle and David Baltimore; M.I.T. Case No. 5675 (Whitehead 87-11AA) "The pp40 Associated with REL is an I-κB" by David Baltimore, Sankar Ghosh et al.; M.I.T. Case No. 5134W (Whitehead No. 89-02) "NF-kB-Mediated Transcriptional Regulation" by Michael J. Lenardo, Chen-ming Fan, Tom Maniatis and David Baltimore and has the right to grant licenses under said Patent Rights, subject only to a royalty-free, nonexclusive license heretofore granted to the United States Government;

WHEREAS, Whitehead has authorized M.I.T. to act as its sole and exclusive agent for the purposes of licensing Whitehead's rights in the Patent Rights and has authorized M.I.T. to enter into this licensing agreement on its own and Whitehead's behalf;

WHEREAS, M.I.T. and Whitehead desire to have the Patent Rights utilized in the public interest and is willing to grant a license thereunder;

WHEREAS, LICENSEE has represented to M.I.T., to induce M.I.T. to enter into this Agreement, that LICENSEE is committed to the development and commercialization of "Licensed Product(s)" (as later defined herein) and/or the use of the "Licensed Process(es)" (as later defined herein) and that it shall commit itself to a thorough, vigorous and diligent program of exploiting the Patent Rights so that public utilization shall result therefrom; and

WHEREAS, LICENSEE desires to obtain a license under the Patent Rights upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein the parties hereto agree as follows:

## ARTICLE I - DEFINITIONS

For the purposes of this Agreement, the following words and phrases shall have the following meanings:

1.1  "LICENSEE" shall include a related company of LICENSEE, the voting stock of which is directly or indirectly at least Fifty Percent (50%) owned or controlled by LICENSEE, an organization which directly or indirectly controls more than Fifty Percent (50%) of the voting stock

Confidential Information Under Protective Order                    ADL 0029160

04/27/2004  09:33  3104767639                LAURIE ALLEN                    PAGE 04

-3-

of LICENSEE and an organization, the majority ownership of which is directly or indirectly common to the ownership of LICENSEE.

    1.2  "Patent Rights" shall mean all of the following Whitehead and M.I.T. intellectual property:

    (a)    the United States and foreign patents and/or patent applications listed in Appendix A;

    (b)    United States and foreign patents issued from the applications listed in Appendix A and from divisionals and continuations of these applications;

    (c)    claims of U.S. and foreign continuation-in-part applications, and of the resulting patents, which are directed to subject matter specifically described in the U.S. and foreign applications listed in Appendix A;

    (d)    claims of all foreign patent applications, and of the resulting patents, which are directed to subject matter specifically described in the United States patents and/or patent applications described in (a), (b), or (c) above;

    (e)    any reissues of United States patents described in (a), (b), (c), or (d) above.

    1.3  A "Licensed Product" shall mean any product or part thereof which:

    (a)    is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the Patent Rights in the country in which any Licensed Product is made, used or sold;

    (b)    is manufactured by using a process which is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the Patent Rights in the country in which any Licensed Process is used or in which such product or part thereof is used or sold;

    (c)    contains the Tangible Property,

subject to the limitations in Paragraph 4.4.

    1.4  A "Licensed Process" shall mean any process which is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the Patent Rights or which uses the Tangible Property, subject to the limitations in Paragraph 4.4.

    1.5  "Net Sales" shall mean LICENSEE's (and its sublicensees' where appropriate) billings for Licensed Products and Licensed Processes produced hereunder less the sum of the following:

    (a)    discounts allowed in amounts customary in the trade;

Confidential Information Under Protective Order

ADL 0029161

04/27/2004   09:33   3104767639                     LAURIE ALLEN                     PAGE   05

-4-

(b)     sales, tariff duties and/or use taxes directly imposed and with reference to particular sales;

(c)     outbound transportation prepaid or allowed; and

(d)     amounts allowed or credited on returns.

No deductions shall be made for commissions paid to individuals whether they be with independent sales agencies or regularly employed by LICENSEE and on its payroll, or for cost of collections. Licensed Products shall be considered "sold" when billed out or invoiced.

    1.6  "Tangible Property" shall mean cell lines containing NF-kB-P50, NF-κB-P65, I-κB obtained directly or indirectly from M.I.T. or Whitehead, and any progeny and derivatives thereof.

## ARTICLE II - GRANT

    2.1  M.I.T. hereby grants to LICENSEE the right and license to make, have made, use, lease and sell the Licensed Products, and to practice the Licensed Processes to the end of the term for which the Patent Rights are granted unless sooner terminated according to the terms hereof.

    2.2  This license shall be subject to the research license and to the option granted to Centocor to acquire a license to the Patent Rights of M.I.T. Case 4167 for use with certain hybridomas, under the Collaborative Research Agreement between Centocor and M.I.T. dated November 14, 1988 as attached hereto as Appendix C. M.I.T. agrees that it will not renew the Collaboration Research Agreement as provided in Paragraph 2 thereof.

    2.3  In order to establish a period of exclusivity for LICENSEE, M.I.T. hereby agrees that with the exception of the rights granted or optioned to Centocor, it shall not grant any other license to make, have made, use, lease and sell Licensed Products or to utilize Licensed Processes during the period of time commencing with the Effective Date of this Agreement and terminating with the first to occur of:

    (a)     for each type of Licensed Product the expiration of Twelve (12) years after the first commercial sale of that Licensed Product; or

    (b)     the expiration of Sixteen (16) years after the Effective Date of this Agreement;

provided, however, that for any Licensed Product for which an application for premarket approval has been submitted to the U.S. FDA prior to July 1, 2007, the time spent by the FDA reviewing said application(s) for that Licensed Product shall be added to the period of exclusivity which would otherwise apply.

Confidential Information Under Protective Order                     ADL 0029162

04/27/2004  09:33    3104767639              LAURIE ALLEN                    PAGE  06

-5-

2.4 At the end of the exclusive period, the license granted hereunder shall become nonexclusive and shall extend to the end of the term or terms for which any Patent Rights are issued, unless sooner terminated as hereinafter provided, or unless the parties agree to extend the period of exclusivity.

2.5 M.I.T. and Whitehead also agree to bring to the attention of LICENSEE any inventions which relate to Nuclear Factors Associated with Transcriptional Regulation which arise prior to December 31, 1994 from the M.I.T. or Whitehead laboratories of any of the inventors of the Patent Rights listed in Appendix A. LICENSEE shall have a three month option, dating from the date at which any such invention is revealed to LICENSEE, to begin negotiations with M.I.T. for an exclusive license to such invention. If such negotiations are begun at LICENSEE's request, LICENSEE shall have an additional three month option to negotiate in good faith for an exclusive license to the invention. LICENSEE's options under this Paragraph 2.5 shall, however, be subject to any options or licenses granted under a research agreement with sponsors of the research leading to such invention, and the terms of such research agreements shall not be limited by the provisions of this Paragraph 2.5. M.I.T. and Whitehead shall use their best reasonable efforts to notify LICENSEE of any planned or completed sponsorship agreements, other than those involving U.S. Government sponsorship, in the field of Nuclear Factors Associated with Transcriptional Regulation, subject, however, to any confidentiality provisions with sponsors that might limit such notification.

2.6 LICENSEE agrees that Licensed Products leased or sold in the United States shall be manufactured substantially in the United States.

2.7 Whitehead and M.I.T. reserve the right to practice under the Patent Rights and to use and distribute the Tangible Property for their noncommercial research purposes under a Materials Transfer agreement similar to that in Appendix D. M.I.T. and Whitehead shall use their best reasonable efforts to notify LICENSEE of any Tangible Property distributed to third parties.

2.8 LICENSEE shall have the right to enter into sublicensing agreements for the rights, privileges and licenses granted hereunder only during the exclusive period of this Agreement. Such sublicensees may extend past the expiration date of the exclusive period of this Agreement, but any exclusivity of such sublicenses will expire upon the expiration of LICENSEE's exclusivity.

2.9 LICENSEE hereby agrees that every sublicensing agreement to which it shall be a party and which shall relate to the rights, privileges and license granted hereunder shall contain a statement setting forth the date upon which LICENSEE's exclusive rights, privileges and license hereunder shall terminate.

Confidential Information Under Protective Order                    ADL 0029163

04/27/2004  09:33  3104767639          LAURIE ALLEN                    PAGE  07

-6-

2.10 LICENSEE agrees that any sublicenses granted by it shall provide that the obligations to M.I.T. and Whitehead of Articles II, V, VII, VIII, IX, X, XII, XIII, and XV of this Agreement shall be binding upon the sublicensee as if it were a party to this Agreement. LICENSEE further agrees to attach copies of these Articles to sublicense agreements.

2.11 LICENSEE agrees to forward to M.I.T. a copy of any and all fully executed sublicense agreements, and further agrees to forward to M.I.T. annually a copy of such reports received by LICENSEE from its sublicensees during the preceding twelve (12) month period under the sublicenses as shall be pertinent to a royalty accounting under said sublicense agreements.

