IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN INC., IMMUNEX CORPORATION,  )
AMGEN USA INC., AMGEN             )
MANUFACTURING LIMITED, IMMUNEX    )
RHODE ISLAND CORPORATION,         )
                                  )
                    Plaintiff,    )        C.A. No. 06-259-KAJ
                                  )
v.                                )
                                  )
ARIAD PHARMACEUTICALS, INC.,      )
                                  )
                    Defendant.    )
                                  )

**DEFENDANT ARIAD PHARMACEUTICALS, INC.'S REPLY MEMORANDUM
OF LAW IN SUPPORT OF ITS MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURISDICTION, FAILURE TO STATE A CLAIM FOR
WHICH RELIEF MAY BE GRANTED, AND FAILURE TO JOIN NECESSARY
AND INDISPENSABLE PARTIES**

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE  19899
Telephone:  (302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Counsel for Defendant
ARIAD Pharmaceuticals, Inc.*

*Of Counsel:*

Morgan Chu
David I. Gindler
Elizabeth Rosenblatt
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Telephone:  (310) 277-1010

Dated:  July 13, 2006

TABLE OF CONTENTS

Page

I.      INTRODUCTION...................................................................................1

II.     DISMISSAL IS APPROPRIATE BECAUSE PLAINTIFFS
        HAVE NO REASONABLE APPREHENSION OF SUIT ......................3

        A.    The Law Protects Licensing Negotiations And Requires A
              Reasonable Apprehension Of *Imminent* Litigation...................................3

        B.    The Facts Do Not Support A Reasonable Apprehension Of
              Imminent Litigation .................................................................5

              1.    Events prior to issuance of the '516 patent did not create
                    a reasonable apprehension of suit ..................................................5

              2.    There were no threats between issuance of the '516
                    patent and the filing of suit ...........................................................7

                    (a)   The June 25, 2002 letter concerned the
                          possibility of a research license.........................................7

                    (b)   Mr. Ungemach may have had a conversation
                          with Mr. Casselman regarding the possibility of
                          a license ...........................................................................7

                    (c)   ARIAD had cordial business relations with
                          Amgen ..............................................................................9

                    (d)   Ms. Carson made no threats to Amgen ...........................9

                    (e)   Dr. Berger's testimony in the Lilly trial makes
                          clear that Amgen had no reasonable
                          apprehension of suit........................................................11

              3.    Events occurring after the filing of suit are irrelevant...............13

              4.    The absence of a covenant not to sue Amgen does not
                    create a reasonable apprehension of imminent suit. ....................13

III.    THE COMPLAINT IS INSUFFICIENT BECAUSE IT DOES
        NOT SET FORTH A BASIS FOR DECLARATORY
        JUDGMENT JURISDICTION .................................................................15

IV.     PLAINTIFFS HAVE NOT PROVEN PERSONAL
        JURISDICTION OVER NECESSARY AND
        INDISPENSABLE PARTIES..................................................................16

Page

A.   The Institutions are necessary parties because they have retained
     substantial rights in the '516 patent ......................................................... 16

B.   The Institutions are indispensable parties because they would
     suffer prejudice if the action proceeded without them ............................. 18

C.   It is improper to assert personal jurisdiction over MIT and
     Harvard .................................................................................................... 19

V.        CONCLUSION ..................................................................................... 20

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Labs. v. Diamedix Corp.,*
    47 F.3d 1128 (Fed. Cir. 1995)........................................................ 19, 20

*Akro Corp. v. Luker,*
    45 F.3d 1541 (Fed. Cir.1995)............................................................ 23

*Alston v. Parker,*
    363 F.3d 229 (3d Cir. 2004)............................................................. 18

*Arrowhead Industrial Water, Inc. v. Ecolochem,*
    846 F.2d 731 (Fed. Cir. 1988)........................................................ 5, 15

*Beverly Hills Fan Co. v. Royal Sovereign Corp.,*
    21 F.3d 1558 (Fed. Cir. 1994)........................................................... 22

*BP Chemicals Ltd. v. Union Carbide Corp.,*
    4 F.3d 975 (Fed. Cir. 1993)......................................................... 12, 15

*Breckenridge Pharmaceutical, Inc. v. Metabolite Laboratories, Inc.,*
    444 F.3d 1356 (Fed. Cir. 2006)...................................................... 22, 23

*Bristol Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.,*
    1996 WL 71492 (S.D.N.Y. Feb. 20, 1996)............................................. 17

*C.R. Bard v. Schwartz,*
    716 F.2d 874 (Fed. Cir. 1983)...................................................... 16, 17

*Capo, Inc. v. Dioptics Medical Prods., Inc.,*
    387 F.3d 1352 (Fed Cir. 2004)........................................................... 17

*Century Indus. v. Wenger Corp.,*
    851 F. Supp. 1260 (S.D. Ind. 1994) ..................................................... 13

*Charles Machine Works, Inc. v. Digital Control Inc.,*
    264 F. Supp. 2d 980 (W.D. Okla. 2003) ................................................. 8

*Citizen Electronics Co., Ltd. v. OSRAM GMBH,*
    377 F.Supp.2d 149 (D.D.C. 2005) ................................................ 4, 8, 14

*Cognex Corp. v. Lemelson Medical, Education & Research Found.,*
    67 F. Supp. 2d 5 (D. Mass. 1999) ...................................................... 23

Page(s)

*Cygnus Therapeutics Systems v. Alza Corp.*,
    92 F.3d 1153 (Fed. Cir. 1996)..................................................................... 8, 12, 15

*DaimlerChrysler Corp. v. U.S.*,
    442 F.3d 1313 (Fed. Cir. 2006)........................................................................... 17

*Dethmers Mfg. Co. v. Automatic Equip. Co.*,
    70 F. Supp. 2d 944 (N.D. Iowa 1999)................................................................... 7

*DuPont Dow Elastomers v. Greene Tweed of Delaware, Inc.*,
    148 F. Supp. 2d 412 (D. Del. 2001)..................................................................... 9

*Electronics for Imaging v. Coyle*,
    394 F.3d 1341 (Fed Cir. 2005)........................................................................... 17

*EMC Corp. v. Norand Corp.*,
    89 F.3d 807 (Fed. Cir. 1996)......................................................................... 4, 17

*Erbamont v. Cetus Corp.*,
    720 F. Supp. 387 (D. Del. 1989)................................................................. 19, 21

