# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION ) ) ) ) ) ) Plaintiff, ) ) vs. ) ) ARIAD PHARMACEUTICALS, INC. ) ) Defendant. ) ) | C.A. No. 06-259-KAJ |

## DEFENDANT ARIAD PHARMACEUTICALS, INC.'S OPENING MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR CERTIFICATION PURSUANT TO 28 U.S.C. § 1292(b)

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone: (302) 654-1888
Facsimile: (302) 654-2067

*Counsel For Defendant*
*ARIAD Pharmaceuticals, Inc.*

Of Counsel:

IRELL & MANELLA LLP
Morgan Chu
David I. Gindler
Elizabeth Rosenblatt
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Telephone: (310) 277-1010
Facsimile: (310) 203-7199

Dated: September 25, 2006

TABLE OF CONTENTS

Page

I.     NATURE AND STAGE OF PROCEEDINGS ....................................................1

II.    SUMMARY OF ARGUMENT ........................................................................2

III.   STATEMENT OF FACTS ............................................................................4

       A.     Documentary evidence obtained by Amgen prior to 2006 ......................5

       B.     Witness statement from Amgen ...................................................6

       C.     Witness statement from Lilly's in-house counsel ....................................8

       D.     Facts disclosed at the Lilly trial .................................................9

       E.     ARIAD's Reply....................................................................10

       F.     This Court's Ruling...............................................................11

IV.    ARGUMENT.............................................................................13

       A.     28 U.S.C. § 1292(b) Presents a Flexible Standard for
              Certification Intended to Expedite Appellate Review of
              Questions That May, as Here, Materially Advance the Ultimate
              Termination of the Litigation. ................................................13

       B.     There Is A Substantial Ground For Difference Of Opinion On
              The Controlling Legal Question Of Whether A Case Or
              Controversy Exists For Purposes Of The Declaratory Judgment
              Act. ..............................................................................15

       C.     The Court Should Exercise its Discretion to Grant Certification. ..........25

V.     CONCLUSION..............................................................................29

<u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>**Cases**</u>

*Aetna Life Ins. Co. v. Haworth,*
   300 U.S. 227 (1937)..................................................................... 15, 16

*Alamo Refining Co. v. Shell Dev. Co.,*
   99 F. Supp. 790 (D. Del. 1951)..................................................... 17, 19

*APCC Svcs., Inc. v. AT&T Corp.,*
   297 F. Supp. 2d 101 (D.D.C. 2003) ....................................... 13, 14, 15, 25

*Arrowhead Industrial Water, Inc. v. Ecolochem,*
   846 F.2d 731 (Fed. Cir. 1988)....................................................... 15, 21

*Bank of New York v. Bank of America,*
   861 F. Supp. 225 (S.D.N.Y. 1994) ....................................................... 13

*Capo, Inc. v. Dioptics Medical Prods., Inc.,*
   387 F.3d 1352 (Fed Cir. 2004)................................................. 20, 21, 22

*Cf. Intel Corp. v. Commonwealth Scientific & Indus. Research Org.,*
   455 F.3d 1364 (Fed. Cir. 2006)........................................................... 13

*Charles Machine Works, Inc. v. Digital Control Inc.,*
   264 F. Supp. 2d 980 (W.D. Okla. 2003) ............................................... 21

*Citizen Electronics Co., Ltd. v. Osram GmbH,*
   377 F. Supp. 2d 149 (D.D.C. 2005) ................................................ 17, 27

*Cygnus Therapeutics v. Alza Corp.,*
   92 F.3d 1153 (Fed. Cir. 1996)............................................................. 23

*Dababnah v. West Virginia Bd. of Medicine,*
   57 F. Supp. 2d 355 (S.D. W.Va. 1999)................................................. 13

*Dayton Independent School Dist. v. U.S. Mineral Prods. Co.,*
   906 F.2d 1059 (5th Cir. 1990) ............................................................ 13

*EMC Corp. v. Norand Corp.,*
   89 F.3d 807 (Fed. Cir. 1996).............................................................. 19

*Klinghoffer v. S.N.C. Achille Lauro,*
   921 F.2d 21 (2d Cir. 1990).................................................................. 14

Page(s)

*Krangel v. Crown,*
    791 F. Supp. 1436 (S.D. Cal. 1992) ..................................................... 14

*Kustom Signals, Inc. v. Applied Concepts, Inc.,*
    1996 WL 568817 (D. Kan. Sept. 6, 1996) ....................................... 8, 24

*Manville Sales Corp. v. Paramount Sys., Inc.,*
    917 F.2d 544  (Fed. Cir. 1990) ............................................................. 15

*Md. Casualty Co. v. Pac. Coal & Oil Co.,*
    312 U.S. 270 (1941) ............................................................................. 16

*Microchip Technology, Inc. v. Chamberlain Group, Inc.,*
    441 F.3d 936 (Fed. Cir. 2006) ....................................................... 15, 16

*Nobelpharma AB v. Implant Innovations, Inc.,*
    141 F.3d 1059 (Fed. Cir. 1998) ........................................................... 23

*Nuclear Engineering Co. v. Scott,*
    660 F.2d 241 (7th Cir. 1981) ......................................................... 13, 14

*Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha,*
    57 F.3d 1051 (Fed. Cir. 1995) ........................................ 19, 20, 22, 27

*Ryan v. Dow Chemical Co.,*
    781 F. Supp. 934 (E.D.N.Y. 1992) ..................................................... 13

*Ryobia Am. Corp. v. Peters,*
    815 F. Supp. 172 (D.S.C. 1993) ......................................................... 24

*Shell Oil Co. v. Amoco Corp.,*
    970 F.2d 885 (Fed. Cir. 1992) ..................................................... 20, 23

*Shoom, Inc. v. Electronic Imaging Systems of America, Inc.,*
    2006 WL 1529983 (N.D. Cal., June 1, 2006) .................................... 23

*Sierra Applied Sciences, Inc. v. Advanced Energy Indus., Inc.,*
    363 F.3d 1361 (Fed. Cir. 2004) ........................................................... 16

*Solid State Equipment Corp. v. Verteq, Inc.,*
    2003 WL 21654705 (E.D. Pa., Jan. 6, 2003) ..................................... 23

*Swint v. Chambers County Comm'n,*
    514 U.S. 35 (1995) ............................................................................... 25

*Telectronics Pacing Systems, Inc. v. Ventritex, Inc.,*
    982 F.2d 1520 (Fed. Cir. 1992) ........................................................... 20

Page(s)

*Teva Pharms. USA, Inc. v. Pfizer, Inc.*,
    395 F.3d 1324 (Fed. Cir. 2005)...................................................... 15, 16

*United States v. Lahey Clinic Hospital, Inc.*,
    399 F.3d 1 (1st Cir. 2005) ............................................................... 13

*Vanguard Research v. Peat, Inc.*,
    304 F.3d 1249 (Fed Cir. 2002).......................................................... 21

**Statutes**

28 U.S.C. § 1292(b) ............................................................... 2, 13, 15

35 U.S.C. § 154(a)(1)....................................................................... 19

35 U.S.C. § 200.......................................................................... 5, 17

35 U.S.C. § 203(a).......................................................................... 18

37 C.F.R. § 401.14(i) ...................................................................... 18

37 C.F.R. § 401.14(k)(1)................................................................... 18

37 C.F.R. § 401.14(k)(4)................................................................... 18

Fed. R. Civ. P. 52(a) ...................................................................... 15

**Other Authorities**

AUTM, *Technology Transfer Works: 100 Cases from Research to Realization*
    (2006) ................................................................................ 17

Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice
    and Procedure* § 3929 (2d ed. 1996) .................................................. 13

Federal Trade Comm'n, *To Promote Innovation: The Proper Balance of
    Competition and Patent Law and Policy*, Ch. 3, at 22 (Oct. 2003) ...................... 27

Harry Jackson, Jr., "How Medical Testing Happens," *The Tribune* (Port St.
    Lucie/Fort Pierce, FL) (March 4, 2005)................................................ 26

*Innovation's Golden Goose*, The Economist, Dec. 14, 2002............................... 17

James W. Moore, *Moore's Federal Practice* § 203.31 (3d ed. 2006)....................... 14

