## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMGEN, INC., IMMUNEX CORPORATION,   )
AMGEN USA INC., AMGEN MANUFACTURING   )
LIMITED, IMMUNEX RHODE ISLAND   )
CORPORATION,   )
  )
      Plaintiffs,   )
  v.   )     C.A. No. 06-259-KAJ
  )
ARIAD PHARMACEUTICALS, INC.,   )
  )
      Defendant.   )

## DECLARATION OF ELIZABETH L. ROSENBLATT
## IN SUPPORT OF ARIAD PHARMACEUTICALS, INC.'S
## MOTION FOR CERTIFICATION PURSUANT TO 28 U.S.C. §1292(b)

### (VOLUME I OF II)

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*Counsel for Defendant*
*ARIAD Pharmaceuticals, Inc.*

*Of Counsel:*

Morgan Chu
David I. Gindler
Elizabeth Rosenblatt
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Telephone: (310) 277-1010

Dated: September 25, 2006

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMGEN, INC., IMMUNEX CORPORATION,<br>AMGEN USA INC., AMGEN MANUFACTURING<br>LIMITED, IMMUNEX RHODE ISLAND<br>CORPORATION | )<br>)<br>)<br>) | C.A. No. 06-259-KAJ |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| ARIAD PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF ELIZABETH L. ROSENBLATT

## IN SUPPORT OF ARIAD PHARMACEUTICALS, INC.'S

## MOTION FOR CERTIFICATION PURSUANT TO 28 U.S.C. § 1292(b)

I, Elizabeth L. Rosenblatt, declare as follows:

1.     I am an attorney at Irell & Manella LLP, outside counsel for ARIAD Pharmaceuticals, Inc. ("ARIAD") in connection with this action. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath. I make this declaration in support of ARIAD's Motion for Certification Pursuant to 28 U.S.C. § 1292(b).

2.     Attached hereto as Exhibit A is a true and correct copy of a letter dated February 8, 2001, from Mr. Fritz Casselman of ARIAD to Dr. Dennis Fenton of Amgen. This letter was attached as Exhibit C to the Declaration of Frank Ungemach ("Ungemach Declaration") filed on June 28, 2006 with Amgen's Opposition to ARIAD's Motion to Dismiss ("Amgen's Opposition") (D.I. 24-7).

3.     Attached hereto as Exhibit B is a true and correct copy of a letter dated March 7, 2001, from Mr. Frank Ungemach of Amgen to Mr. Casselman. This letter was attached as Exhibit D to the Ungemach Declaration filed on June 28, 2006 with Amgen's Opposition (D.I. 24-8).

4.      Attached hereto as Exhibit C is a true and correct copy of a letter dated June 25, 2002, from Mr. Casselman to Mr. Ungemach.  This letter was attached as Exhibit E to the Ungemach Declaration filed on June 28, 2006 with Amgen's Opposition (D.I. 24-9).

5.      Attached hereto as Exhibit D is a true and correct copy of the Ungemach Declaration that was filed on June 28, 2006 with Amgen's Opposition (D.I. 24).

6.      Attached hereto as Exhibit E is a true and correct copy of the Declaration of Paul Cantrell, Esq. that was filed on June 28, 2006 with Amgen's Opposition (D.I. 22).

7.      Attached hereto as Exhibit F is a true and correct copy of the Declaration of Patricia Carson that was filed on July 13, 2006 with ARIAD's Reply Memorandum of Law in Support of its Motion to Dismiss ("Reply") (D.I. 33).

8.      Attached hereto as Exhibit G is a true and correct copy of the ARIAD board presentation that was attached as Exhibit C to the Declaration of Laurie A. Allen that was filed on June 14, 2006 with ARIAD's Motion to Dismiss (D.I. 15-3).

9.      Attached hereto as Exhibit H is a true and correct copy of the Supplemental Declaration of Laurie A. Allen that was filed on July 13, 2006 with ARIAD's Reply (D.I. 32).

10.     Attached hereto as Exhibit I is a true and correct copy of the transcript of the hearing on ARIAD's Motion to Dismiss that took place on September 11, 2006.

11.     Attached hereto as Exhibit J is a true and correct copy of the testimony of Dr. Harvey Berger in the matter of ARIAD Pharmaceuticals Inc. *et al* v. Eli Lilly & Company, C.A. No. 1:02-CV-11280-RWZ (D. Mass) on April 11, 2006.  This transcript was attached as Exhibit B to the Declaration of Laurie A. Allen that was filed on June 14, 2006 with ARIAD's Motion to Dismiss (D.I. 15-2).

12.     Attached hereto as Exhibit K is a true and correct copy of two excerpts printed from ARIAD's website, http://www.ariad.com.

13.     Attached hereto as Exhibit L is a true and correct copy of ARIAD's 2006 Report on Form 10-K for the period ending December 31, 2005, filed with the United States

Securities and Exchange Commission ("SEC").  This report was attached as Exhibit C to the Declaration of Melanie Sharp that was filed on June 28, 2006 with Amgen's Opposition (D.I. 23-3 and 23-4).

14.    Attached hereto as Exhibit M is a true and correct copy of ARIAD's Report on Form 10-Q for the period ending June 30, 2006, filed with the SEC.

15.    Attached hereto as Exhibit N is a true and correct copy of Amgen's Report on Form 10-Q for the period ending June 30, 2006, filed with the SEC.

16.    Attached hereto as Exhibit O is a true and correct copy of ARIAD's August 19, 1991 Exclusive License Agreement with the Massachusetts Institute of Technology and the Whitehead Institute, which was attached as Exhibit F to the Declaration of Melanie Sharp that was filed on June 28, 2006 with Amgen's Opposition (D.I. 23-10).

17.    Attached hereto as Exhibit P is a true and correct copy of the November 20, 1991 Amendment to ARIAD's August 19, 1991 Exclusive License Agreement with the Massachusetts Institute of Technology and the Whitehead Institute, which was attached as Exhibit G to the Declaration of Melanie Sharp that was filed on June 28, 2006 with Amgen's Opposition (D.I. 23-11).

18.    Attached hereto as Exhibit Q is a true and correct copy of the January 2, 2002 Amendment to ARIAD's August 19, 1991 Exclusive License Agreement, which was attached as Exhibit H to the Declaration of Melanie Sharp that was filed on June 28, 2006 with Amgen's Opposition (D.I. 23-12).

Executed on September 25, 2006, at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Elizabeth L. Rosenblatt

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 25th day of September, 2006, the attached **DECLARATION OF ELIZABETH L. ROSENBLATT IN SUPPORT OF ARIAD PHARMACEUTICALS, INC.'S MOTION FOR CERTIFICATION PURSAUNT TO 28 U.S.C. §1292(b) (VOLUME I OF II)** was served upon the below-named counsel of record at the address and in the manner indicated:

Melanie K. Sharp, Esquire            BY HAND, VIA CM/ECF,
Young Conaway Stargatt & Taylor LLP     <u>AND VIA ELECTRONIC MAIL</u>
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

Marcus E. Sernel, Esquire             <u>VIA ELECTRONIC MAIL</u>
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601-6636

J. Drew Diamond, Esquire             <u>VIA ELECTRONIC MAIL</u>
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA  90017-5800

*/s/ Steven J. Balick*
_____
Steven J. Balick

# EXHIBIT A





REDACTED

CERTIFIED MAIL – RETURN RECEIPT

February 8, 2001

Dennis M. Fenton, Ph.D.
Executive Vice President
Amgen, Inc.
One Amgen Center
Thousand Oaks, California 91320-1700

Re: NF-κB and IκB Intellectual Property

Dear Dr. Fenton:

Late last year, we announced the issuance of our latest patent relating to NF-κB and IκB, an important family of proteins that regulate the function of human genes involved in cancer, inflammation, and other diseases (see attached press release). The newly issued U.S. patent covers methods to identify and test inhibitors or activators of NF-κB or IκB at various points in their cellular pathway. I am writing as a follow up to Dr. Berger's letter to Ms. Amrit Shahzad, dated May 15, 2000, and ARIAD's visit with Amgen during May 2000 concerning the same matter.

Our patent portfolio includes pioneering patents and pending applications concerning the NF-κB /IκB signaling pathway and the identification and characterization of drugs that target this pathway (see attached list). In Dr. Berger's prior letter, we offered to enter into business discussions with your company regarding the grant of a non-exclusive license under our NF-κB and IκB patent portfolio.

The new patent, U.S. Patent No. 6,150,090, issued on November 21, 2000 to MIT, the Whitehead Institute, and Harvard University, is exclusively licensed to ARIAD. The '090 patent was granted with broad claims to methods of identifying and testing drugs that modulate signal transduction through the NF-κB/IκB pathway. We believe that your company has an active research interest in this signaling pathway and in the identification and characterization of drugs targeting key points in this pathway. We note, for instance, Amgen's relevant scientific publications and the unmistakable commercial significance of that work to your company along with your patent

Dennis M. Fenton, Ph.D.
February 8, 2001
Page 2

portfolio. Attached to this letter is a list of representative citations relating to your work in this field.

We believe that your R&D program, as reflected in those documents, likely utilizes methodologies claimed in our patents and is directed to the development of products likely to be covered by claims in our patents and thus would require a license from ARIAD. Having not heard from Amgen since Dr. Berger's last letter, we are bringing the newly issued '090 patent, as well as our other patents, to your immediate attention.

We urge that you consider these patents carefully and promptly advise us whether you wish to move ahead with a license to our intellectual property portfolio. Our patent counsel would be happy to join you in informational discussions on the scope of our patents. However, we would like to have your decision as soon as possible, in any event before March 9, 2001, so that we can take your level of interest into account as we make licensing decisions with respect to other parties. While we are withdrawing the terms proposed in our prior letter, we look forward to working with you to find a mutually satisfactory basis for moving forward.

Thank you very much for your prompt attention to this further notice.

Sincerely yours,

Fritz Casselman
Chief Business Officer and
Senior Vice President

FC:bdm

cc: Harvey J. Berger, M.D.

Amgen

Selected Publications:

Am J Pathol 2000 Aug;157(2):435-48
Osteoprotegerin ligand modulates murine osteoclast survival in vitro and in
vivo.

Genes Dev 2000 14, 854-62
Severe liver degeneration and lack of NF-kB activation in NEMO / IKK-gamma
deficient mice.

EMBO J 2000 19, 4976-85
Deficiency of T2K leads to apoptotic liver degeneration and impaired NF-kB-
dependent gene transcription.

Oncogene 1999 Sep 30;18(40):5514-24
Hematopoietic progenitor kinase-1 (HPK1) stress response signaling pathway
activates IkappaB kinases (IKK-alpha/beta) and IKK-beta is a developmentally
regulated protein kinase.

J Biol Chem 1998 Dec 11;273(50):33561-5
Protein phosphatase X interacts with c-Rel and stimulates c-Rel/nuclear factor
kappaB activity.

J Protein Chem 1998 Nov;17, 757-63
Interactions between NF-kB and its inhibitor IkB: biophysical characterization of
a NF-kB/IkB-alpha complex.

Immunity 1997 Nov;7(5):715-25
Early lethality, functional NF-kappaB activation, and increased sensitivity to
TNF-induced cell death in TRAF2-deficient mice.

Biol Chem 1995 Jul 21;270(29):17237-42
Identification of a domain in soluble CD14 essential for lipopolysaccharide (LPS)
signaling but not LPS binding.

Amgen

Selected Patents:

US 5,766,593
Anti-inflammatory CD14 peptides.

US 5,869,055
Anti-inflammatory CD14 peptides.

US 6,015,938
Osteoprotegerin

EP0790306
Tumor necrosis factor (tnf) inhibitor and use thereof

EP0870038
Interleukin-1 coverting enzyme like cysteine protease.


ARIAD

News Release

**FOR IMMEDIATE RELEASE**

CONTACT:    Jay LaMarche (ARIAD)
(617) 494-0400

Tom Pearson (for media)
Pearson Communications
(610) 407-9260

Eytan Apter (for investors)
SmallCaps Online Group, LLC
(212) 554-4158

## TWO ARIAD PATENTS ISSUED ON DRUGS TARGETING HUMAN GENE REGULATOR PROTEINS

*Potential new therapies for inflammatory, immune, cardiac, and bone diseases, and cancer*

Cambridge, MA, November 28, 2000 – ARIAD Pharmaceuticals, Inc. (Nasdaq: ARIA) today announced the issuance of two new U.S. patents covering the discovery of pharmaceuticals that target two critically important families of proteins that regulate the function of human genes. These protein families, collectively known as "NF-κB" and "NF-AT," have been rigorously validated by genetic methods and are being actively pursued by numerous groups as targets for pharmaceutical research and development. The newly issued patents include methods to identify and test inhibitors or activators of NF-κB or NF-AT function at key points in their cellular pathways.

Based on current understanding of the roles of NF-κB and NF-AT in human biology, drugs that inhibit or activate specific targets in their pathways may be effective in a spectrum of serious diseases, including, for example, osteoarthritis, asthma, rheumatoid arthritis, inflammatory bowel disease, neurodegenerative diseases, cancer, osteoporosis, and congestive heart failure.

"The NF-κB and NF-AT human gene regulator proteins have been well validated as targets for drug discovery. Our six issued patents collectively cover treatment methods and drug discovery techniques, as well as genes, proteins, and pathways associated with NF-κB and NF-AT. Many pharmaceutical companies already are developing drugs that affect targets in these cellular pathways, creating new commercial licensing opportunities for us," said Harvey J. Berger, M.D., chairman and chief executive officer of ARIAD.

The NF-κB patent is based on the pioneering research of Dr. David Baltimore, a founding member of ARIAD's scientific advisory board and a Nobel laureate, Dr. Philip Sharp, also a Nobel laureate, and their colleagues from MIT, the Whitehead Institute, and Harvard University. Their research defined, for the first time, a novel class of gene regulator proteins that play a critical role in immune function, inflammatory response, cell adhesion, growth control, cell death, and bone development. ARIAD has an exclusive worldwide license to the newly issued U.S. patent (6,150,090) and two previously issued patents from the same group (6,095,515 and EP 0,407,411 B1).

The NF-AT patent is based on the breakthrough research of Dr. Gerald Crabtree, another founding member of ARIAD's scientific advisory board, and his colleagues from Stanford University. Their research identified a novel class of gene regulator proteins that play a key role in immune function and cardiac hypertrophy. ARIAD has an exclusive worldwide license to the newly issued U.S. patent (6,150,099) and two previously issued patents from the same group (6,095,515 and 5,837,840).

The U.S. patents are available online at the website of the U. S. Patent and Trademark Office (http://www.uspto.gov/web/menu/search.html). Further information about ongoing research in the laboratories of ARIAD's scientific advisors can be found at their websites: Dr. Baltimore of the California Institute of Technology (www.caltech.edu/president) and Dr. Crabtree of Stanford University and the Howard Hughes Medical Institute (http://crablab.stanford.edu).

ARIAD Pharmaceuticals, Inc. (www.ariad.com) is a leader in the discovery and development of gene therapy, cell therapy, stem cell therapy and protein therapy products featuring dose-dependent regulation by small-molecule drugs, as well as small-molecule inhibitors of signal transduction.

Some of the matters discussed in this news release are forward-looking statements that involve risks and uncertainties. For example, there can be no assurance that if a patent is issued, any such patent would be enforceable or provide meaningful patent protection. Other risks and uncertainties include, but are not limited to, the risks and uncertainties regarding the Company's preclinical studies, the ability of the Company to conduct clinical trials of its products and the results of such trials, as well as risks and uncertainties relating to economic conditions, markets, products, competition, intellectual property, services and prices, key employees, future capital needs, dependence on our collaborators and other factors under the heading "Cautionary Statement Regarding Forward-Looking Statements" in ARIAD's Annual Report on Form 10-K for the fiscal year ended December 31, 1999 filed with the Securities and Exchange Commission.

### ###

ARIAD's NF-kB Patent Portfolio

| Country | Patent No. | Title | Description |
|---------|-----------|-------|-------------|
| US | 6,150,090 | Nuclear factors associated with transcriptional regulation | Drug Discovery Methods |
| US | 5,804,374 | Nuclear factors associated with transcriptional regulation | Drug Discovery Methods |
| US | [appl'n pending] | | Use of modulators of NF-kB signaling |
| EP* | 0252146 | Nuclear Factors Associated with Transcriptional Regulation | NF-kB polypeptides |
| EP* | 0407411 | Activation of NF-kB Precursor | Use of modulators of NF-kB signaling |
| Japan | 2749042 | | Materials for drug discovery |
| Canada | 1,340,999 | Nuclear Factors Associated with Transcriptional Regulation | Drug discovery methods and materials |
| Canada | 1,340,174 | Activation of NF-kB Precursor | Use of modulators of NF-kB signaling |
| Canada | [appl'n pending] | Activation of NF-kB Precursor | Drug discovery methods and use of NF-kB modulators |

*The granted European Patents have become national patents in Austria, Belgium, Switzerland, Germany, France, Great Britain, Italy, Luxembourg, the Netherlands and Sweden

# EXHIBIT B

**AMGEN**

March 7, 2001

Amgen Inc.
One Amgen Center Drive
Thousand Oaks, CA 91320-1799
805-447-1000
www.Amgen.com

Fritz Casselman
Chief Business Officer and
Senior Vice President
Ariad Pharmaceuticals, Inc.
26 Landsdowne Street
Cambridge, MA 02139

Dear Mr. Casselman:

This letter is to confirm our telephone conversation on March 6, 2001. Late last week I received a copy of your letter to Dr. Dennis Fenton of Amgen regarding your NF-κB and IκB intellectual property. We are looking into this matter and will be in contact with you regarding Amgen's interest, if any, in this technology as soon as our evaluation is complete.

Please feel free to contact me directly if you have any questions or comments.

Thank you for your patience.

Very truly yours,

Frank Ungemach
Senior Corporate Counsel
Tel:  (805) 447-2234
Fax:  (805) 499-8011

# EXHIBIT C



ARIAD

**BY FEDERAL EXPRESS**

June 25, 2002

Frank Ungemach
Senior Corporate Counsel
Amgen, Inc.
One Amgen Center Drive
Thousand Oaks, CA 91320-1799

Re:    Availability of Research License to Patents on Nuclear Factors Associated with
       Transcriptional Regulation (NF-κB)


Dear Frank:

We are pleased to announce the issuance by the United States Patent and Trademark
Office of our latest patent relating to NF-κB and IκB. This patent covers methods of
treating human disease by regulating NF-κB cell-signaling activity.

The newly issued patent contains more than 200 claims, and Claim 1, for example, reads
as follows:

> "A method for inhibiting expression, in a eukaryotic cell, of a gene whose
> transcription is regulated by NF-κB, the method comprising reducing NF-κB
> activity in the cell such that expression of said gene is inhibited."

A copy of the patent, No. 6,410,516, is available on the websites of the U.S.P.T.O.
(http://164.195.100.11/netahtml/srchnum.htm) and ARIAD
(http://www.ariad.com/patents). The patent was issued today and expires in 2019.
The '516 patent is issued to Massachusetts Institute of Technology, the Whitehead
Institute for Biomedical Research and Harvard University, and is exclusively licensed to
ARIAD (see enclosed press releases). It is from the same family of U.S. patents as Nos.
5,804,374 and 6,150,090, which cover methods of identifying and testing drugs that
modulate signal transduction through the NF-κB/IκB pathway, and is closely related to
European patents relating to the same methods. We have previously offered licenses to
these and related patents and patent applications (including '516) on terms that
reflected the status of our NF-κB patent portfolio at that time. In light of the issuance of

NF-κB Research License
June 25, 2002
Page 2

the '516 patent, previously offered terms and conditions for licenses to these patents are no longer appropriate and are accordingly withdrawn.

Attached is a term sheet for a non-exclusive research license enabling your company to use the methods covered by these patents for internal pharmaceutical research. The term sheet provides that, in the event you develop or have a product covered by the claims of our '516 patent (or foreign equivalents), we agree to negotiate a further agreement enabling the use and sale of that product under these patents on terms and conditions to be determined at that time. We have provided a sliding scale of license fees based on the research expenditures of potential licensees so that the fees reasonably relate to the relevant activity of each licensee and are affordable for all companies active in the field.

Please contact me if you are interested in obtaining a license or if you have any questions. We look forward to working with you and enabling your research.

Sincerely,

Fritz Casselman
Senior Vice President and
Chief Business Officer

617-494-0400 ext. 208
fritz.casselman@ariad.com

Enc:   Term sheet
       Press releases

ARIAD Pharmaceuticals, Inc.

# TERMS FOR
## NON-EXCLUSIVE RESEARCH LICENSE AGREEMENT
### (ARIAD's NF-κB PATENTS)

**Research License:**

**Scope of License:** Non-exclusive, worldwide license, excluding right to grant sublicenses, to practice the Licensed Methods claimed in the Licensed Patents in the Field of Use.

**Licensed Methods:** Any method of assaying the modulation of NF-κB cell-signaling activity that is covered by a claim of the Licensed Patents.

**Licensed Patents:** Issued and pending U.S. and foreign patents pertaining to NF-κB as listed in Schedule A.

**Field of Use:**

**Field of Use:** The Field of Use shall include (1) Research and development performed solely by and for the Licensee's benefit, and (2) the manufacture, use, importation or sale of Derived Products which are not Covered Products (as defined below).

**Derived Product:** "Derived Product" means any product, the identification, discovery, characterization, optimization, development or testing of which, was conducted or accomplished in whole or in part through the use of the Licensed Methods after issuance of the relevant claim of a Licensed Patent but before the first commercial sale of the product; provided, however, that products that do not regulate NF-κB cell-signaling activity but which solely underwent counter-screening using the Licensed Methods shall not be deemed Derived Products.

**Excluded Field:**

**Excluded Field:** The Field of Use shall not include (1) the manufacture, use, importation and sale of any Covered Product, (2) inducing or contributing to infringement by a third party of a claim of a Licensed Patent through use of a Covered Product, (3) the performance of research for any third party, and (4) the sale or transfer for value of any research reagents, assays or kits based on, or to practice, the Licensed Methods.

**Covered Product:** "Covered Product" means any product sold for use in any country in which such use would infringe a claim of a Licensed Patent. *[Note: The use of products which regulate NF-κB cell-signaling activity are*

ARIAD Pharmaceuticals, Inc.

*covered by ARIAD's patents in some countries (e.g., the United States) but not in others (e.g., Australia).]*

**Financial Terms:**

**Initial License Fee and Annual Maintenance Fees:** Licensee shall pay a License Fee at initiation of the Research License Agreement and thereafter pay Annual Maintenance Fees on each succeeding anniversary of initiation. The amounts of such fees are assessed based on the size of the annual research and development expenditure of Licensee during its four fiscal quarters immediately preceding the applicable payment date, on the following schedule:

|  | Four-Quarter R&D Expenditure | | |
|---|---|---|---|
|  | ≤$50M | $50-500M | >$500M |
| Initial License Fee: | $75,000 | $150,000 | $250,000 |
| Annual Maintenance Fee: | $50,000 | $100,000 | $150,000 |

**Milestones:** Milestone payments will be made with respect to Derived Products upon achievement of the following milestones (or, if any such milestones were achieved by Licensee prior to initiation of the License based on practice of the Licensed Methods after issuance of the relevant Licensed Patent, upon initiation of the Research License Agreement) with respect to each Derived Product according to the following schedule:

| Milestone 1: | Designation of Derived Product for pre-IND pharmacology/toxicology studies | $ 150,000 |
|---|---|---|
| Milestone 2: | First dosing of a patient with Derived Product | $ 350,000 |
| Milestone 3: | First dosing of patient in a Phase 2 clinical trial | $ 500,000 |
| Milestone 4: | First dosing of patient in a pivotal clinical trial | $ 750,000 |
| Milestone 5: | First submission of an NDA or European equivalent | $1,000,000 |

**Prepayment of Fees:** In lieu of paying the Initial Licensee Fee, the Annual Maintenance Fees, and Milestones due on Derived Products with respect to which Licensee practices the Licensed Methods *solely* after the effective date of the Research License Agreement, Licensee may elect to pay (upon execution of the Research License Agreement) the following amount based on the size of the research and development expenditure of Licensee during its four fiscal quarters immediately preceding the effective date of the License:

ARIAD Pharmaceuticals, Inc.

| | Four-Quarter R&D Expenditure | | |
|---|---|---|---|
| | <$50M | $50M-$500M | >$500M |
| Prepayment Amount: | $1,000,000 | $2,000,000 | $3,000,000 |

ARIAD is prepared to discuss, on a case-by-case basis, milestone prepayment amounts applicable to Derived Products with respect to which Licensee practiced the Licensed Methods prior to the effective date of the Research License Agreement.

**Royalties:** Licensee shall pay ARIAD a royalty under this Research License Agreement of 1% on worldwide net sales of those Derived Products with respect to which Licensee practiced the Licensed Methods prior to the filing of an IND to initiate human clinical studies. Royalty payments shall be made for 12 years after the date of first commercial sale of each Derived Product. For avoidance of doubt, royalties under the Research License Agreement with respect to these Derived Products shall not be in lieu of royalties or other payments which may be due under a license, if any, granted by ARIAD with respect to Covered Products.

**Term:** The term of the Research License Agreement shall continue until the expiration of the last-to-expire claim included within Licensed Patents; Licensee may not terminate the license until at least five years after initiation.

**No Implied License:**

**Research License Agreement:** No license shall be effective until a definitive Research License Agreement setting for the terms and conditions for a grant in the Field of Use is executed and delivered by duly authorized representatives of ARIAD and the Licensee.

**No Implied License:** The Research License Agreement shall provide that, other than a grant in the Field of Use, no other license, either express, implied or by estoppel, shall be granted to Licensee thereunder. Nor shall the Research License Agreement be construed to obligate ARIAD to grant any other license.

**Covered Product License Agreement:** ARIAD will agree to negotiate with Licensee the terms and conditions under which ARIAD would grant to Licensee a license, on a product-by-product basis, to manufacture, use, import and sell Covered Products; provided, however, that neither ARIAD nor Licensee shall be obligated to agree to any specific license terms therefor.

*These terms may be withdrawn by ARIAD at any time at its sole discretion.*

ARIAD Pharmaceuticals, Inc.

## Schedule A

### ARIAD's NF-κB Assay Patent Portfolio

| Country | Patent No. | Title |
|---------|-----------|-------|
| US | 6,150,090 | Nuclear factors associated with transcriptional regulation |
| US | 5,804,374 | Nuclear factors associated with transcriptional regulation |
| US | 6,410,516 | Nuclear factors associated with transcriptional regulation |
| US | (pending) | Nuclear factors associated with transcriptional regulation |
| US | (pending) | Nuclear factors associated with transcriptional regulation |
| EP* | 0252146 | Nuclear Factors Associated with Transcriptional Regulation |
| EP* | 0407411 | Activation of NF-kB Precursor |
| | | |
| Japan | 2749042 | |
| | | |
| Canada | 1,340,999 | Nuclear Factors Associated with Transcriptional Regulation |
| Canada | 1,340,174 | Activation of NF-kB Precursor |
| Canada | [appl'n pending] | Activation of NF-kB Precursor |

*The granted European Patents have become national patents in Austria, Belgium, Switzerland, Germany, France, Great Britain, Italy, Luxembourg, the Netherlands and Sweden

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation;         )
IMMUNEX CORPORATION, a Washington            )
corporation; AMGEN USA INC., a Delaware      )
corporation; AMGEN MANUFACTURING,            )
LIMITED, a Bermuda Corporation, and          )
IMMUNEX RHODE ISLAND                         )
CORPORATION, a Delaware corporation,         )
                                             )
            Plaintiffs,                      )     Civil Action No. 1:06-cv-259 (KAJ)
                                             )
    vs.                                      )
                                             )
ARIAD PHARMACEUTICALS, INC., a               )
Delaware corporation,                        )
                                             )
            Defendant.                       )
_____  )

## DECLARATION OF FRANK UNGEMACH

I, Frank Ungemach, hereby declare as follows:

1.      I am a Senior Associate General Counsel at Amgen, Inc. ("Amgen"). I submit this Declaration in connection with Plaintiffs' opposition to ARIAD's motion to dismiss in the above-captioned matter. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would competently testify thereto.

2.      I am aware that the two products-at-issue in the above captioned matter are the Kineret® (anakinra) (hereafter "KINERET") product and the Enbrel® (etanercept) (hereafter "ENBREL") product.

3.      First engineered by scientists at Synergen, Inc. (later acquired by Amgen) the KINERET product is a synthetic IL-1 receptor antagonist approved for treatment of some types of rheumatoid arthritis. Amgen's KINERET product first entered the marketplace in 2001.

4.    Unrelated research at Immunex (also later acquired by Amgen) led to the ENBREL product, another human therapeutic approved, among other things, for rheumatoid arthritis. The ENBREL product first entered the marketplace in 1998.

5.    As part of my duties, I am responsible for assisting in the evaluation of potential opportunities for Amgen to obtain licenses to other companies' intellectual property.

6.    Attached as Exhibit A is a copy that I obtained from Amgen's files of a slide presentation that ARIAD gave to Amgen on May 11, 2000.

7.    Attached as Exhibit B is a copy that I obtained from Amgen's files of a May 15, 2000 letter (with enclosures) that ARIAD sent to Amgen from Dr. Harvey Berger to Ms. Amrit Shahzad.

8.    On February 8, 2001, Mr. Fritz Casselman of ARIAD sent a letter to Dr. Dennis Fenton of Amgen "as a follow up to Dr. Berger's letter to Ms. Amrit Shahzad, dated May 15, 2000, and ARIAD's visit with Amgen during May 2000 concerning the same." Enclosed with the letter was a list of publications that ARIAD identified as relevant to showing that Amgen's research programs included activities purportedly covered by ARIAD's NF-κB patent portfolio. A copy of this letter (with enclosures) is attached as Exhibit C.

9.    On March 6, 2001, I telephoned Mr. Fritz Casselman at ARIAD to let him know that Amgen had received ARIAD's February 8, 2001 letter and that we would contact him if we were interested in taking a license.

10.    The next day, on March 7, 2001, I sent Mr. Casselman a letter memorializing our conversation of the previous day. Attached as Exhibit D is a copy of this letter.

11.    On June 25, 2002, ARIAD sent a letter to Amgen from Mr. Casselman to me, announcing issuance of U.S. Patent No. 6,410,516 ("the '516 patent"). Mr. Casselman's letter

2

attached preliminary terms for a non-exclusive license to certain aspects of ARIAD's NF-κB portfolio. A copy of this letter (with enclosures) is attached as Exhibit E.

12.    I later learned that on June 25, 2002, the same day that Mr. Casselman sent me the letter announcing the issuance of the '516 patent, ARIAD sued Eli Lilly and Company ("Lilly") for infringement of the '516 patent.

13.    At some time over the 2002-2003 time period following the receipt of the June 25, 2002 Ariad letter, I received an unexpected telephone call from Mr. Casselman. He began by asking if Amgen had decided whether it was going to take a license to Ariad's NF-κB patents. I told him that Amgen was still in the process of evaluating its interest in Ariad's patents and had not yet made a decision.

14.    Mr. Casselman told me that many companies had been sent letters regarding licensing Ariad's patents and he thought Amgen should be interested in taking a license for its KINERET product. I quizzed him regarding why Ariad's patents would have any implications for KINERET, a commercial product. He explained that Ariad's newest NF-κB patent, the '516 patent, was not limited to the same types of claims as in Ariad's earlier NF-κB patents. He also explained that this '516 patent was the same patent that Ariad had asserted in its patent infringement action against Lilly.

15.    I pressed Mr. Casselman for a definitive statement as to whether Ariad believed that Amgen's KINERET product infringed the '516 patent. He reiterated that he thought Amgen should be interested in taking a license for KINERET. He further indicated that some companies had decided to take a license now and others were going to wait for the outcome of the Lilly litigation before deciding.

3

16.     I indicated that I was not familiar with the '516 patent and Amgen would need to review it before it could make a decision.  I further indicated that if Amgen had an interest in taking a license, Amgen would contact Ariad.

17.     In July of 2002, Amgen acquired Immunex, and, with it, certain rights related to the already commercial ENBREL product.

18.     Attached as Exhibit F is a copy that I obtained from Amgen's files of a February 8, 2001 letter (with enclosures) that ARIAD sent to Immunex from Fritz Casselman to Dr. Douglas Williams.

19.     Attached as Exhibit G is a copy that I obtained from Amgen's files of a May 4, 2001 printout of an email that ARIAD sent to Immunex from Fritz Casselman to Dr. Vasant Gandhi.

20.     Attached as Exhibit H is a copy that I obtained from Amgen's files of a June 25, 2002 letter that ARIAD sent to Immunex from Fritz Casselman to Dr. Vasant Gandhi.

21.     Neither Amgen nor Immunex has ever taken a license to any aspect of ARIAD's NF-κB patent portfolio.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.  Executed this _2-6_ th day of June, 2006.

Frank Ungemach, Esq.

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on June 28, 2006, I caused to be electronically filed a true and correct copy of the foregoing, Declaration of Frank Ungemach, with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> John G. Day, Esquire
> Ashby & Geddes
> 222 Delaware Avenue, 17th Floor
> Wilmington, DE 19801

I further certify that on June 28, 2006, I caused a copy of the foregoing, Declaration of Frank Ungemach, to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

> BY E-MAIL (by agreement of counsel)
> Morgan Chu, Esquire
> David I. Gindler, Esquire
> Amir A. Naini, Esquire
> Christopher M. Newman, Esquire
> Irell & Manella LLP
> 1800 Avenue of the Stars
> Suite 900
> Los Angeles, CA 90067-4276

> Melanie K. Sharp (No. 2501)
> YOUNG CONAWAY STARGATT & TAYLOR, LLP
> The Brandywine Building, 17th Floor
> 1000 West Street
>
> P.O. Box 391
> Wilmington, Delaware 19899-0391
> (302) 571-6681
> msharp@ycst.com
>
> *Attorneys for Plaintiffs*

# EXHIBIT E

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN, INC., a Delaware corporation; IMMUNEX CORPORATION, a Washington corporation; AMGEN USA INC., a Delaware corporation; AMGEN MANUFACTURING, LIMITED, a Bermuda Corporation, and IMMUNEX RHODE ISLAND CORPORATION, a Delaware corporation, | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| ARIAD PHARMACEUTICALS, INC., a Delaware corporation, | ) ) ) ) |
| Defendant. | ) |

Civil Action No. 1:06-cv-259 (KAJ)

### DECLARATION OF PAUL CANTRELL, ESQ

I, Paul Cantrell, hereby declare as follows:

1.     I am the Associate General Patent Counsel for Eli Lilly and Company ("Lilly").  I have personal knowledge of the facts set forth herein and, if called as a witness, could and would competently testify thereto.

2.     Lilly is a pharmaceutical company engaged, among other things, in the research, development, and commercialization of novel human therapeutics.  Two such therapeutics, Evista® (raloxifene hydrochloride) and Xigris® (drotrecogin alfa) are the subject of a patent infringement suit initiated in June of 2002 by Ariad Pharmaceuticals, Inc. ("Ariad"), MIT, the Whitehead Institute, and Harvard (the "*Ariad v. Lilly* litigation").  In that action, Ariad et al. have alleged that Lilly infringes U.S. Patent No. 6,410,516 ("the '516 patent") based upon activities related to the Evista® and Xigris® products.

3.     As the Lilly in-house lawyer primarily responsible for the *Ariad v. Lilly* litigation, I attended several depositions related to the matter.

4.      At one deposition that I attended around the middle of 2004, I recall that, during a break, I had a conversation with Patricia Carson, one of Ariad's outside lawyers at Kaye Scholer LLP.  During this conversation, I expressed surprise that Ariad had alleged that Evista® and Xigris® infringed the '516 Patent and that Ariad had chosen to first sue Lilly in connection with the '516 Patent.  I also asked Ms. Carson why Ariad had not chosen to pursue other products instead.  Ms. Carson responded by stating something to the effect of "Enbrel is on the list."

5.      I was aware of the Enbrel® product and knew it to be a human therapeutic manufactured by Amgen, Inc. ("Amgen").  With that knowledge, I understood the statement "Enbrel is on the list" to mean that sometime either during or after the *Ariad v. Lilly* litigation, Ariad intended to sue Amgen for infringement of its '516 Patent based on Amgen's activities related to the Enbrel® product.

6.      On September 14, 2004, a while after the deposition at which I heard the statement made by Ariad's counsel that "Enbrel is on the list," I had occasion to telephone Amgen regarding the possible deposition of a former Lilly employee who was then employed by Amgen.  I left a message with David Scott, Amgen's General Counsel

7.      My call was returned that day by Monique Cordray, one of Amgen's in-house patent attorneys.  Over the course of my conversation with Ms. Cordray, I discussed general aspects of the *Ariad v. Lilly* litigation, including the fact that Ariad had sent letters regarding the '516 patent to approximately 50 companies in the pharmaceutical and biotechnology fields.  I also relayed to her the statement that I had heard earlier from Ariad's counsel, Ms. Carson, that "Enbrel is on the list."

8.      I was still involved in the *Ariad v. Lilly* litigation when the jury trial commenced in April 2006 in the District of Massachusetts.  I attended every day of the trial.  In the gallery, I

2

noticed that another in-house lawyer for Amgen, Siegmund Gutman, was also present to observe. With him was an attorney I believed to be one of Amgen's outside lawyers.

9.    During the beginning phase of the *Ariad v. Lilly* jury trial, at some point between April 11, 2006 and April 14, 2006, I noticed during a break that Ariad's counsel Ms. Carson was speaking in the courthouse hallway with Mr. Gutman and the outside lawyer I had seen with him earlier.  As I approached, Ms. Carson ended her conversation with them, turning around and saying "and you guys at Amgen are next."  By "next," I took Ms. Carson to mean at some point soon after the jury trial in the *Ariad v. Lilly* case concluded.

10.    At a later recess at the *Ariad v. Lilly* trial, I communicated to Mr. Gutman that I would be willing to sign a declaration attesting, among other things, to what I had heard Ariad's counsel Ms. Carson say to him in the hallway.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.  Executed this 18th day of May, 2006.


                                                                     _Paul Cantrell_

                                                    Paul Cantrell, Esq.

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on June 28, 2006, I caused to be electronically filed a true and correct copy of the foregoing, Declaration of Paul Cantrell, Esq., with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> John G. Day, Esquire
> Ashby & Geddes
> 222 Delaware Avenue, 17th Floor
> Wilmington, DE 19801

I further certify that on June 28, 2006, I caused a copy of the foregoing, Declaration of Paul Cantrell, Esq., to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

> BY E-MAIL (by agreement of counsel)
> Morgan Chu, Esquire
> David I. Gindler, Esquire
> Amir A. Naini, Esquire
> Christopher M. Newman, Esquire
> Irell & Manella LLP
> 1800 Avenue of the Stars
> Suite 900
> Los Angeles, CA 90067-4276

> Melanie K. Sharp (No. 2501)
> YOUNG CONAWAY STARGATT & TAYLOR, LLP
> The Brandywine Building, 17th Floor
> 1000 West Street
> P.O. Box 391
> Wilmington, Delaware 19899-0391
> (302) 571-6681
> msharp@ycst.com

> *Attorneys for Plaintiffs*

# EXHIBIT F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION )<br><br>Plaintiff,<br><br>vs.<br><br>ARIAD PHARMACEUTICALS, INC.<br><br>Defendant. | CIVIL ACTION No. 06-259-KAJ |

## DECLARATION OF PATRICIA CARSON

I, Patricia A. Carson, hereby declare as follows:

1.    I am a partner with the law firm of Kaye Scholer LLP.  I am admitted to the Bars of the States of New York and New Jersey.

2.    I submit this Declaration to respond to the blatant mischaracterizations in the Declaration submitted by Paul Cantrell, Esq. in support of Amgen's opposition to the Motion to Dismiss filed by ARIAD Pharmaceuticals, Inc. ("ARIAD") in this Court.  I have personal knowledge of the facts set forth in this Declaration, if called as a witness, could and would competently testify to those facts under oath.

3.    Since approximately April 2002, I have represented ARIAD, Harvard University, the Massachusetts Institute of Technology and The Whitehead Institute (collectively, "plaintiffs") in a patent infringement lawsuit that they filed against Eli Lilly and Company ("Lilly") on June 25, 2002, in United States District Court for the District of Massachusetts.  In that action, plaintiffs assert that Lilly's Evista® and Xigris® products infringe U.S. Patent No. 6,410,516 (the "'516 patent").

4.      After four years of highly contentious litigation, a jury trial was held in Boston in April 2006. The jury unanimously ruled that both Lilly products infringe the asserted claims of the '516 patent and that Lilly had not proven the asserted claims invalid. The jury awarded plaintiffs nearly $66 million in damages, plus royalties on a going forward basis.

5.      In his Declaration, Mr. Cantrell asserts that during some unspecified deposition in the Lilly case "around the middle of 2004," in the course of an informal conversation "during a break," I stated "something to the effect of 'Enbrel is on the list'." The only deposition that I attended in the Lilly litigation in this time frame took place on April 14, 2004.

6.      I can unequivocally state that I have never suggested to Mr. Cantrell or anyone else, at any time, that ARIAD would sue Amgen, particularly on Enbrel®. Indeed, any such statement would have raised serious ethical issues. Since 2003, I have represented Wyeth, which produces and co-promotes Enbrel® with Amgen. Therefore, absent a conflict waiver (which I have never obtained), I could not and would not threaten to assert the '516 patent against Enbrel®. Indeed, it is for this very reason that Kaye Scholer LLP and I do not represent ARIAD in the action pending in this Court.

7.      Mr. Cantrell further claims that, five months later, on September 15, 2004, he reported my alleged statement to Monique Cordray, an in-house attorney at Amgen. I am familiar with Ms. Cordray and, based on my interactions with her, I know that she is aware that Wyeth produces and co-promotes Enbrel® with Amgen and that Kaye Scholer LLP represents Wyeth. Accordingly, if Mr. Cantrell had reported to Ms. Cordray the statement that I allegedly made five months earlier, I would have expected Ms. Cordray

or someone else from Amgen to contact me. I received no telephone calls from Ms. Cordray or anyone else at Amgen regarding the statement that Mr. Cantrell attributes to me (and which I never made).

8.     Mr. Cantrell also discusses a conversation that I had during a break in the Lilly trial, "sometime between April 11 and April 14, 2006," with Siegmund Gutman and an attorney that Mr. Cantrell "believed to be one of Amgen's outside lawyers." The outside lawyer to whom Mr. Cantrell refers is Mark Pals (who is lead counsel for Amgen in the current ARIAD-Amgen litigation). Mr. Cantrell does not claim to have participated in this conversation. Rather, he says that, as he approached, I ended the conversation with "and you guys at Amgen are next." I may have made this statement—but not as a threat to sue Amgen on the '516 patent. I represent Hoffmann-La Roche in a patent infringement case filed by Amgen on November 8, 2005, in the District Court for the District of Massachusetts and assigned to Judge Young. Judge Young's courtroom is just down the hall from Judge Zobel's courtroom where the Lilly trial occurred. During the Lilly trial which occurred in April 2006, we received word that Judge Young scheduled a hearing on certain pending motions for May 10, 2006. Any conversation or statements that Mr. Cantrell may have overheard related to the case between Hoffmann-La Roche and Amgen and that upcoming hearing.

Executed on July 11, 2006, at New York, New York.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Patricia A. Carson, Esq.

1533035                                    - 3 -

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of July, 2006, the attached **DECLARATION OF**

**PATRICIA CARSON** was served upon the below-named counsel of record at the address and

in the manner indicated:

Melanie K. Sharp, Esquire                                      <u>HAND DELIVERY</u>
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

Marcus E. Sernel, Esquire                                    <u>VIA FEDERAL EXPRESS</u>
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601-6636

J. Drew Diamond, Esquire                                    <u>VIA FEDERAL EXPRESS</u>
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA  90017-5800

*/s/ John G. Day*
_____
John G. Day

# EXHIBIT G





# ARIAD PHARMACEUTICALS, INC.

## BOARD OF DIRECTORS MEETING

December 18, 2001

**ARIAD Pharmaceuticals, Inc.**
26 Landsdowne Street
Cambridge, Massachusetts 02139

***CONFIDENTIAL***

NO FURTHER DISTRIBUTION





Confidential Information Under Protective Order    ADL 0032454

**Agenda for ARIAD Board of Directors Meeting**

**Tuesday, December 18, 2001**

9:30 am        Coffee and Refreshments

10:00 am       Board of Directors Meeting

- Approval of minutes of prior meeting

- Resignation of Tamar Howson from the Board

- Review of recent milestones in lead product development programs

- Presentation on intellectual property portfolio and patent enforcement strategy – David Berstein

12:30 pm       Working Lunch with Senior Management

- Update on technology licensing and product partnering opportunities – Fritz Casselman

- Discussion and approval of 2002 Operating Plan – Brian Lajoie

2:45 pm        Break

3:00 pm        Executive Session (Directors only)

- Discussion and approval of stock option awards and bonuses

- Special awards for 10-year employees and directors

- Renewal of D&O insurance

- Reg FD Policy

- Other matters

3:45 pm        Adjourn

Confidential Information Under Protective Order            ADL 0032455



Confidential Information Under Protective Order          ADL 0032456

Redacted

12-18-01                                                                                      19

Redacted

12-18-01                                                                                      20

Confidential Information Under Protective Order          ADL 0032457

**Redacted**

12-19-01                                                                21

**Redacted**

12-19-01                                                                22

Confidential Information Under Protective Order            ADL 0032458

Redacted

12-18-01                                                                                      23

Redacted

12-18-01                                                                                      24

Confidential Information Under Protective Order                    ADL 0032459

LICENSING AND PARTNERING

*Board of Directors Meeting*
*December 18, 2001*

Fritz Casselman

---

## Basic Elements

- Regulation Technology (RegTech) Licensing

- Product Partnering

- NF-κB Patent Licensing

12-18-01                                                                  32

Confidential Information Under Protective Order                ADL 0032460

Redacted

- Assay claims issued in 1998 and 2000

- Notice of allowance for product (use) claims

- Product claims warrant substantially higher royalties

- Near-term revenues possible from Lilly, Millennium

12-18-01                                                                                    33

Redacted

- ~ 25 letters sent in May 2000 based on 1998 patent
    - Virtually no response

- ~ 40 letters sent in February 2001 based on 2000 patent
    - Only BMS and Millennium expressed serious interest
    - Others (e.g., AHP and Tularik) made unacceptable proposals
    - Others profess no interest but are probably active
    - Others are probably inactive

12-18-01                                                                                    34

Confidential Information Under Protective Order              ADL 0032461

## Lead Players

| | | | |
|---|---|---|---|
| Abbott | AHP | Amgen | Athersys |
| Aventis | Biogen | BMS | Celgene |
| Genentech | GSK | Isis | Immunex |
| J & J | Lilly | Merck | Millennium |
| Novartis | Pharmacia | Roche | Serono |
| Tularik | | | |

12-18-01                                                                                            35

## Marketed and Late-Stage Products

- Sepsis
  - Xigris (Lilly): Just launched. Sales estimates range from $1 to 2.5B
- Oncology
  - LDP-341 (Millennium): Projected 2004 launch. Est. peak sales > $1B
  - Gleevec (Novartis) $86M in first five months
- Bone Disease
  - Osteoprotegerin (Amgen): Bone metastases, osteoporosis in Phase II

12-18-01                                                                                            36

Confidential Information Under Protective Order                    ADL 0032462

## Marketed and Late-Stage Products

- TNF-α anti-inflammatories
    - Enbrel (Immunex): 2001 sales est. > $750M
    - Remicade (J&J): 2001 sales est. ~$500M
    - D2E7 (Abbott): NDA projected 2Q02
    - CDP-870 (Pharmacia): Projected launch 2004
- COX-2 anti-inflammatories
    - Vioxx (Merck): 2001 sales est. $1B
    - Celebrex (Pharmacia): 2001 sales est. $3B
- Other anti-inflammatories
    - Kineret (Amgen): Just launched

12-18-01                                                                37

## Status of Negotiations

- BMS could close soon
    - Need to decide if economic terms are still acceptable
    - Royalty rates: ceiling or floor on litigation recovery?
    - Strategic field limitation may be issue
- Millennium wants a license but won't pay royalties on LDP-341 without seeing the product claims
    - Royalty buy-out possible after product claims issue
- Other parties on hold until product claims issue (1Q02)
- Strategic field restrictions

12-18-01                                                                38

Confidential Information Under Protective Order                    ADL 0032463

## Royalty Buy-Out Calculations – MLNM

| | Downside | Mid | Upside |
|---|---|---|---|
| Peak Sales ($MM) | 539 | 802 | 1001 |
| **Likelihood of success** | | | |
| Multiple Myeloma | 40% | 50% | 70% |
| CLL | 30% | 35% | 50% |
| Pancreatic | 20% | 25% | 35% |
| Other | 15% | 20% | 25% |
| Discount rate | 18% | 15% | 12% |
| Patent risk discount | 50% | 30% | 20% |
| Risk-adjusted NPV ($MM) | $5 | $15 | $38 |

12-18-01                                                                      39

**Redacted**

12-18-01                                                                      40

Confidential Information Under Protective Order          ADL 0032464

## 1Q02 Goals

- Select litigation counsel

- Complete enforcement analysis and action plan

- Patent issuance and associated press activity

12-18-01                                                                                                    41

Confidential Information Under Protective Order          ADL 0032465

# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN INC., IMMUNEX CORPORATION,      )
AMGEN USA INC., AMGEN                  )
MANUFACTURING LIMITED, IMMUNEX        )    CIVIL ACTION No. 06-259-KAJ
RHODE ISLAND CORPORATION              )
                                       )
                         Plaintiff,    )
                                       )
vs.                                    )
                                       )
ARIAD PHARMACEUTICALS, INC.            )
                                       )
                         Defendant.    )

## SUPPLEMENTAL DECLARATION OF LAURIE A. ALLEN

I, Laurie A. Allen, declare as follows:

1.      I am the Senior Vice President and Chief Legal Officer of ARIAD Pharmaceuticals, Inc. ("ARIAD").   I was employed by ARIAD from January 1, 1999 to December 31, 1999, and was re-employed by ARIAD from March 4, 2002, to the present.   During the period from January 1, 2000 to March 3, 2002, I was retained as a part-time consultant to ARIAD.   I currently have primary responsibility for management of the legal and business development functions at ARIAD.   I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      Fritz Casselman's service as Chief Business Officer of ARIAD ended in October 2003.  At that time, I assumed his duties with respect to the licensing program for ARIAD's NF-κB patent portfolio.  Since assuming his duties in this area, I have not had any communications with Amgen or any of its representatives, or received any communications from Amgen or any of its representatives, relating to Enbrel®, Kineret®, NF-κB, the '516 patent or the other patents in our NF-κB patent portfolio.

1533211                              - 1 -

3.     ARIAD's mission is to discover and develop molecularly targeted drugs based on signal transduction technology—breakthrough medicines to treat cancers by regulating cell signaling with small molecules. Human cells—both healthy and malignant—share an elaborate system of molecular pathways that carry signals back and forth from the cell surface to the nucleus and within the cell. Such signaling is essential to cell functioning and viability. When disrupted or over-stimulated, such pathways may trigger diseases such as cancer. We are developing a comprehensive approach to patients with cancer that addresses the greatest medical need—aggressive advanced-stage cancers for which current treatments are inadequate.

4.     One area of research that ARIAD has investigated based on our understanding of signal transduction involves a protein known as NF-κB. NF-κB is a "transcription factor," which may be generally thought of as a biological switch that can be turned off in specific cells to treat human diseases. When activated, NF-κB ordinarily induces genes to produce various proteins. Certain diseases, however, may cause cells to produce too much of a given protein. If NF-κB regulates the production of that protein, then a drug that modulates NF-κB activity can cause the cell to make the right amount of the protein, and thereby return the cell to its healthy state. Drugs that modulate NF-κB activity can be used not only to treat cancer, but other conditions as well, including inflammation and certain bone diseases.

5.     As pointed out by Mr. Ungemach in his declaration, Amgen expressed interest in entering into a potential business relationship with ARIAD relating to ARIAD's signal transduction inhibitor program, which led to the meeting between ARIAD and Amgen on May 11, 2000. The slide presentation made to Amgen by

ARIAD is attached as Exhibit A to Mr. Ungemach's declaration.  Slides 57-63 of that slide presentation specifically focus on work in-progress by ARIAD at that time to identify NF-κB pathway inhibitors that built on the work of the inventors of the '516 patent.  The purpose of these discussions was to stimulate Amgen's interest in supporting ARIAD's NF-κB research program, not to discuss Amgen's research programs or products.  In fact, this meeting occurred prior to time that ARIAD notified Amgen of the issuance of the first patent in our NF-κB portfolio—which contained patent claims covering certain research methods—and did not contain any product or method of treatment claims such as those contained in the '516 patent.

6.    Later in 2000, ARIAD's business was restructured to focus on the development of molecularly targeted cancer drugs discovered by ARIAD's scientists based on our understanding of signal transduction pathways.  Two of these drugs are inhibitors of the protein known as "mTOR" and one is an oncogenic protein kinase inhibitor.  Our lead product candidate, known as AP23573, is an mTOR inhibitor which is in phase 2 clinical trials for a number of cancer indications, with plans to initiate a phase 3 clinical trial in the near future to obtain approval to market AP23573 for treatment of bone and soft tissue sarcomas.

7.    In June 2005, we were informed by an investment banker employed by Lehman Brothers that representatives of Amgen had contacted Lehman Brothers several times to indicate strong interest in potentially partnering with ARIAD on AP23573 in the cancer field.

8.    In July 2005, I was contacted by Paul Park, International Licensing for Amgen, who stated that "I understand that Ariad is currently seeking an ex-US partner for

AP23573, and we'd be very interested in discussing this with you." A true and correct copy of this e-mail is attached hereto as Exhibit E. On July 15, 2005, I had a conference call with Paul and David Johnson, Amgen's Senior Manager, Licensing, to discuss this opportunity and next steps in the discussions.

9.     After entering into a confidentiality agreement, ARIAD sent Amgen a binder with in-depth confidential information relating to the clinical development of AP23573, and representatives of ARIAD traveled to California to Amgen's headquarters to give an inter-active confidential presentation to a cross-functional team of Amgen scientists and business personnel on August 25, 2005. The Amgen representatives at this meeting included Dr. David Parkinson, who was at that time Vice President and Head of the Clinical Oncology Therapeutic Area at Amgen.

10.     Following that meeting, I had a series of discussions with Paul Park and/or Henry Rath, Mr. Park's counterpart in Europe for Amgen, to discuss Amgen's feedback on the AP23573 opportunity and to provide additional information. Mr. Park left Amgen at the end of September 2005, at which time Mr. Rath became my primary contact.

11.     In January 2006, I contacted Mr. Rath to arrange a follow-up teleconference with Amgen's scientific and commercial team on the AP23573 opportunity. After internal discussions, Mr. Rath informed me that Amgen was currently occupied with its own internal research priorities over the next 12 months, but left open the possibility that I could revisit the opportunity with Amgen in early 2007.

12.     At no time during these discussions concerning AP23573 were the subjects of Enbrel, Kineret, NF-κB, the '516 patent or our NF-κB intellectual property portfolio ever discussed.

13.    During the jury trial in the Lilly litigation, I observed that Amgen in-house counsel, Siegmund Gutman, and another attorney identified to me as Mark Pals by ARIAD's trial counsel in that litigation, were present in the courtroom and sitting on Lilly's side of the courtroom. I spoke with Mr. Gutman during one of the days upon which Dr. Berger testified; however, there was no mention made by Mr. Gutman of any concern by Amgen relating to the '516 patent and Amgen's products or programs.

Executed on July 12, 2006, at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Laurie A. Allen, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of July, 2006, the attached **SUPPLEMENTAL DECLARATION OF LAURIE A. ALLEN** was served upon the below-named counsel of record at the address and in the manner indicated:

Melanie K. Sharp, Esquire                                    HAND DELIVERY
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

Marcus E. Sernel, Esquire                                    VIA FEDERAL EXPRESS
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601-6636

J. Drew Diamond, Esquire                                     VIA FEDERAL EXPRESS
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA  90017-5800


                                        */s/ John G. Day*
                                        _____
                                        John G. Day

# EXHIBIT I

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                IN AND FOR THE DISTRICT OF DELAWARE
 2
                            - - -
 3
    AMGEN, INC., a Delaware corporation; :    CIVIL ACTION
 4  IMMUNEX CORPORATION, a Washington     :
    Corporation; AMGEN USA, INC., a       :
 5  Delaware corporation; AMGEN           :
    MANUFACTURING, LIMITED, a Bermuda     :
 6  Corporation; and IMMUNEX RHODE ISLAND :
    CORPORATION a Delaware corporation,   :
 7                                        :
                    Plaintiffs,          :
 8        v                              :
                                         :
 9  ARIAD PHARMACEUTICALS, INC.,         :
    a Delaware corporation               :
10                                       :    NO. 06-259 (KAJ)
                    Defendant.
11                          - - -

12                  Wilmington, Delaware
              Monday, September 11, 2006 at 2:00 p.m.
13                   MOTIONS HEARING

14                          - - -

15  BEFORE:        HONORABLE KENT A. JORDAN, U.S.D.C.J.

16                          - - -
    APPEARANCES:
17

18          YOUNG CONAWAY STARGATT & TAYLOR, LLP
            BY:  MELANIE K. SHARP, ESQ.
19
                and
20
            KIRKLAND & ELLIS, LLP
21          BY:  MARK A. PALS, ESQ., and
                 MARCUS E. SERNEL, ESQ.
22               (Chicago, Illinois)

23                  Counsel for Plaintiffs

24
                        Brian P. Gaffigan
25                      Registered Merit Reporter
```

**2**

```
 1   APPEARANCES:  (Continued)
 2
 3              ASHBY & GEDDES
               BY:  STEVEN J. BALICK, ESQ.
 4
                    and
 5
               IRELL & MANDELLA, LLP
 6             BY:  DAVID I. GINDLER, ESQ., and
                    ELIZABETH L. ROSENBLATT, ESQ.
 7                  (Los Angeles, California)
 8                  Counsel for Defendant
 9                       - oOo -
10              P R O C E E D I N G S
11              (REPORTER'S NOTE:  The following motions hearing
12   was held in open court, beginning at 2:00 p.m.)
13              THE COURT:  Good afternoon.  Please be seated.
14              (The attorneys respond, "good afternoon, Your
15   Honor.")
16              THE COURT:  Let's get started with some
17   introductions.
18              MS. SHARP:  Your Honor, Melanie Sharp on behalf
19   of the Amgen plaintiff.  I'd like to introduce my colleagues
20   from Kirkland & Ellis.  I believe they're already known to
21   the Court.  Mark Pals, who will be presenting argument
22   today, and Mark Sernel.
23              THE COURT:  Okay.  From ARIAD?
24              MR. BALICK:  Good afternoon, Your Honor.  Your
25   Honor, I'm here on behalf of ARIAD Pharmaceuticals; and here
```

**3**

```
 1   from Irell & Manella in California are David Gindler and
 2   Elizabeth Rosenblatt.  And also here today from the company
 3   are Harvey Berger and Laurie Allen, seated in the first row.
 4              THE COURT:  All right.  Welcome.
 5              Who is going to be making the argument today?
 6   Mr. Gindler?
 7              MR. GINDLER:  I will, Your Honor.
 8              THE COURT:  All right.  Well, let's start first
 9   with the motion to dismiss.
10              Mr. Gindler, the floor is yours.
11              MR. GINDLER:  Thank you, Your Honor.  That will
12   be Gindler.
13              Your Honor, I read the transcript of the hearing
14   that took place telephonically on August 18th.  One of the
15   things Your Honor said in that telephone conference is that
16   we should come prepared to this hearing to address the
17   factual arguments which have been made by Amgen.
18              THE COURT:  Right.
19              MR. GINDLER:  And so leaving all the rhetoric
20   behind in the briefs, I'd like to do just that and discuss
21   each of the facts which Amgen claims supports reasonable
22   apprehension of suit and I think establish that they don't
23   establish reasonable apprehension of suit and it's not even
24   close.
25              THE COURT:  All right.
```

**4**

```
 1              MR. GINDLER:  To assist in the presentation, I
 2   do have a PowerPoint presentation.  Let's go first to the
 3   next slide.
 4              This is a rough time line of what we're
 5   discussing today.  You will see the contents go over a
 6   period of six years with the first contact starting in May
 7   of 2000 and the last event taking place in April of 2006.
 8   And you will see that the first three contacts are
 9   essentially letters.  There is a phone call.  And then there
10   is a fairly large gap of time, about three years.  And in
11   the middle of that, there is actually an alleged statement
12   by Dr. Carson, one of the lawyers who represented ARIAD in
13   the Lilly litigation.  And then, in fact, we have the Lilly
14   litigation.
15              I want to march through each of these facts.
16   And let's go to the next slide, please.
17              So we'll move on.  Basically in the first couple
18   of years, we have four communications, and the first is a
19   May 11th, 2000 research presentation by ARIAD.
20              Let's go on.
21              Now, this is a presentation that is part of the
22   record.  Your Honor has seen it.  It's about 60 pages long.
23   And if Your Honor has looked through it, it is highly
24   technical in nature.  There is no testimony from either
25   side about this document but there are a few things one can
```

**5**

```
 1   discern from looking at the document.  One is that given
 2   the highly technical nature of what is in there, it is a
 3   document that was intended to be looked at by people who
 4   understand such things, which are typically scientists.
 5              The second thing Your Honor will notice is that
 6   of the 60 page presentation, the vast majority of it hasn't
 7   got anything to do with NF-kB.  Those occupy I believe a
 8   total of six slides and they come at the very end.
 9              So what was this presentation?  Well, ARIAD
10   wanted to partner up with Amgen to work on drug discovery.
11   And, in fact, the title of the presentation is signal
12   transduction drug discovery.  That was the point of that.
13   ARIAD is a small company, Amgen is a very large and
14   successful company, and they were hoping to partner with
15   them to discover new drugs.
16              There is actually nothing in this presentation
17   which talks about Enbrel or talks about Kineret or really
18   which talks about our patents or how our patents are
19   relevant to Enbrel or Kineret, if they are at all.  This is
20   a presentation which talks mostly about things different
21   than NF-kB.  It talks about our general area of technology,
22   which is signal transduction, but even the slides about
23   NF-kB are slides about drug discovery, using that pathway
24   to discover new drugs.  Let's take a look at some of those.
25              So this describes NF-kB activation in cells.
```

6

1    Let's go back one, please. Here we go.
2    This is about drug discovery and about
3  identifying and validating key NF-kB pathway targets. The
4  point of this was for the companies to work together. We
5  have an expertise in signal transduction; Amgen has an
6  expertise in a number of areas, one of which is treating
7  inflammation; and so we thought it was a good match.
8    We made our presentation. Unfortunately, it did
9  not elicit a partnership with Amgen but this presentation
10  didn't have a thing to do with our patents, asserting our
11  patents, asking them to take a license to our patents or
12  about Enbrel or Kineret.
13    Let's move on to the next.
14    Well, the next contact is a letter that was sent
15  in May of 2000; and it was sent to many, many companies;
16  and it's a form letter. I've tried to pick out the most
17  provocative statements from the form letter. And, Your
18  Honor, if it would be helpful, I do have a bench book
19  prepared which has in it copies of every document I'm going
20  to refer to. If you would like a copy, I'm happy to hand
21  it up.
22    THE COURT: That's fine. I've got the
23  appendices that you all sent in but if this has it in a more
24  compact form, I'm happy to have it.
25    MR. GINDLER: Yes, it's in the order in which I

7

1  will talk about them. But these are the most provocative
2  statements I could find.
3    (Documents passed forward.)
4    MR. GINDLER: This is a letter which talks not
5  about the '516 patent but about an earlier patent which
6  issued in the same family, and the letter makes such
7  benign statements as: We believe they're working on the
8  development and/or commercialization of drugs that are
9  based on the NF-kB signal pathway and that our IP may be of
10  importance to you. It offered a nonexclusive license to our
11  portfolio, at this time the '516 patent had not issued. And
12  the letter referred only to I believe the first patent,
13  which is different than the '516 patent. Speaking very,
14  very generally, the first patent and the second patent are
15  more about ways of identifying compounds which affect the
16  NF-kB pathway as opposed to the use or method of using a
17  compound to inhibit or modulate the NF-kB pathway. And we
18  look forward to a response. And none came. This letter was
19  sent to about I think 25 companies.
20    Let's go on.
21    And then we sent another one when another patent
22  issued. This is in February of 2001. And again, the most
23  provocative statements we can find in this letter are we
24  believe that your R&D program as reflected in the cited
25  documents likely utilizes methodologies claimed in our

8

1  patents.
2    THE COURT: Now, let me ask you a question.
3    MR. GINDLER: Yes.
4    THE COURT: Would you view that as a step up
5  from the last round?
6    MR. GINDLER: I would view this as saying the
7  following, which is it says that we believe that your R&D
8  program, what you are doing for research and development,
9  as reflected in cited documents, and there are a bunch of
10  documents, articles published by Amgen scientists, which
11  related to in some way NF-kB. And so --
12    THE COURT: I know that is what that is saying
13  in words, but what I'm trying to ask you is to make a
14  comparison for me. And I'm asking for ARIAD's position. As
15  I think you rightly note, the first letter that goes out is,
16  hey, we've got some intellectual property that might be of
17  interest to you. Let's talk.
18    MR. GINDLER: Right.
19    THE COURT: This says we believe your R&D
20  methodology utilizes our patents, our stuff we claimed in
21  our patents. Now I'm asking you, is it ARIAD's position
22  that that is just like the first one or is this racheting up
23  the heat a little, the pressure?
24    MR. GINDLER: I don't think it really rachets up
25  the heat because of the following: First, it doesn't accuse

9

1  any existing product of infringing anything, particularly
2  infringing the patent in suit which had not yet even issued.
3  It talked about their R&D programs as reflected in various
4  articles that were actually included with the letter.
5    THE COURT: Is the statement that even though
6  there is no product specified that your R&D program
7  utilizes methodologies claimed in our patents, is that not
8  a statement you are infringing, whether you are making
9  something of ours? It looks like you are saying you're
10  violating some method claim we have. Maybe I am reading it
11  wrong. Point it out for me. I might have interrupted you
12  before prematurely and I apologize, but if that doesn't mean
13  what I just said in a little more ordinary English, then
14  what does that mean?
15    MR. GINDLER: I think what it says -- and I
16  don't think you weren't too far off. I think what it says,
17  we looked at the articles which were attached to the letter,
18  and based upon looking at those articles which described
19  research and development, not any marketed product but
20  research and development, that they likely are practicing
21  our patents. Now, not the '516 patent because it's February
22  of 2001 and that patent hasn't issued.
23    THE COURT: And indeed, no patent is specified
24  here, but there is a statement there, I think we're
25  agreeing, that looks like you are on our turf.

10

1    MR. GINDLER: Well, there is a statement that
2  says it looks like your R&D program may be on our turf for
3  patents other than the '516 patent. So, in other words --
4    THE COURT: Since there is no '516 patent at
5  this point, I guess that sort of goes. That's why it went
6  without saying, perhaps. But go ahead.
7    MR. GINDLER: Yes. So, in other words, the '516
8  patent is not there, it refers to earlier patents which
9  really are in a different field. Again, the '516 patent
10  really was a very important patent because it talked about
11  the use of compounds in drugs to modulate NF-kB activity as
12  opposed to just laboratory techniques to find whether or not
13  a compound does in some way affect NF-kB activity.
14    THE COURT: And you were probably going to or
15  you might have intended to get to this at some point, but
16  now that we're talking specifically about the '516 patent --
17  and I know you are not in this letter, don't mistake me,
18  in this presentation you are making right now -- what does
19  the result of the reexamination mean for this lawsuit, if
20  anything?
21    MR. GINDLER: I think it means the following
22  for this lawsuit: The '516 patent, I could, as an
23  understatement, say is in flux. It has 203 claims.
24    THE COURT: Well, it had; right?
25    MR. GINDLER: Well, it has still 203 claims. We

11

1  have a First Office Action which rejects 160 of them. What
2  happens, what would happen to that patent is anyone's guess.
3  A large part of it might get wiped out, part of it might
4  survive but in a very narrow form. It is --
5    THE COURT: You've actually answered my
6  question. And that's helpful. Thanks. I mean, ARIAD is
7  not letting go of those 160 without a fight; right?
8    MR. GINDLER: ARIAD is going attempt to convince
9  the Patent Office that they're wrong and we'll see if we are
10  successful.
11    You did ask me what the import is. And I'm
12  jumping ahead just a little bit, but I will do that now;
13  which is, the Court does have discretion whether to exercise
14  declaratory judgment jurisdiction even if, at the end of
15  the day, it finds that there is a reasonable apprehension
16  of suit. And I believe that the pending reexamination,
17  and particularly given the First Office Action in the
18  reexamination, suggests that this is really not a ripe
19  dispute. We don't know right now what the '516 patent
20  is going to look like. It's going to go through the
21  reexamination process. It's much faster than it used to be.
22  It's not as fast as people would like it to be but it's
23  faster than it used to be. According to current procedure,
24  there will be one more Office Action, in which case we may
25  then be done and we'll see how we do.

12

1    THE COURT: Now, in the real world, and I'm
2  not saying that ARIAD would do this, and I understand your
3  position, emphatically stated, that you weren't going to
4  sue Amgen, that you weren't thinking about it. This
5  reexamination, even though it has cast into doubt 160 of the
6  203 claims, it wouldn't prevent ARIAD from suing Amgen on
7  the '516 if it wanted to; correct?
8    MR. GINDLER: That's correct.
9    THE COURT: Including on the 160 that are
10  currently in flux, as you said.
11    MR. GINDLER: That's also correct. It creates
12  risks but, right, the patent is still a patent as it exists
13  until there is a result in the reexamination proceeding that
14  is final.
15    THE COURT: Okay.
16    MR. GINDLER: So I agree with that, Your Honor.
17    THE COURT: Okay. Now, let's go back. I asked
18  you a couple of questions off of this 2001 letter. And if
19  there is more you want to tell me about that, please do.
20    MR. GINDLER: No, this is just another form
21  letter. It was sent again to many different companies,
22  simply based upon the company reading about whether or
23  not -- the company, meaning ARIAD, reading about whether
24  or not they were engaged in research and development which
25  implicated the two issued patents, neither of which is the

13

1  '516 and both of which have much different claims.
2    Let's move on.
3    And there was some response from Amgen, as set
4  forth in Mr. Ungemach's declaration, which is that they'll
5  be in contact. And that was the last we heard from them.
6    Now, interestingly, there were some negotiations
7  with Immunex. These took place I believe before Amgen
8  consummated its acquisition of Immunex. This is set forth
9  in Mr. Casselman's declaration. And they tried to negotiate
10  terms. And, in fact, they did not reach an agreement on
11  terms.
12    And so did ARIAD then turn around and sue
13  Immunex after the negotiation has just failed? The answer
14  to that question is no, Amgen, ARIAD took no action against
15  Immunex. Even though they did express an interest in
16  licensing, even though terms were exchanged, they didn't
17  reach an agreement and ARIAD took no action. That would
18  tend to not create a reasonable apprehension on the part of
19  Immunex.
20    Please move on.
21    Now, let's go on to discussions or negotiations
22  that took place in 2002 and 2003.
23    THE COURT: Is the result of what happened with
24  Immunex something that Amgen has known about and familiar
25  with and ought to be in the mix in their thinking?

14

1    MR. GINDLER: Well, I can only say I wouldn't
2  imagine why they wouldn't know about it. They managed to
3  pull out of their files all the letters sent to Immunex.
4  Immunex is known as a separately existing corporation since
5  it's a plaintiff in this case, so I don't have any reason to
6  believe that the people at Amgen wouldn't have knowledge of
7  this since they managed to pull out documents that were sent
8  to Immunex.
9       THE COURT: Okay.
10      MR. GINDLER: So let's move on to the 2002-2003
11 discussions.
12      Now, in June of 2002, that is when the '516
13 patent has issued. And so this letter is about the '516
14 patent. And, again, this letter was sent to many companies
15 and it offered a nonexclusive research license, and it
16 talked about a possible commercial license.
17      I think the most provocative statements in this
18 letter about the '516 patent, the patent we're talking about
19 here today, are, it says, "in the event you develop or have
20 a product covered by the claims," the closest you get to
21 talking about whether or not Amgen has a product that falls
22 within the claims of the '516 patent. And, as you know,
23 you've said we don't know if they do or if they don't
24 because no one has ever done that analysis.
25      Then the letter ends with saying, "please

15

1  contact me if you are interested in obtaining a license."
2       So again, we have no threat of litigation at
3  all. And, in fact, in none of the letters we've seen so far
4  is there any threat of legal action. And one thing that the
5  Federal Circuit case law makes clear is that in the context
6  of negotiations, you have to have a threat of legal actions
7  to take those out of licensing negotiations and into
8  creating a reasonable apprehension of suit. That is what
9  the Phillips case says. That is what the EMC vs. Norad case
10 says.
11      In fact, I was just looking at the EMC case
12 before the hearing, which is 89 F.3d 807, and I'm looking at
13 page 812. And it says: "This court has held where all that
14 is present is negotiation, unaccompanied by threats of legal
15 action, the setting is not sufficiently adverse to create a
16 justiciable controversy."
17      THE COURT: Let me ask you a question. The test
18 isn't whether somebody says I'll sue you; right? I mean
19 it's not whether a specific assertion of impending legal
20 action is in the air, it's whether there is a charge of
21 infringement.
22      MR. GINDLER: No, it's not quite that simple,
23 Your Honor.
24      THE COURT: Then let me read you something from
25 the case, the Capo case.

16

1    MR. GINDLER: Sure.
2       THE COURT: This is headnote 5, and it says:
3  "There must be well-founded reasons for
4  declining to entertain a declaratory judgment action.
5  Absent such reasons, precedent establishes that when there
6  has been a direct charge of infringement by the patentee,
7  and an actual controversy exists due to ongoing activity,"
8  et cetera et cetera, "the accused infringer has the right to
9  resolve the lawsuit."
10      Now, what do I make of that language when
11 there has been a direct charge of infringement and ongoing
12 activity, that's enough?
13      MR. GINDLER: You have to take into account
14 the context in which those statements are made. So, for
15 example, they can be made in the context of licensing
16 negotiations or outside the context of licensing
17 negotiations or licensing overtures. And that is a
18 critical distinction.
19      So if, for example, I have DaveCo. and I have a
20 patent and I want to stop Amgen from practicing my patent, I
21 send them a letter which just says: You are infringing my
22 patent. Please stop doing so or I'm going to do something
23 about it. That may create a reasonable apprehension of
24 suit. I have offered them nothing. I just said you are
25 infringing and please stop.

17

1    In the context of a licensing negotiation, if a
2  party was precluded from saying, look, I think you are using
3  my technology, I think you need to take a license, how would
4  there ever be a licensing negotiation? Because often a
5  patent holder has a patent and approaches companies that
6  they think are practicing the patent. And so the question
7  is, what do they get to say in that conversation? Do they
8  get to say anything more than, hey, just take a look and get
9  back to us? Well, the answer to that question, of course,
10 is no, I'll get to some Federal Circuit case law which says
11 that.
12      In the context of a letter that discusses
13 licensing, parties can say a lot including, look, I think
14 you are using our technology. I think you are practicing
15 our patent. I think you should take a license.
16      Now, the closest that we ever came to saying
17 that was in the second letter that we looked at and talked
18 about likely utilizing methodologies claimed in two patents
19 that are not at issue.
20      THE COURT: Well, when you say that's the only
21 time you got close to saying that, I don't want to take you
22 out of your time line, but obviously I'm going to want to
23 hear you respond to the specific factual assertions that a
24 lawyer, representing ARIAD, said you're next.
25      MR. GINDLER: I absolutely will.

18

1    THE COURT: Okay. Well, then we'll wait. There
2  is at least a factual dispute about whether or not you got
3  a little more specific than the letter you just described
4  coming in February of 2001.
5    MR. GINDLER: That's correct. That's why I want
6  to go through each of the facts in roughly chronological
7  order and to address each of them.
8    THE COURT: Okay. Well, then let's go back into
9  that and let's get into the facts.
10    MR. GINDLER: So this is the letter we sent
11  them about the '516 patent, as I've pointed out. It also
12  no contains threat and it was sent to many, many different
13  companies.
14    Let's move on.
15    Now, there was a follow-up phone call, according
16  to Mr. Ungemach, who talks about a phone conversation he had
17  with Mr. Casselman. Mr. Casselman doesn't remember whether
18  there was a conversation with Amgen, one way or the other,
19  although he does remember phone conversations.
20    So we took out again what likely are
21  characterized as the most provocative statements that are in
22  here. And as you can tell, Mr. Ungemach is trying to press
23  Mr. Casselman in this conversation to say whether or not he
24  believes that Amgen is infringing. He's pretty clear about
25  this. He says: I pressed Mr. Casselman for a definitive

19

1  statement as to whether ARIAD believed Amgen's product
2  infringed the '516 patent. And all that Mr. Casselman would
3  say -- who is not a scientist by the way, he was a head of
4  business development at the time -- was that he thought
5  Amgen would be interesting in taking a license for Kineret.
6  And Mr. Ungemach responded by simply saying that if we had
7  an interest, we'll get back to you.
8    So let's go forward.
9    Let's talk a little bit about the Federal
10  Circuit law.
11    THE COURT: Well, no, I hate to have you -- I
12  want you to wait on the Federal Circuit law.
13    MR. GINDLER: Okay.
14    THE COURT: And let's do finish the facts, okay?
15  Let's get all the factual assertions on the table and then
16  take me into your view of the law.
17    MR. GINDLER: Okay. The only reason I'm
18  stopping here is because these simply deal with statements
19  in licensing negotiations, and that's where we're at right
20  now. All I want to point out, in one moment, is that when
21  parties in licensing negotiations talk about a product
22  falling within a patent scope or operations under a patent,
23  or even if asked, yes, will you enforce the patent, this is
24  in the context of a licensing discussion. This doesn't do
25  it, because parties have to have some leeway in licensing

20

1  discussions.
2    I'm happy to go on now. Let's move on.
3    Now, let's talk about the alleged statements by
4  Dr. Carson. Now, the first one takes place, according to
5  Mr. Cantrell, around the middle of 2004. You may have seen
6  from Dr. Carson's declaration that she went back and looked
7  to see what depositions she was at and any time frame that
8  could be considered the middle of 2004 and the only one she
9  could find was I believe April 14th of 2004 -- not quite the
10  middle, but if there was any such statement, April 14th of
11  2004.
12    Now, what does Mr. Cantrell say? He says I also
13  asked Ms. Carson why ARIAD had not chosen to pursue other
14  products instead of Evista and Xigris. Ms. Carson responded
15  by stating something to the effect of "Enbrel is on the
16  list."
17    Now, Mr. Cantrell gives very little context to
18  this statement. So, for example, this is the only excerpt
19  we have of the conversation. And the response that
20  Ms. Carson is alleged to be given is a little odd in that
21  it doesn't say -- the question posed by Mr. Cantrell was
22  not, hey, why didn't you sue Amgen, they're bigger? All of
23  a sudden, Ms. Carson just pops up and says, "Enbrel is on
24  the list." Well, words to that effect. That's all we know
25  about that. So what list?

21

1    THE COURT: Well, we know a little bit more.
2  The declaration that this gentleman, Mr. Cantrell, put in
3  says what he thought the context meant; right? He says:
4  Based on my understanding of Enbrel being a human
5  therapeutic manufactured by Amgen, I understood that that
6  statement by Ms. Carson, in response to my question, to be
7  a statement of intention to sue. That they're on the list
8  of people we're going after.
9    MR. GINDLER: Yes, I understand that. That is
10  just his interpretation of a statement which he attributes
11  to Ms. Carson. It's not the recitation of what one party
12  said to the other. So we don't know what else it is that
13  took place in that conversation that led him to reach that
14  conclusion or that that conclusion is reasonable in any
15  respect.
16    Now, Ms. Carson denies emphatically making any
17  such statement. She says, I just didn't do that. And she
18  said, Nor would I ever make such a statement.
19    THE COURT: Do you want to respond to the
20  rebuttal letter that your opponent sent in on that point?
21    MR. GINDLER: Certainly. I believe there is
22  an e-mail which Ms. Ben-Ami sent which said something like:
23  Thanks. All my kids will now get Ph.D's!
24    If it matters to the Court, we actually did
25  get -- we actually did ask Ms. Ben-Ami about that e-mail and

22

1  we do have a declaration from her.  And she said at the
2  time that she heard about the lawsuit, she had not seen the
3  complaint and didn't know what it was about Enbrel, Kineret
4  or anything else; and I think at best, that e-mail can be
5  read as some levity.  I don't think it was, gee, thanks,
6  we're going to be there because, in fact, they can't be
7  there and, in fact, they're not here.
8          That's why I'm here.  They have a conflict.  And
9  Ms. Ben-Ami and Dr. Carson have represented Wyeth since
10  2003.  This is not a big secret to Amgen and that agreement
11  is not a big secret to Amgen so it would be very surprising
12  if Dr. Carson were to accuse or say Enbrel is next on the
13  list as if she is part of the group deciding who is going to
14  be suing when she knows that she would have to a conflict of
15  interest in doing that.
16          THE COURT:  What do you think the motivation is
17  for a lawyer from a third-party, a nonparty to this suit, to
18  fabricate this?  Maybe you are not saying she is fabricating
19  it.  And if you're not, tell me what it is but I have a
20  very stark factual difference here.  I have one party saying
21  this is what she said.  I have the other party to the
22  conversation saying, never said it, would never have said
23  it.  So ...
24          MR. GINDLER:  There are a couple of
25  possibilities.  One of which is that he is misremembering

23

1  what was said or the context of what was said.  Because
2  what he is saying essentially is that, in words or effect,
3  that Dr. Carson said we're going to be suing Amgen next
4  on Enbrel.  That is what he is saying took place.  And
5  Dr. Carson says I would never have said anything like that
6  because how could I?  I represent Wyeth.  They're the
7  co-promoter of Enbrel.  I could not ethically do so.
8          So what would help break the tie here, so to
9  speak?  In other words, we have Dr. Carson on one side and
10  we have Mr. Cantrell on the other side.  I would suggest
11  looking at the following three things:
12          Mr. Cantrell, by his own admission, was the
13  attorney in charge of the Lilly litigation, which his
14  company lost to ARIAD.  And one can maybe understand why
15  he is helping Amgen pursue its lawsuit.
16          THE COURT:  So it's sort of a, although you are
17  too polite to put it that way, a sort of a vengeance motive?
18          MR. GINDLER:  I think he has an incentive to
19  help Amgen as much as he possibly can to the best of what
20  he thinks he may recollect.  I don't know Mr. Cantrell.  I
21  never met Mr. Cantrell.  All I know is from his declaration.
22          What else might help break the tie?  Well, it
23  would be I think very unusual for a lawyer to start making
24  statements publicly that they plan to sue on a product
25  which is co-promoted by their own client, because that is

24

1  basically the first way that you lose a client.  So that
2  strikes me as very odd.
3          But there is a third thing one can look at, and
4  that is the last point on this slide.  He relayed this
5  statement to Amgen on September 14, 2004.  Now, I say about
6  three months later because I took the benefit of the doubt
7  and said, okay, middle of 2004, September 14th, that is
8  three months.  But Ms. Carson actually has a better
9  recollection, having looked at her records, as to when any
10  such statement could have take, place, and it was more like
11  five months later, and the conversation was with Monique
12  Cordray, and that is an Amgen attorney.
13          And one would think that to really sort of sew
14  things up here, we would see a declaration from Ms. Cordray
15  and one that would say pretty much what Mr. Cantrell has
16  said, because he said he reported the statement.  And you
17  would have thought not only would she have provided a
18  declaration but that she might have explained how she did
19  it.
20          Well, there is no declaration from anyone from
21  Amgen, no declaration from Ms. Cordray, the person with whom
22  the conversation took place.  So why is that?  And I have
23  given this a lot of thought.  Why is that?
24          I can think of maybe three reasons why it's not
25  the case:

25

1          One is that she affirmatively doesn't recall him
2  making this statement.  She just couldn't truthfully sign a
3  declaration which says, oh, yeah, I heard that.
4          She may affirmatively say, no, it never came up.
5          Or, another possibility is that she doesn't have
6  a recollection, one way or the other.  It may be that.  It
7  could have been said, it could not have been said.  I just
8  don't remember.  Or maybe she wants to explain why it is
9  after hearing this alleged threat that basically Amgen took
10  no action and did nothing for 17 months before it filed this
11  action.
12          But whichever reason is correct, Amgen had a way
13  of trying to corroborate, to support Mr. Cantrell and Amgen
14  chose not to do so.  This is one of the two opportunities
15  that Amgen had to corroborate Mr. Cantrell and in both of
16  occasions, Amgen chose not to do that.  That would be I
17  think the obvious thing to do.
18          THE COURT:  Okay.
19          MR. GINDLER:  So in making a decision about
20  who is saying what, I think we can conclude the following:
21  Ms. Carson has a strong ethical reason why she would not
22  make that statement.  She has a strong business reason why
23  she wouldn't make that statement, like losing a client.
24          Mr. Cantrell may have his own motivation for
25  recalling the conversation the way he did.  And, in fact,

26

1  there is no declaration from Ms. Cordray. That speaks
2  volumes in another way, which is that if it's the case, for
3  example, that Ms. Cordray doesn't remember it, one way or
4  the other, it means it had absolutely no impact on her. It
5  means whatever thing was passed along, she didn't view it as
6  oh, my God, I'm being threatened with a lawsuit, because we
7  don't see a declaration from her and Amgen did nothing for
8  17 months.
9       So that is the first statement. Here we talk
10  about, just summarizing the reasons, which is why the
11  declaration I think is irrelevant and why it does not create
12  a reasonable apprehension of suit.
13      Okay. Let's move on.
14      Now, during the Lilly trial, Mr. Cantrell
15  declares that Dr. Carson told Amgen's inside counsel and
16  Mark Pals, you guys at Amgen are next. And he supposedly
17  hears this as he is approaching a conversation that is
18  taking place between Dr. Carson, Amgen's in-house counsel,
19  who I believe is Mr. Gutman, and Amgen outside counsel, who
20  I believe to be Mr. Pals. He actually is not part of the
21  conversation. He hears this as Ms. Carson is walking away.
22  And then he gives, again, his spin on it, which is that he
23  took Ms. Carson to mean at some point soon after the jury
24  trial, the ARIAD v Lilly case concluded, meaning I think
25  in his view that we're going to seek a lawsuit from ARIAD

27

1  against Amgen.
2       So Mr. Cantrell does not know the context of
3  this conversation because he didn't hear it. And you know
4  what? Amgen has decided not to provide the context of his
5  conversation. So this is a conversation with Mr. Gutman
6  and also Amgen's outside counsel. Do we have declarations
7  from either of them? We do not have declarations from
8  either of them about what was said in the conversation.
9       And I first thought to myself, well, maybe
10  the reason for the declaration is that they didn't hear
11  the comment; that Ms. Carson was walking away and only
12  Mr. Cantrell heard the comment. But I think in the last
13  paragraph of Mr. Cantrell's declaration, he says that he
14  told Mr. Gutman that he would be willing to sign a
15  declaration as to what Ms. Carson said to Mr. Gutman.
16  And then I take away the fact that at least Mr. Gutman
17  allegedly heard this comment.
18      But, in fact, we hear nothing from Amgen's
19  counsel, in-house or outside counsel, about the context of
20  this alleged statement or anything else. Again, Amgen
21  choosing not to corroborate anything that is said at all.
22  Dr. Carson actually says she might have said something
23  along these lines because she also was handling a case in
24  a courtroom down the hallway involving Amgen and La Roche.
25  And there was an upcoming hearing that was going to take

28

1  place. And she said if I made that comment, it's real
2  possible I did, I was talking about that.
3       I believe Amgen points out that the hearing
4  was not I think put on the case docket until April 18th.
5       THE COURT: 19th, something like that.
6       MR. GINDLER: Something like that. And I guess
7  I have a couple of responses to that point:
8       The first is the fact that the hearing date
9  wasn't announced until the 18th or the 19th does not mean
10  that Ms. Carson is not aware that they have a pending motion
11  of some kind and that there is going to be a hearing and
12  it's going to be relatively soon.
13      The second thing is whether or not
14  Mr. Cantrell's recollection of dates is so precise. He says
15  this took place some time between April 11th and April 14th,
16  which he refers to as the first phase, or the beginning
17  phase of the Lilly trial. I'm not sure what that means
18  because the case went on for some time and, in fact, I
19  believe that ARIAD is not even closed its case-in-chief by
20  the 14th. And we know from his declaration, when he talked
21  about a conversation in the middle of 2004, that if you
22  assume the middle is something like June, maybe July, he is
23  off by a couple of months.
24      So we really don't know if it was April 11th,
25  12th, 13th, 14th, 15th or 16th. And we do have Ms. Carson's

29

1  explanation for the statement which is attributed to her,
2  and she does say it's entirely possible I made that
3  statement. And there was ample opportunity for Amgen to try
4  to undercut anything which Ms. Carson had to say. The best
5  way of doing that would have been to provide context and
6  corroboration: a declaration from Mr. Gutman, a declaration
7  from the Amgen outside counsel, three witnesses --
8       THE COURT: I've got you.
9       MR. GINDLER: -- context. Okay.
10      These are the statements by Dr. Carson. So
11  in my mind, I think we can call into question on the first
12  statement, Mr. Cantrell's recollection. I think on the
13  second statement, we have a completely plausible and
14  correct explanation for what Ms. Carson said. And, again,
15  she repeats she wouldn't be accusing Enbrel or any products
16  of the sort because she can't do that, because that is
17  ethically improper.
18      So looking at all of the evidence that is before
19  Your Honor and all the evidence that is not before Your
20  Honor, if one has to make some credibility determinations
21  in this context, I understand that is part of what is going
22  on here, that I think that Ms. Carson in her explanations is
23  more credible than Mr. Cantrell in his statements for the
24  reasons I have explained.
25      Let's move on now.

30

1    Oh, I want to add one more thing, actually,
2    which I have never quite understood, but I'll take them at
3    face value. Amgen says in its brief that it was not aware
4    of this statement until after it filed suit. Now, that is
5    actually in their brief, in their opposition brief.
6        If that is the case, if we just assume that
7    statement is true, then we can stop thinking about that
8    statement. Because what happens after you file a lawsuit is
9    not relevant, whether there is jurisdiction on the day you
10   filed the lawsuit, so anything that they claim happened
11   afterwards would not be relevant.
12       At the same time, they say that this involved
13   the conversation with Ms. Carson and also Mr. Gutman and I
14   believe Mr. Pals, Amgen outside counsel. So I'm not sure
15   which version is correct, the version in Mr. Cantrell's
16   declaration or the version, the statement here in the brief
17   that they weren't aware of it until after the lawsuit was
18   filed.
19       If I just take that statement from their brief
20   at face value, then we don't need to talk about this
21   statement anymore.
22       Let's go on.
23       Now, I think the highlight of Amgen's opposition
24   is this board presentation that was made during the Lilly
25   trial. And I want to discuss Amgen's characterization as

31

1    opposed to what the presentation actually said. And I
2    believe the presentation, whether you look at it naked, all
3    by itself, or if you look at it clothed, in the testimony
4    that was given by Dr. Berger as Amgen saw for the first time
5    in the presentation, either way, the presentation, alone,
6    with Dr. Berger's testimony or alone and combined with the
7    three letters that were sent previously about two other
8    patents and one about the '516 patent, four, five and six
9    years earlier, doesn't catch a bear.
10       So Amgen's characterization, ARIAD published a
11   set of slides for the jury and public to see the name Amgen
12   and Amgen's Enbrel and Kineret on its list of litigation
13   targets. It's a very powerful statement.
14       The reality is a bit different, though. This
15   board presentation was published by Lilly during the
16   cross-examination of Mr. Berger who was the Chairman and
17   Chief Executive Officer of the company and who was present
18   during the presentation. ARIAD published nothing. This
19   was an internal document until it was produced in the
20   Lilly litigation. And when it was produced in the Lilly
21   litigation, it was produced under a protective order.
22       THE COURT: But it wasn't, and you are not
23   contesting that it was, displayed in open court and came to
24   Amgen's attention?
25       MR. PALS: Absolutely. In fact, they had a

32

1    lawyer in the courtroom who has seen certain of, certain
2    portions of it I think on a screen or perhaps through copies
3    they had of exhibits. But that is the first they heard of
4    it. And they also knew that it was not introduced by ARIAD.
5    They also knew that ARIAD did not publish any slides because
6    if they were in the courtroom, they knew it was introduced
7    by Lilly during cross-examination of Dr. Berger.
8        So there is a little bit of literary license
9    that went on with Amgen's brief. That's why we want to
10   take away the rhetoric from. Let's just talk about what
11   happened.
12       Let's move on.
13       Well, the title of the presentation is called
14   Licensing and Partnering, not Litigation Targets, not Who
15   Are We Going to Sue Next? And, of course, from the trial,
16   the question is asked:
17       "Question: This portion of the document from
18   the board of directors' meeting is about licensing and
19   partnering; correct?
20       "Answer: Yes."
21       This is a presentation by Fritz Casselman, not a
22   lawyer, not a litigator. He is in the guy in charge of
23   business development, as is set forth in his declaration.
24   His job is to engage in licensing and partnering.
25       Now let's move on.

33

1    Now, it begins talking about their licensing
2    efforts. Twenty-five letters sent in May. Virtually, no
3    response. Four letters sent in 2001. A few responses.
4    Again, remember, both of these letters are not about the
5    '516 patent which actually hadn't even issued at the time of
6    the board presentation. I believe it had been allowed, but
7    it had not issued.
8        Let's go on.
9        And so what was Dr. Berger's testimony about
10   these slides? Well, he was asked:
11       "Question: Before he sent the letters, didn't
12   you test their products?
13       Answer: No, we didn't.
14       "Question: Did you see if they reduce enough
15   NF-kB activity?
16       "Answer: No, we did not."
17       Let's go on.
18       Now there is a presentation about lead players.
19   Now Amgen refers to this as the list of litigation targets.
20   The document doesn't say litigation targets. It doesn't say
21   enforcement efforts. It doesn't say people who infringe.
22   It doesn't use any of those terms. It just talks about lead
23   players. And, again, Dr. Berger is asked about this:
24       "Question: What do you mean by lead players?"
25   And he says exactly what he means:

34

1    "Answer: The lead players were a mix really
2 to show, as I recall, that some of the major
3 companies in the industry were working in the area of NF-kB
4 in one way, shape or form."
5    That's a way of telling the board this is
6 something where we know these companies have done something
7 in the area and these are big leaders.
8    And let's move on.
9    He says more about it. He says:
10    "Question: How many of these companies do you
11 remember thinking had NF-kB products at the time?
12    And he basically says I don't know. He said we
13 never did that analysis. And he explained that to do the
14 analysis, you have to look at the individual products and
15 how the use of that product relates to the claims of a
16 patent. And he says we hadn't done it then and we haven't
17 done it since. We have focused only on Eli & Lilly.
18    So he both says what the purpose is of having
19 the lead player slide and goes on to explain that he hadn't
20 had a clue whether any of those lead players had a product
21 that infringed any of ARIAD's patents.
22    All right. There is also a discussion of
23 Marketed and Late-Stage Products.
24    And Amgen talks about this also in its brief.
25    Let's go back to the prior slide.

35

1    So the first listed product is one of the
2 accused products in the Lilly lawsuit, Xigris. And then we
3 talk about a product from Millennium, a product from
4 Novartis, and then a product that appears to be in clinical
5 trials at Amgen. And Dr. Berger is asked about this slide,
6 too. And he is asked:
7    "Question: As of this board meeting in December
8 2001, ARIAD was quite interested in the amount of sales of
9 these drugs that might or might not use NF-kB?
10    And his answer was:
11    "Answer: That was largely to provide some
12 context to our board of directors. Not every member of our
13 board has experience in pharmaceuticals. They vary from
14 professors and scientists to financial folks to those who
15 understand pharmaceutical marketing and sales."
16    And he gave the sales estimates to give a
17 benchmark for directors who don't have the breadth of
18 experience in all the areas that they deal with to be able to
19 deal with these products.
20    Let's go back to the previous slide, which does
21 talk about $1 billion to $2.5 billion of sales. The second
22 product, maybe a billion in sales. The next product, maybe
23 $6 million in sales. He is trying to give samples of the
24 sides of the sales range.
25    Let's move forward.

36

1    Here we have again another slide on Marketed and
2 Late-Stage Products which Amgen points to again because
3 there is a reference to antiinflammatories and to one
4 antiinflammatory, which is Enbrel, and another, at the very
5 bottom, Kineret, which it just launched. And, in fact,
6 Dr. Berger is asked about this, too. And what does he say?
7    "They have been identified as products for which
8 there were publications on NF-kB, but we had not done an
9 analysis then and we still haven't done that analysis on
10 whether any or all of these products are actually covered by
11 our patents."
12    And he goes on. He is questioned again:
13    "Question: And so TNF antiinflammatories may
14 reduce NF-kB activity; is that your testimony?"
15    That is a question designed to ask him, are you
16 claiming these antiinflammatories are infringing the '516
17 patent? It is about modulating NF-kB activity.
18    "Answer: No, that is not what I said. I said
19 that TNF antiinflammatories, these examples, may or may not
20 be NF-kB inhibitors. We have not done the analysis or
21 evaluation of any of the products on the list because you
22 have to look at the claims, look at the specifications and
23 look at the actual drug."
24    THE COURT: Now, why don't you talk about
25 page 71 of Dr. Berger's testimony because that is what

37

1 your opponents point to as some language that ought to be
2 important to me; and I assume the reason that they footnote
3 it as they do in their briefing is because of the question
4 on, beginning on line 14:
5    "Question: And the patents rights discussed
6 here are the NF-kB patent rights?
7    "Answer: Yes, they are.
8    "Question: And the licensed product would be
9 what in your understanding?
10    "Answer: They would be products either
11 discovered using the technology or products whose use was
12 covered by the technology and patents.
13    "Question: So the products discovered using
14 NF-kB, correct, would be one part of the licensed products?
15    "Answer: Yes, sir."
16    Now, they will speak for themselves, but I
17 guess --
18    MR. GINDLER: Your Honor, I'm looking at this
19 testimony and I believe this is about the ARIAD agreement
20 with the universities.
21    THE COURT: Okay.
22    MR. GINDLER: Okay?
23    THE COURT: Why do you think they're reciting
24 that to me in their briefing? And let me see if I can find
25 the specific reference.

38

1    If you look on page five of their opposition
2  brief, which is docket item 21.
3        MR. GINDLER: Page five.
4        THE COURT: Right. Footnote eight. They make
5  the statement "In any event, Dr. Berger's testimony supports
6  that these slides at least attempted to identify those
7  classes of drugs generally believed by ARIAD to fall within
8  the '516 patent claims."
9        In other words, I read this to say, the
10 statement, some of the statements I just read there, they
11 actually cite lines eight to 16. I began on line 14.
12       MR. GINDLER: Yes, I see that, Your Honor.
13 There is no way that can be correct, and I can tell you why.
14       THE COURT: That's what I would like you to do.
15       MR. GINDLER: This is referring to, as I
16 mentioned before, an agreement between the universities
17 and ARIAD that license that entire sort of family of
18 intellectual property. This agreement is from 1991, as I
19 recall. There was no '516 patent in 1991. That patent
20 wouldn't issue for 11 more years. In fact, there was no
21 patent in 1991. The first patents to issue were in 1998.
22 All that language talks about is what ARIAD had a license
23 to and what ARIAD would be obligated to pay royalties to
24 universities.
25       So, for example, ARIAD has to pay royalties on

39

1  all three patents. So, for example, two of patents are
2  not about the use of compounds to modulate NF-kB activity
3  but are, again, I'm speaking very generally, that they're
4  primarily directed to screening, doing research and
5  development, to at least find a drug compound which
6  implicates the NF-kB pathway.
7        So quoting from an agreement which talks about
8  ARIAD's loyalty obligations to the universities and one that
9  was done in 1991, quite a long time before any patents had
10 issued and, more importantly, before the '516 patent had
11 issued, that's just not a plausible target.
12       THE COURT: Okay.
13       MR. GINDLER: Okay? And I will come back very
14 briefly to that agreement because I think they use it for a
15 different purpose as well. And I want to be sure I hit all
16 the bases on the factual assertions which they're making.
17       THE COURT: Okay.
18       MR. GINDLER: So let's move on.
19       THE COURT: I have asked you a few questions,
20 and I apologize. I cut into their time.
21       MR. GINDLER: No, please. Ask all you want.
22       THE COURT: I'm going to need you to, even
23 though I sidetracked you, to hit you through the next few
24 things pretty quick.
25       MR. GINDLER: Okay.

40

1        THE COURT: Because I have to give these other
2  folks a chance to talk.
3        MR. GINDLER: Absolutely. And I'm going to
4  finish rather soon. Let's move on.
5        The presentation talks about the state of
6  negotiations. There may be an agreement with Mr. Lionel
7  Squibb. It then talks about royalty calculations which are
8  an impossibility. It talks about first quarter '02 goals:
9  Select litigation counsel, complete enforcement analysis and
10 action plan, patent issuance and associated press activity
11 because we know that the company was going to sue Lilly. We
12 were relying on Lilly's own research, Lilly's presentation
13 to the scientific community, the Patent Office. Lilly
14 scientists were putting it there and saying the drugs
15 inhibit NF-kB.
16       So what is the takeaway from all of this? Does
17 this presentation talk about litigation targets? Or does
18 it specifically identify Amgen and Immunex as litigation
19 targets? And does it identify Enbrel and Kineret as
20 litigation targeting? It doesn't. It talks about, as the
21 title of the slide says, Licensing and Partnering. That is
22 what it talks about. And that is underscored by the fact
23 that during repeated cross-examination, Dr. Berger says they
24 haven't got any idea whether all of those other lead players
25 are practicing the patents or not practicing the patents.

41

1        Why is that offered? To show if you have
2  litigation targets, you usually have a pretty good reason
3  for making them litigation targets, having done something to
4  identify that they're infringing their patent. And, in
5  fact, Dr. Berger is repeatedly asked that, and he repeatedly
6  gives the exact same answer. And, in fact, if Your Honor
7  read all of the testimony, and it appears that you have, you
8  will see that Judge Zobel at one point says: "I don't think
9  you are getting at the answer that you want. Why don't you
10 simply move on." Because he wasn't.
11       So let's move on ourselves. What other evidence
12 does Amgen offer?
13       There is the CNBC interview. This also took
14 place after the lawsuit was filed and therefore not
15 relevant, but all this said is what the company has always
16 said: Our patents are available for licensing. It does
17 not say we're going to start suing everybody. It says we
18 have patents and if pharmaceutical companies are going to
19 use our technology, then they should pay us royalties.
20       That is not a provocative statement. That is
21 not a thread of litigation. It's a statement that any
22 patent holder can reasonably make: I have a patent. If you
23 would like to use it, then pay me something. And that is
24 all that Dr. Berger has said. And, in fact, it's consistent
25 with what has been said by ARIAD since the year 2000, which

42

1  is our patents are available for licensing. We haven't
2  gotten a lot of great responses but we just keep saying it.
3  Dr. Berger says it again here.
4        Let's move on one more.
5        I think we also want to use the ARIAD license
6  agreement with the universities to show that we had to bring
7  a lawsuit. And, in fact, the agreement says that we have
8  the right, but not the obligation, to bring lawsuits. And,
9  in fact, it says that efforts to sublicense are sufficient
10 to satisfy our obligations under the agreement. ARIAD has
11 no obligation to sue anybody at all.
12       Your Honor, I think I have addressed pretty
13 much everything here. The totality of the circumstances are
14 that this patent was first communicated to Amgen in 2002.
15 ARIAD has never demanded that Amgen take a license. ARIAD
16 has never suggested, in a letter or in a conversation, that
17 litigation was an option. There were no communications
18 between ARIAD and Amgen about NF-kB since 2002-2003.
19       I should point out something in Ms. Allen's
20 declaration. There were discussions in 2005 between the
21 companies about a possible business relationship having to
22 do with a cancer drug, an overture initiated by Amgen. If
23 there was ever an opportunity for the parties to talk about
24 NF-kB, again, that would have been it. So they're going to
25 be doing a business deal. It would be a little odd, if

43

1  Amgen thought it was going to be sued the next day or soon
2  on the NF-kB patents or the '516 patent, specifically, that
3  someone wouldn't raise it. And, in fact, it was not raised
4  at all.
5        Your Honor, at the end of the day here, we do
6  not have a reasonable apprehension of suit. I'll take one
7  minute, and not more, to just add one other comment. I
8  don't have much to add about what is in the briefing about
9  whether or not the three institutions who are the owners of
10 the patents should have been included.
11       I think we both agree generally on what the
12 controlling standard is: whether or not all substantial
13 rights in the patent have been transferred from the
14 university to ARIAD. I agree with that because if ARIAD
15 essentially stands in the shoes of the universities, has all
16 of their rights, then they should not be joined.
17       The key factor -- there are a number of factors,
18 but the key factor is does ARIAD have the sole right to
19 indulge infringement? They took no action.
20       THE COURT: Who is the plaintiff in the Lilly
21 suit?
22       MR. GINDLER: Four entities: ARIAD and three
23 universities because ARIAD didn't include them. And the
24 same thing here.
25       Now, Amgen claims that even though the

44

1  universities can bring an action on the patents after six
2  months if they bring to our attention what they think is
3  infringing activity and that ARIAD does nothing, what Amgen
4  says is, yes, you have the absolute right to have a
5  sublicense so you can shut that all down. That is only half
6  true.
7        We can grant a sublicense, as we say in the
8  reply brief, only prospectively. So the universities can
9  sue for past infringement with which would basically be,
10 under the statute of limitations, six years of damage and
11 there is not a thing that ARIAD can do about that.
12       THE COURT: Does that speak, however, to ARIAD's
13 power to enforce?
14       MR. GINDLER: It speaks to the key question:
15 whether or not Ariad has all substantial rights in the
16 patent, the ability to enforce it without joining the
17 universities because that is what you have to have. So
18 the question about whether or not they're indispensable
19 parties, essentially it's flip side of the test, which is
20 can ARIAD bring the suit on its own?
21       THE COURT: And play that hypothetical out with
22 me. Let's say ARIAD was involved in negotiations for a
23 sublicense.
24       MR. GINDLER: Okay.
25       THE COURT: It didn't work out. If it had

45

1  worked out, ARIAD would have, on its own, be able to grant
2  the sublicense; right?
3        MR. GINDLER: Absolutely.
4        THE COURT: Then it would be extending all
5  rights under the patents to the sublicensee; right?
6        MR. GINDLER: In that context, that's correct.
7  But the agreement is real specific about what happens if the
8  universities have the right to bring a lawsuit. And in that
9  context, we don't have an absolute right to sublicense, only
10 as to the future.
11       THE COURT: All right. I believe I have your
12 argument.
13       MR. GINDLER: And that means we don't have the
14 exclusive right to indulge infringement. It's shared. And
15 that is one of the key issues.
16       THE COURT: Okay.
17       MR. GINDLER: Thank you, Your Honor.
18       THE COURT: Thank you. Appreciate it.
19       Mr. Pals.
20       MR. PALS: Good afternoon, Your Honor. We are,
21 to pick up on something Mr. Gindler said, quite literally
22 approaching the end of the day. How long does Your Honor
23 have for argument on this?
24       THE COURT: I'll give you roughly the same
25 amount of time I gave Mr. Gindler, roughly.

46

1    MR. PALS: Okay. Your Honor, we have a
2  selection of exhibits as well that we thought might be
3  easier for the Court to look through as we go through
4  this, if we can pass those out.
5    THE COURT: Sure.
6    (Documents passed forward.)
7    MR. PALS: Your Honor, I don't know what your
8  preference is but it might make sense to start with the
9  indispensable parties issue since we were just talking
10 about that.
11    And we may disagree on the standard a little
12 bit but in the indispensable parties analysis, I think the
13 key is to look at, and the case law says, look at what the
14 intent of the parties is on this. Who is intended to have
15 these rights? Who does have these rights? And it's
16 completely appropriate in the analysis to look at the rights
17 that ARIAD has vs. the rights the institution has. And in
18 many ways, that is perhaps the most cogent, relevant
19 indication.
20    As far as looking at the intent of the parties,
21 I think one of the key provisions to look at is Section 7.5
22 of the license agreement. That is the provision that ARIAD
23 cited in their opening brief and said, look, ARIAD can
24 intervene in DJ actions, except they cited the superseding
25 provision. And when we pointed out they were citing the

47

1  superseding provision, suddenly that gets demoted in its
2  level of importance.
3    If you look at that provision, what that
4  provision is saying is it's expressing the parties'
5  expectation, the parties' intent that if there is a DJ
6  action, ARIAD can defend it. ARIAD alone can defend it.
7    THE COURT: Is it in these documents?
8    MR. PALS: Yes, sir. It's in tab eight, Your
9  Honor, is it original license agreement.
10    THE COURT: Could it be page 11?
11    MR. PALS: At page 11, yes, sir.
12    So what 7.5 said originally was it gave a right
13 to MIT or Whitehead in this case, which means the original
14 agreement as originally written was MIT or Whitehead, gives
15 them the right to intervene and take over sole defense. But
16 there was an amendment entered. And for the record, that
17 is in Exhibit H to Ms. Sharp's declaration. It was entered
18 into January 1, 2002. That's behind the agreement in the
19 materials you have, Your Honor.
20    What that amendment provided was a limitation,
21 and it specifically contemplated that ARIAD would be
22 defending DJ actions, and that only if ARIAD, whose licensee
23 in 7.5 -- let me find it in the binder.
24    THE COURT: Yes.
25    MR. PALS: It's in tab 10. And I think it's the

48

1  last page to that second amendment to the license agreement.
2  This is 7.5 that shows as an amendment.
3    What it says is that it's ARIAD that it has the
4  right to defend a DJ action, and only if ARIAD fails to take
5  reasonable steps to defend such action in timely manner can
6  the institutions have the right to intervene and take over.
7    So the point here is the parties contemplated
8  ARIAD having the right to defend solely declaratory judgment
9  actions just like this one brought by parties challenging
10 the noninfringement or invalidity of the '516 patent or
11 other patents under that license agreement. In addition,
12 the other provisions of the agreement indicate that the
13 parties to that agreement intended the transfer of rights
14 to ARIAD.
15    We have, in that agreement, an exclusive grant
16 of rights to ARIAD. We have, in that agreement, ARIAD, as
17 Your Honor pointed out, pursuant to Section 2.8 of the
18 agreement -- again, 2.8 was amended at one point, but 2.8
19 grants ARIAD the right to grant sublicenses under those
20 patents. Only in the event of litigation do we see any
21 ability of the institutions to do anything, and even then
22 it's ARIAD that has complete control.
23    So ARIAD has complete control prelitigation as
24 to whether to sublicense somebody and takes care of all use,
25 past, present and future use, under these patents. ARIAD

49

1  has the choice as to whether it's going to file suit against
2  somebody. ARIAD has the choice as to whether it's going to
3  settle that litigation. The institutions have the right to
4  consent but the case law has indicated that that is not a
5  limitation. That point is neutral in this analysis when the
6  limitation is consent not to be unreasonably withheld.
7    So it's ARIAD's choice to sublicense, ARIAD's
8  choice to litigate. Only if ARIAD elects not to litigate do
9  the institutions have this residual right; and even then,
10 ARIAD can grant a sublicense to all future use with no input
11 whatsoever from the institutions. So if you look at the
12 rights that are transferred to ARIAD, it's ARIAD that has
13 the rights.
14    THE COURT: All right. Let's talk about facts
15 now.
16    MR. PALS: Okay. Your Honor, what matters here
17 in this analysis is the totality of the circumstances. This
18 isn't a pick and choose. This isn't a take one issue or
19 one exchange at a time and deal with whether that creates a
20 reasonable apprehension or doesn't create an unreasonable
21 apprehension.
22    THE COURT: Well, let me interrupt and say I'm
23 interesting you in responding, and I'll have you do this at
24 the top, and then you can walk me through the totality as
25 you would like. But I'd like you to answer, if you would, a

50

1   couple of assertions.
2           First, the assertion made by Mr. Gindler that
3   the so-called "you're next" comment was one that you
4   expressly disclaimed in your briefing as one you didn't
5   know about, you being Amgen, before suit was filed. And he
6   notes that that is a puzzling assertion since supposedly the
7   conversation involved Mr. Gutman and perhaps even you and
8   supposedly Mr. Cantrell spoke to Mr. Gutman right there on
9   the spot, but nevertheless there is this comment in the
10  brief. Tell me what is going on.
11          MR. PALS: Okay. What is going on, Your Honor,
12  is, I'll speak for myself. I didn't hear the comment from
13  Ms. Carson. She made that comment. It was, in fact, during
14  the week of April 11th through April 14th.
15          THE COURT: I'm not trying to turn you into a
16  witness. I'm just trying to figure it out. But go ahead.
17          MR. PALS: Okay. It was in that week because I
18  was in trial that week and I wasn't in trial the next week.
19  So it was that week, and Mr. Cantrell's recollection is
20  dead solid on that, as I think it is on the other facts.
21  I didn't hear that and we don't rely on that as prefiling
22  bases for apprehension of suit.
23          What that comment goes to is the reasonableness
24  of that apprehension because, again, here is an exchange
25  where Ms. Carson is making a statement, like she said

51

1   before, and that is where that goes, Your Honor. It's not
2   something we rely on for the prefiling apprehension of suit.
3           THE COURT: So you're acknowledging that it
4   couldn't have caused any apprehension of suit at all because
5   you're saying to me it's not something Amgen is relying on
6   as a prefiling basis for apprehension, but that it's
7   something that I should consider in thinking about whether,
8   whatever apprehension existed, was reasonable. Have I
9   understood you right?
10          MR. PALS: If the comment had been perceived,
11  if we heard the comment, then certainly it would have been
12  a basis for reasonable apprehension of suit. It would
13  have been like the previous comment Ms. Carson made, but
14  not having heard the comment, can't rely on it to form a
15  reasonable apprehension of suit.
16          THE COURT: Okay. Got you.
17          MR. PALS: But this -- I'm sorry. Is that it on
18  that point, Your Honor?
19          THE COURT: That is that on that point. There
20  are a couple other things I want you to respond to.
21          The "where is Ms. Cordray" question, where you
22  have a direct dispute between Mr. Cantrell and Ms. Carson.
23  And I should note here that I mean no disrespect to Ms.
24  Carson by not referring to as Dr. Carson but, hey, when it
25  comes to lawyers, everybody is a Mr. or Ms., and I'm not

52

1   given honorifics to them. I'm not comfortable with that.
2           So I have directly opposing testimony in front
3   of me in the form of declarations and you have heard what
4   Mr. Gindler has said about, hey, if they had had any
5   corroboration to give, they would have given it. They
6   didn't. That ought to tell you something. I want you to
7   respond to that argument.
8           MR. PALS: A number of comments, Your Honor.
9   First, I don't believe that the declarations are directly
10  opposing, but let me go come back to that and respond
11  directly to your question.
12          The reason there is no declaration for
13  Ms. Cordray, there are a couple reasons:
14          One, Ms. Carson's declaration only came in on
15  reply.
16          Two, we were concerned about an argument that
17  ARIAD may make as to waiver of a work product or other
18  privilege in submitting declarations from our lawyers as
19  to what our lawyers thought.
20          So if ARIAD were willing to stipulate that there
21  would be no waiver or argument of a waiver of any privilege
22  or work product, we could certainly be happy to submit a
23  declaration.
24          But in the end, the question is not whether
25  Ms. Cordray had a subjective apprehension of suit. It's

53

1   whether the comment created a reasonable, objectively
2   reasonable apprehension of suit. And I think the facts
3   speak that it did and Mr. Cantrell, a third-party, in his
4   view expresses his view that it did.
5           Can I turn to the declarations now, Your Honor?
6           THE COURT: Yes. Why don't you tell me why you
7   say they're not really directly opposed?
8           MR. PALS: What Ms. Carson says in her
9   declaration is not that she didn't say -- as I read it
10  anyway, is not that she didn't say what Mr. Cantrell says
11  she said, but that she didn't suggest that ARIAD would sue
12  Amgen. That's what they're saying now. They're arguing now
13  that nobody has suggested that ARIAD would sue Amgen.
14          We think that is wrong. We see it differently,
15  but this is not inconsistent at all with what they're saying
16  now. And she didn't say I didn't say Enbrel is on the list;
17  but if that is where she is going with that comment, then I
18  think what we have is we have the context in Mr. Cantrell's
19  declaration that he provides who is in litigation with them.
20  We have the fact that he remembers the comment, he remembers
21  the context the comment, that he contacted Ms. Cordray, by
22  his declaration and his statements, and we have the list at
23  trial in fact showing Amgen and showing Enbrel as being on
24  the list when that list is shown at trial.
25          THE COURT: All right. Now, I'll let you go in

54

1  just a minute into whatever order you want to present things
2  in, but the last thing I wanted to ask about regarding this
3  exchange was why the year and-a-half lapse that Mr. Gindler
4  points to and emphasize is it really couldn't have created a
5  reasonable apprehension of suit because the folks at Amgen
6  did nothing for 17 months, I think is how he put it.
7      MR. PALS: Absolutely no obligation that Amgen
8  sue as soon as it obtains a reasonable apprehension of suit.
9      THE COURT: Does timing of the actions of a
10  party have any affect on how the Court should interpret
11  whether there was a reasonable apprehension of suit?
12      MR. PALS: I don't think in this circumstance,
13  Your Honor, it has any bearing at all on that.
14      THE COURT: Why not?
15      MR. GINDLER: Because we have Ms. Carson's
16  statement in the '04 time frame. We have, at that point in
17  time, ARIAD in engaged in litigation with Lilly. It's very
18  reasonable for parties to pick one party at a time and
19  proceed one party at a time. We get to trial, and there is
20  the list again, the list showing Amgen on it right there
21  with Lilly, and Enbrel there, right there with Xigris,
22  (Zi-gris phonetic) which is how the drug is pronounced,
23  which is one of the products at issue in the Lilly
24  litigation.
25      So there is no obligation that Amgen had to file

55

1  suit in 2004. That apprehension was full and created. And
2  was there a risk that ARIAD would to file suit sooner?
3  There was a risk, but Amgen was not obligated to run into
4  court in 2004 and file suit.
5      THE COURT: Okay. Now, you go ahead and take
6  the ball and move about.
7      MR. PALS: What the record shows is a series of
8  contacts. ARIAD initiated contacts, a series of threats
9  and a totality of circumstances that needs to be considered
10  together. And on each point, the courts have come out and
11  indicated that these are relevant factors that go into the
12  analysis of the totality of the circumstances.
13      This isn't a case where there was an exchange of
14  letters and that is it and nothing else happened. This is a
15  case where, yes, there was an exchange of letters but there
16  was threats as well.
17      THE COURT: Okay. So get to the threats. Be
18  explicit with me. What is it that was threatening?
19      MR. PALS: Okay. We have a series of
20  correspondence. We have letters in there. It all deals,
21  Your Honor -- I'm sorry.
22      THE COURT: That's fine. You can --
23      MR. PALS: The explicit threats --
24      THE COURT: Hold on.
25      MR. PALS: Yes. I'm sorry.

56

1      THE COURT: I may not be communicating
2  effectively. I don't want you to characterize things
3  by saying there is a series of letters and these are
4  threatening. What I'm asking you to do is to take me to
5  language and tell me what is threatening. So, with respect,
6  I don't want the editorializing so much as I want you to
7  point me at the record and tell me this is what I want you
8  to look at, judge, because I think you will conclude this is
9  threatening rather than you telling me there is a series of
10  correspondence that is threatening.
11      MR. PALS: Okay, Your Honor. There are letters
12  in the record. What I attached, what I placed on the Elmo
13  is a page from an attachment of the 2000 -- the first
14  letter, I believe, actually. Let me check the date --
15  May 2000 letter. And attached to that May 2000 letter is a
16  licensing proposal. And in that licensing proposal, there
17  are licensing rates that are attached. There is one percent
18  rate for licensed products discovered using a license method
19  and a five percent rate in the event of essentially a
20  covered product.
21      What is happening, therefore, is the ground is
22  being set here that this isn't a trivial monetary issue.
23  This is a significant monetary issue. The products that you
24  saw in that slide presentation have substantial sales, and
25  what this is showing is that the economics of this make

57

1  litigation productive, likely and a reasonable course for
2  ARIAD to follow.
3      Each of these contacts is ARIAD initiated. This
4  isn't Amgen initiating contact with ARIAD. ARIAD is showing
5  its willingness to pursue and its willingness to enforce
6  its patent rights through the May 2000 contact, the 2001
7  contact, and then there is the 2002 letter that is sent out
8  on the day of the issuance of the '516 patent.
9      Now, that is described by Mr. Berger in his
10  testimony as a notice. It's a notice letter. That's not --
11  again, we do see that as a racheting up, Your Honor. We do
12  see a racheting up through these letters in 2000-2001 and
13  then this letter that comes out on the day that the '516
14  patent issues.
15      THE COURT: What is it about the '516 patent
16  letter that is threatening? Tell me.
17      MR. PALS: It's a letter that is sent to Amgen
18  on the day the patent issues when they sued, on that same
19  day, Lilly. So they sent a letter out on the day they sue a
20  company under this patent. This isn't a run-of-the-mill,
21  gee, you might want to know about this patent. This is a
22  you might want to know about this patent that the industry
23  knows they just filed a lawsuit under.
24      THE COURT: So, it's not the language of the
25  letter, if I hear you right, it's the context of sending the

58

1   letter on the day Lilly is sued.
2        MR. PALS: It's the context of everything, Your
3   Honor, and the lawsuit against Lilly. Their willingness to
4   litigate, which we then saw as we took the entire case
5   through a jury trial and through a bench trial, a clear
6   willingness to litigate.
7        And then what we see after that, as the Lilly
8   case is going forward, Mr. Casselman calls Mr. Ungemach.
9   Mr. Casselman was Senior Vice President at ARIAD. He is
10  an official there. And Mr. Casselman calls Mr. Ungemach.
11  And Mr. Casselman doesn't dispute that he made the call, he
12  just doesn't remember it. But what happens is that there
13  is this exchange where Mr. Casselman identifies the Kineret
14  products, he identifies the '516 patent which he notes is
15  in the litigation with Lilly.
16       Now, Mr. Casselman, in explaining why he does
17  that, says gee, sometimes I do some research and analysis --
18  which they said that they didn't do -- but I do research and
19  analysis to identify a product and I identify that to try
20  to stimulate discussion. Why does that work? It works
21  because it's threatening. It stimulates discussion because
22  of the combination of the product and the patent and the
23  existence of the Lilly litigation when raised by an ARIAD
24  person is a threatening approach to a company.
25       And they don't dispute, they can't dispute that

59

1   that took place. And, objectively, reasonably, that creates
2   an apprehension of suit.
3        Then we turn, Your Honor, to the statements by
4   Ms. Carson to Mr. Cantrell. And this is in the context of
5   the Lilly case. Mr. Cantrell provides the context for the
6   conversation and the statement, explains what was said. And
7   we've been through, Your Honor, why it's Mr. Cantrell's
8   recollection, if that credibility line needs to be drawn
9   here, it's his recollection is that more credible. He had
10  the more memorable recollection.
11       The fact that perhaps this was a more unguarded
12  moment from Ms. Carson, and she said something that
13  maybe she thinks she shouldn't have said really doesn't
14  undermine Mr. Cantrell's credibility. Ms. Carson comes
15  back now in the context of litigation and in the context of
16  the declaration and very carefully says that she wouldn't be
17  threatening suit because of this potential conflict.
18       But your Honor raised the e-mail from
19  Ms. Ben-Ami, and Mr. Gindler said it's a joke or there was
20  some levity involved. Perhaps that is true. You know,
21  it's another unguarded moment perhaps by Ms. Ben-Ami, but
22  the point is as of the day after the filing of the suit,
23  there hadn't been a detailed analysis and a decision that
24  they couldn't be handling this case because of a potential
25  conflict. And that's the point. Nor had there been, this

60

1   evidence indicates, a previous determination that Kaye
2   Scholer couldn't be handling any litigation involving this
3   product because of a conflict, which indicates the higher
4   likelihood that Ms. Carson did in fact make the statement
5   that Mr. Cantrell attributes to her.
6        THE COURT: All right.
7        MR. PALS: Then, Your Honor, we get to the
8   trial. And I think it's important in context to understand
9   that ARIAD filed this case action I say against Lilly on the
10  day the patent issued with no advance warning. They didn't
11  send a letter to Lilly saying, gee, we're going to sue you.
12  That is not what companies do. They don't make these kinds
13  of statements that Mr. Gindler wants to seem to find in the
14  record to justify a reasonable apprehension. That is not
15  going to happen.
16       And actually in his trial testimony, Mr. Berger
17  states why it didn't happen. And in Mr. Berger's testimony,
18  which is behind tab five of the binder I passed up, pages
19  102 to 103, Mr. Berger was asked a question:
20       "Question: Why did ARIAD not send a letter
21  about the '516 patent to Lilly after it was allowed?"
22       And Mr. Berger answers:
23       "Answer: We didn't send a litter to Lilly at
24  that time because we made a decision, once the claims were
25  issued, at that time we had already made the decision to

61

1   file a lawsuit against Lilly. We were worried what Lilly
2   might do. Lilly being a very large company, we being a very
3   small company, if they had an opportunity to look at the
4   patent or to look at the claims before the patent had
5   issued. We just had no idea what Lilly might do."
6        This is what Mr. Berger is saying. That is why
7   we see the kinds of careful statements that the courts have
8   indicated don't excuse or don't eliminate a reasonable
9   apprehension of suit. It's because ARIAD was aware, ARIAD
10  was concerned and was being careful as they made these
11  statements that the statements still create a reasonable
12  apprehension of suit.
13       Now, at the Lilly trial, Ms. Carson's statement
14  is made about Amgen being next. What that is really an
15  indication of is confirmation that she makes the kind of
16  statements Mr. Cantrell attributed to her and supports the
17  credibility that that statement was made as well.
18       Now, at trial, the slides are shown. And
19  you have seen some of these slides through Mr. Gindler's
20  presentation, Your Honor. But just to orient you, the
21  lead player slide goes up, and you see on there, Tularik,
22  Amgen and Immunex. Tularik was acquired by Amgen since this
23  slide. Immunex is affiliated with Amgen and is one of the
24  plaintiffs here. And, right there, you also see Lilly,
25  obviously the defendant in that case.

62

1    And then in the next slide, we turn to what
2    was being presented by ARIAD as Marketed and Late-Stage
3    Products. One of those Marketed and Late-Stage Products is
4    for the treatment of sepsis and it's the Xigris product and
5    Lilly's product and it is Lilly's product in the Lilly
6    litigation.
7        The next slide shows some additional Marketed
8    and Late-Stage Products and now we see Enbrel, at that
9    point, Immunex's product, and Kineret, Amgen's product. So
10   we have some 11 products I believe that are among the
11   Marketed and Late-Stage Products. Two of them are Amgen's
12   products and Amgen is front and center on these slides with
13   Lilly and with Lilly's product Xigris which is one of the
14   two Lilly products at issue in the Lilly litigation.
15       The next slide then starts talking about
16   litigation interplay here and royalty rates, whether there
17   is a floor or ceiling of royalty rates that will have an
18   effect on litigation recovery.
19       And then the last slide we have is a slide that
20   refers to selecting litigation counsel and completing the
21   enforcement analysis and action plan.
22       So these slides, Your Honor, further the
23   apprehension of Amgen that Amgen is in fact on the list that
24   Ms. Carson referred to. Amgen is in fact a target of
25   ARIAD's end litigation and Amgen is going to be sued by

63

1    ARIAD.
2        Now, there was some talk about Ms. Berger's
3    post-verdict comments.
4        THE COURT: Before you go to that.
5        MR. PALS: Yes.
6        THE COURT: I want your take on the testimony of
7    Mr. Berger with respect to these slides. You pointed to
8    some, Mr. Gindler has pointed to it here at some length,
9    other parts of the record. First, tell me why you think
10   that language from page 71 of his trial testimony is
11   important and then comment on those portions of the record
12   that Mr. Gindler has directed he to.
13       MR. PALS: Page 71 is relevant, Your Honor,
14   because it goes to ARIAD's obligation to pursue commercial
15   activity, commercialization activities. And I don't have
16   the precise words in front of me, Your Honor.
17       THE COURT: The question was asked:
18       "Question: And it says, the licensee ARIAD
19   shall use its best efforts to bring one or more licensed
20   products or licensed processes to market through thorough
21   big risks and diligent program for exploitation of patent
22   rights. Do you see that?
23       "Answer: Yes, I do.
24       "Question: And the patent rights that are being
25   discussed here, are they NF-kB patent rights?

64

1        Answer: Yes, they are."
2        And then it goes on to talk about further
3    pinning down the products discovered using NF-kB are within
4    the licensed products.
5        So with that in mind, go ahead.
6        MR. PALS: Thank you. Under the license
7    agreement, ARIAD is licensed to co-license. It's the
8    capital P patent rights which are all the patents rights
9    that are subject to that agreement, including the '516
10   patent. That provision was amended in January 2002, along
11   with the other amending with respect to the DJ, Section 7.5.
12   I believe it's the same amendment but it was amended to
13   provide that ARIAD could demonstrate those commercially
14   reasonable efforts by its own product development activity
15   or by sublicensing patent rights. So ARIAD is actually
16   contractually obligated to pursue companies and enforce
17   rights under the '516 patent, be it through sublicensing or,
18   if it can't do that, through litigation. So that is part of
19   the context of that testimony, Your Honor, and relevance to
20   this matter.
21       As far as Dr. Berger's or Mr. Berger's other
22   testimony, the case law is clear, there needn't be a current
23   plan to file suit and it needn't be the case where a company
24   has conducted the analysis. Amgen is not obligated to sit
25   and wait until ARIAD is ready to run up the courthouse steps

65

1    with a complaint or until it thinks ARIAD has completed some
2    analysis when it created the reasonable apprehension and
3    made the threats. What is more, Mr. Casselman already
4    indicated in his declaration that when he made these calls,
5    he did analysis and looked at articles so that he could
6    target and throw out particular product names.
7        The other thing that is relevant to Mr. Berger's
8    testimony is the testimony about the basis for suing Lilly.
9    This wasn't a big test or a big analytical exercise. They
10   referred to the types of articles and the types of refer-
11   ences that Mr. Casselman had talked about in advance of
12   making his calls.
13       So the law doesn't require Amgen to wait for
14   that analysis to find out whether these threats were
15   ethically or reasonably made. They were made.
16       THE COURT: All right.
17       MR. PALS: Mr. Berger's interview post-trial,
18   again confirming the reasonableness of Amgen's apprehension.
19   The transcript of that interview is at Exhibit L of
20   Ms. Sharp's declaration. It's in your binder, Your Honor.
21       Maybe it's not in the binder, Your Honor.
22       THE COURT: Well, I've read it.
23       MR. PALS: I apologize.
24       THE COURT: That's fine.
25       MR. PALS: Anyway, so Mr. Berger is asked the

66

1  question and Mr. Gindler talked about the answer. We're
2  talking about a case where the verdict has just come in.
3  Mr. Berger has beaten the enforcement drum here and he says
4  pharmaceutical and biotech companies need to pay rent for
5  the use of the intellectual property. And Mr. Gindler says,
6  oh, that is just licensing talk.
7       The interviewer has a very interesting
8  reasonably objective reaction to that and the interviewer
9  says: Need to pay rent, and that's what a jury said today.
10      So that's, again, objectively reasonable
11  perception of the types of statements that are being made.
12      THE COURT: Okay.
13      MR. PALS: Do you have any further questions,
14  Your Honor, on the declaratory judgment, reasonable
15  apprehension issues?
16      THE COURT: No.
17      MR. PALS: We talked about necessary parties
18  under the Rule 19 analysis. As far as indispensability,
19  that really comes down to Your Honor, I believe, and I
20  think ARIAD has indicated as much in their reply brief, as
21  to whether there would be a prejudice to the institutions
22  of this case going forward without them. And the record is
23  clear that it wouldn't. They have essentially waived any
24  claim of prejudice. They granted ARIAD the right to
25  bring cases. They granted ARIAD the right to defend DJ

67

1  jurisdictions.
2       ARIAD was represented by the same counsel as the
3  institutions in the Boston case. Your Honor asked how many
4  parties there were. There was four parties. There is one
5  set of lawyers representing all four parties in that case.
6  So in practice, they entrusted the defense of the '516
7  patent to ARIAD and ARIAD's counsel.
8       THE COURT: All right. Mr. Gindler, I'll give
9  you about five minutes or so to respond.
10      MR. GINDLER: I think that is all I will need.
11  I'm going to respond to the points in the order in which I
12  wrote them down.
13      The first is the indispensable party point.
14  And Mr. Pals has talked about what the intent of the
15  parties was. That controls whether there is prejudice.
16  That controls -- actually, what controls is whether or not
17  ARIAD has all substantial rights, whether there is really no
18  meaningful difference between the rights ARIAD has and the
19  right that the patent holder has. That is what the law
20  says.
21      Many companies enter into exclusive agreements
22  thinking they have the right to bring a lawsuit on their own
23  and they learn very sadly, as the case law reports, that
24  they in fact don't have that right. Just because an agree-
25  ment says you have an exclusive license does not mean the

68

1  transfer of all substantial rights. There is a lot of case
2  law on the subject. It's discussed in the parties brief. I
3  don't want to belabor the point but that is the test.
4       And the most important part is the ability to
5  indulge infringement. If you can't indulge infringement,
6  you don't have all substantial rights. And ARIAD does not
7  have the right, exclusively, to indulge infringement. It's
8  shared.
9       THE COURT: What am I to make of the language
10  Mr. Pals has directed me expressly to in the amended
11  agreement?
12      MR. GINDLER: That agreement talks about, there
13  is a change in a provision. And in the first agreement, it
14  said that if a DJ action is filed against ARIAD, that the
15  universities can just step in and take it over.
16      And in the revised agreement, it says the
17  universities can step in and take it over only if ARIAD has
18  not taken reasonable steps to defend in a timely manner. I
19  believe that is the exact language. Okay?
20      So that's just a contractual arrangement as to
21  sort of do the universities have the right to step in and
22  take over the litigation? But that doesn't answer the
23  question, which is the key issue. And it's the key issue
24  as framed by Amgen. There really isn't a disagreement.
25      (Note handed to the Court.)

69

1       THE COURT: I have to interrupt you. I
2  apologize. Counsel, my apologies. I'm going to need a few
3  minutes.
4       (Brief recess taken.)
5       THE COURT: I apologize. Thanks for your
6  patience there. Mr. Gindler, we were so close to being
7  done.
8       MR. GINDLER: Your Honor, we are still so close
9  to being done. I simply had said to Your Honor that the
10  right of the universities to step in and take over a DJ
11  action claimed from having, in the first agreement, an
12  absolute right to a right only if ARIAD failed to take
13  reasonable steps to timely defend, but that is just a
14  contractual right between the two. It doesn't talk about
15  the key issue.
16      THE COURT: Well, isn't it always about
17  contractual rights? That is an interesting thing to me.
18  You keep trying to draw my attention to that, but this is
19  about what rights are transferred by contract. It's all
20  about contractual rights.
21      MR. GINDLER: Right. That is correct. So the
22  question is --
23      THE COURT: What is the effect of these
24  contractual provisions; right?
25      MR. GINDLER: That's correct. So what we know

**70**

1  is that only if ARIAD had all substantial rights is it
2  the dates the universities are not indispensable parties.
3  That's how Amgen phrased the issue, and I think that is
4  actually a rather fair statement. And there are a number of
5  statements which courts look at, the most important of which
6  is the ability to indulge infringement. That provision is
7  relevant, the one Mr. Pals pointed out, because even in the
8  amended agreement, there can be an argument between ARIAD
9  and the universities over just how reasonable or how
10 effective the defense being provided by ARIAD in fact is.
11 And so again, we don't have a blanket transfer of rights.
12 It's your patent. ARIAD doesn't have the rights that a
13 patent holder would have, which is essentially what the
14 test is. Are the rights the same?
15      Now, I wanted to address the question which
16 you asked, Mr. Pals, which has to do with the "you're next"
17 statement and Mr. Pals admitted he didn't hear the comment,
18 and I'm just going to accept as true the statement that
19 Amgen did not know about this comment until after the
20 lawsuit was filed, as Mr. Pals said that here and as said
21 in their brief. So I'm just going to take that as truth.
22      But there are still two things that are a
23 little bit odd about that; one of which is that Mr. Cantrell
24 reported it to somebody at Amgen even after the lawsuit. I
25 don't know who it was reported to, but that person didn't

**71**

1  provide a declaration.
2      And, secondly, it seems to conflict a little bit
3  with what Mr. Cantrell has to say and makes me wonder again
4  whether his recollection is always spot on. He says, in the
5  last paragraph of his declaration: "At a later recess at
6  the ARIAD vs. Lilly trial -- I'm looking at paragraph 10 --
7  I communicated to Mr. Gutman that I would be willing to sign
8  a declaration attesting, among other things, to what I had
9  heard ARIAD's counsel, Ms. Carson, say to him in the
10 hallway." So this suggests that Mr. Cantrell is saying
11 that the statement was made to Mr. Gutman, which would be
12 beforehand. But I'm going to accept Amgen's statement that
13 they learned about it afterwards.
14      So Amgen can't be right and Mr. Cantrell can't
15 be right. One of them has to be wrong, and I'm guessing
16 that it's Mr. Cantrell.
17      You also asked why was there no Cordray
18 declaration. And what we heard is they had a work product
19 concern about disclosing her mental intent. I could care
20 less about Ms. Cordray's mental intent. What I care about
21 is what would she say was told to her by Mr. Cantrell?
22 Because that's the key point. All they would be doing is
23 just simply reciting a conversation, and they had ample
24 opportunity to submit a declaration from Ms. Cordray on that
25 point and they chose not to do so. There is no work product

**72**

1  waiver from Ms. Cordray talking about what Mr. Cantrell
2  supposedly told her on September 14th of 2004.
3      There is also suggestion by Mr. Pals that
4  there is in fact really no conflict between Ms. Carson and
5  Mr. Cantrell over the statement made in 2004.
6      THE COURT: That's okay. I don't have to
7  address that because I've read it. I can decide for myself
8  what it says.
9      MR. GINDLER: Fine. Then you also asked why the
10 17 month delay? If they got this threat in 2004, why didn't
11 you do something? And Mr. Pals responded we didn't have to.
12 We can wait. It's not what the cases say. I don't want to
13 repeat what is in our brief but it's in our reply brief.
14 Waiting shows that there is no reasonable apprehension. The
15 case law is set forth in our reply brief. I need not
16 discuss it again here.
17      Also, we asked him specifically what is the
18 threat in the letters that were sent? What is the threat?
19      And Mr. Pals was not able to find any
20 threatening language. We were very clear with him in
21 telling don't characterize it, point to the language. And
22 what he pointed to, when pressed, was that the five percent
23 rate for commercial products is high. And I believe that
24 the brief describes it as onerous.
25      There is no evidence in the record whatsoever

**73**

1  that five percent is high or is onerous. And as the Court
2  knows, two percent is already owed to universities and so
3  the company wants to make some profit.
4      Mr. Pals also tried to suggest that ARIAD can
5  only satisfy its obligations under its agreement with the
6  universities by litigating. Actually, the agreement says no
7  such thing whatsoever.
8      THE COURT: Well, I didn't hear him make that
9  assertion, but ...
10      MR. GINDLER: Well, just to be clear, Article
11 7.2 says, "During the term of this agreement, licensee shall
12 have the right, but not the obligation, to prosecute, at its
13 own expense, any such infringement of the patent rights."
14      It doesn't have any obligation to do it. And
15 in the amendment, which Mr. Pals talked about, we have an
16 obligation either to bring our own commercial products to
17 market, using the patent rights, or to sublicense others.
18 So we don't satisfy anything by litigating.
19      I want to close.
20      THE COURT: That's your last shot, yes.
21      MR. GINDLER: I want to close with just one
22 point, which is that it's a point made actually in the EMC
23 case. And I actually can't say it better than the EMC case
24 said it. And I'm going to quote from the case on page 811.
25 And this is 89 F.3d at 807.

74

1     "To be sure, any time parties are in
2   negotiations over patent rights, the possibility of a
3   lawsuit looms in the background. No patent owner with any
4   sense would open negotiations by assuring the opposite
5   party that he does not intend to enforce his patent rights
6   under any circumstances. The threat of enforcement either
7   directly by the patentee or indirectly by a third-party to
8   whom the patentee licenses or sells the patent is the entire
9   source of the patentee's bargaining power. Thus, it is
10  unrealistic to suggest that some negotiating patentees
11  intend to enforce their patents, while some do not, and that
12  the first group is subject to declaratory judgment actions
13  while the second is not."
14       Thank you, Your Honor.
15       THE COURT: All right. Thanks.
16       This is a fact intensive inquiry. I appreciate
17  the presentations that have made here and the submissions
18  that were provided. And as I told you before, this was a
19  matter I was going to endeavor to rule on from the bench and
20  I will.
21       There are two issues in play here. One is
22  whether there is declaratory judgment act jurisdiction to
23  begin with and the second is whether, if there is, Amgen
24  has got the right parties here in front of me.
25       As to the first of those issues, there is no

75

1   dispute between the parties that Amgen is engaged in acts,
2   taking concrete action which would qualify under the
3   two-prong test for declaratory judgment act jurisdiction the
4   Federal Circuit has set forth. So the only question is as
5   to the first prong and that is the reasonable apprehension
6   for suit. That is what the briefing is about. That is what
7   discussion today in court has been about.
8        My conclusion is that there is an objectively
9   reasonable apprehension of suit on this record sufficient
10  to sustain jurisdiction. I don't look at any one thing to
11  reach that conclusion. I look, as I'm required to, at the
12  totality of the circumstances.
13       I disagree with Amgen in its assertion that the
14  early letter is threatening, the five-percent royalty rate
15  description somehow constitutes a threat. That I think,
16  on the contrary, is a stretch that won't sustain the
17  characterization that is made of it. But there is a history
18  here of ARIAD being clear that it has patent rights. It
19  wants its patent rights respected, and it wants Amgen taking
20  those rights seriously. That, in and of itself, would not
21  be problematic. As Mr. Gindler has said rightly on behalf
22  of ARIAD, no patentee acquires patent rights with the intent
23  that they be ignored. And ARIAD was certainly within its
24  rights to contact potential licensees and let them know
25  about their rights and suggest that potential licensees take

76

1   a look at those patents.
2        So those letters, in and of themselves, don't
3   create a reasonable apprehension of suit with respect to
4   the '516 patent, but they're not a circumstance that I'm
5   ignoring because they do show ARIAD, on repeated occasions,
6   saying we have these rights and on at least one occasion
7   saying, although not with respect to the '516 patent, we
8   think you are on our rights. And so it's clear that ARIAD
9   is out there looking to see that their rights are respected;
10  a perfectly reasonable and logical position for it to take
11  and background information for what comes next.
12       Among the things that comes next is the issuance
13  of the '516 patent, the immediate contact from ARIAD to
14  Amgen announcing the '516 patent and the immediate lawsuit
15  against Lilly. These are things that all the parties in
16  this suit acknowledge to be facts and which Amgen rightly
17  notes as a feature or a factor in its thinking about what
18  to make of ARIAD's intentions with respect to its, meaning
19  ARIAD's, rights under the '516 patent.
20       Then there is a telephone conversation followed
21  up on correspondence from Mr. Casselman to Mr. Ungemach.
22  In all these interactions, the letters and this telephone
23  conversation which is some time in 2002 or 2003, there is a
24  dance going on. This is not unusual, given the state of the
25  law about declaratory judgment jurisdiction. It's apparent

77

1   from the descriptions I'm able to see in the record that
2   there is an effort by ARIAD to make sure Amgen knows ARIAD
3   is serious about its patent rights without uttering any
4   magic words that would land them in court at the other end
5   of a declaratory judgment action.
6        You know, I've heard Mr. Casselman described as
7   a "nonlawyer." I assume that was not meant as a distinction
8   to say he is better than a lawyer. I assume that was meant
9   to say he is not sophisticated the way a lawyer would be
10  about declaratory judgment act pitfalls. But this appears
11  to be an extremely saddened businessman acting in an under-
12  standably prudent way and with what appears to be a know-
13  ledge of how far he can get without falling into the pit in
14  an effort to try to do exactly that.
15       Nevertheless, it is background information for
16  what comes next: A direct assertion we've got rights.
17  You should be interested in these rights. You should be
18  interested with these rights with respect to a specified
19  product.
20       What came after that is the alleged threat by
21  Ms. Carson in the context of the Lilly litigation.
22       Now, I am persuaded that where there is a
23  dispute in the record of what was said or meant by what
24  was said; and here, counsel for Amgen's point is well
25  taken. Ms. Carson doesn't directly dispute that she made

78

1  the comment attributed to her. She says I would never
2  have threatened suit. So it's less than a direct head-on
3  confrontation, it's more of an oblique confrontation with
4  respect to intent behind her comments, if she made it. And
5  I believe it more likely than not, given the record before
6  me, that she did make the comment attributed to her, that
7  it was in the context in which Mr. Cantrell describes with
8  specificity. And that in that context, it was fairly
9  understood as a statement that there are other players out
10 there and they can expect enforcement efforts.
11     Attorneys, like anybody else, sometimes in the
12 heat of battle, when questioned about what they're doing,
13 will say things that they later regret. And she may well
14 regret having said it or she may well say that judge is a
15 knothead. I said I didn't threaten suit and I meant it.
16 But the record, as best I can figure it, is she probably
17 said it. She probably wishes she hadn't said it but she
18 probably said it. And in the context in which it was said,
19 it was rightly viewed as an assertion that Amgen was in
20 the batter's box. That when they got finished pitching an
21 infringement action at Lilly, the next one that was going to
22 be called in was going to be Amgen.
23     Now, there is delay there. And if nothing had
24 happened next, I think I would be ruling differently than
25 in am today. In fact, I feel sure I would have. But what

79

1  comes next is highly significant to me. In open court,
2  there is displayed internal presentation materials which
3  the ARIAD folks had used to educate their board, explain to
4  their board what their planning was. And certainly in the
5  context of that litigation, again, a savvy businessperson
6  like Mr. Berger, knowing the consequences -- and in this
7  event, I should say Dr. Berger; he is not a lawyer, he is
8  never going to appear in front of me -- Dr. Berger is
9  careful to distance himself in that trial testimony from
10 any implication that, well, this meant we were going to sue
11 people. But I'm looking at the slides themselves and not
12 the explanations for the slides themselves.
13     Let me rephrase that. I certainly have looked
14 at the explanation for the slides, themselves. It's a
15 factor I have weighed in making the judgment I am making
16 here today. But the slides themselves speak more loudly to
17 me than Dr. Berger's careful testimony in the action in the
18 District of Massachusetts. Those slides show that there is
19 a slide 35 naming lead players in the market. I think in
20 context, that can only be understood to mean in the market
21 of products that are likely to be covered by our rights.
22     The next slide, 36, has Marketed and Late-Stage
23 Products as its heading and the very first point there is
24 the Xigris product which is the subject of the then ongoing
25 patent suit.

80

1      The next slide, 37, still headed Marketed and
2  Late-Stage Products, has at the top of it, as its first
3  bullet point, antiinflammatories of which Enbrel is listed
4  as the first one, and Kineret later on in that same page.
5      Later, slide 41 talks about goals for the first
6  quarter of '02 which include selecting litigation counsel,
7  complete enforcement analysis and action plan. Those are
8  not limited to suit against Lilly, they're stated broadly.
9      I think in the context of the overall
10 presentation that was given -- and I say given in the
11 courtroom; that is, as displayed in the courtroom. I have
12 no idea what was said to the board when slides were shown to
13 the board. I'm talking about what a reasonably objective
14 observer could have made, and I think Amgen says it did
15 make, of the information presented in that courtroom. That
16 is, Xigris is first. By its own admission, ARIAD is the
17 David to the pharmaceutical Goliath. That is something that
18 is said a few times. And they're not taking more than one
19 at a time.
20     But Xigris was at the top of slide 36, we're at
21 the top of slide 37, and that, together with "Enbrel is on
22 the list," in the context of the various communications that
23 had gone before, showing that ARIAD was serious about its
24 patent rights and seeing that those rights were respected,
25 was enough for a reasonably objective company in Amgen's

81

1  position to say they're going to sue us. And we're doing
2  things that satisfy the second prong, the declaratory
3  judgment act test. And in that context, the law is pretty
4  clear that you don't have to wait until ARIAD decides it's
5  ready to pull the trigger.
6      I am not taking into account at all in my
7  analysis that "you're next" comment. I think Dr. Carson
8  has given a reasonable explanation. Unlike the earlier
9  conversation Ms. Carson had directly with Mr. Cantrell,
10 Mr. Cantrell only heard a snatch of the conversation. He
11 doesn't know the context of it. Ms. Carson does, and has
12 given a reasonable explanation for it. And, in any event,
13 Amgen is frank to say it's not relying on it as a point of
14 presuit knowledge.
15     For the same reason on that last point, I'm not
16 taking the CNBC interview comments into account at all. To
17 me, they're just flat irrelevant. It doesn't make any
18 difference what Dr. Berger said to the press after this
19 suit was filed and could not possibly have affected
20 anybody's apprehension of suit before suit was filed.
21     I also want to note that the overall tone of
22 the interaction, the going back and forth over a series of
23 conversations, letters, and commentary during the Lilly
24 conversations as recounted by Mr. Cantrell with respect to
25 the "Enbrel is on the list" shows that this is a field in

82

1 which -- and I'm not saying this is a bad thing at all --
2 a field in which ARIAD feels it has rights and feels that
3 the enforcement of those rights is important, and that it
4 has the intention of enforcing those rights. In other
5 words, there is a tone to the totality and the tone is,
6 overall, one that a reasonably objective observer would
7 perceive to be threatening enforcement action.
8        Consequently, I believe I do have the discretion
9 to exercise jurisdiction, and I will not decline to exercise
10 that jurisdiction because of the reexamination that is still
11 in process because of the efforts of ARIAD to overturn the
12 initial decision.
13       I note that the parties may want to talk about
14 whether it makes sense to pursue this litigation at this
15 particular point in time. I am satisfied, however, that
16 ARIAD still has these rights, could still choose to sue on
17 these rights and, for reasons I already described, Amgen
18 rightly concerned that they're the ones who would be sued
19 in short order, so I'm not going to decline jurisdiction
20 on the basis that a large chunk of the '516 patent is, as
21 Mr. Gindler put it, in flux at this time.
22       That brings me to the last issue. That is, do I
23 have the right parties in front of me? And I am going to
24 deny the motion to dismiss without prejudice on this point.
25 It may be that there is some further evidence that would

83

1 come to light that would demonstrate something different on
2 this record than what I think I'm seeing right now. What
3 I'm seeing right now is the grant of substantially all
4 rights associated with the patent. That is, ARIAD has the
5 right to sublicense, ARIAD has the right to enforce, ARIAD
6 has the contractual right to be the sole representative in a
7 DJ action.
8        The language specifically pointed out to me
9 as the replacement language for 7.5 in the agreement that
10 effectively assigns these rights does note that there is
11 some reservation of right if ARIAD fails to do reasonable
12 things to defend a DJ action, but it appears to me that
13 amended language was intended to, and the legal effect is
14 it in fact does, strengthen ARIAD's position to be enforcing
15 and defending the rights associated with this patent all by
16 itself, without anybody else in the mix.
17       Now, I just note I'm doing that without
18 prejudice because it's possible, it's just possible that I
19 missed something or there is something out there that hasn't
20 been put in front of me, and I recognize that I don't have
21 the other parties to this agreement in front of me. I don't
22 have like MIT, Whitehead and other folks in here, and who is
23 to say I won't. There is nothing to prevent, at least at
24 this stage that I'm aware of, third-party practice that
25 would bring them into the suit, if they chose to be here,

84

1 or perhaps even if they didn't. I won't prejudge that for a
2 second. But I'm not stopping and throwing this suit out on
3 indispensable party claim at this point. That means we're
4 here, we're moving forward and discovery is going to go
5 forward.
6        I have before me a motion for protective order
7 and a motion to compel. I had thought we might get to that
8 today and we haven't. Here is the short of it with respect
9 to that, however. I read your follow-up letters. I do not
10 view the language of the protective order entered in the
11 Massachusetts action as an attempt or anything intended by
12 that District Court to do anything other than something I
13 do as a matter of course in my protective orders and that
14 is make sure that nobody is caught short, that confidential
15 information that somebody got from a third-party isn't aired
16 out in public without that party, that third-party having a
17 chance to come in and deal with it.
18       To the extent ARIAD is trying to make the
19 argument -- and I'm not sure it is really, although some of
20 the things said in the teleconference last month and in
21 the correspondence could be read this way. To the extent
22 there is an effort by ARIAD to say, well, judge, you can't
23 really do anything here without making sure you are acting
24 appropriately within the bounds of the District Court of
25 Massachusetts order, you know, I reject that because I don't

85

1 think, A, the District Court in Massachusetts intended that
2 or, B, that it could bind this Court in a fashion suggested
3 by that argument, if that is the argument ARIAD intended to
4 make.
5        On the contrary, I think as I said a moment ago,
6 that this is standard language in a protective order to
7 prevent an unwitting third-party from seeing this private
8 information get out in the public without having a chance to
9 defend its confidentiality in front of the court under whose
10 power the subpoena is issued. That's not the circumstance
11 that we have here. That is, ARIAD is not some unwitting
12 third-party wondering. It's in this suit. It knows what
13 is at issue. It had its opportunity to defend. It has
14 made its position on this record. It has had its rights
15 satisfied. And I'm not granting a protective order and I'm
16 not quashing the subpoena.
17       Now, having said that, I want to emphasize that
18 I am sensitive to ARIAD's concern that its information not
19 be disclosed from Lilly in a manner that is inconsistent
20 with the protective order in this case. In other words, in
21 the first instance, any information that Lilly discloses,
22 I'm not going to have this go Lilly to ARIAD to Amgen. What
23 I will say is this is not going to go beyond counsel's eyes
24 only on the Amgen side until the folks on the ARIAD side
25 have had a chance to vet this and decide whether there are

86

1  confidentiality designations that need to be put in place
2  that are somehow other or different from the ones that
3  existed in the District of Massachusetts. In short, you
4  will have your shot to make sure it doesn't go past
5  attorneys eye's only level under the protective order we've
6  got until you, on the ARIAD side, have a chance to look at
7  it.
8          Last, but not least, there is a motion to
9  compel. I grant it to this limited extent. We're now past
10 the motion to dismiss. Right or wrong? I've given you my
11 best shot and I think you need to move forward at this
12 juncture.
13         However, I do think there is merit to some of
14 what ARIAD has said about the breadth of some of the
15 requests. And I just don't want to get into it at this
16 point because there is just not a sufficient point on the
17 issue for me to address it sensibly. Suffice it to say
18 that the parties should meet and confer in good faith to
19 make sure that the requests that are made of ARIAD are
20 appropriate within the bounds of Rule 26 and designed to
21 move us past disputes that can only waste your client's time
22 and your time, your clients' money and, to a certain degree,
23 the Court's time if things are cast so broadly so as to cast
24 reasonable objections. So I'm asking you to do what the
25 rules already tell you to do, talk to each other, see if you

87

1  can't come to a reasonable accommodation about some of these
2  requests.
3          All right. I think that addresses the matters
4  that were before me. And I do have another matter I am
5  going to need to attend now. But let me ask you first
6  before I take off out of here, Mr. Pals, is there any other
7  matter pending that you think the Court needs to give its
8  attention to?
9          MR. PALS: Not at this time Your Honor.
10         THE COURT: Mr. Gindler?
11         MR. GINDLER: No, Your Honor. Just one
12 question. When you refer to attorneys eyes only, I assume
13 you are referring to outside counsel's eyes only.
14         THE COURT: Yes. Thank you for clarifying that.
15 That is my intent. Well, let me say this. I have not gone
16 back and re-read the protective order that was entered in
17 this case. It may be, in the protective order entered in
18 this case, there is, under the highest designation that you
19 parties negotiated, a level that involves somebody from
20 in-house counsel.
21         Now, you should have that in mind when you are
22 taking whatever position you are taking, okay? Both sides.
23 But I'm telling you since I'm bringing in litigation from
24 another case in the first instance, I'm talking about
25 outside counsels' eyes only because it may be that this

88

1  tranche of documents raises different issues than ARIAD
2  had in mind when it negotiated whatever it negotiated with
3  respect to the protective order in the first place.
4          So that's a long way of saying, yes, it is
5  outside attorneys' eyes only for this significant batch of
6  documents unless and until you guys are able to agree other-
7  wise or I get a persuasive argument that it's impossible for
8  them to deal with you on this point and they are being
9  unreasonable.
10         Have I made myself clear? In short, I don't
11 know, in fact, I think it unlikely, that this collective of
12 documents was specifically in mind when this was being
13 litigated so I'm going to treat this as we treat other
14 things before there is a protective order in place, which is
15 it's outside counsels' eyes only. You folks talk about it.
16 If you have already negotiated certain people to be in the
17 loop on the inside, then you ought to reasonably be talking
18 about whether there is any reason for them not to see it
19 other than just kind of being the dog in the manger; okay?
20         Do you understand what I'm trying to do? I'm
21 trying to protect ARIAD's rights, move this thing forward
22 and hopefully if these people were in the loop before, it
23 was before ARIAD recognized that, yes, they wouldn't be a
24 threat to see the most sensitive stuff. And you ought to be
25 taking that into account, ARIAD, in whether you are really

89

1  going to say, no, this can't be seen by those folks on the
2  other side. But I'm letting you take the first track crack
3  at that; all right?
4          MR. GINDLER: Yes.
5          THE COURT: Before they see it.
6          MR. PALS: That's pretty much where we are,
7  Your Honor. We haven't finalized the negotiated protective
8  order but we have agreed on sort of the structure of the
9  confidentiality restrictions which would allow inside
10 counsel access to the information.
11         MR. GINDLER: It would allow certain of them,
12 and it also would provide, at least in the version we have
13 proposed, and it also is in the protective order from the
14 Lilly case, that nothing in the protective order stops us
15 from seeking a higher level of protection for particular
16 documents. And I think the Court is wise that we take the
17 first crack at seeing whether we are concerned about any
18 document and want to seek a higher level of protection for
19 them.
20         THE COURT: And that's what I'm telling is going
21 to be the case here. Okay?
22         MR. GINDLER: Thank you, Your Honor.
23         THE COURT: All right. Thanks for your time and
24 attendance. Appreciate it. We're in recess.
25         (Motions hearing ends at 4:32 p.m.)

**2**

'02 [2] - 40:8, 80:6
'04 [1] - 54:16
'518 [41] - 7:5, 7:11,
 7:13, 9:21, 10:3,
 10:4, 10:7, 10:9,
 10:16, 10:22, 11:19,
 12:7, 13:1, 14:12,
 14:13, 14:18, 14:22,
 18:11, 19:2, 31:8,
 33:5, 36:16, 38:8,
 38:19, 39:10, 43:2,
 48:10, 57:8, 57:13,
 57:15, 58:14, 60:21,
 64:9, 64:17, 67:6,
 76:4, 76:7, 76:13,
 76:14, 76:19, 82:20

**0**

06-259 [1] - 1:10

**1**

1 [1] - 35:21
10 [2] - 47:25, 71:6
102 [1] - 60:19
103 [1] - 60:19
11 [4] - 38:20, 47:10,
 47:11, 62:10
11th [4] - 4:19, 28:15,
 28:24, 50:14
12 [1] - 1:12
12th [1] - 28:25
13th [1] - 28:25
14 [3] - 24:5, 37:4,
 38:11
14th [8] - 20:9, 20:10,
 24:7, 28:15, 28:20,
 28:25, 50:14, 72:2
15th [1] - 28:25
16 [1] - 38:11
180 [4] - 11:1, 11:7,
 12:5, 12:9
16th [1] - 28:25
17 [4] - 25:10, 26:8,
 54:6, 72:10
18th [3] - 3:14, 28:4,
 28:9
19 [1] - 66:18
1991 [4] - 38:18,
 38:19, 38:21, 39:9
1998 [1] - 38:21
19th [2] - 28:5, 28:9

**2**

2 [1] - 47:18
2.5 [1] - 35:21
2.8 [3] - 48:17, 48:18
2000 [6] - 4:7, 4:19,
 6:15, 41:25, 56:13,
 56:15, 57:6
2000-2001 [1] - 57:12
2001 [7] - 7:22, 9:22,
 12:18, 18:4, 33:3,
 35:8, 57:6
2002 [7] - 13:22,
 14:12, 42:14, 47:18,
 57:7, 64:10, 76:23
2002-2003 [2] - 14:10,
 42:18
2003 [3] - 13:22,
 22:10, 76:23
2004 [12] - 20:5, 20:8,
 20:9, 20:11, 24:5,
 24:7, 28:21, 55:1,
 55:4, 72:2, 72:5,
 72:10
2005 [1] - 42:20
2006 [2] - 1:12, 4:7
203 [3] - 10:23, 10:25,
 12:6
21 [1] - 38:2
25 [1] - 7:19
26 [1] - 86:20
2:00 [2] - 1:12, 2:12

**3**

35 [1] - 79:19
36 [2] - 79:22, 80:20
37 [2] - 80:1, 80:21

**4**

41 [1] - 80:5
4:32 [1] - 89:25

**5**

5 [1] - 16:2

**6**

6 [1] - 35:23
60 [2] - 4:22, 5:6

**7**

7.2 [1] - 73:11

7.5 [6] - 46:21, 47:12,
 47:23, 48:2, 64:11,
 83:9
71 [3] - 36:25, 63:10,
 63:13

**8**

807 [2] - 15:12, 73:25
811 [1] - 73:24
812 [1] - 15:13
89 [2] - 15:12, 73:25

**A**

ability [4] - 44:16,
 48:21, 68:4, 70:6
able [5] - 35:18, 45:1,
 72:19, 77:1, 88:6
Absent [1] - 16:5
absolute [3] - 44:4,
 45:9, 69:12
absolutely [2] - 17:25,
 26:4
Absolutely [4] - 31:25,
 40:3, 45:3, 54:7
accept [2] - 70:18,
 71:12
access [1] - 89:10
accommodation [1] -
 87:1
According [1] - 11:23
according [2] - 18:15,
 20:4
account [4] - 16:13,
 81:6, 81:16, 88:25
accuse [2] - 8:25,
 22:12
accused [2] - 16:8,
 35:2
accusing [1] - 29:15
acknowledge [1] -
 76:16
acknowledging [1] -
 51:3
acquired [1] - 61:22
acquires [1] - 75:22
acquisition [1] - 13:8
act [4] - 74:22, 75:3,
 77:10, 81:3
acting [2] - 77:11,
 84:23
action [27] - 13:14,
 13:17, 15:4, 15:15,
 15:20, 16:4, 25:10,
 25:11, 40:10, 43:19,
 44:1, 47:6, 48:4,
 48:5, 60:9, 62:21,

68:14, 69:11, 75:2,
 77:5, 78:21, 79:17,
 80:7, 82:7, 83:7,
 83:12, 84:11
Action [3] - 11:1,
 11:17, 11:24
ACTION [1] - 1:3
actions [6] - 15:6,
 46:24, 47:22, 48:9,
 54:9, 74:12
activation [1] - 5:25
activities [1] - 63:15
activity [12] - 10:11,
 10:13, 16:7, 16:12,
 33:15, 36:14, 36:17,
 39:2, 40:10, 44:3,
 63:15, 64:14
acts [1] - 75:1
actual [2] - 16:7, 36:23
add [3] - 30:1, 43:7,
 43:8
addition [1] - 48:11
additional [1] - 62:7
address [5] - 3:16,
 18:7, 70:15, 72:7,
 85:17
addressed [1] - 42:12
addresses [1] - 87:3
admission [2] - 23:12,
 80:16
admitted [1] - 70:17
advance [2] - 60:10,
 65:11
adverse [1] - 15:15
affect [3] - 7:15,
 10:13, 54:10
affected [1] - 81:19
affiliated [1] - 61:23
affirmatively [2] -
 25:1, 25:4
afternoon [4] - 2:13,
 2:14, 2:24, 45:20
afterwards [2] - 30:11,
 71:13
ago [1] - 85:5
agree [5] - 12:16,
 43:11, 43:14, 67:24,
 88:6
agreed [1] - 89:8
agreeing [1] - 9:25
agreement [37] -
 13:10, 13:17, 22:10,
 37:19, 38:16, 38:18,
 39:7, 39:14, 40:6,
 42:6, 42:7, 42:10,
 45:7, 46:22, 47:9,
 47:14, 47:18, 48:1,
 48:11, 48:12, 48:13,
 48:15, 48:16, 48:18,
 64:7, 64:9, 68:11,

68:12, 68:13, 68:16,
 69:11, 70:8, 73:5,
 73:6, 73:11, 83:9,
 83:21
agreements [1] -
 67:21
ahead [5] - 10:6,
 11:12, 50:16, 55:5,
 64:5
air [1] - 15:20
aired [1] - 84:15
alleged [6] - 4:11,
 20:3, 20:20, 25:9,
 27:20, 77:20
allegedly [1] - 27:17
Allen [1] - 3:3
Allen's [1] - 42:19
allow [2] - 89:9, 89:11
allowed [2] - 33:6,
 60:21
alone [3] - 31:5, 31:6,
 47:5
amended [6] - 48:18,
 64:10, 64:12, 68:10,
 70:8, 83:13
amending [1] - 64:11
amendment [6] -
 47:16, 47:20, 48:1,
 48:2, 64:12, 73:15
Amgen [104] - 2:19,
 3:17, 3:21, 5:10,
 5:13, 6:5, 6:9, 8:10,
 12:4, 12:6, 13:3,
 13:7, 13:14, 13:24,
 14:6, 14:21, 16:20,
 18:18, 18:24, 19:5,
 20:22, 21:5, 22:10,
 22:11, 23:3, 23:15,
 23:19, 24:5, 24:12,
 24:21, 25:9, 25:12,
 25:13, 25:15, 25:16,
 26:7, 26:16, 26:19,
 27:1, 27:4, 27:20,
 27:24, 28:3, 29:3,
 29:7, 30:3, 30:14,
 31:4, 31:11, 33:19,
 34:24, 35:5, 36:2,
 40:18, 41:12, 42:14,
 42:15, 42:18, 42:22,
 43:1, 43:25, 44:3,
 50:5, 51:5, 53:12,
 53:13, 53:23, 54:5,
 54:7, 54:20, 54:25,
 55:3, 57:4, 57:17,
 61:14, 61:22, 61:23,
 62:12, 62:23, 62:24,
 62:25, 64:24, 65:13,
 68:24, 70:3, 70:19,
 70:24, 71:14, 74:23,
 75:1, 75:13, 75:19,

76:14, 76:16, 77:2, 78:19, 78:22, 80:14, 81:13, 82:17, 85:22, 85:24

**AMGEN** [3] - 1:3, 1:4, 1:5

**Amgen's** [17] - 19:1, 26:15, 26:18, 27:6, 27:18, 30:23, 30:25, 31:10, 31:12, 31:24, 32:9, 62:9, 62:11, 65:18, 71:12, 77:24, 80:25

**Aml** [5] - 21:22, 21:25, 22:9, 59:19, 59:21

**amount** [2] - 35:8, 45:25

**ample** [2] - 29:3, 71:23

**analysis** [23] - 14:24, 34:13, 34:14, 36:9, 36:20, 40:9, 46:12, 46:16, 49:5, 49:17, 55:12, 58:17, 58:19, 59:23, 62:21, 64:24, 65:2, 65:5, 65:14, 66:18, 80:7, 81:7

**analytical** [1] - 65:9

**AND** [1] - 1:1

**and-a-half** [1] - 54:3

**Angeles** [1] - 2:7

**announced** [1] - 28:9

**announcing** [1] - 76:14

**answer** [8] - 13:13, 17:9, 35:10, 41:6, 41:9, 49:25, 66:1, 68:22

**Answer** [12] - 32:20, 33:13, 33:16, 34:1, 35:11, 36:18, 37:7, 37:10, 37:15, 60:23, 63:23, 64:1

**answered** [1] - 11:5

**answers** [1] - 60:22

**antiinflammatories** [5] - 36:3, 36:13, 36:16, 36:19, 80:3

**antiinflammatory** [1] - 36:4

**Anyway** [1] - 65:25

**anyway** [1] - 53:10

**apologies** [1] - 69:2

**apologize** [5] - 9:12, 39:20, 65:23, 69:2, 69:5

**apparent** [1] - 76:25

**appear** [1] - 79:8

**APPEARANCES** [2] - 1:16, 2:1

**appendices** [1] - 6:23

**Appreciate** [2] - 45:18, 89:24

**appreciate** [1] - 74:16

**apprehension** [37] - 3:22, 3:23, 11:15, 13:18, 15:8, 16:23, 26:12, 43:6, 49:20, 49:21, 50:22, 50:24, 51:2, 51:4, 51:6, 51:8, 51:12, 51:15, 52:25, 53:2, 54:5, 54:8, 54:11, 55:1, 59:2, 60:14, 61:9, 61:12, 62:23, 65:2, 65:18, 66:15, 72:14, 75:5, 75:9, 76:3, 81:20

**approach** [1] - 58:24

**approaches** [1] - 17:5

**approaching** [2] - 26:17, 45:22

**appropriate** [2] - 46:16, 86:20

**appropriately** [1] - 84:24

**April** [9] - 4:7, 20:9, 20:10, 28:4, 28:15, 28:24, 50:14

**area** [3] - 5:21, 34:3, 34:7

**areas** [2] - 6:6, 35:18

**arguing** [1] - 53:12

**argument** [12] - 2:21, 3:5, 45:12, 45:23, 52:7, 52:16, 52:21, 70:8, 84:19, 85:3, 88:7

**arguments** [1] - 3:17

**ARIAD** [144] - 1:9, 2:23, 2:25, 4:12, 4:19, 5:9, 5:13, 11:6, 11:8, 12:2, 12:6, 12:23, 13:12, 13:14, 13:17, 17:24, 19:1, 20:13, 23:14, 26:24, 26:25, 28:19, 31:10, 31:18, 32:4, 32:5, 35:8, 37:19, 38:7, 38:17, 38:22, 38:23, 38:25, 41:25, 42:5, 42:10, 42:15, 42:18, 43:14, 43:18, 43:22, 43:23, 44:3, 44:11, 44:20, 44:22, 45:1, 46:17, 46:22, 46:23, 47:6, 47:21, 47:22, 48:3, 48:4, 48:8, 48:14, 48:16, 48:19, 48:22, 48:23, 48:25, 49:2, 49:8, 49:10,

49:12, 52:17, 52:20, 53:11, 53:13, 54:17, 55:2, 55:8, 57:2, 57:3, 57:4, 58:9, 58:23, 60:9, 60:20, 61:9, 62:2, 63:1, 63:18, 64:7, 64:13, 64:15, 64:25, 65:1, 66:20, 66:24, 66:25, 67:2, 67:7, 67:17, 67:18, 68:6, 68:14, 68:17, 69:12, 70:1, 70:8, 70:10, 70:12, 71:6, 73:4, 75:18, 75:22, 75:23, 76:5, 76:8, 76:13, 77:2, 79:3, 80:16, 80:23, 81:4, 82:2, 82:11, 82:16, 83:4, 83:5, 83:11, 84:18, 84:22, 85:3, 85:11, 85:22, 85:24, 86:6, 86:14, 86:19, 88:1, 88:23, 88:25

**Ariad** [1] - 44:15

**ARIAD'S** [16] - 8:14, 8:21, 34:21, 39:8, 44:12, 49:7, 62:25, 63:14, 67:7, 71:9, 76:18, 76:19, 83:14, 85:18, 88:21

**arrangement** [1] - 68:20

**Article** [1] - 73:10

**articles** [6] - 8:10, 9:4, 9:17, 9:18, 65:5, 65:10

**ASHBY** [1] - 2:3

**asserting** [1] - 6:10

**assertion** [7] - 15:19, 50:2, 50:6, 73:9, 75:13, 77:16, 78:19

**assertions** [4] - 17:23, 19:15, 39:16, 50:1

**assigns** [1] - 83:10

**assist** [1] - 4:1

**associated** [3] - 40:10, 83:4, 83:15

**assume** [6] - 28:22, 30:6, 37:2, 77:7, 77:8, 87:12

**assuring** [1] - 74:4

**attached** [4] - 9:17, 56:12, 56:15, 55:17

**attachment** [1] - 56:13

**attempt** [2] - 11:8, 84:11

**attempted** [1] - 38:6

**attend** [1] - 87:5

**attendance** [1] - 89:24

**attention** [4] - 31:24, 44:2, 69:18, 87:8

**attesting** [1] - 71:8

**attorney** [2] - 23:13, 24:12

**Attorneys** [1] - 78:11

**attorneys** [3] - 2:14, 86:5, 87:12

**attorneys'** [1] - 88:5

**attributed** [4] - 29:1, 61:16, 78:1, 78:6

**attributes** [2] - 21:10, 60:5

**August** [1] - 3:14

**available** [2] - 41:16, 42:1

**aware** [5] - 28:10, 30:3, 30:17, 61:9, 83:24

### B

**background** [3] - 74:3, 76:11, 77:15

**bad** [1] - 82:1

**BALICK** [2] - 2:3, 2:24

**ball** [1] - 55:6

**bargaining** [1] - 74:9

**Based** [1] - 21:4

**based** [3] - 7:9, 9:18, 12:22

**bases** [2] - 39:16, 50:22

**basis** [4] - 51:6, 51:12, 65:8, 82:20

**batch** [1] - 88:5

**batter's** [1] - 78:20

**battle** [1] - 78:12

**bear** [1] - 31:9

**bearing** [1] - 54:13

**beaten** [1] - 66:3

**BEFORE** [1] - 1:15

**beforehand** [1] - 71:12

**began** [1] - 38:11

**begin** [1] - 74:23

**beginning** [3] - 2:12, 28:16, 37:4

**begins** [1] - 33:1

**behalf** [3] - 2:18, 2:25, 75:21

**behind** [4] - 3:20, 47:18, 60:18, 78:4

**belabor** [1] - 68:3

**believes** [1] - 18:24

**Ben** [5] - 21:22, 21:25, 22:9, 59:19, 59:21

**Ben-Ami** [5] - 21:22, 21:25, 22:9, 59:19,

59:21

**bench** [3] - 6:18, 58:5, 74:19

**benchmark** [1] - 35:17

**benefit** [1] - 24:6

**benign** [1] - 7:7

**Berger** [23] - 3:3, 31:4, 31:16, 32:7, 33:23, 35:5, 36:6, 40:23, 41:5, 41:24, 42:3, 57:9, 60:16, 60:19, 60:22, 61:6, 63:7, 65:25, 66:3, 79:6, 79:7, 79:8, 81:18

**Berger's** [11] - 31:6, 33:9, 36:25, 38:5, 60:17, 63:2, 64:21, 65:7, 65:17, 79:17

**Bermuda** [1] - 1:5

**best** [8] - 22:4, 23:19, 29:4, 63:19, 78:16, 86:11

**better** [3] - 24:8, 73:23, 77:8

**between** [11] - 26:18, 28:15, 38:16, 42:18, 42:20, 51:22, 67:18, 69:14, 70:8, 72:4, 75:1

**beyond** [1] - 85:23

**big** [6] - 22:10, 22:11, 34:7, 63:21, 65:9

**bigger** [1] - 20:22

**billion** [3] - 35:21, 35:22

**bind** [1] - 85:2

**binder** [4] - 47:23, 60:18, 65:20, 65:21

**biotech** [1] - 66:4

**bit** [8] - 11:12, 19:9, 21:1, 31:14, 32:8, 46:12, 70:23, 71:2

**blanket** [1] - 70:11

**board** [13] - 30:24, 31:15, 32:18, 33:6, 34:2, 34:5, 35:7, 35:12, 35:13, 79:3, 79:4, 80:12, 80:13

**book** [1] - 6:18

**Boston** [1] - 67:3

**bottom** [1] - 36:5

**bounds** [2] - 84:24, 86:20

**box** [1] - 78:20

**breadth** [2] - 35:17, 86:14

**break** [2] - 23:8, 23:22

**Brian** [1] - 1:24

**Brief** [1] - 69:4

**brief** [18] - 30:3, 30:5,

30:16, 30:19, 32:9,
34:24, 38:2, 44:8,
46:23, 50:10, 66:20,
68:2, 70:21, 72:13,
72:15, 72:24
**briefing** [5] - 37:3,
37:24, 43:8, 50:4,
75:6
**briefly** [1] - 39:14
**briefs** [1] - 3:20
**bring** [11] - 42:6, 42:8,
44:1, 44:2, 44:20,
45:8, 63:19, 66:25,
67:22, 73:16, 83:25
**bringing** [1] - 87:23
**brings** [1] - 82:22
**broadly** [2] - 80:8,
86:23
**brought** [1] - 48:9
**bullet** [1] - 80:3
**bunch** [1] - 8:9
**business** [5] - 19:4,
25:22, 32:23, 42:21,
42:25
**businessman** [1] -
77:11
**businessperson** [1] -
79:5
**BY** [4] - 1:18, 1:21,
2:3, 2:6

## C

**calculations** [1] - 40:7
**California** [2] - 2:7,
3:1
**cancer** [1] - 42:22
**Cantrell** [37] - 20:5,
20:12, 20:17, 20:21,
21:2, 23:10, 23:12,
23:20, 23:21, 24:15,
25:13, 25:15, 25:24,
26:14, 27:2, 27:12,
29:23, 50:8, 51:22,
53:3, 53:10, 59:4,
59:5, 60:5, 61:16,
70:23, 71:3, 71:10,
71:14, 71:16, 71:21,
72:1, 72:5, 78:7,
81:9, 81:10, 81:24
**Cantrell's** [8] - 27:13,
28:14, 29:12, 30:15,
50:19, 53:18, 59:7,
59:14
**capital** [1] - 64:8
**Capo** [1] - 15:25
**care** [3] - 48:24, 71:19,
71:20
**careful** [4] - 61:7,

61:10, 79:9, 79:17
**carefully** [1] - 59:16
**Carson** [48] - 4:12,
20:4, 20:13, 20:14,
20:20, 20:23, 21:6,
21:11, 21:16, 22:9,
22:12, 23:3, 23:5,
23:9, 24:8, 25:21,
26:15, 26:18, 26:21,
26:23, 27:11, 27:15,
27:22, 28:10, 29:4,
29:10, 29:14, 29:22,
30:13, 50:13, 50:25,
51:13, 51:22, 51:24,
53:8, 59:4, 59:12,
59:14, 60:4, 62:24,
71:9, 72:4, 77:21,
77:25, 81:7, 81:9,
81:11
**Carson's** [5] - 20:6,
28:25, 52:14, 54:15,
61:13
**case** [46] - 11:24, 14:5,
15:5, 15:9, 15:11,
15:25, 17:10, 24:25,
26:2, 26:24, 27:23,
28:4, 28:18, 28:19,
30:6, 46:13, 47:13,
49:4, 55:13, 55:15,
58:4, 58:8, 59:5,
59:24, 60:9, 61:25,
64:22, 64:23, 66:2,
66:22, 67:3, 67:5,
67:23, 68:1, 72:15,
73:23, 73:24, 85:20,
87:17, 87:18, 87:24,
89:14, 89:21
**case-in-chief** [1] -
28:19
**cases** [2] - 66:25,
72:12
**Casselman** [16] -
18:17, 18:23, 18:25,
19:2, 32:21, 58:8,
58:9, 58:10, 58:11,
58:13, 58:16, 65:3,
65:11, 76:21, 77:6
**Casselman's** [1] -
13:9
**cast** [3] - 12:5, 86:23
**catch** [1] - 31:9
**caught** [1] - 84:14
**caused** [1] - 51:4
**ceiling** [1] - 62:17
**cells** [1] - 5:25
**center** [1] - 62:12
**certain** [5] - 32:1,
86:22, 88:16, 89:11
**certainly** [5] - 51:11,
52:22, 75:23, 79:4,

79:13
**Certainly** [1] - 21:21
**cetera** [2] - 16:8
**Chairman** [1] - 31:16
**challenging** [1] - 48:9
**chance** [5] - 40:2,
84:17, 85:8, 85:25,
86:6
**change** [1] - 68:13
**characterization** [3] -
30:25, 31:10, 75:17
**characterize** [2] -
56:2, 72:21
**characterized** [1] -
18:21
**charge** [5] - 15:20,
16:6, 16:11, 23:13,
32:22
**check** [1] - 56:14
**Chicago** [1] - 1:22
**Chief** [1] - 31:17
**chief** [1] - 28:19
**choice** [4] - 49:1, 49:2,
49:7, 49:8
**choose** [2] - 49:18,
82:16
**choosing** [1] - 27:21
**chose** [4] - 25:14,
25:16, 71:25, 83:25
**chosen** [1] - 20:13
**chronological** [1] -
18:6
**chunk** [1] - 82:20
**Circuit** [5] - 15:5,
17:10, 19:10, 19:12,
75:4
**circumstance** [3] -
54:12, 76:4, 85:10
**circumstances** [6] -
42:13, 49:17, 55:9,
55:12, 74:6, 75:12
**cite** [1] - 38:11
**cited** [4] - 7:24, 8:9,
46:23, 46:24
**citing** [1] - 46:25
**CIVIL** [1] - 1:3
**claim** [4] - 9:10, 30:10,
66:24, 84:3
**claimed** [5] - 7:25,
8:20, 9:7, 17:18,
69:11
**claiming** [1] - 36:16
**claims** [13] - 3:21,
10:23, 10:25, 12:6,
13:1, 14:20, 14:22,
34:15, 36:22, 38:8,
43:25, 60:24, 61:4
**clarifying** [1] - 87:14
**classes** [1] - 38:7
**clear** [11] - 15:5,

18:24, 58:5, 64:22,
66:23, 72:20, 73:10,
75:18, 76:8, 81:4,
88:10
**client** [3] - 23:25, 24:1,
25:23
**client's** [1] - 86:21
**clients'** [1] - 86:22
**clinical** [1] - 35:4
**close** [6] - 3:24, 17:21,
69:6, 69:8, 73:19,
73:21
**closed** [1] - 28:19
**closest** [2] - 14:20,
17:16
**clothed** [1] - 31:3
**clue** [1] - 34:20
**CNBC** [2] - 41:13,
81:16
**co** [3] - 23:7, 23:25,
64:7
**co-license** [1] - 64:7
**co-promoted** [1] -
23:25
**co-promoter** [1] - 23:7
**cogent** [1] - 46:18
**colleagues** [1] - 2:19
**collective** [1] - 88:11
**combination** [1] -
58:22
**combined** [1] - 31:6
**comfortable** [1] - 52:1
**coming** [1] - 18:4
**comment** [24] - 27:11,
27:12, 27:17, 28:1,
43:7, 50:3, 50:9,
50:12, 50:13, 50:23,
51:10, 51:11, 51:13,
51:14, 53:1, 53:17,
53:20, 53:21, 63:11,
70:17, 70:19, 78:1,
78:6, 81:7
**commentary** [1] -
81:23
**comments** [4] - 52:8,
63:3, 78:4, 81:16
**commercial** [4] -
14:16, 63:14, 72:23,
73:16
**commercialization** [2]
- 7:8, 63:15
**commercially** [1] -
64:13
**communicated** [2] -
42:14, 71:7
**communicating** [1] -
56:1
**communications** [3] -
4:18, 42:17, 80:22
**community** [1] - 40:13

**compact** [1] - 6:24
**companies** [16] - 6:4,
6:15, 7:19, 12:21,
14:14, 17:5, 18:13,
34:3, 34:6, 34:10,
41:18, 42:21, 60:12,
64:16, 66:4, 67:21
**company** [16] - 3:2,
5:13, 5:14, 12:22,
12:23, 23:14, 31:17,
40:11, 41:15, 57:20,
58:24, 61:2, 61:3,
64:23, 73:3, 80:25
**comparison** [1] - 8:14
**compel** [2] - 84:7,
86:9
**complaint** [2] - 22:3,
65:1
**complete** [4] - 40:9,
48:22, 48:23, 80:7
**completed** [1] - 65:1
**completely** [2] -
29:13, 46:16
**completing** [1] - 62:20
**compound** [3] - 7:17,
10:13, 39:5
**compounds** [3] - 7:15,
10:11, 39:2
**CONAWAY** [1] - 1:18
**concern** [2] - 71:19,
85:18
**concerned** [4] - 52:16,
61:10, 82:18, 89:17
**conclude** [2] - 25:20,
56:8
**concluded** [1] - 26:24
**conclusion** [4] -
21:14, 75:8, 75:11
**concrete** [1] - 75:2
**conducted** [1] - 64:24
**confer** [1] - 86:18
**conference** [1] - 3:15
**confidential** [1] -
84:14
**confidentiality** [3] -
85:9, 86:1, 89:9
**confirmation** [1] -
61:15
**confirming** [1] - 65:18
**conflict** [7] - 22:8,
22:14, 59:17, 59:25,
60:3, 71:2, 72:4
**confrontation** [2] -
78:3
**consent** [2] - 49:4,
49:6
**consequences** [1] -
79:6
**Consequently** [1] -
82:8

consider [1] - 51:7
considered [2] - 20:8, 55:9
consistent [1] - 41:24
constitutes [1] - 75:16
consummated [1] - 13:8
contact [9] - 4:6, 6:14, 13:5, 15:1, 57:4, 57:6, 57:7, 75:24, 76:13
contacted [1] - 53:21
contacts [4] - 4:8, 55:8, 57:3
contains [1] - 18:12
contemplated [2] - 47:21, 48:7
contents [1] - 4:5
contesting [1] - 31:23
context [39] - 15:5, 16:14, 16:15, 16:16, 17:1, 17:12, 19:24, 20:17, 21:3, 23:1, 27:2, 27:4, 27:19, 29:5, 29:9, 29:21, 35:12, 45:6, 45:9, 53:18, 53:21, 57:25, 58:2, 59:4, 59:5, 59:15, 60:8, 64:19, 77:21, 78:7, 78:8, 78:18, 79:5, 79:20, 80:9, 80:22, 81:3, 81:11
Continued [1] - 2:1
contract [1] - 69:19
contractual [6] - 68:20, 69:14, 69:17, 69:20, 69:24, 83:6
contractually [1] - 64:16
contrary [2] - 75:16, 85:5
control [2] - 48:22, 48:23
controlling [1] - 43:12
controls [3] - 67:15, 67:16
controversy [2] - 15:16, 16:7
conversation [26] - 17:7, 18:16, 18:18, 18:23, 20:19, 21:13, 22:22, 24:11, 24:22, 25:25, 26:17, 26:21, 27:3, 27:5, 27:8, 28:21, 30:13, 42:16, 50:7, 59:6, 71:23, 76:20, 76:23, 81:9, 81:10
conversations [3] -

18:19, 81:23, 81:24
convince [1] - 11:8
copies [2] - 6:19, 32:2
copy [1] - 6:20
Cordray [12] - 24:12, 24:14, 24:21, 26:1, 26:3, 51:21, 52:13, 52:25, 53:21, 71:17, 71:24, 72:1
Cordray's [1] - 71:20
corporation [5] - 1:3, 1:5, 1:6, 1:9, 14:4
CORPORATION [2] - 1:4, 1:6
Corporation [2] - 1:4, 1:6
correct [13] - 12:7, 12:8, 12:11, 18:5, 25:12, 29:14, 30:15, 32:19, 37:14, 38:13, 45:6, 69:21, 69:25
correspondence [4] - 55:20, 56:10, 76:21, 84:21
corroborate [3] - 25:13, 25:15, 27:21
corroboration [2] - 29:6, 52:5
Counsel [3] - 1:23, 2:8, 69:2
counsel [17] - 26:15, 26:18, 26:19, 27:6, 27:19, 29:7, 30:14, 40:9, 62:20, 67:2, 67:7, 71:9, 77:24, 80:6, 87:20, 89:10
counsel's [2] - 85:23, 87:13
counsels' [2] - 87:25, 88:15
couple [6] - 4:17, 12:18, 22:24, 28:7, 28:23, 50:1, 51:20, 52:13
course [4] - 17:9, 32:15, 57:1, 84:13
COURT [105] - 1:1, 2:13, 2:16, 2:23, 3:4, 3:8, 3:18, 3:25, 6:22, 8:2, 8:4, 8:12, 8:19, 9:5, 9:23, 10:4, 10:14, 10:24, 11:5, 12:1, 12:9, 12:15, 12:17, 13:23, 14:9, 15:17, 15:24, 16:2, 17:20, 18:1, 18:8, 19:11, 19:14, 21:1, 21:19, 22:16, 23:16, 25:18, 28:5, 29:8, 31:22, 36:24, 37:21,

37:23, 38:4, 38:14, 39:12, 39:17, 39:19, 39:22, 40:1, 43:20, 44:12, 44:21, 44:25, 45:4, 45:11, 45:16, 45:18, 45:24, 46:5, 47:7, 47:10, 47:24, 49:14, 49:22, 50:15, 51:3, 51:16, 51:19, 53:6, 53:25, 54:9, 54:14, 55:5, 55:17, 55:22, 55:24, 56:1, 57:15, 57:24, 60:6, 63:4, 63:6, 63:17, 65:16, 65:22, 65:24, 66:12, 66:16, 67:8, 68:9, 69:1, 69:5, 69:16, 69:23, 72:6, 73:8, 73:20, 74:15, 87:10, 87:14, 89:5, 89:20, 89:23
court [8] - 2:12, 15:13, 31:23, 55:4, 75:7, 77:4, 79:1, 85:9
Court [13] - 2:21, 11:13, 21:24, 46:3, 54:10, 68:25, 73:1, 84:12, 84:24, 85:1, 85:2, 87:7, 89:16
Court's [1] - 86:23
courthouse [1] - 64:25
courtroom [6] - 27:24, 32:1, 32:6, 80:11, 80:15
courts [3] - 55:10, 61:7, 70:5
covered [5] - 14:20, 36:10, 37:12, 56:20, 79:21
crack [2] - 89:2, 89:17
create [7] - 13:18, 15:15, 16:23, 26:11, 49:20, 61:11, 76:3
created [4] - 53:1, 54:4, 55:1, 65:2
creates [3] - 12:11, 49:19, 59:1
creating [1] - 15:8
credibility [4] - 29:20, 59:8, 59:14, 61:17
credible [2] - 29:23, 59:9
critical [1] - 16:18
cross [3] - 31:16, 32:7, 40:23
cross-examination [3] - 31:16, 32:7, 40:23
current [2] - 11:23, 64:22

cut [1] - 39:20

**D**

damage [1] - 44:10
dance [1] - 76:24
date [2] - 28:8, 56:14
dates [2] - 28:14, 70:2
DaveCo [1] - 16:19
DAVID [1] - 2:6
David [2] - 3:1, 80:17
dead [1] - 50:20
deal [7] - 19:18, 35:18, 35:19, 42:25, 49:19, 84:17, 88:8
deals [1] - 55:20
December [1] - 35:7
decide [2] - 72:7, 85:25
decided [1] - 27:4
decides [1] - 81:4
deciding [1] - 22:13
decision [6] - 25:19, 59:23, 60:24, 60:25, 82:12
declaration [38] - 13:4, 13:9, 20:6, 21:2, 22:1, 23:21, 24:14, 24:18, 24:20, 24:21, 25:3, 26:1, 26:7, 26:11, 27:10, 27:13, 27:15, 28:20, 29:6, 30:16, 32:23, 42:20, 47:17, 52:12, 52:14, 52:23, 53:9, 53:19, 53:22, 59:16, 65:4, 65:20, 71:1, 71:5, 71:8, 71:18, 71:24
declarations [6] - 27:6, 27:7, 52:3, 52:9, 52:18, 53:5
declaratory [11] - 11:14, 16:4, 48:8, 66:14, 74:12, 74:22, 75:3, 76:25, 77:5, 77:10, 81:2
declares [1] - 26:15
decline [2] - 82:9, 82:19
declining [1] - 16:4
defend [11] - 47:6, 48:4, 48:5, 48:8, 66:25, 68:18, 69:13, 83:12, 85:9, 85:13
Defendant [2] - 1:10, 2:8
defendant [1] - 61:25
defending [2] - 47:22,

83:15
defense [3] - 47:15, 67:6, 70:10
definitive [1] - 18:25
degree [1] - 86:22
DELAWARE [1] - 1:1
Delaware [5] - 1:3, 1:5, 1:6, 1:9, 1:12
delay [2] - 72:10, 78:23
demanded [1] - 42:15
demonstrate [2] - 64:13, 83:1
demoted [1] - 47:1
denies [1] - 21:16
deny [1] - 82:24
depositions [1] - 20:7
described [5] - 9:18, 18:3, 57:9, 77:6, 82:17
describes [3] - 5:25, 72:24, 78:7
description [1] - 75:15
descriptions [1] - 77:1
designation [1] - 87:18
designations [1] - 86:1
designed [2] - 36:15, 86:20
detailed [1] - 59:23
determination [1] - 60:1
determinations [1] - 29:20
develop [1] - 14:19
development [9] - 7:8, 8:8, 9:19, 9:20, 12:24, 19:4, 32:23, 39:5, 64:14
difference [3] - 22:20, 67:18, 81:18
different [11] - 5:20, 7:13, 10:9, 12:21, 13:1, 18:12, 31:14, 39:15, 83:1, 86:2, 88:1
differently [2] - 53:14, 78:24
diligent [1] - 63:21
direct [5] - 16:6, 16:11, 51:22, 77:16, 78:2
directed [3] - 39:4, 63:12, 68:10
directly [7] - 52:2, 52:9, 52:11, 53:7, 54:7, 77:25, 81:9
directors [2] - 35:12, 35:17

directors' [1] - 32:18
disagree [2] - 46:11,
 75:13
disagreement [1] -
 68:24
discern [1] - 5:1
disclaimed [1] - 50:4
disclosed [1] - 85:19
discloses [1] - 85:21
disclosing [1] - 71:19
discover [2] - 5:15,
 5:24
discovered [4] -
 37:11, 37:13, 56:18,
 64:3
discovery [5] - 5:10,
 5:12, 5:23, 6:2, 84:4
discretion [2] - 11:13,
 82:8
discuss [3] - 3:20,
 30:25, 72:16
discussed [3] - 37:5,
 63:25, 68:2
discusses [1] - 17:12
discussing [1] - 4:5
discussion [5] -
 19:24, 34:22, 58:20,
 58:21, 75:7
discussions [4] -
 13:21, 14:11, 20:1,
 42:20
dismiss [3] - 3:9,
 82:24, 86:10
displayed [3] - 31:23,
 79:2, 80:11
dispute [9] - 11:19,
 18:2, 51:22, 58:11,
 58:25, 75:1, 77:23,
 77:25
disputes [1] - 86:21
disrespect [1] - 51:23
distance [1] - 79:9
distinction [2] - 16:18,
 77:7
DISTRICT [2] - 1:1, 1:1
District [5] - 79:18,
 84:12, 84:24, 85:1,
 86:3
DJ [10] - 46:24, 47:5,
 47:22, 48:4, 64:11,
 66:25, 68:14, 69:10,
 83:7, 83:12
docket [2] - 28:4, 38:2
document [8] - 4:25,
 5:1, 5:3, 6:19, 31:19,
 32:17, 33:20, 89:18
documents [9] - 7:25,
 8:9, 8:10, 14:7, 47:7,
 88:1, 88:6, 88:12,
 89:16

Documents [2] - 7:3,
 46:6
dog [1] - 88:19
done [12] - 11:25,
 14:24, 34:6, 34:16,
 34:17, 36:8, 36:9,
 36:20, 39:9, 41:3,
 69:7, 69:9
doubt [2] - 12:5, 24:6
down [5] - 27:24, 44:5,
 64:3, 66:19, 67:12
Dr [32] - 4:12, 20:4,
 20:6, 22:9, 22:12,
 23:3, 23:5, 23:9,
 26:15, 26:18, 27:22,
 29:10, 31:4, 31:6,
 32:7, 33:9, 33:23,
 35:5, 36:6, 36:25,
 38:5, 40:23, 41:5,
 41:24, 42:3, 51:24,
 64:21, 79:7, 79:8,
 79:17, 81:7, 81:18
draw [1] - 69:18
drawn [1] - 59:8
drug [8] - 5:10, 5:12,
 5:23, 6:2, 36:23,
 39:5, 42:22, 54:22
drugs [7] - 5:15, 5:24,
 7:8, 10:11, 35:9,
 38:7, 40:14
drum [1] - 66:3
due [1] - 16:7
during [8] - 26:14,
 30:24, 31:15, 31:18,
 32:7, 40:23, 50:13,
 81:23
During [1] - 73:11

E

e-mail [4] - 21:22,
 21:25, 22:4, 59:18
early [1] - 75:14
easier [1] - 46:3
economics [1] - 56:25
editorializing [1] -
 56:6
educate [1] - 79:3
effect [6] - 20:15,
 20:24, 23:2, 62:18,
 69:23, 83:13
effective [1] - 70:10
effectively [2] - 56:2,
 83:10
effort [3] - 77:2, 77:14,
 84:22
efforts [7] - 33:2,
 33:21, 42:9, 63:19,
 64:14, 78:10, 82:11

eight [3] - 38:4, 38:11,
 47:8
either [7] - 4:24, 27:7,
 27:8, 31:5, 37:10,
 73:16, 74:6
elects [1] - 49:8
Eli [1] - 34:17
elicit [1] - 6:9
eliminate [1] - 61:8
ELIZABETH [1] - 2:6
Elizabeth [1] - 3:2
ELLIS [1] - 1:20
Ellis [1] - 2:20
Elmo [1] - 56:12
EMC [4] - 15:9, 15:11,
 73:22, 73:23
emphasize [2] - 54:4,
 85:17
emphatically [2] -
 12:3, 21:16
Enbrel [21] - 5:17,
 5:19, 6:12, 20:15,
 20:23, 21:4, 22:3,
 22:12, 23:4, 23:7,
 29:15, 31:12, 36:4,
 40:19, 53:16, 53:23,
 54:21, 62:8, 80:3,
 80:21, 81:25
ences [1] - 65:11
end [7] - 5:8, 11:14,
 43:5, 45:22, 52:24,
 62:25, 77:4
endeavor [1] - 74:19
ends [2] - 14:25, 89:25
enforce [8] - 19:23,
 44:13, 44:16, 57:5,
 64:16, 74:5, 74:11,
 83:5
enforcement [9] -
 33:21, 40:9, 62:21,
 66:3, 74:6, 78:10,
 80:7, 82:3, 82:7
enforcing [2] - 82:4,
 83:14
engage [1] - 32:24
engaged [3] - 12:24,
 54:17, 75:1
English [1] - 9:13
enter [1] - 67:21
entered [5] - 47:16,
 47:17, 84:10, 87:16,
 87:17
entertain [1] - 16:4
entire [3] - 38:17,
 58:4, 74:8
entirely [1] - 29:2
entities [1] - 43:22
entrusted [1] - 67:6
ESQ [6] - 1:18, 1:21,
 1:21, 2:3, 2:6, 2:6

essentially [7] - 4:9,
 23:2, 43:15, 44:19,
 56:19, 66:23, 70:13
establish [2] - 3:22,
 3:23
establishes [1] - 16:5
estimates [1] - 35:16
et [2] - 16:8
ethical [1] - 25:21
ethically [3] - 23:7,
 29:17, 65:15
evaluation [1] - 36:21
event [7] - 4:7, 14:19,
 38:5, 48:20, 56:19,
 79:7, 81:12
evidence [6] - 29:18,
 29:19, 41:11, 60:1,
 72:25, 82:25
Evista [1] - 20:14
exact [2] - 41:6, 68:19
exactly [2] - 33:25,
 77:14
examination [2] -
 31:16, 32:7, 40:23
example [6] - 16:15,
 16:19, 20:18, 26:3,
 38:25, 39:1
examples [1] - 38:19
except [1] - 46:24
excerpt [1] - 20:18
exchange [6] - 49:19,
 50:24, 54:3, 55:13,
 55:15, 58:13
exchanged [1] - 13:16
exclusive [4] - 45:14,
 48:15, 67:21, 67:25
exclusively [1] - 68:7
excuse [1] - 61:8
Executive [1] - 31:17
exercise [4] - 11:13,
 65:9, 82:9
Exhibit [2] - 47:17,
 65:19
exhibits [2] - 32:3,
 46:2
existed [2] - 51:8, 86:3
existence [1] - 58:23
existing [2] - 9:1, 14:4
exists [2] - 12:12, 16:7
expect [1] - 78:10
expectation [1] - 47:5
expense [1] - 73:13
experience [2] -
 35:13, 35:18
expertise [2] - 6:5, 6:6
explain [2] - 25:8,
 34:19, 79:3
explained [3] - 24:18,
 29:24, 34:13
explaining [1] - 58:16

explains [1] - 59:6
explanation [5] - 29:1,
 29:14, 79:14, 81:8,
 81:12
explanations [2] -
 29:22, 79:12
explicit [2] - 55:18,
 55:23
exploitation [1] -
 63:21
express [1] - 13:15
expresses [1] - 53:4
expressing [1] - 47:4
expressly [2] - 50:4,
 68:10
extending [1] - 45:4
extent [3] - 84:18,
 84:21, 86:9
extremely [1] - 77:11
eye's [1] - 86:5
eyes [6] - 85:23,
 87:12, 87:13, 87:25,
 88:5, 88:15

F

F.3d [2] - 15:12, 73:25
fabricate [1] - 22:18
fabricating [1] - 22:18
face [2] - 30:3, 30:20
fact [36] - 4:13, 5:11,
 13:10, 15:3, 15:11,
 22:6, 22:7, 25:25,
 27:16, 27:18, 28:8,
 28:18, 31:25, 36:5,
 38:20, 40:22, 41:5,
 41:6, 41:24, 42:7,
 42:9, 43:3, 50:13,
 53:20, 53:23, 59:11,
 60:4, 62:23, 62:24,
 67:24, 70:10, 72:4,
 74:16, 78:25, 83:14,
 88:11
factor [4] - 43:17,
 43:18, 76:17, 79:15
factors [2] - 43:17,
 55:11
facts [9] - 3:21, 4:15,
 18:6, 18:9, 19:14,
 49:14, 50:20, 53:2,
 76:16
factual [6] - 3:17,
 17:23, 18:2, 19:15,
 22:20, 39:16
failed [2] - 13:13,
 69:12
falls [2] - 48:4, 83:11
fair [1] - 70:4
fairly [2] - 4:10, 78:8

faith [1] - 86:18
fall [1] - 38:7
falling [2] - 19:22, 77:13
falls [1] - 14:21
familiar [1] - 13:24
family [2] - 7:6, 38:17
far [6] - 9:16, 15:3, 46:20, 64:21, 65:18, 77:13
fashion [1] - 85:2
fast [1] - 11:22
faster [2] - 11:21, 11:23
feature [1] - 76:17
February [3] - 7:22, 9:21, 18:4
Federal [5] - 15:5, 17:10, 19:9, 19:12, 75:4
few [6] - 4:25, 33:3, 39:19, 39:23, 69:2, 80:18
field [3] - 10:9, 81:25, 82:2
fight [1] - 11:7
figure [2] - 50:16, 78:16
file [7] - 30:8, 49:1, 54:25, 55:2, 55:4, 61:1, 64:23
filed [12] - 25:10, 30:4, 30:10, 30:18, 41:14, 50:5, 57:23, 60:9, 68:14, 70:20, 81:19, 81:20
files [1] - 14:3
filling [1] - 59:22
final [1] - 12:14
finalized [1] - 89:7
financial [1] - 35:14
fine [3] - 6:22, 55:22, 65:24
Fine [1] - 72:9
finish [2] - 19:14, 40:4
finished [1] - 78:20
first [42] - 3:3, 3:8, 4:2, 4:6, 4:8, 4:17, 4:18, 7:12, 7:14, 8:15, 8:22, 20:4, 24:1, 26:9, 27:9, 28:8, 28:16, 29:11, 31:4, 32:3, 35:1, 38:21, 40:8, 42:14, 56:13, 67:13, 68:13, 69:11, 74:12, 74:25, 75:5, 79:23, 80:2, 80:4, 80:5, 80:16, 85:21, 87:5, 87:24, 88:3, 89:2, 89:17

First [8] - 8:25, 11:1, 11:17, 50:2, 52:9, 63:9
five [11] - 24:11, 31:8, 33:2, 38:1, 38:3, 56:19, 60:18, 67:9, 72:22, 73:1, 75:14
five-percent [1] - 75:14
flat [1] - 81:17
flip [1] - 44:19
floor [2] - 3:10, 62:17
flux [3] - 10:23, 12:10, 82:21
focused [1] - 34:17
folks [8] - 35:14, 40:2, 54:5, 79:3, 83:22, 85:24, 88:15, 89:1
follow [3] - 18:15, 57:2, 84:9
follow-up [2] - 18:15, 84:9
followed [1] - 76:20
following [6] - 2:11, 8:7, 8:25, 10:21, 23:11, 25:20
footnote [1] - 37:2
Footnote [1] - 38:4
FOR [1] - 1:1
form [8] - 6:16, 6:17, 6:24, 11:4, 12:20, 34:4, 51:14, 52:3
forth [6] - 13:4, 13:8, 32:23, 72:15, 75:4, 81:22
forward [11] - 7:3, 7:18, 19:8, 35:25, 46:6, 58:8, 66:22, 84:4, 84:5, 86:11, 88:21
founded [1] - 16:3
four [4] - 4:18, 31:8, 67:4, 67:5
Four [2] - 33:3, 43:22
frame [2] - 20:7, 54:16
framed [1] - 68:24
frank [1] - 81:13
Fritz [1] - 32:21
front [9] - 52:2, 62:12, 63:16, 74:24, 79:8, 82:23, 83:20, 83:21, 85:9
full [1] - 55:1
future [3] - 45:10, 48:25, 49:10

**G**

Gaffigan [1] - 1:24

gap [1] - 4:10
GEDDES [1] - 2:3
gee [4] - 22:5, 57:21, 58:17, 60:11
general [1] - 5:21
generally [4] - 7:14, 38:7, 39:3, 43:11
gentleman [1] - 21:2
GINDLER [58] - 2:6, 3:7, 3:11, 3:19, 4:1, 6:25, 7:4, 8:3, 8:6, 8:18, 8:24, 9:15, 10:1, 10:7, 10:21, 10:25, 11:8, 12:8, 12:11, 12:16, 12:20, 14:1, 14:10, 15:22, 16:1, 16:13, 17:25, 18:5, 18:10, 19:13, 19:17, 21:9, 21:21, 22:24, 23:18, 25:19, 28:6, 29:9, 37:18, 37:22, 38:3, 38:12, 38:15, 39:13, 39:18, 39:21, 39:25, 40:3, 43:22, 44:14, 44:24, 45:3, 45:6, 45:13, 45:17, 54:15, 67:10, 68:12, 69:8, 69:21, 69:25, 72:9, 73:10, 73:21, 87:11, 89:4, 89:11, 89:22
Gindler [20] - 3:1, 3:6, 3:10, 3:12, 45:21, 45:25, 50:2, 52:4, 54:3, 59:19, 60:13, 63:8, 63:12, 66:1, 66:5, 67:8, 69:6, 75:21, 82:21, 87:10
Gindler's [1] - 61:19
given [14] - 5:1, 11:17, 20:20, 24:23, 31:4, 52:1, 52:5, 76:24, 78:5, 80:10, 81:8, 81:12, 86:10
goals [2] - 40:8, 80:5
God [1] - 26:6
Goliath [1] - 80:17
grant [7] - 44:7, 45:1, 48:15, 48:19, 49:10, 83:3, 86:9
granted [2] - 66:24, 66:25
granting [1] - 85:15
grants [1] - 48:19
great [1] - 42:2
gris [1] - 54:22
ground [1] - 56:21
group [2] - 22:13, 74:12
guess [4] - 10:5, 11:2,

28:6, 37:17
guessing [1] - 71:15
Gutman [11] - 26:19, 27:5, 27:14, 27:15, 27:16, 29:6, 30:13, 50:7, 50:8, 71:7, 71:11
guy [1] - 32:22
guys [2] - 26:16, 88:6

**H**

half [2] - 44:5, 54:3
hallway [2] - 27:24, 71:10
hand [1] - 6:20
handed [1] - 68:25
handling [3] - 27:23, 59:24, 60:2
happy [4] - 6:20, 6:24, 20:2, 52:22
Harvey [1] - 3:3
hate [1] - 19:11
head [2] - 19:3, 78:2
head-on [1] - 78:2
headed [1] - 80:1
heading [1] - 79:23
headnote [1] - 16:2
hear [9] - 17:23, 27:3, 27:10, 27:18, 50:12, 50:21, 57:25, 70:17, 73:8
heard [13] - 13:5, 22:2, 25:3, 27:12, 27:17, 32:3, 51:11, 51:14, 52:3, 71:9, 71:18, 77:6, 81:10
HEARING [1] - 1:13
hearing [10] - 2:11, 3:13, 3:16, 15:12, 25:9, 27:25, 28:3, 28:8, 28:11, 89:25
hears [2] - 26:17, 26:21
heat [3] - 8:23, 8:25, 78:12
held [2] - 2:12, 15:13
help [3] - 23:8, 23:19, 23:22
helpful [2] - 6:18, 11:6
helping [1] - 23:15
high [2] - 72:23, 73:1
higher [3] - 80:3, 89:15, 89:18
highest [1] - 87:18
highlight [1] - 30:23
highly [3] - 4:23, 5:2, 79:1
himself [1] - 79:9

history [1] - 75:17
hit [2] - 39:15, 39:23
Hold [1] - 55:24
holder [4] - 17:5, 41:22, 67:19, 70:13
Honor [61] - 2:15, 2:18, 2:24, 2:25, 3:7, 3:11, 3:13, 3:15, 4:22, 4:23, 5:5, 6:18, 12:16, 15:23, 29:19, 29:20, 37:18, 38:12, 41:6, 42:12, 43:5, 45:17, 45:20, 45:22, 46:1, 46:7, 47:9, 47:19, 48:17, 49:16, 50:11, 51:1, 51:18, 52:8, 53:5, 54:13, 55:21, 56:11, 57:11, 58:3, 59:3, 59:7, 59:18, 60:7, 61:20, 62:22, 63:13, 63:16, 64:19, 65:20, 65:21, 66:14, 66:19, 67:3, 69:8, 69:9, 74:14, 87:9, 87:11, 89:7, 89:22
HONORABLE [1] - 1:15
honorifics [1] - 52:1
hopefully [1] - 88:22
hoping [1] - 5:14
house [3] - 26:18, 27:19, 87:20
human [1] - 21:4
hypothetical [1] - 44:21

**I**

idea [3] - 40:24, 61:5, 80:12
identified [1] - 36:7
identifies [2] - 58:13, 58:14
identify [6] - 38:6, 40:18, 40:19, 41:4, 58:19
identifying [2] - 6:3, 7:15
ignored [1] - 75:23
ignoring [1] - 76:5
Illinois [1] - 1:22
imagine [1] - 14:2
immediate [2] - 76:13, 76:14
Immunex [12] - 13:7, 13:8, 13:13, 13:15, 13:19, 13:24, 14:3, 14:4, 14:8, 40:18,

61:22, 61:23
IMMUNEX [2] - 1:4, 1:6
Immunex's [1] - 62:9
impact [1] - 26:4
impending [1] - 15:19
implicated [1] - 12:25
implicates [1] - 39:6
implication [1] - 79:10
import [1] - 11:11
importance [2] - 7:10, 47:2
important [7] - 10:10, 37:2, 60:8, 63:11, 68:4, 70:5, 82:3
importantly [1] - 39:10
impossibility [1] - 40:8
impossible [1] - 88:7
improper [1] - 29:17
IN [2] - 1:1, 1:1
in-house [3] - 26:18, 27:19, 87:20
INC [3] - 1:3, 1:4, 1:9
incentive [1] - 23:18
include [2] - 43:23, 80:6
included [2] - 9:4, 43:10
including [2] - 17:13, 64:9
Including [1] - 12:9
inconsistent [2] - 53:15, 85:19
indeed [1] - 9:23
indicate [1] - 48:12
indicated [5] - 49:4, 55:11, 61:8, 65:4, 66:20
indicates [2] - 60:1, 60:3
indication [2] - 46:19, 61:15
indirectly [1] - 74:7
indispensability [1] - 66:18
indispensable [6] - 44:18, 46:9, 46:12, 67:13, 70:2, 84:3
individual [1] - 34:14
indulge [6] - 43:19, 45:14, 68:5, 68:7, 70:6
industry [2] - 34:3, 57:22
Inflammation [1] - 6:7
information [8] - 76:11, 77:15, 80:15, 84:15, 85:8, 85:18, 85:21, 89:10

Infringe [1] - 33:21
Infringed [2] - 19:2, 34:21
infringement [12] - 15:21, 16:6, 16:11, 43:19, 44:9, 45:14, 68:5, 68:7, 70:6, 73:13, 78:21
infringer [1] - 16:8
infringing [8] - 9:1, 9:2, 9:8, 16:21, 16:25, 18:24, 36:16, 41:4, 44:3
inhibit [2] - 7:17, 40:15
inhibitors [1] - 36:20
initial [1] - 82:12
initiated [3] - 42:22, 55:8, 57:3
initiating [1] - 57:4
input [1] - 49:10
inquiry [1] - 74:16
inside [3] - 26:15, 88:17, 89:9
instance [2] - 85:21, 87:24
instead [1] - 20:14
institution [1] - 46:17
institutions [6] - 43:9, 48:6, 48:21, 49:3, 49:9, 49:11, 66:21, 67:3
intellectual [3] - 8:16, 38:18, 66:5
intend [2] - 74:5, 74:11
intended [8] - 5:3, 10:15, 46:14, 48:13, 83:13, 84:11, 85:1, 85:3
intensive [1] - 74:16
intent [9] - 46:14, 46:20, 47:5, 67:14, 71:19, 71:20, 75:22, 78:4, 87:15
intention [2] - 21:7, 82:4
intentions [1] - 76:18
interaction [1] - 81:22
interactions [1] - 76:22
interest [4] - 8:17, 13:15, 19:7, 22:15
interested [4] - 15:1, 35:8, 77:17, 77:18
interesting [4] - 19:5, 49:23, 66:7, 69:17
interestingly [1] - 13:6
internal [2] - 31:19, 79:2

interplay [1] - 62:16
interpret [1] - 54:10
interpretation [1] - 21:10
interrupt [2] - 49:22, 69:1
interrupted [1] - 9:11
intervene [3] - 46:24, 47:15, 48:6
interview [4] - 41:13, 65:17, 65:19, 81:16
interviewer [2] - 66:7, 66:8
introduce [1] - 2:19
introduced [2] - 32:4, 32:6
introductions [1] - 2:17
invalidity [1] - 48:10
involved [4] - 30:12, 44:22, 50:7, 59:20
involves [1] - 87:19
involving [2] - 27:24, 60:2
IP [1] - 7:9
IRELL [1] - 2:5
Irell [1] - 3:1
irrelevant [2] - 26:11, 81:17
ISLAND [1] - 1:6
issuance [3] - 40:10, 57:8, 76:12
issue [16] - 17:19, 38:20, 38:21, 46:9, 49:18, 54:23, 56:22, 56:23, 62:14, 68:23, 69:15, 70:3, 82:22, 85:13, 86:17
issued [15] - 7:6, 7:11, 7:22, 9:2, 9:22, 12:25, 14:13, 33:5, 33:7, 39:10, 39:11, 60:10, 60:25, 61:5, 85:10
issues [7] - 45:15, 57:14, 57:18, 66:15, 74:21, 74:25, 88:1
item [1] - 38:2
itself [3] - 31:3, 75:20, 83:16

J

January [1] - 47:18, 64:10
job [1] - 32:24
joined [1] - 43:16
joining [1] - 44:16
joke [1] - 59:19

JORDAN [1] - 1:15
Judge [1] - 41:8
judge [3] - 56:8, 78:14, 84:22
judgment [12] - 11:14, 16:4, 48:8, 66:14, 74:12, 74:22, 75:3, 76:25, 77:5, 77:10, 79:15, 81:3
July [1] - 28:22
jumping [1] - 11:12
juncture [1] - 86:12
June [2] - 14:12, 28:22
jurisdiction [9] - 11:14, 30:9, 74:22, 75:3, 75:10, 76:25, 82:9, 82:10, 82:19
jurisdictions [1] - 67:1
jury [4] - 26:23, 31:11, 58:5, 66:9
justiciable [1] - 15:16
justify [1] - 60:14

K

KAJ [1] - 1:10
Kaye [1] - 60:1
kB [29] - 5:7, 5:21, 5:23, 5:25, 6:3, 7:9, 7:16, 7:17, 8:11, 10:11, 10:13, 33:15, 34:3, 34:11, 35:9, 36:8, 36:14, 36:17, 36:20, 37:6, 37:14, 39:2, 39:6, 40:15, 42:18, 42:24, 43:2, 63:25, 64:3
keep [2] - 42:2, 69:18
KENT [1] - 1:15
key [11] - 6:3, 43:17, 43:18, 44:14, 45:15, 46:13, 46:21, 68:23, 69:15, 71:22
kids [1] - 21:23
kind [3] - 28:11, 61:15, 88:19
kinds [2] - 60:12, 61:7
Kineret [11] - 5:17, 5:19, 6:12, 19:5, 22:3, 31:12, 36:5, 40:19, 58:13, 62:9, 80:4
KIRKLAND [1] - 1:20
Kirkland [1] - 2:20
knothead [1] - 78:15
knowing [1] - 79:6
knowledge [2] - 14:6, 81:14
known [3] - 2:20,

13:24, 14:4
knows [5] - 22:14, 57:23, 73:2, 77:2, 85:12

L

laboratory [1] - 10:12
land [1] - 77:4
language [15] - 16:10, 37:1, 38:22, 56:5, 57:24, 83:10, 68:9, 68:19, 72:20, 72:21, 83:8, 83:9, 83:13, 84:10, 85:6
lapse [1] - 54:3
large [5] - 4:10, 5:13, 11:3, 61:2, 82:20
largely [1] - 35:11
last [13] - 4:7, 8:5, 13:5, 24:4, 27:12, 48:1, 54:2, 62:19, 71:5, 73:20, 81:15, 82:22, 84:20
Last [1] - 86:8
Late [8] - 34:23, 36:2, 62:2, 62:3, 62:8, 62:11, 79:22, 80:2
Late-Stage [8] - 34:23, 36:2, 62:2, 62:3, 62:8, 62:11, 79:22, 80:2
launched [1] - 36:5
Laurie [1] - 3:3
law [15] - 15:5, 17:10, 19:10, 19:12, 19:16, 46:13, 49:4, 64:22, 65:13, 67:19, 67:23, 68:2, 72:15, 76:25, 81:3
lawsuit [22] - 10:19, 10:22, 16:9, 22:2, 23:15, 26:6, 26:25, 30:8, 30:10, 30:17, 35:2, 41:14, 42:7, 45:8, 57:23, 58:3, 61:1, 67:22, 70:20, 70:24, 74:3, 76:14
lawsuits [1] - 42:8
lawyer [8] - 17:24, 22:17, 23:23, 32:1, 32:22, 77:8, 77:9, 79:7
lawyers [5] - 4:12, 51:25, 52:18, 52:19, 67:5
lead [9] - 33:18, 33:22, 33:24, 34:1, 34:19, 34:20, 40:24, 61:21,

79:19
leaders [1] - 34:7
learn [1] - 67:23
learned [1] - 71:13
least [6] - 18:2, 27:16, 38:6, 39:5, 76:6, 83:23, 86:8, 89:12
leaving [1] - 3:19
led [1] - 21:13
ledge [1] - 77:13
leeway [1] - 19:25
legal [5] - 15:4, 15:6, 15:14, 15:19, 83:13
length [1] - 63:8
less [2] - 71:20, 78:2
letter [39] - 6:14, 6:16, 6:17, 7:4, 7:6, 7:12, 7:18, 7:23, 8:15, 9:4, 9:17, 10:17, 12:18, 12:21, 14:13, 14:14, 14:18, 14:25, 16:21, 17:12, 17:17, 18:3, 18:10, 21:20, 42:16, 56:14, 56:15, 57:7, 57:10, 57:13, 57:16, 57:17, 57:19, 57:25, 58:1, 60:11, 60:20, 75:14
letters [19] - 4:9, 14:3, 15:3, 31:7, 33:2, 33:3, 33:4, 33:11, 55:14, 55:15, 55:20, 56:3, 56:11, 57:12, 72:18, 76:2, 76:22, 81:23, 84:9
letting [2] - 11:7, 89:2
level [5] - 47:2, 86:5, 87:19, 89:15, 89:18
levity [2] - 22:5, 59:20
license [21] - 6:11, 7:10, 14:15, 14:16, 15:1, 17:3, 17:15, 19:5, 32:8, 38:17, 38:22, 42:5, 42:15, 46:22, 47:9, 48:1, 48:11, 56:18, 64:6, 64:7, 67:25
licensed [7] - 37:8, 37:14, 56:18, 63:19, 63:20, 64:4, 64:7
licensee [3] - 47:22, 63:18, 73:11
licensees [2] - 75:24, 75:25
licenses [1] - 74:8
Licensing [2] - 32:14, 40:21
licensing [21] - 13:16, 15:7, 16:15, 16:16, 16:17, 17:1, 17:4,

17:13, 19:19, 19:21, 19:24, 19:25, 32:18, 32:24, 33:1, 41:16, 42:1, 56:16, 56:17, 66:6
light [1] - 83:1
likelihood [1] - 60:4
likely [7] - 7:25, 9:20, 17:18, 18:20, 57:1, 78:5, 79:21
Lilly [51] - 4:13, 23:13, 26:14, 26:24, 28:17, 30:24, 31:15, 31:20, 32:7, 34:17, 35:2, 40:11, 40:13, 43:20, 54:17, 54:21, 54:23, 57:19, 58:1, 58:3, 58:7, 58:15, 58:23, 59:5, 60:9, 60:11, 60:21, 60:23, 61:1, 61:2, 61:5, 61:13, 61:24, 62:5, 62:13, 62:14, 65:8, 71:6, 76:15, 77:21, 78:21, 80:8, 81:23, 85:19, 85:21, 85:22, 89:14
Lilly's [5] - 40:12, 62:5, 62:13
limitation [3] - 47:20, 49:5, 49:6
limitations [1] - 44:10
limited [2] - 80:8, 86:9
LIMITED [1] - 1:5
line [5] - 4:4, 17:22, 37:4, 38:11, 59:8
lines [2] - 27:23, 38:11
Lionel [1] - 40:8
list [17] - 20:16, 20:24, 20:25, 21:7, 22:13, 31:12, 33:19, 36:21, 53:16, 53:22, 53:24, 54:20, 62:23, 80:22, 81:25
listed [2] - 35:1, 80:3
literally [1] - 45:21
literary [1] - 32:8
litigate [4] - 49:8, 58:4, 58:6
litigated [1] - 88:13
litigating [2] - 73:6, 73:18
Litigation [1] - 32:14
litigation [40] - 4:13, 4:14, 15:2, 23:13, 31:12, 31:20, 31:21, 33:19, 33:20, 40:9, 40:17, 40:18, 40:20, 41:2, 41:3, 41:21, 42:17, 48:20, 49:3, 53:19, 54:17, 54:24,

57:1, 58:15, 58:23, 59:15, 60:2, 62:6, 62:14, 62:16, 62:18, 62:20, 62:25, 64:18, 88:22, 77:21, 79:5, 80:6, 82:14, 87:23
litigator [1] - 32:22
litter [1] - 60:23
LLP [3] - 1:18, 1:20, 2:5
logical [1] - 76:10
look [30] - 5:24, 7:18, 11:20, 17:2, 17:8, 17:13, 24:3, 31:2, 31:3, 34:14, 36:22, 36:23, 38:1, 46:3, 46:13, 46:16, 46:21, 46:23, 47:3, 49:11, 56:8, 61:3, 61:4, 70:5, 75:10, 75:11, 76:1, 86:6
looked [8] - 4:23, 5:3, 9:17, 17:17, 20:6, 24:9, 65:5, 79:13
looking [11] - 5:1, 9:18, 15:11, 15:12, 23:11, 29:18, 37:18, 46:20, 71:6, 76:9, 79:11
looks [3] - 9:9, 9:25, 10:2
looms [1] - 74:3
loop [2] - 88:17, 88:22
Los [1] - 2:7
lose [1] - 24:1
losing [1] - 25:23
lost [1] - 23:14
loudly [1] - 79:16
loyalty [1] - 39:8

**M**

magic [1] - 77:4
mail [4] - 21:22, 21:25, 22:4, 59:18
major [1] - 34:2
majority [1] - 5:6
managed [2] - 14:2, 14:7
MANDELLA [1] - 2:5
Manella [1] - 3:1
manger [1] - 88:19
manner [3] - 48:5, 68:18, 85:19
manufactured [1] - 21:5
MANUFACTURING [1] - 1:5
march [1] - 4:15

MARCUS [1] - 1:21
Mark [3] - 2:21, 2:22, 26:16
MARK [1] - 1:21
market [4] - 63:20, 73:17, 79:19, 79:20
marketed [1] - 9:19
Marketed [8] - 34:23, 36:1, 62:2, 62:3, 62:7, 62:11, 79:22, 80:1
marketing [1] - 35:15
Massachusetts [5] - 79:18, 84:11, 84:25, 85:1, 86:3
match [1] - 6:7
materials [2] - 47:19, 79:2
matter [5] - 54:20, 74:19, 84:13, 87:4, 87:7
matters [3] - 21:24, 49:16, 87:3
mean [11] - 9:12, 9:14, 10:19, 11:6, 15:18, 26:23, 28:9, 33:24, 51:23, 67:25, 79:20
meaning [3] - 12:23, 26:24, 76:18
meaningful [1] - 67:18
means [6] - 10:21, 26:4, 26:5, 28:17, 33:25, 45:13, 47:13, 84:3
meant [6] - 21:3, 77:7, 77:8, 77:23, 78:15, 79:10
meet [1] - 86:18
meeting [2] - 32:18, 35:7
MELANIE [1] - 1:18
Melanie [1] - 2:18
member [1] - 35:12
memorable [1] - 59:10
ment [1] - 67:25
mental [2] - 71:19, 71:20
mentioned [1] - 38:16
Merit [1] - 1:25
merit [1] - 86:13
met [1] - 23:21
method [3] - 7:16, 9:10, 56:18
methodologies [3] - 7:25, 9:7, 17:18
methodology [1] - 8:20
middle [7] - 4:11, 20:5, 20:8, 20:10, 24:7, 28:21, 28:22

might [17] - 8:16, 9:11, 10:15, 11:3, 23:22, 24:18, 27:22, 35:9, 46:2, 46:8, 57:21, 57:22, 61:2, 61:5, 84:7
mill [1] - 57:20
Millennium [1] - 35:3
million [1] - 35:23
mind [5] - 29:11, 64:5, 87:21, 88:2, 88:12
minute [2] - 43:7, 54:1
minutes [2] - 67:9, 69:3
misremembering [1] - 22:25
missed [1] - 83:19
mistake [1] - 10:17
MIT [3] - 47:13, 47:14, 83:22
mix [3] - 13:25, 34:1, 83:16
modulate [3] - 7:17, 10:11, 39:2
modulating [1] - 36:17
moment [4] - 19:20, 59:12, 59:21, 85:5
Monday [1] - 1:12
monetary [2] - 56:22, 56:23
money [1] - 86:22
Monique [1] - 24:11
month [2] - 72:10, 84:20
months [8] - 24:6, 24:8, 24:11, 25:10, 26:8, 28:23, 44:2, 54:6
most [9] - 6:16, 7:1, 7:22, 14:17, 18:21, 46:18, 68:4, 70:5, 88:24
mostly [1] - 5:20
motion [7] - 3:9, 28:10, 82:24, 84:6, 84:7, 86:8, 86:10
Motions [1] - 89:25
MOTIONS [1] - 1:13
motions [1] - 2:11
motivation [2] - 22:16, 25:24
motive [1] - 23:17
move [22] - 4:17, 6:13, 13:2, 13:20, 14:10, 18:14, 20:2, 26:13, 29:25, 32:12, 32:25, 34:8, 35:25, 39:18, 40:4, 41:10, 41:11, 42:4, 55:6, 86:11, 86:21, 88:21

moving [1] - 84:4
MR [102] - 2:24, 3:7, 3:11, 3:19, 4:1, 6:25, 7:4, 8:3, 8:6, 8:18, 8:24, 9:15, 10:1, 10:7, 10:21, 10:25, 11:8, 12:8, 12:11, 12:16, 12:20, 14:1, 14:10, 15:22, 16:1, 16:13, 17:25, 18:5, 18:10, 19:13, 19:17, 21:9, 21:21, 22:24, 23:18, 25:19, 28:6, 29:9, 31:25, 37:18, 37:22, 38:3, 38:12, 38:15, 39:13, 39:18, 39:21, 39:25, 40:3, 43:22, 44:14, 44:24, 45:3, 45:6, 45:13, 45:17, 45:20, 46:1, 46:7, 47:8, 47:11, 47:25, 49:16, 50:11, 50:17, 51:10, 51:17, 52:8, 53:8, 54:7, 54:12, 54:15, 55:7, 55:19, 55:23, 55:25, 56:11, 57:17, 58:2, 60:7, 63:5, 63:13, 64:6, 65:17, 65:23, 65:25, 66:13, 66:17, 67:10, 68:12, 69:8, 69:21, 69:25, 72:9, 73:10, 73:21, 87:9, 87:11, 89:4, 89:6, 89:11, 89:22
MS [1] - 2:18
must [1] - 16:3

**N**

naked [1] - 31:2
name [1] - 31:11
names [1] - 65:6
naming [1] - 79:19
narrow [1] - 11:4
nature [2] - 4:24, 5:2
necessary [1] - 56:17
need [10] - 17:3, 30:20, 39:22, 66:4, 67:10, 69:2, 72:15, 86:1, 86:11, 87:5
Need [1] - 66:9
needn't [2] - 64:22, 64:23
needs [3] - 55:9, 59:8, 87:7
negotiate [1] - 13:9
negotiated [5] - 87:19, 88:2, 88:16, 89:7

negotiating [1] - 74:10
negotiation [4] - 13:13, 15:14, 17:1, 17:4
negotiations [12] - 13:6, 13:21, 15:6, 15:7, 16:16, 16:17, 19:19, 19:21, 40:6, 44:22, 74:2, 74:4
neutral [1] - 49:5
never [11] - 22:22, 23:5, 23:21, 25:4, 30:2, 34:13, 42:15, 42:16, 78:1, 79:8
nevertheless [1] - 50:9
Nevertheless [1] - 77:15
new [2] - 5:15, 5:24
next [27] - 4:3, 4:16, 6:13, 6:14, 17:24, 22:12, 23:3, 26:16, 35:22, 39:23, 43:1, 50:3, 50:18, 61:14, 62:1, 62:7, 62:15, 70:16, 76:11, 76:12, 77:16, 78:21, 78:24, 79:1, 79:22, 80:1, 81:7
Next [1] - 32:15
NF [29] - 5:7, 5:21, 5:23, 5:25, 6:3, 7:9, 7:16, 7:17, 8:11, 10:11, 10:13, 33:15, 34:3, 34:11, 35:9, 36:8, 36:14, 36:17, 36:20, 37:6, 37:14, 39:2, 39:6, 40:15, 42:18, 42:24, 43:2, 63:25, 64:3
NF-kB [29] - 5:7, 5:21, 5:23, 5:25, 6:3, 7:9, 7:16, 7:17, 8:11, 10:11, 10:13, 33:15, 34:3, 34:11, 35:9, 36:8, 36:14, 36:17, 36:20, 37:6, 37:14, 39:2, 39:6, 40:15, 42:18, 42:24, 43:2, 63:25, 64:3
NO [1] - 1:10
nobody [2] - 53:13, 84:14
none [2] - 7:18, 15:3
nonexclusive [2] - 7:10, 14:15
noninfringement [1] - 48:10
nonlawyer [1] - 77:7
nonparty [1] - 22:17

Norad [1] - 15:9
NOTE [1] - 2:11
Note [1] - 68:25
note [6] - 8:15, 51:23, 81:21, 82:13, 83:10, 83:17
notes [3] - 50:6, 58:14, 76:17
nothing [12] - 5:16, 16:24, 25:10, 26:7, 27:18, 31:18, 44:3, 54:6, 55:14, 78:23, 83:23, 89:14
notice [3] - 5:5, 57:10
Novartis [1] - 35:4
number [4] - 6:6, 43:17, 52:8, 70:4

**O**

objections [1] - 86:24
objective [4] - 56:8, 80:13, 80:25, 82:6
objectively [4] - 53:1, 59:1, 66:10, 75:8
obligated [4] - 38:23, 55:3, 64:16, 64:24
obligation [8] - 42:8, 42:11, 54:7, 54:25, 63:14, 73:12, 73:14, 73:16
obligations [3] - 39:8, 42:10, 73:5
oblique [1] - 78:3
observer [2] - 80:14, 82:6
obtaining [1] - 15:1
obtains [1] - 54:8
obvious [1] - 25:17
obviously [2] - 17:22, 61:25
occasion [1] - 76:6
occasions [2] - 25:16, 76:5
occupy [1] - 5:7
odd [4] - 20:20, 24:2, 42:25, 70:23
OF [1] - 1:1
offer [1] - 41:12
offered [4] - 7:10, 14:15, 16:24, 41:1
Office [5] - 11:1, 11:9, 11:17, 11:24, 40:13
Officer [1] - 31:17
official [1] - 58:10
often [1] - 17:4
once [1] - 60:24
one [61] - 4:12, 4:25, 6:1, 6:6, 7:21, 8:22,

11:24, 14:24, 15:4, 18:18, 19:20, 20:4, 20:8, 21:11, 22:20, 23:9, 23:14, 24:3, 24:13, 24:15, 25:6, 25:14, 26:3, 29:20, 30:1, 31:8, 34:4, 35:1, 36:3, 37:14, 39:8, 41:8, 42:4, 43:6, 43:7, 45:15, 46:21, 48:9, 48:18, 49:18, 49:19, 50:3, 50:4, 54:18, 54:19, 54:23, 56:17, 61:23, 62:13, 63:19, 67:4, 70:7, 70:23, 73:21, 75:10, 76:6, 78:21, 80:4, 80:18, 82:6, 87:11
One [8] - 3:14, 5:1, 22:25, 25:1, 52:14, 62:3, 71:15, 74:21
onerous [2] - 72:24, 73:1
ones [2] - 82:18, 86:2
ongoing [3] - 16:7, 18:11, 79:24
oOo [1] - 2:9
open [4] - 2:12, 31:23, 74:4, 79:1
opening [1] - 46:23
operations [1] - 19:22
opponent [1] - 21:20
opponents [1] - 37:1
opportunities [1] - 25:14
opportunity [5] - 29:3, 42:23, 61:3, 71:24, 85:13
opposed [4] - 7:16, 10:12, 31:1, 53:7
opposing [2] - 52:2, 52:10
opposite [1] - 74:4
opposition [3] - 30:5, 30:23, 38:1
option [1] - 42:17
order [20] - 6:25, 18:7, 31:21, 54:1, 67:11, 82:19, 84:6, 84:10, 84:25, 85:6, 85:15, 85:20, 86:5, 87:16, 87:17, 88:3, 88:14, 89:8, 89:13, 89:14
orders [1] - 84:13
ordinary [1] - 9:13
orient [1] - 61:20
original [2] - 47:9, 47:13
originally [2] - 47:12,

47:14
ought [5] - 13:25, 37:1, 52:6, 88:17, 88:24
ourselves [1] - 41:11
outside [10] - 16:16, 26:19, 27:6, 27:19, 29:7, 30:14, 87:13, 87:25, 88:5, 88:15
overall [2] - 80:9, 81:21, 82:6
overture [1] - 42:22
overtures [1] - 16:17
overturn [1] - 82:11
owed [1] - 73:2
own [11] - 23:12, 23:25, 25:24, 40:12, 44:20, 45:1, 64:14, 67:22, 73:13, 73:16, 80:16
owner [1] - 74:3
owners [1] - 43:9

**P**

p.m [3] - 1:12, 2:12, 89:25
Page [2] - 38:3, 63:13
page [11] - 5:6, 15:13, 36:25, 39:1, 47:10, 47:11, 48:1, 56:13, 63:10, 73:24, 80:4
pages [2] - 4:22, 60:18
PALS [35] - 1:21, 31:25, 45:20, 46:1, 46:7, 47:8, 47:11, 47:25, 49:16, 50:11, 50:17, 51:10, 51:17, 52:8, 53:8, 54:7, 54:12, 55:7, 55:19, 55:23, 55:25, 56:11, 57:17, 58:2, 60:7, 63:5, 63:13, 64:6, 65:17, 65:23, 65:25, 66:13, 66:17, 87:9, 89:6
Pals [17] - 2:21, 26:16, 26:20, 30:14, 45:19, 67:14, 68:10, 70:7, 70:16, 70:17, 70:20, 72:3, 72:11, 72:19, 73:4, 73:15, 87:6
paragraph [3] - 27:13, 71:5, 71:6
part [10] - 4:21, 11:3, 13:18, 22:13, 26:20, 29:21, 37:14, 64:18, 68:4
particular [2] - 65:6,

82:15
**particularly** [2] - 9:1, 11:17
**parties** [29] - 17:13, 19:21, 19:25, 42:23, 44:19, 46:9, 46:12, 46:14, 46:20, 48:7, 48:9, 48:13, 54:18, 66:17, 67:4, 67:5, 67:15, 68:2, 70:2, 74:1, 74:24, 75:1, 76:15, 82:13, 82:23, 83:21, 86:18, 87:19
**parties'** [2] - 47:4, 47:5
**partner** [2] - 5:10, 5:14
**Partnering** [2] - 32:14, 40:21
**partnering** [2] - 32:19, 32:24
**partnership** [1] - 6:9
**parts** [1] - 63:9
**party** [19] - 17:2, 21:11, 22:17, 22:20, 22:21, 53:3, 54:10, 54:18, 54:19, 67:13, 74:5, 74:7, 83:24, 84:3, 84:15, 84:16, 85:7, 85:12
**pass** [1] - 46:4
**passed** [4] - 7:3, 26:5, 46:6, 60:18
**past** [5] - 44:9, 48:25, 86:4, 86:9, 86:21
**Patent** [2] - 11:9, 40:13
**patent** [104] - 7:5, 7:11, 7:12, 7:13, 7:14, 7:21, 9:2, 9:21, 9:22, 9:23, 10:3, 10:4, 10:8, 10:9, 10:10, 10:16, 10:22, 11:2, 11:19, 12:12, 14:13, 14:14, 14:18, 14:22, 16:20, 16:22, 17:5, 17:6, 17:15, 18:11, 19:2, 19:22, 19:23, 31:8, 33:5, 34:16, 36:17, 37:6, 38:8, 38:19, 38:21, 39:10, 40:10, 41:4, 41:22, 42:14, 43:2, 43:13, 44:16, 48:10, 57:6, 57:8, 57:14, 57:15, 57:18, 57:20, 57:21, 57:22, 58:14, 58:22, 60:10, 60:21, 61:4, 63:21, 63:24, 63:25, 64:8, 64:10, 64:15, 64:17, 67:7,

67:19, 70:12, 70:13, 73:13, 73:17, 74:2, 74:3, 74:5, 74:8, 75:18, 75:19, 75:22, 76:4, 76:7, 76:13, 76:14, 76:19, 77:3, 79:25, 80:24, 82:20, 83:4, 83:15
**patentee** [4] - 16:6, 74:7, 74:8, 75:22
**patentee's** [1] - 74:9
**patentees** [1] - 74:10
**patents** [38] - 5:18, 6:10, 6:11, 8:1, 8:20, 8:21, 9:7, 9:21, 10:3, 10:8, 12:25, 17:18, 37:5, 37:12, 38:21, 39:1, 39:9, 40:25, 41:16, 41:18, 42:1, 43:2, 43:10, 44:1, 45:5, 48:11, 48:20, 48:25, 64:8, 74:11, 76:1
**pathway** [6] - 5:23, 6:3, 7:9, 7:16, 7:17, 39:6
**patience** [1] - 69:6
**pay** [6] - 38:23, 38:25, 41:19, 41:23, 66:4, 66:9
**pending** [3] - 11:16, 28:10, 87:7
**people** [8] - 5:3, 11:22, 14:6, 21:8, 33:21, 79:11, 88:16, 88:22
**perceive** [1] - 82:7
**perceived** [1] - 51:10
**percent** [6] - 56:17, 56:19, 72:22, 73:1, 73:2, 75:14
**perception** [1] - 66:11
**perfectly** [1] - 76:10
**perhaps** [7] - 10:6, 32:2, 46:18, 50:7, 59:11, 59:21, 84:1
**Perhaps** [1] - 59:20
**period** [1] - 4:6
**person** [3] - 24:21, 58:24, 70:25
**persuaded** [1] - 77:22
**persuasive** [1] - 88:7
**Ph.D's** [1] - 21:23
**pharmaceutical** [4] - 35:15, 41:18, 66:4, 80:17
**Pharmaceuticals** [1] - 2:25
**pharmaceuticals** [1] -

35:13
**PHARMACEUTICAL S** [1] - 1:9
**phase** [2] - 28:16, 28:17
**Phillips** [1] - 15:9
**phone** [4] - 4:9, 18:15, 18:16, 18:19
**phonetic** [1] - 54:22
**phrased** [1] - 70:3
**pick** [4] - 6:16, 45:21, 49:18, 54:18
**pinning** [1] - 64:3
**pit** [1] - 77:13
**pitching** [1] - 78:20
**pitfalls** [1] - 77:10
**place** [17] - 3:14, 4:7, 13:7, 13:22, 20:4, 21:13, 23:4, 24:10, 24:22, 26:18, 28:1, 28:15, 41:14, 59:1, 86:1, 88:3, 88:14
**placed** [1] - 56:12
**plaintiff** [3] - 2:19, 14:5, 43:20
**Plaintiffs** [2] - 1:7, 1:23
**plaintiffs** [1] - 61:24
**plan** [5] - 23:24, 40:10, 62:21, 64:23, 80:7
**planning** [1] - 79:4
**plausible** [2] - 29:13, 39:11
**play** [2] - 44:21, 74:21
**player** [2] - 34:19, 61:21
**players** [8] - 33:18, 33:23, 33:24, 34:1, 34:20, 40:24, 78:9, 79:19
**point** [41] - 5:12, 6:4, 10:5, 10:15, 19:20, 21:20, 24:4, 26:23, 28:7, 37:1, 41:8, 42:19, 48:7, 48:18, 49:5, 51:18, 51:19, 54:16, 55:10, 56:7, 59:22, 59:25, 62:9, 67:13, 68:3, 71:22, 71:25, 72:21, 73:22, 77:24, 79:23, 80:3, 81:13, 81:15, 82:15, 82:24, 84:3, 86:16, 88:8
**Point** [1] - 9:11
**pointed** [8] - 18:11, 46:25, 48:17, 63:7, 63:8, 70:7, 72:22, 83:8
**points** [4] - 28:3, 36:2,

54:4, 67:11
**polite** [1] - 23:17
**pops** [1] - 20:23
**portfolio** [1] - 7:11
**portion** [1] - 32:17
**portions** [2] - 32:2, 63:11
**posed** [1] - 20:21
**position** [8] - 8:14, 8:21, 12:3, 76:10, 81:1, 83:14, 85:14, 87:22
**possibilities** [1] - 22:25
**possibility** [2] - 25:5, 74:2
**possible** [6] - 14:16, 28:2, 29:2, 42:21, 83:18
**possibly** [2] - 23:19, 81:19
**post** [2] - 63:3, 65:17
**post-trial** [1] - 65:17
**post-verdict** [1] - 63:3
**potential** [4] - 59:17, 59:24, 75:24, 75:25
**power** [3] - 44:13, 74:9, 85:10
**powerful** [1] - 31:13
**PowerPoint** [1] - 4:2
**practice** [2] - 67:6, 83:24
**practicing** [6] - 9:20, 16:20, 17:6, 17:14, 40:25
**precedent** [1] - 16:5
**precise** [2] - 28:14, 63:16
**precluded** [1] - 17:2
**preference** [1] - 46:8
**prefiling** [3] - 50:21, 51:2, 51:6
**prejudge** [1] - 84:1
**prejudice** [5] - 66:21, 66:24, 67:15, 82:24, 83:18
**prelitigation** [1] - 48:23
**prematurely** [1] - 9:12
**prepared** [2] - 3:16, 6:19
**present** [4] - 15:14, 31:17, 48:25, 54:1
**presentation** [30] - 4:1, 4:2, 4:19, 4:21, 5:6, 5:9, 5:11, 5:16, 5:20, 6:8, 6:9, 10:18, 30:24, 31:1, 31:2, 31:5, 31:15, 31:18, 32:13, 32:21, 33:6,

33:18, 40:5, 40:12, 40:17, 56:24, 61:20, 79:2, 80:10
**presentations** [1] - 74:17
**presented** [2] - 62:2, 80:15
**presenting** [1] - 2:21
**President** [1] - 58:9
**press** [3] - 18:22, 40:10, 81:18
**pressed** [2] - 18:25, 72:22
**pressure** [1] - 8:23
**presuit** [1] - 81:14
**pretty** [7] - 18:24, 24:15, 39:24, 41:2, 42:12, 81:3, 89:6
**prevent** [3] - 12:6, 83:23, 85:7
**previous** [3] - 35:20, 51:13, 60:1
**previously** [1] - 31:7
**primarily** [1] - 39:4
**private** [1] - 85:7
**privilege** [2] - 52:18, 52:21
**problematic** [1] - 75:21
**procedure** [1] - 11:23
**proceed** [1] - 54:19
**proceeding** [1] - 12:13
**process** [2] - 11:21, 82:11
**processes** [1] - 63:20
**produced** [3] - 31:19, 31:20, 31:21
**product** [35] - 9:1, 9:6, 9:19, 14:20, 14:21, 19:1, 19:21, 23:24, 34:15, 34:20, 35:1, 35:3, 35:4, 35:22, 37:8, 52:17, 52:22, 56:20, 58:19, 58:22, 60:3, 62:4, 62:5, 62:9, 62:13, 64:14, 65:6, 71:18, 71:25, 77:19, 79:24
**productive** [1] - 57:1
**products** [27] - 20:14, 29:15, 33:12, 34:11, 34:14, 35:2, 35:19, 36:7, 36:10, 36:21, 37:10, 37:11, 37:13, 37:14, 54:23, 56:18, 56:23, 58:14, 62:10, 62:12, 62:14, 63:20, 64:3, 64:4, 72:23, 73:16, 79:21
**Products** [8] - 34:23,

36:2, 62:3, 62:8, 62:11, 79:23, 80:2
professors [1] - 35:14
profit [1] - 73:3
program [5] - 7:24, 8:8, 9:6, 10:2, 63:21
programs [1] - 9:3
promoted [1] - 23:25
promoter [1] - 23:7
prong [3] - 75:3, 75:5, 81:2
pronounced [1] - 54:22
property [3] - 8:16, 38:18, 66:5
proposal [2] - 56:16
proposed [1] - 89:13
prosecute [1] - 73:12
prospectively [1] - 44:8
protect [1] - 88:21
protection [2] - 89:15, 89:18
protective [16] - 31:21, 84:6, 84:10, 84:13, 85:6, 85:15, 85:20, 86:5, 87:16, 87:17, 88:3, 88:14, 89:7, 89:13, 89:14, 89:15
provide [6] - 27:4, 29:5, 35:11, 64:13, 71:1, 89:12
provided [4] - 24:17, 47:20, 70:10, 74:18
provides [2] - 53:19, 59:5
provision [8] - 46:22, 46:25, 47:1, 47:3, 47:4, 64:10, 68:13, 70:6
provisions [3] - 46:21, 48:12, 69:24
provocative [6] - 6:17, 7:1, 7:23, 14:17, 18:21, 41:20
prudent [1] - 77:12
public [3] - 31:11, 84:16, 85:8
publications [1] - 36:8
publicly [1] - 23:24
publish [1] - 32:5
published [4] - 8:10, 31:10, 31:15, 31:18
pull [3] - 14:3, 14:7, 81:5
purpose [2] - 34:18, 39:15
pursuant [1] - 48:17
pursue [6] - 20:13,

23:15, 57:5, 63:14, 64:16, 82:14
put [7] - 21:2, 23:17, 28:4, 54:6, 82:21, 83:20, 86:1
putting [1] - 40:14
puzzling [1] - 50:6

**Q**

qualify [1] - 75:2
quarter [2] - 40:8, 80:6
quashing [1] - 85:16
questioned [2] - 36:12, 78:12
questions [3] - 12:18, 39:19, 66:13
quick [1] - 39:24
quite [6] - 15:22, 20:9, 30:2, 35:8, 39:9, 45:21
quote [1] - 73:24
quoting [1] - 39:7

**R**

R&D [6] - 7:24, 8:7, 8:19, 9:3, 9:6, 10:2
racheting [3] - 8:22, 57:11, 57:12
rachets [1] - 8:24
raise [1] - 43:3
raised [3] - 43:3, 58:23, 59:18
raises [1] - 88:1
range [1] - 35:24
rate [4] - 56:18, 56:19, 72:23, 75:14
rates [3] - 56:17, 62:16, 62:17
rather [3] - 40:4, 56:9, 70:4
re [1] - 87:16
re-read [1] - 87:16
reach [3] - 13:10, 13:17, 21:13, 75:11
reaction [1] - 66:8
read [12] - 3:13, 15:24, 22:5, 38:9, 38:10, 41:7, 53:9, 65:22, 72:7, 84:9, 84:21, 87:16
reading [3] - 9:10, 12:22, 12:23
ready [2] - 64:25, 81:5
real [3] - 12:1, 28:1, 45:7
reality [1] - 31:14

really [19] - 5:17, 8:24, 10:9, 10:10, 11:18, 24:13, 28:24, 34:1, 53:7, 54:4, 59:13, 61:14, 66:19, 67:17, 68:24, 72:4, 84:19, 84:23, 88:25
reason [11] - 14:5, 19:17, 25:12, 25:21, 25:22, 27:10, 37:2, 41:2, 52:12, 81:15, 88:18
reasonable [44] - 3:21, 3:23, 11:15, 13:18, 15:8, 16:23, 21:14, 26:12, 43:6, 48:5, 49:20, 51:8, 51:12, 51:15, 53:1, 53:2, 54:5, 54:8, 54:11, 54:18, 57:1, 60:14, 61:8, 61:11, 64:14, 65:2, 66:10, 66:14, 68:18, 69:13, 70:9, 72:14, 75:5, 75:9, 76:3, 76:10, 81:8, 81:12, 83:11, 86:24, 87:1
reasonableness [2] - 50:23, 65:18
reasonably [8] - 41:22, 59:1, 65:15, 66:8, 80:13, 80:25, 82:6, 88:17
reasons [7] - 16:3, 16:5, 24:24, 26:10, 29:24, 52:13, 82:17
rebuttal [1] - 21:20
recalling [1] - 25:25
recess [3] - 69:4, 71:5, 89:24
recitation [1] - 21:11
reciting [2] - 37:23, 71:23
recognize [1] - 83:20
recognized [1] - 88:23
recollect [1] - 23:20
recollection [9] - 24:9, 25:6, 26:14, 29:12, 50:19, 59:8, 59:9, 59:10, 71:4
record [17] - 4:22, 47:16, 55:7, 56:7, 56:12, 60:14, 63:9, 63:11, 66:22, 72:25, 75:9, 77:1, 77:23, 78:5, 78:16, 83:2, 85:14
records [1] - 24:9
recounted [1] - 81:24
recovery [1] - 62:18

reduce [2] - 33:14, 36:14
reexamination [7] - 10:19, 11:16, 11:18, 11:21, 12:5, 12:13, 82:10
refer [3] - 6:20, 65:10, 87:12
reference [2] - 36:3, 37:25
referred [3] - 7:12, 62:24, 65:10
referring [3] - 38:15, 51:24, 87:13
refers [4] - 10:8, 28:16, 33:19, 62:20
reflected [3] - 7:24, 8:9, 9:3
regarding [1] - 54:2
Registered [1] - 1:25
regret [2] - 78:13, 78:14
reject [1] - 84:25
rejects [1] - 11:1
related [1] - 8:11
relates [1] - 34:15
relationship [1] - 42:21
relatively [1] - 28:12
relayed [1] - 24:4
relevance [1] - 64:19
relevant [6] - 5:19, 30:9, 30:11, 41:15, 46:18, 55:11, 63:13, 65:7, 70:7
rely [3] - 50:21, 51:2, 51:14
relying [3] - 40:12, 51:5, 81:13
remember [7] - 18:17, 18:19, 25:8, 26:3, 33:4, 34:11, 58:12
remembers [2] - 53:20
rent [2] - 66:4, 66:9
repeat [1] - 72:13
repeated [2] - 40:23, 76:5
repeatedly [2] - 41:5
repeats [1] - 29:15
rephrase [1] - 79:13
replacement [1] - 83:9
reply [5] - 44:8, 52:15, 66:20, 72:13, 72:15
reported [2] - 24:16, 70:24, 70:25
Reporter [1] - 1:25
REPORTER'S [1] - 2:11
reports [1] - 67:23
represent [1] - 23:6

representative [1] - 83:6
represented [3] - 4:12, 22:9, 67:2
representing [2] - 17:24, 67:5
requests [3] - 86:15, 86:19, 87:2
require [1] - 65:13
required [1] - 75:11
research [10] - 4:19, 8:8, 9:19, 9:20, 12:24, 14:15, 39:4, 40:12, 58:17, 58:18
reservation [1] - 83:11
residual [1] - 49:9
resolve [1] - 16:9
respect [12] - 21:15, 55:5, 63:7, 64:11, 76:3, 76:7, 76:18, 77:18, 78:4, 81:24, 84:8, 88:3
respected [3] - 75:19, 76:9, 80:24
respond [8] - 2:14, 17:23, 21:19, 51:20, 52:7, 52:10, 67:9, 67:11
responded [3] - 19:6, 20:14, 72:11
responding [1] - 49:23
response [5] - 7:18, 13:3, 20:19, 21:6, 33:3
responses [3] - 28:7, 33:3, 42:2
restrictions [1] - 89:9
result [3] - 10:19, 12:13, 13:23
revised [1] - 68:16
rhetoric [2] - 3:19, 32:10
RHODE [1] - 1:6
rightly [5] - 8:15, 75:21, 76:16, 78:19, 82:18
rights [64] - 37:5, 37:6, 43:13, 43:16, 44:15, 45:5, 46:15, 46:16, 46:17, 48:13, 48:16, 49:12, 49:13, 57:6, 63:22, 63:24, 63:25, 64:8, 64:15, 64:17, 67:17, 67:18, 68:1, 68:6, 69:17, 69:19, 69:20, 70:1, 70:11, 70:12, 70:14, 73:13, 73:17, 74:2, 74:5, 75:18, 75:19, 75:20,

75:22, 75:24, 75:25,
76:6, 76:8, 76:9,
76:19, 77:3, 77:16,
77:17, 77:18, 79:21,
80:24, 82:2, 82:3,
82:4, 82:16, 82:17,
83:4, 83:10, 83:15,
85:14, 88:21
ripe [1] - 11:18
risk [2] - 55:2, 55:3
risks [2] - 12:12, 63:21
Roche [1] - 27:24
ROSENBLATT [1] -
2:6
Rosenblatt [1] - 3:2
rough [1] - 4:4
roughly [3] - 18:6,
45:24, 45:25
round [1] - 8:5
row [1] - 3:3
royalties [3] - 38:23,
38:25, 41:19
royalty [4] - 40:7,
62:16, 62:17, 75:14
Rule [2] - 66:18, 86:20
rule [1] - 74:19
rules [1] - 86:25
ruling [1] - 78:24
run [3] - 55:3, 57:20,
64:25
run-of-the-mill [1] -
57:20

# S

saddened [1] - 77:11
sadly [1] - 67:23
sales [8] - 35:8, 35:15,
35:16, 35:21, 35:22,
35:23, 35:24, 56:24
samples [1] - 35:23
satisfied [2] - 82:15,
85:15
satisfy [4] - 42:10,
73:5, 73:18, 81:2
savvy [1] - 79:5
saw [3] - 31:4, 56:24,
58:4
Scholer [1] - 60:2
scientific [1] - 40:13
scientist [1] - 19:3
scientists [4] - 5:4,
8:10, 35:14, 40:14
scope [1] - 19:22
screen [1] - 32:2
screening [1] - 39:4
seated [2] - 2:13, 3:3
second [11] - 5:5,
7:14, 17:17, 28:13,

29:13, 35:21, 48:1,
74:13, 74:23, 81:2,
84:2
secondly [1] - 71:2
secret [2] - 22:10,
22:11
Section [3] - 46:21,
48:17, 64:11
see [28] - 4:5, 4:8,
11:9, 11:25, 20:7,
24:14, 26:7, 31:11,
33:14, 37:24, 38:12,
41:8, 48:20, 53:14,
57:11, 57:12, 58:7,
61:7, 61:21, 61:24,
62:8, 63:22, 76:9,
77:1, 86:25, 88:18,
88:24, 89:5
seeing [5] - 80:24,
83:2, 83:3, 85:7,
89:17
seek [2] - 26:25, 89:18
seeking [1] - 89:15
seem [1] - 60:13
Select [1] - 40:9
selecting [2] - 62:20,
80:6
selection [1] - 46:2
sells [1] - 74:8
send [4] - 16:21,
60:11, 60:20, 60:23
sending [1] - 57:25
Senior [1] - 58:9
sense [3] - 46:8, 74:4,
82:14
sensibly [1] - 86:17
sensitive [2] - 85:18,
88:24
sent [21] - 6:14, 6:15,
6:23, 7:19, 7:21,
12:21, 14:3, 14:7,
14:14, 18:10, 18:12,
21:20, 21:22, 31:7,
33:2, 33:3, 33:11,
57:7, 57:17, 57:19,
72:18
separately [1] - 14:4
sepsis [1] - 62:4
September [4] - 1:12,
24:5, 24:7, 72:2
series [6] - 55:7, 55:8,
55:19, 56:3, 56:9,
81:22
serious [2] - 77:3,
80:23
seriously [1] - 75:20
SERNEL [1] - 1:21
Sernel [1] - 2:22
set [8] - 13:3, 13:8,
31:11, 32:23, 56:22,

67:5, 72:15, 75:4
setting [1] - 15:15
settle [1] - 49:3
sew [1] - 24:13
shall [2] - 63:19, 73:11
shape [1] - 34:4
shared [2] - 45:14,
68:8
Sharp [1] - 2:18
SHARP [2] - 1:18, 2:18
Sharp's [2] - 47:17,
65:20
shoes [1] - 43:15
short [5] - 82:19, 84:8,
84:14, 86:3, 88:10
shot [3] - 73:20, 86:4,
86:11
show [5] - 34:2, 41:1,
42:6, 76:5, 79:18
showing [6] - 53:23,
54:20, 56:25, 57:4,
80:23
shown [3] - 53:24,
61:18, 80:12
shows [5] - 48:2, 55:7,
62:7, 72:14, 81:25
shut [1] - 44:5
side [8] - 4:25, 23:9,
23:10, 44:19, 85:24,
86:6, 89:2
sides [2] - 35:24,
87:22
sidetracked [1] -
39:23
sign [3] - 25:2, 27:14,
71:7
signal [4] - 5:11, 5:22,
6:5, 7:9
significant [3] - 56:23,
79:1, 88:5
simple [1] - 15:22
simply [6] - 12:22,
19:6, 19:18, 41:10,
69:9, 71:23
sit [1] - 64:24
six [5] - 4:6, 5:8, 31:8,
44:1, 44:10
slide [23] - 4:3, 4:16,
24:4, 34:19, 34:25,
35:5, 35:20, 36:1,
40:21, 56:24, 61:21,
61:23, 62:1, 62:7,
62:15, 62:19, 79:19,
79:22, 80:1, 80:5,
80:20, 80:21
slides [18] - 5:8, 5:22,
5:23, 31:11, 32:5,
33:10, 38:6, 61:18,
61:19, 62:12, 62:22,
63:7, 79:11, 79:12,

79:14, 79:16, 79:18,
80:12
small [2] - 5:13, 61:3
snatch [1] - 81:10
so-called [1] - 50:3
sole [3] - 43:18, 47:15,
83:6
solely [1] - 48:8
solid [1] - 50:20
someone [1] - 43:3
sometimes [2] -
58:17, 78:11
soon [5] - 26:23,
28:12, 40:4, 43:1,
54:8
sooner [1] - 55:2
sophisticated [1] -
77:9
sorry [3] - 51:17,
55:21, 55:25
sort [8] - 10:5, 23:16,
23:17, 24:13, 29:16,
38:17, 68:21, 89:8
source [1] - 74:9
Speaking [1] - 7:13
speaking [1] - 39:3
speaks [2] - 26:1,
44:14
specific [5] - 15:19,
17:23, 18:3, 37:25,
45:7
specifically [7] -
10:16, 40:18, 43:2,
47:21, 72:17, 83:8,
88:12
specifications [1] -
36:22
specificity [1] - 78:8
specified [3] - 9:6,
9:23, 77:18
spin [1] - 26:22
spot [2] - 50:9, 71:4
Squibb [1] - 40:7
stage [1] - 83:24
Stage [8] - 34:23,
36:2, 62:2, 62:3,
62:8, 62:11, 79:22,
80:2
standably [1] - 77:12
standard [3] - 43:12,
46:11, 85:6
stands [1] - 43:15
STARGATT [1] - 1:18
stark [1] - 22:20
start [4] - 3:8, 23:23,
41:17, 46:8
started [1] - 2:16
starting [1] - 4:6
starts [1] - 62:15
state [2] - 40:5, 76:24

statement [49] - 4:11,
9:5, 9:8, 9:24, 10:1,
19:1, 20:10, 20:18,
21:6, 21:7, 21:10,
21:17, 21:18, 24:5,
24:10, 24:16, 25:2,
25:22, 25:23, 26:9,
27:20, 29:1, 29:3,
29:12, 29:13, 30:4,
30:7, 30:8, 30:16,
30:19, 30:21, 31:13,
38:5, 38:10, 41:20,
41:21, 50:25, 54:16,
59:6, 60:4, 61:13,
61:17, 70:4, 70:17,
70:18, 71:11, 71:12,
72:5, 78:9
statements [22] - 6:17,
7:2, 7:7, 7:23, 14:17,
16:14, 18:21, 19:18,
20:3, 23:24, 29:10,
29:23, 38:10, 53:22,
59:3, 60:13, 61:7,
61:11, 61:16, 66:11,
70:5
states [1] - 60:17
STATES [1] - 1:1
stating [1] - 20:15
statute [1] - 44:10
step [5] - 8:4, 68:15,
68:17, 68:21, 69:10
steps [4] - 48:5, 64:25,
68:18, 69:13
STEVEN [1] - 2:3
still [10] - 10:25,
12:12, 36:9, 61:11,
69:8, 70:22, 80:1,
82:10, 82:16
stimulate [1] - 58:20
stimulates [1] - 58:21
stipulate [1] - 52:20
stop [4] - 16:20,
16:22, 16:25, 30:7
stopping [2] - 19:18,
84:2
stops [1] - 89:14
strengthen [1] - 83:14
stretch [1] - 75:16
strikes [1] - 24:2
strong [2] - 25:21,
25:22
structure [1] - 89:8
stuff [2] - 8:20, 88:24
subject [4] - 64:9,
68:2, 74:12, 79:24
subjective [1] - 52:25
sublicense [1] - 42:9,
44:5, 44:7, 44:23,
45:2, 45:9, 48:24,
49:7, 49:10, 73:17,

83:5
sublicensee [1] - 45:5
sublicenses [1] -
48:19
sublicensing [2] -
64:15, 64:17
submissions [1] -
74:17
submit [2] - 52:22,
71:24
submitting [1] - 52:18
subpoena [2] - 85:10,
85:16
substantial [7] -
43:12, 44:15, 56:24,
67:17, 68:1, 68:6,
70:1
substantially [1] -
83:3
successful [2] - 5:14,
11:10
sudden [1] - 20:23
suddenly [1] - 47:1
Sue [1] - 32:15
sue [17] - 12:4, 13:12,
15:18, 20:22, 21:7,
23:24, 40:11, 42:11,
44:9, 53:11, 53:13,
54:8, 57:19, 60:11,
79:10, 81:1, 82:16
sued [5] - 43:1, 57:18,
58:1, 62:25, 82:18
Suffice [1] - 86:17
sufficient [3] - 42:9,
75:9, 86:16
sufficiently [1] - 15:15
suggest [5] - 23:10,
53:11, 73:4, 74:10,
75:25
suggested [3] - 42:16,
53:13, 85:2
suggestion [1] - 72:3
suggests [2] - 11:18,
71:10
suing [5] - 12:6,
22:14, 23:3, 41:17,
65:8
suit [47] - 3:22, 3:23,
9:2, 11:16, 15:8,
16:24, 22:17, 26:12,
30:4, 43:6, 43:21,
44:20, 49:1, 50:5,
50:22, 51:2, 51:4,
51:12, 51:15, 52:25,
53:2, 54:5, 54:8,
54:11, 55:1, 55:2,
55:4, 59:2, 59:17,
59:22, 61:9, 61:12,
64:23, 75:6, 75:9,
76:3, 76:16, 78:2,

78:15, 79:25, 80:8,
81:19, 81:20, 83:25,
84:2, 85:12
summarizing [1] -
26:10
superseding [2] -
46:24, 47:1
support [1] - 25:13
supports [3] - 3:21,
38:5, 61:16
supposedly [4] -
26:16, 50:6, 50:8,
72:2
surprising [1] - 22:11
survive [1] - 11:4
sustain [2] - 75:10,
75:16

T

tab [3] - 47:8, 47:25,
60:18
table [1] - 19:15
takeaway [1] - 40:16
talks [18] - 5:17, 5:18,
5:20, 5:21, 7:4,
18:16, 33:22, 34:24,
38:22, 39:7, 40:5,
40:7, 40:8, 40:20,
40:22, 68:12, 80:5
target [3] - 39:11,
62:24, 65:6
targeting [1] - 40:20
targets [8] - 6:3,
31:13, 33:19, 33:20,
40:17, 40:19, 41:2,
41:3
Targets [1] - 32:14
TAYLOR [1] - 1:18
technical [2] - 4:24,
5:2
techniques [1] - 10:12
technology [6] - 5:21,
17:3, 17:14, 37:11,
37:12, 41:19
teleconference [1] -
84:20
telephone [3] - 3:15,
76:20, 76:22
telephonically [1] -
3:14
tend [1] - 13:18
term [1] - 73:11
terms [4] - 13:10,
13:11, 13:16, 33:22
test [8] - 15:17, 33:12,
44:19, 65:9, 68:3,
70:14, 75:3, 81:3
testimony [21] - 4:24,

31:3, 31:6, 33:9,
36:14, 36:25, 37:19,
38:5, 41:7, 52:2,
57:10, 60:16, 60:17,
63:6, 63:10, 64:19,
64:22, 65:8, 79:9,
79:17
THE [106] - 1:1, 1:1,
2:13, 2:16, 2:23, 3:4,
3:8, 3:18, 3:25, 6:22,
8:2, 8:4, 8:12, 8:19,
9:5, 9:23, 10:4,
10:14, 10:24, 11:5,
12:1, 12:9, 12:15,
12:17, 13:23, 14:9,
15:17, 15:24, 16:2,
17:20, 18:1, 18:8,
19:11, 19:14, 21:1,
21:19, 22:16, 23:16,
25:18, 28:5, 29:8,
31:22, 36:24, 37:21,
37:23, 38:4, 38:14,
39:12, 39:17, 39:19,
39:22, 40:1, 43:20,
44:12, 44:21, 44:25,
45:4, 45:11, 45:16,
45:18, 45:24, 46:5,
47:7, 47:10, 47:24,
49:14, 49:22, 50:15,
51:3, 51:16, 51:19,
53:6, 53:25, 54:9,
54:14, 55:5, 55:17,
55:22, 55:24, 56:1,
57:15, 57:24, 60:6,
63:4, 63:6, 63:17,
65:16, 65:22, 65:24,
66:12, 66:16, 67:8,
68:9, 69:1, 69:5,
69:16, 69:23, 72:5,
73:8, 73:20, 74:15,
87:10, 87:14, 89:5,
89:20, 89:23
themselves [6] -
37:16, 76:2, 79:11,
79:12, 79:14, 79:16
therapeutic [1] - 21:5
therefore [2] - 41:14,
56:21
thinking [7] - 12:4,
13:25, 30:7, 34:11,
51:7, 67:22, 76:17
thinks [3] - 23:20,
59:13, 65:1
third [9] - 22:17, 24:3,
53:3, 74:7, 83:24,
84:15, 84:16, 85:7,
85:12
third-party [8] - 22:17,
53:3, 74:7, 83:24,
84:15, 84:16, 85:7,

85:12
thorough [1] - 63:20
thread [1] - 41:21
threat [12] - 15:2, 15:4,
15:6, 18:12, 25:9,
72:10, 72:18, 74:6,
75:15, 77:20, 88:24
threaten [1] - 78:15
threatened [2] - 26:6,
78:2
threatening [12] -
55:18, 56:4, 56:5,
56:9, 56:10, 57:16,
58:21, 58:24, 59:17,
72:20, 75:14, 82:7
threats [7] - 15:14,
55:8, 55:16, 55:17,
55:23, 65:3, 65:14
three [11] - 4:8, 4:10,
23:11, 24:6, 24:8,
24:24, 29:7, 31:7,
39:1, 43:9, 43:22
throw [1] - 65:6
throwing [1] - 84:2
tie [2] - 23:8, 23:22
timely [3] - 48:5,
68:18, 69:13
timing [1] - 54:9
title [3] - 5:11, 32:13,
40:21
TNF [2] - 36:13, 36:19
today [10] - 2:22, 3:2,
3:5, 4:5, 14:19, 66:9,
75:7, 78:25, 79:16,
84:8
together [3] - 6:4,
55:10, 80:21
tone [3] - 81:21, 82:5
took [17] - 3:14, 13:7,
13:14, 13:17, 13:22,
18:20, 21:13, 23:4,
24:6, 24:22, 25:9,
26:23, 28:15, 41:13,
43:19, 58:4, 59:1
top [4] - 49:24, 80:2,
80:20, 80:21
total [1] - 5:8
totality [7] - 42:13,
49:17, 49:24, 55:9,
55:12, 75:12, 82:5
track [1] - 89:2
tranche [1] - 88:1
transcript [2] - 3:13,
65:19
transduction [3] -
5:12, 5:22, 6:5
transfer [3] - 48:13,
68:1, 70:11
transferred [3] -
43:13, 49:12, 69:19

85:12
treat [2] - 88:13
treating [1] - 6:6
treatment [1] - 62:4
trial [20] - 26:14,
26:24, 28:17, 30:25,
32:15, 50:18, 53:23,
53:24, 54:19, 58:5,
60:8, 60:16, 61:13,
61:18, 63:10, 65:17,
71:6, 79:9
trials [1] - 35:5
tried [3] - 6:16, 13:9,
73:4
trigger [1] - 81:5
trivial [1] - 56:22
true [4] - 30:7, 44:6,
59:20, 70:18
truth [1] - 70:21
truthfully [1] - 25:2
try [3] - 29:3, 58:19,
77:14
trying [10] - 8:13,
18:22, 25:13, 35:23,
50:15, 50:16, 69:18,
84:18, 88:20, 88:21
Tularik [2] - 61:21,
61:22
turf [2] - 9:25, 10:2
turn [5] - 13:12, 50:15,
53:5, 59:3, 62:1
Twenty [1] - 33:2
Twenty-five [1] - 33:2
Two [2] - 52:16, 62:11
two [11] - 12:25,
17:18, 25:14, 31:7,
39:1, 62:14, 69:14,
70:22, 73:2, 74:21,
75:3
two-prong [1] - 75:3
types [3] - 65:10,
66:11
typically [1] - 5:4

U

U.S.D.C.J [1] - 1:15
unaccompanied [1] -
15:14
under [20] - 19:22,
31:21, 42:10, 44:10,
45:5, 48:11, 48:19,
48:25, 57:20, 57:23,
64:17, 66:18, 73:5,
74:6, 75:2, 76:19,
77:11, 85:9, 86:5,
87:18
Under [1] - 64:6
undercut [1] - 29:4
undermine [1] - 59:14

underscored [1] - 40:22
understatement [1] - 10:23
understood [5] - 21:5, 30:2, 51:9, 78:9, 79:20
Unfortunately [1] - 6:8
Ungemach [6] - 18:16, 18:22, 19:6, 58:8, 58:10, 76:21
Ungemach's [1] - 13:4
unguarded [2] - 59:11, 59:21
UNITED [1] - 1:1
universities [19] - 37:20, 38:16, 38:24, 39:8, 42:6, 43:15, 43:23, 44:1, 44:8, 44:17, 45:8, 68:15, 68:17, 68:21, 69:10, 70:2, 70:9, 73:2, 73:6
university [1] - 43:14
unless [1] - 88:6
Unlike [1] - 81:8
unlikely [1] - 88:11
unrealistic [1] - 74:10
unreasonable [2] - 49:20, 88:9
unreasonably [1] - 49:6
unusual [2] - 23:23, 76:24
unwitting [2] - 85:7, 85:11
up [17] - 5:10, 6:21, 8:4, 8:22, 8:24, 18:15, 20:23, 24:14, 25:4, 45:21, 57:11, 57:12, 60:18, 61:21, 64:25, 76:21, 84:9
upcoming [1] - 27:25
USA [1] - 1:4
utilizes [3] - 7:25, 8:20, 9:7
utilizing [1] - 17:18
uttering [1] - 77:3

**V**

validating [1] - 6:3
value [2] - 30:3, 30:20
various [2] - 9:3, 80:22
vary [1] - 35:13
vast [1] - 5:6
vengeance [1] - 23:17
verdict [2] - 63:3, 66:2

version [4] - 30:15, 30:16, 89:12
vet [1] - 85:25
Vice [1] - 58:9
view [8] - 8:4, 8:6, 19:16, 26:5, 26:25, 53:4, 84:10
viewed [1] - 78:19
violating [1] - 9:10
Virtually [1] - 33:2
volumes [1] - 26:2
vs [3] - 15:9, 46:17, 71:6

**W**

wait [6] - 18:1, 19:12, 64:25, 65:13, 72:12, 81:4
Waiting [1] - 72:14
waived [1] - 66:23
waiver [4] - 52:17, 52:21, 72:1
walk [1] - 49:24
walking [2] - 26:21, 27:11
wants [5] - 25:8, 60:13, 73:3, 75:19
warning [1] - 60:10
Washington [1] - 1:4
waste [1] - 86:21
ways [2] - 7:15, 46:18
week [5] - 50:14, 50:17, 50:18, 50:19
weighed [1] - 79:15
Welcome [1] - 3:4
well-founded [1] - 16:3
whatsoever [3] - 49:11, 72:25, 73:7
whichever [1] - 25:12
Whitehead [3] - 47:13, 47:14, 83:22
willing [3] - 27:14, 52:20, 71:7
willingness [4] - 57:5, 58:3, 58:6
Wilmington [1] - 1:12
wiped [1] - 11:3
wise [2] - 88:7, 89:16
wishes [1] - 78:17
withheld [1] - 49:6
witness [1] - 50:16
witnesses [1] - 29:7
wonder [1] - 71:3
wondering [1] - 85:12
words [11] - 8:13, 10:3, 10:7, 20:24, 23:2, 23:9, 38:9,

63:16, 77:4, 82:5, 85:20
works [1] - 58:20
world [1] - 12:1
worried [1] - 61:1
written [1] - 47:14
wrote [1] - 67:12
Wyeth [2] - 22:9, 23:6

**X**

Xigris [8] - 20:14, 35:2, 54:21, 62:4, 62:13, 79:24, 80:16, 80:20

**Y**

year [2] - 41:25, 54:3
years [6] - 4:6, 4:10, 4:18, 31:9, 38:20, 44:10
YOUNG [1] - 1:18

**Z**

Zi [1] - 54:22
Zi-gris [1] - 54:22
Zobel [1] - 41:8

# EXHIBIT J

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No.:1:02-cv-11280-RWZ

ARIAD PHARMACEUTICALS, INC.      )
MASSACHUSETTS INSTITUTE OF        )
TECHNOLOGY, THE WHITEHEAD         )
INSTITUTE FOR BIOMEDICAL RESEARCH)
and THE PRESIDENT AND FELLOWS OF  )
HARVARD COLLEGE,                  )
                Plaintiffs,       )
                                  )
        - vs. -                   )
                                  )
ELI LILLY & COMPANY,              )
                Defendants        )

                **********

                JURY TRIAL
            DAY 2, First Session

        BEFORE THE HONORABLE RYA W. ZOBEL
        UNITED STATES DISTRICT COURT JUDGE

            United States District Court
            John J. Moakley U.S. Courthouse
                1 Courthouse Way
            Boston, Massachusetts  02210
                April 11, 2006

                **********

            REPORTER:  LISA W. STARR, RPR,CRR,CSR
                Tel:  617.771.8336

956f542b-f6f9-4460-8956-62e7e35bdd32

Ariad v. Eli Lilly                                Day 2, Session 1

4-11-06

---

### Page 2

1  APPEARANCES:
2  FOR THE PLAINTIFFS:
    KAYE SCHOLER, LLP
3    BY: Leora Ben-Ami, Esq.
       Patricia A. Carson, Esq.
4    Thomas F. Fleming, Esq.
    Pan Am Building
5    425 Park Avenue
    New York, New York 10022
6    Tel: (212) 836-8000
    e-mail: Lbenami@kayescholer.com
7  -and-
    BROMBERG & SUNSTEIN, LLP
8    BY: Lee C. Bromberg, Esq.
       Kerry L. Timbers, Esq.
9    125 Summer Street
    Boston, Massachusetts 02110-1618
10    e-mail: ldiaz@bromsun.com
11  FOR THE DEFENDANT:
    McDONNELL, BOEHNEN, HULBERT & BERGHOFF
12    BY: Paul H. Berghoff, Esq.
       Granland G. Drutchas, Esq.
13    David M. Frischkorn, Esq.
    300 South Wacker Drive
14    Chicago, Illinois 60606-6709
    Tel: (312) 913-0001
15    e-mail: Drutchas@mbhb.com
16  FOR ELI LILLY & COMPANY
    BY: Paul R. Cantrell, Esq.
17    Associate General Patent Counsel
    Lilly Corporate Center
18    Indianapolis, Indiana 46285
19
20
21
22
23
24
25

---

### Page 3

1                INDEX
2  OPENING STATEMENTS              PAGE
   By Mr. Berghoff           3
3
4
5  WITNESS      DIRECT CROSS REDIRECT RECROSS
   HARVEY BERGER
6    By Ms. Ben-Ami    24
     By Mr. Berghoff    62
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

### Page 4

1           P R O C E E D I N G S
2      (The following proceedings were held i open court
3  before The Honorable Rya W. Zobel, United States District
4  Judge, District of Massachusetts, at the John J. Moakley
5  United States Courthouse, 1 Courthouse Way, Boston,
6  Massachusetts, on April 11, 2006.)
7      THE CLERK: All rise for the Court. Please be
8  seated. Court is now in session.
9      THE COURT: May I please see Ms. Ben-Ami and Mr.
10  Berghoff?
11      (Sidebar conference off the record).
12      THE CLERK: All rise for the jury.
13      (Jury entered the courtroom).
14      THE COURT: Members of the jury, we will continue
15  with Mr. Berghoff's opening, which will finish soon.
16      MR. BERGHOFF: And, your Honor, I'm about halfway
17  through. So I will do my best to speed up, but I had asked
18  for, I said it would be about ninety minutes, and I'm about
19  halfway through. I'll move as quickly as I can.
20      Let's start just very briefly where we left off.
21  Good morning. I feel much better today, thank you. It was a
22  24-hour bug. Everyone says my color is much better today. I
23  think it's a little easier to see this up on the board than it
24  was on the screen.
25      THE COURT: You need to move it back some because

---

### Page 5

1  even if I don't see what's on there, I do wish to see the
2  jury.
3      MR. BERGHOFF: I'm sorry, your Honor. Just to recap
4  on Lilly's development of Evista —
5      THE COURT: Let's not recap, please.
6      MR. BERGHOFF: Yesterday, Plaintiffs' counsel had
7  said that Lilly put Raloxifene on the shelf, was I believe the
8  word. And the evidence will show that prior to 1992, Larry
9  Black was doing work with Raloxifene. Of course, we know that
10  because he filed an application in 1992. Of course he was
11  working on it. It wasn't completely on the shelf, and the
12  evidence will show that.
13      I'd like to turn to the second drug now, Xigris.
14  This is the drug for treating severe sepsis with high risk of
15  death. You may or may not have heard of severe sepsis. It's
16  actually very common. There are about 750,000 cases of it in
17  the United States each year. Five hundred patients die of it
18  each day. It's the leading cause of death in intensive care
19  units that are not specializing in coronary or heart attacks.
20  And it's believed to be the eleventh leading cause of death in
21  total in the United States.
22      If we could see the next slide, 1485. Sepsis is the
23  body's overreaction to infection. And the body's overreaction
24  to infection completely undoes the balance of the blood's
25  coagulation. You want the blood to be clotting when it should

956f542b-f6f9-4460-8956-62e7e35bdd32

Ariad v. Eli Lilly                          Day 2, Session 1
4-11-06

Page 6

1  clot and flowing naturally when it should flow, and that
2  balance gets out of whack. In fact, it gets out of whack so
3  much that one or more of your organs can fail, your heart,
4  your lung, your liver. And this leads to dangerously low
5  blood pressure. We may all think low blood pressure is a good
6  thing, but it can be too low so that the blood doesn't even
7  move properly through the body.
8          Severe sepsis with high risk of death is the most
9  dangerous form of sepsis. It can be caused by any number of
10 types of infections. It's not just one type of infection that
11 can lead to severe sepsis. It can be caused by two types of
12 bacterial infections.
13         This is the type that produces something called LPS.
14 You heard that mentioned yesterday. This is a different type
15 of bacterial infection that does not produce LPS, but it can
16 also be caused by infections from fungus or from viruses.
17         What starts it going is a variety of different
18 things, but it all leads to the same very dangerous condition.
19 Until Lilly developed Xigris, there was no effective treatment
20 for severe sepsis, none.
21         Now, Lilly's research began looking at a natural
22 protein in the body, in the blood, called activated protein C.
23 You're going to hear that referred to as APC throughout this
24 trial. It's a natural protein. It's in everybody's blood,
25 and it acts as an anticoagulant in the blood. It keeps the

Page 7

1  blood from clotting when it shouldn't be clotting.
2          Now, one problem that Lilly faced is that there isn't
3  much natural APC in our blood. So even if you wanted to use
4  natural APC, you couldn't get enough of it from purifying
5  blood. You really don't want to purify things from blood
6  anyway with the risk of hepatitis or HIV. So Lilly found a
7  way to make APC synthetically. This effort was headed by Dr.
8  Bang, an esteemed scientist at Lilly, and he led a team of
9  researchers, and they filed a patent application on how to
10 how to synthetically make activated protein C, how to make
11 Xigris. That application was reviewed by the Patent Office
12 and issued in 1988.
13         So before the guidepost that Plaintiffs' counsel gave
14 you yesterday, before 1989, Lilly had already invented
15 synthetic APC, already invented Xigris. They had filed a
16 patent application on it, and they had gotten a patent issued.
17         And before 1989, Lilly had already, in conjunction
18 with some other researchers, given recombinant and natural
19 APC, both of them, to mammals in experiments to see how it
20 might treat severe sepsis. This is always a step along the
21 way in drug research. You give it to animals first to see
22 what happens before you take the risk of giving it to humans.
23         This research in animals with both synthetic, you'll
24 often hear this word, recombinant, that's a fancy word for
25 synthetic, but recombinant and synthetic and natural APC were

Page 8

1  given to mammals all before 1989, all before the guidepost
2  date of Plaintiffs' counsel. Lilly had the drug and was
3  working on seeing if it would treat sepsis in animals.
4          Lilly continued its efforts throughout the '91 to '94
5  time frame with a large number of scientists and, based on
6  those efforts, filed an application with the FDA to seek
7  approval to start testing it in humans. Again, you need
8  approval from the FDA before you put any new drug into a
9  human.
10         They asked for that approval in late 1994, and it was
11 granted in December of 1994.
12         Lilly then began a series of clinical trials, first
13 Phase I, just looking at safety. Those trials, there were a
14 number of them, went on for three or four years, beginning in
15 1995.
16         They did then a Phase II trial, which I believe began
17 in 1997. That was the trial looking at both safety and
18 effectiveness in humans: Is the synthetic APC, Xigris, going
19 to help actual human patients with sepsis? And the results
20 were quite promising from this Phase II trial. It looked like
21 there was a strong trend towards helping severe sepsis
22 patients, letting them live. That's what we're talking about
23 with sepsis.
24         And this led to a considerably larger than Phase III
25 clinical study, involved 1,600 patients with sepsis. That

Page 9

1  began in the '98-99 time frame, and this Phase III study was
2  actually discontinued. Usually, that sounds like that's a bad
3  thing, but in this case it was a very good thing because an
4  independent panel of scientific experts who were monitoring
5  the Phase III clinical trial being conducted by Eli Lilly
6  decided that the results were so clear that Xigris was saving
7  the lives of at least some severe sepsis patients that it
8  would no longer be right to continue giving placebos to some
9  patients. Of course, that's how they do these clinical
10 trials, some patients get placebos, some patients get the real
11 drug, and you compare the two groups.
12         The independent panel of experts decided that Xigris
13 was so effective, it was so clear it was saving lives, that it
14 could no longer ethically rightly be given to patients — you
15 could no longer ethically give placebos to patients who had
16 severe sepsis; you had to give Xigris to all of them.
17         So this led then to a very short review by the FDA as
18 these things go because the FDA realized that this was a
19 life-saving drug, the only drug in the class, the only drug
20 available to doctors. And it led to approval of Xigris in
21 November 2001.
22         Lilly immediately began marketing it to doctors so
23 that they could use it to save patients' lives. Then we had
24 the same date on the Evista chart, 2002, Lilly finally learns
25 about the Plaintiffs' patent in this case.

3  (Pages 6 to 9)

956f542b-f6f9-4460-8956-62e7e35bdd33

Ariad v. Eli Lilly                                    Day 2, Session 1
                        4-11-06

---

Page 10

1    So, I think this chart clearly shows, and the
2 evidence will support it as it comes in, that Lilly had
3 already invented APC, had a patent on it before 1989. They
4 had already done experiments in animals directed to sepsis.
5 They were working on getting it approved for human use
6 throughout this period, including a whole series of clinical
7 trials, finally leading to its approval in 2001, all before
8 Plaintiffs' patent issued.
9    Xigris really is an amazing drug. Without Xigris,
10 three out of eight patients with severe sepsis with high risk
11 of death die.
12    THE COURT:  Mr. Berghoff, can we stick to the issues
13 in the case, please?
14    MR. BERGHOFF:  I believe this is important to the
15 issues.
16    THE COURT:  No, it isn't.
17    MR. BERGHOFF:  So although not a complete cure,
18 although not a complete cure, at least one of those three
19 patients will live with Xigris.
20    And Lilly, throughout its efforts on Xigris, spent
21 one billion dollars in today's money, in today's dollars.
22    THE COURT:  That is also irrelevant to the issues in
23 the case.
24    MR. BERGHOFF:  I disagree, your Honor, respectfully,
25 on damages.

---

Page 11

1    THE COURT:  Well, since I have the last word on
2 this, I think it would behoove you to listen to what I say.
3 Thank you.
4    MR. BERGHOFF:  Of course, your Honor.
5    The product label for Xigris, like Evista, says
6 nothing about NF-kappaB.  In fact, it says that the specific
7 mechanisms by which Xigris works are not completely
8 understood.  And that's true of many drugs that are on the
9 market today.
10    It indicates that there is a serious side effect with
11 Xigris.  Xigris can in some patients cause bleeding, and
12 that's not surprising because it is an anticoagulant
13 naturally, but it does save one out of eight, the lives of one
14 out of eight patients, one out of three that would have died
15 otherwise.
16    And why is there no mention of NF-kappaB?  Because
17 it's irrelevant.
18    MS. BEN-AMI:  Objection, your Honor.  One, we've
19 been over this ad nauseam yesterday; and two, it is
20 irrelevant.
21    THE COURT:  I agree.  And your objection is noted.
22    MR. BERGHOFF:  Thank you, your Honor.
23    Let's talk a little bit about Plaintiffs' patent, if
24 we could, and what's involved in that.  Plaintiffs' patent
25 describes the inventor's work involving a natural process.

---

Page 12

1 NF-kappaB is a natural protein.  Its inhibitor, IkB, is a
2 natural protein.  They worked in cells for millions of years.
3 And what Plaintiffs did was discover that natural process.
4    Plaintiffs, the evidence will show, are not looking
5 with patients.  They weren't looking to discover new drugs,
6 and they didn't.  They weren't looking for treatments for
7 osteoporosis, and they didn't find any.  They were not looking
8 for treatments for severe sepsis, and they didn't find any.
9 And that's fine because what they were doing is basic
10 scientific research.  They were trying to figure out how cells
11 work, how nature designed cells.
12    But in this case, Ariad is asking Lilly to
13 essentially pay for the basic scientific research that the
14 Plaintiffs did, even though Lilly didn't benefit from that
15 basic scientific research.  It did its own work in developing
16 both of these drugs.
17    And, the evidence will show that the government paid
18 for Plaintiffs' research.  All of Plaintiffs' basic scientific
19 research was funded by the U.S. government.  They received
20 grants from the National Institutes of Health.
21    Now, there is nothing wrong with basic scientific
22 research, nothing at all.  Lilly does some basic scientific
23 research.  Lilly is mostly focused on doing practical research
24 in discovering drugs and new treatments for patients.  And
25 it's entirely possible that Plaintiffs' discovery of the

---

Page 13

1 NF-kappaB pathway and how it works in nature will some day
2 help somebody develop a new drug or a new treatment for
3 patients, and at that point I think it would be very fair to
4 say that that development would have value for patients, for
5 doctors.  But that's not what happened with Evista or Xigris.
6 Neither of those drugs were invented by Lilly because of
7 NF-kappaB or in reliance on the patent.
8    Now, Ariad, one of the Plaintiffs, has had a license
9 to the NF-kappaB technology since 1991.  So that's about
10 fifteen years.  And Ariad is a pharmaceutical research
11 company.  And the evidence will show that Ariad has never
12 performed any research using NF-kappaB.  None.  Here's the
13 company that holds the rights to the Plaintiffs' patent, to
14 the Plaintiffs' work with NF-kappaB.  They've had those rights
15 for fifteen years, and they've never done any research with
16 it.  And we believe actions speak louder than words.
17    Plaintiffs' patent teaches nothing about
18 osteoporosis, teaches nothing about severe sepsis, teaches
19 nothing about bone, which would be a pretty important thing to
20 have in the patent if you're going to try and help somebody
21 treat osteoporosis.  So you could give Plaintiffs' patent to a
22 doctor trying to treat a woman for post-menopausal
23 osteoporosis, and it would be of no help.
24    THE COURT:  That's a misstatement of what the case
25 is about, Mr. Berghoff.

---

4 (Pages 10 to 13)

956f542b-f6f9-4460-8956-62e7e35bdd32

Ariad v. Eli Lilly                                              Day 2, Session 1

4-11-06

Page 14

1    MR. BERGHOFF:  Well, I respectfully disagree, your
2  Honor.
3    THE COURT:  The issue in the case is whether the
4  Defendant's drugs in some way use the invention of the Ariad
5  patent, and that they didn't do research on sepsis or
6  osteoporosis is wholly irrelevant.
7    MR. BERGHOFF:  In contrast, if you give the product
8  label for Evista to a doctor, it will teach the doctor, it
9  will tell the doctor exactly how to treat osteoporosis. And
10  the same is true for sepsis and Xigris. This contains helpful
11  information for a doctor, nothing about NF-kappaB.
12    Now, the Patent Office examination of this
13  patent-in-suit was done in secret. It just involves the
14  Patent Office examiners, and there's a whole series of them
15  involved, one at a time, and Plaintiffs. Members of the
16  public are not permitted into that process. And this is the
17  first time that anyone has been able to address the validity
18  of the patent-in-suit, and the Patent Office makes mistakes
19  from time to time and issues patents that are invalid. And
20  you are the front line defense representing the public
21  interest to be sure that if this patent is invalid it is
22  removed from the books, and so it does not restrict further
23  research in any area.
24    We believe the evidence will show that the
25  patent-in-suit is invalid for two reasons. It covers the use

Page 15

1  of old drugs, drugs that reduce NF-kappaB activity but were in
2  use long before Plaintiffs' patent issued and long before any
3  guidepost of when they discovered NF-kappaB. And I'll discuss
4  that in a little more detail.
5    We also believe that it is invalid because it does
6  not adequately describe how to practice the claimed invention.
7  And you may recall that the claims are what describe the
8  invention. And we believe the evidence will show these are
9  very broad claims because they cover any way of reducing
10  NF-kappaB activity, any way at all. And in order to get a
11  claim that broad, you have to have a very full disclosure of
12  not just one way but many, many different ways of reducing
13  NF-kappaB activity. And the evidence will show that the
14  patent does not contain a detailed explanation of many
15  different ways to reduce NF-kappaB activity.
16    Now, how do we know that old drugs reduce NF-kappaB
17  activity? How do we know that? Well, we know that in a
18  variety of ways. We believe the evidence will show that some
19  of the inventors have stated that that is the case. We
20  believe the evidence will show that at least one of
21  Plaintiffs' experts has said that is the case. And we believe
22  that reliable publications by scientists who know what they're
23  talking about working in the field will show that old drugs
24  reduce NF-kappaB activity.
25    And because old drugs reduce NF-kappaB activity,

Page 16

1  Plaintiffs' patent claims cover old things. I think it's just
2  common sense that you can't get a patent properly that covers
3  things that were used decades ago. You can't get a patent
4  today that covers things that were in use in the seventies, in
5  the sixties, and before that. That takes something from the
6  public, and that's not right.
7    Now, Plaintiffs refer to 1989 as the guidepost date
8  for their patent. We believe the evidence will show it's
9  actually 1991. That is the earliest application filed for a
10  patent by Plaintiffs that even begins to describe their
11  claimed invention. It doesn't do it in enough detail, but
12  that's the only one that even gets close.
13    Now, what old compounds reduce NF-kappaB activity?
14  Aspirin, cyclosporin-A, which is a drug used to prevent
15  rejection of organs in transplant surgery, and it's been used
16  well before the 1989 or '91 date. Something called
17  calcitriol, which is related to vitamin D in milk. That's
18  been used well before 1989, and it reduces NF-kappaB activity.
19  Steroids, a type that's called glucocorticoids. They've been
20  used to treat rheumatoid arthritis since the fifties. They
21  reduce NF-kappaB activity. Red wine, ingredients in red wine
22  reduce NF-kappaB activity. Antibiotics reduce NF-kappaB
23  activity.
24    Just common sense. Plaintiffs' patent, which claims
25  anything that reduces NF-kappaB activity and its use, just

Page 17

1  can't be valid if it's covering the use of these old drugs.
2  You can't charge somebody a royalty today for taking aspirin
3  or red wine or taking antibiotics.
4    Let's look at what one of the inventors told the
5  Patent Office. This is a declaration by Dr. Baltimore, one of
6  the inventors. This was filed with the Patent Office in
7  Plaintiffs' application. Let's look at paragraph 9, please.
8    Right here he says: "Treatment of cells with such
9  compounds as 5-aminosalicylic acid inhibits NF-kappaB mediated
10  gene expression." What Dr. Baltimore is representing to the
11  Patent Office in his declaration, it's a sworn declaration, is
12  that 5-aminosalicylic acid, you'll see it referred to as ASA,
13  inhibits NF-kappaB activity; it reduces it. The evidence will
14  make this clear to you.
15    Well, what is 5-ASA? It's an old drug. It's a drug
16  that's been around since the 1970s and has been used for
17  treating something called irritable bowel syndrome. And right
18  here Dr. Baltimore represents to the Patent Office that it
19  inhibits NF-kappaB gene expression. It inhibits making
20  proteins. It inhibits NF-kappaB activity.
21    It's a blanket statement. There are no
22  qualifications on it.
23    THE COURT:  You know, now you're switching into
24  argument, rather than an opening statement. But let us take a
25  moment to stretch.

956f542b-f6f9-4460-8956-62e7e35bdd32

Ariad v. Eli Lilly                                    Day 2, Session 1
                              4-11-06

| Page 18 | Page 20 |
|---|---|

**Page 18**

1     MR. BERGHOFF:  I apologize, your Honor.
2         (Pause.)
3     MR. BERGHOFF:  But the evidence will also show that
4  Dr. Baltimore, or anybody connected with Plaintiffs, never
5  told the Patent Office that 5-ASA was --
6     MS. BEN-AMI:  Objection.
7     THE COURT:  I don't know what the objection is.
8     MS. BEN-AMI:  You excluded this issue previously.
9     MR. BERGHOFF:  Not as to disclosure.  It's not
10  cumulative.
11     THE COURT:  Why don't we just finish with this,
12  please.
13     MR. BERGHOFF:  Thank you, your Honor.  Plaintiffs
14  say Eli Lilly infringes the patent, both patents.  They say
15  Lilly has admitted that, and we disagree.  We disagree.  I
16  just want to outline for you briefly why Lilly has not
17  admitted infringement of this patent.
18         The only way there can be infringement of this patent
19  is when a doctor prescribes Evista, for example, to a woman
20  either who needs to have osteoporosis prevented or treated,
21  and in her body, in her cells, NF-kappaB activity is reduced.
22  That's the only way infringement can exist.  That's what
23  they're charging with infringement.
24         And so, the focus of the entire infringement issue is
25  what happens in patients' bodies when they take Evista

**Page 19**

1  according to the FDA's product label or when Xigris is given
2  to a patient who has severe sepsis, according to the FDA
3  label.
4         Unless there is evidence that in patients' bodies who
5  take the drugs according to the instructions in the label,
6  unless there is evidence that shows that in those patients
7  NF-kappaB activity is reduced, Plaintiffs, we believe, have
8  not met their burden of proof on this issue.  You may recall,
9  they have the burden of proof on the infringement issue.
10         So that's the issue that we believe you should focus
11  on when you're considering infringement:  What happens in
12  patients' bodies.  And the evidence will show that the
13  supposed admissions by Eli Lilly are not relevant to what
14  happens in patients' bodies.  The Berg tests and the Smith
15  data that you'll hear about weren't in patients' bodies.  They
16  weren't even in bone cells.  They weren't even on cells in a
17  test tube that related to osteoporosis.
18         Instead, they were tests on cells in a test tube, and
19  they were liver cancer cells.  That is not evidence of what
20  happens when Evista is given to a woman to treat or prevent
21  her osteoporosis.  And we believe there is no evidence that
22  shows that NF-kappaB activity is reduced in women who take
23  Evista to treat or prevent osteoporosis.
24         Plaintiffs' evidence on Xigris is similarly lacking.
25  The evidence they will present either doesn't measure

**Page 20**

1  NF-kappaB activity or it's not measurements taken in patients
2  with severe sepsis.  And most of their evidence will be on
3  cells in a test tube, not in patients, and it will be where
4  Xigris was administered to those cells at doses two hundred to
5  three hundred times higher than the product label approved by
6  the FDA says.  Two hundred to three hundred times higher.
7  That's as if your doctor told you to take two aspirin and call
8  him or her in the morning and, instead, somebody suggests you
9  take four hundred aspirin.  I think common sense is you're
10  going to get a much different reaction from taking two hundred
11  times the recommended dose of the drug than you would from the
12  real dose.
13         We believe there is no evidence, you will hear none,
14  that Xigris reduces NF-kappaB activity in severe sepsis
15  patients who take it.
16         Just a little bit on damages.  Plaintiffs want over a
17  hundred million dollars from Lilly.  Now, Plaintiffs have
18  charged a number of companies with infringement asking them to
19  take a license, and none have to date under this patent.  And
20  when I say Plaintiffs have asked for that, the evidence will
21  show that it's really Ariad who is driving this litigation.
22  They will keep 75 percent of any amount of damages that
23  they're seeking from Lilly.  Only 25 percent will go back to
24  the universities.
25         We believe the evidence shows that Plaintiffs' patent

**Page 21**

1  is not infringed, and if it's not infringed they shouldn't
2  have any royalties for either product.  And we believe that
3  the evidence will show that Plaintiffs' patent is invalid for
4  covering old drugs, the use of old drugs, and for failing to
5  describe an adequate description of the invention.  And if the
6  Plaintiffs' patent is invalid, there are no royalties, none.
7         If NF-kappaB had never been discovered, we'd still
8  have both Lilly drugs.  But if NF-kappaB had been discovered
9  and Lilly had not done its work, the public wouldn't have
10  either drug.  It wouldn't have Evista for treating
11  osteoporosis, it wouldn't have Xigris for treating severe
12  sepsis, the only option the doctors have.
13         Both of these drugs were invented before 1989 by
14  Lilly.  Plaintiffs had no role in that; NF-kappaB had no role
15  in that.  We believe the evidence will show that Plaintiffs'
16  patent is not infringed, that it's invalid, and that
17  Plaintiffs are not entitled to any damages in this case.
18         Thank you very much.
19     THE COURT:  Call your first witness, please.
20     MS. BEN-AMI:  Thank you, your Honor.  May I read an
21  admission?
22     THE COURT:  Yes.  Members of the jury, there is a
23  lengthy process before we ever get to trial after a lawsuit is
24  filed.  And much of -- well, two things happen, maybe three
25  in a patent case.  One is there is usually a flurry of

956f542b-f6f9-4460-8956-62e7e35bdd33

Ariad v. Eli Lilly                                    Day 2, Session 1

4-11-06

| Page 22 | Page 24 |
|---|---|

**Page 22**

1  requests to the Court to dismiss the case or dismiss the
2  defenses or whatever. So we went through that.
3        There is a further process called a Markman hearing.
4  The Supreme Court not so long ago decided that if there is a
5  dispute of the language of the claims in the patent, and you
6  will see when you get the patent, the patents are not written
7  in English, they are written in "patentese," if there is a
8  dispute about the meaning of the claims, then there has to be
9  a decision by the judge as to what the meaning of the claims
10  is.
11        In this case, I did in fact interpret the claims that
12  are in issue in the case, and I will explain to you what
13  meaning I gave certain terms, and you will need to accept that
14  meaning. You can't make your own.
15        The third thing that happens before trial and that
16  really takes time is what is called discovery. It is really a
17  process of gathering information from each other and from
18  everywhere else. And they do that, the lawyers do that in a
19  number of different ways. One of them is that they can put
20  questions to each other. They are called interrogatories, and
21  they have to be answered by the other side under oath.
22        They can take depositions; that is, they can call
23  witnesses either from the other side or from anywhere, put
24  them under oath, and a reporter is present, questions are put
25  to the witness, and they are then answered by the witness.

**Page 23**

1        They can ask, and this is what Ms. Ben-Ami is talking
2  about now, they can ask the other side to admit certain facts.
3  They will make a statement, and the other side has to say
4  admitted or denied or I can't answer it as you put it.
5        What else? They can ask for documents and things
6  from the other side. And this is a very long process, and
7  particularly in a complicated case like this it takes awhile
8  and produces a great deal of information. One of the jobs the
9  lawyers have for the trial is to cut all that information down
10  to manageable size, and they have done that. I think they
11  probably have done it very well because we've managed to put
12  this trial into a three-week time frame when in fact it's way
13  out there.
14        So an admission is an agreement by the other side
15  that the statement that was given to it states the truth.
16        MS. BEN-AMI: Thank you, your Honor. I'd like to
17  read Admission No. 26: "The named inventors of the '516
18  patent coined the term NF-kappaB." That is admitted.
19        With that, I'd like to call our first witness, your
20  Honor, Dr. Berger.
21        MR. BERGHOFF: Your Honor, there's a sequestration
22  order.
23        THE COURT: Members of the jury, a sequestration
24  order simply means that any witnesses who are going to testify
25  will wait outside the courtroom until they do testify on the

**Page 24**

1  theory that sometimes our memory or perception of events may
2  be colored by hearing somebody else testify about the same
3  events. So we want you to be able to hear the witnesses
4  unaffected by what other witnesses are saying. So anybody who
5  is going to testify will wait outside until such time as they
6  testify.
7        HARVEY BERGER, sworn
8        MS. BEN-AMI: May I proceed, your Honor?
9        THE COURT: Yes. Could you please tell us your
10  name?
11        THE WITNESS: My name is Harvey Berger. I'm the
12  chairman, founder and chief executive officer of Ariad
13  Pharmaceuticals.
14        MS. BEN-AMI: With the Court's permission, I have
15  binders of the exhibits, your Honor.
16        THE COURT: Are you giving those to the jury, too,
17  now?
18        MS. BEN-AMI: No. These are just broad exhibits.
19  We do have jury notebooks if now is the correct time.
20        THE COURT: Well, it is, if we're going to look at
21  exhibits.
22  DIRECT EXAMINATION
23  BY MS. BEN-AMI:
24  Q. Let me just ask you, Dr. Berger, to clear up something
25  that was just said. Well, I'd like to make a brief

**Page 25**

1  introductory statement.
2        THE COURT: Let me explain that to the jury as well.
3  Would you have one more notebook with the stuff that the jury
4  has?
5        MS. BEN-AMI: Yes, your Honor.
6        THE COURT: Do you have one more? Members of the
7  jury, we have also agreed that counsel will have the
8  opportunity to introduce to you the witness, both to tell you
9  who the witness is and how the witness fits into the trial and
10  a very brief statement as to the purpose of the witness'
11  testimony, again, to assist you in what is likely to be fairly
12  complicated stuff.
13        MS. BEN-AMI: Thank you. Good morning, ladies and
14  gentlemen. Now we actually get to put on the evidence
15  because, as you know, you have to decide based on the evidence
16  in the case. And Dr. Berger is here to tell you just very
17  briefly a few things.
18        They include just a little bit of history of Ariad so
19  you know who the Plaintiff is. I think you probably know
20  Harvard and M.I.T. and Whitehead, but you may not have heard
21  of Ariad.
22        He is here to talk to you about how Ariad licensed
23  the '516 patent and why. And he's here to talk to you about
24  how it came to Ariad's attention that Eli Lilly was
25  infringing. And then, remember at the beginning of the case

7 (Pages 22 to 25)

Ariad v. Eli Lilly                                    Day 2, Session 1

4-11-06

## Page 26

1  yesterday, it seems like a long time ago, I got to open, and I
2  talked to you about how we have different phases of the case.
3  The last issue is from 2002 on. If there is infringement,
4  what are the damages. And we talked about there being a
5  hypothetical negotiation, where you have to make believe
6  there's a negotiation.
7      Dr. Berger will tell you what was Ariad's position as
8  of 2002 so that if you get to that point where you need to
9  consider the hypothetical negotiation you would have some
10  understanding of how Ariad was viewing the patent and what its
11  licensing procedure was.
12      So that's something that is something to consider
13  later, but we have to put the witness on for all issues now,
14  so that's why we're doing that. So he's going to talk about
15  how he learned of the patent, the licensing of the patent, and
16  how he was going to license after the patent, basically.
17  Q. Dr. Berger, let me just ask you one question as we start
18  here. Counsel for Lilly ended his opening by saying that you
19  have charged many companies with infringement. Is that true?
20  A. No, not at all.
21  Q. What have you done?
22  A. We've provided a series of letters to various companies
23  putting them on notice, letting them know from an information
24  point of view that we have our patent, inquiring whether or
25  not they have products or programs that might be relevant to

## Page 27

1  this. But we have never charged anyone other than Lilly with
2  infringement.
3  Q. Have you sued any doctors?
4  A. No, we haven't sued any physicians.
5  Q. Sued any patients?
6  A. No.
7  Q. So then, let's get into what you have done.
8  A. Okay.
9  Q. Just very briefly, could you tell us a bit about your
10  educational background?
11  A. Certainly. I'm a physician by training. I have an
12  undergraduate degree in biology from Colgate University. I
13  went on to get my medical training at Yale University where I
14  received my M.D. degree. Subsequent to that, I did
15  post-graduate research and medical training at Yale-New Haven
16  Hospital, as well as some training here in Boston at
17  Massachusetts General Hospital.
18  Q. Prior to Ariad, have you worked at industry?
19  A. Yes. For about seven or eight years before founding
20  Ariad, I was a senior executive at Centocor, one of the
21  earlier or first generation biotechnology companies, and I was
22  president of the research and development division of
23  Centocor.
24  Q. What were your responsibilities?
25  A. I was responsible for all of research and development,

## Page 28

1  for all of our product development, for all of our basic
2  discovery, research, as well as having complete responsibility
3  for licensing of technologies and products.
4  Q. Why did you leave Centocor?
5  A. I left Centocor to start Ariad. In the early nineties,
6  there were some great opportunities that I saw. And so, I
7  left to be the founder of Ariad.
8  Q. When did you found Ariad?
9  A. Started Ariad in 1991. We became fully operational in
10  1992.
11  Q. Where is Ariad?
12  A. Ariad is located in Cambridge, just down the block from
13  M.I.T., was founded with close relationships with those
14  universities and others.
15  Q. And who were the first employees?
16  A. I was the first employee. Then about eight or nine
17  months into our history, we hired another senior executive
18  from Hofmann-LaRoche, a career chemist, scientist, and for the
19  first year it was really just the two of us creating what is
20  now Ariad.
21  Q. Now, at the time you founded Ariad, how did you go about
22  getting technology for the company?
23  A. Well, we started, quite honestly, with a blank sheet of
24  paper. It was an idea that I had that one could build a new
25  biotechnology company, really starting from the latest

## Page 29

1  discoveries and developments in academia and in basic research
2  and convert those from research in the university setting into
3  pharmaceutical products that could help patients in various
4  different diseases.
5      So I spent the better part of a year meeting with
6  professors, academics, some were colleagues of mine from my
7  former academic life, some were people that I met in this
8  process, but to develop a technology and a focus around an
9  area of science called cell signaling. And cell signaling is
10  a particularly important area of biology, and it's taught us a
11  great deal about how cells work and, in general, how we can
12  treat disease.
13  Q. And just when you talk about cell signaling, what do you
14  mean?
15  A. Well, we thought of cell signaling in the early nineties
16  in the context of what cell biologists said. Cell biologists
17  at the time thought of the cell as a black box. We knew a
18  little bit of what happened on the outside. We knew there was
19  structures. But the communication mechanisms, the processes
20  by which cells communicated with their outside environment,
21  was really barely known in the early nineties.
22      And what we were learning at that time when I founded
23  Ariad was that our growing understanding of the underlying
24  processes in cells, that is, how cells communicated, how
25  signals on the outside, good or bad signals, got translated

8  (Pages 26 to 29)

956f542b-f6f9-4460-8956-62e7e35bdd3

Ariad v. Eli Lilly                                    Day 2, Session 1

4-11-06

## Page 30

1   into, effects inside the cell. We were understanding that,
2   and we were learning that you could interfere or block those
3   pathways, those cell signals, like NF-kappaB, and in turn
4   develop drugs.
5   Q.   Can you tell us what this is?
6   A.   This is something I'm very proud of. When I started
7   Ariad, one of the things you get to do is when you start a
8   company you get to name it. If you don't name it after
9   yourself, and I had no plans of doing that, you name it after
10  something that tells a story.
11         And as I just described, our technology was trying to
12  decipher the labyrinth of the cell and the pathways out of the
13  cell. So if you go back to Greek mythology, Ariadne is really
14  the story of the labyrinth, and Ariadne gave {unintelligible}
15  a spool of thread to find its way into the labyrinth to kill
16  the minotaur, a multi-headed monster in mythical times, and to
17  retrace his path back out of the labyrinth using the spool of
18  thread that had been the actual pathway in and out of the
19  cell.
20         And so, Ariad is a shortened version of Ariadne, and
21  the logo that you see there is really the spool of thread
22  that's really signifying cell signaling, pathways in and out
23  of a cell and ways of interfering with them.
24  Q.   So in the context of considering cell signaling back in
25  the early nineties, how did you come upon NF-kappaB?

## Page 31

1   A.   Well, in the early nineties, we knew very little about
2   cell signaling. There were relatively few well-validated,
3   well-studied cell signaling pathways or molecules. And as
4   part of the process I described earlier, I met with many
5   academics, one of whom was Dr. Baltimore, who at the time was
6   president of Rockefeller University in New York. He had been
7   at M.I.T. for much of his career, and he told me about
8   NF-kappaB and its importance to our strategy of developing
9   drugs to block cell signaling.
10  Q.   Now, at the time, did you know anything about the awards
11  and achievement of Dr. Baltimore?
12  A.   Certainly. Dr. Baltimore, who has been a collaborator of
13  Ariad from the beginning, is one of the most well-known
14  molecular biologists. At the age of 32 or 33 he won the Nobel
15  Prize for work that really changed our understanding of
16  fundamental molecular biology, discoveries that led to the
17  development of many of the first-generation drugs for AIDS
18  called reverse transcriptase inhibitors. And he was
19  recognized with the Nobvel Prize for that discovery.
20  Q.   Do you know what he does for a living now?
21  A.   Yes. After a time at Rockefeller and M.I.T.,
22  Dr. Baltimore became president of Cal Tech in Pasadena, where
23  he has been for the last seven or eight years.
24  Q.   Now, when did you first speak to Dr. Baltimore about
25  NF-kappaB?

## Page 32

1   A.   Well, it was early in 1991, really at the beginning of my
2   effort to put Ariad together, to build the foundation for the
3   company. So I met with him at his office and lab in New York
4   at Rockefeller.
5   Q.   And at the time, did he give you any idea of who the
6   colleagues were that he was working with on NF-kappaB?
7   A.   Well, he mentioned to me his long-standing collaboration
8   with Professor Phil Sharp, who was a professor of molecular
9   biology at M.I.T., who subsequently also has won the Nobel
10  Prize for his work in the area of biology, and Dr. Tom
11  Maniatis, who is a professor at Harvard, and their three labs
12  had worked closely together for much of the eighties in really
13  trying to understand NF-kappaB and cell signaling.
14  Q.   Now, at the time, in early 1991, I imagine, when you were
15  talking to Dr. Baltimore, did you understand that there had
16  been any patents filed or issued?
17  A.   Well, at the time nothing had been issued. Dr.
18  Baltimore, after extensive discussions about our strategy,
19  the spool of thread strategy, you can call it, to really
20  understand cell signaling and think of and identify ways of
21  selecting targets like NF-kappaB and others that are important
22  to this process, this fundamental process in cells, and
23  looking at ways of developing drugs because Ariad was going to
24  be a drug company, although it was going to take us time, and
25  we were going to need to start from our blank sheet of paper

## Page 33

1   and one employee.
2         Our goal was to make drugs, to have products that
3   helped patients with various difficult-to-treat diseases.
4         So we talked about NF-kappaB, and he indicated to me
5   that his former institution, M.I.T., had filed patents on
6   behalf of the inventors. And there were a total of thirteen
7   inventors working in the three laboratories that I described,
8   those headed by him, Dr. Sharp, and Dr. Maniatis.
9         MS. BEN-AMI:   Can we have Exhibit PTX 328, please.
10  Q.   That's in your binder, Doctor.
11  A.   Which one, please?
12  Q.   328.
13         MS. BEN-AMI:   Ladies and gentlemen, you don't have
14  all of the exhibits that the witnesses are going to use.
15  They'll be put up on the screen for you so you don't have to
16  handle so much paper.
17  Q.   Can you tell us what this is?
18  A.   So this is a letter I received from the head of the
19  Technology Licensing Office at M.I.T. in March of 1991. I had
20  met with David Baltimore not long before this. The person who
21  sent this material to me is Lita Nelsen, the head of licensing
22  at M.I.T.
23         MR. BERGHOFF:   Your Honor, I hate to interrupt, but
24  we don't seem to have a copy that we received from Plaintiffs
25  on this. I just want to be able to follow it.

9 (Pages 30 to 33)

956f542b-f6f9-4460-8956-62e7e35bdd3

Ariad v. Eli Lilly                          Day 2, Session 1

4-11-06

---

Page 34

1   Could we have copies as we go along?
2       MS. BEN-AMI:  I believe we had agreed that we would
3   make a list of exhibits, and they would make their own exhibit
4   binders.
5       THE COURT:  You may continue with the witness.
6   A.  So to go back to where I was, Lita Nelson was the head of
7   the licensing office of M.I.T. in 1991.  I had interacted with
8   her and worked with her on licenses in the past when I was at
9   Centocor, so this was a very easy transition for me to go and
10  visit her.
11      I talked with her, and as you can see from this
12  letter, she basically sent me a pile of paper which was many
13  different patents and disclosures and descriptions of the
14  NF-kappaB-related science, as well as some other things.
15      As you can see, I was talking to her about various
16  technologies.  Most of this related to NF-kappaB and to the
17  work that had been done already long prior to 1991.  At the
18  end, she referred me to Dr. Sharp, whose one of the senior
19  inventors in this technology, and suggested I chat with him
20  more about it.
21      THE COURT:  Let's stop for a moment and stretch.
22      (Pause.)
23  Q.  Can you tell us, this is the last page of the document,
24  what is this?
25  A.  This is the third page.  It describes one of the cases

---

Page 35

1   from the pile of papers I was sent.  The way universities
2   provide technology is in the form of cases, not like a case
3   here, but they had different disclosures, different
4   information, and they bundle it together.  It may turn out to
5   be one patent, more than one patent, that's a different issue.
6   But as they get disclosures or details about inventions, they
7   put it all together.
8       And here some of the last description is some of the
9   work that Tom Maniatis and David Baltimore and their groups
10  had disclosed to the M.I.T. office on regulating NF-kappaB
11  expression.  As well, there is the note to Jack with Professor
12  Sharp.
13  Q.  Did you obtain a license to this work?
14  A.  Yes, we did, a number of months later.
15      MS. BEN-AMI:  Could I have PTX 460, please.
16  Q.  Can you tell us what PTX 460 is, Dr. Berger?
17  A.  Yes.  This is the License Agreement that I signed on
18  behalf of Ariad on August 8, 1991.  So about four or five
19  months after I met with M.I.T. originally and after I met with
20  Dr. Baltimore, based on my review of what the patent filing
21  showed, the disclosure showed, my discussions with Dr. Sharp
22  and Dr. Baltimore, Ariad signed a license with M.I.T. for this
23  technology.
24  Q.  Now, you see here that it says there is a right here to
25  the United States government?

---

Page 36

1   A.  Yes, I can see it.
2   Q.  Can you explain that to the jury?
3   A.  Well, this is what's called a march-in right that the
4   government retains really in virtually all of the licenses for
5   technologies where they helped fund part of the research.
6   It's important to put this into perspective in the times.
7       In the early -- up until the early 1980s, there was
8   very little licensing of government funding, NIH-funded
9   research coming to companies.  It was a long and arduous
10  process.
11      In the 1980s, the Bayh-Dole Act was put in place, and
12  it was really put there to foster innovation in the United
13  States.  Senators Bayh from Indiana and Dole felt, as the
14  Congress did in the eighties, that the U.S. was falling behind
15  in innovation because it was so difficult to --
16      MR. BERGHOFF:  Your Honor, objection.  Hearsay.
17      THE COURT:  Well, I don't know that it's being
18  offered for the truth of it.
19      MS. BEN-AMI:  I think it's being offered to explain
20  the license.
21      THE COURT:  I'll allow it.
22  A.  So the objective of the Bayh-Dole Act was to encourage
23  licensing of government-funded research to companies.  And as
24  well, it fostered the filing of patents and the licensing
25  processes that we've described.

---

Page 37

1       And so, in turn, one of the things that the act
2   required was that in case of national emergency or crisis that
3   the government could step in and use those technologies in an
4   unusual or rare circumstance.
5       So I knew exactly what these march-in rights were for
6   the government.  They didn't bother me.  They had no impact on
7   our signing the license.  They were absolutely routine at the
8   time, as I think they still are today, and it's standard
9   procedure.
10  Q.  Well, you heard counsel in his opening make a point of
11  the fact that the government paid for some of the research
12  that's in the patent.  You were here in the courtroom, weren't
13  you?
14  A.  Yes, I was.
15  Q.  And under the rules as you understood them in 1991, was
16  the government encouraging universities and small businesses
17  to patent their discoveries?
18  A.  Without question.  That was really the purpose of the
19  Bayh-Dole Act and congressional action.  They wanted to be
20  sure that NIH-funded, government-funded research was
21  commercialized and developed to insure a competitive position
22  for the United States.  And we fit right into that.
23  Q.  In 1991, when you were licensing this, was it your
24  understanding that the government of the United States was
25  encouraging taking university research into the industrial

---

956f542b-f6f9-4460-8956-62e7e35bdd33

Ariad v. Eli Lilly                                    Day 2, Session 1
4-11-06

**Page 38**

1  field?
2  A. Yes. No question that was my understanding then and that
3  was accepted throughout the licensing community. And that's
4  what -- the opportunities that the Bayh-Dole Act and
5  congressional action created fostered the development of
6  licensing offices, such as the one at M.I.T., but today
7  probably almost, I would suspect, every university today has a
8  licensing office. This is standard practice for big and small
9  universities to take research and discoveries and inventions,
10  just like the NF-kappaB inventions from Dr. Baltimore, Dr.
11  Sharp, Dr. Maniatis, and others, take that research and make
12  sure it's brought into, for the public good, into
13  commercialization.
14  Q. Now, in his opening, counsel talked about the academic
15  world versus the practical world. Does that distinction truly
16  exist?
17  A. No. There really is no distinction anymore, especially
18  in our industry, in the biotechnology and pharmaceutical
19  industries, between the practical and the real world. Basic
20  research, whether conducted in a university or conducted in a
21  biotech company like Ariad or a pharmaceutical, big
22  pharmaceutical company like Lilly, the basic research and the
23  basic discoveries become the foundation for discovering new
24  drugs.
25       And so, from one perspective, you can't really

**Page 39**

1  separate them because those discoveries really become so
2  critically important to our ability to develop new drugs.
3       But, as well, virtually every major biotechnology
4  company you can think of, Genentech, Amgen, Biogen, all of the
5  ones you've probably heard of, they were all founded by
6  academic scientists. They all were created out of the
7  academic scientific world using those discoveries to then make
8  drugs, just like what we're trying to do.
9  Q. So Ariad was founded in 1991?
10  A. '91.
11  Q. And in 1991, it was just --
12  A. Me.
13  Q. You. So today, how many employees are there?
14  A. Got about 110 employees today.
15  Q. And that didn't happen overnight, did it?
16  A. No, it didn't.
17  Q. So tell us what types of technology Ariad has worked on
18  in recent years or as it was progressing to make products.
19  A. Well, really, throughout our history, from the day we
20  came up with the idea of the spiral and the labyrinth,
21  essentially everything we've done is focused on cell
22  signaling. It's been developing intellectual property,
23  patents. It's been developing methods and tests and research
24  approaches, broadening our understanding of the underlying
25  biology of cell signaling so that we have a scientific

**Page 40**

1  understanding to make drugs.
2       Importantly, most of the last six or seven years of
3  our history has been spent actually working on making drugs.
4  And I think it's important, you know, to just take a second to
5  talk about what we've done with 110 people over a relatively
6  short period of time --
7       MR. BERGHOFF:  Your Honor, objection.
8       MS. BEN-AMI:  I could ask a question.
9  Q. You have to answer my question.
10  A. Sorry.
11  Q. I would like you to talk about what products you give to
12  the academic world. Can you tell us what you've developed for
13  the academic world?
14  A. Okay. We have a technology that we've developed in
15  collaboration with professors at various universities called
16  Argent Gene Regulation Technology. It's a technology that's
17  used now by well over a thousand scientists all over the
18  world. We think it's such an important technology that we
19  give it away to them at no cost whatsoever. We provide them
20  with kits to facilitate their research, and that allows them
21  to do experimentation in the academic world.
22       We've also licensed that commercially to companies.
23  But to the academic scientists, they don't require a license.
24  They don't -- they receive those kits at no cost.
25  Q. And now, can you tell the jury what Ariad has been

**Page 41**

1  working on in terms of products for patients?
2  A. Okay. We have several products that the company has
3  developed that are working their way through the FDA process.
4  First, a drug we call Ariad 573. It's a drug that is about to
5  enter the last stage of clinical trials called Phase III.
6  It's a drug that has received fast track designation from the
7  FDA for the treatment of advanced sarcomas. These are cancers
8  that affect the organs and tissues that hold the body
9  together, like bone and muscle and things of that sort.
10       We've also studied that in many other cancers and
11  will be developing it further past sarcoma. So our sarcoma
12  drug is first, most advanced.
13       That same drug is now being used in little devices
14  called stents that are put into the vessels of arteries in
15  patients with coronary disease; for example, patients who
16  might develop heart attacks, who in turn have procedures to
17  expand out the vessel. These stents, these little wire mesh
18  structures, have our drug covered on the outer surface. And
19  we're about to start human trials over the next year of that
20  product.
21       As well, we've recently presented at some of the
22  important cancer research meetings our next products, which
23  will be what are called enzyme inhibitors for the treatment of
24  various types of leukemia where all other treatments have
25  failed, as well as to prevent the spread of cancer from the

11 (Pages 38 to 41)

956f542b-f6f9-4460-8956-62e7e35bdd3:

Ariad v. Eli Lilly                                    Day 2, Session 1

4-11-06

---

**Page 42**

1   main site to distant sites, and we expect as well one of those
2   products to go into human studies, and that's here.
3        MS. BEN-AMI:  Could you bring up DTX 1481, the
4   opening slide.
5   Q.  While we're bringing up the exhibit, what is the status
6   of your cancer drug?
7   A.  Ariad 573 has been studied in eleven clinical trials,
8   close to 600 patients around the world, and will start a
9   large, probably 750 to 1000-patient Phase III clinical trial,
10  the last stage of development, later this year.
11  Q.  Now, counsel for Lilly raised this as a general time line
12  in his opening.  Could you explain to the jury where you are
13  in your process and how long it's taken you?
14  A.  Certainly.  Well, I found this time line interesting
15  relative to what I've been through both at Centocor --
16       THE COURT:  Where on this are you?
17       THE WITNESS:  I'll describe it, your Honor.
18  A.  So today, I'm pointing at Phase III because our lead
19  drug, Ariad 573, should be entering Phase III clinical trials
20  later this year.
21       THE COURT:  With respect to both purposes?
22       THE WITNESS:  No, with respect to the sarcoma, the
23  cancer application, which is our main focus.  Today, we mainly
24  are developing cancer drugs.
25  A.  We have a partner, a medical device company, that's

---

**Page 43**

1   developing with us, but they're responsible for the heart
2   disease application.  The heart disease application will start
3   Phase I trials that I'm pointing to here, we expect, within
4   the next year.
5   Q.  So, Dr. Berger, counsel said it takes this long to make a
6   drug.  You were here during his opening when he talked about
7   that?
8   A.  Yes.
9   Q.  Is Ariad on track?
10  A.  It appears to be based on this schedule.  If you just add
11  up the number of years that are shown there, Ariad was found,
12  became operational about fourteen years ago, which would have
13  us right on this schedule.
14  Q.  Now, does that drug have to do with cell signaling?
15  A.  Absolutely.
16  Q.  And can you very briefly explain why?
17  A.  Sure.  Ariad 573, a drug that we discovered, our
18  scientists discovered, spent years doing the basic research to
19  understand the target, the cell signaling target, which in
20  this case is a target called mTOR.  mTOR is the target, just
21  like NF-kappaB describes another cell signaling pathway.  And
22  our drug, Ariad 573, selectively and potently stops mTOR,
23  which has beneficial effects in cancer because mTOR plays a
24  key role as a cell signaling pathway in cancer cells.
25  Q.  Now, in the opening counsel said that Ariad does not have

---

**Page 44**

1   an NF-kappaB drug.  True?
2   A.  Yes.
3   Q.  Can you explain why?
4   A.  Sure.  There really are two reasons.  Probably the most
5   important reason we don't yet have an NF-kappaB program or a
6   drug is because we have to focus with 110 people, which is not
7   that big, with 110 people doing everything from basic research
8   to finance to running the building to running clinical trials,
9   we've got to focus.
10       I've learned over the last twenty years and at two
11  companies that focus is what is critically important.
12       So we'll get there.  We've successfully, I believe,
13  developed a series of products, cancer and otherwise, and an
14  NF-kappaB inhibitor as part of our plans.  Clearly, it's next.
15       Secondly, from a technical point of view, if you look
16  at the slide that's up there, it talks a lot about on the left
17  10,000 compounds, and it's at least that.  When Ariad started,
18  we didn't have any compounds.  So we had to develop other
19  methods of coming up with drugs.
20       And so, we've developed and optimized other ways of
21  developing drugs, but as that slide points out, in order to
22  make an NF-kappaB inhibitor, say, like Evista, you need to
23  start with lots of compounds.  And we just didn't have those.
24       So now, as we've made progress on our other programs,
25  we have the contents, we have the methods.  We can now pursue

---

**Page 45**

1   NF-kappaB inhibitors, among other targets.
2   Q.  Now, I'd like to talk to you about the period from 2000
3   through 2002 as the patents were coming out and as you were
4   beginning to work on licensing.
5   A.  Okay.
6   Q.  Now, how many patents have the universities and Ariad
7   received based on the NF-kappaB technology in the United
8   States?
9   A.  Three of them.
10  Q.  And do you know when the first patent issued, when it
11  came out to the public?  Do you have an idea?
12       THE COURT:  Excuse me one moment.  The licensing
13  agreement was only with M.I.T. and Whitehead, right?
14       THE WITNESS:  Harvard was included under it.
15       THE COURT:  So Harvard?  Because I didn't see the
16  president and fellows in the part that was there.  Was it
17  there?
18       MS. BEN-AMI:  I'll ask a question to clear that up,
19  if you want, your Honor.  Harvard agreed with M.I.T. and
20  Whitehead that M.I.T. would be the licensing --
21       THE COURT:  Okay.  You now referred to the
22  universities.
23       MS. BEN-AMI:  Yes.  It wouldn't be a conflict among
24  the universities handling this.  They just agreed M.I.T. would
25  handle it.

---

956f542b-f6f9-4460-8956-62e7e35bdd32

Ariad v. Eli Lilly                                    Day 2, Session 1

4-11-06

Page 46

1   THE COURT:  Sorry.
2        MS. BEN-AMI:  Obviously, your Honor, all three are
3   Plaintiffs.
4   Q.  Dr. Berger, can you tell us, to the best of your
5   recollection, during which time period the patents for
6   NF-kappaB were coming out?  When was the first one?
7   A.  I think the first one appeared in the late nineties.  I
8   don't remember the exact date.
9   Q.  So, when a patent appears, do you know whether it becomes
10  public to the world?
11  A.  Yes.  In the United States, when a patent issues, becomes
12  official, that's when it becomes readily available and
13  available to everyone.
14  Q.  And the first patent that issued has all the description
15  in it as the same as the '516 patent?
16  A.  To the best of my knowledge, yes.
17  Q.  And so, was that patent available to companies to look at
18  if they wanted information on NF-kappaB?
19  A.  Right.  Once a patent becomes official, it's available to
20  everyone.  And the description of the basic work is available
21  because it's fully laid out in those patents.
22  Q.  Now, in the early nineties, after you had licensed the
23  NF-kappaB portfolio, were you aware whether or not after
24  patents were filed that the inventors were publishing their
25  work in the scientific journals?

Page 47

1   A.  Certainly.  You know, I think you have to look at this in
2   parallel.  The discovery is made, and then there are two paths
3   filing patents.  But as soon as those patents are filed,
4   especially given the preeminence of the scientists we're
5   talking about, they're out publishing, presenting, going to
6   meetings, and there have been dozens, I don't know the exact
7   number, but certainly the inventors have many papers that have
8   been published describing the research that's in the patents,
9   including the work that's ultimately come out in the '516
10  patent.
11  Q.  So once the papers are put out there for the public to
12  read, are they available to the scientific and industrial
13  community?
14  A.  Sure.  They're available in scientific libraries, and in
15  the late nineties everything became available on-line to
16  scientists.  All these journals would be available to
17  scientists in universities and companies everywhere.  It's the
18  whole purpose of the publication process.
19  Q.  Did there ever come a time when you wrote letters to
20  companies informing them of any of the NF-kappaB patents?
21  A.  Yes.  We did that twice.
22  Q.  When was the first time, to the best of your
23  recollection?
24  A.  First time was in the year 2000, early 2000.
25  Q.  And can you tell us whether you wrote a letter to Lilly?

Page 48

1   A.  Yes, I did.
2   Q.  And who did you write it to?
3   A.  I wrote it to the senior executive in licensing that I
4   knew at Lilly, David Thompson.
5   Q.  And how did you know him?
6   A.  We had met at prior licensing meetings, professional
7   meetings, and he was quite well known in the pharmaceutical
8   community.
9        MS. BEN-AMI:  Can I have PTX 327, please.
10  Q.  Can you, without reading the entire thing, tell us what
11  you were telling Lilly?
12  A.  This was really our first effort at taking the message
13  broadly public to companies.  And we tried to identify
14  companies that we thought from what we had read had programs
15  that might be developing drugs that worked through NF-kappaB
16  cell signaling.
17       So we were providing them with information about the
18  first of our patents and the availability of that patent and
19  if they issued subsequent patents, availability for licensing
20  so that they could have a license and be able to use those
21  patents broadly.
22       MS. BEN-AMI:  Can I have PTX 461, please.
23  Q.  Can you tell us what this is?
24  A.  Yes.  This is what's called a term sheet.  This is a
25  simple two- or three-page outline or summary that says we'd

Page 49

1   like to license some of our patents, some of our technology,
2   and it lays out sort of the structure of what that might look
3   like, what's the field, what can you use it in, and what our
4   expectations would be at the time for the payments we would
5   like you as a potential licensee to make if you conclude that
6   you need the license.
7   Q.  What was Lilly's response?
8   A.  I got a total of I think it's three letters back.  The
9   first one was a letter from Mr. Thompson saying that he
10  referred it to Dr. Wold, who worked in the research group, who
11  then sent me a letter saying that he was going to give it to
12  the scientists to look at.
13       Then he sent me another form letter a few months
14  later, after the summer, saying something like if and when I
15  decide we want to talk to you, we'll get back to you.  I don't
16  know the exact words, but that's basically it.
17       That's the last time we heard from lily.
18  Q.  Now, did there come another time when you sent Lilly a
19  letter?
20  A.  Well, again, this letter to Lilly was not selecting Lilly
21  out.  I mean, this was one of many letters we send just to put
22  folks on notice that these patents had issued in case they
23  hadn't seen them.  We did the same thing again roughly a year
24  later.  And this was when the second of the three patents had
25  issued.  Then we sent letters out more broadly again.

956f542b-f6f9-4460-8956-62e7e35bdd32

Ariad v. Eli Lilly                              Day 2, Session 1
4-11-06

## Page 50

1  Q. Now, just going with this document, at this time in the
2  year 2000, can you tell the jury what you were considering as
3  a fair royalty for the patents?
4  A. Okay. In the year 2000, the first patent had issued.
5  The first patent largely dealt with ways of discovering,
6  finding a drug, that affected NF-kappaB, this important cell
7  signaling target. But there were also, if you look at all the
8  patents and where we were headed, there was also the
9  possibility that there would be patents that would cover the
10  use of the product itself, the method of treating with
11  inhibition or inhibitors of NF-kappaB.
12      So we proposed to Lilly and to others in 2000 a one
13  percent royalty if you just discovered the product, and a
14  5 percent royalty if the use of the product was covered by a
15  method, such as the method of treatment claims that are the
16  basis of our discussions today.
17  Q. Now, at the time you sent this document out in 2000,
18  under your license agreement with the universities, if Ariad
19  makes a product that inhibits NF-kappaB, what does Ariad have
20  to give the universities, if anything?
21  A. Right. If we made a product that was an NF-kappaB
22  inhibitor, then we would owe the universities a 3 percent
23  royalty.
24  Q. So how did you arrive at the 5 percent figure?
25  A. Well, the 5 percent figure was first based on an estimate

## Page 51

1  of what we thought was a fair, reasonable royalty, especially
2  given that the patent that would have covered this
3  circumstance hadn't issued yet. The '516 patent hadn't
4  issued, and we didn't know if it would or wouldn't.
5      My experience in having done licensing for over a
6  decade at that point, probably a little longer, a 5 percent
7  royalty made sense from other examples, from my experience.
8  And clearly, we thought that if we owed M.I.T. a 3 percent
9  royalty, a royalty to someone else should be greater than that
10  because we felt that was what was reasonable and fair.
11  Q. And besides giving the universities a 3 percent royalty
12  on product, did you undertake other financial obligations to
13  the university?
14  A. Yes. We had many obligations under the license
15  agreement. We assumed full responsibility for prosecuting the
16  patents, meaning filing them, updating them, working to get
17  them approved. We had other obligations called milestones.
18  We had to pay some things to the university when certain
19  progress took place.
20      So we had other obligations in addition to the
21  royalties.
22  Q. Now, at the time in the year 2000-2001, when you were
23  working on this licensing program, did you have an
24  understanding of the type of patents that you were ultimately
25  going to get?

## Page 52

1  A. As we moved closer and closer to 2002, when the '516
2  patent issued, we gained confidence that method of treatment
3  patents, method of treatment claims such as the ones that have
4  issued as the '516 patent would be what we ultimately
5  get. Back in 2000, we weren't sure. We thought we might get
6  that, but we weren't sure. But as we got closer, based on
7  what the Patent Office was telling our patent lawyer, we
8  thought there was a good likelihood, and we were aiming for
9  these method patents because those had the greatest value.
10  Q. Now, at the time when you were doing this licensing, did
11  you have an understanding of how common method patents were or
12  were not in the industry?
13  A. It's an important point. Method patents, process
14  patents, such as the method of treatment patents, are
15  commonplace. Without question, these are types of patents
16  that pharmaceutical companies, biotechnology companies,
17  routinely file for and routinely get. There is nothing out of
18  the ordinary from my experience in method patents.
19  Q. And were you aware of what type of companies, named
20  companies, that had method patents at that time?
21  A. We had really looked a bit at that issue because I wanted
22  to be sure that I was right, that my impressions were right.
23  And so, it was easy to find many different patents from big
24  pharmaceutical companies, Pfizer, Merck, Lilly, and
25  biotechnology companies, big ones, Genentech, others. These

## Page 53

1  are very common patents, and although I don't remember them
2  today, but going back then we found lots of examples that were
3  this type of a patent.
4      We weren't doing anything -- and that was important
5  to me -- that was out of the ordinary in asking for a royalty
6  on a method patent.
7  Q. Looking at Exhibit 332, can you tell us what this is?
8  A. This is a letter that was sent to me in September 2000.
9  This was the last of the series of letters that I got in
10  response to my first letter from David Wold at Lilly, vice
11  president-research acquisition.
12  Q. And can you read the last line for the jury, please,
13  because it's a little bit far away?
14  A. Yes. "I have forwarded this information," that's
15  referring to the NF-kappaB information I had sent them, "to
16  the appropriate group in Lilly, and they will contact you if
17  and when they decide further discussion is necessary."
18  Q. Now, in 2005, did you contact Lilly, among others, again?
19  I'm sorry, 2001.
20  A. In 2001, yes.
21      MS. BEN-AMI: And DTX 69, please.
22  Q. Can you tell us what things?
23  A. Yes. This is a summary of terms that we sent out in May
24  of 2001 and we provided to many companies as an update to the
25  types of terms that we were looking for for the NF-kappaB

14 (Pages 50 to 53)

956f542b-f6f9-4460-8956-62e7e35bdd32

Ariad v. Eli Lilly                         Day 2, Session 1

4-11-06

---

Page 54

1  technologies and patents.
2  Q.  Now, can you see the date on this document?
3  A.  Yes, I can.  It's May 1, 2001.
4  Q.  Now, did you send this to Lilly?
5  A.  Yes.
6  Q.  And did they respond?
7  A.  No.
8  Q.  Did you at any point then find out through public means
9  whether or not Lilly was using NF-kappaB technology?
10  A.  Well, what was becoming clear from looking at the
11  scientific literature in early 2001 is that Lilly had done a
12  great deal of work, quite honestly, much more work than we
13  thought, on NF-kappaB and, in fact, the work was specifically
14  about Xigris, the product you've heard about.  This is the
15  product for sepsis.
16      MS. BEN-AMI:  Would you please pull up PTX 314.
17  Q.  Can you tell us what this is?
18  A.  Yes.  This is one of the articles I was referring to.
19  This is a scientific paper in a well-known journal called The
20  journal of Biological Chemistry.  It's a paper on NF-kappaB
21  activity in response to activated protein C, which is Xigris.
22  But, most importantly, the authors are senior researchers at
23  Lilly's Research Laboratories, in particular, Brian
24  Grinnell -- the senior author and the senior person on papers
25  go all the way to the right.  Brian Grinnell is a very senior

Page 55

1  research fellow whose work I had read before at Lilly Research
2  Labs.
3      So this was a striking example of the effect of
4  Lilly's drug, Xigris, on NF-kappaB activity published in April
5  2001, just before the letter went out.
6  Q.  And now over here it says "Using Broad Transcriptional
7  Profiling."  Can you tell us what you understood by that?
8  A.  Putting aside the technical terminology that's up there,
9  but human recombinant activated protein C is Xigris.  What
10  this paper shows me is that Lilly clearly had ongoing research
11  on Xigris and its effects on NF-kappaB cell signaling, but as
12  well in particular that Xigris or recombinant human APC
13  affected NF-kappaB activity, suppressed expression, that means
14  dampened or blocked the activity of NF-kappaB, and that's
15  exactly what we had been talking about throughout this
16  process.  That's what the patents cover.
17  Q.  Now, looking at the line above, do you see where it has a
18  parentheses?  Now, that does not say Xigris, does it?
19  A.  No, it doesn't.
20  Q.  How do you know it is Xigris?
21  A.  Well, based on what I knew at the time, what I think
22  we've heard today, recombinant activated human protein C is
23  the active ingredient in Xigris, and what makes me think that
24  this is directly relevant to the clinical patient-used form of
25  the drug is that the very first sentence says "Recombinant

Page 56

1  activated form of the molecule is completing clinical
2  evaluation for treatment of severe sepsis."
3      As a scientist or physician, my only conclusion is
4  that this paper is about Xigris and its clinical importance.
5  Q.  Now, during this time period, 2001-2002, when Lilly was
6  not responding to you, did you find out whether Lilly was
7  doing any other type of work on NF-kappaB?
8  A.  We also found -- with this in hand, we went and looked a
9  little further, not just about Lilly.  We were trying to
10  understand the value of our patents, the technology, how
11  broadly it might be used and by which companies.  So, we
12  started to look a little bit.  This was really a glaring clue
13  to us that companies were doing work in this area.
14      So we found a patent that related to Evista,
15  Raloxifene, the other drug we're talking about today, Lilly's
16  second product, and we found a patent that showed that
17  Raloxifene worked by inhibiting NF-kappaB.  This was a patent
18  that was filed, again, by Lilly scientists and by Lilly
19  itself.
20      MS. BEN-AMI:  DTX 904, please.  Your Honor, with the
21  Court's permission, I would like to read into evidence two
22  admissions.  One is from the pre-trial order, number 12, which
23  says: "David Berg, David Calnek, and Brian Grinnell were
24  named as applicants on the World Intellectual Property
25  Organization patent application entitled "Methods of

Page 57

1  Modulating NF-kB Transcription Factor" bearing Publication
2  Number WO96/40137.
3      The second one is 13, WO96/40137, was filed by Lilly.
4  Q.  With that in mind, when you saw this, what did it tell
5  you?
6  A.  Well, as you point out, this is, again, a patent by Lilly
7  scientists, the lead scientists, Brian Grinnell and David
8  Berg.  Just look at the title, "Methods of Modulating NF-kB
9  Transcription Factor," and you look down below at the
10  substance that's shown, and that sure looks like Raloxifene.
11      What this tells us, and then if you read more
12  carefully the rest of the patent, that here is Lilly filing a
13  patent on Raloxifene or Evista, and its regulation of
14  NF-kappaB.  That sounds like what we've been talking about.
15  Q.  Now, looking at page 3 of the document, what did that
16  tell you?
17  A.  What you've highlighted here is that this patent deals
18  with Raloxifene, which is the chemical name for Evista.
19  Q.  Now, looking at the first page of the patent, then, again,
20  looking at this, can you tell the jury what the priority
21  filing date of this patent application is, the earliest date?
22  Do you see where it says priority?
23  A.  Right.  The priority date would be June 7, 1995.
24  Q.  Now, I believe counsel for Lilly said that there was no
25  work done on NF-kappaB during the period when they were

15 (Pages 54 to 57)

956f542b-f6f9-4460-8956-62e7e35bdd32

Ariad v. Eli Lilly                                    Day 2, Session 1

4-11-06

---

Page 58

1  developing Evista. Were you in court for that?
2  A.  Yes, I was.
3  Q.  Can you tell us how this date compares to the date when
4  Evista was approved?
5  A.  Well, Evista was approved several years after this, but
6  it's clear that if you filed a patent on June 7, 1995, the
7  research, the work that led to it must have been done even
8  before that.
9       So it certainly suggests in the period 1994, 1995, at
10  least, there was ongoing work at Lilly on NF-kappaB and
11  Raloxifene or Evista.
12  Q.  And just we'll connect this up later with another
13  witness, but could you look where it says "Agent" on the
14  second column and tell the jury who the agent was?
15  A.  Yes.  The agent was James Sales, who I guess is a patent
16  lawyer at Eli Lilly.
17  Q.  Now, did there come a point in time when you negotiated
18  on the issue of the portfolio of patents with another company?
19  A.  Yes.
20  Q.  What company was that?
21  A.  Bristol-Myers-Squibb.
22  Q.  And what was the result of that negotiation?
23  A.  Late in 2002, Bristol-Myers-Squibb, another large
24  pharmaceutical company, signed a license, it was largely to
25  the first two patents that had issued; did not include any of

---

Page 59

1  the method of treatment claims that are in the '516 patent.
2  So it was a license to the drug discovery claims and the
3  portions of the patent portfolio that related to finding an
4  NF-kappa inhibitor rather than its use.
5  Q.  And so, for that use, what was the royalty rate?
6  A.  The royalty rate for that use was one percent.
7  Q.  And did they offer you any royalty rate for claims to a
8  method of treatment should it come out?
9  A.  Yes.  We had asked for 5 percent; they offered two and a
10  half percent.
11  Q.  And what was your response?
12  A.  We were not prepared to accept a two and a half percent
13  royalty.  We did not think that was fair or appropriate.  And
14  so, we turned that down.
15  Q.  Now, does Ariad require academic scientists to take a
16  license under the '516 patent?
17  A.  No.  We made a policy decision early on, years ago, that
18  academic scientists can conduct research, experimentation in
19  universities, they absolutely would not require any license to
20  any of our NF-kappaB patents, the first, the second, or '516.
21  And not only did they not require a license, we didn't even
22  require them to negotiate a free license.  We just said in the
23  universities, and Ariad agreed to this, that we would just let
24  everybody use the technology as broadly as they wanted.
25  Q.  And so, at what point does someone from your view need a

---

Page 60

1  license?
2  A.  They really need a license if they have a commercial
3  benefit.  If they're using the technology or the patents for
4  commercial use, for commercial application, they've got to pay
5  rent.  It's a simple concept.
6  Q.  Now, in the beginning, we talked a little bit about what
7  the sales numbers were for Lilly's products.  Do you recall
8  that?
9  A.  Yes.
10  Q.  And counsel talked about what he's going to prove the
11  costs were?
12  A.  Yes.
13  Q.  So, just so we're clear, the number we put up was roughly
14  two and a half billion dollars in sales for Evista.  But does
15  that number include sales of Evista prior to the issuance of
16  the patent?
17  A.  No, not at all.
18  Q.  Are you seeking any royalty on sales of Evista prior to
19  the issuance of the patent?
20  A.  No, just from the day the patent issued in 2002.
21  Q.  The same for Xigris?
22  A.  Same for Xigris.
23  Q.  And are you seeking any royalty payments for sales
24  outside the United States?
25  A.  No, we're not, only in the U.S.

---

Page 61

1  Q.  Now, do you have any understanding based on your market
2  evaluation of how many sales we're talking about that we're
3  not asking for a royalty on?
4       MR. BERGHOFF:  Objection.  Irrelevant, your Honor.
5       MS. BEN-AMI:  If he can talk about that —
6       THE COURT:  Well, it isn't irrelevant in light of
7  your opening, although I thought that the part of the opening
8  was irrelevant.  So maybe you're compounding irrelevance.
9       MS. BEN-AMI:  Unfortunately, he went on for an hour
10  and a half.
11  Q.  Can you answer?
12  A.  Just a brief answer.  From what I know, it's billions of
13  dollars.
14  Q.  And you're not seeking any royalty on those?
15  A.  No, we're not.  Only U.S. sales since the patent issued.
16       MS. BEN-AMI:  Your Honor, I believe all these
17  exhibits are already admitted into evidence based on our
18  agreement prior to the beginning of the trial.
19       THE COURT:  Okay.  Who will cross examine?
20       MR. BERGHOFF:  I will, your Honor.
21       Your Honor, were you planning on a break, just so I
22  can appropriately plan my questions?
23       THE COURT:  We'll have a break
24            * * * * *
25

---

956f542b-f6f9-4460-8956-62e7e35bdd32

Ariad v. Eli Lilly                                    Day 2, Session 1

4-11-06

Page 62

1  CROSS EXAMINATION
2  BY MR. BERGHOFF:
3  Q.  Dr. Berger, good morning.  My name is Paul Berghoff.
4  A.  Good morning.
5  Q.  So my understanding is that Ariad has no products on the
6  market currently?
7  A.  No pharmaceutical products, yes, that's right.
8  Q.  And the one pharmaceutical product that's furthest along
9  is still in Phase II clinical trials; is that correct?
10  A.  Right.  We expect it to be in Phase III trials later this
11  year.
12  Q.  So is it in Phase II clinical trials at this point?
13  A.  Yes, it is.
14  Q.  And you did not use NF-kappaB technology in any way to
15  identify that drug, Ariad 537?
16  A.  573, no, we didn't.
17  Q.  And that drug may or may not make it to the market?
18  A.  As is the case with all pharmaceuticals.  Some make it,
19  some don't.  Yes, that's right.
20  Q.  It's a high risk business?
21  A.  Yes, it is.
22  Q.  And even best case, that drug, you expect, will not be on
23  the market before 2008?
24  A.  That's right.
25  Q.  And it could be later than that, depending on how the

Page 63

1  clinical trials go?
2  A.  Certainly could be.
3  Q.  And it may never make it?
4  A.  That's right.
5  Q.  And so, am I right that Ariad has no revenue from
6  pharmaceutical products at the current time?
7  A.  We have some licensing revenues, but no revenues today
8  from sales of pharmaceutical products, not yet.
9  Q.  And as the CEO, I assume you own a substantial amount of
10  shares in Ariad?
11  A.  I have a very modest position in the company.
12  Q.  And how many shares is that?
13  A.  I own about one and a half percent of the company.
14  Q.  And the approximate value of that, based on today's stock
15  price?
16  A.  It's, a lot of that stock options, it's impossible to
17  value that, so I really done know the value today.
18  Q.  How many shares of unrestricted stock do you own?
19  A.  I honestly don't remember the number of shares.
20  Q.  350,000, does that sound about right?
21  A.  It is certainly a reasonable number.  I just don't
22  remember the numbers.  I don't focus on this very much.
23  Q.  And the stock price, it's about $6.00 a share at the
24  current time?
25  A.  Yes, it is.

Page 64

1  Q.  You wouldn't disagree that you may own two million
2  dollars worth of unrestricted shares?
3  A.  Yes.
4  Q.  And you have a greater number of restricted shares that
5  you own; is that correct?
6  A.  I have some restricted shares, yes, that's right.
7  Q.  And do you know how many?
8  A.  I don't remember the latest numbers.  I really don't
9  focus on this.
10  Q.  You wouldn't disagree with me if I told you it was over
11  750,000 shares?
12  A.  Yes, I would disagree.  That number is not correct.
13  Q.  But you don't know what the correct number is?
14  A.  That's way off.
15  Q.  And you don't know the value of your options, your stock
16  options?
17  A.  As I said, I really don't focus on it.  I own -- I was
18  the founder of the company.  I've been there for fifteen
19  years.  I have obviously a financial stake in Ariad's success;
20  I don't deny that.  But I have a modest ownership in the
21  company.  When our new proxy comes out in a month or so, then
22  all the numbers will be available.  It hasn't been put
23  together yet.
24      THE COURT:  Are you about to go into another topic?
25      MR. BERGHOFF:  I am, yes, your Honor.

Page 65

1      THE COURT:  We'll take the morning recess now,
2  members of the jury.
3      THE CLERK:  All rise.
4      (Jury was dismissed from the courtroom.
5      (Whereupon, the Court recessed at 11:00 a.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

956f542b-f6f9-4460-8956-62e7e35bdd32

Ariad v. Eli Lilly                        Day 2, Session 1
4-11-06

Page 66

1
2
3              CERTIFICATE
4       I, Lisa W. Starr, Registered Professional Reporter and
5    Certified Realtime Reporter, do hereby certify that the
6    foregoing transcript, from Page 1 Page 65, constitutes to the
7    best of my skill and ability a true and accurate transcription
8    of my stenographic notes taken in the matter of  Civil Action
9    No. 1:02-CV-11280-RWZ, Ariad Pharmaceuticals, et al, vs. Eli
10   Lilly & Company.
11
12
13       _____
14       Lisa W. Starr, RPR,CRR,CSR
15
16
17
18
19
20
21
22
23
24
25

956f542b-f6f9-4460-8956-62e7e35bdd32

Page 66

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 1:02-cv-11280-RWZ


ARIAD PHARMACEUTICALS, et al.,
              Plaintiffs

        vs.

ELI LILLY & COMPANY,
              Defendant

        *********************

        JURY TRIAL

     Day  2, Second Session

  BEFORE THE HONORABLE RYA W. ZOBEL
  UNITED STATES DISTRICT COURT JUDGE


     United States District Court
     John J. Moakley U.S. Courthouse
          1 Courthouse Way
     Boston, Massachusetts 02210
          April 11, 2006


        *******************


REPORTER:  Loretta Hennessey, RPR, RMR
           Tel:  617-771-8336

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                                          Day 2, Session 2

4-11-06

Page 67

1  APPEARANCES:
2  For the Plaintiff:
   Bromberg & Sunstein, LLP
3  (By Lee C. Bromberg, Esq., and
   Kerry L. Timbers, Esq.)
4  125 Summer Street
   Boston, Massachusetts 02110-1618
5
   -AND-
6
   Kay Scholer, LLP
7  (By Leora Ben-Ami, Esq.,
   Patricia A. Carson, Esq., and
8  Thomas F. Fleming, Esq.)
   425 Park Avenue
9  New York, New York 10022
10
11 For the Defendant:
   McDonnell Boehnen Hulbert & Berghoff LLP
12 (By Paul H. Berghoff, Esq.,
   Grantland G. Drutchas, Esq., and
13 David A. Frischkorn, Esq.)
   300 South Wacker Drive
14 Chicago, Illinois 60606-6709
15
16 Eli Lilly and Company
   (By Paul R. Cantrell, Esq.)
17 Associate General Patent Counsel
   Lilly Corporate Center
18 Indianapolis, IN 46285
19
20
21
22
23
24
25

Page 68

1              INDEX
2
      WITNESS    DIRECT CROSS REDIRECT RECROSS
3
4  Harvery Berger
5  (By Mr. Berghoff)      70            114
   (By Ms. Ben-Ami)              112
6
7  Phillip A. Sharp
   (By Ms. Carson)    115
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 69

1              PROCEEDINGS
2      (The following proceedings were held in open court
3  before The Honorable Rya W. Zobel, United States District
4  Judge, District of Massachusetts, at the John J. Moakley
5  United States Courthouse, 1 Courthouse Way, Boston,
6  Massachusetts, on April 11, 2006.)
7      THE CLERK: Please be seated.
8      THE COURT: May I ask counsel, when you get to
9  experts, would there be objection if I polled the jury if they
10 don't understand something, to raise their hand and ask, or
11 just tell us they didn't understand something.
12     MS. BEN-AMI: Just to say "I didn't understand" so
13 they'll repeat it?
14     THE COURT: Yes.
15     MS. BEN-AMI: I think that's okay.
16     MR. BERGHOFF: I see no problem with it.
17     MS. BEN-AMI: Your Honor, I have --
18     THE COURT: They probably won't.
19     MS. BEN-AMI: I understand. For the next witness,
20 for the next witness, your Honor, we're concerned about
21 something they may potentially be crossed-examined about.
22     THE COURT: That's okay, we'll deal with it on the
23 record. Isn't this an issue we dealt with before?
24     MS. BEN-AMI: You gave some general rules and said
25 you'd deal with it as it came up. It might come up, but I

Page 70

1  don't know.
2      THE COURT: Please be seated.
3      (Jury arrives.)
4      THE COURT: Mr. Berghoff, you may proceed.
5      MR. BERGHOFF: Thank you, your Honor.
6      HARVEY BERGER, Continued Cross Examination
7  BY MR. BERGHOFF:
8  Q. Dr. Berger, your salary at ARIAD?
9  A. It's a little bit over $500,000 a year.
10 Q. And you testified that you obtained a license under the
11 NF-kappaB patent applications from MIT in 1991 during your
12 direct testimony; is that correct?
13 A. Yes.
14 Q. And that was shortly after the company was founded, ARIAD
15 was founded?
16 A. Yes.
17 Q. Let's look, if we could, at the License Agreement. Could
18 I have DTX 16, although I believe you have a different copy in
19 your binder. Let's just use your copy, it's PTX 460, excuse
20 me. This License Agreement contains what's called a "best
21 efforts" clause, does it not?
22 A. Which clause are you looking at?
23 Q. You can't remember whether it contains a best efforts
24 clause?
25 A. Not exactly. Would you refer me to what you're --

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                    Day 2, Session 2
4-11-06

---

**Page 71**

1  Q. I will. Paragraph 3.1, which is on Page 6 of the
2  agreement.
3  A. Yes, I see.
4  Q. And if we could look at Paragraph 3.1.
5       This paragraph refers to "licensee," and am I correct
6  that that's ARIAD?
7  A. Yes, sir.
8  Q. And it says that "Licensee," or ARIAD, "shall use its
9  best efforts to bring one or more licensed products or
10  licensed processes to market through a thorough, vigorous and
11  diligent program for exploitation of the patent rights."  Do
12  you see that?
13  A. Yes, I do.
14  Q. And the patent rights that are being discussed here are
15  the NF-kappaB patent rights?
16  A. Yes, they are.
17  Q. And licensed products would be what, in your
18  understanding, Dr. Berger?
19  A. They would be products either discovered using the
20  technology or products whose use was covered by the technology
21  and patents.
22  Q. So products discovered using NF-kappaB, correct, would be
23  one part of licensed products?
24  A. Yes, sir.
25  Q. And the other part would be products that use NF-kappaB

---

**Page 73**

1  Q. ARIAD has never done any research focused on identifying
2  compounds or drugs based on their effect on NF-kappaB,
3  correct?
4  A. Right, that's the same thing.
5  Q. And you've done no research at ARIAD to identify
6  compounds or drugs that might help patients by using NF-kappaB
7  technology?
8  A. We have not, as I've said, we have not had a program to
9  date on developing NF-kappaB inhibitors.
10  Q. And decisions about ARIAD's research programs from the
11  very beginning through today have been made at ARIAD in
12  conjunction with a Scientific Advisory Board; is that correct?
13  A. No, sir, that's wrong.
14  Q. And how is it wrong?
15  A. The Scientific Advisory Board is a group of advisors that
16  have worked with us individually, at times; as a group, at
17  times.  In the past about five or six years, really since
18  1999, we have largely used the scientific advisors on an
19  individual basis, particularly to give advice on specific
20  scientific questions.  But the Scientific Advisory Board has
21  absolutely no role in setting our policies, our direction or
22  the focus of our R&D activities.
23  Q. And never has, is your testimony?
24  A. And never has, yes.
25  Q. And Dr. Baltimore is currently a member of your

---

**Page 72**

1  when they are administered to patients?
2  A. Yes, the method of treatment, applications that we've
3  discussed.
4  Q. And so this paragraph in your License Agreement with MIT
5  and the other universities imposed an obligation of ARIAD to
6  use its best efforts to bring NF-kappaB discovered products or
7  products that use NF-kappaB to market, correct?
8  A. Yes, sir.
9  Q. And ARIAD was under an obligation to bring those patents
10  to market through a thorough, vigorous and diligent program
11  for exploitation of the patent rights; am I right?
12  A. Yes.  But it does not require ARIAD to be the only one to
13  do that.
14  Q. And, in fact, ARIAD has taken no steps, including through
15  today in 2006, to bring a licensed NF-kappaB product to
16  market, correct?
17  A. We have not done research to develop NF-kappaB
18  inhibitors, as I said earlier, and explained why, and we've
19  discussed that with the universities over many years, and the
20  reasons why, and have plans to do so, but also have plans to
21  license the technology broadly, which the universities were
22  quite pleased with that approach.
23  Q. And ARIAD, if I understand it, has never had, to date,
24  any type of research program in the NF-kappaB area?
25  A. Never to develop NF-kappaB inhibitors.

---

**Page 74**

1  Scientific Advisory Board?
2  A. Yes, he is.
3  Q. And he has always been a member of your Scientific
4  Advisory Board?
5  A. Yes.
6  Q. So you have always at ARIAD had access to Dr. Baltimore
7  to ask any questions --
8  A. Certainly.
9  Q. -- about proceeding with an NF-kappaB research program,
10  correct?
11  A. Yes.
12  Q. And is it my understanding that since 1991 when ARIAD was
13  founded, that ARIAD has never conducted a single test on
14  anything for NF-kappaB activity?
15  A. We have done no experiments on trying to develop
16  NF-kappaB inhibitors, although we have had work for many years
17  that involves NF-kappaB itself, and NF-kappaB is an important
18  part of some of our other technology, such as our Argent gene
19  regulation therapy.  So we have done experimentation and
20  research on NF-kappaB, just not the discovery of drugs that
21  are NF-kappaB inhibitors.
22  Q. So it's your testimony that ARIAD has done NF-kappaB
23  tests?
24  A. We have done work with NF-kappaB because NF-kappaB is
25  included as part of our technology, one of our other

---

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                           Day 2, Session 2

4-11-06

## Page 75

1 technologies, but we have never done assays or tests per se as
2 you're describing them on NF-kappaB.
3 Q.  Okay.  Now, you talked during your direct testimony about
4 the purpose of the Bayh-Doyle Act.  Do you recall that
5 testimony?
6 A.  Yes.
7 Q.  And I believe the gist of your testimony was that under
8 the Bayh-Doyle Act, the government wants to encourage the
9 commercialization of technology developed by universities?
10 A.  Yes, in general terms, yes.
11 Q.  And you have not, at ARIAD, commercialized the NF-kappaB
12 technology in any way?
13 A.  What we've done is completely consistent with the goals
14 of the Bayh-Doyle Act, which is to move towards
15 commercialization of that technology:  That can be through
16 further licensing, that can be through collaboration, or that
17 can be through our own internal research.  All of those,
18 really -- and the universities agree -- are fully consistent
19 both with their, the universities' objectives, as well as the
20 Bayh-Doyle Act.
21 Q.  And is this lawsuit furthering the interests of the
22 Bayh-Doyle Act?
23 A.  I don't think I would say it's directly furthering the
24 Bayh-Doyle Act, but certainly it is certainly fully supportive
25 of the objectives of the universities and ARIAD to broadly

## Page 76

1 license the technology and to be sure that value is created
2 and that innovation is fostered.
3 Q.  Now, you said that when you started up ARIAD in 1991,
4 that ARIAD didn't have any drugs.  Do you recall that
5 testimony?
6 A.  Yes.
7 Q.  And that was one of the reasons that you didn't start an
8 NF-kappaB research program?
9 A.  No, I think you've misrepresented what I said.
10 Q.  Well, I certainly didn't mean to, so please clarify.
11 A.  By the example you gave, the illustration that you put
12 up, you showed examples of large libraries, tens of thousands
13 of compounds, that could be screened to potentially find lead
14 molecules that might turn into drugs, and whether it's 20,000
15 or 2 million compounds is a matter of debate, and the
16 evolution of technology.  But what I said is when we started
17 the company, and in our early years, we didn't have large
18 chemical libraries, those were largely the purview of major
19 pharmaceutical companies that had made libraries for screening
20 for many decades.
21       When we were starting, we needed to come up with
22 alternative ways of either, through chemistry, sophisticated
23 chemistry or other strategies to develop our drugs, but large
24 libraries which would have been amenable to discovering
25 NF-kappaB inhibitors like Evista might have, we didn't have at

## Page 77

1 that time.
2 Q.  And so, just so I'm clear, it's your testimony that you
3 need to start with a large library of compounds in order to
4 find a single NF-kappaB inhibitor?
5 A.  No, that's also not correct.  Our focus at ARIAD is the
6 development of chemicals, small molecule drugs.  That's been a
7 theme throughout our history.
8       There are different types of drugs, as you know, from
9 small molecule to proteins such as Xigris, to monoclonal
10 antibodies.  And our selection in that portfolio of options
11 was small molecules because we were a company that was very
12 built on chemistry.  So the relevant example would be Evista,
13 not Xigris.
14       We weren't experts, and never have been, in the
15 development of proteins like insulin or Xigris or antibodies,
16 that's another way to make an NF-kappaB inhibitor.  That
17 wasn't in any way part of our business plan or our technical
18 capabilities.
19 Q.  So to find a small molecule drug like Evista or
20 raloxifene, you want the jury to understand that you need to
21 start with a large chemical library to find even that one?
22 A.  Well, that's the most common way of finding small
23 molecule drugs throughout the pharmaceutical industry.  There
24 are other ways, some of which we have pursued, but generally
25 to find small molecule, to find inhibitors of targets, one of

## Page 78

1 the most common ways of doing that is with large libraries
2 that would have been relevant to the discovery of an NF-kappaB
3 inhibitor.
4 Q.  In 1991 when you founded the company, you did have access
5 to the NF-kappaB patent applications of plaintiffs, did you
6 not?
7 A.  Yes.
8 Q.  And those applications did not identify any small
9 molecule inhibitors of NF-kappaB that you could have started
10 your research with?
11 A.  They identify other NF-kappaB inhibitors that were very
12 well defined, and those were things that we considered.  When
13 I licensed the technology in August of 1991, ARIAD had been in
14 business for about three or four months.  So over the ensuing
15 12 to 18 months, we put together and crystallized the strategy
16 for how we were going to develop our drugs, and it has evolved
17 and changed over time.  But certainly at the time we licensed
18 the technology, we were still determining how we were going to
19 go, whether it was going to be limited to small molecules,
20 whether we were going to make proteins.  We didn't know that,
21 because at that point I was the only employee.
22 Q.  And so in 1991 and thereafter, there were no small
23 molecules identified in plaintiffs' patent applications that
24 you could have used in an NF-kappaB research program; is that
25 correct?

4  (Pages 75 to 78)

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                                    Day 2, Session 2
                              4-11-06

| Page 79 | Page 81 |
|---|---|

**Page 79**

1  A. Well, there were molecules identified that we could use
2  to model. There were what are called NF-kappaB decoys.
3  Q. Is that a small molecule?
4  A. No, but it's something that you can use based on
5  evolving, growing technology that's been developed, you could
6  use that to model as the basis for developing drugs that mimic
7  or look like parts of it, and our understanding of how to do
8  that evolved.
9        Keep in mind that in 1991, this was the infancy of
10 the small, of the cell signaling field for companies, and
11 NF-kappaB was the first, among the first of the new cell
12 signaling targets for which new therapeutic interventions had
13 been proposed. And the original patents taught us that you
14 could block NF-kappaB, they taught us that there were various
15 different ways of doing it, various places to do it.
16       It then took time over the years to look at what were
17 the best ways of doing it, and it was not just limited to us.
18 Lilly had ways of doing it, other companies have ways of doing
19 it.
20       We were very limited in terms of funding, in terms of
21 research capabilities, so we had to pick things that we
22 thought we could reasonably easily.
23 Q. Dr. Berger, it's a simple question. Your research was
24 focusing on small molecules, raloxifene being an example of a
25 small molecule. And the patent applications of plaintiffs

**Page 80**

1  didn't identify a single small molecule that's an NF-kappaB
2  inhibitor, did it?
3  A. I don't remember if it did a single example, but what it
4  had was many examples of NF-kappaB inhibitors --
5  Q. None of which are small molecules?
6  A. -- that could be used to develop both small molecule
7  drugs as well as proteins.
8  Q. But you at ARIAD did not use any of the inhibitors
9  disclosed in the patent applications to start a research
10 program?
11 A. We did not, that's right, because we had to prioritize to
12 other things that we thought we could do faster.
13 Q. And you gave top priority to everything about NF-kappaB,
14 correct?
15 A. No, we gave a great deal of thought and evaluation to
16 using the NF-kappaB technology and have on many instances.
17 And now that our technology has evolved, and we have libraries
18 and a greater understanding of how to develop drugs based on
19 our successes and experience over the last decade, we're now
20 positioned to do that, but we weren't early on because we were
21 just a start-up.
22 Q. And early on during this entire 15-year period from 1991
23 when you obtained the license to today, you have had access to
24 Dr. Baltimore, one of the inventors, to help you identify
25 NF-kappaB inhibitors that you could have used in a research

**Page 81**

1  program, correct?
2  A. That's not the way research is done.
3  Q. But you did have access to him to ask him --
4  A. Certainly.
5  Q. -- "What NF-kappaB inhibitor should we use, Dr.
6  Baltimore?"
7  A. That's not the right question to ask. That has nothing
8  to do --
9        THE COURT: I think you've answered it.
10 Q. And you didn't ask that question of Dr. Baltimore?
11 A. We had lots of discussions with Dr. Baltimore about how
12 to pursue NF-kappaB and when and which and using which
13 technologies, and we're now in a position to do that going
14 forward, but we haven't done it in the past.
15 Q. And ARIAD has never paid royalties to MIT based on any
16 product of ARIAD's?
17 A. Not based on product sales. We've made payments to MIT
18 and the universities under the license, but not for product
19 sales.
20 Q. And you haven't made any milestone payments to MIT under
21 the License Agreement.
22 A. I don't believe so, no.
23 Q. And you haven't paid any royalties to MIT under the
24 NF-kappaB patents or patent applications?
25 A. We've made payments, I don't know how I would

**Page 82**

1  characterize them because I would have to go back and look,
2  but we've made multiple payments to the universities as parts
3  of the successful licenses with Bristol Myers Squibb, so that
4  part of those funds have gone to MIT. Whether they're
5  characterized as royalties or license payments, I just don't
6  recall, but payments have been made.
7  Q. And the Bristol Myers Squibb license does not include
8  rights to the patent in suit, correct?
9  A. That's correct.
10 Q. So ARIAD has not paid any royalties to MIT under the
11 patent in suit?
12 A. Not royalties, yes, that's correct.
13 Q. And you haven't paid any royalties to MIT under the
14 patent in suit because you believe you have no obligation to
15 do so at ARIAD, correct?
16 A. No, we have obligations to pay royalties for products
17 that are covered by the patents or through our licensing
18 effort, which as you know, in the amendments to this agreement
19 the university has supported completely as meeting our
20 diligence obligations.
21 Q. But you don't owe them any royalties as of today because
22 you haven't used the NF-kappaB technology?
23 A. We don't owe them royalties, correct.
24 Q. Now, your hope is that the compound that's in Phase II
25 clinical trials at ARIAD will be successful; is that correct?

5 (Pages 79 to 82)

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                                    Day 2, Session 2

4-11-06

---

Page 83

1  A.  Certainly.
2  Q.  And you're hoping it will be on the market in the coming
3  years and will have a successful run of sales for you,
4  correct?
5  A.  Yes.
6  Q.  And, yet, because ARIAD has never done a single test for
7  NF-kappaB activity, you don't know whether that compound has
8  any effect on NF-kappaB activity or not, do you?
9  A.  That's correct.  If it does --
10     THE COURT:  You've answered the question.
11     THE WITNESS:  Okay.
12  Q.  And you haven't bothered to test it to date?
13  A.  We don't have NF-kappaB assays at ARIAD that would allow
14  us to evaluate whether or not it does or does not block
15  NF-kappaB activity.
16  Q.  You don't even have a way -- you don't even have a test
17  at ARIAD for NF-kappaB in the whole company?
18  A.  That's correct.  We have experiments with NF-kappaB that
19  we have done, but not assays that will let you test the
20  compound because that's not what we have been doing.
21  Q.  Now, ARIAD sent a whole series of letters out to
22  pharmaceutical companies relating to the NF-kappaB technology;
23  is that correct?
24  A.  Yes.
25  Q.  And you basically got the list of companies you sent

Page 84

1  letters to by just looking at pharmaceutical companies in
2  general and seeing who was working in the NF-kappaB area?
3  A.  We looked at the scientific literature.  We did, you
4  know, essentially looked at that, looked at some public
5  information from companies, but to really determine who was
6  working on NF-kappaB inhibitors would require access to
7  information we just plain didn't have.
8  Q.  Let's look at what we've marked as DTX 58.
9     MR. BERGHOFF:  May I approach?
10     THE COURT:  Yes.
11     MR. BERGHOFF:  Your Honor, just a protocol for
12  exhibits.  This is the first new one with the witness.
13  I should give a copy to Dr. Berger and then two to your clerk
14  or hand one up to you directly?
15     THE COURT:  You can give them to my clerk, she
16  decides if I need to read them, she'll hand them to me.
17     MR. BERGHOFF:  Very good.
18  Q.  Do you recognize this document, Dr. Berger?
19  A.  Yes, I do.
20  Q.  And this document relates to a board of directors meeting
21  at ARIAD --
22  A.  Yes.
23  Q.  -- in December of 2001?
24  A.  Yes.
25  Q.  And you attended this meeting, did you not?

Page 85

1  A.  Yes.
2  Q.  And if we could go up just a little higher on the first
3  page.  That's your handwriting on the first page, "Berger"?
4  A.  Yes, it is.
5  Q.  So this is your copy of the document?
6  A.  Yes, it is.
7  Q.  Could you turn with me -- and the document does not have
8  easy page numbers on it, but it's the long number at the
9  bottom that starts 460.
10  A.  Yes.
11  Q.  We'll just wait for a moment for that to come up.
12     If we could look at the top portion of the page.
13  This portion of the document from the board of directors
14  meeting is about licensing and partnering, correct?
15  A.  Yes, it is.
16  Q.  Who is Fritz Casselman?
17  A.  He was at the time our head of business development.
18  Q.  Can we look at the next page of the document, Dr. Berger.
19  This is 461 on the bottom.  And the bottom section.
20     Do you see the word "redacted" there?
21  A.  Yes.
22  Q.  Do you know what was there before your lawyers hid it?
23  A.  Yes --
24     MS. BEN-AMI:  Objection, your Honor.
25     THE COURT:  Members of the jury, there were

Page 86

1  agreements between the parties that certain highly
2  confidential stuff would be taken out.  There are other
3  reasons why it may be taken out.  But in any event, both
4  parties did this to each other, so it's not a hiding of
5  things, it's just -- well, in a sense it is, but it's just
6  ensuring that only relative information that is not
7  confidential is before you.
8     MR. BERGHOFF:  Yes, and I agree with that entirely.
9  Q.  Do you know what was there?
10  A.  I have no recollection.  I have no idea.
11  Q.  This summarizes, this page summarizes the letters that
12  ARIAD wrote to various companies; is that your understanding,
13  Dr. Berger?
14  A.  These are the words of Fritz Casselman, it wasn't my
15  presentation.  In general terms it certainly appears largely
16  correct.
17  Q.  And is it your recollection that ARIAD sent about 25
18  letters in May 2000 to various pharmaceutical companies based
19  on the 1998 NF-kappaB patent?
20  A.  Yes.
21  Q.  And that's not the patent in suit; is that correct?
22  A.  That's correct.
23  Q.  And one of those letters was sent to Lilly?
24  A.  That's right.
25  Q.  And the comment below that is that ARIAD received

6  (Pages 83 to 86)

Ariad v. Eli Lilly                                    Day 2, Session 2

4-11-06

| Page 87 | Page 89 |
|---|---|

**Page 87**

1  virtually no response to these 25 letters; is that your
2  recollection?
3  A.  We received a variety of different responses at that
4  time, ranging from brief responses to more comprehensive
5  responses.  It was all over the map.
6  Q.  So you don't disagree with the characterization here that
7  ARIAD received virtually no response to its letters in May of
8  2000?
9  A.  I'm not sure I would characterize it with those words
10  since I wrote the letter and got the responses, but it was a
11  broad range of different responses.
12  Q.  And then the document goes on to indicate that another 40
13  letters were sent in February, 2001 based on the 2000 patent?
14  A.  Yes.
15     THE COURT:  Is this a patent having to do with
16  nuclear factor kappa B?
17     THE WITNESS:  Yes, it's probably the second of the
18  three patents, it's not the '516 patent.
19     MR. BERGHOFF:  And that was my next question.
20  Q.  These letters did not address the patent in suit?
21  A.  They addressed many of the claims that ultimately became
22  the '516 patent.  They included specific reference to those
23  claims.
24  Q.  And during your testimony, I didn't notice a copy of a
25  letter to Lilly in February, 2001; is that correct?

**Page 88**

1  A.  We clearly sent a letter to Lilly at this time in the
2  group.  I know because I was involved in sending it out.  And
3  what I suspect happened was we had a list of companies to whom
4  the letters went, didn't keep copies of each and every one of
5  the letters.  But I'm sure a letter was sent to Mr. Thompson
6  at Lilly.
7  Q.  Though you don't have a copy of it today?
8  A.  As I said, I don't have copies of any of the letters,
9  because I think we only kept one sample letter, which I think
10  has been provided.
11  Q.  Could we look at DTX 69.  This was something referred to
12  during your direct testimony, Dr. Berger, so you should have
13  it there.
14  A.  What is the number of this?
15  Q.  DTX 69, it's a single page.  Do you have that in front of
16  you?
17  A.  Yes, I do.
18  Q.  I believe your testimony on direct was that this document
19  had been sent to Lilly.  Do you recall that?
20  A.  Yes, I believe it has.
21  Q.  But there's no indication anywhere on this exhibit that
22  it was sent to Lilly, is there?
23  A.  This is a term sheet summary of terms that was provided
24  broadly to many different companies.  None of the companies
25  had one specifically with their name on it, so I can't from

**Page 89**

1  this document be a hundred percent sure that this, that this
2  was what was sent to Lilly, but certainly I recall that we
3  sent the exact same letter to all the companies.
4  Q.  Well, this isn't a letter, is it?
5  A.  No, I meant it was an attachment to the letter.
6  Q.  But there's no evidence on this exhibit itself that this
7  was ever sent to Lilly?
8  A.  That's correct.
9     THE COURT:  Let's stretch.
10     (Pause.)
11  Q.  Could we go back to where we were in this Exhibit DTX 58,
12  to Page 461, at the bottom portion.
13     Is it fair to characterize the response reported in
14  this document to your February, 2001 letters as mixed?
15  A.  Yes.
16  Q.  And, again, this patent, the 2000 patent is not the one
17  that you've sued Lilly on?
18  A.  That's correct.
19  Q.  Let's go to the next page of this document at the top.
20  What was your understanding at the time of the meeting as to
21  the term "lead players" referred to on this page?
22  A.  These were companies that we had identified that had done
23  research on NF-kappaB, in some instances might have NF-kappaB
24  products.
25     It was a mix really to show, as I recall, the board

**Page 90**

1  that some of the major companies in the industry were working
2  in the area of NF-kappaB in one way, shape or form.  Not that
3  they all had NF-kappaB products, but these were companies that
4  had done research in NF-kappaB.
5  Q.  How many of these companies do you remember thinking had
6  NF-kappaB products at the time?
7  A.  We never did that analysis.  You know, in order do that
8  analysis, you have to look specifically at the individual
9  products and how the use of that product relates to the claims
10  of a patent, and we hadn't then done it nor have we done it
11  since.  We have focused on Eli Lilly.
12  Q.  And you would need to test those products to see if they
13  in fact produce NF-kappaB activity, wouldn't you, Dr. Berger?
14  A.  No, I don't think we would.  I think it really depends on
15  analysis of what the companies have said about the products
16  and what research the company has done and published about
17  their products.
18  Q.  Let's go to the bottom section of this page.
19     What do you understand the reference to "marketed and
20  late-stage products" to be.
21  A.  These were marketed and late-stage products, that means
22  products either being sold someplace, U.S. or Europe, or were
23  in the later stages of clinical development, and they had been
24  identified as products that might fit within the group of
25  those that had, for which there were publications on

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                                    Day 2, Session 2

4-11-06

---

Page 91

1  NF-kappaB; but we had not done an analysis then and we still
2  haven't done that analysis on whether any or all of these
3  products are actually covered by our patents.
4  Q.  Well, let's look at the first bullet, "Sepsis." That
5  identifies Xigris, and Eli Lilly and notes it was "just
6  launched" and gives a sales estimate range from one billion to
7  two and a half billion?
8  A.  Right.
9  Q.  And so ARIAD, as of 2001, as of this board meeting in
10  December, 2001, was quite interested in the amount of sales of
11  these drugs that might or might not use NF-kappaB?
12  A.  That was largely to provide some context to our board of
13  directors.  Not every member of our board has experience in
14  pharmaceuticals.  They vary from professors and scientists to
15  financial folks to those who understand pharmaceutical
16  marketing and sales.  So it's of no value to provide to the
17  board the name of a product without what is known in the
18  public about it.  Those were the public, publicly available
19  estimates of what Xigris's sales were estimated to be, either
20  from analysts or from Lilly's own publications and statements.
21  I don't recall which it was based on.  But it's to frame the
22  product, to give it some perspective.
23      You know, Gleevec and Novartis, that's not a lot of
24  sales for the first half a year.  So it's not all big numbers.
25  It varies all over to give a benchmark for directors who don't

Page 92

1  have a breadth of experience to, in all areas that they deal
2  with to be able to understand these products.
3  Q.  And the purpose was to give a perspective to the board of
4  directors so they knew how much money ARIAD could ask for from
5  all of these companies --
6  A.  No.
7  Q.  -- as an infringement of this patent, correct?
8  A.  No, these were estimates.  These were publicly available
9  estimates.
10      When you present to a board of directors as a small
11  company, you need to be sure that the directors understand
12  what's known publicly about a topic, about what you're doing,
13  and Xigris as an example, was a product that both analysts and
14  Lilly were putting forth as a blockbuster, multibillion-dollar
15  drug.  That was known to some directors, not to others.  We
16  needed to level the playing field among the board.
17      There are no statements with respect to
18  Osteoprotegrin and bone disease, Amgen's product.  By all
19  accounts that may be a much bigger product, but we didn't say
20  anything because it wasn't relevant to what we needed to
21  explain to the directors.
22  Q.  And the Amgen product wasn't on the market yet as of this
23  time, was it?
24  A.  No.
25  Q.  So it didn't have any sales?

Page 93

1  A.  Excuse me?
2  Q.  It didn't have any sales?
3  A.  The Lilly product didn't have much sales at that time
4  either, it had just been launched, if I recall correctly.
5  Q.  Under "Oncology," the first item has an estimated peak
6  sales of one billion dollars, is that correct, the first
7  product?
8  A.  Yes.
9  Q.  And under "Bone Disease," there's an Amgen product that's
10  not listed as being on the market.  Evista's not listed here,
11  is it?
12  A.  No, it's not.
13  Q.  And Evista is certainly a drug for bone disease?
14  A.  Right.  But the third category was really focused in on
15  Amgen much more as an example.  That was not meant to be all
16  examples or comprehensive, it was merely examples to help
17  educate our directors on what the potential of NF-kappaB was
18  in terms of its utility, its role in different products.  It
19  was not meant to lay out our estimates of sales, our estimates
20  of royalties, that's not what this was aimed at.
21  Q.  ARIAD had an osteoporosis drug that it was working on at
22  one time, didn't it?
23  A.  We had an osteoporosis program, yes.
24  Q.  And what happened to that program?
25  A.  We, we didn't succeed at getting the compound that we

Page 94

1  wanted that had just the right profile, so we in early 2000 we
2  made the decision to focus all of our research activities,
3  virtually all of them in the cancer area, and our osteoporosis
4  product and work then got shifted over to bone metastases, the
5  same technology that has utility in both metastases, that's
6  the spread of cancer to bone, so we used that technology in
7  various programs that are still ongoing.
8  Q.  And that drug was not identified using NF-kappaB?
9  A.  No, it wasn't.
10  Q.  And you never tested to see if it reduces NF-kappaB
11  activity?
12  A.  No, we didn't.
13  Q.  Even though it was originally the focus of your research
14  to use it for osteoporosis?
15  A.  Not all of osteoporosis equals NF-kappaB.
16  Q.  Let's look at the next page of this document, the top
17  portion.  The first category on this page is "TNF-alpha
18  anti-inflammatories."  Do you see that?
19  A.  Yes, I do.
20  Q.  The purpose of this part of the presentation to the board
21  of directors was to convey to them that these kind of drugs
22  may use NF-kappaB, correct?
23  A.  Just as in the prior slides, a continuation of the prior
24  slide, these are other categories of drugs that were being
25  developed or marketed by different companies that may work by

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                    Day 2, Session 2

4-11-06

## Page 95

1  NF-kappaB --
2  Q.  May?
3  A.  May.
4      -- merely to give examples of the classes of drugs
5  that if we went further to assess that, we would look at
6  those.
7  Q.  And so TNF anti-inflammatories may reduce NF-kappaB
8  activity; is that your testimony?
9  A.  No.  No, that's not what I said.  I said that TNF
10  anti-inflammatories, these examples, may or may not be
11  NF-kappaB inhibitors.  We have not done the analysis or
12  evaluation of any of the products on this list, because you
13  have to look at the claims, look at the specifications and
14  look at the actual drug.
15  Q.  The sales listed here of the top two TNF-alpha
16  anti-inflammatories are over a billion dollars; correct?
17  A.  Yes, that's correct.
18  Q.  And the next category are COX-2 anti-inflammatories?
19  A.  Yes.
20  Q.  Vioxx and Celebrex being on the list?
21  A.  Yes.
22  Q.  And Vioxx is listed as having estimated sales of one
23  billion dollars?
24  A.  Yes.
25  Q.  And Celebrex having three billion dollars?

## Page 96

1  A.  Yes.
2  Q.  And this information was given to your board of directors
3  to let them know just how big a pot of gold you were planning
4  to go after, correct?
5  A.  I can't --
6      THE COURT:  I think you can keep asking the same
7  question and the witness keeps giving you the same answer,
8  which is not the one you're looking for, so maybe we can just
9  skip over the next one.
10  Q.  Is Ibuprofen a COX-2 anti-inflammatory?
11      MS. BEN-AMI:  I think we're getting into expert
12  testimony, your Honor, on some other topics.
13      MR. BERGHOFF:  Dr. Berger can say he doesn't know.
14  A.  I don't know.
15  Q.  Before you sent the letters out to all of these companies
16  that we've seen in this document, and you didn't test any of
17  their products --
18  A.  No, we didn't.
19  Q.  -- to see if they reduce NF-kappaB activity?
20  A.  No, we didn't.
21  Q.  And that includes Lilly's products in suit here, correct?
22  A.  That's correct.
23  Q.  You never tested either of the products before you filed
24  suit to see if they reduced NF-kappaB activity in fact?
25  A.  We were relying on Lilly's own research, Lilly's

## Page 97

1  representation to the scientific community and to the Patent
2  Office.  There's a big difference between Lilly's scientists
3  putting it out there and saying the drugs inhibit NF-kappaB
4  and some random academic who might do an experiment in a drug
5  and publish it but isn't representing the company that
6  developed the drug.  So the Lilly circumstance was different.
7  Q.  And when you filed suit against Lilly in this case, you
8  didn't know how Lilly's drugs had been invented by them or
9  developed; is that correct?
10  A.  I don't think it's germane to the question of whether or
11  not they infringe --
12      THE COURT:  I think, Mr. Berger, if you were just to
13  answer the question yes or no or you can't answer it, we might
14  progress faster.
15      THE WITNESS:  Okay.  Could you repeat the question?
16  Q.  At the time ARIAD sued Lilly in this case charging Evista
17  and Xigris with infringement, you didn't know how Lilly had
18  invented either of those drugs or developed them; is that
19  correct?
20  A.  No, we knew what was published in the literature.
21  Q.  But you didn't know how Lilly had first discovered those
22  drugs, correct?
23  A.  Only to the extent --
24      THE COURT:  The answer is either yes or no or that
25  you can't answer it.  Among other things, consider if you do

## Page 98

1  that, you will stymie Mr. Berghoff.
2  A.  So I don't know.
3  Q.  Let's look at the letter you sent to Lilly in May of
4  2000, if we could.  It's DTX 944.  Oh, it's your PTX 327.
5  There are many exhibits that are marked by both sides, so they
6  have duplicate numbers.
7      We have DTX 944 up on the screen here.  I represent
8  to you it's the same document, Dr. Berger.  Now we have PTX,
9  through the miracle of technology.
10      This letter to Mr. Thompson, who you say you were
11  acquainted with?
12  A.  Yes.
13  Q.  Never specifically identifies either Evista or Xigris,
14  correct?
15  A.  Correct.
16  Q.  Could we look at the top of Page 2 of this exhibit and
17  that very first partial paragraph.
18      Your letter to Mr. Thompson states that "these
19  patents and patent applications," and these were the NF-kappaB
20  patent applications and patents that existed at that time?
21  A.  Yes.
22  Q.  It doesn't include the patent in suit yet, of course,
23  right?
24  A.  Right.
25  Q.  "These patents cover various nonsteroidal

9  (Pages 95 to 98)

Ariad v. Eli Lilly                                    Day 2, Session 2
4-11-06

---

Page 99

1  anti-inflammatory drugs in development such as COX inhibitors,
2  prostaglandins and IkB kinase inhibitors." Now, neither Lilly
3  drug in suit here, Evista or Xigris, is a COX inhibitor, is
4  it?
5  A.  That's correct.
6  Q.  And neither of the drugs in suit are prostaglandins, are
7  they?
8  A.  That's right.
9  Q.  And neither are I-kappaB inhibitors?
10 A.  That's right.
11 Q.  So this letter didn't say: We're looking at Evista or
12 Xigris, right?
13 A.  This was in 2000, before the Joyce Grinnell paper came
14 out, which is what really led us specifically to focus on
15 Evista, excuse me, Xigris, excuse me.
16     And I would also add --
17     THE COURT: No, no, don't add.
18     MR. BERGHOFF: Thank you, your Honor.
19 Q.  So from this letter, Lilly would have no idea that you
20 were considering Xigris or Evista to be infringing on
21 anything?
22 A.  We were not alleging infringement of any particular
23 product.  We were offering a license and left it up to the
24 individual companies to evaluate and decide whether they need
25 a license.

---

Page 100

1  Q.  Dr. Berger, I'd like to show you a copy of the complaint
2  that ARIAD filed against Eli Lilly in this case.
3     THE COURT: I think we have a copy.
4     MR. BERGHOFF: Yes, your Honor.
5  Q.  Can we look at Page 6 of the complaint.  Well, first --
6     MS. BEN-AMI: Your Honor, I would ask that at this
7  point, your Honor, I believe that there's a 403 issue.
8     THE COURT: I'm sorry?
9     MS. BEN-AMI: There may be a 403 issue at this point.
10    MR. BERGHOFF: I'm going to point to specific factual
11 allegations in the complaint.  I can't imagine.
12    MS. BEN-AMI: If that's all that he does.  We'll see,
13 your Honor.
14    THE COURT: The complaint, members of the jury, is
15 the way a lawsuit is started.  In it the lawyers on behalf of
16 a client usually, although sometimes the client himself does
17 it, sets out the names of the parties, what the lawsuit is
18 about in a very short way, the names of all the parties, the
19 plaintiffs, defendants.  It has a statement of the
20 jurisdiction of the court saying why the case belongs into
21 this court, and then it has a series of facts; and eventually
22 it says, it gives various specific legal claims, therefore the
23 defendant violated claim 1, therefore the defendant committed
24 defamation, or whatever the claim is, and there's also then a
25 claim for money, usually gazillions, in every case.

---

Page 101

1  Q.  Dr. Berger, you recognize this as the complaint for
2  patent infringement that ARIAD filed against Eli Lilly?
3  A.  Yes, I do.
4  Q.  Let's look at Paragraph 26 of the complaint, which is on
5  Page 6.
6     And in this Paragraph 26, ARIAD's complaint states
7  that "Plaintiffs have previously sought to initiate
8  discussions with Lilly concerning a license to plaintiffs'
9  NF-kappaB patent estate.  Defendant Lilly has failed to
10 respond to these efforts."  Do you see that statement?
11 A.  Yes, I do.
12 Q.  And, in fact, Lilly sent you three letters in response to
13 your May, 2000 letter; isn't that correct?
14 A.  Yes.
15 Q.  So this is not an accurate statement in the complaint?
16 A.  No, sir, you're wrong.  It is an accurate statement.
17    THE COURT: Is this a verified complaint?
18    MR. BERGHOFF: I don't believe so, your Honor.  I'm
19 not sure, complaints --
20    THE COURT: A verified complaint is one to which a
21 party swears that the statements are true.  Most of the
22 complaints are prepared by lawyers and set out what the lawyer
23 understands the issues to be or the facts to be.
24 Q.  Now, Dr. Berger, ARIAD never sent a letter to Lilly
25 specifically about the '516 patent that's in suit here, did

---

Page 102

1  it?
2  A.  That's correct.
3  Q.  And ARIAD never sent Lilly a copy of the claims from that
4  patent application when they were allowed by the Patent
5  Office, did they?
6  A.  We did not sent them to Lilly or to anyone else.
7  Q.  And those claims were allowed in October of 2000?
8  A.  No, that's much earlier, I think they were allowed late
9  in 2001.
10 Q.  Oh, excuse me, I misspoke.  Yes.  I was thinking 2001 and
11 I said 2000.  Thank you.
12    They were allowed in October of 2001?
13 A.  I don't recall the exact month, but it was late in 2001.
14 Q.  And the reason that you didn't send the allowed claims to
15 Lilly at that point in late 2001 was that it was part of your
16 litigation strategy, correct?
17 A.  No, sir, that's wrong.  We had not decided --
18    THE COURT: Hup.
19    THE WITNESS: I'm sorry.
20 Q.  So the reason you didn't send Lilly a copy of the allowed
21 claims had nothing to do with the fact that you had already
22 decided to sue Lilly?
23 A.  That's correct.
24 Q.  Why did ARIAD not send a letter about the '516 patent to
25 Lilly after it was allowed?

---

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                                    Day 2, Session 2
                              4-11-06

---

Page 103

1  A. We didn't send a letter to anyone until after the claims
2  issued. We had made the decision -- excuse me, I didn't say
3  that correctly.
4       We didn't send a letter to Lilly at that time because
5  we had made a decision, once the claims were issued, at that
6  time we had already made the decision to file a lawsuit
7  against Lilly. We were worried what Lilly might do, Lilly
8  being a very large company, we're being a small company, if
9  they had an opportunity to look at the patent or to look at
10 the claims before the patent had issued. We just had no idea
11 what Lilly might do, and so we had made the decision, based on
12 many factors, but not the least of which is the publications
13 and the patents from Lilly's research labs, that our best
14 approach at the time was to initiate a lawsuit.
15 Q. So it was part of your litigation strategy not to send
16 Eli Lilly a copy of the allowed claims before the patent
17 issued, correct?
18 A. You're mixing up the timing. You asked me about the
19 prior year.
20      As we got very close to the issuance of the patent,
21 and we didn't know when it was going to issue, yes, at that
22 time, just before it issued, we had made the decision to file
23 a lawsuit. But earlier when the claims were allowed back in
24 the prior year and in the early months, we didn't provide the
25 claims to anyone, including Lilly, and we hadn't decided to

---

Page 104

1  sue Lilly.
2  Q. So at the point that the claims were allowed by the
3  Patent Office in late 2001, you had not made the decision to
4  initiate the lawsuit; is that your testimony?
5  A. To the best of my recollection. I don't think we had
6  made it by that time.
7  Q. Do you recall being deposed in this case, Dr. Berger?
8  A. Yes, I do.
9  Q. On two occasions.
10 A. Yes.
11 Q. One of which was in September of 2004?
12      MR. BERGHOFF: Your Honor, we have video clips of
13 depositions, and should I also give the witness a copy of the
14 transcript or should we just watch the video?
15      MS. BEN-AMI: Your Honor, I think both the witness
16 and I need a copy of the transcript.
17      MR. BERGHOFF: Fine.
18      THE COURT: Members of the jury, I told you earlier
19 about depositions being part of the process of getting
20 information about the case. Once the deposition is taken, it
21 may be used in the trial for a number of different things.
22 You will hear some witnesses give testimony by having their
23 deposition testimony read back. Witnesses are sometimes not
24 available and then counsel, under certain circumstances, have
25 the right to offer the testimony of the witness by reading the

---

Page 105

1  deposition. As best as I can tell so far from having reviewed
2  three of these, they're not going to inundate you with those,
3  because they really are difficult to listen to, but counsel
4  have been very sparse in that.
5       Another way in which depositions can be used is by
6  pointing you to testimony given during the deposition that
7  they say is different from the testimony that the witness has
8  given here to you directly.
9       Now, one of the major functions that you will perform
10 as you deliberate on your verdict is to determine whether you
11 believe what the witness has told you. And you will do that
12 based on a number of factors that you know has to be taken
13 into account when someone tells you a story and you decide
14 whether you believe it or not, and one of the ways in which
15 counsel wish to effect your determination of the believability
16 of the witness is by pointing out that the witness has given
17 inconsistent answers at different times.
18      Now, when they do that, you have two functions: One
19 is to determine whether there is indeed an inconsistency, did
20 the witness give a different answer on an earlier occasion
21 from the answer that the witness gave now. And then the
22 second job you have with respect to that is if there was a
23 different answer the first time, does it affect your judgment
24 of the believability of the witness. So just keep that in
25 mind as you are pointed to these earlier snippets of

---

Page 106

1  testimony.
2       MR. BERGHOFF: Thank you, your Honor.
3  Q. Just so we have the question framed again, Dr. Berger --
4       THE COURT: I didn't mean to do interrupt.
5       MR. BERGHOFF: No, your instructions were very good,
6  and this is the first time we've had that.
7       THE COURT: Thank you.
8  Q. ARIAD did not send a letter about the allowed claims of
9  the '516 patent to Lilly because at that point it had made the
10 decision to sue Lilly; isn't that correct?
11 A. When? I don't understand when you're talking about.
12 Q. When the claims were allowed in late 2001, as you recall.
13 A. To the best of my recollection, in late 2001 when the
14 claims were allowed, meaning that we were given a set of the
15 claims that were likely to ultimately become official at that
16 point in time, we had not made the final decision as to how,
17 what to do with that patent and whether we would sue Lilly.
18 Q. And you recall being deposed in this case on September
19 10, 2004?
20 A. Yes, I do.
21 Q. And you recall that your testimony was under oath at that
22 point?
23 A. Yes, I do.
24 Q. Could you turn to Page 228 of the deposition transcript,
25 starting at lines 15, and then we will play now for the jury

---

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                          Day 2, Session 2

4-11-06

| Page 107 | Page 109 |
|---|---|

**Page 107**

1  with your Honor's permission, the video version of that
2  testimony.
3      (Video played.)
4  Q.  Were you asked that question and did you give that answer
5  under oath, Dr. Berger, at your deposition?
6  A.  Yes, I did.
7  Q.  Now, ARIAD has never licensed the '516 patent; is that
8  correct?
9  A.  That's correct.
10 Q.  And it issued in June of 2002?
11 A.  Yes.
12 Q.  And nobody has taken a license under it in the almost
13 four years since then?
14 A.  Yes, that's true.
15 Q.  And in this case you are asking that Lilly pay ARIAD over
16 $100 million in damages; is that correct?
17 A.  What we ask, what we have asked is a four percent royalty
18 on Lilly sales in the United States since the date of issuance
19 of the patent, which is June of 2002.
20 Q.  And my question was, are you asking Lilly for more than
21 $100 million in damages in this case?
22 A.  Yes, we are.
23 Q.  Dr. Berger, I'm going to hand you what we have marked as
24 DTX 2186, and I'll ask if you can identify what this document
25 is?

**Page 109**

1  smaller.  We'll just have to -- I'm pretty sure we can read
2  it.
3      Do you see the second paragraph on this page, Dr.
4  Berger?
5  A.  Yes, I do.
6  Q.  Do you see the next to the last sentence on this page, if
7  we could highlight that, the "net book value."  This page
8  reports to the SEC that the "net book value as of December 31,
9  2005 of intangible assets related to our NF-kappaB technology
10 is $456,000."  Do you see that --
11 A.  Yes, I do.
12 Q.  -- Dr. Berger?
13     And the NF-kappaB technology being referred to are
14 the patents that you're licensed under from MIT?
15 A.  Yes.
16 Q.  And could we look at the next sentence.  Nick will have
17 to go back to that.
18     After stating that "the net book value of the
19 intangible assets related to our NF-kappaB technology is
20 $456,000," ARIAD's annual report to the SEC goes on to note
21 that, "If the patentability of our NF-kappaB patents is
22 successfully challenged and such patents are subsequently
23 narrowed, invalidated or circumvented, we may be required to
24 write off some or all of the net book value related to such
25 technology."  Do you see that?

| Page 108 | Page 110 |
|---|---|

**Page 108**

1  A.  This document is our most recent annual report filed with
2  the SEC.
3  Q.  And it's headed on the first page, if we can have the
4  first page, it's headed "Form 10-K."  What does that refer to?
5  A.  That's the SEC form number that's used for filing an
6  annual report.
7  Q.  And this was filed in March of this year?
8  A.  Yes, it was.
9  Q.  And you signed this report to the SEC on behalf of ARIAD?
10 A.  Along with our chief financial officer, yes.
11 Q.  And this form 10-K is, by law, supposed to be accurate?
12 A.  Yes, it is.
13 Q.  And the SEC is what?
14 A.  It's part of the government that's called the Securities
15 and Exchange Commission.
16 Q.  And they're in charge of being sure that the financial
17 statements about publicly-traded companies are accurate?
18 A.  Among other things, yes.
19 Q.  And ARIAD is a publicly-traded company?
20 A.  Yes, we are.
21 Q.  I think you had mentioned you have stock in ARIAD.
22     Let's turn to page 27 of this exhibit, if we could.
23 And let's look in the second paragraph towards the bottom of
24 that paragraph.  If we could blow that up without losing the
25 edges.  Just a little smaller, I think.  Whoops.  A little

**Page 110**

1  A.  Yes, I do.
2  Q.  And the intangible assets related to "our NF-kappaB
3  technology" referred to in this report to the SEC are the
4  patents and patent applications licensed to you from MIT, are
5  they not?
6  A.  I'm not sure how the net book value is calculated, so I
7  can't really speak to that, to exactly what that term means.
8  Q.  So you have no understanding in this document that you
9  signed as CEO of ARIAD, you have no understanding what's being
10 referred to by "the intangible assets related to our NF-kappaB
11 technology"?
12 A.  That's not what I said.  The intangible assets I'm sure
13 are the NF-kappaB patents.  What I did say, what I said is I
14 didn't know exactly how the net book value is calculated.
15 Q.  But it's stated to be $456,000?
16 A.  I'm sure it's correct.
17 Q.  So ARIAD's been the exclusive licensee under these
18 patents since 1991, correct?
19 A.  Yes.
20 Q.  ARIAD's never used the technology related to NF-kappaB,
21 correct?
22 A.  We haven't done experiments internally, yes.
23 Q.  Never even a single test to see if anything reduced
24 NF-kappaB activity?
25 A.  That's correct.

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                          Day 2, Session 2

4-11-06

---

### Page 111

1  Q.  Even though Dr. Baltimore has always been on your
2  Scientific Advisory Board, correct?
3  A.  Yes.
4  Q.  You told the SEC that the net book value of the NF-kappaB
5  patents and patent applications was --
6      THE COURT:  It's not clear to me why you need to
7  repeat all that.
8  Q.  -- was just a little bit over $450,000; is that
9  correct?
10  A.  I just made that statement, yes.
11  Q.  And, yet, you want more than $100 million from Eli Lilly
12  in this case?
13  A.  We want what we think is fair based on royalties that are
14  industry standard for this type of intellectual property that
15  we have fairly licensed from the universities.
16      MR. BERGHOFF:  Your Honor, if I could offer into
17  evidence at this point the exhibits, the new exhibits that I
18  used.
19      THE COURT:  They are not agreed exhibits?
20      MR. BERGHOFF:  I don't know if these are agreed or
21  not.  Why don't we check with counsel.
22      THE COURT:  Thank you.
23      MR. BERGHOFF:  We'll do that as housekeeping at the
24  end of the day.  No further questions at this time.
25      THE COURT:  Do you have redirect?

---

### Page 112

1      MS. BEN-AMI:  Two.
2          REDIRECT EXAMINATION
3  BY MS. BEN-AMI:
4  Q.  Dr. Berger -- can I do that from here to save time -- Dr.
5  Berger, you have the '516 patent PTX Exhibit 1?
6  A.  Yes, I do, somewhere in here.  Yes.
7  Q.  I just wanted to clarify something.  There was a
8  discussion about screening.  And does the patent talk about
9  screening for drugs?
10      THE COURT:  What's the question?
11  Q.  I'd like to ask you to look at column 18.
12  A.  Yes, I have it.
13  Q.  Can you read to the jury the title of the section
14  starting at 52?
15  A.  "Improved DNA binding assay with enhanced sensitivity
16  for identification of regulatory factors."
17  Q.  Did you, in the two patents -- it's going to be more than
18  two questions, your Honor, it may be five.
19      The related patents to the '516 --
20  A.  Yes.
21  Q.  -- do they share a lot of the language that's in the
22  '516?
23  A.  Yes, a great deal.
24  Q.  And without getting into details, what are those patents
25  on?

---

### Page 113

1  A.  The first two patents that predated the '516 patent are
2  about assays, tests that can be done to screen compounds to
3  identify NF-kappaB inhibitors.
4  Q.  Would you look at the license that was PTX 460.
5  A.  Yes.
6  Q.  I'd like you to look at the second -- there is an
7  amendment that is -- if you look at the little numbers on the
8  bottom, they end in 189?
9  A.  Yes, I have that.
10  Q.  Would you look at amendment to section 3.1.
11  A.  Yes.
12      MS. BEN-AMI:  Could you blow that up, please.
13  Q.  Would you explain that section for the jury, please.
14  A.  This is an amendment, meaning an update to the original
15  license that was signed in 1991, signed by the university, MIT
16  in particular, with ARIAD, to make it clear that commercially
17  reasonable efforts, due diligence, best efforts, as it has
18  been described earlier, by licensee, that's us, to grant
19  sublicenses to companies that licensee reasonably believes are
20  engaged or will engage in such activities shall be adequate to
21  meet our obligations under the license.
22      So our efforts on behalf of the universities to
23  license the technology to many different companies, to pursue
24  those licenses, meets our diligent obligations under the
25  license.  So we've met the obligations that we've signed up

---

### Page 114

1  to.
2  Q.  Now, finally, there was cross-examination about whether
3  you in fact contacted Lilly in 2001?
4  A.  Yes.
5  Q.  And counsel said that there was no evidence.  But you're
6  testifying, your recollection -- what is your evidence?
7  A.  My clear recollection is that we sent a letter to Lilly
8  at the time the second batch of letters went out, and that
9  because I knew Dave Thompson, the head of licensing, had met
10  him in the past, that I followed up, as we did with many
11  companies, but I followed up specifically, placed the call to
12  his office, left a message that it was following up on the
13  letter, never heard back from him.
14  Q.  And in the three years plus since the case has started,
15  has Mr. Thompson ever called you up and said, "Gee, Harvey,
16  I've heard you said this, you know, you never called me?"
17  A.  Never.
18      MS. BEN-AMI:  No further questions.
19      THE COURT:  Any recross?
20      MR. BERGHOFF:  Just on this last new point.
21          RECROSS EXAMINATION
22  BY MR. BERGHOFF:
23  Q.  You never picked up the phone before you sued Lilly and
24  called your friend Mr. Thompson at Lilly to say, "Just a heads
25  up, we're going to be suing you," did you?

---

13  (Pages 111 to 114)

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                                    Day 2, Session 2
4-11-06

---

Page 115

1  A.  Why should I do that?  No.
2      THE COURT:  The answer is no?
3      THE WITNESS:  No.
4      MR. BERGHOFF:  Thank you.
5      THE COURT:  Thank you, Mr. Berger.  You're excused.
6  Who is next?
7      MS. BEN-AMI:  Dr. Sharp is next, and we're going to
8  switch lawyers.
9      THE COURT:  Okay, and we stretch.
10     THE CLERK:  Please be stated and spell your full name
11 for the record.
12     THE WITNESS:  Phillip A. Sharp, S-H-A-R-P.
13         PHILLIP A. SHARP, Sworn
14         DIRECT EXAMINATION
15 BY MS. CARSON:
16 Q.  Ladies and gentlemen of the jury --
17     THE COURT:  Hold it.  Phillip, how many L's?
18     THE WITNESS:  One L.
19     THE COURT:  S-H-A-R-P, no E?
20     THE WITNESS:  No E.
21 BY MS. CARSON:
22 Q.  Ladies and gentlemen of the jury, before we start with
23 Dr. Sharp's testimony, I just wanted to give you an overview
24 of what Dr. Sharp is going to be talking about today.
25     As you've heard, the '516 invention arose from a

---

Page 116

1  collaboration among a number of scientists, and at Harvard,
2  MIT and the Whitehead Institute.  Dr. Sharp is one of the
3  scientists that was involved in that collaboration from MIT.
4  And what Dr. Sharp's going to do today is review some general
5  biological concepts that are going to help you understand the
6  case going forward.  He's also going to describe the
7  pioneering science that gave rise to the invention that's
8  claimed in the '516 patent.
9      Now, Dr. Sharp is not going to get into a detailed
10 explanation of the invention, another one of the inventors,
11 Dr. Manlaitis from Harvard will be here tomorrow to tell you
12 about that.
13     THE COURT:  Members of the jury, if in the course of
14 these explanations by not only Mr. Sharp but any other witness
15 you find yourself at sea and don't understand, raise your
16 hand, and then we can ask the witness to explain again what it
17 is that isn't clear.
18 Q.  Dr. Sharp, could you please introduce yourself to the
19 jury?
20 A.  As I said, Phillip A. Sharp, and I'm a professor at MIT.
21 Q.  Dr. Sharp, if you could turn to PTX 001, and that's the
22 first document that's in your binder.  Can you identify this
23 document for the jury?
24 A.  This is patent '516, which has inventors of myself, Dave
25 Baltimore, Tom Manlaitis and a number of colleagues.

---

Page 117

1  Q.  Before we go any further and talk about the '516 patent
2  and the science, I'd like to give the jury a little bit of
3  background about you.
4      Where did you grow up?
5  A.  I grew up in Kentucky on a farm.
6  Q.  And how did you become interested in science?
7  A.  Well, I was interested in science and math as a kid in
8  high school there, and then as I went to a small college in
9  the mountains of Kentucky, I continued my interest in math and
10 science and then discovered in college that I thought I could
11 go to graduate school, and launched on into graduate school.
12     It was while I was in graduate school and as an
13 undergrad that I read Jim Watson's book about molecular
14 biology and DNA and became fascinated about this field, and
15 continued to evolve my research interest into molecular
16 biology.
17 Q.  Can you tell the jury who Jim Watson is?
18 A.  Jim Watson is of the fame of Watson and Crick.  They
19 discovered the structure of DNA in 1953, and that really
20 launched what is modern cell biology and molecular biology.
21 Q.  Now, Dr. Sharp -- could you please put up PTX 1001,
22 please.
23     Dr. Sharp, could you please explain what's shown on
24 the board to the jury?
25 A.  Well, this is an electron micrograph of DNA.  You see

---

Page 118

1  this long linear -- I think I have a laser here.  You see this
2  long linear line?  That's a micrograph of the DNA.  It's
3  magnified about a million-fold.
4      This particular micrograph is one I'm very fond of
5  because it's these three loops here that taught me that we
6  have an unusual gene structure in our cells and was the basis
7  of the Nobel Prize I received.
8  Q.  Is this how DNA is found in the body?
9  A.  No, DNA in the body is found in a very compact form in
10 the nucleus of the cell, so it is not extended in that form.
11 Q.  And can you tell the jury what they're looking at now?
12 A.  This is a picture of a single cell.  It has been
13 sectioned through the middle of the cell so you can see the
14 interior of it.  This cell is too small to see by your own
15 eye.  And if I point out, this is the surface of the cell, and
16 it's covered with an oily membrane that keeps water out and
17 water and salts in.  And then there's the cytoplasm of the
18 cell here where metabolism occurs and lots of other
19 activities.  And then this is the nucleus of the cell which
20 again has a membrane around it, but the membrane has holes in
21 it, and it's in the nucleus of the cell the DNA exists.
22 Q.  Now, how much DNA is actually found in the nucleus of a
23 cell?
24 A.  It's surprising.  Even though that cell is so small that
25 you can't see it with your naked eye, if I take the DNA from

---

14  (Pages 115 to 118)

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly                                Day 2, Session 2
                          4-11-06

| Page 119 | Page 121 |
|---|---|

**Page 119**

1  one of those cells and put it end to end, it's about that
2  long. (Indicating.) So it's a very long, very thin
3  substance.
4  Q.  And, Dr. Sharp, how many cells make up the human body?
5  A.  Oh, trillions and trillions, and many of them just too
6  vast to actually talk about.  They're too small to be seen.
7  Q.  Dr. Sharp, could you please explain to the jury what
8  they're looking at here?
9  A.  Well, we've just made a schematic of the cell, and to
10  make it a little simpler to point out a few issues, this outer
11  surface is that membrane I mentioned.  Again, it's an oily
12  impermeable membrane to water and salt.  And then in the
13  interior of the membrane is the cytoplasm of the cell, that's
14  that area there where metabolism occurs.  And there's the
15  nucleus of the cell here.  And the graphics should shoot up
16  something in the nucleus.
17       THE COURT:  Can you tell us what you mean by
18  metabolism occurs?
19       THE WITNESS:  Metabolism is where glucose is utilized
20  by proteins and other factors to make energy.  So the
21  energy-generating portion of the cell is the cytoplasm of the
22  cell.  And the nucleus is basically where the genetic material
23  is stored and copied when the cell divides and used to make
24  proteins.
25  Q.  Now, I see that you have three colored items in there

**Page 120**

1  labeled "genes."  How many genes are actually present in the
2  nucleus?
3  A.  Well, it's somewhat debated, but for humans it's
4  somewhere between 20 and 30,000 genes as we now picture our
5  genetic material.  So different genes code for different
6  proteins, so 20 or 30,000 different functional activities.
7  Q.  Now, how do genes code for different proteins?
8  A.  Well, in this case, as illustrated, these three genes are
9  making a linear protein, a Y-shaped protein and a Pac-Man-type
10  protein, and they're functional proteins that have different
11  activities in the cell.
12       The information to make these different proteins is
13  the sequence of the DNA that's of four letters that I think is
14  shown on the next graphic.
15  Q.  Before we move to the next graphic, can you just tell me
16  whether or not the genes that are present in the cell are
17  always making proteins?
18  A.  No.  Genes are turned on and off.  If you think about it,
19  every cell in your body essentially has the same set of genes,
20  and yet when you look at your skin cells, they differ from
21  your blood cells, your red blood cells.  And the difference
22  between those two cells is that even though they have the same
23  set of genes, different genes are being turned on and off in
24  those two cells.
25       The same thing can be true when something assaults a

**Page 121**

1  cell:  The cell can then turn on a gene if it needs to use
2  that gene product to survive.  So the genes are regulated.
3  Q.  And if we could just go back, you were going to explain
4  how the cell knows what protein to make from the DNA?
5  A.  I would like the next addition to that graphic.
6       So as I pointed out before, these wavy lines are
7  indications of DNA.  What's shown down here at the bottom is
8  the actual structure of DNA.  You see these two strands,
9  they're interwoven, they run in opposite directions, and
10  they're connected like your two hands with a hand and glove by
11  four chemical entities.  This is T, G, C and A, and it's those
12  four letters that actually, their order determines the
13  information in the gene.  You read them three at a time.
14       So the functional different proteins here are
15  specified in these different genes by different orders of
16  these four bases.  And it's that order read three at a time
17  and translated into protein that make these different proteins
18  and different functions in the cell.
19  Q.  Now, I believe you said that the genes are not always
20  turned on in a given cell, correct?
21  A.  That's right.
22  Q.  Can you explain how that process works?
23  A.  Well, there's specific switches that regulate genes,
24  illustrated here by a light switch.  And there are sequences
25  near genes that control where they are expressed.  And these

**Page 122**

1  sequences are recognized by factors, which we'll discuss
2  later, and they can turn on and off genes.
3       In this case, a bacteria touches a cell, a signal is
4  sent to turn on the gene.  The gene in this case is making an
5  antibody, which is what circulates in our body to protect us
6  against bacteria, and in this case the antibody is secreted or
7  exits from the cell and would attack the bacteria and
8  therefore neutralize or destroy the bacteria.
9       So the bacteria sends a signal, turns on the gene,
10  the gene makes the antibody, the antibody destroys the
11  bacteria.  Genes are responsive to, can be responsive to
12  external stimuli.
13       THE COURT:  How do the antibodies get through the
14  membrane without poking a hole in it?
15       THE WITNESS:  They have a very sophisticated
16  biochemical mechanism that recognizes one end of the antibody
17  protein as being made and secretes it across a pore in this
18  membrane out to the exterior of the cell.  So that's a very
19  complicated machinery, but basically transports it across that
20  oily membrane to the exterior of the cell.
21  Q.  Now, Dr. Sharp, before we go any further with the
22  science, if you could turn to PTX 415 that's in your book.
23  And can you tell me if that's a copy of your CV?
24  A.  Yes, it is.
25  Q.  Now, is this a current CV?

Ariad v. Eli Lilly                                    Day 2, Session 2

4-11-06

---

Page 123

1   A.  Well, there may be a few recent papers, but by and large
2   it's a current copy of my CV.
3   Q.  Based on your CV, I see in the early 1970s you worked at
4   Cold Spring Harbor Laboratories.  What is Cold Spring Harbor
5   Laboratories?
6   A.  Cold Spring Harbor Laboratories is a research laboratory
7   on the North Shore of Long Island, it was started about a
8   hundred years ago, and it is seen as one of the birth places
9   of molecular biology.  Jim Watson worked at Cold Spring Harbor
10  in the summer, went for courses and meetings that are held
11  every summer there, so it's one of the great institutes of
12  research in the country.
13  Q.  And why did you decide to go to Cold Spring Harbor to do
14  research?
15  A.  When I was at Cal Tech as a post-doctoral fellow, I
16  wanted to further my understanding and training in the
17  structure of genes that are expressed in human cells, and I
18  contacted two laboratories, one was Dave Baltimore's, who was
19  at MIT at that time, and the other was Jim Watson, who was at
20  Cold Spring Harbor.  They both -- Baltimore's lab was full.
21  Jim called me the next day and asked me if I could come, so I
22  went to Cold Spring Harbor as a post-doctoral fellow, and then
23  went on staff there one year later and became a staff member.
24  Q.  When did you leave Cold Spring Harbor?
25  A.  I left Cold Spring Harbor in 1974, three years after I

Page 124

1   went there.
2   Q.  Why did you decide to leave Cold Spring Harbor
3   Laboratories?
4   A.  Well, I had a great deal of fun and was very productive
5   there, but I wanted to get back to a university environment
6   with students and have the sort of mix of things that happen
7   at universities like MIT; and I also wanted to be close to
8   chemists and physicists, which Cold Spring Harbor did not
9   have, primarily it was biologists.
10  Q.  So there came a time when you left Cold Spring Harbor and
11  went to MIT, correct?
12  A.  I went to MIT in 1974.  The Center for Cancer Research at
13  MIT had just been built, and I was offered a position down the
14  hall from Dave Baltimore's lab.  So I was able to, again --
15  well, not again -- join an environment in which Dave Baltimore
16  was part of, and I've been there ever since.
17  Q.  Now, did you work with David Baltimore when you started
18  at MIT?
19  A.  Our labs, as I just mentioned, were close to one another,
20  and we've had common interests since the time I moved there.
21  So over a number of years, I've collaborated with Dave,
22  starting shortly after I went there, and then throughout the
23  twenty years that we were at MIT together.
24  Q.  Dr. Sharp, could you please tell the jury what this
25  picture is of?

Page 125

1   A.  This is a picture of myself and Dave Baltimore over here
2   to the left and Bob Weinberg, about 1984, '85, it's in the
3   lobby of the Whitehead, cause that's a Stella painting behind
4   it, and you can tell I'm considerably younger because my beard
5   is dark there, and it's not quite like it is now.  So this is
6   twenty years ago, and David and I and Bob Weinberg were
7   talking.
8   Q.  How did you come to collaborate with Dr. Baltimore on the
9   work that lead to the '516 patent?
10  A.  I was particularly interested in how genes were turned on
11  and turned off.  I wanted to understand the biochemistry and
12  the chemistry of that process.  And David was interested in
13  the B cell activity of how antibodies were made.  They were of
14  great medical importance, they protect us against viruses and
15  other things and cause disease in some states.
16      So I started to develop the science of analysis of
17  factors that control genes, and I used the antibody gene for
18  that study.  And David was specifically interested in the
19  regulation of the antibody gene in B cells.
20  Q.  Before we discuss the scientific work that you performed
21  in that collaboration, were there any other scientists that
22  were involved at the time?
23  A.  Yes.  Two young colleagues just joined our labs.
24  Harinder Singh was a post-doctoral fellow in my lab and Ranjan
25  Sin a post-doctoral fellow in Dave's lab, so they really were

Page 126

1   critical investigators in the early labs.
2   Q.  Let's go back to the substance of the collaboration.
3      Can you tell the jury what the collaboration set out
4   to learn?
5   A.  Well, it's illustrated here, we've seen this before, but
6   again the cell, and this is the nucleus and this is the
7   antibody gene.  And what we were interested in in the
8   collaboration was identifying the nature of the switch that
9   turned on and controlled whether the antibody gene was being
10  expressed to make these antibodies.  So we were interested in
11  identifying the nature of the factors that bound to DNA and
12  activate the gene.
13  Q.  And before we get into the specifics, generally what did
14  you learn?
15  A.  We generally learned that an important component of the
16  regulation of the antibody gene was a factor called NF-kappaB,
17  which Dave Baltimore named, nuclear factor, because it's a
18  nuclear factor, factor in the nucleus; kappa, because this
19  antibody gene, there are many of them, but the kappa was the
20  one we were studying; and B for B cells.  So it's nuclear
21  factor kappa B.
22  Q.  Dr. Sharp, if you could just explain the mechanism that's
23  depicted in these next few slides for the jury, please.
24  A.  Well, this is how nuclear factor kappa B is regulated.
25  Again I show here the membrane of the cell, but in this case

16  (Pages 123 to 126)

c12758ab-360b-4054-8a87-fa07a78ebed0

Ariad v. Eli Lilly         Day 2, Session 2

4-11-06

## Page 127

1 there's a receptor that spans that membrane. And when there
2 is, as I picture here, a threat to the cell, a bacteria, for
3 example, interacts with this receptor, there's an induction
4 signal that's sent into the cell.
5       Here's the NF-kappaB activity, these two green balls,
6 and then this yellow oblong ball is I-kappaB, inhibitor of
7 kappa B. And the signal is sent into the cell and there it
8 induces the release of I-kappaB from NF-kappaB. And when
9 I-kappaB, inhibitor of kappa B, is released, NF-kappaB moves
10 to the nucleus and binds to a specific set of DNA sequencers.
11       I pointed out those Gs, As, Ts and Cs. Well, this is
12 a very specific example of those. It's near the antibody
13 gene, and by nuclear factor, NF-kappaB binding there, what is
14 called recognition sequences, it then activates expression of
15 the antibody gene, and that turns the gene on by its binding
16 and other components. That makes a message, which is just a
17 blueprint of the gene, a copy of the gene, and that then is
18 used to make the protein that's exited from the cell and would
19 neutralize the bacteria.
20 Q. And what you've just shown here, is this the information
21 that was derived as a result of the collaboration that you had
22 with Dr. Baltimore?
23 A. Yes, in essence that's the information that came out of
24 that collaboration.
25       MS. CARSON: Your Honor, with your permission, we

## Page 128

1 have a board prepared that I'd like Dr. Sharp to use to walk
2 the jury through this.
3 Q. Dr. Sharp, if you could just take the jury through that
4 discovery of the light switch mechanism again that you just
5 described?
6 A. So it's the same mechanism I just outlined. There's
7 actually three different steps: There is one step in which a
8 component interacts with a receptor on the cell, it's in this
9 membrane. There are many receptors. This is a specific
10 receptor, different for different components. That receptor,
11 when it's bound, will undergo a change, and that will send a
12 signal into the cell that then causes the dissociation of this
13 inhibitor of NF-kappaB protein as a component of three
14 proteins, as pictured here, small, large, small unit of
15 NF-kappaB and I-kappaB.
16       The I-kappaB is released, then the two proteins that
17 are the NF-kappaB would move to the nucleus. Because they're
18 held in the cytoplasm by I-kappaB, they move into the nucleus
19 of the cell. There they find the DNA, specifically the DNA
20 for the gene -- there are many thousands and thousands of
21 genes -- but they find the DNA for this gene using that DNA
22 sequence. And that DNA sequence only occurs at a few places,
23 and where it occurs, NF-kappaB will bind to it. And by
24 binding to that specific sequence, again much like a hand and
25 glove, two chemical complementary surfaces, it will then

## Page 129

1 activate the gene, meaning the gene will be copied because
2 this is bound into these blueprints, and many blueprints will
3 be made from the gene, so one gene will make thousands of
4 blueprints.
5       Then you get the blueprint coming out to the
6 cytoplasm where it makes, in this case it would be the
7 antibody gene, and that antibody gene would be secreted from
8 the cell as it's made and then come back and neutralize the
9 bacteria. So there's an induction step, there's the
10 translocation to the nucleus, there's the activation of that
11 gene. That is all part of how NF-kappaB, how the research
12 that David and I and others were involved in identified
13 NF-kappaB as a factor that regulates genes, in this case the
14 antibody gene.
15       THE COURT: How long does it take from the time that
16 there's the threat to the cell to the escape of the antibody
17 from the cell?
18       THE WITNESS: To actually get the translocation of
19 the NF-kappaB to the nucleus can occur in seconds.
20       To build up enough copies of the gene as a blueprint
21 to make enough antibody requires a few hours to get a full,
22 fully developed secretion of antibodies from the cell.
23       MS. BEN-AMI: Your Honor, I'm not sure that all the
24 jurors can see the board. Perhaps he can move.
25       THE COURT: He's finished explaining, I think.

## Page 130

1       MS. BEN-AMI: Okay. Too late.
2 Q. Dr. Sharp, the pathway -- you may be seated. The pathway
3 that you just described, is that anywhere found in the '516
4 patent?
5 A. Yes, it's described in '516 in column 15. This shows the
6 patent, the column 15 is this yellow, and that's blown up
7 here, and as you see in column 15, it says "nuclear factor B
8 acts as an intracellular messenger." "Intracellular" means
9 it's within a cell, it doesn't move outside the cell. And the
10 model which ties together these observations is that NF-kappaB
11 is initially located in the cytoplasm in a form unable to bind
12 DNA because it is complexed with I-kappaB. Various inducers
13 then cause an alteration in I-kappaB allowing NF-kappaB to be
14 released from the complex. Free NF-kappaB then travels to the
15 nucleus and interacts with its DNA recognition sites, that's
16 that specific sequence that I pointed out there, to facilitate
17 gene transcription. And that's the word we use to describe
18 turning on the gene. So this is a description of that
19 schematic and those steps.
20       THE COURT: I think we will elaborate tomorrow.
21       Members of the jury, thank you very much, you're
22 excused until nine o'clock tomorrow morning, and I really do
23 thank you for having been on time this morning.
24       (Adjourned, 1:00 p.m.)
25       CERTIFICATE.

17 (Pages 127 to 130)

Ariad v. Eli Lilly                          Day 2, Session 2
                          4-11-06

Page 131

1        I, Loretta Hennessey, Registered Merit Reporter and
2   Certified Realtime Reporter, do hereby certify that the
3   foregoing transcript, from page 66 to page 131, constitutes to
4   the best of my skill and ability a true and accurate
5   transcription of my stenotype notes taken in the matter of
6   C.A. 1:02-cv-11280-RWZ, Ariad Pharmaceuticals, et al., vs Eli
7   Lilly Company.
8
9
10  April 11, 2006                        _____
11              Loretta Hennessey, RMR, CRR
12
13
14
15
16
17
18
19
20
21
22
23
24
25

c12758ab-360b-4054-8a87-fa07a78ebed0

# EXHIBIT K



# Leading the Path
## TO IMPROVED CANCER THERAPIES

**www.ariad.com · September 2006 · NASDAQ: ARIA**



### Recent Headlines

- **8.15.06** ARIAD Announces Issuance of Key Patent Covering Its mTOR Inhibitors and Treatment Methods in Cancer and Restenosis

- **8.08.06** ARIAD Reports Second Quarter 2006 Results; Key Milestones Achieved in First Half of Year

- **6.05.06** ARIAD Presents Positive Efficacy Data on AP23573, Novel mTOR Inhibitor, in Phase 2 Advanced Sarcoma Cancer Trial

## Pathways to Patients

ARIAD is developing breakthrough medicines that regulate cell-signaling pathways implicated in cancer. Our pipeline includes a series of small molecule product candidates that provide targeted and highly potent anti-cancer activity to treat solid tumors and hematologic cancers, as well as the spread of tumors to distant sites. Our lead candidate—AP23573, a novel mTOR inhibitor—has been given fast track designation by the FDA for the treatment of soft-tissue and bone sarcomas.

In 2006, approximately 1.4 million people in the U.S. will be diagnosed with cancer. According to the National Institutes of Health estimate, the overall cost of cancer in 2005 was $209.9 billion.* To address this healthcare challenge, new and more effective cancer treatments are urgently needed. ARIAD's lead product candidate, AP23573, is a novel, internally-discovered mTOR inhibitor in development for multiple oncology indications that has the potential to improve the treatment of patients with a broad range of cancers.

## AP23573 in Oncology

As part of ARIAD's global clinical development plan and registration strategy, AP23573 has been studied in multiple Phase 2 and 1b clinical trials in the U.S. and Europe as a single agent and in combination with other anti-cancer therapies in patients with solid tumors and hematologic malignancies. As a single agent, AP23573 is being studied in patients with sarcomas, hormone refractory prostate cancer and endometrial cancer. The Phase 3 trial design is based on the promising results achieved in the Phase 2 trial, and the goal will be to prolong progression-free survival and overall survival for these patients. The Company expects to provide additional details regarding the trial design and to launch the trial in 4Q06, and to begin patient enrollment at multiple leading sarcoma centers in 1Q07.

Commercial planning efforts are advancing for the potential launch of AP23573, as ARIAD pursues its strategy of achieving multiple oncology indications for this novel mTOR inhibitor.

Three multi-center Phase 1b trials of AP23573 in combination with other anti-cancer therapies are also underway. These are focused primarily on patients with various types of solid tumors, especially breast, head and neck, non-small-cell lung, and prostate cancers, as well as sarcomas. Further combination studies are planned.

In addition, ARIAD has concluded enrollment in Phase 1b and Phase 2 clinical trials in patients with brain cancer and leukemias and lymphomas, respectively. Eleven clinical trials of AP23573 are ongoing or completed. Intravenous and oral formulations of AP23573 are being studied in these trials.

For up-to-date information on our clinical trials, recently reported trial results and details on our non-oncology programs for AP23573, please visit our website at www.ariad.com.

## Preclinical Programs

In addition to our clinical development programs, we have a focused drug discovery program centered on small-molecule molecularly targeted therapies and cell-signaling pathways implicated in cancer.

Our pipeline includes:

- Inhibitors of mutant oncogenic or cancer-causing proteins (kinases) that regulate cell signaling (e.g., Bcr Abl – the target of imatinib, which becomes resistant to further treatment through various mutations, including one called T315I);

- Single compounds that target multiple cancer pathways (e.g., cell survival, metastasis and angiogenesis); and

- New mTOR inhibitors (i.e., bone-targeted compounds to treat primary bone cancers and cancers that have spread to bone).

These programs are focused on biologically well-validated targets and are aimed at developing product candidates to address major unmet medical needs.

*Source: American Cancer Society, Cancer Facts & Figures 2006.

## Business Strategy

- Build a fully integrated oncology company – a leader in the discovery, development and commercialization of molecularly targeted oncology therapies.

- Establish a U.S. commercial platform.

- Enter into partnerships with major pharmaceutical or biotechnology companies, after obtaining definitive clinical data, to assist in developing our cancer product candidates and commercializing them outside the United States.

- Broadly develop our lead oncology product, AP23573, and build a pipeline of innovative follow-on product candidates.

- License our NF-kB and ARGENT cell-signaling regulation technologies to pharmaceutical and biotechnology companies.

- Develop and commercialize through medical device companies AP23573 in drug-delivery stents and other medical devices to decrease reblockage of injured vessels following stent-assisted angioplasty.

## NF-kB and ARGENT Intellectual Property

We have an exclusive license to pioneering technology and patents related to methods of treating human disease through modulation of the cell-signaling of a protein called NF-kB, and the discovery and development of drugs to regulate NF-kB cell-signaling activity. NF-kB can be generally thought of as a "biological switch" that can be turned off using these treatment methods to treat disorders such as inflammation, cancer, sepsis and osteoporosis.

In May of 2006, ARIAD received a favorable verdict from the jury in the United States District Court (the "Court") for the District of Massachusetts in the lawsuit against Eli Lilly and Company ("Lilly"), alleging infringement of our pioneering U.S. patent covering methods of treating human disease by regulating NF-kB cell-signaling activity. A separate trial, or bench trial, commenced before the judge on August 7, 2006 on certain defenses asserted by Lilly relating to the validity and enforceability of the claims of the patent, which must be addressed before the Court enters a final judgment in this lawsuit.

The co-plaintiffs are Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, and The President and Fellows of Harvard College. Lilly has the right to challenge the verdict in the trial court and on appeal, and certain limited issues relating to validity and enforceability of our patent remain pending before the judge. For updated information regarding ongoing aspects of the NF-kB litigation, please refer to our periodic filings with the Securities and Exchange Commission.

We have also developed a proprietary portfolio of cell-signaling regulation technologies, our ARGENT technology, to control intracellular processes with small molecules, which may be useful in the development of therapeutic vaccines and gene and cell therapy products, and which provide versatile tools for applications in cell biology, functional genomics, and drug discovery research.

## Financials

- We ended the second quarter of 2006 with $54.3 million in cash, cash equivalents and marketable securities.

- We anticipate cash used in operations for 2006 of $53 million to $56 million.

Some of the matters discussed herein are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements are identified by the use of words such as "may", "anticipate", "estimate", "expect", "project", "intend", "plan", "believe", and other words and terms of similar meaning in connection with any discussion of future operating or financial performance. Such statements are based on management's expectations and are subject to certain factors, risks and uncertainties that may cause actual results, outcome of events, timing and performance to differ materially from those expressed or implied by such forward-looking statements. These risks include, but are not limited to, risks and uncertainties regarding our ability to accurately estimate the timing and actual R&D expenses and other costs associated with the preclinical and clinical development and manufacture of our product candidates, the adequacy of our capital resources and the availability of additional funding, risks and uncertainties regarding our ability to manufacture or have manufactured our product candidates on a commercial scale, risks and uncertainties regarding our ability to successfully recruit centers, enroll patients and conduct clinical studies of product candidates, risks and uncertainties that clinical trial results at any phase of development, may be adverse or may not be predictive of future results or lead to regulatory approval of any of our or any partner's product candidates, risks and uncertainties of third-party intellectual property claims relating to our and any partner's product candidates, and risks and uncertainties relating to regulatory oversight, the timing, scope, cost and outcome of legal and patent office proceedings, litigation, prosecution and re-examination proceedings concerning our NF-kB patent portfolio, future capital needs, key employees, dependence on collaborators and manufacturers, markets, economic conditions, products, services, prices, reimbursement rates, competition and other factors detailed in the Company's public filings with the Securities and Exchange Commission, including ARIAD's Annual Report on Form 10-K for the fiscal year ended December 31, 2005. The information contained in this document is believed to be current as of the date of original issue. The Company does not intend to update any of the forward-looking statements after the date of this document to conform these statements to actual results or to changes in the Company's expectations, except as required by law.



**A R I A D**®

ARIAD Pharmaceuticals, Inc.
26 Lansdowne Street
Cambridge, Massachusetts 02139-4234

Telephone: (617) 494-0400
Fascimile: (617) 494-8144

www.ariad.com

NASDAQ: ARIA

## Investor Relations Contact

**Edward M. Fitzgerald**

*Senior Vice President,
Finance and Corporate Operations,
Chief Financial Officer*

edward.fitzgerald@ariad.com

## Business Development Contact

**Laurie A. Allen, Esq.**

*Senior Vice President,
Legal and Business Development,
Chief Legal Officer*

laurie.allen@ariad.com



**About ARIAD     Pipeline & Programs     Investors & Media     Regulation Kits     Careers**

home | contact | site map  [_____]  search

## *AP23573: On the Fast Track*

As part of ARIAD's global clinical development plan and registration strategy, AP23573 has been studied in multiple Phase 2 and 1b clinical trials in the U.S. and Europe as a single agent and in combination with other anti-cancer therapies in patients with solid tumors. As a single agent, AP23573 is being studied in patients with sarcomas, hormone refractory prostate cancer and endometrial cancer. ARIAD is on track to begin a global Phase 3 clinical trial in 2006 in patients with soft-tissue and bone sarcomas. Commercial planning efforts are advancing for the potential launch of AP23573, as ARIAD pursues its strategy of achieving multiple oncology indications for this novel mTOR inhibitor.

Three multi-center Phase 1b trials of AP23573 in combination with other anti-cancer therapies are also underway. These are focused primarily on patients with various types of solid tumors, especially breast, head and neck, non-small-cell lung, and prostate cancers, as well as sarcomas. Further combination studies are planned.

In addition, ARIAD has concluded enrollment in Phase 1b and Phase 2 clinical trials in patients with brain cancer and leukemias and lymphomas, respectively. Eleven clinical trials of AP23573 are ongoing or completed. Intravenous and oral formulations of AP23573 are being studied in these trials.

### How AP23573 Works



ARIAD's lead product candidate, AP23573, is a novel, potent mTOR inhibitor in development for multiple oncology indications.
VIEW VIDEO >

©2006 ARIAD Pharmaceuticals, Inc.                            Terms and Conditions   Privacy Policy   Safe Harbor   Map & Directio

# EXHIBIT L



# Form 10-K

## ARIAD PHARMACEUTICALS INC - ARIA

Filed: March 16, 2006 (period: December 31, 2005)

Annual report which provides a comprehensive overview of the company for the past year

# Table of Contents

## PART I

## PART I

ITEM 1:    BUSINESS
ITEM 1A:   RISK FACTORS
ITEM 1B:   UNRESOLVED STAFF COMMENTS
ITEM 2:    PROPERTIES
ITEM 3:    LEGAL PROCEEDINGS
ITEM 4:    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

## PART II

ITEM 5:    MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND
           ISSUER PURCHASES OF
ITEM 6:    SELECTED FINANCIAL DATA
ITEM 7:    MANAGEMENT S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF
           OPERATIONS
ITEM 7A:   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK
ITEM 8:    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA
ITEM 9:    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL
           DISCLOSURE
ITEM 9A:   CONTROLS AND PROCEDURES
ITEM 9B:   OTHER INFORMATION

## PART III

ITEM 10:   DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT
ITEM 11:   EXECUTIVE COMPENSATION
ITEM 12:   SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND
           RELATED STOCKHOLDER MATT
ITEM 13:   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS
ITEM 14:   PRINCIPAL ACCOUNTING FEES AND SERVICES

## PART IV

ITEM 15:   EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K
SIGNATURES
EXHIBIT INDEX

EX-10.54 (Material contracts)

EX-10.56 (Material contracts)

EX-10.57 (Material contracts)

EX-23.1 (Consents of experts and counsel)

EX-31.1

EX-31.2

EX-32.1

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 10-K**

(Mark One)
[X] **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2005
OR
[ ] **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from_____ to _____**
**Commission file number 0-21696**

**ARIAD Pharmaceuticals, Inc.**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **22-3106987** |
| (State or other jurisdiction of | (I.R.S. Employer Identification No.) |
| incorporation or organization) | |

**26 Landsdowne Street, Cambridge, Massachusetts    02139-4234**
(Address of principal executive offices)    (Zip Code)

**Registrant's telephone number, including area code: (617) 494-0400**

**Securities registered pursuant to Section 12(b) of the Act: None**

**Securities registered pursuant to Section 12(g) of the Act:**

**Common Stock, $.001 Par Value**

**Rights to Purchase Series A Preferred Stock**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes [ ] No [ X ]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.
Yes [ ] No [ X ]

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes [ X ] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "accelerated filer" and "large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):
Large accelerated filer [ ] Accelerated filer [ X ] Non-accelerated filer [ ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes [ ] No [ X ]

The aggregate market value of the registrant's common stock held by nonaffiliates of the registrant (without admitting that any person whose shares are not included in such calculation is an affiliate), computed by reference to the price at which the common stock was last sold, as of the last business day of the registrant's most recently completed second fiscal quarter was $338 million.

As of February 28, 2006, the registrant had 61,840,329 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

The following documents (or parts thereof) are incorporated by reference into the following parts of this Form 10-K: Certain information required in Part III of this Annual Report on Form 10-K is incorporated from the Registrant's Proxy Statement for the Annual Meeting of Stockholders to be held on June 14, 2006.

TABLE OF CONTENTS

**PART I**

| | | |
|---|---|---|
| Item 1: | Business | 1 |
| Item 1A: | Risk Factors | 11 |
| Item 1B: | Unresolved Staff Comments | 21 |
| Item 2: | Properties | 22 |
| Item 3: | Legal Proceedings | 22 |
| Item 4: | Submission of Matters to a Vote of Security Holders | 23 |

**PART II**

| | | |
|---|---|---|
| Item 5: | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 24 |
| Item 6: | Selected Financial Data | 25 |
| Item 7: | Management_s Discussion and Analysis of Financial Condition and Results of Operations | 26 |
| Item 7A: | Quantitative and Qualitative Disclosures About Market Risk | 36 |
| Item 8: | Financial Statements and Supplementary Data | 38 |
| Item 9: | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 56 |
| Item 9A: | Controls and Procedures | 56 |
| Item 9B: | Other Information | 58 |

**PART III**

| | | |
|---|---|---|
| Item 10: | Directors and Executive Officers of the Registrant | 59 |
| Item 11: | Executive Compensation | 59 |
| Item 12: | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 59 |
| Item 13: | Certain Relationships and Related Transactions | 59 |
| Item 14: | Principal Accounting Fees and Services | 59 |

**PART IV**

| | | |
|---|---|---|
| Item 15: | Exhibits, Financial Statement Schedules | 60 |

**PART I**

**ITEM 1:    BUSINESS**

The following Business Section contains forward-looking statements, which involve risks and uncertainties. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of certain factors (see Part I, Item 1A: Risk Factors). Unless the content requires otherwise, references to "ARIAD," "we," "our," and "us," in this Annual Report on Form 10-K refers to ARIAD Pharmaceuticals, Inc. and our subsidiaries.

**Overview**

We are engaged in the discovery and development of breakthrough medicines to treat cancers by regulating cell signaling with small molecules. We are developing a comprehensive approach to patients with cancer that addresses the greatest medical need - aggressive and advanced-stage cancers for which current treatments are inadequate. Our goal is to build a fully integrated oncology company focused on novel, molecularly targeted therapies to treat solid tumors and hematologic cancers, as well as the spread of primary tumors to distant sites.

Human cells - both healthy and malignant - share an elaborate system of molecular pathways that carry signals back and forth from the cell surface to the nucleus and within the cell. Such signaling is essential to cell functioning and viability. When disrupted or over-stimulated, such pathways may trigger diseases such as cancer. For example, growth and proliferation of cancer cells are dependent on signals from external growth factors, as well as signals indicating the availability of sufficient nutrients and blood supply. These signals are conveyed along well-defined pathways, several of which are regulated by a protein called the mammalian target of rapamycin, or mTOR.

Our lead cancer product candidate, AP23573, is an internally discovered, potent mTOR inhibitor. The protein, mTOR, serves as a "master switch" and appears to have a central function in cancer cells. Blocking mTOR creates a starvation-like effect in cancer cells by interfering with cell growth, division, metabolism and angiogenesis.

As part of our global clinical development plan and registration strategy, AP23573 has been studied in multiple Phase 2 and 1b clinical trials in the U.S. and Europe as a single agent in patients with solid tumors, including sarcomas, hormone refractory prostate cancer and endometrial cancer. In addition, three multi-center Phase 1b trials of AP23573 in combination with other anti-cancer therapies are underway, which are focused primarily on patients with various types of solid tumors, especially breast, ovarian, non-small-cell lung, and prostate cancers, as well as sarcomas. Further combination studies are planned. In addition, we have concluded enrollment in Phase 1b and Phase 2 clinical trials in patients with brain cancer and leukemias and lymphomas, respectively. Eleven clinical trials of AP23573 are ongoing or completed. Intravenous and oral formulations of AP23573 have been studied in these trials.

In November 2005, at the AACR-NCI-EORTC International Conference on "Molecular Targets and Cancer Therapeutics," investigators presented preliminary Phase 2 clinical data on AP23573 in advanced sarcoma patients, which showed that 27% (51/188) of patients treated with AP23573 and evaluable for at least four months demonstrated sustained anti-tumor responses. Enrollment in this trial has been completed and, based on these positive data, we expect to start our initial registration trial for AP23573 in patients with sarcomas. The U.S. Food and Drug Administration, or FDA, and the European Medicines Agency, or EMEA, have designated AP23573 as an orphan drug for treatment of soft-tissue and bone sarcomas. The FDA has also designated AP23573 as a fast-track product for the same indications.

In clinical trials to date, AP23573 has been well tolerated at the fixed doses administered, and adverse events were generally mild to moderate in severity and readily reversible. The most common treatment-related adverse events were oral mucositis, rash, fatigue, nausea and lipid abnormalities.

Two clinical trials of AP23573 that have concluded enrollment provide important insights that may be useful in planning follow-up studies. In patients with brain cancer, AP23573 was shown to cross the blood-brain barrier and inhibit brain tumor mTOR activity, while being well tolerated in severely ill patients. In heavily pretreated patients with leukemias and lymphomas, 40% of evaluable patients had AP23573 anti-cancer activity, providing a basis for further studies in selected hematologic malignancies.

The oral dosage form of AP23573 is being studied in a multi-center Phase 1b clinical trial of patients with various solid tumors. Initial results from this trial indicate that the oral dosage form can be administered safely using several daily and intermittent dosing   schedules and achieves blood levels over time   and mTOR inhibition generally consistent with those observed with intravenous administration.

As an mTOR inhibitor, AP23573 has also been shown to potently block the growth, proliferation and migration of vascular smooth muscle cells, the primary cause of narrowing and blockage of injured vessels. In 2005, we entered into a partnership with Medinol Ltd., one of the leading cardiovascular medical device companies, to develop and commercialize stents and other medical devices to deliver AP23573 to prevent reblockage of injured vessels following stent-assisted angioplasty, a common non-surgical procedure for dilating or opening narrowed arteries.

Inhibition of the mTOR pathway may be useful for additional indications beyond oncology and drug-delivery stents, and we are evaluating such indications as part of the broader clinical development plan for AP23573.

In addition to our lead clinical development program, we have a focused drug discovery program centered on small-molecule, molecularly targeted therapies and cell-signaling pathways implicated in cancer. Currently, our preclinical pipeline includes: inhibitors of mutant oncogenic or cancer-causing proteins (kinases) that regulate cell signaling ( *e.g.,*  Bcr-Abl - the target of imatinib, which becomes resistant to further treatment through various mutations, including one called T315I); single compounds that target multiple cancer pathways ( *e.g.,*  cell survival, metastases and angiogenesis); and new mTOR inhibitors ( *i.e.,*  bone-targeted compounds to treat primary bone cancers and cancers that have spread to bone).

We have an exclusive license to pioneering technology and patents related to methods of treating human disease through regulation of the cell-signaling activity of a protein called NF-κB, and the discovery, development and use of drugs to regulate NF-κB cell-signaling activity. NF-κB can be generally thought of as a "biological switch" that can be turned off using these treatment methods to treat disorders such as inflammation, cancer, sepsis and osteoporosis. We permit broad use of our NF-κB intellectual property, at no cost, by investigators at academic and not-for-profit institutions to conduct non-commercial research. Our goal is to license our NF-κB technology to pharmaceutical and biotechnology companies that are conducting research to discover and develop drugs that modulate NF-κB cell signaling and/or that are marketing such drugs.

We have also developed a proprietary portfolio of cell-signaling regulation technologies, our ARGENT technology, to control intracellular processes with small molecules, which may be useful in the development of therapeutic vaccines and gene and cell therapy products, and which provide versatile tools for applications in cell biology, functional genomics and drug discovery research. We distribute our ARGENT technologies at no cost to academic investigators in the form of our Regulation Kits to use in various research applications in an academic setting. Over 1,000 academic investigators worldwide are using or have used this technology in diverse areas of research, and over 250 scientific papers describing their use have been published. In addition, we are seeking opportunities to license our ARGENT technology to pharmaceutical and biotechnology companies to accelerate their drug discovery. To date, we have entered into several research and development licenses for use of our ARGENT technology.

Our current business strategy is to:

- build a fully integrated oncology company - a leader in the discovery, development and commercialization of molecularly targeted oncology therapies;

- establish a U.S. commercial platform;

- enter into partnerships with major pharmaceutical or biotechnology companies, after obtaining definitive clinical data, to assist in developing our cancer product candidates and commercializing them outside the U.S.;

- broadly develop our lead oncology product, AP23573, and build a pipeline of innovative follow-on product candidates;

- license our NF-κB and ARGENT cell-signaling regulation technologies to pharmaceutical and biotechnology companies; and

- develop and commercialize through medical device companies AP23573 drug-delivery stents and other medical devices to decrease reblockage of injured vessels following stent-assisted angioplasty .

We conduct research and development programs on behalf of our 80%-owned subsidiary, ARIAD Gene Therapeutics, Inc., hereinafter referred to as AGTI, relating to our product candidates which are small-molecule mTOR inhibitors. These product candidates include our lead product candidate, AP23573, and compounds in our bone-targeted mTOR inhibitor program. AGTI owns the intellectual property relating to these product candidates and related ARGENT technology. We also seek opportunities on behalf of AGTI to license the ARGENT cell-signaling regulation technology to develop and commercialize products and for research applications.

ARIAD was organized as a Delaware corporation in April 1991. Our principal executive offices are located at 26 Landsdowne Street, Cambridge, Massachusetts 02139-4234, and our telephone number is (617) 494-0400. We maintain an internet website at http://www.ariad.com, the contents of which are not incorporated herein. Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K and all amendments to such reports are made available free of charge through the Investor Relations section of our website as soon as reasonably practicable after they have been electronically filed with or furnished to the United States Securities and Exchange Commission, or SEC.

ARIAD and the ARIAD logo are our registered trademarks. ARGENT is our trademark. Other service marks, trademarks and trade names appearing in this report are the property of their respective owners.

**Our Lead Development Programs**

***Oncology Indications of our mTOR Inhibitor, AP23573***

Human cells - both healthy and malignant - share an elaborate system of molecular pathways that carry signals back and forth from the cell surface to the nucleus and within the cell. Such signaling is essential to cell functioning and viability. When disrupted or over-stimulated, such pathways may trigger diseases such as cancer. For example, growth and proliferation of cancer cells are dependent on signals from external growth factors, as well as signals indicating the availability of sufficient nutrients and blood supply. These signals are conveyed along well-defined pathways, several of which are regulated by the protein mTOR.

Our lead cancer product candidate, AP23573, is an internally discovered, potent mTOR inhibitor. The protein, mTOR, serves as a "master switch" and has a central function in cancer cells. Blocking mTOR creates a starvation-like effect in cancer cells by interfering with cell growth, division, metabolism and angiogenesis.

As part of our global clinical development plan and registration strategy, AP23573 has been studied in multiple Phase 2 and 1b clinical trials in the U.S. and/or Europe as a single agent in patients with solid tumors, including sarcomas, hormone refractory prostate cancer and endometrial cancer. In addition, three multi-center Phase 1b trials of AP23573 in combination with other anti-cancer therapies are underway, which are focused primarily on patients with various types of solid tumors, especially breast, ovarian, non-small-cell lung, and prostate cancers, as well as sarcomas. Further combination studies are planned. In addition, we concluded enrollment in Phase 1b and Phase 2 clinical trials in patients with brain cancer and leukemias and lymphomas, respectively. Eleven clinical trials of AP23573 are ongoing or completed. Intravenous and oral formulations of AP23573 have been studied in these trials.

Our most advanced Phase 2 trial of AP23573 is in sarcoma patients. In November 2005, at the AACR-NCI-EORTC International Conference on "Molecular Targets and Cancer Therapeutics," investigators presented preliminary Phase 2 clinical data on AP23573 in advanced sarcoma patients, who had generally failed alternative anti-cancer treatments and had progressive disease upon entering the trial. This trial includes four subgroups of bone and soft-tissue sarcoma patients. Based on these preliminary data, 27% (51/188) of patients treated with AP23573 and evaluable for at least four months demonstrated sustained anti-tumor responses as defined by RECIST (Response Evaluation Criteria in Solid Tumors), including four patients with partial responses (confirmed tumor regression >30%) and 47 patients with stable disease for at least four months. In addition, the preliminary six-month progression free survival (PFS) rate in the patients in the first stage of the trial was 22%. Enrollment in this trial has been completed. Based on these positive data from our Phase 2 trial, we expect to start our initial registration trial for AP23573 in patients with sarcomas.

In clinical trials to date, AP23573 has been well tolerated at the fixed doses administered, and adverse events were generally mild to moderate in severity and readily reversible. The most common treatment-related adverse events were oral mucositis, rash, fatigue, nausea and lipid abnormalities.

Two clinical trials of AP23573 that have concluded enrollment provide important insights that may be useful in planning follow-up studies. In patients with brain cancer, AP23573 was shown to cross the blood-brain barrier and inhibit brain tumor mTOR activity, while being well tolerated in severely ill patients. In heavily pretreated patients with leukemias and lymphomas, 40% of evaluable patients had AP23573 anti-cancer activity, providing a basis for further combination studies in selected hematologic malignancies.

The oral dosage form of AP23573 is being studied in a multi-center Phase 1b clinical trial of patients with various solid tumors. Initial results from this trial indicate that the oral dosage form can be administered safely using several daily and intermittent dosing schedules and achieves blood levels over time and mTOR inhibition generally consistent with those observed with intravenous administration.

The FDA and the EMEA have designated AP23573 as an orphan drug for treatment of soft-tissue and bone sarcomas. The FDA has also designated AP23573 as a fast-track product for the same indications. Our goal is to initiate the first global registration trial of AP23573 in patients with advanced sarcomas. Beforehand, we expect to finalize selection of the dosing regimen to be used in the Phase 3 clinical trial and finalize the design of the protocol for the pivotal trial with the FDA and EMEA.

In the malignant cells of many of the cancers that we are studying in the AP23573 clinical trials, signaling in the mTOR pathway may be abnormal due to genetic mutations and/or alterations in the activity of key proteins upstream or downstream of mTOR itself. We believe that some of these patients may be particularly responsive to mTOR inhibition. Our scientists and other investigators are leading the identification and development of biomarker assays to identify patients with tumors that harbor such alterations in the mTOR pathway. In addition, our clinical development strategy includes extensive use of biomarkers and functional imaging technologies, such as positron emission tomography, to augment the assessment of the efficacy and safety of AP23573 in patients enrolled in our trials.

### *Cardiovascular Indications of our mTOR Inhibitor, AP23573*

As an mTOR inhibitor, AP23573 has also been shown to potently block the growth, proliferation and migration of vascular smooth muscle cells, the primary cause of narrowing and blockage of injured vessels. In 2005, we entered into a partnership with Medinol Ltd., hereafter referred to as Medinol, one of the leading cardiovascular medical device companies, to develop and commercialize stents and other medical devices to deliver AP23573 to prevent reblockage of injured vessels following stent-assisted angioplasty, a common non-surgical procedure for dilating or opening narrowed arteries.

Cardiovascular disease afflicts more than a quarter of the U.S. population and causes more than five million hospitalizations, over $300 billion in healthcare expenditures, and one million deaths annually. Products expected to have the most profound impact on coronary artery and myocardial disorders - including drug-eluting stents - have only recently been introduced into clinical practice. By 2008, the growing drug-eluting stent market is expected to exceed $6 billion.

Numerous drugs, including many antiplatelet agents, anticoagulants, ACE inhibitors, and cytotoxic agents, administered to patients following coronary angioplasty have failed to significantly reduce the overall incidence of vascular reblockage, which runs as high as 30% in the first few months, depending on the configuration and location of the vascular lesion and other clinical factors, such as diabetes. Recent clinical studies have found lower reblockage rates in patients treated with stents that deliver small-molecule drugs, such as sirolimus, an mTOR inhibitor, or paclitaxel, a cytotoxic agent, locally to the site of vascular injury. Such stents have become the standard-of-care for patients undergoing interventional procedures to open narrowed coronary arteries.

We may grant up to two additional licenses, under our rights to AP23573, to medical device companies for their use in developing and commercializing drug-delivery stents and other medical devices to reduce reblockage of injured vessels following stent-assisted angioplasty.

### *Additional Non-Oncology Indications of our mTOR Inhibitor, AP23573*

Inhibition of the mTOR pathway may be useful for additional indications beyond oncology and drug-delivery stents, and we are evaluating such indications as part of the broader clinical development plan for AP23573.

### **Our Preclinical Programs**

Our research and development programs are focused on discovering and developing small-molecule drugs that regulate cell signaling. Many of the critical functions of cells, such as cell growth, differentiation, gene transcription, metabolism, motility and survival, are dependent on signals carried back and forth from the cell surface to the nucleus and within the cell through a system of molecular pathways. When disrupted or over-stimulated, such pathways may trigger diseases such as cancer. From our inception, our research has focused on exploring cell-signaling pathways, identifying their role in specific diseases, and discovering drug candidates to treat those diseases by interfering with the aberrant signaling pathways of cells. The specific cellular proteins blocked by our product candidates have been well characterized and validated as targets. All of our product candidates are developed in-house through the integrated use of structure-based drug design and computational chemistry, and their targets have been validated with techniques such as functional genomics, proteomics, and chemical genetics.

We have a focused drug discovery program centered on small-molecule, molecularly targeted therapies and cell-signaling pathways implicated in cancer. Currently, our preclinical pipeline includes: inhibitors of mutant oncogenic, or cancer-causing, proteins (kinases) that regulate cell signaling (e.g., Bcr-Abl - the target of imatinib, which becomes resistant to further treatment through various mutations, including one called T315I); single compounds that target multiple cancer pathways (e.g., cell survival, metastases and angiogenesis); and new mTOR inhibitors (i.e., bone-targeted compounds to treat primary bone cancers and cancers that have spread to bone).

**Our Proprietary Technologies**

*NF-κB Cell-signaling Technology*

Dr. David Baltimore, formerly director of the Whitehead Institute for Biomedical Research, Dr. Phillip Sharp of the Massachusetts Institute of Technology, and Dr. Thomas Maniatis of Harvard University, together with a team of scientists in their respective laboratories, discovered a family of genes that encode proteins they called NF-κB and I-κB, its inhibitor; the critical role played by NF-κB cell-signaling in regulating cellular processes involved in various difficult-to-treat diseases; methods to identify compounds to regulate NF-κB cell-signaling activity; and methods of treating disease by inhibiting NF-κB. NF-κB can be generally thought of as a "biological switch" that can be turned off using these methods to treat disorders, such as inflammation, cancer, sepsis and osteoporosis.

We have an exclusive license from these academic institutions to pioneering technology and patents related to methods of treating human disease through modulation of NF-κB cell-signaling activity, and the discovery and development of drugs to regulate NF-κB cell-signaling activity. We have a program to license this technology and these treatment methods to pharmaceutical and biotechnology companies that are conducting research to discover and develop drugs that modulate NF-κB cell-signaling and/or that are marketing such drugs. One of the NF-κB patents is the subject of reexamination proceedings in the U.S. Patent and Trademark Office, or PTO, and a patent infringement lawsuit filed in 2002 by us and the academic institutions against Eli Lilly and Company, hereinafter referred to as Lilly, alleging infringement based on sales of Lilly's osteoporosis drug, Evista®, and Lilly's septic shock drug, Xigris®, and seeking monetary damages. This trial is scheduled to commence in the United States District Court for the District of Massachusetts on April 10, 2006. See Part I, Item 3: Legal Proceedings.

*ARGENT Cell-signaling Regulation Technology*

Our proprietary portfolio of cell-signaling regulation technologies includes the ARGENT signaling and transcription technologies. Our ARGENT technologies allow intracellular processes to be controlled with small molecules, which may be useful in the development of therapeutic vaccines and gene and cell therapy products, and which provide versatile tools for applications in cell biology, functional genomics and drug-discovery research, including three-hybrid screening approaches to discover and characterize targets and lead molecules. To maximize their use by the scientific community, we distribute our technologies at no cost to academic investigators in the form of our Regulation Kits. Over 1,000 investigators worldwide are using or have used our Regulation Kits in diverse areas of research, and over 250 scientific papers describing their use have been published. For researchers in pharmaceutical and biotechnology companies, we have established a licensing program to provide them with access to our ARGENT cell-signaling regulation technologies on commercial terms.

**Our Business Strategy**

Our business strategy is to:

· build a fully integrated oncology company - a leader in the discovery, development and commercialization of molecularly targeted oncology therapies;

· establish a U.S. commercial platform;

· enter into partnerships with major pharmaceutical or biotechnology companies, after obtaining definitive clinical data, to assist in developing our cancer product candidates and commercializing them outside the United States;

· broadly develop our lead oncology product, AP23573, and build a pipeline of innovative follow-on product candidates;

· license our NF-κB and ARGENT cell-signaling regulation technologies to pharmaceutical and biotechnology companies; and

· develop and commercialize through medical device companies AP23573 in drug-delivery stents and other medical devices to decrease reblockage of injured vessels following stent-assisted angioplasty.

**Our Intellectual Property**

Patents and other intellectual property rights are essential to our business. We file patent applications to protect our technology, inventions and improvements to our inventions that are considered important to the development of our business.

As of February 28, 2006 we have 93 patents and pending patent applications in the United States, which are owned, co-owned or exclusively licensed by us or by our subsidiary, AGTI. In addition, we have filed foreign counterparts, as appropriate. We also have several nonexclusive technology licenses from certain institutions in support of our research programs. We anticipate that we will continue to seek licenses from universities and others where applicable technology complements our research and development efforts.

Approximately one third of the patents and patent applications in our portfolio relate generally to our mTOR inhibitor, AP23573, or to our preclinical drug discovery programs. The former cover AP23573, various analogs and uses thereof, as well as the related use of biomarkers, related therapies and inventions involving the mTOR gene. The latter include various families of kinase inhibitor compounds, as well as our bone-targeted mTOR inhibitors. The remainder of the portfolio is primarily focused on ARGENT cell-signaling regulation technologies. These patents and pending applications cover regulatory technologies, specialized variants of the technologies, critical nucleic acid components, small-molecule drugs, the identification and use of dimerizer hormone mimetics, and various uses of the technologies in health care and drug discovery. Patents issued to date include 30 patents covering our cell-signaling regulation technologies.

We also rely on unpatented trade secrets and proprietary know-how. However, trade secrets are difficult to protect. We enter into confidentiality agreements with our employees, consultants, investigators, contractors, collaborators and other third parties to whom we disclose confidential information. In addition, we believe that certain technologies utilized in our research and development programs are in the public domain. Accordingly, we do not believe that patent or other protection is available for these technologies.

-7-

**Our Licenses to Third Parties**

We have a program to license our NF-κB cell-signaling technology and treatment methods to pharmaceutical and biotechnology companies conducting research to discover and develop drugs that modulate NF-κB cell-signaling and/or marketing such drugs. To date, we have entered into several licenses for this technology with pharmaceutical companies and companies manufacturing and commercializing kits, technologies and tools for research applications.

We also have a program to license our ARGENT cell-signaling regulation technologies to pharmaceutical and biotechnology companies to develop and commercialize innovative therapeutic products and to conduct drug discovery research. To date, we have entered into licenses for use of our ARGENT cell-signaling regulation technologies for a variety of applications. In addition, several biotechnology companies are conducting collaborative studies of these technologies for use in gene and cell therapy applications.

In January 2005, we and our subsidiary, AGTI, entered into non-exclusive license and supply agreements with Medinol for the development and commercialization of stents and other medical devices to deliver our mTOR inhibitor, AP23573, to prevent reblockage of injured vessels following stent-assisted angioplasty. The license agreement provides for the payment by Medinol to us of an upfront license fee, payments based on achievement of development, regulatory, and commercial milestones, and royalties based on commercial sales of products, if any, developed by Medinol. We are required to provide Medinol, and Medinol is required to purchase from us, agreed upon quantities of AP23573.

**Our Licenses from Third Parties**

In 1991, we entered into an exclusive license agreement with Massachusetts Institute of Technology and the Whitehead Institute (on behalf of themselves and Harvard University) to the rights to our NF-ºB cell-signaling technologies and treatment methods. This license agreement was amended in 1995 and provides for the payment by us to these academic institutions of an upfront fee, license maintenance fees, a milestone payment, sublicense fees, and royalties based on commercial sales of products and processes developed using the NF-ºB cell-signaling technologies and treatment methods. The license agreement also grants us the right to undertake the enforcement and/or defense of these patent rights at our sole expense, subject to our right to withhold a percentage of the royalties otherwise due the academic institutions to be applied toward reimbursement of our fees and expenses in connection with any such litigation, including our litigation against Lilly. The license agreement also provides that we will share a percentage of any damages, net of fees and expenses, awarded in such litigation with the academic institutions.

We and, in some instances AGTI, our 80% owned subsidiary, have entered into license agreements with various academic institutions pursuant to which we and/or AGTI are the licensees of certain technologies relating to our research and development programs for our product candidates which are small-molecule mTOR inhibitors and our ARGENT cell-signaling regulation technologies. In particular, in 1997, AGTI entered into an amended and restated exclusive license agreement with Stanford University (on behalf of itself and Harvard University) to rights to certain of our ARGENT cell-signaling regulation technologies. This license agreement was amended in 2003 and provides for the payment by AGTI of an upfront fee, license maintenance fees, milestone payments based on achievement of development and commercial milestones, royalties on commercial sales of products, including therapies and research reagents, by AGTI, its co-venturers and partners, and the issuance of 180,000 shares of common stock, or 3% of the initial capitalization, of AGTI.

In some instances, our third party licenses also impose insurance, development, sublicensing and other obligations. Failure by us to comply with these requirements could result in the termination of the applicable agreement, which, depending upon the technologies which are the subject of the applicable agreement, could have a material adverse effect on our business, financial condition, and results of operations.

**Research and Development Spending**

During each of the three years ended December 31, 2005, 2004, and 2003, we spent approximately $45.9 million, $27.7 million, and $14.9 million respectively, on our research and development activities.

-8-

**Manufacturing**

Our drug candidates and preclinical compounds are small molecules that can be readily synthesized by processes that we have developed. We are able to manufacture in-house the quantities of our product candidates necessary for certain preclinical studies. We contract with third party manufacturers to assist in the development and optimization of our manufacturing processes and methods and to supply sufficient quantities of our lead product candidate in bulk quantities and in suitable dosage forms for use in our clinical trials. We also expect to depend on third-party manufacturers for the supply of our products upon commercialization.

Our lead product candidate, AP23573, is produced by an established manufacturing process using conventional synthetic and natural-product fermentation techniques.  The production of AP23573 is based in part on technology that we believe is proprietary to us. We may license this technology to contract manufacturers to enable them to manufacture AP23573 for us. In addition, a contract manufacturer may develop process technology related to the manufacture of our drug candidate that the manufacturer owns either independently or jointly with us. This would increase our reliance on that manufacturer or require us to obtain a license from that manufacturer in order to have our product manufactured. We are currently discussing with our existing suppliers and other third-party manufacturers the long-term supply and manufacture of AP23573 to ensure we have provided for sufficient supply of our product at commercially reasonable costs with appropriate redundancy upon commercialization.

Contract manufacturers are subject to extensive governmental regulation and we depend on them to manufacture our product candidates in accordance with the FDA's current good manufacturing practices, or cGMP. We have established a quality assurance program intended to ensure that third-party manufacturers under contract produce our compounds in accordance with cGMP, and other applicable domestic and foreign regulations. We believe that our current contractors comply with such regulations.

**Competition**

The pharmaceutical and biotechnology industries are intensely competitive. We compete directly and indirectly with other pharmaceutical companies, biotechnology companies and academic and research organizations, many of whom have greater resources than us. We compete with companies who have products on the market or in development for the same indications as our product candidates. We may also complete with organizations that are developing similar technology platforms.

In the area of oncology, pharmaceutical and biotechnology companies such as Amgen Inc., AstraZeneca PLC, Bristol-Myers Squibb Company, Eli Lilly and Company, Genentech, Inc., GlaxoSmithKline plc, Hoffmann LaRoche & Co., Johnson & Johnson, Merck KGaA, Novartis AG, Pfizer, Inc., and Wyeth Corp. are developing and marketing drugs to treat cancer, including mTOR inhibitors. Biotechnology companies such as Amgen Inc., Biogen-Idec, Inc., ImClone Systems, Inc., Millennium Pharmaceuticals, Inc., Onyx Pharmaceuticals, Inc., OSI Pharmaceuticals, Inc., Telik, Inc., and Vertex Pharmaceuticals, Inc. are developing drugs to treat various diseases, including cancer, by inhibiting cell-signaling pathways. Other companies have products on the market or in development against which our drug candidates, if approved, may have to compete. We may also experience competition from companies that have acquired or may acquire technology from companies, universities, and other research institutions. As these companies develop their technologies, they may develop proprietary positions that may materially and adversely affect us.

**Government Regulation**

Our ongoing research and development activities, our clinical trials, the manufacturing and testing procedures and the marketing of our product candidates, if they are approved, all are subject to extensive regulation by numerous governmental authorities in the United States and other countries. Any drug or device developed by us and/or a partner must undergo rigorous preclinical studies and clinical testing and extensive regulatory review administered by the FDA under the federal Food, Drug and Cosmetic Act prior to marketing in the United States. Satisfaction of such regulatory requirements, which includes demonstrating that a product is both safe and effective for its intended indications for use, typically takes several years or more depending upon the type, complexity and novelty of the product and requires the expenditure of substantial resources. Preclinical studies must be conducted in conformance with FDA regulations, including its current Good Laboratory Practices, or cGLP, regulations. Before commencing clinical trials in the United States, we must submit extensive information about the results of preclinical studies, toxicity, manufacturing and control procedures and our proposed clinical research protocol to the FDA in an Investigational New Drug, or IND, application, or an Investigational Device Exemption, or IDE, as the case may be. If the FDA does not respond with any questions on the IND, we can commence clinical trials thirty days after the submission. In addition, an independent institutional review board, or IRB, at each institution at which any clinical trial is being performed, must review and approve the clinical protocol before clinical testing may begin, and it will have ongoing overview of the clinical trial at that institution. With respect to an IDE for certain medical devices, such as drug-delivery stents, clinical trials may not begin until both the FDA and an IRB approve. There can be no assurance that submission of an IND or IDE will result in the commencement of such clinical trials.

We have a limited history of conducting preclinical studies and the clinical trials necessary to obtain regulatory approval. Furthermore, we, the FDA or an IRB may suspend clinical trials at any time if we or they believe that the subjects participating in such trials are being exposed to unacceptable risks or if the FDA finds deficiencies in the conduct of the trials or other problems with our product under development.

Before receiving FDA approval to market a product, we will have to demonstrate that the product is safe and effective in the patients for whom the product is indicated. Data obtained from preclinical studies and clinical trials are susceptible to varying interpretations that could delay, limit or prevent regulatory clearances. In addition, delays or rejections may be encountered based upon additional government regulation from future legislation or administrative action or changes in FDA policy during the period of product development, clinical trials and FDA regulatory review. Similar or even more extensive delays also may be encountered in foreign countries. There can be no assurance that even after such time and expenditures, regulatory approval will be obtained for any product candidates developed by us, or, even if approval is obtained, that the approved indication and related labeling for such products will not limit the product's condition of use, which could materially impact the marketability and profitability of the product. If regulatory approval of a product is granted, such approval will be limited to those disease states and conditions for which the product has been shown useful, as demonstrated by clinical trials. Furthermore, approval may entail ongoing requirements for post-market studies. Even if such regulatory approval is obtained, a marketed product, its manufacturer and its manufacturing facilities and procedures are subject to continual review and periodic inspections by the FDA. Discovery of previously unknown problems with a product, manufacturer, manufacturing procedures or facility may result in restrictions on such product or manufacturer, including costly recalls, an injunction against continued marketing and manufacturing until the problems have been adequately addressed to the FDA's satisfaction or even withdrawal of the product from the market.

There can be no assurance that any compound developed by us alone or in conjunction with others will prove to be safe and efficacious in clinical trials and will meet all of the applicable regulatory requirements needed to receive and maintain marketing approval. Additionally, the marketing, labeling and advertising for an approved product is subject to ongoing FDA scrutiny and the failure to adhere to applicable requirements can result in regulatory action that could have a material adverse impact on the profitability of the product.

Outside the United States, our ability to market a product will be contingent upon receiving a marketing authorization from the appropriate regulatory authorities. The requirements governing the conduct of clinical trials, obtaining marketing authorization, and pricing and reimbursement vary widely from country to country. At present, foreign marketing authorizations are applied for at a national level, although within the European Union, or EU, certain centralized and mutual recognition registration procedures are available to companies wishing to market a product in more than one Member State. These procedures alleviate the need to file a separate application in each EU country. If the regulatory authority is satisfied that adequate evidence of safety, quality and efficacy has been presented, a marketing authorization will be granted. This foreign regulatory approval process includes all of the risks associated with FDA clearance set forth above.

**Our Employees**

As of February 28, 2006, we had 108 employees, 50 of whom hold post-graduate degrees, including 35 with a Ph.D., M.D. or J.D. Most of our employees are engaged directly in research and development. We have entered into confidentiality, assignment of inventions and non-competition agreements with all of our employees. None of our employees are covered by a collective bargaining agreement, and we consider relations with our employees to be good.

### ITEM 1A:  RISK FACTORS

*THE RISKS AND UNCERTAINTIES DESCRIBED BELOW ARE THOSE THAT WE CURRENTLY BELIEVE MAY MATERIALLY AFFECT OUR COMPANY. ADDITIONAL RISKS AND UNCERTAINTIES THAT WE ARE UNAWARE OF ALSO MAY BECOME IMPORTANT FACTORS THAT AFFECT OUR COMPANY. IF ANY OF THE FOLLOWING RISKS ACTUALLY OCCUR, THEY MAY MATERIALLY HARM OUR BUSINESS, OUR FINANCIAL CONDITION AND OUR RESULTS OF OPERATIONS.*

**Risks Relating to Our Business**

*We and our partners may never succeed in developing marketable products or generating product revenues.*

We are a biopharmaceutical company focused on the discovery and development of drugs to provide therapeutic intervention in treating human diseases at the cellular level. As with all science, we face much trial and error, and we may fail at numerous stages along the way, which would inhibit us from successfully developing, manufacturing and marketing our drug candidates. Our lead product candidate, AP23573, is currently in Phase 2 clinical trials for certain cancers, and we do not currently have any products on the market and have no product revenues. Factors which would affect our ability to obtain regulatory approval and to achieve market acceptance and gain market share for our product candidates include, among other factors, product formulation, dose, dosage regimen, our ability to obtain timely and sufficient patient enrollment in our clinical trials, our ability to manufacture, directly or indirectly, sufficient and cost-effective quantities of our product candidates, and our ability to sell, market and distribute, directly or indirectly, such product candidates. We and our medical device partner have limited experience in designing, conducting and managing the clinical testing necessary to obtain such regulatory approval. Additionally, we do not currently have any partners to assist in developing and commercializing our cancer product candidates and expect to be dependent upon such partners to successfully develop and commercialize such cancer products outside the United States. In particular, failure to secure one or more partners to assist in development and commercialization of AP23573 would have a material adverse effect on our ability to generate significant product revenues for AP23573 for cancer indications outside the United States.

-11-

We are also dependent upon the success of Medinol and any future medical device partners (collectively, our partners) to develop, manufacture and market stents or other medical devices to deliver AP23573 to reduce reblockage of injured arteries following stent-assisted angioplasty. To date, we have entered into only one such agreement, with Medinol. If Medinol is not successful and/or if we are not able to enter into agreements with additional medical device companies experienced in the development, manufacture, and marketing of medical devices to deliver AP23573, we will not be able to generate revenues from the marketing of stents or other medical devices that deliver AP23573.

Other than AP23573, we do not have any product candidates in clinical development, and we have not designated any clinical candidates from our existing preclinical programs. We do not expect to have any products on the market before 2008, at the earliest, and, ultimately, we and our partners may not have any products on the market for several years, if at all. We and our partners may not succeed in developing or commercializing any products which will generate product revenues for our company. If we and our partners are not successful in developing or marketing AP23573 or other product candidates, we will not be profitable.

***We have incurred significant losses to date and may never be profitable.***

We have incurred significant operating losses in each year since our formation in 1991 and have an accumulated deficit of $247.1 million from our operations through December 31, 2005. Losses have resulted principally from costs incurred in research and development of our product candidates, including clinical development of AP23573, our lead product candidate, and from general and administrative costs associated with our operations. It is likely that we will incur significant operating losses for the foreseeable future. We currently have no product revenues, limited license revenues and limited commitments for future licensing revenues, and may not be able to generate such revenues in the future. If our losses continue and we and our partners are unable to successfully develop, commercialize, manufacture and market our product candidates and/or we are unable to enter into agreements and licenses of our intellectual property, we may never generate sufficient revenues to achieve profitability. Even if we and our partners are able to commercialize products and we are able to enter into agreements or licenses in the future, we may never generate sufficient revenues to have profitable operations.

***Insufficient funding may jeopardize our research and development programs and may prevent commercialization of our products and technologies.***

We have funded our operations to date through sales of equity securities, debt and operating revenue. Most of our operating revenue to date has been generated through previous collaborative research and development agreements and existing licenses. We currently do not have any committed funding from any pharmaceutical or biotechnology company to advance any of our product development programs. Although we believe that our current available funds will be adequate to satisfy our capital and operating requirements into mid 2007, we will require substantial additional funding for our research and development programs (including pre-clinical development and clinical trials), for operating expenses (including intellectual property protection and enforcement), for the pursuit of regulatory approvals and for establishing manufacturing, marketing and sales capabilities. We received net proceeds of $57.9 million from the sale of 8,625,000 shares of our common stock in August 2005. We have effective shelf registration statements on file with the SEC under which we can sell up to 2,815,000 shares of our common stock. We may sell part or all of these shares at our discretion, and may be able to increase the number of shares to be sold in connection with an offering of these shares, subject to certain limitations under federal securities laws and the rules of the Nasdaq National Market. While we intend to seek additional funding from product-based collaborations, technology licensing, and public or private financings, such additional funding may not be available on terms acceptable to us, or at all. Accordingly, we may not be able to secure the significant funding which is required to maintain and continue each of our research and development programs at their current levels or at levels that may be required in the future. If we cannot secure adequate financing, we may be required to delay, scale back, eliminate or terminate clinical trials and/or seeking marketing approval for AP23573 for one or more indications, to delay, scale back or eliminate one or more of our research and development programs, or to enter into license or other arrangements with third parties to purchase, commercialize or otherwise obtain rights in products or technologies that we would otherwise seek to develop ourselves.

***We have limited manufacturing experience and are dependent upon the ability of third parties to manufacture our product candidates, which raises uncertainty as to our ability to develop and commercialize our product candidates.***

We have no experience in manufacturing any of our product candidates on a large scale and have contracted with third party manufacturers to provide material for clinical trials and to assist in the development and optimization of our manufacturing processes and methods. Our ability to conduct clinical trials and commercialize our product candidates will depend on the ability of such third parties to manufacture our products on a large scale at a competitive cost and in accordance with cGMP and other regulatory requirements. If we are not able to obtain contract manufacturing on commercially reasonable terms, obtain or develop the necessary materials and technologies for manufacturing, or obtain intellectual property rights necessary for manufacturing, we may not be able to conduct or complete clinical trials or commercialize our product candidates. There can be no assurance that we will be able to obtain such requisite terms, materials, technologies and intellectual property necessary to successfully manufacture our product candidates for clinical trials or commercialization.

***The loss of key members of our scientific and management staff could delay and may prevent the achievement of our research, development and business objectives.***

Our performance as a specialized scientific business is substantially dependent on our key officers and members of our scientific staff responsible for areas such as drug development, clinical trials, regulatory affairs, drug discovery, manufacturing, marketing, business development and intellectual property protection and licensing. We also are dependent upon a few of our scientific advisors to assist in formulating our research and development strategy. While we have entered into employment agreements with all of our executive officers, these officers may terminate their employment with us at any time. The loss of, and failure to promptly replace, any member of our management team could significantly delay and may prevent the achievement of our research, development and business objectives.

***We are dependent upon the ability of our medical device partner and potential additional partners to develop, manufacture, test and market stents or other medical devices to deliver AP23573.***

We have no experience in the development of medical devices and will not ourselves develop stents or other medical devices to deliver AP23573. Instead, we have granted one license, and may grant up to two additional licenses, under our rights to AP23573 to medical device companies for their use in developing and commercializing such medical devices to reduce blockage of injured vessels following stent-assisted angioplasty.

While we expect to supply AP23573 to our medical device partner and any additional partners (collectively, our partners), we will be otherwise dependent upon them to develop and commercialize stents or other medical devices to deliver AP23573. Such medical device partners will have various degrees of scientific, technical, medical and regulatory experience and resources to, directly or through third parties, develop, manufacture, test or market stents or other medical devices to deliver AP23573. Their ability to conduct clinical trials and commercialize such medical devices will be dependent on the safety profile of AP23573 and our ability to manufacture and supply AP23573, either directly or through third parties, at a competitive cost and in accordance with cGMP and other regulatory requirements. We depend upon third-party manufacturers or collaborative partners for the production of AP23573 for clinical trials and intend to use third-party manufacturers to produce AP23573 on commercial scale. Our reliance on third-party manufacturers and their potential inability to meet our supply commitments to one or more of our partners could adversely impact the ability of our partners to commercialize stents or other medical devices to deliver AP23573.

-13-

We anticipate that our partners will seek to develop and commercialize stents or other medical devices to deliver AP23573 that do not infringe third-party patents. However, there can be no assurance that the devices delivering AP23573 marketed by our partners will not be subject to third-party claims. Furthermore, the patents issued to us or our partners covering AP23573 and/or medical devices, including stents, may be subject to challenge and may be subsequently narrowed, invalidated or circumvented. Either such event would adversely impact the ability of one or more of our partners to market their stents or other medical devices to deliver AP23573.

Our existing license agreement with Medinol allows either party to terminate under certain circumstances, including Medinol's reasonable business judgment that development of a medical device to deliver AP23573 is not feasible. Accordingly, Medinol may be unable to develop a medical device to deliver AP23573 and we may also not be able to enter into any additional licensing agreements with any other medical device companies to develop such devices on terms which are acceptable to us, or at all. Our inability to enter into such transactions, or the inability of one or more of our partners to develop or commercialize stents or other medical devices to deliver AP23573 for any reason, will adversely impact our ability to generate revenues from any licenses of AP23573.

***We will continue to expend significant resources on the enforcement and licensing of our NF-κB patent portfolio and may be unable to generate material revenues from these efforts, if we are unable to enforce against, or license our NF-κB patents to, pharmaceutical and biotechnology companies.***

We are the exclusive licensee of a family of patents, three in the U.S. and one in Europe, including a pioneering U.S. patent covering methods of treating human disease by regulating NF-κB cell-signaling activity, hereinafter referred to as the `516 Patent, awarded to a team of inventors from The Whitehead Institute for Biomedical Research, Massachusetts Institute of Technology and Harvard University. We have initiated a licensing program to generate revenues from the discovery, development, manufacture and sale of products covered by our NF-κB patent portfolio. These patents have been, and in the future may be, challenged and may be subsequently narrowed, invalidated, declared unenforceable or circumvented, any of which could materially impact our ability to generate licensing revenues from them.

On June 25, 2002, we, together with these academic institutions, filed a lawsuit in the United States District Court for the District of Massachusetts, or the U.S. District Court, against Eli Lilly and Company, hereinafter referred to as Lilly, alleging infringement upon of certain claims of the '516 Patent through sales of Lilly's osteoporosis drug, Evista®, and its septic shock drug, Xigris®. Several cases have been decided by the U.S. Court of Appeals and the Supreme Court addressing issues pertinent to this litigation since its inception. The trial in this case is scheduled to commence on April 10, 2006 in the U.S. District Court.

On April 4, 2005, Lilly filed an *ex parte* request in the United States Patent and Trademark Office, or PTO, to reexamine the patentability of certain claims of the `516 Patent. In addition, a third party filed an *ex parte* request in the PTO on December 2, 2005 to reexamine the patentability of certain claims of the `516 Patent.

-14-

As exclusive licensee of this patent, we are obligated for the costs expended for its prosecution in the PTO, for its enforcement in this litigation and otherwise. Therefore, we will continue to expend significant capital and management resources pursuing this litigation through trial and subsequent appeals and in the reexamination process in the PTO, and the outcome is uncertain.

If the claims of the '516 Patent which are at issue in this litigation are invalidated by the PTO or in the courts or found not to be infringed in this litigation, we will not realize any revenues on sales of Evista or Xigris, and could be liable under certain limited circumstances for Lilly's litigation costs and potentially attorneys' fees. If we prevail at trial in our litigation against Lilly, any damages we may be awarded by the jury could be subsequently eliminated or limited by an adverse finding upon appeal or in the event that the claims of the `516 patent are invalidated by the PTO. Invalidation of these or other claims of the '516 Patent in the litigation or by the PTO would have a significant adverse impact on our ability to generate revenues from our NF- κ B licensing program. Moreover, significant expenditures to enforce these patent rights without generating revenues or accessing additional capital could adversely impact our ability to further our clinical programs and our research and development programs at the current levels or at levels that may be required in the future.

***Because we do not own all of the outstanding stock of our subsidiary, AGTI, we may not realize all of the potential future economic benefit from products developed based on technology licensed to or owned by our subsidiary.***

Our majority-owned subsidiary, AGTI, holds licenses from Harvard University, Stanford University and other universities relating to our ARGENT cell-signaling regulation technology, and owns the intellectual property on our mTOR inhibitors derived from our ARGENT programs, including AP23573. The two directors of AGTI are also members of the Board of Directors of ARIAD. Minority stockholders of AGTI, including Harvard University, Stanford University, several of our scientific advisors, and several current and former members of our management and Board of Directors, own 20% of the issued and outstanding common stock of AGTI. We own the remaining 80% of the issued and outstanding common stock of AGTI.

We do not currently have a license agreement with AGTI that provides us with rights to commercialize product candidates, based on our ARGENT cell-signaling regulation technology or mTOR inhibitors derived from our ARGENT programs, solely for our own benefit, as opposed to for the benefit of AGTI. If we determine it to be in the best interests of our stockholders to commercialize these product candidates solely for our own benefit, we may negotiate with AGTI to obtain a license, on terms to be determined, granting us the sole rights to commercialize such product candidates. If we enter into such a license, the future economic benefit to our stockholders from our commercialization of such products, if any, will be diminished by any royalties or other payments paid under a future agreement with AGTI. If we do not enter into such a license, then the future economic benefit to our stockholders from our commercialization of such products on behalf of AGTI would be in the form of a dividend or other payments received in respect of our 80% interest in AGTI.

Alternatively, if we determine it to be in the best interests of our stockholders, we may seek to acquire some or all of the interests of the minority stockholders in AGTI for cash, shares of our common stock or other securities in a merger, exchange offer or other transaction. If we acquire all of the interests of the minority stockholders in AGTI, then our stockholders will receive all of the future economic benefit from our commercialization of such products on our own behalf. If we acquire these minority interests, we anticipate that this transaction will result in dilution to our stockholders and will require our incurrence of significant transaction costs, which are currently unknown. On January 13, 2004, we acquired an additional 351,909 shares of AGTI common stock, representing approximately 6% of AGTI's outstanding common stock, for a total purchase price of approximately $8.8 million, effected through the reduction of inter-company debt, subject to adjustment in certain circumstances, in order to maintain our 80% interest in AGTI. While such valuation was based on a good-faith determination made by the independent and disinterested members of our Board of Directors as of that date, the economic value of the minority stockholders' interests is difficult to quantify in the absence of a public market. If we acquire all of the interests of the minority stockholders in AGTI, a variety of valuation methodologies may be employed to determine the value per share of AGTI common stock. Factors impacting this valuation would include the progress, likelihood and cost of development and commercialization of product candidates, potential future income streams there from, availability of funding and other factors. If we acquire the minority interests for consideration valued in excess of the value implicitly attributed to such AGTI shares by the market, this could result in a decline in our stock price. If we choose to acquire some or all of these minority interests through a merger in which we do not solicit the consent of the minority stockholders of AGTI, we could become subject to litigation or an appraisal procedure, which would result in additional expense and diversion of management resources.

There can be no assurance that we will, at any time, enter into a license with AGTI or acquire some or all of the interests of the minority stockholders in AGTI. If we pursue either of these alternatives, there can be no assurance as to the timing of any such transaction, the form of such transaction, the particular transaction terms such as the form or amount of consideration offered or provided by us, or the consequences of any such proposed or completed transaction to us or the AGTI minority stockholders.

***Because members of our management team and/or Board of Directors beneficially own a material percentage of the capital stock of our subsidiary, AGTI, and we have agreements with AGTI, there are conflicts of interest present in dealings between ARIAD and AGTI.***

Four members of our management team and/or Board of Directors own approximately 5.6% of the outstanding capital stock of AGTI. Harvey J. Berger, M.D., our Chairman, and Chief Executive Officer, owns 3.2%, David L. Berstein, Esq., our Senior Vice President and Chief Patent Counsel, owns 0.2%, John D. Iuliucci, Ph.D., our Senior Vice President and Chief Development Officer, owns 0.6% and Jay R. LaMarche, one of our directors, owns 1.6%. These same individuals beneficially own an aggregate of approximately 3.1% of our outstanding common stock. Dr. Stuart L. Schreiber, a Harvard professor who is one of our scientific founders, owns approximately 3.2% of the outstanding capital stock of AGTI. Additionally, Dr. Berger and Mr. LaMarche are the two members comprising the Board of Directors of AGTI. As part of the formation of AGTI, we entered into certain agreements with AGTI to provide for the operations of AGTI. As a result, conflicts of interest exist in dealings between AGTI and us. AGTI is the exclusive licensee of the ARGENT cell-signaling intellectual property from Harvard University and Stanford University and of related technologies from other universities, and owns the intellectual property on our mTOR inhibitors derived from our ARGENT programs, including AP23573, which is in Phase 2 clinical trials for use in cancer and in development for use in drug delivery stents and other medical devices, and our bone-targeted mTOR inhibitors. Because of the apparent conflicts of interest, the market may be more inclined to perceive the terms of any transaction between us and AGTI as being unfair to us.

***We may not be able to protect our intellectual property relating to our research programs, technologies and products.***

We and our licensors have issued patents and pending patent applications covering research methods useful in drug discovery, new chemical compounds discovered in our drug discovery programs including, among others, AP23573, certain components, configurations and uses of our cell-signaling regulation technologies and products-in-development, methods and materials for manufacturing our products-in-development and other pharmaceutical products and methods and materials for conducting pharmaceutical research. We have a licensing program to generate revenues from the use of our ARGENT cell-signaling regulation technologies and our NF- κ B intellectual property. Pending patent applications may not issue as patents and may not issue in all countries in which we develop, manufacture or sell our products or in countries where others develop, manufacture and sell products using our technologies. In addition, patents issued to us or our licensors may be challenged, as is the case with the Lilly litigation and related PTO proceedings regarding the NF- κ B `516 Patent, and they may be subsequently narrowed, invalidated or circumvented. In that event, such patents may not afford meaningful protection for our technologies or product candidates, which would materially impact our ability to develop and market our product candidates and to generate licensing revenues from our patent portfolio. Certain technologies utilized in our research and development programs are already in the public domain. Moreover, a number of our competitors have developed technologies, filed patent applications or obtained patents on technologies, compositions and methods of use that are related to our business and may cover or conflict with our patent applications, technologies or product candidates. Such conflicts could limit the scope of the patents that we may be able to obtain or may result in the denial of our patent applications. If a third party were to obtain intellectual proprietary protection for any of the foregoing, we may be required to challenge such protection, terminate or modify our programs impacted by such protection or obtain licenses from such third parties, which might not be available or acceptable terms or at all.

-16-

*We may be unable to develop or commercialize our product candidates, if we are unable to obtain or maintain certain licenses on commercial terms or at all.*

We have entered, and will continue to enter, into agreements, either directly or through AGTI, with third parties to test compounds, blood and tissue samples, to perform gene expression analysis and to develop biological tests for use with our product candidates, which testing may yield new inventions and discoveries requiring us to obtain licenses in order to exclusively develop or market new products, alone or in combination with our product candidates, or to develop or market our product candidates for new indications. We have also entered into license agreements for some of our technologies, either directly or through AGTI. We use third parties to test blood and tissue samples and other biological materials in our clinical programs and to develop biological tests, with respect to which we may be required to obtain licenses or pay royalties or other fees in order to commercialize such tests for use with our product candidates. We also use gene sequences or proteins encoded by those sequences and other biological materials in each of our research programs which are, or may become, patented by others and to which we would be required to obtain licenses in order to develop or market our product candidates. Manufacturing of our products may also require licensing biological materials, technologies and intellectual property from third parties. Our inability to obtain any one or more of these licenses, on commercially reasonable terms, or at all, or to circumvent the need for any such license, could cause significant delays and cost increases and materially affect our ability to develop and commercialize our product candidates. Obtaining licenses for these discoveries, materials and technologies may require us to make cumulative royalty payments or other payments to several third parties, potentially reducing amounts paid to us or making the cost of our products commercially prohibitive.

Some of our licenses obligate us to exercise diligence in pursuing the development of product candidates, to make specified milestone payments and to pay royalties. In some instances, we are responsible for the costs of filing and prosecuting patent applications. These licenses generally expire upon the earlier of a fixed term of years after the date of the license or the expiration of the applicable patents, but each license is also terminable by the other party upon default by us of our obligations. Our inability or failure to meet our diligence requirements or make any payments required under these licenses would result in a reversion to the licensor of the rights granted which, with respect to the licenses pursuant to which we have obtained exclusive rights, would materially and adversely affect our ability to develop and market products based on our licensed technologies.

-17-

***Competing technologies may render some or all of our programs or future products noncompetitive or obsolete.***

Many well-known pharmaceutical, healthcare and biotechnology companies, academic and research institutions and government agencies, which have substantially greater capital, research and development capabilities and experience than us or our potential partners, are presently engaged in one or more of the following activities:

·   developing products based on cell signaling, genomics, proteomics, and computational chemistry;

·   conducting research and development programs for the treatment of the various disease indications in which we are focused; and

·   manufacturing, promoting, marketing and selling pharmaceutical or medical device products for treatment of diseases in all of the various disease indications in which we or our current or possible future partners are focused.

Some of these entities already have competitive products on the market or product candidates in clinical trials or in more advanced preclinical studies than we do. By virtue of having or introducing competitive products on the market before us, these entities may gain a competitive advantage. Competing technologies may render some or all of our programs or future products noncompetitive or obsolete, and we may not be able to make the enhancements to our technology necessary to compete successfully with newly emerging technologies. If we are unable to successfully compete in our chosen markets, we will not become profitable.

***If our product candidates are not accepted by patients, physicians and insurers, we will not be successful.***

Our success is dependent on the acceptance of any approved products. Our product candidates may not achieve market acceptance among patients, physicians or third-party payors, even if we obtain necessary regulatory and reimbursement approvals. Physicians and health care payors may conclude that any of our product candidates are not as safe and/or effective as competing therapies or are not as attractive based on a cost/benefit analysis as alternative treatments. Failure to achieve significant market acceptance of our product candidates will harm our business. We believe that recommendations by physicians and health care payors will be essential for market acceptance of any product candidates.

***If we are unable to establish sales, marketing and distribution capabilities or to enter into agreements with third parties to do so, we may be unable to   successfully market and sell any products.***

We are currently establishing a commercial oncology organization, but we have no experience in marketing or selling any products. While we intend to commercialize our product candidates in the United States and to enter into agreements with partner(s) to commercialize our product candidates elsewhere, we may be unable to successfully, directly or indirectly, sell any products that we obtain marketing approval to sell. If we are unable to effectively sell our products, our ability to generate revenues will be materially adversely affected. We may not be able to hire, in a timely manner, the qualified sales and marketing personnel we need, if at all. In addition, we may not be able to enter into any marketing or distribution agreements on acceptable terms, if at all. If we cannot establish sales, marketing and distribution capabilities as we intend, either by developing our own capabilities or entering into agreements with third parties, sales of future products, if any, may be harmed.

*If we develop a product for commercial use, a subsequent product liability-related claim or recall could have an adverse effect on our business.*

Our business exposes us to potential product liability risks inherent in the testing, manufacturing and marketing of pharmaceutical products. Prior to obtaining regulatory approval to market our products, we are required to test such products in human clinical trials at health care institutions pursuant to agreements which indemnify such institutions in case of harm caused to patients by our products. We may not be able to avoid significant product liability exposure resulting from use of our products. A product liability-related claim or recall could be detrimental to our business. In addition, except for insurance covering product use in our clinical trials, we do not currently have any product liability insurance, and we may not be able to obtain or maintain such insurance on acceptable terms, or we may not be able to obtain any insurance to provide adequate coverage against potential liabilities. Our inability to obtain sufficient insurance coverage at an acceptable cost or otherwise to protect against potential product liability claims could prevent or limit the commercialization of any products that we develop.

*Significant additional losses or insufficient funding may cause us to default on certain covenants of our loan documents.*

At December 31, 2005, we had $7.7 million outstanding under a term loan agreement with a bank, pursuant to which we are required to maintain certain financial and non-financial covenants, including minimum cash, cash equivalents and investments of $13  million, a default of any of which would allow the bank to demand payment of its loan. We currently maintain sufficient liquidity to fund payment of this loan if demand for payment were made. However, if we are unable to raise adequate financing to fund continuing operations or otherwise to refinance our loan, we may not be able to maintain compliance with loan covenants, may be required to pay off the loan and may be required to reduce our spending on operations.

**Risks Relating to Governmental Approvals**

*We have limited experience in conducting clinical trials, which may cause delays in commencing and completing clinical trials of our product candidates.*

Clinical trials must meet FDA and foreign regulatory requirements. We have limited experience in designing, conducting and managing the preclinical studies and clinical trials necessary to obtain regulatory approval for our product candidates in any country. We or our collaborative partners may encounter problems in clinical trials that may cause us or the FDA or foreign regulatory agencies to delay, suspend or terminate our clinical trials at any phase. These problems could include the possibility that we may not be able to manufacture sufficient quantities of cGMP materials for use in our clinical trials, conduct clinical trials at our preferred sites, enroll a sufficient number of patients for our clinical trials at one or more sites, or begin or successfully complete clinical trials in a timely fashion, if at all. Furthermore, we, the FDA or foreign regulatory agencies may suspend clinical trials of our product candidates at any time if we or they believe the subjects participating in the trials are being exposed to unacceptable health risks as a result of adverse events occurring in our trials or if we or they find deficiencies in the clinical trial process or conduct of the investigation. With respect to AP23573, the FDA or foreign regulatory agencies may also suspend our clinical trials if we or they believe the subjects participating in the trials are being exposed to unacceptable health risks as a result of adverse events occurring in the trials of medical devices delivering AP23573 sponsored by our medical device partner or future partners. If clinical trials of any of our product candidates fail, we will not be able to market the product candidate which is the subject of the failed clinical trials. The FDA and foreign regulatory agencies could also require additional clinical trials before or after granting of marketing approval for any of our products, which would result in increased costs and significant delays in the development and commercialization of our products and could result in the withdrawal of our products from the market after obtaining marketing approval. Our failure to adequately demonstrate the safety and efficacy of a product candidate in clinical development could delay or prevent obtaining marketing approval of the product candidate and, after obtaining marketing approval, data from post-approval studies could result in the product being withdrawn from the market, either of which would likely have a material adverse effect on our business.

*We may not be able to obtain government regulatory approval to market our product candidates.*

To date, we have not submitted a marketing application for any product candidate to the FDA or any foreign regulatory agency, and none of our product candidates has been approved for commercialization in any country. Prior to commercialization, each product candidate would be subject to an extensive and lengthy governmental regulatory approval process in the United States and in other countries. We or any prospective partners or our medical device partners may not be able to obtain regulatory approval for any product candidates, or even if approval is obtained, the labeling for such products may place restrictions on their use that could materially impact the marketability and profitability of the product subject to such restrictions. Satisfaction of these regulatory requirements, which includes satisfying the FDA and foreign regulatory authorities that the product is both safe and effective for its intended uses, typically takes several years or more depending upon the type, complexity and novelty of the product and requires the expenditure of substantial resources. Uncertainty with respect to meeting the regulatory requirements governing our product candidates may result in excessive costs or extensive delays in the regulatory approval process, adding to the already lengthy review process. If regulatory approval of a product is granted, such approval will be limited to those disease states and conditions for which the product is proven safe and effective, as demonstrated by clinical trials, and may not include all of the indications necessary to successfully market the product. Even though we have obtained orphan drug designation by the FDA and EMEA for AP23573 in bone and soft-tissue sarcomas, this designation may be challenged by others or may prove to be of no practical benefit.

*We will not be able to sell our product candidates if we or our third-party manufacturers fail to comply with FDA manufacturing regulations.*

Before we can begin to commercially manufacture our product candidates, we must either secure manufacturing in an FDA approved manufacturing facility or obtain regulatory approval of our own manufacturing facility and processes. In addition, the manufacturing of our product candidates must comply with cGMP requirements of the FDA and similar requirements of regulatory agencies in other countries. These requirements govern, among other things, quality control and documentation procedures. We, or any third-party manufacturer of our product candidates, may not be able to comply with these requirements, which would prevent us from selling such products. Material changes to the manufacturing processes of our products after approvals have been granted are also subject to review and approval by the FDA or other regulatory agencies. Post approval, such facilities are subject to continuing FDA and foreign regulatory inspections and failure to comply with cGMPs or similar regulations can result in regulatory action up to and including cessation of shipment of product.

*Even if we bring products to market, we may be unable to effectively price our products or obtain adequate reimbursement for sales of our products, which would prevent our products from becoming profitable.*

If we succeed in bringing any product candidates to the market, they may not be considered cost-effective, and coverage and adequate payments may not be available or may not be sufficient to allow us to sell our products on a competitive basis. In both the United States and elsewhere, sales of medical products and treatments are dependent, in part, on the availability of reimbursement from third-party payors, such as health maintenance organizations and other private insurance plans and governmental programs such as Medicare. Third-party payors are increasingly challenging the prices charged for pharmaceutical products and services. Our business is affected by the efforts of government and third-party payors to contain or reduce the cost of health care through various means. In the United States, there have been and will continue to be a number of federal and state proposals to implement government controls on pricing. Similar government pricing controls exist in varying degrees in other countries. In addition, the emphasis on managed care in the United States has increased and will continue to increase the pressure on the pricing of pharmaceutical products. We cannot predict whether any legislative or regulatory proposals will be adopted or the effect these proposals or managed care efforts may have on our business.

**Risks Relating to Our Common Stock**

***Results of our operations, general market conditions for biotechnology stocks and other factors could result in the sudden change in the value of our stock.***

As a biopharmaceutical company, we have experienced significant volatility in our common stock. In 2005, our stock price ranged from a high of $8.75 to a low of $5.23. Factors that can contribute to such volatility may include: results and timing of preclinical studies and clinical trials; evidence of the safety or efficacy of pharmaceutical products; decisions by regulatory agencies that impact or may impact our product candidates; the results and timing of efforts by our partner or future partners to develop stents or other medical devices to deliver AP23573; announcements of new collaborations; announcements of new equity or debt financings; failure to enter into collaborations; our funding requirements; announcements of technological innovations or new therapeutic products; developments relating to intellectual property rights, including licensing, litigation and governmental regulation and, in particular, our litigation with Lilly in the U.S. District Court and reexamination proceedings in the PTO with respect to the `516 Patent; healthcare or cost-containment legislation; general market trends for the biotechnology industry and related high-technology industries; the impact of exchange rates for the U.S. dollar; the impact of changing interest rates and policies of the Federal Reserve; and public policy pronouncements. These and other factors could have a significant impact on the value and volatility of our common stock in future periods.

***Raising additional capital by issuing securities or through collaboration and licensing arrangements may cause dilution to existing stockholders, restrict our operations or require us to relinquish proprietary rights.***

We may seek the additional capital necessary to fund our operations through public or private equity offerings, debt financings, and collaboration and licensing arrangements. To the extent that we raise additional capital through the sale of equity or convertible debt securities, our stockholders' ownership interest will be diluted, and the terms of such securities may include liquidation or other preferences that adversely affect our stockholders' rights. Under an existing loan agreement with a bank, we are required to maintain certain financial and non-financial covenants, including covenants limiting or restricting our ability to incur additional debt or declare dividends. If we raise additional funds through collaboration and licensing arrangements with third parties, we may have to relinquish valuable rights to our technologies or product candidates, or grant licenses on terms that are not favorable to us.

**ITEM 1B:   UNRESOLVED STAFF COMMENTS**

We have received no written comments from the SEC staff regarding our periodic or current reports under the Securities Exchange Act of 1934, as amended, which comments remain unresolved.

**ITEM 2:  PROPERTIES**

We have leased approximately 100,000 square feet (approximately 34,000 square feet currently under sublease to a third party) of laboratory and office space at 26 Landsdowne Street, Cambridge, Massachusetts. The lease originally had a ten-year term, which ended in July of 2002, with two consecutive five-year renewal options. We have extended the lease for the first five-year option period through July 2007. We believe that our currently leased facility will, in large part, be adequate for our research and development activities at least through the year 2007. We believe that any additional space we may require will be available on commercially reasonable terms.

**ITEM 3:  LEGAL PROCEEDINGS**

**NF-ºB Patent Infringement Litigation and Reexamination**

In 2002, we, together with Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research and Harvard University (collectively, the Plaintiffs) filed a lawsuit in the United States District Court for the District of Massachusetts, or the U.S. District Court, against Eli Lilly and Company, hereinafter referred to as Lilly, alleging infringement of certain claims, or the NF- κ B `516 Claims, of the Plaintiffs' U.S. Patent No. 6,410,516, or the `516 Patent covering methods of treating human disease by regulating NF- κ B cell-signaling activity through sales of Lilly's osteoporosis drug, Evista®, and Lilly's septic shock drug, Xigris®, and seeking monetary damages from Lilly.

*Re-examination Proceedings in PTO*

On April 4, 2005, Lilly filed an *ex parte* request in the United States Patent and Trademark Office, or PTO, to reexamine the patentability of certain claims of the `516 Patent. On June 8, 2005, the PTO mailed to counsel for the patentees of the `516 Patent its Order granting a reexamination of all of the claims of the `516 Patent. On August 4, 2005, counsel for the patentees of the `516 Patent filed a Petition requesting the PTO to vacate its Order granting reexamination of the `516 Patent and a Petition requesting the PTO to stay its reexamination, or Patentees' Petitions. On October 6, 2005, the PTO mailed to counsel for the patentees of the `516 Patent its Decision denying Patentees' Petitions, or PTO's October 6 Decision, whereupon, on November 25, 2005, counsel for the patentees filed a Request for Reconsideration of the PTO's October 6 Decision. On February 8, 2006, the PTO mailed to counsel for the patentees of the `516 Patent its Decision granting patentees' Request for Reconsideration and denying the relief sought by patentees thereunder.

In addition, an unrelated third party filed an *ex parte* request in the PTO on December 2, 2005 to reexamine the patentability of certain claims of the `516 Patent, or the Second Request. On December 12, 2005, the PTO mailed to counsel for the patentees of the `516 Patent its Order granting a reexamination based on this Second Request. On February 13, 2006, counsel for the patentees of the `516 Patent filed Petitions requesting the PTO to vacate its Order granting reexamination of the `516 Patent based on this Second Request and requesting the PTO to stay this reexamination.

*Motions to Stay Litigation*

In connection with its request for reexamination of the `516 Patent, Lilly filed a motion in the U.S. District Court on April 4, 2005 requesting a stay of the NF-ºB patent infringement litigation by the Court pending reexamination of the `516 Patent by the PTO. On June 6, 2005, the U.S. District Court denied Lilly's motion. On January 17, 2006, Lilly filed a renewed motion to stay pending reexamination of the `516 Patent by the PTO, which was denied by the U.S. District Court on February 13, 2006.

*Trial and Pre-Trial Motions*

On December 23, 2005, Lilly filed two motions for summary judgment of invalidity**.** At a status conference held on March 9, 2006, the U.S. District Court confirmed that the trial would begin on April 10, 2006 and gave no indication as to when it would rule on the pending summary judgment motions. A pre-trial conference in this case is scheduled for April 5, 2006, with trial scheduled to commence on April 10, 2006.

The ultimate outcome of the request for reexamination and the litigation cannot be determined at this time, and, as a result, no determination can be made with respect to whether the PTO will allow the claims of the `516 Patent in the reexamination proceeding, nor can any determination be made with respect to the validity or infringement of the claims of the `516 Patent in the Lilly litigation, nor can an estimate of a damage award or range of awards in the Lilly litigation, if any, be made. If we prevail at trial in the Lilly litigation, any damages we may be awarded by the jury could be subsequently eliminated or limited by an adverse finding upon appeal or in the event that the claims of the `516 Patent are invalidated by the PTO.

**ITEM 4:       SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS**

No matters were submitted to a vote of security holders during the quarter ended December 31, 2005.

**PART II**

ITEM 5:    **MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**Market Information**

Our common stock is traded on the Nasdaq National Market under the symbol "ARIA". The following table sets forth the high and low sales prices of our common stock as quoted on the Nasdaq National Market for the periods indicated.

| 2005: | High | Low |
|---|---|---|
| First Quarter | $ 8.05 | $ 5.42 |
| Second Quarter | 7.40 | 5.23 |
| Third Quarter | 8.75 | 6.45 |
| Fourth Quarter | 7.73 | 5.52 |
| | | |
| 2004: | | |
| First Quarter | $11.32 | $ 6.96 |
| Second Quarter | 13.74 | 6.75 |
| Third Quarter | 7.50 | 3.70 |
| Fourth Quarter | 7.63 | 5.25 |

On February 28, 2006, the last reported sale price of our common stock was $6.71.

**Stockholders**

The approximate number of holders of record of our common stock as of February 28, 2006 was 480, and the approximate total number of beneficial holders of our common stock as of February 28, 2006 was 39,000.

**Dividends**

We have not declared or paid dividends on our common stock in the past and do not intend to declare or pay such dividends in the foreseeable future. Our long-term debt agreement prohibits the payment of cash dividends.

**Unregistered Sales of Securities**

Not applicable.

**Issuer Purchases of Equity Securities**

Not applicable.

-24-

ITEM 6:   SELECTED FINANCIAL DATA

The selected financial data set forth below as of December 31, 2005, 2004, 2003, 2002 and 2001 and for each of the years then ended have been derived from the audited consolidated financial statements of the Company, of which the financial statements as of December 31, 2005 and 2004 and for the years ended December 31, 2005, 2004 and 2003 are included elsewhere in this Annual Report on Form 10-K, and are qualified by reference to such financial statements. The information set forth below should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the audited consolidated financial statements, and the notes thereto, and other financial information included herein.

|  | Years Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| *In thousands, except share and per share data* | **2005** | **2004** | **2003** | **2002** | **2001** |
| **Consolidated Statements of Operations Data:** | | | | | |
| Revenue | $ 1,217 | $ 742 | $ 660 | $ 67 | $ 4 |
| Operating expenses: | | | | | |
| Research and development | 45,916 | 27,711 | 14,889 | 23,018 | 16,587 |
| General and administrative | 12,261 | 9,442 | 5,547 | 5,718 | 4,469 |
| Operating expenses | 58,177 | 37,153 | 20,436 | 28,736 | 21,056 |
| Loss from operations | (56,960) | ( 36,411) | (19,776) | (28,669) | (21,052) |
| Other income (expense): | | | | | |
| Interest income | 1,900 | 1,110 | 353 | 615 | 1,578 |
| Interest expense | (422) | (272) | (303) | (323) | (285) |
| Other income - tax refund | | | | 534 | |
| Other income (expense), net | 1,478 | 838 | 50 | 826 | 1,293 |
| Net loss | $ (55,482) | $ (35,573) | $ (19,726) | $ (27,843) | $ (19,759) |
| Net loss per share | $ (0.99) | $ (0.69) | $ (0.51) | $ (0.86) | $ (0.68) |
| Weighted average number of shares of common stock outstanding | 56,283,948 | 51,294,160 | 39,036,073 | 32,475,083 | 29,256,767 |

|  | As of December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| *In thousands* | **2005** | **2004** | **2003** | **2002** | **2001** |
| **Consolidated Balance Sheet Data:** | | | | | |
| Cash, cash equivalents and marketable securities | $ 81,516 | $ 75,506 | $ 66,740 | $ 26,850 | $ 47,186 |
| Working capital | 65,971 | 68,874 | 61,587 | 21,126 | 43,249 |
| Total assets | 96,174 | 87,189 | 74,284 | 35,104 | 55,361 |
| Long-term debt | 5,735 | 7,655 | 6,575 | 5,437 | 6,847 |
| Accumulated deficit | (247,098) | (191,616) | (156,043) | (136,317) | (108,474) |
| Stockholders' equity | 71,378 | 67,440 | 59,326 | 21,852 | 43,093 |

**ITEM 7:   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read the following discussion and analysis in conjunction with "Selected Financial Data" and our consolidated financial statements and the related notes included elsewhere in this report.*

**Overview**

We are engaged in the discovery and development of breakthrough medicines to treat cancers by regulating cell signaling with small molecules. We are developing a comprehensive approach to patients with cancer that addresses the greatest medical need - aggressive and advanced-stage cancers for which current treatments are inadequate. Our goal is to build a fully integrated oncology company focused on novel, molecularly targeted therapies to treat solid tumors and hematologic cancers, as well as the spread of primary tumors to distant sites.

Our lead cancer product candidate, AP23573, has been or is being studied in multiple clinical trials in patients with various types of cancers, including sarcomas, hormone refractory prostate cancer, endometrial cancer, brain cancer and leukemias and lymphomas. Medinol Ltd. is also developing stents to deliver AP23573 to prevent reblockage at sites of vascular injury following stent-assisted angioplasty.

We have a focused drug discovery program centered on small-molecule, molecularly targeted therapies and cell-signaling pathways implicated in cancer. We also have an exclusive license to pioneering technology and patents related to certain NF-$\kappa$B cell-signaling activity, which may be useful in treating certain diseases. Additionally, we have developed a proprietary portfolio of cell-signaling regulation technologies, our ARGENT technology, to control intracellular processes with small molecules, which may be useful in the development of therapeutic vaccines and gene and cell therapy products, and which provide versatile tools for applications in cell biology, functional genomics and drug discovery research.

Since our inception in 1991, we have devoted substantially all of our resources to our research and development programs. We receive no revenue from the sale of pharmaceutical products, and most of our revenue to date was received in connection with a joint venture we had with a major pharmaceutical company from 1997 to 1999. Except for the gain on the sale of our fifty percent interest in that joint venture in December 1999, which resulted in net income for fiscal 1999, we have not been profitable since inception. We expect to incur substantial and increasing operating losses for the foreseeable future, primarily due to costs associated with our pharmaceutical product development programs, including costs for clinical trials and product manufacturing, personnel and our intellectual property. We expect that losses will fluctuate from quarter to quarter and that these fluctuations may be substantial. As of December 31, 2005, we had an accumulated deficit of $247.1 million and cash, cash equivalents and marketable securities of $81.5 million and working capital of $66.0 million.

**General**

Our operating losses are primarily due to the costs associated with our pharmaceutical product development programs, personnel and intellectual property protection and enforcement. As our product development programs progress, we incur significant costs for toxicology and pharmacology studies, product development, manufacturing, clinical trials and regulatory support. These costs can vary significantly from quarter to quarter depending on the number of product candidates in development, the stage of development of each product candidate, the number of patients enrolled in and complexity of clinical trials and other factors. Costs associated with our intellectual property include legal fees and other costs to prosecute, maintain, protect and enforce our intellectual property, which can fluctuate from quarter to quarter depending on the status of patent issues being pursued.

Because we currently receive no revenue from the sale of pharmaceutical products and receive only limited license revenue, we have relied primarily on the capital markets as our source of funding. In March 2004 and August 2005, we raised approximately $40.0 million and $57.9 million, respectively, through underwritten public offerings of our common stock. We also utilize long-term debt to supplement our funding, particularly as a means to fund investment in property and equipment and infrastructure needs. In addition, we may seek funding from collaborations with pharmaceutical, biotechnology and/or medical device companies for development and commercialization of our product candidates. These collaborations may take the form of licensing arrangements, co-development or joint venture arrangements or other structures. If funding from these various sources is unavailable on reasonable terms, we may be required to reduce our operating expenses in order to conserve cash and capital by delaying, scaling back or eliminating one or more of our product development programs.

-26-

**Critical Accounting Policies and Estimates**

Our financial position and results of operations are affected by subjective and complex judgments, particularly in the areas of the carrying value of intangible assets, deferred compensation benefits for executives, and stock-based compensation to consultants.

At December 31, 2005, we reported $4.6 million of intangible assets consisting of capitalized costs related primarily to purchased and issued patents, patent applications and licenses, net of accumulated amortization. These costs are being amortized over the estimated useful lives of the underlying patents or licenses. Changes in these lives or a decision to discontinue using the technologies could result in material changes to our balance sheet and statements of operations. For example, during 2005 and 2004, we expensed $43,000 and $87,000, respectively, of unamortized costs related to certain intangible assets which we are not actively pursuing any longer. We have concluded that the carrying value of our remaining intangible assets is not currently impaired because such assets are utilized in our product development programs and/or continue to be viable technologies for collaborations or licensing efforts which we continue to pursue. If we were to abandon the underlying technologies or terminate our efforts to pursue collaborations or license agreements, we may be required to write off a portion of the carrying value of our intangible assets. The net book value as of December 31, 2005 of intangible assets related to our NF-$\kappa$B technology is $456,000. If the patentability of our NF-$\kappa$B patents is successfully challenged and such patents are subsequently narrowed, invalidated or circumvented, we may be required to write off some or all of the net book value related to such technology.

In determining expense related to stock-based compensation to consultants, recorded balances are adjusted at each reporting period to reflect fair value utilizing the Black-Scholes option pricing model that takes into account, among other things, the price and volatility of our common stock, a risk-free discount rate, and an estimate of the life of the option contract. In addition, under our deferred executive compensation plans, we are required to adjust our recorded obligations to our employees on a periodic basis to reflect fair value based on the value of certain underlying mutual funds. Fluctuations in those factors can result in uneven expense charges or credits to our statements of operations. If, for example, the market prices of the underlying securities in our deferred executive compensation plans were 10% higher at December 31, 2005, we would have recognized an additional $133,000 in compensation expense in 2005. Similarly, if the price and volatility of our common stock were 10% greater as of December 31, 2005, we would have recognized an increase of $4,000 in stock-based compensation to consultants in 2005.

**Results of Operations**

*Years Ended December 31, 2005 and 2004*

*Revenue*

We recognized license revenue of $1.2 million for the year ended December 31, 2005 compared to $742,000 for the year ended December 31, 2004. The increase in license revenue was due primarily to a license agreement we signed in January 2005 with Medinol to develop and commercialize stents and other medical devices to deliver our lead product candidate, AP23573, to prevent reblockage of injured vessels following stent-assisted angioplasty.

*Operating Expenses*

*Research and Development Expenses*

Research and development expenses increased by $18.2 million, or 66%, from $27.7 million in 2004 to $45.9 million in 2005. The research and development process necessary to develop a pharmaceutical product for commercialization is subject to extensive regulation by numerous governmental authorities in the United States and other countries. This process typically takes years to complete and requires the expenditure of substantial resources. Current requirements include:

· preclinical toxicology, pharmacology and metabolism studies, as well as *in vivo* efficacy studies in relevant animal models of disease;

· manufacturing of drug product for preclinical studies and clinical trials and ultimately for commercial supply;

· submission of the results of preclinical studies and information regarding manufacturing and control and proposed clinical protocol to the FDA in an Investigational New Drug application, or IND, (or similar filings with regulatory agencies outside the United States);

· conduct of clinical trials designed to provide data and information regarding the safety and efficacy of the product candidate in humans; and

· submission of all the results of testing to the FDA in a New Drug Application, or NDA, (or similar filings with regulatory agencies outside the United States).

Upon approval by the appropriate regulatory authorities, including in some countries approval of product pricing, we may commence commercial marketing and distribution of the product.

We group our research and development, or R&D, expenses into two major categories: direct external expenses and all other R&D expenses. Direct external expenses consist of costs of outside parties to conduct laboratory studies, to develop manufacturing processes and manufacture product candidates, to conduct and manage clinical trials and similar costs related to our clinical and preclinical studies. These costs are accumulated and tracked by product candidate. All other R&D expenses consist of costs to compensate personnel, to purchase lab supplies and services, to lease, operate and maintain our facility, equipment and overhead and similar costs of our research and development efforts. These costs apply to work on our clinical and preclinical candidates as well as our discovery research efforts. These costs are not tracked by product candidate because the number of product candidates and projects in R&D may vary from time to time and because we utilize internal resources across multiple projects at the same time.

Direct external expenses are further categorized as costs for clinical programs and costs for preclinical programs. Preclinical programs include product candidates undergoing toxicology, pharmacology, metabolism and efficacy studies and manufacturing process development required before testing in humans can begin. Product candidates are designated as clinical programs once we have filed an IND with the FDA, or a similar filing with regulatory agencies outside the United States, for the purpose of commencing clinical trials in humans.

Our R&D expenses for 2005 as compared to 2004 were as follows:

| In thousands | Year ended December 31, | | Increase/(decrease) |
| --- | --- | --- | --- |
| | 2005 | 2004 | |
| Direct external expenses: | $        26,311 | $        11,542 | $        14,769 |
| Clinical programs | 1,142 | 3,494 | (2,352) |
| Preclinical programs | 18,463 | 12,675 | 5,788 |
| All other R&D expenses | $        45,916 | $        27,711 | $        18,205 |

AP23573, our lead product candidate which is in Phase 2 clinical trials, was our only clinical program in 2005 and 2004. Direct external expenses for AP23573 increased by $14.8 million in 2005 as compared to 2004 due primarily to increases in clinical trial costs ($10.9 million) and manufacturing-related costs ($3.5 million). In 2005, we continued to enroll patients in our existing clinical trials of AP23573 and initiated new clinical trials in additional disease indications, including prostate and endometrial cancer. The increase in clinical trial costs is directly related to the increased enrollment, the costs of evaluating enrolled patients, the costs of managing the trials, laboratory costs and the costs of compiling and analyzing results obtained in the trials. Manufacturing costs include product and process development work, as well as the costs to produce drug product. Manufacturing costs for AP23573 increased in 2005 as compared to 2004 due to an increase in the quantities of drug product manufactured for the clinical trials and investments in manufacturing process development. Through December 31, 2005, we have incurred a total of approximately $40.4 million in direct external expenses for AP23573 from the date it became a clinical program. We expect that our direct external costs for AP23573 will increase in 2006 as we continue to manage our clinical trials and incur the related costs of manufacturing and other costs to support such trials for this product candidate.

Preclinical programs consist primarily of our oncogenic kinase inhibitor program and our bone-targeted mTOR inhibitor program. Direct external expenses on preclinical programs will increase or decrease over time depending on the status and number of programs in this stage of development and the mix between external and internal efforts applied to such programs. Direct external expenses for preclinical programs decreased by $2.4 million in 2005 as compared to 2004 due primarily to the completion of certain pharmacology and toxicology studies conducted by outside contract laboratories in 2004, as well as expansion of internal efforts on these programs in 2005. We expect that our direct external expenses for preclinical programs will increase in 2006, as resources allow, as we continue to move these programs forward in development.

All other R&D expenses increased by $5.8 million in 2005 as compared to 2004 due to higher personnel and related costs ($2.6 million) as a result of an increase in the number of personnel and salary adjustments, an increase in depreciation and amortization costs related to our property and equipment ($1.9 million) due to the impact of capital improvements and purchases in 2004 and 2005, an increase in laboratory supplies and services ($506,000) related to ongoing development of our clinical and preclinical programs and miscellaneous increases in costs related to our facility, including maintenance and utility costs. We expect that all other R&D expenses will increase in 2006 in support of the expanding activity in our clinical and preclinical programs.

The successful development of our products is uncertain and subject to a number of risks. We cannot be certain that any of our product candidates will prove to be safe and effective or will meet all of the applicable regulatory requirements needed to receive and maintain marketing approval. Data from preclinical studies and clinical trials are susceptible to varying interpretations that could delay, limit or prevent regulatory clearance. We, the FDA or other regulatory authorities may suspend clinical trials at any time if we or they believe that the subjects participating in such trials are being exposed to unacceptable risks or if such regulatory agencies find deficiencies in the conduct of the trials or other problems with our products under development. Delays or rejections may be encountered based on additional governmental regulation, legislation, administrative action or changes in FDA or other regulatory policy during development or the review process. Other risks associated with our product development programs are described in Part I, Item 1A: Risk Factors. Due to these uncertainties, accurate and meaningful estimates of the ultimate cost to bring a product to market, the timing of completion of any of our drug development programs and the period in which material net cash inflows from any of our drug development programs will commence are unavailable.

*General and Administrative Expenses*

General and administrative expenses increased by $2.8 million, or 30%, from $9.4 million in 2004 to $12.3 million in 2005. Professional fees increased by $3.2 million to $7.4 million in 2005 as compared to $4.2 million in 2004 due primarily to costs related to expansion of business and commercial development initiatives and to our patent infringement litigation with Lilly. This increase was offset in part by a decrease in expenses related to a restricted stock grant to our chief executive officer in January 2004 which was fully amortized by December 31, 2004. We expect that our general and administrative expenses will increase in 2006 as necessary to support our research and development programs.

We expect that our operating expenses in total will increase in 2006 for the reasons described above, and such increase could be substantial. In addition, we expect that our R&D expenses and our general and administrative expenses will increase in 2006 due to the adoption of SFAS No. 123(R), *Share-Based Payment* , pursuant to which we will begin to recognize expenses in 2006 related to stock options and other share-based payments to employees. Operating expenses may fluctuate from quarter to quarter. The actual amount of any increase in operating expenses will depend on the progress of our product development programs, including preclinical and clinical studies and product manufacturing, the status of our patent infringement litigation with Lilly and our ability to raise funding through equity offerings, collaborations, licensing, joint ventures or other sources.

### *Interest Income/Expense*

Interest income increased by 71% to $1.9 million in 2005 from $1.1 million in 2004, as a result of higher interest yields from our securities, offset in part by a lower average balance of funds invested in 2005.

Interest expense increased by 55% to $422,000 in 2005 from $272,000 in 2004, as a result of higher interest rates and higher average loan balances in 2005.

### *Operating Results*

We reported a loss from operations of $57.0 million in 2005 compared to a loss from operations of $36.4 million in 2004, an increase in loss of $20.5 million, or 56%. We expect that our loss from operations will increase in 2006 due to the expected increases in R&D expenses and general and administrative expenses described above. Losses may fluctuate depending on the extent to which, if at all, we enter into collaborations or partnerships for one or more of our product candidates or licenses for our technologies. The extent of operating losses will also depend on our ability to raise funds from other sources, such as the capital markets, which will influence the amount we will spend on research and development and the development timelines for our product candidates.

We reported a net loss of $55.5 million in 2005 compared to a net loss of $35.6 million in 2004, an increase in net loss of $19.9 million or 56%, and a net loss per share of $0.99 and $0.69 in 2005 and 2004, respectively.

### Years Ended December 31, 2004 and 2003

#### Revenue

We recognized license revenue of $742,000 for the year ended December 31, 2004 compared to $660,000 for the year ended December 31, 2003. The increase in license revenue was due to license agreements into which we entered during this period related to our NF-$\kappa$B technology and our ARGENT cell-signaling regulation technology.

#### Operating Expenses

#### Research and Development Expenses

R&D expenses increased by $12.8 million, or 86%, from $14.9 million in 2003 to $27.7 million in 2004. Our R&D expenses for 2004 as compared to 2003 were as follows:

| In thousands | Year ended December 31, | | Increase/(decrease) |
|---|---|---|---|
| | 2004 | 2003 | |
| Direct external expenses: | | | |
| Clinical programs | $ 11,542 | $ 2,540 | $ 9,002 |
| Preclinical programs | 3,494 | 1,246 | 2,248 |
| All other R&D expenses | 12,675 | 11,103 | 1,572 |
| | $ 27,711 | $ 14,889 | $ 12,822 |

AP23573 was our only clinical program in 2004 and 2003. Direct external expenses for AP23573 increased by $9.0 million in 2004 as compared to 2003 due primarily to increases in clinical trial costs ($3.3 million) and manufacturing-related costs ($4.6 million). In 2004, we continued to manage our ongoing Phase 1 trials of AP23573, initiated additional Phase 1 trials and commenced enrollment of patients in Phase 2 trials. The increase in clinical trial costs is directly related to the initiation of trials, increased enrollment, the costs of evaluating enrolled patients, the costs of managing the trials, laboratory costs and the costs of compiling and analyzing results obtained in the trials. Manufacturing costs include product and process development work, as well as the costs to produce drug product. Manufacturing costs for AP23573 increased significantly in 2004 due to an increase in the quantities of drug product manufactured for the clinical trials and investments in manufacturing process development.

Preclinical programs consist primarily of our oncogenic kinase inhibitor program and our bone-targeted mTOR inhibitor program. Direct external expenses on preclinical programs will increase or decrease over time depending on the status and number of programs in this stage of development. Direct external expenses for preclinical programs increased by $2.2 million in 2004 as compared to 2003 due to pharmacology and toxicology studies conducted by outside contract laboratories, particularly in the first half of 2004, as well as product and process development efforts for these product candidates.

All other R&D expenses increased by $1.6 million in 2004 as compared to 2003 due to higher personnel and related costs ($1.4 million) as a result of an increase in the number of personnel and salary adjustments, and miscellaneous increases in supplies, consulting fees, equipment maintenance costs and travel-related expenses in support of our research and development programs. Increases in these expenses were partially offset by decreases in write-offs of capitalized license and patent costs ($433,000) and termination or buy-out of equipment leases in 2003 ($229,000).

*General and Administrative Expenses*

General and administrative expenses increased 70% to $9.4 million in 2004 from $5.5 million in 2003. Professional fees increased by $2.3 million to $4.2 million in 2004 as compared to $1.9 million in 2003 due primarily to costs related to our patent infringement litigation with Lilly and to business development and other corporate initiatives, including compliance with the internal control requirements of the Sarbanes-Oxley Act of 2002. The increase in general and administrative expenses was also due to the awarding in January 2004 of restricted stock grants, to our chief executive officer and each of the other members of our Board of Directors. In 2004, we recorded an expense of $1.3 million related to these awards. Other increases in general and administrative expenses included salary adjustments, the cost of awards under our deferred executive compensation plan, and miscellaneous increases in insurance, state taxes and travel-related expenses.

*Interest Income/Expense*

Interest income increased by 214% to $1.1 million in 2004 from $353,000 in 2003, primarily as a result of a higher level of funds invested in 2004.

Interest expense decreased by 10% to $272,000 in 2004 from $303,000 in 2003, primarily as a result of lower average loan balances in 2004.

*Operating Results*

We reported a loss from operations of $36.4 million in 2004 compared to a loss from operations of $19.8 million in 2003, an increase in loss of $16.6 million, or 84%.

We reported a net loss of $35.6 million in 2004 compared to a net loss of $19.7 million in 2003, an increase in net loss of $15.9 million or 80%, and a net loss per share of $0.69 and $0.51 in 2004 and 2003, respectively.

**Selected Quarterly Financial Data**

Summarized unaudited quarterly financial data are as follows:

| *In thousands, except per share amounts* | 2005 Quarters | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **First** | | **Second** | | **Third** | | **Fourth** | |
| Total license revenue | $ | 304 | $ | 350 | $ | 321 | $ | 242 |
| Net loss | | (12,346) | | (14,083) | | (14,594) | | (14,459) |
| Net loss per share | | (0.23) | | (0.27) | | (0.25) | | (0.23) |

| | 2004 Quarters | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **First** | | **Second** | | **Third** | | **Fourth** | |
| Total license revenue | $ | 190 | $ | 188 | $ | 185 | $ | 179 |
| Net loss | | (6,235) | | (9,245) | | (9,379) | | (10,714) |
| Net loss per share | | (0.13) | | (0.18) | | (0.18) | | (0.20) |

**Liquidity and Capital Resources**

We have financed our operations and investments primarily through offerings of our common stock and, to a lesser extent, through issuances of our common stock pursuant to our stock option and employee stock purchase plans, supplemented by the issuance of long-term debt. We sell securities and incur debt when the terms of such transactions are deemed favorable by us and as necessary to fund our current and projected cash needs. We seek to balance the level of cash, cash equivalents and marketable securities on hand with our projected needs and to allow us to withstand periods of uncertainty relative to the availability of funding on favorable terms.

*Sources of Funds*

During the years ended December 31, 2005, 2004 and 2003, our sources of funds were as follows:

| In thousands | Year ended December 31, | | |
| --- | --- | --- | --- |
| | 2005 | 2004 | 2003 |
| Sales/issuances of common stock: | | | |
| In common stock offerings | $ 57,860 | $ 40,001 | $ 56,180 |
| Pursuant to stock option and employee stock purchase plans | 970 | 2,382 | 964 |
| Proceeds from long-term borrowings | - | 3,000 | 9,500 |
| | $ 58,830 | $ 45,383 | $ 66,644 |

The amount of funding we raise through sales of our common stock depends on many factors, including, but not limited to, the status and progress of our product development programs, projected cash needs, availability of funding from other sources, our stock price and the status of the capital markets. In 2003, we completed three offerings of our common stock and realized net proceeds of $56.2 million. In 2004 and 2005, we completed underwritten offerings of our common stock for net proceeds of $40.0 million and $57.9 million, respectively. The following table details our common stock offerings in 2003, 2004 and 2005:

| | Number of Shares | Price Per Share | Net Cash Proceeds |
| --- | --- | --- | --- |
| | | | In thousands |
| **2003** | | | |
| May | 4,000,000 | $ 2.50 | $ 9,338 |
| October | 6,438,113 | 6.35 | 38,094 |
| December | 1,175,375 | 8.00 | 8,748 |
| | 11,613,488 | | $ 56,180 |
| **2004** | | | |
| March | 5,060,000 | 8.50 | $ 40,001 |
| | | | |
| **2005** | | | |
| August | 8,625,000 | 7.20 | $ 57,860 |

We have filed shelf registration statements with the SEC, from time to time, to ensure that we have registered shares of our common stock available for sale, giving us the opportunity to raise funding when terms are favorable. On December 19, 2003, we filed a shelf registration statement with the SEC for the issuance of up to 7,000,000 shares of our common stock, which was declared effective on January 9, 2004. As of December 31, 2005, after selling 5,060,000 of these shares in our March 2004 offering, we have 1,940,000 shares available for issuance under this shelf registration. On February 18, 2005, we filed another shelf registration statement with the SEC which was amended on March 11, 2005 for the issuance of up to 9,500,000 shares of our common stock. This filing was declared effective on March 14, 2005. As of December 31, 2005, after selling 8,625,000 of these shares in our August 2005 offering, we have 875,000 shares available for issuance under this shelf registration.

In March 2003, we entered into a term loan agreement with a bank for $7.5 million, the proceeds of which were used to repay existing long-term debt, to pay off our obligations under certain operating leases for equipment and for general working capital purposes. The loan is secured by all of our assets excluding intellectual property, which we have agreed not to pledge to any other party. The loan carries interest at the bank's prime rate or LIBOR plus 2%. We amended the terms of the loan on December 31, 2003 and December 31, 2004, receiving another $2.0 million and $3.0 million, respectively, in loan proceeds. The amended loan is payable in monthly installments of $160,000 plus interest beginning in January 2005 with a final payment of $3.5 million due in March 2008. The terms of the loan require us to maintain at least $13.0 million in unrestricted cash, cash equivalents and investments. The agreement also contains certain covenants that restrict additional indebtedness, additional liens, and sales of assets, and dividends, distributions or repurchases of common stock. The balance outstanding as of December 31, 2005 was $7,655,000.

*Uses of Funds*

The primary uses of our cash are to fund our operations and working capital requirements and, to a lesser degree, to repay our long-term borrowings and invest in intellectual property and property and equipment as needed for our business. Our uses of cash during the years ended December 31, 2005, 2004 and 2003 were as follows:

| | Year ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| *In thousands* | **2005** | | **2004** | | **2003** | |
| Net cash used in operating activities | $ | 44,556 | $ | 31,559 | $ | 18,014 |
| Repayment of long-term borrowings | | 1,920 | | 1,800 | | 8,040 |
| Investment in intangible assets | | 675 | | 730 | | 507 |
| Investment in property and equipment | | 6,538 | | 2,743 | | 307 |
| | $ | 53,689 | $ | 36,832 | $ | 26,868 |

The net cash used in operating activities is comprised of our net losses and working capital requirements. As noted above, our net loss increased in 2004 and 2005 due primarily to the increased costs of advancing our product candidates through preclinical and clinical phases of development. Also as noted above, we expect that our loss from operations will increase in 2006 due to continued progress in development of our product candidates, and we expect that our net cash used in operations will increase accordingly. We expect that our investment in intangible assets, consisting of our intellectual property, will increase in 2006 in support of our product development activities. Our investment in property and equipment increased in 2005 primarily due to a renovation project to create more useable space in our facility and an upgrade to our information technology infrastructure. We expect that our investment in property and equipment will decrease in 2006.

-34-

**Contractual Obligations**

We have substantial fixed contractual obligations under various research and licensing agreements, consulting and employment agreements, lease agreements and long-term debt instruments. These contractual obligations were comprised of the following as of December 31, 2005:

| *In thousands* | | Payments Due By Period | | | |
|---|---|---|---|---|---|
| | Total | In 2006 | 2007 through 2009 | 2010 through 2011 | After 2011 |
| Long-term debt | $ 7,655 | $ 1,920 | $ 5,735 | $ | $ |
| Operating leases | 871 | 550 | 321 | | |
| Other long-term obligations | 14,948 | 4,800 | 8,527 | 1,226 | 395 |
| | $ 23,474 | $ 7,270 | $ 14,583 | $ 1,226 | $ 395 |

Long-term debt consists of scheduled principal payments on such debt. Interest on our long-term debt is based on variable interest rates. Assuming a constant interest rate of 6.28%, our average interest rate on our debt at December 31, 2005, over the remaining term of the debt, our interest expense would total approximately $420,000 in 2006 and $357,000 in the period 2007 through 2009.

Other long-term obligations are comprised primarily of employment agreements, obligations under our deferred executive compensation plans and license agreements. The license agreements generally provide for payment by us of annual license fees, milestone payments and royalties upon successful commercialization of products. All license agreements are cancelable by us. The above table reflects remaining license fees for the lives of the agreements but excludes milestone and royalty payments, as such amounts are not probable or estimable at this time.

**Liquidity**

At December 31, 2005, we had cash, cash equivalents and marketable securities totaling $81.5 million and working capital of $66.0 million, compared to cash, cash equivalents and marketable securities totaling $75.5 million and working capital of $68.9 million at December 31, 2004.

We will require substantial additional funding for our research and development programs, including preclinical development and clinical trials, for operating expenses including intellectual property protection and enforcement, for the pursuit of regulatory approvals, and for establishing manufacturing, marketing and sales capabilities. In order to fund our needs, we may (1) sell common stock through public or private offerings as market conditions permit, (2) enter into partnerships for our product candidates, and/or (3) license our cell-signaling technologies, including our ARGENT and NF-ºB intellectual property. We have available 2,815,000 shares of our common stock under currently effective shelf registration statements, which may be sold to raise funding.

We believe that our cash, cash equivalents and marketable securities should be sufficient to satisfy our capital and operating requirements into mid 2007. However, there are numerous factors that are likely to affect our spending levels, including the timing of the start of the initial registration trial for AP23573, the timing of product and process development work for AP23573, the manufacture of drug product for clinical trials and potential product launch, if approved, developments in our ongoing clinical trials, the timing and terms of a partnership, if any, to commercialize AP23573 outside of the U.S., the status of our in-house efforts to prepare for the potential launch of AP23573 in the U.S., the progress of our preclinical programs, and developments in our NF- κ B litigation, among other factors. These variables could result in earlier depletion of our current funds. In any event, we expect to need additional funding in order to pursue our business plan, which we will seek to raise through the sale of additional securities, collaborative partnerships, and possible additional credit arrangements. There can be no assurance, however, that adequate resources will be available when needed or on terms acceptable to us.

**Recently Issued Accounting Pronouncements**

In December 2004, the Financial Accounting Standards Board, or FASB, issued SFAS No. 123(R), *Share-Based Payment*, which revised SFAS No. 123 and superseded APB Opinion No. 25, *Accounting for Stock Issued to Employees* . SFAS No. 123(R) requires that companies recognize compensation expense associated with grants of stock options and other equity instruments to employees in the financial statements, effective as of the first annual reporting period that begins after June 15, 2005. Compensation cost will be measured based on the fair value of the instrument on the grant date and will be recognized over the vesting period. This pronouncement applies to all grants after the effective date and to the unvested portion of stock options outstanding as of the effective date. SFAS No. 123(R) eliminates the ability to account for such transactions using the intrinsic method currently used by us. We are required to adopt SFAS No. 123(R) as of January 1, 2006. We expect to adopt SFAS 123(R) using the modified prospective application method. Assuming the continuation of current programs, our estimate of stock compensation expense for 2006 is in the range of $4.5 million to $5.0 million. SFAS No. 123(R) also requires that companies recognize compensation expense associated with purchases of shares of common stock by employees at a discount to market value under employee stock purchase plans that meet certain criteria. The impact of this requirement on the Company's consolidated financial statements is not expected to be material.

## ITEM 7A:   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We invest our available funds in accordance with our investment policy to preserve principal, maintain proper liquidity to meet operating needs and maximize yields. Our investment policy specifies credit quality standards for our investments and limits the amount of credit exposure to any single issue, issuer or type of investment.

We invest cash balances in excess of operating requirements first in short-term, highly liquid securities, with original maturities of 90 days or less, and money market accounts. Depending on our level of available funds and our expected cash requirements, we may invest a portion of our funds in marketable securities, consisting generally of corporate debt and U.S. government and agency securities. Maturities of our marketable securities are generally limited to periods necessary to fund our liquidity needs and may not in any case exceed three years. These securities are classified as available-for-sale. Available-for-sale securities are recorded on the balance sheet at fair market value with unrealized gains or losses reported as a separate component of stockholders' equity (accumulated other comprehensive income or loss). Realized gains and losses on marketable security transactions are reported on the specific-identification method. Interest income is recognized when earned. A decline in the market value of any available-for-sale security below cost that is deemed other than temporary results in a charge to earnings and establishes a new cost basis for the security.

Our investments are sensitive to interest rate risk. We believe, however, that the effect, if any, of reasonably possible near-term changes in interest rates on our financial position, results of operations and cash flows generally would not be material due to the current short-term nature of these investments. In particular, at December 31, 2005, because our available funds were invested solely in cash equivalents and short-term marketable securities with maturities of 12 months or less, our risk of loss due to changes in interest rates is not material.

We have an executive compensation plan which provides participants an option to purchase certain designated mutual funds at a discount. These deferred compensation arrangements are accounted for as derivatives under SFAS No. 133. The fair value of the derivatives is reflected as a liability on our balance sheet. Effective October 1, 2005, we adopted a new executive compensation plan that defers the payment of annual bonus awards to future periods as specified in each award. We accrue a liability based on the fair value of the awards ratably over the vesting period. The fair value of such awards is increased or decreased based on the actual total return of certain underlying mutual funds. As of December 31, 2005, in the event of a hypothetical 10% increase (decrease) in the fair market value of the underlying mutual funds, we would incur approximately $133,000 of additional (reduced) compensation expense.

At December 31, 2005, we had $7.7 million outstanding under a bank term note which bears interest at prime or, alternatively, LIBOR +2%. This note is sensitive to changes in interest rates. In the event of a hypothetical 10% increase in the interest rate on which the loan is based (63 basis points at December 31, 2005), we would incur approximately $42,000 of additional interest expense in 2006.

**Certain Factors That May Affect Future Results of Operations**

The SEC encourages companies to disclose forward-looking information so that investors can better understand a company's future prospects and make informed investment decisions. This Annual Report on Form 10-K contains such "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These statements may be made directly in this Annual Report, and they may also be made a part of this Annual Report by reference to other documents filed with the SEC, which is known as "incorporation by reference."

Such statements in connection with any discussion of future operating or financial performance may be identified by use of words such as "may," "anticipate," "estimate," "expect," "project," "intend," "plan," "believe," and other words and terms of similar meaning. Such statements are based on management's expectations and are subject to certain factors, risks and uncertainties that may cause actual results, outcome of events, timing and performance to differ materially from those expressed or implied by such forward-looking statements. These risks include, but are not limited to, risks and uncertainties regarding our ability to accurately estimate the timing and actual R&D expenses and other costs associated with the preclinical and clinical development and manufacture of our product candidates, the adequacy of our capital resources and the availability of additional funding, risks and uncertainties regarding our ability to manufacture or have manufactured our product candidates on a commercial scale, risks and uncertainties regarding our ability to successfully enroll and conduct clinical studies of product candidates, risks and uncertainties that clinical trial results at any phase of development may be adverse or may not be predictive of future results or lead to regulatory approval of any of our or any partner's product candidates, risks and uncertainties of third-party intellectual property claims relating to our and any partner's product candidates, and risks and uncertainties relating to regulatory oversight, the timing, scope, cost and outcome of legal proceedings, including litigation concerning our NF-$\kappa$B patent portfolio, future capital needs, key employees, dependence on collaborators and manufacturers, markets, economic conditions, products, services, prices, reimbursement rates, competition and other factors. Please also see the discussion under Part I, Item 1A: Risk Factors appearing elsewhere in this Annual Report for more details regarding these and other risks.

In light of these assumptions, risks and uncertainties, the results and events discussed in the forward-looking statements contained in this Annual Report or in any document incorporated by reference might not occur. Stockholders are cautioned not to place undue reliance on the forward-looking statements, which speak only as of the date of this report or the date of the document incorporated by reference in this Annual Report. We are not under any obligation, and we expressly disclaim any obligation, to update or alter any forward-looking statements, whether as a result of new information, future events or otherwise. All subsequent forward-looking statements attributable to us or to any person acting on our behalf are expressly qualified in their entirety by the cautionary statements contained or referred to in this section.

**ITEM 8: FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of
ARIAD Pharmaceuticals, Inc.:

We have audited the accompanying consolidated balance sheets of ARIAD Pharmaceuticals, Inc. and subsidiaries (the "Company") as of December 31, 2005 and 2004, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2005. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of ARIAD Pharmaceuticals, Inc. and subsidiaries as of December 31, 2005 and 2004, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2005, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of the Company's internal control over financial reporting as of December 31, 2005, based on the criteria established in Internal Control--Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission, and our report dated March 13, 2006 expressed an unqualified opinion on management's assessment of the effectiveness of the Company's internal control over financial reporting and an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

/s/ DELOITTE & TOUCHE LLP

Boston, Massachusetts
March 13, 2006

-38-

ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS

| *In thousands, except share and per share data* | December 31, | |
| --- | --- | --- |
| | 2005 | 2004 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 25,453 | $ 18,556 |
| Marketable securities | 56,063 | 56,950 |
| Inventory and other current assets | 2,225 | 1,965 |
| Total current assets | 83,741 | 77,471 |
| Property and equipment: | | |
| Leasehold improvements | 17,840 | 12,693 |
| Equipment and furniture | 9,908 | 6,525 |
| Construction in progress | | 2,049 |
| Total | 27,748 | 21,267 |
| Less accumulated depreciation and amortization | (20,022) | (18,031) |
| Property and equipment, net | 7,726 | 3,236 |
| Intangible and other assets, net | 4,707 | 6,482 |
| Total assets | $ 96,174 | $ 87,189 |

| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| --- | --- | --- |
| Current liabilities: | | |
| Accounts payable | $ 3,961 | $ 2,129 |
| Current portion of long-term debt | 1,920 | 1,920 |
| Accrued compensation and benefits | 497 | 310 |
| Accrued product development expenses | 8,444 | 2,934 |
| Other accrued expenses | 2,097 | 591 |
| Current portion of deferred revenue | 851 | 713 |
| Total current liabilities | 17,770 | 8,597 |
| Long-term debt | 5,735 | 7,655 |
| Deferred revenue | 24 | 404 |
| Deferred executive compensation | 1,267 | 3,093 |
| Commitments, contingent liabilities and minority interest (Note 1, 6, 7, 10) | | |
| Stockholders' equity: | | |
| Preferred stock, authorized, 10,000,000 shares, none issued and outstanding | | |
| Common stock, $.001 par value, authorized, 145,000,000 shares, issued and | | |
| outstanding, 61,698,129 shares in 2005, 52,688,673 shares in 2004 | 62 | 53 |
| Additional paid-in capital | 318,684 | 259,122 |
| Deferred compensation | (246) | (58) |
| Accumulated other comprehensive loss | (24) | (61) |
| Accumulated deficit | (247,098) | (191,616) |
| Total stockholders' equity | 71,378 | 67,440 |
| Total liabilities and stockholders' equity | $ 96,174 | $ 87,189 |

See notes to consolidated financial statements.

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
| *In thousands, except share and per share data* | **2005** | **2004** | **2003** |
| License revenue | $ 1,217 | $ 742 | $ 660 |
| Operating expenses: | | | |
| Research and development | 45,916 | 27,711 | 14,889 |
| General and administrative | 12,261 | 9,442 | 5,547 |
| Operating expenses | 58,177 | 37,153 | 20,436 |
| Loss from operations | (56,960) | (36,411) | (19,776) |
| Other income (expense): | | | |
| Interest income | 1,900 | 1,110 | 353 |
| Interest expense | (422) | (272) | (303) |
| Other income, net | 1,478 | 838 | 50 |
| Net loss | $ (55,482) | $ (35,573) | $ (19,726) |
| Net loss per share | $ (0.99) | $ (0.69) | $ (0.51) |
| Weighted average number of shares of common stock outstanding | 56,283,948 | 51,294,160 | 39,036,073 |

See
See   See notes to consolidated financial statements.

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**For the Years Ended December 31, 2003, 2004 and 2005**

| *In thousands, except share data* | Common Stock | | Additional Paid-in Capital | Deferred Compensati | Accumulated Other Comprehensive Income (Loss) | Accumulate Deficit | Shareholder Equity |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | |
| Balance, December 31, 2002 | 34,828,689 $ | 35 $ | 158,147 $ | (13) $ | -- $ | (136,317) $ | 21,852 |
| Issuance of common stock, net of issuance costs | 11,613,488 | 12 | 56,168 | | | | 56,180 |
| Issuance of shares pursuant to ARIAD stock plans | 374,855 | | 964 | | | | 964 |
| Stock-based compensation to consultants | | | 64 | (64) | | | |
| Amortization of stock-based compensation | | | | 55 | | | 55 |
| Comprehensive loss: | | | | | | | |
| Net loss | | | | | | (19,726) | (19,726) |
| Other comprehensive income (loss) | | | | | | | |
| Net unrealized losses on marketable securities | | | | | 1 | | 1 |
| Comprehensive loss | | | | | | | (19,725) |
| Balance, December 31, 2003 | 46,817,032 | 47 | 215,343 | (22) | 1 | (156,043) | 59,326 |
| Issuance of common stock, net of issuance costs | 5,060,000 | 5 | 39,996 | | | | 40,001 |
| Issuance of shares pursuant to ARIAD stock plans | 811,641 | 1 | 3,689 | | | | 3,690 |
| Stock-based compensation to consultants | | | 94 | (94) | | | |
| Amortization of stock-based compensation | | | | 58 | | | 58 |
| Comprehensive loss: | | | | | | | |
| Net loss | | | | | | (35,573) | (35,573) |
| Other comprehensive income (loss) | | | | | | | |
| Net unrealized gains on marketable securities | | | | | (62) | | (62) |
| Comprehensive loss | | | | | | | (35,635) |
| Balance, December 31, 2004 | 52,688,673 | 53 | 259,122 | (58) | (61) | (191,616) | 67,440 |
| Issuance of common stock, net of issuance costs | 8,625,000 | 9 | 57,851 | | | | 57,860 |
| Issuance of shares pursuant to ARIAD stock plans | 384,456 | | 1,512 | | | | 1,512 |
| Stock-based compensation to consultants | | | 213 | (213) | | | |
| Amortization of stock-based compensation | | | (14) | 25 | | | 11 |
| Comprehensive loss: | | | | | | | |
| Net loss | | | | | | (55,482) | (55,482) |
| Other comprehensive income (loss) | | | | | | | |
| Net unrealized losses on marketable securities | | | | | 37 | | 37 |
| Comprehensive loss | | | | | | | (55,445) |
| Balance, December 31, 2005 | 61,698,129 $ | 62 $ | 318,684 $ | (246) $ | (24) $ | (247,098) $ | 71,378 |

See notes to consolidated financial statements.

ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Years Ended December 31, | | |
|---|---|---|---|
| *In thousands* | **2005** | **2004** | **2003** |
| **Cash flows from operating activities:** | | | |
| Net loss | $ (55,482) | $ (35,573) | $ (19,726) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization | 1,970 | 911 | 1,602 |
| Stock-based compensation | 554 | 1,366 | 55 |
| Deferred executive compensation expense | 374 | 800 | 444 |
| Increase (decrease) from: | | | |
| Inventory and other current assets | (260) | (1,431) | 313 |
| Other assets | 6 | 15 | 21 |
| Accounts payable | 1,832 | 1,376 | (1,391) |
| Accrued compensation and benefits | 187 | (156) | 67 |
| Accrued product development expenses | 5,510 | 2,054 | (126) |
| Other accrued expenses | 1,506 | (454) | (265) |
| Deferred revenue | (242) | (216) | 1,100 |
| Deferred executive compensation paid | (511) | (251) | (108) |
| Net cash used in operating activities | (44,556) | (31,559) | (18,014) |
| **Cash flows from investing activities:** | | | |
| Acquisitions of marketable securities | (58,888) | (58,259) | (32,296) |
| Proceeds from sales and maturities of marketable securities | 60,644 | 16,590 | 17,344 |
| Investment in property and equipment | (6,538) | (2,743) | (307) |
| Investment in intangible assets | (675) | (730) | (507) |
| Net cash used in investing activities | (5,457) | (45,142) | (15,766) |
| **Cash flows from financing activities:** | | | |
| Proceeds from long-term debt borrowings | | 3,000 | 9,500 |
| Repayment of long-term debt borrowings | (1,920) | (1,800) | (8,040) |
| Proceeds from issuance of common stock, net of issuance costs | 57,860 | 40,001 | 56,180 |
| Proceeds from issuance of common stock pursuant to stock option and purchase plans | 970 | 2,382 | 964 |
| Net cash provided by financing activities | 56,910 | 43,583 | 58,604 |
| Net increase (decrease) in cash and cash equivalents | 6,897 | (33,118) | 24,824 |
| Cash and cash equivalents, beginning of year | 18,556 | 51,674 | 26,850 |
| Cash and cash equivalents, end of year | $ 25,453 | $ 18,556 | $ 51,674 |
| | | | |
| Interest paid, net of amounts capitalized | $ 333 | $ 273 | $ 256 |

See notes to consolidated financial statements.

-42-

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1.  Nature of Business and Summary of Significant Accounting Policies**

*Nature of Business*

The Company is engaged in the discovery and development of breakthrough medicines to treat cancers by regulating cell signaling with small molecules. The Company is developing a comprehensive approach to patients with cancer that addresses the greatest medical need - aggressive and advanced-stage cancers for which current treatments are inadequate. The Company's goal is to build a fully integrated oncology company focused on novel, molecularly targeted therapies to treat solid tumors and hematologic cancers, as well as the spread of primary tumors to distant sites. The Company's lead cancer product candidate, AP23573, has been or is being studied in multiple clinical trials in patients with various types of cancers, including sarcomas, hormone refractory prostate cancer, endometrial cancer, brain cancer and leukemias and lymphomas. Medinol Ltd. is also developing stents to deliver AP23573 to prevent reblockage at sites of vascular injury following stent-assisted angioplasty.

The Company has a focused drug discovery program centered on small molecule, molecularly targeted therapies and cell-signaling pathways implicated in cancer. The Company also has an exclusive license to pioneering technology and patents related to certain NF-$\kappa$B cell-signaling activity, which may be useful in treating certain diseases. Additionally, the Company has developed a proprietary portfolio of cell-signaling regulation technologies, the Company's ARGENT technology, to control intracellular processes with small molecules, which may be useful in the development of therapeutic vaccines and gene and cell therapy products, and which provide versatile tools for use in cell biology, functional genomics and drug discovery research.

*Principles of Consolidation*

The consolidated financial statements include the accounts of ARIAD Pharmaceuticals, Inc., its wholly-owned subsidiaries, ARIAD Corporation and ARIAD Pharma S.A., and its 80%-owned subsidiary ARIAD Gene Therapeutics, Inc. ("AGTI") (Note 7). The Company's research and development relating to product candidates based on its ARGENT cell-signaling regulation technology and its small molecule mTOR inhibitors derived from the ARGENT programs are conducted on behalf of AGTI. Intercompany accounts and transactions have been eliminated in consolidation. AGTI is a research and development company and its accumulated deficit exceeds its total paid-in capital at December 31, 2005. Because the Company funds all losses of AGTI and the minority interest holders of AGTI common stock are not obligated to fund such losses, no minority interest income/gain or asset is recorded in the Company's consolidated financial statements.

*Fair Value of Financial Instruments*

The carrying amounts of cash, cash equivalents, accounts payable and accrued liabilities approximate fair value because of their short-term nature. Marketable securities are recorded in the consolidated financial statements at aggregate fair value (Note 2). The carrying amount of the Company's bank term note of $7.7 million at December 31, 2005 approximates fair value due to its variable interest rate (Note 4). The Company's obligation under its executive compensation plans (Note 5) is based in part on the current fair market value of underlying securities, which is therefore stated at its estimated current fair value.

-43-

*Accounting Estimates*

The preparation of the consolidated financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts and disclosure of assets and liabilities at the date of the consolidated financial statements and the reported amounts and disclosure of revenue and expenses during the reporting period. Actual results could differ from those estimates.

*Cash Equivalents*

Cash equivalents include short-term, highly liquid investments, which consist principally of United States government and agency securities, purchased with remaining maturities of 90 days or less, and money market accounts.

*Marketable Securities*

The Company has classified its marketable securities as "available-for-sale" and, accordingly, carries such securities at aggregate fair value. The difference between fair value and original cost is reflected as a component of accumulated other comprehensive income (loss). Fair value has been determined based on quoted market prices, in a dealer market, at the closing bid for each individual security held.

*Inventory*

Inventory consists of bulk pharmaceutical material to be used for multiple development programs. Inventories are carried at cost using the first-in, first-out method and are charged to research and development expense when consumed. The carrying value of inventory amounted to $1.7 million and $1.3 million at December 31, 2005 and 2004, respectively.

*Property and Equipment*

Property and equipment are recorded at cost. Depreciation is recorded using the straight-line method over the estimated useful lives of the assets (3 to 10 years). Leasehold improvements are amortized over the shorter of their useful lives or lease term using the straight-line method (4 to 10 years). Costs classified as construction in progress are accumulated and are not amortized or depreciated until placed in service. The Company capitalized approximately $42,000 of interest costs related to construction in progress in 2005. No interest was capitalized in 2004 or 2003.

*Intangible and Other Assets*

Intangible and other assets consist primarily of capitalized patent and license costs, deposits and the unvested portion of the fair value of certain outstanding grants under the Company's executive compensation plan (Note 5). The cost of purchased patents and patent applications, costs incurred in filing patents and certain license fees are capitalized. Capitalized costs related to issued patents are amortized over a period not to exceed seventeen years or the remaining life of the patent, whichever is shorter, using the straight-line method. Capitalized license fees are amortized over the periods to which they relate. In addition, capitalized costs are expensed when it becomes determinable that such patent applications or technology will not be pursued.

-44-

*Impairment of Long-Lived Assets*

The Company reviews its long-lived assets, including the above-mentioned intangible assets, for impairment when events or changes in circumstances indicate that the carrying amount of a long-lived asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to future net cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets.

*Revenue Recognition*

The Company recognizes revenue in accordance with the Securities and Exchange Commission ("SEC") Staff Accounting Bulletin ("SAB") No. 101, *Revenue Recognition in Financial Statements,* SAB No. 104, *Revenue Recognition* , and Emerging Issues Task Force ("EITF"), No. 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables.* Revenue is principally comprised of license fees received under agreements that provide the licensee with access to and/or the right to review and evaluate certain technology owned or controlled by the Company. Upfront and annual license fees are recorded as deferred revenue upon receipt and recognized as revenue on a systematic basis over the period of time they are earned in accordance with the terms of the agreements. Such agreements may also include milestone and royalty payments. Such payments are recognized as revenue when earned in accordance with the terms of the related agreements.

*Income Taxes*

The Company accounts for income taxes in accordance with Statement of Financial Accounting Standard ("SFAS") No. 109, *Accounting for Income Taxes,* which requires an asset and liability approach to financial accounting and reporting for income taxes. Deferred income tax assets and liabilities are computed annually for differences between financial statement basis and the income tax basis of assets and liabilities that will result in taxable or deductible amounts in the future. Such deferred income tax computations are based on enacted tax laws and rates applicable to the years in which the differences are expected to affect taxable income. A valuation allowance is established when it is necessary to reduce deferred income tax assets to the expected realized amounts (Note 9).

*Segment Reporting*

The Company organizes itself into one segment reporting to the chief executive officer. No significant revenues from product sales or services occurred in 2005, 2004 or 2003.

*Stock-Based Compensation*

SFAS No. 123, *Accounting for Stock-Based Compensation*, addresses the financial accounting and reporting standards for stock or other equity-based compensation arrangements. The Company accounts for stock or other equity-based compensation for non-employees under the fair value-based method as required by SFAS No. 123 and EITF No. 96-18, *Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services* and other related interpretations. Under this method, the equity-based instrument is valued at either the fair value of the consideration received or the equity instrument issued on the date of grant. The resulting compensation cost is recognized and charged to operations over the service period, which is usually the vesting period. The unearned portion of these awards is classified as a component of stockholders' equity and is listed as "deferred compensation" on the consolidated balance sheet.

The Company uses the intrinsic value method to measure compensation expense associated with grants of stock options to employees. Since options are granted to employees with exercise prices equal to the fair market value of the Company's common stock on the date of grant, there was no expense included in the statement of operations for the years ended December 31, 2005, 2004 and 2003 related to employee stock options. On a *pro forma* basis, had the Company used the fair value method to measure compensation, the net loss and net loss per share would have been reported as follows:

-45-

| *In thousands (except per share data)* | Years ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2005 | | 2004 | | 2003 |
| Net loss, as reported | $ | (55,482) | $ | (35,573) | $ | (19,726) |
| Effect of stock options if valued at fair value | | (4,159) | | (4,026) | | (3,564) |
| *Pro forma* net loss | $ | (59,641) | $ | (39,599) | $ | (23,290) |
| | | | | | | |
| Net loss per share, as reported | $ | (0.99) | $ | (0.69) | $ | (0.51) |
| Effect of stock options if valued at fair value | | (.07) | | (0.08) | | (0.09) |
| *Pro forma* net loss per share | $ | (1.06) | $ | (0.77) | $ | (0.60) |

The above disclosure, required by SFAS No. 123, includes only the effect of grants made subsequent to January 1, 1996. For purposes of calculating the above disclosure, the fair value of options on their grant date was measured using the Black-Scholes option pricing model. Key assumptions used to apply this pricing model included a risk-free interest rate of 4.17% for 2005, 3.71% for 2004 and 3.42% for 2003, expected lives of the option grants ranging from one to eight years and expected rates of volatility for the underlying stock of 101% for 2005, 112% for 2004 and 115% for 2003. Using this model, the weighted average fair value per option for all options granted to employees in 2005, 2004 and 2003 was $5.46, $6.02 and $2.88, respectively.

*Earnings Per Share*

Basic earnings per common share are computed using the weighted average number of common shares outstanding during each year. Diluted earnings per common share reflect the effect of the Company's outstanding options using the treasury stock method, except where such items would be anti-dilutive. In years in which a net loss is reported, basic and diluted per share amounts are the same. In 2005, 2004 and 2003, options amounting to 6,826,644, 5,889,532 and 5,647,839 shares of common stock, respectively, were not included in the computation of dilutive earnings per share, because the effect would be anti-dilutive. There were no warrants or convertible securities outstanding at December 31, 2005, 2004 or 2003.

*Executive Compensation Plan*

The Company maintains a deferred executive compensation plan, established in 1997 (the "1997 Plan"), which provides participants, in lieu of a cash bonus, an option to purchase certain designated mutual funds at a discount. EITF No. 02-8, *Accounting for Options Granted to Employees in Unrestricted, Publicly Traded Shares of an Unrelated Party* , and SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities* require that the Company account for such benefits as derivatives. Under these pronouncements, the Company records the fair value of the awards as an asset and a liability and amortizes the asset to expense over the vesting period of the awards. Subsequent changes in the fair value of the liability are included in the determination of net income or loss.

Effective October 1, 2005, the Company adopted a new deferred executive compensation plan (the "2005 Plan") that defers the payment of annual bonus awards to future periods as specified in each award. The Company accrues a liability based on the fair value of the awards ratably over the vesting period. The recorded balances of such awards are increased or decreased based on the actual total return of specified mutual funds.

*Recently Issued Accounting Pronouncements*

In December 2004, the Financial Accounting Standards Board ("FASB") issued SFAS No. 123(R), *Share-Based Payment*, which revised SFAS No. 123 and superseded Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* . SFAS No. 123(R) requires that companies recognize compensation expense associated with grants of stock options and other equity instruments to employees in the financial statements, effective as of the first annual reporting period that begins after June 15, 2005. Compensation cost will be measured based on the fair value of the instrument on the grant date and will be recognized over the vesting period. This pronouncement applies to all grants after the effective date and to the unvested portion of stock options outstanding as of the effective date. SFAS No. 123(R) eliminates the ability to account for such transactions using the intrinsic method currently used by the Company. The Company will be required to adopt SFAS No. 123(R) as of January 1, 2006. The Company expects to adopt SFAS No. 123(R) using the modified prospective application method. Assuming the continuation of current programs, the preliminary estimate of stock compensation expense for 2006 is in the range of $4.5 million to $5.0 million.

SFAS No. 123(R) also requires that companies recognize compensation expense associated with purchases of shares of common stock by employees at a discount to market value under employee stock purchase plans that meet certain criteria. The impact of this requirement on the Company's consolidated financial statements is not expected to be material.

**2. Marketable Securities**

The Company has classified its marketable securities as available-for-sale and, accordingly, carries such securities at aggregate fair value. At December 31, 2005 and 2004, all of the Company's marketable securities consisted of United States Treasury or agency securities.

At December 31, 2005, the aggregate fair value and amortized cost of the Company's marketable securities were $56,063,000 and $56,087,000, respectively. Gross unrealized gains and losses were $9,000 and $33,000, respectively, at December 31, 2005. The gross unrealized losses of $33,000 pertain to fourteen marketable securities with an aggregate fair value of $35.6 million, all of which have been in a continuous loss position for less than twelve months.

At December 31, 2004, the aggregate fair value and amortized cost of the Company's marketable securities were $56,950,000 and $57,011,000, respectively. Gross unrealized gains and losses were $0 and $61,000, respectively, at December 31, 2004. The gross unrealized losses of $61,000 pertain to eighteen marketable securities with an aggregate fair value of $51.5 million, all of which have been in a continuous loss position for less than twelve months.

The Company's marketable securities with unrealized losses consist of U.S. Treasury and agency securities that are guaranteed by the U.S. government or an agency thereof. The unrealized losses were caused by increased interest rates. Because the Company has the intent and ability to hold the securities to maturity which should result in a recovery of the fair value, the Company does not consider the investments to be other-than-temporarily impaired.

Realized gains and losses on investment security transactions are reported on the specific-identification method. Realized gains and losses on sales of marketable securities were not material in 2005, 2004 and 2003. Changes in market values resulted in a decrease (increase) in net unrealized losses of $37,000, ($62,000) and $1,000 in 2005, 2004 and 2003, respectively.

**3.  Intangible and Other Assets, Net**

Intangible and other assets, net, were comprised of the following at December 31:

| *In thousands* | | 2005 | | 2004 |
|---|---|---|---|---|
| Capitalized patent and license costs | $ | 9,433 | $ | 8,796 |
| Less accumulated amortization | | (4,784) | | (4,067) |
| | | 4,649 | | 4,729 |
| Unvested deferred executive compensation (Note 5) | | 0 | | 1,690 |
| Other | | 58 | | 63 |
| | $ | 4,707 | $ | 6,482 |

Amortization expense for intangible assets amounted to $717,000, $697,000 and $692,000 in 2005, 2004 and 2003 respectively. In addition, the Company expensed unamortized patent and license costs of $43,000, $87,000 and $520,000 in 2005, 2004 and 2003, respectively, related to patent applications or technology no longer being pursued. The estimated future amortization expenses for capitalized patent and license costs are $720,000 for 2006, $690,000 for 2007, $444,000 for 2008, $354,000 for 2009 and $349,000 for 2010.

**4.  Long-Term Debt**

Long-term debt was comprised of the following at December 31:

| *In thousands* | | 2005 | | 2004 |
|---|---|---|---|---|
| Bank term note at prime rate or LIBOR +2% (average interest rate of 6.28% at December 31, 2005) payable in monthly installments of $160,000 plus interest, through March 2008 | $ | 7,655 | $ | 9,575 |
| Less current portion | | (1,920) | | (1,920) |
| | $ | 5,735 | $ | 7,655 |

In March 2003, the Company entered into a term loan agreement with a bank for $7.5 million, the proceeds of which were used to pay off then outstanding loans as well as remaining obligations under certain operating leases. Such repayments totaled $6.9 million in the aggregate. The loan is secured by a lien on all assets of the Company excluding intellectual property, which the Company has agreed not to pledge to any other party. This term loan agreement was amended on December 31, 2003 and on December 31, 2004 pursuant to which the Company received another $5.0 million in loan proceeds in the aggregate. The loan, as amended, is repayable in monthly installments of $160,000 plus interest with a balloon payment of $3.5 million in March 2008. The loan, as amended, requires the Company to maintain a minimum of $13.0 million in unrestricted cash, cash equivalents and investments. The agreement also contains certain covenants that restrict additional indebtedness, additional liens and sales of assets, and dividends, distributions or repurchases of common stock.

The annual aggregate future principal payments of the above loan, as amended, are $1.9 million in each of 2006 and 2007, and $3.8 million in 2008.

**5.  Executive Compensation Plans**

Under the Company's deferred executive compensation plan established in 1997 (the "1997 Plan"), the Company recorded an asset and a liability on the date of grant equal to the fair value of awards granted under the 1997 Plan. The fair value of awards made in 2004 and 2003 under the 1997 Plan were $1.0 million and $930,000, respectively. The asset is amortized to expense over the vesting period and the liability is revalued and adjusted to fair value at each reporting period. Under the Company's 2005 Plan, the Company accrues a liability for the fair value of awards ratably over the vesting period. The value of awards made in 2005 under the 2005 Plan was $962,000.

Pursuant to an amendment to the 1997 Plan in 2005, the unvested balances as of December 31, 2004 of awards under the 1997 Plan were cancelled. The value of such unvested balances was transferred to the 2005 Plan and will be accounted for accordingly. The recorded asset and liability balances attributable to the 1997 Plan were adjusted to reflect the cancellation and transfer of unvested awards. The net expense for these plans was $374,000, $800,000 and $440,000 in 2005, 2004 and 2003, respectively. The estimated future expenses for awards made through December 31, 2005 are $858,000, $637,000, $372,000 and $183,000 for 2006, 2007, 2008 and 2009, respectively.

**6.  Leases, Licensed Technology and Other Commitments**

*Facility Lease*

The Company conducts its operations in a 100,000 square foot office and laboratory facility under a non-cancelable operating lease. The original ten-year term of the lease expired in July 2002, and the Company has extended the lease for the first of two five-year extension periods. The Company currently subleases approximately 34,000 square feet of space to one tenant. Rent expense, net of sublease income of $1.3 million, $1.4 million and $1.4 million in 2005, 2004 and 2003 respectively, amounted to $620,000, $509,000 and $446,000 respectively. Future minimum annual rental payments through July 2007, the expiration of the first extension period, are $550,000 in 2006 and $321,000 in 2007, which are net of expected sublease income of $1.1 million in 2006 and $654,000 in 2007.

*Licensed Technology*

The Company and AGTI have entered into agreements with several universities under the terms of which the Company and/or AGTI have received exclusive licenses to technology and intellectual property. The agreements, which are generally cancelable by the Company and/or AGTI, provide for the payment of license fees and/or minimum payments, which are generally creditable against future royalties. Fees paid by the Company on behalf of the Company and/or AGTI amounted to $145,000, $238,000 and $165,000 in 2005, 2004 and 2003, respectively, and are expected to amount to approximately $145,000 annually in 2006 through 2010. In addition, the agreements provide for payments upon the achievement of certain milestones in product development. The agreements also require the Company to fund certain costs associated with the filing and prosecution of patent applications.

*Other Commitments*

The Company has entered into various employment agreements with 15 senior officers. The agreements provide for aggregate annual base salaries of $10.4 million and remaining terms of employment of up to three years.

**7.  Stockholders' Equity**

*Preferred Stock*

The Company has authorized 10,000,000 shares of preferred stock which the Board of Directors is empowered to designate and issue in different series. At December 31, 2005, the Board of Directors had designated 500,000 shares as series A preferred stock, and 9,500,000 shares remained undesignated.

*Common Stock*

On May 19, 2003, the Company sold 4,000,000 registered shares of its common stock to institutional investors at a price of $2.50 per share and received gross proceeds of $10.0 million before commissions and expenses of $662,000. These shares were sold pursuant to previously filed shelf registration statements and under a related registration statement pursuant to SEC rules. No shares remain available for sale under those shelf registrations.

On July 3, 2003, the Company filed a shelf registration statement with the SEC for the issuance of up to 7,500,000 shares of its common stock. On October 8, 2003, the Company sold 6,438,113 registered shares of its common stock, registered pursuant to this shelf registration, to institutional investors at a price of $6.35 per share and received gross proceeds of $40.9 million before commissions and expenses of $2.8 million. On December 3, 2003, the Company sold 1,175,375 registered shares of its common stock, including 113,489 shares registered under a related registration statement pursuant to SEC rules, to institutional investors at a price of $8.00 per share and received gross proceeds of $9.4 million before commissions and expenses of $652,000. Following this sale, no shares remain available for sale under this shelf registration.

On December 19, 2003, the Company filed a shelf registration statement with the SEC for the issuance of up to 7,000,000 shares of its common stock. This filing was declared effective on January 9, 2004. On March 29, 2004, the Company sold 5,060,000 of these registered shares in an underwritten public offering at a price of $8.50 per share for net proceeds of $40.0 million. As of December 31, 2005, the Company has 1,940,000 shares available for issuance under this shelf registration.

On February 18, 2005, the Company filed a shelf registration statement with the SEC, which was amended on March 11, 2005, registering 9,500,000 shares of common stock. The filing was declared effective on March 14, 2005. On August 10, 2005 and August 18, 2005, the Company sold an aggregate of 8,625,000 of these registered shares in an underwritten public offering at a price of $7.20 per share for net proceeds of approximately $57.9 million. At December 31, 2005, the Company had 875,000 shares that remain available for issuance under this shelf registration.

*Stockholder Rights Plan*

The Board of Directors of the Company adopted a Rights Agreement, dated as of June 8, 2000 (the "2000 Rights Agreement"), between the Company and State Street Bank and Trust Company, as Rights Agent, and approved the declaration of a dividend distribution of one Preferred Share Purchase Right (a "Right") on each outstanding share of its Common Stock. In general, the Rights become exercisable if a person or group hereafter acquires 15% or more of the Common Stock of the Company or announces a tender offer for 15% or more of the Common Stock. The Board of Directors will, in general, be entitled to redeem the Rights at one cent per Right at any time before any such person hereafter acquires 15% or more of the outstanding Common Stock. The plan is designed to protect the Company's stockholders in the event that an attempt is made to acquire the Company without an offer of fair value.

If a person hereafter acquires 15% or more of the outstanding Common Stock of the Company (the "Acquiring Person"), each Right will entitle its holder to purchase, for an initial exercise price of $65, a number of shares of Common Stock having a market value at that time of twice the Right's exercise price. Rights held by the Acquiring Person will become void. If the Company is acquired in a merger or other business combination transaction after a person acquires 15% or more of the Company's Common Stock, each Right will entitle its holder to purchase, at the Right's then-current exercise price, a number of the acquiring company's common shares having a market value at that time of twice the Right's exercise price.

The dividend distribution of Rights was payable on July 19, 2000 to shareholders of record on June 19, 2000. The Rights will expire in ten years. The Rights distribution is not taxable to the Company's stockholders.

The Board of Directors also adopted two amendments to the Rights Agreement dated December 15, 1994, (the "1994 Rights Agreement"), between the Company and State Street Bank and Trust Company, as Rights Agent. As a result of these amendments, the adoption of the 2000 Rights Agreement and the setting of a record date to distribute new Rights, the 1994 Rights Agreement is no longer in effect.

*Minority Interest in Subsidiary*

At December 31, 2003, AGTI had 5,195,779 shares of its common stock outstanding. Of this amount, the Company owned 4,157,143 shares or 80%, which allows it to consolidate for tax purposes the results of operations of AGTI with those of the Company. On January 17, 2004, stock options for a total of 87,428 shares of AGTI common stock held by minority interest holders were exercised prior to their expiration on that date. In order to maintain its 80% ownership interest in AGTI, the Company acquired an additional 351,909 shares of AGTI common stock on January 13, 2004. The purchase price of such shares was approximately $8.8 million, effected through the reduction of intercompany debt representing the estimated fair value of such shares, subject to adjustment in certain circumstances.

After taking into account the above transactions, AGTI has a total of 5,635,116 shares of its common stock outstanding of which 80% are owned by ARIAD, 14% are owned by Stanford University, Harvard University, consultants and inventors, and 6% are owned by certain current members of the Company's management and Board of Directors. Approximately 75% of the shares of common stock owned by the minority interest holders are subject to restrictions on transfer and a right of first refusal held by AGTI to repurchase such shares of AGTI common stock before sale of such shares to another purchaser. There are currently no outstanding options to purchase AGTI common stock and no shares available for grant of additional options.

**8. Stock Plans**

*ARIAD Stock Option and Stock Plans*

The Company's 1991, 1994 and 2001 stock option and stock plans (the "Plans") provide for the awarding of nonqualified and incentive stock options, stock grants and restricted stock units to officers, directors, employees and consultants of the Company. Stock options become exercisable as specified in the related option certificate, typically over a four-year period, and expire ten years from the date of grant. Stock grants and restricted stock units provide the recipient with ownership of common stock subject to any rights the Company may have to repurchase the shares granted or other restrictions. The 1991 and 1994 Plans have expired according to their terms, although existing stock options granted under these Plans remain outstanding. As of December 31, 2005, there are 696,046 shares available awards under the 2001 Plan.

Stock option transactions under the Plans for the years ended December 31, 2003, 2004 and 2005 are as follows:

-51-

| | Number Of Shares | | Weighted Average Exercise Price Per Share |
|---|---|---|---|
| Options outstanding, January 1, 2003 | 5,392,311 | $ | 4.51 |
| Granted | 781,220 | | 3.90 |
| Forfeited | (239,473) | | 5.16 |
| Exercised | (286,219) | | 2.94 |
| Options outstanding, December 31, 2003 | 5,647,839 | | 4.48 |
| Granted | 1,192,150 | | 6.02 |
| Forfeited | (320,114) | | 6.17 |
| Exercised | (630,343) | | 3.62 |
| Options outstanding, December 31, 2004 | 5,889,532 | | 4.80 |
| Granted | 1,310,875 | | 7.30 |
| Forfeited | (132,444) | | 7.16 |
| Exercised | (241,319) | | 3.52 |
| Options outstanding, December 31, 2005 | 6,826,644 | $ | 5.28 |
| Options exercisable, | December 31, 2003 | 3,605,255 | $ | 4.27 |
| | December 31, 2004 | 4,078,371 | $ | 4.65 |
| | December 31, 2005 | 4,345,848 | $ | 4.70 |

In addition to the above stock option transactions, in 2005 and 2004, the Company awarded grants of its common stock totaling 120,000 and 170,000 shares, respectively, to its directors and chief executive officer. The 2005 stock grant to the chief executive officer remains subject to the right of the Company to repurchase the shares in certain circumstances until January 2007. The Company recognized expense of $548,000 and $1.3 million in 2005 and 2004, respectively, related to these grants, based on the fair market value of the common stock on the date of grant.

The following table sets forth information regarding options outstanding at December 31, 2005:

| Range of Exercise Prices | Number of Shares | Weighted Average Exercise Price | Weighted Average Remaining Life (years) | Number of Option Shares Currently Exercisable | Weighted Average Exercise Price for Currently Exercisable |
|---|---|---|---|---|---|
| $.75 - 1.25 | 392,396 | $  0.78 | 3.8 | 392,396 | $  0.78 |
| 1.34 - 2.31 | 624,308 | 1.59 | 4.5 | 528,942 | 1.62 |
| 2.68 - 4.88 | 2,149,875 | 4.14 | 5.3 | 1,968,312 | 4.13 |
| 4.89 - 8.00 | 3,345,565 | 6.46 | 8.0 | 1,144,886 | 6.07 |
| 9.65 - 14.63 | 314,500 | 13.40 | 4.6 | 311,312 | 13.44 |
| | 6,826,644 | $  5.28 | 6.4 | 4,345,848 | $  4.70 |

*ARIAD Gene Therapeutics, Inc. Stock Option Plan*

The Company's subsidiary, AGTI, adopted a stock option plan in 1993, which was approved by the Company's stockholders and which has now expired according to its terms. At December 31, 2003, there were 87,428 options outstanding all of which were exercised on January 17, 2004 for proceeds to AGTI of approximately $37,000 (Note 7). There were no other options exercised nor any options granted under this plan in 2005, 2004 or 2003. At December 31, 2005, there are no outstanding options to purchase AGTI common stock under this plan.

-52-

*Employee Stock Purchase Plan*

In 1997, the Company adopted the 1997 Employee Stock Purchase Plan and reserved 500,000 shares of common stock for issuance under this plan. Under this plan, substantially all of its employees may, through payroll withholdings, purchase shares of the Company's stock at a price of 85% of the lesser of the fair market value at the beginning or end of each three-month withholding period. In 2005, 2004 and 2003, 23,137, 11,298 and 88,636 shares of common stock were issued under the plan, respectively.

## 9.  Income Taxes

At December 31, 2005, the Company had available, for federal tax reporting purposes, net operating loss carryforwards of approximately $250.0 million, which expire commencing in 2009 and, for state tax reporting purposes, net operating loss carryforwards of approximately $156.3 million, which expire commencing in 2006. The Company also had federal research and development credit carryovers of approximately $9.3 million, which expire commencing in 2006, and state research and development credit carryovers of $5.1 million, which expire commencing in 2007. Both the net operating loss carryforwards and credits are subject to certain limitations under federal tax law.

The components of deferred income taxes were as follows at December 31:

| *In thousands* | 2005 | 2004 |
|---|---:|---:|
| Deferred tax liabilities: | | |
|     Intangible and other assets | $       1,860 | $       1,891 |
| | | |
| Deferred tax assets: | | |
|     Net operating loss carryforwards | 94,345 | 73,863 |
|     Federal and State tax credit carryovers | 16,451 | 14,804 |
|     Depreciation | 3,800 | 3,489 |
|     Other | 1,344 | 1,478 |
| Total deferred tax assets | 115,940 | 93,634 |
| | | |
| Deferred tax assets, net | 114,080 | 91,742 |
| Valuation allowance | (114,080) | (91,742) |
| Total deferred taxes | $              0 | $              0 |

Since the Company has not yet achieved sustained profitable operations, management believes the tax benefits as of December 31, 2005 and 2004 do not satisfy the realization criteria set forth in SFAS No. 109 and has recorded a valuation allowance for the entire net deferred tax asset. The increase in the valuation allowance of $22.3 million in 2005 and $16.8 million in 2004 resulted primarily from net operating loss carryforwards and tax credit carryovers from operations in those years and that were not benefited.

## 10.  Litigation

### NF-"B Patent Infringement Litigation and Reexamination

In 2002, the Company, together with Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research and Harvard University (collectively, the "Plaintiffs") filed a lawsuit in the United States District Court for the District of Massachusetts (the "U.S. District Court") against Eli Lilly and Company ("Lilly") alleging infringement of certain claims ("the NF- κ B `516 Claims") of the Plaintiffs' U.S. Patent No. 6,410,516 (the "`516 Patent") covering methods of treating human disease by regulating NF- κ B cell-signaling activity through sales of Lilly's osteoporosis drug, Evista®, and Lilly's septic shock drug, Xigris®, and seeking monetary damages from Lilly.

*Re-examination Proceedings in PTO*

On April 4, 2005, Lilly filed an *ex parte* request in the United States Patent and Trademark Office ("PTO") to reexamine the patentability of certain claims of the `516 Patent. On June 8, 2005, the PTO mailed to counsel for the patentees of the `516 Patent its Order granting a reexamination of all of the claims of the `516 Patent. On August 4, 2005, counsel for the patentees of the `516 Patent filed a Petition requesting the PTO to vacate its Order granting reexamination of the `516 Patent and a Petition requesting the PTO to stay its reexamination ("Patentee's Petitions"). On October 6, 2005, the PTO mailed to counsel for patentees of the `516 Patent its Decision denying Patentee's Petitions ("PTO's October 6 Decision"), whereupon, on November 25, 2005, counsel for the patentees filed a Request for Reconsideration of the PTO's October 6 Decision. On February 8, 2006, the PTO mailed to counsel for the patentees of the `516 Patent its Decision granting patentee's Request for Reconsideration and denying the relief sought by patentees there under.

In addition, an unrelated third party filed an *ex parte* request in the PTO on December 2, 2005 to reexamine the patentability of certain claims of the `516 Patent ("Second Request"). On December 12, 2005, the PTO mailed to counsel for the patentees of the `516 Patent its Order granting a reexamination based on this Second Request. On February 13, 2006, counsel for the patentees of the `516 Patent filed Petitions requesting the PTO to vacate its Order granting reexamination of the `516 Patent based on this Second Request and requesting the PTO to stay this reexamination.

*Motions to Stay Litigation*

In connection with its request for reexamination of the `516 patent, Lilly filed a motion in the U.S. District Court on April 4, 2005 requesting a stay of the NF-ºB patent infringement litigation by the Court pending reexamination of the `516 Patent by the PTO. On June 6, 2005, the U.S. District Court denied Lilly's motion. On January 17, 2006, Lilly filed a renewed motion to stay pending reexamination of the `516 patent by the PTO, which was denied by the U.S. District Court on February 13, 2006.

*Trial and Pre-Trial Motions*

On December 23, 2005, Lilly filed two motions for summary judgment of invalidity. At a status conference held on March 9, 2006, the U.S. District Court confirmed that the trial would begin on April 10, 2006 and gave no indication as to when it would rule on the pending summary judgment motions.    A pre-trial conference in this case is scheduled for April 5, 2006, with trial scheduled to commence on April 10, 2006.

The ultimate outcome of the request for reexamination and litigation cannot be determined at this time, and, as a result, no determination can be made with respect to the PTO's allowance of the claims of the `516 patent in the reexamination, nor can any determination be made with respect to the validity or infringement of the claims of the `516 patent in the Lilly litigation, nor can an estimate of a damage award or range of awards in the Lilly litigation, if any, be made. If the Company prevails at trial in the Lilly litigation, any damages it may be awarded by the jury could be subsequently eliminated or limited by an adverse finding upon appeal or in the event that the claims of the `516 Patent are invalidated by the PTO.

-54-

**11.  Related Party Transactions**

For the Company's March 2004 and August 2005 public offerings of common stock, Lehman Brothers served as the sole-book running manager for which it received underwriting discounts and commissions of $1,399,090 and $2,018,250, respectively. In addition, Lehman Brothers provided assistance to the Company in connection with its January 2005 transaction with Medinol Ltd. for the development of drug-eluting stents for which Lehman Brothers earned a fee of $200,000. The spouse of a member of our Board of Directors is a vice chairman of Lehman Brothers. We believe the transactions with Lehman Brothers were entered into on terms no less favorable to us than we could have obtained from unaffiliated third parties.

**ITEM 9: CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

Not applicable.

**ITEM 9A: CONTROLS AND PROCEDURES**

(a) *Evaluation of Disclosure Controls and Procedures.* Our principal executive officer and principal financial officer, after evaluating the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this Annual Report on Form 10-K, have concluded that, based on such evaluation, our disclosure controls and procedures were adequate and effective to ensure that material information relating to us, including our consolidated subsidiaries, was made known to them by others within those entities, particularly during the period in which this Annual Report on Form 10-K was being prepared.

In designing and evaluating our disclosure controls and procedures, our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

(b) *Changes in Internal Controls.* There were no changes in our internal control over financial reporting, identified in connection with the evaluation of such internal control that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Management's Report On Internal Control Over Financial Reporting**

The management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended. The Company's internal control system was designed to provide reasonable assurance to the Company's management and board of directors regarding the preparation and fair presentation of published financial statements. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2005. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework. Based on our assessment we believe that, as of December 31, 2005, the Company's internal control over financial reporting is effective based on those criteria.

The Company's independent auditors have issued an audit report on our assessment of the Company's internal control over financial reporting. This report appears below.

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of
ARIAD Pharmaceuticals, Inc.:

We have audited management's assessment, included in the accompanying Management's Report on Internal Control Over Financial Reporting, that ARIAD Pharmaceuticals, Inc. and subsidiaries (the "Company") maintained effective internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control--Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that the Company maintained effective internal control over financial reporting as of December 31, 2005, is fairly stated, in all material respects, based on the criteria established in Internal Control--Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2005, based on the criteria established in Internal Control--Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements as of and for the year ended December 31, 2005 of the Company and our report dated March 13, 2006 expressed an unqualified opinion on those financial statements.

/s/ DELOITTE & TOUCHE LLP
Boston, Massachusetts
March 13, 2006

**ITEM 9B: OTHER INFORMATION**

Not applicable.

**PART III**

**ITEM 10:     DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT**

The response to this item is incorporated by reference from the discussion responsive thereto under the captions "Board of Directors," "Executive Officers," "Section 16(a) Beneficial Ownership Reporting Compliance" and "Corporate Code of Conduct and Ethics" in the Company's Proxy Statement for the 2006 Annual Meeting of Stockholders.

**ITEM 11:     EXECUTIVE COMPENSATION**

The response to this item is incorporated by reference from the discussion responsive thereto under the caption "Executive Compensation" and "Board of Directors" in the Company's Proxy Statement for the 2006 Annual Meeting of Stockholders.

**ITEM 12:     SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND  RELATED STOCKHOLDER MATTERS**

The response to this item is incorporated by reference from the discussion responsive thereto under the captions "Security Ownership of Certain Beneficial Owners and Management" and "Executive Compensation-Equity Compensation Plan Information" in the Company's Proxy Statement for the 2006 Annual Meeting of Stockholders.

**ITEM 13:     CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS**

The response to this item is incorporated by reference from the discussion responsive thereto under the captions "Certain Relationships and Related Transactions" and "Executive Compensation-Employment Agreements, Termination of Employment and Change in Control Arrangements" in the Company's Proxy Statement for the 2006 Annual Meeting of Stockholders.

**ITEM 14:     PRINCIPAL ACCOUNTING FEES AND SERVICES**

The response to this item is incorporated by reference from the discussion responsive thereto under the caption "Proposal 2: Ratification of Selection of Independent Registered Public Accounting Firm" in the Company's Proxy Statement for the 2006 Annual Meeting of Stockholders.

**PART IV**

**ITEM 15:  EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K**

(a)(1)          The following Consolidated Financial Statements, Notes thereto and Report of Independent Registered Public Accounting Firm have been presented in Item 8:

   Report of Independent Registered Public Accounting Firm

   Consolidated Balance Sheets

   Consolidated Statements of Operations

   Consolidated Statements of Stockholders' Equity

   Consolidated Statements of Cash Flows

   Notes to Consolidated Financial Statements

(a)(2)          Financial Statement Schedules:

   Schedules have been omitted because of the absence of conditions under which they are required or because the required information is included in the financial statements or notes thereto.

(a)(3)          The Exhibits listed in the Exhibit Index are filed herewith in the manner set forth therein.

(b)             See (a) (3) above.

(c)             See (a) (2) above.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Cambridge and Commonwealth of Massachusetts on the 14th of March, 2006.

### ARIAD PHARMACEUTICALS, INC.

By: /s/ Harvey J. Berger, M.D.
Name: Harvey J. Berger, M.D.
Title: Chairman, Chief Executive Officer and President

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Harvey J. Berger, M.D.<br>Harvey J. Berger, M.D. | Chairman of the Board of Directors, Chief Executive Officer and President (Principal Executive Officer) | March 14, 2006 |
| /s/ Sandford D. Smith<br>Sandford D. Smith | Vice Chairman of the Board of Directors | March 14, 2006 |
| /s/ Edward M. Fitzgerald<br>Edward M. Fitzgerald | Senior Vice President, Finance and Corporate Operations, Chief Financial Officer and Treasurer (Principal Financial Officer and Principal Accounting Officer) | March 14, 2006 |
| /s/ Michael D. Kishbauch<br>Michael D. Kishbauch | Director | March 14, 2006 |
| /s/ Jay R. LaMarche<br>Jay R. LaMarche | Director | March 14, 2006 |
| _____<br>Athanase Lavidas, Ph.D | Director | |
| /s/ Peter J. Nelson<br>Peter J. Nelson | Director | March 14, 2006 |
| /s/ Burton E. Sobel, M.D.<br>Burton E. Sobel, M.D. | Director | March 14, 2006 |
| /s/ Mary C. Tanner<br>Mary C. Tanner | Director | March 14, 2006 |
| /s/ Elizabeth H.S. Wyatt<br>Elizabeth H.S. Wyatt | Director | March 14, 2006 |

EXHIBIT INDEX

| Exhibit No. | Title |
|---|---|
| 3.1 | Certificate of Incorporation of the Company, as amended. (16) |
| 3.2 | Restated By-laws of the Company, as amended. (5) |
| 4.1 | Rights Agreement, dated as of June 8, 2000, between the Company and State Street Bank and Trust Company, which includes the Form of Certificate of Designations in respect of the Series A Preferred Stock, as Exhibit A, the Form of Right Certificate as Exhibit B and the Summary of Rights to Purchase Series A Preferred Stock as Exhibit C. Pursuant to the Rights Agreement, Right Certificates will not be mailed until after the Separation Date (as defined therein). (3) |
| 10.1 | Lease Agreement, dated January 8, 1992, between ARIAD Pharmaceuticals, Inc. and Forest City Cambridge, Inc. (1) |
| 10.2+ | Executive Employment Agreement, dated as of January 1, 1992, between ARIAD Pharmaceuticals, Inc. and Harvey J. Berger, M.D. (1) |
| 10.3+ | ARIAD Pharmaceuticals, Inc. 1991 Stock Option Plan for Employees and Consultants, as amended. (4) |
| 10.4+ | ARIAD Pharmaceuticals, Inc. 1991 Stock Option Plan for Directors. (1) |
| 10.5+ | ARIAD Retirement Savings Plan. (1) |
| 10.6** | Amended and Restated Agreement, dated as of December 12, 1997, between The Board of Trustees of The Leland Stanford Junior University and ARIAD Gene Therapeutics, Inc. (6) |
| 10.7+ | Amendment, dated April 19, 1994, to Executive Employment Agreement between ARIAD Pharmaceuticals, Inc. and Harvey J. Berger, M.D. (2) |
| 10.8+ | Amendment No. 2, dated June 30, 1994, to Executive Employment Agreement between ARIAD Pharmaceuticals, Inc. and Harvey J. Berger, M.D. (4) |
| 10.9+ | ARIAD Pharmaceuticals, Inc. 1994 Stock Option Plan for Non-Employee Directors. (4) |
| 10.10+ | Amendment, dated January 1, 1997, to Executive Employment Agreement between ARIAD Pharmaceuticals, Inc. and Harvey J. Berger, M.D. (11) |
| 10.11+ | ARIAD Pharmaceuticals, Inc. 1997 Employee Stock Purchase Plan. (11) |
| 10.12+ | Amendment to the 1991 Stock Option Plan for Employees and Consultants. (11) |
| 10.13+ | Amendment to the 1994 Stock Option Plan for Non-Employee Directors. (11) |
| 10.14+ | ARIAD Pharmaceuticals, Inc. 1997 Executive Compensation Plan. (6) |
| 10.15+ | Executive Employment Agreement, dated May 1, 1992, Fourth Amendment to Employment Agreement dated June 8, 2000, Third Amendment to Employment Agreement dated January 1, 1999, and Amendments to Employment Agreements dated January 1, 1997 and March 2, 1994 between ARIAD Pharmaceuticals, Inc. and John Iuliucci, Ph.D. (7) |
| 10.16+ | Executive Employment Agreement, dated August 1, 1993, Third Amendment to Employment Agreement dated June 8, 2000, and Amendments to Employment Agreements dated January 1, 1997 and March 2, 1994 between ARIAD Pharmaceuticals, Inc. and David L. Berstein, J.D. (7) |
| 10.17+ | Amendment, dated as of January 1, 2001, to Executive Employment Agreement with John Iuliucci, Ph.D. (8) |
| 10.18+ | Amendment, dated as of January 1, 2001, to Executive Employment Agreement with David Berstein, Esq. (8) |
| 10.19+ | ARIAD Pharmaceuticals, Inc. 2001 Stock Plan, as amended. (16) |
| 10.20 | Revised and Restated Research and Development Agreement, dated as of March 15, 2002, by and between ARIAD Pharmaceuticals, Inc. and ARIAD Corporation. (9) |
| 10.21 | Revised and Restated Research and Development Agreement, dated as of March 15, 2002, by and between ARIAD Gene Therapeutics, Inc. and ARIAD Corporation. (9) |
| 10.22+ | Executive Employment Agreement, dated as of March 4, 2002, between ARIAD Pharmaceuticals, Inc. and Laurie A. Allen, Esq. (9) |
| 10.23 | Stock Transfer Agreement between ARIAD Gene Therapeutics, Inc. and the individuals listed on Exhibit A thereto. (9) |
| 10.24 | Notice of Extension of Lease, dated October 2, 2001, from ARIAD Corporation to Forest City Commercial Group. (9) |
| 10.25+ | Executive Employment Agreement, dated May 6, 2002, between ARIAD Pharmaceuticals, Inc. and Edward M. Fitzgerald (10) |
| 10.26+ | Executive Employment Agreement, dated June 8, 2000, between ARIAD Pharmaceuticals, Inc. and Timothy Clackson, Ph.D.(12) |

10.27+  Amendment to Employment Agreement, dated July 1, 2001, between ARIAD Pharmaceuticals, Inc. and Timothy Clackson, Ph.D. (12)

10.28+  Amendment to Employment Agreement, dated July 12, 2002, between ARIAD Pharmaceuticals, Inc. and Timothy Clackson, Ph.D. (12)

10.29   Agreement of Sublease, dated December 31, 1999, between ARIAD Corporation and Aventis Pharmaceuticals Inc. (12)

10.30   First Amendment to Sublease, dated July 26, 2002, between ARIAD Corporation and Aventis Pharmaceuticals Inc. (12)

10.31   Credit Agreement, dated as of March 12, 2003, by and among ARIAD Pharmaceuticals, Inc., ARIAD Corporation and ARIAD Gene Therapeutics, Inc. and Citizens Bank of Massachusetts. (13)

10.32   Security Agreement - All Assets, dated as of March 12, 2003, by and between ARIAD Pharmaceuticals, Inc. and Citizens Bank of Massachusetts. (13)

10.33   Security Agreement - All Assets, dated as of March 12, 2003, by and between ARIAD Corporation and Citizens Bank of Massachusetts. (13)

10.34   Security Agreement - All Assets, dated as of March 12, 2003, by and between ARIAD Gene Therapeutics, Inc. and Citizens Bank of Massachusetts. (13)

10.35+  Amendment to Employee Agreement, dated September 2, 2003, between ARIAD Pharmaceuticals, Inc. and Harvey J. Berger, M.D. (14)

10.36+  Amendment to Employee Agreement, dated September 2, 2003, between ARIAD Pharmaceuticals, Inc. and Laurie A. Allen, Esq. (14)

10.37+  Amendment to Employee Agreement, dated September 2, 2003, between ARIAD Pharmaceuticals, Inc. and David Berstein, Esq. (14)

10.38+  Amendment to Employee Agreement, dated September 2, 2003, between ARIAD Pharmaceuticals, Inc. and Timothy P. Clackson, Ph.D. (14)

10.39+  Amendment to Employee Agreement, dated September 2, 2003, between ARIAD Pharmaceuticals, Inc. and Edward M. Fitzgerald. (14)

10.40+  Amendment to Employee Agreement, dated September 2, 2003 between ARIAD Pharmaceuticals, Inc. and John D. Iuliucci, Ph.D. (14)

10.41   Amendment No. 1 to Credit Agreement, dated as of December 31, 2003, by and among ARIAD Pharmaceuticals, Inc., ARIAD Corporation and ARIAD Gene Therapeutics, Inc. and Citizens Bank of Massachusetts. (15)

10.42   Stock Issuance Agreement, dated January 13, 2004, between ARIAD Gene Therapeutics, Inc. and ARIAD Pharmaceuticals, Inc. (15)

10.43   Stock Transfer Agreement, dated January 17, 2004, between ARIAD Gene Therapeutics, Inc. and the individuals listed on Exhibit A thereto. (15)

10.44   Amendment No. 2 to Credit Agreement dated as of December 31, 2004 by and among ARIAD Pharmaceuticals, Inc., ARIAD Corporation and ARIAD Gene Therapeutics, Inc. and Citizens Bank of Massachusetts. (17)

10.45   Second Amended and Restated Term Note, dated December 31, 2004, issued ARIAD Pharmaceuticals, Inc., ARIAD Corporation and ARIAD Gene Therapeutics, Inc. to Citizens Bank of Massachusetts. (17)

10.46**  License Agreement, effective January 26, 2005, by and between ARIAD Pharmaceuticals, Inc. and Medinol Ltd. (19)

10.47**  Supply Agreement, entered into as of January 26, 2005, by and between ARIAD Pharmaceuticals, Inc. and Medinol Ltd. (19)

10.48+  Executive Employment Agreement, dated August 19, 2002, and First Amendment to Employment Agreement, dated September 2, 2003, between ARIAD Pharmaceuticals, Inc., and Camille L. Bedrosian, M.D. (18)

10.49+  ARIAD Pharmaceuticals, Inc. 2005 Executive Compensation Plan. (20)

10.50+  Amendment to ARIAD Pharmaceuticals, Inc. 1997 Executive Compensation Plan. (20)

10.51+  ARIAD Pharmaceuticals, inc. Amended and Restated 2001 Stock Plan. (20)

10.52+  Executive Bonus and Stock Option Arrangements. (20)

10.53+  Director Compensation Arrangements. (20)

10.54+*  Executive Compensation Arrangements

10.55+  Amendment to Executive Employment Agreements, as of October 4, 2005, between ARIAD Pharmaceuticals, Inc. and each of Laurie A. Allen, Esq., Camille L. Bedrosian, M.D., David L. Berstein, Esq., Timothy P. Clackson, Ph.D., Edward M. Fitzgerald and John D. Iuliucci, Ph.D. (20)

10.56+*  Amendment to Executive Employment Agreement, dated as of January 1, 2006 between ARIAD Pharmaceuticals, Inc. and Harvey J. Berger, M.D.
10.57+*  Executive Employment Agreement, dated as of September 25, 2005 between ARIAD Pharmaceuticals, Inc. and Richard W. Pascoe.


21.1    Subsidiaries of the Company. (17)
23.1*   Consent of Deloitte & Touche LLP.
31.2*   Certification of the Chief Executive Officer.
31.3*   Certification of the Chief Financial Officer.
32.1*   Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.


**Notes to Exhibits:**

(+)    Management Contract or Compensatory Plan or Arrangement

(*)    Filed Herewith.

(**)   Confidential treatment has been granted by the Securities and Exchange Commission as to certain portions.

(1)    Incorporated by reference to Registration Statement on Form 10 of the Company filed with the Securities and Exchange Commission on June 25, 1993.

(2)    Incorporated by reference to Registration Statement on Form S-1 of the Company (No. 33-76414) filed with the Securities and Exchange Commission on March 11, 1994.

(3)    Incorporated by reference to Form 8-A of the Company filed with the Securities and Exchange Commission on June 19, 2000.

(4)    Incorporated by reference to Form 10-K of the Company for the fiscal year ended December 31, 1994 filed with the Securities and Exchange Commission on March 31, 1995.

(5)    Incorporated by reference to Amendment No. 1 to the Registration Statement on Form S-3 of the Company (No. 333-38664) filed with the Securities and Exchange

            Commission  on June 23, 2000.

(6)    Incorporated by reference to Form 10-K of the Company for the fiscal year ended December 31, 1997 filed with the Securities and Exchange Commission on March 10, 1998.

(7)    Incorporated by reference to Form 10-Q of the Company filed with the Securities and Exchange Commission on August 10, 2000.

(8)    Incorporated herein by reference to Form 10-Q of the Company filed with the Securities and Exchange Commission on May 14, 2001.

(9)    Incorporated by reference to Form 10-K of the Company for the fiscal year ended December 31, 2001 filed with the Securities and Exchange Commission on March 22, 2002.

(10)   Incorporated herein by reference to Form 10-Q of the Company filed with the Securities and Exchange Commission on May 9, 2002.

(11)   Incorporated by reference to Form 10-Q of the Company filed with the Securities and Exchange Commission on August 12, 1997.

(12)   Incorporated by reference to Form 10-Q of the Company filed with the Securities and Exchange Commission in March 14, 2003.

(13)   Incorporated by reference to Form 10-Q of the Company filed with the Securities and Exchange Commission in May 13, 2003.

(14)   Incorporated by reference to Form 10-Q of the Company filed with the Securities and Exchange Commission in November 4, 2003.

(15)   Incorporated by reference to Form 10-K of the Company filed with the Securities and Exchange Commission on March 2, 2004.

(16)              Incorporated by reference to Registration Statement on Form S-8 of the Company (No. 333-116996) filed with the Securities and Exchange Commission on June 30, 2004.

(17)              Incorporated by reference to Form 10-K of the Company filed with the Securities and Exchange Commission on February 18, 2005.

(18)              Incorporated by reference to Form 10-K/A of the Company filed with the Securities and Exchange Commission on March 11, 2005.

(19)              Incorporated by reference to Form 10-Q of the Company filed with the Securities and Exchange Commission on May 10, 2005.

(20)              Incorporated by reference to Form 10-Q of the Company filed with the Securities and Exchange Commission on November 9, 2005.

**EXHIBIT 10.54**

**EXECUTIVE COMPENSATION ARRANGEMENTS**

Listed below are the salaries, bonuses and stock option grants for our executive officers that were awarded during fiscal 2005 and the salaries that have been established for fiscal 2006. Bonuses for fiscal 2006 have not yet been determined.

| Executive Officer | | 2005 | | | | 2006 |
| | | Salary | | Bonus[1] | Stock Option Grants[2] | Salary |
|---|---|---|---|---|---|---|
| Harvey J. Berger, M.D. [3]<br>*Chairman of the Board of Directors,*<br>*Chief Executive Officer and President* | $ | 504,000 | | --- | 150,000 | $ 544,000 |
| Laurie A. Allen, Esq.<br>*Senior Vice President, Legal and Business*<br>*Development, Chief Legal Officer and Secretary* | $ | 288,000 | $ | 110,000 | 60,000 | $ 309,000 |
| David L. Berstein, Esq.<br>*Senior Vice President, Chief Patent Counsel* | $ | 288,000 | $ | 110,000 | 60,000 | $ 309,000 |
| Timothy P. Clackson, Ph.D.<br>*Senior Vice President, Chief Scientific Officer* | $ | 290,000 | $ | 110,000 | 57,500 | $ 309,000 |
| Edward M. Fitzgerald<br>*Senior Vice President, Finance and Corporate*<br>*Operations, Chief Financial Officer and Treasurer* | $ | 288,000 | $ | 110,000 | 60,000 | $ 309,000 |
| John D. Iuliucci, Ph.D.<br>*Senior Vice President, Chief Development Officer* | $ | 290,000 | $ | 115,000 | 70,000 | $ 309,000 |
| Camille L. Bedrosian, M.D.<br>*Vice President, Chief Medical Officer* | $ | 290,000 | $ | 110,000 | 70,000 | $ 309,000 |
| Richard W. Pascoe [4]<br>*Vice President, Chief Commercial Officer* | $ | 61,959 | | --- | 75,000 | $ 275,000 |

[1]  These bonuses were awarded and deferred under our 2005 Executive Compensation Plan, a non-qualified, unfunded, deferred compensation plan.

[2]  Stock options, except for Mr. Pascoe's stock options, were granted on October 4, 2005, have an exercise price of $7.56 per share, which was the fair market value of our common stock on the date of grant, and vest 25% per year over four years. Mr. Pascoe's stock options, awarded on December 13, 2005 in consideration of his commencement of employment with the Company, have an exercise price of $6.04 per share, and vest 25% per year over four years.

[3]  The Board of Directors also awarded 40,000 shares of restricted stock to Dr. Berger on December 13, 2005. The fair market value of the stock on the date of grant was $6.04 per share. The restricted stock is subject to repurchase by the Company for $.001 per share if Dr. Berger's employment with the Company is terminated for cause prior to the thirteen-month anniversary of the grant date. The Company's right of repurchase lapses under certain circumstances, including a change in control of the Company and termination of his employment by the Company other than for cause. These terms are subject to the terms of Dr. Berger's employment agreement. The restricted shares may not be sold, transferred, assigned, hypothecated, pledged, encumbered or otherwise disposed of other than to the Company as long as the Company's right of repurchase is in effect.

[4]  Mr. Pascoe commenced employment with the Company on November 7, 2005 at an agreed-upon annual salary of $275,000. The amount of salary presented for 2005 represents the amount paid to Mr. Pascoe in 2005.

**EXHIBIT 10.56**

## FIFTH AMENDMENT TO EMPLOYMENT AGREEMENT

This FIFTH AMENDMENT TO EMPLOYMENT AGREEMENT (the " Fifth Amendment") made as of January 1, 2006 between ARIAD Pharmaceuticals, Inc., a Delaware corporation (the "Company"), and Harvey J. Berger, M.D. (the "Employee").

The Company and the Employee have entered into an Employment Agreement dated as of January 1, 1992, as amended as of April 19, 1994, June 30, 1994, January 1, 1997, and September 2, 2003 (the "Agreement"), and the parties hereto desire to further amend certain provisions of the Agreement.

NOW, THEREFORE, in consideration of the premises set forth herein and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree to further amend the Agreement as follows:

I.  Termination of Employment. The first sentence of Section 2 is hereby amended to read as follows:

"The term of the Employee's employment under this Agreement (the "Term") commenced as of January 1, 1992 (the "Effective Date") and shall end on December 31, 2009, unless sooner terminated pursuant to Section 4 or 5 of this Agreement;"

II. Compensation. The first sentence of Section 3.1 is hereby amended to read as follows:

"3.1 As full compensation for all services to be rendered pursuant to this Agreement, the Company agrees to pay the Employee, during the Term, a salary at the fixed rate of $544,000 per annum during the first year of the term and increased each year thereafter as set forth below, payable in equal semi-monthly installments, less such deductions or amounts to be withheld as shall be required by applicable law and regulations."

III. Definitions. The definition of the Company's "Field of Interest" in Section 16 (c) of the Agreement is hereby amended to read as follows:

"The Company's `Field of Interest' means the discovery, development, manufacture, distribution, and commercialization of any pharmaceutical product that is based on or involves (a) intervention in cell signaling, (b) cancer therapy, or (c) gene and cell therapy."

IV. This Fifth Amendment shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts applicable to agreements made and to be performed entirely in Massachusetts.

V. Except as modified by this Fifth Amendment, the Agreement remains in full force and effect and unchanged.

IN WITNESS WHEREOF, the parties have executed this Fifth Amendment as of the date first written above.

ARIAD PHARMACEUTICALS, INC.

By:  /s/ Laurie A. Allen
    Laurie A. Allen, Esq.
    Corporate Secretary

EMPLOYEE

/s/  Harvey J. Berger
    Harvey J. Berger, M.D.

2

EXHIBIT 10.57

**Executive Employment Agreement**

      EMPLOYMENT AGREEMENT (the "Agreement") made as of September 25, 2005 between ARIAD Pharmaceuticals, Inc. (the "Company"), a Delaware corporation, and Richard W. Pascoe (the "Employee").

      1. <u>Employment, Duties and Acceptance</u>.

      1.1 The Company hereby employs the Employee, for the Term (as hereinafter defined), to render full-time services to the Company, and to perform such duties as he shall reasonably be directed by the Chief Executive Officer of the Company to perform. The Employee's title shall be designated by the Chief Executive Officer and initially shall be Vice President and Chief Commercial Officer.

      1.2  The Employee hereby accepts such employment and agrees to render the services described above.

1.3 The principal place of employment of the Employee hereunder shall be in the greater Boston, Massachusetts area, or other locations reasonably acceptable to the Employee. The Employee acknowledges that for limited periods of time he may be required to provide services to the Company outside of the Boston, Massachusetts area.

1.4 Notwithstanding anything to the contrary herein, although the Employee shall provide services as a full-time employee, it is understood that the Employee may (a) have an academic appointment and (b) participate in professional activities (collectively, "Permitted Activities');  <u>provided</u> , <u>however</u> , that such Permitted Activities do not interfere with the Employee's duties to the Company.

1

2. <u>Term of Employment</u>.

The term of the Employee's employment under this Agreement (the "Term") shall commence on November 14, 2005 (the "Effective Date"), or such other date mutually agreed upon by the parties, and shall end on December 31, 2007, unless sooner terminated pursuant to Section 4 or 5 of this Agreement; provided, however, that this Agreement shall automatically be renewed for successive one-year terms (the Term and, if the period of employment is so renewed, such additional period(s) of employment are collectively referred to herein as the "Term") unless terminated by written notice given by either party to the other at least 90 days prior to the end of the applicable Term.

3. <u>Compensation</u>.

3.1  As full compensation for all services to be rendered pursuant to this Agreement, the Company agrees to pay the Employee, during the Term, a salary at the fixed rate of $275,000 per annum during the first year of the Term and increased each year thereafter by amounts, if any, to be determined by the Board of Directors of the Company (the "Board"), in its sole discretion, payable in equal biweekly installments, less such deductions or amounts to be withheld as shall be required by applicable law and regulations.

3.2  Each year, Employee shall be eligible to receive a discretionary bonus of up to a target of 30% of base salary, which bonus shall be determined annually in the sole discretion of the Board. The bonus, if any, may be paid in the form of stock options, restricted stock awards or units, deferred compensation or cash, as determined by the Board.

2

3.3  The Company shall pay or reimburse the Employee for all reasonable expenses actually incurred or paid by him during the Term in the performance of his services under this Agreement, upon presentation of expense statements or vouchers or such other supporting information as it may require.

3.4  The Employee shall be eligible under any incentive plan, stock award plan, bonus, deferred or extra compensation plan, pension, group health, disability, long-term care, and life insurance or other so-called "fringe" benefits, which the Company provides for its executives at the comparable level. All stock options and stock awards granted to the Employee shall be subject to a vesting schedule, which shall be determined by the Compensation Committee of the Board. The stock options and stock awards, if any, to be granted to the Employee in the future shall also be subject to the terms of a stock option plan and certificate and stock award plan and certificate, respectively. Any unvested options shall be forfeited to the Company in the event (a) this Agreement is terminated by the Company for Cause pursuant to Section 4 herein, or (b) either party elects not to renew this Agreement pursuant to Section 2 herein.

3.5  The Company shall grant the Employee an option to purchase 75,000 shares of the Company's Common Stock at the fair market value on the date of the Board's approval of the grant. The Employee agrees that all such options shall be subject to a four-year vesting schedule, vesting in equal increments of 25% on each anniversary of their issuance and shall be subject to the terms and conditions of a stock option agreement between the Employee and the Company. Any unvested options shall be forfeited to the Company in the event (a) this Agreement is terminated by the Company for Cause pursuant to Section 4 herein, or (b) either party elects not to renew this Agreement pursuant to Section 2 herein.

4.  <u>Termination by the Company.</u>

The Company may terminate this Agreement, if any one or more of the following shall occur:

(a) The Employee shall die during the Term; provided, however, that the Employee's legal representatives shall be entitled to receive the compensation provided for hereunder to the last day of the month in which his death occurs.

(b)  The Employee shall become physically or mentally disabled, whether totally or partially, so that he is unable substantially to perform his services hereunder for (i) a period of 180 consecutive days,  or (ii) for shorter periods aggregating 180 days during any 12 month period.

(c)   The Employee acts, or fails to act, in a manner that provides Cause for termination. For purposes of this Agreement, the term "Cause" means (i) the failure by the Employee to perform any of his material duties hereunder, (ii) the conviction of the Employee of any felony involving moral turpitude, (iii) any acts of fraud or embezzlement by the Employee involving the Company or any of its Affiliates, (iv) violation of any federal, state or local law, or administrative regulation related to the business of the Company, (v) breach of fiduciary duty, including, but not limited to, conflict of interest, (vi) conduct that could result in publicity reflecting unfavorably on the Company in a material way, (vii) failure to comply with any written policies of the Company, or (viii) a breach of the terms of this Agreement by the Employee. If the conduct constituting Cause hereunder is susceptible to cure, the Company shall provide the Employee written notice of termination pursuant to this Section 4, and Employee shall have 30 days to cure or remedy such failure or breach, in which case this Agreement shall not be terminated. If the conduct is not susceptible to cure, this Agreement shall terminate upon written notice by the Company.

4

5. <u>Termination by the Employee.</u>

5.1 The Employee may terminate this Agreement, if any one or more of the following shall occur:

(a) a material breach of the terms of this Agreement by the Company and such breach continues for 30 days after the Employee gives the Company written notice of such breach;

(b) the Company shall make a general assignment for benefit of creditors; or any proceeding shall be instituted by the Company seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property or the Company shall take any corporate action to authorize any of the actions set forth above in this subsection 5(b);

(c) an involuntary petition shall be filed or an action or proceeding otherwise commenced against the Company seeking reorganization, arrangement or readjustment of the Company's debts or for any other relief under the Federal Bankruptcy Code, as amended, or under any other bankruptcy or insolvency act or law, state or federal, now or hereafter existing and remain undismissed or unstayed for a period of 30 days; or

(d)  a receiver, assignee, liquidator, trustee or similar officer for the Company or for all or any part of its property shall be appointed involuntarily.

6.  <u>Severance</u>.

6.1 If (i) the Company terminates this Agreement without Cause or (ii) the Employee terminates this Agreement pursuant to Section 5.1(a), then: (1) except in the case of death or disability, the Company shall continue to pay Employee his then-current salary for the remaining period of the applicable Term; (2) all stock options granted pursuant to this Agreement that would have vested during the Term shall vest immediately prior to such termination; and (3) the Company shall continue to provide all benefits subject to COBRA at its expense for up to one year.

7.  <u>Other Benefits</u>.

In addition to all other benefits contained herein, the Employee shall be entitled to:

(a) Relocation expenses for the Employee, consisting of (i) all reasonable direct out-of-pocket costs of transporting the Employee, the Employee's immediate family, and the Employee's household items from the Employee's current residence in New Jersey to a new residence in the greater Boston, Massachusetts area; (ii) reasonable travel and lodging to visit the greater Boston, Massachusetts area to search for a new residence; (iii) reasonable costs of rent and primary services associated with temporary housing at an approved location in the greater Boston, Massachusetts area for a

maximum period of 60 days from the Employee's start date or until he finds a suitable residence, if earlier, and (iv) except as described in the next succeeding sentence and subject to prior approval, the reasonable closing costs associated with the Employee's purchase of a new residence in the greater Boston, Massachusetts area within ten months of the Employee's date of employment. The following closing (settlement) costs will not be paid by the Company: (1) real estate and other taxes, (2) insurance premiums other than title insurance, and (3) commitment fees and prepaid interest (i.e., "points") in excess of 2%

(b)  Vacation time of four weeks per year taken in accordance with the vacation policy of the Company.

(c)  After six years of employment, one three-month period of fully paid leave of absence in accordance with Company policies in place at that time; it being understood that such policies may restrict the Employee from taking such leave of absence until a time that is acceptable to the Company and may include other such limitations.

(d)  Group health, disability, long-term care, and life insurance.

(e)  The Company shall provide the Employee with an automobile allowance of $750 per month and standard tax preparation and planning services.

(f)  To facilitate the Employee's relocation, the Company will provide the Employee with a one-time relocation advance (the "Relocation Advance") in the amount of $25,000 to be used towards the purchase of the Employee's new principal residence (the "Residence"), payable by the Company at the time of closing on such residence (the "Closing"). The Employee shall be obligated to repay the Relocation Advance within thirty days of the occurrence of any of the following events: (a) the Employee terminates this Agreement prior to December 31, 2006, except as provided pursuant to Section 5.1 herein, or (b) the Company terminates this Agreement for Cause pursuant to Section 4 herein. As of December 31, 2006, the Relocation Advance shall no longer be subject to repayment by the Employee.

8. Confidentiality.

        8.1 The Employee acknowledges that, during the course of performing his services hereunder, the Company shall be disclosing information to the Employee related to the Company's Field of Interest, Inventions, projects and business plans, as well as other information (collectively, "Confidential Information"). The Employee acknowledges that the Company's business is extremely competitive, dependent in part upon the maintenance of secrecy, and that any disclosure of the Confidential Information would result in serious harm to the Company.

8.2   The Employee agrees that the Confidential Information only shall be used by the Employee in connection with his activities hereunder as an employee of the Company, and shall not be used in any way that is detrimental to the Company.

        8.3 The Employee agrees not to disclose, directly or indirectly, the Confidential Information to any third person or entity, other than representatives or agents of the Company. The Employee shall treat all such information as confidential and proprietary property of the Company.

        8.4 The term "Confidential Information" does not include information that (a) is or becomes generally available to the public other than by disclosure in violation of this Agreement, (b) was within the Employee's possession prior to being furnished to such Employee, (c) becomes available to the Employee on a nonconfidential basis or (d) was independently developed by the Employee without reference to the information provided by the Company.

8.5  The Employee may disclose any Confidential Information that is required to be disclosed by law, government regulation or court order. If disclosure is required, the Employee shall give the Company advance notice so that the Company may seek a protective order or take other action reasonable in light of the circumstances.

8.6 Upon termination of this Agreement, the Employee shall promptly return to the Company all materials containing Confidential Information, as well as data, records, reports and other property, furnished by the Company to the Employee or produced by the Employee in connection with services rendered hereunder. Notwithstanding such return or any of the provisions of this Agreement, the Employee shall continue to be bound by the terms of the confidentiality provisions contained in this Section 8 for a period of three years after the termination of this Agreement.

8.7 In connection with his employment by the Company, the Employee hereby acknowledges that he may enter into more than one agreement with regard to (a) the confidentiality of certain books, records, documents and business, (b) rights to certain inventions, proprietary information, and writings, (c) publication of certain materials, and (d) other related matters (the "Confidential Matters") of the Company (the "Confidentiality Agreements"). In order to clarify any potential conflicts between certain respective provisions of such Confidentiality Agreements, the Employee and the Company hereby agree that, as among such Confidentiality Agreements, the provision (or part thereof) in any such Confidentiality Agreement which affords the greatest protection to the Company with respect to the Confidential Matters shall control.

9. <u>Inventions Discovered by the Employee While Performing Services Hereunder</u>.

During the Term, the Employee shall promptly disclose to the Company any invention, improvement, discovery, process, formula, or method or other intellectual property, whether or not patentable, whether or not copyrightable (collectively, "Inventions") made, conceived or first reduced to practice by the Employee, either alone or jointly with others, while performing service hereunder. The Employee hereby assigns to the Company all of his right, title and interest in and to any such Inventions. During and after the Term, the Employee shall execute any documents necessary to perfect the assignment of such Inventions to the Company and to enable the Company to apply for, obtain, and enforce patents and copyrights in any and all countries on such Inventions. The Employee hereby irrevocably designates the Chief Patent Counsel to the Company as his agent and attorney-in-fact to execute and file any such document and to do all lawful acts necessary to apply for and obtain patents and copyrights and to enforce the Company's rights under this paragraph. This Section 9 shall survive the termination of this Agreement.

9

10.  <u>Non-Competition and Non-Solicitation</u>.

During the Term and for a period of one year following the date of termination or nonrenewal for any reason (other than termination pursuant to Section 5.1(a): (a) the Employee shall not in the United States or in any country in which the Company shall then be doing business, directly or indirectly, enter the employ of, or render any services to, any person, firm or corporation engaged in any business competitive with the business of the Company or of any of its subsidiaries or affiliates of which the Employee may become an employee or officer during the Term; he shall not engage in such business on his own account; and he shall not become interested in any such business, directly or indirectly, as an individual, partner, shareholder, director, officer, principal, agent, employee, trustee, consultant, or any other relationship or capacity; provided, however, that nothing contained in this Section 10 shall be deemed to prohibit the Employee from acquiring, solely as an investment, shares of capital stock of any public corporation; (b) neither the Employee nor any Affiliate of the Employee shall solicit or utilize, or assist any person in any way to solicit or utilize, the services, directly or indirectly, of any of the Company's directors, consultants, members of the Board of Scientific and Medical Advisors, officers or employees (collectively, "Associates of the Company"). This nonsolicitation and nonutilization provision shall not apply to Associates of the Company who have previously terminated their relationship with the Company.

10.1  If the Employee commits a breach, or threatens to commit a breach, of any of the provisions of this Section 10, the Company shall have the following rights and remedies:

10.1.1  The right and remedy to have the provisions of this Agreement specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to the Company and that money damages shall not provide an adequate remedy to the Company; and

10

10.1.2  The right and remedy to require the Employee to account for and pay over to the Company all compensation, profits, monies, accruals,  increments or other benefits (collectively "Benefits") derived or received by the Employee as the result of any transactions constituting a breach of any of the provisions of the preceding paragraph, and the Employee hereby agrees to account for and pay over such Benefits to the Company.

Each of the rights and remedies enumerated above shall be independent of the other, and shall be severally enforceable, and all of such rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available to the Company under law or in equity.

10.2 If any of the covenants contained in Section 8, 9 or 10, or any part thereof, is hereafter construed to be invalid or unenforceable, the same shall not affect the remainder of the covenant or covenants, which shall be given full effect without regard to the invalid portions.

10.3 If any of the covenants contained in Section 8, 9 or 10, or any part thereof, is held to be unenforceable because of the duration of such provision or the area covered thereby, the parties agree that the court making such determination shall have the power to reduce the duration and/or area of such provision and, in its reduced form, such provision shall then be enforceable.

10.4 The parties hereto intend to and hereby confer jurisdiction to enforce the covenants contained in Sections 8, 9 and 10 upon the courts of any state within the geographical scope of such covenants. In the event that the courts of any one or more of such states shall hold any such covenant wholly unenforceable by reason of the breadth of such scope or otherwise, it is the intention of the parties hereto that such determination not bar or in any way affect the Company's right to the relief provided above in the courts of any other states within the geographical scope of such covenants, as to breaches of such covenants in such other respective jurisdictions, the above covenants as they relate to each state being, for this purpose, severable into diverse and independent covenants.

11.  <u>Indemnification</u>.

The Company shall indemnify the Employee, to the maximum extent permitted by applicable law, against all costs, charges and expenses incurred or sustained by him in connection with any action, suit or proceeding to which he may be made a party by reason of his being an officer, director or employee of the Company or of any subsidiary or affiliate of the Company. The Company shall provide, subject to its availability upon reasonable terms (which determination shall be made by the Board) at its expense, directors and officers insurance for the Employee in reasonable amounts. Determination with respect to (a) the availability of insurance upon reasonable terms and (b) the amount of such insurance coverage shall be made by the Board in its sole discretion.

12.  <u>Notices</u>.

All notices, requests, consents and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if sent by prepaid telegram (confirmed delivery by the telegram service), private overnight mail service (delivery confirmed by such service), registered or certified mail (return receipt requested), or delivered personally, as follows (or to such other address as either party shall designate by notice in writing to the other in accordance herewith):

If to the Company:

ARIAD Pharmaceuticals, Inc.
26 Landsdowne Street
Cambridge, Massachusetts 02139
Attention: Chief Executive Officer

Telephone:  (617) 494-0400
Facsimile: (617) 494-1828

If to the Employee:

Richard W. Pascoe
39 Monroe Avenue
Belle Mead, New Jersey 08502

Telephone:  (609) 240-4926

12

13.   <u>General</u>.

13.1 This Agreement shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts applicable to agreements made and to be performed entirely in Massachusetts.

13.2  The Section headings contained herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

13.3  This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter hereof, and supersedes all prior agreements, arrangements and understandings, written or oral, relating to the subject matter hereof. No representation, promise or inducement has been made by either party that is not embodied in this Agreement, and neither party shall be bound by or liable for any alleged representation, promise or inducement not so set forth.

13

13.4  This Agreement and the Employee's rights and obligations hereunder may not be assigned by the Employee or the Company; provided, however, the Company may assign this Agreement to an Affiliate or a successor-in interest.

13.5 This Agreement may be amended, modified, superseded, canceled, renewed or extended, and the terms or covenants hereof may be waived, only by a written instrument executed by the parties hereto, or in the case of a waiver, by the party waiving compliance. The failure of a party at any time or times to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same. No waiver by a party of the breach of any term or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such breach, or a waiver of the breach of any other term or covenant contained in this Agreement.

14. Definitions. As used herein the following terms have the following meaning:

(a)  "Affiliate" means and includes any corporation or other business entity controlling, controlled by or under common control with the corporation in question.

(b) The "Company's Field of Interest" is the discovery, development and commercialization of pharmaceutical products based on (a) intervention in cell signaling and (b) gene and cell therapy. The Company's Field of Interest may be changed at any time at the sole discretion of the Company and upon written notice to Employee.

14

(c)  "Person" means any natural person, corporation, partnership, firm, joint venture, association, joint stock company, trust, unincorporated organization, governmental body or other entity.

(d)  "Subsidiary" means any corporation or other business entity directly or indirectly controlled by the corporation in question.

[This space intentionally left blank.]

15

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

ARIAD PHARMACEUTICALS, INC.

By:  /s/ Harvey J. Berger
_____
     Harvey J. Berger, M.D.
     Chairman and Chief Executive Officer

EMPLOYEE

  /s/ Richard W. Pascoe
_____
     Richard W. Pascoe

16

EXHIBIT 23.1

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Registration Statement Nos. 33-90854, 333-36597, 333-63706, 333-90480 and 333-116996 of ARIAD Pharmaceuticals, Inc. on Form S-8 and Registration Statement Nos. 333-111401 and 333-122909 of ARIAD Pharmaceuticals, Inc. on Form S-3 of our report dated March 13, 2006, relating to the consolidated financial statements of ARIAD Pharmaceuticals, Inc. and management's report on the effectiveness of internal control over financial reporting, appearing in this Annual Report on Form 10-K of ARIAD Pharmaceuticals, Inc. for the year ended December 31, 2005.


/s/DELOITTE & TOUCHE LLP


Boston, Massachusetts
March 13, 2006

EXHIBIT 31.1

**CERTIFICATIONS**

I, Harvey J. Berger, M.D., certify that:

1. I have reviewed this annual report on Form 10-K of ARIAD Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

    a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

March 14, 2006

/s/ Harvey J. Berger, M.D.
Harvey J. Berger, M.D.
Chairman of the Board of Directors,
Chief Executive Officer and President

EXHIBIT 31.2

## CERTIFICATIONS

I, Edward M. Fitzgerald, certify that:

1. I have reviewed this annual report on Form 10-K of ARIAD Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

March 14, 2006                                    /s/ Edward M. Fitzgerald
                                                 Edward M. Fitzgerald
                                                 Senior Vice President,
                                                 Finance and Corporate Operations, and
                                                 Chief Financial Officer and Treasurer

EXHIBIT 32.1

**CERTIFICATION**
**PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**
**(Subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code)**

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), each of the undersigned officers of ARIAD Pharmaceuticals, Inc., a Delaware corporation (the "Company"), does hereby certify, to such officer's knowledge, that:

The Annual Report on Form 10-K for the year ended December 31, 2005 (the "Form 10-K") of the Company fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, and the information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: March 14, 2006

/s/ Harvey J. Berger, M.D.
Harvey J. Berger, M.D.
Chairman of the Board of Directors,
Chief Executive Officer and President

Dated: March 14, 2006

/s/ Edward M. Fitzgerald
Edward M. Fitzgerald
Senior Vice President,
Finance and Corporate Operations, and
Chief Financial Officer and Treasurer

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

Created by 10KWizard     www.10KWizard.com

# EXHIBIT M



# Form 10-Q

## ARIAD PHARMACEUTICALS INC - ARIA
Filed: August 08, 2006 (period: June 30, 2006)

Quarterly report which provides a continuing view of a company's financial position

# Table of Contents

## PART I.

FINANCIAL INFORMATION 1
ITEM 1.    UNAUDITED FINANCIAL STATEMENTS 1

## PART I.

FINANCIAL INFORMATION
ITEM 1.    UNAUDITED FINANCIAL STATEMENTS
ITEM 2.    MANAGEMENTS DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF
OPERATIONS
ITEM 3.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK
ITEM 4.    CONTROLS AND PROCEDURES

## PART II.

OTHER INFORMATION
ITEM 1.    LEGAL PROCEEDINGS
ITEM 1A.  RISK FACTORS
ITEM 4.    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS
ITEM 6.    EXHIBITS
SIGNATURES
EXHIBIT INDEX

EX-10.2 (Material contracts)

EX-10.3 (Material contracts)

EX-10.4 (Material contracts)

EX-10.5 (Material contracts)

EX-31.1

EX-31.2

EX-32.1

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-Q

|X|    QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934
**For the quarterly period ended June 30, 2006**

OR

| |    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (d)
OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to _____

Commission File Number: 0-21696

# ARIAD Pharmaceuticals, Inc.

(Exact name of Registrant as specified in its charter)

**Delaware**                                                                                          **22-3106987**

(State or other jurisdiction of                                             (I.R.S. Employer Identification No.)
incorporation or organization)

**26 Landsdowne Street, Cambridge, Massachusetts 02139**

(Address of principal executive offices) (Zip Code)

**Registrant's Telephone Number, Including Area Code: (617) 494-0400**

Former Name, Former Address and Former Fiscal Year,
If Changed Since Last Report: Not Applicable

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

**Yes |X|**                    **No | |**

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "large accelerated filer and accelerated filer" in Rule 12b-2 of the Exchange Act.

**Large accelerated filer | |**                    **Accelerated filer |X|**                    **Non-accelerated filer | |**

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b - 2 of the Exchange Act).

**Yes | |**                    **No |X|**

The number of shares of the Registrant's common stock outstanding as of August 1, 2006 was 62,107,793.

**ARIAD PHARMACEUTICALS, INC.**

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| PART I. | FINANCIAL INFORMATION | 1 |
| ITEM 1. | UNAUDITED FINANCIAL STATEMENTS | 1 |
| | Condensed Consolidated Balance Sheets - June 30, 2006 and December 31, 2005 | 1 |
| | Condensed Consolidated Statements of Operations for the Three Months and Six Months Ended June 30, 2006 and 2005 | 2 |
| | Condensed Consolidated Statements of Cash Flows for the Six Months Ended June 30, 2006 and 2005 | 3 |
| | Notes to Unaudited Condensed Consolidated Financial Statements | 4 |
| ITEM 2. | MANAGEMENT_S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 10 |
| ITEM 3. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 19 |
| ITEM 4. | CONTROLS AND PROCEDURES | 21 |
| PART II. | OTHER INFORMATION | 22 |
| ITEM 1. | LEGAL PROCEEDINGS | 22 |
| ITEM 1A. | RISK FACTORS | 24 |
| ITEM 4. | SUBMISSION OF MATTERS TO VOTE OF SECURITY HOLDERS | 27 |
| ITEM 6. | EXHIBITS | 28 |
| | SIGNATURES | 29 |
| | EXHIBIT INDEX | 30 |

**ITEM 1. UNAUDITED FINANCIAL STATEMENTS**

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**

| *In thousands, except share and per share data* | | June 30, 2006 | | December 31, 2005 |
|---|---|---|---|---|
| | | (Unaudited) | | |
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 24,499 | $ | 25,453 |
| Marketable securities | | 29,830 | | 56,063 |
| Inventory and other current assets | | 2,935 | | 2,225 |
| Total current assets | | 57,264 | | 83,741 |
| Property and equipment: | | | | |
| Leasehold improvements | | 18,058 | | 17,840 |
| Equipment and furniture | | 10,540 | | 9,908 |
| Total | | 28,598 | | 27,748 |
| Less accumulated depreciation and amortization | | (21,825) | | (20,022) |
| Property and equipment, net | | 6,773 | | 7,726 |
| Intangible and other assets, net | | 4,501 | | 4,707 |
| Total assets | $ | 68,538 | $ | 96,174 |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Current portion of long-term debt | $ | 1,920 | $ | 1,920 |
| Accounts payable | | 5,889 | | 3,961 |
| Accrued compensation and benefits | | 774 | | 497 |
| Accrued product development expenses | | 7,350 | | 8,444 |
| Other accrued expenses | | 3,018 | | 2,097 |
| Deferred revenue - current portion | | 729 | | 851 |
| Total current liabilities | | 19,680 | | 17,770 |
| Long-term debt | | 4,775 | | 5,735 |
| Deferred revenue | | 13 | | 24 |
| Deferred executive compensation | | 1,415 | | 1,267 |
| Stockholders' equity: | | | | |
| Common stock, $.001 par value; authorized, 145,000,000 shares; issued and outstanding, 62,097,526 shares in 2006 and 61,698,129 shares in 2005 | | 62 | | 62 |
| Additional paid-in capital | | 322,060 | | 318,684 |
| Deferred compensation | | | | (246) |
| Accumulated other comprehensive loss | | (15) | | (24) |
| Accumulated deficit | | (279,452) | | (247,098) |
| Total stockholders' equity | | 42,655 | | 71,378 |
| Total liabilities and stockholders' equity | $ | 68,538 | $ | 96,174 |

See notes to unaudited condensed consolidated financial statements.

1

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| *In thousands, except share and per share data* | 2006 | 2005 | 2006 | 2005 |
|---|---|---|---|---|
| License revenue | $ 229 | $ 350 | $ 458 | $ 654 |
| Operating expenses: | | | | |
| Research and development | 10,144 | 12,093 | 21,818 | 22,747 |
| General and administrative | 7,531 | 2,600 | 11,987 | 4,916 |
| Total operating expenses | 17,675 | 14,693 | 33,805 | 27,663 |
| Loss from operations | (17,446) | (14,343) | (33,347) | (27,009) |
| Other income (expense): | | | | |
| Interest income | 574 | 367 | 1,239 | 761 |
| Interest expense | (124) | (107) | (246) | (181) |
| Total other income, net | 450 | 260 | 993 | 580 |
| Net loss | $ (16,996) | $ (14,083) | $ (32,354) | $ (26,429) |
| Net loss per share | $ (.27) | $ (.27) | $ (.52) | $ (.50) |
| Weighted-average number of shares of common stock outstanding | 62,093,353 | 52,901,275 | 61,827,494 | 52,854,653 |

See notes to unaudited condensed consolidated financial statements.

2

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**

|  | Six Months Ended June 30, | |
| --- | --- | --- |
| *In thousands* | **2006** | **2005** |
| Cash flows from operating activities: | | |
| Net loss | $ (32,354) | $ (26,429) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 2,344 | 969 |
| Accretion of discount on marketable securities | (973) | (371) |
| Deferred executive compensation expense | 449 | 282 |
| Stock-based compensation | 2,272 | 273 |
| Increase (decrease) from: | | |
| Inventory and other current assets | (710) | 110 |
| Other assets | 3 | (27) |
| Accounts payable | 1,928 | 383 |
| Accrued compensation and benefits | 277 | 127 |
| Accrued product development expenses | (1,094) | 3,135 |
| Other accrued expenses | 921 | 941 |
| Deferred revenue | (133) | 171 |
| Deferred executive compensation paid | (301) | (291) |
| Net cash used in operating activities | (27,371) | (20,727) |
| Cash flows from investing activities: | | |
| Proceeds from sales and maturities of marketable securities | 53,753 | 29,625 |
| Purchases of marketable securities | (26,538) | (10,501) |
| Investment in property and equipment | (860) | (4,100) |
| Investment in intangible assets | (327) | (492) |
| Net cash provided by investing activities | 26,028 | 14,532 |
| Cash flows from financing activities: | | |
| Repayment of borrowings | (960) | (960) |
| Proceeds from issuance of stock pursuant to stock option and purchase plans | 1,349 | 585 |
| Net cash provided by (used in) financing activities | 389 | (375) |
| Net increase in cash and cash equivalents | (954) | (6,570) |
| Cash and cash equivalents, beginning of period | 25,453 | 18,556 |
| Cash and cash equivalents, end of period | $ 24,499 | $ 11,986 |

See notes to unaudited condensed consolidated financial statements.

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**NOTES TO UNAUDITED CONDENSED CONSOLIDATED**
**FINANCIAL STATEMENTS**

**1. Management Statement**

In the opinion of the Company's management, the accompanying unaudited condensed consolidated financial statements contain all adjustments (consisting of items of a normal and recurring nature) necessary to present fairly the financial position as of June 30, 2006, the results of operations for the three-month and six-month periods ended June 30, 2006 and 2005 and cash flows for the six-month periods ended June 30, 2006 and 2005. The results of operations for the six-month period ended June 30, 2006 are not necessarily indicative of the results to be expected for the full year. These financial statements should be read in conjunction with the Company's Annual Report on Form 10-K for the year ended December 31, 2005, which includes consolidated financial statements and notes thereto for the years ended December 31, 2005, 2004 and 2003.

**2. Marketable Securities**

The Company has classified its marketable securities as available-for-sale and, accordingly, carries such securities at aggregate fair value. At June 30, 2006, all of the Company's marketable securities consisted of United States government or agency securities.

At June 30, 2006, the aggregate fair value and amortized cost of the Company's marketable securities were $29,830,000 and $29,845,000, respectively. Gross unrealized gains and losses were $1,000 and $16,000, respectively, at June 30, 2006. The gross unrealized losses of $16,000 pertain to ten marketable securities with an aggregate fair value of $26.9 million, all of which have been in a continuous loss position for less than twelve months.

At December 31, 2005, the aggregate fair value and amortized cost of the Company's marketable securities were $56,063,000 and $56,087,000, respectively. Gross unrealized gains and losses were $9,000 and $33,000 respectively, at December 31, 2005. The gross unrealized losses of $33,000 pertain to fourteen marketable securities with an aggregate fair value of $35.6 million, all of which have been in a continuous loss position for less than twelve months.

The Company's marketable securities with unrealized losses consist of U.S. Treasury and agency securities that are guaranteed by the U.S. government or an agency thereof. The unrealized losses were caused by increased interest rates. Because the Company has the intent and ability to hold the securities to maturity which should result in a recovery of the fair value, the Company does not consider the investments to be other-than-temporarily impaired.

Realized gains and losses on investment security transactions are reported on the specific-identification method. Realized gains and losses on sales of marketable securities were not material during the six months ended June 30, 2006. Changes in market values resulted in a decrease in net unrealized loss of $9,000 for the six-month period ended June 30, 2006.

**3. Executive Compensation Plans**

Under the Company's deferred executive compensation plan established in 1997 (the "1997 Plan"), participants were granted options to purchase shares of certain designated mutual funds at a discount equal to the amount of the award. The options vest equally over four years.

Effective in October 2005, the Company established a new deferred executive compensation plan (the "2005 Plan") and amended the 1997 Plan to meet the new requirements of Section 409A of the Internal Revenue Code. Under the 2005 Plan, the Company may grant deferred performance-based or ad hoc bonuses to its executive officers, key employees and key advisors. Such awards will include vesting and payment provisions, as provided under the terms of the 2005 Plan. The value of amounts deferred under the 2005 Plan will be based on the actual performance of investments designated by the Company from time to time. The Company will recognize expense related to these awards over the vesting period.

Total expense related to these plans amounted to $449,000 and $282,000 for the six-month periods ended June 30, 2006 and 2005, respectively.

**4. Net Loss Per Share**

Net loss per share amounts have been computed based on the weighted-average number of common shares outstanding during each period. Because of the net loss reported in each period, diluted and basic per share amounts are the same. For the six months ended June 30, 2006 and 2005, options to purchase 6,907,899 and 5,973,138 shares of common stock, respectively, were not included in the computation of net loss per share, because the effect would have been anti-dilutive.

**5. Stock-Based Compensation**

The Company awards stock options and other equity-based instruments to its employees, directors and consultants and provides employees the right to purchase common stock (collectively "share-based payments"), pursuant to stockholder approved plans. Effective January 1, 2006, the Company adopted Statement of Financial Accounting Standards No. 123 (revised 2004), *Share-Based Payment* ("SFAS No. 123R"), using the Statement's modified prospective application method. Accordingly, prior period results have not been restated.

Under the provisions of SFAS No. 123R, the Company recognizes compensation expense in its financial statements associated with awards of stock options and other equity-based instruments to employees, directors and consultants. Compensation cost is measured based on the fair value of the instrument on the grant date and is recognized over the requisite service period, which generally equals the vesting period. All of the Company's stock-based compensation is based on grants of equity instruments and no liability awards have been granted.

The Company's statement of operations included total compensation cost from share-based payments for the three-month and six-month periods ended June 30, 2006 and 2005 as follows:

| In thousands | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2006 | 2005 | 2006 | 2005 |
| Compensation cost from: | | | | |
| Stock options | $ 896 | $ (14) | $ 1,880 | $ 9 |
| Stock and stock units | 185 | 132 | 369 | 264 |
| Purchases of common stock at a discount | 15 | -- | 23 | -- |
| | $ 1,096 | $ 118 | $ 2,272 | $ 273 |

The adoption of SFAS No. 123R resulted in incremental stock-based compensation expense of $908,000 and $1.9 million for the three months and six months ended June 30, 2006, respectively, which caused the Company's net loss to increase by $908,000 and $1.9 million and its net loss per share to increase by $ 0.02 and $0.04 per share for the corresponding periods. The adoption had no impact on cash used in operating activities or cash provided by financing activities.

Prior to January 1, 2006, the Company followed Accounting Principles Board ("APB") Opinion 25, *Accounting for Stock Issued to Employees*, and related interpretations, in accounting for its stock-based awards. The following table illustrates the effect on net income and earnings per share if the Company had applied the fair value recognition provisions of SFAS No. 123 to stock-based awards for the three-month and six-month periods ended June 30, 2005.

|  | Three Months Ended June 30, 2005 | Six Months Ended June 30, 2005 |
|---|---|---|
| *In thousands, except per share amounts* | | |
| Net loss as reported | $ (14,083) | $ (26,429) |
| Effect of stock options if valued at fair value | (972) | (1,997) |
| Pro forma net loss | $ (15,055) | $ (28,426) |
| | | |
| Net loss per share as reported | $ (.27) | $ (.50) |
| Effect of stock options if valued at fair value | (.02) | (.04) |
| Pro forma net loss per share | $ (.29) | $ (.54) |

*Stock Options*

Stock options are granted with an exercise price equal to the closing market price of the Company's common stock on the date of grant. Stock options generally vest ratably over four years and have contractual terms of ten years. Stock options are valued using the Black-Scholes option valuation model and compensation is recognized based on such fair value over the period of vesting on a straight-line basis.

The following table summarizes information about stock options for the six-month periods ended June 30, 2006 and 2005:

|  | Six Months Ended June 30, | |
|---|---|---|
| *In thousands, except per share amounts* | **2006** | **2005** |
| Weighted average fair value of options granted, per share | $ 4.20 | $ 6.12 |
| Total cash received from exercises of stock options | 1,259 | 535 |
| Total intrinsic value of stock options exercised | 1,103 | 469 |
| Total fair value of stock options vested | 1,551 | 1,049 |

The weighted average fair value of options granted in the six-month periods ended June 30, 2006 and 2005 reflect the following weighted-average assumptions:

|  | Six Months Ended June 30, | |
|---|---|---|
|  | **2006** | **2005** |
| Expected life of options granted (*in years*) | 7.12 | 6.04 |
| Expected volatility | 70.72% | 109.43% |
| Risk-free rate | 4.59% | 3.86% |
| Expected dividends | 0% | 0% |

The expected life assumption is based on an analysis of historical behavior of participants related to options awarded over time. The expected volatility assumption for the six months ended June 30, 2006, is based on the implied volatility of the Company's common stock, derived from analysis of historical traded and quoted options on the Company's common stock over the period commensurate with the expected life of the options granted. The expected volatility for the six months ended June 30, 2005 is based on the historical volatility of the Company's common stock. The risk-free rate is based on the forward U.S. Treasury yield curve. The expected dividends reflect the Company's current and expected future policy for dividends on its common stock.

6

Based on the Company's historical employee departure rates, an annualized estimated forfeiture rate of 16.2% has been used in calculating compensation cost. Under the provisions of SFAS No. 123R, additional expense will be recorded if the actual forfeiture rate is lower than estimated, and a recovery of prior expense will be recorded if the actual forfeiture is higher than estimated.

Stock option activity under the Company's stock plans for the six-month period ended June 30, 2006 was as follows:

| | Number of Shares | | Weighted Average Exercise Price Per Share |
|---|---|---|---|
| Options outstanding, January 1, 2006 | 6,826,644 | $ | 5.28 |
| Granted | 518,045 | | 6.41 |
| Exercised | (351,315) | | 3.58 |
| Forfeited | (20,540) | | 7.13 |
| Expired | (64,935) | | 11.72 |
| Options outstanding, June 30, 2006 | 6,907,899 | | 5.38 |
| Options exercisable, June 30, 2006 | 4,283,722 | | 4.72 |

Activity for non-vested stock option awards for the six-month period ended June 30, 2006 was as follows:

| | Number of Shares | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Non-vested options outstanding, January 1, 2006 | 2,480,796 | $ | 5.22 |
| Granted | 518,045 | | 4.20 |
| Vested | (354,124) | | 4.38 |
| Forfeited | (20,540) | | 5.66 |
| Non-vested options outstanding, June 30, 2006 | 2,624,177 | | 5.15 |

The following table summarizes information about stock options outstanding as of June 30, 2006:

| | Options Outstanding | | Options Exercisable | |
|---|---|---|---|---|
| Number of options | | 6,907,899 | | 4,283,722 |
| Weighted-average exercise price per share | $ | 5.38 | $ | 4.72 |
| Aggregate intrinsic value (in 000's) | $ | (6,018) | $ | (879) |
| Weighted average remaining contractual term (in years) | | 6.41 | | 4.90 |

At June 30, 2006, total unrecognized compensation cost related to non-vested stock options outstanding amounted to $5,891,000. That cost is expected to be recognized over a weighted-average period of 2.2 years.

*Stock and Stock Unit Grants*

Stock and stock unit grants are provided to directors as compensation and generally carry no restrictions as to resale. Stock grants to executive officers carry restrictions as to resale for periods of time specified in the grant. Stock and stock unit grants are valued at the closing market price of the Company's common stock on the date of grant and compensation is recognized over the requisite service period or period during which restrictions remain on the common stock or stock units granted.

Stock and stock units amounting to 80,000 were granted in each of the six-month periods ended June 30, 2006 and 2005. The weighted-average fair value of stock and stock unit awards granted in the six-month periods ended June 30, 2006 and 2005 was $6.43 and $6.62, respectively. At June 30, 2006, total unrecognized compensation cost related to stock and stock unit awards amounted to $369,000 which is expected to be recognized over a weighted-average period of six months.

7

*Purchase of Common Stock Pursuant to Employee Stock Purchase Plan*

Purchases of common stock by employees are provided pursuant to the Company's employee stock purchase plan. Purchase price is calculated as 85% of the lower of the closing price of our common stock on the first trading day or last trading day of each calendar quarter. Compensation cost is equal to the fair value of the discount on the date of grant and is recognized as compensation in the period of purchase.

**6. Litigation**

NF-°B Patent Infringement Litigation and Reexamination

*Lilly Litigation*

In 2002, the Company, together with Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research and Harvard University (collectively, the Plaintiffs) filed a lawsuit in the United States District Court for the District of Massachusetts, or the U.S. District Court, against Eli Lilly and Company, hereinafter referred to as Lilly, alleging infringement of certain claims, or the NF-κB `516 Claims, of the Plaintiffs' U.S. Patent No. 6,410,516, or the `516 Patent, covering methods of treating human disease by regulating NF-κB cell-signaling activity through sales of Lilly's osteoporosis drug, Evista®, and Lilly's septic shock drug, Xigris®, and seeking monetary damages from Lilly.

This case was tried before a jury in the U.S. District Court from April 10, 2006 through April 28, 2006. After deliberations, on May 4, 2006, the jury rendered a verdict in favor of the Plaintiffs by finding that the NF-κB `516 Claims asserted in the lawsuit are valid and infringed by Lilly through sales of Evista and Xigris in the United States. The jury awarded damages to the Plaintiffs in the amount of approximately $65.2 million, based on the jury's determination of a reasonable royalty rate of 2.3% to be paid by Lilly to the Plaintiffs based on U.S. sales of Evista and Xigris from the date of the filing of the lawsuit on June 25, 2002 through February 28, 2006. The jury awarded further damages on an ongoing basis, in amounts to be determined, equal to 2.3% of U.S. sales of Evista and Xigris through the year 2019, when the patent expires. If the verdict is upheld, damages paid by Lilly will be applied first to reimburse the Company for any unreimbursed legal fees and expenses relating to the litigation. The Company will receive 91% of the remainder, and the co-plaintiffs will receive 9%.

A separate trial, or bench trial, commenced before the judge on August 7, 2006 on certain defenses asserted by Lilly relating to the validity and enforceability of the NF-κB `516 Claims, which must be addressed before the judge enters a final judgment in this lawsuit. Lilly has the right to file motions challenging the jury's verdict in this lawsuit, and, upon the entry of a final judgment by the U.S. District Court, to file an appeal of the jury's verdict and other rulings by the U.S. District Court with the Court of Appeals for the Federal Circuit.

*Amgen Litigation*

On April 20, 2006, Amgen Inc. and certain affiliated entities, hereinafter referred to as Amgen, filed a lawsuit against the Company in the U.S. District Court for the District of Delaware seeking a declaratory judgment that each of the claims contained in the `516 Patent are invalid and that Amgen has not infringed any of the claims of the `516 Patent based on activities related to Amgen's products, Enbrel® and Kineret®.

The Company believes there is no basis for the declaratory relief sought by Amgen. Therefore, the Company filed a motion to dismiss this case in the U.S. District Court on June 14, 2006. Amgen filed its opposition to the motion to dismiss on June 28, 2006, to which the Company filed its reply memorandum of law in support of its motion to dismiss on July 13, 2006. Oral argument on the motion to dismiss is scheduled for September 11, 2006.

Pending ruling by the U.S. District Court on the Company's motion to dismiss this action, a scheduling order pursuant to Rule 16 of the Federal Rules of Civil Procedure was entered by the U.S. District Court on July 19, 2006. Pursuant to that order, a claim construction hearing in this case is scheduled for September 7, 2007, with trial scheduled to commence on February 4, 2008.

*Re-examination Proceedings in PTO*

On April 4, 2005, Lilly filed an ex parte request in the United States Patent and Trademark Office, or PTO, to reexamine the patentability of certain claims of the `516 Patent. In addition, an unrelated third party filed an ex parte request in the PTO on December 2, 2005 to reexamine the patentability of certain claims of the `516 Patent. The PTO has granted both of these reexamination requests. On April 4, 2006, counsel for the patentees of the `516 Patent filed separate Petitions requesting the PTO to merge these two reexamination requests, which was granted by the PTO on May 4, 2006. Additionally, on April 7, 2006, counsel for the patentees of the `516 Patent filed a third ex parte request in the PTO with respect to one claim of the `516 Patent, which was denied by the PTO on May 5, 2006.

As a result of the PTO orders described above, Lilly's ex parte request has been merged into a single action with the ex parte request filed on December 2, 2005 (the "Merged Requests"). The Merged Requests question the patentability of certain claims of the `516 Patent by newly cited references which (i) either inherently or expressly disclose the use of a variety of prior art compounds as reducing NF- $\kappa$ B activity and resulting gene expression, or (ii) are directed to the use of oligonucleotides having an NF- $\kappa$ B binding site for reduction of NF- $\kappa$ B activity. The PTO issued a first office action addressing the Merged Requests on August 2, 2006. Prior thereto, on June 9, 2006, Plaintiffs filed a complaint in the U.S. District Court in the Eastern District of Virginia requesting that the U.S. District Court enjoin the PTO from continuing the reexamination of the Merged Requests and ordering the PTO to grant the patentee's petition to vacate the PTO's orders granting the Merged Requests. Also, on July 12, 2006, Plaintiffs filed a motion for summary judgment on their complaint with the U.S. District Court. On August 1, 2006, Lilly filed a motion to intervene and opposing Plaintiff's motion for summary judgment. A hearing on Plaintiff's motion for summary judgment will be held in the U.S. District Court on September 1, 2006. If Plaintiff's motion is granted, the PTO's office action will be nullified, and the reexamination is discontinued pending any appeal by the PTO.

The timing and ultimate outcome of Plaintiff's motion for summary judgment enjoining the PTO from proceeding with the reexamination of the Merged Requests, and the consequent reexamination of the Merged Requests by the PTO if the motion is denied by the U.S. District Court, the Lilly litigation (including the pending bench trial and any appeal of the jury verdict and court's ruling in the bench trial) and the Amgen litigation (including pending motion to dismiss) cannot be determined at this time, and, as a result, no determination can be made with respect to allowance of the claims of the `516 Patent in any reexamination proceedings, nor can any final determination be made with respect to the validity or infringement of the claims of the `516 Patent in the Lilly litigation and the Amgen litigation, nor can management predict whether the damages awarded by the jury in the U.S. District Court in the Lilly litigation will be upheld, eliminated or limited. Although the Company has prevailed at trial in the Lilly litigation, the damages the Company has been awarded by the jury may be eliminated or limited by an adverse finding upon appeal or in the event that the claims of the `516 Patent are invalidated by the PTO. As a consequence, the Company has recorded no revenue in its statement of operations for the period ended June 30, 2006 related to the damages awarded in the Lilly litigation.

9

**ITEM 2. MANAGEMENTS' DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**Overview**

We are engaged in the discovery and development of breakthrough medicines to treat cancers by regulating cell signaling with small molecules. We are developing a comprehensive approach to patients with cancer that addresses the greatest medical need - aggressive and advanced-stage cancers for which current treatments are inadequate. Our goal is to build a fully integrated oncology company focused on novel, molecularly targeted therapies to treat solid tumors and hematologic cancers, as well as the spread of primary tumors to distant sites.

Our lead cancer product candidate, AP23573, has been or is being studied in multiple clinical trials in patients with various types of cancers, including sarcomas, hormone refractory prostate cancer, endometrial cancer, brain cancer and leukemias and lymphomas. Medinol Ltd. is also developing stents to deliver AP23573 to prevent reblockage at sites of vascular injury following stent-assisted angioplasty.

We have a focused drug discovery program centered on small-molecule, molecularly targeted therapies and cell-signaling pathways implicated in cancer. We also have an exclusive license to pioneering technology and patents related to certain NF-ºB cell-signaling activity, which may be useful in treating certain diseases. Additionally, we have developed a proprietary portfolio of cell-signaling regulation technologies, our ARGENT technology, to control intracellular processes with small molecules, which may be useful in the development of therapeutic vaccines and gene and cell therapy products, and which provide versatile tools for applications in cell biology, functional genomics and drug discovery research.

Since our inception in 1991, we have devoted substantially all of our resources to our research and development programs. We receive no revenue from the sale of pharmaceutical products, and most of our revenue to date was received in connection with a joint venture we had with a major pharmaceutical company from 1997 to 1999. Except for the gain on the sale of our fifty percent interest in that joint venture in December 1999, which resulted in net income for fiscal 1999, we have not been profitable since inception. We expect to incur substantial and increasing operating losses for the foreseeable future, primarily due to costs associated with our pharmaceutical product development programs, including costs for clinical trials and product manufacturing, personnel and our intellectual property. We expect that losses will fluctuate from quarter to quarter and that these fluctuations may be substantial. At June 30, 2006, we had an accumulated deficit of $279.5 million and cash, cash equivalents and marketable securities of $54.3 million and working capital of $37.6 million.

**General**

Our operating losses are primarily due to the costs associated with our pharmaceutical product development programs, personnel and intellectual property protection and enforcement. As our product development programs progress, we incur significant costs for toxicology and pharmacology studies, product development, manufacturing, clinical trials and regulatory support. These costs can vary significantly from quarter to quarter depending on the number of product candidates in development, the stage of development of each product candidate, the number of patients enrolled in and complexity of clinical trials and other factors. Costs associated with our intellectual property include legal fees and other costs to prosecute, maintain, protect and enforce our intellectual property, which can fluctuate from quarter to quarter depending on the status of patent issues being pursued.

Because we currently receive no revenue from the sale of pharmaceutical products and receive only limited license revenue, we have relied primarily on the capital markets as our source of funding. In August 2005, we raised approximately $57.9 million through an underwritten public offering of our common stock. We also utilize long-term debt to supplement our funding, particularly as a means to fund investment in property and equipment and infrastructure needs. In addition, we may seek funding from collaborations with pharmaceutical, biotechnology and/or medical device companies for development and commercialization of our product candidates. These collaborations may take the form of licensing arrangements, co-development or joint venture arrangements or other structures. If funding from these various sources is unavailable on reasonable terms, we may be required to reduce our operating expenses in order to conserve cash and capital by delaying, scaling back or eliminating one or more of our product development programs.

**Critical Accounting Policies and Estimates**

Our financial position and results of operations are affected by subjective and complex judgments, particularly in the areas of the carrying value of intangible assets, deferred compensation benefits for executives, and stock-based compensation.

At June 30, 2006, we reported $4.5 million of intangible assets consisting of capitalized costs related primarily to purchased and issued patents, patent applications and licenses, net of accumulated amortization. These costs are being amortized over the estimated useful lives of the underlying patents or licenses. Changes in these lives or a decision to discontinue using the technologies could result in material changes to our balance sheet and statements of operations. For example, for the six-month period ended June 30, 2006, we expensed $173,000 of unamortized costs related to certain intangible assets which we are no longer actively pursuing. We have concluded that the carrying value of our remaining intangible assets is not impaired because such assets are utilized in our product development programs and/or continue to be viable technologies for collaborations or licensing efforts which we continue to pursue. If we were to abandon the underlying technologies or terminate our efforts to pursue collaborations or license agreements, we may be required to write off a portion of the carrying value of our intangible assets. The net book value as of June 30, 2006 of intangible assets related to our NF-ᵏB technology is $489,000. If the patentability of our NF-ᵏB patents is successfully challenged and such patents are subsequently narrowed, invalidated or circumvented, we may be required to write off some or all of the net book value related to such technology.

Under our deferred executive compensation plans, we are required to adjust our recorded obligations to our employees on a periodic basis to reflect fair value based on the value of certain underlying mutual funds. Fluctuations in the fair value of such mutual funds can result in uneven expense charges or credits to our statements of operations. If, for example, the market prices of the underlying mutual funds were 10% higher at June 30, 2006, we would have recognized an additional $89,000 in compensation expense in the six-month period ended June 30, 2006.

In determining expense related to stock-based compensation, we utilize the Black-Scholes valuation model to estimate the fair value of stock options granted to employees, consultants and directors. Application of the Black-Scholes valuation model requires the use of factors such as the market value and volatility of our common stock, a risk-free discount rate and an estimate of the life of the option contract. Fluctuations in these factors can result in adjustments to our statements of operations. If, for example, the market value of our common stock, its volatility, or the expected life of stock options granted in the three-month period ended June 30, 2006 were 10% higher or lower than used in the valuation of such stock options, our stock-based compensation expense for the awards would have increased or decreased by up to $60,000, $47,000, or $48,000, respectively.

11

**Results of Operations**

*For the three months ended June 30, 2006 and 2005*

*Revenue*

We recognized license revenue of $229,000 in the three month period ended June 30, 2006, compared to $350,000 in the corresponding period in 2005. The decrease in license revenue was due primarily to the expected timing of receipt of future milestone payments pursuant to our agreement with Medinol Ltd., in accordance with our revenue recognition policy.

*Operating Expenses*

*Research and Development Expenses*

Research and development expenses decreased by $1.9 million, or 16%, to $10.1 million in the three month period ended June 30, 2006, compared to $12.1 million in the corresponding period in 2005. The research and development process necessary to develop a pharmaceutical product for commercialization is subject to extensive regulation by numerous governmental authorities in the United States and other countries. This process typically takes years to complete and requires the expenditure of substantial resources. Current requirements include:

· preclinical toxicology, pharmacology and metabolism studies, as well as in vivo efficacy studies in relevant animal models of disease;

· manufacturing of drug product for preclinical studies and clinical trials and ultimately for commercial supply;

· submission of the results of preclinical studies and information regarding manufacturing and control and proposed clinical protocol to the United States Food and Drug Administration, or FDA, in an Investigational New Drug application, or IND (or similar filings with regulatory agencies outside the United States);

· conduct of clinical trials designed to provide data and information regarding the safety and efficacy of the product candidate in humans; and

· submission of all the results of testing to the FDA in a New Drug Application, or NDA (or similar filings with regulatory agencies outside the United States).

Upon approval by the appropriate regulatory authorities, including in some countries approval of product pricing, we may commence commercial marketing and distribution of the product.

We group our research and development, or R&D, expenses into two major categories: direct external expenses and all other R&D expenses. Direct external expenses consist of costs of outside parties to conduct laboratory studies, to develop manufacturing processes and manufacture the product candidate, to conduct and manage clinical trials and similar costs related to our clinical and preclinical studies. These costs are accumulated and tracked by product candidate. All other R&D expenses consist of costs to compensate personnel, to purchase lab supplies and services, to maintain our facility, equipment and overhead and similar costs of our research and development efforts. These costs apply to work on our clinical and preclinical candidates as well as our discovery research efforts. These costs are not tracked by product candidate because the number of product candidates and projects in R&D may vary from time to time and because we utilize internal resources across multiple projects at the same time.

Direct external expenses are further categorized as costs for clinical programs and costs for preclinical programs. Preclinical programs include product candidates undergoing toxicology, pharmacology, metabolism and efficacy studies and manufacturing process development required before testing in humans can begin. Product candidates are designated as clinical programs once we have filed an IND with the FDA, or a similar filing with regulatory agencies outside the United States, for the purpose of commencing clinical trials in humans.

Our research and development expenses for the three month period ended June 30, 2006, as compared to the corresponding period in 2005, were as follows:

| | Three months ended June 30, | | | | | Increase/ | |
|---|---|---|---|---|---|---|---|
| _In thousands_ | | 2006 | | | 2005 | | (decrease) |
| Direct external expenses: | | | | | | | |
| Clinical programs | $ | 3,238 | $ | | 7,257 | $ | (4,019) |
| Preclinical programs | | 243 | | | 367 | | (124) |
| All other R&D expenses | | 6,663 | | | 4,469 | | 2,194 |
| | $ | 10,144 | $ | | 12,093 | $ | (1,949) |

AP23573, our lead product candidate which is in Phase 2 clinical trials, was our only clinical program in 2006 and 2005. Direct external expenses for AP23573 decreased by $4.0 million in the three-month period ended June 30, 2006, as compared to the corresponding period in 2005, due primarily to decreases in manufacturing related costs of $1.8 million and clinical trials costs of $2.2 million. The decrease in manufacturing related costs was due to the completion in 2005 of certain product and process development studies and the timing of production runs of AP23573. The decrease in clinical trial costs is directly related to a decrease in number of patients on trial during the period driven by successful conclusion in 2005 of enrollment in several clinical trials. Through June 30, 2006, we have incurred a total of approximately $47.8 million in direct external expenses for AP23573 from the date it became a clinical program. We expect that our direct external costs for AP23573 will increase during the remainder of 2006 as we prepare to initiate a Phase 3 trial for this product candidate.

Preclinical programs consist primarily of our oncogenic kinase inhibitor program and our bone-targeted mTOR inhibitor program. Direct external expenses on preclinical programs will increase or decrease from period to period depending on the status and number of programs in this stage of development and the mix between external and internal efforts applied to such programs. Direct external expenses for preclinical programs decreased by $124,000 in the three month period ended June 30, 2006 as compared to the corresponding period in 2005 due primarily to the completion of certain pharmacology and contract manufacturing studies conducted by outside contract laboratories in 2005. We expect that our direct external expenses for preclinical programs will increase slightly during the remainder of 2006 as we continue to move these programs forward in development.

All other R&D expenses increased by $2.2 million in the three month period ended June 30, 2006 as compared to the corresponding period in 2005 due to higher personnel and related costs as a result of an increase in the number of personnel and salary adjustments ($1.2 million) and the impact of the adoption of SFAS No. 123R regarding stock-based compensation expense ($353,000), an increase in depreciation and amortization costs due to investments in property and equipment ($303,000), and miscellaneous increases in laboratory supplies and services, maintenance and utility costs related to our facility, and intellectual property expenses. We expect that all other R&D expenses will remain at approximately the current level for the remainder of 2006 to support our clinical and preclinical development programs.

The successful development of our products is uncertain and subject to a number of risks. We cannot be certain that any of our product candidates will prove to be safe and effective or will meet all of the applicable regulatory requirements needed to receive and maintain marketing approval. Data from preclinical studies and clinical trials are susceptible to varying interpretations that could delay, limit or prevent regulatory clearance. We, the FDA or other regulatory authorities may suspend clinical trials

13

at any time if we or they believe that the subjects participating in such trials are being exposed to unacceptable risks or if such regulatory agencies find deficiencies in the conduct of the trials or other problems with our products under development. Delays or rejections may be encountered based on additional governmental regulation, legislation, administrative action or changes in FDA or other regulatory policy during development or the review process. Other risks associated with our product development programs are described in Risk Factors in our Form 10-K for the fiscal year ended December 31, 2005, which has been filed with the SEC as updated from time to time in our subsequent Quarterly Reports on Form 10-Q and Current Reports on Form 8-K. Due to these uncertainties, accurate and meaningful estimates of the ultimate cost to bring a product to market, the timing of completion of any of our drug development programs and the period in which material net cash inflows from any of our drug development programs will commence are unavailable.

*General and Administrative Expenses*

General and administrative expenses were $7.5 million in the three month period ended June 30, 2006, as compared to $2.6 million in the corresponding period in 2005. Professional fees increased by $2.9 million to $4.4 million in the three month period ended June 30, 2006 as compared to $1.5 million in the corresponding period in 2005, due primarily to costs related to business and commercial development initiatives, including market research, and to our patent infringement litigation with Lilly. Personnel and related costs increased by $872,000 to $1.6 million in the three month period ended June 30, 2006 as compared to $683,000 in the corresponding period in 2005 due to an increase in the number of personnel and salary adjustments ($257,000) and the impact of adoption of SFAS No. 123R ($615,000). We expect that our general and administrative expenses will remain at approximately the current level for the remainder of 2006 as necessary to support our research and development programs, excluding an expected decrease in professional fees related to our patent infringement litigation with Lilly due to completion of the jury trial during the three-month period ended June 30, 2006.

We expect that our operating expenses in total will remain at approximately the current level for the remainder of 2006 for the reasons described above. Operating expenses may fluctuate from quarter to quarter. The actual amount of any change in operating expenses will depend on the progress of our product development programs, including preclinical and clinical studies and product manufacturing, the status of our patent infringement litigation with Lilly and Amgen and our ability to raise funding through equity offerings, collaborations, licensing, joint ventures or other sources.

*Interest Income/Expense*

Interest income increased to $574,000 in the three month period ended June 30, 2006 from $367,000 in the corresponding period in 2005, as a result of a higher interest yields from our securities.

Interest expense increased to $124,000 in the three month period ended June 30, 2006 from $107,000 in the corresponding period in 2005, as a result of higher interest rates in 2006, offset, in part, by lower average loan balances.

*Operating Results*

We reported a loss from operations of $17.4 million in the three month period ended June 30, 2006 compared to a loss from operations of $14.3 million in the corresponding period in 2005, an increase in loss of $3.1 million, or 22%. Such increase was due primarily to the increase in operating expenses noted above. We expect that our loss from operations will remain at approximately the current level for the reminder of 2006 due to the various factors discussed under Operating Expenses above. Losses may fluctuate depending on the extent to which, if at all, we enter into collaborations for one or more of our product candidates or licenses for our technologies. The extent of operating losses will also depend on our ability to raise funds from other sources, such as the capital markets, which will influence the amount we will spend on research and development and the development timelines for our product candidates.

We reported a net loss of $17.0 million in the three month period ended June 30, 2006, compared to a net loss of $14.1 million in the corresponding period in 2005, an increase in net loss of $2.9 million or 21%, and a net loss per share of $0.27 and $0.27, respectively.

**For the six months ended June 30, 2006 and 2005**

*Revenue*

We recognized license revenue of $458,000 in the six-month period ended June 30, 2006, compared to $654,000 in the corresponding period in 2005. The decrease in license revenue was due primarily to the expected timing of receipt of future milestone payments pursuant to our agreement with Medinol Ltd., in accordance with our revenue recognition policy.

*Operating Expenses*

*Research and Development Expenses*

Research and development expenses decreased by $929,000 or less than 1%, to $21.8 million in the six-month period ended June 30, 2006, as compared to $22.7 million in the corresponding period in 2005.

Our research and development expenses for the six-month period ended June 30, 2006, as compared to the corresponding period in 2005, were as follows:

| | Six months ended June 30, | | Increase/ |
| *In thousands* | 2006 | 2005 | (decrease) |
|---|---|---|---|
| Direct external expenses: | | | |
| Clinical programs | $ 7,424 | $ 13,406 | $ (5,982) |
| Preclinical programs | 377 | 804 | (427) |
| All other R&D expenses | 14,017 | 8,537 | 5,480 |
| | $ 21,818 | $ 22,747 | $ (929) |

AP23573, our lead product candidate which is in Phase 2 clinical trials, was our only clinical program in 2006 and 2005. Direct external expenses for AP23573 decreased by $6.0 million in the six-month period ended June 30, 2006, as compared to the corresponding period in 2005, due primarily to decreases in manufacturing related costs of $3.1 million and clinical trials costs of $2.4 million. The decrease in manufacturing related costs was due to the completion in 2005 of certain product and process development studies and the timing of production runs of AP23573. The decrease in clinical trial costs is directly related to a decrease in number of patients on trial during the period driven by successful conclusion in 2005 of enrollment in several clinical trials.

Direct external expenses for preclinical programs decreased by $427,000 in the six-month period ended June 30, 2006 as compared to the corresponding period in 2005 due primarily to the completion of certain pharmacology and contract manufacturing studies conducted by outside contract laboratories in 2005.

All other R&D expenses increased by $5.5 million in the six-month period ended June 30, 2006 as compared to the corresponding period in 2005 due to higher personnel and related costs as a result of an increase in the number of personnel and salary adjustments ($2.6 million) and the impact of the adoption of SFAS No. 123R regarding stock-based compensation expense ($1.2 million), an increase in depreciation and amortization costs due to investments in property and equipment ($849,000), and miscellaneous increases in laboratory supplies and services, maintenance and utility costs related to our facility, and intellectual property expenses.

*General and Administrative Expenses*

General and administrative expenses were $12.0 million in the six-month period ended June 30, 2006, as compared to $4.9 million in the corresponding period in 2005. Professional fees increased by $4.2 million to $6.8 million in the six-month period ended June 30, 2006 as compared to $2.6 million in the corresponding period in 2005, due primarily to costs related to business and commercial development initiatives, including market research, and to our patent infringement litigation with Lilly. Personnel and related costs increased by $1.3 million to $2.7 million in the six-month period ended June 30, 2006 as compared to $1.4 million in the corresponding period in 2005 due to an increase in the number of personnel and salary adjustments ($455,000) and the impact of adoption of SFAS No. 123R ($830,000).

### *Interest Income/Expense*

Interest income increased to $1.2 million in the six-month period ended June 30, 2006 from $761,000 in the corresponding period in 2005, as a result of a higher interest yields from our securities.

Interest expense increased to $246,000 in the six-month period ended June 30, 2006 from $181,000 in the corresponding period in 2005, as a result of higher interest rates in 2006, offset, in part, by lower average loan balances.

### *Operating Results*

We reported a loss from operations of $33.3 million in the six-month period ended June 30, 2006 compared to a loss from operations of $27.0 million in the corresponding period in 2005, an increase in loss of $6.3 million, or 23%. Such increase was due primarily to the increase in operating expenses noted above.

We reported a net loss of $32.4 million in the six-month period ended June 30, 2006, compared to a net loss of $26.4 million in the corresponding period in 2005, an increase in net loss of $5.9 million or 22%, and a net loss per share of $0.52 and $0.50, respectively.

### Liquidity and Capital Resources

We have financed our operations and investments primarily through sales of our common stock to institutional investors and, to a lesser extent, through issuances of our common stock pursuant to our stock option and employee stock purchase plans, supplemented by the issuance of long-term debt. We sell securities and incur debt when the terms of such transactions are deemed favorable to us and as necessary to fund our current and projected cash needs. We most recently completed an underwritten public offering of our common stock in August 2005 from which we realized net proceeds of approximately $57.9 million. We seek to balance the level of cash, cash equivalents and marketable securities on hand with our projected needs and to allow us to withstand periods of uncertainty relative to the availability of funding on favorable terms. We manage our marketable securities portfolio to provide cash as needed for payment of our obligations.

*Sources of Funds*

For the three months and six months ended June 30, 2006 and 2005, our sources of funds were as follows:

| In thousands | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2006 | | 2005 | | 2006 | | 2005 | |
| Sales and maturities of marketable securities, net of purchases | $ | 16,024 | $ | 18,000 | $ | 27,215 | $ | 19,124 |
| Proceeds from issuance of common stock pursuant to stock option and purchase plans | | 363 | | 290 | | 1,349 | | 585 |
| | $ | 16,387 | $ | 18,290 | $ | 28,564 | $ | 19,709 |

We manage our marketable securities portfolio to provide cash for payment of our obligations. Upon sale or maturity of such marketable securities, a portion will be retained as cash to provide for payment of current obligations while the remainder will be reinvested in accordance with our investment policy. For the three months and six months ended June 30, 2006 and 2005, proceeds from sales and maturities of marketable securities, purchases of marketable securities and the resulting net amount retained as cash for payment of obligations was as follows:

| In thousands | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2006 | | 2005 | | 2006 | | 2005 | |
| Proceeds from sales and maturities of marketable securities | $ | 30,922 | $ | 20,000 | $ | 53,753 | $ | 29,625 |
| Purchases of marketable securities | | (14,898) | | (2,000) | | (26,538) | | (10,501) |
| | $ | 16,024 | $ | 18,000 | $ | 27,215 | $ | 19,124 |

*Uses of Funds*

The primary uses of our cash are to fund our operations and working capital requirements and, to a lesser degree, to repay our long-term debt, to invest in intellectual property and to invest in our property and equipment as needed for our business. For the three months and six months ended June 30, 2006 and 2005, our uses of funds were as follows:

| In thousands | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2006 | | 2005 | | 2006 | | 2005 | |
| Net cash used in operating activities | $ | 13,426 | $ | 10,581 | $ | 27,371 | $ | 20,727 |
| Repayment of borrowings | | 480 | | 480 | | 960 | | 960 |
| Investment in intangible assets | | 119 | | 279 | | 327 | | 492 |
| Investment in property and equipment | | 506 | | 2,377 | | 860 | | 4,100 |
| | $ | 14,531 | $ | 13,717 | $ | 29,518 | $ | 26,279 |

The net cash used in operating activities is comprised of our net losses, adjusted for non-cash expenses and working capital requirements. As noted above, our net loss for the six months ended June 30, 2006 increased by $5.9 million, as compared to the corresponding period in 2005, due primarily to increased personnel and professional services expenses. However, as a result of changes in our working capital requirements offset in part by increases in non-cash expenses, including stock-based compensation expense, our net cash used in operating activities increased by $6.6 million for the six months ended June 30, 2006, as compared with the corresponding period in 2005. Also, as noted above, we expect that our loss from operations will increase in the remainder of 2006 due to continued progress in development of our product candidates, and we expect that our net cash used in operations will increase accordingly. We also expect that our investment in intangible assets, consisting of our intellectual property, will increase in support of our product development activities.

17

*Contractual Obligations*

We have substantial fixed contractual obligations under various research and licensing agreements, consulting and employment agreements, lease agreements and long-term debt instruments. These contractual obligations were comprised of the following as of June 30, 2006:

| *In thousands* | Total | In 2006 | 2007 through 2009 | 2010 through 2011 | After 2011 |
|---|---|---|---|---|---|
| Long-term debt | $ 6,695 | $ 960 | $ 5,735 | $ -- | $ -- |
| Operating leases, net of sub-leases | 631 | 310 | 321 | -- | -- |
| Other long-term obligations | 13,273 | 2,211 | 9,431 | 1,236 | 395 |
| Total fixed contractual obligations | $ 20,599 | $ 3,481 | $ 15,487 | $ 1,236 | $ 395 |

Long-term debt consists of scheduled principal payments on such debt. Interest on our long-term debt is based on variable interest rates. Assuming a constant interest rate of 7.2%, our average interest rate on our debt at June 30, 2006, over the remaining term of the debt, our interest expense would total approximately $223,000 for the remainder of 2006 and $409,000 in the period 2007 through 2009.

Other long-term obligations are comprised primarily of employment agreements and license agreements. The license agreements generally provide for payment by us of annual license fees, milestone payments and royalties upon successful commercialization of products. All license agreements are cancelable by us. The above table reflects remaining license fees for the lives of the agreements but excludes milestone and royalty payments, as such amounts are not probable or estimable at this time.

*Liquidity*

At June 30, 2006, we had cash, cash equivalents and marketable securities totaling $54.3 million and working capital of $37.6 million, compared to cash, cash equivalents and marketable securities totaling $81.5 million and working capital of $66.0 million at December 31, 2005.

We will require substantial additional funding for our research and development programs, including pre-clinical development and clinical trials, for operating expenses including intellectual property protection and enforcement, for the pursuit of regulatory approvals, and for establishing manufacturing, marketing and sales capabilities. In order to fund our needs, we may, among other things, (1) sell common stock through public or private offerings as market conditions permit, (2) enter into partnerships for our product candidates, and/or (3) license our cell-signaling technologies, including our ARGENT and NF- κ B intellectual property portfolios. We have available 2,815,000 shares of our common stock under effective shelf registration statements, which may be sold to raise capital.

We believe that our cash, cash equivalents and marketable securities should be sufficient to satisfy our capital and operating requirements into the third quarter of 2007. However, there are numerous factors that are likely to affect our spending levels, including the timing of the start of the initial registration trial for AP23573, the timing of product and process development work for AP23573, the manufacture of drug product for clinical trials and potential product launch, if approved, developments in our ongoing clinical

18

trials, the timing and terms of a partnership, if any, to commercialize AP23573 outside of the U.S., the status of our in-house efforts to prepare for the potential launch of AP23573 in the U.S., the progress of our preclinical programs, and developments in our NF- κ B litigation, among other factors. These variables could result in earlier depletion of our current funds if we are to achieve our intended timelines for development. In any event, we expect to need additional capital in order to pursue our business plan, which we will seek to raise through the sale of additional securities, collaborative partnerships, and possible additional credit arrangements. There can be no assurance, however, that adequate resources will be available when needed or on terms acceptable to us.

**Securities Litigation Reform Act**

*Safe harbor statement under the Private Securities Litigation Reform Act of 1995:* Except for the historical information contained in this Quarterly Report on Form 10-Q, some of the matters discussed herein are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements are identified by the use of words such as "may," "anticipate," "estimate," "expect," "project," "intend," "plan," "believe," and other words and terms of similar meaning in connection with any discussion of future operating or financial performance. Such statements are based on management's current expectations and are subject to certain factors, risks and uncertainties that may cause actual results, outcome of events, timing and performance to differ materially from those expressed or implied by such forward-looking statements. These risks include, but are not limited to, risks and uncertainties regarding our ability to accurately estimate the timing and actual research and development expenses and other costs associated with the preclinical and clinical development and manufacture of our product candidates, the adequacy of our capital resources and the availability of additional funding, risks and uncertainties regarding our ability to successfully recruit centers, enroll patients and conduct clinical studies of product candidates, risks and uncertainties regarding our ability to manufacture or have manufactured our product candidates on a commercial scale or to supply our product candidates to partners, risks and uncertainties that clinical trial results at any phase of development may be adverse or may not be predictive of future results or lead to regulatory approval of any of our or any partner's product candidates, risks and uncertainties of third-party intellectual property claims relating to our and any partner's product candidates, and risks and uncertainties relating to regulatory oversight, the timing, scope, cost and outcome of legal and patent office proceedings, litigation, prosecution and reexamination proceedings concerning our NF- κ B patent portfolio, future capital needs, key employees, dependence on collaborators and manufacturers, markets, economic conditions, products, services, prices, reimbursement rates, competition and other risks detailed under the heading "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2005, which has been filed with the SEC, as updated from time to time in our subsequent Quarterly Reports on Form 10-Q and Current Reports on Form 8-K. As a result of these and other factors, actual events or results could differ materially from those described herein. We are not under any obligation, and we expressly disclaim any obligation, to update or alter any forward-looking statements, whether as a result of new information, future events or otherwise.

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We invest our available funds in accordance with our investment policy to preserve principal, maintain proper liquidity to meet operating needs and maximize yields. Our investment policy specifies credit quality standards for our investments and limits the amount of credit exposure to any single issue, issuer or type of investment.

We invest cash balances in excess of operating requirements first in short-term, highly liquid securities, with maturities of 90 days or less, and money market accounts. Depending on our level of available funds and our expected cash requirements, we may invest a portion of our funds in marketable securities, consisting generally of corporate debt and U.S. government and agency securities. Maturities of our marketable securities are generally limited to periods necessary to fund our liquidity needs and may not in any case exceed

three years. These securities are classified as available-for-sale. Available-for-sale securities are recorded on the balance sheet at fair market value with unrealized gains or losses reported as a separate component of stockholders' equity (accumulated other comprehensive income or loss). Realized gains and losses on marketable security transactions are reported on the specific-identification method. Interest income is recognized when earned. A decline in the market value of any available-for-sale security below cost that is deemed other than temporary results in a charge to earnings and establishes a new cost basis for the security.

Our investments are sensitive to interest rate risk. We believe, however, that the effect, if any, of reasonable possible near-term changes in interest rates on our financial position, results of operations and cash flows generally would not be material due to the current short-term nature of these investments. In particular, at June 30, 2006, because our available funds are invested solely in short-term securities with remaining maturities of twelve months or less, our risk of loss due to changes in interest rates is not material.

We have a deferred executive compensation program which provides participants with deferred compensation based on the value of certain designated mutual funds. The fair value of our obligations under this program is reflected as a liability on our balance sheet. In the event of a hypothetical 10% increase in the fair market value of the underlying mutual funds as of June 30, 2006, we would have incurred approximately $89,000 of additional compensation expense in the three-month period ended June 30, 2006.

At June 30, 2006, we had $6.7 million outstanding under a bank term note which bears interest at prime or, alternatively, LIBOR + 2%. This note is sensitive to interest rate risk. In the event of a hypothetical 10% increase in the interest rate on which the loan is based (71.9 basis points), we would incur approximately $41,000 of additional interest expense per year based on expected balances over the next twelve months.

**ITEM 4. CONTROLS AND PROCEDURES**

(a) *Evaluation of Disclosure Controls and Procedures*. Our principal executive officer and principal financial officer, after evaluating the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of the end of the period covered by this Quarterly Report on Form 10-Q, have concluded that, based on such evaluation, our disclosure controls and procedures were adequate and effective to ensure that material information relating to us, including our consolidated subsidiaries, was made known to them by others within those entities, particularly during the period in which this Quarterly Report on Form 10-Q was being prepared.

In designing and evaluating our disclosure controls and procedures, our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

(b) *Changes in Internal Controls*. There were no changes in our internal control over financial reporting, identified in connection with the evaluation of such internal control that occurred during the last fiscal quarter, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

PART II. OTHER INFORMATION

ITEM 1. LEGAL PROCEEDINGS

NF-κB Patent Infringement Litigation and Reexamination

*Lilly Litigation*

In 2002, we, together with Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research and Harvard University (collectively, the Plaintiffs) filed a lawsuit in the United States District Court for the District of Massachusetts, or the U.S. District Court, against Eli Lilly and Company, hereinafter referred to as Lilly, alleging infringement of certain claims, or the NF- κ B `516 Claims, of the Plaintiffs' U.S. Patent No. 6,410,516, or the `516 Patent, covering methods of treating human disease by regulating NF- κ B cell-signaling activity through sales of Lilly's osteoporosis drug, Evista®, and Lilly's septic shock drug, Xigris®, and seeking monetary damages from Lilly.

This case was tried before a jury in the U.S. District Court from April 10, 2006 through April 28, 2006. After deliberations, on May 4, 2006, the jury rendered a verdict in favor of the Plaintiffs by finding that the NF- κ B `516 Claims asserted in the lawsuit are valid and infringed by Lilly through sales of Evista and Xigris in the United States. The jury awarded damages to the Plaintiffs in the amount of approximately $65.2 million, based on the jury's determination of a reasonable royalty rate of 2.3% to be paid by Lilly to the Plaintiffs based on U.S. sales of Evista and Xigris from the date of the filing of the lawsuit on June 25, 2002 through February 28, 2006. The jury awarded further damages on an ongoing basis, in amounts to be determined, equal to 2.3% of U.S. sales of Evista and Xigris through the year 2019, when the patent expires. If the verdict is upheld, damages paid by Lilly will be applied first to reimburse us for any unreimbursed legal fees and expenses relating to the litigation. We will receive 91% of the remainder, and the co-plaintiffs will receive 9%.

A separate trial, or bench trial, commenced before the judge on August 7, 2006 on certain defenses asserted by Lilly relating to the validity and enforceability of the NF- κ B `516 Claims, which must be addressed before the judge enters a final judgment in this lawsuit. Lilly has the right to file motions challenging the jury's verdict in this lawsuit, and, upon the entry of a final judgment by the U.S. District Court, to file an appeal of the jury's verdict and other rulings by the U.S. District Court with the Court of Appeals for the Federal Circuit.

*Amgen Litigation*

On April 20, 2006, Amgen Inc. and certain affiliated entities, hereinafter referred to as Amgen, filed a lawsuit against us in the U.S. District Court for the District of Delaware seeking a declaratory judgment that each of the claims contained in the `516 Patent are invalid and that Amgen has not infringed any of the claims of the `516 Patent based on activities related to Amgen's products, Enbrel® and Kineret®.

We believe there is no basis for the declaratory relief sought by Amgen. Therefore, we filed a motion to dismiss this case in the U.S. District Court on June 14, 2006. Amgen filed its opposition to the motion to dismiss on June 28, 2006, to which we filed our reply memorandum of law in support of our motion to dismiss on July 13, 2006. Oral argument on our motion to dismiss is scheduled for September 11, 2006.

Pending ruling by the U.S. District Court on our motion to dismiss this action, a scheduling order pursuant to Rule 16 of the Federal Rules of Civil Procedure was entered by the U.S. District Court on July 19, 2006. Pursuant to that order, a claim construction hearing in this case is scheduled for September 7, 2007, with trial scheduled to commence on February 4, 2008.

*Re-examination Proceedings in PTO*

On April 4, 2005, Lilly filed an ex parte request in the United States Patent and Trademark Office, or PTO, to reexamine the patentability of certain claims of the `516 Patent. In addition, an unrelated third party filed an ex parte request in the PTO on December 2, 2005 to reexamine the patentability of certain claims of the `516 Patent. The PTO has granted both of these reexamination requests. On April 4, 2006, counsel for the patentees of the `516 Patent filed separate Petitions requesting the PTO to merge these two reexamination requests, which was granted by the PTO on May 4, 2006. Additionally, on April 7, 2006, counsel for the patentees of the `516 Patent filed a third ex parte request in the PTO with respect to one claim of the `516 Patent, which was denied by the PTO on May 5, 2006.

As a result of the PTO orders described above, Lilly's ex parte request has been merged into a single action with the ex parte request filed on December 2, 2005 (the "Merged Requests"). The Merged Requests question the patentability of certain claims of the `516 Patent by newly cited references which (i) either inherently or expressly disclose the use of a variety of prior art compounds as reducing NF- $\kappa$ B activity and resulting gene expression, or (ii) are directed to the use of oligonucleotides having an NF- $\kappa$ B binding site for reduction of NF- $\kappa$ B activity. The PTO issued a first office action affirming the Merged Requests on August 2, 2006. Prior thereto, on June 9, 2006, Plaintiffs filed a complaint in the U.S. District Court in the Eastern District of Virginia requesting that the U.S. District Court enjoin the PTO from continuing the reexamination of the Merged Requests and ordering the PTO to grant the patentee's petition to vacate the PTO's orders granting the Merged Requests. Also, on July 12, 2006, Plaintiffs filed a motion for summary judgment on their complaint with the U.S. District Court. On August 1, 2006, Lilly filed a motion to intervene and opposing Plaintiff's motion for summary judgment. A hearing on Plaintiff's motion for summary judgment will be held in the U.S. District Court on September 1, 2006. If Plaintiff's motion is granted, the PTO's office action will be nullified, and the reexamination discontinued pending any appeal by the PTO.

The timing and ultimate outcome of Plaintiff's motion for summary judgment enjoining the PTO from proceeding with the reexamination of the Merged Requests, and the consequent reexamination of the Merged Requests by the PTO if the motion is denied by the U.S. District Court, the Lilly litigation (including the pending bench trial and any appeal of the jury verdict and court's ruling in the bench trial), and the Amgen litigation (including our pending motion to dismiss) cannot be determined at this time, and, as a result, no determination can be made with respect to allowance of the claims of the `516 Patent in any reexamination proceedings, nor can any final determination be made with respect to the validity or infringement of the claims of the `516 Patent in the Lilly litigation and the Amgen litigation, nor can management predict whether the damages awarded by the jury in the U.S. District Court in the Lilly litigation will be upheld, eliminated or limited. Although we have prevailed at trial in the Lilly litigation, the damages we have been awarded by the jury may be eliminated or limited by an adverse finding upon appeal or in the event that the claims of the `516 Patent are invalidated by the PTO.

**ITEM 1A.  RISK FACTORS**

There have been no material changes to the risk factors included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2005, other than as set forth below:

*We will continue to expend significant resources on the enforcement and licensing of our NF-κB patent portfolio and may be unable to generate material revenues from these efforts, if we are unable to enforce against, or license our NF-κB patents to, pharmaceutical and biotechnology companies.*

We are the exclusive licensee of a family of patents, three in the U.S. and one in Europe, including a pioneering U.S. patent covering methods of treating human disease by regulating NF-κB cell-signaling activity, hereinafter referred to as the '516 Patent, awarded to a team of inventors from The Whitehead Institute for Biomedical Research, Massachusetts Institute of Technology and Harvard University. We have initiated a licensing program to generate revenues from the discovery, development, manufacture and sale of products covered by our NF-κB patent portfolio. These patents have been, and in the future may be, challenged and may be subsequently narrowed, invalidated, declared unenforceable or circumvented, any of which could materially impact our ability to generate licensing revenues from them.

On June 25, 2002, we, together with these academic institutions, hereinafter collectively referred to as the Plaintiffs, filed a lawsuit in the United States District Court for the District of Massachusetts, or the U.S. District Court, against Eli Lilly and Company, hereinafter referred to as Lilly, alleging infringement of certain claims of the '516 Patent through sales of Lilly's osteoporosis drug, Evista®, and its septic shock drug, Xigris®.

This case was tried before a jury in the U.S. District Court from April 10, 2006 through April 28, 2006. After deliberations, on May 4, 2006, the jury rendered a verdict in favor of the Plaintiffs by finding that the NF-κB '516 Claims asserted in the lawsuit are valid and infringed by Lilly through sales of Evista and Xigris in the United States. However, a separate trial, or bench trial, is scheduled to begin August 7, 2006 on certain defenses asserted by Lilly relating to the validity and enforceability of the NF-κB '516 Claims before a final judgment may be entered in this lawsuit by the U.S. District Court. Lilly also has the right to file motions challenging the jury's verdict in this lawsuit and to file an appeal of the jury's verdict and other rulings by the U.S. District Court.

On April 20, 2006, Amgen Inc. and certain affiliated entities, hereinafter referred to as Amgen, filed a lawsuit against us in the U.S. District Court for the District of Delaware seeking a declaratory judgment that each of the claims contained in the `516 Patent are invalid and that Amgen has not infringed any of the claims of the `516 Patent based on activities related to Amgen's products, Enbrel® and Kineret®. We filed a motion to dismiss this action on June 14, 2006, and a hearing on our motion is scheduled for September 11, 2006.

In addition, on April 4, 2005, Lilly filed a request in the United States Patent and Trademark Office, or PTO, to reexamine the patentability of certain claims of the `516 Patent. An unrelated third party filed a similar request in the PTO on December 2, 2005 to reexamine the patentability of certain claims of the `516 Patent. These two requests have been merged by the PTO and the PTO issued its first office action on August 2, 2006. The Plaintiffs have filed a complaint in the U.S. District Court in the Eastern District of Virginia requesting that the court enjoin the PTO from continuing with the reexamination proceedings, along with a motion for summary judgment, which is scheduled for hearing on September 11, 2006. However, we can provide no assurance that the Plaintiffs will prevail in this action and that the PTO will not subsequently invalidate some or all of the claims of the `516 Patent.

As exclusive licensee of this patent, we are obligated for the costs expended for its prosecution in the PTO, for its enforcement in the above noted litigation and otherwise. Therefore, we will continue to expend significant capital and management resources pursuing these matters in court and in the reexamination process in the PTO, and the outcome is uncertain.

If some or all of the claims of the '516 Patent are invalidated by the PTO or in the courts or found not to be infringed in these matters, we will not realize any revenues on sales of the above-named products, and could be liable under certain limited circumstances in the Lilly litigation for litigation costs and potentially attorneys' fees. Additionally, although we have prevailed in the jury trial in the Lilly litigation, the damages awarded to us and the other Plaintiffs could be subsequently eliminated or limited by an adverse finding by the U.S. District Court judge following the bench trial, upon appeal or in the event that the claims of the `516 Patent are invalidated by the PTO. Invalidation of any of the claims of the '516 Patent in litigation or by the PTO or in the courts would have a significant adverse impact on our ability to generate revenues from our NF- κ B licensing program. Moreover, significant expenditures to enforce these patent rights without generating revenues or accessing additional capital or other funding could adversely impact our ability to further our clinical programs and our research and development programs at the current levels or at levels that may be required in the future.

*We may not be able to protect our intellectual property relating to our research programs, technologies and products.*

We and our licensors have issued patents and pending patent applications covering research methods useful in drug discovery, new chemical compounds discovered in our drug discovery programs including, among others, AP23573, certain components, configurations and uses of our cell-signaling regulation technologies and products-in-development, methods and materials for manufacturing our products-in-development and other pharmaceutical products and methods and materials for conducting pharmaceutical research. We have a licensing program to generate revenues from the use of our ARGENT cell-signaling regulation technologies and our NF- κ B intellectual property. Pending patent applications may not issue as patents and may not issue in all countries in which we develop, manufacture or sell our products or in countries where others develop, manufacture and sell products using our technologies. In addition, patents issued to us or our licensors may be challenged, as is the case with the Lilly litigation and related PTO proceedings and the Amgen litigation regarding the NF- κ B `516 Patent, and they may be subsequently narrowed, invalidated or circumvented. In that event, such patents may not afford meaningful protection for our technologies or product candidates, which would materially impact our ability to develop and market our product candidates and to generate licensing revenues from our patent portfolio. Certain technologies utilized in our research and development programs are already in the public domain. Moreover, a number of our competitors have developed technologies, filed patent applications or obtained patents on technologies, compositions and methods of use that are related to our business and may cover or conflict with our patent applications, technologies or product candidates. Such conflicts could limit the scope of the patents that we may be able to obtain or may result in the denial of our patent applications. If a third party were to obtain intellectual proprietary protection for any of the foregoing, we may be required to challenge such protection, terminate or modify our programs impacted by such protection or obtain licenses from such third parties, which might not be available or acceptable terms or at all.

*Because we do not own all of the outstanding stock of our subsidiary, AGTI, we may not realize all of the potential future economic benefit from products developed based on technology licensed to or owned by our subsidiary.*

Our majority-owned subsidiary, AGTI, holds licenses from Harvard University, Stanford University and other universities relating to our ARGENT cell-signaling regulation technology, and owns the intellectual property on our mTOR inhibitors derived from our ARGENT programs, including AP23573. The two directors of AGTI are also members of the Board of Directors of ARIAD. Minority stockholders of AGTI, including Harvard University, Stanford University, several of our scientific advisors, and several current and former members of our management and Board of Directors, own 20% of the issued and outstanding common stock of AGTI. We own the remaining 80% of the issued and outstanding common stock of AGTI.

25

We do not currently have a license agreement with AGTI that provides us with rights to commercialize product candidates, based on our ARGENT cell-signaling regulation technology or mTOR inhibitors derived from our ARGENT programs, solely for our own benefit, as opposed to for the benefit of AGTI. If we determine it to be in the best interests of our stockholders to commercialize these product candidates solely for our own benefit, we may negotiate with AGTI to obtain a license, on terms to be determined, granting us the sole rights to commercialize such product candidates. If we enter into such a license, the future economic benefit to our stockholders from our commercialization of such products, if any, will be diminished by any royalties or other payments paid under a future agreement with AGTI. If we do not enter into such a license, then the future economic benefit to our stockholders from our commercialization of such products on behalf of AGTI would be in the form of a dividend or other payments received in respect of our 80% interest in AGTI.

Alternatively, if we determine it to be in the best interests of our stockholders, we may seek to acquire some or all of the interests of the minority stockholders in AGTI for cash, shares of our common stock or other securities in a merger, exchange offer or other transaction. If we acquire all of the interests of the minority stockholders in AGTI, then our stockholders will receive all of the future economic benefit from our commercialization of such products on our own behalf. If we acquire these minority interests, we anticipate that this transaction will result in dilution to our stockholders and will require our incurrence of significant transaction costs, which are currently unknown. On January 13, 2004, we acquired an additional 351,909 shares of AGTI common stock, representing approximately 6% of AGTI's outstanding common stock, for a total purchase price of approximately $8.8 million, effected through the reduction of inter-company debt, subject to adjustment in certain circumstances, in order to maintain our 80% interest in AGTI. While such valuation was based on a good-faith determination made by the independent and disinterested members of our Board of Directors as of that date, the economic value of the minority stockholders' interests is difficult to quantify in the absence of a public market. If we acquire all of the interests of the minority stockholders in AGTI, a variety of valuation methodologies may be employed to determine the value per share of AGTI common stock. Factors impacting this valuation would include the progress, likelihood and cost of development and commercialization of product candidates, potential future income streams therefrom, availability of funding and other factors. If we acquire the minority interests for consideration valued in excess of the value implicitly attributed to such AGTI shares by the market, this could result in a decline in our stock price. If we choose to acquire some or all of these minority interests through a merger in which we do not solicit the consent of the minority stockholders of AGTI, we could become subject to litigation or an appraisal procedure, which would result in additional expense and diversion of management resources.

The independent and disinterested members of our Board of Directors have engaged legal counsel to help them evaluate strategic options regarding AGTI, which could include an acquisition of some or all of the interests of the minority stockholders in AGTI, a license from AGTI and/or certain other transactions, and our independent and disinterested directors may engage other advisors to assist them with such evaluation. There can be no assurance, however, that we will, at any time, enter into a transaction with AGTI. If any of these strategic options is pursued, there can be no assurance as to the timing of any such transaction, the form of such transaction, the particular transaction terms such as the form or amount of consideration offered or provided by us, or the consequences of any such proposed or completed transaction to us or the AGTI minority stockholders.

**ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS**

Our Annual Meeting of stockholders was held on June 14, 2006. Of 62,097,526 shares of common stock issued and outstanding and eligible to vote as of the record date of April 19, 2006, a quorum of 51,988,654 shares or 84% of the eligible shares, was present in person or represented by proxy. The following actions were taken at such meeting.

(a) Reelection of the following Class 3 Directors of the Company.

|  | Voted For | Withhold Authority |
|---|---|---|
| Harvey J. Berger, M.D. | 50,705,739 | 1,282,915 |
| Michael D. Kishbauch | 50,929,335 | 1,059,319 |
| Burton E. Sobel, M.D. | 50,932,088 | 1,056,566 |

After the meeting, Athanase Lavidas, Ph.D., Peter J. Nelson and Mary C. Tanner continued to serve as Class 1 Directors of the Company for terms which expire in 2007 and until their successors are duly elected and qualified. Jay R. LaMarche, Sandford D. Smith and Elizabeth H.S. Wyatt continued to serve as Class 2 Directors of the Company for terms which expire in 2008 and until their successors are duly elected and qualified.

(b) Ratification of the selection of the Audit Committee of the Board of Directors of Deloitte & Touche LLP as our independent registered public accounting firm for the year ending December 31, 2006. The voting results were 50,738,595 votes for, 1,099,231 votes against, and 150,877 votes abstaining.

(c) Approval of adoption of the ARIAD Pharmaceuticals, Inc. 2006 Long-Term Incentive Plan and reservation of 4,500,000 shares of common stock for stock options and other equity-based grants pursuant to this plan. The voting results were 24,240,426 votes for, 3,158,886 votes against and 191,353 votes abstaining. There were also 24,397,989 broker non-votes.

27

**ITEM 6. EXHIBITS**

| | |
|---|---|
| 10.1 | ARIAD Pharmaceuticals, Inc. 2006 Long-Term Incentive Plan (filed as Appendix A to our definitive proxy statement on Schedule 14A (File No. 000-21696) filed with the Commission on April 28, 2006). |
| 10.2 | Form of Stock Option Certificate under the ARIAD Pharmaceuticals, Inc. 2006 Long-Term Incentive Plan. |
| 10.3 | Form of Stock Grant Certificate under the ARIAD Pharmaceuticals, Inc. 2006 Long-Term Incentive Plan. |
| 10.4 | Form of Restricted Stock Unit Certificate under the ARIAD Pharmaceuticals, Inc. 2006 Long-Term Incentive Plan. |
| 10.5 | Form of Indemnity Agreement between ARIAD Pharmaceuticals, Inc. and its directors and officers. |
| 31.1 | Certification of the Chief Executive Officer. |
| 31.2 | Certification of the Chief Financial Officer. |
| 32.1 | Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

ARIAD and the ARIAD logo are our registered trademarks and ARGENT is our trademark. The domain name and website address www.ariad.com, and all rights thereto, are registered in the name of, and owned by, ARIAD. The information in our website is not intended to be part of this Quarterly Report on Form 10-Q. We include our website address herein only as an inactive textual reference and do not intend it to be an active link to our website.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

ARIAD Pharmaceuticals, Inc.

(Registrant)


By: /s/ Harvey J. Berger, M.D.

Harvey J. Berger, M.D.

Chairman and Chief Executive Officer


By: /s/ Edward M. Fitzgerald

Edward M. Fitzgerald

Senior Vice President, Finance and Corporate Operations and Chief Financial Officer

(Duly authorized officer, principal financial officer

Date: August 8, 2006                           and chief accounting officer)

29

**EXHIBIT INDEX**

| Exhibit No. | Title |
|---|---|
| 10.1 | ARIAD Pharmaceuticals, Inc. 2006 Long-Term Incentive Plan (filed as Appendix A to our definitive proxy statement on Schedule 14A (File No. 000-21696) filed with the Commission on April 28, 2006). |
| 10.2 | Form of Stock Option Certificate under the ARIAD Pharmaceuticals, Inc. 2006 Long-Term Incentive Plan. |
| 10.3 | Form of Stock Grant Certificate under the ARIAD Pharmaceuticals, Inc. 2006 Long-Term Incentive Plan. |
| 10.4 | Form of Restricted Stock Unit Certificate under the ARIAD Pharmaceuticals, Inc. 2006 Long-Term Incentive Plan. |
| 10.5 | Form of Indemnity Agreement between ARIAD Pharmaceuticals, Inc. and its directors and officers. |
| 31.1 | Certification of the Chief Executive Officer. |
| 31.2 | Certification of the Chief Financial Officer. |
| 32.1 | Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

Exhibit 10.2

FORM OF
**STOCK OPTION CERTIFICATE**

This Stock Option Certificate certifies that, pursuant to the ARIAD Pharmaceuticals, Inc. 2006 Long-Term Incentive Plan (the "2006 Plan"), the Board of Directors of ARIAD Pharmaceuticals, Inc. (the "Company") has granted an option (the "Option") to purchase shares of the Company's common stock, $.001 par value per share ("Shares"), as follows:

> **Name of Participant:**
>
> **Number of Option Shares:**
>
> **Type of Stock Option Grant:**
>
> **Exercise Price:**
>
> **Date of Grant:**

This Option is subject to all the terms, conditions and limitations set forth in the 2006 Plan, which is incorporated herein by reference, and to the following additional terms specified by the Board of Directors of the Company. The Option shall be exercisable as follows:

> [terms]

The Option shall terminate ten years from the Date of Grant or such shorter period as set forth in the 2006 Plan in the event of the Optionee's termination of service, Death or Disability. The Option is not assignable or transferable, other than as provided in the 2006 Plan. No partial exercise of the Option may be for less than 100 full shares. In no event shall the Company be required to issue fractional shares.

This Stock Option Certificate, together with the 2006 Plan and any other written agreement between the Company and the Participant relevant to the subject matter hereof and executed contemporaneously herewith or hereafter, embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written agreements and understandings relating to the subject matter hereof and no other statement, representation, warranty, covenant or agreement shall affect or be used to interpret, change or restrict, the express terms and provisions of this Stock Option Grant, provided, however, in any event, this Stock Option Certificate shall be subject to and governed by the 2006 Plan.

In witness whereof, the Company has caused this Option Certificate to be executed by its duly authorized officers.

Dated:

_____
Edward M. Fitzgerald

Senior Vice President

Finance and Corporate Operations

Chief Financial Officer

_____
Harvey J. Berger, M.D.

Chairman and Chief Executive Officer

Exhibit 10.3

**FORM OF**
**STOCK GRANT CERTIFICATE**

This Stock Grant Certificate certifies that, pursuant to the ARIAD Pharmaceuticals, Inc. 2006 Long-Term Incentive Plan (the "2006 Plan"), the Board of Directors of ARIAD Pharmaceuticals, Inc. (the "Company") has granted shares of Common Stock, $.001 par value per share, of the Company (the "Stock Grant"), as follows:

**Name of Participant:**
**Number of Granted Shares:**
**Grant Price:**
**Grant Date:**

The Stock Grant is subject to all the terms, conditions and limitations set forth in the 2006 Plan, which is incorporated herein by reference, and to the following additional terms specified by the Board of Directors of the Company. Capitalized terms used herein and not otherwise defined shall have the meaning set forth in the 2006 Plan.

*Legends.* To the extent the Participant is an affiliate at the date of issuance of the Granted Shares, all certificates representing the Granted Shares to be issued to the Participant pursuant to this Stock Grant Certificate shall contain a legend required by virtue of the fact that the Participant is an affiliate (as defined in Rule 144(a)(1) of the Securities Act of 1933, as amended) of the Company.

*Tax Considerations.* The Participant acknowledges and agrees that any income taxes or other taxes due from the Participant with respect to the Granted Shares shall be the Participant's responsibility.

In witness whereof, the Company has caused this Stock Grant Certificate to be executed by its duly authorized officer.

Dated:

ARIAD PHARMACEUTICALS, INC.:

_____
Harvey J. Berger, M.D.
Chairman and Chief Executive Officer

_____
Edward M. Fitzgerald
Senior Vice President
Finance and Corporate Operations
Chief Financial Officer

Exhibit 10.4

**FORM OF**
**RESTRICTED STOCK UNIT CERTIFICATE**

This Restricted Stock Unit Certificate certifies that, pursuant to the ARIAD Pharmaceuticals, Inc. 2006 Long-Term Incentive Plan (the "2006 Plan"), the Board of Directors of ARIAD Pharmaceuticals, Inc. (the "Company") has granted the right to receive shares of Common Stock, $.001 par value per share, of the Company (the "Grant"), as follows:

**Name of Participant:**

**Number of Granted Shares:**

**Grant Price:**

**Grant Date:**

**Share Issue Date:**

The Grant is subject to all the terms, conditions and limitations set forth in the 2006 Plan, which is incorporated herein by reference, and to the following additional terms specified by the Board of Directors of the Company. Capitalized terms used herein and not otherwise defined shall have the meaning set forth in the 2006 Plan.

*Legends.* To the extent the Participant is an affiliate at the date of issuance of the Granted Shares, all certificates representing the Granted Shares to be issued to the Participant pursuant to this Restricted Stock Unit Certificate shall contain a legend required by virtue of the fact that the Participant is an affiliate (as defined in Rule 144(a)(1) of the Securities Act of 1933, as amended) of the Company.

*Tax Considerations.* The Participant acknowledges and agrees that any income taxes or other taxes due from the Participant with respect to the Granted Shares shall be the Participant's responsibility.

In witness whereof, the Company has caused this Restricted Stock Unit Certificate to be executed by its duly authorized officer.

Dated:

ARIAD PHARMACEUTICALS, INC.:


_____
Harvey J. Berger, M.D.
Chairman and Chief Executive Officer

_____
Edward M. Fitzgerald
Senior Vice President
Finance and Corporate Operations
Chief Financial Officer

Exhibit 10.5

ATTORNEY-CLIENT PRIVILEGED
HIGHLY CONFIDENTIAL

## FORM OF INDEMNITY AGREEMENT

This Indemnity Agreement ("Agreement") is made as of _____, ____ by and between ARIAD Pharmaceuticals, Inc., a Delaware corporation (the "Company"), and _____ ("Indemnitee").

## RECITALS

WHEREAS,  highly competent persons have become more reluctant to serve publicly-held corporations as directors or in other capacities unless they are provided with adequate protection through insurance or adequate indemnification against inordinate risks of claims and actions against them arising out of their service to and activities on behalf of the corporation.

WHEREAS,  the Board of Directors of the Company (the "Board") has determined that, in order to attract and retain qualified individuals, the Company will attempt to maintain on an ongoing basis, at its sole expense, liability insurance to protect persons serving the Company and its subsidiaries from certain liabilities. Although the furnishing of such insurance has been a customary and widespread practice among United States-based corporations and other business enterprises, the Company believes that, given current market conditions and trends, such insurance may be available to it in the future only at higher premiums and with more exclusions. At the same time, directors, officers and other persons in service to corporations or business enterprises are being increasingly subjected to expensive and time-consuming litigation relating to, among other things, matters that traditionally would have been brought only against the Company or business enterprise itself. The Certificate of Incorporation (the "Charter") and the Bylaws of the Company require indemnification of the officers and directors of the Company. Indemnitee may also be entitled to indemnification pursuant to applicable provisions of the Delaware General Corporation Law ("DGCL"). The Charter, the Bylaws and the DGCL expressly provide that the indemnification provisions set forth therein are not exclusive, and thereby contemplate that contracts may be entered into between the Company and members of the board of directors, officers and other persons with respect to indemnification, hold harmless, exoneration, advancement and reimbursement rights.

WHEREAS,  the uncertainties relating to such insurance and to indemnification have increased the difficulty of attracting and retaining such persons.

WHEREAS,  the Board has determined that the increased difficulty in attracting and retaining such persons is detrimental to the best interests of the Company's stockholders and that the Company should act to assure such persons that there will be increased certainty of such protection in the future.

WHEREAS, it is reasonable, prudent and necessary for the Company contractually to obligate itself to indemnify, hold harmless, exonerate and to advance expenses on behalf of, such persons to the fullest extent permitted by applicable law so that they will serve or continue to serve the Company free from undue concern that they will not be so protected against liabilities.

WHEREAS, this Agreement is a supplement to and in furtherance of the Charter, the Bylaws of the Company and any resolutions adopted pursuant thereto, and shall not be deemed a substitute therefor, nor to diminish or abrogate any rights of Indemnitee thereunder.

WHEREAS, Indemnitee does not regard the protection available under the Company's Charter, Bylaws and insurance as adequate in the present circumstances, and may not be willing to serve as an officer or director without adequate protection, and the Company desires Indemnitee to serve in such capacity. Indemnitee is willing to serve, continue to serve and to take on additional service for or on behalf of the Company on the condition that he be so indemnified.

NOW, THEREFORE, in consideration of the premises and the covenants contained herein, the Company and Indemnitee do hereby covenant and agree as follows:

1. **Services To The Company.** Indemnitee will serve or continue to serve as an officer, director or key employee of the Company for so long as Indemnitee is duly elected or appointed or until Indemnitee tenders his resignation.

2. **Definitions.** As used in this Agreement:

(a) References to "agent" shall mean any person who is or was a director, officer, or employee of the Company or a subsidiary of the Company or other person authorized by the Company to act for the Company, to include such person serving in such capacity as a director, officer, employee, fiduciary or other official of another corporation, partnership, limited liability company, joint venture, trust or other enterprise at the request of, for the convenience of, or to represent the interests of the Company or a subsidiary of the Company.

(b) The terms "Beneficial Owner" and "Beneficial Ownership" shall have the meanings set forth in Rule 13d-3 promulgated under the Exchange Act (as defined below) in effect on the date hereof.

(c) A "Change in Control" shall be deemed to occur upon the earliest to occur after the date of this Agreement of any of the following events:

(i) <u>Acquisition of Stock by Third Party</u>. Any Person (as defined below) is or becomes the Beneficial Owner, directly or indirectly, of securities of the Company representing fifteen percent (15%) or more of the combined voting power of the Company's then outstanding securities entitled to vote generally in the election of directors, unless (1) the change in the relative Beneficial Ownership of the Company's securities by any Person results solely from a reduction in the aggregate number of outstanding shares of securities entitled to vote generally in the election of directors, or (2) such acquisition was approved in advance by the Continuing Directors (as defined below) and such acquisition would not constitute a Change in Control under part (iii) of this definition;

2

(ii)  <u>Change in Board of Directors</u>. Individuals who, as of the date hereof, constitute the Board, and any new director whose election by the Board or nomination for election by the Company's stockholders was approved by a vote of at least two thirds of the directors then still in office who were directors on the date hereof or whose election for nomination for election was previously so approved (collectively, the "Continuing Directors"), cease for any reason to constitute at least a majority of the members of the Board;

(iii)  <u>Corporate Transactions</u>. The effective date of a reorganization, merger or consolidation of the Company (a "Business Combination"), in each case, unless, following such Business Combination: (1) all or substantially all of the individuals and entities who were the Beneficial Owners of securities entitled to vote generally in the election of directors immediately prior to such Business Combination beneficially own, directly or indirectly, more than 51% of the combined voting power of the then outstanding securities of the Company entitled to vote generally in the election of directors resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more Subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination, of the securities entitled to vote generally in the election of directors; (2) no Person (excluding any corporation resulting from such Business Combination) is the Beneficial Owner, directly or indirectly, of 15% or more of the combined voting power of the then outstanding securities entitled to vote generally in the election of directors of such corporation except to the extent that such ownership existed prior to the Business Combination; and (3) at least a majority of the Board of Directors of the corporation resulting from such Business Combination were Continuing Directors at the time of the execution of the initial agreement, or of the action of the Board of Directors, providing for such Business Combination;

(iv)  <u>Liquidation</u>. The approval by the stockholders of the Company of a complete liquidation of the Company or an agreement or series of agreements for the sale or disposition by the Company of all or substantially all of the Company's assets, other than factoring the Company's current receivables or escrows due (or, if such approval is not required, the decision by the Board to proceed with such a liquidation, sale, or disposition in one transaction or a series of related transactions); or

(v)  <u>Other Events</u>. There occurs any other event of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A (or a response to any similar item on any similar schedule or form) promulgated under the Exchange Act (as defined below), whether or not the Company is then subject to such reporting requirement.

(d)  "Corporate Status" describes the status of a person who is or was a director, officer, trustee, general partner, managing member, fiduciary, employee or agent of the Company or of any other Enterprise (as defined below) which such person is or was serving at the request of the Company.

3

(e)    "Delaware Court" shall mean the Court of Chancery of the State of Delaware.

(f)    "Disinterested Director" shall mean a director of the Company who is not and was not a party to the Proceeding (as defined below) in respect of which indemnification is sought by Indemnitee.

(g)    "Enterprise" shall mean the Company and any other corporation, constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger to which the Company (or any of its wholly owned subsidiaries) is a party, limited liability company, partnership, joint venture, trust, employee benefit plan or other enterprise of which Indemnitee is or was serving at the request of the Company as a director, officer, trustee, general partner, managing member, fiduciary, employee or agent.

(h)    "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

(i)    "Expenses" shall include attorneys' fees and costs, retainers, court costs, transcript costs, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or expenses in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, or otherwise participating in, a Proceeding (as defined below). Expenses also shall include Expenses incurred in connection with any appeal resulting from any Proceeding (as defined below), including without limitation the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(j)    "Independent Counsel" shall mean a law firm or a member of a law firm that is experienced in matters of corporation law and neither presently is, nor in the past five years has been, retained to represent: (i) the Company or Indemnitee in any matter material to either such party (other than with respect to matters concerning the Indemnitee under this Agreement, or of other indemnitees under similar indemnification agreements); or (ii) any other party to the Proceeding (as defined below) giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(k)    References to "fines" shall include any excise tax assessed on Indemnitee with respect to any employee benefit plan; references to "serving at the request of the Company" shall include any service as a director, officer, employee, agent or fiduciary of the Company which imposes duties on, or involves services by, such director, officer, employee, agent or fiduciary with respect to an employee benefit plan, its participants or beneficiaries; and if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in the best interests of the participants and beneficiaries of an employee benefit plan, Indemnitee shall be deemed to have acted in a manner "not opposed to the best interests of the Company" as referred to in this Agreement.

4

(l)    The term "Person" shall have the meaning as set forth in Sections 13(d) and 14(d) of the Exchange Act as in effect on the date hereof; provided , however , that "Person" shall exclude: (i) the Company; (ii) any Subsidiaries (as defined below) of the Company; (iii) any employment benefit plan of the Company or of a Subsidiary (as defined below) of the Company or of any corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company; and (iv) any trustee or other fiduciary holding securities under an employee benefit plan of the Company or a Subsidiary (as defined below) of the Company or of a corporation owned directly or indirectly by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(m)    A "Potential Change in Control" shall be deemed to have occurred if: (i) the Company enters into an agreement or arrangement, the consummation of which would result in the occurrence of a Change in Control; (ii) any Person or the Company publicly announces an intention to take or consider taking actions which if consummated would constitute a Change in Control; (iii) any Person who becomes the Beneficial Owner, directly or indirectly, of securities of the Company representing 5% or more of the combined voting power of the Company's then outstanding securities entitled to vote generally in the election of directors increases his Beneficial Ownership of such securities by 5% or more over the percentage so owned by such Person on the date hereof; or (iv) the Board adopts a resolution to the effect that, for purposes of this Agreement, a Potential Change in Control has occurred.

(n)    The term "Proceeding" shall include any threatened, pending or completed action, suit, arbitration, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened or completed proceeding, whether brought in the right of the Company or otherwise and whether of a civil (including intentional or unintentional tort claims), criminal, administrative or investigative nature, in which Indemnitee was, is or will be involved as a party or otherwise by reason of the fact that Indemnitee is or was a director or officer of the Company, by reason of any action (or failure to act) taken by him or of any action (or failure to act) on his part while acting as a director or officer of the Company, or by reason of the fact that he is or was serving at the request of the Company as a director, officer, trustee, general partner, managing member, fiduciary, employee or agent of any other Enterprise, in each case whether or not serving in such capacity at the time any liability or expense is incurred for which indemnification, reimbursement, or advancement of expenses can be provided under this Agreement.

5

(o)  The term "Subsidiary," with respect to any Person, shall mean any corporation or other entity of which a majority of the voting power of the voting equity securities or equity interest is owned, directly or indirectly, by that Person.

3.  **Indemnity In Third-Party Proceedings.** The Company shall indemnify and hold harmless Indemnitee in accordance with the provisions of this Section 3 if Indemnitee was, is, or is threatened to be made, a party to or a participant (as a witness or otherwise) in any Proceeding, other than a Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 3, Indemnitee shall be indemnified against all Expenses, judgments, liabilities, fines, penalties and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such Expenses, judgments, fines, penalties and amounts paid in settlement) actually and reasonably incurred by Indemnitee or on his behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company and, in the case of a criminal Proceeding, had no reasonable cause to believe that his conduct was unlawful.

4.  **Indemnity In Proceedings By Or In The Right Of The Company.** The Company shall indemnify and hold harmless Indemnitee in accordance with the provisions of this Section 4 if Indemnitee was, is, or is threatened to be made, a party to or a participant (as a witness or otherwise) in any Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 4, Indemnitee shall be indemnified against all Expenses actually and reasonably incurred by him or on his behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company. No indemnification, hold harmless or exoneration for Expenses shall be made under this Section 4 in respect of any claim, issue or matter as to which Indemnitee shall have been finally adjudged by a court to be liable to the Company, unless and only to the extent that any court in which the Proceeding was brought or the Delaware Court shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, Indemnitee is fairly and reasonably entitled to indemnification., to be held harmless or to exoneration.

5.  **Indemnification For Expenses Of A Party Who Is Wholly Or Partly Successful.** Notwithstanding any other provisions of this Agreement, to the extent that Indemnitee is a party to (or a participant in) and is successful, on the merits or otherwise, in any Proceeding or in defense of any claim, issue or matter therein, in whole or in part, the Company shall indemnify and hold harmless Indemnitee against all Expenses actually and reasonably incurred by him in connection therewith. If Indemnitee is not wholly successful in such Proceeding but is successful, on the merits or otherwise, as to one or more but less than all claims, issues or matters in such Proceeding, the Company shall indemnify and hold harmless Indemnitee against all Expenses actually and reasonably incurred by him or on his behalf in connection with each successfully resolved claim, issue or matter. If the Indemnitee is not wholly successful in such Proceeding, the Company also shall indemnify and hold harmless Indemnitee against all Expenses reasonably incurred in connection with a claim, issue or matter related to any claim, issue, or matter on which the Indemnitee was successful. For purposes of this Section and without limitation, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

6

6.    **Indemnification For Expenses Of A Witness.** Notwithstanding any other provision of this Agreement, to the extent that Indemnitee is, by reason of his Corporate Status, a witness in any Proceeding to which Indemnitee is not a party, he shall be indemnified and held harmless against all Expenses actually and reasonably incurred by him or on his behalf in connection therewith.

7.    **Additional Indemnification, Hold Harmless and Exoneration Rights.**

       (a)    Notwithstanding any limitation in Sections 3, 4, or 5, the Company shall indemnify and hold harmless Indemnitee if Indemnitee is a party to or threatened to be made a party to any Proceeding (including a Proceeding by or in the right of the Company to procure a judgment in its favor) against all Expenses, judgments, fines, penalties and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such Expenses, judgments, fines, penalties and amounts paid in settlement) actually and reasonably incurred by Indemnitee in connection with the Proceeding. No indemnification, hold harmless or exoneration rights shall be made under this Section 7(a) on account of Indemnitee's conduct which constitutes a breach of Indemnitee's duty of loyalty to the Company or its stockholders or is an act or omission not in good faith or which involves intentional misconduct or a knowing violation of the law.

       (b)    Notwithstanding any limitation in Sections 3, 4, 5 or 7(a), the Company shall indemnify and hold harmless Indemnitee if Indemnitee is a party to or threatened to be made a party to any Proceeding (including a Proceeding by or in the right of the Company to procure a judgment in its favor) against all Expenses, judgments, fines, penalties and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such Expenses, judgments, fines, penalties and amounts paid in settlement) actually and reasonably incurred by Indemnitee in connection with the Proceeding.

8.    **Contribution In The Event Of Joint Liability.**

       (a)    To the fullest extent permissible under applicable law, if the indemnification and hold harmless rights provided for in this Agreement are unavailable to Indemnitee in whole or in part for any reason whatsoever, the Company, in lieu of indemnifying and holding harmless Indemnitee, shall pay, in the first instance, the entire amount incurred by Indemnitee, whether for judgments, liabilities, fines, penalties, amounts paid or to be paid in settlement and/or for Expenses, in connection with any Proceeding without requiring Indemnitee to contribute to such payment, and the Company hereby waives and relinquishes any right of contribution it may have at any time against Indemnitee.

(b)   The Company shall not enter into any settlement of any Proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such Proceeding) unless such settlement provides for a full and final release of all claims asserted against Indemnitee.

(c)   The Company hereby agrees to fully indemnify and hold harmless Indemnitee from any claims for contribution which may be brought by officers, directors or employees of the Company other than Indemnitee who may be jointly liable with Indemnitee.

9.   **Exclusions.** Notwithstanding any provision in this Agreement, the Company shall not be obligated under this Agreement to make any indemnification, hold harmless or exoneration payments in connection with any claim made against Indemnitee:

(a)   for which payment has actually been received by or on behalf of Indemnitee under any insurance policy or other indemnity provision, except with respect to any excess beyond the amount actually received under any insurance policy, contract, agreement, other indemnity provision or otherwise;

(b)   for an accounting of profits made from the purchase and sale (or sale and purchase) by Indemnitee of securities of the Company within the meaning of Section 16(b) of the Exchange Act or similar provisions of state statutory law or common law; or

(c)   except as otherwise provided in Sections 14(e)-(f) hereof, prior to a Change in Control, in connection with any Proceeding (or any part of any Proceeding) initiated by Indemnitee, including any Proceeding (or any part of any Proceeding) initiated by Indemnitee against the Company or its directors, officers, employees or other indemnitees, unless (i) the Board authorized the Proceeding (or any part of any Proceeding) prior to its initiation or (ii) the Company provides the indemnification, hold harmless or exoneration payment, in its sole discretion, pursuant to the powers vested in the Company under applicable law.

10.   **Advances Of Expenses; Defense Of Claim.**

(a)   Notwithstanding any provision of this Agreement to the contrary, and to the fullest extent permitted by applicable law, the Company shall advance the Expenses incurred by Indemnitee (or reasonably expected by Indemnitee to be incurred by Indemnitee within three months) in connection with any Proceeding within ten (10) days after the receipt by the Company of a statement or statements requesting such advances from time to time, whether prior to or after final disposition of any Proceeding. Advances shall be unsecured and interest free. Advances shall be made without regard to Indemnitee's ability to repay the Expenses and without regard to Indemnitee's ultimate entitlement to be indemnified, held harmless or exonerated under the other provisions of this Agreement. Advances shall include any and all reasonable Expenses incurred pursuing a Proceeding to enforce this right of advancement, including Expenses incurred preparing and forwarding statements to the Company to support the advances claimed. The Indemnitee shall qualify for advances, to the fullest extent permitted by applicable law, solely upon the execution and delivery to the Company of an undertaking providing that the Indemnitee undertakes to repay the advance to the extent that it is ultimately determined that Indemnitee is not entitled to be indemnified by the Company under the provisions of this Agreement, the Charter, the Bylaws of the Company, applicable law or otherwise. This Section 10(a) shall not apply to any claim made by Indemnitee for which an indemnification, hold harmless or exoneration payment is excluded pursuant to Section 9.

8

(b)    The Company will be entitled to participate in the Proceeding at its own expense.

(c)    The Company shall not settle any action, claim or Proceeding (in whole or in part) which would impose any Expense, judgment, fine, penalty or limitation on the Indemnitee without the Indemnitee's prior written consent.

**11.    Procedure For Notification And Application For Indemnification.**

(a)    Indemnitee agrees to notify promptly the Company in writing upon being served with any summons, citation, subpoena, complaint, indictment, information or other document relating to any Proceeding or matter which may be subject to indemnification, hold harmless or exoneration rights, or advancement of Expenses covered hereunder. The failure of Indemnitee to so notify the Company shall not relieve the Company of any obligation which it may have to the Indemnitee under this Agreement, or otherwise.

(b)    Indemnitee may deliver to the Company a written application to indemnify and hold harmless Indemnitee in accordance with this Agreement. Such application(s) may be delivered from time to time and at such time(s) as Indemnitee deems appropriate in his or her sole discretion. Following such a written application for indemnification by Indemnitee, the Indemnitee's entitlement to indemnification shall be determined according to Section 12(a) of this Agreement.

**12.    Procedure Upon Application For Indemnification.**

(a)    A determination, if required by applicable law, with respect to Indemnitee's entitlement to indemnification shall be made in the specific case by one of the following methods, which shall be at the election of Indemnitee: (i) by a majority vote of the Disinterested Directors, even though less than a quorum of the Board or (ii) by Independent Counsel in a written opinion to the Board, a copy of which shall be delivered to Indemnitee. The Company promptly will advise Indemnitee in writing with respect to any determination that Indemnitee is or is not entitled to indemnification, including a description of any reason or basis for which indemnification has been denied. If it is so determined that Indemnitee is entitled to indemnification, payment to Indemnitee shall be made within ten (10) days after such determination. Indemnitee shall reasonably cooperate with the person, persons or entity making such determination with respect to Indemnitee's entitlement to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information which is not privileged or otherwise protected from disclosure and which is reasonably available to Indemnitee and reasonably necessary to such determination. Any costs or Expenses (including attorneys' fees and disbursements) incurred by Indemnitee in so cooperating with the person, persons or entity making such determination shall be borne by the Company (irrespective of the determination as to Indemnitee's entitlement to indemnification) and the Company hereby indemnifies and agrees to hold Indemnitee harmless therefrom.

(b)   In the event the determination of entitlement to indemnification is to be made by Independent Counsel pursuant to Section 12(a) hereof, the Independent Counsel shall be selected as provided in this Section 12(b). The Independent Counsel shall be selected by Indemnitee (unless Indemnitee shall request that such selection be made by the Board), and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected and certifying that the Independent Counsel so selected meets the requirements of "Independent Counsel" as defined in Section 2 of this Agreement. If the Independent Counsel is selected by the Board, the Company shall give written notice to Indemnitee advising him of the identity of the Independent Counsel so selected and certifying that the Independent Counsel so selected meets the requirements of "Independent Counsel" as defined in Section 2 of this Agreement. In either event, Indemnitee or the Company, as the case may be, may, within ten (10) days after such written notice of selection shall have been received, deliver to the Company or to Indemnitee, as the case may be, a written objection to such selection; provided , however , that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements of "Independent Counsel" as defined in Section 2 of this Agreement, and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the person so selected shall act as Independent Counsel. If such written objection is so made and substantiated, the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court of competent jurisdiction has determined that such objection is without merit. If, within twenty (20) days after submission by Indemnitee of a written request for indemnification pursuant to Section 11(a) hereof, no Independent Counsel shall have been selected and not objected to, either the Company or Indemnitee may petition the Delaware Court for resolution of any objection which shall have been made by the Company or Indemnitee to the other's selection of Independent Counsel and/or for the appointment as Independent Counsel of a person selected by the Delaware Court, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under Section 12(a) hereof. Upon the due commencement of any judicial proceeding or arbitration pursuant to Section 14(a) of this Agreement, Independent Counsel shall be discharged and relieved of any further responsibility in such capacity (subject to the applicable standards of professional conduct then prevailing).

(c)   The Company agrees to pay the reasonable fees and expenses of Independent Counsel and to fully indemnify and hold harmless such Independent Counsel against any and all Expenses, claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

10

**13.    Presumptions and Effect Of Certain Proceedings.**

(a)    In making a determination with respect to entitlement to indemnification hereunder, the person, persons or entity making such determination shall presume that Indemnitee is entitled to indemnification under this Agreement if Indemnitee has submitted a request for indemnification in accordance with Section 11(b) of this Agreement, and the Company shall have the burden of proof to overcome that presumption in connection with the making by any person, persons or entity of any determination contrary to that presumption. Neither the failure of the Company (including by its directors or Independent Counsel) to have made a determination prior to the commencement of any action pursuant to this Agreement that indemnification is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor an actual determination by the Company (including by its directors or Independent Counsel) that Indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that Indemnitee has not met the applicable standard of conduct.

(b)    If the person, persons or entity empowered or selected under Section 12 of this Agreement to determine whether Indemnitee is entitled to indemnification shall not have made a determination within thirty (30) days after receipt by the Company of the request therefor, the requisite determination of entitlement to indemnification shall be deemed to have been made and Indemnitee shall be entitled to such indemnification, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statement not materially misleading, in connection with the request for indemnification, or (ii) a final judicial determination that any or all such indemnification is expressly prohibited under applicable law; provided , however , that such 30-day period may be extended for a reasonable time, not to exceed an additional fifteen (15) days, if the person, persons or entity making the determination with respect to entitlement to indemnification in good faith requires such additional time for the obtaining or evaluating of documentation and/or information relating thereto.

(c)    The termination of any Proceeding or of any claim, issue or matter therein, by judgment, order, settlement or conviction, or upon a plea of nolo contendere or its equivalent, shall not (except as otherwise expressly provided in this Agreement) of itself adversely affect the right of Indemnitee to indemnification or create a presumption that Indemnitee did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that Indemnitee had reasonable cause to believe that his conduct was unlawful.

(d)    For purposes of any determination of good faith, Indemnitee shall be deemed to have acted in good faith if Indemnitee's action is based on the records or books of account of the Enterprise, including financial statements, or on information supplied to Indemnitee by the officers of the Enterprise in the course of their duties, or on the advice of legal counsel for the Enterprise or on information or records given or reports made to the Enterprise by an independent certified public accountant or by an appraiser or other expert selected by the Enterprise. The provisions of this Section 13(d) shall not be deemed to be exclusive or to limit in any way the other circumstances in which the Indemnitee may be deemed or found to have met the applicable standard of conduct set forth in this Agreement.

11

(e)    The knowledge and/or actions, or failure to act, of any other director, officer, trustee, partner, managing member, fiduciary, agent or employee of the Enterprise shall not be imputed to Indemnitee for purposes of determining the right to indemnification under this Agreement.

**14.    Remedies Of Indemnitee.**

(a)    In the event that (i) a determination is made pursuant to Section 12 of this Agreement that Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement of Expenses, to the fullest extent permitted by applicable law, is not timely made pursuant to Section 10 of this Agreement, (iii) no determination of entitlement to indemnification shall have been made pursuant to Section 12(a) of this Agreement within thirty (30) days after receipt by the Company of the request for indemnification, (iv) payment of indemnification is not made pursuant to Section 5, 6, 7 or the last sentence of Section 12(a) of this Agreement within ten (10) days after receipt by the Company of a written request therefor, (v) a contribution payment is not made in a timely manner pursuant to Section 8 of this Agreement, (vi) payment of indemnification pursuant to Section 3 or 4 of this Agreement is not made within ten (10) days after a determination has been made that Indemnitee is entitled to indemnification, or (vii) payments to Indemnitee pursuant to any hold harmless or exoneration rights under this Agreement or otherwise is not made within ten (10) days after receipt by the Company of a written request therefor, Indemnitee shall be entitled to an adjudication by the Delaware Court to such indemnification, hold harmless, exoneration, contribution or advancement rights. Alternatively, Indemnitee, at his option, may seek an award in arbitration to be conducted by a single arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Except as set forth herein, the provisions of Delaware law (without regard to its conflict of laws rules) shall apply to any such arbitration. The Company shall not oppose Indemnitee's right to seek any such adjudication or award in arbitration.

(b)    In the event that a determination shall have been made pursuant to Section 12(a) of this Agreement that Indemnitee is not entitled to indemnification, any judicial proceeding or arbitration commenced pursuant to this Section 14 shall be conducted in all respects as a _de_ _novo_ trial, or arbitration, on the merits and Indemnitee shall not be prejudiced by reason of that adverse determination. In any judicial proceeding or arbitration commenced pursuant to this Section 14, Indemnitee shall be presumed to be entitled to be indemnified, held harmless, exonerated and to receive advances of Expenses under this Agreement and the Company shall have the burden of proving Indemnitee is not entitled to be indemnified, held harmless, exonerated or receive advances of Expenses as the case may be, and the Company may not refer to or introduce into evidence any determination pursuant to Section 12(a) of this Agreement adverse to Indemnitee for any purpose. If Indemnitee commences a judicial proceeding or arbitration pursuant to this Section 14, Indemnitee shall not be required to reimburse the Company for any advances pursuant to Section 10 until a final determination is made with respect to Indemnitee's entitlement to indemnification (as to which all rights of appeal have been exhausted or lapsed).

12

(c)    If a determination shall have been made pursuant to Section 12(a) of this Agreement that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding or arbitration commenced pursuant to this Section 14, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statement not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law.

(d)    The Company shall be precluded from asserting in any judicial proceeding or arbitration commenced pursuant to this Section 14 that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court or before any such arbitrator that the Company is bound by all the provisions of this Agreement.

(e)    The Company shall indemnify and hold harmless Indemnitee to the fullest extent permitted by law against all Expenses and, if requested by Indemnitee, shall (within ten (10) days after the Company's receipt of such written request) advance to Indemnitee, to the fullest extent permitted by applicable law, such Expenses which are incurred by Indemnitee in connection with any judicial proceeding or arbitration brought by Indemnitee (i) to enforce his rights under, or to recover damages for breach of, this Agreement or any other indemnification, hold harmless, exoneration, advancement or contribution agreement or provision of the Charter, or the Company's Bylaws now or hereafter in effect; or (ii) for recovery or advances under any insurance policy maintained by any person for the benefit of Indemnitee, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advance, contribution or insurance recovery, as the case may be.

(f)    Interest shall be paid by the Company to Indemnitee at the legal rate under Delaware law for amounts which the Company indemnifies, holds harmless or exonerates or is obliged to indemnify, hold harmless or exonerate for the period commencing with the date on which Indemnitee requests indemnification, to be held harmless, exonerated, contribution, reimbursement or advancement of any Expenses and ending with the date on which such payment is made to Indemnitee by the Company.

15.    **Establishment Of Trust.** In the event of a Potential Change in Control, the Company shall, upon written request by Indemnitee, create a "Trust" for the benefit of Indemnitee and from time to time upon written request of Indemnitee shall fund such Trust in an amount sufficient to satisfy any and all Expenses reasonably anticipated at the time of each such request to be incurred in connection with investigating, preparing for, participating in or defending any Proceedings, and any and all judgments, fines, penalties and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such judgments, fines penalties and amounts paid in settlement) in connection with any and all Proceedings from time to time actually paid or claimed, reasonably anticipated or proposed to be paid. The trustee of the Trust (the "Trustee") shall be a bank or trust company or other individual or entity chosen by the Indemnitee and reasonably acceptable to the Company. Nothing in this Section 15 shall relieve the Company of any of its obligations under this Agreement. The amount or amounts to be deposited in the Trust pursuant to the foregoing funding obligation shall be determined by mutual agreement of the Indemnitee and the Company or, if the Company and the Indemnitee are unable to reach such an agreement, by Independent Counsel selected in accordance with Section 12(b) of this Agreement. The terms of the Trust shall provide that, except upon the consent of both the Indemnitee and the Company, upon a Change in Control: (a) the Trust shall not be revoked or the principal thereof invaded, without the written consent of the Indemnitee; (b) the Trustee shall advance, to the fullest extent permitted by applicable law, within two (2) business days of a request by the Indemnitee and upon the execution and delivery to the Company of an undertaking providing that the Indemnitee undertakes to repay the advance to the extent that it is ultimately determined that Indemnitee is not entitled to be indemnified, held harmless or exonerated by the Company; (c) the Trust shall continue to be funded by the Company in accordance with the funding obligations set forth above; (d) the Trustee shall promptly pay to the Indemnitee all amounts for which the Indemnitee shall be entitled to indemnification, or to be held harmless or exonerated pursuant to this Agreement or otherwise; and (e) all unexpended funds in such Trust shall revert to the Company upon mutual agreement by the Indemnitee and the Company or, if the Indemnitee and the Company are unable to reach such an agreement, by Independent Counsel selected in accordance with Section 12(b) of this Agreement, that the Indemnitee has been fully indemnified, held harmless and exonerated under the terms of this Agreement. The Trust shall be governed by Delaware law (without regard to its conflicts of laws rules) and the Trustee shall consent to the exclusive jurisdiction of the Delaware Court in accordance with Section 23 of this Agreement.

13

16.   **Security.** Notwithstanding anything herein to the contrary, to the extent requested by the Indemnitee and approved by the Board, the Company may at any time and from time to time provide security to the Indemnitee for the Company's obligations hereunder through an irrevocable bank line of credit, funded trust or other collateral. Any such security, once provided to the Indemnitee, may not be revoked or released without the prior written consent of the Indemnitee.

17.   **Non-Exclusivity; Survival Of Rights; Insurance; Subrogation.**

(a)   The rights of Indemnitee as provided by this Agreement shall not be deemed exclusive of any other rights to which Indemnitee may at any time be entitled under applicable law, the Charter, the Company's Bylaws, any agreement, a vote of stockholders or a resolution of directors, or otherwise. No amendment, alteration or repeal of this Agreement or of any provision hereof shall limit or restrict any right of Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee in his Corporate Status prior to such amendment, alteration or repeal. To the extent that a change in applicable law, whether by statute or judicial decision, permits greater indemnification, hold harmless or exoneration rights or advancement of Expenses than would be afforded currently under the Charter, the Company's Bylaws or this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change. No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

14

(b)  The DGCL, the Charter and the Company's Bylaws permit the Company to purchase and maintain insurance or furnish similar protection or make other arrangements including, but not limited to, providing a trust fund, letter of credit, or surety bond ("Indemnification Arrangements") on behalf of Indemnitee against any liability asserted against him or incurred by or on behalf of him or in such capacity as a director, officer, employee or agent of the Company, or arising out of his status as such, whether or not the Company would have the power to indemnify him against such liability under the provisions of this Agreement or under the DGCL, as it may then be in effect. The purchase, establishment, and maintenance of any such Indemnification Arrangement shall not in any way limit or affect the rights and obligations of the Company or of the Indemnitee under this Agreement except as expressly provided herein, and the execution and delivery of this Agreement by the Company and the Indemnitee shall not in any way limit or affect the rights and obligations of the Company or the other party or parties thereto under any such Indemnification Arrangement.

(c)  To the extent that the Company maintains an insurance policy or policies providing liability insurance for directors, officers, trustees, partners, managing members, fiduciaries, employees, or agents of the Company or of any other Enterprise which such person serves at the request of the Company, Indemnitee shall be covered by such policy or policies in accordance with its or their terms to the maximum extent of the coverage available for any such director, officer, trustee, partner, managing member, fiduciary, employee or agent under such policy or policies. If, at the time the Company receives notice from any source of a Proceeding as to which Indemnitee is a party or a participant (as a witness or otherwise), the Company has director and officer liability insurance in effect, the Company shall give prompt notice of such Proceeding to the insurers in accordance with the procedures set forth in the respective policies. The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of the Indemnitee, all amounts payable as a result of such Proceeding in accordance with the terms of such policies.

(d)  In the event of any payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.

15

(e) The Company's obligation to indemnify, hold harmless, exonerate or advance Expenses hereunder to Indemnitee who is or was serving at the request of the Company as a director, officer, trustee, partner, managing member, fiduciary, employee or agent of any other Enterprise shall be reduced by any amount Indemnitee has actually received as indemnification, hold harmless or exoneration payments or advancement of expenses from such Enterprise.

18.    **Duration Of Agreement.** All agreements and obligations of the Company contained herein shall continue during the period Indemnitee serves as a director or officer of the Company or as a director, officer, trustee, partner, managing member, fiduciary, employee or agent of any other corporation, partnership, joint venture, trust, employee benefit plan or other Enterprise which Indemnitee serves at the request of the Company and shall continue thereafter so long as Indemnitee shall be subject to any possible Proceeding (including any rights of appeal thereto and any Proceeding commenced by Indemnitee pursuant to Section 14 of this Agreement) by reason of his Corporate Status, whether or not he is acting in any such capacity at the time any liability or expense is incurred for which indemnification can be provided under this Agreement.

19.    **Severability.** If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (a) the validity, legality and enforceability of the remaining provisions of this Agreement (including, without limitation, each portion of any Section, paragraph or sentence of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and shall remain enforceable to the fullest extent permitted by law; (b) such provision or provisions shall be deemed reformed to the extent necessary to conform to applicable law and to give the maximum effect to the intent of the parties hereto; and (c) to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of any Section, paragraph or sentence of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested thereby.

20.    **Enforcement And Binding Effect.**

(a)    The Company expressly confirms and agrees that it has entered into this Agreement and assumed the obligations imposed on it hereby in order to induce Indemnitee to serve as a director, officer or key employee of the Company, and the Company acknowledges that Indemnitee is relying upon this Agreement in serving as a director, officer or key employee of the Company.

(b)    Without limiting any of the rights of Indemnitee under the Charter or Bylaws of the Company as they may be amended from time to time, this Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

(c)    The indemnification, hold harmless, exoneration and advancement of expenses rights provided by or granted pursuant to this Agreement shall be binding upon and be enforceable by the parties hereto and their respective successors and assigns (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company), shall continue as to an Indemnitee who has ceased to be a director, officer, employee or agent of the Company or of any other Enterprise at the Company's request, and shall inure to the benefit of Indemnitee and his or her spouse, assigns, heirs, devisees, executors and administrators and other legal representatives.

(d)    The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part, of the business and/or assets of the Company, by written agreement in form and substance satisfactory to the Indemnitee, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

(e)    The Company and Indemnitee agree herein that a monetary remedy for breach of this Agreement, at some later date, may be inadequate, impracticable and difficult of proof, and further agree that such breach may cause Indemnitee irreparable harm. Accordingly, the parties hereto agree that Indemnitee may enforce this Agreement by seeking injunctive relief and/or specific performance hereof, without any necessity of showing actual damage or irreparable harm and that by seeking injunctive relief and/or specific performance, Indemnitee shall not be precluded from seeking or obtaining any other relief to which he may be entitled. The Company and Indemnitee further agree that Indemnitee shall be entitled to such specific performance and injunctive relief, including temporary restraining orders, preliminary injunctions and permanent injunctions, without the necessity of posting bonds or other undertaking in connection therewith. The Company acknowledges that in the absence of a waiver, a bond or undertaking may be required of Indemnitee by the Court, and the Company hereby waives any such requirement of such a bond or undertaking.

21.    **Modification And Waiver.** No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by the parties hereto. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions of this Agreement nor shall any waiver constitute a continuing waiver.

22.    **Notices.** All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (i) if delivered by hand and receipted for by the party to whom said notice or other communication shall have been directed, or (ii) mailed by certified or registered mail with postage prepaid, on the third (3rd) business day after the date on which it is so mailed:

(a)    If to Indemnitee, at the address indicated on the signature page of this Agreement, or such other address as Indemnitee shall provide in writing to the Company.

17

(b)    If to the Company, to:

ARIAD Pharmaceuticals, Inc.
26 Landsdowne Street
Cambridge, MA 02139
Attention: Chief Legal Officer

or to any other address as may have been furnished to Indemnitee in writing by the Company.

23.    **Applicable Law And Consent To Jurisdiction.** This Agreement and the legal relations among the parties shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflict of laws rules. Except with respect to any arbitration commenced by Indemnitee pursuant to Section 14(a) of this Agreement, the Company and Indemnitee hereby irrevocably and unconditionally: (a) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the Delaware Court and not in any other state or federal court in the United States of America or any court in any other country; (b) consent to submit to the exclusive jurisdiction of the Delaware Court for purposes of any action or proceeding arising out of or in connection with this Agreement; (c) appoint irrevocably, to the extent such party is not a resident of the State of Delaware, RL&F Service Corp., One Rodney Square, 10th Floor, 10th and King Streets, Wilmington, Delaware 19801 as its agent in the State of Delaware as such party's agent for acceptance of legal process in connection with any such action or proceeding against such party with the same legal force and validity as if served upon such party personally within the State of Delaware; (d) waive any objection to the laying of venue of any such action or proceeding in the Delaware Court; and (e) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the Delaware Court has been brought in an improper or inconvenient forum, or is subject (in whole or in part) to a jury trial.

24.    **Identical Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement. Only one such counterpart signed by the party against whom enforceability is sought needs to be produced to evidence the existence of this Agreement.

25.    **Miscellaneous.** Use of the masculine pronoun shall be deemed to include usage of the feminine pronoun where appropriate. The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed as of the day and year first above written.

ARIAD PHARMACEUTICALS, INC.                                    INDEMNITEE

By: _____                             _____
Harvey J. Berger, M.D.                                         Name:
Chairman and Chief Executive Officer                           Address:

**CERTIFICATIONS**

**Chief Executive Officer**

I, Harvey J. Berger, M.D., certify that:

1.  I have reviewed this quarterly report of ARIAD Pharmaceuticals, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluation; and

    d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

By: /s/ Harvey J. Berger, M.D.

Harvey J. Berger, M.D.

Date: August 8, 2006                                         Chairman and Chief Executive Officer

31

Exhibit 31.2

## CERTIFICATIONS

**Chief Financial Officer**

I, Edward M. Fitzgerald, certify that:

1.  I have reviewed this quarterly report of ARIAD Pharmaceuticals, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluation; and

    d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

By: /s/ Edward M. Fitzgerald
Edward M. Fitzgerald

Date: August 8, 2006                    Senior Vice President, Finance and Corporate
Operations and Chief Financial Officer
(Principal financial officer and chief accounting officer)

**Exhibit 32.1**

**Certification**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**
**(Subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code)**

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), each of the undersigned officers of ARIAD Pharmaceuticals, Inc., a Delaware corporation (the "Company"), does hereby certify, to such officer's knowledge, that:

The Quarterly Report on Form 10-Q for the period ended June 30, 2006 (the "Form 10-Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: August 8, 2006

/s/ Harvey J. Berger, M.D
Harvey J. Berger, M.D.
Chairman and Chief Executive Officer

Date: August 8, 2006

/s/ Edward M. Fitzgerald
Edward M. Fitzgerald
Senior Vice President, Finance and Corporate Operations and Chief Financial Officer

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

Created by 10KWizard    www.10KWizard.com