## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMGEN, INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 06-259-KAJ |
| ARIAD PHARMACEUTICALS, INC., | ) ) | |
| Defendant. | ) | |

## DECLARATION OF ELIZABETH L. ROSENBLATT
## IN SUPPORT OF ARIAD PHARMACEUTICALS, INC.'S
## <u>MOTION FOR CERTIFICATION PURSUANT TO 28 U.S.C. §1292(b)</u>

### (VOLUME II OF II)

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*Counsel for Defendant*
*ARIAD Pharmaceuticals, Inc.*

*Of Counsel:*

Morgan Chu
David I. Gindler
Elizabeth Rosenblatt
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Telephone:  (310) 277-1010

Dated:  September 25, 2006

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 25th day of September, 2006, the attached **DECLARATION OF ELIZABETH L. ROSENBLATT IN SUPPORT OF ARIAD PHARMACEUTICALS, INC.'S MOTION FOR CERTIFICATION PURSAUNT TO 28 U.S.C. §1292(b) (VOLUME II OF II)** was served upon the below-named counsel of record at the address and in the manner indicated:

Melanie K. Sharp, Esquire
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

BY HAND, VIA CM/ECF,
<u>AND VIA ELECTRONIC MAIL</u>

Marcus E. Sernel, Esquire
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601-6636

<u>VIA ELECTRONIC MAIL</u>

J. Drew Diamond, Esquire
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA  90017-5800

<u>VIA ELECTRONIC MAIL</u>

*/s/ Steven J. Balick*
_____
Steven J. Balick

# EXHIBIT N



# Form 10-Q

## AMGEN INC - amgn
Filed: August 09, 2006 (period: June 30, 2006)

Quarterly report which provides a continuing view of a company's financial position

# Table of Contents

## PART I

- FINANCIAL INFORMATION
Item 1.    Financial Statements
Item 2.    Management s Discussion and Analysis of Financial Condition and Results of Operations
Item 4.    Controls and Procedures

## PART II

- OTHER INFORMATION
Item 1.    Legal Proceedings
Item 1A.   Risk Factors
Item 2.    Unregistered Sales of Equity Securities, Use of Proceeds and Issuer Purchases of Equity Secu
Item 4.    Submission of Matters to a Vote of Security Holders
Item 6.    Exhibits
SIGNATURES
INDEX TO EXHIBITS

EX-4.19 (Instruments defining the rights of security holders)

EX-4.20 (Instruments defining the rights of security holders)

EX-31 (Certifications required under Section 302 of the Sarbanes-Oxley Act of 2002)

EX-32 (Certifications required under Section 906 of the Sarbanes-Oxley Act of 2002)

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington D.C. 20549**

# Form 10-Q

**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2006**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number 000-12477**

# Amgen Inc.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **95-3540776** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **One Amgen Center Drive, Thousand Oaks, California** | **91320-1799** |
| (Address of principal executive offices) | (Zip Code) |

**(805) 447-1000**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer" and "large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act)   Yes ☐   No ☒

As of July 21, 2006, the registrant had 1,170,571,415 shares of common stock, $0.0001 par value, outstanding.

**AMGEN INC.**

**INDEX**

**PART I          FINANCIAL INFORMATION**

    Item 1.                    Financial Statements

                       Condensed Consolidated Statements of Operations -
                        Three and six months ended June 30, 2006 and 2005

                       Condensed Consolidated Balance Sheets -
                        June 30, 2006 and December 31, 2005

                       Condensed Consolidated Statements of Cash Flows –
                        Six months ended June 30, 2006 and 2005

                       Notes to Condensed Consolidated Financial Statements

    Item 2.                    Management's Discussion and Analysis of Financial Condition and Results of Operations

    Item 4.                    Controls and Procedures

**PART II      OTHER INFORMATION**

    Item 1.          Legal Proceedings

    Item 1A.      Risk Factors

    Item 2.          Unregistered Sales of Equity Securities, Use of Proceeds and Issuer Purchases of Equity Securities

    Item 4.          Submission of matters to a Vote of Security Holders

    Item 6.          Exhibits

    Signatures

    Index to Exhibits

**PART I - FINANCIAL INFORMATION**

**Item 1.       Financial Statements**

The information in this report for the three and six months ended June 30, 2006 and 2005 is unaudited but includes all adjustments (consisting only of normal recurring accruals, unless otherwise indicated) which Amgen Inc., including its subsidiaries ("Amgen"), considers necessary for a fair presentation of the results of operations for those periods.

The Condensed Consolidated Financial Statements should be read in conjunction with our Consolidated Financial Statements and the notes thereto contained in our Annual Report on Form  10-K for the year ended December 31, 2005.

Interim results are not necessarily indicative of results for the full fiscal year.

1

**AMGEN INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In millions, except per share data)**
**(Unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2006 | 2005 | 2006 | 2005 |
| **Revenues:** | | | | |
| Product sales | $ 3,491 | $ 3,072 | $ 6,618 | $ 5,807 |
| Other revenues | 113 | 100 | 203 | 198 |
| Total revenues | 3,604 | 3,172 | 6,821 | 6,005 |
| | | | | |
| **Operating expenses:** | | | | |
| Cost of sales (excludes amortization of acquired intangible assets presented below) | 493 | 530 | 1,045 | 1,019 |
| Research and development | 788 | 567 | 1,443 | 1,091 |
| Selling, general and administrative | 840 | 646 | 1,529 | 1,223 |
| Write-off of acquired in-process research and development | 1,101 | — | 1,101 | — |
| Amortization of acquired intangible assets | 87 | 87 | 174 | 174 |
| Legal settlements | — | 49 | — | 49 |
| Total operating expenses | 3,309 | 1,879 | 5,292 | 3,556 |
| | | | | |
| Operating income | 295 | 1,293 | 1,529 | 2,449 |
| | | | | |
| Interest and other income and (expense), net | 21 | 6 | 101 | (4) |
| | | | | |
| Income before income taxes | 316 | 1,299 | 1,630 | 2,445 |
| | | | | |
| Provision for income taxes | 302 | 270 | 615 | 562 |
| | | | | |
| Net income | $ 14 | $ 1,029 | $ 1,015 | $ 1,883 |
| | | | | |
| **Earnings per share:** | | | | |
| Basic | $ 0.01 | $ 0.83 | $ 0.85 | $ 1.52 |
| Diluted | $ 0.01 | $ 0.82 | $ 0.84 | $ 1.49 |
| | | | | |
| **Shares used in calculation of earnings per share:** | | | | |
| Basic | 1,173 | 1,233 | 1,188 | 1,241 |
| Diluted | 1,185 | 1,250 | 1,202 | 1,270 |

See accompanying notes.

2

**AMGEN INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(In millions, except per share data)**
**(Unaudited)**

|  | June 30, 2006 | December 31, 2005 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 1,947 | $ 1,840 |
| Marketable securities | 3,023 | 3,415 |
| Trade receivables, net | 2,018 | 1,769 |
| Inventories | 1,520 | 1,258 |
| Other current assets | 995 | 953 |
| Total current assets | 9,503 | 9,235 |
| Property, plant, and equipment, net | 5,438 | 5,038 |
| Intangible assets, net | 3,965 | 3,742 |
| Goodwill | 11,210 | 10,495 |
| Other assets | 1,172 | 787 |
|  | $ 31,288 | $ 29,297 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 668 | $ 596 |
| Accrued liabilities | 3,477 | 2,999 |
| Convertible notes | 1,768 | — |
| Total current liabilities | 5,913 | 3,595 |
| Deferred tax liabilities | 1,064 | 1,163 |
| Convertible notes | 5,000 | 1,759 |
| Other long-term debt | 2,232 | 2,198 |
| Other non-current liabilities | 240 | 131 |
| Contingencies | | |
| Stockholders' equity: | | |
| Preferred stock; $0.0001 par value; 5 shares authorized; none issued or outstanding | — | — |
| Common stock and additional paid-in capital; $0.0001 par value; 2,750 shares authorized; outstanding - 1,170 shares in 2006 and 1,224 shares in 2005 | 23,240 | 23,561 |
| Accumulated deficit | (6,385) | (3,132) |
| Accumulated other comprehensive (loss) income | (16) | 22 |
| Total stockholders' equity | 16,839 | 20,451 |
|  | $ 31,288 | $ 29,297 |

See accompanying notes.

3

**AMGEN INC.**

**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**

**(In millions)**
**(Unaudited)**

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2006 | 2005 |
| Cash flows from operating activities: | | |
| Net income | $ 1,015 | $ 1,883 |
| Write-off of in-process research and development | 1,101 | — |
| Depreciation and amortization | 476 | 419 |
| Stock-based compensation expense | 229 | 50 |
| Tax benefits related to employee stock-based compensation | 55 | 124 |
| Other items, net | (193) | (99) |
| Cash provided by (used in) changes in operating assets and liabilities: | | |
| Trade receivables, net | (249) | (246) |
| Inventories | (193) | (96) |
| Other assets | 41 | 39 |
| Accounts payable | 88 | (4) |
| Accrued income taxes | 154 | 78 |
| Other accrued liabilities | 50 | 192 |
| Net cash provided by operating activities | 2,574 | 2,340 |
| | | |
| Cash flows from investing activities: | | |
| Cash paid for acquisition of Abgenix, Inc., net of cash acquired | (1,888) | — |
| Purchases of property, plant, and equipment | (458) | (403) |
| Proceeds from maturities of marketable securities | 527 | 212 |
| Proceeds from sales of marketable securities | 1,414 | 8,955 |
| Purchases of marketable securities | (1,546) | (7,704) |
| Other | (91) | 44 |
| Net cash (used in) provided by investing activities | (2,042) | 1,104 |
| | | |
| Cash flows from financing activities: | | |
| Repurchases of common stock (see Notes 5 and 6) | (1,250) | (2,425) |
| Repayment of debt assumed in Abgenix acquisition | (653) | — |
| Repayment of convertible notes | (1) | (1,175) |
| Proceeds from issuance of convertible notes and related transactions, net (see Note 5) | 440 | — |
| Proceeds from issuance of warrants (see Note 5) | 774 | — |
| Net proceeds from issuance of common stock upon the exercise of employee stock options and in connection with an employee stock purchase plan | 225 | 270 |
| Other | 40 | (19) |
| Net cash used in financing activities | (425) | (3,349) |
| | | |
| Increase in cash and cash equivalents | 107 | 95 |
| | | |
| Cash and cash equivalents at beginning of period | 1,840 | 1,526 |
| | | |
| Cash and cash equivalents at end of period | $ 1,947 | $ 1,621 |

See accompanying notes.

4

AMGEN INC.

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS

June 30, 2006

1.    **Summary of significant accounting policies**

*Business*

Amgen Inc., including its subsidiaries, ("Amgen") is a global biotechnology company that discovers, develops, manufactures, and markets human therapeutics based on advances in cellular and molecular biology.

*Basis of presentation*

The financial information for the three and six months ended June 30, 2006 and 2005 is unaudited but includes all adjustments (consisting only of normal recurring accruals, unless otherwise indicated), which we consider necessary for a fair presentation of the results of operations for those periods. Interim results are not necessarily indicative of results for the full fiscal year.

*Principles of consolidation*

The consolidated financial statements include the accounts of Amgen as well as its wholly owned subsidiaries. We do not have any significant interests in any variable interest entities. All material intercompany transactions and balances have been eliminated in consolidation.

*Use of estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States ("GAAP") requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results may differ from those estimates.

*Inventories*

Inventories are stated at the lower of cost or market. Cost, which includes amounts related to materials, labor, and overhead, is determined in a manner which approximates the first-in, first-out (FIFO) method. Inventories consisted of the following (in millions):

|  | June 30, 2006 | December 31, 2005 |
|---|---|---|
| Raw materials | $ 196 | $ 145 |
| Work in process. | 1,015 | 758 |
| Finished goods | 309 | 355 |
|  | $ 1,520 | $ 1,258 |

*Intangible assets and goodwill*

Intangible assets are recorded at cost, less accumulated amortization. Amortization of intangible assets is provided over their estimated useful lives ranging from 5 to 15 years on a straight-line basis (weighted-average amortization period of 13.7 years at June 30, 2006). Intangible assets primarily consist of acquired product technology rights of $3,299 million, net of accumulated amortization of $1,316 million, which relate to the identifiable intangible assets acquired in connection with the Immunex Corporation ("Immunex") acquisition in July 2002. Amortization of acquired product technology rights is included in "Amortization of acquired intangible assets" in the accompanying Condensed Consolidated Statements of Operations. Intangible assets also include technology used in research and development with alternative future uses, specifically the XenoMouse® technology acquired in the Abgenix, Inc. ("Abgenix") acquisition (see Note 8, "Abgenix, Inc. acquisition"). Amortization of the XenoMouse® technology is included in "Research and development" in the accompanying Condensed Consolidated Statements of Operations. We review our intangible assets for impairment periodically and whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable.

| Intangible assets subject to amortization | Weighted average amortization period | June 30, 2006 | December 31, 2005 |
|---|---|---|---|
| Acquired product technology rights: | | | |
| Developed product technology | 14.3 years | $ 3,077 | $ 3,077 |
| Core technology | 15 years | 1,348 | 1,348 |
| Trade name | 15 years | 190 | 190 |
| XenoMouse® technology | 5 years | 320 | — |
| Other intangible assets | 10.9 years | 450 | 335 |
| | | 5,385 | 4,950 |
| Less accumulated amortization | | (1,420) | (1,208) |
| | | $ 3,965 | $ 3,742 |

Goodwill principally relates to the acquisition of Immunex. The increase over the balance at December 31, 2005 is due to the goodwill associated with the Abgenix acquisition on April 1, 2006 (see Note 8, "Abgenix, Inc. acquisition") net of the decrease due primarily to tax benefits realized upon exercise of Immunex related stock options during the six months ended June 30, 2006. We perform an impairment test annually and whenever events or changes in circumstances indicate that the carrying amount of goodwill may not be recoverable.

*Product sales*

Product sales primarily consist of sales of Aranesp® (darbepoetin alfa), EPOGEN® (Epoetin alfa), Neulasta® (pegfilgrastim)/NEUPOGEN® (Filgrastim), and Enbrel® (etanercept).

We have the exclusive right to sell Epoetin alfa for dialysis, certain diagnostics and all non-human, non-research uses in the United States. We sell Epoetin alfa under the brand name EPOGEN®. We granted to Ortho Pharmaceutical Corporation (which has assigned its rights under the product license agreement to Ortho Biotech Products, L.P.), a subsidiary of Johnson & Johnson

("Johnson & Johnson"), a license relating to Epoetin alfa for sales in the United States for all human uses except dialysis and diagnostics. This license agreement, which is perpetual, may be terminated for various reasons, including upon mutual agreement of the parties, or default. The parties are required to compensate each other for Epoetin alfa sales that either party makes into the other party's exclusive market, sometimes referred to as "spillover." Accordingly, we do not recognize product sales we make into the exclusive market of Johnson & Johnson and do recognize the product sales made by Johnson & Johnson into our exclusive market. Sales in our exclusive market are derived from our sales to our customers, as adjusted for spillover. We are employing an arbitrated audit methodology to measure each party's spillover based on estimates of and subsequent adjustments thereto of third-party data on shipments to end users and their usage.

Sales of our other products are recognized when shipped and title and risk of loss have passed. Product sales are recorded net of accruals for estimated rebates, wholesaler chargebacks, discounts, and other incentives (collectively "sales incentives") and returns.

### Research and development costs

Research and development ("R&D") costs, which are expensed as incurred, are primarily comprised of costs for: salaries and benefits associated with R&D personnel, overhead and occupancy, clinical trial and related clinical manufacturing, including contract services and other outside costs, process development, quality assurance, information systems, and amortization of technology used in R&D with alternative future uses. R&D expenses also include such costs related to activities performed on behalf of corporate partners.

### Acquired in-process research and development

The fair value of acquired in-process research and development ("IPR&D") projects and technologies which have no alternative future use and which have not reached technological feasibility at the date of acquisition are expensed as incurred. In the second quarter of 2006 we wrote off $1,101 million of acquired IPR&D related to the Abgenix acquisition (see Note 8, "Abgenix, Inc. acquisition"). Acquired IPR&D is considered part of total R&D expense.

### Earnings per share

Basic earnings per share ("EPS") is based upon the weighted-average number of common shares outstanding. Diluted EPS is based upon the weighted-average number of common shares and dilutive potential common shares outstanding. Potential common shares outstanding principally include stock options under our employee stock option plans and potential issuances of stock under our other equity incentive plans and under the assumed conversion of our 2032 Modified Convertible Notes, 2011 Convertible Notes, 2013 Convertible Notes and under the assumed exercise of our warrants using the treasury stock method (collectively "Dilutive Securities"). Potential common shares also include common stock to be issued upon conversion of our 2032 Convertible Notes under the if-converted method. For further information regarding our convertible notes and warrants (see Note 5, "Financing arrangements").

The following table sets forth the computation for basic and diluted EPS (in millions, except per share information):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2006 | 2005 | 2006 | 2005 |
|---|---|---|---|---|
| Income (Numerator): | | | | |
| Net income for basic EPS | $ 14 | $ 1,029 | $ 1,015 | $ 1,883 |
| Adjustment for interest expense on 2032 Convertible Notes, net of tax | — | 1 | — | 6 |
| Net income for diluted EPS, after assumed conversion | $ 14 | $ 1,030 | $ 1,015 | $ 1,889 |
| | | | | |
| Shares (Denominator): | | | | |
| Weighted-average shares for basic EPS | 1,173 | 1,233 | 1,188 | 1,241 |
| Effect of Dilutive Securities | 12 | 9 | 14 | 10 |
| Effect of 2032 Convertible Notes, after assumed conversion | — | 8 | — | 19 |
| Weighted-average shares for diluted EPS | 1,185 | 1,250 | 1,202 | 1,270 |
| | | | | |
| Basic earnings per share | $ 0.01 | $ 0.83 | $ 0.85 | $ 1.52 |
| Diluted earnings per share | $ 0.01 | $ 0.82 | $ 0.84 | $ 1.49 |

*Recent Accounting Pronouncements*

Effective January 1, 2006, we adopted the fair value recognition provisions of Statement of Financial Accounting Standards ("SFAS") No. 123(R), "Share-Based Payment", using the modified-prospective-transition method. See Note 2, "Employee stock-based payments" for further discussion regarding this accounting pronouncement.

In June 2006, the Financial Accounting Standards Board ("FASB") issued FASB Interpretation No. ("FIN") 48, "Accounting for Uncertainty in Income Taxes", effective for fiscal years beginning after December 15, 2006. FIN 48 clarifies the accounting for uncertainty in income taxes by prescribing rules for recognition, measurement, classification and disclosure in our financial statements of tax positions taken or expected to be taken in a tax return. We are currently evaluating the provisions in FIN 48, but have not yet determined its expected impact on us; however it is not anticipated to be material. We plan to adopt this new standard on January 1, 2007.

*Reclassifications*

Certain prior period amounts have been reclassified to conform to the current period presentation.

8

## 2.    Employee stock-based payments

We have employee compensation plans under which various types of stock-based instruments are granted. These instruments, as more fully described below, principally include stock options, restricted stock (including restricted stock units), and performance units. As of June 30, 2006, these plans provide for future grants and/or issuances of up to 44 million shares of common stock to our employees. Stock-based awards under our employee compensation plans are made with newly issued shares reserved for this purpose.

Prior to January 1, 2006, we accounted for our employee stock-based compensation under the recognition and measurement principles of Accounting Principles Board Opinion ("APB") No. 25, "Accounting for Stock Issued to Employees," and related Interpretations, as permitted by SFAS No. 123, "Accounting for Stock-Based Compensation". Under the recognition principles of APB No. 25, compensation expense related to restricted stock and performance units was recognized in our financial statements. However, APB No. 25 generally did not require the recognition of compensation expense for our stock options because the exercise price of these instruments was generally equal to the market value of the underlying common stock on the date of grant, and the related number of shares granted were fixed at that point in time.

Effective January 1, 2006, we adopted the fair value recognition provisions of SFAS No. 123(R), "Share-Based Payment". In addition to recognizing compensation expense related to restricted stock and performance units, SFAS No. 123(R) also requires us to recognize compensation expense related to the estimated fair value of stock options. We adopted SFAS No. 123(R) using the modified-prospective-transition method. Under that transition method, compensation expense recognized subsequent to adoption includes: (a) compensation cost for all share-based payments granted prior to, but not yet vested as of January 1, 2006, based on the values estimated in accordance with the original provisions of SFAS No. 123, and (b) compensation cost for all share-based payments granted subsequent to January 1, 2006, based on the grant-date fair values estimated in accordance with the provisions of SFAS No. 123(R). Consistent with the modified-prospective-transition method, our results of operations for prior periods have not been adjusted to reflect the adoption of FAS 123(R).

As a result of recognizing compensation expense for stock options pursuant to the provisions of SFAS No. 123(R), our income before income taxes for the three and six months ended June 30, 2006, was $63 million and $129 million lower, respectively, and our net income was $43 million and $88 million lower, respectively, than if we had continued to account for stock options under APB No. 25. In addition, both basic and diluted earnings per share for the three and six months ended June 30, 2006 were $.04 and $.08 lower, respectively, than if we had continued to account for stock options under APB No. 25.

The following table reflects the components of stock-based compensation expense recognized in our Condensed Consolidated Statements of Operations for the three and six months ended June 30, 2006 and 2005 (amounts in millions):

|  | Three months ended June 30, | | Six months ended June 30, | |
|---|---|---|---|---|
|  | 2006 | 2005 | 2006 | 2005 |
| Stock options | $ 63 | $ — | $ 129 | $ — |
| Restricted stock | 14 | 17 | 25 | 22 |
| Performance units | 52 | 17 | 75 | 28 |
| Total stock-based compensation expense, pre-tax | 129 | 34 | 229 | 50 |
| Tax benefit from stock-based compensation expense | (42) | (11) | (74) | (15) |
| Total stock-based compensation expense, net of tax | $ 87 | $ 23 | $ 155 | $ 35 |

The above table does not reflect any stock option compensation for the three and six months ended June 30, 2005 as we generally did not record stock option expense under APB No. 25, as previously discussed. The following table illustrates the effect on net income and earnings per share for the three and six months ended June 30, 2005 if we had applied the fair value recognition provisions to our stock options as provided under SFAS No. 123 (in millions, except per share information):

|  | Three Months Ended June 30, 2005 | Six Months Ended June 30, 2005 |
|---|---|---|
| Net income | $ 1,029 | $ 1,883 |
| Stock-based compensation, net of tax | (66) | (137) |
| Pro forma net income | $ 963 | $ 1,746 |
|  |  |  |
| Earnings per share: |  |  |
| Basic | $ 0.83 | $ 1.52 |
| Impact of stock option expense | (0.05) | (0.11) |
| Basic - pro forma | $ 0.78 | $ 1.41 |
|  |  |  |
| Diluted | $ 0.82 | $ 1.49 |
| Impact of stock option expense | (0.05) | (0.11) |
| Diluted - pro forma | $ 0.77 | $ 1.38 |

For purposes of this pro forma disclosure, the fair values of stock options were estimated using the Black-Scholes option valuation model and amortized to expense over the options' vesting periods.

*Employee stock option and restricted stock grants*

Several of our equity-based compensation plans provide for grants of stock options to employees. The option exercise price is set at the closing price of our common stock on the date of grant, and the related number of shares granted is fixed at that point in time. These plans also provide for grants of restricted stock. Grants of these equity instruments generally vest/have restrictions which lapse over a three to five year period. In addition, stock option awards expire seven years from the date of grant. Eligible employees generally receive a grant of stock options

10

and/or restricted stock annually with the number of shares and type of instrument generally determined by the employee's salary grade and performance level. In addition, certain management and professional level employees typically receive a stock option grant upon commencement of employment. These stock-based plans provide for accelerated vesting/lapse of restrictions if there is a change in control as defined in the plans.

We use the Black-Scholes option valuation model to estimate the grant date fair value of employee stock options. The expected volatility reflects the consideration of the implied volatility in our publicly traded instruments during the period the option is granted. We believe implied volatility in these instruments is more indicative of expected future volatility than the historical volatility in the price of our common stock. Upon the adoption of SFAS No. 123(R) the expected life of the option is estimated using the "simplified" method as provided in Securities and Exchange Commission Staff Accounting Bulletin No. 107. Under this method, the expected life equals the arithmetic average of the vesting term and the original contractual term of the option. Prior to adoption of SFAS No. 123(R), we used historical data to estimate the expected life of the options. The risk-free interest rates for periods within the expected life of the option are based on the U.S. Treasury yield curve in effect during the period the options were granted. Upon adoption of SFAS No. 123(R), we began using historical data to estimate forfeiture rates applied to the gross amount of expense determined using the option valuation model. Prior to adoption of SFAS No. 123(R), we recognized forfeitures as they occurred. There was no material impact upon adoption of SFAS No. 123(R) between these methods of accounting for forfeitures. The assumptions used to estimate the fair value of the stock options using the Black-Scholes option valuation model were as follows for the six months ended June 30:

|  | 2006 | 2005 |
|---|---|---|
| Weighted average fair value of common stock | $    71.83 | $    59.34 |
| Weighted average fair value of stock options granted | $    22.03 | $    17.45 |
| Risk-free interest rate | 4.8% | 4.0% |
| Expected life (in years) | 4.7 | 5.1 |
| Expected volatility | 25.0% | 24.0% |
| Expected dividend yield | 0% | 0% |

11

Stock option information with respect to our stock-based compensation plans during the six months ended June 30, 2006 is as follows (options and dollars in millions, except per share amounts):

| | Options | | Weighted-average exercise price | Weighted-average remaining contractual life (Yrs) | | Aggregate intrinsic value |
|---|---|---|---|---|---|---|
| Balance unexercised at December 31, 2005 | 67.6 | $ | 56.03 | | | |
| Granted | 8.9 | $ | 71.83 | | | |
| Assumed from Abgenix (including 1.4 vested) | 1.9 | $ | 33.79 | | | |
| Exercised | (6.1) | $ | 33.79 | | | |
| Forfeited/expired | (1.5) | $ | 55.93 | | | |
| Balance unexercised at June 30, 2006 | 70.8 | $ | 59.32 | 4.1 | $ | 539 |
| Vested or expected to vest at June 30, 2006 | 66.9 | $ | 59.01 | 4.0 | $ | 524 |
| Exercisable at June 30, 2006 | 38.5 | $ | 56.31 | 3.2 | $ | 377 |

The total intrinsic value of options exercised during the three and six months ended June 30, 2006 was $164 million and $217 million, respectively.

The fair values of shares of restricted stock are determined based on the closing price of Amgen common stock on the grant dates. Information regarding our restricted stock during the six months ended June 30, 2006 is as follows (shares in millions):

| Nonvested shares | Shares | | Weighted-average grant date fair value |
|---|---|---|---|
| Nonvested at December 31, 2005 | 2.8 | $ | 58.90 |
| Granted | 2.3 | $ | 71.64 |
| Vested | (0.7) | $ | 59.44 |
| Forfeited | (0.2) | $ | 60.46 |
| Nonvested at June 30, 2006 | 4.2 | $ | 65.56 |

The total fair value of shares of restricted stock that vested during the three and six months ended June 30, 2006 was $5 million and $51 million, respectively.

As of June 30, 2006, there was $612 million of total unrecognized compensation cost related to nonvested awards of both stock options and shares of restricted stock. That cost is expected to be recognized over a weighted-average period of 1.6 years. For stock option and restricted stock awards subject to graded vesting that were issued after January 1, 2006, we recognize the total compensation cost on a straight-line basis over the service period for the entire award.

*Performance award program*

Beginning in 2004, certain management-level employees receive annual grants of performance units. A performance unit gives the recipient the right to receive common stock that is contingent upon achievement of specified pre-established performance goals over a three-year performance period. The performance goals are based upon both Amgen's standalone performance and its performance compared to other benchmark companies, in each case with respect to compound annual growth rates for revenue and earnings per share, as defined in the program. Performance units are assigned a unit value based on the fair market value of Amgen common stock on the grant date. The ultimate level of attainment of performance goals is determined at the end of the performance period and expressed as a percentage (within a range of 0% to 225%). This percentage is multiplied by the number of performance units initially granted and by the initial value per unit to determine the aggregate dollar value of the award. The aggregate dollar value is then divided by the average closing price of Amgen common stock during a specified period following the performance period to determine the number of shares of common stock payable to the recipient.

Because the first performance period for these instruments ends on December 31, 2006, no performance units have yet vested and no common stock has been issued to any recipient. As of June 30, 2006, there was $176 million of total estimated unrecognized compensation cost related to performance units that is expected to be recognized over a weighted-average period of 1.1 years.

Under APB No. 25, the estimated amounts owed for grants of performance units were classified in stockholders' equity, but upon adoption of SFAS 123(R), these amounts are classified as liabilities. Accordingly, on January 1, 2006, a reclassification was made from stockholders' equity to liabilities (current and non-current) totaling $104 million.

3.    **Related party transactions**

We own a 50% interest in Kirin-Amgen, Inc. ("KA"), a corporation formed in 1984 with Kirin Brewery Company, Limited ("Kirin") for the development and commercialization of certain products based on advanced biotechnology. We account for our interest in KA under the equity method and include our share of KA's profits or losses in "Selling, general and administrative" in the Condensed Consolidated Statements of Operations. During the three and six months ended June 30, 2006 our share of KA's profits were $16 million and $28 million, respectively. During the three and six months ended June 30, 2005, our share of KA's profits were $15 million and $30 million, respectively. At June 30, 2006 and December 31, 2005 the carrying value of our equity method investment in KA was $207 million and $180 million, respectively, and is included in non-current other assets in the accompanying Condensed Consolidated Balance Sheets. KA's revenues consist of royalty income related to its licensed technology rights. All of our rights to manufacture and market certain products including erythropoietin, granulocyte colony-stimulating factor ("G-CSF"), darbepoetin alfa, and pegfilgrastim are pursuant to exclusive licenses from KA. We currently market certain of these products under the brand names EPOGEN® (erythropoietin), NEUPOGEN® (G-CSF), Aranesp® (darbepoetin alfa), and Neulasta® (pegfilgrastim). KA receives royalty income from us, as well as Kirin, Johnson & Johnson, and F. Hoffmann-La Roche Ltd under separate product license agreements for certain geographic areas outside of the United States. During the three and six months ended June 30, 2006, KA earned royalties from us of $82 million and $156 million, respectively. During the

13

three and six months ended June 30, 2005 KA earned royalties from us of $75 million and $143 million, respectively. These amounts are included in "Cost of sales (excludes amortization of acquired intangible assets)" in the Condensed Consolidated Statements of Operations.

KA's expenses primarily consist of costs related to R&D activities conducted on its behalf by Amgen and Kirin. KA pays Amgen and Kirin for such services at negotiated rates. During the three and six months ended June 30, 2006, we earned revenues from KA of $35 million and $63 million, respectively, for certain R&D activities performed on KA's behalf. During the three and six months ended June 30, 2005, we earned revenues from KA of $25 million and $47 million, respectively. These amounts are included in "Other revenues" in the accompanying Condensed Consolidated Statements of Operations.

**4.    Income taxes**

The tax rates for the three and six months ended June 30, 2006 are different from the statutory rate primarily as a result of the write-off of non-deductible acquired IPR&D in connection with the acquisition of Abgenix and indefinitely invested earnings of our foreign operations. We do not provide for U.S. income taxes on undistributed earnings of our foreign operations that are intended to be invested indefinitely outside the United States.

Our income tax returns are routinely audited by the Internal Revenue Service and various state and foreign tax authorities. Significant disputes can arise with these tax authorities involving issues of the timing and amount of deductions and allocations of income among various tax jurisdictions because of differing interpretations of tax laws and regulations. We periodically evaluate our exposures associated with tax filing positions. While we believe our positions comply with applicable laws, we record liabilities based upon estimates of the ultimate outcomes of these matters.

14

**5.     Financing arrangements**

The following table reflects the carrying value of our long-term borrowings under our various financing arrangements as of June 30, 2006 and December 31, 2005 (in millions):

| | June 30, 2006 | December 31, 2005 |
|---|---|---|
| 0.125% convertible notes due 2011 (2011 Convertible Notes) | $ 2,500 | $ — |
| 0.375% convertible notes due 2013 (2013 Convertible Notes) | 2,500 | — |
| Zero coupon 30 year modified convertible notes due in 2032 (2032 Modified Convertible Notes) | 1,748 | 1,739 |
| 4.85% notes due 2014 (2014 Notes) | 1,000 | 1,000 |
| 4.00% notes due 2009 (2009 Notes) | 999 | 998 |
| 6.5% debt securities due 2007 (2007 Notes) | 100 | 100 |
| 8.1% notes due 2097 (Century Notes) | 100 | 100 |
| Non-interest bearing note due 2013 (acquired Abgenix note) | 33 | — |
| Zero coupon 30 year convertible notes due in 2032 (2032 Convertible Notes) | 20 | 20 |
| Total borrowings | 9,000 | 3,957 |
| Less current portion | 1,768 | — |
| Total non-current debt | $ 7,232 | $ 3,957 |

*2011 and 2013 Convertible Notes*

In February 2006, we issued $2.5 billion principal amount of convertible notes due in 2011 (the "2011 Convertible Notes") and $2.5 billion principal amount of convertible notes due in 2013 (the "2013 Convertible Notes") in a private placement. The 2011 Convertible Notes and the 2013 Convertible Notes were issued at par and pay interest at a rate of 0.125% and 0.375%, respectively. The 2011 Convertible Notes and the 2013 Convertible Notes may be convertible based on an initial conversion rate of 12.5247 shares and 12.5814 shares, respectively, per $1,000 principal amount of notes (which represents an initial conversion price of approximately $79.84 and $79.48 per share, respectively). These conversion rates will be adjusted if we make specified types of distributions or enter into certain other transactions in respect to our common stock. The 2011 Convertible Notes and the 2013 Convertible Notes may only be converted: 1) during any calendar quarter beginning after June 30, 2006 if the closing price of our common stock exceeds 130% of the respective conversion price per share during a defined period at the end of the previous quarter, 2) if we make specified distributions to holders of our common stock or specified corporate transactions occur, or 3) one month prior to the respective maturity date. Upon conversion, a holder would receive the conversion value equal to the conversion rate multiplied by the volume weighted average price of our common stock during a specified period following the conversion date. The conversion value will be paid in: 1) cash equal to the lesser of the principal amount of the note or the conversion value, as defined, and 2) to the extent the conversion value exceeds the principal amount of the note, shares of our common stock, cash, or a combination of common stock and cash, at our option (the "excess conversion value"). In addition, upon a change in control, as defined, the holders may require us to purchase for cash all or a portion of their notes for 100% of the principal amount of the notes plus accrued and

15

unpaid interest, if any. Debt issuance costs totaled approximately $88 million and are being amortized over the life of the notes.

In connection with issuance of these convertible notes, a total of $3.0 billion of our common stock was repurchased under our stock repurchase program. Also concurrent with the issuance of the 2011 Convertible Notes and the 2013 Convertible Notes, we purchased convertible note hedges in private transactions. The convertible note hedges allow us to receive shares of our common stock and/or cash from the counterparties to the transactions equal to the amounts of common stock and/or cash related to the excess conversion value that we would pay to the holders of the 2011 Convertible Notes and the 2013 Convertible Notes upon conversion. These transactions will terminate at the earlier of the maturity dates of the related notes or the first day none of the related notes remain outstanding due to conversion or otherwise. The cost of the convertible note hedges aggregated approximately $1.5 billion. The net proceeds received from the issuance of the 2011 and 2013 Convertible Notes, the repurchase of our common stock and the purchase of the convertible note hedges was $440 million.

Also concurrent with the issuance of the 2011 Convertible Notes and the 2013 Convertible Notes, we sold warrants to acquire shares of our common stock at an exercise price of $107.90 per share in a private placement. Pursuant to these transactions, warrants for approximately 31.3 million shares of our common stock may be settled in May 2011 and warrants for approximately 31.5 million shares of our common stock may be settled in May 2013 (the "settlement dates"). If the average price of our common stock during a defined period ending on or about the respective settlement dates exceeds the exercise price of the warrants, the warrants will be settled, at our option, in cash or shares of our common stock. Proceeds received from the issuance of the warrants totaled approximately $774 million.

Because we have the choice of settling the convertible note hedges and warrants in cash or shares of our stock, and these contracts meet all of the applicable criteria for equity classification as outlined in EITF No. 00-19, "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock," the cost of the convertible note hedges and net proceeds from the sale of the warrants are classified in stockholders' equity. In addition, because both of these contracts are classified in stockholders' equity and are indexed to our own common stock, they are not accounted for as derivatives under SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities".

*2032 Convertible Notes and 2032 Modified Convertible Notes*

In 2002, we issued zero coupon, 30 year convertible notes ("2032 Convertible Notes"). In March 2005, certain of these notes were repurchased at their then accreted value, for cash, in accordance with their terms. Subsequently, in March and August, of 2005, we modified the terms of substantially all of the remaining 2032 Convertible Notes ("2032 Modified Convertible Notes"). Pursuant to the terms of the 2032 Convertible Notes and 2032 Modified Convertible Notes, as amended, holders of such notes may require us to purchase on specific dates all or some of their notes generally for cash. The next specified date when holders can require us to repurchase some or all of their notes at their then accreted value is on March 1, 2007. Accordingly, the notes are classified as current liabilities as of June 30, 2006 in the accompanying Condensed Consolidated Balance Sheet.

16

**6.    Stockholders' equity**

*Stock repurchase program*

A summary of activity under our stock repurchase program for the six months ended June 30, 2006 and 2005 is as follows:

| | 2006 | | | 2005 | | |
|---|---|---|---|---|---|---|
| | **Shares** | | **Dollars** | **Shares** | | **Dollars** |
| First quarter | 46.7 | $ | 3,374 | 26.8 | $ | 1,675 |
| Second quarter | 13.0 | | 876 | 12.1 | | 750 |
| Total | 59.7 | $ | 4,250 | 38.9 | $ | 2,425 |

As of June 30, 2006, $2,289 million was available for stock repurchases under our stock repurchase program authorized by the Board of Directors in December 2005. The manner of purchases, the amount we spend, and the number of shares repurchased will vary based on a variety of factors including the stock price and blackout periods in which we are restricted from repurchasing shares, and may include private block purchases as well as market transactions.

*Stockholder Rights Agreement*

On July 11, 2006, Amgen's board of directors voted unanimously to terminate our preferred stock rights plan. The plan was originally scheduled to expire on December 12, 2010, but was amended to accelerate the expiration date to July 31, 2006.

*Comprehensive income*

Our comprehensive income includes net income, unrealized gains and losses on our available-for-sale securities and foreign currency forward and option contracts, which qualify and are designated as cash flow hedges, and foreign currency translation adjustments. During the three and six months ended June 30, 2006, total comprehensive income was $5 million and $977 million, respectively. During the three and six months ended June 30, 2005, total comprehensive income was $1,060 million and $1,911 million, respectively.

**7.    Contingencies**

In the ordinary course of business, we are involved in various legal proceedings and other matters, including those that are tax-related. While it is not possible to accurately predict or determine the eventual outcome of these items, we do not believe any such items currently pending will have a material adverse effect on our consolidated financial position or liquidity, although an adverse resolution in any quarterly or annual reporting period of one or more of these items could have a material impact on the consolidated results of our operations for that period.

**8.    Abgenix, Inc. acquisition**

On April 1, 2006, we acquired all of the outstanding common stock of Abgenix, a company specializing in the discovery, development and manufacture of human therapeutic antibodies. We paid cash consideration of $22.50 per share in this transaction that was accounted for as a business combination. Additionally, we issued 1.9 million stock options in exchange for Abgenix stock options assumed in the acquisition, 1.4 million options of which were vested at the date of acquisition. The purchase price was as follows (in millions):

| | | |
|---|---|---|
| Cash paid for shares | $ | 2,103 |
| Other, principally fair value of vested options assumed | | 92 |
| Total | $ | 2,195 |

The purchase price was preliminarily allocated to all of the tangible and intangible assets acquired and liabilities assumed based on their estimated fair values at the acquisition date. The excess of the purchase price over the fair values of assets and liabilities acquired was assigned to goodwill. The following table summarizes the estimated fair values at the acquisition date (in millions):

| | | |
|---|---|---|
| In-process research and development | $ | 1,101 |
| Identifiable intangible asset | | 320 |
| Cash | | 252 |
| Deferred tax assets, net | | 258 |
| Property, plant and equipment | | 220 |
| Other assets | | 76 |
| Liabilities, principally convertible debt | | (762) |
| Goodwill | | 730 |
| Net assets acquired | $ | 2,195 |

The preliminary estimated fair values of in-process research and development ("IPR&D"), the identifiable intangible asset, and property, plant and equipment were determined with the assistance of an independent valuation firm. The estimated fair values of the intangible assets were determined based upon discounted after-tax cash flows adjusted for the probabilities of successful development and commercialization. The final determination of the purchase price allocation is expected to be completed as soon as practicable. The identifiable intangible asset consists of Abgenix's XenoMouse® technology that has alternative future uses in our research and development activities and will be amortized over its 5-year estimated useful life. The amount preliminarily allocated to IPR&D was immediately expensed in the Condensed Consolidated Statement of Operations during the three months ended June 30, 2006 (see Note 1, "Summary of significant accounting policies – Acquired in process-research and development"). The results of Abgenix's operations have been included in the Condensed Consolidated Financial Statements commencing April 1, 2006. Pro forma results of operations for the three and six months ended June 30, 2006 assuming the acquisition of Abgenix had taken place at the beginning of 2006 would not differ significantly from actual reported results.

**Item 2.**     **Management's Discussion and Analysis of Financial Condition and Results of Operations**

*Forward looking statements*

     This report and other documents we file with the Securities and Exchange Commission ("SEC") contain forward looking statements that are based on current expectations, estimates, forecasts and projections about us, our future performance, our business, our beliefs and our management's assumptions. In addition, we, or others on our behalf, may make forward looking statements in press releases or written statements, or in our communications and discussions with investors and analysts in the normal course of business through meetings, webcasts, phone calls, and conference calls. Words such as "expect," "anticipate," "outlook," "could," "target," "project," "intend," "plan," "believe," "seek," "estimate," "should," "may," "assume," "continue," variations of such words and similar expressions are intended to identify such forward looking statements. These statements are not guarantees of future performance and involve certain risks, uncertainties, and assumptions that are difficult to predict. We describe our respective risks, uncertainties, and assumptions that could affect the outcome or results of operations in "Item 1A. Risk Factors". We have based our forward looking statements on our management's beliefs and assumptions based on information available to our management at the time the statements are made. We caution you that actual outcomes and results may differ materially from what is expressed, implied, or forecast by our forward looking statements. Reference is made in particular to forward looking statements regarding product sales, reimbursement, expenses, earnings per share ("EPS"), liquidity and capital resources, and trends. Except as required under the federal securities laws and the rules and regulations of the SEC, we do not have any intention or obligation to update publicly any forward looking statements after the distribution of this report, whether as a result of new information, future events, changes in assumptions, or otherwise.

**Overview**

     The following management's discussion and analysis ("MD&A") is intended to assist the reader in understanding Amgen's business. MD&A is provided as a supplement to, and should be read in conjunction with, our Condensed Consolidated Financial Statements and accompanying notes included in this Quarterly Report on Form 10-Q and our Consolidated Financial Statements and accompanying notes included in our Annual Report on Form 10-K for the year ended December 31, 2005.

     We are a global biotechnology company that discovers, develops, manufactures, and markets human therapeutics based on advances in cellular and molecular biology. Our mission is to serve patients. As a science-based, patient-focused organization, we discover and develop innovative therapies to treat grievous illness. We operate in one business segment – human therapeutics. Therefore, our results of operations are discussed on a consolidated basis.

     We primarily earn revenues and income and generate cash from sales of human therapeutic products in the areas of inflammation, nephrology and supportive cancer care. For the three and six months ended June 30, 2006, total revenues were $3.6 billion and $6.8 billion, respectively. For the three and six months ended June 30, 2006, net income was $14 million and $1.0 billion, respectively, or $0.01 per share and $0.84 per share. The results of our operations for the three and six months ended June 30, 2006 reflect the $1.1 billion write-off of acquired in-process research and development ("IPR&D") costs associated with the Abgenix, Inc. ("Abgenix") acquisition recorded in the three

19

months ended June 30, 2006. As of June 30, 2006, cash, cash equivalents and marketable securities were $5.0 billion, of which approximately $4.5 billion was generated from operations in foreign tax jurisdictions and is intended for use outside the United States.

Our principal products include Aranesp® (darbepoetin alfa), EPOGEN® (Epoetin alfa), Neulasta® (pegfilgrastim)/NEUPOGEN® (Filgrastim), and Enbrel® (etanercept), which is marketed under a co-promotion agreement with Wyeth in the United States and Canada. For additional information about our principal products, their approved indications, and where they are marketed, see "Item 1. Business – Principal products" in Part I of our Annual Report on Form 10-K for the year ended December 31, 2005. For the three and six months ended June 30, 2006 and 2005, product sales represented 97% of total revenues. Over the last several years, our product sales growth has been primarily driven by sales of Aranesp®, ENBREL, and Neulasta®, which have benefited primarily from share gains and/or segment growth. We expect these products to continue to drive year over year sales growth in 2006. However, we expect that continued share gains will be more of a challenge than those achieved in previous years as we operate in a highly competitive environment. Going forward, we will continue to focus on growing our segments, including increasing our penetration in the therapeutic areas in which our products are used, while maintaining our focus on share gains. Our principal products have attained significant sales levels, and for certain of our products, in a relatively short period of time. As a result, although we have experienced significant year over year sales growth as a result of share gains and/or segment growth, in the near term, we expect our product sales growth to be lower than that achieved in the past several years. Furthermore, various factors can influence sales growth on a sequential quarterly basis, such as wholesaler and end-user inventory management practices and fluctuations in foreign exchange rates. For example, wholesaler buying patterns in advance of holidays may result in higher sequential quarterly sales growth for the quarters ending June 30 and December 31.

Most patients receiving our principal products for approved indications are covered by either government or private payer health care programs. Beginning in the first quarter of 2006, ENBREL and Sensipar® (cinacalcet HCl) also became eligible for coverage from the U.S. Government under Medicare Program Part D. Therefore, our principal product sales and sales growth are and will be affected by government and private payer reimbursement policies. While we believe that our 2005 product sales were not significantly impacted by the reimbursement changes resulting from the Medicare Prescription Drug Improvement and Modernization Act (or the "Medicare Modernization Act" ("MMA")) that went into effect in 2005, additional provisions of the MMA and other regulations affecting reimbursement that have gone or are expected to go into effect in 2006 could affect our product sales and related sales growth in the future. However, we believe that such changes are not likely to have a significant impact to our business in 2006. See "Reimbursement" below for further information.

International product sales represented approximately 18% of total product sales for each of the three and six month periods ended June 30, 2006 and 2005. Our international product sales consist principally of European sales of Aranesp® and Neulasta®/NEUPOGEN® and were unfavorably impacted by foreign currency changes of approximately $9 million and $55 million (see "Results of Operations" discussion below) for the three and six months ended June 30, 2006, respectively. However, both the positive and negative impacts that movements in foreign exchange rates have on our international product sales are mitigated, in part, by the natural, opposite impact these exchange rate movements have on our international operating expenses and as a result of our foreign currency hedging activities. Our hedging activities seek to offset the impact, both positive and negative, that

20

foreign exchange rate changes may have on our net income. As such, the impact to our net results of operations from changes in foreign currency exchange rates has been largely mitigated.

For the three and six months ended June 30, 2006 and 2005, operating income was as follows:

(Amounts in millions)

| | Three months ended June 30, | | | | Six months ended June 30, | | |
|---|---|---|---|---|---|---|---|
| | 2006 | 2005 | Change | | 2006 | 2005 | Change |
| Operating Income | $ 295 | $ 1,293 | (77)% | $ | 1,529 | $ 2,449 | (38)% |

Operating income as a percentage of product sales was 8% and 42% for the three months ended June 30, 2006 and 2005, respectively. For the six months ended June 30, 2006 and 2005, operating income as a percentage of product sales was 23% and 42%, respectively. The decline in operating income for the three and six month periods largely reflects the write-off of acquired IPR&D of $1.1 billion in connection with the Abgenix acquisition.

We focus our research and development ("R&D") on novel human therapeutics for the treatment of grievous illness. We have expanded and will need to continue to significantly expand our clinical development resources, including human capital, to manage and execute increasingly larger and more complex clinical trials. Throughout 2006, we are expecting a significant increase in the number, size, duration and complexity of our clinical trials, in particular with respect to denosumab, our late-stage investigational product for osteoporosis and metastatic bone cancer. For example, testing denosumab in the osteoporosis setting requires large clinical trials, substantial time and resources to recruit patients and significant expense to execute. We have begun seven and expect to begin conducting two additional "mega-site" trials (involving 200 or more sites) in 2006 to support denosumab and our other late-stage programs. (Two additional "mega-site" trials associated with our late-stage program for AMG 706, specifically the Phase 3 studies in first line breast cancer and first line non-small cell lung cancer, previously expected to begin in the fourth quarter of 2006 have been delayed as a result of observing an increased frequency of cholecystis, inflammation of the gall bladder, in patients treated with this late stage product candidate see "Item 1A. Risk Factors in Part II herein – Before we commercialize and sell any of our product candidates, we must conduct clinical trials in humans; if we fail to adequately manage these trials we may not be able to sell future products and our sales could be adversely affected.") To execute our clinical trial programs, we need to continue to accelerate the growth of our development organization and associated R&D support organizations, implement new management structures and approaches, and increase dependence on third-party contract clinical trial providers. Further, to increase the number of patients available for enrollment for our clinical trials, we have and will continue to open clinical sites and enroll patients in a number of new geographic locations where our experience conducting clinical trials is more limited, including Russia, China, India and some Central and South American countries utilizing third-party contract clinical trial providers.

On April 1, 2006, we paid shareholders of Abgenix $22.50 in cash per common share for a total value of approximately $2.1 billion to acquire all of the shares and assumed Abgenix's outstanding debt with a fair value of approximately $686 million. Abgenix specialized in the discovery, development and manufacture of human therapeutic antibodies and was our co-development

21

partner for Vectibix™ (panitumumab) (pending FDA approval). The results of Abgenix's operations have been included in our Condensed Consolidated Financial Statements commencing April 1, 2006.

There are many economic and industry-wide factors that affect our business generally and uniquely, including, among others, those relating to broad reimbursement changes, increased complexity and cost of R&D, increasingly intense competition for our currently marketed products and product candidates including the expected introduction of biosimilar products in Europe, complex and expanding regulatory requirements, and intellectual property protection. See "Item 1. Business" in Part I of our Annual Report on Form 10-K for the year ended December 31, 2005 and "Item 1A. Risk Factors" in Part II herein for further information on these economic and industry-wide factors and their impact on our business.

## Reimbursement

In the United States, dialysis providers are primarily reimbursed for EPOGEN® by the federal government through the End Stage Renal Disease Program ("ESRD Program") of Medicare. The ESRD Program reimburses approved providers for 80% of allowed dialysis costs; the remainder is paid by other sources, including patients, state Medicaid programs, private insurance, and to a lesser extent, state kidney patient programs. The ESRD Program reimbursement rate is established by federal law and is monitored and implemented by the Centers for Medicare & Medicaid Services ("CMS"). Most patients receiving Aranesp®, Neulasta®, and NEUPOGEN® for approved indications are covered by both government and private payer health care programs. Since January 1, 2006, ENBREL and Sensipar® are eligible for coverage from the U.S. government under Medicare Part D. Although both ENBREL and Sensipar® have received broad formulary placement in 2006, Part D formulary placements are made by individual Part D plan sponsors with oversight by CMS and are subject to revision in the future. Generally, in Europe and other countries outside the U.S., the government sponsored healthcare system is the primary payer of healthcare costs of patients. Governments may regulate access to, prices or reimbursement levels of our products to control costs. Worldwide use of our products may be affected by these cost containment pressures and cost shifting from governments and private insurers to health care providers in response to ongoing initiatives to reduce health care expenditures. Therefore, sales of all of our principal products are dependent, in part, on the availability and extent of reimbursement from third-party payers, including governments and private insurance plans.

The Medicare Prescription Drug Improvement and Modernization Act (or the "Medicare Modernization Act" ("MMA")) was enacted into law in December 2003 and became effective January 1, 2005. Changes resulting from the MMA, which lowered reimbursement for our products, could negatively affect product sales of some of our marketed products. However in 2005, we believe that our product sales were not significantly impacted by the reimbursement changes resulting from the MMA. We believe this was, in part, due to the effects of CMS' oncology demonstration project (the "2005 Demonstration Project") on sales of our products used in supportive cancer care, especially Aranesp®. Furthermore, we believe this was also, in part, due to increased reimbursement rates to physicians from CMS for services associated with drug administration. The 2005 Demonstration Project, which provided financial incentives to physicians for collecting and reporting oncology patient survey data, expired on December 31, 2005. In November 2005, CMS announced a new demonstration project (the "2006 Demonstration Project") that uses different criteria for how patients with cancer are evaluated and treated and that is targeted at approximately half of the funding originally targeted for the 2005 Demonstration Project. The final rule for the 2006 Medicare Physician

22

Fee Schedule Payment Final Rule issued in November 2005 reduced payments for physician services in 2006 by approximately 4.4% on average. Although legislation eliminated this reduction for 2006, it is uncertain whether payments for physician services will again be reduced after 2006. Because we cannot accurately predict the impact of any such changes on how, or under what circumstances, healthcare providers will prescribe or administer our products, we cannot estimate the full impact of the MMA on our business. However, we believe that it is not likely to be significant to our business in 2006.

The main components of the MMA that affect our currently marketed products are as follows:

- Through 2004, the Average Wholesale Price ("AWP") mechanism was the basis of Medicare Part B payment for covered outpatient drugs and biologics. Since January 1, 2005, in the physician clinic setting, Aranesp®, Neulasta® and NEUPOGEN® are being reimbursed under a Medicare Part B payment methodology that reimburses each product at 106% of its "average sales price" ("ASP") (sometimes referred to as "ASP+6%"). ASP is calculated by the manufacturer based on a statutorily defined formula and submitted to CMS. A product's ASP is calculated on a quarterly basis and therefore may change each quarter. The ASP in effect for a given quarter (the "Current Period") is based upon certain historical sales and sales incentive data covering a statutorily defined period of time preceding the Current Period. For example, the ASP for Aranesp® that we submit for the fourth quarter of 2006 will be based on certain historical sales and sales incentive data for Aranesp® from July 1, 2005 through June 30, 2006. CMS publishes the ASPs for products in advance of the quarter in which they go into effect. The ASPs for Aranesp® and Neulasta® trended downward during the first three quarters of 2005, began to stabilize during the fourth quarter of 2005 and have remained relatively stable in 2006.

- Per the MMA, beginning in 2006, physicians in the physician clinic setting will have the choice between purchasing and billing for specific drugs under the ASP+6% system or obtaining those drugs from vendors selected by CMS under the "competitive acquisition program" ("CAP"). Physicians who select to obtain drugs from CAP will no longer purchase or obtain reimbursement directly for such drugs under Medicare. CMS issued several rules related to CAP in 2005 and delayed implementation until July 2006. In April 2006, CMS announced that BioScrip would be the sole initial vendor for CAP. The initial physician election period occurred between May 8, 2006 through June 2, 2006 and physicians who elected to participate in CAP during this timeframe began the program on July 1, 2006. CMS announced an extension of the election period to June 30, 2006 and physicians who elected to participate in CAP between June 2, 2006 and June 30, 2006 began participation on August 1, 2006 for the initial period until December 31, 2006. Based upon disclosed CAP enrollment data, we do not anticipate widespread adoption of this program initially. Although we cannot fully predict how many physicians will select to obtain drugs from CAP, we believe CAP is unlikely to have a significant impact on our business. Pursuant to the final rule, discounts to CAP vendors are excluded from the calculation of ASPs and therefore do not have the potential to impact the ASPs for our products that would be available through the CAP.

- Medicare's hospital outpatient prospective payment system ("OPPS"), which determines payment rates for specified covered outpatient drugs and biologics in the hospital outpatient setting, utilized AWP as the basis for reimbursement in 2005. CMS'

23

2005 reimbursement rate, as in 2003 and 2004, continued the application of an "equitable adjustment" such that the 2005 Aranesp® reimbursement rate was based on the AWP of PROCRIT®. For 2005, the reimbursement rate for Aranesp® was 83% of the AWP for PROCRIT®, down from 88% of the AWP for PROCRIT® in 2004, with a dose conversion ratio of 330 U PROCRIT® to 1 mcg Aranesp®, the same ratio as 2004. Effective January 1, 2006, the OPPS system changed from an AWP based reimbursement system to a system based on ASP. This change affects Aranesp®, Neulasta® and NEUPOGEN® when administered in the hospital outpatient setting. The OPPS rule for 2006 bases reimbursement for non-pass through products such as Aranesp®, Neulasta® and NEUPOGEN® on an ASP+6% using the same payment amounts as used in the physician clinic setting and does not apply an "equitable adjustment" to tie the reimbursement rate for Aranesp® to PROCRIT® using a dose conversion ratio. In the final rule, CMS noted that it reserves the right to apply "equitable adjustment" to the Aranesp® reimbursement rate calculation methodology in years after 2006.

- Pursuant to final rules issued by CMS on November 3, 2004, Medicare reimbursement for EPOGEN® used in the dialysis setting for calendar year 2005 changed from the previous rate in 2004 of $10 per 1,000 Units to $9.76 per 1,000 Units, in 2005, a rate based upon an average acquisition cost for 2003 determined by the Office of the Inspector General ("OIG") and adjusted for price inflation based on the Producer Price Index for pharmaceutical products. Pursuant to the CMS final rules, the difference between the 2004 reimbursement rates for all drugs separately billed outside the dialysis composite rate (including EPOGEN®) and the 2005 reimbursement rates for such drugs was added to the composite rate that dialysis providers receive for dialysis treatment. Pursuant to the Medicare Physician Fee Schedule Payment Final Rule, effective January 1, 2006, the payment mechanism for separately reimbursed dialysis drugs in both freestanding and hospital-based dialysis centers, including EPOGEN® and Aranesp®, is reimbursed by Medicare at ASP+6% using the same payment amounts used in the physician clinic setting and calculated quarterly in the same manner as described above for our products under the Medicare Part B payment methodology. CMS publishes the ASPs for products in advance of the quarter in which they go into effect. Based on this final rule, the reimbursement rate for EPOGEN®, for the first three quarters of 2006 decreased from the reimbursement rate in 2005, and we expect that the reimbursement rate for the fourth quarter of 2006 will also be lower than the reimbursement rate in 2005. Because we cannot accurately predict the extent to which this reduced reimbursement will impact how, or under what circumstances, healthcare providers will prescribe or administer EPOGEN®, we cannot estimate the full impact of the reduced reimbursement rate on our EPOGEN® product sales. However, we believe that it is not likely to be significant in 2006.

- The Office of the Inspector General (OIG) released a study entitled "Medicare Reimbursement for New End Stage Renal Disease Drugs" on March 31, 2006. A section of the MMA required OIG to study "new" drugs' acquisition costs. A small fraction of providers (approximately 1 percent of all dialysis centers) were identified by the OIG as using Aranesp® for treatment of anemia in dialysis patients and were surveyed by the OIG for the study. The OIG data indicated that 99.9% of "new" drug expenditures in dialysis were for Aranesp®, so Aranesp® was the only drug studied in the report. The OIG stated that this small group of providers acquired Aranesp® at

24

prices below the Medicare reimbursement amount, at an average of 17.5% below the dollar-weighted average Medicare reimbursement rate (ASP+6%) for 2005. The report noted that Aranesp® dialysis expenditures accounted for less than 2% ($26 million) of total Medicare reimbursement for all ESRD drugs billed by independent dialysis facilities compared to the almost $800 million reimbursed by Medicare Part B in 2005 for darbepoetin alfa provided in physician offices. The results of this report by the OIG may be taken into consideration by CMS in setting payment rates for Aranesp®, although the OIG made no specific recommendations in the report. To the extent that CMS uses this report to lower reimbursement for Aranesp®, patient access and our sales may be negatively impacted.

In addition, on November 9, 2005, CMS released a final revision to the Hematocrit Measurement Audit Program Memorandum ("HMA-PM"), a Medicare payment review mechanism used by CMS to audit EPOGEN® and Aranesp® (when used in dialysis) utilization and appropriate hematocrit outcomes of dialysis patients. The new policy, Claims Monitoring Policy: Erythropoietin/darbepoetin alfa usage for beneficiaries with end stage renal disease ("Claims Monitoring Policy"), became effective April 1, 2006. The final Claims Monitoring Policy provides that if a patient's hemoglobin is greater than 13 grams per deciliter, providers are instructed to reduce the patient's EPOGEN® and Aranesp® dose by twenty-five percent. If the provider does not reduce the patient's EPOGEN® and Aranesp® dose and there is no medical documentation to support the higher dosage, reimbursement will be reduced to the level it would have been had the provider reduced dosage by twenty-five percent. Based on our preliminary evaluation, we do not expect the new Claims Monitoring Policy to have a negative impact on EPOGEN® and Aranesp® sales and given the importance of EPOGEN® and Aranesp® for maintaining the quality of care for dialysis patients, we do not expect that the new policy will substantially impact the utilization of EPOGEN® and Aranesp®. However, we are currently in the process of further evaluating the new Claims Monitoring Policy. As a result, we cannot predict the potential full impact of this final guidance on our business.

Further, the Deficit Reduction Act of 2005 ("DRA") included provisions, which are phased in over time, regarding state collection and submission of data for the purpose of collecting Medicaid drug rebates from manufacturers for physician-administered drugs. We expect that state compliance with elements of these provisions that become effective in 2007 will increase the level of Medicaid rebates paid by us. We are currently in the process of further evaluating the impact of the DRA, and as a result we cannot predict the potential full impact on our business.

**Results of Operations**

*Product sales*

For the three and six months ended June 30, 2006 and 2005, worldwide product sales and total product sales by geographic region were as follows:

(Amounts in millions)

| | Three months ended June 30, | | | Six months ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2006 | 2005 | Change | 2006 | 2005 | Change |
| Aranesp® | $ 1,055 | $ 837 | 26% | $ 1,948 | $ 1,560 | 25% |
| EPOGEN® | 613 | 647 | (5)% | 1,217 | 1,230 | (1)% |
| Neulasta®/NEUPOGEN® | 1,005 | 899 | 12% | 1,901 | 1,694 | 12% |
| Enbrel® | 724 | 639 | 13% | 1,382 | 1,231 | 12% |
| Sensipar® | 79 | 36 | 119% | 140 | 63 | 122% |
| Other | 15 | 14 | 7% | 30 | 29 | 3% |
| Total product sales | $ 3,491 | $ 3,072 | 14% | $ 6,618 | $ 5,807 | 14% |
| | | | | | | |
| Total U.S. | $ 2,861 | $ 2,532 | 13% | $ 5,432 | $ 4,763 | 14% |
| Total International | 630 | 540 | 17% | 1,186 | 1,044 | 14% |
| Total product sales | $ 3,491 | $ 3,072 | 14% | $ 6,618 | $ 5,807 | 14% |

Product sales are influenced by a number of factors, including demand, third-party reimbursement availability and policies, pricing strategies, wholesaler and end-user inventory management practices, fluctuations in foreign exchange rates, new product launches and indications, competitive products, product supply, and acquisitions.

Sales growth for the three and six months ended June 30, 2006 was principally driven by demand for Aranesp®, ENBREL, and Neulasta®. International product sales growth for the three and six months ended June 30, 2006 was unfavorably impacted by approximately $9 million and $55 million, respectively, from foreign currency exchange rate changes.

We expect Aranesp®, ENBREL, and Neulasta® to continue to drive year over year sales growth in the near term. However, we expect that continued share gains will be more of a challenge than those achieved in previous years as we operate in a highly competitive environment. Going forward, we will continue to focus on growing our segments, including increasing our penetration in the therapeutic areas in which our products are used, while maintaining our focus on share gains.

While we believe that our 2005 product sales were not significantly impacted by the reimbursement changes resulting from the MMA that went into effect in 2005, additional provisions of the MMA and other regulations affecting reimbursement that have gone or are expected to go into effect in 2006 could affect our product sales and related sales growth in the future. Because we cannot accurately predict the impact of any such changes on how, or under what circumstances, healthcare providers will prescribe or administer our products, we cannot estimate the full impact of the MMA on our business. However, we believe that such changes are not likely to have a significant impact on

our business in 2006. For additional information on reimbursement and its impact on our business, see "Reimbursement" above.

*Aranesp®*

(Amounts in millions)

| | Three months ended June 30, | | | Six months ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2006 | 2005 | Change | 2006 | 2005 | Change |
| Aranesp® - U.S. | $  713 | $  536 | 33% | $  1,309 | $  983 | 33% |
| Aranesp® - International | 342 | 301 | 14% | 639 | 577 | 11% |
| Total Aranesp® | $  1,055 | $  837 | 26% | $  1,948 | $  1,560 | 25% |

The increase in U.S. Aranesp® sales for the three and six months ended June 30, 2006 was primarily driven by demand reflecting both segment growth and continued overall share gains. The increase in international Aranesp® sales for the three and six months ended June 30, 2006 was also principally driven by demand. International sales for the six months ended June 30, 2006 were unfavorably impacted by $35 million due to changes in foreign currency exchange rates.

For the remainder of 2006, we believe that Aranesp® sales growth will be driven primarily by increased demand due to both segment growth and continued share gains resulting from extended dosing. Further, sales of Aranesp® have been and may continue to be benefited by its use in U.S. hospital dialysis clinics to treat anemia associated with chronic renal failure instead of EPOGEN®, however, we believe this conversion had stabilized as of June 30, 2006. In addition, we believe future worldwide Aranesp® sales growth will also be dependent, in part, on such factors as: reimbursement by third-party payers (including governments and private insurance plans) (see "Item 1A. Risk Factors in Part II herein – Our sales depend on payment and reimbursement from third-party payers, and, to the extent that reimbursement for our products is reduced, this could negatively impact the utilization of our products."); cost containment pressures from governments and private insurers on health care providers; governmental or private organization regulations or guidelines relating to the use of our products; government programs such as the 2006 Demonstration Project; penetration of existing and new segments, including potential new indications; patient population growth; the effects of pricing strategies; competitive products or therapies, including biosimilar products in Europe; the development of new treatments for cancer; and changes in foreign currency exchange rates.

*EPOGEN®*

(Amounts in millions)

| | Three months ended June 30, | | | Six months ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2006 | 2005 | Change | 2006 | 2005 | Change |
| EPOGEN® - U.S. | $  613 | $  647 | (5)% | $  1,217 | $  1,230 | (1)% |

27

Reported EPOGEN® sales for the three months ended June 30, 2006 decreased primarily due to changes in wholesaler inventory levels and increased use of Aranesp® in the hospital setting, which offset the demand for EPOGEN® in the freestanding dialysis clinics. Reported EPOGEN® sales for the six months ended June 30, 2006 decreased primarily due to increased use of Aranesp® in the hospital setting. We believe that conversion to Aranesp® in the hospital setting has stabilized as of June 30, 2006.

We believe EPOGEN® should experience sales growth for the remainder of 2006 primarily as a result of patient population growth and the stabilization of conversion to Aranesp® in the U.S. hospital dialysis clinics. On an annual basis, we believe demand for EPOGEN® in the freestanding dialysis clinics, which account for a majority of EPOGEN® sales, remains consistent with estimated annual patient population growth at approximately 3-4%. Patients receiving treatment for anemia associated with end stage renal disease with EPOGEN® are covered primarily under medical programs provided by the federal government. Therefore, going forward, we believe EPOGEN® sales growth will further depend on changes in reimbursement rates or a change in the basis for reimbursement by the federal government (see "Item 1A. Risk Factors in Part II herein – Our sales depend on payment and reimbursement from third-party payers, and, to the extent that reimbursement for our products is reduced, this could negatively impact the utilization of our products."). We believe EPOGEN® sales growth will also be dependent, in part, on future governmental or private organization regulations or guidelines relating to the use of our products, cost containment pressures from the federal government on health care providers and the effects of pricing strategies.

*Neulasta®/NEUPOGEN®*

(Amounts in millions)

| | Three months ended June 30, | | | Six months ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2006 | 2005 | Change | 2006 | 2005 | Change |
| Neulasta® - U.S. | $ 579 | $ 490 | 18% | $ 1,076 | $ 906 | 19% |
| NEUPOGEN® - U.S. | 206 | 208 | (1)% | 397 | 390 | 2% |
| U.S. Neulasta®/NEUPOGEN® - Total | 785 | 698 | 12% | 1,473 | 1,296 | 14% |
| Neulasta® - International | 122 | 97 | 26% | 233 | 182 | 28% |
| NEUPOGEN® - International | 98 | 104 | (6)% | 195 | 216 | (10)% |
| International Neulasta®/NEUPOGEN® - Total | 220 | 201 | 9% | 428 | 398 | 8% |
| Total Worldwide Neulasta®/NEUPOGEN® | $1,005 | $899 | 12% | $1,901 | $1,694 | 12% |

The increase in U.S. Neulasta®/NEUPOGEN® sales for the three and six months ended June 30, 2006 was driven primarily by demand for Neulasta®. In addition, the increase in demand for Neulasta® for the three months ended June 30, 2006 also includes the impact of a 2 percent U.S. price increase in April 2006. U.S. demand for Neulasta® continued to benefit from a product label extension based on new clinical data demonstrating the value of first cycle use in moderate risk chemotherapy regimens. The increase in international Neulasta®/NEUPOGEN® sales for the three and six months ended June 30, 2006 was driven primarily by demand for Neulasta®. International sales for the six months ended June 30, 2006 were unfavorably impacted by $22 million in foreign currency exchange rate changes.

28

For the remainder of 2006, we believe sales growth for Neulasta®/NEUPOGEN® will continue to benefit from a label extension for Neulasta® based on new clinical data demonstrating the value of first cycle use in moderate risk chemotherapy regimes. In addition, future worldwide Neulasta®/NEUPOGEN® sales growth will be dependent, in part, on such factors as: reimbursement by third-party payers (including governments and private insurance plans) (see "Item 1A. Risk Factors in Part II herein – Our sales depend on payment and reimbursement from third-party payers, and, to the extent that reimbursement for our products is reduced, this could negatively impact the utilization of our products."); cost containment pressures from governments and private insurers on health care providers; governmental or private organization regulations or guidelines relating to the use of our products; government programs such as the 2006 Demonstration Project; penetration of existing segments; patient population growth; the effects of pricing strategies; competitive products or therapies, including biosimilar products in Europe; the development of new treatments for cancer; and changes in foreign currency exchange rates. Future chemotherapy treatments that are less myelosuppressive may require less Neulasta®/NEUPOGEN®, however, other future chemotherapy treatments that are more myelosuppressive, such as dose dense chemotherapy, could require more Neulasta®/NEUPOGEN®. NEUPOGEN® competes with Neulasta® in the United States and Europe. U.S. and International NEUPOGEN® sales have been adversely impacted by conversion to Neulasta®. However, we believe that most of the conversion in the United States has occurred. In Europe, we plan to continue actively converting NEUPOGEN® patients to Neulasta®, emphasizing its less frequent dosing requirements as compared to NEUPOGEN®. However, we cannot accurately predict the rate or timing of future conversion of NEUPOGEN® patients to Neulasta® in Europe.

*ENBREL*

(Amounts in millions)

| | Three months ended June 30, | | | | Six months ended June 30, | | | |
| | 2006 | | 2005 | | Change | 2006 | | 2005 | | Change |
|---|---|---|---|---|---|---|---|---|---|---|
| ENBREL - U.S. | $ | 685 | $ | 614 | 12% | $ | 1,314 | $ | 1,184 | 11% |
| ENBREL - International | | 39 | | 25 | 56% | | 68 | | 47 | 45% |
| Total ENBREL | $ | 724 | $ | 639 | 13% | $ | 1,382 | $ | 1,231 | 12% |

ENBREL sales growth for the three and six months ended June 30, 2006 was driven by demand. In addition, the increase in demand for the three months ended June 30, 2006 also includes the impact of a 4.9 percent U.S. price increase. While ENBREL continued to maintain a leading position in both rheumatology and dermatology, ENBREL sales growth has been affected in 2006 by slowing segment growth in dermatology and by increased competitive activities in both segments. The year to date sales growth was also impacted by slower segment growth in rheumatology in the three months ended March 31, 2006, in part, due to slower than anticipated Medicare Part D patient enrollment. In addition, sales growth for the six months ended June 30, 2006 has been affected by share loss in rheumatology and, to a lesser degree, in dermatology.

We believe 2006 sales growth will be driven by increased penetration in both the rheumatology and dermatology settings and as a result of ENBREL, beginning in 2006, being eligible for coverage from the U.S. Government under Medicare Program Part D. Going forward, future ENBREL sales growth will be dependent, in part, on such factors as: the effects of competing

products or therapies; penetration of existing and new segments, including potential new indications; the availability and extent of reimbursement by government and third-party payers; cost containment pressures from governments and private insurers on health care providers; government programs such as Medicare Program Part D; governmental or private organization regulations or guidelines relating to the use of our products; and the effects of pricing strategies (see "Item 1A. Risk Factors in Part II herein – Our sales depend on payment and reimbursement from third-party payers and, to the extent that reimbursement for our products is reduced, this could negatively impact the utilization of our products.").

*Selected operating expenses*

The following table summarizes selected operating expenses (amounts in millions):

| | Three months ended June 30, | | | | Six months ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2006 | | 2005 | Change | 2006 | | 2005 | Change |
| Product sales | $ 3,491 | $ | 3,072 | 14% | $ 6,618 | $ | 5,807 | 14% |
| Operating expenses: | | | | | | | | |
| Cost of sales (excludes amortization of acquired intangible assets) | $ 493 | $ | 530 | (7)% | $ 1,045 | $ | 1,019 | 3% |
| % of product sales | 14% | | 17% | | 16% | | 18% | |
| Research and development | $ 788 | $ | 567 | 39% | $ 1,443 | $ | 1,091 | 32% |
| % of product sales | 23% | | 18% | | 22% | | 19% | |
| Selling, general and administrative | $ 840 | $ | 646 | 30% | $ 1,529 | $ | 1,223 | 25% |
| % of product sales | 24% | | 21% | | 23% | | 21% | |
| Write-off of acquired in-process research and development | $ 1,101 | $ | — | | $ 1,101 | $ | — | |

*Cost of sales*

Cost of sales, which excludes the amortization of acquired intangible assets (see "Condensed Consolidated Statements of Operations"), decreased 7% for the three months and increased 3% for the six months ended June 30, 2006. The decrease in the three months ended June 30, 2006 was primarily driven by lower royalty expenses and, to a lesser extent, production efficiencies. Royalty expenses were lower in the three months ended June 30, 2006 due to the expiration of certain contractual royalty obligations on Neulasta® and NEUPOGEN® and the acquisition of certain royalty rights on sales of ENBREL and European Union sales of Neulasta® and NEUPOGEN®. The increase in costs of sales for the six months ended June 30, 2006 is primarily due to higher manufacturing costs in the first three months, in part due to higher sales volumes, offsetting the reduction experienced during the last three months.

*Research and development*

R&D expenses are primarily comprised of costs and expenses for: salaries and benefits associated with R&D personnel, overhead and occupancy, clinical trial and related clinical manufacturing, including contract services and other outside costs, process development, quality assurance, information systems, and amortization of technology used in R&D with alternative future uses. R&D expenses also include such costs related to activities performed on behalf of corporate

30

partners. R&D expenses increased 39% and 32%, respectively, for the three and six months ended June 30, 2006 primarily driven by higher staff-related costs and increased funding to support clinical trials for our late stage programs, including higher clinical material and manufacturing costs. In addition, R&D costs for the three and six months ended June 30, 2006, include approximately $28 million and $57 million, respectively, in stock option expense, which was not reflected in our Consolidated Results of Operations prior to January 1, 2006 (see "Stock option expense"). During the three months ended June 30, 2006, staff-related costs, including stock option compensation, and clinical trial and clinical manufacturing costs increased approximately $115 million and $81 million, respectively. During the six months ended June 30, 2006, staff-related costs, including stock option compensation, and clinical trial and clinical manufacturing costs increased approximately $208 million and $125 million, respectively. We expect R&D expense growth rates to accelerate in the remainder of the year reflecting a full six months of the seven "mega-site" trials started in the first half of the year and two additional "mega-site" trials expected to start in the second half.

### Acquired in-process research and development

The fair value of acquired IPR&D projects and technologies which have no alternative future use and which have not reached technological feasibility at the date of acquisition are expensed as incurred. In the second quarter of 2006 we wrote off $1,101 million of acquired IPR&D related to the Abgenix acquisition. Acquired IPR&D is considered part of total R&D expense.

### Selling, general and administrative

Selling, general and administrative ("SG&A") expenses are primarily comprised of salaries and benefits associated with sales and marketing, finance, legal, and other administrative personnel; outside marketing expenses; overhead and occupancy costs; and other general and administrative costs. SG&A increased 30% for the three months ended June 30, 2006 primarily to support our growing organization, including $119 million of costs associated with higher staff levels and $15 million of additional infrastructure costs primarily associated with our Global Enterprise Resource Planning (ERP) system. In addition, we incurred $21 million in higher legal costs associated with ongoing litigation and $55 million in increased outside marketing expenses in support of our principal products, including the Wyeth profit share related to ENBREL. SG&A increased 25% for the six months ended June 30, 2006 primarily due to $203 million of costs associated with higher staff levels, $23 million of additional infrastructure costs primarily associated with our ERP system, $35 million in higher legal costs associated with ongoing litigation, and $65 million in increased outside marketing expenses in support of our principal products, including the Wyeth profit share related to ENBREL. Staff-related expenses for the three and six months ended June 30, 2006, include approximately $34 million and $71 million, respectively, in stock option expense, which was not reflected in our Consolidated Results of Operations prior to January 1, 2006 (see "Stock option expense").

### Interest and other income and (expense), net

Interest and other income (expense), net for the three months ended June 30, 2006 was $21 million of income compared to $6 million of income for the three months ended June 30, 2005. Interest and other income (expense), net for the six months ended June 30, 2006 was $101 million of income compared to net expense of $4 million for the six months ended June 30, 2005. These increases were principally attributable to an increase in interest income.

31

*Legal settlements*

During the three months ended June 30, 2005, we settled certain legal matters, primarily related to a patent legal proceeding, and recorded an expense of $49 million, net of amounts previously accrued.

*Income taxes*

Our effective tax rates for the three and six months ended June 30, 2006 were 95.6% and 37.7%, respectively, compared with 20.8% and 23.0%, respectively, for the same periods last year. Our effective tax rates for the three and six months ended June 30, 2006 have increased primarily due to the write-off of acquired IPR&D costs in connection with the acquisition of Abgenix and the expiration of the federal research and experimentation (R&E) credit in 2005. Also, the second quarter of 2005 reflected a one-time decrease in the tax rate due to the favorable resolution with the Internal Revenue Service of prior year foreign tax credit claims and research and development tax credits. The increase in the rates for 2006 was partially offset by an increase in the amount of foreign earnings intended to be invested indefinitely outside of the United States. As permitted in Accounting Principles Board Opinion ("APB") No. 23, "Accounting for Income Taxes – Special Areas", we do not provide for U.S. income taxes on undistributed earnings of our foreign operations that are intended to be invested indefinitely outside the United States.

See Note 4, "Income taxes", to the Condensed Consolidated Financial Statements for further discussion.

*Recent accounting pronouncements*

On January 1, 2006 we adopted SFAS No. 123R, "Share-Based Payment." SFAS No. 123R requires us to account for our stock options using a fair-value-based method as described in such statement and recognize the resulting compensation expense in our financial statements. Prior to January 1, 2006, we accounted for our employee stock options using the intrinsic value method under APB No. 25, "Accounting for Stock Issued to Employees" and related Interpretations, as permitted by SFAS No. 123, "Accounting for Stock-Based Compensation", which generally did not result in any employee stock option expense. We adopted SFAS No. 123R using the modified-prospective-transition method. Under this transition method, compensation expense recognized subsequent to adoption includes: (a) compensation cost for all share-based payments granted prior to, but not yet vested as of January 1, 2006, based on the values estimated in accordance with the original provisions of SFAS No. 123, and (b) compensation cost for all share-based payments granted subsequent to January 1, 2006, based on the grant-date fair values estimated in accordance with the provisions of SFAS No. 123(R). The modified-prospective-transition method did not require recognition of related compensation expense in our financial statements for prior periods. Comparability, therefore, of the current period financial statements to prior periods will be impacted.

The adoption of SFAS No. 123R will have a material impact on our results of operations for 2006. The actual annual stock option expense in 2006 is dependent on a number of factors including the number of stock options granted, our common stock price and related expected volatility, and other inputs utilized in estimating the fair value of the stock options at the time of grant. As a result of recognizing compensation expense for stock options pursuant to the provisions of SFAS No. 123(R), our income before income taxes for the three and six months ended June 30, 2006, was $63 million and $129 million lower, respectively, and our net income was $43 million and $88 million

lower, respectively, than if we had continued to account for stock options under APB No. 25. In addition, both basic and diluted earnings per share for the three and six months ended June 30, 2006 were $.04 and $.08 lower, respectively, than if we had continued to account for stock options under APB No. 25. We expect the impact of stock option expense to be in the range of $0.12 to $0.14 per share in 2006 compared to $0.19 for 2005 (see Note 2, "Employee stock-based payments" in the Condensed Consolidated Financial Statements). The estimated impact of stock option expense for 2006 is less than the corresponding pro forma expense amount for 2005 principally due to a reduction in the estimated number of stock options granted in recent years in favor of a combination of other equity awards. Other equity awards are comprised principally of restricted stock and performance units. Pre-tax stock-based compensation expense relating to these other equity awards for the three months ended June 30, 2006 and June 30, 2005 were $66 million and $34 million, respectively. As of June 30, 2006, there was $612 million of total unrecognized compensation cost related to unvested stock options and shares of restricted stock that is expected to be recognized over the weighted-average period of 1.6 years and $176 million of total unrecognized compensation cost related to performance units that is expected to be recognized over the weighted-average period of 1.1 years.

In June 2006, the Financial Accounting Standards Board ("FASB") issued FASB Interpretation No. ("FIN") 48, "Accounting for Uncertainty in Income Taxes", effective for fiscal years beginning after December 15, 2006. FIN 48 clarifies the accounting for uncertainty in income taxes by prescribing rules for recognition, measurement, classification and disclosure in our financial statements of tax positions taken or expected to be taken in a tax return. We are currently evaluating the provisions in FIN 48, but have not yet determined its expected impact on us, however it is not anticipated to be material. We plan to adopt this new standard on January 1, 2007.

**Financial Condition, Liquidity and Capital Resources**

The following table summarizes selected financial data (amounts in millions):

|  | June 30, 2006 | December 31, 2005 |
|---|---|---|
| Cash, cash equivalents, restricted cash, and marketable securities | $      4,970 | $      5,255 |
| Total assets | 31,288 | 29,297 |
| Current debt | 1,768 | — |
| Non-current debt | 7,232 | 3,957 |
| Stockholders' equity | 16,839 | 20,451 |

We believe that existing funds, cash generated from operations, and existing sources of and access to financing are adequate to satisfy our working capital, capital expenditure and debt service requirements for the foreseeable future, as well as to support our stock repurchase program and other business initiatives, including acquisitions and licensing activities. However, in order to provide for greater financial flexibility and liquidity, we may raise additional capital from time to time by accessing both public and private markets.

*Cash, cash equivalents, and marketable securities*

Of the total cash, cash equivalents, and marketable securities at June 30, 2006, approximately $4.5 billion was generated from operations in foreign tax jurisdictions and is intended for use outside the United States. If these funds are repatriated for use in our U.S. operations, substantial additional taxes on certain of these amounts will be required to be paid.

*Financing arrangements*

In February 2006, we issued $2.5 billion principal amount of convertible notes due in 2011 (the "2011 Convertible Notes") and $2.5 billion principal amount of convertible notes due in 2013 (the "2013 Convertible Notes") in a private placement. The 2011 Convertible Notes and the 2013 Convertible Notes were issued at par and pay interest at a rate of 0.125% and 0.375%, respectively. The 2011 Convertible Notes and the 2013 Convertible Notes may be convertible based on an initial conversion rate of 12.5247 shares and 12.5814 shares, respectively, per $1,000 principal amount of notes (which represents an initial conversion price of approximately $79.84 and $79.48 per share, respectively). The 2011 Convertible Notes and the 2013 Convertible Notes may only be converted: 1) during any calendar quarter beginning after June 30, 2006 if the closing price of our common stock exceeds 130% of the respective conversion price per share during a defined period at the end of the previous quarter, 2) if we make specified distributions to holders of our common stock or specified corporate transactions occur, or 3) one month prior to the respective maturity date. Upon conversion, a holder would receive: 1) cash equal to the lesser of the principal amount of the note or the conversion value, as defined, and 2) to the extent the conversion value exceeds the principal amount of the note, shares of our common stock, cash, or a combination of common stock and cash, at our option (the "excess conversion value"). In addition, upon a change in control, as defined, the holders may require us to purchase for cash all or a portion of their notes for 100% of the principal amount of the notes plus accrued and unpaid interest, if any. Debt issuance costs totaled approximately $88

million and are being amortized over the life of the notes. Moody's and Standard & Poor's rate our outstanding convertible notes A2 and A+, respectively.

In connection with the issuance of these convertible notes, a total of $3.0 billion of our common stock was repurchased under our stock repurchase program. Also concurrent with the issuance of the 2011 Convertible Notes and the 2013 Convertible Notes, we purchased convertible note hedges in private transactions. The convertible note hedges allow us to receive shares of our common stock and/or cash from the counterparties to the transactions equal to the amounts of common stock and/or cash related to the excess conversion value that we would pay to the holders of the 2011 Convertible Notes and the 2013 Convertible Notes upon conversion. These transactions will terminate the earlier of the maturity dates of the related notes or the first day none of the related notes remain outstanding due to conversion or otherwise. The cost of the convertible note hedges, which aggregated approximately $1.5 billion, was recorded as a reduction of equity. The net proceeds from the issuance of the 2011 and 2013 Convertible Notes, the repurchase of common stock and the purchase of the convertible note hedges was $440 million.

Also concurrent with the issuance of the 2011 Convertible Notes and the 2013 Convertible Notes, we sold warrants to acquire shares of our common stock at an exercise price of $107.90 per share in a private placement. Pursuant to these transactions, warrants for approximately 31.3 million shares of our common stock may be settled in May 2011 and warrants for approximately 31.5 million shares of our common stock may be settled in May 2013 (the "settlement dates"). If the average price of our common stock during a defined period ending on or about the respective settlement dates exceeds the exercise price of the warrants, the warrants will be settled, at our option, in cash or shares of our common stock. Proceeds received from the issuance of the warrants totaled approximately $774 million.

As of June 30, 2006 we had zero coupon convertible notes due in 2032 with an accreted value of $1.8 billion outstanding and having an aggregate face amount of $2.36 billion and yield to maturity of 1.125%. The holders of these convertible notes may require us to purchase, generally for cash, all or a portion of their convertible notes on specified dates (the "Put Option"), at a price equal to the original issuance price plus the accrued original issue discount through the purchase date. The next available Put Option date is on March 1, 2007. Accordingly, the convertible notes were classified as current liabilities in the accompanying Condensed Consolidated Balance Sheet as of June 30, 2006. Moody's and Standard & Poor's rate our outstanding convertible notes A2 and A+, respectively.

As of June 30, 2006 we had $2.0 billion of long-term notes outstanding. These long-term notes consisted of: 1) $1.0 billion of notes that bear interest at a fixed rate of 4.0% and mature in 2009, and 2) $1.0 billion of notes that bear interest at a fixed rate of 4.85% and mature in 2014. Moody's and Standard & Poor's rate our outstanding long-term senior notes A2 and A+, respectively.

As of June 30, 2006, we had $233 million of additional long-term debt securities outstanding. These long-term debt securities consisted of: 1) $100 million of debt securities that bear interest at a fixed rate of 6.5% and mature in 2007 under a $500 million debt shelf registration (the "$500 Million Shelf"), 2) $100 million of debt securities that bear interest at a fixed rate of 8.1% and mature in 2097, and 3) $33 million in notes due in 2013 with an effective rate of 5.35% assumed in the Abgenix acquisition. Our outstanding long-term debt is rated A2 by Moody's and A+ by Standard & Poor's. Under the $500 Million Shelf, all of the remaining $400 million of debt securities available for issuance may be offered from time to time under our medium-term note program with terms to be determined at the time of issuance.

35

We have a $1.0 billion unsecured revolving credit facility to be used for general corporate purposes, including commercial paper support, which matures in November 2010. Additionally, we have a commercial paper program, which provides for unsecured, short-term borrowings of up to an aggregate of $1.2 billion. No amounts were outstanding under the credit facility or commercial paper program as of June 30, 2006.

We have a $1.0 billion shelf registration (the "$1 Billion Shelf") which allows us to issue debt securities, common stock, and associated preferred share purchase rights, preferred stock, warrants to purchase debt securities, common stock or preferred stock, securities purchase contracts, securities purchase units and depositary shares. The $1 Billion Shelf was established to provide for further financial flexibility and the securities available for issuance may be offered from time to time with terms to be determined at the time of issuance. As of June 30, 2006, no securities had been issued under the $1 Billion Shelf.

Certain of our financing arrangements contain non-financial covenants and as of June 30, 2006, we were in compliance with all applicable covenants.

*Cash flows*

The following table summarizes our cash flow activity (amounts in millions):

|  | Six months ended June 30, | |
|  | 2006 | 2005 |
| --- | --- | --- |
| Net cash provided by operating activities | $ 2,574 | $ 2,340 |
| Net cash (used in) provided by investing activities | (2,042) | 1,104 |
| Net cash used in financing activities | (425) | (3,349) |

*Operating*

Cash provided by operating activities has been and is expected to continue to be our primary recurring source of funds. Cash provided by operating activities during the six months ended June 30, 2006 increased from the prior year six month period due to higher cash receipts from customers driven by the growth in product sales partially offset by increased payments associated with higher operating costs and the timing of payments in the ordinary course of business. (See Condensed Consolidated Statements of Cash Flows).

*Investing*

On April, 1, 2006, we completed our acquisition of Abgenix and paid $2.1 billion in cash to the shareholders of Abgenix to acquire all outstanding shares. In addition, we acquired $252 million in cash, and subsequent to the completion of the acquisition, we paid off $653 million of convertible debt assumed in this transaction.

Capital expenditures totaled $458 million during the six months ended June 30, 2006, compared with $403 million during the same period last year. The capital expenditures during the six months ended June 30, 2006 were primarily associated with ongoing manufacturing and site expansion in Puerto Rico and other locations, and costs associated with implementing our ERP system.

Capital expenditures for the six months ended June 30, 2005 totaled $403 million and were primarily associated with manufacturing and site expansion in Puerto Rico, manufacturing expansion in Colorado, administration and site development in Thousand Oaks, and building improvements for our research facility in Massachusetts.

We currently estimate 2006 spending on capital projects and equipment to be in excess of $1 billion as we continue to increase our manufacturing and R&D operations globally and implementation of our ERP system. The most significant of these expenditures are expected to be incurred with the further expansion of the Puerto Rico bulk manufacturing, formulation, fill, and finish facilities, the start of engineering and construction of a new process development, bulk manufacturing and formulation, fill, and finish facility in Ireland, the expansion of R&D operations at existing sites in the United States and the United Kingdom, and construction of a new development center in Uxbridge, United Kingdom.

*Financing*

In February 2006, we issued $5.0 billion convertible notes, of which $2.5 billion pay interest at 0.125% and are due in 2011 and $2.5 billion pay interest at 0.375% and are due in 2013. In connection with the issuance of these convertible notes, a total of $3.0 billion of our common stock was repurchased under our stock repurchase program. Also concurrent with the issuance of these convertible notes, we purchased convertible note hedges at a cost of approximately $1.5 billion. The net proceeds received from the issuance of the 2011 and 2013 Convertible Notes, the repurchase of common stock and the purchase of the convertible note hedges was $440 million. Also concurrent with the issuance of the convertible notes, we sold 62.8 million warrants to acquire shares of our common stock for proceeds of $774 million, 31.3 million of which may be settled in May 2011 and 31.5 million of which may be settled in May 2013. For further information on these transactions, see "Financing arrangements" above.

During the six months ended June 30, 2006 and 2005, we repurchased 59.7 million and 38.9 million shares of our common stock, respectively, at a total cost of $4,250 million and $2,425 million, respectively. As of June 30, 2006, we had $2,289 million available for stock repurchases under our stock repurchase program authorized by the Board of Directors. The manner of purchases, amount we spend, and the number of shares repurchased will vary based on a variety of factors including the stock price and blackout periods in which we are restricted from repurchasing shares, and may include private block purchases as well as market transactions. Repurchases under our stock repurchase program reflect, in part, our confidence in the long-term value of Amgen common stock. Additionally, we believe that it is an effective way of returning cash to our stockholders.

For additional information regarding our stock repurchase program see Part II – Other Information, Item 2. Unregistered Sales of Equity Securities, Use of Proceeds and Issuer Purchases of Equity Securities.

On March 2, 2005, as a result of certain holders of the zero coupon convertible notes due in 2032 exercising their March 1, 2005 Put Option, we repurchased $1.59 billion aggregate principal amount or approximately 40% of the then outstanding convertible notes at their then-accreted value for $1,175 million in cash.

We receive cash from the exercise of employee stock options and proceeds from the sale of stock pursuant to the employee stock purchase plan. Employee stock option exercises and proceeds from the sale of stock by us pursuant to the employee stock purchase plans provided $225 million and $270 million of cash during the six months ended June 30, 2006 and 2005, respectively. Proceeds from the exercise of employee stock options will vary from period to period based upon, among other factors, fluctuations in the market value of our stock relative to the exercise price of such options.

**Item 4.    Controls and Procedures**

We maintain "disclosure controls and procedures", as such term is defined under Exchange Act Rule 13a-15(e), that are designed to ensure that information required to be disclosed in Amgen's Exchange Act reports is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to Amgen's management, including its Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. In designing and evaluating the disclosure controls and procedures, Amgen's management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives and in reaching a reasonable level of assurance Amgen's management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures. We have carried out an evaluation under the supervision and with the participation of our management, including Amgen's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Amgen's disclosure controls and procedures. Based upon their evaluation and subject to the foregoing, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of June 30, 2006.

Further, management determined that, as of June 30, 2006, there were no changes in our internal control over financial reporting that occurred during the fiscal quarter then ended that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## PART II - OTHER INFORMATION

**Item 1.    Legal Proceedings**

    Certain of our legal proceedings are reported in our Annual Report on Form 10-K for the year ended December 31, 2005, with material developments since that report described below. While it is not possible to accurately predict or determine the eventual outcome of these items, we do not believe any such items currently pending will have a material adverse effect on our consolidated financial position or liquidity, although an adverse resolution in any quarterly or annual reporting period of one or more of these items could have a material impact on the consolidated results of our operations for that period.

*Transkaryotic Therapies ("TKT") and Aventis Litigation*

    On August 3, 2006, the U.S. Court of Appeals for the Federal Circuit affirmed the Massachusetts District Court's decision that TKT and Hoechst Marion Roussel, Inc. ("HMR" – now Aventis Pharmaceuticals Inc., together with TKT, the "Defendants") infringe claims 4-9 of the '698 patent and claims 1, 3, 4, 6, and 7 of the '349 patents. The court further affirmed the validity of claims 4-9 of the '698 patent and claim 7 of the '349 patent. The court found that claims 2-4 of the '080 patent were not infringed under the doctrine of equivalents. The court vacated and remanded to the District Court for further consideration of the validity of claim 1 of the '422 patent. The August 3, 2006 decision, in conjunction with the court's prior rulings, upholds infringement by TKT of 12 claims in 3 patents owned by Amgen ('933, '698, and '422).

*Israel Bio-Engineering Project Litigation  ("IBEP")*

    On June 1, 2006, Amgen and Yeda Research and Development Co. Ltd. each filed its opposition brief with the U.S. Court of Appeals for the Federal Circuit and IBEP filed its reply brief on June 29, 2006. The parties currently await scheduling of oral argument.

*Average Wholesale Price Litigation*

    In the Multi-District Litigation (the "MDL") Proceeding, the Massachusetts District Court rescheduled the hearing date of July 20, 2006 to September 12, 2006 for plaintiffs' motion for class certification as to the Phase II defendants, which include Amgen and Immunex Corporation ("Immunex").

    *Commonwealth of Kentucky v. Alphapharma, Inc., et al.*

    On June 6, 2006, a hearing was held on defendants' (which include Amgen and Immunex) motion to dismiss before the Franklin County Circuit Court, Franklin County, Kentucky. Defendants filed answers to the complaints on July 19, 2006.

*Johnson & Johnson Matters*

    *Arbitration/Demand for Separate BLA*

    On July 12, 2006, a hearing was held on the motions for summary judgment submitted by Amgen and Ortho Biotech Products, L.P., ("Ortho Biotech") Ortho Biotech Inc., and Ortho-McNeil Pharmaceutical (wholly owned subsidiaries of Johnson & Johnson, collectively, "Ortho") before the arbitration panel. Both parties motions were denied. A final arbitration hearing has been scheduled beginning September 11, 2006.

    *Ortho Biotech Litigation*

    From June 12-15, 2006, a hearing was held on Ortho Biotech's motion for preliminary injunction in Trenton, New Jersey before the United States District Court for the District of New Jersey. By order of the Court, the parties are filing findings of fact and conclusions of law, along with the evidentiary record.

*Roche Matters*

*Amgen Inc. v. F. Hoffmann-La Roche Ltd., et al.*

On May 10, 2006, oral arguments were held before the United States District Court in Boston, Massachusetts on the motions by Ortho Biotech to intervene in the lawsuit and motions by F. Hoffman-La Roche Ltd., Roche Diagnostics GmbH, and Hoffman–La Roche, Inc. (collectively, "Roche") to dismiss the lawsuit based on a lack of subject matter jurisdiction and lack of personal jurisdiction over F. Hoffmann-La Roche Ltd. and Roche Diagnostics GmbH. On May 18, 2006, Roche withdrew its motion to dismiss based upon lack of personal jurisdiction.

*U.S. International Trade Commission*

On July 7, 2006, the Administrative Law Judge ("ALJ") at the U.S. International Trade Commission ("Commission") in Washington D.C. issued a summary determination that Roche's importation and use of pegylated recombinant human erythropoietin ("peg-EPO") in the United States to date are subject to a clinical trial exemption to patent infringement. On July 14, 2006, Amgen filed a petition requesting that the ALJ's summary determination be reviewed by the full Commission. Amgen anticipates that the Commission will make its decision whether or not to review the ALJ's decision by September 5, 2006. The Commission has made no determination with respect to the merits of Amgen's claim that Roche's future importation and sale of peg-EPO will infringe Amgen's patents. The decision does not prevent Amgen from re-filing its complaint at a later time.

*Amgen Inc., et. al. v. Ariad Pharmaceuticals, Inc.*

On June 14, 2006, Ariad Pharmaceuticals, Inc. ("Ariad") filed a motion to dismiss with the United States District Court in Delaware, which Amgen opposed on June 28, 2006.  The Court has scheduled trial to begin on February 4, 2008.

*Other*

On July 12, 2006, teams of prosecutors and police conducted separate site visits to the offices of Amgen GmbH our German affiliate in Munich, Germany and our European Logistics Center in Breda, The Netherlands and seized numerous files and computer tapes. The search warrant issued by a Munich court alleges improper payments by our German affiliate to a single hospital physician in Germany in 2001.

40

**Item 1A.**     **Risk Factors**

The following items are representative of the risks, uncertainties, and assumptions that could affect the outcome of the forward looking statements and actual results could be materially different.

*If our intellectual property positions are challenged, invalidated, circumvented or expire, or if we fail to prevail in present and future intellectual property litigation, our business could be adversely affected.*

The patent positions of pharmaceutical and biotechnology companies can be highly uncertain and often involve complex legal, scientific, and factual questions. To date, there has emerged no consistent policy regarding breadth of claims allowed in such companies' patents. Third parties may challenge, invalidate, or circumvent our patents and patent applications relating to our products, product candidates, and technologies. In addition, our patent positions might not protect us against competitors with similar products or technologies because competing products or technologies may not infringe our patents. For certain of our product candidates, there are third parties who have patents or pending patents that they may claim prevent us from commercializing these product candidates in certain territories. Patent disputes are frequent, costly, and can preclude or delay commercialization of products. We are currently, and in the future may be, involved in patent litigation. For example, F. Hoffmann-La Roche Ltd ("Roche") is developing a pegylated erythropoietin molecule that, according to Roche's public statements, they expect to bring to the U.S. market despite their acknowledgement of our U.S. erythropoietin patents. On November 8, 2005, we filed a lawsuit against Roche for patent infringement of six of our U.S. patents. This lawsuit is described in "Item 1. Legal Proceedings – Amgen Inc. v. F. Hoffmann-La Roche Ltd., et al." in our Form 10-K for the year ended December 31, 2005, and updated in Item 1. Legal Proceedings – Roche Matters" above. In addition, on April 11, 2006, we filed a complaint with the U.S. International Trade Commission (ITC) requesting that the ITC institute an investigation of Roche's importation of pegylated recombinant human erythropoietin. This matter is described in "Item 1. Legal Proceedings – Roche Matters." Further, we are currently involved in an ongoing patent infringement lawsuit against Transkaryotic Therapies, Inc. ("TKT") and Aventis with respect to our erythropoietin patents. If we lose or settle current or future litigations at certain stages or entirely, we could be: subject to competition and/or significant liabilities; required to enter into third-party licenses for the infringed product or technology; or required to cease using the technology or product in dispute. In addition, we cannot guarantee that such licenses will be available on terms acceptable to us, or at all.

Our success depends in part on our ability to obtain and defend patent rights and other intellectual property rights that are important to the commercialization of our products and product candidates. We have filed applications for a number of patents and have been granted patents or obtained rights relating to erythropoietin, natural and recombinant G-CSF, darbepoetin alfa, pegfilgrastim, etanercept, and our other products and potential products. We market our erythropoietin, recombinant G-CSF, darbepoetin alfa, pegfilgrastim, and etanercept products as EPOGEN® (Epoetin alfa), NEUPOGEN® (Filgrastim), Aranesp® (darbepoetin alfa), Neulasta® (pegfilgrastim), and Enbrel® (etanercept), respectively. Our material patents are set forth below. With respect to our material patents, we have had a number of G-CSF patent expiries in the United States and one erythropoietin patent expiry in the European Union ("EU").

41

| Product | | General Subject Matter | Expiration |
|---|---|---|---|
| **Epoetin alfa** | U.S. | — Process of making erythropoietin | 8/15/2012 |
| | | — Product claims to erythropoietin | 8/20/2013 |
| | | — Pharmaceutical compositions of erythropoietin | 8/20/2013 |
| | | — Cells that make certain levels of erythropoietin | 5/26/2015 |
| **darbepoetin alfa** | Europe(1) | — Glycosylation analogs of erythropoietin proteins | 10/12/2010 |
| | | — Glycosylation analogs of erythropoietin proteins | 8/16/2014 |
| **Filgrastim** | U.S. | — G-CSF polypeptides | 12/3/2013 |
| | | — Methods of treatment using G-CSF polypeptides | 12/10/2013 |
| | Europe(1) | — G-CSF DNA Vectors, cells, polypeptides, methods of use and production | 8/22/2006 |
| **pegfilgrastim** | U.S. | — Pegylated G-CSF | 10/20/2015 |
| | Europe(1) | — Pegylated G-CSF | 2/8/2015 |
| **Etanercept** | U.S. | — Methods of treating TNF — dependent disease | 9/5/2009 |
| | | — TNFR proteins and pharmaceutical compositions | 9/5/2009 |
| | | — TNFR DNA vectors, cells and processes for making proteins | 10/23/2012 |

(1)    In some cases these European patents may also be entitled to supplemental protection in one or more countries in Europe and the length of any such extension will vary country by country.

We also have been granted or obtained rights to patents in Europe relating to: erythropoietin; G-CSF; pegfilgrastim (pegylated G-CSF); etanercept; two relating to darbepoetin alfa; and hyperglycosylated erythropoietic proteins. Our principal European patent relating to erythropoietin expired on December 12, 2004 and our principal European patent relating to G-CSF expires on August 22, 2006. We believe that after the expiration of each of these patents, other companies could receive approval for and market follow-on or biosimilar products to compete with these products in the EU; presenting additional competition to our products. (See "——Our marketed products face substantial competition and other companies may discover, develop, acquire or commercialize products before or more successfully than we do.") While we do not market EPOGEN® in Europe as this right belongs to Johnson & Johnson (through Kirin Amgen, Inc. ("KA")), we do market Aranesp® in the EU, which competes with Johnson & Johnson's EPREX® product, Roche's Neorecormon® product, and others' erythropoietin products. Although we cannot predict with certainty when the first biosimilar products could appear on the market in the EU, we expect that biosimilar erythropoietin products may be approved in the EU in 2007 and could be available in the EU shortly after approval. In addition, based on an announcement by Shire Pharmaceuticals Group plc ("Shire"), we expect that a competing erythropoietin product, manufactured by Shire, may appear on the market in the EU in 2007. We also expect that the first biosimilar G-CSF product may be approved in the EU as early as third quarter of 2007 and that it would compete with Neulasta® and NEUPOGEN®. In 2006, the European Medicines Agency ("EMEA") developed and issued final regulatory guidelines related to the development and approval of biosimilar products. The final guidelines included clinical trial guidance for certain biosimilar products including erythropoietins and granulocyte-colony stimulating factors, which guidance recommends that applicants seeking approval of such biosimilar products conduct fairly extensive pharmacodynamic, toxicological, clinical safety studies and a pharmacovigilance program. Although, we cannot predict whether or to what extent the entry of biosimilar products would impact future Aranesp®, Neulasta® or

NEUPOGEN® sales in the EU, biosimilar or other products that effectively compete with our products could reduce sales which could have a material adverse affect on our results of operations.

*Before we commercialize and sell any of our product candidates, we must conduct clinical trials in humans; if we fail to adequately manage these trials we may not be able to sell future products and our sales could be adversely affected.*

Before we can sell any products, we must conduct clinical trials which demonstrate that our product candidates are safe and effective for use in humans for the indications sought. The results of these clinical trials are used as the basis to obtain regulatory approval from government authorities such as the U.S. Food and Drug Administration ("FDA"). Clinical trials are experiments conducted using our product candidates in human patients having the diseases or medical conditions we are trying to address. Conducting clinical trials is a complex, time-consuming and expensive process. We are required to conduct clinical trials using an appropriate number of trial sites and patients to support the product label claims we are seeking. The length of time, number of trial sites and patients required for clinical trials vary substantially according to the type, complexity, novelty and intended use of the product candidate, and therefore, we may spend as much as several years completing certain trials. Our ability to timely complete our clinical trials depends in large part on a number of key factors including regulatory approval to commence a study, reaching agreement on acceptable clinical study agreement terms, obtaining institutional review board approval to conduct a study at a prospective clinical trial site and the rate of patient enrollment in clinical trials. Patient enrollment is a function of several factors, including the size and location of the patient population, enrollment criteria and competition with other clinical trials for eligible patients. As such, there may be limited availability of patients who meet the criteria for certain clinical trials. Delays in planned clinical trials can result in increased development costs, delays in regulatory approvals and associated delays in product candidates reaching the market. Patients may also suffer adverse medical events or side effects in the course of our clinical trials that may delay or prohibit regulatory approval of our product candidates or may render the product candidate commercially infeasible. For example, as a result of observing an increased frequency of cholecystis, inflammation of the gall bladder, in patients treated with our late-stage product candidate AMG 706, we recently announced that two of our "mega-site" trials (involving 200 or more sites) associated with the AMG 706 program, specifically the Phase 3 study in first line breast cancer and first line non-small cell lung cancer, previously expected to begin in the fourth quarter of 2006, have been delayed subject to additional Phase 1 and 2 data and protocol modifications. Additionally, clinical trials must be designed based on the current standard of medical care. However in certain diseases, such as cancer, the standard of care is evolving rapidly. In these diseases, the duration of time needed to complete certain clinical trials may result in the design of such clinical trials being based on an out of date standard of medical care; limiting the utility and application of such trials. Of course, even if we successfully manage our clinical trials, we may not obtain favorable clinical trial results and may not be able to obtain regulatory approval on this basis.

The number, size, duration and complexity of our clinical trials has increased and we expect will continue to increase significantly for 2006, in particular with respect to denosumab, our late-stage investigational product for osteoporosis and metastatic bone cancer. As the number of large-scale clinical trials initiated during the rest of the year further increases, we expect to see further accelerated growth in research and development expense in 2006 as compared to 2005. For example, testing denosumab in the osteoporosis setting requires large clinical trials, substantial time and resources to recruit patients and significant expense to execute. We have begun seven and expect to begin conducting two additional "mega-site" trials in 2006 to support denosumab and our other late-stage

43

programs. To execute our clinical trial programs, we need to accelerate the growth of our development organization, implement new management structures and approaches and increase dependence on third-party contract clinical trial providers. Further, to increase the number of patients available for enrollment for our clinical trials, we are planning to open clinical sites and enroll patients in a number of new geographic locations where our experience conducting clinical trials is more limited, including Russia, China, India and some Central and South American countries. We plan to conduct clinical trial activities in these new territories with the assistance of third-party contract clinical trial providers.

If we fail to adequately manage the increasing number, size and complexity of our clinical trials, our clinical trials and corresponding regulatory approvals may be delayed or we may fail to gain approval for our product candidates altogether. If we are unable to market and sell our product candidates or are unable to obtain approvals in the timeframe needed to execute our product strategies, our business and results of operations would be adversely affected materially.

*We may not be able to develop commercial products.*

We intend to continue an aggressive research and development program. Successful product development in the biotechnology industry is highly uncertain, and very few research and development projects produce a commercial product. Product candidates that appear promising in the early phases of development, such as in early human clinical trials, may fail to reach the market for a number of reasons, such as:

- the product candidate did not demonstrate acceptable clinical trial results even though it demonstrated positive preclinical trial results

- the product candidate was not effective or more effective than currently available therapies in treating a specified condition or illness

- the product candidate had harmful side effects in humans or animals

- the necessary regulatory bodies, such as the FDA, did not approve our product candidate for an intended use

- the product candidate was not economical for us to manufacture and commercialize

- other companies or people have or may have proprietary rights to our product candidate, such as patent rights, and will not let us sell it on reasonable terms, or at all

- the product candidate is not cost effective in light of existing therapeutics

- we and certain of our licensors or partners may fail to effectively conduct clinical development or clinical manufacturing activities

Several of our product candidates have failed or been discontinued at various stages in the product development process, including, but not limited to, Brain Derived Neurotrophic Factor ("BDNF"), Megakaryocyte Growth and Development Factor ("MGDF"), and Glial Cell Lined-Derived Neurotrophic Factor ("GDNF"). For example, in 1997, we announced the failure of BDNF for the treatment of amyotrophic lateral sclerosis, or Lou Gehrig's Disease, because the product

44

candidate, when administered by injection, did not produce acceptable clinical results for a specific use after a phase 3 trial, even though BDNF had progressed successfully through preclinical and earlier clinical trials. In addition, in 1998, we discontinued development of MGDF, a novel platelet growth factor, at the phase 3 trial stage after several people in platelet donation trials developed low platelet counts and neutralizing antibodies. Also, in June 2004, we announced that the phase 2 study of GDNF for the treatment of advanced Parkinson's disease did not meet the primary study endpoint upon completion of nine months of the double-blind treatment phase of the study even though a small phase 1 pilot investigator initiated open label study over a three year period appeared to result in improvements for advanced Parkinson's disease patients. Subsequently, in the fall of 2004 we discontinued clinical development of GDNF in patients with advanced Parkinson's disease after several patients in the phase 2 study developed neutralizing antibodies and new preclinical data showed that GDNF caused irreversible damage to the area of the brain critical to movement control and coordination. On February 11, 2005, we confirmed our previous decision to halt clinical trials and, as a part of that decision and based on thorough scientific review, we also concluded that we will not provide GDNF to the 48 patients who participated in clinical trials that were terminated in the fall of 2004. Of course, there may be other factors that prevent us from marketing a product. We cannot guarantee we will be able to produce or manufacture commercially successful products. (See "—Difficulties, disruptions or delays in manufacturing or failure to comply with manufacturing regulations may limit supply of our products and limit our product sales.", "—Our current products and products in development cannot be sold if we do not maintain regulatory approval of our products and we may be required to perform additional clinical trials or change the labeling of our products if we or others identify side effects after our products are on the market." and "—Before we commercialize and sell any of our product candidates, we must conduct clinical trials in humans; if we fail to adequately manage these trials we may not be able to sell future products and our sales could be adversely affected.")

> *Our sales depend on payment and reimbursement from third-party payers, and, to the extent that reimbursement for our products is reduced, this could negatively impact the utilization of our products.*

In the United States, dialysis providers are primarily reimbursed for EPOGEN® by the federal government through the End Stage Renal Disease Program ("ESRD Program") of Medicare. The ESRD Program reimburses approved providers for 80% of allowed dialysis costs; the remainder is paid by other sources, including patients, state Medicaid programs, private insurance, and to a lesser extent, state kidney patient programs. The ESRD Program reimbursement rate is established by federal law and is monitored and implemented by the Centers for Medicare & Medicaid Services ("CMS"). Most patients receiving Aranesp®, Neulasta®, and NEUPOGEN® for approved indications are covered by both government and private payer health care programs. Since January 1, 2006, ENBREL and Sensipar® are eligible for coverage from the U.S. government under Medicare Part D. Although both ENBREL and Sensipar® have received broad formulary placement in 2006, Part D formulary placements are made by individual Part D plan sponsors with oversight by CMS and are subject to revision in the future. Generally, in Europe and other countries outside the U.S., the government sponsored healthcare system is the primary payer of healthcare costs of patients. Governments may regulate access to, prices or reimbursement levels of our products to control costs. Worldwide use of our products may be affected by these cost containment pressures and cost shifting from governments and private insurers to health care providers in response to ongoing initiatives to reduce health care expenditures. Therefore, sales of all of our principal products are dependent, in part, on the availability and extent of reimbursement from third-party payers, including governments and private insurance plans.

45

The Medicare Prescription Drug Improvement and Modernization Act (or the "Medicare Modernization Act" ("MMA")) was enacted into law in December 2003 and became effective January 1, 2005. Changes resulting from the MMA, which lowered reimbursement for our products, could negatively affect product sales of some of our marketed products. However in 2005, we believe that our product sales were not significantly impacted by the reimbursement changes resulting from the MMA. We believe this was, in part, due to the effects of CMS' oncology demonstration project (the "2005 Demonstration Project") on sales of our products used in supportive cancer care, especially Aranesp®. Furthermore, we believe this was also, in part, due to increased reimbursement rates to physicians from CMS for services associated with drug administration. The 2005 Demonstration Project, which provided financial incentives to physicians for collecting and reporting oncology patient survey data, expired on December 31, 2005. In November 2005, CMS announced a new demonstration project (the "2006 Demonstration Project") that uses different criteria for how patients with cancer are evaluated and treated and that is targeted at approximately half of the funding originally targeted for the 2005 Demonstration Project. The final rule for the 2006 Medicare Physician Fee Schedule Payment Final Rule issued in November 2005 reduced payments for physician services in 2006 by approximately 4.4% on average. Although legislation eliminated this reduction for 2006, it is uncertain whether payments for physician services will again be reduced after 2006. Because we cannot accurately predict the impact of any such changes on how, or under what circumstances, healthcare providers will prescribe or administer our products, we cannot estimate the full impact of the MMA on our business. However, we believe that it is not likely to be significant to our business in 2006.

The main components of the MMA that affect our currently marketed products are as follows:

- Through 2004, the Average Wholesale Price ("AWP") mechanism was the basis of Medicare Part B payment for covered outpatient drugs and biologics. Since January 1, 2005, in the physician clinic setting, Aranesp®, Neulasta® and NEUPOGEN® are being reimbursed under a Medicare Part B payment methodology that reimburses each product at 106% of its "average sales price" ("ASP") (sometimes referred to as "ASP+6%"). ASP is calculated by the manufacturer based on a statutorily defined formula and submitted to CMS. A product's ASP is calculated on a quarterly basis and therefore may change each quarter. The ASP in effect for a given quarter (the "Current Period") is based upon certain historical sales and sales incentive data covering a statutorily defined period of time preceding the Current Period. For example, the ASP for Aranesp® that we submit for the fourth quarter of 2006 will be based on certain historical sales and sales incentive data for Aranesp® from July 1, 2005 through June 30, 2006. CMS publishes the ASPs for products in advance of the quarter in which they go into effect. The ASPs for Aranesp® and Neulasta® trended downward during the first three quarters of 2005, began to stabilize during the fourth quarter of 2005 and have remained relatively stable in 2006.

- Per the MMA, beginning in 2006, physicians in the physician clinic setting will have the choice between purchasing and billing for specific drugs under the ASP+6% system or obtaining those drugs from vendors selected by CMS under the "competitive acquisition program" ("CAP"). Physicians who select to obtain drugs from CAP will no longer purchase or obtain reimbursement directly for such drugs under Medicare. CMS issued several rules related to CAP in 2005 and delayed implementation until July 2006. In April 2006, CMS announced that BioScrip would be the sole initial vendor for CAP. The initial physician election period occurred between

46

May 8, 2006 through June 2, 2006 and physicians who elected to participate in CAP during this timeframe began the program on July 1, 2006. CMS announced an extension of the election period to June 30, 2006 and physicians who elected to participate in CAP between June 2, 2006 and June 30, 2006 began participation on August 1, 2006 for the initial period until December 31, 2006. Based upon disclosed CAP enrollment data, we do not anticipate widespread adoption of this program initially. Although we cannot fully predict how many physicians will select to obtain drugs from CAP, we believe CAP is unlikely to have a significant impact on our business. Pursuant to the final rule, discounts to CAP vendors are excluded from the calculation of ASPs and therefore do not have the potential to impact the ASPs for our products that would be available through the CAP.

- Medicare's hospital outpatient prospective payment system ("OPPS"), which determines payment rates for specified covered outpatient drugs and biologics in the hospital outpatient setting, utilized AWP as the basis for reimbursement in 2005. CMS' 2005 reimbursement rate, as in 2003 and 2004, continued the application of an "equitable adjustment" such that the 2005 Aranesp® reimbursement rate was based on the AWP of PROCRIT®. For 2005, the reimbursement rate for Aranesp® was 83% of the AWP for PROCRIT®, down from 88% of the AWP for PROCRIT® in 2004, with a dose conversion ratio of 330 U PROCRIT® to 1 mcg Aranesp®, the same ratio as 2004. Effective January 1, 2006, the OPPS system changed from an AWP based reimbursement system to a system based on ASP. This change affects Aranesp®, Neulasta® and NEUPOGEN® when administered in the hospital outpatient setting. The OPPS rule for 2006 bases reimbursement for non-pass through products such as Aranesp®, Neulasta® and NEUPOGEN® on an ASP+6% using the same payment amounts as used in the physician clinic setting and does not apply an "equitable adjustment" to tie the reimbursement rate for Aranesp® to PROCRIT® using a dose conversion ratio. In the final rule, CMS noted that it reserves the right to apply "equitable adjustment" to the Aranesp® reimbursement rate calculation methodology in years after 2006.

- Pursuant to final rules issued by CMS on November 3, 2004, Medicare reimbursement for EPOGEN® used in the dialysis setting for calendar year 2005 changed from the previous rate in 2004 of $10 per 1,000 Units to $9.76 per 1,000 Units, in 2005, a rate based upon an average acquisition cost for 2003 determined by the Office of the Inspector General ("OIG") and adjusted for price inflation based on the Producer Price Index for pharmaceutical products. Pursuant to the CMS final rules, the difference between the 2004 reimbursement rates for all drugs separately billed outside the dialysis composite rate (including EPOGEN®) and the 2005 reimbursement rates for such drugs was added to the composite rate that dialysis providers receive for dialysis treatment. Pursuant to the Medicare Physician Fee Schedule Payment Final Rule, effective January 1, 2006, the payment mechanism for separately reimbursed dialysis drugs in both freestanding and hospital-based dialysis centers, including EPOGEN® and Aranesp®, is reimbursed by Medicare at ASP+6% using the same payment amounts used in the physician clinic setting and calculated quarterly in the same manner as described above for our products under the Medicare Part B payment methodology. CMS publishes the ASPs for products in advance of the quarter in which they go into effect. Based on this final rule, the reimbursement rate for EPOGEN®, for the first three quarters of 2006 decreased from the reimbursement rate

47

in 2005, and We expect that the reimbursement rate for the fourth quarter of 2006 will also be lower than the reimbursement rate in 2005. Because we cannot accurately predict the extent to which this reduced reimbursement will impact how, or under what circumstances, healthcare providers will prescribe or administer EPOGEN®, we cannot estimate the full impact of the reduced reimbursement rate on our EPOGEN® product sales. However, we believe that it is not likely to be significant in 2006.

- The Office of the Inspector General (OIG) released a study entitled "Medicare Reimbursement for New End Stage Renal Disease Drugs" on March 31, 2006. A section of the MMA required OIG to study "new" drugs' acquisition costs. A small fraction of providers (approximately 1 percent of all dialysis centers) were identified by the OIG as using Aranesp® for treatment of anemia in dialysis patients and were surveyed by the OIG for the study. The OIG data indicated that 99.9% of "new" drug expenditures in dialysis were for Aranesp®, so Aranesp® was the only drug studied in the report. The OIG stated that this small group of providers acquired Aranesp® at prices below the Medicare reimbursement amount, at an average of 17.5% below the dollar-weighted average Medicare reimbursement rate (ASP+6%) for 2005. The report noted that Aranesp® dialysis expenditures accounted for less than 2% ($26 million) of total Medicare reimbursement for all ESRD drugs billed by independent dialysis facilities compared to the almost $800 million reimbursed by Medicare Part B in 2005 for darbepoetin alfa provided in physician offices. The results of this report by the OIG may be taken into consideration by CMS in setting payment rates for Aranesp®, although the OIG made no specific recommendations in the report. To the extent that CMS uses this report to lower reimbursement for Aranesp®, patient access and our sales may be negatively impacted.

In addition, on November 9, 2005, CMS released a final revision to the Hematocrit Measurement Audit Program Memorandum ("HMA-PM"), a Medicare payment review mechanism used by CMS to audit EPOGEN® and Aranesp® (when used in dialysis) utilization and appropriate hematocrit outcomes of dialysis patients. The new policy, Claims Monitoring Policy: Erythropoietin/darbepoetin alfa usage for beneficiaries with end stage renal disease ("Claims Monitoring Policy"), became effective April 1, 2006. The final Claims Monitoring Policy provides that if a patient's hemoglobin is greater than 13 grams per deciliter, providers are instructed to reduce the patient's EPOGEN® and Aranesp® dose by twenty-five percent. If the provider does not reduce the patient's EPOGEN® and Aranesp® dose and there is no medical documentation to support the higher dosage, reimbursement will be reduced to the level it would have been had the provider reduced dosage by twenty-five percent. Based on our preliminary evaluation, we do not expect the new Claims Monitoring Policy to have a negative impact on EPOGEN® and Aranesp® sales and given the importance of EPOGEN® and Aranesp® for maintaining the quality of care for dialysis patients, we do not expect that the new policy will substantially impact the utilization of EPOGEN® and Aranesp®. However, we are currently in the process of further evaluating the new Claims Monitoring Policy. As a result, we cannot predict the potential full impact of this final guidance on our business.

Further, the Deficit Reduction Act of 2005 ("DRA") included provisions, which are phased in over time, regarding state collection and submission of data for the purpose of collecting Medicaid drug rebates from manufacturers for physician-administered drugs. We expect that state compliance with elements of these provisions that become effective in 2007 will increase the level of Medicaid

rebates paid by us. We are currently in the process of further evaluating the impact of the DRA, and as a result we cannot predict the potential full impact on our business.

If, and when, reimbursement rates or availability for our marketed products changes adversely or if we fail to obtain adequate reimbursement for our current or future products, health care providers may limit how much or under what circumstances they will prescribe or administer them, which could reduce the use of our products or cause us to reduce the price of our products. This could result in lower product sales, which could have a material adverse effect on us and our results of operations. For example, the use of EPOGEN® in the United States in connection with treatment for end stage renal disease is funded primarily by the U.S. federal government. In early 1997, CMS, formerly known as Healthcare Financing Administration ("HCFA"), instituted a reimbursement change for EPOGEN®, which materially and adversely affected our EPOGEN® sales until the policies were revised. Also, we believe the increasing emphasis on cost-containment initiatives in the United States, Europe, and other countries has and will continue to put pressure on the price and usage of our products, which may adversely impact product sales. Further, when a new therapeutic product is approved, the governmental and/or private coverage and reimbursement for that product is uncertain and a failure to demonstrate clear economic value associated with the use of a new therapeutic product as compared to existing therapeutic products or practices may result in inadequate or no reimbursement. We cannot predict the availability or amount of reimbursement for our approved products or product candidates, including those at a late stage of development, and current reimbursement policies for marketed products may change at any time. Sales of all our products are and will be affected by government and private payer reimbursement policies. Reduction in reimbursement for our products could have a material adverse effect on our product sales and results of operations.

*We rely on single third-party suppliers for some of our raw materials, medical devices and components; if these third-parties fail to supply these items, we may be unable to supply our products.*

Certain raw materials necessary for commercial manufacturing and formulation of our products are provided by single-source unaffiliated third-party suppliers. Also, certain medical devices and components necessary for formulation, fill, and finish of our products are provided by single-source unaffiliated third-party suppliers. Certain of these raw materials, medical devices, and components are the proprietary products of these unaffiliated third-party suppliers and, in some cases, such proprietary products are specifically cited in our drug application with the FDA so that they must be obtained from that specific sole source and could not be obtained from another supplier unless and until the FDA approved that other supplier. We would be unable to obtain these raw materials, medical devices, or components for an indeterminate period of time if these third-party single-source suppliers were to cease or interrupt production or otherwise fail to supply these materials or products to us for any reason, including:

- regulatory requirements or action by the FDA or others

- adverse financial developments at or affecting the supplier

- unexpected demand for or shortage of raw materials, medical devices or components

- labor shortages or disputes

- failure to comply with our quality standards which results in quality failures, product contamination and/or recall

These events could adversely affect our ability to satisfy demand for our products, which could adversely affect our product sales and operating results materially. For example, we have experienced shortages in certain components necessary for the formulation, fill, and finish of certain of our products in our Puerto Rico facility without impact on our ability to supply these products. However, we may experience these shortages in the future resulting in delayed shipments, supply constraints and/or stock-outs of our products.

Also, certain of the raw materials required in the commercial manufacturing and the formulation of our products are derived from biological sources, including mammalian tissues, bovine serum and human serum albumin, or HSA. We are investigating alternatives to certain biological sources as such raw materials may be subject to contamination and/or recall. Also, some countries in which we market our products may restrict the use of certain biologically derived substances in the manufacture of drugs. A material shortage, contamination, recall, and/or restriction of the use of certain biologically derived substances in the manufacture of our products could adversely impact or disrupt our commercial manufacturing of our products or could result in a mandated withdrawal of our products from the market. This could adversely affect our ability to satisfy demand for our products, which could adversely affect our product sales and operating results materially.

*Our current products and products in development cannot be sold if we do not maintain regulatory approval of our products and we may be required to perform additional clinical trials or change the labeling of our products if we or others identify side effects after our products are on the market.*

We and certain of our licensors and partners conduct research, preclinical testing, and clinical trials for our product candidates. In addition, we manufacture and contract manufacture and certain of our licensors and partners manufacture our product candidates. We also manufacture and contract manufacture, price, sell, distribute, and market or co-market our products for their approved indications. These activities are subject to extensive regulation by numerous state and federal governmental authorities in the United States, such as the FDA and CMS, as well as in foreign countries, including European countries, Canada, Australia and Japan. Currently, we are required in the United States and in foreign countries to obtain approval from those countries' regulatory authorities before we can manufacture (or have our third-party manufacturers produce), market and sell our products in those countries. The FDA and other U.S. and foreign regulatory agencies have substantial authority to terminate clinical trials, require additional testing, delay or withhold registration and marketing approval, mandate product withdrawals and require changes in labeling of our products.

In our experience, obtaining regulatory approval is costly and takes many years, and after it is obtained, remains costly to maintain. With the occurrence of a number of high profile safety events with certain pharmaceutical products such as Vioxx and Bextra, regulatory authorities, medical professionals including physicians and investigators, and the general public are increasingly concerned about potential or perceived safety issues associated with pharmaceutical and biological products. As a result, clinical trials may receive greater scrutiny with respect to safety. Any safety concerns may result in the FDA or other regulatory authorities requiring longer or additional clinical trials that may result in substantial additional expense. (See "—Before we commercialize and sell any of our product candidates, we must conduct clinical trials in humans; if we fail to adequately manage

50

these trials we may not be able to sell future products and our sales could be adversely affected.") In addition, if regulatory authorities determine that we or our licensor or partner conducting research and development activities on our behalf have not complied with regulations in the research and development of a product candidate, then they may not approve the product candidate and we will not be able to market and sell it. If we were unable to market and sell our products or product candidates, our business and results of operations would be materially and adversely affected.

Substantially all of our marketed products are currently approved in the United States and most are approved in Europe and in other foreign countries for specific uses. However, later discovery of unknown problems with our products could result in restrictions on the sale or use of such products, including potential withdrawal of the product from the market. If new medical data suggests an unacceptable safety risk or previously unidentified side-effects, we may voluntarily withdraw, or regulatory authorities may mandate the withdrawal of, such product from the market for some period or permanently. For example, we have previously conducted a voluntary wholesaler recall of a limited number of lots of ENBREL as a result of a small number of reports of missing, detached or loose rubber caps on the needle-less syringe filled with diluent liquid by a third-party contract manufacturer and packaged with the vials of ENBREL. Although there have been no observable adverse event trends associated with the reports of missing detached or loose rubber caps, we may experience the same or other problems in the future resulting in broader product recalls or adverse event trends. Further, regulatory agencies could change existing, or promulgate new, regulations at any time which may affect our ability to obtain or maintain approval of our existing or future products or require significant additional costs to obtain or maintain such approvals.

If we or others identify side effects after any of our products are on the market, or if manufacturing problems occur, regulatory approval may be withdrawn and reformulation of our products, additional clinical trials, changes in labeling of our products, and changes to or re-approvals of our manufacturing facilities may be required, any of which could have a material adverse effect on sales of the affected products and on our business and results of operations. After any of our products are approved for commercial use, we or regulatory bodies could decide, and have in the past decided, that changes to our product labeling are required. Label changes may be necessary for a number of reasons, including: the identification of actual or theoretical safety or efficacy concerns by regulatory agencies; the discovery of significant problems with a similar product that implicates an entire class of products or subsequent concerns about the sufficiency of the data or studies underlying the label. For example, the FDA instituted a class label change for the three recombinant erythropoiesis stimulating proteins (ESPs) marketed in the U.S. The label change to the class, which included EPOGEN® and Aranesp®, added information about pure red cell aplasia (PRCA) to the adverse event profile section to the three ESP product labels in the U.S. Any significant concerns raised about the safety or efficacy of our products could also result in the need to reformulate those products, to conduct additional clinical trials, to make changes to our manufacturing processes, or to seek re-approval of our manufacturing facilities. Significant concerns about the safety and effectiveness of a product could ultimately lead to the revocation of its marketing approval. The revision of product labeling or the regulatory actions described above could be required even if there is no clearly established connection between the product and the safety or efficacy concerns that have been raised. If the revision of product labeling or the regulatory actions described above resulted in decreased use of our products, it could have a material adverse effect on sales of the affected products and on our business and results of operations.

51

*Difficulties, disruptions or delays in manufacturing or failure to comply with manufacturing regulations may limit supply of our products and limit our product sales.*

We currently manufacture and market all our principal products, and we plan to manufacture and market many of our potential products. Manufacturing biologic human therapeutic products is difficult, complex and highly regulated. (See "—Our current products and products in development cannot be sold if we do not maintain regulatory approval of our products and we may be required to perform additional clinical trials or change the labeling of our products if we or others identify side effects after our products are on the market.")  We currently manufacture our products at our manufacturing facilities located in Thousand Oaks, California, Boulder and Longmont, Colorado, West Greenwich, Rhode Island and Juncos, Puerto Rico (See "—We formulate, fill, and finish substantially all our products at our Puerto Rico manufacturing facility; if significant natural disasters or production failures occur at this facility, we may not be able to supply these products."). Additionally, we currently use third-party contract manufacturers to produce ENBREL and plan to use contract manufacturers to produce a number of our late stage product candidates. (See "—We are dependent on third parties for a significant portion of our bulk supply and the formulation, fill, and finish of ENBREL")  For example, we are currently seeking FDA approval of our facility in Fremont, California that we acquired in the Abgenix transaction and a third-party contract manufacturer fill and finish facility for the manufacture of Vectibix ™ (panitumumab) (pending FDA approval). Our ability to adequately and timely manufacture and supply our products is dependent on the uninterrupted and efficient operation of our facilities which is impacted by many manufacturing variables, including:

- availability or contamination of raw materials and components used in the manufacturing process, particularly those for which we have no other source or supplier

- facility capacity

- facility contamination by microorganisms or viruses

- compliance with regulatory requirements

- changes in forecasts of future demand

- timing and actual number of production runs

- production success rates and bulk drug yields

- timing and outcome of product quality testing

If we have problems in one or more of these or other manufacturing variables, we may experience delayed shipments, supply constraints, stock-outs and/or recalls of our products. For example, in the second quarter of 2002, the prior co-marketers with respect to ENBREL experienced a brief period where no ENBREL was available to fill patient prescriptions, primarily due to variation in the expected production yield from Boehringer Ingelheim Pharma KG ("BI Pharma"). If we are at any time unable to provide an uninterrupted supply of our products to patients, we may lose patients, physicians may elect to prescribe competing therapeutics instead of our products, and sales of our products will be adversely affected, which could materially and adversely affect our product sales and results of operations.

52

We manufacture and contract manufacture, price, sell, distribute, and market or co-market our products for their approved indications. These activities are subject to extensive regulation by numerous state and federal governmental authorities in the United States, such as the FDA and CMS, as well as in foreign countries, including European countries, Canada, Australia and Japan. Although we have obtained regulatory approval for our marketed products, these products and our manufacturing processes and those of our third-party contract manufacturers must undergo a potentially lengthy FDA or other regulatory approval process are subject to continued review by the FDA and other regulatory authorities. It can take longer than five years to build and license a new manufacturing plant and it can take longer than three years to qualify a new contract manufacturer. In order to maintain adequate supply to keep up with growing demand for our products,  mitigate risks associated with the vast majority of our formulation, fill and finish operations located in Puerto Rico, and to adequately prepare to launch a number of our late-stage product candidates, we must successfully implement a number of manufacturing projects on schedule, operate our facilities at nearly full production capacity over the next few years and maintain a state of regulatory compliance. Key manufacturing projects include: 1) construction, qualification and licensure of our new plant in Ireland; 2) construction, qualification and licensure of new formulation, fill and finish facilities at our Puerto Rico site; 3) expansion of existing bulk protein facilities at our Puerto Rico site including the licensure of our Puerto Rico plant for production of Aranesp® and EPOGEN® bulk drug substance; and 4) licensure of our Fremont, California manufacturing facility and a third-party contract manufacturer fill and finish facility for the manufacture of Vectibix™ which we expect to launch before the end of 2006.

If regulatory authorities determine that we or our third-party contract manufacturers or third-party service providers have violated regulations or if they restrict, suspend, or revoke our prior approvals, they could prohibit us from manufacturing or selling our marketed products until we or our third-party contract manufacturers or third-party service providers comply, or indefinitely. Because our third-party contract manufacturers and third-party service providers are subject to FDA and foreign regulatory authorities, alternative qualified third-party contract manufacturers and service providers may not be available on a timely basis or at all. If we or our third-party contract manufacturers and third-party service providers cease or interrupt production or if our third-party contract manufacturers and third-party service providers fail to supply materials, products, or services to us for any reason, we may experience delayed shipments, supply constraints, stock-outs and/or recalls of our products. If we are unable to manufacture, market and sell our products, our business and results of operations would be materially and adversely affected.

*We formulate, fill, and finish substantially all our products at our Puerto Rico manufacturing facility; if significant natural disasters or production failures occur at this facility, we may not be able to supply these products.*

We currently perform all of the formulation, fill, and finish for EPOGEN®, Aranesp®, Neulasta® and NEUPOGEN® and some formulation, fill, and finish operations for ENBREL at our manufacturing facility in Juncos, Puerto Rico. Our global supply of these products is significantly dependent on the uninterrupted and efficient operation of this facility. Additionally, to keep up with the growing demand for our products, we are operating this facility at nearly full production capacity. A number of factors could adversely affect our formulation, fill and finish operations, including:

- power failures

- breakdown, failure or substandard performance of equipment

53

- improper installation or operation of equipment

- labor shortages or disputes

- inability of third-party suppliers to provide raw materials and components

- natural or other disasters, including hurricanes

- failures to comply with regulatory requirements, including those of the FDA

For example, this facility in Puerto Rico has experienced manufacturing component shortages and has had evidence of adverse trends in the microbial bioburden of the production environment that reduced the production output. Although these experiences in Puerto Rico have not impacted our ability to supply product in the past, the same or other problems may result in our being unable to supply these products, which could adversely affect our product sales and operating results materially. Although we have obtained limited insurance to protect against certain business interruption losses, there can be no assurance that such coverage will be adequate or that such coverage will continue to remain available on acceptable terms, if at all. The extent of the coverage of our insurance could limit our ability to mitigate for lost sales and could result in such losses adversely affecting our product sales and operating results materially.  (See "—Difficulties, disruptions or delays in manufacturing or failure to comply with manufacturing regulations may limit supply of our products and limit our product sales.")

*We are dependent on third parties for a significant portion of our bulk supply and the formulation, fill, and finish of ENBREL.*

We currently produce a substantial portion of annual ENBREL supply at our Rhode Island manufacturing facilities. However, we also depend on third parties for a significant portion of our ENBREL bulk supply as well as for some of the formulation, fill, and finish of ENBREL that we manufacture. BI Pharma is our third-party contract manufacturer of ENBREL bulk drug; accordingly, our U.S. and Canadian supply of ENBREL is currently significantly dependent on BI Pharma's production schedule for ENBREL. We would be unable to produce ENBREL in sufficient quantities to substantially offset shortages in BI Pharma's scheduled production if BI Pharma or other third-party contract manufacturers used for the formulation, fill, and finish of ENBREL bulk drug were to cease or interrupt production or services or otherwise fail to supply materials, products, or services to us for any reason, including due to labor shortages or disputes, regulatory requirements or action, or contamination of product lots or product recalls. For example, in the second quarter of 2002, the prior co-marketers with respect to ENBREL experienced a brief period where no ENBREL was available to fill patient prescriptions, primarily due to variation in the expected production yield from BI Pharma. We cannot guarantee that an alternative third-party contract manufacturer would be available on a timely basis or at all. This in turn could materially reduce our ability to satisfy demand for ENBREL, which could materially and adversely affect our operating results.

Among the factors that could affect our actual supply of ENBREL at any time include, without limitation, BI Pharma's and the Rhode Island facilities' bulk drug production scheduling. For example, BI Pharma does not produce ENBREL continuously; rather, it produces the bulk drug substance through a series of periodic campaigns throughout the year. Our Rhode Island manufacturing facilities are currently dedicated to ENBREL production. The amount of commercial inventory available to us at any time depends on a variety of factors, including the timing and actual

54

number of BI Pharma's production runs, the actual number of runs at our Rhode Island manufacturing facilities, and, for either the Rhode Island or BI Pharma facilities, the level of production yields and success rates, the timing and outcome of product quality testing, and the amount of formulation, fill, and finish capacity. We are also dependent on third-parties for some formulation, fill, and finish of ENBREL bulk drug substance manufactured at our Rhode Island facilities. If third-party formulation, fill, and finish manufacturers are unable to provide sufficient capacity or are otherwise unable to provide services to us, the supply of ENBREL could be adversely affected materially.

Under a collaboration and global supply agreement, we and Wyeth share the total worldwide supply of ENBREL produced by Amgen's Rhode Island manufacturing facilities, BI Pharma's manufacturing facility in Germany and Wyeth's manufacturing facility in Ireland. Our ENBREL supply forecasts rely on certain assumptions of how much ENBREL each of these manufacturing facilities is expected to produce. If any of these manufacturing facilities are unable to produce in accordance with our or Wyeth's expectations, the worldwide supply of ENBREL could be adversely affected materially. In such cases, we may be required to allocate supply for Wyeth's benefit. To the extent that there is a shortfall in worldwide production expectations, our supply of ENBREL could be adversely affected. Additionally, the costs associated with a shortfall or failure in production of ENBREL would be borne by both parties.

*Our marketed products face substantial competition and other companies may discover, develop, acquire or commercialize products before or more successfully than we do.*

We operate in a highly competitive environment. Our products compete with other products or treatments for diseases for which our products may be indicated. For example, ENBREL competes in certain circumstances with products marketed by Centocor, Inc., Johnson & Johnson, Abbott Laboratories, Biogen IDEC Inc., Genentech, Inc., Pfizer Inc., Novartis Corp., and Sanofi-Aventis, as well as the generic drug methotrexate, and may face competition from other potential therapies being developed. Additionally, Aranesp® competes with products marketed by Johnson & Johnson in the United States and the EU and with products marketed by Roche in the EU. Also, Aranesp® may face competition in the EU from another erythropoietin product produced by Shire in 2007. Aranesp® and EPOGEN® may also face competition from Roche's pegylated erythropoietin molecule that, according to Roche's public statements, they expect to bring to the U.S. market despite their acknowledgement of our U.S. erythropoietin patents. (See "—If our intellectual property positions are challenged, invalidated, circumvented or expire, or if we fail to prevail in present and future intellectual property litigation, our business could be adversely affected.") Further, if our currently marketed products are approved for new uses, or if we sell new products, we may face new, additional competition that we do not face today. Our products may compete against products that have lower prices, superior performance, are easier to administer, or that are otherwise competitive with our products. Our principal European patent relating to erythropoietin expired on December 12, 2004 and our principal European patent relating to G-CSF expires on August 22, 2006. We believe that after the expiration of each of these patents, other companies could receive approval for and market biosimilar products to compete with our products in the EU, presenting additional competition to our products. While we do not market EPOGEN® in Europe as this right belongs to Johnson & Johnson (through KA), we do market Aranesp® in the EU, which competes with Johnson & Johnson's EPREX® product, Roche's Neorecormon® product and others' erythropoietin products. Although, we cannot predict with certainty when the first biosimilar products could appear on the market in the EU, we believe that biosimilar erythropoietin products may be approved in the EU in 2007 and could be available in the EU shortly after approval. We also expect that the first biosimilar G-CSF product may be approved as early as third quarter of 2007 and that it would compete with Neulasta® and

55

NEUPOGEN®. In 2006, the EMEA developed and issued final regulatory guidelines related to the development and approval of biosimilar products. The final guidelines included clinical trial guidance for certain biosimilar products including erythropoietins and granulocyte-colony stimulating factors, which guidance recommends that applicants seeking approval of such biosimilar products conduct fairly extensive pharmacodynamic, toxicological, clinical safety studies and a pharmacovigilance program. We cannot predict whether or to what extent the entry of biosimilar products would impact future Aranesp®, Neulasta® or NEUPOGEN® sales in the EU. Our inability to compete effectively could reduce sales which could have a material adverse affect on our results of operations.

Certain of our competitors, including biotechnology and pharmaceutical companies, market products or are actively engaged in research and development in areas where we have products or where we are developing product candidates or new indications for existing products. In the future, we expect that our products will compete with new drugs currently in development, drugs approved for other indications that may be approved for the same indications as those of our products, and drugs approved for other indications that are used off-label.

Large pharmaceutical corporations may have greater clinical, research, regulatory, manufacturing, marketing, financial and human resources than we do. In addition, some of our competitors may have technical or competitive advantages over us for the development of technologies and processes. These resources may make it difficult for us to compete with them to successfully discover, develop, and market new products and for our current products to compete with new products or new product indications that these competitors may bring to market. Business combinations among our competitors may also increase competition and the resources available to our competitors.

*We have grown rapidly, and if we fail to adequately manage that growth our business could be adversely impacted.*

We have had an aggressive growth plan that has included substantial and increasing investments in research and development, sales and marketing, and facilities. We plan to continue to grow and our plan has a number of risks, some of which we cannot completely control. For example:

- we need to generate higher revenues to cover a higher level of operating expenses, and our ability to do so may depend on factors that we do not control

- we need to attract and retain highly qualified management, scientific, manufacturing and sales and marketing personnel, including the planned hiring of approximately 1,000 new staff into our research and development organizations and a significant number of new personnel to support our manufacturing operations in 2006

- we will need to assimilate new staff members and we will need to manage complexities associated with a larger, faster growing and geographically diverse organization

- we will need to significantly expand our clinical development resources to manage and execute increasingly global, larger and more complex clinical trials

- we will need to significantly expand our sales and marketing resources to launch a number of late-stage product candidates close in time

- we will need to accurately anticipate demand for the products we manufacture and maintain adequate manufacturing capacity for both commercial and clinical supply

- we will need to start up and operate a number of new manufacturing facilities and enter into and manage new third-party contract manufacturing arrangements, which may result in temporary inefficiencies and higher cost of goods

- we are implementing an enterprise resource planning system to support our increasingly complex business and business processes and such implementation carries substantial operations risk, including loss of data or information, unanticipated increases in costs, disruption of operations or business interruption

Of course, there may be other risks and we cannot guarantee that we will be able to successfully manage these or other risks. If we fail to manage our growth in these ways or others, such failure could result in a material adverse affect on our business and results of operations.

*Concentration of sales at certain of our wholesaler distributors and consolidation of freestanding dialysis clinic businesses may negatively impact our bargaining power and profit margins.*

The substantial majority of our product sales are made to three pharmaceutical product wholesaler distributors, AmerisourceBergen Corporation, Cardinal Health, Inc., and McKesson Corporation. These distributors, in turn, sell our products to their customers, which include clinics, dialysis centers, hospitals and pharmacies. One of these products, EPOGEN®, is primarily sold to independent freestanding dialysis clinics, which have recently experienced significant consolidation. Two of these freestanding dialysis clinics, DaVita Inc. and Fresenius Medical Care North America, Inc., account for a significant majority of all EPOGEN® sales in the freestanding dialysis clinic setting. This concentration and consolidation has increased these entities' purchasing leverage and may put pressure on our pricing by their potential ability to extract price discounts on our products or fees for other services, correspondingly negatively impacting our bargaining position and profit margins. The results of these developments may have a material adverse effect on our product sales and results of operations.

*Our marketing of ENBREL will be dependent in part upon Wyeth.*

Under a co-promotion agreement, we and Wyeth market and sell ENBREL in the United States and Canada. A management committee comprised of an equal number of representatives from us and Wyeth is responsible for overseeing the marketing and sales of ENBREL including strategic planning, the approval of an annual marketing plan, product pricing, and the establishment of a brand team. The brand team, with equal representation from us and Wyeth, prepares and implements the annual marketing plan, which includes a minimum level of financial and sales personnel commitment from each party, and is responsible for all sales activities. If Wyeth fails to market ENBREL effectively or if we and Wyeth fail to coordinate our efforts effectively, our sales of ENBREL may be adversely affected materially.

*Our business may be impacted by government investigations or litigation.*

We and certain of our subsidiaries are involved in legal proceedings relating to various patent matters, government investigations, our business operations, government requests for information, and other legal proceedings that arise from time to time in the ordinary course of our business. Matters required to be disclosed by us are set forth in "Item 3. Legal Proceedings" in Form 10-K for the year ended December 31, 2005, and are updated as required in subsequently filed Form 10-Qs. Litigation is inherently unpredictable, and the outcome can result in excessive verdicts and/or injunctive relief that affects how we operate our business. Consequently, it is possible that we could, in the future, incur judgments or enter into settlements of claims for monetary damages or change the way we operate our business, which could have a material adverse effect on our results of operations (in the case of monetary damages, in the period in which such damages are incurred).

The federal government, state governments and private payers are investigating, and many have filed actions against numerous pharmaceutical and biotechnology companies, including Amgen and Immunex Corporation, now a wholly owned subsidiary of ours, alleging that the reporting of prices for pharmaceutical products has resulted in false and overstated AWP, which in turn is alleged to have improperly inflated the reimbursement paid by Medicare beneficiaries, insurers, state Medicaid programs, medical plans and other payers to health care providers who prescribed and administered those products. A number of these actions have been brought against us and/or Immunex. Additionally, a number of states have pending investigations regarding our Medicaid drug pricing practices and the U.S. Departments of Justice and Health and Human Services have requested that Immunex produce documents relating to pricing issues. Further, certain state government entity plaintiffs in some of these AWP cases are also alleging that companies, including ours, are not reporting their "best price" to the states under the Medicaid program. These cases and investigations are described in "Item 3. Legal Proceedings - Average Wholesale Price Litigation" in Form 10-K for the year ended December 31, 2005, and are updated as required in subsequent Form 10-Qs. Other states and agencies could initiate investigations of our pricing practices. A decision adverse to our interests on these actions and/or investigations could result in substantial economic damages and could have a material adverse effect on our results of operations in the period in which such liabilities are incurred.

*We may be required to defend lawsuits or pay damages for product liability claims.*

Product liability is a major risk in testing and marketing biotechnology and pharmaceutical products. We may face substantial product liability exposure in human clinical trials and for products that we sell after regulatory approval. Product liability claims, regardless of their merits, could be costly and divert management's attention, and adversely affect our reputation and the demand for our products. Amgen and Immunex have been named as defendants in product liability actions for certain company products.

*Guidelines and recommendations published by various organizations can reduce the use of our products.*

Government agencies promulgate regulations and guidelines directly applicable to us and to our products. However, professional societies, practice management groups, private health/science foundations, and organizations involved in various diseases from time to time may also publish guidelines or recommendations to the health care and patient communities. Recommendations of government agencies or these other groups/organizations may relate to such matters as usage,

58

dosage, route of administration, and use of related therapies. Organizations like these have in the past made recommendations about our products. Recommendations or guidelines that are followed by patients and health care providers could result in decreased use of our products. For example, the Agency for Healthcare Research and Quality ("AHRQ") issued a report on May 23, 2006 on erythropoietic stimulating proteins ("ESPs") used in cancer treatment, comparing the effectiveness of Aranesp® and PROCRIT®. In its report, AHRQ concluded that there was no clinically significant difference in the two products' efficacy in the chemotherapy-induced anemia setting. Although we do not believe Aranesp®  sales will be significantly impacted by the release of this report, payers may use the report's findings to modify coverage and reimbursement for ESPs used for treatment of chemotherapy-induced anemia, including Aranesp®, and use of this product could be affected. In addition, the perception by the investment community or stockholders that recommendations or guidelines will result in decreased use of our products could adversely affect prevailing market prices for our common stock.

*Our stock price is volatile, which could adversely affect your investment.*

Our stock price, like that of other biotechnology companies, is volatile. For example, in the fifty-two weeks prior to June 30, 2006, the trading price of our common stock has ranged from a high of $86.92 per share to a low of $60.26 per share. Our stock price may be affected by a number of factors, such as:

- changes in reimbursement policies or medical practices

- adverse developments regarding the safety or efficacy of our products

- actual or anticipated clinical trial results

- actual or anticipated product supply constraints

- product development or other business announcements by us or our competitors

- regulatory matters or actions

- announcements in the scientific and research community

- intellectual property and legal matters

- broader economic, industry and market trends unrelated to our performance

In addition, if our revenues, earnings or other financial results in any period fail to meet the investment community's expectations, there could be an immediate adverse impact on our stock price.

*Our corporate compliance program cannot guarantee that we are in compliance with all potentially applicable U.S. federal and state regulations and all potentially applicable foreign regulations.*

The development, manufacturing, distribution, pricing, sales, marketing, and reimbursement of our products, together with our general operations, is subject to extensive federal and state

regulation in the United States and to extensive regulation in foreign countries. (See "—Our current products and products in development cannot be sold if we do not maintain regulatory approval of our products and we may be required to perform additional clinical trials or change the labeling of our products if we or others identify side effects after our products are on the market." and "—Difficulties, disruptions or delays in manufacturing or failure to comply with manufacturing regulations may limit supply of our products and limit our product sales.") While we have developed and instituted a corporate compliance program based on what we believe to be current best practices, we cannot assure you that we or our employees are or will be in compliance with all potentially applicable U.S. federal and state regulations and/or laws or all potentially applicable foreign regulations and/or laws. If we fail to comply with any of these regulations and/or laws a range of actions could result, including, but not limited to, the termination of clinical trials, the failure to approve a product candidate, restrictions on our products or manufacturing processes, including withdrawal of our products from the market, significant fines, exclusion from government healthcare programs, or other sanctions or litigation.

*Our revenues may fluctuate, and this fluctuation could cause financial results to be below expectations.*

Our operating results may fluctuate from period to period for a number of reasons. In budgeting our operating expenses for the foreseeable future, we assume that revenues will continue to grow; however, some of our operating expenses are fixed in the short term. Because of this, even a relatively small revenue shortfall may cause a period's results to be below our expectations or projections. A revenue shortfall could arise from any number of factors, some of which we cannot control. For example, we may face:

- changes in the government's or private payers' reimbursement policies for our products

- inability to maintain regulatory approval of marketed products or manufacturing facilities

- changes in our product pricing strategies

- lower than expected demand for our products

- inability to provide adequate supply of our products

- changes in wholesaler buying patterns

- increased competition from new or existing products

- fluctuations in foreign currency exchange rates

Of course, there may be other factors that affect our revenues in any given period. Similarly if investors or the investment community are uncertain about our financial performance for a given period, our stock price could also be adversely impacted.

60

*We may not realize all of the anticipated benefits of our merger with Abgenix, Inc.*

On April 1, 2006, we completed our acquisition of Abgenix for approximately $2.1 billion in cash plus the assumption of debt. The acquisition provides us with full ownership of Vectibix ™ and eliminates a tiered royalty on denosumab, two of our most important advanced pipeline products, as well as provides us with Abgenix's manufacturing plant. The success of the merger will depend, in part, on our ability to realize the anticipated growth opportunities from integrating the businesses. In particular, this will require the successful regulatory approval and commercial launch of panitumumab along with production of panitumumab at Abgenix's manufacturing plant. The integration of two independent companies is a complex, costly, and time-consuming process. We cannot assure you that the integration of Abgenix with us will result in the realization of the full post-merger benefits anticipated by us.

*Continual manufacturing process improvement efforts may result in the carrying value of certain existing manufacturing facilities or other assets becoming impaired.*

In connection with our ongoing process improvement activities associated with products we manufacture, we continually invest in our various manufacturing practices and related processes with the objective of increasing production yields and success rates to gain increased cost efficiencies and capacity utilization. Depending on the timing and outcomes of these efforts and our other estimates and assumptions regarding future product sales, the carrying value of certain manufacturing facilities or other assets may not be fully recoverable and could result in the recognition of an impairment in the carrying value at the time that such effects are identified. The potential recognition of impairment in the carrying value, if any, could have a material and adverse affect on our results of operations.

**Item 2.    Unregistered Sales of Equity Securities, Use of Proceeds and Issuer Purchases of Equity Securities**

During the three months ended June 30, 2006, we had one outstanding stock repurchase program. The manner of purchases, the amount we spend and the number of shares repurchased will vary based on a variety of factors including the stock price and blackout periods in which we are restricted from repurchasing shares and may include private block purchases as well as market transactions. Repurchases under our stock repurchase program reflect, in part, our confidence in the long-term value of Amgen common stock. Additionally, we believe that it is an effective way of returning cash to our stockholders. A summary of our repurchase activity for the three months ended June 30, 2006 is as follows:

| | Total Number of Shares Purchased | | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Programs | Maximum $ Value that May Yet Be Purchased Under the Programs (1) | |
|---|---|---|---|---|---|---|
| April 1 - April 30 | 2,770,788 | $ | 67.01 | 2,767,000 | $ | 2,979,655,946 |
| May 1 - May 31 | 8,983,155 | | 67.59 | 8,961,700 | | 2,373,958,099 |
| June 1 - June 30 | 1,240,205 | | 68.38 | 1,239,500 | | 2,289,207,393 |
| **Total** | 12,994,148(**2**) | $ | 67.54 | 12,968,200(**2**) | | |

(1)  In December 2005, the Board authorized us to repurchase up to $5.0 billion of common stock.
(2)  The difference between total number of shares purchased and the total number of shares purchased as part of publicly announced programs is due to repurchases of common stock from certain employees in connection with their exercise of stock options issued prior to June 23, 1998 as well as shares of common stock withheld by us for the payment of taxes upon vesting of certain employees' restricted stock.

## Item 4. Submission of Matters to a Vote of Security Holders

(a)      The Company held its Annual Meeting of Stockholders on May 10, 2006.

(b)      Omitted pursuant to Instruction 3 to Item 4 of Form 10-Q.

(c)      The three items voted upon at the meeting were: (i) to elect four directors to a three-year term of office expiring at the 2009 Annual Meeting of Stockholders ("Item One"); (ii) to ratify the selection of Ernst & Young LLP as the independent registered public accounting firm for the Company for the year ending December 31, 2006 ("Item Two"); and (iii) the Stockholder Proposals ("Item Three"):
(A) Stockholder Proposal #1 relating to stock retention by senior executives
(B) Stockholder Proposal # 2 relating to executive compensation
(C) Stockholder Proposal # 3 relating to shareholders rights plans
(D) Stockholder Proposal #4 relating to animal welfare policy
(E) Stockholder Proposal #5 relating to majority elections
(F) Stockholder Proposal #6 relating to corporate political contributions.

The voting was as follows:

|  | In Favor | Against ("Withheld" for purposes of Item One) | Abstain | Broker Non-Votes |
|---|---|---|---|---|
| **Item One** | | | | |
| Frederick W. Gluck | 969,066,888 | 44,164,128 | 0 | 0 |
| J. Paul Reason | 997,075,515 | 16,155,501 | 0 | 0 |
| Donald B. Rice | 962,226,736 | 51,004,280 | 0 | 0 |
| Leonard D. Schaeffer | 997,663,865 | 15,567,151 | 0 | 0 |
| | | | | |
| **Item Two** | 986,763,699 | 5,728,453 | 7,588,378 | 13,150,486 |
| | | | | |
| **Item Three** | | | | |
| Stockholder Proposal #1 | 264,597,349 | 493,137,254 | 27,286,820 | 228,209,593 |
| Stockholder Proposal #2 | 70,924,122 | 655,126,297 | 62,123,916 | 225,056,681 |
| Stockholder Proposal #3 | 615,606,033 | 161,515,439 | 11,054,186 | 225,055,358 |
| Stockholder Proposal #4 | 57,690,021 | 631,411,401 | 99,079,540 | 225,050,054 |
| Stockholder Proposal #5 | 365,824,620 | 408,694,741 | 13,662,222 | 225,049,433 |
| Stockholder Proposal #6 | 528,107,747 | 171,119,517 | 87,749,589 | 226,254,163 |

All nominees for the Board of Directors were declared to have been elected as directors to hold office until the 2009 Annual Meeting of Stockholders. Item Two was declared to

have been approved. Stockholder Proposals #s 3 and 6 were declared to have been approved. Stockholder Proposals #s 1, 2, 4 and 5 were declared to have not been approved.

(d)     Not applicable.

**Item 6.     Exhibits**

(a)     *Reference is made to the Index to Exhibits included herein.*

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this Quarterly Report to be signed on its behalf by the undersigned, thereunto duly authorized.

<table>
<tr><td></td><td></td><td>Amgen Inc.</td></tr>
<tr><td></td><td></td><td>(Registrant)</td></tr>
</table>

Date:    August 8, 2006                    By:          /s/ RICHARD D. NANULA

Richard D. Nanula
Executive Vice President
and Chief Financial Officer

64

**AMGEN INC.**

**INDEX TO EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 3.1 | Restated Certificate of Incorporation (As Restated December 6, 2005). (Filed as an exhibit to Form 10-K for the year ended December 31, 2005 on March 10, 2006 and incorporated herein by reference.) |
| 3.2 | Amended and Restated Bylaws of Amgen Inc. (As Amended and Restated May 10, 2006). (Filed as an exhibit to Form 8-K dated March 13, 2006 and incorporated herein by reference.) |
| 4.1 | Form of stock certificate for the common stock, par value $.0001 of the Company. (Filed as an exhibit to the Form 10-Q for the quarter ended March 31, 1997 on May 13, 1997 and incorporated herein by reference.) |
| 4.2 | Form of Indenture, dated January 1, 1992, between Amgen Inc. and Citibank N.A. (Filed as an exhibit to Form S-3 Registration Statement dated and filed on December 19, 1991 and incorporated herein by reference.) |
| 4.3 | 6.50% Notes Due December 1, 2007. (Filed as an exhibit to the Form 8-K Current Report dated and filed on December 5, 1997 and incorporated herein by reference.) |
| 4.4 | First Supplemental Indenture, dated February 26, 1997, between Amgen Inc. and Citibank, N.A. (Filed as an exhibit to the Form 8-K Current Report dated March 14, 1997 on March 14, 1997 and incorporated herein by reference.) |
| 4.5 | Officer's Certificate, dated as of January 1, 1992, as supplemented by the First Supplemental Indenture, dated as of February 26, 1997, each between Amgen Inc. and Citibank, N.A., establishing a series of securities entitled "6.50% Notes Due December 1, 2007" (Filed as an exhibit to the Form 8-K Current Report dated and filed on December 5, 1997 and incorporated herein by reference.) |
| 4.6 | 8-1/8% Debentures due April 1, 2097. (Filed as an exhibit to the Form 8-K Current Report dated and filed on April 8, 1997 and incorporated herein by reference.) |
| 4.7 | Officer's Certificate, dated as of January 1, 1992, as supplemented by the First Supplemental Indenture, dated as of February 26, 1997, each between Amgen Inc. and Citibank, N.A., establishing a series of securities entitled "8 1/8% Debentures due April 1, 2097." (Filed as an exhibit to the Form 8-K Current Report dated and filed on April 8, 1997 and incorporated herein by reference.) |
| 4.8 | Form of Liquid Yield Option™ Note due 2032. (Filed as an exhibit to the Form 8-K Current Report dated February 21, 2002 on March 1, 2002 and incorporated herein by reference.) |
| 4.9 | Indenture, dated as of March 1, 2002, between Amgen Inc. and LaSalle Bank National Association. (Filed as an exhibit to the Form 8-K Current Report dated February 21, 2002 on March 1, 2002 and incorporated herein by reference.) |
| 4.10 | First Supplemental Indenture, dated March 2, 2005, between Amgen Inc. and LaSalle Bank National Association. (Filed as an exhibit to Form 8-K dated and filed on March 4, 2005 and incorporated herein by reference.) |
| 4.11 | Registration Rights Agreement, dated as of March 1, 2002, between Amgen Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated. (Filed as an exhibit to the Form 8-K Current Report dated February 21, 2002 on March 1, 2002 and incorporated herein by reference.) |
| 4.12 | Indenture, dated as of August 4, 2003, between Amgen Inc. and JPMorgan Chase Bank. |

(Filed as an exhibit to Form S-3 Registration Statement dated and filed on August 4, 2003 and incorporated herein by reference.)

4.13    Form of 4.00% Senior Note due 2009. (Filed as an exhibit to Form 8-K dated November 15, 2004 on November 19, 2004 and incorporated herein by reference.)

4.14    Form of 4.85% Senior Notes due 2014. (Filed as an exhibit to Form 8-K dated November 15, 2004 on November 19, 2004 and incorporated herein by reference.)

4.15    Officers' Certificate, dated November 18, 2004, including forms of the 4.00% Senior Notes due 2009 and 4.85% Senior Notes due 2014. (Filed as an exhibit to Form 8-K dated November 15, 2004 on November 19, 2004 and incorporated herein by reference.)

4.16    Registration Rights Agreement, dated as of November 18, 2004, among Amgen Inc. and Morgan Stanley & Co. Incorporated and Merrill Lynch, Pierce, Fenner & Smith Incorporated. (Filed as an exhibit to Form 8-K dated November 15, 2004 on November 19, 2004 and incorporated herein by reference.)

4.17    Form of Zero Coupon Convertible Note due 2032. (Filed as Exhibit A to an exhibit to Form 8-K dated and filed on May 6, 2005 and incorporated herein by reference.)

4.18    Indenture, dated as of May 6, 2005, between Amgen Inc. and LaSalle Bank National Association. (Filed as an exhibit to Form 8-K dated and filed on May 6, 2005 and incorporated herein by reference.)

4.19*    Indenture, dated as of February 17, 2006 and First Supplemental Indenture, dated as of June 8, 2006, between Amgen Inc. and JPMorgan Chase Bank, N.A, as trustee (including form of 0.125% Convertible Senior Note due 2011).

4.20*    Indenture, dated as of February 17, 2006 and First Supplemental Indenture, dated as of June 8, 2006 between Amgen Inc. and JPMorgan Chase Bank, N.A., as trustee (including form of 0.375% Convertible Senior Note due 2013).

4.21    Registration Rights Agreement, dated as of February 17, 2006, among Amgen Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley & Co. Incorporated, Citigroup Global Markets Inc., JPMorgan Securities Inc., Lehman Brothers Inc., Bear, Stearns & Co. Inc., Credit Suisse Securities (USA) LLC. (Filed as an exhibit to Form 8-K dated and filed on February 21, 2006 and incorporated herein by reference.)

4.22    Corporate Commercial Paper - Master Note between and among Amgen Inc., as Issuer, Cede & Co., as Nominee of The Depository Trust Company, and Citibank, N.A., as Paying Agent. (Filed as an exhibit to the Form 10-Q for the quarter ended March 31, 1998 on May 13, 1998 and incorporated herein by reference.)

4.23    The instruments defining the rights of holders of the long-term debt securities of Abgenix, Inc. and its subsidiaries are omitted pursuant to section (b)(4)(iii)(A) of Item 601 of Regulation S-K. Amgen Inc. hereby agrees to furnish copies of these instruments to the Securities and Exchange Commission upon request.

10.1+    Amended and Restated 1991 Equity Incentive Plan (As Amended and Restated December 5, 2005). (Filed as an exhibit to Form 8-K dated and filed on December 8, 2005 and incorporated herein by reference.)

10.2+    Forms of Stock Option Grant Agreements and Restricted Stock Unit Agreements for the Amended and Restated 1991 Equity Incentive Plan (As Amended and Restated December 5, 2005). (Filed as an exhibit to Form 8-K dated and filed on December 8, 2005 and incorporated herein by reference.)

10.3+    Amgen Inc. Director Equity Incentive Program (As Amended and Restated December 6, 2005). (Filed as an exhibit to Form 8-K dated and filed on December 8, 2005 and incorporated herein by reference.)

10.4+    Forms of Stock Option Grant Agreements and Restricted Stock Unit Agreements for the Amgen Inc. Director Equity Incentive Plan. (Filed as an exhibit to Form 8-K dated and filed on December 8, 2005 and incorporated herein by reference.)

66

10.5+    Amgen Inc. Amended and Restated 1997 Equity Incentive Plan (As Amended and Restated December 5, 2005). (Filed as an exhibit to Form 8-K dated and filed on December 8, 2005 and incorporated herein by reference.)

10.6+    Forms of Stock Option Grant Agreements and Restricted Stock Unit Agreements for the 1997 Equity Incentive Plan (As Amended and Restated December 5, 2005). (Filed as an exhibit to Form 8-K dated and filed on December 8, 2005 and incorporated herein by reference.)

10.7+    Amended and Restated 1999 Equity Incentive Plan (As Amended and Restated of December 5, 2005). (Filed as an exhibit to Form 8-K dated and filed on December 8, 2005 and incorporated herein by reference.)

10.8+    Forms of Stock Option Grant Agreements for 1999 Equity Incentive Plan (As Amended and Restated December 5, 2005). (Filed as an exhibit to Form 8-K dated and filed on December 8, 2005 and incorporated herein by reference.)

10.9+    Amgen Inc. Amended and Restated Employee Stock Purchase Plan. (Filed as an exhibit to the Form 10-Q for the quarter ended June 30, 2000 on August 1, 2000 and incorporated herein by reference.)

10.10+    First Amendment to the Amgen Inc. Amended and Restated Employee Stock Purchase Plan (As Amended and Restated July 12, 2005). (Filed as an exhibit to Form 8-K dated July 12, 2005 on July 14, 2005 and incorporated herein by reference.)

10.11+    Amgen Retirement and Savings Plan (As Amended and Restated effective January 1, 2006). (Filed as an exhibit to Form 8-K dated October 19, 2005 on October 20, 2005 and incorporated herein by reference.)

10.12+    First Amendment to the Amgen Retirement and Savings Plan (As Amended and Restated January 1, 2006). (Filed as an exhibit to Form 8-K dated and filed on May 16, 2006 and incorporated herein by reference.)

10.13+    Second Amendment to the Amgen Retirement and Savings Plan (As Amended and Restated January 1, 2006). (Filed as an exhibit to Form 8-K dated and filed on July 14, 2006 and incorporated herein by reference.)

10.14+    Amgen Supplemental Retirement Plan (As Amended and Restated January 1, 2005). (Filed as an exhibit to the Form 8-K Current Report dated October 7, 2004 on October 12, 2004 and incorporated herein by reference.)

10.15+    First Amendment to the Amgen Supplemental Retirement Plan (As Amended and Restated January 1, 2005). (Filed as an exhibit to Form 8-K dated October 19, 2005 on October 20, 2005 and incorporated herein by reference.)

10.16+    Second Amendment to the Amgen Supplemental Retirement Plan (As Amended and Restated July 1, 2006). (Filed as an exhibit to Form 8-K dated and filed on May 16, 2006 and incorporated herein by reference.)

10.17+    Amgen Inc. Change of Control Severance Plan. (Filed as an exhibit to the Annual Report on Form 10-K for the year ended December 31, 1998 on March 16, 1999 and incorporated herein by reference.)

10.18+    First Amendment to Amgen Inc. Change of Control Severance Plan (As Amended May 10, 2000). (Filed as an exhibit to the Form 10-Q for the quarter ended June 30, 2000 on August 1, 2000 and incorporated herein by reference.)

10.19+    Second Amendment to the Amgen Inc. Change in Control Severance Plan (As Amended October 16, 2001). (Filed as an exhibit to the Form 10-Q for the quarter ended September 30, 2001 on October 26, 2001 and incorporated herein by reference.)

10.20+    Third Amendment to the Amgen Inc. Change of Control Severance Plan (As Amended January 1 2004). (Filed as an exhibit to Form 10-K for the year ended December 31, 2004 on March 9, 2005 and incorporated herein by reference.)

10.21+    Fourth Amendment to the Amgen Inc. Change of Control Severance Plan (As Amended

67

June 1, 2004). (Filed as an exhibit to Form 10-K for the year ended December 31, 2004 on March 9, 2005 and incorporated herein by reference.)

| 10.22+ | Fifth Amendment to the Amgen Inc. Change of Control Severance Plan (As Amended December 6, 2004). (Filed as an exhibit to Form 8-K dated and filed on December 9, 2004 and incorporated herein by reference.) |
|---|---|
| 10.23+ | Sixth Amendment to the Amgen Inc. Change of Control Severance Plan (As Amended May 10, 2006). (Filed as an exhibit to Form 8-K dated and filed on May 16, 2006 and incorporated herein by reference.) |
| 10.24+ | Amgen Inc. Executive Incentive Plan. (Filed as Annex G to Amendment No. 1 to the Form S-4 Registration Statement dated and filed on March 22, 2002 and incorporated herein by reference.) |
| 10.25+ | First Amendment to the Amgen Inc. Executive Incentive Plan (As Amended December 6, 2004). (Filed as an exhibit to Form 8-K dated and filed on December 9, 2004 and incorporated herein by reference.) |
| 10.26+ | Amgen Inc. Executive Nonqualified Retirement Plan. (Filed as an exhibit to the Annual Report on Form 10-K for the year ended December 31, 2001 on February 26, 2002 and incorporated herein by reference.) |
| 10.27+ | Amgen Nonqualified Deferred Compensation Plan (As Amended and Restated effective January 1, 2005). (Filed as an exhibit to the Form 8-K Current Report dated October 5, 2004 on October 12, 2004 and incorporated herein by reference.) |
| 10.28+ | First Amendment to the Amgen Nonqualified Deferred Compensation Plan (As Amended January 1, 2005). (Filed as an exhibit to Form 8-K dated October 19, 2005 on October 20, 2005 and incorporated herein by reference.) |
| 10.29+ | Amended and Restated Amgen Inc. Performance Award Program (As Amended and Restated December 5, 2005). (Filed as an exhibit to Form 8-K dated and filed on December 8, 2005 and incorporated herein by reference.) |
| 10.30+ | Form of Performance Unit Agreement to the Amended and Restated Amgen Inc. Performance Award Program (As Amended and Restated December 5, 2005). (Filed as an exhibit to Form 8-K dated and filed on December 8, 2005 and incorporated herein by reference.) |
| 10.31+ | Amgen Inc. Amended and Restated 1987 Directors' Stock Option Plan. (Filed as an exhibit to the Annual Report on Form 10-K for the year ended December 31, 1996 on March 24, 1997 and incorporated herein by reference.) |
| 10.32+ | 2002 Special Severance Pay Plan for Amgen Employees. (Filed as an exhibit to the Form 10-Q for the quarter ended June 30, 2002 on August 13, 2002 and incorporated herein by reference.) |
| 10.33+ | Agreement, dated March 2, 2001, between Amgen Inc. and Mr. George J. Morrow. (Filed as an exhibit to the Form 10-Q for the quarter ended March 31, 2001 on May 14, 2001 and incorporated herein by reference.) |
| 10.34+ | Agreement, dated March 2, 2001 between Amgen Inc. and Dr. Roger M. Perlmutter, M.D., Ph.D. (Filed as an exhibit to the Form 10-Q for the quarter ended March 31, 2001 on May 14, 2001 and incorporated herein by reference.) |
| 10.35+ | Promissory Note, dated June 29, 2001, of Dr. Roger M. Perlmutter. (Filed as an exhibit to the Form 10-Q for the quarter ended June 30, 2001 on July 27, 2001 and incorporated herein by reference.) |
| 10.36+ | Agreement, dated May 2, 2001, between Amgen Inc. and Mr. Brian McNamee. (Filed as an exhibit to the Form 10-Q for the quarter ended June 30, 2001 on July 27, 2001 and incorporated herein by reference.) |
| 10.37+ | Restricted Stock Purchase Agreement, dated March 3, 2003, between Amgen Inc. and Brian M. McNamee. (Filed as an exhibit to the Form 10-Q for the quarter ended June 30, |

2003 on July 30, 2003 and incorporated herein by reference.)

10.38+   Agreement, dated May 14, 2001, between Amgen Inc. and Mr. Richard Nanula. (Filed as an exhibit to the Form 10-Q for the quarter ended June 30, 2001 on July 27, 2001 and incorporated herein by reference.)

10.39+   Promissory Note, dated June 27, 2001, of Mr. Richard Nanula. (Filed as an exhibit to the Form 10-Q for the quarter ended June 30, 2001 on July 27, 2001 and incorporated herein by reference.)

10.40+   Agreement, dated February 11, 2004, between Amgen Inc. and David J. Scott. (Filed as an exhibit to the Annual Report on Form 10-K for the year ended December 31, 2003 on March 11, 2004 and incorporated herein by reference.)

10.41+   Restricted Stock Purchase Agreement, dated December 6, 2004, between Amgen Inc. and Dennis M. Fenton. (Filed as an exhibit to Form 10-K for the year ended December 31, 2005 on March 10, 2006 and incorporated herein by reference.)

10.42+   Amgen Inc. Amended and Restated 1996 Incentive Stock Plan (As Amended and Restated April 1, 2006). (Filed as an exhibit to Form S-8 dated and filed on April 3, 2006 and incorporated herein by reference.)

10.43+   Amgen Inc. Amended and Restated 1999 Incentive Stock Plan (As Amended and Restated April 1, 2006). (Filed as an exhibit to Form S-8 dated and filed on April 3, 2006 and incorporated herein by reference.)

10.44   Product License Agreement, dated September 30, 1985, and Technology License Agreement, dated, September 30, 1985 between Amgen and Ortho Pharmaceutical Corporation. (Filed as an exhibit to the Form 10-Q for the quarter ended June 30, 2000 on August 1, 2000 and incorporated herein by reference.)

10.45   Shareholders' Agreement, dated May 11, 1984, among Amgen, Kirin Brewery Company, Limited and Kirin-Amgen, Inc. (Filed as an exhibit to the Annual Report on Form 10-K for the year ended December 31, 2000 on March 7, 2001 and incorporated herein by reference.)

10.46   Amendment No. 1 dated March 19, 1985, Amendment No. 2 dated July 29, 1985 (effective July 1, 1985), and Amendment No. 3, dated December 19, 1985, to the Shareholders' Agreement dated May 11, 1984. (Filed as an exhibit to the Form 10-Q for the quarter ended June 30, 2000 on August 1, 2000 and incorporated herein by reference.)

10.47   Amendment No. 4 dated October 16, 1986 (effective July 1, 1986), Amendment No. 5 dated December 6, 1986 (effective July 1, 1986), Amendment No. 6 dated June 1, 1987, Amendment No. 7 dated July 17, 1987 (effective April 1, 1987), Amendment No. 8 dated May 28, 1993 (effective November 13, 1990), Amendment No. 9 dated December 9, 1994 (effective June 14, 1994), Amendment No. 10 effective March 1, 1996, and Amendment No. 11 effective March 20, 2000 to the Shareholders' Agreement, dated May 11, 1984. (Filed as exhibits to the Annual Report on Form 10-K for the year ended December 31, 2000 on March 7, 2001 and incorporated herein by reference.)

10.48   Amendment No. 12 to the Shareholders' Agreement, dated January 31, 2001. (Filed as an exhibit to Form 10-Q for the quarter ended June 30, 2005 on August 8, 2005 and incorporated herein by reference.)

10.49   Product License Agreement, dated September 30, 1985, and Technology License Agreement, dated September 30, 1985, between Kirin-Amgen, Inc. and Ortho Pharmaceutical Corporation. (Filed as an exhibit to the Form 10-Q for the quarter ended June 30, 2000 on August 1, 2000 and incorporated herein by reference.)

10.50   Research, Development Technology Disclosure and License Agreement: PPO, dated January 20, 1986, by and between Kirin Brewery Co., Ltd. and Amgen Inc. (Filed as an exhibit to Amendment No. 1 to Form S-1 Registration Statement (Registration No. 33-3069) dated March 10, 1986 on March 11, 1986 and incorporated herein by reference.)

| 10.51 | Amendment Agreement, dated June 30, 1988, to Research, Development, Technology Disclosure and License Agreement: GM-CSF dated March 31, 1987, between Kirin Brewery Company, Limited and Amgen Inc. (Filed as an exhibit to Form 8 amending the Quarterly Report on Form 10-Q for the quarter ended June 30, 1988 on August 25, 1988 and incorporated herein by reference.) |
|---|---|
| 10.52 | Assignment and License Agreement, dated October 16, 1986 (effective July 1, 1986, between Amgen and Kirin-Amgen, Inc. (Filed as an exhibit to the Annual Report on Form 10-K for the year ended December 31, 2000 on March 7, 2001 and incorporated herein by reference.) |
| 10.53 | G-CSF United States License Agreement, dated June 1, 1987 (effective July 1, 1986), Amendment No. 1, dated October 20, 1988, and Amendment No. 2, dated October 17, 1991 (effective November 13, 1990), between Kirin-Amgen, Inc. and Amgen Inc. (Filed as exhibits to the Annual Report on Form 10-K for the year ended December 31, 2000 on March 7, 2001 and incorporated herein by reference.) |
| 10.54 | G-CSF European License Agreement, dated December 30, 1986, between Kirin-Amgen and Amgen, Amendment No. 1 to Kirin-Amgen, Inc. / Amgen G-CSF European License Agreement, dated June 1, 1987, Amendment No. 2 to Kirin-Amgen, Inc. / Amgen G-CSF European License Agreement, dated March 15, 1998, Amendment No. 3 to Kirin-Amgen, Inc. / Amgen G-CSF European License Agreement, dated October 20, 1988, and Amendment No. 4 to Kirin-Amgen, Inc. / Amgen G-CSF European License Agreement, dated December 29, 1989, between Kirin-Amgen, Inc. and Amgen Inc. (Filed as exhibits to the Annual Report on Form 10-K for the year ended December 31, 2000 on March 7, 2001 and incorporated herein by reference.) |
| 10.55 | ENBREL® Supply Agreement among Immunex Corporation, American Home Products Corporation and Boehringer Ingelheim Pharma KG, dated as of November 5, 1998 (with certain confidential information deleted therefrom). (Filed as an exhibit to the Immunex Corporation Annual Report on Form 10-K of for the year ended December 31, 1998.) |
| 10.56 | Amendment No. 1 to the ENBREL® Supply Agreement, dated June 27, 2000, among Immunex Corporation, American Home Products Corporation and Boehringer Ingelheim Pharma KG, (with certain confidential information deleted therefrom). (Filed as an exhibit to the Immunex Corporation Form 10-Q for the quarter ended June 30, 2000 on August 11, 2000 and incorporated herein by reference.) |
| 10.57 | Amendment No. 2 to the ENBREL® Supply Agreement, dated June 3, 2002, among Immunex Corporation, Wyeth (formerly known as American Home Products Corporation) and Boehringer Ingelheim Pharma KG (with certain confidential information deleted therefrom). (Filed as an exhibit to the Form 10-Q for the quarter ended June 30, 2002 on August 13, 2002 and incorporated herein by reference.) |
| 10.58 | Amendment No. 3 to the ENBREL® Supply Agreement, dated December 18, 2002, among Immunex Corporation, Wyeth (formerly, "American Home Products Corporation") and Boehringer Ingelheim Pharma KG (with certain confidential information deleted therefrom). (Filed as an exhibit to the Form 10-K for the year ended December 31, 2002 on March 10, 2003 and incorporated herein by reference.) |
| 10.59 | Amendment No. 4 to the ENBREL® Supply Agreement, dated May 21, 2004, among Immunex Corporation, Wyeth (formerly, "American Home Products Corporation") and Boehringer Ingelheim Pharma KG. (Filed as an exhibit to Form 10-Q for the quarter ended June 30, 2005 on August 8, 2005 and incorporated herein by reference.) |
| 10.60 | Amendment No. 5 to the ENBREL® Supply Agreement, dated August 30, 2005, among Immunex Corporation, Wyeth (formerly, "American Home Products Corporation") and Boehringer Ingelheim Pharma KG. (Filed as an exhibit to Form 10-Q for the quarter ended September 30, 2005 on November 9, 2005 and incorporated herein by reference.) |

10.61    Agreement Regarding Governance and Commercial Matters, dated December 16, 2001, by and among American Home Products Corporation, American Cyanamid Company and Amgen Inc. (with certain confidential information deleted therefrom). (Filed as an exhibit to Amendment No. 1 to the Form S-4 Registration Statement dated and filed on March 22, 2002 and incorporated herein by reference.)

10.62    Asset Purchase Agreement dated May 2, 2002, by and between Immunex Corporation and Schering Aktiengesellschaft (with certain confidential information deleted therefrom). (Filed as an exhibit to the Form 10-Q for the quarter ended June 30, 2002 on August 13, 2002 and incorporated herein by reference.)

10.63    Amendment No. 1 dated as of June 25, 2002 and Amendment No. 2 dated as of July 17, 2002 to the Asset Purchase Agreement dated as of September 25, 2002, by and between Immunex Corporation and Schering Aktiengesellschaft. (Filed as an exhibit to the Form 10-Q for the quarter ended June 30, 2002 on August 13, 2002 and incorporated herein by reference.)

10.64    Amended and Restated Promotion Agreement, dated as of December 16, 2001, by and among Immunex Corporation, American Home Products Corporation and Amgen Inc. (with certain confidential information deleted therefrom). (Filed as an exhibit to Amendment No. 1 to the Form S-4 Registration Statement dated and filed on March 22, 2002 and incorporated herein by reference.)

10.65    Description of Amendment No. 1 to Amended and Restated Promotion Agreement, effective as of July 8, 2003, among Wyeth, Amgen Inc. and Immunex Corporation, (with certain confidential information deleted therefrom). (Filed as an exhibit to the Annual Report on Form 10-K for the year ended December 31, 2003 on March 11, 2004 and incorporated herein by reference.)

10.66    Description of Amendment No. 2 to Amended and Restated Promotion Agreement, effective as of April 20, 2004, by and among Wyeth, Amgen Inc. and Immunex Corporation. (Filed as an exhibit to the Form S-4/A dated and filed on June 29, 2004 and incorporated herein by reference.)

10.67    Amendment No. 3 to Amended and Restated Promotion Agreement, effective as of January 1, 2005, by and among Wyeth, Amgen Inc. and Immunex Corporation (with certain confidential information deleted therefrom). (Filed as an exhibit to Form 10-Q for the quarter ended March 31, 2005 on May 4, 2005 and incorporated herein by reference.)

10.68    Credit Agreement, dated as of July 16, 2004, among Amgen Inc., the Banks therein named, Citibank N.A., as Issuing Bank, Citicorp USA, Inc., as Administrative Agent, and Barclays Bank PLC, as Syndication Agent. (Filed as an exhibit to the Form 10-Q for the quarter ended June 30, 2004 on August 6, 2004 and incorporated herein by reference.)

10.69    First Amendment dated as of December 6, 2004, to the Credit Agreement dated as of July 16, 2004, among Amgen Inc., the Banks therein named, Citibank N.A., as Issuing Bank, Citicorp USA, Inc, as Administrative Agent, and Barclays Bank PLC, as Syndication Agent. (Filed as an exhibit to Form 8-K dated and filed on December 8, 2005 and incorporated herein by reference.)

10.70    Purchase Agreement, dated as of November 15, 2004, among Amgen Inc. and Morgan Stanley & Co. Incorporated and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as representatives of the several initial purchasers. (Filed as an exhibit to Form 8-K dated November 18, 2004 on November 19, 2004 and incorporated herein by reference.)

10.71    Purchase Agreement, dated as of February 14, 2006, among Amgen Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley & Co. Incorporated, Citigroup Global Markets Inc., JPMorgan Securities, Inc., Lehman Brothers Inc, Bear, Stearns & Co. Inc., Credit Suisse Securities (USA) LLC. (Filed as an exhibit to Form 8-K dated and filed on February 21, 2006 and incorporated herein by reference.)

| 10.72 | Confirmation of OTC Convertible Note Hedge related to 2011 Notes, dated February 14, 2006, to Amgen Inc. from Merrill Lynch International related to the 0.125% Convertible Senior Notes Due 2011. (Filed as an exhibit to Form 10-K for the year ended December 31, 2005 on March 10, 2006 and incorporated herein by reference.) |
| --- | --- |
| 10.73 | Confirmation of OTC Convertible Note Hedge related to 2013 Notes, dated February 14, 2006, to Amgen Inc. from Merrill Lynch International related to 0.375% Convertible Senior Notes Due 2013. (Filed as an exhibit to Form 10-K for the year ended December 31, 2005 on March 10, 2006 and incorporated herein by reference.) |
| 10.74 | Confirmation of OTC Convertible Note Hedge related to 2011 Notes, dated February 14, 2006, to Amgen Inc. from Morgan Stanley & Co. International Limited related to the 0.125% Convertible Senior Notes Due 2011 Notes. (Filed as an exhibit to Form 10-K for the year ended December 31, 2005 on March 10, 2006 and incorporated herein by reference.) |
| 10.75 | Confirmation of OTC Warrant Transaction, dated February 14, 2006, to Amgen Inc. from Merrill Lynch International for warrants expiring in 2011. (Filed as an exhibit to Form 10-K for the year ended December 31, 2005 on March 10, 2006 and incorporated herein by reference.) |
| 10.76 | Confirmation of OTC Warrant Transaction, dated February 14, 2006, to Amgen Inc. from Merrill Lynch International for warrants expiring in 2013. (Filed as an exhibit to Form 10-K for the year ended December 31, 2005 on March 10, 2006 and incorporated herein by reference.) |
| 10.77 | Confirmation of OTC Warrant Transaction, dated February 14, 2006, to Amgen Inc. from Morgan Stanley & Co. International Limited for warrants maturing in 2011. (Filed as an exhibit to Form 10-K for the year ended December 31, 2005 on March 10, 2006 and incorporated herein by reference.) |
| 10.78 | Purchase Agreement, dated February 16, 2006, between Amgen Inc. and Citigroup Global Markets Inc. (Filed as an exhibit to Form 10-K for the year ended December 31, 2005 on March 10, 2006 and incorporated herein by reference.) |
| 31* | Rule 13a-14(a) Certifications. |
| 32** | Section 1350 Certifications. |

(*   = filed herewith)

(**  = furnished herewith and not "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended)

(+   = management contract or compensatory plan or arrangement.)

Exhibit 4.19

**AMGEN INC.**
**$2,500,000,000**
**0.125% Convertible Senior Notes due 2011**

**INDENTURE**

**Dated as of February 17, 2006**

**JPMORGAN CHASE BANK, N.A.,**
**Trustee**

**CROSS REFERENCE TABLE\***

---

\*        Note:  This Cross Reference Table shall not, for any purpose, be deemed to be part of the Indenture.

| TIA Section | Indenture Section |
|---|---|
| 310 (a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (b) | 7.08; 7.10 |
| (c) | N.A. |
| 311 (a) | N.A. |
| (b) | N.A. |
| (c) | N.A. |
| 312 (a) | 2.05 |
| (b) | 12.03 |
| (c) | 12.03 |
| 313 (a) | 7.06 |
| (b)(1) | N.A. |
| (b)(2) | 7.06 |
| (c) | 12.02 |
| (d) | 7.06 |
| 314 (a) | 4.02; 4.03; 12.02 |
| (b) | N.A. |
| (c)(1) | 12.04 |
| (c)(2) | 12.04 |
| (c)(3) | N.A. |
| (d) | N.A. |
| (e) | 12.05 |
| (f) | N.A. |
| 315 (a) | 7.01 |
| (b) | 7.05; 12.02 |
| (c) | 7.01 |
| (d) | 7.01 |
| (e) | 6.11 |

| TIA Section | Indenture Section |
|---|---|
| 316 (a) (last sentence) | 2.08 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| 317 (a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.04 |
| 318 (a) | 12.01 |

N.A. means not applicable.

# TABLE OF CONTENTS

**Page**

## ARTICLE 1

### DEFINITIONS AND INCORPORATION BY REFERENCE

| | | |
|---|---|---|
| SECTION 1.01 | Definitions | 1 |
| SECTION 1.02 | Other Definitions | 7 |
| SECTION 1.03 | Incorporation by Reference of Trust Indenture Act | 8 |
| SECTION 1.04 | Rules of Construction | 8 |
| SECTION 1.05 | Acts of Holders | 8 |

## ARTICLE 2

### THE SECURITIES

| | | |
|---|---|---|
| SECTION 2.01 | Form and Dating | 10 |
| SECTION 2.02 | Execution and Authentication | 11 |
| SECTION 2.03 | Registrar, Paying Agent and Conversion Agent | 12 |
| SECTION 2.04 | Paying Agent to Hold Money and Securities in Trust | 12 |
| SECTION 2.05 | Securityholder Lists | 13 |
| SECTION 2.06 | Transfer and Conversion | 13 |
| SECTION 2.07 | Replacement Securities | 14 |
| SECTION 2.08 | Outstanding Securities; Determinations of Holders' Action | 15 |
| SECTION 2.09 | Temporary Securities | 16 |
| SECTION 2.10 | Cancellation | 16 |
| SECTION 2.11 | Persons Deemed Owners | 16 |
| SECTION 2.12 | Legend; Additional Transfer and Exchange Requirements | 17 |
| SECTION 2.13 | CUSIP Numbers | 22 |

## ARTICLE 3

### PURCHASES

| | | |
|---|---|---|
| SECTION 3.01 | Purchase of Securities at Option of the Holder upon Change in Control | 23 |
| SECTION 3.02 | Effect of Change in Control Purchase Notice | 26 |
| SECTION 3.03 | Deposit of Change in Control Purchase Price | 27 |
| SECTION 3.04 | Securities Purchased in Part | 27 |
| SECTION 3.05 | Covenant to Comply With Securities Laws Upon Purchase of Securities | 28 |
| SECTION 3.06 | Repayment to the Company | 28 |

ARTICLE 4

COVENANTS

| | | |
|---|---|---|
| SECTION 4.01 | Payment of Securities | 28 |
| SECTION 4.02 | SEC and Other Reports | 29 |
| SECTION 4.03 | Compliance Certificate | 29 |
| SECTION 4.04 | Maintenance of Office or Agency | 29 |

ARTICLE 5

SUCCESSOR CORPORATION

| | | |
|---|---|---|
| SECTION 5.01 | When Company May Merge or Transfer Assets | 30 |

ARTICLE 6

DEFAULTS AND REMEDIES

| | | |
|---|---|---|
| SECTION 6.01 | Events of Default | 31 |
| SECTION 6.02 | Acceleration | 32 |
| SECTION 6.03 | Other Remedies | 33 |
| SECTION 6.04 | Waiver of Past Defaults | 33 |
| SECTION 6.05 | Control by Majority | 33 |
| SECTION 6.06 | Limitation on Suits | 34 |
| SECTION 6.07 | Rights of Holders to Receive Payment | 34 |
| SECTION 6.08 | Collection Suit by Trustee | 34 |
| SECTION 6.09 | Trustee May File Proofs of Claim | 34 |
| SECTION 6.10 | Priorities | 35 |
| SECTION 6.11 | Undertaking for Costs | 36 |
| SECTION 6.12 | Waiver of Stay, Extension or Usury Laws | 36 |

ARTICLE 7

TRUSTEE

| | | |
|---|---|---|
| SECTION 7.01 | Duties of Trustee | 36 |
| SECTION 7.02 | Rights of Trustee | 37 |
| SECTION 7.03 | Individual Rights of Trustee | 39 |
| SECTION 7.04 | Trustee's Disclaimer | 39 |
| SECTION 7.05 | Notice of Defaults | 39 |
| SECTION 7.06 | Reports by Trustee to Holders | 39 |
| SECTION 7.07 | Compensation and Indemnity | 40 |
| SECTION 7.08 | Replacement of Trustee | 40 |
| SECTION 7.09 | Successor Trustee by Merger | 41 |
| SECTION 7.10 | Eligibility; Disqualification | 41 |

ARTICLE 8

DISCHARGE OF INDENTURE

SECTION 8.01     Discharge of Liability on Securities                                          42
SECTION 8.02     Repayment to the Company                                                       42

ARTICLE 9

AMENDMENTS

SECTION 9.01     Without Consent of Holders                                                     42
SECTION 9.02     With Consent of Holders                                                        43
SECTION 9.03     Compliance with Trust Indenture Act                                            44
SECTION 9.04     Revocation and Effect of Consents, Waivers and Actions                        44
SECTION 9.05     Notation on or Exchange of Securities                                          44
SECTION 9.06     Trustee to Sign Supplemental Indentures                                        44
SECTION 9.07     Effect of Supplemental Indentures                                              45

ARTICLE 10

CONVERSION

SECTION 10.01     Conversion Privilege                                                          45
SECTION 10.02     Conversion Procedure                                                          46
SECTION 10.03     Fractional Shares                                                             47
SECTION 10.04     Taxes on Conversion                                                           47
SECTION 10.05     Company to Provide Stock                                                      47
SECTION 10.06     Adjustment for Change In Capital Stock                                        47
SECTION 10.07     Adjustment for Rights Issue                                                   48
SECTION 10.08     Adjustment for Other Distributions                                            49
SECTION 10.09     Adjustment for Cash Dividends                                                 51
SECTION 10.10     Adjustment for Tender Offer                                                   52
SECTION 10.11     Adjustment to Conversion Rate Upon Change in Control Transactions            53
SECTION 10.12     Adjustment to Conversion Rate After a Public Acquirer Change in Control      54
SECTION 10.13     When Adjustment May Be Deferred                                              55
SECTION 10.14     When No Adjustment Required                                                   56
SECTION 10.15     Notice of Adjustment                                                          56
SECTION 10.16     Notice of Certain Transactions                                                56
SECTION 10.17     Reorganization of Company; Special Distributions                             57
SECTION 10.18     Company Determination Final                                                   57
SECTION 10.19     Trustee's Adjustment Disclaimer                                               57
SECTION 10.20     Simultaneous Adjustments                                                      58
SECTION 10.21     Successive Adjustments                                                        58

SECTION 10.22     Rights Issued in Respect of Common Stock Issued Upon Conversion     58
SECTION 10.23     Withholding Taxes for Adjustments in Conversion Rate     58

ARTICLE 11

PAYMENT OF INTEREST

SECTION 11.01     Interest Payments     59
SECTION 11.02     Defaulted Interest     59
SECTION 11.03     Interest Rights Preserved     60

ARTICLE 12

MISCELLANEOUS

SECTION 12.01     Trust Indenture Act Controls     60
SECTION 12.02     Notices; Address of Agency     60
SECTION 12.03     Communication by Holders with Other Holders     63
SECTION 12.04     Certificate and Opinion as to Conditions Precedent     63
SECTION 12.05     Statements Required in Certificate or Opinion     63
SECTION 12.06     Separability Clause     64
SECTION 12.07     Rules by Trustee, Paying Agent, Conversion Agent and Registrar     64
SECTION 12.08     Calculations     64
SECTION 12.09     Legal Holidays     64
SECTION 12.10     Governing Law     64
SECTION 12.11     No Recourse Against Others     64
SECTION 12.12     Successors     65
SECTION 12.13     Multiple Originals     65

iv

INDENTURE dated as of February 17, 2006 between AMGEN INC., a Delaware corporation (the "**Company**"), and JPMorgan Chase Bank, N.A., a national banking association, as trustee ("Trustee").

Each party agrees as follows for the benefit of the other party and for the equal and ratable benefit of the Holders of the Company's 0.125% Convertible Senior Notes due 2011 (the " Securities "):

# ARTICLE 1

## DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01     Definitions.

"Additional Interest" means all additional interest owing on the Notes pursuant to the Registration Rights Agreement.

"Affiliate" of any specified person means any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person. For the purposes of this definition, "control" when used with respect to any specified person means the power to direct or cause the direction of the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Applicable Conversion Rate" means the Conversion Rate on any Trading Day, as adjusted in accordance with Article 10. For purposes of determining the Conversion Value, the Applicable Conversion Rate means the Conversion Rate on the Conversion Date.

"Applicable Procedures" means, with respect to any transfer or transaction involving a Global Security or beneficial interest therein, the rules and procedures of the Depositary for such Security, in each case to the extent applicable to such transaction and as in effect from time to time.

"Average Closing Price" means (1) with respect to distributions of rights, warrants or options, the average of the Closing Prices per share of Common Stock for the five (5) consecutive Trading Days ending on the date immediately preceding the first public announcement of the distribution and (2) with respect to other distributions, the average of the Closing Prices per share of Common Stock for the five (5) consecutive Trading Days ending on the date immediately preceding the Time of Determination.

In the event that the Ex-Dividend Time (or in the case of a subdivision, combination or reclassification, the effective date with respect thereto) with respect to a dividend, subdivision, combination or reclassification to which Section 10.06(1), (2), (3) or (5) applies occurs during the period applicable for calculating " Average Closing Price " pursuant to the definition in the preceding sentence, " Average Closing Price " shall be calculated for such period in a manner determined by the Board of Directors to reflect the impact of such dividend,

1

subdivision, combination or reclassification on the Closing Price of the Common Stock during such period.

"<u>Board of Directors</u>" means either the board of directors of the Company or any duly authorized committee of such board.

"<u>Business Day</u>" means any weekday that is not a day on which banking institutions in the City of New York, New York are authorized or obligated to close.

"<u>Capital Stock</u>" for any corporation means any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) stock issued by that corporation.

"<u>Certificated Securities</u>" means Securities that are substantially in the form of the Securities attached hereto as Exhibit A.

"<u>Close of Business</u>" means 5:00 p.m. (New York City time).

"<u>Closing Price</u>" of the Common Stock on any date means the closing per share sale price (or, if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and average ask prices) on such date as reported in composite transactions for the principal United States securities exchange on which the Common Stock is traded or, if the Common Stock is not listed on a United States national or regional securities exchange, (i) as reported by the National Association of Securities Dealers Automated Quotation System or by the National Quotation Bureau Incorporated, or (ii) if such bid and ask prices are not reported by the National Association of Securities Dealers Automated Quotation System or by the National Quotation Bureau Incorporated, in a manner to be determined by the Company on the basis of such quotation as the Company considers appropriate in its sole and absolute discretion.

"<u>Common Stock</u>" means the shares of common stock, $0.0001 par value, of the Company as it exists on the date of this Indenture or any other shares of Capital Stock of the Company into which the Common Stock shall be reclassified or changed.

"<u>Company</u>" means the party named as the "<u>Company</u>" in the first paragraph of this Indenture until a successor replaces it pursuant to the applicable provisions of this Indenture and, thereafter, shall mean such successor. The foregoing sentence shall likewise apply to any subsequent such successor or successors.

"<u>Company Request</u>" or "<u>Company Order</u>" means a written request or order signed in the name of the Company by any two Officers.

"<u>Conversion Date</u>" means the date on which the Holder of the Security has complied with all requirements under this Indenture to convert such Security.

"<u>Conversion Price</u>" per share of Common Stock as of any day means the result obtained by dividing $1,000 by the then Applicable Conversion Rate.

"Conversion Rate" means the number of shares of Common Stock issuable upon conversion of a Security per $1,000 of Principal Amount thereof, subject to adjustment pursuant to Article 10.

"Conversion Reference Period" means (a) for Securities that are converted during the period beginning on the 30th day prior to the Maturity Date, the ten consecutive Trading Days beginning on the third Trading Day following the Maturity Date and (b) in all other instances, the ten consecutive Trading Days beginning on the third Trading Day following the Conversion Date.

"Conversion Value" means the amount equal to the product of (a) the Applicable Conversion Rate multiplied by (b) the average of the Volume Weighted Average Price on each of the Trading Days during the Conversion Reference Period.

"Corporate Trust Office" means the principal office of the Trustee at which at any time its corporate trust business shall be administered, which office at the date hereof is located at 4 New York Plaza, 15th Floor, New York, NY 10004, Attention: Worldwide Securities Services, or such other address as the Trustee may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor Trustee (or such other address as a successor Trustee may designate from time to time by notice to the Holders and the Company).

"Daily Share Amounts" means, for each Trading Day of the Conversion Reference Period and each $1,000 Principal Amount of Securities surrendered for conversion, a number of shares of Common Stock (but in no event less than zero) determined by the following formula:

$$\frac{(\text{Volume Weighted Average Price per share of Common Stock for such Trading Day} \quad x \quad \text{Conversion Rate in effect on the Conversion Date*})}{\text{Volume Weighted Average Price per share of Common Stock for such Trading Day} \ x \ 10} - \$1,000$$

* appropriately adjusted to take into account the occurrence on or before such Trading Day of any event which would require an anti-dilution adjustment.

"Default" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"Depositary" means DTC or the nominee thereof, or any successor thereto.

"DTC" means The Depository Trust Company.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Global Securities" means Securities that are in the form of the Securities attached hereto as Exhibit A.

3

"Holder" or "Securityholder" means a person in whose name a Security is registered on the Registrar's books.

"Indebtedness" means with respect to the Company at any date, without duplication, obligations (other than nonrecourse obligations) for borrowed money or evidenced by bonds, debentures, notes or similar instruments.

"Indenture" means this Indenture, as amended or supplemented from time to time in accordance with the terms hereof, including the provisions of the TIA that are deemed to be a part hereof.

"Initial Conversion Rate" means 12.5247 shares of Common Stock per Principal Amount of $1,000, subject to adjustment pursuant to Article 10.

"Interest Payment Date" means each date specified as such in paragraph 1 of the Securities.

"Issue Date" of any Security means the date on which the Security was originally issued or deemed issued as set forth on the face of the Security.

"Market Disruption Event" means the occurrence or existence for more than one half hour period in the aggregate on any scheduled Trading Day for the Common Stock of any suspension or limitation imposed on trading (by reason of movements in price exceeding limits permitted by the Nasdaq National Market or otherwise) in Common Stock or in any options, contracts or future contracts relating to the Common Stock, and such suspension or limitation occurs or exists at any time before 1:00 p.m. (New York City time) on such day.

"Officer" means the Chairman of the Board, the Vice Chairman, the Chief Executive Officer, the President, any Executive Vice President, any Senior Vice President, any Vice President, the Treasurer or the Secretary or any Assistant Treasurer or Assistant Secretary of the Company.

"Officers' Certificate" means a written certificate containing the information specified in Sections 12.04 and 12.05, signed in the name of the Company by any two Officers, and delivered to the Trustee. One of the officers executing the Officers' Certificate pursuant to Section 4.03 shall be the principal executive officer, financial officer or accounting officer of the Company.

"Opinion of Counsel" means a written opinion containing the information specified in Sections 12.04 and 12.05, from legal counsel who is acceptable to the Trustee. The counsel may be an employee of, or counsel to, the Company or the Trustee.

"Person" or "person" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Principal Amount" of a Security means the Principal Amount as set forth on the face of the Security.

4

"Protected Purchaser" shall have the meaning set forth in Section 2.07.

"Registration Rights Agreement" means the Registration Rights Agreement, dated as of the date hereof, among the Company, Merrill Lynch, Pierce, Fenner & Smith Incorporated, and Morgan Stanley & Co. Incorporated on behalf of the Initial Purchasers.

"Regular Record Date" means, with respect to any Interest Payment Date, the January 15 or the July 15 immediately preceding such Interest Payment Date.

"Responsible Officer" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee having direct responsibility for the administration of this Indenture.

"Restricted Global Security" means a Global Security that is a Restricted Security.

"Restricted Security" means a Security required to bear the Legend.

"Rule 144" means Rule 144 under the Securities Act or any successor to such Rule.

"Rule 144A" means Rule 144A under the Securities Act or any successor to such Rule.

"SEC" means the Securities and Exchange Commission.

"Securities" means any of the Company's 0.125% Convertible Senior Notes due 2011, as amended or supplemented from time to time, issued under this Indenture.

"Securities Act" means the Securities Act of 1933, as amended.

"Securityholder" or "Holder" means a person in whose name a Security is registered on the Registrar's books.

"Significant Subsidiary" means a "significant subsidiary", as such term is defined in Rule 1-02 of Regulation S-X under the Securities Act of 1933.

"Special Record Date" means for the payment of any Defaulted Interest, the date fixed by the Trustee pursuant to Section 11.02.

"Stated Maturity," when used with respect to any Security or any installment of interest thereon, means the date specified in such Security as the fixed date on which an amount equal to the Principal Amount of such Security or such installment of interest is due and payable.

"Subsidiary" means (i) a corporation, a majority of whose Voting Stock is, at the date of determination, directly or indirectly owned by the Company, by one or more Subsidiaries of the Company, or by the Company and one or more Subsidiaries of the Company, (ii) a partnership in which the Company, a Subsidiary of the Company or the Company and one or

5

more Subsidiaries of the Company, holds a majority interest in the equity capital or profits of such partnership, or (iii) any other person (other than a corporation or a partnership) in which the Company, a Subsidiary of the Company, or the Company and one or more Subsidiaries of the Company, directly or indirectly, at the date of determination, has (x) at least a majority ownership interest or (y) the power to elect or direct the election of a majority of the directors or trustees, as the case may be, or other governing body of such person.

"TIA" means the Trust Indenture Act of 1939 as in effect on the date of this Indenture, provided, however, that in the event the TIA is amended after such date, TIA means, to the extent required by any such amendment, the TIA as so amended.

"Time of Determination" means the time and date of the earlier of (i) the determination of stockholders entitled to receive rights, warrants or options or a distribution, in each case, to which Sections 10.07, 10.08 or 10.10 applies and (ii) the time ("Ex-Dividend Time") immediately prior to the commencement of "ex-dividend" trading for such rights, warrants or options or distribution on the Nasdaq National Market or such other national or regional exchange or market on which the Common Stock is then listed or quoted.

"Trading Day" means any day on which (i) there is no Market Disruption Event and (ii) the Nasdaq National Market or, if the Common Stock is not quoted on the Nasdaq National Market, the principal national securities exchange on which the Common Stock is listed, is open for trading or, if the Common Stock is not so listed, admitted for trading or quoted, any business day. A Trading Day only includes those days that have a scheduled closing time of 4:00 p.m. (New York City time) or the then standard closing time for regular trading on the relevant exchange or trading system.

"Trustee" means the party named as the "Trustee" in the first paragraph of this Indenture until a successor replaces it pursuant to the applicable provisions of this Indenture and, thereafter, shall mean such successor. The foregoing sentence shall likewise apply to any subsequent such successor or successors.

"Volume Weighted Average Price" means the price per share of the Common Stock on any Trading Day as displayed on Bloomberg (or any successor service) page AMGN <equity> VAP in respect of the period from 9:30 a.m. to 4:00 p.m. (New York City time), on such Trading Day; or, if such price is not available, the market value per share of the Common Stock on such day as determined by a nationally recognized independent investment banking firm retained for this purpose by the Company.

"Voting Stock" means, with respect to any corporation, association, company or business trust, stock or other securities of the class or classes having general voting power under ordinary circumstances to elect at least a majority of the board of directors, managers or trustees of such corporation, association, company or business trust, provided that, for the purposes hereof, stock or other securities which carry only the right to vote conditionally on the happening of an event shall not be considered Voting Stock whether or not such event shall have happened.

SECTION 1.02     Other Definitions.

| Term | Defined in Section |
|---|---|
| "Act" | 1.05 |
| "Agent Members" | 2.12(e) |
| "Bankruptcy Law" | 6.01(a) |
| "beneficial owner" | 3.01(a) |
| "Cash Percentage" | 10.01 |
| "Cash Percentage Notice" | 10.01 |
| "Change in Control" | 3.01(a) |
| "Change in Control Effective Date" | 10.11 |
| "Change in Control Purchase Date" | 3.01(a) |
| "Change in Control Purchase Notice" | 3.01(c) |
| "Change in Control Purchase Price" | 3.01(a) |
| "Conversion Agent" | 2.03(a) |
| "Conversion Trigger Price" | Note |
| "Custodian" | 6.01(b) |
| "Defaulted Interest" | 11.02 |
| "Event of Default" | 6.01 |
| "Ex-Dividend Date" | 10.08(b) |
| "Ex-Dividend Time" | Definition of "Time of Determination" |
| "Expiration Time" | 10.11 |
| "Initial Purchasers" | 2.01 |
| "Legal Holiday" | 12.09 |
| "Legend" | 2.12(a) |
| "Make-Whole Shares" | 10.11 |
| "Notice of Default" | 6.01 |
| "Paying Agent" | 2.03(a) |
| "Post-Distribution Price" | 10.08(b) |
| "Public Acquirer Change in Control" | 10.12 |
| "Public Acquirer Change in Control Effective Date" | 10.12 |
| "Public Acquirer Common Stock" | 10.12 |
| "Purchase Agreement" | 2.01 |
| "Purchased Shares" | 10.10 |
| "QIB" | 2.01(a) |
| "Registrar" | 2.03(a) |
| "Remaining Shares" | 10.01 |
| "Required Cash Amount" | 10.01 |
| "Resale Restriction Termination Date" | 2.12(f) |
| "Rights" | 10.22 |
| "Shareholders Rights Plan" | 10.22 |
| "Stock Price" | 10.11 |

SECTION 1.03     Incorporation by Reference of Trust Indenture Act.

Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in and made a part of this Indenture. The following TIA terms used in this Indenture have the following meanings:

"Commission" means the SEC.

"indenture securities" means the Securities.

"indenture security holder" means a Securityholder.

"indenture to be qualified" means this Indenture.

"indenture trustee" or "institutional trustee" means the Trustee.

"obligor" on the indenture securities means the Company.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule have the meanings assigned to them by such definitions.

SECTION 1.04     Rules of Construction.

Unless the context otherwise requires:

(1)     a term has the meaning assigned to it;

(2)     an accounting term not otherwise defined has the meaning assigned to it in accordance with United States generally accepted accounting principles as in effect from time to time;

(3)     "or" is not exclusive;

(4)     "including" means including, without limitation; and

(5)     words in the singular include the plural, and words in the plural include the singular.

SECTION 1.05     Acts of Holders.

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments (which may take the form of an electronic writing or messaging or otherwise be in accordance with customary procedures of the Depositary or the Trustee) of substantially similar tenor signed by such Holders in person or by agent duly appointed in writing (which may be in electronic form); and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee and, where it is hereby expressly required, to the Company. Such

8

instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of Holders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent (either of which may be in electronic form) shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Company, if made in the manner provided in this Section.

(a)       The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution (or electronic delivery) or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing or delivering such instrument or writing acknowledged to such officer the execution thereof (or electronic delivery). Where such execution is by a signer acting in a capacity other than such signer's individual capacity, such certificate or affidavit shall also constitute sufficient proof of such signer's authority. The fact and date of the execution of any such instrument or writing (electronic or otherwise), or the authority of the Person executing the same, may also be proved in any other manner which the Trustee deems sufficient.

(b)       The ownership of Securities shall be proved by the register for the Securities maintained by the Registrar.

(c)       Any request, demand, authorization, direction, notice, consent, waiver or other Act of the Holder of any Security shall bind every future Holder of the same Security and the holder of every Security issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee or the Company in reliance thereon, whether or not notation of such action is made upon such Security.

(d)       If the Company shall solicit from the Holders any request, demand, authorization, direction, notice, consent, waiver or other Act, the Company may, at its option, by or pursuant to a resolution of the Board of Directors, fix in advance a record date for the determination of Holders entitled to give such request, demand, authorization, direction, notice, consent, waiver or other Act, but the Company shall have no obligation to do so. If such a record date is fixed, such request, demand, authorization, direction, notice, consent, waiver or other Act may be given before or after such record date, but only the Holders of record at the Close of Business on such record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of outstanding Securities have authorized or agreed or consented to such request, demand, authorization, direction, notice, consent, waiver or other Act, and for that purpose the outstanding Securities shall be computed as of such record date; provided that no such authorization, agreement or consent by the Holders on such record date shall be deemed effective unless it shall become effective pursuant to the provisions of this Indenture not later than six months after the record date.

9

# ARTICLE 2

# THE SECURITIES

SECTION 2.01     Form and Dating.

The Securities and the Trustee's certificate of authentication shall be substantially in the form of Exhibit A, which is a part of this Indenture. The Securities may have notations, legends or endorsements required by law, stock exchange rule or usage (provided that any such notation, legend or endorsement required by usage is in a form acceptable to the Company). The Company shall provide any such notations, legends or endorsements to the Trustee in writing. Each Security shall be dated the date of its authentication. The Securities are being offered and sold by the Company pursuant to a Purchase Agreement dated February 14, 2006 (the " Purchase Agreement ") between the Company and the several purchasers named in Schedule A thereto (collectively, the "Initial Purchasers"), in transactions exempt from, or not subject to, the registration requirements of the Securities Act.

(a)     Restricted Global Securities. All of the Securities are initially being offered and sold to qualified institutional buyers as defined in Rule 144A (collectively, " QIBS " or individually, each a " QIB ") in reliance on Rule 144A under the Securities Act and shall be issued initially in the form of one or more Restricted Global Securities, which shall be deposited on behalf of the purchasers of the securities represented thereby with the Trustee, at its Corporate Trust Office, as custodian for the depositary, The Depository Trust Company (" DTC ", and such depositary, or any successor thereto, being hereinafter referred to as the "Depositary"), and registered in the name of its nominee, Cede & Co. (or any successor thereto), for the accounts of participants in the Depositary, duly executed by the Company and authenticated by the Trustee as hereinafter provided.

(b)     Global Securities in General. Each Global Security shall represent such of the outstanding Securities as shall be specified therein and each shall provide that it shall represent the aggregate Principal Amount of outstanding Securities from time to time endorsed thereon and that the aggregate Principal Amount of outstanding Securities represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges, redemptions and conversions. Except as provided in this Section 2.01, 2.06 or 2.12, owners of beneficial interests in Global Securities will not be entitled to receive physical delivery of Certificated Securities.

Any adjustment of the aggregate Principal Amount of a Global Security to reflect the amount of any increase or decrease in the Principal Amount of outstanding Securities represented thereby shall be made by the Trustee in accordance with instructions given by the Holder thereof as required by Section 2.12 hereof and shall be made on the records of the Trustee and the Depositary, subject in each case to compliance with Applicable Procedures.

(c)     Book-Entry Provisions. This Section 2.01(c) shall apply only to Global Securities deposited with or on behalf of the Depositary.

10

The Company shall execute and the Trustee shall, in accordance with this Section 2.01(c), authenticate and deliver initially one or more Global Securities that (a) shall be registered in the name of the Depositary, (b) shall be delivered by the Trustee to the Depositary or pursuant to the Depositary's instructions and (c) shall bear legends substantially to the following effect:

"UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS, IN WHOLE BUT NOT IN PART, TO NOMINEES OF THE DEPOSITORY TRUST COMPANY OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN ARTICLE TWO OF THE INDENTURE REFERRED TO ON THE REVERSE HEREOF."

(d)        Certificated Securities. Securities not issued as interests in the Global Securities will be issued in certificated form substantially in the form of Exhibit A attached hereto.

SECTION 2.02        Execution and Authentication.

(a)        The Securities shall be executed on behalf of the Company by any Officer. The signature of the Officer on the Securities may be manual or facsimile.

(b)        Securities bearing the manual or facsimile signatures of an individual who was at the time of the execution of the Securities the proper Officer of the Company shall bind the Company, notwithstanding that such individual has ceased to hold such office prior to the authentication and delivery of such Securities or did not hold such office at the date of authentication of such Securities.

(c)        No Security shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Security a certificate of authentication substantially in the form provided for herein duly executed by the Trustee by manual signature of an authorized officer of the Trustee, and such certificate upon any Security

shall be conclusive evidence, and the only evidence, that such Security has been duly authenticated and delivered hereunder.

(d)      Subject to the terms of Section 12.04 and 12.05 hereof, the Trustee shall authenticate and deliver Securities for original issue in an aggregate Principal Amount of  $2,500,000,000 (subject to Section 2.07 hereof) upon a Company Order without any further action by the Company. The aggregate Principal Amount of Securities outstanding at any time may not exceed the amount set forth in the foregoing sentence, except as provided in Section 2.07.

(e)      The Securities shall be issued only in registered form without coupons and only in denominations of $1,000 of Principal Amount and any integral multiple thereof.

(f)       The Trustee shall have the right to decline to authenticate and deliver any securities under this Section if the Trustee, being advised by counsel, determines that such action may not be lawfully taken or if the Trustee in good faith shall determine that such action would expose the Trustee to personal liability to existing Holders.

SECTION 2.03      Registrar, Paying Agent and Conversion Agent.

(a)      The Company shall maintain an office or agency where Securities may be presented for registration of transfer or for exchange for other Securities (" Registrar "), an office or agency where Securities may be presented for purchase or payment (" Paying Agent ") and an office or agency where Securities may be presented for conversion into Common Stock (" Conversion Agent "). The Registrar shall keep a register of the Securities and of their registration of transfer and exchange. The Company may have one or more co-registrars, one or more additional paying agents and one or more additional conversion agents. The term Paying Agent includes any additional paying agent, including any named pursuant to Section 4.05. The term Conversion Agent includes any additional conversion agent, including any named pursuant to Section 4.05.

(b)      The Company shall enter into an appropriate agency agreement with any Registrar or co-registrar, Paying Agent or Conversion Agent (other than the Trustee). The agreement shall implement the provisions of this Indenture that relate to such agent. The Company shall notify the Trustee of the name and address of any such agent. If the Company fails to maintain a Registrar, Paying Agent or Conversion Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.07. The Company or any Subsidiary or an Affiliate of either of them may act as Paying Agent, Registrar, Conversion Agent or co-registrar.

(c)      The Company initially appoints the Trustee as Registrar, Conversion Agent and Paying Agent in connection with the Securities.

SECTION 2.04      Paying Agent to Hold Money and Securities in Trust.

Except as otherwise provided herein, by no later than 10:00 a.m., New York City time, on or prior to each due date of payments in respect of any Security, the Company shall

12

deposit with the Paying Agent a sum of money (in immediately available funds if deposited on the due date) or Common Stock sufficient to make such payments when so becoming due. The Company shall require each Paying Agent (other than the Trustee) to agree in writing that the Paying Agent shall hold in trust for the benefit of Securityholders or the Trustee all money and Common Stock held by the Paying Agent for the making of payments in respect of the Securities and shall notify the Trustee of any default by the Company in making any such payment. At any time during the continuance of any such default, the Paying Agent shall, upon the written request of the Trustee, forthwith pay to the Trustee all money and Common Stock so held in trust. If the Company or a Subsidiary or an Affiliate of either of them acts as Paying Agent, it shall segregate the money and Common Stock held by it as Paying Agent and hold it as a separate trust fund. The Company at any time may require a Paying Agent to pay all money and Common Stock held by it to the Trustee and to account for any funds and Common Stock disbursed by it. Upon doing so, the Paying Agent shall have no further liability for the money or Common Stock.

SECTION 2.05    Securityholder Lists.

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Securityholders. If the Trustee is not the Registrar, the Company shall cause to be furnished to the Trustee at least semiannually on June 1 and December 1 a listing of Securityholders dated within 15 days of the date on which the list is furnished and at such other times as the Trustee may request in writing a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Securityholders.

SECTION 2.06    Transfer and Conversion.

Subject to Section 2.12 hereof,

(a)    upon surrender for registration of transfer of any Security, together with a written instrument of transfer satisfactory to the Registrar duly executed by the Securityholder or such Securityholder's attorney duly authorized in writing, at the office or agency of the Company designated as Registrar or co-registrar pursuant to Section 2.03, the Company shall execute, and the Trustee upon receipt of a Company Order shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Securities of any authorized denomination or denominations, of a like aggregate Principal Amount. The Company shall not charge a service charge for any registration of transfer or exchange, but the Company or the Trustee may require payment of a sum sufficient to pay all taxes, assessments or other governmental charges that may be imposed in connection with the registration of transfer or exchange of the Securities from the Securityholder requesting such registration of transfer or exchange.

At the option of the Holder, Certificated Securities may be exchanged for other Securities of any authorized denomination or denominations, of a like aggregate Principal Amount, upon surrender of the Securities to be exchanged, together with a written instrument of transfer satisfactory to the Registrar duly executed by the Securityholder or such Securityholder's attorney duly authorized in writing, at such office or agency. Whenever any Securities are so surrendered for exchange, the Company shall execute, and the Trustee upon

13

receipt of a Company Order shall authenticate and deliver, the Securities which the Holder making the exchange is entitled to receive.

The Company shall not be required to make, and the Registrar need not register, any Securities in respect of which a Change in Control Purchase Notice has been given and not withdrawn by the Holder thereof in accordance with the terms of this Indenture (except, in the case of Securities to be purchased in part, the portion thereof not to be purchased).

(b)    Notwithstanding any provision to the contrary herein, so long as a Global Security remains outstanding and is held by or on behalf of the Depositary, transfers of a Global Security, in whole or in part, shall be made only in accordance with Section 2.12 and this Section 2.06(b). Transfers of a Global Security shall be limited to transfers of such Global Security in whole, or in part, to nominees of the Depositary or to a successor of the Depositary or such successor's nominee.

(c)    Successive registrations and registrations of transfers and exchanges as aforesaid may be made from time to time as desired, and each such registration shall be noted on the register for the Securities.

(d)    Any Registrar appointed pursuant to Section 2.03 hereof shall provide to the Trustee such information as the Trustee may reasonably require in connection with the delivery by such Registrar of Securities upon registration of transfer or exchange of Securities.

(e)    No Registrar shall be required to make registrations of transfer or exchange of Securities during any periods designated in the text of the Securities or in this Indenture as periods during which such registration of transfers and exchanges need not be made.

SECTION 2.07    Replacement Securities.

(a)    If (i) any mutilated Security is surrendered to the Trustee, or (ii) the Company and the Trustee receive evidence to their satisfaction of the destruction, loss or theft of any Security, and there is delivered to the Company and the Trustee such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Company or the Trustee that such Security has been acquired by a protected purchaser within the meaning of Article 8 of the Uniform Commercial Code as in effect from time to time in the State of New York (a " Protected Purchaser "), the Company shall execute and upon a Company Request the Trustee shall authenticate and deliver, in exchange for any such mutilated Security or in lieu of any such destroyed, lost or stolen Security, a new Security of like tenor and Principal Amount, bearing a number not contemporaneously outstanding.

(b)    In case any such mutilated, destroyed, lost or stolen Security has become or is about to become due and payable, or is about to be purchased by the Company pursuant to Article 3 hereof, the Company in its discretion may, instead of issuing a new Security, pay or purchase such Security, as the case may be.

(c)    Upon the issuance of any new Securities under this Section, the Company may require the payment of a sum sufficient to cover any tax or other governmental

14

charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

(d)        Every new Security issued pursuant to this Section in lieu of any mutilated, destroyed, lost or stolen Security shall constitute an original additional contractual obligation of the Company, whether or not the mutilated, destroyed, lost or stolen Security shall be at any time enforceable by anyone, and shall be entitled to all benefits of this Indenture equally and proportionately with any and all other Securities duly issued hereunder.

(e)        The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Securities.

SECTION 2.08        Outstanding Securities; Determinations of Holders' Action.

(a)        Securities outstanding at any time are all the Securities authenticated by the Trustee except for those cancelled by it, those paid pursuant to Section 2.07 and delivered to it for cancellation and those described in this Section 2.08 as not outstanding. A Security does not cease to be outstanding because the Company or an Affiliate thereof holds the Security; provided, however, that in determining whether the Holders of the requisite Principal Amount of Securities have given or concurred in any request, demand, authorization, direction, notice, consent or waiver hereunder, Securities owned by the Company or any other obligor upon the Securities or any Affiliate of the Company or such other obligor shall be disregarded and deemed not to be outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Securities which a Responsible Officer of the Trustee actually knows to be so owned shall be so disregarded. Subject to the foregoing, only Securities outstanding at the time of such determination shall be considered in any such determination (including, without limitation, determinations pursuant to Articles 6 and 9).

(b)        If a Security is replaced pursuant to Section 2.07, the replaced Security ceases to be outstanding unless the Trustee and the Company receive proof satisfactory to each of them that the replaced Security is held by a Protected Purchaser.

(c)        If the Paying Agent holds, in accordance with this Indenture, on a Change in Control Purchase Date, or on Stated Maturity, money or securities, if permitted hereunder, sufficient to pay Securities payable on that date, then immediately after such Change in Control Purchase Date or Stated Maturity, as the case may be, such Securities shall cease to be outstanding and interest on such Securities shall cease to accrue whether or not the Security is delivered to the Paying Agent.

(d)        If a Security is converted in accordance with Article 10, then from and after the time of conversion on the Conversion Date, such Security shall cease to be outstanding and interest shall cease to accrue on such Security.

SECTION 2.09      Temporary Securities.

(a)      Pending the preparation of definitive Securities, the Company may execute, and the Trustee upon receipt of a Company Order shall authenticate and deliver, temporary Securities which are printed, lithographed, typewritten, mimeographed or otherwise produced, in any authorized denomination, substantially of the tenor of the definitive Securities in lieu of which they are issued and with such appropriate insertions, omissions, substitutions and other variations as the officers executing such Securities may determine, as conclusively evidenced by their execution of such Securities.

(b)      If temporary Securities are issued, the Company will cause definitive Securities to be prepared without unreasonable delay. After the preparation of definitive Securities, the temporary Securities shall be exchangeable for definitive Securities upon surrender of the temporary Securities at the office or agency of the Company designated for such purpose pursuant to Section 2.03, without charge to the Holder. Upon surrender for cancellation of any one or more temporary Securities, the Company shall execute and the Trustee upon receipt of a Company Order shall authenticate and deliver in exchange therefor a like Principal Amount of definitive Securities of authorized denominations. Until so exchanged the temporary Securities shall in all respects be entitled to the same benefits under this Indenture as definitive Securities.

SECTION 2.10      Cancellation.

All Securities surrendered for payment, purchase by the Company pursuant to Article 3, conversion or registration of transfer or exchange shall, if surrendered to any person other than the Trustee, be delivered to the Trustee and shall be promptly cancelled by it. The Company may at any time deliver to the Trustee for cancellation any Securities previously authenticated and delivered hereunder which the Company may have acquired in any manner whatsoever, and all Securities so delivered shall be promptly cancelled by the Trustee. The Company may not issue new Securities to replace Securities it has paid or delivered to the Trustee for cancellation or that any Holder has converted pursuant to Article 10. No Securities shall be authenticated in lieu of or in exchange for any Securities cancelled as provided in this Section, except as expressly permitted by this Indenture. All cancelled Securities held by the Trustee shall be disposed of by the Trustee in accordance with the Trustee's customary procedure.

SECTION 2.11      Persons Deemed Owners.

Prior to due presentment of a Security for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name such Security is registered as the owner of such Security for the purpose of receiving payment of principal of the Security or the payment of any Change in Control Purchase Price in respect thereof, and interest thereon, for the purpose of conversion and for all other purposes whatsoever, whether or not such Security be overdue, and neither the Company, the Trustee nor any agent of the Company or the Trustee shall be affected by notice to the contrary.

16

SECTION 2.12     <u>Legend; Additional Transfer and Exchange Requirements</u>.

(a)     If Securities are issued upon the transfer, exchange or replacement of Securities subject to restrictions on transfer and bearing the legends set forth in Section 2.12(f) (collectively, the "<u>Legend</u>"), or if a request is made to remove the Legend on a Security, the Securities so issued shall bear the Legend, or the Legend shall not be removed, as the case may be, unless there is delivered to the Company and the Registrar such satisfactory evidence, which shall include an Opinion of Counsel, as may be reasonably required by the Company and the Registrar, that neither the Legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of Rule 144A or Rule 144 under the Securities Act or that such Securities are not "<u>restricted</u>" within the meaning of Rule 144 under the Securities Act; provided that no such evidence need be supplied in connection with the sale of such Security pursuant to a registration statement that is effective at the time of such sale. Upon (1) provision of such satisfactory evidence if requested, or (2) notification by the Company to the Trustee and Registrar of the sale of such Security pursuant to a registration statement that is effective at the time of such sale, the Trustee, upon Company Order, shall authenticate and deliver a Security that does not bear the Legend. If the Legend is removed from the face of a Security and the Security is subsequently held by an Affiliate of the Company, the Legend shall be reinstated.

(b)     Subject to Section 2.12(c)(i) and in compliance with Section 2.12(d), every Security shall be subject to the restrictions on transfer provided in the Legend. Whenever any Restricted Security other than a Restricted Global Security is presented or surrendered for registration of transfer or in exchange for a Security registered in a name other than that of the Holder, such Security must be accompanied by a certificate in substantially the form set forth in Exhibit A, dated the date of such surrender and signed by the Holder of such Security, as to compliance with such restrictions on transfer. The Registrar shall not be required to accept for such registration of transfer or exchange any Security not so accompanied by a properly completed certificate.

(c)     Notwithstanding any other provisions of this Indenture or the Securities, (A) transfers of a Global Security, in whole or in part, shall be made only in accordance with Section 2.06 and Section 2.12(c)(i), (B) transfer of a beneficial interest in a Global Security for a Certificated Security shall comply with Section 2.06 and Section 2.12(c)(ii) below, and (C) transfers of a Certificated Security shall comply with Section 2.06 and Section 2.12(c)(iii) and (iv) below.

(i)     Transfer of Global Security. A Global Security may not be transferred, in whole or in part, to any Person other than the Depositary or a nominee or any successor thereof, and no such transfer to any such other Person may be registered; provided that this clause (i) shall not prohibit any transfer of a Security that is issued in exchange for a Global Security but is not itself a Global Security. No transfer of a Security to any Person shall be effective under this Indenture or the Securities unless and until such Security has been registered in the name of such Person. Nothing in this Section 2.12(c)(i) shall prohibit or render ineffective any transfer of a beneficial interest in a Global Security effected in accordance with the other provisions of this Section 2.12(c).

17

(ii)        Restrictions on Transfer of a Beneficial Interest in a Global Security for a Certificated Security. A beneficial interest in a Global Security may not be exchanged for a Certificated Security except upon satisfaction of the requirements set forth below. Upon receipt by the Trustee of a request for transfer of a beneficial interest in a Global Security in accordance with Applicable Procedures for a Certificated Security in the form satisfactory to the Trustee, together with written instructions to the Trustee to make, or direct the Registrar to make, an adjustment on its books and records with respect to such Global Security to reflect a decrease in the aggregate Principal Amount of the Securities represented by the Global Security, such instructions to contain information regarding the Depositary account to be credited with such decrease, then the Trustee shall cause, or direct the Registrar to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Registrar, the aggregate Principal Amount of Securities represented by the Global Security to be decreased by the aggregate Principal Amount of the Certificated Security to be issued, shall authenticate and deliver such Certificated Security and shall debit or cause to be debited to the account of the Person specified in such instructions a beneficial interest in the Global Security equal to the Principal Amount of the Certificated Security so issued.

(iii)       Transfer and Exchange of Certificated Securities. When Certificated Securities are presented to the Registrar with a request:

          (x)        to register the transfer of such Certificated Securities; or

          (y)        to exchange such Certificated Securities for an equal Principal Amount of Certificated Securities of other authorized denominations,

the Registrar shall register the transfer or make the exchange as requested if its reasonable requirements for such transaction are met; provided, however, that the Certificated Securities surrendered for registration of transfer or exchange shall be duly endorsed or accompanied by a written instrument of transfer in form reasonably satisfactory to the Company and the Registrar, duly executed by the Holder thereof or his attorney duly authorized in writing.

(iv)        Restrictions on Transfer of a Certificated Security for a Beneficial Interest in a Global Security. A Certificated Security may not be exchanged for a beneficial interest in a Global Security except upon satisfaction of the requirements set forth below.

Upon receipt by the Trustee of a Certificated Security, duly endorsed or accompanied by appropriate instruments of transfer, in form satisfactory to the Trustee, together with written instructions directing the Trustee to make, or to direct the Registrar to make, an adjustment on its books and records with respect to such Global Security to reflect an increase in the aggregate Principal Amount of the Securities represented by the Global Security, such instructions to contain information regarding the Depositary account to be credited with such increase, then the Trustee shall cancel such Certificated Security and cause, or direct the Registrar to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Registrar, the aggregate Principal Amount of Securities represented by the Global Security to be increased by the aggregate Principal Amount of the Certificated Security to be exchanged,

18

and shall credit or cause to be credited to the account of the Person specified in such instructions a beneficial interest in the Global Security equal to the Principal Amount of the Certificated Security so cancelled. If no Global Securities are then outstanding, the Company shall issue and the Trustee upon receipt of a Company Order shall authenticate a new Global Security in the appropriate Principal Amount.

(d)     The restrictions imposed by the Legend upon the transferability of any Security shall cease and terminate when such Security has been sold pursuant to an effective registration statement under the Securities Act or transferred in compliance with Rule 144 under the Securities Act (or any successor provision thereto) or, if earlier, upon the expiration of the holding period applicable to sales thereof under Rule 144(k) under the Securities Act (or any successor provision). Any Security as to which such restrictions on transfer shall have expired in accordance with their terms or shall have terminated may, upon a surrender of such Security for exchange to the Registrar in accordance with the provisions of this Section 2.12 (accompanied, in the event that such restrictions on transfer have terminated by reason of a transfer in compliance with Rule 144 or any successor provision, by an Opinion of Counsel reasonably acceptable to the Company and the Registrar and addressed to the Company and the Registrar, to the effect that the transfer of such Security has been made in compliance with Rule 144 or such successor provision), be exchanged for a new Security, of like tenor and aggregate principal amount, which shall not bear the restrictive Legend. The Company shall inform the Trustee of the effective date of any registration statement registering the offer and sale of the Securities under the Securities Act. The Trustee or the Registrar shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the aforementioned Opinion of Counsel.

As used in Sections 2.12(b) and (d), the term "transfer" encompasses any sale, pledge, transfer, hypothecation or other disposition of any Security

(e)     The provisions of clauses (1), (2), (3) and (4) below shall apply only to Global Securities:

(1)     Notwithstanding any other provisions of this Indenture or the Securities, except as provided in Section 2.12(c)(ii), a Global Security shall not be exchanged in whole or in part for a Security registered in the name of any Person other than the Depositary or one or more nominees thereof, provided that a Global Security may be exchanged for Securities registered in the names of any person designated by the Depositary in the event that (i) the Depositary has notified the Company that it is unwilling or unable to continue as Depositary for such Global Security or such Depositary has ceased to be a "clearing agency" registered under the Exchange Act, and a successor Depositary is not appointed by the Company within 90 days, (ii) the Company decides to discontinue use of the system of book-entry transfer through DTC (or any successor depositary); or (iii) an Event of Default has occurred and is continuing with respect to the Securities. Any Global Security exchanged pursuant to clause (i) or (ii) above shall be so exchanged in whole and not in part, and any Global Security exchanged pursuant to clause (iii) above may be exchanged in whole or from time to time in part as directed by the Depositary. Any Security issued in exchange for a Global Security or any portion thereof shall be a Global Security; provided that any such Security so issued that is registered in the name of a Person other than the Depositary or a nominee thereof shall not be a Global Security.

19

(2)        Securities issued in exchange for a Global Security or any portion thereof shall be issued in definitive, fully registered form, without interest coupons, shall have an aggregate Principal Amount equal to that of such Global Security or portion thereof to be so exchanged, shall be registered in such names and be in such authorized denominations as the Depositary shall designate and shall bear the applicable legends provided for herein. Any Global Security to be exchanged in whole shall be surrendered by the Depositary to the Trustee, as Registrar. With regard to any Global Security to be exchanged in part, either such Global Security shall be so surrendered for exchange or, if the Trustee is acting as custodian for the Depositary or its nominee with respect to such Global Security, the Principal Amount thereof shall be reduced, by an amount equal to the portion thereof to be so exchanged, by means of an appropriate adjustment made on the records of the Trustee. Upon any such surrender or adjustment, the Trustee shall authenticate and deliver the Security issuable on such exchange to or upon the order of the Depositary or an authorized representative thereof.

(3)        Subject to the provisions of clause (5) below, the registered Holder may grant proxies and otherwise authorize any Person, including Agent Members (as defined below) and persons that may hold interests through Agent Members, to take any action which a holder is entitled to take under this Indenture or the Securities.

(4)        In the event of the occurrence of any of the events specified in clause (1) above, the Company will promptly make available to the Trustee a reasonable supply of Certificated Securities in definitive, fully registered form, without interest coupons.

(5)        Neither any members of, or participants in, the Depositary (collectively, the "Agent Members") nor any other Persons on whose behalf Agent Members may act shall have any rights under this Indenture with respect to any Global Security registered in the name of the Depositary or any nominee thereof, or under any such Global Security, and the Depositary or such nominee, as the case may be, may be treated by the Company, the Trustee and any agent of the Company or the Trustee as the absolute owner and holder of such Global Security for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Trustee or any agent of the Company or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depositary or such nominee, as the case may be, or impair, as between the Depositary, its Agent Members and any other person on whose behalf an Agent Member may act, the operation of customary practices of such Persons governing the exercise of the rights of a holder of any Security.

(f)        Until the expiration of the holding period applicable to sales thereof under Rule 144(k) under the Securities Act (or any successor provision thereto), any stock certificate representing Common Stock issued upon conversion of any Security shall bear a legend in substantially the following form, unless such Common Stock has been sold pursuant to a registration statement that has been declared effective under the Securities Act (and which continues to be effective at the time of such transfer) or transferred in compliance with Rule 144 under the Securities Act (or any successor provision thereto), or such Common Stock has been issued upon conversion of Securities that have been transferred pursuant to a registration statement that has been declared effective under the Securities Act or pursuant to Rule 144 under the Securities Act (or any successor provision thereto), or unless otherwise agreed by the Company in writing with written notice thereof to the transfer agent:

20

THE COMMON STOCK EVIDENCED HEREBY HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS, AND, ACCORDINGLY, MAY NOT BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATION UNDER THE SECURITIES ACT.

BY ITS ACQUISITION HEREOF, THE HOLDER AGREES TO OFFER, SELL OR OTHERWISE TRANSFER THE COMMON STOCK EVIDENCED HEREBY PRIOR TO THE DATE THAT IS TWO YEARS AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH AMGEN INC. (THE "COMPANY") OR ANY AFFILIATE OF THE COMPANY WAS THE OWNER OF THE COMMON STOCK EVIDENCED HEREBY (OR ANY PREDECESSOR OF THE COMMON STOCK EVIDENCED HEREBY) (THE "RESALE RESTRICTION TERMINATION DATE") ONLY (A) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, (B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, OR (C) PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE COMPANY'S AND THE TRANSFER AGENT'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSE (C) PRIOR TO THE RESALE RESTRICTION TERMINATION DATE TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATIONS AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM, AND IN EACH OF THE FOREGOING CASES, TO REQUIRE THAT A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THE OTHER SIDE OF THIS CERTIFICATE IS COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE TRANSFER AGENT. THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE HOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE.

Any such Common Stock as to which such restrictions on transfer shall have expired in accordance with their terms or as to which the conditions for removal of the foregoing legend set forth therein have been satisfied may, upon surrender of the certificates representing such shares of Common Stock for exchange in accordance with the procedures of the transfer agent for the Common Stock, be exchanged for a new certificate or certificates for a like number of shares of Common Stock, which shall not bear the restrictive legend required by this section.

(g)    Until the expiration of the holding period applicable to sales thereof under Rule 144(k) under the Securities Act (or any successor provision thereto), any certificate representing any Security shall bear a legend in substantially the following form, unless such Security has been sold pursuant to a registration statement that has been declared effective under the Securities Act (and which continues to be effective at the time of such transfer) or transferred in compliance with Rule 144 under the Securities Act (or any successor provision thereto), or unless otherwise agreed by the Company in writing with written notice thereof to the transfer agent:

THE NOTES AND THE SHARES OF COMMON STOCK ISSUABLE UPON CONVERSION OF THIS NOTE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF

21

1933, AS AMENDED (THE SECURITIES ACT), OR ANY STATE SECURITIES LAWS. NEITHER THIS NOTE, THE SHARES OF COMMON STOCK ISSUABLE UPON CONVERSION OF THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN OR THEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATION.

BY ITS ACQUISITION HEREOF, THE HOLDER (1) AGREES TO OFFER, SELL OR OTHERWISE TRANSFER SUCH NOTE PRIOR TO THE DATE WHICH IS TWO YEARS AFTER THE LATER OF THE LAST ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE COMPANY OR ANY AFFILIATE OF THE COMPANY WAS THE OWNER OF THIS NOTE (OR ANY PREDECESSOR OF THIS NOTE) ONLY (A) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, (B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) TO A PERSON IT REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE COMPANY'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSE (D) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATIONS AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM, AND IN EACH OF THE FOREGOING CASES, TO REQUIRE THAT A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THE OTHER SIDE OF THIS NOTE IS COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE TRUSTEE. THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE HOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE.

Any such Security as to which such restrictions on transfer shall have expired in accordance with their terms or as to which the conditions for removal of the foregoing legend set forth therein have been satisfied may, upon surrender of the certificates representing such Security for exchange in accordance with the procedures of the transfer agent, be exchanged for a new certificate or certificates for a like amount of Securities, which shall not bear the restrictive legend required by this section.

SECTION 2.13    CUSIP Numbers.

The Company in issuing the Securities may use "CUSIP" numbers (if then generally in use), and, if so, the Trustee shall use " CUSIP " numbers in notices of redemption as a convenience to Holders; provided that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Securities or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Securities, and any such redemption shall not be affected by any defect in or omission of such numbers. The Company will promptly notify the Trustee in writing of any change in the CUSIP numbers.

# ARTICLE 3

# PURCHASES

SECTION 3.01      Purchase of Securities at Option of the Holder upon Change in Control.

(a)        If on or prior to the date specified in paragraph 5 of the Securities, there shall have occurred a Change in Control, each Holder shall have the right, at such Holder's option, to require the Company to purchase for cash all or any portion of such Holder's Securities in integral multiples of $1,000 Principal Amount at a purchase price specified in paragraph 5 of the Securities (the "Change in Control Purchase Price"), as of the date that is no later than 35 Business Days after the occurrence of the Change in Control but in no event prior to the date on which such Change in Control occurs (the "Change in Control Purchase Date"), subject to satisfaction by or on behalf of the Holder of the requirements set forth in Section 3.01(c).

A "Change in Control" shall be deemed to have occurred at such time as either of the following events shall occur:

(1)        any person or group, other than the Company, its Subsidiaries or any employee benefits plan of the Company or its Subsidiaries, files a Schedule 13D or Schedule TO (or any successor schedule, form or report) pursuant to the Exchange Act, disclosing that such person has become the beneficial owner of 50% or more of the voting power of the Common Stock then outstanding or other capital stock into which the Common Stock is reclassified or changed; provided, however, that a person shall not be deemed beneficial owner of, or to own beneficially, (A) any securities tendered pursuant to a tender or exchange offer made by or on behalf of such person or any of such person's Affiliates until such tendered securities are accepted for purchase or exchange thereunder, or (B) any securities if such beneficial ownership (1) arises solely as a result of a revocable proxy delivered in response to a proxy or consent solicitation made pursuant to the applicable rules and regulations under the Exchange Act, and (2) is not also then reportable on Schedule 13D (or any successor schedule) under the Exchange Act; or

(2)        the Company consolidates with or merges with or into another person (other than a Subsidiary of the Company), or sells, conveys, transfers or leases all or substantially all of its properties and assets to any person (other than a Subsidiary of the Company) or any person (other than a Subsidiary of the Company) consolidates with or merges with or into the Company, and the outstanding Voting Stock of the Company is reclassified into, converted for or converted into the right to receive any other property or security, provided that none of these circumstances will be a change in control if the persons that beneficially own the Voting Stock of the Company immediately prior to the transaction own, directly or indirectly, shares with a majority of the total voting power of all outstanding Voting Stock of the surviving or transferee person that are entitled to vote generally in the election of that person's board of directors, managers or trustees immediately after the transaction.

For purposes of defining a Change in Control:

23

(x)       the term "<u>person</u>" and the term "<u>group</u>" have the meanings given by Section 13(d) and 14(d) of the Exchange Act or any successor provisions;

(y)       the term "<u>group</u>" includes any group acting for the purpose of acquiring, holding or disposing of securities within the meaning of Rule 13d-5(b)(1) under the Exchange Act or any successor provision; and

(z)       the term "<u>beneficial owner</u>" is determined in accordance with Rules 13d-3 and 13d-5 under the Exchange Act or any successor provisions, except that a person will be deemed to have beneficial ownership of all shares that person has the right to acquire irrespective of whether that right is exercisable immediately or only after the passage of time.

Notwithstanding the foregoing, it will not constitute a Change in Control if 100% of the consideration for the Common Stock (excluding cash payments for fractional shares and cash payments made in respect of dissenter's appraisal rights and cash payment of the Required Cash Amount, if any) in the transaction or transactions constituting the Change in Control consists of common stock traded on a United States national securities exchange or quoted on The Nasdaq National Market, or which will be so traded or quoted when exchanged in connection with the Change in Control, and as a result of such transaction or transactions the Securities become convertible solely into such common stock.

(b)       As promptly as practicable following the date the Company publicly announces the Change in Control transaction, but in no event less than 15 Business Days prior to the anticipated effective date of a Change in Control, the Company shall mail a written notice of Change in Control by first-class mail to the Trustee and to each Holder at their addresses shown in the register of the Registrar (and to beneficial owners as required by applicable law). The notice shall include a form of Change in Control Purchase Notice to be completed by the Securityholder and shall state:

(1)       briefly, the events causing a Change in Control;

(2)       the anticipated effective date of such Change in Control;

(3)       whether such Change in Control will also constitute a Public Acquirer Change in Control and the conversion rights available to the Holders in connection with such Public Acquirer Change in Control, including the period of conversion, if any, and any adjustments to the Conversion Rate;

(4)       the date by which the Change in Control Purchase Notice pursuant to this Section 3.01 must be given;

(5)       the Change in Control Purchase Price;

(6)       the Change in Control Purchase Date;

(7)        the name and address of the Paying Agent and the Conversion Agent;

(8)        the Conversion Rate and any adjustments thereto;

(9)        that Securities with respect to which a Change in Control Purchase Notice has been given by the Holder may be converted pursuant to Article 10 hereof only if the Change in Control Purchase Notice has been withdrawn in accordance with the terms of this Indenture;

(10)       the procedures a Holder must follow to exercise rights under this Section 3.01;

(11)       that Securities must be surrendered to the Paying Agent to collect payment of the Change in Control Purchase Price;

(12)       that the Change in Control Purchase Price for any Security as to which a Change in Control Purchase Notice has been duly given and not withdrawn, together with any accrued interest payable with respect thereto, will be paid on or prior to the third Business Day following the later of the Change in Control Purchase Date and the time of surrender of such Security;

(13)       briefly, the procedures the Holder must follow to exercise rights under this Section 3.01;

(14)       briefly, the conversion rights of the Securities;

(15)       the procedures for withdrawing a Change in Control Purchase Notice;

(16)       that, unless the Company defaults in making payment of such Change in Control Purchase Price and interest due, if any, interest on Securities surrendered for purchase will cease to accrue on and after the Change in Control Purchase Date; and

(17)       the CUSIP number of the Securities.

(c)        A Holder may exercise its rights specified in Section 3.01(a) by delivery of a written notice of purchase (a "<u>Change in Control Purchase Notice</u> ") to the Paying Agent at any time prior to the Close of Business on the Change in Control Purchase Date, stating:

(1)        the certificate number of the Security which the Holder will deliver to be purchased;

(2)        the portion of the Principal Amount of the Security which the Holder will deliver to be purchased, which portion must be $1,000 or an integral multiple thereof; and

(3)        that such Security shall be purchased pursuant to the terms and conditions specified in paragraph 5 of the Securities.

The delivery of such Security to the Paying Agent prior to, on or after the Change in Control Purchase Date (together with all necessary endorsements) at the offices of the Paying Agent shall be a condition to the receipt by the Holder of the Change in Control Purchase Price therefor; provided, however, that such Change in Control Purchase Price shall be so paid pursuant to this Section 3.01 only if the Security so delivered to the Paying Agent shall conform in all respects to the description thereof set forth in the related Change in Control Purchase Notice.

The Company shall purchase from the Holder thereof, pursuant to this Section 3.01, a portion of a Security if the Principal Amount of such portion is $1,000 or an integral multiple of $1,000. Provisions of this Indenture that apply to the purchase of all of a Security also apply to the purchase of such portion of such Security.

Any purchase by the Company contemplated pursuant to the provisions of this Section 3.01 shall be consummated by the delivery of the consideration to be received by the Holder (together with accrued and unpaid interest) on or prior to the third Business Day following the later of the Change in Control Purchase Date and the time of delivery of the Security to the Paying Agent in accordance with this Section 3.01.

Notwithstanding anything herein to the contrary, any Holder delivering to the Paying Agent the Change in Control Purchase Notice contemplated by this Section 3.01(c) shall have the right to withdraw such Change in Control Purchase Notice at any time prior to the Close of Business on the Change in Control Purchase Date by delivery of a written notice of withdrawal to the Paying Agent in accordance with Section 3.02.

The Paying Agent shall promptly notify the Company of the receipt by it of any Change in Control Purchase Notice or written withdrawal thereof.

The Company shall not be required to comply with this Section 3.01 if a third party mails a written notice of Change in Control in the manner, at the times and otherwise in compliance with this Section 3.01 and repurchases all Securities for which a Change in Control Purchase Notice shall be delivered and not withdrawn.

SECTION 3.02      <u>Effect of Change in Control Purchase Notice</u>.

Upon receipt by the Paying Agent of the Change in Control Purchase Notice specified in Section 3.01(c), the Holder of the Security in respect of which such Change in Control Purchase Notice was given shall (unless such Change in Control Purchase Notice is withdrawn as specified in the following two paragraphs) thereafter be entitled to receive solely the Change in Control Purchase Price and any accrued and unpaid interest, with respect to such Security. Such Change in Control Purchase Price and interest shall be paid to such Holder, subject to receipt of funds by the Paying Agent, on or prior to the third Business Day following the later of (x) the Change in Control Purchase Date, with respect to such Security (provided the conditions in Section 3.01(c) have been satisfied) and (y) the time of delivery of such Security to the Paying Agent by the Holder thereof in the manner required by Section 3.01(c). Securities in

respect of which a Change in Control Purchase Notice has been given by the Holder thereof may not be converted pursuant to Article 10 hereof on or after the date of the delivery of such Change in Control Purchase Notice unless such Change in Control Purchase Notice has first been validly withdrawn as specified in the following two paragraphs.

A Change in Control Purchase Notice may be withdrawn by means of a written notice of withdrawal delivered to the office of the Paying Agent in accordance with the Change in Control Purchase Notice at any time prior to the Close of Business on the Change in Control Purchase Date specifying:

(1)        the certificate number of the Security in respect of which such notice of withdrawal is being submitted,

(2)        the Principal Amount of the Security with respect to which such notice of withdrawal is being submitted, and

(3)        the Principal Amount, if any, of such Security which remains subject to the original Change in Control Purchase Notice and which has been or will be delivered for purchase by the Company.

A written notice of withdrawal of a Change in Control Purchase Notice may be in the form set forth in the preceding paragraph.

There shall be no purchase of any Securities pursuant to 3.01 if there has occurred (prior to, on or after, as the case may be, the giving, by the Holders of such Securities, of the required Change in Control Purchase Notice) and is continuing an Event of Default (other than a default in the payment of the Change in Control Purchase Price). The Paying Agent will promptly return to the respective Holders thereof any Securities (x) with respect to which a Change in Control Purchase Notice has been withdrawn in compliance with this Indenture, or (y) held by it during the continuance of an Event of Default (other than a default in the payment of the Change in Control Purchase Price) in which case, upon such return, the Change in Control Purchase Notice with respect thereto shall be deemed to have been withdrawn.

SECTION 3.03        Deposit of Change in Control Purchase Price.

Prior to 10:00 a.m. (New York City time) on or prior to the third Business Day following the Change in Control Purchase Date, as the case may be, the Company shall deposit with the Trustee or with the Paying Agent (or, if the Company or a Subsidiary or an Affiliate of either of them is acting as the Paying Agent, shall segregate and hold in trust as provided in Section 2.04) an amount of money (in immediately available funds if deposited on such Business Day) sufficient to pay the aggregate Change in Control Purchase Price of all the Securities or portions thereof which are to be purchased as of the Change in Control Purchase Date.

SECTION 3.04        Securities Purchased in Part.

Any Security which is to be purchased only in part shall be surrendered at the office of the Paying Agent (with, if the Company or the Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Company and the Trustee duly

executed by, the Holder thereof or such Holder's attorney duly authorized in writing) and the Company shall execute and the Trustee shall authenticate and deliver to the Holder of such Security, without service charge, a new Security or Securities, of any authorized denomination as requested by such Holder in aggregate Principal Amount equal to, and in exchange for, the portion of the Principal Amount of the Security so surrendered which is not purchased.

SECTION 3.05    Covenant to Comply With Securities Laws Upon Purchase of Securities.

          In connection with any offer to purchase or purchase of Securities under Section 3.01 hereof (provided that such offer or purchase constitutes an " issuer tender offer " for purposes of Rule 13e-4 (which term, as used herein, includes any successor provision thereto) under the Exchange Act at the time of such offer or purchase), the Company shall, to the extent required by law, (i) comply with Rule 13e-4, Rule 14e-1 and any other tender offer rules under the Exchange Act which may then apply and (ii) otherwise comply with all Federal and state securities laws so as to permit the rights and obligations under 3.01 to be exercised in the time and in the manner specified in Section 3.01.

SECTION 3.06    Repayment to the Company.

          The Trustee and the Paying Agent shall return to the Company any cash that remains unclaimed as provided in paragraph 10 of the Securities, together with interest thereon (subject to the provisions of Section 7.01(f)), held by them for the payment of the Change in Control Purchase Price; provided, however, that to the extent that the aggregate amount of cash deposited by the Company pursuant to Section 3.03 exceeds the aggregate Change in Control Purchase Price, with respect to, the Securities or portions thereof which the Company is obligated to purchase as of the Change in Control Purchase Date, whether as a result of withdrawal or otherwise, then promptly after the Business Day following the Change in Control Purchase Date, the Trustee shall return any such excess to the Company together with interest thereon (subject to the provisions of Section 7.01(f)).

## ARTICLE 4

## COVENANTS

SECTION 4.01    Payment of Securities.

          The Company shall promptly make all payments of principal of, premium, if any, and interest in respect of the Securities on the dates and in the manner provided in the Securities or pursuant to this Indenture. Any amounts to be given to the Trustee or Paying Agent, shall be deposited with the Trustee or Paying Agent by 10:00 a.m., New York City time, by the Company. Principal Amount, Change in Control Purchase Price, and interest, shall be considered paid on the applicable date due if on such date (or, in the case of a Change in Control Purchase Price, on or prior to the third Business Day following the applicable Change in Control Purchase Date) the Trustee or the Paying Agent holds, in accordance with this Indenture, money or securities, if permitted hereunder, sufficient to pay all such amounts then due. All references in this indenture to "interest" shall include Additional Interest, if any. The Company shall pay

all Additional Interest, if any, in the same manner on the dates set forth in the Securities and in the amounts set forth in the Registration Rights Agreement.

The Company shall, to the extent permitted by law, pay interest on overdue amounts at the rate per annum set forth in paragraph 1 of the Securities, compounded semiannually, which interest shall accrue from the date such overdue amount was originally due to the date payment of such amount, including interest thereon, has been made or duly provided for.

SECTION 4.02    SEC and Other Reports.

The Company shall deliver to the Trustee, within 15 days after it files such annual and quarterly reports, information, documents and other reports with the SEC, copies of its annual report and of the information, documents and other reports (or copies of such portions of any of the foregoing as the SEC may by rules and regulations prescribe) which the Company is required to file with the SEC pursuant to Section 13 or 15(d) of the Exchange Act. In the event the Company is at any time no longer subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, it shall continue to provide the Trustee with reports containing substantially the same information as would have been required to be filed with the SEC had the Company continued to have been subject to such reporting requirements. In such event, such reports shall be provided at the times the Company would have been required to provide reports had it continued to have been subject to such reporting requirements. The Company also shall comply with the other provisions of TIA Section 314(a). Delivery of such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt of the same shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officers' Certificates).

SECTION 4.03    Compliance Certificate.

The Company shall deliver to the Trustee within 120 days after the end of each fiscal year of the Company (beginning with the fiscal year ending on December 31, 2006) an Officers' Certificate, stating whether or not to the knowledge of the signers thereof the Company is in default in the performance and observance of any of the terms, provisions and conditions of this Indenture (without regard to any period of grace or requirement of notice provided hereunder) and if the Company shall be in default, specifying all such defaults and the nature and status thereof of which they may have knowledge.

SECTION 4.04    Maintenance of Office or Agency.

The Company will maintain an office or agency of the Trustee, Registrar, Paying Agent and Conversion Agent where Securities may be presented or surrendered for payment, where Securities may be surrendered for registration of transfer, exchange for other Securities, purchase or conversion for Common Stock and where notices and demands to or upon the Company in respect of the Securities and this Indenture may be served. The Trustee's office specified in Section 12.02 shall initially be such office or agency for all of the aforesaid

29

purposes. The Company shall give prompt written notice to the Trustee of the location, and of any change in the location, of any such office or agency (other than a change in the location of the office of the Trustee). If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the address of the Trustee set forth in Section 12.02.

The Company may also from time to time designate one or more other offices or agencies where the Securities may be presented or surrendered for any or all such purposes and may from time to time rescind such designations.

## ARTICLE 5

## SUCCESSOR CORPORATION

SECTION 5.01    When Company May Merge or Transfer Assets.

The Company shall not consolidate with or merge with or into any other person or convey, transfer or lease all or substantially all its properties and assets to another person, unless:

(a)    either (1) the Company shall be the continuing corporation or (2) the person (if other than the Company) formed by such consolidation or into which the Company is merged or the person which acquires by conveyance, transfer or lease all or substantially all the properties and assets of the Company (i) shall be organized and validly existing under the laws of the United States, any State thereof or the District of Columbia and (ii) shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, in form satisfactory to the Trustee, all of the obligations of the Company under the Securities and this Indenture;

(b)    immediately after giving effect to such transaction, no Default shall have occurred and be continuing; and

(c)    the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger, conveyance, transfer or lease and, if a supplemental indenture is required in connection with such transaction, such supplemental indenture, comply with this Article 5 and that all conditions precedent herein provided for relating to such transaction have been satisfied.

For purposes of the foregoing, the transfer (by lease, assignment, sale or otherwise) of the properties and assets of one or more Subsidiaries (other than to the Company or another Subsidiary), which, if such assets were owned by the Company, would constitute all or substantially all of the properties and assets of the Company, shall be deemed to be the transfer of all or substantially all of the properties and assets of the Company.

The successor person formed by such consolidation or into which the Company is merged or the successor person to which such conveyance, transfer or lease is made shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture with the same effect as if such successor had been named as the Company

30

herein; and thereafter, except in the case of a lease and obligations the Company may have under a supplemental indenture pursuant to Section 10.17, the Company shall be discharged from all obligations and covenants under this Indenture and the Securities. Subject to Section 9.06, the Company, the Trustee and the successor person shall enter into a supplemental indenture to evidence the succession and substitution of such successor person and such discharge and release of the Company.

# ARTICLE 6

## DEFAULTS AND REMEDIES

SECTION 6.01     Events of Default.

An "Event of Default" occurs if:

(1)     the Company defaults in the payment of the Principal Amount or Change in Control Purchase Price on any Security when the same becomes due and payable at its Stated Maturity, upon declaration, when due for purchase by the Company or otherwise;

(2)     the Company defaults in payment of any interest due on the Securities, which default continues for 30 days;

(3)     the Company fails to comply with any of its agreements in the Securities or this Indenture (other than those referred to in clauses (1) and (2) above) and such failure continues for 60 days after receipt by the Company of a Notice of Default (as defined below);

(4)     (a) the Company fails to make any payment by the end of any applicable grace period after maturity of Indebtedness in an amount in excess of $50,000,000 and continuance of such failure, or (b) the acceleration of Indebtedness has occurred in an amount in excess of $50,000,000 because of a default with respect to such Indebtedness without such Indebtedness having been discharged or such acceleration having been cured, waived, rescinded or annulled, in the case of (a) above, for a period of 30 days after receipt by the Company of a Notice of Default; provided, however, that if any such failure or acceleration referred to in (a) or (b) above shall cease or be cured, waived, rescinded or annulled, then the Event of Default by reason thereof shall be deemed not to have occurred; or

(5)     the Company or any Significant Subsidiary, pursuant to or under or within the meaning of any Bankruptcy Law:

(A)     commences a voluntary case or proceeding;

(B)      consents to the entry of an order for relief against it in an involuntary case or proceeding or the commencement of any case against it;

(C)      consents to the appointment of a Custodian of it or for any substantial part of its property;

(D)        makes a general assignment for the benefit of its creditors;

(E)        files a petition in bankruptcy or answer or consent seeking reorganization or relief; or

(F)        consents to the filing of such petition or the appointment of or taking possession by a Custodian; or

(6)        a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(A)        is for relief against the Company or any Significant Subsidiary in an involuntary case or proceeding, or adjudicates the Company or any Significant Subsidiary insolvent or bankrupt;

(B)        appoints a Custodian of the Company or any Significant Subsidiary or for any substantial part of its property; or (C) orders the winding up or liquidation of the Company or any Significant Subsidiary;

and the order or decree remains unstayed and in effect for 60 days.

(a)        "<u>Bankruptcy Law</u>" means Title 11, United States Code, or any similar Federal or state law for the relief of debtors.

(b)        "<u>Custodian</u>" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

         A Default under clause (3) or clause (4) above is not an Event of Default until the Trustee notifies the Company, or the Holders of at least 25% in aggregate Principal Amount of the Securities at the time outstanding notify the Company and the Trustee, of the Default and the Company does not cure such Default (and such Default is not waived) within the time specified in clause (3) or clause (4) above after actual receipt of such notice. Any such notice must specify the Default, demand that it be remedied and state that such notice is a "<u>Notice of Default</u>".

         The Company shall deliver to the Trustee, within 30 days after it becomes aware of the occurrence thereof, written notice of any event which with the giving of notice or the lapse of time, or both, would become an Event of Default under clause (3) or clause (4) above, its status and what action the Company is taking or proposes to take with respect thereto.

SECTION 6.02        <u>Acceleration</u>.

         If an Event of Default (other than an Event of Default specified in Section 6.01(5) or (6) in respect of the Company) occurs and is continuing, the Trustee by Notice to the Company, or the Holders of at least 25% in aggregate Principal Amount of the Securities at the time outstanding by notice to the Company and the Trustee, may declare the Principal Amount through the date of declaration, and any accrued and unpaid interest through the date of such declaration, on all the Securities to be immediately due and payable. Upon such a declaration,

32

such Principal Amount, and such accrued and unpaid interest if any, shall be due and payable immediately. If an Event of Default specified in Section 6.01(5) or (6) in respect of the Company occurs and is continuing, the Principal Amount plus accrued and unpaid interest if any, on all the Securities shall become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Securityholders. The Holders of a majority in aggregate Principal Amount of the Securities at the time outstanding, by notice to the Trustee (and without notice to any other Securityholder) may rescind an acceleration and its consequences if the rescission would not conflict with any judgment or decree and if all existing Events of Default have been cured or waived except nonpayment of the Principal Amount that have become due solely as a result of acceleration and if all amounts due to the Trustee under Section 7.07 have been paid. No such rescission shall affect any subsequent Default or impair any right consequent thereto.

SECTION 6.03      Other Remedies.

      If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of the Principal Amount plus any accrued and unpaid interest if any, on the Securities or to enforce the performance of any provision of the Securities or this Indenture. The Trustee may maintain a proceeding even if the Trustee does not possess any of the Securities or does not produce any of the Securities in the proceeding. A delay or omission by the Trustee or any Securityholder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of, or acquiescence in, the Event of Default. Except as set forth in Section 2.07 hereof, no remedy is exclusive of any other remedy. All available remedies are cumulative.

SECTION 6.04      Waiver of Past Defaults.

      Subject to Section 6.02, the Holders of a majority in aggregate Principal Amount of the Securities at the time outstanding, by notice to the Trustee (and without notice to any other Securityholder), may waive an existing or past Default and its consequences except (1) an Event of Default described in Section 6.01(1) or (2), or (2) a Default in respect of a provision that under Section 9.02 cannot be amended without the consent of each Securityholder affected. When a Default is waived, it is deemed cured, but no such waiver shall extend to any subsequent or other Default or impair any consequent right. This Section 6.04 shall be in lieu of Section 316(a)1(A) of the TIA and such Section 316(a)1(A) is hereby expressly excluded from this Indenture, as permitted by the TIA.

SECTION 6.05      Control by Majority.

      The Holders of a majority in aggregate Principal Amount of the Securities at the time outstanding may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture or that the Trustee determines in good faith is unduly prejudicial to the rights of other Securityholders or could, in reasonable likelihood, impose personal liability upon the Trustee unless the Trustee is offered indemnity satisfactory to it. This Section 6.05 shall be in lieu of

Section 316(a)1(B) of the TIA and such Section 316(a)1(B) is hereby expressly excluded from this Indenture, as permitted by the TIA.

SECTION 6.06      Limitation on Suits.

A Securityholder may not pursue any remedy with respect to this Indenture or the Securities unless:

(1)      the Holder gives to the Trustee written notice stating that an Event of Default is continuing;

(2)      the Holders of at least 25% in aggregate Principal Amount of the Securities at the time outstanding make a written request to the Trustee to pursue the remedy;

(3)      such Holder or Holders offer to the Trustee security or indemnity satisfactory to the Trustee against any loss, liability or expense;

(4)      the Trustee does not comply with the request within 60 days after receipt of such notice, request and offer of security or indemnity; and

(5)      the Holders of a majority in aggregate Principal Amount of the Securities at the time outstanding do not give the Trustee a direction inconsistent with the request during such 60-day period.

A Securityholder may not use this Indenture to prejudice the rights of any other Securityholder or to obtain a preference or priority over any other Securityholder.

SECTION 6.07      Rights of Holders to Receive Payment.

Notwithstanding any other provision of this Indenture, the right of any Holder to receive payment of the Principal Amount, Change in Control Purchase Price, and interest in respect of the Securities held by such Holder, on or after the respective due dates expressed in the Securities, and to convert the Securities in accordance with Article 10, or to bring suit for the enforcement of any such payment on or after such respective dates or the right to convert, shall not be impaired or affected adversely without the consent of such Holder.

SECTION 6.08      Collection Suit by Trustee.

If an Event of Default described in Section 6.01(1) or (2) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Company for the whole amount owing with respect to the Securities and the amounts provided for in Section 7.07.

SECTION 6.09      Trustee May File Proofs of Claim.

In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the

34

Company or any other obligor upon the Securities or the property of the Company or of such other obligor or their creditors, the Trustee (irrespective of whether the Principal Amount, Change in Control Purchase Price, and interest in respect of the Securities shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand on the Company for the payment of any such amount) shall be entitled and empowered, by intervention in such proceeding or otherwise,

(a)       to file and prove a claim for the whole amount of the Principal Amount, Change in Control Purchase Price, or interest and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel or any other amounts due the Trustee under Section 7.07) and of the Holders allowed in such judicial proceeding, and

(b)       to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or similar official in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Securities or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

SECTION 6.10       Priorities.

If the Trustee collects any money pursuant to this Article 6, it shall pay out the money in the following order:

FIRST: to the Trustee for amounts due under Section 7.07;

SECOND: to Securityholders for amounts due and unpaid on the Securities for the Principal Amount, Change in Control Purchase Price and interest, ratably, without preference or priority of any kind, according to such amounts due and payable on the Securities; and

THIRD: the balance, if any, to the Company.

The Trustee may fix a record date and payment date for any payment to Securityholders pursuant to this Section 6.10. At least 15 days before such record date, the Trustee shall mail to each Securityholder and the Company a notice that states the record date, the payment date and the amount to be paid.

SECTION 6.11     Undertaking for Costs.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit (other than the Trustee) of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit (other than the Trustee), having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.07 or a suit by Holders of more than 10% in aggregate Principal Amount of the Securities at the time outstanding. This Section 6.11 shall be in lieu of Section 315(e) of the TIA and such Section 315(e) is hereby expressly excluded from this Indenture, as permitted by the TIA.

SECTION 6.12     Waiver of Stay, Extension or Usury Laws.

The Company covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury or other law wherever enacted, now or at any time hereafter in force, which would prohibit or forgive the Company from paying all or any portion of the Principal Amount, Change in Control Purchase Price and interest in respect of Securities, or any interest on such amounts, as contemplated herein, or which may affect the covenants or the performance of this Indenture; and the Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

# ARTICLE 7

# TRUSTEE

SECTION 7.01     Duties of Trustee.

(a)     If an Event of Default has occurred and is continuing, the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)     Except during the continuance of an Event of Default:

(1)     the Trustee need perform only those duties that are specifically set forth in this Indenture and no others; and

(2)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificate or opinion furnished to the Trustee and conforming to the requirements of this Indenture, but in case of any such certificates or opinions which by any

provision hereof are specifically required to be furnished to the Trustee, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture, but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein.

This Section 7.01(b) shall be in lieu of Section 315(a) of the TIA and such Section 315(a) is hereby expressly excluded from this Indenture, as permitted by the TIA.

(c)    The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(1)    this paragraph (c) does not limit the effect of paragraph (b) of this Section 7.01;

(2)    the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and (3) the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05.

Subparagraphs (c)(1), (2) and (3) shall be in lieu of Sections 315(d)(1), 315(d)(2) and 315(d)(3) of the TIA and such Sections 315(d)(1), 315(d)(2) and 315(d)(3) are hereby expressly excluded from this Indenture, as permitted by the TIA.

(d)    Every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b), (c) and (e) of this Section 7.01.

(e)    The Trustee may refuse to perform any duty or exercise any right or power or extend or risk its own funds or otherwise incur any financial liability unless it receives indemnity satisfactory to it against any loss, liability or expense.

(f)    Money held by the Trustee in trust hereunder need not be segregated from other funds except to the extent required by law. The Trustee (acting in any capacity hereunder) shall be under no liability for interest on any money received by it hereunder unless otherwise agreed in writing with the Company.

SECTION 7.02    Rights of Trustee.

Subject to its duties and responsibilities under the provisions of Section 7.01, and, except as expressly excluded from this Indenture pursuant to said Section 7.01, subject also to its duties and responsibilities under the TIA:

(a)    the Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

37

(b)        whenever in the administration of this Indenture the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, request and conclusively rely upon an Officers' Certificate;

(c)        the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder;

(d)        the Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith which it believes to be authorized or within its rights or powers conferred under this Indenture;

(e)        the Trustee may consult with counsel selected by it and any advice or Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such advice or Opinion of Counsel;

(f)        the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order or direction of any of the Holders, pursuant to the provisions of this Indenture, unless such Holders shall have offered to the Trustee security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby;

(g)        any request or direction of the Company mentioned herein shall be sufficiently evidenced by a Company Request or Company Order and any resolution of the Board of Directors may be sufficiently evidenced by a resolution of the Board of Directors;

(h)        the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document, including, without limitation, any Company Request, Company Order or Officers' Certificate, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Company, personally or by agent or attorney at the sole cost of the Company and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation or lack thereof;

(i)        the Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee received written notice of an event which is in fact such a Default or Event of Default, and such notice references the Securities and this Indenture, describes the event with specificity, and alleges that the occurrence of this event is a Default or an Event of Default under this Indenture;

(j)        the rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall

be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other Person employed to act hereunder;

(k)        the Trustee may request that the Company deliver an Officers' Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded; and

(l)        the permissive rights of the Trustee enumerated herein shall not be construed as duties.

SECTION 7.03      Individual Rights of Trustee.

         The Trustee in its individual or any other capacity may become the owner or pledgee of Securities and may otherwise deal with the Company or its Affiliates with the same rights it would have if it were not Trustee. Any Paying Agent, Registrar, Conversion Agent or co-registrar may do the same with like rights. However, the Trustee must comply with Section 7.10.

SECTION 7.04      Trustee's Disclaimer.

         The Trustee makes no representation as to the validity or adequacy of this Indenture or the Securities, it shall not be accountable for the Company's use or application of the proceeds from the Securities, it shall not be responsible for any statement in the registration statement for the Securities under the Securities Act or in the Indenture or the Securities (other than its certificate of authentication), or the determination as to which beneficial owners are entitled to receive any notices hereunder.

SECTION 7.05      Notice of Defaults.

         If a Default occurs and if it is known to the Trustee, the Trustee shall give to each Securityholder notice of the Default within 90 days after the Trustee gains knowledge of the Default unless such Default shall have been cured or waived before the giving of such notice. Except in the case of a Default described in Section 6.01(1) or (2), the Trustee may withhold the notice if and so long as a committee of its Responsible Officers in good faith determines that withholding the notice is in the interests of Securityholders. The second sentence of this Section 7.05 shall be in lieu of the proviso to Section 315(b) of the TIA and such proviso is hereby expressly excluded from this Indenture, as permitted by the TIA. The Trustee shall not be deemed to have knowledge of a Default unless a Responsible Officer of the Trustee has received written notice of such Default in the manner described in Section 7.02(i).

SECTION 7.06      Reports by Trustee to Holders.

(1)        Within 60 days after each May 15 beginning with the May 15 following the date of this Indenture, the Trustee shall transmit to each Securityholder such reports as may be required under Section 313 of the TIA.

39

SECTION 7.07    Compensation and Indemnity.

The Company agrees:

(a)    to pay to the Trustee from time to time such reasonable compensation as the Company and the Trustee shall from time to time agree in writing for all services rendered by it hereunder (which compensation shall not be limited (to the extent permitted by law) by any provision of law in regard to the compensation of a trustee of an express trust);

(b)    to reimburse the Trustee upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including the reasonable compensation and the expenses, advances and disbursements of its agents and counsel), except any such expense, disbursement or advance as may be attributable to its negligence or bad faith; and

(c)    to indemnify the Trustee or any predecessor Trustee and their agents for, and to hold them harmless against, any loss, damage, claim, liability, cost or expense (including reasonable attorney's fees and expenses and taxes (other than taxes based upon, measured by or determined by the income of the Trustee)) reasonably incurred without negligence or bad faith on its part, arising out of or in connection with the acceptance or administration of this trust, including the reasonable costs and expenses of defending itself against any claim (whether asserted by the Company or any Holder or any other Person) or liability in connection with the acceptance, exercise or performance of any of its powers or duties hereunder.

To secure the Company's payment obligations in this Section 7.07, Holders shall have been deemed to have granted to the Trustee a lien prior to the Securities on all money or property held or collected by the Trustee, except that held in trust to pay the Principal Amount, Change in Control Purchase Price, or interest, as the case may be, on particular Securities.

The Company's payment obligations pursuant to this Section 7.07 shall survive the discharge of this Indenture and the resignation or removal of the Trustee. When the Trustee incurs expenses after the occurrence of a Default specified in Section 6.01(5) or (6), its expenses including the reasonable charges and expenses of its counsel, are intended to constitute expenses of administration under any Bankruptcy Law.

SECTION 7.08    Replacement of Trustee.

The Trustee may resign by so notifying the Company; provided, however, no such resignation shall be effective until a successor Trustee has accepted its appointment pursuant to this Section 7.08. The Holders of a majority in aggregate Principal Amount of the Securities at the time outstanding may remove the Trustee by so notifying the Trustee and the Company. The Company shall remove the Trustee if:

(1)    the Trustee fails to comply with Section 7.10;

(2)    the Trustee is adjudged bankrupt or insolvent;

(3)        a receiver or public officer takes charge of the Trustee or its property; or

(4)        the Trustee otherwise becomes incapable of acting.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Company shall promptly appoint, by resolution of the Board of Directors, a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Company satisfactory in form and substance to the retiring Trustee and the Company. Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall mail a notice of its succession to Securityholders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 7.07.

If a successor Trustee does not take office within 30 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Company or the Holders of a majority in aggregate Principal Amount of the Securities at the time outstanding may petition any court of competent jurisdiction at the expense of the Company for the appointment of a successor Trustee.

If the Trustee fails to comply with Section 7.10, any Securityholder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

The resignation or removal of a Trustee shall not diminish, impair or terminate its rights to indemnification pursuant to Section 7.07 as they relate to periods prior to such resignation or removal.

SECTION 7.09      Successor Trustee by Merger.

If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee.

SECTION 7.10      Eligibility; Disqualification.

There shall at all times be a Trustee hereunder which shall be eligible to act as Trustee and shall have a combined capital and surplus of at least $50,000,000. If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of federal, state, territorial or District of Columbia supervising or examining authority, then, for the purposes of this Section 7.10, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 7.10, it shall resign immediately in the manner and with the effect hereinafter specified in this Article 7.

41

# ARTICLE 8

## DISCHARGE OF INDENTURE

SECTION 8.01      Discharge of Liability on Securities.

       When (i) the Company delivers to the Trustee all outstanding Securities (other than Securities replaced pursuant to Section 2.07) for cancellation or (ii) all outstanding Securities have become due and payable and the Company deposits with the Trustee, the Paying Agent (if the Paying Agent is not the Company or any Subsidiary or any Affiliate of either of them) or the Conversion Agent cash or, if expressly permitted by the terms of the Securities and the Indenture, Common Stock (solely to satisfy the rights of Holders granted in Article 10) or governmental obligations sufficient to pay all amounts due and owing on all outstanding Securities (other than Securities replaced pursuant to Section 2.07), and if in either case the Company pays all other sums payable hereunder by the Company, then this Indenture shall, subject to Section 7.07, cease to be of further effect. The Trustee shall join in the execution of a document prepared by the Company acknowledging satisfaction and discharge of this Indenture on demand of the Company accompanied by an Officers' Certificate stating that the consideration being given is expressly permitted by the terms of the Securities and that all conditions precedent to the discharge of the Indenture have been complied with by the Company and an Opinion of Counsel that such satisfaction and discharge does not violate the terms of this Indenture or the Securities, and at the cost and expense of the Company. The Trustee shall be allowed to conclusively rely on such Officers' Certificate.

SECTION 8.02      Repayment to the Company.

       The Trustee and the Paying Agent shall return to the Company upon written request any money or securities held by them for the payment of any amount with respect to the Securities that remains unclaimed for two years, subject to applicable unclaimed property law. After return to the Company, Holders entitled to the money or securities must look to the Company for payment as general creditors unless an applicable abandoned property law designates another person and the Trustee and the Paying Agent shall have no further liability to the Securityholders with respect to such money or securities for that period commencing after the return thereof.

# ARTICLE 9

## AMENDMENTS

SECTION 9.01      Without Consent of Holders.

       The Company and the Trustee may amend this Indenture or the Securities without the consent of any Securityholder:

(1)       to cure any ambiguity, omission, defect or inconsistency;

(2)       to comply with Article 5 or Section 10.17;

(3)        to secure the Company's obligations under the Securities and this Indenture;

(4)        to add to the Company's covenants for the benefit of the Securityholders or to surrender any right or power conferred upon the Company;

(5)        to make any change to comply with the TIA, or any amendment thereto, or to comply with any requirement of the SEC in connection with the qualification of the Indenture under the TIA, or as necessary in connection with the registration of the Securities under the Securities Act if at any time the Company seeks to register the Securities thereunder; or

(6)        to make any change that does not adversely affect the rights of any Holder.

No amendment to cure any ambiguity, omission, defect or inconsistency in this Indenture made solely to conform the Indenture to the description of the Securities contained in the offering memorandum pursuant to which the Securities have been initially offered shall be deemed to adversely affect the interests of the Holders.

SECTION 9.02        With Consent of Holders.

With the written consent of the Holders of at least a majority in aggregate Principal Amount of the Securities at the time outstanding, the Company and the Trustee may amend this Indenture or the Securities. However, without the consent of each Securityholder affected, an amendment to this Indenture or the Securities may not:

(1)        reduce the Principal Amount, or Change in Control Purchse Price with respect to or any premium or interest on any Security;

(2)        make any Security payable in money or securities other than that stated in the Security;

(3)        change the Stated Maturity of any Security;

(4)        make any change that adversely affects the right of a Holder to convert any Security;

(5)        make any change that adversely affects the right to require the Company to purchase the Securities in accordance with the terms thereof and this Indenture;

(6)        impair the right to convert or receive payment with respect to, a Security, or right to institute suit for the enforcement of any payment with respect to, or conversion of, the Securities; or

(7)        make any change in Section 6.04, Section 6.07 or this Section 9.02, except to increase any percentage set forth therein.

It shall not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent approves the substance thereof.

After an amendment under this Section 9.02 becomes effective, the Company shall mail to each Holder a notice briefly describing the amendment. Failure to mail such notice or a defect in the notice shall not affect the validity of the amendment.

SECTION 9.03    Compliance with Trust Indenture Act.

Every supplemental indenture executed pursuant to this Article shall comply with the TIA.

SECTION 9.04    Revocation and Effect of Consents, Waivers and Actions.

Until an amendment, waiver or other action by Holders becomes effective, a consent thereto by a Holder of a Security hereunder is a continuing consent by the Holder and every subsequent Holder of that Security or portion of the Security that evidences the same obligation as the consenting Holder's Security, even if notation of the consent, waiver or action is not made on the Security. However, any such Holder or subsequent Holder may revoke the consent, waiver or action as to such Holder's Security or portion of the Security if the Trustee receives the notice of revocation before the date the amendment, waiver or action becomes effective. After an amendment, waiver or action becomes effective, it shall bind every Securityholder.

SECTION 9.05    Notation on or Exchange of Securities.

Securities authenticated and delivered after the execution of any supplemental indenture pursuant to this Article may, and shall if required by the Trustee, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture. If the Company shall so determine, new Securities so modified as to conform, in the opinion of the Board of Directors, to any such supplemental indenture may be prepared and executed by the Company and authenticated and delivered by the Trustee in exchange for outstanding Securities.

SECTION 9.06    Trustee to Sign Supplemental Indentures.

The Trustee shall sign any supplemental indenture authorized pursuant to this Article 9 if the amendment contained therein does not adversely affect the rights, duties, liabilities or immunities of the Trustee. If it does, the Trustee may, but need not, sign such supplemental indenture. In signing such supplemental indenture the Trustee shall receive, and (subject to the provisions of Section 7.01) shall be fully protected in relying upon, in addition to the documents required by Section 12.04, an Officers' Certificate and an Opinion of Counsel stating that such amendment is authorized or permitted by this Indenture.

44

SECTION 9.07    Effect of Supplemental Indentures.

        Upon the execution of any supplemental indenture under this Article, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Securities theretofore or thereafter authenticated and delivered hereunder shall be bound thereby.

**ARTICLE 10**

**CONVERSION**

SECTION 10.01    Conversion Privilege.

        A Holder of a Security may convert such Security at any time during the period stated in paragraph 6 of the Securities upon the occurrence of any of the events set forth in paragraph 6 of the Securities, subject to the provisions of this Article 10. Subject to certain exceptions described in paragraph 6 of the Securities, if a Holder surrenders its Securities for conversion, such holder will receive, in respect of each $1,000 of Principal Amount into the Conversion Value which shall be paid as follows:

(i)        Cash in an amount equal to the lesser of (A) $1,000 and (B) the Conversion Value (the "Required Cash Amount"); and

(ii)       if the Conversion Value is greater than $1,000, a number of shares of Common Stock (the "Remaining Shares"), equal to the sum of the Daily Share Amounts for each of the ten consecutive Trading Days in the Conversion Reference Period, subject to the right of the Company to deliver cash in lieu of all or a portion of such Remaining Shares as described below.

        On any day prior to the first Trading Day of the applicable Conversion Reference Period, the Company may specify a percentage of the Daily Share Amount that will be settled in cash (the " Cash Percentage ") and will notify the Securityholder of such Cash Percentage through written notice to the Trustee (the " Cash Percentage Notice "). If the Company elects to specify a Cash Percentage, the amount of cash that the Company will deliver in respect of each Trading Day in the applicable Conversion Reference Period will equal the product of: (1) the Cash Percentage, (2) the Daily Share Amount for such Trading Day, and (3) the Volume Weighted Average Price of the Common Stock for such Trading Day (provided that after the consummation of a Change in Control in which the consideration is comprised entirely of cash, the amount used in this clause (3) will be the cash price per share of Common Stock received by holders of Common Stock in such Change in Control). The number of shares deliverable in respect of each Trading Day in the applicable Conversion Reference Period will be a percentage of the Daily Share Amount equal to 100% minus the Cash Percentage. If the Company does not specify a Cash Percentage by the start of the applicable Conversion Reference Period, the Company shall settle 100% of the Daily Share Amount for each Trading Day in the applicable Conversion Reference Period with shares of Common Stock; provided, however, that the Company will pay cash in lieu of fractional shares otherwise issuable upon conversion of such

45

Security, pursuant to Section 10.03 hereof. The Company may, at its option, revoke any Cash Percentage Notice through written notice to the Trustee prior to the start of the applicable Conversion Reference Period.

A Holder may convert a portion of the Principal Amount of a Security if the portion is $1,000 or an integral multiple of $1,000. Provisions of this Indenture that apply to conversion of all of a Security also apply to conversion of a portion of a Security.

In the event of a stock split, combination, dividend or any other event resulting in an adjustment to the Conversion Rate pursuant to Sections 10.06, 10.07, 10.08, 10.09 or 10.10, during the applicable Conversion Reference Period, appropriate adjustment to the equation for calculating Conversion Value and Remaining Shares shall be made, as determined by the Board of Directors.

SECTION 10.02    Conversion Procedure.

To convert a Security, a Holder must satisfy the requirements in paragraph 6 of the Securities. The Conversion Agent shall, within one (1) Business Day of the Conversion Date, provide notice to the Company as set forth in Section 12.02(b).

As promptly as practicable following the end of the Conversion Reference Period applicable to the Securities being converted, the Company shall deliver to the Holder, through the Conversion Agent, the Required Cash Amount and Net Share Amount, if any (including cash in lieu of fractional shares pursuant to Section 10.03 hereof). The person in whose name the certificate representing any shares is registered shall be treated as a stockholder of record on and after the Conversion Date; provided, however, that no surrender of a Security on any date when the stock transfer books of the Company shall be closed shall be effective to constitute the person or persons entitled to receive the Net Share Amount upon such conversion as the record holder or holders of such shares of Common Stock on such date, but such surrender shall be effective to constitute the person or persons entitled to receive such shares of Common Stock as the record holder or holders thereof for all purposes at the Close of Business on the next succeeding day on which such stock transfer books are open; such conversion shall be at the Conversion Rate in effect on the date that such Security shall have been surrendered for conversion, as if the stock transfer books of the Company had not been closed. Upon conversion of a Security, such person shall no longer be a Holder of such Security.

No payment or adjustment will be made for dividends on, or other distributions with respect to, any Common Stock except as provided in this Article 10. On conversion of a Security, accrued interest with respect to the converted Security shall not be cancelled, extinguished or forfeited, but rather shall be deemed to be paid in full to the Holder thereof through delivery of the Required Cash Amount and Net Share Amount, if any (together with the cash payment, if any, in lieu of fractional shares) in exchange for the Security being converted pursuant to the provisions hereof.

If the Holder converts more than one Security at the same time, the Required Cash Amount and Net Share Amount, if any (together with the cash payment, if any, in lieu of fractional shares) shall be based on the total Principal Amount of the Securities converted.

46

If the last day on which a Security may be converted is a Legal Holiday, the Security may be surrendered on the next succeeding day that is not a Legal Holiday.

Upon surrender of a Security that is converted in part, the Company shall execute, and the Trustee shall authenticate and deliver to the Holder, a new Security in an authorized denomination equal in Principal Amount to the unconverted portion of the Security surrendered.

SECTION 10.03    Fractional Shares.

The Company will not issue a fractional share of Common Stock upon conversion of a Security. Instead, the Company will deliver cash for the current market value of the fractional share. The current market value of a fractional share shall equal the arithmetic average of the Volume Weighted Average Price of the Common Stock for each of the ten consecutive Trading Days of the Conversion Reference Period, rounded to the nearest whole cent.

SECTION 10.04    Taxes on Conversion.

If a Holder converts a Security, the Company shall pay any documentary, stamp or similar issue or transfer tax due on the issue of any shares of Common Stock upon the conversion. However, the Holder shall pay any such tax which is due because the Holder requests the shares to be issued in a name other than the Holder's name. The Conversion Agent may refuse to deliver the certificates representing the Common Stock being issued in a name other than the Holder's name until the Conversion Agent receives a sum sufficient to pay any tax which will be due because the shares are to be delivered in a name other than the Holder's name. Nothing herein shall preclude any tax withholding required by law or regulations.

SECTION 10.05    Company to Provide Stock.

The Company shall, prior to issuance of any Securities under this Article 10, and from time to time as may be necessary, reserve out of its authorized but unissued Common Stock a sufficient number of shares of Common Stock to permit the payment of the Net Share Amount, if applicable, upon conversion of the Securities.

All shares of Common Stock delivered upon payment of any Net Share Amount, if applicable, upon conversion of the Securities shall be newly issued shares or treasury shares, shall be duly and validly issued and fully paid and nonassessable and shall be free from preemptive rights and free of any lien or adverse claim.

The Company will comply with all federal and state securities laws regulating the offer and delivery of shares of Common Stock upon payment of any Net Share Amount, if applicable, upon conversion of Securities, if any, and will list or cause to have quoted such shares of Common Stock on each national securities exchange or in the over-the-counter market or such other market on which the Common Stock is then listed or quoted.

SECTION 10.06    Adjustment for Change In Capital Stock.

If, after the Issue Date of the Securities, the Company:

47

(1)         pays a dividend or makes a distribution on its Common Stock payable in shares of its Common Stock or shares of other Capital Stock;

(2)         subdivides or combines its shares of Common Stock; or

(3)         issues by reclassification of its Common Stock any shares of its Capital Stock (other than rights, warrants or options for its Capital Stock),

then the Conversion Rate in effect immediately prior to such action shall be adjusted so that the Holder of a Security thereafter converted may receive the number of shares of Capital Stock of the Company which such Holder would have owned immediately following such action if such Holder had converted the Security immediately prior to such action.

The adjustment shall become effective immediately after the record date in the case of a dividend or distribution and immediately after the effective date in the case of a subdivision, combination or reclassification.

If after an adjustment a Holder of a Security upon conversion of such Security may receive shares of two or more classes of Capital Stock of the Company, the Conversion Rate shall thereafter be subject to adjustment upon the occurrence of an action taken with respect to any such class of Capital Stock as is contemplated by this Article 10 with respect to the Common Stock, on terms comparable to those applicable to Common Stock in this Article 10.

SECTION 10.07    Adjustment for Rights Issue.

If, after the Issue Date of the Securities, the Company distributes any rights, warrants or options to all holders of its Common Stock entitling them, for a period expiring within 60 days after the record date for such distribution, to purchase shares of Common Stock at a price per share less than the Average Closing Price, the Conversion Rate shall be adjusted in accordance with the formula:

$$R' = R \text{ x } \frac{(O + N)}{(O + (N \text{ x } P)/M)}$$

where:

R' = the adjusted Conversion Rate.

R = the current Conversion Rate.

O = the number of shares of Common Stock outstanding on the record date for the distribution to which this Section 10.07 is being applied.

N = the number of additional shares of Common Stock offered pursuant to the distribution.

P = the offering price per share of the additional shares.

48

M = the Average Closing Price, minus, in the case of (i) a distribution to which Section 10.06(4) applies or (ii) a distribution to which Section 10.08 applies, for which, in each case, (x) the record date shall occur on or before the record date for the distribution to which this Section 10.07 applies and (y) the Ex-Dividend Time shall occur on or after the date of the first public announcement for the distribution to which this Section 10.07 applies, the fair market value (on the record date for the distribution to which this Section 10.07 applies) of the

(1)     Capital Stock of the Company distributed in respect of each share of Common Stock in such Section 10.06(4) distribution and

(2)     assets of the Company or debt securities or any rights, warrants or options to purchase securities of the Company distributed in respect of each share of Common Stock in such Section 10.08 distribution.

The Board of Directors shall determine fair market values for the purposes of this Section 10.07.

In the event the Company makes a distribution pursuant to this Section 10.07 which has a per share value equal to more than 15% of the Closing Price of shares of Common Stock on the day preceding the declaration date for such distribution, the Company will be required to give notice to the holders of Securities at least 20 days prior to the Ex-Dividend Date, as defined below, for such distribution.

The adjustment shall become effective immediately after the record date for the determination of shareholders entitled to receive the rights, warrants or options to which this Section 10.07 applies. If all of the shares of Common Stock subject to such rights, warrants or options have not been issued when such rights, warrants or options expire, then the Conversion Rate shall promptly be readjusted to the Conversion Rate that would then be in effect had the adjustment upon the issuance of such rights, warrants or options been made on the basis of the actual number of shares of Common Stock issued upon the exercise of such rights, warrants or options.

No adjustment shall be made under this Section 10.07 if the application of the formula stated above in this Section 10.07 would result in a value of R' that is equal to or less than the value of R.

SECTION 10.08     Adjustment for Other Distributions.

(a)     If, after the Issue Date of the Securities, the Company distributes to all holders of its Common Stock any of its assets (including shares of any Subsidiary or business unit of the Company, but excluding distributions of Capital Stock or equity interests referred to in Section 10.08(b)), or debt securities or any rights, warrants or options to purchase securities of the Company (including securities or cash, but excluding (x) distributions of Capital Stock referred to in Section 10.06 and distributions of rights, warrants or options referred to in Section 10.07 and (y) cash dividends or other cash distributions referred to in Section 10.09, the Conversion Rate shall be adjusted, subject to the provisions of Section 10.08(c), in accordance with the formula:

49

$$R' = \frac{R \times M}{M - F}$$

where:

R' = the adjusted Conversion Rate.

R = the current Conversion Rate.

M = the Average Closing Price, minus, in the case of a distribution to which Section 10.06(4) applies, for which (i) the record date shall occur on or before the record date for the distribution to which this Section 10.08(a) applies and (ii) the Ex-Dividend Time shall occur on or after the date of the Time of Determination for the distribution to which this Section 10.08(a) applies, the fair market value (on the record date for the distribution to which this Section 10.08(a) applies) of any Capital Stock of the Company distributed in respect of each share of Common Stock in such Section 10.06(4) distribution.

F = the fair market value (on the record date for the distribution to which this Section 10.08(a) applies) of the assets, securities, rights, warrants or options to be distributed in respect of each share of Common Stock in the distribution to which this Section 10.08(a) is being applied (including, in the case of cash dividends or other cash distributions giving rise to an adjustment, all such cash distributed concurrently).

The Board of Directors shall determine fair market values for the purposes of this Section 10.08(a).

The adjustment shall become effective immediately after the record date for the determination of shareholders entitled to receive the distribution to which this Section 10.08(a) applies.

(b)     If, after the Issue Date of the Securities, the Company pays a dividend or makes a distribution to all holders of its Common Stock consisting of Capital Stock of any class or series, or similar equity interests, of or relating to a Subsidiary or other business unit of the Company, then the Conversion Rate shall be adjusted in accordance with the formula:

$$R' = R \times (1 + F/M)$$

R' = the adjusted Conversion Rate.

R = the current Conversion Rate.

M = the average of the Post-Distribution Prices of the Common Stock for the 10 Trading Days commencing on and including the fifth Trading Day after the date on which "ex-dividend trading" commences for such dividend or distribution on the principal United States exchange or market which such securities are then listed or quoted (the " Ex-Dividend Date ").

F = the fair market value of the securities distributed in respect of each share of Common Stock for which this Section 10.08(b) shall mean the number of securities distributed in

50

respect of each share of Common Stock multiplied by the average of the Post-Distribution Prices of those securities distributed for the 10 Trading Days commencing on and including the fifth Trading Day after the Ex-Dividend Date.

"Post-Distribution Price" of Capital Stock or any similar equity interest on any date means the closing per unit sale price (or, if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on such date for trading of such units on a "when issued" basis without due bills (or similar concept) as reported in the composite transactions for the principal United States securities exchange on which such Capital Stock or equity interest is traded or, if the Capital Stock or equity interest, as the case may be, is not listed on a United States national or regional securities exchange, as reported by the National Association of Securities Dealers Automated Quotation System or by the National Quotation Bureau Incorporated; provided that if on any date such units have not traded on a "when issued" basis, the Post-Distribution Price shall be the closing per unit sale price (or, if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on such date for trading of such units on a "regular way" basis without due bills (or similar concept) as reported in the composite transactions for the principal United States securities exchange on which such Capital Stock or equity interest is traded or, if the Capital Stock or equity interest, as the case may be, is not listed on a United States national or regional securities exchange, as reported by the National Association of Securities Dealers Automated Quotation System or by the National Quotation Bureau Incorporated. In the absence of such quotation, the Company shall be entitled to determine the Post-Distribution Price on the basis of such quotations which reflect the post-distribution value of the Capital Stock or equity interests as it considers appropriate.

(c)    In the event that, with respect to any distribution to which Section 10.08(a) would otherwise apply, the difference "M-F" as defined in the formula set forth in Section 10.08(a) is less than $1.00 or "F" is equal to or greater than "M", then the adjustment provided by Section 10.08(a) shall not be made and in lieu thereof the provisions of Section 10.16 shall apply to such distribution.

(d)    In the event the Company makes a distribution pursuant to this Section 10.08 which has a per share value equal to more than 15% of the Closing Price of shares of Common Stock on the day preceding the declaration date for such distribution, the Company will be required to give notice to the holders of Securities at least 20 days prior to the Ex-Dividend Date, as defined below, for such distribution.

SECTION 10.09    Adjustment for Cash Dividends.

(a)    If, after the Issue Date of the Securities, the Company distributes to all or substantially all holders of its Common Stock any cash (excluding any dividend or distribution in connection with the liquidation, dissolution or winding up of the Company, whether voluntary or involuntary), the Conversion Rate shall be adjusted, subject to the provisions of Section 10.09(b) in accordance with the formula:

$$R' = R \times \frac{M}{(M - C)}$$

51

where,

R' = the adjusted Conversion Rate;

R = the Conversion Rate in effect immediately prior to the Time of Determination;

M = the average of the Closing Prices of the Common Stock for the five consecutive Trading Days prior to the Trading Day immediately preceding the Time of Determination; and

C = the amount in cash per share the Company distributes to holders of the Common Stock (and for which no adjustment has been made).

SECTION 10.10    Adjustment for Tender Offer.

If, after the Issue Date, the Company makes a payment of cash or other consideration to holders of Common Stock in respect of a tender offer or exchange offer, other than an odd-lot offer, for the Common Stock, and the value of the sum of (i) the aggregate cash and other consideration paid for such Common Stock, and (ii) the aggregate fair market value of any consideration paid for the purchase of Common Stock in respect of a tender offer or exchange offer, other than an odd-lot offer, within the twelve (12) months preceding the date of purchase of such shares of Common Stock in respect of which no adjustment pursuant to this Section 10.10 previously has been made, expressed as an amount per share of Common Stock validly tendered or exchanged pursuant to such tender offer or exchange offer, exceeds the Closing Price of the Common Stock on the Trading Day immediately following the last time (the "Expiration Time") on which tenders or exchanges may be made pursuant to the tender or exchange offer, then the Conversion Rate shall be adjusted in accordance with the formula:

$$R' = R \times \frac{F + (P \times O)}{O' \times P}$$

where,

R = the Conversion Rate in effect on the Expiration Time;

R' = the Conversion Rate in effect immediately after the Expiration Time;

F = the fair market value (as determined by the Board of Directors) of the aggregate value of all cash and any other consideration paid or payable for shares of Common Stock validly tendered or exchanged and not withdrawn as of the Expiration Time (the "Purchased Shares");

O = the number of shares of Common Stock outstanding immediately after the Expiration Time less any Purchased Shares;

52

O' =  the number of shares of Common Stock outstanding immediately after the Expiration Time, including any Purchased Shares; and

P =  the Closing Price of the Common Stock on the Trading Day next succeeding the Expiration Time.

Such increase (if any) shall become effective immediately prior to the opening of business on the day following the Expiration Time. In the event that the Company is obligated to purchase shares pursuant to any such tender offer, but the Company is prevented by applicable law from effecting any such purchases or all such purchases are rescinded, the Conversion Rate shall again be adjusted to be the Conversion Rate that would then be in effect if such tender or exchange offer had not been made. If the application of this Section 10.10 to any tender or exchange offer would result in a decrease in the Conversion Rate, no adjustment shall be made for such tender or exchange offer under this Section 10.10.

SECTION 10.11    <u>Adjustment to Conversion Rate Upon Change in Control Transactions</u>.

If, after the Issue Date, a Change in Control occurs and a Holder elects to convert its Securities in connection with such Change in Control, the Company will increase the Applicable Conversion Rate for the Securities surrendered by conversion by a number of additional shares of Common Stock (the " <u>Make-Whole Shares</u> "), as described in this Section 10.11. A conversion of Securities will be deemed for the purposes of this Section 10.11 to be " <u>in connection with</u> " a Change in Control transaction if the notice of conversion of the Securities is received by the Conversion Agent from and including the date that is ten Trading Days prior to the anticipated effective date of the Change in Control, up to and including the Trading Day prior to the related purchase date.

The number of Make-Whole Shares will be determined by reference to the table below and is based on the date which such Change in Control transaction becomes effective (the " <u>Change in Control Effective Date</u> ") and the price (the " <u>Stock Price</u> ") paid per share of Common Stock in such Change in Control transaction. If the holders of Common Stock receive only cash in the Change in Control transaction, the Stock Price shall be the cash amount paid per share of Common Stock. Otherwise, the Stock Price shall be the average of the closing sale prices of the Common Stock on the ten consecutive Trading Days up to but excluding the Change in Control Effective Date.

The Stock Prices set forth in the first column of the table below will be adjusted as of any date on which the Conversion Rate is adjusted. The adjusted Stock Prices will equal the Stock Prices applicable immediately prior to such adjustment, multiplied by a fraction, the numerator of which is the Applicable Conversion Rate immediately prior to the adjustment giving rise to the Stock Price adjustment and the denominator of which is the Applicable Conversion Rate as so adjusted.

53

| | Effective Date | | | | | |
|---|---|---|---|---|---|---|
| Stock Price on Effective Date | February 17, 2006 | February 1, 2007 | February 1, 2008 | February 1, 2009 | February 1, 2010 | February 1, 2011 |
| $ 71.93 | 1.3777 | 1.3777 | 1.3777 | 1.3777 | 1.3777 | 1.3777 |
| 75.00 | 1.1797 | 1.2154 | 1.2362 | 1.2202 | 1.1312 | 0.8086 |
| $ 80.00 | 0.9181 | 0.9280 | 0.9170 | 0.8674 | 0.7306 | 0.0000 |
| $ 85.00 | 0.7169 | 0.7113 | 0.6772 | 0.6103 | 0.4579 | 0.0000 |
| $ 90.00 | 0.5615 | 0.5462 | 0.5022 | 0.4251 | 0.2787 | 0.0000 |
| $ 95.00 | 0.4410 | 0.4203 | 0.3724 | 0.2964 | 0.1642 | 0.0000 |
| $ 100.00 | 0.3472 | 0.3240 | 0.2758 | 0.2056 | 0.0943 | 0.0000 |
| $ 105.00 | 0.2740 | 0.2502 | 0.2041 | 0.1418 | 0.0528 | 0.0000 |
| $ 110.00 | 0.2166 | 0.1931 | 0.1506 | 0.0971 | 0.0284 | 0.0000 |
| $ 115.00 | 0.1715 | 0.1493 | 0.1108 | 0.0657 | 0.0155 | 0.0000 |
| $ 120.00 | 0.1359 | 0.1153 | 0.0809 | 0.0438 | 0.0100 | 0.0000 |
| $ 125.00 | 0.1074 | 0.0889 | 0.0575 | 0.0298 | 0.0097 | 0.0000 |
| $ 130.00 | 0.0836 | 0.0681 | 0.0450 | 0.0207 | 0.0093 | 0.0000 |
| $ 135.00 | 0.0675 | 0.0521 | 0.0342 | 0.0179 | 0.0089 | 0.0000 |
| $ 140.00 | 0.0566 | 0.0416 | 0.0261 | 0.0173 | 0.0085 | 0.0000 |
| $ 145.00 | 0.0469 | 0.0332 | 0.0245 | 0.0166 | 0.0083 | 0.0000 |
| $ 150.00 | 0.0388 | 0.0315 | 0.0236 | 0.0159 | 0.0076 | 0.0000 |
| $ 155.00 | 0.0349 | 0.0284 | 0.0227 | 0.0153 | 0.0072 | 0.0000 |
| $ 160.00 | 0.0303 | 0.0273 | 0.0219 | 0.0147 | 0.0072 | 0.0000 |
| $ 165.00 | 0.0298 | 0.0264 | 0.0212 | 0.0140 | 0.0066 | 0.0000 |
| $ 170.00 | 0.0294 | 0.0256 | 0.0206 | 0.0136 | 0.0066 | 0.0000 |
| $ 175.00 | 0.0290 | 0.0248 | 0.0198 | 0.0131 | 0.0058 | 0.0000 |
| $ 180.00 | 0.0285 | 0.0240 | 0.0193 | 0.0128 | 0.0058 | 0.0000 |
| $ 185.00 | 0.0293 | 0.0234 | 0.0187 | 0.0123 | 0.0053 | 0.0000 |
| $ 190.00 | 0.0291 | 0.0229 | 0.0182 | 0.0118 | 0.0053 | 0.0000 |
| $ 195.00 | 0.0281 | 0.0220 | 0.0176 | 0.0116 | 0.0049 | 0.0000 |
| $ 200.00 | 0.0276 | 0.0219 | 0.0173 | 0.0112 | 0.0047 | 0.0000 |

If the exact Stock Prices and effective dates are not set forth in the table, then: (i) if the Stock Price is between two Stock Price amounts in the table or the effective date is between two dates in the table, the Make-Whole Shares issued upon conversion of the Securities will be determined by a straight-line interpolation between the number of Make-Whole Shares set forth for the higher and lower Stock Price amounts and the two dates in the table, based on a 365-day year, (ii) if the Stock Price exceeds $200.00 per share, subject to adjustment as set forth herein, no Make-Whole Shares will be issued upon conversion of the Securities; and (iii) if the Stock Price is less than $71.93 per share, subject to adjustment as set forth herein, no Make-Whole Shares will be issued upon conversion of the Securities.

SECTION 10.12    Adjustment to Conversion Rate After a Public Acquirer Change in Control.

Notwithstanding the provisions of Section 10.11, if, following the Issue Date, a Change in Control constituting a Public Acquirer Change in Control (as defined below) occurs, the Company may, in lieu of issuing additional shares of Common Stock upon conversion, elect to adjust the Conversion Rate and the related conversion obligation such that from and after the effective date of such Public Acquirer Change in Control (the " Public Acquirer Change in Control Effective Date"),  Holders shall be entitled to convert their Securities into a number of shares of Public Acquirer Common Stock (as defined below), still subject to the arrangements for payment upon conversion otherwise applicable pursuant to this Article 10, by adjusting the Conversion Rate in effect immediately before the Public Acquirer Change in Control by a fraction (i) the numerator of which will be (a) in the case of a share exchange, consideration,

54

merger or binding share exchange pursuant to which the Common Stock is converted into cash, securities, or other property, the average value of all cash and any other consideration (as determined by the Board of Directors of the Company) paid or payable per share of Common Stock or (b) in the case of any other Public Acquirer Change in Control, the average of the last reported sale prices of our Common Stock for the five consecutive Trading Days prior to but excluding the Public Acquirer Change in Control Effective Date; and (ii) the denominator of which will be the average of the last reported sales prices of the Public Acquirer Common Stock for the five consecutive Trading Days commencing on the Trading Day next succeeding the Public Acquirer Change in Control Effective Date.

A "Public Acquirer Change in Control" means a Change in Control in which the acquirer has a class of common stock traded on a U.S. national securities exchange or quoted on The Nasdaq National Market or which will be so traded or quoted when issued or exchanged in connection with such change in control (the " Public Acquirer Common Stock "). If an acquirer does not itself have a class of common stock satisfying the foregoing requirement, it will be deemed to have "public acquirer common stock" if a corporation that directly or indirectly owns at least a majority of the acquirer has a class of common stock satisfying the foregoing requirement, in such case, all references to public acquirer common stock shall refer to such class of common stock. Majority owned for these purposes means having "beneficial ownership" (as defined in Rule 13d-3 under the Exchange Act of more than 50% of the total voting power of all shares of the respective entity's capital stock that are entitled to vote generally in the election of directors.

Upon a Public Acquirer Change in Control, at the election of the Company, Holders may convert their Securities at the adjusted Conversion Rate described in the second preceding paragraph in this Section 10.12 but shall not be entitled to receive additional shares upon conversion as described herein. The Company shall be required to notify Holders of its election in its notice to holders of such Public Acquirer Change in Control pursuant to Section 3.01.

SECTION 10.13    When Adjustment May Be Deferred.

No adjustment in the Conversion Rate need be made unless the adjustment would require an increase or decrease of at least 1% of the Conversion Rate. Any adjustments that are less than 1% of the Conversion Rate shall be carried forward and taken into account in determining any subsequent adjustment. In addition, the Company shall make and pay any carry forward adjustments not otherwise effected on each anniversary of the Issue Date, upon conversion of any Note, upon required purchase of the notes pursuant to Section 3.01, and five business days prior to the Stated Maturity.

Notwithstanding the provisions of this Article 10, in no event will the Conversion Rate exceed 13.9024 shares per $1,000 Principal Amount of the Securities, as adjusted, other than on account of Sections 10.6, 10.7, 10.8, 10.9, 10.11, and 10.12.

All calculations under this Article 10 shall be made to the nearest cent or to the nearest 1/1,000th of a share, as the case may be (with one-half cent and 5/10,000ths of a share being rounded upward).

55

SECTION 10.14    <u>When No Adjustment Required</u>.

No adjustment need be made for a transaction referred to in Section 10.06, 10.07, 10.08, 10.09, 10.10 or 10.17 if Securityholders are to participate in the transaction on a basis and with notice that the Board of Directors determines to be fair and appropriate in light of the basis and notice on which holders of Common Stock participate in the transaction. Such participation by Securityholders may include participation upon conversion provided that an adjustment shall be made at such time as the Securityholders are no longer entitled to participate.

No adjustment need be made for rights to purchase Common Stock pursuant to a Company plan for reinvestment of dividends or interest.

No adjustment need be made for a change in the par value or no par value of the Common Stock.

To the extent the Securities become convertible pursuant to this Article 10 into cash, no adjustment need be made thereafter as to the cash. Interest will not accrue on the cash.

SECTION 10.15    <u>Notice of Adjustment</u>.

Whenever the Conversion Rate is adjusted, the Company shall promptly mail to Securityholders a notice of the adjustment. The Company shall file with the Trustee and the Conversion Agent such notice and a certificate from the Company's independent public accountants briefly stating the facts requiring the adjustment and the manner of computing it. The certificate shall be conclusive evidence that the adjustment is correct. Neither the Trustee nor any Conversion Agent shall be under any duty or responsibility with respect to any such certificate except to exhibit the same to any Holder desiring inspection thereof.

SECTION 10.16    <u>Notice of Certain Transactions</u>.

If:

(1)    the Company takes any action that would require an adjustment in the Conversion Rate pursuant to Section 10.06, 10.07, 10.08, 10.09, 10.10 or 10.11 (unless no adjustment is to occur pursuant to Section 10.14); or

(2)    the Company takes any action that would require a supplemental indenture pursuant to Section 10.17; or

(3)    there is a liquidation or dissolution of the Company;

then the Company shall mail to Securityholders and file with the Trustee and the Conversion Agent a notice stating the proposed record date for a dividend or distribution or the proposed effective date of a subdivision, combination, reclassification, consolidation, merger, binding share exchange, transfer, liquidation or dissolution. The Company shall file and mail the notice at least 15 days before such date. Failure to file or mail the notice or any defect in it shall not affect the validity of the transaction.

SECTION 10.17    Reorganization of Company; Special Distributions.

If the Company is a party to a transaction subject to Section 5.01 (other than a sale of all or substantially all of the assets of the Company in a transaction in which the holders of Common Stock immediately prior to such transaction do not receive securities, cash or other assets of the Company or any other person) or a merger or binding share exchange which reclassifies or changes the outstanding Common Stock of the Company, the person obligated to deliver securities, cash or other assets upon conversion of Securities shall enter into a supplemental indenture. If the issuer of securities deliverable upon conversion of Securities is an Affiliate of the successor Company, that issuer shall join in the supplemental indenture.

The supplemental indenture shall provide that after the effective time of the transaction, settlement of the Net Share Amount will be based on the kind and amount of cash, securities or other assets of the Company or another Person that a holder of Common Stock received in such transaction (or, if such transaction provides for the holders of Common Stock the right to receive more than a single type of consideration determined based in part upon any form of stockholder election, the weighted average of the types and amounts of consideration received by the holders of Common Stock); provided that, for the avoidance of doubt, the Conversion Value will be paid in cash and at the Company's election, cash, Common Stock or a combination of cash and Common Stock in accordance with the terms of this Article 10. The supplemental indenture shall provide for adjustments which shall be as nearly equivalent as may be practical to the adjustments provided for in this Article 10. The successor Company shall mail to Securityholders a notice briefly describing the supplemental indenture.

If this Section applies, neither Section 10.06 nor 10.07 applies. If the Company makes a distribution to all holders of its Common Stock of any of its assets, or debt securities or any rights, warrants or options to purchase securities of the Company that, but for the provisions of Section 10.08(c), would otherwise result in an adjustment in the Conversion Rate pursuant to the provisions of Section 10.08, then, from and after the record date for determining the holders of Common Stock entitled to receive the distribution, a Holder of a Security that converts such Security in accordance with the provisions of this Indenture shall upon such conversion be entitled to receive, in addition to the shares of Common Stock into which the Security is convertible, the kind and amount of securities, cash or other assets comprising the distribution that such Holder would have received if such Holder had converted the Security immediately prior to the record date for determining the holders of Common Stock entitled to receive the distribution.

SECTION 10.18    Company Determination Final.

Any determination that the Company or the Board of Directors must make pursuant to Section 10.03, 10.06, 10.07, 10.08, 10.09, 10.10, 10.13, 10.14, 10.17 or 10.20 is conclusive.

SECTION 10.19    Trustee's Adjustment Disclaimer.

The Trustee has no duty to determine when an adjustment under this Article 10 should be made, how it should be made or what it should be. The Trustee has no duty to

determine whether a supplemental indenture under Section 10.17 need be entered into or whether any provisions of any supplemental indenture are correct. The Trustee shall not be accountable for and makes no representation as to the validity or value of any securities or assets issued upon conversion of Securities. The Trustee shall not be responsible for the Company's failure to comply with this Article 10. Each Conversion Agent shall have the same protection under this Section 10.19 as the Trustee.

SECTION 10.20     Simultaneous Adjustments.

In the event that this Article 10 requires adjustments to the Conversion Rate under more than one of Sections 10.06(4), 10.07, 10.08 or 10.09, and the record dates for the distributions giving rise to such adjustments shall occur on the same date, then such adjustments shall be made by applying, first, the provisions of Section 10.06, second, the provisions of Section 10.08, third, the provisions of Section 10.09 and, fourth, the provisions of 10.07.

SECTION 10.21     Successive Adjustments.

After an adjustment to the Conversion Rate under this Article 10, any subsequent event requiring an adjustment under this Article 10 shall cause an adjustment to the Conversion Rate as so adjusted.

SECTION 10.22     Rights Issued in Respect of Common Stock Issued Upon Conversion.

Each share of Common Stock issued upon conversion of Securities pursuant to this Article 10 shall be entitled to receive the appropriate number of rights (" Rights "), if any, and the certificates representing the Common Stock issued upon such conversion shall bear such legends, if any, in each case as may be provided by the terms of the Company's Amended and Restated Rights Agreement, dated as of December 12, 2000, between the Company and American Stock Transfer & Trust Company, as Rights Agent, or any successor shareholder rights agreement adopted by the Company, as the same may be amended form time to time (in each case, a " Shareholders Rights Plan "). Provided that such Shareholders Rights Plan requires that each share of Common Stock issued upon conversion of Securities (or cash in lieu thereof) at any time prior to the distribution of separate certificates representing the Rights be entitled to receive such Rights, then, notwithstanding anything else to the contrary in this Article 10, there shall not be any adjustment to the conversion privilege or Conversion Rate as a result of the issuance of Rights, the distribution of separate certificates representing the Rights, the exercise or redemption of such Rights in accordance with any Shareholders Rights Plan, or the termination or invalidation of such Rights.

SECTION 10.23     Withholding Taxes for Adjustments in Conversion Rate.

If the Company pays withholding taxes on behalf of a Holder as a result of an adjustment to the Conversion Rate, the Company may, at its option, set off such payments against payments of cash and Common Stock on the Securities.

58

# ARTICLE 11

# PAYMENT OF INTEREST

SECTION 11.01    Interest Payments.

Interest on any Security that is payable, and is punctually paid or duly provided for, on any applicable Interest Payment Date shall be paid to the person in whose name that Security is registered at the Close of Business on the Regular Record Date or accrual date, as the case may be, for such interest at the office or agency of the Company maintained for such purpose. Each installment of interest payable in cash on any Security shall be paid in same-day funds by transfer to an account maintained by the payee located inside the United States, if the Trustee shall have received proper wire transfer instructions from such payee not later than the related Regular Record Date or accrual date, as the case may be, or, if no such instructions have been received by check drawn on a bank in the City of New York mailed to the payee at its address set forth on the Registrar's books. In the case of a permanent Global Security, interest payable on any applicable payment date will be paid to the Depositary, with respect to that portion of such permanent Global Security held for its account by Cede & Co. for the purpose of permitting such party to credit the interest received by it in respect of such permanent Global Security to the accounts of the beneficial owners thereof.

SECTION 11.02    Defaulted Interest.

Except as otherwise specified with respect to the Securities, any interest on any Security that is payable, but is not punctually paid or duly provided for, within 30 days following any applicable payment date (herein called " Defaulted Interest ", which term shall include any accrued and unpaid interest that has accrued on such defaulted amount in accordance with paragraph 1 of the Securities), shall forthwith cease to be payable to the registered Holder thereof on the relevant Regular Record Date or accrual date, as the case may be, by virtue of having been such Holder, and such Defaulted Interest may be paid by the Company, at its election in each case, as provided in clause (1) or (2) below. All such Defaulted Interest shall be payable on the next Interest Payment Date.

(1)        The Company may elect to make payment of any Defaulted Interest to the persons in whose names the Securities are registered at the Close of Business on a Special Record Date for the payment of such Defaulted Interest, which shall be fixed in the following manner. The Company shall notify the Trustee in writing of the amount of Defaulted Interest proposed to be paid on each Security and the date of the proposed payment (which shall not be less than 20 days after such notice is received by the Trustee), and at the same time the Company shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Trustee for such deposit on or prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the persons entitled to such Defaulted Interest as in this clause provided. Thereupon the Trustee shall fix a special record date for the payment of such Defaulted Interest which shall be not more than 15 days and not less than 10 days prior to the date of the proposed payment and not less than 10 days after the receipt by the Trustee of the notice of the proposed payment (the " Special Record Date "). The Trustee shall promptly notify

59

the Company of such Special Record Date and, in the name and at the expense of the Company, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be mailed, first-class postage prepaid, to each Holder of Securities at his address as it appears on the list of Securityholders maintained pursuant to Section 2.05 not less than 10 days prior to such Special Record Date. Notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor having been mailed as aforesaid, such Defaulted Interest shall be paid to the persons in whose names the Securities are registered at the Close of Business on such Special Record Date and shall no longer be payable pursuant to the following clause (2).

(2)       The Company may make payment of any Defaulted Interest on the Securities in any other lawful manner not inconsistent with the requirements of any securities exchange on which such Securities may be listed, and upon such notice as may be required by such exchange, if, after notice given by the Company to the Trustee of the proposed payment pursuant to this clause, such manner of payment shall be deemed practicable by the Trustee.

SECTION 11.03    Interest Rights Preserved.

Subject to the foregoing provisions of this Article 11 and Section 2.06, each Security delivered under this Indenture upon registration of transfer of or in exchange for or in lieu of any other Security shall carry the rights to interest accrued and unpaid, and to accrue, which were carried by such other Security.

# ARTICLE 12

## MISCELLANEOUS

SECTION 12.01    Trust Indenture Act Controls.

If any provision of this Indenture limits, qualifies, or conflicts with another provision which is required to be included in this Indenture by the TIA, the required provision shall control.

SECTION 12.02    Notices; Address of Agency.

(a)  Other than as set forth in Section 10.01, any request, demand, authorization, notice, waiver, consent or communication shall be in writing and delivered in person or mailed by first-class mail, postage prepaid, addressed as follows or transmitted by facsimile transmission (confirmed by guaranteed overnight courier) to the following facsimile numbers:

if to the Company:
    Amgen Inc.
One Amgen Center Drive
Thousand Oaks, CA 91320-1799
Telephone No.: (805) 447-1000
Facsimile No.: (805) 449-2863
Attention: Treasurer

    with a copy to:

        Latham & Watkins LLP
633 West Fifth Street
Suite 4000
Los Angeles, CA 90071
Telephone No.: (213) 485-1234
Facsimile No.: (213) 891-8763
Attention: Gregory Rodgers, Esq.

    if to the Trustee:

        JPMorgan Chase Bank, N.A.
4 New York Plaza, 15th Floor
        New York, NY 10004
Telephone No.: (212) 623-5233
Facsimile No.: (212) 623-6215
Attention: Carol Ng, Vice President

    with a copy to:

        Pryor Cashman Sherman & Flynn LLP
        410 Park Avenue
        New York, NY 10022
        Telephone No.: (212) 326-0820
        Facsimile No.: (212) 798-6909
        Attention: Michael Fruchter, Esq.

    The Company or the Trustee by notice given to the other in the manner provided above may designate additional or different addresses for subsequent notices or communications.

    Any notice or communication given to a Securityholder shall be mailed to the Securityholder, by first-class mail, postage prepaid, at the Securityholder's address as it appears on the registration books of the Registrar and shall be sufficiently given if so mailed within the time prescribed.

    Failure to mail a notice or communication to a Securityholder or any defect in it shall not affect its sufficiency with respect to other Securityholders. If a notice or communication

61

is mailed in the manner provided above, it is duly given, whether or not received by the addressee.

If the Company mails a notice or communication to the Securityholders, it shall mail a copy to the Trustee and each Registrar, Paying Agent, Conversion Agent or co-registrar.

(b)  Any request, demand, authorization, notice, waiver, consent or communication to be provided in connection with Section 10.12 shall be in writing and delivered in person or transmitted by facsimile transmission (confirmed by guaranteed overnight courier) to the following facsimile numbers or via e-mail to the account or accounts specified by the Company by written notice to the Trustee:

if to the Company:

Amgen Inc.
One Amgen Center Drive
Thousand Oaks, CA 91320-1799
Telephone No.: (805) 447-1000
Facsimile No.: (805) 449-2863
Attention:  Treasurer

with a copy to:

Latham & Watkins LLP
633 West Fifth Street
Suite 4000
Los Angeles, CA  90071
Telephone No.: (213) 485-1234
Facsimile No.: (213) 891-8763
Attention:  Gregory Rodgers, Esq.

with a copy to:

Merrill Lynch International
Merrill Lynch Financial Centre
2 King Edward Street
London EC1A 1HQ
Telephone No.: 44 207 995 3769
Facsimile No.: 44 207 995 2004
Attention:  Manager, Fixed Income Settlements

and

Morgan Stanley & Co. International Limited
c/o Morgan Stanley Bank
One New York Plaza, 4th Floor
New York, NY  10004

Attention: Fred Gonfiantini
Facsimile No.: (212) 507-0724
Telephone No.: (212) 276-2427

Any notice party set forth in this Section 12.02(b) by notice given to the others in the manner provided above may designate additional or different addresses for subsequent notices or communications, including e-mail addresses.

SECTION 12.03    Communication by Holders with Other Holders.

Securityholders may communicate pursuant to TIA Section 312(b) with other Securityholders with respect to their rights under this Indenture or the Securities. The Company, the Trustee, the Registrar, the Paying Agent, the Conversion Agent and anyone else shall have the protection of TIA Section 312(c).

SECTION 12.04    Certificate and Opinion as to Conditions Precedent.

Upon any request or application by the Company to the Trustee to take any action under this Indenture, the Company shall furnish to the Trustee:

(1)      an Officers' Certificate stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(2)      an Opinion of Counsel stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

SECTION 12.05    Statements Required in Certificate or Opinion.

Unless the Trustee agrees, in its sole discretion, to accept a different form or format, each Officers' Certificate or Opinion of Counsel with respect to compliance with a covenant or condition provided for in this Indenture shall include:

(1)      a statement that each person making such Officers' Certificate or Opinion of Counsel has read such covenant or condition;

(2)      a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such Officers' Certificate or Opinion of Counsel are based;

(3)      a statement that, in the opinion of each such person, he has made such examination or investigation as is necessary to enable such person to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4)      a statement that, in the opinion of such person, such covenant or condition has been complied with.

SECTION 12.06     Separability Clause.

In case any provision in this Indenture or in the Securities shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

SECTION 12.07     Rules by Trustee, Paying Agent, Conversion Agent and Registrar.

The Trustee may make reasonable rules for action by or a meeting of Securityholders. The Registrar, Conversion Agent and the Paying Agent may make reasonable rules for their functions.

SECTION 12.08     Calculations.

The calculation of the Conversion Value, Conversion Date, Volume Weighted Average Price, Conversion Reference Period, Change in Control Purchase Price, Conversion Rate, Closing Price of the Common Stock, Required Cash Amount, Trading Price, the number of shares, if any, to be issued upon conversion and each other calculation to be made hereunder shall be the obligation of the Company. All calculations made by the Company as contemplated pursuant to this Section 12.08 shall be in good faith and final and binding on the Company and the Holders absent manifest error. The Company will provide a schedule of the calculations to the Trustee and the Trustee is entitled to rely upon the accuracy of the calculations without independent verification.

SECTION 12.09     Legal Holidays.

A "Legal Holiday" is any day other than a Business Day. If any specified date (including a date for giving notice) is a Legal Holiday, the action shall be taken on the next succeeding day that is not a Legal Holiday, and, if the action to be taken on such date is a payment in respect of the Securities, interest shall accrue for the intervening period.

SECTION 12.10     Governing Law.

THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN THIS INDENTURE AND THE SECURITIES.

SECTION 12.11     No Recourse Against Others.

A director, officer, employee or stockholder, as such, of the Company shall not have any liability for any obligations of the Company under the Securities or this Indenture or for any claim based on, in respect of or by reason of such obligations or their creation. By accepting a Security, each Securityholder shall waive and release all such liability. The waiver and release shall be part of the consideration for the issue of the Securities.

SECTION 12.12   Successors.

All agreements of the Company in this Indenture and the Securities shall bind its successor. All agreements of the Trustee in this Indenture shall bind its successor.

SECTION 12.13   Multiple Originals.

The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement. One signed copy is enough to prove this Indenture.

*(Signature Pages Follow)*

65

IN WITNESS WHEREOF, the undersigned, being duly authorized, have executed this Indenture on behalf of the respective parties hereto as of the date first above written.

AMGEN INC.

By: /s/ RICHARD D. NANULA
    Name:  Richard D. Nanula
    Title:   Executive Vice President and
            Chief Financial Officer


JPMORGAN CHASE BANK, N.A.,
  as Trustee


By /s/ CAROL NG
    Name:  Carol Ng
    Title:   Vice President

66

## EXHIBIT A

## [FORM OF FACE OF SECURITY]

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.(1)

 TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF THE DEPOSITORY TRUST COMPANY, OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN ARTICLE TWO OF THE INDENTURE REFERRED TO ON THE REVERSE HEREOF.(1)

THE NOTES AND THE SHARES OF COMMON STOCK ISSUABLE UPON CONVERSION OF THIS NOTE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE SECURITIES ACT), OR ANY STATE SECURITIES LAWS. NEITHER THIS NOTE, THE SHARES OF COMMON STOCK ISSUABLE UPON CONVERSION OF THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN OR THEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATION.(2)

BY ITS ACQUISITION HEREOF, THE HOLDER (1) AGREES TO OFFER, SELL OR OTHERWISE TRANSFER SUCH NOTE PRIOR TO THE DATE WHICH IS TWO YEARS AFTER THE LATER OF THE LAST ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE COMPANY OR ANY AFFILIATE OF THE COMPANY WAS THE OWNER OF THIS NOTE (OR ANY PREDECESSOR OF THIS NOTE) ONLY (A) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, (B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) TO A PERSON IT REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE

---

(1)        This paragraph should be included only if the Security is a Global Security.

(2)        This paragraph should be included only if the Security is a Restricted Security.

A-1

ON RULE 144A, (D) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE COMPANY'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSE (D) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATIONS AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM, AND IN EACH OF THE FOREGOING CASES, TO REQUIRE THAT A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THE OTHER SIDE OF THIS NOTE IS COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE TRUSTEE. THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE HOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE.(2)

---

(2)       This paragraph should be included only if the Security is a Restricted Security.

A-2

**AMGEN INC.**
**0.125% Convertible Senior Note due 2011**

No.                                        CUSIP: 031162 AM 2
Issue Date:
Principal Amount:

           AMGEN INC., a Delaware Corporation, promises to pay to Cede & Co. or registered assigns, the Principal Amount
of            on February 1, 2011.

           This Security shall bear cash interest at the rate of 0.125% per annum. This Security is convertible as specified on the other side of this Security.

           Additional provisions of this Security are set forth on the other side of this Security.

           AMGEN INC.

           By: _____
                   Name:
                   Title:

TRUSTEE'S CERTIFICATE OF
 AUTHENTICATION

JPMorgan Chase Bank, N.A.,
 as Trustee, certifies that this
 is one of the Securities referred
 to in the within-mentioned Indenture.

By: _____
    Authorized Officer

A-3

**[FORM OF REVERSE SIDE OF NOTE]**
**0.125% Convertible Senior Note due 2011**

1.       Interest.

      This Security shall bear cash interest at the rate of 0.125% per annum. Interest on this Security shall accrue from the Issue Date, or from the most recent date to which interest has been paid or provided for. Interest shall be payable semiannually in arrears on February 1 and August 1 of each year, beginning on August 1, 2006, to the holders of record of Securities at the Close of Business on the January 15 or July 15 immediately preceding such Interest Payment Date. Each payment of cash interest on this Security shall include interest accrued for the period commencing on and including the immediately preceding Interest Payment Date (or, if none, the scheduled original Issue Date) through the day before the applicable Interest Payment Date or purchase date. Any payment required to be made on any day that is not a Business Day shall be made on the next succeeding Business Day. Interest shall be calculated using a 360-day year composed of twelve 30-day months. Interest shall cease to accrue on this Security upon its Stated Maturity, conversion or purchase by the Company at the option of the Holder upon a Change in Control in accordance with paragraph 5 hereof.

      If the Principal Amount hereof or any portion of such Principal Amount is not paid when due (whether upon acceleration pursuant to Section 6.02 of the Indenture, upon the date set for payment of the Change in Control Purchase Price pursuant to paragraph 5 hereof or upon the Stated Maturity of this Security) or if interest due hereon or any portion of such interest is not paid when due in accordance with paragraph 5 or 7 hereof, then in each such case the overdue amount shall, to the extent permitted by law, bear interest at the rate of 1.125% per annum, compounded semiannually, which interest shall accrue from the date such overdue amount was originally due to the date payment of such amount, including interest thereon, has been made or duly provided for. All such interest shall be payable on the next Interest Payment Date.

2.       Method of Payment.

      Subject to the terms and conditions of the Indenture, the Company will make payments in respect of Change in Control Purchase Prices and at Stated Maturity to Holders who surrender Securities to a Paying Agent to collect such payments in respect of the Securities. The Company will pay any cash amounts in money of the United States that at the time of payment is legal tender for payment of public and private debts. However, the Company may make such cash payments by check payable in such money.

3.       Paying Agent, Conversion Agent and Registrar.

      Initially, JPMorgan Chase Bank, N.A., a national banking association (the "Trustee"), will act as Paying Agent, Conversion Agent and Registrar. The Company may appoint and change any Paying Agent, Conversion Agent, Registrar or co-registrar without notice, other than notice to the Trustee. The Company or any of its Subsidiaries or any of their Affiliates may act as Paying Agent, Conversion Agent, Registrar or co-registrar. The Company

A-4

may maintain deposit accounts and conduct other banking transactions with the Trustee in the normal course of business.

4.      Indenture.

The Company issued the Securities under an Indenture dated as of February 17, 2006 (the "Indenture"), between the Company and the Trustee. The terms of the Securities include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as in effect from time to time (the " TIA "). Capitalized terms used herein and not defined herein have the meanings ascribed thereto in the Indenture. The Securities are subject to all such terms, and Securityholders are referred to the Indenture for a statement of those terms.

The Securities are senior unsecured obligations of the Company limited to $2,500,000,000 aggregate Principal Amount (subject to Section 2.07 of the Indenture). The Indenture does not limit other indebtedness of the Company, secured or unsecured.

5.      Purchase by the Company at the Option of the Holder upon a Change in Control.

At the option of the Holder and subject to the terms and conditions of the Indenture, the Company shall become obligated to purchase the Securities held by such Holder no later than 35 Business Days after the occurrence of a Change in Control of the Company for a Change in Control Purchase Price equal to the Principal Amount of the Securities to be purchased, plus accrued and unpaid interest to the Change in Control Purchase Date, which Change in Control Purchase Price shall be paid in cash.

In addition to the Change in Control Purchase Price payable with respect to all Securities or portions thereof to be purchased as of the Change in Control Purchase Date, the Holders of such Securities (or portions thereof) shall be entitled to receive accrued and unpaid interest with respect thereto, which shall be paid in cash on or prior to the third Business Day following the later of the Change in Control Purchase Date and the time of delivery of such Securities to the Paying Agent pursuant to the Indenture.

Holders have the right to withdraw any Change in Control Purchase Notice by delivering to the Paying Agent a written notice of withdrawal in accordance with the provisions of the Indenture.

If cash (and/or securities if permitted under the Indenture) sufficient to pay the Change in Control Purchase Price, of, together with any accrued and unpaid interest with respect to, all Securities or portions thereof to be purchased as of the Change in Control Purchase Date is deposited with the Paying Agent on or prior to the third Business Day following the Change in Control Purchase Date, interest shall cease to accrue on such Securities (or portions thereof) immediately after such Change in Control Purchase Date whether or not the Security is delivered to the Paying Agent, and the Holder thereof shall have no other rights as such (other than the right to receive the Change in Control Purchase Price and accrued and unpaid interest upon surrender of such Security).

6.          Conversion.

A Holder of a Security may convert such Security into cash and, at the option of the Company, shares of Common Stock of the Company before the Close of Business on February 1, 2011, if at least one of the following conditions is satisfied:

(a)          during any calendar quarter commencing at any time after June 30, 2006, and only during such calendar quarter, if, as of the last day of the preceding calendar quarter, the Closing Price of the Common Stock for at least 20 Trading Days in the period of 30 consecutive Trading Days ending on the last Trading Day of such preceding calendar quarter exceeds 130% of the Conversion Price per share on that 30th  Trading Day on the last day of such preceding calendar quarter (the "Conversion Trigger Price"). The Conversion Agent will determine on the Company's behalf at the beginning of each calendar quarter commencing at any time after June 30, 2006 through the calendar quarter ending December 31, 2010, whether the Securities are convertible as a result of the price of the Common Stock and notify the Company and the Trustee;

(b)          the Company elects to distribute to all holders of Common Stock (i) rights or warrants entitling them to subscribe for or purchase, for a period expiring within 60 days after the record date for such distribution, Common Stock at less than the average of the Closing Prices of the Common Stock for the five consecutive Trading Days ending on the date immediately preceding the first public announcement of the distribution, or (ii) cash, debt securities (or other evidence of Indebtedness) or other assets (excluding dividends or distributions described in Sections 10.06(1), 10.06(2) and 10.06(3) of the Indenture, which distribution, together with all other distributions within the preceding twelve months, has a per share value exceeding 15% of the average of the Closing Prices of the Common Stock for the five consecutive Trading Days ending on the date immediately preceding the first public announcement of the distribution; or

(c)          in the event the Company is a party to a consolidation, merger, binding share exchange, transfer or lease of all or substantially all of the Company's assets, pursuant to which the Common Stock would be converted into cash, securities or other assets, at any time from or after the date which is 15 days prior to the anticipated effective time of the transaction until 35 days after the actual date of such transaction (or, if the transaction also constitutes a change in control, until the Change in Control Purchase Date). After the effective time of the transaction, settlement of the Conversion Value will be based on the kind and amount of cash, securities or other assets of the Company or another Person that a holder of Common Stock received in such transaction (or, if the transaction provides for the holders of Common Stock the right to receive more than a single type of consideration determined based in part upon any form of stockholder election, the weighted average of the types and amounts of consideration received by the holders of Common Stock); provided that, for the avoidance of doubt, the Conversion Value will be paid in cash and at the Company's election, cash, Common Stock or a combination of cash and Common Stock in accordance with the terms of the Indenture. The Company will notify Holders and the Trustee as promptly as practicable following the date the Company publicly announces such transaction (but in no event less than 15 days prior to the anticipated effective date of such transaction).

A-6

If the Company makes a distribution described in subsection (a) or (b), the Company must notify Holders at least 20 days prior to the Ex-Dividend Date for such distribution. Once the Company has given such notice, Holders may surrender their Securities for conversion at any time until the earlier of the Close of Business on the Business Day prior to the Ex-Dividend Date or the Company's announcement that such distribution will not take place, even if the Securities are not convertible at that time. No adjustment to the ability of Holders to convert will be made if Holders are entitled to participate in the distribution without conversion.

If the transaction also constitutes a "<u>Change in Control</u>," the Holder can require the Company to purchase all or a portion of its Securities described in paragraph 5.

A Security in respect of which a Holder has delivered a Change in Control Purchase Notice exercising the option of such Holder to require the Company to purchase such Security may be converted only if such notice of exercise is withdrawn in accordance with the terms of the Indenture.

The Initial Conversion Rate is 12.5247 shares of Common Stock per $1,000 Principal Amount, subject to adjustment in certain events described in the Indenture. The Company will deliver cash or a check in lieu of any fractional share of Common Stock.

Notwithstanding anything herein to the contrary, Securityholders may surrender the Securities for conversion at any time on or after January 1, 2011, until the Close of Business on the Business Day immediately preceding the Maturity Date.

Accrued and unpaid interest will not be paid in cash on Securities that are converted but will be paid in the manner provided in the following paragraph; provided, however, that Securities surrendered for conversion during the period, in the case of interest, from the Close of Business on any Regular Record Date next preceding any Interest Payment Date to the opening of business on such Interest Payment Date, shall be entitled to receive such semiannual interest payable on such Securities on the corresponding Interest Payment Date and Securities surrendered for conversion during such periods must be accompanied by payment of an amount equal to the interest with respect thereto that the registered Holder is to receive; provided that no such payment need be made (i) in connection with any conversion following the Regular Record Date immediately preceding the final Interest Payment Date; (ii) if the Company has specified a Change in Control Purchase Date that is after a Record Date and on or prior to the corresponding Interest Payment Date; or (iii) to the extent of Defaulted Interest, if any Defaulted Interest exists at the time of conversion with respect to such Security.

A Holder may convert a portion of a Security if the Principal Amount of such portion is $1,000 or an integral multiple of $1,000. No payment or adjustment will be made for dividends on the Common Stock except as provided in the Indenture. On conversion of a Security, a Securityholder will not receive, except as described herein, any cash payment representing accrued interest. Instead, accrued interest will be deemed paid by the shares of Common Stock (or any cash in lieu thereof) received by the Securityholder on conversion. Delivery to the holder of the full number of shares of Common Stock into which the Security is convertible (or any cash in lieu thereof), together with any cash payment, will be deemed to satisfy the Company's obligation to pay (i) the Principal Amount of the Security and (ii) accrued

and unpaid interest, and accrued interest with respect to the converted Security shall not be cancelled, extinguished or forfeited, but rather shall be deemed to be paid in full.

The Company will not adjust the Conversion Rate to account for accrued interest.

To convert a Security that is represented by a Global Security, a Holder must convert by book-entry transfer to the Conversion Agent through the facilities of the DTC. To convert a Security that is represented by a Certificated Security, a Holder must (1) complete and manually sign the conversion notice below and deliver such notice to the Conversion Agent, (2) surrender the Security to the Conversion Agent, (3) furnish appropriate endorsements and transfer documents if required by the Conversion Agent, the Company or the Trustee and (4) pay all transfer or similar tax, if required.

The Conversion Rate will be adjusted for dividends or distributions on Common Stock payable in Common Stock or other Capital Stock; subdivisions, combinations or certain reclassifications of Common Stock; distributions to all holders of Common Stock of certain rights to purchase Common Stock for a period expiring within 60 days of the record date for such distribution at less than the Closing Price of the Common Stock at the Time of Determination; distributions to such holders of assets (including shares of Capital Stock of a Subsidiary) or debt securities of the Company or certain rights to purchase securities of the Company; cash dividends or cash distributions; and distributions in respect of a tender offer or exchange offer of the Common Stock. However, no adjustment need be made if Securityholders may participate in the transaction or in certain other cases. The Company from time to time may voluntarily increase the Conversion Rate.

7.     Defaulted Interest.

Except as otherwise specified with respect to the Securities, any Defaulted Interest on any Security shall forthwith cease to be payable to the registered Holder thereof on the relevant Regular Record Date or accrual date, as the case may be, by virtue of having been such Holder, and such Defaulted Interest may be paid by the Company as provided for in Section 11.02 of the Indenture.

8.     Denominations; Transfer; Exchange.

The Securities are in fully registered form, without coupons, in denominations of $1,000 of Principal Amount and integral multiples of $1,000. A Holder may transfer or exchange Securities in accordance with the Indenture. The Registrar may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture. The Registrar need not register the transfer or exchange of any Securities in respect of which a Change in Control Purchase Notice has been given and not withdrawn (except, in the case of a Security to be purchased in part, the portion of the Security not to be purchased).

9.     Persons Deemed Owners.

The registered Holder of this Security may be treated as the owner of this Security for all purposes.

10.    Unclaimed Money or Securities.

The Trustee and the Paying Agent shall return to the Company upon written request any money or securities held by them for the payment of any amount with respect to the Securities that remains unclaimed for two years, subject to applicable unclaimed property laws. After return to the Company, Holders entitled to the money or securities must look to the Company for payment as general creditors unless an applicable abandoned property law designates another person.

11.    Amendment; Waiver.

Subject to certain exceptions set forth in the Indenture, (i) the Indenture or the Securities may be amended with the written consent of the Holders of at least a majority in aggregate Principal Amount of the Securities at the time outstanding and (ii) certain Defaults may be waived with the written consent of the Holders a majority in aggregate Principal Amount of the Securities at the time outstanding. Subject to certain exceptions set forth in the Indenture, without the consent of any Securityholder, the Company and the Trustee may amend the Indenture or the Securities to cure any ambiguity, omission, defect or inconsistency, or to comply with Article 5 or Section 10.17 of the Indenture, to secure the Company's obligations under this Security or to add to the Company's covenants for the benefit of the Securityholders or to surrender any right or power conferred, or to comply with any requirement of the SEC in connection with the qualification of the Indenture under the Trust Indenture Act of 1939 and any amendment thereof, or as necessary in connection with the registration of the Securities under the Securities Act or to make any change that does not adversely affect the rights of any Holders.

12.    Defaults and Remedies.

Under the Indenture, Events of Default include (i) default in the payment of interest which becomes due and payable upon exercise by the Company of its option provided for in paragraph 6(a) hereof which default in any such case continues for 30 days; (ii) default in payment of the Principal Amount or Change in Control Purchase Price in respect of the Securities when the same becomes due and payable; (iii) failure by the Company to comply with other agreements in the Indenture or the Securities, subject to notice and lapse of time; (iv) (a) failure of the Company to make any payment by the end of any applicable grace period after maturity of Indebtedness in an amount in excess of $50.0 million, or (b) the acceleration of Indebtedness in an amount in excess of $50.0 million because of a default with respect to such Indebtedness without such Indebtedness having been discharged or such acceleration having been cured, waived, rescinded or annulled, subject to notice and lapse of time; provided, however, that if any such failure or acceleration referred to in (a) or (b) above shall cease or be cured, waived, rescinded or annulled, then the Event of Default by reason thereof shall be deemed not to have occurred; and (v) certain events of bankruptcy or insolvency. If an Event of Default occurs and is continuing, the Trustee, or the Holders of at least 25% in aggregate Principal Amount of the Securities at the time outstanding, may declare the Principal Amount through the date of such declaration, and any accrued and unpaid interest through the date of such declaration, on all the Securities to be due and payable immediately. Certain events of bankruptcy or insolvency are Events of Default which will result in the Principal Amount on the

A-9

Securities, and any accrued and unpaid interest through the occurrence of such event, becoming due and payable immediately upon the occurrence of such Events of Default.

Securityholders may not enforce the Indenture or the Securities except as provided in the Indenture. The Trustee may refuse to enforce the Indenture or the Securities unless it receives indemnity or security reasonably satisfactory to it. Subject to certain limitations, Holders of a majority in aggregate Principal Amount of the Securities at the time outstanding may direct the Trustee in its exercise of any trust or power. The Trustee may withhold from Securityholders notice of any continuing Default (except a Default in payment of amounts specified in clause (i) or (ii) above) if it determines that withholding notice is in their interests.

13.    Trustee Dealings with the Company.

Subject to certain limitations imposed by the TIA, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Securities and may otherwise deal with and collect obligations owed to it by the Company or its Affiliates and may otherwise deal with the Company or its Affiliates with the same rights it would have if it were not Trustee.

14.    No Recourse Against Others.

A director, officer, employee or stockholder, as such, of the Company shall not have any liability for any obligations of the Company under the Securities or the Indenture or for any claim based on, in respect of or by reason of such obligations or their creation. By accepting a Security, each Securityholder waives and releases all such liability. The waiver and release are part of the consideration for the issue of the Securities.

15.    Authentication.

This Security shall not be valid until an authorized officer of the Trustee manually signs the Trustee's Certificate of Authentication on the other side of this Security.

16.    Abbreviations.

Customary abbreviations may be used in the name of a Securityholder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entireties), JT TEN (=joint tenants with right of survivorship and not as tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors Act).

17.    GOVERNING LAW.

THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE INDENTURE AND THIS SECURITY.

The Company will furnish to any Securityholder upon written request and without charge a copy of the Indenture which has in it the text of this Security in larger type. Requests may be made to:

Amgen Inc.

One Amgen Center Drive
Thousand Oaks, CA 91320-1799
Telephone No.: (805) 447-1000
Facsimile No.: (805) 499-8011
Attention:  Treasurer

A-11

## ASSIGNMENT FORM

To assign this Security, fill in the form below:

I or we assign and transfer this Security to

_____

_____

(Insert assignee's soc. sec. or tax ID no.)

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint

        agent to transfer this Security on the books of the Company. The agent may substitute another to act for him.

## CONVERSION NOTICE

To convert this Security into Common Stock of the Company, check the box:   ☐

To convert only part of this Security, state the Principal Amount to be converted (which must be $1,000 or an integral multiple of $1,000):

$

If you want the stock certificate made out in another person's name, fill in the form below:

_____

_____

(Insert other person's soc. sec. or tax ID no.)

_____

_____

(Print or type other person's name, address and zip code)

Date: _____    Your Signature: _____

_____

_____

(Sign exactly as your name appears on the other side of this Security)

A-12

**AMGEN INC.**
**$2,500,000,000**
**0.125% Convertible Senior Notes due 2011**

**FIRST SUPPLEMENTAL INDENTURE**

**Dated as of June 8, 2006**

**to the**

**INDENTURE**

**Dated as of February 17, 2006**

**JPMORGAN CHASE BANK, N.A.,**
**Trustee**

FIRST SUPPLEMENTAL INDENTURE dated as of June 8, 2006 between Amgen Inc., a Delaware corporation (the " **Company** "), and JPMorgan Chase Bank, N.A., a national banking association (" **Trustee** "), to the Indenture (as defined below).

## <u>RECITALS</u>

A.     The Company is a party to that certain Indenture, dated as of February 17, 2006 (the "**Indenture**"), pursuant to which the Company's 0.125% Convertible Senior Notes due 2011 (the " **Securities** ") were originally issued. Capitalized terms used herein without definition have the meanings provided to them in the Indenture.

B.     Section 9.01(1) of the Indenture provides that the Company and the Trustee may amend the Indenture and the Securities to cure any ambiguity, omission, defect or inconsistency; and Section 9.01(6) of the Indenture provides that the Company and the Trustee may amend the Indenture and the Securities to make any change that does not adversely affect the rights of any holders of the Securities. Section 9.01 of the Indenture also provides that no amendment to cure any ambiguity, omission, defect or inconsistency in this Indenture made solely to conform the Indenture to the description of the Securities contained in the offering memorandum to which the Securities have been initially offered shall be deemed to adversely affect the interests of the Holders.

C.     The Company desires to amend the Indenture and the Securities to cure certain ambiguities, omissions, defects and/or inconsistencies and to conform the Indenture to the "Description of Notes" section of the offering memorandum pursuant to which the Securities were initially offered, dated February 14, 2006 (the " **Offering Memorandum** "), in each case as provided herein.

D.     The Company has authorized the execution and delivery of this Supplemental Indenture and the Trustee has received an Opinion of Counsel and an Officers' Certificate pursuant to Section 12.04 of the Indenture.

Each party agrees as follows for the benefit of the other party and for the equal and ratable benefit of the Holders of the Securities:

1.     <u>Amendments to the Securities</u>. In order to amend the Indenture and the Securities to cure certain ambiguities, omissions, defects and/or inconsistencies and to conform the Indenture to the "Description of Notes" section of the Offering Memorandum, the following sections of the Indenture are modified or supplemented as follows:

   a.   SECTION 1.01     <u>Definitions</u>.

      i.     The second paragraph of the definition of "<u>Average Closing Price</u>" is modified to change the reference to ", (3) or (5)" to "or (3)".

      ii.     Section 1.01 is amended to add the following definition:

"Net Share Amount" means (i) the Remaining Shares after giving effect to any election by the Company to pay cash in lieu of all or a portion thereof pursuant to Section 10.01 and (ii) any such cash.

b.    SECTION 10.07    Adjustment for Rights Issue.

    i.    Section 10.07 is amended to change all references to "Section 10.06(4)" to "Section 10.06(3)".

c.    SECTION 10.08    Adjustment for Other Distributions.

    i.    Section 10.08 is amended to change all references to "Section 10.06(4)" to "Section 10.06(3)".

d.    SECTION 10.09(a)    Adjustment for Cash Dividends.

    i.    Section 10.09(a) is amended to delete ", subject to the provisions of Section 10.09(b)".

e.    SECTION 10.13    When Adjustment May Be Deferred.

    i.    The second paragraph of Section 10.13 is amended to change the reference to "Sections 10.6, 10.7, 10.8, 10.9, 10.11, and 10.12" to "Sections 10.06, 10.07, 10.08 and 10.09".

f.    SECTION 10.20    Simultaneous Adjustments.

    i.    Section 10.20 is amended to change the reference to "Section 10.06(4)" to "Section 10.06(3)".

g.    SECTION 12.02(b)    Notices; Address of Agency.

    i.    Section 12.02(b) is amended to change the reference to "Section 10.12" to "Section 10.02".

h.    NOTES – SECTION 6

    i.    The last paragraph of Section 6 of the Form of Note and each of the Global Securities previously issued is amended to remove the following sentence:  "The Company from time to time may voluntarily increase the Conversion Rate.".

i.    NOTES – SECTION 12

    i.    The first sentence of the first paragraph of Section 12 of the Form of Note and each of the Global Securities previously issued is amended to change section (i) to "default in the payment of interest, which default continues for 30 days;".

2.    <u>Confirmations; Effectiveness</u>. As amended by this Supplemental Indenture, the Indenture and the Securities are ratified and confirmed in all respects, and the Indenture as so amended shall be read, taken and construed as one and the same instrument. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every holder of Securities heretofore or hereafter authenticated and delivered shall be bound hereby.

3.    <u>Trustee</u>. The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Company.

4.    <u>Trust Indenture Act</u>. If and to the extent that any provision of this Supplemental Indenture limits, qualifies or conflicts with another provision included in this Supplemental Indenture or in the Indenture, which is required to be included in this Supplemental Indenture or the Indenture by the Trust Indenture Act of 1939, as amended (the " **TIA** "), such required provision of the TIA shall control.

5.    <u>Conflicts</u>. To the extent of any inconsistency between the terms of the Indenture and this Supplemental Indenture, the terms of this Supplemental Indenture will control.

6.    <u>Governing Law</u>. THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN THIS SUPPLEMENTAL INDENTURE.

7.    <u>Multiple Originals</u>. The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement. One signed copy is enough to prove this Supplemental Indenture.

8.    <u>Entire Agreement</u>. This Supplemental Indenture constitutes the entire agreement of the parties hereto with respect to the amendments to the Indenture set forth herein.

9.    <u>Separability Clause</u>. In case any provision in this Supplemental Indenture or in the Securities shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

*(Signature Page Follows)*

3

IN WITNESS WHEREOF, the undersigned, being duly authorized, have executed this Supplemental Indenture on behalf of the respective parties hereto as of the date first above written.

AMGEN INC.

By: /s/ David J. Scott

Name:  David J. Scott

Title:    Senior Vice President, General
Counsel and Secretary

Signature Page to Supplemental Indenture for Notes due 2011

JPMORGAN CHASE BANK, N.A.,
as Trustee


By:  /s/ L. O'Brien
Name:  L. O'Brien
Title:    Vice President

Signature Page to Supplemental Indenture for Notes due 2011

Exhibit 4.20

**AMGEN INC.**
**$2,500,000,000**
**0.375% Convertible Senior**
**Notes due 2013**


**INDENTURE**

**Dated as of February 17, 2006**

**JPMORGAN CHASE BANK, N.A.,**

**Trustee**

**CROSS REFERENCE TABLE\***

\*        Note:  This Cross Reference Table shall not, for any purpose, be deemed to be part of the Indenture.

| TIA Section | Indenture Section |
| --- | --- |
| 310 (a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (b) | 7.08; 7.10 |
| (c) | N.A. |
| 311 (a) | N.A. |
| (b) | N.A. |
| (c) | N.A. |
| 312 (a) | 2.05 |
| (b) | 12.03 |
| (c) | 12.03 |
| 313 (a) | 7.06 |
| (b)(1) | N.A. |
| (b)(2) | 7.06 |
| (c) | 12.02 |
| (d) | 7.06 |
| 314 (a) | 4.02; 4.03; 12.02 |
| (b) | N.A. |
| (c)(1) | 12.04 |
| (c)(2) | 12.04 |
| (c)(3) | N.A. |
| (d) | N.A. |
| (e) | 12.05 |
| (f) | N.A. |
| 315 (a) | 7.01 |
| (b) | 7.05; 12.02 |
| (c) | 7.01 |
| (d) | 7.01 |
| (e) | 6.11 |

i

| TIA Section | Indenture Section |
|---|---|
| 316 (a) (last sentence) | 2.08 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| 317 (a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.04 |
| 318 (a) | 12.01 |

N.A. means Not Applicable.

**TABLE OF CONTENTS**

**Page**

ARTICLE 1

DEFINITIONS AND INCORPORATION BY REFERENCE

| | | |
|---|---|---|
| SECTION 1.01 | Definitions | 1 |
| SECTION 1.02 | Other Definitions | 7 |
| SECTION 1.03 | Incorporation by Reference of Trust Indenture Act | 8 |
| SECTION 1.04 | Rules of Construction | 8 |
| SECTION 1.05 | Acts of Holders | 8 |

ARTICLE 2

THE SECURITIES

| | | |
|---|---|---|
| SECTION 2.01 | Form and Dating | 10 |
| SECTION 2.02 | Execution and Authentication | 11 |
| SECTION 2.03 | Registrar, Paying Agent and Conversion Agent | 12 |
| SECTION 2.04 | Paying Agent to Hold Money and Securities in Trust | 12 |
| SECTION 2.05 | Securityholder Lists | 13 |
| SECTION 2.06 | Transfer and Conversion | 13 |
| SECTION 2.07 | Replacement Securities | 14 |
| SECTION 2.08 | Outstanding Securities; Determinations of Holders' Action | 15 |
| SECTION 2.09 | Temporary Securities | 16 |
| SECTION 2.10 | Cancellation | 16 |
| SECTION 2.11 | Persons Deemed Owners | 16 |
| SECTION 2.12 | Legend; Additional Transfer and Exchange Requirements | 17 |
| SECTION 2.13 | CUSIP Numbers | 22 |

ARTICLE 3

PURCHASES

| | | |
|---|---|---|
| SECTION 3.01 | Purchase of Securities at Option of the Holder upon Change in Control | 23 |
| SECTION 3.02 | Effect of Change in Control Purchase Notice | 26 |
| SECTION 3.03 | Deposit of Change in Control Purchase Price | 27 |
| SECTION 3.04 | Securities Purchased in Part | 27 |
| SECTION 3.05 | Covenant to Comply With Securities Laws Upon Purchase of Securities | 28 |
| SECTION 3.06 | Repayment to the Company | 28 |

ARTICLE 4

COVENANTS

i

| SECTION 4.01 | Payment of Securities | 28 |
|---|---|---|
| SECTION 4.02 | SEC and Other Reports | 29 |
| SECTION 4.03 | Compliance Certificate | 29 |
| SECTION 4.04 | Maintenance of Office or Agency | 29 |

ARTICLE 5

SUCCESSOR CORPORATION

| SECTION 5.01 | When Company May Merge or Transfer Assets | 30 |
|---|---|---|

ARTICLE 6

DEFAULTS AND REMEDIES

| SECTION 6.01 | Events of Default | 31 |
|---|---|---|
| SECTION 6.02 | Acceleration | 32 |
| SECTION 6.03 | Other Remedies | 33 |
| SECTION 6.04 | Waiver of Past Defaults | 33 |
| SECTION 6.05 | Control by Majority | 33 |
| SECTION 6.06 | Limitation on Suits | 34 |
| SECTION 6.07 | Rights of Holders to Receive Payment | 34 |
| SECTION 6.08 | Collection Suit by Trustee | 34 |
| SECTION 6.09 | Trustee May File Proofs of Claim | 34 |
| SECTION 6.10 | Priorities | 35 |
| SECTION 6.11 | Undertaking for Costs | 36 |
| SECTION 6.12 | Waiver of Stay, Extension or Usury Laws | 36 |

ARTICLE 7

TRUSTEE

| SECTION 7.01 | Duties of Trustee | 36 |
|---|---|---|
| SECTION 7.02 | Rights of Trustee | 37 |
| SECTION 7.03 | Individual Rights of Trustee | 39 |
| SECTION 7.04 | Trustee's Disclaimer | 39 |
| SECTION 7.05 | Notice of Defaults | 39 |
| SECTION 7.06 | Reports by Trustee to Holders | 39 |
| SECTION 7.07 | Compensation and Indemnity | 40 |
| SECTION 7.08 | Replacement of Trustee | 40 |
| SECTION 7.09 | Successor Trustee by Merger | 41 |
| SECTION 7.10 | Eligibility; Disqualification | 41 |

ARTICLE 8

DISCHARGE OF INDENTURE

| SECTION 8.01 | Discharge of Liability on Securities | 42 |
|---|---|---|

SECTION 8.02    Repayment to the Company                                                          42


ARTICLE 9

AMENDMENTS

SECTION 9.01    Without Consent of Holders                                                        42
SECTION 9.02    With Consent of Holders                                                           43
SECTION 9.03    Compliance with Trust Indenture Act                                               44
SECTION 9.04    Revocation and Effect of Consents, Waivers and Actions                            44
SECTION 9.05    Notation on or Exchange of Securities                                             44
SECTION 9.06    Trustee to Sign Supplemental Indentures                                           44
SECTION 9.07    Effect of Supplemental Indentures                                                 44


ARTICLE 10

CONVERSION

SECTION 10.01    Conversion Privilege                                                             45
SECTION 10.02    Conversion Procedure                                                             46
SECTION 10.03    Fractional Shares                                                                47
SECTION 10.04    Taxes on Conversion                                                              47
SECTION 10.05    Company to Provide Stock                                                         47
SECTION 10.06    Adjustment for Change In Capital Stock                                           47
SECTION 10.07    Adjustment for Rights Issue                                                      48
SECTION 10.08    Adjustment for Other Distributions                                              49
SECTION 10.09    Adjustment for Cash Dividends                                                    51
SECTION 10.10    Adjustment for Tender Offer                                                      52
SECTION 10.11    Adjustment to Conversion Rate Upon Change in Control Transactions               53
SECTION 10.12    Adjustment to Conversion Rate After a Public Acquirer Change in Control         54
SECTION 10.13    When Adjustment May Be Deferred                                                  55
SECTION 10.14    When No Adjustment Required                                                      56
SECTION 10.15    Notice of Adjustment                                                             56
SECTION 10.16    Notice of Certain Transactions                                                   56
SECTION 10.17    Reorganization of Company; Special Distributions                                 57
SECTION 10.18    Company Determination Final                                                      57
SECTION 10.19    Trustee's Adjustment Disclaimer                                                  57
SECTION 10.20    Simultaneous Adjustments                                                         58
SECTION 10.21    Successive Adjustments                                                           58
SECTION 10.22    Rights Issued in Respect of Common Stock Issued Upon Conversion                  58
SECTION 10.23    Withholding Taxes for Adjustments in Conversion Rate                             58

iii

ARTICLE 11

PAYMENT OF INTEREST

SECTION 11.01     Interest Payments                                                          59
SECTION 11.02     Defaulted Interest                                                         59
SECTION 11.03     Interest Rights Preserved                                                  60

ARTICLE 12

MISCELLANEOUS

SECTION 12.01     Trust Indenture Act Controls                                               60
SECTION 12.02     Notices; Address of Agency                                                 60
SECTION 12.03     Communication by Holders with Other Holders                                63
SECTION 12.04     Certificate and Opinion as to Conditions Precedent                         63
SECTION 12.05     Statements Required in Certificate or Opinion                              63
SECTION 12.06     Separability Clause                                                        64
SECTION 12.07     Rules by Trustee, Paying Agent, Conversion Agent and Registrar             64
SECTION 12.08     Calculations                                                               64
SECTION 12.09     Legal Holidays                                                             64
SECTION 12.10     Governing Law                                                              64
SECTION 12.11     No Recourse Against Others                                                 64
SECTION 12.12     Successors                                                                 65
SECTION 12.13     Multiple Originals                                                         65

INDENTURE dated as of February 17, 2006 between AMGEN INC., a Delaware corporation (the "Company"), and JPMorgan Chase Bank, N.A., a national banking association, as trustee (" Trustee ").

Each party agrees as follows for the benefit of the other party and for the equal and ratable benefit of the Holders of the Company's 0.375% Convertible Senior Notes due 2013 (the " Securities "):

## ARTICLE 1

## DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01      Definitions.

"Additional Interest" means all additional interest owing on the Notes pursuant to the Registration Rights Agreement.

"Affiliate" of any specified person means any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person. For the purposes of this definition, "control" when used with respect to any specified person means the power to direct or cause the direction of the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Applicable Conversion Rate" means the Conversion Rate on any Trading Day, as adjusted in accordance with Article 10. For purposes of determining the Conversion Value, the Applicable Conversion Rate means the Conversion Rate on the Conversion Date.

"Applicable Procedures" means, with respect to any transfer or transaction involving a Global Security or beneficial interest therein, the rules and procedures of the Depositary for such Security, in each case to the extent applicable to such transaction and as in effect from time to time.

"Average Closing Price" means (1) with respect to distributions of rights, warrants or options, the average of the Closing Prices per share of Common Stock for the five (5) consecutive Trading Days ending on the date immediately preceding the first public announcement of the distribution and (2) with respect to other distributions, the average of the Closing Prices per share of Common Stock for the five (5) consecutive Trading Days ending on the date immediately preceding the Time of Determination.

In the event that the Ex-Dividend Time (or in the case of a subdivision, combination or reclassification, the effective date with respect thereto) with respect to a dividend, subdivision, combination or reclassification to which Section 10.06(1), (2), (3) or (5) applies occurs during the period applicable for calculating " Average Closing Price " pursuant to the definition in the preceding sentence, " Average Closing Price " shall be calculated for such period in a manner determined by the Board of Directors to reflect the impact of such dividend,

1

subdivision, combination or reclassification on the Closing Price of the Common Stock during such period.

"<u>Board of Directors</u>" means either the board of directors of the Company or any duly authorized committee of such board.

"<u>Business Day</u>" means any weekday that is not a day on which banking institutions in the City of New York, New York are authorized or obligated to close.

"<u>Capital Stock</u>" for any corporation means any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) stock issued by that corporation.

"<u>Certificated Securities</u>" means Securities that are substantially in the form of the Securities attached hereto as Exhibit A.

"<u>Close of Business</u>" means 5:00 p.m. (New York City time).

"<u>Closing Price</u>" of the Common Stock on any date means the closing per share sale price (or, if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and average ask prices) on such date as reported in composite transactions for the principal United States securities exchange on which the Common Stock is traded or, if the Common Stock is not listed on a United States national or regional securities exchange, (i) as reported by the National Association of Securities Dealers Automated Quotation System or by the National Quotation Bureau Incorporated, or (ii) if such bid and ask prices are not reported by the National Association of Securities Dealers Automated Quotation System or by the National Quotation Bureau Incorporated, in a manner to be determined by the Company on the basis of such quotation as the Company considers appropriate in its sole and absolute discretion.

"<u>Common Stock</u>" means the shares of common stock, $0.0001 par value, of the Company as it exists on the date of this Indenture or any other shares of Capital Stock of the Company into which the Common Stock shall be reclassified or changed.

"<u>Company</u>" means the party named as the "<u>Company</u>" in the first paragraph of this Indenture until a successor replaces it pursuant to the applicable provisions of this Indenture and, thereafter, shall mean such successor. The foregoing sentence shall likewise apply to any subsequent such successor or successors.

"<u>Company Request</u>" or "<u>Company Order</u>" means a written request or order signed in the name of the Company by any two Officers.

"<u>Conversion Date</u>" means the date on which the Holder of the Security has complied with all requirements under this Indenture to convert such Security.

"<u>Conversion Price</u>" per share of Common Stock as of any day means the result obtained by dividing $1,000 by the then Applicable Conversion Rate.

"Conversion Rate" means the number of shares of Common Stock issuable upon conversion of a Security per $1,000 principal amount thereof, subject to adjustment pursuant to Article 10.

"Conversion Reference Period" means (a) for Securities that are converted during the period beginning on the 30th day prior to the Maturity Date, the ten consecutive Trading Days beginning on the third Trading Day following the Maturity Date and (b) in all other instances, the ten consecutive Trading Days beginning on the third Trading Day following the Conversion Date.

"Conversion Value" means the amount equal to the product of (a) the Applicable Conversion Rate multiplied by (b) the average of the Volume Weighted Average Price on each of the Trading Days during the Conversion Reference Period.

"Corporate Trust Office" means the principal office of the Trustee at which at any time its corporate trust business shall be administered, which office at the date hereof is located at 4 New York Plaza, 15th Floor, New York, NY 10004, Attention: Worldwide Securities Services, or such other address as the Trustee may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor Trustee (or such other address as a successor Trustee may designate from time to time by notice to the Holders and the Company).

"Daily Share Amounts" means, for each Trading Day of the Conversion Reference Period and each $1,000 Principal Amount of Securities surrendered for conversion, a number of shares of Common Stock (but in no event less than zero) determined by the following formula:

$$\frac{(\text{Volume Weighted Average Price per share of Common Stock for such Trading Day} \quad \times \quad \text{Conversion Rate in effect on the Conversion Date*})}{\text{Volume Weighted Average Price per share of Common Stock for such Trading Day x 10}} - \$1,000$$

* appropriately adjusted to take into account the occurrence on or before such Trading Day of any event which would require an anti-dilution adjustment.

"Default" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"Depositary" means DTC or the nominee thereof, or any successor thereto.

"DTC" means The Depository Trust Company.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Global Securities" means Securities that are in the form of the Securities attached hereto as Exhibit A.

3

"Holder" or "Securityholder" means a person in whose name a Security is registered on the Registrar's books.

"Indebtedness" means with respect to the Company at any date, without duplication, obligations (other than nonrecourse obligations) for borrowed money or evidenced by bonds, debentures, notes or similar instruments.

"Indenture" means this Indenture, as amended or supplemented from time to time in accordance with the terms hereof, including the provisions of the TIA that are deemed to be a part hereof.

"Initial Conversion Rate" means 12.5814 shares of Common Stock per Principal Amount of $1,000, subject to adjustment pursuant to Article 10.

"Interest Payment Date" means each date specified as such in paragraph 1 of the Securities.

"Issue Date" of any Security means the date on which the Security was originally issued or deemed issued as set forth on the face of the Security.

"Market Disruption Event" means the occurrence or existence for more than one half hour period in the aggregate on any scheduled Trading Day for the Common Stock of any suspension or limitation imposed on trading (by reason of movements in price exceeding limits permitted by the Nasdaq National Market or otherwise) in Common Stock or in any options, contracts or future contracts relating to the Common Stock, and such suspension or limitation occurs or exists at any time before 1:00 p.m. (New York City time) on such day.

"Officer" means the Chairman of the Board, the Vice Chairman, the Chief Executive Officer, the President, any Executive Vice President, any Senior Vice President, any Vice President, the Treasurer or the Secretary or any Assistant Treasurer or Assistant Secretary of the Company.

"Officers' Certificate" means a written certificate containing the information specified in Sections 12.04 and 12.05, signed in the name of the Company by any two Officers, and delivered to the Trustee. One of the officers executing the Officers' Certificate pursuant to Section 4.03 shall be the principal executive officer, financial officer or accounting officer of the Company.

"Opinion of Counsel" means a written opinion containing the information specified in Sections 12.04 and 12.05, from legal counsel who is acceptable to the Trustee. The counsel may be an employee of, or counsel to, the Company or the Trustee.

"Person" or "person" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Principal Amount" of a Security means the Principal Amount as set forth on the face of the Security.

4

"Protected Purchaser" shall have the meaning set forth in Section 2.07.

"Registration Rights Agreement" means the Registration Rights Agreement,  dated as of the date hereof, among the Company, Merrill Lynch, Pierce, Fenner & Smith Incorporated, and Morgan Stanley & Co. Incorporated on behalf of the Initial Purchasers.

"Regular Record Date" means, with respect to any Interest Payment Date, the January 15 or the July 15 immediately preceding such Interest Payment Date.

"Responsible Officer" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee having direct responsibility for the administration of this Indenture.

"Restricted Global Security" means a Global Security that is a Restricted Security.

"Restricted Security" means a Security required to bear the Legend.

"Rule 144" means Rule 144 under the Securities Act or any successor to such Rule.

"Rule 144A" means Rule 144A under the Securities Act or any successor to such Rule.

"SEC" means the Securities and Exchange Commission.

"Securities" means any of the Company's 0.375% Convertible Senior Notes due 2013, as amended or supplemented from time to time, issued under this Indenture.

"Securities Act" means the Securities Act of 1933, as amended.

"Securityholder" or "Holder" means a person in whose name a Security is registered on the Registrar's books.

"Significant Subsidiary" means a "significant subsidiary", as such term is defined in Rule 1-02 of Regulation S-X under the Securities Act of 1933.

"Special Record Date" means for the payment of any Defaulted Interest, the date fixed by the Trustee pursuant to Section 11.02.

"Stated Maturity," when used with respect to any Security or any installment of interest thereon, means the date specified in such Security as the fixed date on which an amount equal to the Principal Amount of such Security or such installment of interest is due and payable.

"Subsidiary" means (i) a corporation, a majority of whose Voting Stock is, at the date of determination, directly or indirectly owned by the Company, by one or more Subsidiaries of the Company, or by the Company and one or more Subsidiaries of the Company, (ii) a partnership in which the Company, a Subsidiary of the Company or the Company and one or

5

more Subsidiaries of the Company, holds a majority interest in the equity capital or profits of such partnership, or (iii) any other person (other than a corporation or a partnership) in which the Company, a Subsidiary of the Company, or the Company and one or more Subsidiaries of the Company, directly or indirectly, at the date of determination, has (x) at least a majority ownership interest or (y) the power to elect or direct the election of a majority of the directors or trustees, as the case may be, or other governing body of such person.

"TIA" means the Trust Indenture Act of 1939 as in effect on the date of this Indenture, provided, however, that in the event the TIA is amended after such date, TIA means, to the extent required by any such amendment, the TIA as so amended.

"Time of Determination" means the time and date of the earlier of (i) the determination of stockholders entitled to receive rights, warrants or options or a distribution, in each case, to which Sections 10.07, 10.08 or 10.10 applies and (ii) the time ("Ex-Dividend Time") immediately prior to the commencement of "ex-dividend" trading for such rights, warrants or options or distribution on the Nasdaq National Market or such other national or regional exchange or market on which the Common Stock is then listed or quoted.

"Trading Day" means any day on which (i) there is no Market Disruption Event and (ii) the Nasdaq National Market or, if the Common Stock is not quoted on the Nasdaq National Market, the principal national securities exchange on which the Common Stock is listed, is open for trading or, if the Common Stock is not so listed, admitted for trading or quoted, any business day. A Trading Day only includes those days that have a scheduled closing time of 4:00 p.m. (New York City time) or the then standard closing time for regular trading on the relevant exchange or trading system.

"Trustee" means the party named as the "Trustee" in the first paragraph of this Indenture until a successor replaces it pursuant to the applicable provisions of this Indenture and, thereafter, shall mean such successor. The foregoing sentence shall likewise apply to any subsequent such successor or successors.

"Volume Weighted Average Price" means the price per share of the Common Stock on any Trading Day as displayed on Bloomberg (or any successor service) page AMGN <equity> VAP in respect of the period from 9:30 a.m. to 4:00 p.m. (New York City time), on such Trading Day; or, if such price is not available, the market value per share of the Common Stock on such day as determined by a nationally recognized independent investment banking firm retained for this purpose by the Company.

"Voting Stock" means, with respect to any corporation, association, company or business trust, stock or other securities of the class or classes having general voting power under ordinary circumstances to elect at least a majority of the board of directors, managers or trustees of such corporation, association, company or business trust, provided that, for the purposes hereof, stock or other securities which carry only the right to vote conditionally on the happening of an event shall not be considered Voting Stock whether or not such event shall have happened.

6

SECTION 1.02     Other Definitions.

| Term | Defined in Section |
| --- | --- |
| "Act" | 1.05 |
| "Agent Members" | 2.12(e) |
| "Bankruptcy Law" | 6.01(a) |
| "beneficial owner" | 3.01(a) |
| "Cash Percentage" | 10.01 |
| "Cash Percentage Notice" | 10.01 |
| "Change in Control" | 3.01(a) |
| "Change in Control Effective Date" | 10.11 |
| "Change in Control Purchase Date" | 3.01(a) |
| "Change in Control Purchase Notice" | 3.01(c) |
| "Change in Control Purchase Price" | 3.01(a) |
| "Conversion Agent" | 2.03(a) |
| "Conversion Trigger Price" | Note |
| "Custodian" | 6.01(b) |
| "Defaulted Interest" | 11.02 |
| "Event of Default" | 6.01 |
| "Ex-Dividend Date" | 10.08(b) |
| "Ex-Dividend Time" | Definition of "Time of Determination" |
| "Expiration Time" | 10.11 |
| "Initial Purchasers" | 2.01 |
| "Legal Holiday" | 12.09 |
| "Legend" | 2.12(a) |
| "Make-Whole Shares" | 10.11 |
| "Notice of Default" | 6.01 |
| "Paying Agent" | 2.03(a) |
| "Post-Distribution Price" | 10.08(b) |
| "Public Acquirer Change in Control" | 10.12 |
| "Public Acquirer Change in Control Effective Date" | 10.12 |
| "Public Acquirer Common Stock" | 10.12 |
| "Purchased Shares" | 10.10 |
| "QIB" | 2.01(a) |
| "Registrar" | 2.03(a) |
| "Remaining Shares" | 10.01 |
| "Required Cash Amount" | 10.01 |
| "Resale Restriction Termination Date" | 2.12(f) |
| "Rights" | 10.22 |
| "Shareholders Rights Plan" | 10.22 |
| "Stock Price" | 10.11 |

SECTION 1.03     Incorporation by Reference of Trust Indenture Act.

Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in and made a part of this Indenture. The following TIA terms used in this Indenture have the following meanings:

"Commission" means the SEC.

"indenture securities" means the Securities.

"indenture security holder" means a Securityholder.

"indenture to be qualified" means this Indenture.

"indenture trustee" or "institutional trustee" means the Trustee.

"obligor" on the indenture securities means the Company.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule have the meanings assigned to them by such definitions.

SECTION 1.04     Rules of Construction.

Unless the context otherwise requires:

(1)     a term has the meaning assigned to it;

(2)     an accounting term not otherwise defined has the meaning assigned to it in accordance with United States generally accepted accounting principles as in effect from time to time;

(3)     "or" is not exclusive;

(4)     "including" means including, without limitation; and

(5)     words in the singular include the plural, and words in the plural include the singular.

SECTION 1.05     Acts of Holders.

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments (which may take the form of an electronic writing or messaging or otherwise be in accordance with customary procedures of the Depositary or the Trustee) of substantially similar tenor signed by such Holders in person or by agent duly appointed in writing (which may be in electronic form); and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee and, where it is hereby expressly required, to the Company. Such

instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of Holders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent (either of which may be in electronic form) shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Company, if made in the manner provided in this Section.

(a)     The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution (or electronic delivery) or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing or delivering such instrument or writing acknowledged to such officer the execution thereof (or electronic delivery). Where such execution is by a signer acting in a capacity other than such signer's individual capacity, such certificate or affidavit shall also constitute sufficient proof of such signer's authority. The fact and date of the execution of any such instrument or writing (electronic or otherwise), or the authority of the Person executing the same, may also be proved in any other manner which the Trustee deems sufficient.

(b)     The ownership of Securities shall be proved by the register for the Securities maintained by the Registrar.

(c)     Any request, demand, authorization, direction, notice, consent, waiver or other Act of the Holder of any Security shall bind every future Holder of the same Security and the holder of every Security issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee or the Company in reliance thereon, whether or not notation of such action is made upon such Security.

(d)     If the Company shall solicit from the Holders any request, demand, authorization, direction, notice, consent, waiver or other Act, the Company may, at its option, by or pursuant to a resolution of the Board of Directors, fix in advance a record date for the determination of Holders entitled to give such request, demand, authorization, direction, notice, consent, waiver or other Act, but the Company shall have no obligation to do so. If such a record date is fixed, such request, demand, authorization, direction, notice, consent, waiver or other Act may be given before or after such record date, but only the Holders of record at the Close of Business on such record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of outstanding Securities have authorized or agreed or consented to such request, demand, authorization, direction, notice, consent, waiver or other Act, and for that purpose the outstanding Securities shall be computed as of such record date; provided that no such authorization, agreement or consent by the Holders on such record date shall be deemed effective unless it shall become effective pursuant to the provisions of this Indenture not later than six months after the record date.

9

# ARTICLE 2

# THE SECURITIES

SECTION 2.01     Form and Dating.

The Securities and the Trustee's certificate of authentication shall be substantially in the form of Exhibit A, which is a part of this Indenture. The Securities may have notations, legends or endorsements required by law, stock exchange rule or usage (provided that any such notation, legend or endorsement required by usage is in a form acceptable to the Company). The Company shall provide any such notations, legends or endorsements to the Trustee in writing. Each Security shall be dated the date of its authentication. The Securities are being offered and sold by the Company pursuant to a Purchase Agreement dated February 14, 2006 (the " Purchase Agreement ") between the Company and the several purchasers named in Schedule A thereto (collectively, the " Initial Purchasers "), in transactions exempt from, or not subject to, the registration requirements of the Securities Act.

(a)     Restricted Global Securities. All of the Securities are initially being offered and sold to qualified institutional buyers as defined in Rule 144A (collectively, " QIBS " or individually, each a " QIB ") in reliance on Rule 144A under the Securities Act and shall be issued initially in the form of one or more Restricted Global Securities, which shall be deposited on behalf of the purchasers of the securities represented thereby with the Trustee, at its Corporate Trust Office, as custodian for the depositary, The Depository Trust Company (" DTC ", and such depositary, or any successor thereto, being hereinafter referred to as the "Depositary"), and registered in the name of its nominee, Cede & Co. (or any successor thereto), for the accounts of participants in the Depositary, duly executed by the Company and authenticated by the Trustee as hereinafter provided.

(b)     Global Securities in General. Each Global Security shall represent such of the outstanding Securities as shall be specified therein and each shall provide that it shall represent the aggregate Principal Amount of outstanding Securities from time to time endorsed thereon and that the aggregate Principal Amount of outstanding Securities represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges, redemptions and conversions. Except as provided in this Section 2.01, 2.06 or 2.12, owners of beneficial interests in Global Securities will not be entitled to receive physical delivery of Certificated Securities.

Any adjustment of the aggregate Principal Amount of a Global Security to reflect the amount of any increase or decrease in the Principal Amount of outstanding Securities represented thereby shall be made by the Trustee in accordance with instructions given by the Holder thereof as required by Section 2.12 hereof and shall be made on the records of the Trustee and the Depositary, subject in each case to compliance with Applicable Procedures.

(c)     Book-Entry Provisions. This Section 2.01(c) shall apply only to Global Securities deposited with or on behalf of the Depositary.

10

The Company shall execute and the Trustee shall, in accordance with this Section 2.01(c), authenticate and deliver initially one or more Global Securities that (a) shall be registered in the name of the Depositary, (b) shall be delivered by the Trustee to the Depositary or pursuant to the Depositary's instructions and (c) shall bear legends substantially to the following effect:

"UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS, IN WHOLE BUT NOT IN PART, TO NOMINEES OF THE DEPOSITORY TRUST COMPANY OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN ARTICLE TWO OF THE INDENTURE REFERRED TO ON THE REVERSE HEREOF."

(d)      Certificated Securities. Securities not issued as interests in the Global Securities will be issued in certificated form substantially in the form of Exhibit A attached hereto.

SECTION 2.02      Execution and Authentication.

(a)      The Securities shall be executed on behalf of the Company by any Officer. The signature of the Officer on the Securities may be manual or facsimile.

(b)      Securities bearing the manual or facsimile signatures of an individual who was at the time of the execution of the Securities the proper Officer of the Company shall bind the Company, notwithstanding that such individual has ceased to hold such office prior to the authentication and delivery of such Securities or did not hold such office at the date of authentication of such Securities.

(c)      No Security shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Security a certificate of authentication substantially in the form provided for herein duly executed by the Trustee by manual signature of an authorized officer of the Trustee, and such certificate upon any Security

shall be conclusive evidence, and the only evidence, that such Security has been duly authenticated and delivered hereunder.

(d)        Subject to the terms of Section 12.04 and 12.05 hereof, the Trustee shall authenticate and deliver Securities for original issue in an aggregate Principal Amount of $2,500,000,000 (subject to Section 2.07 hereof) upon a Company Order without any further action by the Company. The aggregate Principal Amount of Securities outstanding at any time may not exceed the amount set forth in the foregoing sentence, except as provided in Section 2.07.

(e)        The Securities shall be issued only in registered form without coupons and only in denominations of $1,000 of Principal Amount and any integral multiple thereof.

(f)        The Trustee shall have the right to decline to authenticate and deliver any securities under this Section if the Trustee, being advised by counsel, determines that such action may not be lawfully taken or if the Trustee in good faith shall determine that such action would expose the Trustee to personal liability to existing Holders.

SECTION 2.03       Registrar, Paying Agent and Conversion Agent.

(a)        The Company shall maintain an office or agency where Securities may be presented for registration of transfer or for exchange for other Securities (" Registrar "), an office or agency where Securities may be presented for purchase or payment (" Paying Agent ") and an office or agency where Securities may be presented for conversion into Common Stock (" Conversion Agent "). The Registrar shall keep a register of the Securities and of their registration of transfer and exchange. The Company may have one or more co-registrars, one or more additional paying agents and one or more additional conversion agents. The term Paying Agent includes any additional paying agent, including any named pursuant to Section 4.05. The term Conversion Agent includes any additional conversion agent, including any named pursuant to Section 4.05.

(b)        The Company shall enter into an appropriate agency agreement with any Registrar or co-registrar, Paying Agent or Conversion Agent (other than the Trustee). The agreement shall implement the provisions of this Indenture that relate to such agent. The Company shall notify the Trustee of the name and address of any such agent. If the Company fails to maintain a Registrar, Paying Agent or Conversion Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.07. The Company or any Subsidiary or an Affiliate of either of them may act as Paying Agent, Registrar, Conversion Agent or co-registrar.

(c)        The Company initially appoints the Trustee as Registrar, Conversion Agent and Paying Agent in connection with the Securities.

SECTION 2.04       Paying Agent to Hold Money and Securities in Trust.

Except as otherwise provided herein, by no later than 10:00 a.m., New York City time, on or prior to each due date of payments in respect of any Security, the Company shall

12

deposit with the Paying Agent a sum of money (in immediately available funds if deposited on the due date) or Common Stock sufficient to make such payments when so becoming due. The Company shall require each Paying Agent (other than the Trustee) to agree in writing that the Paying Agent shall hold in trust for the benefit of Securityholders or the Trustee all money and Common Stock held by the Paying Agent for the making of payments in respect of the Securities and shall notify the Trustee of any default by the Company in making any such payment. At any time during the continuance of any such default, the Paying Agent shall, upon the written request of the Trustee, forthwith pay to the Trustee all money and Common Stock so held in trust. If the Company or a Subsidiary or an Affiliate of either of them acts as Paying Agent, it shall segregate the money and Common Stock held by it as Paying Agent and hold it as a separate trust fund. The Company at any time may require a Paying Agent to pay all money and Common Stock held by it to the Trustee and to account for any funds and Common Stock disbursed by it. Upon doing so, the Paying Agent shall have no further liability for the money or Common Stock.

SECTION 2.05     Securityholder Lists.

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Securityholders. If the Trustee is not the Registrar, the Company shall cause to be furnished to the Trustee at least semiannually on June 1 and December 1 a listing of Securityholders dated within 15 days of the date on which the list is furnished and at such other times as the Trustee may request in writing a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Securityholders.

SECTION 2.06     Transfer and Conversion.

Subject to Section 2.12 hereof,

(a)        upon surrender for registration of transfer of any Security, together with a written instrument of transfer satisfactory to the Registrar duly executed by the Securityholder or such Securityholder's attorney duly authorized in writing, at the office or agency of the Company designated as Registrar or co-registrar pursuant to Section 2.03, the Company shall execute, and the Trustee upon receipt of a Company Order shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Securities of any authorized denomination or denominations, of a like aggregate Principal Amount. The Company shall not charge a service charge for any registration of transfer or exchange, but the Company or the Trustee may require payment of a sum sufficient to pay all taxes, assessments or other governmental charges that may be imposed in connection with the registration of transfer or exchange of the Securities from the Securityholder requesting such registration of transfer or exchange.

At the option of the Holder, Certificated Securities may be exchanged for other Securities of any authorized denomination or denominations, of a like aggregate Principal Amount, upon surrender of the Securities to be exchanged, together with a written instrument of transfer satisfactory to the Registrar duly executed by the Securityholder or such Securityholder's attorney duly authorized in writing, at such office or agency. Whenever any Securities are so surrendered for exchange, the Company shall execute, and the Trustee upon

13

receipt of a Company Order shall authenticate and deliver, the Securities which the Holder making the exchange is entitled to receive.

The Company shall not be required to make, and the Registrar need not register, any Securities in respect of which a Change in Control Purchase Notice has been given and not withdrawn by the Holder thereof in accordance with the terms of this Indenture (except, in the case of Securities to be purchased in part, the portion thereof not to be purchased).

(b)        Notwithstanding any provision to the contrary herein, so long as a Global Security remains outstanding and is held by or on behalf of the Depositary, transfers of a Global Security, in whole or in part, shall be made only in accordance with Section 2.12 and this Section 2.06(b). Transfers of a Global Security shall be limited to transfers of such Global Security in whole, or in part, to nominees of the Depositary or to a successor of the Depositary or such successor's nominee.

(c)        Successive registrations and registrations of transfers and exchanges as aforesaid may be made from time to time as desired, and each such registration shall be noted on the register for the Securities.

(d)        Any Registrar appointed pursuant to Section 2.03 hereof shall provide to the Trustee such information as the Trustee may reasonably require in connection with the delivery by such Registrar of Securities upon registration of transfer or exchange of Securities.

(e)        No Registrar shall be required to make registrations of transfer or exchange of Securities during any periods designated in the text of the Securities or in this Indenture as periods during which such registration of transfers and exchanges need not be made.

SECTION 2.07        <u>Replacement Securities</u>.

(a)        If (i) any mutilated Security is surrendered to the Trustee, or (ii) the Company and the Trustee receive evidence to their satisfaction of the destruction, loss or theft of any Security, and there is delivered to the Company and the Trustee such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Company or the Trustee that such Security has been acquired by a protected purchaser within the meaning of Article 8 of the Uniform Commercial Code as in effect from time to time in the State of New York (a " <u>Protected Purchaser</u> "), the Company shall execute and upon a Company Request the Trustee shall authenticate and deliver, in exchange for any such mutilated Security or in lieu of any such destroyed, lost or stolen Security, a new Security of like tenor and Principal Amount, bearing a number not contemporaneously outstanding.

(b)        In case any such mutilated, destroyed, lost or stolen Security has become or is about to become due and payable, or is about to be purchased by the Company pursuant to Article 3 hereof, the Company in its discretion may, instead of issuing a new Security, pay or purchase such Security, as the case may be.

(c)        Upon the issuance of any new Securities under this Section, the Company may require the payment of a sum sufficient to cover any tax or other governmental

14

charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

(d)    Every new Security issued pursuant to this Section in lieu of any mutilated, destroyed, lost or stolen Security shall constitute an original additional contractual obligation of the Company, whether or not the mutilated, destroyed, lost or stolen Security shall be at any time enforceable by anyone, and shall be entitled to all benefits of this Indenture equally and proportionately with any and all other Securities duly issued hereunder.

(e)    The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Securities.

SECTION 2.08    Outstanding Securities; Determinations of Holders' Action.

(a)    Securities outstanding at any time are all the Securities authenticated by the Trustee except for those cancelled by it, those paid pursuant to Section 2.07 and delivered to it for cancellation and those described in this Section 2.08 as not outstanding. A Security does not cease to be outstanding because the Company or an Affiliate thereof holds the Security; provided, however, that in determining whether the Holders of the requisite Principal Amount of Securities have given or concurred in any request, demand, authorization, direction, notice, consent or waiver hereunder, Securities owned by the Company or any other obligor upon the Securities or any Affiliate of the Company or such other obligor shall be disregarded and deemed not to be outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Securities which a Responsible Officer of the Trustee actually knows to be so owned shall be so disregarded. Subject to the foregoing, only Securities outstanding at the time of such determination shall be considered in any such determination (including, without limitation, determinations pursuant to Articles 6 and 9).

(b)    If a Security is replaced pursuant to Section 2.07, the replaced Security ceases to be outstanding unless the Trustee and the Company receive proof satisfactory to each of them that the replaced Security is held by a Protected Purchaser.

(c)    If the Paying Agent holds, in accordance with this Indenture, on a Change in Control Purchase Date, or on Stated Maturity, money or securities, if permitted hereunder, sufficient to pay Securities payable on that date, then immediately after such Change in Control Purchase Date or Stated Maturity, as the case may be, such Securities shall cease to be outstanding and interest on such Securities shall cease to accrue whether or not the Security is delivered to the Paying Agent.

(d)    If a Security is converted in accordance with Article 10, then from and after the time of conversion on the Conversion Date, such Security shall cease to be outstanding and interest shall cease to accrue on such Security.

SECTION 2.09    Temporary Securities.

(a)    Pending the preparation of definitive Securities, the Company may execute, and the Trustee upon receipt of a Company Order shall authenticate and deliver, temporary Securities which are printed, lithographed, typewritten, mimeographed or otherwise produced, in any authorized denomination, substantially of the tenor of the definitive Securities in lieu of which they are issued and with such appropriate insertions, omissions, substitutions and other variations as the officers executing such Securities may determine, as conclusively evidenced by their execution of such Securities.

(b)    If temporary Securities are issued, the Company will cause definitive Securities to be prepared without unreasonable delay. After the preparation of definitive Securities, the temporary Securities shall be exchangeable for definitive Securities upon surrender of the temporary Securities at the office or agency of the Company designated for such purpose pursuant to Section 2.03, without charge to the Holder. Upon surrender for cancellation of any one or more temporary Securities, the Company shall execute and the Trustee upon receipt of a Company Order shall authenticate and deliver in exchange therefor a like Principal Amount of definitive Securities of authorized denominations. Until so exchanged the temporary Securities shall in all respects be entitled to the same benefits under this Indenture as definitive Securities.

SECTION 2.10    Cancellation.

All Securities surrendered for payment, purchase by the Company pursuant to Article 3, conversion or registration of transfer or exchange shall, if surrendered to any person other than the Trustee, be delivered to the Trustee and shall be promptly cancelled by it. The Company may at any time deliver to the Trustee for cancellation any Securities previously authenticated and delivered hereunder which the Company may have acquired in any manner whatsoever, and all Securities so delivered shall be promptly cancelled by the Trustee. The Company may not issue new Securities to replace Securities it has paid or delivered to the Trustee for cancellation or that any Holder has converted pursuant to Article 10. No Securities shall be authenticated in lieu of or in exchange for any Securities cancelled as provided in this Section, except as expressly permitted by this Indenture. All cancelled Securities held by the Trustee shall be disposed of by the Trustee in accordance with the Trustee's customary procedure.

SECTION 2.11    Persons Deemed Owners.

Prior to due presentment of a Security for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name such Security is registered as the owner of such Security for the purpose of receiving payment of principal of the Security or the payment of any Change in Control Purchase Price in respect thereof, and interest thereon, for the purpose of conversion and for all other purposes whatsoever, whether or not such Security be overdue, and neither the Company, the Trustee nor any agent of the Company or the Trustee shall be affected by notice to the contrary.

16

SECTION 2.12     Legend; Additional Transfer and Exchange Requirements.

(a)     If Securities are issued upon the transfer, exchange or replacement of Securities subject to restrictions on transfer and bearing the legends set forth in Section 2.12(f) (collectively, the "Legend"), or if a request is made to remove the Legend on a Security, the Securities so issued shall bear the Legend, or the Legend shall not be removed, as the case may be, unless there is delivered to the Company and the Registrar such satisfactory evidence, which shall include an Opinion of Counsel, as may be reasonably required by the Company and the Registrar, that neither the Legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of Rule 144A or Rule 144 under the Securities Act or that such Securities are not "restricted" within the meaning of Rule 144 under the Securities Act; provided that no such evidence need be supplied in connection with the sale of such Security pursuant to a registration statement that is effective at the time of such sale. Upon (1) provision of such satisfactory evidence if requested, or (2) notification by the Company to the Trustee and Registrar of the sale of such Security pursuant to a registration statement that is effective at the time of such sale, the Trustee, upon Company Order, shall authenticate and deliver a Security that does not bear the Legend. If the Legend is removed from the face of a Security and the Security is subsequently held by an Affiliate of the Company, the Legend shall be reinstated.

(b)     Subject to Section 2.12(c)(i) and in compliance with Section 2.12(d), every Security shall be subject to the restrictions on transfer provided in the Legend. Whenever any Restricted Security other than a Restricted Global Security is presented or surrendered for registration of transfer or in exchange for a Security registered in a name other than that of the Holder, such Security must be accompanied by a certificate in substantially the form set forth in Exhibit A, dated the date of such surrender and signed by the Holder of such Security, as to compliance with such restrictions on transfer. The Registrar shall not be required to accept for such registration of transfer or exchange any Security not so accompanied by a properly completed certificate.

(c)     Notwithstanding any other provisions of this Indenture or the Securities, (A) transfers of a Global Security, in whole or in part, shall be made only in accordance with Section 2.06 and Section 2.12(c)(i), (B) transfer of a beneficial interest in a Global Security for a Certificated Security shall comply with Section 2.06 and Section 2.12(c)(ii) below, and (C) transfers of a Certificated Security shall comply with Section 2.06 and Section 2.12(c)(iii) and (iv) below.

(i)     Transfer of Global Security. A Global Security may not be transferred, in whole or in part, to any Person other than the Depositary or a nominee or any successor thereof, and no such transfer to any such other Person may be registered; provided that this clause (i) shall not prohibit any transfer of a Security that is issued in exchange for a Global Security but is not itself a Global Security. No transfer of a Security to any Person shall be effective under this Indenture or the Securities unless and until such Security has been registered in the name of such Person. Nothing in this Section 2.12(c)(i) shall prohibit or render ineffective any transfer of a beneficial interest in a Global Security effected in accordance with the other provisions of this Section 2.12(c).

17

(ii)        Restrictions on Transfer of a Beneficial Interest in a Global Security for a Certificated Security. A beneficial interest in a Global Security may not be exchanged for a Certificated Security except upon satisfaction of the requirements set forth below. Upon receipt by the Trustee of a request for transfer of a beneficial interest in a Global Security in accordance with Applicable Procedures for a Certificated Security in the form satisfactory to the Trustee, together with written instructions to the Trustee to make, or direct the Registrar to make, an adjustment on its books and records with respect to such Global Security to reflect a decrease in the aggregate Principal Amount of the Securities represented by the Global Security, such instructions to contain information regarding the Depositary account to be credited with such decrease, then the Trustee shall cause, or direct the Registrar to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Registrar, the aggregate Principal Amount of Securities represented by the Global Security to be decreased by the aggregate Principal Amount of the Certificated Security to be issued, shall authenticate and deliver such Certificated Security and shall debit or cause to be debited to the account of the Person specified in such instructions a beneficial interest in the Global Security equal to the Principal Amount of the Certificated Security so issued.

(iii)       Transfer and Exchange of Certificated Securities. When Certificated Securities are presented to the Registrar with a request:

(x)        to register the transfer of such Certificated Securities; or

(y)        to exchange such Certificated Securities for an equal Principal Amount of Certificated Securities of other authorized denominations,

the Registrar shall register the transfer or make the exchange as requested if its reasonable requirements for such transaction are met; provided, however, that the Certificated Securities surrendered for registration of transfer or exchange shall be duly endorsed or accompanied by a written instrument of transfer in form reasonably satisfactory to the Company and the Registrar, duly executed by the Holder thereof or his attorney duly authorized in writing.

(iv)       Restrictions on Transfer of a Certificated Security for a Beneficial Interest in a Global Security. A Certificated Security may not be exchanged for a beneficial interest in a Global Security except upon satisfaction of the requirements set forth below.

Upon receipt by the Trustee of a Certificated Security, duly endorsed or accompanied by appropriate instruments of transfer, in form satisfactory to the Trustee, together with written instructions directing the Trustee to make, or to direct the Registrar to make, an adjustment on its books and records with respect to such Global Security to reflect an increase in the aggregate Principal Amount of the Securities represented by the Global Security, such instructions to contain information regarding the Depositary account to be credited with such increase, then the Trustee shall cancel such Certificated Security and cause, or direct the Registrar to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Registrar, the aggregate Principal Amount of Securities represented by the Global Security to be increased by the aggregate Principal Amount of the Certificated Security to be exchanged,

18

and shall credit or cause to be credited to the account of the Person specified in such instructions a beneficial interest in the Global Security equal to the Principal Amount of the Certificated Security so cancelled. If no Global Securities are then outstanding, the Company shall issue and the Trustee upon receipt of a Company Order shall authenticate a new Global Security in the appropriate Principal Amount.

(d)    The restrictions imposed by the Legend upon the transferability of any Security shall cease and terminate when such Security has been sold pursuant to an effective registration statement under the Securities Act or transferred in compliance with Rule 144 under the Securities Act (or any successor provision thereto) or, if earlier, upon the expiration of the holding period applicable to sales thereof under Rule 144(k) under the Securities Act (or any successor provision). Any Security as to which such restrictions on transfer shall have expired in accordance with their terms or shall have terminated may, upon a surrender of such Security for exchange to the Registrar in accordance with the provisions of this Section 2.12 (accompanied, in the event that such restrictions on transfer have terminated by reason of a transfer in compliance with Rule 144 or any successor provision, by an Opinion of Counsel reasonably acceptable to the Company and the Registrar and addressed to the Company and the Registrar, to the effect that the transfer of such Security has been made in compliance with Rule 144 or such successor provision), be exchanged for a new Security, of like tenor and aggregate principal amount, which shall not bear the restrictive Legend. The Company shall inform the Trustee of the effective date of any registration statement registering the offer and sale of the Securities under the Securities Act. The Trustee or the Registrar shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the aforementioned Opinion of Counsel.

As used in Sections 2.12(b) and (d), the term "transfer" encompasses any sale, pledge, transfer, hypothecation or other disposition of any Security

(e)    The provisions of clauses (1), (2), (3) and (4) below shall apply only to Global Securities:

(1)    Notwithstanding any other provisions of this Indenture or the Securities, except as provided in Section 2.12(c)(ii), a Global Security shall not be exchanged in whole or in part for a Security registered in the name of any Person other than the Depositary or one or more nominees thereof, provided that a Global Security may be exchanged for Securities registered in the names of any person designated by the Depositary in the event that (i) the Depositary has notified the Company that it is unwilling or unable to continue as Depositary for such Global Security or such Depositary has ceased to be a "clearing agency" registered under the Exchange Act, and a successor Depositary is not appointed by the Company within 90 days, (ii) the Company decides to discontinue use of the system of book-entry transfer through DTC (or any successor depositary); or (iii) an Event of Default has occurred and is continuing with respect to the Securities. Any Global Security exchanged pursuant to clause (i) or (ii) above shall be so exchanged in whole and not in part, and any Global Security exchanged pursuant to clause (iii) above may be exchanged in whole or from time to time in part as directed by the Depositary. Any Security issued in exchange for a Global Security or any portion thereof shall be a Global Security; provided that any such Security so issued that is registered in the name of a Person other than the Depositary or a nominee thereof shall not be a Global Security.

19

(2)       Securities issued in exchange for a Global Security or any portion thereof shall be issued in definitive, fully registered form, without interest coupons, shall have an aggregate Principal Amount equal to that of such Global Security or portion thereof to be so exchanged, shall be registered in such names and be in such authorized denominations as the Depositary shall designate and shall bear the applicable legends provided for herein. Any Global Security to be exchanged in whole shall be surrendered by the Depositary to the Trustee, as Registrar. With regard to any Global Security to be exchanged in part, either such Global Security shall be so surrendered for exchange or, if the Trustee is acting as custodian for the Depositary or its nominee with respect to such Global Security, the Principal Amount thereof shall be reduced, by an amount equal to the portion thereof to be so exchanged, by means of an appropriate adjustment made on the records of the Trustee. Upon any such surrender or adjustment, the Trustee shall authenticate and deliver the Security issuable on such exchange to or upon the order of the Depositary or an authorized representative thereof.

(3)       Subject to the provisions of clause (5) below, the registered Holder may grant proxies and otherwise authorize any Person, including Agent Members (as defined below) and persons that may hold interests through Agent Members, to take any action which a holder is entitled to take under this Indenture or the Securities.

(4)       In the event of the occurrence of any of the events specified in clause (1) above, the Company will promptly make available to the Trustee a reasonable supply of Certificated Securities in definitive, fully registered form, without interest coupons.

(5)       Neither any members of, or participants in, the Depositary (collectively, the "Agent Members") nor any other Persons on whose behalf Agent Members may act shall have any rights under this Indenture with respect to any Global Security registered in the name of the Depositary or any nominee thereof, or under any such Global Security, and the Depositary or such nominee, as the case may be, may be treated by the Company, the Trustee and any agent of the Company or the Trustee as the absolute owner and holder of such Global Security for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Trustee or any agent of the Company or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depositary or such nominee, as the case may be, or impair, as between the Depositary, its Agent Members and any other person on whose behalf an Agent Member may act, the operation of customary practices of such Persons governing the exercise of the rights of a holder of any Security.

(f)       Until the expiration of the holding period applicable to sales thereof under Rule 144(k) under the Securities Act (or any successor provision thereto), any stock certificate representing Common Stock issued upon conversion of any Security shall bear a legend in substantially the following form, unless such Common Stock has been sold pursuant to a registration statement that has been declared effective under the Securities Act (and which continues to be effective at the time of such transfer) or transferred in compliance with Rule 144 under the Securities Act (or any successor provision thereto), or such Common Stock has been issued upon conversion of Securities that have been transferred pursuant to a registration statement that has been declared effective under the Securities Act or pursuant to Rule 144 under the Securities Act (or any successor provision thereto), or unless otherwise agreed by the Company in writing with written notice thereof to the transfer agent:

20

THE COMMON STOCK EVIDENCED HEREBY HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS, AND, ACCORDINGLY, MAY NOT BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATION UNDER THE SECURITIES ACT.

BY ITS ACQUISITION HEREOF, THE HOLDER AGREES TO OFFER, SELL OR OTHERWISE TRANSFER THE COMMON STOCK EVIDENCED HEREBY PRIOR TO THE DATE THAT IS TWO YEARS AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH AMGEN INC. (THE "COMPANY") OR ANY AFFILIATE OF THE COMPANY WAS THE OWNER OF THE COMMON STOCK EVIDENCED HEREBY (OR ANY PREDECESSOR OF THE COMMON STOCK EVIDENCED HEREBY) (THE "RESALE RESTRICTION TERMINATION DATE") ONLY (A) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, (B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, OR (C) PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE COMPANY'S AND THE TRANSFER AGENT'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSE (C) PRIOR TO THE RESALE RESTRICTION TERMINATION DATE TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATIONS AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM, AND IN EACH OF THE FOREGOING CASES, TO REQUIRE THAT A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THE OTHER SIDE OF THIS CERTIFICATE IS COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE TRANSFER AGENT. THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE HOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE.

Any such Common Stock as to which such restrictions on transfer shall have expired in accordance with their terms or as to which the conditions for removal of the foregoing legend set forth therein have been satisfied may, upon surrender of the certificates representing such shares of Common Stock for exchange in accordance with the procedures of the transfer agent for the Common Stock, be exchanged for a new certificate or certificates for a like number of shares of Common Stock, which shall not bear the restrictive legend required by this section.

(g)    Until the expiration of the holding period applicable to sales thereof under Rule 144(k) under the Securities Act (or any successor provision thereto), any certificate representing any Security shall bear a legend in substantially the following form, unless such Security has been sold pursuant to a registration statement that has been declared effective under the Securities Act (and which continues to be effective at the time of such transfer) or transferred in compliance with Rule 144 under the Securities Act (or any successor provision thereto), or unless otherwise agreed by the Company in writing with written notice thereof to the transfer agent:

THE NOTES AND THE SHARES OF COMMON STOCK ISSUABLE UPON CONVERSION OF THIS NOTE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF

1933, AS AMENDED (THE SECURITIES ACT), OR ANY STATE SECURITIES LAWS. NEITHER THIS NOTE, THE SHARES OF COMMON STOCK ISSUABLE UPON CONVERSION OF THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN OR THEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATION.

BY ITS ACQUISITION HEREOF, THE HOLDER (1) AGREES TO OFFER, SELL OR OTHERWISE TRANSFER SUCH NOTE PRIOR TO THE DATE WHICH IS TWO YEARS AFTER THE LATER OF THE LAST ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE COMPANY OR ANY AFFILIATE OF THE COMPANY WAS THE OWNER OF THIS NOTE (OR ANY PREDECESSOR OF THIS NOTE) ONLY (A) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, (B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) TO A PERSON IT REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE COMPANY'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSE (D) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATIONS AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM, AND IN EACH OF THE FOREGOING CASES, TO REQUIRE THAT A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THE OTHER SIDE OF THIS NOTE IS COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE TRUSTEE. THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE HOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE.

Any such Security as to which such restrictions on transfer shall have expired in accordance with their terms or as to which the conditions for removal of the foregoing legend set forth therein have been satisfied may, upon surrender of the certificates representing such Security for exchange in accordance with the procedures of the transfer agent, be exchanged for a new certificate or certificates for a like amount of Securities, which shall not bear the restrictive legend required by this section.

SECTION 2.13    CUSIP Numbers.

The Company in issuing the Securities may use "CUSIP" numbers (if then generally in use), and, if so, the Trustee shall use "CUSIP" numbers in notices of redemption as a convenience to Holders; provided that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Securities or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Securities, and any such redemption shall not be affected by any defect in or omission of such numbers. The Company will promptly notify the Trustee in writing of any change in the CUSIP numbers.

## ARTICLE 3

## PURCHASES

SECTION 3.01     Purchase of Securities at Option of the Holder upon Change in Control.

(a)          If on or prior to the date specified in paragraph 5 of the Securities, there shall have occurred a Change in Control, each Holder shall have the right, at such Holder's option, to require the Company to purchase for cash all or any portion of such Holder's Securities in integral multiples of $1,000 Principal Amount at a purchase price specified in paragraph 5 of the Securities (the "Change in Control Purchase Price"), as of the date that is no later than 35 Business Days after the occurrence of the Change in Control but in no event prior to the date on which such Change in Control occurs (the "Change in Control Purchase Date"), subject to satisfaction by or on behalf of the Holder of the requirements set forth in Section 3.01(c).

A "Change in Control" shall be deemed to have occurred at such time as either of the following events shall occur:

(1)          any person or group, other than the Company, its Subsidiaries or any employee benefits plan of the Company or its Subsidiaries, files a Schedule 13D or Schedule TO (or any successor schedule, form or report) pursuant to the Exchange Act, disclosing that such person has become the beneficial owner of 50% or more of the voting power of the Common Stock then outstanding or other capital stock into which the Common Stock is reclassified or changed; provided, however, that a person shall not be deemed beneficial owner of, or to own beneficially, (A) any securities tendered pursuant to a tender or exchange offer made by or on behalf of such person or any of such person's Affiliates until such tendered securities are accepted for purchase or exchange thereunder, or (B) any securities if such beneficial ownership (1) arises solely as a result of a revocable proxy delivered in response to a proxy or consent solicitation made pursuant to the applicable rules and regulations under the Exchange Act, and (2) is not also then reportable on Schedule 13D (or any successor schedule) under the Exchange Act; or

(2)          the Company consolidates with or merges with or into another person (other than a Subsidiary of the Company), or sells, conveys, transfers or leases all or substantially all of its properties and assets to any person (other than a Subsidiary of the Company) or any person (other than a Subsidiary of the Company) consolidates with or merges with or into the Company, and the outstanding Voting Stock of the Company is reclassified into, converted for or converted into the right to receive any other property or security, provided that none of these circumstances will be a change in control if the persons that beneficially own the Voting Stock of the Company immediately prior to the transaction own, directly or indirectly, shares with a majority of the total voting power of all outstanding Voting Stock of the surviving or transferee person that are entitled to vote generally in the election of that person's board of directors, managers or trustees immediately after the transaction.

For purposes of defining a Change in Control:

23

(x)     the term "<u>person</u>" and the term "<u>group</u>" have the meanings given by Section 13(d) and 14(d) of the Exchange Act or any successor provisions;

(y)     the term "<u>group</u>" includes any group acting for the purpose of acquiring, holding or disposing of securities within the meaning of Rule 13d-5(b)(1) under the Exchange Act or any successor provision; and

(z)     the term "<u>beneficial owner</u>" is determined in accordance with Rules 13d-3 and 13d-5 under the Exchange Act or any successor provisions, except that a person will be deemed to have beneficial ownership of all shares that person has the right to acquire irrespective of whether that right is exercisable immediately or only after the passage of time.

Notwithstanding the foregoing, it will not constitute a Change in Control if 100% of the consideration for the Common Stock (excluding cash payments for fractional shares and cash payments made in respect of dissenter's appraisal rights and cash payment of the Required Cash Amount, if any) in the transaction or transactions constituting the Change in Control consists of common stock traded on a United States national securities exchange or quoted on The Nasdaq National Market, or which will be so traded or quoted when exchanged in connection with the Change in Control, and as a result of such transaction or transactions the Securities become convertible solely into such common stock.

(b)     As promptly as practicable following the date the Company publicly announces the Change in Control transaction, but in no event less than 15 Business Days prior to the anticipated effective date of a Change in Control, the Company shall mail a written notice of Change in Control by first-class mail to the Trustee and to each Holder at their addresses shown in the register of the Registrar (and to beneficial owners as required by applicable law). The notice shall include a form of Change in Control Purchase Notice to be completed by the Securityholder and shall state:

(1)     briefly, the events causing a Change in Control;

(2)     the anticipated effective date of such Change in Control;

(3)     whether such Change in Control will also constitute a Public Acquirer Change in Control and the conversion rights available to the Holders in connection with such Public Acquirer Change in Control, including the period of conversion, if any, and any adjustments to the Conversion Rate;

(4)     the date by which the Change in Control Purchase Notice pursuant to this Section 3.01 must be given;

(5)     the Change in Control Purchase Price;

(6)     the Change in Control Purchase Date;

24

(7)        the name and address of the Paying Agent and the Conversion Agent;

(8)        the Conversion Rate and any adjustments thereto;

(9)        that Securities with respect to which a Change in Control Purchase Notice has been given by the Holder may be converted pursuant to Article 10 hereof only if the Change in Control Purchase Notice has been withdrawn in accordance with the terms of this Indenture;

(10)      the procedures a Holder must follow to exercise rights under this Section 3.01;

(11)      that Securities must be surrendered to the Paying Agent to collect payment of the Change in Control Purchase Price;

(12)      that the Change in Control Purchase Price for any Security as to which a Change in Control Purchase Notice has been duly given and not withdrawn, together with any accrued interest payable with respect thereto, will be paid on or prior to the third Business Day following the later of the Change in Control Purchase Date and the time of surrender of such Security;

(13)      briefly, the procedures the Holder must follow to exercise rights under this Section 3.01;

(14)      briefly, the conversion rights of the Securities;

(15)      the procedures for withdrawing a Change in Control Purchase Notice;

(16)      that, unless the Company defaults in making payment of such Change in Control Purchase Price and interest due, if any, interest on Securities surrendered for purchase will cease to accrue on and after the Change in Control Purchase Date; and

(17)      the CUSIP number of the Securities.

(c)        A Holder may exercise its rights specified in Section 3.01(a) by delivery of a written notice of purchase (a "Change in Control Purchase Notice") to the Paying Agent at any time prior to the Close of Business on the Change in Control Purchase Date, stating:

(1)        the certificate number of the Security which the Holder will deliver to be purchased;

(2)        the portion of the Principal Amount of the Security which the Holder will deliver to be purchased, which portion must be $1,000 or an integral multiple thereof; and

(3)      that such Security shall be purchased pursuant to the terms and conditions specified in paragraph 5 of the Securities.

The delivery of such Security to the Paying Agent prior to, on or after the Change in Control Purchase Date (together with all necessary endorsements) at the offices of the Paying Agent shall be a condition to the receipt by the Holder of the Change in Control Purchase Price therefor; provided, however, that such Change in Control Purchase Price shall be so paid pursuant to this Section 3.01 only if the Security so delivered to the Paying Agent shall conform in all respects to the description thereof set forth in the related Change in Control Purchase Notice.

The Company shall purchase from the Holder thereof, pursuant to this Section 3.01, a portion of a Security if the Principal Amount of such portion is $1,000 or an integral multiple of $1,000. Provisions of this Indenture that apply to the purchase of all of a Security also apply to the purchase of such portion of such Security.

Any purchase by the Company contemplated pursuant to the provisions of this Section 3.01 shall be consummated by the delivery of the consideration to be received by the Holder (together with accrued and unpaid interest) on or prior to the third Business Day following the later of the Change in Control Purchase Date and the time of delivery of the Security to the Paying Agent in accordance with this Section 3.01.

Notwithstanding anything herein to the contrary, any Holder delivering to the Paying Agent the Change in Control Purchase Notice contemplated by this Section 3.01(c) shall have the right to withdraw such Change in Control Purchase Notice at any time prior to the Close of Business on the Change in Control Purchase Date by delivery of a written notice of withdrawal to the Paying Agent in accordance with Section 3.02.

The Paying Agent shall promptly notify the Company of the receipt by it of any Change in Control Purchase Notice or written withdrawal thereof.

The Company shall not be required to comply with this Section 3.01 if a third party mails a written notice of Change in Control in the manner, at the times and otherwise in compliance with this Section 3.01 and repurchases all Securities for which a Change in Control Purchase Notice shall be delivered and not withdrawn.

SECTION 3.02      Effect of Change in Control Purchase Notice.

Upon receipt by the Paying Agent of the Change in Control Purchase Notice specified in Section 3.01(c), the Holder of the Security in respect of which such Change in Control Purchase Notice was given shall (unless such Change in Control Purchase Notice is withdrawn as specified in the following two paragraphs) thereafter be entitled to receive solely the Change in Control Purchase Price and any accrued and unpaid interest, with respect to such Security. Such Change in Control Purchase Price and interest shall be paid to such Holder, subject to receipt of funds by the Paying Agent, on or prior to the third Business Day following the later of (x) the Change in Control Purchase Date, with respect to such Security (provided the conditions in Section 3.01(c) have been satisfied) and (y) the time of delivery of such Security to the Paying Agent by the Holder thereof in the manner required by Section 3.01(c). Securities in

26

respect of which a Change in Control Purchase Notice has been given by the Holder thereof may not be converted pursuant to Article 10 hereof on or after the date of the delivery of such Change in Control Purchase Notice unless such Change in Control Purchase Notice has first been validly withdrawn as specified in the following two paragraphs.

A Change in Control Purchase Notice may be withdrawn by means of a written notice of withdrawal delivered to the office of the Paying Agent in accordance with the Change in Control Purchase Notice at any time prior to the Close of Business on the Change in Control Purchase Date specifying:

(1)    the certificate number of the Security in respect of which such notice of withdrawal is being submitted,

(2)    the Principal Amount of the Security with respect to which such notice of withdrawal is being submitted, and

(3)    the Principal Amount, if any, of such Security which remains subject to the original Change in Control Purchase Notice and which has been or will be delivered for purchase by the Company.

A written notice of withdrawal of a Change in Control Purchase Notice may be in the form set forth in the preceding paragraph.

There shall be no purchase of any Securities pursuant to 3.01 if there has occurred (prior to, on or after, as the case may be, the giving, by the Holders of such Securities, of the required Change in Control Purchase Notice) and is continuing an Event of Default (other than a default in the payment of the Change in Control Purchase Price). The Paying Agent will promptly return to the respective Holders thereof any Securities (x) with respect to which a Change in Control Purchase Notice has been withdrawn in compliance with this Indenture, or (y) held by it during the continuance of an Event of Default (other than a default in the payment of the Change in Control Purchase Price) in which case, upon such return, the Change in Control Purchase Notice with respect thereto shall be deemed to have been withdrawn.

SECTION 3.03    Deposit of Change in Control Purchase Price.

Prior to 10:00 a.m. (New York City time) on or prior to the third Business Day following the Change in Control Purchase Date, as the case may be, the Company shall deposit with the Trustee or with the Paying Agent (or, if the Company or a Subsidiary or an Affiliate of either of them is acting as the Paying Agent, shall segregate and hold in trust as provided in Section 2.04) an amount of money (in immediately available funds if deposited on such Business Day) sufficient to pay the aggregate Change in Control Purchase Price of all the Securities or portions thereof which are to be purchased as of the Change in Control Purchase Date.

SECTION 3.04    Securities Purchased in Part.

Any Security which is to be purchased only in part shall be surrendered at the office of the Paying Agent (with, if the Company or the Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Company and the Trustee duly

27

executed by, the Holder thereof or such Holder's attorney duly authorized in writing) and the Company shall execute and the Trustee shall authenticate and deliver to the Holder of such Security, without service charge, a new Security or Securities, of any authorized denomination as requested by such Holder in aggregate Principal Amount equal to, and in exchange for, the portion of the Principal Amount of the Security so surrendered which is not purchased.

SECTION 3.05    Covenant to Comply With Securities Laws Upon Purchase of Securities.

In connection with any offer to purchase or purchase of Securities under Section 3.01 hereof (provided that such offer or purchase constitutes an "issuer tender 30 offer" for purposes of Rule 13e-4 (which term, as used herein, includes any successor provision thereto) under the Exchange Act at the time of such offer or purchase), the Company shall, to the extent required by law, (i) comply with Rule 13e-4, Rule 14e-1 and any other tender offer rules under the Exchange Act which may then apply and (ii) otherwise comply with all Federal and state securities laws so as to permit the rights and obligations under 3.01 to be exercised in the time and in the manner specified in Section 3.01.

SECTION 3.06    Repayment to the Company.

The Trustee and the Paying Agent shall return to the Company any cash that remains unclaimed as provided in paragraph 10 of the Securities, together with interest thereon (subject to the provisions of Section 7.01(f)), held by them for the payment of the Change in Control Purchase Price; provided, however, that to the extent that the aggregate amount of cash deposited by the Company pursuant to Section 3.03 exceeds the aggregate Change in Control Purchase Price, with respect to, the Securities or portions thereof which the Company is obligated to purchase as of the Change in Control Purchase Date, whether as a result of withdrawal or otherwise, then promptly after the Business Day following the Change in Control Purchase Date, the Trustee shall return any such excess to the Company together with interest thereon (subject to the provisions of Section 7.01(f)).

## ARTICLE 4

## COVENANTS

SECTION 4.01    Payment of Securities.

The Company shall promptly make all payments of principal of, premium, if any, and interest in respect of the Securities on the dates and in the manner provided in the Securities or pursuant to this Indenture. Any amounts to be given to the Trustee or Paying Agent, shall be deposited with the Trustee or Paying Agent by 10:00 a.m., New York City time, by the Company. Principal Amount, Change in Control Purchase Price, and interest, shall be considered paid on the applicable date due if on such date (or, in the case of a Change in Control Purchase Price, on or prior to the third Business Day following the applicable Change in Control Purchase Date) the Trustee or the Paying Agent holds, in accordance with this Indenture, money or securities, if permitted hereunder, sufficient to pay all such amounts then due. All references in this indenture to "interest" shall include Additional Interest, if any. The Company shall pay

28

all Additional Interest, if any, in the same manner on the dates set forth in the Securities and in the amounts set forth in the Registration Rights Agreement.

The Company shall, to the extent permitted by law, pay interest on overdue amounts at the rate per annum set forth in paragraph 1 of the Securities, compounded semiannually, which interest shall accrue from the date such overdue amount was originally due to the date payment of such amount, including interest thereon, has been made or duly provided for.

SECTION 4.02    SEC and Other Reports.

The Company shall deliver to the Trustee, within 15 days after it files such annual and quarterly reports, information, documents and other reports with the SEC, copies of its annual report and of the information, documents and other reports (or copies of such portions of any of the foregoing as the SEC may by rules and regulations prescribe) which the Company is required to file with the SEC pursuant to Section 13 or 15(d) of the Exchange Act. In the event the Company is at any time no longer subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, it shall continue to provide the Trustee with reports containing substantially the same information as would have been required to be filed with the SEC had the Company continued to have been subject to such reporting requirements. In such event, such reports shall be provided at the times the Company would have been required to provide reports had it continued to have been subject to such reporting requirements. The Company also shall comply with the other provisions of TIA Section 314(a). Delivery of such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt of the same shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officers' Certificates).

SECTION 4.03    Compliance Certificate.

The Company shall deliver to the Trustee within 120 days after the end of each fiscal year of the Company (beginning with the fiscal year ending on December 31, 2006) an Officers' Certificate, stating whether or not to the knowledge of the signers thereof the Company is in default in the performance and observance of any of the terms, provisions and conditions of this Indenture (without regard to any period of grace or requirement of notice provided hereunder) and if the Company shall be in default, specifying all such defaults and the nature and status thereof of which they may have knowledge.

SECTION 4.04    Maintenance of Office or Agency.

The Company will maintain an office or agency of the Trustee, Registrar, Paying Agent and Conversion Agent where Securities may be presented or surrendered for payment, where Securities may be surrendered for registration of transfer, exchange for other Securities, purchase or conversion for Common Stock and where notices and demands to or upon the Company in respect of the Securities and this Indenture may be served. The Trustee's office specified in Section 12.02 shall initially be such office or agency for all of the aforesaid

29

purposes. The Company shall give prompt written notice to the Trustee of the location, and of any change in the location, of any such office or agency (other than a change in the location of the office of the Trustee). If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the address of the Trustee set forth in Section 12.02.

The Company may also from time to time designate one or more other offices or agencies where the Securities may be presented or surrendered for any or all such purposes and may from time to time rescind such designations.

## ARTICLE 5

## SUCCESSOR CORPORATION

SECTION 5.01    When Company May Merge or Transfer Assets.

The Company shall not consolidate with or merge with or into any other person or convey, transfer or lease all or substantially all its properties and assets to another person, unless:

(a)    either (1) the Company shall be the continuing corporation or (2) the person (if other than the Company) formed by such consolidation or into which the Company is merged or the person which acquires by conveyance, transfer or lease all or substantially all the properties and assets of the Company (i) shall be organized and validly existing under the laws of the United States, any State thereof or the District of Columbia and (ii) shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, in form satisfactory to the Trustee, all of the obligations of the Company under the Securities and this Indenture;

(b)    immediately after giving effect to such transaction, no Default shall have occurred and be continuing; and

(c)    the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger, conveyance, transfer or lease and, if a supplemental indenture is required in connection with such transaction, such supplemental indenture, comply with this Article 5 and that all conditions precedent herein provided for relating to such transaction have been satisfied.

For purposes of the foregoing, the transfer (by lease, assignment, sale or otherwise) of the properties and assets of one or more Subsidiaries (other than to the Company or another Subsidiary), which, if such assets were owned by the Company, would constitute all or substantially all of the properties and assets of the Company, shall be deemed to be the transfer of all or substantially all of the properties and assets of the Company.

The successor person formed by such consolidation or into which the Company is merged or the successor person to which such conveyance, transfer or lease is made shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture with the same effect as if such successor had been named as the Company

herein; and thereafter, except in the case of a lease and obligations the Company may have under a supplemental indenture pursuant to Section 10.17, the Company shall be discharged from all obligations and covenants under this Indenture and the Securities. Subject to Section 9.06, the Company, the Trustee and the successor person shall enter into a supplemental indenture to evidence the succession and substitution of such successor person and such discharge and release of the Company.

## ARTICLE 6

## DEFAULTS AND REMEDIES

SECTION 6.01     Events of Default.

An "Event of Default" occurs if:

(1)     the Company defaults in the payment of the Principal Amount or Change in Control Purchase Price on any Security when the same becomes due and payable at its Stated Maturity, upon declaration, when due for purchase by the Company or otherwise;

(2)     the Company defaults in payment of any interest due on the Securities, which default continues for 30 days;

(3)     the Company fails to comply with any of its agreements in the Securities or this Indenture (other than those referred to in clauses (1) and (2) above) and such failure continues for 60 days after receipt by the Company of a Notice of Default (as defined below);

(4)     (a) the Company fails to make any payment by the end of any applicable grace period after maturity of Indebtedness in an amount in excess of $50,000,000 and continuance of such failure, or (b) the acceleration of Indebtedness has occurred in an amount in excess of $50,000,000 because of a default with respect to such Indebtedness without such Indebtedness having been discharged or such acceleration having been cured, waived, rescinded or annulled, in the case of (a) above, for a period of 30 days after receipt by the Company of a Notice of Default; provided, however, that if any such failure or acceleration referred to in (a) or (b) above shall cease or be cured, waived, rescinded or annulled, then the Event of Default by reason thereof shall be deemed not to have occurred; or

(5)     the Company or any Significant Subsidiary, pursuant to or under or within the meaning of any Bankruptcy Law:

(A)     commences a voluntary case or proceeding;

(B)     consents to the entry of an order for relief against it in an involuntary case or proceeding or the commencement of any case against it;

(C)     consents to the appointment of a Custodian of it or for any substantial part of its property;

(D)        makes a general assignment for the benefit of its creditors;

(E)        files a petition in bankruptcy or answer or consent seeking reorganization or relief; or

(F)        consents to the filing of such petition or the appointment of or taking possession by a Custodian; or

(6)        a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(A)        is for relief against the Company or any Significant Subsidiary in an involuntary case or proceeding, or adjudicates the Company or any Significant Subsidiary insolvent or bankrupt;

(B)        appoints a Custodian of the Company or any Significant Subsidiary or for any substantial part of its property; or (C) orders the winding up or liquidation of the Company or any Significant Subsidiary;

and the order or decree remains unstayed and in effect for 60 days.

(a)        "Bankruptcy Law" means Title 11, United States Code, or any similar Federal or state law for the relief of debtors.

(b)        "Custodian" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

        A Default under clause (3) or clause (4) above is not an Event of Default until the Trustee notifies the Company, or the Holders of at least 25% in aggregate Principal Amount of the Securities at the time outstanding notify the Company and the Trustee, of the Default and the Company does not cure such Default (and such Default is not waived) within the time specified in clause (3) or clause (4) above after actual receipt of such notice. Any such notice must specify the Default, demand that it be remedied and state that such notice is a " Notice of Default ".

        The Company shall deliver to the Trustee, within 30 days after it becomes aware of the occurrence thereof, written notice of any event which with the giving of notice or the lapse of time, or both, would become an Event of Default under clause (3) or clause (4) above, its status and what action the Company is taking or proposes to take with respect thereto.

SECTION 6.02     Acceleration.

        If an Event of Default (other than an Event of Default specified in Section 6.01(5) or (6) in respect of the Company) occurs and is continuing, the Trustee by Notice to the Company, or the Holders of at least 25% in aggregate Principal Amount of the Securities at the time outstanding by notice to the Company and the Trustee, may declare the Principal Amount through the date of declaration, and any accrued and unpaid interest through the date of such declaration, on all the Securities to be immediately due and payable. Upon such a declaration,

32

such Principal Amount, and such accrued and unpaid interest if any, shall be due and payable immediately. If an Event of Default specified in Section 6.01(5) or (6) in respect of the Company occurs and is continuing, the Principal Amount plus accrued and unpaid interest if any, on all the Securities shall become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Securityholders. The Holders of a majority in aggregate Principal Amount of the Securities at the time outstanding, by notice to the Trustee (and without notice to any other Securityholder) may rescind an acceleration and its consequences if the rescission would not conflict with any judgment or decree and if all existing Events of Default have been cured or waived except nonpayment of the Principal Amount that have become due solely as a result of acceleration and if all amounts due to the Trustee under Section 7.07 have been paid. No such rescission shall affect any subsequent Default or impair any right consequent thereto.

SECTION 6.03    Other Remedies.

If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of the Principal Amount plus any accrued and unpaid interest if any, on the Securities or to enforce the performance of any provision of the Securities or this Indenture. The Trustee may maintain a proceeding even if the Trustee does not possess any of the Securities or does not produce any of the Securities in the proceeding. A delay or omission by the Trustee or any Securityholder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of, or acquiescence in, the Event of Default. Except as set forth in Section 2.07 hereof, no remedy is exclusive of any other remedy. All available remedies are cumulative.

SECTION 6.04    Waiver of Past Defaults.

Subject to Section 6.02, the Holders of a majority in aggregate Principal Amount of the Securities at the time outstanding, by notice to the Trustee (and without notice to any other Securityholder), may waive an existing or past Default and its consequences except (1) an Event of Default described in Section 6.01(1) or (2), or (2) a Default in respect of a provision that under Section 9.02 cannot be amended without the consent of each Securityholder affected. When a Default is waived, it is deemed cured, but no such waiver shall extend to any subsequent or other Default or impair any consequent right. This Section 6.04 shall be in lieu of Section 316(a)1(A) of the TIA and such Section 316(a)1(A) is hereby expressly excluded from this Indenture, as permitted by the TIA.

SECTION 6.05    Control by Majority.

The Holders of a majority in aggregate Principal Amount of the Securities at the time outstanding may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture or that the Trustee determines in good faith is unduly prejudicial to the rights of other Securityholders or could, in reasonable likelihood, impose personal liability upon the Trustee unless the Trustee is offered indemnity satisfactory to it. This Section 6.05 shall be in lieu of

Section 316(a)1(B) of the TIA and such Section 316(a)1(B) is hereby expressly excluded from this Indenture, as permitted by the TIA.

SECTION 6.06     Limitation on Suits.

A Securityholder may not pursue any remedy with respect to this Indenture or the Securities unless:

(1)     the Holder gives to the Trustee written notice stating that an Event of Default is continuing;

(2)     the Holders of at least 25% in aggregate Principal Amount of the Securities at the time outstanding make a written request to the Trustee to pursue the remedy;

(3)     such Holder or Holders offer to the Trustee security or indemnity satisfactory to the Trustee against any loss, liability or expense;

(4)     the Trustee does not comply with the request within 60 days after receipt of such notice, request and offer of security or indemnity; and

(5)     the Holders of a majority in aggregate Principal Amount of the Securities at the time outstanding do not give the Trustee a direction inconsistent with the request during such 60-day period.

A Securityholder may not use this Indenture to prejudice the rights of any other Securityholder or to obtain a preference or priority over any other Securityholder.

SECTION 6.07     Rights of Holders to Receive Payment.

Notwithstanding any other provision of this Indenture, the right of any Holder to receive payment of the Principal Amount, Change in Control Purchase Price, and interest in respect of the Securities held by such Holder, on or after the respective due dates expressed in the Securities, and to convert the Securities in accordance with Article 10, or to bring suit for the enforcement of any such payment on or after such respective dates or the right to convert, shall not be impaired or affected adversely without the consent of such Holder.

SECTION 6.08     Collection Suit by Trustee.

If an Event of Default described in Section 6.01(1) or (2) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Company for the whole amount owing with respect to the Securities and the amounts provided for in Section 7.07.

SECTION 6.09     Trustee May File Proofs of Claim.

In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the

Company or any other obligor upon the Securities or the property of the Company or of such other obligor or their creditors, the Trustee (irrespective of whether the Principal Amount, Change in Control Purchase Price, and interest in respect of the Securities shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand on the Company for the payment of any such amount) shall be entitled and empowered, by intervention in such proceeding or otherwise,

(a)        to file and prove a claim for the whole amount of the Principal Amount, Change in Control Purchase Price, or interest and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel or any other amounts due the Trustee under Section 7.07) and of the Holders allowed in such judicial proceeding, and

(b)        to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or similar official in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Securities or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

SECTION 6.10    Priorities.

If the Trustee collects any money pursuant to this Article 6, it shall pay out the money in the following order:

FIRST: to the Trustee for amounts due under Section 7.07;

SECOND: to Securityholders for amounts due and unpaid on the Securities for the Principal Amount, Change in Control Purchase Price and interest, ratably, without preference or priority of any kind, according to such amounts due and payable on the Securities; and

THIRD: the balance, if any, to the Company.

The Trustee may fix a record date and payment date for any payment to Securityholders pursuant to this Section 6.10. At least 15 days before such record date, the Trustee shall mail to each Securityholder and the Company a notice that states the record date, the payment date and the amount to be paid.

35

SECTION 6.11    Undertaking for Costs.

             In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit (other than the Trustee) of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit (other than the Trustee), having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.07 or a suit by Holders of more than 10% in aggregate Principal Amount of the Securities at the time outstanding. This Section 6.11 shall be in lieu of Section 315(e) of the TIA and such Section 315(e) is hereby expressly excluded from this Indenture, as permitted by the TIA.

SECTION 6.12    Waiver of Stay, Extension or Usury Laws.

             The Company covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury or other law wherever enacted, now or at any time hereafter in force, which would prohibit or forgive the Company from paying all or any portion of the Principal Amount, Change in Control Purchase Price and interest in respect of Securities, or any interest on such amounts, as contemplated herein, or which may affect the covenants or the performance of this Indenture; and the Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

**ARTICLE 7**

**TRUSTEE**

SECTION 7.01    Duties of Trustee.

(a)      If an Event of Default has occurred and is continuing, the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)      Except during the continuance of an Event of Default:

(1)      the Trustee need perform only those duties that are specifically set forth in this Indenture and no others; and

(2)      in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificate or opinion furnished to the Trustee and conforming to the requirements of this Indenture, but in case of any such certificates or opinions which by any

36

provision hereof are specifically required to be furnished to the Trustee, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture, but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein.

This Section 7.01(b) shall be in lieu of Section 315(a) of the TIA and such Section 315(a) is hereby expressly excluded from this Indenture, as permitted by the TIA.

(c)     The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(1)     this paragraph (c) does not limit the effect of paragraph (b) of this Section 7.01;

(2)     the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and (3) the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05.

Subparagraphs (c)(1), (2) and (3) shall be in lieu of Sections 315(d)(1), 315(d)(2) and 315(d)(3) of the TIA and such Sections 315(d)(1), 315(d)(2) and 315(d)(3) are hereby expressly excluded from this Indenture, as permitted by the TIA.

(d)     Every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b), (c) and (e) of this Section 7.01.

(e)     The Trustee may refuse to perform any duty or exercise any right or power or extend or risk its own funds or otherwise incur any financial liability unless it receives indemnity satisfactory to it against any loss, liability or expense.

(f)     Money held by the Trustee in trust hereunder need not be segregated from other funds except to the extent required by law. The Trustee (acting in any capacity hereunder) shall be under no liability for interest on any money received by it hereunder unless otherwise agreed in writing with the Company.

SECTION 7.02     Rights of Trustee.

Subject to its duties and responsibilities under the provisions of Section 7.01, and, except as expressly excluded from this Indenture pursuant to said Section 7.01, subject also to its duties and responsibilities under the TIA:

(a)     the Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)        whenever in the administration of this Indenture the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, request and conclusively rely upon an Officers' Certificate;

(c)        the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder;

(d)        the Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith which it believes to be authorized or within its rights or powers conferred under this Indenture;

(e)        the Trustee may consult with counsel selected by it and any advice or Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such advice or Opinion of Counsel;

(f)        the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order or direction of any of the Holders, pursuant to the provisions of this Indenture, unless such Holders shall have offered to the Trustee security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby;

(g)        any request or direction of the Company mentioned herein shall be sufficiently evidenced by a Company Request or Company Order and any resolution of the Board of Directors may be sufficiently evidenced by a resolution of the Board of Directors;

(h)        the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document, including, without limitation, any Company Request, Company Order or Officers' Certificate, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Company, personally or by agent or attorney at the sole cost of the Company and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation or lack thereof;

(i)        the Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee received written notice of an event which is in fact such a Default or Event of Default, and such notice references the Securities and this Indenture, describes the event with specificity, and alleges that the occurrence of this event is a Default or an Event of Default under this Indenture;

(j)        the rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall

be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other Person employed to act hereunder;

(k)    the Trustee may request that the Company deliver an Officers' Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded; and

(l)    the permissive rights of the Trustee enumerated herein shall not be construed as duties.

SECTION 7.03    Individual Rights of Trustee.

The Trustee in its individual or any other capacity may become the owner or pledgee of Securities and may otherwise deal with the Company or its Affiliates with the same rights it would have if it were not Trustee. Any Paying Agent, Registrar, Conversion Agent or co-registrar may do the same with like rights. However, the Trustee must comply with Section 7.10.

SECTION 7.04    Trustee's Disclaimer.

The Trustee makes no representation as to the validity or adequacy of this Indenture or the Securities, it shall not be accountable for the Company's use or application of the proceeds from the Securities, it shall not be responsible for any statement in the registration statement for the Securities under the Securities Act or in the Indenture or the Securities (other than its certificate of authentication), or the determination as to which beneficial owners are entitled to receive any notices hereunder.

SECTION 7.05    Notice of Defaults.

If a Default occurs and if it is known to the Trustee, the Trustee shall give to each Securityholder notice of the Default within 90 days after the Trustee gains knowledge of the Default unless such Default shall have been cured or waived before the giving of such notice. Except in the case of a Default described in Section 6.01(1) or (2), the Trustee may withhold the notice if and so long as a committee of its Responsible Officers in good faith determines that withholding the notice is in the interests of Securityholders. The second sentence of this Section 7.05 shall be in lieu of the proviso to Section 315(b) of the TIA and such proviso is hereby expressly excluded from this Indenture, as permitted by the TIA. The Trustee shall not be deemed to have knowledge of a Default unless a Responsible Officer of the Trustee has received written notice of such Default in the manner described in Section 7.02(i).

SECTION 7.06    Reports by Trustee to Holders.

(1)    Within 60 days after each May 15 beginning with the May 15 following the date of this Indenture, the Trustee shall transmit to each Securityholder such reports as may be required under Section 313 of the TIA.

39

SECTION 7.07     Compensation and Indemnity.

The Company agrees:

(a)     to pay to the Trustee from time to time such reasonable compensation as the Company and the Trustee shall from time to time agree in writing for all services rendered by it hereunder (which compensation shall not be limited (to the extent permitted by law) by any provision of law in regard to the compensation of a trustee of an express trust);

(b)     to reimburse the Trustee upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including the reasonable compensation and the expenses, advances and disbursements of its agents and counsel), except any such expense, disbursement or advance as may be attributable to its negligence or bad faith; and

(c)     to indemnify the Trustee or any predecessor Trustee and their agents for, and to hold them harmless against, any loss, damage, claim, liability, cost or expense (including reasonable attorney's fees and expenses and taxes (other than taxes based upon, measured by or determined by the income of the Trustee)) reasonably incurred without negligence or bad faith on its part, arising out of or in connection with the acceptance or administration of this trust, including the reasonable costs and expenses of defending itself against any claim (whether asserted by the Company or any Holder or any other Person) or liability in connection with the acceptance, exercise or performance of any of its powers or duties hereunder.

To secure the Company's payment obligations in this Section 7.07, Holders shall have been deemed to have granted to the Trustee a lien prior to the Securities on all money or property held or collected by the Trustee, except that held in trust to pay the Principal Amount, Change in Control Purchase Price, or interest, as the case may be, on particular Securities.

The Company's payment obligations pursuant to this Section 7.07 shall survive the discharge of this Indenture and the resignation or removal of the Trustee. When the Trustee incurs expenses after the occurrence of a Default specified in Section 6.01(5) or (6), its expenses including the reasonable charges and expenses of its counsel, are intended to constitute expenses of administration under any Bankruptcy Law.

SECTION 7.08     Replacement of Trustee.

The Trustee may resign by so notifying the Company; provided, however, no such resignation shall be effective until a successor Trustee has accepted its appointment pursuant to this Section 7.08. The Holders of a majority in aggregate Principal Amount of the Securities at the time outstanding may remove the Trustee by so notifying the Trustee and the Company. The Company shall remove the Trustee if:

(1)     the Trustee fails to comply with Section 7.10;

(2)     the Trustee is adjudged bankrupt or insolvent;

(3)        a receiver or public officer takes charge of the Trustee or its property; or

(4)        the Trustee otherwise becomes incapable of acting.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Company shall promptly appoint, by resolution of the Board of Directors, a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Company satisfactory in form and substance to the retiring Trustee and the Company. Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall mail a notice of its succession to Securityholders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 7.07.

If a successor Trustee does not take office within 30 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Company or the Holders of a majority in aggregate Principal Amount of the Securities at the time outstanding may petition any court of competent jurisdiction at the expense of the Company for the appointment of a successor Trustee.

If the Trustee fails to comply with Section 7.10, any Securityholder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

The resignation or removal of a Trustee shall not diminish, impair or terminate its rights to indemnification pursuant to Section 7.07 as they relate to periods prior to such resignation or removal.

SECTION 7.09     Successor Trustee by Merger.

If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee.

SECTION 7.10     Eligibility; Disqualification.

There shall at all times be a Trustee hereunder which shall be eligible to act as Trustee and shall have a combined capital and surplus of at least \$50,000,000. If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of federal, state, territorial or District of Columbia supervising or examining authority, then, for the purposes of this Section 7.10, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 7.10, it shall resign immediately in the manner and with the effect hereinafter specified in this Article 7.

# ARTICLE 8

## DISCHARGE OF INDENTURE

SECTION 8.01     Discharge of Liability on Securities.

When (i) the Company delivers to the Trustee all outstanding Securities (other than Securities replaced pursuant to Section 2.07) for cancellation or (ii) all outstanding Securities have become due and payable and the Company deposits with the Trustee, the Paying Agent (if the Paying Agent is not the Company or any Subsidiary or any Affiliate of either of them) or the Conversion Agent cash or, if expressly permitted by the terms of the Securities and the Indenture, Common Stock (solely to satisfy the rights of Holders granted in Article 10) or governmental obligations sufficient to pay all amounts due and owing on all outstanding Securities (other than Securities replaced pursuant to Section 2.07), and if in either case the Company pays all other sums payable hereunder by the Company, then this Indenture shall, subject to Section 7.07, cease to be of further effect. The Trustee shall join in the execution of a document prepared by the Company acknowledging satisfaction and discharge of this Indenture on demand of the Company accompanied by an Officers' Certificate stating that the consideration being given is expressly permitted by the terms of the Securities and that all conditions precedent to the discharge of the Indenture have been complied with by the Company and an Opinion of Counsel that such satisfaction and discharge does not violate the terms of this Indenture or the Securities, and at the cost and expense of the Company. The Trustee shall be allowed to conclusively rely on such Officers' Certificate.

SECTION 8.02     Repayment to the Company.

The Trustee and the Paying Agent shall return to the Company upon written request any money or securities held by them for the payment of any amount with respect to the Securities that remains unclaimed for two years, subject to applicable unclaimed property law. After return to the Company, Holders entitled to the money or securities must look to the Company for payment as general creditors unless an applicable abandoned property law designates another person and the Trustee and the Paying Agent shall have no further liability to the Securityholders with respect to such money or securities for that period commencing after the return thereof.

# ARTICLE 9

## AMENDMENTS

SECTION 9.01     Without Consent of Holders.

The Company and the Trustee may amend this Indenture or the Securities without the consent of any Securityholder:

(1)        to cure any ambiguity, omission, defect or inconsistency;

(2)        to comply with Article 5 or Section 10.17;

42

(3)        to secure the Company's obligations under the Securities and this Indenture;

(4)        to add to the Company's covenants for the benefit of the Securityholders or to surrender any right or power conferred upon the Company;

(5)        to make any change to comply with the TIA, or any amendment thereto, or to comply with any requirement of the SEC in connection with the qualification of the Indenture under the TIA, or as necessary in connection with the registration of the Securities under the Securities Act if at any time the Company seeks to register the Securities thereunder; or

(6)        to make any change that does not adversely affect the rights of any Holder.

No amendment to cure any ambiguity, omission, defect or inconsistency in this Indenture made solely to conform the Indenture to the description of the Securities contained in the offering memorandum pursuant to which the Securities have been initially offered shall be deemed to adversely affect the interests of the Holders.

SECTION 9.02        With Consent of Holders.

With the written consent of the Holders of at least a majority in aggregate Principal Amount of the Securities at the time outstanding, the Company and the Trustee may amend this Indenture or the Securities. However, without the consent of each Securityholder affected, an amendment to this Indenture or the Securities may not:

(1)        reduce the Principal Amount, or Change in Control Purchse Price with respect to or any premium or interest on any Security;

(2)        make any Security payable in money or securities other than that stated in the Security;

(3)        change the Stated Maturity of any Security;

(4)        make any change that adversely affects the right of a Holder to convert any Security;

(5)        make any change that adversely affects the right to require the Company to purchase the Securities in accordance with the terms thereof and this Indenture;

(6)        impair the right to convert or receive payment with respect to, a Security, or right to institute suit for the enforcement of any payment with respect to, or conversion of, the Securities; or

(7)        make any change in Section 6.04, Section 6.07 or this Section 9.02, except to increase any percentage set forth therein.

It shall not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent approves the substance thereof.

After an amendment under this Section 9.02 becomes effective, the Company shall mail to each Holder a notice briefly describing the amendment. Failure to mail such notice or a defect in the notice shall not affect the validity of the amendment.

SECTION 9.03    Compliance with Trust Indenture Act.

Every supplemental indenture executed pursuant to this Article shall comply with the TIA.

SECTION 9.04    Revocation and Effect of Consents, Waivers and Actions.

Until an amendment, waiver or other action by Holders becomes effective, a consent thereto by a Holder of a Security hereunder is a continuing consent by the Holder and every subsequent Holder of that Security or portion of the Security that evidences the same obligation as the consenting Holder's Security, even if notation of the consent, waiver or action is not made on the Security. However, any such Holder or subsequent Holder may revoke the consent, waiver or action as to such Holder's Security or portion of the Security if the Trustee receives the notice of revocation before the date the amendment, waiver or action becomes effective. After an amendment, waiver or action becomes effective, it shall bind every Securityholder.

SECTION 9.05    Notation on or Exchange of Securities.

Securities authenticated and delivered after the execution of any supplemental indenture pursuant to this Article may, and shall if required by the Trustee, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture. If the Company shall so determine, new Securities so modified as to conform, in the opinion of the Board of Directors, to any such supplemental indenture may be prepared and executed by the Company and authenticated and delivered by the Trustee in exchange for outstanding Securities.

SECTION 9.06    Trustee to Sign Supplemental Indentures.

The Trustee shall sign any supplemental indenture authorized pursuant to this Article 9 if the amendment contained therein does not adversely affect the rights, duties, liabilities or immunities of the Trustee. If it does, the Trustee may, but need not, sign such supplemental indenture. In signing such supplemental indenture the Trustee shall receive, and (subject to the provisions of Section 7.01) shall be fully protected in relying upon, in addition to the documents required by Section 12.04, an Officers' Certificate and an Opinion of Counsel stating that such amendment is authorized or permitted by this Indenture.

SECTION 9.07    Effect of Supplemental Indentures.

Upon the execution of any supplemental indenture under this Article, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form

44

a part of this Indenture for all purposes; and every Holder of Securities theretofore or thereafter authenticated and delivered hereunder shall be bound thereby.

## ARTICLE 10

## CONVERSION

SECTION 10.01     Conversion Privilege.

A Holder of a Security may convert such Security at any time during the period stated in paragraph 6 of the Securities upon the occurrence of any of the events set forth in paragraph 6 of the Securities, subject to the provisions of this Article 10. Subject to certain exceptions described in paragraph 6 of the Securities, if a Holder surrenders its Securities for conversion, such holder will receive, in respect of each $1,000 of Principal Amount into the Conversion Value which shall be paid as follows:

(i)        Cash in an amount equal to the lesser of (A) $1,000 and (B) the Conversion Value (the "Required Cash Amount"); and

(ii)       if the Conversion Value is greater than $1,000, a number of shares of Common Stock (the "Remaining Shares"), equal to the sum of the Daily Share Amounts for each of the ten consecutive Trading Days in the Conversion Reference Period, subject to the right of the Company to deliver cash in lieu of all or a portion of such Remaining Shares as described below.

On any day prior to the first Trading Day of the applicable Conversion Reference Period, the Company may specify a percentage of the Daily Share Amount that will be settled in cash (the "Cash Percentage") and will notify the Securityholder of such Cash Percentage through written notice to the Trustee (the "Cash Percentage Notice"). If the Company elects to specify a Cash Percentage, the amount of cash that the Company will deliver in respect of each Trading Day in the applicable Conversion Reference Period will equal the product of: (1) the Cash Percentage, (2) the Daily Share Amount for such Trading Day, and (3) the Volume Weighted Average Price of the Common Stock for such Trading Day (provided that after the consummation of a Change in Control in which the consideration is comprised entirely of cash, the amount used in this clause (3) will be the cash price per share of Common Stock received by holders of Common Stock in such Change in Control). The number of shares deliverable in respect of each Trading Day in the applicable Conversion Reference Period will be a percentage of the Daily Share Amount equal to 100% minus the Cash Percentage. If the Company does not specify a Cash Percentage by the start of the applicable Conversion Reference Period, the Company shall settle 100% of the Daily Share Amount for each Trading Day in the applicable Conversion Reference Period with shares of Common Stock; provided, however, that the Company will pay cash in lieu of fractional shares otherwise issuable upon conversion of such Security, pursuant to Section 10.03 hereof. The Company may, at its option, revoke any Cash Percentage Notice through written notice to the Trustee prior to the start of the applicable Conversion Reference Period.

A Holder may convert a portion of the Principal Amount of a Security if the portion is $1,000 or an integral multiple of $1,000. Provisions of this Indenture that apply to conversion of all of a Security also apply to conversion of a portion of a Security.

In the event of a stock split, combination, dividend or any other event resulting in an adjustment to the Conversion Rate pursuant to Sections 10.06, 10.07, 10.08 10.09 or 10.10, during the applicable Conversion Reference Period, appropriate adjustment to the equation for calculating Conversion Value and Remaining Shares shall be made, as determined by the Board of Directors.

SECTION 10.02    <u>Conversion Procedure</u>.

To convert a Security, a Holder must satisfy the requirements in paragraph 6 of the Securities. The Conversion Agent shall, within one (1) Business Day of the Conversion Date, provide notice to the Company as set forth in Section 12.02(b).

As promptly as practicable following the end of the Conversion Reference Period applicable to the Securities being converted, the Company shall deliver to the Holder, through the Conversion Agent, the Required Cash Amount and Net Share Amount, if any (including cash in lieu of fractional shares pursuant to Section 10.03 hereof). The person in whose name the certificate representing any shares is registered shall be treated as a stockholder of record on and after the Conversion Date; provided, however, that no surrender of a Security on any date when the stock transfer books of the Company shall be closed shall be effective to constitute the person or persons entitled to receive the Net Share Amount upon such conversion as the record holder or holders of such shares of Common Stock on such date, but such surrender shall be effective to constitute the person or persons entitled to receive such shares of Common Stock as the record holder or holders thereof for all purposes at the Close of Business on the next succeeding day on which such stock transfer books are open; such conversion shall be at the Conversion Rate in effect on the date that such Security shall have been surrendered for conversion, as if the stock transfer books of the Company had not been closed. Upon conversion of a Security, such person shall no longer be a Holder of such Security.

No payment or adjustment will be made for dividends on, or other distributions with respect to, any Common Stock except as provided in this Article 10. On conversion of a Security, accrued interest with respect to the converted Security shall not be cancelled, extinguished or forfeited, but rather shall be deemed to be paid in full to the Holder thereof through delivery of the Required Cash Amount and Net Share Amount, if any (together with the cash payment, if any, in lieu of fractional shares) in exchange for the Security being converted pursuant to the provisions hereof.

If the Holder converts more than one Security at the same time, the Required Cash Amount and Net Share Amount, if any (together with the cash payment, if any, in lieu of fractional shares) shall be based on the total Principal Amount of the Securities converted.

If the last day on which a Security may be converted is a Legal Holiday, the Security may be surrendered on the next succeeding day that is not a Legal Holiday.

46

Upon surrender of a Security that is converted in part, the Company shall execute, and the Trustee shall authenticate and deliver to the Holder, a new Security in an authorized denomination equal in Principal Amount to the unconverted portion of the Security surrendered.

SECTION 10.03    Fractional Shares.

The Company will not issue a fractional share of Common Stock upon conversion of a Security. Instead, the Company will deliver cash for the current market value of the fractional share. The current market value of a fractional share shall equal the arithmetic average of the Volume Weighted Average Price of the Common Stock for each of the ten consecutive Trading Days of the Conversion Reference Period, rounded to the nearest whole cent.

SECTION 10.04    Taxes on Conversion.

If a Holder converts a Security, the Company shall pay any documentary, stamp or similar issue or transfer tax due on the issue of any shares of Common Stock upon the conversion. However, the Holder shall pay any such tax which is due because the Holder requests the shares to be issued in a name other than the Holder's name. The Conversion Agent may refuse to deliver the certificates representing the Common Stock being issued in a name other than the Holder's name until the Conversion Agent receives a sum sufficient to pay any tax which will be due because the shares are to be delivered in a name other than the Holder's name. Nothing herein shall preclude any tax withholding required by law or regulations.

SECTION 10.05    Company to Provide Stock.

The Company shall, prior to issuance of any Securities under this Article 10, and from time to time as may be necessary, reserve out of its authorized but unissued Common Stock a sufficient number of shares of Common Stock to permit the payment of the Net Share Amount, if applicable, upon conversion of the Securities.

All shares of Common Stock delivered upon payment of any Net Share Amount, if applicable, upon conversion of the Securities shall be newly issued shares or treasury shares, shall be duly and validly issued and fully paid and nonassessable and shall be free from preemptive rights and free of any lien or adverse claim.

The Company will comply with all federal and state securities laws regulating the offer and delivery of shares of Common Stock upon payment of any Net Share Amount, if applicable, upon conversion of Securities, if any, and will list or cause to have quoted such shares of Common Stock on each national securities exchange or in the over-the-counter market or such other market on which the Common Stock is then listed or quoted.

SECTION 10.06    Adjustment for Change In Capital Stock.

If, after the Issue Date of the Securities, the Company:

(1)        pays a dividend or makes a distribution on its Common Stock payable in shares of its Common Stock or shares of other Capital Stock;

47

(2)        subdivides or combines its shares of Common Stock; or

(3)        issues by reclassification of its Common Stock any shares of its Capital Stock (other than rights, warrants or options for its Capital Stock),

then the Conversion Rate in effect immediately prior to such action shall be adjusted so that the Holder of a Security thereafter converted may receive the number of shares of Capital Stock of the Company which such Holder would have owned immediately following such action if such Holder had converted the Security immediately prior to such action.

The adjustment shall become effective immediately after the record date in the case of a dividend or distribution and immediately after the effective date in the case of a subdivision, combination or reclassification.

If after an adjustment a Holder of a Security upon conversion of such Security may receive shares of two or more classes of Capital Stock of the Company, the Conversion Rate shall thereafter be subject to adjustment upon the occurrence of an action taken with respect to any such class of Capital Stock as is contemplated by this Article 10 with respect to the Common Stock, on terms comparable to those applicable to Common Stock in this Article 10.

SECTION 10.07    Adjustment for Rights Issue.

If, after the Issue Date of the Securities, the Company distributes any rights, warrants or options to all holders of its Common Stock entitling them, for a period expiring within 60 days after the record date for such distribution, to purchase shares of Common Stock at a price per share less than the Average Closing Price, the Conversion Rate shall be adjusted in accordance with the formula:

$$R' = R \text{ x } \frac{(O + N)}{(O + (N \text{ x } P) / M)}$$

where:

R' = the adjusted Conversion Rate.

R = the current Conversion Rate.

O = the number of shares of Common Stock outstanding on the record date for the distribution to which this Section 10.07 is being applied.

N = the number of additional shares of Common Stock offered pursuant to the distribution.

P = the offering price per share of the additional shares.

M = the Average Closing Price, minus, in the case of (i) a distribution to which Section 10.06(4) applies or (ii) a distribution to which Section 10.08 applies, for which, in each

48

case, (x) the record date shall occur on or before the record date for the distribution to which this Section 10.07 applies and (y) the Ex-Dividend Time shall occur on or after the date of the first public announcement for the distribution to which this Section 10.07 applies, the fair market value (on the record date for the distribution to which this Section 10.07 applies) of the

(1)      Capital Stock of the Company distributed in respect of each share of Common Stock in such Section 10.06(4) distribution and

(2)      assets of the Company or debt securities or any rights, warrants or options to purchase securities of the Company distributed in respect of each share of Common Stock in such Section 10.08 distribution.

The Board of Directors shall determine fair market values for the purposes of this Section 10.07.

In the event the Company makes a distribution pursuant to this Section 10.07 which has a per share value equal to more than 15% of the Closing Price of shares of Common Stock on the day preceding the declaration date for such distribution, the Company will be required to give notice to the holders of Securities at least 20 days prior to the Ex-Dividend Date, as defined below, for such distribution.

The adjustment shall become effective immediately after the record date for the determination of shareholders entitled to receive the rights, warrants or options to which this Section 10.07 applies. If all of the shares of Common Stock subject to such rights, warrants or options have not been issued when such rights, warrants or options expire, then the Conversion Rate shall promptly be readjusted to the Conversion Rate that would then be in effect had the adjustment upon the issuance of such rights, warrants or options been made on the basis of the actual number of shares of Common Stock issued upon the exercise of such rights, warrants or options.

No adjustment shall be made under this Section 10.07 if the application of the formula stated above in this Section 10.07 would result in a value of R' that is equal to or less than the value of R.

SECTION 10.08      Adjustment for Other Distributions.

(a)      If, after the Issue Date of the Securities, the Company distributes to all holders of its Common Stock any of its assets (including shares of any Subsidiary or business unit of the Company but excluding distributions of Capital Stock or equity interests referred to in Section 10.08(b)), or debt securities or any rights, warrants or options to purchase securities of the Company (including securities or cash, but excluding (x) distributions of Capital Stock referred to in Section 10.06 and distributions of rights, warrants or options referred to in Section 10.07 and (y) cash dividends or other cash distributions referred to in Section 10.09, the Conversion Rate shall be adjusted, subject to the provisions of Section 10.08(c), in accordance with the formula:

$$R' = \frac{R \times M}{M - F}$$

49

where:

R' = the adjusted Conversion Rate.

R = the current Conversion Rate.

M = the Average Closing Price, minus, in the case of a distribution to which Section 10.06(4) applies, for which (i) the record date shall occur on or before the record date for the distribution to which this Section 10.08(a) applies and (ii) the Ex-Dividend Time shall occur on or after the date of the Time of Determination for the distribution to which this Section 10.08(a) applies, the fair market value (on the record date for the distribution to which this Section 10.08(a) applies) of any Capital Stock of the Company distributed in respect of each share of Common Stock in such Section 10.06(4) distribution.

F = the fair market value (on the record date for the distribution to which this Section 10.08(a) applies) of the assets, securities, rights, warrants or options to be distributed in respect of each share of Common Stock in the distribution to which this Section 10.08(a) is being applied (including, in the case of cash dividends or other cash distributions giving rise to an adjustment, all such cash distributed concurrently).

The Board of Directors shall determine fair market values for the purposes of this Section 10.08(a).

The adjustment shall become effective immediately after the record date for the determination of shareholders entitled to receive the distribution to which this Section 10.08(a) applies.

(b)        If, after the Issue Date of the Securities, the Company pays a dividend or makes a distribution to all holders of its Common Stock consisting of Capital Stock of any class or series, or similar equity interests, of or relating to a Subsidiary or other business unit of the Company, then the Conversion Rate shall be adjusted in accordance with the formula:

$$R' = R \times (1 + F/M)$$

R' = the adjusted Conversion Rate.

R = the current Conversion Rate.

M = the average of the Post-Distribution Prices of the Common Stock for the 10 Trading Days commencing on and including the fifth Trading Day after the date on which "ex-dividend trading" commences for such dividend or distribution on the principal United States exchange or market which such securities are then listed or quoted (the " Ex-Dividend Date ").

F = the fair market value of the securities distributed in respect of each share of Common Stock for which this Section 10.08(b) shall mean the number of securities distributed in respect of each share of Common Stock multiplied by the average of the Post-Distribution Prices

50

of those securities distributed for the 10 Trading Days commencing on and including the fifth Trading Day after the Ex-Dividend Date.

"Post-Distribution Price" of Capital Stock or any similar equity interest on any date means the closing per unit sale price (or, if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on such date for trading of such units on a "when issued" basis without due bills (or similar concept) as reported in the composite transactions for the principal United States securities exchange on which such Capital Stock or equity interest is traded or, if the Capital Stock or equity interest, as the case may be, is not listed on a United States national or regional securities exchange, as reported by the National Association of Securities Dealers Automated Quotation System or by the National Quotation Bureau Incorporated; provided that if on any date such units have not traded on a "when issued" basis, the Post-Distribution Price shall be the closing per unit sale price (or, if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on such date for trading of such units on a "regular way" basis without due bills (or similar concept) as reported in the composite transactions for the principal United States securities exchange on which such Capital Stock or equity interest is traded or, if the Capital Stock or equity interest, as the case may be, is not listed on a United States national or regional securities exchange, as reported by the National Association of Securities Dealers Automated Quotation System or by the National Quotation Bureau Incorporated. In the absence of such quotation, the Company shall be entitled to determine the Post-Distribution Price on the basis of such quotations which reflect the post-distribution value of the Capital Stock or equity interests as it considers appropriate.

(c)    In the event that, with respect to any distribution to which Section 10.08(a) would otherwise apply, the difference "M-F" as defined in the formula set forth in Section 10.08(a) is less than $1.00 or "F" is equal to or greater than "M", then the adjustment provided by Section 10.08(a) shall not be made and in lieu thereof the provisions of Section 10.16 shall apply to such distribution.

(d)    In the event the Company makes a distribution pursuant to this Section 10.08 which has a per share value equal to more than 15% of the Closing Price of shares of Common Stock on the day preceding the declaration date for such distribution, the Company will be required to give notice to the holders of Securities at least 20 days prior to the Ex-Dividend Date, as defined below, for such distribution.

SECTION 10.09    Adjustment for Cash Dividends.

(a)    If, after the Issue Date of the Securities, the Company distributes to all or substantially all holders of its Common Stock any cash (excluding any dividend or distribution in connection with the liquidation, dissolution or winding up of the Company, whether voluntary or involuntary), the Conversion Rate shall be adjusted, subject to the provisions of Section 10.09(b) in accordance with the formula:

$$R' = R \times \frac{M}{(M - C)}$$

51

where,

R' = the adjusted Conversion Rate;

R = the Conversion Rate in effect immediately prior to the Time of Determination;

M = the average of the Closing Prices of the Common Stock for the five consecutive Trading Days prior to the Trading Day immediately preceding the Time of Determination; and

C = the amount in cash per share the Company distributes to holders of the Common Stock (and for which no adjustment has been made).

SECTION 10.10    Adjustment for Tender Offer.

If, after the Issue Date, the Company makes a payment of cash or other consideration to holders of Common Stock in respect of a tender offer or exchange offer, other than an odd-lot offer, for the Common Stock, and the value of the sum of (i) the aggregate cash and other consideration paid for such Common Stock, and (ii) the aggregate fair market value of any consideration paid for the purchase of Common Stock in respect of a tender offer or exchange offer, other than an odd-lot offer, within the twelve (12) months preceding the date of purchase of such shares of Common Stock in respect of which no adjustment pursuant to this Section 10.10 previously has been made, expressed as an amount per share of Common Stock validly tendered or exchanged pursuant to such tender offer or exchange offer, exceeds the Closing Price of the Common Stock on the Trading Day immediately following the last time (the " Expiration Time ") on which tenders or exchanges may be made pursuant to the tender or exchange offer, then the Conversion Rate shall be adjusted in accordance with the formula:

$$R' = R \times \frac{F + (P \times O)}{O' \times P}$$

where,

R  = the Conversion Rate in effect on the Expiration Time;

R'  = the Conversion Rate in effect immediately after the Expiration Time;

F  = the fair market value (as determined by the Board of Directors) of the aggregate value of all cash and any other consideration paid or payable for shares of Common Stock validly tendered or exchanged and not withdrawn as of the Expiration Time (the " Purchased Shares ");

O  = the number of shares of Common Stock outstanding immediately after the Expiration Time less any Purchased Shares;

52

O' =  the number of shares of Common Stock outstanding immediately after the Expiration Time, including any Purchased Shares; and

P =  the Closing Price of the Common Stock on the Trading Day next succeeding the Expiration Time.

Such increase (if any) shall become effective immediately prior to the opening of business on the day following the Expiration Time. In the event that the Company is obligated to purchase shares pursuant to any such tender offer, but the Company is prevented by applicable law from effecting any such purchases or all such purchases are rescinded, the Conversion Rate shall again be adjusted to be the Conversion Rate that would then be in effect if such tender or exchange offer had not been made. If the application of this Section 10.10 to any tender or exchange offer would result in a decrease in the Conversion Rate, no adjustment shall be made for such tender or exchange offer under this Section 10.10.

SECTION 10.11    Adjustment to Conversion Rate Upon Change in Control Transactions.

If, after the Issue Date, a Change in Control occurs and a Holder elects to convert its Securities in connection with such Change in Control, the Company will increase the Applicable Conversion Rate for the Securities surrendered by conversion by a number of additional shares of Common Stock (the " Make-Whole Shares "), as described in this Section 10.11. A conversion of Securities will be deemed for the purposes of this Section 10.11 to be "in connection with" a Change in Control transaction if the notice of conversion of the Securities is received by the Conversion Agent from and including the date that is ten Trading Days prior to the anticipated effective date of the Change in Control, up to and including the Trading Day prior to the related purchase date.

The number of Make-Whole Shares will be determined by reference to the table below and is based on the date which such Change in Control transaction becomes effective (the " Change in Control Effective Date ") and the price (the " Stock Price ") paid per share of Common Stock in such Change in Control transaction. If the holders of Common Stock receive only cash in the Change in Control transaction, the Stock Price shall be the cash amount paid per share of Common Stock. Otherwise, the Stock Price shall be the average of the closing sale prices of the Common Stock on the ten consecutive Trading Days up to but excluding the Change in Control Effective Date.

The Stock Prices set forth in the first column of the table below will be adjusted as of any date on which the Conversion Rate is adjusted. The adjusted Stock Prices will equal the Stock Prices applicable immediately prior to such adjustment, multiplied by a fraction, the numerator of which is the Applicable Conversion Rate immediately prior to the adjustment giving rise to the Stock Price adjustment and the denominator of which is the Applicable Conversion Rate as so adjusted.

53

| Stock Price on Effective Date | Effective Date | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | February 17, 2006 | February 1, 2007 | February 1, 2008 | February 1, 2009 | February 1, 2010 | February 1, 2011 | February 1, 2012 | February 1, 2013 |
| $ 71.93 | 1.3210 | 1.3210 | 1.3210 | 1.3210 | 1.3210 | 1.3210 | 1.3210 | 1.3210 |
| $ 75.00 | 1.1568 | 1.1837 | 1.2126 | 1.2288 | 1.2285 | 1.1969 | 1.0933 | 0.7519 |
| $ 80.00 | 0.9384 | 0.9448 | 0.9445 | 0.9392 | 0.9133 | 0.8494 | 0.6997 | 0.0000 |
| $ 85.00 | 0.7681 | 0.7630 | 0.7451 | 0.7194 | 0.6780 | 0.5985 | 0.4358 | 0.0000 |
| $ 90.00 | 0.6347 | 0.6221 | 0.5955 | 0.5612 | 0.5029 | 0.4192 | 0.2652 | 0.0000 |
| $ 95.00 | 0.5296 | 0.5120 | 0.4803 | 0.4418 | 0.3789 | 0.2919 | 0.1578 | 0.0000 |
| $ 100.00 | 0.4459 | 0.4255 | 0.3911 | 0.3513 | 0.2895 | 0.2086 | 0.0935 | 0.0000 |
| $ 105.00 | 0.3791 | 0.3573 | 0.3220 | 0.2827 | 0.2240 | 0.1520 | 0.0589 | 0.0000 |
| $ 110.00 | 0.3248 | 0.3030 | 0.2678 | 0.2302 | 0.1757 | 0.1128 | 0.0404 | 0.0000 |
| $ 115.00 | 0.2811 | 0.2586 | 0.2252 | 0.1893 | 0.1398 | 0.0855 | 0.0314 | 0.0000 |
| $ 120.00 | 0.2456 | 0.2236 | 0.1914 | 0.1579 | 0.1129 | 0.0688 | 0.0301 | 0.0000 |
| $ 125.00 | 0.2163 | 0.1951 | 0.1634 | 0.1341 | 0.0972 | 0.0574 | 0.0290 | 0.0000 |
| $ 130.00 | 0.1933 | 0.1747 | 0.1471 | 0.1162 | 0.0840 | 0.0548 | 0.0279 | 0.0000 |
| $ 135.00 | 0.1772 | 0.1580 | 0.1317 | 0.1028 | 0.0773 | 0.0527 | 0.0268 | 0.0000 |
| $ 140.00 | 0.1622 | 0.1444 | 0.1190 | 0.0963 | 0.0744 | 0.0508 | 0.0259 | 0.0000 |
| $ 145.00 | 0.1460 | 0.1319 | 0.1119 | 0.0940 | 0.0718 | 0.0490 | 0.0249 | 0.0000 |
| $ 150.00 | 0.1416 | 0.1251 | 0.1084 | 0.0909 | 0.0693 | 0.0474 | 0.0239 | 0.0000 |
| $ 155.00 | 0.1374 | 0.1203 | 0.1058 | 0.0861 | 0.0672 | 0.0455 | 0.0227 | 0.0000 |
| $ 160.00 | 0.1335 | 0.1167 | 0.0983 | 0.0833 | 0.0647 | 0.0440 | 0.0222 | 0.0000 |
| $ 165.00 | 0.1301 | 0.1140 | 0.0962 | 0.0804 | 0.0627 | 0.0426 | 0.0211 | 0.0000 |
| $ 170.00 | 0.1276 | 0.1109 | 0.0938 | 0.0780 | 0.0608 | 0.0412 | 0.0202 | 0.0000 |
| $ 175.00 | 0.1244 | 0.1083 | 0.0915 | 0.0758 | 0.0590 | 0.0399 | 0.0198 | 0.0000 |
| $ 180.00 | 0.1213 | 0.1067 | 0.0893 | 0.0735 | 0.0574 | 0.0388 | 0.0189 | 0.0000 |
| $ 185.00 | 0.1183 | 0.1039 | 0.0885 | 0.0716 | 0.0557 | 0.0376 | 0.0185 | 0.0000 |
| $ 190.00 | 0.1153 | 0.1016 | 0.0867 | 0.0699 | 0.0543 | 0.0367 | 0.0179 | 0.0000 |
| $ 195.00 | 0.1129 | 0.0996 | 0.0842 | 0.0678 | 0.0531 | 0.0356 | 0.0173 | 0.0000 |
| $ 200.00 | 0.1095 | 0.0971 | 0.0823 | 0.0663 | 0.0517 | 0.0346 | 0.0167 | 0.0000 |

If the exact Stock Prices and effective dates are not set forth in the table, then: (i) if the Stock Price is between two Stock Price amounts in the table or the effective date is between two dates in the table, the Make-Whole Shares issued upon conversion of the Securities will be determined by a straight-line interpolation between the number of Make-Whole Shares set forth for the higher and lower Stock Price amounts and the two dates in the table, based on a 365-day year, (ii) if the Stock Price exceeds $200.00 per share, subject to adjustment as set forth herein, no Make-Whole Shares will be issued upon conversion of the Securities; and (iii) if the Stock Price is less than $71.93 per share, subject to adjustment as set forth herein, no Make-Whole Shares will be issued upon conversion of the Securities.

SECTION 10.12    Adjustment to Conversion Rate After a Public Acquirer Change in Control.

Notwithstanding the provisions of Section 10.11, if, following the Issue Date, a Change in Control constituting a Public Acquirer Change in Control (as defined below) occurs, the Company may, in lieu of issuing additional shares of Common Stock upon conversion, elect to adjust the Conversion Rate and the related conversion obligation such that from and after the effective date of such Public Acquirer Change in Control (the " Public Acquirer Change in Control Effective Date "), Holders shall be entitled to convert their Securities into a number of shares of Public Acquirer Common Stock (as defined below), still subject to the arrangements for payment upon conversion otherwise applicable pursuant to this Article 10, by adjusting the Conversion Rate in effect immediately before the Public Acquirer Change in Control by a fraction (i) the numerator of which will be (a) in the case of a share exchange, consideration,

54

merger or binding share exchange pursuant to which the Common Stock is converted into cash, securities, or other property, the average value of all cash and any other consideration (as determined by the Board of Directors of the Company) paid or payable per share of Common Stock or (b) in the case of any other Public Acquirer Change in Control, the average of the last reported sale prices of our Common Stock for the five consecutive Trading Days prior to but excluding the Public Acquirer Change in Control Effective Date; and (ii) the denominator of which will be the average of the last reported sales prices of the Public Acquirer Common Stock for the five consecutive Trading Days commencing on the Trading Day next succeeding the Public Acquirer Change in Control Effective Date.

A "Public Acquirer Change in Control" means a Change in Control in which the acquirer has a class of common stock traded on a U.S. national securities exchange or quoted on The Nasdaq National Market or which will be so traded or quoted when issued or exchanged in connection with such change in control (the " Public Acquirer Common Stock "). If an acquirer does not itself have a class of common stock satisfying the foregoing requirement, it will be deemed to have "public acquirer common stock" if a corporation that directly or indirectly owns at least a majority of the acquirer has a class of common stock satisfying the foregoing requirement, in such case, all references to public acquirer common stock shall refer to such class of common stock. Majority owned for these purposes means having "beneficial ownership" (as defined in Rule 13d-3 under the Exchange Act of more than 50% of the total voting power of all shares of the respective entity's capital stock that are entitled to vote generally in the election of directors.

Upon a Public Acquirer Change in Control, at the election of the Company, Holders may convert their Securities at the adjusted Conversion Rate described in the second preceding paragraph in this Section 10.12 but shall not be entitled to receive additional shares upon conversion as described herein. The Company shall be required to notify Holders of its election in its notice to holders of such Public Acquirer Change in Control pursuant to Section 3.01.

SECTION 10.13    When Adjustment May Be Deferred.

No adjustment in the Conversion Rate need be made unless the adjustment would require an increase or decrease of at least 1% of the Conversion Rate. Any adjustments that are less than 1% of the Conversion Rate shall be carried forward and taken into account in determining any subsequent adjustment. In addition, the Company shall make and pay any carry forward adjustments not otherwise effected on each anniversary of the Issue Date, upon conversion of any Note, upon required purchase of the notes pursuant to Section 3.01, and five business days prior to the Stated Maturity.

Notwithstanding the provisions of this Article 10, in no event will the Conversion Rate exceed 13.9024 shares per $1,000 Principal Amount of the Securities, as adjusted, other than on account of Sections 10.6, 10.7, 10.8, 10.9, 10.11, and 10.12.

All calculations under this Article 10 shall be made to the nearest cent or to the nearest 1/1,000th of a share, as the case may be (with one-half cent and 5/10,000ths of a share being rounded upward).

55

SECTION 10.14    When No Adjustment Required.

No adjustment need be made for a transaction referred to in Section 10.06, 10.07, 10.08, 10.09, 10.10 or 10.17 if Securityholders are to participate in the transaction on a basis and with notice that the Board of Directors determines to be fair and appropriate in light of the basis and notice on which holders of Common Stock participate in the transaction. Such participation by Securityholders may include participation upon conversion provided that an adjustment shall be made at such time as the Securityholders are no longer entitled to participate.

No adjustment need be made for rights to purchase Common Stock pursuant to a Company plan for reinvestment of dividends or interest.

No adjustment need be made for a change in the par value or no par value of the Common Stock.

To the extent the Securities become convertible pursuant to this Article 10 into cash, no adjustment need be made thereafter as to the cash. Interest will not accrue on the cash.

SECTION 10.15    Notice of Adjustment.

Whenever the Conversion Rate is adjusted, the Company shall promptly mail to Securityholders a notice of the adjustment. The Company shall file with the Trustee and the Conversion Agent such notice and a certificate from the Company's independent public accountants briefly stating the facts requiring the adjustment and the manner of computing it. The certificate shall be conclusive evidence that the adjustment is correct. Neither the Trustee nor any Conversion Agent shall be under any duty or responsibility with respect to any such certificate except to exhibit the same to any Holder desiring inspection thereof.

SECTION 10.16    Notice of Certain Transactions.

If:

(1)    the Company takes any action that would require an adjustment in the Conversion Rate pursuant to Section 10.06, 10.07, 10.08, 10.09, 10.10 or 10.11 (unless no adjustment is to occur pursuant to Section 10.14); or

(2)    the Company takes any action that would require a supplemental indenture pursuant to Section 10.17; or

(3)    there is a liquidation or dissolution of the Company;

then the Company shall mail to Securityholders and file with the Trustee and the Conversion Agent a notice stating the proposed record date for a dividend or distribution or the proposed effective date of a subdivision, combination, reclassification, consolidation, merger, binding share exchange, transfer, liquidation or dissolution. The Company shall file and mail the notice at least 15 days before such date. Failure to file or mail the notice or any defect in it shall not affect the validity of the transaction.

SECTION 10.17    <u>Reorganization of Company; Special Distributions</u>.

If the Company is a party to a transaction subject to Section 5.01 (other than a sale of all or substantially all of the assets of the Company in a transaction in which the holders of Common Stock immediately prior to such transaction do not receive securities, cash or other assets of the Company or any other person) or a merger or binding share exchange which reclassifies or changes the outstanding Common Stock of the Company, the person obligated to deliver securities, cash or other assets upon conversion of Securities shall enter into a supplemental indenture. If the issuer of securities deliverable upon conversion of Securities is an Affiliate of the successor Company, that issuer shall join in the supplemental indenture.

The supplemental indenture shall provide that after the effective time of the transaction, settlement of the Net Share Amount will be based on the kind and amount of cash, securities or other assets of the Company or another Person that a holder of Common Stock received in such transaction (or, if such transaction provides for the holders of Common Stock the right to receive more than a single type of consideration determined based in part upon any form of stockholder election, the weighted average of the types and amounts of consideration received by the holders of Common Stock); provided that, for the avoidance of doubt, the Conversion Value will be paid in cash and at the Company's election, cash, Common Stock or a combination of cash and Common Stock in accordance with the terms of this Article 10. The supplemental indenture shall provide for adjustments which shall be as nearly equivalent as may be practical to the adjustments provided for in this Article 10. The successor Company shall mail to Securityholders a notice briefly describing the supplemental indenture.

If this Section applies, neither Section 10.06 nor 10.07 applies. If the Company makes a distribution to all holders of its Common Stock of any of its assets, or debt securities or any rights, warrants or options to purchase securities of the Company that, but for the provisions of Section 10.08(c), would otherwise result in an adjustment in the Conversion Rate pursuant to the provisions of Section 10.08, then, from and after the record date for determining the holders of Common Stock entitled to receive the distribution, a Holder of a Security that converts such Security in accordance with the provisions of this Indenture shall upon such conversion be entitled to receive, in addition to the shares of Common Stock into which the Security is convertible, the kind and amount of securities, cash or other assets comprising the distribution that such Holder would have received if such Holder had converted the Security immediately prior to the record date for determining the holders of Common Stock entitled to receive the distribution.

SECTION 10.18    <u>Company Determination Final</u>.

Any determination that the Company or the Board of Directors must make pursuant to Section 10.03, 10.06, 10.07, 10.08, 10.09, 10.10, 10.13, 10.14, 10.17 or 10.20 is conclusive.

SECTION 10.19    <u>Trustee's Adjustment Disclaimer</u>.

The Trustee has no duty to determine when an adjustment under this Article 10 should be made, how it should be made or what it should be. The Trustee has no duty to

57

determine whether a supplemental indenture under Section 10.17 need be entered into or whether any provisions of any supplemental indenture are correct. The Trustee shall not be accountable for and makes no representation as to the validity or value of any securities or assets issued upon conversion of Securities. The Trustee shall not be responsible for the Company's failure to comply with this Article 10. Each Conversion Agent shall have the same protection under this Section 10.19 as the Trustee.

SECTION 10.20    <u>Simultaneous Adjustments</u>.

In the event that this Article 10 requires adjustments to the Conversion Rate under more than one of Sections 10.06(4), 10.07, 10.08 or 10.09, and the record dates for the distributions giving rise to such adjustments shall occur on the same date, then such adjustments shall be made by applying, first, the provisions of Section 10.06, second, the provisions of Section 10.08, third, the provisions of Section 10.09 and, fourth, the provisions of 10.07.

SECTION 10.21    <u>Successive Adjustments</u>.

After an adjustment to the Conversion Rate under this Article 10, any subsequent event requiring an adjustment under this Article 10 shall cause an adjustment to the Conversion Rate as so adjusted.

SECTION 10.22    <u>Rights Issued in Respect of Common Stock Issued Upon Conversion</u>.

Each share of Common Stock issued upon conversion of Securities pursuant to this Article 10 shall be entitled to receive the appropriate number of rights (" <u>Rights</u> "), if any, and the certificates representing the Common Stock issued upon such conversion shall bear such legends, if any, in each case as may be provided by the terms of the Company's Amended and Restated Rights Agreement, dated as of December 12, 2000, between the Company and American Stock Transfer & Trust Company, as Rights Agent, or any successor shareholder rights agreement adopted by the Company, as the same may be amended form time to time (in each case, a " <u>Shareholders Rights Plan</u> "). Provided that such Shareholders Rights Plan requires that each share of Common Stock issued upon conversion of Securities (or cash in lieu thereof) at any time prior to the distribution of separate certificates representing the Rights be entitled to receive such Rights, then, notwithstanding anything else to the contrary in this Article 10, there shall not be any adjustment to the conversion privilege or Conversion Rate as a result of the issuance of Rights, the distribution of separate certificates representing the Rights, the exercise or redemption of such Rights in accordance with any Shareholders Rights Plan, or the termination or invalidation of such Rights.

SECTION 10.23    <u>Withholding Taxes for Adjustments in Conversion Rate</u>.

If the Company pays withholding taxes on behalf of a Holder as a result of an adjustment to the Conversion Rate, the Company may, at its option, set off such payments against payments of cash and Common Stock on the Securities.

# ARTICLE 11

# PAYMENT OF INTEREST

SECTION 11.01    Interest Payments.

Interest on any Security that is payable, and is punctually paid or duly provided for, on any applicable Interest Payment Date shall be paid to the person in whose name that Security is registered at the Close of Business on the Regular Record Date or accrual date, as the case may be, for such interest at the office or agency of the Company maintained for such purpose. Each installment of interest payable in cash on any Security shall be paid in same-day funds by transfer to an account maintained by the payee located inside the United States, if the Trustee shall have received proper wire transfer instructions from such payee not later than the related Regular Record Date or accrual date, as the case may be, or, if no such instructions have been received by check drawn on a bank in the City of New York mailed to the payee at its address set forth on the Registrar's books. In the case of a permanent Global Security, interest payable on any applicable payment date will be paid to the Depositary, with respect to that portion of such permanent Global Security held for its account by Cede & Co. for the purpose of permitting such party to credit the interest received by it in respect of such permanent Global Security to the accounts of the beneficial owners thereof.

SECTION 11.02    Defaulted Interest.

Except as otherwise specified with respect to the Securities, any interest on any Security that is payable, but is not punctually paid or duly provided for, within 30 days following any applicable payment date (herein called " Defaulted Interest ", which term shall include any accrued and unpaid interest that has accrued on such defaulted amount in accordance with paragraph 1 of the Securities), shall forthwith cease to be payable to the registered Holder thereof on the relevant Regular Record Date or accrual date, as the case may be, by virtue of having been such Holder, and such Defaulted Interest may be paid by the Company, at its election in each case, as provided in clause (1) or (2) below. All such Defaulted Interest shall be payable on the next Interest Payment Date.

(1)        The Company may elect to make payment of any Defaulted Interest to the persons in whose names the Securities are registered at the Close of Business on a Special Record Date for the payment of such Defaulted Interest, which shall be fixed in the following manner. The Company shall notify the Trustee in writing of the amount of Defaulted Interest proposed to be paid on each Security and the date of the proposed payment (which shall not be less than 20 days after such notice is received by the Trustee), and at the same time the Company shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Trustee for such deposit on or prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the persons entitled to such Defaulted Interest as in this clause provided. Thereupon the Trustee shall fix a special record date for the payment of such Defaulted Interest which shall be not more than 15 days and not less than 10 days prior to the date of the proposed payment and not less than 10 days after the receipt by the Trustee of the notice of the proposed payment (the " Special Record Date "). The Trustee shall promptly notify

59

the Company of such Special Record Date and, in the name and at the expense of the Company, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be mailed, first-class postage prepaid, to each Holder of Securities at his address as it appears on the list of Securityholders maintained pursuant to Section 2.05 not less than 10 days prior to such Special Record Date. Notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor having been mailed as aforesaid, such Defaulted Interest shall be paid to the persons in whose names the Securities are registered at the Close of Business on such Special Record Date and shall no longer be payable pursuant to the following clause (2).

(2)        The Company may make payment of any Defaulted Interest on the Securities in any other lawful manner not inconsistent with the requirements of any securities exchange on which such Securities may be listed, and upon such notice as may be required by such exchange, if, after notice given by the Company to the Trustee of the proposed payment pursuant to this clause, such manner of payment shall be deemed practicable by the Trustee.

SECTION 11.03    Interest Rights Preserved.

Subject to the foregoing provisions of this Article 11 and Section 2.06, each Security delivered under this Indenture upon registration of transfer of or in exchange for or in lieu of any other Security shall carry the rights to interest accrued and unpaid, and to accrue, which were carried by such other Security.

## ARTICLE 12

## MISCELLANEOUS

SECTION 12.01    Trust Indenture Act Controls.

If any provision of this Indenture limits, qualifies, or conflicts with another provision which is required to be included in this Indenture by the TIA, the required provision shall control.

SECTION 12.02    Notices; Address of Agency.

(a)  Other than as set forth in Section 10.01, any request, demand, authorization, notice, waiver, consent or communication shall be in writing and delivered in person or mailed by first-class mail, postage prepaid, addressed as follows or transmitted by facsimile transmission (confirmed by guaranteed overnight courier) to the following facsimile numbers:

60

if to the Company:

>Amgen Inc.
>One Amgen Center Drive
>Thousand Oaks, CA 91320-1799
>Telephone No.: (805) 447-1000
>Facsimile No.: (805) 449-2863
>Attention:  Treasurer

with a copy to:

>Latham & Watkins LLP
>633 West Fifth Street
>Suite 4000
>Los Angeles, CA  90071
>Telephone No.: (213) 485-1234
>Facsimile No.: (213) 891-8763
>Attention:  Gregory Rodgers, Esq.

if to the Trustee:

>JPMorgan Chase Bank, N.A.
>4 New York Plaza, 15th Floor
>New York, NY 10004
>Telephone No.: (212) 623-5233
>Facsimile No.: (212) 623-6215
>Attention:  Carol Ng, Vice President

with a copy to:

>Pryor Cashman Sherman & Flynn LLP
>410 Park Avenue
>New York, NY 10022
>Telephone No.: (212) 326-0820
>Facsimile No.: (212) 798-6909
>Attention: Michael Fruchter, Esq.

The Company or the Trustee by notice given to the other in the manner provided above may designate additional or different addresses for subsequent notices or communications.

Any notice or communication given to a Securityholder shall be mailed to the Securityholder, by first-class mail, postage prepaid, at the Securityholder's address as it appears on the registration books of the Registrar and shall be sufficiently given if so mailed within the time prescribed.

Failure to mail a notice or communication to a Securityholder or any defect in it shall not affect its sufficiency with respect to other Securityholders. If a notice or communication

is mailed in the manner provided above, it is duly given, whether or not received by the addressee.

If the Company mails a notice or communication to the Securityholders, it shall mail a copy to the Trustee and each Registrar, Paying Agent, Conversion Agent or co-registrar.

(b)  Any request, demand, authorization, notice, waiver, consent or communication to be provided in connection with Section 10.12 shall be in writing and delivered in person or transmitted by facsimile transmission (confirmed by guaranteed overnight courier) to the following facsimile numbers or via e-mail to the account or accounts specified by the Company by written notice to the Trustee:

if to the Company:

> Amgen Inc.
> One Amgen Center Drive
> Thousand Oaks, CA 91320-1799
> Telephone No.: (805) 447-1000
> Facsimile No.: (805) 449-2863
> Attention:  Treasurer

with a copy to:

> Latham & Watkins LLP
> 633 West Fifth Street
> Suite 4000
> Los Angeles, CA  90071
> Telephone No.: (213) 485-1234
> Facsimile No.: (213) 891-8763
> Attention:  Gregory Rodgers, Esq.

with a copy to:

> Merrill Lynch International
> Merrill Lynch Financial Centre
> 2 King Edward Street
> London EC1A 1HQ
> Telephone No.:     44 207 995 3769
> Facsimile No.:     44 207 995 2004
> Attention:     Manager, Fixed Income Settlements

and

> Morgan Stanley & Co. International Limited
> c/o Morgan Stanley Bank
> One New York Plaza, 4th Floor
> New York, NY  10004

Attention:       Fred Gonfiantini
Facsimile No.:      (212) 507-0724
Telephone No.:(212) 276-2427

Any notice party set forth in this Section 12.02(b) by notice given to the others in the manner provided above may designate additional or different addresses for subsequent notices or communications, including email addresses.

SECTION 12.03    Communication by Holders with Other Holders.

Securityholders may communicate pursuant to TIA Section 312(b) with other Securityholders with respect to their rights under this Indenture or the Securities. The Company, the Trustee, the Registrar, the Paying Agent, the Conversion Agent and anyone else shall have the protection of TIA Section 312(c).

SECTION 12.04    Certificate and Opinion as to Conditions Precedent.

Upon any request or application by the Company to the Trustee to take any action under this Indenture, the Company shall furnish to the Trustee:

(1)       an Officers' Certificate stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(2)       an Opinion of Counsel stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

SECTION 12.05    Statements Required in Certificate or Opinion.

Unless the Trustee agrees, in its sole discretion, to accept a different form or format, each Officers' Certificate or Opinion of Counsel with respect to compliance with a covenant or condition provided for in this Indenture shall include:

(1)       a statement that each person making such Officers' Certificate or Opinion of Counsel has read such covenant or condition;

(2)       a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such Officers' Certificate or Opinion of Counsel are based;

(3)       a statement that, in the opinion of each such person, he has made such examination or investigation as is necessary to enable such person to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4)       a statement that, in the opinion of such person, such covenant or condition has been complied with.

SECTION 12.06   Separability Clause.

In case any provision in this Indenture or in the Securities shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

SECTION 12.07   Rules by Trustee, Paying Agent, Conversion Agent and Registrar.

The Trustee may make reasonable rules for action by or a meeting of Securityholders. The Registrar, Conversion Agent and the Paying Agent may make reasonable rules for their functions.

SECTION 12.08   Calculations.

The calculation of the Conversion Value, Conversion Date, Volume Weighted Average Price, Conversion Reference Period, Change in Control Purchase Price, Conversion Rate, Closing Price of the Common Stock, Required Cash Amount, Trading Price, the number of shares, if any, to be issued upon conversion and each other calculation to be made hereunder shall be the obligation of the Company. All calculations made by the Company as contemplated pursuant to this Section 12.08 shall be in good faith and final and binding on the Company and the Holders absent manifest error. The Company will provide a schedule of the calculations to the Trustee and the Trustee is entitled to rely upon the accuracy of the calculations without independent verification.

SECTION 12.09   Legal Holidays.

A "Legal Holiday" is any day other than a Business Day. If any specified date (including a date for giving notice) is a Legal Holiday, the action shall be taken on the next succeeding day that is not a Legal Holiday, and, if the action to be taken on such date is a payment in respect of the Securities, interest shall accrue for the intervening period.

SECTION 12.10   Governing Law.

THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN THIS INDENTURE AND THE SECURITIES.

SECTION 12.11   No Recourse Against Others.

A director, officer, employee or stockholder, as such, of the Company shall not have any liability for any obligations of the Company under the Securities or this Indenture or for any claim based on, in respect of or by reason of such obligations or their creation. By accepting a Security, each Securityholder shall waive and release all such liability. The waiver and release shall be part of the consideration for the issue of the Securities.

SECTION 12.12   <u>Successors</u>.


All agreements of the Company in this Indenture and the Securities shall bind its successor. All agreements of the Trustee in this Indenture shall bind its successor.

SECTION 12.13   <u>Multiple Originals</u>.


The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement. One signed copy is enough to prove this Indenture.

*(Signature Pages Follow)*

65

IN WITNESS WHEREOF, the undersigned, being duly authorized, have executed this Indenture on behalf of the respective parties hereto as of the date first above written.

AMGEN INC.

By:  /s/ RICHARD D. NANULA
        Name:   Richard D. Nanula
        Title:    Executive Vice President and
                Chief Financial Officer

JPMORGAN CHASE BANK, N.A.,
   as Trustee

By   /s/ CAROL NG
        Name:   Carol Ng
        Title:    Vice President

66

## EXHIBIT A

### [FORM OF FACE OF SECURITY]

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.(1)

TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF THE DEPOSITORY TRUST COMPANY, OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN ARTICLE TWO OF THE INDENTURE REFERRED TO ON THE REVERSE HEREOF.(1)

THE NOTES AND THE SHARES OF COMMON STOCK ISSUABLE UPON CONVERSION OF THIS NOTE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE SECURITIES ACT), OR ANY STATE SECURITIES LAWS. NEITHER THIS NOTE, THE SHARES OF COMMON STOCK ISSUABLE UPON CONVERSION OF THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN OR THEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATION.(2)

BY ITS ACQUISITION HEREOF, THE HOLDER (1) AGREES TO OFFER, SELL OR OTHERWISE TRANSFER SUCH NOTE PRIOR TO THE DATE WHICH IS TWO YEARS AFTER THE LATER OF THE LAST ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE COMPANY OR ANY AFFILIATE OF THE COMPANY WAS THE OWNER OF THIS NOTE (OR ANY PREDECESSOR OF THIS NOTE) ONLY (A) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, (B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) TO A PERSON IT REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE

---

(1)       This paragraph should be included only if the Security is a Global Security.

(2)       This paragraph should be included only if the Security is a Restricted Security.

ON RULE 144A, (D) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE COMPANY'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSE (D) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATIONS AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM, AND IN EACH OF THE FOREGOING CASES, TO REQUIRE THAT A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THE OTHER SIDE OF THIS NOTE IS COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE TRUSTEE. THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE HOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE.(2)

---

(2)     This paragraph should be included only if the Security is a Restricted Security.

A-2

**AMGEN INC.**
**0.375% Convertible Senior Note due 2013**

No.                                                    CUSIP: 031162 AP 5
Issue Date:
Principal Amount:


         AMGEN INC., a Delaware Corporation, promises to pay to Cede & Co. or registered assigns, the Principal Amount
of        on February 1, 2013.


         This Security shall bear cash interest at the rate of 0.375% per annum. This Security is convertible as specified on the other side of this Security.


         Additional provisions of this Security are set forth on the other side of this Security.


                 AMGEN INC.

                 By: _____
                     Name:
                     Title:


TRUSTEE'S CERTIFICATE OF
AUTHENTICATION

JPMorgan Chase Bank, N.A.,
as Trustee, certifies that this
is one of the Securities referred
to in the within-mentioned Indenture.


By: _____
     Authorized Officer

**[FORM OF REVERSE SIDE OF NOTE]**
**0.375% Convertible Senior Note due 2013**

1.        Interest.

        This Security shall bear cash interest at the rate of 0.375% per annum. Interest on this Security shall accrue from the Issue Date, or from the most recent date to which interest has been paid or provided for. Interest shall be payable semiannually in arrears on February 1 and August 1 of each year, beginning on August 1, 2006, to the holders of record of Securities at the Close of Business on the January 15 or July 15 immediately preceding such Interest Payment Date. Each payment of cash interest on this Security shall include interest accrued for the period commencing on and including the immediately preceding Interest Payment Date (or, if none, the scheduled original Issue Date) through the day before the applicable Interest Payment Date or purchase date. Any payment required to be made on any day that is not a Business Day shall be made on the next succeeding Business Day. Interest shall be calculated using a 360-day year composed of twelve 30-day months. Interest shall cease to accrue on this Security upon its Stated Maturity, conversion or purchase by the Company at the option of the Holder upon a Change in Control in accordance with paragraph 5 hereof.

        If the Principal Amount hereof or any portion of such Principal Amount is not paid when due (whether upon acceleration pursuant to Section 6.02 of the Indenture, upon the date set for payment of the Change in Control Purchase Price pursuant to paragraph 5 hereof or upon the Stated Maturity of this Security) or if interest due hereon or any portion of such interest is not paid when due in accordance with paragraph 5 or 7 hereof, then in each such case the overdue amount shall, to the extent permitted by law, bear interest at the rate of 1.375% per annum, compounded semiannually, which interest shall accrue from the date such overdue amount was originally due to the date payment of such amount, including interest thereon, has been made or duly provided for. All such interest shall be payable on the next Interest Payment Date.

2.        Method of Payment.

        Subject to the terms and conditions of the Indenture, the Company will make payments in respect of Change in Control Purchase Prices and at Stated Maturity to Holders who surrender Securities to a Paying Agent to collect such payments in respect of the Securities. The Company will pay any cash amounts in money of the United States that at the time of payment is legal tender for payment of public and private debts. However, the Company may make such cash payments by check payable in such money.

3.        Paying Agent, Conversion Agent and Registrar.

        Initially, JPMorgan Chase Bank, N.A., a national banking association (the "Trustee"), will act as Paying Agent, Conversion Agent and Registrar. The Company may appoint and change any Paying Agent, Conversion Agent, Registrar or co-registrar without notice, other than notice to the Trustee. The Company or any of its Subsidiaries or any of their Affiliates may act as Paying Agent, Conversion Agent, Registrar or co-registrar. The Company

A-4

may maintain deposit accounts and conduct other banking transactions with the Trustee in the normal course of business.

4.        Indenture.

The Company issued the Securities under an Indenture dated as of February 17, 2006 (the "<u>Indenture</u>"), between the Company and the Trustee. The terms of the Securities include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as in effect from time to time (the "<u>TIA</u>"). Capitalized terms used herein and not defined herein have the meanings ascribed thereto in the Indenture. The Securities are subject to all such terms, and Securityholders are referred to the Indenture for a statement of those terms.

The Securities are senior unsecured obligations of the Company limited to $2,500,000,000 aggregate Principal Amount (subject to Section 2.07 of the Indenture). The Indenture does not limit other indebtedness of the Company, secured or unsecured.

5.        Purchase by the Company at the Option of the Holder upon a Change in Control.

At the option of the Holder and subject to the terms and conditions of the Indenture, the Company shall become obligated to purchase the Securities held by such Holder no later than 35 Business Days after the occurrence of a Change in Control of the Company for a Change in Control Purchase Price equal to the Principal Amount of the Securities to be purchased, plus accrued and unpaid interest to the Change in Control Purchase Date, which Change in Control Purchase Price shall be paid in cash.

In addition to the Change in Control Purchase Price payable with respect to all Securities or portions thereof to be purchased as of the Change in Control Purchase Date, the Holders of such Securities (or portions thereof) shall be entitled to receive accrued and unpaid interest with respect thereto, which shall be paid in cash on or prior to the third Business Day following the later of the Change in Control Purchase Date and the time of delivery of such Securities to the Paying Agent pursuant to the Indenture.

Holders have the right to withdraw any Change in Control Purchase Notice by delivering to the Paying Agent a written notice of withdrawal in accordance with the provisions of the Indenture.

If cash (and/or securities if permitted under the Indenture) sufficient to pay the Change in Control Purchase Price, of, together with any accrued and unpaid interest with respect to, all Securities or portions thereof to be purchased as of the Change in Control Purchase Date is deposited with the Paying Agent on or prior to the third Business Day following the Change in Control Purchase Date, interest shall cease to accrue on such Securities (or portions thereof) immediately after such Change in Control Purchase Date whether or not the Security is delivered to the Paying Agent, and the Holder thereof shall have no other rights as such (other than the right to receive the Change in Control Purchase Price and accrued and unpaid interest upon surrender of such Security).

6.        Conversion.

A Holder of a Security may convert such Security into cash and, at the option of the Company, shares of Common Stock of the Company before the Close of Business on February 1, 2013, if at least one of the following conditions is satisfied:

(a)        during any calendar quarter commencing at any time after June 30, 2006, and only during such calendar quarter, if, as of the last day of the preceding calendar quarter, the Closing Price of the Common Stock for at least 20 Trading Days in the period of 30 consecutive Trading Days ending on the last Trading Day of such preceding calendar quarter exceeds 130% of the Conversion Price per share on that 30th Trading Day on the last day of such preceding calendar quarter (the "Conversion Trigger Price"). The Conversion Agent will determine on the Company's behalf at the beginning of each calendar quarter commencing at any time after June 30, 2006 through the calendar quarter ending December 31, 2010, whether the Securities are convertible as a result of the price of the Common Stock and notify the Company and the Trustee;

(b)        the Company elects to distribute to all holders of Common Stock (i) rights or warrants entitling them to subscribe for or purchase, for a period expiring within 60 days after the record date for such distribution, Common Stock at less than the average of the Closing Prices of the Common Stock for the five consecutive Trading Days ending on the date immediately preceding the first public announcement of the distribution, or (ii) cash, debt securities (or other evidence of Indebtedness) or other assets (excluding dividends or distributions described in Sections 10.06(1), 10.06(2) and 10.06(3) of the Indenture, which distribution, together with all other distributions within the preceding twelve months, has a per share value exceeding 15% of the average of the Closing Prices of the Common Stock for the five consecutive Trading Days ending on the date immediately preceding the first public announcement of the distribution; or

(c)        in the event the Company is a party to a consolidation, merger, binding share exchange, transfer or lease of all or substantially all of the Company's assets, pursuant to which the Common Stock would be converted into cash, securities or other assets, at any time from or after the date which is 15 days prior to the anticipated effective time of the transaction until 35 days after the actual date of such transaction (or, if the transaction also constitutes a change in control, until the Change in Control Purchase Date). After the effective time of the transaction, settlement of the Conversion Value will be based on the kind and amount of cash, securities or other assets of the Company or another Person that a holder of Common Stock received in such transaction (or, if the transaction provides for the holders of Common Stock the right to receive more than a single type of consideration determined based in part upon any form of stockholder election, the weighted average of the types and amounts of consideration received by the holders of Common Stock); provided that, for the avoidance of doubt, the Conversion Value will be paid in cash and at the Company's election, cash, Common Stock or a combination of cash and Common Stock in accordance with the terms of the Indenture. The Company will notify Holders and the Trustee as promptly as practicable following the date the Company publicly announces such transaction (but in no event less than 15 days prior to the anticipated effective date of such transaction).

A-6

If the Company makes a distribution described in subsection (a) or (b), the Company must notify Holders at least 20 days prior to the Ex-Dividend Date for such distribution. Once the Company has given such notice, Holders may surrender their Securities for conversion at any time until the earlier of the Close of Business on the Business Day prior to the Ex-Dividend Date or the Company's announcement that such distribution will not take place, even if the Securities are not convertible at that time. No adjustment to the ability of Holders to convert will be made if Holders are entitled to participate in the distribution without conversion.

If the transaction also constitutes a "<u>Change in Control</u>," the Holder can require the Company to purchase all or a portion of its Securities described in paragraph 5.

A Security in respect of which a Holder has delivered a Change in Control Purchase Notice exercising the option of such Holder to require the Company to purchase such Security may be converted only if such notice of exercise is withdrawn in accordance with the terms of the Indenture.

The Initial Conversion Rate is 12.5814 shares of Common Stock per $1,000 Principal Amount, subject to adjustment in certain events described in the Indenture. The Company will deliver cash or a check in lieu of any fractional share of Common Stock.

Notwithstanding anything herein to the contrary, Securityholders may surrender the Securities for conversion at any time on or after January 1, 2013, until the Close of Business on the Business Day immediately preceding the Maturity Date.

Accrued and unpaid interest will not be paid in cash on Securities that are converted but will be paid in the manner provided in the following paragraph; provided, however, that Securities surrendered for conversion during the period, in the case of interest, from the Close of Business on any Regular Record Date next preceding any Interest Payment Date to the opening of business on such Interest Payment Date, shall be entitled to receive such semiannual interest payable on such Securities on the corresponding Interest Payment Date and Securities surrendered for conversion during such periods must be accompanied by payment of an amount equal to the interest with respect thereto that the registered Holder is to receive; provided that no such payment need be made (i) in connection with any conversion following the Regular Record Date immediately preceding the final Interest Payment Date; (ii) if the Company has specified a Change in Control Purchase Date that is after a Record Date and on or prior to the corresponding Interest Payment Date; or (iii) to the extent of Defaulted Interest, if any Defaulted Interest exists at the time of conversion with respect to such Security.

A Holder may convert a portion of a Security if the Principal Amount of such portion is $1,000 or an integral multiple of $1,000. No payment or adjustment will be made for dividends on the Common Stock except as provided in the Indenture. On conversion of a Security, a Securityholder will not receive, except as described herein, any cash payment representing accrued interest. Instead, accrued interest will be deemed paid by the shares of Common Stock (or any cash in lieu thereof) received by the Securityholder on conversion. Delivery to the holder of the full number of shares of Common Stock into which the Security is convertible (or any cash in lieu thereof), together with any cash payment, will be deemed to satisfy the Company's obligation to pay (i) the Principal Amount of the Security and (ii) accrued

and unpaid interest, and accrued interest with respect to the converted Security shall not be cancelled, extinguished or forfeited, but rather shall be deemed to be paid in full.

The Company will not adjust the Conversion Rate to account for accrued interest.

To convert a Security that is represented by a Global Security, a Holder must convert by book-entry transfer to the Conversion Agent through the facilities of the DTC. To convert a Security that is represented by a Certificated Security, a Holder must (1) complete and manually sign the conversion notice below and deliver such notice to the Conversion Agent, (2) surrender the Security to the Conversion Agent, (3) furnish appropriate endorsements and transfer documents if required by the Conversion Agent, the Company or the Trustee and (4) pay all transfer or similar tax, if required.

The Conversion Rate will be adjusted for dividends or distributions on Common Stock payable in Common Stock or other Capital Stock; subdivisions, combinations or certain reclassifications of Common Stock; distributions to all holders of Common Stock of certain rights to purchase Common Stock for a period expiring within 60 days of the record date for such distribution at less than the Closing Price of the Common Stock at the Time of Determination; distributions to such holders of assets (including shares of Capital Stock of a Subsidiary) or debt securities of the Company or certain rights to purchase securities of the Company; cash dividends or cash distributions; and distributions in respect of a tender offer or exchange offer of the Common Stock. However, no adjustment need be made if Securityholders may participate in the transaction or in certain other cases. The Company from time to time may voluntarily increase the Conversion Rate.

7.     Defaulted Interest.

Except as otherwise specified with respect to the Securities, any Defaulted Interest on any Security shall forthwith cease to be payable to the registered Holder thereof on the relevant Regular Record Date or accrual date, as the case may be, by virtue of having been such Holder, and such Defaulted Interest may be paid by the Company as provided for in Section 11.02 of the Indenture.

8.     Denominations; Transfer; Exchange.

The Securities are in fully registered form, without coupons, in denominations of $1,000 of Principal Amount and integral multiples of $1,000. A Holder may transfer or exchange Securities in accordance with the Indenture. The Registrar may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture. The Registrar need not register the transfer or exchange of any Securities in respect of which a Change in Control Purchase Notice has been given and not withdrawn (except, in the case of a Security to be purchased in part, the portion of the Security not to be purchased).

9.     Persons Deemed Owners.

The registered Holder of this Security may be treated as the owner of this Security for all purposes.

10.    Unclaimed Money or Securities.

The Trustee and the Paying Agent shall return to the Company upon written request any money or securities held by them for the payment of any amount with respect to the Securities that remains unclaimed for two years, subject to applicable unclaimed property laws. After return to the Company, Holders entitled to the money or securities must look to the Company for payment as general creditors unless an applicable abandoned property law designates another person.

11.    Amendment; Waiver.

Subject to certain exceptions set forth in the Indenture, (i) the Indenture or the Securities may be amended with the written consent of the Holders of at least a majority in aggregate Principal Amount of the Securities at the time outstanding and (ii) certain Defaults may be waived with the written consent of the Holders of a majority in aggregate Principal Amount of the Securities at the time outstanding. Subject to certain exceptions set forth in the Indenture, without the consent of any Securityholder, the Company and the Trustee may amend the Indenture or the Securities to cure any ambiguity, omission, defect or inconsistency, or to comply with Article 5 or Section 10.17 of the Indenture, to secure the Company's obligations under this Security or to add to the Company's covenants for the benefit of the Securityholders or to surrender any right or power conferred, or to comply with any requirement of the SEC in connection with the qualification of the Indenture under the Trust Indenture Act of 1939 and any amendment thereof, or as necessary in connection with the registration of the Securities under the Securities Act or to make any change that does not adversely affect the rights of any Holders.

12.    Defaults and Remedies.

Under the Indenture, Events of Default include (i) default in the payment of interest which becomes due and payable upon exercise by the Company of its option provided for in paragraph 6(a) hereof which default in any such case continues for 30 days; (ii) default in payment of the Principal Amount or Change in Control Purchase Price in respect of the Securities when the same becomes due and payable; (iii) failure by the Company to comply with other agreements in the Indenture or the Securities, subject to notice and lapse of time; (iv) (a) failure of the Company to make any payment by the end of any applicable grace period after maturity of Indebtedness in an amount in excess of $50.0 million, or (b) the acceleration of Indebtedness in an amount in excess of $50.0 million because of a default with respect to such Indebtedness without such Indebtedness having been discharged or such acceleration having been cured, waived, rescinded or annulled, subject to notice and lapse of time; provided, however, that if any such failure or acceleration referred to in (a) or (b) above shall cease or be cured, waived, rescinded or annulled, then the Event of Default by reason thereof shall be deemed not to have occurred; and (v) certain events of bankruptcy or insolvency. If an Event of Default occurs and is continuing, the Trustee, or the Holders of at least 25% in aggregate Principal Amount of the Securities at the time outstanding, may declare the Principal Amount through the date of such declaration, and any accrued and unpaid interest through the date of such declaration, on all the Securities to be due and payable immediately. Certain events of bankruptcy or insolvency are Events of Default which will result in the Principal Amount on the

Securities, and any accrued and unpaid interest through the occurrence of such event, becoming due and payable immediately upon the occurrence of such Events of Default.

Securityholders may not enforce the Indenture or the Securities except as provided in the Indenture. The Trustee may refuse to enforce the Indenture or the Securities unless it receives indemnity or security reasonably satisfactory to it. Subject to certain limitations, Holders of a majority in aggregate Principal Amount of the Securities at the time outstanding may direct the Trustee in its exercise of any trust or power. The Trustee may withhold from Securityholders notice of any continuing Default (except a Default in payment of amounts specified in clause (i) or (ii) above) if it determines that withholding notice is in their interests.

13.     Trustee Dealings with the Company.

Subject to certain limitations imposed by the TIA, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Securities and may otherwise deal with and collect obligations owed to it by the Company or its Affiliates and may otherwise deal with the Company or its Affiliates with the same rights it would have if it were not Trustee.

14.     No Recourse Against Others.

A director, officer, employee or stockholder, as such, of the Company shall not have any liability for any obligations of the Company under the Securities or the Indenture or for any claim based on, in respect of or by reason of such obligations or their creation. By accepting a Security, each Securityholder waives and releases all such liability. The waiver and release are part of the consideration for the issue of the Securities.

15.     Authentication.

This Security shall not be valid until an authorized officer of the Trustee manually signs the Trustee's Certificate of Authentication on the other side of this Security.

16.     Abbreviations.

Customary abbreviations may be used in the name of a Securityholder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entireties), JT TEN (=joint tenants with right of survivorship and not as tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors Act).

17.     GOVERNING LAW.

THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE INDENTURE AND THIS SECURITY.

The Company will furnish to any Securityholder upon written request and without charge a copy of the Indenture which has in it the text of this Security in larger type. Requests may be made to:

Amgen Inc.

> One Amgen Center Drive
> Thousand Oaks, CA 91320-1799
> Telephone No.: (805) 447-1000
> Facsimile No.: (805) 499-8011
> Attention: Treasurer

A-11

**ASSIGNMENT FORM**

To assign this Security, fill in the form below:

I or we assign and transfer this Security to

_____

(Insert assignee's soc. sec. or tax ID no.)

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint

agent to transfer this Security on the books of the Company. The agent may substitute another to act for him.

**CONVERSION NOTICE**

To convert this Security into Common Stock of the Company, check the box:   ☐

To convert only part of this Security, state the Principal Amount to be converted (which must be $1,000 or an integral multiple of $1,000):

$

If you want the stock certificate made out in another person's name, fill in the form below:

_____

(Insert other person's soc. sec. or tax ID no.)

_____

_____

(Print or type other person's name, address and zip code)

Date: _____     Your Signature: _____

_____

(Sign exactly as your name appears on the other side of this Security)

A-12

**AMGEN INC.**
**$2,500,000,000**
**0.375% Convertible Senior Notes due 2013**

**FIRST SUPPLEMENTAL INDENTURE**

**Dated as of June 8, 2006**

**to the**

**INDENTURE**

**Dated as of February 17, 2006**

**JPMORGAN CHASE BANK, N.A.,**
**Trustee**

FIRST SUPPLEMENTAL INDENTURE dated as of June 8, 2006 between Amgen Inc., a Delaware corporation (the " **Company** "), and JPMorgan Chase Bank, N.A., a national banking association (" **Trustee** "), to the Indenture (as defined below).

## RECITALS

A.       The Company is a party to that certain Indenture, dated as of February 17, 2006 (the "**Indenture**"), pursuant to which the Company's 0.375% Convertible Senior Notes due 2013 (the " **Securities** ") were originally issued. Capitalized terms used herein without definition have the meanings provided to them in the Indenture.

B.       Section 9.01(1) of the Indenture provides that the Company and the Trustee may amend the Indenture and the Securities to cure any ambiguity, omission, defect or inconsistency; and Section 9.01(6) of the Indenture provides that the Company and the Trustee may amend the Indenture and the Securities to make any change that does not adversely affect the rights of any holders of the Securities. Section 9.01 of the Indenture also provides that no amendment to cure any ambiguity, omission, defect or inconsistency in this Indenture made solely to conform the Indenture to the description of the Securities contained in the offering memorandum to which the Securities have been initially offered shall be deemed to adversely affect the interests of the Holders.

C.       The Company desires to amend the Indenture and the Securities to cure certain ambiguities, omissions, defects and/or inconsistencies and to conform the Indenture to the "Description of Notes" section of the offering memorandum pursuant to which the Securities were initially offered, dated February 14, 2006 (the " **Offering Memorandum** "), in each case as provided herein.

D.       The Company has authorized the execution and delivery of this Supplemental Indenture and the Trustee has received an Opinion of Counsel and an Officers' Certificate pursuant to Section 12.04 of the Indenture.

Each party agrees as follows for the benefit of the other party and for the equal and ratable benefit of the Holders of the Securities:

1.       Amendments to the Securities. In order to amend the Indenture and the Securities to cure certain ambiguities, omissions, defects and/or inconsistencies and to conform the Indenture to the "Description of Notes" section of the Offering Memorandum, the following sections of the Indenture are modified or supplemented as follows:

a.       SECTION 1.01       Definitions.

i.       The second paragraph of the definition of "Average Closing Price" is modified to change the reference to ", (3) or (5)" to "or (3)".

ii.       Section 1.01 is amended to add the following definition:

"Net Share Amount" means (i) the Remaining Shares after giving effect to any election by the Company to pay cash in lieu of all or a portion thereof pursuant to Section 10.01 and (ii) any such cash.

b.    SECTION 10.07        Adjustment for Rights Issue.

i.    Section 10.07 is amended to change all references to "Section 10.06(4)" to "Section 10.06(3)".

c.    SECTION 10.08        Adjustment for Other Distributions.

i.    Section 10.08 is amended to change all references to "Section 10.06(4)" to "Section 10.06(3)".

d.    SECTION 10.09(a)     Adjustment for Cash Dividends.

i.    Section 10.09(a) is amended to delete ", subject to the provisions of Section 10.09(b)".

e.    SECTION 10.13        When Adjustment May Be Deferred.

i.    The second paragraph of Section 10.13 is amended to change the reference to "Sections 10.6, 10.7, 10.8, 10.9, 10.11, and 10.12" to "Sections 10.06, 10.07, 10.08 and 10.09".

f.    SECTION 10.20        Simultaneous Adjustments.

i.    Section 10.20 is amended to change the reference to "Section 10.06(4)" to "Section 10.06(3)".

g.    SECTION 12.02(b)     Notices; Address of Agency.

i.    Section 12.02(b) is amended to change the reference to "Section 10.12" to "Section 10.02".

h.    NOTES – SECTION 6

i.    Section 6(a) of the Form of Note and each of the Global Securities previously issued is amended to change the reference to "December 31, 2010" to "December 31, 2012".

ii.   The last paragraph of Section 6 of the Form of Note and each of the Global Securities previously issued is amended to remove the following sentence:  "The Company from time to time may voluntarily increase the Conversion Rate.".

2

    i.        NOTES – SECTION 12

        i.        The first sentence of the first paragraph of Section 12 of the Form of Note and each of the Global Securities previously issued is amended to change section (i) to "default in the payment of interest, which default continues for 30 days;".

2.     <u>Confirmations; Effectiveness</u>. As amended by this Supplemental Indenture, the Indenture and the Securities are ratified and confirmed in all respects, and the Indenture as so amended shall be read, taken and construed as one and the same instrument. This Supplemental Indenture shall form a part of the Indenture for all purposes, and every holder of Securities heretofore or hereafter authenticated and delivered shall be bound hereby.

3.     <u>Trustee</u>. The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Company.

4.     <u>Trust Indenture Act</u>. If and to the extent that any provision of this Supplemental Indenture limits, qualifies or conflicts with another provision included in this Supplemental Indenture or in the Indenture, which is required to be included in this Supplemental Indenture or the Indenture by the Trust Indenture Act of 1939, as amended (the " **TIA** "), such required provision of the TIA shall control.

5.     <u>Conflicts</u>. To the extent of any inconsistency between the terms of the Indenture and this Supplemental Indenture, the terms of this Supplemental Indenture will control.

6.     <u>Governing Law</u>. THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN THIS SUPPLEMENTAL INDENTURE.

7.     <u>Multiple Originals</u>. The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement. One signed copy is enough to prove this Supplemental Indenture.

8.     <u>Entire Agreement</u>. This Supplemental Indenture constitutes the entire agreement of the parties hereto with respect to the amendments to the Indenture set forth herein.

9.     <u>Separability Clause</u>. In case any provision in this Supplemental Indenture or in the Securities shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

*(Signature Page Follows)*

IN WITNESS WHEREOF, the undersigned, being duly authorized, have executed this Supplemental Indenture on behalf of the respective parties hereto as of the date first above written.

AMGEN INC.

By:      /s/ David J. Scott
Name:   David J. Scott
Title:    Senior Vice President, General
          Counsel and Secretary

Signature Page to Supplemental Indenture for Notes due 2013

JPMORGAN CHASE BANK, N.A.,
as Trustee

By:    /s/ L. O'Brien
Name:    L. O'Brien
Title:    Vice President

Signature Page to Supplemental Indenture for Notes due 2013

**Exhibit 31**

## CERTIFICATIONS

I, Kevin W. Sharer, Chairman of the Board, Chief Executive Officer and President of Amgen Inc., certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Amgen Inc.;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

    (d) Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:   August 8, 2006                          /s/ KEVIN W. SHARER
                                                Kevin W. Sharer
                                                Chairman of the Board,
                                                Chief Executive Officer and President

## CERTIFICATIONS

I, Richard D. Nanula, Executive Vice President and Chief Financial Officer of Amgen Inc., certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Amgen Inc.;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

   (d) Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  August 8, 2006                                  /s/ RICHARD D. NANULA
                                                       Richard D. Nanula
                                                       Executive Vice President
                                                       and Chief Financial Officer

**Exhibit 32**

### Certification of Chief Executive Officer

Pursuant to 18 U.S.C. § 1350, as created by Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned officer of Amgen Inc. (the "Company") hereby certifies that:

(i)    the accompanying Quarterly Report on Form 10-Q of the Company for the period ended June 30, 2006 (the "Report") fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and

(ii)   information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Dated:    August 8, 2006                              /s/ KEVIN W. SHARER
                                                    Kevin W. Sharer
                                          Chairman of the Board, Chief Executive
                                                 Officer and President



A signed original of this written statement required by Section 906 of the Sarbanes-Oxley Act of 2002 ("Section 906"), or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to Amgen Inc. and will be retained by Amgen Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

**Certification of Chief Financial Officer**

Pursuant to 18 U.S.C. § 1350, as created by Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned officer of Amgen Inc. (the "Company") hereby certifies that:

(i)     the accompanying Quarterly Report on Form 10-Q of the Company for the period ended June 30, 2006 (the "Report") fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and

(ii)    information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated:     August 8, 2006                                          /s/ RICHARD D. NANULA
                                                                          Richard D. Nanula
                                                                       Executive Vice President
                                                                    and Chief Financial Officer

A signed original of this written statement required by Section 906 of the Sarbanes-Oxley Act of 2002 ("Section 906"), or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to Amgen Inc. and will be retained by Amgen Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Created by 10KWizard     www.10KWizard.com

# EXHIBIT O

04/27/2004  09:33  3104767639            LAURIE ALLEN                    PAGE 02

WHI Vers -1/28/91

LLN/#4: 4167ariad.agt
Date: August 8, 1991

## LICENSE AGREEMENT

### TABLE OF CONTENTS

PREAMBLE

ARTICLES:

| | |
|---|---|
| I | DEFINITIONS |
| II | GRANT |
| III | DUE DILIGENCE |
| IV | ROYALTIES |
| V | REPORTS AND RECORDS |
| VI | PATENT PROSECUTION |
| VII | INFRINGEMENT |
| VIII | PRODUCT LIABILITY |
| IX | EXPORT CONTROLS |
| X | NON-USE OF NAMES |
| XI | ASSIGNMENTS |
| XII | ARBITRATION |
| XIII | TERMINATION |
| XIV | PAYMENTS, NOTICES AND OTHER COMMUNICATIONS |
| XV | MISCELLANEOUS PROVISIONS |

APPENDICES
| | |
|---|---|
| A | Patent Rights |
| B | Foreign Filings |
| C | Centocor Collaborative Research Agt. |
| D | Materials Transfer Agreement |

This Agreement is made and entered into this 19th day of *August*, 1991, (the Effective Date) by and between MASSACHUSETTS INSTITUTE OF TECHNOLOGY, a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts and having its principal office at 77 Massachusetts Avenue, Cambridge, Massachusetts 02139, U.S.A. (hereinafter referred to as M.I.T.), and the WHITEHEAD INSTITUTE, a corporation organized and existing under the laws of Delaware and having its principal office at Nine Cambridge Center, Cambridge, Massachusetts 02142, U.S.A., (hereinafter referred to as Whitehead) and ARIAD PHARMACEUTICALS, INC., a corporation duly organized under the laws of Delaware and having its principal office at 687 Wetherby Lane, Devon, Pennsylvania 19333 (hereinafter referred to as LICENSEE).

**PTX 0460**
02 CV 11280 RWZ



Confidential Information Under Protective Order

ADL 0029159

04/27/2004  09:33    3104767639             LAURIE ALLEN                    PAGE  03

-2-

## WITNESSETH

**WHEREAS**, M.I.T. and Whitehead are the owners of certain "Patent Rights" (as later defined herein) relating to M.I.T. Case No. 4167, "Nuclear Factors Associated With Transcriptional Regulation" by David Baltimore, Ranjan Sen, Phillip A. Sharp, Harinder Singh, Louis Staudt, Jonathan LeBowitz, Albert S. Baldwin, Jr., Roger Clerc, and Lynn M. Corcoran; M.I.T. Case No. 4442W (Whitehead No. 86-10) "Method of Inducible Gene Expression" by Ranjan Sen and David Baltimore; M.I.T. Case No. 4695W (Whitehead No. 87-11) "Activation of NF-kB Precursor" by Patrick Baeuerle and David Baltimore; M.I.T. Case No. 5675 (Whitehead 87-11AA) "The pp40 Associated with REL is an I-κB" by David Baltimore, Sankar Ghosh et al.; M.I.T. Case No. 5134W (Whitehead No. 89-02) "NF-kB-Mediated Transcriptional Regulation" by Michael J. Lenardo, Chen-ming Fan, Tom Maniatis and David Baltimore and has the right to grant licenses under said Patent Rights, subject only to a royalty-free, nonexclusive license heretofore granted to the United States Government;

**WHEREAS**, Whitehead has authorized M.I.T. to act as its sole and exclusive agent for the purposes of licensing Whitehead's rights in the Patent Rights and has authorized M.I.T. to enter into this licensing agreement on its own and Whitehead's behalf;

**WHEREAS**, M.I.T. and Whitehead desire to have the Patent Rights utilized in the public interest and is willing to grant a license thereunder;

**WHEREAS**, LICENSEE has represented to M.I.T., to induce M.I.T. to enter into this Agreement, that LICENSEE is committed to the development and commercialization of "Licensed Product(s)" (as later defined herein) and/or the use of the "Licensed Process(es)" (as later defined herein) and that it shall commit itself to a thorough, vigorous and diligent program of exploiting the Patent Rights so that public utilization shall result therefrom; and

**WHEREAS**, LICENSEE desires to obtain a license under the Patent Rights upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants contained herein the parties hereto agree as follows:

## ARTICLE I - DEFINITIONS

For the purposes of this Agreement, the following words and phrases shall have the following meanings:

1.1  "LICENSEE" shall include a related company of LICENSEE, the voting stock of which is directly or indirectly at least Fifty Percent (50%) owned or controlled by LICENSEE, an organization which directly or indirectly controls more than Fifty Percent (50%) of the voting stock

Confidential Information Under Protective Order

ADL 0029160

04/27/2004  09:33   3104767639                    LAURIE ALLEN                        PAGE  04

-3-

of LICENSEE and an organization, the majority ownership of which is directly or indirectly common to the ownership of LICENSEE.

1.2  "Patent Rights" shall mean all of the following Whitehead and M.I.T. intellectual property:

    (a)    the United States and foreign patents and/or patent applications listed in Appendix A;

    (b)    United States and foreign patents issued from the applications listed in Appendix A and from divisionals and continuations of these applications;

    (c)    claims of U.S. and foreign continuation-in-part applications, and of the resulting patents, which are directed to subject matter specifically described in the U.S. and foreign applications listed in Appendix A;

    (d)    claims of all foreign patent applications, and of the resulting patents, which are directed to subject matter specifically described in the United States patents and/or patent applications described in (a), (b), or (c) above;

    (e)    any reissues of United States patents described in (a), (b), (c), or (d) above.

1.3  A "Licensed Product" shall mean any product or part thereof which:

    (a)    is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the Patent Rights in the country in which any Licensed Product is made, used or sold;

    (b)    is manufactured by using a process which is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the Patent Rights in the country in which any Licensed Process is used or in which such product or part thereof is used or sold;

    (c)    contains the Tangible Property,

subject to the limitations in Paragraph 4.4.

1.4  A "Licensed Process" shall mean any process which is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the Patent Rights or which uses the Tangible Property, subject to the limitations in Paragraph 4.4.

1.5  "Net Sales" shall mean LICENSEE's (and its sublicensees' where appropriate) billings for Licensed Products and Licensed Processes produced hereunder less the sum of the following:

    (a)    discounts allowed in amounts customary in the trade;

Confidential Information Under Protective Order

ADL 0029161

04/27/2004  09:33    3104767639                    LAURIE ALLEN                         PAGE  05

-4-

(b)    sales, tariff duties and/or use taxes directly imposed and with reference to particular sales;

(c)    outbound transportation prepaid or allowed; and

(d)    amounts allowed or credited on returns.

No deductions shall be made for commissions paid to individuals whether they be with independent sales agencies or regularly employed by LICENSEE and on its payroll, or for cost of collections.  Licensed Products shall be considered "sold" when billed out or invoiced.

1.6  "Tangible Property" shall mean cell lines containing NF-kB-P50, NF-κB-P65, I-κB obtained directly or indirectly from M.I.T. or Whitehead, and any progeny and derivatives thereof.

## ARTICLE II - GRANT

2.1  M.I.T. hereby grants to LICENSEE the right and license to make, have made, use, lease and sell the Licensed Products, and to practice the Licensed Processes to the end of the term for which the Patent Rights are granted unless sooner terminated according to the terms hereof.

2.2  This license shall be subject to the research license and to the option granted to Centocor to acquire a license to the Patent Rights of M.I.T. Case 4167 for use with certain hybridomas, under the Collaborative Research Agreement between Centocor and M.I.T. dated November 14, 1988 as attached hereto as Appendix C.  M.I.T. agrees that it will not renew the Collaboration Research Agreement as provided in Paragraph 2 thereof.

2.3  In order to establish a period of exclusivity for LICENSEE, M.I.T. hereby agrees that with the exception of the rights granted or optioned to Centocor, it shall not grant any other license to make, have made, use, lease and sell Licensed Products or to utilize Licensed Processes during the period of time commencing with the Effective Date of this Agreement and terminating with the first to occur of:

(a)    for each type of Licensed Product the expiration of Twelve (12) years after the first commercial sale of that Licensed Product; or

(b)    the expiration of Sixteen (16) years after the Effective Date of this Agreement;

provided, however, that for any Licensed Product for which an application for premarket approval has been submitted to the U.S. FDA prior to July 1, 2007, the time spent by the FDA reviewing said application(s) for that Licensed Product shall be added to the period of exclusivity which would otherwise apply.

Confidential Information Under Protective Order

04/27/2004  09:33   3104767639                LAURIE ALLEN                    PAGE  06

-5-

2.4 At the end of the exclusive period, the license granted hereunder shall become nonexclusive and shall extend to the end of the term or terms for which any Patent Rights are issued, unless sooner terminated as hereinafter provided, or unless the parties agree to extend the period of exclusivity.

2.5 M.I.T. and Whitehead also agree to bring to the attention of LICENSEE any inventions which relate to Nuclear Factors Associated with Transcriptional Regulation which arise prior to December 31, 1994 from the M.I.T. or Whitehead laboratories of any of the inventors of the Patent Rights listed in Appendix A. LICENSEE shall have a three month option, dating from the date at which any such invention is revealed to LICENSEE, to begin negotiations with M.I.T. for an exclusive license to such invention. If such negotiations are begun at LICENSEE's request, LICENSEE shall have an additional three month option to negotiate in good faith for an exclusive license to the invention. LICENSEE's options under this Paragraph 2.5 shall, however, be subject to any options or licenses granted under a research agreement with sponsors of the research leading to such invention, and the terms of such research agreements shall not be limited by the provisions of this Paragraph 2.5. M.I.T. and Whitehead shall use their best reasonable efforts to notify LICENSEE of any planned or completed sponsorship agreements, other than those involving U.S. Government sponsorship, in the field of Nuclear Factors Associated with Transcriptional Regulation, subject, however, to any confidentiality provisions with sponsors that might limit such notification.

2.6 LICENSEE agrees that Licensed Products leased or sold in the United States shall be manufactured substantially in the United States.

2.7 Whitehead and M.I.T. reserve the right to practice under the Patent Rights and to use and distribute the Tangible Property for their noncommercial research purposes under a Materials Transfer agreement similar to that in Appendix D. M.I.T. and Whitehead shall use their best reasonable efforts to notify LICENSEE of any Tangible Property distributed to third parties.

2.8 LICENSEE shall have the right to enter into sublicensing agreements for the rights, privileges and licenses granted hereunder only during the exclusive period of this Agreement. Such sublicenses may extend past the expiration date of the exclusive period of this Agreement, but any exclusivity of such sublicenses will expire upon the expiration of LICENSEE's exclusivity.

2.9 LICENSEE hereby agrees that every sublicensing agreement to which it shall be a party and which shall relate to the rights, privileges and license granted hereunder shall contain a statement setting forth the date upon which LICENSEE's exclusive rights, privileges and license hereunder shall terminate.

Confidential Information Under Protective Order

ADL 0029163

04/27/2004   09:33   3104767639                 LAURIE ALLEN                        PAGE   07

-6-

2.10  LICENSEE agrees that any sublicenses granted by it shall provide that the obligations to M.I.T. and Whitehead of Articles II, V, VII, VIII, IX, X, XII, XIII, and XV of this Agreement shall be binding upon the sublicensee as if it were a party to this Agreement. LICENSEE further agrees to attach copies of these Articles to sublicense agreements.

2.11  LICENSEE agrees to forward to M.I.T. a copy of any and all fully executed sublicense agreements, and further agrees to forward to M.I.T. annually a copy of such reports received by LICENSEE from its sublicensees during the preceding twelve (12) month period under the sublicenses as shall be pertinent to a royalty accounting under said sublicense agreements.

2.12  LICENSEE shall not receive from sublicensees anything of value in lieu of cash payments in consideration for any sublicense under this Agreement, without the express prior written permission of M.I.T..

2.13  The license granted hereunder shall not be construed to confer any rights upon LICENSEE by implication, estoppel or otherwise as to any technology not specifically set forth in Appendix A hereof and Paragraph 2.5.

## ARTICLE III - DUE DILIGENCE

3.1  LICENSEE shall use its best efforts to bring one or more Licensed Products or Licensed Processes to market through a thorough, vigorous and diligent program for exploitation of the Patent Rights.

3.2  In addition, LICENSEE shall adhere to the following milestones:

(a)  LICENSEE shall deliver to M.I.T. on or before June 30, 1992 a business plan showing the amount of money, number and kind of personnel and time budgeted and planned for each phase of development of the Licensed Products and Licensed Processes and shall provide similar reports to M.I.T. on an annual basis on or before the ninetieth (90th) day following the close of LICENSEE's fiscal year.

(b)  ARIAD PHARMACEUTICALS, INC. (LICENSEE) shall have received at least One Million Dollars ($1,000,000) in equity investment on or before June 30, 1992.

(c)  ARIAD PHARMACEUTICALS, INC. (LICENSEE) shall have received a cumulative total of at least Five Million ($5,000,000) in equity investment and/or research program payments on or before June 30, 1993.

(d)  LICENSEE shall, within six (6) months of a request by a suitable sublicensee willing to take a sublicense upon reasonable business terms, grant at least one sublicense to the Patent Rights and Tangible Property for sale of Licensed Products as research reagents with appropriate protection of LICENSEE's

Confidential Information Under Protective Order                    ADL 0029164

04/27/2004  09:33    3104767639    LAURIE ALLEN    PAGE 08

-7-

commercial interests. Failure to reach such an agreement within six (6) months after a bona fide request shall allow M.I.T. to grant a license to the Patent Rights to the requestor for sale of research reagents on terms no more favorable than those of paragraph 4.1(d) below.

(e)    In any calendar year after December 31, 1994 that LICENSEE has not made at least One Million Dollars ($1,000,000) in Net Sales of Licensed Product, LICENSEE shall have invested a minimum of Five Hundred Thousand Dollars ($500,000) in projects devoted to the development and/or marketing of Licensed Products and development of protection of the Patents Rights.

3.3  LICENSEE's failure to perform in accordance with Paragraphs 3.1 and 3.2 above shall be grounds for M.I.T. to terminate this Agreement pursuant to Paragraph 13.3 hereof.

## ARTICLE IV - ROYALTIES

4.1  For the rights, privileges and license granted hereunder, LICENSEE shall pay royalties to M.I.T. in the manner hereinafter provided to the end of the term of the Patent Rights or until this Agreement shall be terminated as hereinafter provided:

(a)    License Issue Fee of Twenty-Five Thousand Dollars ($25,000), which said License Issue Fee shall be deemed earned and due thirty days after the execution of this Agreement.

(b)    License Maintenance Fees of Twenty-Five Thousand Dollars ($25,000) per year payable on January 1, 1993 and on January 1 of each year thereafter until the first submission by LICENSEE of an IND (Investigational New Drug application) to the FDA or an equivalent application to a European or Japanese regulatory agency. Following the submission of such application, the License Maintenance Fees shall be Fifty Thousand Dollars ($50,000) per year beginning January 1 of the year following the submission. However, beginning January 1, 1998, the License Maintenance Fees shall be Fifty Thousand Dollars ($50,000) per year whether or not an IND or equivalent application has been submitted by LICENSEE. The License Maintenance Fee for a given year shall be fully creditable against any Running Royalties subsequently due.

(c)    A one-time Milestone Fee of One Hundred Thousand Dollars ($100,000) payable within ninety (90) days after LICENSEE receives approval to initiate clinical trials on a Licensed Product based upon its submission of its first IND to the FDA or an equivalent application to a European or Japanese regulatory agency.

(d)    Running Royalties in an amount equal to Three Percent (3%) of the Net Sales of Licensed Products and Licensed Processes used, leased or sold by and/or for LICENSEE which are covered by an issued claim of the Patent Rights in

04/27/2004  09:33    3104767639    LAURIE ALLEN    PAGE  09

-8-

any country in which the Licensed Products and/or Licensed Processes are made, used, leased or sold; and Running Royalties in an amount equal to One and One Half Percent (1.5%) of the Net Sales of Licensed Products and Licensed Processes used, leased or sold by and/or for LICENSEE which are covered only by a pending claim of the Patent Rights in any country in which the Licensed Products and/or Licensed Processes are made, used, leased or sold.  The provisions of this paragraph shall not apply to any Licensed Products leased or sold by LICENSEE or its sublicensees for use as research reagents.

(e)    Running Royalties in an amount equal to Five Percent (5%) of the Net Sales price of Licensed Products sold by or for LICENSEE or its sublicensees for use as research reagents.

(f)    Twenty-Five Percent (25%) of any payments made to LICENSEE for sublicensing of the Patent Rights and/or Tangible Property.  This subparagraph 4.1(f) shall not apply, however, to royalties paid to LICENSEE by sublicensee(s) on the Net Sales of Licensed Products sold by sublicensee(s) for use as research reagents, which shall fall under subparagraph 4.1(e) above.

4.2  The License Issue Fee, Milestone Fee and all License Maintenance Fees shall be cumulatively creditable against Running Royalties.

4.3  All patent costs incurred prior to July 1, 1991 and reimbursed by LICENSEE under Article VI shall be creditable against Running Royalties except for Running royalties on research reagents.  Fifty Percent (50%) of patent costs incurred after July 1, 1991 shall be creditable against Running Royalties except for Running Royalties on research reagents.

4.4  The definitions of Paragraphs 1.3 and 1.4 notwithstanding, after June 30, 1997 Running Royalties shall be due on the Net Sales of a Licensed Product only if the Licensed Product is covered by an issued claim of the Patent Rights.

4.5  LICENSEE shall be entitled to credit fifty percent (50%) of the royalties paid to third parties for the use, lease or sale of a Licensed Product or Licensed Process by LICENSEE against the Running Royalties for that Licensed Product or Licensed Process due under subparagraph 4.1(d) above; provided, however that the amount credited shall not reduce the Running Royalty paid below Two Percent (2.0%) for the Licensed Product or Licensed Process covered by an issued claim, and One Percent (1.0%) if the Licensed Product or Licensed Process is covered only by a pending claim.

4.6  In no instance shall the amount paid to M.I.T. in total in a given year be less than the License Maintenance Fee for that year.

4.7  All payments due hereunder shall be paid in full, without deduction of taxes or other fees which may be imposed by any government and which shall be paid by LICENSEE.

Confidential Information Under Protective Order    ADL 0029166

04/27/2004 09:33    3104767639    LAURIE ALLEN    PAGE 10

-9-

4.8 No multiple royalties shall be payable because any Licensed Product, its manufacture, use, lease or sale are or shall be covered by more than one patent application or patent licensed under this Agreement.

4.9 Royalty payments shall be paid in United States dollars in Cambridge, Massachusetts, or at such other place as M.I.T. may reasonably designate consistent with the laws and regulations controlling in any foreign country. If any currency conversion shall be required in connection with the payment of royalties hereunder, such conversion shall be made by using the exchange rate prevailing at the Chase Manhattan Bank (N.A.) on the last business day of the calendar quarterly reporting period to which such royalty payments relate.

## ARTICLE V - REPORTS AND RECORDS

5.1 LICENSEE, within sixty (60) days after March 31, June 30, September 30 and December 31, of each year, shall deliver to M.I.T. true and accurate reports, giving such particulars of the business conducted by LICENSEE and its sublicensees during the preceding three-month period under this Agreement as shall be pertinent to a royalty accounting hereunder. These shall include at least the following:

(a)    number of Licensed Products manufactured and sold.

(b)    total billings for Licensed Products sold.

(c)    accounting for all Licensed Processes used or sold.

(d)    deductions applicable as provided in Paragraph 1.5.

(e)    total royalties due.

(f)    names and addresses of all sublicensees of LICENSEE.

5.2 With each such report submitted, LICENSEE shall pay to M.I.T. the royalties due and payable under this Agreement. If no royalties shall be due, LICENSEE shall so report.

5.3 On or before the ninetieth (90th) day following the close of LICENSEE's fiscal year, LICENSEE shall provide M.I.T. with LICENSEE's certified financial statements for the preceding fiscal year including, at a minimum, a Balance Sheet and an Operating Statement.

5.4 The royalty payments set forth in this Agreement shall, if overdue, bear interest until payment at a per annum rate two percent (2%) above the prime rate in effect at the Chase Manhattan Bank (N.A.) on the due date. The payment of such interest shall not foreclose M.I.T. from exercising any other rights it may have as a consequence of the lateness of any payment.

Confidential Information Under Protective Order

ADL 0029167

-10-

## ARTICLE VI - PATENT PROSECUTION

6.1  M.I.T. (and/or Whitehead, as appropriate, depending on ownership of the individual Patent Rights) shall apply for, seek prompt issuance of, and maintain during the term of this Agreement the Patent Rights in the United States and in the foreign countries listed in Appendix B hereto. Appendix B may be amended by verbal agreement of both parties, such agreement to be confirmed in writing within ten (10) days. The prosecution, filing and maintenance of all Patent Rights patents and applications shall be the primary responsibility of M.I.T. (and/or Whitehead); provided, however, LICENSEE shall have reasonable opportunities to advise M.I.T. (and/or Whitehead) and shall cooperate with M.I.T. (and/or Whitehead) in such prosecution, filing and maintenance.

6.2  Payment of all fees and costs relating to the filing, prosecution, and maintenance of the Patent Rights shall be the responsibility of LICENSEE, whether such fees and costs were incurred before or after the date of this Agreement. Such payments shall be creditable as specified in Paragraphs 4.2 and 4.3. For fees and costs incurred prior to July 1, 1991, LICENSEE shall reimburse M.I.T. and Whitehead on the following schedule:

| | |
|---|---|
| 25% of total: | 30 days after billing |
| 25% of total: | January 15, 1992 |
| 25% of total: | July 15, 1992 |
| 25% of total: | January 15, 1993 |

Fees and costs incurred after July 1, 1991 shall be reimbursed within 30 days after billing.

## ARTICLE VII - INFRINGEMENT

7.1  LICENSEE, M.I.T. and Whitehead shall promptly inform each other of any alleged infringement of the Patent Rights by a third party and of any available evidence thereof.

7.2  During the term of this Agreement, LICENSEE shall have the right, but shall not be obligated, to prosecute at its own expense any such infringements of the Patent Rights and in furtherance of such right, M.I.T. and Whitehead hereby agree that LICENSEE may include M.I.T. or Whitehead as party plaintiffs in any such suit ,without expense to M.I.T. or Whitehead. The total cost of any such infringement action commenced or defended solely by LICENSEE shall be borne by LICENSEE. LICENSEE may, for such purposes, use the name of M.I.T. or Whitehead as party plaintiffs provided, however, that such right to bring an infringement action shall remain in effect only for so long as the license granted herein remains exclusive. No settlement, consent judgment or other voluntary final disposition of the suit may be entered into without the consent of

04/27/2004  09:33    3104767639              LAURIE ALLEN                    PAGE  12

-11-

M.I.T. and Whitehead, which consent shall not unreasonably be withheld. LICENSEE shall indemnify M.I.T. and Whitehead against any order for costs associated with the litigation that may be made against M.I.T. or Whitehead in such proceedings.

7.3  In the event that LICENSEE shall undertake the enforcement and/or defense of the Patent Rights by litigation, LICENSEE may withhold up to fifty percent (50%) of the royalties otherwise thereafter due M.I.T. hereunder and apply the same toward reimbursement of up to half of LICENSEE's expenses, including reasonable attorney's fees, in connection therewith. Any recovery of damages by LICENSEE for any such suit shall be applied pro rata in satisfaction of (i) any "unreimbursed expenses" and legal fees of LICENSEE relating to the suit; and (ii) any royalties due M.I.T. and withheld by LICENSEE and applied pursuant to this Paragraph 7.3. The balance remaining from any such recovery shall be divided between LICENSEE and M.I.T. in the proportion of 91% LICENSEE/9% M.I.T.

7.4  If within six (6) months after having been notified of any alleged infringement, LICENSEE shall have been unsuccessful in persuading the alleged infringer to desist and shall not have brought and shall not be diligently prosecuting an infringement action, or if LICENSEE shall notify M.I.T. at any time prior thereto of its intention not to bring suit against any alleged infringer, then, and in those events only, M.I.T. or Whitehead, as appropriate) shall have the right, but shall not be obligated, to prosecute at its own expense any infringement of the Patent Rights, and, in furtherance of such right, LICENSEE hereby agrees that M.I.T. (or Whitehead) may include LICENSEE as a party plaintiff in any such suit, without expense to LICENSEE. The total cost of any such infringement action commenced or defended solely by M.I.T. (or Whitehead) shall be borne by M.I.T. (or Whitehead), and M.I.T. (or Whitehead) shall keep any recovery or damages for past infringement derived therefrom. No settlement, consent judgement or other voluntary final disposition of the suit maybe entered into without the consent of LICENSEE, which consent shall not unreasonable be withheld.

7.5  In the event that a declaratory judgment action alleging invalidity or noninfringement of any of the Patent Rights shall be brought against LICENSEE, M.I.T. (or Whitehead), at its option, shall have the right, within thirty (30) days after commencement of such action, to intervene and take over the sole defense of the action at its own expense.

7.6  In any infringement suit as any party may institute to enforce the Patent Rights pursuant to this Agreement, the other parties hereto shall, at the request and expense of the party initiating such suit, cooperate in all respects and, to the extent possible, have its employees testify when requested and make available relevant records, papers, information, samples, specimens, and the like.

-12-

7.7  LICENSEE, during the exclusive period of this Agreement, shall have the sole right in accordance with the terms and conditions herein to sublicense any alleged infringer for future use of the Patent Rights.  Any upfront fees paid to LICENSEE as part of such sublicense shall be handled in accordance with subparagraph 4.1(f).

## ARTICLE VIII - PRODUCT LIABILITY

8.1  LICENSEE shall at all times during the term of this Agreement and thereafter, indemnify, defend and hold M.I.T. and Whitehead, their trustees, officers, employees and affiliates, harmless against all claims and expenses, including legal expenses and reasonable attorneys' fees, arising out of the death of or injury to any person or persons or out of any damage to property and against any other claim, proceeding, demand, expense and liability of any kind whatsoever resulting from the production, manufacture, sale, use, lease, consumption or advertisement of the Licensed Product(s) and/or Licensed Process(es) or arising from any obligation of LICENSEE hereunder.

8.2  LICENSEE shall obtain prior to the first use of a Licensed Product or Licensed Process on humans and carry in full force and effect liability insurance which shall protect LICENSEE, M.I.T. and Whitehead in regard to events covered by Paragraph 8.1 above.

8.3  EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, M.I.T. AND WHITEHEAD MAKE NO REPRESENTATIONS AND EXTEND NO WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND VALIDITY OF PATENT RIGHTS CLAIMS, ISSUED OR PENDING.

## ARTICLE IX - EXPORT CONTROLS

It is understood that M.I.T. and Whitehead are subject to United States laws and regulations controlling the export of technical data, computer software, laboratory prototypes and other commodities (including the Arms Export Control Act, as amended and the Export Administration Act of 1979), and that its obligations hereunder are contingent on compliance with applicable United States export laws and regulations.  The transfer of certain technical data and commodities may require a license from the cognizant agency of the United States Government and/or written assurances by LICENSEE that LICENSEE shall not export data or commodities to certain foreign countries without prior approval of such agency.  M.I.T. neither represents that a license shall not be required nor that, if required, it shall be issued.

Confidential Information Under Protective Order                    ADL 0029170

-13-

## ARTICLE X - NON-USE OF NAMES

LICENSEE shall not use the names of the Massachusetts Institute of Technology nor of the Whitehead Institute nor any of their employees, nor any adaptation thereof, in any advertising, promotional or sales literature without prior written consent obtained from M.I.T. in each case, except that LICENSEE may state that it is licensed by Whitehead or M.I.T. under one or more of the patents and/or applications comprising the Patent Rights.

## ARTICLE XI - ASSIGNMENT

The rights of ARIAD under this Agreement may not be assigned and the duties of ARIAD under this Agreement may not be delegated without the prior written consent of M.I.T. and Whitehead, except that ARIAD may assign this Agreement to an entity, acceptable to M.I.T. and Whitehead, with which it merges or consolidates or which ARIAD controls, or to which substantially all of its assets relating to the Patent Rights are sold or otherwise transferred or to a partnership of which ARIAD or any of its affiliates in the general partner.

## ARTICLE XII - ARBITRATION

12.1  Any and all claims, disputes or controversies arising under, out of, or in connection with this Agreement, including any dispute relating to patent validity or infringement, which have not been resolved by good faith negotiations between the parties, shall be resolved by final and binding arbitration in Boston, Massachusetts under the rules of the American Arbitration Association, or the Patent Arbitration Rules if applicable, then obtaining. The arbitrators shall have no power to add to, subtract from or modify any of the terms or conditions of this Agreement. Any award rendered in such arbitration may be enforced by either party in either the courts of the Commonwealth of Massachusetts or in the United States District Court for the District of Massachusetts, to whose jurisdiction for such purposes M.I.T., Whitehead and LICENSEE each hereby irrevocably consents and submits.

12.2  Notwithstanding the foregoing, nothing in this Article shall be construed to waive any rights or timely performance of any obligations existing under this Agreement.

## ARTICLE XIII - TERMINATION

13.1  If LICENSEE shall cease to carry on its business, this Agreement shall terminate upon notice by M.I.T.

04/27/2004  09:33  3104767639                 LAURIE ALLEN                        PAGE  15

-14-

    13.2 Should LICENSEE fail to pay M.I.T. royalties due and payable hereunder, M.I.T. shall have the right to terminate this Agreement on thirty (30) days' notice, unless LICENSEE shall pay M.I.T. within the thirty (30) day period, all such royalties and interest due and payable. Upon the expiration of the thirty (30) day period, if LICENSEE shall not have paid all such royalties and interest due and payable, the rights, privileges and license granted hereunder shall terminate.

    13.3 Upon any material breach or default of this Agreement by LICENSEE, other than those occurrences set out in Paragraphs 13.1 and 13.2 hereinabove, which shall always take precedence in that order over any material breach or default referred to in this Paragraph 13.3, M.I.T. shall have the right to terminate this Agreement and the rights, privileges and license granted hereunder by ninety (90) days' notice to LICENSEE. Such termination shall become effective unless LICENSEE shall have cured any such breach or default prior to the expiration of the ninety (90) day period.

    13.4 LICENSEE shall have the right to terminate this Agreement at any time on six (6) months' notice to M.I.T., and upon payment of all amounts due M.I.T. through the effective date of the termination.

    13.5 Upon termination of this Agreement for any reason, nothing herein shall be construed to release either party from any obligation that matured prior to the effective date of such termination. LICENSEE and any sublicensee thereof may, however, after the effective date of such termination, sell all Licensed Products, and complete Licensed Products in the process of manufacture at the time of such termination and sell the same, provided that LICENSEE shall pay to M.I.T. the royalties thereon as required by Article IV of this Agreement and shall submit the reports required by Article V hereof on the sales of Licensed Products.

    13.6 Upon termination of this Agreement for any reason, any sublicensee not then in default shall have the right to seek a license from M.I.T.

    13.7 LICENSEE shall have the right, upon written notice to M.I.T., to separately terminate its license to any independent patent application or patent of the Patent Rights.

## ARTICLE XIV - PAYMENTS, NOTICES
## AND OTHER COMMUNICATIONS

    Any payment, notice or other communication pursuant to this Agreement shall be sufficiently made or given on the date of mailing if sent to such party by certified first class mail, postage prepaid, addressed to it at its address below or as it shall designate by written notice given to the other party:

04/27/2004  09:33    3104767639                LAURIE ALLEN                        PAGE  16

-15-

In the case of M.I.T.:

        Director
        Technology Licensing Office
        Massachusetts Institute of Technology
        Room E32-300
        Cambridge, Massachusetts  02139

In the case of WHITEHEAD:

        Vice President
        Whitehead Institute
        Nine Cambridge Center
        Cambridge, MA  02142

In the case of LICENSEE:

        Harvey J. Berger, M.D.
        Chairman and Chief Executive Officer
        ARIAD Pharmaceuticals, Inc.
        687 Wetherby Lane
        Devon, PA  19333

or as amended in writing from time to time by any party.

## ARTICLE XV - MISCELLANEOUS PROVISIONS

15.1  This Agreement shall be construed, governed, interpreted and applied in accordance with the laws of the Commonwealth of Massachusetts, U.S.A., except that questions affecting the construction and effect of any patent shall be determined by the law of the country in which the patent was granted.

15.2  The parties hereto acknowledge that this Agreement sets forth the entire Agreement and understanding of the parties hereto as to the subject matter hereof, and shall not be subject to any change or modification except by the execution of a written instrument subscribed to by the parties hereto.

15.3  The provisions of this Agreement are severable, and in the event that any provisions of this Agreement shall be determined to be invalid or unenforceable under any controlling body of the law, such invalidity or unenforceability shall not in any way affect the validity or enforceability of the remaining provisions hereof.

Confidential Information Under Protective Order

ADL 0029173

04/27/2004  09:33   3104767639                    LAURIE ALLEN                          PAGE 17

-16-

15.4 LICENSEE agrees to mark the Licensed Products sold in the United States with all applicable United States patent numbers. All Licensed Products shipped to or sold in other countries shall be marked in such a manner as to conform with the patent laws and practice of the country of manufacture or sale.

15.5 The failure of any party to assert a right hereunder or to insist upon compliance with any term or condition of this Agreement shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition by the other parties.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals and duly executed this Agreement the day and year set forth below.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY
By _____
Name _____
    JOHN T. PRESTON, DIRECTOR
Title _____
    TECHNOLOGY LICENSING OFFICE
Date  8 - 26 - 91

WHITEHEAD INSTITUTE
By _____
Name  John Pratt
Title  Vice President
Date  8/28/91

ARIAD PHARMACEUTICALS, INC.
By  Harvey Berger , M.D.
Name  HARVEY J. BERGER, M.D.
Title  Chairman + Chief Executive Officer
Date  8/19/91

Confidential Information Under Protective Order                    ADL 0029174

04/27/2004  09:33   3104767639              LAURIE ALLEN                    PAGE  18

-17-

## APPENDIX A

**M.I.T. Case No. 4167AA**
"Nuclear Factors Associated With Transcriptional Regulation"
By David Baltimore, Ranjan Sen, Phillip A. Sharp, Harinder Singh, Louis Staudt, Jonathan
LeBowitz, Albert S. Baldwin, Jr., Roger Clerc, and Lynn M. Corcoran
U.S.S.N. 280,173 (Filed 12/5/88)
(Owned by M.I.T. and the Whitehead Institute, jointly)

**FOREIGN FILING(S)**

**M.I.T. Case No. 4167:**

European Application No. 87 900968.6  (Filed 1/9/87)
   *(Claiming Austria, Belgium, Switzerland/Liechtenstein, Germany, France, Great
   Britain, Italy, Luxembourg, Netherlands, Sweden)*

Japanese Application No. PCT/US87/00086  (Filed 1/9/87)

**M.I.T. Case No. 4167A/4167AA:**

Canadian Application No. 590,892 (Filed 2/13/89)
European Application No. 89 902888.0  (Filed 2/10/89)
   *(Claiming Austria, Belgium, Switzerland/Liechtenstein, Germany, France, Great
   Britain, Italy, Luxembourg, Netherlands, Sweden)*
Japanese Application No. PCT/US89/00553  (Filed 2/10/89)

**M.I.T. Case No. 4442W (Whitehead No. 86-10)**
"Method of Inducible Gene Expression"
By Ranjan Sen and David Baltimore
U.S.S.N. 946,365 (Filed 12/24/86)
(Owned by The Whitehead Institute)

**FOREIGN FILING(S)**

All foreign filing has been abandoned.

04/27/2004  09:33  3104767639                    LAURIE ALLEN                    PAGE  19

-18-

**M.I.T. Case No. 4695W (Whitehead No. 87-11)**
"Activation of NF-kB Precursor"
By Patrick Baeuerle and David Baltimore"
U.S.S.N. 318,901 (Filed 3/3/89)
(Owned by The Whitehead Institute)

FOREIGN FILING(S)

European Application No. PCT/US89/00820  (Filed 3/1/89)
          *(Claiming Austria, Belgium, Switzerland/Liechtenstein, Germany, France, Great
          Britain, Italy, Luxembourg, Netherlands, Sweden)*

**M.I.T. Case No. 5134W (Whitehead No. 89-02)**
"NF-kB-Mediated Transcriptional Regulation"
By Michael J. Lenardo, Chen-ming Fan, Tom Maniatis and David Baltimore
U.S.S.N. 341,436 (Filed 4/21/89)
(Owned by The Whitehead Institute and Harvard University, jointly.  Harvard University has
given M.I.T. the authority to license Harvard's rights on Harvard's behalf and has given
Whitehead full rights to prosecute and defend the Patent Rights.)

FOREIGN FILING(S)

None

**M.I.T. Case 5675   (Whitehead 87-11AA)**
"The pp40 Associated with REL is an I-κB" by David Baltimore, Sankar Ghosh et al.
To be filed
(Owned by The Whitehead Institute)

Confidential Information Under Protective Order                    ADL 0029176

04/27/2004  09:33    3104767639              LAURIE ALLEN                    PAGE  20

-19-

## APPENDIX B

Foreign countries in which Patent Rights shall be filed, prosecuted and maintained in accordance with Article VI where legally possible:

Canada
Japan
Great Britain
France
Germany
Italy

Confidential Information Under Protective Order                    ADL 0029177

04/27/2004  09:33   3184767639                LAURIE ALLEN                    PAGE  21

APPENDIX C

#1/LLN/11/14/88
CentCollabResAgt

# COLLABORATIVE RESEARCH AGREEMENT

This Agreement between Centocor, Inc. and the Massachusetts Institute of Technology ("M.I.T.") defines the terms and conditions under which Centocor scientists will collaborate with Prof. Phillip A. Sharp and colleagues in the Cancer Center at M.I.T. in the area of antibody gene expression ("The Collaboration").

Centocor and M.I.T. hereby agree as follows:

1. FIELD:  The Field of the Collaboration is defined by the Work Statement attached hereto as Appendix A.

2. DURATION:  The Collaboration shall begin on December 1, 1988 and terminate on November 30, 1991, unless sooner terminated by either party notifying the other, in writing, that it wishes to terminate the Collaboration.  The Collaboration may be extended by written mutual consent.

3. EXCHANGE OF INFORMATION:  During the Collaboration, each party shall provide the other with all data and other information that it develops under the Collaboration.

4. M.I.T. TANGIBLE PROPERTY:  M.I.T. shall provide to Centocor certain biological materials ("M.I.T.") developed before the Collaboration, for Centocor's use in the Collaboration.  Centocor shall not give samples, progeny, or derivatives of such M.I.T. Tangible Property to any third party except with the written permission of M.I.T.

5. BIOLOGICAL MATERIAL DEVELOPED UNDER THE COLLABORATION: Any biological material developed by one party under the Collaboration shall be provided to the other for its use under the Collaboration.  Samples, progeny or derivatives of any biological materials developed under the Collaboration shall not be delivered to any third party without the written permission of the developing party, except as specified in



Confidential Information Under Protective Order                        ADL 0029178

2

Paragraph 8(c) below. Notwithstanding the foregoing, for hybridomas developed under this Collaboration which are of commercial value to Centocor and which are derived from hybridomas developed or obtained by Centocor outside of this Collaboration, Centocor shall not be required to provide said hybridomas to MIT unless provision is specifically requested by MIT for specific purposes and, unless suitable cell line transfer agreements in the form of those contained in Appendix C are executed between the parties hereto."

6. PUBLICATION: Either party shall be free to publish any of the results it obtains under the Collaboration, and shall acknowledge the contribution of the other party, or include the other party as co-author, as appropriate. The publishing party shall provide the other party with a copy of manuscripts submitted for publication at least thirty days prior to publication, in order to allow the other party to identify potentially patentable material and request that a patent application be filed.

7. INVENTIONS: Any inventions made by Centocor personnel shall belong to Centocor; inventions made by M.I.T. personnel shall be owned by M.I.T. Inventions made jointly by M.I.T. and Centocor personnel shall belong jointly to M.I.T. and Centocor. Each party shall promptly notify the other if it makes an invention during the Collaboration, and if it intends to file a patent application on any such inventions. Copies of any such patent applications which are filed by one party shall be promptly provided to the other party.

8. PATENT AND LICENSING RIGHTS:

(a) During the Collaboration, M.I.T. shall grant to Centocor a royalty-free nonexclusive license to the Patent Rights of the M.I.T. Cases listed in Appendix B and to the M.I.T. Tangible Property for internal research and development use in the field of use of "Expression of Antibodies". If Centocor does not terminate this Agreement at any time prior to October 31, 1991, the internal research and development use license to the Patent Rights and the M.I.T. Tangible Property shall be in perpetuity.

(b) M.I.T. shall have the right to use any biological property and inventions developed by Centocor under the Collaboration for its own internal uses, royalty-free in perpetuity.

(c) "Transferrable Property" is defined as any biological property developed by Centocor under the Collaboration, but excluding hybridomas developed by Centocor which produce antibody of commercial value to Centocor. "Licensable Centocor Patent Rights" shall mean

Confidential Information Under Protective Order                    ADL 0029179

3

patent rights to inventions made by Centocor under the Collaboration, but excluding claims to hybridomas producing antibody of commercial value to Centocor. M.I.T. shall have the right to license to third parties, only in conjunction with the Patent Rights to Appendix B, any Transferrable Property and Licensable Centocor Inventions. M.I.T. shall pay to Centocor twenty-five percent (25%) of the Net Royalties it receives from such licenses. ("Net Royalties" is defined as Gross Royalties minus 15% for administration and marketing, and minus any unreimbursed out-of-pocket patenting costs.)

(d) Centocor shall have a first option to an exclusive royalty-bearing license with suitable due diligence provisions, for certain Applications, to the M.I.T. Tangible Property, the Patent Rights of Appendix B, and any M.I.T. inventions or biological property developed under the Collaboration. An "Application" is defined as all hybridomas producing antibodies to a single antigen or directed to detection of a single disease state if all tests for that disease are based on the same antigen or set of antigens operating by the same basic mechanism in the disease state. The terms of Centocor's option are as follows:

(i) Centocor shall have a first option to all Applications for one year following the beginning of the Collaboration. Thereafter, Centocor's option shall be only to Applications for which M.I.T. has not previously granted a license to a third party.

*[handwritten: for an exclusive license and an option for a non-exclusive license until one year following the end of the Collaboration]*

(ii) Centocor may exercise its option to an exclusive license for an Application only after Centocor demonstrates that it has developed a suitable hybridoma for that Application, or that it has an intensive development program in place specifically devoted to development of a hybridoma for that Application. In the latter event, Centocor's license to the hybridoma shall terminate if a functional hybridoma is not developed by Centocor within two years of the effective date of the license.

(iii) If Centocor exercises its option to an exclusive license to an Application, the royalties shall be as follows:

((a)) For Applications using known hybridomas whose efficiency of production of antibody is increased by use of the Patent Rights of Appendix B or the M.I.T. Tangible Property and/or M.I.T. patents or M.I.T. biological property developed under the Collaboration (together defined as "M.I.T. Intellectual and Material Property"), royalties shall include a License Issue Fee of $10,000 per Application, and a Running

04/27/2004  09:33   3104767639                LAURIE ALLEN                      PAGE  24

4

Royalty of one-half of one percent (0.5%) of Centocor's sales of product produced and sold using the M.I.T. Intellectual and Material Property.

((b))   For Applications using new hybridomas which could not be practically developed without use of the M.I.T. Intellectual and Material Property, a License Issue Fee of $25,000 per Application, and a Running Royalty of 2.5% of product sales.

AGREED TO FOR:

MASSACHUSETTS INSTITUTE
OF TECHNOLOGY

By _John T Preston_____

Title _____

Date _Nov. 14, 1988____

CENTOCOR, INC.

By _____

Title _Chairman of Board_

Date _Nov , 1988_

APPENDIX A

WORK STATEMENT

As part of a continuing collaboration between MIT scientists (represented by Dr. Phillip Sharp and Centocor), the MIT scientists will isolate and characterize cDNA clones representing cellular factors involved in the regulation of immunoglobulin gene expression.  Said cDNA clones will then be sent to Centocor where they will be used in one or more of the following ways:

a)    The cDNA clones will be used as probes to determine the level of expression of said factors in hybridoma and other cell lines.

b)    the cDNA clones will be expressed in hybridoma or other mammalian cells in order to study their effects on immunoglobulin production.

c)    the cDNA clones will be expressed in E. coli in order to obtain large quantities for study and for production of antisera.

d)    Recombinants of the cDNAs and other activator genes may also be tested in the course of these experiments.

LBOOKSAS.NO1/11

APPENDIX D

MASSACHUSETTS INSTITUTE OF TECHNOLOGY  CAMBRIDGE, MASSACHUSETTS 02139

Date: _____

Biomaterials Coordinator
Technology Licensing Office
Massachusetts Institute of Technology
Building E32-300
77 Massachusetts Ave.
Cambridge, MA 02139

Biology Department
Massachusetts Institute of Technology
Building
77 Massachusetts Ave.
Cambridge, MA 02139

Subject:  BIOLOGICAL MATERIAL TRANSFER AGREEMENT

Dear

This is to acknowledge your request for _____
_____, which is owned by MASSACHUSETTS INSTITUTE
OF TECHNOLOGY (M.I.T.).  M.I.T. will provide this material to you, for your use in
noncommercial scientific research only, under the following conditions:

1.    The Material covered by this Agreement includes _____
      any additional progeny or derivatives which could not have been made but for
      the _____ and any related information and
      know-how which will be received under this agreement.

2.    The Material will be used only by you and by individuals working under your
      direct supervision in your institution, and will not be transferred, distributed or
      released to any other person.

3.    The Material will be used only for noncommercial, publishable research
      purposes.  It will not be used on any research to be used for the development
      of any commercial product, including drug screening or development for
      commercial purposes or on behalf of any commercial entity.

4.    You will be free to publish any research results using the Material.  We would
      appreciate your acknowledging in such publication(s) MIT and its personnel as
      scientifically appropriate, and providing MIT with copies of such publication(s).

5.    The Material is made available for investigational use only in laboratory
      animals or in in vitro experiments and will not be used in humans or for

Page 1

Confidential Information Under Protective Order

ADL 0029183

any other purpose.

6.   All characteristics of the Material are not fully understood and its use may involve risks or dangers that are not known or fully appreciated. The Material is being provided without warranty of any sort, express or implied.

7.   You and your Institution will use the Material in compliance with all laws and governmental regulations and guidelines applicable to the Material and will comply with all NIH guidelines and other relevant NIH instructions. In particular:

   A) Your laboratory has been reviewed by its institutional biohazards committee (IBC) which has certified that facilities, procedures, and the training and expertise of the personnel involved are adequate;

   B) Your laboratory has received the appropriate approvals and has registered its rDNA program with the IBC; and

   C) A copy of this letter is on file with your laboratory's IBC.

8.   You will hold MASSACHUSETTS INSTITUTE OF TECHNOLOGY (M.I.T.) and its employees harmless from any loss, claim, damage or liability, of any kind, which may arise from or in connection with this Agreement or the use, handling or storage of the Material. In no case shall M.I.T. or Professor _____ _____ be liable for any use by you, by individuals working under your direct supervision, or by your Institution, of the Material or any loss, claim, damage or liability, of any kind, which may arise from or in connection with this Agreement or the use, handling or storage of the Material.

9.   You understand that no other right or license to this Material or to its use is granted or implied as a result of our sending the Material to you.

10.  At the request of MASSACHUSETTS INSTITUTE OF TECHNOLOGY, unused Material will be returned to M.I.T. or destroyed.

Research Project:  Studies on the activation and differentiation of monocytic cells.

If you agree to accept the Material under the above conditions, please sign the Agreement, have it signed by an authorized representative of your Institution and return it to:

Page 2

Confidential Information Under Protective Order                     ADL 0029184

04/27/2004  09:33    3104767639                    LAURIE ALLEN                    PAGE  28

_____
_____
_____
_____

The Material will be sent to you as soon as possible after the receipt of the signed agreement.

Sincerely,

Accepted:

REQUESTER
INSTITUTION _____

By:_____ _____        By:_____
(Signature)                        (Signature)

By:_____        By:_____
(Printed Name)                     (Authorized Representative's
                                   Printed Name)

Date:_____        Date:_____

Page 3

Confidential Information Under Protective Order                    ADL 0029185

# Exhibit P

04/27/2004  09:33  3104767639                    LAURIE ALLEN                        PAGE  29
                                                 MINTZ LEVIN                                    ☑002

## FIRST AMENDMENT

This amendment, dated _November 20, 1991_ is to the License Agreement dated August 19, 1991 between MASSACHUSETTS INSTITUTE OF TECHNOLOGY, the WHITEHEAD INSTITUTE, and ARIAD PHARMACEUTICALS, INC.

The parties agree that the License Agreement shall be amended as follows in order to acknowledge Harvard University's ownership of certain Patent Rights:

1. The following paragraph shall be added to the WITNESSETH section:

   "WHEREAS, M.I.T. Case No. 5134W (Whitehead No. 89-02) "NF-kB Mediated Transcriptional Regulation" by Michael J. Lenardo, Chen-ming Fan, Tom Maniatis and David Baltimore is jointly owned by Harvard University, and Harvard University (Harvard)has authorized M.I.T. to act as its sole and exclusive agent for the purposes of licensing Harvard's rights in the Patent Rights and has authorized M.I.T. to enter into this licensing agreement on Harvard's behalf;

2. The word "Harvard" shall be added after "Whitehead," in the first sentence of Paragraph 1.2.

3. The words "and Harvard" shall be added after "Whitehead and M.I.T." and "M.I.T. and Whithead" in Paragraph 2.7.

4. The words "and/or Harvard" shall be added after the words "and/or Whitehead" in all instances in Paragraph 6.1.

5. The words "and Harvard" shall be added after the words "M.I.T. and Whitehead" in Paragraphs 7.1 and & 7.2. The words "or Harvard" shall be added after the words "M.I.T. or Harvard" in Paragraph 7.2.

6. The words "and Harvard" shall be added after the words "M.I.T. and Whitehead" in all instances in Paragraphs 8.1, 8.2 and 8.3.

7. The words "nor of Harvard University" shall be added after "nor of the Whitehead Institute", and the words "or Harvard" shall be added after the words "Whithead or M.I.T." in Section X.

Confidential Information Under Protective Order                    ADL 0029186

04/27/2004  09:33    3104767639         LAURIE ALLEN                PAGE  30
04/27/02  10:20 FAX 342 2201            MINTZ LEVIN                    ☐003

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals and duly
executed this Agreement the day and year set forth below.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY

By _John T. Preston_

Name    JOHN T. PRESTON, DIRECTOR
        TECHNOLOGY LICENSING OFFICE

Title _____

Date _11 – 11 – 91_

WHITEHEAD INSTITUTE

By _John Pratt_

Name    _John Pratt_

Title   _Vice President_

Date    _11/20/91_

ARIAD PHARMACEUTICALS, INC.

By _Harvey Berger_

Name    _HARVEY J. BERGER_

Title   _Chairman + CEO_

Date    _11/20/91_

IA/ac
5134.ariad.amend.1105

Confidential Information Under Protective Order          ADL 0029187

# EXHIBIT Q

04/27/2004   09:33   3104767639                LAURIE ALLEN                        PAGE   31

## SECOND AMENDMENT TO LICENSE AGREEMENT

This Second Amendment to License Agreement ("Second Amendment to License Agreement") is made and entered into as of this 2nd day of January, 2002, (the "Effective Date") by and between MASSACHUSETTS INSTITUTE OF TECHNOLOGY, a corporation organized and existing under the laws of the Commonwealth of Massachusetts and having its principal offices at 77 Massachusetts Avenue, Cambridge, Massachusetts (hereinafter referred to as "M.I.T."), and the WHITEHEAD INSTITUTE, a corporation organized and existing under the laws of Delaware and having its principal offices at Nine Cambridge Center, Cambridge, Massachusetts (hereinafter referred to as "Whitehead") and ARIAD PHARMACEUTICALS, INC., a corporation duly organized under the laws of Delaware and having its principal offices at 20 Landsdowne Street, Cambridge, Massachusetts (hereinafter referred to as "LICENSEE").

WHEREAS, M.I.T., WHITEHEAD and LICENSEE entered into that certain License Agreement dated August 19, 1991, and amended same effective November 20, 1991 (collectively, the "Agreement"); and

WHEREAS, the parties to the Agreement desire to amend certain terms of the Agreement, to add certain terms to the Agreement and to confirm the validity and effectiveness of the remaining terms and conditions set forth in the Agreement, all as further set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and obligations set forth herein, the parties hereby agree as follows:

### ARTICLE 1

1. **Definitions.** Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Agreement.

### ARTICLE 2

2. **Amendment of the Agreement.** The Agreement is hereby amended as set forth in this Article 2.

2.1 **Amendment of Article II - Grant.** Article II of the Agreement is hereby amended as set forth herein.

2.1.1 **Amendment of Paragraph 2.2.** Paragraph 2.2 of the Agreement is hereby deleted and replaced with the following text:

"2.2 [RESERVED]"

2.1.3 **Amendment of Paragraph 2.3.** Paragraph 2.3 of the Agreement is hereby deleted and replaced with the following text:

Confidential Information Under Protective Order                    ADL 0029188

04/27/2004   09:33   3184767639                    LAURIE ALLEN                    PAGE   32

"2.3  Except as otherwise specifically set forth herein, the rights granted under Paragraph 2.1 hereof shall be and remain exclusively granted to LICENSEE and shall continue until the end of the term or terms for which any Patent Rights are issued, unless sooner terminated as provided herein.  Without limiting the generality of the foregoing, upon a failure of LICENSEE to pay the License Maintenance Fees due hereunder, the rights granted under Paragraph 2.1 hereunder shall convert to non-exclusive upon written notice from M.I.T. to LICENSEE.  The right to convert the rights granted hereunder to non-exclusive shall not be in limitation of any other rights that M.I.T. may have hereunder or at law upon such a failure by LICENSEE to pay the License Maintenance Fees hereunder."

**2.1.3  Amendment of Paragraph 2.4.**  Paragraph 2.4 of the Agreement is hereby deleted and replaced with the following text:

"2.4  [RESERVED]"

**2.1.4  Amendment of Paragraph 2.8.**  Paragraph 2.8 of the Agreement is hereby deleted and replaced with the following text:

"2.8  LICENSEE shall have the right to enter into sublicenses for the rights, privileges and licenses granted hereunder.  Such sublicenses shall contain provisions enabling LICENSEE to fulfill its obligations to M.I.T. hereunder."

**2.1.5  Amendment of Paragraphs 2.9 and 2.10.**  Paragraphs 2.9 and 2.10 of the Agreement are hereby deleted and replaced with the following text:

"2.9  [RESERVED]

2.10  [RESERVED]"

**2.2  Amendment of Article III - DUE DILIGENCE.**  Article III of the Agreement is hereby amended as set forth herein.

**2.2.1  Amendment of Paragraph 3.1.**  Paragraph 3.1 of the Agreement is hereby deleted and replaced with the following text:

"3.1  LICENSEE shall use reasonable commercial efforts to bring one or more Licensed Products to market through a thorough, vigorous and diligent program for exploitation of the Patent Rights.  Commercially reasonable efforts by LICENSEE to grant sublicenses to companies that LICENSEE reasonably believes are engaged or will engage in such activities shall be sufficient to satisfy LICENSEE's obligations hereunder."

**2.2.2  Amendment of Paragraph 3.2.**  Paragraph 3.2 of the Agreement is hereby deleted and replaced with the following text:

"3.2  [RESERVED]"

2

Confidential Information Under Protective Order                    ADL 0029189

04/27/2004 09:33    3104767639                LAURIE ALLEN                    PAGE 33

**2.3    Amendment of Article VII - INFRINGEMENT.** Article VII of the Agreement is hereby amended as set forth herein.

**2.3.1    Amendment of Paragraph 7.5.** Paragraph 7.5 of the Agreement is hereby deleted and replaced with the following text:

"7.5  In the event that a declaratory action alleging invalidity or noninfringement of any of the Patent Rights shall be brought against LICENSEE, and LICENSEE fails to take reasonable steps to defend such action in a timely manner, M.I.T. (or Whitehead), at its option, shall have the right to intervene and take over sole defense of such action at its own expense."

## ARTICLE 3
## CONFIRMATION OF VALIDITY AND EFFECTIVENESS

**3.    Confirmation of Validity and Effectiveness.** Except as otherwise specifically set forth herein, the parties hereby confirm the validity and continued effectiveness of the Agreement.

IN WITNESS WHEREOF, the parties have hereunto set their hands and duly executed this Second Amendment to License Agreement as of the Effective Date.

**MASSACHUSETTS INSTITUTE OF TECHNOLOGY**

By: _____
Name: _____
Title: _____

**WHITEHEAD INSTITUTE**

By: _____
Name: _____
Title: _____

**ARIAD PHARMACEUTICALS, INC.**

By:    Fritz Casselman
       Senior Vice President and
       Chief Business Officer

TRA 1616308v1

3

Confidential Information Under Protective Order                    ADL 0029190