# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMGEN, INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION, | ) ) ) ) | C.A. No. 06-259-KAJ |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| ARIAD PHARMACEUTICALS, INC., | ) ) | |
| Defendant. | ) | |

## DEFENDANT ARIAD PHARMACEUTICALS, INC.'S OPENING MEMORANDUM OF LAW IN SUPPORT OF ITS RENEWED MOTION TO DISMISS FOR FAILURE TO NAME NECESSARY AND INDISPENSABLE PARTIES OR, IN THE ALTERNATIVE, TO TRANSFER PURSUANT TO 28 U.S.C. § 1404(a)

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone:  (302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Counsel for Defendant*
*ARIAD Pharmaceuticals, Inc.*

*Of Counsel:*

Morgan Chu
David I. Gindler
Elizabeth Rosenblatt
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Telephone:  (310) 277-1010

Dated:  October 5, 2006
173901.1

TABLE OF CONTENTS

Page

I.    NATURE AND STAGE OF THE PROCEEDING..................................................1

II.   SUMMARY OF ARGUMENTS ...........................................................................3

III.  ARGUMENT .........................................................................................................8

    A.   The Court Should Dismiss This Action Because Plaintiffs Have
        Failed And Refused To Name The Institutions As Defendants...............8

        1.   The Institutions Are Necessary And Indispensable
            Parties Because They Have Retained Substantial Rights
            In The '516 Patent .........................................................................9

            a.   The Institutions are necessary and indispensable
                parties because they retained the right to
                "indulge" infringement ...................................................10

            b.   The Institutions are necessary and indispensable
                parties because they retained the right to control
                ARIAD's assignments of rights ......................................12

            c.   The Institutions are necessary and indispensable
                parties because they retained other key rights ...............13

            d.   The Institutions' right to take over a declaratory
                judgment action in certain circumstances does
                not change their status as necessary and
                indispensable parties ......................................................16

            2.   The Institutions And ARIAD Would Be Prejudiced By
            The Exclusion Of The Institutions...............................................20

    B.   If This Action Is Not Dismissed, It Should Be Transferred To
        The District Of Massachusetts ...................................................................23

        1.   Legal Standard .............................................................................24

        2.   This Action Could Have Been Brought In The District
            Of Massachusetts .........................................................................25

        3.   The Relevant Factors Favor Transfer Of This Action To
            The District Of Massachusetts .....................................................26

Page

a.    Public Factors:  The Interests Of Justice And
      Judicial Economy Weigh Heavily In Favor Of
      Transfer .................................................................... 26

      (1)    Transfer would avoid issues relating to
             personal jurisdiction ............................................ 26

      (2)    Transfer would avoid duplication of
             effort and the potential for inconsistent
             rulings ................................................................ 29

b.    Private Factors:  The Interests Of Convenience
      And Witness Availability Weigh Heavily In
      Favor Of Transfer .......................................................... 34

      (1)    Delaware is a less convenient forum than
             Massachusetts for ARIAD and for
             Plaintiffs ............................................................ 34

      (2)    Key witnesses and documents are located
             in Massachusetts ................................................ 35

      (3)    Other private factors ............................................ 37

IV.    CONCLUSION ....................................................................... 40

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Labs. v. Diamedix Corp.,*
    47 F.3d 1128 (Fed. Cir. 1995)............................................................... 10

*Affymetrix, Inc. v. Synteni, Inc.,*
    28 F. Supp. 2d 192 (D. Del. 1998)........................................... 28, 29, 34

*Allergan, Inc. v. Alcon Labs., Inc.,*
    No. 02-1682-GMS, 2003 WL 473380 (D. Del. Feb. 25, 2003)............................ 29

*American Optical Co. v. Curtiss,*
    59 F.R.D. 644 (S.D.N.Y. 1973) ............................................................. 13

*APV N. Am., Inc. v. Sig Simonazzi N. Am. Inc.,*
    295 F. Supp. 2d 393 (D. Del. 2002)....................................................... 35

*Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.,*
    444 F.3d 1356 (Fed. Cir. 2006)............................................................ 25

*Brunswick Corp. v. Precor Inc.,*
    No. 00-691-GMS, 2000 WL 1876477 (D. Del. Dec. 12, 2000) ......... 22, 24, 29, 35

*Caldwell Mfg. Co. v. Unique Balance Co.,*
    18 F.R.D. 258 (S.D.N.Y. 1955) ............................................................. 16

*Calgon Corp. v. Nalco Chem. Co.,*
    726 F. Supp. 983 (D. Del. 1989)........................................................... 12

*Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.,*
    395 F.3d 1315 (Fed. Cir. 2005)............................................................ 25

*Dainippon Screen Mfg. Co. v. CFMT, Inc.,*
    142 F.3d 1266 (Fed. Cir. 1998)............................................................ 21

*Datasouth Computer Corp. v. Three Dimensional Techs., Inc.,*
    719 F. Supp. 446 (W.D.N.C. 1989) ....................................................... 26

*Dentsply Int'l, Inc. v. Centrix, Inc.,*
    553 F. Supp. 289 (D. Del. 1982)........................................................... 20

*E.I. DuPont Nemours & Co. v. Diamond Shamrock Corp.,*
    522 F. Supp. 588 (D. Del. 1981)........................................................... 29

Page(s)

*eSpeed, Inc. v. BrokerTec USA, L.L.C.,*
    No. 03-612-KAJ, 2004 WL 2346137 (D. Del. Sept. 13, 2004) ..................... 24, 25

*Hall v. Kittay,*
    396 F. Supp. 261 (D. Del. 1975) .......................................................................... 31

*In re DVI, Inc.*
    No. 03-12656 MFW, C.A. 04-170 JJF, 2004 WL 1498593 (D. Del.
    June 23, 2004) ....................................................................................................... 26

*Intel Corp. v. Amberwave Sys. Corp.,*
    233 F.R.D. 416 (D. Del. 2005) ............................................................................. 29

*Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.,*
    248 F.3d 1333 (Fed. Cir. 2001) ................................................................ 10, 12, 18

*Jumara v. State Farm Ins. Co.,*
    55 F.3d 873 (3d Cir. 1995) ........................................................................... passim

*Kahhan v. City of Fort Lauderdale,*
    566 F. Supp. 736 (E.D. Pa. 1983) ........................................................................ 26

*Krupp Int'l, Inc. v. Yarn Indus., Inc.,*
    615 F. Supp. 1103 (D. Del. 1985) ........................................................................ 35

*Mentor Graphics Corp. v. Quickturn Design Sys., Inc.,*
    77 F. Supp. 2d 505 (D. Del. 1999) ........................................................... 26, 31, 35

*Merial Ltd. v. Intervet Inc.,*
    430 F. Supp. 2d 1357 (N.D. Ga. 2006) ................................................................ 13

*Mi-Jack Prods, Inc. v. Taylor Group, Inc.,*
    No. 96-C-7850, 1998 WL 89356 (N.D. Ill. Feb. 20, 1998) .................. 8, 15, 19, 20

*Milton G. Waldbaum Co. v. Roberts Dairy Co.,*
    325 F. Supp. 772 (D. Neb. 1971) .................................................................. 10, 14

*Minstar, Inc. v. Laborde,*
    626 F. Supp. 142 (D. Del. 1985) .......................................................................... 35

*Multistate Legal Studies, Inc. v. Marino,*
    41 U.S.P.Q. 2d 1886 (C.D. Cal. 1996).......................................................... 24, 26

*Network Appliance v. Bluearc Corp.,*
    D. Del. No. 03-714, Transcript of Nov. 19, 2003 Hearing ................................... 35

Page(s)

*Nilssen v. Everbrite, Inc.*,
    No. 00-189-JJF, 2001 WL 34368396 (D. Del. Feb. 16, 2001) ........... 29, 30, 32, 35

*Nilssen v. Osram Sylvania, Inc.*,
    No. 00-695-JJF, 2001 WL 34368395 (D. Del. May 1, 2001) ................................ 32

*Package Concepts & Materials, Inc. v. Jif-Pak*,
    C.A. 6:05-1184-HMH, 2005 WL 3055073 (D.S.C. Nov. 14, 2005) .............. 16, 17

*Perkins v. Benguet Consol. Min. Co.*,
    342 U.S. 437 (1952) ........................................................................................ 23

*Pfizer Inc. v. Elan Pharm. Research Corp.*,
    812 F. Supp. 1352 (D. Del. 1993) .............................................................. 12, 13, 18

*Prima Tek II, L.L.C. v. A-Roo Co.*,
    222 F.3d 1372 (Fed. Cir. 2000) ...................................................................... 17, 18

*Rainville Co. v. Consupak, Inc.*,
    407 F. Supp. 221 (D.N.J. 1976) ......................................................................... 13

*Refac Int'l v. Visa USA Inc.*,
    16 U.S.P.Q. 2d 2024 (N.D. Cal. 1990) ................................................................ 14

*Sherwood Med. Co. v. IVAC Med. Sys., Inc.*,
    No. 96-305 MMS, 1996 WL 700261 (D. Del. Nov. 25, 1996) ....................... 31, 33

*Sicom Sys. Ltd. v. Agilent Techs., Inc*,
    427 F.3d 971 (Fed. Cir. 2005) ..................................................................... passim

*Sumito Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*,
    No. 04-852-SLR, 2005 WL 735880 (D. Del. Mar. 30, 2005) ....................... 29, 30

*Tell v. Trs. of Dartmouth Coll.*,
    145 F.3d 417 (1st Cir. 1998) ............................................................................. 20

*Terukuni Kaiun Kaisha, Ltd. v. C.R. Rittenberry & Assocs.*,
    454 F. Supp. 418 (S.D.N.Y. 1978) ...................................................................... 26

*Tol-O-Matic, Inc. v. Proma Produkt-Und Mktg. Gesellschaft, m.b.H.*,
    690 F. Supp. 798 (D. Minn. 1987) ..................................................................... 8, 9

*Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.*,
    395 F.3d 1275 (Fed. Cir. 2005) .......................................................................... 25

*Waterman v. Mackenzie*,
    138 U.S. 252 (1891) ..................................................................... 9, 13, 17, 18

Page(s)

**Statutes**

10 Del. C. § 3104 ................................................................................................ 25

28 U.S.C. § 1292(b) ............................................................................................... 2

28 U.S.C. § 1391 ................................................................................................. 23

28 U.S.C. § 1404(a) ............................................................................. 6, 22, 23, 26

35 U.S.C. § 101 ................................................................................................ 6, 27

35 U.S.C. § 102 ................................................................................................ 6, 27

35 U.S.C. § 112 ................................................................................................ 6, 27

**Rules**

D. Del. Local Rule 3.1 ......................................................................................... 28

Fed. R. Civ. P. 19 .......................................................................................... 3, 8, 15

Fed. R. Civ. P. 26(b)(1) ....................................................................................... 28

Fed. R. Civ. P. 45(b)(2) ....................................................................................... 32

## I.    NATURE AND STAGE OF THE PROCEEDING

Amgen Inc. and certain related entities (collectively, "Plaintiffs") filed this action seeking a declaration of non-infringement and invalidity of U.S. Patent No. 6,410,516 ("the '516 patent"). The '516 patent is owned by the Massachusetts Institute of Technology ("MIT"), the Whitehead Institute for Biomedical Research ("Whitehead"), and The President and Fellows of Harvard College ("Harvard") (collectively referred to herein as the "Institutions"). (Ex. A.)[1] The inventors of the '516 patent include several scientists who worked with Nobel Laureate Dr. David Baltimore, a founder of Whitehead and the immediate past President of the California Institute of Technology, in conjunction with the laboratories of fellow Nobel Laureate Dr. Phillip Sharp and National Academy of Science member and Harvard Professor Dr. Thomas Maniatis. ( Exs. A–D, I at ¶ 11, V at 31:10–33:8.)

