**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION ) ) ) ) ) | C.A. No. 06-259-KAJ |
| Plaintiff, ) | |
| vs. ) | |
| ARIAD PHARMACEUTICALS, INC. ) | |
| Defendant. ) | |

**DECLARATION OF LITA NELSEN IN SUPPORT OF
ARIAD PHARMACEUTICALS, INC.'S RENEWED MOTION TO DISMISS FOR
FAILURE TO NAME NECESSARY AND INDISPENSABLE PARTIES OR, IN
THE ALTERNATIVE, TO TRANSFER PURSUANT TO 28 U.S.C. § 1404(a)**

I, Lita Nelsen, declare as follows:

1.     I am the Director of the Technology and Licensing Office ("TLO") of the Massachusetts Institute of Technology ("MIT"). I have been employed at the TLO since 1986. A true and correct copy of my curriculum vitae is attached hereto as Exhibit A.

2.     The TLO is one of the most active technology transfer offices in the country. We manage the patenting and licensing process for MIT, Lincoln Laboratory, and the Whitehead Institute for Biomedical Research (the "Whitehead Institute"). The mission of the TLO is to benefit the public by moving the results of MIT research into societal use via technology licensing, utilizing a process that is consistent with academic principles, demonstrates a concern for the welfare of students and faculty, and conforms to the highest ethical standards. This process benefits the public by creating new products and promoting economic development.

3.     The TLO, acting on behalf of MIT and the Whitehead Institute, negotiated a license agreement with ARIAD Pharmaceuticals, Inc. ("ARIAD") effective August 8, 1991. The original license agreement, a true and correct copy of which is attached as Exhibit B, was largely derived from the TLO's then-current standard license

agreement, which reflects certain institutional goals of MIT. I negotiated the original license agreement directly with Dr. Harvey Berger, the Chairman and Chief Executive Officer of ARIAD. I have personal knowledge of the negotiations with ARIAD, the purpose of the terms in the TLO's standard license agreement, and the goals MIT hoped to achieve in its relationship with ARIAD.

4.    This license agreement has been amended twice: The first amendment, effective November 20, 1991 (a true and correct copy of which is attached hereto as Exhibit C), principally served to make Harvard University ("Harvard") a party granting rights under the license agreement (as Harvard researchers participated in the development of the intellectual property licensed to ARIAD). The second amendment, dated January 2, 2002 (a true and correct copy of which is attached hereto as Exhibit D), made minor modifications to a number of provisions of the original license agreement. I was involved in the negotiation of both amendments. I will refer to the original license agreement and the two amendments collectively as the ARIAD License Agreement. I will refer to MIT, the Whitehead Institute, and Harvard collectively as the Institutions.

5.    The ARIAD License Agreement grants rights to a body of related intellectual property, including the Patent Rights listed in Appendix A. The patent applications listed in Appendix A ultimately matured into a number of issued patents, including United States Patent No. 6,410,516 (the "'516 patent"). As reflected in the '516 patent, the research that led to the '516 Patent was supported in part by funds from the National Cancer Institute, an agency of the United States National Institutes of Health. As a result, the '516 patent is subject to the requirements of the Bayh-Dole Act.

6.    The Bayh-Dole Act grants non-profit institutions and small businesses the right to receive title to federally-funded inventions. The Act, however, circumscribes the rights institutions who elect title can grant to their licensees. For example, two relevant limitations that the TLO considers when licensing federally funded patents are:

- Non-profit institutions cannot assign ownership rights in federally funded patents without permission from the granting agency; and.

- Non-profit institutions must ensure that appropriate steps are taken to commercialize the patented invention.

7.    The TLO drafted the terms of its standard license agreement to retain for MIT ultimate control over a critical set of rights in any patents covered by the agreement, while granting certain exclusive rights to the licensee. The TLO intended to reserve a number of controls over any licensed patent rights for two principal reasons: (1) to ensure compliance with MIT's obligations under the Bayh-Dole Act; (2) to protect against any divergence in the interests of the licensee from the interests of MIT.

8.    When the TLO grants certain exclusive rights in a patent to a commercial licensee, MIT's interest is to ensure the protection of the licensed inventions and their appropriate commercialization. A commercial licensee's interest is to create value for its shareholders (or other owners, if the licensee is not a corporation). The TLO recognizes that these goals do not always align. For example, a licensee may have an interest in engaging in a business relationship with a third party that is unrelated to the intellectual property rights covered by the license agreement between MIT and the licensee. The third party may desire a license to our intellectual property as a condition of the business arrangement. The licensee may value that potential business relationship much more highly than our intellectual property so that, in the absence of appropriate controls, it would be willing to grant a sublicense to our intellectual property for nominal consideration as part of a package business deal. While that agreement may benefit the licensee, who values the business relationship with the third party more than our intellectual property, it does not benefit MIT and does not secure payment for the true value of our intellectual property.

9.    Since MIT's then-current standard license agreement served as the template for the ARIAD License Agreement, I will use the ARIAD License Agreement

- 3 -

to illustrate the major rights retained by the Institutions. Where the ARIAD License Agreement differs in a material respect from our standard license agreement at the time, I will note and explain the difference.

10. The rights retained by MIT in the ARIAD License Agreement have a common theme: they prevent ARIAD from exerting final authority over decisions that could negatively impact the value of the licensed Patent Rights, including the '516 patent. The value of these retained rights is essentially dependent on the value of the intellectual property covered by the ARIAD License Agreement. Thus, if one or more patents licensed under the ARIAD License Agreement were held to be invalid, MIT's rights would be harmed.

**Right to Decide Whether To Sue A Third Party For Infringement**

11. The Institutions gave ARIAD the lead role in managing the process of sublicensing and enforcing the '516 patent. MIT agreed that ARIAD "shall have the right to enter into sublicensing agreements for the rights, privileges and licenses granted hereunder" (Section 2.8) and that, with certain exceptions for prior granted rights, MIT "shall not grant any other license" under the Patent Rights during the specified exclusivity period (Section 2.3). In addition, Section 7.2 provides that "LICENSEE shall have the right, but shall not be obligated, to prosecute at its own expense any such infringement of the Patent Rights . . . ."

12. This provision and several others in Article 7 differ from MIT's standard license agreement in 1991 (with which I am familiar). In particular, Section 7.2 permits ARIAD, rather than MIT, the right of "first refusal" to initiate and bear the cost of litigation. Moreover, under Section 7.2, the Institutions consented to participate as plaintiffs in offensive litigation brought by ARIAD, on the condition that ARIAD pay all litigation expenses and indemnify the Institutions against any costs. In contrast, under MIT's standard license agreement, MIT (rather than the licensee) has the initial right to decide whether to file and bear the cost of litigation.

- 4 -

13.     Notwithstanding this modification, which I believe was made at ARIAD's request, the Institutions retained ultimate authority over certain critical elements of enforcing the '516 patent. For example, Section 7.4 provides that if the Institutions notify ARIAD of an alleged infringement of the '516 patent, and ARIAD declines to bring suit against the alleged infringer, then MIT or the Whitehead Institute may file suit against the alleged infringer, at their own expense, and may "keep any recovery or damages for past infringement derived therefrom." ARIAD's right to grant a sublicense to the alleged infringer is more restrictive when MIT or the Whitehead Institute has filed suit against that alleged infringer pursuant to Section 7.4 than when ARIAD has filed its own suit. In the case of a suit by MIT or the Whitehead Institute, ARIAD may only "sublicense any alleged infringer *for future use* of the Patent Rights." Section 7.7 (emphasis added). This more restrictive language is necessary in order to allow MIT and Whitehead the sole right to keep any recovery for past infringement when they are entitled to file suit, as provided in Section 7.4. Thus, the right to decide whether to sue a third party for infringement and recover damages is shared between ARIAD, MIT, and the Whitehead Institute.

**Limitations on Transfer of Patent Rights**

14.     Article XI provides that "[t]he rights of ARIAD under this Agreement may not be assigned and the duties of ARIAD under this Agreement may not be delegated without the prior written consent of M.I.T. and Whitehead," with certain limited exceptions for subsidiaries, mergers, and sale of ARIAD's business. Article XI contains no restriction on MIT's and the Whitehead Institute's right to prevent ARIAD from assigning its rights.

15.     In addition, Section 2.12 provides that "LICENSEE shall not receive from sublicensees anything of value in lieu of cash payments in consideration for any sublicense under this Agreement, without the express prior written permission of M.I.T." Section 2.12 contains no restriction on MIT's right to deny permission.

16.    Finally, Section 2.6 provides that "LICENSEE agrees that Licensed Products leased or sold in the United Sates shall be manufactured substantially in the United States." MIT included this provision because it is a requirement of the Bayh-Dole Act.

**Right to Practice**

17.    The ARIAD License Agreement does not grant ARIAD the exclusive right to use the Patent Rights after the effective date of the Agreement. Rather, Section 2.7 provides that "Whitehead and M.I.T, reserve the right to practice under the Patent Rights . . . for their noncommercial research purposes." Harvard also retains this right under the first amendment to the Agreement.

**Right to Prosecute Patent Rights**

18.    ARIAD has no right to prosecute, or to control the prosecution of, any patent applications falling within the definition of Patent Rights. Section 6.1 provides that "M.I.T (and/or Whitehead, as appropriate, depending on ownership of the individual Patent Rights), shall apply for, seek prompt issuance of, and maintain during the term of this Agreement the Patent Rights in the United States and in the foreign countries listed in Appendix B hereto. . . .The prosecution, filing and maintenance of all Patent Rights and applications shall be the primary responsibility of M.I.T. (and/or Whitehead)," although "LICENSEE shall have reasonable opportunities to advise M.I.T. (and/or Whitehead)" in connection with such activities. Harvard also retains these rights under the first amendment to the Agreement. Although the Institutions ultimately allowed ARIAD to take the lead in patent prosecution matters, the Institutions retained the contractual right to control and take over that process, if they so chose.

