## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMGEN, INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION | ) ) ) ) | C.A. No. 06-259-KAJ |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) ) | |
| ARIAD PHARMACEUTICALS, INC., | ) ) | |
| Defendant. | ) ) | |

### DECLARATION OF ELIZABETH L. ROSENBLATT IN SUPPORT OF ARIAD PHARMACEUTICALS, INC.'S RENEWED MOTION TO DISMISS FOR FAILURE TO NAME NECESSARY AND INDISPENSABLE PARTIES OR, IN THE ALTERNATIVE, TO TRANSFER PURSUANT TO 28 U.S.C. § 1404(a)

I, Elizabeth L. Rosenblatt, declare as follows:

1.    I am an attorney at Irell & Manella LLP, counsel of record for ARIAD Pharmaceuticals, Inc. ("ARIAD") in connection with this action. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath. I make this declaration in support of ARIAD's Renewed Motion to Dismiss for Failure to Name Necessary and Indispensable Parties or, in the Alternative, to Transfer Pursuant to 28 U.S.C. § 1404(a).

2.    Attached hereto as Exhibit A is a true and correct copy of the first page of United States Patent No. 6,410,516 ("the '516 patent"). A full copy of the '516 patent is attached as Exhibit 1 to Plaintiffs' Complaint for Declaratory Judgment of Patent Invalidity and Noninfringement (D.I. 1). I have reviewed the file history for this patent, which is approximately 1081 pages in length.

3.    Attached hereto as Exhibit B is a true and correct copy of a printout from the Caltech website (http://pr.caltech.edu/media/Press_Releases/PR12746.html), which is a press release entitled "Baltimore to Retire as Caltech President; Will Remain at Institute as Biology Professor," which discusses a number of Dr. David Baltimore's achievements.

4.      Attached hereto as Exhibit C is a true and correct copy of a printout from the Massachusetts Institute of Technology website (http://web.mit.edu/sharplab/CV.html), which is the *Curriculum Vitae* of Dr. Phillip Sharp.

5.      Attached hereto as Exhibit D are true and correct copies of printouts from the website of Harvard University (http://www.mcb.harvard.edu/Faculty/Maniatis.html), and (http://www.hno.harvard.edu/gazette/1997/09.11/ManiatisNamedFi.html), which contain information about Dr. Maniatis's work and his achievements.

6.      Attached hereto as Exhibit E is a true and correct copy of a License Agreement, entered into on August 19, 1991, between Massachusetts Institute of Technology, the Whitehead Institute for Biomedical Research, and ARIAD ("the August 19, 1991 License").

7.      Attached hereto as Exhibit F is a true and correct copy of the November 20, 1991 First Amendment to the August 19, 1991 License.

8.      Attached hereto as Exhibit G is a true and correct copy of the January 2, 2002 Second Amendment to the August 19, 1991 License.

9.      Attached hereto as Exhibit H is a true and correct copy of the transcript of the hearing on ARIAD's Motion to Dismiss that took place on September 11, 2006.

10.     Attached hereto as Exhibit I is a true and correct copy of the Complaint filed by ARIAD on June 25, 2002, in *ARIAD Pharmaceuticals, Inc., Massachusetts Institute of Technology, the Whitehead Institute for Biomedical Research, and the President and Fellows of Harvard College v. Eli Lilly and Company*, Case No. 1:02-cv-11280-RWZ (D. Mass.) (hereinafter, "the Lilly litigation").

11.     Attached hereto as Exhibit J is a true and correct copy of Eli Lilly and Company's Answer to Plaintiffs' Complaint and Counterclaims filed on May 27, 2003 in the Lilly litigation.

12.    Attached hereto as Exhibit K is a true and correct copy of the docket from the Lilly litigation, as printed from the United States District Court for the District of Massachusetts's ECF/Pacer website.

13.    Attached hereto as Exhibit L is a true and correct copy of the Jury Verdict from the Lilly litigation, as printed from the United States District Court for the District of Massachusetts's ECF/Pacer website.

14.    Attached hereto as Exhibit M is a true and correct copy of Plaintiffs' Trial Brief from the Lilly litigation, as printed from the United States District Court for the District of Massachusetts's ECF/Pacer website.

15.    Attached hereto as Exhibit N is a true and correct copy of ARIAD's Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1) from the present litigation.

16.    Attached hereto as Exhibit O is a true and correct copy of Plaintiffs' Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1) from the present litigation.

17.    Attached hereto as Exhibit P is a true and correct copy of a Fact Sheet with information "About Amgen" printed from Amgen's website (http://www.amgen.com/pdfs/Fact_Sheet_Amgen.pdf).

18.    Attached hereto as Exhibit Q is a true and correct copy of ARIAD's Report on Form 10-K for the period ending December 31, 2005, filed with the United States Securities and Exchange Commission ("SEC").

19.    Attached hereto as Exhibit R is a true and correct copy of a Fact Sheet with information "About Amgen manufacturing" printed from Amgen's website (http://www.amgen.com/pdfs/Fact_Sheet_Manufacturing.pdf).

20.    Attached hereto as Exhibit S are true and correct copies of printouts from www.mapquest.com. These printouts are the results of requests for driving directions from Immunex's location in West Greenwich, Rhode Island to the United States District Court of Massachusetts in Boston, Massachusetts and United States the District Court of Delaware in Wilmington, Delaware, respectively.

21.    Attached hereto as Exhibit T is a true and correct copy of a printout from The Boston Globe's website (http://www.boston.com/business/globe/articles/2006/03/02/amgen_to_expand_research_unit_here/), which is a news article dated March 2, 2006 and entitled "Amgen to expand research here."

22.    Attached hereto as Exhibit U is a true and correct copy of a printout from Amgen's website (http://www.amgen.com/about/leadership_team_board_of_directors.html) showing the Amgen Board of Directors.

23.    Attached hereto as Exhibit V is a true and correct copy of an excerpt of the testimony of Dr. Harvey Berger in the Lilly litigation.

24.    I have corresponded with Ranjan Sen and Chen-Ming Fan. For each, I have used an address at a place of employment in Baltimore, Maryland.

25.    Attached hereto as Exhibit W is a true and correct copy of a printout from the Ropes & Gray website (http://www.ropesgray.com/matthewvincent/).

26.    Attached hereto as Exhibit X are true and correct copies of printouts from the Wolf Greenfield website (http://www.wolfgreenfield.com/index.php?page=professionals&sub=bio&id=102 and http://www.wolfgreenfield.com/index.php?page=about&id=1).

27.    Attached hereto as Exhibit Y is a true and correct copy of a printout from the Amgen website (http://www.amgen.com/about/locations.html) listing the locations of Amgen's operations in the United States.

28.    Attached hereto as Exhibit Z is a true and correct copy of the transcript the Nov. 19, 2003 Hearing in the matter of *Network Appliance v. Bluearc Corp.*, D. Del. No. 03-714.

Executed on October 4, 2006, at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Elizabeth L. Rosenblatt

1572629                                        - 4 -

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of October, 2006, the attached **DECLARATION OF ELIZABETH L. ROSENBLATT IN SUPPORT OF ARIAD PHARMACEUTICALS, INC.'S RENEWED MOTION TO DISMISS FOR FAILURE TO NAME NECESSARY AND INDISPENSABLE PARTIES OR, IN THE ALTERNATIVE, TO TRANSFER PURSUANT TO 28 U.S.C. § 1404(a)** was served upon the below-named counsel of record at the address and in the manner indicated:

Melanie K. Sharp, Esquire
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

<u>BY HAND, VIA CM/ECF,
AND VIA ELECTRONIC MAIL</u>

Marcus E. Sernel, Esquire
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601-6636

<u>VIA FEDERAL EXPRESS
& ELECTRONIC MAIL</u>

J. Drew Diamond, Esquire
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA  90017-5800

<u>VIA FEDERAL EXPRESS
& ELECTRONIC MAIL</u>

*/s/ Tiffany Geyer Lydon*
_____
Tiffany Geyer Lydon

# EXHIBIT A



US006410516B1

(12) **United States Patent**
Baltimore et al.

(10) **Patent No.:** **US 6,410,516 B1**
(45) **Date of Patent:** **Jun. 25, 2002**

(54) **NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL REGULATION**

(75) Inventors: **David Baltimore**, New York, NY (US);
**Ranjan Sen**, Cambridge; **Phillip A. Sharp**, Newton, both of MA (US);
**Harinder Singh**, Chicago, IL (US);
**Louis Staudt**, Silver Springs, MD (US);
**Jonathan H. Lebowitz**, Zionsville, IN (US); **Albert S. Baldwin, Jr.**, Chapel Hill, NC (US); **Roger G. Clerc**, Binningen (CH); **Lynn M. Corcoran**, Port Melbourne (AU); **Patrick A. Baeuerle**, Eichenau (DE); **Michael J. Lenardo**, Potomac, MD (US);
**Chen-Ming Fan**, San Francisco;
**Thomas P. Maniatis**, Belmont, both of MA (US)

(73) Assignees: **President & Fellows of Harvard College; Massachusetts Institute of Technology; Whitehead Instittue for Biomedical Research**, all of Cambridge, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **08/464,364**

(22) Filed: **Jun. 5, 1995**

**Related U.S. Application Data**

(60) Division of application No. 08/418,266, filed on Apr. 6, 1995, now Pat. No. 5,804,374, which is a continuation of application No. 07/791,898, filed on Nov. 13, 1991, now abandoned, which is a continuation-in-part of application No. 06/946,365, filed on Dec. 24, 1986, now abandoned, application No. 08/418,266, which is a continuation-in-part of application No. 07/341,436, filed on Apr. 21, 1989, now abandoned, and a continuation-in-part of application No. 07/318,901, filed on Mar. 3, 1989, now abandoned, and a continuation-in-part of application No. 07/280,173, filed on Dec. 5, 1988, now abandoned, and a continuation-in-part of application No. 07/162,680, filed on Mar. 1, 1988, now abandoned, and a continuation-in-part of application No. 07/155,207, filed on Feb. 12, 1988, now abandoned, and a continuation-in-part of application No. 06/817,441, filed on Jan. 9, 1986, now abandoned.

(51) Int. Cl.$^7$ ........................ **A61K 31/711**; C12N 5/10; C12N 15/10

(52) U.S. Cl. ............................ **514/44**; 435/6; 435/455; 435/325; 435/366; 435/370; 435/372; 435/372.2; 435/372.3

(58) Field of Search ........................ 435/6, 172.3, 455, 435/325, 366, 370, 372, 372.2, 372.3; 514/2, 44; 935/34, 36

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

WO          87/04170          7/1987

OTHER PUBLICATIONS

Gosh, S. and Baltimore, D., "Activation in vitro of NF–kB by phosphorylation of its inhibitor IkB," Nature, 344(6267): 678–682 (1990).

Zabel, U. and Baeurle, P., "Purified Human IkB Can Rapidly Dissociate the Complex of the NF kB Transcription Factor with it Cognate DNA," Cell, 61:255–265 (1990).

Haskill, S., et al., "Characterization of an Immediate–Early Gene Induced in Adherent Monocytes That Encodes IkB–like Activity," Cell, 65:1281–1289 (1991).

Baldwin, Jr., A.S., and Sharp, P.A., "Two transcription factors, NF–kB and H2TF1, interact with a single regulatory sequence in the class I major histocompatability complex promotor," Proc. Natl. Acad. Sci, USA, 85:723–727 (1988).

Böhnlein, E.,, et al., "The Same Inducible Nuclear Proteins Regulates Mitogen Activation of Both the Interleukin–2 Receptor–Alpha Gene and Type 1 HIV," Cell, 53:827–836 (1988).

Leung, K. and Nable, G.J., "HTLV–1 transactivator induces interleukin–2 receptor expression through an NF–kB–like factor," Nature, 333:776–778 (1988).

Ruben, S., et al., "Cellular Transcription Factors and Regulation of IL–2 Receptor Gene Expression by HTLV–1 tax Gene Product," Science, 241:89–92 (1988).

Lenardo, J.J., et al., "NF–kB protein purification from bovine spleen: Nucleotide stimulation and binding site specificity," Prod. Natl. Acad. Sci. USA, 85:8825–8829 (1988).

Wirth, T. and Baltimore, D., "Nuclear factor NF–kB can interact functionally with its cognate binding site to provide lymphoid–specific promotor function," The EMBO Journal, 7 (10):3109–3113 (1988).

Nelsen, B., et al., "The NF–kB–Binding Site Mediates Phorbol Ester–Inducible Transcription in Nonlymphoid Cells," Mol. & Cell Biol., 8:3526–3531 (1988).

Ballard, D.W., et al., "HTLV–I Tax Induces Cellular Proteins That Activate the kB Element in the IL–2 Receptor a Gene," Science, 241:1652–1657 (1988).

Blanar, M.A., et al., "NF–kB Binds within a Region Required for B–Cell–Specific Expression of the Major Histocompatibility Complex Class II Gene Ead," Mol. & Cell. Biol., 9 (2):844–846.

Karin, M., et al., "Activation of a Heterologous Promoter in Response to Dexamethasone and Cadmium by Metallothionein Gene 5'Flanking DNA," Cell, 36:371–379 (1984).

(List continued on next page.)

*Primary Examiner*—David Guzo
(74) *Attorney, Agent, or Firm*—David L. Berstein; Matthew P. Vincent; Ropes & Gray

(57) **ABSTRACT**

Constitutive and tissue-specific protein factors which bind to transcriptional regulatory elements of Ig genes (promoter and enhancer) are described. The factors were identified and isolated by an improved assay for protein-DNA binding. Genes encoding factors which positively regulate transcription can be isolated and employed to enhance transripion of Ig genes. In particular, NF-kB, the gene encoding NF-kB, IkB and the gene encoding IkB and uses therefor.

**203 Claims, 58 Drawing Sheets**

# Exhibit B

Caltech Press Release, 10/3/2005, David Baltimore, Kip Thorne, Paul Jenn... Kresa, Eli Broad, Ben Rosen, Gordon Moore, Henry Lester, Walter Weisman

Case 1:06-cv-00259-MPT     Document 87-3     Filed 10/05/2006     Page 2 of 4




News
Releases


Experts
Guide


Special
Events


Earthquake
Information


Broadcast
Information


Contact Media
Relations

## News Releases

### October 3, 2005

**Baltimore to Retire as Caltech President; Will Remain at Institute as Biology Professor**

PASADENA, Calif.- David Baltimore, the seventh president of the California Institute of Technology, will retire on June 30, 2006, after nearly nine years in the post. He will remain at the Institute, where he intends to focus on his scientific work and teaching.

"This is not a decision that I have made easily," Baltimore announced to the Caltech trustees, faculty, staff, and students, "but I am convinced that the interests of the Institute will be best served by a presidential transition at this particular time in its history. By next summer we will be well along in the process of implementing our plans to strengthen the financial foundation of the Institute. Although our $1.4 billion campaign is not scheduled for completion until the end of 2007, we have made remarkable progress, and successful attainment of its audacious goals will remain my highest priority. As these important endeavors near their final stages, it will be time for the Institute to once again turn to the future, guided most effectively by the revitalizing vision and leadership of a new president."

He has agreed to remain in the position until a successor is named.

"David Baltimore's articulate advocacy of the Institute's mission has played a huge role in raising the public's awareness of Caltech as a unique national treasure. Our task ahead is to find our next president to carry this vision of excellence into the future," said Kent Kresa, the chairman of the Caltech Board of Trustees.

Baltimore, 67, assumed the presidency on October 15, 1997. His tenure saw many significant events at Caltech. Early on, he oversaw the completion of a fund-raising initiative for the biological sciences, marked by the construction and dedication of the Broad Center for the Biological Sciences. He launched the current $1.4 billion capital campaign, which has included receipt of the largest gift to higher education, $600 million from Gordon and Betty Moore and the Gordon and Betty Moore Foundation. The campaign still has two years to run, but has already raised almost $1.1 billion. An important aspect of Caltech is its stewardship of the Jet Propulsion Laboratory, supported by NASA. Baltimore's presidency has seen many spectacular JPL successes, notably the Mars Exploration Rovers, as well as the appointment of a new director, Dr. Charles Elachi.

"David Baltimore will go down in history as not only a great scientist, but also as one of the great presidents of Caltech," said Eli Broad, a trustee of, and major donor to, the Institute. "It is rare to find someone of his intelligence, integrity, and leadership who can relate so well to people both within and outside the world of science. It was David who inspired Edye and me to become interested in science. We had no background in the field, but he made us feel comfortable. We are fortunate that he will continue his research at Caltech."

Other events during his term have been Caltech's acquisition of the former St. Luke Medical Center in northeast Pasadena; the funding of the design-development phase of the Thirty Meter Telescope; and the establishment of the Information Science and Technology (IST) initiative. Baltimore championed contemporary architecture, chosing James Freed of Pei, Cobb, Freed for the Broad Center, Thom Mayne of Morphosis for the new Cahill Center for Astronomy and Astrophysics, and Rem Koolhaas for the new Walter and Leonore Annenberg Center for Information Science and Technology. The latter two buildings are still in the design phase. Baltimore worked toward increasing diversity at Caltech, particularly by bringing more women into administrative roles. He also was concerned about the quality of undergraduate life, appointing the first full-time vice president for student

Caltech Press Release, 10/3/2005, David Baltimore, Kip Thorne, Paul Jenn... Kresa, Eli Broad, Ben Rosen, Gordon Moore, Henry Lester, Walter Weisman

Case 1:06-cv-00259-MPT     Document 87-3     Filed 10/05/2006     Page 3 of 4

affairs and starting a $3 million fund for enhancing student life. During the last year, an important activity for him has been his membership on the Independent Citizens Oversight Committee for the California stem cell initiative.

"David Baltimore is an incisive and articulate leader who has strengthened Caltech's core commitments to excellence in research and teaching and has led several initiatives that have ensured promising avenues of research can be pursued at the Institute," said Paul Jennings, Caltech's provost. In a written announcement to the campus and its trustees, Baltimore said, "It has been a privilege to serve as president of Caltech and a pleasure to work with the dedicated and remarkable Caltech faculty, staff, students, trustees, and alumni. The administration in place at Caltech is an extraordinary group, and I will retire with full confidence in their abilities to effect a smooth transition. During my time in the president's office, I have worked to keep Caltech the unique and highly effective university that was imagined into existence by George Ellery Hale almost 100 years ago. Its dedication to excellence has been undiminished, requiring that it continually be in flux, reaching for the altering frontiers of knowledge. The great gift from Gordon and Betty Moore has provided the resources for maintaining our momentum and was truly a defining event of my time as Caltech's president."

Baltimore will remain at Caltech as a professor of biology. In June he was awarded a grant of $13.9 million by the Grand Challenges in Global Health initiative for his proposal "Engineering Immunity Against HIV and Other Dangerous Pathogens," which promises to address the challenge of creating immunological methods to deal with chronic diseases. This grant was awarded by the Bill & Melinda Gates Foundation.

"David has been a wonderful Caltech president," said Caltech faculty chair Henry Lester, the Bren Professor of Biology. "His energy, articulate intelligence, and vision have resulted in a stronger, more interesting, and more diverse Caltech. Speaking also as a Caltech biologist, I'm delighted that he will remain on campus to contribute to our research and teaching programs."

Baltimore, who received a Nobel Prize for his work on the genetic mechanisms of viruses in 1975 at the age of 37, has contributed widely to the understanding of cancer, AIDS, and the molecular basis of the immune response. He has continued to operate his research lab while president and has announced many important findings while at Caltech, including establishing a new methodology to help fight cancer, developing a new gene therapy that is highly effective in preventing HIV from infecting individual cells in the immune system, and creating a new methodology for producing transgenic mice. He has also joined with others in proposing a new global effort to create an HIV vaccine. He received the National Medal of Science in 1999 from President Bill Clinton and the Warren Alpert Foundation Scientific Prize in 2001 for pioneering work leading to cancer therapy.

Not only has Baltimore been prolific in writing about his findings in scientific journals, but he also raised Caltech's visibility by contributing opinion pieces to general interest media on such subjects as the value of stem cell research, the unnecessary public panic that arose during the SARS epidemic, science research under the Bush administration, and maintaining the scientific workforce in the U.S.

"Throughout my years as a Caltech trustee, I have been repeatedly impressed by David's skill at communicating the importance of Caltech to a wide range of constituencies, from the scientific community to potential donors to readers of daily newspapers," said Kresa, the chairman of the Caltech Board of Trustees.

Baltimore has several outstanding administrative and public policy achievements to his credit. In the mid-1970s, he played an important role in creating a consensus on national science policy regarding recombinant DNA research. He served as founding director of the Whitehead Institute for Biomedical Research at MIT from 1982 until 1990, and was president of Rockefeller University in 1990-91. An early advocate of federal AIDS research, he cochaired the 1986 National Academy of Sciences Committee on a National Strategy for AIDS and was appointed in 1996 to head the National Institutes of Health AIDS Vaccine Research Committee.

Feynman Professor and Professor of Theoretical Physics Kip Thorne, who chaired the faculty search committee that selected Baltimore, feels Baltimore has accomplished what the search committee hoped he would. "We attracted David to Caltech to provide leadership in a period of change-changing relations to the federal government, changing ties to the private sector, and a growth in biological sciences at Caltech-while maintaining our traditional strengths. He has led us through this superbly well, and has been a remarkable intellectual force on campus. His presidential shoes will be hard to fill, but I'm tremendously pleased he will remain as a professor, liberated to contribute more strongly to the intellectual life of the Caltech community," Thorne said.

Caltech Press Release, 10/3/2005, David Baltimore, Kip Thorne, Paul Jenn... Kresa, Eli Broad, Ben Rosen, Gordon Moore, Henry Lester, Walter Weisman

Case 1:06-cv-00259-MPT    Document 87-3    Filed 10/05/2006    Page 4 of 4

Walter Weisman, trustee chairman of the Caltech capital campaign, has worked closely with Baltimore since its kickoff in 2002, and is pleased with the impact Baltimore has had. "David Baltimore has made an enormous contribution to our campaign success. I am delighted that he will continue to assist the Institute with the campaign as he moves to full-time research. His legacy at Caltech will be felt for years to come, thanks in no small part to his fund-raising achievements as president of the Institute."

Gordon Moore-a Caltech alumnus who was trustee chairman when Baltimore was hired-said, "David's leadership over the last nine years has significantly strengthened Caltech in many important ways. His impact will be felt for decades."

Ben Rosen, also an alumnus and former trustee chairman, said, "During his years of leadership at Caltech, David Baltimore elevated the already considerable reputation and strengths of the Institute. The faculty is stronger than it has ever been. The students are smarter, more diverse, and better rounded. The facilities have been substantially augmented to meet the growing needs of leading-edge research. JPL has achieved triumph after triumph. And the ambitious capital campaign that began during his period in office, and led by his energetic fund-raising skills, will assure that future Caltech needs are met and our goals achieved. Sometime next year, David will begin doing research full time in his biology lab, and a new president will lead Caltech. But because David will remain on campus, we'll still be lucky enough to share with him his myriad interests outside of science, a small sample of which would include art, fly-fishing, music, architecture, travel, literature, and politics."

Caltech's Board of Trustees will immediately initiate the search process for a new president.

Baltimore is the seventh person to lead "modern day" Caltech, his predecessors being James A. B. Scherer, Robert A. Millikan, Lee A. DuBridge, Harold Brown, Marvin L. Goldberger, and Thomas E. Everhart.

###

Contact: Jill Perry (626) 395-3226 **jperry@caltech.edu**

Visit the Caltech Media Relations Web site at: **http://pr.caltech.edu/media**

 

**Navigating Tools**

**Search for:**        in
Email us at **prmedia@caltech.edu** with comments, questions or suggestions.

# EXHIBIT C

# CURRICULUM VITAE

## Phillip A. Sharp, Ph.D.
### Institute Professor
### Director, The McGovern Institute

---

## PROFESSIONAL ADDRESS

Center for Cancer Research                Phone Number:  617-253-6421
Room E17-529B                             Fax Number:  617-253-3867
Massachusetts Institute of Technology        E. mail:  sharppa@mit.edu
77 Massachusetts Avenue
(or 40 Ames Street for express mail or courier service)
Cambridge, MA  02139-4307

---

## EDUCATION

1966:  B.A., Chemistry & Mathematics, Union College, Barbourville, KY
1969:  Ph.D., Chemistry, University of Illinois, Urbana

---

## POSITIONS

2000-date:   Director, The McGovern Institute, MIT
1999-date:   Institute Professor, MIT
1991-1999:  Salvador E. Luria Professor of Biology, MIT
1991-1999:  Head, Department of Biology, MIT
1987-1992:  John D. MacArthur Professor of Biology, MIT
1985-1991:  Director, Center for Cancer Research, MIT
1982-1985:  Associate Director, Center for Cancer Research, MIT
1979-1999:  Professor, Center for Cancer Research and Department of Biology, MIT
1974-1979:  Associate Professor, Center for Cancer Research and Department of Biology, MIT
1972-1974:  Senior Research Investigator, Cold Spring Harbor Laboratory, CSH, New York
1971-1972:  Postdoctoral Fellow, Cold Spring Harbor Laboratory
1969-1971:  Postdoctoral Fellow, California Institute of Technology

1966-1669:  Research Assistant/Graduate Student, Department of Chemistry, University of Illinois

---

## HONORS AND AWARDS

2003:  Received the University of Illinois Alumni Achievement Award
2002:  The Fourth Annual Biotechnology Heritage Medal, Chemical Heritage Foundation
2002:  Elected Honorary Fellow of the Royal Society of Edinburgh, Scotland
2001:  Honorary Doctorate from Northern Kentucky University
2001:  The Walker Prize from the Museum of Science, Boston, MA
1999:  Doctor Honoris Causa, University of Buenos Aires, Argentina
1999:  Honorary Doctor of Medicine, Uppsala University, Sweden
1999:  Institute Professor, MIT
1999:  The Benjamin Franklin Medal of the American Philosophical Society
1999:  Honorary Doctor of Science, Thomas More College, KY
1998:  Honorary Doctor of Science, University of Glasgow, Scotland
1996:  Honorary Doctor of Science, Albright College, Reading, PA
1996:  Honorary Doctor of Science, University of Tel Aviv
1995:  Honorary Doctor of Science Degree, Bowdoin College, Brunswick, ME
1994:  Honorary Doctor of Science Degree, University of Kentucky
1993:  The Nobel Prize in Physiology or Medicine
1993:  Elected Fellow of the American Academy of Microbiology
1993:  The James R. Killian, Jr., Faculty Achievement Award, MIT
1993:  The Mendel Medal Award from Villanova University, Villanova, PA
1992:  The Salvador E. Luria Professorship (Chair), MIT
1991:  Honorary Degree of Doctor of Humane Letters from Union College, Barbourville, KY
1991:  Elected Member of the American Philosophical Society
1991:  Elected Member of the Institute of Medicine of the National Academy of Sciences
1990:  The Dickson Prize, University of Pittsburgh
1988:  The Albert Lasker Basic Medical Research Award
1988:  Louisa Gross Horwitz Prize, Columbia University
1987:  The John D. MacArthur Professorship (Chair), MIT
1987:  Elected Fellow of the American Association for the Advancement of Science
1987:  Elected Councilor of the National Academy of Sciences (to 1990)
1986:  The New York Academy of Sciences Award in Biological and Medical Sciences
1986:  The Gairdner Foundation International Award, Canada
1986:  The General Motors Research Foundation Alfred P. Sloan, Jr. Prize for Cancer Research
1986:  Class of '41 Professorship (Chair), MIT
1985:  The Howard Ricketts Award, The University of Chicago

1985:  The Harvey Society Lecture
1983:  Elected to the National Academy of Sciences
1983:  Elected to the American Academy of Arts and Sciences
1980:  The Eli Lilly Award in Biological Chemistry
1980:  The National Academy of Sciences' U.S. Steel Foundation Award in Molecular Biology
1974:  Recipient of an American Cancer Society Career Development Award (to 1979)

---

## SERVICE

Elected Member of the Corporation of Partners HealthCare Systems Inc., 2003-2007
Member of the Board of Trustees of the Massachusetts General Hospital, 2002-
Member and Chair, Committee on Research and Education, Partners HealthCare Systems Inc., 2003
Member of the Board of Advisors, Polaris Venture Partners, 2002 -
Member of the Board of Scientific Governors of the Scripps Research Institute, 1999-
Member of the Science Advisory Committee for the Sandler Basic Science Program, UCSF, 1999-
Member of the Scientific Committee of the Ludwig Institute for Cancer Research, 1998-
Member of the National Cancer Advisory Board (NCAB), NCI , 1996-2000
Chairman of the National Cancer Advisory Board (NCAB), NCI, 2000-2002
Member of the NCI Advisory Committee to the Director, 2000-2001
Chairman of the Scientific Advisory Committee, Dana-Farber Cancer Institute , 1996-
Member of the Scientific Board of Advisors, The Van Andel Institute, 1996-
Chairman of the Scientific and Medical Advisory Board of the Huntsman Cancer Foundation, 1995-2001
Trustee and Member of the Alfred P. Sloan Foundation, 1995-
Chairman of the General Motors Cancer Research Foundation Awards Assembly, 1994-
Member of the Faculty of the Harvard-MIT Division of Health Sciences and Technology
Member of the Review Committee, The Medical Foundation, 1982-present, and its Chairman, 1988-
Member of the Advisory Council of the Molecular Biology Department, Princeton University, 1987-2003
Co-founder of Biogen, Inc. and Member of the Board of Directors, 1978-
Co-founder, Chairman of the Scientific Board and Member of the Board of Directors of Alnylam Pharmaceuticals Inc., 2002-

---

## PROFESSIONAL SOCIETIES

The National Academy of Sciences
The American Association for the Advancement of Science
The American Society for Virology
The American Society of Biological Chemists
The American Association for Cancer Research
The American Chemical Society
The American Society for Microbiology
The American Academy of Arts and Sciences
The American Society for Biochemistry and Molecular Biology
The American Philosophical Society
The Society for Neurosciences

---

**EDITORIAL BOARDS**

J. Virol. (to 1985); Mol. Cell. Biol. (to 1985); Virology (to 1986); Cell (to 1995); RNA (1995-)

# EXHIBIT D

Dept of MCB, Harvard U: Faculty and Research - Maniatis



HARVARD UNIVERSITY | DEPARTMENT OF
## Molecular and Cellular Biology

Faculty

Overview

Faculty and Research

Graduate Programs

Undergraduate Study

Resources

News and Events

Outreach

Jobs

Search
Site Map
Directory
Biology Links
Harvard Links
MCB Internal Web



# TOM MANIATIS

Thomas H. Lee Professor of Molecular and Cellular Biology

Email: maniatis@mcb.harvard.edu
Phone: (617) 495-1811
Fax: (617) 495-3537
Mail: 7 Divinity Ave, Room 487, Cambridge MA, 02138

Members of the Maniatis Lab
List of Publications from PubMed

## Research:

We are interested in understanding the mechanisms involved in the regulation of RNA transcription and pre-messenger RNA splicing. Our studies of transcription are focused on the question of how eukaryotic genes are activated in response to extracellular signals or virus infection. We have chosen the human interferon-ß gene and Drosophila immune response genes to approach this question.

We have characterized the structure and function of regulated transcriptional enhancers and promoters, and analyzed the synergistic interactions between multiple transcriptional activator proteins that specifically associate with these elements. The goal of these studies is to understand how multiprotein transcriptional enhancer complexes are assembled, and how they function to activate or repress gene transcription.

We have also studied the signal transduction pathways leading to the activation of the interferon-ß gene and Drosophila immune response genes. These studies led to the discovery that regulated proteolysis mediated by the ubiquitin-proteasome pathway plays a critical role in the activation of transcriptional activator proteins required for both pathways.

Our studies of pre-mRNA splicing are directed towards understanding both the basic mechanisms of the splicing reaction and the regulation of alternative pre-mRNA splicing.

The mammalian protocadherin gene cluster provides an interesting system for studying a number of problems of gene regulation in the brain, including the mechanisms that regulate promoter choice in individual neurons and alternative pre-mRNA splicing.

## Selected Publications:

### Innate Immunity: Gene Regulation and Signal Transduction

Silverman, N., and **Maniatis, T.** (2001). NF-κB signaling pathways in mammalian and insect innate immunity. *Genes Dev* 15, 2321-2342.

Lin, C. H., Hare, B. J., Wagner, G., Harrison, S. C., **Maniatis, T.**, and Fraenkel, E. (2001). A small domain of CBP/p300 binds diverse proteins: solution structure and functional studies. *Mol Cell* 8, 581-590.

Agalioti, T., Lomvardas, S., Parekh, B., Yie, J., **Maniatis, T.**, and Thanos, D. (2000). Ordered recruitment of chromatin modifying and general transcription factors to the IFN-b promoter. *Cell* 103, 667-678.

Peters, R. T., Liao, S. M., and **Maniatis, T.** (2000). IKKε is part of a novel PMA-inducible IκB kinase complex. *Mol Cell* 5, 513-522.

Silverman, N., Zhou, R., Stoven, S., Pandey, N., Hultmark, D., and **Maniatis, T.** (2000). A Drosophila IkB kinase complex required for Relish cleavage and antibacterial immunity. *Genes Dev* 14, 2461-2471.

**Maniatis, T.**, Falvo, J. V., Kim, T. H., Kim, T. K., Lin, C. H., Parekh, B. S., and Wathelet, M. G. (1998). Structure and function of the interferon-beta enhanceosome. *Cold Spring Harb Symp Quant Biol* 63, 609-620.

### Mechanisms of pre-mRNA splicing

**Maniatis, T.**, and Reed, R. (2002). An extensive network of coupling among gene expression machines. *Nature* 416, 499-506.

**Maniatis, T.**, and Tasic, B. (2002). Alternative pre-mRNA splicing and proteome expansion in metazoans. *Nature* 418, 236-243.

Schaal, T. D., and **Maniatis, T.** (1999). Multiple distinct splicing enhancers in the protein-coding sequences of a constitutively spliced pre-mRNA. *Mol Cell Biol* 19, 261-273.

### Regulation of Protocadherin Gene Expression

Tasic, B., Nabholz, C. E., Baldwin, K. K., Kim, Y., Rueckert, E. H., Ribich, S. A., Cramer, P., Wu, Q., Axel, R., and **Maniatis, T.** (2002). Promoter choice determines splice site selection in protocadherin alpha and gamma pre-mRNA splicing. *Mol Cell* 10, 21-33.

Wu, Q., Zhang, T., Cheng, J. F., Kim, Y., Grimwood, J., Schmutz, J., Dickson, M., Noonan, J. P., Zhang, M. Q., Myers, R. M., and **Maniatis, T.** (2001). Comparative DNA sequence analysis of mouse and human protocadherin gene clusters. *Genome Res* 11, 389-404

Wu, Q., and **Maniatis, T.** (1999). A striking organization of a large family of human neural cadherin-like cell adhesion genes. *Cell* 97, 779-790.

---

[an error occurred while processing this directive]



September 11, 1997

contents
notes
newsmakers
police log

- Gazette home
- Gazette archives
- Harvard News Office
- Feedback

SEARCH THE GAZETTE

### HARVARD GAZETTE ARCHIVES

## Maniatis Named First Thomas H. Lee Professor

The work of Thomas Maniatis, the first Thomas H. Lee Professor of Molecular and Cellular Biology, perfectly embodies the benefits of research science. At a time when funding for basic research is under scrutiny, his accomplishments in the field of genetics -- and that of his colleagues -- are proving extraordinary.

"An exciting aspect of biology today is that much of what we learn through basic research has direct applications to fighting disease and improving human health," said Maniatis. "I never dreamed that my laboratory research would have an impact on society in my lifetime, and to see that projects we undertook just 10 years ago are benefiting people now is very gratifying."

The University Governing Boards recently approved Maniatis' appointment to a chair established thanks to Thomas H. Lee '65, who gave $22 million to the University last year.

The president and founder of the private Boston-based Thomas H. Lee Co., Lee is widely regarded as a pioneer in growth company buyouts. Active at Harvard as well as numerous other educational, medical, and arts organizations, he is a member of the Committee on University Resources Campaign Executive Committee, the Visiting Committee to Harvard College, the Boston Major Gifts Steering Committee, and the Faculty of Arts and Sciences Financial Aid Council.

Lee offered Dean of the Faculty of Arts and Sciences Jeremy R. Knowles the discretion of allocating $9.5 million of the gift. Knowles directed some of this to establish the new professorship and to create a fund for the recruitment of new biology faculty. Lee sees the sciences as critical components of liberal education and is particularly interested in the Human Genome Project and its impact on civilization.

Knowles added the remainder of the gift to the Thomas H. Lee AB '65 Scholarship Fund, which provides financial aid to undergraduates.

Lee also gave President Neil L. Rudenstine the discretion to allocate $9.5 million of the gift, which Rudenstine will do after further discussions with him. Lee asked that the remaining $3 million support programs at the Graduate School of Education and various affiliated institutions.

**Chair to honor Knowles**

While Lee's name now identifies the chair, it ultimately will be known as the Jeremy R. Knowles Professorship of Molecular and Cellular Biology.

"I wanted to honor Jeremy and recognize his achievement not only as an effective dean but also as an eminent scientist," said Lee.

It is the University's practice to refrain from naming a chair for a current dean, so the designation will change after Dean Knowles steps down from the deanship.

Maniatis added: "I am so pleased to hold a chair that will carry the name of such a distinguished scientist and dean."

Dean Knowles said: "I am most grateful to Tom Lee for providing the Faculty of Arts and Sciences with such a wonderful opportunity to boost our research and teaching in molecular biology. Harvard is fortunate to have an outstanding faculty member -- Tom Maniatis -- whose creativity and scholarship are of the highest quality and make such a difference for so many, to hold this chair. Personally, I am deeply honored that Tom Lee, such a thoughtful friend and generous alumnus, should wish to endow this chair in my name."

**Understanding genes**

Maniatis and his research team pioneered the development of molecular cloning methods and their application to the study of gene structure and expression. These methods have had a profound impact on biology, from the advancement of basic knowledge, to the identification of mutations that cause human genetic diseases such as cystic fibrosis and certain forms of cancer.

Maniatis and his team were the first to isolate, or "clone," a human gene, and to identify mutations in genes isolated from patients with a genetic disease. Specifically, they cloned the human hemoglobin gene, which encodes the red blood cell protein that carries oxygen from the lungs to the rest of the body. By comparing genes obtained from normal individuals with those from individuals with a genetic disease called thalassemia, the researchers were able to precisely pinpoint mutations that cause the disease. This general approach was subsequently adopted by others to identify the genetic basis of scores of other human diseases.

In 1982, Maniatis coauthored a laboratory manual for genetic research entitled *Molecular Cloning*, which can be found on students' desks from Boston to Beijing (and, in earlier days, on Knowles'). This manual has played a pivotal role in training students and in the practice of recombinant DNA research over the past 15 years.

Maniatis' objective in developing gene cloning technology was to obtain tools for studying gene regulation, the process by which genetic information encoded in the DNA of the gene is translated into protein, the basic building blocks of cells. This process involves transcribing DNA to produce a similar molecule called RNA, which in turn is translated into protein. However, the gene contains regions that cannot be decoded. These nonsense sequences are transcribed into RNA, so they must be removed by a process called RNA splicing. This mechanism is analogous to editing a piece of film, where unwanted sections are cut out and the remainder spliced together. The primary focus of the Maniatis laboratory is to understand gene expression at the level of RNA transcription and RNA splicing. Many genetic diseases emerge as the consequence of defects in these processes.

Maniatis and his colleagues have identified complex arrays of proteins required for gene expression, and have cloned the genes that encode them. These proteins can then be produced in large amounts employing recombinant DNA methods and then used to reconstitute transcription and splicing in a test tube. These studies have led to a better understanding of how these processes occur, and how they are regulated during normal cell growth and differentiation.

Recently, the Maniatis lab has focused on understanding how the beta-interferon gene is regulated. This gene is normally silent, but is activated when cells are infected by viruses, such as those that cause

colds and flu. The interferon gene produces a protein that binds to surrounding, uninfected cells and protects them from virus infection. In the course of understanding how this regulation works, Maniatis's lab showed that proteins required for interferon regulation also play a key role in inflammatory diseases such as asthma and arthritis. In collaboration with a Cambridge biotechnology company, ProScript, which Maniatis cofounded, he and his co-workers are studying the function and activation of these proteins with the ultimate goal of identifying inhibitors that could be used in the treatment of inflammatory diseases.

Most of Maniatis's work, however, entails basic research. For example, the sex of fruitflies is determined by how a particular RNA molecule is spliced. If it is spliced one way the fly is female, while a different splice produces a male. Maniatis and his coworkers have succeeded in reconstituting this differential RNA splicing reaction in a test tube and have determined the mechanisms involved. Remarkably, the same mechanisms used for controlling RNA splicing in the fruitfly also function in human cells.

**Distinguished Career**

Maniatis began his research career as a postdoctoral fellow at Harvard in 1971. A Denver native, he earned bachelor's and master's degrees from the University of Colorado and, in 1971, a doctorate in molecular biology from Vanderbilt University.

Exchanging Cambridge, Mass., for Cambridge, England, he spent one year at Britain's Medical Research Council of Molecular Biology. After returning to Harvard, he left again to become senior staff investigator at Cold Spring Harbor Laboratory, where he and his coworkers developed a method called cDNA cloning, in which RNA transcripts are converted back into DNA and cloned. The researchers used this method to obtain the cDNA clone of the RNA that encodes hemoglobin. This development presented a major breakthrough which allowed the RNA encoding any gene to be cloned. At the time this work was being done, Maniatis held a joint appointment between Harvard and Cold Spring Harbor, but the research was undertaken at Cold Spring Harbor because the Cambridge City Council had passed a moratorium on his area of biotechnological research -- making this the only place in the world that prohibited the work. As a result, Maniatis accepted a position at the California Institute of Technology, where his lab devised methods for directly cloning genes rather than their

RNA transcripts. The lab produced the first "library" of human genes, a major advance in gene research. Using this library, it was possible to isolate virtually any human gene, and this library has been used by researchers worldwide to isolate and study new human genes.

Following the lifting of the moratorium on recombinant DNA research in Cambridge, Maniatis returned to Harvard as professor of biochemistry and molecular biology. He served as chairman of the department from 1985 to 1988, and has held the Mallinckrodt Professorship in Molecular and Cellular Biology since 1995.

Among the many honors bestowed on Maniatis are the Eli Lilly Award in Microbiology and Immunology from the American Society of Microbiology in 1981, and the 1985 Richard Lounsbery Award for Biology and Medicine from the U.S. and French national academies of science. He is a member of the U.S. National Academy of Sciences and a fellow of the American Academy of Arts and Sciences.

Maniatis is a cofounder of Genetics Institute, a leading Cambridge biotechnology company, and served as a member of its board of directors and scientific advisory board for more than 17 years. The company has developed protein-based drugs such as blood-clotting factors, and growth factors that stimulate the production of red blood cells and the cells of the immune system.

One of Genetics Institute's most significant accomplishments enables people with hemophilia A or B to live normal lives; they previously were at constant risk of infection, and many contracted AIDS because the clotting factors they require were purified from blood. "The Genetics Institute scientists cloned the genes that are defective in individuals with hemophilia A or B, and then reinserted them into specially designed cells that could be used to produce the clotting factors in large amounts. Thus, highly purified proteins could be made in large amounts from a source free of any infectious agents," said Maniatis.

Maniatis's teaching duties have for many years included the basic undergraduate course in molecular biology. During the past few years, he has focused on senior honor students and graduate students with an advanced course on gene regulation.



# EXHIBIT E

04/27/2004  09:33   3104767639              LAURIE ALLEN                    PAGE  02

WHI Vers -1/28/91

LLN/#4: 4167ariad.agt
Date: August 8, 1991

## LICENSE AGREEMENT

### TABLE OF CONTENTS

PREAMBLE

ARTICLES:

| I | DEFINITIONS |
| II | GRANT |
| III | DUE DILIGENCE |
| IV | ROYALTIES |
| V | REPORTS AND RECORDS |
| VI | PATENT PROSECUTION |
| VII | INFRINGEMENT |
| VIII | PRODUCT LIABILITY |
| IX | EXPORT CONTROLS |
| X | NON-USE OF NAMES |
| XI | ASSIGNMENTS |
| XII | ARBITRATION |
| XIII | TERMINATION |
| XIV | PAYMENTS, NOTICES AND OTHER COMMUNICATIONS |
| XV | MISCELLANEOUS PROVISIONS |

APPENDICES

| A | Patent Rights |
| B | Foreign Filings |
| C | Centocor Collaborative Research Agt. |
| D | Materials Transfer Agreement |

This Agreement is made and entered into this *19th* day of *August*, 199*1*, (the Effective Date) by and between MASSACHUSETTS INSTITUTE OF TECHNOLOGY, a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts and having its principal office at 77 Massachusetts Avenue, Cambridge, Massachusetts 02139, U.S.A. (hereinafter referred to as M.I.T.), and the WHITEHEAD INSTITUTE, a corporation organized and existing under the laws of Delaware and having its principal office at Nine Cambridge Center, Cambridge, Massachusetts 02142, U.S.A., (hereinafter referred to as Whitehead) and ARIAD PHARMACEUTICALS, INC., a corporation duly organized under the laws of Delaware and having its principal office at 687 Wetherby Lane, Devon, Pennsylvania 19333 (hereinafter referred to as LICENSEE).



PTX 0460
02 CV 11280 RWZ



Confidential Information Under Protective Order

ADL 0029159

-2-

### WITNESSETH

WHEREAS, M.I.T. and Whitehead are the owners of certain "Patent Rights" (as later defined herein) relating to M.I.T. Case No. 4167, "Nuclear Factors Associated With Transcriptional Regulation" by David Baltimore, Ranjan Sen, Phillip A. Sharp, Harinder Singh, Louis Staudt, Jonathan LeBowitz, Albert S. Baldwin, Jr., Roger Clerc, and Lynn M. Corcoran; M.I.T. Case No. 4442W (Whitehead No. 86-10) "Method of Inducible Gene Expression" by Ranjan Sen and David Baltimore; M.I.T. Case No. 4695W (Whitehead No. 87-11) "Activation of NF-kB Precursor" by Patrick Baeuerle and David Baltimore; M.I.T. Case No. 5675 (Whitehead 87-11AA) "The pp40 Associated with REL is an I-κB" by David Baltimore, Sankar Ghosh et al.; M.I.T. Case No. 5134W (Whitehead No. 89-02) "NF-kB-Mediated Transcriptional Regulation" by Michael J. Lenardo, Chen-ming Fan, Tom Maniatis and David Baltimore and has the right to grant licenses under said Patent Rights, subject only to a royalty-free, nonexclusive license heretofore granted to the United States Government;

WHEREAS, Whitehead has authorized M.I.T. to act as its sole and exclusive agent for the purposes of licensing Whitehead's rights in the Patent Rights and has authorized M.I.T. to enter into this licensing agreement on its own and Whitehead's behalf;

WHEREAS, M.I.T. and Whitehead desire to have the Patent Rights utilized in the public interest and is willing to grant a license thereunder;

WHEREAS, LICENSEE has represented to M.I.T., to induce M.I.T. to enter into this Agreement, that LICENSEE is committed to the development and commercialization of "Licensed Product(s)" (as later defined herein) and/or the use of the "Licensed Process(es)" (as later defined herein) and that it shall commit itself to a thorough, vigorous and diligent program of exploiting the Patent Rights so that public utilization shall result therefrom; and

WHEREAS, LICENSEE desires to obtain a license under the Patent Rights upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein the parties hereto agree as follows:

### ARTICLE I - DEFINITIONS

For the purposes of this Agreement, the following words and phrases shall have the following meanings:

1.1  "LICENSEE" shall include a related company of LICENSEE, the voting stock of which is directly or indirectly at least Fifty Percent (50%) owned or controlled by LICENSEE, an organization which directly or indirectly controls more than Fifty Percent (50%) of the voting stock

Confidential Information Under Protective Order

ADL 0029160

04/27/2004  09:33    3104767639                    LAURIE ALLEN                    PAGE  04

-3-

of LICENSEE and an organization, the majority ownership of which is directly or indirectly common to the ownership of LICENSEE.

    1.2  "Patent Rights" shall mean all of the following Whitehead and M.I.T. intellectual property:

        (a)    the United States and foreign patents and/or patent applications listed in Appendix A;

        (b)    United States and foreign patents issued from the applications listed in Appendix A and from divisionals and continuations of these applications;

        (c)    claims of U.S. and foreign continuation-in-part applications, and of the resulting patents, which are directed to subject matter specifically described in the U.S. and foreign applications listed in Appendix A;

        (d)    claims of all foreign patent applications, and of the resulting patents, which are directed to subject matter specifically described in the United States patents and/or patent applications described in (a), (b), or (c) above;

        (e)    any reissues of United States patents described in (a), (b), (c), or (d) above.

    1.3  A "Licensed Product" shall mean any product or part thereof which:

        (a)    is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the Patent Rights in the country in which any Licensed Product is made, used or sold;

        (b)    is manufactured by using a process which is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the Patent Rights in the country in which any Licensed Process is used or in which such product or part thereof is used or sold;

        (c)    contains the Tangible Property,

    subject to the limitations in Paragraph 4.4.

    1.4  A "Licensed Process" shall mean any process which is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the Patent Rights or which uses the Tangible Property, subject to the limitations in Paragraph 4.4.

    1.5  "Net Sales" shall mean LICENSEE's (and its sublicensees' where appropriate) billings for Licensed Products and Licensed Processes produced hereunder less the sum of the following:

        (a)    discounts allowed in amounts customary in the trade;

Confidential Information Under Protective Order                    ADL 0029161

-4-

(b)    sales, tariff duties and/or use taxes directly imposed and with reference to
       particular sales;

(c)    outbound transportation prepaid or allowed; and

(d)    amounts allowed or credited on returns.

No deductions shall be made for commissions paid to individuals whether they be with
independent sales agencies or regularly employed by LICENSEE and on its payroll, or for cost of
collections. Licensed Products shall be considered "sold" when billed out or invoiced.

   1.6  "Tangible Property" shall mean cell lines containing NF-kB-P50, NF-κB-P65, I-κB
obtained directly or indirectly from M.I.T. or Whitehead, and any progeny and derivatives thereof.

## ARTICLE II - GRANT

   2.1  M.I.T. hereby grants to LICENSEE the right and license to make, have made, use,
lease and sell the Licensed Products, and to practice the Licensed Processes to the end of the term
for which the Patent Rights are granted unless sooner terminated according to the terms hereof.

   2.2  This license shall be subject to the research license and to the option granted to
Centocor to acquire a license to the Patent Rights of M.I.T. Case 4167 for use with certain
hybridomas, under the Collaborative Research Agreement between Centocor and M.I.T. dated
November 14, 1988 as attached hereto as Appendix C. M.I.T. agrees that it will not renew the
Collaboration Research Agreement as provided in Paragraph 2 thereof.

   2.3  In order to establish a period of exclusivity for LICENSEE, M.I.T. hereby agrees that
with the exception of the rights granted or optioned to Centocor, it shall not grant any other license
to make, have made, use, lease and sell Licensed Products or to utilize Licensed Processes during
the period of time commencing with the Effective Date of this Agreement and terminating with the
first to occur of:

       (a)    for each type of Licensed Product the expiration of Twelve (12) years after the
              first commercial sale of that Licensed Product; or

       (b)    the expiration of Sixteen (16) years after the Effective Date of this Agreement;

provided, however, that for any Licensed Product for which an application for premarket approval
has been submitted to the U.S. FDA prior to July 1, 2007, the time spent by the FDA reviewing
said application(s) for that Licensed Product shall be added to the period of exclusivity which
would otherwise apply.

Confidential Information Under Protective Order                    ADL 0029162

04/27/2004  09:33    3104767639                    LAURIE ALLEN                      PAGE  06

-5-

2.4  At the end of the exclusive period, the license granted hereunder shall become nonexclusive and shall extend to the end of the term or terms for which any Patent Rights are issued, unless sooner terminated as hereinafter provided, or unless the parties agree to extend the period of exclusivity.

2.5  M.I.T. and Whitehead also agree to bring to the attention of LICENSEE any inventions which relate to Nuclear Factors Associated with Transcriptional Regulation which arise prior to December 31, 1994 from the M.I.T. or Whitehead laboratories of any of the inventors of the Patent Rights listed in Appendix A.  LICENSEE shall have a three month option, dating from the date at which any such invention is revealed to LICENSEE, to begin negotiations with M.I.T. for an exclusive license to such invention.  If such negotiations are begun at LICENSEE's request, LICENSEE shall have an additional three month option to negotiate in good faith for an exclusive license to the invention.  LICENSEE's options under this Paragraph 2.5 shall, however, be subject to any options or licenses granted under a research agreement with sponsors of the research leading to such invention, and the terms of such research agreements shall not be limited by the provisions of this Paragraph 2.5.  M.I.T. and Whitehead shall use their best reasonable efforts to notify LICENSEE of any planned or completed sponsorship agreements, other than those involving U.S. Government sponsorship, in the field of Nuclear Factors Associated with Transcriptional Regulation, subject, however, to any confidentiality provisions with sponsors that might limit such notification.

2.6  LICENSEE agrees that Licensed Products leased or sold in the United States shall be manufactured substantially in the United States.

2.7  Whitehead and M.I.T. reserve the right to practice under the Patent Rights and to use and distribute the Tangible Property for their noncommercial research purposes under a Materials Transfer agreement similar to that in Appendix D.  M.I.T. and Whitehead shall use their best reasonable efforts to notify LICENSEE of any Tangible Property distributed to third parties.

2.8  LICENSEE shall have the right to enter into sublicensing agreements for the rights, privileges and licenses granted hereunder only during the exclusive period of this Agreement.  Such sublicensees may extend past the expiration date of the exclusive period of this Agreement, but any exclusivity of such sublicenses will expire upon the expiration of LICENSEE's exclusivity.

2.9  LICENSEE hereby agrees that every sublicensing agreement to which it shall be a party and which shall relate to the rights, privileges and license granted hereunder shall contain a statement setting forth the date upon which LICENSEE's exclusive rights, privileges and license hereunder shall terminate.

Confidential Information Under Protective Order

-6-

2.10  LICENSEE agrees that any sublicenses granted by it shall provide that the obligations
to M.I.T. and Whitehead of Articles II, V, VII, VIII, IX, X, XII, XIII, and XV of this Agreement
shall be binding upon the sublicensee as if it were a party to this Agreement.  LICENSEE further
agrees to attach copies of these Articles to sublicense agreements.

2.11  LICENSEE agrees to forward to M.I.T. a copy of any and all fully executed
sublicense agreements, and further agrees to forward to M.I.T. annually a copy of such reports
received by LICENSEE from its sublicensees during the preceding twelve (12) month period under
the sublicenses as shall be pertinent to a royalty accounting under said sublicense agreements.

2.12  LICENSEE shall not receive from sublicensees anything of value in lieu of cash
payments in consideration for any sublicense under this Agreement, without the express prior
written permission of M.I.T..

2.13  The license granted hereunder shall not be construed to confer any rights upon
LICENSEE by implication, estoppel or otherwise as to any technology not specifically set forth in
Appendix A hereof and Paragraph 2.5.

### ARTICLE III - DUE DILIGENCE

3.1  LICENSEE shall use its best efforts to bring one or more Licensed Products or
Licensed Processes to market through a thorough, vigorous and diligent program for exploitation
of the Patent Rights.

3.2  In addition, LICENSEE shall adhere to the following milestones:

(a)     LICENSEE shall deliver to M.I.T. on or before June 30, 1992 a business
plan showing the amount of money, number and kind of personnel and time
budgeted and planned for each phase of development of the Licensed Products
and Licensed Processes and shall provide similar reports to M.I.T. on an
annual basis on or before the ninetieth (90th) day following the close of
LICENSEE's fiscal year.

(b)     ARIAD PHARMACEUTICALS, INC. (LICENSEE) shall have received at
least One Million Dollars ($1,000,000) in equity investment on or before
June 30, 1992.

(c)     ARIAD PHARMACEUTICALS, INC. (LICENSEE) shall have received a
cumulative total of at least Five Million ($5,000,000) in equity investment
and/or research program payments on or before June 30, 1993.

(d)     LICENSEE shall, within six (6) months of a request by a suitable sublicensee
willing to take a sublicense upon reasonable business terms, grant at least one
sublicense to the Patent Rights and Tangible Property for sale of Licensed
Products as research reagents with appropriate protection of LICENSEE's

Confidential Information Under Protective Order                                 ADL 0029164

04/27/2004  09:33    3104767639                    LAURIE ALLEN                    PAGE  08

-7-

commercial interests. Failure to reach such an agreement within six (6) months after a bona fide request shall allow M.I.T. to grant a license to the Patent Rights to the requestor for sale of research reagents on terms no more favorable than those of paragraph 4.1(d) below.

(e)    In any calendar year after December 31, 1994 that LICENSEE has not made at least One Million Dollars ($1,000,000) in Net Sales of Licensed Product, LICENSEE shall have invested a minimum of Five Hundred Thousand Dollars ($500,000) in projects devoted to the development and/or marketing of Licensed Products and/development of protection of the Patents Rights.

3.3  LICENSEE's failure to perform in accordance with Paragraphs 3.1 and 3.2 above shall be grounds for M.I.T. to terminate this Agreement pursuant to Paragraph 13.3 hereof.

## ARTICLE IV - ROYALTIES

4.1  For the rights, privileges and license granted hereunder, LICENSEE shall pay royalties to M.I.T. in the manner hereinafter provided to the end of the term of the Patent Rights or until this Agreement shall be terminated as hereinafter provided:

(a)    License Issue Fee of Twenty-Five Thousand Dollars ($25,000), which said License Issue Fee shall be deemed earned and due thirty days after the execution of this Agreement.

(b)    License Maintenance Fees of Twenty-Five Thousand Dollars ($25,000) per year payable on January 1, 1993 and on January 1 of each year thereafter until the first submission by LICENSEE of an IND (Investigational New Drug application) to the FDA or an equivalent application to a European or Japanese regulatory agency. Following the submission of such application, the License Maintenance Fees shall be Fifty Thousand Dollars ($50,000) per year beginning January 1 of the year following the submission. However, beginning January 1, 1998, the License Maintenance Fees shall be Fifty Thousand Dollars ($50,000) per year whether or not an IND or equivalent application has been submitted by LICENSEE. The License Maintenance Fee for a given year shall be fully creditable against any Running Royalties subsequently due.

(c)    A one-time Milestone Fee of One Hundred Thousand Dollars ($100,000) payable within ninety (90) days after LICENSEE receives approval to initiate clinical trials on a Licensed Product based upon its submission of its first IND to the FDA or an equivalent application to a European or Japanese regulatory agency.

(d)    Running Royalties in an amount equal to Three Percent (3%) of the Net Sales of Licensed Products and Licensed Processes used, leased or sold by and/or for LICENSEE which are covered by an issued claim of the Patent Rights in

Confidential Information Under Protective Order                    ADL 0029165

04/27/2004  09:33    3104767639                    LAURIE ALLEN                        PAGE  09

-8-

any country in which the Licensed Products and/or Licensed Processes are made, used, leased or sold; and Running Royalties in an amount equal to One and One Half Percent (1.5%) of the Net Sales of Licensed Products and Licensed Processes used, leased or sold by and/or for LICENSEE which are covered only by a pending claim of the Patent Rights in any country in which the Licensed Products and/or Licensed Processes are made, used, leased or sold. The provisions of this paragraph shall not apply to any Licensed Products leased or sold by LICENSEE or its sublicensees for use as research reagents.

(e)    Running Royalties in an amount equal to Five Percent (5%) of the Net Sales price of Licensed Products sold by or for LICENSEE or its sublicensees for use as research reagents.

(f)    Twenty-Five Percent (25%) of any payments made to LICENSEE for sublicensing of the Patent Rights and/or Tangible Property. This subparagraph 4.1(f) shall not apply, however, to royalties paid to LICENSEE by sublicensee(s) on the Net Sales of Licensed Products sold by sublicensee(s) for use as research reagents, which shall fall under subparagraph 4.1(e) above.

4.2  The License Issue Fee, Milestone Fee and all License Maintenance Fees shall be cumulatively creditable against Running Royalties.

4.3  All patent costs incurred prior to July 1, 1991 and reimbursed by LICENSEE under Article VI shall be creditable against Running Royalties except for Running royalties on research reagents. Fifty Percent (50%) of patent costs incurred after July 1, 1991 shall be creditable against Running Royalties except for Running Royalties on research reagents.

4.4  The definitions of Paragraphs 1.3 and 1.4 notwithstanding, after June 30, 1997 Running Royalties shall be due on the Net Sales of a Licensed Product only if the Licensed Product is covered by an issued claim of the Patent Rights.

4.5  LICENSEE shall be entitled to credit fifty percent (50%) of the royalties paid to third parties for the use, lease or sale of a Licensed Product or Licensed Process by LICENSEE against the Running Royalties for that Licensed Product or Licensed Process due under subparagraph 4.1(d) above; provided, however that the amount credited shall not reduce the Running Royalty paid below Two Percent (2.0%) for the Licensed Product or Licensed Process covered by an issued claim, and One Percent (1.0%) if the Licensed Product or Licensed Process is covered only by a pending claim.

4.6  In no instance shall the amount paid to M.I.T. in total in a given year be less than the License Maintenance Fee for that year.

4.7  All payments due hereunder shall be paid in full, without deduction of taxes or other fees which may be imposed by any government and which shall be paid by LICENSEE.

Confidential Information Under Protective Order                    ADL 0029166

-9-

4.8 No multiple royalties shall be payable because any Licensed Product, its manufacture, use, lease or sale are or shall be covered by more than one patent application or patent licensed under this Agreement.

4.9 Royalty payments shall be paid in United States dollars in Cambridge, Massachusetts, or at such other place as M.I.T. may reasonably designate consistent with the laws and regulations controlling in any foreign country. If any currency conversion shall be required in connection with the payment of royalties hereunder, such conversion shall be made by using the exchange rate prevailing at the Chase Manhattan Bank (N.A.) on the last business day of the calendar quarterly reporting period to which such royalty payments relate.

## ARTICLE V - REPORTS AND RECORDS

5.1 LICENSEE, within sixty (60) days after March 31, June 30, September 30 and December 31, of each year, shall deliver to M.I.T. true and accurate reports, giving such particulars of the business conducted by LICENSEE and its sublicensees during the preceding three-month period under this Agreement as shall be pertinent to a royalty accounting hereunder. These shall include at least the following:

    (a)      number of Licensed Products manufactured and sold.

    (b)      total billings for Licensed Products sold.

    (c)      accounting for all Licensed Processes used or sold.

    (d)      deductions applicable as provided in Paragraph 1.5.

    (e)      total royalties due.

    (f)      names and addresses of all sublicensees of LICENSEE.

5.2 With each such report submitted, LICENSEE shall pay to M.I.T. the royalties due and payable under this Agreement. If no royalties shall be due, LICENSEE shall so report.

5.3 On or before the ninetieth (90th) day following the close of LICENSEE's fiscal year, LICENSEE shall provide M.I.T. with LICENSEE's certified financial statements for the preceding fiscal year including, at a minimum, a Balance Sheet and an Operating Statement.

5.4 The royalty payments set forth in this Agreement shall, if overdue, bear interest until payment at a per annum rate two percent (2%) above the prime rate in effect at the Chase Manhattan Bank (N.A.) on the due date. The payment of such interest shall not foreclose M.I.T. from exercising any other rights it may have as a consequence of the lateness of any payment.

Confidential Information Under Protective Order

ADL 0029167

-10-

## ARTICLE VI - PATENT PROSECUTION

6.1  M.I.T. (and/or Whitehead, as appropriate, depending on ownership of the individual Patent Rights) shall apply for, seek prompt issuance of, and maintain during the term of this Agreement the Patent Rights in the United States and in the foreign countries listed in Appendix B hereto.  Appendix B may be amended by verbal agreement of both parties, such agreement to be confirmed in writing within ten (10) days.  The prosecution, filing and maintenance of all Patent Rights patents and applications shall be the primary responsibility of M.I.T. (and/or Whitehead); provided, however, LICENSEE shall have reasonable opportunities to advise M.I.T. (and/or Whitehead) and shall cooperate with M.I.T. (and/or Whitehead) in such prosecution, filing and maintenance.

6.2  Payment of all fees and costs relating to the filing, prosecution, and maintenance of the Patent Rights shall be the responsibility of LICENSEE, whether such fees and costs were incurred before or after the date of this Agreement.  Such payments shall be creditable as specified in Paragraphs 4.2 and 4.3.  For fees and costs incurred prior to July 1, 1991, LICENSEE shall reimburse M.I.T. and Whitehead on the following schedule:

| | |
|---|---|
| 25% of total: | 30 days after billing |
| 25% of total: | January 15, 1992 |
| 25% of total: | July 15, 1992 |
| 25% of total: | January 15, 1993 |

Fees and costs incurred after July 1, 1991 shall be reimbursed within 30 days after billing.

## ARTICLE VII - INFRINGEMENT

7.1  LICENSEE, M.I.T. and Whitehead shall promptly inform each other of any alleged infringement of the Patent Rights by a third party and of any available evidence thereof.

7.2  During the term of this Agreement, LICENSEE shall have the right, but shall not be obligated, to prosecute at its own expense any such infringements of the Patent Rights and in furtherance of such right, M.I.T. and Whitehead hereby agree that LICENSEE may include M.I.T. or Whitehead as party plaintiffs in any such suit , without expense to M.I.T. or Whitehead.  The total cost of any such infringement action commenced or defended solely by LICENSEE shall be borne by LICENSEE.  LICENSEE may, for such purposes, use the name of M.I.T. or Whitehead as party plaintiffs provided, however, that such right to bring an infringement action shall remain in effect only for so long as the license granted herein remains exclusive.  No settlement, consent judgment or other voluntary final disposition of the suit may be entered into without the consent of

Confidential Information Under Protective Order

ADL 0029168

-11-

M.I.T. and Whitehead, which consent shall not unreasonably be withheld. LICENSEE shall indemnify M.I.T. and Whitehead against any order for costs associated with the litigation that may be made against M.I.T. or Whitehead in such proceedings.

7.3  In the event that LICENSEE shall undertake the enforcement and/or defense of the Patent Rights by litigation, LICENSEE may withhold up to fifty percent (50%) of the royalties otherwise thereafter due M.I.T. hereunder and apply the same toward reimbursement of up to half of LICENSEE's expenses, including reasonable attorney's fees, in connection therewith. Any recovery of damages by LICENSEE for any such suit shall be applied pro rata in satisfaction of (i) any unreimbursed expenses and legal fees of LICENSEE relating to the suit; and (ii) any royalties due M.I.T. and withheld by LICENSEE and applied pursuant to this Paragraph 7.3. The balance remaining from any such recovery shall be divided between LICENSEE and M.I.T. in the proportion of 91% LICENSEE/9% M.I.T.

7.4  If within six (6) months after having been notified of any alleged infringement, LICENSEE shall have been unsuccessful in persuading the alleged infringer to desist and shall not have brought and shall not be diligently prosecuting an infringement action, or if LICENSEE shall notify M.I.T. at any time prior thereto of its intention not to bring suit against any alleged infringer, then, and in those events only, M.I.T. or Whitehead, as appropriate) shall have the right, but shall not be obligated, to prosecute at its own expense any infringement of the Patent Rights, and, in furtherance of such right, LICENSEE hereby agrees that M.I.T. (or Whitehead) may include LICENSEE as a party plaintiff in any such suit, without expense to LICENSEE. The total cost of any such infringement action commenced or defended solely by M.I.T. (or Whitehead) shall be borne by M.I.T. (or Whitehead), and M.I.T. (or Whitehead) shall keep any recovery or damages for past infringement derived therefrom. No settlement, consent judgement or other voluntary final disposition of the suit maybe entered into without the consent of LICENSEE, which consent shall not unreasonable be withheld.

7.5  In the event that a declaratory judgment action alleging invalidity or noninfringement of any of the Patent Rights shall be brought against LICENSEE, M.I.T. (or Whitehead), at its option, shall have the right, within thirty (30) days after commencement of such action, to intervene and take over the sole defense of the action at its own expense.

7.6  In any infringement suit as any party may institute to enforce the Patent Rights pursuant to this Agreement, the other parties hereto shall, at the request and expense of the party initiating such suit, cooperate in all respects and, to the extent possible, have its employees testify when requested and make available relevant records, papers, information, samples, specimens, and the like.

Confidential Information Under Protective Order                    ADL 0029169

04/27/2004  09:33    3104767639                    LAURIE ALLEN                    PAGE  13

-12-

7.7 LICENSEE, during the exclusive period of this Agreement, shall have the sole right in accordance with the terms and conditions herein to sublicense any alleged infringer for future use of the Patent Rights.  Any upfront fees paid to LICENSEE as part of such sublicense shall be handled in accordance with subparagraph 4.1(f).

### ARTICLE VIII - PRODUCT LIABILITY

8.1 LICENSEE shall at all times during the term of this Agreement and thereafter, indemnify, defend and hold M.I.T.and Whitehead, their trustees, officers, employees and affiliates, harmless against all claims and expenses, including legal expenses and reasonable attorneys' fees, arising out of the death of or injury to any person or persons or out of any damage to property and against any other claim, proceeding, demand, expense and liability of any kind whatsoever resulting from the production, manufacture, sale, use, lease, consumption or advertisement of the Licensed Product(s) and/or Licensed Process(es) or arising from any obligation of LICENSEE hereunder.

8.2 LICENSEE shall obtain prior to the first use of a Licensed Product or Licensed Process on humans and carry in full force and effect liability insurance which shall protect LICENSEE, M.I.T.and Whitehead in regard to events covered by Paragraph 8.1 above.

8.3 EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, M.I.T. AND WHITEHEAD MAKE NO REPRESENTATIONS AND EXTEND NO WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND VALIDITY OF PATENT RIGHTS CLAIMS, ISSUED OR PENDING.

### ARTICLE IX - EXPORT CONTROLS

It is understood that M.I.T.and Whitehead are subject to United States laws and regulations controlling the export of technical data, computer software, laboratory prototypes and other commodities (including the Arms Export Control Act, as amended and the Export Administration Act of 1979), and that its obligations hereunder are contingent on compliance with applicable United States export laws and regulations.  The transfer of certain technical data and commodities may require a license from the cognizant agency of the United States Government and/or written assurances by LICENSEE that LICENSEE shall not export data or commodities to certain foreign countries without prior approval of such agency.  M.I.T. neither represents that a license shall not be required nor that, if required, it shall be issued.

Confidential Information Under Protective Order                    ADL 0029170

-13-

## ARTICLE X - NON-USE OF NAMES

LICENSEE shall not use the names of the Massachusetts Institute of Technology nor of the Whitehead Institute nor any of their employees, nor any adaptation thereof, in any advertising, promotional or sales literature without prior written consent obtained from M.I.T. in each case, except that LICENSEE may state that it is licensed by Whitehead or M.I.T. under one or more of the patents and/or applications comprising the Patent Rights.

## ARTICLE XI - ASSIGNMENT

The rights of ARIAD under this Agreement may not be assigned and the duties of ARIAD under this Agreement may not be delegated without the prior written consent of M.I.T. and Whitehead, except that ARIAD may assign this Agreement to an entity, acceptable to M.I.T. and Whitehead, with which it merges or consolidates or which ARIAD controls, or to which substantially all of its assets relating to the Patent Rights are sold or otherwise transferred or to a partnership of which ARIAD or any of its affiliates in the general partner.

## ARTICLE XII - ARBITRATION

12.1   Any and all claims, disputes or controversies arising under, out of, or in connection with this Agreement, including any dispute relating to patent validity or infringement, which have not been resolved by good faith negotiations between the parties, shall be resolved by final and binding arbitration in Boston, Massachusetts under the rules of the American Arbitration Association, or the Patent Arbitration Rules if applicable, then obtaining. The arbitrators shall have no power to add to, subtract from or modify any of the terms or conditions of this Agreement. Any award rendered in such arbitration may be enforced by either party in either the courts of the Commonwealth of Massachusetts or in the United States District Court for the District of Massachusetts, to whose jurisdiction for such purposes M.I.T., Whitehead and LICENSEE each hereby irrevocably consents and submits.

12.2   Notwithstanding the foregoing, nothing in this Article shall be construed to waive any rights or timely performance of any obligations existing under this Agreement.

## ARTICLE XIII - TERMINATION

13.1   If LICENSEE shall cease to carry on its business, this Agreement shall terminate upon notice by M.I.T.

Confidential Information Under Protective Order

04/27/2004  09:33    3184767639              LAURIE ALLEN                    PAGE  15

-14-

13.2  Should LICENSEE fail to pay M.I.T. royalties due and payable hereunder, M.I.T. shall have the right to terminate this Agreement on thirty (30) days' notice, unless LICENSEE shall pay M.I.T. within the thirty (30) day period, all such royalties and interest due and payable.  Upon the expiration of the thirty (30) day period, if LICENSEE shall not have paid all such royalties and interest due and payable, the rights, privileges and license granted hereunder shall terminate.

13.3  Upon any material breach or default of this Agreement by LICENSEE, other than those occurrences set out in Paragraphs 13.1 and 13.2 hereinabove, which shall always take precedence in that order over any material breach or default referred to in this Paragraph 13.3, M.I.T. shall have the right to terminate this Agreement and the rights, privileges and license granted hereunder by ninety (90) days' notice to LICENSEE.  Such termination shall become effective unless LICENSEE shall have cured any such breach or default prior to the expiration of the ninety (90) day period.

13.4  LICENSEE shall have the right to terminate this Agreement at any time on six (6) months' notice to M.I.T., and upon payment of all amounts due M.I.T. through the effective date of the termination.

13.5  Upon termination of this Agreement for any reason, nothing herein shall be construed to release either party from any obligation that matured prior to the effective date of such termination.  LICENSEE and any sublicensee thereof may, however, after the effective date of such termination, sell all Licensed Products, and complete Licensed Products in the process of manufacture at the time of such termination and sell the same, provided that LICENSEE shall pay to M.I.T. the royalties thereon as required by Article IV of this Agreement and shall submit the reports required by Article V hereof on the sales of Licensed Products.

13.6  Upon termination of this Agreement for any reason, any sublicensee not then in default shall have the right to seek a license from M.I.T.

13.7  LICENSEE shall have the right, upon written notice to M.I.T., to separately terminate its license to any independent patent application or patent of the Patent Rights.

## ARTICLE XIV - PAYMENTS, NOTICES AND OTHER COMMUNICATIONS

Any payment, notice or other communication pursuant to this Agreement shall be sufficiently made or given on the date of mailing if sent to such party by certified first class mail, postage prepaid, addressed to it at its address below or as it shall designate by written notice given to the other party:

Confidential Information Under Protective Order

ADL 0029172

-15-

In the case of M.I.T.:

        Director
        Technology Licensing Office
        Massachusetts Institute of Technology
        Room E32-300
        Cambridge, Massachusetts 02139

In the case of WHITEHEAD:

        Vice President
        Whitehead Institute
        Nine Cambridge Center
        Cambridge, MA 02142

In the case of LICENSEE:

        Harvey J. Berger, M.D.
        Chairman and Chief Executive Officer
        ARIAD Pharmaceuticals, Inc.
        687 Wetherby Lane
        Devon, PA 19333

or as amended in writing from time to time by any party.


## ARTICLE XV - MISCELLANEOUS PROVISIONS

    15.1  This Agreement shall be construed, governed, interpreted and applied in accordance with the laws of the Commonwealth of Massachusetts, U.S.A., except that questions affecting the construction and effect of any patent shall be determined by the law of the country in which the patent was granted.

    15.2  The parties hereto acknowledge that this Agreement sets forth the entire Agreement and understanding of the parties hereto as to the subject matter hereof, and shall not be subject to any change or modification except by the execution of a written instrument subscribed to by the parties hereto.

    15.3  The provisions of this Agreement are severable, and in the event that any provisions of this Agreement shall be determined to be invalid or unenforceable under any controlling body of the law, such invalidity or unenforceability shall not in any way affect the validity or enforceability of the remaining provisions hereof.

Confidential Information Under Protective Order

-16-

15.4 LICENSEE agrees to mark the Licensed Products sold in the United States with all applicable United States patent numbers. All Licensed Products shipped to or sold in other countries shall be marked in such a manner as to conform with the patent laws and practice of the country of manufacture or sale.

15.5 The failure of any party to assert a right hereunder or to insist upon compliance with any term or condition of this Agreement shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition by the other parties.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals and duly executed this Agreement the day and year set forth below.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY

By _____

Name    JOHN T. PRESTON, DIRECTOR

Title    TECHNOLOGY LICENSING OFFICE

Date    8 - 26 - 91

WHITEHEAD INSTITUTE

By _____

Name    John Pratt

Title    Vice President

Date    8/28/91

ARIAD PHARMACEUTICALS, INC.

By    Harvey Berger, M.D.

Name    HARVEY J. BERGER, M.D.

Title    Chairman + Chief Executive Officer

Date    8/19/91

Confidential Information Under Protective Order

04/27/2004  09:33   3104767639            LAURIE ALLEN                    PAGE  18

-17-

### APPENDIX A

**M.I.T. Case No. 4167AA**
"Nuclear Factors Associated With Transcriptional Regulation"
By David Baltimore, Ranjan Sen, Phillip A. Sharp, Harinder Singh, Louis Staudt, Jonathan
LeBowitz, Albert S. Baldwin, Jr., Roger Clerc, and Lynn M. Corcoran
U.S.S.N. 280,173 (Filed 12/5/88)
(Owned by M.I.T. and the Whitehead Institute, jointly)

FOREIGN FILING(S)

M.I.T. Case No. 4167:

    European Application No. 87 900968.6 (Filed 1/9/87)
        *(Claiming Austria, Belgium, Switzerland/Liechtenstein, Germany, France, Great
        Britain, Italy, Luxembourg, Netherlands, Sweden)*

    Japanese Application No. PCT/US87/00086 (Filed 1/9/87)

M.I.T. Case No. 4167A/4167AA:

    Canadian Application No. 590,892 (Filed 2/13/89)
    European Application No. 89 902888.0 (Filed 2/10/89)
        *(Claiming Austria, Belgium, Switzerland/Liechtenstein, Germany, France, Great
        Britain, Italy, Luxembourg, Netherlands, Sweden)*
    Japanese Application No. PCT/US89/00553 (Filed 2/10/89)

**M.I.T. Case No. 4442W (Whitehead No. 86-10)**
"Method of Inducible Gene Expression"
By Ranjan Sen and David Baltimore
U.S.S.N. 946,365 (Filed 12/24/86)
(Owned by The Whitehead Institute)

FOREIGN FILING(S)

    All foreign filing has been abandoned.

Confidential Information Under Protective Order

ADL 0029175

-18-

**M.I.T. Case No. 4695W  (Whitehead No. 87-11)**
"Activation of NF-kB Precursor"
By Patrick Baeuerle and David Baltimore"
U.S.S.N. 318,901 (Filed 3/3/89)
(Owned by The Whitehead Institute)

<u>FOREIGN FILING(S)</u>

European Application No. PCT/US89/00820  (Filed 3/1/89)
(*Claiming  Austria, Belgium, Switzerland/Liechtenstein, Germany, France, Great Britain, Italy, Luxembourg, Netherlands, Sweden*)

**M.I.T. Case No. 5134W  (Whitehead No. 89-02)**
"NF-kB-Mediated Transcriptional Regulation"
By Michael J. Lenardo, Chen-ming Fan, Tom Maniatis and David Baltimore
U.S.S.N. 341,436 (Filed 4/21/89)
(Owned by The Whitehead Institute and Harvard University, jointly.  Harvard University has given M.I.T. the authority to license Harvard's rights on Harvard's behalf and has given Whitehead full rights to prosecute and defend the Patent Rights.)

<u>FOREIGN FILING(S)</u>

None

**M.I.T. Case 5675   (Whitehead 87-11AA)**
"The pp40 Associated with REL is an I-κB" by David Baltimore, Sankar Ghosh et al.
To be filed
(Owned by The Whitehead Institute)

Confidential Information Under Protective Order

ADL 0029176

-19-

## APPENDIX B

Foreign countries in which Patent Rights shall be filed, prosecuted and maintained in accordance with Article VI where legally possible:

Canada
Japan
Great Britain
France
Germany
Italy

Confidential Information Under Protective Order                    ADL 0029177

APPENDIX C

#1/LLN/11/14/88
CentCollabResAgt

## COLLABORATIVE RESEARCH AGREEMENT

This Agreement between Centocor, Inc. and the Massachusetts Institute of Technology ("M.I.T.") defines the terms and conditions under which Centocor scientists will collaborate with Prof. Phillip A. Sharp and colleagues in the Cancer Center at M.I.T. in the area of antibody gene expression ("The Collaboration").

Centocor and M.I.T. hereby agree as follows:

1. FIELD:  The Field of the Collaboration is defined by the Work Statement attached hereto as Appendix A.

2. DURATION:  The Collaboration shall begin on December 1, 1988 and terminate on November 30, 1991, unless sooner terminated by either party notifying the other, in writing, that it wishes to terminate the Collaboration.  The Collaboration may be extended by written mutual consent.

3. EXCHANGE OF INFORMATION:  During the Collaboration, each party shall provide the other with all data and other information that it develops under the Collaboration.

4. M.I.T. TANGIBLE PROPERTY:  M.I.T. shall provide to Centocor certain biological materials ("M.I.T.") developed before the Collaboration, for Centocor's use in the Collaboration.  Centocor shall not give samples, progeny, or derivatives of such M.I.T. Tangible Property to any third party except with the written permission of M.I.T.

5. BIOLOGICAL MATERIAL DEVELOPED UNDER THE COLLABORATION:  Any biological material developed by one party under the Collaboration shall be provided to the other for its use under the Collaboration.  Samples, progeny or derivatives of any biological materials developed under the Collaboration shall not be delivered to any third party without the written permission of the developing party, except as specified in



Confidential Information Under Protective Order                ADL 0029178

04/27/2004  09:33    3184767639                    LAURIE ALLEN                        PAGE  22

2

Paragraph 8(c) below. Notwithstanding the foregoing, for hybridomas developed under
this Collaboration which are of commercial value to Centocor and which are derived from
hybridomas developed or obtained by Centocor outside of this Collaboration, Centocor
shall not be required to provide said hybridomas to MIT unless provision is specifically
requested by MIT for specific purposes and, unless suitable cell line transfer agreements in
the form of those contained in Appendix C are executed between the parties hereto."

6. PUBLICATION:  Either party shall be free to publish any of the results it obtains under
the Collaboration, and shall acknowledge the contribution of the other party, or include the
other party as co-author, as appropriate.  The publishing party shall provide the other party
with a copy of manuscripts submitted for publication at least thirty days prior to
publication, in order to allow the other party to identify potentially patentable material and
request that a patent application be filed.

7. INVENTIONS:  Any inventions made by Centocor personnel shall belong to Centocor;
inventions made by M.I.T. personnel shall be owned by M.I.T.  Inventions made jointly
by M.I.T. and Centocor personnel shall belong jointly to M.I.T. and Centocor.  Each party
shall promptly notify the other if it makes an invention during the Collaboration, and if it
intends to file a patent application on any such inventions.  Copies of any such patent
applications which are filed by one party shall be promptly provided to the other party.

8. PATENT AND LICENSING RIGHTS:

(a) During the Collaboration, M.I.T. shall grant to Centocor a royalty-free nonexclusive
license to the Patent Rights of the M.I.T. Cases listed in Appendix B and to the M.I.T.
Tangible Property for internal research and development use in the field of use of
"Expression of Antibodies".  If Centocor does not terminate this Agreement at any time
prior to October 31, 1991, the internal research and development use license to the Patent
Rights and the M.I.T. Tangible Property shall be in perpetuity.

(b) M.I.T. shall have the right to use any biological property and inventions developed by
Centocor under the Collaboration for its own internal uses, royalty-free in perpetuity.

(c) "Transferrable Property" is defined as any biological property developed by Centocor
under the Collaboration, but excluding hybridomas developed by Centocor which produce
antibody of commercial value to Centocor.  "Licensable Centocor Patent Rights" shall mean



Confidential Information Under Protective Order                    ADL 0029179

04/27/2004  09:33  3104767639                    LAURIE ALLEN                    PAGE  23

3

patent rights to inventions made by Centocor under the Collaboration, but excluding claims to hybridomas producing antibody of commercial value to Centocor. M.I.T. shall have the right to license to third parties, only in conjunction with the Patent Rights to Appendix B, any Transferrable Property and Licensable Centocor Inventions. M.I.T. shall pay to Centocor twenty-five percent (25%) of the Net Royalties it receives from such licenses. ("Net Royalties" is defined as Gross Royalties minus 15% for administration and marketing, and minus any unreimbursed out-of-pocket patenting costs.)

(d) Centocor shall have a first option to an exclusive royalty-bearing license with suitable due diligence provisions, for certain Applications, to the M.I.T. Tangible Property, the Patent Rights of Appendix B, and any M.I.T. inventions or biological property developed under the Collaboration. An "Application" is defined as all hybridomas producing antibodies to a single antigen or directed to detection of a single disease state if all tests for that disease are based on the same antigen or set of antigens operating by the same basic mechanism in the disease state. The terms of Centocor's option are as follows:

(i) Centocor shall have a first option to all Applications for one year following the beginning of the Collaboration. Thereafter, Centocor's option shall be only to Applications for which M.I.T. has not previously granted a license to a third party.

*[handwritten: for an exclusive license and an option for a non-exclusive license until one year following the end of the Collaboration]*

(ii) Centocor may exercise its option to an exclusive license for an Application only after Centocor demonstrates that it has developed a suitable hybridoma for that Application, or that it has an intensive development program in place specifically devoted to development of a hybridoma for that Application. In the latter event, Centocor's license to the hybridoma shall terminate if a functional hybridoma is not developed by Centocor within two years of the effective date of the license.

(iii) If Centocor exercises its option to an exclusive license to an Application, the royalties shall be as follows:

((a)) For Applications using known hybridomas whose efficiency of production of antibody is increased by use of the Patent Rights of Appendix B or the M.I.T. Tangible Property and/or M.I.T. patents or M.I.T. biological property developed under the Collaboration (together defined as "M.I.T. Intellectual and Material Property"), royalties shall include a License Issue Fee of $10,000 per Application, and a Running

Confidential Information Under Protective Order

ADL 0029180

4

Royalty of one-half of one percent (0.5%) of Centocor's sales of product produced and sold using the M.I.T. Intellectual and Material Property.

((b))    For Applications using new hybridomas which could not be practically developed without use of the M.I.T. Intellectual and Material Property, a License Issue Fee of $25,000 per Application, and a Running Royalty of 2.5% of product sales.

AGREED TO FOR:

MASSACHUSETTS INSTITUTE
OF TECHNOLOGY

By _____

Title _____

Date __Nov. 14 1988__

CENTOCOR, INC.

By _____

Title __Chairman of Board__

Date __Nov____, 1988__

Confidential Information Under Protective Order

ADL 0029181

## APPENDIX A

### WORK STATEMENT

As part of a continuing collaboration between MIT scientists (represented by Dr. Phillip Sharp and Centocor), the MIT scientists will isolate and characterize cDNA clones representing cellular factors involved in the regulation of immunoglobulin gene expression. Said cDNA clones will then be sent to Centocor where they will be used in one or more of the following ways:

a)    The cDNA clones will be used as probes to determine the level of expression of said factors in hybridoma and other cell lines.

b)    the cDNA clones will be expressed in hybridoma or other mammalian cells in order to study their effects on immunoglobulin production.

c)    the cDNA clones will be expressed in E. coli in order to obtain large quantities for study and for production of antisera.

d)    Recombinants of the cDNAs and other activator genes may also be tested in the course of these experiments.

LBOOKSAS.NO1/11



Confidential Information Under Protective Order

ADL 0029182

APPENDIX D

MASSACHUSETTS INSTITUTE OF TECHNOLOGY  CAMBRIDGE, MASSACHUSETTS 02139

Date: _____

Biomaterials Coordinator
Technology Licensing Office
Massachusetts Institute of Technology
Building E32-300
77 Massachusetts Ave.
Cambridge, MA 02139

Biology Department
Massachusetts Institute of Technology
Building
77 Massachusetts Ave.
Cambridge, MA 02139

Subject:  **BIOLOGICAL MATERIAL TRANSFER AGREEMENT**

Dear

This is to acknowledge your request for _____
_____, which is owned by MASSACHUSETTS INSTITUTE
OF TECHNOLOGY (M.I.T.). M.I.T. will provide this material to you, for your use in
noncommercial scientific research only, under the following conditions:

1.    The Material covered by this Agreement includes _____
      any additional progeny or derivatives which could not have been made but for
      the _____ and any related information and
      know-how which will be received under this agreement.

2.    The Material will be used only by you and by individuals working under your
      direct supervision in your Institution, and will not be transferred, distributed or
      released to any other person.

3.    The Material will be used only for noncommercial, publishable research
      purposes. It will not be used on any research to be used for the development
      of any commercial product, including drug screening or development for
      commercial purposes or on behalf of any commercial entity.

4.    You will be free to publish any research results using the Material. We would
      appreciate your acknowledging in such publication(s) MIT and its personnel as
      scientifically appropriate, and providing MIT with copies of such publication(s).

5.    The Material is made available for investigational use only in laboratory
      animals or in _in vitro_ experiments and will not be used in humans or for

Page 1

Confidential Information Under Protective Order                            ADL 0029183

04/27/2004  09:33    3104767639                    LAURIE ALLEN                    PAGE  27

any other purpose.

6.    All characteristics of the Material are not fully understood and its use may involve risks or dangers that are not known or fully appreciated. The Material is being provided without warranty of any sort, express or implied.

7.    You and your Institution will use the Material in compliance with all laws and governmental regulations and guidelines applicable to the Material and will comply with all NIH guidelines and other relevant NIH instructions. In particular:

   A) Your laboratory has been reviewed by its institutional biohazards committee (IBC) which has certified that facilities, procedures, and the training and expertise of the personnel involved are adequate;

   B) Your laboratory has received the appropriate approvals and has registered its rDNA program with the IBC; and

   C) A copy of this letter is on file with your laboratory's IBC.

8.    You will hold **MASSACHUSETTS INSTITUTE OF TECHNOLOGY (M.I.T.)** and its employees harmless from any loss, claim, damage or liability, of any kind, which may arise from or in connection with this Agreement or the use, handling or storage of the Material. In no case shall M.I.T. or Professor _____ _____ be liable for any use by you, by individuals working under your direct supervision, or by your Institution, of the Material or any loss, claim, damage or liability, of any kind, which may arise from or in connection with this Agreement or the use, handling or storage of the Material.

9.    You understand that no other right or license to this Material or to its use is granted or implied as a result of our sending the Material to you.

10.   At the request of **MASSACHUSETTS INSTITUTE OF TECHNOLOGY**, unused Material will be returned to M.I.T. or destroyed.


Research Project:  Studies on the activation and differentiation of monocytic cells.


      If you agree to accept the Material under the above conditions, please sign the Agreement, have it signed by an authorized representative of your Institution and return it to:


Page 2


Confidential Information Under Protective Order                    ADL 0029184

04/27/2004  09:33    3104767639                    LAURIE ALLEN                    PAGE   28

The Material will be sent to you as soon as possible after the receipt of the signed agreement.

Sincerely,

Accepted:

REQUESTER
INSTITUTION· _____

By:_____ __ _____        By:_____
(Signature)                    (Signature)

By:_____    By:_____
(Printed Name)                 (Authorized Representative's
                               Printed Name)

Date:_____   Date:_____

Page 3

# EXHIBIT F

84/27/2004  09:33    3104767639                    LAURIE ALLEN                        PAGE  29
                                                MINTZ LEVIN                                        ☐002

## FIRST AMENDMENT

This amendment, dated ___November 20, 1991___, is to the License Agreement dated August 19, 1991 between MASSACHUSETTS INSTITUTE OF TECHNOLOGY, the WHITEHEAD INSTITUTE, and ARIAD PHARMACEUTICALS, INC.

The parties agree that the License Agreement shall be amended as follows in order to acknowledge Harvard University's ownership of certain Patent Rights:

1.    The following paragraph shall be added to the WITNESSETH section:

"WHEREAS, M.I.T. Case No. 5134W (Whitehead No. 89-02) "NF-kB Mediated Transcriptional Regulation" by Michael J. Lenardo, Chen-ming Fan, Tom Maniatis and David Baltimore is jointly owned by Harvard University, and Harvard University (Harvard) has authorized M.I.T. to act as its sole and exclusive agent for the purposes of licensing Harvard's rights in the Patent Rights and has authorized M.I.T. to enter into this licensing agreement on Harvard's behalf;

2.    The word "Harvard" shall be added after "Whitehead," in the first sentence of Paragraph 1.2.

3.    The words "and Harvard" shall be added after "Whitehead and M.I.T." and "M.I.T. and Whitehead" in Paragraph 2.7.

4.    The words "and/or Harvard" shall be added after the words "and/or Whitehead" in all instances in Paragraph 6.1.

5.    The words "and Harvard" shall be added after the words "M.I.T. and Whitehead" in Paragraphs 7.1 and & 7.2. The words "or Harvard" shall be added after the words "M.I.T. or Harvard" in Paragraph 7.2.

6.    The words "and Harvard" shall be added after the words "M.I.T. and Whitehead" in all instances in Paragraphs 8.1, 8.2 and 8.3.

7.    The words "nor of Harvard University" shall be added after "nor of the Whitehead Institute", and the words "or Harvard" shall be added after the words "Whitehead or M.I.T." in Section X.

04/27/2004  09:33    3184767639              LAURIE ALLEN                    PAGE  30
                                             MINTZ LEVIN                     ☑003

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals and duly executed this Agreement the day and year set forth below.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY

By _____

Name    JOHN T. PRESTON, DIRECTOR
        TECHNOLOGY LICENSING OFFICE

Title _____

Date    11 - 11 - 91

WHITEHEAD INSTITUTE

By _____

Name    John Pratt

Title   Vice President

Date    11/20/91

ARIAD PHARMACEUTICALS, INC.

By _____

Name    HARVEY J. BERGER

Title   Chairman + CEO

Date    11/20/91

IA/sc
5134.ariad.amend.1105

Confidential Information Under Protective Order                    ADL 0029187

# EXHIBIT G

## SECOND AMENDMENT TO LICENSE AGREEMENT

This Second Amendment to License Agreement ("Second Amendment to License Agreement") is made and entered into as of this 2nd day of January, 2002, (the "Effective Date") by and between MASSACHUSETTS INSTITUTE OF TECHNOLOGY, a corporation organized and existing under the laws of the Commonwealth of Massachusetts and having its principal offices at 77 Massachusetts Avenue, Cambridge, Massachusetts (hereinafter referred to as "M.I.T."), and the WHITEHEAD INSTITUTE, a corporation organized and existing under the laws of Delaware and having its principal offices at Nine Cambridge Center, Cambridge, Massachusetts (hereinafter referred to as "Whitehead") and ARIAD PHARMACEUTICALS, INC., a corporation duly organized under the laws of Delaware and having its principal offices at 20 Landsdowne Street, Cambridge, Massachusetts (hereinafter referred to as "LICENSEE").

WHEREAS, M.I.T., WHITEHEAD and LICENSEE entered into that certain License Agreement dated August 19, 1991, and amended same effective November 20, 1991 (collectively, the "Agreement"); and

WHEREAS, the parties to the Agreement desire to amend certain terms of the Agreement, to add certain terms to the Agreement and to confirm the validity and effectiveness of the remaining terms and conditions set forth in the Agreement, all as further set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and obligations set forth herein, the parties hereby agree as follows.

### ARTICLE 1

1.    **Definitions.**  Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Agreement.

### ARTICLE 2

2.    **Amendment of the Agreement.**  The Agreement is hereby amended as set forth in this Article 2.

2.1    **Amendment of Article II - Grant.**  Article II of the Agreement is hereby amended as set forth herein.

2.1.1    **Amendment of Paragraph 2.2.**  Paragraph 2.2 of the Agreement is hereby deleted and replaced with the following text:

"2.2  [RESERVED]"

2.1.3    **Amendment of Paragraph 2.3.**  Paragraph 2.3 of the Agreement is hereby deleted and replaced with the following text:

Confidential Information Under Protective Order

ADL 0029188

04/27/2004  09:33    3184767639                    LAURIE ALLEN                              PAGE  32

"2.3 Except as otherwise specifically set forth herein, the rights granted under Paragraph 2.1 hereof shall be and remain exclusively granted to LICENSEE and shall continue until the end of the term or terms for which any Patent Rights are issued, unless sooner terminated as provided herein. Without limiting the generality of the foregoing, upon a failure of LICENSEE to pay the License Maintenance Fees due hereunder, the rights granted under Paragraph 2.1 hereunder shall convert to non-exclusive upon written notice from M.I.T. to LICENSEE. The right to convert the rights granted hereunder to non-exclusive shall not be in limitation of any other rights that M.I.T. may have hereunder or at law upon such a failure by LICENSEE to pay the License Maintenance Fees hereunder."

   2.1.3    Amendment of Paragraph 2.4. Paragraph 2.4 of the Agreement is hereby deleted and replaced with the following text:

   "2.4 [RESERVED]"

   2.1.4    Amendment of Paragraph 2.8. Paragraph 2.8 of the Agreement is hereby deleted and replaced with the following text:

   "2.8 LICENSEE shall have the right to enter into sublicenses for the rights, privileges and licenses granted hereunder. Such sublicenses shall contain provisions enabling LICENSEE to fulfill its obligations to M.I.T. hereunder."

   2.1.5    Amendment of Paragraphs 2.9 and 2.10. Paragraphs 2.9 and 2.10 of the Agreement are hereby deleted and replaced with the following text:

   "2.9 [RESERVED]

   2.10 [RESERVED]"

   2.2    Amendment of Article III - DUE DILIGENCE. Article III of the Agreement is hereby amended as set forth herein.

   2.2.1    Amendment of Paragraph 3.1. Paragraph 3.1 of the Agreement is hereby deleted and replaced with the following text:

   "3.1 LICENSEE shall use reasonable commercial efforts to bring one or more Licensed Products to market through a thorough, vigorous and diligent program for exploitation of the Patent Rights. Commercially reasonable efforts by LICENSEE to grant sublicenses to companies that LICENSEE reasonably believes are engaged or will engage in such activities shall be sufficient to satisfy LICENSEE's obligations hereunder."

   2.2.2    Amendment of Paragraph 3.2. Paragraph 3.2 of the Agreement is hereby deleted and replaced with the following text:

   "3.2 [RESERVED]"

2

Confidential Information Under Protective Order                    ADL 0029189

    **2.3**   **Amendment of Article VII - INFRINGEMENT.** Article VII of the Agreement is hereby amended as set forth herein.

        **2.3.1**   **Amendment of Paragraph 7.5.** Paragraph 7.5 of the Agreement is hereby deleted and replaced with the following text:

      "7.5  In the event that a declaratory action alleging invalidity or noninfringement of any of the Patent Rights shall be brought against LICENSEE, and LICENSEE fails to take reasonable steps to defend such action in a timely manner, M.I.T. (or Whitehead), at its option, shall have the right to intervene and take over sole defense of such action at its own expense."

**ARTICLE 3**
**CONFIRMATION OF VALIDITY AND EFFECTIVENESS**

    **3.**   **Confirmation of Validity and Effectiveness.** Except as otherwise specifically set forth herein, the parties hereby confirm the validity and continued effectiveness of the Agreement.

    IN WITNESS WHEREOF, the parties have hereunto set their hands and duly executed this Second Amendment to License Agreement as of the Effective Date.

**MASSACHUSETTS INSTITUTE OF TECHNOLOGY**

By: _____
Name: _____
Title: _____


**WHITEHEAD INSTITUTE**

By: _____
Name: _____
Title: _____


**ARIAD PHARMACEUTICALS, INC.**

By:  Fritz Casselman
      Senior Vice President and
      Chief Business Officer

3

TRA 1616308v1

Confidential Information Under Protective Order                    ADL 0029190

# EXHIBIT H

1

```
 1                IN THE UNITED STATES DISTRICT COURT
                 IN AND FOR THE DISTRICT OF DELAWARE
 2
                            - - -
 3
     AMGEN, INC., a Delaware corporation; :    CIVIL ACTION
 4   IMMUNEX CORPORATION, a Washington     :
     Corporation; AMGEN USA, INC., a       :
 5   Delaware corporation; AMGEN           :
     MANUFACTURING, LIMITED, a Bermuda     :
 6   Corporation; and IMMUNEX RHODE ISLAND :
     CORPORATION a Delaware corporation,   :
 7
                    Plaintiffs,            :
 8        v                                :
                                           :
 9   ARIAD PHARMACEUTICALS, INC.,          :
     a Delaware corporation                :
10                                         :    NO. 06-259 (KAJ)
                    Defendant.
11                          - - -

12                    Wilmington, Delaware
               Monday, September 11, 2006 at 2:00 p.m.
13                      MOTIONS HEARING

14                          - - -

15   BEFORE:       HONORABLE KENT A. JORDAN, U.S.D.C.J.

16                          - - -

     APPEARANCES:
17

18             YOUNG CONAWAY STARGATT & TAYLOR, LLP
               BY:  MELANIE K. SHARP, ESQ.
19
                    and
20
               KIRKLAND & ELLIS, LLP
21             BY:  MARK A. PALS, ESQ., and
                    MARCUS E. SERNEL, ESQ.
22                  (Chicago, Illinois)

23                    Counsel for Plaintiffs

24
                              Brian P. Gaffigan
25                            Registered Merit Reporter
```

**2**

1  APPEARANCES:  (Continued)

2

3         ASHBY & GEDDES
        BY:  STEVEN J. BALICK, ESQ.

4         and

5  IRELL & MANDELLA, LLP
        BY:  DAVID I. GINDLER, ESQ., and

6         ELIZABETH L. ROSENBLATT, ESQ.
        (Los Angeles, California)

7

8         Counsel for Defendant

9         - oOo -

10         P R O C E E D I N G S

11         (REPORTER'S NOTE:  The following motions hearing

12  was held in open court, beginning at 2:00 p.m.)

13         THE COURT:  Good afternoon.  Please be seated.

14         (The attorneys respond, "good afternoon, Your

15  Honor.")

16         THE COURT:  Let's get started with some

17  introductions.

18         MS. SHARP:  Your Honor, Melanie Sharp on behalf

19  of the Amgen plaintiff.  I'd like to introduce my colleagues

20  from Kirkland & Ellis.  I believe they're already known to

21  the Court.  Mark Pals, who will be presenting argument

22  today, and Mark Sernel.

23         THE COURT:  Okay.  From ARIAD?

24         MR. BALICK:  Good afternoon, Your Honor.  Your

25  Honor, I'm here on behalf of ARIAD Pharmaceuticals; and here

**3**

1  from Irell & Manella in California are David Gindler and

2  Elizabeth Rosenblatt.  And also here today from the company

3  are Harvey Berger and Laurie Allen, seated in the first row.

4         THE COURT:  All right.  Welcome.

5         Who is going to be making the argument today?

6  Mr. Gindler?

7         MR. GINDLER:  I will, Your Honor.

8         THE COURT:  All right.  Well, let's start first

9  with the motion to dismiss.

10         Mr. Gindler, the floor is yours.

11         MR. GINDLER:  Thank you, Your Honor.  That will

12  be Gindler.

13         Your Honor, I read the transcript of the hearing

14  that took place telephonically on August 18th.  One of the

15  things Your Honor said in that telephone conference is that

16  we should come prepared to this hearing to address the

17  factual arguments which have been made by Amgen.

18         THE COURT:  Right.

19         MR. GINDLER:  And so leaving all the rhetoric

20  behind in the briefs, I'd like to do just that and discuss

21  each of the facts which Amgen claims supports reasonable

22  apprehension of suit and I think establish that they don't

23  establish reasonable apprehension of suit and it's not even

24  close.

25         THE COURT:  All right.

**4**

1         MR. GINDLER:  To assist in the presentation, I

2  do have a PowerPoint presentation.  Let's go first to the

3  next slide.

4         This is a rough time line of what we're

5  discussing today.  You will see the contents go over a

6  period of six years with the first contact starting in May

7  of 2000 and the last event taking place in April of 2006.

8  And you will see that the first three contacts are

9  essentially letters.  There is a phone call.  And then there

10  is a fairly large gap of time, about three years.  And in

11  the middle of that, there is actually an alleged statement

12  by Dr. Carson, one of the lawyers who represented ARIAD in

13  the Lilly litigation.  And then, in fact, we have the Lilly

14  litigation.

15         I want to march through each of these facts.

16  And let's go to the next slide, please.

17         So we'll move on.  Basically in the first couple

18  of years, we have four communications, and the first is a

19  May 11th, 2000 research presentation by ARIAD.

20         Let's go on.

21         Now, this is a presentation that is part of the

22  record.  Your Honor has seen it.  It's about 60 pages long.

23  And if Your Honor has looked through it, it is highly

24  technical in nature.  There is no testimony from either

25  side about this document but there are a few things one can

**5**

1  discern from looking at the document.  One is that given

2  the highly technical nature of what is in there, it is a

3  document that was intended to be looked at by people who

4  understand such things, which are typically scientists.

5         The second thing Your Honor will notice is that

6  of the 60 page presentation, the vast majority of it hasn't

7  got anything to do with NF-kB.  Those occupy I believe a

8  total of six slides and they come at the very end.

9         So what was this presentation?  Well, ARIAD

10  wanted to partner up with Amgen to work on drug discovery.

11  And, in fact, the title of the presentation is signal

12  transduction drug discovery.  That was the point of that.

13  ARIAD is a small company, Amgen is a very large and

14  successful company, and they were hoping to partner with

15  them to discover new drugs.

16         There is actually nothing in this presentation

17  which talks about Enbrel or talks about Kineret or really

18  which talks about our patents or how our patents are

19  relevant to Enbrel or Kineret, if they are at all.  This is

20  a presentation which talks mostly about things different

21  than NF-kB.  It talks about our general area of technology,

22  which is signal transduction, but even the slides about

23  NF-kB are slides about drug discovery, using that pathway

24  to discover new drugs.  Let's take a look at some of those.

25         So this describes NF-kB activation in cells.

6

1  Let's go back one, please. Here we go.
2  This is about drug discovery and about
3  identifying and validating key NF-kB pathway targets. The
4  point of this was for the companies to work together. We
5  have an expertise in signal transduction; Amgen has an
6  expertise in a number of areas, one of which is treating
7  inflammation; and so we thought it was a good match.
8  We made our presentation. Unfortunately, it did
9  not elicit a partnership with Amgen but this presentation
10  didn't have a thing to do with our patents, asserting our
11  patents, asking them to take a license to our patents or
12  about Enbrel or Kineret.
13  Let's move on to the next.
14  Well, the next contact is a letter that was sent
15  in May of 2000; and it was sent to many, many companies;
16  and it's a form letter. I've tried to pick out the most
17  provocative statements from the form letter. And, Your
18  Honor, if it would be helpful, I do have a bench book
19  prepared which has in it copies of every document I'm going
20  to refer to. If you would like a copy, I'm happy to hand
21  it up.
22  THE COURT: That's fine. I've got the
23  appendices that you all sent in but if this has it in a more
24  compact form, I'm happy to have it.
25  MR. GINDLER: Yes, it's in the order in which I

7

1  will talk about them. But these are the most provocative
2  statements I could find.
3  (Documents passed forward. )
4  MR. GINDLER: This is a letter which talks not
5  about the '516 patent but about an earlier patent which
6  issued in the same family, and the letter makes such
7  benign statements as: We believe they're working on the
8  development and/or commercialization of drugs that are
9  based on the NF-kB signal pathway and that our IP may be of
10  importance to you. It offered a nonexclusive license to our
11  portfolio, at this time the '516 patent had not issued. And
12  the letter referred only to I believe the first patent,
13  which is different than the '516 patent. Speaking very,
14  very generally, the first patent and the second patent are
15  more about ways of identifying compounds which affect the
16  NF-kB pathway as opposed to the use or method of using a
17  compound to inhibit or modulate the NF-kB pathway. And we
18  look forward to a response. And none came. This letter was
19  sent to about I think 25 companies.
20  Let's go on.
21  And then we sent another one when another patent
22  issued. This is in February of 2001. And again, the most
23  provocative statements we can find in this letter are we
24  believe that your R&D program as reflected in the cited
25  documents likely utilizes methodologies claimed in our

8

1  patents.
2  THE COURT: Now, let me ask you a question.
3  MR. GINDLER: Yes.
4  THE COURT: Would you view that as a step up
5  from the last round?
6  MR. GINDLER: I would view this as saying the
7  following, which is it says that we believe that your R&D
8  program, what you are doing for research and development,
9  as reflected in cited documents, and there are a bunch of
10  documents, articles published by Amgen scientists, which
11  related to in some way NF-kB. And so --
12  THE COURT: I know that is what that is saying
13  in words, but what I'm trying to ask you is to make a
14  comparison for me. And I'm asking for ARIAD's position. As
15  I think you rightly note, the first letter that goes out is,
16  hey, we've got some intellectual property that might be of
17  interest to you. Let's talk.
18  MR. GINDLER: Right.
19  THE COURT: This says we believe your R&D
20  methodology utilizes our patents, our stuff we claimed in
21  our patents. Now I'm asking you, is it ARIAD's position
22  that that is just like the first one or is this racheting up
23  the heat a little, the pressure?
24  MR. GINDLER: I don't think it really rachets up
25  the heat because of the following: First, it doesn't accuse

9

1  any existing product of infringing anything, particularly
2  infringing the patent in suit which had not yet even issued.
3  It talked about their R&D programs as reflected in various
4  articles that were actually included with the letter.
5  THE COURT: Is the statement that even though
6  there is no product specified that your R&D program
7  utilizes methodologies claimed in our patents, is that not
8  a statement you are infringing, whether you are making
9  something of ours? It looks like you are saying you're
10  violating some method claim we have. Maybe I am reading it
11  wrong. Point it out for me. I might have interrupted you
12  before prematurely and I apologize, but if that doesn't mean
13  what I just said in a little more ordinary English, then
14  what does that mean?
15  MR. GINDLER: I think what it says -- and I
16  don't think you weren't too far off. I think what it says,
17  we looked at the articles which were attached to the letter,
18  and based upon looking at those articles which described
19  research and development, not any marketed product but
20  research and development, that they likely are practicing
21  our patents. Now, not the '516 patent because it's February
22  of 2001 and that patent hasn't issued.
23  THE COURT: And indeed, no patent is specified
24  here, but there is a statement there, I think we're
25  agreeing, that looks like you are on our turf.

10

1  MR. GINDLER: Well, there is a statement that
2  says it looks like your R&D program may be on our turf for
3  patents other than the '516 patent. So, in other words --
4  THE COURT: Since there is no '516 patent at
5  this point, I guess that sort of goes. That's why it went
6  without saying, perhaps. But go ahead.
7  MR. GINDLER: Yes. So, in other words, the '516
8  patent is not there, it refers to earlier patents which
9  really are in a different field. Again, the '516 patent
10  really was a very important patent because it talked about
11  the use of compounds in drugs to modulate NF-kB activity as
12  opposed to just laboratory techniques to find whether or not
13  a compound does in some way affect NF-kB activity.
14  THE COURT: And you were probably going to or
15  you might have intended to get to this at some point, but
16  now that we're talking specifically about the '516 patent --
17  and I know you are not in this letter, don't mistake me,
18  in this presentation you are making right now -- what does
19  the result of the reexamination mean for this lawsuit, if
20  anything?
21  MR. GINDLER: I think it means the following
22  for this lawsuit: The '516 patent, I could, as an
23  understatement, say is in flux. It has 203 claims.
24  THE COURT: Well, it had; right?
25  MR. GINDLER: Well, it has still 203 claims. We

11

1  have a First Office Action which rejects 160 of them. What
2  happens, what would happen to that patent is anyone's guess.
3  A large part of it might get wiped out, part of it might
4  survive but in a very narrow form. It is --
5  THE COURT: You've actually answered my
6  question. And that's helpful. Thanks. I mean, ARIAD is
7  not letting go of those 160 without a fight; right?
8  MR. GINDLER: ARIAD is going attempt to convince
9  the Patent Office that they're wrong and we'll see if we are
10  successful.
11  You did ask me what the import is. And I'm
12  jumping ahead just a little bit, but I will do that now;
13  which is, the Court does have discretion whether to exercise
14  declaratory judgment jurisdiction even if, at the end of
15  the day, it finds that there is a reasonable apprehension
16  of suit. And I believe that the pending reexamination,
17  and particularly given the First Office Action in the
18  reexamination, suggests that this is really not a ripe
19  dispute. We don't know right now what the '516 patent
20  is going to look like. It's going to go through the
21  reexamination process. It's much faster than it used to be.
22  It's not as fast as people would like it to be but it's
23  faster than it used to be. According to current procedure,
24  there will be one more Office Action, in which case we may
25  then be done and we'll see how we do.

12

1  THE COURT: Now, in the real world, and I'm
2  not saying that ARIAD would do this, and I understand your
3  position, emphatically stated, that you weren't going to
4  sue Amgen, that you weren't thinking about it. This
5  reexamination, even though it has cast into doubt 160 of the
6  203 claims, it wouldn't prevent ARIAD from suing Amgen on
7  the '516 if it wanted to; correct?
8  MR. GINDLER: That's correct.
9  THE COURT: Including on the 160 that are
10  currently in flux, as you said.
11  MR. GINDLER: That's also correct. It creates
12  risks but, right, the patent is still a patent as it exists
13  until there is a result in the reexamination proceeding that
14  is final.
15  THE COURT: Okay.
16  MR. GINDLER: So I agree with that, Your Honor.
17  THE COURT: Okay. Now, let's go back. I asked
18  you a couple of questions off of this 2001 letter. And if
19  there is more you want to tell me about that, please do.
20  MR. GINDLER: No, this is just another form
21  letter. It was sent again to many different companies,
22  simply based upon the company reading about whether or
23  not -- the company, meaning ARIAD, reading about whether
24  or not they were engaged in research and development which
25  implicated the two issued patents, neither of which is the

13

1  '516 and both of which have much different claims.
2  Let's move on.
3  And there was some response from Amgen, as set
4  forth in Mr. Ungemach's declaration, which is that they'll
5  be in contact. And that was the last we heard from them.
6  Now, interestingly, there were some negotiations
7  with Immunex. These took place I believe before Amgen
8  consummated its acquisition of Immunex. This is set forth
9  in Mr. Casselman's declaration. And they tried to negotiate
10  terms. And, in fact, they did not reach an agreement on
11  terms.
12  And so did ARIAD then turn around and sue
13  Immunex after the negotiation has just failed? The answer
14  to that question is no, Amgen, ARIAD took no action against
15  Immunex. Even though they did express an interest in
16  licensing, even though terms were exchanged, they didn't
17  reach an agreement and ARIAD took no action. That would
18  tend to not create a reasonable apprehension on the part of
19  Immunex.
20  Please move on.
21  Now, let's go on to discussions or negotiations
22  that took place in 2002 and 2003.
23  THE COURT: Is the result of what happened with
24  Immunex something that Amgen has known about and familiar
25  with and ought to be in the mix in their thinking?

14

1    MR. GINDLER:  Well, I can only say I wouldn't
2  imagine why they wouldn't know about it.  They managed to
3  pull out of their files all the letters sent to Immunex.
4  Immunex is known as a separately existing corporation since
5  it's a plaintiff in this case, so I don't have any reason to
6  believe that the people at Amgen wouldn't have knowledge of
7  this since they managed to pull out documents that were sent
8  to Immunex.
9    THE COURT:  Okay.
10    MR. GINDLER:  So let's move on to the 2002-2003
11  discussions.
12    Now, in June of 2002, that is when the '516
13  patent has issued.  And so this letter is about the '516
14  patent.  And, again, this letter was sent to many companies
15  and it offered a nonexclusive research license, and it
16  talked about a possible commercial license.
17    I think the most provocative statements in this
18  letter about the '516 patent, the patent we're talking about
19  here today, are, it says, "in the event you develop or have
20  a product covered by the claims," then you get to
21  talking about whether or not Amgen has a product that falls
22  within the claims of the '516 patent.  And, as you know,
23  you've said we don't know if they do or if they don't
24  because no one has ever done that analysis.
25    Then the letter ends with saying, "please

15

1  contact me if you are interested in obtaining a license."
2    So again, we have no threat of litigation at
3  all.  And, in fact, in none of the letters we've seen so far
4  is there any threat of legal action.  And one thing that the
5  Federal Circuit case law makes clear is that in the context
6  of negotiations, you have to have a threat of legal actions
7  to take those out of licensing negotiations and into
8  creating a reasonable apprehension of suit.  That is what
9  the Phillips case says.  That is what the EMC vs. Norad case
10  says.
11    In fact, I was just looking at the EMC case
12  before the hearing, which is 89 F.3d 807, and I'm looking at
13  page 812.  And it says: "This court has held where all that
14  is present is negotiation, unaccompanied by threats of legal
15  action, the setting is not sufficiently adverse to create a
16  justiciable controversy."
17    THE COURT:  Let me ask you a question.  The test
18  isn't whether somebody says I'll sue you; right?  I mean
19  it's not whether a specific assertion of impending legal
20  action is in the air, it's whether there is a charge of
21  infringement.
22    MR. GINDLER:  No, it's not quite that simple,
23  Your Honor.
24    THE COURT:  Then let me read you something from
25  the case, the Capo case.

16

1    MR. GINDLER:  Sure.
2    THE COURT:  This is headnote 5, and it says:
3    "There must be well-founded reasons for
4  declining to entertain a declaratory judgment action.
5  Absent such reasons, precedent establishes that when there
6  has been a direct charge of infringement by the patentee,
7  and an actual controversy exists due to ongoing activity,"
8  et cetera et cetera, "the accused infringer has the right to
9  resolve the lawsuit."
10    Now, what do I make of that language when
11  there has been a direct charge of infringement and ongoing
12  activity, that's enough?
13    MR. GINDLER:  You have to take into account
14  the context in which those statements are made.  So, for
15  example, they can be made in the context of licensing
16  negotiations or outside the context of licensing
17  negotiations or licensing overtures.  And that is a
18  critical distinction.
19    So if, for example, I have DaveCo. and I have a
20  patent and I want to stop Amgen from practicing my patent, I
21  send them a letter which just says:  You are infringing my
22  patent.  Please stop doing so or I'm going to do something
23  about it.  That may create a reasonable apprehension of
24  suit.  I have offered them nothing.  I just said you are
25  infringing and please stop.

17

1    In the context of a licensing negotiation, if a
2  party was precluded from saying, look, I think you are using
3  my technology, I think you need to take a license, how would
4  there ever be a licensing negotiation?  Because often a
5  patent holder has a patent and approaches companies that
6  they think are practicing the patent.  And so the question
7  is, what do they get to say in that conversation?  Do they
8  get to say anything more than, hey, just take a look and get
9  back to us?  Well, the answer to that question, of course,
10  is no, I'll get to some Federal Circuit case law which says
11  that.
12    In the context of a letter that discusses
13  licensing, parties can say a lot including, look, I think
14  you are using our technology.  I think you are practicing
15  our patent.  I think you should take a license.
16    Now, the closest that we ever came to saying
17  that was in the second letter that we looked at and talked
18  about likely utilizing methodologies claimed in two patents
19  that are not at issue.
20    THE COURT:  Well, when you say that's the only
21  time you got close to saying that, I don't want to take you
22  out of your time line, but obviously I'm going to want to
23  hear you respond to the specific factual assertions that a
24  lawyer, representing ARIAD, said you're next.
25    MR. GINDLER:  I absolutely will.

**18**

1    THE COURT: Okay. Well, then we'll wait. There
2 is at least a factual dispute about whether or not you got
3 a little more specific than the letter you just described
4 coming in February of 2001.
5    MR. GINDLER: That's correct. That's why I want
6 to go through each of the facts in roughly chronological
7 order and to address each of them.
8    THE COURT: Okay. Well, then let's go back into
9 that and let's get into the facts.
10    MR. GINDLER: So this is the letter we sent
11 them about the '516 patent, as I've pointed out. It also
12 no contains threat and it was sent to many, many different
13 companies.
14    Let's move on.
15    Now, there was a follow-up phone call, according
16 to Mr. Ungemach, who talks about a phone conversation he had
17 with Mr. Casselman. Mr. Casselman doesn't remember whether
18 there was a conversation with Amgen, one way or the other,
19 although he does remember phone conversations.
20    So we took out again what likely are
21 characterized as the most provocative statements that are in
22 here. And as you can tell, Mr. Ungemach is trying to press
23 Mr. Casselman in this conversation to say whether or not he
24 believes that Amgen is infringing. He's pretty clear about
25 this. He says: I pressed Mr. Casselman for a definitive

**19**

1 statement as to whether ARIAD believed Amgen's product
2 infringed the '516 patent. And all that Mr. Casselman would
3 say -- who is not a scientist by the way, he was a head of
4 business development at the time -- was that he thought
5 Amgen would be interesting in taking a license for Kineret.
6 And Mr. Ungemach responded by simply saying that if we had
7 an interest, we'll get back to you.
8    So let's go forward.
9    Let's talk a little bit about the Federal
10 Circuit law.
11    THE COURT: Well, no, I hate to have you -- I
12 want you to wait on the Federal Circuit law.
13    MR. GINDLER: Okay.
14    THE COURT: And let's do finish the facts, okay?
15 Let's get all the factual assertions on the table and then
16 take me into your view of the law.
17    MR. GINDLER: Okay. The only reason I'm
18 stopping here is because these simply deal with statements
19 in licensing negotiations, and that's where we're at right
20 now. All I want to point out, in one moment, is that when
21 parties in licensing negotiations talk about a product
22 falling within a patent scope or operations under a patent,
23 or even if asked, yes, will you enforce the patent, this is
24 in the context of a licensing discussion. This doesn't do
25 it, because parties have to have some leeway in licensing

**20**

1 discussions.
2    I'm happy to go on now. Let's move on.
3    Now, let's talk about the alleged statements by
4 Dr. Carson. Now, the first one takes place, according to
5 Mr. Cantrell, around the middle of 2004. You may have seen
6 from Dr. Carson's declaration that she went back and looked
7 to see what depositions she was at and any time frame that
8 could be considered the middle of 2004 and the only one she
9 could find was I believe April 14th of 2004 -- not quite the
10 middle, but if there was any such statement, April 14th of
11 2004.
12    Now, what does Mr. Cantrell say? He says I also
13 asked Ms. Carson why ARIAD had not chosen to pursue other
14 products instead of Evista and Xigris. Ms. Carson responded
15 by stating something to the effect of "Enbrel is on the
16 list."
17    Now, Mr. Cantrell gives very little context to
18 this statement. So, for example, this is the only excerpt
19 we have of the conversation. And the response that
20 Ms. Carson is alleged to give is a little odd in that
21 it doesn't say -- the question posed by Mr. Cantrell was
22 not, hey, why didn't you sue Amgen, they're bigger? All of
23 a sudden, Ms. Carson just pops up and says, "Enbrel is on
24 the list." Well, words to that effect. That's all we know
25 about that. So what list?

**21**

1    THE COURT: Well, we know a little bit more.
2 The declaration that this gentleman, Mr. Cantrell, put in
3 says what he thought the context meant; right? He says:
4 Based on my understanding of Enbrel being a human
5 therapeutic manufactured by Amgen, I understood that that
6 statement by Ms. Carson, in response to my question, to be
7 a statement of intention to sue. That they're on the list
8 of people we're going after.
9    MR. GINDLER: Yes, I understand that. That is
10 just his interpretation of a statement which he attributes
11 to Ms. Carson. It's not the recitation of what one party
12 said to the other. So we don't know what else it is that
13 took place in that conversation that led him to reach that
14 conclusion or that that conclusion is reasonable in any
15 respect.
16    Now, Ms. Carson denies emphatically making any
17 such statement. She says, I just didn't do that. And she
18 said, Nor would I ever make such a statement.
19    THE COURT: Do you want to respond to the
20 rebuttal letter that your opponent sent in on that point?
21    MR. GINDLER: Certainly. I believe there is
22 an e-mail which Ms. Ben-Ami sent which said something like:
23 Thanks. All my kids will now get Ph.D's!
24    If it matters to the Court, we actually did
25 get -- we actually did ask Ms. Ben-Ami about that e-mail and

22

1  we do have a declaration from her. And she said at the
2  time that she heard about the lawsuit, she had not seen the
3  complaint and didn't know what it was about Enbrel, Kineret
4  or anything else; and I think at best, that e-mail can be
5  read as some levity. I don't think it was, gee, thanks,
6  we're going to be there because, in fact, they can't be
7  there and, in fact, they're not here.
8       That's why I'm here. They have a conflict. And
9  Ms. Ben-Ami and Dr. Carson have represented Wyeth since
10  2003. This is not a big secret to Amgen and that agreement
11  is not a big secret to Amgen so it would be very surprising
12  if Dr. Carson were to accuse or say Enbrel is next on the
13  list as if she is part of the group deciding who is going to
14  be suing when she knows that she would have to a conflict of
15  interest in doing that.
16       THE COURT: What do you think the motivation is
17  for a lawyer from a third-party, a nonparty to this suit, to
18  fabricate this? Maybe you are not saying she is fabricating
19  it. And if you're not, tell me what it is but I have a
20  very stark factual difference here. I have one party saying
21  this is what she said. I have the other party to the
22  conversation saying, never said it, would never have said
23  it. So ...
24       MR. GINDLER: There are a couple of
25  possibilities. One of which is that he is misremembering

23

1  what was said or the context of what was said. Because
2  what he is saying essentially is that, in words or effect,
3  that Dr. Carson said we're going to be suing Amgen next
4  on Enbrel. That is what he is saying took place. And
5  Dr. Carson says I would never have said anything like that
6  because how could I? I represent Wyeth. They're the
7  co-promoter of Enbrel. I could not ethically do so.
8       So what would help break the tie here, so to
9  speak? In other words, we have Dr. Carson on one side and
10  we have Mr. Cantrell on the other side. I would suggest
11  looking at the following three things:
12       Mr. Cantrell, by his own admission, was the
13  attorney in charge of the Lilly litigation, which his
14  company lost to ARIAD. And one can maybe understand why
15  he is helping Amgen pursue its lawsuit.
16       THE COURT: So it's sort of a, although you are
17  too polite to put it that way, a sort of a vengeance motive?
18       MR. GINDLER: I think he has an incentive to
19  help Amgen as much as he possibly can to the best of what
20  he thinks he may recollect. I don't know Mr. Cantrell. I
21  never met Mr. Cantrell. All I know is from his declaration.
22       What else might help break the tie? Well, it
23  would be I think very unusual for a lawyer to start making
24  statements publicly that they plan to sue on a product
25  which is co-promoted by their own client, because that is

24

1  basically the first way that you lose a client. So that
2  strikes me as very odd.
3       But there is a third thing one can look at, and
4  that is the last point on this slide. He relayed this
5  statement to Amgen on September 14, 2004. Now, I say about
6  three months later because I took the benefit of the doubt
7  and said, okay, middle of 2004, September 14th, that is
8  three months. But Ms. Carson actually has a better
9  recollection, having looked at her records, as to when any
10  such statement could have take, place, and it was more like
11  five months later, and the conversation was with Monique
12  Cordray, and that is an Amgen attorney.
13       And one would think that to really sort of sew
14  things up here, we would see a declaration from Ms. Cordray
15  and one that would say pretty much what Mr. Cantrell has
16  said, because he said he reported the statement. And you
17  would have thought not only would she have provided a
18  declaration but that she might have explained how she did
19  it.
20       Well, there is no declaration from anyone from
21  Amgen, no declaration from Ms. Cordray, the person with whom
22  the conversation took place. So why is that? And I have
23  given this a lot of thought. Why is that?
24       I can think of maybe three reasons why it's not
25  the case:

25

1       One is that she affirmatively doesn't recall him
2  making this statement. She just couldn't truthfully sign a
3  declaration which says, oh, yeah, I heard that.
4       She may affirmatively say, no, it never came up.
5       Or, another possibility is that she doesn't have
6  a recollection, one way or the other. It may be that. It
7  could have been said, it could not have been said. I just
8  don't remember. Or maybe she wants to explain why it is
9  after hearing this alleged threat that basically Amgen took
10  no action and did nothing for 17 months before it filed this
11  action.
12       But whichever reason is correct, Amgen had a way
13  of trying to corroborate, to support Mr. Cantrell and Amgen
14  chose not to do so. This is one of the two opportunities
15  that Amgen had to corroborate Mr. Cantrell and in both of
16  occasions, Amgen chose not to do that. That would be I
17  think the obvious thing to do.
18       THE COURT: Okay.
19       MR. GINDLER: So in making a decision about
20  who is saying what, I think we can conclude the following:
21  Ms. Carson has a strong ethical reason why she would not
22  make that statement. She has a strong business reason why
23  she wouldn't make that statement, like losing a client.
24       Mr. Cantrell may have his own motivation for
25  recalling the conversation the way he did. And, in fact,

26

1  there is no declaration from Ms. Cordray. That speaks
2  volumes in another way, which is that if it's the case, for
3  example, that Ms. Cordray doesn't remember it, one way or
4  the other, it means it had absolutely no impact on her. It
5  means whatever thing was passed along, she didn't view it as
6  oh, my God, I'm being threatened with a lawsuit, because we
7  don't see a declaration from her and Amgen did nothing for
8  17 months.
9       So that is the first statement. Here we talk
10  about, just summarizing the reasons, which is why the
11  declaration I think is irrelevant and why it does not create
12  a reasonable apprehension of suit.
13      Okay. Let's move on.
14      Now, during the Lilly trial, Mr. Cantrell
15  declares that Dr. Carson told Amgen's inside counsel and
16  Mark Pals, you guys at Amgen are next. And he supposedly
17  hears this as he is approaching a conversation that is
18  taking place between Dr. Carson, Amgen's in-house counsel,
19  who I believe is Mr. Gutman, and Amgen outside counsel, who
20  I believe to be Mr. Pals. He actually is not part of the
21  conversation. He hears this as Ms. Carson is walking away.
22  And then he gives, again, his spin on it, which is that he
23  took Ms. Carson to mean at some point soon after the jury
24  trial, the ARIAD v Lilly case concluded, meaning I think
25  in his view that we're going to seek a lawsuit from ARIAD

27

1  against Amgen.
2       So Mr. Cantrell does not know the context of
3  this conversation because he didn't hear it. And you know
4  what? Amgen has decided not to provide the context of his
5  conversation. So this is a conversation with Mr. Gutman
6  and also Amgen's outside counsel. Do we have declarations
7  from either of them? We do not have declarations from
8  either of them about what was said in the conversation.
9       And I first thought to myself, well, maybe
10  the reason for the declaration is that they didn't hear
11  the comment; that Ms. Carson was walking away and only
12  Mr. Cantrell heard the comment. But I think in the last
13  paragraph of Mr. Cantrell's declaration, he says that he
14  told Mr. Gutman that he would be willing to sign a
15  declaration as to what Ms. Carson said to Mr. Gutman.
16  And then I take away the fact that at least Mr. Gutman
17  allegedly heard this comment.
18      But, in fact, we hear nothing from Amgen's
19  counsel, in-house or outside counsel, about the context of
20  this alleged statement or anything else. Again, Amgen
21  choosing not to corroborate anything that is said at all.
22  Dr. Carson actually says she might have said something
23  along these lines because she also was handling a case in
24  a courtroom down the hallway involving Amgen and La Roche.
25  And there was an upcoming hearing that was going to take

28

1  place. And she said if I made that comment, it's real
2  possible I did, I was talking about that.
3       I believe Amgen points out that the hearing
4  was not I think put on the case docket until April 18th.
5       THE COURT: 19th, something like that.
6       MR. GINDLER: Something like that. And I guess
7  I have a couple of responses to that point:
8       The first is the fact that the hearing date
9  wasn't announced until the 18th or the 19th does not mean
10  that Ms. Carson is not aware that they have a pending motion
11  of some kind and that there is going to be a hearing and
12  it's going to be relatively soon.
13      The second issue is whether or not
14  Mr. Cantrell's recollection of dates is so precise. He says
15  this took place some time between April 11th and April 14th,
16  which he refers to as the first phase, or the beginning
17  phase of the Lilly trial. I'm not sure what that means
18  because the case went on for some time and, in fact, I
19  believe that ARIAD is not even closed its case-in-chief by
20  the 14th. And we know from his declaration, when he talked
21  about a conversation in the middle of 2004, that if you
22  assume the middle is something like June, maybe July, he is
23  off by a couple of months.
24      So we really don't know if it was April 11th,
25  12th, 13th, 14th, 15th or 16th. And we do have Ms. Carson's

29

1  explanation for the statement which is attributed to her,
2  and she does say it's entirely possible I made that
3  statement. And there was ample opportunity for Amgen to try
4  to undercut anything which Ms. Carson had to say. The best
5  way of doing that would have been to provide context and
6  corroboration: a declaration from Mr. Gutman, a declaration
7  from the Amgen outside counsel, three witnesses --
8       THE COURT: I've got you.
9       MR. GINDLER: -- context. Okay.
10      These are the statements by Dr. Carson. So
11  in my mind, I think we can call into question on the first
12  statement, Mr. Cantrell's recollection. I think on the
13  second statement, we have a completely plausible and
14  correct explanation for what Ms. Carson said. And, again,
15  she repeats that she wouldn't be accusing Enbrel or any products
16  of the sort because she can't do that, because that is
17  ethically improper.
18      So looking at all of the evidence that is before
19  Your Honor and all the evidence that is not before Your
20  Honor, if one has to make some credibility determinations
21  in this context, I understand that is part of what is going
22  on here, that I think that Ms. Carson in her explanations is
23  more credible than Mr. Cantrell in his statements for the
24  reasons I have explained.
25      Let's move on now.

30

1      Oh, I want to add one more thing, actually,
2  which I have never quite understood, but I'll take them at
3  face value. Amgen says in its brief that it was not aware
4  of this statement until after it filed suit. Now, that is
5  actually in their brief, in their opposition brief.
6      If that is the case, if we just assume that
7  statement is true, then we can stop thinking about that
8  statement. Because what happens after you file a lawsuit is
9  not relevant, whether there is jurisdiction on the day you
10  filed the lawsuit, so anything that they claim happened
11  afterwards would not be relevant.
12      At the same time, they say that this involved
13  the conversation with Ms. Carson and also Mr. Gutman and I
14  believe Mr. Pals, Amgen outside counsel. So I'm not sure
15  which version is correct, the version in Mr. Cantrell's
16  declaration or the version, the statement here in the brief
17  that they weren't aware of it until after the lawsuit was
18  filed.
19      If I just take that statement from their brief
20  at face value, then we don't need to talk about this
21  statement anymore.
22      Let's go on.
23      Now, I think the highlight of Amgen's opposition
24  is this board presentation that was made during the Lilly
25  trial. And I want to discuss Amgen's characterization as

31

1  opposed to what the presentation actually said. And I
2  believe the presentation, whether you look at it naked, all
3  by itself, or if you look at it clothed, in the testimony
4  that was given by Dr. Berger as Amgen saw for the first time
5  in the presentation, either way, the presentation, alone,
6  with Dr. Berger's testimony or alone and combined with the
7  three letters that were sent previously about two other
8  patents and one about the '516 patent, four, five and six
9  years earlier, doesn't catch a bear.
10      So Amgen's characterization, ARIAD published a
11  set of slides for the jury and public to see the name Amgen
12  and Amgen's Enbrel and Kineret on its list of litigation
13  targets. It's a very powerful statement.
14      The reality is a bit different, though. This
15  board presentation was published by Lilly during the
16  cross-examination of Mr. Berger who was the Chairman and
17  Chief Executive Officer of the company and who was present
18  during the presentation. ARIAD published nothing. This
19  was an internal document until it was produced in the
20  Lilly litigation. And when it was produced in the Lilly
21  litigation, it was produced under a protective order.
22      THE COURT: But it wasn't, and you are not
23  contesting that it was, displayed in open court and came to
24  Amgen's attention?
25      MR. PALS: Absolutely. In fact, they had a

32

1  lawyer in the courtroom who has seen certain of, certain
2  portions of it I think on a screen or perhaps through copies
3  they had of exhibits. But that is the first they heard of
4  it. And they also knew that it was not introduced by ARIAD.
5  They also knew that ARIAD did not publish any slides because
6  if they were in the courtroom, they knew it was introduced
7  by Lilly during cross-examination of Dr. Berger.
8      So there is a little bit of literary license
9  that went on with Amgen's brief. That's why we want to
10  take away the rhetoric from. Let's just talk about what
11  happened.
12      Let's move on.
13      Well, the title of the presentation is called
14  Licensing and Partnering, not Litigation Targets, not Who
15  Are We Going to Sue Next? And, of course, from the trial,
16  the question is asked:
17      "Question: This portion of the document from
18  the board of directors' meeting is about licensing and
19  partnering; correct?
20      "Answer: Yes."
21      This is a presentation by Fritz Casselman, not a
22  lawyer, not a litigator. He is in the guy in charge of
23  business development, as is set forth in his declaration.
24  His job is to engage in licensing and partnering.
25      Now let's move on.

33

1      Now, it begins talking about their licensing
2  efforts. Twenty-five letters sent in May. Virtually, no
3  response. Four letters sent in 2001. A few responses.
4  Again, remember, both of these letters are not about the
5  '516 patent which actually hadn't even issued at the time of
6  the board presentation. I believe it had been allowed, but
7  it had not issued.
8      Let's go on.
9      And so what was Dr. Berger's testimony about
10  these slides? Well, he was asked:
11      "Question: Before he sent the letters, didn't
12  you test their products?
13      Answer: No, we didn't.
14      "Question: Did you see if they reduce enough
15  NF-kB activity?
16      "Answer: No, we did not."
17      Let's go on.
18      Now there is a presentation about lead players.
19  Now Amgen refers to this as the list of litigation targets.
20  The document doesn't say litigation targets. It doesn't say
21  enforcement efforts. It doesn't say people who infringe.
22  It doesn't use any of those terms. It just talks about lead
23  players. And, again, Dr. Berger is asked about this:
24      "Question: What do you mean by lead players?"
25  And he says exactly what he means:

34

1       "Answer: The lead players were a mix really
2   to show, as I recall, the board that some of the major
3   companies in the industry were working in the area of NF-kB
4   in one way, shape or form."
5       That's a way of telling the board this is
6   something where we know these companies have done something
7   in the area and these are big leaders.
8       And let's move on.
9       He says more about it. He says:
10      "Question: How many of these companies do you
11  remember thinking had NF-kB products at the time?
12      And he basically says I don't know. He said we
13  never did that analysis. And he explained that to do the
14  analysis, you have to look at the individual products and
15  how the use of that product relates to the claims of a
16  patent. And he says we hadn't done it then and we haven't
17  done it since. We have focused only on Eli & Lilly.
18      So he both says what the purpose is of having
19  the lead player slide and goes on to explain that he hadn't
20  had a clue whether any of those lead players had a product
21  that infringed any of ARIAD's patents.
22      All right. There is also a discussion of
23  Marketed and Late-Stage Products.
24      And Amgen talks about this also in its brief.
25      Let's go back to the prior slide.

35

1       So the first listed product is one of the
2   accused products in the Lilly lawsuit, Xigris. And then we
3   talk about a product from Millennium, a product from
4   Novartis, and then a product that appears to be in clinical
5   trials at Amgen. And Dr. Berger is asked about this slide,
6   too. And he is asked:
7       "Question: As of this board meeting in December
8   2001, ARIAD was quite interested in the amount of sales of
9   these drugs that might or might not use NF-kB?
10      And his answer was:
11      "Answer: That was largely to provide some
12  context to our board of directors. Not every member of our
13  board has experience in pharmaceuticals. They vary from
14  professors and scientists to financial folks to those who
15  understand pharmaceutical marketing and sales."
16      And he gave the sales estimates to give a
17  benchmark for directors who don't have the breadth of
18  experience all the areas that they deal with to be able to
19  deal with these products.
20      Let's go back to the previous slide, which does
21  talk about $1 billion to $2.5 billion of sales. The second
22  product, maybe a billion in sales. The next product, maybe
23  $6 million in sales. He is trying to give samples of the
24  sides of the sales range.
25      Let's move forward.

36

1       Here we have again another slide on Marketed and
2   Late-Stage Products which Amgen points to again because
3   there is a reference to antiinflammatories and to one
4   antiinflammatory, which is Enbrel, and another, at the very
5   bottom, Kineret, which it just launched. And, in fact,
6   Dr. Berger is asked about this, too. And what does he say?
7       "They have been identified as products for which
8   there were publications on NF-kB, but we had not done an
9   analysis then and we still haven't done that analysis on
10  whether any or all of these products are actually covered by
11  our patents."
12      And he goes on. He is questioned again:
13      "Question: And so TNF antiinflammatories may
14  reduce NF-kB activity; is that your testimony?"
15      That is a question designed to ask him, are you
16  claiming these antiinflammatories are infringing the '516
17  patent? It is about modulating NF-kB activity.
18      "Answer: No, that is not what I said. I said
19  that TNF antiinflammatories, these examples, may or may not
20  be NF-kB inhibitors. We have not done the analysis or
21  evaluation of any of the products on the list because you
22  have to look at the claims, look at the specifications and
23  look at the actual drug."
24      THE COURT: Now, why don't you talk about
25  page 71 of Dr. Berger's testimony because that is what

37

1   your opponents point to as some language that ought to be
2   important to me; and I assume the reason that they footnote
3   it as they do in their briefing is because of the question
4   on, beginning on line 14:
5       "Question: And the patents rights discussed
6   here are the NF-kB patent rights?
7       "Answer: Yes, they are.
8       "Question: And the licensed product would be
9   what in your understanding?
10      "Answer: They would be products either
11  discovered using the technology or products whose use was
12  covered by the technology and patents.
13      "Question: So the products discovered using
14  NF-kB, correct, would be one part of the licensed products?
15      "Answer: Yes, sir.
16      Now, they will speak for themselves, but I
17  guess --
18      MR. GINDLER: Your Honor, I'm looking at this
19  testimony and I believe this is about the ARIAD agreement
20  with the universities.
21      THE COURT: Okay.
22      MR. GINDLER: Okay?
23      THE COURT: Why do you think they're reciting
24  that to me in their briefing? And let me see if I can find
25  the specific reference.

38

1     If you look on page five of their opposition
2   brief, which is docket item 21.
3       MR. GINDLER:  Page five.
4       THE COURT:  Right.  Footnote eight.  They make
5   the statement "In any event, Dr. Berger's testimony supports
6   that these slides at least attempted to identify those
7   classes of drugs generally believed by ARIAD to fall within
8   the '516 patent claims."
9       In other words, I read this to say, the
10  statement, some of the statements I just read there, they
11  actually cite lines eight to 16.  I began on line 14.
12      MR. GINDLER:  Yes, I see that, Your Honor.
13  There is no way that can be correct, and I can tell you why.
14      THE COURT:  That's what I would like you to do.
15      MR. GINDLER:  This is referring to, as I
16  mentioned before, an agreement between the universities
17  and ARIAD that license that entire sort of family of
18  intellectual property.  This agreement is from 1991, as I
19  recall.  There was no '516 patent in 1991.  That patent
20  wouldn't issue for 11 more years.  In fact, there was no
21  patent in 1991.  The first patents to issue were in 1998.
22  All that language talks about is what ARIAD had a license
23  to and what ARIAD would be obligated to pay royalties to
24  universities.
25      So, for example, ARIAD has to pay royalties on

39

1   all three patents.  So, for example, two of patents are
2   not about the use of compounds to modulate NF-kB activity
3   but are, again, I'm speaking very generally, that they're
4   primarily directed to screening, doing research and
5   development, to at least find a drug compound which
6   implicates the NF-kB pathway.
7       So quoting from an agreement which talks about
8   ARIAD's loyalty obligations to the universities and one that
9   was done in 1991, quite a long time before any patents had
10  issued and, more importantly, before the '516 patent had
11  issued, that's just not a plausible target.
12      THE COURT:  Okay.
13      MR. GINDLER:  Okay?  And I will come back very
14  briefly to that agreement because I think they use it for a
15  different purpose as well.  And I want to be sure I hit all
16  the bases on the factual assertions which they're making.
17      THE COURT:  Okay.
18      MR. GINDLER:  So let's move on.
19      THE COURT:  I have asked you a few questions,
20  and I apologize.  I cut into their time.
21      MR. GINDLER:  No, please.  Ask all you want.
22      THE COURT:  I'm going to need you to, even
23  though I sidetracked you, to hit you through the next few
24  things pretty quick.
25      MR. GINDLER:  Okay.

40

1       THE COURT:  Because I have to give these other
2   folks a chance to talk.
3       MR. GINDLER:  Absolutely.  And I'm going to
4   finish rather soon.  Let's move on.
5       The presentation talks about the state of
6   negotiations.  There may be an agreement with Mr. Lionel
7   Squibb.  It then talks about royalty calculations which are
8   an impossibility.  It talks about first quarter '02 goals:
9   Select litigation counsel, complete enforcement analysis and
10  action plan, patent issuance and associated press activity
11  because we know that the company was going to sue Lilly.  We
12  were relying on Lilly's own research, Lilly's presentation
13  to the scientific community, the Patent Office.  Lilly
14  scientists were putting it there and saying the drugs
15  inhibit NF-kB.
16      So what is the takeaway from all of this?  Does
17  this presentation talk about litigation targets?  Or does
18  it specifically identify Amgen and Immunex as litigation
19  targets?  And does it identify Enbrel and Kineret as
20  litigation targeting?  It doesn't.  It talks about, as the
21  title of the slide says, Licensing and Partnering.  That is
22  what it talks about.  And that is underscored by the fact
23  that during repeated cross-examination, Dr. Berger says they
24  haven't got any idea whether all of those other lead players
25  are practicing the patents or not practicing the patents.

41

1       Why is that offered?  To show if you have
2   litigation targets, you usually have a pretty good reason
3   for making them litigation targets, having done something to
4   identify that they're infringing their patent.  And, in
5   fact, Dr. Berger is repeatedly asked that, and he repeatedly
6   gives the exact same answer.  And, in fact, if Your Honor
7   read all of the testimony, and it appears that you have, you
8   will see that Judge Zobel at one point says:  "I don't think
9   you are getting at the answer that you want.  Why don't you
10  simply move on."  Because he wasn't.
11      So let's move on ourselves.  What other evidence
12  does Amgen offer?
13      There is the CNBC interview.  This also took
14  place after the lawsuit was filed and therefore not
15  relevant, but all this said is what the company has always
16  said:  Our patents are available for licensing.  It does
17  not say we're going to start suing everybody.  It says we
18  have patents and if pharmaceutical companies are going to
19  use our technology, then they should pay us royalties.
20      That is not a provocative statement.  That is
21  not a thread of litigation.  It's a statement that any
22  patent holder can reasonably make:  I have a patent.  If you
23  would like to use it, then pay me something.  And that is
24  all that Dr. Berger has said.  And, in fact, it's consistent
25  with what has been said by ARIAD since the year 2000, which

42

1  is our patents are available for licensing. We haven't
2  gotten a lot of great responses but we just keep saying it.
3  Dr. Berger says it again here.
4        Let's move on one more.
5        I think we also want to use the ARIAD license
6  agreement with the universities to show that we had to bring
7  a lawsuit. And, in fact, the agreement says that we have
8  the right, but not the obligation, to bring lawsuits. And,
9  in fact, it says that efforts to sublicense are sufficient
10  to satisfy our obligations under the agreement. ARIAD has
11  no obligation to sue anybody at all.
12        Your Honor, I think I have addressed pretty
13  much everything here. The totality of the circumstances are
14  that this patent was first communicated to Amgen in 2002.
15  ARIAD has never demanded that Amgen take a license. ARIAD
16  has never suggested, in a letter or in a conversation, that
17  litigation was an option. There were no communications
18  between ARIAD and Amgen about NF-kB since 2002-2003.
19        I should point out something in Ms. Allen's
20  declaration. There were discussions in 2005 between the
21  companies about a possible business relationship having to
22  do with a cancer drug, an overture initiated by Amgen. If
23  there was ever an opportunity for the parties to talk about
24  NF-kB, again, that would have been it. So they're going to
25  be doing a business deal. It would be a little odd, if

43

1  Amgen thought it was going to be sued the next day or soon
2  on the NF-kB patents or the '516 patent, specifically, that
3  someone wouldn't raise it. And, in fact, it was not raised
4  at all.
5        Your Honor, at the end of the day here, we do
6  not have a reasonable apprehension of suit. I'll take one
7  minute, and not more, to just add one other comment. I
8  don't have much to add about what is in the briefing about
9  whether or not the three institutions who are the owners of
10  the patents should have been included.
11        I think we both agree generally on what the
12  controlling standard is: whether or not all substantial
13  rights in the patent have been transferred from the
14  university to ARIAD. I agree with that because if ARIAD
15  essentially stands in the shoes of the universities, has all
16  of their rights, then they should not be joined.
17        The key factor -- there are a number of factors,
18  but the key factor is does ARIAD have the sole right to
19  indulge infringement? They took no action.
20        THE COURT: Who is the plaintiff in the Lilly
21  suit?
22        MR. GINDLER: Four entities: ARIAD and three
23  universities because ARIAD didn't include them. And the
24  same thing here.
25        Now, Amgen claims that even though the

44

1  universities can bring an action on the patents after six
2  months if they bring to our attention what they think is
3  infringing activity and that ARIAD does nothing, what Amgen
4  says is, yes, you have the absolute right to have a
5  sublicense so you can shut that all down. That is only half
6  true.
7        We can grant a sublicense, as we say in the
8  reply brief, only prospectively. So the universities can
9  sue for past infringement with which would basically be,
10  under the statute of limitations, six years of damage and
11  there is not a thing that ARIAD can do about that.
12        THE COURT: Does that speak, however, to ARIAD's
13  power to enforce?
14        MR. GINDLER: It speaks to the key question:
15  whether or not Ariad has all substantial rights in the
16  patent, the ability to enforce it without joining the
17  universities because that is what you have to have. So
18  the question about whether or not they're indispensable
19  parties, essentially it's flip side of the test, which is
20  can ARIAD bring the suit on its own?
21        THE COURT: And play that hypothetical out with
22  me. Let's say ARIAD was involved in negotiations for a
23  sublicense.
24        MR. GINDLER: Okay.
25        THE COURT: It didn't work out. If it had

45

1  worked out, ARIAD would have, on its own, be able to grant
2  the sublicense; right?
3        MR. GINDLER: Absolutely.
4        THE COURT: Then it would be extending all
5  rights under the patents to the sublicensee; right?
6        MR. GINDLER: In that context, that's correct.
7  But the agreement is real specific about what happens if the
8  universities have the right to bring a lawsuit. And in that
9  context, we don't have an absolute right to sublicense, only
10  as to the future.
11        THE COURT: All right. I believe I have your
12  argument.
13        MR. GINDLER: And that means we don't have the
14  exclusive right to indulge infringement. It's shared. And
15  that is one of the key issues.
16        THE COURT: Okay.
17        MR. GINDLER: Thank you, Your Honor.
18        THE COURT: Thank you. Appreciate it.
19  Mr. Pals.
20        MR. PALS: Good afternoon, Your Honor. We are,
21  to pick up on something Mr. Gindler said, quite literally
22  approaching the end of the day. How long does Your Honor
23  have for argument on this?
24        THE COURT: I'll give you roughly the same
25  amount of time I gave Mr. Gindler, roughly.

United States District Court - Honorable Kent A. Jordan

46

1    MR. PALS:  Okay.  Your Honor, we have a
2  selection of exhibits as well that we thought might be
3  easier for the Court to look through as we go through
4  this, if we can pass those out.
5    THE COURT:  Sure.
6    (Documents passed forward.)
7    MR. PALS:  Your Honor, I don't know what your
8  preference is but it might make sense to start with the
9  indispensable parties issue since we were just talking
10  about that.
11    And we may disagree on the standard a little
12  bit but in the indispensable parties analysis, I think the
13  key is to look at, and the case law says, look at what the
14  intent of the parties is on this.  Who is intended to have
15  these rights?  Who does have these rights?  And it's
16  completely appropriate in the analysis to look at the rights
17  that ARIAD has vs. the rights the institution has.  And in
18  many ways, that is perhaps the most cogent, relevant
19  indication.
20    As far as looking at the intent of the parties,
21  I think one of the key provisions to look at is Section 7.5
22  of the license agreement.  That is the provision that ARIAD
23  cited in their opening brief and said, look, ARIAD can
24  intervene in DJ actions, except they cited the superseding
25  provision.  And when we pointed out they were citing the

47

1  superseding provision, suddenly that gets demoted in its
2  level of importance.
3    If you look at that provision, what that
4  provision is saying is it's expressing the parties'
5  expectation, the parties' intent that if there is a DJ
6  action, ARIAD can defend it.  ARIAD alone can defend it.
7    THE COURT:  Is it in these documents?
8    MR. PALS:  Yes, sir.  It's in tab eight, Your
9  Honor, is it original license agreement.
10    THE COURT:  Could it be page 11?
11    MR. PALS:  At page 11, yes, sir.
12    So what 7.5 said originally was it gave a right
13  to MIT or Whitehead in this case, which means the original
14  agreement as originally written was MIT or Whitehead, gives
15  them the right to intervene and take over sole defense.  But
16  there was an amendment entered.  And for the record, that
17  is in Exhibit H to Ms. Sharp's declaration.  It was entered
18  into January 2, 2002.  That's behind the agreement in the
19  materials you have, Your Honor.
20    What that amendment provided was a limitation,
21  and it specifically contemplated that ARIAD would be
22  defending DJ actions, and that only if ARIAD, whose licensee
23  in 7.5 -- let me find it in the binder.
24    THE COURT:  Yes.
25    MR. PALS:  It's in tab 10.  And I think it's the

48

1  last page to that second amendment to the license agreement.
2  This is 7.5 that shows as an amendment.
3    What it says is that it's ARIAD that it has the
4  right to defend a DJ action, and only if ARIAD fails to take
5  reasonable steps to defend such action in timely manner can
6  the institutions have the right to intervene and take over.
7    So the point here is the parties contemplated
8  ARIAD having the right to defend solely declaratory judgment
9  actions just like this one brought by parties challenging
10  the noninfringement or invalidity of the '516 patent or
11  other patents under that license agreement.  In addition,
12  the other provisions of the agreement indicate that the
13  parties to that agreement intended the transfer of rights
14  to ARIAD.
15    We have, in that agreement, an exclusive grant
16  of rights to ARIAD.  We have, in that agreement, ARIAD, as
17  Your Honor pointed out, pursuant to Section 2.8 of the
18  agreement -- again, 2.8 was amended at one point, but 2.8
19  grants ARIAD the right to grant sublicenses under those
20  patents.  Only in the event of litigation do we see any
21  ability of the institutions to do anything, and even then
22  it's ARIAD that has complete control.
23    So ARIAD has complete control prelitigation as
24  to whether to sublicense somebody and takes care of all use,
25  past, present and future use, under these patents.  ARIAD

49

1  has the choice as to whether it's going to file suit against
2  somebody.  ARIAD has the choice as to whether it's going to
3  settle that litigation.  The institutions have the right to
4  consent but the case law has indicated that that is not a
5  limitation.  That point is neutral in this analysis when the
6  limitation is consent not to be unreasonably withheld.
7    So it's ARIAD's choice to sublicense, ARIAD's
8  choice to litigate.  Only if ARIAD elects not to litigate do
9  the institutions have this residual right; and even then,
10  ARIAD can grant a sublicense to all future use with no input
11  whatsoever from the institutions.  So if you look at the
12  rights that are transferred to ARIAD, it's ARIAD that has
13  the rights.
14    THE COURT:  All right.  Let's talk about facts
15  now.
16    MR. PALS:  Okay.  Your Honor, what matters here
17  in this analysis is the totality of the circumstances.  This
18  isn't a pick and choose.  This isn't a take one issue or
19  one exchange at a time and deal with whether that creates a
20  reasonable apprehension or doesn't create an unreasonable
21  apprehension.
22    THE COURT:  Well, let me interrupt and say I'm
23  interesting you in responding, and I'll have you do this at
24  the top, and then you can walk me through the totality as
25  you would like.  But I'd like you to answer, if you would, a

50

1   couple of assertions.
2          First, the assertion made by Mr. Gindler that
3   the so-called "you're next" comment was one that you
4   expressly disclaimed in your briefing as one you didn't
5   know about, you being Amgen, before suit was filed.  And he
6   notes that that is a puzzling assertion since supposedly the
7   conversation involved Mr. Gutman and perhaps even you and
8   supposedly Mr. Cantrell spoke to Mr. Gutman right there on
9   the spot, but nevertheless there is this comment in the
10  brief.  Tell me what is going on.
11         MR. PALS:  Okay.  What is going on, Your Honor,
12  is, I'll speak for myself.  I didn't hear the comment from
13  Ms. Carson.  She made that comment.  It was, in fact, during
14  the week of April 11th through April 14th.
15         THE COURT:  I'm not trying to turn you into a
16  witness.  I'm just trying to figure it out.  But go ahead.
17         MR. PALS:  Okay.  It was in that week because I
18  was in trial that week and I wasn't in trial the next week.
19  So it was that week, and Mr. Cantrell's recollection is
20  dead solid on that, as I think it is on the other facts.
21  I didn't hear that and we don't rely on that as prefiling
22  bases for apprehension of suit.
23         What that comment goes to is the reasonableness
24  of that apprehension because, again, here is an exchange
25  where Ms. Carson is making a statement, like she said

51

1   before, and that is where that goes, Your Honor.  It's not
2   something we rely on for the prefiling apprehension of suit.
3          THE COURT:  So you're acknowledging that it
4   couldn't have caused any apprehension of suit at all because
5   you're saying to me it's not something Amgen is relying on
6   as a prefiling basis for apprehension, but that it's
7   something that I should consider in thinking about whether,
8   whatever apprehension existed, was reasonable.  Have I
9   understood you right?
10         MR. PALS:  If the comment had been perceived,
11  if we heard the comment, then certainly it would have been
12  a basis for reasonable apprehension of suit.  It would
13  have been like the previous comment Ms. Carson made, but
14  not having heard the comment, can't rely on it to form a
15  reasonable apprehension of suit.
16         THE COURT:  Okay.  Got you.
17         MR. PALS:  But this -- I'm sorry.  Is that it on
18  that point, Your Honor?
19         THE COURT:  That is that on that point.  There
20  are a couple other things I want you to respond to.
21         The "where is Ms. Cordray" question, where you
22  have a direct dispute between Mr. Cantrell and Ms. Carson.
23  And I should note here that I mean no disrespect to Ms.
24  Carson by not referring to as Dr. Carson but, hey, when it
25  comes to lawyers, everybody is a Mr. or Ms., and I'm not

52

1   given honorifics to them.  I'm not comfortable with that.
2          So I have directly opposing testimony in front
3   of me in the form of declarations and you have heard what
4   Mr. Gindler has said about, hey, if they had had any
5   corroboration to give, they would have given it.  They
6   didn't.  That ought to tell you something.  I want you to
7   respond to that argument.
8          MR. PALS:  A number of comments, Your Honor.
9   First, I don't believe that the declarations are directly
10  opposing, but let me go come back to that and respond
11  directly to your question.
12         The reason there is no declaration for
13  Ms. Cordray, there are a couple of reasons:
14         One, Ms. Carson's declaration only came in on
15  reply.
16         Two, we were concerned about an argument that
17  ARIAD may make as to waiver of a work product or other
18  privilege in submitting declarations from our lawyers as
19  to what our lawyers thought.
20         So if ARIAD were willing to stipulate that there
21  would be no waiver or argument of a waiver of any privilege
22  or work product, we could certainly be happy to submit a
23  declaration.
24         But in the end, the question is not whether
25  Ms. Cordray had a subjective apprehension of suit.  It's

53

1   whether the comment created a reasonable, objectively
2   reasonable apprehension of suit.  And I think the facts
3   speak that it did and Mr. Cantrell, a third-party, in his
4   view expresses his view that it did.
5          Can I turn to the declarations now, Your Honor?
6          THE COURT:  Yes.  Why don't you tell me why you
7   say they're not really directly opposed?
8          MR. PALS:  What Ms. Carson says in her
9   declaration is not that she didn't say -- as I read it
10  anyway, is not that she didn't say what Mr. Cantrell says
11  she said, but that she didn't suggest that ARIAD would sue
12  Amgen.  That's what they're saying now.  They're arguing now
13  that nobody has suggested that ARIAD would sue Amgen.
14         We think that is wrong.  We see it differently,
15  but this is not inconsistent at all with what they're saying
16  now.  And she didn't say I didn't say Enbrel is on the list;
17  but if that is where she is going with that comment, then I
18  think what we have is we have the context in Mr. Cantrell's
19  declaration that he provides who is in litigation with them.
20  We have the fact that he remembers the comment, he remembers
21  the context the comment, that he contacted Ms. Cordray, by
22  his declaration and his statements, and we have the list at
23  trial in fact showing Amgen and showing Enbrel as being on
24  the list when that list is shown at trial.
25         THE COURT:  All right.  Now, I'll let you go in

54

1 just a minute into whatever order you want to present things
2 in, but the last thing I wanted to ask about regarding this
3 exchange was why the year and-a-half lapse that Mr. Gindler
4 points to and emphasize is it really couldn't have created a
5 reasonable apprehension of suit because the folks at Amgen
6 did nothing for 17 months, I think is how he put it.
7       MR. PALS:  Absolutely no obligation that Amgen
8 sue as soon as it obtains a reasonable apprehension of suit.
9       THE COURT:  Does timing of the actions of a
10 party have any affect on how the Court should interpret
11 whether there was a reasonable apprehension of suit?
12       MR. PALS:  I don't think in this circumstance,
13 Your Honor, it has any bearing at all on that.
14       THE COURT:  Why not?
15       MR. GINDLER:  Because we have Ms. Carson's
16 statement in the '04 time frame.  We have, at that point in
17 time, ARIAD in engaged in litigation with Lilly.  It's very
18 reasonable for parties to pick one party at a time and
19 proceed one party at a time.  We get to trial, and there is
20 the list again, the list showing Amgen on it right there
21 with Lilly, and Enbrel there, right there with Xigris,
22 (Zi-gris phonetic) which is how the drug is pronounced,
23 which is one of the products at issue in the Lilly
24 litigation.
25       So there is no obligation that Amgen had to file

55

1 suit in 2004.  That apprehension was full and created.  And
2 was there a risk that ARIAD would to file suit sooner?
3 There was a risk, but Amgen was not obligated to run into
4 court in 2004 and file suit.
5       THE COURT:  Okay.  Now, you go ahead and take
6 the ball and move about.
7       MR. PALS:  What the record shows is a series of
8 contacts.  ARIAD initiated contacts, a series of threats
9 and a totality of circumstances that needs to be considered
10 together.  And on each point, the courts have come out and
11 indicated that these are relevant factors that go into the
12 analysis of the totality of the circumstances.
13       This isn't a case where there was an exchange of
14 letters and that is it and nothing else happened.  This is a
15 case where, yes, there was an exchange of letters but there
16 was threats as well.
17       THE COURT:  Okay.  So get to the threats.  Be
18 explicit with me.  What is it that was threatening?
19       MR. PALS:  Okay.  We have a series of
20 correspondence.  We have letters in there.  It all deals,
21 Your Honor -- I'm sorry.
22       THE COURT:  That's fine.  You can --
23       MR. PALS:  The explicit threats --
24       THE COURT:  Hold on.
25       MR. PALS:  Yes.  I'm sorry.

56

1       THE COURT:  I may not be communicating
2 effectively.  I don't want you to characterize things
3 by saying there is a series of letters and these are
4 threatening.  What I'm asking you to do is to take me to
5 language and tell me what is threatening.  So, with respect,
6 I don't want the editorializing so much as I want you to
7 point me at the record and tell me this is what I want you
8 to look at, judge, because I think you will conclude this is
9 threatening rather than you telling me there is a series of
10 correspondence that is threatening.
11       MR. PALS:  Okay, Your Honor.  There are letters
12 in the record.  What I attached, what I placed on the Elmo
13 is a page from an attachment of the 2000 -- the first
14 letter, I believe, actually.  Let me check the date --
15 May 2000 letter.  And attached to that May 2000 letter is a
16 licensing proposal.  And in that licensing proposal, there
17 are licensing rates that are attached.  There is one percent
18 rate for licensed products discovered using a license method
19 and a five percent rate in the event of essentially a
20 covered product.
21       What is happening, therefore, is the ground is
22 being set here that this isn't a trivial monetary issue.
23 This is a significant monetary issue.  The products that you
24 saw in that slide presentation have substantial sales, and
25 what this is showing is that the economics of this make

57

1 litigation productive, likely and a reasonable course for
2 ARIAD to follow.
3       Each of these contacts is ARIAD initiated.  This
4 isn't Amgen initiating contact with ARIAD.  ARIAD is showing
5 its willingness to pursue and its willingness to enforce
6 its patent rights through the May 2000 contact, the 2001
7 contact, and then there is the 2002 letter that is sent out
8 on the day of the issuance of the '516 patent.
9       Now, that is described by Mr. Berger in his
10 testimony as a notice.  It's a notice letter.  That's not --
11 again, we do see that as a racheting up, Your Honor.  We do
12 see a racheting up through these letters in 2000-2001 and
13 then this letter that comes out on the day that the '516
14 patent issues.
15       THE COURT:  What is it about the '516 patent
16 letter that is threatening?  Tell me.
17       MR. PALS:  It's a letter that is sent to Amgen
18 on the day the patent issues when they sued, on that same
19 day, Lilly.  So they sent a letter out on the day they sue a
20 company under this patent.  This isn't a run-of-the-mill,
21 gee, you might want to know about this patent.  This is a
22 you might want to know about this patent that the industry
23 knows they just filed a lawsuit under.
24       THE COURT:  So, it's not the language of the
25 letter, if I hear you right, it's the context of sending the

58

1  letter on the day Lilly is sued.
2       MR. PALS: It's the context of everything, Your
3  Honor, and the lawsuit against Lilly. Their willingness to
4  litigate, which we then saw as we took the entire case
5  through a jury trial and through a bench trial, a clear
6  willingness to litigate.
7       And then what we see after that, as the Lilly
8  case is going forward, Mr. Casselman calls Mr. Ungemach.
9  Mr. Casselman was Senior Vice President at ARIAD. He is
10 an official there. And Mr. Casselman calls Mr. Ungemach.
11 And Mr. Casselman doesn't dispute that he made the call, he
12 just doesn't remember it. But what happens is that there
13 is this exchange where Mr. Casselman identifies the Kineret
14 products, he identifies the '516 patent which he notes is
15 in the litigation with Lilly.
16      Now, Mr. Casselman, in explaining why he does
17 that, says gee, sometimes I do some research and analysis --
18 which they said that they didn't do -- but I do research and
19 analysis to identify a product and I identify that to try
20 to stimulate discussion. Why does that work? It works
21 because it's threatening. It stimulates discussion because
22 of the combination of the product and the patent and the
23 existence of the Lilly litigation when raised by an ARIAD
24 person is a threatening approach to a company.
25      And they don't dispute, they can't dispute that

59

1  that took place. And, objectively, reasonably, that creates
2  an apprehension of suit.
3       Then we turn, Your Honor, to the statements by
4  Ms. Carson to Mr. Cantrell. And this is in the context of
5  the Lilly case. Mr. Cantrell provides the context for the
6  conversation and the statement, explains what was said. And
7  we've been through, Your Honor, why it's Mr. Cantrell's
8  recollection, if that credibility line needs to be drawn
9  here, it's his recollection is that more credible. He had
10 the more memorable recollection.
11      The fact that perhaps this was a more unguarded
12 moment from Ms. Carson, and she said something that
13 maybe she thinks she shouldn't have said really doesn't
14 undermine Mr. Cantrell's credibility. Ms. Carson comes
15 back now in the context of litigation and in the context of
16 the declaration and very carefully says that she wouldn't be
17 threatening suit because of this potential conflict.
18      But your Honor raised the e-mail from
19 Ms. Ben-Ami, and Mr. Gindler said it's a joke or there was
20 some levity involved. Perhaps that is true. You know,
21 it's another unguarded moment perhaps by Ms. Ben-Ami, but
22 the point is as of the day after the filing of the suit,
23 there hadn't been a detailed analysis and a decision that
24 they couldn't be handling this case because of a potential
25 conflict. And that's the point. Nor had there been, this

60

1  evidence indicates, a previous determination that Kaye
2  Scholer couldn't be handling any litigation involving this
3  product because of a conflict, which indicates the higher
4  likelihood that Ms. Carson did in fact make the statement
5  that Mr. Cantrell attributes to her.
6       THE COURT: All right.
7       MR. PALS: Then, Your Honor, we get to the
8  trial. And I think it's important in context to understand
9  that ARIAD filed this case action I say against Lilly on the
10 day the patent issued with no advance warning. They didn't
11 send a letter to Lilly saying, gee, we're going to sue you.
12 That is not what companies do. They don't make these kinds
13 of statements that Mr. Gindler wants to seem to find in the
14 record to justify a reasonable apprehension. That is not
15 going to happen.
16      And actually in his trial testimony, Mr. Berger
17 states why it didn't happen. And in Mr. Berger's testimony,
18 which is behind tab five of the binder I passed up, pages
19 102 to 103, Mr. Berger was asked a question:
20      "Question: Why did ARIAD not send a letter
21 about the '516 patent to Lilly after it was allowed?"
22      And Mr. Berger answers:
23      "Answer: We didn't send a litter to Lilly at
24 that time because we made a decision, once the claims were
25 issued, at that time we had already made the decision to

61

1  file a lawsuit against Lilly. We were worried what Lilly
2  might do. Lilly being a very large company, we being a very
3  small company, if they had an opportunity to look at the
4  patent or to look at the claims before the patent had
5  issued. We just had no idea what Lilly might do."
6       This is what Mr. Berger is saying. That is why
7  we see the kinds of careful statements that the courts have
8  indicated don't excuse or don't eliminate a reasonable
9  apprehension of suit. It's because ARIAD was aware, ARIAD
10 was concerned and was being careful as they made these
11 statements that the statements still create a reasonable
12 apprehension of suit.
13      Now, at the Lilly trial, Ms. Carson's statement
14 is made about Amgen being next. What that is really an
15 indication of is confirmation that she makes the kind of
16 statements Mr. Cantrell attributed to her and supports the
17 credibility that that statement was made as well.
18      Now, at trial, the slides are shown. And
19 you have seen some of these slides through Mr. Gindler's
20 presentation, Your Honor. But just to orient you, the
21 lead player slide goes up, and you see on there, Tularik,
22 Amgen and Immunex. Tularik was acquired by Amgen since this
23 slide. Immunex is affiliated with Amgen and is one of the
24 plaintiffs here. And, right there, you also see Lilly,
25 obviously the defendant in that case.

62

1 And then in the next slide, we turn to what
2 was being presented by ARIAD as Marketed and Late-Stage
3 Products. One of those Marketed and Late-Stage Products is
4 for the treatment of sepsis and it's the Xigris product and
5 Lilly's product and it is Lilly's product in the Lilly
6 litigation.
7 The next slide shows some additional Marketed
8 and Late-Stage Products and now we see Enbrel, at that
9 point, Immunex's product, and Kineret, Amgen's product. So
10 we have some 11 products I believe that are among the
11 Marketed and Late-Stage Products. Two of them are Amgen's
12 products and Amgen is front and center on these slides with
13 Lilly and with Lilly's product Xigris which is one of the
14 two Lilly products at issue in the Lilly litigation.
15 The next slide then starts talking about
16 litigation interplay here and royalty rates, whether there
17 is a floor or ceiling of royalty rates that will have an
18 effect on litigation recovery.
19 And then the last slide we have is a slide that
20 refers to selecting litigation counsel and completing the
21 enforcement analysis and action plan.
22 So these slides, Your Honor, further the
23 apprehension of Amgen that Amgen is in fact on the list that
24 Ms. Carson referred to. Amgen is in fact a target of
25 ARIAD's end litigation and Amgen is going to be sued by

63

1 ARIAD.
2 Now, there was some talk about Ms. Berger's
3 post-verdict comments.
4 THE COURT: Before you go to that.
5 MR. PALS: Yes.
6 THE COURT: I want your take on the testimony of
7 Mr. Berger with respect to these slides. You pointed to
8 some, Mr. Gindler has pointed to it here at some length,
9 other parts of the record. First, tell me why you think
10 that language from page 71 of his trial testimony is
11 important and then comment on those portions of the record
12 that Mr. Gindler has directed he to.
13 MR. PALS: Page 71 is relevant, Your Honor,
14 because it goes to ARIAD's obligation to pursue commercial
15 activity, commercialization activities. And I don't have
16 the precise words in front of me, Your Honor.
17 THE COURT: The question was asked:
18 "Question: And it says, the licensee ARIAD
19 shall use its best efforts to bring one or more licensed
20 products or licensed processes to market through thorough
21 big risks and diligent program for exploitation of patent
22 rights. Do you see that?
23 "Answer: Yes, I do.
24 "Question: And the patent rights that are being
25 discussed here, are they NF-kB patent rights?

64

1 Answer: Yes, they are."
2 And then it goes on to talk about further
3 pinning down the products discovered using NF-kB are within
4 the licensed products.
5 So with that in mind, go ahead.
6 MR. PALS: Thank you. Under the license
7 agreement, ARIAD is licensed to co-license. It's the
8 capital P patent rights which are all the patents rights
9 that are subject to that agreement, including the '516
10 patent. That provision was amended in January 2002, along
11 with the other amending with respect to the DJ, Section 7.5.
12 I believe it's the same amendment but it was amended to
13 provide that ARIAD could demonstrate those commercially
14 reasonable efforts by its own product development activity
15 or by sublicensing patent rights. So ARIAD is actually
16 contractually obligated to pursue companies and enforce
17 rights under the '516 patent, be it through sublicensing or,
18 if it can't do that, through litigation. So that is part of
19 the context of that testimony, Your Honor, and relevance to
20 this matter.
21 As far as Dr. Berger's or Mr. Berger's other
22 testimony, the case law is clear, there needn't be a current
23 plan to file suit and it needn't be the case where a company
24 has conducted the analysis. Amgen is not obligated to sit
25 and wait until ARIAD is ready to run up the courthouse steps

65

1 with a complaint or until it thinks ARIAD has completed some
2 analysis when it created the reasonable apprehension and
3 made the threats. What is more, Mr. Casselman already
4 indicated in his declaration that when he made these calls,
5 he did analysis and looked at articles so that he could
6 target and throw out particular product names.
7 The other thing that is relevant to Mr. Berger's
8 testimony is the testimony about the basis for suing Lilly.
9 This wasn't a big test or a big analytical exercise. They
10 referred to the types of articles and the types of refer-
11 ences that Mr. Casselman had talked about in advance of
12 making his calls.
13 So the law doesn't require Amgen to wait for
14 that analysis to find out whether these threats were
15 ethically or reasonably made. They were made.
16 THE COURT: All right.
17 MR. PALS: Mr. Berger's interview post-trial,
18 again confirming the reasonableness of Amgen's apprehension.
19 The transcript of that interview is at Exhibit L of
20 Ms. Sharp's declaration. It's in your binder, Your Honor.
21 Maybe it's not in the binder, Your Honor.
22 THE COURT: Well, I've read it.
23 MR. PALS: I apologize.
24 THE COURT: That's fine.
25 MR. PALS: Anyway, so Mr. Berger is asked the

66

1 question and Mr. Gindler talked about the answer. We're
2 talking about a case where the verdict has just come in.
3 Mr. Berger has beaten the enforcement drum here and he says
4 pharmaceutical and biotech companies need to pay rent for
5 the use of the intellectual property. And Mr. Gindler says,
6 oh, that is just licensing talk.
7       The interviewer has a very interesting
8 reasonably objective reaction to that and the interviewer
9 says: Need to pay rent, and that's what a jury said today.
10       So that's, again, objectively reasonable
11 perception of the types of statements that are being made.
12       THE COURT: Okay.
13       MR. PALS: Do you have any further questions,
14 Your Honor, on the declaratory judgment, reasonable
15 apprehension issues?
16       THE COURT: No.
17       MR. PALS: We talked about necessary parties
18 under the Rule 19 analysis. As far as indispensability,
19 that really comes down to Your Honor, I believe, and I
20 think ARIAD has indicated as much in their reply brief, as
21 to whether there would be a prejudice to the institutions
22 of this case going forward without them. And the record is
23 clear that it wouldn't. They have essentially waived any
24 claim of prejudice. They granted ARIAD the right to
25 bring cases. They granted ARIAD the right to defend DJ

67

1 jurisdictions.
2       ARIAD was represented by the same counsel as the
3 institutions in the Boston case. Your Honor asked how many
4 parties there were. There was four parties. There is one
5 set of lawyers representing all four parties in that case.
6 So in practice, they entrusted the defense of the '516
7 patent to ARIAD and ARIAD's counsel.
8       THE COURT: All right. Mr. Gindler, I'll give
9 you about five minutes or so to respond.
10       MR. GINDLER: I think that is all I will need.
11 I'm going to respond to the points in the order in which I
12 wrote them down.
13       The first is the indispensable party point.
14 And Mr. Pals has talked about what the intent of the
15 parties was. That controls whether there is prejudice.
16 That controls -- actually, what controls is whether or not
17 ARIAD has all substantial rights, whether there is really no
18 meaningful difference between the rights ARIAD has and the
19 right that the patent holder has. That is what the law
20 says.
21       Many companies enter into exclusive agreements
22 thinking they have the right to bring a lawsuit on their own
23 and they learn very sadly, as the case law reports, that
24 they in fact don't have that right. Just because an agree-
25 ment says you have an exclusive license does not mean the

68

1 transfer of all substantial rights. There is a lot of case
2 law on the subject. It's discussed in the parties brief. I
3 don't want to belabor the point but that is the test.
4       And the most important part is the ability to
5 indulge infringement. If you can't indulge infringement,
6 you don't have all substantial rights. And ARIAD does not
7 have the right, exclusively, to indulge infringement. It's
8 shared.
9       THE COURT: What am I to make of the language
10 Mr. Pals has directed me expressly to in the amended
11 agreement?
12       MR. GINDLER: That agreement talks about, there
13 is a change in a provision. And in the first agreement, it
14 said that if a DJ action is filed against ARIAD, that the
15 universities can just step in and take it over.
16       And in the revised agreement, it says the
17 universities can step in and take it over only if ARIAD has
18 not taken reasonable steps to defend in a timely manner. I
19 believe that is the exact language. Okay?
20       So that's just a contractual arrangement as to
21 sort of do the universities have the right to step in and
22 take over the litigation? But that doesn't answer the
23 question, which is the key issue. And it's the key issue
24 as framed by Amgen. There really isn't a disagreement.
25       (Note handed to the Court.)

69

1       THE COURT: I have to interrupt you. I
2 apologize. Counsel, my apologies. I'm going to need a few
3 minutes.
4       (Brief recess taken.)
5       THE COURT: I apologize. Thanks for your
6 patience there. Mr. Gindler, we were so close to being
7 done.
8       MR. GINDLER: Your Honor, we are still so close
9 to being done. I simply had said to Your Honor that the
10 right of the universities to step in and take over a DJ
11 action claimed from having, in the first agreement, an
12 absolute right to a right only if ARIAD failed to take
13 reasonable steps to timely defend, but that is just a
14 contractual right between the two. It doesn't talk about
15 the key issue.
16       THE COURT: Well, isn't it always about
17 contractual rights? That is an interesting thing to me.
18 You keep trying to draw my attention to that, but this is
19 about what rights are transferred by contract. It's all
20 about contractual rights.
21       MR. GINDLER: Right. That is correct. So the
22 question is --
23       THE COURT: What is the effect of these
24 contractual provisions; right?
25       MR. GINDLER: That's correct. So what we know

**70**

1  is that only if ARIAD had all substantial rights is it
2  the dates the universities are not indispensable parties.
3  That's how Amgen phrased the issue, and I think that is
4  actually a rather fair statement.  And there are a number of
5  statements which courts look at, the most important of which
6  is the ability to indulge infringement.  That provision is
7  relevant, the one Mr. Pals pointed out, because even in the
8  amended agreement, there can be an argument between ARIAD
9  and the universities over just how reasonable or how
10  effective the defense being provided by ARIAD in fact is.
11  And so again, we don't have a blanket transfer of rights.
12  It's your point.  ARIAD doesn't have the rights that a
13  patent holder would have, which is essentially what the
14  test is.  Are the rights the same?
15        Now, I wanted to address the question which
16  you asked, Mr. Pals, which has to do with the "you're next"
17  statement and Mr. Pals admitted he didn't hear the comment,
18  and I'm just going to accept as true the statement that
19  Amgen did not know about this comment until after the
20  lawsuit was filed, as Mr. Pals said that here and as he said
21  in their brief.  So I'm just going to take that as truth.
22        But there are still two things that are a
23  little bit odd about that; one of which is that Mr. Cantrell
24  reported it to somebody at Amgen even after the lawsuit.  I
25  don't know who it was reported to, but that person didn't

**71**

1  provide a declaration.
2        And, secondly, it seems to conflict a little bit
3  with what Mr. Cantrell has to say and makes me wonder again
4  whether his recollection is always spot on.  He says, in the
5  last paragraph of his declaration: "At a later recess at
6  the ARIAD vs. Lilly trial -- I'm looking at paragraph 10 --
7  I communicated to Mr. Gutman that I would be willing to sign
8  a declaration attesting, among other things, to what I had
9  heard ARIAD's counsel, Ms. Carson, say to him in the
10  hallway."  So this suggests that Mr. Cantrell is saying
11  that the statement was made to Mr. Gutman, which would be
12  beforehand.  But I'm going to accept Amgen's statement that
13  they learned about it afterwards.
14        So Amgen can't be right and Mr. Cantrell can't
15  be right.  One of them has to be wrong, and I'm guessing
16  that it's Mr. Cantrell.
17        You also asked why was there no Cordray
18  declaration.  And what we heard is they had a work product
19  concern about disclosing her mental intent.  I could care
20  less about Ms. Cordray's mental intent.  What I care about
21  is what would she say was told to her by Mr. Cantrell?
22  Because that's the key point.  All they would be doing is
23  just simply reciting a conversation, and they had ample
24  opportunity to submit a declaration from Ms. Cordray on that
25  point and they chose not to do so.  There is no work product

**72**

1  waiver from Ms. Cordray talking about what Mr. Cantrell
2  supposedly told her on September 14th of 2004.
3        There is also suggestion by Mr. Pals that
4  there is in fact really no conflict between Ms. Carson and
5  Mr. Cantrell over the statement made in 2004.
6        THE COURT:  That's okay.  I don't have to
7  address that because I've read it.  I can decide for myself
8  what it says.
9        MR. GINDLER:  Fine.  Then you also asked why the
10  17 month delay?  If they got this threat in 2004, why didn't
11  you do something?  And Mr. Pals responded we didn't have to.
12  We can wait.  It's not what the cases say.  I don't want to
13  repeat what is in our brief but it's in our reply brief.
14  Waiting shows that there is no reasonable apprehension.  The
15  case law is set forth in our reply brief.  I need not
16  discuss it again here.
17        Also, we asked him specifically what is the
18  threat in the letters that were sent?  What is the threat?
19        And Mr. Pals was not able to find any
20  threatening language.  We were very clear with him in
21  telling don't characterize it, point to the language.  And
22  what he pointed to, when pressed, was that the five percent
23  rate for commercial products is high.  And I believe that
24  the brief describes it as onerous.
25        There is no evidence in the record whatsoever

**73**

1  that five percent is high or is onerous.  And as the Court
2  knows, two percent is already owed to universities and so
3  the company wants to make some profit.
4        Mr. Pals also tried to suggest that ARIAD can
5  only satisfy its obligations under its agreement with the
6  universities by litigating.  Actually, the agreement says no
7  such thing whatsoever.
8        THE COURT:  Well, I didn't hear him make that
9  assertion, but ...
10        MR. GINDLER:  Well, just to be clear, Article
11  7.2 says, "During the term of this agreement, licensee shall
12  have the right, but not the obligation, to prosecute, at its
13  own expense, any such infringement of the patent rights."
14        It doesn't have any obligation to do it.  And
15  in the amendment, which Mr. Pals talked about, we have an
16  obligation either to bring our own commercial products to
17  market, using the patent rights, or to sublicense others.
18  So we don't satisfy anything by litigating.
19        I want to close.
20        THE COURT:  That's your last shot, yes.
21        MR. GINDLER:  I want to close with just one
22  point, which is that it's a point made actually in the EMC
23  case.  And I actually can't say it better than the EMC case
24  said it.  And I'm going to quote from the case on page 811.
25  And this is 89 F.3d at 807.

74

1      "To be sure, any time parties are in
2  negotiations over patent rights, the possibility of a
3  lawsuit looms in the background.  No patent owner with any
4  sense would open negotiations by assuring the opposite
5  party that he does not intend to enforce his patent rights
6  under any circumstances.  The threat of enforcement either
7  directly by the patentee or indirectly by a third-party to
8  whom the patentee licenses or sells the patent is the entire
9  source of the patentee's bargaining power.  Thus, it is
10  unrealistic to suggest that some negotiating patentees
11  intend to enforce their patents, while some do not, and that
12  the first group is subject to declaratory judgment actions
13  while the second is not."
14      Thank you, Your Honor.
15      THE COURT:  All right.  Thanks.
16      This is a fact intensive inquiry.  I appreciate
17  the presentations that have made here and the submissions
18  that were provided.  And as I told you before, this was a
19  matter I was going to endeavor to rule on from the bench and
20  I will.
21      There are two issues in play here.  One is
22  whether there is declaratory judgment act jurisdiction to
23  begin with and the second is whether, if there is, Amgen
24  has got the right parties here in front of me.
25      As to the first of those issues, there is no

75

1  dispute between the parties that Amgen is engaged in acts,
2  taking concrete action which would qualify under the
3  two-prong test for declaratory judgment act jurisdiction the
4  Federal Circuit has set forth.  So the only question is as
5  to the first prong and that is the reasonable apprehension
6  for suit.  That is what the briefing is about.  That is what
7  discussion today in court has been about.
8      My conclusion is that there is an objectively
9  reasonable apprehension of suit on this record sufficient
10  to sustain jurisdiction.  I don't look at any one thing to
11  reach that conclusion.  I look, as I'm required to, at the
12  totality of the circumstances.
13      I disagree with Amgen in its assertion that the
14  early letter is threatening, the five-percent royalty rate
15  description somehow constitutes a threat.  That I think,
16  on the contrary, is a stretch that won't sustain the
17  characterization that is made of it.  But there is a history
18  here of ARIAD being clear that it has patent rights.  It
19  wants its patent rights respected, and it wants Amgen taking
20  those rights seriously.  That, in and of itself, would not
21  be problematic.  As Mr. Gindler has said rightly on behalf
22  of ARIAD, no patentee acquires patent rights with the intent
23  that they be ignored.  And ARIAD was certainly within its
24  rights to contact potential licensees and let them know
25  about their rights and suggest that potential licensees take

76

1  a look at those patents.
2      So those letters, in and of themselves, don't
3  create a reasonable apprehension of suit with respect to
4  the '516 patent, but they're not a circumstance that I'm
5  ignoring because they do show ARIAD, on repeated occasions,
6  saying we have these rights and on at least one occasion
7  saying, although not with respect to the '516 patent, we
8  think you are on our rights.  And so it's clear that ARIAD
9  is out there looking to see that their rights are respected;
10  a perfectly reasonable and logical position for it to take
11  and background information for what comes next.
12      Among the things that comes next is the issuance
13  of the '516 patent, the immediate contact from ARIAD to
14  Amgen announcing the '516 patent and the immediate lawsuit
15  against Lilly.  These are things that all the parties in
16  this suit acknowledge to be facts and which Amgen rightly
17  notes as a feature or a factor in its thinking about what
18  to make of ARIAD's intentions with respect to its, meaning
19  ARIAD's, rights under the '516 patent.
20      Then there is a telephone conversation followed
21  up on correspondence from Mr. Casselman to Mr. Ungemach.
22  In all these interactions, the letters and this telephone
23  conversation which is some time in 2002 or 2003, there is a
24  dance going on.  This is not unusual, given the state of the
25  law about declaratory judgment jurisdiction.  It's apparent

77

1  from the descriptions I'm able to see in the record that
2  there is an effort by ARIAD to make sure Amgen knows ARIAD
3  is serious about its patent rights without uttering any
4  magic words that would land them in court at the other end
5  of a declaratory judgment action.
6      You know, I've heard Mr. Casselman described as
7  a "nonlawyer."  I assume that was not meant as a distinction
8  to say he is better than a lawyer.  I assume that was meant
9  to say he is not sophisticated the way a lawyer would be
10  about declaratory judgment act pitfalls.  But this appears
11  to be an extremely saddened businessman acting in an under-
12  standably prudent way and with what appears to be a know-
13  ledge of how far he can get without falling into the pit in
14  an effort to try to do exactly that.
15      Nevertheless, it is background information for
16  what comes next:  A direct assertion we've got rights.
17  You should be interested in these rights.  You should be
18  interested with these rights with respect to a specified
19  product.
20      What came after that is the alleged threat by
21  Ms. Carson in the context of the Lilly litigation.
22      Now, I am persuaded that where there is a
23  dispute in the record of what was said or meant by what
24  was said; and here, counsel for Amgen's point is well
25  taken.  Ms. Carson doesn't directly dispute that she made

78

1   the comment attributed to her.  She says I would never
2   have threatened suit.  So it's less than a direct head-on
3   confrontation, it's more of an oblique confrontation with
4   respect to intent behind her comments, if she made it.  And
5   I believe it more likely than not, given the record before
6   me, that she did make the comment attributed to her, that
7   it was in the context in which Mr. Cantrell describes with
8   specificity.  And that in that context, it was fairly
9   understood as a statement that there are other players out
10  there and they can expect enforcement efforts.
11      Attorneys, like anybody else, sometimes in the
12  heat of battle, when questioned about what they're doing,
13  will say things that they later regret.  And she may well
14  regret having said it or she may well say that judge is a
15  knothead.  I said I didn't threaten suit and I meant it.
16  But the record, as best I can figure it, is she probably
17  said it.  She probably wishes she hadn't said it but she
18  probably said it.  And in the context in which it was said,
19  it was rightly viewed as an assertion that Amgen was in
20  the batter's box.  That when they got finished pitching an
21  infringement action at Lilly, the next one that was going to
22  be called in was going to be Amgen.
23      Now, there is delay there.  And if nothing had
24  happened next, I think I would be ruling differently than
25  in am today.  In fact, I feel sure I would have.  But what

79

1   comes next is highly significant to me.  In open court,
2   there is displayed internal presentation materials which
3   the ARIAD folks had used to educate their board, explain to
4   their board what their planning was.  And certainly in the
5   context of that litigation, again, a savvy businessperson
6   like Mr. Berger, knowing the consequences -- and in this
7   event, I should say Dr. Berger; he is not a lawyer, he is
8   never going to appear in front of me -- Dr. Berger is
9   careful to distance himself in that trial testimony from
10  any implication that, well, this meant we were going to sue
11  people.  But I'm looking at the slides themselves and not
12  the explanations for the slides themselves.
13      Let me rephrase that.  I certainly have looked
14  at the explanation for the slides, themselves.  It's a
15  factor I have weighed in making the judgment I am making
16  here today.  But the slides themselves speak more loudly to
17  me than Dr. Berger's careful testimony in the action in the
18  District of Massachusetts.  Those slides show that there is
19  a slide 35 naming lead players in the market.  I think in
20  context, that can only be understood to mean in the market
21  of products that are likely to be covered by our rights.
22      The next slide, 36, has Marketed and Late-Stage
23  Products as its heading and the very first point there is
24  the Xigris product which is the subject of the then ongoing
25  patent suit.

80

1   The next slide, 37, still headed Marketed and
2   Late-Stage Products, has at the top of it, as its first
3   bullet point, antiinflammatories of which Enbrel is listed
4   as the first one, and Kineret later on in that same page.
5      Later, slide 41 talks about goals for the first
6   quarter of '02 which include selecting litigation counsel,
7   complete enforcement analysis and action plan.  Those are
8   not limited to suit against Lilly, they're stated broadly.
9      I think in the context of the overall
10  presentation that was given -- and I say given in the
11  courtroom; that is, as displayed in the courtroom.  I have
12  no idea what was said to the board when slides were shown to
13  the board.  I'm talking about what a reasonably objective
14  observer could have made, and I think Amgen says it did
15  make, of the information presented in that courtroom.  That
16  is, Xigris is first.  By its own admission, ARIAD is the
17  David to the pharmaceutical Goliath.  That is something that
18  is said a few times.  And they're not taking more than one
19  at a time.
20      But Xigris was at the top of slide 36, we're at
21  the top of slide 37, and that, together with "Enbrel is on
22  the list," in the context of the various communications that
23  had gone before, showing that ARIAD was serious about its
24  patent rights and seeing that those rights were respected,
25  was enough for a reasonably objective company in Amgen's

81

1   position to say they're going to sue us.  And we're doing
2   things that satisfy the second prong, the declaratory
3   judgment act test.  And in that context, the law is pretty
4   clear that you don't have to wait until ARIAD decides it's
5   ready to pull the trigger.
6      I am not taking into account at all in my
7   analysis that "you're next" comment.  I think Dr. Carson
8   has given a reasonable explanation.  Unlike the earlier
9   conversation Ms. Carson had directly with Mr. Cantrell,
10  Mr. Cantrell only heard a snatch of the conversation.  He
11  doesn't know the context of it.  Ms. Carson does, and has
12  given a reasonable explanation for it.  And, in any event,
13  Amgen is frank to say it's not relying on it as a point of
14  presuit knowledge.
15      For the same reason on that last point, I'm not
16  taking the CNBC interview comments into account at all.  To
17  me, they're just flat irrelevant.  It doesn't make any
18  difference what Dr. Berger said to the press after this
19  suit was filed and could not possibly have affected
20  anybody's apprehension of suit before suit was filed.
21      I also want to note that the overall tone of
22  the interaction, the going back and forth over a series of
23  conversations, letters, and commentary during the Lilly
24  conversations as recounted by Mr. Cantrell with respect to
25  the "Enbrel is on the list" shows that this is a field in

82

1   which -- and I'm not saying this is a bad thing at all --
2   a field in which ARIAD feels it has rights and feels that
3   the enforcement of those rights is important, and that it
4   has the intention of enforcing those rights.  In other
5   words, there is a tone to the totality and the tone is,
6   overall, one that a reasonably objective observer would
7   perceive to be threatening enforcement action.
8       Consequently, I believe I do have the discretion
9   to exercise jurisdiction, and I will not decline to exercise
10  that jurisdiction because of the reexamination that is still
11  in process because of the efforts of ARIAD to overturn the
12  initial decision.
13      I note that the parties may want to talk about
14  whether it makes sense to pursue this litigation at this
15  particular point in time.  I am satisfied, however, that
16  ARIAD still has these rights, could still choose to sue on
17  these rights and, for reasons I already described, Amgen
18  rightly concerned that they're the ones who would be sued
19  in short order, so I'm not going to decline jurisdiction
20  on the basis that a large chunk of the '516 patent is, as
21  Mr. Gindler put it, in flux at this time.
22      That brings me to the last issue.  That is, do I
23  have the right parties in front of me?  And I am going to
24  deny the motion to dismiss without prejudice on this point.
25  It may be that there is some further evidence that would

83

1   come to light that would demonstrate something different on
2   this record than what I think I'm seeing right now.  What
3   I'm seeing right now is the grant of substantially all
4   rights associated with the patent.  That is, ARIAD has the
5   right to sublicense, ARIAD has the right to enforce, ARIAD
6   has the contractual right to be the sole representative in a
7   DJ action.
8       The language specifically pointed out to me
9   as the replacement language for 7.5 in the agreement that
10  effectively assigns these rights does note that there is
11  some reservation of right if ARIAD fails to do reasonable
12  things to defend a DJ action, but it appears to me that that
13  amended language was intended to, and the legal effect is
14  it in fact does, strengthen ARIAD's position to be enforcing
15  and defending the rights associated with this patent all by
16  itself, without anybody else in the mix.
17      Now, I just note I'm doing that without
18  prejudice because it's possible, it's just possible that I
19  missed something or there is something out there that hasn't
20  been put in front of me, and I recognize that I don't have
21  the other parties to this agreement in front of me.  I don't
22  have like MIT, Whitehead and other folks in here, and who is
23  to say I won't.  There is nothing to prevent, at least at
24  this stage that I'm aware of, third-party practice that
25  would bring them into the suit, if they chose to be here,

84

1   or perhaps even if they didn't.  I won't prejudge that for a
2   second.  But I'm not stopping and throwing this suit out on
3   indispensable party claim at this point.  That means we're
4   here, we're moving forward and discovery is going to go
5   forward.
6       I have before me a motion for protective order
7   and a motion to compel.  I had thought we might get to that
8   today and we haven't.  Here is the short of it with respect
9   to that, however.  I read your follow-up letters.  I do not
10  view the language of the protective order entered in the
11  Massachusetts action as an attempt or anything intended by
12  that District Court to do anything other than something I
13  do as a matter of course in my protective orders and that
14  is make sure that nobody is caught short, that confidential
15  information that somebody got from a third-party isn't aired
16  out in public without that party, that third-party having a
17  chance to come in and deal with it.
18      To the extent ARIAD is trying to make the
19  argument -- and I'm not sure it is really, although some of
20  the things said in the teleconference last month and in
21  the correspondence could be read this way.  To the extent
22  there is an effort by ARIAD to say, well, judge, you can't
23  really do anything here without making sure you are acting
24  appropriately within the bounds of the District Court of
25  Massachusetts order, you know, I reject that because I don't

85

1   think, A, the District Court in Massachusetts intended that
2   or, B, that it could bind this Court in a fashion suggested
3   by that argument, if that is the argument ARIAD intended to
4   make.
5       On the contrary, I think as I said a moment ago,
6   that this is standard language in a protective order to
7   prevent an unwitting third-party from seeing this private
8   information get out in the public without having a chance to
9   defend its confidentiality in front of the court under whose
10  power the subpoena is issued.  That's not the circumstance
11  that we have here.  That is, ARIAD is not some unwitting
12  third-party wondering.  It's in this suit.  It knows what
13  is at issue.  It had its opportunity to defend.  It has
14  made its position on this record.  It has had its rights
15  satisfied.  And I'm not granting a protective order and I'm
16  not quashing the subpoena.
17      Now, having said that, I want to emphasize that
18  I am sensitive to ARIAD's concern that its information not
19  be disclosed from Lilly in a manner that is inconsistent
20  with the protective order in this case.  In other words, in
21  the first instance, any information that Lilly discloses,
22  I'm not going to have this go Lilly to ARIAD to Amgen.  What
23  I will say is this is not going to go beyond counsel's eyes
24  only on the Amgen side until the folks on the ARIAD side
25  have had a chance to vet this and decide whether there are

86

1  confidentiality designations that need to be put in place
2  that are somehow other or different from the ones that
3  existed in the District of Massachusetts. In short, you
4  will have your shot to make sure it doesn't go past
5  attorneys eye's only level under the protective order we've
6  got until you, on the ARIAD side, have a chance to look at
7  it.
8        Last, but not least, there is a motion to
9  compel. I grant it to this limited extent. We're now past
10  the motion to dismiss. Right or wrong? I've given you my
11  best shot and I think you need to move forward at this
12  juncture.
13        However, I do think there is merit to some of
14  what ARIAD has said about the breadth of some of the
15  requests. And I just don't want to get into it at this
16  point because there is just not a sufficient point on the
17  issue for me to address it sensibly. Suffice it to say
18  that the parties should meet and confer in good faith to
19  make sure that the requests that are made of ARIAD are
20  appropriate within the bounds of Rule 26 and designed to
21  move us past disputes that can only waste your client's time
22  and your time, your clients' money and, to a certain degree,
23  the Court's time if things are cast so broadly so as to cast
24  reasonable objections. So I'm asking you to do what the
25  rules already tell you to do, talk to each other, see if you

87

1  can't come to a reasonable accommodation about some of these
2  requests.
3        All right. I think that addresses the matters
4  that were before me. And I do have another matter I am
5  going to need to attend now. But let me ask you first
6  before I take off out of here, Mr. Pals, is there any other
7  matter pending that you think the Court needs to give its
8  attention to?
9        MR. PALS: Not at this time Your Honor.
10        THE COURT: Mr. Gindler?
11        MR. GINDLER: No, Your Honor. Just one
12  question. When you refer to attorneys eyes only, I assume
13  you are referring to outside counsel's eyes only.
14        THE COURT: Yes. Thank you for clarifying that.
15  That is my intent. Well, let me say this. I have not gone
16  back and re-read the protective order that was entered in
17  this case. It may be, in the protective order entered in
18  this case, there is, under the highest designation that you
19  parties negotiated, a level that involves somebody from
20  in-house counsel.
21        Now, you should have that in mind when you are
22  taking whatever position you are taking, okay? Both sides.
23  But I'm telling you since I'm bringing in litigation from
24  another case in the first instance, I'm talking about
25  outside counsels' eyes only because it may be that this

88

1  tranche of documents raises different issues than ARIAD
2  had in mind when it negotiated whatever it negotiated with
3  respect to the protective order in the first place.
4        So that's a long way of saying, yes, it is
5  outside attorneys' eyes only for this significant batch of
6  documents unless and until you guys are able to agree other-
7  wise or I get a persuasive argument that it's impossible for
8  them to deal with you on this point and they are being
9  unreasonable.
10        Have I made myself clear? In short, I don't
11  know, in fact, I think it unlikely, that this collective of
12  documents was specifically in mind when this was being
13  litigated so I'm going to treat this as we treat other
14  things before there is a protective order in place, which is
15  it's outside counsels' eyes only. You folks talk about it.
16  If you have already negotiated certain people to be in the
17  loop on the inside, then you ought to reasonably be talking
18  about whether there is any reason for them not to see it
19  other than just kind of being the dog in the manger; okay?
20        Do you understand what I'm trying to do? I'm
21  trying to protect ARIAD's rights, move this thing forward
22  and hopefully if these people were in the loop before, it
23  was before ARIAD recognized that, yes, they wouldn't be a
24  threat to see the most sensitive stuff. And you ought to be
25  taking that into account, ARIAD, in whether you are really

89

1  going to say, no, this can't be seen by those folks on the
2  other side. But I'm letting you take the first track crack
3  at that; all right?
4        MR. GINDLER: Yes.
5        THE COURT: Before they see it.
6        MR. PALS: That's pretty much where we are,
7  Your Honor. We haven't finalized the negotiated protective
8  order but we have agreed on sort of the structure of the
9  confidentiality restrictions which would allow inside
10  counsel access to the information.
11        MR. GINDLER: It would allow certain of them,
12  and it also would provide, at least in the version we have
13  proposed, and it also is in the protective order from the
14  Lilly case, that nothing in the protective order stops us
15  from seeking a higher level of protection for specific
16  documents. And I think the Court is wise that we take the
17  first crack at seeing whether we are concerned about any
18  document and want to seek a higher level of protection for
19  them.
20        THE COURT: And that's what I'm telling is going
21  to be the case here. Okay?
22        MR. GINDLER: Thank you, Your Honor.
23        THE COURT: All right. Thanks for your time and
24  attendance. Appreciate it. We're in recess.
25        (Motions hearing ends at 4:32 p.m.)

# EXHIBIT I

# UNITED STATES DISTRICT COURT
## FOR THE
### DISTRICT OF MASSACHUSETTS

**02 CV 1 1 2 8 0 RWZ**

ARIAD PHARMACEUTICALS, INC., )
MASSACHUSETTS INSTITUTE OF )
TECHNOLOGY, THE WHITEHEAD INSTITUTE )  No. _____
FOR BIOMEDICAL RESEARCH, and THE )
PRESIDENT AND FELLOWS OF HARVARD )
COLLEGE )
)
)
Plaintiffs, )
)
v. )
)
ELI LILLY & CO., )
)
Defendant. )

**Jury Trial Demanded**

RECEIPT # 40085
AMOUNT $ 150·00
SUMMONS ISS. ___ 442
LOCAL RULE 4.1 _____
WAIVER OF SERV. _____
MCF ISSUED _____
AO 120 OR 121 _____
BY DPTY CLK _____
DATE 6/25/02

## COMPLAINT

Plaintiffs ARIAD Pharmaceuticals, Inc. ("ARIAD"), Massachusetts Institute of Technology ("M.I.T."), the Whitehead Institute for Biomedical Research ("THE WHITEHEAD INSTITUTE"), and the President and Fellows of Harvard College ("HARVARD") (hereinafter collectively referred to as "Plaintiffs"), through their attorneys, for their Complaint against Defendant Eli Lilly & Co. ("Lilly"), allege as follows:

### NATURE OF THE ACTION

1.      This is a patent infringement action against Lilly based on Lilly's activity in connection with its Xigris® and Evista® products covered by claims of Plaintiffs' United States Patent No. 6,410,516 ("the '516 patent"), entitled "Nuclear Factors Associated With Transcriptional Regulation."  A copy of the patent is attached as Exhibit 1.



2.      Plaintiffs seek monetary damages, including but not limited to a reasonable royalty for Defendant Lilly's current and future infringement of the '516 patent.

## PARTIES, JURISDICTION AND VENUE

3.      ARIAD is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 26 Landsdowne Street, Cambridge, Massachusetts.

4.      M.I.T is a co-educational, privately endowed research university located at 77 Massachusetts Avenue, Cambridge, Massachusetts.

5.      THE WHITEHEAD INSTITUTE is a non-profit research and education institute located at Nine Cambridge Center, Cambridge, Massachusetts. It is affiliated with M.I.T in its teaching activities, but is wholly responsible for its own research programs, governance, and finance.

6.      HARVARD is a co-educational, privately endowed research university located at Massachusetts Hall, Cambridge, Massachusetts.

7.      Upon information and belief, Defendant Lilly is a corporation organized and existing under the laws of the State of Indiana with its principal place of business located at Lilly Corporate Center, Indianapolis, Indiana. Lilly does substantial business in this judicial district.

8.      This is an action for patent infringement under the Patent Act of the United States, 35 U.S.C. § 100 *et seq.*, including §§ 271 and 281. This Court has subject matter jurisdiction over this patent infringement action pursuant to 28 U.S.C. § 1338(a).

9.      Venue is proper in this judicial district pursuant to §§ 1400(b) and 1391(c).

## FACTUAL BACKGROUND

10.     Living cells respond to a vast array of different signals in their environment, including natural

regulatory factors (e.g. hormones) and harmful factors (e.g. toxins).  A primary way that cells respond to

such signals is through intricate networks of signaling proteins inside the cell, which act as "messengers"

to regulate expression of genes that are critical for normal cell function. Normal cell signaling and gene

regulation are both controlled at a molecular level by specific interactions of these "messenger" proteins

with other proteins and DNA.  Identifying these "messenger" proteins and how they function is a crucial

step in developing drugs for treating diseases associated with abnormal cell signaling and gene regulation.

11.     The invention of the '516 patent arose from a collaboration between research groups at three of

the world's leading biomedical research institutions, M.I.T., THE WHITEHEAD INSTITUTE, and

HARVARD. The collaboration was directed by three distinguished scientists, Dr. David Baltimore, Nobel

Laureate and former director of THE WHITEHEAD INSTITUTE, Dr. Phillip Sharp, also a Nobel

Laureate and now Institute Professor at M.I.T., and Dr. Thomas Maniatis, Thomas H. Lee Professor of

Molecular and Cellular Biology at HARVARD.

12.     In the mid 1980s, Dr. Baltimore and his colleagues identified a "messenger" protein, which they

named "NF-KB."  As discussed in the '516 patent specification, Dr. Baltimore and his colleagues initially

believed that NF-KB was only found in certain cells known as "B cells" and, therefore, had a limited role

in cell signaling and gene regulation.

13.     Extensive studies on NF-KB carried out by the named inventors in Dr. Baltimore's laboratory at

THE WHITEHEAD INSTITUTE and the other co-inventors in Dr. Sharp's laboratory at M.I.T. and Dr.

Maniatis' laboratory at HARVARD led to the surprising discovery, described in the '516 patent, that NF-

KB is found in "many, if not all, cell types and that it acts as an intracellular messenger capable of playing

a broad role in gene regulation as a mediator of inducible signal transduction." ('516 patent col. 2, lines

29-31.) Most significantly, through the work disclosed in the '516 patent, the inventors also showed how the NF-KB cell-signaling pathway could be regulated and used for medical and therapeutic applications.

14. ARIAD, since its founding in 1991, has been engaged in research and development of pharmaceutical products that regulate cell signaling pathways and gene function. ARIAD's drug discovery program is aimed at developing small-molecule drugs to inhibit or block disease-related abnormal cell-signaling and to control gene function and cell-signaling.

15. In part for his preeminent contribution to the cell-signaling field and the relevance of this expertise to ARIAD's research and development program, ARIAD invited, and Dr. Baltimore agreed, to join ARIAD's board of scientific and medical advisors as a founding member.

16. In 1986, the first of a series of U.S. patent applications relating to the NF-KB research spearheaded by Dr. Baltimore and various of his co-inventors was filed. Through extensive prosecution, during which the Patent Office carefully scrutinized the claimed subject matter for compliance with the statutory requirements for patentability, the Patent Office awarded the inventors several patents claiming various, separate aspects of this pioneering technology. The '516 patent asserted herein, is the most recent patent to issue of this family of patents.

### THE PATENT-IN-SUIT

17. On June 25, 2002, the '516 patent, entitled "Nuclear Factors Associated With Transcriptional Regulation," with claims that cover methods of treating human disease by regulating NF-KB activity, was duly and legally issued to Baltimore *et al.* and assigned to M.I.T. THE WHITEHEAD INSTITUTE, and HARVARD.

18. Based on a license agreement executed in 1991, ARIAD is the exclusive licensee from M.I.T., THE WHITEHEAD INSTITUTE, and HARVARD of the '516 patent, which presents claims directed to

one aspect of the pioneering technology discovered by the inventors, i.e., the use of drugs that regulate NF-KB cell signaling.

## LILLY'S INFRINGEMENT OF THE '516 PATENT

19.     Upon information and belief, Lilly is engaged in the manufacture, importation, use, sale and/or offers of sale, and promotion of pharmaceutical products marketed under the brandname Evista®.

20.     Upon information and belief, Evista® is a form of the selective estrogen receptor modulator raloxifene hydrochloride, and was approved for sale by the United States Food and Drug Administration on or about December 10, 1997, for the prevention and treatment of osteoporosis in postmenopausal women.

21.     Upon information and belief, a molecular basis for the action of Evista® in treating osteoporosis has been demonstrated to occur through the modulation of NF-KB activity. Some of these findings were published by Lilly scientists in a World Intellectual Property Organization Patent Application entitled "Methods of Modulating NF-KB Transcription Factor" and bearing publication number WO 96/40137. A copy of this patent application is attached as Exhibit 2.

22.     Upon information and belief Lilly is engaged in the manufacture, importation, use, sale and/or offers of sale and promotion of pharmaceutical products marketed under the brandname Xigris®.

23.     Upon information and belief, Xigris® is a form of recombinant human activated protein C, and was approved for sale by the United States Food and Drug Administration on or about November 21, 2001, for the reduction of mortality in human adult patients with severe sepsis who have a high risk of death.

24.     Upon information and belief, a molecular basis for the action of Xigris® in treating septic shock has been demonstrated to occur through the inhibition of NF-KB activity. These findings were published

by Lilly scientists in papers by Joyce *et al.*, J. Biol. Chem., 276: 11199-11203, 2001 and Crit. Care Med. 30:S288-S293, 2002. Copies of these papers are attached as Exhibits 3 and 4.

25.     Plaintiffs have suffered and will continue to suffer damages as a result of Lilly's infringing activities.

26.     Plaintiffs have previously sought to initiate discussions with Lilly concerning a license to Plaintiffs' NF-KB patent estate.  Defendant Lilly has failed to respond to these efforts.

## COUNTS

### Count 1 – Patent Infringement of the '516 Patent

27.     Paragraphs 1-26 of this Complaint are incorporated by reference as if stated fully herein.

28.     Defendant Lilly, by engaging in the unauthorized manufacture, importation, use, sale and/or offers for sale of raloxifene hydrochloride in the United States, including pharmaceutical products marketed as Evista®, has committed acts of direct, contributory and/or induced infringement of claims 69-72, 80, 82, 84, 85 and 93-96 of the '516 patent.

29.     Defendant Lilly, by engaging in the unauthorized manufacture, importation, use, sale and/or offers for sale of recombinant human activated protein C in the United States, including pharmaceutical products marketed as Xigris®, has committed acts of direct, contributory and/or induced infringement of claims 14, 15, 144-146, and 154-156 of the '516 patent.

30.     Defendant Lilly has offered for sale, sold and/or imported raloxifene hydrochloride into the United States, including pharmaceutical products marketed as Evista®, with knowledge that such products have a molecular basis of action through the modulation of NF-KB activity and are especially made or adapted for use in an infringment of the '516 patent.  Evista®, which constitutes a material part of the invention, is not a staple article or commodity of commerce suitable for substantial non-infringing

use. By its actions, Defendant Lilly is actively and knowingly inducing infringement of claims 69-72, 80, 82, 84, 85 and 93-96 of the '516 patent.

31.     Defendant Lilly has offered for sale, sold and/or imported recombinant human activated protein C into the United States, including pharmaceutical products marketed as Xigris®, with knowledge that such products have a molecular basis of action through the inhibition of NF-KB activity and are especially made or adapted for use in an infringement of the '516 patent. Xigris® which constitutes a material part of the invention, is not a staple article or commodity of commerce suitable for substantial non-infringing use. By its actions, Defendant Lilly is actively and knowingly inducing infringement of claims 14, 15, 144-146, and 154-156 of the '516 patent.

32.     Plaintiffs have suffered and will continue to suffer damages as a result of Defendant's infringing activities.

        WHEREFORE, Plaintiff respectfully request that the Court:

A.      Award to Plaintiffs damages adequate to compensate Plaintiffs for infringement of the '516 patent, but in no event less than a reasonable royalty, together with interest and costs.

B.      Enter an order declaring this an exceptional case pursuant to 25 U.S.C. § 285 and award to Plaintiffs reasonable attorney fees;

and,

C.      Grant to Plaintiffs such other and further relief as may be just and appropriate.

# JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs respectfully demand a trial by jury on all issues that are properly triable to a jury in this action.

BROMBERG & SUNSTEIN LLP

By: _Lee Carl Bromberg_

Lee Carl Bromberg, BBO# 058480
Kerry L. Timbers, BBO# 552293
Anne Marie Longobucco, BBO#649299
125 Summer Street
Boston, MA 02110-1618
Tel: (617) 443-9292

CLIFFORD CHANCE ROGERS & WELLS LLP

Leora Ben-Ami
Thomas F. Fleming
Patricia A. Carson
200 Park Avenue
New York, NY, 10166
(212) 878-8000

Attorneys for Plaintiffs ARIAD Pharmaceuticals, Inc., Massachusetts Institute of Technology, the Whitehead Institute for Biomedical Research, and the President and Fellows of Harvard College

02695/00501 206781.1

# EXHIBIT J

ORIGINAL

# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, and THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE <br><br> Plaintiffs, <br><br> v. <br><br> ELI LILLY AND COMPANY, <br><br> Defendant. | Civil Action No. 02 CV 11280 RWZ <br><br> U.S. District Judge <br> Rya W. Zobel |

## ELI LILLY AND COMPANY'S ANSWER TO PLAINTIFFS' COMPLAINT AND COUNTERCLAIMS

Defendant, Eli Lilly and Company ("Lilly"), responds to the Complaint of Plaintiffs ARIAD Pharmaceuticals, Inc. ("ARIAD"), Massachusetts Institute of Technology ("M.I.T."), the Whitehead Institute for Biomedical Research ("THE WHITEHEAD INSTITUTE"), and the President and Fellows of Harvard College ("HARVARD") (hereinafter collectively referred to as "Plaintiffs") as follows:

## NATURE OF THE ACTION

1. This is a patent infringement action against Lilly based on Lilly's activity in connection with its Xigris® and Evista® products covered by claims of Plaintiffs' United States Patent No. 6,410,516 ("the '516 patent"), entitled "Nuclear Factors Associated With Transcriptional Regulation." A copy of the patent is attached as Exhibit 1.

**Answer to Paragraph 1 of the Complaint:**

Lilly admits that Plaintiffs' Complaint alleges claims based on the patent laws. Lilly further admits that a copy of United States Patent No. 6,410,516 ("the '516 patent"), entitled "Nuclear Factors Associated With Transcriptional Regulation" was attached to the Complaint as Exhibit 1. Lilly denies Xigris® and Evista® are covered by any valid claims of the '516 patent. Lilly denies each and every remaining allegation contained in paragraph 1 of the Complaint, and specifically denies that Plaintiffs have any claim against Lilly for patent infringement.

2. Plaintiffs seek monetary damages, including but not limited to a reasonable royalty for Defendant Lilly's current and future infringement of the '516 patent.

**Answer to Paragraph 2 of the Complaint:**

Lilly admits that Plaintiffs' Complaint seeks monetary damages. Lilly denies each and every remaining allegation contained in paragraph 2 of the Complaint.

## PARTIES, JURISDICTION AND VENUE

3. ARIAD is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 26 Landsdowne Street, Cambridge, Massachusetts.

**Answer to Paragraph 3 of the Complaint:**

Lilly is without information sufficient to admit or deny the allegations contained in Paragraph 3 of the Complaint, and therefore denies each and every allegation contained in paragraph 3 of the Complaint.

4. M.I.T is a co-educational, privately endowed research university located at 77 Massachusetts Avenue, Cambridge, Massachusetts.

2

**Answer to Paragraph 4 of the Complaint:**

Lilly is without information sufficient to admit or deny the allegations contained

in Paragraph 4 of the Complaint, and therefore denies each and every allegation

contained in paragraph 4 of the Complaint.

5. THE WHITEHEAD INSTITUTE is a non-profit research and education institute located at Nine Cambridge Center, Cambridge, Massachusetts. It is affiliated with M.I.T in its teaching activities, but is wholly responsible for its own research programs, governance, and finance.

**Answer to Paragraph 5 of the Complaint:**

Lilly is without information sufficient to admit or deny the allegations contained

in Paragraph 5 of the Complaint and therefore denies each and every allegation contained

in paragraph 5 of the Complaint..

6. HARVARD is a co-educational, privately endowed research university located at Massachusetts Hall, Cambridge, Massachusetts.

**Answer to Paragraph 6 of the Complaint:**

Lilly is without information sufficient to admit or deny the allegations contained

in Paragraph 6 of the Complaint and therefore denies each and every allegation contained

in paragraph 6 of the Complaint..

7. Upon information and belief, Defendant Lilly is a corporation organized and existing under the laws of the State of Indiana with its principal place of business located at Lilly Corporate Center, Indianapolis, Indiana. Lilly does substantial business in this judicial district.

**Answer to Paragraph 7 of the Complaint:**

Lilly admits that it is a corporation organized and existing under the laws of the

State of Indiana with its principal place of business located at Lilly Corporate Center,

Indianapolis, Indiana. Lilly admits that it does business in this judicial

district. Lilly denies each and every remaining allegation contained in paragraph 7.

> 8. This is an action for patent infringement under the Patent Act of the United States, 35 U.S.C. § 100 *et seq.*, including §§ 271 and 281. This Court has subject matter jurisdiction over this patent infringement action pursuant to 28 U.S.C. § 1338(a).

**Answer to Paragraph 8 of the Complaint:**

Paragraph 8 of Plaintiffs' Complaint merely purports to describe the nature of the

action brought by Plaintiffs. To the extent an answer is required, Lilly admits that

Plaintiffs base their claims on the patent laws of the United States 35 U.S.C. § 100 *et*

*seq.*, including §§ 271 and 281. Except as so admitted, Lilly denies each and every

remaining allegation contained in paragraph 8 of the Complaint, and specifically denies

that Plaintiffs have any claim against Lilly for patent infringement. Lilly does not contest

the Court's subject matter jurisdiction pursuant to 28 U.S.C. § 1338(a).

> 9. Venue is proper in this judicial district pursuant to §§ 1400(b) and 1391(c).

**Answer to Paragraph 9 of the Complaint:**

Lilly does not contest that venue is proper in this judicial district pursuant to 28

U.S.C. §§ 1400(b) and 1391(c).

## FACTUAL BACKGROUND

10. Living cells respond to a vast array of different signals in their environment, including natural regulatory factors (e.g. hormones) and harmful factors (e.g.

4

toxins). A primary way that cells respond to such signals is through intricate networks of signaling proteins inside the cell, which act as "messengers" to regulate expression of genes that are critical for normal cell function. Normal cell signaling and gene regulation are both controlled at a molecular level by specific interactions of these "messenger" proteins with other proteins and DNA. Identifying these "messenger" proteins and how they function is a crucial step in developing drugs for treating diseases associated with abnormal cell signaling and gene regulation.

**Answer to Paragraph 10 of the Complaint:**

Lilly admits that living cells respond to a vast array of different signals in their environment. Except as so admitted, Lilly cannot admit or deny the remaining allegations contained in paragraph 10 of the Complaint to the extent paragraph 10 does not contain allegations of fact. To the extent paragraph 10 of the Complaint does contain additional allegations of fact, Lilly denies each and every such allegation.

11. The invention of the '516 patent arose from a collaboration between research groups at three of the world's leading biomedical research institutions, M.I.T., THE WHITEHEAD INSTITUTE, and HARVARD. The collaboration was directed by three distinguished scientists, Dr. David Baltimore, Nobel Laureate and former director of THE WHITEHEAD INSTITUTE, Dr. Phillip Sharp, also a Nobel Laureate and now Institute Professor at M.I.T., and Dr. Thomas Maniatis, Thomas H. Lee Professor of Molecular and Cellular Biology at HARVARD.

**Answer to Paragraph 11 of the Complaint:**

Lilly is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 11 of the Complaint and therefore denies each and every allegation contained in paragraph 11 of the Complaint.

12. In the mid 1980s, Dr. Baltimore and his colleagues identified a "messenger" protein, which they named "NF-KB." As discussed in the '516 patent specification, Dr. Baltimore and his colleagues initially believed that NF-KB was

5

only found in certain cells known as "B cells" and therefore, had a limited role in cell signaling and gene regulation.

**Answer to Paragraph 12 of the Complaint:**

Lilly is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12 of the Complaint and therefore denies each and every allegation contained in paragraph 12 of the Complaint.

13. Extensive studies on NF-KB carried out by the named inventors in Dr. Baltimore's laboratory at THE WHITEHEAD INSTITUTE and the other co-inventors in Dr. Sharp's laboratory at M.I.T. and Dr. Maniatis' laboratory at HARVARD led to the surprising discovery, described in the '516 patent, that NF-KB is found in "many, if not all, cell types and that it acts as an intracellular messenger capable of playing a broad role in gene regulation as a mediator of inducible signal transduction." ('516 patent col. 2, lines 29-31.) Most significantly, through the work disclosed in the '516 patent, the inventors also showed how the NF-KB cell-signaling pathway could be regulated and used for medical and therapeutic applications.

**Answer to Paragraph 13 of the Complaint:**

Lilly is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13 of the Complaint and therefore denies each and every allegation contained in paragraph 13 of the Complaint.

14. ARIAD, since its founding in 1991, has been engaged in research and development of pharmaceutical products that regulate cell signaling pathways and gene function. ARIAD's drug discovery program is aimed at developing small-molecule drugs to inhibit or block disease-related abnormal cell-signaling and to control gene function and cell-signaling.

**Answer to Paragraph 14 of the Complaint:**

Lilly is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 14 of the Complaint and therefore denies each and every allegation contained in paragraph 14 of the Complaint.

6

15. In part for his preeminent contribution to the cell-signaling field and the relevance of this expertise to ARIAD's research and development program, ARIAD invited, and Dr. Baltimore agreed, to join ARIAD's board of scientific and medical advisors as a founding member.

**Answer to Paragraph 15 of the Complaint:**

Lilly is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 15 of the Complaint and therefore denies each and every allegation contained in paragraph 15 of the Complaint.

16. In 1986, the first of a series of U.S. patent applications relating to the NF-KB research spearheaded by Dr. Baltimore and various of his co-inventors was filed. Through extensive prosecution, during which the Patent Office carefully scrutinized the claimed subject matter for compliance with the statutory requirements for patentability, the Patent Office awarded the inventors several patents claiming various, separate aspects of this pioneering technology. The '516 patent asserted herein, is the most recent patent to issue of this family of patents.

**Answer to Paragraph 16 of the Complaint:**

Lilly admits that the '516 patent claims priority as a continuation-in-part of United States Patent Application Serial Number 06/871,441 filed January 9, 1986. Lilly denies each and every remaining allegation contained in paragraph 16 of the Complaint.

## THE PATENT-IN-SUIT

17. On June 25, 2002, the '516 patent, entitled "Nuclear Factors Associated With Transcriptional Regulation," with claims that cover methods of treating human disease by regulating NF-KB activity, was duly and legally issued to Baltimore *et al.* and assigned to M.I.T., THE WHITEHEAD INSTITUTE, and HARVARD.

**Answer to Paragraph 17 of the Complaint:**

Lilly admits United States Patent No. 6,410,516 ("the 516 patent") states on its face that it issued on June 25, 2002. Lilly admits that the inventors named on the face of United States Patent No. 6,410,516 are Baltimore *et al*. Lilly admits that the Assignees named on the face of United States Patent No. 6,410,516 are M.I.T., THE WHITEHEAD INSTITUTE, and HARVARD, but Lilly is without knowledge or information sufficient to form a belief as to whether or when the '516 patent was assigned to M.I.T., THE WHITEHEAD INSTITUTE, and HARVARD and therefore denies such allegation. Otherwise, Lilly denies each and every remaining allegation contained in paragraph 17 of the Complaint.

18. Based on a license agreement executed in 1991, ARIAD is the exclusive licensee from M.I.T., THE WHITEHEAD INSTITUTE, and HARVARD of the '516 patent, which presents claims directed to one aspect of the pioneering technology discovered by the inventors, i.e., the use of drugs that regulate NF-KB cell signaling.

**Answer to Paragraph 18 of the Complaint:**

Lilly is without knowledge or information sufficient to form a belief as to the existence of a license agreement between ARIAD, M.I.T., THE WHITEHEAD INSTITUTE and HARVARD, or whether such an agreement was executed in 1991, and therefore denies such allegation. Lilly denies each and every remaining allegation contained in paragraph 18 of the Complaint.

## LILLY'S INFRINGEMENT OF THE '516 PATENT

19. Upon information and belief, Lilly is engaged in the manufacture, importation, use, sale and/or offers of sale, and promotion of pharmaceutical products marketed under the brandname Evista®.

**Answer to Paragraph 19 of the Complaint:**

Lilly admits that it is engaged in the manufacture, use, sale and/or

offers of sale, and promotion of raloxifene hydrocholoride marketed under the brandname

Evista®. Except as so admitted, Lilly denies each and every remaining allegation.

> 20. Upon information and belief, Evista® is a form of the selective estrogen
> receptor modulator raloxifene hydrocholoride, and was approved for sale by the
> United States Food and Drug Administration on or about December 10, 1997, for
> the prevention and treatment of osteoporosis in postmenopausal women.

**Answer to Paragraph 20 of the Complaint:**

Lilly admits that Evista® is a form of the selective estrogen receptor modulator

raloxifene hydrocholoride, and was approved for sale by the United States Food and Drug

Administration in December 1997 for the prevention and treatment of osteoporosis in

postmenopausal women. Except as so admitted, Lilly denies each and every remaining

allegation.

> 21. Upon information and belief, a molecular basis for the action of Evista® in
> treating osteoporosis has been demonstrated to occur through the modulation of
> NF-KB activity. Some of these findings were published by Lilly scientists in a
> World Intellectual Property Organization Patent Application entitled "Methods of
> Modulating NF-KB Transcription Factor" and bearing publication number WO
> 96/40137. A copy of this patent application is attached as Exhibit 2.

**Answer to Paragraph 21 of the Complaint:**

Lilly admits that Lilly scientists are named as inventors on the World Intellectual

Property Organization Patent Application entitled "Methods of Modulating NF-KB

Transcription Factor." Lilly admits that the patent application bears publication number

WO 96/40137. Lilly admits that World Intellectual Property Organization Patent

Application entitled "Methods of Modulating NF-KB Transcription Factor" claimed

9

methods of modulating NF-KB transcription factor comprising administering to a human in need of an effective amount of a certain compound. Lilly further admits that a copy of the World Intellectual Property Organization Patent Application entitled "Methods of Modulating NF-KB Transcription Factor" and bearing publication number WO 96/40137 was attached to the Complaint as Exhibit 2. Lilly denies each and every remaining allegation in paragraph 21 of the Complaint. Except as so admitted, Lilly denies each and every remaining allegation.

> 22. Upon information and belief Lilly is engaged in the manufacture, importation, use, sale and/or offers of sale and promotion of pharmaceutical products marketed under the brandname Xigris®.

**Answer to Paragraph 22 of the Complaint:**

Lilly admits that it is engaged in the manufacture, use, sale and/or offers of sale, and promotion of a form of recombinant human activated protein C marketed under the brandname Xigris®. Except as so admitted, Lilly denies each and every remaining allegation.

> 23. Upon information and belief, Xigris® is a form of recombinant human activated protein C, and was approved for sale by the United States Food and Drug Administration on or about November 21, 2001, for the reduction of mortality in human adult patients with severe sepsis who have a high risk of death.

**Answer to Paragraph 23 of the Complaint:**

Lilly admits that Xigris® is a form of recombinant human activated protein C, and was approved for sale by the United States Food and Drug Administration on or about November 21, 2001 for the reduction of mortality in human adult patients with severe sepsis who have a high risk of death. Except as so admitted, Lilly denies each and

every remaining allegation.

24. Upon information and belief, a molecular basis for the action of Xigris® in treating septic shock has been demonstrated to occur through the inhibition of NF-KB activity. These findings were published by Lilly scientists in papers by Joyce *et al.*, J. Biol. Chem., 276: 11199-11203, 2001 and Crit. Care Med. 30:S288-S293, 2002. Copies of these papers are attached as Exhibits 3 and 4.

**Answer to Paragraph 24 of the Complaint:**

Lilly admits that Lilly scientists published papers in J. Biol. Chem., 276: 11199-11203, 2001 and Crit. Care Med. 30:S288-S293, 2002. Lilly admits that copies of Joyce *et al.*, J. Biol. Chem., 276: 11199-11203, 2001 and Crit. Care Med. 30:S288-S293, 2002 were attached to the Complaint as Exhibits 3 and 4 respectively. Lilly denies each and every remaining allegation in paragraph 24 of the Complaint.

25. Plaintiffs have suffered and will continue to suffer damages as a result of Lilly's infringing activities.

**Answer to Paragraph 25 of the Complaint:**

Lilly denies each and every allegation contained in paragraph 25 of the Complaint.

26. Plaintiffs have previously sought to initiate discussions with Lilly concerning a license to Plaintiffs' NF-KB patent estate. Defendant Lilly has failed to respond to these efforts.

**Answer to Paragraph 26 of the Complaint:**

Lilly admits that one or more of Plaintiffs contacted Lilly with respect to other patents in their portfolio. Lilly denies that Plaintiffs have sought to initiate discussions with Lilly concerning the '516 patent-in-suit. Lilly denies each and every remaining allegation in paragraph 26 of the Complaint.

## COUNTS

### Count 1 – Patent Infringement of the '561 Patent

27. Paragraphs 1-26 of this Complaint are incorporated by reference as if stated fully herein.

**Answer to Paragraph 27 of the Complaint:**

Lilly incorporates herein by reference its responses to paragraphs 1-26 of the Complaint.

28. Defendant Lilly, by engaging in the unauthorized manufacture, importation, use, sale and/or offers for sale of raloxifene hydrochloride in the United States, including pharmaceutical products marked as Evista®, has committed acts of direct, contributory and/or induced infringement of claims 69-72, 80, 82, 84, 85 and 93-96 of the '516 patent.

**Answer to Paragraph 28 of the Complaint:**

Lilly denies each and every allegation contained in paragraph 28 of the Complaint.

29. Defendant Lilly, by engaging in the unauthorized manufacture, importation, use, sale and/or offers for sale of recombinant human activated protein C in the United States, including pharmaceutical products marketed as Xigris®, has committed acts of direct, contributory and/or induced infringement of claims 14, 15, 144-146, and 154-156 of the '516 patent.

**Answer to Paragraph 29 of the Complaint:**

Lilly denies each and every allegation contained in paragraph 29 of the Complaint.

30. Defendant Lilly has offered for sale, sold and/or imported raloxifene hydrochloride into the United States, including pharmaceutical products marketed as Evista®, with knowledge that such products have a molecular basis of action through the modulation of NF-KB activity and are especially made or adapted for

12

use in an infringment of the '516 patent. Evista®, which constitutes a material part of the invention, is not a staple article or commodity of commerce suitable for substantial non-infringing use. By its actions, Defendant Lilly is actively and knowingly inducing infringement of claims 69-72, 80, 82, 84, 85 and 93-96 of the '516 patent.

**Answer to Paragraph 30 of the Complaint:**

Lilly admits that it has offered for sale, sold and/or imported raloxifene

hydrochloride into the United States, including pharmaceutical products marketed as

Evista®. Lilly denies each and every remaining allegation contained in paragraph 30 of

the Complaint.

31. Defendant Lilly has offered for sale, sold and/or imported recombinant human activated protein C into the United States, including pharmaceutical products marketed as Xigris®, with knowledge that such products have a molecular basis of action through the inhibition of NF-KB activity and are especially made or adapted for use in an infringement of the '516 patent. Xigris® which constitutes a material part of the invention, is not a staple article or commodity of commerce suitable for substantial non-infringing use. By its actions, Defendant Lilly is actively and knowingly inducing infringement of claims 14, 15, 144-146, and 154-156 of the '516 patent.

**Answer to Paragraph 31 of the Complaint:**

Lilly admits that it has offered for sale, sold and/or imported recombinant human

activated protein C into the United States, including pharmaceutical products marketed as

Xigris®. Lilly denies each and every remaining allegation contained in paragraph 31 of

the Complaint.

32. Plaintiffs have suffered and will continue to suffer damages as a result of Defendant's infringing activities.

**Answer to Paragraph 32 of the Complaint:**

Lilly denies each and every allegation contained in paragraph 32 of the

Complaint. Lilly specifically denies that the Plaintiffs are entitled to their requested

relief.

13

## AFFIRMATIVE AND OTHER DEFENSES

### FIRST AFFIRMATIVE DEFENSE
#### Non-infringement

34. Lilly does not infringe any valid claim of United States Patent No. 6,410,516.

### SECOND AFFIRMATIVE DEFENSE
#### Patent Invalidity

35. The claims of United States Patent No. 6,410,516 are invalid for failing to meet the requirements of one or more of the provisions of 35 U.S.C §§ 101, 102, 103 and/or 112.

36. U.S. Patent No. 6,410,516 is invalid for the prosecution form of laches.

### THIRD AFFIRMATIVE DEFENSE
#### Patent unenforceability for Inequitable Conduct

37. United States Patent No. 6,410,516 is unenforceable as the result of the inequitable conduct during the prosecution of the application that issued as the '516 patent. The Plaintiffs and/or their representatives committed inequitable acts that misled the Patent and Trademark Office. In particular, persons associated with the filing and prosecution of the application on Plaintiffs' behalf, having knowledge of the United States Patent No. 4,418,068 ("the Jones Patent"), willfully or with gross negligence failed to disclose the Jones patent to the Patent and Trademark Office during prosecution and, therefore violated their duty of disclosure under 37 CFR 1.56.

38. Plaintiffs, through their attorneys, filed this action on June 25, 2002, the very day that the '516 patent in suit issued. The persons associated with the filing and prosecution of the application that matured as the '516 patent were, on information and belief, aware of the complaint in this action and the references cited therein prior to June 25, 2002, and thus prior to the issuance of the '516 patent. Plaintiffs and their attorneys attached to the complaint in this action as "Exhibit 2" a World Intellectual Property Organization Patent Application 96/40137 entitled "Methods of Modulating NF-KB Transcription Factor." ("WO application"). The Jones Patent, which discloses the administration of raloxifene hydrochloride before the priority dates for the '516 patent, was incorporated by reference in that application. (See p. 4 lines 10-14 of the WO application). Thus, the persons associated with the filing and prosecution of the application that issued as the '516 patent, including Plaintiffs and their attorneys, knew or should have known of the prior art Jones patent before the issuance of the '516 patent, yet failed to disclose it to the U.S. Patent and Trademark Office.

39. The Jones Patent discloses the use of raloxifene hydrochloride as "pharmaceuticals for antiestrogen and antiandrogen therapy" in the treatment of mammary and prostatic tumors. This prior art reference specifically describes administering "an effective dose of a compound as described to a subject suffering from such a condition or at risk of suffering from such condition." (Jones Patent, col. 1, lines 33-37). The Jones Patent describes giving such formulations to mammals (cols. 28 et seq.) and teaches administration to humans of up 1000 mg/day of raloxifene hydrochloride (col. 38 et seq.), well in excess of the preferred range taught by the WO application.

40. Plaintiffs and their counsel attached the WO application as evidence that the administration of raloxifene hydrochloride, as taught in the prior art Jones Patent, "modulat[es] NF-κB activity." Complaint, ¶ 21. The WO application itself states that raloxifene hydrochloride is "effective in blocking the action of the important cellular regulatory molecule NF-κB." (WO application, p. 12). As such, the Jones Patent is clearly material prior art that anticipates one or more of the claims of the '516 patent.

41. Moreover, on information and belief, plaintiffs, one or more of the inventors, and/or their attorneys were clearly aware of a variety of articles that teach that the inhibition of NF-κB is an inherent property of a number of compounds that were commonly administered in the prior art. Indeed, the inherency of NF-κB modulation in many of these prior art compounds was described by one of the co-inventors in a review article published while the application was still pending, Baldwin AS Jr., *Series Introduction: the transcription factor NF-kB and human disease*, J. Clin. Invest., Jan; 107(1):3-6 (2001). *See also* E. Kopp and S. Ghosh, *Inhibition of NF-κB by Sodium Salicylate and Aspirin*, SCIENCE 265: 956-959 (1994) (Aspirin), Yumi Yamamoto, et al., *Sulindac Inhibits Activation of the NF-κB Pathway*, 274 J. BIOL. CHEM. 27307 (1999) (Sulindac and its metabolites); Albert S. Baldwin, Jr., *The NF-κB and IκB Proteins: New Discoveries and Insights*, 14 ANN. REV. IMMUNOL. 649, 671 (1996) (Prednisone and other Glucocorticoids); N. Auphan, J. DiDonato, C. Rosette, A. Helmberg and M. Karin, Immunosuppression by Glucocorticoids: Inhibition of NF-κB Activity Through Induction of IκB Synthesis, Science, Vol. 270:286-290 (1995) (same); Albert S. Baldwin, Jr., *The NF-κB and IκB Proteins: New Discoveries and Insights*, 14 ANN. REV. IMMUNOL. 649, 671 (1996) (Cyclosporin A); Kye-Im Jeon, Jae-Yeon Jeong and Dae-Myung Jue, *Thiol-*

16

*reactive Metal Compounds Inhibit NF-κB Activation By Blocking IκB kinase*, J.

Immunol. 164 (11): 5981-5989 (June 1, 2000) (Gold Compounds); Luis Miguel Blanco-

Colio, et al., *Red Wine Intake Prevents Nuclear Factor-κB Activation in Peripheral*

*Blood Mononuclear Cells of Healthy Volunteers During Postprandial Lipemia,*

CIRCULATION, 102: 1020 (2000) (Red Wine); Fajun Yang, et al., Green Tea Polyphenols

Block Endotoxin-Induced TNF-Production and Lethality in a Murine Model, 128 J. Nutr.

2334 (1998) (Green Tea); Suppression of Lipopolysaccharide-Induced Nuclear Factor-

κB Activity by Theaflavin-3,3'-Digallate from Black Tea and Other Polyphenols through

Downregulation of IκB Kinase Activity in Macrophages, 59 Biochem. Phamacol. 357

(2000) (Black Tea); M.M. Manson, et al., *Modulation of signal-transduction pathways by*

*chemopreventive agents*, 28 BIOCHEM. SOC. TRANS. 7 (2000) (Turmeric); and Nagaotshi

Ide and Benjamin H.S. Lau, Garlic Compounds Minimize Intracellular Oxidative Stress

and Inhibit Nuclear Factor-κB Activation, 131 J. Nutr. 1020S (2001) (Garlic). None of

these references, though clearly material to the prosecution of the application that issued

as the '516 patent, were disclosed to the examiner.

42. Thus, persons associated with the filing and prosecution of the application that

led to the '516 patent, including Plaintiffs, the inventors, and their attorneys, were clearly

aware of the Jones Patent and/or other prior art references and their high materiality to

the patent application examination process during the pendency of the prosecution of that

application. This material information is not cumulative, and thus should have been

disclosed. Therefore, the '516 patent is unenforceable as the result of inequitable

conduct.

17

## COUNTERCLAIMS FOR DECLARATORY RELIEF

43. Defendant and counterclaimant, Lilly asserts this counterclaim against Plaintiffs and Counterdefendants ARIAD, M.I.T, THE WHITEHEAD INSTITUTE, and HARVARD and avers as follows:

## JURISDICTION AND VENUE

44. This action arises under the patent laws of the United States, 35 U.S.C. §§ 1 et seq. This Court has original jurisdiction under 28 U.S.C. §§1331, 1338(a) and Fed. R. Civ. P. 13(a). Counterclaimant Lilly seeks declaratory judgment pursuant to Sections 2201 and 2202 of Title 28 of the United States Code.

45. There is an actual controversy within this judicial district arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, and Declaratory Judgments Act, 28 U.S.C. §§ 2201 *et seq.*, between Counterclaimant and Counterdefendants. Plaintiffs initiated this action against Lilly, alleging infringement by Lilly of United States Patent No. 6,410,516. An actual controversy exists at least by virtue of Plaintiffs' Complaint and Lilly's Answer thereto, asserting non-infringement, and invalidity of the patent in suit.

46. Venue for these Counterclaims is proper under 28 U.S.C. § 1391 (b) and (c) and 1400 (b).

## **PARTIES**

47. Upon information and belief based upon representations made in Plaintiff's Complaint, ARIAD is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 26 Landsdowne Street, Cambridge, Massachusetts.

48. Upon information and belief based upon representations made in Plaintiff's Complaint, M.I.T is a co-educational, privately endowed research university located at 77 Massachusetts Avenue, Cambridge, Massachusetts.

49. Upon information and belief based upon representations made in Plaintiff's Complaint, THE WHITEHEAD INSTITUTE is a non-profit research and education institute located at Nine Cambridge Center, Cambridge, Massachusetts.

50. Upon information and belief based upon representations made in Plaintiff's Complaint, HARVARD is a co-educational, privately endowed research university located at Massachusetts Hall, Cambridge, Massachusetts.

51. Defendant Lilly is a corporation organized and existing under the laws of the State of Indiana with its principal place of business located at Lilly Corporate Center, Indianapolis, Indiana.

52. U.S. Patent No. 6,410,516, which issued June 25, 2002, references on its face a priority date of January 9, 1986, more than sixteen years prior.

53. Plaintiffs have charged Lilly with infringement of United States Patent No. 6,410,516, for the sale of products whose active ingredients were taught for administration in humans in patent applications filed before the earliest claimed priority date of the '516 patent.

19

54. Plaintiffs did not seek to add the claims asserted against Lilly's accused products to the patent application that issued as the '516 patent until after Lilly had commercialized its accused products.

## COUNTERCLAIM I – NON-INFRINGEMENT AND INVALIDITY

55. Lilly has not infringed any valid claim of United States Patent No. 6,410,516 in any way, i.e., directly, contributorily, or by inducement. Therefore, Lilly is entitled to a judicial declaration that Lilly has not and does not infringe United States Patent No. 6,410,516.

56. United States Patent No. 6,410,516 is invalid for failure to comply with one or more of the requirements, conditions and provisions set forth in at least 35 U.S.C. §§ 101, 102, 103, and/or 112. Therefore, Lilly is entitled to a judicial declaration that the United States Patent No. 6,410,516 is invalid and unenforceable.

57. United States Patent No. 6,410,516 is invalid for the prosecution form of laches.

## COUNTERCLAIM II - UNENFORCEABILITY

58. Lilly incorporates by reference the fact and allegations set forth in Paragraphs 37-42, supra.

59. United States Patent No. 6,410,516 is unenforceable due to inequitable conduct. Therefore, Lilly is entitled to a judicial declaration that the United States Patent No. 6,410,516 is unenforceable.

20

## RELIEF REQUESTED

WHEREFORE, defendant-counterclaimant Lilly prays for judgment and relief against Plaintiff-counterdefendants, ARIAD, M.I.T, THE WHITEHEAD INSTITUTE, and HARVARD including:

(A)     A dismissal with prejudice of Plaintiffs' Complaint and a denial of plaintiffs' claims for relief against defendant-counterclaimant Lilly.

(B)     A declaration that defendant-counterclaimant has not infringed any valid claim of United States Patent No. 6,410,516.

(C)     A declaration that United States Patent No. 6,410,516 is invalid.

(D)     A declaration that United States Patent No. 6,410,516 is unenforceable.

(E)     An injunction permanently preventing counterdefendants from asserting or enforcing United States Patent No. 6,410,516 against Lilly and/or purchasers or users of Lilly products.

(F)     Judgment that this is an exceptional case and that defendant-counterclaimant be awarded costs, expenses and reasonable attorney's fees pursuant to 35 U.S.C. §285.

(G)     Awarding such other and further relief as this Court may deem just and proper.

May 27, 2003

Respectfully submitted,

Paul H. Berghoff
Grantland G. Drutchas
David M. Frischkorn
McDonnell Boehnen Hulbert
& Berghoff
300 S. Wacker Drive
Chicago, Illinois 60606
Tel:    (312) 913-0001
Fax:    (312) 913-0002

Lawrence R. Robins
Finnegan, Henderson,
Farabow, Garrett & Dunner
55 Cambridge Parkway
Cambridge, MA 02142
Phone: 617-452-1660
Fax:    617-452-1666

## CERTIFICATE OF SERVICE

I, Jenny E. Macioge, hereby certify that on May 27, 2003, a true and correct copy

of the foregoing was served by the indicated means to the persons at the addresses listed:

ELI LILLY and COMPANY'S ANSWER TO PLAINTIFFS' COMPLAINT AND

COUNTERCLAIMS

Lee Carl Bromberg
Kerry L. Timbers
Anne Marie Longobucco
BROMBERG & SUNSTEIN LLP
125 Summer Street
Boston, MA 02110

☒ Via First Class Mail
☐ Via Hand Delivery
☐ Via Overnight Courier
☒ Via Facsimile

Leora Ben-Ami
Thomas F. Fleming
Patricia A. Carson
CLIFFORD CHANCE ROGERS & WELLS
200 Park Avenue
New York, NY 10166

☒ Via First Class Mail
☐ Via Hand Delivery
☐ Via Overnight Courier
☒ Via Facsimile

Jenry E. Macioge

FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
55 Cambridge Parkway
Cambridge, MA 02142
TEL: 617-452-1625

# EXHIBIT K

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:02-cv-11280-RWZ

Ariad Pharmaceutical, et al v. Eli Lilly & CO.
Assigned to: Judge Rya W. Zobel
Demand: $0
Cause: 28:1338 Patent Infringement

Date Filed: 06/25/2002
Jury Demand: None
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

## Plaintiff

**Ariad Pharmaceutical**                    represented by  **Anne M. Longobucco**
Demeo & Associates, P.C.
One Lewis Wharf
Boston, MA 02110
617-263-2600
Fax: 617-263-2300
Email: alongobucco@jdemeo.com
*TERMINATED: 11/26/2003*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher T. Jagoe**
425 Park Ave
New York, NY 10022-3598
US
212-836-8000
Fax: 8689
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lee C. Bromberg**
Bromberg & Sunstein LLP
125 Summer Street
Boston, MA 02110
617-443-9292
Fax: 617-443-0004
Email: lbromberg@bromsun.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Leora Ben-Ami**
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022
212-836-7203
Fax: 212-836-6330
Email: lbenami@kayescholer.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patricia A. Carson**
Kaye Scholer LLP (NY)
425 Park Avenue
New York, NY 10022
212-836-7466
Email: pcarson@kayescholer.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas F. Fleming**
Kaye Scholer LLP (NY)
425 Park Avenue
New York, NY 10022
212-836-7515
Email: tfleming@kayescholer.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Vladimir Drozdoff**
Kaye Scholer LLP (NY)
425 Park Avenue
New York, NY 10022
212-836-7629
Fax: 212-836-8000
Email: vdrozdoff@kayescholer.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Meredith L. Ainbinder**
Bromberg & Sunstein
125 Summer St.
Boston, MA 02110
617-443-9292
Fax: 617-443-0004
Email: mainbinder@bromsun.com
*ATTORNEY TO BE NOTICED*

**Kerry L. Timbers**
Bromberg & Sunstein LLP
125 Summer Street
Boston, MA 02110-1618
617-443-9292
Fax: 617-443-0004
Email: ktimbers@bromsun.com
*ATTORNEY TO BE NOTICED*

**Lisa M. Fleming**
Bromberg & Sunstein
125 Summer Street

Boston, MA 02110-1618
617-443-9292
Fax: 617-443-0004
Email: lfleming@bromsun.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Massachusetts Institute of
Technology**                    represented by  **Anne M. Longobucco**
                                                (See above for address)
                                                *TERMINATED: 11/26/2003*
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Christopher T. Jagoe**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Lee C. Bromberg**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Leora Ben-Ami**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Patricia A. Carson**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Thomas F. Fleming**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Vladimir Drozdoff**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Meredith L. Ainbinder**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

                                                **Kerry L. Timbers**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

**Lisa M. Fleming**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**The Whitehead Institute for**            represented by   **Anne M. Longobucco**
**Biomedical Research**                                     (See above for address)
                                                           *TERMINATED: 11/26/2003*
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Christopher T. Jagoe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lee C. Bromberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Leora Ben-Ami**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patricia A. Carson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas F. Fleming**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Vladimir Drozdoff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Meredith L. Ainbinder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kerry L. Timbers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lisa M. Fleming**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**The President and Fellows of Harvard College**    represented by   **Anne M. Longobucco**
(See above for address)
*TERMINATED: 11/26/2003*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher T. Jagoe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lee C. Bromberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Leora Ben-Ami**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patricia A. Carson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas F. Fleming**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Vladimir Drozdoff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Meredith L. Ainbinder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kerry L. Timbers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lisa M. Fleming**

(See above for address)
*ATTORNEY TO BE NOTICED*

**V.**

**Defendant**

**Eli Lilly & CO.**                    represented by   **Alison Baldwin**
McDonnell Boehnen Hulbert &
Berghoff
300 South Wacker Drive
Suite 3200
Chicago, IL 60606
US
312-913-0001
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew M. Williams**
McDonnell Boehnen Hulbert &
Berghoff
300 South Wacker Drive
Chicago, IL 60606
313-913-0001
Fax: 312-913-0002
Email: williams@mbhb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anita Terpstra**
McDonnell Boehnen Hulbert &
Berghoff
300 South Wacker Drive
Suite 3200
Chicago, IL 60606
US
312-913-0001
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles E. Lipsey**
Finnegan,Henderson,Farabow,Garrett &
Dunner, LLP.
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190
US
571-203-2700
Fax: 202-408-4400
Email: charles.lipsey@finnegan.com
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Christopher S. Schultz**
Finnegan,Henderson,Farabow,Garrett &
Dunner,LLP.
55 Cambridge Parkway
Cambridge, MA 02142
617-452-1623
Fax: 617-452-1666
Email:
christopher.schultz@finnegan.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David S. Forman**
Finnegan,Hebderson,Farabow,Garrett &
Dunner,LLP.
901 New York Avenue
Washington, DC 20001
US
202-408-4000
Fax: 202-408-4400
Email: david.forman@finnegan.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David M. Frischkorn**
McDonnell Boehnen Hulbert &
Berghoff
300 South Wacker Drive
Chicago, IL 60606
313-913-0001
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Grantland G. Drutchas**
McDonnell Boehnen Hulbert &
Berghoff
300 South Wacker Drive
Chicago, IL 60606
313-913-0001
Fax: 312-913-0002
Email: Drutchas@mbhb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Howard W. Levine**
Finnegan,Henderson,Farabow,Garrett &
Dunner, L.L.P.
901 New York Avenue

Washington, DC 20001
US
202-408-4000
Fax: 4400
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Johnson**
Finnegan, Henderson, Farabow, Garrett
& Dunner, L.L.P.
901 New York Avenue
Washington, DC 20001
US
202-408-4000
Fax: 4400
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura P. Masurovsky**
Finnegan,Henderson,Farabow,Garrett &
Dunner, LLP
901 New York Avenue
Washington, DC 20001
US
202-408-4000
Fax: 202-408-4400
Email:
laura.masurovsky@finnegan.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lawrence R. Robins**
Finnegan, Henderson, Farabow, Garrett
& Dunner, LLP
55 Cambridge Parkway
Cambridge, MA 02142
617-452-1600
Fax: 617-452-1666
Email: Larry.Robins@Finnegan.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Leslie A. McDonell**
Finnegan, Henderson, Fararabow,
Garrett, & Dunner LLP
55 Cambridge Street
Suite 700
Cambridge, MA 02142
617-452-1600
Fax: 617-452-1666

Email: Leslie.McDonell@finnegan.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicole A. Keenan**
McDonnell Boehnen Hulbert &
Berghoff
300 South Wacker Drive
Chicago, IL 60606
313-913-0001
Email: keenan@mbhb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul H. Berhgoff**
McDonnell Boehnen Hulbert &
Berghoff
300 South Wacker Drive
Chicago, IL 60606
313-913-0001
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert D. Bajefsky**
Finnegan, Henderson, Farabow, Garrett
& Dunner
901 New York Avenue
Washington, DC 20001
202-408-4000
Fax: 202-408-4400
Email: robert.bajefsky@finnegan.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**S. Richard Carden**
McDonnell Boehnen Hulbert &
Berghoff
300 South Wacker Drive
Chicago, IL 60606
313-913-0001
Email: carden@mbhb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sanya Sukduang**
Finnegan,Henderson,Farabow,Garrett &
Dunner,LLP.
901 New York Avenue
Washington, DC 20001

US
202-408-4000
Fax: 202-408-4400
Email: sanya.sukduang@finnegan.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**Dr. Stuart Schreiber**                    represented by    **Stephanie Taverna Siden**
                                                              Demeo & Associates
                                                              One Lewis Wharf
                                                              Boston, MA 02110
                                                              617-263-2600
                                                              Fax: 617-263-2300
                                                              Email: ssiden@jdemeo.com
                                                              *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Eli Lilly & CO.**                         represented by    **Charles E. Lipsey**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **David S. Forman**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Howard W. Levine**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Jennifer A. Johnson**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Laura P. Masurovsky**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Leslie A. McDonell**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Robert D. Bajefsky**
                                                              (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sanya Sukduang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew M. Williams**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Ariad Pharmaceutical**     represented by    **Christopher T. Jagoe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Massachusetts Institute of Technology**     represented by    **Christopher T. Jagoe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**The President and Fellows of Harvard College**     represented by    **Christopher T. Jagoe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**The Whitehead Institute for Biomedical Research**     represented by    **Christopher T. Jagoe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/25/2002 | 1 | Complaint filed. Case assigned to Judge: Zobel. Receipt #: 40085 Amount:$ 150.00. Fee Status: pd (jdj) (Entered: 06/26/2002) |
| 06/25/2002 | | Summons issued for Eli Lilly & CO. (jdj) (Entered: 06/26/2002) |
| 06/27/2002 | 2 | Letter from Christina Bonney dated: 6/25/02 to: Ms Timbers re: CT Corp System is not the registered agent for a company by the name of Eli Lilly. filed. (jdj) (Entered: 06/27/2002) |
| 06/28/2002 | | Second Summons issued for Eli Lilly & CO. (jdj) (Entered: 06/28/2002) |

| 07/18/2002 | 3 | Notice of appearance of attorney for Eli Lilly & CO. by Lawrence R. Robins, Leslie A. McDonell, Christopher S Schultz, filed. (jdj) (Entered: 07/19/2002) |
|---|---|---|
| 07/18/2002 | 4 | STIPULATION by Ariad Pharmaceutical, MIT, The Whitehead Insti, Pesident and Fellows, Eli Lilly & CO., reset answer due for 8/19/02 for Eli Lilly & CO. , filed. (jdj) (Entered: 07/19/2002) |
| 08/19/2002 | 5 | Motion by Eli Lilly & CO. to dismiss ,and for summary judgment , filed cs. (jdj) (Entered: 08/20/2002) |
| 08/19/2002 | 6 | Memorandum by Eli Lilly & CO. in support of [5-1] motion to dismiss, [5-2] motion for summary judgment , filed. (jdj) (Entered: 08/20/2002) |
| 08/19/2002 | 7 | Statement of Facts as to which there is no genuine issue of facts by Eli Lilly & CO. re: [5-1] motion to dismiss, [5-2] motion for summary judgment , filed. (jdj) (Entered: 08/20/2002) |
| 08/19/2002 | 8 | Affidavit of Michael Karin for Eli Lilly & CO. , re: [5-1] motion to dismiss, [5-2] motion for summary judgment , filed. (jdj) (Entered: 08/20/2002) |
| 08/19/2002 | 9 | Appendix/exhibits by Eli Lilly & CO. in support of [6-1] support memorandum to its motion to dismiss and its motion for summary judgment, filed. (cannot be scanned, bound booklet) (jdj) (Entered: 08/20/2002) |
| 08/19/2002 | 10 | Motion by Eli Lilly & CO. for Paul H. Berhgoff, S.Richard Carden, Grantland G. Drutchas, Nicole A. Fiorella David M. Frischkorn, Andrew W. William to appear pro hac vice fee status: pd fee amt: $300.00 Receipt #: 41323 , filed. (jdj) (Entered: 08/21/2002) |
| 08/21/2002 | | Judge Rya W. Zobel . Endorsed Order entered granting [10-1] motion for Paul H. Berhgoff, S.Richard Carden, Grantland G. Drutchas, Nicole A. Fiorella David M. Frischkorn, Andrew W. William to appear pro hac vice fee status: pd fee amt: $300.00 Receipt #: 41323 Added Paul H. Berhgoff, S. Richard Carden, Grantland G. Drutchas Nicole A. Fiorella, David M. Frischkorn, Andrew W. William. cc/cl [EOD Date 8/21/02] (jdj) (Entered: 08/21/2002) |
| 08/26/2002 | 11 | Motion by Ariad Pharmaceutical, MIT, The Whitehead Insti, Pesident and Fellows for Leora Ben-Ami, Patricia A. Carson,Thomas Fleming and Vladimir Drozdoff to appear pro hac vice fee status: pd fee amt: $200.00 Receipt #: 41449 , filed cs. (jdj) (Entered: 08/27/2002) |
| 08/27/2002 | | Judge Rya W. Zobel . Endorsed Order entered granting [11-1] motion for Leora Ben-Ami, Patricia A. Carson,Thomas Fleming and Vladimir Drozdoff to appear pro hac vice fee status: pd fee amt: $200.00 Receipt #: 41449 Added Leora Ben-Ami, Patricia A. Carson, Thomas F. Fleming, Vladimir Drozdoff . [EOD Date 8/27/02] cc/cl (jdj) (Entered: 08/27/2002) |
| 08/30/2002 | 12 | Joint motion by Ariad Pharmaceutical, MIT, The Whitehead Insti, Pesident and Fellows, Eli Lilly & CO. to extend time to 10/17/02 to |

| | | oppose motion to dismiss and for leave to file reply , filed cs . (jdj) (Entered: 09/04/2002) |
|---|---|---|
| 09/11/2002 | 13 | Letter by Lee C. Bromberg dated: 9/11/02 to: Judge Zobel re: Judge Zobel's advising counsel of her of service w/ Harvard filed. (jdj) (Entered: 09/11/2002) |
| 09/19/2002 | | Judge Rya W. Zobel . Endorsed Order entered granting [12-1] joint motion to extend time to 10/17/02 to oppose motion to dismiss and for leave to file reply, Motion hearing set for 2:00 11/21/02 for [5-1] motion to dismiss . [EOD Date 9/19/02] cc/cl (jdj) (Entered: 09/19/2002) |
| 10/17/2002 | 14 | Response by Ariad Pharmaceutical, MIT, The Whitehead Insti, President and Fellows in opposition to [5-1] motion to dismiss , filed. (cannot be scanned, bound booklet) (jdj) (Entered: 10/18/2002) |
| 10/17/2002 | 15 | Affidavit of Laurie H. Glimcher,M.D. , re: [14-1] opposition response , filed. (jdj) (Entered: 10/18/2002) |
| 10/17/2002 | 16 | Motion by Ariad Pharmaceutical, MIT, The Whitehead Insti, President and Fellows for relief from Defendants motion for summary judgment of invalidity under 35 USC sections 102 and 112 , filed cs. (jdj) (Entered: 10/18/2002) |
| 10/17/2002 | 17 | Memorandum by Ariad Pharmaceutical, MIT, The Whitehead Insti, Pesident and Fellows in support of [16-1] motion for relief from Defendants motion for summary judgment of invalidity under 35 USC sections 102 and 112 , filed cs. (jdj) (Entered: 10/18/2002) |
| 10/17/2002 | 18 | Affidavit of Vladimir Drozdoff , re: [16-1] motion for relief from Defendants motion for summary judgment of invalidity under 35 USC sections 102 and 112 , filed. (jdj) (Entered: 10/18/2002) |
| 10/17/2002 | 19 | (Consent) Motion by Ariad Pharmaceutical, MIT, The Whitehead Insti, President and Fellows for leave to file memorandum of more than 20 pgs , filed. (jdj) (Entered: 10/18/2002) |
| 10/17/2002 | 20 | Statement of Facts by Ariad Pharmaceutical, MIT, The Whitehead Insti, Pesident and Fellows re: [16-1] motion for relief from Defendants motion for summary judgment of invalidity under 35 USC sections 102 and 112 , filed. (jdj) (Entered: 10/18/2002) |
| 10/17/2002 | 21 | Affidavit of Dr. Thomas D. Gilmore , re: [16-1] motion for relief from Defendants motion for summary judgment of invalidity under 35 USC sections 102 and 112 , filed. (cannot be scanned,bound booklet) (jdj) Modified on 10/18/2002 (Entered: 10/18/2002) |
| 10/17/2002 | 22 | Affidavit of Brendan F. Boyce, MB Ch.B , re: [16-1] motion for relief from Defendants motion for summary judgment of invalidity under 35 USC sections 102 and 112 , filed. (cannot be scanned,bound booklet) (jdj) Modified on 10/18/2002 (Entered: 10/18/2002) |
| 10/17/2002 | 23 | Affidavit of Charles A. Dinarello,M.D. , re: [16-1] motion for relief from Defendants motion for summary judgment of invalidity under 35 USC |

| | | sections 102 and 112 , filed. (cannot be scanned,bound booklet) (jdj) Modified on 10/18/2002 (Entered: 10/18/2002) |
|---|---|---|
| 10/18/2002 | | Judge Rya W. Zobel . Endorsed Order entered granting [19-1] motion for leave to file memorandum of more than 20 pgs . cc/cl [EOD Date 10/18/02] (jdj) (Entered: 10/18/2002) |
| 10/31/2002 | 24 | Response by Eli Lilly & CO. in opposition to [16-1] motion for relief from Defendants motion for summary judgment of invalidity under 35 USC sections 102 and 112 , filed. (jdj) (Entered: 11/01/2002) |
| 11/19/2002 | 25 | Reply by Eli Lilly & CO. to response to [5-1] motion to dismiss, [5-2] motion for summary judgment , filed cs. (jdj) (Entered: 11/19/2002) |
| 11/21/2002 | 26 | Motion by Ariad Pharmaceutical, MIT, The Whitehead Insti, Pesident and Fellows for leave to file surreply declaration in opposition to motion to dismiss or for summary judgment , filed cs. (jdj) (Entered: 11/22/2002) |
| 11/21/2002 | | Motion hearing re: [5-1] motion to dismiss Motion hearing held (jdj) (Entered: 11/22/2002) |
| 11/21/2002 | | Motion hearing re: [5-1] motion to dismiss (jdj) (Entered: 11/25/2002) |
| 11/21/2002 | 27 | Judge Rya W. Zobel . Clerk's Notes: re: motion hearing held [5-1] motion to dismiss etc, taken under advisement Court Reporter: McLaughlin (jdj) (Entered: 11/25/2002) |
| 11/25/2002 | 28 | Transcript of proceedings for held on proceeding date: 11/21/02 before Judge: Zobel. Court Reporter: James McLaughlin (jdj) (Entered: 11/25/2002) |
| 11/25/2002 | 29 | Response by Eli Lilly & CO. in opposition to [26-1] motion for leave to file surreply declaration in opposition to motion to dismiss or for summary judgment , filed. (jdj) (Entered: 12/02/2002) |
| 12/23/2002 | 31 | Letter by Lee C. Bromberg dated: 12/23/02 to: Judge Zobel re: Vacated action by the US Court of appeals for an en banc review. filed. (jdj) (Entered: 01/02/2003) |
| 12/30/2002 | 30 | Letter by Paul H. Berhgoff dated: 12/23/02 to: Judge Zobel re: attached rulings from Court of Appeals in California filed. (jdj) (Entered: 12/30/2002) |
| 02/13/2003 | 32 | Letter by Lee C. Bromberg dated: 2/13/03 to: Court re: status on defendants motion to dismiss and for summary judgment. filed. (jdj) (Entered: 02/20/2003) |
| 05/12/2003 | 33 | J Judge Rya W. Zobel . Memorandum and Order entered. denying J [16-1] motion for relief from Defendants motion for summary judgment of invalidity under 35 USC sections 102 and 112, as moot;1 denying [5-1] motion to dismiss, denying [5-2] motion for summary judgment [EOD Date 5/12/03] Entered cc/cl (lau) (Entered: 05/12/2003) |
| 05/12/2003 | 34 | Judge Rya W. Zobel . Notice of Hearing/conference: set scheduling conference for 3:00 6/19/03 . Entered cc/cl . (lau) (Entered: 05/12/2003) |

| | | |
|---|---|---|
| 05/14/2003 | | Terminated document: mooting [26-1] motion for leave to file surreply declaration in opposition to motion to dismiss or for summary judgment Requested by lau. (lau) (Entered: 05/14/2003) |
| 05/27/2003 | 35 | ANSWER to Complaint, COUNTERCLAIM against Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College, The Whitehead Institute for Biomedical Research by Eli Lilly & CO. filed cs.(Johnson, Jay) (Entered: 05/30/2003) |
| 06/12/2003 | 36 | JOINT STATEMENT re scheduling conference. (Johnson, Jay) (Entered: 06/17/2003) |
| 06/17/2003 | 37 | MOTION to Disqualify Counsel Patricia A. Carson and The Clifford Chance U.S. Firm by Eli Lilly & CO. filed cs.(Johnson, Jay) (Entered: 06/18/2003) |
| 06/17/2003 | 38 | MEMORANDUM in Support re 37 MOTION to Disqualify Counsel filed by Eli Lilly & CO. filed cs. (Johnson, Jay) (Entered: 06/18/2003) |
| 06/19/2003 | 39 | CERTIFICATION pursuant to Local Rule 16.1 by Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College, The Whitehead Institute for Biomedical Research. (Johnson, Jay) (Entered: 06/20/2003) |
| 06/19/2003 | 40 | CERTIFICATION pursuant to Local Rule 16.1 by Eli Lilly & CO.. (Johnson, Jay) (Entered: 06/20/2003) |
| 06/19/2003 | 41 | Electronic Clerk's Notes for proceedings held before Judge Rya W. Zobel : Scheduling Conference held on 6/19/2003. parties to file an agreed upon Protective Order; parties agree on mediation and will let court know next week if they would like the court to send case to mediation; Judge accepts Eli Lilly's schedule;Markman Hearing set for 1/13/2004 02:00 PM in Courtroom 12 before Rya W. Zobel; no evidence; (Urso, Lisa) (Entered: 06/20/2003) |
| 06/19/2003 | | Judge Rya W. Zobel : ORDER entered ENDORSEMENT ; The court accepts the schedule with the Lilly dates; markman hearing 1/13/04 at 2:00 p.m.(Urso, Lisa) (Entered: 06/20/2003) |
| 06/19/2003 | 42 | ANSWER to Counterclaim by Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College, The Whitehead Institute for Biomedical Research.filed c(Johnson, Jay) (Entered: 06/24/2003) |
| 07/03/2003 | 43 | OPPOSITION to Motion re 37 MOTION to Disqualify Counsel filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College, The Whitehead Institute for Biomedical Research. c/s(Filo, Jennifer) (Entered: 07/09/2003) |
| 07/09/2003 | 44 | REPLY to Response to Motion re 37 MOTION to Disqualify Counsel Patricia A. Carson and The Clifford Chance U.S. Firm filed by Eli Lilly & CO. (Rynne, Michelle) (Entered: 07/11/2003) |

| | | |
|---|---|---|
| 07/11/2003 | 45 | MOTION for Leave to File sur-reply in opposition to motion to disqualify by Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College, The Whitehead Institute for Biomedical Research.(Rynne, Michelle) (Entered: 07/21/2003) |
| 07/16/2003 | 46 | MEMORANDUM in Opposition re 45 MOTION for Leave to File a Rur-Reply Memorandum filed by Eli Lilly & CO., FILED, c/s. (Boyce, Kathy) (Entered: 07/23/2003) |
| 08/13/2003 | | Judge Rya W. Zobel : ORDER entered denying 37 Motion to Disqualify Counsel. Carson's position in the PTO was a subordinate one and carried no authority to make decisions; it was greatly distant in time - 14 years; it involved work on an application several generations removed from the patent in suit and on matters not related to the issues in suit. Entered cc/cl (Urso, Lisa) (Entered: 08/13/2003) |
| 10/03/2003 | 47 | NOTICE of Hearing: Evidentiary Hearing set for 11/3/2003 09:30 AM in Courtroom 12 before Judge Rya W. Zobel. (Urso, Lisa) (Entered: 10/03/2003) |
| 10/09/2003 | 48 | NOTICE of Appearance by Kerry L. Timbers on behalf of all plaintiffs (Timbers, Kerry) (Entered: 10/09/2003) |
| 10/30/2003 | 49 | Letter/request permission to bring electronic items into Courthouse(non-motion) from Lawrence R. Robins. (Johnson, Jay) (Entered: 11/03/2003) |
| 11/03/2003 | | Electronic Clerk's Notes for proceedings held before Judge Rya W. Zobel : Hearing re Tutorial held on 11/3/2003. Counsel to file motions for protective order by 11/14; opposition due 11/21; (Court Reporter Valerie O' Hara.) (Urso, Lisa) (Entered: 11/03/2003) |
| 11/05/2003 | 50 | Letter/request (non-motion) from Andrew W. Williams w/attached tutorial used at presentation. (Johnson, Jay) (Entered: 11/05/2003) |
| 11/13/2003 | 51 | MOTION for resolution of protective order disputes by Eli Lilly & CO.. (Johnson, Jay) (Entered: 11/13/2003) |
| 11/20/2003 | 52 | TRANSCRIPT of Proceedings held on 11/3/03 before Judge Zobel. Court Reporter: Valerie A. O'Hara. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter or the Clerk's Office. (Johnson, Jay) (Entered: 11/20/2003) |
| 11/21/2003 | 53 | MEMORANDUM in Opposition re 51 MOTION for resolution of protective order disputes filed by Ariad Pharmaceutical. (Johnson, Jay) (Entered: 11/24/2003) |
| 11/24/2003 | 54 | NOTICE of Opening Brief on Claim Construction by Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College, The Whitehead Institute for Biomedical Research (Johnson, Jay) (Entered: 11/25/2003) |
| 11/24/2003 | 55 | NOTICE of Opening Claim Construction Brief by Eli Lilly & CO. |

| | | (Johnson, Jay) (Entered: 11/25/2003) |
|---|---|---|
| 11/24/2003 | 56 | EXHIBIT re 55 Notice of Opening Claim Construction Brief filed by Eli Lilly & CO. by Eli Lilly & CO.. (Johnson, Jay) (Entered: 11/25/2003) |
| 11/24/2003 | 57 | AFFIDAVIT/DECLARATION of Vladimir V. Drozdoff re 54 Notice of Plaintiffs Opening Claim Construction Brief by Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College. (Johnson, Jay) (Entered: 11/25/2003) |
| 11/24/2003 | 58 | AFFIDAVIT/DECLARATION of Dr. Thomas D. Gilmore by Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College, The Whitehead Institute for Biomedical Research. (Johnson, Jay) (Entered: 11/25/2003) |
| 11/24/2003 | 59 | AFFIDAVIT/DECLARATION of Laurie H. Glimcher, M.D. by Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College, The Whitehead Institute for Biomedical Research. (Johnson, Jay) (Entered: 11/25/2003) |
| 11/24/2003 | 60 | MOTION for Leave to File Brief on Claim Construction in Excess of 20 pgs by Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College, The Whitehead Institute for Biomedical Research.(Johnson, Jay) Modified on 12/1/2003 (Johnson, Jay). (Entered: 11/25/2003) |
| 11/26/2003 | 61 | NOTICE of Withdrawal of Appearance Attorney Anne M. Longobucco terminated. (Longobucco, Anne) (Entered: 11/26/2003) |
| 12/09/2003 | 62 | MEMORANDUM in Opposition re 60 MOTION for Leave to File brief on claim construction in excess of 20 pgs filed by Eli Lilly & CO.. (Johnson, Jay) (Entered: 12/11/2003) |
| 12/18/2003 | | Judge Rya W. Zobel : Electronic ORDER entered granting 60 Motion for Leave to File (Urso, Lisa) (Entered: 12/18/2003) |
| 12/22/2003 | 63 | Response in Opposition by Eli Lilly & CO. to 54 Ariad's Claim Construction Brief. (Johnson, Jay) (Entered: 12/29/2003) |
| 12/22/2003 | 64 | EXHIBITS re 63 Response in Opposition to Claim Constuction Brief filed by Eli Lilly & CO. by Eli Lilly & CO.. (Johnson, Jay) (Entered: 12/29/2003) |
| 12/22/2003 | 65 | MOTION to Compel Deposition Testimony Responsive to Plaintiffs Notice of Deposition Pursuant to Rules 30(B)(6) and 30(B)(5) to Eli Lilly & Co. by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research.(Johnson, Jay) (Entered: 12/29/2003) |
| 12/22/2003 | 66 | MEMORANDUM in Support re 65 MOTION to Compel Deposition Testimony filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College. (Johnson, Jay) (Entered: 12/29/2003) |

| 12/22/2003 | 67 | SUPPLEMENTAL/AFFIDAVIT of Thomas D. Gilmore. (Johnson, Jay) (Entered: 12/29/2003) |
| 12/22/2003 | 68 | NOTICE of Change of Address by Leora Ben-Ami (Johnson, Jay) (Entered: 12/29/2003) |
| 12/22/2003 | 69 | Response in Opposition by Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College to 55 Notice of Claim Construction Brief. (Johnson, Jay) (Entered: 12/29/2003) |
| 12/22/2003 | 70 | AFFIDAVIT/DECLARATION in Support re 69 Plaintiffs Response in Opposition Brief on Claim Construction. (Johnson, Jay) (Entered: 12/29/2003) |
| 01/09/2004 | 71 | Letter/request (non-motion) from Lawrence R. Robins to bring equipment to courtroom. (Johnson, Jay) (Entered: 01/09/2004) |
| 01/09/2004 | 72 | Letter/request (non-motion) from Kerry Timbers for permission to bring in equipment to courtroom. (Johnson, Jay) (Entered: 01/09/2004) |
| 01/09/2004 | 73 | MOTION for Leave to File supplemental declaration of Dr. Thomas D. Gilmore by Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College, The Whitehead Institute for Biomedical Research.(Urso, Lisa) (Entered: 01/12/2004) |
| 01/09/2004 | 74 | Agrred MOTION for Extension of Time to 1/12/04 to file response to plaintiff's motion to compel deposition testimony and memorandum in support by Eli Lilly & CO..(Urso, Lisa) (Entered: 01/12/2004) |
| 01/13/2004 |  | Electronic Clerk's Notes for proceedings held before Judge Rya W. Zobel : Hearing re claim construction held on 1/13/2004. Argued and taken under advisement; (just received clerk note) (Urso, Lisa) (Entered: 03/02/2004) |
| 03/03/2004 | 75 | Judge Rya W. Zobel : ORDER entered MEMORANDUM OF DECISION AND ORDER; The court construes the disputed claim terms as follows: see memo for more details.(Urso, Lisa) (Entered: 03/03/2004) |
| 03/19/2004 | 76 | TRANSCRIPT of Markman Hearing held on January 13, 2004 before Judge Zobel. Court Reporter: Lee A. Marzilli. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/345-6787 or the Clerk's Office. (Scalfani, Deborah) (Entered: 03/19/2004) |
| 04/21/2004 | 77 | Withdrawal of motion: 65 MOTION to Compel filed by Massachusetts Institute of Technology, Ariad Pharmaceutical, The Whitehead Institute for Biomedical Research.. (Johnson, Jay) (Entered: 04/23/2004) |
| 05/04/2004 | 78 | Letter/request (non-motion) from Vlsdimir Drozdoff re; conference (Urso, Lisa) (Entered: 05/06/2004) |
| 05/06/2004 |  | NOTICE of Hearing: Status Conference set for 5/18/2004 03:00 PM in Courtroom 12 before Judge Rya W. Zobel. Any counsel wishing to |

| | | participate by phone, may do so by calling the clerk.(Urso, Lisa) (Entered: 05/06/2004) |
|---|---|---|
| 05/17/2004 | 79 | RULE 37 MOTION to Compel Production of Documents and Responses to Interrogatories by Eli Lilly & CO..(Johnson, Jay) (Entered: 05/18/2004) |
| 05/17/2004 | 80 | MEMORANDUM in Support re 79 RULE 37 MOTION to Compel the Production of Documents and Responses to Interrogatories filed by Eli Lilly & CO.. (Johnson, Jay) (Entered: 05/18/2004) |
| 05/19/2004 | 81 | STIPULATION to modify scheduling order by Ariad Pharmaceutical, Eli Lilly & CO., Massachusetts Institute of Technology, The President and Fellows of Harvard College, The Whitehead Institute for Biomedical Research. (Johnson, Jay) (Entered: 05/21/2004) |
| 05/21/2004 | 82 | Judge Rya W. Zobel : ORDER entered ELECTRONIC ENDORSEMENT re 81 Signed Stipulation filed by Eli Lilly & CO., Massachusetts Institute of Technology, Ariad Pharmaceutical, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College(Johnson, Jay) (Entered: 05/21/2004) |
| 05/21/2004 | | electronic Clerk's Notes for proceedings held before Judge Rya W. Zobel : Status Conference held on 5/21/2004. Judge allows motion to modify scheduling order. Hearing on Lilly's motion to compel scheduled for 6/7/04 at 2:15. (Urso, Lisa) (Entered: 06/28/2004) |
| 05/25/2004 | 83 | Judge Rya W. Zobel : ORDER entered granting 51 Motion for Resolution of protective order disputes. After consideration of the parties' argument, I agree with defendant that it is likely to be harmed if required to share the technical information implicated in this litigation. (Urso, Lisa) (Entered: 05/26/2004) |
| 06/01/2004 | 84 | MEMORANDUM in Opposition re 79 MOTION to Compel the Production of Documents and Responses to Interrogatories and Cross Motion for Protective Order filed by Ariad Pharmaceutical. (Johnson, Jay) Modified on 6/2/2004 (Johnson, Jay). (Entered: 06/02/2004) |
| 06/01/2004 | 85 | DECLARATION of Vladimir V. Drozdoff re 84 Memorandum in Opposition to Motion by Ariad Pharmaceutical. (Johnson, Jay) (Entered: 06/02/2004) |
| 06/04/2004 | 86 | Response in Opposition by Eli Lilly & CO. to 84 Memorandum in Opposition to Motion and Cross Motion for Protective Order. (Johnson, Jay) (Entered: 06/08/2004) |
| 06/07/2004 | | electronic Clerk's Notes for proceedings held before Judge Rya W. Zobel : Motion Hearing held on 6/7/2004 re 79 MOTION to Compel filed by Eli Lilly & CO.. Motion taken under advisement. (Court Reporter Romanow.) (Urso, Lisa) (Entered: 06/28/2004) |
| 06/14/2004 | 87 | NOTICE of Appearance by Lisa M. Fleming on behalf of all plaintiffs (Fleming, Lisa) (Entered: 06/14/2004) |
| | | |

| 06/14/2004 | 88 | Joint MOTION for Protective Order by Ariad Pharmaceutical. (Attachments: # 1 Protective Order)(Fleming, Lisa) (Entered: 06/14/2004) |
| 07/02/2004 | 89 | TRANSCRIPT of Motion Hearing held on June 7, 2004 before Judge Zobel. Court Reporter: Richard H. Romanow. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/737-0370 or the Clerk's Office. (Scalfani, Deborah) (Entered: 07/02/2004) |
| 07/13/2004 | | Motions terminated: 73 MOTION for Leave to File filed by Massachusetts Institute of Technology, Ariad Pharmaceutical, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College, 74 MOTION for Extension of Time to 1/12/04 to file response filed by Eli Lilly & CO.. (Urso, Lisa) (Entered: 07/13/2004) |
| 07/14/2004 | | Judge Rya W. Zobel : endorsed ORDER entered granting 88 Motion for Protective Order (Urso, Lisa) (Entered: 07/14/2004) |
| 07/14/2004 | 90 | Judge Rya W. Zobel : ORDER entered Stipulated PROTECTIVE ORDER entered(Urso, Lisa) (Entered: 07/14/2004) |
| 07/30/2004 | 91 | Judge Rya W. Zobel : ORDER Concerning discovery entered granting in part and denying in part 79 Motion to Compel (Urso, Lisa) (Entered: 07/30/2004) |
| 10/18/2004 | 92 | MOTION to Compel A Supplemental Response to Plaintiffs Interrogatory #4 by Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College, The Whitehead Institute for Biomedical Research.(Johnson, Jay) (Entered: 10/19/2004) |
| 10/18/2004 | 93 | MEMORANDUM in Support re 92 MOTION to Compel A Supplemental Response to Plaintiffs Interrogatory #4 filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College, The Whitehead Institute for Biomedical Research. (Johnson, Jay) (Entered: 10/19/2004) |
| 10/18/2004 | 94 | DECLARATION of Vadimir V. Drozdoff re 92 MOTION to Compel by Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College, The Whitehead Institute for Biomedical Research. (Johnson, Jay) (Entered: 10/19/2004) |
| 11/02/2004 | 95 | (Agreed to) MOTION for Extension of Time to 11/8/04 to File Opposition to Plaintiffs Motion to Compel by Eli Lilly & CO.. (Attachments: # 1 Exhibit A)(Johnson, Jay) (Entered: 11/04/2004) |
| 11/08/2004 | | Judge Rya W. Zobel : electronic ORDER entered granting 95 Motion for Extension of Time to File opposition to 11/8/04 (Urso, Lisa) (Entered: 11/08/2004) |
| 11/08/2004 | 96 | Opposition re 92 MOTION to Compel *A Supplemental Response to Plaintiffs' Interrogatory No. 4* filed by Eli Lilly & CO.. (Attachments: # 1 Exhibit A)(Robins, Lawrence) (Entered: 11/08/2004) |

| | | |
|---|---|---|
| 11/10/2004 | | electronic Clerk's Notes for proceedings held before Judge Rya W. Zobel : Telephone Conference held on 11/10/2004.dispute about scope & confidentiality agreement; (Urso, Lisa) (Entered: 11/10/2004) |
| 11/19/2004 | 98 | MOTION for Leave to File Reply Brief for defendant's opposition to the motion to compel a supplemental response to plaintiffs interrogatory #4 by Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College, The Whitehead Institute for Biomedical Research.(Johnson, Jay) (Entered: 11/29/2004) |
| 12/01/2004 | | electronic Clerk's Notes for proceedings held before Judge Rya W. Zobel : Telephone Conference held on 12/1/2004. Attorneys call from Germany re: dispute of deposition of Dr. Baurele of 1991. (Urso, Lisa) (Entered: 12/01/2004) |
| 01/12/2005 | | Judge Rya W. Zobel : endorsedORDER entered denying 92 Motion to Compel, finding as moot 98 Motion for Leave to File. Denied, however Lilly shall be limited in the presentation of evidence to the matters disclosed. (Urso, Lisa) (Entered: 01/12/2005) |
| 01/12/2005 | 99 | (Assented to) MOTION to Seal Document (Memorandum in Support) by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College.(Johnson, Jay) (Entered: 01/13/2005) |
| 01/12/2005 | 100 | MOTION to Compel Lilly to comply w/outstanding discovery requests for materials relating to compound A by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Johnson, Jay) (Entered: 01/13/2005) |
| 01/12/2005 | 101 | MOTION to Compel Lilly to comply w/outstanding discovery requests for materials relating to damages or in the alternative to preclude Lilly from relying on such materials by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College.(Johnson, Jay) (Entered: 01/13/2005) |
| 01/12/2005 | 102 | MEMORANDUM in Support re 100 MOTION to Compel Lilly to comply w/outstanding discovery requests for materials relating to compound A filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Sealed) (Johnson, Jay) Modified on 1/13/2005 (Johnson, Jay). (Entered: 01/13/2005) |
| 01/12/2005 | 103 | MEMORANDUM in Support re 101 MOTION to Compel Lilly to comply w/outstanding discovery requests for materials relating to damages or in the alternative to preclude Lilly from relying on such materials filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Johnson, Jay) (Entered: 01/13/2005) |
| | | |

| | | |
|---|---|---|
| 01/13/2005 | | Judge Rya W. Zobel : ElectronicORDER entered granting 99 Motion to Seal Document (Johnson, Jay) (Entered: 01/13/2005) |
| 01/14/2005 | 106 | MOTION to Compel the testimony of Dr. Richard B. Gaynor by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College.(Johnson, Jay) (Entered: 01/20/2005) |
| 01/14/2005 | 107 | MEMORANDUM in Support re 106 MOTION to Compel the testimony of Dr.Richard B. Gaynor filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Johnson, Jay) (Entered: 01/20/2005) |
| 01/19/2005 | 104 | MOTION to Compel *A Response to Interrogatory No. 8* by Eli Lilly & CO.. (Attachments: # 1 Text of Proposed Order Ex. A Proposed Order) (McDonell, Leslie) (Entered: 01/19/2005) |
| 01/19/2005 | 105 | MEMORANDUM in Support re 104 MOTION to Compel *A Response to Interrogatory No. 8* filed by Eli Lilly & CO.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D)(McDonell, Leslie) (Entered: 01/19/2005) |
| 01/26/2005 | 108 | Opposition re 101 MOTION to Compel *Discovery Relating to Damages* filed by Eli Lilly & CO.. (Robins, Lawrence) (Entered: 01/26/2005) |
| 01/26/2005 | 109 | Assented to MOTION to Seal Document - *Exhibits E and F to Opposition to Plaintiffs' Motion to Compel Lilly to Comply with Outstanding Discovery Requests for Materials Relating to Compound A* by Eli Lilly & CO..(Robins, Lawrence) (Entered: 01/26/2005) |
| 01/26/2005 | 110 | NOTICE by Eli Lilly & CO. *of Filing with Clerk's Office* (Robins, Lawrence) (Entered: 01/26/2005) |
| 01/26/2005 | 111 | Opposition re 100 MOTION to Compel *Lilly to Comply with Outstanding Discovery Requests for Materials Relating to Compound A* filed by Eli Lilly & CO.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Errata F# 7 Exhibit G# 8 Errata H)(Robins, Lawrence) (Entered: 01/26/2005) |
| 01/27/2005 | 112 | EXHIBIT E re 111 Opposition to Motion to Compel Lilly to Comply w/Outstanding Discovery Requests for Materials Relating to Compound A, by Eli Lilly & CO. (Sealed). (Johnson, Jay) (Entered: 01/27/2005) |
| 01/27/2005 | 113 | EXHIBIT F re 111 Opposition to Plaintiffs Motion to Compel Lilly to Comply w/Outstanding Discovery Requests for Materials Relating to Compound A, by Eli Lilly & CO.(Sealed). (Johnson, Jay) (Entered: 01/27/2005) |
| 01/27/2005 | 119 | EXHIBIT C (oversized document, not scanned) re 116 Opposition to Motion, by Eli Lilly & CO.. (Johnson, Jay) (Entered: 02/02/2005) |
| 01/28/2005 | 114 | Assented to MOTION to Seal Document - *Exhibits C and D to Defendant's Opposition to Plaintiffs' Motion to Compel the Testimony of* |

| | | |
|---|---|---|
| | | *Dr. Richard B. Gaynor* by Eli Lilly & CO..(Robins, Lawrence) (Entered: 01/28/2005) |
| 01/28/2005 | 115 | Cross MOTION for Protective Order by Eli Lilly & CO..(Robins, Lawrence) (Entered: 01/28/2005) |
| 01/28/2005 | 116 | Opposition re 106 MOTION to Compel *the Testimony of Dr. Richard B. Gaynor, and Memorandum in Support of Lilly's Cross-Motion for a Protective Order* filed by Eli Lilly & CO.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit B1# 4 Exhibit C# 5 Exhibit D# 6 Exhibit E) (Robins, Lawrence) (Entered: 01/28/2005) |
| 01/28/2005 | 117 | EXHIBIT C (Sealed) re 116 Opposition to Motion to Compel, by Eli Lilly & CO.. (Johnson, Jay) (Entered: 02/01/2005) |
| 01/28/2005 | 118 | EXHIBIT D (Sealed) re 116 Opposition to Motion to Compel, by Eli Lilly & CO.. (Johnson, Jay) (Entered: 02/01/2005) |
| 01/31/2005 | 120 | MOTION for Extension of Time to 2/16/05 to File Response/Reply as to 104 MOTION to Compel *A Response to Interrogatory No. 8* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College.(Johnson, Jay) (Entered: 02/02/2005) |
| 02/01/2005 | | Judge Rya W. Zobel : electronicORDER entered granting 109 Motion to Seal Document, granting 114 Motion to Seal Document (Urso, Lisa) (Entered: 02/01/2005) |
| 02/08/2005 | 121 | MOTION for Leave to File Reply Brief to Defendant's Oppositions to Plaintiffs Motions to Compel by Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College. (Johnson, Jay) (Entered: 02/15/2005) |
| 02/16/2005 | 122 | MEMORANDUM in Opposition re 104 MOTION to Compel *A Response to Interrogatory No. 8* filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College. (Johnson, Jay) Additional attachment(s) added on 2/18/2005 (Johnson, Jay). (Entered: 02/17/2005) |
| 02/22/2005 | 123 | Opposition re 121 MOTION for Leave to File *Reply Briefs In Support of Their Motions to Compel* filed by Eli Lilly & CO., Eli Lilly & CO.. (McDonell, Leslie) (Entered: 02/22/2005) |
| 02/23/2005 | 124 | MOTION for Extension of Time to March 14, 2005 to To Respond to Plaintiffs' Fifth Set of Interrogatories to Eli Lilly and Company Nos. 19-20 by Eli Lilly & CO., Eli Lilly & CO.. (Attachments: # 1 Exhibit A# 2 Exhibit Exhibit B# 3 Exhibit Exhibit C# 4 Exhibit Exhibit D# 5 Exhibit Exhibit E (Drutchas Decl.)# 6 Text of Proposed Order Exhibit F - Proposed Order)(McDonell, Leslie) (Entered: 02/23/2005) |
| 02/24/2005 | 125 | Assented to MOTION for Leave to File *A Reply Brief* by Eli Lilly & CO., Eli Lilly & CO..(McDonell, Leslie) (Entered: 02/24/2005) |
| 02/24/2005 | 126 | REPLY to Response to Motion re 104 MOTION to Compel *A Response to Interrogatory No. 8* filed by Eli Lilly & CO., Eli Lilly & CO.. |

| | | |
|---|---|---|
| | | (McDonell, Leslie) (Entered: 02/24/2005) |
| 02/25/2005 | | Judge Rya W. Zobel : electronicORDER entered granting 120 Motion for Extension of Time to File Response/Reply, granting 125 Motion for Leave to File (Urso, Lisa) (Entered: 02/25/2005) |
| 02/27/2005 | | Notice of correction to docket made by Court staff. Correction: #126 Reply Memorandum corrected because: Motion for Leave has not been Allowed. No Edit,however in the future the filer should either wait until the motion for leave has been allowed or attach the Reply Memorandum as an exhibit. (Johnson, Jay) (Entered: 02/27/2005) |
| 03/03/2005 | 127 | Opposition re 124 MOTION for Extension of Time to March 14, 2005 to To Respond to Plaintiffs' Fifth Set of Interrogatories to Eli Lilly and Company Nos. 19-20 filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Civil Cover Sheet F# 7 Exhibit G# 8 Exhibit H# 9 Exhibit I# 10 Exhibit J# 11 Exhibit K# 12 Exhibit L)(Johnson, Jay) (Entered: 03/07/2005) |
| 03/10/2005 | 130 | JOINT MOTION for Hearing/Status Conference by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College, Eli Lilly & CO..(Johnson, Jay) (Entered: 03/15/2005) |
| 03/11/2005 | 128 | MOTION for Leave to File *Reply to Plaintiffs' Opposition to Lilly's Motion for Extension of Time to Respond to Plaintiffs' Fifth Set of Interrogatories* by Eli Lilly & CO.. (Attachments: # 1 Exhibit A - Proposed Reply# 2 Text of Proposed Order Exhibit B Proposed Order) (McDonell, Leslie) (Entered: 03/11/2005) |
| 03/14/2005 | 129 | Judge Rya W. Zobel : OrderSecond ORDER Concerning Discovery entered denying 100 Motion to Compel, granting 101 Motion to Compel, granting 104 Motion to Compel, granting 106 Motion to Compel, granting 121 Motion for Leave to File, granting in part and denying in part 124 Motion for Extension of Time (Urso, Lisa) (Entered: 03/14/2005) |
| 03/22/2005 | | Judge Rya W. Zobel : endorsedORDER entered granting 130 Motion for Hearing. A Further scheduling conference is set for 4/6/05 at 10:00 a.m. (Urso, Lisa) (Entered: 03/22/2005) |
| 04/04/2005 | 131 | MOTION to Stay *This Litigation Pending Reexamination of the '516 patent-in suit* by Eli Lilly & CO.. (Attachments: # 1 Exhibit A (Proposed Order))(Robins, Lawrence) (Entered: 04/04/2005) |
| 04/04/2005 | 132 | MEMORANDUM in Support re 131 MOTION to Stay *This Litigation Pending Reexamination of the '516 patent-in suit* filed by Eli Lilly & CO.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Exhibit G# 8 Exhibit H# 9 Exhibit I# 10 Exhibit J)(Robins, Lawrence) (Entered: 04/04/2005) |
| | | |

| 04/04/2005 | 133 | MOTION for Reconsideration *of Discovery Order* by Eli Lilly & CO.. (Attachments: # 1 Exhibit A)(Robins, Lawrence) (Entered: 04/04/2005) |
| 04/04/2005 | 134 | MEMORANDUM in Support re 133 MOTION for Reconsideration *of Discovery Order* filed by Eli Lilly & CO.. (Attachments: # 1 Exhibit A# 2 Exhibit B)(Robins, Lawrence) (Entered: 04/04/2005) |
| 04/05/2005 | 135 | EXHIBIT re 132 Memorandum in Support of Motion, *EXHIBIT K* by Eli Lilly & CO.. (Robins, Lawrence) (Entered: 04/05/2005) |
| 04/06/2005 | | electronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Further Scheduling Conference held on 4/6/2005. Jury trial 2-4 weeks; motion to stay to be decided; periodic reports; discovery to be continued by 2 months (Urso, Lisa) Modified on 4/8/2005 (Johnson, Jay). (Entered: 04/08/2005) |
| 04/12/2005 | 136 | MOTION to Quash *Subpoena or for Protective Order* by Stuart Schreiber. (Attachments: # (1) Affidavit Declaration of Dr. Stuart L. Schreiber)(Siden, Stephanie) Additional attachment(s) added on 4/13/2005 (Johnson, Jay). (Entered: 04/12/2005) |
| 04/12/2005 | 137 | MOTION to Quash Subpoena Served upon Third-Party Dr Stuart L. Schreiber and in the Alternative, Motion for a Protective Order by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College.(Johnson, Jay) (Entered: 04/13/2005) |
| 04/12/2005 | 138 | MEMORANDUM in Support re 137 MOTION to Quash filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Johnson, Jay) (Entered: 04/13/2005) |
| 04/12/2005 | 139 | MEMORANDUM in Support re 136 MOTION to Quash *Subpoena or for Protective Order* filed by Stuart Schreiber. (Johnson, Jay) Additional attachment(s) added on 4/13/2005 (Johnson, Jay). (Entered: 04/13/2005) |
| 04/12/2005 | 140 | DECLARATION re 139 Memorandum in Support of Motion, 136 MOTION to Quash *Subpoena or for Protective Order* by Stuart Schreiber. (Johnson, Jay) (Entered: 04/13/2005) |
| 04/13/2005 | | Notice of correction to docket made by Court staff. Correction: #136 Motion to Quash corrected because: Unsigned Document. "Although the signature is below the signature line, it should be on the line on either side of the /s/. An e-mail has been sent describing the fix." (Johnson, Jay) (Entered: 04/13/2005) |
| 04/18/2005 | 141 | MEMORANDUM in Opposition re 133 MOTION for Reconsideration *of Discovery Order* filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Exhibits Not Scanned) (Johnson, Jay) (Entered: 04/19/2005) |
| 04/18/2005 | 142 | MEMORANDUM in Opposition re 131 MOTION to Stay *This Litigation Pending Reexamination of the '516 patent-in suit* filed by Ariad |

| | | |
|---|---|---|
| | | Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Exhibits Not Scanned) (Johnson, Jay) (Entered: 04/19/2005) |
| 04/19/2005 | | Notice of correction to docket made by Court staff. Correction: #141 and 142 memorandums in opposition corrected because: Exhibits were to Large (Johnson, Jay) (Entered: 04/19/2005) |
| 04/22/2005 | 143 | EXHIBIT *(s) In Support of Eli Lilly and Company's Proposed Reply to Plaintiffs' Opposition to Lilly's MOtion to Stay This Litigation Pending Reexamination of the '516 Patent* by Eli Lilly & CO.. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Exhibit 5# 6 Exhibit 6# 7 Exhibit 7# 8 Exhibit 8# 9 Exhibit 9# 10 Exhibit 10# 11 Exhibit 11# 12 Exhibit 12# 13 Exhibit 13# 14 Exhibit 14# 15 Exhibit 15# 16 Exhibit 16# 17 Exhibit 17# 18 Exhibit 18# 19 Exhibit 19# 20 Exhibit 20# 21 Exhibit 21# 22 Exhibit 22# 23 Exhibit 23# 24 Exhibit 24)(Robins, Lawrence) (Entered: 04/22/2005) |
| 04/22/2005 | 144 | MOTION for Leave to File *and Memorandum in Support thereof - For Leave to File Reply Briefs in Support of (1) Lilly's Motion to Stay this Litigation Pending Reexamination and (2) Lilly's Motion for Reconsideration of Discovery Order* by Eli Lilly & CO.. (Attachments: # 1 Exhibit A - Reply to Plaintiffs' Opposition to Lilly's Motion to Stay This Litigation Pending Reexamination of the '516 Patent# 2 Exhibit B - Lilly's Reply in Support of its Motion for Reconsideration of Discovery Order)(Robins, Lawrence) (Entered: 04/22/2005) |
| 04/26/2005 | 145 | MEMORANDUM in Opposition re 137 MOTION to Quash, 136 MOTION to Quash *Subpoena or for Protective Order* filed by Eli Lilly & CO.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E)(Robins, Lawrence) (Entered: 04/26/2005) |
| 04/27/2005 | 146 | Opposition re 144 MOTION for Leave to File *and Memorandum in Support thereof - For Leave to File Reply Briefs in Support of (1) Lilly's Motion to Stay this Litigation Pending Reexamination and (2) Lilly's Motion for Reconsideration of Discovery Order* filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 # 2)(Johnson, Jay) (Entered: 04/28/2005) |
| 04/29/2005 | 147 | MOTION to Compel Lilly to Offer a Timely Date for Dr.Richard Gaynor's Deposition by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College.(Johnson, Jay) (Entered: 05/02/2005) |
| 05/13/2005 | 148 | Opposition re 147 MOTION to Compel *Lilly to Offer a Timely Date for Dr. Richard Gaynor's Deposition* filed by Eli Lilly & CO.. (Robins, Lawrence) (Entered: 05/13/2005) |
| 06/06/2005 | 149 | Judge Rya W. Zobel : Order concerning discovery and stay of proceedings;ORDER entered denying 131 Motion to Stay, granting 133 Motion for Reconsideration, denying 136 Motion to Quash, denying 137 |

| | | |
|---|---|---|
| | | Motion to Quash, granting 147 Motion to Compel (Urso, Lisa) (Entered: 06/06/2005) |
| 06/24/2005 | 150 | Proposed Document(s) submitted by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. Document received: Scheduling Order. (Johnson, Jay) (Entered: 06/27/2005) |
| 07/21/2005 | | Motions terminated: 115 Cross MOTION for Protective Order filed by Eli Lilly & CO.,. (Urso, Lisa) (Entered: 07/21/2005) |
| 07/29/2005 | 151 | Letter/request (non-motion) from Leora Ben-Ami. (Attachments: # 1 proposed order)(Johnson, Jay) (Entered: 08/02/2005) |
| 08/08/2005 | | Judge Rya W. Zobel : endorsed ORDER entered. ELECTRONIC ENDORSEMENT re 151 Letter/request (non-motion). Judge accepts proposed schedule. Jury trial set for 4/10/06 at 9:00 a.m. Pretrial conference set for 2/21/06 at 2:00 p.m.(Urso, Lisa) (Entered: 08/08/2005) |
| 09/14/2005 | 152 | Letter/request (non-motion) from Leora Ben-Ami requesting rescheduling of conference. (Johnson, Jay) (Entered: 09/15/2005) |
| 09/16/2005 | | Set/Reset Hearings: Pretrial Conference reset for 2/28/2006 02:00 PM in Courtroom 12 before Judge Rya W. Zobel. (Urso, Lisa) (Entered: 09/16/2005) |
| 10/25/2005 | | Motions terminated: 128 MOTION for Leave to File *Reply to Plaintiffs' Opposition to Lilly's Motion for Extension of Time to Respond to Plaintiffs' Fifth Set of Interrogatories* filed by Eli Lilly & CO.,, 144 MOTION for Leave to File *and Memorandum in Support thereof - For Leave to File Reply Briefs in Support of (1) Lilly's Motion to Stay this Litigation Pending Reexamination and (2) Lilly's Motion for Reconsideration of Discovery Order* filed by Eli Lilly & CO.,. (Urso, Lisa) (Entered: 10/25/2005) |
| 10/25/2005 | 153 | STIPULATION extending time to exchange reply expert reports by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College, Eli Lilly & CO.. (Attachments: # 1 proposed order) (Johnson, Jay) (Entered: 10/26/2005) |
| 10/27/2005 | | Judge Rya W. Zobel : endorsed ORDER entered. ELECTRONIC ENDORSEMENT re 153 Stipulation, filed by Eli Lilly & CO.,, Massachusetts Institute of Technology,, Ariad Pharmaceutical,, The Whitehead Institute for Biomedical Research,, The President and Fellows of Harvard College. ALLOWED.A pretrial conference is scheduled for 4/5/06 at 2:00 p.m. (Urso, Lisa) (Entered: 10/28/2005) |
| 11/08/2005 | 154 | Letter/request (non-motion) from Patricia A. Carson regarding emergency motion. (Johnson, Jay) (Entered: 11/09/2005) |
| 11/08/2005 | 155 | EMERGENCY MOTION to Take Deposition by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for |

| | | Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 part 2)(Johnson, Jay) (Entered: 11/09/2005) |
|---|---|---|
| 11/11/2005 | 156 | Opposition re 155 MOTION to Take Deposition filed by Eli Lilly & CO.. (Robins, Lawrence) (Entered: 11/11/2005) |
| 11/14/2005 | 157 | MOTION to Compel by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1)(Johnson, Jay) (Entered: 11/15/2005) |
| 11/16/2005 | | Judge Rya W. Zobel : endorsedORDER entered denying 155 Motion to Take Deposition. On condition that defendants pay the expenses of two plaintiffs' lawyers in connection with their conducting the depositions in London, and that they arrange for the depositions to be taken there, at defendant's cost. (Urso, Lisa) (Entered: 11/17/2005) |
| 11/28/2005 | 158 | Opposition re 157 MOTION to Compel *Lilly to Produce a Sample of its Xigris Product* filed by Eli Lilly & CO.. (Attachments: # 1 Exhibit A Part I# 2 Exhibit A Part II# 3 Exhibit B# 4 Exhibit C# 5 Exhibit D)(Robins, Lawrence) (Entered: 11/28/2005) |
| 12/06/2005 | 159 | MOTION to Seal Designated Exhibits to Plaintiffs Motion to Extend the Deposition of Stavros Manolagas and Strike Portions of Eli Lilly's Expert Reports by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College.(Johnson, Jay) (Entered: 12/07/2005) |
| 12/06/2005 | 160 | MOTION for Extension the Deposition of Stavros Manolagas and Strike Portions of Eli Lilly's Expert Reports by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Johnson, Jay) (Entered: 12/07/2005) |
| 12/06/2005 | 161 | MOTION to Preclude Lilly from Asserting Indefiniteness and Striking Portions of Expert Reports by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College.(Johnson, Jay) (Entered: 12/07/2005) |
| 12/15/2005 | | Judge Rya W. Zobel : endorsedORDER entered denying 157 Motion to Compel, subject to Dr. Bernard's rebuttal report deleting the referenced sentences about certain amino acids. (Urso, Lisa) (Entered: 12/16/2005) |
| 12/20/2005 | 162 | NOTICE by Eli Lilly & CO. *of Filing with Clerk's Office* (Schultz, Christopher) (Entered: 12/20/2005) |
| 12/20/2005 | 163 | MOTION to Seal Document - *Motion for Leave to File Under Seal Exhibits A and B to Eli Lilly and Company's Opposition to Plaintiffs' Second Motion in Limine: to Preclude Lilly From Asserting Indefiniteness and Striking Portions of Expert Reports* by Eli Lilly & CO.. (Attachments: # 1 Text of Proposed Order)(Schultz, Christopher) (Entered: 12/20/2005) |
| | | |

| | | |
|---|---|---|
| 12/20/2005 | 164 | Opposition re 160 MOTION for Extension of Time to the Deposition of Stavros Manolagas and Strike Portions of Eli Lilly's Expert Reports - *Opposition to Plaintiffs' First Motion in Limine: To Extend the Deposition of Dr. Manolagas and to Strike Portions of Eli Lilly & Co.'s Expert Reports* filed by Eli Lilly & CO.. (Schultz, Christopher) (Entered: 12/20/2005) |
| 12/20/2005 | 165 | Opposition re 161 MOTION to Preclude Lilly from Asserting Indefiniteness and Striking Portions of Expert Reports - *Opposition to Plaintiffs' Second Motion in Limine: to Preclude Lilly from Asserting Indefiniteness and Striking Portions of Expert Reports* filed by Eli Lilly & CO.. (Attachments: # 1 Exhibit A - SEALED# 2 Exhibit B - SEALED# 3 Exhibit C)(Schultz, Christopher) (Entered: 12/20/2005) |
| 12/20/2005 | 166 | CERTIFICATE OF SERVICE by Eli Lilly & CO.. (Schultz, Christopher) (Entered: 12/20/2005) |
| 12/23/2005 | 167 | Assented to MOTION to Seal Document - *Assented to Motion for Leave to File Under Seal Exhibits 2, 4, and 5 to the Declaration of Lawrence R. Robins in Support of Defendant Eli Lilly and Company's Motion for Summary Judgment of Invalidity Under 35 USC Sec. 102* by Eli Lilly & CO.. (Attachments: # 1 Text of Proposed Order)(Robins, Lawrence) (Entered: 12/23/2005) |
| 12/23/2005 | 168 | Assented to MOTION to Seal Document - *Motion for Leave to File Under Seal Defendant Eli Lilly and Company's Memorandum in Support of Its Motion for Summary Judgment of Invalidity Under 35 USC Secs. 101 and 112 AND Exhibits A, B, K, L, and M to the Declaration of Lawrence R. Robins in Support of Same* by Eli Lilly & CO.. (Attachments: # 1)(Robins, Lawrence) (Entered: 12/23/2005) |
| 12/23/2005 | 169 | NOTICE by Eli Lilly & CO. *of Filing With Clerk's Office Defendant's Memorandum in Support of its Motion for Summary Judgment of Invalidity Under 35 USC Secs. 101 and 112, First Paragraph* (Robins, Lawrence) (Entered: 12/23/2005) |
| 12/23/2005 | 170 | NOTICE by Eli Lilly & CO. *of Filing With Clerk's Office Exhibits A, B, K, L, and M to the Declaration of Lawrence R. Robins in Support of Defendant's Motion for Summary Judgment of Invalidity Under 35 USC Secs. 101 and 112, First Paragraph; AND Exhibits 2, 4, and 5 to the Declaration of Lawrence R. Robins in Support of Defendant's Motion for Summary Judgment of Invalidity Under 35 USC Sec. 102* (Robins, Lawrence) (Entered: 12/23/2005) |
| 12/23/2005 | 171 | MOTION for Summary Judgment *of Invalidity Under 35 U.S.C. Sec. 102* by Eli Lilly & CO..(Robins, Lawrence) (Entered: 12/23/2005) |
| 12/23/2005 | 172 | MEMORANDUM in Support re 171 MOTION for Summary Judgment *of Invalidity Under 35 U.S.C. Sec. 102* filed by Eli Lilly & CO.. (Robins, Lawrence) (Entered: 12/23/2005) |
| 12/23/2005 | 173 | STATEMENT of facts re 171 MOTION for Summary Judgment *of Invalidity Under 35 U.S.C. Sec. 102 Pursuant to Local Rule 56.1.* |

| | | |
|---|---|---|
| | | (Robins, Lawrence) (Entered: 12/23/2005) |
| 12/23/2005 | 174 | DECLARATION re 171 MOTION for Summary Judgment *of Invalidity Under 35 U.S.C. Sec. 102 - Declaration of Lawrence R. Robins* - by Eli Lilly & CO.. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Exhibit 5# 6 Exhibit 6# 7 Exhibit 7# 8 Exhibit 8# 9 Exhibit 9# 10 Exhibit 10# 11 Exhibit 11# 12 Exhibit 12# 13 Exhibit 13)(Robins, Lawrence) (Entered: 12/23/2005) |
| 12/23/2005 | 175 | MOTION for Summary Judgment *of Invalidity Under 35 USC Secs. 101 and 112, First Paragraph* by Eli Lilly & CO..(Robins, Lawrence) (Entered: 12/23/2005) |
| 12/23/2005 | 176 | MEMORANDUM in Support re 175 MOTION for Summary Judgment *of Invalidity Under 35 USC Secs. 101 and 112, First Paragraph COVER PAGE - DOCUMENT FILED MANUALLY WITH COURT - UNDER SEAL* filed by Eli Lilly & CO.. (Robins, Lawrence) (Entered: 12/23/2005) |
| 12/23/2005 | 177 | STATEMENT of facts re 175 MOTION for Summary Judgment *of Invalidity Under 35 USC Secs. 101 and 112, First Paragraph - Pursuant to Local Rule 56.1.* (Robins, Lawrence) (Entered: 12/23/2005) |
| 12/23/2005 | 178 | DECLARATION re 175 MOTION for Summary Judgment *of Invalidity Under 35 USC Secs. 101 and 112, First Paragraph - Declaration of Lawrence R. Robins* - by Eli Lilly & CO.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C - Part 1 of 2# 4 Exhibit C - Part 2 of 2# 5 Exhibit D - Part 1 of 2# 6 Exhibit D - Part 2 of 2# 7 Exhibit E# 8 Exhibit F# 9 Exhibit G# 10 Exhibit H# 11 Exhibit I# 12 Exhibit J# 13 Exhibit K# 14 Exhibit L# 15 Exhibit M# 16 Exhibit N)(Robins, Lawrence) (Entered: 12/23/2005) |
| 12/23/2005 | 179 | CERTIFICATE OF SERVICE by Eli Lilly & CO.. (Robins, Lawrence) (Entered: 12/23/2005) |
| 01/04/2006 | | Judge Rya W. Zobel : Electronic ORDER entered granting 167 Motion to Seal Document, granting 168 Motion to Seal Document (Johnson, Jay) (Entered: 01/04/2006) |
| 01/04/2006 | 180 | SEALED MEMORANDUM in Support re 175 MOTION for Summary Judgment *of Invalidity Under 35 USC Secs. 101 and 112, First Paragraph* filed by Eli Lilly & CO.. (Johnson, Jay) Modified on 1/4/2006 (Johnson, Jay). (Entered: 01/04/2006) |
| 01/04/2006 | 181 | SEALED EXHIBIT 2 re 174 Declaration of Lawrence Robins, by Eli Lilly & CO.. (Johnson, Jay) Modified on 1/4/2006 (Johnson, Jay). (Entered: 01/04/2006) |
| 01/04/2006 | 182 | SEALED EXHIBIT 4 re 174 Declaration Lawrence Robbins, by Eli Lilly & CO.. (Johnson, Jay) (Entered: 01/04/2006) |
| 01/04/2006 | 183 | SEALED EXHIBIT 5 re 174 Declaration of Lawrence Robins, by Eli Lilly & CO.. (Johnson, Jay) (Entered: 01/04/2006) |

| 01/04/2006 | 184 | SEALED EXHIBIT A re 178 Declaration of Lawrence Robins,, by Eli Lilly & CO.. (Johnson, Jay) (Entered: 01/04/2006) |
| 01/04/2006 | 185 | SEALED EXHIBIT B re 178 Declaration of Lawrence Robins,, by Eli Lilly & CO.. (Johnson, Jay) (Entered: 01/04/2006) |
| 01/04/2006 | 186 | SEALED EXHIBIT K re 178 Declaration of Lawrence Robins,, by Eli Lilly & CO.. (Johnson, Jay) (Entered: 01/04/2006) |
| 01/04/2006 | 187 | SEALED EXHIBIT L re 178 Declaration of Lawrence Robins,, by Eli Lilly & CO.. (Johnson, Jay) (Entered: 01/04/2006) |
| 01/04/2006 | 188 | SEALED EXHIBIT M re 178 Declaration of Lawrence Robins,, by Eli Lilly & CO.. (Johnson, Jay) (Entered: 01/04/2006) |
| 01/04/2006 | | Judge Rya W. Zobel : Electronic ORDER entered granting 163 Motion to Seal Document (Johnson, Jay) (Entered: 01/04/2006) |
| 01/04/2006 | 189 | SEALED EXHIBIT A re 165 Opposition to Second Motion In Limine, by Eli Lilly & CO.. (Johnson, Jay) (Entered: 01/04/2006) |
| 01/04/2006 | 190 | SEALED EXHIBIT B re 165 Opposition to Second Motion In Limine, by Eli Lilly & CO.. (Johnson, Jay) (Entered: 01/04/2006) |
| 01/06/2006 | 191 | (Revised) EXHIBIT M re 178 Declaration,, by Eli Lilly & CO.(Sealed). (Johnson, Jay) (Entered: 01/09/2006) |
| 01/17/2006 | 192 | MOTION to Stay - *Eli Lilly and Company's Renewed Motion to Stay this Litigation Pending Reexamination of the '516 Patent-in-Suit* by Eli Lilly & CO.. (Attachments: # 1 Text of Proposed Order)(Robins, Lawrence) (Entered: 01/17/2006) |
| 01/17/2006 | 193 | MEMORANDUM in Support re 192 MOTION to Stay - *Eli Lilly and Company's Renewed Motion to Stay this Litigation Pending Reexamination of the '516 Patent-in-Suit* filed by Eli Lilly & CO.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Exhibit G# 8 Exhibit H# 9 Exhibit I# 10 Exhibit J# 11 Exhibit K# 12 Exhibit L# 13 Exhibit M# 14 Exhibit N# 15 Exhibit O# 16 Exhibit P# 17 Exhibit Q# 18 Exhibit R# 19 Exhibit S# 20 Exhibit T)(Robins, Lawrence) (Entered: 01/17/2006) |
| 01/23/2006 | | Judge Rya W. Zobel : endorsedORDER entered granting 159 Motion to Seal Document, granting in part and denying in part 160 Motion for Extension of Time; allowed as to item 1 - a two day deposition of Dr. Manolagas; denied as to item 2 - striking portions of expert reports; denying 161 Motion to preclude Lilly from asserting indefiniteness and striking portions of expert reports; (Urso, Lisa) (Entered: 01/25/2006) |
| 01/31/2006 | 194 | MEMORANDUM in Opposition re 192 MOTION to Stay - *Eli Lilly and Company's Renewed Motion to Stay this Litigation Pending Reexamination of the '516 Patent-in-Suit* filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 |

| | | |
|---|---|---|
| | | Exhibit 5 (Part A)# 6 Exhibit 5 (Part B)# 7 Exhibit 6# 8 Exhibit 7# 9 Exhibit 8)(Drozdoff, Vladimir) (Entered: 01/31/2006) |
| 02/02/2006 | 195 | Assented to MOTION for Leave to Appear Pro Hac Vice by Alison J. Baldwin and Anita J. Terpstra by Eli Lilly & CO.. (Attachments: # 1 Exhibit A# 2 Exhibit B)(Robins, Lawrence) (Entered: 02/02/2006) |
| 02/03/2006 | 196 | MOTION to Seal *Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment of Invalidity Under 35 U.S.C. Section 102 and Related Exhibits* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1) (Drozdoff, Vladimir) (Entered: 02/03/2006) |
| 02/03/2006 | 197 | MOTION to Seal *Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment of Invalidity Under 35 U.S.C. Section 101 and 112 and Related Exhibits* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1)(Drozdoff, Vladimir) (Entered: 02/03/2006) |
| 02/03/2006 | 198 | Opposition re 175 MOTION for Summary Judgment *of Invalidity Under 35 USC Secs. 101 and 112, First Paragraph* filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4 (Part A)# 5 Exhibit 4 (Part B)# 6 Exhibit 4 (Part C)# 7 Exhibit 5# 8 Exhibit 6# 9 Exhibit 7# 10 Exhibit 8# 11 Exhibit 9# 12 Exhibit 10# 13 Exhibit 11# 14 Exhibit 12# 15 Exhibit 13# 16 Exhibit 14 (Part A)# 17 Exhibit 14 (Part B)# 18 Exhibit 15# 19 Exhibit 16# 20 Exhibit 17# 21 Exhibit 18# 22 Exhibit 19# 23 Exhibit 20# 24 Exhibit 21# 25 Exhibit 22# 26 Exhibit 23# 27 Exhibit 24# 28 Exhibit 25# 29 Exhibit 26# 30 Exhibit 27# 31 Exhibit 28# 32 Exhibit 29# 33 Exhibit 30# 34 Exhibit 31# 35 Exhibit 32# 36 Exhibit 33# 37 Exhibit 34# 38 Exhibit 35# 39 Exhibit 36) (Drozdoff, Vladimir) (Entered: 02/03/2006) |
| 02/03/2006 | 199 | STATEMENT of facts re #198 Opposition to 175 MOTION for Summary Judgment *of Invalidity Under 35 USC Secs. 101 and 112, First Paragraph*. (Drozdoff, Vladimir) Modified on 2/6/2006 (Johnson, Jay). (Entered: 02/03/2006) |
| 02/03/2006 | 200 | DECLARATION re #198 Opposition to 175 MOTION for Summary Judgment *of Invalidity Under 35 USC Secs. 101 and 112, First Paragraph* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) Modified on 2/6/2006 (Johnson, Jay). (Entered: 02/03/2006) |
| 02/03/2006 | 201 | Opposition re 171 MOTION for Summary Judgment *of Invalidity Under 35 U.S.C. Sec. 102* filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: |

| | | |
|---|---|---|
| | | # 1 Exhibit 1# 2 Exhibit 2 (Part A)# 3 Exhibit 2 (Part B)# 4 Exhibit 3# 5 Exhibit 4# 6 Exhibit 5# 7 Exhibit 6# 8 Exhibit 7# 9 Exhibit 8# 10 Exhibit 9# 11 Exhibit 10# 12 Exhibit 11# 13 Exhibit 12# 14 Exhibit 13# 15 Exhibit 14# 16 Exhibit 15# 17 Exhibit 16# 18 Exhibit 17# 19 Exhibit 18) (Drozdoff, Vladimir) (Entered: 02/03/2006) |
| 02/03/2006 | 202 | STATEMENT of facts re #201 Opposition to 171 MOTION for Summary Judgment *of Invalidity Under 35 U.S.C. Sec. 102*. (Drozdoff, Vladimir) Modified on 2/6/2006 (Johnson, Jay). (Entered: 02/03/2006) |
| 02/03/2006 | 203 | DECLARATION re #201 Opposition to 171 MOTION for Summary Judgment *of Invalidity Under 35 U.S.C. Sec. 102* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) Modified on 2/6/2006 (Johnson, Jay). (Entered: 02/03/2006) |
| 02/06/2006 | | Filing fee: $ 100, receipt number 70050 regarding Motion for pro hac vice #195 (Johnson, Jay) (Entered: 02/06/2006) |
| 02/10/2006 | 204 | STIPULATION *Parties' Joint Stipulation to Modify Scheduling Order* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) (Entered: 02/10/2006) |
| 02/10/2006 | 205 | *Defendant Eli Lilly and Company's* Letter/request (non-motion) from Lawrence R. Robins Requesting Status Conference. (Attachments: # 1 Exhibit A)(Robins, Lawrence) (Entered: 02/10/2006) |
| 02/10/2006 | | Judge Rya W. Zobel : endorsedORDER entered denying 192 Motion to Stay (Urso, Lisa) (Entered: 02/13/2006) |
| 02/14/2006 | | Judge Rya W. Zobel : Electronic ORDER entered granting 195 Motion for Leave to Appear Pro Hac Vice Added Anita Terpstra for Eli Lilly & CO., Alison Baldwin for Eli Lilly & CO. (Urso, Lisa) (Entered: 02/14/2006) |
| 02/15/2006 | 206 | Letter/request (non-motion) from Jenny Macioge-Reilly regarding attached(Sealed)revised exhibit. K (Johnson, Jay) Additional attachment (s) added on 2/16/2006 . (Entered: 02/16/2006) |
| 02/15/2006 | | Judge Rya W. Zobel : endorsed ORDER entered. ELECTRONIC ENDORSEMENT re 204 Stipulation, filed by Massachusetts Institute of Technology,, Ariad Pharmaceutical,, The Whitehead Institute for Biomedical Research,, The President and Fellows of Harvard College. ALLOWED.Motions 3/10/06; oppositions 3/24/06. (Urso, Lisa) (Entered: 02/16/2006) |
| 02/16/2006 | 207 | Letter/request (non-motion) from Meredith L. Ainbinder regarding exhibits already filed on 2/3/06. (copies of exhibits filed w/letter) (Johnson, Jay) (Entered: 02/17/2006) |
| 02/17/2006 | | NOTICE of Hearing: Status Conference set for 3/9/2006 03:00 PM in Courtroom 12 before Judge Rya W. Zobel. (Urso, Lisa) (Entered: |

| | | 02/17/2006) |
|---|---|---|
| 02/24/2006 | 208 | NOTICE by Eli Lilly & CO. *Of Filing with Clerk's Office* (McDonell, Leslie) (Entered: 02/24/2006) |
| 02/24/2006 | 209 | MOTION to Seal *Exhibit O to the Declaration of Leslie A. McDonell in Support of Eli Lilly and Company's Reply Memorandum in Support of its Motion for Summary Judgment of Invalidity Under 35 U.S.C. Sections 101 and 112, First Paragraph* by Eli Lilly & CO.. (Attachments: # 1 Text of Proposed Order Proposed Order re Motion to Seal)(McDonell, Leslie) (Entered: 02/24/2006) |
| 02/24/2006 | 210 | MOTION for Leave to File *Reply Memorandum in Support of Defendant Eli Lilly and Company's Motion for Summary Judgment of Invalidity Under 35 U.S.C. Sections 101 and 112, First Paragraph* by Eli Lilly & CO.. (Attachments: # 1 Exhibit A - Proposed Reply Brief# 2 Text of Proposed Order Exhibit B - Proposed Order)(McDonell, Leslie) (Entered: 02/24/2006) |
| 02/24/2006 | 211 | DECLARATION *of Leslie A. McDonell in Support of Eli Lilly and Company's Reply Memorandum in Support of Its Motion for Summary Judgment of Invalidity Under 35 U.S.C. Sections 101 and 112, First Paragraph* by Eli Lilly & CO.. (Attachments: # 1 Exhibit O - to Proposed Reply Brief)(McDonell, Leslie) (Entered: 02/24/2006) |
| 02/24/2006 | 212 | CERTIFICATE OF SERVICE by Eli Lilly & CO.. (McDonell, Leslie) (Entered: 02/24/2006) |
| 02/24/2006 | 213 | MOTION for Leave to File *Reply Memorandum in Support of Defendant Eli Lilly and Company's Motion for Summary Judgment of Invalidity Under 35 U.S.C. Section 102* by Eli Lilly & CO.. (Attachments: # 1 Exhibit A - Proposed Reply Brief# 2 Text of Proposed Order Exhibit B - Proposed Order)(McDonell, Leslie) (Entered: 02/24/2006) |
| 02/24/2006 | 214 | DECLARATION *of Leslie A. McDonell in Support of Defendant Eli Lilly and Company's Reply Memorandum in Support of its Motion for Summary Judgment of Invalidity Under 35 U.S.C. Section 102* by Eli Lilly & CO.. (Attachments: # 1 Exhibit 14 - to Proposed Reply Brief) (McDonell, Leslie) (Entered: 02/24/2006) |
| 02/24/2006 | 215 | MOTION to Strike - *Defendant Eli Lilly and Company's Combined Motion to Strike the First and Second Declarations of Jeffrey V. Ravetch and Memorandum in Support of Motion* by Eli Lilly & CO..(McDonell, Leslie) (Entered: 02/24/2006) |
| 03/02/2006 | 216 | NOTICE of Appearance by Meredith L. Ainbinder on behalf of all plaintiffs (Ainbinder, Meredith) (Entered: 03/02/2006) |
| 03/03/2006 | 217 | Opposition re 210 MOTION for Leave to File *Reply Memorandum in Support of Defendant Eli Lilly and Company's Motion for Summary Judgment of Invalidity Under 35 U.S.C. Sections 101 and 112, First Paragraph* filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The |

| | | |
|---|---|---|
| | | President and Fellows of Harvard College. (Drozdoff, Vladimir) (Entered: 03/03/2006) |
| 03/03/2006 | 218 | Opposition re 213 MOTION for Leave to File *Reply Memorandum in Support of Defendant Eli Lilly and Company's Motion for Summary Judgment of Invalidity Under 35 U.S.C. Section 102* filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1)(Drozdoff, Vladimir) (Entered: 03/03/2006) |
| 03/10/2006 | 219 | MOTION in Limine *To Preclude Defendant Eli Lilly and Co. from Admitting into Evidence Hearsay References in Support of its Contentions Under 35 USC section 102* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) (Entered: 03/10/2006) |
| 03/10/2006 | 220 | MOTION in Limine *to Preclude Defendant Eli Lilly and Co. from Admitting into Evidence Comments of Third Parties on the Validity of the '516 Patent or the Merits of the Case* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3)(Drozdoff, Vladimir) (Entered: 03/10/2006) |
| 03/10/2006 | 221 | Opposition re 215 MOTION to Strike - *Defendant Eli Lilly and Company's Combined Motion to Strike the First and Second Declarations of Jeffrey V. Ravetch and Memorandum in Support of Motion* filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1# 2 Exhibit 2)(Drozdoff, Vladimir) (Entered: 03/10/2006) |
| 03/10/2006 | 222 | MOTION in Limine *to Preclude Defendant Eli Lilly and Co. from Asserting a 35 USC section 102 Defense* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3 part 1# 4 Exhibit 3 part 2# 5 Exhibit 4 part 1# 6 Exhibit 4 part 2# 7 Exhibit 4 part 3# 8 Exhibit 5 part 1# 9 Exhibit 5 part 2# 10 Exhibit 5 part 3# 11 Exhibit 5 part 4# 12 Exhibit 5 part 5# 13 Exhibit 5 part 6# 14 Exhibit 6)(Drozdoff, Vladimir) (Entered: 03/10/2006) |
| 03/10/2006 | 223 | MOTION in Limine *to Preclude Defendant Eli Lilly and Co. from Asserting Arguments in Contradiction of the Information Contained in its US Patent No 6,545,027* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Exhibit 5) (Drozdoff, Vladimir) (Entered: 03/10/2006) |

| | | |
|---|---|---|
| 03/10/2006 | [224](#) | Memorandum in Support of MOTION in Limine *To Prevent Defendant From Putting Forward Evidence Pertaining To Subject Matter That They Have Previously Claimed As Protected By Privilege* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # [1](#) Exhibit 1# [2](#) Exhibit 2# [3](#) # [4](#) Exhibit 4) (Drozdoff, Vladimir) Modified on 3/13/2006 (Johnson, Jay). (Entered: 03/10/2006) |
| 03/10/2006 | [225](#) | MOTION in Limine - *Defendant Eli Lilly and Company's Motion in Limine to Exclude Evidence of Direct Infringement of the '516 Patent by Eli Lilly and Company* by Eli Lilly & CO..(Robins, Lawrence) (Entered: 03/10/2006) |
| 03/10/2006 | [226](#) | Memorandum in Support of MOTION in Limine *To Prevent Defendant From Putting Forward Evidence Pertaining To Studies Conducted By Natalie Franchimont* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # [1](#) Exhibit 1# [2](#) Exhibit 2# [3](#) Exhibit 3# [4](#) Exhibit 4# [5](#) Exhibit 5# [6](#) Exhibit 6# [7](#) Exhibit 7# [8](#) Exhibit 8# [9](#) Exhibit 9# [10](#) Exhibit 10)(Drozdoff, Vladimir) Modified on 3/13/2006 (Johnson, Jay). (Entered: 03/10/2006) |
| 03/10/2006 | [227](#) | MOTION in Limine - *Defendant Eli Lilly and Company's Motion in Limine to Exclude Adding Claim Limitations and Expert Testimony that Offers Construction of Claim Terms Inconsistent with the Court's Construction* by Eli Lilly & CO..(Robins, Lawrence) (Entered: 03/10/2006) |
| 03/10/2006 | [228](#) | NOTICE by Eli Lilly & CO. *Notice Pursuant to 35 USC Section 282* (Attachments: # [1](#) Supplement Part II# [2](#) Supplement Part 3# [3](#) Supplement Part 4# [4](#) Supplement Part 5 (end))(Robins, Lawrence) (Entered: 03/10/2006) |
| 03/10/2006 | [229](#) | MOTION in Limine *Plaintiffs? Motion In Limine To Preclude Testimony From Defendant Eli Lilly & Co.?S Patent Law Expert, Stanley Lieberstein, On Improper Subject Matter* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # [1](#) Exhibit 2# [2](#) Exhibit 3# [3](#) Exhibit 4)(Drozdoff, Vladimir) (Entered: 03/10/2006) |
| 03/10/2006 | [230](#) | EXHIBIT re [227](#) MOTION in Limine - *Defendant Eli Lilly and Company's Motion in Limine to Exclude Adding Claim Limitations and Expert Testimony that Offers Construction of Claim Terms Inconsistent with the Court's Construction EXHIBITS A & B TO MOTION IN LIMINE* by Eli Lilly & CO.. (Attachments: # [1](#) Exhibit A - Part 1# [2](#) Exhibit A - Part 2# [3](#) Exhibit A - Part 3# [4](#) Exhibit A - Part 4# [5](#) Exhibit B - Part 1# [6](#) Exhibit B - Part 2# [7](#) Exhibit B - Part 3# [8](#) Exhibit B - Part 4# [9](#) Exhibit B - Part 5# [10](#) Exhibit B - Part 6# [11](#) Exhibit B - Part 7)(Robins, Lawrence) (Entered: 03/10/2006) |

| 03/10/2006 | 231 | MOTION in Limine *Plaintiffs? Motion In Limine No. 1 To Preclude Defendant Eli Lilly And Co. From Introducing Evidence Or Allegations Of The Reexamination Proceedings Relating To The ?516 Patent During Trial* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Ex 1# 2 Ex 2# 3 Ex 3# 4 Ex 4)(Drozdoff, Vladimir) (Entered: 03/10/2006) |
|---|---|---|
| 03/10/2006 | 232 | PRETRIAL MEMORANDUM by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Ex 1# 2 Ex 2# 3 Ex 3# 4 Ex 4# 5 Ex 5# 6 Ex 6# 7 Ex 7)(Drozdoff, Vladimir) (Entered: 03/10/2006) |
| 03/10/2006 | 233 | EXHIBIT re 232 Pretrial Memorandum, *Exhibit 10* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) (Entered: 03/10/2006) |
| 03/10/2006 | 234 | EXHIBIT re 232 Pretrial Memorandum, *Exhibit 11* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) (Entered: 03/10/2006) |
| 03/10/2006 | 235 | EXHIBIT re 232 Pretrial Memorandum, *Exhibit 12* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) (Entered: 03/10/2006) |
| 03/10/2006 | 236 | EXHIBIT re 232 Pretrial Memorandum, *Exhibit 13* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) (Entered: 03/10/2006) |
| 03/10/2006 | 237 | EXHIBIT re 232 Pretrial Memorandum, *Exhibit 15* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) (Entered: 03/10/2006) |
| 03/10/2006 | 238 | EXHIBIT re 232 Pretrial Memorandum, *Exhibit 16* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) (Entered: 03/10/2006) |
| 03/10/2006 | 239 | EXHIBIT re 232 Pretrial Memorandum, *Exhibit 8* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) (Entered: 03/10/2006) |
| 03/10/2006 | 240 | EXHIBIT re 232 Pretrial Memorandum, *Exhibit 9* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) (Entered: 03/10/2006) |

| 03/10/2006 | 241 | *Plaintiff's* Exhibit List by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College.. (Attachments: # 1 # 2) (Drozdoff, Vladimir) (Entered: 03/10/2006) |
| --- | --- | --- |
| 03/10/2006 | 242 | *Defendant's* Exhibit List by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College.. (Attachments: # 1 # 2 # 3)(Drozdoff, Vladimir) (Entered: 03/10/2006) |
| 03/13/2006 |  | Notice of correction to docket made by Court staff. Correction: #224 "Motion in Limine" corrected because: Pleading is the Memorandum in Support of Motion in limine. Docket now reflects what the pleading is. (Johnson, Jay) (Entered: 03/13/2006) |
| 03/13/2006 | 243 | MOTION in Limine *Regarding docket # 224, Memorandum in Support of Motion in Limine to Prevent Defendant from Putting Forward Evidence Pertaining to Subject Matter That They Have Previously Claimed as Protected by Privilege filed on March 10, 2006* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College.(Drozdoff, Vladimir) (Entered: 03/13/2006) |
| 03/13/2006 | 244 | MOTION in Limine *Regarding docket # 226, Memorandum in Support of Motion in Limine to Prevent Defendant from Putting Forward Evidence Pertaining to Studies Conducted by Natalie Franchimont filed on March 10, 2006* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College.(Drozdoff, Vladimir) (Entered: 03/13/2006) |
| 03/13/2006 | 245 | EXHIBIT re 229 MOTION in Limine *Plaintiffs? Motion In Limine To Preclude Testimony From Defendant Eli Lilly & Co.?S Patent Law Expert, Stanley Lieberstein, On Improper Subject Matter Exhibit 1* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) (Entered: 03/13/2006) |
| 03/13/2006 | 246 | *Part 3 to Plaintiff's* Exhibit List *in place of attachment #2 to docket entry 241* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College.. (Drozdoff, Vladimir) (Entered: 03/13/2006) |
| 03/17/2006 | 247 | Letter/request (non-motion) from Counsel for Defendant Eli Lilly and Company *Regarding Withdrawal of Motions to Seal.* (Robins, Lawrence) (Entered: 03/17/2006) |
| 03/17/2006 | 248 | Letter/request (non-motion) from Leora Ben-Ami, Counsel for Plaintiffs'. (Attachments: # 1 Exhibit 1# 2 Exhibit 2)(Drozdoff, Vladimir) (Entered: 03/17/2006) |
| 03/20/2006 | 249 | Letter/request (non-motion) from Counsel for Eli Lilly and Company *regarding Plaintiffs' pending motions in limine.* (Robins, Lawrence) |

| | | (Entered: 03/20/2006) |
|---|---|---|
| 03/20/2006 | 250 | Emergency MOTION to Strike *Plaintiffs' Motions In Limine in Excess of the Parties' Agreed Limit* by Eli Lilly & CO..(Robins, Lawrence) (Entered: 03/20/2006) |
| 03/21/2006 | 251 | Opposition re 250 Emergency MOTION to Strike *Plaintiffs' Motions In Limine in Excess of the Parties' Agreed Limit* filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) (Entered: 03/21/2006) |
| 03/21/2006 | 252 | Letter/request (non-motion) from Counsel for Defendant Eli Lilly and Company *regarding bifurcation*. (Robins, Lawrence) (Entered: 03/21/2006) |
| 03/23/2006 | | NOTICE of Hearing:Telephone Conference set for 3/27/2006 02:00 PM in Courtroom 12 before Judge Rya W. Zobel. Counsel to instruct the court on how this conference will take place.(Urso, Lisa) (Entered: 03/23/2006) |
| 03/23/2006 | 253 | Letter/request (non-motion) from Leora Ben-Ami (Counsel for Plaintiffs). (Drozdoff, Vladimir) (Entered: 03/23/2006) |
| 03/23/2006 | 254 | DECLARATION re 253 Letter/request (non-motion) by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit to Declaration Part 1# 2 Exhibit to Declaration Part 2# 3 Exhibit to Declaration Part 3)(Drozdoff, Vladimir) (Entered: 03/23/2006) |
| 03/23/2006 | 255 | DECLARATION re 253 Letter/request (non-motion) by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) (Entered: 03/23/2006) |
| 03/24/2006 | 256 | Opposition re 227 MOTION in Limine - *Defendant Eli Lilly and Company's Motion in Limine to Exclude Adding Claim Limitations and Expert Testimony that Offers Construction of Claim Terms Inconsistent with the Court's Construction* filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit)(Drozdoff, Vladimir) (Entered: 03/24/2006) |
| 03/24/2006 | 257 | RESPONSE to Motion re 225 MOTION in Limine - *Defendant Eli Lilly and Company's Motion in Limine to Exclude Evidence of Direct Infringement of the '516 Patent by Eli Lilly and Company* filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) (Entered: 03/24/2006) |
| 03/24/2006 | 258 | Assented to MOTION to Seal *Documents* by Eli Lilly & CO.. (Attachments: # 1 Text of Proposed Order)(Robins, Lawrence) (Entered: |

| | | 03/24/2006) |
|---|---|---|
| 03/24/2006 | 259 | Opposition re 226 MOTION in Limine *To Prevent Defendant From Putting Forward Evidence Pertaining To Studies Conducted By Natalie Franchimont* filed by Eli Lilly & CO.. (Robins, Lawrence) (Entered: 03/24/2006) |
| 03/24/2006 | 260 | Opposition re 222 MOTION in Limine *to Preclude Defendant Eli Lilly and Co. from Asserting a 35 USC section 102 Defense* filed by Eli Lilly & CO.. (Attachments: # 1 Exhibit A - Part 1 of 2# 2 Exhibit A - Part 2 of 2)(Robins, Lawrence) (Entered: 03/24/2006) |
| 03/24/2006 | 261 | Opposition re 220 MOTION in Limine *to Preclude Defendant Eli Lilly and Co. from Admitting into Evidence Comments of Third Parties on the Validity of the '516 Patent or the Merits of the Case* filed by Eli Lilly & CO.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D)(Robins, Lawrence) (Entered: 03/24/2006) |
| 03/24/2006 | 262 | Opposition re 223 MOTION in Limine *to Preclude Defendant Eli Lilly and Co. from Asserting Arguments in Contradiction of the Information Contained in its US Patent No 6,545,027* filed by Eli Lilly & CO.. (Attachments: # 1 Exhibit A)(Robins, Lawrence) (Entered: 03/24/2006) |
| 03/24/2006 | 263 | Opposition re 229 MOTION in Limine *Plaintiffs? Motion In Limine To Preclude Testimony From Defendant Eli Lilly & Co.?S Patent Law Expert, Stanley Lieberstein, On Improper Subject Matter* filed by Eli Lilly & CO.. (Attachments: # 1 Exhibit A - Part 1 of 4# 2 Exhibit A - Part 2 of 4# 3 Exhibit A - Part 3 of 4# 4 Exhibit A - Part 4 of 4)(Robins, Lawrence) (Entered: 03/24/2006) |
| 03/24/2006 | 264 | Opposition re 231 MOTION in Limine *Plaintiffs? Motion In Limine No. 1 To Preclude Defendant Eli Lilly And Co. From Introducing Evidence Or Allegations Of The Reexamination Proceedings Relating To The ?516 Patent During Trial* filed by Eli Lilly & CO.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D)(Robins, Lawrence) (Entered: 03/24/2006) |
| 03/24/2006 | 265 | Opposition re 219 MOTION in Limine *To Preclude Defendant Eli Lilly and Co. from Admitting into Evidence Hearsay References in Support of its Contentions Under 35 USC section 102* filed by Eli Lilly & CO.. (Attachments: # 1 Exhibit A - FILED UNDER SEAL# 2 Exhibit B - FILED UNDER SEAL# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F)(Robins, Lawrence) (Entered: 03/24/2006) |
| 03/24/2006 | 266 | Opposition re 224 MOTION in Limine *To Prevent Defendant From Putting Forward Evidence Pertaining To Subject Matter That They Have Previously Claimed As Protected By Privilege* filed by Eli Lilly & CO.. (Robins, Lawrence) (Entered: 03/24/2006) |
| 03/24/2006 | 267 | CERTIFICATE OF SERVICE by Eli Lilly & CO.. (Robins, Lawrence) (Entered: 03/24/2006) |
| 03/27/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. |

| | | |
|---|---|---|
| | | Zobel : Telephone Conference held on 3/27/2006. Trief briefs to be filed explaining claims & defense; (Urso, Lisa) (Entered: 03/27/2006) |
| 03/28/2006 | 268 | Objection by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College *to Eli Lilly and Company's Pretrial Disclosures Under Rule 26(a)(3)(C)*. (Attachments: # 1 Objection Part 2# 2 Objection Part 3# 3 Objection Part 4# 4 Objection Part 5# 5 Objection Part 6# 6 Objection Part 7# 7 Objection Part 8# 8 Letter regarding Objections# 9 Certificate of Service)(Drozdoff, Vladimir) (Entered: 03/28/2006) |
| 03/28/2006 | 269 | Objection by Eli Lilly & CO. *to Exhibits Identified by Plaintiffs Pursuant to Rule 26(a)(3)(c)*. (Attachments: # 1 Objections - Part 2# 2 Objections - Part 3# 3 Objections - Part 4# 4 Objections - Part 5)(Robins, Lawrence) (Entered: 03/28/2006) |
| 04/04/2006 | 270 | TRIAL BRIEF by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit to Trial Brief)(Drozdoff, Vladimir) (Entered: 04/04/2006) |
| 04/04/2006 | 271 | MOTION for Leave to File *REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS? MOTION IN LIMINE TO PRECLUDE DEFENDANT ELI LILLY AND COMPANY FROM INTRODUCING EVIDENCE OR ALLEGATIONS OF THE REEXAMINATION PROCEEDINGS RELATING TO THE ?516 PATENT DURING TRIAL* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 [Proposed] Order# 2 Proposed Reply# 3 Exhibit Part A# 4 Exhibit Part B# 5 Exhibit Part C# 6 Exhibit Part D# 7 Exhibit Part E# 8 Exhibit Part F# 9 Exhibit Part G# 10 Exhibit Part H) (Drozdoff, Vladimir) (Entered: 04/04/2006) |
| 04/04/2006 | 272 | MOTION for Leave to File *REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS? MOTION IN LIMINE TO PRECLUDE DEFENDANT ELI LILLY AND COMPANY FROM ASSERTING A 35 U.S.C. sec. 102(g) DEFENSE* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 [Proposed] Order# 2 Proposed Reply# 3 Exhibit 1# 4 Exhibit 2)(Drozdoff, Vladimir) (Entered: 04/04/2006) |
| 04/04/2006 | 273 | MOTION for Leave to Appear Pro Hac Vice by Christopher T. Jagoe by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit A - Declaration) (Ainbinder, Meredith) (Entered: 04/04/2006) |
| 04/05/2006 | 274 | TRIAL BRIEF by Eli Lilly & CO.. (Robins, Lawrence) (Entered: 04/05/2006) |
| 04/05/2006 | | Filing fee: $ 50, receipt number 71521 for 273 MOTION for Leave to |

| | | |
|---|---|---|
| | | Appear Pro Hac Vice by Christopher T. Jagoe (Johnson, Jay) (Entered: 04/05/2006) |
| 04/05/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Final Pretrial Conference held on 4/5/2006. Jury trial set for 4/10/06; 3 weeks; sitting everyday except Patriot's Day. (Court Reporter Cheryl Dahlstrom.) (Urso, Lisa) (Entered: 04/06/2006) |
| 04/06/2006 | | Judge Rya W. Zobel : Electronic ORDER entered granting 273 Motion for Leave to Appear Pro Hac Vice Added Christopher T. Jagoe for Ariad Pharmaceutical, Massachusetts Institute of Technology, The President and Fellows of Harvard College, The Whitehead Institute for Biomedical Research (Johnson, Jay) (Entered: 04/06/2006) |
| 04/06/2006 | 275 | BRIEF by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College *BENCH MEMORANDUM REGARDING INDUCEMENT OF INFRINGEMENT AND CONTRIBUTORY INFRINGEMENT UNDER 35 U.S.C. ? 271(b) AND 271(c).* (Drozdoff, Vladimir) (Entered: 04/06/2006) |
| 04/07/2006 | 276 | Proposed Jury Instructions by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Exhibit 5# 6 Exhibit 6# 7 Exhibit 7# 8 Exhibit 8)(Drozdoff, Vladimir) (Entered: 04/07/2006) |
| 04/07/2006 | 277 | TRANSCRIPT of Pretrial Conference held on April 5, 2006 before Judge Zobel. Court Reporter: Cheryl Dahlstrom. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617-951-4555 or the Clerk's Office. (Scalfani, Deborah) Modified on 4/13/2006 (Sonnenberg, Elizabeth). (Entered: 04/07/2006) |
| 04/07/2006 | 278 | Proposed Jury Instructions by Eli Lilly & CO., Eli Lilly & CO.. (Williams, Andrew) (Entered: 04/07/2006) |
| 04/07/2006 | | Judge Rya W. Zobel : Electronic ORDER entered granting 222 Motion in Limine, granting 229 Motion in Limine, granting 231 Motion in Limine (Urso, Lisa) (Entered: 04/07/2006) |
| 04/07/2006 | 279 | Judge Rya W. Zobel : ORDER entered. PROCEDURAL ORDER re pretrial/trial Jury Trial set for 4/10/2006 09:00 AM in Courtroom 12 before Judge Rya W. Zobel.(Urso, Lisa) (Entered: 04/07/2006) |
| 04/07/2006 | 280 | MEMORANDUM OF LAW by Eli Lilly & CO., Eli Lilly & CO.. (Williams, Andrew) (Entered: 04/07/2006) |
| 04/10/2006 | 281 | TRANSCRIPT of Motions Hearing held on April 7, 2006 before Judge Zobel. Court Reporter: Catherine A. Handel. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/261-0555 or the Clerk's Office. |

| | | |
|---|---|---|
| | | (Scalfani, Deborah) (Entered: 04/10/2006) |
| 04/10/2006 | 282 | TRANSCRIPT of Jury Trial Day One held on April 10, 2006 before Judge Zobel. Court Reporter: Catherine A. Handel. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/261-0555 or the Clerk's Office. (Scalfani, Deborah) Modified on 5/2/2006 (Scalfani, Deborah). (Entered: 04/10/2006) |
| 04/10/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Jury Trial Day One held on 4/10/2006; Jury of eight selected and sworn; plaintiff's opening; defendant's opening; (Court Reporter Lisa.) (Urso, Lisa) (Entered: 04/13/2006) |
| 04/11/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Jury Trial Day Two held on 4/11/2006; defendant's opening continued; plaintiff's witness #1 Dr. Harvey Berger; cross; redirect; recross; witness #2 Phillip A. Sharp; direct; (Court Reporter Lisa.) (Urso, Lisa) (Entered: 04/13/2006) |
| 04/12/2006 | 283 | MEMORANDUM OF LAW by Eli Lilly & CO., Eli Lilly & CO.. (Attachments: # 1 Exhibit A: Material Transfer Agreement# 2 Exhibit B, Part 1: License Agreement# 3 Exhibit B, Part 2: License Agreement# 4 Exhibit C: Assignment# 5 Exhibit D: Assignment# 6 Exhibit E: Assignment# 7 Exhibit F: Assignment# 8 Exhibit G: Assignment) (Williams, Andrew) (Entered: 04/12/2006) |
| 04/12/2006 | 284 | MEMORANDUM OF LAW by Eli Lilly & CO., Eli Lilly & CO.. (Attachments: # 1 Exhibit A: Material Transfer Agreement# 2 Exhibit B, Part 1: License Agreement# 3 Exhibit B, Part 2: License Agreement# 4 Exhibit c: Assignment# 5 Exhibit D: Assignment# 6 Exhibit E: Assignment# 7 Exhibit F: Assignment# 8 Exhibit G: Assignment) (Williams, Andrew) (Entered: 04/12/2006) |
| 04/12/2006 | 285 | MOTION to Withdraw 283 Memorandum of Law, *Motion to Withdraw Docket Entry 283* by Eli Lilly & CO., Eli Lilly & CO..(Williams, Andrew) (Entered: 04/12/2006) |
| 04/12/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Jury Trial Day three held on 4/12/2006; direct of Phillip Sharp continued; cross; redirect; witness #3 Tom Mauiatis; cross; redirect; recross; plaintiff reads admissions into record; Deposition testimony of Dain Katherine Waters; (Court Reporter Lisa.) (Urso, Lisa) (Entered: 04/13/2006) |
| 04/13/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Jury Trial Day 4 held on 4/13/2006; witness #5 Dr. Caroline Smith; cross; redirect; recross; witness #6 Brendan Boyce; cross; redirect; recross; (Court Reporter Lisa.) (Urso, Lisa) (Entered: 04/13/2006) |
| 04/14/2006 | 286 | MEMORANDUM OF LAW by Eli Lilly & CO., Eli Lilly & CO.. (Attachments: # 1 Exhibit A: Manual of Patent Examining Procedure Sections)(Williams, Andrew) (Entered: 04/14/2006) |

| | | |
|---|---|---|
| 04/14/2006 | 287 | MEMORANDUM OF LAW by Eli Lilly & CO., Eli Lilly & CO.. (Attachments: # 1 Exhibit A: Letter to Joyce Brinton# 2 Exhibit B: Assignment# 3 Exhibit C: Assignment# 4 Exhibit D: Assignment# 5 Exhibit E: Assignment# 6 Exhibit F: Assignment)(Williams, Andrew) (Entered: 04/14/2006) |
| 04/14/2006 | 288 | TRANSCRIPT of Jury Trial Day 1 (Second Session) held on April 10, 2006 before Judge Zobel. Court Reporter: Lisa W. Starr. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 04/14/2006) |
| 04/14/2006 | 289 | TRANSCRIPT of Jury Trial Day Two (First Session) held on April 11, 2006 before Judge Zobel. Court Reporter: Lisa W. Starr. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 04/14/2006) |
| 04/14/2006 | 290 | TRANSCRIPT of Jury Trial Day Two (Second Session) held on April 11, 2006 before Judge Zobel. Court Reporter: Loretta Hennessey. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 04/14/2006) |
| 04/14/2006 | 291 | TRANSCRIPT of Jury Trial Day Four (First Session) held on April 13, 2006 before Judge Zobel. Court Reporter: Lisa A. Starr. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 04/14/2006) |
| 04/14/2006 | 292 | TRANSCRIPT of Jury Trial Day Four (Second Session) held on April 13, 2006 before Judge Zobel. Court Reporter: Loretta Hennessey. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 04/14/2006) |
| 04/14/2006 | 293 | TRANSCRIPT of Jury Trial Day Three (First Session) held on April 12, 2006 before Judge Zobel. Court Reporter: Lisa W. Starr. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 04/14/2006) |
| 04/14/2006 | 294 | TRANSCRIPT of Jury Trial Day Three (Second Session) held on April 12, 2006 before Judge Zobel. Court Reporter: Loretta Hennessey. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 04/14/2006) |
| 04/14/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Jury Trial day five held on 4/14/2006.witness by video deposition James Sales; direct; cross; redirect; witness by video deposition Dr. Stanley Nasraway, Jr,; direct; cross; redirect; Dr. David Livingston; direct; cross; witness by video deposition Dr. David Joyce; direct; |

| | | |
|---|---|---|
| | | witness by deposition read into record; James Harenberg; (Court Reporter Lisa.) (Urso, Lisa) (Entered: 04/18/2006) |
| 04/17/2006 | 295 | MOTION in Limine *TO LIMIT THE TESTIMONY OF ELI LILLY AND COMPANY?S FACT WITNESSES SAU-CHI BETTY YAN, WILLIAM MACIAS, MICHAEL DRAPER, BRIAN GRINNELL, AND LARRY BLACK TO RELEVANT, PERSONAL KNOWLEDGE* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Exhibit G# 8 Exhibit H# 9 Exhibit I# 10 Exhibit J# 11 Exhibit K# 12 Exhibit L# 13 Exhibit M# 14 Exhibit N# 15 Exhibit O# 16 Exhibit P1# 17 Exhibit P2# 18 Exhibit Q# 19 Exhibit R# 20 Exhibit S)(Drozdoff, Vladimir) (Entered: 04/17/2006) |
| 04/18/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Jury Trial day six held on 4/18/2006. James Harenberg continued reading of depo into record; plaintiff witness Mark Edwards; direct; cross; redirect; recross; plaintiff rests; subjecto to rulings on disputed exhibits; defendant witness #1 William Macias; direct; (Court Reporter Lisa.) (Urso, Lisa) (Entered: 04/18/2006) |
| 04/18/2006 | 296 | MOTION for Judgment as a Matter of Law *Notice of Filing* by Eli Lilly & CO., Eli Lilly & CO.. (Attachments: # 1 Exhibit Eli Lilly and Company's Motion For Judgment as a Matter of Law# 2 Exhibit Memorandum In Support of Eli Lilly and Company's Motion for Judgment as a Matter of Law)(Williams, Andrew) (Entered: 04/18/2006) |
| 04/19/2006 | | Notice of correction to docket made by Court staff. Correction: #296 Motion for Judgment as a matter of law. In the future the main document should be the Motion as described and the memorandum in support should not be filed as an exhibit but a seperate document. FYI (Johnson, Jay) (Entered: 04/19/2006) |
| 04/19/2006 | 297 | TRANSCRIPT of Jury Trial Day Five (First Session) held on April 14, 2006 before Judge Zobel. Court Reporter: Lisa W. Starr. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 04/19/2006) |
| 04/19/2006 | 298 | TRANSCRIPT of Jury Trial Day Five (Second Session) held on April 14, 2006 before Judge Zobel. Court Reporter: Loretta Hennessey. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 04/19/2006) |
| 04/19/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Jury Trial Day 7 held on 4/19/2006; Dr. William Macias; continued direct by defendant; cross; redirect; recross; witness #2 Dr. Gordon Bernard; direct; cross; redirect; recross; plaintiff's transition statement; witness #3 Dr. Sau-Chi Betty Yan; direct; cross; (Court Reporter Lisa.) (Urso, Lisa) (Entered: 04/19/2006) |

| 04/19/2006 | 299 | MOTION to Quash *Subpoena of Thomas D. Gilmore* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College.(Drozdoff, Vladimir) (Entered: 04/19/2006) |
|---|---|---|
| 04/19/2006 | 300 | MOTION in Limine *to Exclude Testimony of Draper Pertaining to Non-Disclosed Clinical Tests Regarding Evista and Cancer Treatment and to Preclude Plaintiff from Offering Hearsay Testimony* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Exhibit 5# 6 Exhibit 6# 7 Exhibit 7# 8 Exhibit 8# 9 Exhibit 9# 10 Exhibit 10# 11 Exhibit 11# 12 Exhibit 12# 13 Exhibit 13# 14 Exhibit 14# 15 Exhibit 15# 16 Exhibit 16# 17 Exhibit 17)(Drozdoff, Vladimir) (Entered: 04/19/2006) |
| 04/20/2006 | | Notice of correction to docket made by Court staff. Correction: #299 "Motion" corrected because: WRONG EVENT. This document is the memorandum supporting the motion to quash. An e-mail has been sent describing the fix. (Johnson, Jay) (Entered: 04/20/2006) |
| 04/20/2006 | 301 | MOTION in Limine *TO PRECLUDE DR. STAVROS MANOLAGAS FROM OFFERING TESTIMONY REGARDING CERTAIN DOCUMENTS OF DR. THOMAS GILMORE* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3(a)# 4 Exhibit 3(b)# 5 Exhibit 3(c)# 6 Exhibit 4# 7 Exhibit 5# 8 Exhibit 6# 9 Exhibit 7) (Drozdoff, Vladimir) (Entered: 04/20/2006) |
| 04/20/2006 | 302 | Letter/request (non-motion) from Leora Ben-Ami. (Attachments: # 1 Part One# 2 Part Two# 3 Part Three# 4 Part Four# 5 Part Five)(Drozdoff, Vladimir) (Entered: 04/20/2006) |
| 04/20/2006 | 303 | MEMORANDUM OF LAW by Eli Lilly & CO., Eli Lilly & CO.. (Williams, Andrew) (Entered: 04/20/2006) |
| 04/20/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Jury Trial Day 8 held on 4/20/2006. defendant's witness #4 by video deposition Larry Black; witness #5 Michael Draper; direct; cross; redirect; recross; witness #6 direct; (Court Reporter Lisa.) (Urso, Lisa) (Entered: 04/21/2006) |
| 04/21/2006 | 304 | MOTION in Limine *TO PRECLUDE GARY NOONAN FROM OFFERING TESTIMONY HEARSAY AND EXPERT TESTIMONY* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Exhibit 5)(Drozdoff, Vladimir) (Entered: 04/21/2006) |
| 04/21/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Jury Trial day 9 held on 4/21/2006; Dr. Stavros Manolagns; continued direct by defendant; cross by plaintiff; (Court Reporter Lisa.) |

| | | |
|---|---|---|
| | | (Urso, Lisa) (Entered: 04/27/2006) |
| 04/24/2006 | 305 | MOTION in Limine *TO PRECLUDE EXPERT TESTIMONY FROM DR. BARNES* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Exhibit 5# 6 Exhibit 6# 7 Exhibit 7)(Drozdoff, Vladimir) (Entered: 04/24/2006) |
| 04/24/2006 | 306 | Proposed Jury Instructions by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 2nd Part of Final Jury Instructions)(Drozdoff, Vladimir) (Entered: 04/24/2006) |
| 04/24/2006 | 307 | Proposed Jury Verdict by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) (Entered: 04/24/2006) |
| 04/24/2006 | 308 | TRANSCRIPT of Jury Trial - Day Six (First Session) held on April 18, 2006 before Judge Zobel. Court Reporter: Lisa W. Starr. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 04/24/2006) |
| 04/24/2006 | 309 | TRANSCRIPT of Jury Trial Day Six (Second Session) held on April 18, 2006 before Judge Zobel. Court Reporter: Loretta Hennessey. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 04/24/2006) |
| 04/24/2006 | 310 | TRANSCRIPT of Jury Trial Day Seven (First Session) held on April 19, 2006 before Judge Zobel. Court Reporter: Lisa W. Starr. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 04/24/2006) |
| 04/24/2006 | 311 | TRANSCRIPT of Jury Trial Day Seven (Second Session) held on April 19, 2006 before Judge Zobel. Court Reporter: Loretta Hennessey. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 04/24/2006) |
| 04/24/2006 | 312 | TRANSCRIPT of Jury Trial Day Eight (First Session) held on April 20, 2006 before Judge Zobel. Court Reporter: Lisa W. Starr. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 04/24/2006) |
| 04/24/2006 | 313 | TRANSCRIPT of Jury Trial Day Eight (Second Session) held on April 20, 2006 before Judge Zobel. Court Reporter: Loretta Hennessey. The original transcripts are maintained in the case file in the Clerk's Office. |

| | | |
|---|---|---|
| | | Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 04/24/2006) |
| 04/24/2006 | 314 | Supplemental MOTION in Limine *TO PRECLUDE EXPERT TESTIMONY FROM DR. BARNES* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1# 2 Exhibit 2)(Drozdoff, Vladimir) (Entered: 04/24/2006) |
| 04/24/2006 | 315 | Proposed Jury Instructions by Eli Lilly & CO., Eli Lilly & CO.. (Williams, Andrew) (Entered: 04/24/2006) |
| 04/24/2006 | 316 | Proposed Jury Verdict by Eli Lilly & CO., Eli Lilly & CO.. (Williams, Andrew) (Entered: 04/24/2006) |
| 04/24/2006 | 317 | MOTION for Reconsideration *to Admit Evidence* by Eli Lilly & CO., Eli Lilly & CO.. (Attachments: # 1 Exhibit 1: Trial Transcript# 2 Exhibit 2: Clinical Study Synopsis# 3 Exhibit 3: Trial Transcript# 4 Exhibit 4: Trial Transcript)(Williams, Andrew) (Entered: 04/24/2006) |
| 04/24/2006 | 318 | MOTION in Limine *to Preclude David Latchman from Introducing Evidence Regarding indefiniteness* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) (Entered: 04/24/2006) |
| 04/24/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Jury Trial Day 10 held on 4/24/2006; continued cross by plaintiff of Dr. Manolagas; redirect by defendant; recross by plaintifff; gary Noonan; direct by defendant; cross by plaintiff; (Court Reporter Lisa.) (Urso, Lisa) (Entered: 04/27/2006) |
| 04/25/2006 | 319 | TRANSCRIPT of Jury Trial Day Nine (First and Second Session) held on April 21, 2006 before Judge Zobel. Court Reporter: Loretta Hennessey. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 04/25/2006) |
| 04/25/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Jury Trial Day 11 held on 4/25/2006; continued cross by plaintiff og Gary Noonan; redirect by defendant; Dr. Vincent O'Brien; direct of defendant; cross by plaintiff; redirect; recross; Dr. David Latchman; defendant's direct; (Court Reporter Lisa.) (Urso, Lisa) (Entered: 04/27/2006) |
| 04/26/2006 | 320 | Memorandum in Response to MOTION for Judgment as a Matter of Law *OF NON-INFRINGEMENT AND PLAINTIFFS? MOTION FOR JUDGMENT AS A MATTER OF LAW THAT LILLY HAS CONTRIBUTORILY INFRINGED AND INDUCED INFRINGEMENT OF THE ?516 PATENT* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical |

| | | |
|---|---|---|
| | | Research, The President and Fellows of Harvard College.(Drozdoff, Vladimir) Modified on 4/27/2006 (Johnson, Jay). (Entered: 04/26/2006) |
| 04/26/2006 | 321 | MEMORANDUM OF LAW by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) Additional attachment(s) added on 4/27/2006 (Johnson, Jay). (Entered: 04/26/2006) |
| 04/26/2006 | 322 | MOTION To Admit Into Evidence References Relied On At Trial by Eli Lilly & CO., Eli Lilly & CO..(Williams, Andrew) (Entered: 04/26/2006) |
| 04/26/2006 | 323 | MEMORANDUM in Support re 322 MOTION To Admit Into Evidence References Relied On At Trial filed by Eli Lilly & CO., Eli Lilly & CO.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Exhibit G)(Williams, Andrew) (Entered: 04/26/2006) |
| 04/26/2006 | 324 | TRANSCRIPT of Jury Trial Day Ten (First and Second Session) held on April 24, 2006 before Judge Zobel. Court Reporter: Loretta Hennessey. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 04/27/2006) |
| 04/26/2006 | 325 | TRANSCRIPT of Jury Trial DAy Eleven (First and Second Session) held on April 25, 2006 before Judge Zobel. Court Reporter: Lisa W. Starr. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 04/27/2006) |
| 04/26/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Jury Trial Day 12 held on 4/26/2006;continued direct by dfendant as to Latchman; cross; redirect; defendant's rest; plaintiff reads admission #14 into record; Black videotape deposition; Dr.Jeffrey Ravetcl; direct; cross; redirect; Dr. Stephen M. Presco; direct; (Court Reporter Lisa.) (Urso, Lisa) (Entered: 04/27/2006) |
| 04/27/2006 | | Notice of correction to docket made by Court staff. Correction: #320 "Motion for Judgment as a Matter of Law corrected because: Document is a Response to a Motion Judgment as a matter of law and document should be filed as 2 seperate entries. E-mail sent describing the fix. (Johnson, Jay) (Entered: 04/27/2006) |
| 04/27/2006 | | Notice of correction to docket made by Court staff. Correction: #321 Memorandum of law corrected because: Unsigned Document. E-mail sent describing the fix. (Johnson, Jay) (Entered: 04/27/2006) |
| 04/27/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Jury Trial day 13 held on 4/27/2006; Dr. Prescoh continued; direct; cross; redirect; Dr. Tom Kadesch; direct; cross; redirect; recross; (Court Reporter Lisa.) (Urso, Lisa) (Entered: 04/27/2006) |
| | | |

| 04/27/2006 | 326 | Second MOTION for Judgment as a Matter of Law by Eli Lilly & CO., Eli Lilly & CO..(Williams, Andrew) (Entered: 04/27/2006) |
|---|---|---|
| 04/27/2006 | 327 | MEMORANDUM in Support re 326 Second MOTION for Judgment as a Matter of Law filed by Eli Lilly & CO., Eli Lilly & CO.. (Williams, Andrew) (Entered: 04/27/2006) |
| 04/27/2006 | 328 | *Defendant Eli Lilly and Company's* Letter/request (non-motion) *Submission of Video Testimony for Inclusion in Trial Transcript.* (Williams, Andrew) (Entered: 04/27/2006) |
| 04/27/2006 | 329 | MOTION in Limine *TO STRIKE DR. BOYCE'S TESTIMONY ON CROSS-EXAMINATION THAT EXCEEDED THE SCOPE OF DIRECT* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1)(Drozdoff, Vladimir) (Entered: 04/27/2006) |
| 04/27/2006 | 330 | MEMORANDUM OF LAW by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) (Entered: 04/27/2006) |
| 04/27/2006 | 331 | MOTION for Judgment as a Matter of Law *THAT THE ASSERTED CLAIMS ARE VALID* by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College.(Drozdoff, Vladimir) (Entered: 04/27/2006) |
| 04/27/2006 | 332 | Opposition re 317 MOTION for Reconsideration *to Admit Evidence Relating to Raloxifene's Ability to Prevent Breast Cancer* filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1# 2 Exhibit 2)(Drozdoff, Vladimir) (Entered: 04/27/2006) |
| 04/28/2006 | 333 | Opposition re 322 MOTION To Admit Into Evidence References Relied On At Trial *by Expert Witnesses Testifying on 35 U.S.C. 102 Issues* filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4)(Drozdoff, Vladimir) (Entered: 04/28/2006) |
| 04/28/2006 | 334 | MEMORANDUM OF LAW by Eli Lilly & CO., Eli Lilly & CO.. (Williams, Andrew) (Entered: 04/28/2006) |
| 04/28/2006 | | Notice of correction to docket made by Court staff. Correction: #31 motion for judgment of matter of law corrected because: UNSIGNED DOCUMENT. E-mail sent desribing the fix. (Johnson, Jay) (Entered: 04/28/2006) |
| 04/28/2006 | 335 | Opposition re 329 MOTION in Limine *TO STRIKE DR. BOYCE'S TESTIMONY ON CROSS-EXAMINATION THAT EXCEEDED THE* |

| | | |
|---|---|---|
| | | *SCOPE OF DIRECT* filed by Eli Lilly & CO., Eli Lilly & CO.. (Williams, Andrew) (Entered: 04/28/2006) |
| 04/28/2006 | 336 | MEMORANDUM OF LAW in Opposition to Bench Memorandum regarding contributory infringement an inducement by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) Modified on 5/1/2006 (Johnson, Jay). (Entered: 04/28/2006) |
| 04/28/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Jury Trial Day 14 held on 4/28/2006. defendant's closing argument; plaintiff's closing argument; Jury charge. (Court Reporter Lisa.) (Urso, Lisa) (Entered: 05/01/2006) |
| 05/01/2006 | 337 | MEMORANDUM in Opposition re 326 Second MOTION for Judgment as a Matter of Law filed by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Drozdoff, Vladimir) (Entered: 05/01/2006) |
| 05/01/2006 | | Judge Rya W. Zobel : endorsedORDER entered denying 317 Motion for Reconsideration, denying 322 Motion (Urso, Lisa) (Entered: 05/01/2006) |
| 05/01/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Jury Trial 15 held on 5/1/2006. Jury deliberates till 4:00. Question 11:45 a.m. (Court Reporter Catherine Handel.) (Urso, Lisa) (Entered: 05/03/2006) |
| 05/02/2006 | 338 | TRANSCRIPT of Jury Trial Day Twelve (First Session) held on April 27, 2006 before Judge Zobel. Court Reporter: Lisa W. Starr. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 05/02/2006) |
| 05/02/2006 | 339 | TRANSCRIPT of Jury Trial Day Twelve (Second Session) held on April 26, 2006 before Judge Zobel. Court Reporter: Loretta Hennessey. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) Modified on 5/2/2006 (Scalfani, Deborah). (Entered: 05/02/2006) |
| 05/02/2006 | 340 | TRANSCRIPT of Jury Trial Day Thirteen (First Session) held on April 27, 2006 before Judge Zobel. Court Reporter: Lisa W. Starr. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 05/02/2006) |
| 05/02/2006 | 341 | TRANSCRIPT of Jury Trial Day Thirteen (Second Session) held on April 27, 2006 before Judge Zobel. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: |

| | | |
|---|---|---|
| | | 05/02/2006) |
| 05/02/2006 | 342 | TRANSCRIPT of Jury Trial Day Thirteen (Third Session - Charge Conference) held on April 27, 2006 before Judge Zobel. Court Reporter: Loretta Hennessey. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) Modified on 5/2/2006 (Scalfani, Deborah). (Entered: 05/02/2006) |
| 05/02/2006 | 343 | TRANSCRIPT of Jury Trial Day Fourteen (First Session) held on April 28, 2006 before Judge Zobel. Court Reporter: Lisa W. Starr. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 05/02/2006) |
| 05/02/2006 | 344 | TRANSCRIPT of Jury Trial Day Fourteen (Second Session) held on April 28, 2006 before Judge Zobel. Court Reporter: Loretta Hennessey. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 05/02/2006) |
| 05/02/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Jury Trial Day 16 held on 5/2/2006. Jury deliberates; 3 questions; (Court Reporter Catherine Handel.) (Urso, Lisa) (Entered: 05/03/2006) |
| 05/03/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Jury Trial day 17 held on 5/3/2006. question 10:10 a.m. (Court Reporter Catherien Handel.) (Urso, Lisa) (Entered: 05/08/2006) |
| 05/04/2006 | 345 | TRANSCRIPT of Jury Questions held on May 2, 2006 before Judge Zobel. Court Reporter: Catherine A. Handel. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/261-0555 or the Clerk's Office. (Scalfani, Deborah) (Entered: 05/04/2006) |
| 05/04/2006 | 346 | JURY VERDICT. (Urso, Lisa) (Entered: 05/04/2006) |
| 05/04/2006 | 347 | TRANSCRIPT of Jury Trial Day Eighteen (Verdict) held on May 4, 2006 before Judge Zobel. Court Reporter: Debra M. Joyce. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/737-4410 or the Clerk's Office. (Scalfani, Deborah) (Entered: 05/04/2006) |
| 05/04/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Jury Trial day 17 completed on 5/4/2006. Jury Verdict at 9:50 a.m. (Court Reporter Debra Joyce.) (Urso, Lisa) (Entered: 05/08/2006) |
| 05/24/2006 | 348 | Letter/request (non-motion) from Lee Carl Bromberg *Requesting Status Conference*. (Bromberg, Lee) (Entered: 05/24/2006) |
| 05/26/2006 | | ELECTRONIC NOTICE of Hearing : Status Conference set for 6/1/2006 02:00 PM in Courtroom 12 before Judge Rya W. Zobel. (Urso, Lisa) (Entered: 05/26/2006) |

| 05/26/2006 | 349 | MOTION for Leave to Appear Pro Hac Vice by Charles E. Lipsey, David S. Forman, Laura P. Masurovsky, Robert D. Bajefsky, and Sanya Sukduang by Eli Lilly & CO.. (Attachments: # 1 Exhibit A - Declaration of Charles Lipsey# 2 Exhibit B - Declaration of David Forman# 3 Exhibit C - Declaration of Laura Masurovsky# 4 Exhibit D - Declaration of Robert Bajefsky# 5 Exhibit E - Declaration of Sanya Sukduang)(Robins, Lawrence) (Entered: 05/26/2006) |
| --- | --- | --- |
| 05/26/2006 | 350 | Letter/request (non-motion) from Lawrence R. Robins. (Robins, Lawrence) (Entered: 05/26/2006) |
| 05/31/2006 | | Filing fee: $ 250, receipt number 72761 for 349 MOTION for Leave to Appear Pro Hac Vice by Charles E. Lipsey, David S. Forman, Laura P. Masurovsky, Robert D. Bajefsky, and Sanya Sukduang (Johnson, Jay) (Entered: 05/31/2006) |
| 06/01/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Status Conference held on 6/1/2006. Bench Trial set for 8/7/2006 09:00 AM in Courtroom 12 before Judge Rya W. Zobel. 3 days; set telephone conference re; pretrial; (Urso, Lisa) (Entered: 06/01/2006) |
| 06/12/2006 | | Judge Rya W. Zobel : Electronic ORDER entered granting 349 Motion for Leave to Appear Pro Hac Vice Added Charles E. Lipsey for Eli Lilly & CO., David S. Forman for Eli Lilly & CO., Laura P. Masurovsky for Eli Lilly & CO., Robert D. Bajefsky for Eli Lilly & CO., Sanya Sukduang for Eli Lilly & CO. (Johnson, Jay) (Entered: 06/12/2006) |
| 07/11/2006 | | Judge Rya W. Zobel : Electronic ORDER entered finding as moot 171 Motion for Summary Judgment, finding as moot 175 Motion for Summary Judgment, granting 196 Motion to Seal, granting 197 Motion to Seal, granting 209 Motion to Seal, granting 210 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures, granting 213 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures, finding as moot 215 Motion to Strike (Urso, Lisa) (Entered: 07/11/2006) |
| 07/13/2006 | | ELECTRONIC NOTICE of Hearing : Pretrial Conference by telephone set for 8/2/2006 02:00 PM in Courtroom 12 before Judge Rya W. Zobel. Counsel will arrange the phone call.(Urso, Lisa) (Entered: 07/13/2006) |
| 07/13/2006 | 351 | MOTION for Leave to Appear Pro Hac Vice by Jennifer A. Johnson and Howard W. Levine by Eli Lilly & CO.. (Attachments: # 1 Exhibit A# 2 Exhibit B)(Robins, Lawrence) (Entered: 07/13/2006) |
| 07/13/2006 | 352 | REPLY to Response to Motion re 175 MOTION for Summary Judgment of Invalidity Under 35 USC Secs. 101 and 112, First Paragraph - Filed Pursuant to Court's Electronic Order dated July 11, 2006 - filed by Eli Lilly & CO.. (McDonell, Leslie) (Entered: 07/13/2006) |
| 07/13/2006 | 353 | REPLY to Response to Motion re 171 MOTION for Summary Judgment |

| | | |
|---|---|---|
| | | *of Invalidity Under 35 U.S.C. Sec. 102 - Filed Pursuant to Court's Electronic Order dated July 11, 2006* filed by Eli Lilly & CO.. (McDonell, Leslie) (Entered: 07/13/2006) |
| 07/14/2006 | | Filing fee: $ 100, receipt number 73706 for 351 MOTION for Leave to Appear Pro Hac Vice by Jennifer A. Johnson and Howard W. Levine (Johnson, Jay) (Entered: 07/14/2006) |
| 07/19/2006 | 354 | Letter/request (non-motion) from Counsel for Defendant, Eli Lilly and Company. (Lipsey, Charles) (Entered: 07/19/2006) |
| 07/20/2006 | 355 | Letter/request (non-motion) from Counsel for Plaintiff, Ariad Pharmaceutical. (Timbers, Kerry) (Entered: 07/20/2006) |
| 07/28/2006 | | Judge Rya W. Zobel : ELECTRONIC ENDORSEMENT re 354 Letter/request (non-motion) Defendant is coorect. Although the jury determined validity on the grounds submitted to it, the court expressly reserved decision on validity under 35 USC 110. The summary judgment motion will be addressed on the merits.(Urso, Lisa) (Entered: 07/28/2006) |
| 07/31/2006 | 356 | MOTION in Limine *to Exclude Expert Testimony on Issues Overlapping with Issues Decided by the Jury* by all plaintiffs. (Attachments: # 1 Exhibit 1)(Fleming, Thomas) (Entered: 07/31/2006) |
| 07/31/2006 | 357 | MOTION in Limine *to Preclude Testimony from Lilly's Patent Attorney Witness, Or, Alternatively to Exclude Evidence of the Pending Re-Exam and Evidence of Materiality Not Based on the Law at the Time of Prosecution of the '516 Patent* by all plaintiffs. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Exhibit 5# 6 Exhibit 6# 7 Exhibit 7)(Fleming, Thomas) (Entered: 07/31/2006) |
| 08/01/2006 | 358 | Opposition re 356 MOTION in Limine *to Exclude Expert Testimony on Issues Overlapping with Issues Decided by the Jury* filed by Eli Lilly & CO.. (Attachments: # 1 Exhibit 1)(Lipsey, Charles) (Entered: 08/01/2006) |
| 08/01/2006 | 359 | Opposition re 357 MOTION in Limine *to Preclude Testimony from Lilly's Patent Attorney Witness, Or, Alternatively to Exclude Evidence of the Pending Re-Exam and Evidence of Materiality Not Based on the Law at the Time of Prosecution of the '516 Patent and Cross Motion to Admit in Evidence the Reexamination (DTXs 973-974 and 2213-2215) Relating to U.S. Patent No. 6,410,516* filed by Eli Lilly & CO.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Exhibit G)(Lipsey, Charles) (Entered: 08/01/2006) |
| 08/02/2006 | 360 | TRIAL BRIEF by all plaintiffs. (Fleming, Thomas) (Entered: 08/02/2006) |
| 08/02/2006 | 361 | EXHIBIT re 360 Trial Brief by Ariad Pharmaceutical, Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, The President and Fellows of Harvard College. (Attachments: # 1 exhibit 1 part b# 2 exhibit 1 part c# 3 exhibit 1 part d# 4 exhibit 1 part |

| | | |
|---|---|---|
| | | e# 5 exhibit 1 part f# 6 exhibit 1 part g# 7 exhibit 2# 8 exhibit 3# 9 exhibit 4# 10 exhibit 5# 11 exhibit 6# 12 exhibit 7# 13 exhibit 8# 14 exhibit 9# 15 exhibit 10# 16 exhibit 11# 17 exhibit 12# 18 exhibit 13) (Fleming, Thomas) (Entered: 08/02/2006) |
| 08/02/2006 | 362 | TRIAL BRIEF by Eli Lilly & CO.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C)(Lipsey, Charles) (Entered: 08/02/2006) |
| 08/02/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Final Pretrial Conference held on 8/2/2006. Counsel went over issues to be tried; (Urso, Lisa) (Entered: 08/02/2006) |
| 08/02/2006 | 363 | Letter/request (non-motion) from Charles E. Lipsey, Counsel for Eli Lilly and Company. (Lipsey, Charles) (Entered: 08/02/2006) |
| 08/03/2006 | 364 | MOTION in Limine *to Preclude Ariad from Relying on Testimony from Dr. Barnes, a Non-Testifying Lilly Expert* by Eli Lilly & CO..(Lipsey, Charles) (Entered: 08/03/2006) |
| 08/03/2006 | 365 | MOTION to Supplement Trial Exhibit *PTX 2 in Order to Complete the PTO Prosecution File of U.S. Patent No. 6,410,516* by Eli Lilly & CO.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E)(Lipsey, Charles) (Entered: 08/03/2006) |
| 08/03/2006 | 366 | Letter/request (non-motion) from Plaintiff, ARIAD Pharmaceuticals, Inc.. (Bromberg, Lee) (Entered: 08/03/2006) |
| 08/03/2006 | 367 | Supplement to Lilly's Opposition re 357 MOTION in Limine *to Preclude Testimony from Lilly's Patent Attorney Witness, Or, Alternatively to Exclude Evidence of the Pending Re-Exam and Evidence of Materiality Not Based on the Law at the Time of Prosecution of the '516 Patent,* 359 Opposition to Motion,, *and Cross Motion to Admit in Evidence the Reexamination (DTXS 973-974 and 2213-2215) Relating to U.S. Patent No. 6,410,516* by Eli Lilly & CO..(Lipsey, Charles) Modified on 8/4/2006 (Johnson, Jay). (Entered: 08/03/2006) |
| 08/04/2006 | | Motions terminated: 367 MOTION to Supplement Lilly's Opposition re 357 MOTION in Limine *to Preclude Testimony from Lilly's Patent Attorney Witness, Or, Alternatively to Exclude Evidence of the Pending Re-Exam and Evidence of Materiality Not Based on the Law at filed by Eli Lilly & CO.,. (Johnson, Jay) (Entered: 08/04/2006)* |
| 08/04/2006 | | Notice of correction to docket made by Court staff. Correction: #367 "Motion to Supplement" corrected because: WRONG EVENT. Pleading is a Supplement to an Opposition, not a motion. Also this document should have been filed as two entries E-mail sent describing the fix. (Johnson, Jay) Modified on 8/4/2006 (Johnson, Jay). (Entered: 08/04/2006) |
| 08/04/2006 | 368 | Opposition re 364 MOTION in Limine *to Preclude Ariad from Relying on Testimony from Dr. Barnes, a Non-Testifying Lilly Expert* filed by all plaintiffs. (Fleming, Thomas) (Entered: 08/04/2006) |
| 08/04/2006 | 369 | Opposition re 367 MOTION to Supplement Lilly's Opposition re 357 |

| | | |
|---|---|---|
| | | MOTION in Limine *to Preclude Testimony from Lilly's Patent Attorney Witness, Or, Alternatively to Exclude Evidence of the Pending Re-Exam and Evidence of Materiality Not Based on the Law at Opposition to Cross Motion filed* by all plaintiffs. (Attachments: # 1 Exhibit 1)(Fleming, Thomas) (Entered: 08/04/2006) |
| 08/04/2006 | 370 | MOTION for Leave to File *Reply in Support of Plaintiffs? Motion in Limine to Preclude Expert Testimony on Issues Overlapping with Issues Decided by the Jury* by all plaintiffs. (Attachments: # 1 Exhibit A) (Fleming, Thomas) (Entered: 08/04/2006) |
| 08/04/2006 | | Judge Rya W. Zobel : ELECTRONIC ENDORSEMENT re 366 Letter/request (non-motion), 363 Letter/request (non-motion) "The parties may each make an opening statement of no more than 20 minutes". (Johnson, Jay) (Entered: 08/04/2006) |
| 08/04/2006 | 371 | NOTICE by Eli Lilly & CO. *of Filing with Clerk's Office* (Lipsey, Charles) (Entered: 08/04/2006) |
| 08/04/2006 | 372 | Letter/request (non-motion) from C. Lipsey, Counsel for Eli Lilly and Company. (Lipsey, Charles) (Entered: 08/04/2006) |
| 08/04/2006 | 373 | MOTION to Overrule Ariad's Objections to Lilly's Deposition Designations and Corresponding Exhibits by Eli Lilly & CO..(Lipsey, Charles) (Entered: 08/04/2006) |
| 08/04/2006 | 374 | Opposition re 365 MOTION to Supplement Trial Exhibit *PTX 2 in Order to Complete the PTO Prosecution File of U.S. Patent No. 6,410,516 filed* by all plaintiffs. (Fleming, Thomas) (Entered: 08/04/2006) |
| 08/04/2006 | 375 | MOTION for Leave to File *Reply Memorandum Supporting Its Motion to Admit in Evidence the Reexamination (DTXs 973-974 and 2213-2215) Relating to U.S. Patent No. 6,410,516* by Eli Lilly & CO.. (Attachments: # 1 Exhibit A# 2 Exhibit H# 3 Exhibit I)(Lipsey, Charles) (Entered: 08/04/2006) |
| 08/04/2006 | 376 | MOTION for Leave to File *Reply in Support of Defendant Eli Lilly and Company's Motion In Limine to Preclude Ariad from Relying on Testimony from Dr. Barnes, a Non-Testifying Lilly Expert* by Eli Lilly & CO.. (Attachments: # 1 Exhibit A to Motion# 2 Exhibit A to Reply) (Lipsey, Charles) (Entered: 08/04/2006) |
| 08/04/2006 | 377 | AMENDED DOCUMENT by Eli Lilly & CO.. Amendment to 376 MOTION for Leave to File *Reply in Support of Defendant Eli Lilly and Company's Motion In Limine to Preclude Ariad from Relying on Testimony from Dr. Barnes, a Non-Testifying Lilly Expert (to Replace Exhibit to Motion)*. (Lipsey, Charles) (Entered: 08/04/2006) |
| 08/04/2006 | 378 | AMENDED DOCUMENT by Eli Lilly & CO.. Amendment to 376 MOTION for Leave to File *Reply in Support of Defendant Eli Lilly and Company's Motion In Limine to Preclude Ariad from Relying on Testimony from Dr. Barnes, a Non-Testifying Lilly Expert*, 377 Amended Document, *Exhibit to Motion*. (Lipsey, Charles) (Entered: 08/04/2006) |

| 08/05/2006 | 379 | APPENDIX/EXHIBIT re 367 MOTION to Supplement Lilly's Opposition re 357 MOTION in Limine *to Preclude Testimony from Lilly's Patent Attorney Witness, Or, Alternatively to Exclude Evidence of the Pending Re-Exam and Evidence of Materiality Not Based on the Law at Exhibit A to Supplement by Eli Lilly & CO.. (Lipsey, Charles) (Entered: 08/05/2006)* |
|---|---|---|
| 08/05/2006 | 380 | APPENDIX/EXHIBIT re 372 Letter/request (non-motion) *(Exhibit A)* by Eli Lilly & CO.. (Lipsey, Charles) (Entered: 08/05/2006) |
| 08/07/2006 | 381 | Opposition re 373 MOTION to Overrule Ariad's Objections to Lilly's Deposition Designations and Corresponding Exhibits filed by all plaintiffs. (Attachments: # 1 Exhibit A# 2 Exhibit B)(Drozdoff, Vladimir) (Entered: 08/07/2006) |
| 08/07/2006 | 382 | Opposition re 365 MOTION to Supplement Trial Exhibit *PTX 2 in Order to Complete the PTO Prosecution File of U.S. Patent No. 6,410,516* filed by all plaintiffs. (Fleming, Thomas) (Entered: 08/07/2006) |
| 08/07/2006 | | Judge Rya W. Zobel : Electronic ORDER entered granting 351 Motion for Leave to Appear Pro Hac Vice Added Jennifer A. Johnson for Eli Lilly & CO., Howard W. Levine for Eli Lilly & CO. (Johnson, Jay) (Entered: 08/07/2006) |
| 08/07/2006 | 383 | MOTION to Preclude a Claim Construction That is Barred by Judicial Estoppel by Eli Lilly & CO..(Lipsey, Charles) (Entered: 08/07/2006) |
| 08/07/2006 | 384 | Letter/request (non-motion) from C. Lipsey, Counsel for Eli Lilly and Company. (Lipsey, Charles) (Entered: 08/07/2006) |
| 08/07/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Bench Trial Day One held on 8/7/2006; defendant's opening; plaintiff's opening; defendant's calls witness #1 David Latchman; cross; (Court Reporter Lisa/Catherine.) (Urso, Lisa) (Entered: 08/10/2006) |
| 08/08/2006 | | Notice of correction to docket made by Court staff. Correction: #381 Opposition corrected because: Attorney who files the document must SIGN the document. Email sent describing the fix. (Johnson, Jay) (Entered: 08/08/2006) |
| 08/08/2006 | 385 | Opposition re 383 MOTION to Preclude a Claim Construction That is Barred by Judicial Estoppel filed by all plaintiffs. (Fleming, Thomas) (Entered: 08/08/2006) |
| 08/08/2006 | 386 | TRANSCRIPT of Bench Trial - Day One (First Session) held on August 7, 2006 before Judge Zobel. Court Reporter: Lisa W. Starr. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 08/08/2006) |
| 08/08/2006 | 387 | TRANSCRIPT of Bench Trial - Day One (Second Session) held on August 7, 2006 before Judge Zobel. Court Reporter: Catherine A. Handel. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at |

| | | 617/261-0555 or the Clerk's Office. (Scalfani, Deborah) (Entered: 08/08/2006) |
|---|---|---|
| 08/08/2006 | 388 | EXHIBIT re 383 MOTION to Preclude a Claim Construction That is Barred by Judicial Estoppel by Eli Lilly & CO.. (Lipsey, Charles) (Entered: 08/08/2006) |
| 08/08/2006 | 389 | MOTION in Limine *to Preclude Dr. Ravetch from Providing Testimony Beyond the Scope of His Expert Reports* by Eli Lilly & CO.. (Attachments: # 1 Exhibit Excerpts from Report)(Lipsey, Charles) (Entered: 08/08/2006) |
| 08/08/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Bench Trial Day two held on 8/8/2006. Continued cross of Latchman; redirect; defendant call witness #2 Stanley Liebastein; direct; cross; redirect; recross; defendant rests pending decisions on motions; plaintiff's witness #1 Jeffrey Reuetch; direct; (Court Reporter Lisa/Catherine.) (Urso, Lisa) (Entered: 08/10/2006) |
| 08/09/2006 | 390 | Opposition re 389 MOTION in Limine *to Preclude Dr. Ravetch from Providing Testimony Beyond the Scope of His Expert Reports* filed by all plaintiffs. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F)(Fleming, Thomas) (Entered: 08/09/2006) |
| 08/09/2006 | 391 | TRANSCRIPT of Bench Trial Day Two - First Session held on August 8, 2006 before Judge Zobel. Court Reporter: Lisa W. Starr. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 08/09/2006) |
| 08/09/2006 | 392 | TRANSCRIPT of Bench Trial Day Two (Second Session) held on August 8, 2006 before Judge Zobel. Court Reporter: Catherine A. Handel. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/261-0555 or the Clerk's Office. (Scalfani, Deborah) (Entered: 08/09/2006) |
| 08/09/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Bench Trial Day Three held on 8/9/2006; continued direct of Rauctch; plaintiff's witness #2 Matt Vincent; direct; cross; redirect; (Court Reporter Lisa/Catherine.) (Urso, Lisa) (Entered: 08/10/2006) |
| 08/10/2006 | | ElectronicClerk's Notes for proceedings held before Judge Rya W. Zobel : Bench Trial Day 4 completed on 8/10/2006; continued cross of Dr. Raustch; redirect; recross; defendant's closing; plaintiff's closing; (Court Reporter Lisa/Catherine.) (Urso, Lisa) (Entered: 08/14/2006) |
| 08/14/2006 | 393 | TRANSCRIPT of Bench Trial Day Three (First Session) held on August 9, 2006 before Judge Zobel. Court Reporter: Lisa W. Starr. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/771-8336 or the Clerk's Office. (Scalfani, Deborah) (Entered: 08/14/2006) |

| | | |
|---|---|---|
| 08/14/2006 | 394 | TRANSCRIPT of Bench Trial Day Three (Second Session) held on August 9, 2006 before Judge Zobel. Court Reporter: Catherine A. Handel. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/261-0555 or the Clerk's Office. (Scalfani, Deborah) (Entered: 08/14/2006) |
| 08/14/2006 | 395 | TRANSCRIPT of Bench Trial Day Four (Second Session) held on August 10, 2006 before Judge Zobel. Court Reporter: Catherine A. Handel. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/261-0555 or the Clerk's Office. (Scalfani, Deborah) (Entered: 08/14/2006) |
| 09/05/2006 | 396 | STIPULATION *(Joint) to Extend Deadlines* by Eli Lilly & CO.. (Lipsey, Charles) (Entered: 09/05/2006) |
| 09/11/2006 | 397 | Proposed Findings of Fact by Eli Lilly & CO.. (Lipsey, Charles) (Entered: 09/11/2006) |
| 09/11/2006 | 398 | Proposed Findings of Fact by all plaintiffs. (Attachments: # 1 Exhibit A) (Fleming, Thomas) Additional attachment(s) added on 9/13/2006 (Johnson, Jay). (Entered: 09/11/2006) |
| 09/12/2006 | | Notice of correction to docket made by Court staff. Correction: #398 Proposed Findings of Fact corrected because: Unsigned Document. E-mail sent describing the fix. (Johnson, Jay) (Entered: 09/12/2006) |
| 09/20/2006 | 399 | Letter/request (non-motion) from C. Lipsey, Counsel for Eli Lilly and Company. (Lipsey, Charles) (Entered: 09/20/2006) |
| 09/22/2006 | 400 | STIPULATION *(Joint) to Extend Deadlines* by Eli Lilly & CO.. (Lipsey, Charles) (Entered: 09/22/2006) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/27/2006 17:44:34 | | |
| **PACER Login:** | im0142 | **Client Code:** | 159923-0001-mnvk |
| **Description:** | Docket Report | **Search Criteria:** | 1:02-cv-11280-RWZ |
| **Billable Pages:** | 30 | **Cost:** | 2.40 |

# EXHIBIT L



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 02-11280-RWZ

ARIAD PHARMACEUTICALS, INC.,
MASSACHUSETTS INSTITUTE OF TECHNOLOGY,
THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,
and THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE

v.

ELI LILLY & COMPANY

## QUESTIONS TO THE JURY ON SPECIAL VERDICT

April 28, 2006

ZOBEL, D.J.

## INFRINGEMENT

### Evista

1 (a)  Does a patient who takes Evista in accordance with the product label for

prevention and/or treatment of osteoporosis infringe claim 80 and/or claim 95 of the

'516 patent?

Claim 80:  YES $\cancel{\quad}$     NO _____

Claim 95:  YES $\cancel{\quad}$     NO _____

If the answer is YES as to one or both claims, please answer the corresponding

part of Questions 1 (b) and 1 (c).

If the answer is NO as to both claims, please answer next Question 2 (a).

### Inducement to Infringe

1 (b) Did defendant Eli Lilly induce infringement of claim 80 and/or claim 95 by

selling or causing a third party to sell Evista to such patients?

Claim 80:  YES_____   NO_____

Claim 95:  YES_____   NO_____

### Contributory Infringement

1 (c) Did defendant Eli Lilly contributorily infringe claim 80 and/or claim 95 by

selling or causing a third party to sell Evista?

Claim 80:  YES_____   NO_____

Claim 95:  YES_____   NO_____

## Xigris

2 (a) Does a patient who takes Xigris in accordance with the product label for

treatment of severe sepsis infringe claim 144 and/or claim 145?

Claim 144:  YES_____   NO_____

Claim 145:  YES_____   NO_____

If the answer is YES as to one or both claims, please answer the corresponding

part of Questions 2 (b) and 2 (c).

If the answer is NO as to both claims, please answer next Question 3.

### Inducement to Infringe

2 (b) Did defendant Eli Lilly induce infringement of claim 144 and/or claim 145 of

the '516 patent by selling or causing a third party to sell Xigris?

Claim 144:  YES_____   NO_____

Claim 145  YES_____   NO_____

2

Contributory Infringement

2 (c) Did defendant Eli Lilly contributorily infringe claim 144 and/or claim 145 by selling or causing a third party to sell Xigris?

Claim 144: YES___✗___ NO_____

Claim 145: YES___✗___ NO_____

Please answer next Questions 3 and 4 through 7 as to all claims.

## VALIDITY

Filing Date

3. The effective filing date of the '516 patent is

a) April 21, 1989 ___✗___

b) November 13, 1991 _____

Anticipation

4. Are one or more of the asserted claims of the '516 patent invalid because the claimed process was anticipated by a single prior art publication or reference?

Claim 80: YES_____ NO___✗___

Claim 95: YES_____ NO___✗___

Claim 144: YES_____ NO___✗___

Claim 145: YES_____ NO___✗___

5. Are one or more of the asserted claims of the '516 patent invalid because the claimed process was anticipated by prior public use?

Claim 80: YES_____ NO___✗___

Claim 95: YES_____ NO___✗___

Claim 144: YES_____ NO___✗___

3

Claim 145: YES_____ NO__X___

Enablement

6. Are one or more of the asserted claims of the '516 patent invalid for failing to satisfy the enablement requirement?

Claim 80: YES_____ NO__X___

Claim 95: YES_____ NO__X___

Claim 144: YES_____ NO__X___

Claim 145: YES_____ NO__X___

Written Description

7. Are one or more of the asserted claims of the '516 patent invalid for failure to satisfy the written description requirement?

Claim 80: YES_____ NO__X___

Claim 95: YES_____ NO__X___

Claim 144: YES_____ NO__X___

Claim 145: YES_____ NO__X___

If you found infringement of one or more claims and also that those claims are valid, please answer next the questions concerning damages. That is, if you answered YES to one or more parts of Questions 1 and 2, and NO to each corresponding part of Questions 3 through 7, please answer next the corresponding questions concerning damages.

If you found either no claims to be infringed by answering NO to all parts of Questions 1 and 2, or if you found all infringed claims to be invalid by answering YES to all parts of Questions 3 through 8, please return your verdict to the court.

4

## DAMAGES

### Reasonable Royalty

8. What is the reasonable royalty for infringement of any valid claim?

_2.3_ %

### Evista

9 (a) What amount of Evista Net Sales should serve as the royalty base for

computing damages?

$ _2,418,553,338.00_

9 (b) The amount of damages attributable to Evista sales is

$ _____

### Xigris

10 (a) What amount of Xigris sales should serve as the royalty base for

computing damages?

$ _415,513,335.00_

10 (b) The amount of damages attributable to Xigris sales is

$ _____

### Pre-Judgment Interest

11 (a) Should pre-judgment interest by awarded on the amounts determined in

Questions 9 (b) and 10 (b)?

YES_____    NO__ X ____

If the answer to Question 11 (a) is YES, please answer Question 11 (b).

If the answer to Question 11 (a) is NO, please return your verdict to the court.

11 (b) The rate of pre-judgment interest is _____%

_5-4-06_

DATE

Janie E. Crasaman

FOREPERSON'S SIGNATURE

5

## MEANING OF CLAIM TERMS

| Term | Court's Construction |
|---|---|
| Reducing NF-κB Activity | Decreasing the function of NF-κB to act as an intracellular messenger that regulates transcription of particular genes, in response to certain stimuli |
| Reducing Binding of NF-κB to NF-κB Recognition Sites on Genes Which Are Transcriptionally Regulated by NF-κB | Decreasing binding of NF-κB to DNA sequences specifically recognized by NF-κB, where such DNA sequences are in genes whose transcription is regulated by increasing or decreasing NF-κB activity, and where binding denotes a chemical and/or physical interaction between NF-κB and specific DNA sequences. |

| Term | Court's Construction |
|---|---|
| So As to Reduce Bacterial Lipopolysaccharide-Induced Expression of Said Cytokines in the Cells | To decrease expression of cytokines in the cells, where expression of those cytokines is caused by bacterial lipopolysaccharide and where expression refers to the process by which the cell interprets its genetic information to make proteins |
| Immune Cells | Specialized cells that defend the body against infection.  Immune cells are present in all body tissues, the blood stream, and the lymphatic system, and derive from a common precursor cell known as a hematopoietic stem cell.  They include T cells, B cells, natural killer cells, monocytes and other monocyte derivatives, macrophages, neutrophils, eosinophils, mast cells, and basophils.  Although these cells typically function to eliminate harmful foreign invaders, immune cells occasionally mistake the body's own tissues as non-self (causing autoimmune disease) or attack harmless foreign substances or donated organs (causing allergy or organ rejection). |

The parties have agreed to the definitions of the following terms:

| NF-κB | a protein factor that; <br> (a) resides in the cytoplasm as an inactive precursor bound to an IκB inhibitor protein; <br> (b) when released from the inhibitor, travels to the nucleus of the cell; <br> (c) once in the nucleus, functions to turn on transcription of certain genes by binding to specific DNA recognition sequences in those genes |
|---|---|
| A method for . . . in cells | These claims encompass methods wherein NF-κB is modulated in cells, regardless of where they are found. |

| NF-κB mediated intracellular signaling | Molecular communication within cells effected by, or conveyed through, NF-κB |
|---|---|
| Such that NF-κB-mediated effects of external influences are modified | Changing or altering effects that are both caused by an inducing substance outside the cell and are conveyed through NF-κB |
| Cytokines | Secreted polypeptides (proteins) that affect the functions of other cells, and which are important for the interactions between cells in the immune response. There are many different cytokines, one example of which is TNF-α. |
| Activated by extracellular influences | Stimulated by one or more inducing substances outside the cell |

# EXHIBIT M

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ARIAD PHARMACEUTICALS, INC.,** ) <br> **MASSACHUSETTS INSTITUTE OF** ) <br> **TECHNOLOGY, THE WHITEHEAD** ) <br> **INSTITUTE FOR BIOMEDICAL RESEARCH,** ) <br> **and THE PRESIDENT AND FELLOWS OF** ) <br> **HARVARD COLLEGE** ) <br> ) <br>              **Plaintiffs,** ) <br> ) <br>    **v.** ) <br> ) <br> **ELI LILLY AND CO.,** ) <br> ) <br>              **Defendant.** ) <br> ) | **Civil Action No. 02 CV 11280 RWZ** <br><br> **U.S. District Judge** <br> **Rya W. Zobel** |

## PLAINTIFFS' TRIAL BRIEF

Leora Ben-Ami
Patricia A. Carson
Vladimir Drozdoff
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022
Tel: (212) 836-8000
Fax: (212) 836-8689

Lee Carl Bromberg, BBO# 058480
Kerry L. Timbers, BBO# 552293
BROMBERG & SUNSTEIN LLP
125 Summer Street
Boston, MA 02110-1618
Tel.: (617) 443-9292

*Attorneys for Plaintiffs*
*ARIAD Pharmaceuticals, Inc., Massachusetts*
*Institute of Technology, the Whitehead Institute*
*for Biomedical Research, and the President*
*and Fellows of Harvard College*

## I.     THE PATENTED INVENTION

This is a civil case involving a claim of patent infringement.  In this case, the inventors include several scientists who worked at Harvard University, the Massachusetts Institute of Technology, and the Whitehead Institute.  The subject matter of the patent concerns a signaling mechanism known as the NF-κB pathway, first described by the patent's inventors, which relates to how cells make proteins.  In the body, our cells make thousands of different proteins.  While in most cases these proteins are necessary for our survival, in some diseases, humans produce too much of a certain protein.  The overproduction of these proteins harms the body.  The research of the inventors focused on the mechanism by which certain cells produce proteins.  The inventors at MIT and Whitehead Institute, led by the Nobel-prize winning scientists David Baltimore and Phillip Sharp, conducted research on how cells produced antibodies, which are proteins that are important in the immune response.  Thomas Maniatis, a renowned scientist at Harvard, was conducting research on how cells produce a protein known as interferon, which is important in the body responding to viral infection.  The scientists' research focused on transcription factors, which work like messengers in the cell by telling the cell which proteins to make and in what quantities.  While thousands of transcription factors exist, the scientists found that one particular transcription factor regulated the production of certain proteins, in particular those related to inflammation and related disorders, in many different cells.  The scientists named this transcription factor NF-κB.

Realizing the importance of this transcription factor to human disease, the scientists at Harvard, MIT, and the Whitehead invented methods of interfering in the NF-κB pathway to reduce its activity and lessen cellular production of harmful proteins.  The United States Patent

1

Office awarded these scientists U.S. Patent No. 6,410,516, or, for short, the '516 patent.  The universities licensed their rights to the patent to ARIAD Pharmaceuticals.

## II.    PLAINTIFFS' CASE-IN-CHIEF

Plaintiffs contend that Eli Lilly and Company ("Lilly") infringes the '516 patent by selling two drugs, Xigris® and Evista®, and directing patients and doctors to use these pharmaceuticals in a way that infringes the claims of the '516 patent.  Doctors use Xigris® to treat severe sepsis.  Severe sepsis is caused by an infection, often from a type of bacteria, which leads to an excessive inflammatory response by the body.  Evista® is prescribed to women for the treatment of postmenopausal osteoporosis.  Osteoporosis is a disease in which bone becomes porous and brittle, making it more likely to fracture and break.  Plaintiffs assert that Lilly directs its customers to use Xigris® and Evista® in such a way that they practice the claimed invention.  To meet their burden, Plaintiffs must prove infringement by a preponderance of the evidence.

Plaintiffs assert that Lilly infringes four claims of the '516 patent.  Each of these claims depend from other claims not being asserted.  The dependent claims have additional limitations not contained in the independent claims.  The dependent claims stand or fall on their own.  The patent statute provides that "dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim."  35 U.S.C. § 282.  Plaintiffs propose formatting the dependent claims in independent terms for the ease of the jury, so that the jurors need not look from independent claims and add the dependent claim features.

The claims of the patents are directed to methods of reducing the effects of an outside stimulus on a cell by reducing NF-κB activity.  Plaintiffs assert two of the claims, 144 and 145, against Lilly's use of Xigris®.  These claims cover a method of reducing the expression of proteins known as cytokines, where such expression has been induced by lipopolysaccharide, or LPS.  LPS is a substance that is found on the surface of some bacteria.  When LPS contacts cells

2

in the human body it can cause the cells to express cytokines.  The claims call for the reduction

of this expression by reducing NF-κB activity.  Plaintiffs assert claims 80 and 95 of the '516

patent against Lilly's use of Evista®.  These claims are directed to the reduction of the effects of

an external stimulus on a cell.  Claims 80 and 95 call for, respectively, the reduction of NF-κB

signaling in a cell and the reduction of gene expression in a cell.  Claim 80 specifies that NF-κB

activity must be reduced in a particular way, by reducing the binding of NF-κB to DNA in the

cell's nucleus.  Claim 95 also requires that NF-κB be reduced in a human cell.

      The patent statute provides that Lilly can be held liable for instructing doctors and

patients to use its drugs.  If Lilly specifically intended that patients use their drugs in such a way

that infringes the '516 patent, Lilly has induced infringement.  *Water Techs. Corp. v. Calco Ltd.*,

850 F.2d 660 (Fed. Cir. 1988).  By selling its drugs knowing that they were specifically made for

the infringing purpose, Lilly has contributorily infringed the '516 patent.  *Preemption Devices,*

*Inc. v. Minnesota Mining & Mfg. Co.*, 803 F.2d 1170 (Fed. Cir. 1986).  Lilly must have intended

that others perform the infringing acts.  Plaintiffs do not need to show that Lilly specifically

intended that others commit acts that were infringing, for example, by reducing cytokine

expression through reducing NF-κB activity.  "[T]he only intent required of [the accused

infringer] is the intent to cause the acts that constitute infringement."  *Moba, B.V. v. Diamond*

*Automation, Inc.*, 325 F.3d 1306, 1318 (Fed. Cir. 2003), *cert. denied*, 124 S. Ct. 464 (2003).

      To prove either inducement or contributory infringement, Plaintiffs must demonstrate

that there were direct acts of infringement.  In this case, the directly infringing acts are the use of

Evista® and Xigris® by patients and doctors according to their FDA-approved product label.

Lilly has not agreed to stipulate that these drugs are used according to the FDA-approved use.

Nevertheless, Plaintiffs may prove infringement using circumstantial evidence.  *Moleculon*

*Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986). Plaintiffs are prepared to call a patient taking Evista and a doctor regarding Xigris if required by Lilly, but believe this is a distraction and a waste of trial time basically unheard of in patent cases. With regard to the physician treating with Xigris, Plaintiffs request that the testimony be taken by a deposition *de bene esse*, so the physician can continue to treat patients rather than wait in court.

If Plaintiffs prove infringement, the law provides that Lilly must pay Plaintiffs a reasonable royalty for the use of the invention. In this case, Plaintiffs seek a reasonable royalty of 4%. Plaintiffs do not seek to recover any lost profits.

## III.    LILLY'S CASE-IN-CHIEF

Lilly asserts several defenses in this action. According to the pretrial memorandum, these are non-infringement, invalidity of the patent for failure to claim patentable subject matter under § 101, express anticipation, inherent anticipation, lack of enablement, lack of written description, indefiniteness, inequitable conduct, and prosecution laches. Lilly lists 767 references on its § 282 statement. Given the extraordinary breadth of Lilly's defenses, Plaintiffs cannot address validity until their rebuttal case which will follow the first time defendant limits its case, so Plaintiffs can respond. Therefore Plaintiffs request that the Court employ time management requirements so that Plaintiffs can address validity.

### A.    Defenses to Be Tried to the Court

At least four of Lilly's defenses are issues for the Court rather than the jury. Lilly asserts that the claims of the '516 patent are directed to unpatentable subject matter because the claims of the patent cover a natural phenomenon in violation of 35 U.S.C. § 101. The issue of whether the '516 patent is directed to patentable subject matter is a question of law for the Court. *AT&T Corp. v. Excel Communications, Inc.*, 172 F.3d 1352, 1355 (Fed. Cir. 1999); *Arrhythmia Research Technology v. Corazonix Corp.*, 958 F.2d 1053, 1055-56 (Fed.Cir.1992).

The issue of indefiniteness is also a matter of law. *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1378 (Fed. Cir. 1999). Lilly contends that the asserted claims of the '516 patent are invalid as indefinite under § 112. Lilly never supplemented its interrogatories to include this defense and first disclosed this defense in their reply expert reports. Plaintiffs moved to preclude Lilly from asserting this defense. The Court denied this motion on January 23, 2006. A claim meets the definiteness requirement so long as one of skill in the art could understand the bounds of the claim when read in light of the specification. *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1359-60 (Fed. Cir. 2001). Only if the claim is insolubly ambiguous should it be held invalid. *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1366 (Fed. Cir. 2004). Lilly asserts that no test or assay exists by which one of skill in the art could determine that NF-κB activity has been reduced. Plaintiffs assert that the patent provides tests that may be used to determine reduction of NF-κB.

Lilly also asserts that the '516 patent is unenforceable for two reasons. First, Lilly asserts that Plaintiffs committed inequitable conduct by making misrepresentations before the Patent office and withholding material information during prosecution. Second, Lilly asserts that the '516 patent is unenforceable under the doctrine of prosecution laches. Lilly claims that the '516 patent issued after an unexplained and unreasonable delay in prosecution resulting from an egregious misuse of the patent system. Both inequitable conduct and prosecution laches are equitable issues that must be decided solely by the court. *Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209, 1211-13 (Fed.Cir.1987). In the joint pretrial memorandum, Lilly seeks the right to amend its "pleadings regarding inequitable conduct if Plaintiffs contend that Lilly has failed to adequately plead those allegations to conform with the evidence adduced during discovery as set forth in its interrogatory responses and expert reports." D.I. 232 at 2. Plaintiffs

believe that Defendant should be required to lay out with particularity the totality of its inequitable conduct defenses by interrogatory, prior to the start of trial. If done before trial begins, Plaintiffs will make an effort to agree that there is no need for late amendment unless there is material surprise. Plaintiffs assert that once trial starts there will be prejudice if there is late disclosure. *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 200 (Fed. Cir. 1986).

### B. Defenses to Be Tried to the Jury

The remainder of Lilly's defenses may be tried to the jury. Lilly asserts that neither Evista® or Xigris® reduce NF-κB activity, and concludes that the use of these products does not infringe the asserted claims. In addition to this non-infringement defense, Lilly asserts that the '516 patent is invalid. Because the '516 patent is entitled to a presumption of validity, Lilly must prove the patent invalid by clear and convincing evidence.

### 1. Anticipation

Lilly has stated that the patent is invalid because certain compounds, such as aspirin, red wine, and many others noted in the 282 statement, each anticipate the '516 patent claims because they were used prior to the filing date of the '516 patent. Lilly contends that these uses inherently reduced NF-κB activity, although no one knew this at the time.

There is a conflict of law on the issue of inherency and the recognition requirement which has previously been discussed and which Plaintiffs again wish to bring to the Court's attention. The Supreme Court has long held that an unintended and unappreciated performance of a method in the prior art cannot inherently anticipate a patent claim. *Eibel Process Co. v. Minn. & Ontario Paper Co.*, 261 U.S. 45,66 (1923); *Tilghman v. Proctor*, 102 U.S. 707, 711 (1880). The Court of Customs and Patent Appeals, the predecessor of the Federal Circuit, also required that the prior art invention must be appreciated to anticipate. *In re Seaborg*, 328 F.2d

996, 1108 (CCPA 1964); *Riney v. Thomas*, 77 F.2d 525, 528 (CCPA 1935).[1] The Federal Circuit followed suit, requiring that the party asserting inherent anticipation must prove that "the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991); *accord In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999). However, recently, the Federal Circuit has stated that recognition is not required to prove inherent anticipation. *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003); *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1351 (Fed. Cir. 2002).

Plaintiffs believe that there are a few ways to handle this conflict of law which may ultimately need to be resolved by the Supreme Court. First, Lilly could stipulate that those of skill in the art would not have recognized the inherent features at the time of the invention. This would be consistent with its expert's testimony. (Ex. __, 12/22/2005 Manolagas depo. at 129:2-12). In that instance, the Court could charge on inherency without the recognition requirement, and the appeals court would be able to analyze the jury's verdict on the other factors relating to inherency. If the Federal Circuit agreed that there was a recognition requirement, there would be no inherency. If the Court held there was no recognition requirement, then it could review the jury's verdict. If Lilly will not stipulate to the absence of recognition, then Plaintiffs suggest a separate interrogatory in the verdict form on the topic.

Despite this conflict on one aspect of inherency, the Federal Circuit recently reaffirmed a related longstanding principle of patent law: a new use of an old compound is patentable. *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1378 (Fed. Cir. 2005). In *Perricone*, a party

---

[1]     Cases of the Court of Customs and Patent Appeals are binding precedent for the Federal Circuit. *South Corp. v. United States*, 690 F.2d 1368, 1370-71 (Fed. Cir. 1982).

challenged the validity of a patent by contending that the prior art teaching of applying a compound to the human skin anticipated a claim to using the same compound to treat a sunburn. The Federal Circuit rejected this argument and upheld the validity of the claims, finding that the prior use of generally applying the compound to the skin was not the same as the specific use of applying the compound to a sunburn. The Federal Circuit made the following analogy: "the disclosure that a sunburn can be prevented by wearing a hat clearly does not anticipate a claim to the discovery that one can treat an existing sunburn by putting on a hat." *Id.* at 1379. Therefore Lilly cannot prove anticipation by demonstrating that a compound was simply used in the prior art.

The law is also settled that to demonstrate inherent anticipation, Lilly must prove that these prior art uses would have necessarily and inevitably reduced NF-κB activity. Mere probabilities or possibilities that the prior art reference described the claimed invention cannot establish inherent anticipation. *In re Robertson*, 169 F.3d at 745. Plaintiffs contend that the prior uses cited by Lilly cannot anticipate the '516 patent claims because each and every use did not necessarily meet each claim limitation. Additionally, a prior art reference can only anticipate if it is enabled. *Elan Pharms., Inc. v. Mayo Found. for Med. Education & Research*, 346 F.3d 1051, 1054 (Fed. Cir. 2003). To determine whether a prior art reference is enabled, courts consider the same facts that they would use in considering an enablement challenge to a patent. *See id.* at 1054-55.

## 2. Enablement

Lilly challenges the validity of the '516 patent on the grounds of enablement. Pursuant to 35 U.S.C. § 112, Plaintiffs must have taught one of skill in the art to practice the invention without undue experimentation. *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1334 (Fed. Cir. 2003). Even if some experimentation is required to practice the invention, the

patent satisfies the enablement requirement so long as the experimentation is not undue. *Moba*, 325 F.3d at 1318. The Federal Circuit has directed court to consider several underlying facts in determining whether one of skill in the art would have needed undue experimentation to practice the claims. *In re Wands*, 858 F.2d 731, 737 (Fed.Cir.1988). These underlying facts form the foundation for deciding the legal issue of enablement. *See Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1373 (Fed. Cir. 2005) (enablement is a question of law based on underlying facts). Plaintiffs may rely upon the teachings in the disclosure of the patent and evidence that demonstrates that those of skill in the art were able to practice the invention after the patent filing date. *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1336-37 (Fed. Cir. 2003).

As part of its enablement argument, Lilly asserts that the patent claims all means of producing a desired result and is therefore invalid. *Fiers v. Revel*, 984 F. 2d 1164, 1171 (Fed. Cir. 1993). Lilly cannot, however, prove invalidity simply by demonstrating that the claims are overly broad. *United States Steel Corp. v. Phillips Petroleum Co.*, 865 F.2d 1247, 1251 (Fed. Cir. 1989). Nor does the mere fact that Plaintiffs' claims recite functional language render them invalid. The Supreme Court has held that use of functional language in claims is permissible and may even be desirable. *Gen. Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 371 (1938). Plaintiffs contend that the asserted claims use permissible functional language and are directed to particular methods of reducing the effects of external influences on cells by reducing NF-κB activity.

### 3.     Written Description

Lilly also asserts that the patent is invalid because the inventors failed to fulfill the written description requirement of 35 U.S.C. § 112. The statute requires that the inventor was in possession of the claimed invention. *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1561, 1563-64 (Fed. Cir. 1991). In order to satisfy the written description requirement, Plaintiffs may disclose

9

structural characteristics, physical or chemical properties of their invention, functional characteristics coupled with a known structure, or some combination of any of these. *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1072 (Fed. Cir. 2005). Whether the patentees have satisfied this requirement is a question of fact. *Moba*, 325 F.3d at 1319. Analysis of the written description involves a comparison between the disclosure and the claims. The inquiry does not involve a comparison between the disclosure and the allegedly infringing products. Plaintiffs do not have to disclose future embodiments of their invention, such as Evista or Xigris, to satisfy this requirement. *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1365 (Fed. Cir. 2003).

## IV.    REQUEST UNDER FEDERAL RULE OF EVIDENCE 615

Pursuant to Federal Rule of Evidence 615, Plaintiffs request that this Court exclude from these proceedings all persons that the parties have identified as fact witnesses with the exception of one corporate representative for each party. Such a ruling preserves the integrity of the judicial process by discouraging and exposing fabrication, inaccuracy, and collusion. Advisory Committee Rules to Fed. R. Evid. 615.

## V.    CONCLUSION

In summary, the issues in this case are whether or not the use of two of Lilly's products, Xigris® and Evista® infringe claims of the '516 patent, whether or not the '516 patent claims are valid, and, if affirmative, the amount of a reasonable royalty to award to Plaintiffs.

Dated:  April 4, 2006

Respectfully Submitted

By:

**Attorneys for Plaintiffs**
ARIAD Pharmaceuticals, Inc.,
Massachusetts Institute of Technology,
the Whitehead Institute for Biomedical
Research, and the President and
Fellows of Harvard College

/s/ Vladimir V. Drozdoff
Leora Ben-Ami
Patricia A. Carson
Vladimir Drozdoff
KAYE SCHOLER LLP
425 Park Avenue
New York, NY  10022
Tel: (212) 836-8000
Fax: (212) 836-8689
VDrozdoff@kayescholer.com

Lee Carl Bromberg, BBO# 058480
Kerry L. Timbers, BBO# 552293
BROMBERG & SUNSTEIN LLP
125 Summer Street
Boston, MA  02110-1618
Tel.: (617) 443-9292
Fax: (617) 443-0004
ktimbers@bromsun.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 4, 2006.

/s/ Vladimir V. Drozdoff

02695/00501  483019.1

11

# EXHIBIT N

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

AMGEN INC., IMMUNEX CORPORATION,  )
AMGEN USA INC., AMGEN                              )
MANUFACTURING LIMITED, IMMUNEX    )    C.A. No. 06-259-KAJ
RHODE ISLAND CORPORATION                  )
                                                                          )
                                    Plaintiff,          )
                                                                          )
vs.                                                                    )
                                                                          )
ARIAD PHARMACEUTICALS, INC.                )
                                                                          )
                                    Defendant.        )
                                                                          )

## DEFENDANT'S RULE 26(a)(1) INITIAL DISCLOSURE

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), Defendant ARIAD Pharmaceuticals, Inc. ("ARIAD") provides the following initial disclosures to Plaintiffs. ARIAD has moved to dismiss the Complaint in this action for lack of subject matter, failure to state a claim, and failure to join indispensable and necessary parties. This document should not be construed as a waiver of any argument in this motion, or of ARIAD's right to assert counterclaims at a later date if this action is not dismissed.

ARIAD's disclosures represent a good faith effort to identify information it reasonably believes is discoverable and that it may use to support its defenses as required by Fed. R. Civ. P. 26(a)(1), in the event that ARIAD's motion to dismiss is denied. ARIAD's disclosures do not waive ARIAD's position that the allegations in the Complaint have not been sufficiently set forth for ARIAD to determine all categories of discoverable information that ARIAD may use to support its defenses. ARIAD makes these initial disclosures based on information reasonably available to it at this time and

reserves the right to supplement or correct these disclosures under Fed. R. Civ. P. 26(e) upon continuing investigation, and to include information acquired hereafter or omitted by mistake or inadvertence.  By making these disclosures, ARIAD does not waive its right to object to production of any document, data compilation or tangible thing on the basis of privilege, work product doctrine, relevancy, undue burden, or any other valid objection.

### A.    Individuals Likely To Have Discoverable Information That ARIAD May Use To Support Its Defenses

ARIAD identifies the following individuals who may be likely to have discoverable information that ARIAD may use to support its defenses, unless solely for impeachment, pursuant to Fed. R. Civ. P. Rule 26(a)(1)(A), in the event that ARIAD's motion to dismiss is denied..  ARIAD also provides information by which each individual may be contacted. ARIAD does not consent or authorize any communications by Plaintiffs with ARIAD's employees, officers, directors, attorneys or inventors, whether formerly or currently associated with or employed by ARIAD, and does not consent to or authorize any communication otherwise prohibited by all applicable rules of professional conduct.

ARIAD has not identified all employees or persons otherwise under control of Plaintiffs who may have discoverable information that ARIAD may use to support their claims or defenses (in the event that ARIAD's motion to dismiss is denied), as information about the identity of all such individuals is currently only in Plaintiffs' possession. ARIAD reserves the right to supplement these disclosures when such information becomes available through further discovery.

Subject to the foregoing qualifications, ARIAD discloses the following:

| **Individual** | **Subject** |
| --- | --- |

David Baltimore, Ph.D.                    Invention of the patent-in-suit
c/o Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Phone (310) 277-1010

Ranjan Sen, Ph.D.                         Invention of the patent-in-suit
c/o Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Phone (310) 277-1010

Phillip A. Sharp, Ph.D.                   Invention of the patent-in-suit
c/o Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Phone (310) 277-1010

Harinder Singh, Ph.D.                     Invention of the patent-in-suit
c/o Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Phone (310) 277-1010

Louis M. Staudt, M.D., Ph.D.             Invention of the patent-in-suit
c/o Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Phone (310) 277-1010

Jonathan H. Lebowitz, Ph.D.              Invention of the patent-in-suit
c/o Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Phone (310) 277-1010

Albert S. Baldwin, Jr., Ph.D.                    Invention of the patent-in-suit
c/o Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Phone (310) 277-1010

Roger G. Clerc, Ph.D.                            Invention of the patent-in-suit
c/o Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Phone (310) 277-1010

Lynn M. Corcoran, Ph.D.                          Invention of the patent-in-suit
c/o Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Phone (310) 277-1010

Patrick A. Baeuerle, PhD.                        Invention of the patent-in-suit
c/o Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Phone (310) 277-1010

Michael J. Lenardo, M.D.                         Invention of the patent-in-suit
c/o Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Phone (310) 277-1010

Chen-Ming Fan, Ph.D.                             Invention of the patent-in-suit
c/o Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Phone (310) 277-1010

Thomas P. Maniatis, Ph.D.                      Invention of the patent-in-suit
c/o Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Phone (310) 277-1010

David L. Berstein                              Prosecution of the patent-in-suit
c/o Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Phone (310) 277-1010

Harvey J. Berger, M.D.                         Licensing of the patent-in-suit
c/o Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Phone (310) 277-1010

Matthew P. Vincent, J.D., Ph.D.                Prosecution of the patent-in-suit
c/o Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Phone (310) 277-1010

Patricia Granahan, J.D., Sc.D.                 Prosecution of the patent-in-suit
c/o Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Phone (310) 277-1010

These disclosures should not be construed to mean that any of the above individuals are or will be available for discovery and/or trial.

**B.**     **Documents, Data Compilations and Tangible Things in Plaintiffs' Possession, Custody, or Control That Plaintiffs May Use To Support Their Claims or Defenses**

ARIAD provides the following "description by category and location of all documents, data compilations, and tangible things" that are in ARIAD's possession, custody, or control that ARIAD reasonably believes it may use to support its defenses, unless solely for impeachment, pursuant to Rule 26(a)(1)(B), in the event that its motion to dismiss is denied.    ARIAD reserves its right to object to the production of any document, data compilation, and tangible thing included within the following categories described herein on any basis permitted by the Fed. R. Civ. P.    For example, certain documents, data compilations, and tangible things included within the following category are not discoverable, either because they are protected from disclosure by attorney-client privilege or work-product doctrine, or are not sufficiently relevant to the issues at stake in the litigation to justify the burden or expense of such discovery.    Advisory Committee Notes, 1993 and 2000 Amendments.

The following documents, data compilations and tangible things are located or can be made available at the offices of ARIAD's counsel, Irell & Manella LLP, 1800 Avenue of the Stars, Suite 900, Los Angeles, California 90067:

- Documents relating to the invention and prosecution of U.S. Patent No. 6,410,516

**C.**     **Computation of Damages**

In light of its pending motion to dismiss, ARIAD does not seek damages at this time.    This document should not be construed as a waiver of ARIAD's right to seek damages at a later date if this action is not dismissed, and to supplement this document as appropriate.

**D.    Insurance**

ARIAD is unaware at this time of any insurance agreements it has entered into that are pertinent to this proceeding.

ASHBY & GEDDES

Steven J. Balick  (I.D. # 2114)
John G. Day (I.D. # 2403)
Tiffany Geyer Lydon (I.D. # 3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE  19899
Telephone:  (302) 654-1888
Facsimile:  (302) 654-2067

*Attorneys for Defendant*
*ARIAD PHARMACEUTICALS, INC.*

*Of Counsel:*

Morgan Chu
David I. Gindler
Elizabeth Rosenblatt
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Telephone:  (310) 277-1010
Facsimile:  (310) 203-7199

Dated:  July 26, 2006
171643.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of July, 2006, the attached **DEFENDANT'S RULE**

**26(a)(1) INITIAL DISCLOSURE** was served upon the below-named counsel of record at the

address and in the manner indicated:


Melanie K. Sharp, Esquire                                    HAND DELIVERY
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391


Marcus E. Sernel, Esquire                                    VIA FEDERAL EXPRESS
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601-6636


J. Drew Diamond, Esquire                                     VIA FEDERAL EXPRESS
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA  90017-5800



_____
John G. Day

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMGEN INC., IMMUNEX CORPORATION, )
AMGEN USA INC., AMGEN )
MANUFACTURING LIMITED, IMMUNEX )   C.A. No. 06-259-KAJ
RHODE ISLAND CORPORATION )
                                )
             Plaintiff, )
                                )
vs. )
                                )
ARIAD PHARMACEUTICALS, INC. )
                                )
             Defendant. )
                                )

## NOTICE OF SERVICE

The undersigned hereby certifies that on the 26th day of July, 2006, **DEFENDANT'S**

**RULE 26(a)(1) INITIAL DISCLOSURE** was served upon the following counsel of record at

the address and in the manner indicated:


Melanie K. Sharp, Esquire                    HAND DELIVERY
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

Marcus E. Sernel, Esquire               VIA FEDERAL EXPRESS
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601-6636

J. Drew Diamond, Esquire               VIA FEDERAL EXPRESS
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA  90017-5800

ASHBY & GEDDES

/s/ *John G. Day*

Steven J. Balick  (I.D. # 2114)
John G. Day (I.D. # 2403)
Tiffany Geyer Lydon (I.D. # 3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE  19899
Telephone:  (302) 654-1888
Facsimile:   (302) 654-2067
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendant*
*ARIAD PHARMACEUTICALS, INC.*

*Of Counsel:*

Morgan Chu
David I. Gindler
Elizabeth Rosenblatt
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Telephone:  (310) 277-1010
Facsimile:   (310) 203-7199

Dated:  July 26, 2006
171644.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of July, 2006, the attached **NOTICE OF SERVICE**

was served upon the below-named counsel of record at the address and in the manner indicated:

Melanie K. Sharp, Esquire                          <u>HAND DELIVERY</u>
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

Marcus E. Sernel, Esquire                          <u>VIA FEDERAL EXPRESS</u>
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601-6636

J. Drew Diamond, Esquire                           <u>VIA FEDERAL EXPRESS</u>
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA  90017-5800


/s/ *John G. Day*
_____
John G. Day

## Discovery Documents

1:06-cv-00259-KAJ Amgen Inc. et al v. Ariad Pharmaceuticals Inc.

### U.S. District Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Day, John entered on 7/26/2006 at 5:34 PM EDT and filed on 7/26/2006

**Case Name:** Amgen Inc. et al v. Ariad Pharmaceuticals Inc.
**Case Number:** 1:06-cv-259
**Filer:** Ariad Pharmaceuticals Inc.
**Document Number:** 43

**Docket Text:**
NOTICE OF SERVICE of Defendant's Rule 26(a)(1) Initial Disclosure by Ariad Pharmaceuticals Inc.. (Day, John)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=7/26/2006] [FileNumber=250000-0]
[8e1c029aa50c79f3a4f8f0b66fdef7cc49aad69932e89fe9913e33503df04e5a6a28
5e31264d38040e41a24eebd11912fdae46b0dd15309a9a5f4cb94fa687df]]

**1:06-cv-259 Notice will be electronically mailed to:**

Morgan Chu   mchu@irell.com,

John G. Day   jday@ashby-geddes.com, sbalick@ashby-geddes.com; mkipp@ashby-geddes.com; dfioravanti@ashby-geddes.com; nlopez@ashby-geddes.com; tlydon@ashby-geddes.com; lmaguire@ashby-geddes.com; dharker@ashby-geddes.com

David I. Gindler   dgindler@irell.com,

Amir A. Naini   anaini@irell.com,

Christopher M. Newman   cnewman@irell.com

Elizabeth L. Rosenblatt   brosenblatt@irell.com

Melanie K. Sharp   msharp@ycst.com, achacko@ycst.com; chunter@ycst.com; beichner@ycst.com

**1:06-cv-259 Notice will be delivered by other means to:**

# EXHIBIT O

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN, INC., a Delaware corporation; IMMUNEX CORPORATION, a Washington corporation; AMGEN USA INC., a Delaware corporation; AMGEN MANUFACTURING, LIMITED, a Bermuda Corporation, and IMMUNEX RHODE ISLAND CORPORATION, a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> ARIAD PHARMACEUTICALS, INC., a Delaware corporation, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 06-259 |

### PLAINTIFFS' INITIAL DISCLOSURES PURSUANT TO
### FEDERAL RULE OF CIVIL PROCEDURE 26(a)(1)

Pursuant to Fed. R. Civ. P. 26(a)(1), Amgen, Inc., Immunex Corp., Amgen USA Inc., Amgen Manufacturing, Limited, and Immunex Rhode Island Corporation (collectively "Amgen") make the following Initial Disclosures to Ariad Pharmaceuticals, Inc. Amgen submits these Initial Disclosures based upon information it has acquired to date, and reserves all rights, consistent with Rule 26(e), to modify, amend, and/or supplement the disclosures made herein as additional evidence and information become available.

A.    **The names of each individual likely to have discoverable information that Amgen may use to support its claims or defenses and the identity of the subjects of such information. The individuals listed in paragraphs 1-6 below may be contacted through counsel for Amgen.**

1.    Robert C. Thompson, who may have information relating to the development of KINERET.

2.    William P. Arend, who may have information relating to the development of KINERET.

3.    Raymond G. Goodwin, who may have information relating to the development of ENBREL.

4.    Laura Hamill, who may have information relating to the selling and marketing of KINERET and ENBREL.

5.    Brent Appleton, who may have information relating to the clinical development of KINERET.

6.    James Louie, who may have information relating to the clinical development of ENBREL.

7.    Fritz Casselman, who may have information relating to the licensing of the patent-in-suit.

8.    Harvey J. Berger, who may have information relating to the licensing of the patent-in-suit.

9.    Laurie A. Allen, who may have information relating to the licensing of the patent-in-suit.

10.    All persons listed as inventors on the face of the patent-in-suit, who may have information relating to the patent-in-suit and the subject matter to which the patent-in-suit is directed.

11.    All persons involved in the prosecution of the patent-in-suit, who may have information relating to the prosecution of the patent-in-suit, including without limitation David L. Berstein.

**B.    The description by category of, all documents, data compilations, and tangible things that Amgen may use to support its claims or defenses. These documents are believed to be in ARIAD's possession, custody, or control or will be made available at the offices of Kirkland & Ellis LLP, AON Center, 200 E. Randolph Dr., Chicago, IL 60601.**

1.      The patent-in-suit, related patents and patent applications, and their file histories.

2.      Documents related to the subject matter of the patent-in-suit authored by ARIAD and/or the inventors listed on the face of the patent-in-suit.

3.      Prior art to the patent-in-suit, including but not limited to the prior art cited to the examiner(s) during prosecution of the patent-in-suit.

4.      Documents relating to the alleged invention and reduction to practice of the subject matter of the patent-in-suit.

5.      Documents related to the development and/or functioning of KINERET and/or ENBREL.

6.      Documents related to the selling and marketing of KINERET and/or ENBREL.

7.      Documents related to the non-enablement and/or insufficient written description of the claims of the patent-in-suit.

8.      Documents related to the amount of experimentation required by one of ordinary skill in the art to practice the claims of the patent-in-suit.

9.      Documents related to the sufficiency of the patent-in-suit to show possession by the inventors listed on the face of the patent-in-suit of the claims of the patent-in-suit.

10.     Documents relating to attempts to license the patent-in-suit.

11.     Documents relating to litigation and other legal and/or administrative proceedings involving or related to the patent-in-suit.

**C.      Insurance Agreements disclosed pursuant to Rule 34.**

Amgen is not presently aware of an insurance agreement that must be disclosed pursuant to this rule.

**D.      Computation of any category of damages claimed.**

3

Amgen is at least entitled to its costs and reasonable attorney fees under 35 U.S.C. § 285, and such other relief as may be appropriate.

Amgen's Initial Disclosures are made without waiving (1) the right to object to discovery on the grounds of attorney client or work product privileges, competency, undue burden, relevancy and materiality, or any other proper grounds; (2) the right to object to the use of any such information, for any purpose, in whole or in part, in any later proceeding in this or any other action; and (3) the right to object on any grounds, at any time, to any discovery request or proceeding relating to or involving the subject matter of this disclosure.

DB02:5439851.1

065028.1001

DATED: July 26, 2006

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Mary F. Dugan*

Melanie K. Sharp (No. 2501)
Mary F. Dugan (No. 4704)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801

P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6681
msharp@ycst.com
mdugan@ycst.com

Mark A. Pals
Marcus E. Sernel
Jamie H. McDole
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL  60601-6636
(312)861-2000

Drew Diamond
KIRKLAND & ELLIS LLP
South Figueroa Street
Los Angeles, CA  900017-5800
(213)680-8400

*Attorneys for Plaintiffs Amgen, Inc., Immunex Corporation,
Amgen USA Inc., Amgen Manufacturing, Limited, and
Immunex Rhode Island Corporation*

5

## CERTIFICATE OF SERVICE

I, Mary F. Dugan, Esquire, hereby certify that on July 26, 2006, I caused to be served two copies of the foregoing, Plaintiffs' Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1), upon the following counsel of record in the manner indicated:

### BY HAND DELIVERY & E-MAIL
John G. Day, Esquire
Steven J. Balick, Esquire
Ashby & Geddes
222 Delaware Avenue, 17th Floor
Wilmington, DE 19801

I further certify that on July 26, 2006, I caused a copy of the foregoing to be served upon the following non-registered participants in the manner indicated.

### BY E-MAIL (by agreement of counsel)
Morgan Chu, Esquire
David I. Gindler, Esquire
Amir A. Naini, Esquire
Christopher M. Newman, Esquire
Elizabeth L. Rosenblatt, Esquire
Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA  90067-4276

*Mary F. Duga*

Mary F. Dugan, Esquire (No. 4704)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street

P.O. Box 391
Wilmington, Delaware  19899-0391
(302) 571-5028
mdugan@ycst.com

*Attorneys for Plaintiffs Amgen, Inc., Immunex Corporation, Amgen USA Inc., Amgen Manufacturing, Limited, and Immunex Rhode Island Corporation*

# Exhibit P

**AMGEN**



F a c t   S h e e t

# About **Amgen**

Amgen discovers, develops and delivers innovative human therapeutics. A biotechnology pioneer since 1980, Amgen was one of the first companies to realize the new science's promise by bringing novel medicines from lab, to manufacturing plant, to patient. Amgen therapeutics have changed the practice of medicine, helping millions of people in the fight against cancer, kidney disease, rheumatoid arthritis and other serious illnesses. With a broad and deep pipeline of potential new medicines, Amgen remains committed to advancing science to dramatically improve people's lives.

## Reaching Patients Worldwide

Amgen medicines help patients around the world. The company has facilities or subsidiaries in the following locations:

**United States (including Puerto Rico)**
California (Fremont, South San Francisco, Thousand Oaks)
Colorado (Boulder, Longmont)
Kentucky (Louisville)
Massachusetts (Cambridge)
Puerto Rico (Juncos)
Rhode Island (West Greenwich)
Washington (Bothell, Seattle)
Washington, D.C.



**Outside the United States**

| | | | |
|---|---|---|---|
| Australia | Estonia | Latvia | Slovakia |
| Austria | Finland | Lithuania | Slovenia |
| Barbados | France | Luxembourg | Spain |
| Belgium | Germany | Netherlands | Sweden |
| Canada | Hungary | Norway | Switzerland |
| China | Ireland | Poland | United Arab Emirates |
| Czech Republic | Italy | Portugal | United Kingdom |
| Denmark | Japan | | |

### Quick Facts

**Headquarters**
Thousand Oaks, California

**Full-Time Staff**
More than 18,000

**Stock Listing**
Nasdaq: AMGN

**Chairman and CEO**
Kevin W. Sharer

**2005 Financial Highlights**
Total revenue: $12.4 billion
Product sales: $12.0 billion
R&D investment: $2.3 billion

**Address/Phone**
One Amgen Center Drive
Thousand Oaks, CA 91320-1799

Main: (805) 447-1000
Media: (805) 447-4587
Investors: (805) 447-1060

### Our Mission

To serve patients

**AMGEN**

## An Interdisciplinary Approach to R&D

For more than 25 years, Amgen has been a leading innovator in the identification, isolation, production and use of human proteins as therapeutic agents. Today, Amgen scientists work at the cutting edge between the traditional disciplines of chemistry and cellular and molecular biology in an effort to discover and develop the medical breakthroughs of tomorrow. We focus on pioneering treatments for serious illness. As part of that commitment, our R&D organization has cultivated expertise in multiple treatment modalities—large-molecule proteins, small molecules and antibodies—allowing us to choose the best target for attacking disease and to use the modality most likely to affect that target.

Amgen has research programs in inflammation, metabolic disorders and osteoporosis, neuroscience, oncology and hematology. Our research facilities are located in South San Francisco and Thousand Oaks, California; Cambridge, Massachusetts; Seattle, Washington; Cambridge, United Kingdom; and Regensburg, Germany.

## A Pioneer in Biotechnology Manufacturing

Assuring that Amgen medicines rapidly, reliably and safely reach "every patient, every time" is the charge of Amgen's manufacturing, process development, quality and distribution teams. From the beginning, the company's contributions to the field of biotechnological production of human therapeutics have been driven by a strong commitment to meet the needs of patients.



Manufacturing therapies based on proteins found in the human body is a complex and highly specialized activity. From process development and clinical manufacturing to full-scale therapeutic protein production, Amgen has built one of the industry's largest and most reliable operations, and the company continues to expand its capabilities.

Amgen operates manufacturing facilities in California, Colorado, Rhode Island, Washington, and Puerto Rico. In early 2006, Amgen announced its intention to invest more than $1 billion to build a new manufacturing facility in Cork, Ireland. The Cork facility, which the company expects to begin operating in 2009, will help Amgen ensure supplies of medicines for patients in Europe and other parts of the world.

## Advancing Science through Strategic Partnerships

With more than 100 active collaborations, Amgen is well-suited to be a partner of choice in the human therapeutics business. With the capabilities and financial strength of a large company, Amgen can offer partners the resources to support a potential new medicine as it advances from lab to clinic to marketplace. At the same time, Amgen retains the agility and decisiveness of a smaller biotech, with an unwavering commitment to science and patients.

### CEO Staff

**Kevin W. Sharer**
Chairman of the Board,
Chief Executive Officer, and President

**Hassan Dayem**
Senior Vice President and
Chief Information Officer

**Dennis M. Fenton**
Executive Vice President,
Operations

**Brian M. McNamee**
Senior Vice President,
Human Resources

**George J. Morrow**
Executive Vice President,
Global Commercial Operations

**Richard D. Nanula**
Executive Vice President
and Chief Financial Officer

**Roger M. Perlmutter**
Executive Vice President,
Research and Development

**David J. Scott**
Senior Vice President,
General Counsel, and Secretary

### Investor Information

This fact sheet is a summary of more detailed disclosure that can be found in Amgen's filings with the U.S. Securities and Exchange Commission and its press releases. This fact sheet contains forward-looking statements that involve significant risks and uncertainties, discussion of which can be found in Amgen's most recent Forms 10-K, 10-Q, and 8-K and on www.amgen.com/investors. The information in this fact sheet is given as of the date below, and Amgen does not undertake any obligation to update any information in this document.

# Principal Products

(U.S. Indications)

**Aranesp®** (darbepoetin alfa) is prescribed for the treatment of anemia associated with chronic kidney disease and chemotherapy. *Aranesp® is contraindicated in patients with uncontrolled hypertension.*

**Enbrel®** (etanercept) is prescribed for the treatment of moderately-to-severely-active rheumatoid arthritis, polyarticular-course juvenile rheumatoid arthritis, psoriatic arthritis, ankylosing spondylitis (arthritis of the spine), and moderate to severe plaque psoriasis in adults. *Patients on Enbrel® have reported serious adverse events, some of them fatal, including infections, neurologic and hematologic disorders, and lymphoma. The most common adverse events are injection site reactions.*



**EPOGEN®** (Epoetin alfa) is prescribed for the treatment of anemia in patients with chronic kidney disease who are on dialysis. *EPOGEN® is contraindicated in patients with uncontrolled hypertension.*

**Kepivance®** (palifermin) is prescribed to decrease the incidence and duration of severe oral mucositis (mouth sores) in patients with hematologic (blood) cancers who are undergoing high-dose chemo-therapy, with or without radiation, followed by bone marrow transplant. The safety and efficacy of Kepivance® have not been established in patients with non-hematologic malignancies. *In clinical trials, the most common serious adverse reaction attributed to Kepivance® as in rash, reported in less than 1 percent of patients.*

**Neulasta®** (pegfilgrastim) or **NEUPOGEN®** (Filgrastim) is prescribed to reduce the risk of infection (initially marked by fever) in certain cancer patients who are receiving chemotherapy that could decrease their number of infection-fighting white blood cells. Neulasta® is a longer-acting form of NEUPOGEN® that requires only one injection per chemotherapy cycle—a meaningful benefit for patients. *Rare events of adult respiratory distress syndrome, splenic rupture, and sickle cell crises have been reported in postmarketing experience in patients receiving NEUPOGEN® or Neulasta®.*

**Sensipar®** (cinacalcet HCl) is a first-in-class, oral therapy prescribed to treat hyperparathyroidism (excessive levels of parathyroid hormone) caused by chronic kidney disease; it is approved for use in patients who are receiving dialysis. It is also indicated to treat elevated calcium levels in patients with malignant tumors of the parathyroid gland. *Sensipar® lowers serum calcium. Significant reductions in calcium may lower the threshold for seizures.*

For additional product information, see **www.amgen.com**.

## Amgen History

**1980**
– AMGen (Applied Molecular Genetics Inc.) established on April 8
– George B. Rathmann named CEO

**1983**
– Company changes name to Amgen
– Fu-Kuen Lin clones the gene for human erythropoietin (EPO) and produces recombinant EPO, later patented and named EPOGEN® (Epoetin alfa)
– Initial public offering raises nearly $40 million

**1985**
– A research team led by Larry Souza clones the gene for granulocyte colony-stimulating factor (G-CSF) and produces recombinant G-CSF, later patented and named NEUPOGEN® (Filgrastim)

**1987**
– Amgen receives first patent on DNA used in producing Epoetin alfa

**1988**
– Gordon M. Binder named CEO

**1989**
– Immunex discovers and files a patent application on a new tumor necrosis factor receptor that will be developed to become Enbrel® (etanercept)
– Amgen receives first patent for recombinant G-CSF (NEUPOGEN®)
– The U.S. Food and Drug Administration (FDA) approves EPOGEN® for treatment of anemia in adult patients with chronic renal failure who are on dialysis
– Amgen opens first offices in Europe

**1991**
– FDA approves NEUPOGEN® to decrease the incidence of infection associated with chemotherapy-induced neutropenia in patients with non-myeloid cancers
– Amgen establishes the Amgen Foundation for charitable giving
– Federal Appeals Court rules in favor of Amgen in EPO patent dispute with Genetic Institute
– Amgen opens offices in Australia and Canada

**1993**
– Amgen opens Amgen K.K., the company's subsidiary in Japan

**1994**
– Amgen receives U.S. Department of Commerce National Medal of Technology

**AMGEN**

## Community Involvement

In the communities in which Amgen staff live and work, the company commits millions of dollars in charitable donations, and individual staff members devote thousands of hours of personal time to programs and services that can make meaningful differences in people's lives.

The company sustains many programs, including the Amgen Staff Volunteer Program, sponsorship of community events, and the Amgen Awards for Science Teaching Excellence.

One of the most important vehicles for Amgen's corporate philanthropy is the **Amgen Foundation**. Since its founding in 1991, the Amgen Foundation has contributed more than $70 million to regional and national nonprofit groups that advance science education, improve quality of care and access for patients, and support vital community resources. The Foundation also matches Amgen staff member donations to eligible organizations. Since the inception of the Matching Gift Program in 1993, the Foundation has matched $10.5 million in staff donations, resulting in more than $21 million in support of worthy organizations across the United States and Puerto Rico.

## Recent Recognition

In the inaugural *Barron's* investor survey of the most respected global companies, published September 2005, Amgen ranked 14th.

Amgen placed 33rd in *Business Week*'s Global 1200 in December 2005.

Amgen ranked 51st in the *Financial Times* "Europe's Global 500" in 2005.

Amgen was named *Forbes*'s "Company of the Year" for 2004.

On *Fortune*'s 2006 list of "America's Most Admired Companies," Amgen ranked third in its industry. In 2006, Amgen appeared for the seventh time on *Fortune*'s "100 Best Companies to Work For in America" list.

In 2005, Amgen tied for the number one spot in *Pharmaceutical Executive*'s Industry Audit, which analyzes the performance of 16 publicly traded pharmaceutical and biotechnology companies.

In 2006, for the second year in a row, Amgen's pipeline was named "Best Biotechnology Pipeline" by *R&D Directions* and *Med Ad News*.

Amgen ranked second in *Science*'s 2005 survey of the best biotechnology and pharmaceutical employers, out of 459 companies evaluated.

Amgen was ranked first among large companies by *The Scientist* on its 2006 "Best Places to Work in Industry" survey.

## Industry Affiliations

Amgen actively participates in industry organizations such as the Biotechnology Industry Organization, the Healthcare Leadership Council, and Pharmaceutical Research and Manufacturers of America.

**1998**
– FDA approves Enbrel® (etanercept) to treat patients with rheumatoid arthritis

**1999**
– FDA approves ENBREL to treat moderately-to-severely-active polyarticular-course juvenile rheumatoid arthritis

**2000**
– Kevin W. Sharer named CEO

**2001**
– Regulators in the U.S. and Europe approve Aranesp® (darbepoetin alfa) to treat anemia associated with chronic renal failure

**2002**
– Regulators in the U.S. and Europe approve Neulasta® (pegfilgrastim) to decrease the incidence of infection in patients with non-myeloid cancers who are receiving chemotherapy
– Regulators in the U.S. and Europe approve Aranesp® for the treatment of chemotherapy-induced anemia in patients with nonmyeloid malignancies
– Amgen completes Immunex acquisition
– FDA approves ENBREL to treat the signs and symptoms of active arthritis in patients with psoriatic arthritis

**2003**
– FDA approves ENBREL for the treatment of ankylosing spondylitis and other expanded indications

**2004**
– FDA approves Sensipar® (cinacalcet HCl) for the treatment of secondary hyperparathyroidism in patients with chronic kidney disease who are on dialysis
– FDA approves ENBREL for the treatment of chronic moderate to severe plaque psoriasis in adults
– Amgen completes acquisition of Tularik Inc.
– FDA approves Kepivance® (palifermin) to decrease the incidence and duration of severe oral mucositis in patients with hematologic cancers who are undergoing high-dose chemotherapy and bone marrow transplant

**2005**
– FDA grants licensure to two new Amgen manufacturing facilities in West Greenwich, RI, and Juncos, PR.

**2006**
– Amgen completes acquisition of Abgenix, Inc.

# Exhibit Q



# Form 10-K

## ARIAD PHARMACEUTICALS INC - ARIA

Filed: March 16, 2006 (period: December 31, 2005)

Annual report which provides a comprehensive overview of the company for the past year

# Table of Contents

## PART I

## PART I

ITEM 1:    BUSINESS
ITEM 1A:   RISK FACTORS
ITEM 1B:   UNRESOLVED STAFF COMMENTS
ITEM 2:    PROPERTIES
ITEM 3:    LEGAL PROCEEDINGS
ITEM 4:    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

## PART II

ITEM 5:    MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND
           ISSUER PURCHASES OF
ITEM 6:    SELECTED FINANCIAL DATA
ITEM 7:    MANAGEMENT S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF
           OPERATIONS
ITEM 7A:   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK
ITEM 8:    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA
ITEM 9:    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL
           DISCLOSURE
ITEM 9A:   CONTROLS AND PROCEDURES
ITEM 9B:   OTHER INFORMATION

## PART III

ITEM 10:   DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT
ITEM 11:   EXECUTIVE COMPENSATION
ITEM 12:   SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND
           RELATED STOCKHOLDER MATT
ITEM 13:   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS
ITEM 14:   PRINCIPAL ACCOUNTING FEES AND SERVICES

## PART IV

ITEM 15:   EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K
SIGNATURES
EXHIBIT INDEX

EX-10.54 (Material contracts)

EX-10.56 (Material contracts)

EX-10.57 (Material contracts)

EX-23.1 (Consents of experts and counsel)

EX-31.1

EX-31.2

EX-32.1

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 10-K**

(Mark One)

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2005
OR
[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from_____ to _____
Commission file number 0-21696

**ARIAD Pharmaceuticals, Inc.**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **22-3106987** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**26 Landsdowne Street, Cambridge, Massachusetts   02139-4234**
(Address of principal executive offices)    (Zip Code)

**Registrant's telephone number, including area code: (617) 494-0400**

**Securities registered pursuant to Section 12(b) of the Act: None**

**Securities registered pursuant to Section 12(g) of the Act:**

**Common Stock, $.001 Par Value**

**Rights to Purchase Series A Preferred Stock**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes [ ] No [ X ]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.
Yes [ ] No [ X ]

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes [ X ] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "accelerated filer" and "large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):
Large accelerated filer [ ] Accelerated filer [ X ] Non-accelerated filer [ ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes [ ] No [ X ]

The aggregate market value of the registrant's common stock held by nonaffiliates of the registrant (without admitting that any person whose shares are not included in such calculation is an affiliate), computed by reference to the price at which the common stock was last sold, as of the last business day of the registrant's most recently completed second fiscal quarter was $338 million.

As of February 28, 2006, the registrant had 61,840,329 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

The following documents (or parts thereof) are incorporated by reference into the following parts of this Form 10-K: Certain information required in Part III of this Annual Report on Form 10-K is incorporated from the Registrant's Proxy Statement for the Annual Meeting of Stockholders to be held on June 14, 2006.

**TABLE OF CONTENTS**

**PART I**

| | | |
|---|---|---|
| Item 1: | Business | 1 |
| Item 1A: | Risk Factors | 11 |
| Item 1B: | Unresolved Staff Comments | 21 |
| Item 2: | Properties | 22 |
| Item 3: | Legal Proceedings | 22 |
| Item 4: | Submission of Matters to a Vote of Security Holders | 23 |

**PART II**

| | | |
|---|---|---|
| Item 5: | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 24 |
| Item 6: | Selected Financial Data | 25 |
| Item 7: | Management_s Discussion and Analysis of Financial Condition and Results of Operations | 26 |
| Item 7A: | Quantitative and Qualitative Disclosures About Market Risk | 36 |
| Item 8: | Financial Statements and Supplementary Data | 38 |
| Item 9: | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 56 |
| Item 9A: | Controls and Procedures | 56 |
| Item 9B: | Other Information | 58 |

**PART III**

| | | |
|---|---|---|
| Item 10: | Directors and Executive Officers of the Registrant | 59 |
| Item 11: | Executive Compensation | 59 |
| Item 12: | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 59 |
| Item 13: | Certain Relationships and Related Transactions | 59 |
| Item 14: | Principal Accounting Fees and Services | 59 |

**PART IV**

| | | |
|---|---|---|
| Item 15: | Exhibits, Financial Statement Schedules | 60 |

**PART I**

ITEM 1:  BUSINESS

The following Business Section contains forward-looking statements, which involve risks and uncertainties. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of certain factors (see Part I, Item 1A: Risk Factors). Unless the content requires otherwise, references to "ARIAD," "we," "our," and "us," in this Annual Report on Form 10-K refers to ARIAD Pharmaceuticals, Inc. and our subsidiaries.

**Overview**

We are engaged in the discovery and development of breakthrough medicines to treat cancers by regulating cell signaling with small molecules. We are developing a comprehensive approach to patients with cancer that addresses the greatest medical need - aggressive and advanced-stage cancers for which current treatments are inadequate. Our goal is to build a fully integrated oncology company focused on novel, molecularly targeted therapies to treat solid tumors and hematologic cancers, as well as the spread of primary tumors to distant sites.

Human cells - both healthy and malignant - share an elaborate system of molecular pathways that carry signals back and forth from the cell surface to the nucleus and within the cell. Such signaling is essential to cell functioning and viability. When disrupted or over-stimulated, such pathways may trigger diseases such as cancer. For example, growth and proliferation of cancer cells are dependent on signals from external growth factors, as well as signals indicating the availability of sufficient nutrients and blood supply. These signals are conveyed along well-defined pathways, several of which are regulated by a protein called the mammalian target of rapamycin, or mTOR.

Our lead cancer product candidate, AP23573, is an internally discovered, potent mTOR inhibitor. The protein, mTOR, serves as a "master switch" and appears to have a central function in cancer cells. Blocking mTOR creates a starvation-like effect in cancer cells by interfering with cell growth, division, metabolism and angiogenesis.

As part of our global clinical development plan and registration strategy, AP23573 has been studied in multiple Phase 2 and 1b clinical trials in the U.S. and Europe as a single agent in patients with solid tumors, including sarcomas, hormone refractory prostate cancer and endometrial cancer. In addition, three multi-center Phase 1b trials of AP23573 in combination with other anti-cancer therapies are underway, which are focused primarily on patients with various types of solid tumors, especially breast, ovarian, non-small-cell lung, and prostate cancers, as well as sarcomas. Further combination studies are planned. In addition, we have concluded enrollment in Phase 1b and Phase 2 clinical trials in patients with brain cancer and leukemias and lymphomas, respectively. Eleven clinical trials of AP23573 are ongoing or completed. Intravenous and oral formulations of AP23573 have been studied in these trials.

In November 2005, at the AACR-NCI-EORTC International Conference on "Molecular Targets and Cancer Therapeutics," investigators presented preliminary Phase 2 clinical data on AP23573 in advanced sarcoma patients, which showed that 27% (51/188) of patients treated with AP23573 and evaluable for at least four months demonstrated sustained anti-tumor responses. Enrollment in this trial has been completed and, based on these positive data, we expect to start our initial registration trial for AP23573 in patients with sarcomas. The U.S. Food and Drug Administration, or FDA, and the European Medicines Agency, or EMEA, have designated AP23573 as an orphan drug for treatment of soft-tissue and bone sarcomas. The FDA has also designated AP23573 as a fast-track product for the same indications.

In clinical trials to date, AP23573 has been well tolerated at the fixed doses administered, and adverse events were generally mild to moderate in severity and readily reversible. The most common treatment-related adverse events were oral mucositis, rash, fatigue, nausea and lipid abnormalities.

Two clinical trials of AP23573 that have concluded enrollment provide important insights that may be useful in planning follow-up studies. In patients with brain cancer, AP23573 was shown to cross the blood-brain barrier and inhibit brain tumor mTOR activity, while being well tolerated in severely ill patients. In heavily pretreated patients with leukemias and lymphomas, 40% of evaluable patients had AP23573 anti-cancer activity, providing a basis for further studies in selected hematologic malignancies.

The oral dosage form of AP23573 is being studied in a multi-center Phase 1b clinical trial of patients with various solid tumors. Initial results from this trial indicate that the oral dosage form can be administered safely using several daily and intermittent dosing   schedules and achieves blood levels over time   and mTOR inhibition generally consistent with those observed with intravenous administration.

As an mTOR inhibitor, AP23573 has also been shown to potently block the growth, proliferation and migration of vascular smooth muscle cells, the primary cause of narrowing and blockage of injured vessels. In 2005, we entered into a partnership with Medinol Ltd., one of the leading cardiovascular medical device companies, to develop and commercialize stents and other medical devices to deliver AP23573 to prevent reblockage of injured vessels following stent-assisted angioplasty, a common non-surgical procedure for dilating or opening narrowed arteries.

Inhibition of the mTOR pathway may be useful for additional indications beyond oncology and drug-delivery stents, and we are evaluating such indications as part of the broader clinical development plan for AP23573.

In addition to our lead clinical development program, we have a focused drug discovery program centered on small-molecule, molecularly targeted therapies and cell-signaling pathways implicated in cancer. Currently, our preclinical pipeline includes: inhibitors of mutant oncogenic or cancer-causing proteins (kinases) that regulate cell signaling ( *e.g.,*  Bcr-Abl - the target of imatinib, which becomes resistant to further treatment through various mutations, including one called T315I); single compounds that target multiple cancer pathways ( *e.g.,*  cell survival, metastases and angiogenesis); and new mTOR inhibitors ( *i.e.,*  bone-targeted compounds to treat primary bone cancers and cancers that have spread to bone).

We have an exclusive license to pioneering technology and patents related to methods of treating human disease through regulation of the cell-signaling activity of a protein called NF-κB, and the discovery, development and use of drugs to regulate NF-κB cell-signaling activity. NF-κB can be generally thought of as a "biological switch" that can be turned off using these treatment methods to treat disorders such as inflammation, cancer, sepsis and osteoporosis. We permit broad use of our NF-κB intellectual property, at no cost, by investigators at academic and not-for-profit institutions to conduct non-commercial research. Our goal is to license our NF-κB technology to pharmaceutical and biotechnology companies that are conducting research to discover and develop drugs that modulate NF-κB cell signaling and/or that are marketing such drugs.

We have also developed a proprietary portfolio of cell-signaling regulation technologies, our ARGENT technology, to control intracellular processes with small molecules, which may be useful in the development of therapeutic vaccines and gene and cell therapy products, and which provide versatile tools for applications in cell biology, functional genomics and drug discovery research. We distribute our ARGENT technologies at no cost to academic investigators in the form of our Regulation Kits to use in various research applications in an academic setting. Over 1,000 academic investigators worldwide are using or have used this technology in diverse areas of research, and over 250 scientific papers describing their use have been published. In addition, we are seeking opportunities to license our ARGENT technology to pharmaceutical and biotechnology companies to accelerate their drug discovery. To date, we have entered into several research and development licenses for use of our ARGENT technology.

Our current business strategy is to:

·    build a fully integrated oncology company - a leader in the discovery, development and commercialization of molecularly targeted oncology therapies;

·    establish a U.S. commercial platform;

·    enter into partnerships with major pharmaceutical or biotechnology companies, after obtaining definitive clinical data, to assist in developing our cancer product candidates and commercializing them outside the U.S.;

·    broadly develop our lead oncology product, AP23573, and build a pipeline of innovative follow-on product candidates;

·    license our NF-κB and ARGENT cell-signaling regulation technologies to pharmaceutical and biotechnology companies; and

·    develop and commercialize through medical device companies AP23573 drug-delivery stents and other medical devices to decrease reblockage of injured vessels following stent-assisted angioplasty .

We conduct research and development programs on behalf of our 80%-owned subsidiary, ARIAD Gene Therapeutics, Inc., hereinafter referred to as AGTI, relating to our product candidates which are small-molecule mTOR inhibitors. These product candidates include our lead product candidate, AP23573, and compounds in our bone-targeted mTOR inhibitor program. AGTI owns the intellectual property relating to these product candidates and related ARGENT technology. We also seek opportunities on behalf of AGTI to license the ARGENT cell-signaling regulation technology to develop and commercialize products and for research applications.

ARIAD was organized as a Delaware corporation in April 1991. Our principal executive offices are located at 26 Landsdowne Street, Cambridge, Massachusetts 02139-4234, and our telephone number is (617) 494-0400. We maintain an internet website at http://www.ariad.com, the contents of which are not incorporated herein. Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K and all amendments to such reports are made available free of charge through the Investor Relations section of our website as soon as reasonably practicable after they have been electronically filed with or furnished to the United States Securities and Exchange Commission, or SEC.

ARIAD and the ARIAD logo are our registered trademarks. ARGENT is our trademark. Other service marks, trademarks and trade names appearing in this report are the property of their respective owners.

**Our Lead Development Programs**

***Oncology Indications of our mTOR Inhibitor, AP23573***

Human cells - both healthy and malignant - share an elaborate system of molecular pathways that carry signals back and forth from the cell surface to the nucleus and within the cell. Such signaling is essential to cell functioning and viability. When disrupted or over-stimulated, such pathways may trigger diseases such as cancer. For example, growth and proliferation of cancer cells are dependent on signals from external growth factors, as well as signals indicating the availability of sufficient nutrients and blood supply. These signals are conveyed along well-defined pathways, several of which are regulated by the protein mTOR.

Our lead cancer product candidate, AP23573, is an internally discovered, potent mTOR inhibitor. The protein, mTOR, serves as a "master switch" and has a central function in cancer cells. Blocking mTOR creates a starvation-like effect in cancer cells by interfering with cell growth, division, metabolism and angiogenesis.

As part of our global clinical development plan and registration strategy, AP23573 has been studied in multiple Phase 2 and 1b clinical trials in the U.S. and/or Europe as a single agent in patients with solid tumors, including sarcomas, hormone refractory prostate cancer and endometrial cancer. In addition, three multi-center Phase 1b trials of AP23573 in combination with other anti-cancer therapies are underway, which are focused primarily on patients with various types of solid tumors, especially breast, ovarian, non-small-cell lung, and prostate cancers, as well as sarcomas. Further combination studies are planned. In addition, we concluded enrollment in Phase 1b and Phase 2 clinical trials in patients with brain cancer and leukemias and lymphomas, respectively. Eleven clinical trials of AP23573 are ongoing or completed. Intravenous and oral formulations of AP23573 have been studied in these trials.

Our most advanced Phase 2 trial of AP23573 is in sarcoma patients. In November 2005, at the AACR-NCI-EORTC International Conference on "Molecular Targets and Cancer Therapeutics," investigators presented preliminary Phase 2 clinical data on AP23573 in advanced sarcoma patients, who had generally failed alternative anti-cancer treatments and had progressive disease upon entering the trial. This trial includes four subgroups of bone and soft-tissue sarcoma patients. Based on these preliminary data, 27% (51/188) of patients treated with AP23573 and evaluable for at least four months demonstrated sustained anti-tumor responses as defined by RECIST (Response Evaluation Criteria in Solid Tumors), including four patients with partial responses (confirmed tumor regression >30%) and 47 patients with stable disease for at least four months. In addition, the preliminary six-month progression free survival (PFS) rate in the patients in the first stage of the trial was 22%. Enrollment in this trial has been completed. Based on these positive data from our Phase 2 trial, we expect to start our initial registration trial for AP23573 in patients with sarcomas.

In clinical trials to date, AP23573 has been well tolerated at the fixed doses administered, and adverse events were generally mild to moderate in severity and readily reversible. The most common treatment-related adverse events were oral mucositis, rash, fatigue, nausea and lipid abnormalities.

Two clinical trials of AP23573 that have concluded enrollment provide important insights that may be useful in planning follow-up studies. In patients with brain cancer, AP23573 was shown to cross the blood-brain barrier and inhibit brain tumor mTOR activity, while being well tolerated in severely ill patients. In heavily pretreated patients with leukemias and lymphomas, 40% of evaluable patients had AP23573 anti-cancer activity, providing a basis for further combination studies in selected hematologic malignancies.

The oral dosage form of AP23573 is being studied in a multi-center Phase 1b clinical trial of patients with various solid tumors. Initial results from this trial indicate that the oral dosage form can be administered safely using several daily and intermittent dosing schedules and achieves blood levels over time and mTOR inhibition generally consistent with those observed with intravenous administration.

The FDA and the EMEA have designated AP23573 as an orphan drug for treatment of soft-tissue and bone sarcomas. The FDA has also designated AP23573 as a fast-track product for the same indications. Our goal is to initiate the first global registration trial of AP23573 in patients with advanced sarcomas. Beforehand, we expect to finalize selection of the dosing regimen to be used in the Phase 3 clinical trial and finalize the design of the protocol for the pivotal trial with the FDA and EMEA.

In the malignant cells of many of the cancers that we are studying in the AP23573 clinical trials, signaling in the mTOR pathway may be abnormal due to genetic mutations and/or alterations in the activity of key proteins upstream or downstream of mTOR itself. We believe that some of these patients may be particularly responsive to mTOR inhibition. Our scientists and other investigators are leading the identification and development of biomarker assays to identify patients with tumors that harbor such alterations in the mTOR pathway. In addition, our clinical development strategy includes extensive use of biomarkers and functional imaging technologies, such as positron emission tomography, to augment the assessment of the efficacy and safety of AP23573 in patients enrolled in our trials.

### *Cardiovascular Indications of our mTOR Inhibitor, AP23573*

As an mTOR inhibitor, AP23573 has also been shown to potently block the growth, proliferation and migration of vascular smooth muscle cells, the primary cause of narrowing and blockage of injured vessels. In 2005, we entered into a partnership with Medinol Ltd., hereafter referred to as Medinol, one of the leading cardiovascular medical device companies, to develop and commercialize stents and other medical devices to deliver AP23573 to prevent reblockage of injured vessels following stent-assisted angioplasty, a common non-surgical procedure for dilating or opening narrowed arteries.

Cardiovascular disease afflicts more than a quarter of the U.S. population and causes more than five million hospitalizations, over $300 billion in healthcare expenditures, and one million deaths annually. Products expected to have the most profound impact on coronary artery and myocardial disorders - including drug-eluting stents - have only recently been introduced into clinical practice. By 2008, the growing drug-eluting stent market is expected to exceed $6 billion.

Numerous drugs, including many antiplatelet agents, anticoagulants, ACE inhibitors, and cytotoxic agents, administered to patients following coronary angioplasty have failed to significantly reduce the overall incidence of vascular reblockage, which runs as high as 30% in the first few months, depending on the configuration and location of the vascular lesion and other clinical factors, such as diabetes. Recent clinical studies have found lower reblockage rates in patients treated with stents that deliver small-molecule drugs, such as sirolimus, an mTOR inhibitor, or paclitaxel, a cytotoxic agent, locally to the site of vascular injury. Such stents have become the standard-of-care for patients undergoing interventional procedures to open narrowed coronary arteries.

We may grant up to two additional licenses, under our rights to AP23573, to medical device companies for their use in developing and commercializing drug-delivery stents and other medical devices to reduce reblockage of injured vessels following stent-assisted angioplasty.

### *Additional Non-Oncology Indications of our mTOR Inhibitor, AP23573*

Inhibition of the mTOR pathway may be useful for additional indications beyond oncology and drug-delivery stents, and we are evaluating such indications as part of the broader clinical development plan for AP23573.

### **Our Preclinical Programs**

Our research and development programs are focused on discovering and developing small-molecule drugs that regulate cell signaling. Many of the critical functions of cells, such as cell growth, differentiation, gene transcription, metabolism, motility and survival, are dependent on signals carried back and forth from the cell surface to the nucleus and within the cell through a system of molecular pathways. When disrupted or over-stimulated, such pathways may trigger diseases such as cancer. From our inception, our research has focused on exploring cell-signaling pathways, identifying their role in specific diseases, and discovering drug candidates to treat those diseases by interfering with the aberrant signaling pathways of cells. The specific cellular proteins blocked by our product candidates have been well characterized and validated as targets. All of our product candidates are developed in-house through the integrated use of structure-based drug design and computational chemistry, and their targets have been validated with techniques such as functional genomics, proteomics, and chemical genetics.

We have a focused drug discovery program centered on small-molecule, molecularly targeted therapies and cell-signaling pathways implicated in cancer. Currently, our preclinical pipeline includes: inhibitors of mutant oncogenic, or cancer-causing, proteins (kinases) that regulate cell signaling (e.g., Bcr-Abl - the target of imatinib, which becomes resistant to further treatment through various mutations, including one called T315I); single compounds that target multiple cancer pathways (e.g., cell survival, metastases and angiogenesis); and new mTOR inhibitors (i.e., bone-targeted compounds to treat primary bone cancers and cancers that have spread to bone).

**Our Proprietary Technologies**

*NF-κB Cell-signaling Technology*

Dr. David Baltimore, formerly director of the Whitehead Institute for Biomedical Research, Dr. Phillip Sharp of the Massachusetts Institute of Technology, and Dr. Thomas Maniatis of Harvard University, together with a team of scientists in their respective laboratories, discovered a family of genes that encode proteins they called NF- κ B and I- κ B, its inhibitor; the critical role played by NF- κ B cell-signaling in regulating cellular processes involved in various difficult-to-treat diseases; methods to identify compounds to regulate NF- κ B cell-signaling activity; and methods of treating disease by inhibiting NF- κ B. NF- κ B can be generally thought of as a "biological switch" that can be turned off using these methods to treat disorders, such as inflammation, cancer, sepsis and osteoporosis.

We have an exclusive license from these academic institutions to pioneering technology and patents related to methods of treating human disease through modulation of NF- κ B cell-signaling activity, and the discovery and development of drugs to regulate NF- κ B cell-signaling activity. We have a program to license this technology and these treatment methods to pharmaceutical and biotechnology companies that are conducting research to discover and develop drugs that modulate NF- κ B cell-signaling and/or that are marketing such drugs. One of the NF- κ B patents is the subject of reexamination proceedings in the U.S. Patent and Trademark Office, or PTO, and a patent infringement lawsuit filed in 2002 by us and the academic institutions against Eli Lilly and Company, hereinafter referred to as Lilly, alleging infringement based on sales of Lilly's osteoporosis drug, Evista®, and Lilly's septic shock drug, Xigris®, and seeking monetary damages. This trial is scheduled to commence in the United States District Court for the District of Massachusetts on April 10, 2006. See Part I, Item 3: Legal Proceedings.

*ARGENT Cell-signaling Regulation Technology*

Our proprietary portfolio of cell-signaling regulation technologies includes the ARGENT signaling and transcription technologies. Our ARGENT technologies allow intracellular processes to be controlled with small molecules, which may be useful in the development of therapeutic vaccines and gene and cell therapy products, and which provide versatile tools for applications in cell biology, functional genomics and drug-discovery research, including three-hybrid screening approaches to discover and characterize targets and lead molecules. To maximize their use by the scientific community, we distribute our technologies at no cost to academic investigators in the form of our Regulation Kits. Over 1,000 investigators worldwide are using or have used our Regulation Kits in diverse areas of research, and over 250 scientific papers describing their use have been published. For researchers in pharmaceutical and biotechnology companies, we have established a licensing program to provide them with access to our ARGENT cell-signaling regulation technologies on commercial terms.

**Our Business Strategy**

Our business strategy is to:

· build a fully integrated oncology company - a leader in the discovery, development and commercialization of molecularly targeted oncology therapies;

· establish a U.S. commercial platform;

· enter into partnerships with major pharmaceutical or biotechnology companies, after obtaining definitive clinical data, to assist in developing our cancer product candidates and commercializing them outside the United States;

· broadly develop our lead oncology product, AP23573, and build a pipeline of innovative follow-on product candidates;

· license our NF-κB and ARGENT cell-signaling regulation technologies to pharmaceutical and biotechnology companies; and

· develop and commercialize through medical device companies AP23573 in drug-delivery stents and other medical devices to decrease reblockage of injured vessels following stent-assisted angioplasty.

**Our Intellectual Property**

Patents and other intellectual property rights are essential to our business. We file patent applications to protect our technology, inventions and improvements to our inventions that are considered important to the development of our business.

As of February 28, 2006 we have 93 patents and pending patent applications in the United States, which are owned, co-owned or exclusively licensed by us or by our subsidiary, AGTI. In addition, we have filed foreign counterparts, as appropriate. We also have several nonexclusive technology licenses from certain institutions in support of our research programs. We anticipate that we will continue to seek licenses from universities and others where applicable technology complements our research and development efforts.

Approximately one third of the patents and patent applications in our portfolio relate generally to our mTOR inhibitor, AP23573, or to our preclinical drug discovery programs. The former cover AP23573, various analogs and uses thereof, as well as the related use of biomarkers, related therapies and inventions involving the mTOR gene. The latter include various families of kinase inhibitor compounds, as well as our bone-targeted mTOR inhibitors. The remainder of the portfolio is primarily focused on ARGENT cell-signaling regulation technologies. These patents and pending applications cover regulatory technologies, specialized variants of the technologies, critical nucleic acid components, small-molecule drugs, the identification and use of dimerizer hormone mimetics, and various uses of the technologies in health care and drug discovery. Patents issued to date include 30 patents covering our cell-signaling regulation technologies.

We also rely on unpatented trade secrets and proprietary know-how. However, trade secrets are difficult to protect. We enter into confidentiality agreements with our employees, consultants, investigators, contractors, collaborators and other third parties to whom we disclose confidential information. In addition, we believe that certain technologies utilized in our research and development programs are in the public domain. Accordingly, we do not believe that patent or other protection is available for these technologies.

-7-

**Our Licenses to Third Parties**

We have a program to license our NF-κB cell-signaling technology and treatment methods to pharmaceutical and biotechnology companies conducting research to discover and develop drugs that modulate NF- κ B cell-signaling and/or marketing such drugs. To date, we have entered into several licenses for this technology with pharmaceutical companies and companies manufacturing and commercializing kits, technologies and tools for research applications.

We also have a program to license our ARGENT cell-signaling regulation technologies to pharmaceutical and biotechnology companies to develop and commercialize innovative therapeutic products and to conduct drug discovery research. To date, we have entered into licenses for use of our ARGENT cell-signaling regulation technologies for a variety of applications. In addition, several biotechnology companies are conducting collaborative studies of these technologies for use in gene and cell therapy applications.

In January 2005, we and our subsidiary, AGTI, entered into non-exclusive license and supply agreements with Medinol for the development and commercialization of stents and other medical devices to deliver our mTOR inhibitor, AP23573, to prevent reblockage of injured vessels following stent-assisted angioplasty. The license agreement provides for the payment by Medinol to us of an upfront license fee, payments based on achievement of development, regulatory, and commercial milestones, and royalties based on commercial sales of products, if any, developed by Medinol. We are required to provide Medinol, and Medinol is required to purchase from us, agreed upon quantities of AP23573.

**Our Licenses from Third Parties**

In 1991, we entered into an exclusive license agreement with Massachusetts Institute of Technology and the Whitehead Institute (on behalf of themselves and Harvard University) to the rights to our NF-ºB cell-signaling technologies and treatment methods. This license agreement was amended in 1995 and provides for the payment by us to these academic institutions of an upfront fee, license maintenance fees, a milestone payment, sublicense fees, and royalties based on commercial sales of products and processes developed using the NF-ºB cell-signaling technologies and treatment methods. The license agreement also grants us the right to undertake the enforcement and/or defense of these patent rights at our sole expense, subject to our right to withhold a percentage of the royalties otherwise due the academic institutions to be applied toward reimbursement of our fees and expenses in connection with any such litigation, including our litigation against Lilly. The license agreement also provides that we will share a percentage of any damages, net of fees and expenses, awarded in such litigation with the academic institutions.

We and, in some instances AGTI, our 80% owned subsidiary, have entered into license agreements with various academic institutions pursuant to which we and/or AGTI are the licensees of certain technologies relating to our research and development programs for our product candidates which are small-molecule mTOR inhibitors and our ARGENT cell-signaling regulation technologies. In particular, in 1997, AGTI entered into an amended and restated exclusive license agreement with Stanford University (on behalf of itself and Harvard University) to rights to certain of our ARGENT cell-signaling regulation technologies. This license agreement was amended in 2003 and provides for the payment by AGTI of an upfront fee, license maintenance fees, milestone payments based on achievement of development and commercial milestones, royalties on commercial sales of products, including therapies and research reagents, by AGTI, its co-venturers and partners, and the issuance of 180,000 shares of common stock, or 3% of the initial capitalization, of AGTI.

In some instances, our third party licenses also impose insurance, development, sublicensing and other obligations. Failure by us to comply with these requirements could result in the termination of the applicable agreement, which, depending upon the technologies which are the subject of the applicable agreement, could have a material adverse effect on our business, financial condition, and results of operations.

**Research and Development Spending**

During each of the three years ended December 31, 2005, 2004, and 2003, we spent approximately $45.9 million, $27.7 million, and $14.9 million respectively, on our research and development activities.

**Manufacturing**

Our drug candidates and preclinical compounds are small molecules that can be readily synthesized by processes that we have developed. We are able to manufacture in-house the quantities of our product candidates necessary for certain preclinical studies. We contract with third party manufacturers to assist in the development and optimization of our manufacturing processes and methods and to supply sufficient quantities of our lead product candidate in bulk quantities and in suitable dosage forms for use in our clinical trials. We also expect to depend on third-party manufacturers for the supply of our products upon commercialization.

Our lead product candidate, AP23573, is produced by an established manufacturing process using conventional synthetic and natural-product fermentation techniques. The production of AP23573 is based in part on technology that we believe is proprietary to us. We may license this technology to contract manufacturers to enable them to manufacture AP23573 for us. In addition, a contract manufacturer may develop process technology related to the manufacture of our drug candidate that the manufacturer owns either independently or jointly with us. This would increase our reliance on that manufacturer or require us to obtain a license from that manufacturer in order to have our product manufactured. We are currently discussing with our existing suppliers and other third-party manufacturers the long-term supply and manufacture of AP23573 to ensure we have provided for sufficient supply of our product at commercially reasonable costs with appropriate redundancy upon commercialization.

Contract manufacturers are subject to extensive governmental regulation and we depend on them to manufacture our product candidates in accordance with the FDA's current good manufacturing practices, or cGMP. We have established a quality assurance program intended to ensure that third-party manufacturers under contract produce our compounds in accordance with cGMP, and other applicable domestic and foreign regulations. We believe that our current contractors comply with such regulations.

**Competition**

The pharmaceutical and biotechnology industries are intensely competitive. We compete directly and indirectly with other pharmaceutical companies, biotechnology companies and academic and research organizations, many of whom have greater resources than us. We compete with companies who have products on the market or in development for the same indications as our product candidates. We may also complete with organizations that are developing similar technology platforms.

In the area of oncology, pharmaceutical and biotechnology companies such as Amgen Inc., AstraZeneca PLC, Bristol-Myers Squibb Company, Eli Lilly and Company, Genentech, Inc., GlaxoSmithKline plc, Hoffmann LaRoche & Co., Johnson & Johnson, Merck KGaA, Novartis AG, Pfizer, Inc., and Wyeth Corp. are developing and marketing drugs to treat cancer, including mTOR inhibitors. Biotechnology companies such as Amgen Inc., Biogen-Idec, Inc., ImClone Systems, Inc., Millennium Pharmaceuticals, Inc., Onyx Pharmaceuticals, Inc., OSI Pharmaceuticals, Inc., Telik, Inc., and Vertex Pharmaceuticals, Inc. are developing drugs to treat various diseases, including cancer, by inhibiting cell-signaling pathways. Other companies have products on the market or in development against which our drug candidates, if approved, may have to compete. We may also experience competition from companies that have acquired or may acquire technology from companies, universities, and other research institutions. As these companies develop their technologies, they may develop proprietary positions that may materially and adversely affect us.

**Government Regulation**

Our ongoing research and development activities, our clinical trials, the manufacturing and testing procedures and the marketing of our product candidates, if they are approved, all are subject to extensive regulation by numerous governmental authorities in the United States and other countries. Any drug or device developed by us and/or a partner must undergo rigorous preclinical studies and clinical testing and extensive regulatory review administered by the FDA under the federal Food, Drug and Cosmetic Act prior to marketing in the United States. Satisfaction of such regulatory requirements, which includes demonstrating that a product is both safe and effective for its intended indications for use, typically takes several years or more depending upon the type, complexity and novelty of the product and requires the expenditure of substantial resources. Preclinical studies must be conducted in conformance with FDA regulations, including its current Good Laboratory Practices, or cGLP, regulations. Before commencing clinical trials in the United States, we must submit extensive information about the results of preclinical studies, toxicity, manufacturing and control procedures and our proposed clinical research protocol to the FDA in an Investigational New Drug, or IND, application, or an Investigational Device Exemption, or IDE, as the case may be. If the FDA does not respond with any questions on the IND, we can commence clinical trials thirty days after the submission. In addition, an independent institutional review board, or IRB, at each institution at which any clinical trial is being performed, must review and approve the clinical protocol before clinical testing may begin, and it will have ongoing overview of the clinical trial at that institution. With respect to an IDE for certain medical devices, such as drug-delivery stents, clinical trials may not begin until both the FDA and an IRB approve. There can be no assurance that submission of an IND or IDE will result in the commencement of such clinical trials.

We have a limited history of conducting preclinical studies and the clinical trials necessary to obtain regulatory approval. Furthermore, we, the FDA or an IRB may suspend clinical trials at any time if we or they believe that the subjects participating in such trials are being exposed to unacceptable risks or if the FDA finds deficiencies in the conduct of the trials or other problems with our product under development.

Before receiving FDA approval to market a product, we will have to demonstrate that the product is safe and effective in the patients for whom the product is indicated. Data obtained from preclinical studies and clinical trials are susceptible to varying interpretations that could delay, limit or prevent regulatory clearances. In addition, delays or rejections may be encountered based upon additional government regulation from future legislation or administrative action or changes in FDA policy during the period of product development, clinical trials and FDA regulatory review. Similar or even more extensive delays also may be encountered in foreign countries. There can be no assurance that even after such time and expenditures, regulatory approval will be obtained for any product candidates developed by us, or, even if approval is obtained, that the approved indication and related labeling for such products will not limit the product's condition of use, which could materially impact the marketability and profitability of the product. If regulatory approval of a product is granted, such approval will be limited to those disease states and conditions for which the product has been shown useful, as demonstrated by clinical trials. Furthermore, approval may entail ongoing requirements for post-market studies. Even if such regulatory approval is obtained, a marketed product, its manufacturer and its manufacturing facilities and procedures are subject to continual review and periodic inspections by the FDA. Discovery of previously unknown problems with a product, manufacturer, manufacturing procedures or facility may result in restrictions on such product or manufacturer, including costly recalls, an injunction against continued marketing and manufacturing until the problems have been adequately addressed to the FDA's satisfaction or even withdrawal of the product from the market.

There can be no assurance that any compound developed by us alone or in conjunction with others will prove to be safe and efficacious in clinical trials and will meet all of the applicable regulatory requirements needed to receive and maintain marketing approval. Additionally, the marketing, labeling and advertising for an approved product is subject to ongoing FDA scrutiny and the failure to adhere to applicable requirements can result in regulatory action that could have a material adverse impact on the profitability of the product.

Outside the United States, our ability to market a product will be contingent upon receiving a marketing authorization from the appropriate regulatory authorities. The requirements governing the conduct of clinical trials, obtaining marketing authorization, and pricing and reimbursement vary widely from country to country. At present, foreign marketing authorizations are applied for at a national level, although within the European Union, or EU, certain centralized and mutual recognition registration procedures are available to companies wishing to market a product in more than one Member State. These procedures alleviate the need to file a separate application in each EU country. If the regulatory authority is satisfied that adequate evidence of safety, quality and efficacy has been presented, a marketing authorization will be granted. This foreign regulatory approval process includes all of the risks associated with FDA clearance set forth above.

**Our Employees**

As of February 28, 2006, we had 108 employees, 50 of whom hold post-graduate degrees, including 35 with a Ph.D., M.D. or J.D. Most of our employees are engaged directly in research and development. We have entered into confidentiality, assignment of inventions and non-competition agreements with all of our employees. None of our employees are covered by a collective bargaining agreement, and we consider relations with our employees to be good.

### ITEM 1A:  RISK FACTORS

***THE RISKS AND UNCERTAINTIES DESCRIBED BELOW ARE THOSE THAT WE CURRENTLY BELIEVE MAY MATERIALLY AFFECT OUR COMPANY. ADDITIONAL RISKS AND UNCERTAINTIES THAT WE ARE UNAWARE OF ALSO MAY BECOME IMPORTANT FACTORS THAT AFFECT OUR COMPANY. IF ANY OF THE FOLLOWING RISKS ACTUALLY OCCUR, THEY MAY MATERIALLY HARM OUR BUSINESS, OUR FINANCIAL CONDITION AND OUR RESULTS OF OPERATIONS.***

**Risks Relating to Our Business**

***We and our partners may never succeed in developing marketable products or generating product revenues.***

We are a biopharmaceutical company focused on the discovery and development of drugs to provide therapeutic intervention in treating human diseases at the cellular level. As with all science, we face much trial and error, and we may fail at numerous stages along the way, which would inhibit us from successfully developing, manufacturing and marketing our drug candidates. Our lead product candidate, AP23573, is currently in Phase 2 clinical trials for certain cancers, and we do not currently have any products on the market and have no product revenues. Factors which would affect our ability to obtain regulatory approval and to achieve market acceptance and gain market share for our product candidates include, among other factors, product formulation, dose, dosage regimen, our ability to obtain timely and sufficient patient enrollment in our clinical trials, our ability to manufacture, directly or indirectly, sufficient and cost-effective quantities of our product candidates, and our ability to sell, market and distribute, directly or indirectly, such product candidates. We and our medical device partner have limited experience in designing, conducting and managing the clinical testing necessary to obtain such regulatory approval. Additionally, we do not currently have any partners to assist in developing and commercializing our cancer product candidates and expect to be dependent upon such partners to successfully develop and commercialize such cancer products outside the United States. In particular, failure to secure one or more partners to assist in development and commercialization of AP23573 would have a material adverse effect on our ability to generate significant product revenues for AP23573 for cancer indications outside the United States.

-11-

We are also dependent upon the success of Medinol and any future medical device partners (collectively, our partners) to develop, manufacture and market stents or other medical devices to deliver AP23573 to reduce reblockage of injured arteries following stent-assisted angioplasty. To date, we have entered into only one such agreement, with Medinol. If Medinol is not successful and/or if we are not able to enter into agreements with additional medical device companies experienced in the development, manufacture, and marketing of medical devices to deliver AP23573, we will not be able to generate revenues from the marketing of stents or other medical devices that deliver AP23573.

Other than AP23573, we do not have any product candidates in clinical development, and we have not designated any clinical candidates from our existing preclinical programs. We do not expect to have any products on the market before 2008, at the earliest, and, ultimately, we and our partners may not have any products on the market for several years, if at all. We and our partners may not succeed in developing or commercializing any products which will generate product revenues for our company. If we and our partners are not successful in developing or marketing AP23573 or other product candidates, we will not be profitable.

*We have incurred significant losses to date and may never be profitable.*

We have incurred significant operating losses in each year since our formation in 1991 and have an accumulated deficit of $247.1 million from our operations through December 31, 2005. Losses have resulted principally from costs incurred in research and development of our product candidates, including clinical development of AP23573, our lead product candidate, and from general and administrative costs associated with our operations. It is likely that we will incur significant operating losses for the foreseeable future. We currently have no product revenues, limited license revenues and limited commitments for future licensing revenues, and may not be able to generate such revenues in the future. If our losses continue and we and our partners are unable to successfully develop, commercialize, manufacture and market our product candidates and/or we are unable to enter into agreements and licenses of our intellectual property, we may never generate sufficient revenues to achieve profitability. Even if we and our partners are able to commercialize products and we are able to enter into agreements or licenses in the future, we may never generate sufficient revenues to have profitable operations.

*Insufficient funding may jeopardize our research and development programs and may prevent commercialization of our products and technologies.*

We have funded our operations to date through sales of equity securities, debt and operating revenue. Most of our operating revenue to date has been generated through previous collaborative research and development agreements and existing licenses. We currently do not have any committed funding from any pharmaceutical or biotechnology company to advance any of our product development programs. Although we believe that our current available funds will be adequate to satisfy our capital and operating requirements into mid 2007, we will require substantial additional funding for our research and development programs (including pre-clinical development and clinical trials), for operating expenses (including intellectual property protection and enforcement), for the pursuit of regulatory approvals and for establishing manufacturing, marketing and sales capabilities **.** We received net proceeds of $57.9 million from the sale of 8,625,000 shares of our common stock in August 2005. We have effective shelf registration statements on file with the SEC under which we can sell up to 2,815,000 shares of our common stock **.** We may sell part or all of these shares at our discretion, and may be able to increase the number of shares to be sold in connection with an offering of these shares, subject to certain limitations under federal securities laws and the rules of the Nasdaq National Market. While we intend to seek additional funding from product-based collaborations, technology licensing, and public or private financings, such additional funding may not be available on terms acceptable to us, or at all. Accordingly, we may not be able to secure the significant funding which is required to maintain and continue each of our research and development programs at their current levels or at levels that may be required in the future. If we cannot secure adequate financing, we may be required to delay, scale back, eliminate or terminate clinical trials and/or seeking marketing approval for AP23573 for one or more indications, to delay, scale back or eliminate one or more of our research and development programs, or to enter into license or other arrangements with third parties to purchase, commercialize or otherwise obtain rights in products or technologies that we would otherwise seek to develop ourselves.

***We have limited manufacturing experience and are dependent upon the ability of third parties to manufacture our product candidates, which raises uncertainty as to our ability to develop and commercialize our product candidates.***

We have no experience in manufacturing any of our product candidates on a large scale and have contracted with third party manufacturers to provide material for clinical trials and to assist in the development and optimization of our manufacturing processes and methods. Our ability to conduct clinical trials and commercialize our product candidates will depend on the ability of such third parties to manufacture our products on a large scale at a competitive cost and in accordance with cGMP and other regulatory requirements. If we are not able to obtain contract manufacturing on commercially reasonable terms, obtain or develop the necessary materials and technologies for manufacturing, or obtain intellectual property rights necessary for manufacturing, we may not be able to conduct or complete clinical trials or commercialize our product candidates. There can be no assurance that we will be able to obtain such requisite terms, materials, technologies and intellectual property necessary to successfully manufacture our product candidates for clinical trials or commercialization.

***The loss of key members of our scientific and management staff could delay and may prevent the achievement of our research, development and business objectives.***

Our performance as a specialized scientific business is substantially dependent on our key officers and members of our scientific staff responsible for areas such as drug development, clinical trials, regulatory affairs, drug discovery, manufacturing, marketing, business development and intellectual property protection and licensing. We also are dependent upon a few of our scientific advisors to assist in formulating our research and development strategy. While we have entered into employment agreements with all of our executive officers, these officers may terminate their employment with us at any time. The loss of, and failure to promptly replace, any member of our management team could significantly delay and may prevent the achievement of our research, development and business objectives.

***We are dependent upon the ability of our medical device partner and potential additional partners to develop, manufacture, test and market stents or other medical devices to deliver AP23573.***

We have no experience in the development of medical devices and will not ourselves develop stents or other medical devices to deliver AP23573. Instead, we have granted one license, and may grant up to two additional licenses, under our rights to AP23573 to medical device companies for their use in developing and commercializing such medical devices to reduce blockage of injured vessels following stent-assisted angioplasty.

While we expect to supply AP23573 to our medical device partner and any additional partners (collectively, our partners), we will be otherwise dependent upon them to develop and commercialize stents or other medical devices to deliver AP23573. Such medical device partners will have various degrees of scientific, technical, medical and regulatory experience and resources to, directly or through third parties, develop, manufacture, test or market stents or other medical devices to deliver AP23573. Their ability to conduct clinical trials and commercialize such medical devices will be dependent on the safety profile of AP23573 and our ability to manufacture and supply AP23573, either directly or through third parties, at a competitive cost and in accordance with cGMP and other regulatory requirements. We depend upon third-party manufacturers or collaborative partners for the production of AP23573 for clinical trials and intend to use third-party manufacturers to produce AP23573 on commercial scale. Our reliance on third-party manufacturers and their potential inability to meet our supply commitments to one or more of our partners could adversely impact the ability of our partners to commercialize stents or other medical devices to deliver AP23573.

We anticipate that our partners will seek to develop and commercialize stents or other medical devices to deliver AP23573 that do not infringe third-party patents. However, there can be no assurance that the devices delivering AP23573 marketed by our partners will not be subject to third-party claims. Furthermore, the patents issued to us or our partners covering AP23573 and/or medical devices, including stents, may be subject to challenge and may be subsequently narrowed, invalidated or circumvented. Either such event would adversely impact the ability of one or more of our partners to market their stents or other medical devices to deliver AP23573.

Our existing license agreement with Medinol allows either party to terminate under certain circumstances, including Medinol's reasonable business judgment that development of a medical device to deliver AP23573 is not feasible. Accordingly, Medinol may be unable to develop a medical device to deliver AP23573 and we may also not be able to enter into any additional licensing agreements with any other medical device companies to develop such devices on terms which are acceptable to us, or at all. Our inability to enter into such transactions, or the inability of one or more of our partners to develop or commercialize stents or other medical devices to deliver AP23573 for any reason, will adversely impact our ability to generate revenues from any licenses of AP23573.

***We will continue to expend significant resources on the enforcement and licensing of our NF-κB patent portfolio and may be unable to generate material revenues from these efforts, if we are unable to enforce against, or license our NF-κB patents to, pharmaceutical and biotechnology companies.***

We are the exclusive licensee of a family of patents, three in the U.S. and one in Europe, including a pioneering U.S. patent covering methods of treating human disease by regulating NF-κB cell-signaling activity, hereinafter referred to as the `516 Patent, awarded to a team of inventors from The Whitehead Institute for Biomedical Research, Massachusetts Institute of Technology and Harvard University. We have initiated a licensing program to generate revenues from the discovery, development, manufacture and sale of products covered by our NF-κB patent portfolio. These patents have been, and in the future may be, challenged and may be subsequently narrowed, invalidated, declared unenforceable or circumvented, any of which could materially impact our ability to generate licensing revenues from them.

On June 25, 2002, we, together with these academic institutions, filed a lawsuit in the United States District Court for the District of Massachusetts, or the U.S. District Court, against Eli Lilly and Company, hereinafter referred to as Lilly, alleging infringement upon of certain claims of the '516 Patent through sales of Lilly's osteoporosis drug, Evista®, and its septic shock drug, Xigris®. Several cases have been decided by the U.S. Court of Appeals and the Supreme Court addressing issues pertinent to this litigation since its inception. The trial in this case is scheduled to commence on April 10, 2006 in the U.S. District Court.

On April 4, 2005, Lilly filed an *ex parte* request in the United States Patent and Trademark Office, or PTO, to reexamine the patentability of certain claims of the `516 Patent. In addition, a third party filed an *ex parte* request in the PTO on December 2, 2005 to reexamine the patentability of certain claims of the `516 Patent.

-14-

As exclusive licensee of this patent, we are obligated for the costs expended for its prosecution in the PTO, for its enforcement in this litigation and otherwise. Therefore, we will continue to expend significant capital and management resources pursuing this litigation through trial and subsequent appeals and in the reexamination process in the PTO, and the outcome is uncertain.

If the claims of the '516 Patent which are at issue in this litigation are invalidated by the PTO or in the courts or found not to be infringed in this litigation, we will not realize any revenues on sales of Evista or Xigris, and could be liable under certain limited circumstances for Lilly's litigation costs and potentially attorneys' fees. If we prevail at trial in our litigation against Lilly, any damages we may be awarded by the jury could be subsequently eliminated or limited by an adverse finding upon appeal or in the event that the claims of the `516 patent are invalidated by the PTO. Invalidation of these or other claims of the '516 Patent in the litigation or by the PTO would have a significant adverse impact on our ability to generate revenues from our NF- $\kappa$ B licensing program. Moreover, significant expenditures to enforce these patent rights without generating revenues or accessing additional capital could adversely impact our ability to further our clinical programs and our research and development programs at the current levels or at levels that may be required in the future.

***Because we do not own all of the outstanding stock of our subsidiary, AGTI, we may not realize all of the potential future economic benefit from products developed based on technology licensed to  or owned by our subsidiary.***

Our majority-owned subsidiary, AGTI, holds licenses from Harvard University, Stanford University and other universities relating to our ARGENT cell-signaling regulation technology, and owns the intellectual property on our mTOR inhibitors derived from our ARGENT programs, including AP23573. The two directors of AGTI are also members of the Board of Directors of ARIAD. Minority stockholders of AGTI, including Harvard University, Stanford University, several of our scientific advisors, and several current and former members of our management and Board of Directors, own 20% of the issued and outstanding common stock of AGTI. We own the remaining 80% of the issued and outstanding common stock of AGTI.

We do not currently have a license agreement with AGTI that provides us with rights to commercialize product candidates, based on our ARGENT cell-signaling regulation technology or mTOR inhibitors derived from our ARGENT programs, solely for our own benefit, as opposed to for the benefit of AGTI. If we determine it to be in the best interests of our stockholders to commercialize these product candidates solely for our own benefit, we may negotiate with AGTI to obtain a license, on terms to be determined, granting us the sole rights to commercialize such product candidates. If we enter into such a license, the future economic benefit to our stockholders from our commercialization of such products, if any, will be diminished by any royalties or other payments paid under a future agreement with AGTI. If we do not enter into such a license, then the future economic benefit to our stockholders from our commercialization of such products on behalf of AGTI would be in the form of a dividend or other payments received in respect of our 80% interest in AGTI.

Alternatively, if we determine it to be in the best interests of our stockholders, we may seek to acquire some or all of the interests of the minority stockholders in AGTI for cash, shares of our common stock or other securities in a merger, exchange offer or other transaction. If we acquire all of the interests of the minority stockholders in AGTI, then our stockholders will receive all of the future economic benefit from our commercialization of such products on our own behalf. If we acquire these minority interests, we anticipate that this transaction will result in dilution to our stockholders and will require our incurrence of significant transaction costs, which are currently unknown. On January 13, 2004, we acquired an additional 351,909 shares of AGTI common stock, representing approximately 6% of AGTI's outstanding common stock, for a total purchase price of approximately $8.8 million, effected through the reduction of inter-company debt, subject to adjustment in certain circumstances, in order to maintain our 80% interest in AGTI. While such valuation was based on a good-faith determination made by the independent and disinterested members of our Board of Directors as of that date, the economic value of the minority stockholders' interests is difficult to quantify in the absence of a public market. If we acquire all of the interests of the minority stockholders in AGTI, a variety of valuation methodologies may be employed to determine the value per share of AGTI common stock. Factors impacting this valuation would include the progress, likelihood and cost of development and commercialization of product candidates, potential future income streams there from, availability of funding and other factors. If we acquire the minority interests for consideration valued in excess of the value implicitly attributed to such AGTI shares by the market, this could result in a decline in our stock price. If we choose to acquire some or all of these minority interests through a merger in which we do not solicit the consent of the minority stockholders of AGTI, we could become subject to litigation or an appraisal procedure, which would result in additional expense and diversion of management resources.

There can be no assurance that we will, at any time, enter into a license with AGTI or acquire some or all of the interests of the minority stockholders in AGTI. If we pursue either of these alternatives, there can be no assurance as to the timing of any such transaction, the form of such transaction, the particular transaction terms such as the form or amount of consideration offered or provided by us, or the consequences of any such proposed or completed transaction to us or the AGTI minority stockholders.

***Because members of our management team and/or Board of Directors beneficially own a material percentage of the capital stock of our subsidiary, AGTI, and we  have agreements with AGTI, there are conflicts of interest present in   dealings between ARIAD and AGTI.***

Four members of our management team and/or Board of Directors own approximately 5.6% of the outstanding capital stock of AGTI. Harvey J. Berger, M.D., our Chairman, and Chief Executive Officer, owns 3.2%, David L. Berstein, Esq., our Senior Vice President and Chief Patent Counsel, owns 0.2%, John D. Iuliucci, Ph.D., our Senior Vice President and Chief Development Officer, owns 0.6% and Jay R. LaMarche, one of our directors, owns 1.6%. These same individuals beneficially own an aggregate of approximately 3.1% of our outstanding common stock. Dr. Stuart L. Schreiber, a Harvard professor who is one of our scientific founders, owns approximately 3.2% of the outstanding capital stock of AGTI. Additionally, Dr. Berger and Mr. LaMarche are the two members comprising the Board of Directors of AGTI. As part of the formation of AGTI, we entered into certain agreements with AGTI to provide for the operations of AGTI. As a result, conflicts of interest exist in dealings between AGTI and us. AGTI is the exclusive licensee of the ARGENT cell-signaling intellectual property from Harvard University and Stanford University and of related technologies from other universities, and owns the intellectual property on our mTOR inhibitors derived from our ARGENT programs, including AP23573, which is in Phase 2 clinical trials for use in cancer and in development for use in drug delivery stents and other medical devices, and our bone-targeted mTOR inhibitors. Because of the apparent conflicts of interest, the market may be more inclined to perceive the terms of any transaction between us and AGTI as being unfair to us.

***We may not be able to protect our intellectual property relating to our research programs, technologies and products.***

We and our licensors have issued patents and pending patent applications covering research methods useful in drug discovery, new chemical compounds discovered in our drug discovery programs including, among others, AP23573, certain components, configurations and uses of our cell-signaling regulation technologies and products-in-development, methods and materials for manufacturing our products-in-development and other pharmaceutical products and methods and materials for conducting pharmaceutical research. We have a licensing program to generate revenues from the use of our ARGENT cell-signaling regulation technologies and our NF- $\kappa$ B intellectual property. Pending patent applications may not issue as patents and may not issue in all countries in which we develop, manufacture or sell our products or in countries where others develop, manufacture and sell products using our technologies. In addition, patents issued to us or our licensors may be challenged, as is the case with the Lilly litigation and related PTO proceedings regarding the NF- $\kappa$ B `516 Patent, and they may be subsequently narrowed, invalidated or circumvented. In that event, such patents may not afford meaningful protection for our technologies or product candidates, which would materially impact our ability to develop and market our product candidates and to generate licensing revenues from our patent portfolio. Certain technologies utilized in our research and development programs are already in the public domain. Moreover, a number of our competitors have developed technologies, filed patent applications or obtained patents on technologies, compositions and methods of use that are related to our business and may cover or conflict with our patent applications, technologies or product candidates. Such conflicts could limit the scope of the patents that we may be able to obtain or may result in the denial of our patent applications. If a third party were to obtain intellectual proprietary protection for any of the foregoing, we may be required to challenge such protection, terminate or modify our programs impacted by such protection or obtain licenses from such third parties, which might not be available or acceptable terms or at all.

***We may be unable to develop or commercialize our product candidates, if we are unable to obtain or maintain certain licenses on commercial terms or at all.***

We have entered, and will continue to enter, into agreements, either directly or through AGTI, with third parties to test compounds, blood and tissue samples, to perform gene expression analysis and to develop biological tests for use with our product candidates, which testing may yield new inventions and discoveries requiring us to obtain licenses in order to exclusively develop or market new products, alone or in combination with our product candidates, or to develop or market our product candidates for new indications. We have also entered into license agreements for some of our technologies, either directly or through AGTI. We use third parties to test blood and tissue samples and other biological materials in our clinical programs and to develop biological tests, with respect to which we may be required to obtain licenses or pay royalties or other fees in order to commercialize such tests for use with our product candidates. We also use gene sequences or proteins encoded by those sequences and other biological materials in each of our research programs which are, or may become, patented by others and to which we would be required to obtain licenses in order to develop or market our product candidates. Manufacturing of our products may also require licensing biological materials, technologies and intellectual property from third parties. Our inability to obtain any one or more of these licenses, on commercially reasonable terms, or at all, or to circumvent the need for any such license, could cause significant delays and cost increases and materially affect our ability to develop and commercialize our product candidates. Obtaining licenses for these discoveries, materials and technologies may require us to make cumulative royalty payments or other payments to several third parties, potentially reducing amounts paid to us or making the cost of our products commercially prohibitive.

Some of our licenses obligate us to exercise diligence in pursuing the development of product candidates, to make specified milestone payments and to pay royalties. In some instances, we are responsible for the costs of filing and prosecuting patent applications. These licenses generally expire upon the earlier of a fixed term of years after the date of the license or the expiration of the applicable patents, but each license is also terminable by the other party upon default by us of our obligations. Our inability or failure to meet our diligence requirements or make any payments required under these licenses would result in a reversion to the licensor of the rights granted which, with respect to the licenses pursuant to which we have obtained exclusive rights, would materially and adversely affect our ability to develop and market products based on our licensed technologies.

***Competing technologies may render some or all of our programs or future products noncompetitive or obsolete.***

Many well-known pharmaceutical, healthcare and biotechnology companies, academic and research institutions and government agencies, which have substantially greater capital, research and development capabilities and experience than us or our potential partners, are presently engaged in one or more of the following activities:

· developing products based on cell signaling, genomics, proteomics, and computational chemistry;

· conducting research and development programs for the treatment of the various disease indications in which we are focused; and

· manufacturing, promoting, marketing and selling pharmaceutical or medical device products for treatment of diseases in all of the various disease indications in which we or our current or possible future partners are focused.

Some of these entities already have competitive products on the market or product candidates in clinical trials or in more advanced preclinical studies than we do. By virtue of having or introducing competitive products on the market before us, these entities may gain a competitive advantage. Competing technologies may render some or all of our programs or future products noncompetitive or obsolete, and we may not be able to make the enhancements to our technology necessary to compete successfully with newly emerging technologies. If we are unable to successfully compete in our chosen markets, we will not become profitable.

***If our product candidates are not accepted by patients, physicians and insurers, we will not be successful.***

Our success is dependent on the acceptance of any approved products. Our product candidates may not achieve market acceptance among patients, physicians or third-party payors, even if we obtain necessary regulatory and reimbursement approvals. Physicians and health care payors may conclude that any of our product candidates are not as safe and/or effective as competing therapies or are not as attractive based on a cost/benefit analysis as alternative treatments. Failure to achieve significant market acceptance of our product candidates will harm our business. We believe that recommendations by physicians and health care payors will be essential for market acceptance of any product candidates.

***If we are unable to establish sales, marketing and distribution capabilities or to enter into agreements with third parties to do so, we may be unable to   successfully market and sell any products.***

We are currently establishing a commercial oncology organization, but we have no experience in marketing or selling any products. While we intend to commercialize our product candidates in the United States and to enter into agreements with partner(s) to commercialize our product candidates elsewhere, we may be unable to successfully, directly or indirectly, sell any products that we obtain marketing approval to sell. If we are unable to effectively sell our products, our ability to generate revenues will be materially adversely affected. We may not be able to hire, in a timely manner, the qualified sales and marketing personnel we need, if at all. In addition, we may not be able to enter into any marketing or distribution agreements on acceptable terms, if at all. If we cannot establish sales, marketing and distribution capabilities as we intend, either by developing our own capabilities or entering into agreements with third parties, sales of future products, if any, may be harmed.

*If we develop a product for commercial use, a subsequent product liability-related claim or recall could have an adverse effect on our business.*

Our business exposes us to potential product liability risks inherent in the testing, manufacturing and marketing of pharmaceutical products. Prior to obtaining regulatory approval to market our products, we are required to test such products in human clinical trials at health care institutions pursuant to agreements which indemnify such institutions in case of harm caused to patients by our products. We may not be able to avoid significant product liability exposure resulting from use of our products. A product liability-related claim or recall could be detrimental to our business. In addition, except for insurance covering product use in our clinical trials, we do not currently have any product liability insurance, and we may not be able to obtain or maintain such insurance on acceptable terms, or we may not be able to obtain any insurance to provide adequate coverage against potential liabilities. Our inability to obtain sufficient insurance coverage at an acceptable cost or otherwise to protect against potential product liability claims could prevent or limit the commercialization of any products that we develop.

*Significant additional losses or insufficient funding may cause us to default on certain covenants of our loan documents.*

At December 31, 2005, we had $7.7 million outstanding under a term loan agreement with a bank, pursuant to which we are required to maintain certain financial and non-financial covenants, including minimum cash, cash equivalents and investments of $13  million, a default of any of which would allow the bank to demand payment of its loan. We currently maintain sufficient liquidity to fund payment of this loan if demand for payment were made. However, if we are unable to raise adequate financing to fund continuing operations or otherwise to refinance our loan, we may not be able to maintain compliance with loan covenants, may be required to pay off the loan and may be required to reduce our spending on operations.

**Risks Relating to Governmental Approvals**

*We have limited experience in conducting clinical trials, which may cause delays in commencing and completing clinical trials of our product candidates.*

Clinical trials must meet FDA and foreign regulatory requirements. We have limited experience in designing, conducting and managing the preclinical studies and clinical trials necessary to obtain regulatory approval for our product candidates in any country. We or our collaborative partners may encounter problems in clinical trials that may cause us or the FDA or foreign regulatory agencies to delay, suspend or terminate our clinical trials at any phase. These problems could include the possibility that we may not be able to manufacture sufficient quantities of cGMP materials for use in our clinical trials, conduct clinical trials at our preferred sites, enroll a sufficient number of patients for our clinical trials at one or more sites, or begin or successfully complete clinical trials in a timely fashion, if at all. Furthermore, we, the FDA or foreign regulatory agencies may suspend clinical trials of our product candidates at any time if we or they believe the subjects participating in the trials are being exposed to unacceptable health risks as a result of adverse events occurring in our trials or if we or they find deficiencies in the clinical trial process or conduct of the investigation. With respect to AP23573, the FDA or foreign regulatory agencies may also suspend our clinical trials if we or they believe the subjects participating in the trials are being exposed to unacceptable health risks as a result of adverse events occurring in the trials of medical devices delivering AP23573 sponsored by our medical device partner or future partners. If clinical trials of any of our product candidates fail, we will not be able to market the product candidate which is the subject of the failed clinical trials. The FDA and foreign regulatory agencies could also require additional clinical trials before or after granting of marketing approval for any of our products, which would result in increased costs and significant delays in the development and commercialization of our products and could result in the withdrawal of our products from the market after obtaining marketing approval. Our failure to adequately demonstrate the safety and efficacy of a product candidate in clinical development could delay or prevent obtaining marketing approval of the product candidate and, after obtaining marketing approval, data from post-approval studies could result in the product being withdrawn from the market, either of which would likely have a material adverse effect on our business.

*We may not be able to obtain government regulatory approval to market our product candidates.*

To date, we have not submitted a marketing application for any product candidate to the FDA or any foreign regulatory agency, and none of our product candidates has been approved for commercialization in any country. Prior to commercialization, each product candidate would be subject to an extensive and lengthy governmental regulatory approval process in the United States and in other countries. We or any prospective partners or our medical device partners may not be able to obtain regulatory approval for any product candidates, or even if approval is obtained, the labeling for such products may place restrictions on their use that could materially impact the marketability and profitability of the product subject to such restrictions. Satisfaction of these regulatory requirements, which includes satisfying the FDA and foreign regulatory authorities that the product is both safe and effective for its intended uses, typically takes several years or more depending upon the type, complexity and novelty of the product and requires the expenditure of substantial resources. Uncertainty with respect to meeting the regulatory requirements governing our product candidates may result in excessive costs or extensive delays in the regulatory approval process, adding to the already lengthy review process. If regulatory approval of a product is granted, such approval will be limited to those disease states and conditions for which the product is proven safe and effective, as demonstrated by clinical trials, and may not include all of the indications necessary to successfully market the product. Even though we have obtained orphan drug designation by the FDA and EMEA for AP23573 in bone and soft-tissue sarcomas, this designation may be challenged by others or may prove to be of no practical benefit.

*We will not be able to sell our product candidates if we or our third-party manufacturers fail to comply with FDA manufacturing regulations.*

Before we can begin to commercially manufacture our product candidates, we must either secure manufacturing in an FDA approved manufacturing facility or obtain regulatory approval of our own manufacturing facility and processes. In addition, the manufacturing of our product candidates must comply with cGMP requirements of the FDA and similar requirements of regulatory agencies in other countries. These requirements govern, among other things, quality control and documentation procedures. We, or any third-party manufacturer of our product candidates, may not be able to comply with these requirements, which would prevent us from selling such products. Material changes to the manufacturing processes of our products after approvals have been granted are also subject to review and approval by the FDA or other regulatory agencies. Post approval, such facilities are subject to continuing FDA and foreign regulatory inspections and failure to comply with cGMPs or similar regulations can result in regulatory action up to and including cessation of shipment of product.

*Even if we bring products to market, we may be unable to effectively price our products or obtain adequate reimbursement for sales of our products, which would prevent our products from becoming profitable.*

If we succeed in bringing any product candidates to the market, they may not be considered cost-effective, and coverage and adequate payments may not be available or may not be sufficient to allow us to sell our products on a competitive basis. In both the United States and elsewhere, sales of medical products and treatments are dependent, in part, on the availability of reimbursement from third-party payors, such as health maintenance organizations and other private insurance plans and governmental programs such as Medicare. Third-party payors are increasingly challenging the prices charged for pharmaceutical products and services. Our business is affected by the efforts of government and third-party payors to contain or reduce the cost of health care through various means. In the United States, there have been and will continue to be a number of federal and state proposals to implement government controls on pricing. Similar government pricing controls exist in varying degrees in other countries. In addition, the emphasis on managed care in the United States has increased and will continue to increase the pressure on the pricing of pharmaceutical products. We cannot predict whether any legislative or regulatory proposals will be adopted or the effect these proposals or managed care efforts may have on our business.

**Risks Relating to Our Common Stock**

***Results of our operations, general market conditions for biotechnology stocks and other factors could result in the sudden change in the value of our stock.***

As a biopharmaceutical company, we have experienced significant volatility in our common stock. In 2005, our stock price ranged from a high of $8.75 to a low of $5.23. Factors that can contribute to such volatility may include: results and timing of preclinical studies and clinical trials; evidence of the safety or efficacy of pharmaceutical products; decisions by regulatory agencies that impact or may impact our product candidates; the results and timing of efforts by our partner or future partners to develop stents or other medical devices to deliver AP23573; announcements of new collaborations; announcements of new equity or debt financings; failure to enter into collaborations; our funding requirements; announcements of technological innovations or new therapeutic products; developments relating to intellectual property rights, including licensing, litigation and governmental regulation and, in particular, our litigation with Lilly in the U.S. District Court and reexamination proceedings in the PTO with respect to the `516 Patent; healthcare or cost-containment legislation; general market trends for the biotechnology industry and related high-technology industries; the impact of exchange rates for the U.S. dollar; the impact of changing interest rates and policies of the Federal Reserve; and public policy pronouncements. These and other factors could have a significant impact on the value and volatility of our common stock in future periods.

***Raising additional capital by issuing securities or through collaboration and licensing arrangements may cause dilution to existing stockholders, restrict our operations or require us to relinquish proprietary rights.***

We may seek the additional capital necessary to fund our operations through public or private equity offerings, debt financings, and collaboration and licensing arrangements. To the extent that we raise additional capital through the sale of equity or convertible debt securities, our stockholders' ownership interest will be diluted, and the terms of such securities may include liquidation or other preferences that adversely affect our stockholders' rights. Under an existing loan agreement with a bank, we are required to maintain certain financial and non-financial covenants, including covenants limiting or restricting our ability to incur additional debt or declare dividends. If we raise additional funds through collaboration and licensing arrangements with third parties, we may have to relinquish valuable rights to our technologies or product candidates, or grant licenses on terms that are not favorable to us.

### ITEM 1B:   UNRESOLVED STAFF COMMENTS

We have received no written comments from the SEC staff regarding our periodic or current reports under the Securities Exchange Act of 1934, as amended, which comments remain unresolved.

**ITEM 2: PROPERTIES**

We have leased approximately 100,000 square feet (approximately 34,000 square feet currently under sublease to a third party) of laboratory and office space at 26 Landsdowne Street, Cambridge, Massachusetts. The lease originally had a ten-year term, which ended in July of 2002, with two consecutive five-year renewal options. We have extended the lease for the first five-year option period through July 2007. We believe that our currently leased facility will, in large part, be adequate for our research and development activities at least through the year 2007. We believe that any additional space we may require will be available on commercially reasonable terms.

**ITEM 3: LEGAL PROCEEDINGS**

**NF-ºB Patent Infringement Litigation and Reexamination**

In 2002, we, together with Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research and Harvard University (collectively, the Plaintiffs) filed a lawsuit in the United States District Court for the District of Massachusetts, or the U.S. District Court, against Eli Lilly and Company, hereinafter referred to as Lilly, alleging infringement of certain claims, or the NF- κ B `516 Claims, of the Plaintiffs' U.S. Patent No. 6,410,516, or the `516 Patent covering methods of treating human disease by regulating NF- κ B cell-signaling activity through sales of Lilly's osteoporosis drug, Evista®, and Lilly's septic shock drug, Xigris®, and seeking monetary damages from Lilly.

*Re-examination Proceedings in PTO*

On April 4, 2005, Lilly filed an *ex parte* request in the United States Patent and Trademark Office, or PTO, to reexamine the patentability of certain claims of the `516 Patent. On June 8, 2005, the PTO mailed to counsel for the patentees of the `516 Patent its Order granting a reexamination of all of the claims of the `516 Patent. On August 4, 2005, counsel for the patentees of the `516 Patent filed a Petition requesting the PTO to vacate its Order granting reexamination of the `516 Patent and a Petition requesting the PTO to stay its reexamination, or Patentees' Petitions. On October 6, 2005, the PTO mailed to counsel for the patentees of the `516 Patent its Decision denying Patentees' Petitions, or PTO's October 6 Decision, whereupon, on November 25, 2005, counsel for the patentees filed a Request for Reconsideration of the PTO's October 6 Decision. On February 8, 2006, the PTO mailed to counsel for the patentees of the `516 Patent its Decision granting patentees' Request for Reconsideration and denying the relief sought by patentees thereunder.

In addition, an unrelated third party filed an *ex parte* request in the PTO on December 2, 2005 to reexamine the patentability of certain claims of the `516 Patent, or the Second Request. On December 12, 2005, the PTO mailed to counsel for the patentees of the `516 Patent its Order granting a reexamination based on this Second Request. On February 13, 2006, counsel for the patentees of the `516 Patent filed Petitions requesting the PTO to vacate its Order granting reexamination of the `516 Patent based on this Second Request and requesting the PTO to stay this reexamination.

*Motions to Stay Litigation*

In connection with its request for reexamination of the `516 Patent, Lilly filed a motion in the U.S. District Court on April 4, 2005 requesting a stay of the NF-ºB patent infringement litigation by the Court pending reexamination of the `516 Patent by the PTO. On June 6, 2005, the U.S. District Court denied Lilly's motion. On January 17, 2006, Lilly filed a renewed motion to stay pending reexamination of the `516 Patent by the PTO, which was denied by the U.S. District Court on February 13, 2006.

*Trial and Pre-Trial Motions*

On December 23, 2005, Lilly filed two motions for summary judgment of invalidity. At a status conference held on March 9, 2006, the U.S. District Court confirmed that the trial would begin on April 10, 2006 and gave no indication as to when it would rule on the pending summary judgment motions. A pre-trial conference in this case is scheduled for April 5, 2006, with trial scheduled to commence on April 10, 2006.

The ultimate outcome of the request for reexamination and the litigation cannot be determined at this time, and, as a result, no determination can be made with respect to whether the PTO will allow the claims of the `516 Patent in the reexamination proceeding, nor can any determination be made with respect to the validity or infringement of the claims of the `516 Patent in the Lilly litigation, nor can an estimate of a damage award or range of awards in the Lilly litigation, if any, be made. If we prevail at trial in the Lilly litigation, any damages we may be awarded by the jury could be subsequently eliminated or limited by an adverse finding upon appeal or in the event that the claims of the `516 Patent are invalidated by the PTO.

**ITEM 4:    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS**

No matters were submitted to a vote of security holders during the quarter ended December 31, 2005.

**PART II**

ITEM 5: **MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**Market Information**

Our common stock is traded on the Nasdaq National Market under the symbol "ARIA". The following table sets forth the high and low sales prices of our common stock as quoted on the Nasdaq National Market for the periods indicated.

| 2005: | High | Low |
|---|---|---|
| First Quarter | $ 8.05 | $ 5.42 |
| Second Quarter | 7.40 | 5.23 |
| Third Quarter | 8.75 | 6.45 |
| Fourth Quarter | 7.73 | 5.52 |
| | | |
| 2004: | | |
| First Quarter | $11.32 | $ 6.96 |
| Second Quarter | 13.74 | 6.75 |
| Third Quarter | 7.50 | 3.70 |
| Fourth Quarter | 7.63 | 5.25 |

On February 28, 2006, the last reported sale price of our common stock was $6.71.

**Stockholders**

The approximate number of holders of record of our common stock as of February 28, 2006 was 480, and the approximate total number of beneficial holders of our common stock as of February 28, 2006 was 39,000.

**Dividends**

We have not declared or paid dividends on our common stock in the past and do not intend to declare or pay such dividends in the foreseeable future. Our long-term debt agreement prohibits the payment of cash dividends.

**Unregistered Sales of Securities**

Not applicable.

**Issuer Purchases of Equity Securities**

Not applicable.

-24-

ITEM 6:   SELECTED FINANCIAL DATA

The selected financial data set forth below as of December 31, 2005, 2004, 2003, 2002 and 2001 and for each of the years then ended have been derived from the audited consolidated financial statements of the Company, of which the financial statements as of December 31, 2005 and 2004 and for the years ended December 31, 2005, 2004 and 2003 are included elsewhere in this Annual Report on Form 10-K, and are qualified by reference to such financial statements. The information set forth below should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the audited consolidated financial statements, and the notes thereto, and other financial information included herein.

| *In thousands, except share and per share data* | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2005** | **2004** | **2003** | **2002** | **2001** |
| **Consolidated Statements of Operations Data:** | | | | | |
| Revenue | $ 1,217 | $ 742 | $ 660 | $ 67 | $ 4 |
| Operating expenses: | | | | | |
| Research and development | 45,916 | 27,711 | 14,889 | 23,018 | 16,587 |
| General and administrative | 12,261 | 9,442 | 5,547 | 5,718 | 4,469 |
| Operating expenses | 58,177 | 37,153 | 20,436 | 28,736 | 21,056 |
| Loss from operations | (56,960) | ( 36,411) | (19,776) | (28,669) | (21,052) |
| Other income (expense): | | | | | |
| Interest income | 1,900 | 1,110 | 353 | 615 | 1,578 |
| Interest expense | (422) | (272) | (303) | (323) | (285) |
| Other income - tax refund | | | | 534 | |
| Other income (expense), net | 1,478 | 838 | 50 | 826 | 1,293 |
| Net loss | $ (55,482) | $ (35,573) | $ (19,726) | $ (27,843) | $ (19,759) |
| | | | | | |
| Net loss per share | $ (0.99) | $ (0.69) | $ (0.51) | $ (0.86) | $ (0.68) |
| Weighted average number of shares of common stock outstanding | 56,283,948 | 51,294,160 | 39,036,073 | 32,475,083 | 29,256,767 |

| *In thousands* | As of December 31, | | | | |
|---|---|---|---|---|---|
| | **2005** | **2004** | **2003** | **2002** | **2001** |
| **Consolidated Balance Sheet Data:** | | | | | |
| Cash, cash equivalents and marketable securities | $ 81,516 | $ 75,506 | $ 66,740 | $ 26,850 | $ 47,186 |
| Working capital | 65,971 | 68,874 | 61,587 | 21,126 | 43,249 |
| Total assets | 96,174 | 87,189 | 74,284 | 35,104 | 55,361 |
| Long-term debt | 5,735 | 7,655 | 6,575 | 5,437 | 6,847 |
| Accumulated deficit | (247,098) | (191,616) | (156,043) | (136,317) | (108,474) |
| Stockholders' equity | 71,378 | 67,440 | 59,326 | 21,852 | 43,093 |

ITEM 7:  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read the following discussion and analysis in conjunction with "Selected Financial Data" and our consolidated financial statements and the related notes included elsewhere in this report.*

## Overview

We are engaged in the discovery and development of breakthrough medicines to treat cancers by regulating cell signaling with small molecules. We are developing a comprehensive approach to patients with cancer that addresses the greatest medical need - aggressive and advanced-stage cancers for which current treatments are inadequate. Our goal is to build a fully integrated oncology company focused on novel, molecularly targeted therapies to treat solid tumors and hematologic cancers, as well as the spread of primary tumors to distant sites.

Our lead cancer product candidate, AP23573, has been or is being studied in multiple clinical trials in patients with various types of cancers, including sarcomas, hormone refractory prostate cancer, endometrial cancer, brain cancer and leukemias and lymphomas. Medinol Ltd. is also developing stents to deliver AP23573 to prevent reblockage at sites of vascular injury following stent-assisted angioplasty.

We have a focused drug discovery program centered on small-molecule, molecularly targeted therapies and cell-signaling pathways implicated in cancer. We also have an exclusive license to pioneering technology and patents related to certain NF-ᵃB cell-signaling activity, which may be useful in treating certain diseases. Additionally, we have developed a proprietary portfolio of cell-signaling regulation technologies, our ARGENT technology, to control intracellular processes with small molecules, which may be useful in the development of therapeutic vaccines and gene and cell therapy products, and which provide versatile tools for applications in cell biology, functional genomics and drug discovery research.

Since our inception in 1991, we have devoted substantially all of our resources to our research and development programs. We receive no revenue from the sale of pharmaceutical products, and most of our revenue to date was received in connection with a joint venture we had with a major pharmaceutical company from 1997 to 1999. Except for the gain on the sale of our fifty percent interest in that joint venture in December 1999, which resulted in net income for fiscal 1999, we have not been profitable since inception. We expect to incur substantial and increasing operating losses for the foreseeable future, primarily due to costs associated with our pharmaceutical product development programs, including costs for clinical trials and product manufacturing, personnel and our intellectual property. We expect that losses will fluctuate from quarter to quarter and that these fluctuations may be substantial. As of December 31, 2005, we had an accumulated deficit of $247.1 million and cash, cash equivalents and marketable securities of $81.5 million and working capital of $66.0 million.

## General

Our operating losses are primarily due to the costs associated with our pharmaceutical product development programs, personnel and intellectual property protection and enforcement. As our product development programs progress, we incur significant costs for toxicology and pharmacology studies, product development, manufacturing, clinical trials and regulatory support. These costs can vary significantly from quarter to quarter depending on the number of product candidates in development, the stage of development of each product candidate, the number of patients enrolled in and complexity of clinical trials and other factors. Costs associated with our intellectual property include legal fees and other costs to prosecute, maintain, protect and enforce our intellectual property, which can fluctuate from quarter to quarter depending on the status of patent issues being pursued.

Because we currently receive no revenue from the sale of pharmaceutical products and receive only limited license revenue, we have relied primarily on the capital markets as our source of funding. In March 2004 and August 2005, we raised approximately $40.0 million and $57.9 million, respectively, through underwritten public offerings of our common stock. We also utilize long-term debt to supplement our funding, particularly as a means to fund investment in property and equipment and infrastructure needs. In addition, we may seek funding from collaborations with pharmaceutical, biotechnology and/or medical device companies for development and commercialization of our product candidates. These collaborations may take the form of licensing arrangements, co-development or joint venture arrangements or other structures. If funding from these various sources is unavailable on reasonable terms, we may be required to reduce our operating expenses in order to conserve cash and capital by delaying, scaling back or eliminating one or more of our product development programs.

**Critical Accounting Policies and Estimates**

Our financial position and results of operations are affected by subjective and complex judgments, particularly in the areas of the carrying value of intangible assets, deferred compensation benefits for executives, and stock-based compensation to consultants.

At December 31, 2005, we reported $4.6 million of intangible assets consisting of capitalized costs related primarily to purchased and issued patents, patent applications and licenses, net of accumulated amortization. These costs are being amortized over the estimated useful lives of the underlying patents or licenses. Changes in these lives or a decision to discontinue using the technologies could result in material changes to our balance sheet and statements of operations. For example, during 2005 and 2004, we expensed $43,000 and $87,000, respectively, of unamortized costs related to certain intangible assets which we are not actively pursuing any longer. We have concluded that the carrying value of our remaining intangible assets is not currently impaired because such assets are utilized in our product development programs and/or continue to be viable technologies for collaborations or licensing efforts which we continue to pursue. If we were to abandon the underlying technologies or terminate our efforts to pursue collaborations or license agreements, we may be required to write off a portion of the carrying value of our intangible assets. The net book value as of December 31, 2005 of intangible assets related to our NF-κB technology is $456,000. If the patentability of our NF-κB patents is successfully challenged and such patents are subsequently narrowed, invalidated or circumvented, we may be required to write off some or all of the net book value related to such technology.

In determining expense related to stock-based compensation to consultants, recorded balances are adjusted at each reporting period to reflect fair value utilizing the Black-Scholes option pricing model that takes into account, among other things, the price and volatility of our common stock, a risk-free discount rate, and an estimate of the life of the option contract. In addition, under our deferred executive compensation plans, we are required to adjust our recorded obligations to our employees on a periodic basis to reflect fair value based on the value of certain underlying mutual funds. Fluctuations in those factors can result in uneven expense charges or credits to our statements of operations. If, for example, the market prices of the underlying securities in our deferred executive compensation plans were 10% higher at December 31, 2005, we would have recognized an additional $133,000 in compensation expense in 2005. Similarly, if the price and volatility of our common stock were 10% greater as of December 31, 2005, we would have recognized an increase of $4,000 in stock-based compensation to consultants in 2005.

**Results of Operations**

*Years Ended December 31, 2005 and 2004*

*Revenue*

We recognized license revenue of $1.2 million for the year ended December 31, 2005 compared to $742,000 for the year ended December 31, 2004. The increase in license revenue was due primarily to a license agreement we signed in January 2005 with Medinol to develop and commercialize stents and other medical devices to deliver our lead product candidate, AP23573, to prevent reblockage of injured vessels following stent-assisted angioplasty.

*Operating Expenses*

*Research and Development Expenses*

Research and development expenses increased by $18.2 million, or 66%, from $27.7 million in 2004 to $45.9 million in 2005. The research and development process necessary to develop a pharmaceutical product for commercialization is subject to extensive regulation by numerous governmental authorities in the United States and other countries. This process typically takes years to complete and requires the expenditure of substantial resources. Current requirements include:

· preclinical toxicology, pharmacology and metabolism studies, as well as *in vivo* efficacy studies in relevant animal models of disease;

· manufacturing of drug product for preclinical studies and clinical trials and ultimately for commercial supply;

· submission of the results of preclinical studies and information regarding manufacturing and control and proposed clinical protocol to the FDA in an Investigational New Drug application, or IND, (or similar filings with regulatory agencies outside the United States);

· conduct of clinical trials designed to provide data and information regarding the safety and efficacy of the product candidate in humans; and

· submission of all the results of testing to the FDA in a New Drug Application, or NDA, (or similar filings with regulatory agencies outside the United States).

Upon approval by the appropriate regulatory authorities, including in some countries approval of product pricing, we may commence commercial marketing and distribution of the product.

We group our research and development, or R&D, expenses into two major categories: direct external expenses and all other R&D expenses. Direct external expenses consist of costs of outside parties to conduct laboratory studies, to develop manufacturing processes and manufacture product candidates, to conduct and manage clinical trials and similar costs related to our clinical and preclinical studies. These costs are accumulated and tracked by product candidate. All other R&D expenses consist of costs to compensate personnel, to purchase lab supplies and services, to lease, operate and maintain our facility, equipment and overhead and similar costs of our research and development efforts. These costs apply to work on our clinical and preclinical candidates as well as our discovery research efforts. These costs are not tracked by product candidate because the number of product candidates and projects in R&D may vary from time to time and because we utilize internal resources across multiple projects at the same time.

Direct external expenses are further categorized as costs for clinical programs and costs for preclinical programs. Preclinical programs include product candidates undergoing toxicology, pharmacology, metabolism and efficacy studies and manufacturing process development required before testing in humans can begin. Product candidates are designated as clinical programs once we have filed an IND with the FDA, or a similar filing with regulatory agencies outside the United States, for the purpose of commencing clinical trials in humans.

-28-

Our R&D expenses for 2005 as compared to 2004 were as follows:

| In thousands | Year ended December 31, | | | | | Increase/(decrease) |
|---|---|---|---|---|---|---|
| | | 2005 | | 2004 | | |
| Direct external expenses: | $ | 26,311 | $ | 11,542 | $ | 14,769 |
| Clinical programs | | 1,142 | | 3,494 | | (2,352) |
| Preclinical programs | | 18,463 | | 12,675 | | 5,788 |
| All other R&D expenses | $ | 45,916 | $ | 27,711 | $ | 18,205 |

AP23573, our lead product candidate which is in Phase 2 clinical trials, was our only clinical program in 2005 and 2004. Direct external expenses for AP23573 increased by $14.8 million in 2005 as compared to 2004 due primarily to increases in clinical trial costs ($10.9 million) and manufacturing-related costs ($3.5 million). In 2005, we continued to enroll patients in our existing clinical trials of AP23573 and initiated new clinical trials in additional disease indications, including prostate and endometrial cancer. The increase in clinical trial costs is directly related to the increased enrollment, the costs of evaluating enrolled patients, the costs of managing the trials, laboratory costs and the costs of compiling and analyzing results obtained in the trials. Manufacturing costs include product and process development work, as well as the costs to produce drug product. Manufacturing costs for AP23573 increased in 2005 as compared to 2004 due to an increase in the quantities of drug product manufactured for the clinical trials and investments in manufacturing process development. Through December 31, 2005, we have incurred a total of approximately $40.4 million in direct external expenses for AP23573 from the date it became a clinical program. We expect that our direct external costs for AP23573 will increase in 2006 as we continue to manage our clinical trials and incur the related costs of manufacturing and other costs to support such trials for this product candidate.

Preclinical programs consist primarily of our oncogenic kinase inhibitor program and our bone-targeted mTOR inhibitor program. Direct external expenses on preclinical programs will increase or decrease over time depending on the status and number of programs in this stage of development and the mix between external and internal efforts applied to such programs. Direct external expenses for preclinical programs decreased by $2.4 million in 2005 as compared to 2004 due primarily to the completion of certain pharmacology and toxicology studies conducted by outside contract laboratories in 2004, as well as expansion of internal efforts on these programs in 2005. We expect that our direct external expenses for preclinical programs will increase in 2006, as resources allow, as we continue to move these programs forward in development.

All other R&D expenses increased by $5.8 million in 2005 as compared to 2004 due to higher personnel and related costs ($2.6 million) as a result of an increase in the number of personnel and salary adjustments, an increase in depreciation and amortization costs related to our property and equipment ($1.9 million) due to the impact of capital improvements and purchases in 2004 and 2005, an increase in laboratory supplies and services ($506,000) related to ongoing development of our clinical and preclinical programs and miscellaneous increases in costs related to our facility, including maintenance and utility costs. We expect that all other R&D expenses will increase in 2006 in support of the expanding activity in our clinical and preclinical programs.

The successful development of our products is uncertain and subject to a number of risks. We cannot be certain that any of our product candidates will prove to be safe and effective or will meet all of the applicable regulatory requirements needed to receive and maintain marketing approval. Data from preclinical studies and clinical trials are susceptible to varying interpretations that could delay, limit or prevent regulatory clearance. We, the FDA or other regulatory authorities may suspend clinical trials at any time if we or they believe that the subjects participating in such trials are being exposed to unacceptable risks or if such regulatory agencies find deficiencies in the conduct of the trials or other problems with our products under development. Delays or rejections may be encountered based on additional governmental regulation, legislation, administrative action or changes in FDA or other regulatory policy during development or the review process. Other risks associated with our product development programs are described in Part I, Item 1A: Risk Factors. Due to these uncertainties, accurate and meaningful estimates of the ultimate cost to bring a product to market, the timing of completion of any of our drug development programs and the period in which material net cash inflows from any of our drug development programs will commence are unavailable.

*General and Administrative Expenses*

General and administrative expenses increased by $2.8 million, or 30%, from $9.4 million in 2004 to $12.3 million in 2005. Professional fees increased by $3.2 million to $7.4 million in 2005 as compared to $4.2 million in 2004 due primarily to costs related to expansion of business and commercial development initiatives and to our patent infringement litigation with Lilly. This increase was offset in part by a decrease in expenses related to a restricted stock grant to our chief executive officer in January 2004 which was fully amortized by December 31, 2004. We expect that our general and administrative expenses will increase in 2006 as necessary to support our research and development programs.

We expect that our operating expenses in total will increase in 2006 for the reasons described above, and such increase could be substantial. In addition, we expect that our R&D expenses and our general and administrative expenses will increase in 2006 due to the adoption of SFAS No. 123(R), *Share-Based Payment*, pursuant to which we will begin to recognize expenses in 2006 related to stock options and other share-based payments to employees. Operating expenses may fluctuate from quarter to quarter. The actual amount of any increase in operating expenses will depend on the progress of our product development programs, including preclinical and clinical studies and product manufacturing, the status of our patent infringement litigation with Lilly and our ability to raise funding through equity offerings, collaborations, licensing, joint ventures or other sources.

*Interest Income/Expense*

Interest income increased by 71% to $1.9 million in 2005 from $1.1 million in 2004, as a result of higher interest yields from our securities, offset in part by a lower average balance of funds invested in 2005.

Interest expense increased by 55% to $422,000 in 2005 from $272,000 in 2004, as a result of higher interest rates and higher average loan balances in 2005.

*Operating Results*

We reported a loss from operations of $57.0 million in 2005 compared to a loss from operations of $36.4 million in 2004, an increase in loss of $20.5 million, or 56%. We expect that our loss from operations will increase in 2006 due to the expected increases in R&D expenses and general and administrative expenses described above. Losses may fluctuate depending on the extent to which, if at all, we enter into collaborations or partnerships for one or more of our product candidates or licenses for our technologies. The extent of operating losses will also depend on our ability to raise funds from other sources, such as the capital markets, which will influence the amount we will spend on research and development and the development timelines for our product candidates.

We reported a net loss of $55.5 million in 2005 compared to a net loss of $35.6 million in 2004, an increase in net loss of $19.9 million or 56%, and a net loss per share of $0.99 and $0.69 in 2005 and 2004, respectively.

**Years Ended December 31, 2004 and 2003**

**Revenue**

We recognized license revenue of $742,000 for the year ended December 31, 2004 compared to $660,000 for the year ended December 31, 2003. The increase in license revenue was due to license agreements into which we entered during this period related to our NF-κB technology and our ARGENT cell-signaling regulation technology.

**Operating Expenses**

*Research and Development Expenses*

R&D expenses increased by $12.8 million, or 86%, from $14.9 million in 2003 to $27.7 million in 2004. Our R&D expenses for 2004 as compared to 2003 were as follows:

| | Year ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| *In thousands* | | **2004** | | **2003** | | **Increase/(decrease)** |
| Direct external expenses: | | | | | | |
| Clinical programs | $ | 11,542 | $ | 2,540 | $ | 9,002 |
| Preclinical programs | | 3,494 | | 1,246 | | 2,248 |
| All other R&D expenses | | 12,675 | | 11,103 | | 1,572 |
| | $ | 27,711 | $ | 14,889 | $ | 12,822 |

AP23573 was our only clinical program in 2004 and 2003. Direct external expenses for AP23573 increased by $9.0 million in 2004 as compared to 2003 due primarily to increases in clinical trial costs ($3.3 million) and manufacturing-related costs ($4.6 million). In 2004, we continued to manage our ongoing Phase 1 trials of AP23573, initiated additional Phase 1 trials and commenced enrollment of patients in Phase 2 trials. The increase in clinical trial costs is directly related to the initiation of trials, increased enrollment, the costs of evaluating enrolled patients, the costs of managing the trials, laboratory costs and the costs of compiling and analyzing results obtained in the trials. Manufacturing costs include product and process development work, as well as the costs to produce drug product. Manufacturing costs for AP23573 increased significantly in 2004 due to an increase in the quantities of drug product manufactured for the clinical trials and investments in manufacturing process development.

Preclinical programs consist primarily of our oncogenic kinase inhibitor program and our bone-targeted mTOR inhibitor program. Direct external expenses on preclinical programs will increase or decrease over time depending on the status and number of programs in this stage of development. Direct external expenses for preclinical programs increased by $2.2 million in 2004 as compared to 2003 due to pharmacology and toxicology studies conducted by outside contract laboratories, particularly in the first half of 2004, as well as product and process development efforts for these product candidates.

All other R&D expenses increased by $1.6 million in 2004 as compared to 2003 due to higher personnel and related costs ($1.4 million) as a result of an increase in the number of personnel and salary adjustments, and miscellaneous increases in supplies, consulting fees, equipment maintenance costs and travel-related expenses in support of our research and development programs. Increases in these expenses were partially offset by decreases in write-offs of capitalized license and patent costs ($433,000) and termination or buy-out of equipment leases in 2003 ($229,000).

-31-

*General and Administrative Expenses*

General and administrative expenses increased 70% to $9.4 million in 2004 from $5.5 million in 2003. Professional fees increased by $2.3 million to $4.2 million in 2004 as compared to $1.9 million in 2003 due primarily to costs related to our patent infringement litigation with Lilly and to business development and other corporate initiatives, including compliance with the internal control requirements of the Sarbanes-Oxley Act of 2002. The increase in general and administrative expenses was also due to the awarding in January 2004 of restricted stock grants, to our chief executive officer and each of the other members of our Board of Directors. In 2004, we recorded an expense of $1.3 million related to these awards. Other increases in general and administrative expenses included salary adjustments, the cost of awards under our deferred executive compensation plan, and miscellaneous increases in insurance, state taxes and travel-related expenses.

*Interest Income/Expense*

Interest income increased by 214% to $1.1 million in 2004 from $353,000 in 2003, primarily as a result of a higher level of funds invested in 2004.

Interest expense decreased by 10% to $272,000 in 2004 from $303,000 in 2003, primarily as a result of lower average loan balances in 2004.

*Operating Results*

We reported a loss from operations of $36.4 million in 2004 compared to a loss from operations of $19.8 million in 2003, an increase in loss of $16.6 million, or 84%.

We reported a net loss of $35.6 million in 2004 compared to a net loss of $19.7 million in 2003, an increase in net loss of $15.9 million or 80%, and a net loss per share of $0.69 and $0.51 in 2004 and 2003, respectively.

**Selected Quarterly Financial Data**

Summarized unaudited quarterly financial data are as follows:

| *In thousands, except per share amounts* | 2005 Quarters | | | |
|---|---|---|---|---|
| | **First** | **Second** | **Third** | **Fourth** |
| Total license revenue | $    304 | $    350 | $    321 | $    242 |
| Net loss | (12,346) | (14,083) | (14,594) | (14,459) |
| Net loss per share | (0.23) | (0.27) | (0.25) | (0.23) |

| | 2004 Quarters | | | |
|---|---|---|---|---|
| | **First** | **Second** | **Third** | **Fourth** |
| Total license revenue | $    190 | $    188 | $    185 | $    179 |
| Net loss | (6,235) | (9,245) | (9,379) | (10,714) |
| Net loss per share | (0.13) | (0.18) | (0.18) | (0.20) |

**Liquidity and Capital Resources**

We have financed our operations and investments primarily through offerings of our common stock and, to a lesser extent, through issuances of our common stock pursuant to our stock option and employee stock purchase plans, supplemented by the issuance of long-term debt. We sell securities and incur debt when the terms of such transactions are deemed favorable by us and as necessary to fund our current and projected cash needs. We seek to balance the level of cash, cash equivalents and marketable securities on hand with our projected needs and to allow us to withstand periods of uncertainty relative to the availability of funding on favorable terms.

*Sources of Funds*

During the years ended December 31, 2005, 2004 and 2003, our sources of funds were as follows:

| | Year ended December 31, | | |
|---|---|---|---|
| *In thousands* | **2005** | **2004** | **2003** |
| Sales/issuances of common stock: | | | |
|     In common stock offerings | $ 57,860 | $ 40,001 | $ 56,180 |
|     Pursuant to stock option and employee stock purchase plans | 970 | 2,382 | 964 |
| Proceeds from long-term borrowings | - | 3,000 | 9,500 |
| | $ 58,830 | $ 45,383 | $ 66,644 |

The amount of funding we raise through sales of our common stock depends on many factors, including, but not limited to, the status and progress of our product development programs, projected cash needs, availability of funding from other sources, our stock price and the status of the capital markets. In 2003, we completed three offerings of our common stock and realized net proceeds of $56.2 million. In 2004 and 2005, we completed underwritten offerings of our common stock for net proceeds of $40.0 million and $57.9 million, respectively. The following table details our common stock offerings in 2003, 2004 and 2005:

| | Number of Shares | Price Per Share | Net Cash Proceeds |
|---|---|---|---|
| | | | *In thousands* |
| **2003** | | | |
| May | 4,000,000 | $ 2.50 | $ 9,338 |
| October | 6,438,113 | 6.35 | 38,094 |
| December | 1,175,375 | 8.00 | 8,748 |
| | 11,613,488 | | $ 56,180 |
| **2004** | | | |
| March | 5,060,000 | 8.50 | $ 40,001 |
| | | | |
| **2005** | | | |
| August | 8,625,000 | 7.20 | $ 57,860 |

We have filed shelf registration statements with the SEC, from time to time, to ensure that we have registered shares of our common stock available for sale, giving us the opportunity to raise funding when terms are favorable. On December 19, 2003, we filed a shelf registration statement with the SEC for the issuance of up to 7,000,000 shares of our common stock, which was declared effective on January 9, 2004. As of December 31, 2005, after selling 5,060,000 of these shares in our March 2004 offering, we have 1,940,000 shares available for issuance under this shelf registration. On February 18, 2005, we filed another shelf registration statement with the SEC which was amended on March 11, 2005 for the issuance of up to 9,500,000 shares of our common stock. This filing was declared effective on March 14, 2005. As of December 31, 2005, after selling 8,625,000 of these shares in our August 2005 offering, we have 875,000 shares available for issuance under this shelf registration.

In March 2003, we entered into a term loan agreement with a bank for $7.5 million, the proceeds of which were used to repay existing long-term debt, to pay off our obligations under certain operating leases for equipment and for general working capital purposes. The loan is secured by all of our assets excluding intellectual property, which we have agreed not to pledge to any other party. The loan carries interest at the bank's prime rate or LIBOR plus 2%. We amended the terms of the loan on December 31, 2003 and December 31, 2004, receiving another $2.0 million and $3.0 million, respectively, in loan proceeds. The amended loan is payable in monthly installments of $160,000 plus interest beginning in January 2005 with a final payment of $3.5 million due in March 2008. The terms of the loan require us to maintain at least $13.0 million in unrestricted cash, cash equivalents and investments. The agreement also contains certain covenants that restrict additional indebtedness, additional liens, and sales of assets, and dividends, distributions or repurchases of common stock. The balance outstanding as of December 31, 2005 was $7,655,000.

*Uses of Funds*

The primary uses of our cash are to fund our operations and working capital requirements and, to a lesser degree, to repay our long-term borrowings and invest in intellectual property and property and equipment as needed for our business. Our uses of cash during the years ended December 31, 2005, 2004 and 2003 were as follows:

| | | Year ended December 31, | | | | |
|---|---|---|---|---|---|---|
| *In thousands* | | **2005** | | **2004** | | **2003** |
| Net cash used in operating activities | $ | 44,556 | $ | 31,559 | $ | 18,014 |
| Repayment of long-term borrowings | | 1,920 | | 1,800 | | 8,040 |
| Investment in intangible assets | | 675 | | 730 | | 507 |
| Investment in property and equipment | | 6,538 | | 2,743 | | 307 |
| | $ | 53,689 | $ | 36,832 | $ | 26,868 |

The net cash used in operating activities is comprised of our net losses and working capital requirements. As noted above, our net loss increased in 2004 and 2005 due primarily to the increased costs of advancing our product candidates through preclinical and clinical phases of development. Also as noted above, we expect that our loss from operations will increase in 2006 due to continued progress in development of our product candidates, and we expect that our net cash used in operations will increase accordingly. We expect that our investment in intangible assets, consisting of our intellectual property, will increase in 2006 in support of our product development activities. Our investment in property and equipment increased in 2005 primarily due to a renovation project to create more useable space in our facility and an upgrade to our information technology infrastructure. We expect that our investment in property and equipment will decrease in 2006.

**Contractual Obligations**

We have substantial fixed contractual obligations under various research and licensing agreements, consulting and employment agreements, lease agreements and long-term debt instruments. These contractual obligations were comprised of the following as of December 31, 2005:

| *In thousands* | | Payments Due By Period | | | |
|---|---|---|---|---|---|
| | Total | In 2006 | 2007 through 2009 | 2010 through 2011 | After 2011 |
| Long-term debt | $ 7,655 | $ 1,920 | $ 5,735 | $ | $ |
| Operating leases | 871 | 550 | 321 | | |
| Other long-term obligations | 14,948 | 4,800 | 8,527 | 1,226 | 395 |
| | $ 23,474 | $ 7,270 | $ 14,583 | $ 1,226 | $ 395 |

Long-term debt consists of scheduled principal payments on such debt. Interest on our long-term debt is based on variable interest rates. Assuming a constant interest rate of 6.28%, our average interest rate on our debt at December 31, 2005, over the remaining term of the debt, our interest expense would total approximately $420,000 in 2006 and $357,000 in the period 2007 through 2009.

Other long-term obligations are comprised primarily of employment agreements, obligations under our deferred executive compensation plans and license agreements. The license agreements generally provide for payment by us of annual license fees, milestone payments and royalties upon successful commercialization of products. All license agreements are cancelable by us. The above table reflects remaining license fees for the lives of the agreements but excludes milestone and royalty payments, as such amounts are not probable or estimable at this time.

**Liquidity**

At December 31, 2005, we had cash, cash equivalents and marketable securities totaling $81.5 million and working capital of $66.0 million, compared to cash, cash equivalents and marketable securities totaling $75.5 million and working capital of $68.9 million at December 31, 2004.

We will require substantial additional funding for our research and development programs, including preclinical development and clinical trials, for operating expenses including intellectual property protection and enforcement, for the pursuit of regulatory approvals, and for establishing manufacturing, marketing and sales capabilities. In order to fund our needs, we may (1) sell common stock through public or private offerings as market conditions permit, (2) enter into partnerships for our product candidates, and/or (3) license our cell-signaling technologies, including our ARGENT and NF-ºB intellectual property. We have available 2,815,000 shares of our common stock under currently effective shelf registration statements, which may be sold to raise funding.

We believe that our cash, cash equivalents and marketable securities should be sufficient to satisfy our capital and operating requirements into mid 2007. However, there are numerous factors that are likely to affect our spending levels, including the timing of the start of the initial registration trial for AP23573, the timing of product and process development work for AP23573, the manufacture of drug product for clinical trials and potential product launch, if approved, developments in our ongoing clinical trials, the timing and terms of a partnership, if any, to commercialize AP23573 outside of the U.S., the status of our in-house efforts to prepare for the potential launch of AP23573 in the U.S., the progress of our preclinical programs, and developments in our NF-$\kappa$B litigation, among other factors. These variables could result in earlier depletion of our current funds. In any event, we expect to need additional funding in order to pursue our business plan, which we will seek to raise through the sale of additional securities, collaborative partnerships, and possible additional credit arrangements. There can be no assurance, however, that adequate resources will be available when needed or on terms acceptable to us.

**Recently Issued Accounting Pronouncements**

In December 2004, the Financial Accounting Standards Board, or FASB, issued SFAS No. 123(R), *Share-Based Payment*, which revised SFAS No. 123 and superseded APB Opinion No. 25, *Accounting for Stock Issued to Employees* . SFAS No. 123(R) requires that companies recognize compensation expense associated with grants of stock options and other equity instruments to employees in the financial statements, effective as of the first annual reporting period that begins after June 15, 2005. Compensation cost will be measured based on the fair value of the instrument on the grant date and will be recognized over the vesting period. This pronouncement applies to all grants after the effective date and to the unvested portion of stock options outstanding as of the effective date. SFAS No. 123(R) eliminates the ability to account for such transactions using the intrinsic method currently used by us. We are required to adopt SFAS No. 123(R) as of January 1, 2006. We expect to adopt SFAS 123(R) using the modified prospective application method. Assuming the continuation of current programs, our estimate of stock compensation expense for 2006 is in the range of $4.5 million to $5.0 million. SFAS No. 123(R) also requires that companies recognize compensation expense associated with purchases of shares of common stock by employees at a discount to market value under employee stock purchase plans that meet certain criteria. The impact of this requirement on the Company's consolidated financial statements is not expected to be material.

## ITEM 7A:    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We invest our available funds in accordance with our investment policy to preserve principal, maintain proper liquidity to meet operating needs and maximize yields. Our investment policy specifies credit quality standards for our investments and limits the amount of credit exposure to any single issue, issuer or type of investment.

We invest cash balances in excess of operating requirements first in short-term, highly liquid securities, with original maturities of 90 days or less, and money market accounts. Depending on our level of available funds and our expected cash requirements, we may invest a portion of our funds in marketable securities, consisting generally of corporate debt and U.S. government and agency securities. Maturities of our marketable securities are generally limited to periods necessary to fund our liquidity needs and may not in any case exceed three years. These securities are classified as available-for-sale. Available-for-sale securities are recorded on the balance sheet at fair market value with unrealized gains or losses reported as a separate component of stockholders' equity (accumulated other comprehensive income or loss). Realized gains and losses on marketable security transactions are reported on the specific-identification method. Interest income is recognized when earned. A decline in the market value of any available-for-sale security below cost that is deemed other than temporary results in a charge to earnings and establishes a new cost basis for the security.

Our investments are sensitive to interest rate risk. We believe, however, that the effect, if any, of reasonably possible near-term changes in interest rates on our financial position, results of operations and cash flows generally would not be material due to the current short-term nature of these investments. In particular, at December 31, 2005, because our available funds were invested solely in cash equivalents and short-term marketable securities with maturities of 12 months or less, our risk of loss due to changes in interest rates is not material.

We have an executive compensation plan which provides participants an option to purchase certain designated mutual funds at a discount. These deferred compensation arrangements are accounted for as derivatives under SFAS No. 133. The fair value of the derivatives is reflected as a liability on our balance sheet. Effective October 1, 2005, we adopted a new executive compensation plan that defers the payment of annual bonus awards to future periods as specified in each award. We accrue a liability based on the fair value of the awards ratably over the vesting period. The fair value of such awards is increased or decreased based on the actual total return of certain underlying mutual funds. As of December 31, 2005, in the event of a hypothetical 10% increase (decrease) in the fair market value of the underlying mutual funds, we would incur approximately $133,000 of additional (reduced) compensation expense.

At December 31, 2005, we had $7.7 million outstanding under a bank term note which bears interest at prime or, alternatively, LIBOR +2%. This note is sensitive to changes in interest rates. In the event of a hypothetical 10% increase in the interest rate on which the loan is based (63 basis points at December 31, 2005), we would incur approximately $42,000 of additional interest expense in 2006.

**Certain Factors That May Affect Future Results of Operations**

The SEC encourages companies to disclose forward-looking information so that investors can better understand a company's future prospects and make informed investment decisions. This Annual Report on Form 10-K contains such "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These statements may be made directly in this Annual Report, and they may also be made a part of this Annual Report by reference to other documents filed with the SEC, which is known as "incorporation by reference."

Such statements in connection with any discussion of future operating or financial performance may be identified by use of words such as "may," "anticipate," "estimate," "expect," "project," "intend," "plan," "believe," and other words and terms of similar meaning. Such statements are based on management's expectations and are subject to certain factors, risks and uncertainties that may cause actual results, outcome of events, timing and performance to differ materially from those expressed or implied by such forward-looking statements. These risks include, but are not limited to, risks and uncertainties regarding our ability to accurately estimate the timing and actual R&D expenses and other costs associated with the preclinical and clinical development and manufacture of our product candidates, the adequacy of our capital resources and the availability of additional funding, risks and uncertainties regarding our ability to manufacture or have manufactured our product candidates on a commercial scale, risks and uncertainties regarding our ability to successfully enroll and conduct clinical studies of product candidates, risks and uncertainties that clinical trial results at any phase of development may be adverse or may not be predictive of future results or lead to regulatory approval of any of our or any partner's product candidates, risks and uncertainties of third-party intellectual property claims relating to our and any partner's product candidates, and risks and uncertainties relating to regulatory oversight, the timing, scope, cost and outcome of legal proceedings, including litigation concerning our NF-$\kappa$B patent portfolio, future capital needs, key employees, dependence on collaborators and manufacturers, markets, economic conditions, products, services, prices, reimbursement rates, competition and other factors. Please also see the discussion under Part I, Item 1A: Risk Factors appearing elsewhere in this Annual Report for more details regarding these and other risks.

In light of these assumptions, risks and uncertainties, the results and events discussed in the forward-looking statements contained in this Annual Report or in any document incorporated by reference might not occur. Stockholders are cautioned not to place undue reliance on the forward-looking statements, which speak only as of the date of this report or the date of the document incorporated by reference in this Annual Report. We are not under any obligation, and we expressly disclaim any obligation, to update or alter any forward-looking statements, whether as a result of new information, future events or otherwise. All subsequent forward-looking statements attributable to us or to any person acting on our behalf are expressly qualified in their entirety by the cautionary statements contained or referred to in this section.

ITEM 8:  FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of
ARIAD Pharmaceuticals, Inc.:

We have audited the accompanying consolidated balance sheets of ARIAD Pharmaceuticals, Inc. and subsidiaries (the "Company") as of December 31, 2005 and 2004, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2005. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of ARIAD Pharmaceuticals, Inc. and subsidiaries as of December 31, 2005 and 2004, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2005, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of the Company's internal control over financial reporting as of December 31, 2005, based on the criteria established in Internal Control--Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission, and our report dated March 13, 2006 expressed an unqualified opinion on management's assessment of the effectiveness of the Company's internal control over financial reporting and an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

/s/ DELOITTE & TOUCHE LLP

Boston, Massachusetts
March 13, 2006

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

|  | December 31, | |
|---|---|---|
| *In thousands, except share and per share data* | **2005** | **2004** |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 25,453 | $ 18,556 |
| Marketable securities | 56,063 | 56,950 |
| Inventory and other current assets | 2,225 | 1,965 |
| Total current assets | 83,741 | 77,471 |
| Property and equipment: | | |
| Leasehold improvements | 17,840 | 12,693 |
| Equipment and furniture | 9,908 | 6,525 |
| Construction in progress |  | 2,049 |
| Total | 27,748 | 21,267 |
| Less accumulated depreciation and amortization | (20,022) | (18,031) |
| Property and equipment, net | 7,726 | 3,236 |
| Intangible and other assets, net | 4,707 | 6,482 |
| Total assets | $ 96,174 | $ 87,189 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 3,961 | $ 2,129 |
| Current portion of long-term debt | 1,920 | 1,920 |
| Accrued compensation and benefits | 497 | 310 |
| Accrued product development expenses | 8,444 | 2,934 |
| Other accrued expenses | 2,097 | 591 |
| Current portion of deferred revenue | 851 | 713 |
| Total current liabilities | 17,770 | 8,597 |
| Long-term debt | 5,735 | 7,655 |
| Deferred revenue | 24 | 404 |
| Deferred executive compensation | 1,267 | 3,093 |
| Commitments, contingent liabilities and minority interest (Note 1, 6, 7, 10) | | |
| Stockholders' equity: | | |
| Preferred stock, authorized, 10,000,000 shares, none issued and outstanding | | |
| Common stock, $.001 par value, authorized, 145,000,000 shares, issued and | | |
| outstanding, 61,698,129 shares in 2005, 52,688,673 shares in 2004 | 62 | 53 |
| Additional paid-in capital | 318,684 | 259,122 |
| Deferred compensation | (246) | (58) |
| Accumulated other comprehensive loss | (24) | (61) |
| Accumulated deficit | (247,098) | (191,616) |
| Total stockholders' equity | 71,378 | 67,440 |
| Total liabilities and stockholders' equity | $ 96,174 | $ 87,189 |

See notes to consolidated financial statements.

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| *In thousands, except share and per share data* | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2005** | **2004** | **2003** |
| License revenue | $ 1,217 | $ 742 | $ 660 |
| Operating expenses: | | | |
| Research and development | 45,916 | 27,711 | 14,889 |
| General and administrative | 12,261 | 9,442 | 5,547 |
| Operating expenses | 58,177 | 37,153 | 20,436 |
| Loss from operations | (56,960) | (36,411) | (19,776) |
| Other income (expense): | | | |
| Interest income | 1,900 | 1,110 | 353 |
| Interest expense | (422) | (272) | (303) |
| Other income, net | 1,478 | 838 | 50 |
| Net loss | $ (55,482) | $ (35,573) | $ (19,726) |
| Net loss per share | $ (0.99) | $ (0.69) | $ (0.51) |
| Weighted average number of shares of common stock outstanding | 56,283,948 | 51,294,160 | 39,036,073 |

See
See  See notes to consolidated financial statements.

-40-

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**For the Years Ended December 31, 2003, 2004 and 2005**

| *In thousands, except share data* | Common Stock Shares | Amount | Additional Paid-in Capital | Deferred Compensati | Accumulated Other Comprehensive Income (Loss) | Accumulate Deficit | Shareholder Equity |
|---|---|---|---|---|---|---|---|
| Balance, December 31, 2002 | 34,828,689 $ | 35 $ | 158,147 $ | (13) $ | -- $ | (136,317) $ | 21,852 |
| Issuance of common stock, net of issuance costs | 11,613,488 | 12 | 56,168 | | | | 56,180 |
| Issuance of shares pursuant to ARIAD stock plans | 374,855 | | 964 | | | | 964 |
| Stock-based compensation to consultants | | | 64 | (64) | | | |
| Amortization of stock-based compensation | | | | 55 | | | 55 |
| Comprehensive loss: | | | | | | | |
| Net loss | | | | | | (19,726) | (19,726) |
| Other comprehensive income (loss) | | | | | | | |
| Net unrealized losses on marketable securities | | | | | 1 | | 1 |
| Comprehensive loss | | | | | | | (19,725) |
| Balance, December 31, 2003 | 46,817,032 | 47 | 215,343 | (22) | 1 | (156,043) | 59,326 |
| Issuance of common stock, net of issuance costs | 5,060,000 | 5 | 39,996 | | | | 40,001 |
| Issuance of shares pursuant to ARIAD stock plans | 811,641 | 1 | 3,689 | | | | 3,690 |
| Stock-based compensation to consultants | | | 94 | (94) | | | |
| Amortization of stock-based compensation | | | | 58 | | | 58 |
| Comprehensive loss: | | | | | | | |
| Net loss | | | | | | (35,573) | (35,573) |
| Other comprehensive income (loss) | | | | | | | |
| Net unrealized gains on marketable securities | | | | | (62) | | (62) |
| Comprehensive loss | | | | | | | (35,635) |
| Balance, December 31, 2004 | 52,688,673 | 53 | 259,122 | (58) | (61) | (191,616) | 67,440 |
| Issuance of common stock, net of issuance costs | 8,625,000 | 9 | 57,851 | | | | 57,860 |
| Issuance of shares pursuant to ARIAD stock plans | 384,456 | | 1,512 | | | | 1,512 |
| Stock-based compensation to consultants | | | 213 | (213) | | | |
| Amortization of stock-based compensation | | | (14) | 25 | | | 11 |
| Comprehensive loss: | | | | | | | |
| Net loss | | | | | | (55,482) | (55,482) |
| Other comprehensive income (loss) | | | | | | | |
| Net unrealized losses on marketable securities | | | | | 37 | | 37 |
| Comprehensive loss | | | | | | | (55,445) |
| Balance, December 31, 2005 | 61,698,129 $ | 62 $ | 318,684 $ | (246) $ | (24) $ | (247,098) $ | 71,378 |

See notes to consolidated financial statements.

ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS

| | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| *In thousands* | | 2005 | | 2004 | | 2003 |
| **Cash flows from operating activities:** | | | | | | |
| Net loss | $ | (55,482) | $ | (35,573) | $ | (19,726) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | | | |
| Depreciation and amortization | | 1,970 | | 911 | | 1,602 |
| Stock-based compensation | | 554 | | 1,366 | | 55 |
| Deferred executive compensation expense | | 374 | | 800 | | 444 |
| Increase (decrease) from: | | | | | | |
| Inventory and other current assets | | (260) | | (1,431) | | 313 |
| Other assets | | 6 | | 15 | | 21 |
| Accounts payable | | 1,832 | | 1,376 | | (1,391) |
| Accrued compensation and benefits | | 187 | | (156) | | 67 |
| Accrued product development expenses | | 5,510 | | 2,054 | | (126) |
| Other accrued expenses | | 1,506 | | (454) | | (265) |
| Deferred revenue | | (242) | | (216) | | 1,100 |
| Deferred executive compensation paid | | (511) | | (251) | | (108) |
| Net cash used in operating activities | | (44,556) | | (31,559) | | (18,014) |
| **Cash flows from investing activities:** | | | | | | |
| Acquisitions of marketable securities | | (58,888) | | (58,259) | | (32,296) |
| Proceeds from sales and maturities of marketable securities | | 60,644 | | 16,590 | | 17,344 |
| Investment in property and equipment | | (6,538) | | (2,743) | | (307) |
| Investment in intangible assets | | (675) | | (730) | | (507) |
| Net cash used in investing activities | | (5,457) | | (45,142) | | (15,766) |
| **Cash flows from financing activities:** | | | | | | |
| Proceeds from long-term debt borrowings | | | | 3,000 | | 9,500 |
| Repayment of long-term debt borrowings | | (1,920) | | (1,800) | | (8,040) |
| Proceeds from issuance of common stock, net of issuance costs | | 57,860 | | 40,001 | | 56,180 |
| Proceeds from issuance of common stock pursuant to stock option and purchase plans | | 970 | | 2,382 | | 964 |
| Net cash provided by financing activities | | 56,910 | | 43,583 | | 58,604 |
| Net increase (decrease) in cash and cash equivalents | | 6,897 | | (33,118) | | 24,824 |
| Cash and cash equivalents, beginning of year | | 18,556 | | 51,674 | | 26,850 |
| Cash and cash equivalents, end of year | $ | 25,453 | $ | 18,556 | $ | 51,674 |
| | | | | | | |
| Interest paid, net of amounts capitalized | $ | 333 | $ | 273 | $ | 256 |

See notes to consolidated financial statements.

-42-

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1.    Nature of Business and Summary of Significant Accounting Policies**

*Nature of Business*

The Company is engaged in the discovery and development of breakthrough medicines to treat cancers by regulating cell signaling with small molecules. The Company is developing a comprehensive approach to patients with cancer that addresses the greatest medical need - aggressive and advanced-stage cancers for which current treatments are inadequate. The Company's goal is to build a fully integrated oncology company focused on novel, molecularly targeted therapies to treat solid tumors and hematologic cancers, as well as the spread of primary tumors to distant sites. The Company's lead cancer product candidate, AP23573, has been or is being studied in multiple clinical trials in patients with various types of cancers, including sarcomas, hormone refractory prostate cancer, endometrial cancer, brain cancer and leukemias and lymphomas. Medinol Ltd. is also developing stents to deliver AP23573 to prevent reblockage at sites of vascular injury following stent-assisted angioplasty.

The Company has a focused drug discovery program centered on small molecule, molecularly targeted therapies and cell-signaling pathways implicated in cancer. The Company also has an exclusive license to pioneering technology and patents related to certain NF-$\kappa$B cell-signaling activity, which may be useful in treating certain diseases. Additionally, the Company has developed a proprietary portfolio of cell-signaling regulation technologies, the Company's ARGENT technology, to control intracellular processes with small molecules, which may be useful in the development of therapeutic vaccines and gene and cell therapy products, and which provide versatile tools for use in cell biology, functional genomics and drug discovery research.

*Principles of Consolidation*

The consolidated financial statements include the accounts of ARIAD Pharmaceuticals, Inc., its wholly-owned subsidiaries, ARIAD Corporation and ARIAD Pharma S.A., and its 80%-owned subsidiary ARIAD Gene Therapeutics, Inc. ("AGTI") (Note 7). The Company's research and development relating to product candidates based on its ARGENT cell-signaling regulation technology and its small molecule mTOR inhibitors derived from the ARGENT programs are conducted on behalf of AGTI. Intercompany accounts and transactions have been eliminated in consolidation. AGTI is a research and development company and its accumulated deficit exceeds its total paid-in capital at December 31, 2005. Because the Company funds all losses of AGTI and the minority interest holders of AGTI common stock are not obligated to fund such losses, no minority interest income/gain or asset is recorded in the Company's consolidated financial statements.

*Fair Value of Financial Instruments*

The carrying amounts of cash, cash equivalents, accounts payable and accrued liabilities approximate fair value because of their short-term nature. Marketable securities are recorded in the consolidated financial statements at aggregate fair value (Note 2). The carrying amount of the Company's bank term note of $7.7 million at December 31, 2005 approximates fair value due to its variable interest rate (Note 4). The Company's obligation under its executive compensation plans (Note 5) is based in part on the current fair market value of underlying securities, which is therefore stated at its estimated current fair value.

*Accounting Estimates*

The preparation of the consolidated financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts and disclosure of assets and liabilities at the date of the consolidated financial statements and the reported amounts and disclosure of revenue and expenses during the reporting period. Actual results could differ from those estimates.

*Cash Equivalents*

Cash equivalents include short-term, highly liquid investments, which consist principally of United States government and agency securities, purchased with remaining maturities of 90 days or less, and money market accounts.

*Marketable Securities*

The Company has classified its marketable securities as "available-for-sale" and, accordingly, carries such securities at aggregate fair value. The difference between fair value and original cost is reflected as a component of accumulated other comprehensive income (loss). Fair value has been determined based on quoted market prices, in a dealer market, at the closing bid for each individual security held.

*Inventory*

Inventory consists of bulk pharmaceutical material to be used for multiple development programs. Inventories are carried at cost using the first-in, first-out method and are charged to research and development expense when consumed. The carrying value of inventory amounted to $1.7 million and $1.3 million at December 31, 2005 and 2004, respectively.

*Property and Equipment*

Property and equipment are recorded at cost. Depreciation is recorded using the straight-line method over the estimated useful lives of the assets (3 to 10 years). Leasehold improvements are amortized over the shorter of their useful lives or lease term using the straight-line method (4 to 10 years). Costs classified as construction in progress are accumulated and are not amortized or depreciated until placed in service. The Company capitalized approximately $42,000 of interest costs related to construction in progress in 2005. No interest was capitalized in 2004 or 2003.

*Intangible and Other Assets*

Intangible and other assets consist primarily of capitalized patent and license costs, deposits and the unvested portion of the fair value of certain outstanding grants under the Company's executive compensation plan (Note 5). The cost of purchased patents and patent applications, costs incurred in filing patents and certain license fees are capitalized. Capitalized costs related to issued patents are amortized over a period not to exceed seventeen years or the remaining life of the patent, whichever is shorter, using the straight-line method. Capitalized license fees are amortized over the periods to which they relate. In addition, capitalized costs are expensed when it becomes determinable that such patent applications or technology will not be pursued.

-44-

*Impairment of Long-Lived Assets*

The Company reviews its long-lived assets, including the above-mentioned intangible assets, for impairment when events or changes in circumstances indicate that the carrying amount of a long-lived asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to future net cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets.

*Revenue Recognition*

The Company recognizes revenue in accordance with the Securities and Exchange Commission ("SEC") Staff Accounting Bulletin ("SAB") No. 101, *Revenue Recognition in Financial Statements,* SAB No. 104, *Revenue Recognition* , and Emerging Issues Task Force ("EITF"), No. 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables.* Revenue is principally comprised of license fees received under agreements that provide the licensee with access to and/or the right to review and evaluate certain technology owned or controlled by the Company. Upfront and annual license fees are recorded as deferred revenue upon receipt and recognized as revenue on a systematic basis over the period of time they are earned in accordance with the terms of the agreements. Such agreements may also include milestone and royalty payments. Such payments are recognized as revenue when earned in accordance with the terms of the related agreements.

*Income Taxes*

The Company accounts for income taxes in accordance with Statement of Financial Accounting Standard ("SFAS") No. 109, *Accounting for Income Taxes,* which requires an asset and liability approach to financial accounting and reporting for income taxes. Deferred income tax assets and liabilities are computed annually for differences between financial statement basis and the income tax basis of assets and liabilities that will result in taxable or deductible amounts in the future. Such deferred income tax computations are based on enacted tax laws and rates applicable to the years in which the differences are expected to affect taxable income. A valuation allowance is established when it is necessary to reduce deferred income tax assets to the expected realized amounts (Note 9).

*Segment Reporting*

The Company organizes itself into one segment reporting to the chief executive officer. No significant revenues from product sales or services occurred in 2005, 2004 or 2003.

*Stock-Based Compensation*

SFAS No. 123, *Accounting for Stock-Based Compensation*, addresses the financial accounting and reporting standards for stock or other equity-based compensation arrangements. The Company accounts for stock or other equity-based compensation for non-employees under the fair value-based method as required by SFAS No. 123 and EITF No. 96-18, *Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services* and other related interpretations. Under this method, the equity-based instrument is valued at either the fair value of the consideration received or the equity instrument issued on the date of grant. The resulting compensation cost is recognized and charged to operations over the service period, which is usually the vesting period. The unearned portion of these awards is classified as a component of stockholders' equity and is listed as "deferred compensation" on the consolidated balance sheet.

The Company uses the intrinsic value method to measure compensation expense associated with grants of stock options to employees. Since options are granted to employees with exercise prices equal to the fair market value of the Company's common stock on the date of grant, there was no expense included in the statement of operations for the years ended December 31, 2005, 2004 and 2003 related to employee stock options. On a *pro forma* basis, had the Company used the fair value method to measure compensation, the net loss and net loss per share would have been reported as follows:

| | Years ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| *In thousands (except per share data)* | | **2005** | | **2004** | | **2003** |
| Net loss, as reported | $ | (55,482) | $ | (35,573) | $ | (19,726) |
| Effect of stock options if valued at fair value | | (4,159) | | (4,026) | | (3,564) |
| *Pro forma* net loss | $ | (59,641) | $ | (39,599) | $ | (23,290) |
| | | | | | | |
| Net loss per share, as reported | $ | (0.99) | $ | (0.69) | $ | (0.51) |
| Effect of stock options if valued at fair value | | (.07) | | (0.08) | | (0.09) |
| *Pro forma* net loss per share | $ | (1.06) | $ | (0.77) | $ | (0.60) |

The above disclosure, required by SFAS No. 123, includes only the effect of grants made subsequent to January 1, 1996. For purposes of calculating the above disclosure, the fair value of options on their grant date was measured using the Black-Scholes option pricing model. Key assumptions used to apply this pricing model included a risk-free interest rate of 4.17% for 2005, 3.71% for 2004 and 3.42% for 2003, expected lives of the option grants ranging from one to eight years and expected rates of volatility for the underlying stock of 101% for 2005, 112% for 2004 and 115% for 2003. Using this model, the weighted average fair value per option for all options granted to employees in 2005, 2004 and 2003 was $5.46, $6.02 and $2.88, respectively.

*Earnings Per Share*

Basic earnings per common share are computed using the weighted average number of common shares outstanding during each year. Diluted earnings per common share reflect the effect of the Company's outstanding options using the treasury stock method, except where such items would be anti-dilutive. In years in which a net loss is reported, basic and diluted per share amounts are the same. In 2005, 2004 and 2003, options amounting to 6,826,644, 5,889,532 and 5,647,839 shares of common stock, respectively, were not included in the computation of dilutive earnings per share, because the effect would be anti-dilutive. There were no warrants or convertible securities outstanding at December 31, 2005, 2004 or 2003.

*Executive Compensation Plan*

The Company maintains a deferred executive compensation plan, established in 1997 (the "1997 Plan"), which provides participants, in lieu of a cash bonus, an option to purchase certain designated mutual funds at a discount. EITF No. 02-8, *Accounting for Options Granted to Employees in Unrestricted, Publicly Traded Shares of an Unrelated Party* , and SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*  require that the Company account for such benefits as derivatives. Under these pronouncements, the Company records the fair value of the awards as an asset and a liability and amortizes the asset to expense over the vesting period of the awards. Subsequent changes in the fair value of the liability are included in the determination of net income or loss.

Effective October 1, 2005, the Company adopted a new deferred executive compensation plan (the "2005 Plan") that defers the payment of annual bonus awards to future periods as specified in each award. The Company accrues a liability based on the fair value of the awards ratably over the vesting period. The recorded balances of such awards are increased or decreased based on the actual total return of specified mutual funds.

*Recently Issued Accounting Pronouncements*

In December 2004, the Financial Accounting Standards Board ("FASB") issued SFAS No. 123(R), *Share-Based Payment*, which revised SFAS No. 123 and superseded Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* . SFAS No. 123(R) requires that companies recognize compensation expense associated with grants of stock options and other equity instruments to employees in the financial statements, effective as of the first annual reporting period that begins after June 15, 2005. Compensation cost will be measured based on the fair value of the instrument on the grant date and will be recognized over the vesting period. This pronouncement applies to all grants after the effective date and to the unvested portion of stock options outstanding as of the effective date. SFAS No. 123(R) eliminates the ability to account for such transactions using the intrinsic method currently used by the Company. The Company will be required to adopt SFAS No. 123(R) as of January 1, 2006. The Company expects to adopt SFAS No. 123(R) using the modified prospective application method. Assuming the continuation of current programs, the preliminary estimate of stock compensation expense for 2006 is in the range of $4.5 million to $5.0 million.

SFAS No. 123(R) also requires that companies recognize compensation expense associated with purchases of shares of common stock by employees at a discount to market value under employee stock purchase plans that meet certain criteria. The impact of this requirement on the Company's consolidated financial statements is not expected to be material.

**2.   Marketable Securities**

The Company has classified its marketable securities as available-for-sale and, accordingly, carries such securities at aggregate fair value. At December 31, 2005 and 2004, all of the Company's marketable securities consisted of United States Treasury or agency securities.

At December 31, 2005, the aggregate fair value and amortized cost of the Company's marketable securities were $56,063,000 and $56,087,000, respectively. Gross unrealized gains and losses were $9,000 and $33,000, respectively, at December 31, 2005. The gross unrealized losses of $33,000 pertain to fourteen marketable securities with an aggregate fair value of $35.6 million, all of which have been in a continuous loss position for less than twelve months.

At December 31, 2004, the aggregate fair value and amortized cost of the Company's marketable securities were $56,950,000 and $57,011,000, respectively. Gross unrealized gains and losses were $0 and $61,000, respectively, at December 31, 2004. The gross unrealized losses of $61,000 pertain to eighteen marketable securities with an aggregate fair value of $51.5 million, all of which have been in a continuous loss position for less than twelve months.

The Company's marketable securities with unrealized losses consist of U.S. Treasury and agency securities that are guaranteed by the U.S. government or an agency thereof. The unrealized losses were caused by increased interest rates. Because the Company has the intent and ability to hold the securities to maturity which should result in a recovery of the fair value, the Company does not consider the investments to be other-than-temporarily impaired.

Realized gains and losses on investment security transactions are reported on the specific-identification method. Realized gains and losses on sales of marketable securities were not material in 2005, 2004 and 2003. Changes in market values resulted in a decrease (increase) in net unrealized losses of $37,000, ($62,000) and $1,000 in 2005, 2004 and 2003, respectively.

**3.   Intangible and Other Assets, Net**

Intangible and other assets, net, were comprised of the following at December 31:

| *In thousands* | | 2005 | | 2004 |
|---|---|---|---|---|
| Capitalized patent and license costs | $ | 9,433 | $ | 8,796 |
| Less accumulated amortization | | (4,784) | | (4,067) |
| | | 4,649 | | 4,729 |
| Unvested deferred executive compensation (Note 5) | | 0 | | 1,690 |
| Other | | 58 | | 63 |
| | $ | 4,707 | $ | 6,482 |

Amortization expense for intangible assets amounted to $717,000, $697,000 and $692,000 in 2005, 2004 and 2003 respectively. In addition, the Company expensed unamortized patent and license costs of $43,000, $87,000 and $520,000 in 2005, 2004 and 2003, respectively, related to patent applications or technology no longer being pursued. The estimated future amortization expenses for capitalized patent and license costs are $720,000 for 2006, $690,000 for 2007, $444,000 for 2008, $354,000 for 2009 and $349,000 for 2010.

**4.   Long-Term Debt**

Long-term debt was comprised of the following at December 31:

| *In thousands* | | 2005 | | 2004 |
|---|---|---|---|---|
| Bank term note at prime rate or LIBOR +2% (average interest rate of 6.28% at December 31, 2005) payable in monthly installments of $160,000 plus interest, through March 2008 | $ | 7,655 | $ | 9,575 |
| Less current portion | | (1,920) | | (1,920) |
| | $ | 5,735 | $ | 7,655 |

In March 2003, the Company entered into a term loan agreement with a bank for $7.5 million, the proceeds of which were used to pay off then outstanding loans as well as remaining obligations under certain operating leases. Such repayments totaled $6.9 million in the aggregate. The loan is secured by a lien on all assets of the Company excluding intellectual property, which the Company has agreed not to pledge to any other party. This term loan agreement was amended on December 31, 2003 and on December 31, 2004 pursuant to which the Company received another $5.0 million in loan proceeds in the aggregate. The loan, as amended, is repayable in monthly installments of $160,000 plus interest with a balloon payment of $3.5 million in March 2008. The loan, as amended, requires the Company to maintain a minimum of $13.0 million in unrestricted cash, cash equivalents and investments. The agreement also contains certain covenants that restrict additional indebtedness, additional liens and sales of assets, and dividends, distributions or repurchases of common stock.

The annual aggregate future principal payments of the above loan, as amended, are $1.9 million in each of 2006 and 2007, and $3.8 million in 2008.

-48-

**5. Executive Compensation Plans**

Under the Company's deferred executive compensation plan established in 1997 (the "1997 Plan"), the Company recorded an asset and a liability on the date of grant equal to the fair value of awards granted under the 1997 Plan. The fair value of awards made in 2004 and 2003 under the 1997 Plan were $1.0 million and $930,000, respectively. The asset is amortized to expense over the vesting period and the liability is revalued and adjusted to fair value at each reporting period. Under the Company's 2005 Plan, the Company accrues a liability for the fair value of awards ratably over the vesting period. The value of awards made in 2005 under the 2005 Plan was $962,000.

Pursuant to an amendment to the 1997 Plan in 2005, the unvested balances as of December 31, 2004 of awards under the 1997 Plan were cancelled. The value of such unvested balances was transferred to the 2005 Plan and will be accounted for accordingly. The recorded asset and liability balances attributable to the 1997 Plan were adjusted to reflect the cancellation and transfer of unvested awards. The net expense for these plans was $374,000, $800,000 and $440,000 in 2005, 2004 and 2003, respectively. The estimated future expenses for awards made through December 31, 2005 are $858,000, $637,000, $372,000 and $183,000 for 2006, 2007, 2008 and 2009, respectively.

**6. Leases, Licensed Technology and Other Commitments**

*Facility Lease*

The Company conducts its operations in a 100,000 square foot office and laboratory facility under a non-cancelable operating lease. The original ten-year term of the lease expired in July 2002, and the Company has extended the lease for the first of two five-year extension periods. The Company currently subleases approximately 34,000 square feet of space to one tenant. Rent expense, net of sublease income of $1.3 million, $1.4 million and $1.4 million in 2005, 2004 and 2003 respectively, amounted to $620,000, $509,000 and $446,000 respectively. Future minimum annual rental payments through July 2007, the expiration of the first extension period, are $550,000 in 2006 and $321,000 in 2007, which are net of expected sublease income of $1.1 million in 2006 and $654,000 in 2007.

*Licensed Technology*

The Company and AGTI have entered into agreements with several universities under the terms of which the Company and/or AGTI have received exclusive licenses to technology and intellectual property. The agreements, which are generally cancelable by the Company and/or AGTI, provide for the payment of license fees and/or minimum payments, which are generally creditable against future royalties. Fees paid by the Company on behalf of the Company and/or AGTI amounted to $145,000, $238,000 and $165,000 in 2005, 2004 and 2003, respectively, and are expected to amount to approximately $145,000 annually in 2006 through 2010. In addition, the agreements provide for payments upon the achievement of certain milestones in product development. The agreements also require the Company to fund certain costs associated with the filing and prosecution of patent applications.

*Other Commitments*

The Company has entered into various employment agreements with 15 senior officers. The agreements provide for aggregate annual base salaries of $10.4 million and remaining terms of employment of up to three years.

**7. Stockholders' Equity**

*Preferred Stock*

The Company has authorized 10,000,000 shares of preferred stock which the Board of Directors is empowered to designate and issue in different series. At December 31, 2005, the Board of Directors had designated 500,000 shares as series A preferred stock, and 9,500,000 shares remained undesignated.

*Common Stock*

On May 19, 2003, the Company sold 4,000,000 registered shares of its common stock to institutional investors at a price of $2.50 per share and received gross proceeds of $10.0 million before commissions and expenses of $662,000. These shares were sold pursuant to previously filed shelf registration statements and under a related registration statement pursuant to SEC rules. No shares remain available for sale under those shelf registrations.

On July 3, 2003, the Company filed a shelf registration statement with the SEC for the issuance of up to 7,500,000 shares of its common stock. On October 8, 2003, the Company sold 6,438,113 registered shares of its common stock, registered pursuant to this shelf registration, to institutional investors at a price of $6.35 per share and received gross proceeds of $40.9 million before commissions and expenses of $2.8 million. On December 3, 2003, the Company sold 1,175,375 registered shares of its common stock, including 113,489 shares registered under a related registration statement pursuant to SEC rules, to institutional investors at a price of $8.00 per share and received gross proceeds of $9.4 million before commissions and expenses of $652,000. Following this sale, no shares remain available for sale under this shelf registration.

On December 19, 2003, the Company filed a shelf registration statement with the SEC for the issuance of up to 7,000,000 shares of its common stock. This filing was declared effective on January 9, 2004. On March 29, 2004, the Company sold 5,060,000 of these registered shares in an underwritten public offering at a price of $8.50 per share for net proceeds of $40.0 million. As of December 31, 2005, the Company has 1,940,000 shares available for issuance under this shelf registration.

On February 18, 2005, the Company filed a shelf registration statement with the SEC, which was amended on March 11, 2005, registering 9,500,000 shares of common stock. The filing was declared effective on March 14, 2005. On August 10, 2005 and August 18, 2005, the Company sold an aggregate of 8,625,000 of these registered shares in an underwritten public offering at a price of $7.20 per share for net proceeds of approximately $57.9 million. At December 31, 2005, the Company had 875,000 shares that remain available for issuance under this shelf registration.

*Stockholder Rights Plan*

The Board of Directors of the Company adopted a Rights Agreement, dated as of June 8, 2000 (the "2000 Rights Agreement"), between the Company and State Street Bank and Trust Company, as Rights Agent, and approved the declaration of a dividend distribution of one Preferred Share Purchase Right (a "Right") on each outstanding share of its Common Stock. In general, the Rights become exercisable if a person or group hereafter acquires 15% or more of the Common Stock of the Company or announces a tender offer for 15% or more of the Common Stock. The Board of Directors will, in general, be entitled to redeem the Rights at one cent per Right at any time before any such person hereafter acquires 15% or more of the outstanding Common Stock. The plan is designed to protect the Company's stockholders in the event that an attempt is made to acquire the Company without an offer of fair value.

If a person hereafter acquires 15% or more of the outstanding Common Stock of the Company (the "Acquiring Person"), each Right will entitle its holder to purchase, for an initial exercise price of $65, a number of shares of Common Stock having a market value at that time of twice the Right's exercise price. Rights held by the Acquiring Person will become void. If the Company is acquired in a merger or other business combination transaction after a person acquires 15% or more of the Company's Common Stock, each Right will entitle its holder to purchase, at the Right's then-current exercise price, a number of the acquiring company's common shares having a market value at that time of twice the Right's exercise price.

The dividend distribution of Rights was payable on July 19, 2000 to shareholders of record on June 19, 2000. The Rights will expire in ten years. The Rights distribution is not taxable to the Company's stockholders.

The Board of Directors also adopted two amendments to the Rights Agreement dated December 15, 1994, (the "1994 Rights Agreement"), between the Company and State Street Bank and Trust Company, as Rights Agent. As a result of these amendments, the adoption of the 2000 Rights Agreement and the setting of a record date to distribute new Rights, the 1994 Rights Agreement is no longer in effect.

*Minority Interest in Subsidiary*

At December 31, 2003, AGTI had 5,195,779 shares of its common stock outstanding. Of this amount, the Company owned 4,157,143 shares or 80%, which allows it to consolidate for tax purposes the results of operations of AGTI with those of the Company. On January 17, 2004, stock options for a total of 87,428 shares of AGTI common stock held by minority interest holders were exercised prior to their expiration on that date. In order to maintain its 80% ownership interest in AGTI, the Company acquired an additional 351,909 shares of AGTI common stock on January 13, 2004. The purchase price of such shares was approximately $8.8 million, effected through the reduction of intercompany debt representing the estimated fair value of such shares, subject to adjustment in certain circumstances.

After taking into account the above transactions, AGTI has a total of 5,635,116 shares of its common stock outstanding of which 80% are owned by ARIAD, 14% are owned by Stanford University, Harvard University, consultants and inventors, and 6% are owned by certain current members of the Company's management and Board of Directors. Approximately 75% of the shares of common stock owned by the minority interest holders are subject to restrictions on transfer and a right of first refusal held by AGTI to repurchase such shares of AGTI common stock before sale of such shares to another purchaser. There are currently no outstanding options to purchase AGTI common stock and no shares available for grant of additional options.

**8. Stock Plans**

*ARIAD Stock Option and Stock Plans*

The Company's 1991, 1994 and 2001 stock option and stock plans (the "Plans") provide for the awarding of nonqualified and incentive stock options, stock grants and restricted stock units to officers, directors, employees and consultants of the Company. Stock options become exercisable as specified in the related option certificate, typically over a four-year period, and expire ten years from the date of grant. Stock grants and restricted stock units provide the recipient with ownership of common stock subject to any rights the Company may have to repurchase the shares granted or other restrictions. The 1991 and 1994 Plans have expired according to their terms, although existing stock options granted under these Plans remain outstanding. As of December 31, 2005, there are 696,046 shares available awards under the 2001 Plan.

Stock option transactions under the Plans for the years ended December 31, 2003, 2004 and 2005 are as follows:

|  | Number Of Shares | | Weighted Average Exercise Price Per Share |
|---|---|---|---|
| Options outstanding, January 1, 2003 | 5,392,311 | $ | 4.51 |
| Granted | 781,220 | | 3.90 |
| Forfeited | (239,473) | | 5.16 |
| Exercised | (286,219) | | 2.94 |
| Options outstanding, December 31, 2003 | 5,647,839 | | 4.48 |
| Granted | 1,192,150 | | 6.02 |
| Forfeited | (320,114) | | 6.17 |
| Exercised | (630,343) | | 3.62 |
| Options outstanding, December 31, 2004 | 5,889,532 | | 4.80 |
| Granted | 1,310,875 | | 7.30 |
| Forfeited | (132,444) | | 7.16 |
| Exercised | (241,319) | | 3.52 |
| Options outstanding, December 31, 2005 | 6,826,644 | $ | 5.28 |
| Options exercisable, December 31, 2003 | 3,605,255 | $ | 4.27 |
| December 31, 2004 | 4,078,371 | $ | 4.65 |
| December 31, 2005 | 4,345,848 | $ | 4.70 |

In addition to the above stock option transactions, in 2005 and 2004, the Company awarded grants of its common stock totaling 120,000 and 170,000 shares, respectively, to its directors and chief executive officer. The 2005 stock grant to the chief executive officer remains subject to the right of the Company to repurchase the shares in certain circumstances until January 2007. The Company recognized expense of $548,000 and $1.3 million in 2005 and 2004, respectively, related to these grants, based on the fair market value of the common stock on the date of grant.

The following table sets forth information regarding options outstanding at December 31, 2005:

| Range of Exercise Prices | Number of Shares | Weighted Average Exercise Price | Weighted Average Remaining Life (years) | Number of Option Shares Currently Exercisable | Weighted Average Exercise Price for Currently Exercisable |
|---|---|---|---|---|---|
| $.75 - 1.25 | 392,396 | $ 0.78 | 3.8 | 392,396 | $ 0.78 |
| 1.34 - 2.31 | 624,308 | 1.59 | 4.5 | 528,942 | 1.62 |
| 2.68 - 4.88 | 2,149,875 | 4.14 | 5.3 | 1,968,312 | 4.13 |
| 4.89 - 8.00 | 3,345,565 | 6.46 | 8.0 | 1,144,886 | 6.07 |
| 9.65 - 14.63 | 314,500 | 13.40 | 4.6 | 311,312 | 13.44 |
|  | 6,826,644 | $ 5.28 | 6.4 | 4,345,848 | $ 4.70 |

*ARIAD Gene Therapeutics, Inc. Stock Option Plan*

The Company's subsidiary, AGTI, adopted a stock option plan in 1993, which was approved by the Company's stockholders and which has now expired according to its terms. At December 31, 2003, there were 87,428 options outstanding all of which were exercised on January 17, 2004 for proceeds to AGTI of approximately $37,000 (Note 7). There were no other options exercised nor any options granted under this plan in 2005, 2004 or 2003. At December 31, 2005, there are no outstanding options to purchase AGTI common stock under this plan.

*Employee Stock Purchase Plan*

In 1997, the Company adopted the 1997 Employee Stock Purchase Plan and reserved 500,000 shares of common stock for issuance under this plan. Under this plan, substantially all of its employees may, through payroll withholdings, purchase shares of the Company's stock at a price of 85% of the lesser of the fair market value at the beginning or end of each three-month withholding period. In 2005, 2004 and 2003, 23,137, 11,298 and 88,636 shares of common stock were issued under the plan, respectively.

## 9.  Income Taxes

At December 31, 2005, the Company had available, for federal tax reporting purposes, net operating loss carryforwards of approximately $250.0 million, which expire commencing in 2009 and, for state tax reporting purposes, net operating loss carryforwards of approximately $156.3 million, which expire commencing in 2006. The Company also had federal research and development credit carryovers of approximately $9.3 million, which expire commencing in 2006, and state research and development credit carryovers of $5.1 million, which expire commencing in 2007. Both the net operating loss carryforwards and credits are subject to certain limitations under federal tax law.

The components of deferred income taxes were as follows at December 31:

| *In thousands* | 2005 | 2004 |
|---|---|---|
| Deferred tax liabilities: | | |
| Intangible and other assets | $      1,860 | $      1,891 |
| | | |
| Deferred tax assets: | | |
| Net operating loss carryforwards | 94,345 | 73,863 |
| Federal and State tax credit carryovers | 16,451 | 14,804 |
| Depreciation | 3,800 | 3,489 |
| Other | 1,344 | 1,478 |
| Total deferred tax assets | 115,940 | 93,634 |
| | | |
| Deferred tax assets, net | 114,080 | 91,742 |
| Valuation allowance | (114,080) | (91,742) |
| Total deferred taxes | $      0 | $      0 |

Since the Company has not yet achieved sustained profitable operations, management believes the tax benefits as of December 31, 2005 and 2004 do not satisfy the realization criteria set forth in SFAS No. 109 and has recorded a valuation allowance for the entire net deferred tax asset. The increase in the valuation allowance of $22.3 million in 2005 and $16.8 million in 2004 resulted primarily from net operating loss carryforwards and tax credit carryovers from operations in those years and that were not benefited.

## 10.  Litigation

### NF-"B Patent Infringement Litigation and Reexamination

In 2002, the Company, together with Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research and Harvard University (collectively, the "Plaintiffs") filed a lawsuit in the United States District Court for the District of Massachusetts (the "U.S. District Court") against Eli Lilly and Company ("Lilly") alleging infringement of certain claims ("the NF-κB `516 Claims") of the Plaintiffs' U.S. Patent No. 6,410,516 (the "`516 Patent") covering methods of treating human disease by regulating NF-κB cell-signaling activity through sales of Lilly's osteoporosis drug, Evista®, and Lilly's septic shock drug, Xigris®, and seeking monetary damages from Lilly.

*Re-examination Proceedings in PTO*

On April 4, 2005, Lilly filed an *ex parte* request in the United States Patent and Trademark Office ("PTO") to reexamine the patentability of certain claims of the `516 Patent. On June 8, 2005, the PTO mailed to counsel for the patentees of the `516 Patent its Order granting a reexamination of all of the claims of the `516 Patent. On August 4, 2005, counsel for the patentees of the `516 Patent filed a Petition requesting the PTO to vacate its Order granting reexamination of the `516 Patent and a Petition requesting the PTO to stay its reexamination ("Patentee's Petitions"). On October 6, 2005, the PTO mailed to counsel for patentees of the `516 Patent its Decision denying Patentee's Petitions ("PTO's October 6 Decision"), whereupon, on November 25, 2005, counsel for the patentees filed a Request for Reconsideration of the PTO's October 6 Decision. On February 8, 2006, the PTO mailed to counsel for the patentees of the `516 Patent its Decision granting patentee's Request for Reconsideration and denying the relief sought by patentees there under.

In addition, an unrelated third party filed an *ex parte* request in the PTO on December 2, 2005 to reexamine the patentability of certain claims of the `516 Patent ("Second Request"). On December 12, 2005, the PTO mailed to counsel for the patentees of the `516 Patent its Order granting a reexamination based on this Second Request. On February 13, 2006, counsel for the patentees of the `516 Patent filed Petitions requesting the PTO to vacate its Order granting reexamination of the `516 Patent based on this Second Request and requesting the PTO to stay this reexamination.

*Motions to Stay Litigation*

In connection with its request for reexamination of the `516 patent, Lilly filed a motion in the U.S. District Court on April 4, 2005 requesting a stay of the NF-ºB patent infringement litigation by the Court pending reexamination of the `516 Patent by the PTO. On June 6, 2005, the U.S. District Court denied Lilly's motion. On January 17, 2006, Lilly filed a renewed motion to stay pending reexamination of the `516 patent by the PTO, which was denied by the U.S. District Court on February 13, 2006.

*Trial and Pre-Trial Motions*

On December 23, 2005, Lilly filed two motions for summary judgment of invalidity. At a status conference held on March 9, 2006, the U.S. District Court confirmed that the trial would begin on April 10, 2006 and gave no indication as to when it would rule on the pending summary judgment motions.   A pre-trial conference in this case is scheduled for April 5, 2006, with trial scheduled to commence on April 10, 2006.

The ultimate outcome of the request for reexamination and litigation cannot be determined at this time, and, as a result, no determination can be made with respect to the PTO's allowance of the claims of the `516 patent in the reexamination, nor can any determination be made with respect to the validity or infringement of the claims of the `516 patent in the Lilly litigation, nor can an estimate of a damage award or range of awards in the Lilly litigation, if any, be made. If the Company prevails at trial in the Lilly litigation, any damages it may be awarded by the jury could be subsequently eliminated or limited by an adverse finding upon appeal or in the event that the claims of the `516 Patent are invalidated by the PTO.

**11.　Related Party Transactions**

For the Company's March 2004 and August 2005 public offerings of common stock, Lehman Brothers served as the sole-book running manager for which it received underwriting discounts and commissions of $1,399,090 and $2,018,250, respectively. In addition, Lehman Brothers provided assistance to the Company in connection with its January 2005 transaction with Medinol Ltd. for the development of drug-eluting stents for which Lehman Brothers earned a fee of $200,000. The spouse of a member of our Board of Directors is a vice chairman of Lehman Brothers. We believe the transactions with Lehman Brothers were entered into on terms no less favorable to us than we could have obtained from unaffiliated third parties.

**ITEM 9:  CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

Not applicable.

**ITEM 9A:  CONTROLS AND PROCEDURES**

(a) *Evaluation of Disclosure Controls and Procedures.* Our principal executive officer and principal financial officer, after evaluating the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this Annual Report on Form 10-K, have concluded that, based on such evaluation, our disclosure controls and procedures were adequate and effective to ensure that material information relating to us, including our consolidated subsidiaries, was made known to them by others within those entities, particularly during the period in which this Annual Report on Form 10-K was being prepared.

In designing and evaluating our disclosure controls and procedures, our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

(b) *Changes in Internal Controls.* There were no changes in our internal control over financial reporting, identified in connection with the evaluation of such internal control that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Management's Report On Internal Control Over Financial Reporting**

The management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended. The Company's internal control system was designed to provide reasonable assurance to the Company's management and board of directors regarding the preparation and fair presentation of published financial statements. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2005. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework. Based on our assessment we believe that, as of December 31, 2005, the Company's internal control over financial reporting is effective based on those criteria.

The Company's independent auditors have issued an audit report on our assessment of the Company's internal control over financial reporting. This report appears below.

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of
ARIAD Pharmaceuticals, Inc.:

We have audited management's assessment, included in the accompanying Management's Report on Internal Control Over Financial Reporting, that ARIAD Pharmaceuticals, Inc. and subsidiaries (the "Company") maintained effective internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control--Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that the Company maintained effective internal control over financial reporting as of December 31, 2005, is fairly stated, in all material respects, based on the criteria established in Internal Control--Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2005, based on the criteria established in Internal Control--Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements as of and for the year ended December 31, 2005 of the Company and our report dated March 13, 2006 expressed an unqualified opinion on those financial statements.

/s/ DELOITTE & TOUCHE LLP
Boston, Massachusetts
March 13, 2006

**ITEM 9B: OTHER INFORMATION**

Not applicable.

**PART III**

**ITEM 10:      DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT**

The response to this item is incorporated by reference from the discussion responsive thereto under the captions "Board of Directors," "Executive Officers," "Section 16(a) Beneficial Ownership Reporting Compliance" and "Corporate Code of Conduct and Ethics" in the Company's Proxy Statement for the 2006 Annual Meeting of Stockholders.

**ITEM 11:      EXECUTIVE COMPENSATION**

 The response to this item is incorporated by reference from the discussion responsive thereto under the caption "Executive Compensation" and "Board of Directors" in the Company's Proxy Statement for the 2006 Annual Meeting of Stockholders.

**ITEM 12:      SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND  RELATED STOCKHOLDER MATTERS**

The response to this item is incorporated by reference from the discussion responsive thereto under the captions "Security Ownership of Certain Beneficial Owners and Management" and "Executive Compensation-Equity Compensation Plan Information" in the Company's Proxy Statement for the 2006 Annual Meeting of Stockholders.

**ITEM 13:      CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS**

 The response to this item is incorporated by reference from the discussion responsive thereto under the captions "Certain Relationships and Related Transactions" and "Executive Compensation-Employment Agreements, Termination of Employment and Change in Control Arrangements" in the Company's Proxy Statement for the 2006 Annual Meeting of Stockholders.

**ITEM 14:      PRINCIPAL ACCOUNTING FEES AND SERVICES**

 The response to this item is incorporated by reference from the discussion responsive thereto under the caption "Proposal 2: Ratification of Selection of Independent Registered Public Accounting Firm" in the Company's Proxy Statement for the 2006 Annual Meeting of Stockholders.

**PART IV**

**ITEM 15:  EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K**

(a)(1)  The following Consolidated Financial Statements, Notes thereto and Report of Independent Registered Public Accounting Firm have been presented in Item 8:

Report of Independent Registered Public Accounting Firm

Consolidated Balance Sheets

Consolidated Statements of Operations

Consolidated Statements of Stockholders' Equity

Consolidated Statements of Cash Flows

Notes to Consolidated Financial Statements

(a)(2)  Financial Statement Schedules:

Schedules have been omitted because of the absence of conditions under which they are required or because the required information is included in the financial statements or notes thereto.

(a)(3)  The Exhibits listed in the Exhibit Index are filed herewith in the manner set forth therein.

(b)  See (a) (3) above.

(c)  See (a) (2) above.

-60-

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Cambridge and Commonwealth of Massachusetts on the 14th of March, 2006.

### ARIAD PHARMACEUTICALS, INC.

By: /s/ Harvey J. Berger, M.D.
Name: Harvey J. Berger, M.D.
Title: Chairman, Chief Executive Officer and President

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Harvey J. Berger, M.D.<br>Harvey J. Berger, M.D. | Chairman of the Board of Directors, Chief Executive Officer and President (Principal Executive Officer) | March 14, 2006 |
| /s/ Sandford D. Smith<br>Sandford D. Smith | Vice Chairman of the Board of Directors | March 14, 2006 |
| /s/ Edward M. Fitzgerald<br>Edward M. Fitzgerald | Senior Vice President, Finance and Corporate Operations, Chief Financial Officer and Treasurer (Principal Financial Officer and Principal Accounting Officer) | March 14, 2006 |
| /s/ Michael D. Kishbauch<br>Michael D. Kishbauch | Director | March 14, 2006 |
| /s/ Jay R. LaMarche<br>Jay R. LaMarche | Director | March 14, 2006 |
| _____<br>Athanase Lavidas, Ph.D | Director | |
| /s/ Peter J. Nelson<br>Peter J. Nelson | Director | March 14, 2006 |
| /s/ Burton E. Sobel, M.D.<br>Burton E. Sobel, M.D. | Director | March 14, 2006 |
| /s/ Mary C. Tanner<br>Mary C. Tanner | Director | March 14, 2006 |
| /s/ Elizabeth H.S. Wyatt<br>Elizabeth H.S. Wyatt | Director | March 14, 2006 |

EXHIBIT INDEX

| Exhibit No. | Title |
|---|---|
| 3.1 | Certificate of Incorporation of the Company, as amended. (16) |
| 3.2 | Restated By-laws of the Company, as amended. (5) |
| 4.1 | Rights Agreement, dated as of June 8, 2000, between the Company and State Street Bank and Trust Company, which includes the Form of Certificate of Designations in respect of the Series A Preferred Stock, as Exhibit A, the Form of Right Certificate as Exhibit B and the Summary of Rights to Purchase Series A Preferred Stock as Exhibit C. Pursuant to the Rights Agreement, Right Certificates will not be mailed until after the Separation Date (as defined therein). (3) |
| 10.1 | Lease Agreement, dated January 8, 1992, between ARIAD Pharmaceuticals, Inc. and Forest City Cambridge, Inc. (1) |
| 10.2+ | Executive Employment Agreement, dated as of January 1, 1992, between ARIAD Pharmaceuticals, Inc. and Harvey J. Berger, M.D. (1) |
| 10.3+ | ARIAD Pharmaceuticals, Inc. 1991 Stock Option Plan for Employees and Consultants, as amended. (4) |
| 10.4+ | ARIAD Pharmaceuticals, Inc. 1991 Stock Option Plan for Directors. (1) |
| 10.5+ | ARIAD Retirement Savings Plan. (1) |
| 10.6** | Amended and Restated Agreement, dated as of December 12, 1997, between The Board of Trustees of The Leland Stanford Junior University and ARIAD Gene Therapeutics, Inc. (6) |
| 10.7+ | Amendment, dated April 19, 1994, to Executive Employment Agreement between ARIAD Pharmaceuticals, Inc. and Harvey J. Berger, M.D. (2) |
| 10.8+ | Amendment No. 2, dated June 30, 1994, to Executive Employment Agreement between ARIAD Pharmaceuticals, Inc. and Harvey J. Berger, M.D. (4) |
| 10.9+ | ARIAD Pharmaceuticals, Inc. 1994 Stock Option Plan for Non-Employee Directors. (4) |
| 10.10+ | Amendment, dated January 1, 1997, to Executive Employment Agreement between ARIAD Pharmaceuticals, Inc. and Harvey J. Berger, M.D. (11) |
| 10.11+ | ARIAD Pharmaceuticals, Inc. 1997 Employee Stock Purchase Plan. (11) |
| 10.12+ | Amendment to the 1991 Stock Option Plan for Employees and Consultants. (11) |
| 10.13+ | Amendment to the 1994 Stock Option Plan for Non-Employee Directors. (11) |
| 10.14+ | ARIAD Pharmaceuticals, Inc. 1997 Executive Compensation Plan. (6) |
| 10.15+ | Executive Employment Agreement, dated May 1, 1992, Fourth Amendment to Employment Agreement dated June 8, 2000, Third Amendment to Employment Agreement dated January 1, 1999, and Amendments to Employment Agreements dated January 1, 1997 and March 2, 1994 between ARIAD Pharmaceuticals, Inc. and John Iuliucci, Ph.D. (7) |
| 10.16+ | Executive Employment Agreement, dated August 1, 1993, Third Amendment to Employment Agreement dated June 8, 2000, and Amendments to Employment Agreements dated January 1, 1997 and March 2, 1994 between ARIAD Pharmaceuticals, Inc. and David L. Berstein, J.D. (7) |
| 10.17+ | Amendment, dated as of January 1, 2001, to Executive Employment Agreement with John Iuliucci, Ph.D. (8) |
| 10.18+ | Amendment, dated as of January 1, 2001, to Executive Employment Agreement with David Berstein, Esq. (8) |
| 10.19+ | ARIAD Pharmaceuticals, Inc. 2001 Stock Plan, as amended. (16) |
| 10.20 | Revised and Restated Research and Development Agreement, dated as of March 15, 2002, by and between ARIAD Pharmaceuticals, Inc. and ARIAD Corporation. (9) |
| 10.21 | Revised and Restated Research and Development Agreement, dated as of March 15, 2002, by and between ARIAD Gene Therapeutics, Inc. and ARIAD Corporation. (9) |
| 10.22+ | Executive Employment Agreement, dated as of March 4, 2002, between ARIAD Pharmaceuticals, Inc. and Laurie A. Allen, Esq. (9) |
| 10.23 | Stock Transfer Agreement between ARIAD Gene Therapeutics, Inc. and the individuals listed on Exhibit A thereto. (9) |
| 10.24 | Notice of Extension of Lease, dated October 2, 2001, from ARIAD Corporation to Forest City Commercial Group. (9) |
| 10.25+ | Executive Employment Agreement, dated May 6, 2002, between ARIAD Pharmaceuticals, Inc. and Edward M. Fitzgerald (10) |
| 10.26+ | Executive Employment Agreement, dated June 8, 2000, between ARIAD Pharmaceuticals, Inc. and Timothy Clackson, Ph.D.(12) |

| 10.27+ | Amendment to Employment Agreement, dated July 1, 2001, between ARIAD Pharmaceuticals, Inc. and Timothy Clackson, Ph.D. (12) |
| 10.28+ | Amendment to Employment Agreement, dated July 12, 2002, between ARIAD Pharmaceuticals, Inc. and Timothy Clackson, Ph.D. (12) |
| 10.29 | Agreement of Sublease, dated December 31, 1999, between ARIAD Corporation and Aventis Pharmaceuticals Inc. (12) |
| 10.30 | First Amendment to Sublease, dated July 26, 2002, between ARIAD Corporation and Aventis Pharmaceuticals Inc. (12) |
| 10.31 | Credit Agreement, dated as of March 12, 2003, by and among ARIAD Pharmaceuticals, Inc., ARIAD Corporation and ARIAD Gene Therapeutics, Inc. and Citizens Bank of Massachusetts. (13) |
| 10.32 | Security Agreement - All Assets, dated as of March 12, 2003, by and between ARIAD Pharmaceuticals, Inc. and Citizens Bank of Massachusetts. (13) |
| 10.33 | Security Agreement - All Assets, dated as of March 12, 2003, by and between ARIAD Corporation and Citizens Bank of Massachusetts. (13) |
| 10.34 | Security Agreement - All Assets, dated as of March 12, 2003, by and between ARIAD Gene Therapeutics, Inc. and Citizens Bank of Massachusetts. (13) |
| 10.35+ | Amendment to Employee Agreement, dated September 2, 2003, between ARIAD Pharmaceuticals, Inc. and Harvey J. Berger, M.D. (14) |
| 10.36+ | Amendment to Employee Agreement, dated September 2, 2003, between ARIAD Pharmaceuticals, Inc. and Laurie A. Allen, Esq. (14) |
| 10.37+ | Amendment to Employee Agreement, dated September 2, 2003, between ARIAD Pharmaceuticals, Inc. and David Berstein, Esq. (14) |
| 10.38+ | Amendment to Employee Agreement, dated September 2, 2003, between ARIAD Pharmaceuticals, Inc. and Timothy P. Clackson, Ph.D. (14) |
| 10.39+ | Amendment to Employee Agreement, dated September 2, 2003, between ARIAD Pharmaceuticals, Inc. and Edward M. Fitzgerald. (14) |
| 10.40+ | Amendment to Employee Agreement, dated September 2, 2003 between ARIAD Pharmaceuticals, Inc. and John D. Iuliucci, Ph.D. (14) |
| 10.41 | Amendment No. 1 to Credit Agreement, dated as of December 31, 2003, by and among ARIAD Pharmaceuticals, Inc., ARIAD Corporation and ARIAD Gene Therapeutics, Inc. and Citizens Bank of Massachusetts. (15) |
| 10.42 | Stock Issuance Agreement, dated January 13, 2004, between ARIAD Gene Therapeutics, Inc. and ARIAD Pharmaceuticals, Inc. (15) |
| 10.43 | Stock Transfer Agreement, dated January 17, 2004, between ARIAD Gene Therapeutics, Inc. and the individuals listed on Exhibit A thereto. (15) |
| 10.44 | Amendment No. 2 to Credit Agreement dated as of December 31, 2004 by and among ARIAD Pharmaceuticals, Inc., ARIAD Corporation and ARIAD Gene Therapeutics, Inc. and Citizens Bank of Massachusetts. (17) |
| 10.45 | Second Amended and Restated Term Note, dated December 31, 2004, issued ARIAD Pharmaceuticals, Inc., ARIAD Corporation and ARIAD Gene Therapeutics, Inc. to Citizens Bank of Massachusetts. (17) |
| 10.46** | License Agreement, effective January 26, 2005, by and between ARIAD Pharmaceuticals, Inc. and Medinol Ltd. (19) |
| 10.47** | Supply Agreement, entered into as of January 26, 2005, by and between ARIAD Pharmaceuticals, Inc. and Medinol Ltd. (19) |
| 10.48+ | Executive Employment Agreement, dated August 19, 2002, and First Amendment to Employment Agreement, dated September 2, 2003, between ARIAD Pharmaceuticals, Inc., and Camille L. Bedrosian, M.D. (18) |
| 10.49+ | ARIAD Pharmaceuticals, Inc. 2005 Executive Compensation Plan. (20) |
| 10.50+ | Amendment to ARIAD Pharmaceuticals, Inc. 1997 Executive Compensation Plan. (20) |
| 10.51+ | ARIAD Pharmaceuticals, inc. Amended and Restated 2001 Stock Plan. (20) |
| 10.52+ | Executive Bonus and Stock Option Arrangements. (20) |
| 10.53+ | Director Compensation Arrangements. (20) |
| 10.54+* | Executive Compensation Arrangements |
| 10.55+ | Amendment to Executive Employment Agreements, as of October 4, 2005, between ARIAD Pharmaceuticals, Inc. and each of Laurie A. Allen, Esq., Camille L. Bedrosian, M.D., David L. Berstein, Esq., Timothy P. Clackson, Ph.D., Edward M. Fitzgerald and John D. Iuliucci, Ph.D. (20) |

10.56+*  Amendment to Executive Employment Agreement, dated as of January 1, 2006 between ARIAD Pharmaceuticals, Inc. and Harvey J. Berger, M.D.

10.57+*  Executive Employment Agreement, dated as of September 25, 2005 between ARIAD Pharmaceuticals, Inc. and Richard W. Pascoe.


21.1     Subsidiaries of the Company. (17)
23.1*    Consent of Deloitte & Touche LLP.
31.2*    Certification of the Chief Executive Officer.
31.3*    Certification of the Chief Financial Officer.
32.1*    Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.


**Notes to Exhibits:**

(+)      Management Contract or Compensatory Plan or Arrangement

(*)      Filed Herewith.

(**)     Confidential treatment has been granted by the Securities and Exchange Commission as to certain portions.

(1)      Incorporated by reference to Registration Statement on Form 10 of the Company filed with the Securities and Exchange Commission on June 25, 1993.

(2)      Incorporated by reference to Registration Statement on Form S-1 of the Company (No. 33-76414) filed with the Securities and Exchange Commission on March 11, 1994.

(3)      Incorporated by reference to Form 8-A of the Company filed with the Securities and Exchange Commission on June 19, 2000.

(4)      Incorporated by reference to Form 10-K of the Company for the fiscal year ended December 31, 1994 filed with the Securities and Exchange Commission on March 31, 1995.

(5)      Incorporated by reference to Amendment No. 1 to the Registration Statement on Form S-3 of the Company (No. 333-38664) filed with the Securities and Exchange

         Commission  on June 23, 2000.

(6)      Incorporated by reference to Form 10-K of the Company for the fiscal year ended December 31, 1997 filed with the Securities and Exchange Commission on March 10, 1998.

(7)      Incorporated by reference to Form 10-Q of the Company filed with the Securities and Exchange Commission on August 10, 2000.

(8)      Incorporated herein by reference to Form 10-Q of the Company filed with the Securities and Exchange Commission on May 14, 2001.

(9)      Incorporated by reference to Form 10-K of the Company for the fiscal year ended December 31, 2001 filed with the Securities and Exchange Commission on March 22, 2002.

(10)     Incorporated herein by reference to Form 10-Q of the Company filed with the Securities and Exchange Commission on May 9, 2002.

(11)     Incorporated by reference to Form 10-Q of the Company filed with the Securities and Exchange Commission on August 12, 1997.

(12)     Incorporated by reference to Form 10-Q of the Company filed with the Securities and Exchange Commission on March 14, 2003.

(13)     Incorporated by reference to Form 10-Q of the Company filed with the Securities and Exchange Commission in May 13, 2003.

(14)     Incorporated by reference to Form 10-Q of the Company filed with the Securities and Exchange Commission in November 4, 2003.

(15)     Incorporated by reference to Form 10-K of the Company filed with the Securities and Exchange Commission on March 2, 2004.

(16)        Incorporated by reference to Registration Statement on Form S-8 of the Company (No. 333-116996) filed with the Securities and Exchange Commission on June 30, 2004.

(17)        Incorporated by reference to Form 10-K of the Company filed with the Securities and Exchange Commission on February 18, 2005.

(18)        Incorporated by reference to Form 10-K/A of the Company filed with the Securities and Exchange Commission on March 11, 2005.

(19)        Incorporated by reference to Form 10-Q of the Company filed with the Securities and Exchange Commission on May 10, 2005.

(20)        Incorporated by reference to Form 10-Q of the Company filed with the Securities and Exchange Commission on November 9, 2005.

EXHIBIT 10.54

**EXECUTIVE COMPENSATION ARRANGEMENTS**

Listed below are the salaries, bonuses and stock option grants for our executive officers that were awarded during fiscal 2005 and the salaries that have been established for fiscal 2006. Bonuses for fiscal 2006 have not yet been determined.

| Executive Officer | | 2005 | | | 2006 |
| --- | --- | --- | --- | --- | --- |
| | Salary | Bonus[1] | Stock Option Grants[2] | | Salary |
| Harvey J. Berger, M.D. [3] *Chairman of the Board of Directors, Chief Executive Officer and President* | $ 504,000 | --- | 150,000 | $ | 544,000 |
| Laurie A. Allen, Esq. *Senior Vice President, Legal and Business Development, Chief Legal Officer and Secretary* | $ 288,000 | $ 110,000 | 60,000 | $ | 309,000 |
| David L. Berstein, Esq. *Senior Vice President, Chief Patent Counsel* | $ 288,000 | $ 110,000 | 60,000 | $ | 309,000 |
| Timothy P. Clackson, Ph.D. *Senior Vice President, Chief Scientific Officer* | $ 290,000 | $ 110,000 | 57,500 | $ | 309,000 |
| Edward M. Fitzgerald *Senior Vice President, Finance and Corporate Operations, Chief Financial Officer and Treasurer* | $ 288,000 | $ 110,000 | 60,000 | $ | 309,000 |
| John D. Iuliucci, Ph.D. *Senior Vice President, Chief Development Officer* | $ 290,000 | $ 115,000 | 70,000 | $ | 309,000 |
| Camille L. Bedrosian, M.D. *Vice President, Chief Medical Officer* | $ 290,000 | $ 110,000 | 70,000 | $ | 309,000 |
| Richard W. Pascoe [4] *Vice President, Chief Commercial Officer* | $ 61,959 | --- | 75,000 | $ | 275,000 |

[1]    These bonuses were awarded and deferred under our 2005 Executive Compensation Plan, a non-qualified, unfunded, deferred compensation plan.

[2]    Stock options, except for Mr. Pascoe's stock options, were granted on October 4, 2005, have an exercise price of $7.56 per share, which was the fair market value of our common stock on the date of grant, and vest 25% per year over four years. Mr. Pascoe's stock options, awarded on December 13, 2005 in consideration of his commencement of employment with the Company, have an exercise price of $6.04 per share, and vest 25% per year over four years.

[3]    The Board of Directors also awarded 40,000 shares of restricted stock to Dr. Berger on December 13, 2005. The fair market value of the stock on the date of grant was $6.04 per share. The restricted stock is subject to repurchase by the Company for $.001 per share if Dr. Berger's employment with the Company is terminated for cause prior to the thirteen-month anniversary of the grant date. The Company's right of repurchase lapses under certain circumstances, including a change in control of the Company and termination of his employment by the Company other than for cause. These terms are subject to the terms of Dr. Berger's employment agreement. The restricted shares may not be sold, transferred, assigned, hypothecated, pledged, encumbered or otherwise disposed of other than to the Company as long as the Company's right of repurchase is in effect.

[4]    Mr. Pascoe commenced employment with the Company on November 7, 2005 at an agreed-upon annual salary of $275,000. The amount of salary presented for 2005 represents the amount paid to Mr. Pascoe in 2005.

EXHIBIT 10.56

<u>**FIFTH AMENDMENT TO EMPLOYMENT AGREEMENT**</u>

This FIFTH AMENDMENT TO EMPLOYMENT AGREEMENT (the " Fifth Amendment") made as of January 1, 2006 between ARIAD Pharmaceuticals, Inc., a Delaware corporation (the "Company"), and Harvey J. Berger, M.D. (the "Employee").

The Company and the Employee have entered into an Employment Agreement dated as of January 1, 1992, as amended as of April 19, 1994, June 30, 1994, January 1, 1997, and September 2, 2003 (the "Agreement"), and the parties hereto desire to further amend certain provisions of the Agreement.

NOW, THEREFORE, in consideration of the premises set forth herein and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree to further amend the Agreement as follows:

       I. <u>Termination of Employment.</u> The first sentence of Section 2 is hereby amended to read as follows:

             "The term of the Employee's employment under this Agreement (the "Term") commenced as of January 1, 1992 (the "Effective Date") and shall end on December 31, 2009, unless sooner terminated pursuant to Section 4 or 5 of this Agreement;"

       II. <u>Compensation</u>. The first sentence of Section 3.1 is hereby amended to read as follows:

"3.1 As full compensation for all services to be rendered pursuant
to this Agreement, the Company agrees to pay the Employee, during the Term, a salary at the fixed rate of $544,000 per annum during the first year of the term and increased each year thereafter as set forth below, payable in equal semi-monthly installments, less such deductions or amounts to be withheld as shall be required by applicable law and regulations."

       III. <u>Definitions.</u> The definition of the Company's "Field of Interest" in Section 16 (c) of the Agreement is hereby amended to read as follows:

"The Company's `Field of Interest' means the discovery, development,
manufacture, distribution, and commercialization of any pharmaceutical product that is based on or involves (a) intervention in cell signaling, (b) cancer therapy, or (c) gene and cell therapy."

       IV. This Fifth Amendment shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts applicable to agreements made and to be performed entirely in Massachusetts.

V. Except as modified by this Fifth Amendment, the Agreement remains in full force and effect and unchanged.

IN WITNESS WHEREOF, the parties have executed this Fifth Amendment as of the date first written above.

ARIAD PHARMACEUTICALS, INC.

By: /s/ Laurie A. Allen
_____
Laurie A. Allen, Esq.
Corporate Secretary


EMPLOYEE


/s/  Harvey J. Berger
_____
Harvey J. Berger, M.D.

2

**EXHIBIT 10.57**

**Executive Employment Agreement**

EMPLOYMENT AGREEMENT (the "Agreement") made as of September 25, 2005 between ARIAD Pharmaceuticals, Inc. (the "Company"), a Delaware corporation, and Richard W. Pascoe (the "Employee").

1. <u>Employment, Duties and Acceptance</u>.

1.1 The Company hereby employs the Employee, for the Term (as hereinafter defined), to render full-time services to the Company, and to perform such duties as he shall reasonably be directed by the Chief Executive Officer of the Company to perform. The Employee's title shall be designated by the Chief Executive Officer and initially shall be Vice President and Chief Commercial Officer.

1.2 The Employee hereby accepts such employment and agrees to render the services described above.

1.3 The principal place of employment of the Employee hereunder shall be in the greater Boston, Massachusetts area, or other locations reasonably acceptable to the Employee. The Employee acknowledges that for limited periods of time he may be required to provide services to the Company outside of the Boston, Massachusetts area.

1.4 Notwithstanding anything to the contrary herein, although the Employee shall provide services as a full-time employee, it is understood that the Employee may (a) have an academic appointment and (b) participate in professional activities (collectively, "Permitted Activities'); <u>provided</u>, <u>however</u>, that such Permitted Activities do not interfere with the Employee's duties to the Company.

1

2. <u>Term of Employment</u>.

The term of the Employee's employment under this Agreement (the "Term") shall commence on November 14, 2005 (the "Effective Date"), or such other date mutually agreed upon by the parties, and shall end on December 31, 2007, unless sooner terminated pursuant to Section 4 or 5 of this Agreement; provided, however, that this Agreement shall automatically be renewed for successive one-year terms (the Term and, if the period of employment is so renewed, such additional period(s) of employment are collectively referred to herein as the "Term") unless terminated by written notice given by either party to the other at least 90 days prior to the end of the applicable Term.

3. <u>Compensation</u>.

3.1   As full compensation for all services to be rendered pursuant to this Agreement, the Company agrees to pay the Employee, during the Term, a salary at the fixed rate of $275,000 per annum during the first year of the Term and increased each year thereafter by amounts, if any, to be determined by the Board of Directors of the Company (the "Board"), in its sole discretion, payable in equal biweekly installments, less such deductions or amounts to be withheld as shall be required by applicable law and regulations.

3.2   Each year, Employee shall be eligible to receive a discretionary bonus of up to a target of 30% of base salary, which bonus shall be determined annually in the sole discretion of the Board. The bonus, if any, may be paid in the form of stock options, restricted stock awards or units, deferred compensation or cash, as determined by the Board.

2

3.3  The Company shall pay or reimburse the Employee for all reasonable expenses actually incurred or paid by him during the Term in the performance of his services under this Agreement, upon presentation of expense statements or vouchers or such other supporting information as it may require.

3.4  The Employee shall be eligible under any incentive plan, stock award plan, bonus, deferred or extra compensation plan, pension, group health, disability, long-term care, and life insurance or other so-called "fringe" benefits, which the Company provides for its executives at the comparable level. All stock options and stock awards granted to the Employee shall be subject to a vesting schedule, which shall be determined by the Compensation Committee of the Board. The stock options and stock awards, if any, to be granted to the Employee in the future shall also be subject to the terms of a stock option plan and certificate and stock award plan and certificate, respectively. Any unvested options shall be forfeited to the Company in the event (a) this Agreement is terminated by the Company for Cause pursuant to Section 4 herein, or (b) either party elects not to renew this Agreement pursuant to Section 2 herein.

3.5 The Company shall grant the Employee an option to purchase 75,000 shares of the Company's Common Stock at the fair market value on the date of the Board's approval of the grant. The Employee agrees that all such options shall be subject to a four-year vesting schedule, vesting in equal increments of 25% on each anniversary of their issuance and shall be subject to the terms and conditions of a stock option agreement between the Employee and the Company. Any unvested options shall be forfeited to the Company in the event (a) this Agreement is terminated by the Company for Cause pursuant to Section 4 herein, or (b) either party elects not to renew this Agreement pursuant to Section 2 herein.

4.  <u>Termination by the Company.</u>

The Company may terminate this Agreement, if any one or more of the following shall occur:

(a)  The Employee shall die during the Term; provided, however, that the Employee's legal representatives shall be entitled to receive the compensation provided for hereunder to the last day of the month in which his death occurs.

(b)  The Employee shall become physically or mentally disabled, whether totally or partially, so that he is unable substantially to perform his services hereunder for (i) a period of 180 consecutive days,  or (ii) for shorter periods aggregating 180 days during any 12 month period.

(c)  The Employee acts, or fails to act, in a manner that provides Cause for termination. For purposes of this Agreement, the term "Cause" means (i) the failure by the Employee to perform any of his material duties hereunder, (ii) the conviction of the Employee of any felony involving moral turpitude, (iii) any acts of fraud or embezzlement by the Employee involving the Company or any of its Affiliates, (iv) violation of any federal, state or local law, or administrative regulation related to the business of the Company, (v) breach of fiduciary duty, including, but not limited to, conflict of interest, (vi) conduct that could result in publicity reflecting unfavorably on the Company in a material way, (vii) failure to comply with any written policies of the Company, or (viii) a breach of the terms of this Agreement by the Employee. If the conduct constituting Cause hereunder is susceptible to cure, the Company shall provide the Employee written notice of termination pursuant to this Section 4, and Employee shall have 30 days to cure or remedy such failure or breach, in which case this Agreement shall not be terminated. If the conduct is not susceptible to cure, this Agreement shall terminate upon written notice by the Company.

5. Termination by the Employee.

5.1 The Employee may terminate this Agreement, if any one or more of the following shall occur:

(a) a material breach of the terms of this Agreement by the Company and such breach continues for 30 days after the Employee gives the Company written notice of such breach;

(b) the Company shall make a general assignment for benefit of creditors; or any proceeding shall be instituted by the Company seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property or the Company shall take any corporate action to authorize any of the actions set forth above in this subsection 5(b);

(c) an involuntary petition shall be filed or an action or proceeding otherwise commenced against the Company seeking reorganization, arrangement or readjustment of the Company's debts or for any other relief under the Federal Bankruptcy Code, as amended, or under any other bankruptcy or insolvency act or law, state or federal, now or hereafter existing and remain undismissed or unstayed for a period of 30 days; or

5

(d)  a receiver, assignee, liquidator, trustee or similar officer for the Company or for all or any part of its property shall be appointed involuntarily.

6.  Severance.

6.1 If (i) the Company terminates this Agreement without Cause or (ii) the Employee terminates this Agreement pursuant to Section 5.1(a), then: (1) except in the case of death or disability, the Company shall continue to pay Employee his then-current salary for the remaining period of the applicable Term; (2) all stock options granted pursuant to this Agreement that would have vested during the Term shall vest immediately prior to such termination; and (3) the Company shall continue to provide all benefits subject to COBRA at its expense for up to one year.

7.  Other Benefits.

In addition to all other benefits contained herein, the Employee shall be entitled to:

(a) Relocation expenses for the Employee, consisting of (i) all reasonable direct out-of-pocket costs of transporting the Employee, the Employee's immediate family, and the Employee's household items from the Employee's current residence in New Jersey to a new residence in the greater Boston, Massachusetts area; (ii) reasonable travel and lodging to visit the greater Boston, Massachusetts area to search for a new residence; (iii) reasonable costs of rent and primary services associated with temporary housing at an approved location in the greater Boston, Massachusetts area for a

maximum period of 60 days from the Employee's start date or until he finds a suitable residence, if earlier, and (iv) except as described in the next succeeding sentence and subject to prior approval, the reasonable closing costs associated with the Employee's purchase of a new residence in the greater Boston, Massachusetts area within ten months of the Employee's date of employment. The following closing (settlement) costs will <u>not</u> be paid by the Company: (1) real estate and other taxes, (2) insurance premiums other than title insurance, and (3) commitment fees and prepaid interest (i.e., "points") in excess of 2%

    (b)   Vacation time of four weeks per year taken in accordance with the vacation policy of the Company.

    (c)   After six years of employment, one three-month period of fully paid leave of absence in accordance with Company policies in place at that time; it being understood that such policies may restrict the Employee from taking such leave of absence until a time that is acceptable to the Company and may include other such limitations.

    (d)   Group health, disability, long-term care, and life insurance.

    (e)   The Company shall provide the Employee with an automobile allowance of $750 per month and standard tax preparation and planning services.

    (f)   To facilitate the Employee's relocation, the Company will provide the Employee with a one-time relocation advance (the "Relocation Advance") in the amount of $25,000 to be used towards the purchase of the Employee's new principal residence (the "Residence"), payable by the Company at the time of closing on such residence (the "Closing"). The Employee shall be obligated to repay the Relocation Advance within thirty days of the occurrence of any of the following events: (a) the Employee terminates this Agreement prior to December 31, 2006, except as provided pursuant to Section 5.1 herein, or (b) the Company terminates this Agreement for Cause pursuant to Section 4 herein. As of December 31, 2006, the Relocation Advance shall no longer be subject to repayment by the Employee.

8. Confidentiality.

       8.1 The Employee acknowledges that, during the course of performing his services hereunder, the Company shall be disclosing information to the Employee related to the Company's Field of Interest, Inventions, projects and business plans, as well as other information (collectively, "Confidential Information"). The Employee acknowledges that the Company's business is extremely competitive, dependent in part upon the maintenance of secrecy, and that any disclosure of the Confidential Information would result in serious harm to the Company.

8.2   The Employee agrees that the Confidential Information only shall be used by the Employee in connection with his activities hereunder as an employee of the Company, and shall not be used in any way that is detrimental to the Company.

       8.3 The Employee agrees not to disclose, directly or indirectly, the Confidential Information to any third person or entity, other than representatives or agents of the Company. The Employee shall treat all such information as confidential and proprietary property of the Company.

       8.4 The term "Confidential Information" does not include information that (a) is or becomes generally available to the public other than by disclosure in violation of this Agreement, (b) was within the Employee's possession prior to being furnished to such Employee, (c) becomes available to the Employee on a nonconfidential basis or (d) was independently developed by the Employee without reference to the information provided by the Company.

8

8.5  The Employee may disclose any Confidential Information that is required to be disclosed by law, government regulation or court order. If disclosure is required, the Employee shall give the Company advance notice so that the Company may seek a protective order or take other action reasonable in light of the circumstances.

8.6 Upon termination of this Agreement, the Employee shall promptly return to the Company all materials containing Confidential Information, as well as data, records, reports and other property, furnished by the Company to the Employee or produced by the Employee in connection with services rendered hereunder. Notwithstanding such return or any of the provisions of this Agreement, the Employee shall continue to be bound by the terms of the confidentiality provisions contained in this Section 8 for a period of three years after the termination of this Agreement.

8.7 In connection with his employment by the Company, the Employee hereby acknowledges that he may enter into more than one agreement with regard to (a) the confidentiality of certain books, records, documents and business, (b) rights to certain inventions, proprietary information, and writings, (c) publication of certain materials, and (d) other related matters (the "Confidential Matters") of the Company (the "Confidentiality Agreements"). In order to clarify any potential conflicts between certain respective provisions of such Confidentiality Agreements, the Employee and the Company hereby agree that, as among such Confidentiality Agreements, the provision (or part thereof) in any such Confidentiality Agreement which affords the greatest protection to the Company with respect to the Confidential Matters shall control.

9. <u>Inventions Discovered by the Employee While Performing Services Hereunder</u>.

During the Term, the Employee shall promptly disclose to the Company any invention, improvement, discovery, process, formula, or method or other intellectual property, whether or not patentable, whether or not copyrightable (collectively, "Inventions") made, conceived or first reduced to practice by the Employee, either alone or jointly with others, while performing service hereunder. The Employee hereby assigns to the Company all of his right, title and interest in and to any such Inventions. During and after the Term, the Employee shall execute any documents necessary to perfect the assignment of such Inventions to the Company and to enable the Company to apply for, obtain, and enforce patents and copyrights in any and all countries on such Inventions. The Employee hereby irrevocably designates the Chief Patent Counsel to the Company as his agent and attorney-in-fact to execute and file any such document and to do all lawful acts necessary to apply for and obtain patents and copyrights and to enforce the Company's rights under this paragraph. This Section 9 shall survive the termination of this Agreement.

10.  <u>Non-Competition and Non-Solicitation</u>.

During the Term and for a period of one year following the date of termination or nonrenewal for any reason (other than termination pursuant to Section 5.1(a): (a) the Employee shall not in the United States or in any country in which the Company shall then be doing business, directly or indirectly, enter the employ of, or render any services to, any person, firm or corporation engaged in any business competitive with the business of the Company or of any of its subsidiaries or affiliates of which the Employee may become an employee or officer during the Term; he shall not engage in such business on his own account; and he shall not become interested in any such business, directly or indirectly, as an individual, partner, shareholder, director, officer, principal, agent, employee, trustee, consultant, or any other relationship or capacity; provided, however, that nothing contained in this Section 10 shall be deemed to prohibit the Employee from acquiring, solely as an investment, shares of capital stock of any public corporation; (b) neither the Employee nor any Affiliate of the Employee shall solicit or utilize, or assist any person in any way to solicit or utilize, the services, directly or indirectly, of any of the Company's directors, consultants, members of the Board of Scientific and Medical Advisors, officers or employees (collectively, "Associates of the Company"). This nonsolicitation and nonutilization provision shall not apply to Associates of the Company who have previously terminated their relationship with the Company.

10.1  If the Employee commits a breach, or threatens to commit a breach, of any of the provisions of this Section 10, the Company shall have the following rights and remedies:

10.1.1  The right and remedy to have the provisions of this Agreement specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to the Company and that money damages shall not provide an adequate remedy to the Company; and

10

10.1.2  The right and remedy to require the Employee to account for and pay over to the Company all compensation, profits, monies, accruals,  increments or other benefits (collectively "Benefits") derived or received by the Employee as the result of any transactions constituting a breach of any of the provisions of the preceding paragraph, and the Employee hereby agrees to account for and pay over such Benefits to the Company.

Each of the rights and remedies enumerated above shall be independent of the other, and shall be severally enforceable, and all of such rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available to the Company under law or in equity.

10.2 If any of the covenants contained in Section 8, 9 or 10, or any part thereof, is hereafter construed to be invalid or unenforceable, the same shall not affect the remainder of the covenant or covenants, which shall be given full effect without regard to the invalid portions.

10.3 If any of the covenants contained in Section 8, 9 or 10, or any part thereof, is held to be unenforceable because of the duration of such provision or the area covered thereby, the parties agree that the court making such determination shall have the power to reduce the duration and/or area of such provision and, in its reduced form, such provision shall then be enforceable.

10.4 The parties hereto intend to and hereby confer jurisdiction to enforce the covenants contained in Sections 8, 9 and 10 upon the courts of any state within the geographical scope of such covenants. In the event that the courts of any one or more of such states shall hold any such covenant wholly unenforceable by reason of the breadth of such scope or otherwise, it is the intention of the parties hereto that such determination not bar or in any way affect the Company's right to the relief provided above in the courts of any other states within the geographical scope of such covenants, as to breaches of such covenants in such other respective jurisdictions, the above covenants as they relate to each state being, for this purpose, severable into diverse and independent covenants.

11

11.  Indemnification.

The Company shall indemnify the Employee, to the maximum extent permitted by applicable law, against all costs, charges and expenses incurred or sustained by him in connection with any action, suit or proceeding to which he may be made a party by reason of his being an officer, director or employee of the Company or of any subsidiary or affiliate of the Company. The Company shall provide, subject to its availability upon reasonable terms (which determination shall be made by the Board) at its expense, directors and officers insurance for the Employee in reasonable amounts. Determination with respect to (a) the availability of insurance upon reasonable terms and (b) the amount of such insurance coverage shall be made by the Board in its sole discretion.

12.  Notices.

All notices, requests, consents and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if sent by prepaid telegram (confirmed delivery by the telegram service), private overnight mail service (delivery confirmed by such service), registered or certified mail (return receipt requested), or delivered personally, as follows (or to such other address as either party shall designate by notice in writing to the other in accordance herewith):

If to the Company:

ARIAD Pharmaceuticals, Inc.
26 Landsdowne Street
Cambridge, Massachusetts 02139
Attention: Chief Executive Officer

Telephone:  (617) 494-0400
Facsimile: (617) 494-1828

If to the Employee:

Richard W. Pascoe
39 Monroe Avenue
Belle Mead, New Jersey 08502

Telephone:  (609) 240-4926

12

13.  <u>General</u>.

  13.1 This Agreement shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts applicable to agreements made and to be performed entirely in Massachusetts.

  13.2  The Section headings contained herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

  13.3  This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter hereof, and supersedes all prior agreements, arrangements and understandings, written or oral, relating to the subject matter hereof. No representation, promise or inducement has been made by either party that is not embodied in this Agreement, and neither party shall be bound by or liable for any alleged representation, promise or inducement not so set forth.

13.4  This Agreement and the Employee's rights and obligations hereunder may not be assigned by the Employee or the Company; provided, however, the Company may assign this Agreement to an Affiliate or a successor-in interest.

13.5 This Agreement may be amended, modified, superseded, canceled, renewed or extended, and the terms or covenants hereof may be waived, only by a written instrument executed by the parties hereto, or in the case of a waiver, by the party waiving compliance. The failure of a party at any time or times to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same. No waiver by a party of the breach of any term or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such breach, or a waiver of the breach of any other term or covenant contained in this Agreement.

14. Definitions. As used herein the following terms have the following meaning:

(a)  "Affiliate" means and includes any corporation or other business entity controlling, controlled by or under common control with the corporation in question.

(b) The "Company's Field of Interest" is the discovery, development and commercialization of pharmaceutical products based on (a) intervention in cell signaling and (b) gene and cell therapy. The Company's Field of Interest may be changed at any time at the sole discretion of the Company and upon written notice to Employee.

14

(c)  "Person" means any natural person, corporation, partnership, firm, joint venture, association, joint stock company, trust, unincorporated organization, governmental body or other entity.

(d)  "Subsidiary" means any corporation or other business entity directly or indirectly controlled by the corporation in question.

[This space intentionally left blank.]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.


ARIAD PHARMACEUTICALS, INC.


By:  /s/ Harvey J. Berger
_____
     Harvey J. Berger, M.D.
     Chairman and Chief Executive Officer


EMPLOYEE


 /s/ Richard W. Pascoe
_____
     Richard W. Pascoe


16

EXHIBIT 23.1

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Registration Statement Nos. 33-90854, 333-36597, 333-63706, 333-90480 and 333-116996 of ARIAD Pharmaceuticals, Inc. on Form S-8 and Registration Statement Nos. 333-111401 and 333-122909 of ARIAD Pharmaceuticals, Inc. on Form S-3 of our report dated March 13, 2006, relating to the consolidated financial statements of ARIAD Pharmaceuticals, Inc. and management's report on the effectiveness of internal control over financial reporting, appearing in this Annual Report on Form 10-K of ARIAD Pharmaceuticals, Inc. for the year ended December 31, 2005.


/s/DELOITTE & TOUCHE LLP

Boston, Massachusetts
March 13, 2006

EXHIBIT 31.1

**CERTIFICATIONS**

I, Harvey J. Berger, M.D., certify that:

1. I have reviewed this annual report on Form 10-K of ARIAD Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

    a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

March 14, 2006                                          /s/ Harvey J. Berger, M.D.
                                                        Harvey J. Berger, M.D.
                                                        Chairman of the Board of Directors,
                                                        Chief Executive Officer and President

EXHIBIT 31.2

## CERTIFICATIONS

I, Edward M. Fitzgerald, certify that:

1. I have reviewed this annual report on Form 10-K of ARIAD Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

March 14, 2006                                          /s/ Edward M. Fitzgerald
                                                        Edward M. Fitzgerald
                                                        Senior Vice President,
                                                        Finance and Corporate Operations, and
                                                        Chief Financial Officer and Treasurer

EXHIBIT 32.1

**CERTIFICATION**
**PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**
**(Subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code)**

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), each of the undersigned officers of ARIAD Pharmaceuticals, Inc., a Delaware corporation (the "Company"), does hereby certify, to such officer's knowledge, that:

The Annual Report on Form 10-K for the year ended December 31, 2005 (the "Form 10-K") of the Company fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, and the information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: March 14, 2006                                    /s/ Harvey J. Berger, M.D.
                                                         Harvey J. Berger, M.D.
                                                         Chairman of the Board of Directors,
                                                         Chief Executive Officer and President

Dated: March 14, 2006                                    /s/ Edward M. Fitzgerald
                                                         Edward M. Fitzgerald
                                                         Senior Vice President,
                                                         Finance and Corporate Operations, and
                                                         Chief Financial Officer and Treasurer

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

_____
 Created by 10KWizard     www.10KWizard.com

# EXHIBIT R





F a c t   S h e e t

# **Amgen** Manufacturing

At Amgen, one of the many important ways we fulfill our mission to serve patients is by producing vital medicines in sufficient quantity to meet patient demand, while following good manufacturing practices to ensure that our products meet our high standards for safety and potency.

Manufacturing biotechnological medicines is a highly specialized activity, and Amgen is a leader in the field. The company's state-of-the-art biotechnology manufacturing and process development capabilities help us to realize the potential of our pipeline for patients around the world.

Scalable, flexible, and committed to safety and reliability, our capabilities in process development, manufacturing, quality and supply chain management are continually growing. Amgen is making significant investments to increase our capacities in those areas to meet future needs.

## A Pioneer in Biotechnology Manufacturing

Manufacturing therapies based on proteins found in the human body is a complex process. In the biotechnology industry, therapeutics are manufactured using living organisms that contain the genetic code for the



specific molecule being produced. Precisely controlling the manufacturing process and environment is necessary to obtain consistent results and to ensure efficacy and safety.

As one of the industry's original innovators, Amgen has extensive knowledge and first-hand expertise in clinical and commercial manufacturing of biotechnology-based medicines. We have an outstanding track record of regulatory compliance, thanks to stringent controls and a superior quality system. We have world-class capabilities in process development and continually innovate newer and more efficient ways to produce therapies using biotechnology. Most importantly, we have a track record of safely and reliably delivering medicines to patients who need them.

### Quick Facts

**Locations**
Fremont and Thousand Oaks, California
Boulder and Longmont, Colorado
Juncos, Puerto Rico
West Greenwich, Rhode Island
Bothell, Washington
County Cork, Ireland (planned)

**Staff**
Approximately 8,000

**Key Functions**
– Process Development
– Manufacturing (clinical, bulk, formulation, fill and finish; contract manufacturing)
– Quality and Regulatory Compliance
– Supply Chain Management
– Environmental Health and Safety
– Operations Planning
– Corporate Engineering and Capital Projects

**Principal Protein Therapeutics Manufactured**
– Aranesp® (darbepoetin alfa)
– Enbrel® (etanercept)
– EPOGEN® (Epoetin alfa)
– Kepivance® (palifermin)
– Kineret® (anakinra)
– Neulasta® (pegfilgrastim)
– NEUPOGEN® (Filgrastim)
– Vectibix™ (panitumumab)*

* Under review with the U.S. Food and Drug Administration

**Contact**
Media: (805) 447-4587
Investors: (805) 447-1060

## Growing Our Operations to Meet Patient Needs

Amgen has been working to expand manufacturing operations worldwide.

### California

Amgen has long had protein manufacturing capabilities at our Thousand Oaks headquarters. The site has a proud history as Amgen's first manufacturing location and still produces commercial bulk for several marketed and clinical medicines. Going forward, Thousand Oaks will increasingly focus on clinical operations. In 2006, with the acquisition of Abgenix Inc. in Fremont, we expanded our development and production capability for human monoclonal antibodies. The 100,000-square-foot manufacturing facility in Fremont will manufacture Vectibix™ (panitumumab), a novel anti-cancer medicine currently under review with the U.S. Food and Drug Administration (FDA).

### Colorado

Amgen has two manufacturing facilities near Boulder, Colorado: Longmont and LakeCentre. Longmont is responsible for bulk manufacture of EPOGEN® (Epoetin alfa) and Aranesp® (darbepoetin alfa). LakeCentre manufactures Kineret® (anakinra), Kepivance® (palifermin) and a number of pipeline product candidates in late-stage clinical development. To accomodate our growing pipeline, we are increasing capacity at our LakeCentre facility.

### Ireland

In 2006, Amgen announced plans to construct a major production site in County Cork, Ireland. Once operational, this site will include capacity for process development, bulk protein production, formulation, fill and finish, as well as quality testing. The Ireland facility will play a crucial role in the expansion of Amgen's global manufacturing network, producing medicines to serve a growing number of patients in Europe and other parts of the world.

### Puerto Rico

Amgen has developed a state-of-the-art biotechnology campus for bulk manufacturing in Juncos, Puerto Rico, with biologics manufacturing capability, expanded full-testing quality analytical labs, formulation, fill and finish capability, warehouses, process development facilities, administrative and training buildings, a cafeteria and a child care center. Amgen Puerto Rico recently received FDA approval of a bulk manufacturing facility for NEUPOGEN® (Filgrastim) and Neulasta® (pegfilgrastim). Amgen is also adding a manufacturing plant in Juncos to produce Aranesp® and EPOGEN®.

### Rhode Island

Amgen's facility in West Greenwich, Rhode Island, operates around the clock to manufacture Enbrel® (etanercept) in bulk substance form. The first Amgen plant in West Greenwich received FDA approval in December 2002, and a new plant received FDA approval in September 2005. The new plant adds to the campus more than 500,000 square feet of manufacturing, utility, administrative and laboratory space. It houses one of the world's largest mammalian protein manufacturing facilities as well as administrative, utilities and quality analytical laboratory buildings.

### Washington

Amgen's Process Development and Cell Culture facilities in Bothell are devoted to developing cost-effective manufacturing processes to yield the highest quality products as well as material for clinical studies.

### About Amgen

Amgen (NASDAQ: AMGN) discovers, develops and delivers innovative human therapeutics. A biotechnology pioneer since 1980, Amgen was one of the first companies to realize the new science's promise by bringing novel medicines from lab, to manufacturing plant to patient. Amgen therapeutics have changed the practice of medicine, helping millions of people in the fight against cancer, kidney disease, rheumatoid arthritis and other serious illnesses.

Headquartered in Southern California, with offices in 31 countries, Amgen has more than 18,000 staff members worldwide. With a broad and deep pipeline of potential new medicines, Amgen remains committed to advancing science to dramatically improve people's lives. To learn more about our pioneering science and our vital medicines, visit www.amgen.com.

# EXHIBIT S



**Sorry!** To see all the details that are visible on the screen, use the "Printer Friendly" link above the map.



| | |
|---|---|
| **START** 40 Technology Way<br>West Greenwich, RI 02817-1700, US | **END** 1 Courthouse Way<br>Boston, MA 02210-3002, US |

**Total Est. Time:**
1 hour, 15 minutes

**Total Est. Distance:**
67.66 miles

| Maneuvers | Distance |
|---|---|
| **START** **1:** Start out going NORTHWEST on TECHNOLOGY WAY toward HOPKINS HILL RD. | 0.1 miles |
| **2:** Turn LEFT onto HOPKINS HILL RD. | 0.5 miles |
| **3:** Merge onto I-95 N (Crossing into MASSACHUSETTS). | 49.6 miles |
| **4:** Merge onto I-93 N / US-1 N via EXIT 12 toward BOSTON. | 15.3 miles |
| **5:** Take EXIT 20 toward I-90 / LOGAN AIRPORT / WORCESTER / S. STATION. | 0.4 miles |
| **6:** Take the I-90 E exit on the LEFT toward LOGAN AIRPORT / SOUTH BOSTON. | 1.0 miles |
| **7:** Keep RIGHT at the fork in the ramp. | 0.1 miles |
| **8:** Keep LEFT at the fork in the ramp. | <0.1 miles |
| **9:** Stay STRAIGHT to go onto E SERVICE RD. | 0.1 miles |
| **10:** E SERVICE RD becomes NORTHERN AVE. | 0.2 miles |
| **END** **11:** End at **1 Courthouse Way**<br>Boston, MA 02210-3002, US | |

**Total Est. Time:** 1 hour, 15 minutes     **Total Est. Distance:** 67.66 miles



All rights reserved. Use Subject to License/Copyright
These directions are informational only. No representation is made or warranty given as to their content, road conditions or route usability or expeditiousness. User assumes all risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from such use.



**Sorry!** To see all the details that are visible on the screen, use the "Printer Friendly" link above the map.



**START  40 Technology Way**
West Greenwich, RI 02817-1700, US

**END  844 N King St**
Wilmington, DE 19801-3519, US

**Total Est. Time:**
4 hours, 58 minutes

**Total Est. Distance:**
288.52 miles

| Maneuvers | | Distance |
|---|---|---|
| **START** | **1:** Start out going NORTHWEST on TECHNOLOGY WAY toward HOPKINS HILL RD. | 0.1 miles |
| | **2:** Turn LEFT onto HOPKINS HILL RD. | 0.3 miles |
| SOUTH 95 | **3:** Merge onto I-95 S (Portions toll) (Passing through CONNECTICUT- then crossing into NEW YORK). | 153.6 miles |
| SOUTH 95 | **4:** Keep RIGHT to take I-95 S toward G W BRIDGE / LOWER LEVEL / LAST NY EXIT (Crossing into NEW JERSEY). | 2.5 miles |
| SOUTH 95 EXP | **5:** Keep LEFT to take I-95 EXPRESS LN S / NEW JERSEY TURNPIKE S toward I-80 / GARDEN STATE PARKWAY / PATERSON. | 2.5 miles |
| SOUTH 95 | **6:** Take I-95 S / NEW JERSEY TURNPIKE S toward US-46 / NEWARK (Portions toll). | 12.9 miles |
| | **7:** Keep RIGHT to take NEW JERSEY TURNPIKE S toward CARS-TRUCKS-BUSES (Portions toll). | 105.9 miles |
| SOUTH 295 | **8:** NEW JERSEY TURNPIKE S becomes I-295 S (Portions toll) (Crossing into DELAWARE). | 5.5 miles |
| NORTH 95 | **9:** Merge onto I-95 N / US-202 N via the exit on the LEFT toward WILMINGTON. | 3.6 miles |
| 7 EXIT | **10:** Take EXIT 7 toward SR-52 / DELAWARE AVE.. | 0.1 miles |
| | **11:** Turn SLIGHT LEFT onto N ADAMS ST. | 0.2 miles |
| SOUTH 52 | **12:** Turn SLIGHT RIGHT onto DELAWARE AVE / DE-52 S. Continue to follow DE-52 S. | 0.5 miles |
| SOUTH 13 BR | **13:** Turn RIGHT onto N KING ST / US-13 BR S. | 0.1 miles |
| **END** | **14:** End at **844 N King St** Wilmington, DE 19801-3519, US | |

**Total Est. Time:** 4 hours, 58 minutes     **Total Est. Distance:** 288.52 miles



**Start:**
**40 Technology Way**
West Greenwich, RI 02817-1700, US

**End:**
**844 N King St**
Wilmington, DE 19801-3519, US





All rights reserved. Use Subject to License/Copyright
These directions are informational only. No representation is made or warranty given as to their content, road conditions or route usability or expeditiousness. User assumes all risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from such use.

# EXHIBIT T



# Verizon Yellow Pages™
## superpages.com

**boston.com Business**

*your connection to* The Boston Globe

| Home | News | A&E | **Business** | Sports | Travel | Your Life | Cars | Jobs | Personals | Real Estate |

Sign In | Register Now

Personal Tech | Markets | Your Money | Technology | Healthcare | Columnists | Latest news | Message Boards

Home > Business

# Amgen to expand research unit here

*The Boston Globe*

## Calif. firm will boost staff at labs to 400

**By Christopher Rowland, Globe Staff  |  March 2, 2006**

Amgen Inc. plans to increase to 400 the number of scientists and support staff at its Kendall Square laboratories over the next few years, substantially expanding its footprint in Cambridge, chief executive Kevin Sharer said in Boston yesterday.

Amgen, with headquarters in Thousand Oaks, Calif., and more than 14,000 employees, is the largest biotechnology company in the world. It had revenue of $12.4 billion in 2005.

Amgen's Cambridge research operation is relatively small, with 135 employees in a 300,000-square-foot building that Amgen opened in 2001. The expansion, however, will gradually move its Cambridge facility to among the top dozen pharmaceutical and biotechnology labs in Massachusetts.

The company said the Cambridge operation would employ 200 people by the end of this year.

Sharer said Boston's concentration of academic medical centers, universities, and biotechnology companies was the main reason Amgen decided to expand here.

Sharer also cited a positive regulatory environment as a reason for doing business in Massachusetts, a view not often voiced by the state's business leaders.

"This is a great place to do business," said Sharer, a former high-ranking executive at MCI Communications who joined Amgen in 1992 and rose to chief executive in 2000. Amgen's larger Cambridge operation, he said, will have a "fully capable, fully scalable research site."

He discussed the company's plans in an interview at The Boston Globe yesterday and in response to a question after speaking before the Boston College Chief Executives' Club at the Boston Harbor Hotel. He told business leaders that Amgen is looking to make acquisitions.

"Boston's full of companies that may some day want to be part of the Amgen family," he said.

Amgen grew from a tiny California start-up in the 1980s on the back of its star drug, Epogen, which treats anemia in cancer patients and patients undergoing renal dialysis. It has continued to focus on expensive injectable drugs.

Advertisement

## Latest business news
- Yahoo teams up with HP on search engine
- Microsoft sets $250 price for Zune, songs for 99 cents
- Yahoo in deal to feature services on HP computers
- Would-be globe trotters find partners online
- Former Rite Aid exec seeks new trial
- **More business news**

## BOSTON.COM'S MOST E-MAILED
- Boston theaters offer free tickets
- College consultant finds customers among anxious parents
- Love to hate you
- General hospitality
- Legal residents' rights curbed in detainee bill
- **See full list of most e-mailed**

## SEARCH THE ARCHIVES

Today (free)          Past 30 days

Yesterday (free)      Last 12 months

Advanced search / Historic Archives

Advertisement

More recently, its growth accelerated with several acquisitions: Kinetix Corp., of Medford, in 2000; Immunex Corp., of Seattle, in 2002; and Tularik Inc., of San Francisco, in 2004. Late last year it struck a deal to acquire Abgenix Inc., of Fremont, Calif. The Immunex deal allowed it to acquire Enbrel, a popular drug used to treat rheumatoid arthritis and psoriasis that it manufactures at a plant in East Greenwich, R.I.

Last month, Amgen said it would spend heavily in 2006 on new research and development activities in the United States and Europe.

The most visible change so far at Amgen's Cambridge operation has been the arrival last month of its new leader, Mark Duggan, senior director of medicinal chemistry.

He joined Amgen after leaving Merck & Co., a company with a recently troubled history that includes the withdrawal of the painkiller Vioxx and a pipeline of new drugs that is considered weak by investors.

Duggan said Amgen researchers in Cambridge will be heavily focused on finding treatments for neurological ailments, like pain, Alzheimer's disease, and schizophrenia. Cancer also will be a key target, he said.

Amgen's expansion news was welcomed by the Massachusetts Biotechnology Council, an industry trade group. Its president, Thomas M. Finneran, the former Massachusetts House speaker, cited it as an example of the company's faith in the state's intellectual and scientific resources.

''Amgen's a player. Given their extraordinary success, their deep pockets, their good pipeline, for them to be making that type of additional commitment says they have a lot of confidence in Massachusetts,'' Finneran said.

Two other major national drug firms, Novartis AG and Merck, have made significant research investments in the Boston area in the last three years.

Novartis plans to hire 1,000 employees at its laboratories in Cambridge, and Merck plans to put 400 to work at its laboratory in Boston's Longwood Medical Area.

*Christopher Rowland can be reached at crowland@globe.com.* ∎

© Copyright 2006 Globe Newspaper Company.

---

**More:**

Business section | Latest business news | Globe front page | Boston.com

**Sign up for:** Globe Headlines e-mail | Breaking News Alerts

---

🖨 Printer friendly  ✉ E-mail to a friend  XML Available RSS feeds  ✉ Most e-mailed  R Reprints/permissions



Verizon Yellow Pages

feedback form | help | site index | globe archives | rss

© 20 The New York Times Company

Home delivery for as
little as $1.75 a week!

The Boston Globe

click here

# EXHIBIT U

- [About Amgen](#)
- [Science](#)
- [Corporate Philanthropy](#)
- [Site Map](#)
- [Search](#)
- [Privacy & Terms](#)
- [Contact Us](#)



- [Patients](#)
- [Medical Professionals](#)
- [Partners](#)
- [Investors](#)
- [Careers](#)
- [Media](#)

- [print](#)
- [mail](#)

- [Home](#)
- [About Amgen](#)
- [Leadership Team](#)
- [Board of Directors](#)

## Leadership

- [Overview](#)

- [Mission & Values](#)

- [Leadership Team](#)

- [Corporate Governance](#)

- [Corporate Compliance](#)

- [Awards & Recognition](#)

- [Company History](#)

- [Fact Sheets](#)

- [Locations](#)

-

Leadership Team

- [Executive Management](#)
- [Board of Directors](#)

Kevin W. Sharer
Chairman of the Board, Chief Executive Officer and President, Amgen Inc.

Mr. Kevin W. Sharer, age 58, has served as a director of the Company since November 1992. Since May 2000, Mr. Sharer has been Chief Executive Officer and President of the Company and has also been Chairman of the Board since December 2000. From October 1992 to May 2000, Mr. Sharer served as President and Chief Operating Officer of the Company. From April 1989 to October 1992, Mr. Sharer was President of the Business Markets Division of MCI Communications Corporation, a telecommunications company. From February 1984 to March 1989, Mr. Sharer served in numerous executive capacities at General Electric Company. Mr. Sharer is a director of 3M Company and Northrop Grumman Corporation.

David Baltimore
President, California Institute of Technology

Dr. David Baltimore, age 68, has served as a director of the Company since June 1999. Since October 1997, Dr. Baltimore has been the President of the California Institute of Technology. From July 1995 to October 1997, Dr. Baltimore was an Institute Professor at the Massachusetts Institute of Technology ("MIT"), and from July 1994 to October 1997, the Ivan R. Cottrell Professor of Molecular Biology and Immunology at MIT. Dr. Baltimore is a director of BB Biotech, AG, a Swiss investment company, and MedImmune, Inc. In 1975, Dr. Baltimore was the co-recipient of the Nobel Prize in Medicine.

Frank J. Biondi, Jr.
Senior Managing Director, WaterView Advisors LLC

Mr. Frank J. Biondi, Jr., age 61, has served as a director of the Company since January 2002. Since March 1999, he has served as Senior Managing Director of WaterView Advisors LLC, an investment advisor organization. From April 1996 to November 1998, Mr. Biondi served as Chairman and Chief Executive Officer of Universal Studios, Inc. From July 1987 to January 1996, Mr. Biondi served as President and Chief Executive Officer of Viacom, Inc. Mr. Biondi is a director of Cablevision Systems Corp., Harrahs Entertainment, Inc., Hasbro, Inc., The Bank of New York Company, Inc. and Seagate Technology.

Jerry D. Choate
Retired Chairman and Chief Executive Officer, The Allstate Corporation

Mr. Jerry D. Choate, age 67, has served as a director of the Company since August 1998. From January 1995 to January 1999, Mr. Choate served as Chairman of the Board and Chief Executive Officer of The Allstate Corporation ("Allstate"), an insurance holding company. From August 1994 to January 1995, Mr. Choate served as President and Chief Executive Officer of Allstate and had previously held various management positions at Allstate since 1962. Mr. Choate is a director of Valero Energy Corporation and serves on the Board of Trustees for the Van Kampen Mutual Funds.

Frederick W. Gluck
Former Managing Director, McKinsey & Company, Inc.

Mr. Frederick W. Gluck, age 70, has served as a director of the Company since February 1998. Mr. Gluck is a former managing partner of McKinsey & Company, Inc. ("McKinsey"), an international management consulting firm. From 1967 to 1995, he served with McKinsey and from 1988 to 1994 he led the firm as its Managing Director, when he retired to join Bechtel Group, Inc. ("Bechtel"), an engineering, construction and project management company, where he served as Vice Chairman and Director. Mr. Gluck retired from Bechtel in July 1998. He rejoined McKinsey as a consultant in 1998 and continued in that role until July 2003, when he retired. Mr. Gluck is a director of HCA Inc. and GVI Security Solutions, Inc.

Frank C. Herringer
Chairman of the Board, Transamerica Corporation

Mr. Frank C. Herringer, age 63, has served as a director of the Company since May 2004. Mr. Herringer has been Chairman of the Board of Transamerica Corporation ("Transamerica"), a financial services company, since 1995. From 1991 to 1999, he served as Chief Executive Officer of Transamerica and from 1986 to 1999 he served as President. From 1999 to 2000, Mr. Herringer served on the Executive Board of Aegon N.V. and as Chairman of the Board of Aegon U.S.A. Mr. Herringer is a director of The Charles Schwab Corporation and Hawaii Biotech, Inc.

Gilbert S. Omenn

Professor of Internal Medicine, Human Genetics and Public Health, University of Michigan

Dr. Gilbert S. Omenn, age 64, has served as a director of the Company since January 1987. Since September 1997, he has been Professor of Internal Medicine, Human Genetics and Public Health at the University of Michigan. From September 1997 to July 2002, Dr. Omenn also served as Executive Vice President for Medical Affairs and as Chief Executive Officer of the University of Michigan Health System. From July 1982 to September 1997, Dr. Omenn was the Dean of the School of Public Health and Community Medicine and Professor of Medicine at the University of Washington. Dr. Omenn is a director of Rohm & Haas Co. and OccuLogix, Inc.

Judith C. Pelham
President Emeritus, Trinity Health

Ms. Judith C. Pelham, age 60, has served as a director of the Company since May 1995. She is currently President Emeritus of Trinity Health, a national system of healthcare facilities, including hospitals, long-term care, home care, psychiatric care, residences for the elderly and ambulatory care, and the third largest Catholic healthcare system in the U.S. From May 2000 to December 2004, Ms. Pelham was President and Chief Executive Officer of Trinity Health. From January 1993 to April 2000, Ms. Pelham was the President and Chief Executive Officer of Mercy Health Services, a system of hospitals, home care, long-term care, ambulatory services and managed care established to carry out the health ministry sponsored by the Sisters of Mercy Regional Community of Detroit. From 1982 to 1992, Ms. Pelham was President and Chief Executive Officer of Daughters of Charity Health Services, Austin, Texas, a network of hospitals, home care and ambulatory services serving central Texas. Ms. Pelham is a director of Hospira, Inc.

J. Paul Reason
Vice Chairman and Director, Metro Machine Corporation

Admiral J. Paul Reason, USN (Retired), age 65, has served as a director of the Company since January 2001. Since September 2005, he has been Vice Chairman and Director of Metro Machine Corporation, a privately-held ship repair company ("Metro Machine"). From July 2000 to September 2005, he served as President and Chief Operating Officer of Metro Machine. From December 1996 to September 1999, Admiral Reason was a Four Star Admiral and Commander-In-Chief of the U.S. Atlantic Fleet of the U. S. Navy. From August 1994 to November 1996, Admiral Reason served as Deputy Chief of Naval Operations. From June 1965 to July 1994, Admiral Reason served in numerous capacities, both at sea and ashore, in the U.S. Navy. Admiral Reason is a director of Wal-Mart Stores, Inc. and Norfolk Southern Corporation.

Donald B. Rice
Chairman of the Board, President and Chief Executive Officer, Agensys, Inc.

Dr. Donald B. Rice, age 66, has served as a director of the Company since October 2000. Dr. Rice is Chairman of the Board of Agensys, Inc., a private biotechnology company, and has been Chief Executive Officer and President of Agensys, Inc. since its founding in late 1996. From March 1993 until August 1996, Dr. Rice was President and Chief Operating Officer and a director of Teledyne, Inc., a diversified technology-based manufacturing company with major segments in specialty metals and aerospace. Dr. Rice is a director of Wells Fargo & Company, Vulcan Materials Company and Chevron Corporation.

Leonard D. Schaeffer
Founding Chairman and Chief Executive Officer, WellPoint, Inc.

Mr. Leonard D. Schaeffer, age 60, has served as a director of the Company since March 2004. Mr. Schaeffer is the former Chairman of the Board of Directors of WellPoint Inc., the largest health insurance company in the U.S. From 1992 through 2004 he was Chairman and Chief Executive Officer of WellPoint Health Networks Inc. Mr. Schaeffer was the Administrator of the U.S. Health Care Financing Administration from 1978 to 1980. He is Chairman of the Board of the National Institute for Health Care Management and a member of the Institute of Medicine. Mr. Schaeffer is a director of Allergan, Inc. Mr. Schaeffer was recommended by the Chief Executive Officer when Mr. Schaeffer was appointed in March 2004.

footer

# EXHIBIT V

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No.:1:02-cv-11280-RWZ

ARIAD PHARMACEUTICALS, INC.      )
MASSACHUSETTS INSTITUTE OF       )
TECHNOLOGY, THE WHITEHEAD        )
INSTITUTE FOR BIOMEDICAL RESEARCH)
and THE PRESIDENT AND FELLOWS OF )
HARVARD COLLEGE,                 )
                Plaintiffs,      )
                                 )
      - vs. -                    )
                                 )
ELI LILLY & COMPANY,             )
                Defendants       )

********

JURY TRIAL
DAY 2, First Session

BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT COURT JUDGE

United States District Court
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts  02210
April 11, 2006

********

REPORTER:  LISA W. STARR, RPR,CRR,CSR
Tel:  617.771.8336

Ariad v. Eli Lilly                          Day 2, Session 1
                          4-11-06

Page 24

1    theory that sometimes our memory or perception of events may

2    be colored by hearing somebody else testify about the same

3    events.  So we want you to be able to hear the witnesses

4    unaffected by what other witnesses are saying.  So anybody who

5    is going to testify will wait outside until such time as they

6    testify.

7                         HARVEY BERGER, sworn

8           MS. BEN-AMI:   May I proceed, your Honor?

9           THE COURT:   Yes.  Could you please tell us your

10   name?

11          THE WITNESS:  My name is Harvey Berger.  I'm the

12   chairman, founder and chief executive officer of Ariad

13   Pharmaceuticals.

14          MS. BEN-AMI:  With the Court's permission, I have

15   binders of the exhibits, your Honor.

16          THE COURT:  Are you giving those to the jury, too,

17   now?

18          MS. BEN-AMI:   No.  These are just broad exhibits.

19   We do have jury notebooks if now is the correct time.

20          THE COURT:  Well, it is, if we're going to look at

21   exhibits.

22   DIRECT EXAMINATION

23   BY MS. BEN-AMI:

24   Q.   Let me just ask you, Dr. Berger, to clear up something

25   that was just said.  Well, I'd like to make a brief

Ariad v. Eli Lilly                          Day 2, Session 1

4-11-06

1    into, effects inside the cell.  We were understanding that,

2    and we were learning that you could interfere or block those

3    pathways, those cell signals, like NF-kappaB, and in turn

4    develop drugs.

5    Q.   Can you tell us what this is?

6    A.   This is something I'm very proud of.  When I started

7    Ariad, one of the things you get to do is when you start a

8    company you get to name it.  If you don't name it after

9    yourself, and I had no plans of doing that, you name it after

10   something that tells a story.

11        And as I just described, our technology was trying to

12   decipher the labyrinth of the cell and the pathways out of the

13   cell.  So if you go back to Greek mythology, Ariadne is really

14   the story of the labyrinth, and Ariadne gave {unintelligible}

15   a spool of thread to find its way into the labyrinth to kill

16   the minotaur, a multi-headed monster in mythical times, and to

17   retrace his path back out of the labyrinth using the spool of

18   thread that had been the actual pathway in and out of the

19   cell.

20        And so, Ariad is a shortened version of Ariadne, and

21   the logo that you see there is really the spool of thread

22   that's really signifying cell signaling, pathways in and out

23   of a cell and ways of interfering with them.

24   Q.   So in the context of considering cell signaling back in

25   the early nineties, how did you come upon NF-kappaB?

Ariad v. Eli Lilly                          Day 2, Session 1

4-11-06

Page 31

1    A.   Well, in the early nineties, we knew very little about

2    cell signaling.  There were relatively few well-validated,

3    well-studied cell signaling pathways or molecules.  And as

4    part of the process I described earlier, I met with many

5    academics, one of whom was Dr. Baltimore, who at the time was

6    president of Rockefeller University in New York.  He had been

7    at M.I.T. for much of his career, and he told me about

8    NF-kappaB and its importance to our strategy of developing

9    drugs to block cell signaling.

10   Q.   Now, at the time, did you know anything about the awards

11   and achievement of Dr. Baltimore?

12   A.   Certainly.  Dr. Baltimore, who has been a collaborator of

13   Ariad from the beginning, is one of the most well-known

14   molecular biologists.  At the age of 32 or 33 he won the Nobel

15   Prize for work that really changed our understanding of

16   fundamental molecular biology, discoveries that led to the

17   development of many of the first-generation drugs for AIDS

18   called reverse transcriptase inhibitors.  And he was

19   recognized with the Nobvel Prize for that discovery.

20   Q.   Do you know what he does for a living now?

21   A.   Yes.  After a time at Rockefeller and M.I.T.,

22   Dr. Baltimore became president of Cal Tech in Pasadena, where

23   he has been for the last seven or eight years.

24   Q.   Now, when did you first speak to Dr. Baltimore about

25   NF-kappaB?

Ariad v. Eli Lilly                                    Day 2, Session 1

4-11-06

1    A.   Well, it was early in 1991, really at the beginning of my

2    effort to put Ariad together, to build the foundation for the

3    company.  So I met with him at his office and lab in New York

4    at Rockefeller.

5    Q.   And at the time, did he give you any idea of who the

6    colleagues were that he was working with on NF-kappaB?

7    A.   Well, he mentioned to me his long-standing collaboration

8    with Professor Phil Sharp, who was a professor of molecular

9    biology at M.I.T., who subsequently also has won the Nobel

10   Prize for his work in the area of biology, and Dr. Tom

11   Maniatis, who is a professor at Harvard, and their three labs

12   had worked closely together for much of the eighties in really

13   trying to understand NF-kappaB and cell signaling.

14   Q.   Now, at the time, in early 1991, I imagine, when you were

15   talking to Dr. Baltimore, did you understand that there had

16   been any patents filed or issued?

17   A.   Well, at the time nothing had been issued.  Dr.

18   Baltimore, after extensive discussions about our strategy,

19   the spool of thread strategy, you can call it, to really

20   understand cell signaling and think of and identify ways of

21   selecting targets like NF-kappaB and others that are important

22   to this process, this fundamental process in cells, and

23   looking at ways of developing drugs because Ariad was going to

24   be a drug company, although it was going to take us time, and

25   we were going to need to start from my blank sheet of paper

Ariad v. Eli Lilly                                    Day 2, Session 1

4-11-06

Page 33

1    and one employee.

2             Our goal was to make drugs, to have products that

3    helped patients with various difficult-to-treat diseases.

4             So we talked about NF-kappaB, and he indicated to me

5    that his former institution, M.I.T., had filed patents on

6    behalf of the inventors.  And there were a total of thirteen

7    inventors working in the three laboratories that I described,

8    those headed by him, Dr. Sharp, and Dr. Maniatis.

9             MS. BEN-AMI:   Can we have Exhibit PTX 328, please.

10   Q.   That's in your binder, Doctor.

11   A.   Which one, please?

12   Q.   328.

13            MS. BEN-AMI:   Ladies and gentlemen, you don't have

14   all of the exhibits that the witnesses are going to use.

15   They'll be put up on the screen for you so you don't have to

16   handle so much paper.

17   Q.   Can you tell us what this is?

18   A.   So this is a letter I received from the head of the

19   Technology Licensing Office at M.I.T. in March of 1991.  I had

20   met with David Baltimore not long before this.  The person who

21   sent this material to me is Lita Nelsen, the head of licensing

22   at M.I.T.

23            MR. BERGHOFF:   Your Honor, I hate to interrupt, but

24   we don't seem to have a copy that we received from Plaintiffs

25   on this.  I just want to be able to follow it.

Ariad v. Eli Lilly                                    Day 2, Session 1

4-11-06

Page 34

1          Could we have copies as we go along?

2          MS. BEN-AMI:   I believe we had agreed that we would

3     make a list of exhibits, and they would make their own exhibit

4     binders.

5          THE COURT:   You may continue with the witness.

6     A.   So to go back to where I was, Lita Nelson was the head of

7     the licensing office of M.I.T. in 1991.  I had interacted with

8     her and worked with her on licenses in the past when I was at

9     Centocor, so this was a very easy transition for me to go and

10    visit her.

11         I talked with her, and as you can see from this

12    letter, she basically sent me a pile of paper which was many

13    different patents and disclosures and descriptions of the

14    NF-kappaB-related science, as well as some other things.

15         As you can see, I was talking to her about various

16    technologies.  Most of this related to NF-kappaB and to the

17    work that had been done already long prior to 1991.  At the

18    end, she referred me to Dr. Sharp, whose one of the senior

19    inventors in this technology, and suggested I chat with him

20    more about it.

21         THE COURT:   Let's stop for a moment and stretch.

22                       (Pause).

23    Q.   Can you tell us, this is the last page of the document,

24    what is this?

25    A.   This is the third page.  It describes one of the cases

# Exhibit W



**Matthew P. Vincent**
Partner

**Ropes & Gray**
One International Place
Boston, MA 02110-2624

T 617-951-7739
F 617-951-7050
617-854-2087 secretary
matthew.vincent@ropesgray.com

Printable Bio

Add to Outlook Contacts

PRACTICES
**Corporate**
- Life Sciences
- Technology Company
- Venture Capital

**Fish & Neave IP Group**
- Biotechnology
- Chemical
- Licensing & Licensing Programs
- Medical Devices
- Patent Prosecution & Applications
- Pharmaceutical
- Portfolio Evaluation and Management

INDUSTRIES
- Life Sciences/Pharmaceutical



### Practice

Related Events

Matt Vincent, a partner at Ropes & Gray, has been working in the field of health and life science law since 1991, practicing principally in the areas of intellectual property and business and trade regulation as a patent agent and attorney.

### Professional Experience

Matt's graduate training concerned the engineering of enzyme specificity and catalytic activity, as well as the rational development of potent inhibitors of proteolytic enzymes. Through his research, Matt is familiar with enzymology and immunology, as well as NMR spectroscopy, recombinant DNA technology, protein purification methods, and computer-aided molecular modeling and dynamics.

Matt serves as counsel to many sectors of the biotechnology and chemical business community, including both start-up and established companies, as well as non-profit research and educational institutions and hospitals. Particular areas of expertise include biotechnology- and chemistry- related patent, trade secret, and licensing issues. His diverse clients include those in the fields of molecular biology, genomics, cellular and developmental biology, immunology, biochemistry, pharmacology, neurobiology, enzymology, pharmaceuticals, and combinatorial chemistry. He has represented various biopharmaceutical companies working in the fields of cell-cycle regulation to develop small molecule antiproliferatives and gene therapy; developmental biology with programs in neuronal regulation, skeletogenic regulation and functional genomics; signal transduction involved in inflammatory responses and apoptosis; and small molecule activated gene therapy.

In addition, Matt counsels various universities and hospitals in assorted patent-related matters and IP transactions. He has also recently counseled an international venture capital firm in its investment in companies developing gene-therapy treatments and therapeutic agents for regulating gene transaction.

### Honors & Awards

- *Massachusetts Super Lawyers - Rising Stars* (2005, 2006)

ROPES
& GRAY

About Ropes & Gray
Professionals
Industries
Practice Areas
Locations
Careers
News & Publications
Events

SEARCH

GO

Sitemap • Disclaimer • Contact Us



### Professional & Civic Activities

- Professional and academic affiliations include the Boston Patent Law Association, American Chemical Society, American Association for the Advancement of Science, Tau Beta Pi (National Engineering Honor Society), and Phi Lambda Upsilon (National Chemistry and Chemical Engineering Honor Society)

### Memberships & Affiliations

- Massachusetts Bar Association

### Bar Admission

- Massachusetts, 1996

### Education

- 1996, J.D., *cum laude*, Suffolk University Law School
- 1991, Ph.D. (Biochemical Sciences), Tufts University School of Medicine
- 1986, B.S. (Chemistry), *summa cum laude*, Worcester Polytechnic Institute

©2006 Ropes & Gray LLP. All rights reserved.

BACK TO TOP

# EXHIBIT X



**Practice Group**
**Biotechnology**

**Education**
Harvard School of Public
Health, Sc.D.
*Nutrition*

Harvard School of Public
Health, M.S.

Simmons College, A.B.

Suffolk University Law School,
J.D.



PROFESSIONALS

# Patricia Granahan  |PRINT|

**Partner**
pgranahan@wolfgreenfield.com
617.646.8250

Pat Granahan is a partner and member of the firm's Biotechnology Group
counsel, particularly in the areas of biotechnology and biopharmaceutical;
profit academic, medical and research institutions, start-up companies an
businesses.

In her more than 20 years in practice, Pat has written and prosecuted pat
provided advice for protecting pioneering inventions in many areas of tech
gene therapy, signal transduction, gene activation, oncology, and transge
extensive experience in obtaining and defending patent rights in the Unite
in other countries; providing legal opinions as to patentability and inventor
validity, infringement, and freedom to operate; and drafting and providing
licensing, technology transfer and confidentiality agreements.

Pat previously served as Patent Counsel at the Whitehead Institute for Bio
and has worked in product development and evaluation as a member of the
Division at Arthur D. Little, Inc. She also headed a University of Massachu
education program for children in low-income families, worked on analysis
dietary data from a large federal study, and taught nutrition in a Boston co
joining the firm, Pat was a partner at Ropes & Gray in Boston.

Home | About the Firm | Professionals | Practice Areas | Industries | Newsstand | Q&A Bool
Directions | Disclaimer | Email Us | © 2006 Wolf, Greenfield & Sacks, P.C. All Rights Reser



| ABOUT THE FIRM | PROFESSIONALS | PRACTICE AREAS | INDUSTRIES | NEWSSTAND | Q&A BOOKLE |

**Wolf Greenfield**
SPECIALISTS IN INTELLECTUAL PROPERTY LAW

Biotechnology
Chemical
Electrical&ComputerTechnologies
Interference
IPTransactions
Litigation

For the fourth year in a row,
Wolf Greenfield has been
named one of the
"Best Places to Work" by
*Boston Business Journal.*



## Overview  |PRINT|

For more than 75 years, Wolf Greenfield has protected and expanded the
property rights of products and services that have **helped shape the wor**
**it**—the way we communicate, live, feel, and even heal.

Our professionals provide a level of expertise that can only be achieved b
exclusively to IP law. **We are engineers, scientists, and lawyers.** So, its
we ask more questions, test, and retest. In addition to the legal issues, we
avoid potential industry barriers that could adversely affect our primary pu
business goals.

Our experience sets us apart. We draw from industry, academic, and pos
experience in areas including biotechnology, electrical engineering, chem
computer science, mechanical engineering, and medicine. While others a
the technical details, we are steps ahead—developing strategies to solidi
trademark, litigation, copyright or licensing position.

Clients encounter a work dynamic that's more characteristic of a partners
else. We become more personally involved in your business objectives, b
colleagues, an extension of your in-house team. We enjoy this relationshi
ranging from start-ups to Fortune 500s to institutions and hospitals to ven

From concept to market, and every point along the way, we protect, enfor
expand your innovations and brand identity. **We turn your ideas into val**
**assets.**

**Wolf, Greenfield & Sacks, P.C.**
600 Atlantic Avenue
Boston, MA 02210-2206
Tel: +1.617.646.8000
Fax: +1.617.646.8646

Home | About the Firm | Professionals | Practice Areas | Industries | Newsstand | Q&A Bool
Directions | Disclaimer | Email Us | © 2006 Wolf, Greenfield & Sacks, P.C. All Rights Reser

# Exhibit Y

- [About Amgen](#)
- [Science](#)
- [Corporate Philanthropy](#)
- [Site Map](#)
- [Search](#)
- [Privacy & Terms](#)
- [Contact Us](#)



- [Patients](#)
- [Medical Professionals](#)
- [Partners](#)
- [Investors](#)
- [Careers](#)
- [Media](#)

- [print](#)
- [mail](#)

- [Home](#)
- [About Amgen](#)
- [Locations](#)

## Locations

- [Overview](#)

- [Mission & Values](#)

- [Leadership Team](#)

- [Corporate Governance](#)

- [Corporate Compliance](#)

- [Awards & Recognition](#)

- [Company History](#)

- [Fact Sheets](#)

- [Locations](#)

-

[United States](#)
[Canada](#)
[Europe](#)
[Australia](#)
[Asia](#)



# United States

Thousand Oaks, CA
Amgen Inc. (Headquarters)

- One Amgen Center Drive
- Thousand Oaks, CA
- 91320-1799
- USA

  - 805-447-1000 (tel)
  - 805-447-1010 (fax)
  - Professional Services Hotline: 800-77-AMGEN
  - Customer Services Hotline: 800-28-AMGEN

CAMBRIDGE, MA
Amgen Inc.

- [Map to Thousand Oaks, CA](#)

- 1 Kendall Square
- Bldg. 1000
- Cambridge, MA
- 02139
- USA

  - 617-444-5000 (tel)
  -

- www.amgen.com

## BOTHELL, WA
Amgen Inc.

- 21507 23rd Drive SE
- Bothell, WA
- 98021
- USA

  - 206-265-7000 (tel)
  -

## BOULDER, CO
Amgen Inc.

- 5550 Airport Blvd.
- Boulder, CO
- 80301
- USA

  - 303-401-1000 (tel)
  -

## LONGMONT, CO
Amgen Inc. (Manufacturing Center)

- 4000 Nelson Road
- Longmont, CO
- 80503
- USA

  - 303-401-1000 (tel)
  -

## LOUISVILLE, KY
Amgen Inc. (Distribution Center)

- 12000 Plantside Drive
- Louisville, KY
- 40299
- USA

  - 502-266-2700 (tel)
  - 502-267-1476 (fax)

PUERTO RICO
Amgen Manufacturing, Limited

- P.O. Box 4060
- Juncos, PR
- 00777
- USA

  - 787-656-2000 (tel)
  - 787-734-6161 (fax)

SEATTLE, WA
Amgen Inc.

- 1201 Amgen Court West
- Seattle, WA
- 98119-3105
- USA

  - 206-265-7000 (tel)
  -

SAN FRANCISCO, CA
Amgen Inc.

- 1120 Veterans Boulevard
- South San Francisco, CA
- 94080
- USA

  - 650.244.2000 (tel)
  - 650.244.2023 (fax)

- [Map to Seattle, WA](#)

WASHINGTON, D.C.
Amgen Inc. (Global Government Affairs)

- Columbia Square
- 555 - 13th Street, N.W., Suite 600-West
- Washington, D.C.
- 20004
- USA

    - 202-585-9500 (tel)
    - 202-585-9729 (fax)

WEST GREENWICH, RI
Amgen Inc.

- 40 Technology Way
- West Greenwich, RI
- 02817
- USA

    - 401-392-1200 (tel)
    - 

footer

# EXHIBIT Z

1

1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                        - - -

4    NETWORK APPLIANCE,            :   CIVIL ACTION
                                   :
5              Plaintiff           :
                                   :
6              v.                  :
                                   :
7                                  :
     BLUEARC CORPORATION,          :
8                                  :
               Defendant           :   NO. 03-714 (KAJ)
9                        - - -

10
                          Wilmington, Delaware
11                        Wednesday, November 19, 2003
                          4:45 o'clock, p.m.
12
                          - - -
13

14   BEFORE:  HONORABLE KENT A. JORDAN, U.S.D.C.J.

15                        - - -

     APPEARANCES:
16
                   POTTER, ANDERSON & CORROON LLP
17                 BY:  PHILIP A. ROVNER, ESQ.

18                        -and-

19                 HOWREY SIMON LLP
                   BY:  SCOTT WALES, ESQ.
20                      (San Francisco, California)

21                      Counsel for Plaintiff

22

23

24                                Valerie J. Gunning
                                  Official Court Reporter
25

1   APPEARANCES (Continued):

2           MORRIS, NICHOLS, ARSHT & TUNNELL
            BY:  RODER D. SMITH, ESQ.
3
                    -and-
4
            KEKER & VAN NEST LLP
5           BY:  BRIAN L. FERRALL, ESQ.
                 (San Francisco, California)
6
            Counsel for Defendant
7
                    - - -
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1
2    ).
3                (Proceedings commenced in the courtroom beginning
4    at 4:45 p.m.)
5
6                THE COURT:  All right.  Let's talk about Section
7    1404.  Come on forward, gentlemen.
8                THE COURT:  Okay.  Mr. Smith, do you want to
9    introduce who you have with you?
10               MR. SMITH:  Yes.  Rodger Smith of Morris Nichols,
11   on behalf of the defendant, Blue Arc Corporation.
12               With me today is Brian Ferrall of the Keker
13   & Van Nest firm in San Francisco, who has been admitted
14   pro hac vice and will be presenting the argument today.
15               THE COURT:  All right.  Good afternoon.
16               MR. FERRALL:  Good afternoon, your Honor.
17               THE COURT:  For the plaintiffs?
18               MR. ROVNER:  Good afternoon, your Honor.  Philip
19   Rovner from Potter, Anderson & Corroon for the plaintiff,
20   Network Appliance, and with me is Scott Wales from the firm
21   of Howrey Simon in San Francisco.
22               And I will be arguing on behalf of the plaintiff
23   opposing the motion to transfer.
24               THE COURT:  All right.  All right.  Mr. Smith or
25   Mr. Ferrall, whoever is going to be addressing this on behalf

4

1    of the defendant, it's your motion.  Come on forward.

2              MR. FERRALL:  Thank you, your Honor, for giving

3    us the opportunity to present this today.

4              My -- I just want to reiterate a couple of points

5    and elaborate on something in the papers.

6              This is not your typical transfer motion where

7    there are facts on one side and facts on the other side and

8    the parties are talking about which balances out one way or

9    the other.  This is one where every fact, to the extent that

10   they are relevant, weighs in favor of a transfer to

11   California but for the bare facts that establishes personal

12   jurisdiction:  Namely, that my client is incorporated in the

13   State of Delaware.

14             And so we view this motion as one in which

15   denying a transfer in this case is essentially, I believe,

16   taking the position that so long as there's personal

17   jurisdiction, there is no convenience factor that's going to

18   justify a transfer.  And that's not what the law is.

19             The statute, Section 1404, calls for a practical

20   and pragmatic assessment of the facts to determine for the

21   convenience of parties and the witnesses and in the interests

22   of justice is a transfer appropriate.  And in light of that,

23   I think this case presents essentially a question of is

24   Delaware or California the more appropriate forum, given that

25   the parties are within miles of each other, in Silicon

1    Valley, headquartered there.

2              The patents were developed in Silicon Valley,

3    under -- pursuant to a -- a company that is located in

4    Silicon Valley, now in bankruptcy in the Northern District of

5    California.  The inventors are all in the Northern District

6    of California.

7              The defendant, Bluearc, does not sell any

8    products in Delaware, does not have an office in Delaware,

9    does not do business in Delaware.  Again, only its state of

10   incorporation is here.  And the plaintiff, Network Appliance,

11   has no offices, headquarters or facilities here, and has a

12   very modest amount of its sales here.

13             I won't go through all of those facts in our

14   motion, but I do want to touch upon two points that I think

15   are very critical and would make a trial in this case in

16   Delaware manifestly unfair to Bluearc.  That is, the first

17   point is the third-party witness issue, which we talk about

18   in the papers a little bit.

19             As we've said, the inventions were not developed

20   by Network Appliance.  They were developed by a company

21   called All Specs.  That company is no longer in existence,

22   but all of the inventors are in Northern California.  There

23   are eight inventors in total on these patents, two of whom I

24   understand are currently Network Appliance employees, and one

25   is deceased.  That leaves five unbiased, if you will,

1 uninterested third-party inventors.

2          And what we fear will be the case is, obviously,

3 these third-party inventors are not subject to the subpoena

4 power here, and we've emphasized the importance of that.  I

5 think the case law emphasizes the importance of that.

6          But here we have a case where not only is the

7 trial threatened with sort of a uneven balance of evidence,

8 but it's really to the detriment of Bluearc because the

9 inventors who we can be sure are going to be here are their

10 employees.  So they sort of have control over they want to

11 present their inventors.  We have no control over any of

12 them.  And so we're left with, at best, deposition testimony

13 of these other third-party inventors.

14          Now, it's not just the inventors, though, that

15 could disrupt the fair presentation of the case at trial.

16 All Specs, the former employees of All Specs, are likely --

17 the evidence regarding issues such as on-sale bar, commercial

18 success or failure of the products embodies these patents, is

19 likely to come from All Specs.  It has to come from All Specs

20 and it's likely to be found in the Northern District of

21 California, where those employees probably still are.

22          Now, I can't tell you right now the names of

23 those employees.  The case has just started and we just

24 started discovery.  I don't know who at All Specs is around.

25 We can be sure they're much more likely to be in the Northern

1    District of California than Delaware.

2            And one other thing that I want to point out with

3    respect to third-party evidence.  The patents, I won't get

4    into the details of them, but they relate to file sharing

5    and, in other words, ways in which computers read and write

6    data to storage and control the reading and writing of data

7    to storage.

8            And if you -- if you look at the very beginning

9    of every patent, it refers to these patents are essentially

10   follow-ons to development of something called NFS, Network

11   File System, developed by Sun Micro Systems, which also is

12   located in the Northern District of California.

13           So what we have is patents that are follow-ons to

14   Sun Micro System, who was the pioneer in this area in the

15   1980's.  And, again, I can't give you names and documents,

16   but it's highly likely that prior art and background of this

17   technology is going to be located in the Northern District of

18   California and not here.

19           So that's factor number one that I think really

20   is decisive given the way all of the other facts play out in

21   point two, the Northern District.

22           The other factor I want to talk about is the

23   relative financial strength of the parties, which we discuss

24   in the briefs, but really troubles my client.

25           Unlike Network Appliance, frankly, your Honor, my

8

1    client is not one for whom the expenses of patent litigation

2    come easy.   It is a company which is not profitable yet, has

3    not been profitable.   Its assets are a very small fraction of

4    Network Appliance's, and those assets, to the extent they

5    exist, have to tie it over to profitability.

6              THE COURT:   Okay.   I don't want to cut you off

7    unnecessarily, but I think you made that argument effectively

8    in your papers.

9              MR. FERRALL:   Fair enough, your Honor.   With

10   that, I'm happy to respond to questions.   I believe we have

11   put the facts in the papers and I just wanted to reiterate

12   those two points.

13             THE COURT:   Okay.   Thanks.

14             I will ask Mr. Rovner to come forward.

15             Now, let's get to the heart of it.   I've heard

16   the assertions made by Mr. Ferrall, Mr. Rovner, and you've

17   certainly had a chance to read their papers.

18             Other than the fact that they're incorporated

19   here, which is not a minor point, and that you folks picked

20   this location, which also is not a minor point, other than

21   those two things, tell me what weighs in favor of keeping

22   this case here.   And you can trust I've read your papers, but

23   pick your best stuff and put it in front of me.

24             MR. ROVNER:   Well, my best stuff, our best stuff

25   is really what the standards are here.

1      I read -- we all read the papers and everyone

2  knows what the contacts are in Delaware and what the contacts

3  are in California.  But what the defendant doesn't realize or

4  does not recognize or does not want to come forward with

5  today is what the test is, what is the burden.  And I've

6  looked at the cases.

7      They cite the IKOS decision.  I was in that case,

8  as they point out.  I know what happens there I could cite

9  many cases with similar facts and go the other way and say

10  transfer is inappropriate.

11      I was trying to think, what would be the best

12  way to present the argument to the Court, and the best thing

13  that I found was a very, what I thought was a very good sort

14  of a breakdown of the law that Judge -- Chief Judge Robinson

15  gave in the Cypress Semiconductor case.  We both cite that

16  case.

17      It's either a benefit or a curse that we have a

18  lot of law in Delaware on motions to transfer and they all

19  come down to basically the fact at issue in this case,

20  because we can both cite cases.

21      But let me just read what Judge Robinson wrote in

22  Cypress Semiconductor, where she did find that transfer was

23  inappropriate.  She wrote, "The burden of establishing the

24  need to transfer rests with the movant, movant, to establish

25  that the balance of convenience to the parties and witnesses

1    strongly favors the defendants.  Unless the balance is

2    strongly in favor of a transfer, the plaintiff's choice of

3    forum should prevail."

4            I think we all agree that that is the standard

5    and it has to strongly tip to California because plaintiff

6    brought the case in Delaware.

7            We are a Delaware -- Network Appliance is a

8    Delaware corporation.  Bluearc is a Delaware corporation, as

9    they acknowledge.  But what they seem to equate is personal

10   jurisdiction with the transfer standards.  I can get personal

11   jurisdiction over many companies in Delaware without using

12   their standard as a Delaware corporation if they had minimum

13   contacts.

14           Here, this defendant purposely availed itself of

15   the Delaware laws ands the Court has consistently recognized

16   that that is a key factor, and Judge McKelvie in the ADE case

17   said that was not just a minor thing.  That was something

18   that strongly tipped in the defendant's -- in the party's

19   favor who brought the case in Delaware.

20           And I find it somewhat objectionable that they

21   would try to disregard that.  It's not our burden to show

22   that we should keep this case in Delaware.  We have a right

23   to be here and they should have expected to be here.  The

24   burden is on them to show that it's not to be -- it should be

25   disrupted.

1           And here's what --

2           THE COURT:  Wait, wait, Mr. Rovner.  You can

3    fully expect that I will hold them to the burden.  What I'm

4    trying to find out is, and I will repeat:  Other than the

5    state of incorporation, which is not a minor point, and your

6    choice of this forum, which is not a minor point, I'm asking

7    you, very specifically, are there any other factors that you

8    believe weigh in favor of keeping this litigation in Delaware

9    as opposed to sending it to California?

10          MR. ROVNER:  Well, I wanted to talk about what

11   the burdens were and what our obligation was, but, obviously,

12   in the public factors, we believe that this Court is the best

13   Court to resolve this type of patent infringement matter.

14          This Court is well recognized across the U.S. as

15   being a Court that patent plaintiffs look to.  It's not, as

16   Judge McKelvie said in the ADE case, we had a few choices

17   here.  We could have sued in California.  We could have sued

18   in Delaware to guarantee that we got jurisdiction and we

19   picked Delaware.

20          Are there better contacts in Delaware?  I can't

21   say that.  There are the inventors.  We really looked to

22   issues of nonparty witnesses.  We don't really acknowledge

23   where the parties are, what is more convenient.

24          They talked about financial issues.  I don't

25   think that's relevant, and I will tell you why in a moment.

1    But, sure, there are inventors in California and there are

2    none in Delaware, but how significant is that?

3              As Mr. Ferrall pointed out, there are eight

4    inventors.  One is deceased.  Three, I believe, worked with

5    Network Appliance.  We're down to four.  One, Mr. Pitts, has

6    signed a declaration saying that he sees no reason why he

7    would not come to Delaware.

8              So we're left with three inventors who Bluearc

9    says are in California at this time.  I don't see why that

10   necessarily means that they won't come to Delaware.

11             Judge McKelvie, in the ADE case, said let's not

12   just look at the negative.  Why should we assume that they

13   won't come voluntarily to Delaware?  He said let's expect

14   that they will until proven otherwise.

15             Today we've got three inventors who purportedly

16   live in California.  Who's to say that when we go to trial in

17   18 months or so, that they're going to be still in

18   California?

19             We can take the deposition, but, Mr. Ferrall

20   said, and this is a quote from the -- from his argument a few

21   minutes ago, "At best, we are left with deposition

22   testimony."

23             Well, who says at best?  That's Mr. Ferrall

24   saying at best.  Why does he assume that the three inventors

25   won't come to Delaware?  And what I am concerned about is

1    that he's just assuming -- he has never contacted them.

2            Nobody has said they won't come, so I don't

3    believe that the inventor issue tips in favor of California.

4            Now, we're talking --

5            THE COURT:  Do you disagree that these people are

6    all located in the Northern District of California?

7            MR. ROVNER:  They are today.  The three of the

8    seven that are alive, as I said, three are with Network

9    Appliance.  One, Mr. Pitts, has said that he would come to

10   Delaware.  There's no reason why he wouldn't.

11           So there are three that we don't know about,

12   and it's not our burden to tell you that they will or

13   won't.  It's their burden and they have not even approached

14   it.

15           THE COURT:  Okay.  You don't have to remind me of

16   the burdens.  I know where the burdens lie.

17           MR. ROVNER:  Okay.  I thought five or six

18   times --

19           THE COURT:  Just state the facts.

20           MR. ROVNER:  And the other issue is, and they

21   point out, we're talking about witnesses and we're talking

22   about their financial condition, and they don't want to come

23   to Delaware.  Your Honor said you're familiar with that

24   because it was well put in their papers.

25           And let me just raise something that I don't

1    think -- I missed the first time I read their papers.  They

2    are talking about themselves as a regional California

3    company.

4            Well, in their papers they say they have 82

5    employees in California.  They have 85 in the U.K..

6    And of the employees that are in the U.K., they are the

7    inventors and those that are responsible for the infringing

8    product.

9            So there's no reason why it would be any easier

10   to proceed in California when the -- at least one of the

11   infringing products and the only one that we have identified,

12   the silicon server architecture, is in the U.K.  And they

13   even admit that of the, I think there are eight inventors on

14   that, seven of them are in the U.K., and that's a patent

15   application that we are aware of.

16           So the product at issue is based in the U.K.

17           So they are talking about themselves as a

18   regional California company.  As I said, more employees in

19   U.K. than in California.

20           And the other thing is, I'm not taking Mr.

21   Ferrall to task, but he does say that the financial condition

22   is one that your Honor should consider.  But in the

23   declaration that they provided to you, this is from their

24   Chief Technology Officer, Executive Vice President, founder,

25   Mr. Barrall.  When he's coming forward to this Court and

1  saying that Bluearc is in such a financial situation, it

2  would be a hardship to litigate in Delaware, one, I don't

3  understand why litigating in Delaware would present more

4  financial hardships really than in California.  Maybe during

5  the trial, hotel accommodations, things like that.  But the

6  Courts have basically said that's not necessarily a factor

7  that would dictate transfer.

8          But what he says is, and this is in Paragraph 3

9  of his reply declaration:  Because Bluearc is not a public

10 company, its financial performance is confidential.  Certain

11 information is public, however.

12         Well, he's coming to this Court trying to

13 convince your Honor that the financial situation is such that

14 he shouldn't be in Delaware, but he's telling you he won't

15 give you everything because it's confidential.  He could have

16 filed it under seal.  He could have done everything to let

17 you have the information.  Instead, they've given you the

18 information that they want to give you.  And I really don't

19 think that's a separate burden, but they have not come close

20 to attempting to reach it by hiding under confidentiality

21 issues.

22         THE COURT:  All right.

23         MR. ROVNER:  The issue is should they expect to

24 come to Delaware and should they expect to stay.  I think the

25 answer is yes.

1          THE COURT:  Thanks, Mr. Rovner.

2          All right.  You know what?  There is a lot of

3   case law on this in this district and I'm not going to add to

4   it, and I will give you a ruling right now and the reasons

5   for it.

6          And I'm granting the motion to transfer, and I

7   don't do it lightly.  There's a reason why there is a lot of

8   case law in this district that says if you incorporate here,

9   you can expect to be sued here.  And it does not behooves you

10  to come here and be incorporated and then say, Oh, we're

11  surprised.  Who would have thought we would have ever gotten

12  sued here?

13          I take that corporate status seriously and I take

14  seriously the plaintiff's choice of forum.  However, there

15  are factors in this case that I think mean that the defendant

16  has succeeded in showing it is the public and private

17  interest that's the responsibility of this Court to weigh and

18  it's not a sham, it's not a pretend thing that we do this

19  weighing.

20          State of incorporation is an important factor,

21  but it's not dispositive.  If it were dispositive, we

22  wouldn't go through the business of asking about these other

23  matters and trying to put them onto the scales and figure out

24  what's going on.

25          There has been no dispute that these companies

1    are based, both, in the Northern District of California.

2    There has been no dispute that the inventor testimony, which

3    appears to be of particular importance in this, as it is in

4    many, many cases, is going to involve witnesses who are, to

5    the extent they're unaffiliated with either party, are all

6    located in the same place:  The Northern District of

7    California.

8            It appears, at least a persuasive argument is

9    made to the Court that the bulk of third-party discovery will

10   take place at or near, to the extent it's in the United

11   States, the Northern District of California.

12           There is some question in my mind and I mention

13   it not because it's dispositive, but because it's a factor in

14   my decision, that the company from which this information,

15   technology, was acquired, is a company which is apparently,

16   to the extent it's still functioning, based in the Northern

17   District of California, where a court proceeding is pending

18   in the Bankruptcy Court, and that may or may not have some

19   effect, but to the extent it has any effect, it weighs

20   against keeping the case here.

21           When you put those things together, I think this

22   is the rare case and it is a rare case where a defendant

23   who's a Delaware corporation can come in here and say, Look,

24   pretty much everything points at the Northern District of

25   California.  It's not as if we had one in Massachusetts and

1    one in the Northern District of California, like there was in

2    the ADE versus KLA case.  It's not even as if you had one in

3    the Northern District of California and one in the Southern

4    or Central District of California.

5            If I were to say I'm keeping it here because they

6    have not made their showing in this case, I think it would be

7    tantamount to saying, you know what?  If you are incorporated

8    here, you are never getting transferred out, and I'm not

9    prepared to go that far.

10           So I think they've made their showing.  I will

11   emphasize, I think it's the rare case.  I hope corporations

12   get that message, not because I want them to stay away.  I

13   think Delaware is a wonderful place to have your corporate

14   home.  But under the peculiar circumstances of this case, I

15   think the defendant has succeeded in showing the balance of

16   private interests tips strongly in favor of transferring the

17   case.

18           Now, to the extent I have considered, and I have,

19   the public interest, I would say that the Northern District

20   of California is a superb Court which will be able to, in my

21   estimation, provide a swift and appropriate resolution to

22   your dispute, and so I'm sending you on your way,

23   regretfully.  I'm happy to see litigant here.

24           I appreciate Mr. Rovner's comments about the

25   skill this District brings to this kind of litigatoin.  I

1   hope that's a view that's shared by others.  This is not

2   intended to signal anything about the character or merit of

3   your case or the Court's interest in helping people resolve

4   disputes like this.  It's factually rooted.

5         So that's my ruling.  I will give you a written

6   order on it, but you can consider it effective as of today.

7         All right.  Is there any other matter that the

8   parties want to raise with the Court before we recess?

9         MR. SMITH:  No, your Honor.

10        MR. FERRALL:  No, your Honor.

11        THE COURT:  All right.  Then we're in recess.

12        (Court recessed at 5:09 p.m.)

13            - - -

14

15

16

17

18

19

20

21

22

23

24

25