## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMGEN, INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION | ) ) ) ) | C.A. No. 06-259-KAJ |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| ARIAD PHARMACEUTICALS, INC., | ) ) | |
| Defendant. | ) ) | |

### DECLARATION OF ELIZABETH L. ROSENBLATT

### IN SUPPORT OF ARIAD PHARMACEUTICALS, INC.'S

### MOTION TO STAY PROCEEDINGS PENDING INTERLOCUTORY APPEAL

I, Elizabeth L. Rosenblatt, declare as follows:

1.    I am an attorney at Irell & Manella LLP, outside counsel for ARIAD Pharmaceuticals, Inc. ("ARIAD") in connection with this action. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath. I make this declaration in support of ARIAD's Motion To Stay Proceedings Pending Interlocutory Appeal.

2.    Attached hereto as Exhibit A is a true and correct copy of an ARIAD News Release dated June 7, 2005, reflecting the Sarcoma Foundation of America's award of its first-ever Symbol of Caring Award to ARIAD.

3.    Attached hereto as Exhibit B is a true and correct copy of a summary of ARIAD's oncology work entitled "Leading the Path to Improved Cancer Therapies" as printed from ARIAD's website, http://www.ariad.com.

4.    Attached hereto as Exhibit C is a true and correct copy of one of ARIAD's Form 8-K Reports of unscheduled material events or corporate changes, filed with the United States Securities and Exchange Commission ("SEC") on November 2, 2006.

5.    Attached hereto as Exhibit D is a true and correct copy of ARIAD's Form 10-Q for the period ended September 30, 2006, filed with the SEC on November 9, 2006.

6.    Attached hereto as Exhibit E is a true and correct copy of Amgen Inc.'s Form 8-K Report of unscheduled material events or corporate changes, filed with the SEC on October 23, 2006.

7.    Attached hereto as Exhibit F is a true and correct copy of the transcript of the hearing on ARIAD's Motion for Certification Pursuant to 28 U.S.C. § 1292(b) that took place on November 3, 2006.

8.    Attached hereto as Exhibit G is a true and correct copy of ARIAD's Form 10-Q for the period ended June 30, 2006, filed with the SEC on August 8, 2006.

9.    Attached hereto as Exhibit H is a true and correct copy of the complaint filed by ARIAD, *et al*. against Eli Lilly & Co. in the District of Massachusetts (Case No. 02-CV 11280 (RWZ)) on June 25, 2002.

Executed on November 13, 2006, at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Elizabeth L. Rosenblatt

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 13th day of November, 2006, the attached **DECLARATION OF ELIZABETH L. ROSENBLATT IN SUPPORT OF ARIAD PHARMACEUTICALS, INC.'S MOTION TO STAY PROCEEDINGS PENDING INTERLOCUTORY APPEAL** was served upon the below-named counsel of record at the address and in the manner indicated:

Melanie K. Sharp, Esquire                    <u>BY HAND and ELECTRONIC MAIL</u>
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

Marcus E. Sernel, Esquire                    <u>VIA FEDERAL EXPRESS and ELECTRONIC MAIL</u>
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601-6636

J. Drew Diamond, Esquire                    <u>VIA FEDERAL EXPRESS and ELECTRONIC MAIL</u>
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA  90017-5800

*/s/ Tiffany Geyer Lydon*
_____
Tiffany Geyer Lydon

# EXHIBIT A



ARIAD®                                                    **News Release**

---

**FOR IMMEDIATE RELEASE**          **CONTACT:**  **ARIAD:**
                                                 Andrea Johnston
                                                 Pure Communications
                                                 (910) 681-1088

                                                 **SFA:**
                                                 Jody Cummings, Executive Director
                                                 (415) 606-2555

### ARIAD HONORED BY SARCOMA FOUNDATION OF AMERICA FOR DEVELOPMENT OF AP23573 AS BREAKTHROUGH TREATMENT FOR SARCOMAS

**Cambridge, MA, June 7, 2005** – ARIAD Pharmaceuticals, Inc. (Nasdaq: ARIA) today announced that the Company has been honored by the Sarcoma Foundation of America (SFA) with the *Symbol of Caring Award* for the discovery and development of AP23573 – ARIAD's breakthrough medicine for the treatment of soft-tissue and bone sarcomas. With over 600 guests in attendance last night at the SFA's Third Annual Gala in New York, Harvey J. Berger, M.D., founder, chairman and chief executive officer of ARIAD, and Camille L. Bedrosian, M.D., chief medical officer, accepted the award on behalf of ARIAD. AP23573, a novel mTOR inhibitor, is currently in Phase 2 clinical trials and has been designated a fast-track product by the U.S. Food and Drug Administration for the treatment of advanced sarcomas.

"ARIAD is the first-ever recipient of our *Symbol of Caring Award*," said Mark Thornton, M.D., Ph.D., co-founder and president of the SFA. "This Award honors ARIAD for its commitment to developing better treatments and better care for patients with sarcoma. AP23573 represents the first new treatment for sarcoma in over twenty years, and we are pleased to recognize ARIAD's focus on developing this much-needed therapy."

"We are honored to receive this recognition from the SFA on behalf of our organization and particularly the ARIAD scientists who discovered AP23573 and those who are leading its clinical development," said Harvey J. Berger, M.D., chairman and chief executive officer of ARIAD. "There are no effective drugs currently available to treat patients with advanced sarcoma, and new therapies such as AP23573 are urgently required. We commend the tireless efforts of the SFA in providing much needed information, support and encouragement for patients suffering from this often-forgotten cancer, as well as their families and friends."

Selected to receive the *Nobility in Science Award* at last night's event was Murray

Brennan, M.D., Surgeon-in-Chief at Memorial Sloan-Kettering Cancer Center and a world-renown expert on soft-tissue sarcoma, who has authored or co-authored more than 800 scientific papers and book chapters.

Actress Heather Menzies Urich accepted the *Leadership in Courage Award* which was awarded posthumously to her husband and actor Robert Urich, who died of sarcoma three years ago and, along with Heather, was deeply involved in activities to support sarcoma research and awareness.

**About the Sarcoma Foundation of America**

The mission of the Sarcoma Foundation of America is to act as an advocate for sarcoma medical research. Its goal is to provide funding to support research focused on discovering and developing new weapons with which to treat and eradicate sarcoma. For more information about the SFA and sarcomas, visit http://www.curesarcoma.org.

**About Sarcoma**

Sarcomas are cancers of the connective tissue, including bones, muscles, fat, cartilage, and joints and do not discriminate by age, gender or race. Sarcomas can arise anywhere in the body and are divided into two main groups – bone tumors and soft tissue sarcomas. They are further sub-classified based on the type of cell or tissue from which the tumor developed. There are approximately 12,000 new cases of sarcoma diagnosed each year in the United States and approximately 100,000 sarcoma patients overall in the United States.

**About AP23573**

ARIAD's small-molecule drug, AP23573, starves cancer cells and shrinks tumors by inhibiting the critical cell-signaling protein, mTOR, which regulates the response of tumor cells to nutrients and growth factors, and controls tumor blood supply and angiogenesis through effects on Vascular Endothelial Growth Factor (VEGF) in tumor and endothelial cells. AP23573 also blocks the proliferation and migration of vascular smooth muscle cells, the primary cause of narrowing and reblockage of injured arteries, and is an analog of sirolimus, another mTOR inhibitor that has been approved for use in drug-eluting stents. AP23573 is currently in Phase 1 and 2 clinical trials in patients with solid tumors and hematologic cancers. AP23573 has been designated a fast-track product by the U.S. Food and Drug Administration for the treatment of soft tissue and bone sarcomas.

**About ARIAD**

ARIAD is engaged in the discovery and development of breakthrough medicines to treat disease by regulating cell signaling with small molecules. The Company is developing a comprehensive approach to patients with cancer that addresses the greatest medical need – aggressive and advanced-stage cancers for which current treatments are inadequate. Medinol Ltd. also is developing stents and other medical devices that deliver ARIAD's

lead cancer product candidate to prevent reblockage at sites of vascular injury following stent-assisted angioplasty. ARIAD has an exclusive license to pioneering technology and patents related to certain NF-κB treatment methods, and the discovery and development of drugs to regulate NF-κB cell-signaling activity, which may be useful in treating certain diseases. Additional information about ARIAD can be found on the web at http://www.ariad.com.

Some of the matters discussed herein are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements are identified by the use of words such as "anticipate," "estimate," "expect," "project," "intend," "plan," "believe," and other words and terms of similar meaning in connection with any discussion of future operating or financial performance. Such statements are based on management's current expectations and are subject to certain factors, risks and uncertainties that may cause actual results, outcome of events, timing and performance to differ materially from those expressed or implied by such forward-looking statements. These risks include, but are not limited to, risks and uncertainties regarding the Company's ability to accurately estimate the timing and actual research and development expenses and other costs associated with the preclinical and clinical development and manufacture of our product candidates, the adequacy of our capital resources and the availability of additional funding, risks and uncertainties regarding our ability to manufacture our product candidates on a commercial scale or to supply our product candidates to our collaborator for use in its product candidates, risks and uncertainties regarding our and our collaborator's ability to successfully enroll and conduct preclinical and clinical studies of product candidates, including our product candidate to treat cancer described in this release and our collaborator's medical device product candidates to treat vascular disease, risks and uncertainties that clinical trial results at any phase of development may be adverse or may not be predictive of future results or lead to regulatory approval of any of our or our collaborator's product candidates, risks and uncertainties of third-party intellectual property claims relating to our and our collaborator's product candidates, and risks and uncertainties relating to regulatory oversight, the timing, scope, cost and outcome of legal proceedings, including litigation concerning our NF-κB patent portfolio, future capital needs, key employees, dependence on our collaborators and manufacturers, markets, economic conditions, products, services, prices, reimbursement rates, competition and other risks detailed in the Company's public filings with the Securities and Exchange Commission, including ARIAD's Annual Report on Form 10-K, as amended, for the fiscal year ended December 31, 2004. The information contained in this document is believed to be current as of the date of original issue. The Company does not intend to update any of the forward-looking statements after the date of this document to conform these statements to actual results or to changes in the Company's expectations, except as required by law.

<div align="center">###</div>

# EXHIBIT B



# Leading the Path
## TO IMPROVED CANCER THERAPIES

www.ariad.com · October 2006 · NASDAQ: ARIA



### Recent Headlines

- **10.11.06** ARIAD Grants Commercial License to Its Patented ARGENT™ Cell-Signaling Regulation Technology for Development of New Cancer Therapies

- **8.15.06** ARIAD Announces Issuance of Key Patent Covering Its mTOR Inhibitors and Treatment Methods in Cancer and Restenosis

- **8.08.06** ARIAD Reports Second Quarter 2006 Results; Key Milestones Achieved in First Half of Year

- **6.05.06** ARIAD Presents Positive Efficacy Data on AP23573, Novel mTOR Inhibitor, in Phase 2 Advanced Sarcoma Cancer Trial

## Pathways to Patients

ARIAD is developing breakthrough medicines that regulate cell-signaling pathways implicated in cancer. Our pipeline includes a series of small molecule product candidates that provide targeted and highly potent anti-cancer activity to treat solid tumors and hematologic cancers, as well as the spread of tumors to distant sites. Our lead candidate—AP23573, a novel mTOR inhibitor—has been given fast track designation by the FDA for the treatment of soft-tissue and bone sarcomas.

In 2006, approximately 1.4 million people in the U.S. will be diagnosed with cancer. According to the National Institutes of Health estimate, the overall cost of cancer in 2005 was $209.9 billion.* To address this healthcare challenge, new and more effective cancer treatments are urgently needed. ARIAD's lead product candidate, AP23573, is a novel, internally discovered mTOR inhibitor in development for multiple oncology indications that has the potential to improve the treatment of patients with a broad range of cancers.

## AP23573 in Oncology

As part of ARIAD's global clinical development plan and registration strategy, AP23573 has been studied in multiple Phase 2 and 1b clinical trials in the U.S. and Europe as a single agent and in combination with other anti-cancer therapies in patients with solid tumors and hematologic malignancies. As a single agent, AP23573 is being studied in Phase 2 studies in patients with sarcomas, hormone refractory prostate cancer and endometrial cancer. The Phase 3 trial design is based on the promising results achieved in the Phase 2 advanced sarcoma trial, and the goal will be to prolong progression-free survival and overall survival for these patients. The Company expects to provide additional details regarding the trial design and to launch the trial in 4Q06, and to begin patient enrollment at multiple leading sarcoma centers in 1Q07.

Commercial planning efforts are advancing for the potential launch of AP23573, as ARIAD pursues its strategy of achieving multiple oncology indications for this novel mTOR inhibitor.

Three multi-center Phase 1b trials of AP23573 in combination with other anti-cancer therapies are also underway. These are focused primarily on patients with various types of solid tumors, especially breast, head and neck, non-small-cell lung, and prostate cancers, as well as sarcomas. Further combination studies are planned.

In addition, ARIAD has concluded enrollment in Phase 1b and Phase 2 clinical trials in patients with brain cancer and leukemias and lymphomas, respectively. Eleven clinical trials of AP23573 are ongoing or completed. Intravenous and oral formulations of AP23573 are being studied in these trials.

For up-to-date information on our clinical trials, recently reported trial results and details on our non-oncology programs for AP23573, please visit our website at www.ariad.com.

## Preclinical Programs

In addition to our clinical development programs, we have a focused drug discovery program centered on small-molecule molecularly targeted therapies and cell-signaling pathways implicated in cancer.

Our pipeline includes:

- Inhibitors of mutant oncogenic or cancer-causing proteins (kinases) that regulate cell signaling (e.g., Bcr Abl – the target of imatinib, which becomes resistant to further treatment through various mutations, including one called T315I);

- Single compounds that target multiple cancer pathways (e.g., cell survival, metastasis and angiogenesis); and

- New mTOR inhibitors (i.e., bone-targeted compounds to treat primary bone cancers and cancers that have spread to bone).

These programs are focused on biologically well-validated targets and are aimed at developing product candidates to address major unmet medical needs.

*Source: American Cancer Society, Cancer Facts & Figures 2006.

## Business Strategy

- Build a fully integrated oncology company – a leader in the discovery, development and commercialization of molecularly targeted oncology therapies.

- Establish a U.S. commercial platform.

- Enter into partnerships with major pharmaceutical or biotechnology companies, after obtaining definitive clinical data, to assist in developing our cancer product candidates and commercializing them outside the United States.

- Broadly develop our lead oncology product candidate, AP23573, and build a pipeline of innovative follow-on product candidates.

- License our NF-κB and ARGENT™ cell-signaling regulation technologies to pharmaceutical and biotechnology companies.

- Develop and commercialize through medical device companies AP23573 in drug-delivery stents and other medical devices to decrease reblockage of injured vessels following stent-assisted angioplasty.

## NF-kB and ARGENT™ Intellectual Property

We have an exclusive license to pioneering technology and patents related to methods of treating human disease through modulation of the cell-signaling of a protein called NF-κB, and the discovery and development of drugs to regulate NF-κB cell-signaling activity. NF-κB can be generally thought of as a "biological switch" that can be turned off using these treatment methods to treat disorders such as inflammation, cancer, sepsis and osteoporosis.

In May of 2006, ARIAD received a favorable verdict from the jury in the United States District Court (the "Court") for the District of Massachusetts in the lawsuit against Eli Lilly and Company ("Lilly"), alleging infringement of our pioneering U.S. patent covering methods of treating human disease by regulating NF-κB cell-signaling activity. A separate trial, or bench trial, commenced before the judge on August 7, 2006 on certain defenses asserted by Lilly relating to the validity and enforceability of the claims of the patent, which must be addressed before the Court enters a final judgment in this lawsuit.

The co-plaintiffs are Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research, and The President and Fellows of Harvard College. Lilly has the right to challenge the verdict in the trial court and on appeal, and certain limited issues relating to validity and enforceability of our patent remain pending before the judge. For updated information regarding ongoing aspects of the NF-κB litigation, please refer to our periodic filings with the Securities and Exchange Commission.

We have also developed a proprietary portfolio of cell-signaling regulation technologies, our ARGENT™ technology, to control intracellular processes with small molecules, which may be useful in the development of therapeutic vaccines and gene and cell therapy products, and which provide versatile tools for applications in cell biology, functional genomics, and drug discovery research. In October 2006, ARIAD announced a non-exclusive, royalty-bearing license agreement to its ARGENT™ cell-signaling regulation technology with Bellicum Pharmaceuticals, Inc. to develop and commercialize new cancer therapies. ARIAD will have an equity stake in Bellicum and will receive additional payments based on certain development, regulatory and commercial milestones achieved by the company.

## Financials

- We ended the second quarter of 2006 with $54.3 million in cash, cash equivalents and marketable securities.

- We anticipate cash used in operations for 2006 of $53 million to $56 million.

Some of the matters discussed herein are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements are identified by the use of words such as "may", "anticipate," "estimate," "expect," "project," "intend," "plan," "believe," and other words and terms of similar meaning in connection with any discussion of future operating or financial performance. Such statements are based on management's expectations and are subject to certain factors, risks and uncertainties that may cause actual results, outcome of events, timing and performance to differ materially from those expressed or implied by such forward-looking statements. These risks include, but are not limited to, risks and uncertainties regarding our ability to accurately estimate the timing and actual R&D expenses and other costs associated with the preclinical and clinical development and manufacture of our product candidates, the adequacy of our capital resources and the availability of additional funding, risks and uncertainties regarding our ability to manufacture or have manufactured our product candidates on a commercial scale, risks and uncertainties regarding our ability to successfully recruit centers, enroll patients and conduct clinical studies of product candidates, risks and uncertainties that clinical trial results at any phase of development, may be adverse or may not be predictive of future results or lead to regulatory approval of any of our or any partner's product candidates, risks and uncertainties of third-party intellectual property claims relating to our and any partner's product candidates, and risks and uncertainties relating to regulatory oversight, the timing, scope, cost and outcome of legal and patent office proceedings, litigation, prosecution and re-examination proceedings concerning our NF-κB patent portfolio, future capital needs, key employees, dependence on collaborators and manufacturers, markets, economic conditions, products, services, prices, reimbursement rates, competition and other factors detailed in the Company's public filings with the Securities and Exchange Commission, including ARIAD's Annual Report on Form 10-K for the fiscal year ended December 31, 2005. The information contained in this document is believed to be current as of the date of original issue. The Company does not intend to update any of the forward-looking statements after the date of this document to conform these statements to actual results or to changes in the Company's expectations, except as required by law.



**ARIAD**®

ARIAD Pharmaceuticals, Inc.
26 Landsdowne Street
Cambridge, Massachusetts 02139-4234

Telephone: (617) 494-0400
Fascimile: (617) 494-8144

www.ariad.com

NASDAQ: ARIA

### Investor Relations Contact

**Edward M. Fitzgerald**

*Senior Vice President,
Finance and Corporate Operations,
Chief Financial Officer*

edward.fitzgerald@ariad.com

### Business Development Contact

**Laurie A. Allen, Esq.**

*Senior Vice President,
Legal and Business Development,
Chief Legal Officer*

laurie.allen@ariad.com

# EXHIBIT C



# FORM 8−K

## ARIAD PHARMACEUTICALS INC − ARIA

**Filed: November 02, 2006 (period: November 02, 2006)**

Report of unscheduled material events or corporate changes.

# Table of Contents

**ITEM 8.01**    Other Events.

**ITEM 9.01**    Financial Statements and Exhibits.

SIGNATURES
EXHIBIT INDEX
EX-99.1 (ARIAD PHARMACEUTICALS)

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 8-K

CURRENT REPORT
Pursuant to Section 13 or 15(d) of The Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): November 2, 2006

ARIAD Pharmaceuticals, Inc.
(Exact name of registrant as specified in its charter)

| Delaware | 0-21696 | 22-3106987 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

26 Landsdowne Street, Cambridge, Massachusetts 02139
(Address of principal executive offices) (Zip Code)

Registrant's telephone number, including area code: (617) 494-0400

Not Applicable
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

|_|  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

|_|  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

|_|  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

|_|  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Source: ARIAD PHARMACEUTICAL, 8-K, November 02, 2006

ITEM 8.01 Other Events.

In a press release dated November 2, 2006, ARIAD Pharmaceuticals, Inc. announced additional positive efficacy data on AP23573 - its novel mTOR inhibitor - from further analysis of its ongoing Phase 2 trial of AP23573 in patients with metastatic and/or unresectable bone and soft-tissue sarcomas. The expanded analysis focuses on the 61 patients with an AP23573 clinical-benefit response - the primary end-point of the 212-patient trial - and its relation to progression-free survival.

A copy of the press release is filed herewith as Exhibit 99.1 and the information contained therein is incorporated by reference into this Item 8.01 of this Current Report on Form 8-K.

ITEM 9.01 Financial Statements and Exhibits.

(c)  The following exhibits are filed with this report

| Exhibit Number | Description |
| ------ | ----------- |
| 99.1 | Press release dated November 2, 2006. |

2

SIGNATURES

    Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

              ARIAD Pharmaceuticals, Inc.

              By: /s/ Edward M. Fitzgerald
              ----------------------------------------------
              Edward M. Fitzgerald
              Senior Vice President, Finance and Corporate
              Operations, Chief Financial Officer

Date: November 2, 2006

3

Source: ARIAD PHARMACEUTICAL, 8-K, November 02, 2006

EXHIBIT INDEX
-------------

| Exhibit Number | Description |
| ------ | ----------- |
| 99.1 | Press release dated November 2, 2006. |

4

```
</TEXT>
</DOCUMENT>
```

EXHIBIT 99.1

ARIAD Presents Expanded Efficacy Data On AP23573, Novel mTOR Inhibitor, In Phase 2 Advanced Sarcoma Cancer Trial

VENICE, Italy and CAMBRIDGE, Mass.--(BUSINESS WIRE)--Nov. 2, 2006--ARIAD Pharmaceuticals, Inc. (NASDAQ: ARIA) today announced additional positive efficacy data on AP23573 - its novel mTOR inhibitor - from further analysis of its ongoing Phase 2 trial of AP23573 in patients with metastatic and/or unresectable bone and soft-tissue sarcomas. The expanded analysis focuses on the 61 patients with an AP23573 clinical-benefit response - the primary end-point of the 212-patient trial - and its relation to progression-free survival.

Patients with an AP23573 clinical-benefit response (CBR) - tumor regression or disease stabilization - had a progression-free survival (PFS) rate at six months of 70% and a median PFS of 36 weeks. The PFS rate in this patient subset was nearly triple that of the overall trial population (vs. 24%), and the median PFS was approximately 21 weeks longer than that of the overall trial population (vs. 15 weeks). These data show that CBR is a clinically useful surrogate for PFS in this difficult-to-treat patient population.

"These results provide further evidence of the beneficial effects of AP23573 in patients with advanced sarcomas and demonstrate that the clinical-benefit responses achieved with AP23573 in this patient population led to clinically meaningful prolongation of progression-free survival," said Harvey J. Berger, M.D., chairman and chief executive officer of ARIAD. "We are moving rapidly to launch our randomized, worldwide Phase 3 clinical trial of oral AP23573 in patients with advanced sarcomas."

These results are being presented by Dr. Sant Chawla, co-principal investigator of the study, at the 12th Annual Connective Tissue Oncology Society (CTOS) Meeting in Venice, Italy, November 2 to 4, 2006.

Camille L. Bedrosian, M.D., chief medical officer of ARIAD, added, "the data from the expanded analysis of the Phase 2 trial further support our Phase 3 trial strategy which focuses on advanced sarcoma patients who have experienced a favorable response to prior chemotherapy and have stable disease. We believe this patient population has the greatest likelihood of achieving sustained clinical benefit from treatment with a new molecularly targeted agent such as AP23573."

Advanced Sarcoma Phase 2 Trial Design and Results

Earlier this year, at the American Society of Clinical Oncology annual meeting, ARIAD announced that AP23573 demonstrated efficacy and was well tolerated as a single agent in this multi-center Phase 2 trial of patients with advanced sarcomas, at least 90% of whom had progressive disease. The efficacy of AP23573 was evaluated using two closely related measures of disease progression: CBR (characterized as tumor regression - complete or partial response - or disease stabilization for at least four cycles by RECIST guidelines), and PFS (reported as the six-month rate and the median duration). The primary end-point of the trial - evidenced by CBR rates - was achieved in the three most prevalent types of sarcoma (i.e., bone sarcoma, leiomyosarcoma and liposarcoma), and treatment with AP23573 more than doubled PFS when compared to historical control data from the European Organization for Research and Treatment of Cancer (EORTC).

About AP23573

ARIAD's lead product candidate, AP23573, is a novel small-molecule inhibitor of the protein mTOR, a "master switch" in cancer cells. Blocking mTOR creates a starvation-like effect in cancer cells by interfering with cell growth, division, metabolism, and angiogenesis. AP23573 is currently in Phase 1 and 2 clinical trials in patients with solid tumors and hematologic cancers. AP23573 has been designated both as a fast-track product and an orphan drug by the U.S. Food and Drug Administration and as an orphan drug by the European Medicines Agency for the treatment of soft-tissue and bone sarcomas. In addition to its program in oncology, ARIAD is collaborating with Medinol Ltd to develop stents and other medical devices that deliver AP23573 to prevent reblockage at sites of vascular injury following stent-assisted angioplasty.

About ARIAD

ARIAD is engaged in the discovery and development of breakthrough medicines to treat cancer by regulating cell signaling with small molecules. The Company is developing a comprehensive approach to patients with cancer that addresses the greatest medical need - aggressive and advanced-stage cancers for which current treatments are inadequate. Medinol Ltd. also is developing stents and other medical devices that deliver ARIAD's lead cancer product candidate to prevent reblockage at sites of vascular injury following stent-assisted angioplasty. ARIAD has an exclusive license to pioneering technology and patents related to certain NF-(kappa)B treatment methods, and the discovery and development of drugs to regulate NF-(kappa)B cell-signaling activity, which may be useful in treating certain diseases. Additional information about ARIAD can be found on the web at http://www.ariad.com.

Some of the matters discussed herein are "forward-looking statements"

within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements are identified by the use of words such as "may", "anticipate," "estimate," "expect," "project," "intend," "plan," "believe," and other words and terms of similar meaning in connection with any discussion of future operating or financial performance. Such statements are based on management's expectations and are subject to certain factors, risks and uncertainties that may cause actual results, outcome of events, timing and performance to differ materially from those expressed or implied by such forward-looking statements. These risks include, but are not limited to, risks and uncertainties regarding our ability to accurately estimate the timing and actual R&D expenses and other costs associated with the preclinical and clinical development and manufacture of our product candidates, the adequacy of our capital resources and the availability of additional funding, risks and uncertainties regarding our ability to manufacture or have manufactured our product candidates on a commercial scale, risks and uncertainties regarding our ability to successfully recruit centers, enroll patients and conduct clinical studies of product candidates including our Phase 3 clinical trial in advanced sarcomas referred to in this press release, risks and uncertainties that clinical trial results at any phase of development, including those described in this press release, may be adverse or may not be predictive of future results or lead to regulatory approval of any of our or any partner's product candidates, risks and uncertainties of third-party intellectual property claims relating to our and any partner's product candidates, risks and uncertainties related to the potential acquisition of or other strategic transaction regarding the minority stockholders' interests in our 80%-owned subsidiary, ARIAD Gene Therapeutics, Inc., and risks and uncertainties relating to regulatory oversight, the timing, scope, cost and outcome of legal and patent office proceedings, litigation, prosecution and re-examination proceedings concerning our NF-(kappa)B patent portfolio, future capital needs, key employees, dependence on collaborators and manufacturers, markets, economic conditions, products, services, prices, reimbursement rates, competition and other factors detailed in the Company's public filings with the Securities and Exchange Commission (SEC), including ARIAD's Annual Report on Form 10-K for the fiscal year ended December 31, 2005, as updated from time to time in our subsequent periodic and current reports filed with the SEC. The information contained in this document is believed to be current as of the date of original issue. The Company does not intend to update any of the forward-looking statements after the date of this document to conform these statements to actual results or to changes in the Company's expectations, except as required by law.

```
CONTACT: Investors
         ARIAD Pharmaceuticals, Inc.
         Edward Fitzgerald, 617-621-2345
         or
         Media
         Pure Communications
         Adriana Jenkins, 617-710-8350
</TEXT>
</DOCUMENT>
```

---

Created by 10KWizard    www.10KWizard.com

# EXHIBIT D



# FORM 10−Q

## ARIAD PHARMACEUTICALS INC − ARIA

**Filed: November 09, 2006 (period: September 30, 2006)**

Quarterly report which provides a continuing view of a company's financial position

# Table of Contents

## PART I.

FINANCIAL INFORMATION
**ITEM 1.**     UNAUDITED FINANCIAL STATEMENTS
**ITEM 2.**     MANAGEMENTS DISCUSSION AND ANALYSIS OF FINANCIAL
               CONDITION AND RESULTS OF OPERATIONS
**ITEM 3.**     QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET
               RISK
**ITEM 4.**     CONTROLS AND PROCEDURES

## PART II.

OTHER INFORMATION
**ITEM 1.**      LEGAL PROCEEDINGS
**ITEM 1A.**     RISK FACTORS
**ITEM 5.**      OTHER INFORMATION
**ITEM 6.**      EXHIBITS
SIGNATURES
EXHIBIT INDEX
EX–31.1 (ARIAD PHARMACEUTICALS EXHIBIT 31.1)

EX–31.2 (ARIAD PHARMACEUTICALS EXHIBIT 31.2)

EX–32.1 (ARIAD PHARMACEUTICALS EXHIBIT 32.1)

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 10-Q**

|X|   QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934
**For the quarterly period ended September 30, 2006**

OR

| |   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (d)
OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to _____

Commission File Number: 0-21696

**ARIAD Pharmaceuticals, Inc.**
(Exact name of Registrant as specified in its charter)

**Delaware**                                             **22-3106987**
(State or other jurisdiction of                (I.R.S. Employer Identification No.)
incorporation or organization)

**26 Landsdowne Street, Cambridge, Massachusetts 02139**
(Address of principal executive offices) (Zip Code)

**Registrant's Telephone Number, Including Area Code: (617) 494-0400**

Former Name, Former Address and Former Fiscal Year,
If Changed Since Last Report: Not Applicable

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

**Yes |X|        No | |**

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "large accelerated filer and accelerated filer" in Rule 12b-2 of the Exchange Act.

**Large accelerated filer | |     Accelerated filer |X|     Non-accelerated filer | |**

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b - 2 of the Exchange Act).

**Yes | |     No |X|**

The number of shares of the Registrant's common stock outstanding as of November 3, 2006 was 65,285,497.

**ARIAD PHARMACEUTICALS, INC.**

### TABLE OF CONTENTS

| | | |
|---|---|---|
| PART I. | FINANCIAL INFORMATION | 1 |
| ITEM 1. | UNAUDITED FINANCIAL STATEMENTS | 1 |
| | Condensed Consolidated Balance Sheets – September 30, 2006 and December 31, 2005 | 1 |
| | Condensed Consolidated Statements of Operations for the Three Months and Nine Months Ended September 30, 2006 and 2005 | 2 |
| | Condensed Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2006 and 2005 | 3 |
| | Notes to Unaudited Condensed Consolidated Financial Statements | 4 |
| ITEM 2. | MANAGEMENT S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 10 |
| ITEM 3. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 20 |
| ITEM 4. | CONTROLS AND PROCEDURES | 20 |
| PART II. | OTHER INFORMATION | 21 |
| ITEM 1. | LEGAL PROCEEDINGS | 21 |
| ITEM 1A. | RISK FACTORS | 23 |
| ITEM 5. | OTHER INFORMATION | 35 |
| ITEM 6. | EXHIBITS | 39 |
| | SIGNATURES | 40 |
| | EXHIBIT INDEX | 41 |

Source: ARIAD PHARMACEUTICAL, 10−Q, November 09, 2006

PART I. FINANCIAL INFORMATION

ITEM 1. UNAUDITED FINANCIAL STATEMENTS

## ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES
### CONDENSED CONSOLIDATED BALANCE SHEETS

| *In thousands, except share and per share data* | September 30, 2006 (Unaudited) | December 31, 2005 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 14,821 | $ 25,453 |
| Marketable securities | 24,400 | 56,063 |
| Inventory and other current assets | 2,318 | 2,225 |
| Total current assets | 41,539 | 83,741 |
| Property and equipment: | | |
| Leasehold improvements | 18,088 | 17,840 |
| Equipment and furniture | 10,666 | 9,908 |
| Total | 28,754 | 27,748 |
| Less accumulated depreciation and amortization | (22,766) | (20,022) |
| Property and equipment, net | 5,988 | 7,726 |
| Intangible and other assets, net | 4,386 | 4,707 |
| Total assets | $ 51,913 | $ 96,174 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Current portion of long–term debt | $ 1,920 | $ 1,920 |
| Accounts payable | 4,058 | 3,961 |
| Accrued compensation and benefits | 904 | 497 |
| Accrued product development expenses | 7,004 | 8,444 |
| Other accrued expenses | 2,998 | 2,097 |
| Deferred revenue – current portion | 505 | 851 |
| Total current liabilities | 17,389 | 17,770 |
| Long–term debt | 4,295 | 5,735 |
| Deferred revenue | 7 | 24 |
| Deferred executive compensation | 1,513 | 1,267 |
| Stockholders' equity: | | |
| Common stock, $.001 par value; authorized, 145,000,000 shares; issued and outstanding, 62,152,793 shares in 2006 and 61,698,129 shares in 2005 | 62 | 62 |
| Additional paid–in capital | 323,314 | 318,684 |
| Deferred compensation | | (246) |
| Accumulated other comprehensive income (loss) | 5 | (24) |
| Accumulated deficit | (294,672) | (247,098) |
| Total stockholders' equity | 28,709 | 71,378 |
| Total liabilities and stockholders' equity | $ 51,913 | $ 96,174 |

See notes to unaudited condensed consolidated financial statements.

1

Source: ARIAD PHARMACEUTICAL, 10–Q, November 09, 2006

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**

| *In thousands, except share and per share data* | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| License revenue | $        229 | $        321 | $        688 | $        975 |
| | | | | |
| Operating expenses: | | | | |
| Research and development | 10,564 | 12,381 | 32,382 | 35,128 |
| General and administrative | 5,244 | 2,892 | 17,231 | 7,808 |
| Total operating expenses | 15,808 | 15,273 | 49,613 | 42,936 |
| | | | | |
| Loss from operations | (15,579) | (14,952) | (48,925) | (41,961) |
| | | | | |
| Other income (expense): | | | | |
| Interest income | 482 | 474 | 1,720 | 1,236 |
| Interest expense | (123) | (116) | (369) | (298) |
| Total other income, net | 359 | 358 | 1,351 | 938 |
| | | | | |
| Net loss | $   (15,220) | $   (14,594) | $   (47,574) | $   (41,023) |
| | | | | |
| Net loss per share | $        (.25) | $        (.25) | $        (.77) | $        (.75) |
| | | | | |
| Weighted–average number of shares of common stock outstanding | 62,120,381 | 57,662,708 | 62,013,462 | 54,474,950 |

See notes to unaudited condensed consolidated financial statements.

2

Source: ARIAD PHARMACEUTICAL, 10-Q, November 09, 2006

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**

| | Nine Months Ended September 30, | |
|---|---|---|
| *In thousands* | 2006 | 2005 |
| Cash flows from operating activities: | | |
| Net loss | $ (47,574) | $ (41,023) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 3,476 | 1,850 |
| Accretion of discount on marketable securities | (1,313) | (527) |
| Deferred executive compensation expense | 669 | 453 |
| Stock–based compensation | 3,388 | 408 |
| Increase (decrease) from: | | |
| Inventory and other current assets | (93) | 525 |
| Other assets | 35 | (8) |
| Accounts payable | 97 | 48 |
| Accrued compensation and benefits | 407 | 352 |
| Accrued product development expenses | (1,440) | 5,229 |
| Other accrued expenses | 901 | 1,454 |
| Deferred revenue | (363) | (151) |
| Deferred executive compensation paid | (423) | (445) |
| | | |
| Net cash used in operating activities | (42,233) | (31,835) |
| | | |
| Cash flows from investing activities: | | |
| Proceeds from sales and maturities of marketable securities | 70,766 | 47,812 |
| Purchases of marketable securities | (37,761) | (16,687) |
| Investment in property and equipment | (1,018) | (5,069) |
| Investment in intangible assets | (434) | (583) |
| | | |
| Net cash provided by investing activities | 31,553 | 25,473 |
| | | |
| Cash flows from financing activities: | | |
| Repayment of borrowings | (1,440) | (1,440) |
| Proceeds from issuance of common stock, net of issuance costs | | 57,860 |
| Proceeds from issuance of stock pursuant to stock option and purchase plans | 1,488 | 850 |
| | | |
| Net cash provided by financing activities | 48 | 57,270 |
| | | |
| Net increase (decrease) in cash and cash equivalents | (10,632) | 50,908 |
| Cash and cash equivalents, beginning of period | 25,453 | 18,556 |
| | | |
| Cash and cash equivalents, end of period | $ 14,821 | $ 69,464 |

See notes to unaudited condensed consolidated financial statements.

3

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**NOTES TO UNAUDITED CONDENSED CONSOLIDATED**
**FINANCIAL STATEMENTS**

1. **Management Statement**

In the opinion of the Company's management, the accompanying unaudited condensed consolidated financial statements contain all adjustments (consisting of items of a normal and recurring nature) necessary to present fairly the financial position as of September 30, 2006, the results of operations for the three–month and nine–month periods ended September 30, 2006 and 2005 and cash flows for the nine–month periods ended September 30, 2006 and 2005. The results of operations for the nine–month period ended September 30, 2006 are not necessarily indicative of the results to be expected for the full year. These financial statements should be read in conjunction with the Company's Annual Report on Form 10–K for the year ended December 31, 2005, which includes consolidated financial statements and notes thereto for the years ended December 31, 2005, 2004 and 2003.

2. **Marketable Securities**

The Company has classified its marketable securities as available–for–sale and, accordingly, carries such securities at aggregate fair value. At September 30, 2006, all of the Company's marketable securities consisted of United States government or agency securities.

At September 30, 2006, the aggregate fair value and amortized cost of the Company's marketable securities were $24,400,000 and $24,395,000, respectively. Gross unrealized gains and losses were $6,000 and $1,000, respectively, at September 30, 2006. The gross unrealized losses of $1,000 pertain to two marketable securities with an aggregate fair value of $5.3 million, both of which have been in a continuous loss position for less than twelve months.

At December 31, 2005, the aggregate fair value and amortized cost of the Company's marketable securities were $56,063,000 and $56,087,000, respectively. Gross unrealized gains and losses were $9,000 and $33,000 respectively, at December 31, 2005. The gross unrealized losses of $33,000 pertain to fourteen marketable securities with an aggregate fair value of $35.6 million, all of which had been in a continuous loss position for less than twelve months.

The Company's marketable securities with unrealized losses consist of U.S. government agency securities that are guaranteed by the U.S. government agency. The unrealized losses were caused by increased interest rates. Because the Company has the intent and ability to hold the securities to maturity which should result in a recovery of the fair value, the Company does not consider the investments to be other–than–temporarily impaired.

Realized gains and losses on investment security transactions are reported on the specific–identification method. Realized gains and losses on sales of marketable securities were not material during the nine months ended September 30, 2006. Changes in market values resulted in an increase in net unrealized gains of $29,000 for the nine–month period ended September 30, 2006.

3. **Executive Compensation Plans**

Under the Company's deferred executive compensation plan established in 1997 (the "1997 Plan"), participants were granted options to purchase shares of certain designated mutual funds at a discount equal to the amount of the award. The options vest equally over four years.

Effective in October 2005, the Company established a new deferred executive compensation plan (the "2005 Plan") and amended the 1997 Plan to meet the new requirements of Section 409A of the Internal Revenue Code. Under the 2005 Plan, the Company may grant deferred performance–based or ad hoc bonuses to its executive officers, key employees and key advisors. Such awards will include vesting and payment provisions, as provided under the terms of the 2005 Plan. The value of amounts deferred under the 2005 Plan are based on the actual performance of investments designated by the Company from time to time. The Company recognizes expense related to these awards over the vesting period.

4

Total expense related to these plans amounted to $220,000 and $171,000 for the three–month periods ended September 30, 2006 and 2005, respectively, and $669,000 and $453,000 for the nine–month periods ended September 30, 2006 and 2005, respectively.

**4.    Net Loss Per Share**

Net loss per share amounts have been computed based on the weighted–average number of common shares outstanding during each period. Because of the net loss reported in each period, diluted and basic per share amounts are the same. For the nine months ended September 30, 2006 and 2005, options to purchase 6,836,781 and 5,992,644 shares of common stock, respectively, were not included in the computation of net loss per share, because the effect would have been anti–dilutive.

**5.    Stock–Based Compensation**

The Company awards stock options and other equity–based instruments to its employees, directors and consultants and provides employees the right to purchase common stock (collectively "share–based payments"), pursuant to stockholder approved plans. Effective January 1, 2006, the Company adopted Statement of Financial Accounting Standards No. 123 (revised 2004), *Share–Based Payment* ("SFAS No. 123R"), using the Statement's modified prospective application method. Accordingly, prior period results have not been restated.

Under the provisions of SFAS No. 123R, the Company recognizes compensation expense in its financial statements associated with awards of stock options and other equity–based instruments to employees, directors and consultants. Compensation cost is measured based on the fair value of the instrument on the grant date and is recognized over the requisite service period, which generally equals the vesting period. All of the Company's stock–based compensation is based on grants of equity instruments and no liability awards have been granted.

The Company's statement of operations included total compensation cost from share–based payments for the three–month and nine–month periods ended September 30, 2006 and 2005 as follows:

| In thousands | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2006 | | 2005 | | 2006 | | 2005 | |
| Compensation cost from: | | | | | | | | |
| Stock options | $ | 920 | $ | 2 | $ | 2,801 | $ | 11 |
| Stock and stock units | | 184 | | 133 | | 553 | | 397 |
| Purchases of common stock at a discount | | 12 | | — | | 34 | | — |
| | $ | 1,116 | $ | 135 | $ | 3,388 | $ | 408 |

The adoption of SFAS No. 123R resulted in incremental stock–based compensation expense of $929,000 and $2.8 million for the three months and nine months ended September 30, 2006, respectively, which caused the Company's net loss to increase by $929,000 and $2.8 million and its net loss per share to increase by $0.02 and $0.05 per share for the corresponding periods. The adoption had no impact on cash used in operating activities or cash provided by financing activities.

Prior to January 1, 2006, the Company followed Accounting Principles Board ("APB") Opinion 25, *Accounting for Stock Issued to Employees*, and related interpretations, in accounting for its stock–based awards. The following table illustrates the effect on net income and earnings per share if the Company had applied the fair value recognition provisions of SFAS No. 123R to stock–based awards for the three–month and nine–month periods ended September 30, 2005.

5

| | Three Months Ended September 30, 2005 | Nine Months Ended September 30, 2005 |
|---|---|---|
| *In thousands, except per share amounts* | | |
| Net loss as reported | $ (14,594) | $ (41,023) |
| Effect of stock options if valued at fair value | (981) | (2,978) |
| Pro forma net loss | $ (15,576) | $ (44,001) |
| | | |
| Net loss per share as reported | $ (.25) | $ (.75) |
| Effect of stock options if valued at fair value | (.01) | (.05) |
| Pro forma net loss per share | $ (.26) | $ (.80) |

*Stock Options*

Stock options are granted with an exercise price equal to the closing market price of the Company's common stock on the date of grant. Stock options generally vest ratably over four years and have contractual terms of ten years. Stock options are valued using the Black–Scholes option valuation model and compensation is recognized based on such fair value over the period of vesting on a straight–line basis.

The following table summarizes information about stock options for the nine–month periods ended September 30, 2006 and 2005:

| | Nine Months Ended September 30, | |
|---|---|---|
| *In thousands, except per share amounts* | 2006 | 2005 |
| Weighted average fair value of options granted, per share | $ 4.37 | $ 6.15 |
| Total cash received from exercises of stock options | 1,358 | 770 |
| Total intrinsic value of stock options exercised | 1,204 | 665 |
| Total fair value of stock options vested | 2,880 | 1,811 |

The weighted average fair value of options granted in the nine–month periods ended September 30, 2006 and 2005 reflect the following weighted–average assumptions:

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2006 | 2005 |
| Expected life of options granted (*in years*) | 7.07 | 6.03 |
| Expected volatility | 70.59% | 109.30% |
| Risk–free rate | 4.68% | 3.90% |
| Expected dividends | 0% | 0% |

The expected life assumption is based on an analysis of historical behavior of participants related to options awarded over time. The expected volatility assumption for the nine months ended September 30, 2006 is based on the implied volatility of the Company's common stock, derived from analysis of historical traded and quoted options on the Company's common stock over the period commensurate with the expected life of the options granted. The expected volatility for the nine months ended September 30, 2005 is based on the historical volatility of the Company's common stock. The risk–free rate is based on the forward U.S. Treasury yield curve. The expected dividends reflect the Company's current and expected future policy for dividends on its common stock.

Based on the Company's historical employee departure rates, an annualized estimated forfeiture rate of 16.3% has been used in calculating compensation cost. Under the provisions of SFAS No. 123R, additional expense is recorded if the actual forfeiture rate is lower than estimated, and a recovery of prior expense is recorded if the actual forfeiture rate is higher than estimated.

6

Stock option activity under the Company's stock plans for the nine–month period ended September 30, 2006 was as follows:

| | Number of Shares | Weighted Average Exercise Price Per Share |
|---|---|---|
| Options outstanding, January 1, 2006 | 6,826,644 | $ 5.28 |
| Granted | 563,895 | 6.26 |
| Exercised | (396,315) | 3.43 |
| Forfeited | (91,691) | 6.35 |
| Expired | (65,752) | 11.66 |
| Options outstanding, September 30, 2006 | 6,836,781 | 5.39 |
| Options exercisable, September 30, 2006 | 4,523,420 | 4.79 |

Activity for non–vested stock option awards for the nine–month period ended September 30, 2006 was as follows:

| | Number of Shares | Weighted Average Grant Date Fair Value |
|---|---|---|
| Non–vested options outstanding, January 1, 2006 | 2,480,796 | $ 5.22 |
| Granted | 563,895 | 4.37 |
| Vested | (639,639) | 4.50 |
| Forfeited | (91,691) | 4.99 |
| Non–vested options outstanding, September 30, 2006 | 2,313,361 | 5.23 |

The following table summarizes information about stock options outstanding as of September 30, 2006:

| | Options Outstanding | Options Exercisable |
|---|---|---|
| Number of options | 6,836,781 | 4,523,420 |
| Weighted–average exercise price per share | $ 5.39 | $ 4.79 |
| Aggregate intrinsic value (in 000's) | $ (7,034) | $ (1,959) |
| Weighted average remaining contractual term (in years) | 6.04 | 5.73 |

At September 30, 2006, total unrecognized compensation cost related to non–vested stock options outstanding amounted to $4,911,000. That cost is expected to be recognized over a weighted–average period of 2.2 years.

*Stock and Stock Unit Grants*

Stock and stock unit grants are provided to directors as compensation and generally carry no restrictions as to resale. Stock grants to executive officers carry restrictions as to resale for periods of time specified in the grant. Stock and stock unit grants are valued at the closing market price of the Company's common stock on the date of grant and compensation is recognized over the requisite service period or period during which restrictions remain on the common stock or stock units granted.

Stock and stock units amounting to 80,000 were granted in each of the nine–month periods ended September 30, 2006 and 2005. The weighted–average fair value of stock and stock unit awards granted in the nine–month periods ended September 30, 2006 and 2005 was $6.43 and $6.62, respectively. At September 30, 2006, total unrecognized compensation cost related to stock and stock unit awards amounted to $185,000, which is expected to be recognized over a weighted–average period of three months.

7

Source: ARIAD PHARMACEUTICAL, 10-Q, November 09, 2006

*Purchase of Common Stock Pursuant to Employee Stock Purchase Plan*

Purchases of common stock by employees are provided pursuant to the Company's employee stock purchase plan. Purchase price is calculated as 85% of the lower of the closing price of our common stock on the first trading day or last trading day of each calendar quarter. Compensation cost is equal to the fair value of the discount on the date of grant and is recognized as compensation in the period of purchase.

## 6. Litigation

### NF−ºB Patent Infringement Litigation and Reexamination

#### *Lilly Litigation*

In 2002, the Company, together with Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research and Harvard University (collectively, the Plaintiffs) filed a lawsuit in the United States District Court for the District of Massachusetts, or the U.S. District Court, against Eli Lilly and Company, hereinafter referred to as Lilly, alleging infringement of certain claims, or the NF−ºB `516 Claims, of the Plaintiffs' U.S. Patent No. 6,410,516, or the `516 Patent, covering methods of treating human disease by regulating NF−ºB cell−signaling activity through sales of Lilly's osteoporosis drug, Evista®, and Lilly's septic shock drug, Xigris®, and seeking monetary damages from Lilly.

This case was tried before a jury in the U.S. District Court from April 10, 2006 through April 28, 2006. After deliberations, on May 4, 2006, the jury rendered a verdict in favor of the Plaintiffs by finding that the NF−ºB `516 Claims asserted in the lawsuit are valid and infringed by Lilly through sales of Evista and Xigris in the United States. One defense regarding validity was not submitted to the jury and was instead the subject of a bench trial, as addressed below. The jury awarded damages to the Plaintiffs in the amount of approximately $65.2 million, based on the jury's determination of a reasonable royalty rate of 2.3% to be paid by Lilly to the Plaintiffs based on U.S. sales of Evista and Xigris from the date of the filing of the lawsuit on June 25, 2002 through February 28, 2006. The jury awarded further damages on an ongoing basis, in amounts to be determined, equal to 2.3% of U.S. sales of Evista and Xigris through the year 2019, when the patent expires. If the verdict is upheld, damages paid by Lilly will be applied first to reimburse the Company for any unreimbursed legal fees and expenses relating to the litigation. The Company will receive 91% of the remainder, and the co−plaintiffs will receive 9%.

A separate trial, or bench trial, was held in the U.S. District Court from August 7, 2006 through August 9, 2006 on certain defenses asserted by Lilly relating to the enforceability of the NF−ºB `516 Claims and one defense related to the validity of these claims. The Company is currently awaiting the judge's ruling on the issues tried in the bench trial before a final judgment may be entered in this lawsuit. Lilly has the right to file motions challenging the jury's verdict in this lawsuit, and, upon the entry of a final judgment by the U.S. District Court, to file an appeal of the jury's verdict and other rulings by the U.S. District Court with the Court of Appeals for the Federal Circuit.

#### *Amgen Litigation*

On April 20, 2006, Amgen Inc. and certain affiliated entities, hereinafter referred to as Amgen, filed a lawsuit against the Company in the U.S. District Court for the District of Delaware seeking a declaratory judgment that each of the claims contained in the `516 Patent are invalid and that Amgen has not infringed any of the claims of the `516 Patent based on activities related to Amgen's products, Enbrel® and Kineret®. The Company filed a motion to dismiss this case in the U.S. District Court on June 14, 2006, which was, after a hearing held on September 11, 2006, denied in an order dated September 13, 2006.

On September 25, 2006, the Company filed a motion requesting the judge to certify the Court's September 13, 2006 order denying the Company's motion to dismiss for immediate appeal to the Court of Appeals for the Federal Circuit. On October 5, 2006, the Company also filed a renewed motion to dismiss the Amgen litigation for failure to name the university patentees as necessary and indispensable parties or, in the alternative, to transfer this case to the U.S. District Court for the District of Massachusetts.

8

At a hearing on these motions held on November 3, 2006, the Court granted the Company's motion certifying the Court's September 13, 2006 order for immediate appeal and denied, as moot and without prejudice, the Company's renewed motion to dismiss or transfer the case. The Court also stayed discovery in the case pending a ruling on a motion to stay which the Court ordered the Company to file promptly. A scheduling order pursuant to Rule 16 of the Federal Rules of Civil Procedure was entered by the U.S. District Court on July 19, 2006. Pursuant to that order, a claim construction hearing in this case is scheduled for September 7, 2007, with trial scheduled to commence on February 4, 2008. Modifications to the scheduling order resulting from an appeal or stay in the case cannot be determined at this time.

*Re-examination Proceedings in PTO*

On April 4, 2005, Lilly filed a request in the United States Patent and Trademark Office, or PTO, to reexamine the patentability of certain claims of the `516 Patent. An unrelated third party filed a similar request in the PTO on December 2, 2005 to reexamine the patentability of certain claims of the `516 Patent. These two requests have been granted and were merged by the PTO into a single reexamination proceeding. The Company petitioned the PTO to vacate or stay the grant of these requests, but the Company's petitions were rejected. The Company (with the Plaintiffs) also filed a complaint in the U.S. District Court in the Eastern District of Virginia requesting that the court enjoin the PTO from continuing with the reexamination proceedings, along with a motion for summary judgment, both of which were denied by the Court in an order dated October 3, 2006 granting the PTO's motion to dismiss this action. The Company filed a motion to dismiss its appeal in this case on November 8, 2006.

The PTO issued its first office action on August 2, 2006. In this first office action, 160 of the 203 claims of the `516 Patent were rejected by the PTO, including the claims asserted by the Company in the Lilly litigation and claims which may be asserted by the Company in the Amgen litigation. The Company's response to the first office action is due on November 9, 2006, and the Company expects to receive a final office action sometime thereafter. Accordingly, the Company can provide no assurance that the PTO will not invalidate some of the claims of the `516 Patent in this reexamination process, including the claims which were asserted against Lilly or might be asserted against Amgen, or that we will ultimately prevail in either of these litigations.

The timing and ultimate outcome of the Lilly litigation (including the pending bench trial and any appeal of the jury verdict and court's ruling in the bench trial), the Amgen litigation (including pending motion to dismiss) and the reexamination proceedings cannot be determined at this time, and, as a result, no determination can be made with respect to allowance of the claims of the `516 Patent, nor can any final determination be made with respect to the validity or infringement of the claims of the `516 Patent in the Lilly litigation and the Amgen litigation, nor can the Company predict whether the damages awarded by the jury in the U.S. District Court in the Lilly litigation will be upheld, eliminated or limited. Although the Company has prevailed at jury trial in the Lilly litigation, the damages the Company has awarded by the jury may be eliminated or limited by an adverse finding in the bench trial, on post-trial motions, upon appeal or in the event that the claims of the `516 Patent are invalidated by the PTO.

**7. Subsequent Event**

On October 25, 2006, the Company sold 3,112,945 shares of its common stock, pursuant to its effective shelf registration statements, in an underwritten offering at a purchase price of $4.65 per share. Proceeds to the Company were $14.5 million, or $14.3 million after estimated offering expenses. The Company will also receive approximately $2.2 million in additional net proceeds if the underwriter exercises its overallotment option to purchase 466,942 shares of common stock in full prior to November 18, 2006. Upon completion of the sale of common stock, the Company has no remaining shares available for sale under shelf registration statements.

**8. Recently Issued Accounting Pronouncement**

In July 2006, the Financial Accounting Standards Board ("FASB") issued Interpretation No. 48 ("FIN 48") regarding *Accounting for Uncertainties in Income Taxes*, which defines the threshold for recognizing the benefits of tax-return positions in the financial statements as "more-likely-than-not" to be sustained by the taxing authorities. FIN 48 also requires explicit disclosure requirements about a company's uncertainties related to their income tax position, including a detailed roll-forward of tax benefits taken that do not qualify for financial statement recognition. This Interpretation is effective for fiscal years beginning after December 31, 2006. The Company is assessing the impact of FIN 48.

9

**ITEM 2. MANAGEMENTS' DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*Unless stated otherwise, references in this Quarterly Report on Form 10−Q to "we," "us," or "our" refer to ARIAD Pharmaceuticals, Inc., a Delaware corporation, and our subsidiaries including our 80% owned subsidiary, ARIAD Gene Therapeutics, Inc., or AGTI, unless the context requires otherwise.*

**Overview**

We are engaged in the discovery and development of breakthrough medicines to treat cancers by regulating cell signaling with small molecules. We are developing a comprehensive approach to patients with cancer that addresses the greatest medical need – aggressive and advanced-stage cancers for which current treatments are inadequate. Our goal is to build a fully integrated oncology company focused on novel, molecularly targeted therapies to treat solid tumors and hematologic cancers, as well as the spread of primary tumors to distant sites.

Our lead cancer product candidate, AP23573, has been or is being studied in multiple clinical trials in patients with various types of cancers, including sarcomas, hormone refractory prostate cancer, endometrial cancer, brain cancer and leukemias and lymphomas. We discovered AP23573 in a research and development program conducted by us on behalf of ARIAD Gene Therapeutics, Inc., or AGTI, our 80%−owned subsidiary. In 2005, we entered into a partnership with Medinol Ltd., a leading cardiovascular medical device company, to develop and commercialize stents and other medical devices to deliver AP23573 in order to prevent reblockage of injured vessels following stent−assisted angioplasty, a common non−surgical procedure for dilating or opening narrowed arteries.

In addition to our lead clinical development program, we have a focused drug discovery program centered on small−molecule, molecularly targeted therapies and cell−signaling pathways implicated in cancer. We also have an exclusive license to a family of patents, three in the U.S. and one in Europe, including a pioneering U.S. patent covering methods of treating human disease by regulating NF−ºB cell−signaling activity. Additionally, we have developed a proprietary portfolio of cell−signaling regulation technologies, our ARGENT technology, to control intracellular processes with small molecules, which may be useful in the development of therapeutic vaccines and gene and cell therapy products and which provide versatile tools for applications in cell biology, functional genomics and drug discovery research.

Since our inception in 1991, we have devoted substantially all of our resources to our research and development programs, including those we conduct on behalf of AGTI. We receive no revenue from the sale of pharmaceutical products, and most of our revenue to date was received in connection with a joint venture we had with a major pharmaceutical company from 1997 to 1999. Except for the gain on the sale of our fifty percent interest in that joint venture in December 1999, which resulted in net income for fiscal 1999, we have not been profitable since inception. We expect to incur substantial and increasing operating losses for the foreseeable future, primarily due to costs associated with our pharmaceutical product development programs, including costs for clinical trials and product manufacturing, personnel and our intellectual property. We expect that losses will fluctuate from quarter to quarter and that these fluctuations may be substantial. At September 30, 2006, we had an accumulated deficit of $294.7 million and cash, cash equivalents and marketable securities of $39.2 million and working capital of $24.2 million.

For additional information about our business, including our product candidates and our relationship with AGTI, please see Part II, Item 5 of this Quarterly Report on Form 10−Q.

**General**

Our operating losses are primarily due to the costs associated with our pharmaceutical product development programs, personnel and intellectual property protection and enforcement. As our product development programs progress, we incur significant costs for toxicology and pharmacology studies, product development, manufacturing, clinical trials and regulatory support. These costs can vary significantly from quarter to quarter depending on the number of product candidates in development, the stage of development of each product candidate, the number of patients enrolled in and complexity of clinical trials and other factors. Costs associated with our intellectual property include legal fees and other costs to prosecute, maintain, protect and enforce our intellectual property, which can fluctuate from quarter to quarter depending on the status of patent issues being pursued.

10

---

Because we currently receive no revenue from the sale of pharmaceutical products and receive only limited license revenue, we have relied primarily on the capital markets as our source of funding. In October 2006, we raised $14.5 million through an underwritten public offering of our common stock. We also utilize long−term debt to supplement our funding, particularly as a means to fund investment in property and equipment and infrastructure needs. In addition, we plan to seek funding from collaborations with pharmaceutical, biotechnology and/or medical device companies for development and commercialization of our product candidates. These collaborations may take the form of licensing arrangements, co−development or joint venture arrangements or other structures. If funding from these various sources is unavailable on reasonable terms, we may be required to reduce our operating expenses in order to conserve cash and capital by delaying, scaling back or eliminating one or more of our product development programs.

**Critical Accounting Policies and Estimates**

Our financial position and results of operations are affected by subjective and complex judgments, particularly in the areas of the carrying value of intangible assets, deferred compensation benefits for executives, and stock−based compensation.

At September 30, 2006, we reported $4.4 million of intangible assets, consisting of capitalized costs related primarily to purchased and issued patents, patent applications and licenses, net of accumulated amortization. These costs are being amortized over the estimated useful lives of the underlying patents or licenses. Changes in these lives or a decision to discontinue using the technologies could result in material changes to our balance sheet and statements of operations. For example, for the nine−month period ended September 30, 2006, we expensed $173,000 of unamortized costs related to certain intangible assets which we are no longer actively pursuing. We have concluded that the carrying value of our remaining intangible assets is not impaired because such assets are utilized in our product development programs and/or continue to be viable technologies for collaborations or licensing efforts which we continue to pursue. If we were to abandon the underlying technologies or terminate our efforts to pursue collaborations or license agreements, we may be required to write off a portion of the carrying value of our intangible assets. The net book value as of September 30, 2006 of intangible assets related to our NF−κB technology is $466,000. If the patentability of our NF−κB patents is successfully challenged and such patents are subsequently narrowed, invalidated or circumvented, we may be required to write off some or all of the net book value related to such technology.

Under our deferred executive compensation plans, we are required to adjust our recorded obligations to our employees on a periodic basis to reflect fair value based on the value of certain underlying mutual funds. Fluctuations in the fair value of such mutual funds can result in uneven expense charges or credits to our statements of operations. If, for example, the market prices of the underlying mutual funds were 10% higher at September 30, 2006, we would have recognized an additional $92,000 in compensation expense in the nine−month period ended September 30, 2006.

In determining expense related to stock−based compensation, we utilize the Black−Scholes valuation model to estimate the fair value of stock options granted to employees, consultants and directors. Application of the Black−Scholes valuation model requires the use of factors such as the market value and volatility of our common stock, a risk−free discount rate and an estimate of the life of the option contract. Fluctuations in these factors can result in adjustments to our statements of operations. If, for example, the market value of our common stock, its volatility, or the expected life of stock options granted in the three−month period ended September 30, 2006 were 10% higher or lower than used in the valuation of such stock options, our stock−based compensation expense for the awards would have increased or decreased by up to $15,000, $8,000, or $5,000, respectively.

11

**Results of Operations**

*For the three months ended September 30, 2006 and 2005*

*Revenue*

We recognized license revenue of $229,000 in the three month period ended September 30, 2006, compared to $321,000 in the corresponding period in 2005. The decrease in license revenue was due primarily to the expected timing of receipt of future milestone payments pursuant to our agreement with Medinol Ltd., in accordance with our revenue recognition policy.

*Operating Expenses*

*Research and Development Expenses*

Research and development expenses decreased by $1.8 million, or 15%, to $10.6 million in the three month period ended September 30, 2006, compared to $12.4 million in the corresponding period in 2005. The research and development process necessary to develop a pharmaceutical product for commercialization is subject to extensive regulation by numerous governmental authorities in the United States and other countries. This process typically takes years to complete and requires the expenditure of substantial resources. Current requirements include:

- preclinical toxicology, pharmacology and metabolism studies, as well as in vivo efficacy studies in relevant animal models of disease;

- manufacturing of drug product for preclinical studies and clinical trials and ultimately for commercial supply;

- submission of the results of preclinical studies and information regarding manufacturing and control and proposed clinical protocol to the United States Food and Drug Administration, or FDA, in an Investigational New Drug application, or IND (or similar filings with regulatory agencies outside the United States);

- conduct of clinical trials designed to provide data and information regarding the safety and efficacy of the product candidate in humans; and

- submission of all the results of testing to the FDA in a New Drug Application, or NDA (or similar filings with regulatory agencies outside the United States).

Upon approval by the appropriate regulatory authorities, including in some countries approval of product pricing, we may commence commercial marketing and distribution of the product.

We group our research and development, or R&D, expenses into two major categories: direct external expenses and all other R&D expenses. Direct external expenses consist of costs of outside parties to conduct laboratory studies, to develop manufacturing processes and manufacture the product candidate, to conduct and manage clinical trials and similar costs related to our clinical and preclinical studies. These costs are accumulated and tracked by product candidate. All other R&D expenses consist of costs to compensate personnel, to purchase lab supplies and services, to maintain our facility, equipment and overhead and similar costs of our research and development efforts. These costs apply to work on our clinical and preclinical candidates as well as our discovery research efforts. These costs are not tracked by product candidate because the number of product candidates and projects in R&D may vary from time to time and because we utilize internal resources across multiple projects at the same time.

12

Source: ARIAD PHARMACEUTICAL, 10-Q, November 09, 2006

Direct external expenses are further categorized as costs for clinical programs and costs for preclinical programs. Preclinical programs include product candidates undergoing toxicology, pharmacology, metabolism and efficacy studies and manufacturing process development required before testing in humans can begin. Product candidates are designated as clinical programs once we have filed an IND with the FDA, or a similar filing with regulatory agencies outside the United States, for the purpose of commencing clinical trials in humans.

Our research and development expenses for the three month period ended September 30, 2006, as compared to the corresponding period in 2005, were as follows:

| In thousands | Three months ended September 30, | | Increase/ |
| | 2006 | 2005 | (decrease) |
| --- | --- | --- | --- |
| Direct external expenses: | | | |
| Clinical programs | $ 3,961 | $ 7,173 | $ (3,212) |
| Preclinical programs | 87 | 219 | (132) |
| All other R&D expenses | 6,516 | 4,989 | 1,527 |
| | $ 10,564 | $ 12,381 | $ (1,817) |

AP23573, our lead product candidate which is in Phase 2 clinical trials, was our only clinical program in 2006 and 2005. Direct external expenses for AP23573 decreased by $3.2 million in the three-month period ended September 30, 2006, as compared to the corresponding period in 2005, due primarily to decreases in manufacturing related costs of $762,000 and clinical trials costs of $2.2 million. The decrease in manufacturing related costs was due to the completion in 2005 of certain product and process development studies and the timing of production runs of AP23573. The decrease in clinical trial costs is directly related to a decrease in number of patients on trial during the period driven by successful conclusion in 2005 and the first six months of 2006 of enrollment in several clinical trials. Through September 30, 2006, we have incurred a total of approximately $51.8 million in direct external expenses for AP23573 from the date it became a clinical program. We expect that our direct external costs for AP23573 will increase during the remainder of 2006 as we prepare to initiate a Phase 3 clinical trial for this product candidate.

Preclinical programs consist primarily of our oncogenic kinase inhibitor program and our bone–targeted mTOR inhibitor program. Direct external expenses on preclinical programs will increase or decrease from period to period depending on the status and number of programs in this stage of development and the mix between external and internal efforts applied to such programs. Direct external expenses for preclinical programs decreased by $132,000 in the three month period ended September 30, 2006, as compared to the corresponding period in 2005 due primarily to the completion of certain pharmacology and contract manufacturing studies conducted by outside contract laboratories in 2005. We expect that our direct external expenses for preclinical programs will increase slightly during the remainder of 2006 as we continue to move these programs forward in development.

All other R&D expenses increased by $1.5 million in the three month period ended September 30, 2006 as compared to the corresponding period in 2005, due to higher personnel and related costs as a result of an increase in the number of personnel and salary adjustments ($877,000) and the impact of the adoption of SFAS No. 123R regarding stock–based compensation expense ($510,000), an increase in depreciation and amortization costs due to investments in property and equipment ($272,000), and miscellaneous increases in laboratory supplies and services, and maintenance and utility costs related to our facility. We expect that all other R&D expenses will increase slightly during the remainder of 2006 to support our clinical and preclinical development programs.

The successful development of our product candidates is uncertain and subject to a number of risks. We cannot be certain that any of our product candidates will prove to be safe and effective or will meet all of the applicable regulatory requirements needed to receive and maintain marketing approval.

13

Data from preclinical studies and clinical trials are susceptible to varying interpretations that could delay, limit or prevent regulatory clearance. We, the FDA or other regulatory authorities may suspend clinical trials at any time if we or they believe that the subjects participating in such trials are being exposed to unacceptable risks or if such regulatory agencies find deficiencies in the conduct of the trials or other problems with our products under development. Delays or rejections may be encountered based on additional governmental regulation, legislation, administrative action or changes in FDA or other regulatory policy during development or the review process. Other risks associated with our product development programs are described in Risk Factors in Part II, Item 1A of this Quarterly Report on Form 10–Q, as updated from time to time in our subsequent periodic reports and current reports filed with the SEC. Due to these uncertainties, accurate and meaningful estimates of the ultimate cost to bring a product to market, the timing of completion of any of our drug development programs and the period in which material net cash inflows from any of our drug development programs will commence are unavailable.

*General and Administrative Expenses*

General and administrative expenses were $5.2 million in the three month period ended September 30, 2006, as compared to $2.9 million in the corresponding period in 2005. Professional fees increased by $1.6 million to $3.1 million in the three month period ended September 30, 2006, as compared to $1.5 million in the corresponding period in 2005, due primarily to costs related to business and commercial development initiatives, including market research, and to our patent infringement litigation with Lilly and Amgen. Personnel and related costs increased by $578,000 to $1.3 million in the three month period ended September 30, 2006, as compared to $707,000 in the corresponding period in 2005 due to an increase in the number of personnel and salary adjustments ($101,000) and the impact of adoption of SFAS No. 123R ($477,000). We expect that our general and administrative expenses will remain at approximately the current level for the remainder of 2006 as necessary to support our research and development programs, excluding an expected decrease in professional fees related to our patent infringement litigation with Lilly due to completion of the jury trial during the three–month period ended June 30, 2006.

We expect that our operating expenses in total will increase during the remainder of 2006 for the reasons described above. Operating expenses may fluctuate from quarter to quarter. The actual amount of any change in operating expenses will depend on the progress of our product development programs, including preclinical and clinical studies and product manufacturing, the status of our patent infringement litigation with Lilly and Amgen and our ability to raise funding through equity offerings, collaborations, licensing, joint ventures or other sources.

***Interest Income/Expense***

Interest income increased slightly to $482,000 in the three month period ended September 30, 2006 from $474,000 in the corresponding period in 2005, as a result of a higher interest yields from our securities offset in part by a lower average balance of funds invested in 2006.

Interest expense increased to $123,000 in the three month period ended September 30, 2006 from $116,000 in the corresponding period in 2005, as a result of higher interest rates in 2006, offset, in part, by lower average loan balances.

***Operating Results***

We reported a loss from operations of $15.6 million in the three month period ended September 30, 2006 compared to a loss from operations of $15.0 million in the corresponding period in 2005, an increase in loss of $627,000, or 4%. Such increase was due primarily to the increase in operating expenses noted above. We expect that our loss from operations will increase slightly during the reminder of 2006 due to the various factors discussed under Operating Expenses above. Losses may fluctuate depending on the extent to which, if at all, we enter into collaborations for one or more of our product candidates or licenses for our technologies. The extent of operating losses will also depend on our ability to raise funds from other sources, such as the capital markets, which will influence the amount we will spend on research and development and the development timelines for our product candidates.

<div align="center">14</div>

We reported a net loss of $15.2 million in the three month period ended September 30, 2006, compared to a net loss of $14.6 million in the corresponding period in 2005, an increase in net loss of $626,000 or 4%, and a net loss per share of $0.25 and $0.25, respectively.

*For the nine months ended September 30, 2006 and 2005*

*Revenue*

We recognized license revenue of $688,000 in the nine–month period ended September 30, 2006, compared to $975,000 in the corresponding period in 2005. The decrease in license revenue was due primarily to the expected timing of receipt of future milestone payments pursuant to our agreement with Medinol Ltd., in accordance with our revenue recognition policy.

*Operating Expenses*

*Research and Development Expenses*

Research and development expenses decreased by $2.7 million, or less than 8%, to $32.4 million in the nine–month period ended September 30, 2006, as compared to $35.1 million in the corresponding period in 2005.

Our research and development expenses for the nine–month period ended September 30, 2006, as compared to the corresponding period in 2005, were as follows:

| In thousands | Nine months ended September 30, | | Increase/ (decrease) |
|---|---|---|---|
| | 2006 | 2005 | |
| Direct external expenses: | | | |
| Clinical programs | $ 11,385 | $ 20,580 | $ (9,195) |
| Preclinical programs | 464 | 1,023 | (559) |
| All other R&D expenses | 20,533 | 13,525 | 7,008 |
| | $ 32,382 | $ 35,128 | $ (2,746) |

AP23573, our lead product candidate which is in Phase 2 clinical trials, was our only clinical program in 2006 and 2005. Direct external expenses for AP23573 decreased by $9.2 million in the nine–month period ended September 30, 2006, as compared to the corresponding period in 2005, due primarily to decreases in manufacturing related costs of $3.9 million and clinical trials costs of $4.6 million. The decrease in manufacturing related costs was due to the completion in 2005 of certain product and process development studies and the timing of production runs of AP23573. The decrease in clinical trial costs is directly related to a decrease in number of patients on trial during the period driven by successful conclusion in 2005 of enrollment in several clinical trials.

Direct external expenses for preclinical programs decreased by $559,000 in the nine–month period ended September 30, 2006, as compared to the corresponding period in 2005 due primarily to the completion of certain pharmacology and contract manufacturing studies conducted by outside contract laboratories in 2005.

All other R&D expenses increased by $7.0 million in the nine–month period ended September 30, 2006 as compared to the corresponding period in 2005 due to higher personnel and related costs as a result of an increase in the number of personnel and salary adjustments ($3.5 million) and the impact of the adoption of SFAS No. 123R regarding stock–based compensation expense ($1.7 million), an increase in depreciation and amortization costs due to investments in property and equipment ($1.1 million), and miscellaneous increases in laboratory supplies and services, maintenance and utility costs related to our facility, and intellectual property expenses.

15

*General and Administrative Expenses*

General and administrative expenses were $17.2 million in the nine-month period ended September 30, 2006, as compared to $7.8 million in the corresponding period in 2005. Professional fees increased by $5.7 million to $9.9 million in the nine-month period ended September 30, 2006 as compared to $4.2 million in the corresponding period in 2005, due primarily to costs related to business and commercial development initiatives, including market research, and to our patent infringement litigation with Lilly and Amgen. Personnel and related costs increased by $1.9 million to $4.0 million in the nine-month period ended September 30, 2006 as compared to $2.1 million in the corresponding period in 2005 due to an increase in the number of personnel and salary adjustments ($557,000) and the impact of adoption of SFAS No. 123R ($1.3 million).

*Interest Income/Expense*

Interest income increased to $1.7 million in the nine-month period ended September 30, 2006 from $1.2 million in the corresponding period in 2005, as a result of a higher interest yields from our securities, offset in part by a lower average balance of funds invested in 2006.

Interest expense increased to $369,000 in the nine-month period ended September 30, 2006 from $298,000 in the corresponding period in 2005, as a result of higher interest rates in 2006, offset, in part, by lower average loan balances.

*Operating Results*

We reported a loss from operations of $48.9 million in the nine-month period ended September 30, 2006, compared to a loss from operations of $42.0 million in the corresponding period in 2005, an increase in loss of $6.9 million, or 17%. Such increase was due primarily to the increase in operating expenses noted above.

We reported a net loss of $47.6 million in the nine-month period ended September 30, 2006, compared to a net loss of $41.0 million in the corresponding period in 2005, an increase in net loss of $6.6 million or 16%, and a net loss per share of $0.77 and $0.75, respectively.

**Liquidity and Capital Resources**

We have financed our operations and investments primarily through sales of our common stock to institutional investors and, to a lesser extent, through issuances of our common stock pursuant to our stock option and employee stock purchase plans, supplemented by the issuance of long-term debt. We sell securities and incur debt when the terms of such transactions are deemed favorable to us and as necessary to fund our current and projected cash needs. We most recently completed an underwritten public offering of our common stock in October 2006, from which we realized net proceeds of approximately $14.3 million and from which we will receive approximately $2.2 million in additional net proceeds if the underwriter exercises its overallotment option in full prior to November 18, 2006. We seek to balance the level of cash, cash equivalents and marketable securities on hand with our projected needs and to allow us to withstand periods of uncertainty relative to the availability of funding on favorable terms. We manage our marketable securities portfolio to provide cash as needed for payment of our obligations.

Source: ARIAD PHARMACEUTICAL, 10-Q, November 09, 2006

*Sources of Funds*

For the three months and nine months ended September 30, 2006 and 2005, our sources of funds were as follows:

| In thousands | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Sales and maturities of marketable securities, net of purchases | $ 5,790 | $ 12,001 | $ 33,005 | $ 31,125 |
| Proceeds from issuance of common stock, net of issuance costs | — | 57,860 | — | 57,860 |
| Proceeds from issuance of common stock, pursuant to stock option and purchase plans | 139 | 265 | 1,488 | 850 |
| | $ 5,929 | $ 70,126 | $ 34,493 | $ 89,835 |

We manage our marketable securities portfolio to provide cash for payment of our obligations. Upon sale or maturity of such marketable securities, a portion will be retained as cash to provide for payment of current obligations while the remainder will be reinvested in accordance with our investment policy. For the three months and nine months ended September 30, 2006 and 2005, proceeds from sales and maturities of marketable securities, purchases of marketable securities and the resulting net amount retained as cash for payment of obligations was as follows:

| In thousands | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Proceeds from sales and maturities of marketable securities | $ 17,013 | $ 18,187 | $ 70,766 | $ 47,812 |
| Purchases of marketable securities | (11,223) | (6,186) | (37,761) | (16,687) |
| | $ 5,790 | $ 12,001 | $ 33,005 | $ 31,125 |

*Uses of Funds*

The primary uses of our cash are to fund our operations and working capital requirements and, to a lesser degree, to repay our long−term debt, to invest in intellectual property and to invest in our property and equipment as needed for our business. For the three months and nine months ended September 30, 2006 and 2005, our uses of funds were as follows:

| In thousands | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Net cash used in operating activities | $ 14,862 | $ 11,108 | $ 42,233 | $ 31,835 |
| Repayment of borrowings | 480 | 480 | 1,440 | 1,440 |
| Investment in intangible assets | 107 | 91 | 434 | 583 |
| Investment in property and equipment | 158 | 969 | 1,018 | 5,069 |
| | $ 15,607 | $ 12,648 | $ 45,125 | $ 38,927 |

The net cash used in operating activities is comprised of our net losses, adjusted for non−cash expenses and working capital requirements. As noted above, our net loss for the nine months ended September 30, 2006 increased by $6.5 million, as compared to the corresponding period in 2005, due primarily to increased personnel and professional services expenses. However, as a result of changes in our working capital requirements offset in part by increases in non−cash expenses, including stock−based compensation expense, our net cash used in operating activities increased by $10.4 million for the nine months ended September 30, 2006, as compared with the corresponding period in 2005. Also, as noted above, we expect that our loss from operations will increase in the remainder of 2006 due to continued progress in development of our product candidates, and we expect that our net cash used in operations will increase accordingly. We also expect that our investment in intangible assets, consisting of our intellectual property, will increase in support of our product development activities.

17

*Contractual Obligations*

We have substantial fixed contractual obligations under various research and licensing agreements, consulting and employment agreements, lease agreements and long–term debt instruments. These contractual obligations were comprised of the following as of September 30, 2006:

| | | Payments Due By Period | | | |
|---|---|---|---|---|---|
| *In thousands* | Total | In 2006 | 2007 through 2009 | 2010 through 2011 | After 2011 |
| Long–term debt | $ 6,215 | $ 480 | $ 5,735 | $ — | $ — |
| Operating leases, net of sub–leases | 476 | 155 | 321 | — | — |
| Other long–term obligations | 11,880 | 1,043 | 9,206 | 1,236 | 395 |
| Total fixed contractual obligations | $ 18,571 | $ 1,678 | $ 15,262 | $ 1,236 | $ 395 |

Long–term debt consists of scheduled principal payments on such debt. Interest on our long–term debt is based on variable interest rates. Assuming a constant interest rate of 7.4%, our average interest rate on our debt at September 30, 2006, over the remaining term of the debt, our interest expense would total approximately $111,000 for the remainder of 2006 and $423,000 in the period 2007 through 2009.

Other long–term obligations are comprised primarily of employment agreements and license agreements. The license agreements generally provide for payment by us of annual license fees, milestone payments and royalties upon successful commercialization of products. All license agreements are cancelable by us. The above table reflects remaining license fees for the lives of the agreements but excludes milestone and royalty payments, as such amounts are not probable or estimable at this time.

*Liquidity*

At September 30, 2006, we had cash, cash equivalents and marketable securities totaling $39.2 million and working capital of $24.2 million, compared to cash, cash equivalents and marketable securities totaling $81.5 million and working capital of $66.0 million at December 31, 2005. In October 2006, we raised approximately $14.5 million, or approximately $14.3 million after estimated expenses, through an underwritten offering of 3,112,945 shares of our common stock at a purchase price of $4.65 per share. On a pro forma basis, giving effect to this sale of common stock, on September 30, 2006, we had cash, cash equivalents and marketable securities of $53.5 million and working capital of $38.5 million. We will also receive approximately $2.2 million in additional net proceeds if the underwriter exercises its overallotment option in full prior to November 18, 2006. Following the offering, the Company will have used all of the shares available for issuance under its effective shelf registration statements.

We will require substantial additional funding for our research and development programs, including pre–clinical development and clinical trials, for operating expenses including intellectual property protection and enforcement, for the pursuit of regulatory approvals, and for establishing manufacturing, marketing and sales capabilities. In order to fund our needs, we may, among other things, (1) sell common stock through public or private offerings as market conditions permit, (2) enter into partnerships for our product candidates, and/or (3) license our cell–signaling technologies, including our ARGENT and NF–κB intellectual property portfolios.

18

Source: ARIAD PHARMACEUTICAL, 10–Q, November 09, 2006

We believe that our cash, cash equivalents and marketable securities, including the funds raised in October 2006, should be sufficient to satisfy our capital and operating requirements approximately through the third quarter of 2007. However, there are numerous factors that are likely to affect our spending levels, including the timing of the start of the initial registration trial for AP23573, the timing of product and process development work for AP23573, the potential acquisition of or other strategic transaction regarding the minority stockholders' interests in AGTI, the manufacture of drug product for clinical trials and potential product launch, if approved, developments in our ongoing clinical trials, the timing and terms of a partnership, if any, to commercialize AP23573 outside of the U.S., the status of our in−house efforts to prepare for the potential launch of AP23573 in the U.S., the progress of our preclinical programs, and developments in our NF−κB litigation, among other factors. These variables could result in earlier depletion of our current funds if we are to continue operations in accordance with our current plans and achieve our intended timelines for development. In any event, we expect to need additional capital in order to pursue our business plan, which we will seek to raise through the sale of additional securities, collaborative partnerships, and possible additional credit arrangements. There can be no assurance, however, that adequate resources will be available when needed or on terms acceptable to us, if at all.

**Securities Litigation Reform Act**

*Safe harbor statement under the Private Securities Litigation Reform Act of 1995*: Except for the historical information contained in this Quarterly Report on Form 10−Q, some of the matters discussed herein are "forward−looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements are identified by the use of words such as "may," "anticipate," "estimate," "expect," "project," "intend," "plan," "believe," and other words and terms of similar meaning in connection with any discussion of future operating or financial performance. Such statements are based on management's current expectations and are subject to certain factors, risks and uncertainties that may cause actual results, outcome of events, timing and performance to differ materially from those expressed or implied by such forward−looking statements. These risks include, but are not limited to, risks and uncertainties regarding our ability to accurately estimate the timing and actual research and development expenses and other costs associated with the preclinical and clinical development and manufacture of our product candidates, the adequacy of our capital resources and the availability of additional funding, risks and uncertainties regarding our ability to successfully recruit centers, enroll patients and conduct clinical studies of product candidates, risks and uncertainties regarding our ability to manufacture or have manufactured our product candidates on a commercial scale or to supply our product candidates to partners, risks and uncertainties that clinical trial results at any phase of development may be adverse or may not be predictive of future results or lead to regulatory approval of any of our or any partner's product candidates, risks and uncertainties of third−party intellectual property claims relating to our and any partner's product candidates, risks and uncertainties related to the potential acquisition of or other strategic transaction regarding the minority stockholders' interests in AGTI, and risks and uncertainties relating to regulatory oversight, the timing, scope, cost and outcome of legal and patent office proceedings, litigation, prosecution and reexamination proceedings concerning our NF−κB patent portfolio, future capital needs, key employees, dependence on collaborators and manufacturers, markets, economic conditions, products, services, prices, reimbursement rates, competition and other risks detailed under the heading "Risk Factors" in Part II, Item 1A of this Quarterly Report on Form 10−Q, as updated from time to time in our subsequent periodic and current reports filed with the SEC. As a result of these and other factors, actual events or results could differ materially from those described herein. We are not under any obligation, and we expressly disclaim any obligation, to update or alter any forward−looking statements, whether as a result of new information, future events or otherwise.

19

Source: ARIAD PHARMACEUTICAL, 10−Q, November 09, 2006

ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We invest our available funds in accordance with our investment policy to preserve principal, maintain proper liquidity to meet operating needs and maximize yields. Our investment policy specifies credit quality standards for our investments and limits the amount of credit exposure to any single issue, issuer or type of investment.

We invest cash balances in excess of operating requirements first in short–term, highly liquid securities, with maturities of 90 days or less, and money market accounts. Depending on our level of available funds and our expected cash requirements, we may invest a portion of our funds in marketable securities, consisting generally of corporate debt and U.S. government and agency securities. Maturities of our marketable securities are generally limited to periods necessary to fund our liquidity needs and may not in any case exceed three years. These securities are classified as available–for–sale. Available–for–sale securities are recorded on the balance sheet at fair market value with unrealized gains or losses reported as a separate component of stockholders' equity (accumulated other comprehensive income or loss). Realized gains and losses on marketable security transactions are reported on the specific–identification method. Interest income is recognized when earned. A decline in the market value of any available–for–sale security below cost that is deemed other than temporary results in a charge to earnings and establishes a new cost basis for the security.

Our investments are sensitive to interest rate risk. We believe, however, that the effect, if any, of reasonable possible near–term changes in interest rates on our financial position, results of operations and cash flows generally would not be material due to the current short–term nature of these investments. In particular, at September 30, 2006, because our available funds are invested solely in short–term securities with remaining maturities of twelve months or less, our risk of loss due to changes in interest rates is not material.

We have a deferred executive compensation program which provides participants with deferred compensation based on the value of certain designated mutual funds. The fair value of our obligations under this program is reflected as a liability on our balance sheet. In the event of a hypothetical 10% increase in the fair market value of the underlying mutual funds as of September 30, 2006, we would have incurred approximately $92,000 of additional compensation expense in the three–month period ended September 30, 2006.

At September 30, 2006, we had $6.2 million outstanding under a bank term note which bears interest at prime or, alternatively, LIBOR + 2%. This note is sensitive to interest rate risk. In the event of a hypothetical 10% increase in the interest rate on which the loan is based (74.3 basis points), we would incur approximately $39,000 of additional interest expense per year based on expected balances over the next twelve months.

ITEM 4. CONTROLS AND PROCEDURES

(a) *Evaluation of Disclosure Controls and Procedures.* Our principal executive officer and principal financial officer, after evaluating the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) as of the end of the period covered by this Quarterly Report on Form 10–Q, have concluded that, based on such evaluation, our disclosure controls and procedures were adequate and effective to ensure that material information relating to us, including our consolidated subsidiaries, was made known to them by others within those entities, particularly during the period in which this Quarterly Report on Form 10–Q was being prepared.

In designing and evaluating our disclosure controls and procedures, our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily is required to apply its judgment in evaluating the cost–benefit relationship of possible controls and procedures.

(b) *Changes in Internal Controls.* There were no changes in our internal control over financial reporting, identified in connection with the evaluation of such internal control that occurred during the last fiscal quarter, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Source: ARIAD PHARMACEUTICAL, 10–Q, November 09, 2006

PART II. OTHER INFORMATION

ITEM 1. LEGAL PROCEEDINGS

NF–°B Patent Infringement Litigation and Reexamination

*Lilly Litigation*

In 2002, we, together with Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research and Harvard University (collectively, the Plaintiffs) filed a lawsuit in the United States District Court for the District of Massachusetts, or the U.S. District Court, against Eli Lilly and Company, hereinafter referred to as Lilly, alleging infringement of certain claims, or the NF–°B `516 Claims, of the Plaintiffs' U.S. Patent No. 6,410,516, or the `516 Patent, covering methods of treating human disease by regulating NF–°B cell–signaling activity through sales of Lilly's osteoporosis drug, Evista®, and Lilly's septic shock drug, Xigris®, and seeking monetary damages from Lilly.

This case was tried before a jury in the U.S. District Court from April 10, 2006 through April 28, 2006. After deliberations, on May 4, 2006, the jury rendered a verdict in favor of the Plaintiffs by finding that the NF–°B `516 Claims asserted in the lawsuit are valid and infringed by Lilly through sales of Evista and Xigris in the United States. One defense regarding validity was not submitted to the jury and was instead the subject of a bench trial, as addressed below. The jury awarded damages to the Plaintiffs in the amount of approximately $65.2 million, based on the jury's determination of a reasonable royalty rate of 2.3% to be paid by Lilly to the Plaintiffs based on U.S. sales of Evista and Xigris from the date of the filing of the lawsuit on June 25, 2002 through February 28, 2006. The jury awarded further damages on an ongoing basis, in amounts to be determined, equal to 2.3% of U.S. sales of Evista and Xigris through the year 2019, when the patent expires. If the verdict is upheld, damages paid by Lilly will be applied first to reimburse us for any unreimbursed legal fees and expenses relating to the litigation. We will receive 91% of the remainder, and the co–plaintiffs will receive 9%.

A separate trial, or bench trial, was held in the U.S. District Court from August 7, 2006 through August 9, 2006 on certain defenses asserted by Lilly relating to the enforceability of the NF–°B `516 Claims and one defense related to the validity of these claims. We are currently awaiting the judge's ruling on the issues tried in the bench trial before a final judgment may be entered in this lawsuit. Lilly has the right to file motions challenging the jury's verdict in this lawsuit, and, upon the entry of a final judgment by the U.S. District Court, to file an appeal of the jury's verdict and other rulings by the U.S. District Court with the Court of Appeals for the Federal Circuit.

*Amgen Litigation*

On April 20, 2006, Amgen Inc. and certain affiliated entities, hereinafter referred to as Amgen, filed a lawsuit against us in the U.S. District Court for the District of Delaware seeking a declaratory judgment that each of the claims contained in the `516 Patent are invalid and that Amgen has not infringed any of the claims of the `516 Patent based on activities related to Amgen's products, Enbrel® and Kineret®. We filed a motion to dismiss this case in the U.S. District Court on June 14, 2006, which was, after a hearing held on September 11, 2006, denied in an order dated September 13, 2006.

On September 25, 2006, we filed a motion requesting the judge to certify the Court's September 13, 2006 order denying our motion to dismiss for immediate appeal to the Court of Appeals for the Federal Circuit. On October 5, 2006, we also filed a renewed motion to dismiss the Amgen litigation for failure to name the university patentees as necessary and indispensable parties or, in the alternative, to transfer this case to the U.S. District Court for the District of Massachusetts.

21

Source: ARIAD PHARMACEUTICAL, 10–Q, November 09, 2006

At a hearing on these motions held on November 3, 2006, the Court granted our motion certifying the Court's September 13, 2006 order for immediate appeal and denied, as moot and without prejudice, our renewed motion to dismiss or transfer the case. The court also stayed discovery in the case pending a ruling on a motion to stay which the Court ordered us to file promptly. A scheduling order pursuant to Rule 16 of the Federal Rules of Civil Procedure was entered by the U.S. District Court on July 19, 2006. Pursuant to that order, a claim construction hearing in this case is scheduled for September 7, 2007, with trial scheduled to commence on February 4, 2008. Modifications to the scheduling order resulting from an appeal or stay in the case cannot be determined at this time.

*Re−examination Proceedings in PTO*

On April 4, 2005, Lilly filed a request in the United States Patent and Trademark Office, or PTO, to reexamine the patentability of certain claims of the `516 Patent. An unrelated third party filed a similar request to the PTO on December 2, 2005 to reexamine the patentability of certain claims of the `516 Patent. These two requests have been granted and were merged by the PTO into a single reexamination proceeding. We petitioned the PTO to vacate or stay the grant of these requests, but our petitions were rejected. We (with the Plaintiffs) also filed a complaint in the U.S. District Court in the Eastern District of Virginia requesting that the court enjoin the PTO from continuing with the reexamination proceedings, along with a motion for summary judgment, both of which were denied by the Court in an order dated October 3, 2006 granting the PTO's motion to dismiss this action. We filed a motion to dismiss our appeal in this case on November 8, 2006.

The PTO issued its first office action on August 2, 2006. In this first office action, 160 of the 203 claims of the `516 Patent were rejected by the PTO, including the claims asserted by us in the Lilly litigation and claims which may be asserted by us in the Amgen litigation. Our response to the first office action is due on November 9, 2006, and we expect to receive a final office action sometime thereafter. Accordingly, we can provide no assurance that the PTO will not invalidate some of the claims of the `516 Patent in this reexamination process, including the claims which were asserted against Lilly or might be asserted against Amgen, or that we will ultimately prevail in either of these litigations.

The timing and ultimate outcome of the Lilly litigation (including the pending bench trial and any appeal of the jury verdict and court's ruling in the bench trial), the Amgen litigation (including pending motion to dismiss) and the reexamination proceedings cannot be determined at this time, and, as a result, no determination can be made with respect to allowance of the claims of the `516 Patent, nor can any final determination be made with respect to the validity or infringement of the claims of the `516 Patent in the Lilly litigation and the Amgen litigation, nor can we predict whether the damages awarded by the jury in the Lilly litigation will be upheld, eliminated or limited. Although we have prevailed at jury trial in the Lilly litigation, the damages we have been awarded by the jury may be eliminated or limited by an adverse finding in the bench trial, on post−trial motions, upon appeal or in the event that the claims of the `516 Patent are invalidated by the PTO.

22

Source: ARIAD PHARMACEUTICAL, 10−Q, November 09, 2006

ITEM 1A.  RISK FACTORS

In connection with an underwritten public offering of our common stock in October 2006, we filed prospectus supplements with the Securities and Exchange Commission in which we updated the risk factors included in our Annual Report on Form 10–K for the fiscal year ended December 31, 2005, as set forth below:

**Risks Relating to Our Business**

*We have only one product candidate in clinical trials, AP23573, and we and our partners may never succeed in developing marketable products or generating product revenues.*

We are a biopharmaceutical company focused on the discovery and development of drugs to provide therapeutic intervention in treating human diseases at the cellular level. As with all scientific endeavors, we face much trial and error, and we may fail at numerous stages along the way, which would inhibit us from successfully developing, manufacturing and marketing our drug candidates. Our lead product candidate, AP23573, is currently in Phase 2 clinical trials for certain cancers, and we do not currently have any products on the market and have no product revenues. Our near–term success is therefore substantially dependent on our ability to obtain marketing approval for AP23573. We have not yet submitted any drug candidates to the FDA or foreign regulatory authorities for marketing approval. Factors which would affect our ability to obtain regulatory approval and to achieve market acceptance and gain market share for AP23573 and future product candidates include, among other factors, product formulation, dose, dosage regimen, our ability to obtain timely and sufficient patient enrollment in our clinical trials, the risk of occurrence of adverse side effects in patients participating in clinical trials, our ability to manufacture, directly or indirectly, sufficient and cost–effective quantities of our product candidates, and our ability to sell, market and distribute, directly or indirectly, such product candidates. We and our medical device partner have limited experience in designing, conducting and managing the clinical trials necessary to obtain such regulatory approval. Additionally, we do not currently have any partners to assist in developing and commercializing our cancer product candidates and expect to be dependent upon such partners, if we are able to enter into arrangements with them, to successfully develop and commercialize such cancer products outside the United States. There can be no assurance that we will be able to secure any such partners on terms favorable to us, or at all, and failure to secure one or more partners to assist in development and commercialization of AP23573 would have a material adverse effect on our ability to generate significant product revenues for AP23573.

We are also dependent upon the success of Medinol and any future medical device partners to develop, manufacture and market stents or other medical devices to deliver AP23573 to reduce reblockage of injured arteries following stent–assisted angioplasty. To date, we have entered into only one such agreement, with Medinol. If Medinol is not successful and/or if we are not able to enter into agreements with additional medical device companies experienced in the development, manufacture, and marketing of medical devices to deliver AP23573, we will not be able to generate revenues from the marketing of stents or other medical devices that deliver AP23573.

Other than AP23573, we do not have any product candidates in clinical development, and we have not designated any clinical candidates from our existing preclinical programs. We do not expect to have any products on the market before 2009, at the earliest, and, ultimately, we and our partners may not have any products on the market for several years, if at all. We and our partners may not succeed in developing or commercializing any products which will generate product revenues for our company. If we and our partners are not successful in developing or marketing AP23573 or other product candidates, we will not be profitable.

23

Source: ARIAD PHARMACEUTICAL, 10–Q, November 09, 2006

*We have incurred significant losses to date and may never be profitable.*

We have incurred significant operating losses in each year since our formation in 1991 and have an accumulated deficit of $294.7 million through September 30, 2006. Losses have resulted principally from costs incurred in research and development of our product candidates, including clinical development of AP23573, our lead product candidate, and from general and administrative costs associated with our operations. It is likely that we will incur significant operating losses for the foreseeable future, and we expect such losses to increase as we advance AP23573 into a Phase 3 clinical trial and begin to build a sales and marketing organization in anticipation of obtaining regulatory approval to market AP23573, which approval may never occur. We currently have no product revenues, limited license revenues and limited commitments for future licensing revenues, and may not be able to generate such revenues in the future. If our losses continue and we and our existing partner or potential future partners are unable to successfully develop, commercialize, manufacture and market our product candidates and/or we are unable to enter into agreements and licenses of our intellectual property, we may never generate sufficient revenues to achieve profitability. Even if we and our partners are able to commercialize products and we are able to enter into agreements or licenses in the future, we may never generate sufficient revenues to have profitable operations.

*Insufficient funding may jeopardize our research and development programs and may require us to reduce our operations or prevent commercialization of our products and technologies.*

We have funded our operations to date through sales of equity securities, debt and operating revenues. Most of our operating revenue to date has been generated through previous collaborative research and development agreements and existing licenses. We currently do not have any committed funding from any pharmaceutical or biotechnology company to advance any of our product development programs. Although we believe that our current cash, cash equivalents and marketable securities should be sufficient to satisfy our capital and operating requirements into the fourth quarter of 2007, we will require substantial additional funding for our research and development programs (including pre–clinical development and clinical trials), for operating expenses (including intellectual property protection and enforcement), for the pursuit of regulatory approvals and for establishing manufacturing, marketing and sales capabilities. While we intend to seek additional funding from product–based collaborations, technology licensing, and public or private financings, such additional funding may not be available on terms acceptable to us, or at all. Accordingly, we may not be able to secure the significant funding which is required to maintain our operations or continue to fund each of our research and development programs at their current levels or at levels that may be required in the future. If we cannot secure adequate financing, we may be required to reduce our operations, to delay, scale back, eliminate or terminate clinical trials and/or seeking marketing approval for AP23573 for one or more indications, to delay, scale back or eliminate one or more of our research and development programs, or to enter into license or other arrangements with third parties to purchase, commercialize or otherwise obtain rights in products or technologies that we would otherwise seek to develop ourselves.

*We have limited manufacturing experience and are dependent upon the ability of third parties to manufacture our product candidates, which raises uncertainty as to our ability to develop and commercialize our product candidates.*

We have no experience in manufacturing any of our product candidates on a large scale and have contracted with third party manufacturers to provide material for clinical trials and to assist in the development and optimization of our manufacturing processes and methods. Our ability to conduct clinical trials and commercialize our product candidates will depend on the ability of such third parties to manufacture our products on a large scale at a competitive cost and in accordance with current good manufacturing practices, or cGMP, and other regulatory requirements. If we are not able to obtain contract manufacturing on commercially reasonable terms, obtain or develop the necessary materials and technologies for manufacturing, or obtain intellectual property rights necessary for manufacturing, or if our contract manufacturers fail to provide us with the quantities and quality of the products we require in a timely manner, we may not be able to conduct or complete clinical trials or commercialize our product candidates. There can be no assurance that we will be able to obtain such requisite terms, materials, technologies and intellectual property necessary to successfully manufacture our product candidates for clinical trials or commercialization.

Source: ARIAD PHARMACEUTICAL, 10-Q, November 09, 2006

***The loss of key members of our scientific and management staff could delay and may prevent the achievement of our research, development and business objectives.***

Our performance as a specialized scientific business is substantially dependent on our key officers and members of our scientific staff responsible for areas such as drug development, clinical trials, regulatory affairs, drug discovery, manufacturing, marketing, business development and intellectual property protection and licensing. We also are dependent upon a few of our scientific advisors to assist in formulating our research and development strategy. While we have entered into employment agreements with all of our executive officers, these officers may terminate their employment with us at any time. The loss of, and failure to promptly replace, any member of our management team could significantly delay and may prevent the achievement of our research, development and business objectives.

***We are dependent upon the ability of our medical device partner and potential additional partners to develop, manufacture, test and market stents or other medical devices to deliver AP23573.***

We have no experience in the development of medical devices and do not intend ourselves develop stents or other medical devices to deliver AP23573. Instead, we have granted one license and, under that license agreement, we may grant up to two additional licenses, under our rights to AP23573 to medical device companies for their use in developing and commercializing such medical devices to reduce blockage of injured vessels following stent−assisted angioplasty.

While we expect to supply AP23573 to our medical device partner and any additional partners, we will be otherwise dependent upon them to develop and commercialize stents or other medical devices to deliver AP23573. Such medical device partners will have various degrees of scientific, technical, medical and regulatory experience and resources to, directly or through third parties, develop, manufacture, test or market stents or other medical devices to deliver AP23573. Their ability to conduct clinical trials and commercialize such medical devices will be dependent on the safety profile of AP23573 and our ability to manufacture and supply AP23573, either directly or through third parties, at a competitive cost and in accordance with cGMP and other regulatory requirements. We depend upon third−party manufacturers or collaborative partners for the production of AP23573 for clinical trials and intend to use third−party manufacturers to produce AP23573 on a commercial scale. Our reliance on third−party manufacturers and their potential inability to meet our supply commitments to one or more of our partners could adversely impact the ability of our partners to commercialize stents or other medical devices to deliver AP23573.

We anticipate that our partners will seek to develop and commercialize stents or other medical devices to deliver AP23573 that do not infringe third−party patents. However, there can be no assurance that the devices delivering AP23573 marketed by our partners will not be subject to third−party claims. Furthermore, the patents issued to us or our partners covering AP23573 and/or medical devices, including stents, may be subject to challenge and may be subsequently narrowed, invalidated or circumvented. Either such event would adversely impact the ability of one or more of our partners to market their stents or other medical devices to deliver AP23573.

Our existing license agreement with Medinol allows either party to terminate under certain circumstances, including Medinol's reasonable business judgment that development of a medical device to deliver AP23573 is not feasible. Accordingly, Medinol may be unable to develop a medical device to deliver AP23573 and we may also not be able to enter into any additional licensing agreements with any other medical device companies to develop such devices on terms which are acceptable to us, or at all. Our inability to enter into such transactions, or the inability of one or more of our partners to develop or commercialize stents or other medical devices to deliver AP23573 for any reason, will adversely impact our ability to generate revenues from any licenses of AP23573.

25

Source: ARIAD PHARMACEUTICAL, 10−Q, November 09, 2006

*We will continue to expend significant resources on the enforcement and licensing of our NF−ᵏB patent portfolio and may be unable to generate material revenues from these efforts if we are unable to enforce against, or license our NF−ᵏB patents to, pharmaceutical and biotechnology companies.*

We are the exclusive licensee of a family of patents, three in the U.S. and one in Europe, including a pioneering U.S. patent covering methods of treating human disease by regulating NF−ᵏB cell−signaling activity, hereinafter referred to as the '516 Patent, awarded to a team of inventors from The Whitehead Institute for Biomedical Research, Massachusetts Institute of Technology and Harvard University. Dr. David Baltimore, the former president of the California Institute of Technology and one of our consultants and scientific founders, is a lead inventor of the '516 Patent and a member of the board of directors of Amgen Inc. We have a licensing program to generate revenues from the discovery, development, manufacture and sale of products covered by our NF−ᵏB patent portfolio. These patents have been, and in the future may be, challenged and may be subsequently narrowed, invalidated, declared unenforceable or circumvented, any of which could materially impact our ability to generate licensing revenues from them.

On June 25, 2002, we, together with these academic institutions, hereinafter collectively referred to as the Plaintiffs, filed a lawsuit in the United States District Court for the District of Massachusetts, or the U.S. District Court, against Eli Lilly and Company, hereinafter referred to as Lilly, alleging infringement of certain claims of the '516 Patent through sales of Lilly's osteoporosis drug, Evista®, and its septic shock drug, Xigris®. On April 20, 2006, Amgen and certain affiliated entities, hereinafter referred to as Amgen, filed a lawsuit against us in the U.S. District Court for the District of Delaware seeking a declaratory judgment that each of the claims contained in the '516 Patent are invalid and that Amgen has not infringed any of the claims of the '516 Patent based on activities related to Amgen's products, Enbrel® and Kineret®. In addition, pursuant to requests filed by Lilly and by a third party, the PTO is reexamining the patentability of certain claims of the '516 Patent in reexamination proceedings that are currently pending. See a description of the status of these matters in the section entitled "Legal Proceedings" in Part II, Item 1 of this Quarterly Report on Form 10−Q. We cannot provide any assurance that other third parties, who may be infringing our NF−ᵏB patents, will not seek to initiate similar, further proceedings for declaratory relief or reexamination with regard to the '516 Patent or other NF−ᵏB patents.

As exclusive licensee of the '516 Patent, we are obligated for the costs expended for its prosecution in the PTO, for its enforcement in the above noted litigations and otherwise. Therefore, we will continue to expend significant capital and management resources pursuing these matters in court and in the reexamination process in the PTO, and the outcome is uncertain.

If some of the claims of the '516 Patent are invalidated by the PTO or in the courts or found not to be infringed in these matters, we will not realize any revenues on sales of the above−named products, and could be liable under certain limited circumstances in the Lilly litigation for litigation costs and potentially attorneys' fees. Additionally, although we have prevailed in the jury trial in the Lilly litigation, the damages awarded to us and the other Plaintiffs could be subsequently eliminated or limited by an adverse finding by the judge in the U.S. District Court in her ruling following the bench trial, upon appeal, or in the event that the claims of the '516 Patent are invalidated by the PTO. Invalidation of any of the claims of the '516 Patent in litigation or by the PTO or in the courts would have a significant adverse impact on our ability to generate revenues from our NF−ᵏB licensing program from any potential licensee. Moreover, significant expenditures to enforce these patent rights, particularly with respect to the pending litigation initiated by Amgen, without generating revenues or accessing additional capital or other funding, could adversely impact our ability to further our clinical programs and our research and development programs at the current levels or at levels that may be required in the future.

26

Source: ARIAD PHARMACEUTICAL, 10−Q, November 09, 2006

**Because we do not own all of the outstanding stock of our subsidiary, AGTI, we will not realize all of the potential future economic benefit from products developed based on technology licensed to or owned by AGTI.**

Our 80%-owned subsidiary, AGTI, holds licenses from Harvard University, Stanford University and other universities relating to the ARGENT cell–signaling regulation technology, and owns the intellectual property on mTOR inhibitors derived from the ARGENT programs, including AP23573. The two directors of AGTI, Harvey J. Berger, M.D., our Chief Executive Officer, and Jay R. LaMarche, our former Chief Financial Officer, are also members of our Board of Directors. Minority stockholders of AGTI, including Harvard University, Stanford University, Dr. Berger, Mr. LaMarche, several of our scientific advisors, and several other current and former members of our management own 20% of the issued and outstanding common stock of AGTI.

We do not have a license agreement with AGTI that provides us with rights to commercialize product candidates based on the ARGENT cell–signaling regulation technology or mTOR inhibitors derived from AGTI's programs, solely for our benefit, as opposed to the benefit of AGTI. All of the research and development activities of AGTI, including the development of AP23573, have been conducted by us on behalf of AGTI pursuant to a research and development agreement. The purpose of the agreement is to allow AGTI to develop products based on its technology, and AGTI owns all improvements to its technology developed by us. The agreement provides that, upon demand by us, AGTI will either advance funds to us or reimburse us, on a cost plus 10% basis, for all funds advanced by us associated with the cost of our research and development activities on its behalf. However, AGTI has no independent funding or capital resources, and we have funded all research and development services on AGTI's behalf since its inception in 1994. As a result, we have accrued an inter–company receivable totaling approximately $172 million as of September 30, 2006, of which approximately $99 million has been accrued since January 1, 2003, as we have advanced the clinical development of AP23573.

The inter–company receivable on our books and records and the related payable on the books of AGTI are eliminated in accordance with generally accepted accounting principles in our consolidated financial statements. We expect our inter–company receivable from AGTI to continue to increase significantly as we seek to further advance the development of AP23573. In addition, we have spent approximately $4.4 million to date, and expect to spend significant additional amounts, on pre–launch and other commercialization–related activities for AP23573. The research and development agreement does not provide a mechanism for establishing a marketing plan or for the reimbursement by AGTI to us of such expenditures. Other than the fee of 10% of the accrued inter–company receivable related to costs advanced by us, we are not entitled to receive from AGTI any rights or other remuneration under the research and development agreement, and, accordingly, our future economic benefit from the commercialization of such products on behalf of AGTI will only be in the form of dividends or other payments received in respect of our 80% ownership interest in AGTI.

Consequently, as the inter–company receivable has increased to fund the development of AP23573, in order to maximize the value of ARIAD for our stockholders, the independent members of our Board of Directors (all of ARIAD's Board members other than Dr. Berger and Mr. LaMarche) are currently engaged in evaluating a variety of strategic alternatives with respect to acquiring the 20% minority interest of AGTI that we do not own and have hired independent legal counsel and a financial consultant to assist them in their evaluation. Considerations being taken into account by the independent members of the Board in determining whether to acquire the 20% minority interest include the significant increase in our receivable from AGTI, which is expected to continue to increase significantly, the expectation that the perceived value of the 20% minority interest of AGTI will likely increase as the clinical development of AP23573 progresses, the conflicts of interest that exist between ARIAD and AGTI, and the fact that we advance 100% of the research and development costs for AP23573 to AGTI but are only entitled to receive a 10% fee on these costs advanced, together with whatever benefit may be received through our 80% ownership of AGTI. We anticipate that in the context of valuing the 20% minority interest in AGTI for purposes of a possible acquisition of the stock of the minority shareholders, the inter–company receivable from AGTI will be taken into account.

27

Source: ARIAD PHARMACEUTICAL, 10-Q, November 09, 2006

If ARIAD's independent and disinterested directors determine it to be in the best interests of ARIAD's stockholders to commercialize these product candidates solely for ARIAD's own benefit, ARIAD may seek to negotiate with AGTI and/or its minority shareholders to obtain a license, on terms to be determined, granting ARIAD the sole rights to commercialize such product candidates and technologies. If we were to enter into such a license, the future economic benefit to ARIAD from the commercialization of such products, if any, will be diminished by any royalties or other payments paid under a future agreement with AGTI. If ARIAD does not enter into such a license, then the future economic benefit to ARIAD from the commercialization of such products on behalf of AGTI will only be in the form of dividends or other payments received in respect of ARIAD's 80% ownership interest in AGTI.

Alternatively, if ARIAD's independent and disinterested directors determine it to be in the best interests of ARIAD's stockholders, ARIAD may seek to acquire some or all of the interests of the minority stockholders in AGTI for cash, shares of ARIAD's common stock, or other securities in a merger, exchange offer or other transaction. If ARIAD acquires all of the interests of the minority stockholders in AGTI, then ARIAD will receive all of the future economic benefit from the commercialization of such products on its own behalf to the extent that the securities or other consideration exchanged by ARIAD in the transaction do not entitle the minority stockholders of AGTI to continue to receive payments on a contingent and/or installment basis. If ARIAD acquires these minority interests, we anticipate that this transaction will require the incurrence of significant transaction costs, which are currently unknown, and if the consideration exchanged for these minority interests is in the form of equity of ARIAD, we anticipate that this transaction will result in dilution to ARIAD's stockholders. On January 13, 2004, ARIAD acquired an additional 351,909 shares of AGTI common stock, representing approximately 6% of AGTI's outstanding common stock, for a total purchase price of approximately $8.8 million, effected through the reduction of inter−company debt, subject to adjustment in certain circumstances, in order to maintain ARIAD's 80% interest in AGTI. While such valuation was recommended by the Company and approved based on a good−faith determination made by the independent and disinterested members of ARIAD's Board of Directors as of that date, the economic value of the minority stockholders' interests is difficult to quantify in the absence of a public market. If ARIAD acquires all of the interests of the minority stockholders in AGTI, a variety of valuation methodologies may be employed to determine the value per share of AGTI common stock. Factors impacting this valuation would include the progress, likelihood and cost of development and commercialization of AP23573 and other product candidates and technologies, potential future income streams there from, availability of funding and other factors. If ARIAD acquires the minority interests for consideration valued in excess of the value implicitly attributed to such AGTI shares by the market, which implicit value is difficult to determine, this could result in a decline in ARIAD's stock price. If ARIAD chooses to acquire some or all of these minority interests through a merger in which ARIAD does not solicit the consent of the minority stockholders of AGTI, ARIAD could become subject to litigation or an appraisal procedure, which would result in additional expense and diversion of management resources.

As noted above, the independent and disinterested members of ARIAD's Board of Directors have engaged legal counsel and a financial consultant to help them evaluate strategic alternatives with respect to acquiring the 20% minority interest of AGTI that ARIAD does not own, and ARIAD's independent and disinterested directors may engage other advisors to assist them with such evaluation. While this evaluation is currently ongoing, there can be no assurance that ARIAD will, at any time, enter into a transaction with AGTI as a result of this evaluation. If any of these strategic options is pursued as a result of the evaluation by ARIAD's independent and disinterested directors, there can be no assurance as to the timing of any such transaction, the form of such transaction, the particular transaction terms such as the form, amount or timing of payment of consideration offered or provided by ARIAD to the minority stockholders in AGTI, ARIAD's ability to effectuate any such transaction, or the consequences of any such proposed or completed transaction to ARIAD or the AGTI minority stockholders.

Source: ARIAD PHARMACEUTICAL, 10−Q, November 09, 2006

*Because members of ARIAD's management team and/or Board of Directors beneficially own a material percentage of the capital stock of its subsidiary, AGTI, and ARIAD has agreements with AGTI, there are conflicts of interest present in dealings between ARIAD and AGTI.*

Four members of ARIAD's management team and/or Board of Directors own approximately 5.6% of the outstanding capital stock of AGTI. Harvey J. Berger, M.D., Chairman and Chief Executive Officer, owns 3.2%, David L. Berstein, Esq., Senior Vice President and Chief Patent Counsel, owns 0.2%, John D. Iuliucci, Ph.D., Senior Vice President and Chief Development Officer, owns 0.6% and Jay R. LaMarche, one of ARIAD's directors and former Chief Financial Officer, owns 1.6%. These same individuals beneficially own an aggregate of approximately 3.1% of ARIAD's outstanding common stock. Dr. Stuart L. Schreiber, a Harvard professor who is one of our scientific founders, owns approximately 3.2% of the outstanding capital stock of AGTI. Dr. David Baltimore, the former president of the California Institute of Technology and one of our consultants and scientific founders, owns approximately 0.06% of the capital stock of AGTI. Additionally, Dr. Berger and Mr. LaMarche are the two ARIAD board members who are also the sole members of the Board of Directors of AGTI. All of the research and development activities of AGTI, including the development of AP23573, have been conducted by us on behalf of AGTI pursuant to a research and development agreement. As a result, conflicts of interest exist in dealings between AGTI and ARIAD, including those relating to allocation of funds and resources between ARIAD and AGTI and the prioritization of research and development programs. In addition, these conflicts of interest create the risk that any transaction between ARIAD and AGTI will not provide terms as favorable to ARIAD as could be achieved in an arms–length negotiation. Moreover, even if the conflicts of interest do not influence a particular transaction between ARIAD and AGTI, because of the apparent conflicts of interest, the market may be more inclined to perceive the terms of any transaction between ARIAD and AGTI as being unfair to ARIAD.

*We may not be able to protect our intellectual property relating to our research programs, technologies and products.*

We and our licensors have issued patents and pending patent applications covering research methods useful in drug discovery, new chemical compounds discovered in our drug discovery programs including, among others, AP23573, certain components, configurations and uses of our cell–signaling regulation technologies and products–in–development, methods and materials for manufacturing our products–in–development and other pharmaceutical products and methods and materials for conducting pharmaceutical research. We have a licensing program to generate revenues from the use of our ARGENT cell–signaling regulation technologies and our NF–°B intellectual property. Pending patent applications may not issue as patents and may not issue in all countries in which we develop, manufacture or sell our products or in countries where others develop, manufacture and sell products using our technologies. In addition, patents issued to us or our licensors may be challenged, as is the case with the Lilly litigation and related PTO proceedings and the Amgen litigation regarding the NF–°B'516 Patent, and they may be subsequently narrowed, invalidated or circumvented. In that event, such patents may not afford meaningful protection for our technologies or product candidates, which would materially impact our ability to develop and market our product candidates and to generate licensing revenues from our patent portfolio. Certain technologies utilized in our research and development programs are already in the public domain. Moreover, a number of our competitors have developed technologies, filed patent applications or obtained patents on technologies, compositions and methods of use that are related to our business and may cover or conflict with our patent applications, technologies or product candidates. Such conflicts could limit the scope of the patents that we may be able to obtain or may result in the denial of our patent applications. If a third party were to obtain intellectual proprietary protection for any of the foregoing, we may be required to challenge such protection, terminate or modify our programs impacted by such protection or obtain licenses from such third parties, which might not be available or acceptable terms or at all. Also, if a third party were to introduce a product into the market which we believe infringes our patents, we may be required to enforce our patent rights or seek to obtain an injunction or other relief which could be time consuming or expensive.

29

*We may be unable to develop or commercialize our product candidates, if we are unable to obtain or maintain certain licenses on commercial terms or at all.*

We have entered, and will continue to enter, into agreements, either directly or through AGTI, with third parties to test compounds, blood and tissue samples, to perform gene expression analysis and to develop biological tests for use with our product candidates, which testing may yield new inventions and discoveries requiring us to obtain licenses in order to exclusively develop or market new products, alone or in combination with our product candidates, or to develop or market our product candidates for new indications. We have also entered into license agreements for some of our technologies, either directly or through AGTI. We use third parties to test blood and tissue samples and other biological materials in our clinical programs and to develop biological tests, with respect to which we may be required to obtain licenses or pay royalties or other fees in order to commercialize such tests for use with our product candidates. We also use gene sequences or proteins encoded by those sequences and other biological materials in each of our research programs which are, or may become, patented by others and to which we would be required to obtain licenses in order to develop or market our product candidates. Manufacturing of our products may also require licensing biological materials, technologies and intellectual property from third parties. Our inability to obtain any one or more of these licenses, on commercially reasonable terms, or at all, or to circumvent the need for any such license, could cause significant delays and cost increases and materially affect our ability to develop and commercialize or prevent us from developing and commercializing our product candidates. Obtaining licenses for these discoveries, materials and technologies may require us to make cumulative royalty payments or other payments to several third parties, potentially reducing amounts paid to us or making the cost of our products commercially prohibitive.

Some of our licenses obligate us to exercise diligence in pursuing the development of product candidates, to make specified milestone payments and to pay royalties. In some instances, we are responsible for the costs of filing and prosecuting patent applications and actions to enforce our rights against infringers. These licenses generally expire upon the earlier of a fixed term of years after the date of the license or the expiration of the applicable patents, but each license is also terminable by the other party upon default by us of our obligations. Our inability or failure to meet our diligence requirements or make any payments required under these licenses would result in a reversion to the licensor of the rights granted which, with respect to the licenses pursuant to which we have obtained exclusive rights, would materially and adversely affect our ability to develop and market products based on our licensed technologies.

*Competing technologies may render some or all of our programs or future products noncompetitive or obsolete.*

Many well-known pharmaceutical, healthcare and biotechnology companies, academic and research institutions and government agencies, which have substantially greater capital, research and development capabilities and experience than us or our potential partners, are presently engaged in one or more of the following activities:

- developing products based on cell signaling, genomics, proteomics, and computational chemistry;

- conducting research and development programs for the treatment of the various disease indications in which we are focused; and

30

Source: ARIAD PHARMACEUTICAL, 10-Q, November 09, 2006

- manufacturing, promoting, marketing and selling pharmaceutical or medical device products for treatment of diseases in all of the various disease indications in which we or our current or possible future partners are focused.

Some of these entities already have competitive products on the market or product candidates in clinical trials or in more advanced preclinical studies than we do. Many of these entities also have substantially greater research, development, manufacturing and marketing resources and experience than us. In particular, we are aware that Wyeth and Novartis have mTOR inhibitors in Phase 3 clinical trials which are competitive with AP23573, our lead product candidate. Additionally, PharmaMar and its partner, Johnson & Johnson, have a marine derived antitumoral agent currently under registration for the treatment of soft tissue sarcomas. By virtue of having or introducing competitive products on the market before us, these entities may gain a competitive advantage. Competing technologies may render some or all of our programs or future products noncompetitive or obsolete, and we may not be able to make the enhancements to our technology necessary to compete successfully with newly emerging technologies. If we are unable to successfully compete in our chosen markets, we will not become profitable.

### *If our product candidates are not accepted by patients, physicians and insurers, we will not be successful.*

Our success is dependent on the acceptance of any approved products. Our product candidates may not achieve market acceptance among patients, physicians or third–party payors, even if we obtain necessary regulatory and reimbursement approvals. Physicians and health care payors may conclude that any of our product candidates are not as safe and/or effective as competing therapies or are not as attractive based on a cost/benefit analysis as alternative treatments. Failure to achieve significant market acceptance of our product candidates will harm our business. We believe that recommendations by physicians and health care payors will be essential for market acceptance of any product candidates.

### *If we are unable to establish sales, marketing and distribution capabilities or to enter into agreements with third parties to do so, we may be unable to successfully market and sell any products.*

We are currently establishing a commercial oncology organization, but we have no experience in marketing or selling any products. While we intend to commercialize our product candidates in the United States and to enter into agreements with partner(s) to commercialize our product candidates elsewhere, we may be unable to successfully, directly or indirectly, sell any products that we obtain marketing approval to sell. If we are unable to effectively sell our products, our ability to generate revenues will be materially adversely affected. We may not be able to hire, in a timely manner, the qualified sales and marketing personnel we need, if at all. In addition, we may not be able to enter into any marketing or distribution agreements on acceptable terms, if at all. If we cannot establish sales, marketing and distribution capabilities as we intend, either by developing our own capabilities or entering into agreements with third parties, sales of future products, if any, may be harmed.

### *If we develop a product for commercial use, a subsequent product liability–related claim or recall could have an adverse effect on our business.*

Our business exposes us to potential product liability risks inherent in the testing, manufacturing and marketing of pharmaceutical products. Prior to obtaining regulatory approval to market our products, we are required to test such products in human clinical trials at health care institutions pursuant to agreements which indemnify such institutions in case of harm caused to patients by our products. We may not be able to avoid significant product liability exposure resulting from use of our products. A product liability–related claim or recall could be detrimental to our business. In addition, except for insurance covering product use in our clinical trials, we do not currently have any product liability insurance, and we may not be able to obtain or maintain such insurance on acceptable terms, or we may not be able to obtain any insurance to provide adequate coverage against potential liabilities, including liabilities arising from our clinical trials. Our inability to obtain sufficient insurance coverage at an acceptable cost or otherwise to protect against potential product liability claims could prevent or limit the commercialization of any products that we develop.

31

*Significant additional losses or insufficient funding may cause us to default on certain covenants of our loan documents.*

At September 30, 2006, we had $6.2 million outstanding under a term loan agreement with a bank, pursuant to which we are required to maintain certain financial and non–financial covenants, including minimum cash, cash equivalents and investments of $13 million, a default of any of which would allow the bank to demand payment of its loan. We currently have sufficient liquidity to fund payment of this loan if demand for payment were made. However, if we are unable to raise adequate financing to fund continuing operations or otherwise to refinance our loan, we may not be able to maintain compliance with loan covenants, may be required to pay off the loan and may be required to reduce our spending on operations.

## Risks Relating to Governmental Approvals

*We have limited experience in conducting clinical trials, which may cause delays in commencing and completing clinical trials of our product candidates.*

Clinical trials must meet FDA and foreign regulatory requirements. We have limited experience in designing, conducting and managing the preclinical studies and clinical trials necessary to obtain regulatory approval for our product candidates in any country. We or our collaborative partners may encounter problems in clinical trials that may cause us or the FDA or foreign regulatory agencies to delay, suspend or terminate our clinical trials at any phase. These problems could include the possibility that we may not be able to manufacture sufficient quantities of cGMP materials for use in our clinical trials, conduct clinical trials at our preferred sites, enroll a sufficient number of patients for our clinical trials at one or more sites, or begin or successfully complete clinical trials in a timely fashion, if at all. Furthermore, we, the FDA or foreign regulatory agencies may suspend clinical trials of our product candidates at any time if we or they believe the subjects participating in the trials are being exposed to unacceptable health risks as a result of adverse events occurring in our trials or if we or they find deficiencies in the clinical trial process or conduct of the investigation. With respect to AP23573, the FDA or foreign regulatory agencies may also suspend our clinical trials if we or they believe the subjects participating in the trials are being exposed to unacceptable health risks as a result of adverse events occurring in the trials of medical devices delivering AP23573 sponsored by our medical device partner or future partners. If clinical trials of any of our product candidates fail, we will not be able to market the product candidate which is the subject of the failed clinical trials. The FDA and foreign regulatory agencies could also require additional clinical trials before or after granting of marketing approval for any of our products, which would result in increased costs and significant delays in the development and commercialization of our products and could result in the withdrawal of our products from the market after obtaining marketing approval. Our failure to adequately demonstrate the safety and efficacy of a product candidate in clinical development could delay or prevent obtaining marketing approval of the product candidate and, after obtaining marketing approval, data from post–approval studies could result in the product being withdrawn from the market, either of which would likely have a material adverse effect on our business.

*We may not be able to obtain government regulatory approval to market our product candidates.*

To date, we have not submitted a marketing application for any product candidate to the FDA or any foreign regulatory agency, and none of our product candidates has been approved for commercialization in any country. Prior to commercialization, each product candidate would be subject to an extensive and lengthy governmental regulatory approval process in the United States and in other countries. We or any prospective partners or our medical device partner or future partners may not be able to obtain regulatory approval for any product candidates, or even if approval is obtained, the labeling for such products may place restrictions on their use that could materially impact the marketability and profitability of the product subject to such restrictions. Satisfaction of these regulatory requirements, which includes satisfying the FDA and foreign regulatory authorities that the product is both safe and effective for its intended uses, typically takes several years or more depending upon the type, complexity and novelty of the product and requires the expenditure of substantial resources. Uncertainty with respect to meeting the regulatory requirements governing our product candidates may result in excessive costs or extensive delays in the regulatory approval process, adding to the already lengthy review process. If regulatory approval of a product is granted, such approval will be limited to those disease states and conditions for which the product is proven safe and effective, as demonstrated by clinical trials, and may not include all of the indications necessary to successfully market the product. Even though we have obtained orphan drug designation by the FDA and EMEA for AP23573 in bone and soft–tissue sarcomas, this designation may be challenged by others or may prove to be of no practical benefit.

32

*We will not be able to sell our product candidates if we or our third–party manufacturers fail to comply with FDA manufacturing regulations.*

Before we can begin to commercially manufacture our product candidates, we must either secure manufacturing in an FDA approved manufacturing facility or obtain regulatory approval of our own manufacturing facility and processes. In addition, the manufacturing of our product candidates must comply with cGMP requirements of the FDA and similar requirements of regulatory agencies in other countries. These requirements govern, among other things, quality control and documentation procedures. We, or any third–party manufacturer of our product candidates, may not be able to comply with these requirements, which would prevent us from selling such products. Material changes to the manufacturing processes of our products after approvals have been granted are also subject to review and approval by the FDA or other regulatory agencies. Post approval, such facilities are subject to continuing FDA and foreign regulatory inspections and failure to comply with cGMPs or similar regulations can result in regulatory action up to and including cessation of shipment of product.

*Even if we bring products to market, we may be unable to effectively price our products or obtain adequate reimbursement for sales of our products, which would prevent our products from becoming profitable.*

If we succeed in bringing any product candidates to the market, they may not be considered cost–effective, and coverage and adequate payments may not be available or may not be sufficient to allow us to sell our products on a competitive basis. In both the United States and elsewhere, sales of medical products and treatments are dependent, in part, on the availability of reimbursement from third–party payors, such as health maintenance organizations and other private insurance plans and governmental programs such as Medicare. Third–party payors are increasingly challenging the prices charged for pharmaceutical products and services. Our business is affected by the efforts of government and third–party payors to contain or reduce the cost of health care through various means. In the United States, there have been and will continue to be a number of federal and state proposals to implement government controls on pricing. Similar government pricing controls exist in varying degrees in other countries. In addition, the emphasis on managed care in the United States has increased and will continue to increase the pressure on the pricing of pharmaceutical products. We cannot predict whether any legislative or regulatory proposals will be adopted or the effect these proposals or managed care efforts may have on our business.

**Risks Relating to Our Common Stock**

*Results of our operations, general market conditions for biotechnology stocks and other factors could result in a sudden change in the value of our stock.*

As a biopharmaceutical company, we have experienced significant volatility in our common stock. In the 52 weeks preceding October 31, 2006, our stock price ranged from a high of $7.78 to a low of $3.27. Factors that can contribute to such volatility may include: announcements regarding results and timing of preclinical studies and clinical trials; transactions to acquire or otherwise maximize the value of technology held by AGTI; evidence of the safety or efficacy of pharmaceutical products; announcements regarding product

33

developments or regulatory approvals obtained by companies developing competing products; decisions by regulatory agencies that impact or may impact our product candidates; the results and timing of efforts by our partner or future partners to develop stents or other medical devices to deliver AP23573; announcements of new collaborations; announcements of new equity or debt financings; failure to enter into collaborations; our funding requirements; announcements of technological innovations or new therapeutic products; developments relating to intellectual property rights, including licensing, litigation and governmental regulation and, in particular, our litigation with Lilly and with Amgen and reexamination proceedings in the PTO with respect to the `516 Patent; healthcare or cost−containment legislation; general market trends for the biotechnology industry and related high−technology industries; the impact of exchange rates for the U.S. dollar; the impact of changing interest rates and policies of the Federal Reserve; and public policy pronouncements. These and other factors could have a significant impact on the value and volatility of our common stock in future periods.

*Raising additional capital by issuing securities or through collaboration and licensing arrangements may cause dilution to existing stockholders, restrict our operations or require us to relinquish proprietary rights.*

We may seek the additional capital necessary to fund our operations through public or private equity offerings, debt financings, and collaboration and licensing arrangements. To the extent that we raise additional capital through the sale of equity or convertible debt securities, our stockholders' ownership interest will be diluted, and the terms of such securities may include liquidation or other preferences that adversely affect our stockholders' rights. Under an existing loan agreement with a bank, we are required to maintain certain financial and non−financial covenants, including covenants limiting or restricting our ability to incur additional debt or declare dividends. If we raise additional funds through collaboration and licensing arrangements with third parties, we may have to relinquish valuable rights to our technologies or product candidates, or grant licenses on terms that are not favorable to us.

*Anti−takeover provisions of Delaware law, provisions in our charter and bylaws and our stockholders' rights plan, or poison pill, could make a third−party acquisition of us difficult.*

Because we are a Delaware corporation, the anti−takeover provisions of Delaware law could make it more difficult for a third party to acquire control of us, even if the change in control would be beneficial to stockholders. We are subject to the provisions of Section 203 of the General Corporation Law of Delaware, which prohibits us from engaging in certain business combinations, unless the business combination is approved in a prescribed manner. In addition, our certificate of incorporation and our bylaws, each as currently in effect, also contain certain provisions that may make a third−party acquisition of us difficult, including:

- a classified board of directors, with three classes of directors each serving a staggered three−year term;

- the ability of the board of directors to issue preferred stock; and

- the inability of our stockholders to call a special meeting.

We also have implemented a stockholders' rights plan, also called a poison pill, which could make it uneconomical for a third party to acquire our company on a hostile basis. These provisions, as well as Section 203, may discourage certain types of transactions in which our stockholders might otherwise receive a premium for their shares over the current market price, and may limit the ability of our stockholders to approve transactions that they think may be in their best interests.

34

Source: ARIAD PHARMACEUTICAL, 10−Q, November 09, 2006

ITEM 5. OTHER INFORMATION

In connection with an underwritten public offering of our common stock in October 2006, we filed prospectus supplements with the Securities and Exchange Commission in which we provided updated disclosure about our business, as set forth below:

### ARIAD Pharmaceuticals, Inc.

We are engaged in the discovery and development of breakthrough medicines to treat cancers by regulating cell signaling with small molecules. We are developing a comprehensive approach to patients with cancer that addresses the greatest medical need — aggressive and advanced–stage cancers for which current treatments are inadequate. Our goal is to build a fully integrated oncology company focused on novel, molecularly targeted therapies to treat solid tumors and hematologic cancers, as well as the spread of primary tumors to distant sites.

### Our Product Candidates

Human cells, both healthy and malignant, share an elaborate system of molecular pathways that carry signals back and forth from the cell surface to the nucleus and within the cell. Such signaling is essential to cell functioning and viability. When disrupted or over–stimulated, such pathways may trigger diseases such as cancer. For example, growth and proliferation of cancer cells are dependent on signals from external growth factors, as well as signals indicating the availability of sufficient nutrients and blood supply. These signals are conveyed along well–defined pathways, several of which are regulated by a protein called the mammalian target of rapamycin, or mTOR.

Our lead cancer product candidate, AP23573, is an internally discovered, potent mTOR inhibitor. The protein, mTOR, serves as a "master switch" and appears to have a central function in cancer cells. Blocking mTOR creates a starvation–like effect in cancer cells by interfering with cell growth, division, metabolism and angiogenesis. We discovered AP23573 in a research and development program conducted by us on behalf of ARIAD Gene Therapeutics, Inc., or AGTI, our 80%–owned subsidiary.

As part of our global clinical development plan and registration strategy, AP23573 has been studied in multiple Phase 2 and 1b clinical trials in the U.S. and Europe as a single agent in patients with solid tumors, including sarcomas, hormone refractory prostate cancer and endometrial cancer. In addition, three multi–center Phase 1b trials of AP23573 in combination with other anti–cancer therapies are underway. These trials are focused primarily on patients with various types of solid tumors, especially breast, ovarian, non–small–cell lung, and prostate cancers, as well as sarcomas. Further single–agent and combination studies are planned. In addition, we have concluded enrollment in Phase 1b and Phase 2 clinical trials in patients with brain cancer and leukemias and lymphomas, respectively. Eleven clinical trials of AP23573 are ongoing or completed. Both intravenous and oral formulations of AP23573 have been studied in these trials.

In clinical trials to date, AP23573 has been well tolerated at the fixed doses administered, and adverse events were generally mild to moderate in severity and readily reversible. The most common treatment–related adverse events experienced by patients in the trials were mouth sores, rash, fatigue, nausea and lipid abnormalities.

In June 2006, at the annual meeting of the American Society of Clinical Oncology, or ASCO, we announced that single agent AP23573 demonstrated efficacy and was well tolerated when administered intravenously in a multi–center Phase 2 clinical trial in metastatic and/or unresectable soft–tissue and bone sarcomas involving 212 patients, at least 90% of whom had progressive disease. The primary endpoint of the trial, evidenced by clinical–benefit response, or CBR, rates, was achieved in the three most prevalent types of sarcoma, namely bone sarcoma (CBR rate of 30%), leiomyosarcoma (33%) and liposarcoma (30%). In addition, the progression–free survival, or PFS, rate at six months for the patients in this trial was 24%, and the median PFS was 15 weeks. As it relates to both the CBR rate and the PFS rate, there was no statistical difference between the four sub–groups of patients in this trial, indicating that AP23573 demonstrated activity and clinical benefit across all four sub–groups of sarcomas. The adverse events experienced by patients in the trial were generally mild or moderate in severity and reversible.

35

Based on our ongoing interactions with the U.S. Food and Drug Administration, or FDA, and the European Medicines Agency, or EMEA, we plan to conduct a randomized, worldwide Phase 3 clinical trial of an oral dosage form of AP23573 in patients with advanced sarcomas. The FDA and the EMEA have designated AP23573 as an orphan drug for treatment of soft–tissue and bone sarcomas. The FDA has also designated AP23573 as a fast–track product for the same indications.

The oral dosage form of AP23573 is also being studied in a multi–center Phase 1b clinical trial of patients with various solid tumors. Initial results from this trial indicate that the oral dosage form can be administered safely using several daily and intermittent dosing schedules and achieves blood levels over time and mTOR inhibition generally consistent with those observed with intravenous administration.

As an mTOR inhibitor, AP23573 has also been shown to potently block the growth, proliferation and migration of vascular smooth muscle cells, the primary cause of narrowing and blockage of injured vessels. In 2005, we entered into a partnership with Medinol Ltd., a leading cardiovascular medical device company, to develop and commercialize stents and other medical devices to deliver AP23573 in order to prevent reblockage of injured vessels following stent–assisted angioplasty, a common non–surgical procedure for dilating or opening narrowed arteries.

Inhibition of the mTOR pathway may be useful for additional indications beyond oncology and drug–delivery stents, and we are evaluating such opportunities as part of the broader clinical development plan for AP23573.

In addition to our lead clinical development program, we have a focused drug discovery program centered on small–molecule, molecularly targeted therapies and cell–signaling pathways implicated in cancer. Currently, our preclinical pipeline includes: inhibitors of mutant oncogenic or cancer–causing proteins (kinases) that regulate cell signaling ( e.g. , Bcr–Abl — the target of imatinib, which becomes resistant to further treatment through various mutations, including one called T315I); single compounds that target multiple cancer pathways ( e.g. , cell survival, metastases and angiogenesis); and new mTOR inhibitors ( i.e. , bone–targeted compounds to treat primary bone cancers and cancers that have spread to bone).

## Our Technologies

We are the exclusive licensee of a family of patents, three in the U.S. and one in Europe, including a pioneering U.S. patent covering methods of treating human disease by regulating NF–ºB cell–signaling activity, hereinafter referred to as the '516 Patent, awarded to a team of inventors from The Whitehead Institute for Biomedical Research, Massachusetts Institute of Technology and Harvard University. NF–ºB is a protein that can be generally thought of as a "biological switch" that can be turned off using these treatment methods to treat disorders such as inflammation, cancer, sepsis and osteoporosis. We permit broad use of our NF–ºB intellectual property, at no cost, by investigators at academic and not–for–profit institutions to conduct non–commercial research. Our goal is to license our NF–ºB technology to pharmaceutical and biotechnology companies that are conducting research to discover and develop drugs that modulate NF–ºB cell signaling and/or that are marketing such drugs. We have entered into two license agreements for use of our NF–ºB cell–signaling technology for research and development purposes. However, the '516 Patent is the subject of two outstanding lawsuits and a proceeding before the United States Patent and Trademark Office, or PTO. See the section entitled "Legal Proceedings" in Part II, Item 1 of this Quarterly Report on Form 10–Q and a description of the related risks in the section entitled "Risk Factors" in Part II, Item 1A of this Quarterly Report on Form 10–Q.

We have also developed a proprietary portfolio of cell–signaling regulation technologies, our ARGENT technology, to control intracellular processes with small molecules, which may be useful in the development of therapeutic vaccines and gene and cell therapy products and which provide versatile tools for applications in cell biology, functional genomics and drug discovery research. We distribute our ARGENT technologies at no cost to academic investigators in the form of our Regulation Kits to use in various research applications in an academic setting. We have entered into more than 1,175 material transfer agreements with 461 different institutions in 33 countries for the use of this technology in diverse areas of research, and more than 300 scientific papers describing its use have been published. In addition, we have licensed the ARGENT technology to several pharmaceutical and biotechnology companies for research and development and/or commercial purposes.

36

All of our product candidates and technology platforms are covered by claims of our owned or licensed patents and patent applications. As of October 13, 2006, we had 92 patents and patent applications in the United States, with foreign counterparts, of which 28 are owned, co-owned or exclusively licensed by us and 64 are owned, co-owned or exclusively licensed by AGTI. Approximately two-thirds of the United States patent applications we have filed since inception have already issued as patents.

<h3 align="center">Our Relationship with ARIAD Gene Therapeutics, Inc.</h3>

ARIAD Gene Therapeutics, Inc., or AGTI, is our 80%-owned subsidiary. Minority stockholders of AGTI, including Harvey J. Berger, M.D., our Chairman and Chief Executive Officer, Jay R. LaMarche, our former Chief Financial Officer and a member of our Board of Directors, several of our scientific advisors, Harvard University, and Stanford University, own the other 20% of AGTI. AGTI owns or licenses from others the intellectual property related to the ARGENT technology and know-how, as well as the product candidates developed from the application of this technology, including mTOR inhibitors. The mTOR inhibitor program, encompassing our lead product candidate, AP23573, and other compounds, was made possible by the creation of intellectual property, technology, and know-how related to inhibition of mTOR and the development of analogs of rapamycin as part of AGTI's research and development program.

We do not have a license agreement with AGTI that provides us with rights to commercialize product candidates based on the ARGENT cell-signaling regulation technology or mTOR inhibitors derived from AGTI's programs, solely for our benefit, as opposed to the benefit of AGTI. All of the research and development activities of AGTI, including the development of AP23573, have been conducted by us on behalf of AGTI pursuant to a research and development agreement. As of September 30, 2006, we have accrued an inter-company receivable of approximately $172 million representing funds we have advanced to AGTI for costs associated with AGTI's research and development programs, of which approximately $99 million has been accrued since January 1, 2003, as clinical development of AP23573 has progressed. Other than a fee of 10% of the accrued costs advanced by us to fund the research and development activities of AGTI, we are not entitled to receive from AGTI any rights or other remuneration under the research and development agreement. Accordingly, our future economic benefit from the commercialization of such products on behalf of AGTI will only be in the form of dividends or other payments received in respect of our 80% ownership interest in AGTI, unless we acquire the equity interests of the minority shareholders, license rights to AP23573 from AGTI, or enter into a different arrangement with AGTI and/or its minority shareholders.

Consequently, as the inter-company receivable has increased to fund the development of AP23573, in order to maximize the value of ARIAD for our stockholders and to mitigate or eliminate the conflicts of interest which currently exist between ARIAD and AGTI, the independent members of our Board of Directors (all of ARIAD's Board members other than Dr. Berger and Mr. LaMarche) are currently engaged in evaluating a variety of strategic alternatives with respect to acquiring the 20% minority interest of AGTI that we do not own and have hired independent legal counsel and a financial consultant to assist them in their evaluation. See a description of the risk factors related to our relationship with AGTI in the section entitled "Risk Factors" in Part II, Item 1A of this Quarterly Report on Form 10-Q, which include a description of such risks, the existing conflicts of interest between ARIAD and AGTI, and the key terms of the research and development agreement and associated financial accounting.

<div align="center">37</div>

**Our Corporate Strategy**

Our current business strategy is to:

- build a fully integrated oncology company and become a leader in the discovery, development and commercialization of molecularly targeted oncology therapies;

- establish a U.S. commercial platform;

- enter into partnerships with major pharmaceutical or biotechnology companies, after obtaining definitive clinical data, to assist in developing our cancer product candidates and commercializing them outside the U.S.;

- broadly develop our lead oncology product candidate, AP23573, and build a pipeline of innovative follow−on product candidates;

- license our NF−°B and the ARGENT cell−signaling regulation technologies to pharmaceutical and biotechnology companies; and

- develop and commercialize AP23573, in collaboration with up to three medical device companies, in drug−delivery stents and other medical devices to decrease reblockage of injured vessels following stent−assisted angioplasty.

38

**ITEM 6. EXHIBITS**

31.1   Certification of the Chief Executive Officer.

31.2   Certification of the Chief Financial Officer.

32.1   Certification pursuant to Section 906 of the Sarbanes−Oxley Act of 2002.

ARIAD and the ARIAD logo are our registered trademarks and ARGENT is our trademark. The domain name and website address www.ariad.com, and all rights thereto, are registered in the name of, and owned by, ARIAD. The information in our website is not intended to be part of this Quarterly Report on Form 10−Q. We include our website address herein only as an inactive textual reference and do not intend it to be an active link to our website.

<div align="center">39</div>

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**ARIAD Pharmaceuticals**

By:  /s/ Harvey J. Berger, M.D.
_____

Harvey J. Berger, M.D.
Chairman and Chief Executive Officer


By:  /s/ Edward M. Fitzgerald
_____

Edward M. Fitzgerald
Senior Vice President, Finance and Corporate Operations
and Chief Financial Officer
(Duly authorized officer, principal financial officer
and chief accounting officer)

Date: November 9, 2006

40

Source: ARIAD PHARMACEUTICAL, 10-Q, November 09, 2006

**EXHIBIT INDEX**

| Exhibit No. | Title |
|---|---|
| 31.1 | Certification of the Chief Executive Officer. |
| 31.2 | Certification of the Chief Financial Officer. |
| 32.1 | Certification pursuant to Section 906 of the Sarbanes−Oxley Act of 2002. |

41

Source: ARIAD PHARMACEUTICAL, 10−Q, November 09, 2006

Exhibit 31.1

## CERTIFICATIONS

**Chief Executive Officer**

I, Harvey J. Berger, M.D., certify that:

1. I have reviewed this quarterly report of ARIAD Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a−15(f) and 15d−15(f)) for the registrant and have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluation; and

   d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

By: /s/ Harvey J. Berger, M.D.

Harvey J. Berger, M.D.
Chairman and Chief Executive Officer

Date: November 9, 2006

42

Exhibit 31.2

**CERTIFICATIONS**

**Chief Financial Officer**

I, Edward M. Fitzgerald, certify that:

1. I have reviewed this quarterly report of ARIAD Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a−15(f) and 15d−15(f)) for the registrant and have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluation; and

   d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

By:  /s/ Edward M. Fitzgerald
_____

Edward M. Fitzgerald
Senior Vice President, Finance and Corporate
Operations and Chief Financial Officer
Date: November 9, 2006              (Principal financial officer and chief accounting officer)

43

Exhibit 32.1

**Certification**
**Pursuant to Section 906 of the Sarbanes–Oxley Act of 2002**
**(Subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code)**

Pursuant to section 906 of the Sarbanes–Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), each of the undersigned officers of ARIAD Pharmaceuticals, Inc., a Delaware corporation (the "Company"), does hereby certify, to such officer's knowledge, that:

The Quarterly Report on Form 10–Q for the period ended September 30, 2006 (the "Form 10–Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and information contained in the Form 10–Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 9, 2006

By:  /s/ Harvey J. Berger, M.D.
     Harvey J. Berger, M.D.
     Chairman and Chief Executive Officer

Date: November 9, 2006

By:  /s/ Edward M. Fitzgerald
     Edward M. Fitzgerald
     Senior Vice President, Finance and Corporate Operations and
     Chief Financial Officer

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

44

Created by 10KWizard   www.10KWizard.com

Source: ARIAD PHARMACEUTICAL, 10–Q, November 09, 2006

# EXHIBIT E



# FORM 8−K

## AMGEN INC − amgn

**Filed: October 23, 2006 (period: October 23, 2006)**

Report of unscheduled material events or corporate changes.

# Table of Contents

**Item 2.02.**    Results of Operations and Financial Condition

**Item 9.01.**    Financial Statements and Exhibits

SIGNATURES
EXHIBIT INDEX
EX-99.1 (PRESS RELEASE)

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 8−K

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of**
**The Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported)
October 23, 2006

# AMGEN INC.
### (Exact name of registrant as specified in its charter)

| Delaware | 000−12477 | 95−3540776 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| One Amgen Center Drive Thousand Oaks, CA | 91320−1799 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code
805−447−1000

**N/A**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8−K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a−12 under the Exchange Act (17 CFR 240.14a−12)

☐ Pre−commencement communications pursuant to Rule 14d−2(b) under the Exchange Act (17 CFR 240.14d−2(b))

☐ Pre−commencement communications pursuant to Rule 13e−4(c) under the Exchange Act (17 CFR 240.13e−4(c))

Source: AMGEN INC, 8−K, October 23, 2006

**Item 2.02.    Results of Operations and Financial Condition**

On October 23, 2006, Amgen Inc. (the "Company") issued a press release announcing its unaudited results of operations and financial condition for the three and nine months ended September 30, 2006. The full text of the press release is set forth in Exhibit 99.1 attached hereto.

In its press release the Company included certain historical non−GAAP financial measures as defined in Regulation G promulgated by the Securities and Exchange Commission with respect to the three months and nine months ended September 30, 2006 and September 30, 2005. Reconciliations for such historical non−GAAP financial measures are attached to the press release set forth as Exhibit 99.1 attached hereto. The Company believes that its presentation of historical non−GAAP financial measures provides useful supplementary information to and facilitates additional analysis by investors. These historical non−GAAP financial measures are in addition to, not a substitute for, or superior to, measures of financial performance prepared in accordance with U.S. Generally Accepted Accounting Principles ("GAAP").

<u>Three and nine months ended September 30, 2006</u>

For the three and nine months ended September 30, 2006, the Company's adjustments to GAAP financial measures relate to amounts associated with the impact of expensing stock options in accordance with Statement of Financial Accounting Standards No. 123R ("SFAS No. 123R") and with the Company's acquisitions of Abgenix, Inc. ("Abgenix") in April 2006 (the "Abgenix Acquisition"), Tularik Inc. ("Tularik") in August 2004 (the "Tularik Acquisition") and Immunex Corporation ("Immunex") in July 2002 (the "Immunex Acquisition").

For the three and nine months ended September 30, 2006, the Company reported non−GAAP financial results for cost of sales ("COS") expense, research and development ("R&D") expense, selling, general and administrative ("SG&A") expense and diluted shares used in the calculation of adjusted earnings per share. COS expense, R&D expense and SG&A expense were adjusted to exclude the effects of expensing stock options in accordance with SFAS No. 123R. Diluted shares used in the calculation of adjusted diluted earnings per were also adjusted to exclude the effects of adopting SFAS No. 123R. The Company believes that excluding the impact of expensing stock options and the related effect of adopting SFAS No. 123R will facilitate comparisons between periods before, during and after such expenses are incurred.

For the three months ended September 30, 2006, R&D expense was also adjusted to exclude the ongoing, non−cash amortization of the intangible asset, XenoMouse[®] technology, associated with the Abgenix Acquisition (the "Abgenix Intangible Asset Amortization"). The Company believes that excluding the Abgenix Intangible Asset Amortization treats the asset as if the Company had developed it internally in the past, and thus provides a supplemental measure of profitability in which the Company's acquired intellectual property is treated in a comparable manner to its internally developed intellectual property.

For the three months ended September 30, 2006, the Company reported non−GAAP adjusted provision for income taxes, adjusted net income and adjusted earnings per share, excluding (i) the foregoing expense amounts for this period for the reasons discussed above, (ii) the non−cash amortization of acquired intangible assets associated with the Immunex Acquisition (primarily Enbrel[®]) (the "Immunex Intangible Assets' Amortization") and (iii) the impairment of a non−ENBREL related intangible asset previously acquired in the Immunex Acquisition (the "Immunex Intangible Asset Impairment"). The Company believes that excluding the Immunex Intangible Assets' Amortization and the Immunex Intangible Asset Impairment treats those assets as if the Company had developed them internally in the past, and thus provides a supplemental measure of profitability in which the Company's acquired intellectual property is treated in a comparable manner to its internally developed intellectual property.

For the nine months ended September 30, 2006, the Company reported non−GAAP financial results for COS expense, R&D expense and SG&A expense that exclude the items identified above as being excluded in the three months ended September 30, 2006 for the reasons discussed above. R&D expense was also adjusted to exclude the incremental compensation provided to certain Abgenix employees associated with their retention and to exclude incremental compensation provided to certain Tularik employees associated with their retention for the applicable

2

period. Also for the same period, SG&A expense was also adjusted to exclude incremental compensation provided to certain Abgenix employees associated with their retention for the applicable period. The Company believes that excluding Abgenix and Tularik incremental compensation provides supplemental measures that will facilitate comparisons between periods before, during and after such expenses are incurred.

For the nine months ended September 30, 2006, the Company reported non-GAAP adjusted provision for income taxes, adjusted net income and adjusted earnings per share that exclude all of the items identified above as being excluded in the three and nine months ended September 30, 2006, for the reasons discussed above, and the non-cash expense associated with writing off the acquired in-process research and development related to the Abgenix Acquisition (the "Abgenix IPR&D Write-off"). The Company believes that excluding the Abgenix IPR&D Write-off provides a supplemental measure that will facilitate comparisons between periods in which such item did not occur.

<u>Three and nine months ended September 30, 2005</u>

For the three months ended September 30, 2005, the Company's adjustments to GAAP financial measures relate to amounts associated with the write-off of the cost of a semi-completed manufacturing asset that will not be used due to a change in manufacturing strategy (the "Manufacturing Charge"), the Tularik Acquisition and the Immunex Intangible Assets' Amortization.

For the nine months ended September 30, 2005, the Company's adjustments to GAAP financial measures also relate to amounts associated with legal settlements incurred, net of amounts previously accrued, primarily related to settling a patent legal proceeding (the "Settlement Amounts"), the net gain realized upon the Company's termination of a manufacturing agreement with Genentech, Inc. ("Genentech") for the production of Enbrel[®] at Genentech's manufacturing facility in South San Francisco (the "Genentech Termination") and the amounts associated with the pro rata portion of the debt issuance costs (the "Convertible Notes Expense") that were immediately charged to interest expense as a result of certain holders of the Company's 30-year zero coupon senior convertible notes due in 2032 (the "Convertible Notes") exercising their March 1, 2005 put option and the related Convertible Notes being repaid in cash.

For the three months ended September 30, 2005, the Company reported non-GAAP financial results for COS expense and R&D expense. COS expense was adjusted to exclude the Manufacturing Charge and R&D expense was adjusted to exclude incremental compensation provided to certain Tularik employees associated with their retention for the applicable period. The Company believes that excluding the Manufacturing Charge provides a supplemental measure that will facilitate comparisons between periods in which such item did not occur and that excluding such incremental compensation provides a supplemental measure that will facilitate comparisons between periods before, during and after such expense is incurred.

For the three months ended September 30, 2005, the Company reported non-GAAP adjusted provision for income taxes, adjusted net income and adjusted earnings per share, excluding (i) the foregoing expense amounts for this period for the reasons discussed above and (ii) the Immunex Intangible Assets' Amortization. The Company believes that excluding the Immunex Intangible Assets' Amortization treats those assets as if the Company had developed them internally in the past, and thus provides a supplemental measure of profitability in which the Company's acquired intellectual property is treated in a comparable manner to its internally developed intellectual property.

For the nine months ended September 30, 2005, the Company reported non-GAAP financial results for COS expense and R&D expense that exclude the items identified above as being excluded in the three months ended September 30, 2005, for the reasons discussed above. Also for this period, the Company reported non-GAAP adjusted interest and other income (expense), net, adjusted to exclude the net gain realized upon the Genentech Termination and the Convertible Notes Expense. The Company believes that excluding the net gain upon the Genentech Termination and the Convertible Notes Expense provide supplemental measures that will facilitate comparisons between periods in which such items did not occur.

3

For the nine months ended September 30, 2005, the Company reported non–GAAP adjusted provision for income taxes, adjusted net income and adjusted earnings per share that exclude all of the items identified above as being excluded in the three months ended September 30, 2005, for the reasons discussed above, and also excluded the Settlement Amounts, the net gain realized upon the Genentech Termination and the Convertible Notes Expense. The Company believes that excluding the Settlement Amounts, the net gain realized upon the Genentech Termination and the Convertible Notes Expense provide supplemental measures that will facilitate comparisons between periods in which such items did not occur.

The Company uses the foregoing non–GAAP financial measures in connection with its own budgeting and financial planning.

Due to the differing treatments of expensing stock options for the purpose of presenting adjusted earnings per share within and across industries, the Company also reported non–GAAP adjusted earnings per share including the impact of expensing stock options in accordance with SFAS No. 123R for the three and nine months ended September 30, 2006 and September 30, 2005, as a convenience to investors.

**Item 9.01.    Financial Statements and Exhibits**

(c) Exhibits.

99.1   Press Release dated October 23, 2006

4

Source: AMGEN INC, 8–K, October 23, 2006

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

AMGEN INC.

Date: October 23, 2006

By: _____/s/ Richard Nanula_____

Name:                        Richard Nanula

Title:                    Executive Vice President
and Chief Financial Officer

5

**EXHIBIT INDEX**

| Exhibit Number | Document Description |
| --- | --- |
| 99.1 | Press release dated October 23, 2006 |

6

Source: AMGEN INC, 8-K, October 23, 2006

Exhibit 99.1



One Amgen Center Drive
Thousand Oaks, CA 91320–1799
Telephone (805) 447–4587
Fax (805) 499–3507
www.amgen.com

*News Release*

### AMGEN'S THIRD QUARTER 2006 ADJUSTED EARNINGS PER SHARE, EXCLUDING STOCK OPTION EXPENSE, INCREASED 22 PERCENT TO $1.04

---

### GAAP Earnings Per Share Increased 22 Percent to $0.94

---

### Full Year Adjusted Earnings Per Share Guidance Excluding Stock Option Expense Raised to $3.85 – $3.95

---

### Revenues Grew 15 Percent to $3.6 Billion

---

THOUSAND OAKS, Calif. (Oct. 23, 2006) – Amgen (NASDAQ: AMGN) reported adjusted earnings per share (EPS), excluding stock option expense and certain other expenses, of $1.04 for the third quarter of 2006, an increase of 22 percent compared to 85 cents during the third quarter of 2005. Adjusted net income, excluding stock option expense and certain other expenses, increased 15 percent to $1,224 million compared to $1,067 million in the third quarter of 2005. Stock option expense on a per share basis totaled 3 cents in both the third quarter of 2006 and 2005. Adjusted EPS including stock option expense was $1.01 for the third quarter of 2006, an increase of 23 percent compared to 82 cents in the third quarter of 2005.

Total revenue increased 15 percent during the third quarter of 2006 to $3.61 billion from $3.15 billion in the third quarter of 2005.

Adjusted EPS and adjusted net income for the three months ended September 30, 2006 and 2005 exclude certain expenses related to the acquisitions of Immunex, Tularik, and Abgenix, stock option expense, and certain other items. Adjusted EPS, including the impact of stock option expense, is itemized on the reconciliation tables below.

On a reported basis and calculated in accordance with U.S. Generally Accepted Accounting Principles (GAAP), Amgen's EPS was $0.94 in the third quarter of 2006, an

–MORE–

**Amgen's Third Quarter 2006 Adjusted Earnings Per Share Increased 22 Percent To $1.04**
    Page 2

increase of 22 percent compared to $0.77 in the same quarter last year. Net income increased 14 percent to $1.1 billion in the third quarter of 2006 versus $967 million in the third quarter of 2005. Effective January 1, 2006, Amgen began recording expense associated with employee stock options in accordance with Statement of Financial Accounting Standards No. 123R. As a result, reported GAAP results for the third quarter of 2006 were negatively impacted by $50 million on a pre–tax basis.

"Our key products once again drove our strong financial performance in the third quarter," said Kevin Sharer, chairman and CEO. "The recent launch of Vectibix, our first cancer therapeutic, represents an important addition to our product portfolio. We also made progress on our outreach efforts through the announced acquisition of Avidia, which provides us access to a technology platform and an important development stage product for the treatment of inflammation and autoimmune diseases," concluded Sharer.

**Product Sales Performance**

During the third quarter, total product sales increased 15 percent to $3.5 billion from $3.05 billion in the third quarter of 2005. Sales in the United States totaled $2.86 billion, an increase of 14 percent versus $2.5 billion for the third quarter of 2005. International sales increased 18 percent to $639 million versus $543 million for the third quarter of 2005. Excluding the impact of foreign exchange, total product sales increased 14 percent and international product sales increased 15 percent versus the prior year.

Worldwide sales of Aranesp® (darbepoetin alfa) increased 27 percent to $1,067 million in the third quarter of 2006 versus $840 million during the third quarter of 2005. This growth was driven by demand, reflecting segment growth and share gains. U.S. Aranesp sales increased 33 percent to $720 million versus $542 million in the prior year. International Aranesp sales increased 16 percent to $347 million versus $298 million in the third quarter of 2005.

Sales of EPOGEN® (Epoetin alfa) increased 6 percent to $633 million in the third quarter of 2006 versus the third quarter of 2005, due to favorable year over year wholesaler inventory changes and underlying demand growth in the free–standing dialysis clinics. These increases were partially offset by year–over–year increased use of Aranesp in the hospital setting. The Company believes that conversion to Aranesp in the hospital setting has stabilized as of the middle of this year. Underlying demand in free standing dialysis clinics remained consistent with an annual patient population growth of 3–4 percent.

Combined worldwide sales of Neulasta® (pegfilgrastim) and NEUPOGEN® (Filgrastim), increased 13 percent to $998 million in the third quarter of 2006 versus $882 million for the third quarter of 2005, driven by increased demand for Neulasta. Combined sales of Neulasta and NEUPOGEN in the United States were $772 million in the third quarter of

Source: AMGEN INC, 8–K, October 23, 2006

Amgen's Third Quarter 2006 Adjusted Earnings Per Share Increased 22 Percent
To $1.04
   Page 3

2006 versus $680 million in the third quarter of 2005, an increase of 14 percent. U.S. Neulasta sales continue to benefit from a label extension based on new clinical data demonstrating the value of first cycle use in moderate risk chemotherapy regimens. Combined international sales increased 12 percent to $226 million in the third quarter of 2006 versus $202 million for the same quarter in the prior year.

North American sales of Enbrel® (etanercept) increased 6 percent in the third quarter to $705 million versus $668 million during the same period in 2005. Growth was driven primarily by increased demand in the Rheumatology segment. Growth of the Dermatology segment has continued to lag behind our expectations. The psoriasis biologic segment is under-penetrated, which the Company remains committed to addressing through increased patient and physician education. Growth was also impacted by share declines in Rheumatology and Dermatology. ENBREL remains the share leader in both segments.

Worldwide sales of Sensipar® (cinacalcet HCl) increased 93 percent to $83 million in the third quarter of 2006 versus $43 million during the third quarter of 2005. This growth was driven by demand.

**Operating Expense Analysis on an Adjusted Basis:**

   **Cost of sales** declined to $485 million in the third quarter of 2006 versus $505 million in the third quarter of 2005, primarily driven by lower royalty expenses, a favorable product mix and to a lesser extent, production efficiencies. Royalty expenses were lower than the prior year driven by the expiration of certain contractual royalty obligations on Neulasta and NEUPOGEN sales and the acquisition of certain royalty rights on sales of ENBREL and EU Neulasta and NEUPOGEN sales. For the fourth quarter, Amgen expects cost of sales margin to remain lower than 2005.

   **Research and development (R&D)** expenses increased 49 percent to $835 million in the third quarter versus $559 million in the third quarter of 2005. The third quarter increase was primarily due to higher staff levels and increased funding necessary to support clinical trials for our late-stage programs, including clinical material and manufacturing costs. The Company expects continued year-over-year growth in R&D expenses for the fourth quarter, reflecting the ongoing impact of nine mega-trials (trials with more than 200 sites). However, the fourth quarter growth rate will be lower than the 49 percent increase experienced in the third quarter of 2006. The growth rate for the full year is expected to be in the middle of 30-40 percent range that has been given previously.

   **Selling, general and administrative (SG&A)** expenses increased 19 percent to $782 million in the third quarter versus $656 million in the third quarter of 2005, reflecting higher staff and additional infrastructure costs to support the growing

**Amgen's Third Quarter 2006 Adjusted Earnings Per Share Increased 22 Percent**
**To $1.04**
   Page 4

   organization, in particular our Global Enterprise Resource Planning (ERP) program; higher legal costs associated with ongoing litigation; and higher Wyeth profit share expenses related to ENBREL sales. SG&A expenses for the fourth quarter are expected to increase. However, we expect the year−over−year growth rate to be lower than the fourth quarter of 2005.

During the third quarter of 2006, adjusted EPS growth of 22 percent exceeded revenue growth of 15 percent by 7 percentage points. EPS leverage was principally driven by fewer shares used in the computation of adjusted diluted EPS compared to the third quarter of 2005 and a lower adjusted tax rate due to favorable audit settlements. Amgen continues to expect its 2006 full year adjusted tax rate to be lower than in 2005 due to increased overseas manufacturing in Puerto Rico and the favorable audit settlements. However, the fourth quarter adjusted tax rate is expected to be higher than the third quarter of 2006.

During the quarter, Amgen repurchased 7.3 million shares at a total cost of $505 million, with year−to−date repurchases totaling 67 million shares at a total cost of $4.8 billion. In December 2005, Amgen's Board of Directors authorized a new stock repurchase program of $5 billion. The Company currently has $1.8 billion remaining under its stock repurchase program. Average diluted shares for adjusted EPS were 1,174 million versus 1,249 million in the third quarter of 2005, reflecting the Company's aggressive share repurchases.

Capital expenditures for the third quarter of 2006 were approximately $376 million versus $199 million in the third quarter of 2005 as the Company continued its manufacturing capacity and site expansions in Ireland, Puerto Rico and other locations and its investment in the ERP program. Cash and marketable securities were $5.8 billion and debt was $9.0 billion at the end of the third quarter of 2006. The Company expects year−end cash balances to be less than debt by approximately $2.0 billion.

The Company expects to record a charge in the fourth quarter for acquired in−process research and development in accordance with GAAP related to the pending acquisition of Avidia, which will be excluded from adjusted earnings.

The Company now expects 2006 adjusted EPS in the range of $3.85 to $3.95 excluding stock option expense and certain other expenses, up from the prior range of $3.75 to $3.85, based upon sales momentum, and lower cost of sales due to a favorable product mix and efficiencies. The Company is also narrowing its revenue guidance range to $14.1 billion to $14.3 billion, from the previously provided range of $14.0 billion to $14.3 billion.

Amgen's Third Quarter 2006 Adjusted Earnings Per Share Increased 22 Percent
To $1.04
    Page 5


**Third Quarter Product and Pipeline Highlights**


The Company also highlighted research and development matters, including recent regulatory news, updates on selected late–stage clinical programs (Aranesp, Sensipar, Vectibix™ (panitumumab), denosumab and AMG 706) and an early–stage pipeline update.


**Vectibix™:** In September, the FDA approved Vectibix for third–line treatment of metastatic colorectal cancer (CRC). Vectibix is the first entirely human monoclonal antibody for the treatment of patients with epidermal growth factor receptor– (EGFr) expressing metastatic colorectal cancer after disease progression on, or following fluoropyrimidine–, oxaliplatin–, and irinotecan– containing chemotherapy regimens. The FDA approval of Vectibix was based on a progression–free survival endpoint.


Additionally, outside the United States, marketing applications have been submitted to the European Medicines Agency (EMEA) and Health Canada in April, and Australia and Switzerland in May.


During the quarter, the Company completed enrollment in its Panitumumab Advanced Colorectal Cancer Evaluation (PACCE) study, a non–registration–enabling trial evaluating Vectibix in first–line treatment of metastatic colorectal cancer. Over 1,000 patients have been enrolled in the study. Patients are randomized to treatment with Avastin plus chemotherapy with or without Vectibix. The primary endpoint of this study is progression–free survival, with secondary endpoints of response rate, overall survival and safety.


Enrollment in the Company's Phase 3 study in first–line metastatic colorectal cancer began in the quarter. The Phase 3 study in first–line locally advanced Squamous Cell Cancer of the Head and Neck (SCCHN) has been slightly delayed by one to two quarters from the timeline previously disclosed due to modifications in study design. The Phase 3 study in metastatic SCCHN is scheduled to start in the first quarter of 2007 as planned. Additionally, the Company has decided to delay by a quarter its co–operative Phase 3 study with the National Surgical Adjuvant Breast and Bowel Project (NSABP) group in adjuvant CRC while finalizing its design with the NSABP.


**Aranesp®:** As previously announced, the Company has received from the U.S. Food and Drug Administration (FDA) a complete response letter, commonly referred to as an "approvable" letter, for Aranesp de novo once every–two–week and maintenance once–monthly dosing regimens for chronic kidney disease (CKD) patients with anemia not on dialysis.


In December 2005, the Company submitted a biologics license supplement to the FDA for these Aranesp dosing regimens for CKD patients with anemia not on dialysis. The FDA has requested additional clinical data for the once–monthly dosing regimen, including an additional clinical study. The FDA has also requested additional label language and clarification of submitted data for the de novo once every–two–week dosing regimen. The Company is committed to working closely with the FDA to resolve these questions in a timely and efficient manner.

**Amgen's Third Quarter 2006 Adjusted Earnings Per Share Increased 22 Percent
To $1.04**
    Page 6

As part of the ongoing discussions with the FDA, the Company has submitted an intention for an amendment and plans to propose the submission of existing data, including clinical trial data gathered since submission of the biologics license supplement to address the FDA's request for additional data to support both the every–two–weeks and the monthly dosing regimens. Whether the existing data will be sufficient to satisfy the Agency's request for additional information will be a point of discussion between the Company and the FDA.

**AMG 706:** The Company provided an update on their investigational plan of cholecystitis and enlargement of the gall bladder previously observed in patients who had received AMG 706. The Company continues to gather data on this issue. Ongoing studies have continued subject to protocol amendments to ensure that physicians are aware of the possibility that cholecystitis or enlargement of the gall bladder may occur and that they should manage them appropriately. During the fourth quarter, the Company will be re–launching its head–to–head Phase 2 study against Avastin in Breast Cancer as well as launching a second head–to–head Phase 2 study against Avastin in Non–small Cell Lung Cancer.

Additionally, data from the Phase 2 study in gastrointestinal stromal tumors (GIST) will be presented at the Connective Tissue Oncology Society meeting in November.

**Denosumab:** Enrollment has begun in the Company's Phase 3 study to evaluate the safety and efficacy of transitioning therapy from alendronate to denosumab in postmenopausal women with low bone mineral density. The study is expected to enroll 500 patients.

**Sensipar**®: During the quarter, enrollment began in the Phase 3 trial E.V.O.L.V.E. (**EV**aluation **O**f Cinacalcet HCl Therapy to **L**ower Cardio**V**ascular **E**vents). The E.V.O.L.V.E. trial is the largest international, prospective clinical outcomes study to determine whether Sensipar/Mimpara® (cinacalcet HCl) can effectively reduce the risk of mortality and morbidity in patients with stage five chronic kidney disease (CKD) undergoing maintenance dialysis. The trial is expected to enroll 3,800 patients.

**Early–Stage Pipeline Update:** The Company announced that it continues to make progress advancing its early–stage pipeline. Since the start of 2006, eleven new molecules, including four in oncology, two for diabetes, one for idiopathic pulmonary fibrosis, one in cancer cachexia, one in inflammation, one for asthma and one for Alzheimer's have been advanced into clinical development. Additionally, three new molecules, one for diabetes, one for pain and one for psoriasis, have entered the clinic for introduction into humans. During this period, four early–stage programs have been terminated.

Amgen's Third Quarter 2006 Adjusted Earnings Per Share Increased 22 Percent
To $1.04
   Page 7


**Outreach Update:** As previously announced, the Company entered into a definitive merger agreement under which the Company has agreed to acquire Avidia, a privately held biopharmaceutical company that discovers and develops a new class of human therapeutic known as Avimer™ proteins. The transaction provides the Company with Avidia's lead product candidate, an inhibitor of interleukin 6 (IL–6) for the treatment of inflammation and autoimmune diseases, which is in Phase 1 clinical trials. The Company also entered into an agreement with Yeda Research and Development Company Ltd., the commercial arm of the Weizmann Institute of Science. Under the terms of the agreement the Company obtained a license under Yeda's rights in U.S. Patent No. 6,217,866 (the "'866 Patent"). On Sept. 18, 2006, Yeda was awarded sole ownership of the '866 Patent in an opinion and order issued by the U.S. District Court for the Southern District of New York.


For more product information or the full prescribing information, please refer to the Amgen Web site at www.amgen.com.


As previously announced, the Company has posted in the Investor section of the Company's Web site (www.amgen.com/investors) a slide presentation related to its third quarter financial results conference call, scheduled for 2 p.m. Pacific Daylight Time today. The conference call will be broadcast over the internet and can also be found on Amgen's Web site at the above web address.


**Forward−Looking Statements**


This news release contains forward-looking statements that involve significant risks and uncertainties, including those discussed below and others that can be found in our Form 10–K for the year ended December 31, 2005, and in our periodic reports on Form 10–Q and Form 8–K. Amgen is providing this information as of the date of this news release and does not undertake any obligation to update any forward−looking statements contained in this document as a result of new information, future events or otherwise.


No forward-looking statement can be guaranteed and actual results may differ materially from those we project. The Company's results may be affected by our ability to successfully market both new and existing products domestically and internationally, sales growth of recently launched products, difficulties or delays in manufacturing our products, and regulatory developments (domestic or foreign) involving current and future products and manufacturing facilities. In addition, sales of our products are affected by reimbursement policies imposed by third party payors, including governments, private insurance plans and managed care providers, and may be affected by domestic and international trends toward managed care and healthcare cost containment as well as possible U.S. legislation affecting pharmaceutical pricing and reimbursement. Government regulations and reimbursement policies may affect the development, usage and pricing of our products. Furthermore, our research, testing, pricing, marketing and other operations are subject to extensive regulation by domestic and foreign government regulatory authorities. We, or others could identify side effects or manufacturing problems with our products after they are on the market. In

**Amgen's Third Quarter 2006 Adjusted Earnings Per Share Increased 22 Percent**
**To $1.04**
    Page 8

addition, we compete with other companies with respect to some of our marketed products as well as for the discovery and development of new products. Discovery or identification of new product candidates cannot be guaranteed and movement from concept to product is uncertain; consequently, there can be no guarantee that any particular product candidate will be successful and become a commercial product. In addition, while we routinely obtain patents for our products and technology, the protection offered by our patents and patent applications may be challenged, invalidated or circumvented by our competitors. Further, some raw materials, medical devices, and component parts for our products are supplied by sole third party suppliers.

**About Amgen**

Amgen discovers, develops and delivers innovative human therapeutics. A biotechnology pioneer since 1980, Amgen was one of the first companies to realize the new science's promise by bringing safe and effective medicines from lab, to manufacturing plant, to patient. Amgen therapeutics have changed the practice of medicine, helping millions of people around the world in the fight against cancer, kidney disease, rheumatoid arthritis, and other serious illnesses. With a broad and deep pipeline of potential new medicines, Amgen remains committed to advancing science to dramatically improve people's lives. To learn more about our pioneering science and our vital medicines, visit www.amgen.com.

CONTACT:        Amgen, Thousand Oaks
                David Polk, 805/447−4613 (Media)
                Arvind Sood, 805/447−1060 (Investors)

EDITOR'S NOTE: An electronic version of this news release may be accessed via our Web site at www.amgen.com. Journalists and media representatives may sign up to receive all news releases electronically at time of announcement by filling out a short form in the Media section of the Web site.

# # #

Source: AMGEN INC, 8−K, October 23, 2006

Amgen's Third Quarter 2006 Adjusted Earnings Per Share Increased 22 Percent
To $1.04
  Page 9

Appendix 1

Amgen Inc.
Condensed Consolidated Statements of Operations and
Reconciliation of GAAP Earnings to "Adjusted" Earnings − Excluding Stock Option Expense
(In millions, except per share data)
(Unaudited)

| | Three Months Ended September 30, 2006 | | | Three Months Ended September 30, 2005 | | |
|---|---|---|---|---|---|---|
| | GAAP | Adjustments | "Adjusted", Excluding Stock Option Expense | GAAP | Adjustments | "Adjusted", Excluding Stock Option Expense |
| **Revenues:** | | | | | | |
| Product sales | $3,503 | $   — | $  3,503 | $3,047 | $   — | $  3,047 |
| Other revenues | 109 | — | 109 | 107 | — | 107 |
| Total revenues | 3,612 | — | 3,612 | 3,154 | — | 3,154 |
| **Operating expenses:** | | | | | | |
| Cost of sales (excludes amortization of acquired intangible assets presented below) | 489 | (4)(1) | 485 | 552 | (47)(5) | 505 |
| Research and development | 872 | (21)(1) (16)(2) | 835 | 562 | (3)(6) | 559 |
| Selling, general and administrative | 807 | (25)(1) | 782 | 656 | — | 656 |
| Amortization of intangible assets | 122 | (73)(3) (49)(4) | — | 86 | (86)(3) | — |
| Total operating expenses | 2,290 | (188) | 2,102 | 1,856 | (136) | 1,720 |
| Operating income | 1,322 | 188 | 1,510 | 1,298 | 136 | 1,434 |
| Interest and other income (expense), net | 39 | — | 39 | 14 | — | 14 |
| Income before income taxes | 1,361 | 188 | 1,549 | 1,312 | 136 | 1,448 |
| Provision for income taxes | 259 | 66(12) | 325 | 345 | 36(12) | 381 |
| Net income | $1,102 | $   122 | $  1,224 | $   967 | $   100 | $  1,067 |
| **Earnings per share:** | | | | | | |
| Basic | $ 0.94 | | $  1.05 | $ 0.78 | | $  0.87 |
| Diluted (13) | $ 0.94 | | $  1.04(14) | $ 0.77 | | $  0.85(14) |
| **Average shares used in calculation of earnings per share:** | | | | | | |
| Basic | 1,167 | | 1,167 | 1,233 | | 1,233 |
| Diluted (13) | 1,178 | | 1,174 | 1,249 | | 1,249 |

(1) − (14)   See explanatory notes on following pages.

Source: AMGEN INC, 8−K, October 23, 2006

Amgen's Third Quarter 2006 Adjusted Earnings Per Share Increased 22 Percent
To $1.04
    Page 10

**Amgen Inc.**
**Condensed Consolidated Statements of Operations and**
**Reconciliation of GAAP Earnings to "Adjusted" Earnings − Excluding Stock Option Expense**
**(In millions, except per share data)**
**(Unaudited)**

| | Nine Months Ended September 30, 2006 | | | Nine Months Ended September 30, 2005 | | |
|---|---|---|---|---|---|---|
| | GAAP | Adjustments | "Adjusted", Excluding Stock Option Expense | GAAP | Adjustments | "Adjusted", Excluding Stock Option Expense |
| **Revenues:** | | | | | | |
| Product sales | $10,121 | $ — | $ 10,121 | $8,854 | $ — | $ 8,854 |
| Other revenues | 312 | — | 312 | 305 | — | 305 |
| Total revenues | 10,433 | — | 10,433 | 9,159 | — | 9,159 |
| **Operating expenses:** | | | | | | |
| Cost of sales (excludes amortization of acquired intangible assets presented below) | 1,534 | (5)(1) | 1,529 | 1,571 | (47)(5) | 1,524 |
| Research and development | 2,315 | (78)(1) (32)(2) (5)(6) (12)(7) | 2,188 | 1,653 | (9)(6) | 1,644 |
| Selling, general and administrative | 2,336 | (96)(1) (7)(7) | 2,233 | 1,879 | — | 1,879 |
| Write−off of acquired in−process R&D | 1,101 | (1,101)(8) | — | — | — | — |
| Amortization of intangible assets | 296 | (247)(3) (49)(4) | — | 260 | (260)(3) | — |
| Legal settlements | — | — | — | 49 | (49)(9) | — |
| Total operating expenses | 7,582 | (1,632) | 5,950 | 5,412 | (365) | 5,047 |
| Operating income | 2,851 | 1,632 | 4,483 | 3,747 | 365 | 4,112 |
| Interest and other income (expense), net | 140 | — | 140 | 10 | (20)(10) 20(11) | 10 |
| Income before income taxes | 2,991 | 1,632 | 4,623 | 3,757 | 365 | 4,122 |
| Provision for income taxes | 874 | 189(12) | 1,063 | 907 | 120(12) | 1,027 |
| Net income | $ 2,117 | $ 1,443 | $ 3,560 | $2,850 | $ 245 | $ 3,095 |
| **Earnings per share:** | | | | | | |
| Basic | $ 1.79 | | $ 3.01 | $ 2.30 | | $ 2.50 |
| Diluted (13) | $ 1.77 | | $ 2.99(14) | $ 2.26 | | $ 2.46(14) |
| **Average shares used in calculation of earnings per share:** | | | | | | |
| Basic | 1,181 | | 1,181 | 1,238 | | 1,238 |
| Diluted (13) | 1,194 | | 1,190 | 1,263 | | 1,263 |

(1) − (14)    See explanatory notes on following pages.

Source: AMGEN INC, 8−K, October 23, 2006

Amgen's Third Quarter 2006 Adjusted Earnings Per Share Increased 22 Percent
To $1.04
    Page 11

**Amgen Inc.**
**Notes to Reconciliation of GAAP Earnings to "Adjusted" Earnings − Excluding Stock Option Expense**
**(In millions, except per share data)**
**(Unaudited)**

(1)    To exclude the impact of stock option expense in accordance with Statement of Financial Accounting Standards ("SFAS") No. 123R. Effective January 1, 2006, Amgen adopted SFAS No. 123R and elected not to apply this new accounting standard to its prior years' financial statements. Prior to such date, Amgen disclosed in the notes to its financial statements what the related expense and impact to earnings per share (EPS) would have been (i.e. on a pro forma basis) had it elected to expense the fair value of employee stock options in accordance with SFAS No. 123. For the three and nine months ended September 30, 2005, the total pro forma pre−tax expense for all employee stock options in accordance with SFAS No. 123 was $66 million and $263 million, respectively, resulting in dilution to GAAP EPS of 3 cents and 14 cents per share, respectively, on a pro forma basis.

(2)    To exclude the ongoing, non−cash amortization of the intangible asset, XenoMouse® technology, acquired with the Abgenix, Inc. ("Abgenix") acquisition. The non−cash charge for 2006 is currently estimated to be approximately $48 million, pre−tax.

(3)    To exclude the ongoing, non−cash amortization of acquired intangible assets, primarily ENBREL, related to the Immunex Corporation ("Immunex") acquisition. The non−cash charge for 2006 is currently estimated to be approximately $321 million, pre−tax.

(4)    To exclude the impairment of a non−ENBREL related intangible asset previously acquired in the Immunex acquisition.

(5)    To exclude the impact of writing off the cost of a semi−completed manufacturing asset that will not be used due to a change in manufacturing strategy.

(6)    To exclude the incremental compensation provided to certain Tularik Inc. ("Tularik") employees associated with their retention.

(7)    To exclude the incremental compensation provided to certain Abgenix employees associated with their retention. Substantially all related amounts have been incurred.

(8)    To exclude the non−cash expense associated with writing off the acquired in−process research and development related to the Abgenix acquisition.

(9)    To exclude the impact of legal settlements incurred, net of amounts previously accrued, primarily related to settling a patent legal proceeding.

(10)  To exclude the net gain realized on the termination of a manufacturing agreement with Genentech, Inc. ("Genentech") for the production of ENBREL at Genentech's manufacturing facility in South San Francisco.

(11)  To exclude the pro rata portion of the debt issuance costs that were immediately charged to interest expense as a result of certain holders of the convertible notes due in 2032 exercising their March 1, 2005 put option and the related convertible notes being repaid in cash.

(12)  To reflect the tax effect of the above adjustments, except for the non−tax write−off of the acquired in−process research and development related to the Abgenix acquisition. (see (8) above).

Amgen's Third Quarter 2006 Adjusted Earnings Per Share Increased 22 Percent
To $1.04
   Page 12

Amgen Inc.
Notes to Reconciliation of GAAP Earnings to "Adjusted" Earnings − Excluding Stock Option Expense
(In millions, except per share data)
(Unaudited)

(13)  The following table presents the computations for GAAP and "Adjusted" diluted earnings per share, excluding stock option expense, computed under the treasury stock and the "if−converted" methods:

| | Three Months Ended September 30, 2006 | | Three Months Ended September 30, 2005 | |
|---|---|---|---|---|
| | GAAP | "Adjusted", Excluding Stock Option Expense | GAAP | "Adjusted", Excluding Stock Option Expense |
| Income (Numerator): | | | | |
|   Net income for basic EPS | $ 1,102 | $ 1,224 | $ 967 | $ 1,067 |
|   Adjustment for interest expense on convertible notes, net of tax (A) | — | — | — | — |
|   Net income for diluted EPS, after assumed conversion of convertible notes | $ 1,102 | $ 1,224 | $ 967 | $ 1,067 |
| Shares (Denominator): | | | | |
|   Weighted−average shares for basic EPS | 1,167 | 1,167 | 1,233 | 1,233 |
|   Effect of dilutive securities | 11 | 7(B) | 15 | 15 |
|   Effect of convertible notes, after assumed conversion (A) | — | — | 1 | 1 |
|   Weighted−average shares for diluted EPS | 1,178 | 1,174 | 1,249 | 1,249 |
| Diluted earnings per share | $ 0.94 | $ 1.04 | $ 0.77 | $ 0.85 |

| | Nine Months Ended September 30, 2006 | | Nine Months Ended September 30, 2005 | |
|---|---|---|---|---|
| | GAAP | "Adjusted", Excluding Stock Option Expense | GAAP | "Adjusted", Excluding Stock Option Expense |
| Income (Numerator): | | | | |
|   Net income for basic EPS | $ 2,117 | $ 3,560 | $ 2,850 | $ 3,095 |
|   Adjustment for interest expense on convertible notes, net of tax (A) | — | — | 6 | 6 |
|   Net income for diluted EPS, after assumed conversion of convertible notes | $ 2,117 | $ 3,560 | $ 2,856 | $ 3,101 |
| Shares (Denominator): | | | | |
|   Weighted−average shares for basic EPS | 1,181 | 1,181 | 1,238 | 1,238 |
|   Effect of dilutive securities | 13 | 9(B) | 12 | 12 |
|   Effect of convertible notes, after assumed conversion (A) | — | — | 13 | 13 |
|   Weighted−average shares for diluted EPS | 1,194 | 1,190 | 1,263 | 1,263 |
| Diluted earnings per share | $ 1.77 | $ 2.99 | $ 2.26 | $ 2.46 |

(A)  On May 6, 2005 and August 17, 2005, in connection with an exchange offer, we modified the terms of substantially all of our convertible notes due in 2032. As a result, if converted, these convertible notes would be settled in 1) cash equal to the lesser of their accreted value at the conversion date or the conversion value, as defined, and 2) shares of common stock, if any, to the extent the conversion value exceeds the accreted value. Accordingly, the convertible notes due in 2032 do not impact diluted earnings per share under the "if− converted" method but rather, they impact diluted earnings per share under the treasury stock method, and only to the extent that the conversion value exceeds the accreted value during any reporting period, requiring such difference, if any, to be potentially settled in shares of common stock.

(B)  Dilutive securities used to compute "Adjusted" diluted earnings per share for the three and nine months ended September 30, 2006 were computed exclusive of the methodology used to determine dilutive securities under SFAS No. 123R.

**Amgen's Third Quarter 2006 Adjusted Earnings Per Share Increased 22 Percent**
**To $1.04**
 Page 13

**Amgen Inc.**
**Notes to Reconciliation of GAAP Earnings to "Adjusted" Earnings – Excluding Stock Option Expense**
**(In millions, except per share data)**
**(Unaudited)**

(14)  "Adjusted" diluted earnings per share including the impact of stock option expense for the three and nine months ended September 30, 2006 and 2005 is as
 follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| "Adjusted" EPS, excluding stock option expense | $ 1.04 | $ 0.85 | $ 2.99 | $ 2.46 |
| Impact of stock option expense | (0.03) | (0.03) | (0.11) | (0.14) |
| "Adjusted" EPS, including stock option expense | $ 1.01 | $ 0.82 | $ 2.88 | $ 2.32 |

Source: AMGEN INC, 8-K, October 23, 2006

Amgen's Third Quarter 2006 Adjusted Earnings Per Share Increased 22 Percent
To $1.04
 Page 14

**Amgen Inc.**
**Product Sales Detail by Product and Geographic Region**
**(In millions)**
**(Unaudited)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Aranesp® – U.S | $ 720 | $ 542 | $ 2,029 | $ 1,525 |
| Aranesp – International | 347 | 298 | 986 | 875 |
| EPOGEN® – U.S | 633 | 599 | 1,850 | 1,829 |
| Neulasta – U.S | 560 | 475 | 1,636 | 1,381 |
| NEUPOGEN® – U.S | 212 | 205 | 609 | 595 |
| Neulasta – International | 130 | 102 | 363 | 284 |
| NEUPOGEN® – International | 96 | 100 | 291 | 316 |
| Enbrel® – U.S | 669 | 641 | 1,983 | 1,825 |
| Enbrel – International | 36 | 27 | 104 | 74 |
| Sensipar® – U.S | 61 | 33 | 163 | 85 |
| Sensipar® – International | 22 | 10 | 60 | 21 |
| Other product sales – U.S | 9 | 9 | 26 | 27 |
| Other product sales – International | 8 | 6 | 21 | 17 |
| Total product sales | $ 3,503 | $ 3,047 | $ 10,121 | $ 8,854 |
| U.S | $ 2,864 | $ 2,504 | $ 8,296 | $ 7,267 |
| International (1) | 639 | 543 | 1,825 | 1,587 |
| Total product sales (1) | $ 3,503 | $ 3,047 | $ 10,121 | $ 8,854 |

(1)  For the third quarter of 2006, the change in foreign exchange rates from the third quarter of 2005 positively impacted product sales by $16 million.
     Excluding this impact, total product sales would have increased 14% and international product sales would have increased 15% over the prior year
     amounts.

Amgen's Third Quarter 2006 Adjusted Earnings Per Share Increased 22 Percent
To $1.04
   Page 15


**Amgen Inc.**
**Condensed Consolidated Balance Sheets – GAAP**
**(In millions)**
**(Unaudited)**

| | September 30, 2006 | December 31, 2005 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and marketable securities | $   5,781 | $   5,255 |
| Trade receivables, net | 2,124 | 1,769 |
| Inventories | 1,711 | 1,258 |
| Other current assets | 1,040 | 953 |
| Total current assets | 10,656 | 9,235 |
| Property, plant, and equipment, net | 5,673 | 5,038 |
| Intangible assets, net | 3,819 | 3,742 |
| Goodwill | 11,206 | 10,495 |
| Other assets | 1,232 | 787 |
| Total assets | $   32,586 | $   29,297 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities | $   4,515 | $   3,595 |
| Convertible notes | 1,773(1) | — |
| Total current liabilities | 6,288 | 3,595 |
| Deferred tax liabilities | 1,079 | 1,163 |
| Convertible notes | 5,000(2) | 1,759(1) |
| Other long-term debt | 2,233 | 2,198 |
| Other non-current liabilities | 265 | 131 |
| Stockholders' equity | 17,721 | 20,451 |
| Total liabilities and stockholders' equity | $   32,586 | $   29,297 |
| Shares outstanding | 1,166 | 1,224 |


(1)   Holders of our outstanding convertible notes due in 2032 may require the Company to purchase all or a portion of the notes on specific dates as early as
      March 1, 2007 at the original issuance price plus accrued original issue discount through the purchase date. Accordingly, as of September 30, 2006, these
      convertible notes have been classified as current liabilities.

      Holders of these notes also had the right to require the Company to purchase all or a portion of the notes on March 1, 2006. However, because the holders
      of substantially all of the then outstanding convertible notes did not require us to repurchase such notes on this date, these convertible notes were classified
      as non-current liabilities at December 31, 2005.

(2)   In February 2006 we issued $2.5 billion of convertible notes due in 2011 and $2.5 billion of convertible notes due in 2013.


Source: AMGEN INC, 8-K, October 23, 2006

Amgen's Third Quarter 2006 Adjusted Earnings Per Share Increased 22 Percent
To $1.04
    Page 16

**Amgen Inc.**
**Reconciliation of "Adjusted" Earnings Per Share Guidance to GAAP**
**Earnings Per Share Guidance for the Year Ending December 31, 2006**

|  | 2006 |
|---|---|
| "Adjusted" earnings per share guidance – excluding stock option expense | $ 3.85 – $3.95 |
| Known adjustments to arrive at GAAP earnings: | |
|     Write–off of Abgenix acquired in–process research & development (1) | (0.93) |
|     Amortization of acquired intangible assets – primarily ENBREL (2) | (0.18) |
|     Stock option expense (3) | (0.12 – 0.14) |
|     Amortization of acquired intangible assets, XenoMouse® technology (4) | (0.03) |
|     Impairment of a non–ENBREL related intangible asset (5) | (0.03) |
|     Abgenix merger–related incremental compensation (6) | (0.01) |
|     Tularik merger–related incremental compensation (7) | (0.01) |
|     Write–off of Avidia acquired in–process research & development and other merger–related expenses (8) | — |
| GAAP earnings per share guidance | $ 2.52 – $2.64 |

(1)    To exclude a one–time expense associated with writing off acquired in–process research and development related to the acquisition of Abgenix on April 1, 2006.

(2)    To exclude the ongoing, non–cash amortization of acquired intangible assets, primarily ENBREL, related to the Immunex acquisition. The total 2006 non–cash charge is currently estimated to be approximately $321 million, pre–tax.

(3)    To exclude the estimated stock option expense associated with Amgen's adoption of SFAS No. 123R on January 1, 2006.

(4)    To exclude the ongoing, non–cash amortization of the intangible asset, XenoMouse® technology, acquired with the Abgenix acquisition. The non–cash charge for 2006 is currently estimated to be approximately $48 million, pre–tax.

(5)    To exclude the impairment of a non–ENBREL related intangible asset previously acquired in the Immunex acquisition.

(6)    To exclude the incremental compensation provided to certain Abgenix employees associated with their retention.

(7)    To exclude the incremental compensation provided to certain Tularik employees associated with their retention.

(8)    In connection with the pending acquisition of Avidia, Inc. ("Avidia"), Amgen will incur a one–time expense associated with writing off acquired in–process research and development. In addition, Amgen will incur other merger–related expenses. As the final amount of such expenses has not yet been determined, no adjustment is reflected above.

Amgen's Third Quarter 2006 Adjusted Earnings Per Share Increased 22 Percent
To $1.04
   Page 17

**Amgen Inc.**
**Reconciliation of "Adjusted" Research and Development Expense Guidance to GAAP Research and Development Expense Guidance for the Year**
**Ending December 31, 2006**
**(In millions)**

|  | 2006 |
|---|---|
| "Adjusted" research and development expense guidance | $ 2,993 – $3,223 |
| **Known adjustments to arrive at GAAP earnings:** |  |
|   Amortization of acquired intangible assets, XenoMouse® technology (1) | 48 |
|   Abgenix merger–related incremental compensation (2) | 12 |
|   Tularik merger related incremental compensation (3) | 7 |
|   Avidia merger related expenses (4) | — |
|   Stock option compensation (5) | — |
| **GAAP research and development expense guidance** | $ 3,060 – $3,290 |

     **Note: The guidance for both "Adjusted" and GAAP research and development expense excludes one–time expenses associated with writing off acquired in–process research and development related to the acquisition of Abgenix in April 2006 and the pending acquisition of Avidia. The amount of such expense was $1,101 million for the Abgenix acquisition. For the Avidia acquisition, the amount of such expense has not yet been determined. For GAAP reporting purposes, charges relating to acquired in–process research and development are reported separately from research and development expense on the consolidated statements of operations.**

(1)    In connection with the ongoing, non–cash amortization of the intangible asset, XenoMouse® technology, acquired with the Abgenix acquisition. The non–cash charge for 2006 is currently estimated to be approximately $48 million, pre–tax.

(2)    In connection with the incremental compensation provided to certain Abgenix employees associated with their retention. Substantially all related amounts have been incurred.

(3)    In connection with the incremental compensation provided to certain Tularik employees associated with their retention.

(4)    In connection with the pending acquisition of Avidia, Amgen will incur research and development merger–related expenses. As the final amounts of such expenses have not yet been determined, no adjustment is reflected above.

(5)    In connection with Amgen's adoption of SFAS No. 123R on January 1, 2006, Amgen began expensing stock option compensation. As the final amounts of such expenses have not yet been determined, no adjustment is reflected above.

Created by 10KWizard   www.10KWizard.com

# EXHIBIT F

1           IN THE UNITED STATES DISTRICT COURT
            IN AND FOR THE DISTRICT OF DELAWARE
2

3                            - - -

AMGEN, INC., a Delaware corporation; :    CIVIL ACTION
4    IMMUNEX CORPORATION, a Washington    :
     Corporation; AMGEN USA, INC., a      :
5    Delaware corporation; AMGEN          :
     MANUFACTURING, LIMITED, a Bermuda    :
6    Corporation; and IMMUNEX RHODE ISLAND:
     CORPORATION a Delaware corporation,  :
7                                         :
                      Plaintiffs,         :
8         v                               :
                                          :
9    ARIAD PHARMACEUTICALS, INC.,         :
     a Delaware corporation               :
10                                        :   NO. 06-259 (KAJ)
                      Defendant.
11                           - - -

12                   Wilmington, Delaware
             Friday, November 3, 2006 at 9:30 a.m.
13                   MOTION HEARING

14                           - - -

15   BEFORE:       HONORABLE **KENT A**. **JORDAN**, U.S.D.C.J.

16                           - - -

     APPEARANCES:
17

18           YOUNG CONAWAY STARGATT & TAYLOR, LLP
             BY:  MELANIE K. SHARP, ESQ.
19
                 and
20
             KIRKLAND & ELLIS, LLP
21           BY:  MARK A. PALS, ESQ.,
                  MARCUS E. SERNEL, ESQ., and
22                ERICK S. OTTOSON, ESQ.
                  (Chicago, Illinois)
23
                      Counsel for Plaintiffs
24

25                           Brian P. Gaffigan
                             Registered Merit Reporter

2

APPEARANCES:   (Continued)


                    ASHBY & GEDDES
                    BY:  STEVEN J. BALICK, ESQ.

                         and

                    IRELL & MANDELLA, LLP
                    BY:  DAVID I. GINDLER, ESQ., and
                         AMIR A. NAINI, ESQ.
                         (Los Angeles, California)

                              Counsel for Defendant



                              - oOo -

                         P R O C E E D I N G S

                    (REPORTER'S NOTE:  The following motion hearing
          was held in open court, beginning at 9:30 a.m.)
                    THE COURT:  Good morning.  Please be seated.
                    (The attorneys respond, "good morning, Your
          Honor.")
                    THE COURT:  We're here to talk about a few
          things.  The thing I want to talk about first is the motion
          for certification.  So this is ARIAD's motion.  Why don't I
          go ahead and hear from you folks first.
                    MR. GINDLER:  Good morning, Your Honor.  David
          Gindler from Irell & Manella arguing for ARIAD.
                    THE COURT:  All right.
                    MR. GINDLER:  Your Honor, every day

3

1    universities, large and small, license patents which are

2    the result of inventions by their faculty.  This is not an

3    unusual event.  And many of those inventions are the result

4    of federal funding.  And that means the Bayh-Dole Act kicks

5    in, and that means that the universities have an obligation,

6    and that obligation is to take appropriate steps to

7    commercialize the invention.

8              THE COURT:  I don't think anybody is disagreeing

9    with that.  Please address the point that the folks on the

10   other side are asserting, which, as to this, it seems to me

11   to be there really is no tension here because these guys

12   went beyond licensing discussions.

13             MR. GINDLER:  That is exactly where I'm going.

14             THE COURT:  Okay.

15             MR. GINDLER:  So there is an obligation to

16   license.  And if there is an exclusive license granted, that

17   obligation must be passed on to the exclusive licensee.  So

18   ARIAD, of course, has no choice but to go out and

19   aggressively pursue licensing activities.

20             Now, the question is did ARIAD cross the line,

21   as you put it?  And is there a substantial question which

22   warrants certification?  And I think the answer to the

23   first question is, no, they didn't cross the line.  And the

24   answer to the second question is, yes, there is a basis for

25   certification.

4

```
 1              Here is the issue.  There is one line of cases,
 2    exemplified by Capo which states essentially -- and Your
 3    Honor quoted this at the hearing -- if there is a direct
 4    accusation of infringement, that that alone can do it.  That
 5    alone can create the necessary prerequisite for declaratory
 6    judgment jurisdiction.
 7              There is another line of cases which start with
 8    the Phillips case, which actually comes a number of years,
 9    almost I think 10 years before the Capo case.  That case
10    says as long as the parties are engaged in actual work
11    proposed, good faith licensing negotiations, there is no
12    case or controversy until those negotiations break down.
13              More importantly, cases after Phillips have
14    made clear that those discussions are inevitably going to
15    include statements by the patent lawyer, statements by the
16    exclusive licensee that the reason you should take a license
17    is because you're practicing our invention.  That is a
18    statement which would be made ultimately in 95 percent of
19    any negotiations.  Moreover, no licensee, no exclusive
20    licensee, no patent holder is ever going to say I'm in
21    negotiations but, you know what?  If they don't work out,
22    don't worry about it because we're not going to enforce
23    our patent.  And as a result, there is a lot of case law
24    following the Phillips case which says that statements
25    that have been found to create a reasonable apprehension
```

1    if done outside of the licensing context do not create a

2    reasonable apprehension if said within the licensing

3    context.

4            So what happens in this situation?  Here, we

5    have a situation where ARIAD, as the exclusive licensee,

6    has to take on the Bayh-Dole obligations of the

7    universities.  They must go out and engage in licensing

8    activities and not just half-hearted licensing activities.

9    They have to go out and take vigorous steps, diligent steps

10   to license the patent.  They have no choice.  That means

11   they have to try and identify people who might be within

12   the scope of the patent rights and identify parties who

13   should be taking a license and then to try to open up

14   those negotiations.

15           THE COURT:  Your papers on that are pretty

16   clear.  Let me ask you this.  The other side makes a couple

17   points I would like you to respond to.

18           MR. GINDLER:  Yes, Your Honor.

19           THE COURT:  First, they say, and for sake of

20   brevity, please, no one take offense, I'm not attempting, by

21   shortening stuff up, to give short shrift or mischaracterize

22   but they seem to be saying something to the effect of, hey,

23   the real underlying pitch here is we, at ARIAD, we're a

24   small company and we're real busy with this important late

25   stage experimentation and FDA approval process that we're in

1    and you should cut us a break for that.  And they seem to

2    be saying, on the Amgen side, you haven't supported that

3    with anything and you should have; and in any event, it's

4    not really material.  So I want you to talk about that.

5                   MR. GINDLER:  I'm happy to, Your Honor.

6                   It is, I would agree, not material to the

7    question of whether or not this Court in the first instance

8    either has declaratory judgment jurisdiction or, if it has

9    it, whether it should exercise discretion to decline

10   jurisdiction.  It's not one of the factors.  We didn't argue

11   it previously because the case law I think is pretty clear

12   about what is appropriate and about what is not appropriate.

13                  The size of ARIAD or how much money it has or

14   anything else isn't appropriate to the initial question of

15   whether or not there is Article III jurisdiction, whether or

16   not this Court should properly exercise its jurisdiction if

17   there is Article III jurisdiction.  And we didn't argue

18   that.

19                  This fact comes up only in the following

20   context.  There is a standard that we have to meet under

21   1292(b) as to whether or not this is an order which falls

22   within the parameters of something that can be subject to

23   interlocutory review.  But even if it meets those tests,

24   Your Honor has discretion to make a decision.  And the

25   question then is what augurs, one way or the other, as to

1    whether they should be in the field now or later.  Because

2    I think anyone would agree that this is going to be a

3    substantial question and it would be a terrible waste to

4    have a Federal Circuit ultimately decide, after millions

5    and millions of dollars have been spent, that in fact there

6    wasn't declaratory judgment jurisdiction.  The impact that

7    the cost of this litigation could have on ARIAD is not

8    theoretical and it is not unsupported.  In ARIAD's public

9    filings, it has stated that the cost of patent litigation,

10   if unanticipated, could affect its ability to bring products

11   to market.

12          THE COURT:  And what is your response to their

13   assertion that your comments -- and I don't have it right in

14   front of me.  This is page 14 of the opposition brief.

15          "ARIAD bases nearly its entire argument for

16   exercising this Court's discretion on allegations

17   (unsupported by any evidence) that this case will deplete

18   Ariad's resources from bringing its late stage cancer drug

19   to the market."

20          Go ahead, hit back.  What have you told me in

21   the way of evidence that will help me understand this?

22          MR. GINDLER:  All the evidence that we provided

23   to Your Honor is evidence which we have derived from ARIAD's

24   public filings which have to be filed with certifications by

25   CEO and the CFO.

```
 1              THE COURT:  But point me at what is in the

 2    record.  If there is something in the record, point me to

 3    what is in the record.

 4              MR. GINDLER:  Absolutely, Your Honor.  Let me

 5    read you an excerpt from one of the public filings I just

 6    referenced in our brief.

 7              THE COURT:  Which is referenced in your brief?

 8              MR. GINDLER:  Yes, it's quoted in the brief.

 9    There is an exact citation given to the exact public

10    reference.

11              "Significant expenditures to enforce our patent

12    right, without generating revenues or accessing additional

13    capital or funding, could adversely impact our ability to

14    further our clinical programs and our research and

15    development programs at the current levels or a level that

16    may be required in the future."

17              THE COURT:  Okay.

18              MR. GINDLER:  And, moreover, in terms of ARIAD's

19    prospects to get money in the future, ARIAD said -- again,

20    I'm quoting from the same document.  ARIAD expects to incur

21    "substantial and increasing operating losses for the

22    foreseeable future, primarily due to costs associated with

23    our pharmaceutical product development programs, including

24    costs for clinical trials and product manufacturing,

25    personnel and intellectual property protection."
```

```
 1              All the information that we have derived, a
 2     factual basis for the statement that we made about
 3     jeopardizing the clinical program for this promising drug,
 4     are all derived from public statements we have made in SEC
 5     filings.  This is a company which has essentially no revenue
 6     other than debt and very modest licensing.  That is not
 7     unusual for a startup biotechnology company because it costs
 8     a lot of money to bring a product to market.  And until you
 9     have a product on the market, you are in a loss situation,
10     and that is exactly the situation facing this company.
11              THE COURT:  Okay.  Now, they've also dropped in
12     a footnote saying, well, this won't save money because they
13     haven't moved for a stay of discovery.  They're assuming a
14     stay of discovery.  And, in fact, if you let them take this
15     up, it will increase costs because they'll be pursuing an
16     appeal while they're pursuing this case.  Hit back.
17              MR. GINDLER:  I read that.  Yes, I read that.
18     We have the ability to ask Your Honor, if Your Honor is
19     going to grant certification --
20              THE COURT:  And I assume you would ask, right?
21              MR. GINDLER:  We would in fact ask for a stay.
22              THE COURT:  Could I take it that you are asking
23     for a stay?
24              MR. GINDLER:  If Your Honor is going to grant
25     it, we're going to ask you, here today, for a stay of
```

1    discovery; in fact, for a stay of the case.  In fact, I

2    would have to make that request because I can make the same

3    request to the Federal Circuit, if Your Honor does not

4    agree, but I have to ask Your Honor first under Rule 8 of

5    the Federal Rules of Appellate Procedure.

6              THE COURT:  Yes, I know.

7              MR. GINDLER:  I know you know.  So as a result,

8    I don't think there is any surprise to anyone that what

9    we're going to ask for is to have this review now rather

10   than later and to have the case stayed.  Nothing bad is

11   going to happen to Amgen if it has to wait to find out if,

12   in fact, they really did have reasonable apprehension, which

13   we think they do not, but that will be the issue that the

14   Federal Circuit will decide.

15             THE COURT:  Now, let me roll you back to

16   another topic.  You make a point in one of the footnotes in

17   your briefing that -- let me be more polite and put it this

18   way.  You asserted that the Court, I had blown past the

19   requirement that there be a showing of present action that

20   could constitute infringement.  Your pitch and your argument

21   there seemed to be Amgen had the burden of proof.  The fact

22   that we, ARIAD, said nothing doesn't mean that they don't

23   have to put some proof in the record on this point.  And I

24   was a little puzzled by that because my recollection of the

25   evidence was that there was a specific comment made about

1   Enbrel which, of course, would indicate -- I believe it's

2   the "Enbrel is next on the list" or something to that

3   effect.  You may need to help me with the specific comment,

4   but "Enbrel is on the list" I think was the comment, with

5   which I think the rational interpretation of that is they're

6   not talking about a hypothetical thing, they're not picking

7   a trade name with no product behind it to comment on.  That

8   there actually is a product out there called Enbrel.

9            MR. GINDLER:  Indeed, there is.

10           THE COURT:  And there was slides that were

11  shown at the Lilly trial which had Enbrel and Kineret on the

12  slides.  Once again, I think the rational inference is these

13  are real things.  They're not internal memoranda that ARIAD

14  created talking about trade names that they though one day

15  their opponents might put a product behind.  So if those

16  things are in the record, and you never said anything about

17  it to contradict it, I'm a little bit of a loss, where do

18  you all come from saying there is nothing in the record to

19  support the understanding that these are real products?

20           MR. GINDLER:  There is not a question, Your

21  Honor, whether or not these are real products.  Of course,

22  they're real products.  Enbrel and Kineret have both been

23  on the market for a little while and one can look at their

24  sales.  That is not the issue.  Companies generally don't

25  bring lawsuits hopefully over products that don't exist.

1          But the question is while all the information

2     that Your Honor is pointing to, the comment attributed to

3     Ms. Carson that "Enbrel is on the list" and the board slides

4     which identified Enbrel, Kineret as products which the

5     company had made attempts to obtain licenses for, that just

6     goes to, at most, the reasonable apprehension.  In other

7     words, the test for declaratory jurisdiction has two parts.

8     One part focuses on what we do, and one part focuses on what

9     Amgen does.

10          So the question is not do they make Enbrel and

11     Kineret.  The answer is yes, of course they do.  It's

12     undisputed.  The question, though, is different.  The

13     question is:  Have they met their requirement of showing

14     that they are presently engaged in activity that is

15     infringing the patents or within the sphere of infringing

16     the patents?  They have to have --

17          THE COURT:  They don't have to come in and say

18     we're infringers.

19          MR. GINDLER:  Of course not.

20          THE COURT:  That's not what you're asserting;

21     right?  Isn't the standard they have to come in and say,

22     we're doing things, we're taking concrete steps, we're doing

23     something in the real world that is stuff that an argument

24     about infringement could be made.  And, in fact, we're

25     being, stepping to the second prong, given vibes by the

1    other side that that is in fact what they think.

2              MR. GINDLER:  I thin, it's a little more than

3    that, Your Honor.  In other words, they don't have to come

4    in and say, yes, we're infringing.

5              THE COURT:  Well, what do they have to do,

6    Mr. Gindler?

7              MR. GINDLER:  For example, if Enbrel was a

8    paper clip, they could come in and say we're not engaging

9    in activities that could possibly infringe because we make

10   paper clips.  Or, they could come in and say there is

11   absolutely no evidence that our product in any way inhibits

12   NF-kB activity.  It's just not that kind of product because

13   it's rubbing alcohol.  So they could point out what they're

14   doing just isn't within the possible sphere of anything

15   covered by a patent.

16             THE COURT:  Isn't the fact these things are

17   discussed by your client's slide and the fact that there is

18   this comment about "Enbrel is on the list," although you

19   dispute about whether it was said or not, are those not

20   factors that a judge could look at to say whether or not

21   there is an infringement going on at the base level we're

22   talking about for trying to figure out whether there is

23   declaratory judgment jurisdiction?  I have to ignore that?

24   I mean you wouldn't put Enbrel on the list if it was a paper

25   clip or rubbing alcohol product, you would have put it on

 1   the list because you thought it was a product that had to do

 2   with your patent; right?

 3                MR. GINDLER:  Of course.  But if you do it that

 4   way, then the other part of the test just resolves away.

 5   Because whenever somebody engages in activity where they are

 6   saying look, you need to take a license, if they make that

 7   comment, then one could just sort of say, well, the other

 8   side must be engaging in this activity.

 9                What I was going to say, in direct response to

10   Your Honor's question, is that there is no case that I'm

11   aware of which says that the kind of evidence that Your

12   Honor is referring to is sufficient to satisfy the other

13   prong.

14                Moreover, this is a case where we are on record

15   of having said, and there is nothing in the record to the

16   contrary, which is when this action was filed, we don't have

17   a clue as to whether or not Enbrel or Kineret are actually

18   infringing.  All that we knew is that they had publications

19   which talked about inducing or, excuse me, modulating or

20   inhibiting NF-kB activity, and that is how it sort of got on

21   the list of products to look at.  But we don't know, and we

22   said that.  Dr. Berger testified to that at the Lilly trial.

23   So the evidence in the record is we don't know, but we went

24   and approached them because they're one of the companies

25   that we approached.  But whether in fact they are in the

1    sphere of potentially infringing, you know, that is an

2    evidentiary burden.

3              THE COURT:  Well, is there anything else you

4    want to tell me before I give the podium over to folks on

5    the other side?

6              MR. GINDLER:  I wanted to just say a couple of

7    very brief things.  I do think this case really is one of

8    first impression.  We looked high and low for any case

9    that discussed the question how does one think about the

10   reasonable apprehension test in the context where a party

11   that is seeking to license the patent has obligations under

12   a federal law to go and license the patent.  What is the

13   interaction between the Bayh-Dole Act and the reasonable

14   apprehension test?  So we thought that would be pretty

15   helpful to find out.  And, in fact, we can't find actually

16   any case that actually addresses the interaction, what

17   happens.

18              I think this is one of those instances where we

19   have a case of first impression where we have a company

20   which is engaging in exactly what it's supposed to do as the

21   exclusive licensee of a federally funded invention.  It has

22   to go out and it has to make efforts to commercialize the

23   invention.  It has done so by trying to license.  It never,

24   ever took its licensing proposal off the table.  Never,

25   ever.  It was left at Amgen saying we'll get back to you.

1    And in the I think four years that elapsed between "we'll

2    get back to you" and when they filed this action, there was

3    not a single remark that anyone could construe as being

4    threatening except for the alleged remark made after this

5    action was filed which Your Honor has said is not relevant

6    and which is not relevant.  And as a result, licensing

7    negotiations did not break down.  Nor is there any finding

8    in the record that we weren't proceeding in good faith, that

9    our aim is not to license.

10                   THE COURT:  Okay.

11                   MR. GINDLER:  I want to add one other fact and

12    then I'll be quiet.

13                   Your Honor did give weight to the fact that

14    ARIAD had run a lawsuit against Lilly.  And that factored

15    into Your Honor's decision.  But a fact that should also be

16    considered is that ARIAD did not seek either a preliminary

17    or a permanent injunction against Lilly.  All that it had

18    sought was a royalty.  That is because that is what the

19    company is supposed to do.  It's supposed to go out and

20    license a patent.

21                   THE COURT:  That is an interesting thing.  So

22    is your argument that if the remedy a patentee seeks or

23    an exclusive licensee seeks is a royalty instead of an

24    injunction, that that impacts on whether there is

25    declaratory judgment jurisdiction?

```
 1              MR. GINDLER:  In effect, yes, because if you

 2    look at the case law where courts have decided what crosses

 3    the line, what is good enough or not good enough, one of the

 4    things the courts have said, cases like IBMC, which has said

 5    if there really is a threat that someone's production of a

 6    product is going to be shut down, that is the implication,

 7    if we don't make a deal, then that is a factor to be

 8    considered.

 9              Well, since Your Honor has pointed to the Lilly

10    litigation, the question is does the Lilly litigation give

11    rise to an apprehension on the part of Amgen that the goal

12    of ARIAD and the goal of MIT and Harvard, the Whitehead

13    Institute, is to take Enbrel and Kineret off of the market.

14    All we want to do is seek a preliminary or a permanent

15    injunction.  And there is no basis, in looking at the Lilly

16    case, that would be our goal and there is no basis in the

17    record, from looking at any of the parties' exchanges, that

18    we had any other desire other than to get them to take a

19    license and to engage with us in licensing negotiations.  If

20    you look at it in that context, all we have are good faith

21    licensing negotiations.

22              THE COURT:  Okay.

23              MR. GINDLER:  Thank you, Your Honor.

24              THE COURT:  Thanks.

25              Mr. Pals.
```

1           MR. PALS:  Good morning, Your Honor.

2           THE COURT:  Good morning.

3           MR. PALS:  It appears we're back rearguing

4    reasonable apprehension in connection with Mr. Gindler's

5    comments on arguments never previously raised.  I will start

6    with the certification issue and then, to the extent the

7    Court has interest, address his comments on seeking damages

8    only, which is a novel theory I've never seen or heard

9    before and certainly doesn't remove an apprehension of suit.

10   It's not reasonable apprehension of an injunction, it's a

11   reasonable apprehension of suit.

12          THE COURT:  All right.  And let's do move

13   through the three 1292(b) factors.

14          First, would you agree there is a controlling

15   question of law here?

16          MR. PALS:  I think under the Third Circuit

17   standard, Your Honor, controlling question of law has been

18   read fairly broadly.  In your case, the Hurst case talks

19   about that as well, quotes that standard from the Third

20   Circuit.

21          The issue then I think becomes whether there is

22   a substantial ground for a difference of opinion as to a

23   controlling question of law.  What we're talking about

24   here is in the context of obviously a denial of a motion

25   to dismiss for lack of subject matter jurisdiction.

1           We pointed out in our opposition brief that

2     there is not a single case cited in now six briefs or raised

3     in two oral arguments that is a Federal Circuit case, it's

4     a patent DJ case, dealing with the denial of a motion to

5     dismiss for lack of subject matter jurisdiction.  We said

6     that in our most recent opposition brief, and ARIAD still

7     hasn't come up with anything.

8           THE COURT:  Well, I guess I'm not terribly

9     surprised at that because sort of by definition, if they

10    don't get to appeal, then don't you end up, when there

11    finally is an appeal, talking about the merits more

12    particularly than the denial of the subject matter

13    jurisdiction case?

14          MR. PALS:  I think you just proved my point,

15    which is you said "if they don't get to appeal," and that is

16    my point.  You don't get to appeal a denial of a motion to

17    dismiss for lack of subject matter jurisdiction.

18          We cited the Intel case in our opposition brief,

19    which is a patent case.  It's a declaratory judgment case.

20    The District Court considered two issues:  one is for

21    immunity and one is the same DJ analysis this Court has gone

22    through.  Was there a reasonable apprehension of suit, et

23    cetera?  That case went up to the Federal Circuit.  The

24    Federal Circuit looked at it and the Federal Circuit said on

25    immunity, we affirm.  This party is not immune, therefore,

1      this case should go forward.

2              On the other ground, the Court said -- so

3      picking up of the first point, under the collateral order

4      doctrine.  I'm sorry.  This is the Intel case and I'm

5      quoting at page 1369.  "Under the Collateral Order Doctrine,

6      the denial of immunity is typically appealable immediately."

7      So that is the immunity aspect of it.  "In contrast, the

8      denial of a motion to dismiss for lack of subject matter

9      jurisdiction on other grounds is generally not subject to

10     interlocutory appeal."

11             It dismissed the appeal on the DJ question and

12     said, at Page 1371, "the orders denying CSIRO's motions to

13     dismiss are otherwise not properly reviewable on

14     interlocutory appeal."

15             THE COURT:  Well, I obviously didn't frame my

16     question very well.  The position you are taking, I guess,

17     help me out, is there could never be a circumstance where a

18     District Court would say, hey, this is a real close question

19     and I don't want to put the parties to litigation that will

20     cost in the millions of dollars only to discover at the end

21     of the day I didn't have subject matter jurisdiction.  So

22     before we do that, we'll let the Federal Circuit have a

23     crack at it.

24             If I understand what you have just said, the

25     position Amgen is taking is the Federal Circuit will kick

1    this back immediately because they don't view that kind of

2    question as one that they ought to be looking at.  Did I

3    hear you right?

4              MR. PALS:  You did, Your Honor.  I believe

5    the Federal Circuit will kick this back because it is not

6    subject to interlocutory appeal.

7              THE COURT:  All right.

8              MR. PALS:  We cited the Daupel case in our first

9    round of briefing on DJ jurisdiction.  That's a case that

10   went up after the trial on necessary indispensable parties

11   issues and was heard at that point on those issues.  So it's

12   similar kinds of, I mean it's this set of disputes that

13   we've been talking about.  But I think the Federal Circuit

14   bounces this back and says this is not one of those

15   questions.

16             THE COURT:  Now, put the Bayh-Dole question into

17   the mix, something Mr. Gindler presents as a matter of first

18   impression.  Here is a company that is obligated to, and I

19   believing I'm quoting him accurately, aggressively seek

20   licenses.  They are compelled to do that.  And sort of the

21   import of the argument is, what is a nice company to do?

22   We've got this law telling us to go out and license, and

23   then when we do it, people sue us for declaratory judgment.

24   Respond to that, will you?

25             MR. PALS:  Yes.  The Bayh-Dole Act has nothing

1   to do this with this.  The Bayh-Dole Act does not require

2   them to aggressively pursue licensing the patent.  Under

3   the Bayh-Dole Act, what they are to do is to use, they're

4   supposed to go out and use reasonable efforts to

5   commercialize.  They're encouraged to commercialize their

6   license.  They're supposed to either commercialize

7   themselves, they're supposed to use the patented technology,

8   which they don't do, or they're supposed to attempt to

9   license.

10          They have no obligation to go out and threaten

11   suit.  They had no obligation to sue anybody.  They have no

12   obligations to do the types of things that they do.  The

13   Bayh-Dole Act simply operates in the context in which it

14   operates and encourages someone like ARIAD to license the

15   technology and commercialize the technology.  It doesn't

16   require what they've done in this case.

17          THE COURT:  It's accurate, isn't it, that when

18   the Federal Circuit, either on interlocutory basis or at the

19   end of the case, looks at jurisdiction, if it's still a

20   matter that is contested, it's going to look at that de

21   novo; right?  I mean the other side cited cases that the

22   question of whether there is an actual controversy is a

23   question of law as to which the Federal Circuit will

24   exercise de novo review.  Do you disagree with that?

25          MR. PALS:  I do disagree with that.  They'll

 1    look at the underlying factual findings and those are

 2    reviewable for clear error.

 3              THE COURT:  The ultimate question will be a

 4    question of law but there will be clear error review for

 5    factual findings of the Court.  That is what you're telling

 6    me?

 7              MR. PALS:  Yes.  I believe I understand what

 8    you are saying.  The ultimate question is a question of the

 9    Federal Circuit will review but the underlying factual

10    findings are reviewable only for clear error.

11              THE COURT:  And then I'd like you to address the

12    question of whether or not the Court in the first instance,

13    had -- I, in the first instance, had evidence in the record

14    that I could properly rely on to satisfy the first prong of

15    the DJ test, that is, present activity that could constitute

16    infringement.

17              MR. PALS:  I completely disagree with

18    Mr. Gindler's take on that, on that standard and completely

19    agree with Your Honor on what the cases say.  It does not

20    require that we come in and say we are infringing.  It does

21    not require that we come in and say we are doing things

22    that may infringe.  What it requires is that we'd be doing

23    something currently or making substantial preparation to do

24    something that could be argued to fall within or could --

25    it's sort of an interplay between reasonable apprehension

1    and this prong.  This prong requires that we'd be currently

2    or making substantial preparations to do this thing.

3          We obviously deny that we infringe the claims of

4    the patent.  But we're not talking about the paper clips,

5    we're not talking about rubbing alcohol, we're talking about

6    drug products -- drug products that Ms. Carson and their

7    slides have indicated they believe relate to their patent

8    rights.  There is no dispute, and the record has evidence in

9    it, that we are, and Mr. Gindler admits, we are marketing

10   Enbrel and we are marketing Kineret.  Those are the present

11   activities, and that is all that is required.

12         THE COURT:  How about materially advancing the

13   termination of the litigation?  Assume for the sake of

14   discussion that I disagree with you about the question of

15   substantial ground for difference of opinion as to the

16   controlling question and that we were looking at the

17   question of materially advancing the termination of

18   litigation.  What is your take on that?

19         MR. PALS:  I think if you take the Bayh-Dole

20   Act, for example, and you say there has been no case law

21   reconciling the Bayh-Dole Act and the DJ Act, I actually

22   suggest there is probably a whole bunch of statutes that

23   haven't been reconciled or addressed in the context of the

24   DJ Act but they have nothing to do with it.

25         The point here is even if there isn't a case

1   reconciling the Bayh-Dole Act and the DJ Act, that doesn't

2   mean anything because the Bayh-Dole Act says commercial or

3   reasonable efforts to commercialize or what have you.  It

4   doesn't say threaten people with suit.  Say Enbrel is on the

5   list.  These slides are displayed with Enbrel and Kineret

6   showing them on the list.  It doesn't tell ARIAD to do these

7   activities that ARIAD has done.  So at the end of the day,

8   it doesn't make any difference whether there is a case that

9   addresses those or not.

10          THE COURT:  Okay.  Is there anything else you

11  want to talk to me about, about this?  Oh, there is

12  something I wanted to ask you.  Talk to me about the stay

13  of discovery which I'm told they're in effect making if I

14  grant the interlocutory appeal motion.

15          MR. PALS:  Your Honor, if they do request that,

16  and if we get to that point in the discussion, we'd request

17  briefing on it.  But briefly, what they're asking for is a

18  stay and it's for the purpose of the DJ Act.  The DJ Act is

19  there so that parties like Amgen can eliminate this cloud

20  of uncertainty of injunctions and cloud of uncertainty of

21  litigation and damage and so forth.  And a stay in a case in

22  which Your Honor has found the DJ statute to be satisfied

23  and a reasonable apprehension to exist subverts that policy

24  and puts us in a position where we have another 12 or 15,

25  however many months of uncertainty while we wait for the

1    Federal Circuit.

2                    THE COURT:  All right.  Thanks.

3                    Mr. Gindler, I'll give you a response.

4                    MR. GINDLER:  Your Honor, the first alleged

5    threat, if you accept everything that Amgen says is true,

6    took place over four years ago.  So Amgen apparently has

7    found it satisfactory to live under this cloud of a threat

8    for over four years, and it's even earlier than that if you

9    take our licensing overtures as being part of a threat.  It

10   started more than four years ago.  Amgen has somehow managed

11   to muddle along as the second largest biotech company in the

12   world, has continued to sell lots of Enbrel and lots of

13   Kineret.  I don't think the stakes are going to change if

14   the Court decides to stay this action while the Federal

15   Circuit decides whether or not to take it, and if the

16   Federal Circuit takes it, to stay until they make their

17   own decision.

18                    I don't think Amgen's counsel also answered

19   really Your Honor's question about what I'll call a third

20   part of the 1292(b) test, which is will the resolution of

21   this controlling question of law materially advance the

22   case?  And the answer is, well, sure, it will.  Because

23   it wins the case if in fact there is no subject matter

24   jurisdiction.  That is it beginning and ending of any

25   action.  You've got to have subject matter jurisdiction.

1    So, in effect, in a case like this, we said in our papers

2    the first and third prongs are almost always met.  The

3    question is really the second prong, which is, are there

4    substantial grounds for a difference of opinion?

5                THE COURT:  Now, respond to Mr. Pals' statement

6    that you haven't cited a single case when it comes down to

7    really a question of what does the record show about the

8    behavior of the patentee or exclusive licensee being taken

9    by the Court on appeal; not even a matter of whether they

10   won but if the Federal Circuit would take the case or would

11   it kick it back.

12               MR. GINDLER:  Your Honor, that is simply a

13   matter of speculation.  Seeking requests for certification

14   themselves is not typical behavior.  I will have to confess

15   that this is the first time in my 22 years of practice I

16   actually made such a request.  Courts consider it, and

17   then the Federal Circuit considers it, and they'll make a

18   decision.  Every case turns on its own set of facts.  And if

19   this was the very first case ever where certification was

20   granted to the Federal Circuit to consider it, then there

21   always has to be a first case.  I doubt that is the

22   situation.  There could be many orders which are simply are

23   not reported.  We simply don't know.

24               Instead of engaging in that speculation, the

25   question is have we met the standard?  Is there a

1    controlling question of law?  Absolutely.  This is a

2    question of law.  It's reviewed de novo.

3                    THE COURT:  All right.  Thank you, Mr. Gindler.

4                    MR. GINDLER:  Thank you very much.

5                    THE COURT:  Mr. Pals.

6                    MR. PALS:  Your Honor, I apologize.  Could I

7    just briefly address the ARIAD's point that you raised with

8    Mr. Gindler and he discussed regarding their financial

9    condition?

10                   THE COURT:  Sure, and then I'll hear from

11   Mr. Gindler again.

12                   MR. PALS:  I'm sorry.  The point is, Mr. Gindler

13   quoted from their financial statements that are attached

14   I believe to their opening brief.  The quote he read

15   obviously is a very general quote.  I won't denigrate it

16   as boilerplate, but what it doesn't do is it doesn't say

17   anything about the Lilly case or the PTO case or the reexam.

18   It certainly doesn't say it's the Amgen case that is in

19   issue here.

20                   There is simply no evidence.  Our point is

21   there is no evidence that it's this case that is the issue.

22   They have all these other litigations out there, and there

23   is nothing that indicates that it's this case that is in

24   fact going to have this prophecy impact on their drug

25   development.  That's all I wanted to say.

1          THE COURT:  All right.  Do you feel like you

2    need to comment?

3          MR. GINDLER:  I can just comment briefly.  I

4    don't think there is any dispute in the record that this is

5    not a case which ARIAD expected.  There is nothing in its

6    budget and its public disclosures which shows a line item

7    for this case, is anywhere on the company's radar screen.

8    Obviously if the company files a lawsuit on its own, it

9    budgets for it and plans for it and makes a decision that it

10   will not affect other important operations.  This is not

11   that situation.  We didn't start this.  Amgen started this

12   litigation.  That is why this falls into a completely

13   different category.

14         THE COURT:  Well, as you might suspect from my

15   focus on this, out of the disputes that you put before me

16   today, this is the thing that I think is of real moment

17   and significance.  As with the call on subject matter

18   jurisdiction, I think this is a close question.  This is an

19   interesting and a challenging case.  I haven't been doing

20   this judging for 22 years the way Mr. Gindler has been

21   practicing for 22 years but this is the first time I have

22   seen a case that I can recall where I thought you know what?

23   I probably ought to send it up.  I think it makes sense to

24   send it up.  And so I'm going to grant the motion.

25         I think that ARIAD is right that the first and

1    the third prongs here are pretty well established.  This is

2    a controlling question of law.  And if I'm wrong about

3    subject matter jurisdiction, that's the end of the case.  If

4    this were not a case which I expect will take a substantial

5    sum of money to try -- these patent cases, the figures are

6    out there.  They're typically in the millions of dollars in

7    fees and costs.  And I don't see anything that would tell me

8    this is any different.

9              I also have in the record information which I

10   find credible that ARIAD is not a substantial company with a

11   history of success behind it.  It's a startup which is

12   operating, still afloat.  Good for them.  A lot of biotech

13   startups can't say that.  But they're not in the position to

14   easily absorb the kind of costs that are associated with

15   this kind of litigation.  And that is a significant factor

16   in my thinking that I ought to exercise my discretion here,

17   if in fact they meet that second prong, which I will get to

18   in a minute, of the 1292(b) test.

19             So what I have wrestled with here most is that

20   second prong:  Is there a substantial ground for difference

21   of opinion here on a question that the Federal Circuit would

22   accept certification on?  And, Mr. Pals, you may be right.

23   They may look at that and say, gee, what is that guy doing

24   sending this up?  We don't want or need or take these kinds

25   of things.  We're counting on the District Court to make

1    those calls.  I have made the call, and I think I made it

2    right.  But it's not an easy case.  It wasn't an easy call

3    to make when I made it.  It's not made any easier in

4    retrospect as I have gone back and looked at the record.  I

5    still think I was right, but there is certainly a basis for

6    a reasoned disagreement about the conclusion I drew on the

7    facts as I found them.  I said I'm not talking about the

8    facts because I think it is correct that what I determined

9    is subject to clear error.  Maybe the Federal Circuit will

10   say, well, he misunderstood the affidavit that was submitted

11   by Ms. Carson.  She really did deny totally saying what was

12   attributed to her and that makes all the difference.  But I

13   think the record will stand pretty well that I looked at the

14   affidavits and looked at what happened.  I thought it more

15   likely she said what was attributed to her.  I drew some

16   conclusions from that and from the other things that I have

17   already talked about and I thought that's enough.  That's

18   enough to make the cut.

19          But I agree with Mr. Gindler that this is not

20   an area of the law that is perfectly clear because it's a

21   highly fact specific inquiry and sometimes the Federal

22   Circuit says things about it which make you think, well,

23   that would be enough, and other times they say things a

24   person could look at reasonably and say, well, maybe that

25   is not enough.

1          So I add to the mix my own question in my mind

2    which I resolved in favor of Amgen but which I think

3    certainly there is substantial ground for difference of

4    opinion on.  I add to that -- let me back up and say, by

5    "substantial ground for difference of opinion," I'm talking

6    about whether the facts that I found amount enough to say

7    reasonable apprehension of suit.  There is an argument, and

8    it's been well articulated by ARIAD and we don't need to go

9    into it again, that even if you take everything I found as

10   true, it's not enough.  It's not enough to say reasonable

11   apprehension of suit.  But you set that aside for a moment

12   and you also add into the mix here this Bayh-Dole question,

13   which it's true they could be grasping at straws the way

14   Amgen implicitly urges, but I think there is more merit

15   to it than that.  This is not some totally unrelated

16   statute.  There is a statute on point that talks about a

17   responsibility to license and how, if at all, that would

18   impact or screen the kind of licensing behavior that took

19   place here, including enforcement actions which one could

20   argue are a necessary step in making a licensing program

21   credible.

22          It's not a frivolous question to me.  It does

23   have an impact.  So I added it into the mix, I look at it,

24   and I think, you know what?  I think they met the test for

25   1292(b) and that puts me at the point of asking should I

33

1    exercise my discretion?  And I think yes because of two

2    reasons:  One is I am persuaded that I've got a genuine

3    David-and-Goliath thing going here where Goliath has brought

4    David into court and maybe because David stepped in it --

5    not maybe, it is because I found David stepped in it and so

6    they're here by virtue of their own acts.  But if I'm wrong

7    about that conclusion, I don't want litigation itself to be

8    something that can sink this company.  And a suit involving

9    millions of dollars in costs, as patent litigation typically

10   does in fees and costs, has the real prospect of having a

11   more than minimal impact on the existence of a startup.

12           I'm just not prepared to have the process itself

13   become a strategic tool.  I know that happens all the time.

14   I know that this Court and other courts around the country,

15   in intellectual property suits, are part of bigger strategic

16   business plans and maneuvers that we don't know about and

17   frankly don't need to know about.  But the fact that the

18   process itself can be a business tool, it doesn't mean in

19   this instance where -- and I should make it clear, I'm not

20   accusing Amgen of that.  I'm just saying the process itself

21   ought not be what sinks ARIAD here, if in fact I'm wrong

22   that they should be here at all.  So I'm going to give them

23   their crack at making their pitch to the Federal Circuit

24   that, hey, Judge Jordan thought we stepped in it when we

25   were dancing all around the question of threatening suit.

1          Incidently, I should point out, the record of my

2     oral ruling from September 11th is slightly wrong.  There is

3     a statement on page 77, line 11 that says I characterize

4     Mr. Casselman as extremely saddened.  I was saying he was

5     extremely savvy.  That is s-a-v-v-y, I think.  Now, he may

6     be saddened, too, by what I ended up concluding.

7          But I was trying to point out that the record

8     looked to me like these were knowledgeable business

9     executives who understood the risks of declaratory judgment

10    suit and were trying to maneuver around it.  There is this

11    Kabuki dance where people are trying to communicate "I'm

12    coming after you" without saying it the way that is going to

13    let the other side come after them.  It is the state of the

14    law.  It is what it is.  And if it were a perfectly clear

15    picture, we would all know exactly where the line is so we

16    can say "aha," that is it, you stepped over it or you

17    didn't, but we don't know exactly, which is why there is

18    merit to what the position that ARIAD has put in front of

19    me.

20          Did they step over the line?  They say no/I say

21    yes.  There is a substantial ground for difference of

22    opinion here.  That is what makes the Bayh-Dole issue which

23    may affect where the line is something I think the Federal

24    Circuit should take an a crack at, if they want.  And if

25    they say no, we don't think this is something we should take

1   a look at, I won't be upset or disappointed, and I'm sure

2   that Amgen won't, and ARIAD might be, but they'll come back

3   here and we'll move forward.  But I'm going to going to

4   grant the motion for the reasons I have stated.

5          Now, I'm denying without prejudice all these

6   other matters that are before me as moot, and I'm going to

7   grant the request that Amgen has made for briefing on the

8   oral motion to stay discovery because, of course, the risk

9   here is that as Amgen has said, you know, ARIAD will take

10  this thing up and this case will get put in a posture where

11  they have to stay it under a cloud unfairly.  And I think

12  some of the comments I made here already indicate that I'm

13  interested in the process itself not being determinative,

14  but I want to give Amgen a chance to brief their position.

15  I don't want to make a ruling on that without them having a

16  chance to put authorities before me and make their best

17  pitch.  So I'm frank to say I'm inclined to stay but I want

18  to give you your shot at explaining to me why I shouldn't do

19  that, Amgen.

20         So here is what we'll do.  I will ask that since

21  the burden is on ARIAD in this respect that they make their

22  motion to stay discovery promptly with their opening brief,

23  and we'll just go ahead and have briefing on the ordinary

24  local rule schedule, unless you folks want to work out some

25  other sensible schedule to address it.  But in the meantime,

1    since I'm seriously considering it, discovery is stayed

2    while I have this under consideration.

3            Does everybody understand how we're moving

4    forward at this point then?  Mr. Gindler?

5            MR. GINDLER:  Yes, Your Honor.  As I understand

6    it, while the matter is being considered by the Court,

7    discovery is stayed, but only for that time period we're to

8    brief this under the ordinary local rules.

9            THE COURT:  Right.

10           MR. GINDLER:  And unless I left something out

11   with Amgen.

12           THE COURT:  Right.  That's the deal.

13           Okay.  Mr. Pals.

14           MR. PALS:  Understood, Your Honor.

15           THE COURT:  Okay.  Is there anything else we

16   should talk about while we're all here together?

17           MS. SHARP:  Your Honor, there was one other

18   issue with the transcript.  I'm not sure we need to do it on

19   the record.  It was a misidentification of a speaker.  I'm

20   sure counsel can agree.

21           THE COURT:  Then why don't you relay that to

22   Mr. Gaffigan.  All right?

23           MS. SHARP:  (Nodding yes.)

24           THE COURT:  Is there anything else from the

25   defense side?

```
 1              MR. PALS:  No, Your Honor.
 2              THE COURT:  You will get a one-liner that will
 3    confirm, like you did before, that says, "For the reasons
 4    stated in open court, the motion is, and then with the
 5    ruling here, is granted; okay?  We're in recess.
 6              (Motion hearing ends at 10:30 a.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

# EXHIBIT G


10k WIZARD
SEC POWER SEARCH

# FORM 10−Q

## ARIAD PHARMACEUTICALS INC − ARIA

**Filed: August 08, 2006 (period: June 30, 2006)**

Quarterly report which provides a continuing view of a company's financial position

# Table of Contents

## PART I.

FINANCIAL INFORMATION 1
**ITEM 1.**        UNAUDITED FINANCIAL STATEMENTS 1

## PART I.

FINANCIAL INFORMATION
**ITEM 1.**        UNAUDITED FINANCIAL STATEMENTS
**ITEM 2.**        MANAGEMENTS DISCUSSION AND ANALYSIS OF FINANCIAL
                   CONDITION AND RESULTS OF OPERATIONS
**ITEM 3.**        QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET
                   RISK
**ITEM 4.**        CONTROLS AND PROCEDURES

## PART II.

OTHER INFORMATION
**ITEM 1.**        LEGAL PROCEEDINGS
**ITEM 1A.**       RISK FACTORS
**ITEM 4.**        SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS
**ITEM 6.**        EXHIBITS
SIGNATURES
EXHIBIT INDEX
EX–10.2 (EXHIBIT 10.2)

EX–10.3 (EXHIBIT 10.3)

EX–10.4 (EXHIBIT 10.4)

EX–10.5 (EXHIBIT 10.5)

EX–31.1 (EXHIBIT 31.1)

EX–31.2 (EXHIBIT 31.2)

EX–32.1 (EXHIBIT 32.1)

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# FORM 10–Q

|X|  QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934
**For the quarterly period ended June 30, 2006**

OR

| |  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (d)
OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to _____

Commission File Number: 0–21696

# ARIAD Pharmaceuticals, Inc.
(Exact name of Registrant as specified in its charter)

Delaware                                                                         22–3106987
(State or other jurisdiction of
incorporation or organization)                                         (I.R.S. Employer Identification No.)

26 Landsdowne Street, Cambridge, Massachusetts 02139
(Address of principal executive offices) (Zip Code)

**Registrant's Telephone Number, Including Area Code: (617) 494–0400**

Former Name, Former Address and Former Fiscal Year,
If Changed Since Last Report: Not Applicable

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes |X|          No | |

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer or a non–accelerated filer. See definition of "large accelerated filer and accelerated filer" in Rule 12b–2 of the Exchange Act.

**Large accelerated filer | |**                    **Accelerated filer |X|**                    **Non–accelerated filer | |**

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b – 2 of the Exchange Act).

Yes | |          No |X|

The number of shares of the Registrant's common stock outstanding as of August 1, 2006 was 62,107,793.

**ARIAD PHARMACEUTICALS, INC.**

### TABLE OF CONTENTS

| | | |
|---|---|---|
| PART I. | FINANCIAL INFORMATION | 1 |
| ITEM 1. | UNAUDITED FINANCIAL STATEMENTS | 1 |
| | Condensed Consolidated Balance Sheets – June 30, 2006 and December 31, 2005 | 1 |
| | Condensed Consolidated Statements of Operations for the Three Months and Six Months Ended June 30, 2006 and 2005 | 2 |
| | Condensed Consolidated Statements of Cash Flows for the Six Months Ended June 30, 2006 and 2005 | 3 |
| | Notes to Unaudited Condensed Consolidated Financial Statements | 4 |
| ITEM 2. | MANAGEMENT S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 10 |
| ITEM 3. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 19 |
| ITEM 4. | CONTROLS AND PROCEDURES | 21 |
| PART II. | OTHER INFORMATION | 22 |
| ITEM 1. | LEGAL PROCEEDINGS | 22 |
| ITEM 1A. | RISK FACTORS | 24 |
| ITEM 4. | SUBMISSION OF MATTERS TO VOTE OF SECURITY HOLDERS | 27 |
| ITEM 6. | EXHIBITS | 28 |
| | SIGNATURES | 29 |
| | EXHIBIT INDEX | 30 |

Source: ARIAD PHARMACEUTICAL, 10−Q, August 08, 2006

PART I. FINANCIAL INFORMATION

ITEM 1. UNAUDITED FINANCIAL STATEMENTS

### ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES
### CONDENSED CONSOLIDATED BALANCE SHEETS

| *In thousands, except share and per share data* | June 30, 2006 (Unaudited) | December 31, 2005 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 24,499 | $ 25,453 |
| Marketable securities | 29,830 | 56,063 |
| Inventory and other current assets | 2,935 | 2,225 |
| Total current assets | 57,264 | 83,741 |
| Property and equipment: | | |
| Leasehold improvements | 18,058 | 17,840 |
| Equipment and furniture | 10,540 | 9,908 |
| Total | 28,598 | 27,748 |
| Less accumulated depreciation and amortization | (21,825) | (20,022) |
| Property and equipment, net | 6,773 | 7,726 |
| Intangible and other assets, net | 4,501 | 4,707 |
| Total assets | $ 68,538 | $ 96,174 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Current portion of long-term debt | $ 1,920 | $ 1,920 |
| Accounts payable | 5,889 | 3,961 |
| Accrued compensation and benefits | 774 | 497 |
| Accrued product development expenses | 7,350 | 8,444 |
| Other accrued expenses | 3,018 | 2,097 |
| Deferred revenue – current portion | 729 | 851 |
| Total current liabilities | 19,680 | 17,770 |
| Long–term debt | 4,775 | 5,735 |
| Deferred revenue | 13 | 24 |
| Deferred executive compensation | 1,415 | 1,267 |
| Stockholders' equity: | | |
| Common stock, $.001 par value; authorized, 145,000,000 shares; issued and outstanding, 62,097,526 shares in 2006 and 61,698,129 shares in 2005 | 62 | 62 |
| Additional paid–in capital | 322,060 | 318,684 |
| Deferred compensation | | (246) |
| Accumulated other comprehensive loss | (15) | (24) |
| Accumulated deficit | (279,452) | (247,098) |
| Total stockholders' equity | 42,655 | 71,378 |
| Total liabilities and stockholders' equity | $ 68,538 | $ 96,174 |

See notes to unaudited condensed consolidated financial statements.

1

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**

| *In thousands, except share and per share data* | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| License revenue | $ 229 | $ 350 | $ 458 | $ 654 |
| Operating expenses: | | | | |
| Research and development | 10,144 | 12,093 | 21,818 | 22,747 |
| General and administrative | 7,531 | 2,600 | 11,987 | 4,916 |
| Total operating expenses | 17,675 | 14,693 | 33,805 | 27,663 |
| Loss from operations | (17,446) | (14,343) | (33,347) | (27,009) |
| Other income (expense): | | | | |
| Interest income | 574 | 367 | 1,239 | 761 |
| Interest expense | (124) | (107) | (246) | (181) |
| Total other income, net | 450 | 260 | 993 | 580 |
| Net loss | $ (16,996) | $ (14,083) | $ (32,354) | $ (26,429) |
| Net loss per share | $ (.27) | $ (.27) | $ (.52) | $ (.50) |
| Weighted−average number of shares of common stock outstanding | 62,093,353 | 52,901,275 | 61,827,494 | 52,854,653 |

See notes to unaudited condensed consolidated financial statements.

2

Source: ARIAD PHARMACEUTICAL, 10−Q, August 08, 2006

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited)**

| | Six Months Ended June 30, | |
|---|---|---|
| *In thousands* | 2006 | 2005 |
| Cash flows from operating activities: | | |
| Net loss | $ (32,354) | $ (26,429) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 2,344 | 969 |
| Accretion of discount on marketable securities | (973) | (371) |
| Deferred executive compensation expense | 449 | 282 |
| Stock-based compensation | 2,272 | 273 |
| Increase (decrease) from: | | |
| Inventory and other current assets | (710) | 110 |
| Other assets | 3 | (27) |
| Accounts payable | 1,928 | 383 |
| Accrued compensation and benefits | 277 | 127 |
| Accrued product development expenses | (1,094) | 3,135 |
| Other accrued expenses | 921 | 941 |
| Deferred revenue | (133) | 171 |
| Deferred executive compensation paid | (301) | (291) |
| Net cash used in operating activities | (27,371) | (20,727) |
| Cash flows from investing activities: | | |
| Proceeds from sales and maturities of marketable securities | 53,753 | 29,625 |
| Purchases of marketable securities | (26,538) | (10,501) |
| Investment in property and equipment | (860) | (4,100) |
| Investment in intangible assets | (327) | (492) |
| Net cash provided by investing activities | 26,028 | 14,532 |
| Cash flows from financing activities: | | |
| Repayment of borrowings | (960) | (960) |
| Proceeds from issuance of stock pursuant to stock option and purchase plans | 1,349 | 585 |
| Net cash provided by (used in) financing activities | 389 | (375) |
| Net increase in cash and cash equivalents | (954) | (6,570) |
| Cash and cash equivalents, beginning of period | 25,453 | 18,556 |
| Cash and cash equivalents, end of period | $ 24,499 | $ 11,986 |

See notes to unaudited condensed consolidated financial statements.

Source: ARIAD PHARMACEUTICAL, 10-Q, August 08, 2006

ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES
NOTES TO UNAUDITED CONDENSED CONSOLIDATED
FINANCIAL STATEMENTS

**1. Management Statement**

In the opinion of the Company's management, the accompanying unaudited condensed consolidated financial statements contain all adjustments (consisting of items of a normal and recurring nature) necessary to present fairly the financial position as of June 30, 2006, the results of operations for the three–month and six–month periods ended June 30, 2006 and 2005 and cash flows for the six–month periods ended June 30, 2006 and 2005. The results of operations for the six–month period ended June 30, 2006 are not necessarily indicative of the results to be expected for the full year. These financial statements should be read in conjunction with the Company's Annual Report on Form 10–K for the year ended December 31, 2005, which includes consolidated financial statements and notes thereto for the years ended December 31, 2005, 2004 and 2003.

**2. Marketable Securities**

The Company has classified its marketable securities as available–for–sale and, accordingly, carries such securities at aggregate fair value. At June 30, 2006, all of the Company's marketable securities consisted of United States government or agency securities.

At June 30, 2006, the aggregate fair value and amortized cost of the Company's marketable securities were $29,830,000 and $29,845,000, respectively. Gross unrealized gains and losses were $1,000 and $16,000, respectively, at June 30, 2006. The gross unrealized losses of $16,000 pertain to ten marketable securities with an aggregate fair value of $26.9 million, all of which have been in a continuous loss position for less than twelve months.

At December 31, 2005, the aggregate fair value and amortized cost of the Company's marketable securities were $56,063,000 and $56,087,000, respectively. Gross unrealized gains and losses were $9,000 and $33,000 respectively, at December 31, 2005. The gross unrealized losses of $33,000 pertain to fourteen marketable securities with an aggregate fair value of $35.6 million, all of which have been in a continuous loss position for less than twelve months.

The Company's marketable securities with unrealized losses consist of U.S. Treasury and agency securities that are guaranteed by the U.S. government or an agency thereof. The unrealized losses were caused by increased interest rates. Because the Company has the intent and ability to hold the securities to maturity which should result in a recovery of the fair value, the Company does not consider the investments to be other–than–temporarily impaired.

Realized gains and losses on investment security transactions are reported on the specific–identification method. Realized gains and losses on sales of marketable securities were not material during the six months ended June 30, 2006. Changes in market values resulted in a decrease in net unrealized loss of $9,000 for the six–month period ended June 30, 2006.

**3. Executive Compensation Plans**

Under the Company's deferred executive compensation plan established in 1997 (the "1997 Plan"), participants were granted options to purchase shares of certain designated mutual funds at a discount equal to the amount of the award. The options vest equally over four years.

Effective in October 2005, the Company established a new deferred executive compensation plan (the "2005 Plan") and amended the 1997 Plan to meet the new requirements of Section 409A of the Internal Revenue Code. Under the 2005 Plan, the Company may grant deferred performance–based or ad hoc bonuses to its executive officers, key employees and key advisors. Such awards will include vesting and payment provisions, as provided under the terms of the 2005 Plan. The value of amounts deferred under the 2005 Plan will be based on the actual performance of investments designated by the Company from time to time. The Company will recognize expense related to these awards over the vesting period.

4

Total expense related to these plans amounted to $449,000 and $282,000 for the six−month periods ended June 30, 2006 and 2005, respectively.

**4. Net Loss Per Share**

Net loss per share amounts have been computed based on the weighted−average number of common shares outstanding during each period. Because of the net loss reported in each period, diluted and basic per share amounts are the same. For the six months ended June 30, 2006 and 2005, options to purchase 6,907,899 and 5,973,138 shares of common stock, respectively, were not included in the computation of net loss per share, because the effect would have been anti−dilutive.

**5. Stock−Based Compensation**

The Company awards stock options and other equity−based instruments to its employees, directors and consultants and provides employees the right to purchase common stock (collectively "share−based payments"), pursuant to stockholder approved plans. Effective January 1, 2006, the Company adopted Statement of Financial Accounting Standards No. 123 (revised 2004), *Share−Based Payment* ("SFAS No. 123R"), using the Statement's modified prospective application method. Accordingly, prior period results have not been restated.

Under the provisions of SFAS No. 123R, the Company recognizes compensation expense in its financial statements associated with awards of stock options and other equity−based instruments to employees, directors and consultants. Compensation cost is measured based on the fair value of the instrument on the grant date and is recognized over the requisite service period, which generally equals the vesting period. All of the Company's stock−based compensation is based on grants of equity instruments and no liability awards have been granted.

The Company's statement of operations included total compensation cost from share−based payments for the three−month and six−month periods ended June 30, 2006 and 2005 as follows:

| In thousands | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Compensation cost from: | | | | |
| Stock options | $        896 | $        (14) | $     1,880 | $            9 |
| Stock and stock units | 185 | 132 | 369 | 264 |
| Purchases of common stock at a discount | 15 | — | 23 | — |
| | $     1,096 | $        118 | $     2,272 | $        273 |

The adoption of SFAS No. 123R resulted in incremental stock−based compensation expense of $908,000 and $1.9 million for the three months and six months ended June 30, 2006, respectively, which caused the Company's net loss to increase by $908,000 and $1.9 million and its net loss per share to increase by $ 0.02 and $0.04 per share for the corresponding periods. The adoption had no impact on cash used in operating activities or cash provided by financing activities.

Prior to January 1, 2006, the Company followed Accounting Principles Board ("APB") Opinion 25, *Accounting for Stock Issued to Employees*, and related interpretations, in accounting for its stock−based awards. The following table illustrates the effect on net income and earnings per share if the Company had applied the fair value recognition provisions of SFAS No. 123 to stock−based awards for the three−month and six−month periods ended June 30, 2005.

5

| In thousands, except per share amounts | | Three Months Ended June 30, 2005 | | Six Months Ended June 30, 2005 |
|---|---|---|---|---|
| Net loss as reported | $ | (14,083) | $ | (26,429) |
| Effect of stock options if valued at fair value | | (972) | | (1,997) |
| Pro forma net loss | $ | (15,055) | $ | (28,426) |
| | | | | |
| Net loss per share as reported | $ | (.27) | $ | (.50) |
| Effect of stock options if valued at fair value | | (.02) | | (.04) |
| Pro forma net loss per share | $ | (.29) | $ | (.54) |

*Stock Options*

Stock options are granted with an exercise price equal to the closing market price of the Company's common stock on the date of grant. Stock options generally vest ratably over four years and have contractual terms of ten years. Stock options are valued using the Black–Scholes option valuation model and compensation is recognized based on such fair value over the period of vesting on a straight–line basis.

The following table summarizes information about stock options for the six–month periods ended June 30, 2006 and 2005:

| In thousands, except per share amounts | | Six Months Ended June 30, | |
|---|---|---|---|
| | | 2006 | 2005 |
| Weighted average fair value of options granted, per share | $ | 4.20 | $ 6.12 |
| Total cash received from exercises of stock options | | 1,259 | 535 |
| Total intrinsic value of stock options exercised | | 1,103 | 469 |
| Total fair value of stock options vested | | 1,551 | 1,049 |

The weighted average fair value of options granted in the six–month periods ended June 30, 2006 and 2005 reflect the following weighted–average assumptions:

| | Six Months Ended June 30, | |
|---|---|---|
| | 2006 | 2005 |
| Expected life of options granted (*in years*) | 7.12 | 6.04 |
| Expected volatility | 70.72% | 109.43% |
| Risk–free rate | 4.59% | 3.86% |
| Expected dividends | 0% | 0% |

The expected life assumption is based on an analysis of historical behavior of participants related to options awarded over time. The expected volatility assumption for the six months ended June 30, 2006, is based on the implied volatility of the Company's common stock, derived from analysis of historical traded and quoted options on the Company's common stock over the period commensurate with the expected life of the options granted. The expected volatility for the six months ended June 30, 2005 is based on the historical volatility of the Company's common stock. The risk–free rate is based on the forward U.S. Treasury yield curve. The expected dividends reflect the Company's current and expected future policy for dividends on its common stock.

6

Based on the Company's historical employee departure rates, an annualized estimated forfeiture rate of 16.2% has been used in calculating compensation cost. Under the provisions of SFAS No. 123R, additional expense will be recorded if the actual forfeiture rate is lower than estimated, and a recovery of prior expense will be recorded if the actual forfeiture is higher than estimated.

Stock option activity under the Company's stock plans for the six–month period ended June 30, 2006 was as follows:

|  | Number of Shares | | Weighted Average Exercise Price Per Share |
| --- | --- | --- | --- |
| Options outstanding, January 1, 2006 | 6,826,644 | $ | 5.28 |
| Granted | 518,045 | | 6.41 |
| Exercised | (351,315) | | 3.58 |
| Forfeited | (20,540) | | 7.13 |
| Expired | (64,935) | | 11.72 |
| Options outstanding, June 30, 2006 | 6,907,899 | | 5.38 |
| Options exercisable, June 30, 2006 | 4,283,722 | | 4.72 |

Activity for non–vested stock option awards for the six–month period ended June 30, 2006 was as follows:

|  | Number of Shares | | Weighted Average Grant Date Fair Value |
| --- | --- | --- | --- |
| Non-vested options outstanding, January 1, 2006 | 2,480,796 | $ | 5.22 |
| Granted | 518,045 | | 4.20 |
| Vested | (354,124) | | 4.38 |
| Forfeited | (20,540) | | 5.66 |
| Non–vested options outstanding, June 30, 2006 | 2,624,177 | | 5.15 |

The following table summarizes information about stock options outstanding as of June 30, 2006:

|  | Options Outstanding | | Options Exercisable | |
| --- | --- | --- | --- | --- |
| Number of options | | 6,907,899 | | 4,283,722 |
| Weighted–average exercise price per share | $ | 5.38 | $ | 4.72 |
| Aggregate intrinsic value *(in 000's)* | $ | (6,018) | $ | (879) |
| Weighted average remaining contractual term *(in years)* | | 6.41 | | 4.90 |

At June 30, 2006, total unrecognized compensation cost related to non–vested stock options outstanding amounted to $5,891,000. That cost is expected to be recognized over a weighted–average period of 2.2 years.

*Stock and Stock Unit Grants*

Stock and stock unit grants are provided to directors as compensation and generally carry no restrictions as to resale. Stock grants to executive officers carry restrictions as to resale for periods of time specified in the grant. Stock and stock unit grants are valued at the closing market price of the Company's common stock on the date of grant and compensation is recognized over the requisite service period or period during which restrictions remain on the common stock or stock units granted.

Stock and stock units amounting to 80,000 were granted in each of the six–month periods ended June 30, 2006 and 2005. The weighted–average fair value of stock and stock unit awards granted in the six–month periods ended June 30, 2006 and 2005 was $6.43 and $6.62, respectively. At June 30, 2006, total unrecognized compensation cost related to stock and stock unit awards amounted to $369,000 which is expected to be recognized over a weighted–average period of six months.

7

*Purchase of Common Stock Pursuant to Employee Stock Purchase Plan*

Purchases of common stock by employees are provided pursuant to the Company's employee stock purchase plan. Purchase price is calculated as 85% of the lower of the closing price of our common stock on the first trading day or last trading day of each calendar quarter. Compensation cost is equal to the fair value of the discount on the date of grant and is recognized as compensation in the period of purchase.

**6. Litigation**

NF−°B Patent Infringement Litigation and Reexamination

*Lilly Litigation*

In 2002, the Company, together with Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research and Harvard University (collectively, the Plaintiffs) filed a lawsuit in the United States District Court for the District of Massachusetts, or the U.S. District Court, against Eli Lilly and Company, hereinafter referred to as Lilly, alleging infringement of certain claims, or the NF−κB `516 Claims, of the Plaintiffs' U.S. Patent No. 6,410,516, or the `516 Patent, covering methods of treating human disease by regulating NF−κB cell−signaling activity through sales of Lilly's osteoporosis drug, Evista®, and Lilly's septic shock drug, Xigris®, and seeking monetary damages from Lilly.

This case was tried before a jury in the U.S. District Court from April 10, 2006 through April 28, 2006. After deliberations, on May 4, 2006, the jury rendered a verdict in favor of the Plaintiffs by finding that the NF−κB `516 Claims asserted in the lawsuit are valid and infringed by Lilly through sales of Evista and Xigris in the United States. The jury awarded damages to the Plaintiffs in the amount of approximately $65.2 million, based on the jury's determination of a reasonable royalty rate of 2.3% to be paid by Lilly to the Plaintiffs based on U.S. sales of Evista and Xigris from the date of the filing of the lawsuit on June 25, 2002 through February 28, 2006. The jury awarded further damages on an ongoing basis, in amounts to be determined, equal to 2.3% of U.S. sales of Evista and Xigris through the year 2019, when the patent expires. If the verdict is upheld, damages paid by Lilly will be applied first to reimburse the Company for any unreimbursed legal fees and expenses relating to the litigation. The Company will receive 91% of the remainder, and the co−plaintiffs will receive 9%.

A separate trial, or bench trial, commenced before the judge on August 7, 2006 on certain defenses asserted by Lilly relating to the validity and enforceability of the NF−κB `516 Claims, which must be addressed before the judge enters a final judgment in this lawsuit. Lilly has the right to file motions challenging the jury's verdict in this lawsuit, and, upon the entry of a final judgment by the U.S. District Court, to file an appeal of the jury's verdict and other rulings by the U.S. District Court with the Court of Appeals for the Federal Circuit.

*Amgen Litigation*

On April 20, 2006, Amgen Inc. and certain affiliated entities, hereinafter referred to as Amgen, filed a lawsuit against the Company in the U.S. District Court for the District of Delaware seeking a declaratory judgment that each of the claims contained in the `516 Patent are invalid and that Amgen has not infringed any of the claims of the `516 Patent based on activities related to Amgen's products, Enbrel® and Kineret®.

The Company believes there is no basis for the declaratory relief sought by Amgen. Therefore, the Company filed a motion to dismiss this case in the U.S. District Court on June 14, 2006. Amgen filed its opposition to the motion to dismiss on June 28, 2006, to which the Company filed its reply memorandum of law in support of its motion to dismiss on July 13, 2006. Oral argument on the motion to dismiss is scheduled for September 11, 2006.

Source: ARIAD PHARMACEUTICAL, 10−Q, August 08, 2006

Pending ruling by the U.S. District Court on the Company's motion to dismiss this action, a scheduling order pursuant to Rule 16 of the Federal Rules of Civil Procedure was entered by the U.S. District Court on July 19, 2006. Pursuant to that order, a claim construction hearing in this case is scheduled for September 7, 2007, with trial scheduled to commence on February 4, 2008.

*Re−examination Proceedings in PTO*

On April 4, 2005, Lilly filed an ex parte request in the United States Patent and Trademark Office, or PTO, to reexamine the patentability of certain claims of the `516 Patent. In addition, an unrelated third party filed an ex parte request in the PTO on December 2, 2005 to reexamine the patentability of certain claims of the `516 Patent. The PTO has granted both of these reexamination requests. On April 4, 2006, counsel for the patentees of the `516 Patent filed separate Petitions requesting the PTO to merge these two reexamination requests, which was granted by the PTO on May 4, 2006. Additionally, on April 7, 2006, counsel for the patentees of the `516 Patent filed a third ex parte request in the PTO with respect to one claim of the `516 Patent, which was denied by the PTO on May 5, 2006.

As a result of the PTO orders described above, Lilly's ex parte request has been merged into a single action with the ex parte request filed on December 2, 2005 (the "Merged Requests"). The Merged Requests question the patentability of certain claims of the `516 Patent by newly cited references which (i) either inherently or expressly disclose the use of a variety of prior art compounds as reducing NF−κB activity and resulting gene expression, or (ii) are directed to the use of oligonucleotides having an NF−κB binding site for reduction of NF−κB activity. The PTO issued a first office action addressing the Merged Requests on August 2, 2006. Prior thereto, on June 9, 2006, Plaintiffs filed a complaint in the U.S. District Court in the Eastern District of Virginia requesting that the U.S. District Court enjoin the PTO from continuing the reexamination of the Merged Requests and ordering the PTO to grant the patentee's petition to vacate the PTO's orders granting the Merged Requests. Also, on July 12, 2006, Plaintiffs filed a motion for summary judgment on their complaint with the U.S. District Court. On August 1, 2006, Lilly filed a motion to intervene and opposing Plaintiff's motion for summary judgment. A hearing on Plaintiff's motion for summary judgment will be held in the U.S. District Court on September 1, 2006. If Plaintiff's motion is granted, the PTO's office action will be nullified, and the reexamination is discontinued pending any appeal by the PTO.

The timing and ultimate outcome of Plaintiff's motion for summary judgment enjoining the PTO from proceeding with the reexamination of the Merged Requests, and the consequent reexamination of the Merged Requests by the PTO if the motion is denied by the U.S. District Court, the Lilly litigation (including the pending bench trial and any appeal of the jury verdict and court's ruling in the bench trial) and the Amgen litigation (including pending motion to dismiss) cannot be determined at this time, and, as a result, no determination can be made with respect to allowance of the claims of the `516 Patent in any reexamination proceedings, nor can any final determination be made with respect to the validity or infringement of the claims of the `516 Patent in the Lilly litigation and the Amgen litigation, nor can management predict whether the damages awarded by the jury in the U.S. District Court in the Lilly litigation will be upheld, eliminated or limited. Although the Company has prevailed at trial in the Lilly litigation, the damages the Company has been awarded by the jury may be eliminated or limited by an adverse finding upon appeal or in the event that the claims of the `516 Patent are invalidated by the PTO. As a consequence, the Company has recorded no revenue in its statement of operations for the period ended June 30, 2006 related to the damages awarded in the Lilly litigation.

<div style="text-align:center">9</div>

---

Source: ARIAD PHARMACEUTICAL, 10−Q, August 08, 2006

**ITEM 2. MANAGEMENTS' DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**Overview**

We are engaged in the discovery and development of breakthrough medicines to treat cancers by regulating cell signaling with small molecules. We are developing a comprehensive approach to patients with cancer that addresses the greatest medical need − aggressive and advanced−stage cancers for which current treatments are inadequate. Our goal is to build a fully integrated oncology company focused on novel, molecularly targeted therapies to treat solid tumors and hematologic cancers, as well as the spread of primary tumors to distant sites.

Our lead cancer product candidate, AP23573, has been or is being studied in multiple clinical trials in patients with various types of cancers, including sarcomas, hormone refractory prostate cancer, endometrial cancer, brain cancer and leukemias and lymphomas. Medinol Ltd. is also developing stents to deliver AP23573 to prevent reblockage at sites of vascular injury following stent−assisted angioplasty.

We have a focused drug discovery program centered on small−molecule, molecularly targeted therapies and cell−signaling pathways implicated in cancer. We also have an exclusive license to pioneering technology and patents related to certain NF−ᵏB cell−signaling activity, which may be useful in treating certain diseases. Additionally, we have developed a proprietary portfolio of cell−signaling regulation technologies, our ARGENT technology, to control intracellular processes with small molecules, which may be useful in the development of therapeutic vaccines and gene and cell therapy products, and which provide versatile tools for applications in cell biology, functional genomics and drug discovery research.

Since our inception in 1991, we have devoted substantially all of our resources to our research and development programs. We receive no revenue from the sale of pharmaceutical products, and most of our revenue to date was received in connection with a joint venture we had with a major pharmaceutical company from 1997 to 1999. Except for the gain on the sale of our fifty percent interest in that joint venture in December 1999, which resulted in net income for fiscal 1999, we have not been profitable since inception. We expect to incur substantial and increasing operating losses for the foreseeable future, primarily due to costs associated with our pharmaceutical product development programs and product manufacturing, personnel and our intellectual property. We expect that losses will fluctuate from quarter to quarter and that these fluctuations may be substantial. At June 30, 2006, we had an accumulated deficit of $279.5 million and cash, cash equivalents and marketable securities of $54.3 million and working capital of $37.6 million.

**General**

Our operating losses are primarily due to the costs associated with our pharmaceutical product development programs, personnel and intellectual property protection and enforcement. As our product development programs progress, we incur significant costs for toxicology and pharmacology studies, product development, manufacturing, clinical trials and regulatory support. These costs can vary significantly from quarter to quarter depending on the number of product candidates in development, the stage of development of each product candidate, the number of patients enrolled in and complexity of clinical trials and other factors. Costs associated with our intellectual property include legal fees and other costs to prosecute, maintain, protect and enforce our intellectual property, which can fluctuate from quarter to quarter depending on the status of patent issues being pursued.

10

Source: ARIAD PHARMACEUTICAL, 10−Q, August 08, 2006

Because we currently receive no revenue from the sale of pharmaceutical products and receive only limited license revenue, we have relied primarily on the capital markets as our source of funding. In August 2005, we raised approximately $57.9 million through an underwritten public offering of our common stock. We also utilize long−term debt to supplement our funding, particularly as a means to fund investment in property and equipment and infrastructure needs. In addition, we may seek funding from collaborations with pharmaceutical, biotechnology and/or medical device companies for development and commercialization of our product candidates. These collaborations may take the form of licensing arrangements, co−development or joint venture arrangements or other structures. If funding from these various sources is unavailable on reasonable terms, we may be required to reduce our operating expenses in order to conserve cash and capital by delaying, scaling back or eliminating one or more of our product development programs.

**Critical Accounting Policies and Estimates**

Our financial position and results of operations are affected by subjective and complex judgments, particularly in the areas of the carrying value of intangible assets, deferred compensation benefits for executives, and stock−based compensation.

At June 30, 2006, we reported $4.5 million of intangible assets consisting of capitalized costs related primarily to purchased and issued patents, patent applications and licenses, net of accumulated amortization. These costs are being amortized over the estimated useful lives of the underlying patents or licenses. Changes in these lives or a decision to discontinue using the technologies could result in material changes to our balance sheet and statements of operations. For example, for the six−month period ended June 30, 2006, we expensed $173,000 of unamortized costs related to certain intangible assets which we are no longer actively pursuing. We have concluded that the carrying value of our remaining intangible assets is not impaired because such assets are utilized in our product development programs and/or continue to be viable technologies for collaborations or licensing efforts which we continue to pursue. If we were to abandon the underlying technologies or terminate our efforts to pursue collaborations or license agreements, we may be required to write off a portion of the carrying value of our intangible assets. The net book value as of June 30, 2006 of intangible assets related to our NF−°B technology is $489,000. If the patentability of our NF−°B patents is successfully challenged and such patents are subsequently narrowed, invalidated or circumvented, we may be required to write off some or all of the net book value related to such technology.

Under our deferred executive compensation plans, we are required to adjust our recorded obligations to our employees on a periodic basis to reflect fair value based on the value of certain underlying mutual funds. Fluctuations in the fair value of such mutual funds can result in uneven expense charges or credits to our statements of operations. If, for example, the market prices of the underlying mutual funds were 10% higher at June 30, 2006, we would have recognized an additional $89,000 in compensation expense in the six−month period ended June 30, 2006.

In determining expense related to stock−based compensation, we utilize the Black−Scholes valuation model to estimate the fair value of stock options granted to employees, consultants and directors. Application of the Black−Scholes valuation model requires the use of factors such as the market value and volatility of our common stock, a risk−free discount rate and an estimate of the life of the option contract. Fluctuations in these factors can result in adjustments to our statements of operations. If, for example, the market value of our common stock, its volatility, or the expected life of stock options granted in the three−month period ended June 30, 2006 were 10% higher or lower than used in the valuation of such stock options, our stock−based compensation expense for the awards would have increased or decreased by up to $60,000, $47,000, or $48,000, respectively.

11

Source: ARIAD PHARMACEUTICAL, 10−Q, August 08, 2006

**Results of Operations**

*For the three months ended June 30, 2006 and 2005*

*Revenue*

We recognized license revenue of $229,000 in the three month period ended June 30, 2006, compared to $350,000 in the corresponding period in 2005. The decrease in license revenue was due primarily to the expected timing of receipt of future milestone payments pursuant to our agreement with Medinol Ltd., in accordance with our revenue recognition policy.

*Operating Expenses*

*Research and Development Expenses*

Research and development expenses decreased by $1.9 million, or 16%, to $10.1 million in the three month period ended June 30, 2006, compared to $12.1 million in the corresponding period in 2005. The research and development process necessary to develop a pharmaceutical product for commercialization is subject to extensive regulation by numerous governmental authorities in the United States and other countries. This process typically takes years to complete and requires the expenditure of substantial resources. Current requirements include:

- preclinical toxicology, pharmacology and metabolism studies, as well as in vivo efficacy studies in relevant animal models of disease;

- manufacturing of drug product for preclinical studies and clinical trials and ultimately for commercial supply;

- submission of the results of preclinical studies and information regarding manufacturing and control and proposed clinical protocol to the United States Food and Drug Administration, or FDA, in an Investigational New Drug application, or IND (or similar filings with regulatory agencies outside the United States);

- conduct of clinical trials designed to provide data and information regarding the safety and efficacy of the product candidate in humans; and

- submission of all the results of testing to the FDA in a New Drug Application, or NDA (or similar filings with regulatory agencies outside the United States).

Upon approval by the appropriate regulatory authorities, including in some countries approval of product pricing, we may commence commercial marketing and distribution of the product.

We group our research and development, or R&D, expenses into two major categories: direct external expenses and all other R&D expenses. Direct external expenses consist of costs of outside parties to conduct laboratory studies, to develop manufacturing processes and manufacture the product candidate, to conduct and manage clinical trials and similar costs related to our clinical and preclinical studies. These costs are accumulated and tracked by product candidate. All other R&D expenses consist of costs to compensate personnel, to purchase lab supplies and services, to maintain our facility, equipment and overhead and similar costs of our research and development efforts. These costs apply to work on our clinical and preclinical candidates as well as our discovery research efforts. These costs are not tracked by product candidate because the number of product candidates and projects in R&D may vary from time to time and because we utilize internal resources across multiple projects at the same time.

12

Direct external expenses are further categorized as costs for clinical programs and costs for preclinical programs. Preclinical programs include product candidates undergoing toxicology, pharmacology, metabolism and efficacy studies and manufacturing process development required before testing in humans can begin. Product candidates are designated as clinical programs once we have filed an IND with the FDA, or a similar filing with regulatory agencies outside the United States, for the purpose of commencing clinical trials in humans.

Our research and development expenses for the three month period ended June 30, 2006, as compared to the corresponding period in 2005, were as follows:

| In thousands | Three months ended June 30, | | Increase/ (decrease) |
|---|---|---|---|
| | 2006 | 2005 | |
| Direct external expenses: | | | |
| Clinical programs | $ 3,238 | $ 7,257 | $ (4,019) |
| Preclinical programs | 243 | 367 | (124) |
| All other R&D expenses | 6,663 | 4,469 | 2,194 |
| | $ 10,144 | $ 12,093 | $ (1,949) |

AP23573, our lead product candidate which is in Phase 2 clinical trials, was our only clinical program in 2006 and 2005. Direct external expenses for AP23573 decreased by $4.0 million in the three–month period ended June 30, 2006, as compared to the corresponding period in 2005, due primarily to decreases in manufacturing related costs of $1.8 million and clinical trials costs of $2.2 million. The decrease in manufacturing related costs was due to the completion in 2005 of certain product and process development studies and the timing of production runs of AP23573. The decrease in clinical trial costs is directly related to a decrease in number of patients on trial during the period driven by successful conclusion in 2005 of enrollment in several clinical trials. Through June 30, 2006, we have incurred a total of approximately $47.8 million in direct external expenses for AP23573 from the date it became a clinical program. We expect that our direct external costs for AP23573 will increase during the remainder of 2006 as we prepare to initiate a Phase 3 trial for this product candidate.

Preclinical programs consist primarily of our oncogenic kinase inhibitor program and our bone–targeted mTOR inhibitor program. Direct external expenses on preclinical programs will increase or decrease from period to period depending on the status and number of programs in this stage of development and the mix between external and internal efforts applied to such programs. Direct external expenses for preclinical programs decreased by $124,000 in the three month period ended June 30, 2006 as compared to the corresponding period in 2005 due primarily to the completion of certain pharmacology and contract manufacturing studies conducted by outside contract laboratories in 2005. We expect that our direct external expenses for preclinical programs will increase slightly during the remainder of 2006 as we continue to move these programs forward in development.

All other R&D expenses increased by $2.2 million in the three month period ended June 30, 2006 as compared to the corresponding period in 2005 due to higher personnel and related costs as a result of an increase in the number of personnel and salary adjustments ($1.2 million) and the impact of the adoption of SFAS No. 123R regarding stock–based compensation expense ($353,000), an increase in depreciation and amortization costs due to investments in property and equipment ($303,000), and miscellaneous increases in laboratory supplies and services, maintenance and utility costs related to our facility, and intellectual property expenses. We expect that all other R&D expenses will remain at approximately the current level for the remainder of 2006 to support our clinical and preclinical development programs.

The successful development of our products is uncertain and subject to a number of risks. We cannot be certain that any of our product candidates will prove to be safe and effective or will meet all of the applicable regulatory requirements needed to receive and maintain marketing approval. Data from preclinical studies and clinical trials are susceptible to varying interpretations that could delay, limit or prevent regulatory clearance. We, the FDA or other regulatory authorities may suspend clinical trials

13

Source: ARIAD PHARMACEUTICAL, 10-Q, August 08, 2006

at any time if we or they believe that the subjects participating in such trials are being exposed to unacceptable risks or if such regulatory agencies find deficiencies in the conduct of the trials or other problems with our products under development. Delays or rejections may be encountered based on additional governmental regulation, legislation, administrative action or changes in FDA or other regulatory policy during development or the review process. Other risks associated with our product development programs are described in Risk Factors in our Form 10–K for the fiscal year ended December 31, 2005, which has been filed with the SEC as updated from time to time in our subsequent Quarterly Reports on Form 10–Q and Current Reports on Form 8–K. Due to these uncertainties, accurate and meaningful estimates of the ultimate cost to bring a product to market, the timing of completion of any of our drug development programs and the period in which material net cash inflows from any of our drug development programs will commence are unavailable.

*General and Administrative Expenses*

General and administrative expenses were $7.5 million in the three month period ended June 30, 2006, as compared to $2.6 million in the corresponding period in 2005. Professional fees increased by $2.9 million to $4.4 million in the three month period ended June 30, 2006 as compared to $1.5 million in the corresponding period in 2005, due primarily to costs related to business and commercial development initiatives, including market research, and to our patent infringement litigation with Lilly. Personnel and related costs increased by $872,000 to $1.6 million in the three month period ended June 30, 2006 as compared to $683,000 in the corresponding period in 2005 due to an increase in the number of personnel and salary adjustments ($257,000) and the impact of adoption of SFAS No. 123R ($615,000). We expect that our general and administrative expenses will remain at approximately the current level for the remainder of 2006 as necessary to support our research and development programs, excluding an expected decrease in professional fees related to our patent infringement litigation with Lilly due to completion of the jury trial during the three–month period ended June 30, 2006.

We expect that our operating expenses in total will remain at approximately the current level for the remainder of 2006 for the reasons described above. Operating expenses may fluctuate from quarter to quarter. The actual amount of any change in operating expenses will depend on the progress of our product development programs, including preclinical and clinical studies and product manufacturing, the status of our patent infringement litigation with Lilly and Amgen and our ability to raise funding through equity offerings, collaborations, licensing, joint ventures or other sources.

*Interest Income/Expense*

Interest income increased to $574,000 in the three month period ended June 30, 2006 from $367,000 in the corresponding period in 2005, as a result of a higher interest yields from our securities.

Interest expense increased to $124,000 in the three month period ended June 30, 2006 from $107,000 in the corresponding period in 2005, as a result of higher interest rates in 2006, offset, in part, by lower average loan balances.

*Operating Results*

We reported a loss from operations of $17.4 million in the three month period ended June 30, 2006 compared to a loss from operations of $14.3 million in the corresponding period in 2005, an increase in loss of $3.1 million, or 22%. Such increase was due primarily to the increase in operating expenses noted above. We expect that our loss from operations will remain at approximately the current level for the reminder of 2006 due to the various factors discussed under Operating Expenses above. Losses may fluctuate depending on the extent to which, if at all, we enter into collaborations for one or more of our product candidates or licenses for our technologies. The extent of operating losses will also depend on our ability to raise funds from other sources, such as the capital markets, which will influence the amount we will spend on research and development and the development timelines for our product candidates.

14

Source: ARIAD PHARMACEUTICAL, 10–Q, August 08, 2006

We reported a net loss of $17.0 million in the three month period ended June 30, 2006, compared to a net loss of $14.1 million in the corresponding period in 2005, an increase in net loss of $2.9 million or 21%, and a net loss per share of $0.27 and $0.27, respectively.

*For the six months ended June 30, 2006 and 2005*

*Revenue*

We recognized license revenue of $458,000 in the six-month period ended June 30, 2006, compared to $654,000 in the corresponding period in 2005. The decrease in license revenue was due primarily to the expected timing of receipt of future milestone payments pursuant to our agreement with Medinol Ltd., in accordance with our revenue recognition policy.

*Operating Expenses*

*Research and Development Expenses*

Research and development expenses decreased by $929,000 or less than 1%, to $21.8 million in the six-month period ended June 30, 2006, as compared to $22.7 million in the corresponding period in 2005.

Our research and development expenses for the six-month period ended June 30, 2006, as compared to the corresponding period in 2005, were as follows:

| In thousands | Six months ended June 30, | | Increase/ |
| | 2006 | 2005 | (decrease) |
|---|---|---|---|
| Direct external expenses: | | | |
| Clinical programs | $ 7,424 | $ 13,406 | $ (5,982) |
| Preclinical programs | 377 | 804 | (427) |
| All other R&D expenses | 14,017 | 8,537 | 5,480 |
| | $ 21,818 | $ 22,747 | $ (929) |

AP23573, our lead product candidate which is in Phase 2 clinical trials, was our only clinical program in 2006 and 2005. Direct external expenses for AP23573 decreased by $6.0 million in the six-month period ended June 30, 2006, as compared to the corresponding period in 2005, due primarily to decreases in manufacturing related costs of $3.1 million and clinical trials costs of $2.4 million. The decrease in manufacturing related costs was due to the completion in 2005 of certain product and process development studies and the timing of production runs of AP23573. The decrease in clinical trial costs is directly related to a decrease in number of patients on trial during the period driven by successful conclusion in 2005 of enrollment in several clinical trials.

Direct external expenses for preclinical programs decreased by $427,000 in the six-month period ended June 30, 2006 as compared to the corresponding period in 2005 due primarily to the completion of certain pharmacology and contract manufacturing studies conducted by outside contract laboratories in 2005.

All other R&D expenses increased by $5.5 million in the six-month period ended June 30, 2006 as compared to the corresponding period in 2005 due to higher personnel and related costs as a result of an increase in the number of personnel and salary adjustments ($2.6 million) and the impact of the adoption of SFAS No. 123R regarding stock-based compensation expense ($1.2 million), an increase in depreciation and amortization costs due to investments in property and equipment ($849,000), and miscellaneous increases in laboratory supplies and services, maintenance and utility costs related to our facility, and intellectual property expenses.

15

Source: ARIAD PHARMACEUTICAL, 10-Q, August 08, 2006

*General and Administrative Expenses*

General and administrative expenses were $12.0 million in the six-month period ended June 30, 2006, as compared to $4.9 million in the corresponding period in 2005. Professional fees increased by $4.2 million to $6.8 million in the six-month period ended June 30, 2006 as compared to $2.6 million in the corresponding period in 2005, due primarily to costs related to business and commercial development initiatives, including market research, and to our patent infringement litigation with Lilly. Personnel and related costs increased by $1.3 million to $2.7 million in the six-month period ended June 30, 2006 as compared to $1.4 million in the corresponding period in 2005 due to an increase in the number of personnel and salary adjustments ($455,000) and the impact of adoption of SFAS No. 123R ($830,000).

*Interest Income/Expense*

Interest income increased to $1.2 million in the six-month period ended June 30, 2006 from $761,000 in the corresponding period in 2005, as a result of a higher interest yields from our securities.

Interest expense increased to $246,000 in the six-month period ended June 30, 2006 from $181,000 in the corresponding period in 2005, as a result of higher interest rates in 2006, offset, in part, by lower average loan balances.

*Operating Results*

We reported a loss from operations of $33.3 million in the six-month period ended June 30, 2006 compared to a loss from operations of $27.0 million in the corresponding period in 2005, an increase in loss of $6.3 million, or 23%. Such increase was due primarily to the increase in operating expenses noted above.

We reported a net loss of $32.4 million in the six-month period ended June 30, 2006, compared to a net loss of $26.4 million in the corresponding period in 2005, an increase in net loss of $5.9 million or 22%, and a net loss per share of $0.52 and $0.50, respectively.

**Liquidity and Capital Resources**

We have financed our operations and investments primarily through sales of our common stock to institutional investors and, to a lesser extent, through issuances of our common stock pursuant to our stock option and employee stock purchase plans, supplemented by the issuance of long-term debt. We sell securities and incur debt when the terms of such transactions are deemed favorable to us and as necessary to fund our current and projected cash needs. We most recently completed an underwritten public offering of our common stock in August 2005 from which we realized net proceeds of approximately $57.9 million. We seek to balance the level of cash, cash equivalents and marketable securities on hand with our projected needs and to allow us to withstand periods of uncertainty relative to the availability of funding on favorable terms. We manage our marketable securities portfolio to provide cash as needed for payment of our obligations.

16

---

Source: ARIAD PHARMACEUTICAL, 10-Q, August 08, 2006

*Sources of Funds*

For the three months and six months ended June 30, 2006 and 2005, our sources of funds were as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| *In thousands* | 2006 | 2005 | 2006 | 2005 |
| Sales and maturities of marketable securities, net of purchases | $ 16,024 | $ 18,000 | $ 27,215 | $ 19,124 |
| Proceeds from issuance of common stock pursuant to stock option and purchase plans | 363 | 290 | 1,349 | 585 |
| | $ 16,387 | $ 18,290 | $ 28,564 | $ 19,709 |

We manage our marketable securities portfolio to provide cash for payment of our obligations. Upon sale or maturity of such marketable securities, a portion will be retained as cash to provide for payment of current obligations while the remainder will be reinvested in accordance with our investment policy. For the three months and six months ended June 30, 2006 and 2005, proceeds from sales and maturities of marketable securities, purchases of marketable securities and the resulting net amount retained as cash for payment of obligations was as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| *In thousands* | 2006 | 2005 | 2006 | 2005 |
| Proceeds from sales and maturities of marketable securities | $ 30,922 | $ 20,000 | $ 53,753 | $ 29,625 |
| Purchases of marketable securities | (14,898) | (2,000) | (26,538) | (10,501) |
| | $ 16,024 | $ 18,000 | $ 27,215 | $ 19,124 |

*Uses of Funds*

The primary uses of our cash are to fund our operations and working capital requirements and, to a lesser degree, to repay our long−term debt, to invest in intellectual property and to invest in our property and equipment as needed for our business. For the three months and six months ended June 30, 2006 and 2005, our uses of funds were as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| *In thousands* | 2006 | 2005 | 2006 | 2005 |
| Net cash used in operating activities | $ 13,426 | $ 10,581 | $ 27,371 | $ 20,727 |
| Repayment of borrowings | 480 | 480 | 960 | 960 |
| Investment in intangible assets | 119 | 279 | 327 | 492 |
| Investment in property and equipment | 506 | 2,377 | 860 | 4,100 |
| | $ 14,531 | $ 13,717 | $ 29,518 | $ 26,279 |

The net cash used in operating activities is comprised of our net losses, adjusted for non−cash expenses and working capital requirements. As noted above, our net loss for the six months ended June 30, 2006 increased by $5.9 million, as compared to the corresponding period in 2005, due primarily to increased personnel and professional services expenses. However, as a result of changes in our working capital requirements offset in part by increases in non−cash expenses, including stock−based compensation expense, our net cash used in operating activities increased by $6.6 million for the six months ended June 30, 2006, as compared with the corresponding period in 2005. Also, as noted above, we expect that our loss from operations will increase in the remainder of 2006 due to continued progress in development of our product candidates, and we expect that our net cash used in operations will increase accordingly. We also expect that our investment in intangible assets, consisting of our intellectual property, will increase in support of our product development activities.

17

Source: ARIAD PHARMACEUTICAL, 10-Q, August 08, 2006

*Contractual Obligations*

We have substantial fixed contractual obligations under various research and licensing agreements, consulting and employment agreements, lease agreements and long−term debt instruments. These contractual obligations were comprised of the following as of June 30, 2006:

| *In thousands* | Total | In 2006 | 2007 through 2009 | 2010 through 2011 | After 2011 |
|---|---|---|---|---|---|
| | | | **Payments Due By Period** | | |
| Long−term debt | $ 6,695 | $ 960 | $ 5,735 | $ — | $ — |
| Operating leases, net of sub−leases | 631 | 310 | 321 | — | — |
| Other long−term obligations | 13,273 | 2,211 | 9,431 | 1,236 | 395 |
| Total fixed contractual obligations | $ 20,599 | $ 3,481 | $ 15,487 | $ 1,236 | $ 395 |

Long−term debt consists of scheduled principal payments on such debt. Interest on our long−term debt is based on variable interest rates. Assuming a constant interest rate of 7.2%, our average interest rate on our debt at June 30, 2006, over the remaining term of the debt, our interest expense would total approximately $223,000 for the remainder of 2006 and $409,000 in the period 2007 through 2009.

Other long−term obligations are comprised primarily of employment agreements and license agreements. The license agreements generally provide for payment by us of annual license fees, milestone payments and royalties upon successful commercialization of products. All license agreements are cancelable by us. The above table reflects remaining license fees for the lives of the agreements but excludes milestone and royalty payments, as such amounts are not probable or estimable at this time.

*Liquidity*

At June 30, 2006, we had cash, cash equivalents and marketable securities totaling $54.3 million and working capital of $37.6 million, compared to cash, cash equivalents and marketable securities totaling $81.5 million and working capital of $66.0 million at December 31, 2005.

We will require substantial additional funding for our research and development programs, including pre−clinical development and clinical trials, for operating expenses including intellectual property protection and enforcement, for the pursuit of regulatory approvals, and for establishing manufacturing, marketing and sales capabilities. In order to fund our needs, we may, among other things, (1) sell common stock through public or private offerings as market conditions permit, (2) enter into partnerships for our product candidates, and/or (3) license our cell−signaling technologies, including our ARGENT and NF−κB intellectual property portfolios. We have available 2,815,000 shares of our common stock under effective shelf registration statements, which may be sold to raise capital.

We believe that our cash, cash equivalents and marketable securities should be sufficient to satisfy our capital and operating requirements into the third quarter of 2007. However, there are numerous factors that are likely to affect our spending levels, including the timing of the start of the initial registration trial for AP23573, the timing of product and process development work for AP23573, the manufacture of drug product for clinical trials and potential product launch, if approved, developments in our ongoing clinical

18

Source: ARIAD PHARMACEUTICAL, 10−Q, August 08, 2006

trials, the timing and terms of a partnership, if any, to commercialize AP23573 outside of the U.S., the status of our in–house efforts to prepare for the potential launch of AP23573 in the U.S., the progress of our preclinical programs, and developments in our NF–κB litigation, among other factors. These variables could result in earlier depletion of our current funds if we are to achieve our intended timelines for development. In any event, we expect to need additional capital in order to pursue our business plan, which we will seek to raise through the sale of additional securities, collaborative partnerships, and possible additional credit arrangements. There can be no assurance, however, that adequate resources will be available when needed or on terms acceptable to us.

**Securities Litigation Reform Act**

*Safe harbor statement under the Private Securities Litigation Reform Act of 1995*: Except for the historical information contained in this Quarterly Report on Form 10–Q, some of the matters discussed herein are "forward–looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements are identified by the use of words such as "may," "anticipate," "estimate," "expect," "project," "intend," "plan," "believe," and other words and terms of similar meaning in connection with any discussion of future operating or financial performance. Such statements are based on management's current expectations and are subject to certain factors, risks and uncertainties that may cause actual results, outcome of events, timing and performance to differ materially from those expressed or implied by such forward–looking statements. These risks include, but are not limited to, risks and uncertainties regarding our ability to accurately estimate the timing and actual research and development expenses and other costs associated with the preclinical and clinical development and manufacture of our product candidates, the adequacy of our capital resources and the availability of additional funding, risks and uncertainties regarding our ability to successfully recruit centers, enroll patients and conduct clinical studies of product candidates, risks and uncertainties regarding our ability to manufacture or have manufactured our product candidates on a commercial scale or to supply our product candidates to partners, risks and uncertainties that clinical trial results at any phase of development may be adverse or may not be predictive of future results or lead to regulatory approval of any of our or any partner's product candidates, risks and uncertainties of third–party intellectual property claims relating to our and any partner's product candidates, and risks and uncertainties relating to regulatory oversight, the timing, scope, cost and outcome of legal and patent office proceedings, litigation, prosecution and reexamination proceedings concerning our NF–κB patent portfolio, future capital needs, key employees, dependence on collaborators and manufacturers, markets, economic conditions, products, services, prices, reimbursement rates, competition and other risks detailed under the heading "Risk Factors" in our Annual Report on Form 10–K for the fiscal year ended December 31, 2005, which has been filed with the SEC, as updated from time to time in our subsequent Quarterly Reports on Form 10–Q and Current Reports on Form 8–K. As a result of these and other factors, actual events or results could differ materially from those described herein. We are not under any obligation, and we expressly disclaim any obligation, to update or alter any forward–looking statements, whether as a result of new information, future events or otherwise.

**ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

We invest our available funds in accordance with our investment policy to preserve principal, maintain proper liquidity to meet operating needs and maximize yields. Our investment policy specifies credit quality standards for our investments and limits the amount of credit exposure to any single issue, issuer or type of investment.

We invest cash balances in excess of operating requirements first in short–term, highly liquid securities, with maturities of 90 days or less, and money market accounts. Depending on our level of available funds and our expected cash requirements, we may invest a portion of our funds in marketable securities, consisting generally of corporate debt and U.S. government and agency securities. Maturities of our marketable securities are generally limited to periods necessary to fund our liquidity needs and may not in any case exceed

19

Source: ARIAD PHARMACEUTICAL, 10-Q, August 08, 2006

three years. These securities are classified as available–for–sale. Available–for–sale securities are recorded on the balance sheet at fair market value with unrealized gains or losses reported as a separate component of stockholders' equity (accumulated other comprehensive income or loss). Realized gains and losses on marketable security transactions are reported on the specific–identification method. Interest income is recognized when earned. A decline in the market value of any available–for–sale security below cost that is deemed other than temporary results in a charge to earnings and establishes a new cost basis for the security.

Our investments are sensitive to interest rate risk. We believe, however, that the effect, if any, of reasonable possible near–term changes in interest rates on our financial position, results of operations and cash flows generally would not be material due to the current short–term nature of these investments. In particular, at June 30, 2006, because our available funds are invested solely in short–term securities with remaining maturities of twelve months or less, our risk of loss due to changes in interest rates is not material.

We have a deferred executive compensation program which provides participants with deferred compensation based on the value of certain designated mutual funds. The fair value of our obligations under this program is reflected as a liability on our balance sheet. In the event of a hypothetical 10% increase in the fair market value of the underlying mutual funds as of June 30, 2006, we would have incurred approximately $89,000 of additional compensation expense in the three–month period ended June 30, 2006.

At June 30, 2006, we had $6.7 million outstanding under a bank term note which bears interest at prime or, alternatively, LIBOR + 2%. This note is sensitive to interest rate risk. In the event of a hypothetical 10% increase in the interest rate on which the loan is based (71.9 basis points), we would incur approximately $41,000 of additional interest expense per year based on expected balances over the next twelve months.

20

Source: ARIAD PHARMACEUTICAL, 10–Q, August 08, 2006

**ITEM 4. CONTROLS AND PROCEDURES**

(a) *Evaluation of Disclosure Controls and Procedures*. Our principal executive officer and principal financial officer, after evaluating the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e)) as of the end of the period covered by this Quarterly Report on Form 10−Q, have concluded that, based on such evaluation, our disclosure controls and procedures were adequate and effective to ensure that material information relating to us, including our consolidated subsidiaries, was made known to them by others within those entities, particularly during the period in which this Quarterly Report on Form 10−Q was being prepared.

In designing and evaluating our disclosure controls and procedures, our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily is required to apply its judgment in evaluating the cost−benefit relationship of possible controls and procedures.

(b) *Changes in Internal Controls*. There were no changes in our internal control over financial reporting, identified in connection with the evaluation of such internal control that occurred during the last fiscal quarter, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Source: ARIAD PHARMACEUTICAL, 10-Q, August 08, 2006

PART II. OTHER INFORMATION

ITEM 1. LEGAL PROCEEDINGS

NF−κB Patent Infringement Litigation and Reexamination

*Lilly Litigation*

In 2002, we, together with Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research and Harvard University (collectively, the Plaintiffs) filed a lawsuit in the United States District Court for the District of Massachusetts, or the U.S. District Court, against Eli Lilly and Company, hereinafter referred to as Lilly, alleging infringement of certain claims, or the NF−κB `516 Claims, of the Plaintiffs' U.S. Patent No. 6,410,516, or the `516 Patent, covering methods of treating human disease by regulating NF−κB cell−signaling activity through sales of Lilly's osteoporosis drug, Evista®, and Lilly's septic shock drug, Xigris®, and seeking monetary damages from Lilly.

This case was tried before a jury in the U.S. District Court from April 10, 2006 through April 28, 2006. After deliberations, on May 4, 2006, the jury rendered a verdict in favor of the Plaintiffs by finding that the NF−κB `516 Claims asserted in the lawsuit are valid and infringed by Lilly through sales of Evista and Xigris in the United States. The jury awarded damages to the Plaintiffs in the amount of approximately $65.2 million, based on the jury's determination of a reasonable royalty rate of 2.3% to be paid by Lilly to the Plaintiffs based on U.S. sales of Evista and Xigris from the date of the filing of the lawsuit on June 25, 2002 through February 28, 2006. The jury awarded further damages on an ongoing basis, in amounts to be determined, equal to 2.3% of U.S. sales of Evista and Xigris through the year 2019, when the patent expires. If the verdict is upheld, damages paid by Lilly will be applied first to reimburse us for any unreimbursed legal fees and expenses relating to the litigation. We will receive 91% of the remainder, and the co−plaintiffs will receive 9%.

A separate trial, or bench trial, commenced before the judge on August 7, 2006 on certain defenses asserted by Lilly relating to the validity and enforceability of the NF−κB `516 Claims, which must be addressed before the judge enters a final judgment in this lawsuit. Lilly has the right to file motions challenging the jury's verdict in this lawsuit, and, upon the entry of a final judgment by the U.S. District Court, to file an appeal of the jury's verdict and other rulings by the U.S. District Court with the Court of Appeals for the Federal Circuit.

*Amgen Litigation*

On April 20, 2006, Amgen Inc. and certain affiliated entities, hereinafter referred to as Amgen, filed a lawsuit against us in the U.S. District Court for the District of Delaware seeking a declaratory judgment that each of the claims contained in the `516 Patent are invalid and that Amgen has not infringed any of the claims of the `516 Patent based on activities related to Amgen's products, Enbrel® and Kineret®.

We believe there is no basis for the declaratory relief sought by Amgen. Therefore, we filed a motion to dismiss this case in the U.S. District Court on June 14, 2006. Amgen filed its opposition to the motion to dismiss on June 28, 2006, to which we filed our reply memorandum of law in support of our motion to dismiss on July 13, 2006. Oral argument on our motion to dismiss is scheduled for September 11, 2006.

Pending ruling by the U.S. District Court on our motion to dismiss this action, a scheduling order pursuant to Rule 16 of the Federal Rules of Civil Procedure was entered by the U.S. District Court on July 19, 2006. Pursuant to that order, a claim construction hearing in this case is scheduled for September 7, 2007, with trial scheduled to commence on February 4, 2008.

Source: ARIAD PHARMACEUTICAL, 10−Q, August 08, 2006

*Re−examination Proceedings in PTO*

On April 4, 2005, Lilly filed an ex parte request in the United States Patent and Trademark Office, or PTO, to reexamine the patentability of certain claims of the `516 Patent. In addition, an unrelated third party filed an ex parte request in the PTO on December 2, 2005 to reexamine the patentability of certain claims of the `516 Patent. The PTO has granted both of these reexamination requests. On April 4, 2006, counsel for the patentees of the `516 Patent filed separate Petitions requesting the PTO to merge these two reexamination requests, which was granted by the PTO on May 4, 2006. Additionally, on April 7, 2006, counsel for the patentees of the `516 Patent filed a third ex parte request in the PTO with respect to one claim of the `516 Patent, which was denied by the PTO on May 5, 2006.

As a result of the PTO orders described above, Lilly's ex parte request has been merged into a single action with the ex parte request filed on December 2, 2005 (the "Merged Requests"). The Merged Requests question the patentability of certain claims of the `516 Patent by newly cited references which (i) either inherently or expressly disclose the use of a variety of prior art compounds as reducing NF−κB activity and resulting gene expression, or (ii) are directed to the use of oligonucleotides having an NF−κB binding site for reduction of NF−κB activity. The PTO issued a first office action affirming the Merged Requests on August 2, 2006. Prior thereto, on June 9, 2006, Plaintiffs filed a complaint in the U.S. District Court in the Eastern District of Virginia requesting that the U.S. District Court enjoin the PTO from continuing the reexamination of the Merged Requests and ordering the PTO to grant the patentee's petition to vacate the PTO's orders granting the Merged Requests. Also, on July 12, 2006, Plaintiffs filed a motion for summary judgment on their complaint with the U.S. District Court. On August 1, 2006, Lilly filed a motion to intervene and opposing Plaintiff's motion for summary judgment. A hearing on Plaintiff's motion for summary judgment will be held in the U.S. District Court on September 1, 2006. If Plaintiff's motion is granted, the PTO's office action will be nullified, and the reexamination discontinued pending any appeal by the PTO.

The timing and ultimate outcome of Plaintiff's motion for summary judgment enjoining the PTO from proceeding with the reexamination of the Merged Requests, and the consequent reexamination of the Merged Requests by the PTO if the motion is denied by the U.S. District Court, the Lilly litigation (including the pending bench trial and any appeal of the jury verdict and court's ruling in the bench trial), and the Amgen litigation (including our pending motion to dismiss) cannot be determined at this time, and, as a result, no determination can be made with respect to allowance of the claims of the `516 Patent in any reexamination proceedings, nor can any final determination be made with respect to the validity or infringement of the claims of the `516 Patent in the Lilly litigation and the Amgen litigation, nor can management predict whether the damages awarded by the jury in the U.S. District Court in the Lilly litigation will be upheld, eliminated or limited. Although we have prevailed at trial in the Lilly litigation, the damages we have been awarded by the jury may be eliminated or limited by an adverse finding upon appeal or in the event that the claims of the `516 Patent are invalidated by the PTO.

23

ITEM 1A.   RISK FACTORS

There have been no material changes to the risk factors included in our Annual Report on Form 10−K for the fiscal year ended December 31, 2005, other than as set forth below:

*We will continue to expend significant resources on the enforcement and licensing of our NF−κB patent portfolio and may be unable to generate material revenues from these efforts, if we are unable to enforce against, or license our NF−κB patents to, pharmaceutical and biotechnology companies.*

We are the exclusive licensee of a family of patents, three in the U.S. and one in Europe, including a pioneering U.S. patent covering methods of treating human disease by regulating NF−κB cell−signaling activity, hereinafter referred to as the '516 Patent, awarded to a team of inventors from The Whitehead Institute for Biomedical Research, Massachusetts Institute of Technology and Harvard University. We have initiated a licensing program to generate revenues from the discovery, development, manufacture and sale of products covered by our NF−κB patent portfolio. These patents have been, and in the future may be, challenged and may be subsequently narrowed, invalidated, declared unenforceable or circumvented, any of which could materially impact our ability to generate licensing revenues from them.

On June 25, 2002, we, together with these academic institutions, hereinafter collectively referred to as the Plaintiffs, filed a lawsuit in the United States District Court for the District of Massachusetts, or the U.S. District Court, against Eli Lilly and Company, hereinafter referred to as Lilly, alleging infringement of certain claims of the '516 Patent through sales of Lilly's osteoporosis drug, Evista®, and its septic shock drug, Xigris®.

This case was tried before a jury in the U.S. District Court from April 10, 2006 through April 28, 2006. After deliberations, on May 4, 2006, the jury rendered a verdict in favor of the Plaintiffs by finding that the NF−κB '516 Claims asserted in the lawsuit are valid and infringed by Lilly through sales of Evista and Xigris in the United States. However, a separate trial, or bench trial, is scheduled to begin August 7, 2006 on certain defenses asserted by Lilly relating to the validity and enforceability of the '516 Claims before a final judgment may be entered in this lawsuit by the U.S. District Court. Lilly also has the right to file motions challenging the jury's verdict in this lawsuit and to file an appeal of the jury's verdict and other rulings by the U.S. District Court.

On April 20, 2006, Amgen Inc. and certain affiliated entities, hereinafter referred to as Amgen, filed a lawsuit against us in the U.S. District Court for the District of Delaware seeking a declaratory judgment that each of the claims contained in the '516 Patent are invalid and that Amgen has not infringed any of the claims of the '516 Patent based on activities related to Amgen's products, Enbrel® and Kineret®. We filed a motion to dismiss this action on June 14, 2006, and a hearing on our motion is scheduled for September 11, 2006.

In addition, on April 4, 2006, Lilly filed a request in the United States Patent and Trademark Office, or PTO, to reexamine the patentability of certain claims of the '516 Patent. An unrelated third party filed a similar request in the PTO on December 2, 2005 to reexamine the patentability of certain claims of the '516 Patent. These two requests have been merged by the PTO and the PTO issued its first office action on August 2, 2006. The Plaintiffs have filed a complaint in the U.S. District Court in the Eastern District of Virginia requesting that the court enjoin the PTO from continuing with the reexamination proceedings, along with a motion for summary judgment, which is scheduled for hearing on September 11, 2006. However, we can provide no assurance that the Plaintiffs will prevail in this action and that the PTO will not subsequently invalidate some or all of the claims of the '516 Patent.

As exclusive licensee of this patent, we are obligated for the costs expended for its prosecution in the PTO, for its enforcement in the above noted litigation and otherwise. Therefore, we will continue to expend significant capital and management resources pursuing these matters in court and in the reexamination process in the PTO, and the outcome is uncertain.

24

Source: ARIAD PHARMACEUTICAL, 10-Q, August 08, 2006

If some or all of the claims of the '516 Patent are invalidated by the PTO or in the courts or found not to be infringed in these matters, we will not realize any revenues on sales of the above-named products, and could be liable under certain limited circumstances in the Lilly litigation for litigation costs and potentially attorneys' fees. Additionally, although we have prevailed in the jury trial in the Lilly litigation, the damages awarded to us and the other Plaintiffs could be subsequently eliminated or limited by an adverse finding by the U.S. District Court judge following the bench trial, upon appeal or in the event that the claims of the '516 Patent are invalidated by the PTO. Invalidation of any of the claims of the '516 Patent in litigation or by the PTO or in the courts would have a significant adverse impact on our ability to generate revenues from our NF–κB licensing program. Moreover, significant expenditures to enforce these patent rights without generating revenues or accessing additional capital or other funding could adversely impact our ability to further our clinical programs and our research and development programs at the current levels or at levels that may be required in the future.

*We may not be able to protect our intellectual property relating to our research programs, technologies and products.*

We and our licensors have issued patents and pending patent applications covering research methods useful in drug discovery, new chemical compounds discovered in our drug discovery programs including, among others, AP23573, certain components, configurations and uses of our cell–signaling regulation technologies and products–in–development, methods and materials for manufacturing our products–in–development and other pharmaceutical products and methods and materials for conducting pharmaceutical research. We have a licensing program to generate revenues from the use of our ARGENT cell–signaling regulation technologies and our NF–κB intellectual property. Pending patent applications may not issue as patents and may not issue in all countries in which we develop, manufacture or sell our products or in countries where others develop, manufacture and sell products using our technologies. In addition, patents issued to us or our licensors may be challenged, as is the case with the Lilly litigation and related PTO proceedings and the Amgen litigation regarding the NF–κB '516 Patent, and they may be subsequently narrowed, invalidated or circumvented. In that event, such patents may not afford meaningful protection for our technologies or product candidates, which would materially impact our ability to develop and market our product candidates and to generate licensing revenues from our patent portfolio. Certain technologies utilized in our research and development programs are already in the public domain. Moreover, a number of our competitors have developed technologies, filed patent applications or obtained patents on technologies, compositions and methods of use that are related to our business and may cover or conflict with our patent applications, technologies or product candidates. Such conflicts could limit the scope of the patents that we may be able to obtain or may result in the denial of our patent applications. If a third party were to obtain intellectual proprietary protection for any of the foregoing, we may be required to challenge such protection, terminate or modify our programs impacted by such protection or obtain licenses from such third parties, which might not be available or acceptable terms or at all.

*Because we do not own all of the outstanding stock of our subsidiary, AGTI, we may not realize all of the potential future economic benefit from products developed based on technology licensed to or owned by our subsidiary.*

Our majority–owned subsidiary, AGTI, holds licenses from Harvard University, Stanford University and other universities relating to our ARGENT cell–signaling regulation technology, and owns the intellectual property on our mTOR inhibitors derived from our ARGENT programs, including AP23573. The two directors of AGTI are also members of the Board of Directors of ARIAD. Minority stockholders of AGTI, including Harvard University, Stanford University, several of our scientific advisors, and several current and former members of our management and Board of Directors, own 20% of the issued and outstanding common stock of AGTI. We own the remaining 80% of the issued and outstanding common stock of AGTI.

25

Source: ARIAD PHARMACEUTICAL, 10–Q, August 08, 2006

We do not currently have a license agreement with AGTI that provides us with rights to commercialize product candidates, based on our ARGENT cell−signaling regulation technology or mTOR inhibitors derived from our ARGENT programs, solely for our own benefit, as opposed to for the benefit of AGTI. If we determine it to be in the best interests of our stockholders to commercialize these product candidates solely for our own benefit, we may negotiate with AGTI to obtain a license, on terms to be determined, granting us the sole rights to commercialize such product candidates. If we enter into such a license, the future economic benefit to our stockholders from our commercialization of such products, if any, will be diminished by any royalties or other payments paid under a future agreement with AGTI. If we do not enter into such a license, then the future economic benefit to our stockholders from our commercialization of such products on behalf of AGTI would be in the form of a dividend or other payments received in respect of our 80% interest in AGTI.

Alternatively, if we determine it to be in the best interests of our stockholders, we may seek to acquire some or all of the interests of the minority stockholders in AGTI for cash, shares of our common stock or other securities in a merger, exchange offer or other transaction. If we acquire all of the interests of the minority stockholders in AGTI, then our stockholders will receive all of the future economic benefit from our commercialization of such products on our own behalf. If we acquire these minority interests, we anticipate that this transaction will result in dilution to our stockholders and will require our incurrence of significant transaction costs, which are currently unknown. On January 13, 2004, we acquired an additional 351,909 shares of AGTI common stock, representing approximately 6% of AGTI's outstanding common stock, for a total purchase price of approximately $8.8 million, effected through the reduction of inter−company debt, subject to adjustment in certain circumstances, in order to maintain our 80% interest in AGTI. While such valuation was based on a good−faith determination made by the independent and disinterested members of our Board of Directors as of that date, the economic value of the minority stockholders' interests is difficult to quantify in the absence of a public market. If we acquire all of the interests of the minority stockholders in AGTI, a variety of valuation methodologies may be employed to determine the value per share of AGTI common stock. Factors impacting this valuation would include the progress, likelihood and cost of development and commercialization of product candidates, potential future income streams therefrom, availability of funding and other factors. If we acquire the minority interests for consideration valued in excess of the value implicitly attributed to such AGTI shares by the market, this could result in a decline in our stock price. If we choose to acquire some or all of these minority interests through a merger in which we do not solicit the consent of the minority stockholders of AGTI, we could become subject to litigation or an appraisal procedure, which would result in additional expense and diversion of management resources.

The independent and disinterested members of our Board of Directors have engaged legal counsel to help them evaluate strategic options regarding AGTI, which could include an acquisition of some or all of the interests of the minority stockholders in AGTI, a license from AGTI and/or certain other transactions, and our independent and disinterested directors may engage other advisors to assist them with such evaluation. There can be no assurance, however, that we will, at any time, enter into a transaction with AGTI. If any of these strategic options is pursued, there can be no assurance as to the timing of any such transaction, the form of such transaction, the particular transaction terms such as the form or amount of consideration offered or provided by us, or the consequences of any such proposed or completed transaction to us or the AGTI minority stockholders.

26

**ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS**

Our Annual Meeting of stockholders was held on June 14, 2006. Of 62,097,526 shares of common stock issued and outstanding and eligible to vote as of the record date of April 19, 2006, a quorum of 51,988,654 shares or 84% of the eligible shares, was present in person or represented by proxy. The following actions were taken at such meeting.

(a) Reelection of the following Class 3 Directors of the Company.

|  | Voted For | Withhold Authority |
|---|---|---|
| Harvey J. Berger, M.D. | 50,705,739 | 1,282,915 |
| Michael D. Kishbauch | 50,929,335 | 1,059,319 |
| Burton E. Sobel, M.D. | 50,932,088 | 1,056,566 |

After the meeting, Athanase Lavidas, Ph.D., Peter J. Nelson and Mary C. Tanner continued to serve as Class 1 Directors of the Company for terms which expire in 2007 and until their successors are duly elected and qualified. Jay R. LaMarche, Sandford D. Smith and Elizabeth H.S. Wyatt continued to serve as Class 2 Directors of the Company for terms which expire in 2008 and until their successors are duly elected and qualified.

(b) Ratification of the selection of the Audit Committee of the Board of Directors of Deloitte & Touche LLP as our independent registered public accounting firm for the year ending December 31, 2006. The voting results were 50,738,595 votes for, 1,099,231 votes against, and 150,877 votes abstaining.

(c) Approval of adoption of the ARIAD Pharmaceuticals, Inc. 2006 Long–Term Incentive Plan and reservation of 4,500,000 shares of common stock for stock options and other equity–based grants pursuant to this plan. The voting results were 24,240,426 votes for, 3,158,886 votes against and 191,353 votes abstaining. There were also 24,397,989 broker non–votes.

27

Source: ARIAD PHARMACEUTICAL, 10–Q, August 08, 2006

**ITEM 6. EXHIBITS**

| | |
|---|---|
| 10.1 | ARIAD Pharmaceuticals, Inc. 2006 Long–Term Incentive Plan (filed as Appendix A to our definitive proxy statement on Schedule 14A (File No. 000–21696) filed with the Commission on April 28, 2006). |
| 10.2 | Form of Stock Option Certificate under the ARIAD Pharmaceuticals, Inc. 2006 Long–Term Incentive Plan. |
| 10.3 | Form of Stock Grant Certificate under the ARIAD Pharmaceuticals, Inc. 2006 Long–Term Incentive Plan. |
| 10.4 | Form of Restricted Stock Unit Certificate under the ARIAD Pharmaceuticals, Inc. 2006 Long–Term Incentive Plan. |
| 10.5 | Form of Indemnity Agreement between ARIAD Pharmaceuticals, Inc. and its directors and officers. |
| 31.1 | Certification of the Chief Executive Officer. |
| 31.2 | Certification of the Chief Financial Officer. |
| 32.1 | Certification pursuant to Section 906 of the Sarbanes–Oxley Act of 2002. |

ARIAD and the ARIAD logo are our registered trademarks and ARGENT is our trademark. The domain name and website address www.ariad.com, and all rights thereto, are registered in the name of, and owned by, ARIAD. The information in our website is not intended to be part of this Quarterly Report on Form 10–Q. We include our website address herein only as an inactive textual reference and do not intend it to be an active link to our website.

28

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

<div style="margin-left:40%">

ARIAD Pharmaceuticals, Inc.
(Registrant)


By: /s/ Harvey J. Berger, M.D.
———————————————
Harvey J. Berger, M.D.
Chairman and Chief Executive Officer


By: /s/ Edward M. Fitzgerald
———————————————
Edward M. Fitzgerald
Senior Vice President, Finance and Corporate Operations and Chief Financial Officer
(Duly authorized officer, principal financial officer
and chief accounting officer)

</div>

Date: August 8, 2006

<div style="text-align:center">29</div>

Source: ARIAD PHARMACEUTICAL, 10-Q, August 08, 2006

### EXHIBIT INDEX

| Exhibit No. | Title |
| --- | --- |
| 10.1 | ARIAD Pharmaceuticals, Inc. 2006 Long–Term Incentive Plan (filed as Appendix A to our definitive proxy statement on Schedule 14A (File No. 000–21696) filed with the Commission on April 28, 2006). |
| 10.2 | Form of Stock Option Certificate under the ARIAD Pharmaceuticals, Inc. 2006 Long–Term Incentive Plan. |
| 10.3 | Form of Stock Grant Certificate under the ARIAD Pharmaceuticals, Inc. 2006 Long–Term Incentive Plan. |
| 10.4 | Form of Restricted Stock Unit Certificate under the ARIAD Pharmaceuticals, Inc. 2006 Long–Term Incentive Plan. |
| 10.5 | Form of Indemnity Agreement between ARIAD Pharmaceuticals, Inc. and its directors and officers. |
| 31.1 | Certification of the Chief Executive Officer. |
| 31.2 | Certification of the Chief Financial Officer. |
| 32.1 | Certification pursuant to Section 906 of the Sarbanes–Oxley Act of 2002. |

Source: ARIAD PHARMACEUTICAL, 10-Q, August 08, 2006

Source: ARIAD PHARMACEUTICAL, 10−Q, August 08, 2006

Exhibit 10.2

## FORM OF
## STOCK OPTION CERTIFICATE

This Stock Option Certificate certifies that, pursuant to the ARIAD Pharmaceuticals, Inc. 2006 Long–Term Incentive Plan (the "2006 Plan"), the Board of Directors of ARIAD Pharmaceuticals, Inc. (the "Company") has granted an option (the "Option") to purchase shares of the Company's common stock, $.001 par value per share ("Shares"), as follows:

**Name of Participant:**
**Number of Option Shares:**
**Type of Stock Option Grant:**
**Exercise Price:**
**Date of Grant:**

This Option is subject to all the terms, conditions and limitations set forth in the 2006 Plan, which is incorporated herein by reference, and to the following additional terms specified by the Board of Directors of the Company. The Option shall be exercisable as follows:

[terms]

The Option shall terminate ten years from the Date of Grant or such shorter period as set forth in the 2006 Plan in the event of the Optionee's termination of service, Death or Disability. The Option is not assignable or transferable, other than as provided in the 2006 Plan. No partial exercise of the Option may be for less than 100 full shares. In no event shall the Company be required to issue fractional shares.

This Stock Option Certificate, together with the 2006 Plan and any other written agreement between the Company and the Participant relevant to the subject matter hereof and executed contemporaneously herewith or hereafter, embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written agreements and understandings relating to the subject matter hereof and no other statement, representation, warranty, covenant or agreement shall affect or be used to interpret, change or restrict, the express terms and provisions of this Stock Option Grant, provided, however, in any event, this Stock Option Certificate shall be subject to and governed by the 2006 Plan.

In witness whereof, the Company has caused this Option Certificate to be executed by its duly authorized officers.

Dated:

_____          _____
Edward M. Fitzgerald                                         Harvey J. Berger, M.D.
Senior Vice President                                          Chairman and Chief Executive Officer
Finance and Corporate Operations
Chief Financial Officer

Exhibit 10.3

FORM OF
**STOCK GRANT CERTIFICATE**

This Stock Grant Certificate certifies that, pursuant to the ARIAD Pharmaceuticals, Inc. 2006 Long–Term Incentive Plan (the "2006 Plan"), the Board of Directors of ARIAD Pharmaceuticals, Inc. (the "Company") has granted shares of Common Stock, $.001 par value per share, of the Company (the "Stock Grant"), as follows:

**Name of Participant:**
**Number of Granted Shares:**
**Grant Price:**
**Grant Date:**

The Stock Grant is subject to all the terms, conditions and limitations set forth in the 2006 Plan, which is incorporated herein by reference, and to the following additional terms specified by the Board of Directors of the Company. Capitalized terms used herein and not otherwise defined shall have the meaning set forth in the 2006 Plan.

*Legends.* To the extent the Participant is an affiliate at the date of issuance of the Granted Shares, all certificates representing the Granted Shares to be issued to the Participant pursuant to this Stock Grant Certificate shall contain a legend required by virtue of the fact that the Participant is an affiliate (as defined in Rule 144(a)(1) of the Securities Act of 1933, as amended) of the Company.

*Tax Considerations.* The Participant acknowledges and agrees that any income taxes or other taxes due from the Participant with respect to the Granted Shares shall be the Participant's responsibility.

In witness whereof, the Company has caused this Stock Grant Certificate to be executed by its duly authorized officer.

Dated:

ARIAD PHARMACEUTICALS, INC.:

_____
Harvey J. Berger, M.D.
Chairman and Chief Executive Officer

_____
Edward M. Fitzgerald
Senior Vice President
Finance and Corporate Operations
Chief Financial Officer

Source: ARIAD PHARMACEUTICAL, 10–Q, August 08, 2006

Exhibit 10.4

<div align="center">

FORM OF
**RESTRICTED STOCK UNIT CERTIFICATE**

</div>

This Restricted Stock Unit Certificate certifies that, pursuant to the ARIAD Pharmaceuticals, Inc. 2006 Long−Term Incentive Plan (the "2006 Plan"), the Board of Directors of ARIAD Pharmaceuticals, Inc. (the "Company") has granted the right to receive shares of Common Stock, $.001 par value per share, of the Company (the "Grant"), as follows:

> **Name of Participant:**
> **Number of Granted Shares:**
> **Grant Price:**
> **Grant Date:**
> **Share Issue Date:**

The Grant is subject to all the terms, conditions and limitations set forth in the 2006 Plan, which is incorporated herein by reference, and to the following additional terms specified by the Board of Directors of the Company. Capitalized terms used herein and not otherwise defined shall have the meaning set forth in the 2006 Plan.

*Legends*. To the extent the Participant is an affiliate at the date of issuance of the Granted Shares, all certificates representing the Granted Shares to be issued to the Participant pursuant to this Restricted Stock Unit Certificate shall contain a legend required by virtue of the fact that the Participant is an affiliate (as defined in Rule 144(a)(1) of the Securities Act of 1933, as amended) of the Company.

*Tax Considerations*. The Participant acknowledges and agrees that any income taxes or other taxes due from the Participant with respect to the Granted Shares shall be the Participant's responsibility.

In witness whereof, the Company has caused this Restricted Stock Unit Certificate to be executed by its duly authorized officer.

Dated:

ARIAD PHARMACEUTICALS, INC.:

_____                    _____
Harvey J. Berger, M.D.                          Edward M. Fitzgerald
Chairman and Chief Executive Officer            Senior Vice President
                                                Finance and Corporate Operations
                                                Chief Financial Officer

Exhibit 10.5

ATTORNEY−CLIENT PRIVILEGED
HIGHLY CONFIDENTIAL

## FORM OF INDEMNITY AGREEMENT

This Indemnity Agreement ("Agreement") is made as of _____, ____ by and between ARIAD Pharmaceuticals, Inc., a Delaware corporation (the "Company"), and _____ ("Indemnitee").

## RECITALS

WHEREAS,  highly competent persons have become more reluctant to serve publicly−held corporations as directors or in other capacities unless they are provided with adequate protection through insurance or adequate indemnification against inordinate risks of claims and actions against them arising out of their service to and activities on behalf of the corporation.

WHEREAS,  the Board of Directors of the Company (the "Board") has determined that, in order to attract and retain qualified individuals, the Company will attempt to maintain on an ongoing basis, at its sole expense, liability insurance to protect persons serving the Company and its subsidiaries from certain liabilities. Although the furnishing of such insurance has been a customary and widespread practice among United States−based corporations and other business enterprises, the Company believes that, given current market conditions and trends, such insurance may be available to it in the future only at higher premiums and with more exclusions. At the same time, directors, officers and other persons in service to corporations or business enterprises are being increasingly subjected to expensive and time−consuming litigation relating to, among other things, matters that traditionally would have been brought only against the Company or business enterprise itself. The Certificate of Incorporation (the "Charter") and the Bylaws of the Company require indemnification of the officers and directors of the Company. Indemnitee may also be entitled to indemnification pursuant to applicable provisions of the Delaware General Corporation Law ("DGCL"). The Charter, the Bylaws and the DGCL expressly provide that the indemnification provisions set forth therein are not exclusive, and thereby contemplate that contracts may be entered into between the Company and members of the board of directors, officers and other persons with respect to indemnification, hold harmless, exoneration, advancement and reimbursement rights.

WHEREAS,  the uncertainties relating to such insurance and to indemnification have increased the difficulty of attracting and retaining such persons.

WHEREAS,  the Board has determined that the increased difficulty in attracting and retaining such persons is detrimental to the best interests of the Company's stockholders and that the Company should act to assure such persons that there will be increased certainty of such protection in the future.

WHEREAS, it is reasonable, prudent and necessary for the Company contractually to obligate itself to indemnify, hold harmless, exonerate and to advance expenses on behalf of, such persons to the fullest extent permitted by applicable law so that they will serve or continue to serve the Company free from undue concern that they will not be so protected against liabilities.

WHEREAS, this Agreement is a supplement to and in furtherance of the Charter, the Bylaws of the Company and any resolutions adopted pursuant thereto, and shall not be deemed a substitute therefor, nor to diminish or abrogate any rights of Indemnitee thereunder.

WHEREAS, Indemnitee does not regard the protection available under the Company's Charter, Bylaws and insurance as adequate in the present circumstances, and may not be willing to serve as an officer or director without adequate protection, and the Company desires Indemnitee to serve in such capacity. Indemnitee is willing to serve, continue to serve and to take on additional service for or on behalf of the Company on the condition that he be so indemnified.

NOW, THEREFORE, in consideration of the premises and the covenants contained herein, the Company and Indemnitee do hereby covenant and agree as follows:

1. **Services To The Company.** Indemnitee will serve or continue to serve as an officer, director or key employee of the Company for so long as Indemnitee is duly elected or appointed or until Indemnitee tenders his resignation.

2. **Definitions.** As used in this Agreement:

(a) References to "agent" shall mean any person who is or was a director, officer, or employee of the Company or a subsidiary of the Company or other person authorized by the Company to act for the Company, to include such person serving in such capacity as a director, officer, employee, fiduciary or other official of another corporation, partnership, limited liability company, joint venture, trust or other enterprise at the request of, for the convenience of, or to represent the interests of the Company or a subsidiary of the Company.

(b) The terms "Beneficial Owner" and "Beneficial Ownership" shall have the meanings set forth in Rule 13d–3 promulgated under the Exchange Act (as defined below) as in effect on the date hereof.

(c) A "Change in Control" shall be deemed to occur upon the earliest to occur after the date of this Agreement of any of the following events:

(i) _Acquisition of Stock by Third Party._ Any Person (as defined below) is or becomes the Beneficial Owner, directly or indirectly, of securities of the Company representing fifteen percent (15%) or more of the combined voting power of the Company's then outstanding securities entitled to vote generally in the election of directors, unless (1) the change in the relative Beneficial Ownership of the Company's securities by any Person results solely from a reduction in the aggregate number of outstanding shares of securities entitled to vote generally in the election of directors, or (2) such acquisition was approved in advance by the Continuing Directors (as defined below) and such acquisition would not constitute a Change in Control under part (iii) of this definition;

2

Source: ARIAD PHARMACEUTICAL, 10–Q, August 08, 2006

(ii) <u>Change in Board of Directors</u>. Individuals who, as of the date hereof, constitute the Board, and any new director whose election by the Board or nomination for election by the Company's stockholders was approved by a vote of at least two thirds of the directors then still in office who were directors on the date hereof or whose election for nomination for election was previously so approved (collectively, the "Continuing Directors"), cease for any reason to constitute at least a majority of the members of the Board;

(iii) <u>Corporate Transactions</u>. The effective date of a reorganization, merger or consolidation of the Company (a "Business Combination"), in each case, unless, following such Business Combination: (1) all or substantially all of the individuals and entities who were the Beneficial Owners of securities entitled to vote generally in the election of directors immediately prior to such Business Combination beneficially own, directly or indirectly, more than 51% of the combined voting power of the then outstanding securities of the Company entitled to vote generally in the election of directors resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more Subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination, of the securities entitled to vote generally in the election of directors; (2) no Person (excluding any corporation resulting from such Business Combination) is the Beneficial Owner, directly or indirectly, of 15% or more of the combined voting power of the then outstanding securities entitled to vote generally in the election of directors of such corporation except to the extent that such ownership existed prior to the Business Combination; and (3) at least a majority of the Board of Directors of the corporation resulting from such Business Combination were Continuing Directors at the time of the execution of the initial agreement, or of the action of the Board of Directors, providing for such Business Combination;

(iv) <u>Liquidation</u>. The approval by the stockholders of the Company of a complete liquidation of the Company or an agreement or series of agreements for the sale or disposition by the Company of all or substantially all of the Company's assets, other than factoring the Company's current receivables or escrows due (or, if such approval is not required, the decision by the Board to proceed with such a liquidation, sale, or disposition in one transaction or a series of related transactions); or

(v) <u>Other Events</u>. There occurs any other event of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A (or a response to any similar item on any similar schedule or form) promulgated under the Exchange Act (as defined below), whether or not the Company is then subject to such reporting requirement.

(d) "Corporate Status" describes the status of a person who is or was a director, officer, trustee, general partner, managing member, fiduciary, employee or agent of the Company or of any other Enterprise (as defined below) which such person is or was serving at the request of the Company.

3

Source: ARIAD PHARMACEUTICAL, 10-Q, August 08, 2006

(e) "Delaware Court" shall mean the Court of Chancery of the State of Delaware.

(f) "Disinterested Director" shall mean a director of the Company who is not and was not a party to the Proceeding (as defined below) in respect of which indemnification is sought by Indemnitee.

(g) "Enterprise" shall mean the Company and any other corporation, constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger to which the Company (or any of its wholly owned subsidiaries) is a party, limited liability company, partnership, joint venture, trust, employee benefit plan or other enterprise of which Indemnitee is or was serving at the request of the Company as a director, officer, trustee, general partner, managing member, fiduciary, employee or agent.

(h) "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

(i) "Expenses" shall include attorneys' fees and costs, retainers, court costs, transcript costs, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or expenses in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, or otherwise participating in, a Proceeding (as defined below). Expenses also shall include Expenses incurred in connection with any appeal resulting from any Proceeding (as defined below), including without limitation the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(j) "Independent Counsel" shall mean a law firm or a member of a law firm that is experienced in matters of corporation law and neither presently is, nor in the past five years has been, retained to represent: (i) the Company or Indemnitee in any matter material to either such party (other than with respect to matters concerning the Indemnitee under this Agreement, or of other indemnitees under similar indemnification agreements); or (ii) any other party to the Proceeding (as defined below) giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(k) References to "fines" shall include any excise tax assessed on Indemnitee with respect to any employee benefit plan; references to "serving at the request of the Company" shall include any service as a director, officer, employee, agent or fiduciary of the Company which imposes duties on, or involves services by, such director, officer, employee, agent or fiduciary with respect to an employee benefit plan, its participants or beneficiaries; and if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in the best interests of the participants and beneficiaries of an employee benefit plan, Indemnitee shall be deemed to have acted in a manner "not opposed to the best interests of the Company" as referred to in this Agreement.

4

(l)    The term "Person" shall have the meaning as set forth in Sections 13(d) and 14(d) of the Exchange Act as in effect on the date hereof; provided, however, that "Person" shall exclude: (i) the Company; (ii) any Subsidiaries (as defined below) of the Company; (iii) any employment benefit plan of the Company or of a Subsidiary (as defined below) of the Company or of any corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company; and (iv) any trustee or other fiduciary holding securities under an employee benefit plan of the Company or of a Subsidiary (as defined below) of the Company or of a corporation owned directly or indirectly by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(m)    A "Potential Change in Control" shall be deemed to have occurred if: (i) the Company enters into an agreement or arrangement, the consummation of which would result in the occurrence of a Change in Control; (ii) any Person or the Company publicly announces an intention to take or consider taking actions which if consummated would constitute a Change in Control; (iii) any Person who becomes the Beneficial Owner, directly or indirectly, of securities of the Company representing 5% or more of the combined voting power of the Company's then outstanding securities entitled to vote generally in the election of directors increases his Beneficial Ownership of such securities by 5% or more over the percentage so owned by such Person on the date hereof; or (iv) the Board adopts a resolution to the effect that, for purposes of this Agreement, a Potential Change in Control has occurred.

(n)    The term "Proceeding" shall include any threatened, pending or completed action, suit, arbitration, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened or completed proceeding, whether brought in the right of the Company or otherwise and whether of a civil (including intentional or unintentional tort claims), criminal, administrative or investigative nature, in which Indemnitee was, is or will be involved as a party or otherwise by reason of the fact that Indemnitee is or was a director or officer of the Company, by reason of any action (or failure to act) taken by him or of any action (or failure to act) on his part while acting as a director or officer of the Company, or by reason of the fact that he is or was serving at the request of the Company as a director, officer, trustee, general partner, managing member, fiduciary, employee or agent of any other Enterprise, in each case whether or not serving in such capacity at the time any liability or expense is incurred for which indemnification, reimbursement, or advancement of expenses can be provided under this Agreement.

5

Source: ARIAD PHARMACEUTICAL, 10-Q, August 08, 2006

(o) The term "Subsidiary," with respect to any Person, shall mean any corporation or other entity of which a majority of the voting power of the voting equity securities or equity interest is owned, directly or indirectly, by that Person.

3. **Indemnity In Third–Party Proceedings.** The Company shall indemnify and hold harmless Indemnitee in accordance with the provisions of this Section 3 if Indemnitee was, is, or is threatened to be made, a party to or a participant (as a witness or otherwise) in any Proceeding, other than a Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 3, Indemnitee shall be indemnified against all Expenses, judgments, liabilities, fines, penalties and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such Expenses, judgments, fines, penalties and amounts paid in settlement) actually and reasonably incurred by Indemnitee or on his behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company and, in the case of a criminal Proceeding, had no reasonable cause to believe that his conduct was unlawful.

4. **Indemnity In Proceedings By Or In The Right Of The Company.** The Company shall indemnify and hold harmless Indemnitee in accordance with the provisions of this Section 4 if Indemnitee was, is, or is threatened to be made, a party to or a participant (as a witness or otherwise) in any Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 4, Indemnitee shall be indemnified against all Expenses actually and reasonably incurred by him or on his behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company. No indemnification, hold harmless or exoneration for Expenses shall be made under this Section 4 in respect of any claim, issue or matter as to which Indemnitee shall have been finally adjudged by a court to be liable to the Company, unless and only to the extent that any court in which the Proceeding was brought or the Delaware Court shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, Indemnitee is fairly and reasonably entitled to indemnification., to be held harmless or to exoneration.

5. **Indemnification For Expenses Of A Party Who Is Wholly Or Partly Successful.** Notwithstanding any other provisions of this Agreement, to the extent that Indemnitee is a party to (or a participant in) and is successful, on the merits or otherwise, in any Proceeding or in defense of any claim, issue or matter therein, in whole or in part, the Company shall indemnify and hold harmless Indemnitee against all Expenses actually and reasonably incurred by him in connection therewith. If Indemnitee is not wholly successful in such Proceeding but is successful, on the merits or otherwise, as to one or more but less than all claims, issues or matters in such Proceeding, the Company shall indemnify and hold harmless Indemnitee against all Expenses actually and reasonably incurred by him or on his behalf in connection with each successfully resolved claim, issue or matter. If the Indemnitee is not wholly successful in such Proceeding, the Company also shall indemnify and hold harmless Indemnitee against all Expenses reasonably incurred in connection with a claim, issue or matter related to any claim, issue, or matter on which the Indemnitee was successful. For purposes of this Section and without limitation, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

6

Source: ARIAD PHARMACEUTICAL, 10-Q, August 08, 2006

6. **Indemnification For Expenses Of A Witness.** Notwithstanding any other provision of this Agreement, to the extent that Indemnitee is, by reason of his Corporate Status, a witness in any Proceeding to which Indemnitee is not a party, he shall be indemnified and held harmless against all Expenses actually and reasonably incurred by him or on his behalf in connection therewith.

7. **Additional Indemnification, Hold Harmless and Exoneration Rights.**

(a) Notwithstanding any limitation in Sections 3, 4, or 5, the Company shall indemnify and hold harmless Indemnitee if Indemnitee is a party to or threatened to be made a party to any Proceeding (including a Proceeding by or in the right of the Company to procure a judgment in its favor) against all Expenses, judgments, fines, penalties and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such Expenses, judgments, fines, penalties and amounts paid in settlement) actually and reasonably incurred by Indemnitee in connection with the Proceeding. No indemnification, hold harmless or exoneration rights shall be made under this Section 7(a) on account of Indemnitee's conduct which constitutes a breach of Indemnitee's duty of loyalty to the Company or its stockholders or is an act or omission not in good faith or which involves intentional misconduct or a knowing violation of the law.

(b) Notwithstanding any limitation in Sections 3, 4, 5 or 7(a), the Company shall indemnify and hold harmless Indemnitee if Indemnitee is a party to or threatened to be made a party to any Proceeding (including a Proceeding by or in the right of the Company to procure a judgment in its favor) against all Expenses, judgments, fines, penalties and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such Expenses, judgments, fines, penalties and amounts paid in settlement) actually and reasonably incurred by Indemnitee in connection with the Proceeding.

8. **Contribution In The Event Of Joint Liability.**

(a) To the fullest extent permissible under applicable law, if the indemnification and hold harmless rights provided for in this Agreement are unavailable to Indemnitee in whole or in part for any reason whatsoever, the Company, in lieu of indemnifying and holding harmless Indemnitee, shall pay, in the first instance, the entire amount incurred by Indemnitee, whether for judgments, liabilities, fines, penalties, amounts paid or to be paid in settlement and/or for Expenses, in connection with any Proceeding without requiring Indemnitee to contribute to such payment, and the Company hereby waives and relinquishes any right of contribution it may have at any time against Indemnitee.

Source: ARIAD PHARMACEUTICAL, 10-Q, August 08, 2006

(b)   The Company shall not enter into any settlement of any Proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such Proceeding) unless such settlement provides for a full and final release of all claims asserted against Indemnitee.

(c)   The Company hereby agrees to fully indemnify and hold harmless Indemnitee from any claims for contribution which may be brought by officers, directors or employees of the Company other than Indemnitee who may be jointly liable with Indemnitee.

9.   **Exclusions.** Notwithstanding any provision in this Agreement, the Company shall not be obligated under this Agreement to make any indemnification, hold harmless or exoneration payments in connection with any claim made against Indemnitee:

(a)   for which payment has actually been received by or on behalf of Indemnitee under any insurance policy or other indemnity provision, except with respect to any excess beyond the amount actually received under any insurance policy, contract, agreement, other indemnity provision or otherwise;

(b)   for an accounting of profits made from the purchase and sale (or sale and purchase) by Indemnitee of securities of the Company within the meaning of Section 16(b) of the Exchange Act or similar provisions of state statutory law or common law; or

(c)   except as otherwise provided in Sections 14(e)–(f) hereof, prior to a Change in Control, in connection with any Proceeding (or any part of any Proceeding) initiated by Indemnitee, including any Proceeding (or any part of any Proceeding) initiated by Indemnitee against the Company or its directors, officers, employees or other indemnitees, unless (i) the Board authorized the Proceeding (or any part of any Proceeding) prior to its initiation or (ii) the Company provides the indemnification, hold harmless or exoneration payment, in its sole discretion, pursuant to the powers vested in the Company under applicable law.

10.   **Advances Of Expenses; Defense Of Claim.**

(a)   Notwithstanding any provision of this Agreement to the contrary, and to the fullest extent permitted by applicable law, the Company shall advance the Expenses incurred by Indemnitee (or reasonably expected by Indemnitee to be incurred by Indemnitee within three months) in connection with any Proceeding within ten (10) days after the receipt by the Company of a statement or statements requesting such advances from time to time, whether prior to or after final disposition of any Proceeding. Advances shall be unsecured and interest free. Advances shall be made without regard to Indemnitee's ability to repay the Expenses and without regard to Indemnitee's ultimate entitlement to be indemnified, held harmless or exonerated under the other provisions of this Agreement. Advances shall include any and all reasonable Expenses incurred pursuing a Proceeding to enforce this right of advancement, including Expenses incurred preparing and forwarding statements to the Company to support the advances claimed. The Indemnitee shall qualify for advances, to the fullest extent permitted by applicable law, solely upon the execution and delivery to the Company of an undertaking providing that the Indemnitee undertakes to repay the advance to the extent that it is ultimately determined that Indemnitee is not entitled to be indemnified by the Company under the provisions of this Agreement, the Charter, the Bylaws of the Company, applicable law or otherwise. This Section 10(a) shall not apply to any claim made by Indemnitee for which an indemnification, hold harmless or exoneration payment is excluded pursuant to Section 9.

8

(b)  The Company will be entitled to participate in the Proceeding at its own expense.

(c)  The Company shall not settle any action, claim or Proceeding (in whole or in part) which would impose any Expense, judgment, fine, penalty or limitation on the Indemnitee without the Indemnitee's prior written consent.

**11.  Procedure For Notification And Application For Indemnification.**

(a)  Indemnitee agrees to notify promptly the Company in writing upon being served with any summons, citation, subpoena, complaint, indictment, information or other document relating to any Proceeding or matter which may be subject to indemnification, hold harmless or exoneration rights, or advancement of Expenses covered hereunder. The failure of Indemnitee to so notify the Company shall not relieve the Company of any obligation which it may have to the Indemnitee under this Agreement, or otherwise.

(b)  Indemnitee may deliver to the Company a written application to indemnify and hold harmless Indemnitee in accordance with this Agreement. Such application(s) may be delivered from time to time and at such time(s) as Indemnitee deems appropriate in his or her sole discretion. Following such a written application for indemnification by Indemnitee, the Indemnitee's entitlement to indemnification shall be determined according to Section 12(a) of this Agreement.

**12.  Procedure Upon Application For Indemnification.**

(a)  A determination, if required by applicable law, with respect to Indemnitee's entitlement to indemnification shall be made in the specific case by one of the following methods, which shall be at the election of Indemnitee: (i) by a majority vote of the Disinterested Directors, even though less than a quorum of the Board or (ii) by Independent Counsel in a written opinion to the Board, a copy of which shall be delivered to Indemnitee. The Company promptly will advise Indemnitee in writing with respect to any determination that Indemnitee is or is not entitled to indemnification, including a description of any reason or basis for which indemnification has been denied. If it is so determined that Indemnitee is entitled to indemnification, payment to Indemnitee shall be made within ten (10) days after such determination. Indemnitee shall reasonably cooperate with the person, persons or entity making such determination with respect to Indemnitee's entitlement to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information which is not privileged or otherwise protected from disclosure and which is reasonably available to Indemnitee and reasonably necessary to such determination. Any costs or Expenses (including attorneys' fees and disbursements) incurred by Indemnitee in so cooperating with the person, persons or entity making such determination shall be borne by the Company (irrespective of the determination as to Indemnitee's entitlement to indemnification) and the Company hereby indemnifies and agrees to hold Indemnitee harmless therefrom.

9

(b)    In the event the determination of entitlement to indemnification is to be made by Independent Counsel pursuant to Section 12(a) hereof, the Independent Counsel shall be selected as provided in this Section 12(b). The Independent Counsel shall be selected by Indemnitee (unless Indemnitee shall request that such selection be made by the Board), and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected and certifying that the Independent Counsel so selected meets the requirements of "Independent Counsel" as defined in Section 2 of this Agreement. If the Independent Counsel is selected by the Board, the Company shall give written notice to Indemnitee advising him of the identity of the Independent Counsel so selected and certifying that the Independent Counsel so selected meets the requirements of "Independent Counsel" as defined in Section 2 of this Agreement. In either event, Indemnitee or the Company, as the case may be, may, within ten (10) days after such written notice of selection shall have been received, deliver to the Company or to Indemnitee, as the case may be, a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements of "Independent Counsel" as defined in Section 2 of this Agreement, and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the person so selected shall act as Independent Counsel. If such written objection is so made and substantiated, the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court of competent jurisdiction has determined that such objection is without merit. If, within twenty (20) days after submission by Indemnitee of a written request for indemnification pursuant to Section 11(a) hereof, no Independent Counsel shall have been selected and not objected to, either the Company or Indemnitee may petition the Delaware Court for resolution of any objection which shall have been made by the Company or Indemnitee to the other's selection of Independent Counsel and/or for the appointment as Independent Counsel of a person selected by the Delaware Court, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under Section 12(a) hereof. Upon the due commencement of any judicial proceeding or arbitration pursuant to Section 14(a) of this Agreement, Independent Counsel shall be discharged and relieved of any further responsibility in such capacity (subject to the applicable standards of professional conduct then prevailing).

(c)    The Company agrees to pay the reasonable fees and expenses of Independent Counsel and to fully indemnify and hold harmless such Independent Counsel against any and all Expenses, claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

10

Source: ARIAD PHARMACEUTICAL, 10-Q, August 08, 2006

**13.  Presumptions and Effect Of Certain Proceedings.**

(a)  In making a determination with respect to entitlement to indemnification hereunder, the person, persons or entity making such determination shall presume that Indemnitee is entitled to indemnification under this Agreement if Indemnitee has submitted a request for indemnification in accordance with Section 11(b) of this Agreement, and the Company shall have the burden of proof to overcome that presumption in connection with the making by any person, persons or entity of any determination contrary to that presumption. Neither the failure of the Company (including by its directors or Independent Counsel) to have made a determination prior to the commencement of any action pursuant to this Agreement that indemnification is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor an actual determination by the Company (including by its directors or Independent Counsel) that Indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that Indemnitee has not met the applicable standard of conduct.

(b)  If the person, persons or entity empowered or selected under Section 12 of this Agreement to determine whether Indemnitee is entitled to indemnification shall not have made a determination within thirty (30) days after receipt by the Company of the request therefor, the requisite determination of entitlement to indemnification shall be deemed to have been made and Indemnitee shall be entitled to such indemnification, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statement not materially misleading, in connection with the request for indemnification, or (ii) a final judicial determination that any or all such indemnification is expressly prohibited under applicable law; provided, however, that such 30−day period may be extended for a reasonable time, not to exceed an additional fifteen (15) days, if the person, persons or entity making the determination with respect to entitlement to indemnification in good faith requires such additional time for the obtaining or evaluating of documentation and/or information relating thereto.

(c)  The termination of any Proceeding or of any claim, issue or matter therein, by judgment, order, settlement or conviction, or upon a plea of nolo contendere or its equivalent, shall not (except as otherwise expressly provided in this Agreement) of itself adversely affect the right of Indemnitee to indemnification or create a presumption that Indemnitee did not in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that Indemnitee had reasonable cause to believe that his conduct was unlawful.

(d)  For purposes of any determination of good faith, Indemnitee shall be deemed to have acted in good faith if Indemnitee's action is based on the records or books of account of the Enterprise, including financial statements, or on information supplied to Indemnitee by the officers of the Enterprise in the course of their duties, or on the advice of legal counsel for the Enterprise or on information or records given or reports made to the Enterprise by an independent certified public accountant or by an appraiser or other expert selected by the Enterprise. The provisions of this Section 13(d) shall not be deemed to be exclusive or to limit in any way the other circumstances in which the Indemnitee may be deemed or found to have met the applicable standard of conduct set forth in this Agreement.

11

(e)    The knowledge and/or actions, or failure to act, of any other director, officer, trustee, partner, managing member, fiduciary, agent or employee of the Enterprise shall not be imputed to Indemnitee for purposes of determining the right to indemnification under this Agreement.

**14.    Remedies Of Indemnitee.**

(a)    In the event that (i) a determination is made pursuant to Section 12 of this Agreement that Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement of Expenses, to the fullest extent permitted by applicable law, is not timely made pursuant to Section 10 of this Agreement, (iii) no determination of entitlement to indemnification shall have been made pursuant to Section 12(a) of this Agreement within thirty (30) days after receipt by the Company of the request for indemnification, (iv) payment of indemnification is not made pursuant to Section 5, 6, 7 or the last sentence of Section 12(a) of this Agreement within ten (10) days after receipt by the Company of a written request therefor, (v) a contribution payment is not made in a timely manner pursuant to Section 8 of this Agreement, (vi) payment of indemnification pursuant to Section 3 or 4 of this Agreement is not made within ten (10) days after a determination has been made that Indemnitee is entitled to indemnification, or (vii) payments to Indemnitee pursuant to any hold harmless or exoneration rights under this Agreement or otherwise is not made within ten (10) days after receipt by the Company of a written request therefor, Indemnitee shall be entitled to an adjudication by the Delaware Court to such indemnification, hold harmless, exoneration, contribution or advancement rights. Alternatively, Indemnitee, at his option, may seek an award in arbitration to be conducted by a single arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Except as set forth herein, the provisions of Delaware law (without regard to its conflict of laws rules) shall apply to any such arbitration. The Company shall not oppose Indemnitee's right to seek any such adjudication or award in arbitration.

(b)    In the event that a determination shall have been made pursuant to Section 12(a) of this Agreement that Indemnitee is not entitled to indemnification, any judicial proceeding or arbitration commenced pursuant to this Section 14 shall be conducted in all respects as a de novo trial, or arbitration, on the merits and Indemnitee shall not be prejudiced by reason of that adverse determination. In any judicial proceeding or arbitration commenced pursuant to this Section 14, Indemnitee shall be presumed to be entitled to be indemnified, held harmless, exonerated and to receive advances of Expenses under this Agreement and the Company shall have the burden of proving Indemnitee is not entitled to be indemnified, held harmless, exonerated or receive advances of Expenses as the case may be, and the Company may not refer to or introduce into evidence any determination pursuant to Section 12(a) of this Agreement adverse to Indemnitee for any purpose. If Indemnitee commences a judicial proceeding or arbitration pursuant to this Section 14, Indemnitee shall not be required to reimburse the Company for any advances pursuant to Section 10 until a final determination is made with respect to Indemnitee's entitlement to indemnification (as to which all rights of appeal have been exhausted or lapsed).

12

Source: ARIAD PHARMACEUTICAL, 10-Q, August 08, 2006

(c)    If a determination shall have been made pursuant to Section 12(a) of this Agreement that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding or arbitration commenced pursuant to this Section 14, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statement not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law.

(d)    The Company shall be precluded from asserting in any judicial proceeding or arbitration commenced pursuant to this Section 14 that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court or before any such arbitrator that the Company is bound by all the provisions of this Agreement.

(e)    The Company shall indemnify and hold harmless Indemnitee to the fullest extent permitted by law against all Expenses and, if requested by Indemnitee, shall (within ten (10) days after the Company's receipt of such written request) advance to Indemnitee, to the fullest extent permitted by applicable law, such Expenses which are incurred by Indemnitee in connection with any judicial proceeding or arbitration brought by Indemnitee (i) to enforce his rights under, or to recover damages for breach of, this Agreement or any other indemnification, hold harmless, exoneration, advancement or contribution agreement or provision of the Charter, or the Company's Bylaws now or hereafter in effect; or (ii) for recovery or advances under any insurance policy maintained by any person for the benefit of Indemnitee, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advance, contribution or insurance recovery, as the case may be.

(f)    Interest shall be paid by the Company to Indemnitee at the legal rate under Delaware law for amounts which the Company indemnifies, holds harmless or exonerates or is obliged to indemnify, hold harmless or exonerate for the period commencing with the date on which Indemnitee requests indemnification, to be held harmless, exonerated, contribution, reimbursement or advancement of any Expenses and ending with the date on which such payment is made to Indemnitee by the Company.

15.    **Establishment Of Trust.** In the event of a Potential Change in Control, the Company shall, upon written request by Indemnitee, create a "Trust" for the benefit of Indemnitee and from time to time upon written request of Indemnitee shall fund such Trust in an amount sufficient to satisfy any and all Expenses reasonably anticipated at the time of each such request to be incurred in connection with investigating, preparing for, participating in or defending any Proceedings, and any and all judgments, fines, penalties and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such judgments, fines penalties and amounts paid in settlement) in connection with any and all Proceedings from time to time actually paid or claimed, reasonably anticipated or proposed to be paid. The trustee of the Trust (the "Trustee") shall be a bank or trust company or other individual or entity chosen by the Indemnitee and reasonably acceptable to the Company. Nothing in this Section 15 shall relieve the Company of any of its obligations under this Agreement. The amount or amounts to be deposited in the Trust pursuant to the foregoing funding obligation shall be determined by mutual agreement of the Indemnitee and the Company or, if the Company and the Indemnitee are unable to reach such an agreement, by Independent Counsel selected in accordance with Section 12(b) of this Agreement. The terms of the Trust shall provide that, except upon the consent of both the Indemnitee and the Company, upon a Change in Control: (a) the Trust shall not be revoked or the principal thereof invaded, without the written consent of the Indemnitee; (b) the Trustee shall advance, to the fullest extent permitted by applicable law, within two (2) business days of a request by the Indemnitee and upon the execution and delivery to the Company of an undertaking providing that the Indemnitee undertakes to repay the advance to the extent that it is ultimately determined that Indemnitee is not entitled to be indemnified, held harmless or exonerated by the Company; (c) the Trust shall continue to be funded by the Company in accordance with the funding obligations set forth above; (d) the Trustee shall promptly pay to the Indemnitee all amounts for which the Indemnitee shall be entitled to indemnification, or to be held harmless or exonerated pursuant to this Agreement or otherwise; and (e) all unexpended funds in such Trust shall revert to the Company upon mutual agreement by the Indemnitee and the Company or, if the Indemnitee and the Company are unable to reach such an agreement, by Independent Counsel selected in accordance with Section 12(b) of this Agreement, that the Indemnitee has been fully indemnified, held harmless and exonerated under the terms of this Agreement. The Trust shall be governed by Delaware law (without regard to its conflicts of laws rules) and the Trustee shall consent to the exclusive jurisdiction of the Delaware Court in accordance with Section 23 of this Agreement.

13

16.  **Security.** Notwithstanding anything herein to the contrary, to the extent requested by the Indemnitee and approved by the Board, the Company may at any time and from time to time provide security to the Indemnitee for the Company's obligations hereunder through an irrevocable bank line of credit, funded trust or other collateral. Any such security, once provided to the Indemnitee, may not be revoked or released without the prior written consent of the Indemnitee.

17.  **Non−Exclusivity; Survival Of Rights; Insurance; Subrogation.**

(a)   The rights of Indemnitee as provided by this Agreement shall not be deemed exclusive of any other rights to which Indemnitee may at any time be entitled under applicable law, the Charter, the Company's Bylaws, any agreement, a vote of stockholders or a resolution of directors, or otherwise. No amendment, alteration or repeal of this Agreement or of any provision hereof shall limit or restrict any right of Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee in his Corporate Status prior to such amendment, alteration or repeal. To the extent that a change in applicable law, whether by statute or judicial decision, permits greater indemnification, hold harmless or exoneration rights or advancement of Expenses than would be afforded currently under the Charter, the Company's Bylaws or this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change. No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

14

(b)    The DGCL, the Charter and the Company's Bylaws permit the Company to purchase and maintain insurance or furnish similar protection or make other arrangements including, but not limited to, providing a trust fund, letter of credit, or surety bond ("Indemnification Arrangements") on behalf of Indemnitee against any liability asserted against him or incurred by or on behalf of him or in such capacity as a director, officer, employee or agent of the Company, or arising out of his status as such, whether or not the Company would have the power to indemnify him against such liability under the provisions of this Agreement or under the DGCL, as it may then be in effect. The purchase, establishment, and maintenance of any such Indemnification Arrangement shall not in any way limit or affect the rights and obligations of the Company or of the Indemnitee under this Agreement except as expressly provided herein, and the execution and delivery of this Agreement by the Company and the Indemnitee shall not in any way limit or affect the rights and obligations of the Company or the other party or parties thereto under any such Indemnification Arrangement.

(c)    To the extent that the Company maintains an insurance policy or policies providing liability insurance for directors, officers, trustees, partners, managing members, fiduciaries, employees, or agents of the Company or of any other Enterprise which such person serves at the request of the Company, Indemnitee shall be covered by such policy or policies in accordance with its or their terms to the maximum extent of the coverage available for any such director, officer, trustee, partner, managing member, fiduciary, employee or agent under such policy or policies. If, at the time the Company receives notice from any source of a Proceeding as to which Indemnitee is a party or a participant (as a witness or otherwise), the Company has director and officer liability insurance in effect, the Company shall give prompt notice of such Proceeding to the insurers in accordance with the procedures set forth in the respective policies. The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of the Indemnitee, all amounts payable as a result of such Proceeding in accordance with the terms of such policies.

(d)    In the event of any payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.

15

(e)   The Company's obligation to indemnify, hold harmless, exonerate or advance Expenses hereunder to Indemnitee who is or was serving at the request of the Company as a director, officer, trustee, partner, managing member, fiduciary, employee or agent of any other Enterprise shall be reduced by any amount Indemnitee has actually received as indemnification, hold harmless or exoneration payments or advancement of expenses from such Enterprise.

18.   **Duration Of Agreement.** All agreements and obligations of the Company contained herein shall continue during the period Indemnitee serves as a director or officer of the Company or as a director, officer, trustee, partner, managing member, fiduciary, employee or agent of any other corporation, partnership, joint venture, trust, employee benefit plan or other Enterprise which Indemnitee serves at the request of the Company and shall continue thereafter so long as Indemnitee shall be subject to any possible Proceeding (including any rights of appeal thereto and any Proceeding commenced by Indemnitee pursuant to Section 14 of this Agreement) by reason of his Corporate Status, whether or not he is acting in any such capacity at the time any liability or expense is incurred for which indemnification can be provided under this Agreement.

19.   **Severability.** If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (a) the validity, legality and enforceability of the remaining provisions of this Agreement (including, without limitation, each portion of any Section, paragraph or sentence of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and shall remain enforceable to the fullest extent permitted by law; (b) such provision or provisions shall be deemed reformed to the extent necessary to conform to applicable law and to give the maximum effect to the intent of the parties hereto; and (c) to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of any Section, paragraph or sentence of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested thereby.

20.   **Enforcement And Binding Effect.**

(a)   The Company expressly confirms and agrees that it has entered into this Agreement and assumed the obligations imposed on it hereby in order to induce Indemnitee to serve as a director, officer or key employee of the Company, and the Company acknowledges that Indemnitee is relying upon this Agreement in serving as a director, officer or key employee of the Company.

(b)   Without limiting any of the rights of Indemnitee under the Charter or Bylaws of the Company as they may be amended from time to time, this Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

16

(c)   The indemnification, hold harmless, exoneration and advancement of expenses rights provided by or granted pursuant to this Agreement shall be binding upon and be enforceable by the parties hereto and their respective successors and assigns (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company), shall continue as to an Indemnitee who has ceased to be a director, officer, employee or agent of the Company or of any other Enterprise at the Company's request, and shall inure to the benefit of Indemnitee and his or her spouse, assigns, heirs, devisees, executors and administrators and other legal representatives.

(d)   The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part, of the business and/or assets of the Company, by written agreement in form and substance satisfactory to the Indemnitee, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

(e)   The Company and Indemnitee agree herein that a monetary remedy for breach of this Agreement, at some later date, may be inadequate, impracticable and difficult of proof, and further agree that such breach may cause Indemnitee irreparable harm. Accordingly, the parties hereto agree that Indemnitee may enforce this Agreement by seeking injunctive relief and/or specific performance hereof, without any necessity of showing actual damage or irreparable harm and that by seeking injunctive relief and/or specific performance, Indemnitee shall not be precluded from seeking or obtaining any other relief to which he may be entitled. The Company and Indemnitee further agree that Indemnitee shall be entitled to such specific performance and injunctive relief, including temporary restraining orders, preliminary injunctions and permanent injunctions, without the necessity of posting bonds or other undertaking in connection therewith. The Company acknowledges that in the absence of a waiver, a bond or undertaking may be required of Indemnitee by the Court, and the Company hereby waives any such requirement of such a bond or undertaking.

21.   **Modification And Waiver.** No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by the parties hereto. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions of this Agreement nor shall any waiver constitute a continuing waiver.

22.   **Notices.** All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (i) if delivered by hand and receipted for by the party to whom said notice or other communication shall have been directed, or (ii) mailed by certified or registered mail with postage prepaid, on the third (3rd) business day after the date on which it is so mailed:

(a)   If to Indemnitee, at the address indicated on the signature page of this Agreement, or such other address as Indemnitee shall provide in writing to the Company.

17

Source: ARIAD PHARMACEUTICAL, 10-Q, August 08, 2006

(b)   If to the Company, to:

> ARIAD Pharmaceuticals, Inc.
> 26 Landsdowne Street
> Cambridge, MA 02139
> Attention: Chief Legal Officer

or to any other address as may have been furnished to Indemnitee in writing by the Company.

23.   **Applicable Law And Consent To Jurisdiction.** This Agreement and the legal relations among the parties shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflict of laws rules. Except with respect to any arbitration commenced by Indemnitee pursuant to Section 14(a) of this Agreement, the Company and Indemnitee hereby irrevocably and unconditionally: (a) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the Delaware Court and not in any other state or federal court in the United States of America or any court in any other country; (b) consent to submit to the exclusive jurisdiction of the Delaware Court for purposes of any action or proceeding arising out of or in connection with this Agreement; (c) appoint irrevocably, to the extent such party is not a resident of the State of Delaware, RL&F Service Corp., One Rodney Square, 10th Floor, 10th and King Streets, Wilmington, Delaware 19801 as its agent in the State of Delaware as such party's agent for acceptance of legal process in connection with any such action or proceeding against such party with the same legal force and validity as if served upon such party personally within the State of Delaware; (d) waive any objection to the laying of venue of any such action or proceeding in the Delaware Court; and (e) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the Delaware Court has been brought in an improper or inconvenient forum, or is subject (in whole or in part) to a jury trial.

24.   **Identical Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement. Only one such counterpart signed by the party against whom enforceability is sought needs to be produced to evidence the existence of this Agreement.

25.   **Miscellaneous.** Use of the masculine pronoun shall be deemed to include usage of the feminine pronoun where appropriate. The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

<div align="center">18</div>

Source: ARIAD PHARMACEUTICAL, 10-Q, August 08, 2006

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed as of the day and year first above written.

ARIAD PHARMACEUTICALS, INC.                          INDEMNITEE

By: _____          _____
Harvey J. Berger, M.D.                               Name:
Chairman and Chief Executive Officer                 Address:

19

_____

CERTIFICATIONS

**Chief Executive Officer**

I, Harvey J. Berger, M.D., certify that:

1.   I have reviewed this quarterly report of ARIAD Pharmaceuticals, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a−15(f) and 15d−15(f)) for the registrant and have:

     a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

     b)   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

     c)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluation; and

     d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

     a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

By: /s/ Harvey J. Berger, M.D.

Harvey J. Berger, M.D.

Chairman and Chief Executive Officer

Date: August 8, 2006

31

Source: ARIAD PHARMACEUTICAL, 10-Q, August 08, 2006

**CERTIFICATIONS**

**Chief Financial Officer**

I, Edward M. Fitzgerald, certify that:

1.  I have reviewed this quarterly report of ARIAD Pharmaceuticals, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

    a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluation; and

    d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

<div style="margin-left:40%;">

By: /s/ Edward M. Fitzgerald
_____
Edward M. Fitzgerald
Senior Vice President, Finance and Corporate
Operations and Chief Financial Officer
(Principal financial officer and chief accounting officer)

</div>

Date: August 8, 2006

<div style="text-align:center;">32</div>

Exhibit 32.1

**Certification**
**Pursuant to Section 906 of the Sarbanes−Oxley Act of 2002**
**(Subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code)**

Pursuant to section 906 of the Sarbanes−Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), each of the undersigned officers of ARIAD Pharmaceuticals, Inc., a Delaware corporation (the "Company"), does hereby certify, to such officer's knowledge, that:

The Quarterly Report on Form 10−Q for the period ended June 30, 2006 (the "Form 10−Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and information contained in the Form 10−Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: August 8, 2006                    /s/ Harvey J. Berger, M.D
                                        Harvey J. Berger, M.D.
                                        Chairman and Chief Executive Officer

Date: August 8, 2006                    /s/ Edward M. Fitzgerald
                                        Edward M. Fitzgerald
                                        Senior Vice President, Finance and Corporate Operations and Chief Financial Officer

A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

Created by 10KWizard    www.10KWizard.com

# EXHIBIT H

## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

**02 CV 1 1 2 8 0 RWZ**

|  |  |  |
|---|---|---|
| ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, and THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE | ) ) ) ) ) ) ) | No. _____ |
| Plaintiffs, | ) ) | **Jury Trial Demanded** |
| v. | ) ) | |
| ELI LILLY & CO., | ) ) | |
| Defendant. | ) ) | |

RECEIPT # _40085_
AMOUNT $ _150·00_
SUMMONS ISS. _y/2_
LOCAL RULE 4.1 _____
WAIVER OF SERV. _____
MCF ISSUED _____
AO 120 OR 121 _____
BY DPTY CLK. _____
DATE _6/25/02_

### COMPLAINT

Plaintiffs ARIAD Pharmaceuticals, Inc. ("ARIAD"), Massachusetts Institute of Technology ("M.I.T."), the Whitehead Institute for Biomedical Research ("THE WHITEHEAD INSTITUTE"), and the President and Fellows of Harvard College ("HARVARD") (hereinafter collectively referred to as "Plaintiffs"), through their attorneys, for their Complaint against Defendant Eli Lilly & Co. ("Lilly"), allege as follows:

### NATURE OF THE ACTION

1.      This is a patent infringement action against Lilly based on Lilly's activity in connection with its Xigris® and Evista® products covered by claims of Plaintiffs' United States Patent No. 6,410,516 ("the '516 patent"), entitled "Nuclear Factors Associated With Transcriptional Regulation." A copy of the patent is attached as Exhibit 1.



2.      Plaintiffs seek monetary damages, including but not limited to a reasonable royalty for Defendant Lilly's current and future infringement of the '516 patent.

## PARTIES, JURISDICTION AND VENUE

3.      ARIAD is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 26 Landsdowne Street, Cambridge, Massachusetts.

4.      M.I.T is a co-educational, privately endowed research university located at 77 Massachusetts Avenue, Cambridge, Massachusetts.

5.      THE WHITEHEAD INSTITUTE is a non-profit research and education institute located at Nine Cambridge Center, Cambridge, Massachusetts. It is affiliated with M.I.T in its teaching activities, but is wholly responsible for its own research programs, governance, and finance.

6.      HARVARD is a co-educational, privately endowed research university located at Massachusetts Hall, Cambridge, Massachusetts.

7.      Upon information and belief, Defendant Lilly is a corporation organized and existing under the laws of the State of Indiana with its principal place of business located at Lilly Corporate Center, Indianapolis, Indiana. Lilly does substantial business in this judicial district.

8.      This is an action for patent infringement under the Patent Act of the United States, 35 U.S.C. § 100 *et seq.*, including §§ 271 and 281. This Court has subject matter jurisdiction over this patent infringement action pursuant to 28 U.S.C. § 1338(a).

9.      Venue is proper in this judicial district pursuant to §§ 1400(b) and 1391(c).

## FACTUAL BACKGROUND

10.     Living cells respond to a vast array of different signals in their environment, including natural regulatory factors (e.g. hormones) and harmful factors (e.g. toxins). A primary way that cells respond to such signals is through intricate networks of signaling proteins inside the cell, which act as "messengers" to regulate expression of genes that are critical for normal cell function. Normal cell signaling and gene regulation are both controlled at a molecular level by specific interactions of these "messenger" proteins with other proteins and DNA. Identifying these "messenger" proteins and how they function is a crucial step in developing drugs for treating diseases associated with abnormal cell signaling and gene regulation.

11.     The invention of the '516 patent arose from a collaboration between research groups at three of the world's leading biomedical research institutions, M.I.T., THE WHITEHEAD INSTITUTE, and HARVARD. The collaboration was directed by three distinguished scientists, Dr. David Baltimore, Nobel Laureate and former director of THE WHITEHEAD INSTITUTE, Dr. Phillip Sharp, also a Nobel Laureate and now Institute Professor at M.I.T., and Dr. Thomas Maniatis, Thomas H. Lee Professor of Molecular and Cellular Biology at HARVARD.

12.     In the mid 1980s, Dr. Baltimore and his colleagues identified a "messenger" protein, which they named "NF-KB." As discussed in the '516 patent specification, Dr. Baltimore and his colleagues initially believed that NF-KB was only found in certain cells known as "B cells" and, therefore, had a limited role in cell signaling and gene regulation.

13.     Extensive studies on NF-KB carried out by the named inventors in Dr. Baltimore's laboratory at THE WHITEHEAD INSTITUTE and the other co-inventors in Dr. Sharp's laboratory at M.I.T. and Dr. Maniatis' laboratory at HARVARD led to the surprising discovery, described in the '516 patent, that NF-KB is found in "many, if not all, cell types and that it acts as an intracellular messenger capable of playing a broad role in gene regulation as a mediator of inducible signal transduction." ('516 patent col. 2, lines

29-31.) Most significantly, through the work disclosed in the '516 patent, the inventors also showed how the NF-KB cell-signaling pathway could be regulated and used for medical and therapeutic applications.

14.     ARIAD, since its founding in 1991, has been engaged in research and development of pharmaceutical products that regulate cell signaling pathways and gene function. ARIAD's drug discovery program is aimed at developing small-molecule drugs to inhibit or block disease-related abnormal cell-signaling and to control gene function and cell-signaling.

15.     In part for his preeminent contribution to the cell-signaling field and the relevance of this expertise to ARIAD's research and development program, ARIAD invited, and Dr. Baltimore agreed, to join ARIAD's board of scientific and medical advisors as a founding member.

16.     In 1986, the first of a series of U.S. patent applications relating to the NF-KB research spearheaded by Dr. Baltimore and various of his co-inventors was filed.  Through extensive prosecution, during which the Patent Office carefully scrutinized the claimed subject matter for compliance with the statutory requirements for patentability, the Patent Office awarded the inventors several patents claiming various, separate aspects of this pioneering technology.  The '516 patent asserted herein, is the most recent patent to issue of this family of patents.

### THE PATENT-IN-SUIT

17.     On June 25, 2002, the '516 patent, entitled "Nuclear Factors Associated With Transcriptional Regulation," with claims that cover methods of treating human disease by regulating NF-KB activity, was duly and legally issued to Baltimore *et al.* and assigned to M.I.T. THE WHITEHEAD INSTITUTE, and HARVARD.

18.     Based on a license agreement executed in 1991, ARIAD is the exclusive licensee from M.I.T., THE WHITEHEAD INSTITUTE, and HARVARD of the '516 patent, which presents claims directed to

one aspect of the pioneering technology discovered by the inventors, i.e., the use of drugs that regulate NF-KB cell signaling.

## LILLY'S INFRINGEMENT OF THE '516 PATENT

19.    Upon information and belief, Lilly is engaged in the manufacture, importation, use, sale and/or offers of sale, and promotion of pharmaceutical products marketed under the brandname Evista®.

20.    Upon information and belief, Evista® is a form of the selective estrogen receptor modulator raloxifene hydrochloride, and was approved for sale by the United States Food and Drug Administration on or about December 10, 1997, for the prevention and treatment of osteoporosis in postmenopausal women.

21.    Upon information and belief, a molecular basis for the action of Evista® in treating osteoporosis has been demonstrated to occur through the modulation of NF-KB activity. Some of these findings were published by Lilly scientists in a World Intellectual Property Organization Patent Application entitled "Methods of Modulating NF-KB Transcription Factor" and bearing publication number WO 96/40137. A copy of this patent application is attached as Exhibit 2.

22.    Upon information and belief Lilly is engaged in the manufacture, importation, use, sale and/or offers of sale and promotion of pharmaceutical products marketed under the brandname Xigris®.

23.    Upon information and belief, Xigris® is a form of recombinant human activated protein C, and was approved for sale by the United States Food and Drug Administration on or about November 21, 2001, for the reduction of mortality in human adult patients with severe sepsis who have a high risk of death.

24.    Upon information and belief, a molecular basis for the action of Xigris® in treating septic shock has been demonstrated to occur through the inhibition of NF-KB activity. These findings were published

by Lilly scientists in papers by Joyce *et al.*, J. Biol. Chem., 276: 11199-11203, 2001 and Crit. Care Med. 30:S288-S293, 2002. Copies of these papers are attached as Exhibits 3 and 4.

25.     Plaintiffs have suffered and will continue to suffer damages as a result of Lilly's infringing activities.

26.     Plaintiffs have previously sought to initiate discussions with Lilly concerning a license to Plaintiffs' NF-KB patent estate. Defendant Lilly has failed to respond to these efforts.

## COUNTS

### Count 1 – Patent Infringement of the '516 Patent

27.     Paragraphs 1-26 of this Complaint are incorporated by reference as if stated fully herein.

28.     Defendant Lilly, by engaging in the unauthorized manufacture, importation, use, sale and/or offers for sale of raloxifene hydrochloride in the United States, including pharmaceutical products marketed as Evista®, has committed acts of direct, contributory and/or induced infringement of claims 69-72, 80, 82, 84, 85 and 93-96 of the '516 patent.

29.     Defendant Lilly, by engaging in the unauthorized manufacture, importation, use, sale and/or offers for sale of recombinant human activated protein C in the United States, including pharmaceutical products marketed as Xigris®, has committed acts of direct, contributory and/or induced infringement of claims 14, 15, 144-146, and 154-156 of the '516 patent.

30.     Defendant Lilly has offered for sale, sold and/or imported raloxifene hydrochloride into the United States, including pharmaceutical products marketed as Evista®, with knowledge that such products have a molecular basis of action through the modulation of NF-KB activity and are especially made or adapted for use in an infringment of the '516 patent. Evista®, which constitutes a material part of the invention, is not a staple article or commodity of commerce suitable for substantial non-infringing

use. By its actions, Defendant Lilly is actively and knowingly inducing infringement of claims 69-72, 80, 82, 84, 85 and 93-96 of the '516 patent.

31.     Defendant Lilly has offered for sale, sold and/or imported recombinant human activated protein C into the United States, including pharmaceutical products marketed as Xigris®, with knowledge that such products have a molecular basis of action through the inhibition of NF-KB activity and are especially made or adapted for use in an infringement of the '516 patent. Xigris® which constitutes a material part of the invention, is not a staple article or commodity of commerce suitable for substantial non-infringing use. By its actions, Defendant Lilly is actively and knowingly inducing infringement of claims 14, 15, 144-146, and 154-156 of the '516 patent.

32.     Plaintiffs have suffered and will continue to suffer damages as a result of Defendant's infringing activities.

WHEREFORE, Plaintiff respectfully request that the Court:

A.     Award to Plaintiffs damages adequate to compensate Plaintiffs for infringement of the '516 patent, but in no event less than a reasonable royalty, together with interest and costs.

B.     Enter an order declaring this an exceptional case pursuant to 25 U.S.C. § 285 and award to Plaintiffs reasonable attorney fees;

and,

C.     Grant to Plaintiffs such other and further relief as may be just and appropriate.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs respectfully demand a trial by jury on all issues that are properly triable to a jury in this action.

BROMBERG & SUNSTEIN LLP

By: _Lee Carl Bromberg_

Lee Carl Bromberg, BBO# 058480
Kerry L. Timbers, BBO# 552293
Anne Marie Longobucco, BBO#649299
125 Summer Street
Boston, MA 02110-1618
Tel: (617) 443-9292

CLIFFORD CHANCE ROGERS & WELLS LLP

Leora Ben-Ami
Thomas F. Fleming
Patricia A. Carson
200 Park Avenue
New York, NY, 10166
(212) 878-8000

Attorneys for Plaintiffs ARIAD Pharmaceuticals,
Inc., Massachusetts Institute of Technology, the
Whitehead Institute for Biomedical Research, and
the President and Fellows of Harvard College

02695/00501 206781.1