## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation;              )
IMMUNEX CORPORATION, a Washington          )
corporation; AMGEN USA INC., a Delaware      )
corporation; AMGEN MANUFACTURING,          )
LIMITED, a Bermuda Corporation, and            )
IMMUNEX RHODE ISLAND                           )
CORPORATION, a Delaware corporation,           )
                                                                       )
            Plaintiffs,                                            )    Civil Action No. 1:06-cv-259 (KAJ)
                                                                       )
      vs.                                                            )
                                                                       )
ARIAD PHARMACEUTICALS, INC., a            )
Delaware corporation,                                       )
                                                                       )
            Defendant.                                          )

## DECLARATION OF MELANIE K. SHARP

I, Melanie K. Sharp, hereby declare as follows:

1.        I am a partner at the law firm of Young, Conaway, Stargatt & Taylor LLP in Wilmington, Delaware, counsel for Plaintiffs in the above-captioned matter.  I submit this Declaration in connection with Plaintiffs' Opposition To ARIAD Pharmaceuticals, Inc.'s Motion To Stay Proceedings Pending Interlocutory Appeal in this matter.  I have personal knowledge of the facts set forth herein and, if called as a witness, could and would competently testify thereto.

2.        Attached hereto as Exhibit A is a true and correct copy of the transcript of the hearing from ARIAD's Motion for Certification Pursuant to 28 U.S.C. § 1292(b) that took place on November 3, 2006.

3.        Attached hereto as Exhibit B is a true and correct copy of a CNBC interview transcript with Dr. Harvey Berger of ARIAD, dated May 4, 2006.

4.        Attached hereto as Exhibit C is a true and correct copy of a document entitled, "NF-κB Highlights" listed on the "Investor Downloads" section of ARIAD's website.

5.      Attached hereto as Exhibit D is a true and correct copy of ARIAD's Form 10-K for the fiscal year ended December 31, 2002, filed with the SEC on March 14, 2003.

6.      Attached hereto as Exhibit E is a true and correct copy of ARIAD's prospectus supplement to prospectus dated March 14, 2005, dated August 1, 2005.

7.      Attached hereto as Exhibit F is a true and correct copy of ARIAD's petition for extension of time for responding to the Patent and Trademark Office's August 2, 2006 office action.

8.      Attached hereto as Exhibit G is a true and correct copy of a transcript of ARIAD's third quarter fiscal year 2006 Earnings Conference Call.

9.      Attached hereto as Exhibit H is a true and correct copy of ARIAD's Form 10-Q for the quarter ended June 30, 2002, filed with the SEC on July 31, 2002.

10.     Attached hereto as Exhibit I is a true and correct copy of an article entitled "Financings Roundup," appearing in BioWorld Today on October 26, 2006.

11.     Attached hereto as Exhibit J is a true and correct copy of a November 2, 2006 letter from Tiffany Lydon, Esq. to The Honorable Kent A. Jordan.

12.     Attached hereto as Exhibit K is a true and correct copy of an article entitled "Decision on NF-κB Patent Could Have Broad Implications for Biotech," appearing in Science on May 12, 2006.

13.     Attached hereto as Exhibit L is a true and correct copy of an article entitled "Industry Sweats After Patent Verdict," appearing in the June, 2006 issue of Nature.

14.     Attached hereto as Exhibit M is a true and correct copy of an article entitled "Lilly Loses Patent Case to Ariad," appearing in the New York Times on May 5, 2006.

DB02:5642077.1

065028.1001

15.    Attached hereto as Exhibit N is a true and correct copy of Eli Lilly and Company's Form 10-Q for the quarter ended September 30, 2006, filed with the SEC on November 3, 2006.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.  Executed this 1st day of December, 2006.

Melanie K. Sharp, Esq.

065028.1001

# EXHIBIT A

```
                  IN THE UNITED STATES DISTRICT COURT
                  IN AND FOR THE DISTRICT OF DELAWARE


                                - - -


AMGEN, INC., a Delaware corporation; :    CIVIL ACTION
IMMUNEX CORPORATION, a Washington    :
Corporation; AMGEN USA, INC., a      :
Delaware corporation; AMGEN          :
MANUFACTURING, LIMITED, a Bermuda    :
Corporation; and IMMUNEX RHODE ISLAND:
CORPORATION a Delaware corporation,  :
                                     :
            Plaintiffs,              :
      v                              :
                                     :
ARIAD PHARMACEUTICALS, INC.,         :
a Delaware corporation               :
                                     :    NO. 06-259 (KAJ)
            Defendant.        - - -


                    Wilmington, Delaware
             Friday, November 3, 2006 at 9:30 a.m.
                      MOTION HEARING


                                - - -


BEFORE:          HONORABLE KENT A. JORDAN, U.S.D.C.J.


                                - - -

APPEARANCES:


        YOUNG CONAWAY STARGATT & TAYLOR, LLP
        BY:  MELANIE K. SHARP, ESQ.

             and

        KIRKLAND & ELLIS, LLP
        BY:  MARK A. PALS, ESQ.,
             MARCUS E. SERNEL, ESQ., and
             ERICK S. OTTOSON, ESQ.
             (Chicago, Illinois)

                   Counsel for Plaintiffs


                      Brian P. Gaffigan
                      Registered Merit Reporter
```

1

APPEARANCES:   (Continued)

2

3

       ASHBY & GEDDES
4       BY:  STEVEN J. BALICK, ESQ.

5          and

6       IRELL & MANDELLA, LLP
       BY:  DAVID I. GINDLER, ESQ., and
7          AMIR A. NAINI, ESQ.
          (Los Angeles, California)
8
             Counsel for Defendant
9

10

11            - oOo -

12       P R O C E E D I N G S

13       (REPORTER'S NOTE:  The following motion hearing

14 was held in open court, beginning at 9:30 a.m.)

15       THE COURT:  Good morning.  Please be seated.

16       (The attorneys respond, "good morning, Your

17 Honor.")

18       THE COURT:  We're here to talk about a few

19 things.  The thing I want to talk about first is the motion

20 for certification.  So this is ARIAD's motion.  Why don't I

21 go ahead and hear from you folks first.

22       MR. GINDLER:  Good morning, Your Honor.  David

23 Gindler from Irell & Manella arguing for ARIAD.

24       THE COURT:  All right.

25       MR. GINDLER:  Your Honor, every day

1  universities, large and small, license patents which are

2  the result of inventions by their faculty.  This is not an

3  unusual event.  And many of those inventions are the result

4  of federal funding.  And that means the Bayh-Dole Act kicks

5  in, and that means that the universities have an obligation,

6  and that obligation is to take appropriate steps to

7  commercialize the invention.

8        THE COURT:  I don't think anybody is disagreeing

9  with that.  Please address the point that the folks on the

10  other side are asserting, which, as to this, it seems to me

11  to be there really is no tension here because these guys

12  went beyond licensing discussions.

13        MR. GINDLER:  That is exactly where I'm going.

14        THE COURT:  Okay.

15        MR. GINDLER:  So there is an obligation to

16  license.  And if there is an exclusive license granted, that

17  obligation must be passed on to the exclusive licensee.  So

18  ARIAD, of course, has no choice but to go out and

19  aggressively pursue licensing activities.

20        Now, the question is did ARIAD cross the line,

21  as you put it?  And is there a substantial question which

22  warrants certification?  And I think the answer to the

23  first question is, no, they didn't cross the line.  And the

24  answer to the second question is, yes, there is a basis for

25  certification.

1          Here is the issue.  There is one line of cases,

2     exemplified by Capo which states essentially -- and Your

3     Honor quoted this at the hearing -- if there is a direct

4     accusation of infringement, that that alone can do it.  That

5     alone can create the necessary prerequisite for declaratory

6     judgment jurisdiction.

7          There is another line of cases which start with

8     the Phillips case, which actually comes a number of years,

9     almost I think 10 years before the Capo case.  That case

10    says as long as the parties are engaged in actual work

11    proposed, good faith licensing negotiations, there is no

12    case or controversy until those negotiations break down.

13         More importantly, cases after Phillips have

14    made clear that those discussions are inevitably going to

15    include statements by the patent lawyer, statements by the

16    exclusive licensee that the reason you should take a license

17    is because you're practicing our invention.  That is a

18    statement which would be made ultimately in 95 percent of

19    any negotiations.  Moreover, no licensee, no exclusive

20    licensee, no patent holder is ever going to say I'm in

21    negotiations but, you know what?  If they don't work out,

22    don't worry about it because we're not going to enforce

23    our patent.  And as a result, there is a lot of case law

24    following the Phillips case which says that statements

25    that have been found to create a reasonable apprehension

1    if done outside of the licensing context do not create a

2    reasonable apprehension if said within the licensing

3    context.

4            So what happens in this situation?  Here, we

5    have a situation where ARIAD, as the exclusive licensee,

6    has to take on the Bayh-Dole obligations of the

7    universities.  They must go out and engage in licensing

8    activities and not just half-hearted licensing activities.

9    They have to go out and take vigorous steps, diligent steps

10   to license the patent.  They have no choice.  That means

11   they have to try and identify people who might be within

12   the scope of the patent rights and identify parties who

13   should be taking a license and then to try to open up

14   those negotiations.

15           THE COURT:  Your papers on that are pretty

16   clear.  Let me ask you this.  The other side makes a couple

17   points I would like you to respond to.

18           MR. GINDLER:  Yes, Your Honor.

19           THE COURT:  First, they say, and for sake of

20   brevity, please, no one take offense, I'm not attempting, by

21   shortening stuff up, to give short shrift or mischaracterize

22   but they seem to be saying something to the effect of, hey,

23   the real underlying pitch here is we, at ARIAD, we're a

24   small company and we're real busy with this important late

25   stage experimentation and FDA approval process that we're in

1    and you should cut us a break for that.  And they seem to

2    be saying, on the Amgen side, you haven't supported that

3    with anything and you should have; and in any event, it's

4    not really material.  So I want you to talk about that.

5              MR. GINDLER:  I'm happy to, Your Honor.

6              It is, I would agree, not material to the

7    question of whether or not this Court in the first instance

8    either has declaratory judgment jurisdiction or, if it has

9    it, whether it should exercise discretion to decline

10   jurisdiction.  It's not one of the factors.  We didn't argue

11   it previously because the case law I think is pretty clear

12   about what is appropriate and about what is not appropriate.

13             The size of ARIAD or how much money it has or

14   anything else isn't appropriate to the initial question of

15   whether or not there is Article III jurisdiction, whether or

16   not this Court should properly exercise its jurisdiction if

17   there is Article III jurisdiction.  And we didn't argue

18   that.

19             This fact comes up only in the following

20   context.  There is a standard that we have to meet under

21   1292(b) as to whether or not this is an order which falls

22   within the parameters of something that can be subject to

23   interlocutory review.  But even if it meets those tests,

24   Your Honor has discretion to make a decision.  And the

25   question then is what augurs, one way or the other, as to

1    whether they should be in the field now or later.  Because

2    I think anyone would agree that this is going to be a

3    substantial question and it would be a terrible waste to

4    have a Federal Circuit ultimately decide, after millions

5    and millions of dollars have been spent, that in fact there

6    wasn't declaratory judgment jurisdiction.  The impact that

7    the cost of this litigation could have on ARIAD is not

8    theoretical and it is not unsupported.  In ARIAD's public

9    filings, it has stated that the cost of patent litigation,

10   if unanticipated, could affect its ability to bring products

11   to market.

12           THE COURT:  And what is your response to their

13   assertion that your comments -- and I don't have it right in

14   front of me.  This is page 14 of the opposition brief.

15           "ARIAD bases nearly its entire argument for

16   exercising this Court's discretion on allegations

17   (unsupported by any evidence) that this case will deplete

18   Ariad's resources from bringing its late stage cancer drug

19   to the market."

20           Go ahead, hit back.  What have you told me in

21   the way of evidence that will help me understand this?

22           MR. GINDLER:  All the evidence that we provided

23   to Your Honor is evidence which we have derived from ARIAD's

24   public filings which have to be filed with certifications by

25   CEO and the CFO.

1          THE COURT:  But point me at what is in the

2     record.  If there is something in the record, point me to

3     what is in the record.

4          MR. GINDLER:  Absolutely, Your Honor.  Let me

5     read you an excerpt from one of the public filings I just

6     referenced in our brief.

7          THE COURT:  Which is referenced in your brief?

8          MR. GINDLER:  Yes, it's quoted in the brief.

9     There is an exact citation given to the exact public

10    reference.

11         "Significant expenditures to enforce our patent

12    right, without generating revenues or accessing additional

13    capital or funding, could adversely impact our ability to

14    further our clinical programs and our research and

15    development programs at the current levels or a level that

16    may be required in the future."

17         THE COURT:  Okay.

18         MR. GINDLER:  And, moreover, in terms of ARIAD's

19    prospects to get money in the future, ARIAD said -- again,

20    I'm quoting from the same document.  ARIAD expects to incur

21    "substantial and increasing operating losses for the

22    foreseeable future, primarily due to costs associated with

23    our pharmaceutical product development programs, including

24    costs for clinical trials and product manufacturing,

25    personnel and intellectual property protection."

1          All the information that we have derived, a

2    factual basis for the statement that we made about

3    jeopardizing the clinical program for this promising drug,

4    are all derived from public statements we have made in SEC

5    filings.  This is a company which has essentially no revenue

6    other than debt and very modest licensing.  That is not

7    unusual for a startup biotechnology company because it costs

8    a lot of money to bring a product to market.  And until you

9    have a product on the market, you are in a loss situation,

10   and that is exactly the situation facing this company.

11          THE COURT:  Okay.  Now, they've also dropped in

12   a footnote saying, well, this won't save money because they

13   haven't moved for a stay of discovery.  They're assuming a

14   stay of discovery.  And, in fact, if you let them take this

15   up, it will increase costs because they'll be pursuing an

16   appeal while they're pursuing this case.  Hit back.

17          MR. GINDLER:  I read that.  Yes, I read that.

18   We have the ability to ask Your Honor, if Your Honor is

19   going to grant certification --

20          THE COURT:  And I assume you would ask, right?

21          MR. GINDLER:  We would in fact ask for a stay.

22          THE COURT:  Could I take it that you are asking

23   for a stay?

24          MR. GINDLER:  If Your Honor is going to grant

25   it, we're going to ask you, here today, for a stay of

1    discovery; in fact, for a stay of the case.  In fact, I

2    would have to make that request because I can make the same

3    request to the Federal Circuit, if Your Honor does not

4    agree, but I have to ask Your Honor first under Rule 8 of

5    the Federal Rules of Appellate Procedure.

6                THE COURT:  Yes, I know.

7                MR. GINDLER:  I know you know.  So as a result,

8    I don't think there is any surprise to anyone that what

9    we're going to ask for is to have this review now rather

10   than later and to have the case stayed.  Nothing bad is

11   going to happen to Amgen if it has to wait to find out if,

12   in fact, they really did have reasonable apprehension, which

13   we think they do not, but that will be the issue that the

14   Federal Circuit will decide.

15               THE COURT:  Now, let me roll you back to

16   another topic.  You make a point in one of the footnotes in

17   your briefing that -- let me be more polite and put it this

18   way.  You asserted that the Court, I had blown past the

19   requirement that there be a showing of present action that

20   could constitute infringement.  Your pitch and your argument

21   there seemed to be Amgen had the burden of proof.  The fact

22   that we, ARIAD, said nothing doesn't mean that they don't

23   have to put some proof in the record on this point.  And I

24   was a little puzzled by that because my recollection of the

25   evidence was that there was a specific comment made about

1 Enbrel which, of course, would indicate -- I believe it's

2 the "Enbrel is next on the list" or something to that

3 effect.  You may need to help me with the specific comment,

4 but "Enbrel is on the list" I think was the comment, with

5 which I think the rational interpretation of that is they're

6 not talking about a hypothetical thing, they're not picking

7 a trade name with no product behind it to comment on.  That

8 there actually is a product out there called Enbrel.

9         MR. GINDLER:  Indeed, there is.

10         THE COURT:  And there was slides that were

11 shown at the Lilly trial which had Enbrel and Kineret on the

12 slides.  Once again, I think the rational inference is these

13 are real things.  They're not internal memoranda that ARIAD

14 created talking about trade names that they though one day

15 their opponents might put a product behind.  So if those

16 things are in the record, and you never said anything about

17 it to contradict it, I'm a little bit of a loss, where do

18 you all come from saying there is nothing in the record to

19 support the understanding that these are real products?

20         MR. GINDLER:  There is not a question, Your

21 Honor, whether or not these are real products.  Of course,

22 they're real products.  Enbrel and Kineret have both been

23 on the market for a little while and one can look at their

24 sales.  That is not the issue.  Companies generally don't

25 bring lawsuits hopefully over products that don't exist.

1          But the question is while all the information

2     that Your Honor is pointing to, the comment attributed to

3     Ms. Carson that "Enbrel is on the list" and the board slides

4     which identified Enbrel, Kineret as products which the

5     company had made attempts to obtain licenses for, that just

6     goes to, at most, the reasonable apprehension.  In other

7     words, the test for declaratory jurisdiction has two parts.

8     One part focuses on what we do, and one part focuses on what

9     Amgen does.

10          So the question is not do they make Enbrel and

11     Kineret.  The answer is yes, of course they do.  It's

12     undisputed.  The question, though, is different.  The

13     question is:  Have they met their requirement of showing

14     that they are presently engaged in activity that is

15     infringing the patents or within the sphere of infringing

16     the patents?  They have to have --

17          THE COURT:  They don't have to come in and say

18     we're infringers.

19          MR. GINDLER:  Of course not.

20          THE COURT:  That's not what you're asserting;

21     right?  Isn't the standard they have to come in and say,

22     we're doing things, we're taking concrete steps, we're doing

23     something in the real world that is stuff that an argument

24     about infringement could be made.  And, in fact, we're

25     being, stepping to the second prong, given vibes by the

Page 13

1   other side that that is in fact what they think.

2           MR. GINDLER:  I thin, it's a little more than

3   that, Your Honor.  In other words, they don't have to come

4   in and say, yes, we're infringing.

5           THE COURT:  Well, what do they have to do,

6   Mr. Gindler?

7           MR. GINDLER:  For example, if Enbrel was a

8   paper clip, they could come in and say we're not engaging

9   in activities that could possibly infringe because we make

10  paper clips.  Or, they could come in and say there is

11  absolutely no evidence that our product in any way inhibits

12  NF-kB activity.  It's just not that kind of product because

13  it's rubbing alcohol.  So they could point out what they're

14  doing just isn't within the possible sphere of anything

15  covered by a patent.

16          THE COURT:  Isn't the fact these things are

17  discussed by your client's slide and the fact that there is

18  this comment about "Enbrel is on the list," although you

19  dispute about whether it was said or not, are those not

20  factors that a judge could look at to say whether or not

21  there is an infringement going on at the base level we're

22  talking about for trying to figure out whether there is

23  declaratory judgment jurisdiction?  I have to ignore that?

24  I mean you wouldn't put Enbrel on the list if it was a paper

25  clip or rubbing alcohol product, you would have put it on

Page 14

1   the list because you thought it was a product that had to do

2   with your patent; right?

3                  MR. GINDLER:  Of course.  But if you do it that

4   way, then the other part of the test just resolves away.

5   Because whenever somebody engages in activity where they are

6   saying look, you need to take a license, if they make that

7   comment, then one could just sort of say, well, the other

8   side must be engaging in this activity.

9                  What I was going to say, in direct response to

10  Your Honor's question, is that there is no case that I'm

11  aware of which says that the kind of evidence that Your

12  Honor is referring to is sufficient to satisfy the other

13  prong.

14                 Moreover, this is a case where we are on record

15  of having said, and there is nothing in the record to the

16  contrary, which is when this action was filed, we don't have

17  a clue as to whether or not Enbrel or Kineret are actually

18  infringing.  All that we knew is that they had publications

19  which talked about inducing or, excuse me, modulating or

20  inhibiting NF-kB activity, and that is how it sort of got on

21  the list of products to look at.  But we don't know, and we

22  said that.  Dr. Berger testified to that at the Lilly trial.

23  So the evidence in the record is we don't know, but we went

24  and approached them because they're one of the companies

25  that we approached.  But whether in fact they are in the

1    sphere of potentially infringing, you know, that is an

2    evidentiary burden.

3              THE COURT:  Well, is there anything else you

4    want to tell me before I give the podium over to folks on

5    the other side?

6              MR. GINDLER:  I wanted to just say a couple of

7    very brief things.  I do think this case really is one of

8    first impression.  We looked high and low for any case

9    that discussed the question how does one think about the

10   reasonable apprehension test in the context where a party

11   that is seeking to license the patent has obligations under

12   a federal law to go and license the patent.  What is the

13   interaction between the Bayh-Dole Act and the reasonable

14   apprehension test?  So we thought that would be pretty

15   helpful to find out.  And, in fact, we can't find actually

16   any case that actually addresses the interaction, what

17   happens.

18              I think this is one of those instances where we

19   have a case of first impression where we have a company

20   which is engaging in exactly what it's supposed to do as the

21   exclusive licensee of a federally funded invention.  It has

22   to go out and it has to make efforts to commercialize the

23   invention.  It has done so by trying to license.  It never,

24   ever took its licensing proposal off the table.  Never,

25   ever.  It was left at Amgen saying we'll get back to you.

1    And in the I think four years that elapsed between "we'll

2    get back to you" and when they filed this action, there was

3    not a single remark that anyone could construe as being

4    threatening except for the alleged remark made after this

5    action was filed which Your Honor has said is not relevant

6    and which is not relevant.  And as a result, licensing

7    negotiations did not break down.  Nor is there any finding

8    in the record that we weren't proceeding in good faith, that

9    our aim is not to license.

10            THE COURT:  Okay.

11            MR. GINDLER:  I want to add one other fact and

12   then I'll be quiet.

13            Your Honor did give weight to the fact that

14   ARIAD had run a lawsuit against Lilly.  And that factored

15   into Your Honor's decision.  But a fact that should also be

16   considered is that ARIAD did not seek either a preliminary

17   or a permanent injunction against Lilly.  All that it had

18   sought was a royalty.  That is because that is what the

19   company is supposed to do.  It's supposed to go out and

20   license a patent.

21            THE COURT:  That is an interesting thing.  So

22   is your argument that if the remedy a patentee seeks or

23   an exclusive licensee seeks is a royalty instead of an

24   injunction, that that impacts on whether there is

25   declaratory judgment jurisdiction?

1          MR. GINDLER:  In effect, yes, because if you

2     look at the case law where courts have decided what crosses

3     the line, what is good enough or not good enough, one of the

4     things the courts have said, cases like IBMC, which has said

5     if there really is a threat that someone's production of a

6     product is going to be shut down, that is the implication,

7     if we don't make a deal, then that is a factor to be

8     considered.

9          Well, since Your Honor has pointed to the Lilly

10    litigation, the question is does the Lilly litigation give

11    rise to an apprehension on the part of Amgen that the goal

12    of ARIAD and the goal of MIT and Harvard, the Whitehead

13    Institute, is to take Enbrel and Kineret off of the market.

14    All we want to do is seek a preliminary or a permanent

15    injunction.  And there is no basis, in looking at the Lilly

16    case, that would be our goal and there is no basis in the

17    record, from looking at any of the parties' exchanges, that

18    we had any other desire other than to get them to take a

19    license and to engage with us in licensing negotiations.  If

20    you look at it in that context, all we have are good faith

21    licensing negotiations.

22          THE COURT:  Okay.

23          MR. GINDLER:  Thank you, Your Honor.

24          THE COURT:  Thanks.

25          Mr. Pals.

Page 18

1          MR. PALS:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MR. PALS:  It appears we're back rearguing

4   reasonable apprehension in connection with Mr. Gindler's

5   comments on arguments never previously raised.  I will start

6   with the certification issue and then, to the extent the

7   Court has interest, address his comments on seeking damages

8   only, which is a novel theory I've never seen or heard

9   before and certainly doesn't remove an apprehension of suit.

10  It's not reasonable apprehension of an injunction, it's a

11  reasonable apprehension of suit.

12         THE COURT:  All right.  And let's do move

13  through the three 1292(b) factors.

14         First, would you agree there is a controlling

15  question of law here?

16         MR. PALS:  I think under the Third Circuit

17  standard, Your Honor, controlling question of law has been

18  read fairly broadly.  In your case, the Hurst case talks

19  about that as well, quotes that standard from the Third

20  Circuit.

21         The issue then I think becomes whether there is

22  a substantial ground for a difference of opinion as to a

23  controlling question of law.  What we're talking about

24  here is in the context of obviously a denial of a motion

25  to dismiss for lack of subject matter jurisdiction.

1          We pointed out in our opposition brief that

2    there is not a single case cited in now six briefs or raised

3    in two oral arguments that is a Federal Circuit case, it's

4    a patent DJ case, dealing with the denial of a motion to

5    dismiss for lack of subject matter jurisdiction.  We said

6    that in our most recent opposition brief, and ARIAD still

7    hasn't come up with anything.

8          THE COURT:  Well, I guess I'm not terribly

9    surprised at that because sort of by definition, if they

10   don't get to appeal, then don't you end up, when there

11   finally is an appeal, talking about the merits more

12   particularly than the denial of the subject matter

13   jurisdiction case?

14         MR. PALS:  I think you just proved my point,

15   which is you said "if they don't get to appeal," and that is

16   my point.  You don't get to appeal a denial of a motion to

17   dismiss for lack of subject matter jurisdiction.

18         We cited the Intel case in our opposition brief,

19   which is a patent case.  It's a declaratory judgment case.

20   The District Court considered two issues:  one is for

21   immunity and one is the same DJ analysis this Court has gone

22   through.  Was there a reasonable apprehension of suit, et

23   cetera?  That case went up to the Federal Circuit.  The

24   Federal Circuit looked at it and the Federal Circuit said on

25   immunity, we affirm.  This party is not immune, therefore,

Page 20

1   this case should go forward.

2          On the other ground, the Court said -- so

3   picking up of the first point, under the collateral order

4   doctrine.  I'm sorry.  This is the Intel case and I'm

5   quoting at page 1369.  "Under the Collateral Order Doctrine,

6   the denial of immunity is typically appealable immediately."

7   So that is the immunity aspect of it.  "In contrast, the

8   denial of a motion to dismiss for lack of subject matter

9   jurisdiction on other grounds is generally not subject to

10  interlocutory appeal."

11         It dismissed the appeal on the DJ question and

12  said, at Page 1371, "the orders denying CSIRO's motions to

13  dismiss are otherwise not properly reviewable on

14  interlocutory appeal."

15         THE COURT:  Well, I obviously didn't frame my

16  question very well.  The position you are taking, I guess,

17  help me out, is there could never be a circumstance where a

18  District Court would say, hey, this is a real close question

19  and I don't want to put the parties to litigation that will

20  cost in the millions of dollars only to discover at the end

21  of the day I didn't have subject matter jurisdiction.  So

22  before we do that, we'll let the Federal Circuit have a

23  crack at it.

24         If I understand what you have just said, the

25  position Amgen is taking is the Federal Circuit will kick

1  this back immediately because they don't view that kind of

2  question as one that they ought to be looking at.  Did I

3  hear you right?

4          MR. PALS:  You did, Your Honor.  I believe

5  the Federal Circuit will kick this back because it is not

6  subject to interlocutory appeal.

7          THE COURT:  All right.

8          MR. PALS:  We cited the Daupel case in our first

9  round of briefing on DJ jurisdiction.  That's a case that

10  went up after the trial on necessary indispensable parties

11  issues and was heard at that point on those issues.  So it's

12  similar kinds of, I mean it's this set of disputes that

13  we've been talking about.  But I think the Federal Circuit

14  bounces this back and says this is not one of those

15  questions.

16          THE COURT:  Now, put the Bayh-Dole question into

17  the mix, something Mr. Gindler presents as a matter of first

18  impression.  Here is a company that is obligated to, and I

19  believing I'm quoting him accurately, aggressively seek

20  licenses.  They are compelled to do that.  And sort of the

21  import of the argument is, what is a nice company to do?

22  We've got this law telling us to go out and license, and

23  then when we do it, people sue us for declaratory judgment.

24  Respond to that, will you?

25          MR. PALS:  Yes.  The Bayh-Dole Act has nothing

Page 22

1   to do this with this.  The Bayh-Dole Act does not require

2   them to aggressively pursue licensing the patent.  Under

3   the Bayh-Dole Act, what they are to do is to use, they're

4   supposed to go out and use reasonable efforts to

5   commercialize.  They're encouraged to commercialize their

6   license.  They're supposed to either commercialize

7   themselves, they're supposed to use the patented technology,

8   which they don't do, or they're supposed to attempt to

9   license.

10          They have no obligation to go out and threaten

11  suit.  They had no obligation to sue anybody.  They have no

12  obligations to do the types of things that they do.  The

13  Bayh-Dole Act simply operates in the context in which it

14  operates and encourages someone like ARIAD to license the

15  technology and commercialize the technology.  It doesn't

16  require what they've done in this case.

17          THE COURT:  It's accurate, isn't it, that when

18  the Federal Circuit, either on interlocutory basis or at the

19  end of the case, looks at jurisdiction, if it's still a

20  matter that is contested, it's going to look at that de

21  novo; right?  I mean the other side cited cases that the

22  question of whether there is an actual controversy is a

23  question of law as to which the Federal Circuit will

24  exercise de novo review.  Do you disagree with that?

25          MR. PALS:  I do disagree with that.  They'll

Page  23

1    look at the underlying factual findings and those are

2    reviewable for clear error.

3              THE COURT:  The ultimate question will be a

4    question of law but there will be clear error review for

5    factual findings of the Court.  That is what you're telling

6    me?

7              MR. PALS:  Yes.  I believe I understand what

8    you are saying.  The ultimate question is a question of the

9    Federal Circuit will review but the underlying factual

10   findings are reviewable only for clear error.

11             THE COURT:  And then I'd like you to address the

12   question of whether or not the Court in the first instance,

13   had -- I, in the first instance, had evidence in the record

14   that I could properly rely on to satisfy the first prong of

15   the DJ test, that is, present activity that could constitute

16   infringement.

17             MR. PALS:  I completely disagree with

18   Mr. Gindler's take on that, on that standard and completely

19   agree with Your Honor on what the cases say.  It does not

20   require that we come in and say we are infringing.  It does

21   not require that we come in and say we are doing things

22   that may infringe.  What it requires is that we'd be doing

23   something currently or making substantial preparation to do

24   something that could be argued to fall within or could --

25   it's sort of an interplay between reasonable apprehension

Page 24

1  and this prong.  This prong requires that we'd be currently

2  or making substantial preparations to do this thing.

3          We obviously deny that we infringe the claims of

4  the patent.  But we're not talking about the paper clips,

5  we're not talking about rubbing alcohol, we're talking about

6  drug products -- drug products that Ms. Carson and their

7  slides have indicated they believe relate to their patent

8  rights.  There is no dispute, and the record has evidence in

9  it, that we are, and Mr. Gindler admits, we are marketing

10  Enbrel and we are marketing Kineret.  Those are the present

11  activities, and that is all that is required.

12          THE COURT:  How about materially advancing the

13  termination of the litigation?  Assume for the sake of

14  discussion that I disagree with you about the question of

15  substantial ground for difference of opinion as to the

16  controlling question and that we were looking at the

17  question of materially advancing the termination of

18  litigation.  What is your take on that?

19          MR. PALS:  I think if you take the Bayh-Dole

20  Act, for example, and you say there has been no case law

21  reconciling the Bayh-Dole Act and the DJ Act, I actually

22  suggest there is probably a whole bunch of statutes that

23  haven't been reconciled or addressed in the context of the

24  DJ Act but they have nothing to do with it.

25          The point here is even if there isn't a case

Page 25

1    reconciling the Bayh-Dole Act and the DJ Act, that doesn't

2    mean anything because the Bayh-Dole Act says commercial or

3    reasonable efforts to commercialize or what have you.  It

4    doesn't say threaten people with suit.  Say Enbrel is on the

5    list.  These slides are displayed with Enbrel and Kineret

6    showing them on the list.  It doesn't tell ARIAD to do these

7    activities that ARIAD has done.  So at the end of the day,

8    it doesn't make any difference whether there is a case that

9    addresses those or not.

10        THE COURT:  Okay.  Is there anything else you

11   want to talk to me about, about this?  Oh, there is

12   something I wanted to ask you.  Talk to me about the stay

13   of discovery which I'm told they're in effect making if I

14   grant the interlocutory appeal motion.

15        MR. PALS:  Your Honor, if they do request that,

16   and if we get to that point in the discussion, we'd request

17   briefing on it.  But briefly, what they're asking for is a

18   stay and it's for the purpose of the DJ Act.  The DJ Act is

19   there so that parties like Amgen can eliminate this cloud

20   of uncertainty of injunctions and cloud of uncertainty of

21   litigation and damage and so forth.  And a stay in a case in

22   which Your Honor has found the DJ statute to be satisfied

23   and a reasonable apprehension to exist subverts that policy

24   and puts us in a position where we have another 12 or 15,

25   however many months of uncertainty while we wait for the

Page 26

1    Federal Circuit.

2              THE COURT:  All right.  Thanks.

3              Mr. Gindler, I'll give you a response.

4              MR. GINDLER:  Your Honor, the first alleged

5    threat, if you accept everything that Amgen says is true,

6    took place over four years ago.  So Amgen apparently has

7    found it satisfactory to live under this cloud of a threat

8    for over four years, and it's even earlier than that if you

9    take our licensing overtures as being part of a threat.  It

10   started more than four years ago.  Amgen has somehow managed

11   to muddle along as the second largest biotech company in the

12   world, has continued to sell lots of Enbrel and lots of

13   Kineret.  I don't think the stakes are going to change if

14   the Court decides to stay this action while the Federal

15   Circuit decides whether or not to take it, and if the

16   Federal Circuit takes it, to stay until they make their

17   own decision.

18              I don't think Amgen's counsel also answered

19   really Your Honor's question about what I'll call a third

20   part of the 1292(b) test, which is will the resolution of

21   this controlling question of law materially advance the

22   case?  And the answer is, well, sure, it will.  Because

23   it wins the case if in fact there is no subject matter

24   jurisdiction.  That is it beginning and ending of any

25   action.  You've got to have subject matter jurisdiction.

Page  27

1   So, in effect, in a case like this, we said in our papers

2   the first and third prongs are almost always met.  The

3   question is really the second prong, which is, are there

4   substantial grounds for a difference of opinion?

5           THE COURT:  Now, respond to Mr. Pals' statement

6   that you haven't cited a single case when it comes down to

7   really a question of what does the record show about the

8   behavior of the patentee or exclusive licensee being taken

9   by the Court on appeal; not even a matter of whether they

10  won but if the Federal Circuit would take the case or would

11  it kick it back.

12          MR. GINDLER:  Your Honor, that is simply a

13  matter of speculation.  Seeking requests for certification

14  themselves is not typical behavior.  I will have to confess

15  that this is the first time in my 22 years of practice I

16  actually made such a request.  Courts consider it, and

17  then the Federal Circuit considers it, and they'll make a

18  decision.  Every case turns on its own set of facts.  And if

19  this was the very first case ever where certification was

20  granted to the Federal Circuit to consider it, then there

21  always has to be a first case.  I doubt that is the

22  situation.  There could be many orders which are simply are

23  not reported.  We simply don't know.

24          Instead of engaging in that speculation, the

25  question is have we met the standard?  Is there a

1   controlling question of law?  Absolutely.  This is a

2   question of law.  It's reviewed de novo.

3                  THE COURT:  All right.  Thank you, Mr. Gindler.

4                  MR. GINDLER:  Thank you very much.

5                  THE COURT:  Mr. Pals.

6                  MR. PALS:  Your Honor, I apologize.  Could I

7   just briefly address the ARIAD's point that you raised with

8   Mr. Gindler and he discussed regarding their financial

9   condition?

10                  THE COURT:  Sure, and then I'll hear from

11  Mr. Gindler again.

12                  MR. PALS:  I'm sorry.  The point is, Mr. Gindler

13  quoted from their financial statements that are attached

14  I believe to their opening brief.  The quote he read

15  obviously is a very general quote.  I won't denigrate it

16  as boilerplate, but what it doesn't do is it doesn't say

17  anything about the Lilly case or the PTO case or the reexam.

18  It certainly doesn't say it's the Amgen case that is in

19  issue here.

20                  There is simply no evidence.  Our point is

21  there is no evidence that it's this case that is the issue.

22  They have all these other litigations out there, and there

23  is nothing that indicates that it's this case that is in

24  fact going to have this prophecy impact on their drug

25  development.  That's all I wanted to say.

Page  29

1              THE COURT:  All right.  Do you feel like you

2    need to comment?

3              MR. GINDLER:  I can just comment briefly.  I

4    don't think there is any dispute in the record that this is

5    not a case which ARIAD expected.  There is nothing in its

6    budget and its public disclosures which shows a line item

7    for this case, is anywhere on the company's radar screen.

8    Obviously if the company files a lawsuit on its own, it

9    budgets for it and plans for it and makes a decision that it

10   will not affect other important operations.  This is not

11   that situation.  We didn't start this.  Amgen started this

12   litigation.  That is why this falls into a completely

13   different category.

14             THE COURT:  Well, as you might suspect from my

15   focus on this, out of the disputes that you put before me

16   today, this is the thing that I think is of real moment

17   and significance.  As with the call on subject matter

18   jurisdiction, I think this is a close question.  This is an

19   interesting and a challenging case.  I haven't been doing

20   this judging for 22 years the way Mr. Gindler has been

21   practicing for 22 years but this is the first time I have

22   seen a case that I can recall where I thought you know what?

23   I probably ought to send it up.  I think it makes sense to

24   send it up.  And so I'm going to grant the motion.

25             I think that ARIAD is right that the first and

1  the third prongs here are pretty well established.  This is

2  a controlling question of law.  And if I'm wrong about

3  subject matter jurisdiction, that's the end of the case.  If

4  this were not a case which I expect will take a substantial

5  sum of money to try -- these patent cases, the figures are

6  out there.  They're typically in the millions of dollars in

7  fees and costs.  And I don't see anything that would tell me

8  this is any different.

9         I also have in the record information which I

10  find credible that ARIAD is not a substantial company with a

11  history of success behind it.  It's a startup which is

12  operating, still afloat.  Good for them.  A lot of biotech

13  startups can't say that.  But they're not in the position to

14  easily absorb the kind of costs that are associated with

15  this kind of litigation.  And that is a significant factor

16  in my thinking that I ought to exercise my discretion here,

17  if in fact they meet that second prong, which I will get to

18  in a minute, of the 1292(b) test.

19         So what I have wrestled with here most is that

20  second prong:  Is there a substantial ground for difference

21  of opinion here on a question that the Federal Circuit would

22  accept certification on?  And, Mr. Pals, you may be right.

23  They may look at that and say, gee, what is that guy doing

24  sending this up?  We don't want or need or take these kinds

25  of things.  We're counting on the District Court to make

1  those calls.  I have made the call, and I think I made it

2  right.  But it's not an easy case.  It wasn't an easy call

3  to make when I made it.  It's not made any easier in

4  retrospect as I have gone back and looked at the record.  I

5  still think I was right, but there is certainly a basis for

6  a reasoned disagreement about the conclusion I drew on the

7  facts as I found them.  I said I'm not talking about the

8  facts because I think it is correct that what I determined

9  is subject to clear error.  Maybe the Federal Circuit will

10  say, well, he misunderstood the affidavit that was submitted

11  by Ms. Carson.  She really did deny totally saying what was

12  attributed to her and that makes all the difference.  But I

13  think the record will stand pretty well that I looked at the

14  affidavits and looked at what happened.  I thought it more

15  likely she said what was attributed to her.  I drew some

16  conclusions from that and from the other things that I have

17  already talked about and I thought that's enough.  That's

18  enough to make the cut.

19       But I agree with Mr. Gindler that this is not

20  an area of the law that is perfectly clear because it's a

21  highly fact specific inquiry and sometimes the Federal

22  Circuit says things about it which make you think, well,

23  that would be enough, and other times they say things a

24  person could look at reasonably and say, well, maybe that

25  is not enough.

1          So I add to the mix my own question in my mind

2     which I resolved in favor of Amgen but which I think

3     certainly there is substantial ground for difference of

4     opinion on.  I add to that -- let me back up and say, by

5     "substantial ground for difference of opinion," I'm talking

6     about whether the facts that I found amount enough to say

7     reasonable apprehension of suit.  There is an argument, and

8     it's been well articulated by ARIAD and we don't need to go

9     into it again, that even if you take everything I found as

10    true, it's not enough.  It's not enough to say reasonable

11    apprehension of suit.  But you set that aside for a moment

12    and you also add into the mix here this Bayh-Dole question,

13    which it's true they could be grasping at straws the way

14    Amgen implicitly urges, but I think there is more merit

15    to it than that.  This is not some totally unrelated

16    statute.  There is a statute on point that talks about a

17    responsibility to license and how, if at all, that would

18    impact or screen the kind of licensing behavior that took

19    place here, including enforcement actions which one could

20    argue are a necessary step in making a licensing program

21    credible.

22          It's not a frivolous question to me.  It does

23    have an impact.  So I added it into the mix, I look at it,

24    and I think, you know what?  I think they met the test for

25    1292(b) and that puts me at the point of asking should I

Page 33

1    exercise my discretion?  And I think yes because of two

2    reasons:  One is I am persuaded that I've got a genuine

3    David-and-Goliath thing going here where Goliath has brought

4    David into court and maybe because David stepped in it --

5    not maybe, it is because I found David stepped in it and so

6    they're here by virtue of their own acts.  But if I'm wrong

7    about that conclusion, I don't want litigation itself to be

8    something that can sink this company.  And a suit involving

9    millions of dollars in costs, as patent litigation typically

10   does in fees and costs, has the real prospect of having a

11   more than minimal impact on the existence of a startup.

12         I'm just not prepared to have the process itself

13   become a strategic tool.  I know that happens all the time.

14   I know that this Court and other courts around the country,

15   in intellectual property suits, are part of bigger strategic

16   business plans and maneuvers that we don't know about and

17   frankly don't need to know about.  But the fact that the

18   process itself can be a business tool, it doesn't mean in

19   this instance where -- and I should make it clear, I'm not

20   accusing Amgen of that.  I'm just saying the process itself

21   ought not be what sinks ARIAD here, if in fact I'm wrong

22   that they should be here at all.  So I'm going to give them

23   their crack at making their pitch to the Federal Circuit

24   that, hey, Judge Jordan thought we stepped in it when we

25   were dancing all around the question of threatening suit.

Page  34

1          Incidently, I should point out, the record of my

2    oral ruling from September 11th is slightly wrong.  There is

3    a statement on page 77, line 11 that says I characterize

4    Mr. Casselman as extremely saddened.  I was saying he was

5    extremely savvy.  That is s-a-v-v-y, I think.  Now, he may

6    be saddened, too, by what I ended up concluding.

7          But I was trying to point out that the record

8    looked to me like these were knowledgeable business

9    executives who understood the risks of declaratory judgment

10   suit and were trying to maneuver around it.  There is this

11   Kabuki dance where people are trying to communicate "I'm

12   coming after you" without saying it the way that is going to

13   let the other side come after them.  It is the state of the

14   law.  It is what it is.  And if it were a perfectly clear

15   picture, we would all know exactly where the line is so we

16   can say "aha," that is it, you stepped over it or you

17   didn't, but we don't know exactly, which is why there is

18   merit to what the position that ARIAD has put in front of

19   me.

20          Did they step over the line?  They say no/I say

21   yes.  There is a substantial ground for difference of

22   opinion here.  That is what makes the Bayh-Dole issue which

23   may affect where the line is something I think the Federal

24   Circuit should take an a crack at, if they want.  And if

25   they say no, we don't think this is something we should take

Page 35

1  a look at, I won't be upset or disappointed, and I'm sure

2  that Amgen won't, and ARIAD might be, but they'll come back

3  here and we'll move forward.  But I'm going to going to

4  grant the motion for the reasons I have stated.

5          Now, I'm denying without prejudice all these

6  other matters that are before me as moot, and I'm going to

7  grant the request that Amgen has made for briefing on the

8  oral motion to stay discovery because, of course, the risk

9  here is that as Amgen has said, you know, ARIAD will take

10  this thing up and this case will get put in a posture where

11  they have to stay it under a cloud unfairly.  And I think

12  some of the comments I made here already indicate that I'm

13  interested in the process itself not being determinative,

14  but I want to give Amgen a chance to brief their position.

15  I don't want to make a ruling on that without them having a

16  chance to put authorities before me and make their best

17  pitch.  So I'm frank to say I'm inclined to stay but I want

18  to give you your shot at explaining to me why I shouldn't do

19  that, Amgen.

20          So here is what we'll do.  I will ask that since

21  the burden is on ARIAD in this respect that they make their

22  motion to stay discovery promptly with their opening brief,

23  and we'll just go ahead and have briefing on the ordinary

24  local rule schedule, unless you folks want to work out some

25  other sensible schedule to address it.  But in the meantime,

Page 36

1  since I'm seriously considering it, discovery is stayed

2  while I have this under consideration.

3          Does everybody understand how we're moving

4  forward at this point then?  Mr. Gindler?

5          MR. GINDLER:  Yes, Your Honor.  As I understand

6  it, while the matter is being considered by the Court,

7  discovery is stayed, but only for that time period we're to

8  brief this under the ordinary local rules.

9          THE COURT:  Right.

10         MR. GINDLER:  And unless I left something out

11  with Amgen.

12         THE COURT:  Right.  That's the deal.

13         Okay.  Mr. Pals.

14         MR. PALS:  Understood, Your Honor.

15         THE COURT:  Okay.  Is there anything else we

16  should talk about while we're all here together?

17         MS. SHARP:  Your Honor, there was one other

18  issue with the transcript.  I'm not sure we need to do it on

19  the record.  It was a misidentification of a speaker.  I'm

20  sure counsel can agree.

21         THE COURT:  Then why don't you relay that to

22  Mr. Gaffigan.  All right?

23         MS. SHARP:  (Nodding yes.)

24         THE COURT:  Is there anything else from the

25  defense side?

Page 37

1          MR. PALS:  No, Your Honor.

2          THE COURT:  You will get a one-liner that will

3   confirm, like you did before, that says, "For the reasons

4   stated in open court, the motion is, and then with the

5   ruling here, is granted; okay?  We're in recess.

6          (Motion hearing ends at 10:30 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

2 of 2 DOCUMENTS

Copyright 2006 Voxant, Inc.
All Rights Reserved.
Copyright 2006 CNBC/Dow Jones Business Video, a division of CNBC/Dow Jones Desktop
Video, LLC.
All Rights Reserved.
CNBC/Dow Jones Business Video

**SHOW:** CNBC/DOW JONES BUSINESS VIDEO 3:17 PM EST

May 4, 2006 Thursday

**TRANSCRIPT:** 050401cb.y51

**SECTION:** BUSINESS

**LENGTH:** 747  words

**HEADLINE:** Ariad Pharmaceuticals -- Chairman & CEO Inter

**BYLINE:** Maria Bartiromo, Mike Huckman

**GUESTS:** Dr. Harvey Berger

**BODY:**

MARIA BARTIROMO, CNBC ANCHOR: Well, a David versus Goliath story in biotech to tell you about. A small biotech company took on big pharma and won big. We`re talking about Ariad Pharmaceutical`s victory today against Eli Lilly. Ariad is receiving at least $62.5 million and a percentage of future and past revenue from the sale of two drugs. CNBC`s pharmaceuticals reporter Mike Huckman is here now with another "First-on- CNBC" interview with Ariad`s CEO -- Mike.

MIKE HUCKMAN, CNBC PHARMACEUTICALS REPORTER: Yes, Maria, about 20 times the average daily volume traded in this stock so far today. The federal court jury decision in Boston this morning was unanimous that Lilly pay Ariad and its academic institution co-plaintiffs, including MIT and Harvard, the damages plus more than 2 percent of the drug sales from 2002 all the way through 2019. The jury says Lilly is infringing the Ariad Pharmaceutical`s patent on technology that Lilly uses to make its billion dollar blockbuster osteoporosis drug, called Evista and its $200 million septic shock drug called Xigris.

The stock of Ariad was halted when CNBC broke this news of the verdict this morning, but they spiked as soon as trading reopened. Right now, the stock is up 26 percent on very heavy volume. But in a strongly worded press release, Lilly says it will appeal. Quoting the company`s general council Robert Armitage: "I`ve never seen a jury verdict with which I so strongly dis-

agree. We are obviously confident that we will succeed on appeal." And he says, "The Ariad position is equivalent to discovering that gravity is the force that makes water roll downhill and then demanding the owners of all the existing hydro electric plants begin to pay patent royalties on their use of gravity." And so, on that note, let`s bring in Ariad Pharmaceuticals chairman and CEO Dr. Harvey Berger, joining us live first on CNBC from Boston this afternoon.

Dr. Berger, thanks for being here.

DR. HARVEY BERGER, CHAIRMAN & CEO, ARIAD PHARMACEUTICALS: Hello, Mike.

HUCKMAN: So your reaction to Lilly`s lawyer`s statement?

BERGER: Well, I think today is a very important day for Ariad, for our shareholders, and for science. As you pointed out, the jury found unanimously in our favor both in terms of infringement as well as validity of our patent. You know, I think each of the issues that Mr. Armitage addressed in his quote were largely dealt with by the jury and by the trial. Lilly put forth its best case and we were able to prevail. And the jury spoke today.

HUCKMAN: Dr. Berger, if this holds up on appeal, what kind of windfall could this mean for your company and your academic partners?

BERGER: Well, it`s a very important finding for Ariad and for our academic collaborators and colleagues. The numbers, which you put forth earlier, certainly speak to the damages which the jury has awarded us, the $65 million for a back sales as well as almost a 2 1/2 percent royalty on Xigris and Evista sales in the U.S. going forward through the end of the patent life. And so, those are very important numbers for us in the future. It doesn`t affect our guidance for this year, but certainly could kick in in the future.

HUCKMAN: And Dr. Berger, you`re not done yet. You think you can get royalties from other drug companies as well, correct?

BERGER: Well, there`s no question that NF-(kappa)B cell-signaling pathway plays an important role in many different diseases, not only septic shock and bone disease, osteoporosis, but as well as cancer and inflammation. And there certainly are opportunities for other companies to license our technology and our patents. And we are committed to broadly licensing this patent to other pharmaceutical companies, biotech companies. That`s never been a question. Academics, universities, can use the technology at no charge with no restriction, but pharmaceutical and biotech companies need to pay rent for the use of the intellectual property.

HUCKMAN: Need to pay rent and that`s what a jury said today. Dr. Harvey Berger, the chairman and CEO of Ariad Pharmaceuticals, thanks again for joining us first on CNBC after this favorable jury verdict.

And Maria, separately, I should add, this company is going to have data coming out on ASGRO, the big oncology conference next month on one of its pipeline products for rare cancer called sarcoma. So investors have that to look forward to as well.

BARTIROMO: All right, we`ll watch that. Thanks so much, Mike. Great interview, good story there, Mike Huckman.

**LOAD-DATE:** May 5, 2006

# EXHIBIT C



ARIAD®

### NF-κB Highlights

We have an exclusive license to pioneering technology and patents related to certain NF-κB treatment methods, and the discovery and development of drugs that regulate NF-κB cell-signaling activity.  Regulation of NF-κB cell-signaling activity may be useful in treating certain medically important disorders.

- **The Science.** Dr. David Baltimore, formerly director of the Whitehead Institute for Biomedical Research, Dr. Phillip Sharp of the Massachusetts Institute of Technology, and Dr. Thomas Maniatis of Harvard University, together with a team of scientists in their respective laboratories, discovered a family of genes that encode proteins they called NF-κB and I-κB, its inhibitor; the critical role played by NF-κB cell signaling in regulating cellular processes involved in various difficult-to-treat diseases; methods to identify compounds to regulate NF-κB cell-signaling activity; and methods of treating disease by inhibiting NF-κB. NF-κB can be generally thought of as a "biological switch" that can be turned off using these methods to treat disorders, such as inflammation, cancer, sepsis and osteoporosis.

- **The Patents.** We have an exclusive license to a portfolio of four issued patents relating to NF-κB, three in the United States and one in Europe. The most recent U.S. patent, issued in June 2002, contains a range of focused claims to methods useful for treating various disease conditions through modulation of NF-κB activity. In June 2002, we and our inventors' academic institutions filed a lawsuit against Eli Lilly and Company alleging infringement of certain claims of this patent by Lilly through sales of its osteoporosis drug, Evista®, and its septic shock drug, Xigris®.

- **The Licensing Program.** We permit broad use of our NF-κB intellectual property at no cost by investigators at academic and not-for-profit institutions to conduct non-commercial research. Our goal is to license our NF-κB technology to pharmaceutical and biotechnology companies conducting research on the discovery of drugs that modulate NF-κB cell signaling and/or marketing such drugs. Bristol-Myers Squibb Company and DiscoveRx Corporation, a high-throughput screening company, have entered into research and development licenses for our NF-κB intellectual property.

- **The Business Implications.** The use of many currently marketed drugs and products in development, in addition to the two highlighted in the Lilly litigation, are examples of NF-κB treatment methods which may be covered by our NF-κB patents. While we cannot predict today the revenue stream that may ultimately result from its NF-κB patent portfolio, our share of any proceeds from Lilly or any other company that licenses our intellectual property portfolio will be used to fund the development of our innovative treatments for cancer and other life-threatening diseases – supporting our efforts to build a science-driven, product development company focused primarily on cancer.

For updated information about the proceedings in our case against Lilly, see our most recent <u>filings with the Securities and Exchange Commission</u> (including reports on Forms 8-K, 10-K, and 10-Q).

**(Last updated:  March 10, 2004)**

# EXHIBIT D

# ARIAD PHARMACEUTICALS INC (ARIA)

26 LANDSDOWNE ST
CAMBRIDGE, MA 02139
617. 494.0400

# 10−K

**ARIAD PHARMACEUTICALS FORM 10−K**
**Filed on 03/14/2003 − Period: 12/31/2002**
File Number 333−76486



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10−K

(Mark One)

[X]  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2002

**OR**

[  ]  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from     to
Commission file number 033−76414

# ARIAD Pharmaceuticals, Inc.

(Exact name of registrant as specified in its charter)

| **Delaware** | **22−3106987** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**26 Landsdowne Street, Cambridge, Massachusetts 02139−4234**

| (Address of principal executive offices) | (Zip Code) |
|---|---|

**Registrant's telephone number, including area code: (617) 494−0400**

**Securities registered pursuant to Section 12(b) of the Act: None**

**Securities registered pursuant to Section 12(g) of the Act:**

**Common Stock, $.001 Par Value**

**Rights to Purchase Series A Preferred Stock**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes [X]   No [  ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S−K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10−K or any amendment to this Form 10−K. [X]

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b−2 of the Act).

Yes [X]   No [  ]

The aggregate market value of the registrant's common stock held by nonaffiliates of the registrant (without admitting that any person whose shares are not included in such calculation is an affiliate) computed by reference to the price at which the common stock was last sold, or the average bid and asked price of the common stock, as of the last business day of the registrant's most recently completed second fiscal quarter was $121.8 million.

As of March 12, 2003, the registrant had 34,846,640 shares of common stock outstanding.

## TABLE OF CONTENTS

PART I
    ITEM 1: BUSINESS
    ITEM 2: PROPERTIES
    ITEM 3: LEGAL PROCEEDINGS
    ITEM 4: SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS
PART II
    ITEM 5: MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER
    MATTERS
    ITEM 6: SELECTED FINANCIAL DATA
    ITEM 7: MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
    OF OPERATIONS
    ITEM 7A: QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK
    ITEM 8: FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA
    ITEM 9: CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND
    FINANCIAL DISCLOSURE
PART III
    ITEM 10: DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT
    ITEM 11: EXECUTIVE COMPENSATION
    ITEM 12: SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND
    RELATED STOCKHOLDERS MATTERS
    ITEM 13: CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS
    ITEM 14: CONTROLS AND PROCEDURES
PART IV
    ITEM 15: EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8–K
SIGNATURES
EXHIBIT INDEX
EX–10.49 AGREEMENT DATED 6/8/2000
EX–10.50 AMENDMENT TO CLACKSON AGREEMENT 7/1/01
EX–10.51 AMENDMENT TO AGMT DATED 7/12/2002
EX–10.52 AGMT DATED 7/1/2002
EX–10.53 STOCK PURCHASE AGMT DATED 11/8/2002
EX–10.54 LETTER DATED 12/27/2002
EX–10.55 SUBLEASE DATED 12/31/99
EX–10.56 AMENDMENT TO SUBLEASE DATED 7/26/2002
CONSENT OF DELLOITTE & TOUCHE
906 CERTIFICATION

## TABLE OF CONTENTS

**PART I**

| | | |
|---|---|---|
| Item 1: | Business | 1 |
| Item 2: | Properties | 25 |
| Item 3: | Legal Proceedings | 25 |
| Item 4: | Submission of Matters to a Vote of Security Holders | 26 |

**PART II**

| | | |
|---|---|---|
| Item 5: | Market for Registrant's Common Equity and Related Stockholder Matters | 27 |
| Item 6: | Selected Financial Data | 28 |
| Item 7: | Management's Discussion and Analysis of Financial Condition and Results of Operations | 29 |
| Item 7A: | Quantitative and Qualitative Disclosures About Market Risk | 36 |
| Item 8: | Financial Statements and Supplementary Data | 38 |
| Item 9: | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 56 |

**PART III**

| | | |
|---|---|---|
| Item 10: | Directors and Executive Officers of the Registrant | 57 |
| Item 11: | Executive Compensation | 62 |
| Item 12: | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 66 |
| Item 13: | Certain Relationships and Related Transactions | 68 |
| Item 14: | Controls and Procedures | 69 |

**PART IV**

| | | |
|---|---|---|
| Item 15: | Exhibits, Financial Statement Schedules and Reports on Form 8–K | 70 |

Table of Contents

PART I

**ITEM 1: BUSINESS**

The following Business Section contains forward−looking statements, which involve risks and uncertainties. Our actual results could differ materially from those anticipated in these forward−looking statements as a result of certain factors (see "Certain Factors That May Affect Future Results of Operations"). In this Annual Report on Form 10−K, we incorporate by reference certain information from parts of other documents filed with the Securities and Exchange Commission, or the SEC. The SEC allows us to disclose important information by referring to it in that manner. When reading this Annual Report, please refer to such information which is incorporated by reference in this document.

Our internet website address is http://www.ariad.com. Our annual reports on Form 10−K, quarterly reports on Form 10−Q and current reports on Form 8−K which have been filed with the SEC are available to you free of charge through a hyperlink on our internet website.

**Corporate Overview**

We are engaged in the discovery and development of breakthrough medicines that regulate cell signaling with small molecules. Breakthrough medicines are products, created *de novo,* that may be used to treat diseases in innovative ways. We are developing a comprehensive approach to the treatment of cancer and are primarily focused on a series of product candidates for targeted indications: (1) AP23573, which is in phase 1 development, to treat solid tumors and other malignancies; (2) AP23464 to block the spread of cancer, or metastases, and to treat certain forms of leukemia; and (3) AP23841 to treat cancer that has spread to bone, or bone metastases, and to treat primary bone cancers, such as osteogenic sarcomas. These small−molecule product candidates have novel mechanisms of action and have been demonstrated to provide highly potent targeted anti−cancer activity. The AP23573 and AP23841 class of drugs, known as mTOR inhibitors, starves cancer cells by inhibiting nutrient uptake (metabolic arrest) and growth factor stimulation. AP23464, a Src/Abl inhibitor, blocks the process by which certain solid tumors migrate from primary to distant sites; it also inhibits a key enzyme that is abnormally active in certain forms of leukemia.

AP23573 can also be used to block the migration and proliferation of vascular smooth muscle cells − the primary cause of narrowing and blockage of coronary and peripheral arteries. With the advent of a newly emerging medical technology − drug−delivery stents to reduce restenosis, or reblockage, of injured arteries following angioplasty and stenting − active discussions have been initiated with potential medical device partners that may open up this second clinical and commercial opportunity for AP23573 delivered in vascular stents.

We also are developing two regulated gene or cellular product candidates to treat diseases that occur commonly in patients with certain cancers and various blood diseases: (1) a regulated protein therapy product candidate to treat anemia in which the production of erythropoietin is controlled *in vivo* by an orally administered drug, AP22594; and (2) a T cell immunotherapy product candidate in which a non−immunosuppressive drug, AP1903, may be used to treat graft−vs−host disease following donor bone marrow and stem cell transplantation.

With respect to the development and commercialization of our lead product candidates, our goals are to: (1) enter into a partnership with a pharmaceutical or biotechnology company to develop and commercialize our lead product candidate, AP23573, to treat cancer; (2) enter into partnerships with medical device companies to develop and commercialize our lead product candidate, AP23573, in drug−delivery stents to decrease reblockage of arteries following angioplasty and stenting; (3) independently develop as many of

Table of Contents

our product candidates as possible through at least phase 2 before partnering them; (4) establish the commercial infrastructure to market or co−market our anti−cancer product candidates in the United States; and (5) enter into partnerships for our other product candidates outside the United States.

We have an exclusive license to pioneering technology and patents related to the discovery, development and use of drugs to regulate NF−κB cell−signaling activity, which can be used to treat medically important disorders, including inflammation, cancer and osteoporosis. We permit broad use of our NF−κB intellectual property at no cost by investigators at academic and not−for−profit institutions to conduct non−commercial research. Our goal is to license our NF−κB technology to pharmaceutical and biotechnology companies conducting research on the discovery of drugs that modulate NF−κB cell signaling and/or marketing such drugs. Bristol−Myers Squibb Company entered into a research and development license for our NF−κB technology in November 2002.

We distribute our RegTech cell−signaling technologies at no cost to academic investigators in the form of our Regulation Kits. Over 600 academic investigators worldwide already are using this technology in diverse areas of research, and over 150 scientific papers describing their use have been published. Our goal is to license our RegTech cell−signaling technologies to pharmaceutical and biotechnology companies to accelerate their drug discovery. GPC Biotech AG entered into a research and development license for our ARGENT cell−signaling regulation technology in January 2003. In addition, we may jointly develop product candidates incorporating our ARGENT cell−signaling regulation technology, with companies that have proprietary therapeutic genes, cellular systems or gene−delivery vectors.

ARIAD was organized as a Delaware corporation in April 1991. Our principal executive offices are located at 26 Landsdowne Street, Cambridge, Massachusetts 02139−4234, and our telephone number is (617) 494−0400. We maintain an internet website at http://www.ariad.com, the contents of which are not incorporated into this Annual Report.

**Our Primary Lead Product Candidates**

We currently are focused primarily on developing three lead anti−cancer product candidates for targeted clinical indications – all of which are small−molecule drugs that regulate cell signaling. Many of the critical functions of cells, such as cell growth, differentiation, gene transcription, metabolism, motility and survival, take place through the processes of cell signaling. Disruption or over−stimulation of cell−signaling pathways has been implicated in many disease states. Our product candidates interfere with specific cellular proteins or pathways that have been well−characterized and validated as targets. All of these product candidates were developed in−house through the integration of structure−based drug design and chemo−informatics, or computational chemistry, functional genomics and proteomics. We believe that our product candidates, if successfully developed, will serve large, unmet medical needs.

2

**Table of Contents**

Our primary lead product candidates are as follows:

| Product Candidate | Target | Initial Clinical Indications | Development Status |
|---|---|---|---|
| AP23573 | mTOR | Solid tumors/other malignancies | Phase 1 |
| AP23464 | Src/Abl | Cancer metastases | Pre–IND |
| AP23464 | Src/Abl | Leukemia | Pre–IND |
| AP23841 | mTOR | Bone metastases | Pre–IND |
| AP23841 | mTOR | Primary bone cancers | Pre–IND |
| AP23573/Drug–delivery Stents | mTOR | Vascular disease (Restenosis) | Pre–IDE |

In the case of pharmaceutical products, after a development candidate (and back–up candidates) have been designated, Pre–Investigational New Drug, or pre–IND, development is initiated and consists of longer–term investigational toxicology studies, as well as other studies required by the U.S. Food and Drug Administration, or FDA, or other regulatory authorities for inclusion in an IND or other regulatory filings to initiate human studies. Examples of these studies include toxicology, pharmacology, and metabolism studies conducted under the current Good Laboratory Practices, or cGLP, requirements, as well as *in vivo* efficacy studies in relevant animal models of disease. Clinical development requires manufacturing of clinical–grade material for use in humans produced under current Good Manufacturing Practices, or cGMP, requirements. Phase 1 development includes obtaining regulatory and institutional review board, or IRB, approvals for administering product candidates for the first time to healthy volunteers and select patients with disease (*e.g.*, refractory cancers) and conducting clinical trials that are designed to provide initial safety and pharmacokinetic data. Phase 2 development includes obtaining regulatory and IRB approvals for administering product candidates to patients with a broader spectrum of diseases and conducting clinical trials that are designed to provide further safety data and initial indications of a product candidate's clinical efficacy in its proposed use. In the case of medical devices such as drug–delivery stents, pre–Investigational Device Exemption, or pre–IDE, development consists of stent formulation development and other studies required by the FDA or other regulatory authorities for inclusion in an IDE or other regulatory filings to initiate human studies. Examples of these studies include kinetic experiments on the release of drug from drug–delivery stents, as well as safety and efficacy studies in relevant animal models of disease.

**Solid Tumors and Other Malignancies**

*The Disease:* Cancer, the second leading cause of death in the Western world, is a complex collection of hundreds of separate diseases characterized by the uncontrolled growth, proliferation and spread of abnormal cells. Great strides have been made in the past few decades in understanding the molecular basis for the transformation of normal cells into cancer cells by searching for genetic differences between them. These studies have revealed that cancer cells often harbor genetic mutations that alter the controlling mechanisms in cell signaling that constrain cell growth in healthy cells and induce cell death in abnormal cells. Two major classes of such genetic alteration have been identified. Genes that turn on cell growth and division and generate conditions conducive to the spread of cancer are often over–activated or over–expressed in tumors. These genes are called oncogenes, and they represent key targets for anti–cancer drug design, since drugs that inhibit their activity should re–establish normal regulation of cell growth and proliferation and prevent the spread of malignant cells. A second class of genes, called tumor suppressors,

3

Table of Contents

plays an opposite role by preventing uncontrolled cell growth. Without treatment, these genes are often inactivated or deleted in tumors, leading to uncontrolled proliferation and potentially enhancing the effects of oncogenes.

*Current Therapies:* Several forms of medical therapy have evolved as adjuncts or alternatives to surgery, including the introduction of cytotoxic chemotherapy and radiation therapy over 50 years ago. Although these therapies have evolved and continue to be the mainstay of cancer treatment, especially after the cancer has spread from its site of origin, these therapies often are limited by lack of specificity and result in general toxicity by killing healthy cells, along with malignant cells. Recently, a number of alternative therapies have been introduced, including endocrine therapy to treat cancers of certain hormone−sensitive organs, recombinant biologics, and small molecules and monoclonal antibodies that target the molecular determinants of the transformation to malignancy. Several growth factor inhibitors and protein kinase inhibitors have been developed to block molecular pathways implicated in cancer.

*Our Approach:* Our lead anti−cancer product candidate, AP23573, is a potent small−molecule inhibitor of the cell−signaling protein mTOR − a well−defined target that plays a key role in orchestrating the progression of the cell cycle through the regulation of nutrient uptake (metabolic arrest) and growth factor stimulation. To sustain accelerated growth and proliferation, cancer cells require an ample supply of nutrients and stimulation by growth factors, and these key processes are blocked by AP23573. Our extensive *in vivo* studies demonstrate that AP23573 shrinks cancer cells and arrests tumor growth in animal models.

Other studies indicate that the effect of mTOR inhibitors may be even more pronounced in tumor cells with a mutated or inactivated form of a recently discovered tumor suppressor gene, known as PTEN. Several difficult−to−treat cancers, including prostate, uterine, pancreatic, and ovarian cancer, as well as melanoma, leukemia and gliomas, frequently are missing the PTEN protein due to such a mutation. Since cancer patients with PTEN−deficient tumor cells can be identified using readily available tests, it may be possible to select those who may benefit most from AP23573. This product candidate is currently in phase 1 development. Dosing of patients with refractory or advanced cancers is expected to begin in the second quarter 2003 in two clinical trials at major cancer centers in the United States.

**Cancer Metastases**

*The Disease:* Tumor cell migration, or metastases, is an early event in cancer progression. Cancer cells escape from the primary tumor, first invading the surrounding local tissue, then traveling through the blood or lymphatic circulation to more distant sites where they reestablish themselves and proliferate further. Only a small number of cancer cells, estimated to be less than 0.01%, survive this highly complex journey. The most common distant sites to which cancers migrate are bone, lung, liver, lymph nodes and brain.

Based on estimates for 2003, approximately 1.2 million new cases of invasive cancer will be diagnosed annually in the United States. In one−third of these newly diagnosed cases, patients are likely to have overt spread of the primary cancer at initial presentation. Another third are likely to have microscopic metastases which are undetectable with routine diagnostic tests other than tumor biopsy. As soon as the diagnosis of cancer is established, the first priority is to determine whether, and to what extent, the disease has spread beyond the primary site(s). This process is referred to as staging, and there is a high correlation between the extent of metastases and patient morbidity and mortality.

*Current Therapies:* Chemotherapy is often administered as an adjunct to surgery in an attempt to eliminate disseminated tumor cells. Because of the general toxicity of chemotherapy, the side−effects can be severe, and the cure rate is low. Sometimes, very high doses of chemotherapy are prescribed despite the risk that potentially life−threatening complications may result, including compromise of the patient's bone marrow and stem cells, which may necessitate a bone−marrow or stem−cell transplant.

4

Table of Contents

Alternative therapies that may be used to treat cancer metastases include hormonal therapy, radiotherapy, analgesics for pain and anti–resorptive drugs for bone metastases; these treatments may decrease morbidity and mortality but rarely eradicate the patient's cancer after it has spread widely.

The urgent need for safer and more effective alternatives to treating the spread of cancer has prompted widespread research to decipher the multi–step genetic regulation of the metastatic process. Numerous studies demonstrate that migrating tumor cells generally exhibit either a loss or an augmentation of the function of a particular gene or set of genes – in some cases, both loss and augmentation. Two approaches are being considered: those that target factors outside the cell that stimulate gene expression and those that target gene–regulated factors inside the cell which have been implicated in tumor progression and metastases.

*Our Approach:* We have pioneered the discovery and development of small–molecule drugs to inhibit proteins, such as Src, that are believed to orchestrate the progression and spread of cancer. Recent research has elucidated the critical role that enhanced expression of the Src protein plays in the dissemination of colon cancer – a finding that has attracted widespread attention in the scientific community. Based on this work, the Src protein is now known to be involved in loosening the structure of tissue surrounding a tumor, opening the way for cancer cells to spread. AP23464 is a potent inhibitor of the Src protein (and the Abl protein – see next section on leukemia) and is being developed to treat the spread of solid tumors, such as colon and breast cancers. AP23464 is in pre–IND development.

### Leukemia

*The Disease:* Leukemia is cancer that occurs in the bone marrow resulting in excessive production of dysfunctional blood cells, usually white blood cells, and, as a result, insufficient production of red blood cells and platelets. Based on estimates for 2003, approximately 30,000 patients will be diagnosed with leukemia in the United States annually, and over 20,000 are expected to die from this disease. While ten times as many adults as children develop leukemia, this blood malignancy is the number one cause of death from cancer in children and young adults under age 20.

Multiple genetic defects have been implicated in the development of leukemia, of which there are four main types based on how fast the abnormal cells are produced – acute, or quickly, and chronic, or slowly – and on the type of white blood cell that has become malignant. Acute myeloid leukemia, or AML, is the most common type, occurring in about one–third of newly diagnosed leukemia patients. Chronic myelogenous leukemia, or CML, was the first cancer to be linked to an identified genetic defect. This genetic abnormality leads to the over–activation of a protein known as Abl, which plays a pivotal role in regulating cell growth and maturation. While CML is diagnosed in fewer than 5,000 patients in the United States each year, it is frequently associated with a poor prognosis. A closely related genetic defect is detectable in approximately 25 to 30% of patients with acute lymphoid leukemia, or ALL.

*Current Therapies:* There are five major approaches to the treatment of leukemia: (1) cytotoxic chemotherapy, often given in combination, to kill leukemia cells; (2) interferon therapy to slow the reproduction of leukemia cells and promote the immune system's anti–cancer activity; (3) radiation therapy to kill leukemic cells in localized areas such as the brain; (4) bone–marrow or stem–cell transplantation to enable treatment with high doses of chemotherapy and radiation therapy; and (5) surgery to remove an enlarged spleen. Recently, a new drug called imatinib mesylate (known as Gleevec®) that inhibits the activity of the Abl protein has been added to the treatment options for CML patients. However, not all patients are equally responsive to this drug, and many who are initially responsive become resistant to the drug after an initially favorable response. Investigation of the mechanism of this resistance suggests that over–activation of another protein, the Src protein – also known to be a key regulator of cell–growth – may play an important role in the development of resistance to imatinib mesylate therapy.

**Table of Contents**

*Our Approach:* Our scientists have discovered a small–molecule product candidate that potently inhibits both the Abl protein and the Src protein. This dual inhibitor, AP23464, may address the need for an alternative treatment for CML patients who have become resistant to imatinib mesylate and for certain patients with leukemia as first–line therapy. In addition, AP23464 may be administered in combination with drugs that target other proteins implicated in the uncontrolled cell growth and proliferation that are characteristic of most cancers, including leukemia. AP23464 is in pre–IND development.

**Bone Metastases**

*The Disease:* The spread of malignant cells from the primary tumor to the skeleton and the subsequent destruction of bone is a frequent and debilitating complication of many cancers, especially breast, prostate, colon, and lung cancer and multiple myeloma. An estimated 750,000 patients worldwide die each year with bone metastases. In those patients originally diagnosed with breast and prostate cancers, most of the tumor burden at the time of death is in bone.

Bone is a very attractive target for migrating cancer cells. Once they arrive, cancer cells begin stimulating the breakdown of bone by cells known as osteoclasts. The breakdown of bone, in turn, releases bone–derived growth factors that attract more cancer cells and facilitate their growth and proliferation, creating a vicious cycle of malignant growth within bone.

Bone metastases are a common cause of cancer–associated morbidity. Like osteoporosis, bone metastases result in severe bone loss but also are associated with local pain, fractures, vertebral instability and compression, and elevations in blood calcium often to life–threatening levels. These clinical findings can be devastating to a cancer patient. Bone metastases are a major problem in cancer management, both in terms of cost and morbidity.

*Current Therapies:* There is no known cure for bone metastases. However, several therapies are used to treat bone metastases and skeletal–related events, including chemotherapy, hormonal therapy, radiotherapy, analgesics for pain and anti–resorptive drugs. Most recently, newer–generation bisphosphonates have been advanced for the treatment of bone metastases and have already achieved substantial clinical use for this indication.

*Our Approach:* Recent research demonstrates that most skeletal destruction due to bone metastases is caused by cancer cell stimulation of osteoclasts, the bone cells responsible for bone breakdown, and the tumor burden in bones, especially the long bones, spine, and hips. Advances in our understanding of the biology of bone metastases has led to a new preventive and therapeutic strategy: designing a small–molecule product candidate, AP23841, that both inhibits bone breakdown – interrupting the vicious cycle that makes bone such an attractive environment for tumor growth – and blocks the growth of cancer cells that have spread to bone. AP23841 is a potent inhibitor of mTOR, a protein known to play a key role in orchestrating nutrient uptake and growth factor stimulation in tumors, and has chemical properties that target it selectively to bone. AP23841 is in pre–IND development.

**Primary Bone Cancers**

*The Disease:* Primary bone cancer is relatively rare with approximately 2,400 new cases diagnosed each year in the United States. The most common type of primary bone cancer is osteogenic sarcoma which develops in new tissue in growing bones, followed by Ewing's sarcoma which begins in immature nerve tissue in the bone marrow. Both cancers almost always occur in children and adolescents, particularly those who have had radiation and chemotherapy treatments for other diseases. Approximately 1,300 patients with primary bone cancer will succumb to their disease this year.

6

Table of Contents

*Current Therapies:* Primary bone cancers are extremely difficult to treat. Pre—operative chemotherapy followed by limb—sparing surgery, if possible, is the standard regimen. Multiple chemotherapeutic agents are used in combination to treat these aggressive tumors. Unfortunately, many patients require limb amputation and/or radiation therapy, and five—year survival is poor, especially if the primary tumor is located in the pelvis or the cancer has already spread outside of bone.

*Our Approach:* Like all cancers, bone tumors require an ample supply of nutrients and the stimulation of growth factors to sustain accelerated growth and proliferation. Our small—molecule product candidate, AP23841, has chemical properties that selectively target the compound to bone where it can inhibit the mTOR protein. The AP23841 class of compounds (including its analog, AP23675) inhibits the growth and proliferation of bone cancer cells making it well suited for the intended clinical application. AP23841 is in pre—IND development.

## Vascular Disease (Restenosis After Angioplasty and Stenting)

*The Disease:* The primary cause of death in the Western world is cardiovascular disease, and the common form is the narrowing and blockage of arteries due to atherosclerosis. Over one million coronary angioplasty procedures are performed annually in the United States to open narrowed or occluded arteries, followed in approximately half of the cases by the insertion of a wire—mesh scaffold, or stent, to prevent or minimize the likelihood of restenosis, or reblockage. A similar procedure is also commonly used to treat blocked peripheral arteries. Without stents, the incidence of vascular reblockage within the first few months runs as high as 40%, depending on the configuration and location of the vascular lesion and other clinical factors. With the use of stents to help keep dilated coronary arteries open, the incidence of reblockage is reduced substantially but still unacceptably high.

*Current Therapies:* Numerous drugs, including many antiplatelet agents, anticoagulants, ACE inhibitors, and cytotoxic agents, administered to patients following coronary angioplasty and stenting have failed to significantly reduce the overall incidence of vascular reblockage. Novel therapeutic interventions are needed. Recent clinical studies have found extremely low reblockage rates in patients treated with stents that are coated with and deliver small—molecule drugs, such as sirolimus, an mTOR inhibitor, or paclitaxel, a cytotoxic agent. Such stents may become the standard—of—care for patients undergoing interventional procedures to open narrowed coronary or peripheral arteries.

*Our Approach:* We have pioneered the discovery and development of sirolimus analogs, including AP23573, our lead product candidate for cancer. The highly potent activity of AP23573 in arresting the growth and proliferation of cancer cells can be duplicated in vascular smooth muscle cells – the primary cause of narrowing and reblockage of arteries. We are currently in active discussions with potential medical device partners to develop and commercialize next—generation stents that deliver AP23573 locally to the site of vascular injury.

## Our Other Product Development Programs

We also are developing two regulated gene or cellular therapy product candidates to treat diseases that occur commonly in patients with certain cancer and various blood diseases: (1) a regulated protein therapy product candidate to treat anemia in which the production of erythropoietin, or Epo, is controlled *in vivo* by an orally administered drug, AP22594; and (2) a T cell immunotherapy product candidate in which a non—immunosuppressive drug, AP1903, may be used to treat graft—vs—host disease, or GvHD, following allogeneic, or donor, bone marrow and stem cell transplantation. These product candidates utilize our ARGENT cell—signaling technology and are summarized as follows:

7

**Table of Contents**

| Product Candidate | Target | Initial Clinical Indications | Development Status |
|---|---|---|---|
| AP22594 | Epo | Anemia | Pre–IND |
| AP1903 | Fas | GvHD after T Cell Immunotherapy (Leukemia and other blood cancers) | Phase 2 |

The development timelines for our GvHD and anemia product candidates have been extended so that we may address vector manufacturing challenges and obtain additional funding or partners for these programs. Future clinical studies of these product candidates can only be conducted after we have successfully addressed these issues.

**Anemia**

*The Disease:* Red blood cells, produced in the bone marrow, transport oxygen from the lungs to the cells of the body and carbon dioxide to the lungs. Erythropoietin, or Epo, is a naturally occurring protein made primarily in the kidney that stimulates the manufacture of more red blood cells, when needed. If the body loses its ability to manufacture sufficient quantities of Epo, the optimal number of red blood cells (and their oxygen carrying component, hemoglobin) can no longer be maintained in the circulation – a condition known as anemia. This is usually the case with patients being treated with current highly cytotoxic anti–cancer therapies and with patients suffering from severe renal disease.

*Current Therapies:* Recombinant Epo (including a newer–generation version) is presently being used for the treatment of anemia caused by cancer chemotherapy, chronic renal failure (including end–stage renal disease) and zidovudine treatment of HIV–infected individuals. Recombinant Epo is routinely injected on a recurring schedule into a vein or under the skin.

*Our Approach:* We are developing an alternative approach to deliver and regulate therapeutic proteins such as Epo based on our ARGENT cell–signaling regulation technology. Rather than relying on repetitive injections of Epo to provide the therapeutic benefit, our approach is designed to involve a single, or infrequent, injection(s) of the Epo gene using a gene–transfer vector into the patient's muscle or other tissue in an inactive form, with Epo only being produced when the patient takes our small–molecule drug, AP22594. We have demonstrated production of therapeutically effective amounts of Epo for almost five years after one–time injection in monkeys of our proprietary gene complex. We anticipate that the patient will take AP22594 on a regular schedule (e.g., weekly, biweekly or monthly) to activate the Epo gene and manufacture Epo in the target tissue (i.e., skeletal muscle). The production of Epo would only occur in response to the patient taking the drug, and the amount of Epo manufactured *in vivo* would depend on the amount of AP22594 the patient takes.

We believe that the potential competitive advantages of our product candidate for anemia include:

- Replacement of a frequently injected recombinant product largely by a small pill taken every one to four weeks;

- Epo production precisely controlled within a therapeutic window as opposed to the oscillating blood levels that frequently occur by injectable routes of administration;

- The ability to cost–effectively deliver the high doses of Epo needed to treat certain types of refractory anemias.

Our AP22594 product candidate for anemia is currently in pre–IND development. One of the principal challenges being addressed in this program is the manufacture of cGMP gene–transfer vector for use in pharmacology and toxicology studies and for human trials.

Table of Contents

**Graft−vs−Host Disease**

*The Disease:* Bone−marrow transplantation, or BMT, followed by T−cell immunotherapy, has become a well−established medical procedure to treat leukemias and other advanced−staged cancers, as well as non−malignant diseases, such as hemoglobinopathies and autoimmune diseases. The procedure permits patients to receive high doses of cytotoxic chemotherapy and/or radiation therapy that not only eliminates the unwanted (malignant) cells but also destroys healthy cells within the bone marrow. Therefore, a patient's bone marrow must be replaced by infusion of bone marrow or peripheral stem cells, generally followed by an infusion of donor T cells that provides temporary immune function that combines potent anti−cancer, anti−viral and anti−bacterial activity until their own immune system has reconstituted. In approximately one third of the procedures, the bone marrow or stem cells and T cells must be provided by a donor, often unrelated to the BMT recipient.

In approximately half of the recipients of donor BMT and donor T cells, the T cells attack the patients' own tissues, causing a disease known as graft−vs−host disease, or GvHD. If there is not a good genetic match between the donor and patient, the recipient has an even higher risk (as high as 90% depending on the degree of mismatch) of developing GvHD – a life−threatening complication. The major organs attacked are the patient's skin, mucosa, liver and gastrointestinal tract.

*Current Therapies:* The incidence and severity of GvHD can be reduced by withholding T−cell immunotherapy following BMT. Unfortunately, this also eliminates the beneficial effects of those T cells. Highly effective treatments for GvHD are currently not available. In fact, clinical experience indicates that approximately 50% of GvHD patients fail to respond fully to the current standard treatment which generally consists of immunosuppressive agents. Such drugs also put the patient at greater risk of infection, since they compromise an already weakened immune system.

*Our Approach:* We are developing a non−immunosuppressive treatment for GvHD that we believe will target and eliminate only the T cells that cause the disease (*i.e.,* the donor's T cells), if those T cells attack the patient's own tissues, while preserving the immune cells that are being produced by the BMT. In our GvHD product candidate, donor T cells are modified using a gene−transfer vector to make them susceptible to our small−molecule drug candidate, AP1903. This drug candidate may be administered if GvHD occurs, potentially killing the disease−causing donor T cells and leaving other immune cells unaffected.

We believe that our AP1903 T−cell immunotherapy product candidate may have a favorable impact on patient outcome and increase the number of patients who could benefit from donor BMT and T−cell immunotherapy by improving the risk−to−benefit ratio of the underlying treatment. AP1903 was found to be safe and well tolerated in a Phase 1 clinical study. In addition, this study showed that AP1903 blood levels were reached that are expected to be clinically effective. Our product candidate for GvHD is in phase 2 development, where the principal challenge is the manufacture of cGMP gene−transfer vector and the development of standardized clinical−scale cell−processing methods to effectively engineer donor T cells for use in our planned multi−center clinical trials.

**Our Research Programs**

The regulation of cell signaling is a part of normal cellular function, and defects play critical roles in many major diseases. As a result, our technologies have a broad range of potential therapeutic applications, and we can leverage the knowledge and expertise that we have gained in the development of our current lead product candidates for use in the cancer field.

Table of Contents

*Cell–signaling Inhibitors That Target Bone Diseases:* We have developed small–molecule inhibitors of a cell–signaling pathway in bone cells that is critically involved in both bone breakdown and new bone formation. In a special strain of mice that was genetically manipulated to delete a key gene, several groups of researchers found that the deletion prevented bone resorption, increased bone mass, and enhanced bone formation. Extensive *in vivo* and *in vitro* studies by our scientists and collaborators have demonstrated that our small–molecule inhibitors have beneficial effects in animal models of diseases, such as osteoporosis and bone metastases. One such compound with potent anti–resorptive activity, AP23451, was being developed to treat bone metastases. However, it has been replaced by AP23841, which we plan to develop for both bone metastases and primary bone cancers.

*Cellular Therapy and Stem Cell Therapy:* In our GvHD product candidate, donor T cells are eliminated if they attack the patient's own tissues. Our approach uses a small–molecule drug to activate a "cell–death" switch in the genetically modified T cells, preserving the immune cells that are being produced by the patient's donated bone marrow. We believe the knowledge gained from this program may be applicable to other cellular therapies.

For example, stem cells are master cells that retain the ability to specialize, or differentiate, into many different types of specialized cells. Recent research has emphasized the broad potential of stem cells, both embryonic and adult forms, to treat disease by providing a source of cells that can be used to replace defective cells, tissues or even whole organs. Along with our collaborators, we have demonstrated, both *in vitro* and *in vivo*, that our cell–signaling regulation technologies can potentially overcome the two key limitations to the widespread use of stem–cell based therapies: (1) the inability to transfer therapeutic or corrective genes into stem cells efficiently; and (2) the subsequent difficulty in reliably deriving large numbers of specialized cells of the correct type and purity to patients.

In preclinical studies, our academic collaborators have also demonstrated regulated growth of other potentially useful cell types using ARGENT cell–growth switches customized for the desired cell therapy product. These include liver cells (for the treatment of hepatic disease), muscle cells (for the treatment of heart failure), and pancreatic islet cells (for the treatment of diabetes).

*Orally Regulated Protein Therapy:* Our ARGENT cell–signaling regulation technology represents a promising general platform for the delivery of secreted therapeutic proteins, because it has the potential to control the level of gene expression using an orally administered drug, and protein levels can be optimized within a therapeutic window. Allowing therapy to be terminated, if necessary, also enhances safety. We believe that results obtained to date from our anemia program with Epo may be used to accelerate the development of other protein therapy candidates. Several biotechnology companies are currently conducting preliminary studies with us to determine the feasibility of jointly developing product candidates incorporating our ARGENT cell–signaling regulation technology.

## Our Core Competencies

Our research programs are built around key areas of competency in structure–based drug design and chemo–informatics, functional genomics and proteomics, and protein engineering. The integration of these strengths provides us with unique opportunities in the era of post–genomic drug discovery.

Functional genomics and proteomics are the study of gene and protein function, or more specifically the study of how particular genes regulate cellular function. A further aspect of functional genomics is the study of how the protein products are linked in cell–signaling pathways and how these pathways are regulated. Functional genomics has particular relevance to the process of identifying specific disease–related molecular targets for drug discovery, a process termed target validation.

10

Table of Contents

Protein engineering is the design and modification of proteins based on the knowledge of their atomic level structure, obtained through the use of protein X−ray crystallography or nuclear magnetic resonance spectroscopy. Usually, the design process utilizes the three−dimensional structure of the protein to incorporate non−native amino acids into the protein's structure. This process generates new surface characteristics, thereby altering the small molecule or protein binding properties of the protein.

Structure−based drug design is a computational approach used to design small organic drug molecules that bind specifically to a particular protein in a cell−signaling pathway, for example, the critical molecular target in that pathway known to be linked to a disease. Using the target protein's three−dimensional atomic structure, drugs can be designed and optimized to bind both tightly and selectively to the target, which should lead to more potent drugs with fewer side effects. Structure−based drug design integrates structural biology and computer−assisted molecular modeling methods and has been applied directly to validated molecular targets in our cell−signaling programs to discover and optimize lead compounds. Chemo−informatic techniques and virtual screening further expand the utility of structural methods in drug discovery.

**Our Enabling Platform Technologies**

*NF−κB Cell−signaling Technology*

*The Science:* Dr. David Baltimore, formerly of the Whitehead Institute for Biomedical Research, Dr. Phillip Sharp of the Massachusetts Institute of Technology, and Dr. Thomas Maniatis of Harvard University, together with a team of scientists in their respective laboratories, discovered a family of genes that encode proteins they called NF−κB and I−κB, its inhibitor; the critical role played by NF−κB cell signaling in regulating cellular processes involved in various difficult−to−treat diseases; and methods to determine whether a compound regulates NF−κB cell−signaling activity. NF−κB can be generally thought of as a "biological switch" that can be turned off or on using these methods to treat disorders, such as inflammation, cancer and osteoporosis.

*The Patents:* ARIAD has a portfolio of four issued patents relating to NF−κB, three in the United States and one in Europe. The most recent U.S. patent, issued in June 2002, contains a range of focused claims to methods useful for treating various disease conditions through modulation of NF−κB activity. Bristol−Myers Squibb Company was the first company to enter into a research and development license for our NF−κB intellectual property in November 2002.

*Regulation Technologies to Accelerate Drug Discovery*

*Overview:* Our proprietary portfolio of cell−signaling regulation technologies includes the ARGENT Signaling, ARGENT Transcription, and RPD Secretion Technologies (collectively known as our RegTech technologies). Intracellular processes can be controlled with small molecules providing versatile tools for use in cell biology, functional genomics, proteomics, and drug−discovery research. For example, our ARGENT technologies form the basis of three−hybrid screening approaches that can be used to discover and characterize targets and lead molecules. To maximize their use by the scientific community, we distribute our technologies at no cost to academic investigators in the form of our Regulation Kits. Over 600 investigators worldwide already are using our Regulation Kits in diverse areas of research, and over 150 scientific papers describing their use have been published. For researchers in pharmaceutical and biotechnology companies, we have established an alternative licensing program to provide them with access to our cell−signaling regulation technologies on commercial terms; GPC Biotech AG was the first company to enter into such a license agreement in January 2003.

11

Table of Contents

***Target Validation – Cell Signaling:*** As analysis of the human genome sequence uncovers a wealth of new uncharacterized genes, a key challenge will be validating those genes that are good drug targets. Many of these are likely to be signaling proteins. Our ARGENT Signaling Technology allows single signaling proteins to be activated in isolation, allowing their precise functional role to be assessed *in vitro* and then *in vivo*. ARGENT tools are effective for early analysis of newly identified "orphan" signaling proteins, because no knowledge of natural ligands or binding partners is required. In addition, identification of new pathway components and gene expression changes that occur with activation can be used to identify and further validate new drug targets.

Once a cell–signaling pathway has been validated, the same ARGENT technology can provide useful tools for the next stages of drug development. The inducible gene can be engineered into experimental animals to provide an ARGENT model of the associated disease. ARGENT cell lines in which the validated signaling complex can be inducibly activated also can provide the basis for highly targeted cell–based screening for small–molecule drug candidates.

***Target Validation – Gene Transcription:*** Varying the expression level of a gene is an effective way to study its function. The tight, dose–dependent control of expression afforded by our ARGENT Transcription Technology allows precise correlation of gene expression levels with their physiological consequences. Our technology also can be used to inducibly express inhibitors of supposed targets, such as dominant–negative mutants or gene–specific DNA binding proteins, for validation purposes.

A major application of our ARGENT Transcription Technology, based on its tight regulation of genes, is the creation of inducible knockout mice. Knockout mice in which both copies of a gene of interest have been eliminated are extremely useful for assessing the role of the deleted gene in disease. Unfortunately, many knockout mice are not viable, because expression of the gene is required during embryonic development. In addition, complete knockouts often suffer from changes in the expression of other genes that may compromise interpretation of the resulting physical, biochemical, and physiological makeup of the animal, or its phenotype. We believe that both of these problems can be solved using our ARGENT Transcription Technology by generating inducible knockouts in which genes are eliminated in the adult mouse by administering a small molecule.

***Product Validation:*** The human genome sequence provides a rich source of potential proteins that are themselves drug candidates. In addition, advances in protein and antibody engineering are increasingly yielding large numbers of novel proteins that have therapeutic potential. Validating these molecules as products required extensive efforts in protein manufacturing, purification, scale–up and formulation. Inducible expression in animals can be used to validate therapeutic protein product candidates, in particular, secreted proteins and monoclonal antibodies, without the need to express and purify large amounts of recombinant protein. Since the level of protein delivered can be precisely controlled, this approach offers an effective way to characterize both the therapeutic and safety profiles of protein product candidates.

Our ARGENT Transcription and RPD Secretion Technologies provide complementary alternatives to this approach to product validation. The use of our ARGENT Transcription Technology allows a protein to be delivered over the course of several days, whereas the alternative approach based on our RPD Secretion Technology is particularly useful for generating rapid bursts of protein expression. The use of our ARGENT and RPD technologies to validate protein therapeutic candidates has particular value when a large number of related proteins need to be evaluated, as studies can be done on a high–throughput basis.

***Drug Screening:*** The ability to induce a specific cell signaling, gene activation or protein secretion event in a cell allows the configuration of "targeted" cell–based screens in which the unique cell context of interest for drug design can be chemically induced. These screens very specifically search for drugs affecting cells in which a particular cell signaling or gene activation event has occurred. The tight regulation afforded by our ARGENT and RPD technologies means that highly specific screens can be set up, using the uninduced cell

12

Table of Contents

line as a stringent counter–screen. Because the cellular event of interest can be induced chemically, the induction step can be configured into high–throughput screens.

**Our Business Strategy**

Our business strategy aims to balance near–term revenues from product partnering and technology licensing with independent product development and commercialization. Our goals are to:

- Enter into a partnership with a major pharmaceutical or biotechnology company to develop and commercialize our lead product candidate, AP23573, to treat cancer;

- Enter into partnerships with medical device companies to develop and commercialize our lead product candidate, AP23573, in drug–delivery stents to decrease reblockage of arteries following angioplasty and stenting;

- Independently develop as many of our product candidates as possible through at least phase 2 before partnering them;

- Establish the commercial infrastructure to market or co–market our anti–cancer product candidates in the United States;

- Enter into commercial partnerships for our other product candidates outside the United States;

- Permit broad use of our NF–κB and RegTech cell–signaling technologies at no cost by investigators at academic and not–for–profit institutions to conduct non–commercial research;

- License our NF–κB technology to pharmaceutical and biotechnology companies conducting research on the discovery of drugs that modulate NF–κB cell signaling and/or marketing such drugs;

- License our RegTech cell–signaling technology to pharmaceutical and biotechnology companies to accelerate their drug discovery; and

- Jointly develop product candidates incorporating our ARGENT cell–signaling regulation technology with companies that have proprietary therapeutic genes, cellular systems, or gene–delivery vectors.

**Technology Licenses**

We have a non–exclusive worldwide license agreement with Bristol–Myers Squibb Company, or Bristol, that grants Bristol the right to conduct pharmaceutical research and development covered by our NF–κB patents, retroactive to September 8, 1998. In addition to an upfront license fee, Bristol will pay us annual license fees as well as product development and commercialization milestones and royalties based on sales of products discovered using our patented NF–κB drug–discovery methods.

We have a non–exclusive license agreement with GPC Biotech AG, or GPC, that grants GPC the right to use our ARGENT cell–signaling regulation technology in GPC's three–hybrid technology platform. The agreement provides for guaranteed fees of $2.0 million, including $1.0 million upon signing. GPC will pay us a percentage of revenues received by GPC from its partnerships utilizing its three–hybrid drug discovery platform, and make development and commercialization milestone payments and royalty payments to us based on GPC products, if any, resulting from the use of our licensed technology in GPC's internal drug discovery programs.

13

Table of Contents

**Research and Development Spending**

During each of the three years ended December 31, 2002, 2001 and 2000, respectively, we spent approximately $23.0 million, $16.6 million, and $12.5 million, respectively, on our research and development activities.

**Manufacturing**

When advantageous, we intend to rely on strategic partners or third−party contractors for manufacturing cGMP material to be used in our product candidates. We believe that our small−molecule drugs can be produced in commercial quantities through conventional synthetic and natural−product fermentation techniques. We expect to access manufacturing for viral vectors from potential partners and third−party manufacturers. Thus far, we have contracted with various commercial and academic entities to develop and optimize our manufacturing methods, but we have not entered into any formal manufacturing agreements adequate to produce our product candidates for large−scale clinical trials or commercial use.

**Intellectual Property**

Patents and other intellectual property rights are essential to our business. We file patent applications to protect our technology, inventions and improvements to our inventions that are considered important to the development of our business.

As of March 12, 2003, we have 113 patents and pending patent applications in the United States, of which 51 are owned, co−owned or exclusively licensed by us and 62 are owned, co−owned or exclusively licensed by our subsidiary, ARIAD Gene Therapeutics, Inc., or AGTI. In addition, we have filed foreign counterparts, as appropriate. We also have several nonexclusive technology licenses from certain institutions in support of our research programs. We anticipate that we will continue to seek licenses from universities and others where applicable technology complements our research and development efforts.

Many of the patents and patent applications in our portfolio cover our cell−signaling regulation technologies. These patents and pending applications cover regulatory technologies, specialized variants of the technologies, critical nucleic acid components, small−molecule drugs, the identification and use of dimerizer hormone mimetics, and various uses of the technologies in health care and drug discovery. Patents issued to date include 30 patents covering our cell−signaling regulation technologies. These patents issued in the United States beginning in November 1998 and should provide proprietary protection for our protein and cell therapy product candidates until at least 2015. We hope to obtain additional patents in the ensuing years based on pending applications.

Our patent portfolio also covers research tools and methods used in our drug discovery programs, as well as multiple classes of small−molecule drug candidates discovered in those programs. We also have a number of issued patents and pending applications relating to cell−signaling proteins and their use in drug discovery and therapeutics.

We also rely on unpatented trade secrets and proprietary know−how. However, trade secrets are difficult to protect. We enter into confidentiality agreements with our employees, consultants and collaborators. In addition, we believe that certain technologies utilized in our research and development programs are in the public domain. Accordingly, we do not believe that patent or other protection is available for these technologies. If a third party were to obtain patent or other proprietary protection for any of these technologies, we may be required to challenge such protections, obtain a license for such technologies or terminate or modify our programs that rely on such technologies.

ARIAD, ARGENT, RPD, RegTech are our trademarks.

14

Table of Contents

**Our Board of Scientific and Medical Advisors**

We have assembled a Board of Scientific and Medical Advisors that currently consists of experts in the fields of molecular and cellular biology, biochemistry, immunology, and organic, physical, and computational chemistry, and molecular medicine. Each advisor is engaged under a consulting agreement that requires the advisor to provide consulting services to us in our field of interest and not to disclose any of our confidential information. Our Board of Scientific and Medical Advisors is chaired by Dr. Stuart L. Schreiber, Morris Loeb Professor and Chair, Chemistry and Chemical Biology; Co−Director, Institute of Chemistry and Cell Biology; and Director, Initiative for Chemical Genetics at Harvard University and an Investigator of the Howard Hughes Medical Institute. Dr. Schreiber is one of our scientific founders.

**Our Licenses**

We and our subsidiary, AGTI, have entered into license agreements with various research institutions and universities pursuant to which we and/or AGTI are the licensee of certain technologies upon which some of our product candidates are based.

We have agreed to pay royalties to our licensors on sales of certain products based on the licensed technologies, as well as, in some instances, milestone payments and patent filing and prosecution costs. The licenses also impose various milestones, commercialization, sublicensing, royalty as well as insurance and other obligations. Failure by us to comply with these requirements could result in the termination of the applicable agreement, which could have a material adverse effect on our business, financial condition, and results of operations.

**Competition**

The pharmaceutical and biotechnology industries are intensely competitive. We compete directly and indirectly with pharmaceutical companies, biotechnology companies and academic and research organizations, many of whom have greater resources than us. We compete with companies who have products on the market or in development for the same indications as our product candidates. We also complete with organizations that are developing similar technology platforms.

In the area of oncology, companies such as AstraZeneca PLC, Bristol−Myers Squibb Company, Eli Lilly and Company, Genentech, Inc., GlaxoSmithKline plc, Hoffmann LaRoche & Co., Merck KGaA, Novartis AG, Pfizer, Inc., and Wyeth Corp. are developing and marketing drugs to treat cancer. In the area of cell−signaling regulation, companies such as Amgen, Inc., AstraZeneca plc, Biogen, Inc., Eli Lilly and Company, Genentech, Inc., Imclone Systems, Inc., Ligand Pharmaceuticals, Inc., Millennium Pharmaceuticals, Inc., Novartis Pharma AG, OSI Pharmaceuticals, Inc., Tularik, Inc., and Vertex Pharmaceuticals, Inc. are developing and/or marketing drugs to treat human disease by inhibiting cell−signaling pathways. Companies developing gene−delivery technologies related to our programs include Avigen, Inc., Biogen, Inc., Cell Genesys, Inc., Genzyme Corp., MediGene, GmbH, and Targeted Genetics Corp. Certain companies have marketed erythropoietin products including Amgen, Inc., Johnson & Johnson, Transkaryotic Therapies, Aventis and Baxter International Inc., and other companies are developing products that may achieve a similar clinical effect. Several companies are developing products to treat GvHD, including AVAX, Inc., Protein Design Labs, Inc., and Repligen Corp. Other companies have products on the market or in development against which our products may have to compete. We may also experience competition from companies that have acquired or may acquire technology from companies, universities, and other research institutions. As these companies develop their technologies, they may develop proprietary positions that may materially and adversely affect us.

15

**Table of Contents**

**Government Regulation**

Our ongoing research and development activities, our clinical trials, the manufacturing and testing procedures and the marketing of our product candidates, if they are approved, all are subject to extensive regulation by numerous governmental authorities in the United States and other countries. Any drug or device developed by us and/or a partner must undergo rigorous preclinical studies and clinical testing and extensive regulatory review administered by the United States Food and Drug Administration , or FDA, under the federal Food, Drug and Cosmetic Act prior to marketing in the United States. Satisfaction of such regulatory requirements, which includes demonstrating that a product is both safe and effective for its intended indications for use, typically takes several years or more depending upon the type, complexity and novelty of the product and requires the expenditure of substantial resources. Preclinical studies must be conducted in conformance with FDA regulations, including its current Good Laboratory Practices, or cGLP, regulations. Before commencing clinical trials in the United States, we must submit extensive information about the results of preclinical studies, toxicity, manufacturing and control procedures and our proposed clinical research protocol to the FDA in an Investigational New Drug application, or IND, or an Investigational Device Exemption, or IDE, as the case may be. If the FDA does not respond with any questions, we can commence clinical trials thirty days after the submission. There can be no assurance that submission of an IND or IDE will result in the commencement of clinical trials. In addition, an independent institutional review board, or IRB, at each institution at which a clinical trial is being performed, must review and approve the clinical protocol before clinical testing may begin, and it will have ongoing overview of the clinical trial at that institution.

In addition, certain clinical studies conducted in the United States involving gene transfer require the review and approval of the National Institutes of Health Recombinant DNA Advisory Committee, or the RAC. There can be no assurance that submission to the RAC will result in clearance to commence clinical trials. We have a limited history of conducting preclinical studies and the clinical trials necessary to obtain regulatory approval. Furthermore, we, the FDA or an IRB may suspend clinical trials at any time if we or they believe that the subjects participating in such trials are being exposed to unacceptable risks or if the FDA finds deficiencies in the conduct of the trials or other problems with our product under development.

Before receiving FDA approval to market a product, we will have to demonstrate that the product is safe and effective in the patients for whom the product is indicated. Data obtained from preclinical studies and clinical trials are susceptible to varying interpretations that could delay, limit or prevent regulatory clearances. In addition, delays or rejections may be encountered based upon additional government regulation from future legislation or administrative action or changes in FDA policy during the period of product development, clinical trials and FDA regulatory review. Similar or even more extensive delays also may be encountered in foreign countries. There can be no assurance that even after such time and expenditures, regulatory approval will be obtained for any product candidates developed by us, or, even if approval is obtained, that the approved indication and related labeling for such products will not limit the product's condition of use, which could materially impact the marketability and profitability of the product. If regulatory approval of a product is granted, such approval will be limited to those disease states and conditions for which the product has been shown useful, as demonstrated by clinical trials. Furthermore, approval may entail ongoing requirements for post–market studies. Even if such regulatory approval is obtained, a marketed product, its manufacturer and its manufacturing facilities are subject to continual review and periodic inspections by the FDA. Discovery of previously unknown problems with a product, manufacturer, manufacturing procedures or facility may result in restrictions on such product or manufacturer, including costly recalls, an injunction against continued marketing and manufacturing until the problems have been adequately addressed to the FDA's satisfaction or even withdrawal of the product from the market.

There can be no assurance that any compound developed by us alone or in conjunction with others will prove to be safe and efficacious in clinical trials and will meet all of the applicable regulatory requirements

16

Table of Contents

needed to receive and maintain marketing approval. Additionally, the marketing, labeling and advertising for an approved product is subject to ongoing FDA scrutiny and the failure to adhere to applicable requirements can result in regulatory action that could have a material adverse impact on the profitability of the product.

Outside the United States, our ability to market a product will be contingent upon receiving a marketing authorization from the appropriate regulatory authorities. The requirements governing the conduct of clinical trials, obtaining marketing authorization, and pricing and reimbursement vary widely from country to country. At present, foreign marketing authorizations are applied for at a national level, although within the European Community, certain registration procedures are available to companies wishing to market a product in more than one Member State. If the regulatory authority is satisfied that adequate evidence of safety, quality and efficacy has been presented, a marketing authorization will be granted. This foreign regulatory approval process includes all of the risks associated with FDA clearance set forth above.

**Our Employees**

As of March 12, 2003, we had 52 employees, 28 of whom hold post–graduate degrees, including 18 with a Ph.D., M.D. or J.D. Most of our employees are engaged directly in research and development. We have entered into confidentiality and noncompetition agreements with all of our employees. None of our employees are covered by a collective bargaining agreement, and we consider relations with our employees to be good.

## RISK FACTORS

*THE RISKS AND UNCERTAINTIES DESCRIBED BELOW ARE THOSE THAT WE CURRENTLY BELIEVE MAY MATERIALLY AFFECT OUR COMPANY. ADDITIONAL RISKS AND UNCERTAINTIES THAT WE ARE UNAWARE OF OR THAT WE CURRENTLY DEEM IMMATERIAL ALSO MAY BECOME IMPORTANT FACTORS THAT AFFECT OUR COMPANY.*

**Risks Relating to Our Business**

*Insufficient funding may jeopardize our research and development programs and may prevent commercialization of our products and technologies.*

We have funded our operations to date through sales of equity securities, debt and operating revenue. Most of our operating revenue to date has been generated through previous collaborative research and development agreements. We do not have any committed funding from any pharmaceutical company to advance any of our product development programs. Although we intend to seek additional funding from product–based collaborations, technology licensing, and public or private financings, additional funding may not be available on terms acceptable to us, or at all. Accordingly, we may not be able to secure the significant funding which is required to maintain and continue each of our research and development programs at their current levels or at levels that may be required in the future. If we cannot secure adequate financing, we may be required to delay, scale back or eliminate one or more of our research and development programs or to enter into license or other arrangements with third parties to commercialize products or technologies that we would otherwise seek to develop ourselves.

*We may never succeed in developing marketable drugs or generating product revenues.*

We are a development stage company, and our main focus is drug discovery and product development. We do not currently have any product revenues, and we may not succeed in developing or commercializing any products which will generate product revenues. We do not expect to have any products on the market for several years, if at all. We are exploring human diseases at the cellular level and attempting to develop

17

Table of Contents

product candidates that intervene with these processes. As with all science, we face much trial and error, and we may fail at numerous stages along the way. If we are not able to enter into agreements with one or more companies experienced in the development and manufacture of gene−transfer vectors, we will not be able to market our gene and cellular therapy experienced product candidates. If we are not able to enter into agreements with one or more medical device companies experienced in the development, manufacture, and marketing of vascular stents, we will not be able to generate product revenues from the marketing of vascular stents that deliver AP23573. If we are not successful in developing or marketing our product candidates, we will not be profitable.

*We have incurred significant losses to date and may never be profitable.*

We have incurred significant operating losses in each year since our formation in 1991 and have an accumulated deficit of approximately $136.3 million from our operations through December 31, 2002. Losses have resulted principally from costs incurred in research and development of product candidates and from general and administrative costs associated with our operations. It is likely that we will incur significant operating losses for the foreseeable future. We currently have no product revenues and limited commitments for future licensing revenues, and may never be able to generate such revenues. If our losses continue and we are unable to successfully develop, commercialize, manufacture and market our product candidates and/or to enter into agreements and licenses of our intellectual property, we may never generate sufficient revenues to achieve profitability. Even if we are able to commercialize any of our product candidates or enter into agreements or licenses in the future, we may never generate sufficient revenues to have profitable operations.

*We have no experience in manufacturing any of our product candidates, which raises uncertainty as to our ability to develop and commercialize our product candidates.*

We have no experience in, and currently lack the resources and capability to, manufacture any of our product candidates on a large scale. Our ability to conduct clinical trials and commercialize our product candidates will depend, in part, on our ability to manufacture our products on a large scale, either directly or through third parties, at a competitive cost and in accordance with cGMP and other regulatory requirements. We depend on third−party manufacturers or collaborative partners for the production of our product candidates for preclinical studies and clinical trials and intend to use third−party manufacturers to produce any products we may eventually commercialize. We have no experience in developing, manufacturing, or marketing drug−delivery vascular stents, and we will be completely dependent on our medical device partners, if any, to conduct these activities. If we are not able to obtain contract manufacturing on commercially reasonable terms and obtain or develop the necessary technologies for manufacturing, we may not be able to conduct or complete clinical trials or commercialize our product candidates, and we do not know whether we will be able to develop such capabilities. If we are not able to develop cell processing methods that comply with regulatory guidelines known as current Good Tissue Practices, or cGTP, we may not be able to commercialize our regulated cellular therapy product.

*Significant additional losses or insufficient funding may cause us to default on certain covenants of our loan documents.*

At December 31, 2002, we had $6.9 million in term notes payable with two financial institutions of which $1.5 million is payable within twelve months and classified as a current liability. On March 12, 2003, we entered into a new $7.5 million term loan agreement with a bank and paid off the above−mentioned term notes. Under our new term loan agreement, we are required to maintain certain financial and non−financial covenants, including minimum cash and cash equivalent balances of $10.0 million, a default of any of which would allow the bank to demand payment of its loan. We currently maintain sufficient cash balances to fund payment of this loan if demand for payment were made. However, if we are unable to raise adequate financing to fund continuing operations or otherwise to refinance our loan, we may not be able to maintain

18

**Table of Contents**

compliance with loan covenants, may be required to pay off the loan and may be required to reduce our spending on operations.

***We may expend significant capital resources on the enforcement and licensing of our NF−κB patent portfolio and be unable to generate revenues from these efforts, if we are unable to enforce or license our patents to pharmaceutical and biotechnology companies.***

We are the exclusive licensee of a family of patents, three in the U.S. and one in Europe, including a pioneering U.S. patent covering methods of treating human disease by regulating NF−κB cell−signaling activity, or the NF−κB '516 Patent, awarded to a team of inventors from the Whitehead Institute for Biomedical Research, Massachusetts Institute of Technology and Harvard University. We have initiated a licensing program to generate revenues from the discovery, development, manufacture and sale of products covered by our NF−κB patent portfolio. These patents may be challenged and subsequently narrowed, invalidated or circumvented, which would materially impact our ability to generate licensing revenues from them.

On June 25, 2002, we, together with these academic institutions, filed a lawsuit in the United States District Court for the District of Massachusetts, or the U.S. District Court, against Eli Lilly and Company, or Lilly alleging infringement upon issuance of certain claims of the NF−κB '516 Patent, or the NF−κB '516 Claims, through sales of Lilly's osteoporosis drug, Evista®, and its septic shock drug, Xigris®. On August 26, 2002, Lilly filed in the U.S. District Court a motion to dismiss or, alternatively, for summary judgment, or Lilly's Combined Motion, challenging the validity of the NF−κB '516 Claims. We filed a response to Lilly's Combined Motion on October 17, 2002, and Lilly filed a reply on November 17, 2002. Oral argument on Lilly's Combined Motion was heard in the U.S. District Court on November 21, 2002. As of March 12, 2003, the U.S. District Court had not yet ruled on Lilly's Combined Motion. If the NF−κB '516 Claims are invalidated, it could have a significant adverse impact on our ability to generate revenues from our NF−κB licensing program. As exclusive licensee of this patent, we are obligated for the costs expended for its enforcement. Accordingly, we anticipate expending significant capital and management resources pursuing this litigation for an indeterminate period, and the outcome is uncertain. Significant expenditures to enforce these patent rights without generating revenues or accessing additional capital could adversely impact our ability to further our research and development programs at the current levels or at levels that may be required in the future.

***Because we do not own all of the outstanding stock of our subsidiary, ARIAD Gene Therapeutics, Inc., or AGTI, we may not realize all of the potential future economic benefit from products developed based on technology licensed to or owned by our subsidiary.***

Our subsidiary, AGTI, holds licenses from Harvard University, Stanford University and other universities relating to our ARGENT cell−signaling regulation technology, a key component of our programs in regulated protein therapy and cellular therapy, and owns the intellectual property on our mTOR inhibitors derived from our ARGENT programs. The two directors of AGTI are also members of the Board of Directors of the Company. Minority stockholders of AGTI, including Harvard University, Stanford University, several of our scientific advisors, and several current and former members of our management and Board of Directors, own 20% of the issued and outstanding capital stock of AGTI. We own the remaining 80% of the issued and outstanding capital stock of AGTI.

We do not currently have a license agreement with AGTI that provides us with rights to commercialize product candidates based on our ARGENT cell−signaling regulation technology or mTOR inhibitors derived from our ARGENT programs In the event that we commercialize product candidates based on our ARGENT cell−signaling regulation technology or mTOR inhibitors derived from our ARGENT programs, we will have to negotiate the terms of a license or other agreements with AGTI on terms to be determined or

19

Table of Contents

acquire all of the capital stock of AGTI that we do not currently own. The economic benefit to our stockholders from such products, if any, that we commercialize will be diminished by any royalties or other payments paid under a future agreement, if any, with AGTI. The economic benefit to our stockholders from products, if any, would be reduced in an amount based on such future agreements and the percentage owned by the minority stockholders of AGTI.

Alternatively, we may acquire all of the interests of the minority stockholders in AGTI for cash, shares of our common stock or other securities, if any. AGTI has a right of first refusal on the sale to third parties of 73% of the minority stockholders' AGTI shares. AGTI does not have a call option, or a right to require the minority stockholders to sell their shares to us, for any of these shares. If we acquire these minority interests, it may result in dilution to our stockholders. The economic value of the minority stockholders' interests is difficult to quantify in the absence of a public market, and the market price of our publicly traded common stock may not accurately reflect its value. Accordingly, the market could change its perception of the value of these minority interests in our subsidiary at any time in reaction to our increased emphasis on these product candidates, announcements regarding these product candidates or for other reasons, any of which could result in a decline in our stock price. In addition, if we acquire the minority interests at a cost greater than the value attributed to them by the market, this also could result in a decline in our stock price. If we choose to acquire these minority interests through a short–form merger in which we do not solicit the consent of the minority stockholders of AGTI, we could become subject to an appraisal procedure, which would result in additional expense and diversion of management resources.

*Because members of our management team and/or Board of Directors beneficially own a material percentage of the capital stock of our subsidiary, AGTI, and we have agreements with AGTI, there may be conflicts of interest present in dealings between ARIAD and AGTI.*

Four members of our management team and/or Board of Directors own or have the right to acquire up to approximately 6.1% of the outstanding capital stock of AGTI. Harvey J. Berger, M.D., our Chairman, Chief Executive Officer and President, owns 3.4%, David L. Berstein, Esq., our Senior Vice President and Chief Patent Counsel, owns 0.3%, John D. Iuliucci, Ph.D., our Senior Vice President, Drug Development, owns 0.7% and Jay R. LaMarche, one of our directors and a part–time employee, owns 1.7%. These same individuals beneficially own approximately 7.0% of our outstanding common stock. Additionally, Dr. Berger, and Mr. LaMarche, are the two members comprising the Board of Directors of AGTI. As part of the formation of AGTI, we entered into certain agreements with AGTI to provide for the operations of AGTI. As a result, the market may perceive conflicts of interest to exist in dealings between AGTI and us. AGTI is the exclusive licensee of the ARGENT cell–signaling intellectual property from Harvard University and Stanford University and of related technologies from other universities, and owns the intellectual property on our mTOR inhibitors derived from our ARGENT programs. Because of the apparent conflicts of interest, the market may be more inclined to perceive the terms of any transaction between us and AGTI as being unfair to us.

*The loss of key members of our scientific and management staff could delay and may prevent the achievement of our research, development and business objectives.*

Our Chairman, Chief Executive Officer and President, Harvey J. Berger, M.D.; our Senior Vice President and Chief Patent Counsel, David L. Berstein, Esq.; our Senior Vice President, Drug Development, John D. Iuliucci, Ph.D.; our Senior Vice President and Chief Business Officer, Fritz Casselman; our Senior Vice President, Science and Technology, Timothy P. Clackson, Ph.D.; and other key officers and members of our scientific staff responsible for areas such as drug development, clinical trials, regulatory affairs, drug discovery, manufacturing and intellectual property protection and licensing are important to our specialized scientific business. We also are dependent upon a few of our scientific advisors to assist in formulating our research and development strategy. The loss of, and failure to promptly replace, any member of our

20

Table of Contents

management team could significantly delay and may prevent the achievement of our research, development and business objectives. While we have entered into employment agreements with all of our officers, these officers may not remain with us.

*We may not be able to protect our intellectual property relating to our research programs, technologies and products.*

We and our licensors have issued patents and pending patent applications covering research methods useful in drug discovery, new chemical compounds discovered in our drug discovery programs, certain components, configurations and uses of our cell–signaling regulation technologies, products–in–development, and methods and materials for conducting pharmaceutical research. We have an ongoing licensing program to generate revenues from the use of our cell–signaling regulation technologies and our NF–κB intellectual property. Pending patent applications may not issue as patents and may not issue in all countries in which we develop, manufacture or sell our products or in countries where others develop, manufacture and sell products using our technologies. In addition, patents issued to us or our licensors may be challenged and subsequently narrowed, invalidated or circumvented. In that event, such patents may not afford meaningful protection for our technologies or product candidates, which would materially impact our ability to develop and market our product candidates and to generate licensing revenues from our gene regulation patent portfolio. Certain technologies utilized in our research and development programs are already in the public domain. Moreover, a number of our competitors have developed technologies, filed patent applications or obtained patents on technologies and compositions that are related to our business and may cover or conflict with our patent applications. Such conflicts could limit the scope of the patents that we may be able to obtain or may result in the denial of our patent applications. If a third party were to obtain intellectual proprietary protection for any of these technologies, we may be required to challenge such protections, terminate or modify our programs that rely on such technologies or obtain licenses for use of these technologies.

*We may be unable to develop or commercialize our product candidates, if we are unable to obtain or maintain certain licenses.*

We have entered into license agreements for some of our technologies, either directly or through AGTI. We are currently attempting to obtain additional licenses for technology useful to our programs. Our inability to obtain any one or more of these licenses, on commercially reasonable terms, or at all, or to circumvent the need for any such license, could cause significant delays and cost increases and materially affect our ability to develop and commercialize our product candidates. We also use gene sequences or proteins encoded by those sequences and other biological materials in each of our research programs which are, or may become, patented by others and to which we would be required to obtain licenses in order to develop or market our product candidates. Some of our programs, including, for example, our regulated protein therapy program, may require the use of multiple proprietary technologies, especially gene–transfer vectors and therapeutic genes. Obtaining licenses for these technologies may require us to make cumulative royalty payments or other payments to several third parties, potentially reducing amounts paid to us or making the cost of our products commercially prohibitive. Manufacturing of gene–transfer vectors may also require licensing technologies and intellectual property from third parties.

Some of our licenses obligate us to exercise diligence in pursuing the development of product candidates, to make specified milestone payments and to pay royalties. In some instances, we are responsible for the costs of filing and prosecuting patent applications. These licenses generally expire upon the earlier of a fixed term of years after the date of the license or the expiration of the applicable patents, but each license is also terminable by the other party upon default by us of our obligations. Our inability or failure to meet our diligence requirements or make any payments required under these licenses would result in a reversion to the licensor of the rights granted which, with respect to the licenses pursuant to which we have obtained

21

Table of Contents

exclusive rights, would materially and adversely affect our ability to develop and market products based on our licensed technologies.

***We may be unable to access or manufacture vectors or other gene−transfer technologies that we will need to develop and commercialize our regulated protein and cellular therapy product candidates.***

We may not be able to access the gene−transfer technologies required to develop, manufacture, and commercialize our regulated protein therapy and cellular therapy product candidates. We are reliant on our ability to enter into license agreements with academic institutions, gene−therapy companies and/or contract manufacturers that can provide us with rights to the necessary technology, production methods, and components of gene−delivery systems. The inability to reach an appropriate agreement with such an entity on reasonable commercial terms could delay or prevent the preclinical evaluation, clinical testing and/or commercialization of our product candidates. Our inability to access gene−transfer technology, including suitable manufacturing methods, would have significant adverse effects on some of our product candidates, including their development timelines. If we do not market our product candidates, we will never become profitable. In addition, the intellectual property landscape covering gene−transfer technologies is uncertain and fragmented. Accordingly, if we select one partner as a source for selected intellectual property rights, we may find that we have not licensed sufficient rights to be able to commercialize our products or we may be forced to acquire additional rights or discontinue marketing our product candidates unexpectedly.

***Competing technologies may render some or all of our programs or future products noncompetitive or obsolete.***

Many well−known pharmaceutical, healthcare and biotechnology companies, academic and research institutions and government agencies, which have substantially greater capital, research and development capabilities and experience than us, are presently engaged in one or more of the following activities:

- Developing products based on cell signaling, genomics, proteomics, computational chemistry and protein and cellular therapies;

- Conducting research and development programs for the treatment of each of the disease areas in which we are focused; and

- Manufacturing, promoting, marketing and selling pharmaceutical or medical device products for treatment of diseases in all of the disease areas in which we are focused.

Some of these entities already have product candidates in clinical trials or in more advanced preclinical studies than we do. These entities may succeed in commercializing competitive products before us, which would give them a competitive advantage. Competing technologies may render some or all of our programs or future products noncompetitive or obsolete, and we may not be able to make the enhancements to our technology necessary to compete successfully with newly emerging technologies. If we are unable to successfully compete in our chosen markets, we will not become profitable.

***If our product candidates are not accepted by physicians and insurers, we will not be successful.***

Our success is dependent on the acceptance of our product candidates. Our product candidates may not achieve significant market acceptance among patients, physicians or third−party payors, even if we obtain necessary regulatory and reimbursement approvals. Failure to achieve significant market acceptance of our product candidates will harm our business. We believe that recommendations by physicians and health care payors will be essential for market acceptance of any product candidates. There is continued concern in the marketplace regarding the potential safety and effectiveness of gene therapy products generally. Physicians and health care payors may conclude that any of our product candidates are not safe.

22

Table of Contents

*If we are unable to establish sales, marketing and distribution capabilities or to enter into agreements with third parties to do so, we may be unable to successfully market and sell any products.*

We currently have no sales, marketing or distribution capabilities. If we are unable to establish sales, marketing or distribution capabilities either by developing our own sales, marketing and distribution organization or by entering into agreements with others, we may be unable to successfully sell any products that we are able to begin to commercialize. If we are unable to effectively sell our products, our ability to generate revenues will be harmed. We may not be able to hire, in a timely manner, the qualified sales and marketing personnel we need, if at all. In addition, we may not be able to enter into any marketing or distribution agreements on acceptable terms, if at all. If we cannot establish sales, marketing and distribution capabilities as we intend, either by developing our own capabilities or entering into agreements with third parties, sales of future products, if any, may be harmed.

*If we develop a product for commercial use, a subsequent product liability–related claim or recall could have an adverse effect on our business.*

Our business exposes us to potential product liability risks inherent in the testing, manufacturing and marketing of pharmaceutical products, and we may not be able to avoid significant product liability exposure. A product liability–related claim or recall could be detrimental to our business. In addition, except for insurance covering product use in our clinical trials, we do not currently have any product liability insurance, and we may not be able to obtain or maintain such insurance on acceptable terms, or we may not be able to obtain any insurance to provide adequate coverage against potential liabilities. Our inability to obtain sufficient insurance coverage at an acceptable cost or otherwise to protect against potential product liability claims could prevent or limit the commercialization of any products that we develop.

**Risks Relating to Governmental Approvals**

*We have limited experience in conducting clinical trials, which may cause delays in commencing and completing clinical trials of our product candidates.*

Clinical trials must meet FDA and foreign regulatory requirements. We have limited experience in conducting and managing the preclinical studies and clinical trials necessary to obtain regulatory approval for our product candidates in any country. We may encounter problems in clinical trials that may cause us or the FDA or foreign regulatory agencies to delay, suspend or terminate our clinical trials at any phase. These problems could include the possibility that we may not be able to manufacture sufficient quantities of cGMP materials for use in our clinical trials, conduct clinical trials at our preferred sites, enroll a sufficient number of patients for our clinical trials at one or more site or begin or successfully complete clinical trials in a timely fashion, if at all. Furthermore, we, the FDA or foreign regulatory agencies may suspend clinical trials at any time if we or they believe the subjects participating in the trials are being exposed to unacceptable health risks or if we or they find deficiencies in the clinical trial process or conduct of the investigation. If clinical trials of any of our product candidates fail, we will not be able to market the product candidate which is the subject of the failed clinical trials. The FDA and foreign regulatory agencies could also require additional clinical trials, which would result in increased costs and significant development delays. Our failure to adequately demonstrate the safety and effectiveness of a pharmaceutical product candidate under development could delay or prevent regulatory approval of the product candidate and could have a material adverse effect on our business.

*We may not be able to obtain government regulatory approval for our product candidates prior to marketing.*

To date, we have not submitted a marketing application for any product candidate to the FDA or any foreign regulatory agency, and none of our product candidates have been approved for commercialization in any

23

Table of Contents

country. Prior to commercialization, each product candidate would be subject to an extensive and lengthy governmental regulatory approval process in the United States and in other countries. We may not be able to obtain regulatory approval for any product candidate we develop or even if approval is obtained, the labeling for such products may place restrictions on their use that could materially impact the marketability and profitability of the product subject to such restrictions. We have limited experience in conducting and managing the clinical testing necessary to obtain such regulatory approval. Satisfaction of these regulatory requirements, which includes satisfying the FDA and foreign regulatory authorities that the product is both safe and effective for its intended therapeutic uses, typically takes several years or more depending upon the type, complexity and novelty of the product and requires the expenditure of substantial resources.

Furthermore, the regulatory requirements governing our product candidates are uncertain. In particular, the FDA and other regulatory agencies have suspended certain gene and cellular therapy clinical trials due to concerns about the potential safety of certain gene–transfer vectors, which may lead to additional regulatory requirements for such products. Uncertainty with respect to the regulatory requirements for all of our product candidates may result in excessive costs or extensive delays in the regulatory approval process, adding to the already lengthy review process. If regulatory approval of a product is granted, such approval will be limited to those disease states and conditions for which the product is proven safe and effective, as demonstrated by clinical trials, and our products will be subject to ongoing regulatory reviews. Although we have been granted orphan drug designation by the FDA for AP1903, the small–molecule drug used in our graft–vs–host disease cellular therapy product candidate, this designation may be challenged by others or may prove to be of no practical benefit.

### We will not be able to sell our product candidates, if we or our third–party manufacturers fail to comply with FDA manufacturing regulations.

Before we can begin to commercially manufacture our product candidates, we must either secure manufacturing in an approved manufacturing facility or obtain regulatory approval of our own manufacturing facility and processes. In addition, the manufacturing of our product candidates must comply with cGMP and/or cGTP requirements of the FDA and requirements by regulatory agencies in other countries. These requirements govern, among other things, quality control and documentation procedures. We, or any third–party manufacturer of our product candidates, may not be able to comply with these requirements, which would prevent us from selling such products. Material changes to the manufacturing processes of our products after approvals have been granted are also subject to review and approval by the FDA or other regulatory agencies.

### Even if we bring products to market, we may be unable to effectively price our products or obtain adequate reimbursement for sales of our products, which would prevent our products from becoming profitable.

If we succeed in bringing our product candidates to the market, they may not be considered cost–effective, and coverage and adequate payments may not be available or may not be sufficient to allow us to sell our products on a competitive basis. In both the United States and elsewhere, sales of medical products and treatments are dependent, in part, on the availability of reimbursement from third–party payors, such as health maintenance organizations and other private insurance plans and governmental programs such as Medicare. Third–party payors are increasingly challenging the prices charged for pharmaceutical products and services. Our business is affected by the efforts of government and third–party payors to contain or reduce the cost of health care through various means. In the United States, there have been and will continue to be a number of federal and state proposals to implement government controls on pricing. In addition, the emphasis on managed care in the United States has increased and will continue to increase the pressure on the pricing of pharmaceutical products. We cannot predict whether any legislative or regulatory proposals will be adopted or the effect these proposals or managed care efforts may have on our business.

24

Table of Contents

**Risks Relating to Our Common Stock**

*Results of our operations and general market conditions for biotechnology stocks could result in the sudden change in the value of our stock.*

As a biopharmaceutical company, we have experienced significant volatility in our common stock. Fluctuations in our operating results and general market conditions for biotechnology stocks could have a significant impact on the volatility of our common stock price. During 2002, our stock price ranged from a high bid price of $6.25 to a low bid price of $1.58. Factors contributing to such volatility include: results and timing of preclinical studies and clinical trials; evidence of the safety or effectiveness of pharmaceutical products; announcements of new collaborations; failure to enter into collaborations; our funding requirements; announcements of technological innovations or new therapeutic products; developments relating to intellectual property rights, including licensing and litigation, including our litigation with Eli Lilly and Company; governmental regulation; policies regarding recombinant DNA and gene therapy; healthcare or cost–containment legislation; general market trends for the biotechnology industry and related high–technology industries; the impact of changing interest rates and policies of the Federal Reserve; and public policy pronouncements.

## ITEM 2: PROPERTIES

We have leased approximately 100,000 square feet (approximately 37,000 square feet currently under sublease to third parties) of laboratory and office space at 26 Landsdowne Street, located at University Park at Massachusetts Institute of Technology in Cambridge, Massachusetts. The lease originally had a ten–year term, which ended in July of 2002, with two consecutive five–year renewal options. We have extended the lease for the first five–year option period through July of 2007. We believe that our currently leased facility will, in large part, be adequate for our research and development activities at least through the year 2007.

## ITEM 3: LEGAL PROCEEDINGS

We were named as a defendant in a purported class action lawsuit commenced in June 1995 in the U.S. District Court for the Southern District of New York. The action named as defendants ARIAD Pharmaceuticals, Inc.; the underwriter of our initial public offering and a market maker in our stock, D. Blech & Co.; the managing director and sole shareholder of D. Blech & Co. and one of our former directors, David Blech; certain other of our directors, and the qualified independent underwriter for the initial public offering, Shoenberg Hieber, Inc., or SHI.

Counsel for the plaintiff class, counsel for the named director defendants of the Company (excluding David Blech), or the Company Defendants, and the Company, and counsel for SHI have executed a stipulation of settlement in the action, or the Settlement. The Settlement was approved pursuant to entry by the Court of a Final Order and Judgment on December 4, 2002. The Final Order and Judgment orders that a payment of $620,000 (of which our contribution was not material and no liability was recorded on the 2002 balance sheet) be distributed to the plaintiffs from a legal escrow account, that this action and a related action entitled In re: Blech Securities Litigation, 94 Civ. 7696 (RWS) are dismissed with prejudice, and that non–settling parties are barred from pursuing contribution–type claims against the Company Defendants.

On May 19, 1999, we filed suit in the Massachusetts Superior Court against Michael Z. Gilman, Ph.D., or Dr. Gilman, our former Chief Scientific Officer, seeking equitable relief for breach of his employment agreements in accepting a position as the research director of molecular biology at Biogen, Inc., or Biogen. The Superior Court issued a temporary injunction on May 19, 1999 restraining Dr. Gilman from using any of our confidential information in his new employment. On June 21, 1999, Dr. Gilman filed counterclaims against us seeking an order awarding damages for breach of contract and barring us from enforcing any provisions of our employment agreements with Dr. Gilman. On May 26, 1999, Biogen filed a motion to intervene as a

**Table of Contents**

defendant in the action which the Superior Court granted on August 2, 1999. Discovery in the case has been completed, and Summary Judgment Motions have been filed, heard and ruled upon.

Counsel for us, counsel for Biogen and counsel for Dr. Gilman have executed a stipulated partial judgment, or the Stipulated Judgment, which was approved pursuant to entry by the Court on January 13, 2003. The Stipulated Judgment dismisses with prejudice our claim for breach of contract against Dr. Gilman and dismisses Biogen as a party to the action. Dr. Gilman's counterclaims will now proceed to trial which we anticipate will be set in 2003. The ultimate outcome of the litigation with Dr. Gilman is not determinable at this time, and as a result, we cannot estimate whether any damages will be awarded or what the range of such an award might be and have not recorded any liability on the December 31, 2002 balance sheet.

On June 25, 2002, we, together with Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research and Harvard University, filed a lawsuit in the United States District Court for the District of Massachusetts, or the U.S. District Court, against Eli Lilly and Company, or Lilly, alleging infringement upon issuance of certain claims of our U.S. patent covering methods of treating human disease by regulating NF−κB cell−signaling activity, or the NF−κB '516 Claims, through sales of Lilly's osteoporosis drug, Evista®, and Lilly's septic shock drug, Xigris®, and seeking monetary damages from Lilly. On August 26, 2002, Lilly filed a motion to dismiss or, alternatively, for summary judgment, or Lilly's Combined Motion, challenging the validity of the NF−κB '516 Claims. We filed a response to Lilly's Combined Motion on October 17, 2002 and Lilly filed a reply on November 17, 2002. Oral argument on Lilly's Combined Motion was heard in the U.S. District Court on November 21, 2002. As of March 12, 2003, the U.S. District Court had not yet ruled on Lilly's Combined Motion. While the ruling on Lilly's Combined Motion is not currently determinable, if Lilly were to be successful and its Combined Motion is granted, we will consider filing an appeal with the Court of Appeals for the Federal Circuit. If Lilly's Combined Motion is denied, a trial scheduling conference pursuant to Rule 16(b) of the Federal Rules of Civil Procedure will be scheduled by the U.S. District Court, and the case will proceed to the discovery phase leading to trial. The ultimate outcome of the litigation cannot be determined at this time, and, as a result, an estimate of a damage award or range of awards, if any, cannot be made.

**ITEM 4: SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS**

No matters were submitted to a vote of security holders during the quarter ended December 31, 2002.

26

Table of Contents

**PART II**

**ITEM 5: MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS**

**Market Information**

Our common stock is traded on the Nasdaq National Market under the symbol "ARIA". The following table sets forth the high and low sales prices of our common stock as quoted on the Nasdaq National Market for the periods indicated.

|  | High | Low |
|---|---|---|
| **2002:** | | |
| First Quarter | $5.65 | $3.32 |
| Second Quarter | 6.25 | 3.55 |
| Third Quarter | 4.47 | 2.75 |
| Fourth Quarter | 4.13 | 1.58 |
| **2001:** | | |
| First Quarter | $8.38 | $2.78 |
| Second Quarter | 6.84 | 3.80 |
| Third Quarter | 5.40 | 1.66 |
| Fourth Quarter | 6.40 | 2.41 |

On March 12, 2003, the last sale price of our common stock was $1.35.

**Stockholders**

The approximate number of holders of record of our common stock as of March 4, 2003 was 478, and the approximate total number of beneficial holders of our common stock as of March 4, 2003 was 25,000.

**Dividends**

We have not declared or paid dividends on our common stock in the past and do not intend to declare or pay such dividends in the foreseeable future. Our long−term debt agreement prohibits the payment of cash dividends. (See "Management's Discussion and Analysis of Financial Condition and Results of Operations – Liquidity and Capital Resources" and Note 4 of "Notes to Consolidated Financial Statements.")

27

<u>Table of Contents</u>

ITEM 6: SELECTED FINANCIAL DATA

The selected financial data set forth below as of December 31, 2002, 2001, 2000, 1999 and 1998 and for each of the years then ended have been derived from the audited consolidated financial statements of the Company, of which the financial statements as of December 31, 2002 and 2001 and for the years ended December 31, 2002, 2001 and 2000 are included elsewhere in this Annual Report on Form 10–K, and are qualified by reference to such financial statements. The information set forth below should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the audited consolidated financial statements, and the notes thereto, and other financial information included herein.

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| _In thousands, except share and per share data_ | **2002** | **2001** | **2000** | **1999** | **1998** |
| **Consolidated Statements of Operations Data:** | | | | | |
| Research revenue (principally related parties prior to 2000) | $          67 | $           4 | $        128 | $     12,468 | $     12,143 |
| Operating expenses: | | | | | |
| Research and development | 23,018 | 16,587 | 12,467 | 28,844 | 35,515 |
| General and administrative | 5,718 | 4,469 | 3,318 | 3,938 | 2,634 |
| Total operating expenses | 28,736 | 21,056 | 15,785 | 32,782 | 38,149 |
| Loss from operations | (28,669) | (21,052) | (15,657) | (20,314) | (26,006) |
| Other income (expense): | | | | | |
| Interest income | 615 | 1,578 | 2,050 | 445 | 999 |
| Interest expense | (323) | (285) | (225) | (522) | (481) |
| Other income – tax refund | 534 | | | | |
| Gain on sale of Genomics Center | | | | 46,440 | |
| Equity in net loss of Genomics Center | | | | (1,493) | (660) |
| Total other income (expense), net | 826 | 1,293 | 1,825 | 44,870 | (142) |
| Income (loss) before cumulative effect of change in accounting principle | (27,843) | (19,759) | (13,832) | 24,556 | (26,148) |
| Cumulative effect of change in accounting principle | | | | (364) | |
| Net income (loss) | (27,843) | (19,759) | (13,832) | 24,192 | (26,148) |
| Repurchase and accretion costs attributable to redeemable convertible preferred stock | | | | (6,435) | (36) |
| Net income (loss) attributable to common stockholders | $    (27,843) | $    (19,759) | $    (13,832) | $     17,757 | $    (26,184) |
| **Earnings (loss) per share:** | | | | | |
| Per common share (basic): | | | | | |
| Income (loss) attributable to common stockholders before cumulative effect of change in accounting principle | $        (.86) | $        (.68) | $        (.53) | $          .82 | $        (1.25) |
| Cumulative effect of change in accounting principle | | | | (.02) | |
| Net income (loss) – basic | $        (.86) | $        (.68) | $        (.53) | $          .80 | $        (1.25) |
| Weighted average number of shares of common stock outstanding – basic | 32,475,083 | 29,256,767 | 25,875,663 | 22,004,646 | 20,966,586 |
| Per common share (diluted): | | | | | |
| Income (loss) before cumulative effect of change in accounting principle | $        (.86) | $        (.68) | $        (.53) | $          .71 | $        (1.25) |
| Cumulative effect of change in accounting principle | | | | (.01) | |
| Net income (loss) – diluted | $        (.86) | $        (.68) | $        (.53) | $          .70 | $        (1.25) |
| Weighted average number of shares of common stock outstanding – diluted | 32,475,083 | 29,256,767 | 25,875,663 | 34,448,015 | 20,966,586 |

28

Table of Contents

| In thousands | As of December 31, | | | | |
|---|---|---|---|---|---|
| | 2002 | 2001 | 2000 | 1999 | 1998 |
| **Consolidated Balance Sheet Data:** | | | | | |
| Cash, cash equivalents and marketable securities | $ 26,850 | $ 47,186 | $ 39,781 | $ 28,320 | $ 14,176 |
| Working capital | 21,126 | 43,249 | 37,165 | 22,875 | 5,852 |
| Total assets | 35,104 | 55,361 | 48,813 | 44,236 | 30,786 |
| Long−term debt | 5,437 | 6,847 | 3,700 | 1,900 | 3,295 |
| Redeemable convertible preferred stock | | | | 8,070 | 5,036 |
| Accumulated deficit | (136,317) | (108,474) | (88,715) | (74,883) | (92,640) |
| Stockholders' equity | 21,852 | 43,093 | 40,851 | 27,068 | 11,733 |

## ITEM 7: MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read the following discussion and analysis in conjunction with "Selected Financial Data" and our consolidated financial statements and the related notes included elsewhere in this report.*

### Overview

We are engaged in the discovery and development of breakthrough medicines that regulate cell signaling with small molecules. Breakthrough medicines are products, created *de novo,* that may be used to treat diseases in innovative ways. We are developing a comprehensive approach to the treatment of cancer and are primarily focused on a series of product candidates for targeted oncology indications. We have an exclusive license to pioneering technology and patents related to the discovery, development, and use of drugs that regulate NF−κB cell−signaling activity, which has been implicated in many major diseases.

### General

Since our inception in 1991, we have devoted substantially all of our resources to our research and development programs. We receive no revenue from the sale of pharmaceutical products, and most of our revenue to date has been received in connection with our past relationship with Aventis Pharmaceuticals, Inc. ("Aventis"). Except for the gain on the sale of our fifty percent interest in the Hoechst−ARIAD Genomics Center LLC (the "Genomics Center") to Aventis in December 1999, which resulted in net income for fiscal 1999, we have not been profitable since inception. We expect to incur substantial operating losses for the foreseeable future, primarily due to costs associated with our pharmaceutical product development programs, clinical trials, and product manufacturing. We expect that losses will fluctuate from quarter to quarter and that these fluctuations may be substantial. As of December 31, 2002, we had an accumulated deficit of $136.3 million.

Our business strategy aims to balance near−term revenues from product partnering and technology licensing with independent product development and commercialization. With respect to the development and commercialization of our lead product candidates, our goals are to: (1) enter into a partnership with a pharmaceutical or biotechnology company to develop and commercialize our lead product candidate, AP23573, to treat cancer; (2) enter into partnerships with medical device companies to develop and commercialize our lead product candidate, AP23573, in drug−delivery stents to decrease reblockage of arteries following angioplasty and stenting; (3) independently develop as many of our product candidates as possible through at least phase 2 before partnering them; (4) establish the commercial infrastructure to market or co−market our anti−cancer product candidates in the United States; and (5) enter into partnerships for our other product candidates outside the United States. With respect to our core technologies and intellectual property, our goals are to license our NF−κB technology to pharmaceutical and biotechnology companies conducting research on the discovery of

29

Table of Contents

drugs that modulate NF–κB cell signaling and/or marketing such drugs and to license our RegTech cell–signaling technologies to pharmaceutical and biotechnology companies to accelerate their drug discovery. In addition, we may jointly develop product candidates incorporating our ARGENT cell–signaling regulation technology, especially with companies that have proprietary therapeutic genes, cellular systems or gene delivery vectors. However, there can be no assurance that we will be successful in achieving our strategies and generating future revenue streams.

## Critical Accounting Policies

Our financial position and results of operations are affected by subjective and complex judgments, particularly in the areas of stock–based compensation to consultants, deferred compensation benefits for executives and key employees, and the carrying value of intangible assets. In determining expense related to stock–based compensation and deferred compensation, recorded balances are adjusted at each reporting period to reflect fair value utilizing the Black Scholes financial model that takes into account, among other things, the price and volatility of our common stock or other underlying securities, an interest–free discount rate, and an estimate of the life of the option contract. Fluctuations in those factors result in uneven expense charges or credits to our statements of operations. If, for example, the price and volatility of our common stock were 10% greater as of December 31, 2002, we would have recognized an increase of $10,000 in stock–based compensation to consultants in 2002. Similarly, if the market price of the underlying securities in our executive deferred compensation plan was 10% higher at December 31, 2002, we would have recognized an additional $214,000 in compensation expense in 2002.

At December 31, 2002, we reported $5.5 million of intangible assets consisting of costs related primarily to purchased patents, patent applications and licenses. These costs are being amortized over the estimated useful lives of the underlying patents or licenses. Changes in these lives or a decision to discontinue using the technologies could result in material changes to our balance sheet and statements of operations. For example, during 2002, we expensed $591,000 of unamortized costs related to certain intangible assets which we are not actively developing any longer. We recently announced that we are focusing our resources primarily on developing our three lead anti–cancer, small–molecule product candidates and have extended our development timelines on several other programs. We have concluded that the carrying value of our intangible assets is not currently impaired because they are utilized in our anti–cancer programs and/or continue to be viable technologies for collaborations or licensing efforts which we continue to pursue. If we were to abandon the underlying technologies or terminate our efforts to pursue collaborations or license agreements, we may be required to write off a portion of the carrying value of our intangible assets.

## Results of Operations

### *Years Ended December 31, 2002 and 2001*

### Revenue

We recognized research revenue of $67,000 for the year ended December 31, 2002 compared to $4,000 for the year ended December 31, 2001. The increase in research revenue was due to license agreements into which we have entered related to our NF–κB and ARGENT cell–signaling technologies.

### Operating expenses

Research and development expenses increased 39% to $23.0 million in 2002 from $16.6 million in 2001. This $6.4 million increase in 2002 expenses as compared to those incurred in 2001 was primarily due to the costs of advancing our product candidates through preclinical and clinical phases of development. As of December 31, 2002, we had seven development candidates of which one was in Phase 2 development. Preclinical costs include product development costs (including pharmacology and toxicology studies) and manufacturing costs to produce and scale–up material for various studies and clinical trials. Our increase in development activity

30

**Table of Contents**

resulted in a higher level of spending on product development of $4.7 million, product manufacturing and external activities in support of clinical development of $940,000 and increased personnel expenses of $780,000. In addition, we wrote off $591,000 of capitalized patent and license costs reflecting our evaluation of several technologies in our portfolio which we are not actively developing at this time. Such increases in costs were partially offset by decreased overhead expenses of $207,000 and decreased consulting costs of $513,000.

General and administrative expenses increased 28% to $5.7 million in 2002 from $4.5 million in 2001. This $1.2 million increase in 2002 expenses as compared to those incurred in 2001 was primarily due to increased professional expenses of $676,000 resulting principally from our litigation with Eli Lilly and Company regarding infringement of certain claims of one of our patents, personnel expenses of $321,000 resulting from additions to our legal and business development personnel and other general expenses of $252,000.

In March 2003, we announced that we are focusing our research and development efforts primarily on our anti−cancer small−molecule product candidates and reducing or deferring our research and development efforts in certain other programs. As a result of this decision, we have reduced our workforce by 20% and expect to reduce our overall expenses by approximately 33% from those amounts incurred in 2002. Actual expenses will be determined in part by our ability to realize revenue through partnerships, licensing, joint ventures or similar arrangements, progress in the development and testing of our product candidates, progress and status of our litigation with Eli Lilly and Company, and our ability to raise additional funding through the sale of equity securities.

**Interest income/expense**

Interest income decreased 61% to $615,000 in 2002 from $1.6 million in 2001 primarily as a result of declining interest rates during the year and a lower level of funds invested. Interest expense increased 13% to $323,000 in 2002 from $285,000 in 2001. This increase was primarily due to a higher level of long−term debt outstanding in 2002 offset, in part, by lower interest rates for 2002.

**Other income – tax refund**

Other income for the year ended December 31, 2002 consisted of a one−time tax refund of $534,000, received in June 2002, due to changes in the tax laws. As a result of these changes, we were able to carry back a portion of the 2001 loss to offset the taxes resulting from the sale of our 50% interest in the Genomics Center to Aventis. In December 1999, we recognized a gain on the sale of $46.4 million, net of $534,000 in Alternative Minimum Tax, and reported the gain in other income.

**Operating results**

We reported a loss from operations of $28.7 million in 2002 compared to a loss from operations of $21.1 million in 2001, an increase in loss of $7.6 million or 36%. We expect that our loss from operations will decrease in 2003 due to focusing our research and development efforts primarily on our three anti−cancer small−molecule product candidates. Losses may fluctuate depending on the extent to which, if at all, we enter into collaborations or partnerships for one or more of our product candidates or licenses for our technologies. The extent of operating losses will also depend on our ability to raise funding from other sources, such as the capital markets, which will influence the amount we will spend on research and development and the development timelines for our product candidates.

We reported a net loss of $27.8 million in 2002 or $.86 per share (basic and diluted). We reported a net loss of $19.8 million in 2001 or $.68 per share (basic and diluted).

Table of Contents

*Years Ended December 31, 2001 and 2000*

**Revenue**

We recognized research revenue of $4,000 for the year ended December 31, 2001 compared to $128,000 for the year ended December 31, 2000. The decrease in research revenue was due to the termination of our services agreements with the Genomics Center as a result of the sale of our 50% ownership interest in the Genomics Center to Aventis on December 31, 1999. Research revenue for the year ended December 31, 2000 was comprised principally of transitional research revenue for services provided to Aventis following the December 31, 1999 sale of our interest in the Genomics Center.

**Operating expenses**

Research and development expenses increased 33% to $16.6 million in 2001 from $12.5 million in 2000. This $4.1 million increase in 2001 expenses as compared to those incurred in 2000 was primarily due to advancing our lead product candidates further through development resulting in a higher level of spending on product development of $867,000, product manufacturing and external activities in support of clinical trials of $1.7 million, costs associated with the launch of our initiatives to promote the commercialization and licensing of our cell–signaling regulation technologies by both corporate and academic researchers of $325,000, increased personnel expenses of $567,000 and overhead expenses of $471,000.

General and administrative expenses increased 35% to $4.5 million in 2001 from $3.3 million in 2000. This $1.2 million increase in 2001 expenses as compared to those incurred in 2000 was primarily due to increased professional expenses of $419,000, resulting from increased use of certain consultants, and personnel expenses of $825,000.

**Interest income/expense**

Interest income decreased 23% to $1.6 million in 2001 from $2.1 million in 2000 primarily as a result of declining interest rates during the year. Interest expense increased 27% to $285,000 in 2001 from $225,000 in 2000. This increase was primarily due to a higher level of long–term debt outstanding in 2001.

**Operating results**

We reported a loss from operations of $21.1 million in 2001 compared to a loss from operations of $15.7 million in 2000, an increase in loss of $5.4 million or 34%. We reported a net loss of $19.8 million in 2001 or $.68 per share (basic and diluted). We reported a net loss of $13.8 million in 2000 or $.53 per share (basic and diluted).

32

Table of Contents

Selected Quarterly Financial Data

Summarized quarterly financial data are as follows:

| *In thousands, except per share amounts* | 2002 Quarters | | | |
|---|---|---|---|---|
| | **First** | **Second** | **Third** | **Fourth** |
| Total research revenue | $ — | $ 13 | $ 12 | $ 42 |
| Net loss | (6,167) | (7,043) | (7,819) | (6,814) |
| Net loss per share (basic and diluted) | (.19) | (.22) | (.24) | (.21) |

| | 2001 Quarters | | | |
|---|---|---|---|---|
| | **First** | **Second** | **Third** | **Fourth** |
| Total research revenue | $ 1 | $ 1 | $ 1 | $ 1 |
| Net loss | (4,157) | (4,716) | (4,745) | (6,141) |
| Net loss per share (basic and diluted) | (.15) | (.17) | (.16) | (.20) |

## Liquidity and Capital Resources

We have financed our operations and investments primarily through private placements and public offerings of our equity securities and research revenue and other transactions resulting from our collaboration with Aventis from 1995 to 1999, including the sale of our 50% interest in the Genomics Center in December 1999. In addition, we have financed our operations through the issuance of long–term debt, operating and capital lease transactions, certain licensing transactions, interest income, and government– sponsored research grants.

At December 31, 2002, we had cash and cash equivalents totaling $26.9 million and working capital of $21.1 million compared to cash, cash equivalents and marketable securities totaling $47.2 million and working capital of $43.2 million at December 31, 2001.

The primary uses of cash during the year ended December 31, 2002 were $24.0 million to finance our operations and working capital requirements, $1.5 million to repay long–term debt, $1.4 million to invest in intellectual property and $269,000 to purchase equipment. We expect that our working capital requirements for 2003 will be reduced from 2002 as a result of focusing our research and development efforts on our three lead anti–cancer small–molecule product candidates.

The primary sources of funds during the year ended December 31, 2002, were $5.6 million from the sale of common stock, $999,000 from the issuance of common stock related to the exercise of stock options and purchases under the employee stock purchase plan, $442,000 from the sales and maturities of marketable securities and $77,000 from additional borrowing to finance purchases of equipment.

On June 22, 2001, we filed a shelf registration statement with the United States Securities and Exchange Commission ("SEC") for the issuance of up to 4.5 million registered shares of our common stock, which was declared effective by the SEC on August 1, 2001 (the "2001 Shelf Registration Statement"). At December 31, 2001, we had 2,572,288 registered shares remaining available for sale at our discretion under this shelf registration, following the sale of 1,927,712 shares of common stock on October 31, 2001. On November 13, 2002, we sold an additional 2,200,000 shares of our common stock registered under such shelf registration statement to existing and new institutional investors at a price of $2.75 per share and received gross proceeds of $6.1 million before commissions and expenses of $415,000. This net amount of $5.6 million was included in the 2002 primary sources of funds mentioned in the preceding paragraph. On January 9, 2002, we filed an additional shelf registration statement with the SEC for the issuance of up to 3.0 million registered shares of our common stock,

33

Table of Contents

which was declared effective on February 13, 2002. The 3.0 million registered shares, as well as the 372,288 shares remaining on the 2001 Shelf Registration Statement, remain available for sale at our discretion, subject to certain limitations under federal securities laws and the rules of the Nasdaq Stock Market.

We have substantial fixed contractual obligations under various research and licensing agreements, consulting and employment agreements, lease agreements and long−term debt instruments. These contractual obligations were comprised of the following as of December 31, 2002:

| *In thousands* | Payments Due By Period | | | | |
|---|---|---|---|---|---|
| **Contractual Obligations** | **Total** | **In 2003** | **2004 through 2006** | **2007 through 2008** | **After 2008** |
| Long−term debt | $ 6,915 | $1,478 | $ 5,437 | $ — | $ — |
| Operating leases | 2,938 | 904 | 1,714 | 320 | |
| Other long−term obligations * | 7,949 | 3,240 | 4,105 | 244 | 360 |
| Total fixed contractual obligations | $17,802 | $5,622 | $11,256 | $564 | $360 |

\* Other long−term obligations are comprised primarily of employment agreements and license agreements. The license agreements generally provide for payment by us of annual license fees, milestone payments and royalties upon successful commercialization of products. All license agreements are cancelable by us. The above table reflects remaining license fees for the lives of the agreements but excludes milestone and royalty payments, as such amounts are not probable or estimable at this time.

In March 2003, we entered into a term loan agreement with a bank for $7.5 million, the proceeds of which were used to repay existing long−term debt, to pay off our obligations under certain operating leases for equipment and for general working capital purposes. The term loan is payable in monthly installments of $125,000 beginning in April 2003 plus interest with a final payment due in March 2006 of $3.0 million. Had this term loan been effective on December 31, 2002, our total fixed contractual obligations in the table above would have been $5.2 million in 2003, $11. 8 million in the period 2004 through 2006, $564,000 in the period 2007 through 2008 and $360,0000 thereafter.

We will require substantial additional funding for our research and development programs for operating expenses, for the pursuit of regulatory approvals and for establishing manufacturing, marketing and sales capabilities. Adequate funds for these purposes, whether obtained through financial markets or other arrangements with collaborative partners, or from other sources, may not be available when needed or on terms acceptable to us.

Based on our current operating plans and assuming no further funding or potential revenues that may be generated from product partnering or licensing initiatives we are currently pursuing, we believe that our current available funds will be adequate to satisfy our capital and operating requirements into the second quarter of 2004. However, there can be no assurance that changes in our research and development plans or other future events affecting our revenues or operating expenses will not result in the earlier depletion of our funds.

**Recently Issued Accounting Pronouncements**

In June 1998, the Financial Accounting Standards Board ("FASB") issued SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*. This standard, requires that all companies record derivatives on the balance sheet as assets or liabilities, measured at fair value. Gains or losses resulting from changes in the values of those derivatives are accounted for depending on the use of the derivative and whether it qualifies for hedge accounting. In April 2002, the EITF issued EITF 02−8, *Accounting for Options Granted to Employees in Unrestricted, Publicly Traded Shares of an Unrelated Entity*. This consensus requires that companies account for such benefits as derivatives under SFAS No. 133. We adopted the provisions of these pronouncements in connection with our executive compensation plan in 2002. See Note 5 of notes to consolidated financial statements.

34

Table of Contents

In December 2002, the EITF issued EITF 00−21, *"Accounting for Revenue Arrangements with Multiple Deliverables."* This consensus provides guidance in determining when a revenue arrangement with multiple deliverables should be divided into separate units of accounting, and, if separation is appropriate, how the arrangement consideration should be allocated to the identified accounting units. The provisions of EITF 00−21 are effective for revenue arrangements entered into in fiscal periods beginning after June 15, 2003. We will evaluate multiple element arrangements in accordance with this EITF conclusion upon its effective date for new arrangements into which it enters.

In December 2002, the FASB issued SFAS No. 148, *"Accounting for Stock−Based Compensation —Transition and Disclosure, an amendment of FASB Statement No. 123."* This Statement amends SFAS No. 123, *"Accounting for Stock−Based Compensation,"* to provide alternative methods of transition for a voluntary change to the fair value based method of accounting for stock−based employee compensation. In addition, this Statement amends the disclosure requirements of SFAS No. 123 to require prominent disclosures in both annual and interim financial statements about the method of accounting for stock−based employee compensation and the effect of the method used on reported results. We have determined that we will continue to account for stock−based compensation to employees under the provisions of APB No. 25 and will make all required disclosures in our annual and interim financial statements.

In June 2002, the FASB issued SFAS No. 146, *"Accounting for Costs Associated with Exit or Disposal Activities."* This statement replaces EITF 94−3 *"Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring)"* and requires that a liability for costs associated with a disposal or exit activity be recognized only when an actual liability is incurred and not when management has committed to a plan as is the case under EITF 94−3. The application of this statement is required for exit or disposal activities that are initiated after December 31, 2002.

35

Table of Contents

ITEM 7A: QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We invest our available funds in accordance with our investment policy to preserve principal, maintain proper liquidity to meet operating needs and maximize yields. Our investment policy specifies credit quality standards for our investments and limits the amount of credit exposure to any single issue, issuer or type of investment.

We invest cash balances in excess of operating requirements first in short-term, highly liquid securities, with maturities of 90 days or less, and money market accounts. Depending on our level of available funds and our expected cash requirements, we may invest a portion of our funds in marketable securities, consisting generally of corporate debt and U.S. government securities with maturities of one year or less, but generally less than six months. These securities are classified as available-for-sale. Available-for-sale securities are recorded on the balance sheet at fair market value with unrealized gains or losses reported as a separate component of stockholders' equity (accumulated other comprehensive loss). Gains and losses on marketable security transactions are reported on the specific-identification method. Interest income is recognized when earned. A decline in the market value of any available-for-sale security below cost that is deemed other than temporary results in a charge to earnings and establishes a new cost basis for the security.

Our investments are sensitive to interest rate risk. We believe, however, that the effect, if any, of reasonable possible near-term changes in interest rates on our financial position, results of operations and cash flows generally would not be material due to the short-term nature of these investments. In particular, at December 31, 2002, because our available funds are invested solely in cash equivalents and short-term securities with maturities less than 90 days, our risk of loss due to changes in interest rates is not material.

We have an executive compensation plan which provides participants, in lieu of a cash bonus, an option to purchase certain designated mutual funds at a discount equal to the amount of the bonus. These deferred compensation arrangements are accounted for as derivatives under SFAS No. 133. The fair value of the derivatives are reflected as a liability on our balance sheet. As of December 31, 2002, in the event of a hypothetical 10% increase (decrease) in the fair market value of the underlying mutual funds, we would incur approximately $214,000 of additional (less) compensation expense.

At December 31, 2002, we have a bank term note which bears interest at prime plus 1%. This note is sensitive to interest rate risk. In the event of a hypothetical 10% increase in the prime rate (42.5 basis points), we would incur approximately $30,000 of additional interest expense per year. Our refinancing in March 2003 would not affect this sensitivity analysis materially.

Certain Factors That May Affect Future Results of Operations

The SEC encourages companies to disclose forward-looking information so that investors can better understand a company's future prospects and make informed investment decisions. This Annual Report contains such "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These statements may be made directly in this Annual Report, and they may also be made a part of this Annual Report by reference to other documents filed with the SEC, which is known as "incorporation by reference."

Such statements in connection with any discussion of future operating or financial performance may be identified by use of words such as "may," "anticipate," "estimate," "expect," "project," "intend," "plan," "believe" and other words and terms of similar meaning. Such statements are based on management's expectations and are subject to certain factors, risks and uncertainties that may cause actual results, outcome of events, timing and performance to differ materially from those expressed or implied by such forward-looking statements. These risks include, but are not limited to, risks and uncertainties regarding our ability to conduct preclinical and clinical studies of our product candidates and the results of such studies, regulatory oversight, intellectual property claims, the timing, scope, cost and outcome of legal proceedings, future capital needs, key employees, dependence on our collaborators and manufacturers, markets, economic conditions, products, services, prices,

36

Table of Contents

reimbursement rates, competition and other factors. Please also see the discussion of risks and uncertainties under "Risk Factors" in Item 1 of this Annual Report.

In light of these assumptions, risks and uncertainties, the results and events discussed in the forward–looking statements contained in this Annual Report or in any document incorporated by reference might not occur. Stockholders are cautioned not to place undue reliance on the forward–looking statements, which speak only of the date of this Annual Report or the date of the document incorporated by reference in this Annual Report. We are not under any obligation, and we expressly disclaim any obligation, to update or alter any forward–looking statements, whether as a result of new information, future events or otherwise. All subsequent forward–looking statements attributable to us or to any person acting on our behalf are expressly qualified in their entirety by the cautionary statements contained or referred to in this section.

Table of Contents

ITEM 8: FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

**Independent Auditors' Report**

The Board of Directors and Stockholders of
ARIAD Pharmaceuticals, Inc.:

We have audited the accompanying consolidated balance sheets of ARIAD Pharmaceuticals, Inc. and its subsidiaries (the "Company") as of December 31, 2002 and 2001, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2002. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of ARIAD Pharmaceuticals, Inc. and its subsidiaries as of December 31, 2002 and 2001, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2002, in conformity with accounting principles generally accepted in the United States of America.

/s/ DELOITTE & TOUCHE LLP

Boston, Massachusetts
March 13, 2003

38

Table of Contents

ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS

| | December 31, | |
|---|---|---|
| *In thousands, except share and per share data* | 2002 | 2001 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 26,850 | $ 46,742 |
| Marketable securities (Note 2) | | 444 |
| Inventory and other current assets | 847 | 1,010 |
| Total current assets | 27,697 | 48,196 |
| Property and equipment: | | |
| Leasehold improvements | 12,642 | 12,624 |
| Equipment and furniture | 5,668 | 5,417 |
| Total | 18,310 | 18,041 |
| Less accumulated depreciation and amortization | (17,269) | (16,190) |
| Property and equipment, net | 1,041 | 1,851 |
| Intangible and other assets, net (Note 3) | 6,366 | 5,314 |
| Total assets | $ 35,104 | $ 55,361 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 2,145 | $ 1,505 |
| Current portion of long–term debt | 1,478 | 1,443 |
| Accrued compensation and benefits | 399 | 348 |
| Accrued product developments expenses | 1,006 | 1,073 |
| Other accrued expenses | 1,310 | 578 |
| Deferred revenue | 233 | |
| Total current liabilities | 6,571 | 4,947 |
| Long–term debt (Notes 4 and 12) | 5,437 | 6,847 |
| Deferred executive compensation (Note 5) | 1,244 | 474 |
| Commitments, contingent liabilities and minority interest (Notes 1, 6, 11) | | |
| Stockholders' equity: | | |
| Preferred stock, authorized, 10,000,000 shares, none issued and outstanding | | |
| Common stock, $.001 par value, authorized, 60,000,000 shares, issued and outstanding, 34,828,689 shares in 2002 and 32,146,774 shares in 2001 | 35 | 32 |
| Additional paid–in capital | 158,147 | 151,638 |
| Deferred compensation | (13) | (106) |
| Accumulated other comprehensive income | | 3 |
| Accumulated deficit | (136,317) | (108,474) |
| Total stockholders' equity | 21,852 | 43,093 |
| Total liabilities and stockholders' equity | $ 35,104 | $ 55,361 |

See notes to consolidated financial statements

39

Table of Contents

ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS

| | Years Ended December 31, | | |
|---|---|---|---|
| *In thousands, except share and per share data* | 2002 | 2001 | 2000 |
| Research revenue | $ 67 | $ 4 | $ 128 |
| Operating expenses: | | | |
| Research and development * | 23,018 | 16,587 | 12,467 |
| General and administrative * | 5,718 | 4,469 | 3,318 |
| Total operating expenses | 28,736 | 21,056 | 15,785 |
| Loss from operations | (28,669) | (21,052) | (15,657) |
| Other income (expense): | | | |
| Interest income | 615 | 1,578 | 2,050 |
| Interest expense | (323) | (285) | (225) |
| Other income – tax refund | 534 | | |
| Total other income, net | 826 | 1,293 | 1,825 |
| Net loss | $ (27,843) | $ (19,759) | $ (13,832) |
| Net loss per share (basic and diluted) | $ (.86) | $ (.68) | $ (.53) |
| Weighted average number of shares of common stock outstanding – basic and diluted | 32,475,083 | 29,256,767 | 25,875,663 |
| *Includes non-cash stock-based compensation expense | | | |
| – Research and development expense | $ (29) | $ 146 | $ 142 |
| – General and administrative expense | | $ 57 | |

See notes to consolidated financial statements.

40

Table of Contents

ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
For the Years Ended December 31, 2000, 2001 and 2002

| In thousands, except share data | Common Stock Shares | Amount | Additional Paid–in Capital | Deferred Compensation |
|---|---|---|---|---|
| Balance, January 1, 2000 | 22,031,888 | $    22 | $101,928 | $    0 |
| Issuance of common stock, series C repurchase | 1,078,038 | 1 | 1,144 | |
| Issuance of common stock, net of issuance costs | 857,024 | 1 | 9,742 | |
| Exercise of warrants | 1,389,498 | 1 | 11,636 | |
| Issuance of shares pursuant to ARIAD and AGTI stock option plans and ARIAD stock purchase plan | 1,935,690 | 2 | 4,952 | |
| Stock–based compensation to consultants | | | 359 | (359) |
| Amortization of stock–based compensation | | | | 142 |
| Comprehensive loss: | | | | |
| Net loss | | | | |
| Other comprehensive loss– | | | | |
| Unrealized loss on marketable securities | | | | |
| Comprehensive loss | | | | |
| Balance, December 31, 2000 | 27,292,138 | 27 | 129,761 | (217) |
| Issuance of common stock, net of issuance costs | 4,551,541 | 5 | 21,296 | |
| Issuance of shares pursuant to ARIAD stock option and purchase plans | 303,095 | | 489 | |
| Stock–based compensation to consultants | | | 92 | (92) |
| Amortization of stock–based compensation | | | | 203 |
| Comprehensive loss: | | | | |
| Net loss | | | | |
| Other comprehensive income – | | | | |
| Unrealized gains on marketable securities | | | | |
| Comprehensive loss | | | | |
| Balance, December 31, 2001 | 32,146,774 | 32 | 151,638 | (106) |
| Issuance of common stock, net of issuance costs | 2,200,000 | 2 | 5,633 | |
| Issuance of shares pursuant to ARIAD stock option and purchase plans | 481,915 | 1 | 998 | |
| Stock–based compensation to consultants | | | (122) | 122 |
| Amortization of stock–based compensation | | | | (29) |
| Comprehensive loss: | | | | |
| Net loss | | | | |
| Other comprehensive loss – | | | | |
| Unrealized loss on marketable securities | | | | |
| Comprehensive loss | | | | |
| Balance, December 31, 2002 | 34,828,689 | $    35 | $158,147 | $    (13) |

[Additional columns below]

[Continued from above table, first column(s) repeated]

| In thousands, except share data | Accumulated Other Comprehensive Income (Loss) | Accumulated Deficit | Stockholders' Equity |
|---|---|---|---|
| Balance, January 1, 2000 | $    0 | $    (74,883) | $    27,067 |
| Issuance of common stock, series C repurchase | | | 1,145 |
| Issuance of common stock, net of issuance costs | | | 9,743 |
| Exercise of warrants | | | 11,637 |
| Issuance of shares pursuant to ARIAD and AGTI stock option plans and ARIAD stock purchase plan | | | 4,954 |
| Stock–based compensation to consultants | | | |
| Amortization of stock–based compensation | | | 142 |
| Comprehensive loss: | | | |
| Net loss | | (13,832) | (13,832) |
| Other comprehensive loss– | | | |
| Unrealized loss on marketable securities | (5) | | (5) |
| Comprehensive loss | | | (13,837) |
| Balance, December 31, 2000 | (5) | (88,715) | 40,851 |
| Issuance of common stock, net of issuance costs | | | 21,301 |
| Issuance of shares pursuant to ARIAD stock option and purchase plans | | | 489 |
| Stock–based compensation to consultants | | | |
| Amortization of stock–based compensation | | | 203 |
| Comprehensive loss: | | | |

| | | | |
|---|---:|---:|---:|
| Net loss | | (19,759) | (19,759) |
| Other comprehensive income – | | | |
|    Unrealized gains on marketable securities | 8 | | 8 |
| Comprehensive loss | | | (19,751) |
| Balance, December 31, 2001 | 3 | (108,474) | 43,093 |
| Issuance of common stock, net of issuance costs | | | 5,635 |
| Issuance of shares pursuant to ARIAD stock option and purchase plans | | | 999 |
| Stock–based compensation to consultants | | | |
| Amortization of stock–based compensation | | | (29) |
| Comprehensive loss: | | (27,843) | (27,843) |
|    Net loss | | | |
|    Other comprehensive loss – | | | |
|       Unrealized loss on marketable securities | (3) | | (3) |
| Comprehensive loss | | | (27,846) |
| Balance, December 31, 2002 | $   — | $(136,317) | $ 21,852 |

See notes to consolidated financial statements

41

Table of Contents

ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Years Ended December 31, | | |
|---|---|---|---|
| In thousands | 2002 | 2001 | 2000 |
| **Cash flows from operating activities:** | | | |
| Net loss | $(27,843) | $(19,759) | $(13,832) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization | 2,253 | 1,889 | 1,675 |
| Stock–based compensation to consultants | (29) | 203 | 142 |
| Executive compensation expense | 205 | 181 | 163 |
| Increase (decrease) from: | | | |
| Inventory and other current assets | 163 | 337 | 262 |
| Other assets | (135) | (53) | (408) |
| Accounts payable | 640 | 70 | (842) |
| Accrued compensation and benefits | 51 | 282 | 58 |
| Accrued product development expenses | (67) | 438 | 103 |
| Other accrued expenses | 732 | (50) | (2,419) |
| Deferred revenue | 233 | | |
| Deferred executive compensation | (161) | (6) | |
| Net cash used in operating activities | (23,958) | (16,468) | (15,098) |
| **Cash flows from investing activities:** | | | |
| Acquisitions of marketable securities | | (7,585) | (42,965) |
| Proceeds from sales and maturities of marketable securities | 442 | 34,356 | 15,805 |
| Investment in property and equipment | (269) | (614) | (447) |
| Investment in intangible assets | (1,366) | (1,002) | (1,205) |
| Net cash provided by (used in) investing activities | (1,193) | 25,155 | (28,812) |
| **Cash flows from financing activities:** | | | |
| Proceeds from long–term debt borrowings | 77 | 4,590 | 3,000 |
| Repayment of long–term debt borrowings | (1,452) | (1,200) | (1,200) |
| Proceeds from issuance of common stock, net of issuance costs | 5,635 | 21,633 | 9,743 |
| Proceeds from issuance of common stock pursuant to stock option and purchase plans | 999 | 489 | 4,953 |
| Proceeds from exercise of warrants, net | | | 11,637 |
| Net cash provided by financing activities | 5,259 | 25,512 | 28,133 |
| Net increase (decrease) in cash and cash equivalents | (19,892) | 34,199 | (15,777) |
| Cash and cash equivalents, beginning of year | 46,742 | 12,543 | 28,320 |
| Cash and cash equivalents, end of year | $ 26,850 | $ 46,742 | $ 12,543 |
| Interest paid | $ 288 | $ 250 | $ 215 |

See notes to consolidated financial statements.

42

Table of Contents

ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**1. Nature of Business and Summary of Significant Accounting Policies**

*Nature of Business*

The Company is engaged in the discovery and development of breakthrough medicines that regulate cell signaling with small molecules. Breakthrough medicines are products, created *de novo,* that may be used to treat diseases in innovative ways. The Company is developing a comprehensive approach to the treatment of cancer and is primarily focused on a series of product candidates for targeted oncology indications. The Company also has an exclusive license to pioneering technology and patents related to the discovery, development and use of drugs that regulate NF–κB cell–signaling activity, which has been implicated in many major diseases.

*Principles of Consolidation*

The consolidated financial statements include the accounts of ARIAD Pharmaceuticals, Inc., its wholly owned subsidiary, ARIAD Corporation, and its 80% owned subsidiary ARIAD Gene Therapeutics, Inc. ("AGTI") (Note 7). The Company's development of product candidates based on the ARGENT cell–signaling regulation technology and mTOR inhibitors derived from the ARGENT programs are conducted on behalf of AGTI. Intercompany accounts and transactions have been eliminated in consolidation. There is no liability recorded for minority interest for AGTI in the consolidated balance sheets, because AGTI currently has a deficiency in its stockholders' equity and, accordingly, the Company currently records 100% of the losses incurred by AGTI. The Company accounts for any gain from the exercise of AGTI options as an adjustment to additional paid–in capital. Because AGTI is a research and development company, the Company believes that the gain realization from the exercise of AGTI options cannot be assured and therefore should be accounted for as a capital transaction in the Company's consolidated financial statements.

*Basis of Presentation*

As shown in the consolidated financial statements, the Company incurred net losses of $27.8 million and $19.8 million and used $24.0 and $16.5 million of cash in operations for the years ended December 31, 2002 and 2001, respectively. At December 31, 2002, the Company had cash and cash equivalents of $26.9 million, long–term debt of $6.9 million and stockholders' equity of $21.9 million. Also at December 31, 2002, the Company was in violation of one of its bank term loan covenants but had received a waiver of any and all covenant violations from the lender. The Company pledged $7.0 million of its cash and cash equivalents to the bank as security for the loan (see Note 4).

In March 2003, the Company announced that it is focusing its resources primarily on developing its lead anti–cancer small–molecule product candidates. As a result of this decision, the Company expects to reduce its operating expenses in 2003 by approximately 33% from those amounts incurred in 2002. In addition, the Company has entered into a new term loan agreement with a bank for $7.5 million (see Notes 4 and 12), the proceeds of which were used to repay existing long–term debt, to pay off obligations under certain operating leases and for general working capital purposes. This refinancing also lowered the Company's cost of financing its equipment. The Company expects to remain in compliance with all covenants of the new term loan through at least December 31, 2003.

The Company will continue to pursue additional funding through the capital markets, collaborations for one or more of its product candidates and additional licenses for its technologies. Based on its current operating plans and the effect of the above actions and assuming no further funding, management believes that the Company's

43

**Table of Contents**

current available funds will be adequate to satisfy its capital and operating requirements into the second quarter of 2004.

*Fair Value of Financial Instruments*

The carrying amounts of cash, cash equivalents, accounts payable and accrued liabilities approximate fair value because of their short–term nature. Marketable securities are recorded in the consolidated financial statements at aggregate fair value (Note 2). The carrying amount of the Company's bank term note of $6.3 million at December 31, 2002 approximates fair value due to its variable interest rate (Note 4). The Company's term note with General Electric Capital Corporation, with an outstanding principal balance of $615,000 at December 31, 2002, bears a fixed interest rate of 9.48% (Note 4). Based on current interest rates for comparable debt, the estimated fair value of this term note is $654,000 at December 31, 2002. The Company's obligation under its executive compensation plan (Note 5) is based on the current fair market value of the underlying securities and is therefore stated at its estimated current fair value.

*Accounting Estimates*

The preparation of the consolidated financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts and disclosure of assets and liabilities at the date of the consolidated financial statements and the reported amounts and disclosure of revenue and expenses during the reporting period. Actual results could differ from those estimates.

*Cash Equivalents*

Cash equivalents include short–term, highly liquid investments, which consist principally of United States government securities and high–grade domestic corporate securities, purchased with remaining maturities of 90 days or less, and money market accounts.

*Marketable Securities*

The Company has classified its marketable securities as "available–for–sale" and, accordingly, carries such securities at aggregate fair value. The difference between fair value and original cost is reflected as a component of accumulated other comprehensive income (loss). Fair value has been determined based on quoted market prices, in a dealer market, at the closing bid for each individual security held.

*Inventory*

Inventory consists of bulk pharmaceutical material to be used for multiple development programs. Inventories are carried at cost using the first–in, first–out method and are charged to research and development expense when consumed. The carrying value of inventory amounted to $430,000 and $682,000 at December 31, 2002 and 2001, respectively.

*Property and Equipment*

Property and equipment are recorded at cost. Depreciation is recorded using the straight–line method over the estimated useful lives of the assets (3 to 10 years). Assets acquired under capital lease obligations are stated at the lower of the present value of the minimum lease payments or the fair market value at the inception of the lease. Assets recorded under capital leases and leasehold improvements are amortized over the shorter of their useful lives or lease term using the straight–line method (4 to 10 years).

44

Table of Contents

*Intangible and Other Assets*

Intangible and other assets consist primarily of capitalized patent and license costs, deposits and the unvested portion of the fair value of outstanding grants under the Company's executive compensation plan (Note 5). The cost of purchased patents and patent applications, costs incurred in filing patents and certain license fees are capitalized. Capitalized costs related to issued patents are amortized over a period not to exceed seventeen years or the remaining life of the patent, whichever is shorter, using the straight–line method. Capitalized license fees are amortized over the periods to which they relate. Amortization expense for intangible assets amounted to $548,000, $502,000, and $431,000 for 2002, 2001 and 2000, respectively. In addition, capitalized costs are expensed when it becomes determinable that such patent applications or technology will not be pursued. The Company expensed $591,000, $0, and $58,000 for the years ended December 31, 2002, 2001 and 2000, respectively, in accordance with this policy.

*Impairment of Long–Lived Assets*

The Company reviews its long–lived assets for impairment when events or changes in circumstances indicate that the carrying amount of a long–lived asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to future net cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets.

*Revenue Recognition*

The Company recognizes revenue in accordance with the Securities and Exchange Commission ("SEC") Staff Accounting Bulletin 101 *Revenue Recognition in Financial Statements.* Revenue is principally comprised of license fees received under agreements that provide the licensee with access to and/or review and evaluation of certain technology owned or controlled by the Company. Upfront and annual license fees are recorded as deferred revenue upon receipt and recognized as revenue on a systematic basis over the period of time they are earned in accordance with the terms of the agreements. Such agreements may also include milestone and royalty payments. Such payments will be recognized as revenue when earned in accordance with the terms of the related agreements.

*Income Taxes*

The Company accounts for income taxes in accordance with Statement of Financial Accounting Standard ("SFAS") SFAS No. 109, "Accounting for Income Taxes," which requires an asset and liability approach to financial accounting and reporting for income taxes. Deferred income tax assets and liabilities are computed annually for differences between financial statement basis and the income tax basis of assets and liabilities that will result in taxable or deductible amounts in the future. Such deferred income tax liability computations are based on enacted tax laws and rates applicable to the years in which the differences are expected to affect taxable income. A valuation allowance is established when it is necessary to reduce deferred income tax assets to the expected realized amounts.

*Segment Reporting*

The Company organizes itself into one segment reporting to the chief executive officer. No significant revenues from product sales or services occurred in the years ended December 31, 2002, 2001 or 2000.

*Stock–Based Compensation*

SFAS No. 123, *Accounting for Stock–Based Compensation*, addresses the financial accounting and reporting standards for stock or other equity–based compensation arrangements. The Company accounts for stock or other equity–

45

**Table of Contents**

based compensation for non—employees under the fair value—based method as required by SFAS No. 123 and Emerging Issues Task Force ("EITF") 96—18, *Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services"* and other related interpretations. Under this method, the equity—based instrument is valued at either the fair value of the consideration received or the equity instrument issued on the date of grant. The resulting compensation cost is recognized and charged to operations over the service period, which is usually the vesting period. The unearned portion of these awards is classified as a component of stockholders' equity and is listed as "deferred compensation" on the consolidated balance sheet.

The Company uses the intrinsic value method to measure compensation expense associated with grants of stock options to employees. On a pro forma basis, had the Company used the fair value method to measure compensation for all stock options, the net loss and net loss per share would have been reported as follows:

| | Years ended December 31, | | |
|---|---|---|---|
| *In thousands (except per share data)* | **2002** | **2001** | **2000** |
| Net loss, as reported | $(27,843) | $(19,759) | $(13,832) |
| Effect of stock options if valued at fair value | (4,239) | (3,617) | (2,835) |
| Pro forma net loss | $(32,082) | $(23,376) | $(16,667) |
| Net loss per share, as reported | $ (.86) | $ (.68) | $ (.53) |
| Effect of stock options if valued at fair market | (.13) | (.12) | (.11) |
| Pro forma net loss per share | $ (.99) | $ (.80) | $ (.64) |

The above disclosure, required by SFAS No. 123, includes only the effect of grants made subsequent to January 1, 1996. For purposes of calculating the above disclosure, the fair value of options on their grant date was measured using the Black—Scholes option pricing model. Key assumptions used to apply this pricing model included a risk—free interest rate of 3.0% for 2002, 4.2% for 2001, and 5.9% for 2000, expected lives of the option grants ranging from one to six years and expected rates of volatility for the underlying stock of 106% for 2002, 108% for 2001, and 109% for 2000. Using this model, the weighted average fair value per option for all options granted to employees in 2002, 2001 and 2000 was $4.01 $4.71, and $9.35, respectively.

*Earnings Per Share*

Basic earnings per common share are computed using the weighted average number of common shares outstanding during each year. Diluted earnings per common share reflect the effect of the Company's outstanding options, warrants and convertible securities, except where such items would be anti—dilutive. In years in which a net loss is reported, basic and diluted per share amounts are the same. In 2002, 2001 and 2000, options amounting to 5,392,311, 4,639,782, and 3,480,360 shares of common stock, respectively, were not included in the computation of dilutive earnings per share, because the effect would be anti—dilutive. There were no warrants or convertible securities outstanding at December 31, 2002, 2001 or 2000.

*Recently Issued Accounting Pronouncements*

In June 1998, the Financial Accounting Standards Board ("FASB") issued SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities.* This standard requires that all companies record derivatives on the balance sheet as assets or liabilities, measured at fair value. Gains or losses resulting from changes in the values of those derivatives are accounted for depending on the use of the derivative and whether it qualifies for hedge accounting. In April 2002, the EITF issued EITF 02—8, *Accounting for Options Granted to Employees in*

46

Table of Contents

*Unrestricted, Publicly Traded Shares of an Unrelated Entity*. This consensus requires that companies account for such benefits as derivatives under SFAS No. 133. The Company adopted the provisions of these pronouncements in 2002 in connection with its executive compensation plan (Note 5).

In December 2002, the EITF issued EITF 00–21, *"Accounting for Revenue Arrangements with Multiple Deliverables."* This consensus provides guidance in determining when a revenue arrangement with multiple deliverables should be divided into separate units of accounting, and, if separation is appropriate, how the arrangement consideration should be allocated to the identified accounting units. The provisions of EITF 00–21 are effective for revenue arrangements entered into in fiscal periods beginning after June 15, 2003. Management will evaluate multiple element arrangements in accordance with this EITF conclusion upon its effective date for new arrangements into which it enters.

In December 2002, the FASB issued SFAS No. 148, *"Accounting for Stock–Based Compensation —Transition and Disclosure, an amendment of FASB Statement No. 123."* This Statement amends SFAS No. 123, *"Accounting for Stock–Based Compensation,"* to provide alternative methods of transition for a voluntary change to the fair value based method of accounting for stock–based employee compensation. In addition, this Statement amends the disclosure requirements of SFAS No. 123 to require prominent disclosures in both annual and interim financial statements about the method of accounting for stock–based employee compensation and the effect of the method used on reported results. The Company has determined that it will continue to account for stock–based compensation to employees under the provisions of APB No. 25 and will make all required disclosures in its annual and interim financial statements.

In June 2002, the FASB issued SFAS No. 146, *"Accounting for Costs Associated with Exit or Disposal Activities."* This statement replaces EITF 94–3 *"Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring)"* and requires that a liability for costs associated with a disposal or exit activity be recognized only when an actual liability is incurred and not when management has committed to a plan as is the case under EITF 94–3. The application of this statement is required for exit or disposal activities that are initiated after December 31, 2002.

*Reclassifications*

Certain reclassifications have been made to prior year financial statements to conform to the 2002 presentation.

**2. Marketable Securities**

The Company has classified its marketable securities as available–for–sale and, accordingly, carries such securities at aggregate fair value. At December 31, 2001, all of the Company's marketable securities consisted of corporate debt securities. At December 31, 2002, the Company held no marketable securities.

At December 31, 2001, the aggregate fair value and amortized cost of the Company's marketable securities were $444,000 and $441,000, respectively. Gross unrealized gains and losses were $3,000 and $0, respectively, at December 31, 2001.

Gains and losses on investment security transactions are reported on the specific–identification method. Realized gains and losses on sales of marketable securities were not material during the years ended December 31, 2002, 2001 and 2000. Changes in market values resulted in an increase (decrease) in net unrealized gains (losses) of ($3,000) $8,000, and ($5,000) for the years ended December 31, 2002, 2001 and 2000, respectively.

47

Table of Contents

**3. Intangible and Other Assets, Net**

Intangible and other assets, net, was comprised of the following at December 31:

|  | 2002 | 2001 |
|---|---|---|
|  | *In thousands* | |
| Capitalized patent and license costs | $ 8,130 | $ 7,356 |
| Less accumulated amortization | (2,680) | (2,130) |
|  | 5,450 | 5,226 |
| Unvested executive deferred compensation (Note 5) | 726 |  |
| Other | 190 | 88 |
|  | $ 6,366 | $ 5,314 |

**4. Long−Term Debt**

Long−term debt was comprised of the following at December 31:

|  | 2002 | 2001 |
|---|---|---|
|  | *In thousands* | |
| Bank term note at prime plus 1% (5.25%, at December 31, 2002) payable in monthly installments of $100,000 plus interest, through January 1, 2005 | $ 6,300 | $ 7,500 |
| General Electric Capital Corporation term notes at average interest rate of 9.48% payable in monthly installments including interest of $27,015, through December 2004 and $1,911 from January 2005 through June 2006 | 615 | 790 |
| Less current portion | (1,478) | (1,443) |
| Long−term debt | $ 5,437 | $ 6,847 |

The bank term note is collateralized by all assets of the Company with the exception of the assets to collateralize the General Electric Capital Corporation ("G.E.") term notes. The Company may, at its option, pledge marketable securities under the bank term note, and, in such event, the interest rate would be adjusted to the equivalent of 90−day LIBOR plus 1.25%.

The bank term note agreement contained certain covenants that would require consent from the bank to change the Company's Chief Executive Officer or increase indebtedness, as well as covenants that limited capital spending and stock redemption and restricted dividend distributions. The agreement also required the Company to pledge its marketable securities or maintain minimum levels of tangible net worth of $15.0 million, working capital of $7.0 million and liquid assets of $15.0 million plus the outstanding principal balance of the G.E. term notes, all as defined. At December 31, 2002, the Company was in violation of one of its bank term loan covenants but had received a waiver of any and all covenant violations from the lender. The Company pledged $7.0 million of its cash and cash equivalents to the bank as security for the loan.

The G.E. term notes were collateralized by certain assets of the Company. The G.E. term notes contained a covenant that required the Company to maintain a minimum unrestricted cash balance of $10.0 million. As noted below, the G.E. term note was paid off in March 2003.

In March 2003, the Company entered into a term loan agreement with another bank for $7.5 million (see Note 12), the proceeds of which were used to repay the existing bank term note and the G.E. term notes as well as to pay off remaining obligations under certain operating leases, such repayments totaling $6.9 million in the

48

Table of Contents

aggregate. The Company expects to remain in compliance with all covenants of the new term loan through at least December 31, 2003. Therefore, the bank term note continues to be classified as a long–term liability at December 31, 2002.

Prior to the March 2003 refinancing, the annual aggregate future principal payments of the above debt agreements were $1.5 million for 2003, $1.5 million for 2004 and $3.9 million in 2005. Interest expense during 2002, 2001, and 2000 were $289,000 $255,000 and $204,000 respectively.

## 5. Executive Compensation Plan

Since 1998, the Company has maintained an executive compensation plan which provides participants, in lieu of a cash bonus, an option to purchase certain designated mutual funds at a discount (75% for each year since the plan's inception) equal to the amount of the bonus. The options vest equally over four years. For awards granted prior to 2002, the benefit obligation had been recorded as compensation expense and a liability as the obligation vested based on the fair market value of the underlying designated mutual funds.

In April 2002, the EITF issued EITF 02–8, *Accounting for Options Granted to Employees in Unrestricted, Publicly Traded Shares of an Unrelated Entity.* This consensus requires that the Company account for such benefits as derivatives under FAS No. 133, *Accounting for Derivative Instruments and Hedging Activities.* Under these pronouncements, the fair value of the derivative should be recorded at its inception as an asset and liability, with the asset amortized to expense over the vesting period. Subsequent changes in the fair value of the derivative should be included in the determination of net income or loss.

In July 2002, the Company approved the 2002 grants to certain executives and key employees and modified all prior year grants to conform certain terms with current year grants. As a result, the Company recorded (1) an asset of $877,000 which represents the unvested portion of the fair value of all outstanding grants, (2) an increase to the deferred executive compensation liability of $910,000 to $1,393,000, and (3) a resulting charge to income of $33,000. Total expense related to the executive compensation plan amounted to $205,000, $181,000 and $163,000 in 2002, 2001 and 2000, respectively. Changes in the fair value of the deferred executive compensation liability during 2002 were not material.

## 6. Leases, Licensed Technology and Other Commitments

*Facility Lease*

The Company conducts its operations in a 100,000 square foot office and laboratory facility under a non–cancelable operating lease. The original ten–year term of the lease expired in July 2002 and the Company has extended the lease for the first of two five–year extension periods. The Company has sublet approximately 37,000 square feet of space to two tenants. Rent expense, net of sublease income of $1.1 million, $950,000, and $1.2 million for the years ended December 31, 2002, 2001, and 2000, respectively, amounted to $601,000, $654,000, and $477,000, respectively. Future minimum annual rental payments, net of sublease income, for the next five years are approximately $654,000 for 2003 and $686,000 for 2004, 2005 and 2006, respectively, and $400,000 in 2007.

*Equipment Leases*

The Company has utilized a lease credit facility from an equipment leasing company to acquire equipment, which is resold to a lessor at cost, with no resulting gain or loss recognized. The lease agreement, which is classified as an operating lease for financial reporting purposes, has a term of five years with various lease renewal or purchase options at the end of the initial term. The Company did not enter into any new equipment lease agreements in 2002, 2001 or 2000. Equipment rental expense for the years ended December 31, 2002, 2001 and 2000 amounted to $788,000, $897,000, and $933,000, respectively. Minimum future rental payments under the initial terms of the leases are approximately $196,000 for 2003, and $33,000 for 2004.

49

Table of Contents

At the end of the five–year lease terms, the Company has the option to purchase the equipment at a negotiated purchase price. In 2002, the Company paid a total of $105,000 to exercise options to purchase such equipment and recorded the expenditure as property and equipment. The assets are being amortized over their estimated remaining useful lives.

In March 2003, the Company utilized a portion of the proceeds of $7.5 million–term loan to pay off the remaining obligations under this lease agreement and purchase the associated assets.

*Licensed Technology*

The Company and AGTI have entered into agreements with several universities under the terms of which the Company and/or AGTI have received exclusive licenses or options to technology and intellectual property. The agreements, which are generally cancelable by the Company and AGTI, provide for the payment of license fees and/or minimum payments, which are generally creditable against future royalties. Fees paid by the Company on behalf of the Company and/or AGTI amounted to $317,000, $127,000 and $127,000 for 2002, 2001 and 2000, respectively, and are expected to amount to approximately $177,000 annually for 2003 through 2007. In addition, the agreements provide for payments upon the achievement of certain milestones in product development. The agreements also require the Company to fund certain costs associated with the filing and prosecution of patent applications.

*Other Commitments*

The Company has entered into various employment agreements with its senior officers. The agreements provide for aggregate annual base salaries of $2.8 million and remaining terms of employment of up to three years.

**7. Stockholders' Equity**

*Preferred Stock*

The Company has authorized 10 million shares of preferred stock which the Board of Directors is empowered to designate and issue in different series. As of December 31, 2002, the Board of Directors had designated 500,000 shares as series A preferred stock, and 9.5 million shares remained undesignated.

*Series C Redeemable Convertible Preferred Stock ("Series C Preferred Stock")*

On January 14, 2000, the Company completed the repurchase of the remaining 3,000 shares of its Series C Preferred Stock (initially issued in November 1998) for an aggregate consideration of $6.9 million plus 1,078,038 shares of common stock.

*Common Stock – Shelf Registration*

On June 22, 2001, the Company filed a shelf registration statement with the SEC for the issuance of up to 4.5 million registered shares of its common stock, which was declared effective by the SEC on August 1, 2001. The registered shares are available for sale at the Company's discretion. On October 31, 2001, the Company sold 1,927,712 registered shares of its common stock to institutional investors at a price of $4.15 per share and received gross proceeds of $8.0 million before commissions and expenses of $464,000. On November 13, 2002, the Company sold 2.2 million registered shares of its common stock to new and existing institutional investors at a price of $2.75 per share and received gross proceeds of $6.1 million before commissions and expenses of $415,000 At December 31, 2002 the Company had 372,288 registered shares remaining available for sale under this shelf registration.

**Table of Contents**

On January 9, 2002, the Company filed a second shelf registration statement with the SEC for the issuance of up to an additional 3.0 million registered shares of its common stock, which was declared effective by the SEC on February 13, 2002. All of these shares remain available for sale under this shelf registration.

*Redemption of Warrants*

The Company received funds aggregating approximately $11.6 million from the exercise of approximately 1.4 million of its publicly traded warrants during the first and second quarters of 2000. Each warrant was exercisable for one share of common stock at an exercise price of $8.40 per share. The warrants had been called for redemption effective April 27, 2000. At December 31, 2002 and 2001, there were no warrants outstanding.

*Common Stock – Other Sales*

In 2001, in addition to the sale of shares under the shelf registration mentioned above, the Company sold an aggregate of 2.6 million shares of common stock in a direct placement and received net proceeds of $13.8 million. All of these shares were publicly registered.

*Stockholder Rights Plan*

The Board of Directors of the Company adopted a Rights Agreement, dated as of June 8, 2000 (the "2000 Rights Agreement"), between the Company and State Street Bank and Trust Company, as Rights Agent, and approved the declaration of a dividend distribution of one Preferred Share Purchase Right (a "Right") on each outstanding share of its Common Stock. In general, the Rights become exercisable if a person or group hereafter acquires 15% or more of the Common Stock of the Company or announces a tender offer for 15% or more of the Common Stock. The Board of Directors will, in general, be entitled to redeem the Rights at one cent per Right at any time before any such person hereafter acquires 15% or more of the outstanding Common Stock. The plan is designed to protect the Company's stockholders in the event that an attempt is made to acquire the Company without an offer of fair value.

If a person hereafter acquires 15% or more of the outstanding Common Stock of the Company (the "Acquiring Person"), each Right will entitle its holder to purchase, for an initial exercise price of $65, a number of shares of Common Stock having a market value at that time of twice the Right's exercise price. Rights held by the Acquiring Person will become void. If the Company is acquired in a merger or other business combination transaction after a person acquires 15% or more of the Company's Common Stock, each Right will entitle its holder to purchase, at the Right's then–current exercise price, a number of the acquiring company's common shares having a market value at that time of twice the Right's exercise price.

The dividend distribution of Rights was payable on July 19, 2000 to shareholders of record on June 19, 2000. The Rights will expire in ten years. The Rights distribution is not taxable to the Company's stockholders.

The Board of Directors also adopted two amendments to the Rights Agreement dated December 15, 1994, (the "1994 Rights Agreement"), between the Company and State Street Bank and Trust Company, as Rights Agent. As a result of these amendments, the adoption of the 2000 Rights Agreement and the setting of a record date to distribute new Rights, the 1994 Rights Agreement is no longer in effect.

*Minority Interest in Subsidiary*

The 20% minority interest in AGTI includes shares owned by Stanford University and Harvard University (which together own 2%) issued in 1995 in connection with a license agreement and shares issued to option holders (18%), including certain current and former members of the Company's management, Board of

51

Table of Contents

Directors, and certain consultants. Additional stock options are outstanding and, if all such options were exercised, the minority interest would increase to 21% (Note 8).

## 8. Stock Option and Stock Purchase Plans

*ARIAD Stock Option and Stock Plans*

The Company's 1991, 1994 and 2001 Stock Option and Stock Plans (the "Plans") provide for the granting of nonqualified and incentive stock options to officers, directors, employees and consultants of the Company. Options become exercisable as specified in the related option agreement, typically over a four–year period, and expire ten years from the date of grant. As of December 31, 2002, the 1991 Plans have terminated according to their terms, although existing stock options granted under these Plans remain outstanding. Also as of December 31, 2002, there are no remaining options available to be issued under the 1994 Plan and 794,044 options available to be granted under the 2001 Plan.

Transactions under the Plans for the years ended December 31, 2000, 2001 and 2002 are as follows:

|  |  | Number of Shares | Weighted Average Exercise Price Per Share |
|---|---|---|---|
| Options outstanding, | January 1, 2000 | 5,069,369 | $ 2.48 |
| Granted |  | 553,300 | 10.99 |
| Forfeited |  | (226,668) | 4.04 |
| Exercised |  | (1,915,641) | 2.40 |
| Options outstanding, | December 31, 2000 | 3,480,360 | 3.77 |
| Granted |  | 1,554,220 | 5.61 |
| Forfeited |  | (120,688) | 5.75 |
| Exercised |  | (274,110) | 1.51 |
| Options outstanding, | December 31, 2001 | 4,639,782 | 4.47 |
| Granted |  | 1,341,300 | 4.01 |
| Forfeited |  | (185,830) | 5.37 |
| Exercised |  | (402,941) | 1.89 |
| Options outstanding, | December 31, 2002 | 5,392,311 | $ 4.51 |
| Options exercisable, | December 31, 2000 | 2,268,950 | $ 2.64 |
|  | December 31, 2001 | 2,650,830 | $ 3.31 |
|  | December 31, 2002 | 3,277,042 | $ 3.95 |

52

Table of Contents

The following table sets forth information regarding options outstanding at December 31, 2002:

| Range of Exercise Prices | Number of Shares | Weighted Average Exercise Price | Weighted Average Remaining Life (years) | Number of Option Shares Currently Exercisable | Weighted Average Exercise Price for Currently Exercisable |
|---|---|---|---|---|---|
| $.75 − 1.25 | 525,714 | $    .77 | 6.8 | 519,289 | $    .77 |
| 1.34 − 2.31 | 876,259 | 1.70 | 5.4 | 711,300 | 1.71 |
| 2.68 − 4.88 | 2,213,366 | 4.17 | 7.7 | 1,228,552 | 4.09 |
| 4.89 − 8.00 | 1,439,722 | 6.04 | 7.9 | 641,776 | 6.16 |
| 12.56 − 14.63 | 337,250 | 3.41 | 7.5 | 176,125 | 13.37 |
| | 5,392,311 | $   4.51 | | 3,277,042 | $   3.95 |

*ARIAD Gene Therapeutics, Inc. Stock Option Plan*

The Company's subsidiary, AGTI, adopted a stock option plan in 1993 substantially similar to the Plans and reserved 1,785,714 shares of AGTI's common stock for issuance pursuant to such plan. At December 31, 2002, options with respect to 87,428 shares of AGTI's common stock (all granted in 1994) were outstanding at an exercise price of $.42 per share, and all options were exercisable. During 2002 and 2001, no options were exercised or forfeited. During 2000, 758,282 options were exercised for aggregate proceeds of $318,000, and 25,000 option shares were forfeited. As of December 31, 2002, AGTI had 5,195,779 shares of its common stock outstanding.

*Employee Stock Purchase Plan*

In 1997, the Company adopted the 1997 Employee Stock Purchase Plan and reserved 500,000 shares of common stock for issuance under this plan. Under this plan, substantially all of its employees may, through payroll withholdings, purchase shares of the Company's stock at a price of 85% of the lesser of the fair market value at the beginning or end of each three−month withholding period. In 2002, 2001 and 2000, 78,974, 28,985 and 20,049 shares of common stock were issued under the plan, respectively.

### 9. Other Income − Tax Refund

Other income consists of a tax refund of $534,000 received in 2002. In March 2002, the "Job Creation and Worker Assistance Act of 2002 (the "Act") was signed into law. The Act allows taxpayers to carry back net operating losses incurred in 2001 and 2002 to the five prior tax years. Prior tax law limited the carry back to two years. In addition, the Act also suspended certain limitations on the utilization of Alternative Minimum Tax net operating losses. As a result of the Act, the Company was able to carry back a portion of its net loss for the year ended December 31, 2001 to recover taxes previously paid attributable to the sale of the Company's 50% interest in the Hoechst−ARIAD Genomics Center, LLC (the "Genomics Center") to Aventis Pharmaceuticals, Inc. on December 31, 1999. As a result of the sale, the Company had recorded a net gain of $46.4 million, net of $534,000 in Alternative Minimum Tax, in 1999 in other income.

### 10. Income Taxes

At December 31, 2002, the Company had available, for federal tax reporting purposes, net operating loss carryforwards of approximately $138.8 million, which expire commencing in 2009 and, for state tax reporting purposes, net operating loss carryforwards of approximately $100.4 million, which expire commencing in 2003. The Company also had federal research and development credit carryovers of approximately $6.0 million, which

**Table of Contents**

expire commencing in 2006. Both the net operating loss carryforwards and credits are subject to certain limitations under federal tax law.

The components of deferred income taxes were as follows at December 31:

| In thousands | 2002 | 2001 |
|---|---|---|
| Deferred tax liabilities: | | |
| Intangible and other assets | $ 2,181 | $ 2,091 |
| Deferred tax assets: | | |
| Net operating loss carryforwards | 53,222 | 42,590 |
| Federal and State tax credit carryovers | 12,714 | 10,808 |
| Depreciation | 3,790 | 3,612 |
| Other | 465 | 408 |
| Total deferred tax assets | 70,191 | 57,418 |
| Deferred tax assets, net | 68,010 | 55,327 |
| Valuation allowance | (68,010) | (55,327) |
| Total deferred taxes | $        0 | $        0 |

Since the Company has not yet achieved sustained profitable operations, management believes the tax benefits as of December 31, 2002 and 2001 do not satisfy the realization criteria set forth in SFAS No. 109 and has recorded a valuation allowance for the entire net deferred tax asset. The increase in the valuation allowance of $12.7 million in 2002 and $8.9 million in 2001 resulted primarily from net operating loss carryforwards and tax credit carryovers that resulted from operations in those years.

## 11. Litigation

The Company was named as a defendant in a purported class action lawsuit commenced in June 1995 in the U.S. District Court for the Southern District of New York. The action named as defendants ARIAD Pharmaceuticals, Inc.; the underwriter of our initial public offering and a market maker in our stock, D. Blech & Co.; the managing director and sole shareholder of D. Blech & Co. and one of our former directors, David Blech; certain other of the Company's directors, and the qualified independent underwriter for the initial public offering, Shoenberg Hieber, Inc., or SHI.

Counsel for the plaintiff class, counsel for the named director defendants of the Company (excluding David Blech), or the Company Defendants, and the Company, and counsel for SHI have executed a stipulation of settlement in the action, or the Settlement. The Settlement was approved pursuant to entry by the Court of a Final Order and Judgment on December 4, 2002. The Final Order and Judgment orders that a payment of $620,000 (of which the Company's contribution was not material and no liability was recorded on the 2002 balance sheet) be distributed to the plaintiffs from a legal escrow account, that this action and a related action entitled In re: Blech Securities Litigation, 94 Civ. 7696 (RWS) are dismissed with prejudice, and that non–settling parties are barred from pursuing contribution–type claims against the Company Defendants.

On May 19, 1999, the Company filed suit in the Massachusetts Superior Court against Michael Z. Gilman, Ph.D., or Dr. Gilman, its former Chief Scientific Officer, seeking equitable relief for breach of his employment agreements in accepting a position as the research director of molecular biology at Biogen, Inc., or Biogen. The Superior Court issued a temporary injunction on May 19, 1999 restraining Dr. Gilman from using any of the Company's confidential information in his new employment. On June 21, 1999, Dr. Gilman filed

54

Table of Contents

counterclaims against the Company seeking an order awarding damages for breach of contract and barring the Company from enforcing any provisions of the Company's employment agreements with Dr. Gilman. On May 26, 1999, Biogen filed a motion to intervene as a defendant in the action which the Superior Court granted on August 2, 1999. Discovery in the case has been completed, and Summary Judgment Motions have been filed, heard and ruled upon.

Counsel for the Company, counsel for Biogen and counsel for Dr. Gilman have executed a stipulated partial judgment, or the Stipulated Judgment, which was approved pursuant to entry by the Court on January 13, 2003. The Stipulated Judgment dismisses with prejudice the Company's claim for breach of contract against Dr. Gilman and dismisses Biogen as a party to the action. Dr. Gilman's counterclaims will now proceed to trial which the Company anticipates will be set in 2003. The ultimate outcome of the litigation with Dr. Gilman is not determinable at this time, and as a result, the Company cannot estimate whether any damages will be awarded or what the range of such an award might be and has not recorded any liability on the December 31, 2002 balance sheet.

On June 25, 2002, the Company, together with Massachusetts Institute of Technology, The Whitehead Institute for Biomedical Research and Harvard University, filed a lawsuit in the United States District Court for the District of Massachusetts, or the U.S. District Court, against Eli Lilly and Company, or Lilly, alleging infringement upon issuance of certain claims of our U.S. patent covering methods of treating human disease by regulating NF−κB cell−signaling activity, or the NF−κB '516 Claims, through sales of Lilly's osteoporosis drug, Evista®, and Lilly's septic shock drug, Xigris®, and seeking monetary damages from Lilly. On August 26, 2002, Lilly filed a motion to dismiss or, alternatively, for summary judgment, or Lilly's combined Motion, challenging the validity of the NF−κB '516 Claims. The Company filed a response to Lilly's Combined Motion on October 17, 2002 and Lilly filed a reply on November 17, 2002. Oral argument on Lilly's Combined Motion was heard in the U.S. District Court on November 21, 2002. As of March 12, 2003, the U.S. District Court had not yet ruled on Lilly's Combined Motion. While the ruling on Lilly's Combined Motion is not currently determinable, if Lilly were to be successful and its Combined Motion is granted, the Company will consider filing an appeal with the Court of Appeals for the Federal Circuit. If Lilly's Combined Motion is denied, a trial scheduling conference pursuant to Rule 16(b) of the Federal Rules of Civil Procedure will be scheduled by the U.S. District Court, and the case will proceed to the discovery phase leading to trial. The ultimate outcome of the litigation cannot be determined at this time, and, as a result, an estimate of a damage award or range of awards, if any, cannot be made.

## 12. Subsequent Events

On January 31, 2003, the Company entered into a non−exclusive license agreement with GPC Biotech AG ("GPC") that gives GPC the right to use the Company's ARGENT cell−signaling regulation technology in GPC's three−hybrid technology platform. The agreement provides for guaranteed fees of $2.0 million, including $1.0 million upon signing. GPC will pay the Company a percentage of revenues received by GPC from its partnerships utilizing its three−hybrid drug discovery platform, and make development and commercialization milestone payments and royalty payments to the Company based on GPC products, if any, resulting from the use of the Company's licensed technology in GPC's internal drug discovery programs.

On March 12, 2003, the Company entered into a $7.5 million term loan agreement with a bank. The loan is secured by a lien on all assets of the Company excluding intellectual property, which the Company has agreed not to pledge to any other party. The proceeds of the loan were used to pay off the existing $6.3 million bank term note and the $615,000 G.E. term notes as well as buy out remaining obligations under certain operating leases for equipment. The term loan carries interest at the bank's prime rate, or at LIBOR plus 2% and is repayable in monthly installments beginning in April 2003 of $125,000 plus interest over 36 months with a balloon payment of $3.0 million at the end of the term. The term loan agreement requires the Company to maintain a minimum of $10.0 million in unrestricted cash, cash equivalents and investments.

Table of Contents

The agreement also contains certain covenants that restrict additional indebtedness, additional liens, sales of assets, and dividends, distributions or repurchases of common stock.

## ITEM 9: CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

Not Applicable.

56

Table of Contents

PART III

**ITEM 10: DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT**

Our directors, officers and key employees are as follows:

| Name | Age | Position |
|---|---|---|
| Harvey J. Berger, M.D. | 52 | Chairman of the Board of Directors, Chief Executive Officer and President |
| Sandford D. Smith | 55 | Vice Chairman of the Board of Directors |
| Laurie A. Allen, Esq. | 42 | Senior Vice President, Chief Legal Officer, and Secretary |
| David L. Berstein, Esq. | 50 | Senior Vice President and Chief Patent Counsel |
| Fritz Casselman | 53 | Senior Vice President and Chief Business Officer |
| Timothy P. Clackson, Ph.D. | 37 | Senior Vice President, Science and Technology |
| Edward M. Fitzgerald | 48 | Senior Vice President, Chief Financial Officer and Treasurer |
| John D. Iuliucci, Ph.D. | 60 | Senior Vice President, Drug Development |
| Thomas A. Pearson | 61 | Senior Vice President, Corporate Strategy and Communications |
| Camille L. Bedrosian, M.D. | 50 | Vice President and Chief Medical Officer |
| David C. Dalgarno, Ph.D. | 45 | Vice President, Physical and Chemical Sciences |
| Maryann G. Krane | 43 | Vice President, Regulatory Affairs |
| Tomi K. Sawyer, Ph.D. | 48 | Vice President, Drug Discovery |
| Joseph Bratica | 39 | Director of Finance and Controller |
| Vaughn D. Bryson | 64 | Director |
| Jay R. LaMarche | 56 | Director |
| Frederick S. Schiff | 55 | Director |
| Burton E. Sobel, M.D. | 65 | Director |
| Raymond S. Troubh | 76 | Director |
| Elizabeth H.S. Wyatt | 55 | Director |

***Harvey J. Berger, M.D.*** is our principal founder and has served as our Chairman of the Board, Chief Executive Officer and President since April 1991. From 1986 to 1991, Dr. Berger held a series of senior management positions at Centocor, Inc., a biotechnology company, including Executive Vice President and President, Research and Development Division. He also has held senior academic and administrative appointments at Emory University, Yale University and the University of Pennsylvania and was an Established Investigator of the American Heart Association. Dr. Berger is a director of PTC Therapeutics, Inc., a closely held biotechnology company. Dr. Berger received his A.B. degree in Biology from Colgate University and his M.D. degree from Yale University School of Medicine and did further medical and research training at the Massachusetts General Hospital and Yale–New Haven Hospital.

***Sandford D. Smith,*** one of our Directors since October 1991 and our Vice Chairman since January 1999, is Corporate Vice President and President, Genzyme Europe and International, Genzyme Corporation. From October 1997 to December 2000, he was President, Therapeutics International, Genzyme Corporation, and from May 1996 to September 1996, Vice President and General Manager, Specialty Therapeutics and International Group, Genzyme Corporation, a biotechnology company. Mr. Smith was President and Chief Executive Officer and a Director of Repligen Corporation, a biotechnology company, from 1986 to March

57

**Table of Contents**

1996. Mr. Smith previously held a number of positions with Bristol−Myers Squibb and Company from 1977 to 1986, including, most recently, Vice President of Corporate Development and Planning for the United States Pharmaceutical and Nutritional Group. Mr. Smith is a Director of CSPI, a software company. Mr. Smith earned his B.A. degree from the University of Denver.

***Laurie A. Allen, Esq.*** has served as our Senior Vice President and Chief Legal Officer since March 2002 and has served continuously as our Secretary since January 1999. Previously, from January 1999 to December 1999, she served as our Senior Vice President, Corporate Development and Legal Affairs and General Counsel. From January 2000 to March 2002, Ms. Allen was Senior Vice President, Business Development and Legal Affairs at Alexandria Real Estate Equities, Inc., a real estate investment trust. Previously, she was a partner with the law firm of Brobeck, Phleger and Harrison, LLP from January 1996 to December 1998. She also was an associate with Brobeck, Phleger & Harrison, LLP from February 1991 to December 1995. Ms. Allen received her A.B. degree in History from the University of California, Los Angeles, her L.L.M. degree in taxation from New York University and her J.D. degree from Emory University School of Law.

***David L. Berstein, Esq.*** has served as our Senior Vice President and Chief Patent Counsel since June 2000. Previously, he served as our Vice President and Chief Patent Counsel from September 1993 to June 2000. Prior to joining us, from 1990 through 1993, Mr. Berstein was Patent Counsel at BASF Bioresearch Corporation, a biotechnology company, where he was responsible for intellectual property matters, including patents and licensing. From 1985 to 1990, Mr. Berstein was a patent attorney at Genetics Institute, Inc., a biotechnology company, where he was involved in various aspects of the patent process from patent procurement through litigation. Mr. Berstein joined Genetics Institute from the law firm of Cooper & Dunham. Mr. Berstein received his B.S. degree from the University of Michigan and his J.D. degree from Fordham University School of Law.

***Fritz Casselman*** has served as our Senior Vice President and Chief Business Officer since February 2001. From February 2000 to January 2001, Mr. Casselman was Senior Vice President, Strategy and Corporate Development at Avant Immunotherapeutics Inc., a biotechnology company. From 1997 to 2000, Mr. Casselman was Director of Worldwide Business Development at SmithKline Beecham, plc, a pharmaceutical company; from 1988 to 1996, Vice President and consultant to Cambridge Biotech Corporation, a biotechnology company; and from 1982 to 1988 an associate and then a partner at the law firm of Bromberg, Sunstein and Casselman. Mr. Casselman received his B.A. degree from the University of Wisconsin (Madison) and his J.D. degree from Boston University School of Law.

***Timothy P. Clackson, Ph.D.*** has served as our Senior Vice President, Science and Technology since June 2002. Previously he served as our Vice President, Gene Therapy and Genomics from June 2000 to June 2002, as our Director, Gene Therapy from August 1999 to June 2000 and as our Department Head, Gene Therapy Biology from March 1999 to August 1999. Prior to joining us, Dr. Clackson was a postdoctoral fellow at Genentech, Inc., a biotechnology company from 1991 to 1994, where he studied the molecular basis for human growth hormone function. Dr. Clackson received his B.A. degree in Biochemistry from the University of Oxford. Dr. Clackson received his Ph.D. in Biology from the University of Cambridge, for research conducted at the MRC Laboratory of Molecular Biology into antibody engineering and the development of phage display technology.

***Edward M. Fitzgerald*** has served as our Senior Vice President, Chief Financial Officer and Treasurer since May 2002. From 1998 to April 2002, he served as Senior Vice President, Chief Financial Officer and Secretary at AltaRex Corp., a biotechnology company. From 1992 to 1997, Mr. Fitzgerald held various management positions at BankBoston Corp., a financial services and commercial banking company. From 1989 to 1992, he was a partner at Arthur Andersen & Co. in the audit and business advisory practice. Previously, from 1978 to 1988, he also was at Arthur Andersen & Co. Mr. Fitzgerald received his B.S. degree in accounting and M.B.A. degree in finance from Babson College.

Table of Contents

***John D. Iuliucci, Ph.D.*** has served as our Senior Vice President, Drug Development since January 1999. Previously, he also served as our Vice President, Drug Development from October 1996 to December 1998 and our Vice President, Preclinical Development from June 1992 to September 1996. Prior to joining us, Dr. Iuliucci was Director of Preclinical Pharmacology and Toxicology at Centocor, Inc., a biotechnology company, from 1984 to 1992. From 1975 to 1984, Dr. Iuliucci headed the Drug Safety Evaluation Department at Adria Laboratories, a pharmaceutical company. He was a Senior Toxicologist at the Warner–Lambert Pharmaceutical Research Institute from 1972 to 1975. Dr. Iuliucci received his B.S. degree in Pharmacy and M.S. and Ph.D. degrees in Pharmacology from Temple University.

***Thomas A. Pearson*** has served as our Senior Vice President, Corporate Strategy and Communications since June 2002. Previously, he served as our Senior Advisor, Corporate Communications and Planning from January 2001 to June 2002, and as our corporate communications consultant from 1992 to January 2001. Mr. Pearson was an independent business consultant since 1983, specializing in biotechnology and high–technology companies. Previously, Mr. Pearson held various management positions in the television stations division of CBS, an entertainment and broadcasting company. Mr. Pearson received his B.A. degree in liberal arts from Wheaton College.

***Camille L. Bedrosian, M.D.*** has served as our Vice President and Chief Medical Officer since September 2002. From 1997 to 2002, Dr. Bedrosian served in the Clinical Research and Development Department of Wyeth/Genetics Institute, Inc., most recently as Senior Director, Oncology/Hematology. From 1986 to 1997, she was a Fellow, an Associate, and then Assistant Professor of Medicine in the Division of Hematology and Oncology at Duke University Medical Center and the Duke Comprehensive Cancer Center. Dr. Bedrosian received her B.A. degree from Harvard University/Radcliffe College in chemistry, her M.S. in biophysics from M.I.T., and her M.D. from Harvard Medical School.

***David C. Dalgarno, Ph.D.*** has served as our Vice President, Physical and Chemical Sciences since November 1999. Previously, he served as our Director, Physical and Chemical Sciences from September 1998 to November 1999 and as our Director, Spectroscopy from October 1996 to August 1998. Prior to joining us in March 1992, Dr. Dalgarno was a scientist at Schering–Plough Corp. focusing on protein structure determination by nuclear magnetic resonance. Dr. Dalgarno received his B.A. and Ph.D. degrees in Chemistry from the University of Oxford. He received his postdoctoral training in Molecular Biophysics and Biochemistry at Yale University.

***Maryann G. Krane*** has served as our Vice President, Regulatory Affairs since May 2001. From September 2000 to May 2001, she served as Senior Director, Regulatory Affairs and Quality Assurance at Avant Immunotherapeutics, Inc., a biotechnology company. From 1986 to 1992 and from 1993 to 2000, Ms. Krane held various positions in regulatory affairs and research at Genetics Institute, Inc., currently a unit of American Home Products Corporation, a diversified healthcare company. Most recently, she was Head, Regulatory Affairs, Global Development of Hemophilia and Oncology Products at Genetics Institute. From August 1992 to April 1993, she was Manager, Regulatory Affairs at Genzyme Corporation, a biotechnology company. Ms. Krane received her B.S. degree in Microbiology from the University of Massachusetts at Amherst, MA.

***Tomi K. Sawyer, Ph.D.*** has served as our Vice President, Drug Discovery since January 1999. Previously, he served as our Director, Drug Discovery – Signal Transduction from October 1997 to December 1998. From July 1993 to September 1997, he was Head and Associate Research Fellow, Structure–Based Design and Chemistry at Parke–Davis Pharmaceutical Research a Division of Warner–Lambert Company, a pharmaceutical company, and Section Director, Peptide and Peptidomimetic Chemistry at Parke–Davis from July 1991 to July 1993. Dr. Sawyer received his B.S. degree in Chemistry from Moorhead State University and his Ph.D. degree in Organic Chemistry from the University of Arizona.

59

**Table of Contents**

*Joseph Bratica* has served as our Director of Finance and Controller since January 1999. Previously, he served as our Assistant Controller from January 1997 to December 1998 and as our Accounting Manager from August 1994 to December 1996. Prior to joining us, he was Accounting Manager at Creative BioMolecules, Inc., a biotechnology company, from 1992 to 1994. Mr. Bratica received his B.A. degree in Accounting from Suffolk University.

*Vaughn D. Bryson,* one of our Directors since February 1995, is President of Life Science Advisors, Inc., a healthcare consulting company. Mr. Bryson was a thirty–two year employee of Eli Lilly & Co., a pharmaceutical company, from 1961 to 1993 and served as President and Chief Executive Officer of Eli Lilly from 1991 to 1993. He served as Executive Vice President of Eli Lilly from 1986 until 1991. He also served as a member of Eli Lilly's Board of Directors from 1984 until his retirement in 1993. Mr. Bryson was Vice Chairman of Vector Securities International Inc., an investment–banking firm, from April 1994 to December 1996. He also is a Director of Chiron Corporation, a biotechnology company, AtheroGenics, Inc., a biotechnology company, Amylin Pharmaceuticals, Inc., a biotechnology company, and Quintiles Transnational Corporation, a pharmaceutical services company. He received his B.S. degree in Pharmacy from the University of North Carolina and completed the Sloan Program at the Stanford University Graduate School of Business.

*Jay R. LaMarche,* one of our Directors since January 1992, has served as a financial advisor since November 2000. Previously, he served as our Chief Financial Officer and Treasurer from January 1992 to November 2000 and as our Executive Vice President from March 1997 to November 2000. Mr. LaMarche was our Senior Vice President, Finance from January 1992 to February 1997. Prior to joining us, he was Chief Financial Officer and a Director of ChemDesign Corporation, a fine chemicals manufacturer. Previously, Mr. LaMarche was a partner with Deloitte Haskins & Sells, a public accounting firm. Mr. LaMarche received his B.B.A. degree in Public Accountancy from the University of Notre Dame and served as an officer in the United States Navy.

*Frederick S. Schiff,* one of our directors since June 2002, is Executive Vice President and Chief Financial Officer of Vital Signs, Inc. Previously, Mr. Schiff held various senior management positions over a period of twenty years at Bristol–Myers Squibb Company (BMS), most recently, from 2001 to 2002, as Senior Vice President and Chief Financial Officer. He also served as Senior Vice President, Financial Operations and Chief Financial Officer, Medicines Business in 2000, Vice President and Controller from 1990 to 1997, and in various financial positions from 1982 to 1989, all at BMS. Previously, he was a principal at Arthur Young & Company and director of auditing at the New York office. He is also a director of Visiting Nurse Services of New York and the Eugene Lang Entrepreneurship Fund of the Graduate Business School of Columbia University. Mr. Schiff received an M.B.A. degree from Columbia University and a B.A. from New York University.

*Burton E. Sobel, M.D.,* one of our directors since June 2002, is E.L. Amidon Professor, Physician–in–Chief, and Professor of Biochemistry at the University of Vermont and a trustee of the Fletcher Allen Health Care Center, Burlington. Previously, he held senior academic and administrative positions at Washington University School of Medicine, from 1973 to 1994, and at the University of California, San Diego, from 1968 to 1973. Dr. Sobel is a director of Scios, Inc., a biopharmaceutical company, and Corvas International, Inc., a biopharmaceutical company. Dr. Sobel completed postgraduate training at the Peter Bent Brigham Hospital, Boston and the National Institutes of Health, Bethesda and received an M.D. from Harvard University and an A.B. from Cornell University.

*Raymond S. Troubh,* one of our Directors since October 1991, has been a financial consultant for more than five years. Prior to this, he was a general partner of Lazard Freres & Co., an investment banking firm, and a governor of the American Stock Exchange. Mr. Troubh is Chairman of the Board of Directors of Enron Corp., an energy distribution company and is a Director of Diamond Offshore Drilling, Inc., a contract drilling company, General American Investors Company, Inc., an investment trust company, Gentiva Health Services, Inc., a healthcare provider, Petrie Stores Corporation, a liquidating trust, Hercules Incorporated, a

60

**Table of Contents**

specialty chemicals company, Triarc Companies, Inc., a holding company, and WHX Corporation, a steel products company. He received his A.B. degree from Bowdoin College and his L.L.B. degree from Yale Law School.

*Elizabeth H.S. Wyatt*, one of our directors since June 2002, held various senior management positions over a period of twenty years at Merck & Co., Inc., most recently, from 1992 to 2000, as Vice President, Corporate Licensing. She also served in leadership positions in corporate licensing from 1980 to 1992 at Merck. Previously, she held academic and administrative positions at Harvard Business School, Doyle Dane Bernbach, and Boston College. Ms. Wyatt is a director of Medimmune, Inc., a biopharmaceutical company and Neose Technologies, Inc., a biopharmaceutical company. She received an M.B.A. from Harvard Business School, an M.S. in education from Boston University, and a B.A. from Sweet Briar College, Virginia.

### Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Securities Exchange Act of 1934 requires our directors and officers, and persons who own more than 10% of the Common Stock, to file with the Securities and Exchange Commission (the "SEC") initial reports of beneficial ownership and reports of changes in beneficial ownership of the Common Stock and our other equity securities. Officers, directors and greater than 10% beneficial owners are required by SEC regulation to furnish us with copies of all Section 16(a) forms they file.

To our knowledge, based solely on review of the copies of such reports furnished to us and written representations that no other reports were required, during the fiscal year ended December 31, 2002, all Section 16(a) filing requirements applicable to its officers, directors and greater than 10% beneficial owners were complied with.

An Annual Statement of Beneficial Ownership on Form 5 is not required to be filed if there are no previously unreported transactions or holdings to report. Nevertheless, we are required to disclose the names of directors, officers and 10% shareholders who did not file a Form 5 unless we have obtained a written statement that no filing is required. At the date of this report, we had not obtained a written statement from Ironwood Capital Management, LLC.

Table of Contents

ITEM 11: EXECUTIVE COMPENSATION

The following table sets forth aggregate amounts of compensation paid or accrued by us for the years ended December 31, 2002, 2001 and 2000 for services rendered in all capacities, by our Chief Executive Officer and our four next most highly compensated executive officers as of December 31, 2002 (the "Named Executive Officers").

<div align="center">Summary Compensation Table</div>

| | | Annual Compensation | | Long–Term Compensation | |
| | | Base Salary | Bonus (1) | Number of Shares Underlying Options | All Other Compensation (2) |
| Name and Principal Position | Year | | | | |
|---|---|---|---|---|---|
| Harvey J. Berger, M.D. | 2002 | $ 433,000 | $   –0– | 150,000 | $    5,297 |
| *Chairman, Chief Executive* | 2001 | 395,000 | –0– | 115,000 | 3,318 |
| *Officer and President* | 2000 | 363,000 | –0– | 100,000 | 3,400 |
| David L. Berstein, Esq. | 2002 | 242,000 | 70,000 | 50,000 | 6,621 |
| *Senior Vice President and* | 2001 | 221,000 | 60,000 | 60,000 | 3,951 |
| *Chief Patent Counsel* | 2000 | 200,000 | 47,000 | 35,000 | 3,082 |
| Fritz Casselman | 2002 | 227,000 | 60,000 | 45,000 | 6,858 |
| *Senior Vice President and* | 2001 | 180,923 | –0– | 200,000 | 3,896 |
| *Chief Business Officer* | 2000 | –0– | –0– | –0– | –0– |
| Timothy P. Clackson, Ph.D. | 2002 | 213,000 | 65,000 | 75,000 | 8,146 |
| *Senior Vice President,* | 2001 | 165,577 | 65,000 | 60,000 | 3,979 |
| *Science and Technology* | 2000 | 129,770 | 31,000 | 25,000 | 2,595 |
| John D. Iuliucci, Ph.D. | 2002 | 242,000 | 70,000 | 70,000 | 7,210 |
| *Senior Vice President,* | 2001 | 221,000 | 60,000 | 55,000 | 5,016 |
| *Drug Development* | 2000 | 207,500 | 37,000 | –0– | 16,485 |

(1)    The amounts listed are for bonuses awarded and deferred under our 1997 Executive Compensation Plan, a non–qualified, unfunded, deferred compensation plan. The amounts awarded vest over a four–year period commencing on the first anniversary of the date of the award.

(2)    The amounts listed for each year consist of our matching contributions of up to $6,000 per year under our 401(k) Plan and, in the case of Mr. Berstein, Mr. Casselman, Dr. Clackson and Dr. Iuliucci, include the aggregate difference between the fair market value and the purchase cost of common stock purchased during fiscal year 2002 under our 1997 Employee Stock Purchase Plan. Dr. Berger is not eligible to participate in our Employee Stock Purchase Plan.

Table of Contents

**Stock Options**

The following table sets forth information regarding each stock option granted during the fiscal year ended December 31, 2002 to each of the Named Executive Officers.

### Stock Option Grants in Last Fiscal Year

| | Individual Grants | | | | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term (2) | |
| Name | Number of Shares Underlying Options Granted (1) | Percent of Total Options Granted to Employees in Fiscal Year | Exercise Price (per share) | Expiration Date | 5% | 10% |
|---|---|---|---|---|---|---|
| Harvey J. Berger, M.D. | 20,000(3) | 1.5% | $ 4.44 | 03/07/12 | $ 55,846 | $141,524 |
| | 130,000(4) | 9.7% | 4.05 | 06/12/12 | 331,113 | 839,105 |
| David L. Berstein, Esq. | 50,000(4) | 3.7% | 4.19 | 06/18/12 | 131,753 | 333,889 |
| Fritz Casselman | 45,000(4) | 3.4% | 4.19 | 06/18/12 | 118,578 | 300,500 |
| Timothy Clackson, Ph.D. | 25,000(4) | 1.9% | 4.05 | 06/13/12 | 63,676 | 161,366 |
| | 50,000(4) | 3.7% | 4.19 | 06/18/12 | 131,753 | 333,889 |
| John D. Iuliucci, Ph.D. | 20,000(3) | 1.5% | 4.44 | 03/07/12 | 55,846 | 141,524 |
| | 50,000(4) | 3.7% | 4.19 | 06/18/12 | 131,753 | 333,889 |

(1)     Options to purchase shares of our common stock under the 2001 Stock Plan.

(2)     These amounts, based on assumed annual appreciation rates of 5% and 10% as prescribed by the rules of the SEC, are for illustration purposes only and are not intended to forecast possible future appreciation, if any, of our stock price. Actual gains, if any, on stock option exercises will depend on the future performance of our common stock, the option holder's continued employment with us through the option exercise period and the date on which the option is exercised.

(3)     Options fully vested upon issuance.

(4)     Options vest annually over four years commencing on the first anniversary of the award.

63

Table of Contents

**Aggregated Option Exercises in Last Fiscal Year and Fiscal Year-End Option Values**

The following table provides information regarding the exercise of options by each of the Named Executive Officers during the fiscal year ended December 31, 2002. In addition, this table includes the number of shares covered by both exercisable and unexercisable stock options as of December 31, 2002 and the values of "in-the-money" options, which values represent the positive spread between the exercise price of any such option and either the actual or estimated fair market value of the underlying security as of December 31, 2002, as applicable.

**Aggregated Option Exercises in Last Fiscal Year and Fiscal Year-End Option Values**

| Name | Shares Acquired on Exercise (#) | Value Realized | No. of Shares Underlying Unexercised Options at Fiscal Year-End Exercisable/ Unexercisable | Value of Unexercised In-the-Money Options at Fiscal Year-End |
|---|---|---|---|---|
| Harvey J. Berger, M.D. | 235,714(1) 0 | $353,571 0 | 470,250/283,750(2) 1,402/0(3) | $324,363/16,538(4) 0/0(5) |
| David L. Berstein, Esq. | 0 0 | 0 0 | 158,214/117,500(2) 112/0(3) | 109,908/4,900(4) 0/0(5) |
| Fritz Casselman | 0 | 0 | 50,000/195,000(2) | 0/0(4) |
| Timothy P. Clackson, Ph.D. | 0 | 0 | 43,760/138,900(2) | 6,935/6,935(4) |
| John D. Iuliucci, Ph.D. | 58,928 0 | 129,858 0 | 202,750/96,200(2) 280/0(3) | 142,960/4,900(4) 0/0(5) |

(1)    Options exercised are shares of our common stock held by The Berger Family Trust.

(2)    Options to purchase shares of our common stock.

(3)    Options to purchase common stock of our subsidiary, AGTI.

(4)    Based upon a fair market value of $2.32 per share of common stock, which was the closing price of a share of our common stock on the NASDAQ National Market on December 31, 2002, less the per share exercise price.

(5)    Based upon an estimated value of the common stock of AGTI, for which there was no public market on December 31, 2002, less the per share exercise price.

**Director Compensation**

Effective as of 2001, members of the Board of Directors, other than Dr. Berger, receive an annual award of options to purchase 15,000 shares of our common stock, which are exercisable on the date of grant. On December 3, 2002, each such director was awarded options to purchase 15,000 shares of our common stock at $2.66 per share, pursuant to our stock options plans. Such options were fully exercisable on the grant date. Mr. Smith receives $4,000 per month for his services as Vice Chairman of the Board of Directors. No other non-employee director receives any cash compensation for service on the Board of Directors or its committees. Mr. LaMarche receives $42,000 per year for his services as a financial advisor to the Company. Directors are reimbursed for their expenses for each meeting they attend.

**Employment Agreements with Named Executive Officers**

Dr. Berger, our Chairman of the Board of Directors, Chief Executive Officer and President, has an employment agreement with us which commenced in January 1992 and terminates in December 2004. Dr. Berger's employment agreement is automatically renewable for successive three-year terms unless terminated by either party. The agreement provides that he shall be employed as our Chief Executive

**Table of Contents**

Officer and President, shall be nominated for election to our Board of Directors, serve as Chairman of the Board and receive an annual base salary during 2002 of $433,000, increasing each year by at least 10% of the preceding year's base salary. Dr. Berger is eligible each year to receive a discretionary bonus, determined by the Board of Directors, of up to 50% of his annual base salary. If we fail to renew the employment agreement, we are obligated to pay Dr. Berger, in addition to his compensation for the remainder of the term, a lump sum payment equal to two times Dr. Berger's annual salary for the final year of the term and to provide for the immediate exercisability of all stock options and other equity rights.

Dr. Berger's employment agreement provides that, if the agreement is terminated by either party upon the occurrence of certain events, including (i) our sale or merger (or stockholder approval of a merger agreement) or an acquisition of a substantial equity interest in us by a person or group of persons, (ii) if Dr. Berger is not elected to membership on our Board of Directors, named as Chairman or designated as Chief Executive Officer or ceases to be our highest ranking executive officer or ceases to control personnel decisions with respect to our employees, (iii) if we are in material breach of the terms of his employment agreement, (iv) if we are bankrupt or insolvent or (v) if we terminate Dr. Berger's employment agreement without cause, (1) we will pay Dr. Berger the greater of (x) any remaining salary payable during the term of the agreement plus the maximum possible bonus for each year remaining in the term (taking into account, in both cases, obligated 10% increases in salary) and (y) an amount equal to twice his current annual salary and maximum bonus for the current year of employment (the "Severance Payment") and (2) all of his stock options, stock awards and similar equity rights will immediately vest and become exercisable. We are not obligated to make the Severance Payment if we discharge Dr. Berger for cause. If the vesting of certain benefits and the payment of certain amounts by us to Dr. Berger are treated as payments in the nature of compensation that are contingent on a "change in control" (within the meaning of Section 280G of the Internal Revenue Code of 1986, as amended (the "Code")), the deductibility of such payments could, depending upon the aggregate amount of such payments, be disallowed pursuant to Section 280G of the Code and an excise tax could be imposed on Dr. Berger pursuant to Section 4999 of the Code for which he would, pursuant to the employment agreement, be indemnified by us on a net after–tax basis. The employment agreement contains a non–competition provision that is effective during the term of the agreement and, if Dr. Berger is terminated for cause, for a period of one year following the date of termination.

We also entered into employment agreements with Mr. Berstein, Mr. Casselman, Dr. Clackson and Dr. Iuliucci. The agreements provide for employment through December 31, 2005 for Mr. Berstein and Dr. Iuliucci and Dr. Clackson, and through February 28, 2004 for Mr. Casselman, at annual base salaries during 2002 of $242,000, $242,000, $213,000 and $227,000, respectively, increasing each year by an amount to be determined by the Board of Directors. In addition, each executive is eligible each year to receive a performance bonus, to be determined by the Board of Directors, of up to 30% of his annual base salary, which may be paid in the form of deferred compensation under the 1997 Executive Compensation Plan, awards of our stock options, or cash. The agreements are renewable for successive one–year terms with the mutual consent of the parties.

Our agreements with Mr. Berstein, Mr. Casselman, Dr. Clackson and Dr. Iuliucci also provide that (i) upon a change of control, such officers will be entitled to receive, upon termination by the officer within 90 days after the change in control, any remaining salary payable during the term or six months' salary, whichever is less, and all stock options held by such officers will immediately vest and become exercisable; and (ii) upon termination by us, without cause, such officer will be entitled to receive his current salary for the remaining period of the applicable term and all outstanding options that would have vested during such term shall vest immediately.

65

Table of Contents

**Compensation Committee Interlocks and Insider Participation**

During the fiscal year ended December 31, 2002, the Compensation Committee was comprised of Dr. Sobel and Messrs. Smith and Troubh. None of our executive officers serve on the Board of Directors or Compensation Committee of any entity that has one or more executive officers serving as a member of our Board of Directors or Compensation Committee. There is no family relationship between or among the members of our Board of Directors or executive officers.

**ITEM 12: SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDERS MATTERS**

The following table sets forth, as of March 12, 2003, certain information with respect to (i) each person (including any "group" as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), known to us to own beneficially more than 5% of our Common Stock, (ii) each of our directors, (iii) each executive officer named in the Summary Compensation Table under "Executive Compensation" and (iv) all directors and executive officers as a group. In accordance with the rules promulgated by the SEC, such ownership includes shares currently owned, as well as shares that the named person has the right to acquire within 60 days of March 12, 2003, including, but not limited to, shares that the named person has the right to acquire through the exercise of any option. Except as otherwise indicated, we believe that the stockholders listed in the table have sole voting and investment powers with respect to the Common Stock shown as beneficially owned by them based on information provided to us by these stockholders. Percentage ownership is based on 34,846,640 shares of our common stock outstanding as of March 12, 2003.

66

Table of Contents

### Stock Ownership by Management, Directors and 5% Beneficial Owners

| Name and Address ** | Number and Nature of Shares Beneficially Owned *** | | Percent of Class |
|---|---|---|---|
| Ironwood Capital Management, LLC | | | |
|    21 Custom House Street, Boston, MA 02110 | 3,876,595 | (1) | 11.1% |
| Harvey J. Berger, M.D. | 1,738,997 | (2) | 4.9% |
| David L. Berstein, Esq | 169,793 | (3) | * |
| Fritz Casselman | 106,203 | (4) | * |
| Timothy P. Clackson, Ph.D. | 61,700 | (5) | * |
| John D. Iuliucci, Ph.D. | 233,450 | (6) | * |
| Vaughn D. Bryson | 155,500 | (7) | * |
| Jay R. LaMarche | 477,856 | (8) | 1.4% |
| Frederick S. Schiff | 15,000 | (9) | * |
| Sandford D. Smith | 191,705 | (10) | * |
| Burton E. Sobel, M.D. | 20,000 | (11) | * |
| Raymond S. Troubh | 201,749 | (12) | * |
| Elizabeth H.S. Wyatt | 15,000 | (13) | * |
| All directors and executive officers as a group (15 persons) | 3,605,053 | (14) | 9.9% |

\*      Indicates less than one percent of the outstanding shares of common stock.

\*\*    Addresses are given for beneficial owners of more than 5% of the outstanding common stock only.

\*\*\*   Attached to each share of common stock is a preferred share purchase right to acquire a number of shares of common stock having a market value at that time of twice the rights' exercise price, which rights are not presently exercisable.

(1)    Such shares are held of record by Ironwood Capital Management, LLC. This information is based solely on review of Schedule 13G, which was filed with the Commission on March 14, 2003.

(2)    Includes 487,750 shares issuable upon exercise of stock options. Includes 771,428 shares of Common Stock held of record by The Berger Family Trust and 8,928 shares of Common Stock held of record by the Wolk Family Trust. Wendy S. Berger and Harvey J. Berger, as co–trustees of such trusts, have the right to vote and dispose of the shares held by such trusts; however, in certain circumstances, Wendy S. Berger as co–trustee will have sole voting power with respect to the shares held by each such trust. Includes 40,892 shares held by Wendy S. Berger, Dr. Berger's spouse, and 13,928 shares held by Dr. Berger's children.

(3)    Includes 163,214 shares issuable upon exercise of stock options.

(4)    Includes 100,000 shares issuable upon exercise of stock options.

(5)    Includes 48,910 shares issuable upon exercise of stock options.

(6)    Includes 207,750 shares issuable upon exercise of stock options.

(7)    Includes 113,000 shares issuable upon exercise of stock options.

(8)    Includes 147,750 shares issuable upon exercise of stock options and 6,696 shares held by Carol B. LaMarche, Mr. LaMarche's spouse.

(9)    Consists of 15,000 shares issuable upon exercise of stock options.

(10)   Includes 163,357 shares issuable upon exercise of stock options.

(11)   Consists of 20,000 shares issuable upon exercise of stock options.

(12)   Includes 145,500 shares issuable upon exercise of stock options.

(13)   Consists of 15,000 shares issuable upon exercise of stock options.

(14)   Includes 1,844,731 shares issuable upon the exercise of stock options held by all directors and executive officers as a group.

**Table of Contents**

**Securities Authorized for Issuance Under Equity Compensation Plans**

The following table sets forth information regarding compensation plans involving our common stock in effect as of December 31, 2002

**Equity Compensation Plan Information**

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options | Weighted Average Exercise Price of Outstanding Options | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (excluding securities reflected in first column) |
|---|---|---|---|
| Equity Compensation Plans Approved by Security Holders (a) | 5,392,311 | $ 4.51 | 794,044 |
| Equity Compensation Plans not Approved by Security Holders | N/A | N/A | N/A |
| Total | 5,392,311 | $ 4.51 | 794,044 |

(a)　　Consists of options to purchase 2,841,355 shares of common stock granted under our 1991 Stock Option Plans for Employees, Consultants and Directors, options to purchase 415,000 shares of common stock granted under our 1994 Stock Option Plan for Non–Employee Directors, and options to purchase 2,135,956 shares of common stock granted under our 2001 Stock Plan.

**ITEM 13: CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS**

Our subsidiary, AGTI, holds licenses from Harvard University, Stanford University and other universities relating to our ARGENT cell–signaling regulation technology, a key component of our programs in regulated protein therapy and cellular therapy and owns the intellectual property on our mTOR inhibitors derived from our ARGENT programs. The two directors of AGTI are also directors of the Company. Minority stockholders of AGTI, including Harvard University, Stanford University, several of our scientific advisors, and several current and former members of our management and Board of Directors, own 20% of the issued and outstanding capital stock of AGTI. We own the remaining 80% of the issued and outstanding capital stock of AGTI. Four members of our management team and/or Board of Directors own or have the right to acquire up to approximately 6.1% of the outstanding capital stock of AGTI. Harvey J. Berger, M.D. owns 3.4%; David L. Berstein, Esq. owns 0.3%; John D. Iuliucci, Ph.D. owns 0.7%; and Jay R. LaMarche owns 1.7%. AGTI has a right of first refusal on the sale to third parties of 73% of the minority stockholders' AGTI shares. AGTI does not have a call option, or a right to require the minority stockholders to sell their shares to us, for any of these shares. As part of the formation of AGTI, we entered into agreements with AGTI to provide for the operations of AGTI.

As part of an employment agreement entered into as of March 4, 2002, we extended a $75,000 relocation loan to Laurie A. Allen, our Senior Vice President and Chief Legal Officer and Secretary, pursuant to a promissory note, and secured by a second mortgage on her residence in Massachusetts. The loan will be forgiven on the third anniversary of the issue date, based on Ms. Allen's continuous service with us. In the event that Ms. Allen terminates her employment prior to such third anniversary, the principal is due and payable within ninety days thereafter, and any unpaid balance as of the due date shall bear interest at a rate of 7% per annum.

Table of Contents

**ITEM 14: CONTROLS AND PROCEDURES**

(a) *Evaluation of Disclosure Controls and Procedures.* Our executive officer and principal financial officer, after evaluating the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a−14(c) and 15d−14(c)) as of a date within 90 days of the filing date of this Annual Report on Form 10−K, have concluded that, based on such evaluation, our disclosure controls and procedures were adequate and effective to ensure that material information relating to the Company, including its consolidated subsidiaries, was made known to them by others within those entities, particularly during the period in which this Annual Report on Form 10−K was being prepared.

(b) *Changes in Internal Controls.* There were no significant changes in our internal controls or in other factors that could significantly affect these controls subsequent to the date of their evaluation, nor were there any significant deficiencies or material weaknesses in the our internal controls. Accordingly, no corrective actions were required or undertaken.

69

**Table of Contents**

**PART IV**

**ITEM 15: EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8–K**

    (a)(1)    The following Consolidated Financial Statements, Notes thereto and Independent Auditors' Report have been presented in Item 8:

        Independent Auditors' Report

        Consolidated Balance Sheets

        Consolidated Statements of Operations

        Consolidated Statements of Stockholders' Equity

        Consolidated Statements of Cash Flows

        Notes to Consolidated Financial Statements

    (a)(2)    Financial Statement Schedules:

Schedules have been omitted because of the absence of conditions under which they are required or because the required information is included in the financial statements or notes thereto.

    (a)(3)    The Exhibits listed in the Exhibit Index are filed herewith in the manner set forth therein.

    (b)    Reports on Form 8–K

We filed a Current Report on Form 8–K on November 1, 2002 announcing that our novel anemia product candidate produced therapeutically effective amounts of the hormone erythropoietin (EPO) more than four years after one–time injection on monkeys of our Company's patented gene complex.

We filed a Current Report on Form 8–K on November 6, 2002 announcing a non–exclusive worldwide license agreement with Bristol–Myers Squibb Company granting Bristol–Myers Squibb the right to conduct pharmaceutical research and development covered by our NF–κB drug discovery patents.

We filed a Current Report on Form 8–K on November 12, 2002 announcing the commencement of the offering of 2.2 million shares of our common stock, par value $0.001 per share, to new and existing investors at a purchase price of $2.75 per share pursuant to a Form S–3 Shelf Registration Statement (Registration No. 333–63708) and the related Prospectus and Prospectus Supplement. Rodman & Renshaw, Inc. served as placement agent for the offering.

We filed a Current Report on Form 8–K on November 12, 2002 announcing that we had entered into definitive agreements with selected existing and new institutional investors for the purchase of 2.2 million shares of our common stock, referred to in the previous Current Report on Form 8–K, at $2.75 per share for gross proceeds of $6.1 million.

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Cambridge and Commonwealth of Massachusetts on the 14th of March, 2003.

ARIAD PHARMACEUTICALS, INC

By: /s/ Harvey J. Berger, M.D.

Name: Harvey J. Berger, M.D.
Title: Chairman, Chief Executive Officer and President

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
| --- | --- | --- |
| /s/ Harvey J. Berger, M.D.<br><br>Harvey J. Berger, M.D. | Chairman of the Board of Directors, Chief Executive Officer and President (Principal Executive Officer) | March 14, 2003 |
| /s/ Sandford D. Smith<br><br>Sandford D. Smith | Vice Chairman of the Board of Directors | March 14, 2003 |
| /s/ Edward M. Fitzgerald<br><br>Edward M. Fitzgerald | Senior Vice President, Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer) | March 14, 2003 |
| /s/ Vaughn D. Bryson<br><br>Vaughn D. Bryson | Director | March 14, 2003 |
| /s/ Jay R. LaMarche<br><br>Jay R. LaMarche | Director | March 14, 2003 |
| /s/ Frederick S. Schiff<br><br>Frederick S. Schiff | Director | March 14, 2003 |
| /s/ Burton E. Sobel, M.D.<br><br>Burton E. Sobel, M.D. | Director | March 14, 2003 |
| /s/ Raymond S. Troubh<br><br>Raymond S. Troubh | Director | March 14, 2003 |
| /s/ Elizabeth H.S. Wyatt<br><br>Elizabeth H.S. Wyatt | Director | March 14, 2003 |

71

Table of Contents

**CERTIFICATIONS**

I, Harvey J. Berger, M.D., certify that:

1.    I have reviewed this annual report on Form 10–K of ARIAD Pharmaceuticals, Inc.;

2.    Based on my knowledge, this annual report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.    Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–14 and 15d–14) for the registrant and have:

     a)    designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

     b)    evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

     c)    presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

     a)    all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

     b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.    The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

March 14, 2003

/s/ Harvey J. Berger, M.D.

Harvey J. Berger, M.D.
Chairman of the Board of Directors, Chief Executive Officer
and President

Table of Contents

## CERTIFICATIONS

I, Edward M. Fitzgerald, certify that:

1.  I have reviewed this annual report on Form 10−K of ARIAD Pharmaceuticals, Inc.;

2.  Based on my knowledge, this annual report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a−14 and 15d−14) for the registrant and have:

    a)  designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    b)  evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

    c)  presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    a)  all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

    b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.  The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

March 14, 2003

/s/ Edward M. Fitzgerald

Edward M. Fitzgerald
Senior Vice President,
Chief Financial Officer

EXHIBIT INDEX

| Exhibit No. | Title |
|---|---|
| 3.1 | Certificate of Incorporation of the Company, as amended. (1) |
| 3.2 | Restated By-laws of the Company, as amended. (6) |
| 3.3 | Amendment of Certificate of Incorporation of the Company, dated April 8, 1994. (2) |
| 3.4 | Amendment of Certificate of Incorporation of the Company, dated October 4, 1994. (5) |
| 3.5 | Certificate of Designations in respect of Series A Preferred Stock of the Company dated June 19, 2000. (4) |
| 4.1 | Principal Stockholders' Agreement, dated as of January 5, 1992, among ARIAD Pharmaceuticals, Inc., David Blech, David Blech as trustee of The Blech Family Trust, Mark S. Germain, Harvey J. Berger, Harvey J. Berger and Wendy S. Berger as Trustees of the Berger Family Trust, Avalon Ventures and Avalon Ventures IV. (1) |
| 4.2 | Rights Agreement, dated as of June 8, 2000, between the Company and State Street Bank and Trust Company, which includes the Form of Certificate of Designations in respect of the Series A Preferred Stock, as Exhibit A, the Form of Right Certificate as Exhibit B and the Summary of Rights to Purchase Series A Preferred Stock as Exhibit C. Pursuant to the Rights Agreement, Right Certificates will not be mailed until after the Separation Date (as defined therein). (4) |
| 4.3 | Stock Purchase Agreement, dated as of April 24, 1995, between ARIAD Pharmaceuticals, Inc. and Biotech Target S.A. (7) |
| 10.1 | Lease Agreement, dated January 8, 1992, between ARIAD Pharmaceuticals, Inc. and Forest City Cambridge, Inc. (1) |
| 10.2+ | Executive Employment Agreement, dated as of January 1, 1992, between ARIAD Pharmaceuticals, Inc. and Harvey J. Berger, M.D. (1) |
| 10.3+ | Executive Employment Agreement, dated as of January 1, 1992, between ARIAD Pharmaceuticals, Inc. and Jay R. LaMarche. (1) |
| 10.4 | Loan and Security Agreement, dated September 23, 1992, by and between ARIAD Pharmaceuticals, Inc., ARIAD Corporation and BayBank Boston, N.A. and related instruments and documents. (1) |
| 10.5+ | ARIAD Pharmaceuticals, Inc. 1991 Stock Option Plan for Employees, as amended. (5) |
| 10.6+ | ARIAD Pharmaceuticals, Inc. 1991 Stock Option Plan for Directors. (1) |
| 10.7+ | ARIAD Retirement Savings Plan. (1) |
| 10.8** | Amended and Restated Agreement, dated as of December 12, 1997, between The Board of Trustees of The Leland Stanford Junior University and ARIAD Gene Therapeutics, Inc. (9) |
| 10.9+ | Amendment, dated April 19, 1994, to Executive Employment Agreement between ARIAD Pharmaceuticals, Inc. and Harvey J. Berger, M.D.(3) |
| 10.10+ | Amendment, dated March 2, 1994, to Executive Employment Agreement between ARIAD Pharmaceuticals, Inc. and Jay R. LaMarche. (3) |
| 10.11+ | Amendment No. 2, dated June 30, 1994, to Executive Employment Agreement between ARIAD Pharmaceuticals, Inc. and Harvey J. Berger, M.D. (5) |
| 10.12+ | ARIAD Pharmaceuticals, Inc. 1994 Stock Option Plan for Non-Employee Directors. (5) |
| 10.13** | License Agreement, dated as of September 12, 1996, between Mochida Pharmaceuticals Co., Ltd. and ARIAD Pharmaceuticals, Inc. (8) |

74

<u>Table of Contents</u>

| Exhibit No. | Title |
|---|---|
| 1014+ | Amendment, dated January 1, 1997, to Executive Employment Agreement between ARIAD Pharmaceuticals, Inc. and Harvey J. Berger, M.D. (23) |
| 10.15+ | Amendment, dated January, 1, 1997, to Executive Employment Agreement between ARIAD Pharmaceuticals, Inc. and Jay R. LaMarche (23) |
| 10.16+ | ARIAD Pharmaceuticals, Inc. 1997 Employee Stock Purchase Plan. (23) |
| 10.17+ | Amendment to the 1991 Stock Option Plan for Employees and Consultants. (23) |
| 10.18+ | Amendment to the 1994 Stock Option Plan for Non–Employee Directors. (23) |
| 10.19 | Fourth Amendment to Loan and Security Agreement, dated June 27, 1997, with BankBoston, N.A. as successor in interest to BayBank, N.A. (23) |
| 10.20** | License Agreement, dated July 17, 1997, between ARIAD Pharmaceuticals, Inc. and Mitotix, Inc. (24) |
| 10.21** | Technology Purchase and Sale Agreement and related agreements, dated July 17, 1997, between ARIAD Pharmaceuticals, Inc. and Mitotix, Inc. (24) |
| 10.22+ | ARIAD Pharmaceuticals, Inc. 1997 Executive Compensation Plan. (9) |
| 10.23+ | Amendment, dated November 10, 2000, to Executive Employment Agreement between ARIAD Pharmaceuticals, Inc. and Jay R. LaMarche. (14) |
| 10.24+ | Executive Employment Agreement, dated January 24, 2001, between ARIAD Pharmaceuticals, Inc. and Fritz Casselman. (15) |
| 10.25 | Common Stock Purchase Agreement, dated as of June 27, 2000, by and between ARIAD Pharmaceuticals, Inc. and Acqua Wellington North American Equities Fund, Ltd. (10) |
| 10.26 | Common Stock Purchase Agreement, dated as of June 27, 2000, by and between ARIAD Pharmaceuticals, Inc. and the Purchaser named therein. (10) |
| 10.27+ | Executive Employment Agreement, dated May 1, 1992, Fourth Amendment to Employment Agreement dated June 8, 2000, Third Amendment to Employment Agreement dated January 1, 1999, and Amendments to Employment Agreements dated January 1, 1997 and March 2, 1994 between ARIAD Pharmaceuticals, Inc. and John Iuliucci, Ph.D. (11) |
| 10.28+ | Executive Employment Agreement, dated August 1, 1993, Third Amendment to Employment Agreement dated June 8, 2000, and Amendments to Employment Agreements dated January 1, 1997 and March 2, 1994 between ARIAD Pharmaceuticals, Inc. and David L. Berstein, J.D.(11) |
| 10.29** | Restructuring Agreement, dated December 31, 1999, by and between Hoechst Marion Roussel (France) and ARIAD Pharmaceuticals, Inc. (**)(12) |
| 10.30** | Restructuring Agreement, dated December 31, 1999, by and among Aventis Pharmaceuticals, Inc., the Hoechst–ARIAD Genomics Center, LLC and ARIAD Pharmaceuticals, Inc. (**)(12) |
| 10.31 | Settlement and Repurchase Agreement by and among ARIAD Pharmaceuticals, Inc., Promethean Investment Group LLC and HFTP Investments, LLC, dated as of January 14, 2000. (13) |
| 10.32+ | Amendment, dated as of January 1, 2001, to Executive Employment Agreement with John Iuliucci, Ph.D. (15) |
| 10.33+ | Amendment, dated as of January 1, 2001, to Executive Employment Agreement with David Berstein, Esq. (15) |
| 10.34+ | ARIAD Pharmaceuticals, Inc. 2001 Stock Plan. (16) |
| 10.35 | December 2001 Amendment to Loan and Security Agreement, dated December 26, 2001, by and among ARIAD Pharmaceuticals, Inc., ARIAD Corporation, ARIAD Gene Therapeutics, Inc. and Fleet National Bank, as successor in interest to BankBoston, N.A.,which includes as Exhibit A, the Second Amended and Restated Secured Term Note dated as of December 26, 2001(17) |
| 10.36 | Master Security Agreement, dated as of December 27, 2001, by and between ARIAD Pharmaceuticals, Inc. and General Electric Capital Corporation. (17) |
| 10.37 | Financial Covenants Addendum No. 001 to Master Lease Agreement between ARIAD Pharmaceuticals, Inc. and General Electric Capital Corporation. (17) |
| 10.38+ | Promissory Note to General Electric Capital Corporation dated as of December 28, 2001. (17) |

Table of Contents

| Exhibit No. | Title |
|---|---|
| 10.39 | Revised and Restated Research and Development Agreement, dated as of March 15, 2002, by and between ARIAD Pharmaceuticals, Inc. and ARIAD Corporation. (17) |
| 10.40 | Revised and Restated Research and Development Agreement, dated as of March 15, 2002, by and between ARIAD Gene Therapeutics, Inc. and ARIAD Corporation. (17) |
| 10.41+ | Executive Employment Agreement, dated as of March 4, 2002, between ARIAD Pharmaceuticals, Inc. and Laurie A. Allen, Esq. (17) |
| 10.42 | Stock Transfer Agreement between ARIAD Gene Therapeutics, Inc. and the individuals listed on Exhibit A thereto. (17) |
| 10.43 | Notice of Extension of Lease, dated October 2, 2001, from ARIAD Corporation to Forest City Commercial Group. (17) |
| 10.44+ | Executive Employment Agreement, dated May 6, 2002, between ARIAD Pharmaceuticals, Inc. and Edward M. Fitzgerald (18) |
| 10.45+ | ARIAD Pharmaceuticals, Inc. 2001 Stock Plan, as amended (19) |
| 10.46+ | Promissory Note issued pursuant to Executive Employment Agreement, dated as of March 4, 1992, by and between ARIAD Pharmaceuticals, Inc. and Laurie A. Allen, Esq., dated as of July 24, 2002 (20) |
| 10.47 | Letter Agreement, dated November 7, 2002, between ARIAD Pharmaceuticals, Inc. and Rodman & Renshaw, Inc. (21) |
| 10.48 | Amendment to Loan and Security Agreement, dated September 30, 2002, by and among ARIAD Pharmaceuticals, Inc., ARIAD Corporation, ARIAD Gene Therapeutics, Inc. and Fleet National Bank. (22) |
| 10.49+* | Executive Employment Agreement, dated June 8, 2000, between ARIAD Pharmaceuticals, Inc. and Timothy Clackson, Ph.D. |
| 10.50+* | Amendment to Employment Agreement, dated July 1, 2001, between ARIAD Pharmaceuticals, Inc. and Timothy Clackson, Ph.D. |
| 10.51+* | Amendment to Employment Agreement, dated July 12, 2002, between ARIAD Pharmaceuticals, Inc. and Timothy Clackson, Ph.D. |
| 10.52+* | Executive Employment Agreement, dated July 1, 2002, between ARIAD Pharmaceuticals, Inc. and Thomas A. Pearson. |
| 10.53* | Form of Stock Purchase Agreement, dated November 8, 2002, between ARIAD Pharmaceuticals, Inc. and each of the parties thereto. |
| 10.54* | Letter Agreement, dated December 27, 2002, by and among ARIAD Pharmaceuticals, Inc., ARIAD Corporation, ARIAD Gene Therapeutics, Inc. and Fleet National Bank. |
| 10.55* | Agreement of Sublease, dated December 31, 1999, between ARIAD Corporation and Aventis Pharmaceuticals Inc. |
| 10.56* | First Amendment to Sublease, dated July 26, 2002, between ARIAD Corporation and Aventis Pharmaceuticals Inc. |
| 21.1 | Subsidiaries of the Company. (3) |
| 23.1* | Consent of Deloitte & Touche LLP. |
| 99.1* | Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

**Notes to Exhibits:**

| | |
|---|---|
| (+) | Management Contract or Compensatory Plan or Arrangement |
| (*) | Filed Herewith. |
| (**) | Confidential treatment has been granted by the Securities and Exchange Commission as to certain portions. |
| (1) | Incorporated by reference to Registration Statement on Form 10 of the Company filed with the Securities and Exchange Commission on June 25, 1993. |
| (2) | Incorporated by reference to Form 10–K of the Company for the fiscal year ended December 31, 1993 filed with the Securities and Exchange Commission on April 15, 1994. |
| (3) | Incorporated by reference to Registration Statement on Form S–1 of the Company (No. 33–76414) filed with the Securities and Exchange Commission on March 11, 1994. |

| | |
|---|---|
| (4) | Incorporated by reference to Form 8–A of the Company filed with the Securities and Exchange Commission on June 19, 2000. |
| (5) | Incorporated by reference to Form 10–K of the Company for the fiscal year ended December 31, 1994 filed with the Securities and Exchange Commission on March 31, 1995. |
| (6) | Incorporated by reference to Amendment No. 1 to the Registration Statement on Form S–3 of the Company (No. 333–38664) filed with the Securities and Exchange Commission on June 23, 2000. |
| (7) | Incorporated by reference to Form 10–K of the Company for the fiscal year ended December 31, 1995 filed with the Securities and Exchange Commission on March 8, 1996. |
| (8) | Incorporated by reference to Forms 10–Q of the Company filed with the Securities and Exchange Commission on May 3, 1997. |
| (9) | Incorporated by reference to Form 10–K of the Company for the fiscal year ended December 31, 1997 filed with the Securities and Exchange Commission on March 10, 1998. |
| (10) | Incorporated by reference to Form 8–K of the Company filed with the Securities and Exchange Commission on July 7, 2000. |
| (11) | Incorporated by reference to Form 10–Q of the Company filed with the Securities and Exchange Commission on August 10, 2000. |
| (12) | Incorporated by reference to Form 8–K of the Company, dated December 31, 1999 and filed with the Securities and Exchange Commission on January 18, 2000. |
| (13) | Incorporated by reference to Form 8–K of the Company, dated January 14, 2000 and filed with the Securities and Exchange Commission on January 18, 2000. |
| (14) | Incorporated by reference to Form 10–K of the Company for the fiscal year ended December 31, 2000 filed with the Securities and Exchange Commission on March 29, 2001. |
| (15) | Incorporated herein by reference to Form 10–Q of the Company filed with the Securities and Exchange Commission on May 14, 2001. |
| (16) | Incorporated herein by reference to Form S–8 of the Company (No. 333–63706) filed with the Securities and Exchange Commission on June 22, 2001. |
| (17) | Incorporated by reference to Form 10–K of the Company for the fiscal year ended December 31, 2001 filed with the Securities and Exchange Commission on March 22, 2002. |
| (18) | Incorporated herein by reference to Form 10–Q of the Company filed with the Securities and Exchange Commission on May 9, 2002. |
| (19) | Incorporated by reference to Registration Statement on Form S–8 of the Company (No. 333–90480) filed with the Securities and Exchange Commission on June 14, 2002. |
| (20) | Incorporated herein by reference to Form 10–Q of the Company filed with the Securities and Exchange Commission on July 31, 2002. |
| (21) | Incorporated herein by reference to Form 8–K of the Company filed with the Securities and Exchange Commission on November 12, 2002. |
| (22) | Incorporated herein by reference to Form 10–Q of the Company filed with the Securities and Exchange Commission on November 14, 2002. |
| (23) | Incorporated by reference to Form 10–Q of the Company filed with the Securities and Exchange Commission on August 12, 1997. |
| (24) | Incorporated by reference to Form 10–Q of the Company filed with the Securities and Exchange Commission on November 12, 1997. |

# ARIAD PHARMACEUTICALS INC (ARIA)

26 LANDSDOWNE ST
CAMBRIDGE, MA 02139
617. 494.0400

# EX−10.49

**EX−10.49 AGREEMENT DATED 6/8/2000**
**10−K Filed on 03/14/2003 − Period: 12/31/2002**
File Number 333−76486



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 10.49

## EXECUTIVE EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT (the "Agreement") made as of June 8, 2000 between ARIAD Pharmaceuticals, Inc. (the "Company") a Delaware corporation, and Timothy Clackson, Ph.D. (the "Employee").

1.    Employment, Duties and Acceptance.

1.1    The Company hereby employs the Employee, for the Term (as hereinafter defined), to render full-time services to the Company, and to perform such duties as he shall reasonably be directed by the Chief Executive Officer of the Company to perform. The Employee's title shall be designated by the Chief Executive Officer and initially shall be Vice President, Gene Therapy.

1.2    The Employee hereby accepts such employment and agrees to render the services described above.

1.3    The principal place of employment of the Employee hereunder shall be in the greater Boston, Massachusetts area, or other locations reasonably acceptable to the Employee. The Employee acknowledges that for limited periods of time he may be required to provide services to the Company outside of the Boston, Massachusetts area.

1.4    Notwithstanding anything to the contrary herein, although the Employee shall provide services as a full-time employee, it is understood that the Employee may (a) have an academic appointment and (b) participate in professional activities (collectively, "Permitted Activities'); provided, however, that such Permitted Activities do not interfere with the Employee's duties to the Company.

1

2.    Term of Employment.

The term of the Employee's employment under this Agreement (the "Term") shall commence July 1, 2000 (the "Effective Date") and shall end on December 31, 2001 unless sooner terminated pursuant to Section 4 or 5 of this Agreement; provided that this Agreement shall automatically be renewed for successive one-year terms (the Term and, if the period of employment is so renewed, such additional period(s) of employment are collectively referred to herein as the "Term") unless terminated by written notice given by either party to the other at least ninety days prior to the end of the applicable Term.

3.    Compensation.

3.1    As full compensation for all services to be rendered pursuant to this Agreement, the Company agrees to pay the Employee, during the Term, a salary at the fixed rate of $135,000 per annum during the first year of the Term and increased each year thereafter, by amounts, if any, to be determined by the Board of Directors of the Company (the "Board"), in its sole discretion, payable in equal biweekly installments, less such deductions or amounts to be withheld as shall be required by applicable law and regulations.

3.2    Each year, the Company shall pay the Employee a discretionary bonus of up to 30% of base salary, which bonus shall be determined annually by the Board. The bonus, if any, may be paid in the form of stock options, stock awards, deferred compensation or cash, as determined by the Board.

3.3    The Company shall pay or reimburse the Employee for all reasonable expenses actually incurred or paid by him during the Term in the performance of his services under this Agreement,

2

upon presentation of expense statements or vouchers or such other supporting information as it may require.

      3.4    The Employee shall be eligible under any incentive plan, stock award plan, bonus, participation or extra compensation plan, pension, group health, disability and life insurance or other so-called "fringe" benefits which the Company provides for its executives at the comparable level. All options and stock awards granted to the Employee shall be subject to a vesting schedule which shall be determined by the Compensation and Stock Option Committee of the Board. The options and awards, if any, to be granted to the Employee shall also be subject to the terms of a stock option plan and certificate and stock award plan and certificate, respectively. Any unvested options shall be forfeited to the Company in the event (a) this Agreement is terminated by the Company for Cause pursuant to Section 4 herein, or (b) either party elects not to renew this Agreement pursuant to Section 2 herein.

    4.    Termination by the Company.

      The Company may terminate this Agreement, if any one or more of the following shall occur:

      (a)    The Employee shall die during the Term; provided, however, the Employee's legal representatives shall be entitled to receive the compensation provided for hereunder to the last day of the month in which his death occurs.

      (b)    The Employee shall become physically or mentally disabled, whether totally or partially, so that he is unable substantially to perform his services hereunder for (i) a period of 180 consecutive days, or (ii) for shorter periods aggregating 180 days during any twelve month period.

(c)     The Employee acts, or fails to act, in a manner that provides Cause for termination. For purposes of this Agreement, the term "Cause" means (i) the failure by the Employee to perform any of his material duties hereunder, (ii) the conviction of the Employee of any felony involving moral turpitude, (iii) any acts of fraud or embezzlement by the Employee involving the Company or any of its Affiliates, (iv) violation of any federal, state or local law, or administrative regulation related to the business of the Company, (v) a conflict of interest, (vi) conduct that could result in publicity reflecting unfavorably on the Company in a material way, (vii) failure to comply with the written policies of the Company, or (viii) a breach of the terms of this Agreement by the Employee. The Company shall provide the Employee written notice of termination pursuant to this Section 4, and Employee shall have 30 days to cure or remedy such failure or breach, in which case this Agreement shall not be terminated.

    5.     Termination by the Employee.

        5.1     The Employee may terminate this Agreement, if any one or more of the following shall occur:

        (a)     a material breach of the terms of this Agreement by the Company and such breach continues for 30 days after the Employee gives the Company written notice of such breach;

        (b)     the Company shall make a general assignment for benefit of creditors; or any proceeding shall be instituted by the Company seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under law

4

relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property or the Company shall take any corporate action to authorize any of the actions set forth above in this subsection 5(b);

        (c)    an involuntary petition shall be filed or an action or proceeding otherwise commenced against the Company seeking reorganization, arrangement or readjustment of the Company's debts or for any other relief under the Federal Bankruptcy Code, as amended, or under any other bankruptcy or insolvency act or law, state or federal, now or hereafter existing and remain undismissed or unstayed for a period of 30 days; or

        (d)    a receiver, assignee, liquidator, trustee or similar officer for the Company or for all or any part of its property shall be appointed involuntarily.

      6.    Severance.

        If (i) the Company terminates this Agreement without Cause or (ii) the Employee terminates this Agreement pursuant to Section 5.1(a), then: (1) except in the case of death or disability, the Company shall continue to pay Employee his current salary for the remaining period of the applicable Term; (2) all options granted to the Employee that would have vested during the Term shall vest immediately prior to such termination; and (3) the Company shall continue to provide all benefits subject to COBRA at its expense for up to one year.

      7.    Other Benefits.

        In addition to all other benefits contained herein, the Employee shall be entitled to:

<div align="center">5</div>

        (a)    Vacation time of four weeks per year taken in accordance with the vacation policy of the Company.

        (b)    After six years of employment, one three-month period of fully paid leave of absence in accordance with Company policies in place at that time; it being understood that such policies may restrict the Employee from taking such leave of absence until a time that is acceptable to the Company and may include other such limitations.

        (c)    Group health, disability and life insurance.

        (d)    The Company shall provide the Employee with an automobile allowance of $750 per month.

    8.    Confidentiality.

        8.1    The Employee acknowledges that, during the course of performing his services hereunder, the Company shall be disclosing information to the Employee related to the Company's Field of Interest, Inventions, projects and business plans, as well as other information (collectively, "Confidential Information"). The Employee acknowledges that the Company's business is extremely competitive, dependent in part upon the maintenance of secrecy, and that any disclosure of the Confidential Information would result in serious harm to the Company.

        8.2    The Employee agrees that the Confidential Information only shall be used by the Employee in connection with his activities hereunder as an employee of the Company, and shall not be used in any way that is detrimental to the Company.

        8.3    The Employee agrees not to disclose, directly or indirectly, the Confidential Information to any third person or entity, other than representatives or agents of the Company. The Employee shall

treat all such information as confidential and proprietary property of the Company.

8.4    The term "Confidential Information" does not include information that (a) is or becomes generally available to the public other than by disclosure in violation of this Agreement, (b) was within the Employee's possession prior to being furnished to such Employee, (c) becomes available to the Employee on a nonconfidential basis or (d) was independently developed by the Employee without reference to the information provided by the Company.

8.5    The Employee may disclose any Confidential Information that is required to be disclosed by law, government regulation or court order. If disclosure is required, the Employee shall give the Company advance notice so that the Company may seek a protective order or take other action reasonable in light of the circumstances.

8.6    Upon termination of this Agreement, the Employee shall promptly return to the Company all materials containing Confidential Information, as well as data, records, reports and other property, furnished by the Company to the Employee or produced by the Employee in connection with services rendered hereunder. Notwithstanding such return or any of the provisions of this Agreement, the Employee shall continue to be bound by the terms of the confidentiality provisions contained in this Section 8 for a period of three years after the termination of this Agreement.

8.7    In connection with his employment by the Company, the Employee hereby acknowledges that he may enter into more than one agreement with regard to (a) the confidentiality of certain

7

books, records, documents and business, (b) rights to certain inventions, proprietary information, and writings, (c) publication of certain materials, and (d) other related matters (the "Confidential Matters") of the Company (the "Confidentiality Agreements"). In order to clarify any potential conflicts between certain respective provisions of such Confidentiality Agreements, the Employee and the Company hereby agree that, as among such Confidentiality Agreements, the provision (or part thereof) in any such Confidentiality Agreement which affords the greatest protection to the Company with respect to the Confidential Matters shall control.

     9.    Inventions Discovered by the Employee While Performing Services Hereunder.

     During the Term, the Employee shall promptly disclose to the Company any invention, improvement, discovery, process, formula, or method or other intellectual property, whether or not patentable, whether or not copyrightable (collectively, "Inventions") made, conceived or first reduced to practice by the Employee, either alone or jointly with others, while performing service hereunder. The Employee hereby assigns to the Company all of his right, title and interest in and to any such Inventions. During and after the Term, the Employee shall execute any documents necessary to perfect the assignment of such Inventions to the Company and to enable the Company to apply for, obtain, and enforce patents and copyrights in any and all countries on such Inventions. The Employee hereby irrevocably designates the Chief Patent Counsel to the Company as his agent and attorney-in-fact to execute and file any such document and to do all lawful acts necessary to apply for and obtain patents and copyrights and to enforce the Company's

rights under this paragraph. This Section 9 shall survive the termination of this Agreement.

    10.    Non-Competition and Non-Solicitation.

    During the Term and for a period of one year following the date of termination or nonrenewal for any reason (other than termination pursuant to Section 5.1(a): (a) the Employee shall not in the United States or in any country in which the Company shall then be doing business, directly or indirectly, enter the employ of, or render any services to, any person, firm or corporation engaged in any business competitive with the business of the Company or of any of its subsidiaries or affiliates of which the Employee may become an employee or officer during the Term; he shall not engage in such business on his own account; and he shall not become interested in any such business, directly or indirectly, as an individual, partner, shareholder, director, officer, principal, agent, employee, trustee, consultant, or any other relationship or capacity; provided, however, that nothing contained in this Section 10 shall be deemed to prohibit the Employee from acquiring, solely as an investment, shares of capital stock of any public corporation; (b) neither the Employee nor any Affiliate of the Employee shall solicit or utilize, or assist any person in any way to solicit or utilize, the services, directly or indirectly, of any of the Company's directors, consultants, members of the Board of Scientific and Medical Advisors, officers or employees (collectively, "Associates of the Company"). This nonsolicitation and nonutilization provision shall not apply to Associates of the Company who have previously terminated their relationship with the Company.

10.1  If the Employee commits a breach, or threatens to commit a breach, of any of the provisions of this Section 10, the Company shall have the following rights and remedies:

10.1.1 The right and remedy to have the provisions of this Agreement specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to the Company and that money damages shall not provide an adequate remedy to the Company; and

10.1.2 The right and remedy to require the Employee to account for and pay over to the Company all compensation, profits, monies, accruals, increments or other benefits (collectively "Benefits") derived or received by the Employee as the result of any transactions constituting a breach of any of the provisions of the preceding paragraph, and the Employee hereby agrees to account for and pay over such Benefits to the Company. Each of the rights and remedies enumerated above shall be independent of the other, and shall be severally enforceable, and all of such rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available to the Company under law or in equity.

10.2  If any of the covenants contained in Section 8, 9 or 10, or any part thereof, is hereafter construed to be invalid or unenforceable, the same shall not affect the remainder of the covenant or covenants, which shall be given full effect without regard to the invalid portions.

10.3  If any of the covenants contained in Section 8, 9 or 10, or any part thereof, is held to be unenforceable because of the

10

duration of such provision or the area covered thereby, the parties agree that the court making such determination shall have the power to reduce the duration and/or area of such provision and, in its reduced form, such provision shall then be enforceable.

10.4  The parties hereto intend to and hereby confer jurisdiction to enforce the covenants contained in Sections 8, 9 and 10 upon the courts of any state within the geographical scope of such covenants. In the event that the courts of any one or more of such states shall hold any such covenant wholly unenforceable by reason of the breadth of such scope or otherwise, it is the intention of the parties hereto that such determination not bar or in any way affect the Company's right to the relief provided above in the courts of any other states within the geographical scope of such covenants, as to breaches of such covenants in such other respective jurisdictions, the above covenants as they relate to each state being, for this purpose, severable into diverse and independent covenants.

11.  Indemnification.

The Company shall indemnify the Employee, to the maximum extent permitted by applicable law, against all costs, charges and expenses incurred or sustained by him in connection with any action, suit or proceeding to which he may be made a party by reason of his being an officer, director or employee of the Company or of any subsidiary or affiliate of the Company. The Company shall provide, subject to its availability upon reasonable terms (which determination shall be made by the Board) at its expense, directors and officers insurance for the Employee in reasonable amounts. Determination with respect to (a) the

11

availability of insurance upon reasonable terms and (b) the amount of such insurance coverage shall be made by the Board in its sole discretion.

    12.    Notices.

        All notices, requests, consents and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if sent by prepaid telegram (confirmed delivery by the telegram service), private overnight mail service (delivery confirmed by such service), registered or certified mail (return receipt requested), or delivered personally, as follows (or to such other address as either party shall designate by notice in writing to the other in accordance herewith):

    If to the Company:

    ARIAD Pharmaceuticals, Inc.
    26 Landsdowne Street
    Cambridge, Massachusetts 02139
    Attention: Chief Executive Officer
    Telephone:  (617) 494-0400
    Fax:      (617) 494-1828

    If to the Employee:

    Timothy Clackson, Ph.D.
    21 Kensington Park
    Arlington, Massachusetts  02476

    13.    General.

        13.1  This Agreement shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts applicable to agreements made and to be performed entirely in Massachusetts.

13.2  The Section headings contained herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

13.3  This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter hereof, and supersedes all prior agreements, arrangements and understandings, written or oral, relating to the subject matter hereof. No representation, promise or inducement has been made by either party that is not embodied in this Agreement, and neither party shall be bound by or liable for any alleged representation, promise or inducement not so set forth.

13.4  This Agreement and the Employee's rights and obligations hereunder may not be assigned by the Employee or the Company; provided, however, the Company may assign this Agreement to an Affiliate or a successor-in interest.

13.5  This Agreement may be amended, modified, superseded, canceled, renewed or extended, and the terms or covenants hereof may be waived, only by a written instrument executed by the parties hereto, or in the case of a waiver, by the party waiving compliance. The failure of a party at any time or times to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same. No waiver by a party of the breach of any term or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such breach, or a waiver of the breach of any other term or covenant contained in this Agreement.

13

14.    Definitions. As used herein the following terms have the following meaning:

(a)    "Affiliate" means and includes any corporation or other business entity controlling, controlled by or under common control with the corporation in question.

(b)    The "Company's Field of Interest" is the discovery, development and commercialization of pharmaceutical products based on (a) intervention in signal transduction pathways and (b) gene and cell therapy. The Company's Field of Interest may be changed at any time at the sole discretion of the Company.

(c)    "person" means any natural person, corporation, partnership, firm, joint venture, association, joint stock company, trust, unincorporated organization, governmental body or other entity.

(d)    "Subsidiary" means any corporation or other business entity directly or indirectly controlled by the corporation in question.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

ARIAD PHARMACEUTICALS, INC.

By       /s/ Harvey J. Berger
-------------------------------------------
Harvey J. Berger, M.D.
Chairman and Chief Executive Officer

14

EMPLOYEE

/s/ Timothy Clackson
---------------------------------------------
Timothy Clackson, Ph.D.

15

# ARIAD PHARMACEUTICALS INC (ARIA)

26 LANDSDOWNE ST
CAMBRIDGE, MA 02139
617. 494.0400

# EX−10.50

**EX−10.50 AMENDMENT TO CLACKSON AGREEMENT 7/1/01**
**10−K Filed on 03/14/2003 − Period: 12/31/2002**
File Number 333−76486



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 10.50

## FIRST AMENDMENT TO EMPLOYMENT AGREEMENT

This AMENDMENT TO EMPLOYMENT AGREEMENT (the "First Amendment") made as of July 1, 2001 between ARIAD Pharmaceuticals, Inc., a Delaware corporation (the "Company"), and Timothy P. Clackson, Ph.D. (the "Employee").

The Company and the Employee have entered into an Employment Agreement dated as of June 8, 2000 (the "Agreement"), and the parties hereto desire to further amend certain provisions of the Agreement.

NOW, THEREFORE, in consideration of the premises set forth herein and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree to further amend the Agreement as follows:

I. Term of Employment. The first sentence of Section 2 is hereby amended to read as follows:

"The term of the Employee's employment under the Agreement is hereby extended to December 31, 2003 (the "Term"), unless sooner terminated pursuant to Section 4 or 5 of this Agreement; provided, however, that this Agreement shall automatically be renewed for successive one-year terms (the Term and, if the period of employment is so renewed, such additional period(s) of employment are collectively referred to herein as the "Term") unless terminated by written notice given by either party to the other at least 90 days prior to the end of the applicable Term."

II. Compensation. Section 3.1 is hereby replaced and amended in its entirety as follows:

"3.1. As full compensation for all services to be rendered pursuant to this Agreement, the Company agrees to pay the Employee a salary at the fixed rate of $185,000 per annum as of the date hereof and increased thereafter during the Term, by amounts, if any, to be determined by the Board of Directors of the Company (the "Board") in its sole discretion, payable in equal semi-monthly installments, less such deductions or amounts to be withheld as shall be required by applicable law and regulations."

III. Definitions. The definition of the Company's "Field of Interest" in Section 14 (b) of the Agreement is hereby amended to read as follows:

1

The "Company's Field of Interest" is the discovery, development and commercialization of (i) pharmaceutical products based on (a) intervention in signal transduction pathways and (b) gene and cell therapy, and (ii) technologies to regulate genes and proteins. The Company's Field of Interest may be changed at any time at the sole discretion of the Company.

IV. This Amendment shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts applicable to agreements made and to be performed entirely in Massachusetts.

V. Except as modified by this First Amendment, the Agreement remains in full force and effect and unchanged.

IN WITNESS WHEREOF, the parties have executed this First Amendment as of the date first written above.

ARIAD PHARMACEUTICALS, INC.

By:      /s/ Harvey J. Berger
    ----------------------------------
    Harvey J. Berger, M.D.
    Chairman and Chief Executive Officer


EMPLOYEE

    /s/ Timothy P. Clackson
    -------------------------------
    Timothy P. Clackson, Ph.D.

2

# ARIAD PHARMACEUTICALS INC (ARIA)

26 LANDSDOWNE ST
CAMBRIDGE, MA 02139
617. 494.0400

# EX−10.51

**EX−10.51 AMENDMENT TO AGMT DATED 7/12/2002**
**10−K Filed on 03/14/2003 − Period: 12/31/2002**
File Number 333−76486



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 10.51

## SECOND AMENDMENT EMPLOYMENT AGREEMENT

This AMENDMENT TO EMPLOYMENT AGREEMENT (the "Second Amendment") made as of June 12, 2002, between ARIAD Pharmaceuticals, Inc., a Delaware corporation (the "Company"), and Timothy P. Clackson, Ph.D. (the "Employee").

The Company and the Employee have entered into an Employment Agreement dated as of June 8, 2000 (the "Agreement"), as previously amended, and the parties hereto desire to further amend certain provisions of the Agreement.

NOW, THEREFORE, in consideration of the premises set forth herein and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree to further amend the Agreement as follows:

I. Employment, Duties and Acceptance. The second sentence of Section 1.1 is hereby amended to read as follows:

"The Employee's title shall be designated by the Chief Executive Officer and shall be Senior Vice President, Science and Technology.

II. Term of Employment. The first sentence of Section 2 is hereby amended to read as follows:

"The term of the Employee's employment under the Agreement is hereby extended to December 31, 2005 (the "Term"), unless sooner terminated pursuant to Section 4 or 5 of this Agreement; provided, however, that this Agreement shall automatically be renewed for successive one-year terms (the Term and, if the period of employment is so renewed, such additional period(s) of employment are collectively referred to herein as the "Term") unless terminated by written notice given by either party to the other at least 90 days prior to the end of the applicable Term."

III. Compensation. Section 3.1 is hereby replaced and amended in its entirety as follows:

"3.1. As full compensation for all services to be rendered pursuant to this Agreement, the Company agrees to pay the Employee, during the Term, a salary at the fixed rate of $213,000 per annum during the first year of the Term and increased each year thereafter, by amounts, if any, to be determined by the Board of Directors of the Company (the "Board") in its sole discretion, payable in equal semi-monthly installments, less such deductions or amounts to be withheld as shall be required by applicable law and regulations."

1

IV. Termination by the Employee. Section 5 is hereby replaced and amended in its entirety as follows:

"5.1. The Employee may terminate this Agreement, if any one or more of the following shall occur: (a) a material breach of the terms of this Agreement by the Company and such breach continues for 30 days after the Employee gives the Company written notice of such breach;

(b) the Company shall make a general assignment for benefit of creditors; or any proceeding shall be instituted by the Company seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking entry of an order for relief of the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property or the Company shall take any corporate action to authorize any of the actions set forth above in this subsection 5.1(b);

(c) an involuntary petition shall be filed or an action or proceeding otherwise commenced against the Company seeking reorganization, arrangement or readjustment of the Company's debts or for any other relief under the Federal Bankruptcy Code, as amended, or under any other bankruptcy or insolvency act or law, state or federal, now or hereafter existing and remain undismissed or unstayed for a period of 30 days;

(d) a receiver, assignee, liquidator, trustee or similar officer for the Company or for all or any part of its property shall be appointed involuntarily, or

(e) a Change in Control as defined in Section 14."

V. Severance. Section 6 is hereby replaced and amended in its entirety as follows:

"6. If (i) the Company terminates this Agreement without Cause or (ii) the Employee terminates this Agreement pursuant to Section 5.1(a), then: (1) except in the case of death or disability, the Company shall continue to pay Employee his current salary for the remaining period of the applicable Term; (2) all options granted pursuant to this Agreement that would have vested during the Term shall vest immediately prior to such termination; (3) the Company shall continue to provide all benefits subject to COBRA at its expense for up to one year.

In the event of a consummation of a Change in Control of the Company, and if the Employee gives notice of termination within 90 days after such occurrence, then (i) all stock, stock options, stock awards and similar equity rights granted to the Employee shall immediately vest and remain fully exercisable through their original term with all rights; and (ii) the Company shall

2

continue to pay Employee his current salary for the shorter of (a) six months, or (b) the remaining period of the applicable Term."

VI. Definitions. The definition of the Company's "Field of Interest" in Section 14 (b) of the Agreement is hereby amended to read as follows:

The "Company's Field of Interest" is the discovery, development and commercialization of pharmaceutical products based on (a) intervention in cell signaling and (b) gene and cell therapy. The Company's Field of Interest may be changed at any time at the sole discretion of the Company and upon written notice to Employee.

The definition of "Change in Control" shall be added as Section 14 (e) of the Agreement as follows:

" 'Change in Control' means the occurrence of any of the following events (without the consent of the Employee):

(i) Any corporation, person or other entity makes a tender or exchange offer for shares of the Company's Common Stock pursuant to which such corporation, person or other entity acquires more than 50% of the issued and outstanding shares of the Company's Common Stock;

(ii) The stockholders of the Company approve a definitive agreement to merge or consolidate the Company with or into another corporation or to sell or otherwise dispose of all or substantially all of the Company's assets; or

(iii) Any person within the meaning of Section 3 (a) (9) or Section 13 (d) of the Securities Exchange Act of 1934 acquires more than 50% of the combined voting power of Company's issued and outstanding voting securities entitled to vote in the election of the Board."

VII. This Amendment shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts applicable to agreements made and to be performed entirely in Massachusetts.

VIII. Except as modified by this Second Amendment, the Agreement remains in full force and effect and unchanged.

THIS SPACE INTENTIONALLY LEFT BLANK

3

IN WITNESS WHEREOF, the parties have executed this Second Amendment as of the date first written above.

ARIAD PHARMACEUTICALS, INC.

By:      /s/ Harvey J. Berger
---------------------------------
Harvey J. Berger, M.D.
Chairman and Chief Executive Officer

EMPLOYEE

/s/ Timothy P. Clackson
------------------------------------
Timothy P. Clackson, Ph.D.

4

# ARIAD PHARMACEUTICALS INC (ARIA)

26 LANDSDOWNE ST
CAMBRIDGE, MA 02139
617. 494.0400

# EX–10.52

**EX–10.52 AGMT DATED 7/1/2002**
**10–K Filed on 03/14/2003 – Period: 12/31/2002**
File Number 333–76486



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 10.52

### EXECUTIVE EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT (the "Agreement") made as of July 1, 2002 between ARIAD Pharmaceuticals, Inc. (the "Company") a Delaware corporation, and Thomas A. Pearson (the "Employee").

1. Employment, Duties and Acceptance.

1.1 The Company hereby employs the Employee, for the Term (as hereinafter defined), to render full-time services to the Company, and to perform such duties as he shall reasonably be directed by the Chief Executive Officer of the Company to perform. The Employee's title shall be designated by the Chief Executive Officer and initially shall be Senior Vice President, Corporate Strategy and Communications.

1.2 The Employee hereby accepts such employment and agrees to render the services described above.

1.3 The Employee's principal office hereunder shall be in the greater Philadelphia, Pennsylvania area, or other locations reasonably acceptable to the Employee. The Employee acknowledges that for periods of time, he will be required to provide services to the Company in the greater Boston, Massachusetts area at the Company's headquarters.

1.4 Notwithstanding anything to the contrary herein, although the Employee shall provide services as a full-time employee, it is understood that the Employee may (a) have an academic appointment and (b) participate in professional activities (collectively,

1

"Permitted Activities"); provided, however, that such Permitted Activities do not interfere with the Employee's duties to the Company.

2. Term of Employment.

The term of the Employee's employment under this Agreement (the "Term") shall commence on July 1, 2002 (the "Effective Date"), or such other date mutually agreed upon by the parties, and shall end on December 31, 2004, unless sooner terminated pursuant to Section 4 or 5 of this Agreement; provided that this Agreement shall automatically be renewed for successive one-year terms (the Term and, if the period of employment is so renewed, such additional period(s) of employment are collectively referred to herein as the "Term") unless terminated by written notice given by either party to the other at least ninety days prior to the end of the applicable Term.

3. Compensation.

3.1 As full compensation for all services to be rendered pursuant to this Agreement, the Company agrees to pay the Employee, during the Term, a salary at the fixed rate of $210,000 per annum during the first year of the Term and increased each year thereafter, by amounts, if any, to be determined by the Board of Directors of the Company (the "Board"), in its sole discretion, payable in equal biweekly installments, less such deductions or amounts to be withheld as shall be required by applicable law and regulations.

3.2 Each year, Employee shall be eligible to receive a discretionary bonus of up to 30% of base salary, which bonus shall be determined annually by the Board. The bonus, if any, may be paid in the form of stock options, stock awards, deferred compensation or cash, as determined by the Board.

2

3.3 The Company shall pay or reimburse the Employee for all reasonable expenses actually incurred or paid by him during the Term in the performance of his services under this Agreement, except those relating to maintenance of his office in the greater Philadelphia, Pennsylvania area, upon presentation of expense statements or vouchers or such other supporting information as it may require.

3.4 The Employee shall be eligible under any incentive plan, stock award plan, bonus, deferred or extra compensation plan, pension, group life and group disability insurance plan, which the Company provides for its executives at the comparable level. All stock options and stock awards granted to the Employee shall be subject to a vesting schedule, which shall be determined by the Compensation Committee of the Board. The stock options and stock awards, if any, to be granted to the Employee shall also be subject to the terms of a stock option plan and certificate and stock award plan and certificate, respectively. Any unvested options shall be forfeited to the Company in the event (a) this Agreement is terminated by the Company for Cause pursuant to Section 4 herein, or (b) either party elects not to renew this Agreement pursuant to Section 2 herein.

4. Termination by the Company.

The Company may terminate this Agreement, if any one or more of the following shall occur:

(a) The Employee shall die during the Term; provided, however, the Employee's legal representatives shall be entitled to receive the compensation provided for hereunder to the last day of the month in which his death occurs.

3

(b) The Employee shall become physically or mentally disabled, whether totally or partially, so that he is unable substantially to perform his services hereunder for (i) a period of 180 consecutive days, or (ii) for shorter periods aggregating 180 days during any twelve month period.

(c) The Employee acts, or fails to act, in a manner that provides Cause for termination. For purposes of this Agreement, the term "Cause" means (i) the failure by the Employee to perform any of his material duties hereunder, (ii) the conviction of the Employee of any felony involving moral turpitude, (iii) any acts of fraud or embezzlement by the Employee involving the Company or any of its Affiliates, (iv) violation of any federal, state or local law, or administrative regulation related to the business of the Company, (v) a conflict of interest, (vi) conduct that could result in publicity reflecting unfavorably on the Company in a material way, (vii) failure to comply with the written policies of the Company, or (viii) a breach of the terms of this Agreement by the Employee. The Company shall provide the Employee written notice of termination pursuant to this Section 4, and Employee shall have 30 days to cure or remedy such failure or breach, in which case this Agreement shall not be terminated.

5. Termination by the Employee.

5.1 The Employee may terminate this Agreement, if any one or more of the following shall occur:

(a) a material breach of the terms of this Agreement by the Company and such breach continues for 30 days after the Employee gives the Company written notice of such breach;

4

(b) the Company shall make a general assignment for benefit of creditors; or any proceeding shall be instituted by the Company seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property or the Company shall take any corporate action to authorize any of the actions set forth above in this subsection 5(b);

(c) an involuntary petition shall be filed or an action or proceeding otherwise commenced against the Company seeking reorganization, arrangement or readjustment of the Company's debts or for any other relief under the Federal Bankruptcy Code, as amended, or under any other bankruptcy or insolvency act or law, state or federal, now or hereafter existing and remain undismissed or unstayed for a period of 30 days; or

(d) a receiver, assignee, liquidator, trustee or similar officer for the Company or for all or any part of its property shall be appointed involuntarily.

(e) a Change in Control as defined in Section 14.

6. Severance.

6.1 If (i) the Company terminates this Agreement without Cause or (ii) the Employee terminates this Agreement pursuant to Section 5.1(a), then: (1) except in the case of death or disability, the Company shall continue to pay Employee his then-current salary for the

5

remaining period of the applicable Term; and (2) all stock options granted pursuant to this Agreement that would have vested during the Term shall vest immediately prior to such termination.

6.2 In the event of a consummation of a Change in Control of the Company, and if the Employee gives notice of termination within 90 days after such occurrence, then (i) all stock, stock options, stock awards, and similar equity rights granted to the Employee shall immediately vest and remain fully exercisable through their original term with all rights; and (ii) the Company shall continue to pay the Employee his then-current salary for the shorter of (a) six months, or (b) the remaining period of the applicable Term.

7. Other Benefits.

In addition to all other benefits contained herein, the Employee shall be entitled to:

(a) Vacation time of four weeks per year taken in accordance with the vacation policy of the Company.

(b) After six years of employment hereunder, one three-month period of fully paid leave of absence in accordance with Company policies in place at that time; it being understood that such policies may restrict the Employee from taking such leave of absence until a time that is acceptable to the Company and may include other such limitations.

(c) Group life and group disability insurance.

(d) The Company shall provide the Employee with an automobile allowance of $750 per month, effective as of January 1, 2002.

6

(e) The Company also will provide the Employee with a one-time, non-recurring payment of $3,500, payable on the effective date of this Agreement, in lieu of the provision of standard tax preparation and planning services.

8. Confidentiality.

8.1 The Employee acknowledges that, during the course of performing his services hereunder, the Company shall be disclosing information to the Employee related to the Company's Field of Interest, Inventions, projects and business plans, as well as other information (collectively, "Confidential Information"). The Employee acknowledges that the Company's business is extremely competitive, dependent in part upon the maintenance of secrecy, and that any disclosure of the Confidential Information would result in serious harm to the Company.

8.2 The Employee agrees that the Confidential Information only shall be used by the Employee in connection with his activities hereunder as an employee of the Company, and shall not be used in any way that is detrimental to the Company.

8.3 The Employee agrees not to disclose, directly or indirectly, the Confidential Information to any third person or entity, other than representatives or agents of the Company. The Employee shall treat all such information as confidential and proprietary property of the Company.

8.4 The term "Confidential Information" does not include information that (a) is or becomes generally available to the public other than by disclosure in violation of this Agreement, (b) was within the Employee's possession prior to being furnished to such Employee, (c)

7

becomes available to the Employee on a nonconfidential basis or (d) was independently developed by the Employee without reference to the information provided by the Company.

8.5 The Employee may disclose any Confidential Information that is required to be disclosed by law, government regulation or court order. If disclosure is required, the Employee shall give the Company advance notice so that the Company may seek a protective order or take other action reasonable in light of the circumstances.

8.6 Upon termination of this Agreement, the Employee shall promptly return to the Company all materials containing Confidential Information, as well as data, records, reports and other property, furnished by the Company to the Employee or produced by the Employee in connection with services rendered hereunder. Notwithstanding such return or any of the provisions of this Agreement, the Employee shall continue to be bound by the terms of the confidentiality provisions contained in this Section 8 for a period of three years after the termination of this Agreement.

8.7 In connection with his employment by the Company, the Employee hereby acknowledges that he may enter into more than one agreement with regard to (a) the confidentiality of certain books, records, documents and business, (b) rights to certain inventions, proprietary information, and writings, (c) publication of certain materials, and (d) other related matters (the "Confidential Matters") of the Company (the "Confidentiality Agreements"). In order to clarify any potential conflicts between certain respective provisions of such Confidentiality Agreements, the Employee and the Company hereby agree that, as among

8

such Confidentiality Agreements, the provision (or part thereof) in any such Confidentiality Agreement which affords the greatest protection to the Company with respect to the Confidential Matters shall control.

9. Inventions Discovered by the Employee While Performing Services Hereunder.

During the Term, the Employee shall promptly disclose to the Company any invention, improvement, discovery, process, formula, or method or other intellectual property, whether or not patentable, whether or not copyrightable (collectively, "Inventions") made, conceived or first reduced to practice by the Employee, either alone or jointly with others, while performing service hereunder. The Employee hereby assigns to the Company all of his right, title and interest in and to any such Inventions. During and after the Term, the Employee shall execute any documents necessary to perfect the assignment of such Inventions to the Company and to enable the Company to apply for, obtain, and enforce patents and copyrights in any and all countries on such Inventions. The Employee hereby irrevocably designates the Chief Patent Counsel to the Company as his agent and attorney-in-fact to execute and file any such document and to do all lawful acts necessary to apply for and obtain patents and copyrights and to enforce the Company's rights under this paragraph. This Section 9 shall survive the termination of this Agreement.

10. Non-Competition and Non-Solicitation.

During the Term and for a period of one year following the date of termination or nonrenewal for any reason (other than termination pursuant to Section 5.1(a): (a) the Employee shall not in the United States or in any country in which the Company shall then be

9

doing business, directly or indirectly, enter the employ of, or render any services to, any person, firm or corporation engaged in any business competitive with the business of the Company or of any of its subsidiaries or affiliates of which the Employee may become an employee or officer during the Term; he shall not engage in such business on his own account; and he shall not become interested in any such business, directly or indirectly, as an individual, partner, shareholder, director, officer, principal, agent, employee, trustee, consultant, or any other relationship or capacity; provided, however, that nothing contained in this Section 10 shall be deemed to prohibit the Employee from acquiring, solely as an investment, shares of capital stock of any public corporation; (b) neither the Employee nor any Affiliate of the Employee shall solicit or utilize, or assist any person in any way to solicit or utilize, the services, directly or indirectly, of any of the Company's directors, consultants, members of the Board of Scientific and Medical Advisors, officers or employees (collectively, "Associates of the Company"). This nonsolicitation and nonutilization provision shall not apply to Associates of the Company who have previously terminated their relationship with the Company.

10.1 If the Employee commits a breach, or threatens to commit a breach, of any of the provisions of this Section 10, the Company shall have the following rights and remedies:

10.1.1 The right and remedy to have the provisions of this Agreement specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to the Company and that money damages shall not provide an adequate remedy to the Company; and

10

10.1.2 The right and remedy to require the Employee to account for and pay over to the Company all compensation, profits, monies, accruals, increments or other benefits (collectively "Benefits") derived or received by the Employee as the result of any transactions constituting a breach of any of the provisions of the preceding paragraph, and the Employee hereby agrees to account for and pay over such Benefits to the Company. Each of the rights and remedies enumerated above shall be independent of the other, and shall be severally enforceable, and all of such rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available to the Company under law or in equity.

10.2 If any of the covenants contained in Section 8, 9 or 10, or any part thereof, is hereafter construed to be invalid or unenforceable, the same shall not affect the remainder of the covenant or covenants, which shall be given full effect without regard to the invalid portions.

10.3 If any of the covenants contained in Section 8, 9 or 10, or any part thereof, is held to be unenforceable because of the duration of such provision or the area covered thereby, the parties agree that the court making such determination shall have the power to reduce the duration and/or area of such provision and, in its reduced form, such provision shall then be enforceable.

10.4 The parties hereto intend to and hereby confer jurisdiction to enforce the covenants contained in Sections 8, 9 and 10 upon the courts of any state within the geographical scope of such covenants. In the event that the courts of any one or more of such states shall hold any such covenant wholly unenforceable by reason of the

11

breadth of such scope or otherwise, it is the intention of the parties hereto that such determination not bar or in any way affect the Company's right to the relief provided above in the courts of any other states within the geographical scope of such covenants, as to breaches of such covenants in such other respective jurisdictions, the above covenants as they relate to each state being, for this purpose, severable into diverse and independent covenants.

        11. Indemnification.

        The Company shall indemnify the Employee, to the maximum extent permitted by applicable law, against all costs, charges and expenses incurred or sustained by him in connection with any action, suit or proceeding to which he may be made a party by reason of his being an officer, director or employee of the Company or of any subsidiary or affiliate of the Company. The Company shall provide, subject to its availability upon reasonable terms (which determination shall be made by the Board) at its expense, directors and officers insurance for the Employee in reasonable amounts. Determination with respect to (a) the availability of insurance upon reasonable terms and (b) the amount of such insurance coverage shall be made by the Board in its sole discretion.

        12. Notices.

        All notices, requests, consents and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if sent by prepaid telegram (confirmed delivery by the telegram service), private overnight mail service (delivery confirmed by such service), registered or certified mail (return receipt requested), or delivered personally, as follows (or to

12

such other address as either party shall designate by notice in writing to the other in accordance herewith):

        If to the Company:
        ARIAD Pharmaceuticals, Inc.
        26 Landsdowne Street
        Cambridge, Massachusetts 02139
        Attention: Chief Executive Officer
        Telephone:    (617) 494-0400
        Fax:         (617) 494-1828

        If to the Employee:
        Mr. Thomas A. Pearson
        87 Andover Court
        Wayne, Pennsylvania  19087

    13. General.

        13.1 This Agreement shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts applicable to agreements made and to be performed entirely in Massachusetts.

        13.2 The Section headings contained herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

        13.3 This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter hereof, and supersedes all prior agreements, arrangements and understandings, written or oral, relating to the subject matter hereof. No

13

representation, promise or inducement has been made by either party that is not embodied in this Agreement, and neither party shall be bound by or liable for any alleged representation, promise or inducement not so set forth.

13.4 This Agreement and the Employee's rights and obligations hereunder may not be assigned by the Employee or the Company; provided, however, the Company may assign this Agreement to an Affiliate or a successor-in interest.

13.5 This Agreement may be amended, modified, superseded, canceled, renewed or extended, and the terms or covenants hereof may be waived, only by a written instrument executed by the parties hereto, or in the case of a waiver, by the party waiving compliance. The failure of a party at any time or times to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same. No waiver by a party of the breach of any term or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such breach, or a waiver of the breach of any other term or covenant contained in this Agreement.

14. Definitions. As used herein the following terms have the following meaning:

(a) "Affiliate" means and includes any corporation or other business entity controlling, controlled by or under common control with the corporation in question.

(b) The "Company's Field of Interest" is the discovery, development and commercialization of pharmaceutical products based on (a) intervention in signal transduction pathways and

14

(b) gene and cell therapy. The Company's Field of Interest may be changed at any time at the sole discretion of the Company and upon written notice to Employee.

(c) "Person" means any natural person, corporation, partnership, firm, joint venture, association, joint stock company, trust, unincorporated organization, governmental body or other entity.

(d) "Subsidiary" means any corporation or other business entity directly or indirectly controlled by the corporation in question.

(e) "Change in Control" means the occurrence of any of the following events (without the consent of the Employee):

(i) Any corporation, person or other entity makes a tender or exchange offer for shares of the Company's Common Stock pursuant to which such corporation, person or other entity acquires more than 50% of the issued and outstanding shares of the Company's Common Stock;

(ii) The stockholders of the Company approve a definitive agreement to merge or consolidate the Company with or into another corporation or to sell or otherwise dispose of all or substantially all of the Company's assets; or

(iii) Any person within the meaning of Section 3(a)(9) or Section 13(d) of the Securities Exchange Act of 1934 acquires more than 50% of the combined voting power of Company's issued and outstanding voting securities entitled to vote in the election of the Board."

15

IN WITNESS WHEREOF, the parties have executed this Agreement
as of the date first above written.

ARIAD PHARMACEUTICALS, INC.

By      /s/ Harvey J. Berger
        --------------------------------------
        Harvey J. Berger, M.D.
        Chairman and Chief Executive Officer

EMPLOYEE

        /s/ Thomas A. Pearson
-----------------------------------------
Thomas A. Pearson

    9/15/02
-----------------------------------------
Date

16

# ARIAD PHARMACEUTICALS INC (ARIA)

26 LANDSDOWNE ST
CAMBRIDGE, MA 02139
617. 494.0400

# EX−10.53

**EX−10.53 STOCK PURCHASE AGMT DATED 11/8/2002**
**10−K Filed on 03/14/2003 − Period: 12/31/2002**
File Number 333−76486



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 10.53

FORM OF STOCK PURCHASE AGREEMENT

This agreement is dated November 8, 2002 between
_____ ("Purchaser"), and ARIAD Pharmaceuticals, Inc. ("Company"),
whereby the parties agree as follows:

The Purchaser shall buy and the Company agrees to sell _____
shares ("Shares") of the Company's Common Stock at a price of $2.75 per share
for a total amount of $_____. The Shares have been registered on a
registration statement on Form S-3, File No. 333-63708, which was declared
effective by the Securities and Exchange Commission on August 1, 2001 and which
has 2,572,288 shares of Common Stock registered and remaining to be issued
thereunder. A preliminary Prospectus Supplement has been prepared regarding the
sale of the Shares, which will be delivered prior to funding and a final
Prospectus Supplement will be delivered promptly after funding. The Shares are
free of restrictive legends and are free of any resale restrictions.

The purchase of the Shares, and any other sales of shares by the
Company that might be considered to be part of the same financing, shall be
subject to the stockholder approval rules of the Nasdaq Stock Market, including,
but not limited to, stockholder approvals required by Marketplace Rule 4350(i)
and related provisions.

The Purchaser represents and warrants to the Company:

(a) The Purchaser is a corporation or other legal entity duly
organized, validly existing and in good standing under the laws of
_____.

(b) The Purchaser has the requisite corporate (or other entity) power
and authority to enter into and perform this Agreement and to purchase the
Shares in accordance with the terms hereof.

(c) In making its investment decision in this offering, the Purchaser
and its advisors, if any, have relied solely on the Company's public filings as
filed with the Securities and Exchange Commission.

The Purchaser shall wire the purchase amount to the Company to the
account set forth below.

COMPANY WIRE TRANSFER INSTRUCTIONS:

Fleet Boston
100 Federal Street
Boston, MA 02110
ABA # 011-000-390
Operating Account # 22383612

2

      The Company shall cause its transfer agent to transmit the Shares electronically to the Purchaser by crediting the account set forth below through the Deposit Withdrawal Agent Commission system.

PURCHASER DWAC INSTRUCTIONS:

AGREED AND ACCEPTED:

ARIAD Pharmaceuticals, Inc.

By:_____
    Name:
    Title:


PURCHASER:


By:_____
    Name:
    Title:

# ARIAD PHARMACEUTICALS INC (ARIA)

26 LANDSDOWNE ST
CAMBRIDGE, MA 02139
617. 494.0400

# EX-10.54

**EX-10.54 LETTER DATED 12/27/2002**
**10-K Filed on 03/14/2003 - Period: 12/31/2002**
File Number 333-76486



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 10.54

[Fleet Letterhead]

December 27, 2002

ARIAD Pharmaceuticals, Inc.
ARIAD Corporation and
ARIAD Therapeutics Inc.
26 Landsdowne Street
Cambridge, Massachusetts 02139
Attention:    Edward Fitzgerald, Chief Financial Officer

        Re:    Loan and Security Agreement Dated September 23, 1992

Ladies and Gentlemen:

        Reference is made to the Loan and Security Agreement dated as of September 23, 1992 between ARIAD PHARMACEUTICALS, INC., a Delaware corporation (the "Borrower"); ARIAD CORPORATION, a Delaware corporation and the wholly owned subsidiary of the Borrower (the "Lessee Subsidiary"), and ARIAD GENE THERAPEUTICS, INC., a Delaware corporation which is controlled by the Borrower ("AGT"), and FLEET NATIONAL BANK (the "Bank"), as amended (as so amended and as hereafter amended, replaced, restated, supplemented, renewed or otherwise modified from time to time, (the "Loan Agreement"). Capitalized terms used herein without definition have the meanings assigned to them in the Loan Agreement.

        The Borrower has requested that, as an accommodation to the Borrower, the Lender grant a waiver of any Events of Default which will have occurred at December 31, 2002 because of the Borrower's failure to comply with its obligations under Section 7.21(b) of the Loan Agreement as of such date.

        In accordance with such request, the Lender hereby waives (A) the Events of Default arising from the Borrower's anticipated failure at December 31, 2002 to comply with its obligations under Section 7.21(b) of the Loan Agreement and (B) any Events of Default under any other Loan Documents which would have arisen, but for such waiver, as a result of the cross-default provisions contained therein.

        In consideration for the waiver, the Borrower will continue to secure the term loan with a pledge of liquid assets. The pledge securing the term loan with a balance of $6,300,000 (as December 27, 2002) is in effect until such time as the Borrower can comply with all terms

and conditions of the Loan Agreement. In addition, the standby letter of credit for $328,000 continues to be secured with a pledge of liquid assets, at all times. Total credit exposure is $6,628M. In accordance with the Loan Agreement, when liquid assets are pledged to secure the term loan balance, the term loan is priced at LIBOR + 125 bps. The pledged funds are held at Fleet Bank as Galaxy Institutional Prime Money Market Fund (formerly known as Boston 1784 Fund). Liquid assets are pledged as follows:

| Par | Description | Market Value | Advance Rate | Pledge Value |
|---|---|---|---|---|
| 7,000,000 | Galaxy Funds | 7,000,000 | 95% | 6,650,000 |
| | | Total Lendable value= | | $6,650.00 |

The waiver granted herein by the Lender is limited to the Events of Default described above, and shall not be construed to constitute a continuing waiver or waiver of any other Event of Default under the Loan Agreement or any such Loan Documents. This letter agreement shall constitute the entire agreement between the Lender and the Borrower regarding such waiver, and shall supersede any prior agreement or understanding, written or oral, between the Borrower and the Lender related to such waiver.

If this letter agreement correctly sets forth our understanding as to the matters contained herein, please so indicate by signing the enclosed counterpart hereof and returning it to the Lender, whereupon this agreement shall become binding between us in accordance with its terms.

Very truly yours,

Fleet National Bank

By:  /s/ Karen M. Kinsella
     ------------------------------
     Karen M. Kinsella, Senior
     Vice President

Accepted and Agreed to as of
December 27, 2002

ARIAD PHARMACEUTICALS, INC.
ARIAD Corporation
ARIAD Gene Therapeutics, Inc.

By: /s/ Edward M. Fitzgerald
    -------------------------------------------

Cc:   James Rubens, Edwards & Angell
      Anna Colton, Fleet National Bank

December 27, 2002

FLEET NATIONAL BANK CORPORATE BORROWING RESOLUTION

I, Laurie A. Allen, hereby certify that (1) I am the Secretary of ARIAD Pharmaceuticals, Inc., a corporation organized and existing under the laws of the State of Delaware, (2) no proceedings are pending for the dissolution or liquidation of said corporation and to the best of my knowledge, no such proceedings are threatened or contemplated, (3) the attached is a true, accurate and compared resolution from the meeting of the Board of Directors of said corporation duly held on December 3, 2002, at which meeting there was present at all times, a quorum authorized to transact the business hereinafter described, (4) the proceedings at said meeting were in accordance with the charter and bylaws of this corporation, the votes taken remain in full force and effect and such votes have not been revoked, annulled, amended or supplemented in any manner whatsoever, (5) no other votes have been adopted or executed by the Board or any committee of the Board relating to the authorization referred to in such voles.

 /s/ Laurie A. Allen
---------------------------
Laurie A. Allen
Secretary of the Corporation

ARIAD Pharmaceuticals, Inc.

Corporate Borrowing Resolution

Date: December 3, 2002

RESOLVED, that Edward M. Fitzgerald, Senior Vice President, Chief Financial Officer, be, and hereby is, authorized and empowered, for and In the name and on behalf of ARIAD Pharmaceuticals, Inc. ("Corporation"), to the extent authorized by the Board of Directors of the Corporation, to:

1. Borrow money and to obtain credit for this Corporation from Fleet National Bank (the "Bank") on such terms as deemed proper and to execute and deliver notes, drafts, acceptances, instruments of guaranty, agreements and any other obligations of this Corporation, containing such terms and conditions and in such form as may be required by said Bank.

2. Pledge, mortgage, grant a security interest in, or assign to said Bank as security for money borrowed or credit obtained any and all assets and property of this Corporation including, without limitation, any of the stocks, bonds or other securities, bills receivable, accounts, mortgages, merchandise, bills-of-lading, warehouse receipts, insurance policies, certificates, contracts, inventory, machinery, equipment and any other property, real or personal, tangible or intangible, held by or belonging to this Corporation, whether now owned or hereafter acquired and of whatever nature and kind and wherever located, and to endorse, assign or guarantee such of said assets and property as is necessary in the name of this Corporation.

3. Discount with said Bank upon such terms as deemed proper any bills receivable or paper held by this Corporation, with full authority to endorse the same In the name of this Corporation.

4. Take any and all actions as deemed necessary, desirable or appropriate to effect the purposes of the above votes, including, but not limited to, the execution and delivery of any and all documents, instruments, agreements, certificates, declarations, statements, forms and other papers required by said Bank in connection with any of the foregoing matters, any such action to be conclusive evidence of his authority to act; and

RESOLVED, that the foregoing powers and authority shall continue and remain In full force and effect until revoked or modified by votes of the Board and until written notice of revocation or modification thereof has been received and acknowledged, in writing, by an officer of the Bank.

# ARIAD PHARMACEUTICALS INC (ARIA)

26 LANDSDOWNE ST
CAMBRIDGE, MA 02139
617. 494.0400

# EX−10.55

**EX−10.55 SUBLEASE DATED 12/31/99**
**10−K Filed on 03/14/2003 − Period: 12/31/2002**
File Number 333−76486



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 10.55

AGREEMENT OF SUBLEASE

This AGREEMENT OF SUBLEASE (this "Sublease") is made this 31st day of December, 1999, by and between ARIAD Corporation ("Sublandlord"), and Aventis Pharmaceuticals Inc. (formerly known as Hoechst Marion Roussel Inc.) ("Subtenant").

BACKGROUND

A. By Lease dated January 8, 1992 ("Original Lease"), ARIAD Pharmaceuticals, Inc. leased from Forest City Cambridge, Inc. ("Prime Landlord") certain space in the building known as The Jackson Building, having a street address of 26 Landsdowne Street, Cambridge, Massachusetts ("Building"). The Prime Lease Premises (defined below) are more particularly described in the Prime Lease (defined herein), a copy of which is annexed hereto as Exhibit A.

B. ARIAD Pharmaceuticals, Inc. assigned its interest in the Original Lease to Sublandlord, which assignment was executed on October 19, 1992, and recorded with the Middlesex County Southern District Registry of Deeds in Book 22527, Page 581, and filed with the Middlesex County Southern Registry District of the Land Court as Document No. 888025 noted on Certificate of Title No. 157415.

C. The Original Lease as amended by the First and the Second Amendments to Lease, each dated May 12, 1994, the Third Amendment to Lease, dated June 1, 1994, a letter agreement, dated December 16, 1996, a letter agreement dated July 31, 1998 and the Sixth Amendment to Lease, dated December 31, 1999 as the same may from time to time be further amended and supplemented, are hereinafter referred to collectively as the "Prime Lease." All of the space in the Building that is now or hereafter leased by Sublandlord pursuant to the Prime Lease is hereinafter referred to as the "Prime Lease Premises." The Prime Lease Premises now contain 100,361 rentable square feet.

D. Subject to and in accordance with the terms and conditions hereinafter set forth, Sublandlord desires to sublease to Subtenant, and Subtenant desires to rent from Sublandlord, that portion of the Prime Lease Premises which comprises: (i) the entire space on the third floor in the Building containing approximately 20,249 rentable square feet; (ii) the office and bioinformatics space known as Suite 125 containing approximately 3,200 rentable square feet on the first floor in the Building; (iii) the additional first floor office space known as Suite 100, containing approximately 4,311 rentable square feet; and (iv) the laboratory space on the fourth floor known as Suite 470, containing approximately 6,605 square feet of rentable space. The foregoing shall collectively be referred to as the "Subleased Premises." The Subleased Premises is substantially shown on Exhibit B attached hereto.

Capitalized terms used in this Sublease and not otherwise defined in this Sublease shall have

the meanings established in the Prime Lease.

NOW, THEREFORE, in consideration of the covenants herein contained, the parties hereto, intending to be legally bound hereby, do covenant and agree as follows:

1. Sublandlord's Representations. Sublandlord represents to Subtenant that: (a) Exhibit A constitutes a true, correct and complete copy of the Prime Lease as of the date hereof, and comprises the entire understanding and agreement of Prime Landlord and Sublandlord with respect to the Prime Lease Premises, (b) the Prime Lease is in full force and effect in accordance with its terms, (c) to Sublandlord's knowledge neither Prime Landlord nor Sublandlord is in default under the Prime Lease, and there exists no state of facts and no event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default by either Prime Landlord or Sublandlord under the Prime Lease and (d) Sublandlord is a wholly-owned subsidiary of ARIAD Pharmaceuticals, Inc. During the Term of this Sublease, Sublandlord shall pay to Prime Landlord when due all rent and all other charges reserved and covenanted to be paid by the "Tenant" under the Prime Lease. Sublandlord agrees that it will not agree to a termination of the Prime Lease unless in connection therewith the Prime Landlord accepts this Sublease as a direct lease between Prime Landlord and Subtenant. Additionally, Sublandlord agrees that it shall not, prior to the expiration of this Sublease, remove any Optional Removable Alterations, Required Removable Alterations or any other property owned by Sublandlord and currently affixed to the Subleased Premises and used in connection with the operations of the Subleased Premises.

2. Subtenant's Representations. Subtenant shall observe and perform when due all covenants, agreements and obligations of the "Tenant" under the Prime Lease as the same shall apply to the Subleased Premises, except for "Tenant's" obligation to pay rent. Subtenant's failure to perform "Tenant's" obligations under the Prime Lease with respect to the Subleased Premises shall be a breach of this Sublease and Sublandlord shall have all the rights against Subtenant as would be available to Prime Landlord under the Prime Lease if such breach were by "Tenant" thereunder. In the event of a default by Sublandlord under the Prime Lease which results in the termination thereof, Subtenant shall, at the option of Prime Landlord attorn to and recognize Prime Landlord as landlord hereunder and shall, promptly upon the Prime Landlord's request, execute and deliver all instruments necessary or appropriate to confirm such attornment and recognition.

3. Incorporation of Prime Lease; Conflicting Terms. This Sublease is made subject to and subordinate to all of the terms and conditions of the Prime Lease and is conditioned upon the written approval of Prime Landlord. Insofar as the Prime Lease relates to the Subleased Premises, each and every provision of the Prime Lease shall be deemed incorporated herein and made a part of this Sublease. The rights of Prime Landlord under the Prime Lease may be enforced by, and are for the benefit of, both the Sublandlord herein and Prime Landlord. Subtenant shall neither do nor permit anything to be done which would cause the Prime Lease to be terminated or forfeited by reason of any right of termination or forfeiture reserved or vested in "Prime Landlord" under the Prime Lease. Any other provision of the Prime Lease or this Sublease to the contrary notwithstanding, Subtenant shall not be responsible for (i) the obligation to pay the Annual Fixed Rent, the real estate taxes and operating expenses described in Paragraph 3 of the Prime Lease or any other charges reserved and covenanted to be paid by the "Tenant" as "rent" under the Prime Lease,

2

but shall be responsible to pay (a) Basic Rent (as herein defined) pursuant to Section 7 herein and (b) its pro-rata share of all such charges to Sublandlord as provided in Section 8 herein, (ii) any obligations of "Tenant" wherever expressed in the Prime Lease to the extent that they relate to the removal of improvements, alterations and additions to the Subleased Premises constructed and installed by Prime Landlord or Sublandlord at or prior to the Commencement Date of this Sublease, (iii) any obligations of "Tenant" wherever expressed in the Prime Lease to the extent that they relate to the repair, replacement or maintenance of a condition of the Subleased Premises existing at or prior to the Commencement Date of this Sublease, (iv) any obligations of "Tenant" wherever expressed in the Prime Lease relating to the indemnification of Prime Landlord with respect to any loss, damage, liability, obligation, cost or expense arising as a result of an act or omission that occurred prior to the Commencement Date of this Sublease or arising as a result of a negligent act or omission of Sublandlord, its agents, employees, contractors or invitees, (v) any obligations of "Tenant" wherever expressed in the Prime Lease relating to the condition of the Subleased Premises at the expiration of the term of this Sublease to the extent that the required repair, maintenance or removal relates to a condition existing on the Commencement Date of this Sublease and (vi) any obligations of "Tenant" under the Prime Lease relating to any portion of the Prime Lease Premises other than the Subleased Premises or arising prior to the Commencement Date of this Sublease or arising after the date of expiration of the Term of this Sublease (all of which obligations expressed in clauses (i) through (vi) above shall be and remain the responsibility of Sublandlord). In the event that any term or provision of the Prime Lease is inconsistent or conflicts with any term or provision of this Sublease, the terms and provisions of the Prime Lease shall control, except to the extent expressly provided herein.

4. Sublease of Premises.

4.01 For the Term (defined below) and upon the terms, covenants and conditions herein set forth, Sublandlord hereby subleases to Subtenant, and Subtenant hereby rents from Sublandlord, the Subleased Premises. During the Term of this Sublease, but under and subject to the terms, covenants and conditions of the Prime Lease, Subtenant shall have the right to use, together with Sublandlord and the other tenants of the Building, the common public areas and facilities of the Building, including, without limitation, the elevators providing access to the Subleased Premises and the parking facilities, and to receive and enjoy the benefit of the services and utilities required to be provided to Sublandlord under the Prime Lease, but only to the extent that the same pertain to the Subleased Premises.

4.02 Without limitation of any of the terms of Section 4.01, Subtenant shall have the right to the pro rata number of parking passes allocable to the Subleased Premises (calculated on the basis of the measurement method then used by Prime Landlord and Sublandlord under the Prime Lease for such purposes).

5. Sublease Term.

5.01 Term. The term of this Sublease (including any renewals or extensions thereof, "Term") shall commence on the date hereof (the "Commencement Date") and, unless extended or sooner terminated as herein provided, end on July 31, 2002, the currently scheduled

3

expiration date of the Prime Lease.

5.02 Extension of Term. In the event Sublandlord extends the term of the Prime Lease as therein provided, Sublandlord shall so notify Subtenant promptly, and the Term of this Sublease, at the option of Subtenant, shall be extended up to July 31, 2007 upon the same terms and conditions as herein expressed and at the Basic Rent, which shall be the higher of: (i) a twenty-five percent (25%) discount to the then current Fair Market Rental Value (as hereinafter defined) of the Subleased Premises in its then condition ; or (ii) the rate of the Annual Fixed Rent paid by Sublandlord to the Prime Landlord under the Prime Lease, calculated to reflect only the premises then constituting the Subleased Premises. Within thirty (30) days after Sublandlord notifies Subtenant of the extension of the Term, Sublandlord shall also notify Subtenant in writing of Sublandlord's reasonable determination of the Basic Rent for the Subleased Premises during such extended Term, which amount shall be based on the market rate. Such amount shall be the "Fair Market Rental Value" unless Subtenant objects to Sublandlord's determination within fifteen (15) days from Subtenant's receipt of Sublandlord's notice that Subtenant does not agree with Sublandlord's determination, in which case the phrase "Fair Market Rental Value" shall mean the then prevailing market rate for base minimum rental, calculated on a per square foot basis for leases covering buildings comparable to the Building (as adjusted for any variances between such buildings and the Building) located in the Cambridge, Massachusetts metropolitan area (hereinafter referred to as the "Market Area") as determined by the following appraisal procedure:

In the event that Subtenant notifies Sublandlord that Subtenant disagrees with Sublandlord's determination of the Fair Market Rental Value for the extension Term, then Subtenant shall specify, in such notice to Sublandlord, Subtenant's selection of a real estate appraiser who shall act on Subtenant's behalf in determining the Fair Market Rental Value. Within twenty (20) days after Sublandlord's receipt of Subtenant's selection of a real estate appraiser, Sublandlord, by written notice to Subtenant, shall designate a real estate appraiser, who shall act on Sublandlord's behalf in the determination of the Fair Market Rental Value. Within twenty (20) days of the selection of Sublandlord's appraiser, the two (2) appraisers shall render a joint written determination of the Fair Market Rental Value, which determination shall take into consideration any differences between the Building and those buildings comparable to the Building located in the Market Area, including without limitation age, location, setting and type of building. If the two (2) appraisers are unable to agree upon a joint written determination within said twenty (20) day period, the two appraisers shall select a third appraiser within such twenty (20) period. Within twenty (20) days after the appointment of the third appraiser, the third appraiser shall render a written determination of the Fair Market Rental Value. The average of the three determinations shall be the final and conclusive Fair Market Rental Value. All appraisers selected in accordance with this Section shall have at least ten (10) years prior experience in the commercial leasing market of the Market Area and shall be members of the American Institute of Real Estate Appraisers or similar professional organization. If either Sublandlord or Subtenant fails or refuses to select an appraiser, the other appraiser shall alone determine the Fair Market Rental Value. Sublandlord and Subtenant agree that they shall be bound by the determination of

4

Fair Market Rental Value pursuant to this Section. Sublandlord shall bear the fee and expenses of its appraiser; Subtenant shall bear the fee and expense of its appraiser; and Sublandlord and Subtenant shall share equally the fee and expenses of the third appraiser, if any.

6. Access to Subleased Premises. Subtenant and its agents, employees and business invitees shall have the right, in common with Sublandlord, to use the elevator lobbies and common hallways of the Building 24 hours per day, 7 days per week in accordance with the Prime Landlord's rules and regulations, for the sole purpose of obtaining ingress to and egress from the Subleased Premises. Subtenant and its agents, employees and business invitees also shall have the right, in common with Sublandlord, to use the common area lavatory facilities of the Building. Sublandlord and Subtenant shall cooperate with each other to facilitate Subtenant's shipping and receiving of Subtenant's materials and supplies to and from the Subleased Premises; without limiting the foregoing, Subtenant and its agents, employees and business invitees shall have the right, in common with Sublandlord, to use the loading dock.

7. Rent. Subtenant shall pay Sublandlord rent ("Basic Rent") at an amount equal to (i) for the entire space on the third floor in the Building containing approximately 20,249 rentable square feet, at a rate of $12.00 per square foot, $242,988.00; (ii) for the office and bioinformatics space known as Suite 125 containing approximately 3,200 rentable square feet on the first floor in the Building, at a rate of $20.00 per square foot, $64,000.00; (iii) for the additional first floor office space known as Suite 100, containing approximately 4,311 rentable square feet, at a rate of $20.00 per square foot, $86,220.00; and (iv) for the laboratory space on the fourth floor known as Suite 470, containing approximately 6,605 square feet of rentable space, at a rate of $39.00 per square foot, $257,595.00; the sum of such amounts being $650,803.00 on an annual basis, payable in equal monthly installments of $54,233.58, in advance, on the first day of each month during said term, at the office of Sublandlord or such other place as Sublandlord may designate, without any set off, counterclaim or deduction whatsoever. The foregoing notwithstanding, during the extended term if any of this sublease, Subtenant shall pay Sublandlord Basic Rent as calculated in accordance with Section 5.02 above. If the Commencement Date should occur on a day other than the first day of a calendar month, or if this Sublease shall expire or terminate on a day other than the last day of a calendar month, then the rent for such fractional month shall be prorated on a daily basis based upon a thirty (30) day calendar month.

8. Additional Rent.

8.01 From and after the Commencement Date, and throughout the Term of this Sublease, Subtenant shall pay as additional rent ("Additional Rent", Basic Rent and Additional Rent, and each installment and/or increment thereof, are sometimes herein collectively called "rent") Subtenant's allocable share of all additional (i.e., in addition to the Basic Rent) sums, costs, expenses and other payments that Sublandlord is obligated to pay Prime Landlord under the Prime Lease to the extent attributable to the Subleased Premises, including, without limitation, the following: (i) Subtenant's Proportionate Share (defined below) of Tenant's Tax Expense Allocable to the Prime Lease Premises (as provided in Section 3.2 of the Prime Lease); (ii) Tenant's parking charges as

5

provided in Section 2.4 of the Prime Lease with respect to those parking passes to which Subtenant is entitled hereunder; (iii) Subtenant's Proportionate Share of Tenant's Operating Expenses Allocable to the Prime Lease Premises in accordance with Section 3.3 of the Prime Lease; and (iv) amounts payable for special services requested by or exclusively benefitting Subtenant pursuant to Section 3.5 of the Prime Lease. For the purposes of this Sublease, Subtenant's Proportionate Share shall mean a fraction, the numerator of which is the number of rentable square feet within the Subleased Premises and the denominator of which is the Sublandlord's Rentable Floor Area.

       8.02 In addition to the costs described in 8.01, Subtenant shall pay to Sublandlord as Additional Rent (i) Subtenant's Proportionate Share of Sublandlord's cost of providing lighting, heating, air conditioning and other utilities to the common lobbies, hallways, stairways, bathrooms and other shared areas within the Prime Lease Premises; (ii) Subtenant's allocable share of the salaries, benefits and other compensation paid by Sublandlord to the Building Manager and the Facilities Engineer for the Prime Lease Premises determined in accordance with Schedule 8.02 attached hereto (it being understood that the salaries, benefits and other compensation paid to such persons shall not exceed the prevailing wages, benefits and compensation packages paid by Sublandlord to other employees with comparable experience and qualifications); and (iii) Subtenant's allocable share of Sublandlord's cost of providing special utilities, support and services to or for the benefit of the Subleased Premises as generally described on Schedule 8.02 attached hereto, it being understood that Section 8.02 is merely a "good faith" estimate of the costs to be incurred by Sublandlord in order to provide such special utilities, support and services to the Subleased Premises, and not a limitation on the categories or amounts of expenses for which Subtenant is responsible. If, during the Term of this Sublease, Sublandlord incurs costs of a capital nature in connection with Sublandlord's provision of any of the utilities, support or services described in this Section 8.02, Subtenant's Proportionate Share of such capital item during any calendar year or other twelve (12) month accounting period selected by Sublandlord shall be limited to the annual amortization of the cost of the capital item (calculated, with interest, over the useful life of the item as reasonably determined by Sublandlord). Subtenant also shall pay directly to the provider of the service all charges for separately metered utilities consumed by Subtenant within the Subleased Premises.

       8.03 Sublandlord understands that confidential information will be stored in the Subleased Premises and, therefore, Subtenant will not permit any unauthorized persons or authorized persons unattended into the Subleased Premises. Notwithstanding the foregoing, the Building Manager and the Facilities Manager shall have limited access to the Subleased Premises, provided that an employee of Subtenant shall accompany the Building Manager and the Facilities Manager into the Subleased Premises at all times, without exception, subject to such confidentiality requirements imposed by Subtenant from time to time. Notwithstanding the foregoing, Sublandlord shall in the event of an emergency use its best efforts to notify Subtenant prior to its entry into the Subleased Premises and in any event will notify Subtenant of such entry as soon as reasonably possible.

       8.04 Sublandlord shall maintain true and complete books of account containing an accurate record of the data necessary for the proper determination and computation of all amounts to be paid by Subtenant to Sublandlord under the terms of this Section to the extent provided by the

Prime Landlord to Sublandlord; provided, however, that Sublandlord shall not be required hereby to maintain any duplicate books of account or records. Sublandlord shall retain and maintain such records in accordance with Sublandlord's records retention policy for its other books and records; provided however, such retained records shall not be destroyed without the consent of Subtenant (such consent not to be unreasonably withheld). Subtenant shall have the right, using the firm of independent certified public accountants employed by Sublandlord to conduct Sublandlord's regular annual audit, or another national firm of independent certified Sublandlord accountants acceptable to Sublandlord (whose approval of such accountants will not be unreasonably withheld), to audit such books for the purpose of verifying such amounts. Such examination shall be made upon reasonable advance notice to Sublandlord during normal business hours at Sublandlord's principal office. In the event that the result of any such audit is less than the amount invoiced by Sublandlord and such difference exceeds five percent (5%) of the invoiced amount, Sublandlord shall promptly pay to Subtenant the full amount of such difference. In the event that the result of any such audit is greater than the amount invoiced by Sublandlord and such difference exceeds five percent (5%) of the invoiced amount, Subtenant shall promptly pay to Sublandlord the full amount of such difference. The cost of any such audit shall be borne by, in the event that any such difference is more than five percent (5%) of the invoiced amount, the paying party, and, in the event that any such difference is less than five percent (5%) of the invoiced amount, the requesting party.

8.05 Security Deposit. Subtenant acknowledges that, as required by Section 12.11 of the Prime Lease, Sublandlord has provided Prime Landlord with a bank letter of credit in the amount of $327,646 ("Letter of Credit") to secure timely performance by Sublandlord of its obligations as "Tenant" under the Prime Lease. In lieu of providing a cash security deposit to Sublandlord hereunder, Subtenant shall pay to Sublandlord as Additional Rent Subtenant's Proportionate Share of Sublandlord's cost of providing and maintaining the Letter of Credit, which cost shall be calculated as the sum of (i) Subtenant's Proportionate Share of any fees or costs paid by Sublandlord during the Term of this Sublease for the continued issuance of the Letter of Credit (not to exceed 1.5% per annum of the stated amount of the Letter of Credit) and (ii) an amount computed at an interest rate equal to the "Prime Lending Rate" as determined on December 1st of each year by the Wall Street Journal per annum of Subtenant's Proportionate Share of the amount of cash or cash equivalent security (not to exceed 120% of the stated amount of the Letter of Credit), if any, pledged by Sublandlord as collateral security for the Letter of Credit. The amount of Additional Rent payable by Subtenant pursuant to this Section 8.05 shall adjust from time to time if, as and when the stated amount of the Letter of Credit is adjusted. If during the Term of this Sublease Sublandlord elects to replace the Letter of Credit with cash or cash equivalent security deposited with Prime Landlord, the Additional Rent payable by Subtenant pursuant to this Section 8.05 shall equal an amount computed using an interest rate calculated as the "Prime Lending Rate" as determined on December 1st of each year by the Wall Street Journal per annum of Subtenant's Proportionate Share of the cash or cash equivalent security deposited from time to time with Prime Landlord.

9. Use. Subtenant shall use and occupy the Subleased Premises for general offices, technical offices for research and development, laboratories and research facilities, manufacturing of drugs and the fabrication, assembling, finishing work and packaging of such drugs, subject, however to Section 6.2 of the Prime Lease.

<center>7</center>

10. Insurance.

10.01 Notwithstanding anything herein to the contrary, to the extent that either party is required by the provisions of this Sublease or the Prime Lease to carry insurance, each party hereto hereby releases the other party, its directors, officers, agents, employees and servants to the extent of the releasing party's actual recovery under its insurance policies, from any and all liability or responsibility to it or anyone claiming by, through or under it or them by way of subrogation or otherwise, for any loss or damage which may be inflicted upon the property of such party, notwithstanding that such loss or damage shall have arisen out of the negligent or intentionally tortious act or omission of the other party, its agents or employees.

10.02 Each insurance policy that either party is required or authorized to carry hereunder shall contain a clause that the release provided herein shall not affect the policy. Each insurance policy that either party is required to carry hereunder shall contain a waiver of any right of subrogation against the other party. Sublandlord and Subtenant hereby waive any right of subrogation against each other on behalf of any and all insurers providing insurance required by the terms hereof.

10.03 Subtenant, at its sole expense, shall maintain for the benefit of Sublandlord and Prime Landlord, such policies of insurance (and in such form) as are required by the Prime Lease with respect to the Subleased Premises, which policies shall be reasonably satisfactory to Sublandlord and Prime Landlord as to coverage and insurer. Each such policy shall name Sublandlord and Prime Landlord as additional insured parties.

11. Hold Harmless. Neither Sublandlord nor Subtenant shall do or cause to be done, or suffer or permit any act or thing to be done, which may cause the Prime Lease or the rights of Sublandlord or Subtenant to be canceled, terminated, forfeited or prejudiced or which may make the other party liable for any damages, claims, fines, penalties, costs or expenses thereunder. Each of the Sublandlord and Subtenant shall indemnify and save harmless the other from all suits, actions, judgments, damages, claims, liabilities, awards, losses, fines penalties, costs, charges and expenses, including attorneys fees, that either may sustain by reason of the other's failure to perform the terms of this Sublease or the Prime Lease or by reason of the breach by the other of any of the terms, covenants or conditions of this Sublease or the Prime Lease except those arising out of the negligent acts or omissions of the party being indemnified.

12. Condition of Subleased Premises. Subtenant hereby leases the Subleased Premises, and accepts them "as is - where is" in their present condition, as a result of whatever inspecting Subtenant deemed necessary, and not as a result of or in reliance upon any representation or warranty of any nature whatsoever by Sublandlord, or any employee or agent of Sublandlord. Sublandlord shall use commercially reasonable efforts to provide Subtenant access to the Subleased Premises prior to the Commencement Date for Subtenant to install furniture, fixtures, office and telecommunications equipment and other items necessary for Subtenant to conduct its business provided that Subtenant provides Sublandlord and any contractors and/or subcontractors provide Sublandlord a copy of its certificate of insurance evidencing the insurance policy required hereunder to be obtained by Subtenant, naming Sublandlord and Prime Landlord as additional insureds prior to

8

any such access.

13. Services.

13.01 Where in the Prime Lease there are duties and obligations owed by Prime Landlord to Sublandlord that are necessary for the proper use and enjoyment of the Subleased Premises by Subtenant under this Sublease, Sublandlord shall use commercially reasonable efforts to obtain the performance of such duties and obligations by Prime Landlord in favor of Subtenant, but Sublandlord shall not be liable to Subtenant for the failure of Prime Landlord to perform said duties and obligations or for the result of such failure. The only services or rights to which Subtenant is entitled hereunder are those to which Sublandlord is entitled under the Prime Lease. Notwithstanding the foregoing, if Prime Landlord shall default in any of its obligations to Sublandlord with respect to the Subleased Premises, Subtenant shall be entitled to participate with Sublandlord in the enforcement of Sublandlord's rights against Prime Landlord. If, after written request from Subtenant, Sublandlord shall fail or refuse to take appropriate action for the enforcement of Sublandlord's rights against the Prime Landlord with respect to the Subleased Premises within a reasonable period of time considering the nature of Prime Landlord's default, Subtenant shall have the right to take such action in its own name, and for that purpose and only to such extent, all of the rights of Sublandlord under the Prime Lease hereby are conferred upon and assigned to Subtenant and Subtenant hereby is subrogated to such rights to the extent that the same shall apply to the Subleased Premises. Sublandlord hereby grants Subtenant the right to deal directly with Prime Landlord with respect to any rights of Sublandlord as Tenant under the Prime Lease which are exercisable with respect to the Subleased Premises, the conduct or manner of conduct of Subtenant's or Prime Landlord's activities therein or work to be performed or services to be rendered therein or thereto by Prime Landlord; it being the intent of the parties hereto that Subtenant may exercise such rights as are reasonably necessary or desirable to permit Subtenant to use and occupy the Subleased Premises on a regular basis as contemplated in this Sublease, and not otherwise.

13.02 Sublandlord covenants and agrees to use commercially reasonable efforts to: (i) furnish to Subtenant the special utilities and other services described in Schedule 8.02; and (ii) provide the employees identified in Schedule 8.02. Sublandlord further covenants and agrees to make available such employees to respond promptly to any problems, complaints or other service requests related to the Building for which Subtenant notified Sublandlord. Notwithstanding the foregoing, Subtenant shall have the right to deal directly with such employees with respect to any such notifications.

14. Subletting and Assignment.

14.01 Subtenant shall not assign or sublet the Subleased Premises without first providing Sublandlord one hundred eighty (180) days written notice of such proposed assignment or sublease whereupon Sublandlord shall have the option within ninety (90) days of receipt of such notice to either consent to such assignment or sublease or terminate this lease and repossess the space proposed to be assigned or sublet. In the event Sublandlord approves such assignment or sublease, Subtenant shall pay to Sublandlord one hundred percent (100%) of all the rent and any and all additional compensation received from such sublessee above the Basic Rent paid owed by

9

Subtenant to Sublandlord under the terms of this Sublease. Notwithstanding the foregoing to the contrary, Subtenant shall not be released of any liability under this Sublease.

14.02 Notwithstanding the provisions of Section 14.01, either party may assign this Sublease to any Affiliate (as defined below) or in connection with the sale of all or substantially all of such party's assets. For the purposes of this Sublease, "Affiliate" shall mean any corporation, firm, partnership or other entity which directly or indirectly controls or is controlled by or is under common control with a party to this Sublease. "Control" means ownership, directly or through one or more Affiliates, of more than fifty percent (50%) of the shares of stock entitled to vote for the election of directors, in the case of a corporation, or more than fifty percent (50%) of the equity interests in the case of any limited liability company or other type of legal entity, status as a general partner in any partnership, or any other arrangement whereby a party controls or has the right to control the board of directors or equivalent governing body of a corporation or other entity.

15. Approvals and Consents. If Sublandlord's consent or approval of a request from Subtenant requires Sublandlord to obtain the consent or approval of Prime Landlord, then any consent or approval from Sublandlord is subject to receiving consent or approval from Prime Landlord and Sublandlord shall forward any such request in a timely manner.

16. Binding Effect. The provisions of this Sublease shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and assigns. This Sublease constitutes the entire agreement between the parties hereto and may not be modified except by an instrument in writing signed by the parties hereto.

17. Notices. Whenever it shall be necessary or desirable for either party to this Sublease to serve any notice or demand on the other party, such notice or demand shall be served by certified mail, return receipt requested, by overnight courier (such as Federal Express), next day delivery, or telecopy, at the addresses set forth below or at such other address as shall be designated by the parties in accordance with this Section. Each party shall provide to the other copies of all notices received by each from Prime Landlord.

If to Sublandlord:

> ARIAD Corporation
> 26 Landsdowne Street
> Cambridge, MA  02139
> Attn: Chief Executive Officer
> Telecopy:  (617) 494-8144

With copy to:

> Mintz, Levin, Cohn, Ferris, Glovsky and Popeo. P.C.
> One Financial Center
> Boston, MA 02111
> Attn: Joel Bloom, Esq.

10

Telecopy: (617)542-2241

If to Subtenant:

Aventis Pharmaceuticals Inc.
Route 202-206
P.O Box 6800
Bridgewater, NJ  08807
Attn:  Vice President and General Counsel,
       Global Drug Development Center
Telecopy:  (908) 231-4480

With copy to:

Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103-2921
Attn: Edward J. Matey Jr., Esquire
Telecopy:  (215) 963-5299

18. Amendments. No amendments shall be made to this Sublease without the prior written approval of Prime Landlord in accordance with the terms of the Prime Lease.

19. Counterparts. This Sublease may be executed in counterparts.

[Remainder of page intentionally left blank.]

11

IN WITNESS WHEREOF, Sublandlord and Subtenant have executed this Sublease as of the date first above written.

SUBLANDLORD:

(Corporate Seal)                          ARIAD Corporation

Attest:  /s/ Harvey J. Berger            By:  /s/ Jay R. LaMarche
         --------------------                 --------------------
         Name:   Harvey J. Berger              Name:  Jay R. LaMarche
         Title:  President                     Title: Treasurer


                                          SUBTENANT:

(Corporate Seal)                          Aventis Pharmaceuticals Inc.

Attest:  /s/                             By:  /s/ Frank L. Douglas
         --------------------                 --------------------
         Name:                                 Name:  Frank L. Douglas
         Title:                                Title: Vice President


                                12

EXHIBIT A

[Attach Copy of Prime Lease]

EXHIBIT B

[Description of Subleased Premises]

SCHEDULE 8.02

# ARIAD PHARMACEUTICALS INC (ARIA)

26 LANDSDOWNE ST
CAMBRIDGE, MA 02139
617. 494.0400

# EX-10.56

**EX-10.56 AMENDMENT TO SUBLEASE DATED 7/26/2002**
**10-K Filed on 03/14/2003 - Period: 12/31/2002**
File Number 333-76486



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 10.56

FIRST AMENDMENT TO SUBLEASE

THIS FIRST AMENDMENT TO SUBLEASE (this "First Amendment") is dated the 26th day of July, 2002, and entered into by and between ARIAD Corporation ("Sublandlord") and Aventis Pharmaceuticals Inc. (formerly known as Hoechst Marion Roussel Inc.) ("Subtenant").

W I T N E S S E T H:

WHEREAS, by Lease dated January 8, 1992 ("Original Lease"), ARIAD Pharmaceuticals, Inc. leased from Forest City Cambridge, Inc. ("Prime Landlord") certain space in the building known as The Jackson Building, having a street address of 26 Landsdowne Street, Cambridge, Massachusetts ("Building").

WHEREAS, ARIAD Pharmaceuticals, Inc. assigned its interest in the Original Lease to Sublandlord, which assignment was executed on October 19, 1992, and recorded with the Middlesex County Southern District Registry of Deeds in Book 22527, Page 581, and filed with the Middlesex County Southern Registry District of the Land Court as Document No. 888025 noted on Certificate of Title No. 157415.

WHEREAS, the Original Lease as amended by the First and the Second Amendments to Lease, each dated May 12, 1994, the Third Amendment to Lease, dated June 1, 1994, a letter agreement, dated December 16, 1996, a letter agreement dated July 31, 1998, the Sixth Amendment to Lease, dated December 31, 1999, a letter agreement dated October 2, 2001, and the Seventh Amendment to Lease, dated March 2001, as the same may from time to time be further amended and supplemented, are hereinafter referred to collectively as the "Prime Lease." All of the space in the Building that is now or hereafter leased by Sublandlord pursuant to the Prime Lease is hereinafter referred to as the "Prime Lease Premises."

WHEREAS, pursuant to a certain Agreement of Sublease, dated December 31, 1999 (the "Original Sublease"; and, together with this First Amendment, the "Sublease"), Sublandlord leased to Subtenant, and Subtenant leased from Sublandlord, approximately 34,365 rentable square feet of the Prime Lease Premises (the "Subleased Premises"), all as more fully described in the Original Sublease; pursuant to a certain Consent to Sublease, dated as of December 31, 1999 ("Consent to Sublease"), Prime Landlord consented to the Original Sublease.

WHEREAS, Sublandlord has exercised its option to extend the termination date of the Prime Lease (the "Prime Lease Term") for a period of five (5) years from July 31, 2002 to July 31, 2007, and Subtenant desires to extend the termination date of the Sublease for a period of five (5) years from July 31, 2002 to July 31, 2007.

WHEREAS, Sublandlord and Subtenant seek to memorialize the terms of the Sublease extension within this First Amendment and, as a condition to this First Amendment, are required to obtain the prior written consent of Prime Landlord.

NOW THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Sublandlord and Subtenant confirm and agree as follows:

1. FIRST SUBLEASE EXTENSION TERM. Sublandlord and Subtenant hereby extend the Term of the Sublease for a period of five (5) years (the "First Sublease Extension Term") commencing on August 1, 2002 (the "First Sublease Extension Term Commencement Date") and, unless sooner terminated pursuant to the Sublease or the Prime Lease, ending on July 31, 2007 ("First Extension Term Termination Date"); provided, however, that Sublandlord agrees that it will not agree to a termination of the Prime Lease prior to the First Extension Term Termination Date unless (i) the Sublease has been terminated pursuant to its terms, or (ii) in connection with Sublandlord's termination of the Prime Lease, the Prime Landlord accepts the Sublease as a direct lease between Prime Landlord and Subtenant. On the First Extension Term Termination Date, Subtenant shall surrender possession of the Subleased Premises and Subtenant waives the right to any notice of termination or notice to quit. Subject to the limitations expressed in clauses (i) though (vi), inclusive, of the fifth sentence of Section 3 of the Original Sublease, Subtenant covenants that upon the First Extension Term Termination Date or sooner termination of the Sublease, Subtenant shall, without notice, deliver up and surrender possession of the Subleased Premises in the same condition in which Subtenant has agreed to keep the same during the continuance of the Term of the Sublease and in accordance with the terms thereof, normal wear and tear excepted, first removing therefrom all good and effects of Subtenant and any Required Removable Alterations (as defined in the Prime Lease) installed by or for the benefit of Subtenant during the Term of the Sublease and repairing all damage caused by such removal and restoring the Subleased Premises as provided in Section 4.3 of the Prime Lease, it being understood that, as more fully expressed in clause (v) of the fifth sentence of Section 3 of the Original Sublease, Subtenant shall not be obligated to remove, repair or restore any Required Removable Alterations existing within the Subleased Premises on the Commencement Date of the Original Sublease.

2. BASIC RENT/ADDITIONAL RENT. Effective as of the First Sublease Extension Term Commencement Date and continuing through the last day of the First Sublease Extension Term, Basic Rent for the Subleased Premises shall be One Million Five Hundred Forty-Six Thousand Four Hundred Twenty-Five and No/100 Dollars ($1,546,425.00) per year with monthly payments of Basic Rent in the amount of One Hundred Twenty-Eight Thousand Eight Hundred Sixty-Eight and 75/100 Dollars ($128,868.75) per month. In addition, Subtenant hereby agrees to pay, during the First Sublease Extension Term, all "Additional Rent" attributable to the Subleased Premises as expressed in Section 8 of the Original Sublease and as generally set forth on Schedule 8.02 attached to the Sublease, except that during the First Sublease Extension Term, in lieu of the current monthly charge of Three Thousand Two Hundred Fifty-One and 80/100 Dollars ($3,251.80) per month and Thirty-Nine Thousand Twenty-One and 60/100 Dollars ($39,021.60) per year being paid by Subtenant toward the operating expenses for shared mechanicals located in the northeast and southeast areas of the first floor, Subtenant shall pay to Sublandlord, on the same day Subtenant's installments of Basic Rent and Additional Rent are due,

2

the sum of Fourteen Thousand Nine Hundred Eighty-Eight and 75/100 Dollars ($14,988.75) per month, and One Hundred Seventy-Nine Thousand Eight Hundred Sixty-Five and No/100 Dollars ($179,865.00) per year.

3. BROKERS. Each of Sublandlord and Subtenant warrants and represents that such party has not dealt with any broker in connection with the consummation of this First Amendment other than The Staubach Company; and in the event any claim is made against either party by any other broker or agent alleging dealings with the representing party, the party against whom the claim is made shall defend, save harmless and indemnify the other on account of any loss, cost, damage and expense (including, without limitation, reasonable attorneys' fees and disbursement) which may be suffered or incurred by the indemnified party by reason of such claim. Subtenant agrees that it shall be solely responsible for the payment of any brokerage commission or fee which may be due to The Staubach Company in connection with this First Amendment.

4. DEFINITIONS. All capitalized terms used herein shall have the same meaning as set forth in the Original Sublease unless specifically otherwise provided herein.

5. EFFECT OF AMENDMENT. Except as set forth herein, the Sublease shall remain unchanged and in full force and effect. All references to the "Sublease" shall be deemed to be references to the Original Sublease as amended by this First Amendment.

6. EFFECTIVENESS UPON CONSENT OF PRIME LANDLORD AND EXECUTION BY THE PARTIES. This First Amendment shall become effective upon (i) delivery of the written consent of Prime Landlord to this First Amendment in accordance with the terms of the Consent to Sublease; and (ii) execution and delivery of this First Amendment by each of Sublandlord and Subtenant. This First Amendment may be executed in one or more counterparts.

EXECUTED in one or more counterparts by persons or officers hereunto duly authorized as of the date and year first above written.

SUBLANDLORD:
ARIAD Corporation

Attest:  /s/ Laurie Allen            By:  /s/ Edward M. Fitzgerald
         ---------------------------      ---------------------------
         Name:  Laurie Allen               Name:  Edward M. Fitzgerald
                -------------------                -------------------
         Title:  Senior Vice President,    Title:  Senior Vice President
                 ------------------------          ----------------------
         Chief Legal Office, Secretary    and Chief Financial Officer
         ---------------------------      -----------------------

                                          SUBTENANT:
                                          Aventis Pharmaceuticals Inc.

Attest:     /s/ Robert P. Cull          By:  /s/ Errol de Souza
            ---------------------------      -----------------------

3

```
Name:   Robert P. Cull              Name:   Erroll de Souza
        ----------------                    ------------------
Title:   Manager, NA Real Estate    Title:  Sr. VP & DIA Site Head
        ------------------------             ----------------------
```

4

# ARIAD PHARMACEUTICALS INC (ARIA)

26 LANDSDOWNE ST
CAMBRIDGE, MA 02139
617. 494.0400

# EX−23.1

**CONSENT OF DELLOITTE & TOUCHE**
**10−K Filed on 03/14/2003 − Period: 12/31/2002**
File Number 333−76486



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 23.1

INDEPENDENT AUDITORS' CONSENT

We consent to the incorporation by reference in Registration Statement Nos. 33-90854 and 333-36597, 333-63706 and 333-90480 of ARIAD Pharmaceuticals, Inc. on Form S-8 and Registration Statement Nos. 33-85166, 333-51687, 333-63708 and 333-76486 of ARIAD Pharmaceuticals, Inc. on Form S-3 of our report dated March 13, 2003, appearing in this Annual Report on Form 10-K of ARIAD Pharmaceuticals, Inc. for the year ended December 31, 2002.

/s/ DELOITTE & TOUCHE LLP

Boston, Massachusetts
March 13, 2003

78

# ARIAD PHARMACEUTICALS INC (ARIA)

26 LANDSDOWNE ST
CAMBRIDGE, MA 02139
617. 494.0400

# EX−99.1

**906 CERTIFICATION**
**10−K Filed on 03/14/2003 − Period: 12/31/2002**
File Number 333−76486



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 99.1

PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
(SUBSECTIONS (a) AND (b) OF SECTION 1350, CHAPTER 63 OF TITLE 18,
UNITED STATES CODE)

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), each of the undersigned officers of ARIAD Pharmaceuticals, Inc., a Delaware corporation (the "Company") does hereby certify, to such officer's knowledge, that:

The Annual Report on Form 10-K for the year ended December 31, 2002 (the "Form 10-K") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:  March 14, 2003            /s/ Harvey J. Berger, M.D.

                                 _____
                                 Harvey J. Berger, M.D.
                                 Chairman, Chief Executive Officer
                                 and President

Date:  March 14, 2003            /s/ Edward M. Fitzgerald

                                 _____
                                 Edward M. Fitzgerald
                                 Senior Vice President and Chief
                                 Financial Officer

The foregoing certification is being furnished solely pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (s) and (b) of section 1350, chapter 63 of title 18, United States Code) and is not being filed as part of a separate disclosure document.

# EXHIBIT E

The information in this prospectus supplement and the accompanying prospectus is not complete and may be changed. A registration statement relating to these securities has been filed with the Securities and Exchange Commission and has been declared effective. This preliminary prospectus supplement and the accompanying prospectus are not an offer to sell nor do they seek an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

**Filed Pursuant to Rule 424(b)(3)**
**Registration No. 333-122909**

Subject to Completion, dated August 1, 2005

PROSPECTUS SUPPLEMENT
(TO PROSPECTUS DATED MARCH 14, 2005)

## 6,000,000 Shares



# ARIAD

## Common Stock

We are offering 6,000,000 shares of our common stock, par value $.001 per share.

Our common stock is traded on The Nasdaq National Market under the symbol *"ARIA."* On July 28, 2005, the last reported sale price of our common stock was $7.48 per share.

*Investing in our common stock involves risks. "Risk Factors" begin on page S-5 of this prospectus supplement and page 4 of the accompanying prospectus.*

|  | Per Share | Total |
|---|---|---|
| Public offering price | $ | $ |
| Underwriting discount and commission | $ | $ |
| Proceeds to ARIAD Pharmaceuticals, Inc. (before expenses) | $ | $ |

We have granted the underwriters a 30-day option to purchase up to an additional 900,000 shares from us on the same terms and conditions as set forth above if the underwriters sell more than 6,000,000 shares of common stock in this offering.

*Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus supplement and the accompanying prospectus are truthful or complete. Any representation to the contrary is a criminal offense.*

Lehman Brothers, on behalf of the underwriters, expects to deliver the shares on or about                    , 2005.

# LEHMAN BROTHERS

# LAZARD CAPITAL MARKETS                    SG COWEN & CO.

, 2005

## TABLE OF CONTENTS

|  | Page |
| --- | --- |
| **Prospectus Supplement** |  |
| Summary | S-1 |
| Risk Factors | S-5 |
| Special Note Regarding Forward-Looking Statements | S-5 |
| Use of Proceeds | S-6 |
| Dividend Policy | S-6 |
| Capitalization | S-7 |
| Dilution | S-8 |
| Underwriting | S-9 |
| Legal Matters | S-12 |
| Experts | S-12 |
| Where You Can Find More Information | S-12 |
| **Prospectus** |  |
| Prospectus Summary | 1 |
| Risk Factors | 4 |
| Special Note Regarding Forward-Looking Statements | 12 |
| About this Prospectus | 13 |
| Use of Proceeds | 13 |
| Plan of Distribution | 13 |
| Legal Matters | 14 |
| Experts | 14 |
| Where You Can Find More Information | 14 |
| Incorporation of Documents by Reference | 15 |

## ABOUT THIS PROSPECTUS SUPPLEMENT

This prospectus supplement and the accompanying prospectus are part of a *"shelf"* registration statement on Form S-3 that we filed with the Securities and Exchange Commission (the *"SEC"*). This prospectus supplement describes the specific details regarding this offering, including the price, the amount of common stock being offered and the risks of investing in our common stock. The accompanying prospectus provides more general information. To the extent that information in this prospectus supplement is inconsistent with the accompanying prospectus or any of the documents incorporated by reference into the accompanying prospectus, you should rely on this prospectus supplement. You should read both this prospectus supplement and the accompanying prospectus together with the additional information about us described in the accompanying prospectus in the sections entitled *"Where You Can Find More Information"* and *"Incorporation of Documents by Reference."*

You should rely only on the information in this prospectus supplement, the accompanying prospectus and the documents we incorporated by reference. Neither we nor the underwriters have authorized anyone to provide you with different information. The information in these documents is accurate only as of their respective dates, regardless of the time of delivery of any document or of any sale of common stock. Our business, financial condition, results of operations and prospects may have changed since the date on any document. We are making offers to sell and seeking offers to buy shares of common stock only in jurisdictions where offers and sales are permitted. You should not consider this prospectus supplement and the accompanying prospectus to be an offer to sell, or a solicitation of an offer to buy, shares of common stock if the person making the offer or solicitation is not qualified to do so or if it is unlawful for you to receive the offer or solicitation.

References in the prospectus supplement, the accompanying prospectus and the documents incorporated by reference to *"we," "our," "us"* and *"the company"* refer to ARIAD Pharmaceuticals, Inc. and its subsidiaries, unless the context requires otherwise.

# SUMMARY

*This summary highlights information contained elsewhere in this prospectus supplement, the accompanying prospectus and the <u>documents incorporated by reference</u>. This summary does not contain all of the information that you should consider before deciding to invest in our common stock. You should read this entire prospectus supplement, the accompanying prospectus and the <u>documents incorporated by reference</u> carefully including the "Risk Factors" section on page S-5 of this prospectus supplement and beginning on page 4 of the accompanying prospectus and our consolidated financial statements and the related notes and the other documents <u>incorporated by reference</u>.*

## ARIAD Pharmaceuticals, Inc.

We are engaged in the discovery and development of breakthrough medicines to treat disease by regulating cell signaling with small molecules. Breakthrough medicines are products, created *de novo,* that may be used to treat diseases in innovative ways. Our initial disease focus is cancer, and we are developing a comprehensive approach that addresses the greatest medical need — novel therapies for aggressive and advanced-stage disease for which current treatments are inadequate. In oncology, our goal is to create a series of novel small-molecule product candidates that provide targeted and highly potent anti-cancer activity to treat both solid tumors and hematologic cancers, as well as the spread of primary tumors to distant sites.

## Our Product Candidates

Human cells — both healthy and malignant — share an elaborate system of molecular pathways that carry signals back and forth from the cell surface to the nucleus and within the cell. Such signaling is essential to cell functioning and viability. When disrupted or over-stimulated, such pathways may trigger diseases such as cancer. For example, growth and proliferation of cancer cells are dependent on signals from external growth factors, as well as signals indicating the availability of sufficient nutrients and blood supply. These signals are conveyed along well-defined pathways, several of which are regulated by a protein called the mammalian target of rapamycin (*"mTOR"*).

Our lead cancer product candidate, AP23573, is a potent mTOR inhibitor that starves cancer cells and shrinks tumors by regulating the response of tumor cells to nutrients and growth factors and by controlling tumor blood supply and angiogenesis through effects on vascular endothelial growth factor in tumor and endothelial cells.

AP23573 has been designated as a fast-track product by the U.S. Food and Drug Administration for the treatment of soft-tissue and bone sarcomas. We will pursue these indications as the initial registration path for AP23573. Sarcoma affects more than 99,000 patients in the United States alone.

AP23573 is in multiple Phase 2 and 1b clinical trials as a single agent in patients with hematologic malignancies (*i.e.,* leukemias and lymphomas) and solid tumors (*i.e.,* sarcomas, endometrial cancer, prostate cancer and glioblastoma multiforme). Two multi-center Phase 1b studies with AP23573 in combination with other anti-cancer therapies, currently underway in Europe, are focusing primarily on patients with breast, ovarian, non-small-cell lung and prostate cancers, as well as certain sarcomas. We have also begun enrollment in a Phase 1b trial of an oral dosage form of AP23573.

Early Phase 2 clinical data on AP23573 in sarcoma patients, who had generally failed alternative anti-cancer treatments and had progressive disease upon entering the trial, were presented at the 2005 annual meeting of the American Society of Clinical Oncology (*"ASCO"*). At the time of the analysis, 37% of patients (19/52) treated with AP23573 and evaluable for at least four months demonstrated sustained anti-tumor responses as defined by RECIST (Response Evaluation Criteria in Solid Tumors), including 3 patients with partial responses (confirmed tumor regression greater than 30%) and 16 patients with stable disease for at least four months. Five of these patients continue on trial with stable disease for at least six months. As a benchmark for evaluating these trial results, the European Organisation for Research and Treatment of Cancer (*"EORTC"*) Soft Tissue and Bone Sarcoma Group, based on their clinical trials data base, estimates the

S-1

progression-free survival rate at six months for sarcoma patients who received inactive chemotherapies to be 8%.

The Phase 2 sarcoma trial results presented at ASCO included patient analysis at one major center showing 72% of patients (23/32) who entered the trial with tumor-related symptoms (*e.g.*, pain, shortness of breath and cough) demonstrated clinically beneficial symptomatic relief early during AP23573 treatment.

In the malignant cells of many patients with the cancers we are studying in the AP23573 clinical trials, signaling along the mTOR pathway may be abnormal due to genetic mutations and/or alterations in the activity of key proteins upstream and downstream of mTOR itself. We believe these patients may be even more responsive to mTOR blockage. Our scientists and other investigators are leading the identification and development of biomarker assays to identify patients with tumors that harbor such alterations in the mTOR pathway, since these patients may be more likely to benefit from treatment with AP23573. In addition, our clinical development strategy includes extensive use of biomarkers and functional imaging technologies, such as positron emission tomography, to augment the assessment of the efficacy and safety of AP23573 in patients enrolled in our trials. Our use of pre-and post-treatment assays and assessment methods reflects a growing trend in the treatment of cancer and the development of such treatment options.

As an mTOR inhibitor, AP23573 has also been shown to potently block the growth, proliferation and migration of vascular smooth muscle cells, the primary cause of narrowing and blockage of injured vessels. In January 2005, we entered into a partnership with Medinol Ltd., one of the leading cardiovascular medical device companies, to develop and commercialize stents and other medical devices to deliver AP23573 to prevent reblockage of injured vessels following stent-assisted angioplasty, a common non-surgical procedure for dilating or opening narrowed arteries. By 2008, the drug-eluting stent market is expected to increase to over $6 billion.

Inhibition of the mTOR pathway may be useful for additional indications beyond oncology and drug-delivery stents. We are actively evaluating such indications as part of the broader clinical development plan for AP23573.

Our oncology drug discovery pipeline includes a bone-targeted mTOR inhibitor program and an oncogenic kinase inhibitor program, both of which are in pre-clinical development.

In our bone-targeted mTOR inhibitor program, we are developing a novel and potent follow-on product candidate analogous to AP23573 — modified using our proprietary chemistry — to localize mTOR inhibition and its subsequent therapeutic effects to bone. This may provide a new treatment approach for primary bone cancers, as well as cancers that have spread to bone. In our oncogenic kinase inhibitor program, we are developing potent inhibitors of enzymes involved in the growth, proliferation and spread of cancer. These programs are focused on biologically well-validated targets and are aimed at developing product candidates to address major unmet medical needs.

### Our Technologies

We have an exclusive license to pioneering technology and patents related to certain NF-kB treatment methods, and the discovery, development and use of drugs to regulate NF-kB cell-signaling activity, which may be useful in treating certain diseases. We permit broad use of our NF-kB intellectual property at no cost by investigators at academic and not-for-profit institutions to conduct non-commercial research. To date, we have entered into several research and development licenses for our NF-kB intellectual property.

We have also developed a proprietary portfolio of cell-signaling regulation technologies, our ARGENT technology, to control intracellular processes with small molecules, which provide versatile tools for applications in cell biology, functional genomics, proteomics and drug discovery research and are useful in regulated protein and cell therapy. We distribute our ARGENT technology at no cost to academic investigators in the form of our Regulation Kits. Over 900 academic investigators worldwide are using or have used this technology in diverse areas of research, and over 225 scientific papers describing their use

S-2

have been published. To date, we have entered into several research and development licenses for use of our ARGENT technology.

All of our product candidates and technology platforms are covered by our intellectual property portfolio. As of July 25, 2005, we had 96 patents and patent applications in the United States, with foreign counterparts, of which 30 are owned, co-owned or exclusively licensed by us and 66 are owned, co-owned or exclusively licensed by our 80%-owned subsidiary, ARIAD Gene Therapeutics, Inc. (*"AGTI"*). Approximately half of our United States patents have already issued.

Our research and development relating to product candidates based on our ARGENT cell-signaling regulation technology and our lead small-molecule mTOR inhibitors, for use in cancer and in the development of drug-delivery stents and other medical devices, derived from the ARGENT programs are conducted on behalf of AGTI, which owns the intellectual property relating to these compounds and technology.

## Our Corporate Strategy

Our corporate strategy aims to balance independent product development and commercialization with near-term revenues from product partnering and technology licensing. With respect to the development and commercialization of our lead product candidates, our business goals are to: (1) develop our oncology product candidates independently as far as possible before partnering them; (2) establish the commercial infrastructure to market our cancer product candidates in the United States; (3) enter into partnerships with major pharmaceutical or biotechnology companies, after obtaining definitive clinical data, to assist in developing our cancer product candidates and commercializing them outside the United States; and (4) enter into up to an additional two worldwide partnerships with medical device companies to develop and commercialize our product candidate, AP23573, in drug-delivery stents and other medical devices to decrease reblockage of injured vessels following stent-assisted angioplasty.

With respect to our core technologies and intellectual property, our goals are to license our NF-kB technology to pharmaceutical and biotechnology companies conducting research on the discovery of drugs that modulate NF-kB cell signaling and/or marketing such drugs, to permit broad use of our NF-kB and ARGENT technologies at no cost by investigators at academic and not-for-profit institutions to conduct non-commercial research, and to license our ARGENT technology to pharmaceutical and biotechnology companies to accelerate their drug discovery programs.

## Additional Information

We were organized as a Delaware corporation in April 1991. Our principal executive offices are located at 26 Landsdowne Street, Cambridge, Massachusetts 02139-4234, and our telephone number is (617) 494-0400. We maintain an internet website at http://www.ariad.com. The information on our website or any other website is not incorporated by reference into this prospectus supplement and does not constitute a part of this prospectus supplement. Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K and all amendments to such reports are made available free of charge through the Investor Relations section of our website as soon as reasonably practicable after they have been filed or furnished with the SEC.

ARIAD and the ARIAD logo are our registered trademarks. ARGENT is our trademark. Other service marks, trademarks and trade names appearing in this report are the property of their respective owners.

S-3

**The Offering**

*Unless otherwise indicated, all of the information in this prospectus supplement assumes no exercise of the underwriters' option to purchase up to an additional 900,000 shares of our common stock.*

| | |
|---|---|
| Common stock offered by us | 6,000,000 shares |
| Common stock to be outstanding after this offering | 58,979,670 shares |
| Use of proceeds | We intend to use the net proceeds of this offering for our operations, including, but not limited to, research and development, clinical trials, product manufacturing, intellectual property protection and enforcement, and working capital, and for other general corporate purposes, including, but not limited to, repayment or refinancing of existing indebtedness or other corporate borrowings, capital expenditures and possible acquisitions. |
| Nasdaq National Market symbol | ARIA |

The number of shares of our common stock to be outstanding after this offering is based on 52,979,670 shares of common stock outstanding as of July 28, 2005 and does not include:

- 5,938,469 shares of our common stock issuable upon exercise of stock options outstanding under our stock option plans as of that date, at a weighted average exercise price of $4.93; and

- 2,204,826 shares of our common stock available as of that date for future grant or issuance pursuant to our employee stock purchase and stock option plans.

S-4

## RISK FACTORS

*Investing in our common stock involves a high degree of risk. Before purchasing our common stock, you should carefully consider the following risk factors as well as all other information contained in this prospectus supplement and the accompanying prospectus and incorporated by reference, including our consolidated financial statements and the related notes. The risks and uncertainties described below are not the only ones facing us. Additional risks and uncertainties that we are unaware of, or that we currently deem immaterial, also may become important factors that affect us. If any of the following risks occur, our business, financial condition or results of operations could be materially and adversely affected. In that case, the trading price of our common stock could decline, and you may lose some or all of your investment.*

### Risks Related to this Offering

*Management will have broad discretion as to the use of the proceeds from this offering.*

We have not designated the amount of net proceeds we will receive from this offering for any particular purpose. Accordingly, our management will have broad discretion as to the application of these net proceeds and could use them for purposes other than those contemplated at the time of this offering. Our stockholders may not agree with the manner in which our management chooses to allocate and spend the net proceeds.

*You will experience immediate dilution in the book value per share of the common stock you purchase.*

Because the price per share of our common stock being offered is substantially higher than the book value per share of our common stock, you will suffer substantial dilution in the net tangible book value of the common stock you purchase in this offering. Based on an assumed public offering price of $7.48 per share in this offering (based on the last reported sale price of our common stock on July 28, 2005), and a net tangible book value per share of our common stock of $0.68 as of June 30, 2005, if you purchase shares of common stock in this offering, you will suffer immediate and substantial dilution of $6.17 per share in the net tangible book value of the common stock. See *"Dilution"* on page S-8 for a more detailed discussion of the dilution you will incur in this offering.

### Additional Risks Related to Our Business, Industry and an Investment in our Common Stock

For a discussion of additional risks associated with our business, our industry and an investment in our common stock, see the section entitled *"Risk Factors"* beginning on page 4 of the accompanying prospectus, as well as the disclosures contained in documents filed by us after the date of the accompanying prospectus pursuant to Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, which are incorporated by reference into, and deemed to be a part of, the accompanying prospectus.

Any statement contained in this prospectus supplement or in the accompanying prospectus (collectively, *"this prospectus"*) or in a document incorporated or deemed to be incorporated by reference into this prospectus will be deemed to be modified or superseded for purposes of this prospectus to the extent that a statement contained in this prospectus or any other subsequently filed document that is deemed to be incorporated by reference into this prospectus modifies or supersedes the statement. Any statement so modified or superseded will not be deemed, except as so modified or superseded, to constitute a part of this prospectus.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

The SEC encourages companies to disclose forward-looking information so that investors can better understand a company's future prospects and make informed investment decisions. This prospectus supplement, the accompanying prospectus and the documents incorporated by reference contain such *"forward-looking statements"* within the meaning of the Private Securities Litigation Reform Act of 1995.

Words such as *"may," "anticipate," "estimate," "expects," "projects," "intends," "plans," "believes"* and words and terms of similar substance used in connection with any discussion of future

operating or financial performance, identify forward-looking statements. All forward-looking statements are management's present expectations of future events and are subject to a number of risks and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements. These risks include, but are not limited to, risks and uncertainties regarding our preclinical studies, our ability to conduct clinical trials of our product candidates and the results of such trials, as well as risks and uncertainties relating to economic conditions, markets, products, competition, intellectual property, services and prices, key employees, future capital needs, dependence on our collaborators and other factors, including those set forth in the sections entitled *"Risk Factors"* on page S-5 of this prospectus supplement and page 4 of the accompanying prospectus.

In light of these assumptions, risks and uncertainties, the results and events discussed in the forward-looking statements contained in this prospectus supplement, the accompanying prospectus or in any document incorporated by reference, including our Annual Report on Form 10-K for the year ended December 31, 2004, as amended, might not occur. Investors are cautioned not to place undue reliance on the forward-looking statements. We are not under any obligation, and we expressly disclaim any obligation, to update or alter any forward-looking statements, whether as a result of new information, future events or otherwise. All subsequent forward-looking statements attributable to us or to any person acting on our behalf are expressly qualified in their entirety by the cautionary statements contained or referred to in this section.

## USE OF PROCEEDS

We estimate that our net proceeds from the sale of the 6,000,000 shares of common stock we are offering will be approximately $41.8 million, or approximately $48.1 million if the underwriters exercise their option to purchase additional shares in full, after deducting the estimated underwriting discount and estimated offering expenses we expect to pay and assuming a public offering price of $7.48 per share (based on the last reported sale price of our common stock on July 28, 2005).

We intend to use the net proceeds of this offering for our operations, including, but not limited to, research and development, clinical trials, product manufacturing, intellectual property protection and enforcement, and working capital, and for other general corporate purposes, including, but not limited to, repayment or refinancing of existing indebtedness or other corporate borrowings, capital expenditures and possible acquisitions. We have not determined the amounts we plan to spend on any of the areas listed above or the timing of these expenditures. As a result, our management will have broad discretion to allocate the net proceeds from this offering for any purpose. Pending application of the net proceeds as described above, we may initially invest the net proceeds in short-term, investment-grade, interest-bearing securities or apply them to the reduction of short-term indebtedness.

## DIVIDEND POLICY

We have never declared or paid any cash dividends on our common stock. We intend to retain any future earnings to finance the growth and development of our business and do not anticipate paying any cash dividends in the foreseeable future. In addition, the terms of our term loan place restrictions on our ability to pay dividends on our common stock.

S-6

# CAPITALIZATION

The following table sets forth our cash and cash equivalents and capitalization as of June 30, 2005 on an actual basis, and on an adjusted basis to give effect to the sale of 6,000,000 shares of common stock in this offering based on an assumed public offering price of $7.48 per share (based on the last reported sale price of our common stock on July 28, 2005), after deducting the estimated underwriting discount and the estimated offering expenses. This table should be read in conjunction with the consolidated financial statements and related information incorporated by reference.

| | At June 30, 2005 | |
| | Actual | As Adjusted |
| --- | --- | --- |
| | (In thousands) | |
| Cash and cash equivalents | $ 11,986 | $ 53,749 |
| Marketable securities | $ 38,183 | $ 38,183 |
| Current portion of long-term debt | $ 1,920 | $ 1,920 |
| Long-term debt, less current portion | 6,695 | 6,695 |
| Stockholders' equity: | | |
| Preferred stock, 10,000,000 shares authorized, none issued and outstanding | — | — |
| Common stock, $0.001 par value, 145,000,000 shares authorized, 52,938,768 shares issued and outstanding before the offering,        shares issued and outstanding after the offering | 53 | 59 |
| Additional paid-in capital | 260,221 | 301,978 |
| Deferred compensation | (298) | (298) |
| Accumulated other comprehensive income (loss) | (75) | (75) |
| Accumulated deficit | (218,046) | (218,046) |
| Total stockholders' equity | 41,855 | 83,618 |
| Total capitalization | $ 50,470 | $ 92,233 |

The number of shares of our common stock to be outstanding after this offering is based on 52,938,768 shares of common stock outstanding as of June 30, 2005, and does not include:

- 5,973,138 shares of our common stock issuable upon exercise of stock options outstanding under our stock option plans as of that date, at a weighted average exercise price of $4.93; and

- 2,211,094 shares of our common stock available as of that date for future grant or issuance pursuant to our employee stock purchase and stock option plans.

S-7

# DILUTION

The net tangible book value of our common stock on June 30, 2005 was $35.7 million, or $0.68 per share of common stock. Net tangible book value per share is calculated by subtracting our total liabilities from our total tangible assets, which is total assets less intangible assets of $6.1 million, and dividing this amount by the number of shares of our common stock outstanding on June 30, 2005. After giving effect to the sale by us of 6,000,000 shares of common stock in this offering at the assumed public offering price of $7.48 per share (based on the last reported sale price of our common stock on July 28, 2005) and after deducting the estimated underwriting discount and the estimated offering expenses, our net tangible book value as of June 30, 2005 would have been $77.5 million, or $1.31 per share of our common stock. This represents an immediate increase in net tangible book value of $0.63 per share to our existing stockholders and an immediate decrease in the net tangible book value of $6.17 per share to new investors. Dilution in the net tangible book value per share represents the difference between the offering price per share and the net tangible book value per share of our common stock immediately after the offering. The following table illustrates this per share dilution:

| | | |
|---|---:|---:|
| Assumed public offering price per share | | $ 7.48 |
| Net tangible book value per share as of June 30, 2005 | $ 0.68 | |
| Increase per share attributable to new investors | $ 0.63 | |
| Adjusted net tangible book value per share after the offering | | 1.31 |
| Dilution per share to new investors | | $ 6.17 |

The number of shares of our common stock to be outstanding after this offering is based on 52,938,768 shares of common stock outstanding as of June 30, 2005, and does not include:

- 5,973,138 shares of our common stock issuable upon exercise of stock options outstanding under our stock option plans as of that date, at a weighted average exercise price of $4.93; and

- 2,211,094 shares of our common stock available as of that date for future grant or issuance pursuant to our employee stock purchase and stock option plans.

To the extent options outstanding as of June 30, 2005 have been or may be exercised or other shares have been or are issued, there may be further dilution to new investors.

S-8

Case 1:06-cv-00259-MPT    Document 178-05    Filed 12/01/2006    Page 23 of 63

## UNDERWRITING

Lehman Brothers Inc., Lazard Capital Markets LLC and SG Cowen & Co., LLC are acting as representatives of the underwriters. Under the terms of an underwriting agreement, which we will file as an exhibit to our current report on Form 8-K and incorporate by reference in this prospectus supplement and the accompanying prospectus, each of the underwriters named below has severally agreed to purchase from us the respective number of common stock shown opposite its name below:

| Underwriters | Number of Shares |
|---|---|
| Lehman Brothers Inc. | |
| Lazard Capital Markets LLC. | |
| SG Cowen & Co., LLC. | |
| Total | 6,000,000 |

The underwriting agreement provides that the underwriters' obligation to purchase shares of common stock depends on the satisfaction of the conditions contained in the underwriting agreement including:

- the obligation to purchase all of the shares of common stock offered hereby, if any of the shares are purchased;

- the representations and warranties made by us to the underwriters are true;

- there is no material change in the financial markets; and

- we deliver customary closing documents to the underwriters.

### Commissions and Expenses

The following table summarizes the underwriting discounts and commissions we will pay to the underwriters. These amounts are shown assuming both no exercise and full exercise of the underwriters' option to purchase additional shares. The underwriting fee is the difference between the initial price to the public and the amount the underwriters pay to us for the shares.

| | No Exercise | Full Exercise |
|---|---|---|
| Per Share | | |
| Total | | |

The representatives of the underwriters have advised us that the underwriters propose to offer the shares of common stock directly to the public at the public offering price on the cover of this prospectus supplement and to selected dealers, which may include the underwriters, at such offering price less a selling concession not in excess of $         per share. The underwriters may allow, and the selected dealers may re-allow, a concession not in excess of $         per share to other dealers. After the offering, the representatives may change the offering price and other selling terms.

The expenses of the offering that are payable by us are estimated to be approximately $200,000 (exclusive of underwriting discounts and commissions).

### Option to Purchase Additional Shares

We have granted the underwriters an option exercisable for 30 days after the date of the underwriting agreement, to purchase, from time to time, in whole or in part, up to an aggregate of 900,000 shares at the public offering price less underwriting discounts and commissions. This option may be exercised if the underwriters sell more than 6,000,000 shares in connection with this offering. To the extent that this option is exercised, each underwriter will be obligated, subject to certain conditions, to purchase its pro rata portion of these additional shares based on the underwriter's percentage underwriting commitment in the offering as indicated in the table at the beginning of this *"Underwriting"* section.

S-9

## Lock-Up Agreements

We have agreed that, subject to specified exceptions, we will not, directly or indirectly, (1) offer, sell, pledge or otherwise dispose of, any shares of our common stock or any securities convertible into or exchangeable for any shares of our common stock or sell or grant options, rights or warrants with respect to any shares of our common stock or securities convertible into or exchangeable for any shares of our common stock, (2) enter into any swap or other derivatives transaction that transfers all or a portion of the economic benefits or risks of ownership of shares of our common stock, or (3) file or cause to be filed a registration statement with respect to any shares of our common stock or securities convertible, exercisable or exchangeable into shares of our common stock or any other securities of us, in each case for a period of 90 days from the date of this prospectus supplement without the prior written consent of Lehman Brothers Inc.

Our officers and directors have agreed under lock-up agreements that they will not, directly or indirectly, (1) offer, sell, pledge or otherwise dispose of any shares of our common stock or securities convertible into or exchangeable for any shares of our common stock or (2) enter into any swap or other derivatives transaction that transfers all or a portion of the economic benefits or risks of ownership of shares of our common stock, in each case for a period of 90 days from the date of this prospectus supplement without the prior written consent of Lehman Brothers Inc.

The 90-day restricted period described in the preceding paragraph will be extended if:

- during the last 17 days of the 90-day restricted period we issue an earnings release or announces material news or a material event; or

- prior to the expiration of the 90-day restricted period, we announce that we will release earnings results during the 16-day period beginning on the last day of the 90-day period;

in which case the restrictions described in the preceding paragraph will continue to apply until the expiration of the 18-day period beginning on the issuance of the earnings release or the announcement of the material news or material event.

## Indemnification

We have agreed to indemnify the underwriters against certain liabilities, including liabilities under the Securities Act of 1933, as amended, and to contribute to payments that the underwriters may be required to make for these liabilities.

## Stabilization, Short Positions and Penalty Bids

The representatives may engage in stabilizing transactions, short sales and purchases to cover positions created by short sales, and penalty bids or purchases for the purpose of pegging, fixing or maintaining the price of the common stock, in accordance with Regulation M under the Securities Exchange Act of 1934, as amended:

- Stabilizing transactions permit bids to purchase the underlying security so long as the stabilizing bids do not exceed a specified maximum.

- A short position involves a sale by the underwriters of shares in excess of the number of shares the underwriters are obligated to purchase in the offering, which creates the syndicate short position. This short position may be either a covered short position or a naked short position. In a covered short position, the number of shares involved in the sales made by the underwriters in excess of the number of shares they are obligated to purchase is not greater than the number of shares that they may purchase by exercising their option to purchase additional shares. In a naked short position, the number of shares involved is greater than the number of shares in their option to purchase additional shares. The underwriters may close out any short position by either exercising their option to purchase additional shares and/or purchasing shares in the open market. In determining the source of shares to close out the short position, the underwriters will consider, among other things, the price of shares

S-10

available for purchase in the open market as compared to the price at which they may purchase shares through their option to purchase additional shares. A naked short position is more likely to be created if the underwriters are concerned that there could be downward pressure on the price of the shares in the open market after pricing that could adversely affect investors who purchase in the offering.

- Syndicate covering transactions involve purchases of the common stock in the open market after the distribution has been completed in order to cover syndicate short positions.

- Penalty bids permit the representatives to reclaim a selling concession from a syndicate member when the common stock originally sold by the syndicate member is purchased in a stabilizing or syndicate covering transaction to cover syndicate short positions.

These stabilizing transactions, syndicate covering transactions and penalty bids may have the effect of raising or maintaining the market price of our common stock or preventing or retarding a decline in the market price of our common stock. As a result, the price of our common stock may be higher than the price that might otherwise exist in the open market. These transactions may be effected on The Nasdaq National Market or otherwise and, if commenced, may be discontinued at any time.

Neither we nor any of the underwriters make any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of our common stock. In addition, neither we nor any of the underwriters make any representation that the representatives will engage in these stabilizing transactions or that any transaction, once commenced, will not be discontinued without notice.

## Passive Market Making

In connection with the offering, underwriters and selling group members may engage in passive market making transactions in our common stock on The Nasdaq National Market in accordance with Rule 103 of Regulation M under the Securities Exchange Act of 1934, as amended, during the period before the commencement of offers or sales of common stock and extending through the completion of the distribution. A passive market maker must display its bids at a price not in excess of the highest independent bid of the security. However, if all independent bids are lowered below the passive market maker's bid, that bid must be lowered when specified purchase limits are exceeded.

## Electronic Distribution

A prospectus supplement in electronic format may be made available on Internet sites or through other online services maintained by one or more of the underwriters and/or selling group members participating in this offering, or by their affiliates. In those cases, prospective investors may view offering terms online and, depending upon the particular underwriter or selling group member, prospective investors may be allowed to place orders online. The underwriters may agree with us to allocate a specific number of shares for sale to online brokerage account holders. Any such allocation for online distributions will be made by the underwriters on the same basis as other allocations.

Other than the prospectus supplement in electronic format, information on any underwriter's or selling group member's web site and any information contained in any other web site maintained by an underwriter or selling group member is not part of this prospectus supplement or the registration statement of which this prospectus supplement and the accompanying prospectus forms a part, has not been approved and/or endorsed by us or any underwriter or selling group member in its capacity as underwriter or selling group member and should not be relied upon by investors.

## Stamp Taxes

If you purchase shares of common stock offered in this prospectus supplement and the accompanying prospectus, you may be required to pay stamp taxes and other charges under the laws and practices of the country of purchase, in addition to the offering price listed on the cover page of this prospectus supplement and the accompanying prospectus.

S-11

## Relationships

Certain of the underwriters and their related entities have engaged and may engage in commercial and investment banking transactions with us in the ordinary course of their business. In particular, Lehman Brothers Inc. and Lazard Capital Markets LLC have acted as underwriters for offerings of our common stock in the past, for which they received fees that we believe were customary for their services.

## LEGAL MATTERS

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, Massachusetts, will pass upon the validity of the issuance of the common stock offered by this prospectus supplement. Members of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. and certain members of their families and trusts for their benefit own an aggregate of approximately 5,200 shares of our common stock and 89,285 shares of the common stock of AGTI. Morrison & Foerster LLP, New York, New York, will pass upon certain legal matters for the underwriters.

## EXPERTS

The financial statements and management's report on the effectiveness of internal control over financial reporting incorporated in this prospectus by reference from the Company's Annual Report on Form 10-K for the year ended December 31, 2004 have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their reports, which is are incorporated herein by reference, and have been so incorporated in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.

## WHERE YOU CAN FIND MORE INFORMATION

We are subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, and file annual, quarterly and current reports, proxy statements and other information with the SEC. You may read and copy these reports, proxy statements and other information at the SEC's public reference facilities at Station Place, 100 F St., N.E., Washington, D.C. 20549. You can request copies of these documents by writing to the SEC and paying a fee for the copying cost. Please call the SEC at 1-800-SEC-0330 for more information about the operation of the public reference facilities. SEC filings are also available at the SEC's website at http://www.sec.gov. Our common stock is listed on the Nasdaq National Market, and you can read and inspect our filings at the offices of the National Association of Securities Dealers, Inc. at 1735 K Street, Washington, D.C. 20006.

S-12

PROSPECTUS

# ARIAD Pharmaceuticals, Inc.

## 9,500,000 SHARES OF

## COMMON STOCK

This prospectus will allow us to issue up to a total of 9,500,000 shares of our common stock from time to time at prices and on terms to be determined at or prior to the time of the offering. We will provide you with specific terms of any offering in one or more supplements to this prospectus. You should read this document and any prospectus supplement carefully before you invest.

Our common stock is listed on the Nasdaq National Market under the symbol *"ARIA."* On March 9, 2005, the last reported sale price of our common stock was $5.66 per share. Prospective purchasers of common stock are urged to obtain current information as to the market prices of our common stock.

*You should consider carefully the risks that we have described in "Risk Factors" beginning on page 4 before deciding whether to invest in our common stock.*

*Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.*

The date of this prospectus is March 14, 2005.

# TABLE OF CONTENTS

|                                                          | Page |
|----------------------------------------------------------|------|
| Prospectus Summary                                       | 1    |
| Risk Factors                                             | 4    |
| Special Note Regarding Forward-Looking Statements        | 12   |
| About This Prospectus                                    | 13   |
| Use of Proceeds                                          | 13   |
| Plan of Distribution                                     | 13   |
| Legal Matters                                            | 14   |
| Experts                                                  | 14   |
| Where You Can Find More Information                      | 14   |
| Incorporation of Documents by Reference                  | 15   |

i

Case 1:06-cv-00259-MPT    Document 118-9    Filed 12/01/2006    Page 33 of 68

# PROSPECTUS SUMMARY

*The following is a summary of what we believe to be the most important aspects of our business and the offering of shares of our common stock under this prospectus. We urge you to read this entire prospectus, including the more detailed consolidated financial statements, notes to the consolidated financial statements and other information incorporated by reference from our other filings with the SEC or included in any applicable prospectus supplement. Investing in our common stock involves risks. Therefore, carefully consider the information provided under the heading "Risk Factors" beginning on page 4.*

## About ARIAD Pharmaceuticals, Inc.

### Overview

We are engaged in the discovery and development of breakthrough medicines to treat disease by regulating cell signaling with small molecules. Breakthrough medicines are products, created *de novo*, that may be used to treat diseases in innovative ways. Our initial disease focus is cancer, and we are developing a comprehensive approach that addresses the greatest medical need — novel therapies for aggressive and advanced-stage disease for which current treatments are inadequate. In oncology, our goal is to create a series of novel small-molecule product candidates that provide targeted and highly potent anti-cancer activity to treat both solid tumors and hematologic cancers, as well as the spread of primary tumors to distant sites.

### Our Product Candidates

All of our product development programs are focused on developing small-molecule drugs that regulate cell-signaling. Human cells — both healthy and malignant — share an elaborate system of molecular pathways that carry signals back and forth from the cell surface to the nucleus and within the cell. Such signaling is essential to cell functioning and viability. When disrupted or over-stimulated, such pathways may trigger diseases such as cancer. For example, growth and proliferation of cancer cells are dependent on signals from external growth factors, as well as signals indicating the availability of sufficient nutrients and blood supply. These signals are conveyed along well-defined pathways, several of which are regulated by a protein called the mammalian target of rapamycin, or mTOR.

AP23573, our lead cancer product candidate, is a potent mTOR inhibitor that starves cancer cells and shrinks tumors by regulating the response of tumor cells to nutrients and growth factors and by controlling tumor blood supply and angiogenesis through effects on vascular endothelial growth factor, or VEGF.

Currently, AP23573 is in multiple Phase 2 and 1b clinical trials at cancer centers in patients with various hematologic malignancies (*i.e.*, leukemias and lymphomas) and solid tumors (*i.e.*, sarcomas and glioblastoma multiforme), whose disease is recurrent and/or refractory. In 2005, we expect to initiate additional Phase 2 multi-center studies of AP23573 in patients with other solid tumors, including endometrial and prostate cancer, as well as Phase 1b studies of AP23573 in combination with other anti-cancer therapies — both chemotherapies and targeted therapies. In addition, we plan to file an investigational new drug (IND) application for, and initiate clinical trials of, an oral dosage form of AP23573. Finally, based on the progress we expect to achieve in the clinical development of AP23573, we anticipate arriving at the initial definition of the registration path for AP23573 in patients with cancer by the end of 2005.

In the malignant cells of many patients with the cancers we are studying in the AP23573 clinical trials, signaling along the mTOR pathway may be abnormal due to genetic mutations and/or alterations in the activity of key proteins upstream and downstream of mTOR itself. We believe these patients may be even more responsive to mTOR blockage. Our scientists and other investigators are leading the identification and development of biomarker assays to identify patients with tumors that harbor such alterations in the mTOR pathway, since these patients may be more likely to benefit from treatment with AP23573. In addition, our clinical development strategy includes extensive use of biomarkers and functional imaging technologies, such as positron emission tomography, to augment the assessment of the efficacy and safety of AP23573 in patients enrolled in our trials. Our use of pre-and post-treatment assays and assessment methods reflects a growing trend in the treatment of cancer and the development of such treatment options.

1

As an mTOR inhibitor, AP23573 blocks the growth, proliferation and migration of vascular smooth muscle cells, the primary cause of narrowing and blockage of injured vessels. In January 2005, we entered into a partnership with Medinol Ltd., one of the leading cardiovascular medical device companies, to develop and commercialize stents and other medical devices to deliver AP23573 to prevent reblockage of injured vessels following stent-assisted angioplasty, a common non-surgical procedure for dilating or opening narrowed arteries. By 2008, the drug-eluting stent market is expected to increase to over $6 billion.

Inhibition of the mTOR pathway may be useful for additional indications beyond oncology and drug-delivery stents, and we are actively evaluating such indications as part of the broader clinical development plan for AP23573.

Our oncology drug discovery pipeline also includes a bone-targeted mTOR inhibitor program and an oncogenic kinase inhibitor program, both of which are in pre-clinical development.

In our bone-targeted mTOR inhibitor program, we are developing a novel and potent follow-on product candidate analogous to AP23573 — modified using our proprietary chemistry — to localize mTOR inhibition and its subsequent therapeutic effects to bone. This may provide a new treatment approach for primary bone cancers, as well as cancers that have spread to bone.

In our oncogenic kinase inhibitor program, we are developing potent inhibitors of enzymes involved in the growth, proliferation and spread of cancer. Our targets include (1) clinically relevant mutants of Abl, to block a signaling pathway that remains active in certain forms of leukemia that are resistant to Gleevec™ treatment and (2) Src, to block signaling pathways that control the migration of cancer cells from the primary tumor to distant sites. These programs are focused on biologically well-validated targets and are aimed at developing product candidates to address major unmet medical needs.

### Our Technologies

We have an exclusive license to pioneering technology and patents related to certain NF-kB treatment methods, and the discovery, development and use of drugs to regulate NF-kB cell-signaling activity, which may be useful in treating certain diseases.

We have also developed a proprietary portfolio of cell-signaling regulation technologies, our ARGENT technology, to control intracellular processes with small molecules, which provide versatile tools for applications in cell biology, functional genomics, proteomics and drug discovery research and are useful in regulated protein and cell therapy.

All of our product candidates and technology platforms are covered by our intellectual property portfolio. As of February 11, 2005 we have 97 patents and pending patent applications in the United States, of which 35 are owned, co-owned or exclusively licensed by us and 62 are owned, co-owned or exclusively licensed by our 80%-owned subsidiary, ARIAD Gene Therapeutics, Inc., or AGTI.

Our research and development relating to product candidates based on our ARGENT cell-signaling regulation technology and our lead small-molecule mTOR inhibitors, for use in cancer and in the development of drug-delivery stents and other medical devices, derived from the ARGENT programs are conducted on behalf of AGTI, which owns the intellectual property relating to these compounds and technology.

### Our Corporate Strategy

With respect to the development and commercialization of our lead product candidates, our business goals are to: (1) develop our oncology product candidates independently as far as possible before partnering them; (2) establish the commercial infrastructure to market our anti-cancer product candidates in the United States; (3) enter into partnerships with pharmaceutical or biotechnology companies after obtaining definitive clinical data, to assist in developing our cancer product candidates and commercializing them outside the United States; and (4) enter into up to an additional two worldwide partnerships with medical device companies to develop and commercialize our product candidate, AP23573, in drug-delivery stents and other medical devices to decrease reblockage of injured vessels following stent-assisted angioplasty.

2

With respect to our core technologies and intellectual property, we permit broad use of our NF-kB intellectual property at no cost by investigators at academic and not-for-profit institutions to conduct non-commercial research. Our goal is to license our NF-kB technology to pharmaceutical and biotechnology companies conducting research on the discovery of drugs that modulate NF-kB cell signaling and/or marketing such drugs. We also distribute our ARGENT technology at no cost to academic investigators in the form of our Regulation Kits. Over 800 academic investigators worldwide are using or have used this technology in diverse areas of research, and over 225 scientific papers describing their use have been published. Our goal is to license our ARGENT technology to pharmaceutical and biotechnology companies to accelerate their drug discovery.

### Additional Information

We were organized as a Delaware corporation in April 1991. Our principal executive offices are located at 26 Landsdowne Street, Cambridge, Massachusetts 02139-4234. Our telephone number is (617) 494-0400, and our website address is http://www.ariad.com. Our annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K which have been filed with the SEC are available to you free of charge through a hyperlink on our internet website. The information on our website or any other website is not incorporated by reference into this prospectus and does not constitute a part of this prospectus. ARIAD and the ARIAD logo are our registered trademarks. ARGENT is our trademark. Other trademarks and trade names appearing in this prospectus are the property of their holders.

### Offerings Under This Prospectus

Under this prospectus we may sell up to 9,500,000 shares of our common stock in one or more offerings. Each time we sell shares of our common stock under this prospectus, we will provide a prospectus supplement that will contain specific information about the terms of the offering.

3

Case 1:06-cv-00259-MPT    Document 113-5    Filed 12/01/2006    Page 46 of 62

## RISK FACTORS

*Investing in our common stock is very risky. Before making an investment decision, you should carefully consider the risks set forth below as well as other information we include or incorporate by reference in this prospectus or include in any applicable prospectus supplement. You should be able to bear a complete loss of your investment.*

### Risks Relating to Our Business

*We and our partners may never succeed in developing marketable products or generating product revenues.*

We are a biopharmaceutical company focused on the discovery and development of drugs to provide therapeutic intervention in treating human diseases at the cellular level. As with all science, we face much trial and error, and we may fail at numerous stages along the way, which would inhibit us from successfully developing, manufacturing and marketing our drug candidates. Although our lead product candidate, AP23573, is currently in Phase 2 clinical trials for certain cancers, we do not currently have any products on the market and have no product revenues. We are also dependent upon the success of our medical device partner(s) in developing, manufacturing and marketing stents or other medical devices to deliver AP23573 to reduce reblockage of injured arteries following stent-assisted angioplasty. We and our partners, including our partner(s) responsible for developing medical devices delivering AP23573, may not succeed in developing or commercializing any products which will generate product revenues for our company. Other than AP23573, we do not have any product candidates in clinical development, and we have not designated any clinical candidates from our existing preclinical programs. We do not expect to have any products on the market before 2007, and, ultimately, we and our partner(s) may not have any products on the market for several years, if at all. If our medical device partner is not successful and/or if we are not able to enter into agreements with additional medical device companies experienced in the development, manufacture, and marketing of medical devices to deliver AP23573, we will not be able to generate product revenues from the marketing of stents or other medical devices that deliver AP23573. If we are not successful in developing or marketing AP23573 or other product candidates, and if our medical device partner(s) are not successful in developing or marketing stents or other medical devices that deliver AP23573, we will not be profitable.

*We have incurred significant losses to date and may never be profitable.*

We have incurred significant operating losses in each year since our formation in 1991 and have an accumulated deficit of $191.6 million from our operations through December 31, 2004. Losses have resulted principally from costs incurred in research and development of our product candidates, including clinical development of AP23573, our lead product candidate, and from general and administrative costs associated with our operations. It is likely that we will incur significant operating losses for the foreseeable future. We currently have no product revenues, limited license revenues and limited commitments for future licensing revenues, and may not be able to generate such revenues in the future. If our losses continue and we and our partner(s) are unable to successfully develop, commercialize, manufacture and market our product candidates and/or we are unable to enter into agreements and licenses of our intellectual property, we may never generate sufficient revenues to achieve profitability. Even if we and our partner(s) are able to commercialize products and we are able to enter into agreements or licenses in the future, we may never generate sufficient revenues to have profitable operations.

*We have limited experience in manufacturing of our product candidates, which raises uncertainty as to our ability to develop and commercialize our product candidates.*

We have limited experience in manufacturing any of our product candidates on a large scale. Our ability to conduct clinical trials and commercialize our product candidates will depend, in part, on our ability to manufacture our products on a large scale, either directly or through third parties, at a competitive cost and in accordance with current Good Manufacturing Practices (*"cGMP"*) and other regulatory requirements. We depend on third-party manufacturers or collaborative partners for the production of our product candidates for

4

preclinical studies and clinical trials and intend to use third-party manufacturers to produce any products we may eventually commercialize. If we are not able to obtain contract manufacturing on commercially reasonable terms, obtain or develop the necessary materials and technologies for manufacturing, or obtain intellectual property rights necessary for manufacturing, we may not be able to conduct or complete clinical trials or commercialize our product candidates. There can be no assurance that we will be able to obtain such requisite terms, materials, technologies and intellectual property necessary to successfully manufacture our product candidates for clinical trials or commercialization.

### *We are dependent upon the ability of our medical device partner(s) to develop, manufacture, test and market stents or other medical devices to deliver AP23573.*

We have no experience in the development of medical devices and will not ourselves develop stents or other medical devices to deliver AP23573. Instead, we have granted one license, and may grant up to two additional licenses, under our rights to AP23573 to medical device companies for their use in developing and commercializing such medical devices to reduce blockage of injured vessels following stent-assisted angioplasty.

While we expect to supply AP23573 to our medical device partner(s), we will be otherwise dependent upon them to develop and commercialize stents or other medical devices to deliver AP23573. Such medical device partner(s) will have various degrees of scientific, technical, medical and regulatory experience and resources to, directly or through third parties, develop, manufacture, test or market stents or other medical devices to deliver AP23573. Their ability to conduct clinical trials and commercialize such medical devices will be dependent on the safety profile of AP23573 and our ability to manufacture and supply AP23573, either directly or through third parties, at a competitive cost and in accordance with cGMP and other regulatory requirements. We depend upon third-party manufacturers or collaborative partners for the production of AP23573 for clinical trials and intend to use third-party manufacturers to produce AP23573 on commercial scale. Our reliance on third-party manufacturers and their potential inability to meet our supply commitments to one or more of our medical device licensees could adversely impact the ability of our medical device partner(s) to commercialize stents or other medical devices to deliver AP23573.

We anticipate that our medical device partner(s) will seek to develop and commercialize stents or other medical devices to deliver AP23573 that do not infringe third-party patents. However, there can be no assurance that the devices delivering AP23573 marketed by our medical device partner(s) will not be subject to third-party claims. Furthermore, the patents issued to us or our medical device partner(s) covering AP23573 and/or medical devices, including stents, may be subject to challenge and may be subsequently narrowed, invalidated or circumvented. Either such event would adversely impact the ability of one or more of our medical device partner(s) to market their stents or other medical devices to deliver AP23573.

Our existing license agreement with our medical device partner allows either party to terminate under certain circumstances, including such partner's reasonable business judgment that development of a medical device to deliver AP23573 is not feasible. Accordingly, our medical device partner may be unable to develop a medical device to deliver AP23573 and we may also not be able to enter into any additional licensing agreements with any medical device company to develop such devices on terms which are acceptable to us, or at all. Our inability to enter into such transactions, or the inability of one or more of our medical device partner(s) to develop or commercialize stents or other medical devices to deliver AP23573 for any reason, will adversely impact our ability to generate revenues from any licenses of AP23573.

### *The loss of key members of our scientific and management staff could delay and may prevent the achievement of our research, development and business objectives.*

Our performance as a specialized scientific business is substantially dependent on our key officers and members of our scientific staff responsible for areas such as drug development, clinical trials, regulatory affairs, drug discovery, manufacturing, marketing, business development and intellectual property protection and licensing. We also are dependent upon a few of our scientific advisors to assist in formulating our research and development strategy. While we have entered into employment agreements with all of our

5

executive officers, these officers may not remain with us. The loss of, and failure to promptly replace, any member of our management team could significantly delay and may prevent the achievement of our research, development and business objectives.

### *Insufficient funding may jeopardize our research and development programs and may prevent commercialization of our products and technologies.*

We have funded our operations to date through sales of equity securities, debt and operating revenue. Most of our operating revenue to date has been generated through previous collaborative research and development agreements and existing licenses. We currently do not have any committed funding from any pharmaceutical company to advance any of our product development programs. Although we believe that our current available funds will be adequate to satisfy our capital and operating requirements into the fourth quarter of 2006, we will require substantial additional funding for our research and development programs (including pre-clinical development and clinical trials), for operating expenses (including intellectual property protection and enforcement), for the pursuit of regulatory approvals and for establishing manufacturing, marketing and sales capabilities. We received net proceeds of $40 million from the sale of 5,060,000 shares of our common stock during fiscal 2004. In addition to the shares of common stock we may sell under this prospectus, we have an additional effective shelf registration statement on file with the SEC under which we can sell up to 1,940,000 shares of our common stock. We may sell part or all of these shares at our discretion, subject to certain limitations under federal securities laws and the rules of the Nasdaq National Market. While we intend to seek additional funding from product-based collaborations, technology licensing, and public or private financings, such additional funding may not be available on terms acceptable to us, or at all. Accordingly, we may not be able to secure the significant funding which is required to maintain and continue each of our research and development programs at their current levels or at levels that may be required in the future. If we cannot secure adequate financing, we may be required to delay, scale back, eliminate or terminate clinical trials and/or seeking marketing approval for AP23573 for one or more indications, to delay, scale back or eliminate one or more of our research and development programs, or to enter into license or other arrangements with third parties to purchase, commercialize or otherwise obtain rights in products or technologies that we would otherwise seek to develop ourselves.

### *We will continue to expend significant resources on the enforcement and licensing of our NF-kB patent portfolio and may be unable to generate material revenues from these efforts, if we are unable to enforce against, or license our NF-kB patents to, pharmaceutical and biotechnology companies.*

We are the exclusive licensee of a family of patents, three in the U.S. and one in Europe, including a pioneering U.S. patent covering methods of treating human disease by regulating NF-kB cell-signaling activity, or the NF-kB '516 Patent, awarded to a team of inventors from The Whitehead Institute for Biomedical Research, Massachusetts Institute of Technology and Harvard University. We have initiated a licensing program to generate revenues from the discovery, development, manufacture and sale of products covered by our NF-kB patent portfolio. These patents may be challenged and subsequently narrowed, invalidated, or circumvented, any of which could materially impact our ability to generate licensing revenues from them.

On June 25, 2002, we, together with these academic institutions, filed a lawsuit in the United States District Court for the District of Massachusetts, or the U.S. District Court, against Eli Lilly and Company, or Lilly, alleging infringement upon issuance of certain claims of the NF-kB '516 Patent, or the NF-kB '516 Claims, through sales of Lilly's osteoporosis drug, Evista®, and its septic shock drug, Xigris®, or the Lilly litigation. As exclusive licensee of this patent, we are obligated for the costs expended for its enforcement in the Lilly litigation and otherwise. A trial date has not been set by the U.S. District Court in this case. Therefore, we will continue to expend, significant capital and management resources pursuing the Lilly litigation for an indeterminate period, and the outcome is uncertain. Several cases have been decided by the U.S. Court of Appeals and the Supreme Court addressing issues pertinent to the Lilly litigation since its inception. If the NF-kB '516 Claims are invalidated or found not to be infringed in the Lilly litigation, we will not realize any revenues on sales of Evista or Xigris, and could be liable under certain limited

6

circumstances for Lilly's litigation costs and potentially attorneys' fees. Invalidation of the NF-kB '516 Claims would have a significant adverse impact on our ability to generate revenues from our NF-kB licensing program. Moreover, significant expenditures to enforce these patent rights without generating revenues or accessing additional capital could adversely impact our ability to further our clinical programs and our research and development programs at the current levels or at levels that may be required in the future.

***Because we do not own all of the outstanding stock of our subsidiary, ARIAD Gene Therapeutics, Inc., or AGTI, we may not realize all of the potential future economic benefit from products developed based on technology licensed to or owned by our subsidiary.***

Our majority-owned subsidiary, AGTI, holds licenses from Harvard University, Stanford University and other universities relating to our ARGENT cell-signaling regulation technology, and owns the intellectual property in our mTOR inhibitors derived from our ARGENT programs — including AP23573, which is in Phase 2 clinical trials for use in cancer and in development for use in drug-delivery stents and other medical devices, and our bone-targeted mTOR inhibitor program. The two directors of AGTI are also members of the Board of Directors of the Company.

Minority stockholders of AGTI, including Harvard University, Stanford University, several of our scientific advisors, and several current and former members of our management and Board of Directors, own 20% of the issued and outstanding common stock of AGTI. We own the remaining 80% of the issued and outstanding common stock of AGTI.

We do not currently have a license agreement with AGTI that provides us with rights to commercialize product candidates, based on our ARGENT cell-signaling regulation technology or mTOR inhibitors derived from our ARGENT programs, solely for our own benefit, as opposed to for the benefit of AGTI. If we determine it to be in the best interests of our stockholders to commercialize these product candidates solely for our own benefit, we may negotiate with AGTI to obtain a license on terms to be determined granting us the sole rights to commercialize such product candidates. If we enter into such a license, the future economic benefit to our stockholders from our commercialization of such products, if any, will be diminished by any royalties or other payments paid under a future agreement with AGTI. If we do not enter into such a license, then the future economic benefit to our stockholders from our commercialization of such products on behalf of AGTI would be in the form of a dividend or other payments received in respect of our 80% interest in AGTI.

Alternatively, if we determine it to be in the best interests of our stockholders, we may seek to acquire some or all of the interests of the minority stockholders in AGTI for cash, shares of our common stock or other securities in a merger, exchange offer or other transaction. If we acquire all of the interests of the minority stockholders in AGTI, then our stockholders will receive all of the future economic benefit from our commercialization of such products on our own behalf. If we acquire these minority interests, we anticipate that this transaction will result in dilution to our stockholders and will require our incurrence of significant transaction costs, which are currently unknown. On January 13, 2004, we acquired an additional 351,909 shares of AGTI common stock, representing approximately 6% of AGTI's outstanding common stock, for a total purchase price of approximately $8.8 million, effected through the reduction of intercompany debt, subject to adjustment in certain circumstances, in order to maintain our 80% interest in AGTI. While such valuation was based on a good-faith determination made by the independent members of our Board of Directors as of that date, the economic value of the minority stockholders' interests is difficult to quantify in the absence of a public market. If we acquire all of the interests of the minority stockholders in AGTI, a variety of valuation methodologies may be employed to determine the value per share of AGTI common stock. Factors impacting this valuation would include the progress, likelihood and cost of development and commercialization of product candidates, potential future income streams therefrom, availability of funding and other factors. If we acquire the minority interests for consideration valued in excess of the value implicitly attributed to such AGTI shares by the market, this could result in a decline in our stock price. If we choose to acquire some or all of these minority interests through a merger in which we do not solicit the consent of the minority stockholders of AGTI, we could become subject to litigation or an appraisal procedure, which could result in additional expense and diversion of management resources.

7

There can be no assurance that we will, at any time, enter into a license with AGTI or acquire some or all of the interests of the minority stockholders in AGTI. If we pursue either of these alternatives, there can be no assurance as to the timing of any such transaction, the form of such transaction, the particular transaction terms such as the form or amount of consideration offered or provided by us, or the consequences of any such proposed or completed transaction to us or the AGTI minority stockholders.

*Because members of our management team and/or Board of Directors beneficially own a material percentage of the capital stock of our subsidiary, AGTI, and we have agreements with AGTI, there are conflicts of interest present in dealings between ARIAD and AGTI.*

Four members of our management team and/or Board of Directors own approximately 5.6% of the outstanding capital stock of AGTI. Harvey J. Berger, M.D., our Chairman, and Chief Executive Officer, owns 3.2%, David L. Berstein, Esq., our Senior Vice President and Chief Patent Counsel, owns 0.2%, John D. Iuliucci, Ph.D., our Senior Vice President and Chief Development Officer, owns 0.6% and Jay R. LaMarche, one of our directors, owns 1.6%. These same individuals beneficially own an aggregate of approximately 5.5% of our outstanding common stock. Additionally, Dr. Berger and Mr. LaMarche are the two members comprising the Board of Directors of AGTI. As part of the formation of AGTI, we entered into certain agreements with AGTI to provide for the operations of AGTI. As a result, conflicts of interest exist in dealings between AGTI and us. AGTI is the exclusive licensee of the ARGENT cell-signaling intellectual property from Harvard University and Stanford University and of related technologies from other universities, and owns the intellectual property on our mTOR inhibitors derived from our ARGENT programs, including AP23573, which is in Phase 2 clinical trials for use in cancer and in development for use in drug-delivery stents and other medical devices, and our bone-targeted mTOR inhibitor program. Because of the apparent conflicts of interest, the market may be more inclined to perceive the terms of any transaction between us and AGTI as being unfair to us.

*We may not be able to protect our intellectual property relating to our research programs, technologies and products.*

We and our licensors have issued patents and pending patent applications covering research methods useful in drug discovery, new chemical compounds discovered in our drug discovery programs, certain components, configurations and uses of our cell-signaling regulation technologies and products-in-development, methods and materials for manufacturing our products-in-development and other pharmaceutical products and methods and materials for conducting pharmaceutical research. We have an ongoing licensing program to generate revenues from the use of our ARGENT cell-signaling regulation technologies and our NF-kB intellectual property. Pending patent applications may not issue as patents and may not issue in all countries in which we develop, manufacture or sell our products or in countries where others develop, manufacture and sell products using our technologies. In addition, patents issued to us or our licensors may be challenged and subsequently narrowed, invalidated or circumvented. In that event, such patents may not afford meaningful protection for our technologies or product candidates, which would materially impact our ability to develop and market our product candidates and to generate licensing revenues from our patent portfolio. Certain technologies utilized in our research and development programs are already in the public domain. Moreover, a number of our competitors have developed technologies, filed patent applications or obtained patents on technologies and compositions that are related to our business and may cover or conflict with our patent applications. Such conflicts could limit the scope of the patents that we may be able to obtain or may result in the denial of our patent applications. If a third party were to obtain intellectual proprietary protection for any of these technologies, we may be required to challenge such protections, terminate or modify our programs that rely on such technologies or obtain licenses for use of these technologies.

*We may be unable to develop or commercialize our product candidates, if we are unable to obtain or maintain certain licenses on commercial terms or at all.*

We have entered, and will continue to enter, into agreements, either directly or through AGTI, with third parties to test compounds, blood and tissue samples, which testing may yield new discoveries requiring us to

8

obtain licenses in order to exclusively develop or market new products, alone or in combination with our product candidates, or to develop or market our product candidates for new indications. We have also entered into license agreements for some of our technologies, either directly or through AGTI. We use gene sequences or proteins encoded by those sequences and other biological materials in each of our research programs which are, or may become, patented by others and to which we would be required to obtain licenses in order to develop or market our product candidates. Our inability to obtain any one or more of these licenses, on commercially reasonable terms, or at all, or to circumvent the need for any such license, could cause significant delays and cost increases and materially affect our ability to develop and commercialize our product candidates. Obtaining licenses for these discoveries and technologies may require us to make cumulative royalty payments or other payments to several third parties, potentially reducing amounts paid to us or making the cost of our products commercially prohibitive. Manufacturing of our products may also require licensing technologies and intellectual property from third parties.

Some of our licenses obligate us to exercise diligence in pursuing the development of product candidates, to make specified milestone payments and to pay royalties. In some instances, we are responsible for the costs of filing and prosecuting patent applications. These licenses generally expire upon the earlier of a fixed term of years after the date of the license or the expiration of the applicable patents, but each license is also terminable by the other party upon default by us of our obligations. Our inability or failure to meet our diligence requirements or make any payments required under these licenses would result in a reversion to the licensor of the rights granted which, with respect to the licenses pursuant to which we have obtained exclusive rights, would materially and adversely affect our ability to develop and market products based on our licensed technologies.

### Competing technologies may render some or all of our programs or future products noncompetitive or obsolete.

Many well-known pharmaceutical, healthcare and biotechnology companies, academic and research institutions and government agencies, which have substantially greater capital, research and development capabilities and experience than us or our potential partners, are presently engaged in one or more of the following activities:

- developing products based on cell signaling, genomics, proteomics, computational chemistry and protein and cellular therapies;

- conducting research and development programs for the treatment of each of the disease areas in which we are focused; and

- manufacturing, promoting, marketing and selling pharmaceutical or medical device products for treatment of diseases in all of the disease areas in which we or our partner(s) are focused.

Some of these entities already have competitive products on the market or product candidates in clinical trials or in more advanced preclinical studies than we do. By virtue of having or introducing competitive products on the market before us, these entities may gain a competitive advantage. Competing technologies may render some or all of our programs or future products noncompetitive or obsolete, and we may not be able to make the enhancements to our technology necessary to compete successfully with newly emerging technologies. If we are unable to successfully compete in our chosen markets, we will not become profitable.

### If our product candidates are not accepted by patients, physicians and insurers, we will not be successful.

Our success is dependent on the acceptance of our product candidates. Our product candidates may not achieve significant market acceptance among patients, physicians or third-party payors, even if we obtain necessary regulatory and reimbursement approvals. Physicians and health care payors may conclude that any of our product candidates are not safe. Failure to achieve significant market acceptance of our product candidates will harm our business. We believe that recommendations by physicians and health care payors will be essential for market acceptance of any product candidates.

9

*If we are unable to establish sales, marketing and distribution capabilities or to enter into agreements with third parties to do so, we may be unable to successfully market and sell any products.*

We currently have no sales, marketing or distribution capabilities. If we are unable to establish sales, marketing or distribution capabilities either by developing our own sales, marketing and distribution organization or by entering into agreements with others, we may be unable to successfully sell any products that we are able to begin to commercialize. If we are unable to effectively sell our products, our ability to generate revenues will be harmed. We may not be able to hire, in a timely manner, the qualified sales and marketing personnel we need, if at all. In addition, we may not be able to enter into any marketing or distribution agreements on acceptable terms, if at all. If we cannot establish sales, marketing and distribution capabilities as we intend, either by developing our own capabilities or entering into agreements with third parties, sales of future products, if any, may be harmed.

*If we develop a product for commercial use, a subsequent product liability-related claim or recall could have an adverse effect on our business.*

Our business exposes us to potential product liability risks inherent in the testing, manufacturing and marketing of pharmaceutical products. Prior to obtaining regulatory approval to market our products, we are required to test such products in human clinical trials at health care institutions pursuant to agreements which indemnify such institutions in case of harm caused to patients by our products. We may not be able to avoid significant product liability exposure resulting from use of our products. A product liability-related claim or recall could be detrimental to our business. In addition, except for insurance covering product use in our clinical trials, we do not currently have any product liability insurance, and we may not be able to obtain or maintain such insurance on acceptable terms, or we may not be able to obtain any insurance to provide adequate coverage against potential liabilities. Our inability to obtain sufficient insurance coverage at an acceptable cost or otherwise to protect against potential product liability claims could prevent or limit the commercialization of any products that we develop.

*Significant additional losses or insufficient funding may cause us to default on certain covenants of our loan documents.*

At December 31, 2004, we had $9.6 million outstanding under a term loan agreement with a bank, pursuant to which we are required to maintain certain financial and non-financial covenants, including minimum cash, cash equivalents and investments of $13 million, a default of any of which would allow the bank to demand payment of its loan. We currently maintain sufficient liquidity to fund payment of this loan if demand for payment were made. However, if we are unable to raise adequate financing to fund continuing operations or otherwise to refinance our loan, we may not be able to maintain compliance with loan covenants, may be required to pay off the loan and may be required to reduce our spending on operations.

**Risks Relating to Governmental Approvals**

*We have limited experience in conducting clinical trials, which may cause delays in commencing and completing clinical trials of our product candidates.*

Clinical trials must meet FDA and foreign regulatory requirements. We have limited experience in designing, conducting and managing the preclinical studies and clinical trials necessary to obtain regulatory approval for our product candidates in any country. We may encounter problems in clinical trials that may cause us or the FDA or foreign regulatory agencies to delay, suspend or terminate our clinical trials at any phase. These problems could include the possibility that we may not be able to manufacture sufficient quantities of cGMP materials for use in our clinical trials, conduct clinical trials at our preferred sites, enroll a sufficient number of patients for our clinical trials at one or more sites or begin or successfully complete clinical trials in a timely fashion, if at all. Furthermore, we, the FDA or foreign regulatory agencies may suspend clinical trials at any time if we or they believe the subjects participating in the trials are being exposed to unacceptable health risks or if we or they find deficiencies in the clinical trial process or conduct of the investigation. If clinical trials of any of our product candidates fail, we will not be able to market the

10

product candidate which is the subject of the failed clinical trials. The FDA and foreign regulatory agencies could also require additional clinical trials before or after granting of marketing approval for any of our products, which would result in increased costs and significant delays in the development and commercialization of our products and could result in the withdrawal of our products from the market after obtaining marketing approval. Our failure to adequately demonstrate the safety and efficacy of a product candidate in clinical development could delay or prevent obtaining marketing approval of the product candidate and, after obtaining marketing approval, could result in the product being withdrawn from the market, either of which would likely have a material adverse effect on our business.

### *We may not be able to obtain government regulatory approval for our product candidates prior to marketing.*

To date, we have not submitted a marketing application for any product candidate to the FDA or any foreign regulatory agency, and none of our product candidates have been approved for commercialization in any country. Prior to commercialization, each product candidate would be subject to an extensive and lengthy governmental regulatory approval process in the United States and in other countries. We may not be able to obtain regulatory approval for any product candidate we develop or even if approval is obtained, the labeling for such products may place restrictions on their use that could materially impact the marketability and profitability of the product subject to such restrictions. We have limited experience in designing, conducting and managing the clinical testing necessary to obtain such regulatory approval. Satisfaction of these regulatory requirements, which includes satisfying the FDA and foreign regulatory authorities that the product is both safe and effective for its intended therapeutic uses, typically takes several years or more depending upon the type, complexity and novelty of the product and requires the expenditure of substantial resources. Furthermore, the regulatory requirements governing our product candidates are uncertain. Uncertainty with respect to the regulatory requirements for all of our product candidates may result in excessive costs or extensive delays in the regulatory approval process, adding to the already lengthy review process. If regulatory approval of a product is granted, such approval will be limited to those disease states and conditions for which the product is proven safe and effective, as demonstrated by clinical trials, and our products will be subject to ongoing regulatory reviews. Even if we obtain orphan drug designation by the FDA for one or more of our product candidates, this designation may be challenged by others or may prove to be of no practical value.

### *We will not be able to sell our product candidates, if we or our third-party manufacturers fail to comply with FDA manufacturing regulations.*

Before we can begin to commercially manufacture our product candidates, we must either secure manufacturing in an approved manufacturing facility or obtain regulatory approval of our own manufacturing facility and processes. In addition, the manufacturing of our product candidates must comply with cGMP requirements of the FDA and requirements by regulatory agencies in other countries. These requirements govern, among other things, quality control and documentation procedures. We, or any third-party manufacturer of our product candidates, may not be able to comply with these requirements, which would prevent us from selling such products. Material changes to the manufacturing processes of our products after approvals have been granted are also subject to review and approval by the FDA or other regulatory agencies.

### *Even if we bring products to market, we may be unable to effectively price our products or obtain adequate reimbursement for sales of our products, which would prevent our products from becoming profitable.*

If we succeed in bringing our product candidates to the market, they may not be considered cost-effective, and coverage and adequate payments may not be available or may not be sufficient to allow us to sell our products on a competitive basis. In both the United States and elsewhere, sales of medical products and treatments are dependent, in part, on the availability of reimbursement from third-party payors, such as health maintenance organizations and other private insurance plans and governmental programs such as Medicare. Third-party payors are increasingly challenging the prices charged for pharmaceutical products and

11

services. Our business is affected by the efforts of government and third-party payors to contain or reduce the cost of health care through various means. In the United States, there have been and will continue to be a number of federal and state proposals to implement government controls on pricing. Similar government pricing controls exist in varying degrees in other countries. In addition, the emphasis on managed care in the United States has increased and will continue to increase the pressure on the pricing of pharmaceutical products. We cannot predict whether any legislative or regulatory proposals will be adopted or the effect these proposals or managed care efforts may have on our business.

**Risks Relating to Our Common Stock**

*Results of our operations and general market conditions for biotechnology stocks could result in the sudden change in the value of our stock.*

As a biopharmaceutical company, we have experienced significant volatility in our common stock. Fluctuations in our operating results and general market conditions for biotechnology stocks could have a significant impact on the volatility of our common stock price. In 2004, our stock price ranged from a high of $13.74 to a low of $3.70. Factors contributing to such volatility include: results and timing of preclinical studies and clinical trials; evidence of the safety or efficacy of pharmaceutical products; the results and timing of product development of stents or other medical devices to deliver AP23573 by our medical device partner(s); announcements of new collaborations; announcements of new equity or debt financings; failure to enter into collaborations; our funding requirements; announcements of technological innovations or new therapeutic products; developments relating to intellectual property rights, including licensing and litigation, including our litigation with Eli Lilly and Company; governmental regulation; healthcare or cost-containment legislation; general market trends for the biotechnology industry and related high-technology industries; the impact of exchange rates for the U.S. Dollar; the impact of changing interest rates and policies of the Federal Reserve; and public policy pronouncements.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

The Securities and Exchange Commission encourages companies to disclose forward-looking information so that investors can better understand a company's future prospects and make informed investment decisions. This prospectus contains such *"forward-looking statements"* within the meaning of the Private Securities Litigation Reform Act of 1995. These statements may be made directly in this prospectus, and they may also be made a part of this prospectus by reference to other documents filed with the Securities and Exchange Commission, which is known as *"incorporation by reference."*

Words such as *"may," "anticipate," "estimate," "expects," "projects," "intends," "plans," "believes"* and words and terms of similar substance used in connection with any discussion of future operating or financial performance, identify forward-looking statements. All forward-looking statements are management's present expectations of future events and are subject to a number of risks and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements. These risks include, but are not limited to, risks and uncertainties regarding our preclinical studies, our ability to conduct clinical trials of our product candidates and the results of such trials, as well as risks and uncertainties relating to economic conditions, markets, products, competition, intellectual property, services and prices, key employees, future capital needs, dependence on our collaborators and other factors. Please also see the discussion of risks and uncertainties under *"Risk Factors."*

In light of these assumptions, risks and uncertainties, the results and events discussed in the forward-looking statements contained in this prospectus or in any document incorporated by reference might not occur. Investors are cautioned not to place undue reliance on the forward-looking statements, which speak only as of the date of this prospectus or the date of the document incorporated by reference in this prospectus. We are not under any obligation, and we expressly disclaim any obligation, to update or alter any forward-looking statements, whether as a result of new information, future events or otherwise. All subsequent forward-looking statements attributable to us or to any person acting on our behalf are expressly qualified in their entirety by the cautionary statements contained or referred to in this section.

12

## ABOUT THIS PROSPECTUS

This prospectus is part of a registration statement that we filed with the Securities and Exchange Commission, or SEC, utilizing a *"shelf"* registration process. Under this shelf process, we may sell up to 9,500,000 shares of our common stock in one or more offerings. Each time we sell securities, we will provide a prospectus supplement that will contain specific information about the terms of that offering.

This prospectus does not contain all of the information included in the registration statement. For a more complete understanding of the offering of the securities, you should refer to the registration statement, including its exhibits. The prospectus supplement may also add, update or change information contained in this prospectus. You should carefully read this prospectus, the applicable prospectus supplement, the information and documents incorporated by reference and the additional information under the heading *"Where You Can Find More Information"* before making an investment decision.

This prospectus may not be used to consummate sales of common stock, unless it is accompanied by a prospectus supplement. To the extent there are inconsistencies between any prospectus supplement, this prospectus and any documents incorporated by reference, the document with the most recent date will control.

## USE OF PROCEEDS

We cannot assure you that we will receive any proceeds in connection with shares of common stock offered pursuant to this prospectus. Unless otherwise indicated in the applicable prospectus supplement, we intend to use any net proceeds from the sale of our common stock for our operations and for other general corporate purposes, including, but not limited to, repayment or refinancing of existing indebtedness or other corporate borrowings, working capital, intellectual property protection and enforcement, capital expenditures, investments, acquisitions and repurchases and redemption of our securities. Pending application of the net proceeds as described above, we may initially invest the net proceeds in short-term, investment-grade, interest-bearing securities or apply them to the reduction of short-term indebtedness.

## PLAN OF DISTRIBUTION

We may offer the common stock from time to time pursuant to underwritten public offerings, negotiated transactions, block trades or a combination of these methods. We may sell the common stock (1) through underwriters or dealers, (2) through agents, and/or (3) directly to one or more purchasers, or through a combination of such methods. We may distribute the common stock from time to time in one or more transactions at:

- a fixed price or prices, which may be changed;

- market prices prevailing at the time of sale;

- prices related to the prevailing market prices; or

- negotiated prices.

We may directly solicit offers to purchase the common stock being offered by this prospectus. We may also designate agents to solicit offers to purchase the common stock from time to time. We will name in a prospectus supplement any underwriter or agent involved in the offer or sale of our common stock.

If we utilize a dealer in the sale of the common stock being offered by this prospectus, we will sell the common stock to the dealer, as principal. The dealer may then resell the common stock to the public at varying prices to be determined by the dealer at the time of resale.

If we utilize an underwriter in the sale of the common stock being offered by this prospectus, we will execute an underwriting agreement with the underwriter at the time of sale, and we will provide the name of any underwriter in the prospectus supplement which the underwriter will use to make resales of the common stock to the public. In connection with the sale of the common stock, we, or the purchasers of our common stock for whom the underwriter may act as agent, may compensate the underwriter in the form of

13

underwriting discounts or commissions. The underwriter may sell the common stock to or through dealers, and the underwriter may compensate those dealers in the form of discounts, concessions or commissions.

With respect to underwritten public offerings, negotiated transactions and block trades, we will provide in the applicable prospectus supplement any compensation we pay to underwriters, dealers or agents in connection with the offering of the common stock, and any discounts, concessions or commissions allowed by underwriters to participating dealers. Underwriters, dealers and agents participating in the distribution of the common stock may be deemed to be underwriters within the meaning of the Securities Act of 1933, as amended (the *"Securities Act"*) and any discounts and commissions received by them and any profit realized by them on resale of the common stock may be deemed to be underwriting discounts and commissions. We may enter into agreements to indemnify underwriters, dealers and agents against civil liabilities, including liabilities under the Securities Act, or to contribute to payments they may be required to make in respect thereof.

Shares of our common stock sold pursuant to the registration statement of which this prospectus is a part will be authorized for quotation and trading on the Nasdaq National Market. To facilitate the offering of the common stock, certain persons participating in the offering may engage in transactions that stabilize, maintain or otherwise affect the price of our common stock. This may include over-allotments or short sales of the common stock, which involve the sale by persons participating in the offering of more shares of common stock than we sold to them. In these circumstances, these persons would cover such over-allotments or short positions by making purchases in the open market or by exercising their over-allotment option. In addition, these persons may stabilize or maintain the price of the common stock by bidding for or purchasing the common stock in the open market or by imposing penalty bids, whereby selling concessions allowed to dealers participating in the offering may be reclaimed if the shares of common stock sold by them are repurchased in connection with stabilization transactions. The effect of these transactions may be to stabilize or maintain the market price of our common stock at a level above that which might otherwise prevail in the open market. These transactions may be discontinued at any time.

The underwriters, dealers and agents may engage in other transactions with us, or perform other services for us, in the ordinary course of their business.

## LEGAL MATTERS

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, Massachusetts, will pass upon the validity of the issuance of the common stock offered by this prospectus. Members of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. and certain members of their families and trusts for their benefit own an aggregate of approximately 5,200 shares of our common stock and 89,285 shares of the common stock of AGTI.

## EXPERTS

The financial statements and management's report on the effectiveness of internal controls over financial reporting incorporated in this prospectus by reference from the Company's Annual Report on Form 10-K for the year ended December 31, 2004 have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their reports, which are incorporated herein by reference, and have been so incorporated in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.

## WHERE YOU CAN FIND MORE INFORMATION

We are subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, and file annual, quarterly and current reports, proxy statements and other information with the SEC. You may read and copy these reports, proxy statements and other information at the SEC's public reference facilities at Judiciary Plaza, 450 Fifth Street, N.W., Room 1200, Washington, D.C. 20549. You can request copies of these documents by writing to the SEC and paying a fee for the copying cost. Please call the SEC at

14

Case 1:06-cv-00259-MPT    Document 178-9    Filed 12/01/2006    Page 68 of 69

1-800-SEC-0330 for more information about the operation of the public reference facilities. SEC filings are also available at the SEC's Web site at http://www.sec.gov. Our common stock is listed on the Nasdaq National Market, and you can read and inspect our filings at the offices of the National Association of Securities Dealers, Inc. at 1735 K Street, Washington, D.C. 20006.

This prospectus is only part of a Registration Statement on Form S-3 that we have filed with the SEC under the Securities Act of 1933 and therefore omits certain information contained in the Registration Statement. We have also filed exhibits and schedules with the Registration Statement that are excluded from this prospectus, and you should refer to the applicable exhibit or schedule for a complete description of any statement referring to any contract or other document. You may inspect a copy of the Registration Statement, including the exhibits and schedules, without charge, at the public reference room or obtain a copy from the SEC upon payment of the fees prescribed by the SEC.

## INCORPORATION OF DOCUMENTS BY REFERENCE

The SEC allows us to *"incorporate by reference"* information that we file with them. Incorporation by reference allows us to disclose important information to you by referring you to those other documents. The information incorporated by reference is an important part of this prospectus, and information that we file later with the SEC will automatically update and supersede this information. We filed a Registration Statement on Form S-3 under the Securities Act of 1933, as amended, with the SEC with respect to the common stock being offered pursuant to this prospectus. This prospectus omits certain information contained in the Registration Statement, as permitted by the SEC. You should refer to the Registration Statement, including the exhibits, for further information about us and the common stock being offered pursuant to this prospectus. Statements in this prospectus regarding the provisions of certain documents filed with, or incorporated by reference in, the Registration Statement are not necessarily complete and each statement is qualified in all respects by that reference. Copies of all or any part of the Registration Statement, including the documents incorporated by reference or the exhibits, may be obtained upon payment of the prescribed rates at the offices of the SEC listed above in *"Where to Find More Information."* The documents we are incorporating by reference are:

(a) Our Annual Report on Form 10-K for the fiscal year ended December 31, 2004 filed on February 18, 2005, as amended on March 11, 2005 (File No. 000-21696);

(b) Our current reports on Form 8-K filed on January 5, 2005 (Items 1.01 and 2.03), February 1, 2005 (Items 1.01 and 9.01) and February 1, 2005 (Items 8.01 and portions of Item 9.01), as amended on February 2, 2005 (File Nos. 000-21696);

(c) The description of our common stock contained in our registration statement on Form 10 filed on June 25, 1993 (File No. 000-21696);

(d) The description of our preferred share purchase rights contained in our registration statement on Form 8-A filed on June 19, 2002 (File No. 000-21696); and

(e) All of the filings pursuant to the Securities Exchange Act of 1934, as amended, after the date of the filing of the original Registration Statement and prior to the effectiveness of the Registration Statement.

In addition, all documents subsequently filed by us pursuant to Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, before the date our offering is terminated or complete are deemed to be incorporated by reference into, and to be a part of, this prospectus.

Any statement contained in this prospectus or in a document incorporated or deemed to be incorporated by reference into this prospectus will be deemed to be modified or superseded for purposes of this prospectus to the extent that a statement contained in this prospectus or any other subsequently filed document that is deemed to be incorporated by reference into this prospectus modifies or supersedes the statement. Any statement so modified or superseded will not be deemed, except as so modified or superseded, to constitute a part of this prospectus.

15

You may request, orally or in writing, a copy of these documents, which will be provided to you at no cost, by contacting: Investor Relations, ARIAD Pharmaceuticals, Inc., 26 Landsdowne Street, Cambridge, Massachusetts 02139-4234. Our telephone number is (617) 494-0400.

You should rely only on information contained in, or incorporated by reference into, this prospectus and any prospectus supplement. We have not authorized anyone to provide you with information different from that contained in this prospectus or incorporated by reference in this prospectus. We are not making offers to sell the securities in any jurisdiction in which such an offer or solicitation is not authorized or in which the person making such offer or solicitation is not qualified to do so or to anyone to whom it is unlawful to make such offer or solicitation.

16

6,000,000 Shares



# ARIAD

Common Stock

---

PROSPECTUS

, 2005

---

## LEHMAN BROTHERS

## LAZARD CAPITAL MARKETS

## SG COWEN & CO.

**Dates Referenced Herein** *and* **Documents Incorporated By Reference**

| *This 424B3 Filing* | *Date* ▾ | *Other Filings* |
|---|---|---|
| | 6/25/93 | |
| | 6/19/02 | 8-K |
| | 6/25/02 | 8-K |
| | 1/13/04 | |
| | 12/31/04 | 10-K, 8-K, 10-K/A |
| | 1/5/05 | 8-K |
| | 2/1/05 | 8-K/A, 8-K |
| | 2/2/05 | 8-K/A |
| | 2/11/05 | |
| | 2/18/05 | 10-K, S-3 |
| | 3/9/05 | |
| | 3/11/05 | S-3/A, 10-K/A |
| | 3/14/05 | |
| | 6/30/05 | 10-Q, 8-K |
| | 7/25/05 | |
| | 7/28/05 | |
| Filed On / Filed As Of | 8/1/05 | 8-K, 10-Q |
| Top | | List All Filings |

---

*Alternative Formats:*  Rich Text / Word (`.rtf`), Text (`.txt`), EDGAR (`.sgml`), XML (`.xml`), et al.

---

Copyright © 2006 *Fran Finnegan & Company*  All Rights Reserved.
*www.secinfo.com* - Tue, 14 Nov 2006 01:13:50.1 GMT - *Help at SEC Info*

# EXHIBIT F

--URGENT ACTION REQUESTED--
Ex Parte REEXAMINATION

Docket No. 74753/JPW/GJG

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

A Merged Proceeding of *Ex Parte* Reexamination Control Nos:

90/007,503          and          90/007,828
Filed April 4, 2005          Filed December 2, 2005

Merged Pursuant to May 4, 2006 Merger Decision
Group Art Unit: 3991   Examiner: B.M. Celsa

Patentees:     David Baltimore, Ranjan Sen, Phillip A. Sharp,
               Harinder Singh, Louis Staudt, Jonathan H. Lebowitz,
               Albert S. Baldwin Jr., Roger G. Clerc, Lynn M.
               Corcoran, Patrick A. Baeuerle, Michael J. Lenardo,
               Chen-Ming Fan, and Thomas P. Maniatis

Patent No.:    6,410,516 B1              Serial No: 08/464,364

Issue Date:    June 25, 2002             Filed:    June 5, 1995

For      :     NUCLEAR  FACTORS  ASSOCIATED  WITH  TRANSCRIPTIONAL
               REGULATION

                                         1185 Avenue of the Americas
                                         New York, New York 10036
                                         October 31, 2006

**BY FACSIMILE   571-273-9900**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Attn.     Director, Central Reexamination Unit

FACSIMILE CERTIFICATE OF TRANSMISSION
IN CONNECTION WITH THE ABOVE-IDENTIFIED APPLICATION

Date of Facsimile: October 31, 2006.  I hereby certify that this paper
is being transmitted to the United States Patent and Trademark Office
on the date indicated above by facsimile and is addressed to
Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450,
Attn: Director, Central Reexamination Unit.

*Susan Kotas*

Printed Name:  Susan Kotas

                         Respectfully submitted,

                         *John P. White*

                         John P. White
                         Registration No. 28,678
                         Gary J. Gershik
                         Registration No. 39,992
                         Attorneys for Applicants
                         Cooper & Dunham LLP
                         1185 Avenue of the Americas
                         New York, New York  10036
                         Tel (212) 278-0400

PAGE 1/6 * RCVD AT 10/31/2006 3:59:18 PM [Eastern Standard Time] * SVR:USPTO-EFXRF-6/33 * DNIS:2739900 * CSID:2123916520 * DURATION (mm-ss):01-32

Copied from 90007828 on 11/01/2006

--URGENT ACTION REQUESTED--
Ex Parte REEXAMINATION

Docket No. 74753/JPW/GJG

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

A Merged Proceeding of *Ex Parte* Reexamination Control Nos:

| 90/007,503 | and | 90/007,828 |
|:---:|:---:|:---:|
| Filed April 4, 2005 | | Filed December 2, 2005 |

Merged Pursuant to May 4, 2006 Merger Decision
Group Art Unit: 3991  Examiner: B.M. Celsa

Patentees:    David Baltimore, Ranjan Sen, Phillip A. Sharp,
Harinder Singh, Louis Staudt, Jonathan H.
Lebowitz, Albert S. Baldwin Jr., Roger G. Clerc,
Lynn M. Corcoran, Patrick A. Baeuerle, Michael J.
Lenardo, Chen-Ming Fan, and Thomas P. Maniatis

Patent No.:    6,410,516 B1          Serial No: 08/464,364

Issue Date:    June 25, 2002          Filed:    June 5, 1995

For      :    NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL
REGULATION

1185 Avenue of the Americas
New York, New York 10036
October 31, 2006

BY FACSIMILE  571-273-9900
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Attn.    Director, Central Reexamination Unit

PETITION FOR EXTENSION OF TIME UNDER 37 C.F.R. § 1.550(c)
FOR RESPONDING TO AUGUST 2, 2006 OFFICE ACTION

An Office Action issued August 2, 2006 in connection with the
above-identified merged *ex parte* reexamination.  The August 2,
2006 Office Action set a two (2) month period for filing a
response, i.e. by due October 2, 2006.  Patentees petitioned, and
on September 29, 2006 the U.S. Patent Office granted Patentees'
request, for a one (1) month extension of time such that a

PAGE 2/6 * RCVD AT 10/31/2006 3:59:18 PM [Eastern Standard Time] * SVR:USPTO-EFXRF-6/33 * DNIS:2739900 * CSID:+2123910526 * DURATION (mm-ss):01-52

Copied from 90007828 on 11/01/2006

Patentees: David Baltimore et al.
*Ex Parte*
Reexamination Control No.: 90/007,503 and 90/007,828
*Page 2 of 5 of Request for Extension*

response to the August 2, 2006 Office Action is now due November 2, 2006. Patentees hereby petition for a <u>one (1) week</u> extension of time so that a response to the August 2, 2006 Office Action will be due November 9, 2006. Patentees hereby authorize the Commissioner to charge the $200.00 fee under 37 C.F.R. § 1.17(g) for filing this Petition to Deposit Account No. 03-3125.

<u>Reasons for Granting Petition</u>

Extensions of time in an *ex parte* reexamination are governed by 37 C.F.R. § 1.550(c), which provides, in relevant part:

> (c) The time for taking any action by a patent owner in an *ex parte* reexamination proceeding will be extended only for sufficient cause and for a reasonable time specified. Any request for such extension must be filed on or before the day on which action by the patent owner is due, but in no case will the mere filing of a request effect any extension. Any request for such extension must be accompanied by the petition fee set forth in § 1.17(g).

Section 2265 of the M.P.E.P. provides that:

> Evaluation of whether sufficient cause has been shown for an extension must be made in the context of providing the patent owner with a fair opportunity to present an argument against any attack on the patent, and the requirement of the statute (35 U.S.C. 305) that the proceedings be conducted with special dispatch.

Patentees respectfully submit that sufficient cause exists in the instant case for extending the deadline for responding to the August 2, 2006 Office Action by <u>one week</u>, i.e. until November 9, 2006.

The Office Action was mailed on August 2, 2006 and received at the undersigned's office on August 7, 2006. The number and complexity of issues presented in the August 2, 2006 Office Action is substantial.[1] Since receiving the August 2, 2006

---

[1] The August 2, 2006 Office Action is sixty-three (63) pages long, rejects 160 of Patentees claims, relies on a total of 53 references and one declaration, and incorporates by reference Exhibits G and H, and Appendices D, E, and F. The material incorporated by reference totals two hundred and eighteen (218) pages.

Copied from 90007828 on 11/01/2006

Patentees: David Baltimore et al.
*Ex Parte*
Reexamination Control No.: 90/007,503 and 90/007,828
*Page 3 of 5 of Request for Extension*

Office Action Patentees, their attorneys and their technical expert have been studying the grounds of rejection of 160 claims of the patent on multiple grounds (as many as 15 grounds being applicable to some claims). Multiple meetings and conferences have taken place to review and discuss the August 2, 2006 Office Action. Patentees have consulted with their technical expert, who is a Professor at the Salk Institute in San Diego, California. Patentees' have also interviewed the Examiner on October 13, 2006. However, Patentees' attorneys still need time to

1) allow their expert to carefully review a draft Declaration which is over 70 pages long, not counting numerous supporting documents,

2) allow the three coowners of the Patent, an exclusive licensee, 13 inventors, and trial counsel involved in two litigations in two jurisdictions, to also review the Declaration that is over 70 pages long and a draft of the response to the Office Action which is about 100 pages long, not counting numerous supporting documents, and

3) consult with, and obtain comments concerning both drafts from all of the parties mentioned, and then obtain final approval.

Therefore, Patentees need one additional week to complete their response against the attack on the subject patent as set forth in the August 2, 2006 Office Action.

Accordingly, there is sufficient cause to extend the period for reply by <u>one week</u> to provide Patentees a fair opportunity to review their response to the lengthy and complex attack on their patent set forth in the August 2, 2006 Office Action. Accordingly, Patentees respectfully submit that a <u>one week</u>

Copied from 90007828 on 11/01/2006

Patentees: David Baltimore et al.
*Ex Parte*
Reexamination Control No.: 90/007,503 and 90/007,828
*Page 4 of 5 of Request for Extension*

extension of time should be granted.

Pursuant to the May 4, 2006 Merger Decision, this Petition is being filed in duplicate, each original bearing an original signature and identifying data for both reexamination files. As set forth above, the undersigned authorizes the Commissioner to charge any fee required in connection with the filing of this Petition to Deposit Account No. 03-3125.

Respectfully submitted,

John P. White
Registration No. 28,678
Gary J. Gershik
Registration No. 39,992
Attorneys for Patentees
Cooper & Dunham LLP
1185 Avenue of the Americas
New York, New York 10036
(212) 278-0400

Copied from 90007828 on 11/01/2006

# EXHIBIT G

## Thomson StreetEvents℠

### ARIA - Q3 2006 ARIAD Pharmaceuticals, Inc. Earnings Conference Call

Event Date/Time: Nov. 02. 2006 / 8:30AM ET

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Nov. 02. 2006 / 8:30AM, ARIA - Q3 2006 ARIAD Pharmaceuticals, Inc. Earnings Conference Call**

## C O R P O R A T E   P A R T I C I P A N T S

**Ed Fitzgerald**
*ARIAD Pharmaceuticals, Inc. - CFO*

**Dr. Harvey Berger**
*ARIAD Pharmaceuticals, Inc. - Chairman, CEO*

## C O N F E R E N C E   C A L L   P A R T I C I P A N T S

**Jim Birchenough**
*Lehman Brothers - Analyst*

**Howard Liang**
*Leerink Swann - Analyst*

**Terence Flynn**
*Lazard Capital Markets - Analyst*

**Leland Gershell**
*Cowen & Co. - Analyst*

**Richard Smith**
*JPMorgan - Analyst*

## P R E S E N T A T I O N

**Operator**

Ladies and gentlemen, thank you for holding, and welcome to the ARIAD Pharmaceuticals third quarter fiscal year 2006 conference call. At this time all participants are in listen-only mode. There will be a question-and-answer session to follow. Please be advised that this call is being taped at the company's request and will be archived on the company's website for two weeks from today. (OPERATOR INSTRUCTIONS) At this time I would like to introduce Mr. Ed Fitzgerald, ARIAD Chief Financial Officer. Please proceed, sir.

---

**Ed Fitzgerald** - *ARIAD Pharmaceuticals, Inc. - CFO*

Thank you. Good morning, and welcome to ARIAD third quarter 2006 investor call to discuss our financial results and progress and product developments in the quarter. Dr. Harvey Berger, our Chairman and Chief Executive Officer, is with me today on the call. The agenda is as follows; I will review the financial highlights for the quarter, and then Harvey will lead us through a review of recent corporate achievements. Harvey will conclude our formal remarks and then open the call up to questions.

Before I get started I would like to state that during this call we will be making forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements are subject to factors, risks and uncertainties, such as those detailed in our form 10-K for the year ended December 31, 2005 and other SEC filings that may cause actual results to differ materially from the results expressed or implied by such forward-looking statements.

As noted in today's press release that we issued earlier this morning, for the quarter ended September 30, 2006 we reported a net loss of $15.2 million or $0.25 per share. As compared to $14.6 million or $0.25 per share for the quarter ended September 30, 2005. The increase in net loss for the quarter is due primarily to higher expenses resulting from our NF-(kappa)B patent infringement litigation and the adoption of new accounting requirements related to stock options and other share based payments. Offset in part by lower research and development costs, reflecting the later stages of certain clinical trials for our lead product candidate, AP23573. For the nine months ended September 30, 2006 cash used in operations was $42.2 million. We are reiterating our financial guidance for 2006 cash used in operations of $53 million to $56 million.

---

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Nov. 02. 2006 / 8:30AM, ARIA - Q3 2006 ARIAD Pharmaceuticals, Inc. Earnings Conference Call**

On October 25, 2006 we completed the sale of approximately 3.1 million shares, representing approximately 5% of our outstanding common stock to Credit Suisse in an underwritten offering for proceeds of $14.5 million or $14.3 million after estimated offering expenses. This offering fully utilized the remaining shares under our outstanding shelf registration statements. This financing was completed at this time to further strengthen our financial position as we prepare to launch our Phase III trial in advanced sarcomas and as we advance our deal negotiations with potential partners for AP23573.

We ended the third quarter of 2006 with $39.2 million in cash, cash equivalents and marketable securities or $53.5 million on a pro forma basis reflecting the sale of common stock referred to earlier in my comments. That compares with $81.5 million in cash, cash equivalents and marketable securities at the end of 2005. Now I would like to turn the call over to Harvey.

---

**Dr. Harvey Berger** - *ARIAD Pharmaceuticals, Inc. - Chairman, CEO*

Good morning, and thank you for joining us on today's call. I am delighted to have the opportunity to highlight for you our considerable progress during the past quarter. For today's call I would like to focus my remarks on the continued development of our lead product candidate, the novel mTOR inhibitor, AP23573, which I will refer to as 573 for the remainder of the call. Specifically, I would like to discuss the expanded efficacy data for 573 in advanced sarcomas that we announced earlier this morning in a press release.

As we've talked about in the past, our strategic product plan for 573 focuses on the initial development of this molecularly targeted agent in sarcoma with potential uses across a broad spectrum of indications, in which there is a solid scientific and clinical rationale for inhibiting mTOR. The mTOR cell signaling pathway plays a crucial role in the development and progression of many difficult to treat cancers, the protein mTOR is a clinically validated targeted oncology thus creating substantial market opportunities for the development and commercialization of a targeted mTOR inhibitor. Either as a single agent, as we are pursuing initially in sarcomas, or in combination with other therapies for use in various different solid tumors and blood cancers.

What distinguishes 573 is its broad applicability across both solid tumors and blood cancers. We have chosen advanced sarcomas as what we like to describe as a strategic gateway to oncology based on a major unmet medical need, and efficient development path going forward and an attractive time to market. At the same time, it is important to highlight that sarcoma represents only a modest portion of the overall potential market for 573, both in the U.S., as well as in ex-U.S. markets. We believe that the high-value follow-on indications including, for example, prostate and breast cancer, should enable 573 to achieve a significant share of the projected market for targeted oncology therapies.

Based on this product assessment we see vast market potential for 573. Today we announced expanded efficacy data on 573 from further analysis of our ongoing Phase II clinical trial of 573 in patients with advanced soft tissue and bone sarcomas. These findings will be presented this week by Dr. Sant Chawla at the 12th annual Connective Tissue Oncology Meeting in Italy.

These results build on the strong data presented earlier this year at the ASCO annual meeting where we announced that 573 demonstrated efficacy and was well tolerated as a single agent in metastatic and/or unresectable soft tissue in bone sarcomas. The new analysis focuses on the 61 patients out of 212 in the trial with an AP23573 clinical benefit response, the primary endpoint of the trial. The efficacy of 573 was evaluated in this trial using two closely related measures of disease progression; the first clinical benefit response which was characterized as tumor regression, complete or partial responses or disease stabilization for at least four cycles. Secondly, progression free survival or PFS, which was reported both as the six-month rate, as well as the median duration. Patients with a 573 clinical benefit, that is 61 patients out of 212, had a rather remarkable PFS rate at six months of 70% and a median PFS of 36 weeks or nine months. These findings are strikingly different from those in the overall population of patients included in the trial. The PFS rate in this patient subset was nearly triple that of the overall group that is compared to 24%, and the median PFS was approximately 21 weeks or about five months longer than that of the overall group compared to 15 weeks.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Nov. 02. 2006 / 8:30AM, ARIA - Q3 2006 ARIAD Pharmaceuticals, Inc. Earnings Conference Call

So while the results for the overall trial were striking when one then teases out the results in the patients who had a clinical benefit response, the effects on PFS are quite striking. These data show further that the clinical benefit response, as we defined it and used it in this trial, is a clinically useful surrogate and predictor for progression free survival in this difficult to treat patient population.

These results provide further evidence, we believe, of the beneficial effects of 573 in patients with advanced sarcomas and demonstrates the clinical benefit responses achieved with 573 in this patient population led to clinically meaningful prolongation of PFS. So what that means is when we see a clinical benefit response that is at least disease stabilization for four months, roughly, that leads to important and clinically meaningful prolongations, or lengthening of the progression free survival. Both progression free survival and clinical benefit response have been used extensively in this area and are important endpoints for evaluating new agents in this type of a trial.

These data also provide important further support for our Phase III pivotal trial design in patients with advanced sarcomas. We have chosen for Phase III a clinical setting in which patients will receive 573 after a favorable response to first or second line chemotherapy. That is a period during which patients generally don't receive any treatment, chemotherapy or otherwise. Our registration strategy for 573 is designed to achieve early market entry and a broad clinical indication for 573 in advanced sarcomas, by addressing this important major unmet medical need. This protocol will, as we've talked about before, evaluate a new treatment paradigm for oncologists, maintenance therapy with oral 573, which may also be applicable importantly to many other difficult to treat tumors. This is an approach that is particularly well-suited for this clinical setting and the expanded data presented this week at CTOS reinforced this opportunity and importantly, this regulatory strategy for 573.

Referring back to the Phase III trial, I want to stress that we are on track to launch our randomized worldwide Phase III trial in advanced sarcomas, and subsequently to initiate patient enrollment in major sarcoma centers during the first quarter of 2007 as we have said before. We expect this trial to form the basis for registration of 573 in global markets. We are planning an investor day for early next year, likely in January, soon after the JPMorgan conference call to provide details concerning the Phase III trial design, timelines, statistics, etc. To answer the questions that many of you have posed and that we will be happy to share broadly with the investment community.

Members of our management team and key opinion leaders in oncology will participate in this investor day. We expect to have principal investigators of the trial and others in this area participating with us. We will also update investors on our oncology development pipeline at this meeting and provide details concerning our next clinical development candidate. This will build upon data that we expect to present shortly at the American society hematology meeting in December regarding our novel oncogenic kinase inhibitor, which we've talked about briefly in the past but the ASH meeting should be the first time we present specific data and details concerning our clinical candidate.

We have made excellent progress in our many other ongoing clinical trials involving 573 Phase II trials in advanced prostate and endometrial cancer; Phase Ib trials in which 573 is being studied in combination with various chemotherapeutic agents, particularly doxorubicin, paclitaxel and capecitabine and a Phase Ib-II trial of the tablet form of 573 in advanced sarcomas and other solid tumors. Importantly, the last trial, the one dealing with the oral formulation of 573, will be particularly important as a foundation for the Phase III trial in that we plan to move forward with a tablet or oral formulation of 573 in our Phase III registration study. And the data we have collected to date in the ongoing trial of oral 573 fully support that decision and those plans.

In parallel our commercial team is working to put the marketing and business infrastructure in place so that we are ready to launch 573 in the U.S. once it's approved. In addition and importantly our negotiations with multiple potential partners regarding an ex-U.S. collaboration for 573 are advancing toward completion. We expect this partnership now to accelerate the development of 573 first through Phase III in patients with sarcomas and subsequently, as well, in other solid tumor in hemologic malignancy indications.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Nov. 02. 2006 / 8:30AM, ARIA - Q3 2006 ARIAD Pharmaceuticals, Inc. Earnings Conference Call

It has been an exciting time in terms of progress. The next key milestones obviously relate to our Phase III trial and our ex-U.S. partnership, and we are on track with respect to both. With this let me open the call to questions to Q&A and turn it back over to the operator.

## QUESTIONS AND ANSWERS

**Operator**

(OPERATOR INSTRUCTIONS) Jim Birchenough, Lehman Brothers.

**Jim Birchenough** - *Lehman Brothers - Analyst*

Good morning, Harvey. A few questions. Just on the Phase III I think on the second quarter call the suggestion was the trial would initiate in the fourth quarter. It is being pushed to the first quarter of '07. Any reason for the delay and any risk that it might get pushed out a little further?

**Dr. Harvey Berger** - *ARIAD Pharmaceuticals, Inc. - Chairman, CEO*

I think we are really saying largely the same thing and I didn't mean to suggest any significant difference between what we said in the past and what we've said now. I think we said at the last call and in prior announcements that major enrollment will be in the first quarter. That is exactly where we are and expect that to be happening. There is no change, really in the timetable, any feedback from regulatory agencies, any planning for the trial. We expect it to launch and to be moving into substantial enrollment in the first quarter, so really not meant to be any change in timing.

**Jim Birchenough** - *Lehman Brothers - Analyst*

Just on the data on the clinical benefit response and prolonged progression free survival, it seems that patients that have a clinical benefit to the mTOR inhibitor have a sustained response. Does that correlate to what you might expect in a Phase III with patients having a favorable response to chemo? Is there any suggestion that they, too, would have a sustained response when you add the mTOR inhibitor?

**Dr. Harvey Berger** - *ARIAD Pharmaceuticals, Inc. - Chairman, CEO*

Well, obviously you've honed in really on the issue we were trying to assess, and while the data that are being presented this week at CTOS are not exactly comparable to what the Phase III trial will look at, they certainly are very indicative of the type of responses that we expect to see. So we think that patients who have had a good response to chemo, a favorable response are the patients in whom you can get the best effect with our mTOR inhibitor with 573. So this prolonged beneficial effect I think is indicative of the type of effect you can see (technical difficulty) what we expect to see with 573 in the maintenance setting in the Phase III trial. So this analysis was in part done as a component of modeling the expected responses for Phase III.

**Jim Birchenough** - *Lehman Brothers - Analyst*

Banks, Harvey.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Nov. 02. 2006 / 8:30AM, ARIA - Q3 2006 ARIAD Pharmaceuticals, Inc. Earnings Conference Call

**Operator**

Howard Liang, Leerink Swann.

**Howard Liang** - *Leerink Swann - Analyst*

Thanks very much. Just following up the updated Phase II data, do you have data on the overall survival of patients with clinical benefit? And I guess also is there in general a correlation between progression free survival and overall survival in sarcoma patients?

**Dr. Harvey Berger** - *ARIAD Pharmaceuticals, Inc. - Chairman, CEO*

Well, there are some -- you asked really two questions. The first is the overall survival data in the 212 patients. That is obviously something we are looking at and collecting data on. We have some preliminary looks at overall survival curves, Kaplan-Meier curves for the overall trial. But in order to be able to do total overall survival for the trial, obviously you need enough events, enough patients dying in the trial. That is something we are looking at, and will report out when we have sufficient events in the trial. I suspect we will present those data at one of the major oncology meetings next year. Could be ASCO, could be one of the subsequent meetings; we just do not have all the data in-house yet on overall survival for the trial. But that is something as you highlight we are looking at. Your second question was -- would you repeat it again?

**Howard Liang** - *Leerink Swann - Analyst*

Just the correlation between OS and PFS.

**Dr. Harvey Berger** - *ARIAD Pharmaceuticals, Inc. - Chairman, CEO*

Yes, obviously that is also important because you'd like to use PFS as a surrogate for overall survival because it is a predictable response that you can see earlier in the natural history of the treatment regimen. There are data from Larry Baker at the University of Michigan and Bob Mackey and Bob Benjamin from M.D. Anderson and Sloan-Kettering that have looked at various agents and looked at PFS and overall survival and do find the correlation and a predictive value of one with the other PFS with overall survival. So we believe that progression free survival is an extremely relevant and predictive measure of overall clinical benefit and predictive overall survival so that a Phase III trial certainly will look at both. We expect PFS and survival data but PFS as has been seen with other targeted agents, similar natural histories to sarcoma has been shown to be a valuable measure of outcome. So there are good published data at last year's ASCO in sarcomas on PFS and OS, and we expect that similar sort of relationship to hold in our trials.

**Howard Liang** - *Leerink Swann - Analyst*

Another question is it sounds like you are talking to multiple potential partners. Maybe what is the most important in your deliberations in choosing a partner? Are you looking for maybe a marketing presence, the portfolio of oncology agents, cost-sharing or downstream economics as to what would you consider to be most important?

**Dr. Harvey Berger** - *ARIAD Pharmaceuticals, Inc. - Chairman, CEO*

I guess I would say all of the above. Given the magnitude of the interest that we are seeing in partnering 573 ex-U.S. I think the final set of terms will be a reflection of the partner's financial commitment up front and over time, the partner's track record in launching and commercializing oncology products that we are clearly focused on the oncology leaders in this region. As well as the potential agents that they can bring to the collaboration so that agents, the products I should say that they have that

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Nov. 02. 2006 / 8:30AM, ARIA - Q3 2006 ARIAD Pharmaceuticals, Inc. Earnings Conference Call**

are approved or in late stage development they could rationally and thoughtfully be combined with 573, represent great clinical development and commercial opportunities. While we obviously will do combination trials going forward not only with our partner's agents or drugs, but with others. However, it is obvious from a commercial point of view the drugs a partner can bring to the partnership will add value to ensuring that we maximize the commercial potential of the product.

So it is really a combination of financial terms, long-term commitment, financially the overall commercial benefit to us, the experience the partner has in the oncology space ex-U.S. and lastly, the products that they bring to the partnership. So I would have a hard time saying it is one versus the other because it really is a package of those various factors. Obviously a partner needs to bring substantial financial commitment up front and over time to the partnership, and that is going to be a key component because as I mentioned earlier, the breadth of the potential applicability of this drug. This is not a drug that you would want to develop with a very small limited budget. You really what to have a partner that is committed to multiple major medical indications for breast cancer, to prostate, to sarcoma to others so that a commitment up front and a commitment in development is essential for a partner to be chosen for this collaboration.

**Howard Liang** - *Leerink Swann - Analyst*

Thank you very much.

**Operator**

Terence Flynn, Lazard Capital Markets.

**Terence Flynn** - *Lazard Capital Markets - Analyst*

Hi, Harvey. How are you doing? Thanks for taking the question. Actually just a follow up on the partnership in speaking to kind of the development plan of the drug going forward, I was just wondering if any of these partners are maybe waiting to see some of the Phase II data from the hormone refractory prostate cancer trial that is ongoing to maybe kind of give them a sense of other indications.

**Dr. Harvey Berger** - *ARIAD Pharmaceuticals, Inc. - Chairman, CEO*

We shared with partners all of the clinical data, including obviously lots of data that have not been published and have not even been submitted for publication. So they have had access to really entire data set of close to 700 patients that have been studied in clinical trials with 573. Just as the FDA and EMEA has seen those data broadly. And so I don't think partners are waiting at all for some publication or further maturity of those trials. They've seen the data. I think the general consensus is that 573 is highly active in solid tumors and hemologic malignancies that the data with sarcomas are clear and unequivocal. The data from several of the Phase II trials support that although obviously not as far advanced as the sarcoma data. And that is not only the prostate data but you got endometrial data, the hemo malignancy data, so there are multiple Phase II trials that are provided insights and a very large database now on the oral drug, probably order of magnitude of close to 150 patients with the oral drug in key malignancies, as well.

So partners are focused on really focused on what it's going to take to successfully develop the drug for multiple indications. The question is by no means is the drug active or efficacious or safe or can we make it or is it ready to go into Phase III. I would say those issues have been largely addressed, and right now the final negotiations and discussions focus in on really the global development strategy, and their abilities to effectively commercialize the drug. And that is what we are evaluating among the various partners that are in negotiations with us.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Nov. 02. 2006 / 8:30AM, ARIA - Q3 2006 ARIAD Pharmaceuticals, Inc. Earnings Conference Call**

**Terence Flynn** - *Lazard Capital Markets - Analyst*

So when would we be seeing any of that data from you, the hormone refractory prostate cancer trial or the endometrial trial?

---

**Dr. Harvey Berger** - *ARIAD Pharmaceuticals, Inc. - Chairman, CEO*

Well all the subsequent Phase II data will get presented at major oncology meetings. Obviously we can share it in confidence with potential partners, but for the broader community we need to present it at scientific meetings. So it will be at next year's major oncology meetings where those data will get rolled out; could be to subspecialty meetings or the large meeting like ASCO. We will provide some additional guidance and update on the oral data when we have the investor day that I talked about earlier because we want to be -- we want to be sure that as we move into Phase III and we base that upon the oral data that we've been able to share some of the data, the top line data, the oral trial with the broader investment community at the time we actually launch the trial.

---

**Terence Flynn** - *Lazard Capital Markets - Analyst*

Okay. Thanks a lot, Harvey.

---

**Operator**

Jim Birchenough, Lehman Brothers.

---

**Jim Birchenough** - *Lehman Brothers - Analyst*

Just wanted to follow up on that last question just on other indications. Could you just give us a general sense of how many patients have been enrolled in trials covering other cancer types?

---

**Dr. Harvey Berger** - *ARIAD Pharmaceuticals, Inc. - Chairman, CEO*

As I said, they are close to 700 patients in the 11 trials that we have run, somewhere between 650 and 700, and I just don't have the current snapshot exactly of the numbers, but it is in that range. Of the close to 700 -- and I'm really estimating here -- I would suspect that about half of the patients are in sarcomas of various sorts and about half are in the other malignancies, roughly. We've got about 200 in the Phase II sarcoma trial. You got a substantial number of sarcoma patients, renal patients and others in the oral trial, and of course you got the various different other indication trials. So about half of the patients overall have been in other tumor types separate from sarcoma.

---

**Jim Birchenough** - *Lehman Brothers - Analyst*

We you be submitting data for hormone refractory prostate cancer for ASCO in December?

---

**Dr. Harvey Berger** - *ARIAD Pharmaceuticals, Inc. - Chairman, CEO*

We haven't decided what we're going to submit, but clearly we're going to submit -- we expect to submit multiple abstracts to ASCO including the clinical data from many trials. We just quite honestly have not made a final decision of what's going to be submitted when.

---

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Nov. 02. 2006 / 8:30AM, ARIA - Q3 2006 ARIAD Pharmaceuticals, Inc. Earnings Conference Call**

**Jim Birchenough** - *Lehman Brothers - Analyst*

And just on the Phase III, just to clarify any further gating steps to starting that Phase III trial, is there anything with the tablet formulation that is gating to trial initiations stability testing or anything like that?

**Dr. Harvey Berger** - *ARIAD Pharmaceuticals, Inc. - Chairman, CEO*

No, we have tablets made as I think I've described before the tablets are distributed in blister packs. The blister packs both the drug and placebo are -- have been or are being made for the trial. We have such long-term stability that is not an issue.

**Jim Birchenough** - *Lehman Brothers - Analyst*

Okay, and just final question just on the oncogenic kinase inhibitor, how should we think about that program? Is this a product that will be a follow on to 464, which you had previously been targeting for Gleevec resistance?

**Dr. Harvey Berger** - *ARIAD Pharmaceuticals, Inc. - Chairman, CEO*

Top line broad strokes, yes. It is clearly the replacement for 464, but it has a much expanded profile in terms of activity than 464. Not only better, metabolism better, bioavailability better characteristics; it also has a better profile with respect to its kinase inhibitory reactivity. We will talk about that around ASH where we will actually present the data under various different Bcr-Abl mutants that are blocked by the drug, and it is much more in terms of scope and breadth than we've talked about -- that we anticipated before 464 so it is a much better drug, we believe, on all fronts than 464. The environment has changed because obviously there are other agents in this area, the Bristol drug, but it takes into account -- and again we will present the data at ASH so it will be much easier to talk about -- but it takes into account the existence of the Bristol drug, new mutations, new approaches to treating leukemia.

**Jim Birchenough** - *Lehman Brothers - Analyst*

Thanks, Harvey.

**Operator**

Leland Gershell, Cowen & Company.

**Leland Gershell** - *Cowen & Co. - Analyst*

Good morning. Thanks for taking my questions. Harvey, first a question on the NF-(kappa)B litigation, particularly with regard to any actions that ARIAD might be taking following the PTO re-examination of the [516] patent?

**Dr. Harvey Berger** - *ARIAD Pharmaceuticals, Inc. - Chairman, CEO*

I'm glad to see that we succeeded for somebody to ask about NF-(kappa)B we cannot get through an investor call without a question on NF-(kappa)B, so as you know I'm always happy to answer those. The company's response, company the inventor's response which we are filing with the universities and the investors with respect to the re-examination is due this week at the patent office. In fact I think it is actually due today, so obviously we will respond to the re-examination on time as planned. Then, and we have met with the examiner, we worked through the standard process that you would do with any re-examination, and

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

**Nov. 02. 2006 / 8:30AM, ARIA - Q3 2006 ARIAD Pharmaceuticals, Inc. Earnings Conference Call**

we expect that the examiner and the team of examiners that are working on our case will then evaluate our quite extensive response to their questions and to the initial nonfinal office action.

So that I think we, as once the documents are filed it will be clear, I think we've addressed the issues, and we remain confident as we have that the patent will stand up to re-examination and that it is valid. And so there will be a filing imminently, and then the ball is back in the patent office's court, the PTO's court to respond. There is no specific timetable for their response. I guess my understanding is they tend to respond in a couple of months.

---

**Leland Gershell** - *Cowen & Co. - Analyst*

Okay, great. And on the stent partnership, any update we might hear on that today?

---

**Dr. Harvey Berger** - *ARIAD Pharmaceuticals, Inc. - Chairman, CEO*

Nothing new at the moment, but given the tremendous interest in drug-eluting stent, as exemplified by the focus of the TCT a week or so ago, and the increasing focus on rapamycin analog as optimal agents to promote inhibition of restenosis, a lot of data on that at the recent TCT Conference. We do expect to complete at least one more partnership on 573 for stenting, and we expect as well, our collaboration with Medinol to move to human studies, based upon the extensive ongoing work that we have done collaboratively with them.

---

**Leland Gershell** - *Cowen & Co. - Analyst*

Okay. Great. And then just one last question, if I may a bookkeeping question, what is your total share count at now following the recent offering?

---

**Ed Fitzgerald** - *ARIAD Pharmaceuticals, Inc. - CFO*

Total is 65.3 million shares outstanding at this time.

---

**Leland Gershell** - *Cowen & Co. - Analyst*

Fantastic. Thanks very much.

---

**Operator**

Richard Smith, JPMorgan.

---

**Richard Smith** - *JPMorgan - Analyst*

Good morning. Yes, sorry I got onto the call a little late. Can you just remind me or tell me what is to be presented at ASH data?

---

**Dr. Harvey Berger** - *ARIAD Pharmaceuticals, Inc. - Chairman, CEO*

Sure, Richard. We haven't given specific details other than what I said this morning, but you should expect that the major presentations at ASH will focus on our next clinical development candidates, our next products go into the clinic which is an oncogenic kinase inhibitor and the first presentation of the profile of that drug, its kinase inhibitory reactivity, its indications,

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Nov. 02. 2006 / 8:30AM, ARIA - Q3 2006 ARIAD Pharmaceuticals, Inc. Earnings Conference Call

how it can be used will be presented at ASH, and we will provide additional guidance around that on our plans for development of that drug.

**Richard Smith** - *JPMorgan - Analyst*

You haven't said what type of kinase it is.

**Dr. Harvey Berger** - *ARIAD Pharmaceuticals, Inc. - Chairman, CEO*

Other than that it includes Bcr-Abl and has, as I just said to Jim, in response to Jim's question, it has a profile comparable and substantially better than the compound we were developing a year or so ago 464, which focused on the mutants of Bcr-Abl. So it includes that profile but substantially more than that. And takes into account the evolving field in the treatment of CML because obviously now you have this happen at the BMS drug and we needed to take into consideration the activity of that agent and the mutations that occur in response to that.

**Richard Smith** - *JPMorgan - Analyst*

All right, okay. Thank you.

**Operator**

Ladies and gentlemen, this concludes our question-and-answer session. I would like to return the floor to Dr. Berger for any closing remarks.

**Dr. Harvey Berger** - *ARIAD Pharmaceuticals, Inc. - Chairman, CEO*

Great. Thank you very much for joining us this morning. Again, great questions. We will be presenting at several investor and medical conferences before year end, including several in the next few weeks. We look forward to seeing you at those events, and with that operator, we will end the call. Thank you.

**Operator**

Ladies and gentlemen thank you for your participation in today's conference. This concludes our presentation. You may now disconnect. Good day.

DISCLAIMER

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2006, Thomson Financial. All Rights Reserved.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

# EXHIBIT H

# ARIAD PHARMACEUTICALS INC (ARIA)

26 LANDSDOWNE ST
CAMBRIDGE, MA 02139
617. 494.0400

# 10−Q

**FORM 10−Q DATED 6/30/02**
**Filed on 07/31/2002 − Period: 06/30/2002**
File Number 333−76486



**GSI**

LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

**Table of Contents**

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# FORM 10-Q

☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934
**For the quarterly period ended June 30, 2002**

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (d)
OF THE SECURITIES EXCHANGE ACT OF 1934
**For the transition period from _____ to _____**

**Commission File Number: 0-21696**

# ARIAD Pharmaceuticals, Inc.

(Exact name of Registrant as specified in its charter)

| Delaware | 22-3106987 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**26 Landsdowne Street, Cambridge, Massachusetts 02139**
(Address of principal executive offices)(Zip Code)

**Registrant's Telephone Number, Including Area Code: (617) 494-0400**

Former Name, Former Address and Former Fiscal Year,
If Changed Since Last Report: Not Applicable

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒    No ☐

The number of shares of the Registrant's common stock outstanding as of July 29, 2002 was 32,538,768.

## TABLE OF CONTENTS

PART I. FINANCIAL INFORMATION
    ITEM 1. UNAUDITED FINANCIAL STATEMENTS
    ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
    OF OPERATIONS
    ITEM 3.  QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK
PART II. OTHER INFORMATION
    ITEM 1. LEGAL PROCEEDINGS
    ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS
    ITEM 5. OTHER INFORMATION
    ITEM 6. EXHIBITS AND REPORTS ON FORM 8–K
PROMISSORY NOTE

Table of Contents

**ARIAD PHARMACEUTICALS, INC.**

**TABLE OF CONTENTS**

|  | Page No. |
|---|---|
| **PART I: FINANCIAL INFORMATION** | |
| ITEM 1. UNAUDITED FINANCIAL STATEMENTS: | |
| Condensed Consolidated Balance Sheets – June 30, 2002 and December 31, 2001 | 1 |
| Condensed Consolidated Statements of Operations for the Three Months and Six Months Ended June 30, 2002 and 2001 | 2 |
| Condensed Consolidated Statements of Cash Flows for the Six Months Ended June 30, 2002 and 2001 | 3 |
| Notes to Unaudited Condensed Consolidated Financial Statements | 4 |
| ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 6 |
| ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 11 |
| **PART II: OTHER INFORMATION** | |
| ITEM 1. LEGAL PROCEEDINGS | 12 |
| ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 12 |
| ITEM 5. OTHER INFORMATION | 12 |
| ITEM 6. EXHIBITS AND REPORTS ON FORM 8–K | 13 |

Table of Contents

PART I.  FINANCIAL INFORMATION

ITEM 1.  UNAUDITED FINANCIAL STATEMENTS

<div align="center">

**ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

</div>

| *In thousands, except share and per share data* | June 30, 2002 | December 31, 2001 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $  35,982 | $  46,742 |
| Marketable securities | | 444 |
| Inventory and other current assets | 701 | 1,010 |
| Total current assets | 36,683 | 48,196 |
| Property and equipment: | | |
| Leasehold improvements | 12,635 | 12,624 |
| Equipment and furniture | 5,504 | 5,417 |
| Total | 18,139 | 18,041 |
| Less accumulated depreciation and amortization | (16,834) | (16,190) |
| Property and equipment, net | 1,305 | 1,851 |
| Intangible and other assets, net | 5,730 | 5,314 |
| Total assets | $  43,718 | $  55,361 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Current portion of long−term debt | $   1,458 | $   1,443 |
| Accounts payable | 2,576 | 1,505 |
| Accrued compensation and benefits | 872 | 1,073 |
| Accrued product development expenses | 1,049 | 578 |
| Other accrued expenses | 888 | 822 |
| Deferred revenue | 37 | |
| Total current liabilities | 6,880 | 5,421 |
| Long−term debt | 6,185 | 6,847 |
| Stockholders' equity: | | |
| Common stock, $.001 par value; authorized, 60,000,000 shares; issued and outstanding, 32,521,975 shares in 2002 and 32,146,774 shares in 2001 | 33 | 32 |
| Additional paid−in capital | 152,352 | 151,638 |
| Deferred compensation | (48) | (106) |
| Accumulated other comprehensive income | | 3 |
| Accumulated deficit | (121,684) | (108,474) |
| Total stockholders' equity | 30,653 | 43,093 |
| Total liabilities & stockholders' equity | $  43,718 | $  55,361 |

<div align="center">

See notes to unaudited condensed consolidated financial statements.

1

</div>

Table of Contents

ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(Unaudited)

| *In thousands, except share and per share data* | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2002 | 2001 | 2002 | 2001 |
| Research revenue | $ 13 | $ 1 | $ 13 | $ 2 |
| Operating expenses: | | | | |
| Research and development * | 6,028 | 3,728 | 11,127 | 7,496 |
| General and administrative | 1,655 | 1,309 | 2,839 | 2,138 |
| Total operating expenses | 7,683 | 5,037 | 13,966 | 9,634 |
| Loss from operations | (7,670) | (5,036) | (13,953) | (9,632) |
| Other income (expense): | | | | |
| Interest income | 180 | 395 | 381 | 933 |
| Interest expense | (87) | (75) | (172) | (174) |
| Other income | 534 | | 534 | |
| Total other income | 627 | 320 | 743 | 759 |
| Net loss | $ (7,043) | $ (4,716) | $ (13,210) | $ (8,873) |
| Net loss per common share (basic and diluted): | $ (.22) | $ (.17) | $ (.41) | $ (.32) |
| Weighted average number of shares of common stock outstanding | 32,452,353 | 28,132,012 | 32,385,139 | 27,724,918 |
| * Includes non-cash stock-based compensation expense (income) | $ (22) | $ 70 | $ — | $ 137 |

See notes to unaudited condensed consolidated financial statements.

2

Table of Contents

ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
(Unaudited)

| | Six Months Ended June 30, | |
| --- | --- | --- |
| *In thousands* | 2002 | 2001 |
| Cash flows from operating activities: | | |
| Net loss | $(13,210) | $ (8,873) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 929 | 971 |
| Stock–based compensation | | 137 |
| Increase (decrease) from: | | |
| Inventory and other current assets | 309 | 144 |
| Other assets | (40) | (17) |
| Accounts payable | 1,071 | 189 |
| Accrued compensation and benefits | 50 | 93 |
| Accrued product development expenses | (24) | 67 |
| Other accrued expenses | 311 | 2 |
| Deferred revenue | 37 | |
| Net cash used in operating activities | (10,567) | (7,287) |
| Cash flows from investing activities: | | |
| Acquisition of marketable securities | | (7,585) |
| Proceeds from sales and maturities of marketable securities | 442 | 26,198 |
| Investment in property and equipment | (99) | (528) |
| Acquisition of intangible assets | (661) | (564) |
| Net cash provided by (used in) investing activities | (318) | 17,521 |
| Cash flows from financing activities: | | |
| Repayment of borrowings | (724) | (600) |
| Proceeds from long–term debt borrowings | 77 | |
| Proceeds from the issuance of common stock under equity facility, net of issuance costs | | 14,174 |
| Proceeds from issuance of stock pursuant to stock option and purchase plans | 772 | 294 |
| Net cash provided by financing activities | 125 | 13,868 |
| Net increase (decrease) in cash and equivalents | (10,760) | 24,102 |
| Cash and equivalents, beginning of period | 46,742 | 12,543 |
| Cash and equivalents, end of period | $ 35,982 | $36,645 |

See notes to unaudited condensed consolidated financial statements.

3

Table of Contents

ARIAD PHARMACEUTICALS, INC. AND SUBSIDIARIES
NOTES TO UNAUDITED CONDENSED CONSOLIDATED
FINANCIAL STATEMENTS

**1. Management Statement**

In the opinion of the Company's management, the accompanying unaudited condensed consolidated financial statements contain all adjustments (consisting of items of a normal and recurring nature) necessary to present fairly the financial position as of June 30, 2002 and the results of operations and cash flows for the three—month and six—month periods ended June 30, 2002 and 2001. These financial statements should be read in conjunction with the Company's Annual Report on Form 10—K for the year ended December 31, 2001, which includes consolidated financial statements and notes thereto for the years ended December 31, 2001, 2000 and 1999. Certain reclassifications have been made to the prior year financial statements to conform to the 2002 presentation.

The results of operations for the three—month and six—month periods ended June 30, 2002 are not necessarily indicative of the results to be expected for the full year.

**2. Cash Equivalents**

Cash equivalents include short—term, highly liquid investments, which consist principally of United States Treasury and Agency securities and high—grade domestic corporate securities, purchased with remaining maturities of 90 days or less and money market accounts. At June 30, 2002, cash and cash equivalents totaled approximately $36.0 million, compared to approximately $46.7 million at December 31, 2001.

**3. Marketable Securities**

The Company has classified its marketable securities as "available—for—sale" and, accordingly, carries such securities at aggregate fair value. At June 30, 2002, the Company held no marketable securities. At December 31, 2001, all of the Company's marketable securities consisted of corporate debt securities.

At December 31, 2001, the aggregate fair value and amortized cost of the Company's marketable securities were $444,000 and $441,000, respectively. Gross unrealized gains and losses were $3,000 and $0, respectively, at December 31, 2001.

**4. Inventory**

Inventories are carried at cost using the first in, first out method and are charged to research and development expense when consumed. Inventory consists of bulk pharmaceutical materials to be used for preclinical and clinical development programs and amounted to $275,000 and $682,000 at June 30, 2002 and December 31, 2001, respectively.

**5. Intangible and Other Assets**

Intangible and other assets consist primarily of purchased patents, patent applications and costs, licenses and deposits. The cost of purchased patents and patent applications and costs incurred in filing patents are capitalized. Capitalized costs related to patent applications are expensed when it becomes determinable that such applications will not be pursued. Capitalized costs related to issued patents are amortized over a period not to exceed seventeen years or the remaining life of the patent, whichever is shorter, using the straight—line method.

4

Table of Contents

**6. Long–Term Debt**

At June 30, 2002, the Company had a five–year term loan outstanding with its principal bank bearing interest at prime plus 1.0% (5.75% at June 30, 2002) in the amount of $6.9 million maturing January 1, 2005, payable in monthly installments of $100,000 plus interest. The bank term note is collateralized by all assets of the Company with the exception of the assets that collateralize the General Electric Capital Corporation ("G.E.") term note discussed below. The Company may, at its discretion, pledge marketable securities under the bank term note, and in such event, the interest rate is adjusted to the equivalent of 90–day LIBOR plus 1.25%. No securities were pledged at June 30, 2002.

The bank term note agreement contains certain covenants that would require consent from the bank to (i) change the Company's Chief Executive Officer, (ii) increase indebtedness, (iii) increase capital spending and stock redemption, and (iv) make dividend distributions, and requires the Company to pledge its marketable securities or maintain minimum levels of tangible net worth of $15.0 million, working capital of $7.0 million and liquid assets of $15.0 million plus the outstanding principal balance of the G. E. term note, all as defined in the agreement.

The G.E. term note, which provides for borrowings up to $1.2 million, is collateralized by certain equipment and leasehold improvements of the Company. At June 30, 2002, the Company has drawn down $867,000 and has available an additional $333,000 remaining to be drawn down on the note. As of June 30, 2002, the G.E. term note had an outstanding balance of $743,000 bearing interest at a weighted average rate of 9.48% payable in monthly installments, including interest, of $27,015, through December 2004 and $1,911 from January 2005 through June 2006. The G.E. term note contains a covenant that requires the Company to maintain a minimum unrestricted cash balance of $10.0 million.

**7. Comprehensive Income (Loss)**

Comprehensive income (loss) is comprised of net income (loss) and other comprehensive income (loss). Other comprehensive income (loss) includes certain changes in stockholders' equity that are excluded from net income (loss). Specifically, unrealized holding gains (losses) on the Company's available–for–sale securities are included in accumulated other comprehensive income in stockholders' equity. Comprehensive income (loss) was not materially different from net loss for all periods presented.

**8. Net Loss Per Share**

Net loss per share amounts have been computed based on the weighted average number of common shares outstanding during each period. Because of the net loss reported in each period, diluted and basic per share amounts are the same. For the six months ended June 30, 2002 and 2001, options to purchase 5,386,279 and 4,226,317 shares of common stock, respectively, were not included in the computation of net loss per share, because the effect would have been anti–dilutive.

**9. Common Stock Shelf Registration**

At June 30, 2002, the Company had 5,572,288 shares of registered common stock available for sale pursuant to shelf registrations previously filed with the Securities and Exchange Commission.

**10. Revenue Recognition**

The Company recognizes revenue in accordance with the Securities and Exchange Commission Staff Accounting Bulletin 101, *Revenue Recognition in Financial Statements*. Revenue is principally comprised of license fees received under license agreements that the Company has entered into that allows for the review and evaluation of certain technology owned by the Company. Revenue is recognized when earned over the life of the agreement.

Table of Contents

**11. Other Income**

Other income consists of a tax refund of $534,000. In March 2002, the "Job Creation and Worker Assistance Act of 2002 (the "Act")" was signed into law. The Act allows taxpayers to carry back net operating losses incurred in 2001 and 2002 to the five prior tax years. Prior tax law limited the carry back to two years. In addition, the Act also suspended certain limitations on the utilization of Alternative Minimum Tax net operating losses. As a result of the Act, the Company was able to carry back a portion of its net loss for the year ended December 31, 2001 to recover taxes paid attributable to the sale of the Company's 50% interest in the Hoechst–ARIAD Genomics Center, LLC (the "Genomics Center") to Aventis Pharmaceuticals, Inc. on December 31, 1999. As a result of the sale, the Company had recorded a net gain of $46.4 million, net of $534,000 in Alternative Minimum Tax in 1999 in other income.

**12. Recently Issued Accounting Pronouncements**

In June 2001, the Financial Accounting Standards Board issued SFAS No. 141, *Business Combinations,* and SFAS No. 142, *Goodwill and Other Intangible Assets*. SFAS No. 141 supersedes APB No. 16, *Business Combinations,* and SFAS No. 38, *Accounting for Preacquisition Contingencies of Purchased Enterprises* and requires that all business combinations be accounted for by a single method – the purchase method. SFAS No. 141 also provides guidance on the recognition of intangible assets identified in a business combination and requires enhanced financial statement disclosures. SFAS No. 142 adopts a more aggregate view of goodwill and bases the accounting for goodwill on the units of the combined entity into which an acquired entity is integrated. In addition, SFAS No. 142 concludes that goodwill and intangible assets that have indefinite useful lives will not be amortized but rather will be tested at least annually for impairment. Intangible assets that have finite lives will continue to be amortized over their useful lives. The adoption of SFAS No. 142 is required for fiscal years beginning after December 15, 2001 (fiscal year 2002 for the Company), except for the nonamortization and amortization provisions which are required for goodwill and intangible assets acquired after June 30, 2001. The adoption of SFAS No. 141 and SFAS No. 142 on January 1, 2002, did not have any material effect on the Company's financial position or results of operation.

In October 2001, the Financial Accounting Standards Board issued SFAS No. 144, *Accounting for the Impairment or Disposal of Long–Lived Assets*. SFAS No. 144 supersedes previous guidelines for financial accounting and reporting for the impairment or disposal of long–lived assets and for segments of a business to be disposed of. The adoption of SFAS No. 144 on January 1, 2002, did not have any effect on the Company's financial position or results of operations.

**ITEM 2.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**Overview**

We are engaged in the discovery and development of breakthrough medicines that regulate cell signaling with small molecules. Breakthrough medicines are products, created *de novo*, that may be used to treat diseases in innovative ways. Our lead product candidates – treatments for cancer, cancer that has spread to bone, or bone metastases, anemia, graft–vs–host disease following T cell immunotherapy, and osteoporosis – all were developed through the integration of genomics, proteomics and structure–based drug design. We have an exclusive license to pioneering technology related to the discovery, development and use of drugs that modulate the cellular protein, NF–κB, and other targets in its pathway, which regulate key genes involved in many major diseases.

Since our inception in 1991, we have devoted substantially all of our resources to our research and development programs. We receive no revenue from the sale of pharmaceutical products, and

6

**Table of Contents**

substantially all revenue to date has been received in connection with our previous collaborations with Aventis Pharmaceuticals, Inc. (formerly known as Hoechst Marion Roussel, Inc.) and its affiliates which ended December 31, 1999.

Except for the gain on the sale of our 50% interest in our genomics joint venture with Aventis Pharmaceuticals, Inc. in December 1999, which resulted in net income for fiscal year 1999, we have not been profitable since inception. We expect to incur substantial operating losses for the foreseeable future, primarily due to the expansion of our pharmaceutical product development programs, clinical trials, and product manufacturing. We expect that losses will fluctuate from quarter to quarter and that these fluctuations may be substantial. As of June 30, 2002, we had an accumulated deficit of $121.7 million.

Our business plan aims to balance potential near–term revenues from licensing of our intellectual property and technology with longer–term product development. To achieve this goal, we plan to develop our lead product candidates at least through phase 2 clinical trials, establish the commercial infrastructure to market our portfolio of hematology and oncology product candidates in the United States, pursue a worldwide partner for our osteoporosis product candidate and partners for our hematology and oncology products outside the United States generally after obtaining phase 2 clinical data, license our cell–signaling regulation technologies, including our
NF–κB intellectual property portfolio, to biotechnology and pharmaceutical companies to accelerate their research programs and to enable their sale of products covered by our patents. In addition, we may partner our cell–signaling regulation technologies for joint development of novel products, especially with companies that have proprietary therapeutic genes, cellular systems (e.g., stem cells) or gene delivery vectors. However, there can be no assurance that we will be successful in achieving our strategies and generating future revenue streams.

### Critical Accounting Policies

Our financial position and results of operations are affected by subjective and complex judgments, particularly in the areas of stock–based compensation to consultants and the carrying value of intangible assets. In determining stock–based compensation expense, we utilize a financial model that takes into account, among other things, the price and volatility of our common stock, an interest–free discount rate, and an estimate of the life of the option contract. Fluctuations in those factors result in uneven expense charges or credits to our statement of operations.

At June 30, 2002, we reported $5.6 million of intangible assets consisting of costs related primarily to purchased patents, patent applications and licenses. These costs are being amortized over the estimated useful lives of the underlying intangible assets. Changes in these lives or a decision to discontinue using the technologies could result in material changes to our balance sheet and statements of operations.

### Results of Operations

*Three Months Ended June 30, 2002 Compared with the Three Months Ended June 30, 2001*

*Research Revenue*

We recognized research revenue of $13,000 for the quarter ended June 30, 2002 compared to $1,000 for the corresponding period in 2001. Research revenue for 2002 results from a license agreement that we have entered into which provides for the review and evaluation of certain technologies we own. Revenue is recognized in accordance with the Securities and Exchange Commission Staff Accounting Bulletin 101, Revenue Recognition in Financial Statements.

**Table of Contents**

*Operating Expenses*

Research and development expenses increased by 62% to $6.0 million for the quarter ended June 30, 2002 compared to $3.7 million for the corresponding period in 2001. This $2.3 million increase was primarily due to higher levels of spending on product development of $205,000, product manufacturing of $691,000, external activities in support of clinical trials of $975,000, and increased personnel and overhead expenses of $418,000. We expect that our research and development expenses will remain at approximately the current levels over the next year, although they may fluctuate from quarter to quarter, as a result of our product development programs, clinical trials and product manufacturing. However, the amount of our research and development spending will be determined, in part, by our ability to attract additional capital or to realize revenue through partnerships, licensing, joint ventures or similar arrangements.

General and administrative expenses increased by 26% to $1.7 million for the quarter ended June 30, 2002 compared to $1.3 million for the corresponding period in 2001. This $346,000 increase was primarily due to increased professional fees of $204,000 and personnel expenses of $73,000.

*Interest Income/Expense*

Interest income decreased by $215,000 to $180,000 for the quarter ended June 30, 2002 compared to $395,000 for the corresponding period in 2001, primarily as a result of lower interest rates during the second quarter of 2002.

Interest expense increased to $87,000 for the quarter ended June 30, 2002 from $75,000 for the corresponding period in 2001. The increase resulted primarily from a higher level of long−term debt outstanding during the second quarter of 2002 offset somewhat by lower interest rates during the second quarter of 2002.

*Other Income*

Other income consists of a one−time tax refund of $534,000 recognized in the quarter ended June 30, 2002, due to changes in the tax laws. As a result of such changes, we were able to carry back a portion of the 2001 loss to offset the taxes resulting from the sale of our 50% interest in the Genomics Center to Aventis. In December 1999, we recognized a gain on the sale of $46.4 million, net of $534,000 in Alternative Minimum Tax and reported the gain in other income.

*Operating Results*

We reported a loss from operations of $7.7 million for the quarter ended June 30, 2002 compared to a loss from operations of $5.0 million for the corresponding period ended June 30, 2001, an increase in loss of $2.7 million or 52%. We expect operating losses will be substantial for several more years as our product development activities continue, and these losses are expected to fluctuate as a result of differences in the timing and composition of revenue earned and expense incurred.

We reported a net loss of $7.0 million for the quarter ended June 30, 2002 compared to a net loss of $4.7 million for the corresponding period in 2001, or $.22 and $.17 per share (basic and diluted), respectively.

Table of Contents

**Results of Operations**

*Six Months Ended June 30, 2002 Compared with the Six Months Ended June 30, 2001*

*Research Revenue*

We recognized research revenue of $13,000 for the six months ended June 30, 2002 compared to $2,000 for the corresponding period in 2001. Research revenue for 2002 results from an agreement that we have entered into which provides for the review and evaluation of certain technologies we own.

*Operating Expenses*

Research and development expenses increased by 48% to $11.1 million for the six–months ended June 30, 2002 compared to $7.5 million for the corresponding period in 2001. This $3.6 million increase was primarily due to higher levels of spending on product development of $275,000, product manufacturing of $1.2 million, external activities in support of clinical trials of $1.5 million, and increased personnel and overhead expenses of $871,000 offset by a decrease in consulting and related expenses of $360,000. We expect that our research and development expenses will remain at approximately the current levels over the next year, although they may fluctuate from quarter to quarter, as a result of our product development programs, clinical trials and product manufacturing. However, the amount of our research and development spending will be determined, in part, by our ability to attract additional capital or to realize revenue through partnerships, licensing, joint ventures or similar arrangements.

General and administrative expenses increased by 33% to $2.8 million for the six–months ended June 30, 2002 compared to $2.1 million for the corresponding period in 2001. This $701,000 increase was primarily due to increased professional fees of $300,000 and personnel expenses of $282,000.

*Interest Income/Expense*

Interest income decreased by $552,000 to $381,000 for the six–months ended June 30, 2002 compared to $933,000 for the corresponding period in 2001, primarily as a result of lower interest rates and a lower level of funds available.

Interest expense decreased to $172,000 for the six months ended June 30, 2002 from $174,000 for the corresponding period in 2001. The decrease resulted primarily from a higher level of long–term debt outstanding during the six months ended June 30, 2002, offset by lower interest rates for the six months ended June 30, 2002.

*Other Income*

Other income consists of a one–time tax refund of $534,000 received during the six–months ended June 30, 2002, due to changes in the tax laws. As a result of these changes, we were able to carry back a portion of the 2001 loss to offset the taxes resulting from the sale of our 50% interest in the Genomics Center to Aventis. In December 1999, we recognized a gain on the sale of $46.4 million, net of $534,000 in Alternative Minimum Tax and reported the gain in other income.

*Operating Results*

We reported a loss from operations of $14.0 million for the six–months ended June 30, 2002 compared to a loss from operations of $9.6 million for the corresponding period in 2001, an increase in loss of $4.4 million or 45%. We expect operating losses will be substantial for several more years as our product development activities continue, and these losses are expected to fluctuate as a result of differences in the timing and composition of revenue earned and expense incurred.

Table of Contents

We reported a net loss of $13.2 million for the six–months ended June 30, 2002 compared to a net loss of $8.9 million for the corresponding period in 2001, or $.41 and $.32 per share (basic and diluted), respectively.

*Liquidity and Capital Resources*

We have financed our operations and investments primarily through the private placement and public offering of our equity securities and through research revenue and other transactions with Aventis. In addition, we have financed our operations through the issuance of long–term debt, operating and capital lease transactions, interest income, and government–sponsored research grants.

At June 30, 2002, we had cash and cash equivalents totaling $36.0 million and working capital of $29.8 million compared to cash, cash equivalents and marketable securities totaling $47.2 million and working capital of $42.8 million at December 31, 2001.

The primary uses of cash during the six–months ended June 30, 2002 were $10.6 million to finance our operations and working capital requirements, $724,000 to repay long–term debt, $661,000 to acquire intellectual property and $99,000 to purchase laboratory equipment. The primary sources of cash during the six–months ended June 30, 2002 were $772,000 from the sale of shares of common stock pursuant to our stock option and employee stock purchase plans, $442,000 from sales and maturities of marketable securities and $77,000 from the draw down on the term loan for equipment financing.

At June 30, 2002, we had 5,572,288 shares of registered common stock available for sale pursuant to shelf registrations previously filed with the Securities and Exchange Commission.

We have substantial fixed contractual obligations under various research and licensing agreements, consulting and employment agreements, lease agreements and long–term debt instruments. These contractual obligations were comprised of the following as of June 30, 2002:

| *In thousands* | Payments Due By Period | | | | |
|---|---|---|---|---|---|
| **Contractual Obligations** | **Total** | **In 2002** | **2003 through 2005** | **2006 through 2007** | **After 2007** |
| Long–term debt | $ 8,367 | $1,452 | $ 6,904 | $   11 | $  — |
| Operating leases | 5,196 | 1,520 | 2,432 | 1,245 | |
| Other long–term obligations * | 7,165 | 3,405 | 3,273 | 324 | 162 |
| Total fixed contractual obligations | $20,728 | $6,377 | $12,609 | $1,580 | $ 162 |

\*    Other long–term obligations are comprised primarily of employment agreements and licensing agreements.

We will require substantial additional funding for our research and development programs, including preclinical development and clinical trials, for operating expenses, for the pursuit of regulatory approvals and for establishing manufacturing, marketing and sales capabilities. We are pursuing the necessary funding to support our research and development programs through potential partnerships for our lead product candidates or product classes; licensing of our intellectual property assets, such as our NF–κB and ARGENT patents; and sale of common stock as market conditions permit. Adequate funding may not be available when needed or on terms acceptable to us.

Based on the historical spending levels to support our operations, we believe our available funds will be adequate to satisfy our capital and operating requirements for approximately one and a half years. However, there can be no assurance that changes in our research and development plans or other future events affecting our revenues or operating expenses will not result in the earlier depletion of our funds.

10

**Table of Contents**

**Securities Litigation Reform Act**

*Safe harbor statement under the Private Securities Litigation Reform Act of 1995:* Except for the historical information contained in this Quarterly Report on Form 10–Q, the matters discussed herein are forward–looking statements that involve risks and uncertainties, including, but not limited to, risks and uncertainties regarding our ability to succeed in developing marketable drugs or generating product revenues, our ability to accurately estimate the actual research and development expenses and other costs associated with the preclinical and clinical development of our product candidates, the success of our preclinical studies, our ability to commence clinical studies, the adequacy of our capital resources and the availability of additional funding, as well as general economic, competitive, governmental and technological factors affecting our operations, markets, products, services and prices, and other factors discussed under the heading "Certain Factors That May Affect Future Results of Operations" in our Annual Report on Form 10–K for the year ended December 31, 2001, which has been filed with the Securities and Exchange Commission. As a result of these and other factors, actual events or results could differ materially from those described herein.

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We maintain an investment portfolio in accordance with our investment policy to preserve principal, maintain proper liquidity to meet operating needs and to maximize yields. Our investment policy specifies credit quality standards for our investments and limits the amount of credit exposure to any single issue, issuer or type of investment.

We invest cash balances in excess of operating requirements in short–term securities, generally with maturities of 90 days or less. Our marketable securities generally consist of corporate debt and U.S. Government securities primarily with maturities of one year or less, but generally less than six months. These securities are classified as "available–for–sale." "Available–for–sale" securities are recorded on the balance sheet at fair market value with unrealized gains or losses reported as a separate component of stockholders' equity (accumulated other comprehensive income (loss)). Gains and losses on marketable security transactions are reported on the specific–identification method. Interest income is recognized when earned. A decline in the market value of any "available–for–sale" security below cost that is deemed other than temporary results in a charge to earnings and establishes a new cost basis for the security. These investments are sensitive to interest rate risk. We believe that the effect, if any, of reasonable possible near–term changes in the interest rates on our financial position, results of operations and cash flows would not be material due to the short–term nature of these investments.

We have an executive compensation plan which provides a deferred compensation benefit for certain executives and key employees. Under the plan, benefits are deferred and generally vest over four years. The benefits obligation is recorded as compensation expense and a liability based on the underlying fair market value of the obligation as it vests. As of June 30, 2002, in the event of a hypothetical 10% increase in the underlying fair market value of the obligation, we would incur approximately $48,000 of additional compensation expense per year.

At June 30, 2002, we have an outstanding bank term note with an interest rate of prime plus 1%. This note is sensitive to interest rate risk. In the event of a hypothetical 10% increase in the prime rate (47.5 basis points), we would incur approximately $30,000 of additional interest expense per year.

11

**Table of Contents**

PART II.   OTHER INFORMATION

ITEM 1.   LEGAL PROCEEDINGS

On June 25, 2002, we, together with Massachusetts Institute of Technology, the Whitehead Institute for Biomedical Research, and the President and Fellows of Harvard College (the "Academic Institutions") filed a patent infringement lawsuit against Eli Lilly and Co. ("Lilly") alleging infringement of a U.S. patent, issued the same day to a team of inventors from the Academic Institutions, covering methods of treating human disease by regulating NF−κB cell signaling activity. As we are the exclusive licensee of this patent, we are obligated for the costs expended in its enforcement. The lawsuit, filed in the United States District Court for the District of Massachusetts in Boston, alleges infringement by Lilly through its sale of two products, Evista $^{®}$ and Xigris $^{®}$, and seeks monetary damages from Lilly.

ITEM 4.   SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

The Annual Meeting of Stockholders of the Company was held on June 12, 2002. Of 32,433,188 shares of common stock issued and outstanding and eligible to vote as of the record date of April 18, 2002, a quorum of 29,402,704 shares, or 90.7% of the eligible shares, were present in person or represented by proxy. The following actions were taken at such meeting.

(a)   Re−election of the following Class 2 Directors of the Company:

|  | Number of Shares | |
|---|---|---|
|  | For | Withheld Authority |
| Jay R. LaMarche | 28,541,218 | 861,486 |
| Sandford D. Smith | 28,548,058 | 854,646 |

After the meeting, John M. Deutch, Ph.D. and Ralph Snyderman, M.D. continued to serve as Class 1 Directors of the Company for terms which expire in 2004 and until their successors are duly elected and qualified. Harvey J. Berger, M.D., Vaughn D. Bryson and Raymond S. Troubh continued to serve as Class 3 Directors of the Company for terms which expire in 2003 and until their successors are duly elected and qualified.

(b)   Ratification of the selection by the Board of Directors of Deloitte & Touche LLP as the Company's independent public accountants for the year ending December 31, 2002. The voting results were 28,902,906 votes for, 458,248 votes against and 41,550 votes abstaining.

(c)   Approval of an amendment to the ARIAD Pharmaceuticals, Inc. 2001 Stock Plan to increase the number of shares of common stock available for issuance under the Plan by 1,600,000 shares. The voting results were 22,293,354 votes for, 6,994,854 votes against and 114,496 votes abstaining.

ITEM 5.   OTHER INFORMATION

Effective June 19, 2002, Dr. Ralph Snyderman resigned as a Director from the Company's Board of Directors. Dr. Snyderman will continue to be a member of the Board of Scientific and Medical Advisors of the Company.

On June 19, 2002, the Company announced the appointment of four new Directors: Elizabeth H.S. Wyatt, former vice president, corporate licensing at Merck & Co., Inc.; Michael D. Kishbauch, former

12

**Table of Contents**

president and chief operating officer at Medimmune, Inc. and current president and chief executive officer at OraPharma, Inc.; Frederick S. Schiff, former senior vice president and chief financial officer at Bristol–Meyers Squibb Company; and Burton E. Sobel, M.D., E.L. Amidon Professor, physician–in–chief, and professor of biochemistry, University of Vermont.

### ITEM 6.  EXHIBITS AND REPORTS ON FORM 8–K

(a)    Exhibits.

The following exhibit is filed herewith:

10.1+ Promissory Note dated July 24, 2002 issued pursuant to Executive Employment Agreement dated March 4, 2002 between the Company and Laurie A. Allen.

(+) Management Contract or Compensation Plan Arrangement

(b)    Reports on Form 8–K

The Company filed three Current Reports on Form 8–K during the quarter ended June 30, 2002.

The Form 8–K, filed on April 9, 2002, reported that the Company was presenting at the American Association for Cancer Research scientific meeting held on April 9, 2002, results of preclinical studies on its lead anti–cancer drug candidate.

The Form 8–K, filed on June 19, 2002, reported that the Company announced the appointment of four new Directors to its Board of Directors and the resignation of one existing Director.

The Form 8–K, filed on June 26, 2002, reported that the Company announced the issuance of a U.S. patent covering methods of treating human disease by regulating NF–κB cell signaling activity. The Company also announced in this Form 8–K, that it along with the Whitehead Institute for Biomedical Research, Massachusetts Institute of Technology and the President and Fellows of Harvard College, has filed a patent infringement lawsuit against Eli Lilly and Co. alleging infringement of the newly issued patent referred to above. Finally, the Company announced in this Form 8–K, the hosting of a live analyst conference call held on June 27, 2002 at 9:00 a.m. Eastern Time to discuss the issued patent and lawsuit.

**Table of Contents**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

<div align="right">

ARIAD Pharmaceuticals, Inc.
(Registrant)
By: /s/ Edward M. Fitzgerald
    Edward M. Fitzgerald
    Senior Vice President and Chief Financial Officer
    (Duly Authorized Officer and Principal Financial Officer)

</div>

Date: July 31, 2002

14

Table of Contents

## EXHIBIT INDEX

| Exhibit No. | Title |
| --- | --- |
| 10.1+ | Promissory Note dated July 24, 2002 issued pursuant to Executive Employment Agreement dated March 4, 2002 between the Company and Laurie A. Allen |

+  Management Contract or Compensation Plan or Arrangement.

15

# ARIAD PHARMACEUTICALS INC (ARIA)

26 LANDSDOWNE ST
CAMBRIDGE, MA 02139
617. 494.0400

# EX−10.1

**PROMISSORY NOTE**
**10−Q Filed on 07/31/2002 − Period: 06/30/2002**
File Number 333−76486

GSI

LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Exhibit 10.1

### PROMISSORY NOTE

(ISSUED PURSUANT TO EXECUTIVE EMPLOYMENT AGREEMENT DATED MARCH 4, 2002)

$75,000                                                                      Cambridge, Massachusetts
                                                                                    July 24, 2002

FOR VALUE RECEIVED, I, Laurie A. Allen of Cambridge, Middlesex County, Massachusetts (hereinafter the "Borrower"), promise to pay to the order of ARIAD PHARMACEUTICALS, INC., a Delaware corporation duly organized according to law with a usual place of business at 26 Landsdowne Street, Cambridge, Massachusetts (hereinafter the "Company"), the principal sum of SEVENTY FIVE THOUSAND AND 00/00 DOLLARS ($75,000) on July 24, 2005 or earlier with any interest accrued thereon as provided herein.

The loan evidenced by this Note is made by the Company pursuant to its obligations under that certain Executive Employment Agreement, dated March 4, 2002, between the Company and Borrower (the "Employment Agreement"). It is expressly agreed that this Note is issued in connection with the relocation of the Borrower to the Borrower's location of employment and the Company's place of business and is issued free of interest thereon, except as provided herein.

IT IS EXPRESSLY AGREED AND UNDERSTOOD THAT UPON RECEIPT OF THE PRINCIPAL SUM OF $75,000.00 (AND ANY INTEREST PROVIDED FOR HEREIN) THE HOLDER OF THIS NOTE SHALL BE PAID IN FULL AND ALL OBLIGATIONS TO MAKE FURTHER PAYMENTS SHALL CEASE AND ALL SECURITY HELD BY THE MAKER ON ACCOUNT OF THIS NOTE SHALL BE RELEASED AND RETURNED TO THE BORROWER.

The principal sum of this Note shall be forgiven (i) if the Borrower terminates her employment as provided in Section 6.2 of the Employment Agreement; or (ii) after a period of three (3) years, BUT ONLY IF the Borrower remains in the continuous, full-time employment of the Company.

Should the Borrower not remain in the continuous full-time employment of the Company for a minimum of three (3) years from the date hereof, other than for the reasons set forth in Sections 5.1 or 6.2 of the Employment Agreement, then all monies advanced hereunder shall be due and payable ninety (90) days from the cessation of her employment.

Notwithstanding the foregoing, automatically without further action by the Company, the entire outstanding principal balance of this Note shall become immediately due and payable without notice or demand upon the occurrence at any time upon the institution by or against the Borrower of any proceedings under the Bankruptcy Act or insolvency law; or the making by the Borrower of an assignment for the benefit of creditors; the application for, consent to or sufferance of the appointment of a receiver or trustee, pursuant to court action or otherwise, or the commencement of any judicial proceedings by or against the Borrower whereby a reorganization or arrangement is sought with respect to the debts of the Borrower.

In the event that payment is due prior to July 24, 2005 for the reasons set forth in the two preceding paragraphs, interest at the rate of 7% per annum shall accrue from such date until all unpaid principal and interest are paid in full.

The undersigned agrees to pay all costs and expenses, including but not limited to all attorney's fees, paid or incurred by the Company in enforcing this Note and collecting the amounts due hereunder whether or not suit is instituted and whether or not foreclosure under the mortgage securing this Note is instituted.

Presentment for payment, notice of dishonor, protest and notice of protest are hereby waived by the undersigned and by all sureties, guarantors and endorsers hereof. The liability of any maker, surety, guarantor and endorser of this Note shall not be terminated or otherwise affected or impaired by the Company's granting any extension of time for payment or by any other indulgence or forbearance granted by the Company to the Borrower. This Note shall be the joint and several obligation of all makers, sureties, guarantors and endorser and shall be binding upon them and their successors and assigns.

In the event of any default hereunder, the Company may, at its option, and without notice, set off against the payment of this Note any sums due from the Company to any maker, surety, guarantor or endorser hereof.

A waiver of any of the terms of this Note by the Company hereof on any one occasion shall not be deemed to be a continuing waiver; nor shall such a waiver on any one occasion be deemed to be a waiver on any subsequent occasions.

This Note is secured by a second mortgage on the Borrower's residence in Cambridge, Massachusetts, pursuant to a certain mortgage by and between the Borrower and the Company of even date herewith.

No provision hereof shall be modified, altered or limited except by a written instrument expressly referring to this Note and to such provision, and executed by the Borrower and the Company.

EXECUTED UNDER SEAL this 24th day of July, 2002


/s/ Edward M. Fitzgerald                    /s/ Laurie A. Allen
--------------------------                  ----------------------------
Witness:                                    Laurie A. Allen

2

# EXHIBIT I

BIOTECH'S MOST RESPECTED NEWS SOURCE FOR OVER 15 YEARS

BIOWORLD® TODAY

THURSDAY
OCTOBER 26, 2006

THE DAILY BIOTECHNOLOGY NEWSPAPER

VOLUME 17, NO. 206
PAGE 1 OF 6

*Financings Roundup*

## VaxInnate Raises $40M Via Series C For TLR Flu Work

**By Trista Morrison**
**Contributing Writer**

Continuing the history of lucrative deals based on Toll-like receptor (TLR) platforms, VaxInnate Corp. raised $40 million in a Series C financing to move its TLR-based flu vaccines into the clinic.

Just last month, Dynavax Technologies Corp. signed a deal worth up to $136 million with AstraZeneca plc for the development of TLR9 agonists to treat asthma and chronic obstructive pulmonary disease (COPD). And last year, TLRs were popular, as Coley Pharmaceutical Group Inc. completed a $96 million IPO just a few months after closing a potential $505 million deal with Pfizer Inc. for cancer drug ProMune, also a TLR9 agonist.

"We were interested in getting into the TLR field,

*See Financings Roundup, Page 3*

## Forest's Phase IIb/III Stroke Compound On Clinical Hold

**By Randall Osborne**
**West Coast Editor**

Two days after the FDA rejected a separate partner's new drug application for their antibiotic, Forest Laboratories Inc. said the steering committee placed on hold the Phase IIb/III study with desmoteplase, the plasminogen activator for acute ischemic stroke in-licensed from Paion AG.

New York-based Forest's stock (NYSE:FRX) closed Wednesday at $48.08, down $1.34, after starting to recover from Monday's 5 percent haircut that left shares at $48.86.

"The market is saying they think this thing is gone," said analyst Megan Murphy with Lazard Capital Markets in New York, although she had not placed much overall value in the drug. "It's not of individual importance, but it's important in the macro sentiment of whether their pipeline

*See Forest, Page 4*

## Forbes Medi-Tech Expanding Pipeline, Acquiring TheraPei

**By Jennifer Boggs**
**Staff Writer**

Seeking to broaden its drug development platform, Forbes Medi-Tech Inc. agreed to buy TheraPei Pharmaceuticals Inc., a privately held firm developing peptides aimed at metabolic diseases.

Terms call for Forbes to make a small up-front payment, issue shares not exceeding 150,000 upon closing, plus pay potential milestones of up to $50 million based on certain clinical achievements. More specific terms were not disclosed, and Forbes said consideration will be made on a staged basis commensurate with the development of TheraPei's technologies.

"We've been looking to bring new technologies into the company," said Laura Wessman, senior vice president of operations for Vancouver, British Columbia-based

*See Forbes, Page 5*

## Cadence IPO's Net: $48.5M For Pair Of Phase III Drugs

**By Randall Osborne**
**West Coast Editor**

Cadence Pharmaceuticals Inc. plans to use most of the $48.5 million from its initial public offering for continued work on two Phase III products – an intravenous form of acetaminophen for pain in adults and children, and Omigard (omiganan pentahydrochloride) gel to prevent and treat infections.

The San Diego-based firm, which priced 6 million shares at $9 each, filed for the IPO in July, shooting for as much as $86 million in gross proceeds. Underwriters have a 30-day option to buy up to 900,000 more shares to cover overallotments. The stock (NASDAQ:CADX) gained 40 cents Wednesday to close at $9.40.

Founded in May 2004 as Strata Pharmaceuticals Inc., Cadence buys rights to late-stage products for the hospital

*See Cadence, Page 6*

INSIDE:

OTHER NEWS TO NOTE (ACHAOGEN GETS $24.7M CONTRACT) ..............2, 4
CLINIC ROUNDUP ..............5-6

AHC Media LLC

To subscribe, please call BIOWORLD® Customer Service at **(800) 688-2421**; outside the U.S. and Canada, call **(404) 262-5476**.
Copyright © 2006 AHC Media LLC. Reproduction is strictly prohibited. Visit our web site at www.bioworld.com

# OTHER NEWS TO NOTE

• **Achaogen Inc.**, of South San Francisco, executed a four-year contract with the Defense Threat Reduction Agency, an agency of the U.S. Department of Defense, worth up to $24.7 million for the development of therapies to treat anthrax and other biothreat agents. Under the terms of the agreement, the first year of which is fully funded, DTRA will pay for the discovery of "achaogens," broad-spectrum small-molecule therapeutics that inhibit proprietary bacterial targets, to treat resistant strains of biothreat agents such as *B. anthracis* or *Y. pestis*, making the bacteria susceptible to existing fluoroquinolones and potentially to other classes of antibacterial drugs. Achaogen then will pursue subsequent preclinical development activities.

• **Amgen Inc.**, of Thousand Oaks, Calif., completed its acquisition of Avidia, a privately held biopharmaceutical company that develops Avimer proteins, a new class of human therapeutic. The transaction gives Amgen Avidia's lead product candidate, an inhibitor of interleukin-6 for inflammation and autoimmune diseases, which is in Phase I clinical trials. The buyout is valued at up to $450 million and was announced last month. (See *BioWorld Today*, Oct. 2, 2006.)

• **Caprion Pharmaceuticals Inc.**, of Montreal, reported an expansion of a previously established biomarker research collaboration with **Vertex Pharmaceuticals Inc.**, of Cambridge, Mass. The expanded collaboration will apply Caprion's CellCarta proteomics biomarker technology across preclinical and clinical development activities being done by Vertex. Caprion is a clinical-stage biotechnology company developing pharmaceutical products in the areas of infectious diseases and oncology.

• **Cellzome Inc.**, of Boston, reported its research collaboration with **Novartis AG**, of Basel, Switzerland, was extended until June 30, 2008. Cellzome will apply its technology to identify tractable therapeutic targets in several disease-relevant pathways, and to the identification of pharmacological targets, and potential off-target effects, of active Novartis compounds.

• **Clinical Cell Culture Ltd.**, of Cambridge, UK, said it plans to raise $10 million in additional capital, via a share purchase plan, to support growth and commercialization of its lead product, ReCell. The company said it remains on track to secure FDA approval for ReCell, a device for harvesting autologous stem cells, in the third quarter of 2007. The SPP is underwritten by Bell Potter Securities Ltd.

• **Cytogen Corp.**, of Princeton, N.J., renewed its agreement with **Laureate Pharma Inc.**, also of Princeton, for the cGMP manufacture of ProstaScint, Cytogen's monoclonal antibody immunoconjugate designed for imaging use in prostate cancer patients. Financial terms of the deal were not disclosed.

• **ImClone Systems Inc.**, of New York, named Carl Icahn chairman, and reported its third-quarter earnings, showing a net income of $57.3 million, or 65 cents per share, for the three months ending Sept. 30. Icahn, who recently criticized ImClone's management, agreed to drop his solicitation of written consents seeking to remove four board members, and the board agreed to drop its rejection. Joseph Fischer, interim CEO of ImClone, has stepped down, and directors Vincent DeVita, John Fazio and William Miller will not stand for re-election at the annual meeting early next year. With his appointment to chairman, Icahn said his goals will be to investigate why ImClone's relationship with New York-based **Bristol-Myers Squibb Co.**, its commercial partner on Erbitux (cetuximab), has "seriously deteriorated" over the past few years, and to find a "qualified CEO with biotechnology experience." ImClone's revenues for the third quarter totaled $150.7 million, which includes its 39-percent share of BMS' in-market Erbitux sales of $174.6 million. As of Sept. 30, ImClone had about $1.1 billion in cash.

BioWorld® Today (ISSN# 1541-0595) is published every business day by AHC Media LLC, 3525 Piedmont Road, Building Six, Suite 400, Atlanta, GA 30305 U.S.A. Opinions expressed are not necessarily those of this publication. Mention of products or services does not constitute endorsement. BioWorld® and BioWorld® Today are trademarks of AHC Media LLC, a Thompson Publishing Group company. Copyright © 2006 AHC Media LLC. All Rights Reserved. No part of this publication may be reproduced without the written consent of AHC Media LLC. (GST Registration Number R128870672).

| | |
|---|---|
| **ATLANTA NEWSROOM:** | Managing Editor: **Brady Huggett**.<br>Senior Staff Writer: **Karen Pihl-Carey**. Staff Writers: **Karen Young**, **Jennifer Boggs**.<br>Senior Production Editor: **Ann Duncan**. |
| **WASHINGTON BUREAU:** | Washington Editor: **Aaron Lorenzo**. |
| **WEST COAST BUREAU:** | Editor: **Randall Osborne**. |
| **EAST COAST BUREAU:** | Science Editor: **Anette Breindl**. |
| **BUSINESS OFFICE:** | Vice President/Group Publisher: **Donald R. Johnston**.<br>Marketing Manager: **Chris Walker**.<br>Account Representatives: **Steve Roberts, Bob Sobel, Chris Wiley**. |
| **DISPLAY ADVERTISING:** | For ad rates and information, please call **Stephen Vance** at (404) 262-5511 or email him at stephen.vance@ahcmedia.com. |
| **REPRINTS:** | For photocopy rights or reprints, please call our reprints department at (404) 262-5479. |
| **PRESS MATERIALS:** | Send all press releases and related information to newsdesk@bioworld.com. |

SUBSCRIBER INFORMATION
Please call **(800) 688-2421** to subscribe or if you have fax transmission problems. Outside U.S. and Canada, call **(404) 262-5476**. Our customer service hours are 8:30 a.m. to 6:00 p.m. EST.

Brady Huggett, **(404) 262-5408**
Aaron Lorenzo, **(202) 739-9556**
Jennifer Boggs, **(404) 262-5427**
Fax: **(404) 814-0759**
Randall Osborne, **(415) 384-0872**
Anette Breindl, **(304) 296-1160**

VP/Group Publisher
Donald R. Johnston, **(404) 262-5439**
Internet: http://www.bioworld.com



THURSDAY, OCTOBER 26, 2006    BIOWORLD® TODAY    PAGE 3 OF 6

# Financings Roundup
*Continued from page 1*

which bought us to VaxInnate," said Philippe Chambon, managing director of New Leaf Venture Partners, lead investor. His firm was joined by new investor Canaan Partners and existing investors HealthCare Ventures, Oxford Bioscience Partners LLC, MedImmune Ventures Inc. and CHL Medical Partners.

The financing brings VaxInnate's total raised to date to more than $64 million, plus an additional $5 million to $6 million in nondilutive government grants and contracts.

Alan Shaw, president and CEO of the Cranbury, N.J.-based company, said he expects the money to last through the middle of 2009 "on its own," not including several potential grants in the works. But even without the grants, the cash gives VaxInnate sufficient funding to generate clinical data on its two lead flu vaccine programs, flagellin.HuHA/flagellin.AvHA and flagellin.HuM2e/flagellin.AvM2e.

Both flu programs are based on VaxInnate's core technology, which involves fusing a vaccine antigen to flagellin, a component of the long, hair-like tails that help bacteria swim. As in most vaccines, the antigen component stimulates an adaptive immune response characterized by the production of pathogen-specific antibodies and T cells. But it is the flagellin that gives the technology its edge, stimulating a broad innate immune response through the antagonism of TLR5.

TLRs recognize foreign structures, such as bacterial flagellin, and trigger an immediate immune response. That innate immunity was, evolutionarily speaking, the first line of defense created to protect multicellular organisms; its components are shared by humans, nematode worms, fruit flies and even plants. Despite its ancient history, however, the innate immune system largely was ignored until about 50 years ago, when William Coley observed that his cancer patients who developed postsurgical infections also gained a heightened immune response that prevented the cancer from recurring. Then, in the early 1990s, German scientist Christiane Nüsslein-Volhard discovered the "Toll" gene in fruit flies, naming it after the German slang for "cool."

While several biotechs are pursuing TLRs, Shaw said VaxInnate is the only company "using flagellin in a serious way as a deliberate TLR5 agonist." Additionally, the fusion of flagellin to the antigen creates a more potent vaccine than administering a mixture of the two components unattached, the company said. And since the fused product is made using simple recombinant DNA techniques, it can be manufactured in *E. coli*, which is faster and cheaper than the egg-based approach used to make flu vaccines.

Flagellin.HuHA links flagellin to viral hemagglutinin (HA), a target antigen for traditional human flu vaccines. Flagellin.AvHA is the avian flu derivative of the program. Similarly, flagellin.HuM2e and flagellin.AvM2e fuse flagellin to the M2 ectodomain of the influenza A virus and avian

influenza virus, respectively. However, while HA tends to vary among flu strains, M2e is conserved.

"The idea of pursuing antigens conserved across several flu strains has been limited by an inability to generate a strong immune response," Chambon said. But Shaw explained that several antigens "become very immunogenic when fused to flagellin."

Data presented at a conference earlier this week indicated that the HuHA candidate showed efficacy in mouse studies at low doses, providing complete protection against a dose of influenza that typically kills 90 percent of animals. Data also have shown the M2e program to protect 90 percent of mice against a lethal influenza challenge.

Both programs are preclinical, but Shaw anticipates beginning clinical trials in the first half of 2007.

"We usually don't invest in preclinical stage companies, but VaxInnate is unique," Chambon said, citing the flu indication as an area in which animal models tend to be predictive of success in humans, as well as the potential for the technology beyond flu.

VaxInnate's technology has produced immune responses in animal models of West Nile virus, Japanese encephalitis virus and listeria. Shaw said the company also is working on a potential collaboration with the Department of Defense on a malaria vaccine, and he has "not ignored" the possibilities in cancer, although he's saving that indication for later considering that the landscape is "littered with the carcasses of failed cancer vaccines."

In other financing news:

• **Ariad Pharmaceuticals Inc.**, of Cambridge, Mass., completed its previously announced offering of 3.1 million shares priced at $4.65 each, for proceeds of $14.5 million. Ariad expects net proceeds to total about $14.3 million, which will be used for research and development, clinical trials, manufacturing, intellectual property protection, working capital and general corporate purposes. Credit Suisse Securities (USA) LLC has an option to purchase up to an additional 466,942 million shares, which expires Nov. 18. (See *BioWorld Today*, Oct. 23, 2006.)

• **Cytheris SA**, of Paris, raised €24.3 million (US$30.7 million) in a Series B financing to drive Phase II trials of its recombinant IL-7 product candidate and to complete preclinical development of a candidate selected from a NKT/dendritic cell activators platform. The round was led by new investor CDC Entreprises Innovation, of France, and included participation by new investor ABN AMRO Capital Life Sciences in the Netherlands, and existing investors AXA Private Equity, also of France. Also participating were Bioam, of France; Crédit Agricole Private Equity, of France; T2C2/Bio 2000, of Canada; and Caisse de Dépôt et Placement du Québec in Canada.

• **Protox Therapeutics Inc.**, of Vancouver, British Columbia, filed to raise C$8 million (US$7.1 million) to C$10

*See Financings Roundup, Page 4*

## Forest
*Continued from page 1*

will survive standard industry attrition rates," she told *BioWorld Today*.

The steering panel for the desmoteplase trial followed the advice of an independent data monitoring committee, which recommended that the study stop while researchers use more data to evaluate an undisclosed safety signal. No conclusions about the drug's safety or efficacy should be drawn as a result of the move, the committee said.

"You could speculate a million ways to Sunday what's going on," Murphy said, adding that the trial's monitors "supposedly have the data now and are convening to look at it." She expects a decision early next week on the next step. "They've had two successful safety looks [at the study] already," she added.

Stroke trials can fail because patients aren't well screened, or don't get enough drug, or get the drug too late.

"You can be too aggressive on your window," Murphy said. "From a marketing perspective, you want to get as much time as possible" from the point of stroke to the time the drug is administered. "They're going for three to nine hours [with desmoteplase]," she said, and that window has worked in Phase II trials.

Activase, the tissue plasminogen activator from South San Francisco-based Genentech Inc. that was cleared for stroke in 1996, must be given within three hours of an episode. Neurobiological Technologies Inc.'s Viprinex (ancrod), the Phase III defibrinogenating thrombin-like enzyme derived from the venom of the Malayan pit viper, has shown efficacy when given as long as six hours after a stroke. (See *BioWorld Today*, July 16, 2004.)

Forest at one point considered in-licensing Viprinex, and NTI sniffed out desmoteplase but chose Viprinex – gained through the buyout of Empire Pharmaceuticals Inc. for $23 million in 2004 – because the drug had been tested in more patients. NTI, a smaller company, didn't like desmoteplase's risk profile. (See *BioWorld Today*, July 16, 2004.)

Forest is paying clinical development costs for the drug as part of a 2004 deal with Aachen, Germany-based Paion. European and Asian marketing rights to the compound belong to H. Lundbeck A/S, through an arrangement made with Paion in 2005.

Word on desmoteplase, an engineered version of a clot-dissolving protein found in the saliva of the vampire bat *Desmodus rotundus*, followed news of a non-approvable letter from the FDA regarding the antibiotic faropenem, partnered with Replidyne Inc. The agency wants further clinical studies, which means a delay of at least two years. (See *BioWorld Today*, Oct. 24, 2006.)

Faropenem's trouble was, "at a minimum, a big setback," Murphy said. "We're not sure that drug is capable of getting approved. The take-away is yet another reminder that you need a lot of products in the clinic to hope that a couple make it to the finish line."

In a research report this week, Murphy still is behind Forest.

"We wouldn't condemn the remaining portfolio on this [faropenem] news," she wrote, pointing to a pipeline that includes a filed NDA, two products in Phase III trials and three in Phase II. ∎

## Financings Roundup
*Continued from page 3*

million in a private placement. The company will sell "units" at C50 cents each, comprising one common share and one-half of one share purchase warrant. Each whole warrant will entitle the holder to purchase one common share within 24 months of the date of closing at a price of C65 cents per share. Proceeds will be used to fund clinical development of cancer drugs PRX321 and PRX302, as well as for research and development and general working capital purposes.

• **VioQuest Pharmaceuticals Inc.**, of Basking Ridge, N.J., raised $4 million through the issuance of 7.9 million shares at 50 cents per share in a private placement. Purchasers also received five-year warrants to purchase about 2.8 million shares at an exercise price of $0.73 per share. Proceeds will be used to strengthen the balance sheet and continue clinical development of cancer drugs VQD-001 and VQD-002. The company also continues to consider strategic alternatives relating to its wholly owned subsidiary, Chiral Quest Inc., which provides chiral chemistry products and serves for pharmaceutical and fine chemical industries. ∎

# OTHER NEWS TO NOTE

• **Pharmaxis Ltd.**, of Sydney, Australia, received marketing approval for its asthma diagnostic and management product, Aridol, in Sweden. Pharmaxis also will market Aridol in the 27 other European Union member states through the mutual recognition procedure. Pharmaxis expects individual approvals early next year. Aridol is administered as a dry powder in a hand-held inhaler.

• **Progenics Pharmaceuticals Inc.**, of Tarrytown, N.Y., earned a $5 million payment from **Wyeth Pharmaceuticals**, of Madison, N.J., the first milestone payment under a December agreement the companies made to develop and commercialize methylnatrexone. The payment was triggered by Progenics' start of a Phase III trial of intravenous methylnatrexone for the treatment of post-operative ileus (POI), a debilitating impairment of the gastrointestinal tract that occurs after surgery. Under the agreement, Progenics has the potential to receive a total of $356.5 million, payable upon achievement of certain milestones.

To subscribe, please call BIOWORLD® Customer Service at **(800) 688-2421**; outside the U.S. and Canada, call **(404) 262-5476**.
Copyright © 2006 AHC Media LLC. Reproduction is strictly prohibited. Visit our web site at www.bioworld.com.

BIOWORLD® TODAY

## Forbes

Continued from page 1

Forbes, "and we thought this was the right opportunity for us."

TheraPei, of San Diego, is based on drug development technology spun out of Sequenom Inc. in 2004, after Sequenom decided to streamline its business to focus on the diagnostic market. Sequenom, also of San Diego, provided the intellectual property and some seed funding, and holds a minority interest in TheraPei.

For Forbes, which is nearing the end of Phase II with its lead product, FM-VP4, in cardiovascular disease, it was the chance to add new technologies that made the proposed acquisition most attractive.

The company wants to diversify its programs, Wessman told *BioWorld Today*, adding that Forbes' work to date has stemmed mostly from its core sterol technology.

"We're staying in the cardiovascular and metabolic field, but we're looking for new approaches to drug development," he said.

The company's most advanced program is a series of peptides designed for once-daily administration in diabetes and inflammatory indications. The lead product, in preclinical development, is described as a long-acting VPAC2 agonist aimed at stimulating insulin secretion, and early research suggested promise in lowering glucose levels by targeting a pathway different from that of Byetta (exenatide), a product that has garnered a large share of the diabetes market since its launch last year by Cambridge, Mass.-based Amylin Pharmaceuticals Inc. and Indianapolis-based Eli Lilly and Co.

Amylin reported net Byetta sales of $126.4 million for the third quarter.

In earlier-stage discovery programs, TheraPei is working on ACC2 inhibitors to target diabetes and obesity and SPT inhibitors against inflammation.

Forbes has not yet disclosed a timeline for developing the TheraPei compounds, but Wessman said it's the company's intention to take them through Phase II before seeking a partner.

That's the same strategy Forbes has for its own compounds, including FM-VP4, a cholesterol-lowering drug that is being evaluated in a placebo-controlled Phase II study. The goal of that study is to demonstrate a minimum of 15 percent reduction from baseline in low-density lipoprotein-cholesterol at week 12.

Forbes expects "results before the end of the year," Wessman said.

Upon closing of the acquisition, TheraPei Founder John Nester, who also is a majority shareholder in TheraPei, will assume the role as chief scientific officer at Forbes.

Forbes agreed to pay all consideration for purchasing TheraPei through a minimum of 80 percent in common shares, and the balance in cash.

Forbes reported a net loss of C$6 million (US$5.3 million), or C17 cents per share, for the second quarter. As of June 30, the company had about C$26 million in cash.

Shares of Forbes (NASDAQ:FMTI) were unchanged Wednesday at $2.53. ∎

# CLINIC ROUNDUP

• **Adenosine Therapeutics LLC**, of Charlottesville, Va., initiated a two-part Phase Ib study in humans to evaluate apadenoson (ATL146e), a selective adenosine A2A agonist, as an anti-inflammatory agent. The study is designed to establish the drug's safety, demonstrate anti-inflammatory effectiveness in humans and determine the optimal dose. The results will serve as the foundation for multiple Phase II clinical trials involving acute inflammation.

• **Amylin Pharmaceuticals Inc.**, of New York, said it is expanding its clinical program in obesity with five additional studies to assess the safety and efficacy of multiple neurohormones used in combination to treat obesity. The first four trials will test pramlintide, an analogue human hormone amylin, in combination with Leptin, PYY 3-36, Leptin plus PYY 3-36, or approved oral obesity agents. The fifth trial will evaluate an amylin mimetic designed with enhanced anti-obesity properties.

• **Anesiva Inc.**, of South San Francisco, started Phase I testing of product candidate 1207, a new topical local anesthetic for numerous pain conditions including naturopathic pain. The study, designed to assess the safety of 1207, will enroll 24 adult healthy male volunteers in up to six dose-escalating cohorts in Australia. The randomized, double-blind, placebo-controlled study also will measure sensory perceptions of touch and warmth following a single topical administration of 1207 compared with placebo.

• **Crucell NV**, of Leiden, the Netherlands, started a Phase I trial of the AdVac-based tuberculosis vaccine it is developing with **AERAS Global TB Vaccine Foundation** in Rockville, Md. The open-label study will test the vaccine in a dose-escalation trial involving 24 healthy volunteers. The trial will be funded and managed by Aeras through a contract research organization, PRA Clinical Pharmacology Center in Lenexa, Kan.

• **EntreMed** Inc., of Rockville, Md., started a multicenter study with its drug candidate MKC-1 in non-small-cell lung cancer patients. MKC-1 is being evaluated in Phase I/II open-label clinical studies against breast cancer and in patients with leukemia. Phase I will assess the safety and maximum tolerated dose of MKC-1 when given orally in combination with pemetrexed Altima, a multi-targeted antifolate. Phase II will assess the antitumor activity and progression-free survival in up to 60 patients with NSCL cancer. MKC-1 is an orally active cell-cycle inhibitor.

To subscribe, please call BIOWORLD® Customer Service at **(800) 688-2421**; outside the U.S. and Canada, call **(404) 262-5476**.
Copyright © 2006 AHC Media LLC. Reproduction is strictly prohibited. Visit our web site at www.bioworld.com.

THURSDAY, OCTOBER 26, 2006                BIOWORLD® TODAY                PAGE 6 OF 6

## Cadence

*Continued from page 1*

sector. In March, the firm raised $53.8 million though an equity financing to support its newly acquired rights to the acetaminophen product, called I.V. APAP, from New York-based Bristol-Myers Squibb Co.

BMS has completed Phase III trials for pain and pediatric fever in Europe and U.S., and Cadence plans to use that data in a new drug application filing, along with data from more trials that are expected to start in the fourth quarter. Results are due in the first half of 2008, and the NDA could be submitted in the second half.

Omigard came from Vancouver, British Columbia-based Migenix Inc., in exchange for a $2 million up-front fee and up to $27 million in milestones, as well as royalties. Cadence gained European and North American rights in a deal more than two years ago. (See *BioWorld Today*, Aug. 4, 2004.)

In August 2005, Cadence began a confirmatory Phase III trial, conducted under a special protocol assessment with the FDA, targeting a primary endpoint of prevention of local catheter site infection. The firm expects data in the second half of next year, and an NDA filing in the first half of 2008.

Net proceeds from the IPO, with existing cash, should be enough to finish clinical trials that will support new drug application filings for I.V. APAP and Omigard. About $43.1 million will be spent on those trials and other research and development activities. About $3 million will fund capital expenditures, mainly equipment for making I.V. APAP. The rest of the IPO money will be spent on general corporate purposes.

Based on the $9 IPO price, as of June 30 on a pro-forma as adjusted basis, Cadence's cash and cash equivalents would have been about $91.3 million, working capital would have been about $85.9 million and total stockholders' equity would have been about $83 million, according to SEC paperwork.

Merrill Lynch & Co., of New York, acted as sole bookrunning manager, and Deutsche Bank Securities Inc., also of New York, acted as co-lead manager for the offering. Pacific Growth Equities LLC, of San Francisco, and JMP Securities LLC, of New York, served as co-managers. ∎

## CLINIC ROUNDUP

• **Tanox Inc.**, of Houston, started dosing a Phase I trial of TNX-650, a humanized monoclonal antibody being evaluated as a treatment for moderate-to-severe asthma. The trial is evaluating a single dose of TNX-650 in 32 healthy volunteers. TNX-650 targets interleukin-13. Tanox also is evaluating the anti-IL-13 effect of TNX-650 as a potential treatment for Hodgkin's lymphoma in an ongoing Phase I trial.

• **Theratechnologies Inc.**, of Montreal, completed the efficacy phase of its first Phase III trial testing TH9507 in HIV-associated lipodystrophy. The Phase III trial is being conducted in 43 centers in the U.S. and Canada examining the safety and efficacy of a daily administration of 2 mg of TH9507 for 26 weeks. The primary endpoint is a reduction of visceral adipose tissue, which is a risk factor for cardiovascular disease and Type II diabetes.

• **Titan Pharmaceuticals Inc.**, of South San Francisco, initiated a Phase III study of Probuphine in opioid dependence. The 150-patient study will evaluate the safety and effectiveness of Probuphine vs. placebo in reducing opioid dependence over 24 weeks of treatment. Probuphine is designed to provide continuous, long-term therapeutic levels of the drug buprenorphine.

## CLINICAL TRIALS STATE OF THE INDUSTRY REPORT 2006:
### Market Players, Data, Drug Development and the Future

This new report features 400 pages of proprietary market research that reveals critical data and information about trends affecting the drug development and study conduct markets, both in the U.S. and Europe:

✔ 440 current charts, 150 which are brand new
✔ CRO market size, growth, costs and performance
✔ Clinical research spending in the U.S. and worldwide
✔ Pharmaceutical, medical device and biotech revenue
✔ Drug development spending and cycle times
✔ Pipeline activity and updates in a dozen therapeutic areas (breast cancer, GERD, Parkinson's, prostate cancer, Type 1 diabetes, etc.)
✔ And much more!

**Call 1-800-688-2421 or 1-404-262-5476 to order!**

# EXHIBIT J

# ASHBY & GEDDES

ATTORNEYS AND COUNSELLORS AT LAW

222 DELAWARE AVENUE

P. O. BOX 1150

WILMINGTON, DELAWARE 19899

TELEPHONE
302-654-1888

FACSIMILE
302-654-2067

November 2, 2006

The Honorable Kent A. Jordan
United States District Court
844 North King Street
Wilmington, Delaware 19810

**VIA ELECTRONIC FILING**

Re:    *Amgen Inc. et al. v. ARIAD Pharmaceuticals, Inc.*, C.A. No. 06-259-KAJ

Dear Judge Jordan:

I am writing on behalf of Defendant ARIAD Pharmaceuticals, Inc. ("ARIAD") in response to Plaintiffs' demand for Court intervention in the discovery process.

For the reasons discussed below, even if Plaintiffs' demands were justified (which they are not), it is premature for the Court to intervene. These discovery issues are of a nature that can and should be resolved between the parties without involving the Court. ARIAD believes that the parties have been, for the most part, taking constructive steps to resolve disagreements regarding Plaintiffs' document requests and misunderstandings regarding electronic document production issues. To the extent that Plaintiffs disagree with the merits of any of ARIAD's objections, ARIAD respectfully submits that ARIAD's concerns are well justified under the Federal Rules of Civil Procedure.

To date, ARIAD's counsel and Plaintiffs' counsel have repeatedly met and conferred regarding Plaintiffs' sixty-two requests for production. Contrary to Plaintiffs' assertion, ARIAD has agreed to produce all relevant, discoverable documents sought by forty-two of Plaintiffs' requests. (Ex. A.) As to the remainder of Plaintiffs' requests, ARIAD has properly objected that the requests are overbroad or duplicative. Nevertheless, in each instance, ARIAD has invited Plaintiffs to narrow their overbroad requests. (*E.g.*, *id.* at 6.) Plaintiffs have declined to do so.

Plaintiffs now seek this Court's plenary approval of every document request that they have propounded, without so much as even addressing any of the issues raised during the parties' extensive meet-and-confer sessions, or providing the Court with any of the parties' correspondence on this subject. Plaintiffs mislead this Court by stating that ARIAD will only produce "some ill-defined subset" of discoverable documents and that ARIAD's "objections leave unclear what documents will and will not be produced." To the contrary, ARIAD has agreed to produce a clearly and concisely delineated set of *all* properly discoverable documents. (Ex. A.)

Plaintiffs also seek to mislead this Court by stating that ARIAD "outright refuse[s] to produce certain categories of clearly discoverable documents, such as documents … that relate to the products in suit … or the Amgen Entities." This is simply not true. ARIAD has agreed to produce relevant non-privileged documents concerning Enbrel or Kineret, such as non-privileged documents concerning any comparison of the claims of the '516 patent to Enbrel or Kineret. (*E.g.*, Ex. A. at 4.) Plaintiffs' sweeping accusation appears to boil down to disagreement over three of ARIAD's objections to some of Plaintiffs' requests.

The Honorable Kent A. Jordan
November 2, 2006
Page 2

First, many requests are exceedingly overbroad and burdensome. For example, Plaintiffs' request no. 37 demands, regardless of context or content, "All documents relating to or mentioning any of the Amgen Entities." ARIAD has requested that Plaintiffs narrow this demand to conform to the standards reflected in Rule 26(b). Plaintiffs have refused.

Second, many requests (especially request nos. 36 et seq.) are duplicative and cumulative to the extent that they request relevant matter. For example, request no. 41, to the extent it requests discoverable material, is subsumed by request nos. 3, 35, 36, 42, 43, and 61.[1] (Ex. A at 1, 3–5.)

Third, ARIAD has declined to produce duplicate copies of documents that have already been produced to Plaintiffs. This case presents the unusual situation where the vast majority of the documents covered by Plaintiffs' document requests were already collected and produced by ARIAD in its still-pending lawsuit against Eli Lilly & Company ("Lilly"). As the Court will recall, Plaintiffs sought to obtain all of these documents on an expedited basis through a subpoena served upon Lilly, instead of waiting for ARIAD's counsel to review and produce these documents. At the hearing on September 11, the Court lifted the temporary stay it had imposed on this discovery and allowed Plaintiffs to collect all of the requested documents from Lilly, without exception.

Plaintiffs' counsel now has every document produced by ARIAD in the Lilly litigation, along with every other document generated by either party in the Lilly litigation (including pleadings, motions, expert reports, and the like). The only condition imposed by the Court in making its ruling was that the documents would be treated as "attorney's eyes only" under Local Rule 26.2 pending review of the documents by ARIAD's counsel—thus allowing ARIAD's counsel to conduct the same sort of review that ordinarily would be conducted if ARIAD were producing its own documents to Plaintiffs in the first instance.

Plaintiffs misstate to this Court that ARIAD has either "blocked" or moved to "prevent" Plaintiffs' in-house counsel from reviewing documents produced by Lilly. There has, in fact, been no such "refusal to confirm" access. To the contrary, ARIAD has reviewed every hard-copy document produced by Lilly as well as the great majority of the electronic production to which ARIAD has had access. Per the Court's September 11 ruling, ARIAD has screened these documents and informed Plaintiffs on a rolling basis that these documents are available to in-house counsel. (Ex. B.) ARIAD expects to complete its screening of the electronic production to which it has had access in the next several business days.

Plaintiffs have misstated ARIAD's position as a refusal to produce discoverable documents, implying that the Federal Rules of Civil Procedure require ARIAD to collect and produce the documents that Plaintiffs' counsel has already received pursuant to the Lilly subpoena. (E.g., Exs. G at 1, I at 1.)[2] ARIAD has repeatedly corrected Plaintiffs misunderstanding and restated ARIAD's pledge to comply fully with all its discovery obligations. (Exs. H, J, K.)

There has been some delay in the ability of ARIAD's counsel to complete its review of the Lilly production—but not a delay of ARIAD's making. Lilly produced the vast majority of the

---

[1] To the extent that these Requests seek irrelevant material, they are also overbroad and unduly burdensome. For example, request no. 41 seeks "All documents and communications … relating to … ENBREL, and/or KINERET." Plaintiffs have refused to narrow the scope of any of these requests.

[2] See also Fed. R. Civ. P. 26(b)(2)(i) (proscribing discovery that is "unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive").

The Honorable Kent A. Jordan
November 2, 2006
Page 3

requested documents on CD. Over three weeks ago, ARIAD's counsel informed Plaintiffs' counsel that part of Lilly's electronic production was flawed or corrupted. (Exs. C, H.) To summarize:

1.  Documents produced in electronic format must be loaded into a database, such as Concordance, in order to be reviewed. To load documents contained on a CD into a database, there must be "load files" included on the CD, along with the electronic images of the documents. The load files contain indexing information necessary to facilitate review of the documents in the database. Many of the CDs received by ARIAD's counsel did not have load files, in accordance with customary electronic production practice. ARIAD's counsel was eventually able to determine that some of the missing load files were actually contained on other CDs, instead of the CDs on which they should have been located. It took time for ARIAD's counsel to identify this problem and associate the correct load files with the correct CD.

2.  There are some CDs for which complete load files were not produced, either on that CD or any other CD. (*See* Exs. C, D, E, H, J (explaining the problem to Plaintiffs).) While this slowed ARIAD's ability to access the production, ARIAD was able to custom program replacement files and notified Plaintiffs accordingly. (Ex. C at 2.)[3]

3.  Six of the twenty-five CDs that Lilly produced contain corrupted data, which result in "image-link errors." These errors continue to prevent ARIAD (and presumably Plaintiffs) from viewing numerous documents located throughout these six CDs.

Over the past three weeks, ARIAD has tried to address these problems repeatedly with Plaintiffs, and requested that Plaintiffs ask Lilly to remake the six corrupted CDs, since the problems likely resulted from errors in the process Lilly used to make the original CDs. (Exs. C, D, E, H, J.) Plaintiffs' counsel has responded with hyperbole and ad hominem attacks. (*E.g.*, Exs. F, G at 2.)

ARIAD respectfully requests that the Court deny Plaintiffs' demands as premature and direct the parties to resolve these matters themselves. In the alternative, ARIAD respectfully requests that the Court deny Plaintiffs' demand for plenary approval of its document requests, and that the Court order Plaintiffs to assist in a constructive solution to correct problems in electronic production.

Respectfully,

*/s/ Tiffany Geyer Lydon*

Tiffany Geyer Lydon

TGL/dmf
Attachments

174793.1
cc:     Melanie K. Sharp, Esquire (by hand and via electronic mail)
        Marcus E. Sernel, Esquire (via electronic mail)
        Erick Ottoson, Esquire (via electronic mail)
        David I. Gindler, Esquire (via electronic mail)

---

[3] Nineteen days after ARIAD informed Plaintiffs of the problem, Plaintiffs provided ARIAD with their own version of the missing "load" files. (Ex. F.) This "assistance" came almost three weeks after ARIAD informed Plaintiffs that ARIAD had programmed its own "load" files to replace the missing ones. (Ex. C at 2.)

# EXHIBIT K

# SCIENCESCOPE

Downloaded from www.sciencemag.org on November 27, 2006

INTELLECTUAL PROPERTY

# Decision on NF-κB Patent Could Have Broad Implications for Biotech

In what one patent expert called a potentially "huge, huge case," a federal jury last week unanimously upheld a biotechnology patent that critics describe as exceptionally broad. If the verdict survives appeal, it could set a new precedent for the enforcement of patents on biological discoveries upstream of actual drugs.

Contrary to some predictions (*Science*, 31 March, p. 1855), on 4 May, a Boston jury ruled that Eli Lilly's osteoporosis drug Evista and sepsis drug Xigris infringed a patent held by the Massachusetts Institute of Technology (MIT), Harvard University, and the Whitehead Institute and licensed exclusively to Ariad Pharmaceuticals, a Cambridge, Massachusetts, biotech company. The jury awarded at least $65.2 million in back royalties to Ariad, which could continue collecting 2.3% of sales of the two drugs until the patent expires in 2019.

The patent covers methods for inhibiting NF-κB, a protein discovered 20 years ago at MIT by David Baltimore, now president of the California Institute of Technology in Pasadena, with help from fellow Nobel Prize winner Phillip Sharp and Harvard biologist Thomas Maniatis. (Sharp and Maniatis both testified for Ariad at the trial.) Because NF-κB, a prolific "transcription factor" that turns more than 175 other genes on and off, is so important in biology and disease—it has also been implicated in arthritis, cancer, diabetes, and stroke—the Lilly case could be the first of many involving the protein. Hundreds of compounds, including many drugs already on the market, are known to inhibit NF-κB.

It is that broad reach that has prompted debate. Ariad CEO Harvey Berger calls the patent claims "very specific" and typical for both industry and academia. "We had a very strong, crystal-clear case," he says. Law professor Arti Rai of Duke University in Durham, North Carolina, on the other hand, calls Ariad's NF-κB patent "a very broad patent." She says that an ultimate Ariad victory would herald a major change in the patent landscape, because previous decisions by the federal appeals court have led to the assumption that biotech patents must be narrow. If the Ariad patent survives appeal, "conventional wisdom gets thrown out the window," Rai says. Lilly spokesperson Philip Belt is more outspoken, calling the verdict "shockingly inconsistent with current patent law."

The patent still faces several legal hurdles. The case in Boston does not end with the jury verdict; a separate trial will be held by federal

Judge Rya Zobel to decide certain legal challenges to the patent's validity and enforceability. Lilly vows to appeal last week's verdict if the judge rejects these arguments. And in late April, Amgen, a biotechnology company in Thousand Oaks, California, filed suit against Ariad to



**High-profile witness.** Nobel Prize winner Phillip Sharp, who helped discover NF-κB 2 decades ago, testified for MIT and Ariad Pharmaceuticals in the patent-infringement trial.

invalidate the patent and certify that its blockbuster arthritis drug Enbrel, and a second arthritis treatment, Kineret, don't infringe. Amgen spokesperson David Polk called the lawsuit "a preemptive move," because the company expected Ariad to eventually sue over Enbrel and Kineret. Berger won't comment on the Amgen claims except to say they're without merit and that licenses are available to commercial entities. (Academic scientists do not need a license, he stressed.)

Berger considers the jury verdict "good for academic research, good for universities, and in the end, good for … discovering new drugs, because it speaks to important technology." But Rai sees it differently. Asked whether the verdict could hinder innovation in the drug industry, she replied: "If, as a precedent, it then led to lots of upstream players deciding that they would try to follow the lead of Ariad and try to cash in on their upstream patents, [then] yes, I think it could." **–KEN GARBER**
Ken Garber is a science writer in Ann Arbor, Michigan.

## Venus Express Blues

Europe's Venus Express spacecraft, orbiting the veiled planet since 11 April, has jammed a mirror on its Planetary Fourier Spectrometer, a key instrument that looks for volcanic hot spots.

Project scientist Håkan Svedhem of the European Space Agency says the problem is "completely unrelated" to a short-lived hitch with a similar instrument on the agency's Mars Express spacecraft in 2005. "It looks like the mirror is starting to move again," says Svedhem, promising a "careful approach" to tests.
**–GOVERT SCHILLING**

## From Lunar Hitchhiking …

NEW DELHI—After more than a year of navigating U.S. red tape, the Indian space agency and NASA have agreed that U.S. instruments will ride India's first moon mission. Concerns about both technology-sharing and security had blocked the agreement, but officials finally inked a deal earlier this week in Bangalore.

Under the pact, the Chandrayaan-I mission will carry a miniature radar to search for elusive water and a mineralogy mapper to help find helium-3 for future fusion power. NASA chief Michael Griffin, who met Indian Space Research Organization chair G. Madhavan Nair to sign the accord, hopes the launch, slated for 2008, will open a new era of Indo-U.S. space cooperation. Officials hope this summer to iron out proprietary technology agreements for future joint missions.
**–PALLAVA BAGLA AND ANDREW LAWLER**

## … To Moon-Mulling

NASA plans to send a bevy of missions to the moon in coming years, and it has asked the National Academies' National Research Council for advice on what to do there. Among other things, NASA Science Mission Directorate Chief Scientist Paul Hertz last week told researchers that the agency wants to know what kinds of experiments could fit into a suitcase-sized box that future astronauts could deploy on the surface, similar to what Apollo astronauts left behind during their forays in the 1970s.

The work raises fears of further science budget erosion at NASA (see p. 824), and Hertz warned that "there isn't new money to do [lunar] science, but there are new opportunities." An interim version of the fast-track report is due to NASA in September, and the final report will be completed late next spring.
**–ANDREW LAWLER**

CREDIT: DONNA COVENEY/MIT

Published by AAAS

# EXHIBIT L

# NEWS & ANALYSIS



First follow-on biologics
finally approved
p445



More questions about
safety of Vioxx
p447



Defeat for patent trolls
p448



Melinda Moree on the
difficulties of creating
a malaria vaccine
p450



The 'not invented here'
myth revealed
p451

## Industry sweats after patent verdict

Court's decision that basic biology can be patented could have major impact on drug companies

*Simon Frantz*

The past few weeks have been a nervous time for anyone concerned about intellectual property in the pharmaceutical industry. The Supreme Court's decision to side with eBay in its case against MercExchange is a setback for pharmaceutical companies, as the ruling tips the balance of power in patent disputes towards the users of patented technologies and away from inventors (see page 448). Of perhaps greater concern is a recent case that pitted one drug company against another, and which could see many drugs becoming embroiled in lengthy patent cases.

Last month, a jury of the US District Court of Massachusetts ruled that two of Lilly's drugs, Xigris (activated protein C) and Evista (raloxifene), infringed a patent owned by the fellows of Harvard College, Massachusetts Institute of Technology and the Whitehead Institute, and licenced to Ariad Pharmaceuticals. The jury awarded the plaintiffs around US$65 million in back royalties and a 2.3% royalty on future US sales of Evista and Xigris until the patent's expiration in 2019.

Patent disputes are part and parcel of drug development, but this case has been under more scrutiny than normal because US Patent No. 6,410,516 — or '516 as it is more commonly known — doesn't cover any specific drug; it covers a biological pathway. Broad patents on pathways, say critics, are perhaps industry's worst nightmare. Forcing companies to pay licencing fees on basic biology puts roadblocks in the path of innovation, the lifeblood of drug discovery and development.

The verdict in favour of Ariad stands at odds with the most basic premise of the patent system, said Robert Armitage, Senior Vice President and general counsel for Lilly, after the case. "The Ariad position is equivalent to discovering that gravity is the force that makes water run downhill and then demanding that the owners of all the existing hydroelectric plants begin to pay patent royalties on their use of gravity."

Ariad disputes the accusation that it is hindering drug development. "A reasonable royalty is what we're looking for," says Harvey Berger, Chairman and Chief Executive of Ariad. Academic scientists doing non-commercial research do not need a licence.

The '516 patent covers methods for inhibiting nuclear factor-κB (NF-κB), a transcription factor that regulates numerous genes (FIG. 1). NF-κB was discovered around 20 years ago by Nobel Laureates David Baltimore and Phillip Sharp, and by the well-respected molecular biologist Thomas Maniatis. Since then, researchers have found that NF-κB is involved in many disease processes as diverse as cancer and arthritis (see BOX). It is thought that more than 200 drugs act directly, or indirectly, through NF-κB.



Figure 1 | **Prized pathway.** Over 200 drugs are thought to act at various points in the nuclear factor-κB (NF-κB) pathway to treat various diseases (shown as pills).

# NEWS & ANALYSIS

The '516 patent was granted after 16 years of prosecution at the US Patent and Trademark Office (see TIMELINE). Almost immediately after the patent was issued, Ariad sued Lilly, alleging that Evista and Xigris infringe the patent, and sent licencing offers to around 50 other companies with experimental or marketed products that work via the NF-κB pathway.

Many experts thought that the courts would not uphold a patent as broad as '516, because a similar case saw the University of Rochester fail to get a percentage of sales from Pfizer's Celebrex (celecoxib). Researchers at Rochester had discovered and patented the gene encoding the COX2 enzyme, and they argued that this enabled the development of selective COX2 inhibitors to treat inflammatory disorders. But the university lost the case because it had not disclosed any drug that was a COX2 inhibitor, or described any reasonable way to identify them.

But the '516 patent is different, say some lawyers, as its first claim specifically states that it covers "[a] method for inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-κB, the method comprising reducing NF-κB activity in the cell such that expression of said gene is inhibited." All in all, the patent presents 203 separate claims that cover methods of treating disease by regulating NF-κB.

---

## Box 1 | Banged to rights

The '516 patent is thought to cover over 200 drugs that are involved in the following disease pathways:

- Inflammation (for example, atherosclerosis, arthritis, inflammatory bowel disease and septic shock)
- Malignant transformation and tumour growth
- Bone breakdown and rebuilding (for example, osteoporosis)

---

> ❝ [Juries] are often impressed by patents, particularly patents that have Nobel-prize winning inventors on them. ❞

Another difference between the two cases is that Ariad's trial was decided by a jury, which can often throw up different or unexpected results, says Arti Rai, professor of law at Duke University. "[Juries] are often impressed by patents, particularly patents that have Nobel-prize-winning inventors on them."

On the other hand, the fact that Lilly says that it discovered Evista and Xigris, and disclosed their properties, years before the

---

patentees' scientists made their discovery, could make the '516 patent too broad. Evista was developed because of its effects on oestrogen receptors, and Xigris because it inhibits Factors Va and VIIIa. It wasn't until NF-κB was discovered, and the full extent of its roles identified, that Lilly realized that the drugs could work, at least in part, through NF-κB. (Lilly filed a patent application in June 1996 entitled 'Methods of modulating NF-κB transcription factor'.)

That doesn't necessarily mean that Lilly infringed a valid patent, says Lawrence Ebert, a patent lawyer in central New Jersey and author of the IPBIZ blog. "If something was already happening before the ['516 patent] application was filed that manifested all parts of the claims, then the claims are invalid, even though the scientific understanding came only with the patent application," says Ebert. "If the process described in the claims is already happening, one cannot patent that process."

Ebert says that a fellow blogger on his site has found that Evista's NF-κB activity, such as it is, is inherent in the compound, and its use predates Ariad's patent application by around 20 years. (US 4,133,814, the patent covering raloxifene, was filed in 1976.) "That, in a sentence, is Lilly's argument," says the blogger, "and it's a crushing one."

Lilly argued during the case that sunlight and red wine also affect the NF-κB pathway, so people have long been practicing the claimed method of regulating NF-κB activity, even though they were not aware of it. "Finding out the mechanism of action of a known therapy makes for a great paper but not necessarily for a valid patent," says the blogger.

What will happen next involves a complex legal cat-and-mouse chase. The USPTO is currently re-examining the patent's validity at the request of Lilly. Amgen — whose arthritis treatments Enbrel (etanercept) and Kineret (anakinra) are also thought to modulate NF-κB — has filed a pre-emptive action against Ariad to invalidate the patent. A separate bench trial with the US District Court of Massachusetts (with no jury) will be held on Lilly's argument that the patent is unenforceable.

Lilly says that if it fails to convince the judge to set aside the court's verdict in favour of Ariad, it will appeal. Ebert says that Ariad can win the appeal provided there is 'substantial evidence' supporting the verdict, even if the appellate court on its own might think they should have lost. "The appellate court determines whether the jury verdict is plausible," says Ebert, "not whether it is the optimum verdict."



Timeline | Twenty years of tussles

December — Ariad, MIT, Whitehead and Harvard file US patent application on protein factors that regulate transcription.

December — FDA approves Evista.

November — Bristol-Myers Squibb is the first to agree to non-exclusive worldwide license of rights from Ariad under the '516 patent.

June — US Patent 6,410,516 issued for methods of treating diseases by regulating NF-κB. Ariad, MIT, Whitehead and Harvard file suit against Lilly claiming that Evista and Xigris infringe the patent. Ariad sends licencing offers to around 50 other companies with experimental or marketed products that work via the NF-κB pathway.

June — USPTO begins reexamination of the '516 patent at the request of Lilly.

June — Lilly files patent application, entitled 'Methods of modulating NF-κB transcription factor'.

November — FDA approves Xigris.

May — DiscoveRx signs up for licence rights from Ariad.

April — Patent infringement trial between Ariad *et al.* and Lilly begins before a federal court jury in Massachusetts. Amgen files an action in the US District Court of Delaware seeking to invalidate the claims contained in the '516 patent.

May — Jury rules in favour of Ariad *et al.* Plaintiffs awarded ~$65 million in back royalties and a 2.3% royalty on future US sales of Evista and Xigris until the patent expires in 2019.

MIT, Massachusetts Institute of Technology; NF-κB, nuclear factor-κB; USPTO, US Patent and Trademark Office.

# EXHIBIT M



**The New York Times**

Friday, December 1, 2006

# Archives

E-MAIL

WORLD | U.S. | N.Y. / REGION | BUSINESS | TECHNOLOGY | SCIENCE | HEALTH | SPORTS PRINT OPINION | ARTS

AUTOS

PERMISSIONS

As a subscriber to TimesSelect, you can access up to 100 articles per month from The Archive.

**Articles remaining this month: 99**

SAVE

**Want to easily save this page** Save it into your Times File by s the "save icon " in the article

FOR YOUR CONSIDERATION

LITTLE MISS SUNSHINE

## Lilly Loses Patent Case To Ariad

By ANDREW POLLACK
Published: May 5, 2006

A federal jury in a closely watched lawsuit ruled yesterday that Eli Lilly & Company had infringed a patent covering drugs that work through one of the body's basic biological pathways, in a verdict that could send ripples through the pharmaceutical industry.

The jury, in Federal District Court in Boston, ordered Lilly to pay $65.2 million in back royalties to Ariad Pharmaceuticals, a biotechnology company that had licensed the patent from Harvard and two other academic institutions. Lilly will also have to pay a 2.3 percent royalty on future United States sales of its osteoporosis drug Evista and its drug Xigris, used to treat septic shock.

The case has attracted attention because Ariad claims the patent, issued in 2002, covers any drug that works by influencing the action of an important protein in the body. Some critics have said that patents covering an entire pathway in the body, as opposed to a particular drug, could hinder drug development.

Ariad executives have said that the patent could cover drugs with billions of dollars in annual sales and that the company had sent letters offering licenses to more than 50 companies. Last week, the biotechnology giant Amgen filed a pre-emptive lawsuit against Ariad, seeking to shield its lucrative arthritis drug Enbrel from infringement charges based on the same patent.

Lilly argued in the trial that Ariad's patent covered a natural phenomenon and was therefore invalid. It also said its two drugs were under development before the protein at the heart of the Ariad patent was even discovered.

"The Ariad position is equivalent to discovering that gravity is the force that makes water run downhill and then demanding the owners of all the existing hydroelectric plants begin to pay patent royalties on their use of gravity," Robert A. Armitage, Lilly's general counsel, said in a statement yesterday.



Lilly said it would ask the judge, Rya W. Zobel, to set aside the verdict and, if that failed, would appeal. The United States Patent and Trademark Office is re-examining the validity of the patent at the request of Lilly.

Harvey J. Berger, the chairman and chief executive of Ariad, disputed Lilly's arguments. "The jury looked at the evidence, looked at this issue and concluded unanimously that the patent was valid and infringed," he said.

No one has yet agreed to pay to license Ariad's patent, according to Dr. Berger, who said companies had been waiting for the outcome of the Lilly litigation. He said Ariad did not want to stop other companies from developing drugs. "A reasonable royalty is what we're looking for," he said. Academic scientists doing noncommercial research do not need a license, he said.

Based on Lilly's 2005 sales for the two drugs, Ariad, based in Cambridge, Mass., would receive $17.8 million in royalties each year until the patent expires in 2019. The company will keep at least 75 percent of its proceeds and share the rest with its academic partners.

Evista, one of Lilly's biggest drugs, was approved by the Food and Drug Administration in 1997 and had United States sales last year of $652.9 million. Xigris, approved in 2001, had United States sales of $119 million in 2005. While royalty payments are not expected to be a big burden for Lilly, they could be a significant boon to Ariad, an unprofitable company that has not yet brought a drug to market.

The case was important enough to his company that Dr. Berger sat through the entire trial, which started April 10. Ariad's shares jumped $1.45, or 26 percent, to $6.99 yesterday, while Lilly rose 6 cents, to $52.02. Analysts had generally expected Lilly to win.

The patent covers drugs that work by modulating the action of nuclear factor kappa B, or NF-kB, a protein that was discovered in the 1980's by scientists at Harvard, the Massachusetts Institute of Technology and the Whitehead Institute for Biomedical Research, in Cambridge, Mass. Among those scientists were Phillip A. Sharp of M.I.T. and David Baltimore, now the president of the California Institute of Technology, who are both Nobel laureates.

NF-kB serves as sort of a master biological switch that turns dozens of genes on or off. It is thought that many drugs, particularly those aimed at cancer, inflammation and immune diseases, might somehow influence NF-kB. Even aspirin and red wine affect the activity of NF-kB, according to a brief filed by Lilly.

The patent, granted in 2002, took 16 years to make it through the patent office. As soon as it was issued, Ariad, joined by the three academic institutions, sued Lilly. Spokesmen for Harvard and M.I.T. had no comment on the verdict, other than Harvard saying it was pleased.

Ariad has not developed any drugs that work through NF-kB, according to Dr. Berger, though it intends to do so.

Edward R. Reines, a Silicon Valley patent attorney, said the case could make pharmaceutical companies more sympathetic to complaints by some computer and Internet companies about patent holders that do not develop products themselves but instead demand payments from companies that have.

"This may be the beginning of an era in which the pharmaceutical industry joins the electronics industry to complain about unfair or improper patent assertions," Mr. Reines said.

Some experts said judges might not uphold a patent as broad as Ariad's. They point to a case in which a federal judge in 2003 invalidated a patent that the University of Rochester claimed covered all pain drugs that worked through a particular mechanism. The judge ruled the patent invalid because Rochester had not actually developed such a drug or shown specifically enough how to do it.

"No compound, no patent," said Gerald P. Dodson, the attorney who represented Rochester. He said that Ariad might "have the same hurdles that we had" but would be helped by having won a favorable jury verdict, which Rochester never did.

The Supreme Court is expected to rule on a separate case in the next few weeks, LabCorp v. Metabolite Laboratories, that could set new guidelines regarding patents related to processes in the body.

# EXHIBIT N

# LILLY ELI & CO (LLY)

LILLY CORPORATE CTR
DROP CODE 1112
INDIANAPOLIS, IN 46285
317. 276.2000

# 10−Q

**QUARTERLY REPORT**
**Filed on 11/03/2006 − Period: 09/30/2006**
File Number 001−06351



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# Form 10−Q

Quarterly Report Under Section 13 or 15(d) of the
Securities Exchange Act of 1934
FOR THE QUARTER ENDED SEPTEMBER 30, 2006
COMMISSION FILE NUMBER 001−6351

# ELI LILLY AND COMPANY

(Exact name of Registrant as specified in its charter)

INDIANA
(State or other jurisdiction of
incorporation or organization)

35−0470950
(I.R.S. Employer
Identification No.)

LILLY CORPORATE CENTER, INDIANAPOLIS, INDIANA 46285
(Address of principal executive offices)
Registrant's telephone number, including area code (317) 276−2000

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days.
Yes   ☑   No.  ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer or a non−accelerated filer.
Large accelerated filer   ☑     Accelerated filer   ☐     Non−accelerated filer   ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b−2 of the Exchange Act).
Yes   ☐   No   ☑

The number of shares of common stock outstanding as of October 20, 2006:

| Class | Number of Shares Outstanding |
|---|---|
| Common | 1,131,588,452 |

**TABLE OF CONTENTS**

PART I. FINANCIAL INFORMATION
    Item 1. Financial Statements
    Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations
    Item 4. Controls and Procedures
PART II. OTHER INFORMATION
    Item 1. Legal Proceedings
    Item 2. Unregistered Sales of Equity Securities and Use of Proceeds
    Item 6. Exhibits and Reports on Form 8−K
SIGNATURES
INDEX TO EXHIBITS

PART I. FINANCIAL INFORMATION
*Item 1. Financial Statements*

CONSOLIDATED CONDENSED STATEMENTS OF INCOME
(Unaudited)
Eli Lilly and Company and Subsidiaries

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| | (Dollars in millions except per−share data) | | | |
| Net sales | $ 3,864.1 | $ 3,601.1 | $ 11,445.7 | $ 10,766.2 |
| Cost of sales | 860.4 | 845.7 | 2,527.5 | 2,576.0 |
| Research and development | 755.7 | 751.0 | 2,271.3 | 2,215.6 |
| Marketing and administrative | 1,198.2 | 1,070.9 | 3,579.0 | 3,307.4 |
| Asset impairments, restructuring, and other special charges | — | — | — | 1,073.4 |
| Other income — net | (56.0) | (85.0) | (135.1) | (229.0) |
| | 2,758.3 | 2,582.6 | 8,242.7 | 8,943.4 |
| Income before income taxes | 1,105.8 | 1,018.5 | 3,203.0 | 1,822.8 |
| Income taxes | 232.2 | 224.1 | 672.6 | 543.8 |
| Net income | $ 873.6 | $ 794.4 | $ 2,530.4 | $ 1,279.0 |
| Earnings per share — basic | $ .80 | $ .73 | $ 2.33 | $ 1.18 |
| Earnings per share — diluted | $ .80 | $ .73 | $ 2.33 | $ 1.17 |
| Dividends paid per share | $ .40 | $ .38 | $ 1.20 | $ 1.14 |

See Notes to Consolidated Condensed Financial Statements.

2

CONSOLIDATED CONDENSED BALANCE SHEETS
Eli Lilly and Company and Subsidiaries

| | September 30, 2006 | December 31, 2005 |
|---|---|---|
| | (Dollars in millions) | |
| | (Unaudited) | |
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Cash and cash equivalents | $ 2,169.9 | $ 3,006.7 |
| Short–term investments | 1,448.6 | 2,031.0 |
| Accounts receivable, net of allowances of $73.1 (2006) and $62.5 (2005) | 2,077.9 | 2,313.3 |
| Other receivables | 399.6 | 448.4 |
| Inventories | 2,199.8 | 1,878.0 |
| Deferred income taxes | 731.2 | 756.4 |
| Prepaid expenses | 744.2 | 362.0 |
| TOTAL CURRENT ASSETS | 9,771.2 | 10,795.8 |
| **OTHER ASSETS** | | |
| Prepaid pension | 2,450.1 | 2,419.6 |
| Investments | 1,294.5 | 1,296.6 |
| Sundry | 2,182.2 | 2,156.3 |
| | 5,926.8 | 5,872.5 |
| **PROPERTY AND EQUIPMENT** | | |
| Land, buildings, equipment, and construction–in–progress | 13,731.7 | 13,136.0 |
| Less allowances for depreciation | (5,516.3) | (5,223.5) |
| | 8,215.4 | 7,912.5 |
| | $ 23,913.4 | $ 24,580.8 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES** | | |
| Short–term borrowings | $ 334.2 | $ 734.7 |
| Accounts payable | 630.6 | 781.3 |
| Employee compensation | 454.3 | 548.8 |
| Dividends payable | — | 436.5 |
| Income taxes payable | 725.2 | 884.9 |
| Other current liabilities | 1,738.5 | 2,330.1 |
| TOTAL CURRENT LIABILITIES | 3,882.8 | 5,716.3 |
| LONG–TERM DEBT | 4,553.3 | 5,763.5 |
| DEFERRED INCOME TAXES | 847.8 | 695.1 |
| OTHER NONCURRENT LIABILITIES | 1,574.8 | 1,614.0 |
| **SHAREHOLDERS' EQUITY** | | |
| Common stock | 707.6 | 706.9 |
| Additional paid–in capital | 3,482.3 | 3,323.8 |
| Retained earnings | 11,692.5 | 10,027.2 |
| Employee benefit trust | (2,635.0) | (2,635.0) |
| Deferred costs — ESOP | (102.5) | (106.3) |
| Accumulated other comprehensive income (loss) | 12.4 | (420.6) |
| | 13,157.3 | 10,896.0 |
| Less cost of common stock in treasury | 102.6 | 104.1 |
| | 13,054.7 | 10,791.9 |
| | $ 23,913.4 | $ 24,580.8 |

See Notes to Consolidated Condensed Financial Statements.

3

CONSOLIDATED CONDENSED STATEMENTS OF CASH FLOWS
(Unaudited)
Eli Lilly and Company and Subsidiaries

|  | Nine Months Ended September 30, | |
|  | 2006 | 2005 |
|  | (Dollars in millions) | |
| CASH FLOWS FROM OPERATING ACTIVITIES |  |  |
| Net income | $ 2,530.4 | $ 1,279.0 |
| Adjustments to reconcile net income to cash flows from operating activities: |  |  |
| Changes in operating assets and liabilities | (1,318.6) | (1,796.0) |
| Depreciation and amortization | 628.2 | 501.3 |
| Stock–based compensation expense | 274.3 | 309.5 |
| Change in deferred taxes | 130.5 | (205.0) |
| Asset impairments, restructuring, and other special charges, net of tax | — | 979.7 |
| Other, net | (126.6) | 30.8 |
| NET CASH PROVIDED BY OPERATING ACTIVITIES | 2,118.2 | 1,099.3 |
| CASH FLOWS FROM INVESTING ACTIVITIES |  |  |
| Net purchases of property and equipment | (667.8) | (878.5) |
| Net change in short–term investments | 580.4 | 833.1 |
| Purchase of noncurrent investments | (1,218.7) | (271.9) |
| Proceeds from sales and maturities of noncurrent investments | 1,135.1 | 327.0 |
| Other, net | 124.4 | (216.4) |
| NET CASH USED IN INVESTING ACTIVITIES | (46.6) | (206.7) |
| CASH FLOWS FROM FINANCING ACTIVITIES |  |  |
| Dividends paid | (1,301.5) | (1,245.7) |
| Purchases of common stock | (122.1) | — |
| Issuances of common stock under stock plans | 44.2 | 71.2 |
| Net change in short–term borrowings | (1.8) | (1,984.6) |
| Net (repayments) issuances of long–term debt | (1,599.0) | 1,998.0 |
| Other, net | 6.3 | 33.2 |
| NET CASH USED IN FINANCING ACTIVITIES | (2,973.9) | (1,127.9) |
| Effect of exchange rate changes on cash and cash equivalents | 65.5 | (160.3) |
| NET DECREASE IN CASH AND CASH EQUIVALENTS | (836.8) | (395.6) |
| Cash and cash equivalents at January 1 | 3,006.7 | 5,365.3 |
| CASH AND CASH EQUIVALENTS AT SEPTEMBER 30 | $ 2,169.9 | $ 4,969.7 |

See Notes to Consolidated Condensed Financial Statements.

4

CONSOLIDATED CONDENSED STATEMENTS OF COMPREHENSIVE INCOME
(Unaudited)
Eli Lilly and Company and Subsidiaries

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2006 | 2005 | 2006 | 2005 |
|---|---|---|---|---|
| | (Dollars in millions) | | | |
| Net income | $ 873.6 | $ 794.4 | $ 2,530.4 | $ 1,279.0 |
| Other comprehensive income (loss) [1] | 132.3 | 48.2 | 433.0 | (468.7) |
| Comprehensive income | $ 1,005.9 | $ 842.6 | $ 2,963.4 | $ 810.3 |

[1] The significant components of other comprehensive income were gains of $123.4 million and $346.7 million from foreign currency translation adjustments for the three months and nine months ended September 30, 2006, respectively, and losses of $421.4 million from foreign currency translation adjustments for the nine months ended September 30, 2005.
See Notes to Consolidated Condensed Financial Statements.

5

SEGMENT INFORMATION

We operate in one significant business segment — pharmaceutical products. Operations of our animal health business segment are not material and share many of the same economic and operating characteristics as our pharmaceutical products. Therefore, they are included with pharmaceutical products for purposes of segment reporting. Our business segments are distinguished by the ultimate end user of the product: humans or animals. Performance is evaluated based on profit or loss from operations before income taxes. Income before income taxes for the animal health business was $47.8 million and $55.7 million for the quarters ended September 30, 2006 and 2005, respectively, and $122.9 million and $143.0 million for the nine months ended September 30, 2006 and 2005, respectively.

SALES BY PRODUCT CATEGORY

Worldwide sales by product category for the three months and nine months ended September 30, 2006 and 2005 were as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2006 | 2005 | 2006 | 2005 |
| | (Dollars in millions) | | | |
| Net sales — to unaffiliated customers | | | | |
| Neurosciences | $ 1,676.1 | $ 1,514.9 | $ 4,869.4 | $ 4,490.2 |
| Endocrinology | 1,221.0 | 1,115.9 | 3,680.9 | 3,402.2 |
| Oncology | 511.8 | 456.9 | 1,477.6 | 1,312.2 |
| Animal health | 216.2 | 215.7 | 615.5 | 612.3 |
| Cardiovascular | 117.3 | 135.8 | 387.9 | 459.6 |
| Anti−infectives | 58.5 | 104.7 | 216.0 | 326.7 |
| Other pharmaceuticals | 63.2 | 57.2 | 198.4 | 163.0 |
| Net sales | $ 3,864.1 | $ 3,601.1 | $ 11,445.7 | $ 10,766.2 |

NOTES TO CONSOLIDATED CONDENSED FINANCIAL STATEMENTS
BASIS OF PRESENTATION
We have prepared the accompanying unaudited consolidated condensed financial statements in accordance with the requirements of Form 10-Q and, therefore, they do not include all information and footnotes necessary for a fair presentation of financial position, results of operations, and cash flows in conformity with accounting principles generally accepted in the United States (GAAP). In our opinion, the financial statements reflect all adjustments (including those that are normal and recurring) that are necessary for a fair presentation of the results of operations for the periods shown. In preparing financial statements in conformity with GAAP, we must make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues, expenses, and related disclosures at the date of the financial statements and during the reporting period. Actual results could differ from those estimates. The information included in this Quarterly Report on Form 10-Q should be read in conjunction with our consolidated financial statements and accompanying notes included in our Annual Report on Form 10-K for the year ended December 31, 2005.
CONTINGENCIES
We are engaged in the following patent litigation matters brought pursuant to procedures set out in the Hatch-Waxman Act (the Drug Price Competition and Patent Term Restoration Act of 1984):

- Dr. Reddy's Laboratories, Ltd. (Reddy), Teva Pharmaceuticals, and Zenith Goldline Pharmaceuticals, Inc., which was subsequently acquired by Teva Pharmaceuticals (together, Teva), each submitted abbreviated new drug applications (ANDAs) seeking permission to market generic versions of Zyprexa® prior to the expiration of our relevant U.S. patent (expiring in 2011) and alleging that this patent was invalid or not enforceable. We filed lawsuits against these companies in the U.S. District Court for the Southern District of Indiana, seeking a ruling that the patent is valid, enforceable, and being infringed. The district court ruled in our favor on all counts on April 14, 2005. We are now awaiting a decision by the Court of Appeals for the Federal Circuit, which on April 6, 2006, heard Reddy's and Teva's respective appeals of this ruling. We are confident Reddy's and Teva's claims are without merit and we expect to prevail. However, it is not possible to predict or determine the outcome of this litigation, and accordingly, we can provide no assurance that we will prevail. An unfavorable outcome would have a material adverse impact on our consolidated results of operations, liquidity, and financial position.

- Barr Laboratories, Inc. (Barr), submitted an ANDA in 2002 seeking permission to market a generic version of Evista® prior to the expiration of our relevant U.S. patents (expiring in 2012-2017) and alleging that these patents are invalid, not enforceable, or not infringed. In November 2002, we filed a lawsuit against Barr in the U.S. District Court for the Southern District of Indiana, seeking a ruling that these patents are valid, enforceable, and being infringed by Barr. Teva has also submitted an ANDA seeking permission to market a generic version of Evista. In June 2006, we filed a lawsuit against Teva in the U.S. District Court for the Southern District of Indiana, seeking a ruling that our relevant U.S. patents (expiring in 2012-2014) are valid, enforceable, and being infringed by Teva. No trial date has been set in either case. We believe Barr's and Teva's claims are without merit and we expect to prevail. However, it is not possible to predict or determine the outcome of this litigation, and accordingly, we can provide no assurance that we will prevail. An unfavorable outcome could have a material adverse impact on our consolidated results of operations, liquidity, and financial position.

- Sicor Pharmaceuticals, Inc. (Sicor), a subsidiary of Teva, submitted ANDAs in November 2005 seeking permission to market generic versions of Gemzar® prior to the expiration of our relevant U.S. patents (expiring in 2010 and 2013), and alleging that these patents are invalid. In February 2006, we filed a lawsuit against Sicor in the U.S. District Court for the Southern District of Indiana, seeking a ruling that these patents are valid and are being infringed by Sicor. In response to our lawsuit, Sicor filed a declaratory judgment action in the U.S. District Court for the Central District of California. The California action has since been dismissed. In September 2006, we received notice that Mayne Pharma (USA) Inc. (Mayne) filed a similar ANDA for Gemzar. In October 2006, we filed a lawsuit against Mayne in the Southern District of Indiana in response to the ANDA filing. We are awaiting the filing of an answer to our complaint against Mayne. In October 2006, we received notice that Sun Pharmaceutical Industries Inc. (Sun) filed a similar ANDA for Gemzar. We are evaluating our option to bring legal action against Sun. We expect to prevail in litigation involving our Gemzar patents and believe that claims made by these generic companies that our patents are not valid are without merit. However, it is not possible to predict or determine the outcome of such litigation, and accordingly, we can provide no assurance that we will prevail. An unfavorable outcome could have a material adverse impact on our consolidated results of operations.

In March 2004, the office of the U.S. Attorney for the Eastern District of Pennsylvania advised us that it has commenced a civil investigation related to our U.S. marketing and promotional practices, including our communications with physicians and

7

remuneration of physician consultants and advisors, with respect to Zyprexa, Prozac®, and Prozac Weekly™. In October 2005, the U.S. Attorney's office advised that it is also conducting an inquiry regarding certain rebate agreements we entered into with a pharmacy benefit manager covering Axid®, Evista, Humalog®, Humulin®, Prozac, and Zyprexa. The inquiry includes a review of Lilly's Medicaid best price reporting related to the product sales covered by the rebate agreements. We are cooperating with the U.S. Attorney in these investigations, including providing a broad range of documents and information relating to the investigations. In June 2005, we received a subpoena from the office of the Attorney General, Medicaid Fraud Control Unit, of the State of Florida, seeking production of documents relating to sales of Zyprexa and our marketing and promotional practices with respect to Zyprexa. In September 2006, we received a subpoena from the California Attorney General's office seeking production of documents related to our efforts to obtain and maintain Zyprexa's status on California's formulary, marketing and promotional practices with respect to Zyprexa, and remuneration of health care providers. It is possible that other Lilly products could become subject to investigation and that the outcome of these matters could include criminal charges and fines, penalties, or other monetary or nonmonetary remedies. We cannot predict or determine the outcome of these matters or reasonably estimate the amount or range of amounts of any fines or penalties that might result from an adverse outcome. It is possible, however, that an adverse outcome could have a material adverse impact on our consolidated results of operations, liquidity, and financial position. We have implemented and continue to review and enhance a broadly based compliance program that includes comprehensive compliance—related activities designed to ensure that our marketing and promotional practices, physician communications, remuneration of health care professionals, managed care arrangements, and Medicaid best—price reporting comply with applicable laws and regulations.

We have been named as a defendant in a large number of Zyprexa product liability lawsuits in the United States and have been notified of many other claims of individuals who have not filed suit. The lawsuits and unfiled claims (together the "claims") allege a variety of injuries from the use of Zyprexa, with the majority alleging that the product caused or contributed to diabetes or high blood—glucose levels. The claims seek substantial compensatory and punitive damages and typically accuse us of inadequately testing for and warning about side effects of Zyprexa. Many of the claims also allege that we improperly promoted the drug. Almost all of the federal lawsuits are part of a Multi—District Litigation (MDL) proceeding before The Honorable Jack Weinstein in the Federal District Court for the Eastern District of New York (MDL No. 1596). The MDL includes three lawsuits requesting certification of class actions on behalf of those who allegedly suffered injuries from the administration of Zyprexa. We have entered into agreements with various plaintiffs' counsel halting the running of the statutes of limitation (tolling agreements) with respect to a number of claimants who do not have lawsuits on file. Since June 2005, we have entered into agreements with various claimants' attorneys involved in U.S. Zyprexa product liability litigation to settle approximately 10,500 claims, including a large number of previously filed lawsuits (including the three purported class actions mentioned above), tolled claims, and other informally asserted claims. The settlements are being overseen and distributed by court—approved claims administrators.

The U.S. Zyprexa product liability claims not subject to these agreements include approximately 1,500 lawsuits in the U.S. covering approximately 9,700 claimants, and approximately 850 tolled claims. The first trials are scheduled for April 2007 in the Federal District Court for the Eastern District of New York. In addition, we have been served with a lawsuit seeking class certification in which the members of the purported class are seeking refunds and medical monitoring. Finally, in early 2005, we were served with four lawsuits seeking class—action status in Canada on behalf of patients who took Zyprexa. One of these four lawsuits has been certified for certain residents of Quebec. The allegations in the Canadian actions are similar to those in the litigation pending in the United States. We are prepared to continue our vigorous defense of Zyprexa in all remaining cases.

In December 2004, we were served with two lawsuits brought in state court in Louisiana by the Louisiana Department of Health and Hospitals, alleging that Zyprexa caused or contributed to diabetes or high blood—glucose levels, and that we improperly promoted the drug. These cases have been removed to federal court and are now part of the MDL proceedings in the Eastern District of New York. In these actions, the Department of Health and Hospitals seeks to recover the costs it paid for Zyprexa through Medicaid and other drug—benefit programs, as well as the costs the department alleges it has incurred and will incur to treat Zyprexa—related illnesses. In 2006, we were served with similar lawsuits filed by the states of Alaska, West Virginia, Mississippi, and New Mexico in the courts of the respective states.

In 2005, two lawsuits were filed in the Eastern District of New York purporting to be nationwide class actions on behalf of all consumers and third—party payors, excluding governmental entities, that have made or will make payments for their members or insured patients being prescribed Zyprexa. These actions have now been consolidated into a single lawsuit, which is brought under certain state consumer—protection statutes, the federal civil RICO statute, and common law theories, seeking a refund of the cost of Zyprexa, treble damages, punitive damages, and attorneys' fees. Four additional lawsuits were filed in 2006: two in the Eastern District of New York, one in the Southern District of Indiana, and one in Indiana state court, all on similar grounds. As with the product liability suits, these lawsuits allege that we inadequately tested for and warned about side effects of Zyprexa and improperly promoted the drug. We have insurance coverage for a portion of our Zyprexa product liability claims exposure. The third—party insurance carriers have raised defenses to their liability under the policies and are seeking to rescind the policies. The dispute is now the subject of litigation

8

in the federal court in Indianapolis against certain carriers and in arbitration in Bermuda against other carriers. While we believe our position is meritorious, there can be no assurance that we will prevail.

In addition, we have been named as a defendant in numerous other product liability lawsuits involving primarily diethylstilbestrol (DES) and thimerosal. With respect to the product liability claims currently asserted against us, we have accrued for our estimated exposures to the extent they are both probable and estimable based on the information available to us. In addition, we have accrued for certain product liability claims incurred but not filed to the extent we can formulate a reasonable estimate of their costs. We estimate these expenses based primarily on historical claims experience and data regarding product usage. Legal defense costs expected to be incurred in connection with significant product liability loss contingencies are accrued when probable and reasonably estimable. A portion of the costs associated with defending and disposing of these suits is covered by insurance. We record receivables for insurance-related recoveries when it is probable they will be realized. These receivables are classified as a reduction of the litigation charges on the statement of income. We estimate insurance recoverables based on existing deductibles, coverage limits, our assessment of any defenses to coverage that might be raised by the carriers, and the existing and projected future level of insolvencies among the insurance carriers.

In the second quarter of 2005, we recorded a net pre-tax charge of $1.07 billion for product liability matters. The $1.07 billion net charge takes into account our estimated recoveries from our insurance coverage related to these matters. The charge covers the following:

- The cost of the Zyprexa settlements described above; and,

- Reserves for product liability exposures and defense costs regarding currently known and expected claims to the extent we can formulate a reasonable estimate of the probable number and cost of the claims. A substantial majority of these exposures and costs relate to current and expected Zyprexa claims not included in the settlements. We have estimated these charges based primarily on historical claims experience, data regarding product usage, and our historical product liability defense cost experience.

During 2005, $700.0 million was paid in connection with Zyprexa settlements, while the cash related to other reserves for product liability exposures and defense costs is expected to be paid out over the next several years, including 2006. The timing of our insurance recoveries is uncertain.

We cannot predict with certainty the additional number of lawsuits and claims that may be asserted. In addition, although we believe it is probable, there can be no assurance that the Zyprexa settlements described above will be concluded. The ultimate resolution of Zyprexa product liability and related litigation could have a material adverse impact on our consolidated results of operations, liquidity, and financial position.

Because of the nature of pharmaceutical products, it is possible that we could become subject to large numbers of product liability claims for other products in the future. We have experienced difficulties in obtaining product liability insurance due to a very restrictive insurance market, and therefore will be largely self-insured for future product liability losses. In addition, as noted above, there is no assurance that we will be able to fully collect from our insurance carriers on past claims.

In June 2002, we were sued by Ariad Pharmaceuticals, Inc., the Massachusetts Institute of Technology, the Whitehead Institute for Biomedical Research and the President and Fellows of Harvard College in the U.S. District Court for the District of Massachusetts alleging that sales of two of our products, Xigris® and Evista, were inducing the infringement of a patent related to the discovery of a natural cell signaling phenomenon in the human body and seeking royalties on past and future sales of these products. We believe that these allegations are without legal merit and that we will ultimately prevail on these issues. In June 2005, the United States Patent and Trademark Office commenced a re-examination of the patent in order to consider certain issues raised by us relating to the validity of the patent. A jury trial commenced in Boston on April 10, 2006 on the patent validity and infringement issues. On May 4, 2006, the jury issued an initial decision in the case that Xigris and Evista sales infringe the patent. The jury awarded the plaintiffs approximately $65 million in damages, calculated by applying a 2.3 percent royalty to all U.S. sales of Xigris and Evista from the date of issuance of the patent through the date of trial. We will seek to have the jury verdict overturned by the trial court judge, and if unsuccessful, will appeal the decision to the Court of Appeals for the Federal Circuit. In addition, a separate bench trial with the U.S. District Court of Massachusetts was held the week of August 7, 2006, on our contention that the patent is unenforceable and impermissibly covers natural processes. No decision has been rendered.

Also, under the Comprehensive Environmental Response, Compensation, and Liability Act, commonly known as Superfund, we have been designated as one of several potentially responsible parties with respect to fewer than 10 sites. Under Superfund, each responsible party may be jointly and severally liable for the entire amount of the cleanup. We also continue remediation of certain of our own sites. We have accrued for estimated Superfund cleanup costs, remediation, and certain other environmental matters. This

9

takes into account, as applicable, available information regarding site conditions, potential cleanup methods, estimated costs, and the extent to which other parties can be expected to contribute to payment of those costs. We have reached a settlement with our liability insurance carriers providing for coverage for certain environmental liabilities.

The litigation accruals and environmental liabilities and the related estimated insurance recoverables have been reflected on a gross basis as liabilities and assets, respectively, on our consolidated balance sheets.

While it is not possible to predict or determine the outcome of the patent, product liability, or other legal actions brought against us or the ultimate cost of environmental matters, we believe that, except as noted above, the resolution of all such matters will not have a material adverse effect on our consolidated financial position or liquidity, but could possibly be material to the consolidated results of operations in any one accounting period.

EARNINGS PER SHARE

Unless otherwise noted in the footnotes, all earnings per–share amounts are presented on a diluted basis; that is, based on the weighted–average number of outstanding common shares plus the effect of all potentially dilutive common shares (primarily unexercised stock options).

STOCK–BASED COMPENSATION

We adopted Statement of Financial Accounting Standards No. 123 (revised 2004), Share–Based Payment (SFAS 123R), effective January 1, 2005. SFAS 123R requires the recognition of the fair value of stock–based compensation in net income. Stock–based compensation primarily consists of stock options and performance awards. We recognized pretax stock–based compensation cost in the amount of $83.0 million and $101.3 million in the third quarter of 2006 and 2005, respectively. In the first nine months of 2006 and 2005, we recognized stock–based compensation expense of $274.3 million and $309.5 million, respectively.

As of September 30, 2006, the total remaining unrecognized compensation cost related to nonvested stock options and performance awards amounted to $128.9 million and $51.2 million, respectively, which will be amortized over the weighted–average remaining requisite service periods, which are approximately 17 months and 3 months, respectively.

Under our policy, all stock option awards are approved prior to the date of grant and the exercise price is the average of the high and low market price on the date of grant. The Compensation Committee of the Board of Directors approves the value of the award and the date of grant. Options that are awarded as part of annual total compensation are made on specific grant dates scheduled in advance. With respect to option awards given to new hires, our policy requires approval of such awards prior to the grant date, and the options are granted on a predetermined monthly date immediately following the date of hire.

RETIREMENT BENEFITS

Net pension and retiree health benefit expense included the following components:

| | Defined Benefit Pension Plans | | | |
| --- | --- | --- | --- | --- |
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2006 | 2005 | 2006 | 2005 |
| | (Dollars in millions) | | | |
| Components of net periodic benefit cost | | | | |
| Service cost | $ 67.8 | $ 79.2 | $ 206.1 | $ 233.6 |
| Interest cost | 81.8 | 73.5 | 244.0 | 222.5 |
| Expected return on plan assets | (121.2) | (111.8) | (361.5) | (334.8) |
| Amortization of prior service cost | 1.4 | 1.9 | 4.3 | 5.8 |
| Recognized actuarial loss | 31.8 | 25.7 | 94.9 | 77.9 |
| Net periodic benefit cost | $ 61.6 | $ 68.5 | $ 187.8 | $ 205.0 |

10

|  | Retiree Health Benefit Plans | | | |
|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|  | 2006 | 2005 | 2006 | 2005 |
|  | (Dollars in millions) | | | |
| Components of net periodic benefit cost |  |  |  |  |
| Service cost | $ 18.0 | $ 14.7 | $ 53.9 | $ 44.1 |
| Interest cost | 24.4 | 20.0 | 73.3 | 60.1 |
| Expected return on plan assets | (22.5) | (18.7) | (67.4) | (54.4) |
| Amortization of prior service cost | (3.9) | (3.9) | (11.6) | (11.9) |
| Recognized actuarial loss | 27.0 | 21.5 | 80.9 | 64.6 |
| Net periodic benefit cost | $ 43.0 | $ 33.6 | $129.1 | $102.5 |

In 2006, we contributed approximately $30 million to our defined benefit pension plans to satisfy minimum funding requirements for the year. In addition, we contributed approximately $140 million of additional discretionary funding to our defined benefit plans and approximately $90 million of discretionary funding to our post retirement benefit plans. We do not expect to contribute additional amounts to our plans during the remainder of 2006.

OTHER INCOME — NET

Other income — net, was comprised of the following:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|  | 2006 | 2005 | 2006 | 2005 |
|  | (Dollars in millions) | | | |
| Interest expense | $ 62.7 | $ 24.3 | $ 193.5 | $ 60.9 |
| Interest income | (67.5) | (51.9) | (195.6) | (144.2) |
| Joint venture (income) loss | (23.8) | (5.8) | (66.1) | 7.3 |
| Other | (27.4) | (51.6) | (66.9) | (153.0) |
|  | $(56.0) | $(85.0) | $(135.1) | $(229.0) |

The joint venture (income) loss represents our share of the Lilly ICOS LLC joint venture results of operations, net of income taxes.

SHAREHOLDERS' EQUITY

As of September 30, 2006, we have purchased $2.58 billion of our previously announced $3.0 billion share repurchase program. During the nine months ended September 30, 2006, we acquired 2.1 million shares pursuant to this program. We do not expect any share repurchases during the remainder of 2006.

IMPLEMENTATION OF NEW FINANCIAL ACCOUNTING PRONOUNCEMENTS

In September 2006, the FASB issued Statement No. 158, Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans — an amendment of FASB Statements No. 87, 88, 106, and 132(R). SFAS 158 requires the recognition of the overfunded or underfunded status of a defined benefit postretirement plan (other than a multiemployer plan) as an asset or liability in its statement of financial position, the measurement of a plan's assets and its obligations that determine its funded status as of the end of the employer's fiscal year, and the recognition of changes in that funded status in the year in which the changes occur through comprehensive income. Additional footnote disclosures will also be required. SFAS 158 is effective for us as of December 31, 2006 and is required to be adopted prospectively. Because the impact on our consolidated financial position upon adoption will depend on the facts and circumstances as of December 31, 2006, we cannot determine the impact at this time; however, if we would have adopted SFAS 158 as of December 31, 2005, there would have been a reduction to our net assets and shareholder's equity of approximately $1.7 billion. There will be no impact to our statements of income or cash flows. We do not expect the change in the measurement date to have an impact on our financial statements.

In September 2006, the SEC issued Staff Accounting Bulletin (SAB) No. 108, which provides interpretive guidance on how the effects of carryover or reversal of prior year misstatements should be considered in quantifying a current year misstatement. The SEC staff believes that errors should be quantified using both a balance sheet and income statement approach and evaluated as to whether either approach results in quantifying a misstatement that, when all relevant quantitative and qualitative factors are considered, is material. The SEC staff has stated that it will not object if there is a one-time cumulative effect adjustment recorded to correct errors existing in prior years that previously had been considered immaterial — quantitatively and qualitatively — based on appropriate use of the registrant's previous approach. SAB 108 describes the circumstances where this would be appropriate as

11

well as the required disclosures and is effective for fiscal years ending after November 15, 2006; therefore we will be required to apply this Bulletin in the year ending December 31, 2006. We are currently evaluating SAB 108 and have not yet determined its impact; however, based on currently available information, we do not expect a material impact on our consolidated financial position or results of operations.

In June 2006, the FASB issued FIN 48, Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109. FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. The Interpretation is effective for fiscal years beginning after December 15, 2006; therefore, we will be required to adopt this Interpretation in the first quarter of 2007. We are currently evaluating FIN 48 and have not yet determined the impact the adoption of this Interpretation will have on our consolidated financial position or results of operations.

In the fourth quarter of 2005, we adopted Financial Accounting Standards Board (FASB) Interpretation (FIN) 47, Accounting for Conditional Asset Retirement Obligations, an interpretation of FASB Statement No. 143. FIN 47 requires us to record the fair value of a liability for conditional asset retirement obligations in the period in which it is incurred, which is adjusted to its present value each subsequent period. In addition, we are required to capitalize a corresponding amount by increasing the carrying amount of the related long–lived asset, which is depreciated over the useful life of the related long–lived asset. The adoption of FIN 47 on December 31, 2005, resulted in a cumulative effect of a change in accounting principle of $22.0 million, net of income taxes of $11.8 million.

POTENTIAL ASSET IMPAIRMENTS, RESTRUCTURING, AND OTHER SPECIAL CHARGES

As part of our ongoing efforts to maximize performance and efficiencies, including the streamlining of manufacturing operations and research and development activities, as announced in June 2006, we have been considering the future of three European facilities, which include the R&D facilities in Mont St. Guibert, Belgium and Hamburg, Germany, and the dry products manufacturing facility in Basingstoke, England. On October 16, 2006, the Board of Directors approved a plan to close the Hamburg, Germany, facility and also approved a social package, including severance payments that were negotiated with the site works council. Under the agreement, operations will decrease during the rest of 2006 and into the first half of 2007, with the official closing anticipated by mid–2007. This will result in a fourth–quarter charge to asset impairment, restructuring and other special charges of $40 million to $50 million (pretax), or $.02 to $.03 per share (after–tax), composed of $35 million to $40 million in severance related charges and lease termination costs, substantially all of which is expected to be in cash, and $5 million to $10 million in non–cash asset impairment charges. We have also been considering the closure of the Basingstoke plant as well as the sale of the plant as an ongoing operation. Several companies have expressed interest in potentially purchasing this site as an ongoing operation, and management intends to diligently pursue the sale option and make a decision by year end. If no viable sale option has been identified by that time, the Board has authorized management to proceed with the closure of the facility and implementation of a severance package negotiated with the employee representatives. No final decisions have been made with respect to the Basingstoke and Mont St. Guibert sites. However, severance and impairment charges as a result of any potential sale or site closure could be significant.

SUBSEQUENT EVENT

On October 17, 2006, we signed an agreement to acquire ICOS Corporation (ICOS) for approximately $2.1 billion in cash. The acquisition brings the full value of Cialis® to us and enables us to realize operational efficiencies in the further development, marketing and selling of this product. Consummation of the acquisition is subject to antitrust clearance under the Hart–Scott–Rodino Act, approval of the ICOS shareholders, and other customary closing conditions. Upon the closing of the transaction, which is expected in late 2006 or early 2007, we will incur a one–time charge to earnings for acquired in–process research and development (IPR&D), but it is premature to estimate what that charge will be.

12

*Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations*
OPERATING RESULTS
<u>Executive Overview</u>
<u>I. Financial Results</u>
Our worldwide sales for the third quarter increased 7 percent to $3.86 billion. Net income was $873.6 million, or $.80 per share, for the third quarter of 2006 compared with $794.4 million, or $.73 per share, for the third quarter of 2005, representing an increase of 10 percent in both net income and earnings per share. The earnings growth was driven by sales increasing at a faster rate than cost of products sold and research and development expenses, offset partially by higher marketing and administrative expenses and decreased other income. Net income was $2.53 billion, or $2.33 per share, for the first nine months of 2006 compared with $1.28 billion, or $1.17 per share, for the first nine months of 2005. These amounts include the impact of the product liability litigation charge of $1.07 billion that was taken in the second quarter of 2005. In addition to this product liability charge, the earnings increase in the nine–month period was driven primarily by increased sales and decreased cost of sales, offset by decreased other income.
II. Business Development, and Recent Product and Late–Stage Pipeline Developments
- On October 17, 2006, we announced our acquisition of ICOS Corporation for approximately $2.1 billion in cash. The acquisition brings the full value of Cialis to us and enables us to realize operational efficiencies in the further development, marketing and selling of this product. We expect this acquisition will increase our earnings and earnings growth rate beginning in 2008 and, after a significant addition to sales in 2007, will modestly accelerate our sales growth rate thereafter. Upon the closing of the transaction, which is expected in late 2006 or early 2007, we will incur a one–time charge to earnings for acquired in–process research and development (IPR&D), but it is premature to estimate what that charge will be. In addition, we expect the impact of including the operations of ICOS in our financial results will be modestly dilutive to earnings in 2007. Consummation of the acquisition is subject to antitrust clearance under the Hart–Scott–Rodino Act, approval of the ICOS shareholders, and other customary closing conditions.

- We received an approvable letter from the U.S. Food and Drug Administration (FDA) for Arxxant™ for the treatment of diabetic retinopathy. The FDA has indicated that it will require efficacy data from an additional Phase III study before it will consider approving the molecule. We have decided to appeal the FDA's decision and have recently begun discussions with the agency. We reached this decision by considering the significance of the unmet medical need that diabetic retinopathy represents, the efficacy demonstrated in the completed clinical studies and the safety profile shown in more than 3,300 patient years of clinical trial exposure. There can be no assurance that our appeal will be successful.

- The Committee for Medicinal Products for Human Use of the European Medicines Evaluation Agency issued a positive opinion recommending approval of Byetta for the treatment of type 2 diabetes. Marketing authorization by the European Commission is expected later this year. Byetta is already approved in the U.S. for this indication.

- We submitted data to the FDA for consideration of a new treatment–resistant depression (TRD) indication for Symbyax®, available as a range of fixed combinations of Zyprexa and Prozac, as well as for Zyprexa used in combination with Prozac. Symbyax is already approved in the U.S. for the treatment of bipolar depression.

- During the second quarter of 2006, Gemzar was approved in the U.S. for the treatment of recurrent ovarian cancer in combination with carboplatin.

- During the second quarter of 2006, we submitted a supplemental NDA to the FDA for Cymbalta® for the treatment of generalized anxiety disorder. We are also conducting Phase III studies on Cymbalta for the treatment of fibromyalgia, a chronic, often debilitating pain disorder.

- During the second quarter of 2006, we initiated a Phase III clinical trial to study enzastaurin as a maintenance therapy to prevent relapse in patients with diffuse large B–cell lymphoma. We initiated a Phase III clinical trial of enzastaurin, a targeted oral agent, during the first quarter of 2006, for the treatment of relapsed glioblastoma multiforme, an aggressive and malignant form of brain cancer.

13

III. Legal, Regulatory, and Other Matters

Certain generic manufacturers have challenged our U.S. compound patent for Zyprexa and are seeking permission to market generic versions of Zyprexa prior to its patent expiration in 2011. On April 14, 2005, the U.S. District Court in Indianapolis ruled in our favor on all counts, upholding our patents. The decision has been appealed.

We have reached agreements with claimants' attorneys involved in certain U.S. Zyprexa product liability litigation to settle a large number of claims against us relating to the medication. A large number of claims remain. As a result of our product liability exposures, the substantial majority of which were related to Zyprexa, we recorded a net pretax charge of $1.07 billion in the second quarter of 2005.

In March 2004, we were notified by the U.S. Attorney's office for the Eastern District of Pennsylvania that it has commenced a civil investigation relating to our U.S. sales, marketing, and promotional practices.

As previously disclosed, we have been considering the future of three European facilities, which include the R&D facilities in Mont St. Guibert, Belgium, and Hamburg, Germany, and the dry products manufacturing facility in Basingstoke, England. On October 16, 2006, the Board of Directors approved a plan to close the Hamburg, Germany, facility by June 30, 2007. No final decisions have been made with respect to the Basingstoke and Mont St. Guibert sites. However, severance and impairment charges as a result of any potential sale or site closure could be significant.

In the United States, implementation of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (MMA), which provides a prescription drug benefit under the Medicare program, took effect January 1, 2006. In 2006, we are experiencing a one-time sales benefit as a result of MMA; however, in the long term there is additional risk of increased pricing pressures. While the MMA prohibits the Secretary of Health and Human Services (HHS) from directly negotiating prescription drug prices with manufacturers, we expect continued challenges to that prohibition over the next several years. Also, the MMA retains the authority of the Secretary of HHS to prohibit the importation of prescription drugs, but we expect Congress to consider several measures that could remove that authority and allow for the importation of products into the U.S. regardless of their safety or cost. If adopted, such legislation would likely have a negative effect on our U.S. sales. Recently, language allowing for personal importation of a 90-day supply of medication from Canada only was passed into law via the Homeland Security Appropriations bill. This language only allows for medication to be carried in person from Canada to the U.S. and does not authorize mail or Internet importation. Further, the language disallows certain medications including injectibles. We believe there is some chance that the new and expanded prescription drug coverage for seniors under the MMA will alleviate the perceived need for a federal importation scheme. Additionally, notwithstanding the federal law that continues to prohibit all but the very narrow drug importation detailed above, approximately a dozen states have implemented importation schemes for their citizens, usually involving a website that links patients to selected Canadian pharmacies. One state has such a program for its state employees.

As a result of the passage of the MMA, aged and disabled patients jointly eligible for Medicare and Medicaid began receiving their prescription drug benefits through the Medicare program, instead of Medicaid, on January 1, 2006. This may relieve some state budget pressures but is unlikely to result in reduced pricing pressures at the state level. A majority of states have implemented supplemental rebates and restricted formularies in their Medicaid programs, and these programs are expected to continue in the post-MMA environment. Moreover, under the 2005 federal Deficit Reduction Act, states will have greater flexibility to impose new cost-sharing requirements on Medicaid beneficiaries for non-preferred prescription drugs that will result in certain beneficiaries bearing more of the cost. Several states also are attempting to extend discounted Medicaid prices to non-Medicaid patients. As a result, we expect pressures on pharmaceutical pricing to continue.

As it relates to the new Medicare program, we announced in the second quarter of 2006 that we temporarily extended our U.S. patient assistance program, LillyAnswers. The temporary extension of LillyAnswers allows patients who are not enrolled in Medicare Part D access to the LillyAnswers program until December 31, 2006. We also temporarily extended LillyAnswers for patients who have enrolled in a Medicare Part D plan and need assistance for Zyprexa and Forteo®. We have received a favorable opinion from the U.S. Department of Health and Human Services Office of the Inspector General (OIG) for our proposal for an "Outside Part D" patient assistance program (i.e., the LillyMedicareAnswers program) which will provide assistance for Zyprexa, Forteo, and Humatrope® beyond the end of this year to eligible patients enrolled in a Medicare Part D plan. We currently anticipate that the specific LillyAnswers program extension involving Zyprexa, Forteo, and Humatrope for patients enrolled in a Medicare Part D plan will continue to be available until December 31, 2006. In order to participate in either the temporary extension as described above or the new LillyMedicareAnswers program, certain eligibility and certification requirements must be met.

International operations also are generally subject to extensive price and market regulations, and there are many proposals for additional cost-containment measures, including proposals that would directly or indirectly impose additional price controls or reduce the value of our intellectual property protection.

14

Sales

Sales growth for the third quarter and first nine months of 2006 was 7 percent and 6 percent, respectively. The primary drivers for growth in the third quarter of 2006 were Cymbalta, Byetta, Forteo, Alimta® and Zyprexa. Sales in the U.S. increased by $178.3 million, or 9 percent for the third quarter of 2006, and $527.3 million, or 9 percent for the first nine months of 2006, compared with the same periods of 2005. The U.S. growth comparison for the nine–month period also benefited from an estimated $170 million of wholesaler destocking in the first nine months of 2005 as a result of restructuring our arrangements with our U.S. wholesalers in the first quarter of 2005. We experienced a one–time sales benefit resulting from a shift of certain low–income patients from Medicaid to Medicare and increased access to medical coverage by certain patients previously covered under our LillyAnswers program following the implementation of MMA in 2006. This contributed part of the increases in U.S. net effective sales prices of 11 percent and 9 percent for the third quarter and first nine months of 2006, respectively. Sales outside the U.S. increased $84.7 million, or 5 percent, and $152.2 million, or 3 percent, for the third quarter and first nine months of 2006, respectively. Worldwide sales volume and exchange rates both increased by 1 percent and selling prices increased by 5 percent in the third quarter of 2006. For the first nine months of 2006, worldwide sales volume and selling prices increased 4 percent and 3 percent, respectively, while exchange rates decreased 1 percent.

The following tables summarize our net sales activity for the three– and nine–month periods ended September 30, 2006 and 2005:

| | Three Months Ended September 30, 2006 | | | Three Months Ended September 30, 2005 | Percent Change From 2005 |
|---|---|---|---|---|---|
| Product | U.S.[1] | Outside U.S. | Total | Total | |
| | (Dollars in millions) | | | | |
| Zyprexa | $ 519.0 | $ 565.7 | $1,084.7 | $ 1,035.1 | 5 |
| Gemzar | 153.0 | 201.6 | 354.6 | 334.3 | 6 |
| Cymbalta | 306.5 | 42.1 | 348.6 | 182.8 | 91 |
| Humalog | 199.0 | 123.2 | 322.2 | 306.2 | 5 |
| Evista | 162.8 | 95.1 | 257.9 | 260.3 | (1) |
| Humulin | 96.7 | 133.3 | 230.0 | 250.9 | (8) |
| Animal health products | 98.0 | 118.2 | 216.2 | 215.7 | 0 |
| Alimta | 89.9 | 67.3 | 157.2 | 122.3 | 29 |
| Forteo | 104.2 | 44.9 | 149.1 | 102.6 | 45 |
| Strattera® | 112.3 | 14.1 | 126.4 | 140.9 | (10) |
| Humatrope | 49.3 | 52.3 | 101.6 | 100.2 | 1 |
| Fluoxetine products | 37.8 | 40.5 | 78.3 | 112.4 | (30) |
| Actos® | 34.7 | 42.3 | 77.0 | 64.3 | 20 |
| ReoPro® | 26.6 | 40.3 | 66.9 | 70.9 | (6) |
| Byetta | 62.1 | — | 62.1 | 10.6 | NM |
| Anti–infectives | 1.0 | 57.5 | 58.5 | 104.7 | (44) |
| Cialis[2] | 1.4 | 54.2 | 55.6 | 40.9 | 36 |
| Xigris | 22.7 | 19.4 | 42.1 | 45.5 | (7) |
| Other pharmaceutical products | 29.6 | 45.5 | 75.1 | 100.5 | (25) |
| Total net sales | $2,106.6 | $1,757.5 | $3,864.1 | $ 3,601.1 | |

15

| Product | Nine Months Ended September 30, 2006 | | | Nine Months Ended September 30, 2005 | Percent Change From 2005 |
|---|---|---|---|---|---|
| | U.S.[1] | Outside U.S. | Total | Total | |
| | (Dollars in millions) | | | | |
| Zyprexa | $1,555.8 | $1,651.3 | $ 3,207.1 | $ 3,170.1 | 1 |
| Gemzar | 452.7 | 584.2 | 1,036.9 | 981.9 | 6 |
| Humalog | 584.2 | 363.1 | 947.3 | 888.6 | 7 |
| Cymbalta | 782.3 | 110.0 | 892.3 | 450.9 | 98 |
| Evista | 486.9 | 288.1 | 775.0 | 770.8 | 1 |
| Humulin | 264.8 | 403.5 | 668.3 | 757.5 | (12) |
| Animal health products | 274.7 | 340.8 | 615.5 | 612.3 | 1 |
| Alimta | 255.5 | 184.9 | 440.4 | 327.4 | 35 |
| Strattera | 373.5 | 49.2 | 422.7 | 384.1 | 10 |
| Forteo | 292.4 | 129.8 | 422.2 | 271.3 | 56 |
| Actos | 237.0 | 121.7 | 358.7 | 338.0 | 6 |
| Humatrope | 149.6 | 156.6 | 306.2 | 313.6 | (2) |
| Fluoxetine products | 113.4 | 122.3 | 235.7 | 339.1 | (30) |
| Anti–infectives | 25.3 | 190.7 | 216.0 | 326.7 | (34) |
| ReoPro | 84.5 | 128.9 | 213.4 | 225.4 | (5) |
| Cialis[2] | 4.6 | 158.5 | 163.1 | 124.9 | 31 |
| Byetta | 150.0 | — | 150.0 | 14.0 | NM |
| Xigris | 75.7 | 65.1 | 140.8 | 162.8 | (14) |
| Other pharmaceutical products | 76.7 | 157.4 | 234.1 | 306.8 | (24) |
| Total net sales | $6,239.6 | $5,206.1 | $11,445.7 | $ 10,766.2 | |

NM — Not meaningful

[1]  U.S. sales include sales in Puerto Rico.

[2]  Cialis had worldwide third–quarter and nine–month sales of $245.6 million and $701.8 million, respectively, representing increases of 26 percent and 31 percent, respectively, compared with the same periods of 2005. The sales shown in the tables above represent results in the territories in which we market Cialis exclusively. The remaining sales relate to the joint–venture territories of Lilly ICOS LLC (North America, excluding Puerto Rico, and Europe). Our share of the joint–venture territory sales, net of expenses, is reported in other income — net in our consolidated condensed statements of income.

Product Highlights
Zyprexa sales in the U.S. increased 3 percent in the third quarter and decreased 1 percent in first nine months of 2006, respectively, compared with the same periods of 2005. The increase resulted from an increase in prices, partially offset by lower demand. However, U.S. prescription volume has held steady during the first nine months of 2006. The increase in net effective selling prices was partially due to the transition of certain low–income patients from Medicaid to Medicare. Sales outside the U.S. increased 6 percent in the third quarter of 2006, driven by increased demand as well as the favorable impact of exchange rates, offset partially by lower prices. International sales for the first nine months of 2006 increased 3 percent, which was due to increased demand.

16

Diabetes care products, composed primarily of Humalog, Humulin, Actos, and Byetta, had worldwide net sales of $712.4 million and $2.18 billion in the third quarter and first nine months of 2006, respectively, representing increases of 9 percent and 6 percent compared with the same periods last year. Diabetes care revenues in the U.S. increased 14 percent and 10 percent, to $408.6 million and $1.28 billion for the third quarter and first nine months of 2006, respectively. These increases were primarily driven by sales of Byetta for both periods. Diabetes care revenues outside the U.S. increased 3 percent and 1 percent, to $303.8 million and $900.8 million in the third quarter and first nine months of 2006, respectively. Results from our primary diabetes care products are as follows:

- Humalog sales in the U.S. increased 3 percent and 6 percent during the third quarter and first nine months of 2006, respectively, due to higher prices, which were partially offset by a decline in demand. Humalog sales outside the U.S. increased 10 percent during the third quarter primarily due to increased demand, as well as a favorable impact of exchange rates, offset partially by lower prices. Humalog sales outside the U.S. increased 8 percent for the first nine months of 2006, primarily due to increased demand, offset by the unfavorable impact of exchange rates.

- Humulin sales decreased 10 percent and 16 percent in the U.S. for the third quarter and first nine months of 2006, respectively, driven primarily by the decline in demand due to continued competitive pressures, offset partially by higher prices. Humulin sales outside the U.S. decreased 7 and 9 percent during the third quarter and first nine months of 2006, respectively, due to a decline in demand.

- Actos revenues in the U.S., the majority of which represent service revenues from a copromotion agreement in the U.S. with Takeda Pharmaceuticals North America (Takeda), increased 17 percent and decreased 1 percent in the third quarter and first nine months of 2006, respectively. Actos is manufactured by Takeda Chemical Industries, Ltd., and sold in the U.S. by Takeda. As previously disclosed, since our share of revenue from the agreement with Takeda will not necessarily track with product sales, it is difficult to make quarterly comparisons for Actos revenue. Our U.S. marketing rights with respect to Actos expired in September 2006; however, we will continue receiving royalties from Takeda at a declining rate through September 2009. The arrangement outside the U.S. continues.

- Sales of Byetta, a first–in–class treatment for type 2 diabetes we market with Amylin Pharmaceuticals (Amylin), launched in the U.S. in June 2005, were $126.4 million and $293.2 million during the third quarter and first nine months of 2006, respectively. We report as revenue our 50 percent share of Byetta's gross margins and our sales of Byetta pen delivery devices to Amylin.

Gemzar sales increased 2 percent and 5 percent in the U.S. for the third quarter and first nine months of 2006, respectively, as compared to the same periods in 2005. This increase is attributable to higher prices in both periods, offset partially by lower demand in the third quarter due to competitive pressures. Gemzar sales outside the U.S. increased 9 percent and 6 percent for the third quarter and first nine months of 2006, respectively, which was due to increased demand, offset partially by lower prices. The third quarter also benefited from the favorable impact of exchange rates.

U.S. sales of Cymbalta, a treatment of major depressive disorder and diabetic peripheral neuropathic pain, increased 80 percent and 85 percent for the third quarter and first nine months of 2006, respectively, as compared to the same periods last year, due to strong demand. Cymbalta sales outside the U.S. continue to reflect significant growth due to recent international launches.

Evista sales in the U.S. increased 1 percent for both the third quarter and first nine months of 2006, as compared to the same periods in 2005, due to higher prices, offset by a decline in demand. Evista sales outside the U.S. decreased 4 percent and remained flat in the third quarter and nine month periods of 2006, due primarily to lower prices in both periods, offset by an increase in demand during the first nine months of 2006.

Alimta, a treatment of malignant pleural mesothelioma and second–line treatment of non–small–cell lung cancer, generated an increase in U.S. sales of 17 percent and 22 percent for the third quarter and first nine months of 2006, respectively, as compared to the same periods in 2005. Alimta sales outside the U.S. increased 48 percent and 57 percent during the third quarter and first nine months of 2006, respectively. These increases are attributable to growth in U.S. and international demand.

Forteo, a treatment for severe osteoporosis, increased 48 and 59 percent in the U.S. in the third quarter and first nine months of 2006, respectively, as compared to the same periods in 2005. In addition to increased demand, U.S. sales significantly benefited from access to medical coverage through the Medicare Part D program and from decreased utilization of our U.S. patient assistance program, LillyAnswers. Sales outside the U.S. increased 39 percent and 48 percent for the third quarter and first nine months of 2006, respectively, which was driven by increased demand along with a favorable impact in exchange rates during the third quarter, offset by a decrease in prices.

17

U.S. sales of Strattera, a treatment of attention–deficit hyperactivity disorder (ADHD) in children, adolescents, and adults, decreased 10 percent during the third quarter and increased 7 percent for the first nine months of 2006, compared with the same periods in 2005. The decline in sales in the third quarter was attributable to a decline in demand, offset by an increase in prices. The increase for the first nine months of 2006 was the result of higher prices as well as the reductions in the U.S. wholesaler inventory levels in 2005, offset by decline in demand.

Total worldwide product sales of Cialis in the third quarter and first nine months of 2006 were composed of $55.0 million and $161.2 million of sales in our territories, respectively, which are reported in our net sales, and $190.6 million and $540.5 million of sales in the joint–venture territories. Within the joint–venture territories, the U.S. sales of Cialis were $94.9 million and $271.3 million in the third quarter and first nine months of 2006, respectively, representing increases of 23 percent and 42 percent from the same periods of 2005. Cialis sales in our territories are reported in revenue, while our 50 percent share of the joint–venture net income is reported in other income — net. Cialis sales growth reflects both gains in market share and growth of the erectile dysfunction market during the third quarter and first nine months of 2006.

Gross Margin, Costs, and Expenses

For the third quarter of 2006, gross margins improved 1.2 percentage points, to 77.7 percent of net sales, compared with the third quarter of 2005. For the first nine months of 2006, gross margins increased 1.8 percentage points, to 77.9 percent of net sales, compared with the first nine months of 2005. The increase for the quarter was primarily due to increased product prices and increased production volume, partially offset by higher manufacturing expenses. This increase for the nine–month period was primarily due to favorable product prices and the favorable impact of foreign exchange rates, partially offset by higher manufacturing expenses.

Operating expenses (the aggregate of research and development and marketing and administrative expenses) increased 7 percent and 6 percent for the third quarter and first nine months of 2006, respectively, compared with the same periods of 2005. Investment in research and development increased 1 percent, to $755.7 million, and 3 percent, to $2.27 billion, for the third quarter and first nine months of 2006, respectively, and represent 20 percent of sales in both periods. Marketing and administrative expenses increased 12 percent, to $1.20 billion, and 8 percent, to $3.58 billion, for the third quarter and first nine months of 2006, respectively, driven largely by increased marketing expenses in support of key products, primarily Cymbalta.

Other income — net consists of interest expense, interest income, the after–tax operating results of the Lilly ICOS joint venture, and all other income and expense items.

- Interest expense for the third quarter and nine–month period in 2006 increased $38.4 million, to $62.7 million, and $132.6 million to $193.5 million, respectively, as compared to the same periods in 2005. These increases are a result of higher interest rates and less capitalized interest due to the completion in late 2005 of certain manufacturing facilities.

- Interest income increased $15.6 million, to $67.5 million and $51.4 million to $195.6 million for the third quarter and first nine months of 2006, respectively, as compared to the same periods in 2005, due to higher short–term interest rates.

- The Lilly ICOS joint–venture income was $23.8 million in the third quarter of 2006, compared with $5.8 million in the third quarter of 2005. For the first nine months of 2006, income was $66.1 million, compared with a loss of $7.3 million in the first nine months of 2005. The increase in both periods was due to increased Cialis sales and decreased selling and marketing expenses.

- Net other income and expense items decreased $24.2 million to $27.4 million for third–quarter 2006 and decreased $86.1 million to $66.9 million for the first nine months of 2006, as compared to the same periods in 2005. The decreases are largely a result of less income from business development transactions.

We incurred tax expense of $232.2 million and $672.6 million, for the third quarter and first nine months of 2006, respectively, representing an effective tax rate of 21 percent in both periods. Tax expense for the third quarter of 2005 was $224.1 million, representing an effective tax rate of 22 percent. Year–to–date comparisons to prior year are not meaningful due to the net loss before income taxes experienced in the second quarter of 2005.

FINANCIAL CONDITION

As of September 30, 2006, cash, cash equivalents, and short–term investments totaled $3.62 billion compared with $5.04 billion at December 31, 2005. Cash flow from operations of $2.12 billion was more than offset by net repayments of long–term debt of $1.60 billion, dividends paid of $1.30 billion and net capital expenditures of $667.8 million. Total debt at September 30, 2006, was $4.89 billion, a decrease of $1.61 billion as compared to December 31, 2005. We currently expect to repay additional debt of approximately $500 million by the end of 2006. We also intend to incur approximately $2.4 billion of debt to finance the ICOS acquisition at the time the transaction is completed.

18

We believe that cash generated from operations, along with available cash and cash equivalents, will be sufficient to fund our normal operating needs, including debt service, capital expenditures, dividends, and taxes for the remainder of 2006. We believe that amounts available through our existing commercial paper program should be adequate to fund maturities of short−term borrowings, if necessary. Various risks and uncertainties, including those discussed in the Financial Expectations for 2006 section, may affect our operating results and cash generated from operations.

LEGAL AND REGULATORY MATTERS

We are engaged in the following patent litigation matters brought pursuant to procedures set out in the Hatch−Waxman Act (the Drug Price Competition and Patent Term Restoration Act of 1984):

- Dr. Reddy's Laboratories, Ltd. (Reddy), Teva Pharmaceuticals, and Zenith Goldline Pharmaceuticals, Inc., which was subsequently acquired by Teva Pharmaceuticals (together, Teva), each submitted abbreviated new drug applications (ANDAs) seeking permission to market generic versions of Zyprexa prior to the expiration of our relevant U.S. patent (expiring in 2011) and alleging that this patent was invalid or not enforceable. We filed lawsuits against these companies in the U.S. District Court for the Southern District of Indiana, seeking a ruling that the patent is valid, enforceable, and being infringed. The district court ruled in our favor on all counts on April 14, 2005. We are now awaiting a decision by the Court of Appeals for the Federal Circuit, which on April 6, 2006, heard Reddy's and Teva's respective appeals of this ruling. We are confident Reddy's and Teva's claims are without merit and we expect to prevail. However, it is not possible to predict or determine the outcome of this litigation, and accordingly, we can provide no assurance that we will prevail on appeal. An unfavorable outcome would have a material adverse impact on our consolidated results of operations, liquidity, and financial position.

- Barr Laboratories, Inc. (Barr), submitted an ANDA in 2002 seeking permission to market a generic version of Evista prior to the expiration of our relevant U.S. patents (expiring in 2012−2017) and alleging that these patents are invalid, not enforceable, or not infringed. In November 2002, we filed a lawsuit against Barr in the U.S. District Court for the Southern District of Indiana, seeking a ruling that these patents are valid, enforceable, and being infringed by Barr. Teva has also submitted an ANDA seeking permission to market a generic version of Evista. In June 2006, we filed a lawsuit against Teva in the U.S. District Court for the Southern District of Indiana, seeking a ruling that our relevant U.S. patents (expiring in 2012−2014) are valid, enforceable, and being infringed by Teva. No trial date has been set in either case. We believe Barr's and Teva's claims are without merit and we expect to prevail. However, it is not possible to predict or determine the outcome of this litigation, and accordingly, we can provide no assurance that we will prevail. An unfavorable outcome could have a material adverse impact on our consolidated results of operations, liquidity, and financial position.

- Sicor Pharmaceuticals, Inc. (Sicor), a subsidiary of Teva, submitted ANDAs in November 2005 seeking permission to market generic versions of Gemzar prior to the expiration of our relevant U.S. patents (expiring in 2010 and 2013), and alleging that these patents are invalid. In February 2006, we filed a lawsuit against Sicor in the U.S. District Court for the Southern District of Indiana, seeking a ruling that these patents are valid and are being infringed by Sicor. In response to our lawsuit, Sicor filed a declaratory judgment action in the U.S. District Court for the Central District of California. The California action has since been dismissed. In September 2006, we received notice that Mayne Pharma (USA) Inc. (Mayne) filed a similar ANDA for Gemzar. In October 2006, we filed a lawsuit against Mayne in the Southern District of Indiana in response to the ANDA filing. We are awaiting the filing of an answer to our complaint against Mayne. In October 2006, we received notice that Sun Pharmaceutical Industries Inc. (Sun) filed a similar ANDA for Gemzar. We are evaluating our option to bring legal action against Sun. We expect to prevail in litigation involving our Gemzar patents and believe that claims made by these generic companies that our patents are not valid are without merit. However, it is not possible to predict or determine the outcome of such litigation, and accordingly, we can provide no assurance that we will prevail. An unfavorable outcome could have a material adverse impact on our consolidated results of operations.

In March 2004, the office of the U.S. Attorney for the Eastern District of Pennsylvania advised us that it has commenced a civil investigation related to our U.S. marketing and promotional practices, including our communications with physicians and remuneration of scientific consultants and advisors, with respect to Zyprexa, Prozac, and Prozac Weekly. In October 2005, the U.S. Attorney's office advised that it is also conducting an inquiry regarding certain rebate agreements we entered into with a pharmacy benefit manager covering Axid, Evista, Humalog, Humulin, Prozac, and Zyprexa. The inquiry includes a review of Lilly's Medicaid best price reporting related to the product sales covered by the rebate agreements. We are cooperating with the U.S. Attorney in these investigations, including providing a broad range of documents and information relating to the investigations. In June 2005, we received a subpoena from the office of the Attorney General, Medicaid Fraud Control Unit, of the State of Florida, seeking production of documents relating to sales of Zyprexa and our marketing and promotional practices with respect to Zyprexa. In September 2006, we received a subpoena from the California Attorney General's office seeking production of documents related to our efforts to obtain and maintain Zyprexa's status on California's formulary, marketing and promotional practices with respect to Zyprexa, and remuneration of health care providers. It is possible that other Lilly products could become subject to investigation and that the

19

outcome of these matters could include criminal charges and fines, penalties, or other monetary or nonmonetary remedies. We cannot predict or determine the outcome of these matters or reasonably estimate the amount or range of amounts of any fines or penalties that might result from an adverse outcome. It is possible, however, that an adverse outcome could have a material adverse impact on our consolidated results of operations, liquidity, and financial position. We have implemented and continue to review and enhance a broadly based compliance program that includes comprehensive compliance−related activities designed to ensure that our marketing and promotional practices, physician communications, remuneration of health care professionals, managed care arrangements, and Medicaid best−price reporting comply with applicable laws and regulations.

We have been named as a defendant in a large number of Zyprexa product liability lawsuits in the United States and have been notified of many other claims of individuals who have not filed suit. The lawsuits and unfiled claims (together the "claims") allege a variety of injuries from the use of Zyprexa, with the majority alleging that the product caused or contributed to diabetes or high blood−glucose levels. The claims seek substantial compensatory and punitive damages and typically accuse us of inadequately testing for and warning about side effects of Zyprexa. Many of the claims also allege that we improperly promoted the drug. Almost all of the federal lawsuits are part of a Multi−District Litigation (MDL) proceeding before The Honorable Jack Weinstein in the Federal District Court for the Eastern District of New York (MDL No. 1596). The MDL includes three lawsuits requesting certification of class actions on behalf of those who allegedly suffered injuries from the administration of Zyprexa. We have entered into agreements with various plaintiffs' counsel halting the running of the statutes of limitation (tolling agreements) with respect to a number of claimants who do not have lawsuits on file. Since June 2005, we have entered into agreements with various claimants' attorneys involved in U.S. Zyprexa product liability litigation to settle approximately 10,500 claims, including a large number of previously filed lawsuits (including the three purported class actions mentioned above), tolled claims, and other informally asserted claims. The settlements are being overseen and distributed by court−approved claims administrators.

The U.S. Zyprexa product liability claims not subject to these agreements include approximately 1,500 lawsuits in the U.S. covering approximately 9,700 claimants, and approximately 850 tolled claims. The first trials are scheduled for April 2007 in the Federal District Court for the Eastern District of New York. In addition, we have been served with a lawsuit seeking class certification in which the members of the purported class are seeking refunds and medical monitoring. Finally, in early 2005, we were served with four lawsuits seeking class−action status in Canada on behalf of patients who took Zyprexa. One of these four lawsuits has been certified for certain residents of Quebec. The allegations in the Canadian actions are similar to those in the litigation pending in the United States. We are prepared to continue our vigorous defense of Zyprexa in all remaining cases.

In December 2004, we were served with two lawsuits brought in state court in Louisiana on behalf of the Louisiana Department of Health and Hospitals, alleging that Zyprexa caused or contributed to diabetes or high blood−glucose levels, and that we improperly promoted the drug. These cases have been removed to federal court and are now part of the MDL proceedings in the Eastern District of New York. In these actions, the Department of Health and Hospitals seeks to recover the costs it paid for Zyprexa through Medicaid and other drug−benefit programs, as well as the costs the department alleges it has incurred and will incur to treat Zyprexa−related illnesses. In 2006, we were served with similar lawsuits filed by the states of Alaska, West Virginia, Mississippi, and New Mexico in the courts of the respective states.

In 2005, two lawsuits were filed in the Eastern District of New York purporting to be nationwide class actions on behalf of all consumers and third−party payors, excluding governmental entities, that have made or will make payments for their members or insured patients prescribed Zyprexa. These actions have now been consolidated into a single lawsuit, which is brought under certain state consumer−protection statutes, the federal civil RICO statute, and common law theories, seeking a refund of the cost of Zyprexa, treble damages, punitive damages, and attorneys' fees. Four additional lawsuits were filed in 2006: two in the Eastern District of New York, one in the Southern District of Indiana, and one in Indiana state court, all on similar grounds. As with the product liability suits, these lawsuits allege that we inadequately tested for and warned about side effects of Zyprexa and improperly promoted the drug. We have insurance coverage for a portion of our Zyprexa product liability claims exposure. The third−party insurance carriers have raised defenses to their liability under the policies and are seeking to rescind the policies. The dispute is now the subject of litigation in the federal court in Indianapolis against certain carriers and in arbitration in Bermuda against other carriers. While we believe our position is meritorious, there can be no assurance that we will prevail.

In addition, we have been named as a defendant in numerous other product liability lawsuits involving primarily diethylstilbestrol (DES) and thimerosal. With respect to the product liability claims currently asserted against us, we have accrued for our estimated exposures to the extent they are both probable and estimable based on the information available to us. In addition, we have accrued for certain product liability claims incurred but not filed to the extent we can formulate a reasonable estimate of their costs. We estimate these expenses based primarily on historical claims experience and data regarding product usage. Legal defense costs expected to be incurred in

20

connection with significant product liability loss contingencies are accrued when probable and reasonably estimable. A portion of the costs associated with defending and disposing of these suits is covered by insurance. We record receivables for insurance–related recoveries when it is probable they will be realized. These receivables are classified as a reduction of the litigation charges on the statement of income. We estimate insurance recoverables based on existing deductibles, coverage limits, our assessment of any defenses to coverage that might be raised by the carriers, and the existing and projected future level of insolvencies among the insurance carriers.

In the second quarter of 2005, we recorded a net pre–tax charge of $1.07 billion for product liability matters. The $1.07 billion net charge takes into account our estimated recoveries from our insurance coverage related to these matters. The charge covers the following:

- The cost of the Zyprexa settlements described above; and,

- Reserves for product liability exposures and defense costs regarding currently known and expected claims to the extent we can formulate a reasonable estimate of the probable number and cost of the claims. A substantial majority of these exposures and costs relate to current and expected Zyprexa claims not included in the settlements. We have estimated these charges based primarily on historical claims experience, data regarding product usage, and our historical product liability defense cost experience.

During 2005, $700.0 million was paid in connection with Zyprexa settlements, while the cash related to other reserves for product liability exposures and defense costs is expected to be paid out over the next several years, including 2006. The timing of our insurance recoveries is uncertain.

We cannot predict with certainty the additional number of lawsuits and claims that may be asserted. In addition, although we believe it is probable, there can be no assurance that the Zyprexa settlements described above will be concluded. The ultimate resolution of Zyprexa product liability and related litigation could have a material adverse impact on our consolidated results of operations, liquidity, and financial position.

Because of the nature of pharmaceutical products, it is possible that we could become subject to large numbers of product liability claims for other products in the future. We have experienced difficulties in obtaining product liability insurance due to a very restrictive insurance market, and therefore will be largely self–insured for future product liability losses. In addition, as noted above, there is no assurance that we will be able to fully collect from our insurance carriers on past claims.

In June 2002, we were sued by Ariad Pharmaceuticals, Inc., the Massachusetts Institute of Technology, the Whitehead Institute for Biomedical Research and the President and Fellows of Harvard College in the U.S. District Court for the District of Massachusetts alleging that sales of two of our products, Xigris® and Evista, were inducing the infringement of a patent related to the discovery of a natural cell signaling phenomenon in the human body and seeking royalties on past and future sales of these products. We believe that these allegations are without legal merit and that we will ultimately prevail on these issues. In June 2005, the United States Patent and Trademark Office commenced a re–examination of the patent in order to consider certain issues raised by us relating to the validity of the patent. A jury trial commenced in Boston on April 10, 2006 on the patent validity and infringement issues. On May 4, 2006, the jury issued an initial decision in the case that Xigris and Evista sales infringe the patent. The jury awarded the plaintiffs approximately $65 million in damages, calculated by applying a 2.3 percent royalty to all U.S. sales of Xigris and Evista from the date of issuance of the patent through the date of trial. We will seek to have the jury verdict overturned by the trial court judge, and if unsuccessful, will appeal the decision to the Court of Appeals for the Federal Circuit. In addition, a separate bench trial with the U.S. District Court of Massachusetts was held the week of August 7, 2006, on our contention that the patent is unenforceable and impermissibly covers natural processes. No decision has been rendered.

Also, under the Comprehensive Environmental Response, Compensation, and Liability Act, commonly known as Superfund, we have been designated as one of several potentially responsible parties with respect to fewer than 10 sites. Under Superfund, each responsible party may be jointly and severally liable for the entire amount of the cleanup. We also continue remediation of certain of our own sites. We have accrued for estimated Superfund cleanup costs, remediation, and certain other environmental matters. This takes into account, as applicable, available information regarding site conditions, potential cleanup methods, estimated costs, and the extent to which other parties can be expected to contribute to payment of those costs. We have reached a settlement with our liability insurance carriers providing for coverage for certain environmental liabilities.

The litigation accruals and environmental liabilities and the related estimated insurance recoverables have been reflected on a gross basis as liabilities and assets, respectively, on our consolidated balance sheets.

While it is not possible to predict or determine the outcome of the patent, product liability, or other legal actions brought against us or the ultimate cost of environmental matters, we believe that, except as noted above, the resolution of all such matters will not have a

<div align="center">21</div>

material adverse effect on our consolidated financial position or liquidity, but could possibly be material to the consolidated results of operations in any one accounting period.

FINANCIAL EXPECTATIONS FOR 2006

For the full year of 2006, we expect earnings per share to be in the range of $3.07 to $3.18. This guidance reflects the closure of the Hamburg, Germany research and development facility previously discussed, which will result in a fourth–quarter charge to asset impairment, restructuring and other special charges of $40 million to $50 million (pretax), or $.02 to $.03 per share (after tax). It does not, however, reflect any other future material unusual items, such as the impact of the ICOS acquisition, including the IPR&D charge, if the transaction closes in 2006. Nor does it include any charges that may occur if further decisions are reached related to our other two European sites.

We expect full–year 2006 sales to grow at approximately the low end of 7 percent to 9 percent growth range. In addition, we expect gross margins as a percent of sales to improve, operating expenses to grow in the mid–single digits in the aggregate, and other income — net, to contribute approximately $175 million to $250 million. Excluding the tax associated with the potential charges discussed above, we also anticipate the effective tax rate to be approximately 21 percent. In terms of cash flow, we expect capital expenditures to be at approximately $1.2 billion in 2006.

We caution investors that any forward–looking statements or projections made by us, including those above, are based on management's belief at the time they are made. However, they are subject to risks and uncertainties. Actual results could differ materially and will depend on, among other things, the continuing growth of our currently marketed products; developments with competitive products; the timing and scope of regulatory approvals and the success of our new product launches; asset impairments, restructurings, and acquisitions of compounds under development resulting in acquired in–process research and development charges; foreign exchange rates; wholesaler inventory changes; the outcome of the Zyprexa patent appeal; other regulatory developments, government investigations, patent disputes, and litigation; and the impact of governmental actions regarding pricing, importation, and reimbursement for pharmaceuticals. Other factors that may affect our operations and prospects are discussed in Item 1A of our 2005 Form 10–K, "Risk Factors." We undertake no duty to update these forward–looking statements.

AVAILABLE INFORMATION ON OUR WEBSITE

We make available through our company website, free of charge, our company filings with the Securities and Exchange Commission (SEC) as soon as reasonably practicable after we electronically file them with or furnish them to the SEC. The reports we make available include annual reports on Form 10–K, quarterly reports on Form 10–Q, current reports on Form 8–K, proxy statements, registration statements, and any amendments to those documents. The website link to our SEC filings is http://investor.lilly.com/edgar.cfm.

*Item 4. Controls and Procedures*

(a) *Evaluation of Disclosure Controls and Procedures.* Under applicable SEC regulations, management of a reporting company, with the participation of the principal executive officer and principal financial officer, must periodically evaluate the company's "disclosure controls and procedures," which are defined generally as controls and other procedures of a reporting company designed to ensure that information required to be disclosed by the reporting company in its periodic reports filed with the commission (such as this Form 10–Q) is recorded, processed, summarized, and reported on a timely basis.

Our management, with the participation of Sidney Taurel, chairman and chief executive officer, and Derica W. Rice, senior vice president and chief financial officer, evaluated our disclosure controls and procedures as of September 30, 2006, and concluded that they are effective.

(b) *Changes in Internal Controls.* During the third quarter of 2006, there were no changes in our internal control over financial reporting that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

PART II. OTHER INFORMATION

*Item 1. Legal Proceedings*

See Part I, Item 2, Management's Discussion and Analysis, "Legal and Regulatory Matters," for information on various legal proceedings, including but not limited to:

- The U.S. patent litigation involving Zyprexa, Evista, and Gemzar

22

- The civil investigation by the U.S. Attorney for the Eastern District of Pennsylvania relating to our U.S. sales, marketing, and promotional practices

- The Zyprexa product liability and related litigation, including claims brought on behalf of healthcare payors

- The legal proceedings we have filed against several of our product liability insurance carriers with respect to our coverage for the Zyprexa product liability claims

That information is incorporated into this Item by reference.

*Other Product Liability Litigation*

We refer to Part I, Item 3, of our Form 10–K annual report for 2005 for the discussion of product liability litigation involving diethylstilbestrol (DES) and vaccines containing the preservative thimerosal. In the DES litigation, we have been named as a defendant in approximately 70 suits involving approximately 120 claimants. In the thimerosal litigation, we have been named as a defendant in approximately 360 suits with approximately 975 claimants. While it is not possible to predict or determine the outcome of the patent, product liability, or other legal actions brought against us or the ultimate cost of environmental matters, we believe that, except as noted above, the resolution of all such matters will not have a material adverse effect on our consolidated financial position or liquidity but could possibly be material to the consolidated results of operations in any one accounting period.

*Item 2. Unregistered Sales of Equity Securities and Use of Proceeds*

The following table summarizes the activity related to repurchases of our equity securities during the quarter ended September 30, 2006:

| Period | Total Number of Shares Purchased (a) | Average Price Paid per Share (b) | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs (c) | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs (d) |
|---|---|---|---|---|
| | (in thousands) | | | (Dollars in millions) |
| July 2006 | 4 | $  55.66 | — | $   419.2 |
| August 2006 | 16 | 53.75 | — | 419.2 |
| September 2006 | 24 | 55.86 | — | 419.2 |
| Total | 44 | | — | |

The amounts presented in columns (a) and (b) above represent purchases of common stock related to employee stock option exercises. The amounts presented in columns (c) and (d) in the above table represent activity related to our $3.0 billion share repurchase program announced in March 2000. As of September 30, 2006, we have purchased $2.58 billion related to this program. During the third quarter of 2006, no shares were repurchased pursuant to this program and we do not expect to purchase any shares under this program during the remainder of 2006.

*Item 6. Exhibits and Reports on Form 8–K*

(a) <u>Exhibits</u>. The following documents are filed as exhibits to this Report:

| | |
|---|---|
| EXHIBIT 10.1 | The Eli Lilly and Company Bonus Plan, as amended |
| EXHIBIT 10.2 | 2007 Change In Control Severance Pay Plan for Select Employees, as amended |
| EXHIBIT 10.3 | Agreement and Plan of Merger by and among Eli Lilly and Company, Tour Merger Sub, Inc., and ICOS Corporation, which is incorporated by reference from Exhibit 2.1 to the Form 8–K filed by ICOS Corporation on October 17, 2006 |
| EXHIBIT 11. | Statement re: Computation of Earnings (Loss) per Share |
| EXHIBIT 12. | Statement re: Computation of Ratio of Earnings From Continuing Operations to Fixed Charges |

EXHIBIT 31.1    Rule 13a–14(a) Certification of Sidney Taurel, Chairman of the Board and Chief Executive Officer

EXHIBIT 31.2    Rule 13a–14(a) Certification of Derica W. Rice, Senior Vice President and Chief Financial Officer

EXHIBIT 32.    Section 1350 Certification

24

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this Report to be signed on its behalf by the undersigned thereunto duly authorized.

ELI LILLY AND COMPANY
(Registrant)

Date    November 1, 2006                           /s/James B. Lootens

                                                   James B. Lootens
                                                   Secretary and Deputy General Counsel

Date    November 1, 2006                           /s/Arnold C. Hanish

                                                   Arnold C. Hanish
                                                   Executive Director, Finance, and
                                                   Chief Accounting Officer

25

INDEX TO EXHIBITS
The following documents are filed as a part of this Report:

Exhibit

| | |
|---|---|
| EXHIBIT 10.1 | The Eli Lilly and Company Bonus Plan, as amended |
| EXHIBIT 10.2 | 2007 Change In Control Severance Pay Plan for Select Employees, as amended |
| EXHIBIT 10.3 | Agreement and Plan of Merger by and among Eli Lilly and Company, Tour Merger Sub, Inc., and ICOS Corporation, which is incorporated by reference from Exhibit 2.1 to the Form 8–K filed by ICOS Corporation on October 17, 2006 |
| EXHIBIT 11. | Statement re: Computation of Earnings (Loss) per Share |
| EXHIBIT 12. | Statement re: Computation of Ratio of Earnings From Continuing Operations to Fixed Charges |
| EXHIBIT 31.1 | Rule 13a–14(a) Certification of Sidney Taurel, Chairman of the Board and Chief Executive Officer |
| EXHIBIT 31.2 | Rule 13a–14(a) Certification of Derica W. Rice, Senior Vice President and Chief Financial Officer |
| EXHIBIT 32. | Section 1350 Certification |

26

# LILLY ELI & CO (LLY)

LILLY CORPORATE CTR
DROP CODE 1112
INDIANAPOLIS, IN 46285
317. 276.2000

# EX−10.1

**BONUS PLAN**
**10−Q Filed on 11/03/2006 − Period: 09/30/2006**
File Number 001−06351



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 10.1

**The Eli Lilly and Company Bonus Plan**
**(as amended October 16, 2006)**
**TABLE OF CONTENTS**

| | |
|---|---|
| Section 1 Purpose | 2 |
| Section 2 Definitions | 2 |
| Section 3 Administration | 8 |
| Section 4 Participation in the Plan | 9 |
| Section 5 Definition and Computation of Company Bonus | 9 |
| Section 6 Time of Payment | 13 |
| Section 7 Administrative Guidelines | 14 |
| Section 8 Miscellaneous | 15 |
| Section 9 Amendment, Suspension, or Termination | 17 |

– 2 –

**The Eli Lilly and Company Bonus Plan**
**(as amended October 16, 2006)**
**SECTION 1. PURPOSE**

The purpose of The Eli Lilly and Company Bonus Plan is to encourage and promote eligible employees to create and deliver innovative pharmaceutical–based health care solutions that enable people to live longer, healthier and more active lives, to outgrow our competitors through a constant stream of pharmaceutical innovation, and to materially increase shareholder value. The Plan is designed to accomplish the following key objectives:

    a.   motivate superior employee performance through the implementation of a performance–based bonus system for all eligible management employees, United States employees (including those in Puerto Rico) and other employees as may be designated from time to time;

    b.   encourage eligible employees to take greater ownership of the company and provide "Answers that Matter" daily by creating a direct relationship between key company measurements and individual bonus payouts; and

    c.   enable the Company to attract and retain employees that will be instrumental in driving sustained growth and performance of Eli Lilly and Company by providing a competitive bonus program that rewards outstanding performance consistent with the Company's mission, values and increased shareholder value.

The Plan is intended to satisfy the requirements for providing "performance–based" compensation under Section 162(m) of the Internal Revenue Code.

**SECTION 2. DEFINITIONS**

The following words and phrases as used in this Plan will have the following meanings unless a different meaning is clearly required by the context. Masculine pronouns will refer both to males and to females:

2.1  <u>Applicable Year</u> means the calendar year immediately preceding the year in which payment of the Company Bonus is payable pursuant to Section 6. For example, the Applicable Year for 2005 payout is January 1, 2004 through December 31, 2004.

2.2  Bonus Target means the percentage of Participant Earnings for each Participant as described in Section 5.6(a) below.

2.3  <u>Committee</u> means (i) with respect to the Executive Officers of Lilly, the Compensation Committee, the members of which will be selected by the Board of Directors of Lilly,

– 3 –

from among its members; and (ii) with respect to all other Eligible Employees, the Compensation Committee of the Board of Directors or its designee. Each member of the Compensation Committee, to the extent deemed necessary or appropriate by the Board of Directors, satisfy the requirements of an "outside director" within the meaning of Section 162(m) of the Internal Revenue Code.

2.4  Company means Eli Lilly and Company and its subsidiaries. .

2.5  Company Bonus means the amount of bonus compensation payable to a Participant as described in Section 5 below. Notwithstanding the foregoing, however, the Committee may determine, in its sole discretion, to reduce the amount of a Participant's Company Bonus if such Participant becomes eligible to participate in such other bonus program of the Company as may be specifically designated by the Committee. Such reduction may be by a stated percentage up to and including 100% of the Company Bonus.

2.6  Company Performance Bonus Multiple means the amount as calculated in Sections 5.3 and 5.4 below.

2.7  Disabled means a Participant who (i) has become eligible for a payment under The Lilly Extended Disability Plan, assuming eligibility to participate in that plan, or (ii) for those employees ineligible to participate in The Lilly Extended Disability Plan, has become otherwise "disabled" under the applicable disability benefit plan or program for the Participant, or, in the event that there is no such disability benefit plan or program, has become disabled under applicable local law.

2.8  Earnings Per Share (EPS) means the diluted earnings per share of the Company as reported in the Company's "Consolidated Statements of Income" in accordance with generally accepted accounting principles and Section 3.4 below.

2.9  Earnings Per Share Growth (EPS Growth) means the percentage increase in EPS in the Applicable Year compared to the prior year.

2.10  Effective Date means January 1, 2004, as amended from time to time.

2.11  Eligible Employee means:
   a.  with respect to employees of Lilly or its Puerto Rican subsidiaries, a person (1) who is employed as an employee by the Company on a scheduled basis of twenty (20) or more hours per week and is scheduled to work at least five (5) months per year; and (2) who is receiving compensation, including temporary illness pay under Lilly's Illness Pay Program or similar short–term disability program, from the Company for services rendered as an employee. Notwithstanding anything herein to the contrary, the term "Eligible Employee" will not include:
       (1)  a person who has reached Retirement with the Company;

– 4 –

    (2)  a person who is Disabled;

    (3)  a person who is a "leased employee" within the meaning of Section 414(n) of the Internal Revenue Code of 1986, as amended, or whose basic compensation for services on behalf of the Company is not paid directly by the Company;

    (4)  a person who is classified as a "Fixed Duration Employee", as that term is used by Lilly;

    (5)  a person who is classified as a special status employee because his employment status is temporary, seasonal, or otherwise inconsistent with regular employment status;

    (6)  a person who is eligible to participate in the Eli Lilly and Company Prem1er Rewards Plan or such other Company bonus or incentive program as may be specifically designated by the Committee or its designee; or

    (7)  a person who submits to the Committee in writing a request that he not be considered eligible for participation in the Plan or is a member of the Board of Directors of Lilly unless he or she is also an Eligible Employee.

    (8)  any other category of employees designated by the Committee in its discretion with respect to any Applicable Year.

  b.  with respect to those employees who are employed by the Company, but not by Lilly or a Puerto Rican subsidiary, an employee of the Company designated by the Committee as a Participant in the Plan with respect to any Applicable Year. In its discretion, the Committee may designate Participants either on an individual basis or by determining that all employees in specified job categories, classifications, levels, subsidiaries or other appropriate classification will be Participants.

  c.  Notwithstanding anything herein to the contrary, the term Eligible Employee will not include any person who is not so recorded on the payroll records of the Company, including any such person who is subsequently reclassified by a court of law or regulatory body as a common law employee of the Company. Consistent with the foregoing, and for purposes of clarification only, the term employee or Eligible Employee does not include any individual who performs services for the Company as an independent contractor or under any other non–employee classification.

2.12  <u>Lilly</u> means Eli Lilly and Company.

– 5 –

2.13 <u>Lilly Executive Officer</u> or <u>Section 162(m) Participant</u> means a Participant who has been designated by the Board of Directors of Lilly as an executive officer pursuant to Rule 3b–7 under the Securities Exchange Act of 1934, as amended. For purposes of this Plan, a Lilly Executive Officer will be considered a Section 162(m) Participant whether or not he is a "covered employee" under Section 162(m).

2.14 <u>Participant</u> means an Eligible Employee who is participating in the Plan.

2.15 <u>Participant Earnings</u> means (A) those amounts described below that are earned during the portion of the Applicable Year during which the employee is a Participant in the Plan:

    (i)    regular compensation (including applicable deferred compensation amounts), overtime, shift premiums and other forms of additional compensation determined by and paid currently pursuant to an established formula or procedure;

    (ii)    salary reduction contributions to The Lilly Employee Savings Plan or elective contributions under any similar tax–qualified plan that is intended to meet the requirements of Section 401(k) of the Internal Revenue Code or similar Company savings program;

    (iii)    elective contributions to any cafeteria plan that is intended to meet the requirements of Section 125 of the Internal Revenue Code or other pre–tax contributions to a similar Company benefit plan;

    (iv)    payments made under the terms of Lilly's Illness Pay Program or other similar Company or government–required leave program during an Applicable Year to a Participant who is on approved leave of absence and is receiving one hundred percent (100%) of his base pay; and

    (v)    other legally–mandated or otherwise required pre–tax deductions from a Participant's base salary.

(B)   The term "Participant Earnings" does not include:

    (i)    compensation paid in lieu of earned vacation;

    (ii)    amounts contributed to the Retirement Plan or any other qualified plan, except as provided in clause (A)(ii), above;

    (iii)    payments made under the terms of Lilly's Illness Pay Program or other similar Company or government–required leave program during an Applicable Year to a Participant who is on approved leave of absence and is receiving less than the full amount of his base pay;

    (iv)    amounts paid under this Plan or other bonus or incentive program of the Company;

    (v)    payments made under The Lilly Severance Pay Plan or any other

– 6 –

severance–type benefit (whether company–sponsored or mandated by law) arising out of or relating to a Participant's termination of employment;

(vi)    payments based upon the discretion of the Company;

(vii)   in the case of a person employed by a Lilly subsidiary, foreign service, cost of living, or other allowances that would not be paid were the person employed by Lilly;

(viii)  amounts paid as commissions, sales bonuses, or Market Premiums (as defined under the Retirement Plan); or

(ix)    earnings with respect to the exercise of stock options or vesting of restricted stock.

2.16  Performance Benchmarks mean the amounts as calculated in Section 5.3 below. The Performance Benchmarks will be established after considering expected pharmaceutical peer group performance and based on performance measures as described in Section 5.2.

2.17  Plan means The Eli Lilly and Company Bonus Plan as set forth herein and as hereafter modified or amended from time to time. The Plan is an incentive compensation program and is not subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), pursuant to Department of Labor Regulation Section 2510.3.

2.18  Plant Closing means the closing of a plant site or other Company location that directly results in termination of employment.

2.19  Reduction in Workforce means the elimination of a work group, functional or business unit or other broadly applicable reduction in job positions that directly results in termination of employment.

2.20  Retirement means the cessation of employment upon the attainment of age fifty–five with ten years of service (55 and 10) or at least eighty (80) points, as determined by the provisions of the Retirement Plan as amended from time to time, assuming eligibility to participate in that plan. For persons who are not participants in the Retirement Plan, Retirement means the cessation of employment as a retired employee under the applicable retirement benefit plan or program as provided by the Company or applicable law.

2.21  Retirement Plan means The Lilly Retirement Plan.

2.22  Sales means, for any Applicable Year, the consolidated net sales of the Company as set forth in the "Consolidated Statements of Income" as reported by the Company in accordance with generally accepted accounting principles and Section 3.4 below.

2.23  Sales Growth means the percentage increase in Sales in the Applicable Year compared to the prior year.

– 7 –

2.24  <u>Section 162(m)</u> means Section 162(m) of the Internal Revenue Code of 1986, as amended.

2.25  <u>Service</u> means the aggregate time of employment of an Eligible Employee by the Company.

– 8 –
## SECTION 3. ADMINISTRATION

3.1 <u>Committee</u>. The Plan will be administered by the Compensation Committee of the Board of Directors of Eli Lilly and Company or, if the name of the Compensation Committee is changed, the Plan will be administered by such successor committee. For all Eligible Employees other than Lilly Executive Officers, the Compensation Committee may delegate all or a portion of its responsibilities within its sole discretion by resolution. Any reference in this Plan to the Committee or its authority will be deemed to include such designees (other than with respect to Lilly Executive Officers or a member of the Board of Directors or for purposes of Section 9).

3.2 <u>Powers of the Committee</u>. The Committee will have the right to interpret the terms and provisions of the Plan and to determine any and all questions arising under the Plan, including, without limitation, the right to remedy possible ambiguities, inconsistencies, or omissions by a general rule or particular decision. The Committee will have authority to adopt, amend and rescind rules consistent with the Plan, to make exceptions in particular cases to the rules of eligibility for participation in the Plan (except with respect to Lilly Executive Officers), and to delegate authority for approval of participation of any Eligible Employee except for Lilly Executive Officers or a member of the Board of Directors. The Committee will take all necessary action to establish annual Performance Benchmarks and approve the timing of payments, as necessary.

3.3 <u>Certification of Results</u>. Before any amount is paid under the Plan, the Committee will certify in writing the calculation of EPS, EPS Growth, Sales and Sales Growth (or other applicable performance measures) for the Applicable Year and the satisfaction of all other material terms of the calculation of the Company Performance Bonus Multiple and Company Bonus.

3.4 <u>Adjustments for Significant Events</u>. Not later than 90 days after the beginning of an Applicable Year, the Committee may specify with respect to Company Bonuses for the Applicable Year that the performance measures described in Section 5.2 will be determined before the effects of acquisitions, divestitures, restructurings or special charges or gains, changes in corporate capitalization, accounting changes, and/or events that are treated as extraordinary items for accounting purposes; provided that such adjustments shall be made only to the extent permitted by Section 162(m) in the case of Lilly Executive Officers.

3.5 <u>Finality of Committee Determinations</u>. Any determination by the Committee of Sales, Sales Growth, EPS, EPS Growth, any other performance measure, Performance Benchmarks and the level and entitlement to Company Bonus, and any interpretation, rule, or decision adopted by the Committee under the Plan or in carrying out or administering the Plan, will be final and binding for all purposes and upon all interested persons, their heirs, and personal representatives. The Committee may rely conclusively on determinations made by Lilly and its auditors to determine Sales, Sales Growth, EPS, EPS Growth and related information for administration of the Plan, whether such

– 9 –

information is determined by the Company, auditors or a third–party vendor engaged specifically to provide such information to the Company. This subsection is not intended to limit the Committee's power, to the extent it deems proper in its discretion, to take any action permitted under the Plan.

## SECTION 4. PARTICIPATION IN THE PLAN

4.1  <u>General Rule</u>. Only Eligible Employees may participate in and receive payments under the Plan.

4.2  <u>Commencement of Participation</u>. An Eligible Employee will become a Participant in the Plan as follows: (i) in the case of Eligible Employees under Section 2.11(a), on the date on which the individual completes at least one hour of employment as an Eligible Employee within the United States or Puerto Rico, and (ii) in the case of Eligible Employees under Section 2.11(b), on the date as of which the Committee has designated the individual to become a Participant in the Plan.

4.3  <u>Termination of Participation</u>. An Eligible Employee will cease to be a Participant upon termination of employment with the Company for any reason, or at the time he otherwise ceases to be an Eligible Employee under the Plan.

## SECTION 5. DEFINITION AND COMPUTATION OF COMPANY BONUS

5.1  <u>Computation for Eligible Employees</u>. Company Bonus amounts will depend significantly on Company performance as well as Participants' individual performance for certain Eligible Employees. As more specifically described below, a Participant's Company Bonus is calculated by multiplying the Participant's Bonus Target by his Participant Earnings and the Company Performance Bonus Multiple. For eligible management and Lilly employees and those Participants designated by the Committee, individual performance will also impact the Company Bonus calculation, as described in Section 5.6(c) below. Company Bonuses are paid out to eligible Participants in the manner provided below.

5.2  <u>Establishment of Performance Measures</u>. Not later than 90 days after the beginning of each Applicable Year, the Committee will, in its sole discretion, determine appropriate performance measures for use in calculating Company Bonus amounts. These performance measures may include Sales Growth, EPS Growth, growth in net income, return on assets, return on equity, total shareholder return, EVA, MVA or any of the foregoing before the effect of acquisitions, divestitures, accounting changes, restructurings and special charges or gains (determined according to objective criteria established by the Committee not later than ninety (90) days after the beginning of the Applicable Year). Unless otherwise specified in a written resolution adopted by the Committee for the Applicable Year, the Committee will use EPS Growth and Sales

– 10 –

Growth, in each case before the effect of acquisitions, divestitures, accounting changes, restructurings and special charges or gains (determined as described above) as performance measures.

5.3 <u>Establishment of Performance Benchmarks.</u> Not later than 90 days after the beginning of each Applicable Year, the Committee will establish Performance Benchmarks for the Company based on the performance measures described in Section 5.2 above. Unless otherwise specified in a written resolution adopted by the Committee for the Applicable Year, the Performance Benchmarks will correspond with EPS Growth and Sales Growth amounts for the Applicable Year, established after considering expected pharmaceutical peer group performance. The Performance Benchmarks will correspond to EPS Growth and Sales Growth multiples equal to 1.0. The Committee will also adopt a formula that will determine the extent to which the performance measure multiples will vary as the Company's actual results vary from the Performance Benchmarks.

5.4 <u>Company Performance Bonus Multiple.</u> Unless otherwise specified in a written resolution adopted by the Committee not later than 90 days after the beginning of the Applicable Year, the Company Performance Bonus Multiple is equal to the product of the EPS Growth multiple and 0.75 plus the product of the Sales Growth multiple and 0.25 (i.e., Company Performance Bonus Multiple = (EPS Growth multiple * 0.75) + (Sales Growth multiple * 0.25)).

5.5 <u>Company Performance Bonus Multiple Threshold and Ceiling:</u> Notwithstanding Sections 5.3 and 5.4, the Company Performance Bonus Multiple will not be less than 0.25 or greater than 2.0 in an Applicable Year. If the calculations described in Sections 5.3 and 5.4 above result in a number that is less than 0.25, the Company Performance Bonus Multiple will equal 0.25 for the Applicable Year. If the calculations described in Sections 5.3 and 5.4 above result in a multiple greater than 2.0, the Company Performance Bonus Multiple will equal 2.0 for the Applicable Year. Notwithstanding the foregoing, the Committee may reduce the Company Performance Bonus Multiple (including but not limited to a reduction to below 0.25) for some or all Eligible Employees, in its discretion.

5.6 Participant Company Bonus.

    a.   <u>Bonus Target.</u> Not later than 90 days after the beginning of the Applicable Year, the Bonus Target for each Participant will be determined by the Committee on a basis that takes into consideration a Participant's pay grade level and job responsibilities. The Bonus Target for each Participant for the Applicable Year will be expressed as a percentage of Participant Earnings as of December 31 of the Applicable Year. Early in the Applicable Year, each Participant will receive information regarding the Participant's Bonus Target. In the event that a Participant's pay grade level changes during the Applicable Year (e.g., because of promotion, demotion or otherwise), the Participant's Bonus Target will be prorated based on the Bonus Target applicable to

– 11 –

each pay grade level (with related job responsibilities) and the percentage of time that the Participant is employed at each pay grade level during the Applicable Year.

b.  Company Bonus Calculation. Except as described in Section 5.6(c) below, a Participant's Company Bonus will equal the product of the Company Performance Bonus Multiple and the Participant's Bonus Target and the Participant's Earnings.

c.  Adjustment for Performance Multiplier, if Applicable. Notwithstanding anything herein to the contrary, all eligible management employees (except Lilly Executive Officers), United States employees and other employees as may be designated from time to time by the Committee are subject to individual performance multipliers. For all such Participants subject to an individual performance multiplier, the amount calculated in Section 5.5(b) above will be adjusted based on the Participant's performance rating at the end of the Applicable Year as described below. For each such Participant, the performance rating will be determined by the Participant's supervision.

1.  Exemplary Performance. If the Participant receives an exemplary or equivalent performance rating (using the applicable performance rating system then in effect for the Participant), the amount calculated in Section 5.6(b) will be multiplied by an amount determined by the Committee, not to exceed 1.5, to obtain the Participant's actual Company Bonus.

2.  Satisfactory Performance. If the Participant receives a satisfactory or equivalent performance rating (using the applicable performance rating system then in effect for the Participant), the amount calculated in Section 5.6(b) will be multiplied by 1.0 so that the Participant's actual Company Bonus will equal the amount calculated in Section 5.6(b) above.

3.  Unsatisfactory Performance. If the Participant receives a year–end unsatisfactory or equivalent performance rating (using the applicable performance rating system then in effect for the Participant), the amount calculated in Section 5.6(b) will be multiplied by 0.0 so that the Participant's actual Company Bonus will equal $0.00.

In the event that a Participant does not receive a year–end performance rating, but is eligible for a Company Bonus, the amount calculated in Section 5.6(b) will be multiplied by 1.0 so that the Participant's actual Company Bonus will be the amount calculated in Section 5.6(b) above.

5.7  Conditions on Company Bonus. Payment of any Company Bonus is neither guaranteed nor automatic. A Participant's Company Bonus is not considered to be any form of compensation, wages, or benefits, unless and until paid.

– 12 –

5.8  Required Employment. Except as provided below in this Section 5.8 or as otherwise designated by the Committee, if a Participant is not employed by the Company on the last day of the Applicable Year, or is otherwise not an Eligible Employee on that date, the Participant is not entitled to any Company Bonus payment under this Plan for that Applicable Year.

   a.  Leaves of Absence. A Participant who, on the last day of the Applicable Year, is on approved leave of absence under the Family and Medical Leave Act of 1993, military leave under the Uniformed Services Employment and Reemployment Rights Act, or such other approved leave of absence will be considered to be an Eligible Employee on that date for purposes of this Plan.

   b.  Transfer. An employee who is a Participant in this Plan for a portion of the Applicable Year and then transfers to a position within the Company in which he is ineligible to participate in this Plan, but who remains employed by the Company on the last day of the Applicable Year, will be treated as satisfying the last–day–of–Applicable Year requirement for purposes of this Plan. In that event, his Company Bonus will be based on his Participant Earnings for the portion of the Applicable Year in which the employee was a Participant in the Plan.

   c.  Retirement, Disability or Death. A Participant who was an Eligible Employee for some portion of the Applicable Year and then takes Retirement, becomes and remains Disabled through the end of the Applicable Year, or dies during the Applicable Year will be considered to satisfy the last–day–of–Applicable–Year requirement described in this Section 5.8 for purposes of this Plan.

   d.  Reallocation, Medical Reassignment, Plant Closing or Reduction in Workforce. A Participant who was an Eligible Employee for some portion of the Applicable Year and whose employment is terminated as a result of his failure to locate a position following his reallocation or medical reassignment in the United States, or a Plant Closing or Reduction in Workforce will be considered to satisfy the last–day–of–Applicable Year requirement described in this Section 5.8 for purposes of this Plan. The Committee or its designee's determination regarding whether a Participant's termination is a direct result of either a Plant Closing or a Reduction in Workforce will be final and binding.

   e.  Notice of Resignation. In addition, a Participant who submits a notice of resignation from employment with the Company prior to the end of the Applicable Year and whose effective date of resignation is two (2) weeks or less from the date of notice of resignation will be considered employed by the Company for purposes of this Plan until the end of his specified notice period.

– 13 –

5.9    <u>New Participants</u>. If an Eligible Employee began participation in the Plan during an Applicable Year and is eligible for a Company Bonus, his Company Bonus will be based on Participant Earnings earned after the employee became a Participant. An Eligible Employee who became assigned to a position eligible for a Company Bonus at any time other than the first of the month will become a Participant the first of the following month.

5.10    <u>Section 162(m) Requirements, Bonus Maximum</u>. In the case of Lilly Executive Officers, all determinations necessary for computing a Company Bonus for the Applicable Year, including establishment of all components of EPS, EPS Growth, Sales, Sales Growth, Company Performance Bonus Multiple and Bonus Target percentages, shall be made by the Committee not later than 90 days after the commencement of the Applicable Year. As and to the extent required by Section 162(m), the terms of a Company Bonus for a Lilly Executive Officer must state, in terms of an objective formula or standard, the method of computing the amount of compensation payable to the Lilly Executive Officer, and must preclude discretion to increase the amount of compensation payable that would otherwise be due under the terms of the award. Notwithstanding anything elsewhere in the Plan to the contrary, the maximum amount of the Company Bonus that may be payable to a Lilly Executive Officer in respect of any Applicable Year will be $7 million.

### SECTION 6. TIME OF PAYMENT

6.1    General Rule. Payment under the Plan will be made prior to April 1 of the year following the Applicable Year.

6.2    <u>Terminated Employee</u>. Except as provided in Section 5.8 above, in the event an Eligible Employee's employment with the Company ends for any reason prior to the last day of the Applicable Year, he will not receive any Company Bonus for the Applicable Year.

6.3    <u>Deceased Eligible Employee</u>. In the event an Eligible Employee dies before payment under the Plan is made, the Committee may, in its sole discretion, authorize the Company to pay to his personal representative or beneficiary an amount not to exceed the amount established by the Committee to reflect the payment accrued at the date of death.

– 14 –

**SECTION 7. ADMINISTRATIVE GUIDELINES**

7.1 <u>Establishment and Amendment by the Committee</u>. The Committee may establish objective and nondiscriminatory written guidelines for administering those provisions of the Plan that expressly provide for the determination of eligibility, Company Bonus or benefits on the basis of rules established by the Committee. The Committee may, from time to time, amend or supplement the administrative guidelines established in accordance with this subsection 7.1. The administrative guidelines established or amended in accordance with this subsection 7.1 will not be effective to the extent that they materially increase the Plan's liability, or to the extent that they are inconsistent with, or purport to amend, any provision of the Plan set forth in a document other than such administrative guidelines.

7.2. <u>Amendment by Board of Directors</u>. Any administrative guidelines established by the Committee pursuant to subsection 7.1 may be amended or revoked by the Board of Directors, either prospectively or retroactively, in accordance with the general amendment procedures set forth in section 9 below.

## SECTION 8. MISCELLANEOUS

8.1 <u>No Vested Right</u>. No employee, participant, beneficiary, or other individual will have a vested right to a Company Bonus or any part thereof until payment is made to him under Section 6.

8.2 <u>No Employment Rights</u>. No provision of the Plan or any action taken by the Company, the Board of Directors of the Company, or the Committee will give any person any right to be retained in the employ of the Company. The right and power of the Company to dismiss or discharge any Participant for any reason or no reason, with or without notice, is specifically reserved.

8.3 <u>No Adjustments</u>. After the certification of the calculation of EPS, EPS Growth, Sales, Sales Growth and any other material terms of the calculation of the Company Performance Bonus Multiple and Company Bonus for the Applicable Year as described in Section 3.3 above, no adjustments will be made to reflect any subsequent change in accounting, the effect of federal, state, or municipal taxes later assessed or determined, or otherwise. Notwithstanding the foregoing, the Company reserves the right to and, in appropriate cases, will, seek restitution of any Company Bonus awarded to a Lilly Executive Officer if:

   a.   The amount of the Company Bonus was calculated based upon the achievement of certain financial results that were subsequently the subject of a restatement of all or a portion of the Company's financial statements;

   b.   The Lilly Executive Officer engaged in intentional misconduct that caused or partially caused the need for such a restatement; and

   c.   The amount of the Company Bonus that would have been awarded to the Lilly Executive Officer had the financial results been properly reported would have been lower than the amount actually awarded.

   This subsection is not intended to limit the Company's power to take such action as it deems necessary to remedy the misconduct, prevent its recurrence and, if appropriate, based on all relevant facts and circumstances, punish the wrongdoer in a manner it deems appropriate.

8.4 <u>Other Representations</u>. Nothing contained in this Plan, and no action taken pursuant to its provisions, will create or be construed to create a trust of any kind, or a fiduciary relationship between the Company and any employee, participant, beneficiary, legal representative, or any other person. Although Participants generally have no right to any payment from this Plan, to the extent that any Participant acquires a right to receive payments from the Company under the Plan, such right will be no greater than the right of an unsecured general creditor of the Company. All payments to be made hereunder will be paid from the general funds of the Company and no special or separate fund will

– 16 –

be established, and no segregation of assets will be made, to assure payment of such amount.

8.5 <u>Tax Withholding</u>. The Company will make such provisions and take such steps as it may deem necessary or appropriate for the withholding of all federal, state, local, and other taxes required by law to be withheld with respect to Company Bonus payments under the Plan, including, but not limited to, deducting the amount required to be withheld from the amount of cash otherwise payable under the Plan, or from salary or any other amount then or thereafter payable to an employee, Participant, beneficiary, or legal representative.

8.6 <u>Currency</u>. The Company Bonus will be based on the currency in which the highest portion of base pay is regularly paid. The Committee will determine the appropriate foreign exchange conversion methodology in its discretion.

8.7 <u>Effect of Plan on other Company plans</u>. Nothing contained in this Plan is intended to amend, modify, terminate, or rescind other benefit or compensation plans established or maintained by the Company. Whether and to what extent a Participant's Company Bonus is taken into account under any other plan will be determined solely in accordance with the terms of such plan.

8.8 <u>Construction</u>. This Plan and all the rights thereunder will be governed by, and construed in accordance with, the laws of the state of Indiana, without reference to the principles of conflicts of law thereof.

8.9 <u>Notice</u>. Any notice to be given to the Company or Committee pursuant to the provisions of the Plan will be in writing and directed to Secretary, Eli Lilly and Company, Lilly Corporate Center, Indianapolis, IN 46285.

– 17 –

### SECTION 9. AMENDMENT, SUSPENSION, OR TERMINATION

The Board of Directors of the Company will have the right to amend, modify, suspend, revoke, or terminate the Plan, in whole or in part, at any time and without notice, by written resolution of the Board of Directors. The Committee also will have the right to amend the Plan, except that the Committee may not amend this Section 9. Solely to the extent deemed necessary or advisable by the Board (or the Committee) for purposes of complying with Section 162(m), the Board (or the Committee) may seek the approval by the Company's stockholders of the Plan or any amendments to the Plan or any aspect of the Plan or Plan amendments. Any such approval shall be obtained in a separate vote of stockholders, with approval by a majority of the votes cast on the issue, including abstentions to the extent abstentions are counted as voting under applicable state law and the Articles of Incorporation and By-laws of the Company. To the extent deemed necessary or advisable by the Board of Directors to comply with Section 162(m), the material terms of the performance measures used in calculating Company Bonus amounts will be disclosed to and reapproved by the stockholders of the Company no later than the Company's 2009 annual meeting.

# LILLY ELI & CO (LLY)

LILLY CORPORATE CTR
DROP CODE 1112
INDIANAPOLIS, IN 46285
317. 276.2000

# EX−10.2

**CHANGE IN CONTROL SEVERANCE PAY PLAN FOR SELECT EMPLOYEES**
**10−Q Filed on 11/03/2006 − Period: 09/30/2006**
File Number 001−06351



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 10.2

<div align="center">

**ELI LILLY AND COMPANY**
**2007 CHANGE IN CONTROL SEVERANCE PAY PLAN**
**FOR SELECT EMPLOYEES**

</div>

**1. PURPOSE**

This Eli Lilly and Company 2007 Change in Control Severance Pay Plan For Select Employees has been established by the Company to provide for the payment of severance pay and benefits to Eligible Employees whose employment with a Participating Employer terminates due to certain conditions created by a Change in Control of the Company. The purpose of the Plan is to assure a continuity in operations of the Company during a period of Change in Control by allowing employees to focus on their responsibilities to the Company knowing that they have certain financial security in the event of their termination of employment. The accomplishment of this purpose is in the best interests of the Company and its shareholders. The Plan replaces the Change in Control Severance Pay Plan for Select Employees that was originally adopted by the Board on March 1, 1995, and shall become operative immediately upon the expiration of such plan with respect to a Change in Control occurring on or after March 1, 2007.

**2. DEFINITIONS**

The terms defined in this Section 2 shall have the meanings given below:

(a) "Base Salary" means an Eligible Employee's gross annualized rate of base salary at the time of any determination hereunder, before any deductions, exclusions or any deferrals or contributions under any Participating Employer plan or program, but excluding bonuses, incentive awards or compensation, employee benefits or any other non-salary form of compensation.

(b) "Board" means the Board of Directors of the Company.

(c) "Change in Control" has the meaning given in Section 3.

(d) "Code" means the Internal Revenue Code of 1986, as amended.

(e) "Committee" means the Compensation Committee of the Board, or such other committee appointed by the Board to perform the functions of the Committee under the Plan, provided that at all times the Committee shall be constituted solely of directors who are Continuing Directors (as defined in Section 3) to the extent any such directors remain on the Board and are willing to serve in such capacity.

(f) "Covered Termination" has the meaning given in Section 6.

(g) "Company" means Eli Lilly and Company, an Indiana corporation.

(h) "Eligible Employee" means a Tier I Employee or a Tier II Employee.

(i) "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(j) "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(k) "Participating Employer" has the meaning given in Section 4.

(l) "Plan" means this Eli Lilly and Company 2007 Change in Control Severance Pay Plan for Select Employees.

(m) "Retirement Age" means the date the Eligible Employee reaches age 65, unless the Company's senior most officer responsible for the Human Resources department has approved a later date as the Retirement Age for the Eligible Employee.

(n) "Severance Period" means the two (2) year period immediately following a Covered Termination.

**3. CHANGE IN CONTROL**

For purposes of the Plan, a "Change in Control" of the Company shall be deemed to have occurred upon:

(a) the acquisition by any "person," as that term is used in Sections 13(d) and 14(d) of the Exchange Act (other than (i) the Company, (ii) any subsidiary of the Company, (iii) any employee benefit plan or employee stock plan of the Company or a subsidiary of the Company or any trustee or fiduciary with respect to any such plan when acting in that capacity, or (iv) Lilly Endowment, Inc.) of "beneficial ownership," as defined in Rule 13d−3 under the Exchange Act, directly or indirectly, of 15% or more of the shares of the Company's capital stock the holders of which have general voting power under ordinary circumstances to elect at least a majority of the Board (or which would have such voting power but for the application of the Indiana Control Shares Statute) ("Voting Stock"); provided, however, that an acquisition of Voting Stock directly from the Company shall not constitute a Change in Control under this Section 3(a);

(b) the first day on which less than two−thirds of the total membership of the Board shall be Continuing Directors (as that term is defined in Article 13(f) of the Company's Articles of Incorporation);

(c) consummation of a merger, share exchange, or consolidation of the Company (a "Transaction"), other than a Transaction which would result in the Voting Stock of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than 60% of the Voting Stock of the Company or such surviving entity immediately after such Transaction;

2

(d) a complete liquidation of the Company or a sale or disposition of all or substantially all the assets of the Company, other than a sale or disposition of assets to any subsidiary of the Company;

(e) either (i) the Company shall have entered into a definitive agreement with any Person, which, if consummated, would result in a Change in Control as specified in paragraphs (a) through (d) of this Section 3 or (ii) any Person initiates a tender offer or exchange offer to acquire shares of the Voting Stock which, if consummated, would result in a Change in Control as specified in paragraphs (a) through (d) of this Section 3; provided, however, that if the Board shall make a final determination that such agreement, tender offer or exchange offer will not be consummated, the occurrence of any such event shall cease to constitute a Change in Control and the termination of employment of an Eligible Employee after such determination shall not be treated as a Covered Termination on the basis of such event; or

(f) the Board adopts a resolution to the effect that any Person has taken actions which, if consummated, would result in its having acquired effective control of the business and affairs of the Company; provided, however, that if the Board shall make a final determination that such actions will not be consummated, the occurrence of any such event shall cease to constitute a Change in Control and the termination of employment of an Eligible Employee after such determination shall not be treated as a Covered Termination on the basis of such event.

For purposes of this Section 3 only, the term "subsidiary" means a corporation or limited liability company of which the Company owns directly or indirectly fifty (50) percent or more of the voting power.

**4. PARTICIPATING EMPLOYERS**

**A. Designation of Participating Employers.** The Company and each subsidiary corporation of which the Company owns directly or indirectly one−hundred (100) percent of the voting power at the time of the Change in Control shall be Participating Employers under the Plan. In addition, the Committee may designate other affiliates of the Company as Participating Employers under the Plan, from time to time and under such terms and conditions, as shall be specified by an action in writing by the Committee. Such terms and conditions may impose limitations on the extent to which any such affiliate participates in the Plan (including but not limited to the duration of any such participation), but shall not provide rights or benefits to Eligible Employees that are broader than those set forth in the Plan. Any entity that is a Participating Employer at the time of a Change in Control shall continue to be a Participating Employer following a Change in Control, and any person, firm or business that is a successor to the business or interests of a Participating Employer following a Change in Control shall be treated as a Participating Employer under the Plan.

**B. Limitations in Foreign Jurisdictions.** Notwithstanding the foregoing or anything elsewhere in the Plan to the contrary, the Committee shall have the discretionary authority, as specified below, to exclude from participation or limit the participation of any Participating Employer with respect to individuals employed outside of the United States. The Committee shall exercise this authority only by an action in writing taken prior to a Change in Control on the basis of a good faith determination that, as a result of the specific effect of applicable local law or practice

3

with respect to the Plan or severance benefits generally, it would be in the best interests of the Company to so exclude or limit such participation. In addition, to the extent specified by an action in writing prior to a Change in Control, the Committee may offset the benefits provided under the Plan to any such Eligible Employee by benefits under severance arrangements that exist by reason of applicable local law or practice.

**5. ELIGIBLE EMPLOYEES**

All employees of the Participating Employers, including executive officers (as defined in Rule 3b–7 under the Exchange Act), who are classified by the Company as G–6 level (Executive Director) or above (or any successor classifications) immediately prior to the Change in Control shall be eligible to participate in the Plan and shall be considered an Eligible Employee for all purposes hereunder. Any person who is an Eligible Employee in accordance with the foregoing shall continue to be an Eligible Employee notwithstanding any change in his/her position or classification following a Change in Control, subject to Section 6 hereof relating to certain terminations of employment. The Committee shall notify each Eligible Employee of his/her participation in the Plan prior to the Change in Control.

**6. COVERED TERMINATIONS**

**A. General.** An Eligible Employee shall be treated as having suffered a "Covered Termination" hereunder if his/her employment is terminated, within a period of two (2) years immediately following the date of a Change in Control, by a Participating Employer other than for "Cause" or by the Eligible Employee for "Good Reason."

For purposes of the foregoing, the two (2) year time period specified above within which a termination of employment may be treated as a Covered Termination shall commence on the date the Change in Control becomes effective and, with respect to a Change in Control under paragraphs (e) and (f) of Section 3, shall recommence (for the full applicable period) on the date of consummation of the underlying actions. For purposes of the Plan, a termination of employment shall be effective as of the last date of the Eligible Employee's employment with the Participating Employer.

An Eligible Employee shall not be treated as having suffered a Covered Termination in the event of (1) death, (2) total disability (within the meaning of the Company's Extended Disability Plan), (3) transfer of employment among Participating Employers (unless such transfer gives rise to a "Good Reason"), (4) involuntary termination by the Participating Employer for "Cause", (5) voluntary termination by the Eligible Employee other than for Good Reason, (6) a termination of employment for any reason by either the Participating Employer or the Eligible Employee that does not occur during the time periods specified above or (7) a termination of employment for any reason by either the Participating Employer or the Eligible Employee after the Eligible Employee reaches Retirement Age.

**B. Termination For Cause.** For purposes hereof, the termination of an Eligible Employee's employment shall be deemed to be a termination for "Cause" if as a result of:

4

(i) the willful refusal of the Eligible Employee to perform, without legal cause, his/her material duties to the Participating Employer, resulting in demonstrable economic harm to any Participating Employer, which the Eligible Employee has failed to cure after thirty (30) calendar days' advance written notice from the Company;

(ii) any act of fraud, dishonesty or gross misconduct of the Eligible Employee resulting in significant economic harm to any Participating Employer or other significant harm to the business reputation of any Participating Employer; or

(iii) the conviction of the Eligible Employee by a court of competent jurisdiction of any crime (or the entering of a plea of guilty or nolo contendere to a charge of any crime) constituting a felony.

A termination for Cause shall be communicated to the Eligible Employee in writing by the Participating Employer and shall specify the provisions of the Plan and factual matters relied upon in making the Cause determination.

**C. Termination for Good Reason.** For purposes hereof, an Eligible Employee may terminate his/her employment for "Good Reason" as a result of:

(i) a material diminution in the nature or status of the Eligible Employee's position, title, reporting relationship, duties, responsibilities or authority, or the assignment to him/her of additional responsibilities that materially increase his/her workload;

(ii) any reduction in the Eligible Employee's then–current Base Salary;

(iii) a material reduction in the Eligible Employee's opportunities to earn incentive bonuses below those in effect for the year most recently completed before the date of the Change in Control, taking into account all material bonus factors such as targeted bonus amounts and corporate performance measures;

(iv) a material reduction in the Eligible Employee's employee benefits and coverages (including, without limitation, pension, profit sharing and all welfare, retiree welfare and fringe benefits) that are provided to the Eligible Employee from the benefit levels in effect immediately prior to the Change in Control;

(v) the failure to grant to the Eligible Employee stock options, stock units, performance shares or similar incentive rights during each twelve (12) month period following the Change in Control on the basis of a number of shares or units and all other material terms (including vesting requirements) at least as favorable to the Eligible Employee as those rights granted to him/her on an annualized average basis for the three (3) year period immediately prior to the Change in Control;

(vi) relocation of the Eligible Employee by more than fifty (50) miles from his/her regularly assigned workplace existing immediately prior to the date of the Change in Control; or

5

(vii) any failure by a successor entity to the Company (including any entity that succeeds to the business or assets of the Company) in connection with a Change in Control to assume by operation of law or otherwise the obligations of the Company under the Plan, or any attempted amendment, termination or repudiation of the Plan by such successor entity, other that pursuant to the provisions of Section 15.

For purposes of the foregoing, but without limitation of the Eligible Employee's right to otherwise terminate employment for Good Reason, if the Eligible Employee is in charge of a principal business unit, division or function of the Company immediately prior to a Change in Control, Good Reason shall not be deemed to exist based solely on the fact that the Eligible Employee is not in charge of such principal business unit, division or function of the combined entity following the Change in Control, unless as a result thereof, the Eligible Employee suffers a material diminution in the nature or status of the Eligible Employee's position, title, reporting relationship, duties, responsibilities or authority or suffers some other Good Reason event.

A termination for Good Reason shall be communicated to the Participating Employer in writing by the Eligible Employee within thirty (30) days following his/her knowledge of the circumstances constituting Good Reason, and shall specify the provisions of the Plan and the factual matters relied upon in making the Good Reason determination. The Participating Employer shall have the opportunity to cure the circumstances constituting Good Reason within 15 days following receipt of such written notice from the Eligible Employee, and if such circumstances are fully cured, such circumstances shall cease to constitute the basis for a Good Reason termination hereunder.

   **7. SEVERANCE PAYMENT**
The amount of the severance payment to be received by an Eligible Employee whose employment is terminated under conditions constituting a Covered Termination shall equal two (2) times the sum of:

   (i) the Eligible Employee's Base Salary at the time of Covered Termination (calculated without regard to any reduction in Base Salary that results in a Good Reason termination) or, if greater, at the time of the Change in Control, *plus*

   (ii) the greater of (a) the amount of the Eligible Employee's target annual cash incentive bonus for the year of Covered Termination or (b) the amount of the Eligible Employee's annual cash incentive bonus earned for the year immediately prior to the Change in Control.

The severance payment to be made hereunder shall be paid to the Eligible Employee in a single lump–sum cash payment, less any required tax withholding, within thirty (30) calendar days after the date of the Eligible Employee's Covered Termination. Any payment required under this Section 7 or any other provision of the Plan that is not made in a timely manner shall bear interest at a rate equal to one hundred twenty (120) percent of the monthly compounded applicable federal rate, as in effect under Section 1274(d) of the Code for the month in which the payment is required to be made.

6

**8. OTHER SEVERANCE BENEFITS**

In addition to the severance payment provided under Section 7, an Eligible Employee shall be entitled to the following benefits and other rights in the event of his/her Covered Termination:

**A. Welfare Benefits.** The Eligible Employee shall be entitled to continued coverage and benefits for the duration of the Severance Period under the Participating Employer's medical and dental plans, group life insurance plans, company–provided death benefit, supplemental life insurance and long–term disability plans for which he/she was eligible at the time of Covered Termination (or, if it would provide benefits or other terms more favorable to the Eligible Employee, at the time of the Change in Control), as though his/her termination of employment had not occurred (the "Welfare Continuation Coverages"). All Welfare Continuation Coverages shall apply to the Eligible Employee and any of his/her dependents who would have been eligible for coverage if the Eligible Employee remained employed for the Severance Period. The Company may provide the Eligible Employee with the Welfare Continuation Coverages under arrangements other than its generally applicable welfare benefit plans, provided that the benefit coverages so provided are at least as favorable to the Eligible Employee as coverage under the otherwise applicable Welfare Continuation Coverages, on a coverage by coverage basis, and taking into account all tax consequences to the Eligible Employee. At the expiration of the Severance Period, the Eligible Employee shall be treated as a then terminating employee with respect to the right to elect continued medical and dental coverages in accordance with Section 4980B of the Code (or any successor provision thereto).

**B. Retiree Welfare Benefits.** For purposes of determining eligibility for the retiree medical and dental plans applicable to Eligible Employee (the "Retiree Welfare Plans"), the Eligible Employee shall receive additional credit for the number of years equal to the Severance Period for purposes of both age and service requirements under the Retiree Welfare Plans, but not beyond the Retirement Age of the Eligible Employee. If an Eligible Employee shall be eligible for participation in the Retiree Welfare Plans at the time of Covered Termination (including by reason of this Section 8.B.), then (i) for the Severance Period, he/she shall be entitled to continue to participate in either the Retiree Welfare Plans or the Welfare Continuation Coverage pursuant to Section 8.A. hereof, whichever provides greater benefits to the Eligible Employee on a coverage by coverage basis, and (ii) following the Severance Period, he/she shall be entitled to continue to participate in the retiree welfare benefit program provided to retired employees of the Participating Employer generally, or if no such program is provided, the program of the successor entity following the Change in Control, if any.

**C. Pension Supplement.** The Eligible Employee shall be entitled to the additional pension benefits that would be payable to him/her, under all defined benefit pension plans of a Participating Employer in which he/she is participating at the time of Covered Termination (or, if it would provide benefits or other terms more favorable to the Eligible Employee, at the time of the Change in Control), including all such tax–qualified and supplemental plans, by taking into account under such plans (i) an additional number of years equal to the Severance Period for purposes of the age and service credit of the Eligible Employee under such plans and (ii) the amount of the severance payment to which the Eligible Employee is entitled under Section 7, expressed on an annualized basis for the number of years equal to the Severance Period, for purposes of the compensation credit

7

of the Eligible Employee under such plans (but only to the extent such additional credit would produce a higher benefit for the Eligible Employee than if it were not taken into account). The additional pension benefits provided hereby shall be paid pursuant to a supplemental pension plan of the Company, at the same time and in the same form as pension benefits are otherwise payable to the Eligible Employee (subject to clause (iii) of Section 8.E). Notwithstanding the foregoing, the Eligible Employee will only receive additional age, service and compensation credit hereunder until his/her Retirement Age.

**D. Equity Incentives.** Immediately upon a Covered Termination, (i) any stock options, or similar equity–based incentive rights granted to the Eligible Employee under a stock incentive plan of a Participating Employer that are not then fully vested and exercisable shall become fully vested and immediately exercisable, (ii) the Eligible Employee shall be entitled to exercise any stock options or similar equity–based incentive rights until the expiration of three years following the date of the Covered Termination (or until such later date as may be applicable under the terms of the option or other right upon termination of employment), subject to the maximum full term of the option but without regard to any earlier termination otherwise applicable in the event of termination of employment, and (iii) any performance shares, stock units or shares of restricted stock granted to the Eligible Employee under a stock incentive plan of a Participating Employer that remain subject to forfeiture, performance conditions or transfer restrictions at such time shall become fully and immediately vested and all such conditions and restrictions shall immediately lapse. In addition, as to any other types of equity–based incentive awards granted to the Eligible Employee under a stock incentive plan of a Participating Employer prior to the date of Covered Termination, any restrictions on exercise, payment or transfer shall immediately lapse, and the Eligible Employee shall have all rights associated with such awards as of the date of Covered Termination. The provisions of this Section 8.D shall apply equally to any awards or rights into which the equity incentive rights described herein are converted or for which such rights are substituted in connection with a Change in Control.

**E. Accrued Rights.** The Eligible Employee shall be entitled to the following payments and benefits in respect of accrued compensation rights at the time of a Covered Termination, in addition to all other rights provided under the Plan: (i) immediate payment of any accrued but unpaid Base Salary through the date of Covered Termination; (ii) payment within fifteen (15) calendar days of Covered Termination of the accrued annual cash bonus for the year in effect on the date of the Covered Termination, determined on the basis of the bonus earned under terms of the applicable bonus plan through the date of termination or, if greater, the pro–rata amount of the target annual cash bonus for the period of such year through the date of termination; (iii) payment within fifteen (15) calendar days of Covered Termination of all non–tax–qualified deferred compensation rights, in lieu of payment in respect of such rights that would otherwise be made at a later date in accordance with the terms of such arrangements, except to the extent such rights are funded by amounts held under an irrevocable grantor trust or other irrevocable commitment of funds by the Company; and (iv) all benefits and rights accrued under the employee benefit plans, fringe benefit programs and payroll practices of a Participating Employer (other than those described in clause (iii) above) in accordance with their terms (including, without limitation, employee pension, employee welfare, incentive bonus and stock incentive plans).

8

**F. Outplacement; Relocation.** The Eligible Employee shall be provided, at the Company's sole expense, with professional outplacement services selected by the Eligible Employee consistent with his/her duties or profession and of a type and level customary for persons in his/her position; provided, however, that the Company shall not be required to pay fees in connection with the foregoing in an amount greater than fifteen (15) percent of the Eligible Employee's Base Salary for purposes of clause (i) of Section 7. The Company shall honor any prior agreement or understanding with an Eligible Employee who has suffered a Covered Termination to reimburse his/her relocation expenses to the Indianapolis, Indiana metropolitan area or, if it does not result in a greater cost to the Company, to such other location selected by the Eligible Employee.

**G. Indemnification.** With respect to any Eligible Employee who is, immediately prior to a Change in Control or a Covered Termination, indemnified by the Company for his/her service as a director, officer or employee of a Participating Employer, the Company shall indemnify such Eligible Employee to the fullest extent permitted by applicable law, and the Company shall maintain in full force and effect, for the duration of all applicable statute of limitation periods, insurance policies at least as favorable to the Eligible Employee as those maintained by the Company for the benefit of its directors and officers at the time of Change in Control, provided that such insurance policies are commercially available from carriers of recognized standing, with respect to all costs, charges and expenses whatsoever (including payment of expenses in advance of final disposition of a proceeding) incurred or sustained by the Eligible Employee in connection with any action, suit or proceeding to which he/she may be made a party by reason of being or having been a director, officer or employee of a Participating Employer or serving or having served any other enterprise as a director, officer or employee at the request of a Participating Employer.

**H. Retention Bonuses and Loans.** Immediately upon a Covered Termination, there shall automatically be forgiven any repayment obligation of the Eligible Employee to the Participating Employer that arises under any retention bonus agreement, forgivable loan or similar arrangement that provides for the lapse of the Eligible Employee's repayment obligation over time based on continued employment or other conditions (but not under any other loan obligations of the Eligible Employee that do not include forgiveness provisions).

**9. EXCISE TAX REIMBURSEMENT**

(a) In the event it shall be determined that any payment, right or distribution by the Company or any other person or entity to or for the benefit of an Eligible Employee pursuant to the terms of this Plan or otherwise, in connection with, or arising out of, his/her employment with a Participating Employer or a change in ownership or effective control of the Company or a substantial portion of its assets (a "Payment") is a "parachute payment" within the meaning of Section 280G of the Code on account of the aggregate value of the Payments due to the Eligible Employee being equal to or greater than three times the "base amount," as defined in Section 280G(b)(3) of the Code, (the "Parachute Threshold") so that the Eligible Employee would be subject to the excise tax imposed by Section 4999 of the Code (the "Excise Tax"), concurrent with the making of such Payment, then (i) in the event the aggregate value of the Payments exceeds the Parachute Threshold by less than 3%, one or more Payments shall be reduced so that the aggregate value of the Payments is $1.00 less than the Threshold Amount, or (ii) in the event that the aggregate value of the Payments exceeds the Parachute Threshold by 3% or more, the Company

9

shall pay to the Eligible Employee an additional payment (the "Gross–Up Payment") in an amount such that the net amount retained by the Eligible Employee, after deduction of any Excise Tax on such Payments and any federal, state or local income tax and Excise Tax on the Gross–Up Payment shall equal the amount of such Payments. In the event the Internal Revenue Service subsequently may assess or seek to assess from the Eligible Employee an amount of Excise Tax in excess of that determined in accordance with the foregoing, the Company shall pay to the Eligible Employee an additional Gross–Up Payment, calculated as described above in respect of such excess Excise Tax, including a Gross–Up Payment in respect of any interest or penalties imposed by the Internal Revenue Service with respect to such excess Excise Tax. The rights of the Eligible Employee to a Gross–Up Payment under this Section 9 shall apply without regard to whether the Eligible Employee has incurred a Covered Termination and shall apply to all payments whether or not in connection with a Covered Termination.

(b) All determinations required to be made under this Section 9, including whether any Payment is a "parachute payment" and whether and when a Gross–Up Payment is required and the amount of such Gross–Up Payment and the assumptions to be utilized in arriving at such determination, shall be made by a nationally recognized accounting firm designated by the Company which is not the auditor of the Company or another party involved in the Change in Control (the "Accounting Firm") and shall be based upon "substantial authority" (within the meaning of Section 6662 of the Code). The Accounting Firm shall provide detailed supporting calculations both to the Company and the Eligible Employee within 15 business days of the receipt of notice from the Company or an Eligible Employee that there has been a Payment, or such earlier time as is requested by the Company. All fees and expenses of the Accounting Firm shall be borne by the Company. Any Gross–Up Payment, as determined pursuant to this Section 9, shall be paid by the Company to the Eligible Employee within five business days of the receipt of the Accounting Firm's determination. Any determination by the Accounting Firm shall be binding upon the Company and the Eligible Employee.

**10. RELEASE OF CLAIMS**

All payments and benefits that may be made to an Eligible Employee upon a Covered Termination under the Plan shall be contingent upon the Eligible Employee entering into a general release of employment law claims against the Company in substantially the form attached hereto as Exhibit A, subject to such modifications as may be determined by the Committee in good faith to take into account changes in employment laws or differences in employment laws in other jurisdictions.

**11. NO MITIGATION OR OFFSET**

The Eligible Employee shall be under no obligation to minimize or mitigate damages by seeking other employment, and the obtaining of any such other employment shall in no event effect any reduction of the Company's obligation to make the payments and provide the benefits required under the Plan. Except as provided in Section 10, the Company's obligation to make the payments and provide the benefits required under the Plan shall not be affected by any circumstances, including, without limitation, any set–off, counterclaim, recoupment, defense or other rights which a Participating Employer may have against the Eligible Employee.

<div align="center">10</div>

**12. UNFUNDED STATUS**

The Plan is intended to constitute an employee pension benefit plan under ERISA which is unfunded and is maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees, and shall be interpreted and administered accordingly. The payments and benefits provided hereunder shall be paid from the general assets of the Company. Nothing herein shall be construed to require the Company to maintain any fund or to segregate any amount for the benefit of any employee, and no employee or other person shall have any right against, right to, or security or other interest in any fund, account or asset of the Company from which the payment pursuant to the Plan may be made. Consistent with the foregoing, the Company may, in its sole discretion, deposit funds in a grantor trust or otherwise establish arrangements to pay amounts that become due under the Plan, and, notwithstanding anything elsewhere in the Plan to the contrary, the payments and benefits due under the Plan shall be reduced to reflect the amount of any payment made in respect of any Eligible Employee from a grantor trust or other arrangement established for this purpose.

**13. ADMINISTRATION**

The Committee shall be the named fiduciary of the Plan and the plan administrator for purposes of ERISA. The Committee shall be responsible for the overall operation of the Plan and shall have the fiduciary responsibility for the general operation of the Plan. The Committee may allocate to any one or more of the Company's employees any responsibility the Committee may have under the Plan and may designate any other person or persons to carry out any of the Committee's responsibilities under the Plan. As plan administrator, the Committee shall maintain records pursuant to the Plan's provisions and shall be responsible for the handling, processing and payment of any claims for benefits under the Plan.

**14. CLAIMS AND DISPUTES**

Within fifteen (15) calendar days following a Covered Termination, the Company shall notify each Eligible Employee whom the Company determines is entitled to payments and benefits under the Plan of his/her entitlement to such payments and benefits. An Eligible Employee who is not so notified may submit a claim for payments and benefits under the Plan in writing to the Company within ninety (90) calendar days after becoming entitled to such benefits as described in Section 6. All such claims shall be approved or denied in writing by the Company within fifteen (15) calendar days after submission.

11

Any denial of a claim by the Company shall be in writing and shall include: (i) the reason or reasons for the denial; (ii) reference to the pertinent Plan provisions on which the denial is based; (iii) a description of any additional material or information necessary for the Eligible Employee to perfect the claim together with an explanation of why the material or information is necessary; and (iv) an explanation of the Plan's claim review procedure, described below. An Eligible Employee shall have a reasonable opportunity to appeal a denied claim to the Company for a full and fair review. The Eligible Employee or authorized representative shall have sixty (60) calendar days after receipt of written notification of the denial of claim in which to request a review and to review pertinent documents of the Plan. The Company shall notify the Eligible Employee or his/her authorized representative of the time and place for the claim review. The Company shall issue a decision on the reviewed claim promptly, but no later than fifteen (15) calendar days after receipt of the request for review. The Company's decision shall be in writing and shall include: (i) the reasons for the decision, and (ii) references to the Plan provisions on which the decision is based.

If the Eligible Employee shall dispute the Company's final decision, the dispute shall be submitted to an arbitration proceeding, conducted before a panel of three arbitrators, in accordance with the rules of the Center for Public Resources (or such other organization selected by mutual agreement of the Company and the Eligible Employee). Such arbitration shall take place in the location most practicably proximate to the Eligible Employee's principal workplace. Judgment may be entered on the arbitrators' award in any court having jurisdiction. Notwithstanding the foregoing, if an Eligible Employee believes the claims procedure or dispute resolution mechanism provided under this Section 14 would be futile or would cause such Eligible Employee irreparable harm, the Eligible Employee may, in his/her sole discretion, elect to enforce his/her rights under the Plan pursuant to Section 502 of ERISA.

The Company shall bear the expense of any enforcement proceeding brought by an Eligible Employee under the Plan and shall reimburse the Eligible Employee for all of his/her reasonable costs and expenses relating to such enforcement proceeding, including, without limitation, reasonable attorneys' fees and expenses, provided that the Eligible Employee is the prevailing party in such proceeding. For purposes hereof, the trier of fact in such enforcement proceeding shall be requested to make a determination as to the reimbursement of the Eligible Employee's costs and expenses as a prevailing party hereunder. In no event shall the Eligible Employee be required to reimburse the Company for any of the costs or expenses relating to such enforcement proceeding.

**15. TERM AND AMENDMENT**

The Plan shall become effective as on July 1, 2004, but shall only be operative with respect to a Change in Control occurring on or after March 1, 2007, the date as of which the Plan as previously in effect shall have been terminated by action of the Board. The Plan shall continue to be effective until terminated in accordance with this Section 15. The Board shall have the right, by resolution or other written action, to terminate or amend the Plan; provided, however, that the Plan

12

may only be terminated or amended prior to a Change in Control, and then only (i) with respect to an amendment or termination that becomes effective upon the second (2nd) anniversary of notice being given thereof to Eligible Employees generally, or (ii) to the extent any such amendment is of a technical or clarifying nature, or increases the rights or benefits of all affected Eligible Employees, and does not in any manner reduce the rights or benefits of any Eligible Employee, unless the Company has obtained the express written consent, in return for good and valuable consideration, of all affected Eligible Employees in respect of any such amendment. Notwithstanding the foregoing, in the event of a Change in Control, the Plan shall continue in effect, and no termination or amendment of the Plan shall occur, until the satisfaction of all severance payments and benefits to which Eligible Employees are or may become entitled to under the Plan. Upon the occurrence of a Change in Control during the term of the Plan, the Plan shall not be operative with respect to any subsequent Change in Control.

**16. SUCCESSORS AND ASSIGNS**

The Plan shall be binding upon any person, firm or business that is a successor to the business or interests of the Company, whether as a result of a Change in Control of the Company or otherwise. Any successor to the Company shall be required to assume the Plan in writing and honor the obligations of the Company and the Participating Employers hereunder. All payments and benefits that become due to an Eligible Employee under the Plan shall inure to the benefit of his/her heirs, assigns, designees or legal representatives.

**17. ENFORCEABILITY**

The Company intends the Plan to constitute a legally enforceable obligation between it and each Eligible Employee, and that the Plan confer vested rights on each Eligible Employee in accordance with the terms of the Plan, with each Eligible Employee being a third–party beneficiary thereof. Nothing in the Plan, however, shall be construed to confer on any Eligible Employee any right to continue in the employ of a Participating Employer or affect the right of a Participating Employer to terminate the employment or change the terms and conditions of employment of an Eligible Employee, with or without notice or cause, prior to a Change in Control, or to take any such action following a Change in Control, subject to the consequences specified by the Plan.

The Plan shall be construed and enforced in accordance with ERISA and the laws of the State of Indiana to the extent not preempted by ERISA, regardless of the law that might otherwise govern under applicable principles or provisions of choice or conflict of law doctrines. To the extent any provision of the Plan shall be invalid or unenforceable under any applicable law, it shall be considered deleted herefrom and all other provisions of the Plan shall be unaffected and shall continue in full force and effect.

13

# LILLY ELI & CO (LLY)

LILLY CORPORATE CTR
DROP CODE 1112
INDIANAPOLIS, IN 46285
317. 276.2000

# EX−11

**STATEMENT REGARDING COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGE**
**10−Q Filed on 11/03/2006 − Period: 09/30/2006**
File Number 001−06351



EXHIBIT 11. STATEMENT RE: COMPUTATION OF EARNINGS PER SHARE
(Unaudited)
Eli Lilly and Company and Subsidiaries

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| | (Dollars and shares in millions except per-share data) | | | |
| BASIC | | | | |
| Net income | $ 873.6 | $ 794.4 | $2,530.4 | $1,279.0 |
| Average number of common shares outstanding | 1,085.2 | 1,088.6 | 1,085.0 | 1,087.6 |
| Contingently issuable shares | .4 | .3 | .4 | .2 |
| Adjusted average shares | 1,085.6 | 1,088.9 | 1,085.4 | 1,087.8 |
| Basic earnings per share | $ .80 | $ .73 | $ 2.33 | $ 1.18 |
| DILUTED | | | | |
| Net income | $ 873.6 | $ 794.4 | $2,530.4 | $1,279.0 |
| Average number of common shares outstanding | 1,085.2 | 1,088.6 | 1,085.0 | 1,087.6 |
| Incremental shares — stock options and contingently issuable shares | 1.2 | 2.8 | 1.4 | 3.5 |
| Adjusted average shares | 1,086.4 | 1,091.4 | 1,086.4 | 1,091.1 |
| Diluted earnings per share | $ .80 | $ .73 | $ 2.33 | $ 1.17 |

# LILLY ELI & CO (LLY)

LILLY CORPORATE CTR
DROP CODE 1112
INDIANAPOLIS, IN 46285
317. 276.2000

# EX−12

**STATEMENT REGARDING COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGE**
**10−Q Filed on 11/03/2006 − Period: 09/30/2006**
File Number 001−06351



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 12. STATEMENT RE: COMPUTATION OF RATIO OF EARNINGS TO FIXED CHARGES
(Unaudited)
Eli Lilly and Company and Subsidiaries
(Dollars in millions)

| | Nine Months Ended September 30, | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 |
| Consolidated pretax income before cumulative effect of a change in accounting principle | $ 3,203.0 | $2,717.5 | $2,941.9 | $3,261.7 | $3,457.7 | $3,506.9 |
| Interest | 273.1 | 245.7 | 162.9 | 121.9 | 140.0 | 253.3 |
| Less interest capitalized during the period | (79.6) | (140.5) | (111.3) | (60.9) | (60.3) | (61.5) |
| Earnings | $ 3,396.5 | $2,822.7 | $2,993.5 | $3,322.7 | $3,537.4 | $3,698.7 |
| Fixed charges | $ 273.1 | $ 245.7 | $ 162.9 | $ 121.9 | $ 140.0 | $ 253.3 |
| Ratio of earnings to fixed charges | 12.4 | 11.5 | 18.4 | 27.3 | 25.3 | 14.6 |

# LILLY ELI & CO (LLY)

LILLY CORPORATE CTR
DROP CODE 1112
INDIANAPOLIS, IN 46285
317. 276.2000

# EX−31.1

**CERTIFICATION**
**10−Q Filed on 11/03/2006 − Period: 09/30/2006**
File Number 001−06351



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 31.1 Rule 13a–14(a) Certification of Sidney Taurel, Chairman of the Board and Chief Executive Officer

## CERTIFICATIONS

I, Sidney Taurel, chairman of the board and chief executive officer, certify that:

1. I have reviewed this report on Form 10–Q of Eli Lilly and Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent function):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: November 1, 2006

By:     /s/Sidney Taurel

        Sidney Taurel
        Chairman of the Board
         and Chief Executive Officer

# LILLY ELI & CO (LLY)

LILLY CORPORATE CTR
DROP CODE 1112
INDIANAPOLIS, IN 46285
317. 276.2000

# EX−31.2

**CERTIFICATION**
**10−Q Filed on 11/03/2006 − Period: 09/30/2006**
File Number 001−06351



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 31.2 Rule 13a–14(a) Certification of Derica W. Rice, Senior Vice President and Chief Financial Officer

**CERTIFICATIONS**

I, Derica W. Rice, senior vice president and chief financial officer, certify that:

1. I have reviewed this report on Form 10–Q of Eli Lilly and Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:
   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent function):
   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: November 1, 2006

By:    /s/Derica W. Rice

      Derica W. Rice
      Senior Vice President
       and Chief Financial Officer

# LILLY ELI & CO (LLY)

LILLY CORPORATE CTR
DROP CODE 1112
INDIANAPOLIS, IN 46285
317. 276.2000

# EX-32

**CERTIFICATION**
**10-Q Filed on 11/03/2006 – Period: 09/30/2006**
File Number 001-06351



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

EXHIBIT 32. Section 1350 Certification

Pursuant to section 906 of the Sarbanes–Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), each of the undersigned officers of Eli Lilly and Company, an Indiana corporation (the "Company"), does hereby certify that, to the best of their knowledge: The Quarterly Report on Form 10–Q for the quarter ended September 30, 2006 (the "Form 10–Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10–Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date November 1, 2006

/s/Sidney Taurel
Sidney Taurel
Chairman of the Board and Chief Executive Officer

Date November 1, 2006

/s/Derica W. Rice
Derica W. Rice
Senior Vice President and Chief Financial Officer