IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN, INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION<br><br>Plaintiffs,<br><br>v.<br><br>ARIAD PHARMACEUTICALS, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) C.A. No. 06-259-KAJ<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT ARIAD PHARMACEUTICALS, INC.'S
REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO
STAY PROCEEDINGS PENDING INTERLOCUTORY APPEAL**

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendant
ARIAD Pharmaceuticals, Inc.*

*Of Counsel:*

Morgan Chu
David I. Gindler
Elizabeth L. Rosenblatt
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 277-1010

Dated: December 8, 2006

TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................1

II. ARGUMENT .........................................................................................................3

    A. Plaintiffs Seek To Apply An Inapplicable Legal Standard........................3

    B. Plaintiffs Further Misrepresent The Facts Of This Case ..........................7

        1. Denying A Stay Will Harm ARIAD............................................7

        2. A Stay Is In The Public Interest..................................................10

        3. Plaintiffs Are Not Threatened Or Prejudiced By A Stay .........................................................................................12

III. CONCLUSION....................................................................................................14

## TABLE OF AUTHORITIES

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*AT&T Co. v. Integrated Network Corp.*,
  716 F.2d 882 (Fed. Cir. 1983)..................................................................................5

*Bd. of Educ. v. F.C. ex rel. R.C.*,
  2 F. Supp. 2d 637 (D.N.J. 1998)..............................................................................6

*Brown v. Tex. & Pacific R.R. Co.*,
  392 F. Supp. 1120 (D. La. 1975)..............................................................................3

*Capo, Inc. v. Dioptics Med. Prods. Inc.*,
  387 F.3d 1352 (Fed. Cir. 2004)..............................................................................12

*Chase Manhattan Bank v. Iridium Afr. Corp.*,
  324 F. Supp. 2d 540 (D. Del. 2004)..........................................................................3

*Clontech Labs, Inc. v. Invitrogen Corp.*,
  406 F.3d 1347 (Fed. Cir. 2005)................................................................................6

*Coca-Cola Bottling Co. of Lehigh Valley v. Grol*,
  1993 U.S. Dist. LEXIS 3734 (E.D. Penn. Mar. 3, 1993)............................................7

*Concepcion v. Morton*,
  306 F.3d 1347 (3d Cir. 2002)...................................................................................3

*Dehoys v. Allstate Corp.*,
  345 F.3d 290 (5th Cir. 2003)....................................................................................6

*Dentsply Int'l, Inc. v. Kerr Mfr. Co.*,
  734 F. Supp. 656 (D. Del. 1990)...............................................................................7

*EMC Corp. v. Norand Corp.*,
  89 F.3d 807 (Fed. Cir. 1996)............................................................................11, 12

*Flying Tiger Line, Inc. v. Cent. States Sw. & Se. Areas Pension Fund*,
  1986 U.S. Dist. LEXIS 16895 (D. Del. Dec. 4, 1986)...............................................3

*Hilton v. Braunskill*,
  481 U.S. 770 (1987)..................................................................................................5

*In re Data Access Sys. Sec. Litig.*,
  843 F.2d 1537 (3d Cir. 1988).....................................................................................3

*John R. Sand & Gravel Co. v. United States*,
  60 Fed. Cl. 347 (2004)...............................................................................................5

*Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. De C.V.*,
  384 F. Supp. 2d 1334 (S.D. Iowa 2005)................................................................5, 6

                                                                                                    Page(s)

*Keystone Bituminous Coal Assn. v. Duncan,*
   771 F.2d 707 (3d Cir. 1985)..............................................................................3

*Klapper v. Commonwealth Realty Trust,*
   662 F. Supp. 235 (D. Del. 1987)........................................................................3

*Landis v. N. Am. Co.,*
   299 U.S. 248 (1936)....................................................................................3, 7

*Landmark Land Co., Inc. v. FDIC,*
   256 F.3d 1365 (Fed. Cir. 2001)..........................................................................6

*Milleville v. United States,*
   751 F. Supp. 976 (M.D. Fla. 1990)....................................................................3

*Nehemiah v. Athletics Congress of U.S.A.,*
   765 F.2d 42 (3d Cir. 1985)................................................................................3

*Nichols Inst. Diagnostics, Inc. v. Scantibodies Clinical Lab., Inc.,*
   166 Fed. Appx. 487 (Fed. Cir. 2006)..................................................................4

*O'Brien v. Avco Corp.,*
   309 F. Supp. 703 (S.D.N.Y. 1969) ....................................................................3

*Purcell v. Keane,*
   406 F.2d 1195 (3d Cir. 1969)............................................................................3

*Republic of Philippines v. Westinghouse Elec. Corp.,*
   949 F.2d 653 (3d Cir. 1991)..............................................................................5

*Saludes v. Ramos,*
   744 F.2d 992 (3d Cir. 1984)..............................................................................3

*San Filippo v. Bongiovanni,*
   961 F.2d 1125 (3d Cir. 1992)............................................................................3

