# ASHBY & GEDDES

ATTORNEYS AND COUNSELLORS AT LAW

500 DELAWARE AVENUE

P. O. BOX 1150

WILMINGTON, DELAWARE 19899

TELEPHONE
302-654-1888

FACSIMILE
302-654-2067

January 3, 2007

The Honorable Mary Pat Thynge  
United States District Court  
844 North King Street  
Wilmington, Delaware 19801

VIA ELECTRONIC FILING

Re: *Amgen et al v. ARIAD Pharmaceuticals, Inc.*,  
C.A. No. 06-259-***

Dear Magistrate Judge Thynge:

This firm represents Defendant ARIAD Pharmaceuticals, Inc. ("ARIAD") in the above-referenced case, in which Plaintiffs seek a declaration that the '516 patent is invalid and not infringed. We write in response to Plaintiffs' letter of January 2, 2007, informing the Court that the Federal Circuit has denied ARIAD's petition for interlocutory review of Judge Jordan's order denying ARIAD's motion to dismiss for lack of subject matter jurisdiction. Judge Jordan had certified this order for interlocutory review pursuant to 28 U.S.C. § 1292(b). (D.I. 104.) Although ARIAD has not received any order from the Federal Circuit that contains a ruling on the petition, ARIAD has confirmed that the PACER docket record for the petition contains a new entry dated December 29, 2006, which states, "Disposition: Motion Denied." The order itself is not available on PACER.

ARIAD disagrees with Plaintiffs' proposal to impose an immediate deadline of January 12, 2007, for ARIAD to amend or supplement its pleading. Rather, ARIAD respectfully submits that, before considering the entry of a new scheduling order for this case, the Court should first rule on a motion filed by ARIAD on October 5, 2006: ARIAD's Renewed Motion to Dismiss for Failure to Name Necessary and Indispensable Parties Or, In the Alternative, to Transfer Pursuant to 28 U.S.C. § 1404(a). (D.I. 83.) This motion is fully briefed and ready for decision. Plaintiffs filed their Opposition on October 20, 2006, (D.I. 95); and ARIAD filed its Reply on October 27, 2006 (D.I. 100). The background of this motion is briefly described below.

In its original motion to dismiss, ARIAD argued that (1) there is no subject matter jurisdiction over this action and (2) Plaintiffs have failed to join the owners of the '516 patent as necessary and indispensable parties. Although the Court denied ARIAD's original motion to dismiss in its entirety, the Court qualified its ruling on the failure to join the patent owners as being without prejudice. (D.I. 69.) In preserving this issue for a renewed motion, the Court observed that "it's just possible that I missed something or there is something out

The Honorable Mary Pat Thynge
January 3, 2007
Page 2

there that hasn't been put in front of me . . . ." (September 11, 2006 motion hearing transcript at 83, excerpt attached hereto as Ex. A.) Accordingly, ARIAD filed a renewed motion to dismiss for failure to join the patent owners, along with an alternative motion to transfer. This motion was scheduled to be heard on November 3, 2006, the same date as the hearing on ARIAD's motion to certify the Court's order denying ARIAD's motion to dismiss for lack of subject matter jurisdiction.[1] In light of its decision to grant the motion for certification, the Court denied the renewed motion to dismiss/motion to transfer without prejudice as moot. (D.I. 104.) This motion is now ripe for decision given the Federal Circuit's denial of ARIAD's petition for interlocutory review of the certified order.

The renewed motion presents two arguments. First, ARIAD argues that this action should be dismissed because Plaintiffs have failed to sue MIT, Harvard, and the Whitehead Institute, the owners of the '516 patent who exclusively licensed some, but not all, of their rights in that patent (and others in the same family) to ARIAD. Plaintiffs did not, and cannot, join all of the institutions as defendants because MIT and Harvard are not subject to personal jurisdiction in Delaware. Because these institutions have retained substantial rights in the '516 patent, they are necessary and indispensable parties under Federal Rule of Civil Procedure 19. ARIAD's renewed motion presents additional evidence regarding, and further analysis of, the license agreement to demonstrate that the institutions did not transfer all substantial rights in the '516 patent to ARIAD and, accordingly, this action must be dismissed for failure to name the institutions as defendants.

