# ASHBY & GEDDES

ATTORNEYS AND COUNSELLORS AT LAW

500 DELAWARE AVENUE

P. O. BOX 1150

WILMINGTON, DELAWARE 19899

TELEPHONE
302-654-1888

FACSIMILE
302-654-2067

January 9, 2007

The Honorable Mary Pat Thynge
United States District Court
844 North King Street
Wilmington, Delaware  19801

**VIA ELECTRONIC FILING**

Re:    *Amgen Inc. et al. v. ARIAD Pharmaceuticals, Inc.*,
       C.A. No. 06-259-***(MPT)

Dear Judge Thynge:

     This law firm represents Defendant ARIAD Pharmaceuticals, Inc. ("ARIAD") in the above-referenced action, in which Plaintiffs seek a declaratory judgment of invalidity and non-infringement of the '516 patent, which was licensed to ARIAD by Harvard University, the Massachusetts Institute of Technology, and the Whitehead Institute for Biomedical Research (collectively, the "Institutions").  I am writing to bring the Court's attention to two issues.

     1.    **Forthcoming Motion to Stay**.  ARIAD plans to file a motion to stay this action pending completion of the reexamination of the '516 patent by the Patent and Trademark Office ("PTO").  A reexamination request was filed on April 4, 2005 by Eli Lilly & Company ("Lilly"), which had been sued by ARIAD and the Institutions in the District of Massachusetts for infringement of the '516 patent.  A second reexamination request was filed on December 2, 2005 by Bawa Biotechnology Consulting, LLC ("Bawa").[1]  The PTO granted Lilly's reexamination request on June 8, 2005, granted Bawa's request on December 12, 2005, and merged the proceedings. In the PTO's first Office Action on August 2, 2006, the PTO rejected 160 of 203 claims of the '516 patent.  ARIAD did not initially file a motion to stay the instant action in light of the reexamination because ARIAD first sought to dismiss this action for lack of subject matter jurisdiction.  Although ARIAD respectfully submits that the Court should grant its pending motion to dismiss for failure to join the Institutions as necessary and indispensable parties (discussed in more  detail below), ARIAD would like to bring the Court's attention to its forthcoming motion to stay so that, if the Court desires, the

---

     [1]    ARIAD and the Institutions also filed a reexamination request on April 7, 2006 for reexamination of a single claim of the '516 patent on obviousness-type double patenting grounds.  The PTO denied the request.

The Honorable Mary Pat Thynge
January 9, 2007
Page 2

motion to stay can be heard at the same time as the pending motion to dismiss.  ARIAD expects to file the motion to stay within a week.[2]

2.    **New Federal Circuit Decision Relevant to ARIAD's Pending Motion to Dismiss or to Transfer**.  In our letter dated January 3, 2007, we requested that the Court set a hearing on ARIAD's pending motion to dismiss for failure to join the Institutions as necessary and indispensable parties or, alternatively, to transfer this action to the District of Massachusetts, where the Lilly case is pending.  (D.I. 84).  We would like to bring the Court's attention to a recently issued Federal Circuit decision, *Propat Int'l Corp. v. Rpost, Inc.*, __ F.3d __, No. 2006-1222, -1223, -1270 (Fed. Cir. Jan. 4, 2007), that clarifies a critical issue relating to ARIAD's pending motion to dismiss—the standard for determining whether a licensee holds "all substantial rights" in a licensed patent.  Unless ARIAD has "all substantial rights" in the '516 patent, it cannot sue for infringement of the '516 patent—nor be sued for a declaratory judgment of non-infringement of '516 patent—without joinder of the Institutions, the parties holding legal title to the '516 patent.  The Federal Circuit's decision in *Propat*, a copy of which is attached hereto, makes clear that ARIAD does not possess all substantial rights in the '516 patent.[3]

In *Propat*, the Federal Circuit affirmed the district's order dismissing the plaintiff's infringement action on the ground that it did not possess all substantial rights in the patent-in-suit.  In reaching this conclusion, the Federal Circuit clarified the factors that must be considered in deciding whether all substantial rights have been transferred.  All of these factors demonstrate that ARIAD lacks all substantial rights in the '516 patent:

