## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN, INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION | ) ) ) C.A. No. 06-259-***(MPT) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ARIAD PHARMACEUTICALS, INC., | ) ) |
| Defendant. | ) ) |

## DECLARATION OF ELIZABETH L. ROSENBLATT

## IN SUPPORT OF ARIAD PHARMACEUTICALS, INC.'S MOTION TO STAY

## LITIGATION PENDING CONCLUSION OF REEXAMINATION

## PROCEEDINGS IN THE PATENT AND TRADEMARK OFFICE

I, Elizabeth L. Rosenblatt, declare as follows:

1.     I am an attorney at Irell & Manella LLP, counsel for ARIAD Pharmaceuticals, Inc. ("ARIAD") in connection with this action. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath. I make this declaration in support of ARIAD's Motion To Stay Litigation Pending Conclusion Of Reexamination Proceedings In The Patent And Trademark Office.

2.     Discovery has been stayed for the bulk of this case's pendency. Discovery has been active for about three of the nine and a half months that this case has been pending, namely from July 7 through August 18, 2006, and from September 11 through November 3, 2006. Discovery was stayed between August 18 and September 11, 2006. (D.I. 61.) Discovery was stayed again on November 3, 2006, followed by a stay of all proceedings on December 21, 2006.

3.    Plaintiffs served their First Set of Requests for Production and First Set of Interrogatories on July 7, 2006. (D.Is. 27–28.) The Court's Scheduling Order was entered on July 19, 2006. (D.I. 37.) The parties exchanged initial disclosures on July 26, 2006. (D.Is. 42–43.) ARIAD served responses to Plaintiffs' requests on August 7, 2006. (D.Is. 47–48.) Discovery was then stayed between August 18 and September 11, 2006, in light of ARIAD's pending motion to dismiss. (D.I. 61.) The Court lifted the stay on September 11 when denying ARIAD's motion to dismiss. ARIAD served Amended Responses to Plaintiffs' Requests for Production on September 27, 2006, and Amended Responses to Plaintiffs' First Set of Interrogatories on October 11, 2006. (D.Is. 78, 92.) Discovery was again stayed on November 3, 2006, to allow for the parties to fully brief the merits of a stay pending ARIAD's petition for interlocutory appeal to the Federal Circuit. (D.I. 105 at 36.) ARIAD's motion for a stay of proceedings pending that appeal was granted on December 21, 2006. (D.I. 120.)

4.    I hereby affirm that, as listed above, the only discovery that has occurred in this matter has been: (i) the parties' exchange of initial disclosures; (ii) Plaintiffs' First Set of Requests for Production and First Set of Interrogatories, with ARIAD's respective replies; and (iii) third party Eli Lilly & Company's subpoenaed production of documents from an earlier litigation.

5.    Attached hereto as Exhibit A is a true and correct copy of the United States Patent and Trademark Office's order granting Eli Lilly & Company's request for ex parte reexamination of United States Patent No. 6,410,516 ("'516 patent").

6.    Attached hereto as Exhibit B is a true and correct copy of the United States Patent and Trademark Office's order granting Bawa Biotechnology Consulting's request for ex parte reexamination of the '516 patent.

7.    Attached hereto as Exhibit C is a true and correct copy of the United States Patent and Trademark Office's decision merging the two reexaminations referenced in Exhibits A and B.

1594076

8.    Attached hereto as Exhibit D is a true and correct copy of the United States Patent and Trademark Office's Office Action dated August 2, 2006, issued in the merged '516 patent reexamination proceeding.

9.    Attached hereto as Exhibit E is a true and correct copy of the response dated November 9, 2006, by Harvard University, M.I.T. and the Whitehead Institute for Biomedical Research to the Office Action referenced in Exhibit D.

10.    Attached hereto as Exhibit F is a true and correct copy of a Press Release dated July 29, 2005, issued by the United States Patent and Trademark Office.

11.    Attached hereto as Exhibit G is a true and correct copy of a summary of statistical data regarding patent reexaminations published by the United States Patent and Trademark Office.

Executed on January 22, 2007, at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Elizabeth L. Rosenblatt

1594076

# EXHIBIT A



### UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,503 | 04/04/2005 | 6410516 | 05-280 | 5583 |

28120      7590      06/08/2005

FISH & NEAVE IP GROUP
ROPES & GRAY LLP
ONE INTERNATIONAL PLACE
BOSTON, MA  02110-2624

| EXAMINER |
|---|
|  |

| ART UNIT | PAPER NUMBER |
|---|---|
|  |  |

DATE MAILED: 06/08/2005

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

| **Order Granting / Denying Request For Ex Parte Reexamination** | Control No. | Patent Under Reexamination |
|---|---|---|
| | 90/007,503 | 6410516 |
| | Examiner | Art Unit | |
| | Terry A. McKelvey | 1636 | |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>04 April 2005</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☐ PTO-892,      b)☒ PTO-1449,     c)☐ Other: _____

1. ☒   The request for *ex parte* reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional): TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐   The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)).  Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)). **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181  ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE  REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

a)☐  by Treasury check or,

b)☐  by credit to Deposit Account No. _____, or

c)☐  by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

cc:Requester ( if third party requester )

Application/Control Number: 90/007,503                    Page 2
Art Unit: 1636

## DECISION

A substantial new question of patentability affecting
claims 1-18, 20-43, 47-51, 53-100, 104-107, 109-110, 114-117,
119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178,
182, 186, 192-193, and 197-201 of United States Patent Number
6,410,516 to Baltimore et al ("Baltimore patent") is raised by
the request for *ex parte* reexamination.

Extensions of time under 37 CFR 1.136(a) will not be
permitted in these proceedings because the provisions of 37
CFR 1.136 apply only to "an applicant" and not to parties in a
reexamination proceeding. Additionally, 35 U.S.C. 305 requires
that *ex parte* reexamination proceedings "will be conducted with
special dispatch" (37 CFR 1.550(a)). Extensions of time in
*ex parte* reexamination proceedings are provided for in 37
CFR 1.550(c).

The patent owner is reminded of the continuing
responsibility under 37 CFR 1.565(a) to apprise the Office of
any litigation activity, or other prior or concurrent
proceeding, involving Patent No. 6,410,516 throughout the course
of this reexamination proceeding. The third party requester is
also reminded of the ability to similarly apprise the Office of

Application/Control Number: 90/007,503                         Page 3
Art Unit: 1636

any such activity or proceeding throughout the course of this

reexamination proceeding.   See MPEP §§ 2207, 2282 and 2286.


    The request indicates that Requestor considers that claims

1-18, 20-43, 47-51, 53-100, 104-107, 109-110, 114-117, 119-120,

124-129, 133-140, 144-150, 154-160, 164-168, 172-178, 182, 186,

192-193, and 197-201 are unpatentable over one or more of the

references cited below.

    It is agreed that the consideration of Emmel, Schmidt, or

Brini raises a substantial new question of patentability as to

claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62,

64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-

117, 192-193, and 197-201 of the Baltimore patent.   As pointed

out on pages 6-7, 20-22, and Exhibit G-1 of the request, Emmel,

Schmidt, and Brini teach administration of cyclosporin A to

cells substantially reduced NF-kB activity in those cells (and

thus would inhibit expression of genes whose transcription is

regulated by NF-kB activity).   In addition, these references all

utilized the HIV LTR in their experiments, they demonstrated

that cyclosporin A reduced the expression of viral genes.   The

teaching as to administration of cyclosporin A which affects NF-

kB activity was not present in the prosecution of the

application which became the Baltimore patent.   Further, there

is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable. Accordingly, Emmel, Schmidt, or Brini raise a substantial new question of patentability as to claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201, which question has not been decided in a previous examination of the Baltimore patent.

It is agreed that the consideration of Meichle or Shirakawa raises a substantial new question of patentability as to claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, ~~53-54, 58-62, 64-65,~~ 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201 of the Baltimore patent. As pointed out on pages 7, 22-24, and Exhibit G-2 of the request, Meichle and Shirakawa teach reduction of NF-kB activity in induced cells using agents that inhibit protein kinase C. In addition, because Meichle used the HIV LTR in their experiments, this reference makes obvious claims drawn to regulating expression of viral genes. The teaching as to using agents that inhibit protein kinase C which reduce NF-kB activity was not present in the prosecution of the application which became the Baltimore patent. Further, there is a substantial likelihood that a

reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable. Accordingly, Meichle or Shirakawa raises a substantial new question of patentability as to claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201, which question has not been decided in a previous examination of the Baltimore patent.

It is agreed that the consideration of PDR(1985), Griffith I, Griffith II, Reed, Kronke, or Sienbelist raises a substantial new question of patentability as to claims 1-2, 6-9, 20-29, 31-40, 53-54, 58-62, 64-73, 75-86, and 88-97 of the Baltimore patent. As pointed out on pages 7, 26-34, and Exhibits H-1, H-2, and H-3 of the request, Griffith I, Griffith II, Reed, Kronke, and Sienbelist teach cyclosporin A administration of cells, which, as is shown from the teachings of Holschermann, Schmidt, Emmel, and Brini, inherently reduces NF-kB activity and thus would inhibit expression of genes whose transcription is regulated by NF-kB activity. The inhibition is done by reducing binding of NF-kB to NF-kB recognition sites, which also decreases the level of NF-kB not bound in a NF-kB-IkB complex, inhibiting the passage of NF-kB into the nucleus of cells,

inhibiting modification of an IkB protein, and inhibiting

degradation of an IkB protein.  Administration to different cell

types are also taught.  The teaching as to administration of

cyclosporin A to cells which inherently reduce NF-kB activity

was not present in the prosecution of the application which

became the Baltimore patent.  Further, there is a substantial

likelihood that a reasonable examiner would consider this

teaching important in deciding whether or not the claims are

patentable.  Accordingly, PDR(1985), Griffith I, Griffith II,

Reed, Kronke, or Sienbelist raises a substantial new question of

patentability as to claims 1-2, 6-9, 20-29, 31-40, 53-54, 58-62,

64-73, 75-86, and 88-97, which question has not been decided in

a previous examination of the Baltimore patent.


It is agreed that the consideration of Tsoukas, Manolagas,

Lemire I, Lemire II, Rigby I, or Rigby II raises a substantial

new question of patentability as to claims 1-2, 5-9, 20-21, 25-

29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-

89, and 93-97 of the Baltimore patent.  As pointed out on pages

8, 34-37, and Exhibit H-4, H-5, and H-6 of the request, Tsoukas,

Manolagas, Lemire I, Lemire II, Rigby I, and Rigby II teach

administration of calcitriol to humans, which, as is shown from

the teachings of Yu, inherently reduces NF-kB activity and thus

would inhibit expression of genes whose transcription is

regulated by NF-kB activity.  The teaching as to administration

of calcitriol which inherently reduce NF-kB activity was not

present in the prosecution of the application which became the

Baltimore patent.  Further, there is a substantial likelihood

that a reasonable examiner would consider this teaching

important in deciding whether or not the claims are patentable.

Accordingly, Tsoukas, Manolagas, Lemire I, Lemire II, Rigby I,

or Rigby II raises a substantial new question of patentability

as to claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62,

64-65, 69-73, 75-76, 80-86, 88-89, and 93-97, which question has

not been decided in a previous examination of the Baltimore

patent.


It is agreed that the consideration of Dew raises a

substantial new question of patentability as to claims 1-2, 5-9,

20-29, 31-40, 53-62, 64-73, 75-86, and 88-97 of the Baltimore

patent.  As pointed out on pages 8, 37-39, and Exhibit H-7 of

the request, Dew teaches administration of 5-ASA for the

treatment of ulcerative colitis in humans, which inherently

reduced NF-kB activity in the cells of the patients, by a

mechanism including phosphorylation of IkB proteins.  The

teaching as to administration of 5-ASA was not present in the

prosecution of the application which became the Baltimore

patent.  Further, there is a substantial likelihood that a

reasonable examiner would consider this teaching important in

deciding whether or not the claims are patentable.  Accordingly,

Dew raises a substantial new question of patentability as to

claims 1-2, 5-9, 20-29, 31-40, 53-62, 64-73, 75-86, and 88-97,

which question has not been decided in a previous examination of

the Baltimore patent.


    It is agreed that the consideration of 1970 PDR, Lefring,

Nagasawa, or Rovera raises a substantial new question of

patentability as to claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40,

53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 of

the Baltimore patent.  As pointed out on pages 8-9, 39-43, and

Exhibit H-8 of the request, 1970 PDR, Lefring, Nagasawa, and

Rovera teaches administration of glucocorticoids such as

dexamethasone or TPA to control inflammation in diseases such as

rheumatoid arthritis, which inherently reduces NF-kB activity.

The teaching as to glucocortocoid administration was not present

in the prosecution of the application which became the Baltimore

patent.  Further, there is a substantial likelihood that a

reasonable examiner would consider this teaching important in

deciding whether or not the claims are patentable.  Accordingly,

Application/Control Number: 90/007,503                    Page 9
Art Unit: 1636

1970 PDR, Lefring, Nagasawa, or Rovera raises a substantial new

question of patentability as to claims 1-2, 5-9, 20-21, 25-29,

31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89,

and 93-97, which question has not been decided in a previous

examination of the Baltimore patent.


It is agreed that the consideration of 1970 PDR raises a

substantial new question of patentability as to claims 1-2, 5-

10, 12-18, 20-21, 25-32, 36-41, 53-54, 58-65, 69-76, 80-89, 93-

100, 104-105, 119-120, 124-129, 133-140, 144-150, 154-160, 164-

168, 172-178, and 182-186 of the Baltimore patent.  As pointed

out on pages 9, 43-45, and Exhibit H-10 of the request, 1970 PDR

teaches administration of antibiotics such as erythromycin,

gentamicin, and tetracycline to kill bacteria in animals.  As

evidenced by the Manolagas declaration, the use of antibiotics

to kill bacteria reduces the amount of lipopolysaccharide (LPS,

which inherently induces NF-kB activity), consequently reduces

NF-kB activity and thereby reduce expression of LPS-induced and

NF-kB-regulated cytokines.  The teaching as to administration of

antibiotics was not present in the prosecution of the

application which became the Baltimore patent.  Further, there

is a substantial likelihood that a reasonable examiner would

consider this teaching important in deciding whether or not the

Application/Control Number: 90/007,503                    Page 10
Art Unit: 1636

claims are patentable.  Accordingly, 1970 PDR raises a

substantial new question of patentability as to claims 1-2, 5-

10, 12-18, 20-21, 25-32, 36-41, 53-54, 58-65, 69-76, 80-89, 93-

100, 104-105, 119-120, 124-129, 133-140, 144-150, 154-160, 164-

168, 172-178, and 182-186, which question has not been decided

in a previous examination of the Baltimore patent.


    It is agreed that the consideration of King James Version

Bible (1611), St. Leger, Dobrilla, or Jones raises a substantial

new question of patentability as to claims 1-2, 6-9, 20-21, 25-

32, 36-41, 64-65, 69-76, 80-89, and 93-98 of the Baltimore

patent.  As pointed out on pages 10, 45-49, and Exhibit H-9 of

the request, King James Version Bible (1611), St. Leger,

Dobrilla, and Jones teach consumption of red wine as a medicine,

which inherently inhibits NF-kB as a part of its activity.  The

teaching as to red wine consumption was not present in the

prosecution of the application which became the Baltimore

patent.  Further, there is a substantial likelihood that a

reasonable examiner would consider this teaching important in

deciding whether or not the claims are patentable.  Accordingly,

King James Version Bible (1611), St. Leger, Dobrilla, or Jones

raises a substantial new question of patentability as to claims

1-2, 6-9, 20-21, 25-32, 36-41, 64-65, 69-76, 80-89, and 93-98,

Application/Control Number: 90/007,503                    Page 11
Art Unit: 1636

which question has not been decided in a previous examination of

the Baltimore patent.


None of the references cited in the request are indicated

as specifically raising a new question of patentability

concerning claims 19, 44-46, 52, 101-103, 108, 111-113, 118,

121-123, 130-132, 141-143, 151-153, 161-163, 169-171, 179-181,

183-185, 187-191, 194-196, and 202-203. However, these claims

will be reexamined along with claims 1-18, 20-43, 47-51, 53-100,

104-107, 109-110, 114-117, 119-120, 124-129, 133-140, 144-150,

154-160, 164-168, 172-178, 182, 186, 192-193, and 197-201 of the

Baltimore patent.


### Conclusion

Certain papers related to this application may be submitted

to Art Unit 1636 by facsimile transmission. The faxing of such

papers must conform with the notices published in the Official

Gazette, 1156 OG 61 (November 16, 1993) and 1157 OG 94 (December

28, 1993) (see 37 C.F.R. § 1.6(d)). The official fax telephone

number for the Group is 571-273-8300. NOTE: If Applicant *does*

submit a paper by fax, the original signed copy should be

retained by applicant or applicant's representative. NO

DUPLICATE COPIES SHOULD BE SUBMITTED so as to avoid the

processing of duplicate papers in the Office.

Application/Control Number: 90/007,503          Page 12
Art Unit: 1636

    Any inquiry of a general nature or relating to the status
of this application or proceeding should be directed to (571)
272-0547.

    Patent applicants with problems or questions regarding
electronic images that can be viewed in the Patent Application
Information Retrieval system (PAIR) can now contact the USPTO's
Patent Electronic Business Center (Patent EBC) for assistance.
Representatives are available to answer your questions daily
from 6 am to midnight (EST). The toll free number is (866) 217-
9197. When calling please have your application serial or patent
number, the type of document you are having an image problem
with, the number of pages and the specific nature of the
problem. The Patent Electronic Business Center will notify
applicants of the resolution of the problem within 5-7 business
days. Applicants can also check PAIR to confirm that the
problem has been corrected. The USPTO's Patent Electronic
Business Center is a complete service center supporting all
patent business on the Internet. The USPTO's PAIR system
provides Internet-based access to patent application status and
history information. It also enables applicants to view the
scanned images of their own application file folder(s) as well
as general patent information available to the public.

    For all other customer support, please call the USPTO Call
Center (UCC) at 800-786-9199.

    Any inquiry concerning rejections or objections in this
communication or earlier communications from the examiner should
be directed to Terry A. McKelvey whose telephone number is (571)
272-0775. The examiner can normally be reached on Monday
through Friday, except for Wednesdays, from about 7:30 AM to
about 6:00 PM. A phone message left at this number will be

Application/Control Number: 90/007,503                    Page 13
Art Unit: 1636

responded to as soon as possible (i.e., shortly after the
examiner returns to his office).

    If attempts to reach the examiner by telephone are
unsuccessful, the examiner's supervisor, Dr. Remy Yucel can be
reached at (571) 272-0781.

Terry A. McKelvey, Ph.D.
Primary Examiner
Art Unit 1636

May 30, 2005

# EXHIBIT B



### UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,828 | 12/02/2005 | 6410516 | | 4525 |

28120     7590     12/12/2005

FISH & NEAVE IP GROUP
ROPES & GRAY LLP
ONE INTERNATIONAL PLACE
BOSTON, MA  02110-2624

| EXAMINER |
|---|
| |

| ART UNIT | PAPER NUMBER |
|---|---|
| | |

DATE MAILED: 12/12/2005

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Dr. Raj Bawa
Bawa Biotechnology Consulting, LLC
21005 Starflower Way
Ashburn, VA 20147

## *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/007,828*.

PATENT NO. *6410516*.

ART UNIT *3991*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

| *Order Granting / Denying Request For Ex Parte Reexamination* | Control No. 90/007,828 | Patent Under Reexamination 6410516 |
|---|---|---|
| | Examiner Bennett Celsa | Art Unit 3991 | |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>02 December 2005</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☒ PTO-892,    b)☐ PTO-1449,    c)☐ Other: _____

1. ☒    The request for *ex parte* reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional): TWO MONTHS from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐    The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)). Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)). **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181 ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

a) ☐ by Treasury check or,

b) ☐ by credit to Deposit Account No. _____ , or

c) ☐ by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

Bennett Celsa
Primary Examiner
Art Unit: 3991

cc:Requester ( if third party requester )
U.S. Patent and Trademark Office
PTOL-471 (Rev. 04-01)          Office Action in *Ex Parte* Reexamination          Part of Paper No. 20051206

### DETAILED ACTIQN: *Reexamination: Granting of Request*

#### Procedural Posture:

The 3rd party Request (dated 12/02/05) for *ex parte* reexamination of claims 1-203 of

U.S. Patent No. 6,410,516 to Baltimore et al. (hereinafter "Baltimore patent") is acknowledged.

#### <u>Decision:</u>

A substantial new question of patentability of claims 1-203 of United States Patent

Number No 6,410,516 is raised by the Request for *ex parte* reexamination.

#### Ongoing Duty To Disclose:

The Request provided reference(s) for reexamination along without providing a PTO-

1449 listing said references.  Enclosed, please find an initialed copy of the PTO-892 indicating

Examiner consideration of publications filed with the request and any newly cited examiner

documents.

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving

Patent No. 5,578,334 throughout the course of this reexamination proceeding.  The third party

requester is also reminded of the ability to similarly apprise the Office of any such activity or

proceeding throughout the course of this reexamination proceeding.  See MPEP §§ 2207, 2282

and 2286.

#### The 6,410,516 Patented Invention:

The Baltimore patent claims are directed to methods of reducing or otherwise modifying

the naturally occurring transcription factor NF-κB activity in cells affecting gene expression.

Claims 1 and 203 are illustrative:

Application/Control Number: 90/007,828                                        Page 3
Art Unit: 3991

*1.* A method of inhibiting expression, in a eukaryotic cell, of a gene whose transcription is

regulated by NF-κB, the method comprising reducing NF-κB activity in the cell such that the

expression of said gene is inhibited.

*203.* A method of inhibiting expression, in a mammalian cell, of a gene whose transcriptional

activity is activated by binding of NF-κB to said gene, comprising introducing a nucleic acid

decoy molecule into the cell in an amount sufficient to inhibit expression of the gene, which

decoy includes a NF-κB binding site that binds NF-κB.

### Substantial New Question of Patentability Raised By The Request

For "a substantial new question of patentability" to be present, it is only necessary that:

A.      The prior art patents and/or printed publications raise a substantial question of

patentability regarding at least one claim i.e. the prior art teaching is such that there is a

substantial likelihood that a reasonable examiner would consider the teaching to be important in

deciding whether or not the claim is patentable; and it is not necessary that the prior art establish

a prima facie case of unpatentability and;

B.      The same question of patentability as to the claim has not been decided by the Office in a

previous examination or pending reexamination of the patent or in a final holding of invalidity

by the Federal Courts in a decision on the merits involving the claim.

See MPEP 2242.

For a reexamination that was ordered on or after November 2, 2002 (the date of

enactment of Public Law 107-273; see Section 13105, of the Patent and Trademark Office

Authorization Act of 2002), reliance *solely* on old art (as the basis for a rejection) does not

necessarily preclude the existence of a substantial new question of patentability (SNQ) that is

Application/Control Number: 90/007,828                                    Page 4
Art Unit: 3991

based exclusively on that old art. Determinations on whether a SNQ exists in such an instance

shall be based upon a fact-specific inquiry done on a case-by-case basis. For example, a SNQ

may be based solely on old art where the old art is being presented/viewed in a new light, or in a

different way, as compared with its use in the earlier concluded examination(s), in view of a

material new argument or interpretation presented in the request. MPEP 2258.01.

   If a substantial new question of patentability is found as to one claim, all claims will be

reexamined during the ex parte reexamination process. See MPEP 2216.

### *Priority*

   Application 08/464,364 (filed 6/5/95) issued US Pat. No. 6,410,516 (Baltimore patent) is:

-A DIV of 08/418,266 (filed 4/6/95) issued as US Pat. No. 5,804,374

which is a CON of 07/791,898 (filed 11/13/91) (ABN: 5/16/95);

which is a CIP of 06/946,365 (filed 12/24/86) (ABN:3/24/92)

AND:

-a CIP of 07/341,436 filed 04/21/1989 (ABN: 4/3/92)

-a CIP of 07/280,173 filed 12/05/1988 (ABN: 3/24/92)

-a CIP of 07/318,901 filed 03/03/1989(ABN: 12/12/91)

- a CIP of 07/162,680 filed 03/01/1988 (ABN:8/30/90)

 -a CIP of 07/155,207 filed 02/12/1988 (ABN:7/26/90)

- a CIP of 06/817,441 filed 01/09/1986 (ABN:1/13/89)

For purposes of 35 USC 120 priority, the above-identified CIP applications (e.g. original

specification and original claims) fail to adequately describe and/or enable the methods of the

current Baltimore Patent claims subject to reexamination. Accordingly, at best, the

reexamination patent claims are entitled to the filing date (e.g. 11/13/91) of continuation

application 07/791,898 for purposes of prior art.

For example, the pre-November 1991 applications fail to disclose:

a. an amino acid or nucleic acid sequence corresponding to NF-κB;

b. an NF-κB inhibitor. The 07/341,436 although mentioning nucleic acid decoy molecules fails

to disclose sequences thereof or a means of delivering these molecules for in vivo use.

c. support for the Baltimore patent claim limitations including (but not limited to):

-"reducing NF-κB activity" in a cell (e.g. mammalian/eukaryotic) and/or an enabling means

thereof (e.g. administering a NF-κB inhibitor) to effect various functions (e.g. inhibit expression

generally, reduce cytokine expression etc.) as required in all the claims;

-"reduce binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally

regulated by NF-κB" (e.g., claims 25, 36, 47, 69, 80, 93, 144, and 154);

-"inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding

to NF-κB" (e.g., claims 22, 33, and 44);

-"inhibiting degradation of an IKB protein" (e.g., claims 23, 34, and 45);

- "inhibiting dissociation of NF-KB:IKB complexes" (e.g., claims 24, 35, and 46).

It is also duly noted that failure of the 06/946,365 (filed 12/24/86) (ABN: 3/24/92)

application to satisfy 35 USC 112, first paragraph would render the 07/162,680; 07/155,207 and

06/817,441 applications unavailable for 35 USC 120 priority because they would not be co-

pending with the 07/791,898 (filed 11/13/91) application. It is further noted that the Griffith

document (with Hölschermann et al as evidence of inherency in which its publication date is not

critical), newly cited by the Examiner below, establishes a substantial new question of

Application/Control Number: 90/007,828                          Page 6
Art Unit: 3991

patentability which predates the earliest possible assertion of 35 USC 120 priority (e.g. CIP of

06/817,441 01/09/1986).   See MPEP 2131.01   Multiple Reference 35 U.S.C. 102 Rejections.

### *Documents Cited By The Requester:*

1. **Bielinska et al.** *Science* 250 :997 (1990) ;

2. **Tanaka et al.** *Nucleic Acids Res.* 22:3069 (1994);

3. **Eck et al.** Mol. *Cell. Biol.* 6530 (1993) ;

4. **Staal et al.** *Proc. Nat'l Acad Sci*  87 :9943 (Dec. 1990) ;

5. **Schreck et al.** *J. Exp. Med.* 175:1181 (May 1992);

6. **Baldwin and Sharp**, *Proc. Nat'l Acad Sci*  85:723  (Feb. 1988).

7. **Schorpp et al.** J. Mol. Biol. 202:307 (1988);

8. **Li et al.** Mol. Cell. Biol. 8:432 (1988);

9. **Hai et al.** Cell 54 :1043 (1988) ;

10.**Chu et al.** Nucleic Acids Res. 15:1311-1326 (1987);

11.**Molecular Biology of THE CELL**, 2nd Ed. (1989) page 423.

### *Documents Cited By The Examiner:*

12. **Griffith et al** Targeted Blood Levels of Cyclosporine for Cardiac Transplantation, J. Thorac.

*Cardiovasc. Surg.* 99:952-957 (December, 1984);

13. **Hölschermann et al.**, Cyclosporin ad Inhibits Monocyte Tissue Factor Activation in Cardiac

Transplant Recipients, *Circulation* 96:4232-4238 (December, 1997). Since this document is

being cited as evidence of inherency, as such, its publication date is not critical. See MPEP

2131.01.

Application/Control Number: 90/007,828                                    Page 7
Art Unit: 3991

## Discussion of the Cited Documents

1. **Bielinska et al.**

As pointed out on pages 7-9 of the request, Bielinska et al.(e.g. at pages 197-198 and Fig. 1) disclose the use of nucleic acid decoy molecules to inhibit NF-κB-dependent expression of a reporter gene in clone 13 B-lymphoblastoid cells.

It is agreed that consideration of the newly cited Bielinska et al. document raises a substantial new question of patentability over the claims of the Baltimore patent since there is a substantial likelihood that a reasonable examiner would consider the teaching of this reference important in deciding whether or not the Baltimore patent claims are patentable

2. **Tanaka et al.**

As pointed out on pages 10-11 of the request, Tanaka et al. (e.g. at pages 3070,3072 and Figures 3 and 4) disclose the use of decoy molecules (e.g. phosphorothionates containing an NF-κB recognition/binding sequence) to inhibit NF-κB-dependent expression of a reporter gene in HeLa cells.

It is agreed that consideration of the newly cited Tanaka et al. document raises a substantial new question of patentability as to the Baltimore patent claims since there is a substantial likelihood that a reasonable examiner would consider the teaching of this reference important in deciding whether or not the Baltimore patent claims are patentable

3. **Eck et al.**

As pointed out on pages 12-14 of the request, Eck et al. (e.g. at pages 6530-32;Figures 2, 4 and 6) disclose the use of double-stranded phosphorothionate oligonucleotides (denoted κB-

PTs) containing the NF-κB binding sequence, GGGACTTTTCC, which specifically inhibits NF-κB-mediated transcription.

It is agreed that consideration of the newly cited Eck et al. document raises a substantial new question of patentability as to the Baltimore patent claims since there is a substantial likelihood that a reasonable examiner would consider the teaching of this reference important in deciding whether or not the Baltimore patent claims are patentable

## 4. Staal et al.

As pointed out on pages 15-16 of the request, Staal et al. (e.g. see Abstract; page 9945; Figures 4-5) disclose a method of inhibiting TNF-α by blocking NF-κB activation in mammalian cells (e.g. Jurkat cells) by administration of N-acetyl-L-cysteine (NAC).

It is agreed that consideration of the newly cited Staal et al. document raises a substantial new question of patentability as to the Baltimore patent claims since there is a substantial likelihood that a reasonable examiner would consider the teaching of this reference important in deciding whether or not the Baltimore patent claims are patentable

## 5. Schreck et al.

As pointed out on pages 16-17 of the request, Schreck et al. (e.g. see Abstract, pages 1181, 1186-1187; Figures 3 and 6) disclose blocking NF-κB activation by suppressing NF-κB dissociation from its inhibitor IκB in IL-1 and TNF-α stimulated Jurkat cells by administration of dithiocarbamates and metal chelators.

It is agreed that consideration of the newly cited Schreck et al. document raises a substantial new question of patentability as to the Baltimore patent claims since there is a

substantial likelihood that a reasonable examiner would consider the teaching of this reference

important in deciding whether or not the Baltimore patent claims are patentable.

6. **Baldwin and Sharp**, *Proc. Nat'l Acad Sci* 85:723 (Feb. 1988).

7. **Schorpp et al.** J. Mol. Biol. 202:307 (1988);

8. **Li et al.** Mol. Cell. Biol. 8:432 (1988);

9. **Hai et al.** Cell 54 :1043 (1988) ;

10. **Chu et al.** Nucleic Acids Res. 15:1311-1326 (1987);

11. **Molecular Biology of THE CELL**, 2nd Ed. (1989) page 423.

As pointed out on pages 17-18 of the request, the Baldwin and Sharp reference disclose

(e.g. pages 724-725; Fig. 2) the use of various DNA probes to compete for NF-κB binding in

nuclear extracts of various mammalian cell types.

Additionally, as pointed out on page 19 of the request, the Schorpp et al., Li et al. and Hai

et al. references teach that an oligonucleotides that specifically and competitively binds a

transcription factor would reduce expression of a gene controlled by the transcription factor.

Further, as pointed out on page 19 of the request, Chu et al. teaches methods for

transfection of oligonucleotides (e.g. DNA) into eukaryotic cells, which once introduced into

cells, readily enter the nucleus through pores. See Molecular Biology of THE CELL at p.423.

It is agreed that consideration of the combined teaching of the newly cited Baldwin and

Sharp,. Schorpp et al. , Li et al. , Hai et al. , Chu et al.  and  Molecular Biology of THE CELL

documents raise a substantial new question of patentability as to the Baltimore patent claims

since there is a substantial likelihood that a reasonable examiner would consider the combined

teaching of these references important in deciding whether or not the Baltimore patent claims are

patentable.


12. **Griffith et al.** and

13. **Hölschermann et al.**

Griffith et al. teach (e.g. see abstract) the administration of cyclosporin to cardiac

transplant plantations.

Hölschermann et al teach (e.g. see page 4236, left column; Fig. 4) that the administration

of cyclosporin to cardiac patients (as taught by Griffith et al.) necessarily (e.g. inherently) results

in reduced NF-κB activity.

Consideration of the newly cited Griffith et al. and Hölschermann et al. documents

would raise a substantial new question of patentability as to the Baltimore patent claims since

there is a substantial likelihood that a reasonable examiner would consider the teaching of the

Griffith et al. reference in view of the Hölschermann et al. document (as evidence of the Griffith

reference method's reduction of NF-κB activity) important in deciding whether or not the

Baltimore patent claims are patentable.

*Conclusion*

A substantial new question of patentability of claims 1-203 of United States Patent

Number No 6,410,516 is raised by the Request for *ex parte* reexamination.

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings

because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination

Application/Control Number: 90/007,828                                    Page 11
Art Unit: 3991

proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)). Extensions of time in

*ex parte* reexamination proceedings are provided for in 37 CFR 1.550(c).

### *Future Correspondences*

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Bennett Celsa whose telephone number is 571-272-0807. The

examiner can normally be reached on M-F from 8-5.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Jean Vollano can be reached at 571-272-0648.

Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system. Status information for published applications

may be obtained from either Private PAIR or Public PAIR. Status information for unpublished

applications is available through Private PAIR only. For more information about the PAIR

system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR

system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

All correspondence relating to this ex parte reexamination proceeding should be directed:

By Mail to:      Mail Stop ex parte Reexam
                 Central Reexamination Unit
                 Office of Patent Legal Administration
                 United States Patent & Trademark Office
                 P.O. Box 1450
                 Alexandria, VA 22313-1450

By FAX to:       (571) 273-9900
                 Central Reexamination Unit

By hand:         Customer Service Window
                 Randolph Building
                 401 Dulany St.

Application/Control Number: 90/007,828    Page 12
Art Unit: 3991

Alexandria, VA  22314

Bennett  Celsa
Primary Examiner
Art Unit 3991

Conferees:

# EXHIBIT C

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

Mailed :

DDJ

John P. White
COOPER & DUNLAP LLP
1185 Avenue of the Americas
New York, New York 10036

(for Patent Owner)

Grantland G. Drutchas
MCDONNELL BOEHNEN HULBERT
& BERGHOFF LLP
300 S. Wacker Drive, Suite 3100
Chicago, IL 60606

(for Third Party Requester)

MAILED
MAY 0 4 2006
REEXAM UNIT

*In re Baltimore et al*
Reexamination Proceeding
Control No.: 90/007,503
Filed: April 4, 2005
For: U.S. Patent 6,410,516

Dr. Raj Bawa
BAWA BIOTECHNOLOGY CONSULTING LLP
21005 Starflower Way
Ashburn VA 20147

(for Third Party Requester)

*In re Baltimore et al*
Reexamination Proceeding
Control No.: 90/007,828
Filed: December 2, 2005
For: U.S. Patent 6,410,516

DECISION MERGING
REEXAMINATION
PROCEEDINGS

The above noted reexamination files are before the Director of the Central Reexamination Unit for consideration of the proceedings under 37 C.F.R. 1.565(c).

## BACKGROUND

1. United States Patent 6,410,516, issued June 25, 2002, is the subject of Reexamination Control Nos. 90/007,503 and 90/007,828.

2. A first request for reexamination, assigned Reexamination Control No. 90/007,503, was filed April 4, 2005 by Grantland G. Drutchas of McDonnell Boehnen Hulbert & Berghoff LLP in Chicago, IL 60606. The request urged that a substantial new question of patentability was raised by the newly cited references which either inherently or expressly disclose the use of a variety of prior art compounds as reducing NF-κB activity and resulting gene expression.

3.  Reexamination was ordered for 90/007,503 on April 4, 2005.

4.  A second request for re-examination, assigned Reexamination Control No. 90,007,828, was filed December 2, 2005 by Dr. Raj Bawa of Bawa Biotechnology Consulting LLP in Ashburn VA 20147. The request urged that a substantial new question of patentability was raised by the newly cited references which are directed to the use of oligonucleotides having a NF-κB binding cite for reduction of NF-κB activity.

5.  Reexamination was ordered for 90/007,828 on December 2, 2005.

6.  No Office action has been issued in either reexamination.

7.  A petition was filed on April 4, 2006 by Patent Owner to merge the above-identified re-examination proceedings 90/007,503 and 90/007,828.


## DISCUSSION

Under 37 C.F.R. 1.565(c):

> If *ex parte* reexamination is ordered while a prior *ex parte* reexamination proceeding is pending and prosecution in the prior *ex parte* proceeding has not been terminated, the *ex parte* reexamination proceedings will be consolidated and result in the issuance of a single certificate under para 1.570.

As noted in the above review of facts, reexamination has been ordered in each of the above reexamination proceedings. Accordingly, merger of the proceedings under 37 C.F.R. 1.5659 (c) is appropriate. MPEP 2283 further sets forth:

> If the second request is based upon essentially the *same* patents or publications as in the first request or on patents or printed publications which raise essentially the same issues as those raised in the first request, and if reexamination is ordered, the examination of the merged proceeding will continue at the point reached in the first reexamination proceeding. If, however, *new* patents or printed publications are presented in the second request which raise different questions than those raised in the first request, then prosecution in the merged reexamination proceeding will be reopened, if applicable, to the extent necessary to fully treat the question raised.


