## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX RHODE ISLAND CORPORATION,<br><br>   Plaintiffs,<br><br>  v.<br><br>ARIAD PHARMACEUTICALS, INC., and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,<br><br>   Defendants. | **REDACTED PUBLIC VERSION**<br><br><br><br>C.A. No. 06-259-MPT |
| ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,<br><br>   Counterclaim- Plaintiffs,<br><br>  v.<br><br>AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION, and WYETH,<br><br>   Counterclaim-Defendants. | |

## DECLARATION OF DAVID I. GINDLER IN SUPPORT OF COUNTERCLAIM-PLAINTIFFS ARIAD'S AND THE INSTITUTIONS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO WYETH'S MOTION TO SEVER AND STAY

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone: (302) 654-1888

*Counsel for ARIAD Pharmaceuticals, Inc.,
Massachusetts Institute of Technology, President &
Fellows of Harvard College, Whitehead Institute for
Biomedical Research*

I, David I. Gindler, declare as follows:

1.      I am a partner at Irell & Manella LLP, counsel for ARIAD Pharmaceuticals, Inc., Massachusetts Institute of Technology, the President and Fellows of Harvard College, and the Whitehead Institute for Biomedical Research (collectively "Counterclaim-Plaintiffs") in connection with this action.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.  I make this declaration in support of Counterclaim-Plaintiffs' Opposition to Wyeth's Motion to Sever and Stay Counterclaim.

2.      Attached hereto as Exhibit A are true and correct copies of excerpts from Wyeth's March 31, 2007 Form 10Q (pages 20 and 31).

3.      Attached hereto as Exhibit B are true and correct copies of excerpts from Amgen's March 31, 2007 Form 10Q (pages 18 and 19).

4.      Attached hereto as Exhibit C is a true and correct copy of the "Amended and Restated Promotion Agreement between Immunex Corporation, American Home Products Corporation, and Amgen, Inc. for the Promotion of ENBREL (TNFR:Fc) in North America Dated as of December 16, 2001."

5.      Attached hereto as Exhibit D are true and correct copies of excerpts from Amgen's 2006 Form 10K (pages 19, 22, 41, 44 and 47).

6.      Attached hereto as Exhibit E is a true and correct copy of the "Collaboration and Global Supply Agreement by and between Immunex Corporation and American Home Products Corporation acting though its Wyeth-Ayerst Pharmaceuticals division" entered into November 6, 2001.

7.      Attached hereto as Exhibit F are true and correct copies of excerpts from Amgen's 2004 Form 10K (page 46).

8.      Attached hereto as Exhibit G is a true and correct copy of the "TNFR License and Development Agreement" by and between Immunex Corporation and American Home

Products Corporation acting though its Wyeth-Ayerst Pharmaceuticals division entered into July 24, 1996.

9.     Attached hereto as Exhibit H is a true and correct copy of an "Agreement" between Immunex and American Home Products executed on September 23, 1994 as reflected in Ex. 10.24 to Immunex's 1994 10K.  This agreement shows that in December 1992, Wyeth's predecessor American Cyanamid acquired a controlling ownership interest in Immunex by purchasing 53.5% of Immunex's stock.

10.     Attached hereto as Exhibit I are true and correct copies of excerpts from Wyeth's September 30, 2001 Form 10Q (page 2).

11.     Attached hereto as Exhibit J is a true and correct copy of the "Promotion Agreement between Immunex Corporation and American Home Products Corporation for the Promotion of Enbrel (TNFR:Fc) in North America" entered into as of September 25, 1997.

12.     Attached hereto as Exhibit K is a true and correct copy of a panel from the box of Enbrel sold in the United States.

Executed on June 18, 2007, at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

David I. Gindler, Esq.

# EXHIBIT A

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

---

# FORM 10-Q

---

(Mark One)

☒  **Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

For the quarterly period ended March 31, 2007

or

☐  **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

For the transition period from _____ to _____

**Commission file number 1–1225**

# Wyeth
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **13–2526821** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **Five Giralda Farms, Madison, N.J.** | **07940** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (973) 660–5000

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non–accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b–2 of the Exchange Act. (Check one):

Large accelerated filer ☒             Accelerated filer ☐             Non–accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b–2 of the Exchange Act).   Yes ☐   No ☒

The number of shares of Wyeth's Common Stock outstanding as of the close of business on April 30, 2007:

| Class | Number of |
|---|---|
| | |

Common Stock, $0.33 $^1/_3$ par value

**Shares Outstanding**
1,345,160,352

Table of Contents

**Management's Discussion and Analysis of Financial Condition
and Results of Operations
Three Months Ended March 31, 2007**

- **EFFEXOR** is our novel antidepressant for treating adult patients with major depressive disorder, generalized anxiety disorder, social anxiety disorder and panic disorder. **EFFEXOR** remains our largest franchise and the number one selling antidepressant globally. See "Our Challenging Business Environment" beginning on page 24 for a discussion of the settlement agreement with Teva, pursuant to which Teva has launched generic versions of **EFFEXOR** (immediate release tablets) in the United States and **EFFEXOR XR** (extended release capsules) in Canada.

- **PREVNAR** is our vaccine for preventing invasive pneumococcal disease in infants and children. It is the first and only vaccine product ever to achieve $1 billion in annual net revenue and now is available in 76 countries worldwide and included in 16 national immunization programs (NIP). We anticipate the number of NIPs to increase as a result of the March 23, 2007 announcement by the World Health Organization recommending the inclusion of **PREVNAR** in NIPs.