2.12 LICENSEE shall not receive from sublicensees anything of value in lieu of cash payments in consideration for any sublicense under this Agreement, without the express prior written permission of M.I.T..

2.13 The license granted hereunder shall not be construed to confer any rights upon LICENSEE by implication, estoppel or otherwise as to any technology not specifically set forth in Appendix A hereof and Paragraph 2.5.

## ARTICLE III - DUE DILIGENCE

3.1 LICENSEE shall use its best efforts to bring one or more Licensed Products or Licensed Processes to market through a thorough, vigorous and diligent program for exploitation of the Patent Rights.

3.2 In addition, LICENSEE shall adhere to the following milestones:

(a)    LICENSEE shall deliver to M.I.T. on or before June 30, 1992 a business plan showing the amount of money, number and kind of personnel and time budgeted and planned for each phase of development of the Licensed Products and Licensed Processes and shall provide similar reports to M.I.T. on an annual basis on or before the ninetieth (90th) day following the close of LICENSEE's fiscal year.

(b)    ARIAD PHARMACEUTICALS, INC. (LICENSEE) shall have received at least One Million Dollars ($1,000,000) in equity investment on or before June 30, 1992.

(c)    ARIAD PHARMACEUTICALS, INC. (LICENSEE) shall have received a cumulative total of at least Five Million ($5,000,000) in equity investment and/or research program payments on or before June 30, 1993.

(d)    LICENSEE shall, within six (6) months of a request by a suitable sublicensee willing to take a sublicense upon reasonable business terms, grant at least one sublicense to the Patent Rights and Tangible Property for sale of Licensed Products as research reagents with appropriate protection of LICENSEE's

Confidential Information Under Protective Order                    ADL 0029164

04/27/2004  09:33   3104767639          LAURIE ALLEN              PAGE  08

-7-

commercial interests. Failure to reach such an agreement within six (6) months after a bona fide request shall allow M.I.T. to grant a license to the Patent Rights to the requestor for sale of research reagents on terms no more favorable than those of paragraph 4.1(d) below.

(e)   In any calendar year after December 31, 1994 that LICENSEE has not made at least One Million Dollars ($1,000,000) in Net Sales of Licensed Product, LICENSEE shall have invested a minimum of Five Hundred Thousand Dollars ($500,000) in projects devoted to the development and/or marketing of Licensed Products and/development of protection of the Patents Rights.

3.3  LICENSEE's failure to perform in accordance with Paragraphs 3.1 and 3.2 above shall be grounds for M.I.T. to terminate this Agreement pursuant to Paragraph 13.3 hereof.

## ARTICLE IV - ROYALTIES

4.1  For the rights, privileges and license granted hereunder, LICENSEE shall pay royalties to M.I.T. in the manner hereinafter provided to the end of the term of the Patent Rights or until this Agreement shall be terminated as hereinafter provided:

(a)   License Issue Fee of Twenty-Five Thousand Dollars ($25,000), which said License Issue Fee shall be deemed earned and due thirty days after the execution of this Agreement.

(b)   License Maintenance Fees of Twenty-Five Thousand Dollars ($25,000) per year payable on January 1, 1993 and on January 1 of each year thereafter until the first submission by LICENSEE of an IND (Investigational New Drug application) to the FDA or an equivalent application to a European or Japanese regulatory agency. Following the submission of such application, the License Maintenance Fees shall be Fifty Thousand Dollars ($50,000) per year beginning January 1 of the year following the submission. However, beginning January 1, 1998, the License Maintenance Fees shall be Fifty Thousand Dollars ($50,000) per year whether or not an IND or equivalent application has been submitted by LICENSEE. The License Maintenance Fee for a given year shall be fully creditable against any Running Royalties subsequently due.

(c)   A one-time Milestone Fee of One Hundred Thousand Dollars ($100,000) payable within ninety (90) days after LICENSEE receives approval to initiate clinical trials on a Licensed Product based upon its submission of its first IND to the FDA or an equivalent application to a European or Japanese regulatory agency.

(d)   Running Royalties in an amount equal to Three Percent (3%) of the Net Sales of Licensed Products and Licensed Processes used, leased or sold by and/or for LICENSEE which are covered by an issued claim of the Patent Rights in

Confidential Information Under Protective Order                    ADL 0029165

-8-

any country in which the Licensed Products and/or Licensed Processes are made, used, leased or sold; and Running Royalties in an amount equal to One and One Half Percent (1.5%) of the Net Sales of Licensed Products and Licensed Processes used, leased or sold by and/or for LICENSEE which are covered only by a pending claim of the Patent Rights in any country in which the Licensed Products and/or Licensed Processes are made, used, leased or sold.  The provisions of this paragraph shall not apply to any Licensed Products leased or sold by LICENSEE or its sublicensees for use as research reagents.

(e)     Running Royalties in an amount equal to Five Percent (5%) of the Net Sales price of Licensed Products sold by or for LICENSEE or its sublicensees for use as research reagents.

(f)     Twenty-Five Percent (25%) of any payments made to LICENSEE for sublicensing of the Patent Rights and/or Tangible Property.  This subparagraph 4.1(f) shall not apply, however, to royalties paid to LICENSEE by sublicensee(s) on the Net Sales of Licensed Products sold by sublicensee(s) for use as research reagents, which shall fall under subparagraph 4.1(e) above.

4.2  The License Issue Fee, Milestone Fee and all License Maintenance Fees shall be cumulatively creditable against Running Royalties.

4.3  All patent costs incurred prior to July 1, 1991 and reimbursed by LICENSEE under Article VI shall be creditable against Running Royalties except for Running royalties on research reagents.  Fifty Percent (50%) of patent costs incurred after July 1, 1991 shall be creditable against Running Royalties except for Running Royalties on research reagents.

4.4  The definitions of Paragraphs 1.3 and 1.4 notwithstanding, after June 30, 1997 Running Royalties shall be due on the Net Sales of a Licensed Product only if the Licensed Product is covered by an issued claim of the Patent Rights.

4.5  LICENSEE shall be entitled to credit fifty percent (50%) of the royalties paid to third parties for the use, lease or sale of a Licensed Product or Licensed Process by LICENSEE against the Running Royalties for that Licensed Product or Licensed Process due under subparagraph 4.1(d) above; provided, however that the amount credited shall not reduce the Running Royalty paid below Two Percent (2.0%) for the Licensed Product or Licensed Process covered by an issued claim, and One Percent (1.0%) if the Licensed Product or Licensed Process is covered only by a pending claim.

4.6  In no instance shall the amount paid to M.I.T. in total in a given year be less than the License Maintenance Fee for that year.

4.7  All payments due hereunder shall be paid in full, without deduction of taxes or other fees which may be imposed by any government and which shall be paid by LICENSEE.

Confidential Information Under Protective Order

-9-

4.8  No multiple royalties shall be payable because any Licensed Product, its manufacture, use, lease or sale are or shall be covered by more than one patent application or patent licensed under this Agreement.

4.9  Royalty payments shall be paid in United States dollars in Cambridge, Massachusetts, or at such other place as M.I.T. may reasonably designate consistent with the laws and regulations controlling in any foreign country.  If any currency conversion shall be required in connection with the payment of royalties hereunder, such conversion shall be made by using the exchange rate prevailing at the Chase Manhattan Bank (N.A.) on the last business day of the calendar quarterly reporting period to which such royalty payments relate.

## ARTICLE V - REPORTS AND RECORDS

5.1  LICENSEE, within sixty (60) days after March 31, June 30, September 30 and December 31, of each year, shall deliver to M.I.T. true and accurate reports, giving such particulars of the business conducted by LICENSEE and its sublicensees during the preceding three-month period under this Agreement as shall be pertinent to a royalty accounting hereunder. These shall include at least the following:

(a)    number of Licensed Products manufactured and sold.

(b)    total billings for Licensed Products sold.

(c)    accounting for all Licensed Processes used or sold.

(d)    deductions applicable as provided in Paragraph 1.5.

(e)    total royalties due.

(f)    names and addresses of all sublicensees of LICENSEE.

5.2  With each such report submitted, LICENSEE shall pay to M.I.T. the royalties due and payable under this Agreement.  If no royalties shall be due, LICENSEE shall so report.

5.3  On or before the ninetieth (90th) day following the close of LICENSEE's fiscal year, LICENSEE shall provide M.I.T. with LICENSEE's certified financial statements for the preceding fiscal year including, at a minimum, a Balance Sheet and an Operating Statement.

5.4  The royalty payments set forth in this Agreement shall, if overdue, bear interest until payment at a per annum rate two percent (2%) above the prime rate in effect at the Chase Manhattan Bank (N.A.) on the due date.  The payment of such interest shall not foreclose M.I.T. from exercising any other rights it may have as a consequence of the lateness of any payment.