*eSpeed, Inc. v. BrokerTec USA, L.L.C.*,
    No. 03-612-KAJ, 2004 WL 2346137 (D. Del. Sept. 13, 2004 2004).................. 22

*GAF Building Materials Corp. v. Elk Corp.*,
    90 F.3d 479 (Fed. Cir. 1996)............................................................................... 7

*Graves v. Lowery*,
    117 F.3d 723 (3d Cir. 1997)............................................................................... 18

*Helicopteros Nacionales de Columbia, S.A. v. Hall*,
    466 U.S. 408 (1984)........................................................................................... 23

*Indium Corp. v. Semi-Alloys, Inc.*,
    781 F.2d 879 (Fed. Cir. 1985)............................................................................. 5

*Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*,
    248 F.3d 1333 (Fed. Cir. 2001)......................................................................... 20

*Kustom Signals, Inc. v. Applied Concepts, Inc.*,
    1996 WL 568817 (D. Kan Sept. 6, 1996)............................................................ 9

*Licata v. U.S. Postal Service*,
    33 F.3d 259 (3d Cir. 1994)................................................................................. 17

*Nobelpharma AB v. Implant Innovations, Inc.*,
    141 F.3d 1059 (Fed. Cir. 1998)........................................................................... 8

Page(s)

*Pfizer Inc. v. Elan Pharm. Research Corp.*,
    812 F. Supp. 1352 (D. Del. 1993) ....................................................... 17

*Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*,
    57 F.3d 1051 (Fed. Cir. 1995) .................................................... 3, 4, 13

*Ryobia Am. Corp. v. Peters*,
    815 F. Supp. 172 (D.S.C. 1993) ........................................................... 8

*Shell Oil Co. v. Amoco Corp.*,
    970 F.2d 885 (Fed. Cir. 1992) ........................................................ 4, 8

*Shoom, Inc. v. Electronic Imaging Systems of America, Inc.*,
    2006 WL 1529983 (N.D. Cal. June 1, 2006) ....................................... 11

*Sicom Systems Ltd. v. Agilent Techs., Inc.*,
    427 F.3d 971 (Fed. Cir. 2005) ........................................................... 16

*Solid State Equipment Corp. v. Verteq, Inc.*,
    2003 WL 21654705 (E.D. Pa. Jan. 6, 2003) ....................................... 3, 4

*Spectronics Corp. v. H.B. Fuller Co.*,
    940 F.2d 631 (Fed. Cir. 1991) ..................................................... 14, 15

*Speedplay, Inc. v. Bebop, Inc.*,
    211 F.3d 1245 (Fed. Cir. 2000) ......................................................... 17

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ............................................................................ 4

*Suprex Corp. v. Lee Scientific, Inc.*,
    660 F. Supp. 89 (W.D. Pa. 1987) ...................................................... 18

*Symbol Techs., Inc. v. Hand Held Prods., Inc.*,
    2003 WL 22750145 (D. Del. Nov. 14, 2003) ................................. 14, 15

*Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.*,
    395 F.3d 1324 (Fed. Cir. 2005) .................................................... 4, 15

*Third Wave Tech, Inc. v. Digene Corp.,*,
    2006 WL 83340 (W.D. Wis. January 10, 2006) ................................. 10

*Vanguard Research v. Peat, Inc.*,
    304 F.3d 1249 (Fed Cir. 2002) .......................................................... 15

*West Interactive Corp. v. First Data Resources, Inc.*,
    972 F.2d 1295 (Fed. Cir. 1992) ......................................................... 10

**Page(s)**

**Statutes**

Fed. R. Civ. P. 8.................................................................................................... 15

**Other Authorities**

U.S. Patent No. 4,479,380..................................................................................... 18

.

## I.    __INTRODUCTION__

Plaintiffs appear to believe that by simply repeating the word "threat" enough times—even if it utterly misrepresents the conversation or document that it purports to characterize—they can either coerce ARIAD to grant them a covenant not to sue or force ARIAD to incur the considerable expense of defending this nuisance suit (which no doubt has as its goal coercing ARIAD to grant the covenant not to sue). In Plaintiffs' vocabulary, literally anything a patent holder does—or *doesn't* do—to market its intellectual property constitutes a "threat" justifying a declaratory action:

- An attempt "to identify those classes of drugs generally believed . . . to fall within" the area of technology relating to the NF-κB pathway (D.I. 21 at 5), made to explain the value of "Licensing and Partnering" to ARIAD's Board of Directors (Allen Decl., Ex. C, at 7),[1] is a list of "prospective litigation targets." (Opp. at 4.)

- A mass mailing that announces the issuance of a patent, offers license terms "in the event you develop or have a product covered by the claims of" that patent, and asks the recipient to "[p]lease contact me if you are interested," (Allen Decl., Ex. D.) qualifies as "threatening letters." (D.I. 21 at 18 n.46.)

- When Amgen makes no response to this mass mailing, and when ARIAD does *nothing else* for four years—*i.e.*, follows up "with four years of silence" (*id.*) rather than pursue licensing negotiations—this justifies the conclusion that ARIAD's offer of a license "can hardly be viewed as sincere," and is "really just a prelude to infringement litigation." (D.I. 21 at 17 n. 44, 18.)

- On the other hand, if ARIAD *does* attempt to pursue licensing negotiations, by calling the recipient and expressing the view that he "should be interested in taking a license," this is characterized as "send[ing] the message that they *must* take a license" (D.I. 21 at 6 (caps removed, emphasis added)), again somehow creating a reasonable apprehension of being sued. (D.I. 21 at 10.)

Plaintiffs' perception of threats in such innocuous conduct does not make their apprehension reasonable. Rather, Plaintiffs bear the burden of establishing, by a

---

[1] Declaration citations herein refer to declarations filed with Defendants' Opening Brief ("D.I. 14") or Plaintiffs' Opposition ("D.I. 21"), with the exception of the Casselman Declaration ("Casselman Decl."), Carson Declaration ("Carson Decl."), and Supplemental Allen Declaration ("Supp. Allen Decl."), filed concurrently herewith.

preponderance of the evidence, that at the time that they filed this action, ARIAD's conduct created an *objectively* reasonable apprehension of imminent suit—not a subjective fear of litigation. Plaintiffs cannot meet this standard.