The United States Constitution, Art. III, Section 2..................................... 15

Page(s)

William Bains, "Failure Rates in Drug Discovery and Development," *Drug
Discovery World Fall 2004* .................................................................................. 26

I.    **NATURE AND STAGE OF PROCEEDINGS**

On April 20, 2006, Amgen Inc. and certain related entities (collectively, "Amgen") filed a complaint seeking a declaration that each claim of U.S. Patent No. 6,410,516 (the "'516 patent") is invalid and that any activities relating to Enbrel or Kineret do not directly or indirectly infringe any valid claim of the '516 patent. ARIAD Pharmaceuticals, Inc. ("ARIAD"), the exclusive licensee of the '516 patent, is named as the sole defendant. ARIAD is a small, but promising, biotechnology company which is seeking FDA approval for a revolutionary, life-saving drug for certain aggressive, late-stage cancers that currently have no meaningful treatment options. Its dedicated team is working feverishly to initiate phase 3 clinical trials in late 2006 and early 2007 to bring this first product, AP23573, to market for soft-tissue and bone sarcomas—diseases that have lacked any new treatment options for the last twenty-five years. ARIAD has limited funding, minimal licensing revenue, few sources of additional capital, and no currently marketed products. Amgen, by contrast, is the second largest biotechnology company in the world, with reported 2006 revenues of $6.82 billion. (Ex.N [Amgen Form 10-Q] at 2.)[1]

On June 14, 2006, ARIAD filed a Motion To Dismiss this action for lack of subject matter jurisdiction, demonstrating that its pre-suit communications with Amgen were centered around partnering discussions related to its signal transduction and oncology product development programs, as well as efforts to interest Amgen (and many other pharmaceutical companies) in taking a sublicense to the '516 patent and other earlier-issued members of the same patent family. ARIAD was required to engage in

---

[1] All exhibits are attached to the accompanying Declaration of Elizabeth Rosenblatt, Esq., dated September 25, 2006. For the convenience of the Court, ARIAD is providing with this motion evidentiary material previously submitted by the parties in connection with the Motion to Dismiss. (Rosenblatt Decl. , Exs A-H and J). Materials originally cited in ARIAD's opening papers in its Motion to Dismiss can also be found in the Court's record at D.I 15. Materials originally cited in Amgen's Opposition can be found at D.I. 22-24. Materials originally cited in ARIAD's reply can be found at D.I. 32-33.

these sublicensing efforts under its license agreement with the patentees, Massachusetts Institute of Technology ("MIT"), the Whitehead Institute for Biomedical Research ("Whitehead"), and Harvard University ("Harvard"), who in turn were obligated to pursue commercialization of the '516 patent under the Bayh-Dole Act, because the research leading to the '516 patent was funded in part by the federal government. At the time that Amgen filed this action, ARIAD has not broken off its licensing discussions with Amgen, and its offer of a license was still on the table.

The Court conducted a hearing on ARIAD's Motion to Dismiss on September 11, 2006. At the conclusion of the hearing, the Court denied ARIAD's motion in a ruling from the bench. The Court subsequently entered a brief Order dated September 13, 2006 ("September 13 Order"), formalizing its ruling. ARIAD timely filed its answer to the complaint on September 25, 2006.

## II.    SUMMARY OF ARGUMENT

1.    ARIAD respectfully requests that this Court certify its September 13 Order for immediate appeal pursuant to 28 U.S.C. § 1292(b). Section 1292(b) allows for immediate appeal of an interlocutory order, such as the September 13 Order denying ARIAD's Motion to Dismiss, when the order "involves a controlling question of law as to which there is substantial ground for difference of opinion" and where "an immediate appeal from the order may materially advance the ultimate termination of the litigation."

2.    This case clearly meets this standard. The controlling question of law is whether ARIAD's creation and implementation of a program to persuade a large number of pharmaceutical companies to license the '516 patent—an obligation imposed on ARIAD by the university patentees in light of their concurrent obligations under the Bayh-Dole Act to broadly commercialize their federally-funded technology—can be found to create a reasonable apprehension of suit in one of many companies to which ARIAD offered a license in performance of ARIAD's obligations under its license agreement with the universities.

3.     There is no Federal Circuit authority addressing the interaction between the commercialization requirements of the Bayh-Dole Act and the test for a justiciable controversy under the Declaratory Judgment Act.  Indeed, more generally, there is an unresolved tension in Federal Circuit authority—outside the context of the Bayh-Dole Act—between conduct that has been held not to create a reasonable apprehension of suit in the context of licensing overtures, and conduct that has been held to create a reasonable apprehension of suit outside the context of licensing discussions.

4.     Given the absence of authority on the interaction between the Bayh-Dole Act and the Declaratory Judgment Act, and the more general tension in the Federal Circuit authority as to the nature and extent of licensing overtures that do, or do not, trigger a case or controversy, there is substantial ground for difference of opinion as to whether Amgen has met its burden to demonstrate that it had a reasonable apprehension of imminent suit—even construing all of the facts in the manner most favorable to Amgen.  As discussed below, ARIAD respectfully submits that the most applicable Federal Circuit authority is that here can be no case or controversy where the patent holder (or its exclusive licensee) initiates licensing discussions and does nothing to break off those discussions or withdraw the offer of a license—the exact situation here.  This jurisdictional question of law is controlling and may materially advance the ultimate termination of this suit.

5.     The facts relating to subject matter jurisdiction in this case are severable from and unrelated to the merits of the dispute, so that an immediate appeal will not result in duplication of effort for the Court of Appeals or for this Court.  If the Court's jurisdictional ruling is ultimately reversed several years and many millions of dollars down the line—an unduly harsh burden for a small biotechnology company with no product revenues and limited resources—the result will have been an enormous waste of the Court's and the parties' resources and another setback for sarcoma patients.

- 3 -

6.      The special circumstances in this case warrant certification.  As discussed above, ARIAD is a small and innovative biotechnology company that is entering the final stages of FDA review of a potentially life-saving therapy for late-stage cancers. ARIAD's world-renowned scientists have devoted more than a decade toward this research, which has the potential to save many thousands of lives every year.  So promising is ARIAD's new cancer treatment that it has passed two phases of federal review, and the FDA has "fast-tracked" the final review process in order to bring the drug to market as quickly as possible.

7.      The burden and costs of this lawsuit, however, threaten ARIAD's ability to devote the necessary resources and funds to the final stages of FDA approval for this highly promising cancer therapy.  Thus, the absence of immediate appellate review does not simply portend a serious, unanticipated drain on ARIAD's resources; it presents the very real possibility that many sarcoma patients who could benefit from ARIAD's cancer therapy will not survive.  The stakes here are enormous—and an immediate appeal will harm no one.  For these reasons, and as stated in more detail below, this Court should exercise its discretion to amend its September 13 Order and certify the controlling legal question of subject matter jurisdiction for immediate appellate review by the Federal Circuit.

## III.    STATEMENT OF FACTS

ARIAD entered into a license agreement with MIT and Whitehead dated August 19, 1991, pursuant to which MIT and Whitehead granted ARIAD an exclusive license to certain defined Patent Rights, which included the family of applications that later matured into the '516 patent, among others.  (Ex. O.)  The license agreement was amended a few months later, effective November 20, 1991, to add Harvard as a licensor of the Patent Rights, given the contribution of Harvard investigators to the inventions covered by the Patent Rights.  (Ex. P.)  The '516 patent—part of the Patent Rights

licensed under the agreement—was the result of research funded in part by the National Cancer Institute, a federal agency. ('516 patent, col.1 ll.19-22.)

Section 3.1 of the original license agreement requires that "LICENSEE shall use its best efforts to bring one or more Licensed Products [i.e., products falling within the claims of the Patent Rights]…to market through a thorough, vigorous, and diligent program for exploitation." (Ex. O at 6.) ARIAD's contractual obligation mirrored the universities' Bayh-Dole obligations to widely commercialize their federally-funded research. *See* 35 U.S.C. § 200. Section 3.1 was modified in an amendment effective January 2, 2002, which added the following second sentence: "Commercially reasonable efforts by LICENSEE to grant sublicenses to companies that LICENSEE reasonably believes are engaged or will engage in such activities shall be sufficient to satisfy LICENSEE'S obligations hereunder." (Ex. Q at 2.)