Plaintiffs have not named the three Institutions as defendants in this action, nor could they do so. Although Whitehead is incorporated in Delaware, MIT and Harvard are based in and incorporated under the laws of Massachusetts and are not subject to personal jurisdiction in Delaware. (Exs. A, I at ¶¶ 4–6.) Accordingly, Plaintiffs cannot sue all of the patent owners in Delaware. In an effort to secure jurisdiction in this District, Plaintiffs have sued only ARIAD Pharmaceuticals, Inc. ("ARIAD"), a small, but innovative, biotechnology company with a mere fraction of the financial resources of the Institutions. ARIAD has licensed certain exclusive rights to patents and patent applications—including the application that eventually matured into the '516 patent— from the Institutions, but this license does not afford ARIAD all substantial rights in the '516 patent. In particular, the Institutions share the right to decide whether or not to sue for or permit infringement, and have an absolute veto over ARIAD's ability to assign its rights under the agreement. (Exs. E–G.)

---

[1] All referenced exhibits are attached to the Declaration of Elizabeth L. Rosenblatt, filed concurrently herewith. All declarations are cited herein as "[Last Name] Decl."

On June 14, 2006, ARIAD filed a Motion to Dismiss this action for lack of subject matter jurisdiction, failure to state a claim, and failure to join the Institutions as necessary and indispensable parties. (D.I. 14.) The Court conducted a hearing on ARIAD's Motion to Dismiss on September 11, 2006. At the conclusion of the hearing, the Court denied ARIAD's motion in its entirety—but qualified its ruling on the failure to join the Institutions as necessary and indispensable parties as being *without prejudice.* (Ex. H at 82:23–24 (D.I. 70); *see also* D.I. 69.) In preserving this issue for a renewed motion, the Court observed that "it's just possible that I missed something or there is something out there that hasn't been put in front of me, and I recognize that I don't have the other parties to this agreement in front of me." (Ex. H at 83:18–21 (D.I. 70).)

The Court subsequently entered an Order dated September 13, 2006 (D.I. 69), formalizing its ruling. ARIAD timely filed its answer to the complaint on September 25, 2006. (D.I. 72.)

On September 25, 2006, ARIAD filed a motion requesting that the Court certify its order denying the motion to dismiss for lack of subject matter jurisdiction for immediate appeal to the Federal Circuit pursuant to 28 U.S.C. § 1292(b). This motion was made on the grounds that the Court's order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

This Memorandum of Law supports ARIAD's renewed motion to dismiss for Plaintiffs' failure to join the Institutions, which are necessary and indispensable parties. This motion is based on a more complete factual record—specifically, a declaration from Lita Nelsen, the Director of MIT's Technology Licensing Office, who was involved in the negotiation of ARIAD's license agreement—and a more detailed discussion of the relevant contractual provisions and applicable law.

- 2 -

## II.    SUMMARY OF ARGUMENTS

1.    Plaintiffs have failed to sue the right parties in the right place. Because the Institutions own the '516 patent and have retained substantial rights in the patent as part of the License Agreement, they are necessary and indispensable parties under Federal Rule of Civil Procedure 19 ("Rule 19"). Without all substantial rights in the '516 patent, ARIAD cannot sue to enforce the patent—or be sued in a declaratory judgment action attacking the patent—in the absence of the Institutions. Accordingly, this action cannot proceed without the Institutions. Plaintiffs have refused to join them in this action—no doubt because Plaintiffs know that there is no basis on which to assert personal jurisdiction over MIT and Harvard in this District, and because Plaintiffs prefer to litigate against a company with limited financial resources, minimal licensing revenues, no marketed products, and few sources of additional capital. If Plaintiffs truly believed they had the right to sue MIT and Harvard in this District, Plaintiffs could have promptly rectified this problem by joining them as defendants. Plaintiffs' failure to do so—particularly when confronted with ARIAD's Motion to Dismiss—speaks volumes.

2.    The Federal Circuit has looked at a number of factors in determining whether an exclusive licensee of a patent has all substantial rights in a patent. The most important factor is whether the exclusive licensee has the sole right to decide whether or not to sue for or permit infringement of the licensed patent. Indeed, the Federal Circuit has repeatedly held that without this particular right, an exclusive licensee lacks all substantial rights in the licensed patent.

3.    There can be no dispute in this case that ARIAD does not have the exclusive right to decide on its own whether or not to sue for or permit infringement of the '516 patent. The License Agreement explicitly provides that, if ARIAD declines to assert a patent infringement suit against a company that the Institutions believe is infringing the '516 patent, then the Institutions may sue that company on their own. (Ex. E at Section 7.4.) ARIAD has no ability to stop the Institutions from bringing such a

- 3 -

suit. The inquiry into whether ARIAD has all substantial rights begins and ends with this undisputable fact.

4.      In opposing ARIAD's original motion to dismiss on this basis, Plaintiffs argued that, because ARIAD has the exclusive right to decide whether or not to grant sublicenses to the '516 patent, ARIAD could always grant a sublicense to any company that the Institutions elected to sue, thereby overriding the Institutions' effort to sue that company for infringement. This argument, however, is only half true. The License Agreement expressly provides that, in those situations where the Institutions have exercised their right to bring suit for infringement of the '516 patent, ARIAD can grant a sublicense to the accused company *only as to future activities*. (Ex. E at Section 7.7.) ARIAD has no right to grant a sublicense to the accused company for past infringement in these circumstances. Accordingly, the Institutions retain the right, at a minimum, to seek damages in a action for past infringement of the '516 patent, and there is nothing that ARIAD can do to stop such an action.

5.      The right to indulge infringement is not the only dispositive substantial right retained by the Institutions. In addition, ARIAD cannot assign or delegate its rights or duties under the Agreement without the prior written consent of MIT and Whitehead, (with certain limited exceptions for subsidiaries, mergers, and sale of ARIAD's business). (Article XI.) The Agreement contains no restriction on MIT's and Whitehead's power to prevent ARIAD from assigning its rights. (*Id.*) The ability to assign rights under an exclusive license—like the right to indulge infringement—is a substantial right which, if retained by the patent holder, is itself sufficient to render the patent holder an indispensable party in a declaratory judgment action against an exclusive licensee.

6.      Moreover, the Institutions also retained a wealth of other rights that are relevant to the "all substantial rights" analysis, such as the right to practice the Patent Rights under the Agreement (including the '516 patent); the right and responsibility to prosecute and maintain patents and patent applications; the right to dictate certain

- 4 -

sublicense terms; the right to receive maintenance fees and running royalties in connection with sublicenses and sublicensed products; and the right to make the Agreement non-exclusive for non-payment of annual fees or terminate the Agreement if ARIAD does not develop or license the intellectual property covered by the Agreement. From these provisions, it is apparent that the parties not only intended for the Institutions to retain the dispositive rights to indulge infringement and to approve or veto ARIAD's ability to assign or delegate its rights under the Agreement, but also intended a relationship in which the Institutions would be involved in proceedings and decisions that could harm the value of the Institutions' Patent Rights.    Thus, these provisions demonstrate that the Institutions must be involved in litigation, like the present litigation, in which the '516 patent could be invalidated or the Institutions' ability to assert the '516 patent could be compromised.

7.    It is certainly true, as the Court observed at the September 11 hearing, that the License Agreement manifests an intent, set forth in Section 7.5, to allow ARIAD to control the defense of a declaratory judgment action attacking the validity of the '516 patent, without interference by the Institutions, unless ARIAD fails to take reasonable steps to defend the action in a timely manner.  (Exs. E at Section 7.5, G at Section 2.3.1.) This provision, however, is ineffective to permit a declaratory plaintiff to bring suit *only* against ARIAD, without joining the patent holders.  This is because, under Federal Circuit authority, ARIAD's right to defend a declaratory relief action on its own attacking the '516 patent is no greater than its right to bring suit on its own to enforce the '516 patent.  Unless ARIAD has all substantial rights in the '516 patent—which must include the sole right to determine whether or not to sue for infringement and the unfettered right to freely assign the Agreement—it can neither sue on its own for the purpose of enforcing the patent or be sued on its own for the purpose of attacking the patent.

8.    There are sound reasons for this rule.  A judgment rendered only against ARIAD would unjustly compromise the Institutions' patent rights without the

- 5 -

Institutions' participation, and would inevitably lead to ill consequences: Either the ruling would exclude the Institutions from a process that could have a preclusive effect on their ability to assert their patents in the future, or it would leave Plaintiffs open to a duplicative suit by the Institutions. In contrast, Plaintiffs would suffer no prejudice by dismissal, because they can assert the same causes of action in the District of Massachusetts,[2] where there are no personal jurisdiction issues to block the participation of all necessary and indispensable parties. Therefore, dismissal is appropriate.