**Defense of the '516 Patent**

19.    The TLO views infringement actions initiated by a licensee as substantially different from declaratory judgment actions defended by a licensee. In the former, the licensee has made an affirmative decision to enforce the patent, making it less

- 6 -

likely that the licensee's interests will diverge from the Institutions' interests. In a declaratory judgment action in which the licensee is an involuntary participant, the risk of divergence of interest is much greater. For example, the licensee may not view the financial reward to be worth the cost of litigation. Or the products of the declaratory judgment plaintiff may not compete with those of the licensee—potentially making the licensee more amenable to settling on terms that are favorable to the declaratory judgment plaintiff, but that do not reflect the true value of our intellectual property.

20.     Accordingly, the ARIAD License Agreement treats declaratory judgment actions in a different fashion than infringement actions. *Compare* Sections 7.2 and 7.5. When ARIAD files an infringement action, ARIAD controls the litigation (subject to the Institutions' right to approve any settlement) and has the absolute right to join the Institutions as parties. *See* Section 7.2. ARIAD does not have these same rights in the context of defending a declaratory judgment claim attacking the '516 patent. *See* Section 7.5. Accordingly, in a declaratory judgment action, ARIAD does not have the right to require the Institutions to join as defendants, nor does it have an unfettered right to control the defense of the action. This reflected the intent of MIT and the Whitehead Institute to retain a substantial role in defensive actions involving the '516 patent.

21.     Thus, Section 7.5 of the original License Agreement provided that "[i]n the event that a declaratory judgment action alleging invalidity or noninfringement of any of the Patent Rights shall be brought against LICENSEE, M.I.T. (or Whitehead), at its option, shall have the right, within thirty (30) days after commencement of such action, to intervene and take over the sole defense of the action at its own expense." The right of MIT and Whitehead to intervene and assume control of the defense of a declaratory judgment action was softened, but not eliminated, in the second amendment to the Agreement, where Section 7.5 was amended to grant MIT and the Whitehead Institute the right to assume sole control over a declaratory judgment action if ARIAD was not taking "reasonable steps" to defend the '516 patent. The purpose of the language in the original

and amended versions of Section 7.5 is the same: To prevent ARIAD from folding its cards and terminating the litigation on grounds that provide no benefit to the Institutions, without the involvement of the Institutions in the decision-making process. Under both the original language and the amended language of Section 7.5, MIT and the Whitehead Institute have the right to oust ARIAD from controlling the defense of a declaratory judgment action and to assume control themselves.

### Mechanisms for Terminating ARIAD's Rights

22.    ARIAD's rights to the '516 patent are contingent upon a number of conditions. In addition to the right to terminate upon material breach, MIT retains the right to make ARIAD's license non-exclusive if it fails to pay annual fees. *See* Sections 2.3 and 13.3. ARIAD also has an obligation to use commercially reasonable efforts to develop or license the intellectual property covered by the ARIAD License Agreement. *See* Section. 3.1. Failure to satisfy this requirement gives MIT the right to terminate. *See* Section 3.3.

Executed on October 3, 2006, at Cambridge, Massachusetts.

. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Lita Nelsen

- 8 -

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of October, 2006, the attached **DECLARATION OF LITA NELSEN IN SUPPORT OF ARIAD PHARMACEUTICALS, INC.'S RENEWED MOTION TO DISMISS FOR FAILURE TO NAME NECESSARY AND INDISPENSABLE PARTIES OR, IN THE ALTERNATIVE, TO TRANSFER PURSUANT TO 28 U.S.C. § 1404(a)** was served upon the below-named counsel of record at the address and in the manner indicated:

Melanie K. Sharp, Esquire
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

<u>BY HAND, VIA CM/ECF,
AND VIA ELECTRONIC MAIL</u>

Marcus E. Sernel, Esquire
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601-6636

<u>VIA FEDERAL EXPRESS
& ELECTRONIC MAIL</u>

J. Drew Diamond, Esquire
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA  90017-5800

<u>VIA FEDERAL EXPRESS
& ELECTRONIC MAIL</u>

*/s/ Tiffany Geyer Lydon*
_____
Tiffany Geyer Lydon

# EXHIBIT A

**LITA L. NELSEN**
**97 Cambridge Street**
**Winchester, MA 01890**
**(781)729-8362**

## EDUCATION:

| | |
|---|---|
| M.B.A.(M.S. Management Science) Alfred P. Sloan Fellow, Sloan School, M. I. T. | 1979 |
| M.S., Chemical Engineering, M.I.T. | 1966 |
| B.S., Chemical Engineering, M.I.T.   (Award for First in Class) | 1964 |

## EXPERIENCE:

MASSACHUSETTS INSTITUTE OF TECHNOLOGY                                  1986-Present
Director, Technology Licensing Office
(Associate Director:  1989-1992; Technology Licensing Officer 1986-1989)

Manage patenting and technology licensing operations for M.I.T., Lincoln Laboratory, and the Whitehead Institute.  Built staff from 8 to 30 people, now handling 450 new invention disclosures per year and 75-100 licensing agreements, including over 20 startups per year.  Personal specialty in technology transfer in the biomedical field and in university entrepreneurship. Have marketed and negotiated over 100 licenses in this field. Recognized expert in university technology transfer. Active lecturer and adviser to many national and international universities and governments in university technology transfer and entrepreneurship.  Cambridge MIT Institute Fellow, studying, advising and training in technology transfer in the UK.

UNIVERSITY SEMINAR CENTER, Chestnut Hill, MA                          1984-1986
President/CEO:  Developed and marketed executive and professional development seminars through university and publishing networks.

APPLIED BIOTECHNOLOGY, INC., Cambridge, MA                            1983-1984
Vice President, Operations:  First employee of a start-up genetic engineering company based on university patents and proprietary technology in subunit vaccines and oncogenes.  In charge of opening and developing facilities, budgeting and financial control, hiring core staff, and marketing and negotiating patent license arrangements and collaborative research agreements.

MILLIPORE CORPORATION, Bedford, MA                                    1975-1983
Business Manager Ultrafiltration:  In charge of marketing, product development and applications engineering.  Customers were primarily in the biotechnology, pharmaceutical and foods industries.

New Ventures Manager:  Identified and analyzed new business ventures and potential acquisitions, primarily in medical and diagnostic markets.

ARTHUR D. LITTLE, INC., Cambridge, MA                                 1972-1975
Senior Consultant:  Case leader responsible for sales and program management.  Programs included market development studies for new medical devices and services, organizational development in technical organizations, and technical projects in environmental control and pharmaceutical manufacture.

AMICON CORPORATION, Lexington, MA                                    1965-1972
<u>Research Group Manager</u>:  Managed a group of engineers and technicians on programs in
medical devices, waste-water processing, and biomedical materials in this start-up, high-
technology firm.  Several of the products developed (including a new artificial kidney) are now
on the market.

## ADDITIONAL ACTIVITIES:

| | |
|---|---|
| IP Advisor to the International AIDS Vaccine Initiative(IAVI) | 1996-Present |
| | |
| Founding Board Member: Center for Management of Intellectual Property | |
| In Health Research and Development (MIHR)—Rockefeller Foundation | 2000-Present |
| External Advisory Board  Children's Hospital Oakland Research Institute | 2001-Present |
|     Chair | 2004-Present |
| Mount Auburn Hospital, Cambridge, MA | 2000-Present |
|     Chair of Medical Affairs Committee | 2005 |
| Massachusetts Technology Development Corporation | 1996-Present |
| Praxis Courses Ltd. (UK university technology training programme) | 2002-Present |
|     Co-Founder | |

| | |
|---|---|
| <u>Past Board Memberships</u> | |
| Association of University Technology Managers | 1991-1994 |
|     President | 1992 |
|     Bayh-Dole Award | 2001 |
| Cornell University Research Foundation | 1990-1997 |
| M.I.T. Enterprise Forum | 1993-1999 |
| Association of MIT Alumnae (President 1986-8) | 1984-1986 |

<u>Consultancies  and Advisory Panel Memberships</u>
Rockefeller Foundation
Many US Universities (Berkeley, Duke, Cornell, etc.)
U.S. Office of Technology Assessment Panels
 National Academy of Sciences panels

<u>International Activities</u>
Invited lecturer and/or led technology transfer training courses in many countries including: UK,
Germany, France, Israel, Japan, Taiwan, China, Singapore and India, among others.

## PUBLICATIONS:

Author of many book chapters, journal articles and invited lectures on technology transfer policies
and practices.  Earlier, author of book chapters and journal articles on membrane processing in
pharmaceutical manufacture and medical devices.