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.,*
   897 F.2d 511 (Fed. Cir. 1991)............................................................................5

*United States v. Connolly,*
   972 F.2d 1321 (Fed. Cir. 1992)..........................................................................5

*Yamaha Motor Corp. U.S.A. v. Calhoun,*
   516 U.S. 199 (1996)..........................................................................................6

**Statutes**

28 U.S.C. § 1292(b)...............................................................................................4, 6

Fed. R. Ap. P. 8.........................................................................................................4

Fed. R. Civ. P. 62(c) .................................................................................................4

Page(s)

**Other Authorities**

11 Charles Alan Wright, et al.,
   *Federal Practice and Procedure* (2d ed. 1995) ............................................................ 4

16 Charles Alan Wright, et al.,
   *Federal Practice and Procedure* (2d ed. 1996) ...................................................... 3, 6, 7

Michael E. Solimine,
   *Revitalizing Interlocutory Appeals in the Federal Courts,*
   58 Geo. Wash. L. Rev. 1165, 1179 (1990) ................................................................. 3

I.  **INTRODUCTION**

Plaintiffs' Memorandum In Opposition To ARIAD Pharmaceuticals, Inc's Motion To Stay Proceedings Pending Interlocutory Appeal ("Plaintiffs' Opposition" or "Pl. Br.") does not even attempt to address the fundamental issue underlying ARIAD's Motion: If the Federal Circuit agrees with ARIAD regarding declaratory judgment jurisdiction, this case is over. The Court certified its September 13, 2006 Order (D.I. 69) ("September 13 Order"), to avoid wasting the parties' time with unnecessary litigation, and a stay will vindicate that purpose. But instead of addressing this central issue, Plaintiffs seek to rush this case through the wasteful and potentially devastating burden of litigation by applying an irrelevant legal standard and by twisting the facts in the face of clear contrary evidence.

Plaintiffs' Opposition does not address the wealth of authority cited by ARIAD showing that stays pending interlocutory appeal of subject matter jurisdiction questions, like the present one, are routinely granted. Instead, Plaintiffs' Opposition seeks to apply a four-prong standard, modeled on the standard for preliminary injunctions, that applies to cases in which courts are asked to stay orders granting, dissolving, or denying injunctions. This four-prong standard has nothing to do with the present case (which does not involve an injunction or a stay of an order). But even if some form of this test were applicable, a stay would still be appropriate in light of the Court's finding that there is a significant "close question" for appeal and in light of the manifest harm to ARIAD and the public that would result from proceeding with litigation, when contrasted with the lack of harm to Plaintiffs from a delay in adjudication of a claim over which jurisdiction may not exist.

Plaintiffs also ignore the harsh reality that the present litigation poses a very real threat to ARIAD's difficult financial situation and places the Phase 3 clinical trials of ARIAD's breakthrough sarcoma drug, AP23573, at risk. Instead, Plaintiffs argue that ARIAD is flush with money, that ARIAD will face a minimal discovery burden from this

litigation, that ARIAD places a high priority on its NF-κB licensing program and that, because ARIAD has been involved in *anticipated* litigation in the past, it should have no trouble absorbing the cost of the present *unanticipated* litigation. But these arguments make no sense in face of the stark numbers: ARIAD has $39 million in cash and marketable securities, and is operating at a loss of $15 million per quarter. Even setting aside Plaintiffs' insistence on extremely broad and duplicative discovery, ARIAD's unavoidable litigation responsibilities will include, among other things, performing an infringement analysis, taking and analyzing discovery from Plaintiffs, preparing expert infringement reports, and conducting expert discovery. These are significant and imminent expenses for which ARIAD cannot rely on work product from its litigation with Eli Lilly & Company regarding different products (the "Lilly litigation"). Every dollar spent on this case is a dollar that had been allocated for other purposes, such as clinical, research, and development programs. Thus, this case is a prime example in which ARIAD's financial well-being, and the public interest, may be dictated by whether or not this litigation proceeds. A stay is necessary to avoid prejudice to ARIAD and harm to the public at large. Moreover, a stay is necessary to prevent Plaintiffs from exploiting ARIAD's situation to extort a covenant not to sue on terms that would not be available in market negotiations.

Finally, Plaintiffs will not be harmed by a stay. Plaintiffs' central argument on this point—that they are entitled to speedy resolution of their claim under the Declaratory Judgment Act—presumes that jurisdiction exists under the Declaratory Judgment Act. Yet this is the very issue as to which this Court has found there exists a "substantial difference of opinion" warranting certification for immediate interlocutory appeal. Moreover, Plaintiffs will suffer no harm from continuing to sell Enbrel® and Kineret®, as they have done freely since before the '516 patent issued over four years ago. Nor do Plaintiffs claim that their efforts to sell Enbrel or Kineret have been impaired in any respect. The existence of this lawsuit, which ARIAD did not initiate and whose

jurisdiction ARIAD disputes, is hardly a "Damoclean threat" calling for urgent resolution. Nor can Plaintiffs credibly claim that relevant documents or information are likely to be lost during the period of the stay, since Plaintiffs already have in their possession the documents (produced by Lilly) that Plaintiffs now contend satisfy all but a "minimal" portion of ARIAD's document production obligations.