In the alternative, ARIAD argues that transfer of this action to the District of Massachusetts is warranted under 28 U.S.C. § 1404(a) because it would serve the convenience of parties and witnesses and the interest of justice. A transfer would avoid any dispute regarding personal jurisdiction over MIT and Harvard in the event the Court determines that they must be joined as defendants. Moreover, transfer would conserve the resources of the parties and the Court in light of related (and earlier filed) litigation in the District of Massachusetts over the '516 patent. In addition, relevant third party witnesses and documents are located in Massachusetts and, aside from some (but not all) of the parties having incorporated in Delaware, none of the parties has any relevant connection to Delaware.

These issues are important and should be decided before the parties incur the substantial expense of this action. ARIAD is a small biotechnology company with limited financial resources. It currently has no marketed products. This litigation raises the specter of forcing ARIAD to redirect resources that otherwise would be spent on the final phase of clinical trials for a breakthrough cancer treatment that has been fast-tracked for approval by

---

[1] ARIAD's motion for certification only pertained to the denial of its motion to dismiss for lack of subject matter jurisdiction. It did not seek certification of the Court's denial without prejudice of ARIAD's motion to dismiss for failure to join necessary and indispensable parties.

The Honorable Mary Pat Thynge
January 3, 2007
Page 3

the FDA. As the renewed motion to dismiss/motion to transfer is fully briefed and ready for decision, ARIAD respectfully submits that there is no sensible reason the Court should construct a new schedule for this case before holding a hearing and issuing a ruling on ARIAD's potentially dispositive motion.

                Respectfully,

                /s/ *Tiffany Geyer Lydon*

                Tiffany Geyer Lydon

TLG: nml
Attachment
176513.1

cc:    David I. Gindler, Esquire (via electronic mail; w/attachment)
       Melanie K. Sharp, Esquire (by hand; w/attachment)
       Marcus E. Sernel, Esquire (via electronic mail; w/attachment)
       Drew Diamond, Esquire (via electronic mail; w/attachment)

# EXHIBIT A

```
                                                   Monday, September 11, 2006
SHEET 1

                                                              1

  1                    IN THE UNITED STATES DISTRICT COURT
                       IN AND FOR THE DISTRICT OF DELAWARE
  2
                                   - - -
  3
      AMGEN, INC., a Delaware corporation; :    CIVIL ACTION
  4   IMMUNEX CORPORATION, a Washington    :
      Corporation; AMGEN USA, INC., a      :
  5   Delaware corporation; AMGEN          :
      MANUFACTURING, LIMITED, a Bermuda    :
  6   Corporation; and IMMUNEX RHODE ISLAND:
      CORPORATION a Delaware corporation,  :
  7                                        :
                        Plaintiffs,        :
  8          v                             :
                                           :
  9   ARIAD PHARMACEUTICALS, INC.,         :
      a Delaware corporation               :
 10                                        :    NO. 06-259 (KAJ)
                        Defendant.
 11                                - - -

 12                         Wilmington, Delaware
                     Monday, September 11, 2006 at 2:00 p.m.
 13                            MOTIONS HEARING

 14                                - - -

 15   BEFORE:        HONORABLE KENT A. JORDAN, U.S.D.C.J.

 16                                - - -
      APPEARANCES:
 17

 18             YOUNG CONAWAY STARGATT & TAYLOR, LLP
                BY:  MELANIE K. SHARP, ESQ.
 19
                        and
 20
                KIRKLAND & ELLIS, LLP
 21             BY:  MARK A. PALS, ESQ., and
                     MARCUS E. SERNEL, ESQ.
 22                (Chicago, Illinois)

 23                     Counsel for Plaintiffs

 24
                                     Brian P. Gaffigan
 25                                  Registered Merit Reporter
```