- Whether the licensee has the right to alienate or assign its license without the patent owner's consent.  *Propat*, slip op. at 4–8.  Relying upon its earlier decision in *Sicom Sys. v. Agilent Techs.*, 427 F.3d 971, 979 (Fed. Cir. 2005), the Federal Circuit stated that the absence of this

---

[2]  Plaintiffs likely will point out that ARIAD successfully opposed Lilly's motion to stay ARIAD's patent infringement action on the grounds of this same reexamination request.  There is at least one critical difference, however, between the circumstances then and now:  At the time that ARIAD opposed Lilly's motion to stay, the PTO had not yet issued its first Office Action in the reexamination.  In light of the first Office Action, it is now apparent that the PTO believes that there are serious issues regarding the patentability of the vast majority of the claims in the '516 patent.  Moreover, in denying Lilly's motion to stay, the district court also relied on the fact that the parties had participated in substantial discovery and the case had already progressed to an advanced stage.  In contrast, the instant action has undergone very little discovery and has been stayed for much of the time since its filing.

[3]  Indeed, it is for this very reason that the Institutions are participating as plaintiffs in the Lilly litigation.

The Honorable Mary Pat Thynge
January 9, 2007
Page 3

right is "'fatal' to the argument that the agreement transferred all substantial rights." *Id*. at 8. ARIAD lacks this right. (D.I. 87 Ex. E [ARIAD's License] at Art. XI (granting the patent owners an absolute veto right over assignments of ARIAD's license).)

- Whether the patent owner retains the right to use the invention as well as the responsibility for maintaining the patent in force for its full term. *Propat*, at 6. The Institutions have these rights and responsibilities. (D.I. 87 Ex. E at ¶ 2.7 (owners' retention of right to use the invention); *id*. at ¶ 6.1 (owners' obligation to maintain the '516 patent for its full term).)

- Whether the patent owner can terminate the license on account of the licensee's bankruptcy, breach of the license agreement, or insufficient sublicensing efforts. *Propat*, at 4. The Institutions have all of these rights. ( D.I. 87 Ex. E at ¶ 13.1 (right to terminate if ARIAD ceases to carry on business); *id*. at ¶ 13.2 (right to terminate if ARIAD fails to pay royalties); *id*. at ¶ 13.3 (right to terminate for ARIAD's breach of agreement); *id*. at ¶¶ 3.1, 3.3 *as amended by* Ex. G ¶ 2.2.1 (right to terminate if no commercially reasonable efforts made to sublicense).)

- Whether the patent owner has a "right to notice of licensing" and is entitled to a defined percentage of sublicensing royalties. *Propat*, at 4, 6. The Institutions possess these rights. ( D.I. 87 Ex. E at ¶¶ 5.1, 5.3 (right to notice of licensing); *id*. at ¶ 4.1(f) (right to defined percentage of royalties).)

- Whether the license agreement imposes limitations on the terms under which the licensee may grant sublicenses. *Propat*, at 4, 6. (*Cf*. D.I. 87 Ex. E at ¶ 2.6 (requiring sublicenses to comply with certain Bayh-Dole Act obligations); *id*. at ¶ 2.12 (prohibiting cross-licensing and non-cash deals).)

Moreover, the Federal Circuit distinguished two of its decisions, *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.p.A.*, 944 F.2d 870, 875 (Fed. Cir. 1991); *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1250 (Fed. Cir. 2000), upon which Plaintiffs rely in opposing ARIAD's Motion to Dismiss. *Propat*, at 9. The Federal Circuit stated:

Each of those cases, however, is distinguishable. In *Vaupel*, the patentee did not retain any rights to control the licensee's exercise of its right to sue; the patentee retained only the right to be informed of the course of litigation on the patent. 944 F.2d at 875. In *Speedplay*, the exclusive licensee had complete

The Honorable Mary Pat Thynge
January 9, 2007
Page 4

effective control over litigation decisions, and the patentee did not have the right to veto the licensee's decision to transfer its rights under the agreement. 211 F.3d at 1250. In this case, by contrast, the patentee must be consulted about and consent to licensing and litigation decisions, and it retains an absolute right to prevent assignment of the licensee's interests.