## DECISION

## I.  MERGER OF PROCEEDINGS

In accordance with 37 C.F.R. 1.565(c), the 90/007,503 and 90/007,828 reexamination proceedings are merged. The merged proceeding will be conducted in accordance with the following guidelines and requirements.

## II.  THE SAME CLAIMS MUST BE MAINTAINED IN BOTH PROCEEDINGS

Patent owner is required to maintain the same claims (and specification) in both files throughout the merged proceeding. Since the claims are the same in both files, a "housekeeping amendment" is NOT needed. See MPEP 2283, "Merger of Reexaminations."

## III.  CONDUCT OF MERGED PROCEEDING

All papers mailed by the Office throughout the merged proceeding will take the form of a single action which applies to all proceedings. All papers issued by the Office of filed by the patent owner will contain the identifying data for all files and will be physically entered in each reexamination file. All papers filed by the patent owner must consist of a single response, **filed in duplicate**, each bearing a signature and identifying data for all files, for entry into each file.

All correspondence from the USPTO will be addressed to the patent owner's representative address listed in Reexamination Control Nos. 90/007,503 and 90/007,828 as:

> John P. White
> COOPER & DUNLAP LLP
> 1185 Avenue of the Americas
> New York, New York 10036

A copy of all correspondence from the USPTO will be served on the third party requester at the address listed in Reexamination Control No. 90/007,503 as:

> Grantland G. Drutchas
> MCDONNELL BOEHNEN HULBERT
> & BERGHOFF LLP
> 300 S. Wacker Drive, Suite 3100
> Chicago, IL 60606

A copy of all correspondence from the USPTO will be served on the third party requester at the address listed in Reexamination Control No. 90/007,828 as:

> Dr. Raj Bawa
> BAWA BIOTECHNOLOGY CONSULTING LLP
> 21005 Starflower Way
> Ashburn  VA 20147

## CONCLUSION

Reexamination Control Nos. 90/007,503 and 90/007,828 are merged.  The merged reexamination files are being forwarded to the examiner for preparation of an Office action, to be issued in due course

Any inquiry concerning this decision should be directed to Deborah Jones, Special Programs Examiner, at telephone No. (571) 272-1535.

Lissi M. Marquis, Director
Central Reexamination Unit

# Eᴀʜɪʙɪᴛ D



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,828 <br> 90/007,503 | 12/02/2005 | 6410516 | | 4525 |

23432     7590     08/02/2006

COOPER & DUNHAM, LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NY 10036

| EXAMINER |
|---|
| Celsa, Bennett |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3991 | |

DATE MAILED: 08/02/2006

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Dr. Raj Bawa

Bawa Biotechnology Consulting, LLC

21005 Starflower Way

Ashburn, VA 20147

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/007,828*.

PATENT NO. *6410516*.

ART UNIT *3991*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Grantland G. Drutchas

MCDONNELL BOEHNEN HULBERT & BERGHOFF

300 S. Wacker Drive, Suite 3100

Chicago, IL 60606

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. <u>90/007,503</u>.

PATENT NO. <u>6410516</u>.

ART UNIT <u>3991</u>.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

| Office Action in Ex Parte Reexamination | Control No. 90/007,828    90/007,503 | Patent Under Reexamination 6410516 |
| --- | --- | --- |
| | Examiner Bennett Celsa | Art Unit 3991 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a☒ Responsive to the communication(s) filed on <u>04 May 2006</u> .      b☐ This action is made FINAL.
c☒ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>two</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I     THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☒ Notice of References Cited by Examiner, PTO-892.      3. ☐ Interview Summary, PTO-474.
2. ☒ Information Disclosure Statement, PTO-1449.      4. ☐ _____ .

Part II    SUMMARY OF ACTION

1a. ☒ Claims *1-203* are subject to reexamination.

1b. ☐ Claims _____ are not subject to reexamination.

2. ☐ Claims _____ have been canceled in the present reexamination proceeding.

3. ☒ Claims *19,44-46,52,101-103,108,111-113,118,121-123,130-132,141-143,151-153,161-163,169-171,179-181,187-191,194-196 and 202* are patentable and/or confirmed.

4. ☒ Claims *1-18,20-43,47-51,53-100,104-107,109,110,114-117,119,120,124-129,133-140,144-150,154-160,164-168,172-178,182-186,192,193, 197-201 and 203* are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ The drawings, filed on _____ are acceptable.

7. ☐ The proposed drawing correction, filed on _____ has been (7a)☐ approved (7b)☐ disapproved.

8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

   a)☐ All  b)☐ Some*  c)☐ None      of the certified copies have

   1☐ been received.

   2☐ not been received.

   3☐ been filed in Application No. _____ .

   4☐ been filed in reexamination Control No. _____ .

   5☐ been received by the International Bureau in PCT application No. _____ .

   * See the attached detailed Office action for a list of the certified copies not received.

9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

10. ☐ Other: _____ .

cc: Requester (if third party requester)

Application/Control Number: 90/007,503; 90/007,828                    Page 2
Art Unit: 3991

## DETAILED ACTION: *Reexamination:*

### *First Office Action In Merged '7503 and '7828 Proceedings.*

#### *Procedural Posture:*

1. U.S. Patent No. 6,410,516 issued on June 25, 2002.

2. A request for reexamination, assigned control No. 90/007,503, was filed by a third party requester on April 4, 2005. Reexamination was ordered for the '7503 proceeding on June 8, 2005.

3. A request for reexamination, assigned control No. 90/007,828, was filed by a third party requester on December 2, 2005. Reexamination was ordered for the '7828 proceeding on December 12, 2005.

4. No Patent Owner's Statement was received in either reexamination.

5. No Office action has been issued in either reexamination.

6. Reexams 90/007,503 and 90/007,828 were merged on May 4, 2006.

#### *Status of the Claims*

U.S. Patent 6,410,516 claims 1-203 are subject to reexamination.

#### Ongoing Duty to Disclose

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving Patent No. 6,410,516 throughout the course of this reexamination proceeding. The third party requesters are also reminded of the ability to similarly apprise the Office of any such activity or proceeding throughout the course of this reexamination proceeding. See MPEP §§ 2207, 2282 and 2286.

#### *Information Disclosure Statement (IDS)*

It is noted that the present proceedings contain more than 1,000 documents submitted in several separate IDS's. It is noted that:

Once the minimum requirements of 37 CFR 1.97 and 37 CFR 1.98 are met, the examiner has an obligation

to consider the information. It is to be noted, however, that consideration by the examiner of the information

submitted in an IDS will be considered  in the same manner as other documents in Office search files are

considered by the examiner while conducting a search of the prior art in a proper field of search. See MPEP

609, at page 600-125, Revision 2, May 2004.  The initials of the examiner placed adjacent to the citations on the

PTO-1449 or PTO/SB/08A and 08B or its equivalent mean that the information has been considered by the examiner

to the extent noted above.  If there is a reference of particular relevance, the patentee is required to point out the

document and its relevance to the Examiner.

## *Priority*

Application 08/464,364 (filed 6/5/95) issued US Pat. No. 6,410,516 (Baltimore
patent) is:

-A DIV of 08/418,266 (filed 4/6/95) issued as US Pat. No. 5,804,374
which is a CON of 07/791,898 (filed 11/13/91) (ABN: 5/16/95);
which is a CIP of 06/946,365 (filed 12/24/86) (ABN:3/24/92)
AND:
-a CIP of 07/341,436 filed 04/21/1989 (ABN: 4/3/92)
-a CIP of 07/280,173 filed 12/05/1988 (ABN: 3/24/92)
-a CIP of 07/318,901 filed 03/03/1989(ABN: 12/12/91)
- a CIP of 07/162,680 filed 03/01/1988 (ABN:8/30/90)
 -a CIP of 07/155,207 filed 02/12/1988 (ABN:7/26/90)
- a CIP of 06/817,441 filed 01/09/1986 (ABN:1/13/89)

For purposes of 35 USC 120 priority, the above-identified CIP applications (e.g.

original specification and original claims) fail to adequately describe and/or enable the

methods of claims 1-203 of the instant Baltimore Patent claims subject to

reexamination. See MPEP 2258. Accordingly, **claims 1-203**, the reexamination patent

claims are entitled to the filing date **11/13/91** of continuation application 07/791,898 for

purposes of prior art. Every claim of the '516 patent (1-203) recites at least one of the

following features which the pre-1991 applications fail to disclose:

a. an amino acid or nucleic acid sequence corresponding to NF-κB;

b. support for the Baltimore patent claim limitations including (but not limited to):

    -"reducing NF-κB activity" in a cell (e.g. especially mammalian/eukaryotic) and/or

    an enabling means thereof (e.g. administering a NF-κB inhibitor) to effect

    various functions (e.g. inhibit expression generally, reduce cytokine expression

    etc.) as *required in all the claims*;

    -"reduce binding of NF-κB to NF-κB recognition sites on genes which are

    transcriptionally regulated by NF-κB" (e.g., claims 25, 36, 47, 69, 80, 93, 144,

    154 and 182);

    -"inhibiting modification of an IκB protein, which modification otherwise reduces

    IκB binding to NF-κB" (e.g., claims 22, 33, and 44);

    -"inhibiting degradation of an IκB protein" (e.g., claims 23, 34, and 45);

    -"inhibiting dissociation of NF-κB:IκB complexes" (e.g., claims 24, 35, and 46).

Regarding claim 203 directed to nucleic acid decoy molecules, the first appearance of

any claims or disclosure relating to nucleic acid decoy molecules occurred in U.S.

Patent Appl. 07/341,436 (filed April 21, 1989). However, the 07/341,436 specification

(at page 29, lines 9-14) and 07/341,436 original claim 18 provide support and

enablement only for the use of "decoy" molecules for inhibiting expression in a cell, as in

cell culture, and NOT for *in vivo* use in *mammalian cells* as encompassed by the instant

claim. This is true since there is no disclosed support in the 07/341,436 for DNA delivery

or transfection of nucleic acid decoys for NF-κB inhibition in mammalian cells as

required in the instant claims; nor are there any disclosed sequences of nucleic acid

decoy molecules for *in vivo* use. The only experimental data correlating NF-κB with a

biological result demonstrates NF-κB's ability to activate or increase gene expression.
See instant patent, Example 15, Col. 73-81. It is noted that the written description
requirement is satisfied only by describing the actual invention, and not that which
makes it obvious. *Lockwood v. American Airlines, Inc.* 107 F.3d 1565, 1572. 41
USPQ2d 1961, 1968 (Fed. Cir. 1997).

Both 3rd Party requesters argue that the instant patent claims should be afforded
the priority of the 08/464,364 (filed 6/5/95) since the newly introduced claims therein
constitute new matter or lack written description under 35 USC 112, first paragraph.

The requester's proposed effective filing date of March 27, 1995 is not adopted. It
is noted that, although a reexamination proceeding provides a complete reexamination
of the patent claims on the basis of prior art patents and printed publications, issues
relating to 35 U.S.C. 112 are addressed only with respect to new claims or amendatory
subject matter in the specification, claims or drawings during the reexamination
proceeding. See 37 CFR 1.552;MPEP 2258 (Scope of Ex Parte Reexamination). In the
reexamination context, effective filing date priority of patented claims to continuation or
divisional applications that do not contain new matter is presumed valid.

**Prior Court Proceedings and Substantial New Question of Patentability**

When the initial question as to whether the prior art raises a substantial new
question of patentability as to a patent claim is under consideration, the existence of a
final court decision of claim validity in view of the same or different prior art does not
necessarily mean that no new question is present, because of the different standards of
proof employed by the Federal District Courts and the Office. While the Office may

Application/Control Number: 90/007,503; 90/007,828                    Page 6
Art Unit: 3991

accord deference to factual findings made by the district court, the determination of

whether a substantial new question of patentability exists will be made independently of

the court's decision on validity, because it is not controlling on the Office. MPEP 2242.

### Unsuccessful Assertions of a Substantial New Question of Patentability

**1. The 90/007,503 Request**:  On pages 50-52 of the '7503 request, under the heading

"Additional Compounds", the requester points the Examiner to an NF-κB org website

which lists additional compounds which are reported to inhibit NF-κB including aspirin,

sulindac, gold compounds, tea, turmeric and garlic to which references were cited

without any indication of the relevant document portions or how these documents were

to be applied to the instant claims.  A proper request for reexamination must include:

(1) A statement pointing out each substantial new question of patentability based on

prior patents and printed publications; and  (2) An identification of every claim for which

reexamination is requested, and a detailed explanation of the pertinency and manner of

applying the cited prior art to every claim for which reexamination is requested. 37

C.F.R. 1.510 (b)(1)(2); 35 U.S.C. 302; MPEP 2214.   Accordingly, the '7503 request

regarding "Additional Compounds" fails to raise a substantial new question of

patentability since the requester fails to specifically recite the substantial new question

of patentability by providing a detailed explanation of the pertinency and manner of

applying the cited prior art to every claim requested for reexamination.

**2. The 90/007,828 Request**:  Upon reconsideration of the Order Granting *Ex Parte*

Reexamination mailed on December 12, 2005 (hereinafter the Order), it is determined

that certain of the grounds upon which substantial new questions of patentability

(SNQs) were found to exist are not proper grounds. Specifically, the '516 patent derives

35 U.S.C. § 120 benefit as being a division of application No. 08/ 418,266 (now U.S.

patent No. 5,804,374), which in turn was a continuation of abandoned application

07/791,898, filed November 13, 1999. Since the patent being reexamined claims

benefit of prior patents and/or applications that are directly related to the patent being

reexamined as continuations and/or divisions, without intervening patents or

applications that are continuations-in-part, the patent claims being reexamined are

entitled to the presumption that examiner considered the question of entitlement to the

Section 120 benefit claims during the examination of the '516 patent for purposes of this

reexamination. Accordingly, the question of such entitlement does not raise a SNQ for

purposes of the present *ex parte* reexamination proceeding, and any statement to that

effect in the December 12, 2005 Order is hereby expressly withdrawn. Therefore, the

action that follows will not contain any discussion of *prior art documents* dated

subsequent to November 13, 1991 including:

1. *Tanaka* et al. *Nucleic Acids Res.* 22:3069 (1994);
2. *Eck* et al. Mol. *Cell. Biol.* 6530 (1993);
3. *Schreck* et al. *J. Exp. Med.* 175:1181 (May 1992).
and will not apply such documents under 35 U.S.C. 102 or 35 U.S.C. 103.

### The 6,410,516 Patented Invention:

The Baltimore patent claims are directed to methods of reducing or otherwise

modifying the naturally occurring transcription factor NF-κB activity in cells affecting

gene expression. Claim 1 is illustrative:

*1.* A method of inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-κB, the method comprising reducing NF-κB activity in the cell such that the expression of said gene is inhibited.

### *Claim Interpretation*

Initially, it is noted that The USPTO must give claims their broadest reasonable interpretation, in light of and consistent with the written description of the invention in the application. See *In re Donaldson Co.*, 16 F.3d 1189, 29 USPQ2d 1845 (Fed. Cir. 1994). With respect to claim 1 it is noted that the sole method step is functional i.e. reducing NF-κB activity. Accordingly, the claims would encompass any *in vitro* or *in vivo*, natural (indirect) or man-made (direct) means of reducing NF-κB activity. Indeed, most of the method steps recited in the Baltimore patent are purely functional with the exception of claim 7 and dependent claims 81, 83 and 85-87 which require "modifying NF-κB activity" (which are partially functional) and claim 203 which requires "introducing a nucleic acid decoy molecule into the cell" which requires an active step. The summary of the remaining reexamination claims provided in pages 12-15 of the '7503 request is herein incorporated by reference.

### *Relevant Case law*

"The discovery of a previously unappreciated property of a prior art composition, or of a scientific explanation for the prior art's functioning, does not render the old composition patentably new to the discoverer." *Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1347, 51 USPQ2d 1943, 1947 (Fed. Cir. 1999). Thus the claiming of a new use, new function or unknown property which is inherently present in the prior art does not necessarily make the claim patentable. *In re Best*, 562 F.2d 1252, 1254, 195 USPQ

430, 433 (CCPA 1977); *Ex parte Novitski*, 26 USPQ2d 1389 (Bd. Pat.App. & Inter.

1993); *In re Cruciferous Sprout Litigation,* 301 F3d. 1343, 64 USPQ2d 1202 (Fed. Cir.

2002); In *In re Crish*, 393 F.3d 1253, 1258, 73 USPQ2d 1364, 1368 (Fed. Cir. 2004).

Although, normally, only one reference should be used in making a rejection under 35

U.S.C. 102, a 35 U.S.C. 102 rejection over multiple references has been held to be

proper when the extra references are cited to show that a characteristic not disclosed in

the reference is inherent. See MPEP 2131.01.  Once a reference's teaching is shown to

provide evidence or reasoning tending to show inherency, the burden shifts to Applicant

to show an unobvious difference. MPEP 2112 (V).

### Claim Rejections - 35 USC § 102

1.    The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for a patent.
(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.
(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or on an international application by another who has fulfilled the requirements of paragraphs (1), (2), and (4) of section 371(c) of this title before the invention thereof by the applicant for patent.

The changes made to 35 U.S.C. 102(e) by the American Inventors Protection Act

of 1999 (AIPA) and the Intellectual Property and High Technology Technical

Amendments Act of 2002 do not apply when the reference is a U.S. patent resulting

directly or indirectly from an international application filed before November 29, 2000.

Therefore, the prior art date of the reference is determined under 35 U.S.C. 102(e) prior

to the amendment by the AIPA (pre-AIPA 35 U.S.C. 102(e)).

### *Claim Rejections - 35 USC § 103*

2.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

### I. PROTEIN KINASE C INHIBITORS: (intervening prior art): *Express anticipation*

### *by Meichle or Shirakawa.*

3.      Claims 1-9, 11, 20-21, 25-29, 31, 32, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65,

69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201

are rejected under 35 U.S.C. 102(b) as anticipated by or, in the alternative, under 35

U.S.C. 103(a) as obvious over *Meichle* (J. Biol. Chem. 265 (5/90) 8339-43).

**Rejection Summary:** *Meichle* teaches the reduction of NF-κB activity in induced cells

using agents that inhibit protein kinase C.  In addition, because *Meichle* used the HIV

LTR in their experiments, this reference anticipates, or alternatively, makes obvious

claims drawn to regulating expression of viral genes.

       The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims

1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under

transcriptional control of NF-κB. For example, NF-κB activity can be effected by

diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit

associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine

protein(claim 5) in a eukaryotic cell.

Meichle analyzed various Protein Kinase C inhibitors and their effect on both PMA- (phorbol 12-myristate-13-acetate) and TNF- (tumor necrosis factor) induced NF-κB activity in eukaryotic Jurkat cells. Using an EMSA binding assay similar to that disclosed in the '516 patent, Meichle found that Protein Kinase C Inhibitor H8 reduced PMA-induced NF-κB activity in these cells (Fig. 3, lane 7). Other inhibitors also were shown to reduce NF-κB activity, including Protein Kinase C Inhibitor H7 (Fig. 2B, lanes 3. vs. 5) and Staurosporine (Fig. 2B, lanes 6 and 7).

Thus, Meichle teaches the use of Protein Kinase Inhibitor H8 (among others) to reduce NF-κB –mediated gene transcription by reducing NF-κB activity and reducing the binding of NF-κB to NF-κB binding sites. As such (and as shown in Exhibit G-2 of the 90/007,503 Request, hereby incorporated by reference) this reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97.

Additionally, because Meichle used a genetic construct comprising HIV LTR and NF-κB binding site, Meichle rendered claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201 immediately envisaged (i.e. anticipated) or alternatively prima facie obvious in light of the fact that the HIV LTR promoter is responsible for regulating the expression of viral (HIV) genes. Therefore, it would have been immediately envisaged, or alternatively prima facie obvious, to regulate NF-κB activity as in Meichle in order to affect associated viral (e.g. HIV) gene expression.

4.      Claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76,

80-86, 88-89 and 93-97 are rejected under 35 U.S.C. 102(b) as anticipated by

*Shirakawa* (Mol. And Cell. Biol. 9 (6/89) 2424-30).

**Rejection Summary:** *Shirakawa* teaches reduction of NF-κB activity in induced cells

using agents that inhibit protein kinase C.

        The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims

1 or 2) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under

transcriptional control of NF-κB. For example, NF-κB activity can be effected by

diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit

associated gene (claims 1-2) expression of a cytokine protein (claim 5) in a eukaryotic

cell.

        Analogous to *Meichle* discussed *supra*, *Shirikawa* performed similar tests with

Protein Kinase C Inhibitor H8 on eukaryotic cells that had been induced with interleukin

1 (IL-1).  The authors first demonstrated that IL-1 acted to induce NF-κB activity in

70Z/3 cells as demonstrated by the EMSA binding and CAT reporter assays (p.2425

Fig. 1; p. 2426 Fig. 2).  The EMSA binding and CAT reporter assays then confirmed that

Protein Kinase Inhibitor H8 reduced NF-κB activity and reduced the resulting CAT gene

expression. More particularly, the treatment of cells with H8 using EMSA resulted in

"[t]he induction by IL-1 was abolished ..." (p. 2426, Fig. 2A, lane 5)"; and using CAT  "IL-

1 induced κ immunoglobulin expression was markedly inhibited ..." (p. 2425). These

results were confirmed in a different cell line ("As was the case in 70Z/3 cells, NF-κB

activation was markedly inhibited by H8 in YT cells (Fig. 2B, lane 9)."

Thus, *Shirikawa* teaches the use of Protein Kinase Inhibitor H8 (among others) to reduce NF-κB –mediated gene transcription by reducing NF-κB activity and reducing the binding of NF-κB to NF-κB binding sites. As such (and as shown in *Exhibit G-2* of the 90/007,503 Request herein incorporated by reference) this reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97.

**IIa. CYCLOSPORIN A (intervening prior art): E*xpress anticipation by Schmidt, Emmel* and *Brini***

5.      Claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201 are rejected under 35 U.S.C. 102(b) as being anticipated, or alternatively rendered obvious under § 103, over *Schmidt* et al., J. Virology 64:4037-4041 (August 1990). See MPEP 2131.01 (evidence of inherency).

**Rejection Summary:** *Schmidt* teaches administration of Cyclosporin A (CsA) to cells which substantially reduced NF-κB activity in those cells thus inhibiting expression of genes whose transcription is regulated by NF-κB activity. In addition, these references all utilized the HIV LTR promoter in their experiments and demonstrated that CsA reduced the expression of viral genes.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit

associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein(claim 5) in a eukaryotic cell.

The *Schmidt* reference discloses that administration of Cyclosporin A (CsA) reduces NF-κB in cells (e.g. Jurkat cells) and therefore must inherently reduce NF-κB-regulated gene expression. In particular, *Schmidt* utilized the Electrophoretic Mobility Shift Assay ("EMSA") disclosed in the '516 patent to measure NF-κB activity to determine that "PHA-mediated induction of complexes binding to the kB enhancer was completely abrogated by [1ug/ml] CsA (Fig. 1, lane 6; no B or A shifts) ....". See *Schmidt* at 4038. These results were confirmed using an NF-κB CAT reporter assay as described in the '516 patent, for example at Col. 17, line 66-Col. 18, line 23.

Thus, *Schmidt* showed that Cyclosporin A reduced PHA-induced NF-κB activity and, therefore, reduced the expression of a gene (CAT) that was regulated by NF-κB. Accordingly, *Schmidt* described the use of Cyclosporin A at concentrations that reduce NF-κB activity and reduce NF-κB regulated gene expression. As such, and as shown in more detail in *Exhibit G-1* of the 90/007,503 Request (herein incorporated by reference), the *Schmidt* reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80- 86, 88-89, and 93-97 of the '516 patent.

Since *Schmidt* used the HIV LTR gene, *Schmidt* demonstrated that CsA reduced viral gene expression thereby anticipating instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201. Additionally, use of the HIV LTR gene by *Schmidt* renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201 immediately envisaged, or alternatively, *prima facie* obvious in

light of the fact that HIV LTR is responsible for regulating the expression of viral (HIV)

genes. Therefore, it would have anticipated, or alternatively *prima facie* obvious, to

regulate NF-κB activity as in *Schmidt* in order to affect associated viral (e.g. HIV) gene

expression.

6.      Claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73,

75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201 are

rejected under 35 U.S.C. 102(b) as being anticipated, or alternatively rendered obvious

under § 103, by *Emmel* et al., Science, <u>246</u> (Dec. 1989):1617-20 See MPEP 2131.01.

**Rejection Summary:** *Emmel* teaches administration of Cyclosporin A (CsA) to cells

which substantially reduced NF-κB activity in those cells thus inhibiting expression of

genes whose transcription is regulated by NF-κB activity. In addition, these references

all utilized the HIV LTR promoter in their experiments and demonstrated that CsA

reduced the expression of viral genes.

        The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims

1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under

transcriptional control of NF-κB. For example, NF-κB activity can be effected by

diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit

associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein

(claim 5) in a eukaryotic cell.

        Similar to the *Schmidt* reference discussed above, the *Emmel* reference

discloses that administration of Cyclosporin A (CsA) reduces NF-κB in cells (e.g.

eukaryotic Jurkat cells) that inherently reduces NF-κB-regulated gene expression.

Like *Schmidt*, *Emmel* described the effects of CsA on Jurkat cells that were

induced with PHA and PMA and CsA was shown (Fig. 3, .01-1ug/ml) to reduce NF-κB

binding activity. In the CAT reporter assay, cells were transfected with a CAT reporter

gene that was engineered to be regulated by HIV LTR gene, i.e. the gene had an NF-κB

binding site incorporated into its regulatory region. As shown in Fig. 2D, CsA

significantly reduced NF-κB activity thereby reducing the NF-κB-mediated expression of

CAT. Additionally, as shown in Figure 3, 0.01-1ug/ml (10-10000 ng/ml) CsA was found

to reduce NF-κB binding activity. Thus, *Emmel* described the use of CsA at

concentrations that reduce NF-κB activity and reduce NF-κB regulated gene

expression, and as such, and as shown in more detail in *Exhibit G-1* of the 90/007,503

Request (incorporated by reference), the *Emmel* reference expressly anticipates at least

claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80- 86, 88-89,

and 93-97 of the '516 patent.

Since *Emmel* used the HIV LTR gene, *Emmel* demonstrated that Cyclosporin A

reduced viral gene expression thereby anticipating claims 3, 4, 11, 42-43, 47-51, 106-

107, 109-110, 114-117, 192-193 and 197-201. Additionally, *Emmel's* use of the HIV

LTR gene renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117,

192-193 and 197-201 immediately envisaged, or alternatively, *prima facie* obvious since

HIV LTR is responsible for regulating the expression of viral (HIV) genes. Therefore, it

would have been anticipated, or alternatively *prima facie* obvious, to regulate NF-κB

activity as in *Emmel* in order to affect associated viral (e.g. HIV) gene expression.

7.      Claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73,

75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201 are

rejected under 35 U.S.C. 102(b) as being anticipated, or alternatively rendered obvious

under § 103 by *Brini* Eur. Cytokine Net. 1: 131-139 (Sept. 1990).

**Rejection Summary:**  *Brini* teaches administration of Cyclosporin A (CsA) to cells

which substantially reduced NF-κB activity in those cells thus inhibiting expression of

genes whose transcription is regulated by NF-κB activity.  In addition, these references

all utilized the HIV LTR promoter in their experiments and demonstrated that CsA

reduced the expression of viral genes.

        The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims

1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under

transcriptional control of NF-κB. For example, NF-κB activity can be effected by

diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit

associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine

protein(claim 5) in a eukaryotic cell.

        The *Brini* reference discloses that administration of Cyclosporin A (CsA) reduces

NF-κB in cells (e.g. T-cells) that inherently reduces NF-κB-regulated gene expression.

        Particularly, *Brini* disclosed the use of 1 ug/ml CsA in human PBM (peripheral

blood T-lymphocytes) that had been induced with PHA. *Brini* assessed NF-κB activity in

an EMSA binding assay (Fig. 5) using the same HIV-1 LTR gene site used in the '516

patent to assess NF-κB activity and binding (see '516 patent, columns 17-18). *Brini*

concluded that "CsA reduced the PHA-induced binding of transactivating factors from T-

cells and κB-like sequences which are present in the IL-2R alpha gene and in the HIV-1

LTR gene (Figures 3 and 4)". See *Brini* at page 137. Additionally, *Brini* reported the

effects of CsA on expression levels of IL-2 Receptor-alpha (*Brini* at page 131 Abstract)

which is taught by the '516 patent to be regulated by PHA-induced NF-κB activity in T-

cells. See '516 patent, col. 17, lines 21-24 ("NF-κB is induced in T-cells by a trans-

activator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-2

receptor alpha gene and possibly the IL-2 gene"). Thus, *Brini* described the use of CsA

at concentrations that reduce NF-κB activity and reduce NF-κB regulated gene

expression and as such, and as shown in more detail in *Exhibit G-1* of the 90/007,503

Request (incorporated by reference), the Emmel reference expressly anticipates at least

claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80- 86, 88-89,

and 93-97 of the '516 patent.

Additionally, since *Brini* used the HIV LTR gene, *Brini* demonstrated that

Cyclosporin A reduced viral gene expression thereby anticipating claims 3, 4, 11, 42-43,

47-51, 106-107, 109-110, 114-117, 192-193 and 197-201. Additionally, *Brini's* use of

HIV LTR renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-

193 and 197-201, immediately envisaged, or alternatively, *prima facie* obvious since

HIV LTR is responsible for regulating the expression of viral (HIV) genes.

Therefore, it would have been anticipated, or alternatively *prima facie* obvious, to

regulate NF-κB activity as in *Brini* in order to affect associated viral (e.g. HIV) gene

expression.

**IIb. CYCLOSPORIN A: (references prior to 12/24/86): inherent anticipation**

**A. Inherent Anticipation by PDR 1985, Griffith I and Griffith II (CsA reduction of NFκB activity in Cardiac Transplant Patients).**

8.      Claims 1-2, 6-9, 20-29, 31-40, 64-73, 75-86 and 88-97 are rejected under 35 U.S.C. 102(b) as being anticipated by the Physician's Desk Reference (*PDR: 1985*) pages 1811-13, *Griffith I* (Griffith et al., Ann. Surg. 196 (9/82): 324-329) or *Griffith II* .(Griffith et al., J. Thorac. Cardiovasc. Surg. 99 (12/84): 952-957) as evidenced by Holschermann et al., Circulation 96 (12/97) 4232-4238. See MPEP 2131.01 (evidence of inherency).

Rejection Summary: *PDR* (1985), *Griffith I and, Griffith II* teach cyclosporin A (CsA) administration of cells, which is shown from the teaching of *Holschermann,* inherently reduces NF-κB activity and thus would inhibit expression of genes whose transcription is regulated by NF-κB activity.  The inhibition is done by reducing binding of NF-κB to NF-κB recognition sites, which also decreases the level of NF-κB not bound in a NF-κB-IκB complex, inhibiting the passage of NF-κB into the nucleus of cells, inhibiting modification of an IκB protein, and inhibiting degradation of an IκB protein. The prior art references also teach CsA administration to different eukaryotic cell types.

        The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing

the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated

gene (claims 1-2) expression in a eukaryotic cell.

The *PDR 1985*, *Griffith I* and *Griffith II* references all teach the *in vivo*

administration of CsA to cardiac transplant patients.

*PDR 1985* teaches that CsA should be administered before and after surgery for

1-2 weeks at a dose of about 15 mg/kg/d, followed by a decrease of 5% per week to a

final level of 5-10 mg/kg/day. When monitoring whole blood levels, a 24-hour trough

value of 250-800 ng/ml CsA appeared to minimize side effects and rejection effects.

*Griffith I* reports the administration of 5-10 mg/kg/d of CsA (average 8 mg/kg/d);

while *Griffith II* reports the administration of 2-30 mg/kg/d (average 7.5-8 mg/kg/d) to

obtain a targeted blood level of CsA of about 1000ng/ml.

*Hölschermann* provides extrinsic evidence that the PDR 1985, Griffith I, and

Griffith II references inherently anticipate the subject claims.

*Hölschermann* essentially repeated the tests disclosed in the *Griffith I* and *II*

references by administering 3.4 ± 0.3 mg/kg/day CsA to cardiac transplant patients,

resulting in blood levels of 681 ± 176 ng/ml. PBM cells were isolated from the blood of

the patients before and after CsA therapy, and nuclear extracts from the cells were

prepared. Id. *Hölschermann* then conducted an EMSA assay using nuclear extracts.

(see Figure 4) which is the same assay format taught by the '516 patent for determining

whether compounds (i) reduce NF-κB activity and (ii) reduce binding of NF-κB to NF-κB

recognition sites. See '516 patent, Col. 18, l.52 – Col. 20, l. 25.

*Hölschermann* confirms that administering CsA to cardiac patients as taught by the prior art *PDR 1985* and *Griffith I* and *II* references necessarily inherently reduces NF-κB activity (and binding of NF-κB to NF-κB recognition sites):

> In cells obtained from transplant recipients during low baseline CsA blood levels (before CsA administration), strong NF-κB binding activity was detected (Fig. 4), whereas cells separated from blood in the presence of high CsA concentrations exhibited decisively reduced NF-κB binding activity. Specificity of the binding reaction was shown by the competition with unlabeled consensus oligonucleotides. *Id.* at 4236.

*Hölschermann* also showed that the administration of CsA to these patients as taught in the prior art *PDR 1985* and *Griffith I* and *II* references reduced Tissue Factor (TF) gene transcription, which is recognized as being regulated by NF-κB: "Indeed, the marked activation of the NF-κB transcription factor, which is known to play a major role in the regulation of the TF gene, was prevented in the presence of high CsA blood concentrations." *Id.* at 4237.

Thus, Cyclosporin A, as administered in the prior art *PDR 1985* and *Griffith I* and *II* references:

a. inhibited expression of a gene whose transcription is regulated by NF-κB (instant claims 1 and 2 and their dependent claims);

b. diminished NF-κB-mediated intracellular signaling (clm 6 and dependent claims); and

c. reduced NF-κB-mediated effects of external influences (claims 7 and 8 and dependent claims).

Since CsA was shown to reduce binding of NF-κB in an EMSA assay which measures

binding of NF-κB to NF-κB recognition sites, *Hölschermann* confirms that the prior art

administration of CsA to cardiac patients reduces NF-κB activity by "reducing binding of

NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB" (e.g.

claims 25, 36 and 58). Additionally, because unbound NF-κB translocates to the

nucleus, the reduced binding activity in the nucleus of cells reflected in *Hölschermann*

means that CsA, as administered in *PDR 1985* and *Griffith I* and *II*, necessarily reduced

NF-κB activity by:

> a. "decreasing the level of NF-κB not bound in any NF-κB- IκB complex" (e.g.
>
> claims 20, 31 and 53); and
>
> b. "inhibiting the passage of NF-κB into the nucleus of cells (e.g. claims 21, 32
>
> and 54).

Furthermore, as *Hölschermann* indicates, CsA is recognized as being able to "abolish

the inducible phosphorylation and degradation of the cytoplasmic inhibitor protein IκB."

*Id.* at 4237 (citing *Alkalay*).   *Hölschermann* confirms that this effect on degradation of

IκB is the mechanism by which CsA reduced NFκB in these cardiac patients. Thus,

Cyclosporin A when administered to humans as in the *PDR 1985* and *Griffith I* and *II*

references reduces NF-κB activity by:

> a. "inhibiting modification of an IκB protein, which modification otherwise reduces
>
> IκB binding to NF-κB" (e.g. claims 22 and 33); and
>
> b. "inhibiting degradation of an I-κB protein" (e.g. claims 23 and 34).

Finally, as demonstrated by *Hölschermann*, the *PDR 1985* and *Griffith I* and *II* reference

CsA administration to human patients reduced NF-κB activity in those patients'

peripheral blood mononuclear cells (PBM's comprised of lymphocytes and monocytes)

which anticipates:

(1) eukaryotic cells (claims 1-2, 5, 7 and 9);

(2) mammalian cells (claims 26, 37, 70, 82 and 94);

(3) human cells (claims 27, 38, 71, 84 and 95);

(4) immune cells (claims 28, 39, 61, 72 and 85); and

(5) lymphocyte cells (claims 29, 40, 62, 73, 86 and 97).

It is noted that the dosage and blood levels of CsA shown by *Holschermann* to

reduce NF-κB activity is slightly lower than the dosages and blood levels of CsA taught

in the *PDR 1985*, *Griffith I* and *II* references. Accordingly, an even greater reduction in

NF-κB activity would result from the prior art administration of CsA to patients as

described these references than shown in *Holschermann*. Moreover, regardless

whether the effect of CsA in reducing NF-κB activity and resulting monocyte TF

activation is direct (by directly affecting monocytes) or indirect (by interfering with

stimulatory lymphocytes), *Holschermann* shows that CsA, as administered in the prior

art references reduces NF-κB activity and resulting TF gene expression. Thus, its

administration to cardiac transplant patients as taught in *PDR 1985*, *Griffith I* and *II*

anticipates at least claims 1-2, 6-9, 20-29, 31-40, 64-73, 75-86 and 88-97 of the'516

patent, as set forth in more detail in *Exhibit H-1* of the 90/007,503 Request

(incorporated by reference).

**B. Inherent *Anticipation by Reed* (*CsA reduction of* NF-κB activity *in vivo* and *in vitro* in *Human PBM Cell Cultures*).**

9.      Claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 are rejected under 35 U.S.C. 102(b) as being anticipated by *Reed* et al., J. Immunol. <u>137</u> (7/86): 150-154 as evidenced by *Brini* Eur. Cytokine Net. 1: 131-139 (Sept. 1990). See MPEP 2131.01 (evidence of inherency).

**Rejection Summary:** *Reed* teaches cyclosporin A (CsA) administration of cells, which, as is shown from *Brini*, inherently reduces NF-κB activity and thus would inhibit expression of genes whose transcription is regulated by NF-κB activity.  The inhibition is done by reducing binding of NF-κB to NF-κB recognition sites, which also decreases the level of NF-κB not bound in a NF-κB-IκB complex, inhibiting the passage of NF-κB into the nucleus of cells, inhibiting modification of an IκB protein, and inhibiting degradation of an IκB protein. The prior art references also teach CsA administration to different cell types.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene  expression of a cytokine protein (claim 5) in a eukaryotic cell.