- **PROTONIX** is our proton pump inhibitor (PPI) for gastroesophageal reflux disease. The PPI category is highly competitive, and we have continued to focus on our strategy of higher value prescriptions within the third—party managed care segment. We also are tailoring our marketing programs to capitalize on unique local market opportunities. **PROTONIX** continues to have the highest preferred access with health maintenance organizations among the branded PPIs and is the leader among branded PPIs on Medicare drug plan formularies.

- **ENBREL** is our treatment for rheumatoid arthritis, psoriasis and other conditions. We have exclusive rights to **ENBREL** outside the United States and Canada, and we co—promote **ENBREL** with Amgen in the United States and Canada. **ENBREL** maintains its leading U.S. market position in rheumatology and dermatology and is ranked ninth in global sales among all pharmaceutical products. **ENBREL** now is approved, launched and reimbursed in Japan, where, until recently, we had been operating under a routine government—required post—marketing safety program. In April 2007, this program was concluded, paving the way for broader patient access and expanded commercial opportunity for **ENBREL** in Japan.

- Alliance revenue includes our share of profits from sales of **ENBREL** in the United States and Canada, where we co—promote the product with Amgen; our share of profits from sales of **ALTACE**, which was co—promoted with King Pharmaceuticals, Inc. (King) prior to 2007; and certain revenue earned related to sirolimus, the active ingredient in **RAPAMUNE**, which coats the **CYPHER** coronary stent marketed by Johnson & Johnson. In July 2006, Wyeth and King announced that the companies had entered into an Amended and Restated Co—Promotion Agreement regarding **ALTACE**. Effective January 1, 2007, King assumed full responsibility for the selling and marketing of **ALTACE**. Wyeth will receive a fee in 2007 through 2010, generally based on a percentage of **ALTACE** net sales and subject to annual payment limits.

- Nutrition includes our infant formula and toddler products **NURSOY, PROGRESS, PROMIL** and **S—26**. We continue to expand into new markets, grow our business in the countries where we compete and shift focus of our business to the more profitable premium sector of the market. Significant manufacturing capacity expansions currently are under way in the Asia/Pacific region to support our nutrition business strategy.

20

Table of Contents

## Management's Discussion and Analysis of Financial Condition
### and Results of Operations
### Three Months Ended March 31, 2007

The following tables set forth the significant worldwide Pharmaceuticals, Consumer Healthcare and Animal Health net revenue by product for the three months ended March 31, 2007 compared with the same period in the prior year:

### Pharmaceuticals

| (In millions) | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2007 | 2006 |
| EFFEXOR | $891.0 | $944.6 |
| PREVNAR | 616.6 | 431.6 |
| PROTONIX | 474.1 | 481.6 |
| ENBREL[1] | 445.2 | 335.4 |
| Nutrition | 346.7 | 288.5 |
| ZOSYN/TAZOCIN | 281.1 | 238.4 |
| PREMARIN family | 241.1 | 265.6 |
| Oral contraceptives | 110.1 | 127.1 |
| BENEFIX | 98.1 | 89.7 |
| rhBMP–2 | 97.0 | 65.3 |
| RAPAMUNE | 83.4 | 75.8 |
| REFACTO | 78.5 | 67.3 |
| TYGACIL | 25.6 | 10.2 |
| ZOTON | 18.8 | 40.5 |
| Alliance revenue[2] | 304.0 | 254.1 |
| Other | 370.1 | 319.8 |
| Total Pharmaceuticals | $4,481.4 | $4,035.5 |

(1)   ENBREL net revenue includes sales of ENBREL outside the United States and Canada, where we have exclusive rights but does not include our share of profits from sales in the United States and Canada, where the product is co-promoted with Amgen, which we record as alliance revenue.

(2)   Alliance revenue is generated from sales of ENBREL (in the United States and Canada), ALTACE and the CYPHER stent. The active ingredient in RAPAMUNE, sirolimus, coats the CYPHER coronary stent marketed by Johnson & Johnson.

31

Source: WYETH, 10-Q, May 09, 2007

# EXHIBIT B

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington D.C. 20549

---

## Form 10−Q

---

(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2007**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number 000−12477**

---

# Amgen Inc.
### (Exact name of registrant as specified in its charter)

---

| | |
|---|---|
| **Delaware** | **95−3540776** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **One Amgen Center Drive, Thousand Oaks, California** | **91320−1799** |
| (Address of principal executive offices) | (Zip Code) |

**(805) 447−1000**
(Registrant's telephone number, including area code)

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non−accelerated filer. See definition of "accelerated filer" and "large accelerated filer" in Rule 12b−2 of the Exchange Act. (Check one):

Large accelerated filer ☒   Accelerated filer ☐   Non−accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b−2 of the Exchange Act)   Yes ☐   No ☒

As of April 16, 2007, the registrant had 1,159,644,524 shares of common stock, $0.0001 par value, outstanding.

Source: AMGEN INC, 10-Q, May 09, 2007

Sensipar® have received broad formulary placement in 2006 and 2007, Part D formulary placements are made by individual Part D plan sponsors with oversight by CMS and are subject to revision in the future.