Confidential Information Under Protective Order

ADL 0029167

-10-

## ARTICLE VI - PATENT PROSECUTION

6.1  M.I.T. (and/or Whitehead, as appropriate, depending on ownership of the individual Patent Rights) shall apply for, seek prompt issuance of, and maintain during the term of this Agreement the Patent Rights in the United States and in the foreign countries listed in Appendix B hereto. Appendix B may be amended by verbal agreement of both parties, such agreement to be confirmed in writing within ten (10) days. The prosecution, filing and maintenance of all Patent Rights patents and applications shall be the primary responsibility of M.I.T. (and/or Whitehead); provided, however, LICENSEE shall have reasonable opportunities to advise M.I.T. (and/or Whitehead) and shall cooperate with M.I.T. (and/or Whitehead) in such prosecution, filing and maintenance.

6.2  Payment of all fees and costs relating to the filing, prosecution, and maintenance of the Patent Rights shall be the responsibility of LICENSEE, whether such fees and costs were incurred before or after the date of this Agreement. Such payments shall be creditable as specified in Paragraphs 4.2 and 4.3. For fees and costs incurred prior to July 1, 1991, LICENSEE shall reimburse M.I.T. and Whitehead on the following schedule:

| | |
|---|---|
| 25% of total: | 30 days after billing |
| 25% of total: | January 15, 1992 |
| 25% of total: | July 15, 1992 |
| 25% of total: | January 15, 1993 |

Fees and costs incurred after July 1, 1991 shall be reimbursed within 30 days after billing.

## ARTICLE VII - INFRINGEMENT

7.1  LICENSEE, M.I.T. and Whitehead shall promptly inform each other of any alleged infringement of the Patent Rights by a third party and of any available evidence thereof.

7.2  During the term of this Agreement, LICENSEE shall have the right, but shall not be obligated, to prosecute at its own expense any such infringements of the Patent Rights and in furtherance of such right, M.I.T. and Whitehead hereby agree that LICENSEE may include M.I.T. or Whitehead as party plaintiffs in any such suit ,without expense to M.I.T. or Whitehead. The total cost of any such infringement action commenced or defended solely by LICENSEE shall be borne by LICENSEE. LICENSEE may, for such purposes, use the name of M.I.T. or Whitehead as party plaintiffs provided, however, that such right to bring an infringement action shall remain in effect only for so long as the license granted herein remains exclusive. No settlement, consent judgment or other voluntary final disposition of the suit may be entered into without the consent of

-11-

M.I.T. and Whitehead, which consent shall not unreasonably be withheld. LICENSEE shall indemnify M.I.T. and Whitehead against any order for costs associated with the litigation that may be made against M.I.T. or Whitehead in such proceedings.

7.3 In the event that LICENSEE shall undertake the enforcement and/or defense of the Patent Rights by litigation, LICENSEE may withhold up to fifty percent (50%) of the royalties otherwise thereafter due M.I.T. hereunder and apply the same toward reimbursement of up to half of LICENSEE's expenses, including reasonable attorney's fees, in connection therewith. Any recovery of damages by LICENSEE for any such suit shall be applied pro rata in satisfaction of (i) any "unreimbursed expenses" and legal fees of LICENSEE relating to the suit; and (ii) any royalties due M.I.T. and withheld by LICENSEE and applied pursuant to this Paragraph 7.3. The balance remaining from any such recovery shall be divided between LICENSEE and M.I.T. in the proportion of 91% LICENSEE/9% M.I.T.

7.4 If within six (6) months after having been notified of any alleged infringement, LICENSEE shall have been unsuccessful in persuading the alleged infringer to desist and shall not have brought and shall not be diligently prosecuting an infringement action, or if LICENSEE shall notify M.I.T. at any time prior thereto of its intention not to bring suit against any alleged infringer, then, and in those events only, M.I.T. or Whitehead, as appropriate) shall have the right, but shall not be obligated, to prosecute at its own expense any infringement of the Patent Rights, and, in furtherance of such right, LICENSEE hereby agrees that M.I.T. (or Whitehead) may include LICENSEE as a party plaintiff in any such suit, without expense to LICENSEE. The total cost of any such infringement action commenced or defended solely by M.I.T. (or Whitehead) shall be borne by M.I.T. (or Whitehead), and M.I.T. (or Whitehead) shall keep any recovery or damages for past infringement derived therefrom. No settlement, consent judgement or other voluntary final disposition of the suit maybe entered into without the consent of LICENSEE, which consent shall not unreasonable be withheld.

7.5 In the event that a declaratory judgment action alleging invalidity or noninfringement of any of the Patent Rights shall be brought against LICENSEE, M.I.T. (or Whitehead), at its option, shall have the right, within thirty (30) days after commencement of such action, to intervene and take over the sole defense of the action at its own expense.

7.6 In any infringement suit as any party may institute to enforce the Patent Rights pursuant to this Agreement, the other parties hereto shall, at the request and expense of the party initiating such suit, cooperate in all respects and, to the extent possible, have its employees testify when requested and make available relevant records, papers, information, samples, specimens, and the like.

Confidential Information Under Protective Order                                          ADL 0029169

04/27/2004  09:33    3104767639              LAURIE ALLEN                    PAGE  13

-12-

7.7 LICENSEE, during the exclusive period of this Agreement, shall have the sole right in accordance with the terms and conditions herein to sublicense any alleged infringer for future use of the Patent Rights. Any upfront fees paid to LICENSEE as part of such sublicense shall be handled in accordance with subparagraph 4.1(f).

### ARTICLE VIII - PRODUCT LIABILITY

8.1 LICENSEE shall at all times during the term of this Agreement and thereafter, indemnify, defend and hold M.I.T. and Whitehead, their trustees, officers, employees and affiliates, harmless against all claims and expenses, including legal expenses and reasonable attorneys' fees, arising out of the death of or injury to any person or persons or out of any damage to property and against any other claim, proceeding, demand, expense and liability of any kind whatsoever resulting from the production, manufacture, sale, use, lease, consumption or advertisement of the Licensed Product(s) and/or Licensed Process(es) or arising from any obligation of LICENSEE hereunder.

8.2 LICENSEE shall obtain prior to the first use of a Licensed Product or Licensed Process on humans and carry in full force and effect liability insurance which shall protect LICENSEE, M.I.T. and Whitehead in regard to events covered by Paragraph 8.1 above.

8.3 EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, M.I.T. AND WHITEHEAD MAKE NO REPRESENTATIONS AND EXTEND NO WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND VALIDITY OF PATENT RIGHTS CLAIMS, ISSUED OR PENDING.

### ARTICLE IX - EXPORT CONTROLS

It is understood that M.I.T. and Whitehead are subject to United States laws and regulations controlling the export of technical data, computer software, laboratory prototypes and other commodities (including the Arms Export Control Act, as amended and the Export Administration Act of 1979), and that its obligations hereunder are contingent on compliance with applicable United States export laws and regulations. The transfer of certain technical data and commodities may require a license from the cognizant agency of the United States Government and/or written assurances by LICENSEE that LICENSEE shall not export data or commodities to certain foreign countries without prior approval of such agency. M.I.T. neither represents that a license shall not be required nor that, if required, it shall be issued.

Confidential Information Under Protective Order

ADL 0029170

04/27/2004  09:33   3104767639                 LAURIE ALLEN                    PAGE  14

-13-

## ARTICLE X - NON-USE OF NAMES

LICENSEE shall not use the names of the Massachusetts Institute of Technology nor of the Whitehead Institute nor any of their employees, nor any adaptation thereof, in any advertising, promotional or sales literature without prior written consent obtained from M.I.T. in each case, except that LICENSEE may state that it is licensed by Whitehead or M.I.T. under one or more of the patents and/or applications comprising the Patent Rights.

## ARTICLE XI - ASSIGNMENT

The rights of ARIAD under this Agreement may not be assigned and the duties of ARIAD under this Agreement may not be delegated without the prior written consent of M.I.T. and Whitehead, except that ARIAD may assign this Agreement to an entity, acceptable to M.I.T. and Whitehead, with which it merges or consolidates or which ARIAD controls, or to which substantially all of its assets relating to the Patent Rights are sold or otherwise transferred or to a partnership of which ARIAD or any of its affiliates in the general partner.

## ARTICLE XII - ARBITRATION

12.1  Any and all claims, disputes or controversies arising under, out of, or in connection with this Agreement, including any dispute relating to patent validity or infringement, which have not been resolved by good faith negotiations between the parties, shall be resolved by final and binding arbitration in Boston, Massachusetts under the rules of the American Arbitration Association, or the Patent Arbitration Rules if applicable, then obtaining.  The arbitrators shall have no power to add to, subtract from or modify any of the terms or conditions of this Agreement. Any award rendered in such arbitration may be enforced by either party in either the courts of the Commonwealth of Massachusetts or in the United States District Court for the District of Massachusetts, to whose jurisdiction for such purposes M.I.T., Whitehead and LICENSEE each hereby irrevocably consents and submits.

12.2  Notwithstanding the foregoing, nothing in this Article shall be construed to waive any rights or timely performance of any obligations existing under this Agreement.