The touchstone of the reasonable apprehension analysis is the "totality of the circumstances." Plaintiffs ill-serve that analysis by extracting events and statements from their natural habitats and crafting "threats" from communications that, in context, could not be perceived as anything of the sort. For example, at the center of Plaintiffs' allegations is a Board of Directors presentation, which they pejoratively mischaracterize as a "litigation list." There is no "litigation list"—and Plaintiffs know it: Their attorneys first learned about the Board of Directors presentation while sitting in the courtroom during the Eli Lilly & Company ("Lilly") litigation, listening to ARIAD's CEO testify during cross-examination that the presentation did *not* identify potential litigation targets and that—as of only a few days before Plaintiffs filed suit—ARIAD had *not* done an infringement analysis on products made by anyone other than Lilly.

Similarly, Plaintiffs have first-hand knowledge that ARIAD is actively involved in developing products and bringing them to market, since Amgen and ARIAD have had talks at various times since 2000 about co-development and partnering opportunities. (See Supp. Allen Decl. at ¶ 3-12). Plaintiffs therefore know better than to mischaracterize ARIAD's licensing overtures as veiled litigation threats. In fact, contrary to their Opposition (at 21), Plaintiffs know that ARIAD is contractually bound to seek licensees for the '516 patent technology, and that a strategy based only on litigation would violate the terms of ARIAD's license agreement. (Sharp Decl., Ex. H at § 2.2.1.)

2

These are only a few examples of how Plaintiffs' version of the facts is myopically misleading. As the Court reads the parties' submissions, ARIAD urges the Court to examine the underlying documents and declarations in the record. These items reveal how far divorced Plaintiffs' "reasonable apprehension" is from reality.

Plaintiffs' blinders also extend to their failure to state a claim, and their failure to join the patent owners as indispensable and necessary parties to this litigation. Section III below discusses how Plaintiffs have failed to meet the basic standards of notice pleading with respect to their allegations of reasonable apprehension. Section IV below explains why the owners of the '516 patent are necessary and indispensable parties, and how dismissal of the present suit is appropriate because Plaintiffs have not met their burden of establishing personal jurisdiction over all indispensable parties.

## II.    DISMISSAL IS APPROPRIATE BECAUSE PLAINTIFFS HAVE NO REASONABLE APPREHENSION OF SUIT

### A.    The Law Protects Licensing Negotiations And Requires A Reasonable Apprehension Of *Imminent* Litigation

The Declaratory Judgment Act is not intended to subject patent holders to suit simply for attempting to market their patents. For this reason, "[t]he offer of a patent license does not create an actual controversy." *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*, 57 F.3d 1051, 1053 (Fed. Cir. 1995); *see also Solid State Equipment Corp. v. Verteq, Inc.*, 2003 WL 21654705 at *4 (E.D. Pa. Jan. 6, 2003) (rejecting interpretation under which patentee "would not be able to inquire about the possibility of patent infringement by another party without subjecting itself to a suit under the Declaratory Judgment Act.").

The Declaratory Judgment Act also does not create jurisdiction based on the vague possibility that a patent holder might decide to sue at some future point. It is a

business reality that, "any time parties are in negotiation over patent rights, the possibility of a lawsuit looms in the background[,]" because "[t]he threat of enforcement . . . is the entire source of the patentee's bargaining power." *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 811 (Fed. Cir. 1996). For this reason, Plaintiffs must show that the threat of suit is ***imminent***. *See Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1333 (Fed. Cir. 2005) (declaratory plaintiff "must be able to demonstrate that it has a reasonable apprehension of *imminent* suit.") (emphasis in original). This "requirement of imminence" reflects the Article III mandate that the controversy must be "'concrete,' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)); *see also Citizen Electronics Co., Ltd. v. OSRAM GMBH*, 377 F. Supp. 2d 149, 157 (D.D.C. 2005) (It is "incorrect as a matter of law" to "read out the requirement of immediacy.").

Nor can declaratory jurisdiction be based on Plaintiffs' subjective fears or selective memory. *Phillips*, 57 F.3d at 1053-54 (actual controversy requirement "requires more than the nervous state of mind of a possible infringer."). Plaintiffs must prove, by a preponderance of the evidence, an ***objective*** basis for a ***reasonable*** apprehension of suit. *Indium Corp. v. Semi-Alloys, Inc.*, 781 F.2d 879, 883 (Fed. Cir. 1985) (apprehension must be objective); *Solid State* 2003 WL 21654705 at *2 (plaintiff must establish reasonable apprehension by a preponderance of the evidence). Whether such an objective basis exists is assessed based on the totality of the circumstances. *See, e.g. Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885 (Fed. Cir. 1992).

The present case is entirely different from *Arrowhead Industrial Water, Inc. v. Ecolochem*, 846 F.2d 731 (Fed. Cir. 1988), on which Plaintiffs rely throughout their

4

opposition.  In that case, the defendant had, among other things, expressly stated an intention to enforce its patent rights by litigation, and had submitted a proposed finding in a separate suit against a third party seeking a determination that Arrowhead was also an infringer.  In contrast, as shown in section II.B.4 below, Plaintiffs have not identified a single case in which jurisdiction was found in a situation analogous to the case at bar.

**B.    The Facts Do Not Support A Reasonable Apprehension Of Imminent Litigation**

This reply focuses largely on a detailed analysis of the facts, as they are at the core of the jurisdictional question.  We present the facts and analysis in chronological order to avoid any confusion that might have been caused by the jumps back and forth in time in Plaintiffs' factual presentation and to aid the Court in forming a clear understanding of the course of events and their (lack of) legal significance.

**1.    Events prior to issuance of the '516 patent did not create a reasonable apprehension of suit**

On May 15, 2000—over two years before the '516 patent issued—ARIAD sent letters to a number of companies, announcing its intellectual property portfolio relating to NF-$\kappa$B and I$\kappa$B and offering to grant non-exclusive licenses.  (Ungemach Decl., Ex. B; Allen Decl., Ex. C at 8.)  The letter's only reference to the recipients' activities was that "[w]e believe that you are working on the development and/or commercialization of drugs that are based on the NF-$\kappa$B signaling pathway and that our intellectual property may be of importance to you."  (Ungemach Decl., Ex. B.)  At this time, ARIAD also made a presentation to Amgen regarding the science of NF-$\kappa$B.  (Ungemach Decl., Ex. A.)  This presentation contained no threat of litigation and did not discuss licensing. (*Id.*)

ARIAD sent new letters on February 8, 2001—more than one year before the issuance of the '516 patent—to a larger number of companies, including Amgen and

Immunex. (Casselman Decl. ¶ 2.) These letters referred to a patent not at issue in this action, and requested that each recipient decide as soon as possible whether it wished to move ahead with a license "so that we can take your level of interest into account as we make licensing decisions with respect to other parties." (Ungemach Decl., Ex. C.) Amgen did not express interest in a license after these overtures, and ARIAD did not press the matter.[2] (Ungemach Decl., Ex. D, Casselman Decl. ¶ 3.)