In its Motion to Dismiss, filed June 14, 2006, ARIAD submitted evidence and argument showing that it had attempted to initiate a commercial licensing negotiation with Amgen (among many other companies), but had taken no other action that could be found to create in Amgen a reasonable apprehension of an imminent suit for infringement of the '516 patent. In particular, ARIAD never broke off licensing discussions with Amgen nor withdrew its offer of a license. Accordingly, ARIAD argued that there was no basis for jurisdiction under the Declaratory Judgment Act. In its Opposition, filed June 28, 2006, Amgen pointed to the following evidence as providing support for the Court's exercise of jurisdiction:

**A.    Documentary evidence obtained by Amgen prior to 2006**

Amgen pointed to documents concerning negotiations between ARIAD and Amgen in the time period from 2000 to 2002, consisting of a May 11, 2000 slide presentation to Amgen proposing a research collaboration in three subject areas, one of which was NF-κB; mass mailings to numerous pharmaceutical companies on May 15, 2000, and again on February 8, 2001, in which ARIAD offered research licenses with

- 5 -

regard to a patent family that did not yet include the '516 patent; and a mass mailing on June 25, 2002, in which ARIAD offered a research license (and possible commercial license) to the just-issued '516 patent. (D.I. 21, Opp. at 8-10.)

The February 8, 2001 form letter stated ARIAD's belief that Amgen's R&D program, as reflected in Amgen's publications, likely utilized methodologies claimed in ARIAD's then-issued patents—which did not include the '516 patent—and was directed to the development of products likely to be covered by claims in ARIAD's patents and thus would require a license from ARIAD. (Ex. A.) Amgen responded with a letter on March 7, 2001, saying "We are looking into this matter and will be in contact with you regarding Amgen's interest, if any, in this technology as soon as our evaluation is complete." (Ex. B.)

There was no further communication between ARIAD and Amgen on the matter until the June 25, 2002 form letter, which did not make reference to any existing Amgen products, instead offering a non-exclusive research license (and possible commercial license) to the '516 patent and proposing to negotiate further "in the event you develop or have a product covered by the claims of our '516 patent (or foreign equivalents)." (Ex. C at 2.) The letter did not threaten litigation, demand cessation of Amgen's sales of any drugs, or even refer to ARIAD's licensing offer as final. Rather, the letter invited further negotiations and closed by saying: "We look forward to working with you and enabling your research." (*Id.*)

### B.     Witness statement from Amgen

Amgen submitted only one declaration from an employee—Frank Ungemach, an in-house lawyer. According to his declaration, Mr. Ungemach learned at some point that ARIAD had sued Eli Lilly & Company ("Lilly") for infringement of the '516 patent. (Ex. D [Ungemach Decl.] ¶ 12.) In 2002 or 2003, Mr. Ungemach received a phone call from Fritz Casselman, then a Senior Vice President at ARIAD. (*Id.* ¶ 13.) According to Mr. Ungemach, during that conversation, Mr. Casselman "began by asking if Amgen had

decided whether it was going to take a license to Ariad's NF-kB patents." (*Id.*).
Mr. Ungemach responded that Amgen "was still in the process of evaluating its interest
in Ariad's patents and had not yet made a decision." Mr. Casselman then told him "that
many companies had been sent letters regarding licensing Ariad's patents and he thought
Amgen should be interested in taking a license for its KINERET product." (*Id.* ¶ 14.)
Mr. Ungemach "pressed Mr. Casselman for a definitive statement as to whether Ariad
believed that Amgen's product infringed the '516 patent." In response, Mr. Casselman
did not assert that ARIAD had reached any conclusions on the matter but rather simply
"reiterated that he thought Amgen should be interested in taking a license for
KINERET." (*Id.* ¶ 15.) Mr. Ungemach also attached to his declaration various
documents relating to negotiations between ARIAD and Immunex, a company acquired
by Amgen in July 2002. None of these documents includes any threat of litigation or
notice that ARIAD was no longer willing to grant a license to Immunex.

Mr. Ungemach's declaration demonstrates that, by 2003 at the latest, Amgen
knew that ARIAD had sent licensing proposals to numerous companies, including
Amgen, and that ARIAD had hired litigation counsel to initiate an infringement suit
against Lilly, which was filed in 2002. Mr. Ungemach, however, does not claim that he
or anyone else at Amgen had any apprehension of suit based on these licensing
negotiations, much less a reasonable apprehension of imminent suit in 2003 or at any
time thereafter. Nor does he state that ARIAD ever broke off licensing negotiations or
withdrew its offer of a license. Rather, ARIAD left the lines of communication open so
that Amgen would have an opportunity to evaluate its interest in a license. (*Id.* ¶ 16.)[2]

---

[2] In opposing ARIAD's motion, Amgen referred to ARIAD's proposed licensing terms
for its earlier patents as "onerous" in an effort to characterize ARIAD's otherwise benign
licensing overtures as a "threat." (D.I. 21, Opp. at 9, 7.) In fact, as Amgen acknowledges,
ARIAD had not even made a proposal to Amgen regarding the royalty rate for a marketed
product under the '516 patent. (*Id.* at 9 n.30.) Moreover, Amgen submitted no evidence
whatsoever to support the notion that the rates Amgen describes as "onerous" fall outside the
bounds of industry standards for an invention of the type claimed in the '516 patent.
Significantly, Amgen's only witness, Mr. Ungemach, does not describe ARIAD's licensing terms

### C.    Witness statement from Lilly's in-house counsel

Amgen also relied on a declaration from Paul Cantrell, in-house litigation counsel for Lilly.   Mr. Cantrell states that "around the middle of 2004," while attending a deposition in the Lilly litigation, he asked attorney Patricia Carson of Kaye Scholer, ARIAD's counsel, why ARIAD had not chosen to pursue products from other companies. According to Mr. Cantrell, Ms. Carson responded "something to the effect of 'Enbrel is on the list.'" (Ex. E [Cantrell Decl.] ¶ 4.) His declaration then states that he understood this comment "to mean that sometime either during or after the *Ariad v. Lilly* litigation, Ariad intended to sue Amgen for infringement of its '516 patent based on Amgen's activities related to the Enbrel® product." (*Id.* ¶ 5.)

According to the undisputed facts, approximately five months later,[3] Mr. Cantrell relayed to an Amgen in-house attorney, Monique Cordray, that Ms. Carson had made a statement to the effect that Enbrel is "on the list."   Mr. Cantrell's declaration does not state whether he also communicated his interpretation of this remark or what Ms. Cordray said in response or how she otherwise reacted.   Amgen chose not to provide any testimony from Ms. Cordray.   Accordingly, the record is silent as to what, if anything, Ms. Cordray heard or understood from Mr. Cantrell's call, or as to whether she even agrees that the call took place.   We do know, however, that Ms. Cordray did not take any steps to confirm with Ms. Carson whether she actually made this statement.   Nor did she

---

as onerous.  Rather, his declaration says that he stated to his counterpart at ARIAD that he needed time to review the '516 patent and that he would be in touch if Amgen was interested, thus leaving the negotiations open.  (Ex. D ¶ 16.)  *Cf. Kustom Signals, Inc. v. Applied Concepts, Inc.,* 1996 WL 568817, *6 (D. Kan. Sept 6, 1996) ("KSI insists that ACI's license proposal was unreasonable and that negotiations had broken down…[H]owever, KSI did not so inform ACI, and thus ACI could reasonably have believed that license negotiations were still ongoing.").

[3] Ms. Carson has testified that she "never made" the statement attributed to her by Mr. Cantrell and that the only deposition that she attended in the Lilly litigation in the time frame referred to by Mr. Cantrell took place on April 14, 2004, which is five months before Mr. Cantrell felt moved to relay the statement to Amgen.  (Ex. F [Carson Decl.] ¶¶ 5, 7.)  Amgen has not disputed the date of the relevant deposition.  For purposes of this motion, we assume that the conversation actually occurred, that it took place on April 14, 2004, and that Mr. Cantrell's declaration accurately describes the substance of the conversation.

- 8 -

or anyone else at Amgen discuss Ms. Carson's alleged statement, or ARIAD's intentions with respect to licensing of the '516 patent, directly with ARIAD.  (Ex. F [Carson Decl.] ¶ 7.)