9.    In the alternative, ARIAD respectfully requests that this Court transfer this action to the District of Massachusetts under 28 U.S.C. § 1404(a). The interests of justice would be served greatly by transferring this action to the District of Massachusetts. A transfer would eliminate any dispute regarding personal jurisdiction over MIT and Harvard, who are necessary and indispensable parties to this action, and thus eliminate the possibility of litigating this action through judgment in the District of Delaware— only to have the case reversed on appeal for Plaintiffs' failure to join MIT and Harvard as defendants. Moreover, a transfer would also conserve the resources of the parties and the Court. The District of Massachusetts has extensive knowledge of the '516 patent, its seven-year prosecution history (reflected in 1081 pages of patent prosecution documents), and its underlying technology by virtue of having presided over ARIAD's action against Eli Lilly & Company ("Lilly") in that District. (Rosenblatt Decl. ¶ 2 and Exs. A, I–K.) Since the Lilly litigation began, the Massachusetts Court has held a technology tutorial, has interpreted the claims of the '516 patent, has become familiar with relevant prior art, has heard several dispositive motions seeking to invalidate the patent pursuant to 35 U.S.C. §§ 101, 102, and 112, and has presided over a three-week jury trial and a four-day bench trial in which Lilly challenged the validity of the '516 patent on virtually every conceivable ground. (Ex. K.) Lilly's challenges to validity of

---

[2] Assuming, for the sake of argument, that Plaintiffs could establish subject matter jurisdiction over the action under the Declaratory Judgment Act.

the '516 patent included arguments that the patent is anticipated or rendered obvious by prior art, is anticipated by prior public use, fails to satisfy the enablement requirement, fails to satisfy the written description requirement, is directed to non-patentable subject matter, and is indefinite. (Ex. L, M at 4–10.) Thus, the Massachusetts Court has already heard extensive evidence regarding, and considered in detail, most (if not all) of the invalidity arguments that Plaintiffs undoubtedly intend to raise. Indeed, Plaintiffs have already taken the position (and the Court has agreed) that every single document, expert report, deposition, and item of correspondence from the Lilly litigation is relevant to the present litigation. (D.I. 67.) It would be a colossal waste of time for this Court to spend time and energy learning technology, disclosures, and prior art that have already been examined in detail by the Massachusetts Court—and an enormously inefficient use of the parties' time and resources to educate this Court about these subjects.

10.   Even setting aside the compelling issues of judicial efficiency and economy, transfer to Massachusetts is appropriate for the convenience of parties and witnesses. Plaintiffs' decision to file this suit in Delaware is a clear case of forum shopping. Plaintiffs filed suit in Delaware, rather than in Massachusetts, specifically to re-litigate issues that the Massachusetts Court decided in ARIAD's favor, in the hope that a second bite at the apple, before a different judge, might yield a different result. Aside from some (but not all) of the parties having incorporated in Delaware (which, although a factor, is not a dispositive one), none of the parties has any relevant connection to Delaware at all. ARIAD has no operations in Delaware. (Allen Decl. ¶ 2.) To ARIAD's knowledge, no Plaintiff has any operations in Delaware. (*Id.* at ¶ 3; Ex. Y.) Nor, to ARIAD's knowledge, is a single witness or item of relevant evidence located in Delaware. (Allen Decl. at ¶ 4.) By contrast, both Amgen and ARIAD have significant ties to Massachusetts, as does the inventive activity that gave rise to this suit. Amgen's second location (listed on its website immediately after its headquarters in Thousand Oaks, California) is in Cambridge, Massachusetts. (Ex. Y.) ARIAD's only location is in

- 7 -

Cambridge, Massachusetts. (Allen Decl. ¶ 2.) The Institutions are all located in Cambridge, Massachusetts. (Exs. A, I at ¶ 4–6.) Two of the inventors are located in Massachusetts. (Exs. C–D.) And several other potential third-party witnesses who would not be subject to compulsory process in Delaware are located in Massachusetts. (*See infra*, § III.B.3.b.(2).)

11.    Finally, transfer is warranted in light of the very significant question as to whether MIT and Harvard, neither of which has any meaningful contacts with this District, are subject to personal jurisdiction in Delaware. If Plaintiffs joined them as defendants in this action (in an effort to remedy the Rule 19 issue), they undoubtedly would move to dismiss on personal jurisdiction grounds, leading to potentially protracted motion practice and discovery on this collateral issue. ARIAD believes that, after any such collateral proceedings, the Court would conclude that MIT and Harvard are not subject to personal jurisdiction in this District—and thus Plaintiffs would be required to file in the District of Massachusetts if they chose to continue litigating this case. Transferring this case to the District of Massachusetts would avoid wasting time and resources fighting over this issue.

## III.    ARGUMENT

### A.    The Court Should Dismiss This Action Because Plaintiffs Have Failed And Refused To Name The Institutions As Defendants

A declaratory judgment action must be dismissed if it is missing a necessary and indispensable party. *See, e.g., Tol-O-Matic, Inc. v. Proma Produkt-Und Mktg. Gesellschaft, m.b.H.*, 690 F. Supp. 798, 801–02 (D. Minn. 1987); *Mi-Jack Prods, Inc. v. Taylor Group, Inc.*, No. 96-C-7850, 1998 WL 89356, at *2–*3 (N.D. Ill. Feb. 20, 1998). It is well established that a patent owner is a necessary and indispensable party under Rule 19 in an action involving the infringement or validity of the patent if the patent owner retains "substantial rights" in the patent, such that the transfer does not "amount[] to an assignment." *See, e.g., Sicom Sys. Ltd. v. Agilent Techs., Inc*, 427 F.3d 971, 976

(Fed. Cir. 2005); *see also Tol-O-Matic*, 690 F. Supp. at 801 ("[i]t is well established that a patent owner who has retained substantive rights in a patent that is the subject of an exclusive license is an indispensable party," citing *Waterman v. Mackenzie*, 138 U.S. 252, 255 (1891)). Even Plaintiffs agree that whether the Institutions transferred "all substantial rights" in the '516 patent to ARIAD is determinative of whether Institutions, as the patent owners, are indispensable parties. (Plaintiffs' Opp., D.I. 21 at 24.) As discussed below, because the Institutions retained substantial rights in the '516 patent, they are necessary and indispensable parties.

### 1.    The Institutions Are Necessary And Indispensable Parties Because They Have Retained Substantial Rights In The '516 Patent

There are a number of individual rights that qualify as "substantial" in and of themselves. If any one of those rights is retained by a patent owner, its licensee does not have all substantial rights in the patent, thereby making the patent owner a necessary and indispensable party in any litigation over the infringement or validity of the patent.

Here, the Institutions retained several major rights as part of the License Agreement, which was derived from the standard license agreement used by MIT's Technology Licensing Office at the time. (Nelsen Decl. ¶ 3.) Like MIT's standard agreement, the ARIAD License Agreement retains for the Institutions ultimate control over a critical set of rights in the licensed Patent Rights, while granting certain exclusive rights to ARIAD. (*See id.* ¶ 5-22.) The reasons for this structure were two-fold: In some instances, the Institutions wanted to retain rights in areas in which they believed the interests of the Institutions and of ARIAD might diverge. In other instances, the Institutions retained rights that, by law, they could not relinquish. (*See id.* ¶ 7.)

### a.    The Institutions are necessary and indispensable parties because they retained the right to "indulge" infringement

A dispositive issue is whether ARIAD has the *exclusive right* to "indulge" infringement—to decide on its own whether or not to sue for patent infringement. The

- 9 -

right to indulge infringement—while not the only right that must be transferred in order to vest a licensee with all substantial rights—*must* be included among the transferred rights. Without that right, an exclusive licensee does not have standing to bring suit on its own, irrespective of whatever additional rights are transferred under the license agreement. *See Sicom*, 427 F.3d at 976 (patentee was an indispensable party in light of its "right to permit infringement in certain cases"; noting that "an important substantial right is the exclusive right to sue for patent infringement"); *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001) (patentee was indispensable party in light of its "right to permit infringement in certain cases"); *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1132 (Fed. Cir. 1995) ("[T]he right to indulge infringements . . . normally accompanies a complete conveyance of the right to sue"); *Milton G. Waldbaum Co. v. Roberts Dairy Co.*, 325 F. Supp. 772, 774 (D. Neb. 1971) (dismissing declaratory judgment action when patentee reserved independent right to sue for infringement).

The exclusive right to indulge infringement was not transferred under the ARIAD License Agreement.[3] That right is shared by ARIAD and the Institutions. The Institutions gave ARIAD "the right to enter into sublicenses for the rights, privileges and licenses granted hereunder" (Section 2.8, as amended) and the right "to prosecute at its own expense any . . . infringements of the Patent Rights and in furtherance of such right, . . . [to] include M.I.T. or Whitehead [or Harvard] as party plaintiffs in any such suit" at no expense to the Institutions (Section 7.2, as amended). MIT and Whitehead, however, retained the crucial right to bring suit against an alleged infringer when ARIAD has elected not to act (Section 7.4):

---

[3] The ARIAD License Agreement (sometimes referred to herein as the "Agreement"), including amendments, is attached as Exhibits E–G to the Rosenblatt Declaration. For simplicity, provisions of the Agreement are referred to hereafter solely by their section numbers. Amendments are noted when appropriate.

> If within six (6) months after having been notified of any alleged infringement, LICENSEE . . . shall not have brought and shall not be diligently prosecuting an infringement action, or if LICENSEE shall notify M.I.T. at any time prior thereto of its intention not to bring suit against any alleged infringer, then, and in those events only, M.I.T. [(]or Whitehead, as appropriate) shall have the right, but shall not be obligated, to prosecute at its own expense any infringement of the Patent Rights . . . . The total cost of any such infringement action commenced or defended solely by M.I.T. (or Whitehead) shall be borne by M.I.T. (or Whitehead), and M.I.T. (or Whitehead) shall keep any recovery or damages for past infringement derived therefrom.

ARIAD cannot override the Institutions' right to bring suit and "keep any recovery or damages for past infringement" by simply granting a sublicense to the alleged infringer. This is because ARIAD's right to grant a sublicense is more restrictive when MIT or Whitehead has filed suit. While ARIAD generally has the right to grant sublicenses to any third party covering past or future activities (so long as ARIAD complies with certain requirements of the Agreement), ARIAD may only "sublicense any alleged infringer *for future use* of the Patent Rights" when MIT or Whitehead has filed suit. (Section 7.7, emphasis added.) This more restrictive language is necessary to allow MIT and Whitehead the sole right to keep any recovery for past infringement when they are entitled to file suit, as provided in Section 7.4. Thus, the right to decide whether to sue a third party for infringement and recover damages is shared between ARIAD, MIT, and Whitehead, and ARIAD therefore does not have the exclusive right to indulge infringement.

> **b.    The Institutions are necessary and indispensable parties because they retained the right to control ARIAD's assignments of rights**

The Institutions retained other crucial rights, in addition to the right to bring suit for infringement when ARIAD elects not to do so. For example, "[t]he rights of ARIAD under this Agreement may not be assigned and the duties of ARIAD under this Agreement may not be delegated without the prior written consent of M.I.T. and Whitehead," with certain limited exceptions for subsidiaries, mergers, and sale of

ARIAD's business. (Article XI.) The Agreement contains no restriction on MIT's and Whitehead's right to prevent ARIAD from assigning its rights in all other circumstances.