# EXHIBIT B

04/27/2004  09:33    3104767639                 LAURIE ALLEN                    PAGE  02

WHI Vers -1/28/91

LLN/#4: 4167ariad.agt
Date:  August 8, 1991

## LICENSE AGREEMENT .

### TABLE OF CONTENTS

PREAMBLE

ARTICLES:

I       DEFINITIONS
II      GRANT
III     DUE DILIGENCE
IV      ROYALTIES
V       REPORTS AND RECORDS
VI      PATENT PROSECUTION
VII     INFRINGEMENT
VIII    PRODUCT LIABILITY
IX      EXPORT CONTROLS
X       NON-USE OF NAMES
XI      ASSIGNMENTS
XII     ARBITRATION
XIII    TERMINATION
XIV     PAYMENTS, NOTICES AND OTHER COMMUNICATIONS
XV      MISCELLANEOUS PROVISIONS
APPENDICES
        A    Patent Rights
        B    Foreign Filings
        C    Centocor Collaborative Research Agt.
        D    Materials Transfer Agreement

This Agreement is made and entered into this *19th* day of *August*, 199*1*, (the Effective Date) by and between MASSACHUSETTS INSTITUTE OF TECHNOLOGY, a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts and having its principal office at 77 Massachusetts Avenue, Cambridge, Massachusetts 02139, U.S.A. (hereinafter referred to as M.I.T.), and the WHITEHEAD INSTITUTE, a corporation organized and existing under the laws of Delaware and having its principal office at Nine Cambridge Center, Cambridge, Massachusetts 02142, U.S.A., (hereinafter referred to as Whitehead) and ARIAD PHARMACEUTICALS, INC., a corporation duly organized under the laws of Delaware and having its principal office at 687 Wetherby Lane, Devon, Pennsylvania  19333 (hereinafter referred to as LICENSEE).



PTX 0460
02 CV 11280 RWZ



Confidential Information Under Protective Order

ADL 0029159

04/27/2004  09:33   3104767639                    LAURIE ALLEN                    PAGE  03

-2-

## WITNESSETH

WHEREAS, M.I.T. and Whitehead are the owners of certain "Patent Rights" (as later defined herein) relating to M.I.T. Case No. 4167, "Nuclear Factors Associated With Transcriptional Regulation" by David Baltimore, Ranjan Sen, Phillip A. Sharp, Harinder Singh, Louis Staudt, Jonathan LeBowitz, Albert S. Baldwin, Jr., Roger Clerc, and Lynn M. Corcoran; M.I.T. Case No. 4442W (Whitehead No. 86-10) "Method of Inducible Gene Expression" by Ranjan Sen and David Baltimore; M.I.T. Case No. 4695W (Whitehead No. 87-11) "Activation of NF-kB Precursor" by Patrick Baeuerle and David Baltimore; M.I.T. Case No. 5675 (Whitehead 87-11AA) "The pp40 Associated with REL is an I-κB" by David Baltimore, Sankar Ghosh et al.; M.I.T. Case No. 5134W (Whitehead No. 89-02) "NF-kB-Mediated Transcriptional Regulation" by Michael J. Lenardo, Chen-ming Fan, Tom Maniatis and David Baltimore and has the right to grant licenses under said Patent Rights, subject only to a royalty-free, nonexclusive license heretofore granted to the United States Government;

WHEREAS, Whitehead has authorized M.I.T. to act as its sole and exclusive agent for the purposes of licensing Whitehead's rights in the Patent Rights and has authorized M.I.T. to enter into this licensing agreement on its own and Whitehead's behalf;

WHEREAS, M.I.T. and Whitehead desire to have the Patent Rights utilized in the public interest and is willing to grant a license thereunder;

WHEREAS, LICENSEE has represented to M.I.T., to induce M.I.T. to enter into this Agreement, that LICENSEE is committed to the development and commercialization of "Licensed Product(s)" (as later defined herein) and/or the use of the "Licensed Process(es)" (as later defined herein) and that it shall commit itself to a thorough, vigorous and diligent program of exploiting the Patent Rights so that public utilization shall result therefrom; and

WHEREAS, LICENSEE desires to obtain a license under the Patent Rights upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein the parties hereto agree as follows:

## ARTICLE I - DEFINITIONS

For the purposes of this Agreement, the following words and phrases shall have the following meanings:

1.1 "LICENSEE" shall include a related company of LICENSEE, the voting stock of which is directly or indirectly at least Fifty Percent (50%) owned or controlled by LICENSEE, an organization which directly or indirectly controls more than Fifty Percent (50%) of the voting stock

Confidential Information Under Protective Order                    ADL 0029160

04/27/2004  09:33   3104767639                    LAURIE ALLEN                    PAGE  04

-3-

of LICENSEE and an organization, the majority ownership of which is directly or indirectly common to the ownership of LICENSEE.

    1.2  "Patent Rights" shall mean all of the following Whitehead and M.I.T. intellectual property:

        (a)    the United States and foreign patents and/or patent applications listed in Appendix A;

        (b)    United States and foreign patents issued from the applications listed in Appendix A and from divisionals and continuations of these applications;

        (c)    claims of U.S. and foreign continuation-in-part applications, and of the resulting patents, which are directed to subject matter specifically described in the U.S. and foreign applications listed in Appendix A;

        (d)    claims of all foreign patent applications, and of the resulting patents, which are directed to subject matter specifically described in the United States patents and/or patent applications described in (a), (b), or (c) above;

        (e)    any reissues of United States patents described in (a), (b), (c), or (d) above.

    1.3  A "Licensed Product" shall mean any product or part thereof which:

        (a)    is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the Patent Rights in the country in which any Licensed Product is made, used or sold;

        (b)    is manufactured by using a process which is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the Patent Rights in the country in which any Licensed Process is used or in which such product or part thereof is used or sold;

        (c)    contains the Tangible Property,

    subject to the limitations in Paragraph 4.4.

    1.4  A "Licensed Process" shall mean any process which is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the Patent Rights or which uses the Tangible Property, subject to the limitations in Paragraph 4.4.

    1.5  "Net Sales" shall mean LICENSEE's (and its sublicensees' where appropriate) billings for Licensed Products and Licensed Processes produced hereunder less the sum of the following:

        (a)    discounts allowed in amounts customary in the trade;

Confidential Information Under Protective Order                    ADL 0029161

04/27/2004   09:33   3104767639      LAURIE ALLEN      PAGE   05

-4-

(b)     sales, tariff duties and/or use taxes directly imposed and with reference to particular sales;

(c)     outbound transportation prepaid or allowed; and

(d)     amounts allowed or credited on returns.

No deductions shall be made for commissions paid to individuals whether they be with independent sales agencies or regularly employed by LICENSEE and on its payroll, or for cost of collections. Licensed Products shall be considered "sold" when billed out or invoiced.

1.6   "Tangible Property" shall mean cell lines containing NF-kB-P50, NF-κB-P65, I-κB obtained directly or indirectly from M.I.T. or Whitehead, and any progeny and derivatives thereof.

## ARTICLE II - GRANT

2.1   M.I.T. hereby grants to LICENSEE the right and license to make, have made, use, lease and sell the Licensed Products, and to practice the Licensed Processes to the end of the term for which the Patent Rights are granted unless sooner terminated according to the terms hereof.

2.2   This license shall be subject to the research license and to the option granted to Centocor to acquire a license to the Patent Rights of M.I.T. Case 4167 for use with certain hybridomas, under the Collaborative Research Agreement between Centocor and M.I.T. dated November 14, 1988 as attached hereto as Appendix C. M.I.T. agrees that it will not renew the Collaboration Research Agreement as provided in Paragraph 2 thereof.

2.3   In order to establish a period of exclusivity for LICENSEE, M.I.T. hereby agrees that with the exception of the rights granted or optioned to Centocor, it shall not grant any other license to make, have made, use, lease and sell Licensed Products or to utilize Licensed Processes during the period of time commencing with the Effective Date of this Agreement and terminating with the first to occur of:

(a)     for each type of Licensed Product the expiration of Twelve (12) years after the first commercial sale of that Licensed Product; or

(b)     the expiration of Sixteen (16) years after the Effective Date of this Agreement;

provided, however, that for any Licensed Product for which an application for premarket approval has been submitted to the U.S. FDA prior to July 1, 2007, the time spent by the FDA reviewing said application(s) for that Licensed Product shall be added to the period of exclusivity which would otherwise apply.

Confidential Information Under Protective Order

ADL 0029162

04/27/2004  09:33    3104767639    LAURIE ALLEN    PAGE  06

-5-

2.4  At the end of the exclusive period, the license granted hereunder shall become nonexclusive and shall extend to the end of the term or terms for which any Patent Rights are issued, unless sooner terminated as hereinafter provided, or unless the parties agree to extend the period of exclusivity.

2.5  M.I.T. and Whitehead also agree to bring to the attention of LICENSEE any inventions which relate to Nuclear Factors Associated with Transcriptional Regulation which arise prior to December 31, 1994 from the M.I.T. or Whitehead laboratories of any of the inventors of the Patent Rights listed in Appendix A.  LICENSEE shall have a three month option, dating from the date at which any such invention is revealed to LICENSEE, to begin negotiations with M.I.T. for an exclusive license to such invention.  If such negotiations are begun at LICENSEE's request, LICENSEE shall have an additional three month option to negotiate in good faith for an exclusive license to the invention.  LICENSEE's options under this Paragraph 2.5 shall, however, be subject to any options or licenses granted under a research agreement with sponsors of the research leading to such invention, and the terms of such research agreements shall not be limited by the provisions of this Paragraph 2.5.  M.I.T. and Whitehead shall use their best reasonable efforts to notify LICENSEE of any planned or completed sponsorship agreements, other than those involving U.S. Government sponsorship, in the field of Nuclear Factors Associated with Transcriptional Regulation, subject, however, to any confidentiality provisions with sponsors that might limit such notification.

2.6  LICENSEE agrees that Licensed Products leased or sold in the United States shall be manufactured substantially in the United States.

2.7  Whitehead and M.I.T. reserve the right to practice under the Patent Rights and to use and distribute the Tangible Property for their noncommercial research purposes under a Materials Transfer agreement similar to that in Appendix D.  M.I.T. and Whitehead shall use their best reasonable efforts to notify LICENSEE of any Tangible Property distributed to third parties.

2.8  LICENSEE shall have the right to enter into sublicensing agreements for the rights, privileges and licenses granted hereunder only during the exclusive period of this Agreement.  Such sublicensees may extend past the expiration date of the exclusive period of this Agreement, but any exclusivity of such sublicenses will expire upon the expiration of LICENSEE's exclusivity.