## II.  ARGUMENT

### A.  Plaintiffs Seek To Apply An Inapplicable Legal Standard

In its Motion, ARIAD explained that the Court has broad discretion to stay cases pending interlocutory appeal, and that such stays are routinely granted within the Third Circuit.[1] ARIAD cited a wealth of case law and secondary authority demonstrating that the present situation—in which subject matter jurisdiction has been submitted for interlocutory appeal—is the archetypal situation in which a stay is granted, because allowing a case to proceed while its subject matter jurisdiction is on appeal would subvert the purpose of permitting such an appeal, namely to conserve judicial and party resources.[2] Yet Plaintiffs' Opposition did not address this authority, or its discretionary standard, at all. The reason is simple: Plaintiffs have no meaningful way of responding

---

[1] *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."); *Chase Manhattan Bank v. Iridium Afr. Corp.*, 324 F. Supp. 2d 540, 546 (D. Del. 2004) (granting stay pending section 1292(b) appeal); *Klapper v. Commonwealth Realty Trust*, 662 F. Supp 235, 235–36 (D. Del. 1987) (same); *Flying Tiger Line, Inc. v. Cent. States Sw. & Se. Areas Pension Fund*, 1986 U.S. Dist. LEXIS 16895, at *8–9 (D. Del. Dec. 4, 1986) (same); *Concepcion v. Morton*, 306 F.3d 1347, 1351–52 (3d Cir. 2002) (noting the district court's grant of a stay pending appeal); *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1126 (3d Cir. 1992) (same); *In re Data Access Sys. Sec. Litig.*, 843 F.2d 1537, 1538 (3d Cir. 1988); *Keystone Bituminous Coal Assn. v. Duncan*, 771 F.2d 707, 710 (3d Cir. 1985); *Nehemiah v. Athletics Congress of U.S.A.*, 765 F.2d 42, 44 (3d Cir. 1985); *Saludes v. Ramos*, 744 F.2d 992, 993 (3d Cir. 1984); *Purcell v. Keane*, 406 F.2d 1195, 1201 (3d Cir. 1969) (same).

[2] *See, e.g., Chase*, 324 F. Supp. 2d at 546; *Milleville v. United States*, 751 F. Supp. 976, 980 (M.D. Fla. 1990); *Klapper*, 662 F. Supp. at 236; *Flying Tiger Line*, 1986 U.S. Dist. LEXIS 16895, at *8–9; *Brown v. Tex. & Pacific R.R. Co.*, 392 F. Supp. 1120, 1126 (D. La. 1975); *O'Brien v. Avco Corp.*, 309 F. Supp. 703, 705 (S.D.N.Y. 1969); 16 Charles Alan Wright, et al., *Federal Practice and Procedure* (2d ed. 1996); Michael E. Solimine, *Revitalizing Interlocutory Appeals in the Federal Courts*, 58 Geo. Wash. L. Rev. 1165, 1179 (1990).

to this authority. In fact, Plaintiffs have not cited a single case, from *any* section 1292(b) appeal in *any* court in *any* jurisdiction, in which a court did not stay proceedings in the face of a certified interlocutory appeal. Nor have Plaintiffs demonstrated why a stay should not be granted in *this* case, where the foundational issue of subject matter jurisdiction has been certified for review.

Instead, Plaintiffs take this Court on a detour into the standard applied when deciding whether to stay an *order* "granting, dissolving or denying an injunction" under Federal Rule of Civil Procedure 62(c).[3] (Pl. Br. at 6–7) Not surprisingly (since such requests are essentially motions for reconsideration of the injunction), the four-prong standard applied in such situations is essentially the four-prong standard applied in considering a claim for preliminary injunctive relief.[4] *See, e.g., Nichols Inst. Diagnostics, Inc. v. Scantibodies Clinical Lab., Inc.*, 166 Fed. Appx. 487, 488 (Fed. Cir. 2006) (cited by Amgen; noting that the same standard applies in deciding whether to grant or to stay an injunction). Because of its injunction-specific reasoning and rationale, Plaintiffs' characterization of the law may be accurate with respect to stays of injunctive orders, but it has nothing to do with the present case, which concerns a stay of *proceedings*.[5]

---

[3] Plaintiffs misleadingly assert that "ARIAD acknowledged that the four-factor test described above is the proper standard against which its motion should be decided." (Pl. Br. at 7.) ARIAD has done no such thing. Plaintiffs attempt to support this claim by arguing (incorrectly) that the "four-factor test has been found to be *the* proper standard for deciding . . . [all] motions to stay pending the kinds of appeals identified in" Federal Rule of Appellate Procedure 8, and that ARIAD agrees that, under Rule 8(a)(1), it is required to first seek a stay in the district court. (*See id.*, emphasis added.) While ARIAD does acknowledge that it must seek a stay in the district court (and has done so), Plaintiffs' attempt to draw a connection between this acknowledgement and Plaintiffs' inaccurate characterization of the law makes no sense.