SHEET 2

2

1    APPEARANCES: (Continued)
2
3           ASHBY & GEDDES
            BY: STEVEN J. BALICK, ESQ.
4
                and
5
            IRELL & MANELLA, LLP
6           BY: DAVID I. GINDLER, ESQ., and
                ELIZABETH L. ROSENBLATT, ESQ.
7               (Los Angeles, California)
8                    Counsel for Defendant
9                         - oOo -
10                    P R O C E E D I N G S
11           (REPORTER'S NOTE: The following motions hearing
12   was held in open court, beginning at 2:00 p.m.)
13           THE COURT: Good afternoon. Please be seated.
14           (The attorneys respond, "good afternoon, Your
15   Honor.")
16           THE COURT: Let's get started with some
17   introductions.
18           MS. SHARP: Your Honor, Melanie Sharp on behalf
19   of the Amgen plaintiff. I'd like to introduce my colleagues
20   from Kirkland & Ellis. I believe they're already known to
21   the Court. Mark Pals, who will be presenting argument
22   today, and Mark Sernel.
23           THE COURT: Okay. From ARIAD?
24           MR. BALICK: Good afternoon, Your Honor. Your
25   Honor, I'm here on behalf of ARIAD Pharmaceuticals; and here

3

1    from Irell & Manella in California are David Gindler and
2    Elizabeth Rosenblatt. And also here today from the company
3    are Harvey Berger and Laurie Allen, seated in the first row.
4            THE COURT: All right. Welcome.
5            Who is going to be making the argument today?
6    Mr. Gindler?
7            MR. GINDLER: I will, Your Honor.
8            THE COURT: All right. Well, let's start first
9    with the motion to dismiss.
10           Mr. Gindler, the floor is yours.
11           MR. GINDLER: Thank you, Your Honor. That will
12   be Gindler.
13           Your Honor, I read the transcript of the hearing
14   that took place telephonically on August 18th. One of the
15   things Your Honor said in that telephone conference is that
16   we should come prepared to this hearing to address the
17   factual arguments which have been made by Amgen.
18           THE COURT: Right.
19           MR. GINDLER: And so leaving all the rhetoric
20   behind in the briefs, I'd like to do just that and discuss
21   each of the facts which Amgen claims supports reasonable
22   apprehension of suit and I think establish that they don't
23   establish reasonable apprehension of suit and it's not even
24   close.
25           THE COURT: All right.

4

1            MR. GINDLER: To assist in the presentation, I
2    do have a PowerPoint presentation. Let's go first to the
3    next slide.
4            This is a rough time line of what we're
5    discussing today. You will see the contents go over a
6    period of six years with the first contact starting in May
7    of 2000 and the last event taking place in April of 2006.
8    And you will see that the first three contacts are
9    essentially letters. There is a phone call. And then there
10   is a fairly large gap of time, about three years. And in
11   the middle of that, there is actually an alleged statement
12   by Dr. Carson, one of the lawyers who represented ARIAD in
13   the Lilly litigation. And then, in fact, we have the Lilly
14   litigation.
15           I want to march through each of these facts.
16   And let's go to the next slide, please.
17           So we'll move on. Basically in the first couple
18   of years, we have four communications, and the first is a
19   May 11th, 2000 research presentation by ARIAD.
20           Let's go on.
21           Now, this is a presentation that is part of the
22   record. Your Honor has seen it. It's about 60 pages long.
23   And if Your Honor has looked through it, it is highly
24   technical in nature. There is no testimony from either
25   side about this document but there are a few things one can