*Id.* In language directly applicable here, the Federal Circuit concluded that: "In no case has this court held that a patentee who retains such broad and wide-ranging powers with respect to a patent has nonetheless transferred 'all substantial rights' in the patent." *Propat*, at 7.[4]

We greatly appreciate Your Honor's consideration of this recent controlling authority as it clarifies the law relevant to ARIAD's motion. We will be available at Your Honor's convenience to answer any questions or discuss this matter further.

Respectfully,

*/s/ John G. Day*

John G. Day

JGD/nml

cc:    David I. Gindler, Esquire (via electronic mail; w/attachment)
       Melanie K. Sharp, Esquire (by hand and via electronic mail; w/attachment)
       Marcus E. Sernel, Esquire (via electronic mail; w/attachment)
       J. Drew Diamond, Esquire (via electronic mail; w/attachment)

---

[4] Plaintiffs will no doubt point out that ARIAD has an exclusive license to the '516 patent, whereas Propat had a bare non-exclusive license. This fact does not, however, detract in any way from the Federal Circuit's clear articulation of the standard for determining whether a patent owner has transferred all substantial rights in the patent to a licensee. Moreover, the Federal Circuit relied on the fact that Propat had a bare non-exclusive license principally in finding that Propat suffered no injury for purposes of Article III standing and therefore had no basis to join the patent owner as a party plaintiff to remedy the jurisdictional defects. *Propat*, at 11–13.

# EXHIBIT A

# United States Court of Appeals for the Federal Circuit

2006-1222, -1223, -1270

PROPAT INTERNATIONAL CORP.,

Plaintiff/Counterclaim Defendant-
Appellant,

and

DAVID FINK and HELENE GLASSER,

Counterclaim Defendants,

v.

RPOST, INC. and RPOST US, INC.,

Defendant/Counterclaimant-Cross
Appellant,

and

RPOST INTERNATIONAL LIMITED, ZAFAR KHAN,
KENNETH BARTON and TERRANCE TOMKOW,

Defendants-Cross Appellants.

Timothy W. Johnson, Law Office of Timothy W. Johnson, of Houston, Texas,
argued for plaintiff/counterclaim defendant-appellant.

Henry Ben-Zvi, Ben-Zvi & Associates, of Santa Monica, California, argued for
defendant/counterclaimant-cross appellant and defendants-cross appellants.

Appealed from:  United States District Court for the Central District of California

Judge James V. Selna

# United States Court of Appeals for the Federal Circuit

2006-1222,-1223,-1270

PROPAT INTERNATIONAL CORP.,

Plaintiff/Counterclaim Defendant-
Appellant,

and

DAVID FINK and HELENE GLASSER,

Counterclaim Defendants,

v.

RPOST, INC. and RPOST US, INC.,

Defendant/Counterclaimant-Cross
Appellant,

and

RPOST INTERNATIONAL LIMITED, ZAFAR KHAN,
KENNETH BARTON and TERRANCE TOMKOW,

Defendants-Cross Appellants.

---

DECIDED: January 4, 2007

---

Before NEWMAN, MAYER, and BRYSON, <u>Circuit Judges</u>.

BRYSON, <u>Circuit Judge</u>.

This "patent standing" case calls on us to decide once again whether a party has

a sufficient ownership interest in a patent to be entitled to sue for infringement.  The

plaintiff, Propat International Corporation, sued RPost, Inc.; RPost US, Inc.; RPost

International Limited; and three individuals (collectively, "RPost") in the United States District Court for the Central District of California. Propat charged RPost with infringing U.S. Patent No. 6,182,219 ("the '219 patent"). That patent, entitled "Apparatus and Method for Authenticating the Dispatch and Contents of Documents," was assigned to Authenticational Technologies Ltd. ("Authentix") by the inventors. After the district court resolved several issues relating to the merits of the lawsuit, the parties filed cross-motions addressing the question whether Propat had standing to bring the action in its own name.