The *in vivo* effect of CsA in reducing NF-κB activity in human PBM cells is confirmed by tests using CsA in human PBM cell cultures.

For example, *Reed* taught the prior art use of CsA in human PBM cell cultures

that had been induced with phytohaemaglutinin (PHA). In particular, *Reed* teaches that

CsA (1ug/ml) significantly reduced PHA induced IL-2 R alpha gene transcription (Figs.

1 and 2) and Tac antigen surface expression (Fig. 3b) in human PBM cells:

> The data presented here demonstrate that CsA and DEX concentrations
> that inhibited PHA-induced proliferation by about 80 to 90% diminished
> by about 50% (on average) the expression of receptors for IL-2 on PBMC.
> This inhibition of IL-2 receptor expression occurred at least in part at a
> pretranslational level and involved a reduction in both high affinity and
> low affinity forms of the receptor. *Reed* at 152.

*Reed* also found that CsA reduced IL-2 gene transcription:"1ug/ml CsA and $10^{-4}$ M DEX

completely blocked the PHA-induced accumulation of mRNA for IL 2 (Fig. 2)." *Id* at 151.

Several years later, *Brini* also looked at the effect of Cyclosporin A on IL-2

Receptor-$\alpha$ production and Tac antigen surface expression and confirmed *Reed's*

results:

> These results are in accordance with Reed et al., who found that CsA
> inhibits Tac induction in mitogen-activated PBMC. The CsA-mediated
> reduction in Tac antigen expression on T-cells was reflected by a decrease
> in the steady state mRNA levels of the IL-2R$\alpha$ chain (Figure 2). *Brini* at 137
> (citations omitted).

*Brini* then went on, however, to show that CsA, as administered in the prior art, reduced

binding of NF-$\kappa$B to NF-$\kappa$B recognition sites for more than one NF-$\kappa$B -medicated gene:

> CsA reduced the PHA-induced binding of transacting factors from T-cells
> and $\kappa$B-like sequences which are present in the IL-2R$\alpha$ gene and in the
> HIV-1 LTR (Figures 3 and 4). *Brini* at 137.

Notably, *Brini* assessed NF-$\kappa$B activity in an EMSA (Fig. 5) using the same H1V-1 LTR

site as used by the instant '516 patent to assess NF-$\kappa$B activity and binding. As such

*Brini* concluded that CsA regulated IL-2Rα gene expression by reducing activation of

NF-κB:

> Taken together, these results suggest that one of the effects of CsA in the
> regulation of the IL-2Rα chain expression in human peripheral T
> lymphocytes is on the activation of sequence specific DNA-binding
> proteins which recognize sequences containing the NF-κB binding site. *Brini* at
> 137.

Using the same inducer, the same immune cells, and the same concentration of

CsA as in *Reed*, *Brini* showed that CsA reduced NF-κB activity and NF-κB –mediated

IL-2 Receptor-α gene expression in PBM cells. In this respect, the instant '516 patent

confirms that the IL-2 receptor alpha (IL-3Rα) gene is regulated by PHA-induced NF-κB

activity in T-cells. Col. 17, lines 21-24 ("NF-κB is induced in T-cells by a trans-activator

(tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-2 receptor alpha

gene and possibly the IL-2 gene"). Thus, *Brini* and the related human T-cell culture

studies discussed below confirm that CsA necessarily and inherently reduced NF-κB

activity and resulting gene expression in PBM cell cultures as taught in *Reed,* thus

anticipating at least claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65,

69-73, 75-76, 80-86, 88-89 and 93-97. A claim element-by-element comparison is

provided in *Exhibit H-2* of the 90/007,503 Request (incorporated by reference).

**C. Inherent** *Anticipation by Kronke and Siebenlist  (CsA reduction of* NF-κB

*activity in vivo and in vitro in Human T-Cell (Jurkat) Cell Cultures).*

10.      Claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76,

80-86, 88-89, and 93-97 are rejected under 35 U.S.C. 102(b) as being anticipated by

*Kronke* et al.(PNAS USA 81 (8/84) 5214-5218) and/or *Siebenlist* et al.(Mol. And Cell

Biol. 6 (9/86) 3042-3049) as evidenced by *Schmidt* et al., J. Virology 64:4037-4041

(August 1990), *Emmel* et al. Science, 246 (Dec. 1989):1617-20 and the *Dr. Manolagas*

*Declaration*. See MPEP 2131.01 (evidence of inherency).

**Rejection Summary:** *Kronke*, or *Siebenlist* teach cyclosporin A (CsA) administration of

cells, which, as is shown from the teachings of *Schmidt and Emmel*, inherently reduces

NF-κB activity and thus would inhibit expression of genes whose transcription is

regulated by NF-κB activity. The inhibition is done by reducing binding of NF-κB to NF-

κB recognition sites, which also decreases the level of NF-κB not bound in a NF-κB-IκB

complex, inhibiting the passage of NF-κB into the nucleus of cells, inhibiting

modification of an IκB protein, and inhibiting degradation of an IκB protein. The prior art

references also teach CsA administration to different cell types.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims

1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene

under transcriptional control of NF-κB. For example, NF-κB activity can be effected by

diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing

the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated

gene expression of a cytokine protein (claim 5) in a eukaryotic cell.

The effect of CsA on reduction of NF-κB activity as administered in the prior art is

also confirmed by tests involving the use of CsA in human T-cell (Jurkat) cultures

including two prior art references, *Kronke* and *Siebenlist*. Using the same inducers, the

same human immune cells, and the same concentration of CsA taught in *Kronke* and

*Siebenlist*, *Schmidt* and *Emmel* provide confirming extrinsic evidence that the use of

CsA in Jurkat cells reduced NF-κB activity. Thus, CsA is clearly recognized to have

necessarily and inherently reduced NF-κB activity and resulting gene expression in

those cells as called for by the instant claims. *Kronke* and *Siebenlist* each disclosed the

use of phytohaemaglutinin (PHA: 1ug/ml) and PMA (50ng/ml) to induce human T-cells

(Jurkat cells). These compounds are described in the instant '516 patent as being

inducers of NF-κB activity (see e.g., '516 patent, col. 33, lines 52-59). *Kronke* and

*Siebenlist* also reported on the effect of 1ug/ml CsA (among other concentrations) on

the cell cultures. Both references report that IL-2 (also known as "TCGF") gene

transcription and/or expression was increased with administration of the NF-κB inducers

phytohaemaglutinin (PHA) and phorbol 12-myristate-13-acetate (PMA), and that such

induced IL-2 expression was reduced by CsA:

> The results of our study demonstrate that TCGF [IL-2] mRNA accumulation in
> induced Jurkat cells is diminished by CsA in a dose-dependent manner and that
> CsA acted by blocking TCGF mRNA transcription. *Kronke at page 5217.*

> &ast;   &ast;   &ast;   &ast;

> CsA at 1 ug/ml ... prevented IL-2 message induction. *Siebenlist at page.3044,*

*Fig. 2.*

Using the same conditions and the same EMSA and CAT reporter assay formats

as described in the instant '516 patent, the *Schmidt* reference clearly demonstrates that

CsA as utilized in the *Kronke and Siebenlist* references reduced NF-κB activity in

Jurkat cell cultures. *Schmidt* reported, however, that there were inducers of NF-κB,

which had different mechanisms of induction than PHA-induction, for which CsA had no

effect. Specifically, *Schmidt* found that phorbol 12-myristate-13-acetate (PMA)-

mediated induction of NF-κB activity was not affected by CsA. The NF-κB CAT reporter

assay confirmed this data, as depicted in Figure 4 ("CsA inhibited the PHA-derived

activation signal but not the PMA signal." *Id.* at 4039).

Similarly, *Emmel* describes the effect of 1ug/ml of CsA on NF-κB activity in

Jurkat cells that had been induced with both PHA and PMA. As shown in Figure 1,

1ug/ml CsA (among other concentrations), reduced NF-κB activity ("NF-κB binding was

reduced 10-20% in nuclear extracts of CsA-treated cells": *Emmel* at 1618).

Furthermore, a CAT assay confirmed these results, as shown in Figure 2d (*Emmel* at

1618) which demonstrates that CsA significantly reduced NF-κB activity at the same

1ug/ml concentration taught in *Kronke* and *Sibenlist,* as shown by the reduced

expression of the NF-κB regulated CAT gene in those cells.

Thus, as discussed above, and in the *Dr. Manolagas Declaration* (*Exhibit J:*

paragraphs 25-32 of 90/007,503 request: incorporated by reference), Schmidt and

Emmel confirm that *Kronke* and *Siebenlist,* which disclose the inhibitory effect of CsA on

NF-κB activity in Jurkat cell cultures, anticipate claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-

40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97of the '516 patent (and

as shown in *Exhibit H-3* of 90/007,503 request: incorporated by reference).

**III.     VITAMIN D (CALCITRIOL) (references prior to 12/24/86): inherent**

**anticipation by *Tsoukas, Manolagas, Lemire I, Lemire II, Rigby I* and *Rigby II***

**(Calcitriol reduces NF-κB activity *in vivo* and *in vitro* in human cell cultures).**

11.      Claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76,

80-86, 88-89 and 93-97 are rejected under 35 U.S.C. 102(b) as being anticipated by

*Tsoukas* (Science 224 (6/84) 1438-40), *Lemire I* (J. Clin. Invest. 74 (8/84) 657-61),

*Lemire II* (J. Immunol. 134 (5/85) 3032-5), *Rigby I* (J. Clin. Invest. 74 (10/84) 1451-5) or

*Rigby II* (J. Immunol. 135 (10/85) 2279-86) and *Manolagas* et al. (JCE&M, 63(1986)

394-400 as evidenced by *Yu* et al. (PNAS USA 92 (11/95) 10990-4) and the *Declaration

of Dr. Manolagas* (paragraphs 7-24) provided in the 90/007,503 request. See MPEP

2131.01 (evidence of inherency).

**Rejection Summary:** *Tsoukas, Manolagas, Lemire I, Lemire II, Rigby I, or Rigby II*

teach administration of calcitriol to humans, which, as is shown from the teachings of

*Yu,* inherently reduces NF-κB activity and thus would inhibit expression of genes whose

transcription is regulated by NF-κB activity.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims

1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene

under transcriptional control of NF-κB. For example, NF-κB activity can be effected by

diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing

the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated

gene  expression of a cytokine protein (claim 5) in a eukaryotic cell.

Calcitriol (1,25-dihydroxyvitamin $D_3$) is the active form of Vitamin D that has been administered to humans for decades.

There are numerous prior art publications that report the study of calcitriol in various human cell cultures, including human Jurkat (T-cell line) leukemic cells (citations omitted) and human peripheral blood monocyte ("PBM") cells, including *Tsoukas* (PBM), *Manolagas* (PBM) *Lemire I*, *Lemire II Rigby I* and *Rigby II*. *Tsoukas and Manolagas* teach that the administration of calcitriol (at least $10^{-8}$ M) in PBM cells reduced IL-2 activity; a result which was confirmed by *Lemire I, Rigby* and *Lemire II* (e.g. *Lemire II* at 3034 demonstrated that calcitriol exhibited "a dramatic and specific reduction of IL-2 production by activated PBM ...").

Independent studies show that IL-2 expression is regulated, at least in part, by NFκB . See *Manolagas Declaration* at page 8, paragraph 15 and documents cited therein.

*Yu* et al. under the same conditions utilized in *Tsoukas* and *Manolagas* (i.e. calcitriol application to PHA activated PBM cells) found that calcitriol reduced NF-κB as well as NF-κB –regulated gene expression in PBM cell cultures. *Yu* described the use of Electrophoretic Mobility Shift Assays ("EMSAs" as in Ex.15 of the instant '516 patent) and the NF-κB binding sequence of human IL-6 promoter to demonstrate (by EMSA) that calcitriol administration "caused a significant reduction in the DNA-protein complex, as evidenced by the decrease in the intensity of this band (lane 4)" (see *Yu* at 10993 and Fig. 5). This data was confirmed using Western blot analyses (Figs. 1 and 3), which showed that calcitriol added to PHA-activated cells (as taught in *Tsoukas* and

*Manolagas*) "caused a significant decrease in the expression of p50 [subunit of NF-κB] at all time points examined". *Id.* at 10991-2.   In an analogous manner in human Jurkat leukemic cells transfected with a CAT gene regulated by NF-κB and activated with PHA, *Yu* found that calcitriol cell application resulted in reduced NF-κB gene expression. See Yu at 10993.

Although the mechanism may not have been known at the time of the *Tsoukas, Manolagas , Lemire I,* Lemire II *Rigby I and Rigby II* publications, the *Yu* reference evidence proved that the administration of calcitriol by these prior art references necessarily and inherently reduced NF-κB activity in induced human cells (PBM/Jurkat) and reduced expression of NF-κB-regulated proteins (IL-2). Thus, these prior art references anticipate at least claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97 of the '516 patent as shown on an element-by-element basis in *Exhibit H-4, H5 and H6* of the 90/007,503 request (incorporated by reference).

**IV. 5-ASA   (references prior to 12/24/86): inherent anticipation by *Dew.***

12.     Claims 1-2, 5-9, 20-29, 31-40, 53-62, 64-73, 75-86, and 88-97 are rejected under 35 U.S.C. 102(b) as being anticipated by *Dew* (Br. Med. J. <u>287</u> (7/83):23-24) as evidenced by *Baldwin II*, J. Clin. Invest. <u>107</u>(1991):63-80, *Bantel* et al. (Amer. J. Gastroenterology <u>287</u> (2000):3452), *Yan* et al. (J. Biol. Chem. <u>274</u> (1999) 366631-36) and the *David Baltimore Declaration* submitted February 2001 in the 08/464,364 application which issued as the Baltimore '526 patent. See MPEP 2131.01 (evidence of inherency).

Application/Control Number: 90/007,503; 90/007,828                    Page 33
Art Unit: 3991

**Summary:** *Dew* teaches administration of 5-ASA for the treatment of ulcerative colitis in humans, which inherently reduced NF-κB activity in the cells of the patients, by a mechanism including phosphorylation of IκB.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression of a cytokine protein (claim 5) in a eukaryotic cell.

*Dew* teaches the administration (oral delayed release of up to 4.4 g/day) of 5-aminosalicyclic acid (5-ASA) to humans for the treatment of ulcerative colitis (an inflammatory bowel disease).

Ulcerative colitis is recognized as being associated with NF-κB activation. See *Baldwin II* at Table 1.

*Bantel* conducted *in vivo* tests (tissue sample immunostaining using p65 NF-κB subunit antibody before/after 5-ASA administration) on human ulcerative colitis patients administered the same 5-ASA formulation (tradename MESALAZINE) in the same amounts (from 1.7-4.5 g/day) as in the *Dew* reference and reported that 5-ASA administration reduced NF-κB activity in the cells of these patients. *Bantel* at 3453. Specifically, *Bantel* found that (1) NF-κB activity is increased in patients with ulcerative colitis, and (2) therapeutic administration of 5-ASA (as in *Dew*) effectively reduced NF-κB activity in these patients. *Id.* at 3454-55. Accordingly, *Bantel* concluded that "5-ASA

is a potent inhibitor of NF-κB activation *in vivo*," at dosage levels and under the same

conditions taught in *Dew*. *Id.* at 3456. Thus, *Dew's* administration of 5-ASA for

ulcerative colitis inherently and necessarily reduces NF-κB activity in human cells.

      Moreover, during prosecution of the Baltimore 08/464,364 application, while

referring to the *Yan* reference (cited above), *Dr. Baltimore in his declaration* admitted

that 5-ASA reduces NF-κB activity as in the instant '516 patent claims: "Treatment of

cells with such compounds as ... 5-aminosalicyclic acid ... inhibits NF-κB mediated

gene expression by a mechanism which includes inhibition of phosphorylation of I-κB

proteins"(which is the naturally occurring NF-κB inhibitor). See *David Baltimore*

*Declaration* paragraph 9.

      Accordingly, the prior art *Dew* administration of 5-ASA necessarily and inherently

reduced NF-κB activity and, thus anticipated at least claims 1-2, 5-9, 20-29, 31-40, 53-

62, 64-73, 75-86, and 88-97 as shown on an element-by-element basis in *Exhibit H-7*

(herein incorporated by reference) provided by the requester in the 90/007,503

proceeding.

**V. GLUCOCORTICOIDS (references prior to 12/24/86): inherent anticipation by**

**1970 PDR, Lefring, Nagasawa, or Rovera**

13.     Claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64 -65, 69- 73, 75-76,

80-86, 88–89 and 93-97 are rejected under 35 U.S.C. 102(b) as being anticipated by

*1970 PDR*, *Lefring et al.* (Crit. Care. Med. 23 (7/95) 1294-1303: References Cited

Therein), *Nagasawa* et al. (J. Cell. Phys. 109 (1981) 181-192), or *Rovera* et al.

(Science 204 (1979) 868-970) as evidenced by *Baldwin I* (Annu. Rev. Immunol. 14

(1996) 649-81, *Auphan* et al. (Science 270 (1995) 286-290), *Scheinman I* (Mol. Cell.

Biol. 15 (2/95) 943-53), *Scheinman II* (Science 270 (10/95) 283-286), *Mukaida* (J. Biol.

Chem. 269 (5/94) 13289-95) and *Padgett* et al. Trends in Immunology, 24(8) (Aug.

2003) pages 444-448 (raised by Examiner).  See MPEP 2131.01 (inherency evidence).

**Rejection Summary:** *1970 PDR, Lefring, Nagasawa, and Rovera* teach administration

of glucocorticoids (e.g. dexamethasone) to control inflammation in diseases such as

rheumatoid arthritis, which inherently reduces NF-κB activity that inhibits NF-κB -

associated cytokine gene expression.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims

1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene

under transcriptional control of NF-κB. For example, NF-κB activity can be effected by

diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing

the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated

gene expression of a cytokine protein (claim 5) in a eukaryotic cell.

Glucocorticoids, such as dexamethasone, were conventionally used to treat

inflammatory and allergic conditions (including asthma and arthritis) and bacterial

infections in the 1950's (see *Lefring* and prior art cited therein) and approved for human

therapeutic use under the trade name DECADRON (see 1970 PDR). Additionally, the

prior art discloses the use of the dexamethasone in human cell culture tests.  For

example, *Nagasawa* taught the induction of human leukemic T-Cells (MOLT-3) by TPA,

followed by the administration of $10^{-6}$ M (1uM) dexamethasone. See *Nagasawa* at 185,

Table 2. Similarly, *Rovera* taught the induction of human leukemic cells (promyelocytes

and mature myeloid cells) with TPA, also followed by administration of $10^{-6}$ M (1uM)

dexamethasone. See *Rovera* at 869, Table 1.

However, it has been known since the mid-1990's, that glucocorticoids effect

their immunosuppression by reducing NF-κB activity by preventing NF-κB from binding

to the appropriate sites on the DNA and/or by increasing the transcription, expression

and/or release of IκB, thereby reducing the amount of activated NF-κB that can

translocate into the nucleus. In this regard, several publications cited by Dr. Baldwin in

his 1996 review article (*Baldwin I*), including the *Auphan, Scheinman I, Schmeinman II*

*and, Mukaida,* in addition to the *Padgett* document, provide extrinsic evidence that

administered glucocorticoids (as described in*1970 PDR* in *Lefring Nagasawa* and

*Rovera* references), such as dexamethasone and cortisol, are recognized to

*necessarily and inherently* reduce NF-κB activity and concomitant cytokine production,

**a) Extrinsic Evidence of Inherency as Provided by *Auphan***

*Auphan* describes methods for reducing NF-κB activity in an induced leukemic T-

cell line at the same $10^{-6}$ concentration of dexamethasone taught by *Nagasawa* and

*Rovera*. First, *Auphan* induced human leukemic T cells (Jurkat strain) or murine T cells

(FJ8.1) with TPA as described in *Nagasawa* and *Rovera* and used EMSA, as described

in the*516 Baltimore patent, to demonstrate NF-κB activity. See *Auphan* at 287-8.

*Auphan* then exposed the cells to $10^{-6}$ M dexamethasone. Id. *Auphan* reports that

dexamethasone clearly reduced NF-κB activity:

> Electrophoretic mobility shift assays (EMSAs) revealed that both AP-I
> and NF-κB DNA binding activities were elevated in nuclear extracts of
> activated [FJ8.1] cells (Fig. 1C). DEX inhibited induction of NF-κB

> binding activity and reduced the amount of AP-1 binding activity . . . .
> DEX also inhibited induction of NF-κB in mouse T lymphocytes in vivo
> (Fig. 1D).
>
>               \*       \*       \*
>
> Inhibition of NF-κB activation by DEX . . . was also observed in a Jurkat
> human T cell leukemia line stably transfected with a GR expression vector
> (Fig. 2A). . . .Inhibition of NF-κB activity was also observed in cells
> stimulated by either 12-O-tetradecanoryl-phorbal13-acetate (TPA) alone or
> by tumor necrosis factor (TNF-α).   Id. (citations omitted).

As Dr. Baldwin noted, *Auphan* demonstrates that glucocorticoids "involves the

transcriptional activation of the I-κBα gene" in these human leukemic cells and

therefore, "by upregulating I-κBα protein levels, function to block nuclear translocation

of NF-κB and DNA binding." *Baldwin* at 671.   As discussed below, Dr. Baldwin's own

results, as reported in the *Scheinman II* document discussed below, confirms this

mechanism for glucocorticoid action.

**b) Extrinsic Evidence of Inherency as Provided by *Scheinman I & II***

     *Scheinman I* and *Scheinman II* confirm that dexamethasone, as used in the prior

art, reduces  NF-κB activity. In particular, *Scheinman I* evaluated the effect of $10^{-7}$ M

dexamethasone on NF-κB activity in human epithelial (HeLa) cell cultures. *Scheinman I*

at 944.  NF-κB activity was measured in at least two assay formats disclosed in the

Baltimore '516 patent (EMSA and reporter assays) as well as Western blot

immunological assays.  Dexamethasone was shown (Figs 1A and B; Fig. 4; and Fig. 7)

to reduce endogenous NF-κB activity in cells ("Pretreatment with DEX resulted in a

profound loss of TNF-α induced NF-κB as well as p50 homodimer (KBF1) gel shift

activity (Fig. 7B, lane 3). Similar data were obtained by treating cells with IL-1 (data not

shown)." *Id* at 949.    *Scheinman I* concluded that dexamethasone reduces NF-κB

activity by two distinct avenues:

> We show that GR can physically interact with NF-κB subunits and also
> block their ability to bind DNA. In addition, we present new data showing
> that dexamethasone (DEX) treatment of HeLa cells causes a significant
> reduction in nuclear p65 protein levels. Thus, glucocorticoids are also able
> to inhibit NF-κB activity by a novel mechanism involving a block of
> cytokine-induced nuclear translocation.
>
>            *        *        *
>
> With EMSA analysis, we found that DEX treatment caused a marked
> reduction in the ability of NF-κB /Rel subunits to bind DNA despite the
> presence of equal amounts of NF-κB subunit protein in the EMSA DNA-
> binding reaction mixtures (Fig. 5, EMSA). *Id*. at 944,948.

Similarly, the *Scheinman II* reference demonstrates that dexamethasone, at the same

$10^{-7}$ M concentration as *Scheinman I* (and at a 10 fold lower concentration than taught

in *Nagasawa* and *Rovera*), reduces NF-κB activity as called for by the claims that are

the subject of this reexamination request. *Scheinman II* confirmed the *Auphan*

conclusion that dexamethasone inhibits TNF-α induced NF-κB activity, at least in part,

by inducing the transcription of the IκB-α gene:

> Together, these data indicate that DEX treatment induces the transcription of the
> IκB-α gene. This induction results in the increased syntheses of the IκB-α
> protein. This increase in protein synthesis leads to the rapid turnover of the IκB-
> α protein associated with preexisting NF-κB complexes. In the presence of an
> activator such as TNF-α, newly released NF-κB reassociates with the DEX-
> induced Iκ-Bα and thus reduces the amount of NF-κB translocating to the
> nucleus. *Scheinman II* at 286.

### c) Extrinsic Evidence of Inherency as Provided by *Mukaida*

   *Mukaida* provides extrinsic evidence that the 1970 PDR, the studies described in

*Lefring*, *Nagasawa*, and *Rovera* inherently anticipate the subject claims. *Mukaida*

observed that IL-8 production was mediated by NF-κB in all cells they previously

examined. *Mukaida* at 13284. In those cells, dexamethasone inhibited NF-κB-regulated

IL-8 production by more than 60% at concentrations equal to and higher than $10^{-8}$M. *Id*

at 13290.

### d) Extrinsic Evidence of Inherency as Provided by *Padgett*

Consistent with the *Scheinman* II and *Auphan* references, *Padgett* teaches that

the body responds to external stressors by release of glucocorticoid hormones,

including cortisol, which binds glucocorticoid receptors expressed on a variety of

immune cells to interfere with NF-κB function, resulting in reduced cytokine production.

See Abstract; p.445 (right column) to p. 446; footnotes 32 and 33; and p. 447 under

"Conclusions".

Thus, the prior art use of corticosteroids (dexamethasone, cortisol) are now

recognized as inherently reducing NF-κB activity as called for by the subject claims of

the Baltimore '516 patent. See 90/007,503 *Exhibit H8* claim analysis herein

incorporated by reference.

## VI. ANTIBIOTICS (references prior to 12/24/86): inherent anticipation by 1970 PDR

14.    Claims 1-2, 5-10, 12-18, 20-21, 25-32, 36-41, 53-54, 58-65, 69-76, 80-89, 93-

100, 104-105, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, and

182-186 are rejected under 35 U.S.C. 102(b) as being anticipated by *1970 PDR* as

evidenced by the *Manolagas declaration, Galdiero et al. (*Microbiology, 147 (2001):

2697-2704), *Yang* et al. (Nature 395 (1998) 284-288), *Mori* et al. (Eur. J. Haematol. 59

(1997): 162-170), the *Baltimore '516 Patent* and *Yasutomi* et al. (J. Immunology

175(2005) 8069-8076) (newly raised by the Examiner). See MPEP 2131.01 (evidence of inherency, including extrinsic publications of any date and intrinsic evidence using applicant's own specification: see *Ex parte Novitski* cited therein).

**Rejection Summary:** As detailed in *Exhibit H-10* of the 90/007,503 request (herein incorporated by reference), *1970 PDR* teaches administration of antibiotics such as erythromycin, gentamicin, and tetracycline to kill bacteria in animals. As evidenced by the *Manolagas declaration*, gram (-) bacteria produce lipopolysaccharides (LPS) which induce NF-κB regulated cytokine production. Antibiotics that kill gram-negative bacteria thereby act to inherently reduce LPS-induced and NF-κB-regulated cytokine production.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene expression of a cytokine protein (claims 5 and 18) and reduce the effects of bacterial lipopolysaccharides (claims 12-17) on eukaryotic (e.g. mammalian) cells.

The instant claims are drawn to a method of inhibiting NF-κB activity (e.g. diminishing bacterially LPS induced NF-κB expression of cytokines mediated, for example, through intracellular signaling: in claims 6-10) and associated gene (claims 1-2) expression (e.g. of a cytokine protein: claim 5) in a eukaryotic cell.

The *1970 PDR* teaches the administration of antibiotics (erythromycin, gentamicin, tetracycline) to treat gram-negative bacterial infections. Erythromycin, for

example, is active against *H. pertusis*. infections (*Id.* at 1379); and gentamicin sulfate

(trade name GARAMYCIN) treats infections caused by *Pseudomona aeruginosa*,

*Aerobater aerogenes*, *E.coli*, *Proteus vulgaris*, and *Klebsiella pneumoniae* (*Id.* at 1167).

Tetracycline is a broad spectrum antibiotic (trade name SUMYCIN) which treats a

variety of infectious gram (-) bacteria, including *E. coli* and *Shigella* (*Id* at 1309).

Gram-negative bacteria produce lipopolysaccharide (LPS), which when in

contact with human cells induces NF-κB activity resulting in the production of cytokines

regulated by NF-κB. Cytokines whose genes are regulated by NF-κB (at least in part)

include tumor necrosis factor alpha (TNF-α) and interleukins 2, 6, 8 and 10 (IL 2, 6, 8

and 10). E.g., *Galdiero; Yang;* and *Mori.*   As noted in *Galdiero* (page 2700), "The lowest

concentration of LPS able to induce cytokine release was 10 ng ml$^{-1}$".

Once produced by gram-negative bacteria, LPS activates NF-κB, which

translocates to the nucleus and binds to the NF-κB recognition sites on genes that are

regulated, at least in part, by NF-κB. E.g., *Baltimore patent*, Col. 2, lines 54-57

("Release of active NF-κB from the I-κB- NF-κB complex has been shown to result from

stimulation of cells by a variety of agents, such as bacterial lipopolysaccharide ... "). In

treating gram-negative bacterial infections, antibiotics kill bacteria or impair bacterial

function thereby reducing bacterial production of LPS (*Manolagas Declaration*,

paragraphs 33-40).  For example, erythromycin has been shown to inhibit the activation

of NF-κB in T cells; and in normal and inflamed human bronchial epithelial cells along

with modulating IL-8 expression. See *Yasutomi* et al. at page 8068 at the bottom of the

right column and footnotes 5-7 (citations therein).  *Yasutomi* further demonstrated the

ability of tetracycline to inhibit lipopolysaccharides and NF-κB activation in human

monocyte-derived dendritic cells and suppress NF-κB induced cytokine (e.g. IL-6, 10,

12p70, 13 and IFN-γ ) production. See Abstract, page 8071-3, see Table 1 and Figures

especially 1-3 and 8.

Thus, by blocking LPS that reaches the cell, administration of the *1970 PDR*

antibiotics to combat gram-negative bacterial infections would necessarily reduce NF-

κB activity in human cells and thereby reduce cytokine expression. As such, as shown

on an element-by-element claim basis in *Exhibit H-10* of the 90/007,503 request

(incorporated by reference), the 1970 PDR antibiotics would inherently anticipate the

subject claims requiring LPS-induced NF-κB activity.

**VII. RED WINE (e.g. RESVERATROL)  (references prior to 12/24/86): inherent**

**anticipation by *King James Version Bible* (1611), *St. Leger, Dobrilla,* or *Jones***

15.      Claims 1-2, 6-9, 20-21, 25-32, 36-41, 64-65, 69-76, 80-89, and 93-98 are

rejected under 35 U.S.C. 102(b) as being anticipated by *King James Version Bible*

(1611) (excerpts), *St. Leger* (The Lancet (5/79) 1017-20),  *Dobrilla* (Hepato-

Gastroenterol. 31 (2/84) 35-37), and *Jones* (Pharm. & Tox. 60 (3/87) 217-20) as

evidenced by *Blanco-Colio* (Circulation 102 (8/00) 1020-6), *Holmes-McNary/Baldwin*

(Cancer Res. 60 (7/00) 3477-83) and *Manna* (J. Immunol. 164 (2000) 6509-6519).

See MPEP 2131.01 (evidence of inherency).

**Rejection Summary:**  As pointed out in *Exhibit H-9* of the 90/007,503 request (herein

incorporated by reference), the *King James Version Bible* (1611), *St. Leger, Dobrilla,*

and *Jones* teach consumption of red wine that inherently inhibits NF-κB as a part of its activity.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -l-κB complex (claim 20) to inhibit associated gene expression in a eukaryotic cell.

The human consumption of red wine harkens back to the *King James (1611) version of the bible*:

> **Luke 10:34** And went to him, and bound up his wounds, pouring in oil and wine, and set him on his own beast, band brought him to and in and took care of him.

> **1 Timothy 5:23** Drink no longer water, but use a little wine for thy stomach's sake and thine often infirmities.

> **Isaiah 27:2** In that day sing ye unto her, A vineyard of red wine.

> **Psalms 75:8** For in the hand of the LORD there is a cup, and the wine is red ... and drink them.

> **Proverbs 23:31** Look not thou upon the wine when it is red ... .

More recently, a study conducted in the late 1970's comparing cardiac problems with factors such as wine, cigarette, and fat consumption obtained a surprising result: France, the country with the highest per capita consumption of wine and a very high consumption of fats, had the lowest rate of cardiac-disease related deaths (*St. Leger*). This effect became known as the "French Paradox" and as discussed below (and as

admitted by the Patentees), the French Paradox is now recognized as being at least in part a result of red wine's inhibitory effect on NF-κB and resulting gene expression.

*Dobrilla and Jones*, like *St. Leger*, conducted studies evaluating the effects of red wine and foods which involved the human consumption of substantial amounts of red wine (20-33 fluid ounces and 33-50 fluid ounces, respectively) along with fatty foods (ham sandwich and potato chips and cheese).

*Blanco-Colio* provides extrinsic evidence that *St. Leger, Dobrilla* and *Jones* inherently anticipate the subject claims. The *Blanco-Colio* study determined that just 4-8 fluid ounces of red wine (significantly less than consumed in *Dobrilla, Jones* or *St. Leger*-taken with fatty foods) were sufficient to reduce NF-κB activity that had been induced by consuming triglycerides. *Blanco-Colio* at 1023, Fig. 2. The authors isolated PBM cells from volunteers at various points in time after food and wine consumption. *Id.* at 1021. NF-κB activity initially increased, induced by post-prandial lipemia resulting from the consumed triglyceride lipoproteins (*Blanco-Colio* at 1022), but after 6-9 hours, patients receiving red wine saw a significant reduction of NF-κB activity:

> In conclusion, red wine intake ... prevents NF-κB activation in PBMC's elicited in healthy volunteers by postprandial lipemia. Because NF-κB activation is involved in the pathogenesis of atherosclerotic lesions, the inhibitory effect of red wine on NF-κB activation provides a further explanation of the beneficial effects of red wine intake in cardiovascular disease. *Blanco-Colio* at 1025.

Thus, the reduction in NF-κB activity caused by red wine consumption (at levels within the range of common human intake) necessarily and always inherently reduces the

expression of NF-κB-regulated proteins that are involved in the development of

atherosclerotic lesions.

The recognized inherent effects of red wine on NF-κB activity are attributed to

the flavenoids and other compounds contained in red wine, including resveratol ("Res").

In this regard, Dr. Baldwin, one of the patentees, published a report confirming that

resveratrol is recognized as a potent inhibitor of NF-κB activity and resulting gene

expression:

> Res was shown to be a potent inhibitor of both NF-κB activation and NF-κB-dependent gene expression through its ability to inhibit IκB kinase activity, the key regulator in NF-κB activation, likely by inhibiting an upstream signaling component. In addition, Res blocked the expression of mRNA-encoding monocytes chemoattractant protein-1, a NF-κB-regulated gene. *Holmes-McNary/Baldwin* at 3477.

Moreover, Patentee's own publications have confirmed that the inhibitory effect of

compounds in red wine, such as resveratrol, on NF-κB activity is largely responsible for

the French paradox:

> Extensive data are now accumulating that dietary constituents can strongly influence the potential for disease outcome. In epidemiological studies, red wine consumption was shown to have numerous protective effects, and Res has been shown to be responsible for those beneficial effects. In particular, a phenomenon defined as the "French paradox" has emerged, which is the association of reduced mortality from coronary disease and breast cancer. Although, it is well established that naturally occurring compounds function as chemopreventive agents, the physiological mechanisms of these dietary constituents as extracellualr signals involved in transcription activation are only presently emerging. *Holmes-McNary/Baldwin* at 3481 (citations omitted).

Thus, *Holmes-McNary/Baldwin* (Patentee's own publication) confirms the results on NF-

κB activity that were disclosed in *Blanco-Colio* and helps to explain the mechanism by

which red wine constituents necessarily inherently inhibits NF-κB activity.

　　　*Manna* also provides extrinsic evidence that *St. Leger, Dobrilla* and *Jones*

inherently anticipate the subject claims. Similar to *Blanco-Colio, Manna* looked at the

effect of resveratrol on NF-κB activity induced by a large range of inducers, including

TNF and LPS, and in a wide range of cells. *Id.* at 6511,6514. *Manna's* conclusion

affirmed that resveratrol, as found in red wine, reduced NF-κB activity and NF-κB-

mediated gene transcription in all cell types and with all inducers tested:

> We found that resveratrol is indeed a potent inhibitor of TNF-induced activation of
> NF-κB, and this inhibition is not cell type specific. The suppression is observed
> in both normal and tumor cells. Besides TNF, resveratrol also blocked NF-κB
> activation induced by a wide variety of other inflammatory agents. NF-κB-
> dependent report gene transcription was also suppressed by resveratrol. *Id.* at
> 6516. See also *id.* at 6512-13, Figs. 2, 4 and 5.

Moreover, the effects of resveratrol were found at concentrations that are achievable by

normal red wine consumption:

> Considering that each gram of fresh grape skin contains 50-100 μg (200-400 μM)
> resveratrol and red wine has 1.5-3 mg/L, this suggests that resveratrol
> concentration used in our studies is achievable *in vivo* by consumption of grapes
> or red wine. Id. at 6517 (citations omitted).

　　　In short, any time someone, over the last several hundred or thousand years,

drank even a moderate amount of red wine with food containing significant fats (e.g.,

the typical French diet) they were reducing NF-κB activity (and concomitant NF-κB

mediated gene expression) that had been induced by the fat content in the food. The

consumption of red wine, as taught in *Dobrilla* and *Jones,* thus inherently reduces NF-

κB activity and concomitant NF-κB mediated gene expression. The table in *Exhibit H-9*

provided with the 90/007,503 request (incorporated by reference), sets forth, on an

element by element basis, how the instant claims are inherently anticipated by The *King*

*James Version Bible* (1611), *St. Leger, Dobrilla,* or *Jones references.*

**VIII. N-ACETYL-L-CYSTEINE (intervening prior art): *Express anticipation by Staal.***

16.    Claims 18 and 182-185 are rejected under 35 U.S.C. 102(a) as being anticipated

by *Staal* et al. *Proc. Nat'l Acad Sci* 87 :9943 (Dec. 1990) ('7828 appendix E:

incorporated by reference).