Other initiatives reviewing the coverage or reimbursement of our products, including those related to safety, could result in less extensive coverage or lower reimbursement and could negatively affect sales of some of our marketed products. For example, on March 14, 2007, shortly after the label changes for all ESAs, CMS announced that the agency had begun reviewing all Medicare policies related to the administration of ESAs in non–renal disease applications as part of a NCA which is generally CMS' first step toward developing a NCD. Generally, a NCD is a national policy statement granting, limiting or excluding Medicare coverage or reimbursement for a specific medical item or service. During the initial comment period which ended on April 13, 2007, we submitted comments to CMS which included a detailed and thorough review of the available clinical data, noted a series of important considerations and made a number of specific recommendations for the agency to consider in developing a NCD. CMS is required to issue a proposed NCD by September 14, 2007, but could propose a NCD at any time prior to that deadline. Given the uncertainty of what recommendations a final NCD would consist of, we cannot predict what impact a NCD would have on our business. Following CMS' announcement that it had begun reviewing all Medicare policies related to the administration of ESAs in non–renal disease applications on March 14, 2007, CMS also stated that the agency is currently reviewing the EMP for patients with ESRD who are dialyzed in renal facilities although they have not yet announced further changes to the EMP. The FDA may also schedule a meeting of the Cardio Renal Advisory Committee to review the use of ESAs in the renal setting although no public announcement has been made. As a result of the revisions and current review of the EMP, we cannot predict the potential full impact any revisions to the EMP may have on our business. However, changes reducing reimbursement coverage could negatively affect product sales of our ESA products.

Further, the Deficit Reduction Act of 2005 ("DRA") included provisions, which are phased in over time, regarding state collection and submission of data for the purpose of collecting Medicaid drug rebates from manufacturers for physician–administered drugs. We expect that state compliance with elements of these provisions that become effective in 2007 will increase the level of Medicaid rebates paid by us. We are currently in the process of further evaluating the impact of the DRA and are uncertain as to the potential full impact on our business. Related to this issue, CMS issued a proposed Medicaid rule on December 18, 2006 that covered a broad range of topics concerning the calculation and use of AMP and best price as well as a proposed definition for bundled sales under the Medicaid program. We submitted a comment to CMS on the proposed rule which the DRA specifies that CMS issue a final rule no later than July 1, 2007. While we cannot predict the impact of the final rule prior to its issuance, changes reducing reimbursement could negatively affect our business.

## Results of Operations

*Product sales*

For the three months ended March 31, 2007 and 2006, worldwide product sales and total product sales by geographic region were as follows (in millions):

18

Source: AMGEN INC, 10–Q, May 09, 2007

| | Three Months Ended March 31, | | |
|---|---|---|---|
| | 2007 | 2006 | Change |
| Aranesp® | $1,020 | $893 | 14% |
| EPOGEN® | 625 | 604 | 3% |
| Neulasta®/NEUPOGEN® | 1,018 | 896 | 14% |
| ENBREL | 730 | 658 | 11% |
| Sensipar® | 105 | 61 | 72% |
| Vectibix™ | 51 | — | n/a |
| Other | 16 | 15 | 7% |
| Total product sales | $3,565 | $3,127 | 14% |
| Total U.S. | $2,884 | $2,571 | 12% |
| Total International | 681 | 556 | 22% |
| Total product sales | $3,565 | $3,127 | 14% |

Product sales are influenced by a number of factors, including demand, third–party reimbursement availability and policies, government programs, regulatory developments or guidelines, clinical trial outcomes, clinical practice, pricing strategies, wholesaler and end–user inventory management practices, patient population, fluctuations in foreign currency exchange rates, new product launches and indications, competitive products, product supply and acquisitions.

Sales growth for the three months ended March 31, 2007 was principally driven by demand for Aranesp®, Neulasta® and ENBREL, which benefited from segment growth and to a lesser degree share gains. International product sales for the three months ended March 31, 2007 were favorably impacted by $42 million from foreign currency exchange rate changes. Excluding the favorable impact of foreign currency exchange rate changes, international product sales increased 15% over the three months ended March 31, 2006.

*Aranesp®*

For the three months ended March 31, 2007 and 2006, total Aranesp® sales by geographic region were as follows (in millions):

| | Three Months Ended March 31, | | |
|---|---|---|---|
| | 2007 | 2006 | Change |
| Aranesp® – U.S. | $ 654 | $ 596 | 10% |
| Aranesp® – International | 366 | 297 | 23% |
| Total Aranesp® | $1,020 | $893 | 14% |

The increase in U.S. Aranesp® sales for the three months ended March 31, 2007 was driven by demand due to segment growth and to a lesser degree favorable wholesaler inventory changes. The slowing growth rate in the United States was driven by initial customer reaction to the ESA product label changes regarding safety discussed above and the resulting loss of substantially all Medicare

19

Source: AMGEN INC, 10–Q, May 09, 2007

# EXHIBIT C

# REDACTED

# EXHIBIT D

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington D.C. 20549

## Form 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2006
**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission file number 000-12477

## Amgen Inc.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **95-3540776** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **One Amgen Center Drive, Thousand Oaks, California** | **91320-1799** |
| (Address of principal executive offices) | (Zip Code) |

**(805) 447-1000**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(g) of the Act:
Common stock, $0.0001 par value; preferred share purchase rights
(Title of class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or Section 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer" and "large accelerated filer" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒    Accelerated filer ☐    Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act) Yes ☐ No ☒

The approximate aggregate market value of voting and non-voting stock held by non-affiliates of the registrant was $76,300,392,427 as of June 30, 2006(A)

(A)  Excludes 591,682 shares of common stock held by directors and officers, and any stockholders whose ownership exceeds five percent of the shares outstanding, at June 30, 2006. Exclusion of shares held by any person should not be construed to indicate that such person possesses the power, directly or indirectly, to direct or cause the direction of the management or policies of the registrant, or that such person is controlled by or under common control with the registrant.