## ARTICLE XIII - TERMINATION

13.1  If LICENSEE shall cease to carry on its business, this Agreement shall terminate upon notice by M.I.T.

Confidential Information Under Protective Order

ADL 0029171

-14-

13.2 Should LICENSEE fail to pay M.I.T. royalties due and payable hereunder, M.I.T. shall have the right to terminate this Agreement on thirty (30) days' notice, unless LICENSEE shall pay M.I.T. within the thirty (30) day period, all such royalties and interest due and payable. Upon the expiration of the thirty (30) day period, if LICENSEE shall not have paid all such royalties and interest due and payable, the rights, privileges and license granted hereunder shall terminate.

13.3 Upon any material breach or default of this Agreement by LICENSEE, other than those occurrences set out in Paragraphs 13.1 and 13.2 hereinabove, which shall always take precedence in that order over any material breach or default referred to in this Paragraph 13.3, M.I.T. shall have the right to terminate this Agreement and the rights, privileges and license granted hereunder by ninety (90) days' notice to LICENSEE. Such termination shall become effective unless LICENSEE shall have cured any such breach or default prior to the expiration of the ninety (90) day period.

13.4 LICENSEE shall have the right to terminate this Agreement at any time on six (6) months' notice to M.I.T., and upon payment of all amounts due M.I.T. through the effective date of the termination.

13.5 Upon termination of this Agreement for any reason, nothing herein shall be construed to release either party from any obligation that matured prior to the effective date of such termination. LICENSEE and any sublicensee thereof may, however, after the effective date of such termination, sell all Licensed Products, and complete Licensed Products in the process of manufacture at the time of such termination and sell the same, provided that LICENSEE shall pay to M.I.T. the royalties thereon as required by Article IV of this Agreement and shall submit the reports required by Article V hereof on the sales of Licensed Products.

13.6 Upon termination of this Agreement for any reason, any sublicensee not then in default shall have the right to seek a license from M.I.T.

13.7 LICENSEE shall have the right, upon written notice to M.I.T., to separately terminate its license to any independent patent application or patent of the Patent Rights.

## ARTICLE XIV - PAYMENTS, NOTICES AND OTHER COMMUNICATIONS

Any payment, notice or other communication pursuant to this Agreement shall be sufficiently made or given on the date of mailing if sent to such party by certified first class mail, postage prepaid, addressed to it at its address below or as it shall designate by written notice given to the other party:

Confidential Information Under Protective Order

-15-

In the case of M.I.T.:

Director
Technology Licensing Office
Massachusetts Institute of Technology
Room E32-300
Cambridge, Massachusetts  02139

In the case of WHITEHEAD:

Vice President
Whitehead Institute
Nine Cambridge Center
Cambridge, MA  02142

In the case of LICENSEE:

Harvey J. Berger, M.D.
Chairman and Chief Executive Officer
ARIAD Pharmaceuticals, Inc.
687 Wetherby Lane
Devon, PA  19333

or as amended in writing from time to time by any party.


## ARTICLE XV - MISCELLANEOUS PROVISIONS

15.1  This Agreement shall be construed, governed, interpreted and applied in accordance with the laws of the Commonwealth of Massachusetts, U.S.A., except that questions affecting the construction and effect of any patent shall be determined by the law of the country in which the patent was granted.

15.2  The parties hereto acknowledge that this Agreement sets forth the entire Agreement and understanding of the parties hereto as to the subject matter hereof, and shall not be subject to any change or modification except by the execution of a written instrument subscribed to by the parties hereto.

15.3  The provisions of this Agreement are severable, and in the event that any provisions of this Agreement shall be determined to be invalid or unenforceable under any controlling body of the law, such invalidity or unenforceability shall not in any way affect the validity or enforceability of the remaining provisions hereof.

Confidential Information Under Protective Order

04/27/2004  09:33  3184767639    LAURIE ALLEN    PAGE  17

-16-

15.4  LICENSEE agrees to mark the Licensed Products sold in the United States with all applicable United States patent numbers.  All Licensed Products shipped to or sold in other countries shall be marked in such a manner as to conform with the patent laws and practice of the country of manufacture or sale.

15.5  The failure of any party to assert a right hereunder or to insist upon compliance with any term or condition of this Agreement shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition by the other parties.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals and duly executed this Agreement the day and year set forth below.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY
By _____
Name  JOHN T. PRESTON, DIRECTOR
Title  TECHNOLOGY LICENSING OFFICE
Date  8 - 26 - 91

WHITEHEAD INSTITUTE
By _____
Name  John Pratt
Title  Vice President
Date  8/28/91

ARIAD PHARMACEUTICALS, INC.
By _____
Name  HARVEY J. BERGER, M.D.
Title  Chairman + Chief Executive Officer
Date  8/19/91

Confidential Information Under Protective Order

ADL 0029174

04/27/2004  09:33    3104767639    LAURIE ALLEN    PAGE  18

-17-

## APPENDIX A

**M.I.T. Case No. 4167AA**
"Nuclear Factors Associated With Transcriptional Regulation"
By David Baltimore, Ranjan Sen, Phillip A. Sharp, Harinder Singh, Louis Staudt, Jonathan
LeBowitz, Albert S. Baldwin, Jr., Roger Clerc, and Lynn M. Corcoran
U.S.S.N. 280,173 (Filed 12/5/88)
(Owned by M.I.T. and the Whitehead Institute, jointly)

### FOREIGN FILING(S)

**M.I.T. Case No. 4167:**

European Application No. 87 900968.6 (Filed 1/9/87)
    *(Claiming Austria, Belgium, Switzerland/Liechtenstein, Germany, France, Great
    Britain, Italy, Luxembourg, Netherlands, Sweden)*

Japanese Application No. PCT/US87/00086 (Filed 1/9/87)

**M.I.T. Case No. 4167A/4167AA:**

Canadian Application No. 590,892 (Filed 2/13/89)
European Application No. 89 902888.0 (Filed 2/10/89)
    *(Claiming Austria, Belgium, Switzerland/Liechtenstein, Germany, France, Great
    Britain, Italy, Luxembourg, Netherlands, Sweden)*
Japanese Application No. PCT/US89/00553 (Filed 2/10/89)

**M.I.T. Case No. 4442W (Whitehead No. 86-10)**
"Method of Inducible Gene Expression"
By Ranjan Sen and David Baltimore
U.S.S.N. 946,365 (Filed 12/24/86)
(Owned by The Whitehead Institute)

### FOREIGN FILING(S)

All foreign filing has been abandoned.

Confidential Information Under Protective Order

ADL 0029175

04/27/2004  09:33  3104767639                LAURIE ALLEN                        PAGE  19

-18-

**M.I.T. Case No. 4695W (Whitehead No. 87-11)**
"Activation of NF-kB Precursor"
By Patrick Baeuerle and David Baltimore"
U.S.S.N. 318,901 (Filed 3/3/89)
(Owned by The Whitehead Institute)

<u>FOREIGN FILING(S)</u>

    European Application No. PCT/US89/00820  (Filed 3/1/89)
        *(Claiming Austria, Belgium, Switzerland/Liechtenstein, Germany, France, Great*
        *Britain, Italy, Luxembourg, Netherlands, Sweden)*


**M.I.T. Case No. 5134W (Whitehead No. 89-02)**
"NF-kB-Mediated Transcriptional Regulation"
By Michael J. Lenardo, Chen-ming Fan, Tom Maniatis and David Baltimore
U.S.S.N. 341,436 (Filed 4/21/89)
(Owned by The Whitehead Institute and Harvard University, jointly. Harvard University has
given M.I.T. the authority to license Harvard's rights on Harvard's behalf and has given
Whitehead full rights to prosecute and defend the Patent Rights.)

<u>FOREIGN FILING(S)</u>

    None

**M.I.T. Case 5675   (Whitehead 87-11AA)**
"The pp40 Associated with REL is an I-κB" by David Baltimore, Sankar Ghosh et al.
To be filed
(Owned by The Whitehead Institute)

Confidential Information Under Protective Order                ADL 0029176

04/27/2004  09:33   3104767639                LAURIE ALLEN                    PAGE  20

-19-

## APPENDIX B


Foreign countries in which Patent Rights shall be filed, prosecuted and maintained in accordance with Article VI where legally possible:


Canada

Japan

Great Britain

France

Germany

Italy

Confidential Information Under Protective Order                    ADL 0029177

APPENDIX C

#1/LLN/11/14/88
CentCollabResAgt

# COLLABORATIVE RESEARCH AGREEMENT

This Agreement between Centocor, Inc. and the Massachusetts Institute of Technology ("M.I.T.") defines the terms and conditions under which Centocor scientists will collaborate with Prof. Phillip A. Sharp and colleagues in the Cancer Center at M.I.T. in the area of antibody gene expression ("The Collaboration").

Centocor and M.I.T. hereby agree as follows:

1. FIELD:  The Field of the Collaboration is defined by the Work Statement attached hereto as Appendix A.

2. DURATION:  The Collaboration shall begin on December 1, 1988 and terminate on November 30, 1991, unless sooner terminated by either party notifying the other, in writing, that it wishes to terminate the Collaboration.  The Collaboration may be extended by written mutual consent.

3. EXCHANGE OF INFORMATION:  During the Collaboration, each party shall provide the other with all data and other information that it develops under the Collaboration.