Neither the letters nor the technology presentations concerned the '516 patent, which had not issued yet. (Ungemach Decl, Ex. A, B, C.) Moreover, neither letter stated any belief that any specific products (such as Enbrel®) were covered by ARIAD's patents or applications, or made even indirect reference to litigation.[3] (Ungemach Decl., Exs. B, C.) No reasonable recipient could have viewed them as attempts "to coerce the Amgen Entities to license" the then-pending application for the '516 patent, as Plaintiffs allege. (D.I. 21 at 8.)

In addition, because these events took place before the issuance of the '516 patent, they cannot create a justiciable controversy, even if they somehow could be characterized as a "threat." *See GAF Building Materials Corp. v. Elk Corp.*, 90 F.3d 479, 482 (Fed. Cir. 1996) ("a threat is not sufficient to create a case or controversy unless it is made with respect to a patent that has issued before a complaint is filed"); *Dethmers Mfg. Co. v. Automatic Equip. Co.*, 70 F. Supp. 2d 944, 958-59 (N.D. Iowa 1999) (no actual

---

[2] ARIAD did have conversations with Immunex in 2001 regarding the possibility of licensing ARIAD's NF-κB patent portfolio. In those conversations, ARIAD never accused Immunex of infringing any ARIAD patent, and never threatened to file suit against Immunex. Although Immunex expressed preliminary interest in a license, the parties could not agree upon terms and the discussions ended. (Casselman Decl. ¶ 3.)

[3] ARIAD may not even have sent either of these letters to Synergen, the original developer of Kineret®. (Casselman Decl. ¶ 2.)

6

controversy where threats were made prior to issuance of patent), partially overruled on other grounds, 272 F.3d 1365 (Fed. Cir. 2001).

Finally, even if these events somehow could be misconstrued as bellicose, they occurred *in 2000 and 2001*, and thus could not give rise to an apprehension of imminent suit *five or six years later*. *See Cygnus Therapeutics Systems v. Alza Corp.*, 92 F.3d 1153, 1159 (Fed. Cir. 1996) (any implicit threat could not have any significant continuing effect five years later), overruled on other grounds, *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998); *Charles Machine Works, Inc. v. Digital Control Inc.*, 264 F. Supp. 2d 980, 986 (W.D. Okla. 2003) (communications in 1997 and 1998 too remote to justify fear of litigation in 2002); *Citizen Electronics,* 377 F. Supp. 2d at 156-57 (defendant "inexplicably wait[ed] to file suit for over six months after the last event that could reasonably have caused an apprehension of suit").

### 2.    There were no threats between issuance of the '516 patent and the filing of suit

#### (a)    The June 25, 2002 letter concerned the possibility of a research license

When the '516 patent issued on June 25, 2002, ARIAD sent announcements to various companies.  (*See* D.I. 14 at 4.)  These form letters contained no demands or accusations.  Rather, they offered a non-exclusive *research* license and a possible further agreement "*in the event you develop* or have a product covered by the claims of our '516 patent (or foreign equivalents)." (Allen Decl., Ex. D at 2 (emphasis added).)

#### (b)    Mr. Ungemach may have had a conversation with Mr. Casselman regarding the possibility of a license

Mr. Ungemach (of Amgen) recalls a telephone call with Mr. Cassleman (of ARIAD) that purportedly took place in "the late 2002-2003 time period"—at least three

to four years ago.[4]  Yet even Mr. Ungemach does not describe this call as conveying any

threat or allegation of infringement.  (D.I. 21 at 7)  Mr. Casselman's (purported)

statement that Amgen "should be interested" in licensing the '516 patent for Kineret®

does not create a reasonable apprehension of imminent litigation.  *See, e.g., Shell Oil*, 970

F.2d at 885 (no reasonable apprehension from license negotiation in which defendant

stated several times its belief that the plaintiff's product infringed its patent); *DuPont*

*Dow Elastomers v. Greene Tweed of Delaware, Inc.*, 148 F. Supp. 2d 412 (D. Del. 2001)

(same where defendant sent letters stating that plaintiff "may be infringing" its patents

and requesting a sample product for evaluation); *Kustom Signals, Inc. v. Applied*

*Concepts, Inc.*, 1996 WL 568817 at *1, 6 (D. Kan Sept. 6, 1996) (same where letter

advised competitors that a patent had issued which "may put some of you in an

infringement situation."); *Ryobia Am. Corp. v. Peters*, 815 F. Supp. 172, 174 (D.S.C.

1993) (same where letter stated that plaintiff's product was apparently within the patent

and defendant made oral representations as to the strength of the patent holder's position).

While Mr. Casselman does not recall this particular conversation, he made several

similar calls during this period to companies who received the June 2002 letter and whose

literature or websites seemed to describe research or products potentially touching the

NF-$\kappa$B pathway.  (Casselman Decl. ¶ 4.)  Because these companies seldom volunteered

information, Mr. Casselman would attempt to stimulate conversation by "throwing out" a

project or product that the company's website or literature appeared to describe as

implicating the NF-$\kappa$B pathway.  (*Id.*)  Mr. Casselman may well have mentioned

---

[4] It is not clear whether Plaintiffs even believe that this call occurred, as they elsewhere assert that after sending the June 25, 2002 letter, ARIAD "then neglected the pursuit of any further licensing negotiations during the Lilly case," by following up with "four years of silence." (D.I. 21 at 17 n. 44; 18 & n.46).

Kineret® in this vein.  (*Id.*)  But as Plaintiffs admit, Mr. Casselman did not accuse

Amgen of infringement, despite Mr. Ungemach's efforts to press him into doing so.  (*Id.*)

**(c)**    **ARIAD had cordial business relations with Amgen**

In the "totality of the circumstances," the period from June 2002 to the present

was far from "four years of silence" between ARIAD and Amgen.  On the contrary,

ARIAD and Amgen had  a number of business communications in this period unrelated

to the '516 patent or NF-$\kappa$B.  For example, in 2005, the parties had talks about the

possibility of Amgen's becoming ARIAD's ex-U.S. partner for ARIAD's lead product, a

promising cancer treatment that is now in late-stage clinical testing.  (Supp. Allen Decl.