D.    **Facts disclosed at the Lilly trial**

Amgen had its in-house counsel attend the Lilly trial in April 2006.  During trial, Amgen's in-house counsel observed Lilly's counsel elicit testimony during the cross-examination of Dr. Harvey Berger, ARIAD's founder, Chairman, and CEO, relating to a presentation that ARIAD's management had made to its Board of Directors four and a half years earlier in December 2001—over six months before the issuance of the '516 patent.  At trial, Lilly displayed certain slides from a portion of the presentation entitled "Licensing and Partnering."  One slide included Amgen and Immunex among a list of twenty-one "Lead Players" working on products relating to NF-κB in some way.  (Ex. G at 9.)  Another slide included Kineret and Enbrel among a list of eleven "Marketed and Late-Stage Products," and showed the actual or anticipated revenues from the listed products.  (*Id.* at 10.)

Dr. Berger testified that slides showing the lists of "Lead Players" and "Marketed and Late-Stage Products" had been intended to educate ARIAD's Board members, not all of whom had extensive experience in the pharmaceutical industry, as to the possibilities for licensing and partnering in the area of NF-κB by identifying companies whose publications indicated that they had done research in this area, as well as the types of known products that might be related to NF-κB.  (Ex. J [Berger Tr.] at 89-92.) Dr. Berger testified that ARIAD had not tested—and in fact lacked the technological capability to test—whether any of these products actually impacted NF-κB activity.  (*Id.* at 83.)  He also testified that ARIAD had not, either at the time of the 2001 presentation, or as of the time of his testimony in 2006, undertaken an analysis as to whether any of the mentioned products infringed the '516 patent.  (*Id.* at 90-91.)  Amgen submitted no evidence rebutting Dr. Berger's description of the Board meeting or his testimony that

- 9 -

ARIAD had never undertaken any analysis of whether activities relating to Enbrel or Kineret infringed the '516 patent.[4]

### E.    ARIAD's Reply

In its reply brief, ARIAD submitted a declaration from Ms. Carson thoroughly denying that she ever made the statement relating to Enbrel attributed to her by Mr. Cantrell or any other language that could be construed as threatening to sue Amgen. Specifically, Ms. Carson said: "I can unequivocally state that I have never suggested to Mr. Cantrell or anyone else, at any time, that ARIAD would sue Amgen, particularly on Enbrel®.... I could not and would not threaten to assert the '516 patent against Enbrel®." (Ex. F ¶ 6.)    Were this not enough, Ms. Carson's declaration goes on to state: "I received no telephone calls from Ms. Cordray [the Amgen in-house counsel to whom Mr. Cantrell purportedly spoke five months after the alleged conversation with Ms. Carson] or anyone else at Amgen regarding the statement that Mr. Cantrell attributes to me *(and which I never made).*" (*Id.* ¶ 7.)

ARIAD also submitted a declaration from its Chief Legal Officer, Ms. Laurie Allen, in which she detailed, with documentary evidence, extensive commercial negotiations in 2005 between ARIAD and Amgen relating to a possible collaboration on ARIAD's promising cancer therapy. (Ex. H [Allen Supp. Decl.] ¶¶ 5-12.)    Although no agreement was reached at that time, the parties left open the possibility of continuing these negotiations in 2007. (*Id.* ¶ 11).    During these negotiations, Amgen did not express any concerns relating to the '516 patent. (*Id.* ¶ 12.)    Nor did Amgen express any such concern to ARIAD during the Lilly litigation. (*Id.* ¶ 13.)    Ms. Allen's testimony was

---

[4] Dr. Berger was not asked during Lilly's cross-examination about every slide in the presentation on "Licensing and Partnering."    In particular, he was not asked about slide 41, which contains bullet points stating "Select litigation counsel" and "Complete enforcement analysis and action plan." (*See* Ex. G [Board presentation] at 12; Ex. J [Berger testimony] at 84-97.)    There is no evidence that this slide was displayed at trial or that Amgen obtained it at any time before filing this action.    Amgen also sought to rely on some additional events that took place after the filing of this action, but the Court correctly ruled that it would be improper to do so. (Ex. I [Transcript of 9/11/06 hearing] at 81.)

unrebutted. That ARIAD and Amgen, following Ms. Carson's alleged statement, were engaged in negotiations relating to establishing a long-term commercial relationship and that Amgen did not raise any concerns regarding the '516 patent in this context, further undermines the existence of any actual controversy between the parties or the existence of any reasonable apprehension on the part of Amgen that it was at risk of an imminent infringement suit.

### F.    This Court's Ruling

The motion was heard on September 11, 2006. Ruling from the bench, the Court denied ARIAD's motion.

In discussing its reasons, the Court found that the form letters ARIAD had sent to Amgen did not, in and of themselves, create a reasonable apprehension of suit, as "no patentee acquires patent rights with the intent that they be ignored," and that ARIAD was "certainly within its rights to contact potential licensees and let them know about their rights and suggest that potential licensees take a look at those patents." The Court stated, nonetheless, that it was relying on the fact that ARIAD brought its patent rights to Amgen's attention on several occasions, and on at least one occasion expressed the view that Amgen was acting within the scope of ARIAD's patent rights (but not with respect to the '516 patent), as circumstances to be considered in determining the existence of reasonable apprehension. (Ex. I at 75-76.)

The Court stated that ARIAD's form letter announcing the issuance of the '516 patent to Amgen (along with many other companies) and the filing of an infringement action against Lilly on the day the '516 patent issued were also factors relevant to the reasonable apprehension analysis. (*Id.* at 76.) The Court further stated that during the telephone call between Mr. Casselman and Mr. Ungemach that followed ARIAD's form letter regarding the '516 patent, Mr. Casselman had been careful not to make any statements that would provide a basis for a declaratory judgment action but that his

- 11 -

statements, coupled with ARIAD's letters, represent an effort by ARIAD "to make sure Amgen knows ARIAD is serious about its patent rights." (*Id.* at 76-77.)

The Court explained that, while there was a dispute in the record as to what Ms. Carson said to Mr. Cantrell and what was meant by it, the two declarations were not in conflict because Ms. Carson did not directly dispute that she made the comment attributed to her but only the intent with which she made it.[5] Based on this construction of the record, the Court apparently discounted Ms. Carson's credibility and concluded that it was "more likely than not" that Ms. Carson had made the oblique comment attributed to her. (*Id.* at 78.) Nevertheless, the Court indicated that if the record had ended after this statement, the Court was "certain" that it would have found no reasonable apprehension of suit. (*Id.*)

Without discussing the further negotiations between ARIAD and Amgen described by Ms. Allen's supplemental declaration (filed with ARIAD's reply), or the fact that ARIAD had never broken off licensing negotiations with Amgen or otherwise indicated that a license was no longer on the table, the Court next addressed the 2001 Board presentation, portions of which were disclosed by Lilly—not by ARIAD—during the cross-examination of Dr. Berger at the Lilly trial in April 2006.

The Court concluded that these materials were "highly significant." (*Id.* at 79.) The Court placed special emphasis on the slides listing "Lead Players," and "Marketed and Late-Stage Products," as well as a slide referring to the possible retention of litigation counsel in the first quarter of 2002 (even though there is no evidence in the record that this last slide was used during Dr. Berger's cross-examination or that Amgen ever saw this slide before initiating this action). (*Id.* at 79-80.)

---

[5] The Court here referenced the representation of Amgen's counsel at argument that Ms. Carson never directly disputed whether she had made the statement. (*Id.* at 77-78.) In fact, as quoted above, Ms. Carson's declaration states that "I never made" the statement that Mr. Cantrell attributes to her. (Ex. F ¶ 7.) For purposes of this motion, however, we assume that Ms. Carson's declaration does not include this statement.

The Court concluded that there was enough evidence before it "for a reasonably objective company in Amgen's position to say they're going to sue us." (*Id.* at 80-81.) The Court elaborated that the "overall tone" of the interactions between Amgen and ARIAD showed that ARIAD "feels it has rights and feels that it has the intention of enforcing those rights," and that a reasonably objective observer would perceive this tone to be "threatening enforcement action." (*Id.* at 81-82.)