Like the right to indulge infringement, the right to assign freely without consent of the patent holder is a crucial right that *must* be transferred for a licensee to have obtained all substantial rights in the licensed patent. *See Sicom*, 427 F.3d at 979-80 (affirming district court's finding that "'the restriction on Sicom's right to assign' was a 'fatal reservation of rights'" for purposes of all substantial rights analysis); *Intellectual Prop. Dev.*, 248 F.3d at 1345 (finding that patentee was an indispensable party in light of limits on licensee's right to assign its interests in licensed patent); *see also Calgon Corp. v. Nalco Chem. Co.*, 726 F. Supp. 983, 986 (D. Del. 1989) (patentee was indispensable party when licensee could not assign its rights without obtaining patentees' prior written consent because "the right to assign patent rights is implicit in any true assignment"). In fact, in a case concerning a contractual term nearly identical to the term here, this Court has held that, since the licensee could not assign its rights without written consent of the patent owner, the court "need look no further in determining that [the owner] reserved substantial rights." *Pfizer Inc. v. Elan Pharm. Research Corp.*, 812 F. Supp. 1352, 1373 (D. Del. 1993).

### c.  The Institutions are necessary and indispensable parties because they retained other key rights

The right to indulge infringement and the right to control ARIAD's ability to assign the Agreement are not the only key rights that the Institutions retained. The Institutions also retained several rights that, while they may not be individually dispositive, collectively demonstrate that the Institutions did not transfer all substantial rights in the '516 patent to ARIAD. These rights include the following:

- Each of the Institutions retains "the right to practice under the Patent Rights and to use and distribute the Tangible Property for their noncommercial research purposes . . . ." (Section 2.7, as amended.) *See,*

e.g., *Merial Ltd. v. Intervet Inc.*, 430 F. Supp. 2d 1357, 1364 (N.D. Ga. 2006) (patent owners were indispensable parties when they retained right to "carry on any internal scientific, research, or teaching works"); *see also Waterman,* 138 U.S. at 255 (patentee transfers fewer than all of its rights when it does not transfer exclusive rights to make, use, and sell under the patent); *Pfizer*, 812 F. Supp. at 1373 (patent owner was indispensable when it retained right for itself and its affiliate to make, have made, use, and sell under the patent);

- "The prosecution, filing and maintenance of all Patent Rights . . . shall be the primary responsibility of [the Institutions]; provided, however, LICENSEE shall have reasonable opportunities to advise [the Institutions] and shall cooperate with [the Institutions] in such prosecution, filing and maintenance." (Section 6.1, as amended.) *See, e.g., American Optical Co. v. Curtiss*, 59 F.R.D. 644, 649, 651 (S.D.N.Y. 1973) (patentee was an indispensable party when it retained the right to indulge infringement, right to prosecute patent applications and substantial rights of cancellation).

- ARIAD does not have complete freedom to dictate terms of sublicenses, such that, for example, "LICENSEE agrees that Licensed Products leased or sold in the United States shall be manufactured substantially in the United States," (Section 2.6); and ARIAD must also obtain express written consent from MIT before receiving anything of value in lieu of cash payments in consideration for any sublicense under the Agreement, again with no restriction on MIT's right to deny permission.  (Section 2.12.) *See, e.g., Rainville Co. v. Consupak, Inc.*, 407 F. Supp. 221, 224–225 (D.N.J. 1976) (patentee was an indispensable party when the licensee did not have autonomy with respect to terms of sublicenses).

- MIT receives maintenance fees and Running Royalties in connection with sublicenses and sublicensed products, including "Twenty-Five Percent (25%) of any payments made to LICENSEE for sublicensing of the Patent Rights and/or Tangible Property," with certain exceptions for research reagents. (Section 4.1). *See Refac Int'l v. Visa USA Inc.*, 16 U.S.P.Q.2d 2024, 2028 (N.D. Cal. 1990) (license requiring licensee to pay royalties to patentee for any sublicenses that the licensee negotiated "does not contemplate a one-time transfer of [the patentee's] entire interest in the patent, but rather contemplates an ongoing relationship wherein [the patentee] reserves substantial rights in the patent" and therefore did not permit licensee to sue for infringement).

- MIT retains the right to make ARIAD's license non-exclusive if ARIAD fails to pay annual fees (Section 2.3, as amended); and retains the right to terminate ARIAD's license if ARIAD does not use commercially reasonable efforts to develop or license the intellectual property covered by the Agreement. (Section 3.1, as amended; and Section 3.3). *See, e.g., Refac Int'l.*, 16 U.S.P.Q.2d at 2028 (patent owner was an indispensable party when it retained the right to terminate the agreement under a variety of circumstances); *Milton G. Waldbaum*, 325 F. Supp. at 774 (dismissing declaratory judgment action when patentee had retained the right to substitute licensee as exclusive licensee if minimum royalty payments were not met).

Moreover, these retained rights have a common theme: they prevent ARIAD from exerting final authority over decisions that could negatively impact the value of the licensed Patent Rights, including the '516 patent. (Nelsen Decl. ¶ 10.) Put differently, they ensure that MIT and the other Institutions are involved in proceedings and decisions that could harm the value of the Patent Rights. Thus, if one or more patents licensed

under the ARIAD License Agreement were held to be invalid, the rights would be harmed. (*Id.*)  In the present case, Plaintiffs seek a declaration that the '516 patent is invalid—which, if granted, could have the effect of rendering the patent worthless and terminating the Institutions' many benefits in connection with the patent, including the Institutions' retained rights and royalty stream.  As a matter of law, and of the parties' contractual intent, this cannot occur without the participation of the Institutions.  Thus, Rule 19 exists for the same reason as the Institutions' retained rights:  so that the value of the Institutions' patent rights will not be compromised without the Institutions' involvement.  *Mi-Jack*, 1998 WL 89356 at *2–*3 ("[A] judgment entered without the presence of the [patent owner] could be prejudicial to the [patent owner] because it is the party that holds the patent.").

> **d.    The Institutions' right to take over a declaratory judgment action in certain circumstances does not change their status as necessary and indispensable parties**

Section 7.5 of the original License Agreement provided that:

> In the event that a declaratory judgment action alleging invalidity or noninfringement of any of the Patent Rights shall be brought against LICENSEE, M.I.T. (or Whitehead), at its option, shall have the right, within thirty (30) days after commencement of such action, to intervene and take over the sole defense of the action at its own expense.

(Section 7.5.)  The right of MIT and Whitehead to intervene and assume control of the defense of a declaratory judgment action was softened, but not eliminated, in the second amendment to the Agreement, which modified Section 7.5 as follows:

> In the event that a declaratory action alleging invalidity or noninfringement of any of the Patent Rights shall be brought against LICENSEE, *and LICENSEE fails to take reasonable steps to defend such action in a timely manner,* M.I.T. (or Whitehead), at its option, shall have the right to intervene and take over sole defense of such action at its own expense.

(Section 7.5, as amended; emphasis added to show new language.)

- 15 -

Plaintiffs have argued that the amended version of Section 7.5 shows that the parties intended that ARIAD would, in most cases, serve as the representative of the Institutions in a declaratory relief action, because MIT and Whitehead can take over the defense only if ARIAD "fails to take reasonable steps to defend such action in a timely manner." This fact is irrelevant, however, to the key inquiry: Does ARIAD have all substantial rights in the '516 patent? If ARIAD does not have all substantial rights in the '516 patent, Section 7.5 cannot grant ARIAD the right to act alone as a declaratory judgment defendant (although the provision appears to consider what would occur if ARIAD could do so).

Put simply, without all substantial rights in the '516 patent, ARIAD cannot sue others by itself to enforce the patent—and others cannot sue ARIAD by itself to attack the patent. Any other result would be absurd because the claims in infringement actions and declaratory judgment actions mirror each other. In an infringement action, the plaintiff brings suit for infringement against the defendant, who then typically asserts counterclaims alleging that the patent is invalid and not infringed. In a declaratory judgment action, the plaintiff seeks a declaration that the patent is invalid and not infringed against the defendant, who then typically asserts counterclaims of infringement. In either case, the same thing is happening—one party is asserting that the patent is infringed and is valid, and the other party is asserting that that the patent is not infringed and is invalid. The question of whether a licensee can assert claims for infringement, and defend against charges of invalidity, does not depend on who throws the first stone. It depends on whether the licensee has all substantial rights in the patent. *See Caldwell Mfg. Co. v. Unique Balance Co.*, 18 F.R.D. 258, 264 (S.D.N.Y. 1955) ("In the absence of an independent right to bring an action for patent infringement, defendant-licensee herein has no independent right to defend a suit seeking a declaration as to the validity of the licensed patent."); *see also Package Concepts & Materials, Inc. v. Jif-Pak*, C.A. 6:05-1184-HMH, 2005 WL 3055073, at *6 (D.S.C. Nov. 14, 2005) ("[J]ust as Jif-Pak could

not bring a suit for infringement of the '148 patent without the patent owners, PCM cannot proceed against a non-exclusive licensee, Jif-Pak, in its declaratory judgment action under the facts before the court."). Thus, section 7.5 no more empowers ARIAD to serve as the sole defendant in a declaratory judgment suit than section 7.2 empowers ARIAD to serve as the sole plaintiff in a patent infringement suit: the parties would need to have transferred all substantial rights in the '516 patent to ARIAD to accomplish either result, and they have not done so.

In reality, the only function of Section 7.5 is to bar ARIAD from objecting if MIT or Whitehead seeks to take over a declaratory judgment action in the circumstances set forth in that section. Section 7.5 does not mean that a declaratory judgment action can proceed without MIT or Whitehead. The logic of this is apparent from the following undisputable propositions: a declaratory judgment action cannot proceed against a non-exclusive licensee alone, even if the license agreement purports to grant the licensee the right to defend such actions. *See Package Concepts*, 2005 WL 3055073 at *6. Likewise, an infringement action cannot be filed by a non-exclusive licensee alone, even if the license agreement purports to grant the licensee the right to file such actions. In either situation, the non-exclusive licensee simply does not have the necessary rights. *See Waterman*, 138 U.S. at 255–56 (transfer of fewer than all substantial rights in a patent does not effect transfer of right to sue); *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1381 (Fed. Cir. 2000) ("a 'right to sue' clause cannot confer standing on a bare licensee"). In each of these cases, the patentee would be free to intervene, which would perpetuate the case, or not to intervene, which (as here) would terminate the case for failure to include a necessary and indispensable party. In other words, the question of whether all necessary and indispensable parties have been named depends not on whether the license agreement contemplates that ARIAD shall have the right to defend a declaratory judgment action under certain circumstances, but whether ARIAD has all substantial rights in the patent.