2.9  LICENSEE hereby agrees that every sublicensing agreement to which it shall be a party and which shall relate to the rights, privileges and license granted hereunder shall contain a statement setting forth the date upon which LICENSEE's exclusive rights, privileges and license hereunder shall terminate.

Confidential Information Under Protective Order

ADL 0029163

04/27/2004  09:33  3104767639                    LAURIE ALLEN                              PAGE  07

-6-

2.10  LICENSEE agrees that any sublicenses granted by it shall provide that the obligations to M.I.T. and Whitehead of Articles II, V, VII, VIII, IX, X, XII, XIII, and XV of this Agreement shall be binding upon the sublicensee as if it were a party to this Agreement.  LICENSEE further agrees to attach copies of these Articles to sublicense agreements.

2.11  LICENSEE agrees to forward to M.I.T. a copy of any and all fully executed sublicense agreements, and further agrees to forward to M.I.T. annually a copy of such reports received by LICENSEE from its sublicensees during the preceding twelve (12) month period under the sublicenses as shall be pertinent to a royalty accounting under said sublicense agreements.

2.12  LICENSEE shall not receive from sublicensees anything of value in lieu of cash payments in consideration for any sublicense under this Agreement, without the express prior written permission of M.I.T..

2.13  The license granted hereunder shall not be construed to confer any rights upon LICENSEE by implication, estoppel or otherwise as to any technology not specifically set forth in Appendix A hereof and Paragraph 2.5.

## ARTICLE III - DUE DILIGENCE

3.1  LICENSEE shall use its best efforts to bring one or more Licensed Products or Licensed Processes to market through a thorough, vigorous and diligent program for exploitation of the Patent Rights.

3.2  In addition, LICENSEE shall adhere to the following milestones:

(a)  LICENSEE shall deliver to M.I.T. on or before June 30, 1992 a business plan showing the amount of money, number and kind of personnel and time budgeted and planned for each phase of development of the Licensed Products and Licensed Processes and shall provide similar reports to M.I.T. on an annual basis on or before the ninetieth (90th) day following the close of LICENSEE's fiscal year.

(b)  ARIAD PHARMACEUTICALS, INC. (LICENSEE) shall have received at least One Million Dollars ($1,000,000) in equity investment on or before June 30, 1992.

(c)  ARIAD PHARMACEUTICALS, INC. (LICENSEE) shall have received a cumulative total of at least Five Million ($5,000,000) in equity investment and/or research program payments on or before June 30, 1993.

(d)  LICENSEE shall, within six (6) months of a request by a suitable sublicensee willing to take a sublicense upon reasonable business terms, grant at least one sublicense to the Patent Rights and Tangible Property for sale of Licensed Products as research reagents with appropriate protection of LICENSEE 's

Confidential Information Under Protective Order                                                    ADL 0029164

04/27/2004  09:33  3104767639                    LAURIE ALLEN                    PAGE  08

-7-

commercial interests. Failure to reach such an agreement within six (6) months
after a bona fide request shall allow M.I.T. to grant a license to the Patent
Rights to the requestor for sale of research reagents on terms no more
favorable than those of paragraph 4.1(d) below.

(e)     In any calendar year after December 31, 1994 that LICENSEE has not made at
least One Million Dollars ($1,000,000) in Net Sales of Licensed Product,
LICENSEE shall have invested a minimum of Five Hundred Thousand Dollars
($500,000) in projects devoted to the development and/or marketing of
Licensed Products and development of protection of the Patents Rights.

3.3  LICENSEE's failure to perform in accordance with Paragraphs 3.1 and 3.2 above
shall be grounds for M.I.T. to terminate this Agreement pursuant to Paragraph 13.3 hereof.

## ARTICLE IV - ROYALTIES

4.1  For the rights, privileges and license granted hereunder, LICENSEE shall pay
royalties to M.I.T. in the manner hereinafter provided to the end of the term of the Patent Rights or
until this Agreement shall be terminated as hereinafter provided:

(a)     License Issue Fee of Twenty-Five Thousand Dollars ($25,000), which said
License Issue Fee shall be deemed earned and due thirty days after the
execution of this Agreement.

(b)     License Maintenance Fees of Twenty-Five Thousand Dollars ($25,000) per
year payable on January 1, 1993 and on January 1 of each year thereafter until
the first submission by LICENSEE of an IND (Investigational New Drug
application) to the FDA or an equivalent application to a European or Japanese
regulatory agency. Following the submission of such application, the License
Maintenance Fees shall be Fifty Thousand Dollars ($50,000) per year
beginning January 1 of the year following the submission. However,
beginning January 1, 1998, the License Maintenance Fees shall be Fifty
Thousand Dollars ($50,000) per year whether or not an IND or equivalent
application has been submitted by LICENSEE. The License Maintenance Fee
for a given year shall be fully creditable against any Running Royalties
subsequently due.

(c)     A one-time Milestone Fee of One Hundred Thousand Dollars ($100,000)
payable within ninety (90) days after LICENSEE receives approval to initiate
clinical trials on a Licensed Product based upon its submission of its first IND
to the FDA or an equivalent application to a European or Japanese regulatory
agency.

(d)     Running Royalties in an amount equal to Three Percent (3%) of the Net Sales
of Licensed Products and Licensed Processes used, leased or sold by and/or
for LICENSEE which are covered by an issued claim of the Patent Rights in

Confidential Information Under Protective Order                    ADL 0029165

04/27/2004  09:33   3104767639                    LAURIE ALLEN                        PAGE  09

-8-

any country in which the Licensed Products and/or Licensed Processes are made, used, leased or sold; and Running Royalties in an amount equal to One and One Half Percent (1.5%) of the Net Sales of Licensed Products and Licensed Processes used, leased or sold by and/or for LICENSEE which are covered only by a pending claim of the Patent Rights in any country in which the Licensed Products and/or Licensed Processes are made, used, leased or sold.  The provisions of this paragraph shall not apply to any Licensed Products leased or sold by LICENSEE or its sublicensees for use as research reagents.

(e)    Running Royalties in an amount equal to Five Percent (5%) of the Net Sales price of Licensed Products sold by or for LICENSEE or its sublicensees for use as research reagents.

(f)    Twenty-Five Percent (25%) of any payments made to LICENSEE for sublicensing of the Patent Rights and/or Tangible Property.  This subparagraph 4.1(f) shall not apply, however, to royalties paid to LICENSEE by sublicensee(s) on the Net Sales of Licensed Products sold by sublicensee(s) for use as research reagents, which shall fall under subparagraph 4.1(e) above.

4.2  The License Issue Fee, Milestone Fee and all License Maintenance Fees shall be cumulatively creditable against Running Royalties.

4.3  All patent costs incurred prior to July 1, 1991 and reimbursed by LICENSEE under Article VI shall be creditable against Running Royalties except for Running royalties on research reagents.  Fifty Percent (50%) of patent costs incurred after July 1, 1991 shall be creditable against Running Royalties except for Running Royalties on research reagents.

4.4  The definitions of Paragraphs 1.3 and 1.4 notwithstanding, after June 30, 1997 Running Royalties shall be due on the Net Sales of a Licensed Product only if the Licensed Product is covered by an issued claim of the Patent Rights.

4.5  LICENSEE shall be entitled to credit fifty percent (50%) of the royalties paid to third parties for the use, lease or sale of a Licensed Product or Licensed Process by LICENSEE against the Running Royalties for that Licensed Product or Licensed Process due under subparagraph 4.1(d) above; provided, however that the amount credited shall not reduce the Running Royalty paid below Two Percent (2.0%) for the Licensed Product or Licensed Process covered by an issued claim, and One Percent (1.0%) if the Licensed Product or Licensed Process is covered only by a pending claim.

4.6  In no instance shall the amount paid to M.I.T. in total in a given year be less than the License Maintenance Fee for that year.

4.7  All payments due hereunder shall be paid in full, without deduction of taxes or other fees which may be imposed by any government and which shall be paid by LICENSEE.

Confidential Information Under Protective Order

ADL 0029166

04/27/2004  09:33  3104767639           LAURIE ALLEN           PAGE 10

-9-

4.8  No multiple royalties shall be payable because any Licensed Product, its manufacture, use, lease or sale are or shall be covered by more than one patent application or patent licensed under this Agreement.

4.9  Royalty payments shall be paid in United States dollars in Cambridge, Massachusetts, or at such other place as M.I.T. may reasonably designate consistent with the laws and regulations controlling in any foreign country. If any currency conversion shall be required in connection with the payment of royalties hereunder, such conversion shall be made by using the exchange rate prevailing at the Chase Manhattan Bank (N.A.) on the last business day of the calendar quarterly reporting period to which such royalty payments relate.

## ARTICLE V - REPORTS AND RECORDS

5.1  LICENSEE, within sixty (60) days after March 31, June 30, September 30 and December 31, of each year, shall deliver to M.I.T. true and accurate reports, giving such particulars of the business conducted by LICENSEE and its sublicensees during the preceding three-month period under this Agreement as shall be pertinent to a royalty accounting hereunder. These shall include at least the following:

    (a)      number of Licensed Products manufactured and sold.

    (b)      total billings for Licensed Products sold.

    (c)      accounting for all Licensed Processes used or sold.

    (d)      deductions applicable as provided in Paragraph 1.5.

    (e)      total royalties due.

    (f)      names and addresses of all sublicensees of LICENSEE.

5.2  With each such report submitted, LICENSEE shall pay to M.I.T. the royalties due and payable under this Agreement. If no royalties shall be due, LICENSEE shall so report.