[4] Specifically, the four-prong test cited by Plaintiffs applies when: (1) a district court considers staying a "judgment granting, dissolving, or denying an injunction" pending appeal, or (2) the Court of Appeals is asked to override the district court's denial of such a stay pending appeal. *See* Fed. R. Civ. Pro. 62(c) (mechanism in district court to a stay injunctive judgment); Fed. R. App. Pro. 8(a)(2) (mechanism for requesting stay from appellate court); 11 Wright, et al. § 2904, at 501 (reciting the four factors and their application to injunctive judgments).

[5] Plaintiffs cite one case from the Southern District of Iowa that applies the four-prong test in denying a stay of proceedings while the court's grant of an injunction was being appealed,

This inapplicable test for stays of injunctive orders is the basis for Plaintiffs' dire claims of a monolithic "stringent" standard, under which ARIAD would need to "first demonstrate that it will suffer irreparable injury [that is] certain and great" in order "[t]o even merit consideration for a stay." (Pl. Br. 9 (internal quotations omitted) (citing *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991) and *Kemin*, 384 F. Supp. 2d at 1341 (D. Iowa 2005)).) But even this inapplicable test is applied flexibly, as explained in the cases Plaintiffs cite: "Since the traditional stay factors contemplate individualized judgments in each case, [a] formula cannot be reduced to a set of rigid rules." *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987); *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 512–13 (Fed. Cir. 1991) (describing "flexible approach").

Even under this inapplicable four-factor test, ARIAD is entitled to a stay. First, this Court has already certified the "close question" of subject matter jurisdiction for appeal (D.I. 105 (Ex. F) at 29),[6] which demonstrates that ARIAD has a substantial case on the merits.[7] *See Hilton*, 481 U.S. at 78 (factor is satisfied where movant can

---

and one case from the Court of Federal Claims in which the parties consented to the application of the four-prong test to a stay of proceedings pending appeal of a motion to intervene. *See Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. De C.V.*, 384 F. Supp. 2d 1334, 1338–39 (S.D. Iowa 2005); *John R. Sand & Gravel Co. v. United States*, 60 Fed. Cl. 347, 349–350 (2004). Here, in contrast, there is no injunction being appealed, and the parties certainly have not agreed to the application of the four-prong test. Moreover, in the Iowa case, the injunction on appeal was not directly related to the proceedings sought to be stayed—unlike the present case, in which the outcome of the present appeal will have a direct, imminent, and possibly terminal effect on the proceedings to be stayed. *See Kemin*, 384 F. Supp. 2d at 1344 (considering potential effect of appeal on counterclaims).

[6] References to "Ex. __" refer to Exhibits to the Declaration of Elizabeth L. Rosenblatt In Support Of ARIAD Pharmaceuticals, Inc.'s Motion To Stay Proceedings Pending Interlocutory Appeal, D.I. 109.

[7] Moreover, Plaintiffs' arguments that the Federal Circuit is unlikely to accept ARIAD's appeal are unavailing. The Federal Circuit has made clear that questions of jurisdiction are excellent candidates for section 1292(b) interlocutory review: "If, upon trial court certification, the court of appeals determines that jurisdiction is lacking (whether or not on the certified ground), interlocutory review saves considerable time and expense on behalf of both courts and litigants." *United States v. Connolly*, 716 F.2d 882, 885 (Fed. Cir. 1983); *AT&T Co. v. Integrated Network Corp.*, 972 F.2d 1321, 1323 (Fed. Cir. 1992) (reviewing jurisdictional ruling following section 1292(b) certification).

"demonstrate a substantial case on the merits"). Second, ARIAD has shown that it will be irreparably injured by having to proceed with litigation, as it will be forced to expend critical and scarce resources that are already earmarked for other purposes, such as clinical trials of its breakthrough sarcoma treatment.[8] (D.I. 107 (Opening Brief) at 7–11; D.I. 108 (Berger Decl.) at 8–13.) Third, issuance of the stay will not harm Plaintiffs, who will be able to continue selling Enbrel® and Kineret®, as they have done unhindered since the '516 patent issued over four years ago. And finally, as ARIAD has