5

1    discern from looking at the document. One is that given
2    the highly technical nature of what is in there, it is a
3    document that was intended to be looked at by people who
4    understand such things, which are typically scientists.
5            The second thing Your Honor will notice is that
6    of the 60 page presentation, the vast majority of it hasn't
7    got anything to do with NF-kB. Those occupy I believe a
8    total of six slides and they come at the very end.
9            So what was this presentation? Well, ARIAD
10   wanted to partner up with Amgen to work on drug discovery.
11   And, in fact, the title of the presentation is signal
12   transduction drug discovery. That was the point of that.
13   ARIAD is a small company, Amgen is a very large and
14   successful company, and they were hoping to partner with
15   them to discover new drugs.
16           There is actually nothing in this presentation
17   which talks about Enbrel or talks about Kineret or really
18   which talks about our patents or how our patents are
19   relevant to Enbrel or Kineret, if they are at all. This is
20   a presentation which talks mostly about things different
21   than NF-kB. It talks about our general area of technology,
22   which is signal transduction, but even the slides about
23   NF-kB are slides about drug discovery, using that pathway
24   to discover new drugs. Let's take a look at some of those.
25           So this describes NF-kB activation in cells.

SHEET 20

**74**

1     "To be sure, any time parties are in
2 negotiations over patent rights, the possibility of a
3 lawsuit looms in the background. No patent owner with any
4 sense would open negotiations by assuring the opposite
5 party that he does not intend to enforce his patent rights
6 under any circumstances. The threat of enforcement either
7 directly by the patentee or indirectly by a third-party to
8 whom the patentee licenses or sells the patent is the entire
9 source of the patentee's bargaining power. Thus, it is
10 unrealistic to suggest that some negotiating patentees
11 intend to enforce their patents, while some do not, and that
12 the first group is subject to declaratory judgment actions
13 while the second is not."
14     Thank you, Your Honor.
15     THE COURT: All right. Thanks.
16     This is a fact intensive inquiry. I appreciate
17 the presentations that have made here and the submissions
18 that were provided. And as I told you before, this was a
19 matter I was going to endeavor to rule on from the bench and
20 I will.
21     There are two issues in play here. One is
22 whether there is declaratory judgment act jurisdiction to
23 begin with and the second is whether, if there is, Amgen
24 has got the right parties here in front of me.
25     As to the first of those issues, there is no

**75**

1 dispute between the parties that Amgen is engaged in acts,
2 taking concrete action which would qualify under the
3 two-prong test for declaratory judgment act jurisdiction the
4 Federal Circuit has set forth. So the only question is as
5 to the first prong and that is the reasonable apprehension
6 for suit. That is what the briefing is about. That is what
7 discussion today in court has been about.
8     My conclusion is that there is an objectively
9 reasonable apprehension of suit on this record sufficient
10 to sustain jurisdiction. I don't look at any one thing to
11 reach that conclusion. I look, as I'm required to, at the
12 totality of the circumstances.
13     I disagree with Amgen in its assertion that the
14 early letter is threatening, the five-percent royalty rate
15 description somehow constitutes a threat. That I think,
16 on the contrary, is a stretch that won't sustain the
17 characterization that is made of it. But there is a history
18 here of ARIAD being clear that it has patent rights. It
19 wants its patent rights respected, and it wants Amgen taking
20 those rights seriously. That, in and of itself, would not
21 be problematic. As Mr. Gindler has said rightly on behalf
22 of ARIAD, no patentee acquires patent rights with the intent
23 that they be ignored. And ARIAD was certainly within its
24 rights to contact potential licensees and let them know
25 about their rights and suggest that potential licensees take