The district court issued an opinion holding that Propat is not the owner of the patent and thus does not have standing to sue. Focusing on a May 2002 agreement between Propat and Authentix, the court ruled that the agreement does not transfer all substantial rights in the patent to Propat but instead merely makes Propat a bare licensee under the patent. Because Propat has no proprietary interest in the patent, the court held that Propat lacks standing to sue infringers even with the patent owner, Authentix, joined as a party-plaintiff. Accordingly, the district court did not rule on Propat's request to join Authentix, but dismissed the action without prejudice.

Following the dismissal, RPost moved for an award of attorney fees and costs. RPost asserted that the case was "exceptional" within the meaning of the fee-shifting provision of the Patent Act, 35 U.S.C. § 285, and that, based on litigation misconduct by Propat, an award of fees and costs was justified under the district court's inherent authority and under 28 U.S.C. §§ 1927 and 1919. The district court issued an opinion analyzing and denying each of RPost's claims.

Propat appeals from the order of dismissal, and RPost cross-appeals from the denial of an award of attorney fees and costs. We affirm the district court's decision that Propat lacks standing to sue for infringement of the '219 patent even with Authentix as an additional party to the action. On the cross-appeal, we affirm the district court's order denying RPost's request for an award of fees and costs.

I

We have addressed the issue of standing in patent cases on a number of occasions. The governing principles are now reasonably clear. The Patent Act provides that "[a] patentee" is entitled to bring a civil action "for infringement of his patent." 35 U.S.C. § 281. The term "patentee" includes "not only the patentee to whom the patent was issued but also the successors in title to the patentee." Id. § 100(d). Those provisions of the Patent Act have been interpreted to require that a suit for infringement of patent rights ordinarily be brought by a party holding legal title to the patent. Sicom Sys. Ltd. v. Agilent Techs., Inc., 427 F.3d 971, 976 (Fed. Cir. 2005); Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1551 (Fed. Cir. 1995) (en banc); Abbott Labs. v. Diamedix Corp., 47 F.3d 1128, 1130 (Fed. Cir. 1995).

Even if the patentee does not transfer formal legal title, the patentee may effect a transfer of ownership for standing purposes if it conveys all substantial rights in the patent to the transferee. In that event, the transferee is treated as the patentee and has standing to sue in its own name. See, e.g., Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 1250 (Fed. Cir. 2000); Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 875 (Fed. Cir. 1991).

A

Propat first argues that the May 2002 agreement grants it a sufficient interest in the patent to entitle it to sue for infringement in its own name, without naming Authentix as a co-plaintiff. Because it is undisputed that Authentix is the party with legal title to the patent, Propat is entitled to sue in its own name alone, without Authentix's participation, only if Authentix has transferred to Propat all substantial rights in the patent. In order to determine whether Authentix has done so, we must look to the agreement between the parties and analyze the respective rights allocated to each party under that agreement. See Aspex Eyewear, Inc. v. Miracle Optics, Inc., 434 F.3d 1336, 1340 (Fed. Cir. 2006); Mentor H/S, Inc. v. Med. Device Alliance, Inc., 240 F.3d 1016, 1017 (Fed. Cir. 2001); Vaupel, 944 F.2d at 874.

In relevant summary, the agreement between Propat and Authentix gives Propat the responsibility to license the patent to third parties, to enforce the licensing agreements, and to sue infringers. In exchange, the agreement gives Propat a defined percentage share of the proceeds of the licensing royalties and of any judgment or settlement arising out of litigation. As part of the agreement, Propat undertakes "to consult with and obtain prior approval" from Authentix for the selection of any potential targets for licensing or suit, although the agreement provides that Authentix may not unreasonably withhold or delay such approval. The agreement further provides that Authentix may terminate the agreement if Propat breaches the agreement, becomes bankrupt or insolvent, fails to obtain certain levels of income from the patent, or ceases to be actively engaged in licensing or litigation efforts. The agreement forbids Propat from assigning its rights and obligations under the agreement without the consent of

Authentix, which consent Authentix may freely withhold.  Finally, the agreement provides that Authentix will consent to be joined as a party to any action brought by Propat if a court requires it to be joined, although in such a case Propat must provide counsel for Authentix and defray all the expenses Authentix may incur in connection with its involvement in the litigation.

The agreement contemplates that Propat will be engaged in licensing and litigation.  It does not explicitly address whether Propat enjoys a license to practice the patent.  Similarly, it does not explicitly state whether Authentix retains the right to practice the patent.