**REJECTION SUMMARY:** *Staal* et al. (see Abstract; page 9945; Figures 4-5) disclose a

method of inhibiting TNF-α by blocking NF-κB activation in mammalian cells (e.g. Jurkat

cells) by administration of N-acetyl-L-cysteine (NAC).

Instant claim 18 recites:  A method for reducing Interleukin-1 or Tumor Necrosis
Factor-α activity in mammalian cells comprising reducing NF-κB activity in the cells so
as to reduce intracellular signaling caused by Interleukin-1 or Tumor necrosis Factor-α
in the cells.

*Staal* teaches a method of inhibiting TNF-α activation and, thus, signaling, in

mammalian cells by reducing NF-κB activity.  Specifically, *Staal* discloses inhibiting

TNF-α stimulation of 293.27.2 and Jurkat cells by selectively blocking NF-κB activation

by administration of N-acetyl-L-cysteine (NAC). See Abstract, and Fig. 5.  Reduction of

intracellular TNF- α signaling is demonstrated by decreased expression of a beta-

galactosidase reporter gene in Jurkat cells, which are mammalian (human) in origin.

See Fig. 4. Accordingly, claim 18 is anticipated.

Instant claim 182, depending from claim 18, further recites that reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB. *Staal* anticipates claim 182 by teaching that high thiol levels (resulting from NAC administration) inhibit NF-κB activation by preventing phosphorylation of I-κB, since phosphorylation of I-κB is necessary for dissociation of NF-κB from its complex with I-κB. Since NAC administration keeps NF-κB complexed to its naturally occurring inhibitor I-κB, NF-κB is unavailable for binding NF-κB recognition sites on genes that are transcriptionally regulated by NF-κB. Thus, instant claim 182 is anticipated since NAC-mediated inactivation of NF-κB described in *Staal* inherently and necessarily results in reduced NF-κB binding to its recognition sites.

Instant claims 183-185, depending from claim 18, are also anticipated by *Staal*. These claims further require that the method is carried out on human cells (claim 183), immune cells (claim 184) and lymphoid cells (claim 185). *Staal* discloses NAC inhibition of TNF-α stimulation in Jurkat cells (see Fig. 4, p. 9945) which are cells derived from a human T-cell leukemia cell line, and, thus, are human, immune and lymphoid anticipating claims 183-185.

## IX. NUCLEIC ACID DECOYS: (intervening prior art): Express anticipation by Bielinska

17.    Claims 1, 2, 20, 25-29, 31, 36-40 and 203 are rejected under 35 U.S.C. 102(a) as being anticipated by *Bielinska* et al. *Science* 250 :997 (Nov. 16, 1990) as evidenced by *Ho*, PNAS USA 86 :6714 (1989) for purposes of defining clone 13B cells disclosed in

*Bielinska.* See MPEP 2131.01: Multiple Reference 35 U.S.C. 102 Rejections (primary

reference term meaning) ('7828 Appendix D: incorporated by reference).

**Rejection Summary:** *Bielinska* (e.g. at pages 197-198 and Fig. 1) discloses the use of

nucleic acid decoy molecules to inhibit NF-κB-dependent expression of a reporter gene

in clone 13 B-lymphoblastoid cells.

     *Bielinska* discloses the use of nucleic acid decoy molecules to inhibit NF-κB-

dependent expression of a reporter gene in clone 12 B-lymphoblastoid cells. See, e.g.,

p. 997, Abstract at mid-paragraph and p. 998 right hand column and Fig. 1D.

Specifically, *Bielinska* discloses the use of phosphoroothioate oligonucleotides as decoy

molecules that competitively bind NF-κB in clone 13 B cells. Id.  These cells contain an

HIV-CAT reporter gene construct that is transcriptionally- regulated  by NF-κB by two

κB binding sites found within the HIV enhancer. Fig. 1, and middle of right column on

page 997.

     *Bielinska* teaches that phosphorothioate oligonucleotides having an NF-κB

binding site consensus sequence, GGGGACTTTCC (the same as disclosed in the

instant '516 patent in Table 2 at col. 37), competitively bind NF-κB, reducing the amount

of NF-κB/HIV enhancer-regulated transcription of chloramphenicol acetyltransferase

(CAT).  See p. 1000, fn. 19.  Administration of these NF-κB decoy molecules in clone 13

cells inhibits HIV-CAT expression by more than 80%. See, e.g., p. 998, right-hand

column next to Fig. 1D.

     Thus, *Bielinska* teaches reducing NF-κB activity in eukaryotic cells such that

expression of a gene whose transcription is regulated by NF-κB is inhibited, as required

by instant claims 1 and 2. Specifically, as discussed above, *Bielinska* teaches a method of inhibiting expression of NF-κB/HIV enhancer-regulated CAT clone 13B lymphoblastoid cells. See e.g. p. 998, right-hand column next to Fig. 1D. This decrease in NF-κB is accomplished by administration of double-stranded phosphorothioates containing the NF-κB binding sequence, GGGGACTTTCC. See p. 1000, fn 19.

*Bielinska* also teaches the methods of instant claims 20, 25-29, 31 and 36-40, which depend from claims 1 and 2.

Instant claims 20 and 31 are drawn to a method wherein NF-κB activity is reduced by decreasing the level of NF-κB not bound in an NF-κB:I-κB complex. These claims are anticipated by the *Bielinska* teaching (discussed *supra*) that double-stranded phosphorothioates containing the NF-κB binding sequence, GGGGACTTTCC, competitively bind NF-κB in clone 13B cells since binding of NF-κB by a decoy molecule necessarily decreases the amount of free NF-κB in the cell which necessarily decreases the level of NF-κB not bound in an NF-κB:I-κB complex.

Instant claims 25 and 36 are drawn to a method wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB. As discussed for dependent claims 20 and 31, *Bielinska* discloses double-stranded oligonucleotide phosphorothioates that compete with the NF-κB binding site, thus reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

Application/Control Number: 90/007,503; 90/007,828                    Page 51
Art Unit: 3991

Instant claims 26-29 and 36-40 are drawn to reducing NF-κB activity in a cell

resulting in inhibited expression of a gene regulated by NF-κB, wherein the method is

carried out on mammalian cells (claims 26 and 37), human cells (claims 27 and 38),

immune cells (claims 28 and 39) and lymphoid cells (claims 29 and 40). The *Bielinska*

clone 13 B cells are human B lymphoblastoid cells and are thus, mammalian, human,

immune, and lymphoid cells, as recited in the instant claims. See *Bielinska* p. 998 (left

hand column at top) and *Ho* provided in Appendix C. *Bielinska* also anticipates instant

claim 203 which is drawn to:

> A method of inhibiting expression, in a mammalian cell, of a gene whose
> transcriptional activity is activated by binding of NF-κB to gene, comprising
> introducing a nucleic acid decoy molecule into the cell in an amount sufficient to
> inhibit expression of the gene, which decoy includes an NF-κB binding site that
> binds to NF-κB.

As discussed above, *Bielinska* teaches a method of inhibiting expression of a CAT

reporter gene using a nucleic acid decoy molecule. Transcription of the CAT reporter

gene is regulated by an NF-κB/HIV enhancer and the *Bielinska* decoy molecule

possesses the NF-κB binding site consensus sequence GGGGACTTTCC disclosed in

the instant patent. *Bielinska* teaches that introduction of this NF-κB decoy molecule into

the clone 13B cells inhibits HIV-CAT expression by more than 80%. See, e.g., p. 998,

right hand column next to Fig. 1D. Therefore, *Bielinska* teaches each and every element

of instant claim 203.

### X. NUCLEIC ACID DECOYS: Obviousness (references prior to 12/24/86)

18.     Claim 203 is rejected under 35 U.S.C. 103(a) as being unpatentable over
*Baldwin and Sharp*, Proc. Nat'l Acad Sci 85:723  (Feb. 1988) in view of  *Schorpp* et al.
J. Mol. Biol. 202:307 (1988); . *Li* et al. Mol. Cell. Biol. 8:432 (1988); *Hai* et al. Cell
54 :1043 (1988) ; *Chu* et al. Nucleic Acids Res. 15:1311-1326 (1987); and *Molecular
Biology of THE CELL*, 2nd Ed. (1989) page 423 ('7828 Appendix F: incorporated by
reference.

**Rejection Summary:** *Baldwin and Sharp* disclose (e.g. pages 724-725; Fig. 2) the use
of various DNA probes to compete for NF-κB binding in nuclear extracts of various
mammalian cell types. Additionally, the *Schorpp* et al., *Li* et al. and *Hai* et al. references
teach that oligonucleotides that specifically and competitively bind a transcription factor
reduce expression of a gene controlled by the transcription factor. Further, *Chu* teaches
methods for transfection of oligonucleotides (e.g. DNA) into eukaryotic cells, which once
introduced into cells, readily enter the nucleus through pores. See *Molecular Biology of
THE CELL* at p.423.

Claim 203 is drawn to a method of inhibiting expression, in a mammalian cell, of
a gene whose transcriptional activity is activated by binding of NF-κB to gene,
comprising introducing a nucleic acid decoy molecule into the cell in an amount
sufficient to inhibit expression of the gene, which decoy includes an NF-κB binding site
that binds to NF-κB.

*Baldwin and Sharp* disclose the use of various DNA probes to compete for NF-
κB binding in nuclear extracts of various cell types including mammalian cells. See
Materials and Methods, p. 723.  One such probe, the k3 probe, contains the NF-κB

binding site. See p. 724, Fig. 1. Competitive DNA binding assays demonstrating the

ability of k3 probe and kappa enhancer to compete for NF-κB binding are also

described. See Fig. 2b, page 724; left-column of page 725.

The *Baldwin and Sharp* reference teaching differs from the instantly claimed

method by failing to disclose the use of its NF-κB binding DNA probes (k3 probe) as a

means of inhibiting NF-κB regulated gene mammalian gene expression.

*Schorpp* et al., *Li* et al. and *Hai* et al. references teach that oligonucleotides that

specifically and competitively binds a transcription factor would reduce expression of a

gene controlled by the transcription factor; and thus these references provide motivation

to one of ordinary skill in the art to utilize the Baldwin and Sharp NF-κB binding DNA

probes to inhibit mammalian gene expression regulated by NF-κB.

Specifically, *Schorpp* teaches that a double-stranded oligonucleotide (HP1),

which contains a cis-element region specifically inhibits the transcription of a synO-TG

reporter gene in rat liver nuclear extract. *Schorpp* states, "If binding is a prerequisite for

HP1 function, addition of an oligonucleotide containing HP1 might compete with

transcriptional activation. See p. 317, right hand column. Moreover, *Schorpp's* data

shows that "transcription of synO-TG is inhibited by added HP1 oligo." *Id.*; see Fig. 10.

Similarly, *Li* teaches that inclusion of a double-stranded oligonucleotide

containing hepatocyte nuclear factor HNF-1 and HNF-2) binding region inhibits

transcriptional activity of the nuclear transcription factor in liver nuclear extracts.  page

4362, Abstract, p. 4366 (right hand column); page 4367 and Fig's 6 and 7.

Analogously, *Hai* teaches that mammalian transcription factor ATF-dependent transcription of E4 is inhibited by a double-stranded oligonucleotide containing an ATF binding site. Pages 1043-4.

Additionally, methods for introducing exogenous DNA into mammalian cells were known in the art. For example, *Chu* teaches that "[a] large number of methods are used" for transfection of DNA into eukaryotic cells, including protoplast fusion, DEAE dextran, calcium phosphate co-precipitation with either DNA or recombinant bacteriophage. Page 1311, first paragraph.  Further, once introduced into cells, oligonucleotides readily enter the nucleus through nuclear pores on the nuclear membrane:

> A protein of 17,000 daltons equilibrates between cytoplasm and nucleus within 2 minutes; a protein of 44,000 daltons takes 30 minutes to equilibrate; while a globular protein larger than about 60,000 daltons seems hardly able to enter the nucleus at all.  Molecular Biology of THE CELL, 2[nd] Ed. (1989) page 423, lines 11-15.

In accordance with this teaching an oligonucleotide smaller than 60,000 daltons (e.g. 245 nucleotides or less) can enter the nucleus by equilibration.

Thus, it would have been *prima facie* obvious to one of ordinary skill in the art at the time the instant invention was made to utilize the *Baldwin* and *Sharp* NF-κB binding DNA probes to inhibit gene expression regulated by NF-κB in mammalian cells since one would be motivated to utilize the *Baldwin and Sharp* NF-κB binding DNA probes as inhibitors of proteins regulated by NF-κB as suggested by *Schorpp* et al., *Li* et al. and *Hai* et al. references utilizing conventional transfection techniques as taught by *Chu* with a reasonable expectation of achieving sufficient inhibiting amounts of a DNA decoy in a

mammalian cell as suggested by the *Molecular Biology of THE CELL,* 2nd Ed. (1989) reference.

## XI. ENDOGENOUS GLUCOCORTICOIDS (reference prior to 12/24/86): Inherent anticipation by *Goodman & Gilman (Newly Raised Examiner Rejection)*

19.    Claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64 -65, 69- 73, 75-76, 80-86, 88–89 and 93-97 are rejected under 35 U.S.C. 102(b) as being anticipated by *Goodman and Gilman's* (The Pharmacological Basis of Therapeutics, (Macmillan Publishing Co., Inc. 1980, pages 1466-1496) (newly raised by Examiner) as evidenced by *Baldwin I* (Annu. Rev. Immunol. 14 (1996) 649-81, *Auphan* et al. (Science 270 (1995) 286-290), *Scheinman I* (Mol. Cell. Biol. 15 (2/95) 943-53), *Scheinman II* (Science 270 (10/95) 283-286) and *Mukaida*  (J. Biol. Chem. 269 (5/94) 13289-95) and *Padgett* et al. Trends in Immunology, 24(8) (Aug. 2003) pages 444-448 (newly raised by Examiner). See MPEP 2131.01 (evidence of inherency).

**Rejection Summary**:  *Goodman & Gilman* teach the naturally occurring   endogenous production and release of glucocorticoids (cortisol) in response to many different types of environmental stressors which *inherently* results in the reduction of NF-κB activity that acts to inhibit expression, in a eukaryotic cell, of cytokines whose transcription is regulated by NF-κB.   In this respect, the NF-κB inhibiting evidence provided by the Baldwin I, Auphan, Scheinman I/II and the Mukaida documents, regarding the synthetically administered steroid dexamethasone (DEX) has been found to be analogous with what occurs upon release of the endogenous cortisol glucocorticoid as evidenced by *Padgett*.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims

1, 2 or 5) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene

under transcriptional control of NF-κB. For example, NF-κB activity can be effected by

diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing

the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated

gene expression of a cytokine protein (claim 5) in a eukaryotic cell.

The instant claims broadly encompass the natural process in which an animal

responds to environmental stressors by increasing production of endogenous

glucocorticoids (cortisol, cortisone, hydrocortisone, corticosterone, aldosterone: see e.g.

page 1473 Table 63-2) that are secreted into the bloodstream.  Increased

glucocorticoids are produced in response to many different types of stressors including

"agonal state, severe infections, surgery, parturition, cold, exercise, and emotional

stress" (*Goodman and Gilman*, 1469,  "Example of Effective Stimuli of Secretion").

These elevated quantities of endogenous glucocorticoids are known to "prevent or

suppress the inflammatory response that takes place as a consequence of the

hypersensitivity reactions" (Goodman and Gilman, page 1479, left column, "Immune

Responses").

However, it has been known since the mid-1990's, that glucocorticoids effect

their immunosuppression by reducing NF-κB activity by preventing NF-κB from binding

to the appropriate sites on the DNA and by increasing the transcription, expression

and/or release of IκB,  thereby reducing the amount of activated NF-κB that can

translocate into the nucleus.  In this regard, several publications cited by Dr. Baldwin in

his 1996 review article (*Baldwin I*), including *Auphan, Scheinman I, Schmeinman II and, Mukaida*, in addition to the *Padgett* document, provide extrinsic evidence that endogenously produced glucocorticoids, such as cortisol, are recognized to *necessarily and inherently* reduce NF-κB activity thus inhibiting cytokine production, *in vivo*, upon the body's release of glucocorticoids in response to external stimuli, such as stress, as described in *Goodman and Gilman*.

### a) Extrinsic Evidence of Inherency as Provided by *Auphan*

Auphan describes methods for reducing NF-κB activity in an induced leukemic T-cell line. First, *Auphan* induced human leukemic T cells (Jurkat strain) or murine T cells (FJ8.1) with TPA and used EMSA, as described in the'516 Baltimore patent, to demonstrate NF-κB activity. See *Auphan* at 287-8. *Auphan* then exposed the cells to $10^{-6}$ M dexamethasone. Id. Auphan reports that dexamethasone clearly reduced NF-κB activity:

> Electrophoretic mobility shift assays (EMSAs) revealed that both AP-I and NF-κB DNA binding activities were elevated in nuclear extracts of activated [FJ8.1] cells (Fig. 1C). DEX inhibited induction of NF-κB binding activity and reduced the amount of A.P-1 binding activity . . . . DEX also inhibited induction of NF-κB in mouse T lymphocytes in vivo (Fig. 1D).
>
>         *      *      *
>
> Inhibition of NF-κB activation by DEX . . . was also observed in a Jurkat human T cell leukemia line stably transfected with a GR expression vector (Fig. 2A). . . .Inhibition of NF-κB activity was also observed in cells stimulated by either 12-O-tetradecanoryl-phorbal 13-acetate (TPA) alone or by tumor necrosis factor (TNF- α). Id. (citations omitted).

As Dr. Baldwin noted, *Auphan* demonstrates that glucocorticoids "involves the transcriptional activation of the I-κBα gene" in these human leukemic cells and

therefore, "by upregulating I-κBα protein levels, function to block nuclear translocation

of NF-κB and DNA binding." *Baldwin* at 671.   As discussed below, Dr. Baldwin's own

results, as reported in the *Scheinman II* document discussed below, confirms this

mechanism for glucocorticoid action.

**b) Extrinsic Evidence of Inherency as Provided by Scheinman I & II**

        *Scheinman I* and *Scheinman II* confirm that dexamethasone, as used in the prior

art, reduces  NF-κB activity. In particular, *Scheinman I* evaluated the effect of $10^{-7}$ M

dexamethasone on NF-κB activity in human epithelial (HeLa) cell cultures. *Scheinman I*

at 944.  NF-κB activity was measured in at least two assay formats disclosed in the

Baltimore '516 patent (EMSA and reporter assays) as well as Western blot

immunological assays.  Dexamethasone was shown (Figs 1A and B; Fig. 4; and Fig. 7)

to reduce endogenous NF-κB activity in cells ("Pretreatment with DEX resulted in a

profound loss of TNF-α induced NF-κB as well as p50 homodimer (KBF1) gel shift

activity (Fig. 7B, lane 3). Similar data were obtained by treating cells with IL-1 (data not

shown)." *Id* at 949.    *Scheinman I* concluded that dexamethasone reduces NF-κB

activity by two distinct avenues:

> We show that GR can physically interact with NF-κB subunits and also
> block their ability to bind DNA. In addition, we present new data showing
> that dexamethasone (DEX) treatment of HeLa cells causes a significant
> reduction in nuclear p65 protein levels. Thus, glucocorticoids are also able
> to inhibit NF-κB activity by a novel mechanism involving a block of
> cytokine-induced nuclear translocation.
>
> *       *       *
>
> With EMSA analysis, we found that DEX treatment caused a marked
> reduction in the ability of NF-κB /Rel subunits to bind DNA despite the
> presence of equal amounts of NF-κB subunit protein in the EMSA DNA-

binding reaction mixtures (Fig. 5, EMSA). *Id.* at 944,948.

Similarly, the *Scheinman II* reference demonstrates that dexamethasone, at the same

$10^{-7}$ M concentration as *Scheinman I* , reduces NF-κB activity as called for by the claims

that are the subject of this reexamination request. *Scheinman II* confirmed the *Auphan*

conclusion that dexamethasone inhibits TNF α induced NF-κB activity, at least in part,

by inducing the transcription of the IκB- α gene:

> Together, these data indicate that DEX treatment induces the transcription of the
> IκB- α gene. This induction results in the increased syntheses of the IκB- α
> protein. This increase in protein synthesis leads to the rapid turnover of the IκB-
> α protein associated with preexisting NF-κB complexes. In the presence of an
> activator such as TNF α, newly released NF-κB reassociates with the DEX-
> induced IκBα and thus reduces the amount of NF-κB translocating to the
> nucleus. *Scheinman II* at 286.

### c) Extrinsic Evidence of Inherency as Provided by *Mukaida*

*Mukaida* observed that IL-8 production was mediated by NF-κB in all cells they

previously examined. *Mukaida* at 13284. In those cells, dexamethasone inhibited NF-

κB-regulated IL-8 production by more than 60% at concentrations equal to and higher

than $10^{-8}$M. *Id* at 13290.

### d) Extrinsic Evidence of Inherency as Provided by *Padgett*

Consistent with the *Scheinman* II and *Auphan* references, *Padgett* teaches that

the body responds to external stressors by release of glucocorticoid hormones,

including cortisol, which bind glucocorticoid receptors expressed on a variety of immune

cells to interfere with NF-κB function, resulting in reduced cytokine production. See

Application/Control Number: 90/007,503; 90/007,828                Page 60
Art Unit: 3991

Abstract; p.445 (right column) to p. 446; footnotes 32 and 33; and p. 447 under "Conclusions".

Thus, endogenous production of glucocorticoids in response to external body stimuli as described in *Goodman and Gilman* is now recognized as necessarily inherently reducing NF-κB activity as called for by the subject claims of the Baltimore '516 patent. See also '7503 *Exhibit H8 (*incorporated by reference) application to claims regarding exogenous glucocorticoid administration.

### Status of Claims

Claims 1-18, 20-43, 47-51, 53-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, 182-186, 192-193, 197-201 and 203 are rejected.   Claims 19, 44-46, 52, 101-103, 108, 111-113, 118, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, 179-181, 187-191, 194-196, and 202 are confirmed patentable.

### STATEMENT OF REASONS FOR PATENTABILITY AND/OR CONFIRMATION

The following is an examiner's statement of reasons for patentability and/or confirmation of the claims found patentable in this reexamination proceeding:  Claims 19, 44-46, 52, 101-103, 108, 111-113, 118, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, 179-181, 187-191, 194-196, and 202 are confirmed patentable since none of the references cited in the 90/007,503 or 90/007,828 proceedings raise a substantial new question of patentability concerning these claims. Any comments considered necessary by PATENT OWNER regarding the above statement must be submitted promptly to avoid processing delays.  Such submission by the patent owner

Application/Control Number: 90/007,503; 90/007,828                    Page 61
Art Unit: 3991

should be labeled: "Comments on Statement of Reasons for Patentability and/or

Confirmation" and will be placed in the reexamination file.

### Extensions of Time

Extensions of time under 37 CFR 1.136 (a) will not be permitted in these proceedings because
the provisions of 37 CFR 1.136 apply only to an applicant and not to parties in a reexamination
proceeding. Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination proceedings "will be
concluded with special dispatch" (37 CFR 1.555(a) ). Extensions of time in *ex parte* reexamination
proceedings are provided for in 37 CFR 1.550(c).

### Service on the Other Party (3rd Party Request)

After the filing of a request for reexamination by a 3rd party requester, any document filed by
either the patent owner or the third party requester must be served on the other party (or parties where
two or more third party requester proceedings are merged) in the reexamination proceeding in the
manner provided in 37 CFR 1.248. See 37 CFR 1.550 (f).

### Patent Owner Amendment

Patent owner is notified that any proposed amendment to the specification and/or claims in this
reexamination proceeding must comply with 37 CFR 1.530(d)-(j), must be formally presented pursuant to
37 CFR 1.52(a) and (b), and must contain any fees required by 37 CFR 1.20(c). In order to ensure full
consideration of any amendments, affidavits or declarations, or other documents as evidence of
patentability, such documents must be submitted in response to this Office action. Submissions after the
next Office action, will be governed by the requirements of 37 CFR 1.116, after final rejection and 37 CFR
41.33 after appeal, which will be strictly enforced.

### Future Correspondences

Any inquiry concerning this communication or earlier communications from the examiner should
be directed to Bennett Celsa whose telephone number is 571-272-0807. The examiner can normally be
reached on 8-5. If attempts to reach the examiner by telephone are unsuccessful, the examiner's
supervisor, Deborah D. Jones can be reached on 571-272-1535. The fax phone number for the
organization where this application or proceeding is assigned is 571-273-9900.

Please mail any communications to:

Attn: Mail Stop "Ex Parte Reexam"
Central Reexamination Unit
Commissioner for Patents
P. O. Box 1450
Alexandria VA  22313-1450

Please FAX any communications to:

Application/Control Number: 90/007,503; 90/007,828                    Page 62

Art Unit: 3991

(571) 273-9900
Central Reexamination Unit

Please hand-deliver any communications to:
Customer Service Window
Attn: Central Reexamination Unit
Randolph Building
401 Dulany Street
Alexandria, VA 22314

     *Information regarding the status of an application may be obtained from the Patent Application*

*Information Retrieval (PAIR) system. Status information for published applications may be obtained from*

*either Private PAIR or Public PAIR. Status information for unpublished applications is available through*

*Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should*

*you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC)*

*at 866-217-9197 (toll-free).*

                             Bennett Celsa
                             Primary Examiner
                             Art Unit 3991

Conferees:

Application/Control Number: 90/007,503; 90/007,828                    Page 63

Art Unit: 3991

## TABLE OF CONTENTS

| PRIOR ART REJECTION SUMMARY | | PAGES |
|---|---|---|
| I. PROTEIN KINASE C INHIBITORS (intervening prior art): Express anticipation: *Meichle* or *Shirikawa* ('7503 Exhibit. G2) of claims 1-9, 11, 20-21, 25-29, 31, 32, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201. | | 10-13 |
| IIa. CYCLOSPORIN A  (intervening prior art) Express anticipation: *Schmidt*, *Emmel* and *Brini* ('7503 Exhibit G1) of claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201. | | 13-18 |
| IIb. CYCLOSPORIN A (references prior to 12/24/86) A. Inherent anticipation: *PDR* (1985), *Griffith I*, *Griffith II* ('7503 Exhibit H1) of claims 1-2, 6-9, 20-29, 31-40, 64-73, 75-86 and 88-97. | 19-23 | 19-29 |
| B. Inherent anticipation *by Reed* ('7503 Exhibit H2) of claims 1-2, 5-9, 20-21 25-29,31-32,36-40,53-54,58-62,64-65,69-73,75-76,80-86,88-89, and 93-97. | 24-26 | |
| C. Inherent anticipation *by Kronke or* Siebenlist ('7503 Exhibit H3) of claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97. | 26-29 | |
| III. VITAMIN D (CALCITRIOL) (references prior to 12/24/86) Inherent anticipation by *Tsoukas*, *Manolagas*, *Lemire I*, *Lemire II*, *Rigby I* and *Rigby II* ('7503 Exhibits H4-H6) of claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97. | | 30-32 |
| IV. 5-ASA  (references prior to 12/24/86) Inherent anticipation by *Dew* ('7503 Exhibit H7) of claims 1-2, 5-9, 20-29, 31-40, 53-62, 64-73, 75-86 and 88-97. | | 32-34 |
| V. GLUCOCORTICOIDS (references prior to 12/24/86) Inherent anticipation by *1970 PDR*, *Lefring*, *Nagasawa*, or *Rovera* ('7503 Exhibit H8) of claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64 -65, 69- 73, 75-76, 80-86, 88–89 and 93-97. | | 34-39 |
| VI. ANTIBIOTICS (references prior to 12/24/86) Inherent anticipation by *1970 PDR* ('7503 Exhibit H10) of claims 1-2, 5-10, 12-18, 20-21, 25-32, 36-41, 53-54, 58-65, 69-76, 80-89, 93-100, 104-105, 119-120, 124-129, 133-140,144-150,154-160, 164-168,172-178, and 182-186. | | 39-42 |
| VII. RED WINE  (references prior to 12/24/86) Inherent anticipation by *King James Version Bible* (1611), *St. Leger*, *Dobrilla*, or *Jones* ('7503 Exhibit H9) of claims 1-2, 6-9, 20-21, 25-32, 36-41, 64-65, 69-76, 80-89, and 93-98. | | 42-47 |
| VIII. N-ACETYL-L-CYSTEINE  (intervening prior art) Express anticipation by *Staal* of claims 18 and 182-185 ('7828 Appendix E). | | 47-48 |
| IX. NUCLEIC ACID DECOYS: (intervening prior art): Express anticipation by *Bielinska* of claims 1, 2, 20, 25-29, 31, 36-40 and 203 ('7828 Appendix D). | | 48-51 |
| X. NUCLEIC ACID DECOYS (Obviousness ) (references prior to 12/24/86) Obviousness of claim 203 ('7828 Appendix F). | | 52-55 |
| XI. ENDOGENOUS GLUCOCORTICOIDS (references prior to 12/24/86) Inherent anticipation by *Goodman & Gilman* ('7503 Exhibit H8) of claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64 -65, 69- 73, 75-76, 80-86, 88–89 and 93-97. | | 55-60 |

# EXHIBIT E

Docket No. 74753/JPW/GJG

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

**A Merged Proceeding of *Ex Parte* Reexamination Control Nos:**

**90/007,503**          **and**          **90/007,828**

**Filed April 4, 2005**          **Filed December 2, 2005**

**Merged Pursuant to May 4, 2006 Merger Decision**
**Group Art Unit: 3991  Examiner: B.M. Celsa**

Patentees:       David Baltimore, Ranjan Sen, Phillip A. Sharp,
                 Harinder Singh, Louis Staudt, Jonathan H.
                 Lebowitz, Albert S. Baldwin Jr., Roger G. Clerc,
                 Lynn M. Corcoran, Patrick A. Baeuerle, Michael J.
                 Lenardo, Chen-Ming Fan, and Thomas P. Maniatis

Patent No.:   6,410,516 B1          Serial No: 08/464,364

Issue Date:   June 25, 2002          Filed:    June 5, 1995

For      :    NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL
              REGULATION

1185 Avenue of the Americas
New York, New York 10036
November 9, 2006

Mail Stop *Ex Parte* Reexamination
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### RESPONSE TO AUGUST 2, 2006 OFFICE ACTION,
### SUMMARY OF OCTOBER 13, 2006 EXAMINER INTERVIEW,
### STATEMENT OF CONCURRENT PROCEEDINGS UNDER 37 C.F.R. § 1.565,
### AND SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT

An Office Action issued August 2, 2006 in connection with the
above-identified merged *ex parte* reexamination.  The August 2,
2006 Office Action set a two (2) month period for filing a
response.  Patentees petitioned, and on September 29, 2006 the
U.S. Patent Office granted Patentees' request for a three (1)
month extension of time such that a response to the August 2,
2006 Office Action was due November 2, 2006. Thereafter, on
October 31, 2006 Patentee's petitioned for, and the U.S. Patent
Office granted Patentee's request for a one (1) week extension

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 2 of 92  of November 9, 2006 Response*

of time such that a response to the August 2, 2006 Office Action
is now due November 9, 2006. Accordingly, this Response is being
timely filed.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 3 of 92  of November 9, 2006 Response*


## In the Claims

Please cancel claims 7, 28, 39, 81, 83, 85, 86 and 203 from the subject patent pursuant to 37 C.F.R. § 1.530(d)(2).

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 4 of 92  of November 9, 2006 Response*

## REMARKS

Patentees respond below to the rejections set forth in the August
2, 2006 Office Action.    The following Table of Contents is
provided for reference:

Table of Contents

Page

I.    INTRODUCTION ................................................... 6

    A.    Status of Claims Pursuant to 37 C.F.R. § 1.530(e)........... 6

    B.    Rejections Made Moot by the Cancellation of Claims ........ 6

    C.    Update of Concurrent Proceedings Under
        37 C.F.R. §1.565........................................... 6

    D.    Summary of Patentees' Response Set Forth in this Response.. 8

II.    SUMMARY OF OCTOBER 13, 2006 EXAMINER INTERVIEW.................. 11

III.    THE IMPROPER USE OF REFERENCES WHICH ARE NOT PRIOR ART
    AND A DECLARATION TO SUPPORT INHERENCY REJECTION IS *ULTRA VIRES*.. 18

    A.    Statutory Grounds For Reexamination........................ 18

    B.    Impermissible Grounds of Rejection in a
        Reexamination.............................................. 18

    C.    The Inherent Anticipation Rejections in the
        August 2, 2006 Office Action are Improper;
        They Rely on Evidence Other Than
        "prior art consisting of patents or
        printed publications" in Violation of the
        Reexamination Statute...................................... 19

    D.    The Claims of the Subject Patent Are Method
        Claims and the Cited Prior Art References are At Most
        Evidence of What Occurred During A Prior
        Public Use................................................. 21

IV.    INCONSISTENCIES IN AUGUST 2, 2006 OFFICE ACTION................. 24

    A.    Rejected Claims Reciting "Liver Cells" Should
        be Confirmed Patentable.................................... 24

    B.    Rejected Claims Reciting Specific Ways of Reducing
        NF-kB Activity Should be Confirmed Patentable.............. 24

V.    PROPER CLAIM CONSTRUCTION....................................... 25

    A.    Claims Require a "Reasonable" Interpretation; The
        Examiner Improperly Expanded The Scope of the claims
        Beyond a Reasonable Interpretation........................ 25

    B.    The Proper Interpretation of Method Claims Requires They Be
        Interpreted As Involving Affirmative Acts.................. 26

    C.    Different Claims Must Be Construed To Have Different Scope. 28

    D.    Proper Construction of the '516 Claims..................... 29

VI.    REJECTIONS ON THE BASIS OF "INTERVENING REFERENCES"............. 33

    A.    Numerous Claims Are Clearly Entitled To At
        Least An April 21, 1989 Effective
        Filing Date................................................ 33

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 5 of 92  of November 9, 2006 Response*

B.    Rejections On the Basis of "Intervening References"
      Should Be Withdrawn As To All Claims Entitled
      To At Least An April 21, 1989 Effective
      Filing Date .............................................. 34

C.    Claims Entitled To At Least An April 21, 1989
      Effective Filing Date And Rejected Solely On
      The Basis of "Intervening References" Should
      Be Confirmed Patentable ................................. 34

D.    Claim Rejections On The Grounds Of Anticipation
      or Obviousness Over The "Intervening References"
      Are Not Valid Even For Claims Entitled To a
      November 13, 1991 Filing Date ........................... 39

      1. Intervening References Relating To Protein Kinase...... 39

      2. Intervening References Relating To Cyclosporin A....... 48

      3. Intervening References Relating To N-Acetyl-L Cysteine. 61

VIII. THE CLAIMS ARE NOT INHERENTLY ANTICIPATED....................... 64

A.    Inherent Anticipation Requires a Showing That
      Each and Every Element of a Claim Necessarily
      Occurred in the Prior Art................................ 64

B.    The References Used As "Extrinsic Evidence" Do Not
      Reproduce What the Prior Art References Describe
      And Therefore Fail to "Explain"
      What Occurred in the Prior Art References................ 66

C.    Even If the References Used As "Extrinsic Evidence"
      Were Deemed To Explain the Prior Art, the Cited
      Prior Art Does Not Teach Each and
      Every Element of the Claims Being Rejected............... 79

IX.   SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT................... 90

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 6 of 92  of November 9, 2006 Response*

I.    INTRODUCTION

    A.    **Status of Claims Pursuant to 37 C.F.R. § 1.530(e).**

Canceled Claims:

 - Claims 7, 28, 39, 81, 83, 85, 86 and 203 have been canceled.

Pending Claims:

 - Claims 1-6, 8-27, 29-38, 40-80, 82, 84, 87-202 as issued on June 25, 2002 are pending in the subject patent.

Of these, claims 19, 44-46, 52, 101-103, 108, 111-113, 118, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, 179-181, 187-191, 194-196 and 202 have been confirmed patentable in the August 2, 2006 Office Action.

    B.    **Rejections Made Moot by the Cancellation of Claims**

Patentees have cancelled claims 7, 28, 39, 81, 83, 85, 86 and 203 without disclaimer or prejudice to applicants' right to pursue related subject matter in a pending application in order to reduce the number of issues in this reexamination.   The cancellation of these claims renders moot their rejection including the rejection of claim 203 in section X on pages 52-55 of the August 2, 2006 Office Action.

The remaining rejection set forth in the August 2, 2006 Office Action are discussed below.

    C.    **Update of Concurrent Proceedings under 37 C.F.R. § 1.565**

*Petitions and Action in the U.S. District Court for the Eastern District of Virginia*

Patentees have previously petitioned the U.S. Patent and Trademark Office to declare the order initiating this reexamination *ultra vires*

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 7 of 92  of November 9, 2006 Response*

in so far as it relied upon references and a declaration which are not prior art to support inherency rejections.  The petitions were denied.  Patentees then requested the U.S. District Court for the Eastern District of Virginia to review the denial of the petitions (06-CV-0679).  On October 3, 2006, the Court dismissed Patentees' request on the basis that Patentees have not suffered harm by the Patent Office's decision to reexamine the subject patent.  The Court did not rule on the substantive issues raised by Patentees concerning the scope of the Patent Office's authority to reexamine this patent including whether references published after the filing date might be relied upon to reject claims.

## *ARIAD Pharmaceutical, Inc. et al. v. Eli Lilly and Co.*

Patentees previously informed the U.S. Patent and Trademark Office that a jury trial at the U.S. District Court for the District of Massachusetts (*ARIAD Pharmaceutical, Inc. et al. v. Eli Lilly and Co.*, 02-CV-11280-RWZ) unanimously found claims 80, 95, 144, and 145 of the subject patent valid and infringed. The art presented to the Court included art relating to  glucocorticoids, cyclosporin A, antibiotics, 5-ASA and red wine.   Expert reports and testimony including reports and testimony from Dr. Manolagas on which the Examiner has relied in part in the August 2, 2006 Office Action, were also presented to the Court.  The jury also determined that the claims at issue were enabled and adequately described in U.S. Serial No. 07/431,436, filed April 21, 1989 and therefore entitled to an April 21, 1989 effective filing date.