1,167,458,942
(Number of shares of common stock outstanding as of January 31, 2007)

**DOCUMENTS INCORPORATED BY REFERENCE**

Specified portions of the registrant's Proxy Statement with respect to the 2007 Annual Meeting of stockholders to be held May 9, 2007 are incorporated by reference into Part III of this annual report.

Source: AMGEN INC, 10-K, February 28, 2007

Table of Contents

The following table reflects other companies and their currently marketed products that will primarily compete with denosumab, if approved:

| Amgen Product Candidate | Competitor Marketed Product | Potential Competitor |
|---|---|---|
| Denosumab | Fosamax[®] | Merck & Co., Inc. |
| Denosumab | Actonel[®] | Procter & Gamble/Aventis |
| Denosumab | Boniva[®] | Roche/GlaxoSmithKline |
| Denosumab | Evista[®] | Eli Lilly and Company ("Eli Lilly") |
| Denosumab | Forteo[®] | Eli Lilly |
| Denosumab | Miacalcin[®] | Novartis |
| Denosumab | Zometa[®] | Novartis |
| Denosumab | Aredia[®] | Novartis |

## Manufacturing and Raw Materials

### Manufacturing

Our manufacturing operations consist of bulk manufacturing and/or formulation, fill and finish activities which produce Aranesp[®], Neulasta[®], NEUPOGEN[®], Epoetin alfa, ENBREL, Vectibix™ and other products (and product candidates) for both commercial and clinical purposes. Bulk manufacturing includes fermentation and cell culture, which are the processes in which our proteins are produced. The proteins are purified to a high quality and then formulated into a stable form. The fill process puts the formulated bulk protein into the vials or syringes used by patients or those that administer treatment to patients. Finally, in the finish process, our products are packaged for distribution. We operate commercial and clinical manufacturing facilities in several locations throughout the United States and in Puerto Rico (see "Item 2. Properties"). Manufacturing of Sensipar[®], our small molecule product, is performed by third-party contractors.

### Commercial Bulk Manufacturing

We operate commercial bulk manufacturing facilities in several locations throughout the United States and in Puerto Rico (see "Item 2. Properties"). To keep up with the growing demand of our products, we operate our bulk manufacturing facilities at nearly full capacity. Other than for ENBREL, we perform all of the bulk manufacturing for our proteins.

Commercial quantities of ENBREL produced at our Rhode Island facilities are insufficient to fill the current level of demand for this product. As a result, the Company and Wyeth also have a contract manufacturing agreement with Boehringer Ingelheim Pharma KG ("BI Pharma") for the production of additional supply of ENBREL. We also have a global supply agreement with Wyeth related to the manufacture, supply, inventory and allocation of bulk supplies of ENBREL. Under this agreement, the Company and Wyeth share the total worldwide bulk supply of ENBREL produced by Amgen's Rhode Island manufacturing facilities, BI Pharma's manufacturing facility in Germany and Wyeth's manufacturing facility in Ireland.

Our supply of ENBREL is significantly dependent on product manufactured by BI Pharma, and, accordingly, we have made significant purchase commitments to BI Pharma (see Note 8, "Commitments and contingencies" to the Consolidated Financial Statements). Under our supply agreements, BI Pharma has reserved a specified level of production capacity for ENBREL, and we are committed to using at least that level of capacity. We are required to submit a rolling three-year forecast for manufacturing the bulk drug for ENBREL and a rolling forecast for a shorter period for the number of finished vials of ENBREL. We will be responsible for substantial payments to BI Pharma if we fail to use the minimum production capacity that BI Pharma has reserved for ENBREL each calendar year or if the BI Pharma supply agreement is terminated prematurely under specified conditions.

In addition to producing our own commercial quantities of Epoetin alfa, we also supply Epoetin alfa in the United States to Johnson & Johnson under a supply agreement (see "Joint Ventures and Business Relationships — Johnson & Johnson").

19

Source: AMGEN INC, 10-K, February 28, 2007

Table of Contents

erythropoietin sold by Johnson & Johnson is manufactured by us and sold by Johnson & Johnson under the trademark PROCRIT ® (Epoetin alfa). PROCRIT® brand Epoetin alfa is identical to EPOGEN® brand Epoetin alfa, which is manufactured and sold by us in the U.S. dialysis market. Pursuant to the license agreement with Johnson & Johnson, we earn a 10% royalty on net sales of PROCRIT® by Johnson & Johnson in the United States.

Outside the United States, with the exception of China and Japan, Johnson & Johnson was granted rights to manufacture and commercialize recombinant human erythropoietin as a human therapeutic for all uses under a licensing agreement with KA. With respect to its sales outside of the United States, Johnson & Johnson manufactures and commercializes its own brand of Epoetin alfa which is then sold throughout the world by Johnson & Johnson under various trademarks such as EPREX® and ERYPO®. We are not involved in the manufacture of Epoetin alfa sold by Johnson & Johnson outside of the United States. (See "Item 3. Legal Proceedings — Johnson & Johnson Matters — Arbitration/Demand for Separate BLA and — Ortho Biotech Antitrust Litigation.")