4. M.I.T. TANGIBLE PROPERTY:  M.I.T. shall provide to Centocor certain biological materials ("M.I.T.") developed before the Collaboration, for Centocor's use in the Collaboration.  Centocor shall not give samples, progeny, or derivatives of such M.I.T. Tangible Property to any third party except with the written permission of M.I.T.

5. BIOLOGICAL MATERIAL DEVELOPED UNDER THE COLLABORATION: Any biological material developed by one party under the Collaboration shall be provided to the other for its use under the Collaboration.  Samples, progeny or derivatives of any biological materials developed under the Collaboration shall not be delivered to any third party without the written permission of the developing party, except as specified in



Confidential Information Under Protective Order                ADL 0029178

2

Paragraph 8(c) below.  Notwithstanding the foregoing, for hybridomas developed under this Collaboration which are of commercial value to Centocor and which are derived from hybridomas developed or obtained by Centocor outside of this Collaboration, Centocor shall not be required to provide said hybridomas to MIT unless provision is specifically requested by MIT for specific purposes and, unless suitable cell line transfer agreements in the form of those contained in Appendix C are executed between the parties hereto."

6. PUBLICATION:  Either party shall be free to publish any of the results it obtains under the Collaboration, and shall acknowledge the contribution of the other party, or include the other party as co-author, as appropriate.  The publishing party shall provide the other party with a copy of manuscripts submitted for publication at least thirty days prior to publication, in order to allow the other party to identify potentially patentable material and request that a patent application be filed.

7. INVENTIONS:  Any inventions made by Centocor personnel shall belong to Centocor; inventions made by M.I.T. personnel shall be owned by M.I.T.  Inventions made jointly by M.I.T. and Centocor personnel shall belong jointly to M.I.T. and Centocor.  Each party shall promptly notify the other if it makes an invention during the Collaboration, and if it intends to file a patent application on any such inventions.  Copies of any such patent applications which are filed by one party shall be promptly provided to the other party.

8. PATENT AND LICENSING RIGHTS:

(a) During the Collaboration, M.I.T. shall grant to Centocor a royalty-free nonexclusive license to the Patent Rights of the M.I.T. Cases listed in Appendix B and to the M.I.T. Tangible Property for internal research and development use in the field of use of "Expression of Antibodies".  If Centocor does not terminate this Agreement at any time prior to October 31, 1991, the internal research and development use license to the Patent Rights and the M.I.T. Tangible Property shall be in perpetuity.

(b) M.I.T. shall have the right to use any biological property and inventions developed by Centocor under the Collaboration for its own internal uses, royalty-free in perpetuity.

(c) "Transferrable Property" is defined as any biological property developed by Centocor under the Collaboration, but excluding hybridomas developed by Centocor which produce antibody of commercial value to Centocor.  "Licensable Centocor Patent Rights" shall mean

Confidential Information Under Protective Order                    ADL 0029179

04/27/2004  09:33   3104767639          LAURIE ALLEN          PAGE   23

3

patent rights to inventions made by Centocor under the Collaboration, but excluding claims to hybridomas producing antibody of commercial value to Centocor. M.I.T. shall have the right to license to third parties, only in conjunction with the Patent Rights to Appendix B, any Transferrable Property and Licensable Centocor Inventions. M.I.T. shall pay to Centocor twenty-five percent (25%) of the Net Royalties it receives from such licenses. ("Net Royalties" is defined as Gross Royalties minus 15% for administration and marketing, and minus any unreimbursed out-of-pocket patenting costs.)

(d) Centocor shall have a first option to an exclusive royalty-bearing license with suitable due diligence provisions, for certain Applications, to the M.I.T. Tangible Property, the Patent Rights of Appendix B, and any M.I.T. inventions or biological property developed under the Collaboration. An "Application" is defined as all hybridomas producing antibodies to a single antigen or directed to detection of a single disease state if all tests for that disease are based on the same antigen or set of antigens operating by the same basic mechanism in the disease state. The terms of Centocor's option are as follows:

(i) Centocor shall have a first option to all Applications for one year following the beginning of the Collaboration. Thereafter, Centocor's option shall be only to Applications for which M.I.T. has not previously granted a license to a third party.

*[handwritten: for an exclusive license and an option for a non-exclusive license until one year following the end of the Collaboration]*

(ii) Centocor may exercise its option to an exclusive license for an Application only after Centocor demonstrates that it has developed a suitable hybridoma for that Application, or that it has an intensive development program in place specifically devoted to development of a hybridoma for that Application. In the latter event, Centocor's license to the hybridoma shall terminate if a functional hybridoma is not developed by Centocor within two years of the effective date of the license.

(iii) If Centocor exercises its option to an exclusive license to an Application, the royalties shall be as follows:

((a)) For Applications using known hybridomas whose efficiency of production of antibody is increased by use of the Patent Rights of Appendix B or the M.I.T. Tangible Property and/or M.I.T. patents or M.I.T. biological property developed under the Collaboration (together defined as "M.I.T. Intellectual and Material Property"), royalties shall include a License Issue Fee of $10,000 per Application, and a Running

4

Royalty of one-half of one percent (0.5%) of Centocor's sales of product produced and
sold using the M.I.T. Intellectual and Material Property.

((b))  For Applications using new hybridomas which could not be
practically developed without use of the M.I.T. Intellectual and Material Property, a
License Issue Fee of $25,000 per Application, and a Running Royalty of 2.5% of product
sales.

AGREED TO FOR:

MASSACHUSETTS INSTITUTE
OF TECHNOLOGY

By _John T Preston_

Title _ASSISTANT TO THE PROVOST_
     _TECHNOLOGY LICENSING OFFICE_

Date _Nov. 14, 1988_

CENTOCOR, INC.

By _____

Title _Chairman of Board_

Date _Nov , 1988_

APPENDIX A

WORK STATEMENT

As part of a continuing collaboration between MIT scientists (represented by
Dr. Phillip Sharp and Centocor), the MIT scientists will isolate and
characterize cDNA clones representing cellular factors involved in the
regulation of immunoglobulin gene expression.  Said cDNA clones will then be
sent to Centocor where they will be used in one or more of the following
ways:

    a)   The cDNA clones will be used as probes to determine the level of
expression of said factors in hybridoma and other cell lines.

    b)   the cDNA clones will be expressed in hybridoma or other mammalian
cells in order to study their effects on immunoglobulin production.

    c)   the cDNA clones will be expressed in E. coli in order to obtain
large quantities for study and for production of antisera.

    d)   Recombinants of the cDNAs and other activator genes may also be
tested in the course of these experiments.

LBOOKSAS.NO1/11

Confidential Information Under Protective Order

ADL 0029182

APPENDIX D

MASSACHUSETTS INSTITUTE OF TECHNOLOGY  CAMBRIDGE, MASSACHUSETTS 02139

Date: _____

Biomaterials Coordinator
Technology Licensing Office
Massachusetts Institute of Technology
Building E32-300
77 Massachusetts Ave.
Cambridge, MA 02139

Biology Department
Massachusetts Institute of Technology
Building
77 Massachusetts Ave.
Cambridge, MA 02139

Subject:  BIOLOGICAL MATERIAL TRANSFER AGREEMENT

Dear

This is to acknowledge your request for _____
_____, which is owned by MASSACHUSETTS INSTITUTE
OF TECHNOLOGY (M.I.T.). M.I.T. will provide this material to you, for your use in
noncommercial scientific research only, under the following conditions:

1.    The Material covered by this Agreement includes _____
      any additional progeny or derivatives which could not have been made but for
      the _____ and any related information and
      know-how which will be received under this agreement.

2.    The Material will be used only by you and by individuals working under your
      direct supervision in your institution, and will not be transferred, distributed or
      released to any other person.

3.    The Material will be used only for noncommercial, publishable research
      purposes. It will not be used on any research to be used for the development
      of any commercial product, including drug screening or development for
      commercial purposes or on behalf of any commercial entity.

4.    You will be free to publish any research results using the Material. We would
      appreciate your acknowledging in such publication(s) MIT and its personnel as
      scientifically appropriate, and providing MIT with copies of such publication(s).

5.    The Material is made available for investigational use only in laboratory
      animals or in in vitro experiments and will not be used in humans or for

Confidential Information Under Protective Order

ADL 0029183

04/27/2004  09:33  3184767639                    LAURIE ALLEN                    PAGE  27

any other purpose.

6.    All characteristics of the Material are not fully understood and its use may
      involve risks or dangers that are not known or fully appreciated.  The
      Material is being provided without warranty of any sort, express or
      implied.

7.    You and your Institution will use the Material in compliance with all laws and
      governmental regulations and guidelines applicable to the Material and
      will comply with all NIH guidelines and other relevant NIH instructions.
      In particular:

      A) Your laboratory has been reviewed by its institutional biohazards
         committee (IBC) which has certified that facilities, procedures, and the
         training and expertise of the personnel involved are adequate;

      B) Your laboratory has received the appropriate approvals and has
         registered its rDNA program with the IBC; and

      C) A copy of this letter is on file with your laboratory's IBC.