¶¶ 7-11.)[5]  If ARIAD wished to threaten Amgen with litigation regarding Enbrel® or

Kineret®, these discussions would have provided ample opportunity.  Yet the subjects of

Enbrel®, Kineret®, the '516 patent, or NF-$\kappa$B never once came up.  (Supp. Allen Decl.

¶ 12.)

**(d)**    **Ms. Carson made no threats to Amgen**

Plaintiffs allege that Patricia Carson (one of the lawyers representing ARIAD in

the Lilly litigation) twice threatened to assert the '516 patent against Amgen.  This

allegation is based *solely* on the Declaration of Paul Cantrell, an in-house lawyer at Lilly

(who says the he had primary responsibility for the ARIAD/Lilly litigation, which Lilly

lost.) (D. I. 21 at 6, 10.)  Ms. Carson made no such threats. (Carson Decl. ¶¶ 2-8.)

---

[5]  Given this negotiation history, Amgen knows well that ARIAD is actively engaged in researching and bringing products to market.  Plaintiffs' gratuitous effort to paint ARIAD as a "patent troll," (D.I. 21 at 11-13), is thus disingenuous as well as irrelevant.

9

The first alleged threat purportedly occurred at a deposition "around the middle of 2004." Mr. Cantrell carefully qualifies his testimony—that Ms. Carson allegedly said that "Enbrel is on the list"—as "something to the effect" and that he "understood the statement" to signify an intention by ARIAD to sue Amgen (although his unspoken "understanding" is irrelevant speculation and thus inadmissible). Whatever Mr. Cantrell now claims was said two years ago, Ms. Carson unequivocally states in her Declaration that she never suggested to Mr. Cantrell or anyone else, at any time, that ARIAD would sue Amgen, particularly on Enbrel®. (Carson Decl. ¶ 6.) As Amgen knows, Ms. Carson has represented Wyeth, which produces and co-promotes Enbrel® with Amgen, since 2003. (*Id.*) Thus, absent a conflict waiver (which Ms. Carson never obtained), she could not make any threat against Enbrel®. (*Id.*) Indeed, it is for this reason that Ms. Carson and her firm, Kaye Scholer LLP, do not represent ARIAD in the present action[6]. (*Id.*)

The second alleged threat purportedly occurred during the Lilly trial, when Ms. Carson was conversing with Siegmund Gutman, an in-house Amgen attorney, and another Amgen attorney whom Mr. Cantrell could not identify, but whom Ms. Carson knew to be Mark Pals (Amgen's lead counsel in the present litigation). (Carson Decl. ¶ 8.) Mr. Cantrell does not claim to have participated in this conversation, but rather overheard Ms. Carson utter the phrase "and you guys at Amgen are next" at the end of the conversation. Ms. Carson admits that she may have said something along those lines, but not as a threat to sue Amgen. (*Id.*) Rather, she was referring to a case pending in a

---

[6] Since Amgen knew of Ms. Carson's representation of Wyeth, and that Ms. Carson therefore had a potential conflict of interest, Amgen could not reasonably ascribe to her apparent authority to make a threat against Enbrel® even if she had made the statement Mr. Cantrell attributes to her. (Carson Decl. ¶¶ 6-7); *See West Interactive Corp. v. First Data Resources, Inc.*, 972 F.2d 1295, 1297-98 (Fed. Cir. 1992) (oral statement not evidently authorized by defendant

courtroom just down the hall, where she represented Hoffmann-La Roche in a suit filed by Amgen. During the Lilly trial, Ms. Carson learned that a hearing in that case had been set for a few weeks later. (*Id.*) Any conversation or statements that Mr. Cantrell may have overheard related to the hearing in the other case.. (*Id.*)

Moreover, even accepting Mr. Cantrell's account, courts routinely hold that statements with far more "threatening" content do not justify a reasonable apprehension of suit. *See, e.g., Cygnus*, 92 F.3d at 1156, 1159 (no express threat in defendant's statements that it didn't want plaintiff to "get into some rocky legal hassels [sic] later"); *BP Chemicals Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 979 (Fed. Cir. 1993) (dismissal affirmed where defendant stated that its patent was strong and that "the courts now tend to uphold patents"); *Shoom, Inc. v. Electronic Imaging Systems of America, Inc.*, 2006 WL 1529983 at *6-7 (N.D. Cal. June 1, 2006) (no direct threat of litigation in statements "You can pay me now or you can pay me later"; "We will let the lawyers handle it."; and "The patent applies to everyone who creates electronic invoices newspapers, you are going to pay."); *Century Indus. v. Wenger Corp.*, 851 F. Supp. 1260, 1263-64 (S.D. Ind. 1994) (letter stating that plaintiff's conduct was within the patent's scope and that defendant would fully enforce the patent did not justify reasonable apprehension of suit).

### (e)    Dr. Berger's testimony in the Lilly trial makes clear that Amgen had no reasonable apprehension of suit

In April 2006, Plaintiffs learned of a confidential, internal presentation entitled "Licensing and Partnering," which had been given to ARIAD's Board of Directors *five years earlier* in December 2001. (Allen Decl., Ex. C at 7.) Plaintiffs encountered this

did not create objectively reasonable apprehension of suit). Amgen's reliance on *Third Wave Tech., Inc. v. Digene Corp.*, 2006 WL 83340 (W.D. Wis. January 10, 2006), is thus misplaced.

presentation in when *Lilly* introduced it as an exhibit while cross examining of Dr. Berger.[7]

The presentation, Dr. Berger explained, was designed to demonstrate the potential licensing value of ARIAD's intellectual property to its Board members, some of whom did not have experience with the NF-$\kappa$B pathway. (*Id.*, Ex. B at 91:13-16.) To do this, the presentation identified potential licensing partners, and the types of products believed to be in the general area of the portfolio. (*Id.*, Ex. C at 9.) As Dr. Berger explained to Amgen and the others in the courtroom, the "lead players" with licensing potential were:

> . . . companies that we had identified that had done research on NF-$\kappa$B, in some instances might have NF-$\kappa$B products. It was a mix really to show, as I recall, the board that some of the major companies in the industry were working in the area of NF-$\kappa$B in one way, shape, or form. Not that they all had NF-$\kappa$B products, but these were companies that had done research in NF-$\kappa$B.
>
> Q. How many of these companies do you remember thinking had NF-$\kappa$B products at the time?
>
> A. We never did that analysis. You know, in order to do that analysis, you have to look specifically at the individual products and how the use of that product relates to the claims of a patent, and we hadn't then done it nor have we done it since.