## IV.   ARGUMENT

### A.   28 U.S.C. § 1292(b) Presents a Flexible Standard for Certification Intended to Expedite Appellate Review of Questions That May, as Here, Materially Advance the Ultimate Termination of the Litigation.

A district court may certify an order for interlocutory appeal if the order "[1] involves a controlling question of law [2] as to which there is substantial ground for difference of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Section 1292(b) is recognized as "the most explicitly flexible provision for interlocutory appeals." Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3929 (2d ed. 1996).

Orders deciding issues of subject matter jurisdiction are frequently certified and accepted for appeal. *See, e.g., United States v. Lahey Clinic Hospital, Inc.*, 399 F.3d 1, 14 (1st Cir. 2005) (addressing federal jurisdiction issue relating to the Medicare Act); *Dayton Independent School Dist. v. U.S. Mineral Prods. Co.*, 906 F.2d 1059, 1062 (5th Cir. 1990) (addressing jurisdiction under CERCLA); *Nuclear Engineering Co. v. Scott*, 660 F.2d 241, 249-50 (7th Cir. 1981) (addressing jurisdiction under Resource Conservation & Recovery Act).[6] *Cf. Intel Corp. v. Commonwealth Scientific & Indus.*

---

[6] *See also APCC Svcs., Inc. v. AT&T Corp.*, 297 F. Supp. 2d 101, 105-09 (D.D.C. 2003) (jurisdictional standing issue under Telecommunications Act); *Dababnah v. West Virginia Bd. of Medicine*, 57 F. Supp. 2d 355, 356-57 (S.D. W.Va. 1999) (whether case fell under exception to *Rooker-Feldman* doctrine); *Bank of New York v. Bank of America*, 861 F. Supp. 225, 232-33 (S.D.N.Y. 1994) (whether international banking jurisdiction covered simple contract case); *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 953 (E.D.N.Y. 1992) (whether Agent Orange liability

*Research Org.*, 455 F.3d 1364, 1366 (Fed. Cir. 2006) (no immunity under Foreign Sovereign Immunities Act). The frequent use of certification orders relating to jurisdictional issues makes logical sense because such rulings are potentially case-dispositive, and appeals relating to jurisdiction often involve legal issues that can be decided "quickly and cleanly." James W. Moore, *Moore's Federal Practice* § 203.31 (3d ed. 2006).

Put another way, orders addressing subject matter jurisdiction will nearly always satisfy the first and third prongs of the test for certification—whether the order "involves a controlling question of law" and whether "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). First, jurisdictional questions, by their very nature, are usually controlling questions of law. *See* Moore, § 203.31 ("[I]f resolution of the question being challenged on appeal will terminate the action in the district court, it is clearly controlling."); *see also Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir. 1990) ("Although the resolution of an issue need not necessarily terminate an action in order to be 'controlling'… it is clear that a question of law is 'controlling' if reversal of the district court's order would terminate the action.") (citations omitted); *APCC Svcs.*, 297 F. Supp. 2d at 105 (same). Second, it naturally follows as a matter of course that "[b]eing jurisdictional questions, their resolution on appeal perforce promises to materially advance the ultimate resolution of [the] litigation and avoid unnecessary expense." *Nuclear Engineering Co.*, 660 F.2d at 247; *see also APCC Svcs.*, 297 F. Supp. 2d at 109 ("An immediate appeal would conserve judicial resources and spare the parties from possibly needless expense if it should turn out that this Court's rulings are reversed.").

The ultimate determination of whether an actual controversy exists under the Declaratory Judgment Act in a patent case is a question of law that the Federal Circuit

---

litigation could be removed under federal officer removal act); *Krangel v. Crown*, 791 F. Supp. 1436, 1448-49 (S.D. Cal. 1992) (same).

reviews *de novo*. *Microchip Technology, Inc. v. Chamberlain Group, Inc.*, 441 F.3d 936, 940 (Fed. Cir. 2006); *see also Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1332 (Fed. Cir. 2005); *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 554 (Fed. Cir. 1990). Further, where the underlying facts are not in dispute, the constituent question of whether the declaratory judgment plaintiff had a reasonable apprehension of imminent suit also becomes a question of law, and "the clearly erroneous standard set forth in Fed.R.Civ.P. 52(a) is not involved." *Arrowhead Industrial Water, Inc. v. Ecolochem*, 846 F.2d 731, 735 (Fed. Cir. 1988). Accordingly, this motion relies on the facts submitted by Amgen irrespective of whether they are disputed, and relies on the facts submitted by ARIAD only if they are undisputed. The matters addressed herein are thus necessarily issues of law.

The only other issue for certification under section 1292(b) is whether "there is substantial ground for difference of opinion" as to the controlling question of law. As set forth below, this case satisfies that criterion as well.[7]

**B.      There Is A Substantial Ground For Difference Of Opinion On The Controlling Legal Question Of Whether A Case Or Controversy Exists For Purposes Of The Declaratory Judgment Act.**

**1.      There must be an actual controversy "of sufficient immediacy and reality" to invoke the Declaratory Judgment Act.**

The United States Constitution limits the exercise of the federal judicial power to "cases" and "controversies." Const., Art. III, Section 2. In its limitation to "cases of actual controversy," the Declaratory Judgment Act refers to this constitutional provision and is operative only with respect to controversies which are such in the constitutional sense. *See Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937).

---

[7] In this case, because the proceedings involve a patent with more than 200 claims and two separate products, the proceedings "threaten to endure for several years." *APCC Svcs.*, 297 F. Supp. 2d at 107. Under such circumstances, and because of equitable factors unique to this case, it would be appropriate to certify this matter for immediate appellate review even if the Court were to conclude that only "a relatively low level of uncertainty" exists. *Id.*

In ruling on issues of subject matter jurisdiction, courts are required to distinguish disputes "of a hypothetical or abstract character" from those that are "definite and concrete." *Id.* (citations omitted). At a minimum, "the facts alleged, under all the circumstances, [must] show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Casualty Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

The Federal Circuit has held that, to satisfy this requirement in patent litigation, a plaintiff bringing a declaratory action must demonstrate "that it has a reasonable apprehension of *imminent* suit." *Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1333 (Fed. Cir. 2005) (emphasis in original).[8] Other courts have also recognized that the need for an actual controversy giving rise to a reasonable apprehension of imminent suit is always required in declaratory judgment actions:

---

[8] In addition to establishing a reasonable apprehension of suit, a declaratory plaintiff also has the burden of demonstrating "present activity by the declaratory plaintiff that could constitute infringement, or concrete steps taken by the plaintiff with the intent to conduct such activity." *Microchip Technology*, 441 F.3d at 942; *see also Sierra Applied Sciences, Inc. v. Advanced Energy Indus., Inc.*, 363 F.3d 1361, 1375 (Fed. Cir. 2004) (noting this prong looks to plaintiff's conduct to "ensure[] that the controversy is sufficiently real and substantial") (citation and internal quotation marks omitted). In ruling on ARIAD's Motion to Dismiss, the Court stated that "there is no dispute between the parties that Amgen is engaged in acts taking concrete action which would qualify under the two-prong test for declaratory judgment act jurisdiction." (Ex. I at 25). In making this observation, the Court no doubt relied on Amgen's Opposition, which states that "ARIAD does not contest that Plaintiffs are presently engaged in making, using, and selling ENBREL and KINERET" and thus "to evaluate subject matter jurisdiction, this Court need only examine the first prong [reasonable apprehension]." (D.I. 21, Opp. at 13.)

Amgen's statement, upon which this Court presumably relied, did not accurately reflect the record or the proper burdens of proof. Although ARIAD argued in its Motion to Dismiss that Amgen could not show that it had a reasonable apprehension of imminent suit, ARIAD was silent on whether any of Amgen's activities related to Enbrel or Kineret "could constitute infringement, or concrete steps ... with the intent to conduct such activity." ARIAD said nothing about this prong of the two-part test because it had not conducted an infringement analysis and did not know whether any Amgen activities potentially infringed the '516 patent. Nor did Amgen, *the party with the burden of proof*, submit any evidence whatsoever to satisfy its burden on this prong, and merely acknowledged that it made, used, and sold Enbrel and Kineret. Accordingly, there is nothing in the record to satisfy the "infringement" prong of the test for subject matter jurisdiction. *Cf. Sierra Applied Sciences*, 363 F.3d at 1380 (finding plaintiff's activity prong not satisfied because design of plaintiff's device was not sufficiently fixed "to vest a dispute over the device with the requisite immediacy and reality").