"Standing to sue for infringement depends entirely on the putative plaintiff's proprietary interest in the patent, not on any contractual arrangements among the parties regarding who may sue and who will be bound by judgments." *Prima Tek II*, 222 F.3d at 1381. This is because "a contract cannot change the statutory requirement for suit to be brought by the patentee." *Id.* (internal quotations omitted). A patent confers on its owner the exclusive rights to make, use, and sell an invention, and to exclude others from undertaking these activities. *Waterman*, 138 U.S. at 255–56. To stand in the shoes of a patentee, a licensee must acquire all substantial rights in the patent, including "the right of exclusivity, the right to transfer and most importantly the right to sue infringers." *Pfizer*, 812 F. Supp. at 1372–73; *see also Waterman*, 138 U.S. at 255–56; *Intellectual Prop. Dev.*, 248 F.3d at 1342–44.

For this reason, even if the Institutions had intended to hand over all rights to defend a declaratory judgment action to ARIAD (which they clearly did not), they could not have done so without granting ARIAD all substantial rights in the patent. In short, parties simply cannot contract around the rule of "all substantial rights." Indeed, the path of the law is strewn with parties who attempted to transfer all substantial rights, or believed they had received all substantial rights, and failed. *See, e.g., Sicom*, 427 F.3d at 980; *Intellectual Prop. Dev.*, 248 F.3d at 1349; *Prima Tek II*, 222 F.3d at 1381.

Moreover, to the extent that Section 7.5 has any relevance to the indispensable party analysis at all, this provision, even as modified, makes clear that the Institutions intended to retain more control over declaratory judgment actions filed against ARIAD than they did over infringement actions instituted by ARIAD—not to relinquish control over declaratory judgment actions to ARIAD. (*Compare* Section 7.2, as amended, *with* Section 7.5, as amended.) This is because MIT understood that the risk of diverging interests between a university licensor and a commercial licensee is greater with respect to declaratory judgment actions filed against the licensee than it is with respect to infringement actions filed by the licensee. (Nelsen Decl. ¶ 19.) For example, as an

- 18 -

involuntary participant in a declaratory judgment action, the licensee may not view the financial reward in such an action to be worth the cost of litigation, particularly with respect to a non-infringement claim.  Or the licensee may not be concerned about a declaratory judgment plaintiff whose products do not compete with those of the licensee. In either case, the licensee may be more amenable to granting a sublicense on nominal terms that are favorable to the declaratory judgment plaintiff, but that do not reflect the true value of the university's intellectual property.  (*Id.*)  This provision thus prevents ARIAD from unilaterally terminating a declaratory judgment action on grounds that provide no meaningful benefit to the Institutions, or from providing a lackluster defense to non-infringement claims.  Thus, under section 7.5, ARIAD can be ousted from the drivers' seat:  it does not have an unfettered right to control the defense of a declaratory judgment action.  (Section 7.5 as amended; Nelsen Decl. at ¶ 20.)

### 2.    The Institutions And ARIAD Would Be Prejudiced By The Exclusion Of The Institutions

There are sound reasons for the rule that an exclusive licensee without all substantial rights cannot be the sole defendant in a declaratory judgment action:  to proceed without the licensors in such an action would be severely prejudicial both to the licensors and to the licensees.

First, as described above, a judgment rendered in the absence of the Institutions would be prejudicial to the Institutions by compromising the Institutions' Patent Rights without the Institutions' participation.  Because Plaintiffs seek a judgment invalidating the '516 patent, it would be unjust for the case to go forward without the Institutions. *See, e.g., Mi-Jack*, 1998 WL 89356, at *2–*3 ("[A] judgment entered without the presence of the [patent owner] could be prejudicial to [the owner] because it is the party that holds the patent.").  The same injustice would occur if a judgment in this case would have a claim preclusive effect barring the Institutions from asserting their own claim against Plaintiffs (a right retained by MIT and Whitehead under Section 7.4 of the

Agreement). *Dentsply Int'l, Inc. v. Centrix, Inc.*, 553 F. Supp. 289, 294 (D. Del. 1982) (patent owner was indispensable party because, among other reasons, there was a possibility that the non-party owner would be collaterally estopped if a court held he was in privity with the licensee). If, on the other hand, a judgment in this case would not have a claim preclusive effect—allowing MIT and Whitehead to bring separate actions against Plaintiffs—then the action as filed would not afford complete relief to Plaintiffs. The Court in *Sicom* explained that "the exclusive right to sue for patent infringement . . . is substantial" in part because "a single infringer could be vulnerable to multiple suits" if the party with the right to indulge infringement is not named in a suit. *Sicom*, 427 F.3d at 979.

Second, this is not a case in which an existing party can serve as a proxy for an absent party, such that there would be no need for the absent party to participate directly in the action. "Without a perfect identity of interests, a court must be very cautious in concluding that a litigant will serve as a proxy for an absent party." *Tell v. Trs. of Dartmouth Coll.*, 145 F.3d 417, 419 (1st Cir. 1998).

ARIAD and the Institutions do not have a perfect identity of interests. They are not related companies, much less entities for whom corporate formalities should be ignored. *See Mi-Jack*, 1998 WL 89356, at *3 (holding that defendant and licensor did not have unity of interest because "[t]he two parties do not commingle funds or undercapitalize and have complied with corporate formalities"). Nor can it even be said that they necessarily have the same interests in litigation, which is precisely why the Institutions retained substantial rights in the ARIAD License Agreement. Specifically, the Institutions' interest is to ensure the protection of the licensed inventions and their appropriate commercialization. ARIAD's interest is to create value for its shareholders. (Nelsen Decl. ¶¶ 8, 19.) In litigation, these goals typically overlap—both ARIAD and the Institutions have an interest in maintaining the validity of the patent and in proving that

the patent is infringed. But they may not always align, particularly with respect to settlement of litigation.

For example, a licensee may have an interest in engaging in a business relationship with its litigation opponent that is unrelated to the intellectual property rights covered by the licensee's agreement with its university licensor. The licensee may value that potential business relationship so highly that, in the absence of appropriate controls, it would be willing to grant a sublicense to the university's intellectual property for nominal consideration as part of a business deal resolving the litigation—a deal that benefits the licensee, but not the university licensor. (*Id.*) This potential divergence of interests is heightened in the declaratory judgment context. In the context of an offensive suit, the licensee has made an affirmative decision to enforce the patent, making it less likely that the licensee's interests will diverge from the Institutions' interests. (*Id.* at ¶ 18.) In a declaratory judgment action, in which the licensee is an involuntary participant, however, the risk of divergence of interest is much greater (for the reasons discussed *supra* at § III.A.1.(d)).[4] (*Id.*)

In short, this case well illustrates the reasons that an exclusive licensee lacking all substantial rights in a patent—i.e., a virtual assignment of the patent to the licensee—cannot exercise the same rights as the patent holder. In the absence of the Institutions, this action must be dismissed.

---

[4] In fact, the joint representation of ARIAD and the Institutions by counsel in the Lilly litigation highlights how the interests may overlap in an offensive action that ARIAD and the Institutions initiate together, whereas the interests may differ markedly in an unexpected defensive action because ARIAD and the Institutions may weigh the advantages and disadvantages of proceeding with the case quite differently. Courts have found that joint representation may sometimes factor against finding that a patent owner is indispensable, but only when coupled with the exercise of complete control over the patent owner by the licensee. In *Dainippon Screen Manufacturing. Co. v. CFMT, Inc.*, a corporate licensee exercised complete control over its wholly-owned patent holding company, and the court noted that the owner and licensee's joint legal representation confirmed that they "share[d] the common goal of assuring that [the patent] not be held invalid or be infringed by [the declaratory judgment plaintiff]." 142 F.3d 1266, 1272 (Fed. Cir. 1998). ARIAD can hardly be said to have complete control over the Institutions, and the interests, while overlapping in certain cases, are not identical in all cases.

**B.    If This Action Is Not Dismissed, It Should Be Transferred To The District Of Massachusetts**

If the Court does not dismiss this case, it should exercise its discretion to transfer it to the District of Massachusetts pursuant to 28 U.S.C. § 1404(a).  This case belongs in Massachusetts, where a related case is currently pending, where *all* of the necessary parties are domiciled, and where—unlike Delaware—the court has subpoena power over key third-party witnesses.    Moreover, the *only* connection between this case and Delaware is that some of the parties, although located elsewhere, are incorporated in Delaware (other parties have no connection to Delaware at all).    Every other relevant factor points to Massachusetts as a superior forum for the convenience of parties and witnesses and the interest of justice.

**1.    Legal Standard**

Transfer of venue is governed by 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  In the Third Circuit, courts balance a nonexclusive list of factors to determine when transfer is appropriate. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995).  "These factors fall into two groups: those relating to the private convenience of the litigants and those affecting the public interest in the fair and efficient administration of justice." *Brunswick Corp. v. Precor Inc.*, No. 00-691-GMS, 2000 WL 1876477, at * 2 (D. Del. Dec. 12, 2000).

The factors relating to the parties' private convenience include:  (1) the plaintiff's original forum preference; (2) the defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses with respect to availability for trial; and (6) the location of the books and records to the extent they could not be produced in the alternative forum. *Jumara*, 55 F.3d at 879.  The factors relating to the public interest in the fair and efficient administration of justice include:    (1) the

enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) court congestion; (4) local interest in deciding local controversies; (5) the public policies of the fora; and (5) familiarity of the trial judge with applicable state law in diversity cases. *Id.* at 879–80.

Here, the relevant public and private factors, including the interest of judicial efficiency, the convenience of the parties, and the convenience and availability of the witnesses, weigh overwhelmingly in favor of transfer.

## 2.    This Action Could Have Been Brought In The District Of Massachusetts

As a threshold matter, this case may be transferred to the District of Massachusetts pursuant to section 1404(a) because it could have been brought originally in that District. The District of Massachusetts—unlike the District of Delaware—can exercise jurisdiction over all necessary parties, as both ARIAD and the Institutions all maintain their chief headquarters and physical operations in Massachusetts. (Allen Decl. ¶ 2; Exs. A, I at ¶¶ 3–6.) These substantial, continuous, and systematic contacts make them subject to personal jurisdiction in Massachusetts. *Perkins v. Benguet Consol. Min. Co.*, 342 U.S. 437, 445 (1952).[5]

For the same reasons, venue is also proper in the District of Massachusetts as to all of the necessary parties pursuant to 28 U.S.C. § 1391. Under that statute, venue is proper as to defendant corporations "in any judicial district in which [the corporation] is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c) ; *see also* 28 U.S.C. § 1391(b) (venue always proper in any district in which all defendants reside). As above, ARIAD and each of the Institutions reside in and are subject to personal jurisdiction in the District of Massachusetts, and therefore are subject to venue in that District. (Allen Decl. ¶ 2; Exs. A, I at ¶¶ 3–6.)