5.3  On or before the ninetieth (90th) day following the close of LICENSEE's fiscal year, LICENSEE shall provide M.I.T. with LICENSEE's certified financial statements for the preceding fiscal year including, at a minimum, a Balance Sheet and an Operating Statement.

5.4  The royalty payments set forth in this Agreement shall, if overdue, bear interest until payment at a per annum rate two percent (2%) above the prime rate in effect at the Chase Manhattan Bank (N.A.) on the due date. The payment of such interest shall not foreclose M.I.T. from exercising any other rights it may have as a consequence of the lateness of any payment.

Confidential Information Under Protective Order

ADL 0029167

-10-

## ARTICLE VI - PATENT PROSECUTION

6.1  M.I.T. (and/or Whitehead, as appropriate, depending on ownership of the individual Patent Rights) shall apply for, seek prompt issuance of, and maintain during the term of this Agreement the Patent Rights in the United States and in the foreign countries listed in Appendix B hereto.  Appendix B may be amended by verbal agreement of both parties, such agreement to be confirmed in writing within ten (10) days.  The prosecution, filing and maintenance of all Patent Rights patents and applications shall be the primary responsibility of M.I.T. (and/or Whitehead); provided, however, LICENSEE shall have reasonable opportunities to advise M.I.T. (and/or Whitehead) and shall cooperate with M.I.T. (and/or Whitehead) in such prosecution, filing and maintenance.

6.2  Payment of all fees and costs relating to the filing, prosecution, and maintenance of the Patent Rights shall be the responsibility of LICENSEE, whether such fees and costs were incurred before or after the date of this Agreement.  Such payments shall be creditable as specified in Paragraphs 4.2 and 4.3.  For fees and costs incurred prior to July 1, 1991, LICENSEE shall reimburse M.I.T. and Whitehead on the following schedule:

| | |
|---|---|
| 25% of total: | 30 days after billing |
| 25% of total: | January 15, 1992 |
| 25% of total: | July 15, 1992 |
| 25% of total: | January 15, 1993 |

Fees and costs incurred after July 1, 1991 shall be reimbursed within 30 days after billing.

## ARTICLE VII - INFRINGEMENT

7.1  LICENSEE, M.I.T. and Whitehead shall promptly inform each other of any alleged infringement of the Patent Rights by a third party and of any available evidence thereof.

7.2  During the term of this Agreement, LICENSEE shall have the right, but shall not be obligated, to prosecute at its own expense any such infringements of the Patent Rights and in furtherance of such right, M.I.T. and Whitehead hereby agree that LICENSEE may include M.I.T. or Whitehead as party plaintiffs in any such suit , without expense to M.I.T. or Whitehead.  The total cost of any such infringement action commenced or defended solely by LICENSEE shall be borne by LICENSEE.  LICENSEE may, for such purposes, use the name of M.I.T. or Whitehead as party plaintiffs provided, however, that such right to bring an infringement action shall remain in effect only for so long as the license granted herein remains exclusive.  No settlement, consent judgment or other voluntary final disposition of the suit may be entered into without the consent of

ADL 0029168

-11-

M.I.T. and Whitehead, which consent shall not unreasonably be withheld. LICENSEE shall indemnify M.I.T. and Whitehead against any order for costs associated with the litigation that may be made against M.I.T. or Whitehead in such proceedings.

7.3  In the event that LICENSEE shall undertake the enforcement and/or defense of the Patent Rights by litigation, LICENSEE may withhold up to fifty percent (50%) of the royalties otherwise thereafter due M.I.T. hereunder and apply the same toward reimbursement of up to half of LICENSEE's expenses, including reasonable attorney's fees, in connection therewith. Any recovery of damages by LICENSEE for any such suit shall be applied pro rata in satisfaction of (i) any unreimbursed expenses and legal fees of LICENSEE relating to the suit; and (ii) any royalties due M.I.T. and withheld by LICENSEE and applied pursuant to this Paragraph 7.3. The balance remaining from any such recovery shall be divided between LICENSEE and M.I.T. in the proportion of 91% LICENSEE/9% M.I.T.

7.4  If within six (6) months after having been notified of any alleged infringement, LICENSEE shall have been unsuccessful in persuading the alleged infringer to desist and shall not have brought and shall not be diligently prosecuting an infringement action, or if LICENSEE shall notify M.I.T. at any time prior thereto of its intention not to bring suit against any alleged infringer, then, and in those events only, M.I.T. or Whitehead, as appropriate) shall have the right, but shall not be obligated, to prosecute at its own expense any infringement of the Patent Rights, and, in furtherance of such right, LICENSEE hereby agrees that M.I.T. (or Whitehead) may include LICENSEE as a party plaintiff in any such suit, without expense to LICENSEE. The total cost of any such infringement action commenced or defended solely by M.I.T. (or Whitehead) shall be borne by M.I.T. (or Whitehead), and M.I.T. (or Whitehead) shall keep any recovery or damages for past infringement derived therefrom. No settlement, consent judgement or other voluntary final disposition of the suit maybe entered into without the consent of LICENSEE, which consent shall not unreasonable be withheld.

7.5  In the event that a declaratory judgment action alleging invalidity or noninfringement of any of the Patent Rights shall be brought against LICENSEE, M.I.T. (or Whitehead), at its option, shall have the right, within thirty (30) days after commencement of such action, to intervene and take over the sole defense of the action at its own expense.

7.6  In any infringement suit as any party may institute to enforce the Patent Rights pursuant to this Agreement, the other parties hereto shall, at the request and expense of the party initiating such suit, cooperate in all respects and, to the extent possible, have its employees testify when requested and make available relevant records, papers, information, samples, specimens, and the like.

Confidential Information Under Protective Order

-12-

7.7 LICENSEE, during the exclusive period of this Agreement, shall have the sole right in accordance with the terms and conditions herein to sublicense any alleged infringer for future use of the Patent Rights. Any upfront fees paid to LICENSEE as part of such sublicense shall be handled in accordance with subparagraph 4.1(f).

## ARTICLE VIII - PRODUCT LIABILITY

8.1 LICENSEE shall at all times during the term of this Agreement and thereafter, indemnify, defend and hold M.I.T.and Whitehead, their trustees, officers, employees and affiliates, harmless against all claims and expenses, including legal expenses and reasonable attorneys' fees, arising out of the death of or injury to any person or persons or out of any damage to property and against any other claim, proceeding, demand, expense and liability of any kind whatsoever resulting from the production, manufacture, sale, use, lease, consumption or advertisement of the Licensed Product(s) and/or Licensed Process(es) or arising from any obligation of LICENSEE hereunder.

8.2 LICENSEE shall obtain prior to the first use of a Licensed Product or Licensed Process on humans and carry in full force and effect liability insurance which shall protect LICENSEE, M.I.T.and Whitehead in regard to events covered by Paragraph 8.1 above.

8.3 EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, M.I.T. AND WHITEHEAD MAKE NO REPRESENTATIONS AND EXTEND NO WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND VALIDITY OF PATENT RIGHTS CLAIMS, ISSUED OR PENDING.

## ARTICLE IX - EXPORT CONTROLS

It is understood that M.I.T.and Whitehead are subject to United States laws and regulations controlling the export of technical data, computer software, laboratory prototypes and other commodities (including the Arms Export Control Act, as amended and the Export Administration Act of 1979), and that its obligations hereunder are contingent on compliance with applicable United States export laws and regulations. The transfer of certain technical data and commodities may require a license from the cognizant agency of the United States Government and/or written assurances by LICENSEE that LICENSEE shall not export data or commodities to certain foreign countries without prior approval of such agency. M.I.T. neither represents that a license shall not be required nor that, if required, it shall be issued.

Confidential Information Under Protective Order                      ADL 0029170

04/27/2004  09:33   3104767639              LAURIE ALLEN                    PAGE  14

-13-

## ARTICLE X - NON-USE OF NAMES

LICENSEE shall not use the names of the Massachusetts Institute of Technology nor of the Whitehead Institute nor any of their employees, nor any adaptation thereof, in any advertising, promotional or sales literature without prior written consent obtained from M.I.T. in each case, except that LICENSEE may state that it is licensed by Whitehead or M.I.T. under one or more of the patents and/or applications comprising the Patent Rights.

## ARTICLE XI - ASSIGNMENT

The rights of ARIAD under this Agreement may not be assigned and the duties of ARIAD under this Agreement may not be delegated without the prior written consent of M.I.T. and Whitehead, except that ARIAD may assign this Agreement to an entity, acceptable to M.I.T. and Whitehead, with which it merges or consolidates or which ARIAD controls, or to which substantially all of its assets relating to the Patent Rights are sold or otherwise transferred or to a partnership of which ARIAD or any of its affiliates in the general partner.

## ARTICLE XII - ARBITRATION

12.1 Any and all claims, disputes or controversies arising under, out of, or in connection with this Agreement, including any dispute relating to patent validity or infringement, which have not been resolved by good faith negotiations between the parties, shall be resolved by final and binding arbitration in Boston, Massachusetts under the rules of the American Arbitration Association, or the Patent Arbitration Rules if applicable, then obtaining. The arbitrators shall have no power to add to, subtract from or modify any of the terms or conditions of this Agreement. Any award rendered in such arbitration may be enforced by either party in either the courts of the Commonwealth of Massachusetts or in the United States District Court for the District of Massachusetts, to whose jurisdiction for such purposes M.I.T., Whitehead and LICENSEE each hereby irrevocably consents and submits.

12.2 Notwithstanding the foregoing, nothing in this Article shall be construed to waive any rights or timely performance of any obligations existing under this Agreement.