---

This case is no exception. Plaintiffs assert that the Federal Circuit lacks jurisdiction to hear the § 1292(b) appeal (Pl. Br. 8), contending that because it referenced the Bayh-Dole Act, the question ARIAD presented to the Federal Circuit "was never considered on its merits." (*Id.*) Plaintiffs' assertion is incorrect on several counts. First, ARIAD's appeal concerns the scope of declaratory judgment jurisdiction in cases involving licensing efforts in light of seemingly conflicting Federal Circuit authority—a matter that was central to this Court's consideration both initially and on certification. (*See* D.I. 87 (Ex H) at 15–16; D.I. 105 (Ex. F) at 32.) The effect of the Bayh-Dole Act is an element of that question, not a "new" issue. Second, evidence regarding the impact of the Bayh-Dole Act was before the Court at the time that it addressed ARIAD's motion to dismiss, and this Court made clear that it believed the impact of the Bayh-Dole Act was a proper subject for review in articulating its grant of certification. (D.I. 87 (Ex. H) at 37-39; D.I. 105 (Ex. F) at 32.) Thus, the question presented to the Federal Circuit was part of the totality of the circumstances before this Court in deciding the Motion, and a fitting subject for appeal. Third, even if the question of the effect of the Bayh-Dole Act were new, § 1292(b) appellate review addresses an entire order, not a particular question. *Yamaha Motor Corp. U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996); 16 Wright, et al. § 3929, at 386, 388–89 & nn. 57, 61 ("[A]ppellate jurisdiction applies to the order certified to the court of appeals, and is not tied to the particular question formulated by the district court. . . . The court may, however, consider any question reasonably bound up with the certified order, whether it is antecedent to, broader or narrower than, or different from the question specified by the district court. Jurisdiction extends to the order, not the question alone. . . ."). The underlying order in this case involves a question of subject matter jurisdiction, which cannot be waived. *See, e.g., Landmark Land Co., Inc. v. FDIC*, 256 F.3d 1365, 1380 (Fed. Cir. 2001). Thus, the cases cited by Plaintiffs do not support their argument that the Federal Circuit lacks jurisdiction to hear ARIAD's section 1292(b) appeal. *See Dehoys v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003 (new preemption arguments did not concern jurisdiction); *Clontech Labs, Inc. v. Invitrogen Corp.*, 406 F.3d 1347 (Fed. Cir. 2005) (not involving appeal under § 1292(b) at all)..

[8] Plaintiffs erroneously claim that "[e]conomic loss does not constitute irreparable harm" that a court can consider in granting a stay under the four-prong test. (Pl. Br. 9.) But as demonstrated by Plaintiffs' own authority, the question is not whether harm is economic—it is whether it is recoverable. "The threat of unrecoverable economic loss may also qualify as irreparable harm." *Kemin Foods*, 384 F. Supp. 2d at 1341; *see also Bd. of Educ. v. F.C. ex rel. R.C.*, 2 F. Supp. 2d 637, 644 (D.N.J. 1998) (same; also cited by Plaintiffs). Here, even if ARIAD recovered 100% of its attorney's fees and costs from Plaintiffs, there is no mechanism by which ARIAD would recover the other costs of defending an improper and unanticipated suit, such as the harm of being without its resources at this potentially critical time in its clinical trial process. Nor could ARIAD recover the constitutional Due Process harm of having to defend itself in a court that lacks jurisdiction.

demonstrated, a stay will benefit the public interest, by permitting ARIAD to continue with its final phase clinical trials of AP23573 for soft tissue and bone sarcomas. (D.I. 107 (Opening Brief) at 9–11; D.I. 108 (Berger Decl.) at 5–7.)

Such an analysis is unnecessary, however. Stays of ***proceedings*** pending interlocutory appeal that do not involve injunctions—like the present one—are stays involving case scheduling, which are purely discretionary. *See, e.g., Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936); 16 Wright, et al. § 3929, at 398. Plaintiffs know this: they rely on cases such as *Landis* and *Dentsply Int'l, Inc. v. Kerr Mfr. Co.*, 734 F. Supp. 656, 658 (D. Del. 1990), which explains that "[a] United States district court has broad power to stay proceedings," and others that apply a straight balancing-of-interests analysis. *See, e.g., Coca-Cola Bottling Co. of Lehigh Valley v. Grol*, 1993 U.S. Dist. LEXIS 3734, *6–7 (E.D. Penn. Mar. 3, 1993) (concerning a stay pending a motion to dismiss; explaining that a stay is more appropriate when, as here, the pending issue is case-dispositive). Moreover, stays in cases like the present one are common, with good reason. Allowing the case to proceed would thwart the purpose of certifying a case-dispositive issue for interlocutory appeal: to conserve judicial and party resources in the face of uncertain subject matter jurisdiction.

### B.   Plaintiffs Further Misrepresent The Facts Of This Case

Plaintiffs' characterization of the balance of burdens also stretches to the point of misrepresentation. The harm to both ARIAD and the public from proceeding with the present litigation is manifest. In contrast, the harm that Plaintiffs claim will result from a stay is invented and illusory.

#### 1.   Denying A Stay Will Harm ARIAD

Contrary to Plaintiffs' assertion (Pl. Br. 9), ARIAD has established in detail how it will be irreparably harmed without a stay—a concern shared by the Court at the November 3rd hearing. (*See* D.I. 105 (Ex. F) at 33.) Plaintiffs, however, ignore the cold, hard numbers and litigation realities, proposing that the Court believe that ARIAD has

some hidden reserve of resources with which to litigate the present matter, and that in any event, ARIAD's cost of marching forward would be "*de minimis*." These propositions are untenable.