**76**

1 a look at those patents.
2     So those letters, in and of themselves, don't
3 create a reasonable apprehension of suit with respect to
4 the '516 patent, but they're not a circumstance that I'm
5 ignoring because they do show ARIAD, on repeated occasions,
6 saying we have these rights and on at least one occasion
7 saying, although not with respect to the '516 patent, we
8 think you are on our rights. And so it's clear that ARIAD
9 is out there looking to see that their rights are respected;
10 a perfectly reasonable and logical position for it to take
11 and background information for what comes next.
12     Among the things that comes next is the issuance
13 of the '516 patent, the immediate contact from ARIAD to
14 Amgen announcing the '516 patent and the immediate lawsuit
15 against Lilly. These are things that all the parties in
16 this suit acknowledge to be facts and which Amgen rightly
17 notes as a feature or a factor in its thinking about what
18 to make of ARIAD's intentions with respect to its, meaning
19 ARIAD's, rights under the '516 patent.
20     Then there is a telephone conversation followed
21 up on correspondence from Mr. Casselman to Mr. Ungemach.
22 In all these interactions, the letters and this telephone
23 conversation which is some time in 2002 or 2003, there is a
24 dance going on. This is not unusual, given the state of the
25 law about declaratory judgment jurisdiction. It's apparent

**77**

1 from the descriptions I'm able to see in the record that
2 there is an effort by ARIAD to make sure Amgen knows ARIAD
3 is serious about its patent rights without uttering any
4 magic words that would land them in court at the other end
5 of a declaratory judgment action.
6     You know, I've heard Mr. Casselman described as
7 a "nonlawyer." I assume that was not meant as a distinction
8 to say he is better than a lawyer. I assume that was meant
9 to say he is not sophisticated the way a lawyer would be
10 about declaratory judgment act pitfalls. But this appears
11 to be an extremely saddened businessman acting in an under-
12 standably prudent way and with what appears to be a know-
13 ledge of how far he can get without falling into the pit in
14 an effort to try to do exactly that.
15     Nevertheless, it is background information for
16 what comes next: A direct assertion we've got rights.
17 You should be interested in these rights. You should be
18 interested with these rights with respect to a specified
19 product.
20     What came after that is the alleged threat by
21 Ms. Carson in the context of the Lilly litigation.
22     Now, I am persuaded that where there is a
23 dispute in the record of what was said or meant by what
24 was said; and here, counsel for Amgen's point is well
25 taken. Ms. Carson doesn't directly dispute that she made

SHEET 21

**78**

1 the comment attributed to her. She says I would never
2 have threatened suit. So it's less than a direct head-on
3 confrontation, it's more of an oblique confrontation with
4 respect to intent behind her comments, if she made it. And
5 I believe it more likely than not, given the record before
6 me, that she did make the comment attributed to her, that
7 it was in the context in which Mr. Cantrell describes with
8 specificity. And that in that context, it was fairly
9 understood as a statement that there are other players out
10 there and they can expect enforcement efforts.
11     Attorneys, like anybody else, sometimes in the
12 heat of battle, when questioned about what they're doing,
13 will say things that they later regret. And she may well
14 regret having said it or she may well say that judge is a
15 knothead. I said I didn't threaten suit and I meant it.
16 But the record, as best I can figure it, is she probably
17 said it. She probably wishes she hadn't said it but she
18 probably said it. And in the context in which it was said,
19 it was rightly viewed as an assertion that Amgen was in
20 the batter's box. That when they got finished pitching an
21 infringement action at Lilly, the next one that was going to
22 be called in was going to be Amgen.
23     Now, there is delay there. And if nothing had
24 happened next, I think I would be ruling differently than
25 in am today. In fact, I feel sure I would have. But what

**79**

1 comes next is highly significant to me. In open court,
2 there is displayed internal presentation materials which
3 the ARIAD folks had used to educate their board, explain to
4 their board what their planning was. And certainly in the
5 context of that litigation, again, a savvy businessperson
6 like Mr. Berger, knowing the consequences -- and in this
7 event, I should say Dr. Berger; he is not a lawyer, he is
8 never going to appear in front of me -- Dr. Berger is
9 careful to distance himself in that trial testimony from
10 any implication that, well, this meant we were going to sue
11 people. But I'm looking at the slides themselves and not
12 the explanations for the slides themselves.
13     Let me rephrase that. I certainly have looked
14 at the explanation for the slides, themselves. It's a
15 factor I have weighed in making the judgment I am making
16 here today. But the slides themselves speak more loudly to
17 me than Dr. Berger's careful testimony in the action in the
18 District of Massachusetts. Those slides show that there is
19 a slide 35 naming lead players in the market. I think in
20 context, that can only be understood to mean in the market
21 of products that are likely to be covered by our rights.
22     The next slide, 36, has Marketed and Late-Stage
23 Products as its heading and the very first point there is
24 the Xigris product which is the subject of the then ongoing
25 patent suit.