The parties take diametrically opposing views of the consequences of the agreement for purposes of determining Propat's standing as a plaintiff in this case. Propat argues that the district court was wrong to dismiss the action, because the agreement gives Propat all substantial rights in the patent and thus is the functional equivalent of an assignment of the patent from Authentix.  Accordingly, Propat contends that it should be treated as the "patentee" and that it is therefore entitled to bring this action without naming Authentix as a co-plaintiff.  RPost, on the other hand, argues not only that Propat is not the "patentee," but also that Propat has no proprietary rights in the patent at all and instead is only a bare licensee.  For that reason, RPost argues, Propat has no right to participate in this action as a plaintiff and the district court properly dismissed the action for lack of jurisdiction.

The district court first found that the agreement does not assign to Propat the right to make, use, and sell the patented invention.  Instead, the court concluded, Propat "merely has a right to enforce or license other parties to use, manufacture, or sell" the

invention.  Second, the court concluded that the right granted to Propat with respect to the invention is not exclusive, because Authentix retains the right to seek new patents on the underlying invention and therefore retains an implicit right to use the invention. Finally, the court found that Propat's power to assign its rights under the agreement is entirely subject to Authentix's consent, which "Authentix can withhold . . . even arbitrarily."  In light of the various rights retained by Authentix, the court found that Propat "was not transferred all substantial rights and, as such, has no standing to sue on its own behalf."

We agree with the district court.  Authentix retains sufficient rights in the patent that it cannot be said to have assigned "all substantial rights" in the patent to Propat.  To begin with, the agreement expressly provides that Authentix is, and will continue to be, the owner of the patent.  The agreement identifies Authentix as the "owner of various technology," including the '219 patent.  Moreover, the agreement provides that Authentix is responsible to "maintain any . . . patents [it] owns or controls . . . each for its full term," a provision that clearly includes the '219 patent.  The responsibility to maintain a patent is one of the obligations that has been recognized by this court as an indication that the party with that obligation has retained an ownership interest in the patent.  Mentor H/S, 240 F.3d at 1018.

In addition, Authentix retains an economic interest in the patent and a substantial measure of control over decisions affecting the patent rights.  It enjoys an equity interest in the proceeds of licensing and litigation activities, a right to notice of licensing and litigation decisions and the right to veto such decisions as long as the veto power was not exercised unreasonably, and the unrestricted power to bar Propat from transferring

its interest in the patent to a third party.  In no case has this court held that a patentee who retains such broad and wide-ranging powers with respect to a patent has nonetheless transferred "all substantial rights" in the patent.

To be sure, the fact that a patent owner has retained a right to a portion of the proceeds of the commercial exploitation of the patent, as Authentix has done in this case, does not necessarily defeat what would otherwise be a transfer of all substantial rights in the patent.  See Rude v. Westcott, 130 U.S. 152, 162-63 (1889); Vaupel, 944 F.2d at 875.  Nonetheless, the fact that Authentix retains a substantial share of the proceeds is consistent with Authentix's retaining ownership rights in the patent, while allocating to Propat the duty to provide licensing and enforcement services.

Authentix's right to veto licensing and litigation decisions also constitutes a significant restriction on Propat's interest in the patent.  Although Authentix may decline to consent to Propat's decisions only if it does so reasonably, Propat's obligation to notify Authentix as to the selection of all targets for licensing or suit and to obtain Authentix's consent to all such decisions indicates that Authentix retains substantial ongoing control of the sort typically associated with the retention of an ownership interest in the patent.  See Sicom Sys., 427 F.3d 971, 979 (Fed. Cir. 2005); Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc., 248 F.3d 1333, 1345 (Fed. Cir. 2001).

Authentix's right to veto any transfer of Propat's rights under the agreement is particularly significant, the more so because the agreement expressly indicates that Authentix is free to veto any such transfer decision, even if it does so "arbitrarily."  The right to dispose of an asset is an important incident of ownership, and such a restriction on that right is a strong indicator that the agreement does not grant Propat all

substantial rights under the patent.  See Sicom Sys., 427 F.3d at 979; Intellectual Prop.