From August 7, 2006 to August 10, 2006, an evidentiary hearing was conducted by the Court on four asserted defenses/counterclaims raised by Lilly which the Court did not submit to the jury.  The four issues presented were whether the subject patent is a) unenforceable because of alleged inequitable conduct during prosecution, b) unenforceable because of alleged prosecution latches, c) invalid for covering non-

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 8 of 92  of November 9, 2006 Response*

patentable subject matter, and d) invalid for indefiniteness.  As of
the date of the filing of this Response, the Court has not decided
these defenses/counterclaims.


*Amgen Inc. et al. v. ARIAD Pharmaceuticals, Inc.*

Patentees previously informed the U.S. Patent and Trademark Office
that a Complaint for Declaratory Judgment of Patent Invalidity And
Non-Infringement of U.S. Patent No. 6,410,516 was filed on April 20,
2006 in the U.S. District Court for the District of Delaware (*Amgen
Inc. et al. v. ARIAD Pharmaceuticals, Inc.,* 06-CV-00259-KAJ).  In a
written order on September 13, 2006, that Court a) denied a motion
by ARIAD to dismiss the case for lack of subject matter jurisdiction,
and b) denied as without prejudice a motion by ARIAD to dismiss for
failure to join necessary and indispensable parties.  On September
25, 2006, ARIAD answered the complaint and denied the allegations of
patent invalidity and non-infringement.  On November 3, 2006 the
Court granted a motion by ARIAD for certification for appeal to the
Court of Appeals for The Federal Circuit ("CAFC") of the Court's
order denying the motion to dismiss for lack of subject matter
jurisdiction.

### D.    Summary of Patentees' Response Set Forth in this Response

In this Response, Patentees put forth their positions as follows:

1.    Reliance in the August 2, 2006 Office Action on references and
      a declaration which are not prior art to reject claims on the
      basis of inherency is *ultra vires* and contravenes the
      reexamination statute by relying as a basis for rejecting claims
      on references which a) are not "prior art consisting of patents
      and printed publications" and/or b) are evidence of a prior
      public use.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 9 of 92  of November 9, 2006 Response*

2.   Most of the claims rejected on "intervening references" dated between April 21, 1989 and November 13, 1991 are entitled to at least an April 21, 1989 filing date.   These "intervening references," therefore, are not properly cited against such claims; and, in any event, do not anticipate or render obvious such claims.

3.   The claims, properly construed, require that NF-kB activity have first been induced in order to reduce such activity and obtain the results recited in the claims.  So construed, the claims are not anticipated by the cited prior art which does not disclose each and every element of the claims, either expressly or inherently.   The references characterized as "extrinsic evidence" of what occurred in the cited prior art do not refer to the prior art, do not repeat or explain any method disclosed in the prior art, and fail to establish that the elements not disclosed in the cited prior art methods necessarily occurred during the practice of such methods.   The declaration characterized as "extrinsic evidence" does not overcome these shortcomings.

4.   More specifically, the cited prior art methods either (a) clearly do not involve reducing NF-kB activity at all or (b) do not necessarily involve reducing NF-kB activity.  For example, cyclosporin A has its effects through a mechanism involving the transcription factor NFAT, not NF-kB; drinking red wine cannot, and does not, result in red wine acting on eukaryotic cells to reduce NF-kB activity in such cells; antibiotics act on bacterial cells, they do not reduce NF-kB activity in eukaryotic cells; administration of 5-ASA to ulcerative colitis patients in remission does not reduce NF-kB activity in such patients at all and/or necessarily; pretreatment of eukaryotic cells with an agent such as vitamin D or a glucocorticoid does not result at all or necessarily in reducing NF-kB activity in such cells.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 10 of 92  of November 9, 2006 Response*

These points are elaborated upon and additional points made in the detailed discussion which follows as well as in the Declaration of Dr. Verma, submitted herewith as **Exhibit 1** and incorporated by reference into this Response in its entirety.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 11 of 92  of November 9, 2006 Response*

II.   SUMMARY OF OCTOBER 13, 2006 EXAMINER INTERVIEW

This Summary is filed pursuant to 37 C.F.R. § 1.560(b) to supplement
the handwritten Interview Summary prepared by Examiner Bennett Celsa
at the conclusion of an October 13, 2006 interview attended by
Examiner Celsa; Examiner Ponnaluri Padmashri; Supervisory Examiner
Deborah Jones; Dr. Inder Verma; David Berstein Esq.; John P. White,
Esq.; and Gary J. Gershik, Esq., and to provide a complete record of
the reasons warranting favorable action in the above-identified
reexamination which were discussed during the October 13, 2006
interview.   Patentees acknowledge with appreciation the courtesy
extended by Examiners Celsa, Padmashri and Jones in connection with
the interview.

Patentees had requested the interview to discuss the grounds of
rejection set forth in the August 2, 2006 Office Action issued in
connection with this merged reexamination.   Patentees briefly
indicated that this response would reiterate Patentees' arguments
concerning the impropriety of relying on non-prior art evidence to
reject claims in the subject reexamination; and would provide a
detailed explanation of Patentees' entitlement to an April 21, 1989
effective filing date rather than the November 13, 1991 date accorded
by the Examiner for most claims rejected on the basis of "intervening
references".   Most of the interview was spent discussing the proper
interpretation of the claims and the lack of basis for the inherent
anticipation rejections set forth in the August 2, 2006 Office
Action.

To assist in understanding the claims, Patentees referred to
Schematics 1-8 (Exhibit 1 to the Declaration of Dr. Verma).
Patentees explained that NF-kB is a nuclear transcription factor that
unless and until activated resides as an inactive complex in the
cytoplasm of a eukaryotic cell (Schematic 1).  Upon activation by an
external influence capable of inducing the NF-kB pathway, the complex

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 12 of 92  of November 9, 2006 Response*

dissociates and NF-kB travels to the nucleus of the cell where it
binds to specific binding sites present on genes that are regulated
by NF-kB resulting in expression transcription of such genes
(Schematic 2). See, e.g. column 2, lines 46-63; column 10, lines 31-
55; column 14, lines 28-30; column 16, lines 22-63 of the subject
patent. While NF-kB activity is essential to allow the cell to
respond to the effects of harmful external agents, in some cases the
activity can become excessive causing other undesirable effects. The
entire NF-kB pathway from induction to gene expression can be
separated into the six (6) segments shown in Schematic 2. The level
of NF-kB activity over time induced by the presence of an external
influence is represented by the color blue in the graph in the upper
right hand corner of Schematic 2.

Patentees discovered and described the NF-kB pathway in eucaryotic
cells. Patentees further provided ways of measuring NF-kB activity
and of interfering with the pathway to reduce NF-kB activity. See,
e.g. column 3, line 59 to column 4, line 28; and column 35, line 13
to column 38, line 24. Interference in the pathway can occur
anywhere along any of the six (6) segments of the pathway, as
represented by the arrows in Schematic 3. Patentees' claims are
directed to achieving the specific claimed results by reducing NF-kB
activity in cells based on interfering with segments of the pathway.
Patentees' claims do not encompass prophylaxis, i.e. systems not
exposed to an inducer, but instead are directed to reducing induced
NF-kB activity so as to achieve desired results in cells, including
cells of patients being treated.

Certain claims, e.g. claims 1, 2 and 5, are directed to methods of
achieving the specific results recited in the claims by interfering
along any of the six (6) segments shown in Schematic 3. Other
claims, e.g. claims 8, 9, 10, 14, 95 and 145, require that the
external influence "induce NF-kB-mediated intracellular signaling,"
i.e. require the persistence of at least the segment 1 involving

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 13 of 92  of November 9, 2006 Response*

induction    and    intracellular    signaling,    and    only    encompass
interference  in  the  NF-kB  pathway  along  the  remaining  five  (5)
segments, each of which is intracellular (Schematic 4).   Yet other
claims    more    precisely    define    along    which    of    the    five    (5)
intracellular segments the reduction of NF-kB activity occurs: e.g.
claims 20, 22, 24, 31, 33, 35, 42, 44 and 46 for segment 2 (Schematic
5); e.g.  claims  23,  34  and  45  for  segment  3  (Schematic  6);  e.g.
claims  21,  32,  43  and  89  for  segment  5  (Schematic  7);  and,  e.g.
claims  25,  47,  80  and  144  for  segment  6  (Schematic  8).

Patentees also discussed the prior art which was cited in the August
2, 2006 Office Action to support inherent anticipation rejections.
With respect to the remaining rejections in the August 2, 2006 Office
Action, Patentees noted that they would cancel a few claims to reduce
the number of issues in the reexamination.

Patentees explained that the so-called "extrinsic evidence" relied
upon by the Examiner did not "explain" the cited prior art because
the "extrinsic evidence" references did not even refer to the prior
art  and  clearly  did  not  reproduce  the  experimental  conditions
described in the cited prior art.   Patentees indicated that this
response  would  include  a  more  detailed  explanation,  and  such
explanation appears herein.   Because the "extrinsic evidence"
provides information about experiments other than the experiments
described  in  the  prior  art  references  it  fails  to  provide  an
explanation of what necessarily occurred in the methods described in
such prior art references. Patentees respectfully submitted that for
this  reason  alone  all  of  the  rejections  based  on  inherent
anticipation were improper and should be withdrawn.

However, even assuming *arguendo* the "extrinsic evidence" could be
relied upon to explain the cited prior art references, Patentees
proceeded to explain with reference to Schematics 9-17 (Exhibit 1 to
the Declaration of Dr. Verma) how the prior art references fail to

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 14 of 92  of November 9, 2006 Response*

anticipate the claims being rejected based thereon.

Patentees discussed the rejection in section IV on pages 32-34 of the
August 2, 2006 Office Action based on 5-ASA.  Only one prior art
reference has been cited, namely, Dew (1983).  In Dew (1983),
however, no NF-KB inducer is described, and to the extent the disease
ulcerative colitis could be alleged to be an indication of NF-kB
activity, the patients in Dew (1983) were "in remission." See, e.g.
title, first paragraph, and second paragraph of Dew (1983).  Thus,
even if ulcerative colitis could be alleged to involve activation of
NF-kB, the patients in Dew (1983) were in remission.  Accordingly,
Dew does not involve necessarily involve reducing induced NF-kB
activity and therefore does not anticipate any now pending claim of
the subject patent which requires reducing NF-kB activity (Schematic
9).

Next, Patentees discussed the antibiotic art cited in the rejection
in section VI on pages 39-42 of the August 2, 2006 Office Action,
i.e. the 1970 Physician's Desk Reference ("1970 PDR").  The 1970 PDR
describes the use of antibiotics to treat bacterial infection in
subjects, including infection by Gram-negative bacteria which have
lipopolysaccharide ("LPS") in their cellular membrane.  Although it
is true that LPS *per se* is an inducer of NF-kB activity, antibiotics
kill bacteria or prevent bacteria from reproducing.  Administration
of antibiotics to a subject does not effect on the induction of the
NF-kB pathway by bacterial associated LPS which would continue to
induce NF-kB activity (Schematic 10).  Thus, antibiotics have no
effect on any of the six (6) segments of the NF-kB pathway.  In fact,
some antibiotics cause bacterial lysis which releases LPS causing
increased induction of NF-kB and increased not reduced NF-kB
activity. (See, e.g. Declaration of Dr. Verma ¶ 130, and references
referred to therein).  Accordingly, the use of antibiotics to treat
bacterial infection according to the 1970 PDR does not necessarily
reduce NF-kB activity and therefore does not anticipate the claims

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 15 of 92 of November 9, 2006 Response*

of the subject patent.

Patentees then discussed the cyclosporin A art cited in the rejections in sections IIb(8)- IIb(10) on pages 19-29, as well as the rejections relying on "intervening references" in sections IIa(5)-IIa(7) on pages 13-19, of the August 2, 2006 Office Action. Briefly, the activity of cyclosporin A has been shown to involve NFAT a transcription factor different from NF-kB. (Schematics 11-13 attached as Exhibit 1 of the Declaration of Dr. Verma and ¶¶ 28-32, 39-43, 49 and 60 thereof). A complete explanation of the cyclosporin A art appears below. Accordingly, the method using cyclosporin A described in the cited prior art does not necessarily involve reducing NF-kB and does not anticipate the claims of the subject patent.

Next, Patentees discussed the vitamin D art cited in the rejection in section III on pages 30-32 of the August 2, 2006 Office Action. The August 2, 2006 Office Action alleged that vitamin D reduces NF-kB activity based on the teaching of a single publication being used as "extrinsic evidence", Yu et al. (1995), and a Declaration by Dr. Manolagas. However, Yu et al. (1995) does not show that vitamin D necessarily reduced NF-kB activity in the cited prior art. In fact, Yu et al. (1995) acknowledged on page 10994 that any NF-kB effect of vitamin D "is a matter of conjecture." Moreover, vitamin D has been shown in several other references to actually induce the NF-kB pathway and increase rather than reduce NF-kB activity (Schematic 14). (See, e.g. Declaration of Dr. Verma ¶ 125, including references referred to therein.) Furthermore, Dr. Manolagas has admitted during deposition and during trial testimony that vitamin D increases rather than reduces NF-kB activity. (See, Dr. Manolagas deposition and trial testimony excerpts attached hereto as **Exhibit 2**.) Accordingly, the method of use of vitamin D described in the cited prior art does not necessarily involve reducing NF-kB activity and does not anticipate the claims of the subject patent.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 16 of 92  of November 9, 2006 Response*

Patentees then discussed the red wine art cited in the rejection in section VII on pages 42-47 of the August 2, 2006 Office Action. The prior art references asserted in support of this rejection are The Bible, St. Leger (1979), Dobrilla (1984) and Jones (1987). These prior art references describe use of red wine by subjects, but do not provide any details about the type of red wine, or the constituents of the red wine which is a complex mixture. Moreover, it is clear that consumed red wine *per se* is not contacting or entering any eukaryotic cell. In this regard, the prior art clearly does not enable any method, express or inherent, of using any specific type of red wine. Moreover, the prior art references do not disclose any inducer of NF-kB, thus making it uncertain whether any of the subjects had NF-kB activity to begin with, let alone NF-kB activity that was reduced (Schematic 15). Accordingly, the methods using red wine described in the prior art are not enabled, and moreover do not and cannot necessarily involve reducing NF-kB activity. Therefore, such methods do not anticipate the claims of the subject patent.

Patentees also discussed the glucocorticoid art cited in the rejection in section V on pages 34-39, and section XI on pages 55-60 of the August 2, 2006 Office Action. Generally, Patentees pointed out that it is not known how glucocorticoids work, and there is no evidence that they reduce NF-kB activity (Schematics 16 & 17). Even a 2003 article cited as "extrinsic evidence" by the Examiner acknowledges the lack of understanding of the mode of action of glucocorticoids. Padgett (2003) at p. 446 ("the story is not very clear"). Such lack of understanding of the mechanism by which glucocorticoids act cannot support the conclusion that reduction of NF-kB activity necessarily occurred during practice of a prior art method that used a glucocorticoid. On the contrary, when the effects of a glucocorticoid on NF-kB activity in human subjects were recently tested, the glucocorticoid was found to have no effect on NF-kB activity. (See, e.g. Declaration of Dr. Verma ¶¶ 96-100, including references referred to therein such as Hart et al). Accordingly, the

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 17 of 92  of November 9, 2006 Response*

methods of use of glucocorticoids described in the prior art do not necessarily reduce NF-kB activity and therefore do not anticipate the claims of the subject patent.

Finally, Patentees pointed out certain unexplained discrepancies in the August 2, 2006 Office Action.  One such discrepancy involves the rejection of claims 30, 41, 63, 74, 87, 98, 138, 148, 158, 176, and 186, each of which recites "liver cells", but the confirmation of patentability of claims 52, 108, 118, 191 and 202 which also recite "liver cells."  No reason is provided in the August 2, 2006 Office Action for distinguishing the rejected claims from those confirmed patentable.  During the interview, Examiner Celsa acknowledged that none of the cited art teaches reducing NF-kB activity in liver cells.  Accordingly, claims 30, 41, 63, 74, 87, 98, 138, 148, 158, 176, and 186 should be confirmed patentable as were claims 52, 108, 118, 191, and 202.

Another discrepancy involves the rejection of claims 22-24, 33-35, 55-57, 66-68, 77-79, and 90-92 which recite specific ways of reducing NF-kB activity, but the confirmation of patentability of analogous claims 44-46, 101-103, 111-113, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, and 194-195 reciting the same specific ways of reducing NF-kB activity.  No reason is provided in the August 2, 2006 Office Action for distinguishing the rejected claims from those confirmed patentable.  Accordingly, claims 22-24, 33-35, 55-57, 66-68, 77-79, and 90-92 should be confirmed patentable as were claims 44-46, 101-103, 111-113, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, and 194-195.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 18 of 92  of November 9, 2006 Response*

III. THE IMPROPER USE OF REFERENCES WHICH ARE NOT PRIOR ART AND A
    <u>DECLARATION TO SUPPORT INHERENCY REJECTION IS *ULTRA VIRES*</u>

### A.    Statutory Grounds For Reexamination

Statutory authority prescribes that in reexamination proceedings
consideration but the Patent Office be limited to "prior art
consisting of patents or printed publications" that have a bearing
on patentability.  35 U.S.C. § 301. *See also* 37 C.F.R. § 1.501.
Indeed, the Manual of Patent Examining Procedure ("MPEP") states that
substantial new questions of patentability must be based on "prior
art patents or printed publications."  Prior art includes that relied
on in the reexamination request, that found elsewhere by the PTO, or
that in the patent file from submissions under 37 C.F.R. § 1.501.
All such art must be "prior art consisting of patents and printed
publications."  MPEP 2216, 2217, and 2244; 37 C.F.R. § 1.501.

### B.    Impermissible Grounds of Rejection in a Reexamination

The Patent Office does not have statutory authority to entertain a
prior public use in a reexamination.  35 U.S.C. § 301, *et seq.*; e.g.,
M.P.E.P. § 2216 (Rev. 2, May 2004) ("Examples of such questions that
will not be considered are public use, on sale, and fraud.")

The lack of statutory authority cannot be circumvented by reliance
on a printed publication that merely describes the public use.  A
prior art citation "cannot include ... a statement as to the public
use of the claimed invention."  M.P.E.P. § 2205 (Rev. 2, May 2004);
"a prior art patent or printed publication <u>cannot</u> be properly applied as
a ground for reexamination <u>if it is merely used as evidence of
alleged prior public use</u> or on sale, insufficiency of disclosure,
etc."  M.P.E.P. § 2217 (Rev. 2, May 2004) (Emphasis added).

Thus, it is clear that the PTO does not have statutory authority to

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 19 of 92  of November 9, 2006 Response*

rely on, as a ground for reexamination, a printed publication which does not itself contain the necessary disclosure, but describes an alleged prior public use.  For the purposes of this legal challenge to the subject reexamination proceeding Patentees also rely upon, and hereby incorporate by reference the Petitions, Requests for Reconsideration, and Pleadings filed in the Mandamus action initiated by Patentees in the U.S. District Court for the Eastern District of Virginia.

      **C.**    **The Inherent Anticipation Rejections in the August 2, 2006 Office Action are Improper; They Rely on Evidence Other Than "prior art consisting of patents or printed publications" in Violation of the Reexamination Statute.**

As noted above, a reexamination must be based on "prior art consisting of patents and printed publications."  MPEP 2216, 2217, and 2244; 37 C.F.R. § 1.501.  Nothing in the statute, the rules, or the M.P.E.P. dictates a different understanding.  Indeed, even prior art patents or printed publications cannot be grounds for reexamination if used merely as evidence of alleged prior public use or on sale activity.  MPEP 2217.  Affidavits or declarations may be considered in reexamination to explain the content or pertinent date of a prior art patent or printed publication.  *Id*.  However, rejection on prior art "cannot be based on the affidavits or declarations as such, but must be based on the prior art patents or printed publications."  *Id*. at 2258(I)(E).

Likewise, an admission may not be the basis for establishing a substantial new question of patentability, although an admission may be used "to determine the scope and content of the prior art in conjunction with prior art patents and printed publications, whether such admissions result from patents or printed publications or from some other source."  *Id*. at 2217 and 2258(I)(F)(1)-(2).  "An admission as to what is in the prior art is simply that, an admission, and requires no independent proof.  It is an acknowledged,

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 20 of 92 of November 9, 2006 Response*

declared, conceded, or recognized fact or truth." *Id.* at 2258(I)(F)(2). However, information supplementing or further defining the admission is improper, as the admission must stand on its own. *Id.* at 2217.

It is clear that reexamination proceedings were designed to be limited in scope to consideration of prior art patents and printed publications, "lest the life of an issued patent be wasted and the patentee's legitimate rights be abused by third party requests for reexamination, for there are myriad grounds on which patentability is subject to challenge." *In re Lonardo*, 119 F.3d 960, 969, 43 USPQ2d 1262 (Fed. Cir. 1997)(Newman, J., dissenting and noting legislative history's "serious concern that reexamination not create new opportunities for abusive tactics and burdensome procedures")(quoting *In re Recreative Technologies Corp.*, 83 F.3d 1394, 1397, 38 USPQ2d 1776, 1778 (Fed. Cir. 1996)).

Despite the statute, the rules and the MPEP, the Examiner advances the following case law on pages 8-9 of the August 2, 2006 Office Action as relevant to the use of non-prior art references in a reexamination:

> The discovery of a previously unappreciated property of a prior art composition, or of a scientific explanation for the prior art's functioning, does not render the old composition patentably new to the discoverer." Atlas *Powder* Co. v. *Ireco* Inc., 190 F.3d 1342,1347,51 USPQ2d 1943,1947 (Fed. Cir. 1999). Thus the claiming of a new use, new function or unknown property which is inherently present in the prior art does not necessarily make the claim patentable. *In re Best*, 562 F.2d 1252, 1254, 195 USPQ 430, 433 (CCPA 1977); *Ex parte Novitski*, 26 USPQ2d 1389 (Bd. Pat.App. & Inter. 1993); *In re Cruciferous Sprout Litigation*, 301 F3d. 1343,64 USPQ2d 1202 (Fed. Cir. 2002); *In re Crish*, 393 F.3d 1253, 1258, 73 USPQ2d 1364, 1368 (Fed. Cir. 2004). Although, normally, only one reference should be used in making a rejection under 35 U.S.C. 102, a 35 U.S.C. 102 rejection over multiple references has been held to be proper when the extra references are cited to show that a characteristic not disclosed in the reference is inherent. See MPEP 2131.01. Once a reference's teaching is shown to provide evidence or reasoning tending to show inherency, the burden shifts to Applicant to show an unobvious difference. MPEP 2112 (V).

Patentees respectfully point out that not one of the cases cited by

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 21 of 92 of November 9, 2006 Response*

the Examiner involves a reexamination or discusses what is a legitimate ground for rejection in a <u>reexamination</u>.

35 U.S.C. § 303 specifically refers to §§ 301 and 302, which require the basis of reexamination to be prior art, whether "patents or publications discovered by [the Director] or cited under the provisions of section 301 [for citation of prior art in a request for reexamination under section 302]." 35 U.S.C. § 303. The Examiner proffers no rationale for interpreting the reexamination statute in a different manner. Yet, the Examiner proceeds to assert that non-prior art documents can be considered during reexamination to show inherent anticipation as "extrinsic evidence" of what is inherent in a prior art reference even when such "extrinsic evidence" does not refer to or reproduce the teachings of the prior art being cited.

    **D.   The Claims of the Subject Patent Are Method Claims and the Cited Prior Art References Are At Most Evidence of What Occurred During A Prior Public Use.**

Each of the prior art references cited in the August 2, 2006 Office Action expressly describes methods that were publicly used, e.g. drinking red wine. The cited prior art, therefore, merely provides evidence of the prior public use of the methods described.

The logic used in the August 2, 2006 Office Action is that when the methods described in the printed publications were practiced by the public, the claimed methods of the '516 Patent "inherently" were practiced. Clearly, however, anything that "inherently" happened, must have occurred *during the <u>public use</u>* of methods described in cited references.

Indeed, the August 2, 2006 Office Action relies on non-prior art references as "extrinsic evidence," as well as a Declaration offered by the Requestor, to allegedly "explain" what would have "inherently" happened during such public use. Clearly, the methods which are actually described in the cited prior art do not raise any

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 22 of 92  of November 9, 2006 Response*

substantial new question of patentability, and the August 2, 2006 Office Action does not allege otherwise. What the August 2, 2006 Office Action effectively relies upon to support the inherent anticipation rejections is evidence of a prior public use.

The Federal Circuit has held in standard patent prosecution that a <u>method</u> is inherently anticipated only by the actual public use of the method (which may or may not have been described in a printed publication).[1]

A method of preparing and administering a food product rich in glucosinolates was found to be inherently anticipated where members of the public have "heretofore grown and eaten one of the many suitable cultivars identified by its patents." *In re Cruciferous Sprout Litigation*, 301 F.3d 1343, 1351 (Fed. Cir. 2002). However, the rationale of this holding is prior public use, not prior publication. This rationale is not available as a ground for rejection in a reexamination.

A claim to a method of hair depilation has been found inherently anticipated on the basis of prior public use in an experiment investigating the safety of a laser on guinea pig backs. The experiment was described in a printed publication, but it was the public use which inherently anticipated, not the publication. Again, prior public use is not available as a basis for a rejection in a reexamination. *MEHL/BIOPHILE International Cor. v. Milgraum*, 192 F.3d 1362, 1366 (Fed. Cir. 1999). Moreover, a different printed publication that merely provided instructions for the use of the same laser to remove tattoos from skin, where there was no prior public

---

[1] The Federal Circuit has found a claim to a *compound* inherently anticipated by a disclosure in a *patent* of administering to a patient a precursor which was necessarily converted in the patient to the compound. *Schering Corporation v. Geneva et al.*, 339 F.3d 1373 (Fed. Cir. 2003). However, the Federal Circuit in *Schering* explicitly stated that the *method* of treatment claims were not inherently anticipated by such a disclosure. *Id*, at 1381.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 23 of 92  of November 9, 2006 Response*

use, was held not to inherently anticipate a claimed depilation method.  *Id* at 1365.

Accordingly, it is clear that inherent anticipation of a patented method only occurs during a prior public use, not in a printed publication describing that prior public use; and prior public use is not a permitted basis for a rejection in a reexamination.

The Office's own rules recognize that a prior art citation "cannot include ... a statement as to the public use of the claimed invention." M.P.E.P. § 2205 (Rev. 2, May 2004); "a prior art patent or printed publication <u>cannot</u> be properly applied as a ground for reexamination <u>if it is merely used as evidence of alleged prior public use</u> or on sale, insufficiency of disclosure, etc." M.P.E.P. § 2217 (Rev. 2, May 2004) (Emphasis added).

Accordingly, the August 2, 2006 Office Action contains improper rejections of a patented method based on prior public use.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 24 of 92  of November 9, 2006 Response*

IV.    <u>INCONSISTENCIES WITHIN THE AUGUST 2, 2006 OFFICE ACTION</u>

     A.    **Rejected Claims Reciting "Liver Cells" Should be Confirmed Patentable.**

As noted above, each of claims 30, 41, 63, 74, 87, 98, 138, 148, 158, 176 and 186 recite "liver cells" and have been rejected.    In contrast, claims 52, 108, 118, 191, and 202 also recite "liver cells" but have been confirmed patentable.   No reason is provided in the August 2, 2006 Office Action for distinguishing the rejected claims from those confirmed patentable.    During the October 13, 2006 interview, Examiner Celsa acknowledged that none of the cited art teaches reducing NF-kB activity in liver cells.   Accordingly, each claim 30, 41, 63, 74, 87, 98, 138, 148, 158, 176 and 186 should be confirmed patentable.

     B.    **Rejected Claims Reciting Specific Ways of Reducing NF-kB Activity Should be Confirmed Patentable.**

Similarly, each of claims 22-24, 33-35, 55-57, 66-68, 77-79 and 90-92 recite specific ways of reducing NF-kB activity, and have been rejected.    In contrast, analogous claims 44-46, 101-103, 111-113, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, and 194-195 also recite the same specific ways of reducing NF-kB activity, but have been confirmed patentable.  No reason is provided in the August 2, 2006 Office Action for distinguishing the rejected claims from those confirmed patentable.   Accordingly, each of claims 22-24, 33-35, 55-57, 66-68, 77-79 and 90-92 should be confirmed patentable.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 25 of 92  of November 9, 2006 Response*

V.    PROPER CLAIM CONSTRUCTION

On page 8 of the August 2, 2006 Office Action, the Examiner set forth
an interpretation of the claims of the subject patent.  The Examiner
stated:

> The USPTO must give claims their broadest reasonable interpretation, in light of and
> consistent with the written description of the invention in the application. See, *In re
> Donaldson Co.*, 16 F.3d 1189,29 USPQ2d 1845 (Fed. Cir. 1994).  With respect to claim
> 1 it is noted that the sole method step is functional i.e. reducing NF-kB activity.
> Accordingly, the claims would encompass any *in* vitro or *in* vivo, natural (indirect) or
> man-made (direct) means of reducing NF-kB activity. Indeed, most of the method steps
> recited in the Baltimore patent are purely functional with the exception of claim 7 and
> dependent claims 81, 83 and 85-87 which require "modifying NF-kB activity" (which
> are partially functional) and claim 203 which requires "introducing a nucleic acid decoy
> molecule into the cell" which requires an active step. The summary of the remaining
> reexamination claims provided in pages 12-15 of the '7503 request is herein
> incorporated by reference.

Patentees respectfully disagree with such an interpretation because,
among other things, the interpretation being advanced is unreasonably
broad, is contrary to the interpretation and understanding which a
person skilled in the art would have, fails to conform to the
doctrine of claim differentiation, and ignores the fact that a method
is being claimed.

   A.    **Claims Require a "Reasonable" Interpretation. The Examiner
         Improperly Expanded the Scope of the Claims Beyond a
         Reasonable Interpretation.**

To determine if prior art anticipates a claim or render it obvious,
the Examiner must first determine the proper scope of the claim.
While a claim is to be given a broad interpretation during
reexamination, this interpretation must be *reasonable* in light of the
specification.  *In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984).
Additionally, the Examiner must construe the claims as one of skill
in the art would interpret them.  *In re American Academy of Science
Tech Center*, 367 F.3d 1359, 1364 (Fed. Cir. 2004).

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 26 of 92  of November 9, 2006 Response*

By construing the claims so broadly that they would even cover
actions that would kill the cell the Examiner adopts an
interpretation contrary to that which would be understood by a person
skilled in the art and has impermissibly given the claims an
unreasonable, broad interpretation. *See In re Cortright*, 165 F.3d
1353, 1359 (Fed. Cir. 1999) (reversing the Examiner's rejection after
finding that one skilled in the art would construe the claim more
narrowly than had the examiner). When the claim terms "are examined
through the viewing glass of a person skilled in the art," as they
are supposed to be, it becomes clear that the Examiner's
interpretation is not reasonable. *Phillips v. AWH Corp*, 415 F.3d
1303, 1313 (Fed. Cir. 2005) *cert. denied*, 126 S.Ct. 1332 (2006)
(quoting *Ferguson Beauregard/Logic Controls  v. Mega Sys., LLC*, 406
F.3d 1359, 1363 (Fed. Cir. 2005)). Such broad interpretations are
impermissible and must be refined. *See In re Marosi*, 710 F.2d 799
(Fed. Cir. 1983) (reversing a claim rejection under 35 U.S.C. §§102
or 103 that failed to interpret the claim in light of one skilled in
the art).

Accordingly, the Examiner should interpret the claims so that their
scope is commensurate with the specification as viewed by one skilled
in the art. For an understanding of who would be a person skilled
in the art, see Declaration of Dr. Verma, ¶ 3.

### B.    The Proper Interpretation of Method Claims Requires They Be Interpreted As Involving Affirmative Acts.

To properly construe method claims, the Examiner must consider that
a process is an act. *See Tilghman v. Proctor*, 102 U.S. 707, 728
(1881)(differentiating between a machine and a process). Courts have
long since held that a "process requires that certain things should
be done." *Cochrane v. Deener*, 94 U.S. 780, 788 (1877). Unlike a
machine, a process requires an affirmative act to be taken. *Tilghman*
at 728.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 27 of 92 of November 9, 2006 Response*

When interpreting method claims, a distinction must be made between "steps," which are descriptions of the elements of a process, and "acts" which are "the implementation of such steps." *O.I. Corp. v. Tekmar Co. Inc.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997). While "steps" can implicate §112, ¶ 6, "acts" do not. *Masco Corp. v. United States*, 1327 (Fed. Cir. 2002)(holding that "if an act is present, then the limitation is not a step plus function limitation"). The Federal Circuit has held process claims that describe steps with "ing" verbs ("gerunds") "acts." *O.I. Corp.* at 1583. Moreover, "a patentee can define a method or process claim containing steps that begin with a gerund . . . without necessarily subjecting the claim to §112 ¶6 limitations." *EBS Dealing Res. Inc. v. Intercontinental Exch. Inc.*, 379 F. Supp.2d 521, 527-528 (S.D.N.Y. 2005) (citations omitted). Method claims without a "step for" provision should not be construed as having a step-plus-function limitation, unless the limitation does not have an act, as courts are reluctant to impose §112 ¶6 "without a showing that the limitation contains . . . [no] act." *Masco Corp. v. United States*, 303 F.3d 1316, 1327 (Fed. Cir. 2002)(holding that "transmitting" was an act, not a function).

In the present case, the method claims contain gerunds such as "reducing". These gerunds clearly should be construed as acts, and the claims should be interpreted as acts that require affirmative steps be taken. See also, Declaration of Dr. Verma, ¶ 11.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 28 of 92 of November 9, 2006 Response*

###    C.    **Different Claims Must Be Construed to Have Different Scope.**

When determining the proper scope of the claims, the Examiner must use an interpretation that provides meaning to all claim terms and prevents different claims from having the same scope. *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987). The doctrine of claim differentiation creates a presumption that each claim has a different scope and should be applied if this presumption is not rebutted. *See Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998)(applying the doctrine of claim differentiation where an alternate interpretation would make a claim superfluous).

The Examiner has improperly interpreted numerous claims so as to in effect have the same scope.    The Examiner has also construed independent claims and claims which depend on them in such a manner that they have the same scope.    Such an interpretation is improper under the doctrine of claim differentiation.    Indeed, where a claim limitation "already appears in a dependent claim, the doctrine of claim differentiation is at its strongest." *Liebel-Flarsheim Co. v. Medrad Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) *cert. denied*, 543 U.S. 925 (2004) (holding that a dependent claim and the independent claim on which it depends do not have the same scope).    Additionally, by determining that claims with different limitations have the same scope, the Examiner has ignored the preference for applying a claim construction that "gives meaning to all the terms of the claim" over one that does not. *Merck & Co., Inc., v. Teva Pharmaceuticals, USA, Inc.*, 395 F3d 1364, 1372 (Fed. Cir. 2005) *cert. denied*, 126 S.Ct. 488 (2005).

In this case, there are numerous dependent claims reciting elements not present in the claims to which they refer that clearly do not have the same scope.    Similarly, independent claims recite elements not preset in other independent claims.    The Examiner should

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 29 of 92  of November 9, 2006 Response*

therefore recognize that the claims are different in scope so as to avoid an interpretation in which claim terms are superfluous and/or redundant.

### D.  **Proper Construction of the '516 Patent Claims**[2]

The invention of the subject patent is based on the pioneering work of the inventors including Dr. David Baltimore, which grew out of studies on how the immune system is regulated. The immune system consists of a variety of specialized cells and protects the body by attacking and eliminating harmful foreign organisms and substances. The inventors' work demonstrated that a particular factor in the cell, NF-kB, plays a central role in regulating how immune cells respond to external influences that are damaging to the body.  NF-kB functions as a transcription factor, which is activated in response to external stimuli and participates in regulating expression of particular genes, such as antibody and cytokine genes.  (Column 2, lines 20-45 and 54-59; column 12, lines 57-66, col. 13, lines 13 – column 14, line 54; and col. 17, lines 30-37; Declaration of Dr. Verma, ¶¶ 5-7.)

In the absence of inducing external stimuli, NF-kB is generally present in an inactive form in the cytoplasm of the cell.  In its inactive form, NF-kB is bound to an inhibitor protein called IkB, which prevents NF-kB from traveling to the nucleus. Upon activation in response to an external influence, NF-kB is released from its complex with IkB. The released NF-kB then moves to the nucleus, where it can participate in regulating expression of particular genes by binding to specific DNA sequences or "recognition sites" on those genes, leading to transcription of such genes.  The entire NF-kB

---

[2]Patentees also refer the Examiner to the construction of certain claims in the District of Massachusetts litigation. In this regard, Patentees refer the Examiner to the material cited in the Supplemental Information Disclosure Statement in Section IX herein discussing among other issues NF-kB activity and use of blocking drugs (and, material previously disclosed).

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 30 of 92  of November 9, 2006 Response*

pathway from induction to gene expression can be separated into the six (6) general segments shown in blue in Schematic 2. While NF-kB activity is essential to allow the body to respond to the effects of harmful external stimuli, in some cases the activity can become excessive causing other undesirable effects. (See, e.g., column 2, lines 46-63; column 10, lines 31-55; column 14, lines 28-30; and column 16, lines 22-63 of the subject patent; Schematics 1 and 2; and Declaration of Dr. Verma, ¶¶ 8-9.)