### Wyeth

Amgen and Wyeth market and sell ENBREL under a co-promotion agreement in the United States and Canada for all approved indications other than for use in oncology. The rights to detail and promote ENBREL in the United States and Canada for oncology indications are reserved to Amgen. The rights to market ENBREL outside of the United States and Canada are reserved to Wyeth. Under the co-promotion agreement, a management committee comprised of equal representation from Wyeth and Amgen is responsible for overseeing the marketing and sales of ENBREL including: strategic planning, the approval of an annual marketing plan, product pricing and the establishment of a brand team. The brand team, with equal representation from each party, prepares and implements the annual marketing plan, which includes a minimum level of financial and sales personnel commitment from each party, and is responsible for all sales activities. Further, pursuant to the co-promotion agreement, Wyeth and Amgen each pay a defined percentage of all selling and marketing expenses approved by the management committee. In addition, we pay Wyeth a percentage of the annual gross profits of ENBREL, which reflect the sharing of manufacturing costs in the United States and Canada attributable to all approved indications for ENBREL on a scale that increases as gross profits increase; however, we maintain a majority share of ENBREL profits. Under the co-promotion agreement, Wyeth is required to reimburse Amgen for: 1) certain clinical and regulatory expenses we incur in connection with the filing and approval of any new indications for ENBREL in the United States and Canada, excluding oncology and rheumatoid arthritis indications; 2) certain specified patent expenses related to ENBREL; and 3) certain costs, expenses and liabilities associated with the manufacture, use, or sale of ENBREL in the United States and Canada.

We also have a global supply agreement with Wyeth related to the manufacture, supply, inventory and allocation of bulk supplies of ENBREL. Under this agreement, the Company and Wyeth share the total worldwide bulk supply of ENBREL produced by Amgen's Rhode Island manufacturing facilities, BI Pharma's manufacturing facility in Germany and Wyeth's manufacturing facility in Ireland.

### Fresenius

In October 2006, we entered into a five-year sole sourcing and supply agreement with an affiliate of Fresenius Medical Care North America, Inc. ("Fresenius"), on its behalf and on behalf of certain of its affiliates, to purchase, and we have agreed to supply, all of Fresenius' commercial requirements for erythropoietic stimulating proteins for use in managing the anemia of its hemodialysis patients in the United States and Puerto Rico, based on forecasts provided by Fresenius and subject to the terms and conditions of the agreement.

### Government Regulation

Regulation by governmental authorities in the United States and other countries is a significant factor in the production and marketing of our products and our ongoing R&D activities.

In order to clinically test, manufacture and market products for therapeutic use, we must satisfy mandatory procedures and safety and effectiveness standards established by various regulatory bodies. In the United States,

Source: AMGEN INC, 10-K, February 28, 2007

Table of Contents

*We are dependent on third parties for a significant portion of our bulk supply and the formulation, fill and finish of ENBREL.*

We currently produce a substantial portion of annual ENBREL supply at our Rhode Island manufacturing facilities. However, we also depend on third parties for a significant portion of our ENBREL bulk supply as well as for some of the formulation, fill and finish of ENBREL that we manufacture. BI Pharma is our third-party contract manufacturer of ENBREL bulk drug; accordingly, our U.S. and Canadian supply of ENBREL is currently significantly dependent on BI Pharma's production schedule for ENBREL. We would be unable to produce ENBREL in sufficient quantities to substantially offset shortages in BI Pharma's scheduled production if BI Pharma or other third-party contract manufacturers used for the formulation, fill and finish of ENBREL bulk drug were to cease or interrupt production or services or otherwise fail to supply materials, products or services to us for any reason, including due to labor shortages or disputes, regulatory requirements or action or contamination of product lots or product recalls. For example, in the second quarter of 2002, the prior co-marketers with respect to ENBREL experienced a brief period where no ENBREL was available to fill patient prescriptions, primarily due to variation in the expected production yield from BI Pharma. We cannot guarantee that an alternative third-party contract manufacturer would be available on a timely basis or at all. This in turn could materially reduce our ability to satisfy demand for ENBREL, which could materially and adversely affect our operating results.

Among the factors that could affect our actual supply of ENBREL at any time include, without limitation, BI Pharma's and the Rhode Island facilities' bulk drug production scheduling. For example, BI Pharma does not produce ENBREL continuously; rather, it produces the bulk drug substance through a series of periodic campaigns throughout the year. Our Rhode Island manufacturing facilities are currently dedicated to ENBREL production. The amount of commercial inventory available to us at any time depends on a variety of factors, including the timing and actual number of BI Pharma's production runs, the actual number of runs at our Rhode Island manufacturing facilities, and, for either the Rhode Island or BI Pharma facilities, the level of production yields and success rates, the timing and outcome of product quality testing and the amount of formulation, fill and finish capacity. We are also dependent on third-parties for some formulation, fill and finish of ENBREL bulk drug substance manufactured at our Rhode Island facilities. If third-party formulation, fill and finish manufacturers are unable to provide sufficient capacity or are otherwise unable to provide services to us, the supply of ENBREL could be adversely affected materially.

Under a collaboration and global supply agreement, the Company and Wyeth share the total worldwide bulk supply of ENBREL produced by Amgen's Rhode Island manufacturing facilities, BI Pharma's manufacturing facility in Germany and Wyeth's manufacturing facility in Ireland. Our ENBREL supply forecasts rely on certain assumptions of how much ENBREL each of these manufacturing facilities is expected to produce. If any of these manufacturing facilities are unable to produce in accordance with our or Wyeth's expectations, the worldwide supply of ENBREL could be adversely affected materially. In such cases, we may be required to allocate supply for Wyeth's benefit. To the extent that there is a shortfall in worldwide production expectations, our supply of ENBREL could be adversely affected. Additionally, the costs associated with a shortfall or failure in production of ENBREL would be borne by both parties.