8.    You will hold **MASSACHUSETTS INSTITUTE OF TECHNOLOGY**
      **(M.I.T.)** and its employees harmless from any loss, claim, damage or liability, of
      any kind, which may arise from or in connection with this Agreement or the use,
      handling or storage of the Material.  In no case shall M.I.T. or Professor _____
      _____ be liable for any use by you, by individuals working under your direct
      supervision, or by your Institution, of the Material or any loss, claim, damage or
      liability, of any kind, which may arise from or in connection with this Agreement
      or the use, handling or storage of the Material.

9.    You understand that no other right or license to this Material or to its use is
      granted or implied as a result of our sending the Material to you.

10.   At the request of **MASSACHUSETTS INSTITUTE OF TECHNOLOGY,**
      unused Material will be returned to M.I.T. or destroyed.

Research Project:  Studies on the activation and differentiation of monocytic cells.

If you agree to accept the Material under the above conditions, please
sign the Agreement, have it signed by an authorized representative of
your Institution and return it to:

Page 2

Confidential Information Under Protective Order

ADL 0029184

04/27/2004  09:33    3104767639    LAURIE ALLEN    PAGE  28

_____
_____
_____
_____

The Material will be sent to you as soon as possible after the receipt of the signed agreement.

Sincerely,


Accepted:

REQUESTER
INSTITUTION: _____

By:_____ _____    By:_____
(Signature)    (Signature)

By:_____    By:_____
(Printed Name)    (Authorized Representative's Printed Name)

Date:_____    Date:_____


Page 3

# EXHIBIT G

04/27/2004  09:33  3104767639                    LAURIE ALLEN                PAGE  29
                                                 MINTZ LEVIN                  ☑002

# FIRST AMENDMENT

This amendment, dated _November 20, 1991_ is to the License Agreement dated August 19, 1991 between MASSACHUSETTS INSTITUTE OF TECHNOLOGY, the WHITEHEAD INSTITUTE, and ARIAD PHARMACEUTICALS, INC.

The parties agree that the License Agreement shall be amended as follows in order to acknowledge Harvard University's ownership of certain Patent Rights:

1.    The following paragraph shall be added to the WITNESSETH section:

      "WHEREAS, M.I.T. Case No. 5134W (Whitehead No. 89-02) "NF-kB Mediated Transcriptional Regulation" by Michael J. Lenardo, Chen-ming Fan, Tom Maniatis and David Baltimore is jointly owned by Harvard University, and Harvard University (Harvard) has authorized M.I.T. to act as its sole and exclusive agent for the purposes of licensing Harvard's rights in the Patent Rights and has authorized M.I.T. to enter into this licensing agreement on Harvard's behalf;

2.    The word "Harvard" shall be added after "Whitehead," in the first sentence of Paragraph 1.2.

3.    The words "and Harvard" shall be added after "Whitehead and M.I.T." and "M.I.T. and Whitehead" in Paragraph 2.7.

4.    The words "and/or Harvard" shall be added after the words "and/or Whitehead" in all instances in Paragraph 6.1.

5.    The words "and Harvard" shall be added after the words "M.I.T. and Whitehead" in Paragraphs 7.1 and & 7.2. The words "or Harvard" shall be added after the words "M.I.T. or Harvard" in Paragraph 7.2.

6.    The words "and Harvard" shall be added after the words "M.I.T. and Whitehead" in all instances in Paragraphs 8.1, 8.2 and 8.3.

7.    The words "nor of Harvard University" shall be added after "nor of the Whitehead Institute", and the words "or Harvard" shall be added after the words "Whitehead or M.I.T." in Section X.

Confidential Information Under Protective Order                          ADL 0029186

04/27/2004  09:33   3104767639           LAURIE ALLEN                PAGE 30
                                          MINTZ LEVIN                 @003

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals and duly
executed this Agreement the day and year set forth below.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY

By _____

Name    JOHN T. PRESTON, DIRECTOR
        TECHNOLOGY LICENSING OFFICE

Title _____

Date    11 – 11 – 91

WHITEHEAD INSTITUTE

By _____

Name    John Pratt

Title   Vice President

Date    11/20/91

ARIAD PHARMACEUTICALS, INC.

By _____

Name    HARVEY J. BERGER

Title   Chairman + CEO

Date    11/20/91


IA/sc
5134.ariad.amend.1105

Confidential Information Under Protective Order          ADL 0029187

# EXHIBIT H

## SECOND AMENDMENT TO LICENSE AGREEMENT

This Second Amendment to License Agreement ("Second Amendment to License Agreement") is made and entered into as of this 2nd day of January, 2002, (the "Effective Date") by and between MASSACHUSETTS INSTITUTE OF TECHNOLOGY, a corporation organized and existing under the laws of the Commonwealth of Massachusetts and having its principal offices at 77 Massachusetts Avenue, Cambridge, Massachusetts (hereinafter referred to as "M.I.T."), and the WHITEHEAD INSTITUTE, a corporation organized and existing under the laws of Delaware and having its principal offices at Nine Cambridge Center, Cambridge, Massachusetts (hereinafter referred to as "Whitehead") and ARIAD PHARMACEUTICALS, INC., a corporation duly organized under the laws of Delaware and having its principal offices at 20 Landsdowne Street, Cambridge, Massachusetts (hereinafter referred to as "LICENSEE").

WHEREAS, M.I.T., WHITEHEAD and LICENSEE entered into that certain License Agreement dated August 19, 1991, and amended same effective November 20, 1991 (collectively, the "Agreement"); and

WHEREAS, the parties to the Agreement desire to amend certain terms of the Agreement, to add certain terms to the Agreement and to confirm the validity and effectiveness of the remaining terms and conditions set forth in the Agreement, all as further set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and obligations set forth herein, the parties hereby agree as follows:

### ARTICLE 1

1.    **Definitions.**  Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Agreement.

### ARTICLE 2

2.    **Amendment of the Agreement.**  The Agreement is hereby amended as set forth in this Article 2.

2.1    **Amendment of Article II - Grant.**  Article II of the Agreement is hereby amended as set forth herein.

2.1.1    **Amendment of Paragraph 2.2.**  Paragraph 2.2 of the Agreement is hereby deleted and replaced with the following text:

"2.2  [RESERVED]"

2.1.3    **Amendment of Paragraph 2.3.**  Paragraph 2.3 of the Agreement is hereby deleted and replaced with the following text:

Confidential Information Under Protective Order

04/27/2004  09:33    3104767639              LAURIE ALLEN                    PAGE  32

"2.3 Except as otherwise specifically set forth herein, the rights granted under Paragraph 2.1 hereof shall be and remain exclusively granted to LICENSEE and shall continue until the end of the term or terms for which any Patent Rights are issued, unless sooner terminated as provided herein. Without limiting the generality of the foregoing, upon a failure of LICENSEE to pay the License Maintenance Fees due hereunder, the rights granted under Paragraph 2.1 hereunder shall convert to non-exclusive upon written notice from M.I.T. to LICENSEE. The right to convert the rights granted hereunder to non-exclusive shall not be in limitation of any other rights that M.I.T. may have hereunder or at law upon such a failure by LICENSEE to pay the License Maintenance Fees hereunder."

    **2.1.3  Amendment of Paragraph 2.4.**  Paragraph 2.4 of the Agreement is hereby deleted and replaced with the following text:

    "2.4  [RESERVED]"

    **2.1.4  Amendment of Paragraph 2.8.**  Paragraph 2.8 of the Agreement is hereby deleted and replaced with the following text:

    "2.8  LICENSEE shall have the right to enter into sublicenses for the rights, privileges and licenses granted hereunder. Such sublicenses shall contain provisions enabling LICENSEE to fulfill its obligations to M.I.T. hereunder."

    **2.1.5  Amendment of Paragraphs 2.9 and 2.10.**  Paragraphs 2.9 and 2.10 of the Agreement are hereby deleted and replaced with the following text:

    "2.9  [RESERVED]

    2.10  [RESERVED]"

    **2.2  Amendment of Article III - DUE DILIGENCE.**  Article III of the Agreement is hereby amended as set forth herein.

    **2.2.1  Amendment of Paragraph 3.1.**  Paragraph 3.1 of the Agreement is hereby deleted and replaced with the following text:

    "3.1  LICENSEE shall use reasonable commercial efforts to bring one or more Licensed Products to market through a thorough, vigorous and diligent program for exploitation of the Patent Rights. Commercially reasonable efforts by LICENSEE to grant sublicenses to companies that LICENSEE reasonably believes are engaged or will engage in such activities shall be sufficient to satisfy LICENSEE's obligations hereunder."

    **2.2.2  Amendment of Paragraph 3.2.**  Paragraph 3.2 of the Agreement is hereby deleted and replaced with the following text:

    "3.2  [RESERVED]"

<div align="center">2</div>

04/27/2004  09:33    3104767639                    LAURIE ALLEN                        PAGE  33

**2.3    Amendment of Article VII - INFRINGEMENT.** Article VII of the Agreement is hereby amended as set forth herein.

    **2.3.1    Amendment of Paragraph 7.5.** Paragraph 7.5 of the Agreement is hereby deleted and replaced with the following text:

    "7.5  In the event that a declaratory action alleging invalidity or noninfringement of any of the Patent Rights shall be brought against LICENSEE, and LICENSEE fails to take reasonable steps to defend such action in a timely manner, M.I.T. (or Whitehead), at its option, shall have the right to intervene and take over sole defense of such action at its own expense."