(*Id.* Ex. B at 89-90.)[8] Despite the best efforts of Lilly's counsel to depict these slides as a litigation "hit list," Dr. Berger consistently rejected this interpretation, stating repeatedly that ARIAD had not analyzed any specific products for infringement other than Lilly's.

---

[7] Amgen describes this trial testimony as if *ARIAD* had "published a set of slides for the jury and public to see," "specifically call[ing] out" Amgen's products and issuing a "threat." (D.I. 21 at 4, 6.) This descriptions is absurd: Lilly "published" the slides, which has been produced during discovery under seal, during Dr. Berger's cross examination. (*Id.*, Ex. B at 84).

[8] Amgen infers dire intent from the presentation's failure to list all the companies to which ARIAD had sent letters in 2001. (D.I. 21 at 4-5.) As is apparent from Mr. Berger's testimony, however, the presentation only provides well-known examples; more examples would have served no purpose, even assuming that any omitted companies qualified as "lead players."

(D.I. 14 at 6; Allen Decl., Ex. B at 84, 90-91.)   Thus, when Plaintiffs learned of the presentation, they also learned that it was *not* a list of litigation targets.[9]

### 3.    Events occurring after the filing of suit are irrelevant

Reasonable apprehension of suit must be established *as of the time suit is filed*. *See, e.g., Arrowhead*, 846 F.2d at 734 n.2 ("The presence or absence of jurisdiction must be determined on the facts existing at the time the complaint under consideration was filed.").   Therefore, Amgen cannot allege that its apprehension stems from a news interview given by ARIAD's CEO *after* Amgen filed suit.   (D.I. 21 at 10-11, 18, 20.) Even so, Dr. Berger's interview falls squarely within the category of generalized business statements that courts have consistently held do not give rise to reasonable apprehension of suit.  *Cygnus*, 92 F.3d at 1156, 1160 (no reasonable apprehension based on statement by CEO at highly visible investment conference that took "a very strong proprietary position" that defendant would refuse to license other companies' products).[10]

### 4.    The absence of a covenant not to sue Amgen does not create a reasonable apprehension of imminent suit.

Finally, the Court should reject Plaintiffs' assertion that to avoid reasonable apprehension, ARIAD must now covenant not to sue Amgen.  (D.I. 21 at 2, 19.)   If this were the law, no declaratory action would be dismissed without such a covenant.  But it

---

[9] Nor could Amgen argue that ARIAD's suit against Lilly—the only suit ever filed on the '516 patent—creates a reasonable apprehension of suit against Amgen.  *See Citizen Electronics*, 377 F. Supp. 2d at 155 n.5 (fact that defendant sued party other than plaintiff could just as easily indicate that plaintiff will *not* be target of suit, where there is no competent evidence to suggest that interests of plaintiff were "served by delay in taking legal action") (quoting *Phillips*, 57 F.3d at 1053).

[10] Contrary to Amgen's Opposition (at 10), Mr. Cantrell asserts that Ms. Carson made her alleged "threat" at the Lilly trial directly to Amgen's attorneys *before* the filing of this action—although Amgen somehow claims that it first learned about Ms. Carson's statements *after* the filing of this action.  If Amgen really contends that it first learned of Ms. Carson's statement after the filing of this action, then it is doubly irrelevant.

is not the law: (1) a defendant's failure to covenant not to sue after the filing of a declaratory action is irrelevant to plaintiff's reasonable apprehension *at the time of filing*,[11] *see Arrowhead*, 846 F.2d at 734 n.2 (jurisdiction must be determined on the facts at the time of filing); and (2) if defendants were generally required to issue covenants not to sue to avoid declaratory actions, no licensing negotiations could take place without creating a reasonable apprehension of suit, *see EMC*, 89 F.3d at 811 (implied threat of patent enforcement is patentee's sole bargaining chip in licensing negotiations).[12]

To sum up, at the time this suit was filed, ARIAD's sole communications with Plaintiffs regarding the '516 patent or NF-$\kappa$B generally were: (1) a presentation and two letters sent *over five years earlier,* before the '516 patent had issued; (2) a single letter sent *four years earlier* to announce the issuance of the '516 patent; (3) a single phone call made *three years earlier* suggesting that Amgen look into the possibility of a license for Kineret®; and (4) testimony under oath in the Lilly trial that ARIAD had not assessed any of Plaintiffs' products for infringement.  Moreover, at various times during this period, ARIAD and Amgen were in discussions about a potential business partnership regarding ARIAD's lead product, without mentioning the '516 patent at all.  Not one of

---

[11] *See also BP Chemicals*, 4 F.3d at 979-80 (refusal to promise non-enforcement at hearing could not supply the "reasonable apprehension of suit" that was otherwise missing); *C.R. Bard*, 716 F.2d 881 (jurisdiction did not arise from prior failure to covenant not to sue, although affidavit filed in that case was insufficient to dispel existing jurisdiction).

[12] If Plaintiffs actually *had* a reasonable apprehension of litigation at the time they filed suit, ARIAD would be able to subsequently *dispel* it with such a covenant, as the defendant did in *Spectronics Corp. v. H.B. Fuller Co.,* 940 F.2d 631 (Fed. Cir. 1991), and thus deprive the Court of continuing jurisdiction. *Id.* at 635-36.  In considering a refusal to covenant after suit was filed, the district court in *Symbol Techs., Inc. v. Hand Held Prods., Inc.*, 2003 WL 22750145 at *4 (D. Del. Nov. 14, 2003) overlooked the core doctrine that apprehension of suit is evaluated at the time of filing.

Plaintiffs' cases supports the proposition that these facts justify reasonable apprehension.[13]

## III.   THE COMPLAINT IS INSUFFICIENT BECAUSE IT DOES NOT SET FORTH A BASIS FOR DECLARATORY JUDGMENT JURISDICTION

A party invoking federal jurisdiction must, in the initial pleading, allege sufficient facts to establish the court's jurisdiction and provide notice to the defendant of the basis of its claims.  *See* Fed. R. Civ. P. 8; *DaimlerChrysler Corp. v. U.S.*, 442 F.3d 1313, 1318 (Fed. Cir. 2006); *Licata v. U.S. Postal Service*, 33 F.3d 259, 260 (3d Cir. 1994).  The prerequisite for declaratory jurisdiction is the existence of an "actual controversy," which here means "reasonable apprehension" of an imminent suit.  *See Teva*, 395 F.3d at 1332.[14]  But here, the Complaint alleges *no* facts to establish that Plaintiffs had a basis for such apprehension, and thus fails to meet even the minimal standard of notice pleading.