- 16 -

> Moreover, plaintiff is incorrect as a matter of law in its attempt to read out the requirement of immediacy. Although it is true that OSRAM need not be "poised on the courthouse steps," a district court cannot render a declaratory judgment in the absence of an "actual controversy," which means that the parties must have "adverse legal interests, of sufficient *immediacy* and reality to warrant the issuance of a declaratory judgment.

*See Citizen Electronics Co., Ltd. v. Osram GmbH*, 377 F. Supp. 2d 149, 157 (D.D.C. 2005) (citations omitted, emphasis in original).

> ### 2.    Federal law encourages—and in some situations requires— patent holders and their exclusive licensees to actively pursue licensing activities.

The "case or controversy" requirement for declaratory judgment jurisdiction must be considered in light of another strong federal interest: Encouraging parties *not* to resort to litigation, but instead to effect the orderly transfers and permissions for intellectual property rights through voluntary commercial agreements rather than judicial action. *See, e.g., Alamo Refining Co. v. Shell Dev. Co.*, 99 F. Supp. 790, 795 (D. Del. 1951) ("[A] strong public policy should exist to permit the unrestricted offering of a patent license").

The federal policy interests in promoting licensing are perhaps best exemplified by the salutary regime established by the Bayh-Dole Act of 1980, 35 U.S.C. § 200, et seq., which allows universities and other non-profit research organizations to hold title to inventions arising out of federally funded research, so long as they seek to license their inventions for commercial development. The Bayh-Dole Act has been called "[p]ossibly the most inspired piece of legislation to be enacted in America over the past half-century," *Innovation's Golden Goose*, The Economist, Dec. 14, 2002, at 3, and has ushered in a proliferation of life-saving products and processes, including advanced treatments for heart attack, stroke, multiple sclerosis, hemophilia, cystic fibrosis, and various types of cancer, that originated from federally funded university research, *See* AUTM, *Technology Transfer Works: 100 Cases from Research to Realization* (2006), *available at* http://betterworldproject.net.

ARIAD, as the exclusive licensee of the '516 patent, is doing exactly what the Bayh-Dole Act intended—and effectively requires—in seeking to broadly sublicense the universities' federally funded patent rights to the pharmaceutical industry. (*See, e.g.,* Ex. J [Berger testimony] at 38.) The Bayh-Dole Act, and its implementing Commerce Department regulations, obligate institutions who take title to federally funded inventions to commercialize those inventions. The Bayh-Dole Act enforces this obligation by, among things, granting "the Federal agency under whose funding agreement the subject invention was made … the right … to require the contractor, an assignee or exclusive licensee of a subject invention to grant a nonexclusive, partially exclusive, or exclusive license in any field of use to a responsible applicant or applicants …, and if the contractor, assignee, or exclusive licensee refuses such request, to grant such a license itself, if the Federal agency determines that such (1) action is necessary because the contractor or assignee has not taken … effective steps to achieve practical application of the subject invention in such field of use...." 35 U.S.C. § 203(a). That the Act contemplates licensing of inventions to for-profit entities to ensure commercialization is also made clear by the many strictures it places on licensing activities, such as preventing institutions from assigning the invention without permission, and requiring institutions to favor both small businesses and United States industry when granting licenses. *See* 37 C.F.R. §§ 401.14(i), (k)(1), (k)(4).

3.   **There is tension in the Federal Circuit case law on whether vigorous efforts to broadly license a patent create an actual controversy that meets the requirements for declaratory judgment jurisdiction.**

The controlling question of law in this case—whether there is an actual controversy between the parties of "sufficient immediacy and reality" to give rise to declaratory judgment jurisdiction—implicates a tension in Federal Circuit case law relating to the situations in which the parties are or have been involved in patent licensing discussions. This tension arises from the most fundamental principle of patent law: A

- 18 -

patent by its nature represents the right to "exclude others from making, using, offering for sale, or selling" an invention. 35 U.S.C. § 154(a)(1). As a result, every licensing negotiation is inherently based on the premise that the patent owner *could* sue to exclude. The patent owner's offer of a license—a promise not to sue to exclude—is the only thing of value that the patent gives him as a bargaining tool. As the Federal Circuit has noted:

> [A]ny time parties are in negotiation over patent rights, the possibility of a lawsuit looms in the background. No patent owner with any sense would open negotiations by assuring his opposite party that he does not intend to enforce his patent rights under any circumstances. The threat of enforcement . . . is the entire source of the patentee's bargaining power.

*EMC Corp. v. Norand Corp.*, 89 F.3d 807, 811 (Fed. Cir. 1996). This being the case, it is necessary in the patent context to distinguish between the implicit threats of eventual enforcement without which no license discussion is possible, and other conduct that creates a substantial controversy of "sufficient immediacy and reality" to warrant the issuance of a declaratory judgment.

On one hand, the Federal Circuit has long held that good-faith licensing negotiations do not generally give rise to an actual controversy that justifies jurisdiction under the Declaratory Judgment Act. As the court explained in *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*, 57 F.3d 1051, 1053 (Fed. Cir. 1995):

> The offer of a patent license does not create an actual controversy. In this case there was no question that a license was available to Phillips Plastics and Illinois Tool Works, if such were needed. Phillips Plastics or Illinois Tool Works was not risking a shut down of its business. License terms were yet to be discussed. When there are proposed or ongoing license negotiations, a litigation controversy normally does not arise until the negotiations have broken down.

*See also Alamo Refining*, 99 F. Supp. at 795 ("The owner of a patent is fettered if the mere offer of a license, without an accompanying charge of infringement or threat of suit, would expose the patentee to a declaratory judgment action. The offer of a license does not have the character of a charge of threat."). It follows that the kinds of statements relating to patent coverage and possible enforcement that provide the necessary premise

for such negotiations also do not create a justiciable controversy. All they mean is that in a potential hypothetical situation in which the parties are unable to reach mutually agreeable terms, a suit may ensue. Thus, in *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885 (Fed. Cir. 1992), there was no actual controversy when the patent owner referred to Shell's actions as "falling within," "covered by," or "under" its patent, and stated when asked that it would enforce its patent. *Id.* at 886-87.

On the other hand, there is another line of cases seemingly in tension with those holding that no justiciable controversy exists as long as good-faith licensing negotiations are proposed or ongoing. At oral argument, the Court made reference to *Capo, Inc. v. Dioptics Medical Prods., Inc.*, 387 F.3d 1352 (Fed Cir. 2004), which contains the statement that "[w]hen there has been a direct charge of infringement by the patentee, and an actual controversy exists due to ongoing activity that has been accused of infringement, the accused infringer has the right to resolve the dispute." *Id.* at 1355.[9] The court in *Capo* did not discuss or distinguish cases such as *Phillips Plastics* and *Shell Oil*, in which there were statements and conduct indicating that the patentee communicated that the declaratory plaintiff practiced the patent and thus required a license to continue its activities. *See Phillips Plastics*, 57 F.3d at 1052; *Shell Oil* at 886-87.[10] Moreover, an examination of the factual context in which the *Capo* court made its broad statement of law suggests that it did not intend to abrogate the rule that similar statements made in the context of good-faith licensing negotiations do not give rise to an actual controversy. Indeed, the court in *Capo* expressly found that the defendant's

---

[9] Though the court described this principle as established by precedent, 387 F.3d at 1355, the only case it cited was *Telectronics Pacing Systems, Inc. v. Ventritex, Inc.*, 982 F.2d 1520 (Fed. Cir. 1992), in which it was the *patentee*, not the infringer, who filed the declaratory action. *See id.* at 1522.

[10] Note that in *Phillips Plastics*, like here, the defendant had "carefully refrained from threatening Phillips Plastics with suit," while the plaintiff argued that "one who may become liable for infringement should not be subject to manipulation by a patentee who uses careful phrases in order to avoid explicit threats[.]" 57 F.3d at 1053.

several deliberate and express threats of lawsuit were "not aimed at negotiation, but at impeding a competitor's commercial activity." *Id.* at 1356.