---

[5] ARIAD disputes subject matter jurisdiction (in any court) under the Declaratory Judgment Act. If, however, subject matter jurisdiction is proper in Delaware as the Court held on September 11, 2006, it is proper anywhere.

3. **The Relevant Factors Favor Transfer Of This Action To The District Of Massachusetts**

a. **Public Factors:  The Interests Of Justice And Judicial Economy Weigh Heavily In Favor Of Transfer**

The most relevant inquiry in the court's analysis of the public factors is whether there are practical considerations that would make trial "easy, expeditious, or inexpensive." *Brunswick*, 2000 WL 1876477, at *3, (citing *Jumara*, 55 F.3d at 879). Here, a transfer to the District of Massachusetts would not only avoid the cost and potential injustice of continued disputes regarding personal jurisdiction over the Institutions, but also would conserve resources by delivering the case to a court with a wealth of knowledge and experience regarding the '516 patent.

(1) **Transfer would avoid issues relating to personal jurisdiction**

Transfer under section 1404 is in the interest of justice and judicial efficiency when it will resolve significant issues related to personal jurisdiction.  *See, e.g., Multistate Legal Studies, Inc. v. Marino*, 41 U.S.P.Q.2d 1886, 1895–96 (C.D. Cal. 1996). This is just such a case.  If Plaintiffs are permitted to name Harvard and MIT as parties, serious questions will remain regarding the propriety of personal jurisdiction over them in the District of Delaware.  Plaintiffs bear the burden of proving that personal jurisdiction is proper over all defendants.  *See eSpeed, Inc. v. BrokerTec USA, L.L.C.*, No. 03-612-KAJ, 2004 WL 2346137, at *1 (D. Del. Sept. 13, 2004).  To establish personal jurisdiction over Harvard or MIT, Plaintiffs would need to establish either that Harvard and MIT are subject to general jurisdiction in the District of Delaware or that Harvard and MIT are subject to specific jurisdiction in the District of Delaware such that (1) Harvard and MIT are subject to Delaware's enumerated long-arm statute[6] and (2) this

---

[6] Pursuant to this statute, jurisdiction may only be exercised as to a cause of action that "arises from" (1) the transaction of business or performance of work or service in Delaware; (2) a contract to supply services or things in Delaware; (3) an act that causes tortious injury in Delaware by an act or omission in Delaware; (4) an act that causes tortious injury in Delaware or outside of Delaware if the person regularly does or solicits business, engages in any other persistent course of conduct in Delaware or derives substantial revenues from services, or things

suit "arises out of or relates to" actions that Harvard and MIT "purposefully directed" at residents of Delaware. *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1361–62 (Fed. Cir. 2006); *eSpeed*, 2004 WL 2346137, at *2 n.5 ("The Delaware Supreme Court has not collapsed the analysis under the Delaware long-arm statute into the constitutional due process analysis, as some courts have done."). Harvard and MIT are located in Massachusetts. Neither the factual record in this case nor the allegations of Plaintiffs' complaint support a finding that either Harvard or MIT has directed any action at Delaware, much less any action giving rise to this action. Nor is it likely that such an issue would resolve quickly or easily: Because questions of personal jurisdiction are often highly factual and may involve determinations of what a defendant knew or did not know, such issues frequently entail the taking of discovery. *See, e.g., Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 395 F.3d 1315, 1323–24 (Fed. Cir. 2005); *Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.*, 395 F.3d 1275, 1283 (Fed. Cir. 2005).

Harvard and MIT are not present to rebut any arguments that Plaintiffs may elect to make on this subject (as they almost certainly would do, if named as parties). Thus, issues of personal jurisdiction cannot be resolved at this juncture. If Harvard and MIT are joined in this action, significant questions regarding personal jurisdiction will inevitably arise. The Court can avoid addressing such jurisdictional disputes by transferring the case to Massachusetts.[7] "Courts have repeatedly held that a change of

---

used or consumed in Delaware; (5) the interest in, use, or possession of real property in Delaware; or (6) a contract to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed or to be performed within the state at the time the contract is made, unless the parties otherwise provide in writing. 10 Del. C. § 3104.

[7] The existence of a continuing dispute regarding personal jurisdiction also weighs in favor of transfer with respect to another of the "public" factors identified in *Jumara*, namely the enforceability of the judgment. *Jumara*, 55 F.3d at 879–80. Because ARIAD maintains that the Institutions are necessary and indispensable parties and that this Court does not have personal jurisdiction over them, there is an increased risk that a Delaware judgment in this case court could be overturned on appeal. Transfer to Massachusetts would eliminate that risk: Because the Institutions are subject to personal jurisdiction in Massachusetts, they may be joined in an action in that venue, and the finality of the Court's ruling (whatever it may be) will not be at risk from

venue from a forum where there is a difficult question of personal jurisdiction or venue to a district where there are not such uncertainties serve the interest of justice." *Multistate Legal Studies*, 41 U.S.P.Q.2d at 1985–96 (holding that interest of justice compelled transfer where it would eliminate preliminary issues regarding jurisdiction and venue); *see also Datasouth Computer Corp. v. Three Dimensional Techs., Inc.*, 719 F. Supp. 446, 452–53 (W.D.N.C. 1989) (granting change of venue that would "completely moot the issue of personal jurisdiction" and thus "save judicial resources"); *Kahhan v. City of Fort Lauderdale*, 566 F. Supp. 736, 740 (E.D. Pa. 1983) (transfer "obviating a jurisdiction difficulty" found to "serve the interests of justice" within the meaning of section 1404(a)); *Terukuni Kaiun Kaisha, Ltd. v. C.R. Rittenberry & Assocs.*, 454 F. Supp. 418, 432 (S.D.N.Y. 1978) (holding transfer, which would obviate jurisdictional difficulties, "would serve the interest of justice" and avoid risk of "squandered energies"). Because the Institutions are domiciled in Massachusetts, a transfer there would "obviate a substantial dispute as to whether this court can exercise personal jurisdiction" over them and thus serve the interests of justice. *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 77 F. Supp. 2d 505, 512 (D. Del. 1999) (transferring case to permit the exercise of personal jurisdiction over a party argued to be indispensable).

### (2)    Transfer would avoid duplication of effort and the potential for inconsistent rulings

Second, the District of Massachusetts is deeply familiar with the '516 patent and the issues likely to arise in the present case by virtue of the Lilly litigation. ARIAD initiated the Lilly litigation for infringement of the '516 patent in June 2002 and Lilly counterclaimed, seeking a declaration that the '516 patent is invalid, unenforceable, and not infringed by Lilly. (Exs. I–J.) Since 2002, Lilly has unsuccessfully brought three dispositive motions based on its claim that the '516 patent is invalid: a combined motion

---

an appeal on that issue. Thus, a transfer would serve the interest of enforceability. *See In re DVI, Inc.*, No. 03-12656 MFW, C.A. 04-170 JJF, 2004 WL 1498593, at *3 (D. Del. June 23, 2004) (recognizing connection between disputed personal jurisdiction and enforceability factor).

to dismiss and motion for summary judgment of invalidity under 35 U.S.C. §§ 102 and 112 (challenging the '516 patent based on anticipation and enablement grounds), a motion for summary judgment of invalidity under 35 U.S.C. §§ 101 and 112 (challenging the patent based on patentability of subject matter, enablement, and written description), and a motion for summary judgment under 35 U.S.C. § 102 (challenging the patent based on anticipation) (Ex. K (Lilly docket sheet) at entries 5, 33, 171, 175, and Electronic Order entered 7/11/06.)  These motions involved extensive briefing, as well as numerous declarations (including expert affidavits) and exhibits.  (Decl. Ex. K at entries 5–9, 14–31, 33, 167–188, 191, 196–203, 208–214, 217–218, 352–353.)  The District Court for the District of Massachusetts had a technology tutorial, received claim construction briefing, held a Markman hearing, and construed the claims of the '516 patent.  (Ex. K at entries 50, 52, 54–60, 62–64, 67, 69–70, 73, 75–76, and Electronic Clerk's Notes dated 11/3/03 and 1/13/04.)  It presided over a jury trial that lasted from April 10, 2006, to May 4, 2006, during which the jurors heard (and rejected) evidence regarding Lilly's claims that the '516 patent was anticipated by prior art, anticipated by prior public use, failed to satisfy the enablement requirement, and failed to satisfy the written description requirement.  (Exs. L (jury verdict in Lilly litigation), M at 4–10 (trial brief from Lilly litigation), K at entries 282, 288–294, 297–298, 308–313, 319, 324–325, 338–347, and Electronic Clerk's Notes dated 4/10/06–5/4/06.)  Following the jury verdict in favor of ARIAD, the Massachusetts court held a four-day bench trial of Lilly's remaining invalidity claims (namely, that the '516 patent claims non-patentable subject matter and is indefinite), as well as Lilly's claim that the patent is unenforceable.  (Ex. M at 4–6, K at entries at 386–87, 391–395, and Electronic Clerk's notes dated 08/07/06 through 08/10/06.)  The bench trial ended on August 10, 2006, and the parties are still awaiting the District Court's ruling on the issues tried to the Court.  (Ex. K at Electronic Clerk's notes dated 08/10/06.)

By handling these matters, and numerous others that have arisen during the pendency of the Lilly litigation, the court in Massachusetts has become well-versed in the technology and development of the '516 patent and intimately familiar with the vast majority of issues likely to be litigated in the present case. The substantial overlap between the subject matter of the present case and the Lilly litigation was best summarized by Plaintiffs (and the Court) in connection with the subpoena issued by Plaintiffs to Lilly in this case: Plaintiffs insisted, and the Court agreed, that *every single document* produced in the Lilly litigation—every expert report, every transcript, every court paper, and all correspondence between the parties relating to that litigation—was relevant to the claims and defenses of the parties in the present litigation. (D.I.s 52, 67, 69); *see also* Fed. R. Civ. P. 26(b)(1).) In light of this extensive overlap, particularly as to validity issues, it would be an enormous waste of time, for both the Court and the parties, to have to educate this Court regarding the same topics and information that the Massachusetts court already knows well.[8]

The judicial efficiency of transferring a patent case to a district where another proceeding is pending concerning the same (or a related) patent—even when the other proceeding also concerns different products in suit—was recognized in *Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 196 (D. Del. 1998). In that case, the court held that this factor supported transfer despite having heard "nothing more than conjecture" regarding whether the asserted claims or disputed claim terms would be the same in both cases. *Id.* at 207. Here, in contrast, Plaintiffs seek a declaration of non-infringement and invalidity with respect to *all* claims of the '516 patent, so overlap is inevitable.