## ARTICLE XIII - TERMINATION

13.1 If LICENSEE shall cease to carry on its business, this Agreement shall terminate upon notice by M.I.T.

Confidential Information Under Protective Order

ADL 0029171

04/27/2004  09:33    3104767639              LAURIE ALLEN              PAGE  15

-14-

13.2  Should LICENSEE fail to pay M.I.T. royalties due and payable hereunder, M.I.T. shall have the right to terminate this Agreement on thirty (30) days' notice, unless LICENSEE shall pay M.I.T. within the thirty (30) day period, all such royalties and interest due and payable.  Upon the expiration of the thirty (30) day period, if LICENSEE shall not have paid all such royalties and interest due and payable, the rights, privileges and license granted hereunder shall terminate.

13.3  Upon any material breach or default of this Agreement by LICENSEE, other than those occurrences set out in Paragraphs 13.1 and 13.2 hereinabove, which shall always take precedence in that order over any material breach or default referred to in this Paragraph 13.3, M.I.T. shall have the right to terminate this Agreement and the rights, privileges and license granted hereunder by ninety (90) days' notice to LICENSEE.  Such termination shall become effective unless LICENSEE shall have cured any such breach or default prior to the expiration of the ninety (90) day period.

13.4  LICENSEE shall have the right to terminate this Agreement at any time on six (6) months' notice to M.I.T., and upon payment of all amounts due M.I.T. through the effective date of the termination.

13.5  Upon termination of this Agreement for any reason, nothing herein shall be construed to release either party from any obligation that matured prior to the effective date of such termination.  LICENSEE and any sublicensee thereof may, however, after the effective date of such termination, sell all Licensed Products, and complete Licensed Products in the process of manufacture at the time of such termination and sell the same, provided that LICENSEE shall pay to M.I.T. the royalties thereon as required by Article IV of this Agreement and shall submit the reports required by Article V hereof on the sales of Licensed Products.

13.6  Upon termination of this Agreement for any reason, any sublicensee not then in default shall have the right to seek a license from M.I.T.

13.7  LICENSEE shall have the right, upon written notice to M.I.T., to separately terminate its license to any independent patent application or patent of the Patent Rights.

## ARTICLE XIV - PAYMENTS, NOTICES AND OTHER COMMUNICATIONS

Any payment, notice or other communication pursuant to this Agreement shall be sufficiently made or given on the date of mailing if sent to such party by certified first class mail, postage prepaid, addressed to it at its address below or as it shall designate by written notice given to the other party:

Confidential Information Under Protective Order                    ADL 0029172

-15-

In the case of M.I.T.:

> Director
> Technology Licensing Office
> Massachusetts Institute of Technology
> Room E32-300
> Cambridge, Massachusetts 02139

In the case of WHITEHEAD:

> Vice President
> Whitehead Institute
> Nine Cambridge Center
> Cambridge, MA 02142

In the case of LICENSEE:

> Harvey J. Berger, M.D.
> Chairman and Chief Executive Officer
> ARIAD Pharmaceuticals, Inc.
> 687 Wetherby Lane
> Devon, PA 19333

or as amended in writing from time to time by any party.

## ARTICLE XV - MISCELLANEOUS PROVISIONS

15.1  This Agreement shall be construed, governed, interpreted and applied in accordance with the laws of the Commonwealth of Massachusetts, U.S.A., except that questions affecting the construction and effect of any patent shall be determined by the law of the country in which the patent was granted.

15.2  The parties hereto acknowledge that this Agreement sets forth the entire Agreement and understanding of the parties hereto as to the subject matter hereof, and shall not be subject to any change or modification except by the execution of a written instrument subscribed to by the parties hereto.

15.3  The provisions of this Agreement are severable, and in the event that any provisions of this Agreement shall be determined to be invalid or unenforceable under any controlling body of the law, such invalidity or unenforceability shall not in any way affect the validity or enforceability of the remaining provisions hereof.

Confidential Information Under Protective Order

ADL 0029173

04/27/2004  09:33   3104767639              LAURIE ALLEN                    PAGE  17

-16-

15.4 LICENSEE agrees to mark the Licensed Products sold in the United States with all applicable United States patent numbers. All Licensed Products shipped to or sold in other countries shall be marked in such a manner as to conform with the patent laws and practice of the country of manufacture or sale.

15.5 The failure of any party to assert a right hereunder or to insist upon compliance with any term or condition of this Agreement shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition by the other parties.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals and duly executed this Agreement the day and year set forth below.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY
By _____
Name _____JOHN T. PRESTON, DIRECTOR_____
Title _____TECHNOLOGY LICENSING OFFICE____
Date _____8 - 26 - 91_____

WHITEHEAD INSTITUTE
By _____
Name _____John Pratt_____
Title _____Vice President_____
Date _____8/28/91_____

ARIAD PHARMACEUTICALS, INC.
By _____Harvey Berger, M.D._____
Name _____HARVEY J. BERGER, M.D._____
Title _____Chairman + Chief Executive Officer_
Date _____8/19/91_____

Confidential Information Under Protective Order                    ADL 0029174

-17-

### APPENDIX A

**M.I.T. Case No. 4167AA**
"Nuclear Factors Associated With Transcriptional Regulation"
By David Baltimore, Ranjan Sen, Phillip A. Sharp, Harinder Singh, Louis Staudt, Jonathan
LeBowitz, Albert S. Baldwin, Jr., Roger Clerc, and Lynn M. Corcoran
U.S.S.N. 280,173 (Filed 12/5/88)
(Owned by M.I.T. and the Whitehead Institute, jointly)

**FOREIGN FILING(S)**

**M.I.T. Case No. 4167:**

    European Application No. 87 900968.6 (Filed 1/9/87)
        *(Claiming Austria, Belgium, Switzerland/Liechtenstein, Germany, France, Great
        Britain, Italy, Luxembourg, Netherlands, Sweden)*

    Japanese Application No. PCT/US87/00086 (Filed 1/9/87)

**M.I.T. Case No. 4167A/4167AA:**

    Canadian Application No. 590,892 (Filed 2/13/89)
    European Application No. 89 902888.0 (Filed 2/10/89)
        *(Claiming Austria, Belgium, Switzerland/Liechtenstein, Germany, France, Great
        Britain, Italy, Luxembourg, Netherlands, Sweden)*
    Japanese Application No. PCT/US89/00553 (Filed 2/10/89)

**M.I.T. Case No. 4442W (Whitehead No. 86-10)**
"Method of Inducible Gene Expression"
By Ranjan Sen and David Baltimore
U.S.S.N. 946,365 (Filed 12/24/86)
(Owned by The Whitehead Institute)

**FOREIGN FILING(S)**

    All foreign filing has been abandoned.

Confidential Information Under Protective Order

ADL 0029175

04/27/2004  09:33   3104767639                LAURIE ALLEN                    PAGE  19

-18-

**M.I.T. Case No. 4695W  (Whitehead No. 87-11)**
"Activation of NF-kB Precursor"
By Patrick Baeuerle and David Baltimore"
U.S.S.N. 318,901 (Filed 3/3/89)
(Owned by The Whitehead Institute)

FOREIGN FILING(S)

  European Application No. PCT/US89/00820  (Filed 3/1/89)
        *(Claiming Austria, Belgium, Switzerland/Liechtenstein, Germany, France, Great
        Britain, Italy, Luxembourg, Netherlands, Sweden)*


**M.I.T. Case No. 5134W  (Whitehead No. 89-02)**
"NF-kB-Mediated Transcriptional Regulation"
By Michael J. Lenardo, Chen-ming Fan, Tom Maniatis and David Baltimore
U.S.S.N. 341,436 (Filed 4/21/89)
(Owned by The Whitehead Institute and Harvard University, jointly.  Harvard University has
given M.I.T. the authority to license Harvard's rights on Harvard's behalf and has given
Whitehead full rights to prosecute and defend the Patent Rights.)

FOREIGN FILING(S)

    None

**M.I.T. Case 5675  (Whitehead 87-11AA)**
"The pp40 Associated with REL is an I-κB" by David Baltimore, Sankar Ghosh et al.
To be filed
(Owned by The Whitehead Institute)

Confidential Information Under Protective Order

ADL 0029176

-19-

## APPENDIX B

Foreign countries in which Patent Rights shall be filed, prosecuted and maintained in accordance with Article VI where legally possible:

Canada
Japan
Great Britain
France
Germany
Italy

Confidential Information Under Protective Order                      ADL 0029177

04/27/2004  09:33   3184767639                LAURIE ALLEN                    PAGE  21

APPENDIX C

#1/LLN/11/14/88
CentCollabResAgt

## COLLABORATIVE RESEARCH AGREEMENT

This Agreement between Centocor, Inc. and the Massachusetts Institute of Technology ("M.I.T.") defines the terms and conditions under which Centocor scientists will collaborate with Prof. Phillip A. Sharp and colleagues in the Cancer Center at M.I.T. in the area of antibody gene expression ("The Collaboration").

Centocor and M.I.T. hereby agree as follows:

1. FIELD:  The Field of the Collaboration is defined by the Work Statement attached hereto as Appendix A.

2. DURATION:  The Collaboration shall begin on December 1, 1988 and terminate on November 30, 1991, unless sooner terminated by either party notifying the other, in writing, that it wishes to terminate the Collaboration.  The Collaboration may be extended by written mutual consent.

3. EXCHANGE OF INFORMATION:  During the Collaboration, each party shall provide the other with all data and other information that it develops under the Collaboration.

4. M.I.T. TANGIBLE PROPERTY:  M.I.T. shall provide to Centocor certain biological materials ("M.I.T.") developed before the Collaboration, for Centocor's use in the Collaboration.  Centocor shall not give samples, progeny, or derivatives of such M.I.T. Tangible Property to any third party except with the written permission of M.I.T.