The Court has seen the numbers. ARIAD is in difficult financial condition, with just over $39 million in cash or equivalents and a current operating loss of $15 million per quarter. Thus, while it may be true, in a vacuum, that "ARIAD actually now has *more* cash . . . than it did before it voluntarily sued Lilly in 2002," that fact is not relevant—and Plaintiffs know it. (Pl. Br. 13–14.) Plaintiffs do not deny that ARIAD is operating at a greater loss now than it was in 2002, with greater financial responsibilities—including responsibilities for clinical trials for the breakthrough sarcoma drug, AP23573—than it had in 2002. And in the very next sentence Plaintiffs acknowledge that ARIAD has repeatedly diluted its stock in the capital markets to continue its operations. (Pl. Br. 14.)

ARIAD has also demonstrated that the cost of the present *unanticipated* litigation is qualitatively different from, and more harmful than, the cost of anticipated litigation such as the Lilly litigation. Because it was not planned, the present litigation diverts resources from projects to which they were already devoted. The Lilly litigation, on the other hand, was an anticipated expense that was factored into budgets so that ARIAD could fulfill its obligations without becoming overstretched. (D.I. 108 (Berger Decl.) at ¶ 10.) It is nonsense to suggest that because ARIAD has sued one blatant infringer and engaged in litigation related to the Patent Office's reexamination of the '516 patent, ARIAD has somehow made itself capable of absorbing the financial burden of an onslaught from all comers. Yet this is what Plaintiffs argue when they state that ARIAD's participation in past *planned* litigation is evidence that ARIAD has the resources to defend against the present *unplanned, unanticipated* litigation without any adverse impact on the clinical, research, and development programs to which its resources were already allocated. Plaintiffs cite ARIAD's public disclosures as evidence

that ARIAD's NF-κB program is a priority for ARIAD; however, as ARIAD explained in is opening brief, these disclosures demonstrate that ARIAD has always viewed "significant expenditures to enforce these patent rights without generating revenues or accessing additional capital"—such as the costs of unanticipated litigation—to be a potential threat to ARIAD's clinical, research, and development programs. (D.I. 107 (Opening Brief) at 10.) Now, it is apparent that ARIAD's concern was warranted.

Third, Plaintiffs ignore the realities of patent litigation—and the arguments they have asserted in discovery—when they argue that proceeding with litigation would impose a "minimal burden" on ARIAD because "ARIAD has already done much of the legwork necessary to defend its patent." (Pl. Br. 10, 14.) Plaintiffs propose that the burden on ARIAD will be "*de minimis*" or "minimal" in light of the discovery already conducted in the Lilly litigation. (*Id.* at 10, 14.) As a threshold matter, Plaintiffs have taken precisely the opposite position in discovery motions before this Court (the same motions Plaintiffs refer to accusatorily in pages 5–6 of their brief), arguing that ARIAD must undertake vastly overbroad discovery and engage in the frivolous expense of conducting duplicative and repetitive searches to re-produce documents already produced to Plaintiffs by Lilly. (*See* D.I.s 101, 102.) But even setting aside those inconsistencies, any experienced patent litigator knows that discovery in this case will be no trivial matter. ARIAD must not only "defend" its own patent (as it did in the Lilly trial), but propound discovery upon Amgen, one of the largest pharmaceutical companies in the world. Then, among other things, ARIAD must then digest and analyze this discovery, serve expert reports, and conduct and defend expert discovery. As this Court and Plaintiffs are well aware, each of these tasks involves substantial expenses that must be diverted from elsewhere within ARIAD.

Thus, the vast inequality of resources between ARIAD and Plaintiffs is meaningful in this case not, as Plaintiffs assert, because it has any effect on whether ARIAD could prevail in eventual litigation if ARIAD's appeal is unsuccessful, but rather

affects whether ARIAD can *afford* such litigation. Amgen has vast resources. But every dollar ARIAD unnecessarily spends on improper or subsequently annulled litigation will be diverted to the detriment of ARIAD and its clinical, research, and development programs. This diversion of resources comes at a critical time, as ARIAD is poised at the threshold of Phase 3 clinical testing on a breakthrough sarcoma treatment. Furthermore, from a constitutional standpoint, ARIAD will be irreparably harmed if, in violation of Due Process, it is required to defend itself in a court that lacks jurisdiction.