**80**

1     The next slide, 37, still headed Marketed and
2 Late-Stage Products, has at the top of it, as its first
3 bullet point, antiinflammatories of which Enbrel is listed
4 as the first one, and Kineret later on in that same page.
5     Later, slide 41 talks about goals for the first
6 quarter of '02 which include selecting litigation counsel,
7 complete enforcement analysis and action plan. Those are
8 not limited to suit against Lilly, they're stated broadly.
9     I think in the context of the overall
10 presentation that was given -- and I say given in the
11 courtroom; that is, as displayed in the courtroom. I have
12 no idea what was said to the board when slides were shown to
13 the board. I'm talking about what a reasonably objective
14 observer could have made, and I think Amgen says it did
15 make, of the information presented in that courtroom. That
16 is, Xigris is first. By its own admission, ARIAD is the
17 David to the pharmaceutical Goliath. That is something that
18 is said a few times. And they're not taking more than one
19 at a time.
20     But Xigris was at the top of slide 36, we're at
21 the top of slide 37, and that, together with "Enbrel is on
22 the list," in the context of the various communications that
23 had gone before, showing that ARIAD was serious about its
24 patent rights and seeing that those rights were respected,
25 was enough for a reasonably objective company in Amgen's

**81**

1 position to say they're going to sue us. And we're doing
2 things that satisfy the second prong, the declaratory
3 judgment act test. And in that context, the law is pretty
4 clear that you don't have to wait until ARIAD decides it's
5 ready to pull the trigger.
6     I am not taking into account at all in my
7 analysis that "you're next" comment. I think Dr. Carson
8 has given a reasonable explanation. Unlike the earlier
9 conversation Ms. Carson had directly with Mr. Cantrell,
10 Mr. Cantrell only heard a snatch of the conversation. He
11 doesn't know the context of it. Ms. Carson does, and has
12 given a reasonable explanation for it. And, in any event,
13 Amgen is frank to say it's not relying on it as a point of
14 presuit knowledge.
15     For the same reason on that last point, I'm not
16 taking the CNBC interview comments into account at all. To
17 me, they're just flat irrelevant. It doesn't make any
18 difference what Dr. Berger said to the press after this
19 suit was filed and could not possibly have affected
20 anybody's apprehension of suit before suit was filed.
21     I also want to note that the overall tone of
22 the interaction, the going back and forth over a series of
23 conversations, letters, and commentary during the Lilly
24 conversations as recounted by Mr. Cantrell with respect to
25 the "Enbrel is on the list" shows that this is a field in

82

1  which -- and I'm not saying this is a bad thing at all --
2  a field in which ARIAD feels it has rights and feels that
3  the enforcement of those rights is important, and that it
4  has the intention of enforcing those rights. In other
5  words, there is a tone to the totality and the tone is,
6  overall, one that a reasonably objective observer would
7  perceive to be threatening enforcement action.
8       Consequently, I believe I do have the discretion
9  to exercise jurisdiction, and I will not decline to exercise
10 that jurisdiction because of the reexamination that is still
11 in process because of the efforts of ARIAD to overturn the
12 initial decision.
13      I note that the parties may want to talk about
14 whether it makes sense to pursue this litigation at this
15 particular point in time. I am satisfied, however, that
16 ARIAD still has these rights, could still choose to sue on
17 these rights and, for reasons I already described, Amgen
18 rightly concerned that they're the ones who would be sued
19 in short order, so I'm not going to decline jurisdiction
20 on the basis that a large chunk of the '516 patent is, as
21 Mr. Gindler put it, in flux at this time.
22      That brings me to the last issue. That is, do I
23 have the right parties in front of me? And I am going to
24 deny the motion to dismiss without prejudice on this point.
25 It may be that there is some further evidence that would