Dev., 248 F.3d at 1345; Abbott Labs., 47 F.3d at 1132.  In fact, the court in Sicom

Systems referred to the restraint on transferability of the rights under the agreement as

"fatal" to the argument that the agreement transferred all substantial rights in the patent.

427 F.3d at 979.

　　　　Finally, if Propat fails to meet certain specified benchmarks in its efforts to exploit

the patent, Authentix is free to terminate the contract, at which point all of Propat's rights

with respect to the patent come to an end.  Authentix's power to terminate the

agreement and end all of Propat's rights in the patent if Propat fails to perform up to the

specified benchmarks, although not dispositive, is yet another indication that Authentix

retains a significant ownership interest in the patent.

　　　　The rights allocated to Propat under the agreement are not sufficiently

substantial to make Propat in effect the assignee of the patent.  It has long been held

that a "right to sue" clause in a contract, unaccompanied by the transfer of other

incidents of ownership, does not constitute an assignment of the patent rights that

entitles the transferee to sue in its own name.  See Indep. Wireless Tele. Co. v. Radio

Corp. of Am., 269 U.S. 459, 474-75 (1926); Crown Die & Tool Co. v. Nye Tool & Mach.

Works, 261 U.S. 24, 35-36 (1923); Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481,

1485 (Fed. Cir. 1998); Ortho Pharm. Corp. v. Genetics Inst., Inc., 52 F.3d 1026, 1034

(Fed. Cir. 1995).  That principle sensibly reflects that a patent owner may give another

responsibility to select targets for suit—a power of attorney, in effect—without

surrendering ownership of the patent.  The same principle applies to Propat's right to

select licensees.  While the rights to sue and grant licenses accord Propat broad

authority to act as Authentix's agent for purposes of licensing and litigation, they do not transfer ownership of Authentix's patent.   See Penril Datacomm Networks, Inc. v. Rockwell Int'l Corp., 934 F. Supp. 708 (D. Md. 1996) (patent marketing agent does not have proprietary interest in patent for purposes of determining standing to sue).

Propat relies heavily on two of this court's decisions, Vaupel and Speedplay.  In those cases, the court held that the agreements in question effected the transfer of all substantial rights in the patent at issue.   Each of those cases, however, is distinguishable.   In Vaupel, the patentee did not retain any rights to control the licensee's exercise of its right to sue; the patentee retained only the right to be informed of the course of litigation on the patent.  944 F.2d at 875.  In Speedplay, the exclusive licensee had complete effective control over litigation decisions, and the patentee did not have the right to veto the licensee's decision to transfer its rights under the agreement.   211 F.3d at 1250.   In this case, by contrast, the patentee must be consulted about and consent to licensing and litigation decisions, and it retains an absolute right to prevent assignment of the licensee's interests.

The facts of this case are closer to those in Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333 (Fed. Cir. 2001), in which we held that the agreement between a patentee and an exclusive licensee did not transfer all substantial rights in the patent and therefore did not confer on the exclusive licensee the right to sue on the patent in its own name alone.  In that case, the patentee granted the plaintiff an exclusive license and the right to sue infringers, but it retained certain rights in the patent.  Those retained rights included the right in certain circumstances to require the exclusive licensee to obtain the patentee's consent to sue; the right in other

cases to be informed of, and consulted about, litigation; the right to consent to settlements of litigation (which consent could not be unreasonably withheld); the right to a 50 percent share of the proceeds of litigation; and the right to prevent the exclusive licensee from assigning its rights under the agreement.  Those rights are similar to the rights retained by Authentix, except that in this case there was no conveyance of an exclusive license to make, use, and sell the invention.  Accordingly, as in Intellectual Property Development, we hold that the district court was correct to conclude that Authentix has not conveyed all substantial rights in the patent to Propat.  For that reason, Propat lacks standing to sue for infringement in the absence of Authentix.

B

In the alternative, Propat argues that even if it is not the owner of all substantial rights in the '219 patent, the trial court should not have dismissed the complaint, but instead should have granted its request to add Authentix as a party and then permitted the action to continue.  The district court, however, concluded that Propat lacks a sufficient interest in the patent to give it standing to sue even as a co-plaintiff and therefore dismissed the action without acting on Propat's request to join Authentix.  The court reasoned that Propat's status is that of a bare licensee with no ownership interest in the patent and no right to participate in the infringement action.