The claims of the '516 patent are directed to various methods for providing a therapeutic benefit by intervening in the processes that constitute the NF-kB pathway, are associated with NF-kB activity, and cause subsequent NF-kB-regulated effects. In situations where there is excessive activation of NF-kB in response to external stimuli, the claimed methods are useful for modifying their potentially harmful effects. The claims are directed to methods for modifying the body's naturally occurring response to such inducing external stimuli and specifically to reducing the harmful effect of such external influences by "reducing NF-kB activity." The '516 patent claims are directed to various methods for providing a therapeutic benefit by intervening in the processes associated with NF-kB activity that cause subsequent NF-kB-regulated effects. For example, see column 3, lines 59-67, where the patent explains that "As a result of this finding, it is now possible to alter or modify the activity of NF-kB as an intracellular messenger and, as a result, to alter or modify the effect of a variety of external influences, referred to as inducing substances, whose messages are transduced within cells through NF-kB activity. Alteration or modification, whether to enhance or reduce NF-kB activity or to change its binding activity (e.g., affinity, specificity), is referred to herein as regulation of NF-kB activity." These desired goals are achieved in the methods claimed in the '516 patent by reducing the ability of NF-kB to act as a messenger inside the cell, so as to regulate specific results recited in the claims, such as reducing NF-kB mediated gene

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 31 of 92 of November 9, 2006 Response*

expression. When read in light of the teachings of the patent disclosure, one skilled in the art would understand the claims to require affirmative acts and, manipulative steps, calculated to achieve such specific results by reducing the ability of NF-kB to act as a messenger inside the cell. (Declaration of Dr. Verma, ¶¶ 10-11.)

The '516 patent teaches that one can reduce induced NF-kB activity by interfering anywhere along any of the six (6) segments of the NF-kB pathway as represented by the arrows in Schematic 3. One skilled in the art would understand the claims of the '516 patent to be directed to achieving specified results by interfering along these segments so as to reduce NF-kB activity. (Declaration of Dr. Verma, ¶ 12.)

In normal cells, in the absence of inducing stimuli, there is no activation of NF-kB, therefore no consequent NF-kB mediated intracellular signaling. Such activation and signaling takes place in response to external influences that act on the cell. Since the pending claims are directed to methods for reducing NF-kB activity, one skilled in the art would understand that the claimed methods do not cover prophylaxis, but instead are directed to methods in which NF-kB activity which has been induced is reduced. (Declaration of Dr. Verma, ¶ 13.)

Some claims, for example, claims 1, 2 and 5, are directed to methods of achieving specified results by interfering along any one of the six (6) segments shown in Schematic 3. Other claims specify that the external influence "induce NF-kB-mediated intracellular signaling." Thus, these claims require the persistence of at least the first step, i.e. stage 1 which induces intracellular signaling, but allow for the interference to occur along any of the remaining five (5) segments inside the cell (Schematic 4). Examples of such claims are claim 8, 9, 10, 14, 95 and 145. Yet other claims are more specifically directed to and specify that interference occurs along

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 32 of 92 of November 9, 2006 Response*

only one of the five (5) intracellular segments.    In this regard,
claims  20,  22,  24,  31,  33,  35,  42,  44  and  46  specify  that
interference is along segment 2 (Schematic 5); claims 23, 34 and 45
specify that interference is along segment 3 (Schematic 6); claims
21,  32,  43  and  89  specify  that  interference  is  along  segment  5
(Schematic  7);  and  claims  25,  47,  80  and  144  specify  that
interference is along segment 6 (Schematic 8).    (Declaration of Dr.
Verma, ¶¶ 14-15.)

Thus, each of the following dependent claims, properly construed,
specify interference along the specific segment in the NF-kB activity
pathway which it recites.    To construe these claims otherwise would
be  contrary  to  the  doctrine  of  claim  differentiation  and  to  the
reasonable interpretation of these claims by one of skill in the art.
The  dependent  claims  that  recite  specific  ways  of  reducing  NF-kB
activity by interfering at specific segments of the NF-kB pathway are
the following:

> 20, 21, 22-24[3] & 25;
> 31, 32, 33-35[3] & 36;
> 42, 43, 44-46[3] & 47;
> 53, 54, 55-57[3] & 58;
> 64, 65, 66-68[3] & 69;
> 75, 76, 77-79[3] & 80;
> 88, 89, 90-92[3] & 93;
> 99, 100, 101-103[3] & 104;
> 109, 110, 111-113[3] & 114;
> 119, 120, 121-123[3] & 124;
> 128, 129, 130-132[3] & 133;
> 139, 140, 141-143[3] & 144;
> 149, 150, 151-153[3] & 154;
> 159, 160, 161-163[3] & 164;
> 167, 168, 169-171[3] & 172;
> 177, 178, 179-181[3] & 182; and
> 192, 193, 194-196[3] & 197.

---

[3]*See, also*, Section IV of the this response pointing out inconsistencies in the
rejections set forth in the August 2, 2006 Office Action apparently acknowledging
patentability of some but not all of dependent claims reciting substantially identical language.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 33 of 92 of November 9, 2006 Response*

VI.    REJECTIONS ON THE BASIS OF "INTERVENING REFERENCES".

On pages 3-4 of the August 2, 2006 Office Action, the Examiner
alleged that all 203 claims of the subject patent are only entitled
to the benefit of a November 13, 1991 filing date, and rejected a
subset of the claims on references having an effective date between
April 21, 1989 and November 13, 1991 (the "intervening references").[4]

   A.    **Numerous Claims Are Clearly Entitled To At Least An April
         21, 1898 Effective Filing Date**

Patentees maintain that numerous claims are clearly entitled at least
to the April 21, 1989 filing date of U.S. Serial No. 07/341,436.

For the subset of claims against which the "intervening references"
are being cited Patentees direct the Examiner's attention to a Claim
Support Chart, attached as **Exhibit 3** to the Declaration of Dr. Verma.
This Claim Support Chart clearly shows support for the claims listed
in the April 21, 1989 application.  The portions of the April 21,
1989 application or of the relevant application(s) incorporated
therein by references and identified in the Claim Support Chart
convey with reasonable clarity the invention recited in the
corresponding claim(s) listed in the chart to one of skill in the
art.  See, also the Declaration of Dr. Verma, ¶¶ 16-21.  Patentees
point out that to the extent support for the pending claims appears
in U.S. Serial Nos. 06/817,441, filed January 9, 1986; 07/155,207,
filed February 12, 1988; and/or 07/280,173, filed December 5, 1988,
each of these applications is incorporated by reference into the
April 21, 1989 application on page 1, lines 4-8 thereof.  In
accordance with M.P.E.P. § 608.01(p)(I), claims are entitled to at

---

[4] *Pending claims which have been rejected on "intervening references" are: 1-8, 9,
11, 18, 20, 21, 25-27, 29, 31, 32, 36-38, 40, 42, 43, 47-51, 53, 54, 58-60, 61, 62, 64, 65, 69-
71, 72, 73, 75, 76, 80, 82, 84, 88, 89, 93-97, 106, 107, 109, 110, 114-117, 182-185, 192, 193,
197-199, 200 and 201.*

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 34 of 92  of November 9, 2006 Response*

least the April 21, 1989 effective filing date of U.S. Serial No. 07/341,436 if supported by the disclosure of an application incorporated therein by reference.

### B. Rejections On The Basis Of "Intervening References" Should Be Withdrawn As To All Claims Entitled To At Least An April 21, 1989 Effective Filing Date

As noted above, numerous claims rejected on the basis of "intervening references" are in fact entitled to at least an April 21, 1989 effective filing date. Therefore, each ground of rejection based on an "intervening reference" should be withdrawn with respect to each claim rejected on such ground which is entitled to the April 21, 1989 filing date. Specifically, the rejections set forth: in section I on pages 10-13; in section IIa on pages 13-18; in section VIII on pages 47-48; and in section IX on pages 48-51 of the August 2, 2006 Office Action should be withdrawn with respect to each pending claim rejected therein which is entitled to an April 21, 1989 effective filing date.

### C. Claims Entitled To At Least An April 21, 1989 Effective Filing Date And Rejected Solely On The Basis Of "Intervening References" Should Be Confirmed Patentable

Because certain claims have only "intervening references" cited against them, such claims should be confirmed patentable as to each such claim found to be entitled to the April 21, 1989 effective filing date. Specifically, Patentees maintain that claims 3, 4, 11, 42, 43, 47-49, 51, 107, 109, 110, 114, 115, 117, 192, 193, 197-199 and 201 are entitled to an April 21, 1989 effective filing date and have only "intervening references" cited against them. Accordingly, each of claim 3, 4, 11, 42, 43, 47-49, 51, 107, 109, 110, 114, 115, 117, 192, 193, 197-199 and 201 should be confirmed patentable.

In addition to the Claim Support Chart discussed above, Patentees now address the Examiner's specific comments on pages 3-4 of the Office

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 35 of 92  of November 9, 2006 Response*

Action which relate to the claims being rejected on the basis of the
intervening references.  The Examiner has alleged that:

> "every claim of the '516 patent (1-203) recites at least one of the following features
> which the pre-1991 applications fail to disclose:
>
> a.    an amino acid or nucleic acid sequence corresponding to NF-κB;
>
> b.    support for the Baltimore patent claim limitations including (but not limited to):
>
>     -'reducing NF-kB activity' in a cell (e.g. especially mammalian/eukaryotic)
>     and/or an enabling means thereof (e.g. administering a NF-kB inhibitor) to
>     effect various functions (e.g. inhibit expression generally, reduce cytokine
>     expression etc.) as *required in all the claims*;
>
>     -'reduce binding of NF-kB to NF-kB recognition sites on genes which are
>     transcriptionally regulated by NF-kB' (e.g., claims 25, 36, 47, 69, 80, 93, 144,
>     154 and 182);
>
>     -'inhibiting modification of an IkB protein, which modification otherwise
>     reduces IkB binding to NF-kB' (e.g., claims 22, 33, and 44);
>
>     -'inhibiting degradation of an IkB protein' (e.g., claims 23, 34, and 45);
>
>     -'inhibiting dissociation of NF-kB:IkB complexes' (e.g., claims 24, 35, and
>     46)."

In response, Patentees note the following:

1. Contrary to the Examiner's assertion, amino acid or nucleic acid
sequences corresponding to NF-kB are not recited in the pending
claims or necessary to enable these claims as of April 21, 1989.  See
Declaration of Dr. Verma ¶ 17.

2. Contrary to the Examiner's assertion, the phrase "reducing NF-kB
activity" in the pending claims is clearly supported by at least the
following passages in of U.S. Serial No. 07/341,436, filed April 21,
1989 (the "April 21, 1989" application):

- page 5, lines 13-16: "Alteration or modification, whether to
enhance or <u>reduce NF-kB activity</u> . . . is referred to herein as

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 36 of 92  of November 9, 2006 Response*

regulation of NF-kB activity."  See, also Declaration of Dr. Verma
¶ 17 and 18.


3. Contrary to the Examiner's assertion, the terms "mammalian cells"
and "eukaryotic cells" in the pending claims are clearly supported
by at least the following passages in the April 21, 1989 application:

- page 1, lines 4-8, incorporating U.S. Serial No. 07/155,207, page
77, lines 8-9: "NF-kB [is] present in a wide variety of <u>mammalian
cells</u>"; and
- page 1, lines 4-8, incorporating U.S. Serial No. 07/280,173, page
4, line 21: "In the present work with <u>eukaryotic cells</u>." See, also,
Declaration of Dr. Verma ¶ 18.


Patentees also note the Examiner's assertion that "'reducing NF-kB
activity' in a cell (e.g. especially mammalian/eukaryotic) and/or an
enabling means thereof (e.g. administering a NF-kB inhibitor) to
effect various functions (e.g. inhibit expression generally, reduce
cytokine expression etc.)" is not disclosed in the subject patent.
In this regard, Patentees respectfully direct the Examiner's
attention to page 23, line 22 to page 30, line 25 of the April 21,
1989 application describing how one skilled in the art may proceed
to reduce NF-kB activity in accordance with the invention.


4. Contrary to the Examiner's assertion, the phrase "reducing binding
of NF-κB to NF-κB recognition sites on genes which are
transcriptionally regulated by NF-κB" in the pending claims is
clearly supported by at least the following passages in the April 21,
1989 application:

- on page 5, line 31 to page 6, line 8: "NF-kB-mediated gene
expression can also be selectively regulated by altering the <u>binding
domain of NF-kB</u> in such a manner that binding specificity and/or
affinity are modified.";

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 37 of 92  of November 9, 2006 Response*

- on page 24, lines 9-29: "According to the methods described herein, the <u>expression of genes under the control of one of these elements is subject to modulation</u> by alteration of the concentration or availability of NF-KB. This can also be carried out, according to the present method, for <u>any gene which contains an NF-kB binding site</u>."; and

- in the Title: "<u>NF-kB-Mediated Transcriptional Regulation</u>".    See, also, Declaration of Dr. Verma ¶ 19.


5. Contrary to the Examiner's assertion, the phrase "inhibiting modification of an IkB protein, which modification otherwise reduces IkB binding to NF-kB" in the pending claims is clearly supported by at least the following passages in the April 21, 1989 application:

-on page 18, lines 28-29: "<u>Inactive NF-kB is complexed</u> with a labile inhibitor protein, I-kB.";
- on page 19, lines 20-21: "The implication is that <u>activation of NF-kB</u> involves a <u>modification of I-kB</u> and not NF-kB."; and
- on page 5, lines 7-13 and 23-25: "<u>As a result of this finding</u>, it is now possible to alter or modify the activity of NF-KB as an intracellular messenger and, as a result, to alter or modify the effect of a variety of external influences, referred to as inducing substances, whose messages are transduced within cells through NF-KB activity....    In particular, the present invention relates to a method of regulating (enhancing or <u>diminishing) the activity of NF-KB</u> in cells in which it is present and capable of acting as an intracellular messenger, as well as to substances or composition useful in such a method."    See, also, Declaration of Dr. Verma ¶ 20.


6. Contrary to the Examiner's assertion, the phrase "inhibiting degradation of an IkB protein" in the pending claims is clearly supported by at least the following passages in the April 21, 1989 application:

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 38 of 92 of November 9, 2006 Response*

- on page 20, lines 1-3: "Various inducer then cause an <u>alteration in I-kB</u> allowing NF-kB to be released from the complex."; and
- on page 5, lines 7-13 and 23-25: "<u>As a result of this finding</u>, it is now possible to alter or modify the activity of NF-KB as an intracellular messenger and, as a result, to alter or modify the effect of a variety of external influences, referred to as inducing substances, whose messages are transduced within cells through NF-KB activity...."  Contrary to the Examiner's assertion, the phrase "inhibiting degradation of an IkB protein" in the pending claims is clearly supported by at least the following passages in the April 21, 1989 application: In particular, the present invention relates to a method of regulating (enhancing or <u>diminishing) the activity of NF-KB</u> in cells in which it is present and capable of acting as an intracellular messenger, as well as to substances or composition useful in such a method." See, also, Declaration of Dr. Verma ¶ 21.

7. Contrary to the Examiner's assertion, the phrase "inhibiting dissociation of NF-kB:IkB complexes" in the pending claims is clearly supported by at least the following passages in the April 21, 1989 application:

- on page 19, lines 1-3: "... <u>dissociating</u> agents such as formamide and deoxycholate to unmask very high levels of NF-kB activity."; and
- on page 20, lines 5-7: "The <u>complex formation</u> of NF-kB with I-kB appears to be rapidly and efficiently <u>reversible</u> ...." See, also, Declaration of Dr. Verma ¶ 21.

Patentees, thus, have shown where each of the terms mentioned by the Examiner has adequate support in the April 21, 1989 application. Accordingly, the claims containing these terms should be according to an April 21, 1989 effective filing date.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 39 of 92 of November 9, 2006 Response*

> **D.    Claim Rejections On The Grounds Of Anticipation or Obviousness Over The "Intervening References" Are Not Valid Even For Claims Entitled To A November 13, 1991 Filing Date.**

Patentees maintain that most of the claims being rejected on the basis of "intervening references" are in fact entitled to an April 21, 1989 effective filing date. Patentees further maintain that each claim being rejected on the basis of "intervening references" are patentable over such references even with respect to any such claim determined to be entitled only to a November 13, 1991 filing date. In the sections which follow Patentees explain why each claim being rejected on the basis of an "intervening reference" is patentably distinct over such intervening reference assuming *arguendo* the claim is entitled to a November 13, 1991 filing date.

> **1.    Intervening References Relating To Protein Kinase**
>
> a. §102(b) or 103 – Meichle (5/90) – *Intervening* Art

On pages 10-11 of the August 2, 2006 Office Action, the Examiner rejected claims 1-9, 11, 20-21, 25-29, 31, 32, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201 under 35 U.S.C. 102(b) as anticipated by or, in the alternative, under 35 U.S.C. 103(a) as obvious over, *Meichle* (J. Biol. Chem. 265 (5/90) 8339-43). The Examiner summarized the rejection as follows: "*Meichle* teaches the reduction of NF-kB activity in induced cells using agents that inhibit protein kinase C. In addition, because *Meichle* used the HIV LTR in their experiments, this reference anticipates, or alternatively, makes obvious claims drawn to regulating expression of viral genes."

The Examiner also alleged that the instant claims are drawn to reducing NF-kB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-kB, and that NF-kB activity

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 40 of 92 of November 9, 2006 Response*

can be effected by diminishing induced NF-kB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein (claim 5) in a eukaryotic cell.  Patentees maintain, however, that the Examiner 1) made the rejection under an incorrect claim construction, and 2) appears to have not considered all of the rejected dependent claims, each of which recites additional patentable elements.

The Examiner alleged that *Meichle* analyzed various Protein Kinase C Inhibitors and their effect on both PMA-(phorbol 12-myristate-13-acetate) and TNF-(tumor necrosis factor) induced NF-kB activity in eukaryotic Jurkat cells, and, using an EMSA binding assay purportedly similar to that disclosed in the '516 patent, *Meichle* found that Protein Kinase C inhibitor H8 reduced PMA-induced NF-kB activity in these cells (Fig. 3, lane 7). The Examiner alleged that other inhibitors also were shown to reduce NF-kB activity, including Protein Kinase C Inhibitor H7 (Fig. 2B, lanes 3. vs. 5) and Staurosporine (Fig. 2B, lanes 3. vs. 5) and Staurosporine (Fig. 2B, lanes 6 and 7).

Thus, the Examiner concluded that *Meichle* teaches the use of Protein Kinase Inhibitor H8 (among others) to reduce NF-kB-mediated gene transcription by reducing NF-kB activity and reducing the binding of NF-kB to NF-kB binding sites. With reference to *Exhibit G-2* of the 90/007,503 Request, the Examiner alleged that *Meichle* expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97.    The Examiner additionally alleged that because *Meichle* used a genetic construct comprising HIV LTR and NF-kB binding site, *Meichle* rendered claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201 immediately envisaged (i.e. anticipated) or alternatively *prima facie* obvious in light of the fact that the HIV LTR promoter is responsible for regulating the expression of viral (HIV) genes.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 41 of 92  of November 9, 2006 Response*

*Patentees' reply*

In response, Patentees respectfully traverse the Examiner's ground of rejection. Initially, Patentees point out that claims 7, 28, 39, 81, 83, 85 and 86 have been cancelled without prejudice. Additionally, Patentees have explained in Section IV above that the remaining rejected claims, i.e. claims 1-6, 8, 9, 11, 20-21, 25-27, 29, 31, 32, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201, are entitled to at least an April 21, 1989 effective filing date. On this basis alone this rejection based on art after April 21, 1989 should be withdrawn.

Notwithstanding, Patentees explain below that even if these claims were not entitled to an April 21, 1989 effective filing date, *Meichle* does not anticipate the claims.

### I) Factual errors in August 2, 2006 Office Action.

The Examiner has erroneously stated on page 10 of the Office Action that "*Meichle* teaches the reduction of NF-kB activity in induced cells…." The experiments *Meichle* describes in which H7, H8 or staurosporine were administered to cells, including the specific experiments the Examiner relies on (portions of Figs. 2 and 3), were all conducted by <u>pretreating</u> cells with these protein kinase inhibitors for 30 to 45 minutes before cells were stimulated with any inducing substance. (*Meichle* at 8341-2, Figs. 2 and 3; Declaration of Dr. Verma, ¶ 149.)

#### ii) None of the experiments with TNF in Meichle are relevant to any of the '516 patent claims.

*Meichle* reports various experiments conducted in two human leukemic cell lines, K562 and Jurkat cells. *Meichle* describes a series of experiments investigating whether in these cell lines, protein kinase C was necessary for the ability of tumor necrosis factor (TNF) to

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 42 of 92  of November 9, 2006 Response*

stimulate NF-kB binding activity.    (*Meichle* at 8339, abstract).
*Meichle* investigated this question by pretreating the cell with H7,
H8 or staurosporine, three relatively non-specific protein kinase
inhibitors. *Id.* Notably, the ability of TNF to stimulate NF-kB
binding activity was unaffected by pretreatment with these
inhibitors, and *Meichle* concludes that its ability to induce NF-kB
binding activity did not involve activation of protein kinases, in
particular protein kinase C (PK-C). *Id.*   Therefore, none of the
experiments with TNF are relevant to any of the '516 patent claims.
(Declaration of Dr. Verma, ¶¶ 147-148.)

> *iii) Meichle does not show reduction of NF-kB activity in
> induced cells, as required by the claims.*

*Meichle* also purports to show that pretreating a cell with either H7
or staurosporine reduced the ability of PMA to stimulate NF-kB
binding activity.    In this regard, the Examiner has erroneously
stated on page 10 of the Office Action that "*Meichle* teaches the
reduction of NF-kB activity in induced cells…."   The experiments
*Meichle* describes in which H7, H8 or staurosporine were administered
to cells, including the specific experiments the Examiner relies on
(portions of Figs. 2 and 3), were all conducted by <u>pretreating</u> cells
with these protein kinase inhibitors for 30 to 45 minutes before
cells were stimulated with any substance. (*Meichle* at 8341-2, Figs.
2 and 3).   As apparent from the discussion of these experiments,
pretreatment was conducted to prevent a cellular response to inducing
substances by inactivating PK-C and PK-A (and most likely other
kinases) before stimulating the cell with any inducing agent.   (See
*Meichle*, at 8339, 8342). The use of these inhibitors as described by
*Meichle*, therefore, was not on induced cells and would not have
reduced any induced effect on the cells. None of the experiments in
*Meichle*, therefore, anticipate the pending claims requiring reducing
NF-kB activity. (Declaration of Dr. Verma, ¶ 149.)

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 43 of 92  of November 9, 2006 Response*

> *iv) Meichle provides no evidence whether PK inhibitors*
> *could prevent any agent from inducing expression of these*
> *constructs.*

The examiner also alleged on page 11 of the Office Action that
*Meichle* teaches use of PK inhibitors to reduce NF-kB-mediated gene
transcription by reducing NF-kB activity.  The Examiner also alleged
that because *Meichle* used a genetic construct comprising HIV LTR,
*Meichle* either would anticipate or render obvious claims 3, 4, 11,
42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201, if
these claims were entitled only to a November 13, 1991 filing date.
However, nothing in *Meichle* either suggests or provides any data
showing that PK inhibitors inhibited gene expression induced by any
agent, or could do so as a result of reducing NF-kB binding activity.
*Meichle* reports experiments conducted with Jurkat cells transfected
with two different CAT reporter constructs, each of which are
described as containing a CAT gene and an enhancer with an NF-kB
binding site. (*Meichle* at 8340). However, none of the experiments
with these constructs, which are reported in Fig. 3, used any PK
inhibitor. (*Meichle* at 8341, Fig. 3).  *Meichle* simply provides no
evidence whether PK inhibitors could prevent any agent from inducing
expression of these constructs. Additionally, *Meichle* provides no
data as to whether PK inhibitors affected expression of any
endogenous gene.   Therefore, one would not read *Meichle* as either
describing or suggesting any use of PK inhibitors to reduce or NF-kB-
mediated gene transcription by reducing NF-kB activity. (Declaration
of Dr. Verma, ¶ 150.)

> *v) Meichle is missing critical controls necessary to show*
> *NF-kB effects.*

In his EMSA assays (Figs. 2 and 3), *Meichle* employed a 29 base pair
oligonucleotide corresponding to a portion of the HIV enhancer. This
sequence, however, has been shown to bind not only NF-kB but also
other  transcription  factors  including  factors  in  the  NFAT
transcription factor family. To substantiate that the most slowly

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 44 of 92  of November 9, 2006 Response*

migrating complex observed in *Meichle*'s EMSA assay corresponded to
NF-kB, it would have been necessary to determine whether mutation of
the putative NF-kB binding site abrogated binding. Without this
control, the data *Meichle* provides are insufficient to support the
conclusion that PK inhibitors reduced NF-kB binding activity.
(Declaration of Dr. Verma, ¶ 151.)

Accordingly, even if the claims were not entitled to a filing date
prior to the date of *Meichle* (which they are), *Meichle* still would
not anticipate or render obvious the invention recited by each of
claims 1-8, 8, 9, 11, 20-21, 25-27, 29, 31, 32, 36-38, 40, 42-43, 47-
51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-
107, 109-110, 114-117, 192-193 and 197-201.    Accordingly, the
rejection of these clams based on *Meichle* should be reconsidered and
withdrawn.

### 2. §102(b) – Shirakawa (6/89) – *Intervening Art*

On pages 12-13 of the August 2, 2006 Office Action, the Examiner
rejected claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62,
64-65, 69-73, 75-76, 80-86, 88-89 and 93-97 under 35 U.S.C. 102(b)
as allegedly anticipated by *Shirakawa* (Mol. And Cell. Biol. 9 (6/89)
2424-30).    The Examiner summarized the rejection by stating,
"*Shirakawa* teaches reduction of NF-kB activity in induced cells using
agents that inhibit protein kinase C."

The Examiner alleged that the instant claims are drawn to reducing
NF-kB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells
(e.g. claim 26) to effect inhibited expression of a gene under
transcriptional control of NF-kB, and that NF-kB activity can be
affected by diminishing induced NF-kB mediated intracellular
signaling (claims 6-9) to inhibit associated gene (claims 1-2)
expression of a cytokine protein (claim 5) in a eukaryotic cell. Of
note, however, is that the Examiner 1) made the rejection under an

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 45 of 92 of November 9, 2006 Response*

incorrect claim construction, and 2) appears to have not considered all of the rejected dependent claims, each of which recites additional patentable elements.

The Examiner alleged that *Shirakawa* is analogous to *Meichle* discussed supra, and *Shirakawa* performed similar tests with Protein Kinase C Inhibitor H8 on eukaryotic cells that had been induced with interleukin 1 (IL-1). The Examiner alleged that *Shirakawa* first demonstrated that IL-1 acted to induce NF-kB activity in 707/3 cells as demonstrated by the EMSA binding and CAT reporter assays (p.2425 Fig. 1; p. 2426 Fig. 2); the EMSA binding and CAT reporter assays then confirmed that Protein Kinase Inhibitor H8 reduced NF-kB activity and reduced the resulting CAT gene expression. More particularly, the result of treatment of cells with H8 using EMSA was that "[t]he induction by IL-1 was abolished ..." (p. 2426, Fig. 2A, lane 5)"; and using CAT "IL-1 induced k immunoglobulin expression was markedly inhibited ..." (p. 2425). The Examiner also alleged that these results were confirmed in a different cell line ("As was the case in 70Z/3 cells, NF-kB activation was markedly inhibited by H8 in YT cells (Fig, 2B, lane 9)."

The Examiner then concluded that *Shirakawa* teaches the use of Protein Kinase Inhibitor H8 (among others) to reduce NF-kB-mediated gene transcription by reducing NF-kB activity and reducing the binding of NF-kB to NF-kB binding sites. With reference to *Exhibit* G-2 of the 90/007,503 Request, the Examiner alleged that *Shirakawa* expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97.

*Patentees' reply*
In response, Patentees respectfully traverse the Examiner's position. Initially, Patentees point out that claims 7, 28, 39, 81, 83, 85 and 86 have been cancelled without prejudice. Additionally, Patentees have explained in Section IV above that the remaining rejected

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 46 of 92 of November 9, 2006 Response*

claims, i.e. claims 1-2, 5-6, 8, 9, 20-21, 25-27, 29, 31, 32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89 and 93-97, are entitled to at least an April 21, 1989 effective filing date. On this basis alone, this rejection based on art after April 21, 1989 should be withdrawn.

Notwithstanding, Patentees explain below that even if the claims are not entitled to an April 21, 1989 effective filing date, *Shirakawa* does not anticipate the claims.

> I) *Factual errors in August 2, 2006 Office Action.*

On page 12 of the Office Action, the Examiner erroneously stated that "Shirikawa [*sic*] teaches the reduction of NF-kB activity in induced cells using agents that inhibit protein kinase C." The experiments *Shirakawa* describes in which H8 was administered to cells, including the specific experiments the Examiner relied on (Fig. 1, portions of Fig. 2), were all conducted by <u>pretreating</u> cells with H8 for 2 hours before cells were stimulated with IL-1. (*Shirakawa* at 2426; Declaration of Dr. Verma, ¶ 153.)

> ii) *Shirakawa does not show reduction of NF-kB activity in induced cells, as required by the claims.*

*Shirakawa* reports various experiments conducted in a mouse pre-B cell line 70Z/3, and in human natural killer-like cell line, YT. *Shirakawa* describes a series of experiments conducted to determine whether the ability of IL-1 in these cells to stimulate NF-kB binding activity required the activity of cAMP-activated kinases. (*Shirakawa* at 2424). The experiments *Shirakawa* describes in which H8 was administered to cells, including the specific experiments the Examiner relies on, (Fig. 1, portions of Fig. 2) were all conducted by pretreating cells with H8 for 2 hours before cells were stimulated with IL-1. (*Shirakawa* at 2426). Again, as in *Meichle*, pretreatment was performed to prevent a cellular response to IL-1 by inactivating PK-C

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 47 of 92 of November 9, 2006 Response*

and PK-A (and most likely other kinases) before stimulating the cell with IL-1. (*Shirakawa* at 24325-26). The use of these inhibitors as described by *Shirakawa*, therefore, was not on induced cells, as assumed by the Examiner. None of the experiments in *Shirakawa*, therefore, could anticipate the pending claims requiring reducing activity that has first been induced. (Declaration of Dr. Verma, ¶ 153.)

> *iii) Shirakawa does not teach use of inhibitor while an inducer is also present.*

On pages 12-13 of the Office Action, the examiner also contended that based on CAT reporter assays described in Fig. 1, *Shirakawa* teaches use of PK inhibitors (H8) to reduce NF-kB-mediated gene transcription by reducing NF-kB activity, and therefore would have practiced the above claims. As noted above, in this experiment cells were pretreated with H8 for two hours before being treated with IL-1. (*Shirakawa* at 2425). In fact, Fig. 1 indicates that before being treated with IL-1, the cells were washed and the H8 removed. The use of H8 in this experiment as described by *Shirakawa*, therefore, was not in induced cells and could not have reduced any induced effect in the cell. (Declaration of Dr. Verma, ¶ 154.)

> *iv) Shirakawa is missing critical controls necessary to show NF-kB effects.*

Each of the three PK inhibitors (H7, H8 and staurosporine) in particular at dose ranges used in *Meichle* and *Shirakawa*, are relatively unspecific and in addition to PK-C and PK-A affect numerous kinases. Significantly, by inhibiting other kinases, these agents can inhibit transcription unrelated to effects on PKC, or NF-kB. In particular, both H7 and H8 have been demonstrated to block gene expression and to inhibit mRNA chain elongation, most likely by inhibiting TFIIH kinase activity. (*Yankulov et al.* 1995; *Kumahara et*

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 48 of 92  of November 9, 2006 Response*

*al.* 1999; Declaration of Dr. Verma, ¶ 155. ). Therefore, appropriate
controls are a necessity in order to properly interpret the effects
of such inhibitors on a transcriptional assay, such as CAT reporter
assay, as being related to NF-kB. *Shirakawa* omits any such controls
from CAT reporter experiment described in Fig. 1, such as, for
example, evidence that H8 would not affect expression of
appropriately matched CAT construct lacking an NF-kB binding site.
One of skill would therefore not have read *Shirakawa* as teaching that
one could use H8 to reduce NF-kB activity (Declaration of Dr. Verma,
¶¶ 152-155.)

Accordingly, even if the claims were not entitled to a filing date
prior to the date of *Shirakawa* (which they are), *Shirakawa* still
would not anticipate or make obvious the invention recited by each
of claims 1-2, 5-6, 8, 9, 20-21, 25-27, 29, 31, 32, 36-38, 40, 53-54,
58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89 and 93-97.
Accordingly, the rejection of these claims based on *Shirakawa* should
be reconsidered and withdrawn.

## 2.    Intervening References Relating To Cyclosporin A

A common fundamental flaw exists in all of the CsA art presented in
the April 4, 2005 Request for *Ex Parte* Reexamination, and relied upon
by the Examiner. CsA has now been shown to have its effects through
a different nuclear factor, NFAT, and not through NF-kB. Patentees
respectfully direct the Examiner's attention to the Declaration of
Dr. Verma, ¶¶ 22-52, incorporated herein by reference, which explains
this and other flaws in the CsA art cited.   For the sake of
completeness, Patentees summarize all of the deficiencies of the each
cited CsA reference in the sub-sections that follow.

### 1. §102(b) or 103 - Schmidt (8/90) - *Intervening* Art

On pages 13-15 of the August 2, 2006 Office Action, the Examiner
rejected claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54,58-

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 49 of 92  of November 9, 2006 Response*

62,64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201 under 35 U.S.C. 102(b) as allegedly anticipated, or alternatively rendered obvious under §103, by *Schmidt* et al., *J. Virology* 64:4037-4041 (August 1990). The Examiner summarized the rejection by stating that, "*Schmidt* teaches administration of Cyclosporin A ("CsA") to cells which substantially reduced NF-kB activity in those cells thus inhibiting expression of genes whose transcription is regulated by NF-kB activity. In addition, these references all utilized the HIV LTR promoter in their experiments and demonstrated that CsA reduced the expression of viral genes."

The Examiner alleged that the instant claims are drawn to reducing NF-kB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-kB, and that NF-kB activity can be affected by diminishing induced NF-kB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein(claim 5) in a eukaryotic cell. Of note, however, is that the Examiner 1) made the rejection under an incorrect claim construction, and 2) appears to have not considered all of the rejected dependent claims, each of which recites additional patentable elements.

The Examiner also alleged that the *Schmidt* reference discloses that administration of CsA reduces NF-kB in cells (e.g. Jurkat cells) and therefore must inherently reduce NF-kB-regulated gene expression. The Examiner alleged that *Schmidt* utilized the Electrophoretic Mobility Shift Assay ("EMSA") disclosed in the '516 patent to measure NF-kB activity to determine that "PHA-mediated induction of complexes binding to the kB enhancer was completely abrogated by [1 ug/ml] CsA (Fig. 1, lane 6; no B or A shifts) . . . ." See *Schmidt* at 4038. The Examiner also alleged that these results were confirmed using an NF-kB CAT reporter assay as described in the '516 patent, for example

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 50 of 92 of November 9, 2006 Response*

at Col. 17, line 66-Col. 18, line 23.

Thus, the Examiner alleged that *Schmidt* showed that CsA reduced PHA-induced NF-kB activity and, therefore, reduced the expression of a gene (CAT) that was regulated by NF-kB, and that *Schmidt* described the use of CsA at concentrations that reduce NF-kB activity and reduce NF-kB regulated gene expression. With reference to *Exhibit* G-1 of the 90/007,503 Request, the Examiner alleged that the *Schmidt* reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 of the '516 patent.

The Examiner reasoned that since *Schmidt* used the HIV LTR gene, *Schmidt* demonstrated that CsA reduced viral gene expression thereby anticipating instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201; and the use of the HIV LTR gene by *Schmidt* renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201 immediately envisaged, or alternatively, *prima facie* obvious in light of the fact that HIV LTR is responsible for regulating the expression of viral (HIV) genes. The Examiner concluded that it would have been anticipated, or alternatively *prima facie* obvious to regulate NF-kB activity as in *Schmidt* in order to affect associated viral (e.g. HIV) gene expression.

## Patentees' reply

In response, Patentees respectfully traverse the Examiner's position. Initially, Patentees point out that claims 7, 28, 39, 81, 83, 85 and 86 have been cancelled without prejudice. Additionally, Patentees have explained in Section IV above that the remaining rejected claims, i.e. claims 1-6, 8, 9, 11, 20-21, 25-27, 29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201, are entitled to at least an April 21, 1989 effective filing date. On this basis alone,

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 51 of 92  of November 9, 2006 Response*

this rejection based on art after April 21, 1989 should be withdrawn.

Notwithstanding, Patentees explain below that even if the claims are not entitled to an April 21, 1989 effective filing date, *Schmidt* does not anticipate the claims.

I) *Factual errors in August 2, 2006 Office Action.*

On page 14 of the Office Action, the Examiner erroneously stated that "*Schmidt* utilized the Electrophoretic Mobility Shift Assay ("EMSA") disclosed in the '516 patent." Among other things, most critically *Schmidt* did not use the same oligonucleotide probe. The particular oligonucleotide probe used as the binding site determines the specificity of the EMSA for measuring NF-kB binding activity under a particular experimental condition. The oligonucleotide probe Schmidt used corresponds to a portion of the HIV enhancer, which has now been shown to bind other factors, such as NFAT. (Declaration of Dr. Verma, ¶¶ 25-27. )

ii) *Schmidt does not show reduction of NF-kB activity in induced cells, as required by the claims.*

In the experiments relied on by the Examiner, CsA was not administered to Jurkat cells which had first been induced with PHA (*Schmidt*, Figs. 1 and 4). Instead, Jurkat cells were <u>simultaneously</u> treated with CsA and PHA. None of these experiments would therefore have carried out the various methods described by these claims. None of the experiments in *Schmidt*, therefore, could anticipate the pending claims requiring reducing activity that has first been induced. (Declaration of Dr. Verma, ¶ 25.)

iii) *A proper interpretation of Schmidt, in view of the '516 patent and other studies, indicates that CsA sensitive binding activity does not correspond to NF-kB, but instead corresponds to another factor, NFAT.*

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 52 of 92 of November 9, 2006 Response*

In his attached Declaration Dr. Verma explains the basis for
concluding that the effects of CsA are mediated through NFAT, not
through NF-kB. (Declaration of Dr. Verma, ¶¶ 28-36.) With respect to
*Schmidt*, Patentees emphasize that *Schmidt's* own experimental data
supports this conclusion.