*Our marketed products face substantial competition and other companies may discover, develop, acquire or commercialize products before or more successfully than we do.*

We operate in a highly competitive environment. Our products compete with other products or treatments for diseases for which our products may be indicated. For example, ENBREL competes in certain circumstances with products marketed by Johnson & Johnson, Abbott, Biogen, Genentech, Bristol-Meyers Squibb, Novartis and Sanofi-Aventis, as well as the generic drug methotrexate, and may face competition from other potential therapies being developed. While ENBREL continues to maintain a leading position in both rheumatology and dermatology, it has experienced share loss to competitors. Additionally, Aranesp® competes with products marketed by Johnson & Johnson in the United States and the EU and with products marketed by Roche in the EU. Also, Aranesp® may face competition in the EU in 2007 from another erythropoietin product produced by Shire. Aranesp® and EPOGEN® may also face competition in the U.S. from Roche's peg-EPO for which they have

41

Table of Contents

*Our marketing of ENBREL will be dependent in part upon Wyeth.*

Under a co–promotion agreement, the Company and Wyeth market and sell ENBREL in the United States and Canada. A management committee comprised of an equal number of representatives from us and Wyeth is responsible for overseeing the marketing and sales of ENBREL including strategic planning, the approval of an annual marketing plan, product pricing and the establishment of a brand team. The brand team, with equal representation from us and Wyeth, prepares and implements the annual marketing plan, which includes a minimum level of financial and sales personnel commitment from each party, and is responsible for all sales activities. If Wyeth fails to market ENBREL effectively or if the Company and Wyeth fail to coordinate our efforts effectively, our sales of ENBREL may be adversely affected materially.

*Our business may be impacted by government investigations or litigation.*

We and certain of our subsidiaries are involved in legal proceedings relating to various patent matters, government investigations, our business operations, government requests for information and other legal proceedings that arise from time to time in the ordinary course of our business. Matters required to be disclosed by us are set forth in "Item 3. Legal Proceedings" and are updated as required in subsequently filed Form 10–Qs. Litigation is inherently unpredictable, and the outcome can result in excessive verdicts and/or injunctive relief that affects how we operate our business. Consequently, it is possible that we could, in the future, incur judgments or enter into settlements of claims for monetary damages or change the way we operate our business, which could have a material adverse effect on our results of operations (in the case of monetary damages, in the period in which such damages are incurred).

The federal government, state governments and private payers are investigating, and many have filed actions against numerous pharmaceutical and biotechnology companies, including Amgen and Immunex, now a wholly owned subsidiary of ours, alleging that the reporting of prices for pharmaceutical products has resulted in false and overstated AWP, which in turn is alleged to have improperly inflated the reimbursement paid by Medicare beneficiaries, insurers, state Medicaid programs, medical plans and other payers to healthcare providers who prescribed and administered those products. A number of these actions have been brought against us and/or Immunex. Additionally, a number of states have pending investigations regarding our Medicaid drug pricing practices and the U.S. Departments of Justice and Health and Human Services have requested that Immunex produce documents relating to pricing issues. Further, certain state government entity plaintiffs in some of these AWP cases are also alleging that companies, including ours, were not reporting their "best price" to the states under the Medicaid program. These cases and investigations are described in "Item 3. Legal Proceedings — Average Wholesale Price Litigation" and are updated as required in subsequent Form 10–Qs. Other states and agencies could initiate investigations of our pricing practices. A decision adverse to our interests on these actions and/or investigations could result in substantial economic damages and could have a material adverse effect on our results of operations in the period in which such liabilities are incurred.

*We may be required to defend lawsuits or pay damages for product liability claims.*

Product liability is a major risk in testing and marketing biotechnology and pharmaceutical products. We may face substantial product liability exposure in human clinical trials and for products that we sell after regulatory approval. Product liability claims, regardless of their merits, could be costly and divert management's attention, and adversely affect our reputation and the demand for our products. Amgen and Immunex have been named as defendants in product liability actions for certain of our products.

*Our stock price is volatile, which could adversely affect your investment.*

Our stock price, like that of other biotechnology companies, is volatile. For example, in the fifty–two weeks prior to December 31, 2006, the trading price of our common stock has ranged from a high of $80.36 per share to a low of $63.92 per share. Our stock price may be affected by a number of factors, such as:

- changes in the government's or private payers' reimbursement policies or prescribing guidelines for our products

44

Source: AMGEN INC, 10–K, February 28, 2007

Table of Contents

Item 2.    PROPERTIES

The following table summarizes our significant properties and their primary functions as of December 31, 2006. For additional information regarding ongoing R&D and manufacturing initiatives see "Item 1. Business — Research and Development and Selected Product Candidates" and "Item 1. Business — Manufacturing and Raw Materials."