**ARTICLE 3**
**CONFIRMATION OF VALIDITY AND EFFECTIVENESS**

    **3.    Confirmation of Validity and Effectiveness.** Except as otherwise specifically set forth herein, the parties hereby confirm the validity and continued effectiveness of the Agreement.

    IN WITNESS WHEREOF, the parties have hereunto set their hands and duly executed this Second Amendment to License Agreement as of the Effective Date.

**MASSACHUSETTS INSTITUTE OF TECHNOLOGY**

By: _____
Name: _____
Title: _____

**WHITEHEAD INSTITUTE**

By: _____
Name: _____
Title: _____

**ARIAD PHARMACEUTICALS, INC.**

By:    Fritz Casselman
    Senior Vice President and
    Chief Business Officer

3

TRA 1616308v1

Confidential Information Under Protective Order                    ADL 0029190

# EXHIBIT I



ARIAD

News Release

FOR IMMEDIATE RELEASE

CONTACT: Tom Pearson
(610) 407-9260

Kathy Lawton
(617) 621-2345

### ARIAD AND CO-PLAINTIFFS OBTAIN FAVORABLE COURT RULING IN LILLY PATENT INFRINGEMENT LAWSUIT

**Cambridge, MA, May 13, 2003** — ARIAD Pharmaceuticals, Inc. (Nasdaq: ARIA) today announced that the United States District Court for the District of Massachusetts (the "Court") has ruled in favor of ARIAD Pharmaceuticals, Inc. and co-plaintiffs in a patent infringement suit filed on June 25, 2002 against Eli Lilly and Company ("Lilly") alleging infringement of their pioneering U.S. patent covering methods of treating human disease by regulating NF-_B cell-signaling activity. The lawsuit alleges infringement by Lilly through sales of its osteoporosis drug, Evista®, and septic shock drug, Xigris®. The Court denied Lilly's combined motion to dismiss and its motion for summary judgment challenging the validity of the NF-_B method of treatment patent claims. The co-plaintiffs are Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research and The President and Fellows of Harvard College.

"We are very pleased with the Court's ruling," said Harvey J. Berger, M.D., chairman and chief executive officer of ARIAD. "Our objective now is to proceed expeditiously to trial and to seek a damage award based on a reasonable royalty on Lilly's sales of Evista and Xigris, as we continue to pursue additional licenses of our NF-_B patent portfolio."

ARIAD is engaged in the discovery and development of breakthrough medicines that regulate cell signaling with small molecules. The Company is developing a comprehensive approach to the treatment of cancer and is primarily focused on a series of product candidates for targeted oncology indications. ARIAD also has an exclusive license to pioneering technology and patents related to the discovery, development and use of drugs that regulate NF-κB cell-signaling activity, which has been implicated in many major diseases.

Additional information about ARIAD can be found on the web at http://www.ariad.com.

Some of the matters discussed herein are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements are identified by the use of words such as "anticipate," "estimate," "expect," "project," "intend," "plan," "believe," and other words and terms of similar meaning in connection with any discussion of future operating or financial performance. Such statements are based on management's current expectations and are subject to certain factors, risks and uncertainties that may cause actual

results, outcome of events, timing and performance to differ materially from those expressed or implied by such forward-looking statements.  These risks include, but are not limited to, risks and uncertainties regarding the Company's ability to conduct preclinical and clinical studies of its product candidates and the results of such studies, regulatory oversight, intellectual property claims, the timing, scope, cost and outcome of legal proceedings, future capital needs, key employees, dependence on the Company's collaborators and manufacturers, markets, economic conditions, products, services, prices, reimbursement rates, competition and other risks detailed in the Company's public filings with the Securities and Exchange Commission, including ARIAD's Annual Report on Form 10-K for the fiscal year ended December 31, 2002. The information contained in this document is believed to be current as of the date of original issue.  The Company does not intend to update any of the forward-looking statements after the date of this document to conform these statements to actual results or to changes in the Company's expectations, except as required by law.

###

# EXHIBIT J

Westlaw.                                                                    NewsRoom

4/28/04 BIOTECHWK 9                                                          Page 1


4/28/04 Biotech Wk. 9
2004 WLNR 519287

Biotech Week
Copyright 2004 Biotech Week via NewsRx.com & NewsRx.net

April 28, 2004

Section: Expanded Reporting

Study expands on effectiveness of AP23464, in Gleevec-resistant leukemia cells
ARIAD Pharmaceuticals, Inc.


**ARIAD Pharmaceuticals, Inc.**, (ARIA) announced that AP23464, its lead product
candidate to treat certain forms of leukemia, is highly effective in blocking the
growth of leukemia cells that harbor any of 30 different mutations in the Abl
protein that confer resistance to Gleevec (imatinib) - today's mainstay of
treatment for chronic myelogenous leukemia (CML).

The research - conducted by a team of scientists led by George Q. Daley, MD,
PhD, of Harvard Medical School and presented at the American Association for
Cancer Research annual meeting - shows that AP23464 effectively suppresses even
those leukemia cells containing robust and common Gleevec-resistant mutants and
provides further support for the clinical development of AP23464 in patients
failing Gleevec therapy.

Resistance to Gleevec develops often in patients with CML, especially those with
advanced-stage disease. Most of these patients have readily identifiable mutant
forms of the Abl oncogenic kinase leading to sustained over-activation of Abl. In
prior studies, AP23464 was also shown to be over 10-fold more potent than Gleevec
in blocking the naturally occurring form of Abl. The greater potency and broader
spectrum of effectiveness of AP23464 make it particularly promising as a treatment
of CML - both resistant disease and as first-line therapy.

"Dr. Daley's research highlights the potential of AP23464 to overcome many of
the clinical limitations of Gleevec," said Harvey J. Berger, MD, chairman and CEO
of ARIAD. "As a potent oncogenic kinase inhibitor, AP23464 is being developed not
only to treat leukemia but also primary and metastatic solid tumors. We expect to
file an IND [investigational new drug application] for AP23464 by fourth quarter
of this year."

ARIAD is engaged in the discovery and development of breakthrough medicines to
treat cancer by regulating cell signaling with small molecules. The company is
developing a comprehensive approach to patients with cancer that addresses the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

greatest medical need - aggressive and advanced-stage cancers for which current treatments are inadequate. ARIAD also has an **exclusive license** to pioneering technology and patents related to certain **NF-**(kappa)B treatment methods, and the discovery and development of drugs to regulate **NF-**(kappa)B cell-signaling activity, which may be useful in treating certain diseases.

   This article was prepared by Biotech Week editors from staff and other reports. Copyright 2004, Biotech Week via NewsRx.com & NewsRx.net.

Copyright © 2004 Biotech Week via NewsRx.com & NewsRx.net

                    ---- INDEX REFERENCES ----

COMPANY: **ARIAD PHARMACEUTICALS INC**

NEWS SUBJECT:  (Health & Family (1HE30))

INDUSTRY:  (Healthcare (1HE06); Pharmaceuticals & Biotechnology (1PH13); Internal Medicine (1IN54); Healthcare Practice Specialties (1HE49); Pharmaceuticals Research & Development (1PH57); Cancer Drugs (1CA21); Oncology & Hematology (1ON95))

Language:  EN

OTHER INDEXING:  (AMERICAN ASSOCIATION FOR CANCER RESEARCH; **ARIAD; ARIAD PHARMACEUTICALS** INC; CML; GLEEVEC; HARVARD MEDICAL SCHOOL; NF)  (Daley; Dr.; George Q. Daley; Harvey J. Berger)

KEYWORDS: **ARIAD Pharmaceuticals**, Inc.; Hematology; All News; Consumer News; Biotechweek

Word Count: 509
4/28/04 BIOTECHWK 9

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT K

Westlaw.                                                          NewsRoom

10/1/05 BIOTECHB (No Page)                                       Page 1

10/1/05 Biotech Bus. (Pg. Unavail. Online)
2005 WLNR 14781190

                        Biotech Business
               COPYRIGHT 2005 Worldwide Videotex

                        October 1, 2005

                     Volume 18; Issue 10

## ARIAD GETS ORPHAN DRUG DESIGNATION FOR AP23573.

**ARIAD Pharmaceuticals**, Inc. (Nasdaq: ARIA), Cambridge, Mass., has announced that AP23573, its novel mTOR inhibitor, has been designated an orphan drug by the United States Food and Drug Administration (FDA) for the treatment of both soft-tissue and bone sarcomas.