---

[13] *See Electronics for Imaging v. Coyle*, 394 F.3d 1341, 1344 (Fed Cir. 2005) (defendant made express threats to sue and issued negotiating deadline and ultimatum); *Teva*, 395 F.3d at 1334 (no reasonable apprehension of imminent suit); *Capo, Inc. v. Dioptics Medical Prods., Inc.*, 387 F.3d 1352,1356 (Fed Cir. 2004) (defendant made several express threats of lawsuit "not aimed at negotiation, but at impeding a competitor's commercial activity"); *Vanguard Research v. Peat, Inc.*, 304 F.3d 1249, 1251 (Fed Cir. 2002) (defendant had already filed suit against plaintiff to enjoin its use of the product and told U.S. government that plaintiff was using technology without permission); *EMC Corp.*, 89 F.3d at 812 (defendant had stated inclination to "turn the matter over to" litigation counsel and urged discussion to avoid "contentious legal activity"); *C.R. Bard v. Schwartz*, 716 F.2d 874, 881 (Fed. Cir. 1983) (defendant had filed suit against plaintiff for breach of license agreement); *Symbol Techs.*, 2003 WL 22750145 at *2-3 ("recent contentious and litigious history between the parties," whose relations had "deteriorated completely"); *Bristol Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 1996 WL 71492 at *3 (S.D.N.Y. Feb. 20, 1996) (defendant had asserted that the product infringed, made direct references to threat of litigation, and increased proposed royalty figure).

[14] *Teva* does not excuse Plaintiffs from pleading facts (D.I. 21 at 22).  Rather, it concerns what the pleaded facts must *establish*.  *See id.*  Plaintiffs' other cases fail in the same regard.  *See Alston v. Parker*, 363 F.3d 229, 234 (3d Cir. 2004) (district court "could have dismissed the complaint without prejudice" and allowed plaintiff to amend to make it plain); *Graves v. Lowery*, 117 F.3d 723, 728 (3d Cir. 1997) (plaintiffs had "alleged facts in their complaint, which, if proven" would support their claim).

## IV.    PLAINTIFFS HAVE NOT PROVEN PERSONAL JURISDICTION OVER NECESSARY AND INDISPENSABLE PARTIES

### A.    The Institutions are necessary parties because they have retained substantial rights in the '516 patent

Dismissal is also appropriate because the Court lacks personal jurisdiction over the owners of the '516 patent:  Harvard, MIT, and the Whitehead Institute (collectively, "the Institutions").  Patent owners are necessary parties to lawsuits involving their patents unless they have "transfer[red] all substantial rights under the patent . . . [such that the transfer] amounts to an assignment." *Sicom Systems Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005) (licensor was necessary party when licensee did not have sole right to indulge infringement, to settle cases without consent, or to assign its interests in the patent without consent).  Here, no such transfer has occurred, and there is no basis to assert personal jurisdiction over Harvard and MIT in Delaware.

The Institutions retain many key rights, including the right to "indulge" past infringement.  This right is crucial to the necessary party analysis. *See, e.g. Sicom*, 427 F.3d at 979 (noting centrality of the power to indulge infringement), citing *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1132 (Fed. Cir. 1995) ("the right to indulge infringements . . . normally accompanies a complete conveyance of the right to sue"); *Erbamont v. Cetus Corp.*, 720 F. Supp. 387, 393 (D. Del. 1989) (licensor was necessary party when it had "a right to bring an infringement action . . . in the event [the licensee] decides not to bring its own").  Plaintiffs argue that ARIAD may essentially veto any legal action by the Institutions by merely granting a sublicense to the alleged infringer. (D.I. 21 at 27.)  This argument misreads the contract between ARIAD and the Institutions ("the contract"), which grants ARIAD the ability to sublicense with respect to "*future* use of the Patent Rights," but not the right to release liability for *past* infringement outside

the context of a litigation settlement, which must be approved by the Institutions. (Sharp Decl. Ex. F at § 7.2.) If ARIAD elects not to sue an infringer, the Institutions have the exclusive right to sue for or indulge past infringement. For this reason, Amgen's reliance on *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245 (Fed. Cir. 2000), in which the licensee had the right to "grant[] the alleged infringer a royalty-free sublicense," is misplaced. *Id.* at 1251.

The Institutions also retain other key rights. For example, ARIAD cannot assign its rights under the agreement without the consent of the Institutions.[15] (Sharp Decl. Ex. F at Art. XI.) This weighs strongly against a finding that all substantial rights have been transferred. *See Sicom*, 427 F.3d at 979; *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001). In fact, in a case concerning a contractual term nearly identical to the term here, former Chief Judge Longobardi held that, since the licensee could not assign without written consent of the patent owner, the court "need look no further in determining that [the owner] reserved substantial rights." *Pfizer Inc. v. Elan Pharm. Research Corp.*, 812 F. Supp. 1352, 1373 (D. Del. 1993).[16]

---

[15] That retained right is not, as Plaintiffs misleadingly state, subject to the limitation that consent "shall not be unreasonably withheld." (*Id.*; D.I. 21 at 26-27; Sharp Ex. F at Art. XI.) Thus, Amgen's reliance on *Speedplay*, in which the contract contained such a provision, is again misplaced. In fact, the *Speedplay* court distinguished that case from *Abbott*, in which the court held that substantial rights were retained when the licensor—like the Institutions here—retained the "right to veto any assignment proposed by the licensee, other than a successor in business." *Speedplay*, 211 F.3d at 1252, *discussing Abbott,* 47 F.3d at 1132.

[16] The *Pfizer* court also found it relevant that, as here, the licensor retained title to the patent and certain other rights such that the licensee would not be the sole distributor of the patented product. *Pfizer*, 812 F. Supp. at 1373. Although the bundle of retained rights here is different from *Pfizer*, the reasoning stands: the Institutions retained not only the rights discussed above, but also several other rights, including the right to distribute patented products to third parties for noncommercial purposes and the right to prosecute patent applications in the same family as the '516 patent.