The same is true of other cases cited by Amgen. In *Vanguard Research v. Peat, Inc.*, 304 F.3d 1249 (Fed Cir. 2002), for example, the defendant had engaged in clearly belligerent acts against the plaintiff, namely the filing of a non-patent lawsuit seeking to enjoin plaintiff's use of the covered product on other grounds (including misappropriation of trade secrets), and telling the U.S. government that the plaintiff was using the technology without permission. *Id.* at 1251. And in *Arrowhead Industrial Water, Inc. v. Ecolochem*, 846 F.2d 731 (Fed. Cir. 1988), the defendant had sent an intimidating letter to Arrowhead's customers as well as a threatening letter to Arrowhead itself (promising an infringement suit if Arrowhead did not "immediately" discontinue practicing the patented process within twenty days), and submitted a proposed finding that Arrowhead was an infringer in an action against another party. *Id.* at 734.[11]

The Federal Circuit has never explicitly attempted to harmonize these two lines of case law. Particularly because the line of demarcation between these two strands of cases

---

[11] In opposing ARIAD's Motion to Dismiss, Amgen made extensive use of *Arrowhead*, relying on the statement that "[i]t would obviously be unrealistic to limit the required apprehension to one of imminent suit against plaintiff when defendant is exhibiting an intent to delay that suit until ... a trial date more convenient for defendant has arrived." *Id.* at 736-37. As discussed above, the facts that gave occasion to this statement, however, were far beyond anything present in this case. Indeed, as one district court has noted in rejecting an argument similar to that made by Amgen here, there were four crucial facts justifying the exercise of declaratory jurisdiction in *Arrowhead*:

> (1) the defendant's letter to the customer that was sufficiently threatening to cause it to demand indemnification; (2) communications directly to the plaintiff expressly stating an intention to enforce the defendant's patent rights by litigation; (3) the defendant's litigation against a third party that "evidenced not only an intent but a willingness and capacity to employ litigation in pursuit of its patent rights;" and (4) the defendant's submission of a proposed finding in its infringement action seeking a determination that Arrowhead was an infringer.

*Charles Machine Works, Inc. v. Digital Control Inc.*, 264 F. Supp. 2d 980, 986 (W.D. Okla. 2003). The court in *Charles Machine* went on to find no reasonable apprehension of suit on the facts before it, including that the patentee had made several licensing overtures to the declaratory judgment plaintiff and had filed not just one but four different patent infringement suits against other parties, and plaintiff had heard that it was a likely future target. *Id.*

may not always be easy to discern, there are substantial grounds for difference of opinion as to the Court's holding that the facts here call for application of the *Capo* line rather than *Phillips Plastics* line of cases. As discussed below, ARIAD submits that the facts of this case should be controlled by the *Phillips Plastics* line of cases, given that ARIAD never broke off licensing negotiations with Amgen or otherwise indicated that a license was no longer available.

> **4.    There are substantial grounds for difference of opinion as to whether the totality of the circumstances gave Amgen a reasonable apprehension of imminent suit.**

While the Court appears to have believed that *Capo* and its progeny obliged it to find a basis for jurisdiction in this case, (Ex. I at 15-16), there are substantial grounds to conclude that the more applicable cases are those holding that no actual controversy exists where good-faith license negotiations are still on the table—particularly given the commercialization obligations imposed by the Bayh-Dole Act upon universities, such as MIT and Harvard in this case, that take title to inventions arising from their federally funded research. Although the Federal Circuit has yet to issue an opinion addressing the interaction between the commercialization obligations under the Bayh-Dole Act and the actual controversy requirement of the Declaratory Judgment Act, there are sound reasons to believe that federally sanctioned licensing activities, when conducted in good faith, do not create a justiciable controversy.

Such is the case here. ARIAD sought to enter into a license agreement with Amgen and never broke off those discussions or withdrew the offer of a license. As the Court acknowledged, ARIAD's licensing letters were well within its rights "to contact potential licensees and let them know about their rights and suggest that potential licensees take a look at those patents." (*Id.* at 75.) Similarly, Mr. Casselman made no definitive claim as to whether Amgen was infringing the '516 patent—although he certainly could have done so in the context of licensing discussions without triggering

- 22 -

declaratory judgment jurisdiction. Rather, the Court found that his statements, suggesting that Amgen should consider whether it needed a license for Kineret, did not give rise to an actual controversy. (*Id.* at 76-78.)[12] It is well established that a patent owner may make statements such as these without giving rise to declaratory jurisdiction, because otherwise there would be no way to broach the topic with a potential licensee without risking a lawsuit. *See, e.g., Solid State Equipment Corp. v. Verteq, Inc.,* 2003 WL 21654705, at *4 (E.D. Pa., Jan. 6, 2003) (no declaratory judgment jurisdiction where Verteq "merely brought the existence of the patent to SSEC's attention and requested a review by SSEC as to whether its product fell within the patent," otherwise a patent holder would not be able to inquire about the possibility of patent infringement by another party without subjecting itself to a suit under the Declaratory Judgment Act.).

In fact, many cases illustrate that patent holders may make statements far more aggressive than anything attributable to ARIAD without thereby causing licensing negotiations to break down and creating a reasonable fear of imminent suit. *See, e.g., Cygnus Therapeutics v. Alza Corp.,* 92 F.3d 1153, 1156, 1159 (Fed. Cir. 1996) (no express threat in defendant's statements that, in view of defendant's patent it "made no sense for Cygnus to continue investing" in its product, that defendant didn't "want to be in litigation," and that defendant didn't want plaintiff to "get into some rocky legal hassles [sic] later"), overruled on other grounds, *Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059 (Fed. Cir. 1998); *Shell Oil Co. v. Amoco Corp.,* 970 F.2d 885 (Fed. Cir. 1992) (no reasonable apprehension from license negotiation in which defendant stated on several occasions its belief that the plaintiff's product fell within its patent).[13]

---

[12] Indeed, Mr. Ungemach does not say that he drew an inference from his discussions with Mr. Casselman that ARIAD would bring imminent suit. Rather, his declaration—and the absence of any statement that this conversation or anything else made Amgen apprehend an imminent suit—suggests the opposite.

[13] *See also Shoom, Inc. v. Electronic Imaging Systems of America, Inc.,* 2006 WL 1529983 (N.D. Cal., June 1, 2006) at *6-7 (no direct threat of litigation in statements "You can

In light of these cases, there are substantial grounds on which the Federal Circuit could find that the Board presentation on "Licensing and Partnering" also fell within the bounds of ordinary commercial licensing efforts. Even if one ignores Dr. Berger's trial testimony as to the actual meaning of the slides and draws the broadest possible inference in Amgen's favor—namely that they show ARIAD had concluded that Amgen practices the '516 patent and wanted to be prepared to sue if and when necessary—there would not exist an actual, imminent controversy under the cases cited above. This is because there is nothing in the slides—or anywhere else in the record before this Court—indicating that ARIAD intended to break off licensing negotiations with Amgen in favor of filing suit.[14]

If executives cannot advise their Board as to potential licensees of the company's patents, or as to the potential size of the licensing market, or as to the steps required for (and the risks involved with) enforcement of those patents if licensing is unsuccessful, then it is simply not possible for a company to design and implement a coherent licensing program without risking the burden and cost of a declaratory judgment suit. Indeed, any such rule would undercut the very purpose of the Bayh-Dole Act—to promote the

---

pay me now or you can pay me later"; "We will let the lawyers handle it."; and "The patent applies to everyone who creates electronic invoices newspapers [sic], you are going to pay."); *Kustom Signals, Inc. v. Applied Concepts, Inc.*, 1996 WL 568817 at *1, 6 (D. Kan., Sept. 6, 1996) (same where letter advised competitors that a patent had issued which "may put some of you in an infringement situation."); *Ryobia Am. Corp. v. Peters*, 815 F. Supp. 172, 174 (D.S.C. 1993) (same where letter stated that plaintiff's product was apparently within the patent and defendant made oral representations as to the strength of the patent holder's position).

[14] Moreover, when Amgen saw this Board presentation, it did not learn anything that it did not already know—i.e., that ARIAD desired to pursue licensing relationships with a broad array of companies performing research in the field of NF-kB, that ARIAD specifically wanted to license its NF-kB patents to Amgen for Kineret and Enbrel, and that ARIAD had retained litigation counsel in or around the first quarter of 2002.