---

[8] The duplication of effort involved in having different courts hear cases concerning the same patent is recognized in Local Rule 3.1, which requires plaintiffs filing a Complaint to "indicate on the civil cover sheet if such action and one or more other civil actions or proceedings previously decided or currently filed in this District or any other court . . . (3) involve the same patent or the same trademark; or (4) for other reasons would entail substantial duplication of labor if heard by different judges." Plaintiffs' failure to comply with this rule by identifying the Lilly litigation on its Civil Cover sheet does not make the cases any less related.

Nor is *Affymetrix* alone on this point:  It is well-established that "the waste of judicial resources in requiring two different courts to become familiar with [the patents in suit], and to render Markman rulings on each of these patents, is a factor that strongly weighs in favor of transfer." *Nilssen v. Everbrite, Inc.*, No. 00-189-JJF, 2001 WL 34368396, at *4 (D. Del. Feb. 16, 2001) (ordering transfer when case pending in other district concerned same patents and when Markman rulings had already been issued and case dispositive motions had already been filed in other jurisdiction); *Brunswick*, 2000 WL 1876477, at * 3 (transferring case when other jurisdiction had adjudicated previous litigation regarding parent of patent in suit and another possibly related matter was pending in other jurisdiction between same parties); *see also Allergan, Inc. v. Alcon Labs., Inc.*, No. 02-1682-GMS, 2003 WL 473380, at *2 (D. Del. Feb. 25, 2003) (transferring action when other district had addressed cases concerning parent patents and was hearing later-filed action between same parties regarding same patent); *Sumito Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*, No. 04-852-SLR, 2005 WL 735880, at *3 (D. Del. Mar. 30, 2005) (transferring case when other district had three years of experience with litigation regarding one of two patents in suit, including several key rulings); *E.I. DuPont Nemours & Co. v. Diamond Shamrock Corp.*, 522 F. Supp. 588, 590 (D. Del. 1981) (litigation of issues arising under same patent in one place before a single court would better serve "efficient litigation and substantive justice").

This practice shares its origins with the rule that mirror image cases should be transferred to the district in which the matter was first filed:  "[A]t a minimum, presentations on infringement for [the present case] will require a judge, on the summary judgment motions that are sure to be filed, and a jury, at any trial of the case, to become familiar with the same field of art, [and] the same fundamental science and technology associated with [the patent-in-suit] . . . ."  *Intel Corp. v. Amberwave Sys. Corp.*, 233 F.R.D. 416, 418 (D. Del. 2005).  Here, although the cases are not mirror images, many of the same issues are likely to arise in this case as arose in the Lilly litigation, and there is

- 29 -

thus a risk of inconsistent rulings.[9]  *Sumito*, 2005 WL 735880, at *3 (transferring case to court with prior experience with one of two patents in suit "in the interests of judicial economy and of avoiding inconsistent rulings" although cases were not mirror images); *Nilssen*, 2001 WL 34368395, at *4 n.10 (transferring case based in part on inherent danger of inconsistent Markman rulings when different cases regarding same patent are heard by different courts).

In sum, the relevant public factors weigh overwhelmingly in favor of transfer.

> **b.    Private Factors:  The Interests Of Convenience And Witness Availability Weigh Heavily In Favor Of Transfer**
>
> **(1)    Delaware is a less convenient forum than Massachusetts for ARIAD and for Plaintiffs**

No party to this litigation is located in Delaware.  (D.I. 1 [Complaint] at ¶¶ 5–10.) In fact, aside from some (but not all) of the parties having incorporated in Delaware, none of the parties has any relevant connection to Delaware at all.  ARIAD has no operations or locations in Delaware.  (Allen Decl. ¶ 2.)  To ARIAD's knowledge, no plaintiff has any operations or locations in Delaware.  (Allen Decl. ¶ 3; Ex. Y.)  In contrast, ARIAD, Amgen, and the Institutions all have their headquarters or another physical location in Cambridge, Massachusetts.  (Allen Decl. ¶ 2; Exs. A, I at ¶¶ 3–6, T, Y.)  The remaining Plaintiffs are all part of Amgen's corporate family, and do not have physical locations in either Massachusetts or Delaware.  (D.I. 1 at ¶¶ 6–9.)

Maintaining this case in Delaware, therefore, would mean travel and hotel bills for all of the parties.  This may not bother Amgen, with its over 18,000 staff members and $12.4 billion revenue for 2005.  (Ex. P at 1.)  But such expenses are more significant

---

[9] Moreover, the parties can expect a shorter time to trial in the District of Massachusetts than in the District of Delaware.  While the current case schedule provides for trial on a relatively tight time frame (21½ months from initiation of suit to trial) (D.I. 37), that schedule is unlikely to remain in place in light of the expected elevation of Judge Jordan to the Third Circuit. Thereafter, the case would be transferred to Magistrate Judge Thynge, and later to another Judge. In the District of Massachusetts, a more predictable and efficient schedule could be set.

when it comes to ARIAD, with only 108 employees (mostly in the field of research and development)—all of whom are located in Massachusetts—and one ten-thousandth the revenues ($1.2 million in revenues for 2005), and development costs far outstripping revenues. (Ex. Q at 11, 25); *see Hall v. Kittay*, 396 F. Supp. 261, 263-64 (D. Del. 1975) (balance of convenience weighed in favor of transfer when transfer "would make very little difference" to plaintiff but when defense employee witnesses and documents were in or near alternative forum and defendant's only contact with Delaware was state of incorporation). As in *Hall*, transferring this case to Massachusetts would eliminate the burden of travel on ARIAD—but here, it would work to the convenience of Plaintiffs as well, since Immunex R.I., where Enbrel® is manufactured, is located less than 70 miles from Boston (but nearly 300 miles from Wilmington). (D.I. 1 at ¶ 15; Exs. R at 2, S.) It would also benefit Amgen to the extent that any of its 135–200 employees in Cambridge, Massachusetts are involved in the case. (Ex. T.) Travel for the remaining Plaintiffs and for the parties' outside counsel (located primarily in Los Angeles and Chicago) is no less convenient to Massachusetts than it is to Delaware.[10]

### (2) Key witnesses and documents are located in Massachusetts

"The convenience of witnesses is often an important factor in a transfer inquiry." *Mentor Graphics*, 77 F. Supp. 2d at 510. The critical question in this analysis is whether non-party witnesses are subject to the trial subpoena power of the jurisdiction from which transfer is sought. *Id.*; *Sherwood Med. Co. v. IVAC Med. Sys., Inc.*, No. 96-305 MMS, 1996 WL 700261, at *4–5 (D. Del. Nov. 25, 1996).

The parties' Rule 26(a) disclosures identify their most likely trial witnesses at this stage of litigation: individuals that the parties believe are likely to have discoverable

---

[10] Nor can Amgen be heard to complain about the convenience of traveling to court in Boston when its in-house counsel voluntarily attended virtually every day (if not every day) of the jury and bench trials in the Lilly litigation in the District of Massachusetts, and Plaintiff's outside counsel attended most days of those trials, as well. (Allen Decl. ¶ 5.)

information in support of their claims and defenses. Many of the individuals identified are third parties: Both parties identify the inventors of the '516 patent; both parties identify attorneys involved in the prosecution of the patent-in-suit (Plaintiffs do so in a blanket manner, while ARIAD identifies third-party patent prosecutors Matthew P. Vincent and Patricia Granahan); and Plaintiffs identify Fritz Casselman, a former ARIAD employee. (Exs. N–O.)

None of the inventors of the '516 patent is located in Delaware and none of them is employed by either party to this litigation.[11] (Ex. A.) Doctors Sharp and Maniatis, who directed the laboratories that were involved in the breakthrough work on NF-$\kappa$B that led to the '516 patent, are located in Massachusetts. (Exs. C–D, I at ¶¶ 11–13, V at 31:24–33:8.) Doctors Sharp and Maniatis (a Nobel Laureate, and National Academy of Sciences member, respectively), are key witnesses because of their central roles overseeing the relevant work. (Exs. C–D, I at ¶¶ 11–13, V at 31:24–33:8.) None of the other inventors of the '516 patent testified at the Lilly trial. (Ex. K at Electronic Clerk's Notes dated 4/10/06–5/4/06, 8/7/06–8/10/06.) Thus, while inventors Ranjan Sen and Chen-Ming Fan are currently located in Baltimore, Maryland (and therefore could be compelled to testify in Wilmington pursuant to Federal Rule of Civil Procedure 45(b)(2))), they are not substitutes for Dr. Maniatis and Dr. Sharp.[12] (Rosenblatt Decl. ¶ 24.)

---

[11] Dr. David Baltimore is on the Board of Directors of Amgen. (Ex. U.)

[12] It is well-established that "videotaped depositions are not an adequate substitute for live trial testimony, when conducting venue transfer analysis, because video depositions are unlikely to hold the rapt attention of a jury. Therefore, the possibility of using videotaped depositions in lieu of trial testimony does not lessen the significance of a witness's unavailability for trial when conducting venue transfer analysis." *Nilssen*, 2001 WL 34368396, at *3 (internal quotations, citation, and ellipsis omitted). *See also Nilssen v. Osram Sylvania, Inc.*, No. 00-695-JJF, 2001 WL 34368395, at *2 (D. Del. May 1, 2001) ("[a] party need not allege that a witness definitely will be unavailable for trial; rather it is sufficient for purposes of venue transfer analysis if the witness is not subject to a court's subpoena power").

Likewise, of the three prosecuting attorneys identified in ARIAD's initial disclosures, two of them—Matthew P. Vincent and Patricia Granahan—are located in Massachusetts and are not subject to compulsory service in Delaware.[13] (Exs. N at 5, W, X.)  The same is true for Fritz Casselman, a former employee of ARIAD who is identified in Plaintiffs' initial disclosures as a potential witness regarding the licensing of the '516 patent. (Ex. O at 2; Allen Decl. ¶ 7.)  ARIAD does not know where Plaintiffs' named witnesses are located, since their individual addresses are not identified in Plaintiffs' initial disclosures, (Ex. O); however, to the extent that any testimony is required of former employees at Amgen's Rhode Island facility (where Enbrel® is manufactured), such employees are far more likely to be subject to the subpoena power of the District of Massachusetts than they are to be subject to the subpoena power of the District of Delaware. (Exs. R at 2, S.)

Thus, this case resembles *Sherwood v. IVAC*, in which the court held that transfer was appropriate despite the plaintiff's choice of Delaware as a forum and despite the defendant's Delaware state of incorporation, on the basis that two of the three inventors and several other key witnesses were not subject to the subpoena power of the Delaware Court, but were subject to the subpoena power of the alternative jurisdiction. *Sherwood*, 1996 WL 700261, at *5.  Under these circumstances, this factor weighs heavily in favor of transfer.