5. BIOLOGICAL MATERIAL DEVELOPED UNDER THE COLLABORATION: Any biological material developed by one party under the Collaboration shall be provided to the other for its use under the Collaboration.  Samples, progeny or derivatives of any biological materials developed under the Collaboration shall not be delivered to any third party without the written permission of the developing party, except as specified in



Confidential Information Under Protective Order

`ADL 0029178

04/27/2004  09:33    3104767639    LAURIE ALLEN    PAGE  22

2

Paragraph 8(c) below. Notwithstanding the foregoing, for hybridomas developed under this Collaboration which are of commercial value to Centocor and which are derived from hybridomas developed or obtained by Centocor outside of this Collaboration, Centocor shall not be required to provide said hybridomas to MIT unless provision is specifically requested by MIT for specific purposes and, unless suitable cell line transfer agreements in the form of those contained in Appendix C are executed between the parties hereto."

6. PUBLICATION: Either party shall be free to publish any of the results it obtains under the Collaboration, and shall acknowledge the contribution of the other party, or include the other party as co-author, as appropriate. The publishing party shall provide the other party with a copy of manuscripts submitted for publication at least thirty days prior to publication, in order to allow the other party to identify potentially patentable material and request that a patent application be filed.

7. INVENTIONS: Any inventions made by Centocor personnel shall belong to Centocor; inventions made by M.I.T. personnel shall be owned by M.I.T. Inventions made jointly by M.I.T. and Centocor personnel shall belong jointly to M.I.T. and Centocor. Each party shall promptly notify the other if it makes an invention during the Collaboration, and if it intends to file a patent application on any such inventions. Copies of any such patent applications which are filed by one party shall be promptly provided to the other party.

8. PATENT AND LICENSING RIGHTS:

(a) During the Collaboration, M.I.T. shall grant to Centocor a royalty-free nonexclusive license to the Patent Rights of the M.I.T. Cases listed in Appendix B and to the M.I.T. Tangible Property for internal research and development use in the field of use of "Expression of Antibodies". If Centocor does not terminate this Agreement at any time prior to October 31, 1991, the internal research and development use license to the Patent Rights and the M.I.T. Tangible Property shall be in perpetuity.

(b) M.I.T. shall have the right to use any biological property and inventions developed by Centocor under the Collaboration for its own internal uses, royalty-free in perpetuity.

(c) "Transferrable Property" is defined as any biological property developed by Centocor under the Collaboration, but excluding hybridomas developed by Centocor which produce antibody of commercial value to Centocor. "Licensable Centocor Patent Rights" shall mean



Confidential Information Under Protective Order

ADL 0029179

04/27/2004  09:33   3104767639                LAURIE ALLEN                      PAGE  23

3

patent rights to inventions made by Centocor under the Collaboration, but excluding claims to hybridomas producing antibody of commercial value to Centocor. M.I.T. shall have the right to license to third parties, only in conjunction with the Patent Rights to Appendix B, any Transferrable Property and Licensable Centocor Inventions. M.I.T. shall pay to Centocor twenty-five percent (25%) of the Net Royalties it receives from such licenses. ("Net Royalties" is defined as Gross Royalties minus 15% for administration and marketing, and minus any unreimbursed out-of-pocket patenting costs.)

(d) Centocor shall have a first option to an exclusive royalty-bearing license with suitable due diligence provisions, for certain Applications, to the M.I.T. Tangible Property, the Patent Rights of Appendix B, and any M.I.T. inventions or biological property developed under the Collaboration. An "Application" is defined as all hybridomas producing antibodies to a single antigen or directed to detection of a single disease state if all tests for that disease are based on the same antigen or set of antigens operating by the same basic mechanism in the disease state. The terms of Centocor's option are as follows:

(i) Centocor shall have a first option *for an exclusive license* to all Applications for one year following the beginning of the Collaboration *and an option for a non-exclusive license until one year following the end of the Collaboration*. Thereafter, Centocor's option shall be only to Applications for which M.I.T. has not previously granted a license to a third party.

(ii) Centocor may exercise its option to an exclusive license for an Application only after Centocor demonstrates that it has developed a suitable hybridoma for that Application, or that it has an intensive development program in place specifically devoted to development of a hybridoma for that Application. In the latter event, Centocor's license to the hybridoma shall terminate if a functional hybridoma is not developed by Centocor within two years of the effective date of the license.

(iii) If Centocor exercises its option to an exclusive license to an Application, the royalties shall be as follows:

((a)) For Applications using known hybridomas whose efficiency of production of antibody is increased by use of the Patent Rights of Appendix B or the M.I.T. Tangible Property and/or M.I.T. patents or M.I.T. biological property developed under the Collaboration (together defined as "M.I.T. Intellectual and Material Property"), royalties shall include a License Issue Fee of $10,000 per Application, and a Running

Confidential Information Under Protective Order

ADL 0029180

04/27/2004  09:33    3104767639                    LAURIE ALLEN                        PAGE  24

4

Royalty of one-half of one percent (0.5%) of Centocor's sales of product produced and sold using the M.I.T. Intellectual and Material Property.

((b))    For Applications using new hybridomas which could not be practically developed without use of the M.I.T. Intellectual and Material Property, a License Issue Fee of $25,000 per Application, and a Running Royalty of 2.5% of product sales.

AGREED TO FOR:

MASSACHUSETTS INSTITUTE                    CENTOCOR, INC.
OF TECHNOLOGY

By                                          By

Title                                       Title  Chairman of Board

Date  Nov. 14, 1988                         Date  Nov    , 1988,

Confidential Information Under Protective Order

ADL 0029181

## APPENDIX A

### WORK STATEMENT

As part of a continuing collaboration between MIT scientists (represented by Dr. Phillip Sharp and Centocor), the MIT scientists will isolate and characterize cDNA clones representing cellular factors involved in the regulation of immunoglobulin gene expression.  Said cDNA clones will then be sent to Centocor where they will be used in one or more of the following ways:

    a)    The cDNA clones will be used as probes to determine the level of expression of said factors in hybridoma and other cell lines.

    b)    the cDNA clones will be expressed in hybridoma or other mammalian cells in order to study their effects on immunoglobulin production.

    c)    the cDNA clones will be expressed in E. coli in order to obtain large quantities for study and for production of antisera.

    d)    Recombinants of the cDNAs and other activator genes may also be tested in the course of these experiments.

LBOOKSAS.NO1/11



Confidential Information Under Protective Order                    ADL 0029182

04/27/2004  09:33   3184767639              LAURIE ALLEN                    PAGE  26

APPENDIX D

MASSACHUSETTS INSTITUTE OF TECHNOLOGY  CAMBRIDGE, MASSACHUSETTS 02139

Date: _____

Biomaterials Coordinator
Technology Licensing Office
Massachusetts Institute of Technology
Building E32-300
77 Massachusetts Ave.
Cambridge, MA 02139

Biology Department
Massachusetts Institute of Technology
Building
77 Massachusetts Ave.
Cambridge, MA 02139

Subject:  BIOLOGICAL MATERIAL TRANSFER AGREEMENT

Dear

This is to acknowledge your request for _____
_____, which is owned by MASSACHUSETTS INSTITUTE
OF TECHNOLOGY (M.I.T.).  M.I.T. will provide this material to you, for your use in
noncommercial scientific research only, under the following conditions:

1.    The Material covered by this Agreement includes _____
      any additional progeny or derivatives which could not have been made but for
      the _____ and any related information and
      know-how which will be received under this agreement.

2.    The Material will be used only by you and by individuals working under your
      direct supervision in your institution, and will not be transferred, distributed or
      released to any other person.

3.    The Material will be used only for noncommercial, publishable research
      purposes.  It will not be used on any research to be used for the development
      of any commercial product, including drug screening or development for
      commercial purposes or on behalf of any commercial entity.

4.    You will be free to publish any research results using the Material.  We would
      appreciate your acknowledging in such publication(s) MIT and its personnel as
      scientifically appropriate, and providing MIT with copies of such publication(s).

5.    The Material is made available for investigational use only in laboratory
      animals or in in vitro experiments and will not be used in humans or for

Page 1

Confidential Information Under Protective Order

ADL 0029183

04/27/2004  09:33    3104767639                LAURIE ALLEN                        PAGE  27

any other purpose.

6.   All characteristics of the Material are not fully understood and its use may involve risks or dangers that are not known or fully appreciated. The Material is being provided without warranty of any sort, express or implied.

7.   You and your Institution will use the Material in compliance with all laws and governmental regulations and guidelines applicable to the Material and will comply with all NIH guidelines and other relevant NIH instructions. In particular:

   A) Your laboratory has been reviewed by its institutional biohazards committee (IBC) which has certified that facilities, procedures, and the training and expertise of the personnel involved are adequate;

   B) Your laboratory has received the appropriate approvals and has registered its rDNA program with the IBC; and

   C) A copy of this letter is on file with your laboratory's IBC.

8.   You will hold **MASSACHUSETTS INSTITUTE OF TECHNOLOGY (M.I.T.)** and its employees harmless from any loss, claim, damage or liability, of any kind, which may arise from or in connection with this Agreement or the use, handling or storage of the Material. In no case shall M.I.T. or Professor _____ _____ be liable for any use by you, by individuals working under your direct supervision, or by your institution, of the Material or any loss, claim, damage or liability, of any kind, which may arise from or in connection with this Agreement or the use, handling or storage of the Material.

9.   You understand that no other right or license to this Material or to its use is granted or implied as a result of our sending the Material to you.

10.  At the request of **MASSACHUSETTS INSTITUTE OF TECHNOLOGY,** unused Material will be returned to M.I.T. or destroyed.