### 2. A Stay Is In The Public Interest

The scarcity of ARIAD's resources is an issue not only for ARIAD's fiscal health, but also for the health of sarcoma patients who await the availability of ARIAD's breakthrough treatment, AP23573. As ARIAD explained in its opening brief, the diversion of resources for unexpected and unnecessary litigation threatens ARIAD's ability to meet its ongoing clinical obligations with respect to AP23573. (D.I. 107 (Opening Brief) at 7–11.) There is no need to belabor the point with repetition. Plaintiffs attempt to brush off this genuine public health interest by asserting that "Dr. Berger's declaration conspicuously excludes any statements that ARIAD would be unable to adequately fund both its clinical programs and its discovery obligations while the Federal Circuit considers ARIAD's Petition for Permission to Appeal." (Pl. Br. 13.) Plaintiffs' hyper-technicality is overreaching. Dr. Berger clearly states that "[t]he timing, scope, and cost of *unplanned* litigation threatens our ability to meet our clinical goals," and explains that ARIAD did not seek out the present litigation nor plan for it in any budget "because ARIAD has never considered suing Amgen with respect to any of our patents." (D.I. 108 (Berger Decl.) at ¶ 10.)

Plaintiffs again overreach in arguing that proceeding with litigation would support the public interest. Plaintiffs raise the alarm, accusing ARIAD of waging a "self-declared . . . war against the pharmaceutical and biotechnology industries," and warning that if left untested, ARIAD's patent "could be an industry's worst nightmare" that might

"negatively impact the growth of the national economy and hinder research and development efforts that would otherwise lead to innovation and yield beneficial therapeutics." (Pl. Br. 5, 17, 20.) This shameless hyperbole is entirely unpersuasive.

The '516 patent is not untested, and a stay would not make it so. As the Court knows, the validity of the '516 patent is currently under review by both the United States District Court in Massachusetts and the Patent Office. The challenges to validity that Plaintiffs may seek to assert—for example, patentability, anticipation, obviousness—are currently being examined and adjudicated by other competent tribunals. Plaintiffs cannot possibly contend that either the Examiner assigned to reexamine the '516 patent in the Patent Office or Judge Zobel of the District of Massachusetts is incompetent to consider these issues or incapable of protecting the public's interest. Rather, Plaintiffs ask this Court to allow them to re-litigate those issues, in case either of these rulings is not to their commercial liking. This, of course, would increase the "uncertainty" surrounding the patent, not decrease it as Plaintiffs claim.

Nor has ARIAD "throw[n] down the gauntlet" to "threaten the marketplace," as Plaintiffs colorfully assert.[9] (Pl. Br. 3, 19.) Plaintiffs' attempt to equate ARIAD's licensing efforts with a declaration of war goes to the heart of the issue on appeal, and conflicts with well-established authority cited by Plaintiffs themselves: Licensing efforts are not threats. *See EMC Corp. v. Norand Corp.*, 89 F.3d 807, 811 (Fed. Cir. 1996). Plaintiffs' insistence on a rush to adjudication of a disputed claim, however, brings to mind the caution voiced by the Federal Circuit that a party "could abuse the declaratory judgment device to obtain a more favorable bargaining position" for a license. *Id.* at 814. As the trial court found in *EMC*, a plaintiff "may be able to obtain a more favorable bargaining position with the defendant by filing a declaratory judgment action, thereby

---

[9] Prior to this opposition, Plaintiffs have never made any claim of "marketplace threats" involving any other party. Plaintiffs' "apprehension" is purportedly based on private communications between ARIAD and Plaintiffs. Plaintiffs' new accusation of "marketplace threats" is unsupportable and untrue.

inducing if not virtually forcing defendant to consider whether as a practical matter it would be better to avoid litigation costs and any risk of adverse rulings that might render their patents less valuable."[10] *Id.* at 810; *see also Capo, Inc. v. Dioptics Med. Prods. Inc.*, 387 F.3d 1352, 1355 (Fed. Cir. 2004) (noting dismissals of declaratory judgment actions are appropriate when the plaintiff has brought the action to gain a business advantage over defendant or when plaintiff has failed to join the necessary parties). Here, it is apparent that Plaintiffs seek to use the tool of a disputed declaratory judgment action to threaten a small company with being driven into the ground for the apparent purpose of extracting a covenant not to sue. This Court has justly warned that "[t]he process itself [should not] become a strategic tool." (D.I. 105 (Ex. F) at 33.)

In sum, a stay is manifestly in the public interest. Plaintiffs' attempts to argue otherwise only mask their own commercial interests and distract from the plain fact that proceeding with litigation would defeat this Court's purpose in certifying the September 13 Order for interlocutory appeal.

### 3. Plaintiffs Are Not Threatened Or Prejudiced By A Stay

Plaintiffs claim that they require urgent adjudication of their claim because ARIAD and the '516 patent pose an imminent "Damoclean threat" to Amgen. (*E.g.*, Pl. Br. 5.) But Plaintiffs can hardly perceive the '516 patent as a sword suspended by a hair, posing a mortal danger, when they have been selling Enbrel® and Kineret® unhindered since before the '516 patent issued over four years ago in 2002.[11]

---

[10] Plaintiffs' commercial motives are apparent from the fact that they embedded in their Opposition Brief yet another attempt to extract from ARIAD a gratuitous covenant not to sue— this time asserting that Plaintiffs suffer from ARIAD's failure to grant them a gratuitous covenant not to seek injunctive relief in connection with any counterclaims it may assert in the present case. Plaintiffs know that ARIAD has not completed the infringement analysis that would be necessary to assess the value of such a covenant. Of course, Plaintiffs also know that ARIAD did not seek an injunction in the only patent infringement case it has ever brought. Plaintiffs can hardly claim that the possibility of such hypothetical relief is a meaningful burden—especially when a stay would actually postpone its (hypothetical) execution with respect to products that Plaintiffs continue to sell at great profit.