83

1  come to light that would demonstrate something different on
2  this record than what I think I'm seeing right now. What
3  I'm seeing right now is the grant of substantially all
4  rights associated with the patent. That is, ARIAD has the
5  right to sublicense, ARIAD has the right to enforce, ARIAD
6  has the contractual right to be the sole representative in a
7  DJ action.
8       The language specifically pointed out to me
9  as the replacement language for 7.5 in the agreement that
10 effectively assigns these rights does note that there is
11 some reservation of right if ARIAD fails to do reasonable
12 things to defend a DJ action, but it appears to me that that
13 amended language was intended to, and the legal effect is
14 it in fact does, strengthen ARIAD's position to be enforcing
15 and defending the rights associated with this patent all by
16 itself, without anybody else in the mix.
17      Now, I just note I'm doing that without
18 prejudice because it's possible, it's just possible that I
19 missed something or there is something out there that hasn't
20 been put in front of me, and I recognize that I don't have
21 the other parties to this agreement in front of me. I don't
22 have like MIT, Whitehead and other folks in here, and who is
23 to say I won't. There is nothing to prevent, at least at
24 this stage that I'm aware of, third-party practice that
25 would bring them into the suit, if they chose to be here,

84

1  or perhaps even if they didn't. I won't prejudge that for a
2  second. But I'm not stopping and throwing this suit out on
3  indispensable party claim at this point. That means we're
4  here, we're moving forward and discovery is going to go
5  forward.
6       I have before me a motion for protective order
7  and a motion to compel. I had thought we might get to that
8  today and we haven't. Here is the short of it with respect
9  to that, however. I read your follow-up letters. I do not
10 view the language of the protective order entered in the
11 Massachusetts action as an attempt or anything intended by
12 that District Court to do anything other than something I
13 do as a matter of course in my protective orders and that
14 is make sure that nobody is caught short, that confidential
15 information that somebody got from a third-party isn't aired
16 out in public without that party, that third-party having a
17 chance to come in and deal with it.
18      To the extent ARIAD is trying to make the
19 argument -- and I'm not sure it is really, although some of
20 the things said in the teleconference last month and in
21 the correspondence could be read this way. To the extent
22 there is an effort by ARIAD to say, well, judge, you can't
23 really do anything here without making sure you are acting
24 appropriately within the bounds of the District Court of
25 Massachusetts order, you know, I reject that because I don't

85

1  think, A, the District Court in Massachusetts intended that
2  or, B, that it could bind this Court in a fashion suggested
3  by that argument, if that is the argument ARIAD intended to
4  make.
5       On the contrary, I think as I said a moment ago,
6  that this is standard language in a protective order to
7  prevent an unwitting third-party from seeing this private
8  information get out in the public without having a chance to
9  defend its confidentiality in front of the court under whose
10 power the subpoena is issued. That's not the circumstance
11 that we have here. That is, ARIAD is not some unwitting
12 third-party wondering. It's in this suit. It knows what
13 is at issue. It had its opportunity to defend. It has
14 made its position on this record. It has had its rights
15 satisfied. And I'm not granting a protective order and I'm
16 not quashing the subpoena.
17      Now, having said that, I want to emphasize that
18 I am sensitive to ARIAD's concern that its information not
19 be disclosed from Lilly in a manner that is inconsistent
20 with the protective order in this case. In other words, in
21 the first instance, any information that Lilly discloses,
22 I'm not going to have this go Lilly to ARIAD to Amgen. What
23 I will say is this is not going to go beyond counsel's eyes
24 only on the Amgen side until the folks on the ARIAD side
25 have had a chance to vet this and decide whether there are

SHEET 23

**86**

confidentiality designations that need to be put in place that are somehow other or different from the ones that existed in the District of Massachusetts. In short, you will have your shot to make sure it doesn't go past attorneys eye's only level under the protective order we've got until you, on the ARIAD side, have a chance to look at it.