A party that is neither the legal owner of the patent nor the transferee of all substantial rights in the patent still has standing to sue for infringement if that party has a legally protected interest in the patent created by the Patent Act, so that it can be said to suffer legal injury from an act of infringement.  See Intellectual Prop. Dev., 248 F.3d at 1345-46.  An exclusive licensee is considered to have such an interest.  Unlike the

patentee or the transferee of all substantial rights in the patent, however, an exclusive licensee ordinarily may not sue in its own name alone, but must join the patent owner in an action brought against an accused infringer. See Indep. Wireless, 269 U.S. at 464, 468-69, 473-74; Waterman v. Mackenzie, 138 U.S. 252, 255 (1891); Textile Prods., 134 F.3d at 1484; Abbott Labs., 47 F.3d at 1131.

In Independent Wireless, the Supreme Court explained the rule regarding exclusive licensees as follows:

> The owner of a patent, who grants to another the exclusive right to make, use, or vend the invention, which does not constitute a statutory assignment, holds the title to the patent in trust for such a licensee, to the extent that he must allow the use of his name as plaintiff in any action brought at the instance of the licensee in law or in equity to obtain damages for the injury to his exclusive right by an infringer.

269 U.S. at 469. This court has characterized the rule in Independent Wireless as meaning that an exclusive licensee has a sufficient interest in the patent to have standing to sue under Article III of the Constitution. See Intellectual Prop. Dev., 248 F.3d at 1346-47 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)); Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372, 1377 (Fed. Cir. 2000). We explained that the requirement that the exclusive licensee must normally join the patent owner in any suit on the patent is a "prudential" requirement, not a constitutional requirement based on Article III limitations, and that an action brought by the exclusive licensee alone may be maintained as long as the licensee joins the patent owner in the course of the litigation. Intellectual Property Dev., 248 F.3d at 1348; Mentor H/S, Inc., 240 F.3d at 1019.

By contrast, a bare licensee, i.e., a party with only a covenant from the patentee that it will not be sued for infringing the patent rights, lacks standing to sue third parties

for infringement of the patent. Thus, an infringement action brought by a bare licensee must be dismissed. A bare licensee cannot cure its lack of standing by joining the patentee as a party. Intellectual Prop. Dev., 248 F.3d at 1348-49; Textile Prods., 134 F.3d at 1485; Abbott Labs., 47 F.3d at 1131; Kalman v. Berlyn Corp., 914 F.2d 1473, 1481 (Fed. Cir. 1990); Weinar v. Rollform Inc., 744 F.2d 797, 807 (Fed. Cir. 1984).

This case does not fit neatly within either of those two categories. As noted, it appears from the agreement that the parties did not envision that Propat would practice the patent, but instead contemplated that Propat would be involved only in licensing and litigation. The agreement is accordingly silent as to Propat's rights to practice the patent, whether exclusively or otherwise, and focuses instead on Propat's rights to license the patent and sue for its infringement.

In this setting, we look for guidance to the Supreme Court's decision in Crown Die & Tool Co. v. Nye Tool & Machine Works, 261 U.S. 24 (1923). There, a patent owner sought to assign to another party the right to sue a competitor for infringement of the patent. The Court, however, refused to recognize an assignment of the right to sue on a patent separate from the conveyance of a proprietary interest in the patent. Id. at 34-36. The Court explained that if it were permissible for the patentee to retain ownership of the patent but to assign to others the right to sue infringers, "it would give the patentee an opportunity without expense to himself to stir up litigation by third persons." Id. at 39. Because the attempted assignment of the right to sue for infringement "carried no part of the title to the patent or interest in it," the Court held that it "conferred no right to sue for damages for infringement of the patent after execution of the [assignment]." Id.