For example, *Schmidt* observed that PHA-induced binding to an HIV
enhancer probe was CsA sensitive in Jurkat cells.    In contrast,
however, as evident from the experiment reported in Fig. 24 of the
subject patent where an HIV enhancer was not used, PHA alone did not
induce NF-kB binding activity in Jurkat cells.    The HIV enhancer is
now known to bind to NFAT.    Indeed, when *Schmidt* assessed induction
of NFAT binding activity in Jurkat cells using an EMSA specific for
NFAT, (*Schmidt*, fig. 2), there was "good activation of NFAT-1 with
PHA alone, but not with PMA alone."    This data explains that the
positive EMSA binding activity upon PHA induction that Schmidt
observed with the HIV enhancer likely corresponded to NFAT.
(Declaration of Dr. Verma, ¶ 31.)

Accordingly, even if the claims are not entitled to a filing date
prior to the date of *Schmidt* (which they are), *Schmidt* still does not
anticipate or make obvious the invention recited by each of claims
1-6, 8, 9, 11, 20-21, 25-27, 29, 36-38, 40, 42-43, 47-51, 53-54,58-
62,64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110,
114-117, 192-193 and 197-201.    Accordingly, the rejection of these
claims based on *Schmidt* should be reconsidered and withdrawn.

## 2. §102(b) or 103 - Emmel (12/89) - *Intervening Art*

On pages 15-16 of the August 2, 2006 Office Action, the Examiner
rejected claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54,
58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110,
114-117, 192-193 and 197-201 under 35 U.S.C. 102(b) as allegedly
anticipated, or alternatively rendered obvious under 103, by *Emmel*

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 53 of 92  of November 9, 2006 Response*

et al., Science, *246* (Dec. 1989): 1617-20. The Examiner summarized the rejection in the following assertion: "*Emmel* teaches administration of Cyclosporin A ("CsA") to cells which substantially reduced NF-kB activity in those cells thus inhibiting expression of genes whose transcription is regulated by NF-kB activity. In addition, these references all utilized the HIV LTR promoter in their experiments and demonstrated that CsA reduced the expression of viral genes."

The Examiner alleged that the instant claims are drawn to reducing NF-kB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-kB. For example, NF-kB activity can be effected by diminishing induced NF-kB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein (claim 5) in a eukaryotic cell.

The Examiner also alleged that similar to the *Schmidt* reference discussed above, the *Emmel* reference discloses that administration of CsA reduces NF-kB in cells (e.g. eukaryotic Jurkat cells) that inherently reduces NF-kB-regulated gene expression. The Examiner alleged that, like *Schmidt, Emmel* described the effects of CsA on Jurkat cells that were induced with PHA and PMA and CsA was shown (Fig. 3, .01-1 ug/ml) to reduce NF-kB binding activity, and in the CAT reporter assay, cells were transfected with a CAT reporter gene that was engineered to be regulated by HIV LTR gene, i.e. the gene had an NF-kB binding site incorporated into its regulatory region. The Examiner alleged that, as shown in Fig. 2D, CsA significantly reduced NF-kB activity thereby reducing the NF-kB-mediated expression of CAT, and as shown in Figure 3, 0.01-1 ug/ml (10-10000 ng/ml) CsA was found to reduce NF-kB binding activity. Thus, *Emmel* described the use of CsA at concentrations that reduce NF-kB activity and reduce NF-kB regulated gene expression, and as such, as shown in more detail

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 54 of 92  of November 9, 2006 Response*

in *Exhibit G-1* of the 90/007,503 Request, the *Emmel* reference
expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 36-40,
53-54, 58-62, 64-65, 69-73, 75-76, 80- 86, 88-89, and 93-97 of the
'516 patent.

The Examiner also alleged that since *Emmel* used the HIV LTR gene,
*Emmel* demonstrated that Cyclosporin A reduced viral gene expression
thereby anticipating claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110,
114-117, 192-193 and 197-201, and *Emmel's* use of the HIV LTR gene
renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-
117, 192-193 and 197-201 immediately envisaged, or alternatively,
*prima facie* obvious since HIV LTR is responsible for regulating the
expression of viral (HIV) genes.

*Patentees' reply*

In response, Patentees respectfully traverse the Examiner's position.
Initially, Patentees point out that claims 7, 28, 39, 81, 83, 85 and
86 have been cancelled without prejudice.  Additionally, Patentees
have explained in Section IV above that the remaining rejected
claims, i.e. claims 1-6, 8, 9, 11, 20-21, 25-27, 29, 36-38, 40, 42-
43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-
97, 106-107, 109-110, 114-117, 192-193 and 197-201, are entitled to
at least an April 21, 1989 effective filing date.  On this basis
alone, this rejection based on art after April 21, 1989 should be
withdrawn.

Notwithstanding, Patentees explain below that even if the claims are
not entitled to an April 21, 1989 effective filing date, *Emmel* does
not anticipate the claims.

*I) Factual errors in August 2, 2006 Office Action.*

On page 16 of the Office Action, the Examiner stated that "*Emmel*
describes the effects of CsA on Jurkat cells that <u>were</u> induced with

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 55 of 92  of November 9, 2006 Response*

PHA and PMA" (emphasis added). This does not accurately describe the experiments Emmel conducted. In the experiments of Emmel the Examiner relies on (Figs. 2D, 3), CsA was not administered to Jurkat cells that had been induced with PHA/PMA. Instead, Jurkat cells were <u>simultaneously</u> stimulated with PHA/PMA and CsA. In these experiments, CsA could not have reduced signaling that was occurring. (Declaration of Dr. Verma, ¶ 38.)

> *ii) Emmel does not show reduction of NF-kB activity in induced cells, as required by the claims.*

In *Emmel*, Jurkat cells were <u>simultaneously</u> stimulated with PHA/PMA and CsA. In these experiments, CsA could only have prevented the ability of PHA/PMA to induce signaling and not as the examiner assumes, have reduced signaling that was occurring. None of the experiments in *Emmel*, therefore, could anticipate the pending claims requiring reducing activity that has first been induced. (Declaration of Dr. Verma, ¶ 38.)

> *iii) A proper interpretation of Emmel, in view of the '516 patent and other studies, indicates that CsA sensitive binding activity does not correspond to NF-kB, but instead corresponds to another factor, NFAT.*

In his attached Declaration Dr. Verma explains the basis for concluding that the effects of CsA are mediated through NFAT, not through NF-kB. (Declaration of Dr. Verma, ¶¶ 28-36 and 39-41.) With respect to *Emmel*, Patentees emphasize that *Emmel's* own experimental data supports this conclusion.

For example, Emmel observed that CsA "virtually eliminated" PHA/PMA-stimulated CAT expression driven by the intact IL-2 enhancer, and that CsA effectively prevented PHA/PMA-stimulated expression of CAT reporter driven by tandem repeats of an NFAT binding site. (*Emmel*, Figure 2B). Significantly, however, deleting the NF-kB binding site did <u>not</u> affect the ability of CsA to prevent PHA/PMA from inducing

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 56 of 92 of November 9, 2006 Response*

CAT expression. (*Emmel* at 1618, Figure 1). These data clearly show that NF-kB does not play a role in mediating the effect of CsA on Il-2 gene expression. Indeed, these data in *Emmel* confirm our current understanding that in Jurkat cells, CsA acts through NFAT, and not through NF-kB. (Declaration of Dr. Verma, ¶ 40.)

> iv) *Emmel is missing critical controls necessary to show NF-kB effects.*

The oligonucleotide probe *Emmel* used would not have discriminated between NF-kB and NFAT binding activities. Accordingly, multiple bands appear in extracts from PHA/PMA treated cells under the conditions *Emmel* used (*Emmel* Fig. 3). (For example, compare with Fig. 24B of the subject patent indicating only a single inducible band in PHA/PMA-treated Jurkat cells.) Appropriate controls would have been critical for the correct identification of the different complexes bound to the probe, and to the overall interpretation of the EMSA data. (Declaration of Dr. Verma, ¶¶ 41-43.)

Accordingly, even if the claims are not entitled to a filing date prior to the date of *Emmel* (which they are), *Emmel* still does not anticipate or make obvious the invention recited by each of claims 1-6, 8, 9, 11, 20-21, 25-27, 29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201. Accordingly, the rejection of these claims based on *Emmel* should be reconsidered and withdrawn.

### 3. §102(b) or 103 - Brini (9/90) - *Intervening Art*

On pages 17-18 of the August 2, 2006 Office Action, the Examiner rejected claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201 under 35 U.S.C. 102(b) as allegedly anticipated, or alternatively, rendered obvious under § 103, by *Brini,* Eur. Cytokine Net. 1: 131 -139 (Sept. 1990). The Examiner

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 57 of 92  of November 9, 2006 Response*

alleged in summary that, "*Brini* teaches administration of Cyclosporin A (CsA) to cells which substantially reduced NF-kB activity in those cells thus inhibiting expression of genes whose transcription is regulated by NF-kB activity.   In addition, these references all utilized the HIV LTR promoter in their experiments and demonstrated that CsA reduced the expression of viral genes."

The Examiner alleged that the instant claims are drawn to reducing NF-kB activity in eukaryotic (e.g, claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-kB. For example, NF-kB activity can be effected by diminishing induced NF-kB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein(claim 5) in a eukaryotic cell.

The Examiner then alleged that the *Brini* reference discloses that administration of Cyclosporin A (CsA) reduces NF-kB in cells (e.g. T-cells) that inherently reduces NF-kB-regulated gene expression. Particularly, the Examiner alleged that *Brini* disclosed the use of 1 ug/ml CsA in human PBM (peripheral blood T-lymphocytes) that had been induced with PHA; *Brini* assessed NF-kB activity in an EMSA binding assay (Fig. 5) using the same HIV-1 LTR gene site used in the '516 patent to assess NF-kB activity and binding (see '516 patent, columns 17-18); *Brini* concluded that "CsA reduced the PHA-induced binding of transactivating factors from T- cells and kB-like sequences which are present in the IL-2R alpha gene and in the HIV-1 LTR gene (Figures 3 and 4)", referring to *Brini* at page 137.   The Examiner also alleged that *Brini* reported the effects of CsA on expression levels of IL-2 Receptor-alpha (Brini at page 131 Abstract) which is taught by the '516 patent to be regulated by PHA-induced NF-kB activity in T-cells, referring to col. 17, lines 21-24 of the subject patent ("NF-kB is induced in T-cells by a transactivator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 58 of 92  of November 9, 2006 Response*

2 receptor alpha gene and possibly the IL-2 gene"). The Examiner then alleged that *Brini* described the use of CsA at concentrations that reduce NF-kB activity and reduce NF-kB regulated gene expression as allegedly shown in more detail in *Exhibit G-1* of the 90/007,503 Request, and that "the Emmel *[sic]* reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 of the '516 patent."

The Examiner also alleged that since *Brini* used the HIV LTR gene, Brini demonstrated that CsA reduced viral gene expression thereby anticipating claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201, and *Brini's* use of HIV LTR renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201, immediately envisaged, or alternatively, prima facie obvious since HIV LTR is responsible for regulating the expression of viral (HIV) genes.

*Patentees' reply*

In response, Patentees respectfully traverse the Examiner's position. Initially, Patentees point out that claims 7, 28, 39, 81, 83, 85 and 86 have been cancelled without prejudice.  Additionally, Patentees have explained in Section IV above that the remaining rejected claims, i.e. claims 1-6, 8, 9, 11, 20-21, 25-27, 29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201, are entitled to at least an April 21, 1989 effective filing date.  On this basis alone this rejection based on art after April 21, 1989 should be withdrawn.

Notwithstanding, Patentees explain below that even if the claims are not entitled to an April 21, 1989 effective filing date, *Brini* does not anticipate the claims.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 59 of 92 of November 9, 2006 Response*

I) *Factual errors in August 2, 2006 Office Action.*

On page 17 of the Office Action, the Examiner erroneously stated that, "*Brini* disclosed the use of 1 ug/ml CsA in human PBM (peripheral blood T-lymphocytes) that <u>had been</u> induced with PHA." (Emphasis added.)  Notably, in all experiments of *Brini*, "CsA was always added to the cells 30 min before stimulation" with PHA (Brini at 132).  (Declaration of Dr. Verma, ¶ 45.)

ii) *Brini does not show reduction of NF-kB activity in induced cells, as required by the claims.*

In *Brini*, "CsA was always added to the cells 30 min before stimulation" with PHA (*Brini* at 132).  None of the experiments in *Brini*, therefore, could anticipate the pending claims requiring reducing activity that has first been induced. (Declaration of Dr. Verma, ¶¶ 44-46.)

iii) *The CsA influenced binding activity observed by Brini may illustrate what we now know, i.e. that it does not correspond to NF-kB, but instead corresponds to another factor, NFAT.*

In his attached Declaration Dr. Verma explains the basis for concluding that the effects of CsA are mediated through NFAT, not through NF-kB. (Declaration of Dr. Verma, ¶¶ 28-36 and 47-49.)

iv) *Brini is missing critical controls necessary to show NF-kB effects.*

T cells can exhibit substantial differences in their response to PHA and PMA.  As shown in Figure 24 A of the subject patent, PHA alone did not induce measurable amounts of NF-kB binding activity in the Jurkat T-cell line.  Without proper controls in *Brini*, there is no basis to assume that treatment of T-cells with PHA alone (as compared to treatment with both PHA and PMA) would similarly induce NF-kB

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 60 of 92  of November 9, 2006 Response*

activity so as to induce expression of any gene.  In fact, Brini reports that PHA appeared to induce binding activity of at least one other transcription factor, AP1, having binding sites in the IL-2 receptor promoter (*Brini*, Figure 5).  Lastly, as noted above, even assuming the complexes *Brini* detected by EMSA (Figs. 3 and 4) correspond to NF-kB, there is no correlation between the presence of these complexes in the EMSA assays (Figs. 3 and 4) and IL-2 receptor mRNA expression (Fig. 2).   These data therefore fail to provide any basis for concluding that with the experimental conditions *Brini* used, the IL-2 receptor expression was regulated in any way by NF-kB. (Declaration of Dr. Verma, ¶¶ 50-52.)

Accordingly, even if the claims are not entitled to a filing date prior to the date of *Brini* (which they are), *Brini* still does not anticipate or make obvious the invention recited by each of claims 1-6, 8, 9, 11, 20-21, 25-27, 29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201.  Accordingly, the rejection of these claims based on *Brini* should be reconsidered and withdrawn.

### Conclusion - CsA Intervening Art

In conclusion, none of the "intervening" art anticipates Patentees' claims even if the claims are not entitled to an April 21, 1989 filing date.  However, as explained in Section VI above, Patentees' claims are entitled to an April 21, 1989 effective filing date. Accordingly, the rejections based on "intervening" art should be withdrawn because the claims rejected have an effective filing date before the "intervening" art date, and/or because the "intervening" art fails to teach subject matter falling within the claims.

In particular, claims 3, 4, 11, 42, 43, 47-49, 51, 107, 109, 110, 114, 115, 117, 192, 193, 197-199 and 201 have only "intervening" art cited against them.  Accordingly, claims 3, 4, 11, 42, 43, 47-49, 51, 107, 109, 110, 114, 115, 117, 192, 193, 197-199 and 201 should be

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 61 of 92  of November 9, 2006 Response*

confirmed patentable because they have an effective filing date
before the "intervening" art, and/or because the "intervening" art
fails to teach subject matter falling within these claims.

### 3.    Intervening References Relating To N-Acetyl-L-Cysteine

On pages 47-48 of the August 2, 2006 Office Action, the Examiner
rejected claims 18 and 182-185 under 35 U.S.C. 102(a) as allegedly
anticipated by *Staal* et al., Proc. Nat'l Acad. Sci. 87:9943 (Dec.
1990) ('7828 appendix E: incorporated by reference).  The Examiner
alleged in summary that, "*Staal et al.* (see Abstract; page 9945;
Figures 4-5) disclose a method of inhibiting TNF-α by blocking NF-kB
activation in mammalian cells (e.g. Jurkat cells) by administration
of N-acetyl-L-cysteine (NAC)."

The Examiner alleged that *Staal* teaches a method of inhibiting TNF-α
activation and, thus, signaling, in mammalian cells by reducing NF-kB
activity.  Specifically, the Examiner alleged that *Staal* discloses
inhibiting TNF-α stimulation of 293.27.2 and Jurkat cells by
selectively blocking NF-kB activation by administration of N-acetyl-
L-cysteine (NAC), referring to Abstract and Fig. 5.  The Examiner
alleged that reduction of intracellular TNF-α signaling is
demonstrated by decreased expression of a betagalactosidase reporter
gene in Jurkat cells, which are mammalian (human) in origin,
referring to Fig. 4.

The Examiner also alleged that claim 182, depending on claim 18,
further recites that reducing NF-kB activity comprising reducing
binding of NF-kB to NF-kB recognition sites on genes which are
transcriptionally regulated by NF-kB, and that *Staal* anticipates
claim 182 by teaching that high thiol levels (resulting from NAC
administration) inhibit NF-kB activation by preventing
phosphorylation of I-kB, since phosphorylation of I-kB is necessary
for dissociation of NF-kB from its complex with I-kB. The Examiner

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 62 of 92 of November 9, 2006 Response*

alleged that since NAC administration keeps NF-kB complexed to its
naturally occurring inhibitor I-kB, NF-kB is unavailable for binding
NF-kB recognition sites on genes that are transcriptionally regulated
by NF-kB. On this basis, the Examiner concluded that claim 182 is
anticipated since NAC-mediated inactivation of NF-kB described in
*Staal* inherently and necessarily results in reduced NF-kB binding to
its recognition sites.

The Examiner also alleged that claims 183-185, depending on claim 18,
and requiring that the method is carried out on human cells (claim
183), immune cells (claim 184), and lymphoid cells (claim 185), are
also anticipated by *Staal*. The Examiner alleged that *Staal* discloses
NAC inhibition of TNF-α stimulation in Jurkat cells (Fig. 4, p. 9945)
which are cells derived from a human T-cell leukemia cell line, and,
thus, are human, immune and lymphoid anticipating claims 183-185.

*Patentees' reply*

In response, Patentees note that *Staal* reports various experiments
conducted in Jurkat cells, a human T cell lymphoma line, and
293.27.2, a cell line stably transfected with a CAT expression
construct.   As *Staal* notes, NAC is a drug which can prevent a
reduction in intracellular thiol levels by serving as a precursor for
the intercellular thiol, glutathione (GSH). (*Staal* at 9943). In
previous studies, *Staal* had observed in certain T cell lines that NAC
prevented TNF from stimulating certain cellular responses. (*Staal* at
9943). In this regard, *Staal* reported that TNF stimulation caused a
rapid transient decrease in intracellular thiol levels. (*Staal* at
9944). *Staal* here reports a series of experiments conducted to
examine whether the ability of NAC to prevent a TNF-stimulated
reduction in intracellular thiol levels also prevented TNF from
activating NF-kB. (*Staal* at 9944).

Thus, the aim of the *Staal* study was to determine whether NAC, by
inhibiting thiol levels, could act on cells before they experienced

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 63 of 92 of November 9, 2006 Response*

stimulation (*Staal* at 9944).    In particular, in the experiments specifically relied upon by the Examiner, cells were always treated <u>simultaneously</u> with both NAC and TNF-α. (*Staal* at 9945-46).    In these experiments, NAC therefore could not have inhibited TNF-α signaling by reducing induced NF-kB activity.    None of these experiments therefore have administered NAC to induced cells. (Declaration of Dr. Verma ¶¶ 160-162.)

Accordingly, *Staal* does not anticipate pending claims 18, 182 and 185, and the rejection based on *Staal* should be reconsidered and withdrawn.

Furthermore, claims 18, 182 and 185 are entitled to at least an April 21, 1989 filing date as explained in Section VI herein.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 64 of 92  of November 9, 2006 Response*

VIII.    THE CLAIMS ARE NOT INHERENTLY ANTICIPATED

    A.    **Inherent Anticipation Requires a Showing That Each and Every Element of a Claim Necessarily Occurred in the Prior Art.**

A finding that a patent claim is anticipated requires a finding that all elements of that claim are found in a single prior art reference. *Studiengesellschaft Kohle m.b.H. v. Dart Industries* Inc., 726 F.2d 724, 727-28 (Fed. Cir. 1984). Any alleged inherency in extrinsic evidence requires that it "make clear that the missing descriptive matter is necessarily present in the thing described in the reference." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). Additionally, "inherency may not be established by probabilities or possibilities" but rather "must be necessarily present" in the single prior art reference. *Crown Operations Intl., Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1377 (Fed. Cir. 2002)(internal quotations omitted).

    1.    The Extrinsic Evidence Relied upon by the Examiner Does Not Establish That the Prior Art Necessarily Discloses All Elements of the Claims.

In contrast to the requirements of the inherency doctrine, the extrinsic evidence relied upon by the Examiner fails to demonstrate that the unstated elements in the prior art are *necessarily* present. At best, the Examiner has shown that it is *possible* that the prior art inherently disclosed unrecited elements of the claims. However, such a showing is insufficient to support a finding of inherent anticipation. *See Rapoport v. Dement*, 254 F.3d 1053, 1062-63 (Fed. Cir. 2001)(finding no anticipation because a treatment regime of three doses per day would not necessarily include administering a dose at the time of sleep, even though a dose *could* be administered at that time). Such findings of inherency based on mere "probabilities or possibilities" are improper. *See In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999)(finding that a system claim was not anticipated by prior art that could be used to perform the same

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 65 of 92  of November 9, 2006 Response*

result with a slightly different structure). Even if the prior art
did sometimes encompass all of the elements of the claims, the claims
should still be allowed as "occasional results are not inherent."
*See Mehl/Biophile Int'l. Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed.
Cir. 1999)(holding that prior art did not anticipate a claim
requiring a substantially vertical orientation even though practice
of the prior art would sometimes result in such an orientation).

Accordingly, the Examiner is not permitted to rely on prior art to
show inherent anticipation where the art does not *necessarily* require
that each and every claim element be present.

### 2.    Inherent  Disclosure  Cannot  Be  Shown By Inconclusive Extrinsic Evidence.

The Examiner improperly has concluded that numerous prior art
references inherently anticipate the claims by relying on
inconclusive non-prior art documents to show the elements missing in
the prior art. *See Finnigan Corp. v. Int'l Trade Commission*, 180
F.3d 1354, 1366 (Fed. Cir. 1999)(holding that extrinsic evidence that
showed a set-up that could perform in either resonance or
nonresonance was insufficient to show inherent disclosure of
nonresonance). Similarly, because the prior art was capable of
producing differing results, only some of which encompassed the
claims, the requirement for anticipation by inherent disclosure has
not been met. *Glaxo Inc.v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed.
Cir. 1995) *cert. denied*, 516 U.S. 988 (1995)(holding that prior art
which did not always produce the claimed compound did not inherently
disclose it).

In this case, the extrinsic evidence cited by the Examiner fails to
conclusively demonstrate how the prior art references necessarily and
always involve each and every element of the rejected claims.
Therefore, the Examiner is not permitted to rely on this evidence to
show that the cited prior art inherently discloses all of the

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 66 of 92 of November 9, 2006 Response*

elements of the present invention.

>   **B.    The Reference Used as "Extrinsic Evidence" Do Not**
>   **Reproduce What The Prior Art References Describe And**
>   **Therefore Fail to "Explain" What Occurred in the Prior Art**
>   **References.**

As explained in this section, the "extrinsic evidence" does not
consider what occurred in the cited prior art. Thus, the "extrinsic
evidence" fails to offer a conclusive explanation of what may have
occurred in the prior art.

>   *I) 5-ASA Art*

On pages 32-34 of the August 2, 2006 Office Action, the Examiner
rejected claims 1-2, 5-9, 20-29, 31-40, 53-62, 64-73, 75-86, and 88-
97 under 35 U.S.C. 102(b) as being anticipated by *Dew* (Br. Med. J.
*287* (7/83):23-24)), as evidenced by *Baldwin II* (J. Clin. Invest.
107(1991):63-80), *Bantel* et al. (Amer. J. Gastroenterology *287*
(2000):3452), *Yan* et al. (J. Biol. Chem. *274* (1999) 366631-36), and
the *David Baltimore Declaration* submitted February 2001 in the
08/464,364 application, which issued as the Baltimore '526 patent.

Patentees respectfully traverse this rejection, *inter alia*, because
*Baldwin II*, *Bantel*, *Yan*, and the *David Baltimore Declaration* do not
repeat the use described by *Dew*. The following table highlights only
some of the discrepancies between the experiments (*See also*,
Declaration of Dr. Verma, ¶¶ 156-159):

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 67 of 92 of November 9, 2006 Response*

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art |
|---|---|
| <u>Dew (7/83)</u><br>-administration of 5-ASA to human subjects.<br>-all human subject are in "remission". Title; p. 23 1st para.; p. 23 2nd para. | <u>Bentel (2000)</u><br>✗ all subjects had "accute" ulcerative colitis. (p. 3453, bottom line, left column.)<br>✗ "newly developed" formulation of 5-ASA (p.3453, top para.; right column)<br><u>Baldwin II (2001)</u><br>✗ no data. This is a review.<br><u>Yan (99)</u><br>✗ mouse cells<br><u>2001 Baltimore Declaration</u><br>✗ no data. Refers to Yan (99) - mouse cells; & Castrillo (2000)- murine cells. |

Because the extrinsic evidence does not repeat what the pre-April 21, 1989 reference described, the extrinsic evidence cannot explain what may have occurred there. Accordingly, this inherent anticipation rejection is improper and should be withdrawn.

        *ii) Antibiotics*

On pages 39-42 of the August 2, 2006 Office Action, the Examiner rejected claims 1-2, 5-10, 12-18, 20-21, 25-32, 36-41, 53-54, 58-65, 69-76, 80-89, 93-100, 104-105, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, and 182-186 under 35 U.S.C. 102(b) as allegedly anticipated by *1970 PDR* as evidenced by the *Manolagas Declaration, Galdiero* et al. (Microbiology, *147* (2001): 2697-2704), *Yang* et al. (Nature *395(*1998) 284-288), *Mori* et al. (Eur. J. Haematol. 59 (1997): 162-170), the *Baltimore '516 Patent* and *Yasutomi* et al. *(J.* Immunology 175(2005) 8069-8076)(newly raised by the Examiner).

The Examiner cited to the subject patent (*Baltimore '516* Patent), on page 41, for the preposition that, "Once produced by gram-negative bacteria, LPS activates NF-kB, which translocates to the nucleus and binds to the NF-kB recognition sites on genes that are regulated, at least in part, by NF-kB." Patentees point out, however, that their patent offers no indication that antibiotics can reduce NF-kB

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 68 of 92  of November 9, 2006 Response*

activity.  Indeed, none of the cited references does so.

Thus, Patentees respectfully traverse this rejection, *inter alia*, because *Manolagas Declaration, Galdiero*, *Yang*, *Mori*, the *Baltimore '516 Patent* and *Yasutomi* do not repeat the use described by the *1970 PDR*. The following table highlights only some of the discrepancies between the experiments (*See also*, Declaration of Dr. Verma, ¶¶ 126-131):

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art |
|---|---|
| 1970 PDR<br>-antibiotics are used to treat bacterial infection in human subjects<br>-antibiotic administered once subject has bacterial infection | Galdiero (01)<br>✗ no antibiotic used.<br>Yang (98)<br>✗ no antibiotic used.<br>Mori (97)<br>✗ no LPS.  Induction is by TNF.<br>✗ no antibiotic.<br>Yasutomi (05)<br>✗ cell culture<br>✗ pretreats with an antibiotic.<br>'516 Patent<br>✗ no antibiotic used.<br>Manolagas Declaration<br>✗ no experiment, only commentary on the cited art is provided. |

Additionally, the *Manolagas Declaration* has been the subject of sworn testimony by Dr. Manolagas.  Certain portions of the sworn testimony calling in to question the conclusion in the *Manolagas Declaration* are attached hereto as **Exhibit 2**.

Because the extrinsic evidence does not repeat what the pre-April 21, 1989 reference described, the extrinsic evidence cannot explain what may have occurred there.  Accordingly, this inherent anticipation rejection is improper and should be withdrawn.

>            *iii-a) Cyclosporin A - In Vivo Art*

On pages 19-23 of the August 2, 2006 Office Action, the Examiner

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 69 of 92 of November 9, 2006 Response*

rejected claims 1-2, 6-9, 20-29, 31-40, 64-73, 75-86 and 88-97 under
35 U.S.C. 102(b) as allegedly anticipated by the Physician's Desk
Reference (PDR: 1985, pages 1811-13), *Griffith I* (Griffith et al.,
Ann. Surg. 196 (9/82):324-329), or *Griffith II* (Griffith et al., J.
Thorac. Cardiovasc. Surg. 99 (12/84): 952-957), as evidenced by
*Holschermann* et al., Circulation 96 (12/97) 4232-4238. The Examiner
referred to M.P.E.P. 2131.01 and alleged that "*Holschermann* provides
extrinsic evidence that the PDR 1985, Griffith I, and Griffith II
references inherently anticipate the subject claims."

Patentees respectfully traverse this rejection, *inter alia*, because
*Holschermann* failed to repeat the use described by any of *PDR 1985,
Griffith I,* or *Griffith II*. *Holschermann* explains what occurred in
a different experiment, or fails to explain what may have occurred
during the use described by the *PDR 1985, Griffith I,* or *Griffith II.*
The following table highlights only some of the discrepancies between
the experiments (*See also*, Declaration of Dr. Verma, ¶¶ 64-74):

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art |
|---|---|
| **1985 PDR** administration of cyclosporin is required -with adrenal corticosteroid (p. 1811 & 1813) | Holschermann (12/97) |
| -4-12 hours prior to transplantation, either: orally | ✗ "3 to 4 days after transplantation" (p. 4233, 1st par.) |
| -at a dose of 14-18 mg/kg per day, -continued postoperatively 1-2 weeks, -then tapered by 5% per week to, -maintenance level of 5-10 mg/kg per day. | |
| or, I.V. | ✗ "3.4 ±0.3" mg/kg per day |
| -same as oral but at 1/3 the dose. (page 1813 of 1985 PDR) | & all patients received azathioprene |
| ✗ use of azathioprene not indicated | & all patients received aspirin |
| ✗ use of aspirin not indicated | |

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 70 of 92  of November 9, 2006 Response*

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art |
|---|---|
| <u>Griffith I (1982)</u><br>cyclosporin administered<br>-with methylprednisone 1g,<br>-"just before"operation (p. 324),<br>    orally<br>-at a dose of 17.5 mg/kg per day,<br>-reduced postoperatively to<br>-4-10 mg/kg per day<br>-with 200 mg per day prednisone, reduced after 10 days<br>to 15-20 mg per day,<br>    or, I.V.<br>-same as oral but at 40% of the dose.  (p. 325)<br>-Antithymocyte Globulin <u>NOT USED</u> (p.325)<br>✗ use of azathioprene not indicated<br>✗ use of aspirin not indicated | <u>Holschermann (12/97)</u><br><br>✗ "3 to 4 days after transplantation" (p. 4233, 1st par.)<br><br>✗ "3.4 ±0.3" mg/kg per day<br><br><br><br><br><br>✗ all patients received antithymocyte globulin<br>& all patients received azathioprene<br>& all patients received aspirin |
| <u>Griffith II (1984)</u><br>cyclosporin administered<br>orally<br>-1-4 hours preoperatively, 10-17.5 mg/kg,<br>-postoperatively every 12 hrs, 5 mg/kg<br>-with prednisone, 0.2 mg/kg per day,<br>-with rabbit antithymocyte globulin<br>✗ use of azathioprene not indicated<br>✗ use of aspirin not indicated | <u>Holschermann (12/97)</u><br><br>✗ "3 to 4 days after transplantation" (p. 4233, 1st par.)<br>✗ "3.4 ±0.3" mg/kg per day<br><br>& all patients received azathioprene<br>& all patients received aspirin . |

Because the extrinsic evidence does not repeat what the pre-April 21,
1989 reference described, the extrinsic evidence cannot explain what
may have occurred there.  Accordingly, this inherent anticipation
rejection is improper and should be withdrawn.

### iii-b) Cyclosporin A - In Vitro Art

On pages 24-26 of the August 2, 2006 Office Action, the Examiner
rejected claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62,
64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 under 35 U.S.C. 102(b)
as allegedly anticipated by *Reed* et al., J. Immunol. *137* (7/86): 150-
154, as evidenced by *Brini,* Eur. Cytokine Net. 1:131-139 (Sept.
1990). The Examiner referred to MPEP 2131.01 and alleged that *Brini*
provides the evidence of inherency.

Patentees respectfully traverse this rejection, *inter alia*, because
*Brini* does not repeat the use described by *Reed.*  Therefore, *Brini*

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 71 of 92  of November 9, 2006 Response*

explains what occurred in a different experiment, and fails to
explain what may have occurred during the use described by *Reed*. The
following table highlights only some of the discrepancies between the
experiments (*See also*, Declaration of Dr. Verma, ¶¶ 53-60):

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art |
|---|---|
| Reed (7/86) | Brini (9/90) |
| - blood mononuclear cells (p. 150) | ✗ >95% pure CD3 T-lymphocytes (p. 132) |
| - PHA with PMA | ✗ PHA alone used as inducer (p.132) |

Because the extrinsic evidence does not repeat what the pre-April 21,
1989 reference described, the extrinsic evidence cannot explain what
may have occurred there.  Accordingly, this inherent anticipation
rejection is improper and should be withdrawn.

            *iii-c) Cyclosporin A - In Vitro Art*

On pages 26-29 of the August 2, 2006 Office Action, the Examiner
rejected claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62,
64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 under 35 U.S.C. 102(b)
as allegedly anticipated by *Kronke* et al. (PNAS USA 81(8/84) 5214-
5218) and/or *Siebenlist* et al. (Mol. Cell. Biol. *6* (9/86) 3042-3049),
as evidenced by *Schmidt* et al., J. Virology 64:4037-4041 (August
1990), *Emmel* et al., Science, *246* (Dec. 1989):1617-20, and the *Dr.
Manolagas Declaration*.  The Examiner referred to MPEP 2131.01 and
alleged that *Schmidt, Emmel* and the *Manolagas Declaration* provide
evidence of inherency.

Patentees respectfully traverse this rejection, *inter alia*, because
*Kronke* or *Siebenlist* do not describe the claimed methods.
(Declaration of Dr. Verma ¶¶ 61-63).  Furthermore, as explained at
length in the Declaration of Dr. Verma, ¶¶ 28-36, we now know that
CsA affects NFAT.  Accordingly, this inherent anticipation rejection
is improper and should be withdrawn.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 72 of 92  of November 9, 2006 Response*

     *iv) Vitamin D*

On pages 30-32 of the August 2, 2006 Office Action, the Examiner
rejected claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62,
64-65, 69-73, 75-76, 80-86, 88-89 and 93-97 under 35 U.S.C. 102(b)
as allegedly anticipated by *Tsoukas* (Science *224* (6/84) 1438-40),
*Lemire I* (J. Clin. Invest. 74(8/84) 657-61), *Lemire II* (J. Immunol.
134 (5/85) 3032-5), *Rigby I* (J. Clin. Invest. *74* (10/84) 1451-5) or
*Rigby II* (J. Immunol. 135 (10/85) 2279-86), and Manolagas et al.
(JCE&M, 63 (1986) 394-400), as evidenced by *Yu* et al. (PNAS USA 92
(11/95) 10990-4) and the *Declaration of Dr. Manolagas (*paragraphs 7-
24*)* provided in the 90/007,503 request.

The Examiner alleged that *Yu* conducted experiments "under the same
conditions utilized in *Tsoukas* and *Manolagas* (i.e. calcitriol
application to PHA activated PBM cells)."  This is not correct as
explained in Declaration of Dr. Verma, ¶¶ 115-117, and summarized in
the table that follows.   For example, the cell populations were
different.    Therefore,  Patentees  respectfully  traverse  this
rejection, *inter alia*, because *Yu and the Manolagas Declaration* do
not repeat the use described by *Tsoukas*, *Manolagas*, or any of the
other cited references. The following table highlights only some of
the discrepancies between the experiments (*See also*, Declaration of
Dr. Verma, ¶¶ 107-125):

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 73 of 92  of November 9, 2006 Response*

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art |
|---|---|
| Tsoukas(6/84)<br>- PBMC cells | Yu (11/95)<br>✗ Yu(11/95) refers to Yu, JBC 1991 for method of purifying cells, which method is not used in the prior art. Thus, the PBMC used in Yu are different (purified, non-adherent monocytes) than the cells in prior art. Yu acknowledges that any NF-kB effect is "matter of conjecture".<br><br>Manolagas Declaration<br>✗ no experiment, only commentary on the cited art is provided.<br><br>✗ Manolagas admitted under oath at trial that, contrary to statements in his expert report, the study by Yu is "not connected" and "lacks correlation" with the prior art work.(Trial Testimony, day 10 p.68; day 13 p. 17; Manolagas Deposition, p.381-382) |
| Manolagas (86)<br>- PBMC cells isolated by method of Boyum (p. 395) | Yu (11/95)<br>✗ Yu(11/95) refers to Yu, JBC 1991 for method of purifying cells, which method is not used in the prior art. Thus, the PBMC used in Yu are different (purified, non-adherent monocytes) than the cells in prior art. Yu acknowledges that any NF-kB effect is "matter of conjecture".<br><br>Manolagas Declaration<br>✗ no experiment, only commentary on the cited art is provided.<br><br>✗ Manolagas admitted under oath at trial that, contrary to statements in his expert report, the study by Yu is "not connected" and "lacks correlation" with the prior art work.(Trial Testimony, day 10 p.68; day 13 p. 17; Manolagas Deposition, p.381-382) |
| Lemire I(8/84) & II(5/85)<br>- PBMC cells<br><br>Rigby I(10/84) & II(10/85)<br>- PBMC cells | Yu (11/95)<br>✗ Yu(11/95) refers to Yu, JBC 1991 for method of purifying cells, which method is not used in the prior art. Thus, the PBMC used in Yu are different (purified, non-adherent monocytes) than the cells in prior art. Yu acknowledges that any NF-kB effect is "matter of conjecture".<br><br>Manolagas Declaration<br>✗ no experiment, only commentary on the cited art is provided.<br><br>✗ Manolagas admitted under oath at trial that, contrary to statements in his expert report, the study by Yu is "not connected" and "lacks correlation" with the prior art work.(Trial Testimony, day 10 p.68; day 13 p. 17; Manolagas Deposition, p.381-382) |

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 74 of 92  of November 9, 2006 Response*

Because the extrinsic evidence does not repeat what the pre-April 21, 1989 reference described, the extrinsic evidence cannot explain what may have occurred there.  Accordingly, this inherent anticipation rejection is improper and should be withdrawn.