| Location | Owned | Leased | Aranesp® | Neulasta® | NEUPOGEN® | Epoetin alfa | Enbrel® | Vectibix® | Other Products | Clinical | Administrative | Research and/or development | Sales and Marketing | Warehouse | Distribution Center |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **United States:** | | | | | | | | | | | | | | | |
| Thousand Oaks, CA | 36 | 12 | B | B | B | | | | | B F | ✓ | ✓ | ✓ | ✓ | ✓ |
| Fremont, CA | - | 4 | | | | | | B | | B | ✓ | | | ✓ | |
| Sacramento, CA | - | 1 | | | | | | | | | ✓ | | ✓ | | |
| San Diego, CA | - | 1 | | | | | | | | | ✓ | | | | |
| San Francisco, CA | - | 11 | | | | | | | | | | ✓ | | ✓ | |
| Boulder, CO | 2 | 4 | | | | | | | B | B | ✓ | | | ✓ | |
| Longmont, CO | 6 | - | B | | | B | | | | B | ✓ | | | ✓ | |
| Washington, D.C. | - | 2 | | | | | | | | | ✓ | | ✓ | | |
| Louisville, KY | 1 | - | | | | | | | | | | | | ✓ | ✓ |
| Cambridge, MA | 2 | - | | | | | | | | | | ✓ | | ✓ | |
| Cranston, RI | - | 1 | | | | | | | | | | | | ✓ | |
| West Greenwich, RI | 6 | 1 | | | | | B | | | B | ✓ | | | ✓ | |
| Seattle, WA | 9 | 6 | | | | | | | | B | ✓ | ✓ | | ✓ | |
| Other U.S. cities | - | 6 | | | | | | | | | ✓ | | | | |
| **Outside United States:** | | | | | | | | | | | | | | | |
| Canada | - | 4 | | | | | | | | | ✓ | | ✓ | | |
| Puerto Rico | 16 | - | B F | B F | B F | F | F | | F | B F | ✓ | | | ✓ | |
| Australia | - | 6 | | | | | | | | | ✓ | | ✓ | | |
| New Zealand | - | 1 | | | | | | | | | | | ✓ | | |
| Japan | - | 3 | | | | | | | | | | ✓ | | | |
| Netherlands | 7 | 1 | F1 | F1 | F1 | | | F1 | F1 | | ✓ | | | | ✓ |
| Ireland | - | 3 | | | | | | | | | | | | | |
| Switzerland | - | 2 | | | | | | | | | ✓ | | | | |
| United Kingdom | - | 4 | | | | | | | | | ✓ | ✓ | ✓ | | |
| Other countries | - | 26 | | | | | | | | | | ✓ | ✓ | | |

B - Bulk manufacturing

F - Formulation, Fill and Finish

F1 - Finish only

47

Source: AMGEN INC, 10-K, February 28, 2007

# EXHIBIT E

REDACTED

# EXHIBIT F

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington D.C. 20549

# Form 10-K

(Mark One)

☑  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2004**

OR

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission file number 000-12477

# Amgen Inc.
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **95-3540776** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **One Amgen Center Drive, Thousand Oaks, California** | **91320-1799** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(805) 447-1000**
*(Registrant's telephone number, including area code)*

Securities registered pursuant to Section 12(g) of the Act:

**Common stock, $0.0001 par value; preferred share purchase rights; Contractual contingent payment rights**
*(Title of class)*

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☑    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☐

Indicate by check mark whether the registrant is an accelerated filer.    ☑

The approximate aggregate market value of voting and non-voting stock held by non-affiliates of the registrant was $78,645,591,780 as of February 10, 2005A

**1,252,717,295**
*(Number of shares of common stock outstanding as of February 10, 2005)*

A Excludes 2,305,892 shares of common stock held by directors and officers, and any stockholders whose ownership exceeds five percent of the shares outstanding, at February 10, 2005. Exclusion of shares held by any person should not be construed to indicate that such person possesses the power, directly or indirectly, to direct or cause the direction of the management or policies of the registrant, or that such person is controlled by or under common control with the registrant.

## INDEX

### PART I

| | | Page No. |
|---|---|---|
| Item 1. | Business | 2 |
| | Overview | 2 |

Source: AMGEN INC, 10-K, March 09, 2005

Table of Contents

- BI Pharma schedules the vialing production runs for ENBREL® in advance, based on the expected timing and yield of bulk drug production runs. Therefore, if BI Pharma realizes production yields beyond expected levels, or provides additional manufacturing capacity for ENBREL®, it may not have sufficient vialing capacity for all of the ENBREL® bulk drug that it produces. As a result, even if we are able to increase our supply of ENBREL® bulk drug, BI Pharma may not be able to fill and finish the extra bulk drug in time to prevent any supply interruptions.

We are dependent on third parties for some fill and finish and packaging of ENBREL® bulk drug substance manufactured at our Rhode Island facility. If third–party fill and finish and packaging manufacturers are unable to provide sufficient capacity or otherwise unable to provide services to us, then supply of ENBREL® could be adversely affected.

Our current plan to increase U.S. and Canadian supply of ENBREL® includes completion of an additional large–scale cell culture commercial manufacturing facility adjacent to the current Rhode Island manufacturing facility. We expect to submit this facility for FDA approval in 2005. Additionally, we have entered into a manufacturing agreement with Genentech to produce ENBREL® at Genentech's manufacturing facility in South San Francisco, California and the FDA approved this facility for ENBREL® production in October 2004. Under the terms of the agreement, Genentech is expected to produce ENBREL® through 2005, with an extension through 2006 by mutual agreement. ENBREL® bulk drug substance produced at the Genentech facility will be produced in campaigns similar to those conducted at BI Pharma. Consequently, supply from the Genentech facility is expected to also be dependent on the timing and number of production runs in addition to the other manufacturing, filling, and packaging risk discussed above. In addition, Wyeth is constructing a new manufacturing facility in Ireland, which is expected to increase the U.S. and Canadian supply of ENBREL®. If the additional ENBREL® manufacturing capacity at the Rhode Island site, or in Ireland are not completed on time, or if these manufacturing facilities do not receive FDA or the European Agency for the Evaluation of Medical Products (EMEA) approval before we encounter supply constraints, our ENBREL® sales would be restricted, which could have a material adverse effect on our results of operations. (See "— Limits on supply for ENBREL® may constrain ENBREL® sales.") If these third–party manufacturing facilities are completed and approved by the various regulatory authorities, our costs of acquiring bulk drug may fluctuate.