"In the absence of any effective treatments for advanced soft-tissue sarcomas or refractory bone sarcomas that have spread, the orphan drug designations for AP23573 provided by the FDA should help us address this unmet medical need more effectively," said Harvey J. Berger, M.D., chairman and chief executive officer of ARIAD. "We are working with key regulatory agencies to advance AP23573 toward its initial registration trial and subsequent regulatory submissions for marketing authorization in these devastating cancers." Orphan drug designation, which is intended to facilitate drug development, provides substantial potential benefits to the sponsor, including funding for certain clinical studies, study-design assistance, waiver of Prescription Drug User Fee Act (PDUFA) fees, tax credits and up to seven years of market exclusivity for the product upon regulatory approval.

About AP23573

ARIAD's small-molecule drug, AP23573, starves cancer cells and shrinks tumors by inhibiting the critical cell-signaling protein, mTOR, which regulates the response of tumor cells to nutrients and growth factors, and controls tumor blood supply and angiogenesis through effects on Vascular Endothelial Growth Factor (VEGF) in tumor and endothelial cells. AP23573 also blocks the proliferation and migration of vascular smooth muscle cells, the primary cause of narrowing and reblockage of injured arteries, and is an analog of sirolimus, another mTOR inhibitor that has been approved for use in drug-eluting stents. AP23573 is currently in Phase 1 and 2 clinical trials in patients with solid tumors and hematologic cancers. AP23573 has been designated both as a fast-track product and an orphan drug by the U.S. Food and Drug Administration for the treatment of soft-tissue and bone sarcomas.

About Sarcoma

Sarcomas are cancers of the connective tissue, including bones, muscles, fat,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cartilage, and joints and do not discriminate by age, gender or race. Sarcomas can arise anywhere in the body and are divided into two main groups - bone tumors and soft tissue sarcomas. They are further sub-classified based on the type of cell or tissue from which the tumor developed. There are approximately 12,000 new cases of sarcoma diagnosed each year in the United States and approximately 100,000 sarcoma patients overall in the United States.

For more information about sarcomas is available at http://www.curesarcoma.org.

About ARIAD

ARIAD is engaged in the discovery and development of breakthrough medicines to treat disease by regulating cell signaling with small molecules. The company is developing a comprehensive approach to patients with cancer that addresses the greatest medical need - aggressive and advanced-stage cancers for which current treatments are inadequate. Medinol Ltd. also is developing stents and other medical devices that deliver ARIAD's lead cancer product candidate to prevent reblockage at sites of vascular injury following stent-assisted angioplasty. ARIAD has an exclusive license to pioneering technology and patents related to certain NF-(kappa)B treatment methods, and the discovery and development of drugs to regulate NF-(kappa)B cell-signaling activity, which may be useful in treating certain diseases.

For more information, visit http://www.ariad.com or call 617/621-2345.

---- INDEX REFERENCES ----

COMPANY: MEDINOL LTD; **ARIAD PHARMACEUTICALS INC**

NEWS SUBJECT: (Major Corporations (1MA93); Economics & Trade (1EC26))

INDUSTRY: (Pharmaceuticals Regulatory (1PH03); Pharmaceuticals & Biotechnology (1PH13); Biopharmaceuticals (1BI13); Growth Factors & Cytokines (1GR66); Healthcare Regulatory (1HE04); Healthcare (1HE06); Drug Approval Process (1DR91); Internal Medicine (1IN54); Pharmaceuticals Research & Development (1PH57); Healthcare Practice Specialties (1HE49); Cancer Drugs (1CA21); Oncology & Hematology (1ON95); Molecular & Cellular Biology (1MO84))

REGION: (Americas (1AM92); North America (1NO39); USA (1US73))

Language: EN

OTHER INDEXING: (ARIAD; **ARIAD PHARMACEUTICALS INC**; ENDOTHELIAL GROWTH FACTOR; FDA; MEDINOL LTD; NASDAQ: ARIA; NF; PRESCRIPTION DRUG USER; SARCOMA; US FOOD AND DRUG ADMINISTRATION; VEGF) (Harvey J. Berger; ORPHAN DRUG DESIGNATION) (United States. Food and Drug Administration; Pharmaceutical industry) (Trade) (Biotechnology industry (BIO); Business (BUSN)) (United States (1USA))

COMPANY TERMS: **ARIAD PHARMACEUTICALS INC**

PRODUCT: Pharmaceutical preparations

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10/1/05 BIOTECHB (No Page)                                        Page 3

SIC: 2834

TICKER SYMBOL: ARIA

Word Count: 715
10/1/05 BIOTECHB (No Page)

END OF DOCUMENT

® 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT L

2 of 2 DOCUMENTS

Copyright 2006 Voxant, Inc.
All Rights Reserved.
Copyright 2006 CNBC/Dow Jones Business Video, a division of CNBC/Dow Jones Desktop
Video, LLC.
All Rights Reserved.
CNBC/Dow Jones Business Video

SHOW: CNBC/DOW JONES BUSINESS VIDEO 3:17 PM EST

May 4, 2006 Thursday

**TRANSCRIPT:** 050401cb.y51

**SECTION:** BUSINESS

**LENGTH:** 747  words

**HEADLINE:** Ariad Pharmaceuticals -- Chairman & CEO Inter

**BYLINE:** Maria Bartiromo, Mike Huckman

**GUESTS:** Dr. Harvey Berger

**BODY:**

   MARIA BARTIROMO, CNBC ANCHOR: Well, a David versus Goliath story in biotech to tell you about. A small biotech company took on big pharma and won big. We're talking about Ariad Pharmaceutical's victory today against Eli Lilly. Ariad is receiving at least $62.5 million and a percentage of future and past revenue from the sale of two drugs. CNBC's pharmaceuticals reporter Mike Huckman is here now with another "First-on- CNBC" interview with Ariad's CEO -- Mike.

   MIKE HUCKMAN, CNBC PHARMACEUTICALS REPORTER: Yes, Maria, about 20 times the average daily volume traded in this stock so far today. The federal court jury decision in Boston this morning was unanimous that Lilly pay Ariad and its academic institution co-plaintiffs, including MIT and Harvard, the damages plus more than 2 percent of the drug sales from 2002 all the way through 2019. The jury says Lilly is infringing the Ariad Pharmaceutical's patent on technology that Lilly uses to make its billion dollar blockbuster osteoporosis drug, called Evista and its $200 million septic shock drug called Xigris.

   The stock of Ariad was halted when CNBC broke this news of the verdict this morning, but they spiked as soon as trading reopened. Right now, the stock is up 26 percent on very heavy volume. But in a strongly worded press release, Lilly says it will appeal. Quoting the company's general council Robert Armitage: "I've never seen a jury verdict with which I so strongly dis-

agree. We are obviously confident that we will succeed on appeal." And he says, "The Ariad position is equivalent to discovering that gravity is the force that makes water roll downhill and then demanding the owners of all the existing hydro electric plants begin to pay patent royalties on their use of gravity." And so, on that note, let`s bring in Ariad Pharmaceuticals chairman and CEO Dr. Harvey Berger, joining us live first on CNBC from Boston this afternoon.

Dr. Berger, thanks for being here.

DR. HARVEY BERGER, CHAIRMAN & CEO, ARIAD PHARMACEUTICALS: Hello, Mike.

HUCKMAN: So your reaction to Lilly`s lawyer`s statement?

BERGER: Well, I think today is a very important day for Ariad, for our shareholders, and for science. As you pointed out, the jury found unanimously in our favor both in terms of infringement as well as validity of our patent. You know, I think each of the issues that Mr. Armitage addressed in his quote were largely dealt with by the jury and by the trial. Lilly put forth its best case and we were able to prevail. And the jury spoke today.

HUCKMAN: Dr. Berger, if this holds up on appeal, what kind of windfall could this mean for your company and your academic partners?

BERGER: Well, it`s a very important finding for Ariad and for our academic collaborators and colleagues. The numbers, which you put forth earlier, certainly speak to the damages which the jury has awarded us, the $65 million for a back sales as well as almost a 2 1/2 percent royalty on Xigris and Evista sales in the U.S. going forward through the end of the patent life. And so, those are very important numbers for us in the future. It doesn`t affect our guidance for this year, but certainly could kick in in the future.

HUCKMAN: And Dr. Berger, you`re not done yet. You think you can get royalties from other drug companies as well, correct?

BERGER: Well, there`s no question that NF-(kappa)B cell-signaling pathway plays an important role in many different diseases, not only septic shock and bone disease, osteoporosis, but as well as cancer and inflammation. And there certainly are opportunities for other companies to license our technology and our patents. And we are committed to broadly licensing this patent to other pharmaceutical companies, biotech companies. That`s never been a question. Academics, universities, can use the technology at no charge with no restriction, but pharmaceutical and biotech companies need to pay rent for the use of the intellectual property.

HUCKMAN: Need to pay rent and that`s what a jury said today. Dr. Harvey Berger, the chairman and CEO of Ariad Pharmaceuticals, thanks again for joining us first on CNBC after this favorable jury verdict.

And Maria, separately, I should add, this company is going to have data coming out on ASGRO, the big oncology conference next month on one of its pipeline products for rare cancer called sarcoma. So investors have that to look forward to as well.

BARTIROMO: All right, we`ll watch that. Thanks so much, Mike. Great interview, good story there, Mike Huckman.

**LOAD-DATE:** May 5, 2006