Also, Plaintiffs' assertion that the Institutions "can intervene in [a declaratory judgment] suit only if ARIAD takes no action at all," is wrong. (D.I. 21 at 26.) Amgen is correct that Section 7.5 of the license agreement was amended to revise the conditions under which the Institutions may take over the defense of a declaratory judgment action. (D.I. 21 at 25-26.)  The amendment is immaterial, however, as the Institutions still retained the right to assess the reasonableness of ARIAD's defense efforts and to "take over sole defense" if ARIAD acts in a way that the Institutions believe does not constitute "reasonable steps to defend . . . in a timely manner." (Sharp Decl., Ex. H at § 2.3.1)

### B. The Institutions are indispensable parties because they would suffer prejudice if the action proceeded without them

Patent owners are indispensable parties if prejudice would likely arise from their exclusion. *See Suprex Corp. v. Lee Scientific, Inc.*, 660 F. Supp. 89 (W.D. Pa. 1987).[17] Relying heavily on *Erbamont*, Plaintiffs argue that no prejudice would arise because the Institutions are contractually required to cooperate in the action.  But here, unlike *Erbamont*, the licensee is the ***defendant***, a situation not identified in the cooperation agreement between ARIAD and the Institutions.  (Sharp Ex. F at § 7.6).  Moreover, unlike the present case, the non-joined parties in *Erbamont* pledged that they would be bound by the litigation and would not sue the defendants in a separate action, which the

---

[17] Plaintiffs assert that *Suprex* has been "implicitly" overruled by virtue of unspecified inconsistencies with unidentified appellate cases. (D.I. 21 at 30 n.66.) ARIAD maintains that *Suprex* applies current law to a situation factually in line with the present one. The so-called "key" distinction Plaintiffs identify is not meaningful. In *Suprex*, as here, the patent in suit was under reexamination by the Patent Office. The Patent Office in *Suprex* had rejected certain claims in reexamination, and the Court noted that this rejection might moot the plaintiffs' claim, such that dismissal for non-joinder would not deprive the plaintiffs of a remedy. *Id.* at 94. (A reexamination certificate amending the claims issued after the *Suprex* court's decision on the motion to dismiss. *See* U.S. Patent No. 4,479,380). More importantly, however, the court found that because "plaintiff may resort to a forum having personal jurisdiction over both defendants," dismissal would not deprive the plaintiffs of a claim. *Id.* Here, Plaintiffs could do the same if they had reasonable apprehension of suit (which they do not).

court considered as "evidence that goes to minimize any prejudice from a judgment in this action." *Id.* at 395. In short, the Institutions face considerable prejudice from their omission as parties to litigation that, Plaintiffs argue, will nonetheless bind them.

### C.    It is improper to assert personal jurisdiction over MIT and Harvard

Because the patent owners are necessary and indispensable parties to this action, the case may not go forward unless Plaintiffs prove that personal jurisdiction over each of them is proper. *See eSpeed, Inc. v. BrokerTec USA, L.L.C.*, No. 03-612-KAJ, 2004 WL 2346137 at *1 (D. Del. Sept. 13, 2004) ("[plaintiffs have the burden of proving that it is proper for [the court] to exercise personal jurisdiction over [defendants] in this District."). Plaintiffs cannot meet this burden with respect to Harvard and MIT, because the exercise of personal jurisdiction over Harvard and MIT would not satisfy due process.[18] *Breckenridge Pharmaceutical, Inc. v. Metabolite Laboratories, Inc.*, 444 F.3d 1356, 1362 (Fed. Cir. 2006) (setting out due process requirement).

Specific personal jurisdiction is appropriate only if "the claim arises out of or relates to" actions that "the defendant purposefully directed . . . at residents of the forum." *Breckenridge*, 444 F.3d at 1363.[19] Plaintiffs argue that this test may be satisfied merely by virtue of the license between the Institutions and ARIAD. Plaintiffs' cited case law, however, concerns multiple-contacts situations, in which the licensors were contractually bound to (and did) participate in the activities that Plaintiffs allege created their apprehension of suit. *Breckenridge*, 444 F.3d at 1366 (licensor's sending of cease and

---

[18] Federal Circuit law applies to the personal jurisdiction analysis in patent cases. *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1564-5 (Fed. Cir. 1994). Amgen's regional circuit and non-patent cases are therefore inapposite.

[19] Amgen has not asserted general personal jurisdiction against Harvard or MIT, which requires substantial, continuous and systematic contacts with the district. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984).

desist letters did not alone justify personal jurisdiction, but justified personal jurisdiction in conjunction with contractual requirement that licensor "discuss in good faith the appropriate action, if any, with respect to third party infringers" and parties' coordination in sending cease and desist letters to forum state); *see also Akro Corp. v. Luker*, 45 F.3d 1541, 1542, 1549 (Fed. Cir.1995) (claim was "related to" agreement with forum corporation when licensor initiated cease-and-desist correspondence pursuant to license agreement); *Cognex Corp. v. Lemelson Medical, Education & Research Found.*, 67 F. Supp. 2d 5, 9 (D. Mass. 1999) ("Crucial to the relatedness analysis was the fact that the license agreement required [the patent owner] to send the infringement notices that ultimately became the basis for the plaintiff's declaratory judgment action."). That is not true here. Plaintiffs accuse neither Harvard nor MIT of participating in ay "threats" on which they base this suit. Thus, this case does not "arise out of or relate to" activities by Harvard or MIT in Delaware, and the specific personal jurisdiction is inappropriate.

## V.    <u>CONCLUSION</u>

This case is not a close call. Amgen has no reasonable apprehension of suit, has failed to state a claim for which relief can be granted, and has failed to join necessary and indispensable parties. Accordingly, ARIAD respectfully requests that the Court grant this Motion.

ASHBY & GEDDES

/s/ *John G. Day*

_____
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE  19899
Telephone:  (302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Counsel for Defendant*
*ARIAD Pharmaceuticals, Inc.*

*Of Counsel:*

Morgan Chu
David I. Gindler
Elizabeth Rosenblatt
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Telephone:  (310) 277-1010

Dated: July 13, 2006
171234.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of July, 2006, the attached **DEFENDANT ARIAD PHARMACEUTICALS, INC.'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION, FAILURE TO STATE A CLAIM FOR WHICH RELIEF MAY BE GRANTED, AND FAILURE TO JOIN NECESSARY AND INDISPENSABLE PARTIES** was served upon the below-named counsel of record at the address and in the manner indicated:

Melanie K. Sharp, Esquire                         HAND DELIVERY
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

Marcus E. Sernel, Esquire                         VIA FEDERAL EXPRESS
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601-6636

J. Drew Diamond, Esquire                          VIA FEDERAL EXPRESS
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA  90017-5800


/s/ John G. Day
_____
John G. Day