In addition, to the extent that Amgen may have learned in 2004 about Ms. Carson's alleged statement to Mr. Cantrell (which Ms. Carson emphatically denies), the full facts disclosed at trial eighteen months later could only have diminished Amgen's apprehension of suit, not heightened it, because they included unrebutted testimony that ARIAD had undertaken no analysis of whether any company was infringing the '516 patent, other than Lilly. Thus, the Lilly trial showed that the likelihood of ARIAD's filing suit against Amgen was remote, not imminent. (Ex. J at 83, 90-97).

commercialization and licensing of patents arising from federally funded university research.

### C.    The Court Should Exercise its Discretion to Grant Certification.

Whether to allow an interlocutory appeal is a matter within the discretion of the district court. *APCC Svcs.*, 297 F. Supp. 2d at 104 (citing *Swint v. Chambers County Comm'n*, 514 U.S. 35, 47 (1995)). In this case, all relevant considerations weigh heavily in favor of permitting ARIAD to pursue an immediate appeal. This litigation threatens harm not just to ARIAD, but to the patients waiting for FDA approval of the first break-through treatment for advanced stage sarcomas in twenty-five years.

ARIAD focuses on developing groundbreaking treatments for cancer by regulating cell-signaling pathways. (Ex. J at 29-30.) Beginning in the early 1990s, ARIAD's founder, Dr. Harvey Berger, entered into discussions with leading scientists at MIT and Harvard University on ways of inhibiting or blocking those communication pathways that could be translated into "products that help[] patients with various difficult-to-treat diseases." (*Id.* at 30-33.) ARIAD subsequently entered into a license agreement with MIT, Whitehead, and Harvard to develop this technology. (*Id.* at 33-38.) Since then, "essentially everything [ARIAD has] done is focused on cell signaling" and developing "intellectual property, patents...methods and tests and research approaches, broadening our understanding of the underlying biology...so that we have a scientific understanding to make drugs." (*Id.* at 39-40; *see also* Ex. K [ARIAD Website]; Ex. L [ARIAD Form 10-K] at 1.)

ARIAD's efforts now stand on the brink of success, not just for the company but for the millions of patients worldwide who could benefit from the products ARIAD is developing. ARIAD's lead product candidate, AP23573, is undergoing the process of FDA approval, and is about to enter the last stage of clinical trials, referred to as Phase 3. (Ex. J at 41; Ex. K.) As Dr. Berger testified, AP23573 has received "fast track" designation from the FDA for treatment of advanced sarcomas, i.e., "cancers that affect

the organs and tissues that hold the body together" such as bone and muscle. (Ex. J at 41.) The expedited status of AP32573 illustrates just how important and potentially invaluable it could be in the fight against advanced-stage cancer, for which current treatments are particularly inadequate.

The present lawsuit, however, threatens ARIAD's ability to bring AP23573, and other products in the early stages of development, to market. ARIAD currently has no drug products on the market. It does not even have any product candidates in clinical development other than AP23573, and does not expect to have any products on the market before 2008 at the earliest—and that is assuming it has sufficient resources to continue current development. (Ex. L at 11, 12; Ex. J. at 62.) Although drugs that reach Phase 3 stand a very high chance of final approval, having cleared the daunting hurdles of Phase 1 and 2 trials, this last phase of testing typically requires as long as three to five years. *See* William Bains, "Failure Rates in Drug Discovery and Development," *Drug Discovery World Fall 2004*, at 12, 14; Harry Jackson, Jr., "How Medical Testing Happens," *The Tribune* (Port St. Lucie/Fort Pierce, FL) (March 4, 2005). ARIAD has only limited licensing revenues, and no committed funding from any pharmaceutical or biotechnology company to advance any of its product development programs. (Ex. L at 12.) It derives most of its funding from sales of stock and long-term debt. (Ex. M [ARIAD Form 10-Q] at 11; Ex. L at 12.) Further, ARIAD has incurred significant operating losses every year since its formation in 1991, and had an accumulated deficit of $247.1 million from operations through December 31, 2005. (*Id.*) It also expects to incur "substantial and increasing operating losses for the foreseeable future, primarily due to costs associated with our pharmaceutical product development programs, including costs for clinical trials and product manufacturing, personnel and intellectual property protection." (Ex. M at 10.)

Moreover, ARIAD is a small company, consisting of 110 people "doing everything from basic research to finance to running the building to running clinical

trials." (Ex. J at 44.) ARIAD ended its second quarter of 2006 with just $54.3 million in cash, cash equivalents and marketable securities, compared to $4.97 *billion* for Amgen. (Ex. M at 1; Ex. N [Amgen Form 10-Q] at 3). This case, if it proceeds, will undoubtedly strain ARIAD's resources (while having no similar impact on Amgen). It has been estimated that a biotechnology patent case costs between $5-7 million to litigate. Federal Trade Comm'n, *To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy*, Ch. 3, at 22 (Oct. 2003), *available at* http://www.ftc.gov/os/2003/10/innovationrpt.pdf. ARIAD's public filings disclose no budget for a plan to enforce the '516 patent with infringement suits against Amgen or anyone else, other than Lilly. This suit was completely unanticipated. Further, as ARIAD itself has acknowledged, "significant expenditures to enforce our patent rights without generating revenues or accessing additional capital or other funding could adversely impact our ability to further our clinical programs and our research and development programs at the current levels or at levels that may be required in the future."[15] (Ex. M at 25; Ex. L at 15.)

ARIAD simply cannot afford to be bullied into a lawsuit that it did not anticipate, did not threaten, has not investigated, and does not want. Given that reasonable minds may differ with the Court's conclusion that a case or controversy exists and that the Federal Circuit will ultimately decide the issue one way or another, concern for the lives

---

[15] The drain on ARIAD's resources is particularly great considering that it precedes the completion of litigation with Lilly, and therefore compounds a cost which ARIAD anticipated with a cost that ARIAD did not. ARIAD had developed its plan to sue Lilly before the '516 patent issued, and therefore anticipated the cost of that suit through trial and potential appeal. (*See* Ex. J at 103 ("[O]nce the claims were issued, at that time we had already made the decision to file a lawsuit against Lilly . . . based on many factors, but not the least of which is the publications and the patents from Lilly's research labs, that our best approach at the time was to initiate a lawsuit.")) By contrast, ARIAD did not anticipate the present suit and therefore could not factor it into its financial plans. The law is clear that a company does not subject itself to declaratory jurisdiction by all comers merely by filing one suit. *See Citizen Electronics*, 377 F. Supp. 2d at 155 n.5 (fact that defendant sued party other than plaintiff could just as easily indicate that plaintiff will not be target of suit, where there is no competent evidence to suggest that interests of plaintiff were "served by delay in taking legal action") (quoting *Phillips Plastics*, 57 F.3d at 1053).

of those who will be helped by ARIAD's work supports an exercise of discretion in favor of immediate appeal.

## CONCLUSION

ARIAD respectfully requests that the Court grant this motion and certify its ruling on subject matter jurisdiction for immediate appeal to the Federal Circuit.

ASHBY & GEDDES

/s/ Steven J. Balick

_____
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*Counsel for Defendant*
*ARIAD Pharmaceuticals, Inc.*

*Of Counsel:*

Morgan Chu
David I. Gindler
Elizabeth Rosenblatt
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Telephone: (310) 277-1010

Dated: September 25, 2006

173559.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of September, 2006, the attached document entitled **DEFENDANT ARIAD PHARMACEUTICALS, INC.'S OPENING MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR CERTIFICATION PURSUANT TO 28 U.S.C. § 1292(b)** was served upon the below-named counsel of record at the address and in the manner indicated:

Melanie K. Sharp, Esquire          BY HAND, VIA CM/ECF,
Young Conaway Stargatt & Taylor LLP    AND VIA ELECTRONIC MAIL
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

Marcus E. Sernel, Esquire          VIA ELECTRONIC MAIL
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601-6636

J. Drew Diamond, Esquire          VIA ELECTRONIC MAIL
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA 90017-5800


*/s/ Steven J. Balick*

_____

Steven J. Balick