Similarly, because ARIAD and the Institutions are located in Massachusetts, virtually all of the relevant documents relating to the '516 patent that will be subject to discovery and ultimately used at trial are located in Massachusetts.  Although those records are capable of being produced at trial if the case remains in Delaware, the

---

[13] The third, David Berstein, is also located in Massachusetts. (Allen Decl. ¶ 6.)  As an ARIAD employee, his appearance in Delaware could be compelled, but as with all ARIAD employees, would be more burdensome and expensive than appearing in Massachusetts.

custodians of records for the Institutions will not be subject to the subpoena power of the court to authenticate the documents.

### (3)    Other private factors

The remaining private factors enumerated in *Jumara*, namely the parties' respective choices of fora and whether Plaintiffs' claims arose outside of Delaware, are considered to be subsumed within the portion of the analysis concerning the availability of witnesses and documents, because "affording weight to these factors for their own sake runs the risk of double-counting them thereby compromising the transfer analysis." *Affymetrix*, 28 F. Supp. 2d at 197.  Nevertheless, they all weigh in favor of transfer, or are neutral.

First, Plaintiffs' claims arise outside of Delaware.   Plaintiffs assert two claims in this action:  one for declaratory judgment of invalidity of the '516 patent, and one for declaratory judgment of non-infringement by Enbrel® and Kineret®. (D.I. 1)  Plaintiffs' invalidity claim arises primarily from the invention of the '516 patent—which can be traced to the locations of the inventors, three of whom were located in Massachusetts in that time period, and none of whom was located in Delaware. (Ex. A.)  Plaintiffs' non-infringement claim arises from the Plaintiffs' own activities in their own locations, none of which are in Delaware—but one of which is in Massachusetts.  (D.I. 1 at ¶¶ 5–9; Exs. T, Y.)  Plaintiffs base their claim of subject matter jurisdiction under the Declaratory Judgment Act on events that took place during the Lilly trial in Massachusetts and on licensing communications initiated by ARIAD in Massachusetts. (D.I. 21 at p. 14–21)  Thus, to the extent that Plaintiffs' claims can be said to have arisen in any single location, it is Massachusetts.

Second, the parties' respective choices of fora weigh in favor of transfer.  For the many reasons identified above, including the burden and expense of educating a new judge regarding the technology, the unavailability of its key witnesses in Delaware, and the expense of traveling to Delaware for litigation, ARIAD strongly prefers that litigation

take place in the District of Massachusetts.[14]    Indeed, the balance of public and private

factors in this case is so dramatically skewed toward Massachusetts that they vastly

outweigh the Plaintiffs' interest in choosing a forum.

Although courts do not lightly disturb a plaintiff's choice of forum, it is far from a

dispositive factor.    A plaintiff's choice of forum is particularly devalued when, as here,

the forum chosen is not the plaintiff's "home turf":    "When, however, the plaintiff has

brought suit in a forum which is not its 'home turf' and which has no connection with the

facts of the lawsuit, the convenience to the plaintiff of litigating in its own choice of

forum is not as great.    Consequently, it will be easier for the Defendant to show that the

balance of convenience favors transfer."    *Krupp Int'l, Inc. v. Yarn Indus., Inc.*, 615 F.

Supp. 1103, 1106 (D. Del. 1985); *see also Minstar, Inc. v. Laborde*, 626 F. Supp. 142,

145–46 (D. Del. 1985) (affording plaintiff's choice of forum little weight when it was not

plaintiff's "home turf").    Here, Delaware is not the "home turf" of any plaintiff (or of

ARIAD, or of any of the Institutions):    according to paragraphs 5–9 of the Complaint,

Plaintiffs are based numerously in Thousand Oaks, California; Juncos, Puerto Rico; and

West Greenwich, Rhode Island—and, as discussed above, the allegations in the

complaint have no connection whatsoever to Delaware.    (D.I. 1.)

Under the current circumstances, Plaintiffs' choice of this forum should be

scrutinized as a factor *favoring* transfer of this case.    Amgen's in-house counsel watched

---

[14] Although ARIAD is incorporated in Delaware, and thus recognizes that there is always a possibility that it will be sued in Delaware, it does not follow that this case should proceed in Delaware.    This court has recognized that "State of incorporation is an important factor, but it's not dispositive.    If it were dispositive, we wouldn't go through the business of asking about these other matters and trying to put them onto the scales and figure out what's going on." *Network Appliance v. Bluearc Corp.*, D. Del. No. 03-714, Transcript of Nov. 19, 2003 Hearing (Ex. Z) at 16:20-24; *Mentor Graphics*, 77 F. Supp. 2d at 509 n.6 (state of incorporation is "certainly not dispositive.    Indeed, it is not mentioned in § 1404, nor is it among the eleven factors identified by the Third Circuit Court of Appeals in *Jumara*.").    The law is clear that "[w]here an alternative forum is more convenient and has more substantial connections with the litigation[,] incorporation in Delaware will not prevent transfer." *APV N. Am., Inc. v. Sig Simonazzi N. Am. Inc.*, 295 F. Supp. 2d 393, 398–99 (D. Del. 2002) (internal quotations omitted); *see also, e.g., Nilssen*, 2001 WL 34368395, at *2 (transferring case when Defendant was incorporated in Delaware); *Brunswick*, 2000 WL 1876477, at *2 (same).

all or most of the Lilly trial in the District of Massachusetts—a fact hardly suggesting that Massachusetts is in any way inconvenient to Plaintiffs. (Allen Decl. ¶ 5.) Plaintiffs could have quite easily—perhaps more easily—brought this case in Massachusets (where Amgen's in-house counsel spent plenty of time during the Lilly litigation), but elected to bring this case in the District of Delaware when it was apparent that the proceedings in the District of Massachusetts supported the validity of the '516 patent. By the time Plaintiffs brought this case, ARIAD had completed its case-in-chief before the jury. (Ex. K at Electronic Clerk's notes dated 4/18/06.). Indeed, Plaintiffs acknowledge a desire not to be in ARIAD's "backyard," (D.I. 21 at 32), despite having offices of their own in the same location. (Ex. Y.) Thus, it is apparent that Plaintiffs did not choose Delaware as a forum for convenience purposes at all, but rather as part of a strategy to re-litigate issues that have already been addressed in ARIAD's favor in the District of Massachusetts, and to force ARIAD to litigate in multiple jurisdictions, thereby increasing the burden and expense to ARIAD. Because Delaware has a tenuous connection to this case and Plaintiffs' motives for filing here are questionable, Plaintiffs' choice of Delaware as a forum should be given little, if any, deference.

## IV.    CONCLUSION

Plaintiffs have failed to sue necessary and indispensable parties, and have sued in the wrong District. For the reasons set forth above, ARIAD respectfully requests that this Court take the opportunity to remedy these errors by dismissing the present suit or, in the alternative, transferring it to the District of Massachusetts.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone: (302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Counsel for Defendant*
*ARIAD Pharmaceuticals, Inc.*

*Of Counsel:*

Morgan Chu
David I. Gindler
Elizabeth Rosenblatt
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Telephone: (310) 277-1010

Dated: October 5, 2006
173901.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of October, 2006, the attached **DEFENDANT ARIAD PHARMACEUTICALS, INC.'S OPENING MEMORANDUM OF LAW IN SUPPORT OF ITS RENEWED MOTION TO DISMISS FOR FAILURE TO NAME NECESSARY AND INDISPENSABLE PARTIES OR, IN THE ALTERNATIVE, TO TRANSFER PURSUANT TO 28 U.S.C. § 1404(a)** was served upon the below-named counsel of record at the address and in the manner indicated:

Melanie K. Sharp, Esquire
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

BY HAND, VIA CM/ECF,
and VIA ELECTRONIC MAIL

Marcus E. Sernel, Esquire
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601-6636

VIA ELECTRONIC MAIL
and FEDERAL EXPRESS

J. Drew Diamond, Esquire
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA  90017-5800

VIA ELECTRONIC MAIL
and FEDERAL EXPRESS

*/s/ Tiffany Geyer Lydon*

Tiffany Geyer Lydon

## Briefs, Responses and Replies

### 1:06-cv-00259-KAJ Amgen Inc. et al v. Ariad Pharmaceuticals Inc.

**U.S. District Court**

**District of Delaware**

Notice of Electronic Filing

The following transaction was received from Lydon, Tiffany entered on 10/5/2006 at 10:58 AM EDT and filed on 10/5/2006

| | |
|---|---|
| **Case Name:** | Amgen Inc. et al v. Ariad Pharmaceuticals Inc. |
| **Case Number:** | 1:06-cv-259 |
| **Filer:** | Ariad Pharmaceuticals Inc. |
| **Document Number:** | 84 |

**Docket Text:**
OPENING BRIEF in Support re [83] MOTION to Dismiss for Failure to Join a Party *or, in the Alternative, to Transfer Pursuant to 28 U.S.C. Section 1404(a) (RENEWED MOTION)* filed by Ariad Pharmaceuticals Inc..Answering Brief/Response due date per Local Rules is 10/20/2006. (Lydon, Tiffany)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=10/5/2006] [FileNumber=283297-0]
[908a1e71211e5a16c7d7048f2e9ce58496cac0f3e5b51f3b31a21a30c262fbda06f2
f2a844c613efbf7b3d2fcf4a311c589e8ac1638fdb29c0d580581564e6b3]]

**1:06-cv-259 Notice will be electronically mailed to:**

Steven J. Balick      sbalick@ashby-geddes.com, jday@ashby-geddes.com; mkipp@ashby-geddes.com; dfioravanti@ashby-geddes.com; nlopez@ashby-geddes.com; tlydon@ashby-geddes.com; lmaguire@ashby-geddes.com; dharker@ashby-geddes.com

Morgan Chu      mchu@irell.com,

John G. Day      jday@ashby-geddes.com, sbalick@ashby-geddes.com; mkipp@ashby-geddes.com; dfioravanti@ashby-geddes.com; nlopez@ashby-geddes.com; tlydon@ashby-geddes.com; lmaguire@ashby-geddes.com; dharker@ashby-geddes.com

David I. Gindler      dgindler@irell.com,

Tiffany Geyer Lydon      tlydon@ashby-geddes.com, dfioravanti@ashby-geddes.com

Amir A. Naini      anaini@irell.com,

Christopher M. Newman      cnewman@irell.com

Elizabeth L. Rosenblatt      brosenblatt@irell.com

Melanie K. Sharp      msharp@ycst.com, achacko@ycst.com; chunter@ycst.com; beichner@ycst.com

**1:06-cv-259 Notice will be delivered by other means to:**