Research Project:  Studies on the activation and differentiation of monocytic cells.

If you agree to accept the Material under the above conditions, please sign the Agreement, have it signed by an authorized representative of your institution and return it to:

Page 2

Confidential Information Under Protective Order                     ADL 0029184

04/27/2004  09:33    3104767639                    LAURIE ALLEN                         PAGE   28

———————————————————
———————————————————
———————————————————
———————————————————

The Material will be sent to you as soon as possible after the receipt of the signed agreement.

Sincerely,

Accepted:

REQUESTER
INSTITUTION· _____

By:____ __ _____        By:_____
(Signature)                       (Signature)

By:_____       By:_____
(Printed Name)                    (Authorized Representative's
                                  Printed Name)

Date:_____     Date:_____

Page 3

Confidential Information Under Protective Order                    ADL 0029185

# EXHIBIT C

04/27/2004  09:33    3104767639                    LAURIE ALLEN                    PAGE  29
                                                   MINTZ LEVIN                      2002

## FIRST AMENDMENT

This amendment, dated _November 20, 1991_, is to the License Agreement dated August 19, 1991 between MASSACHUSETTS INSTITUTE OF TECHNOLOGY, the WHITEHEAD INSTITUTE, and ARIAD PHARMACEUTICALS, INC.

The parties agree that the License Agreement shall be amended as follows in order to acknowledge Harvard University's ownership of certain Patent Rights:

1.    The following paragraph shall be added to the WITNESSETH section:

"WHEREAS, M.I.T. Case No. 5134W (Whitehead No. 89-02) "NF-kB Mediated Transcriptional Regulation" by Michael J. Lenardo, Chen-ming Fan, Tom Maniatis and David Baltimore is jointly owned by Harvard University, and Harvard University (Harvard)has authorized M.I.T. to act as its sole and exclusive agent for the purposes of licensing Harvard's rights in the Patent Rights and has authorized M.I.T. to enter into this licensing agreement on Harvard's behalf;

2.    The word "Harvard" shall be added after "Whitehead," in the first sentence of Paragraph 1.2.

3.    The words "and Harvard" shall be added after "Whitehead and M.I.T." and "M.I.T. and Whitehead" in Paragraph 2.7.

4.    The words "and/or Harvard" shall be added after the words "and/or Whitehead" in all instances in Paragraph 6.1.

5.    The words "and Harvard" shall be added after the words "M.I.T. and Whitehead" in Paragraphs 7.1 and & 7.2. The words "or Harvard" shall be added after the words "M.I.T. or Harvard" in Paragraph 7.2.

6.    The words "and Harvard" shall be added after the words "M.I.T. and Whitehead" in all instances in Paragraphs 8.1, 8.2 and 8.3.

7.    The words "nor of Harvard University" shall be added after "nor of the Whitehead Institute", and the words "or Harvard" shall be added after the words "Whitehead or M.I.T." in Section X.

Confidential Information Under Protective Order                    ADL 0029186

04/27/2004  09:33   3184767639                    LAURIE ALLEN                    PAGE  30
                                                  MINTZ LEVIN                     ☎003

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals and duly executed this Agreement the day and year set forth below.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY

By _John T. Preston_

Name __JOHN T. PRESTON, DIRECTOR__
       __TECHNOLOGY LICENSING OFFICE__

Title _____

Date _11 - 11 - 91_

WHITEHEAD INSTITUTE

By _John Pratt_

Name _John Pratt_

Title _Vice President_

Date _11/20/91_

ARIAD PHARMACEUTICALS, INC.

By _Harvey Berger_

Name _HARVEY J. BERGER_

Title _Chairman + CEO_

Date _11/20/91_

IA/sc
5134.ariad.amend.1105

Confidential Information Under Protective Order          ADL 0029187

# EXHIBIT D

04/27/2004  09:33  3104767639                LAURIE ALLEN                    PAGE  31

## SECOND AMENDMENT TO LICENSE AGREEMENT

This Second Amendment to License Agreement ("Second Amendment to License Agreement") is made and entered into as of this 2nd day of January, 2002, (the "Effective Date") by and between MASSACHUSETTS INSTITUTE OF TECHNOLOGY, a corporation organized and existing under the laws of the Commonwealth of Massachusetts and having its principal offices at 77 Massachusetts Avenue, Cambridge, Massachusetts (hereinafter referred to as "M.I.T."), and the WHITEHEAD INSTITUTE, a corporation organized and existing under the laws of Delaware and having its principal offices at Nine Cambridge Center, Cambridge, Massachusetts (hereinafter referred to as "Whitehead") and ARIAD PHARMACEUTICALS, INC., a corporation duly organized under the laws of Delaware and having its principal offices at 20 Landsdowne Street, Cambridge, Massachusetts (hereinafter referred to as "LICENSEE").

WHEREAS, M.I.T., WHITEHEAD and LICENSEE entered into that certain License Agreement dated August 19, 1991, and amended same effective November 20, 1991 (collectively, the "Agreement"); and

WHEREAS, the parties to the Agreement desire to amend certain terms of the Agreement, to add certain terms to the Agreement and to confirm the validity and effectiveness of the remaining terms and conditions set forth in the Agreement, all as further set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and obligations set forth herein, the parties hereby agree as follows.

### ARTICLE 1

1.    **Definitions.** Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Agreement.

### ARTICLE 2

2.    **Amendment of the Agreement.** The Agreement is hereby amended as set forth in this Article 2.

2.1    **Amendment of Article II - Grant.** Article II of the Agreement is hereby amended as set forth herein.

2.1.1    **Amendment of Paragraph 2.2.** Paragraph 2.2 of the Agreement is hereby deleted and replaced with the following text:

"2.2  [RESERVED]"

2.1.3    **Amendment of Paragraph 2.3.** Paragraph 2.3 of the Agreement is hereby deleted and replaced with the following text:

Confidential Information Under Protective Order

ADL 0029188

04/27/2004  09:33    3104767639                    LAURIE ALLEN                        PAGE  32

"2.3 Except as otherwise specifically set forth herein, the rights granted under Paragraph 2.1 hereof shall be and remain exclusively granted to LICENSEE and shall continue until the end of the term or terms for which any Patent Rights are issued, unless sooner terminated as provided herein. Without limiting the generality of the foregoing, upon a failure of LICENSEE to pay the License Maintenance Fees due hereunder, the rights granted under Paragraph 2.1 hereunder shall convert to non-exclusive upon written notice from M.I.T. to LICENSEE. The right to convert the rights granted hereunder to non-exclusive shall not be in limitation of any other rights that M.I.T. may have hereunder or at law upon such a failure by LICENSEE to pay the License Maintenance Fees hereunder."

**2.1.3   Amendment of Paragraph 2.4.** Paragraph 2.4 of the Agreement is hereby deleted and replaced with the following text:

"2.4 [RESERVED]"

**2.1.4   Amendment of Paragraph 2.8.** Paragraph 2.8 of the Agreement is hereby deleted and replaced with the following text:

"2.8 LICENSEE shall have the right to enter into sublicenses for the rights, privileges and licenses granted hereunder. Such sublicenses shall contain provisions enabling LICENSEE to fulfill its obligations to M.I.T. hereunder."

**2.1.5   Amendment of Paragraphs 2.9 and 2.10.** Paragraphs 2.9 and 2.10 of the Agreement are hereby deleted and replaced with the following text:

"2.9 [RESERVED]

2.10 [RESERVED]"

**2.2   Amendment of Article III - DUE DILIGENCE.** Article III of the Agreement is hereby amended as set forth herein.

**2.2.1   Amendment of Paragraph 3.1.** Paragraph 3.1 of the Agreement is hereby deleted and replaced with the following text:

"3.1 LICENSEE shall use reasonable commercial efforts to bring one or more Licensed Products to market through a thorough, vigorous and diligent program for exploitation of the Patent Rights. Commercially reasonable efforts by LICENSEE to grant sublicenses to companies that LICENSEE reasonably believes are engaged or will engage in such activities shall be sufficient to satisfy LICENSEE's obligations hereunder."

**2.2.2   Amendment of Paragraph 3.2.** Paragraph 3.2 of the Agreement is hereby deleted and replaced with the following text:

"3.2 [RESERVED]"

2

Confidential Information Under Protective Order                    ADL 0029189

04/27/2004  09:33  3104767639                    LAURIE ALLEN                          PAGE  33

2.3    **Amendment of Article VII - INFRINGEMENT.** Article VII of the Agreement is hereby amended as set forth herein.

2.3.1    **Amendment of Paragraph 7.5.** Paragraph 7.5 of the Agreement is hereby deleted and replaced with the following text:

"7.5  In the event that a declaratory action alleging invalidity or noninfringement of any of the Patent Rights shall be brought against LICENSEE, and LICENSEE fails to take reasonable steps to defend such action in a timely manner, M.I.T. (or Whitehead), at its option, shall have the right to intervene and take over sole defense of such action at its own expense."

### ARTICLE 3
### CONFIRMATION OF VALIDITY AND EFFECTIVENESS

3.    **Confirmation of Validity and Effectiveness.** Except as otherwise specifically set forth herein, the parties hereby confirm the validity and continued effectiveness of the Agreement.

IN WITNESS WHEREOF, the parties have hereunto set their hands and duly executed this Second Amendment to License Agreement as of the Effective Date.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY

By: _____
Name: _____
Title: _____


WHITEHEAD INSTITUTE

By: _____
Name: _____
Title: _____


ARIAD PHARMACEUTICALS, INC.

_____
By:    Fritz Casselman
       Senior Vice President and
       Chief Business Officer

3

TRA 1616308v1

Confidential Information Under Protective Order                    ADL 0029190