[11] Plaintiffs' argument that a delay in this case increases their "financial liability" (Pl. Br. at 16, 18) over time contradicts Plaintiffs' vigorous assertions that their products do not infringe, that the '516 patent is invalid, and that they therefore would have *no* liability in connection with

More importantly, however, Plaintiffs' argument entirely ignores that the purpose of the present appeal is to determine whether, as a matter of law, there is any "threat" posed to Plaintiffs under the Declaratory Judgment Act at all. Thus, Plaintiffs cannot fairly rely on arguments that assume jurisdiction is proper. The issue to be addressed in the present motion is not whether Plaintiffs are "entitled to a speedy resolution of [their] claims after properly invoking declaratory judgment jurisdiction" (Pl. Br. at 20), because the question of proper declaratory judgment jurisdiction—and with it, the question of whether anything may happen in the case at all—is in dispute, this Court having found that jurisdiction is a "close question" that is "not an easy case." (D.I. 105 (Ex. F) at 29, 31.)

Plaintiffs also raise the accusatory possibility that documents or information could be lost during the period of the stay, and attempt to villainize ARIAD by alleging, among other things, that ARIAD has "fail[ed] to comply with ongoing discovery," imposed a "de facto stay" of discovery on Amgen, and "refused to comply with the Federal Rules." (*See* Pl. Br. 1, 5–6.) These allegations are false. ARIAD has already responded to them in a letter brief to the Court (D.I. 102), and it would be repetitive to reiterate them here. To summarize, however, ARIAD has fully cooperated in the discovery process, released tens of thousands of documents to Plaintiffs for review, and agreed to produce further discovery, to the extent it exists, in response to over two-thirds of Plaintiffs' requests. Thus, Plaintiffs' allegations are baseless, and ***Plaintiffs already have the documents that they now contend satisfy all but a "minimal" portion of ARIAD's document production obligations.***[12] (Pl. Br. 14.)

---

any counterclaims ARIAD may assert. But even assuming that Plaintiffs infringe valid claims of the '516 patent, declaratory jurisdiction is still a threshold question. The Declaratory Judgment Act does not permit a party who believes it may infringe a patent to sue preemptively in order to minimize its potential damages by shortening the infringement period. Rather, the party must have a reasonable apprehension of suit for declaratory jurisdiction to attach. Here, whether the facts constitute legal grounds for reasonable apprehension of suit is the issue on appeal.

[12] Plaintiffs are also, of course, in possession of all of their own documents and information relating to their claims that Enbrel® and Kineret® do not infringe the '516 patent.

Moreover, Plaintiffs have repeatedly contended that any stay in this case will be short-lived because the Federal Circuit will reject the appeal within a few months. (*E.g.*, Pl. Br. 8, 16.) Plaintiffs cannot plausibly believe that key witnesses are likely to die or evidence not already produced will be lost over the winter holidays. Nor can Plaintiffs overlook the fact that the efficiencies of a stay will benefit them as well as ARIAD. Rather, Plaintiffs' rush to propel the parties and the Court through potentially wasteful litigation appears to be an attempt to eke as much strategic and informational benefit as possible from this case before the appeal is resolved (as Plaintiffs know it may be resolved in ARIAD's favor).

Plaintiffs characterize ARIAD's vigorous attempts to examine the basis for this suit—ARIAD's Motions to Dismiss and the present appeal—as "dilatory tactics designed to avoid reaching the merits of this case." (Pl. Br. 5.) On the contrary, they are ARIAD's attempts to reach an efficient disposition of a matter that ARIAD maintains does not belong in court at all. The Court has agreed that there is a substantial "close" question with respect to subject matter jurisdiction, and that this question should be resolved by interlocutory appeal to protect judicial and party resources. (D.I. 105 (Ex. F) at 29-31, 33.) Plaintiffs will not be harmed by a (potentially brief) delay in the adjudication of a case over which subject matter jurisdiction is in dispute.

### III.  CONCLUSION

As courts frequently do when subject matter jurisdiction is questioned by interlocutory appeal, this Court should grant a stay of proceedings to do justice and protect against any unnecessary squandering of judicial or party resources.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

---

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendant
ARIAD Pharmaceuticals, Inc.*

*Of Counsel:*

Morgan Chu
David I. Gindler
Elizabeth L. Rosenblatt
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 277-1010

Dated: December 8, 2006

175904.1