Last, but not least, there is a motion to compel. I grant it to this limited extent. We're now past the motion to dismiss. Right or wrong? I've given you my best shot and I think you need to move forward at this juncture.

However, I do think there is merit to some of what ARIAD has said about the breadth of some of the requests. And I just don't want to get into it at this point because there is just not a sufficient point on the issue for me to address it sensibly. Suffice it to say that the parties should meet and confer in good faith to make sure that the requests that are made of ARIAD are appropriate within the bounds of Rule 26 and designed to move us past disputes that can only waste your client's time and your time, your clients' money and, to a certain degree, the Court's time if things are cast so broadly so as to cast reasonable objections. So I'm asking you to do what the rules already tell you to do, talk to each other, see if you

**87**

can't come to a reasonable accommodation about some of these requests.

All right. I think that addresses the matters that were before me. And I do have another matter I am going to need to attend now. But let me ask you first before I take off out of here, Mr. Pals, is there any other matter pending that you think the Court needs to give its attention to?

MR. PALS: Not at this time Your Honor.

THE COURT: Mr. Gindler?

MR. GINDLER: No, Your Honor. Just one question. When you refer to attorneys eyes only, I assume you are referring to outside counsel's eyes only.

THE COURT: Yes. Thank you for clarifying that. That is my intent. Well, let me say this. I have not gone back and re-read the protective order that was entered in this case. It may be, in the protective order entered in this case, there is, under the highest designation that you parties negotiated, a level that involves somebody from in-house counsel.

Now, you should have that in mind when you are taking whatever position you are taking, okay? Both sides. But I'm telling you since I'm bringing in litigation from another case in the first instance, I'm talking about outside counsels' eyes only because it may be that this

**88**

tranche of documents raises different issues than ARIAD had in mind when it negotiated whatever it negotiated with respect to the protective order in the first place.

So that's a long way of saying, yes, it is outside attorneys' eyes only for this significant batch of documents unless and until you guys are able to agree otherwise or I get a persuasive argument that it's impossible for them to deal with you on this point and they are being unreasonable.

Have I made myself clear? In short, I don't know, in fact, I think it unlikely, that this collective of documents was specifically in mind when this was being litigated so I'm going to treat this as we treat other things before there is a protective order in place, which is it's outside counsels' eyes only. You folks talk about it. If you have already negotiated certain people to be in the loop on the inside, then you ought to reasonably be talking about whether there is any reason for them not to see it other than just kind of being the dog in the manger; okay?

Do you understand what I'm trying to do? I'm trying to protect ARIAD's rights, move this thing forward and hopefully if these people were in the loop before, it was before ARIAD recognized that, yes, they wouldn't be a threat to see the most sensitive stuff. And you ought to be taking that into account, ARIAD, in whether you are really

**89**

going to say, no, this can't be seen by those folks on the other side. But I'm letting you take the first track crack at that; all right?

MR. GINDLER: Yes.

THE COURT: Before they see it.

MR. PALS: That's pretty much where we are, Your Honor. We haven't finalized the negotiated protective order but we have agreed on sort of the structure of the confidentiality restrictions which would allow inside counsel access to the information.

MR. GINDLER: It would allow certain of them, and it also would provide, at least in the version we have proposed, and it also is in the protective order from the Lilly case, that nothing in the protective order stops us from seeking a higher level of protection for protective documents. And I think the Court is wise that we take the first crack at seeing whether we are concerned about any document and want to seek a higher level of protection for them.

THE COURT: And that's what I'm telling is going to be the case here. Okay?

MR. GINDLER: Thank you, Your Honor.

THE COURT: All right. Thanks for your time and attendance. Appreciate it. We're in recess.

(Motions hearing ends at 4:32 p.m.)

United States District Court - Honorable Kent A. Jordan