It is true that Propat has more rights with respect to the patent than did the assignee in Crown Die. Unlike the assignee in Crown Die, Propat's right to sue is not limited to a particular infringer, and Propat also has an express right to license the patent, albeit one that is subject to Authentix's consent. But the principles underlying the Court's analysis in Crown Die are equally applicable here and dictate the same result. The Court in Crown Die refused to permit the right to sue to be segregated from formal ownership of the patent, with the very narrow exceptions previously recognized, including the right accorded to exclusive licensees. In this case, Propat lacks important indicia of a true ownership interest in the patent, such as the right to transfer its interest. Under the May 2002 agreement, Propat is not allowed to assign its interests under the agreement without Authentix's consent, which can be withheld on any ground. Moreover, as noted, Propat must provide Authentix with notice and obtain Authentix's consent to its selection of targets for licensing and suit. And the agreement requires Propat to "use reasonable efforts consistent with prudent business practices" in its licensing and enforcement efforts, a provision that is more consistent with the status of an agent than a co-owner. We therefore agree with the district court that Propat's rights created by the May 2002 agreement did not accord it rights in the patent sufficient to give it standing to sue, even with Authentix named as a co-plaintiff. Accordingly, we uphold the district court's decision dismissing Propat's action without prejudice for lack of jurisdiction.

II

In its cross-appeal, RPost argues that the district court abused its discretion by failing to award it attorney fees and costs. RPost argues that (1) the district court

should have found the case to be "exceptional" under 35 U.S.C. § 285 and should have awarded attorney fees under that statute because "Propat's lack of standing was manifest" and because of litigation misconduct by Propat; (2) the district court should have granted fees and costs under 28 U.S.C. § 1927, which authorizes such relief if an attorney "multiplies the proceedings in any case unreasonably and vexatiously"; and (3) the court should have awarded costs to RPost under 28 U.S.C. § 1919, which allows a court to "order the payment of just costs" whenever a suit is dismissed by a district court.

The trial court addressed RPost's request for fees and costs and analyzed RPost's various claims in substantial detail.  At the conclusion of its opinion, the court declined to award fees and costs against Propat.  The district court's decision to deny fees and costs is reviewable for abuse of discretion.  See Stephens v. Tech Int'l, Inc., 393 F.3d 1269, 1273 (Fed. Cir. 2004) ("exceptional case" determination under section 285 reviewed for clear error; decision whether to award fees reviewed for abuse of discretion); Gomez v. Vernon, 255 F.3d 1118, 1134-35 (9th Cir. 2001) (section 1927 sanction decisions reviewed for abuse of discretion); Neal & Co. v. United States, 121 F.3d 683, 684 (Fed. Cir. 1997) (denial of award of costs reviewed for abuse of discretion).  In light of the district court's careful analysis of each of RPost's various claims, we are satisfied that the court did not abuse its discretion in denying an award of fees and costs.

First, it was reasonable for the court to conclude that the error in failing to name Authentix as a party plaintiff did not render this action "exceptional" within the meaning of 35 U.S.C. § 285.  While the court concluded that Propat's "standing" argument was

2006-1222,-1223,-1270                    14

legally incorrect, it held, reasonably in our view, that Propat's interpretation and behavior with respect to that issue "was not so reckless as to warrant sanctioning."

Second, with respect to the conduct of Propat's counsel in the litigation, the court observed that the conduct of both parties' counsel "fell far short of a model prosecution and defense of a patent action, and an assessment that they met the minimum expectations would be a generous one." Under those circumstances, the court determined "to leave the parties where it finds them," a decision that falls well within the court's discretion. The court also rejected RPost's charge that Propat engaged in vexatious litigation within the meaning of 28 U.S.C. § 1927. Although the court found that Propat had engaged in some litigation misconduct during the pendency of the action, the court sanctioned Propat for that conduct during the litigation and reasonably concluded that the litigation sanction the court imposed was sufficient, and that further monetary sanctions would be inappropriate.

Third, the court declined to order an award of costs to RPost in the exercise of its discretion under 28 U.S.C. § 1919. On that issue as well, the court determined in light of the conduct of the respective parties that the best course was to "leave the parties where it finds them" and not to award costs to RPost. We find no abuse of discretion in that decision. Accordingly, we uphold the trial court's rejection of each of RPost's claims to an award of fees and costs.

Each party shall bear its own costs for this appeal and cross-appeal.

<u>AFFIRMED</u>.