        *v)  Red Wine*

On pages 42-47 of the August 2, 2006 Office Action, the Examiner rejected claims 1-2, 6-9, 20-21, 25-32, 36-41, 64-65, 69-76, 80-89, and 93-98 under 35 U.S.C. 102(b) as allegedly anticipated by *King James Version Bible* (1611) (excerpts), *St. Leger* (The Lancet (5/79) 1017-20), *Dobrilla* (Hepato-Gastroenterol, 31(2/84) 35-37), and *Jones* (Pharm. & Tox. 60 (3/87) 217-20), as evidenced by *Blanco-Colio* (Circulation *102* (8/00) 1020-6), *Holmes-McNary/Baldwin* (Cancer Res. 60 (7/00) 3477-83) and *Manna* (J. Immunol. 164 (2000) 6509-6519).

Patentees respectfully traverse this rejection, *inter alia*, because *Blanco-Colio*, *Holmes-McNary/Baldwin* and *Manna* do not repeat the use described by the *Bible*, *St. Leger*, *Dobrilla*, or *Jones*. The following table highlights only some of the discrepancies between the experiments (*See also*, Declaration of Dr. Verma, ¶¶ 132-146):

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art |
|---|---|
| The Bible<br>-inducer unknown<br>-type of red wine unknown<br>-in human subject | Blanco-Colio (8/00)<br>✗ type of red wine unknown<br>✗ potentially different inducer<br><br>Holmes-McNary/Baldwin<br>✗ in cells<br>✗ not wine, resveratrol<br><br>Manna (2000)<br>✗ in cells<br>✗ not wine, resveratrol |

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 75 of 92  of November 9, 2006 Response*

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art |
|---|---|
| St.Leger (5/79)<br>-inducer unknown<br>-type of red wine unknown<br>-in human subject | Blanco-Colio (8/00)<br>✗ type of red wine unknown<br>✗ potentially different inducer<br><br>Holmes-McNary/Baldwin<br>✗ in cells<br>✗ not wine, resveratrol<br><br>Manna (2000)<br>✗ in cells<br>✗ not wine, resveratrol |
| Dobrilla (2/84)<br>-inducer unknown<br>-type of red wine unknown<br>-in human subject | Blanco-Colio (8/00)<br>✗ type of red wine unknown<br>✗ potentially different inducer<br><br>Holmes-McNary/Baldwin<br>✗ in cells<br>✗ not wine, resveratrol<br><br>Manna (2000)<br>✗ in cells<br>✗ not wine, resveratrol |
| Jones (3/87)<br>-inducer unknown<br>-type of red wine unknown<br>-in human subject | Blanco-Colio (8/00)<br>✗ type of red wine unknown<br>✗ potentially different inducer<br><br>Holmes-McNary/Baldwin<br>✗ in cells<br>✗ not wine, resveratrol<br><br>Manna (2000)<br>✗ in cells<br>✗ not wine, resveratrol |

Because the extrinsic evidence does not repeat what the pre-April 21, 1989 reference described, the extrinsic evidence cannot explain what may have occurred there.  Accordingly, this inherent anticipation rejection is improper and should be withdrawn.

        vi) *Glucocorticoid Art*

On pages 34-39 of the August 2, 2006 Office Action, the Examiner rejected claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86,88-89 and 93-97 under 35 U.S.C. 102(b) as allegedly anticipated by *1970 PDR, Lefring* et al. (Crit. Care. Med.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 76 of 92  of November 9, 2006 Response*

*23* (7/95) 1294-1303: References Cited Therein), *Nagasawa* et al. *(J. Cell. Phys. 109* (1981) 181-192), or *Rovera* et al. (Science *204* (1979) 868-970), as evidenced by *Baldwin I* (Annu. Rev. Immunol. *14* (1996) 649-81), *Auphan* et al. (Science *270* (1995) 286-290), *Scheinman* I (Mol. Cell. Biol. 15(2/95) 943-53), *Scheinman II* (Science *270* (10/95) 283-286), *Mukaida* (J. Biol. Chem. 269(5/94) 13289-95) and *Padgett* et al., Trends in Immunology, 24(8) (Aug. 2003) pages 444-448 (raised by Examiner).

Initially, Patentees point out that one of the cited references, *Lefring* (1995), is not prior art, but has been cited as if it were with the notation "references cited therein." *Lefring* (1995) cites to 75 other references.  Such citation without particularity is contrary to the rules of the Office and improper.  *See*, e.g. 37 C.F.R. § 1.104(c)(2).  Accordingly, *Lefring* (1995) and the 75 references cited therein cannot constitute a basis for a proper rejection, and Patentees are not addressing *Lefring* (1995).

With respect to the remaining references, Patentees respectfully traverse this rejection, *inter alia*, because *Baldwin I, Auphan, Scheinman I, Scheinman II, Mukaida,* and *Padgett* do not repeat the use described by any of *1970 PDR, Nagasawa*, or *Rovera*. The following table highlights only some of the discrepancies between the experiments (*See also*, Declaration of Dr. Verma, ¶¶ 75-101):

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art |
|---|---|
| <u>1970 PDR</u><br>-glucorticoids (dexamethasone) are used in human patients | <u>Baldwin I (96)</u><br>✗ no data. This is a review.<br><u>Auphan (1995)</u><br>✗ cell culture.<br><u>Scheinmann I(2/95) & II(10/95)</u><br>✗ cell culture; highly modified cells.<br><u>Mukaida (5/94)</u><br>✗ cell culture.<br><u>Padgett (8/03)</u><br>✗ no data. This is a review. |

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 77 of 92 of November 9, 2006 Response*

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art |
|---|---|
| Nagasawa (1981)<br>-leukemic T-cells (MOLT-3), non-tranfected. | Baldwin I (96)<br>✗ no data. This is a review.<br>Auphan (1995)<br>✗ modified cells, primarily Jurkat<br>Scheinmann I(2/95)<br>✗ transfected cell systems<br>Scheinmann II(10/95)<br>✗ HeLa cells (abnormal genotype)<br>Mukaida (5/94)<br>✗ human glioblastoma cell line<br>Padgett (8/03)<br>✗ no data. This is a review. |
| Rovera (1979)<br>-HL-60 cell line, non-transfected. | Baldwin I (96)<br>✗ no data. This is a review.<br>Auphan (1995)<br>✗ modified cells, primarily Jurkat<br>Scheinmann I(2/95)<br>✗ transfected cell systems<br>Scheinmann II(10/95)<br>✗ HeLa cells (abnormal genotype)<br>Mukaida (5/94)<br>✗ human glioblastoma cell line<br>Padgett (8/03)<br>✗ no data. This is a review. |

Furthermore, this rejection suffers from the fact that the mechanism of action of glucocorticoids is poorly understood and the effects of glucocorticoids have been observed to vary between different cell types. In fact, some studies have shown that glucocorticoids have no effect on NF-kB. (Declaration of Dr. Verma ¶ 97).

Because the extrinsic evidence does not repeat what the pre-April 21, 1989 reference described, the extrinsic evidence cannot explain what may have occurred there. Accordingly, this inherent anticipation rejection is improper and should be withdrawn.

        *vii) Endogenous Glucocorticoids*

On pages 55-60 of the August 2, 2006 Office Action, the Examiner rejected claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97 under 35 U.S.C. 102(b) as allegedly anticipated by *Goodman and Gilman's* (The Pharmacological

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 78 of 92  of November 9, 2006 Response*

Basis of Therapeutics, (Macmillan Publishing Co., Inc. 1980, pages 1466-1496) (newly raised by Examiner), as evidenced by *Baldwin I* (Annu. Rev. Immunol. <u>14</u> (1996) 649-81), *Auphan* et al. (Science <u>270</u> (1995) 286-290), *Scheinman I* (Mol. Cell. Biol. 15 (2/95) 943-53), *Scheinman Il* (Science <u>270</u> (10/95) 283-286), *Mukaida* (J. Biol. Chem. <u>269</u> (5/94) 13289-95), and - *Padgett* et al. Trends in Immunology, 24(8) (Aug. 2003) pages 444-448) (newly raised by Examiner).  The Examiner summarized the rejection as follows: "*Goodman* & *Gilman* teach the naturally occurring <u>endogenous production</u> and release of glucocorticoids (<u>cortisol</u>) in response to many different types of environmental stressors which *inherently* results in the reduction of NF-kB activity that acts to inhibit expression, in a eukaryotic cell, of cytokines whose transcription is regulated by NF-kB.  In this respect, the NF-kB inhibiting evidence provided by the Baldwin I, Auphan, Scheinman I/II and the Mukaida documents, regarding the <u>synthetically administered steroid dexamethasone (DEX)</u> has been found to be analogous with what occurs upon release of the endogenous cortisol glucocorticoid as evidenced by *Padgett*" (Emphasis added.)

Patentees respectfully submit that data from studies conducted with synthetic dexamethasone in cell culture cannot offer any explanation of what may occur during endogenous cortisol production in humans. Certainly one of skill in the art would not find such data probative. (Declaration of Dr. Verma, ¶ 105).

Thus, Patentees respectfully traverse this rejection, *inter alia*, because *Baldwin I, Auphan, Scheinman I, Scheinman II, Mukaida,* and *Padgett* do not repeat the use described by *Goodman* & *Gilman*. The following table highlights only some of the discrepancies between the experiments (*See also*, Declaration of Dr. Verma, ¶¶ 102-106):

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 79 of 92  of November 9, 2006 Response*

| Pre-April 21, 1989 Art | Post-April 21, 1989 Art | Highlights of Discrepancies |
|---|---|---|
| Goodman and Gilman (1980) <br> -in humans subjects <br> -endogenous cortisol | Baldwin I (96) <br> ✗ no data. This is a review. <br> Auphan (1995) <br> ✗ cell culture. <br> ✗ dexamethasone (synthetic) <br> Scheinmann I(2/95) & II(10/95) <br> ✗ cell culture; highly modified cells. <br> ✗ dexamethasone (synthetic) <br> Mukaida (5/94) <br> ✗ cell culture. <br> ✗ dexamethasone (synthetic) <br> Padgett (8/03) <br> ✗ no data. This is a review. | The mechanism of action of glucocorticoids is poorly understood and differs in different cell systems. Thus, data in the post-April 21, 1989 using different chemicals in cell culture cannot explain what may have occurred with endogenous cortisol in a human before pre-April 21, 1989. |

Because the extrinsic evidence does not repeat what the pre-April 21, 1989 reference described, the extrinsic evidence cannot explain what may have occurred there. Accordingly, this inherent anticipation rejection is improper and should be withdrawn.

   C.   **Even If the References Used As "Extrinsic Evidence" Were Deemed To Explain the Prior Art, the Cited Prior Art Does Not Teach Each and Every Element of the Claims Rejected.**

As summarized above and detailed in the Declaration of Dr. Inder Verma, which is attached hereto as **Exhibit 1** and incorporated by reference herein, each of the rejections based on inherent anticipation is defective for lacking a showing that the uses described in the pre-April 21, 1989 references inherently practiced the methods Patentees now claim. However, even if what is described in the pre-April 21, 1989 references would be properly explained, Patentees explain below that the pre-April 21, 1989 references cannot anticipate, inherently or otherwise, the methods Patentees now claim.

   1)   5-ASA  -  Art Being Used To Reject Claims 1-2, 5-9, 20-29, 31-40, 53-62, 64-73, 75-86 and 88-97.

The inherent anticipation rejection set forth on pages 32-34 of the August 2, 2006 Office Action is based on *Dew* (7/83), alone and as allegedly "explained" by *Baldwin II* (91), *Bentel* (2000), *Yan* (99) and

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 80 of 92 of November 9, 2006 Response*

2/2001 *Baltimore Declaration*. The Examiner, on page 33, alleged that *Dew* teaches administration of 5-ASA to humans for the treatment of ulcerative colitis, and alleged that ulcerative colitis is associated with NF-kB activation. *Dew*, however, unambiguously discloses in its Title and first two paragraphs that all of the patients who received 5-ASA were in "remission," and the study was focused on "preventing relapse" of ulcerative colitis.

Accordingly, the patients in *Dew* cannot be said to necessarily have had NF-kB activation (even if ulcerative colitis is associated with such activation). There is no basis to assert that ulcerative colitis patients in remission have any NF-kB activation. Thus, whatever may have happened in *Dew*, it is clear that *Dew* cannot anticipate Patentees' claims requiring reduction of NF-kB activity which is present.

Furthermore, *Dew* was investigating the use of high doses of 5-ASA for "preventing relapse" of ulcerative colitis in remission patients. As discussed above, Patentees' claims do not encompass prophylaxis, but rather are directed at reducing NF-kB activity.

*See also*, Schematic No. 9, and Declaration of Dr. Verma ¶¶ 156-159.

      2)    Antibiotics –  Art Being Used To Reject Claims 1-2, 5-10, 12-18, 20-21, 25-32, 36-41, 53-54, 58-65, 69-76, 80-89, 93-100, 104-105, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178 and 182-186.

The inherent anticipation rejection set forth on pages 39-42 of the August 2, 2006 Office Action is based on the *1970 PDR*, alone and as allegedly "explained" by *Manolagas Declaration*, *Galdiero* (01), *Yang* (98), *Mori* (97), *'516 Patent* and *Yasutomi* (05). The Examiner alleged on page 40 that gram-negative bacteria produce lipopolysaccharides ("LPS"), which induce NF-kB regulated cytokine production. The

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 81 of 92  of November 9, 2006 Response*

Examiner also alleged that antibiotics, by killing the gram-negative bacteria, "act to inherently reduce LPS-induced and NF-kB-regulated cytokine production." On page 42, the Examiner alleged that "by blocking LPS that reaches the cell, administration of the 1970 PDR antibiotics to combat gram-negative bacterial infections would necessarily reduce NF-kB activity in human cells and thereby reduce cytokine expression."

Initially, Patentees respectfully point out that the PDR is, at best, evidence of a prior public use. As such, the PDR cannot be relied upon in a reexamination proceeding.

Patentees also point out that the quoted Examiner's language is unclear. To be sure, antibiotics kill bacteria or prevent bacteria from reproducing, which bacteria has LPS on its cell membrane. Antibiotics, however, have no effect on LPS. (Declaration of Dr. Verma, ¶ 127).

Should an antibiotic succeed in preventing bacteria from reproducing, the amount of bacteria is unchanged, and the bacteria still have LPS, which is still inducing NF-kB activity. (Schematic No. 10; Declaration of Dr. Verma, ¶ 128). Thus, antibiotics that may prevent bacteria from reproducing cannot reduce NF-kB activity as recited in the pending claims.

Should an antibiotic successfully kill the bacteria, the consequence would be the release of additional LPS from the dead bacteria. Killing the bacteria disrupts the integrity of its cell membrane, which releases and solubilizes additional LPS from the bacterial cell membrane. Such additional LPS would increase, not decrease, NF-kB activity. (Declaration of Dr. Verma, ¶¶ 129-130).

Thus, antibiotics cannot anticipate Patentees' claims because antibiotics either will not affect NF-kB activity or will increase

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 82 of 92  of November 9, 2006 Response*

NF-kB activity.

Furthermore, certain claims as discussed above, e.g. claims 8 and 9, require that the external influences continue to "induce NF-kB-mediated intracellular signaling," i.e. require the activation of segment 1 outside the cell to be maintained.    Thus, as shown in Schematic 4, the reduction of NF-kB activity in such claims must be occurring as a result of interference inside the cell.  (Declaration of Dr. Verma, ¶ 131).  Use of antibiotics clearly does not anticipate such claims.

> 3)    Cyclosporin A
>
>> i) *In Vivo*  –    Art Being Used To Reject Claims 1-2, 6-9, 20-29, 31-40, 64-73, 75-86 and 88-97.

The inherent anticipation rejection set forth on pages 19-29 of the August 2, 2006 Office Action is based on the *PDR 1995*, *Griffith I* (9/82) or *Griffith II* (12/84), alone and as allegedly "explained" by Holschermann (12/97).

Initially, Patentees respectfully point out that the PDR is, at best, evidence of a prior public use.  As such, the PDR cannot be relied upon in a reexamination proceeding.

Patentees also point out that in *Griffith I* and *Griffith II*, CsA was administered before transplantation.  Even if transplantation could induce NF-kB activity, which has not been shown, and even if CsA was shown to operate through NF-kB, which has not been shown, *Griffith I* and *Griffith II* cannot anticipate Patentees' claims requiring reduction of NF-kB activity that was first induced.  (Declaration of Dr. Verma, ¶¶ 25-27, 38 and 44-46.)

The *1985 PDR*, as the Examiner indicated, teaches CsA should be administered first before and then after surgery.  Again, even if surgery could induce NF-kB activity, which has not been shown, and

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 83 of 92  of November 9, 2006 Response*

even if CsA was shown to operate through NF-kB, which has not been shown, *Griffith I* and *Griffith II* cannot anticipate Patentees' claims requiring reduction of NF-kB activity.  (Declaration of Dr. Verma, ¶¶ 64-74).

> ii) *In Vitro* - Art Being Used To Reject Claims 1-2,
> 5-9, 20-21, 25-29, 31-32, 36-40, 53-
> 54, 58-62, 64-65, 69-73, 75-76, 80-86,
> 88-89 and 93-97

The inherent anticipation rejection set forth on pages 19-29 of the August 2, 2006 Office Action is based on *Reed* (7/86), alone and as allegedly "explained" by *Brini* (9/90).

*Reed*, however, discloses experiments in which CsA was added to cells 20 to 30 minutes before any purported inducer was added to the cells. Even if CsA was shown to operate through NF-kB, which has not been shown, *Reed* cannot anticipate Patentees' claims requiring reduction of NF-kB activity.  (Declaration of Dr. Verma, ¶¶ 53-60).

A similar inherent anticipation rejection is set forth on pages 26-29 of the August 2, 2006 Office Action based on *Kronke* (8/84) and/or *Siebenlist* (9/86), each one alone and as allegedly "explained"  by *Schmidt* (8/90), *Emmel* (12/89) and *Manolagas Declaration*.

Patentees respectfully point out that none of the experiments described in *Siebenlist* used CsA in cells first induced with PHA and PMA.  Even if CsA was shown to operate through NF-kB, which has not been shown, *Siebenlist* cannot anticipate Patentees' claims requiring reduction of NF-kB activity.  (Declaration of Dr. Verma, ¶¶ 61-63).

*Kronke* does describe a single experiment in which cells were treated with CsA after exposure to PHA/PMA.  However, as is evident from Fig. 4 of *Kronke*, CsA treatment did not have a significant effect on the cell when added after cells had been induced with PHA/PMA.  *Kronke*

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 84 of 92  of November 9, 2006 Response*

at 5217. Indeed, when added four hours after induction, CsA did not alter TCGF (IL2) mRNA levels. *Id.* at 5216. Only when CsA was added either before or with PHA/PMA treatment was an effect on IL-2 expression observed. *Id.* These data suggest that, while treatment with CsA appeared able to prevent induction of IL-2 expression, it had no substantial effect on induced IL2 expression. Because the claims of the subject patent specify reduction of NF-kB activity that was first induced, *Kronke* cannot anticipate the claims (even if CsA was shown to operate through NF-kB, which it has not). (Declaration of Dr. Verma, ¶¶ 28-36).

Of course, as explained at length in the Declaration of Dr. Verma, ¶¶ 28-36, we now know that CsA affects NFAT. (*See also*, schematics Nos. 11-13).

             4)    Vitamin D  -  Art Being Used To Reject Claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97

The inherent anticipation rejection set forth on pages 30-32 of the August 2, 2006 Office Action is based on *Tsoukas* (6/84), *Lemire I* (8/84), *Lemire II* (5/85), *Rigby I* (10/84), *Rigby II* (10/85) and *Manolagas* (86), each one alone and as allegedly "explained" by *Yu* (11/95) and *Manolagas Declaration.*

Patentees respectfully point out, however, that none of *Tsoukas*, *Lemire I*, *Lemire II*, *Rigby II* or *Manolagas* administers calcitriol to cells in which NF-kB activity has been induced, as required by the claims. *Tsoukas* describes a series of experiments investigating the effect of calcitriol on proliferation and production of IL-2 protein (as measured indirectly by IL-2 activity) in PBM cells simultaneously stimulated with PHA. *Manolagas* reports experiments investigating the effect of simultaneously administered calcitriol and PHA on proliferation and IL-2 activity in PBM cells. *Lemire I* describe

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 85 of 92 of November 9, 2006 Response*

experiments investigating the effect of calcitriol on DNA synthesis
and IgG production in PBM cells simultaneously stimulated with a
number of different agents, either PHA, pokeweed mitogen (PWA) or
dermatophyton-O.   In *Lemire II*, cells were either pretreated or
simultaneously treated with calcitriol and a number of different
agents, either PHA, PWA, or con A.   In *Rigby II*, cells were always
stimulated with PHA in the presence of calcitriol.   Therefore, even
if calcitriol would be shown to operate through NF-kB, which it has
not, *Tsoukas*, *Lemire I*, *Lemire II*, *Rigby II,* or *Manolagas* cannot
anticipate Patentees' claims requiring reduction of NF-kB activity.
(Declaration of Dr. Verma, ¶¶ 107-125).

*Rigby I* is the only pre-April 21, 1989 reference that describes use
of calcitriol in cells that have been stimulated by PHA.   (*Rigby I*,
page 1453, Figs 2 and 4.)   However, nothing of record shows that the
calitriol in Rigby I necessarily reduced NF-kB activity. (Declaration
of Dr. Verma, ¶¶ 118-125).

Finally, studies have shown that calcitriol in fact induces NF-kB
activity, as opposed to reducing it. (Schematic No. 14; Declaration
of Dr. Verma, ¶ 125).


                    5)    Red Wine    —    Art Being Used To Reject Claims 1-2,
                                            6-9, 20-21, 25-32, 36-41, 64-65, 69-
                                            76, 80-89 and 93-98

The inherent anticipation rejection set forth on pages 30-32 of the
August 2, 2006 Office Action is based on *The Bible* (portions),
*St.Leger* (5/79), *Dobrilla* (2/84), *Jones* (3/87), each one alone and
as allegedly "explained" by *Blanco-Colio* (8/00), *Holmes-
McNary/Baldwin*, and *Manna* (2000).

Initially, Patentees respectfully point out that use of red wine
cannot anticipate any of Patentees' claims because red wine could

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 86 of 92  of November 9, 2006 Response*

never be the agent reducing NF-kB activity.   Upon ingestion, the red
wine is broken down into its components and digested.   Thus, red
wine, as such, cannot be the agent reducing NF-kB activity as
specified by Patentees' claims.   (Declaration of Dr. Verma, ¶ 133).

Patentees further point out that in each of the pre-April 21, 1989
references, namely *The Bible*, *St.Leger*, *Dobrilla*, and *Jones*,
induction of NF-kB activity has not been established, nor has the
inducer of NF-kB been identified.   Accordingly, even if red wine was
shown to operate through NF-kB, which it has not, *The Bible*,
*St.Leger*, *Dobrilla*, or *Jones* cannot anticipate Patentees' claims
specifying reduction of NF-kB activity.   (Schematic No. 15;
Declaration of Dr. Verma, ¶¶ 132-136).

Finally, *The Bible*, *St.Leger*, *Dobrilla*, and *Jones* do not enable use
of red wine for any purpose since none of these references discloses
the type of red wine used in each.   All red wine is certainly not
equal and cannot be expected to have the same effects.   A non-
enabling reference cannot anticipate a claim, inherently or
otherwise.   (Declaration of Dr. Verma ¶¶ 133-137).

> 6) Glucocorticoids   –   Art Being Used To Reject Claims
> 1-2, 5-9, 20-21, 25-29, 31-32,
> 36-40, 53-54, 58-62, 64-65, 69-
> 73, 75-76, 80-86, 88-89 and 93-
> 97

> i) *In Vivo* Art

The inherent anticipation rejection set forth on pages 34-39 of the
August 2, 2006 Office Action is based on the *1970 PDR*, alone and as
allegedly "explained" by *Baldwin I* (96), *Auphan* (1995), *Scheinmann
I*(2/95) and *II*(10/95), *Mukaida* (5/94), and *Padgett* (8/03).

Initially, Patentees respectfully point out that the PDR is, at best,
evidence of a prior public use.   As such, the PDR cannot be relied
upon in a reexamination proceeding.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 87 of 92 of November 9, 2006 Response*

Furthermore, there is no showing that NF-kB activity was induced in
the patients to whom the *1970 PDR* recommends administering
glucocorticoids. Because all of the pending claims specify reducing
NF-kB activity that has been induced, the *1970 PDR* cannot anticipate
the pending claims, inherently or otherwise.

Finally, the mechanisms by which glucocorticoids mediate inflammatory
response are poorly understood still today. Thus, there is no basis
in the record to conclude that glucocorticoids necessarily reduce NF-
kB activity.

*See also*, Schematic No. 17 and Declaration of Dr. Verma, ¶¶ 85-101.

                    ii) *In Vitro* Art

The rejection set forth on pages 34-39 of the August 2, 2006 Office
Action is based on *Nagasawa* (1981) or *Rovera* (1979),[5] alone and as
allegedly "explained" by *Baldwin I* (96), *Auphan* (1995), *Scheinmann
I*(2/95) and *II*(10/95), *Mukaida* (5/94) and *Padgett* (8/03).

Patentees respectfully point out that each of *Nagasawa* and *Rovera*
reports on experiments where dexamethasone was administered to cells
before or simultaneously with TPA. Because all of the pending claims
specify reducing NF-kB activity that has been induced, neither
*Nagasawa* nor *Rovera* could anticipate the pending claims, inherently
or otherwise.

Furthermore, neither *Nagasawa* nor *Rovera* describes any effect of TPA

---

[5]*Lefring* (7/95) is also cited in support of the rejection for "referenced cited therein".
*Lefring* (1995), however, does not predate the 1991 date accorded to all of the claim by the
Examiner. *Lefring* (1995) cites to 75 other references. Such citation without particularity is
contrary to the rules of the U.S. Patent and Trademark Office and improper. *See*, e.g. 37
C.F.R. § 1.104(c)(2). Accordingly, *Lefring* (1995) or the 75 references cited therein cannot
constitute a basis for a proper rejection and Patentees are not addressing *Lefring* (1995).

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 88 of 92 of November 9, 2006 Response*

which could be attributed to NF-kB induction. Thus, it is unclear whether the experiments described by *Nagasawa* or *Rovera* had any induced NF-kB activity, as specified by the pending claims.

Finally, the only conclusion *Nagasawa* makes regarding glucocorticoids in MOLT-3 cells is that administration had no effect on induction of MOLT-3 cells by TPA. (*Nagasawa* at 185). Similarly, the only conclusion that *Rovera* makes regarding glucocorticoids in HL-60 cells is that dexamethasone did not "block[] the response of HL-60 cells to TPA, even when the cells were pretreated with a concentration of the test compound 1000 times greater that the concentration of TPA used to induce differentiation." (*Rovera* at 869). Such acknowledged lack of effects cannot be reconciled with the Examiner's assertion in the Office Action that glucocorticoids reduced NF-kB activity.

Indeed, the mechanisms by which glucocorticoids mediate inflammatory response are poorly understood even today. Thus, there is no basis in the record to conclude that glucocorticoids necessarily reduce NF-kB activity.

*See also*, Schematic No. 16; Declaration of Dr. Verma, ¶¶ 75-84.

iii) Endogenous Glucocorticoid

The rejection set forth on pages 55-60 of the August 2, 2006 Office Action is based on *Goodman and Gilman* (1980), alone and as allegedly "explained" by *Baldwin I* (96), *Auphan* (1995), *Scheinmann I*(2/95) and *II* (10/95), *Mukaida* (5/94) and *Padgett* (8/03).

Initially, Patentees respectfully point out that the pending claims require active steps. As such, natural events cannot anticipate the claims.

Furthermore, there is no showing of record that the widely variable

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 89 of 92  of November 9, 2006 Response*

"environmental stressors" referred to on page 56 of the Office Action would necessarily induce NF-kB activity in a human subject.  Thus, there is no showing that the subjects of *Goodman and Gilman* had induced NF-kB activity, as specified by the pending claims.

Finally, there is no showing that the function of endogenous cortisol referred to in *Goodman and Gilman* is necessarily the same as the function of dexamethasone and other synthetic glucocorticoids referred to by the later references cited.

*See also*, Declaration of Dr. Verma, ¶¶ 102-106.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 90 of 92  of November 9, 2006 Response*

## IX.  SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT

In accordance with their duty of disclosure under 37 C.F.R. §1.555,
Patentees direct the Examiner's attention to the following
disclosures, which are listed on Form PTO-1449 (**Exhibit 3**). Copies
of the disclosures listed below as items 1-8 including listed
attachments are attached hereto as **Exhibits 4-11**, respectively.

1.   March 3, 2004 Memorandum Of Decision And Order on claim
     construction (**Exhibit 4**);

2.   November 11, 2005 Reply Expert Report of Dr. Stephen Prescott,
     paragraphs 16-18 (**Exhibit 5**);

3.   November 11, 2005 Reply Expert Report of Dr. Jeffrey Ravetch,
     paragraphs 6-9 (**Exhibit 6**);

4.   November 11, 2005 Reply Expert Report Of Dr. Laurie H. Glimcher,
     page 11 and 12 (**Exhibit 7**);

5.   November 11, 2005 Rule 26(b)(2) Reply Report of David M.
     Livingston, M.D., pages 17-18 (**Exhibit 8**);

6.   November 22, 2005 Condensed Deposition of Stephen Prescott in
     Civil Case 02 CV 11280 RWZ, page 226, line 24 - page 242, line
     25 and page 262, line 9 - page 267, line 20 (**Exhibit 9**);

7.   November 30, 2005 Condensed Deposition of Jeffrey V. Ravetch in
     Civil Case 02 CV 11281 RWZ, page 40, line 8 - page 58, line 25
     (**Exhibit 10**); and

8.   Trial Transcript - April 26, 2006 Jury Trial Day 12, Second
     Session in Civil Case 02 CV 11281 RWZ, page 112, line 10 and
     page 124, line 16 (**Exhibit 11**).

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 91 of 92  of November 9, 2006 Response*

Pursuant to the May 4, 2006 Merger Decision, this Response is being
filed in duplicate, each original bearing an original signature and
identifying data for both reexamination files.

No fee, other than the enclosed fee of $180.00 for the filing of the
Supplemental Information Disclosure Statement, is deemed necessary
in connection with the filing of this Response.   However, if any
additional fee is required, authorization is hereby given to charge
the amount of any such fee to Deposit Account No. 31-3125.

Respectfully submitted,

John P. White
Registration No. 28,678

Gary J. Gershik
Registration No. 39,992

Attorneys for Patentees
Cooper & Dunham LLP
1185 Avenue of the Americas
New York, New York 10036
(212) 278-0400

I hereby certify that this correspondence is being
deposited this date with the U.S. Postal Service with
sufficient postage as first class mail in an envelope
addressed to:

Mail Stop *Ex Parte* Reexamination
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450.

Gary J. Gershik          11/9/06
Reg. No. 39,992          /Date

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 92 of 92  of November 9, 2006 Response*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing **RESPONSE TO AUGUST 2, 2006 OFFICE ACTION, SUMMARY OF OCTOBER 13, 2006 EXAMINER INTERVIEW, STATEMENT OF CONCURRENT PROCEEDINGS UNDER 37 C.F.R. § 1.565, AND SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT** and any enclosure has been sent to:

McDonnell Boehnen Hulbert & Berghoff, 300 South Wacker Drive, Suite 3200, Chicago, Illinois 60606, Attn: Grantland G. Drutchas, Esq.,

and

Bawa Biotechnology Consulting, LLC, 21005 Starflower Way, Ashburn, VA 20147, Attn: Dr. Raj Bawa,

each by U.S. Postal Service, first class mail service, with sufficient postage, on this 9th day of November, 2006.

Gary J. Gershik

# Exhibit F

 **United States Patent and Trademark Office**                                    **NEWS**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

Press Releases > USPTO Improves Process for Reviewing Patents

**PRESS RELEASE**                                                          **July 29, 2005**
Contact:                                                                          #05-38
Ruth Nyblod
571-272-8400
**ruth.nyblod@uspto.gov**

### USPTO IMPROVES PROCESS FOR REVIEWING PATENTS

The U.S. Department of Commerce's United States Patent and Trademark Office (USPTO) has implemented new processes for handling reexamination proceedings to improve timeliness and quality. Patent reexamination is a valuable, low-cost alternative to litigation for determining the patentability of the claims in an issued patent. Requests for the USPTO to reexamine a patent can be made as long as written evidence is presented that raises a substantial new question of patentability.

"Timeliness and correctness of decisions in reexamination proceedings are important to providing certainty for all users of the patent system," noted Under Secretary of Commerce for Intellectual Property and Director of the USPTO Jon Dudas. "We have a duty to the American public to get reexaminations right and to conduct them with dispatch so they remain an effective tool."

The USPTO's goal is that reexaminations that have been pending with an examiner more than two years now will be resolved by October 1, 2005. In addition, all future reexamination proceedings will be completed within a specific timeframe, which is expected to be less than two years. In March 2005 there were over 420 reexaminations that had been pending more than two years and that number would have grown to over 600 by the end of September 2005. Today, fewer than 360 cases remain, with nearly half in the final stages. To ensure the quality of these proceedings, all reexamination decisions now require a thorough review by a panel of supervisors and senior patent examiners. Reexaminations where an initial decision has been made will remain with the examiner originally assigned to the reexamination. All other reexaminations will be reassigned to a newly formed central reexamination unit.

Prior to the new initiative, reexamination cases were assigned to examiners according to technology. Under the new initiative, 20 highly skilled primary examiners who have a full understanding of reexamination practice and relevant case law will concentrate solely on reexamination. The 20-examiner unit began operation earlier this week and all new requests for reexamination will be assigned to them. Using skilled examiners assigned to a single unit will enhance the quality and reduce the time of reexaminations by allowing the USPTO to monitor more effectively the reexamination operations.

### # # #

---

Last Modified: 07/29/2005 12:11:44

# EXHIBIT G

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.go

*Ex Parte* Reexamination Filing Data  - September 30, 2006

1. Total requests filed since start of ex parte reexam on 07/01/81 .......................................8252[1]

    a. By patent owner                                3348     41%
    b. By other member of public                   4739     57%
    c. By order of Commissioner                  165     2%

2. Number of filings by discipline

    a. Chemical Operation                         2538     31%
    b. Electrical Operation                      2683     32%
    c. Mechanical Operation                   3031     37%

3. Annual Ex Parte Reexam Filings

| Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. |
|---|---|---|---|---|---|---|---|
| 1981 | 78 (3 mos.) | 1989 | 243 | 1997 | 376 | 2005 | 524 |
| 1982 | 187 | 1990 | 297 | 1998 | 350 | 2006 | 511 |
| 1983 | 186 | 1991 | 307 | 1999 | 385 | | |
| 1984 | 189 | 1992 | 392 | 2000 | 318 | | |
| 1985 | 230 | 1993 | 359 | 2001 | 296 | | |
| 1986 | 232 | 1994 | 379 | 2002 | 272 | | |
| 1987 | 240 | 1995 | 392 | 2003 | 392 | | |
| 1988 | 268 | 1996 | 418 | 2004 | 441 | | |

4. Number known to be in litigation..................................................1934     23%

5. Determinations on requests ............................................................................. 7963

    a. No. granted .................................................................................7268....................91%

        (1) By examiner                             7157
        (2) By Director (on petition)               111

    b. No. denied ...................................................................................695......................9%

        (1) By examiner                             660

---

[1] Of the requests received in FY 2006, 35 requests have not yet been accorded a filing date, and preprocessing of one request was terminated, for failure to comply with the requirements of 37 CFR 1.510.  See Clarification of Filing Date Requirements for *Ex Parte* and *Inter Partes* Reexamination Proceedings, Final Rule, 71 Fed. Reg. 44219 (August 4, 2006).

    (2)  Order vacated                            35

6.  Total examiner denials (includes denials reversed by Director) ........................................ 771

    a.  Patent owner requester                    433        56%
    b.  Third party requester                     338        44%

7.  Overall reexamination pendency  (Filing date to certificate issue date)

    a.  Average pendency                       22.9  (mos.)
    b.  Median pendency                        17.8  (mos.)

8.  Reexam certificate claim analysis:

| | Owner Requester | 3rd Party Requester | Comm'r Initiated | Overall |
|---|---|---|---|---|
| a.  All claims confirmed | 23% | 29% | 13% | 26% |
| b.  All claims cancelled | 7% | 12% | 20% | 10% |
| c.  Claims changes | 70% | 59% | 67% | 64% |

9.  Total ex parte reexamination certificates issued (1981 - present).................................... 5537

    a.  Certificates with all claims confirmed        1448      26%
    b.  Certificates with all claims canceled        565      10%
    c.  Certificates with claims changes          3524      64%

10.  Reexam claim analysis - requester is patent owner or 3rd party; or Comm'r initiated.

    a.  Certificates _ PATENT OWNER REQUESTER ..................................................... 2403

        (1)  All claims confirmed            560      23%
        (2)  All claims canceled             176      7%
        (3)  Claim changes                1667      70%

    b.  Certificates _ 3rd PARTY REQUESTER ................................................................ 2992

        (1)  All claims confirmed            870      29%
        (2)  All claims canceled             360      12%
        (3)  Claim changes                1762      59%

    c.  Certificates _ COMM'R INITIATED REEXAM ....................................................... 142

        (1)  All claims confirmed             18      13%
        (2)  All claims canceled              29      20%
        (3)  Claim changes                 95      67%