*We formulate, fill and finish substantially all our products at our Puerto Rico manufacturing facility; if significant natural disasters or production failures occur at this facility, we may not be able to supply these products.*

We currently perform all of the formulation, fill and finish for EPOGEN®, Aranesp®, NEUPOGEN® and Neulasta® and some formulation, fill and finish operations for ENBREL® at our manufacturing facility in Juncos, Puerto Rico. Our global supply of these products is dependent on the uninterrupted and efficient operation of this facility. Power failures, the breakdown, failure or substandard performance of equipment, the improper installation or operation of equipment, natural or other disasters, including hurricanes, or failures to comply with regulatory requirements, including those of the FDA, among others, could adversely affect our formulation, fill and finish operations. As a result, we may be unable to supply these products, which could adversely and materially affect our product sales. Although we have obtained limited insurance to protect against business interruption loss, there can be no assurance that such coverage will be adequate or that such coverage will continue to remain available on acceptable terms, if at all. The extent of the coverage of our insurance could limit our ability to mitigate for lost sales and could result in such losses materially and adversely affecting our operating results.

*Our marketed products face substantial competition and other companies may discover, develop, acquire or commercialize products before or more successfully than we do.*

We operate in a highly competitive environment. Our products compete with other products or treatments for diseases for which our products may be indicated. For example, ENBREL® competes in certain circumstances with rheumatoid arthritis products marketed by Biogen IDEC Inc., Centocor, Inc., Johnson & Johnson, Abbott, Genentech, Pfizer, Novartis, and Sanofi–Aventis, as well as the generic drug methotrexate, and may face competition from other potential therapies being developed. Additionally, Aranesp® competes with Johnson & Johnson in the United States and the EU. Further, if our currently marketed products are

46

Source: AMGEN INC, 10-K, March 09, 2005

# EXHIBIT G

REDACTED

# EXHIBIT H

# REDACTED

# EXHIBIT I

```
============================================================================
                            UNITED STATES
                   SECURITIES AND EXCHANGE COMMISSION
                          WASHINGTON, D.C. 20549

                              FORM 10-Q

              QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15 (d)
                   OF THE SECURITIES EXCHANGE ACT OF 1934
```

For the quarterly period ended                Commission file number 1-1225
    September 30, 2001

                   AMERICAN HOME PRODUCTS CORPORATION
                   -----------------------------------
              (Exact name of registrant as specified in its charter)


         Delaware                               13-2526821
         --------                               ----------
(State or other jurisdiction of        (I.R.S. Employer Identification No.)
 incorporation or organization)


    Five Giralda Farms, Madison, N.J.              07940
    ---------------------------------              -----
(Address of principal executive offices)        (Zip Code)


Registrant's telephone number, including area code (973) 660-5000

        Indicate by check mark whether the registrant (1) has filed all reports
                    required to be filed by Section 13 or 15 (d)
                of the Securities Exchange Act of 1934 during the
                preceding 12 months (or for such shorter period that the
            registrant was required to file such reports), and (2) has been
                subject to such filing requirements for the past 90 days.

                                        Yes  X          No
                                        -----            --


The number of shares of Common Stock outstanding as of the close of business on
October 31, 2001:

                                                 Number of
                    Class                     Shares Outstanding
       ----------------------------------    ------------------
       Common Stock, $0.33-1/3 par value         1,319,235,172

```
============================================================================
```

Source: WYETH, 10-Q, November 14, 2001

Part I - Financial Information
--------------------------------

AMERICAN HOME PRODUCTS CORPORATION AND SUBSIDIARIES

The consolidated condensed financial statements included herein have been
prepared by American Home Products Corporation (the "Company"), without audit,
pursuant to the rules and regulations of the Securities and Exchange Commission.
Certain information and footnote disclosures normally included in financial
statements prepared in accordance with accounting principles generally accepted
in the United States have been condensed or omitted pursuant to such rules and
regulations; however, the Company believes that the disclosures are adequate to
make the information presented not misleading. In the opinion of management, the
consolidated condensed financial statements include all adjustments necessary to
present fairly the financial position of the Company as of September 30, 2001
and December 31, 2000, and the results of its operations, changes in
stockholders' equity and cash flows for the three months and nine months ended
September 30, 2001 and 2000. It is suggested that these consolidated condensed
financial statements and management's discussion and analysis of financial
condition and results of operations be read in conjunction with the financial
statements and the notes thereto included in the Company's 2000 Annual Report on
Form 10-K and Quarterly Reports on Form 10-Q for the quarters ended March 31,
2001 and June 30, 2001.

In the 2000 fourth quarter, the Company sold a portion of its ownership in
Immunex Corporation (Immunex) common stock, which reduced the Company's
ownership interest below 50%. As a result, the financial results of Immunex,
which previously were consolidated in the financial results of the Company, were
deconsolidated and included in the financial results of the Company on an equity
basis retroactive to January 1, 2000. Accordingly, alliance revenue relating to
co-promotion agreements between the Company and Immunex was included in
pharmaceutical net revenue for both the 2001 and 2000 third quarters and first
nine months. The 2000 third quarter and first nine months financial results were
restated to reflect the deconsolidation of Immunex, which had no effect on
income from continuing operations.

As of January 1, 2001, the Company early adopted new authoritative accounting
guidance reflecting certain rebates and sales incentives (i.e., coupons and
other rebate programs) as reductions of revenues instead of selling and
marketing expenses. Financial information for all prior periods presented has
been reclassified to comply with the income statement classification
requirements of the new guidance.

2

# EXHIBIT J

# REDACTED

# EXHIBIT K

