## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX RHODE ISLAND CORPORATION,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>ARIAD PHARMACEUTICALS, INC., and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,<br><br>　　　　　Defendants. | **PUBLIC VERSION**<br><br><br>C.A. No. 06-259-MPT |
| ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,<br><br>　　　　　Counterclaim- Plaintiffs,<br><br>　　v.<br><br>AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION, and WYETH,<br><br>　　　　　Counterclaim-Defendants. | |

### COUNTERCLAIM-PLAINTIFFS ARIAD'S AND THE INSTITUTIONS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO WYETH'S MOTION TO SEVER AND STAY

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone: (302) 654-1888

*Counsel for ARIAD Pharmaceuticals, Inc.,*
*Massachusetts Institute of Technology, President &*
*Fellows of Harvard College, Whitehead Institute for*
*Biomedical Research*

*Of Counsel:*

Morgan Chu
David I. Gindler
Elizabeth L. Rosenblatt
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Telephone:  (310) 277-1010

Dated: June 18, 2007
181625.1

<u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   INTRODUCTION ...................................................................................1

II.  BACKGROUND .....................................................................................3

    A.   The Main Allegations In This Case Relate To Enbrel ............................3

    B.   Wyeth Is An Equal Participant In The Enbrel Enterprise ......................3

        1.   The Promotion Agreement ...................................................3

        2.   The Collaboration and Global Supply Agreement ......................7

    C.   Wyeth Has Been Involved With Enbrel Since 1993 ...............................8

III. ARGUMENT .......................................................................................10

    A.   A Severance Is Neither Warranted Nor In The Interests Of Justice ..............................................................................................10

        1.   The Claims Against Wyeth And Amgen Are Not Significantly Different, But Rather Overlap And Should Be Tried Together ..................................................11

        2.   ARIAD Would Be Greatly Prejudiced By a Severance ...............................................................................12

        3.   Wyeth Cannot Show Prejudice ...........................................14

    B.   The Claim Against Wyeth Is Not "Peripheral" ....................................16

    C.   Wyeth's Position Regarding Whether To Consent To The Jurisdiction Of the Magistrate Judge Is Of No Moment .....................17

    D.   The Court Should Not Grant a Stay .....................................................19

IV.  CONCLUSION ....................................................................................19

<u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*A&E Prods. Group L.P. v. The Accessory Corp.*,
    2002 WL 1041321 (S.D.N.Y. 2002) ................................................................ 11, 13

*Corry v. CFM Majestic, Inc.*,
    16 F. Supp. 2d 660 (E.D. Va. 1998) ................................................................ 16, 17

*German v. Fed. Home Loan Mortgage Corp.*,
    896 F. Supp. 1385 (S.D.N.Y. 1995) ...................................................................... 11

*Guess v. Chenault*,
    108 F.R.D. 446 (N.D. Ind. 1985) .......................................................................... 18

*Hatfield v. Herz*,
    9 F. Supp. 2d 368 (S.D.N.Y. 1998) ...................................................................... 11

*Jeanty v. County of Orange*,
    379 F. Supp. 2d 533 (S.D.N.Y. 2005) ................................................................... 11

*Koh v. Microtek Int'l*,
    250 F. Supp. 2d 627 (E.D. Va. 2003) ................................................................ 16, 17

*Magnavox Co. v. APF Electronics, Inc.*
    496 F. Supp. 29 (N.D. Ill. 1980) ........................................................................... 17

*Miller v. American Bonding Co.*,
    257 U.S. 304 (1921) ............................................................................................... 11

*Neomagic Corp. v. Trident Microsystems, Inc.*,
    2001 WL 1064812 (D. Del. 2001) ......................................................................... 19

*Remcor Prods. Co. v. Servend Int'l, Inc.*,
    1994 WL 594723 (N.D. Ill. 1994) ......................................................................... 12

<u>Statutes</u>

11 U.S.C. § 362 ............................................................................................................. 18

35 U.S.C. § 271(b) ........................................................................................................ 12

<u>Rules</u>

Fed. R. Civ. P. 21 ..................................................................................................... 10, 14

## I.    INTRODUCTION

When ARIAD and the Institutions timely filed their affirmative counterclaims for infringement of the '516 patent, ARIAD asserted those claims against both Amgen and Wyeth, the companies jointly responsible for the manufacture, marketing and sale of Enbrel.[1]  Wyeth was named as a defendant because it is a key player in the infringing activities relating to Enbrel.[2]  In fact, Wyeth's involvement with Enbrel runs deep and long, even longer than Amgen's.  Since 1993, Wyeth has collaborated with Immunex (Amgen's predecessor and now wholly-owned subsidiary) on the research, development, and manufacturing of the product.  Indeed, from 1992 through 2000, Wyeth actually controlled Immunex as a majority-owned subsidiary.  Today, Wyeth manufactures Enbrel, bears primary responsibility for marketing and promoting the product, and shares approximately half of the gross profits.  The 2001 "Promotion Agreement" Wyeth lodged with the Court, as well as other agreements not provided, make clear that Amgen and Wyeth are partners with respect to the Enbrel enterprise.  Underscoring this fact is that Wyeth's name is right on the box, in equal prominence and size to that of Amgen.

**AMGEN   Wyeth**
Manufactured by Immunex Corporation, Thousand Oaks, CA 91320
U.S. License No. 1132
Marketed by Amgen and Wyeth Pharmaceuticals

Although Wyeth is in the thick of the alleged infringement, Wyeth has moved to sever the claims against it based on the erroneous premise that it is a "peripheral party." Wyeth is anything but peripheral.  Amgen's 2006 10K states how "the Company [Amgen]

---

[1] Wyeth was formerly known as American Home Products ("AHP").  AHP had subsidiaries and divisions known as American Cyanamid, Wyeth-Ayerst Laboratories and Wyeth Pharmaceuticals.  In 2002, American Home Products adopted the name Wyeth.

[2] Wyeth suggests that ARIAD and the Institutions have overreached by accusing Wyeth of infringing with respect to Kineret, a product with which Wyeth has no involvement.  Wyeth has not paid attention to the pleadings.  Contrary to Wyeth's incorrect statements at page 4 of its motion, ARIAD's and the Institutions' counterclaim does not accuse Wyeth of infringement with regard to Kineret.  The allegations for Kineret are directed only at the Amgen Entities.  *Compare* D.I. 185 at ¶ 17 (alleging Amgen and Wyeth both infringe with respect to Enbrel) *with* ¶ 18 (alleging only the Amgen Entities infringe with respect to Kineret).

and Wyeth market and sell ENBREL in the United States and Canada." Under the 2001 Promotion Agreement, Amgen and Wyeth *jointly* control the commercialization of Enbrel in the United States through an "Enbrel Management Committee" comprised of an equal number of representatives from Amgen and Wyeth. Wyeth tries to distance itself from the sale of Enbrel, but it is Wyeth's sales force that actively markets and promotes the product to the physicians who prescribe it. Moreover, both Amgen and Wyeth manufacture the infringing drug and the companies share the total bulk supply of Enbrel under a "Collaboration and Global Supply Agreement" – mentioned nowhere in Wyeth's motion – which allows them to purchase product from each other to ensure a sufficient global supply. Wyeth's request for a severance is simply a disguised motion to dismiss to avoid the legal consequences of its activities with regard to Enbrel.

In addition to understating its involvement with regard to Enbrel, Wyeth also has not articulated any meaningful grounds to overcome the presumption in favor of resolving ARIAD's and the Institutions' claims in a single proceeding at a single trial. Indeed, all of the factors that courts consider in deciding whether a claim should be severed show that Wyeth's motion should be denied.

The claims against Amgen and Wyeth are overlapping claims of infringement of the same patent through common and coordinated activities, not significantly different claims that readily could be litigated separately. The law, science, and much of the evidence will be the same. Wyeth also will not be prejudiced. Wyeth already contemplates producing documents and appearing for depositions, and on June 13, 2007, the Court adjusted the overall schedule for the case to accommodate its procedural posture as well as the current state of discovery. ARIAD and the Institutions, in contrast, would be seriously prejudiced in their ability to fully and fairly present their case. Wyeth is integrally involved in promoting and encouraging the use of Enbrel while aware of the ARIAD patents – important facts for establishing inducing infringement and willfulness, among other issues. ARIAD should not be put in the position of having to "try the empty

chair," only then to have to litigate its patent claims against Wyeth once again in a second case.

In short, Wyeth's request for severance does not serve the interests of justice or further the prompt resolution of case. It does exactly the opposite.

## II.    BACKGROUND

### A.    The Main Allegations In This Case Relate To Enbrel

There are two accused products in this case, Enbrel and Kineret. Enbrel belongs to both Amgen and Wyeth. Kineret is a product of Amgen alone. As a result, Amgen and Wyeth are alleged to infringe with respect to Enbrel, whereas only Amgen is alleged to infringe with respect to Kineret. *See* D.I. 185 (Counterclaims at ¶ 17 (Enbrel) & ¶ 18 (Kineret)).

The main product at issue in this case is Enbrel, a drug prescribed for rheumatoid arthritis, as well as dermatological and other inflammatory conditions. Enbrel is *highly* successful. Indeed, Wyeth's recent SEC filings describe Enbrel as "ranked ninth in global sales among all pharmaceutical products." Ex. A (Wyeth March 31, 2007 10Q at 20).[3] Sales of Enbrel are huge. For just the *three months* ended March 31, 2007, Amgen and Wyeth together reported worldwide sales of nearly $1.2 billion. Ex. A (Wyeth 10Q at 31); Ex. B (Amgen March 31, 2007 10Q at 19). Kineret sales are far lower, so much lower that they are not called out separately in public filings. Amgen's recent 10Q states that quarterly product sales for "Other" Amgen products (which must include Kineret, among others) were $16 million. Ex. B (Amgen 10Q at 19).

### B.    Wyeth Is An Equal Participant In The Enbrel Enterprise

#### 1.    The Promotion Agreement

Wyeth and Amgen are parties to number of different agreements relating to Enbrel, agreements that have been amended over the years. Wyeth lodged with the Court

---

[3] All citations in this memorandum to "Ex. ___" are references to the exhibits to the Declaration of David Gindler filed concurrently herewith.

one of these agreements, a December 16, 2001 "Amended and Restated Promotion Agreement between Immunex Corporation, American Home Products Corporation and Amgen, Inc. for the Promotion of Enbrel (TNFR:Fc) in North America" (which we refer to here as the "2001 Promotion Agreement"). Ex. C. This agreement, which restated a September 25, 1997 Promotion Agreement (the "1997 Promotion Agreement"), shows that Wyeth's role is not "tenuous" or "limited," but that Wyeth is an integral player with equal responsibilities.

Under the 2001 Promotion Agreement, Wyeth and Amgen (through or with its subsidiary Immunex) agreed to jointly engage in marketing and selling activities in the United States and Canada. The 2001 Promotion Agreement explains in the first recital: "Immunex and Wyeth intend to market and sell in the Territory (as defined herein) a biological drug for rheumatoid arthritis under the trademark ENBREL™ (TNFR:Fc)." Ex. C at 1. Wyeth and Amgen then stated how they were "enter[ing] into an arrangement" whereby they "would jointly engage in tactical marketing and selling activities (as described more fully herein) to promote sales of Enbrel in the Territory under the terms and conditions set forth below." *Id.* Wyeth's participation in the commercialization of Enbrel was critical to Amgen's decision to acquire Immunex, the company with whom Wyeth had previously collaborated on Enbrel. Indeed, the 2001 Promotion Agreement itself expressly provides that Wyeth's execution of the agreement and commitment to market and promote Enbrel "was a material inducement relied upon by Amgen in entering into the Merger Agreement" with Immunex. *Id.*

Wyeth's assertion at page 4 of it motion that Amgen alone has "essential control" over Enbrel is contradicted by the 2001 Promotion Agreement itself. That agreement outlines how Wyeth and Amgen jointly manage Enbrel in the United States through an "Enbrel Management Committee (EMC)" formed "to establish the commercial policies for Enbrel in the Territory [United States and Canada]." *Id.* at 10 ¶ 3.1. Wyeth and Amgen are equally represented on the Enbrel Management Committee, which initially

consisted of three representatives of each company and is co-chaired by persons Amgen and Wyeth each appoint annually. Neither Amgen nor Wyeth alone can control the Enbrel Management Committee, whose decisions are made "by consensus (i.e., a majority of the members of the EMC)." *Id.* The enumerated responsibilities of the Enbrel Management Committee are significant – establishing an "Enbrel Brand Team consisting of equal representatives from each party; strategic planning; approval of an annual Marketing Plan; product pricing and related items . . . and such other sales and marketing activities which may be considered necessary or desirable by the EMC for the Promotion and Detailing of Enbrel in the Territory." *Id.* at ¶ 3.2. Significantly, the EMC cannot reduce the resources devoted to selling Enbrel without Amgen's or Wyeth's consent. *Id.* at ¶ 6.1(d)(1). The Parties' joint overall responsibilities for Enbrel are apparent from the shared authority of the Enbrel Management Committee.

Wyeth also tries to minimize the importance of its "promotion" and "detailing" – work Amgen relied on as a material inducement in acquiring Immunex. Wyeth would like to leave the impression that this is somehow an unimportant activity with little bearing on the case, and that Wyeth does not engage in any activity related to selling Enbrel (*see* Wyeth's Motion (D.I. 306) at 3). This is fiction. The 2001 Promotion Agreement defines "Promote," "Promotion," "Promoting," or "Promotional" as referring to "those activities and obligations other than Detailing undertaken by a Party *to encourage sales of Enbrel* . . . ." Ex. C at ¶ 1.49 (emphasis added). Likewise, "Detailing" refers to "an interactive face-to-face visit by a Party's *sales representative* with a physician . . . at his or her office, at hospitals or other locations" at which the product's use, effectiveness and characteristics are discussed "in an effort to *increase physician prescribing preferences* for Enbrel . . . ." *Id.* at ¶ 1.16 (emphasis added).

The 2001 Promotion Agreement expressly provides that the Parties "undertake **equal responsibility** for Promotion and Detailing of Enbrel in the Territory" and "shall have **equal responsibility** for all tactical marketing and selling activities relating to

Enbrel in the Territory and for any other activities approved from time to time by the EMC." *Id.* ¶ 4.1 (emphasis added).[4]    Although Enbrel sales in the United States are booked on Amgen's accounts (through Immunex[5]) for accounting purposes, Wyeth has "primary tactical execution responsibility with respect to marketing activities" to physicians, as well as "all core sales training materials," and shares in the gross profits. *Id.* at ¶ 4.2(b) & (c).    Under the contract, it is required that Wyeth's name appear "in positions of equivalent prominence and frequency" for all Enbrel Promotional Materials. *Id.* at ¶ 7.2(a).

While Wyeth tries to cast doubt on the importance of its activities, there is no doubt *to Amgen* that Wyeth is vital.   Amgen's 2006 10K explains:

> Under a co-promotion agreement, the Company [Amgen] and Wyeth market and sell ENBREL in the United States and Canada.   A management committee comprised of an equal number of representatives from us and Wyeth is responsible for overseeing the marketing and sales of ENBREL, including strategic planning, the approval of an annual marketing plan, product pricing and the establishment of a brand team.   The brand team, with equal representation from us and Wyeth, prepares and implements the annual marketing plan, which includes a minimum level of financing and sales personnel commitment from each party, and is responsible for all sales activities.   If Wyeth fails to market ENBREL effectively or if the Company and Wyeth fail to coordinate our efforts effectively, our sales of ENBREL may be adversely affected materially.

Ex. D (Amgen 2006 10K at 44).

Wyeth also has a say in connection with regulatory filings for Enbrel, as well as litigation.   For example, Immunex or its agent, "in consultation with Wyeth," shall prepare and file all regulatory documentation. Ex. C at ¶ 5.3   Wyeth must be given an opportunity to review and comment on any regulatory filings prior to their submission, and Amgen expressly agreed "to give good faith and due consideration to all comments

---

[4] Amgen, however, has exclusive responsibility for Promotion and Detailing for all oncology indications.

[5] Immunex, the company that originally participated with Wyeth in the development of Enbrel, was acquired by Amgen in 2001.   It is now "a wholly owned subsidiary of Amgen." Exhibit C at 1.

submitted by Wyeth and shall not unreasonably refuse to revise such documents to address such comments." *Id.* Wyeth also must be given the opportunity to participate in meetings or discussions with the FDA or other regulatory authorities. *Id.* at ¶ 5.3(b). In the event of litigation, Amgen may control the defense, but subject to Wyeth's ability to be represented by its own counsel and the understanding "that the Parties shall at all times endeavor to cooperate and develop a consensus on the strategy and management of such defense" of litigation. *Id.* at ¶ 11.4(c).

These and other provisions confirm that Wyeth and Amgen have a tightly interconnected relationship regarding the sale of Enbrel.

### 2.    The Collaboration and Global Supply Agreement

Amgen and Wyeth also both manufacture Enbrel, collaborate on its supply, and have the ability to purchase product *from each other* to satisfy the tremendous demand. Enbrel is manufactured at various facilities, including a facility in Rhode Island, which Wyeth sold to Immunex; a plant Wyeth built in Ireland; facilities at Boehringer Ingelheim Pharma in Germany; among other locations. Amgen's 2006 10K describes the need for several sources of supply: "Commercial quantities of ENBREL produced at our Rhode Island facilities are insufficient to fill the current level of demand for this product." Ex. D (Amgen 2006 10K at 19). Amgen and Wyeth therefore have a "global supply agreement related to the manufacture, supply, inventory and allocation of bulk supplies of ENBREL." *Id.*

Specifically, in November 2001, the Parties entered into a "Collaboration and Global Supply Agreement By and Between Immunex Corporation and American Home Products Corporation acting through its Wyeth-Ayerst Pharmaceuticals Division." Ex. E. This agreement explains that "[t]he purpose of the Collaboration is for the Parties to allocate and manage in a collaborative manner the manufacture and supply of Product [Enbrel]." *Id.* at ¶ 2.1. "Under this agreement, the Company and Wyeth share the total worldwide bulk supply of ENBREL produced by Amgen's Rhode Island manufacturing

facilities, BI Pharma's manufacturing facility in Germany and Wyeth's manufacturing facility in Ireland." Ex. D (Amgen 2006 10K at 19, 22 & 41).[6]

The Global Supply Agreement is another agreement reflecting Amgen's and Wyeth's joint control over the supply and allocation of Enbrel. Just as the 2001 Promotion Agreement established the Enbrel Management Committee for matters relating to the commercialization of Enbrel, the Collaboration and Global Supply Agreement established a "Joint Steering Committee" to manage the Collaboration on manufacturing and supply. Ex. E at ¶ 3.1. This committee, as its name broadcasts, is "joint" and is made up of two senior executives from each of Amgen and Wyeth. The chairperson alternates annually between someone from Immunex and Wyeth. *Id.* The Joint Steering Committee's responsibilities are to allocate supplies of the drug, to avoid shortages, and consider "Five Year Plan" proposals from both parties. *Id.* at ¶¶ 3.2, 4.2; *see also id.* at ¶ 5 ("Product Allocation During Supply Shortage").

To ensure a stable supply of Enbrel, the Global Supply Agreement provides that the parties may purchase product from each other. In fact, "the Parties shall purchase Product from each other in the quantities specified in the Five-Year Plan" as set forth in the agreement. *Id.* at ¶ 4.5. The agreement contemplates Wyeth buying Enbrel manufactured at the Rhode Island facility from Immunex, and Immunex buying Enbrel manufactured elsewhere from Wyeth. *Id.* at ¶ 4.5. ARIAD and the Institutions expect these matters to be an important subject of discovery.

C.    **Wyeth Has Been Involved With Enbrel Since 1993**

Wyeth is no "johnny-come-lately" to the development, commercialization, and manufacturing of Enbrel—which Wyeth has described in its SEC filings as the ninth leading pharmaceutical product in the world. With sales of over $1 billion per quarter, Enbrel is obviously a very important product to Wyeth. And it has been for some time.

---

[6] Amgen's 2004 10K explained how "Wyeth is constructing a new manufacturing facility in Ireland, which is expected to increase the U.S. and Canadian supply of ENBREL." Ex. F (Amgen 2004 10K at 46).

- 8 -

Wyeth's involvement with the product began in 1993 when Wyeth (through predecessor entities) entered into a research and development agreement with Immunex to collaborate in oncology research and obtain a license rights to "TNFR" (as Enbrel is sometimes called). *See* Ex. G at 1. Wyeth's involvement with Immunex extended beyond a research agreement. In December 1992, Wyeth's predecessor American Cyanamid actually acquired a controlling ownership interest in Immunex by purchasing 53.5% of Immunex's stock. Ex. H at 94, 96. Wyeth held a controlling interest in Immunex until the fourth quarter of 2000, after Immunex had gone public. At that time, Wyeth sold off a portion of its ownership of Immunex common stock, which reduced Wyeth's ownership interest below 50%. Ex. I (Wyeth November 14, 2001 10Q at 2). In late 2001, Wyeth sold the remainder of its interest in Immunex to Amgen, when Amgen acquired Immunex and made it a wholly-owned subsidiary.

Wyeth's early work with regard to Enbrel continued in 1996, when Immunex and Wyeth entered into a "TNFR License and Development Agreement" in which they agreed to collaborate with regard to Enbrel for the treatment of rheumatoid arthritis and other diseases. Ex. G. Under the 1996 agreement, the parties agreed that Immunex would have certain rights to market and sell Enbrel in the United States and Canada, and Wyeth would have certain rights to market and sell Enbrel in all other countries. *Id.* In September 1997, the parties entered into a Promotion Agreement (the "1997 Promotion Agreement") under which the parties first established the Enbrel Management Committee to establish the commercial policies for Enbrel. Immunex also appointed Wyeth "to undertake Promotion and Detailing of Enbrel in the Territory." Ex. J (1997 Promotion Agreement at ¶ 4.1). Accordingly, Wyeth assumed responsibilities for marketing and promotion of Enbrel in the United States and Canada, having "responsibility for all tactical marketing and selling activities relating to Enbrel in the Territory and for any other activities approved from time to time by the EMC." Ex. J at ¶ 4.2(a).

As the majority owner of Immunex, Wyeth also was involved in the process of obtaining regulatory approval for Enbrel. Under the 1997 Promotion Agreement, Immunex agreed to seek approval from the FDA and its Canadian equivalent, while Wyeth promised to lobby for Medicare and Medicaid coverage. Ex. J at 12-13, 20. Commercial expenses were to be divided, with Immunex funding development expenses. *Id.* at 23-24. In addition, Wyeth agreed to pay Immunex a series of bonuses at certain milestones in the approval process ($15 million on signing of the agreement; $20 million on submission to FDA, $30 million on FDA approval, $15 million for additional FDA certification, and $10 million bonuses for reaching certain sales amounts). *Id.* at 29-30. Immunex, in turn, would pay Wyeth a percentage of gross profits. *Id.* at 30. Wyeth and Immunex also agreed to share potential patent expenses, including expenses for patent litigation. *Id.* at 36-37.

Wyeth (itself or through its predecessor American Home Products) thus has been involved in the marketing of Enbrel from the beginning, and now has significant responsibility for manufacturing and marketing the drug.

## III. ARGUMENT

This is not a case where it is appropriate to invoke the unusual procedure of severance. There is no question that Wyeth was properly joined as a counterclaim-defendant. Wyeth has had a long history with Enbrel and is an active participant with Amgen in the infringement of the '516 patent. ARIAD and the Institutions asserted their infringement claims against Wyeth at the same time as they asserted the claims against Amgen, and it would be severely prejudicial for these overlapping claims not to proceed at the same time on the same schedule.

### A.    A Severance Is Neither Warranted Nor In The Interests Of Justice

Rule 21 of the Federal Rules of Civil Procedure provides that "[a]ny claim against a party may be severed and proceeded with separately." Fed. R. Civ. P. 21. But district

courts examining whether severance is appropriate in a particular case have noted that "the presumption is that all claims in a case will be resolved in a single trial, and 'it is only in exceptional circumstances where there are special and persuasive reasons for departing from this practice that distinct causes of action asserted in the same case may be made the subject of separate trials.'" *Jeanty v. County of Orange*, 379 F. Supp. 2d 533, 549 (S.D.N.Y. 2005) (quoting, among others, *Miller v. American Bonding Co.*, 257 U.S. 304, 308 (1921)) (denying defendants' motion for severance). Severance thus has been described as a "procedural device to be employed only in exceptional circumstances.'" *A&E Products Group L.P. v. The Accessory Corp.*, 2002 WL 1041321, *2 (S.D.N.Y. 2002) (quoting *Hatfield v. Herz*, 9 F. Supp. 2d 368, 373 (S.D.N.Y. 1998)) (denying motion to sever patent claims from antitrust counterclaims). This case is not one of those with exceptional circumstances.

In deciding whether to grant a severance,

> courts generally consider (1) whether the issues sought to be tried separately are significantly different from one another, (2) whether the separable issues require the testimony of different witnesses and different documentary proof, (3) whether the party opposing the severance will be prejudiced if it is granted and (4) whether the party requesting the severance will be prejudiced if it is not granted.

*German v. Fed. Home Loan Mortgage Corp.*, 896 F. Supp. 1385, 1400 (S.D.N.Y. 1995) (denying severance). An examination of each of these factors illuminates that it is not in the interests of justice to sever claims against Wyeth.

## 1.    The Claims Against Wyeth And Amgen Are Not Significantly Different, But Rather Overlap And Should Be Tried Together

Wyeth does not argue that the claims should be severed because they are unrelated. Nor could it do so. The claims against Wyeth and Amgen for infringing the

'516 patent arise out of their joint activities with regard to the manufacture, promotion and sale of Enbrel. While the claims at issue here involve the same patent, courts have declined to sever claims involving different patents when they concern related subject matter. *See Remcor Prods. Co. v. Servend Int'l, Inc.*, 1994 WL 594723, at *2 (N.D. Ill. 1994) (declining to sever counterclaim for infringement of different patent; "[w]hile the patents at issue in Remcor's claim and SerVend's counterclaim are clearly different, both claims involve the same issue—the similarity of the ice/beverage dispensers").

Wyeth also has not argued that there is a difference in the expected evidence or testimony that cuts in favor of severance. Given the close connection between Wyeth and Amgen regarding the management of Enbrel through the jointly-staffed Enbrel Management Committee, the Enbrel Brand Team, and Joint Steering Committee, there is likely to be a substantial overlap in evidence and testimony. Moreover, evidence about the '516 patent, the accused product, and the science will undoubtedly overlap, if not be substantially identical. The first two factors thus strongly cut against severance.

### 2.    ARIAD Would Be Greatly Prejudiced By a Severance

Wyeth briefly argues that ARIAD would not be prejudiced if Wyeth is severed. This is not a serious argument.

Severing out claims against Wyeth drastically undermines ARIAD's ability to fully and fairly present its case for infringement of the '516 patent. Wyeth is a classic joint tortfeasor with Amgen. Wyeth manufactures Enbrel, shares worldwide supply with Amgen through a detailed Collaboration and Global Supply Agreement, participates with Amgen in the management and strategic planning for the product, and has a substantial sales force actively marketing and promoting Enbrel to generate huge dollars in sales. Wyeth also was deeply involved in the development of Enbrel, and was involved before even Amgen. Wyeth's conduct and knowledge of the '516 patent bears directly on infringement under 35 U.S.C. § 271(b) (active inducement), as well as willfulness and other issues. ARIAD needs the opportunity to develop and present its case fully against

- 12 -

both defendants concurrently in the same proceeding. Devising a procedural scenario whereby Wyeth is not a party in effect forces ARIAD to try its case against the "empty chair." Given that Wyeth is a party to this case and has been properly joined as a counterclaim defendant with respect to claims asserted against Amgen and Wyeth at the same time in the same pleading, it would make no sense to require ARIAD to try separately the claims against Amgen and Wyeth.

In addition, ARIAD also would face the obvious prejudice of having to litigate these matters twice, once against Amgen and again against Wyeth. *See A&E Prods. Group L.P.* 2002 WL 1041321, at *1 ("Severed claims become independent actions and judgment is entered upon them independently."). Wyeth tries to downplay the prejudice to ARIAD by suggesting that a second case may be unnecessary. However, neither Wyeth nor Amgen has acknowledged that they are responsible for the infringing acts of the other. Wyeth's motion itself also makes clear that Wyeth is hoping to avoid any legal consequences from this case by trying to reclassify itself as a third party. *See* Wyeth's Motion at 9 ("If it remains a party, Wyeth could be potentially bound by any adverse decision reached by this Court as to the claim construction, validity, and/or enforceability of the '516 patent…"). In other words, Wyeth implicitly wants to reserve the right for a "do over" with respect to any results it does not like. Wyeth certainly has not conceded, nor left the impression, that it will not resist further proceedings if Wyeth were severed and ARIAD and the Institutions were to prevail against Amgen. Similarly, it would be no reward if enforcement of the claim against Amgen required ARIAD and the Institutions to pursue yet another complex case against a second pharmaceutical giant.

There also could be other adverse procedural ramifications if Wyeth were severed, such as procedural complications in discovery. For example, if Wyeth's participation in the case was somehow limited, ARIAD could be deprived of the ability to conduct all the discovery to which it is entitled. Discovery against an opposing party of course includes depositions by notice under Rule 30, requests for production of

documents under Rule 34, interrogatories under Rule 33, and requests for admission under Rule 36, as well as expert and other disclosures required under Rule 26 and all other related discovery. Discovery from a third party, however, is limited to that which may be obtained by subpoena. Wyeth may not use the unusual procedural device of Rule 21, which really has no application here, to transform an integral party into a third party in an effort to constrain ARIAD's ability to conduct full discovery.

Finally, Wyeth argues that its motion should be granted because Amgen is a successful corporation and should be good for any damages that might be awarded. This argument misses the point entirely. Amgen certainly has not agreed to accept responsibility for Wyeth's infringing conduct, and it is unknown what arguments Amgen may later make as to whether it must pay damages for Wyeth's conduct. In any event, the Court should not limit ARIAD's ability to develop and try its claims against a partner in the infringement just because one of them has the money to pay an adverse judgment. Wyeth has not provided any legal support for this position. Both parties are extremely important to the case. Wyeth cannot sweep away its extensive involvement in Enbrel simply because its partner in the enterprise is well-funded. ARIAD and the Institutions are entitled to investigate and pursue all remedies against Wyeth and Amgen. Wyeth argues that an injunction against the product will resolve any issues on a going forward basis, but Wyeth's argument ignores that ARIAD and the Institutions have not requested an injunction. All these points underscore that severance is not in the interests of justice.

### 3.     Wyeth Cannot Show Prejudice

While ARIAD would suffer significant prejudice if Wyeth were severed from this action, Wyeth will suffer no prejudice by the Court's denial of Wyeth's motion – certainly not the kind of prejudice ordinarily considered in reviewing a request for severance. The only point that Wyeth makes in its motion is that the schedule currently in place needs to be extended because the dates then in place would not afford Wyeth sufficient time to conduct discovery. This argument, however, has been mooted in light

of the Court's decision at the June 13, 2007 teleconference to adjust the overall schedule for the case and reset dates. ARIAD and the Institutions agree that the schedule in place was unworkable for a number of reasons. At the June 13 hearing, in light of the procedural posture of the case and the state of discovery and other matters, the Court rescheduled the trial date to November 3, 2008, and directed the parties to prepare an interim schedule based on this revised date. Wyeth thus has ample time to participate in full discovery with Amgen and the other parties.

Moreover, the Promotion Agreement provides that in the event of litigation regarding Enbrel, Wyeth and Amgen "shall at all times endeavor to cooperate and develop a consensus on the strategy and management of such defense" of litigation. *Id.* at ¶ 11.4(c). It thus is likely that Wyeth has already been involved in the litigation, at least behind the scenes before ARIAD's and the Institutions' infringement counterclaim was asserted formally against Amgen and Wyeth in April 2007. Indeed, Wyeth (unremarkably) was named as a defendant in a previous patent lawsuit involving Enbrel. *See Israel Bio-Engineering Project v. Amgen Inc., Immunex Corporation, Wyeth and Wyeth Pharmaceuticals, Inc.*, United States District Court for the Central District of California, Case No. 02-CV-6860, *aff'd*, 475 F.3d 1256 (Fed. Cir. 2007). Wyeth also specifically noted in its 2006 10K that "Under its agreement with Amgen for the promotion of *Enbrel*, the Company has an obligation to pay a portion of any patent litigation expenses related to *Enbrel* in the United States and Canada as well as a portion of any damages or other monetary relief awarded in such patent litigation." Ex. D (Wyeth 2006 10K at 47).

Wyeth's claim of prejudice also is belied by its agreement to allow at least some discovery "as if served by subpoena" and to submit to the Court's jurisdiction to hear all discovery disputes. (Wyeth Motion at 10.) This is not much of a concession given that Wyeth is a Delaware corporation that is already subject to the Court's jurisdiction for purposes of the subpoena power and resolving discovery disputes. In any event, Wyeth

knows that it will need to participate in discovery in the case and it is not "prejudice" for a proper and integral party to a lawsuit to respond to discovery.

Wyeth also suggests that it "could be potentially bound by any adverse decision reached by this Court as to the claim construction, validity and/or enforceability of the '516 patent if Ariad were to assert infringement by products that Wyeth sells in the United States or will sell in the future." (Wyeth Motion at 9). Adverse consequences from being on the losing end of a lawsuit, however, is not the kind of prejudice that can justify a severance. All this shows is that Wyeth's motion is really a disguised motion to dismiss or other creative vehicle to try to avoid dealing with the allegations that have been duly made.

## B.　The Claim Against Wyeth Is Not "Peripheral"

Rather than provide any meaningful explanation as to how the factors to be considered support severing the infringement claim against it, Wyeth takes refuge in the conclusory assertion that it is a "peripheral" party. As outlined at length above, Wyeth's position is contradicted by the litany of agreements between Amgen and Wyeth outlining Wyeth's joint control over Enbrel.

Further, Wyeth relies on cases that involved entirely different circumstances. In particular, Wyeth cites *Koh v. Microtek Int'l*, 250 F. Supp. 2d 627, 632 (E.D. Va. 2003) and *Corry v. CFM Majestic, Inc.*, 16 F. Supp. 2d 660, 666 (E.D. Va. 1998)). Both of these cases are inapposite. As Wyeth acknowledges, *Koh* and *Corry* both relate to severance in the context of motions to transfer, an issue not at all present here. (Wyeth Motion at 6). In any event, both cases involved the different situation when secondary claims were asserted against "resellers." *Koh* involved a claim against an entity that "owns and operates one store, . . . which is responsible for a small number of [allegedly infringing] sales." The Court found the allegations against this party peripheral to the central issues in the action against the main defendant. *Koh*, 250 F. Supp. 2d at 632. Similarly, *Corry* involved a "distributor [who] (i) was only secondarily involved, (ii) did

*not* manufacture the alleged infringing device and (iii) would be liable only if the main defendant was found to be infringing the patent." *Corry*, 16 F. Supp. 2d at 666 (emphasis added). Significantly, the distributor seeking severance also *stipulated* to be bound by the result of the transferred claims against the main defendant. *Id.* at 665 n. 9.

In contrast, Wyeth is not a reseller. It is deeply involved in both the manufacture and sale of Enbrel. Wyeth has been selling Enbrel throughout the world, and has a vital role in marketing the product in the United States with its sales force. Unlike the non-manufacturing distributors in *Koh* and *Corry*, Wyeth also manufactures Enbrel, and Wyeth's agreements with Amgen clearly contemplate sales between Wyeth and Amgen to ensure an adequate global supply of the product. Far from being "peripheral," the claim against it is as central to this case as the claim against Amgen. *See Magnavox Co. v. APF Electronics, Inc.* 496 F. Supp. 29, 35 (N.D. Ill. 1980) (large distributor not peripheral, severance denied).

### C. Wyeth's Position Regarding Whether To Consent To The Jurisdiction Of the Magistrate Judge Is Of No Moment

Wyeth suggests that it should be severed because it currently does not consent to a trial before the Magistrate Judge, whereas the other parties have so consented. (Wyeth Motion at 5-6). While Wyeth is free to make its own determination as to whether to consent to the jurisdiction of this Court for trial and dispositive motions, this should have no impact on its status as a party to the case.

Wyeth tries to manufacture the rule of law that its decision on consent should trump all other considerations on the severance inquiry. This argument first ignores the framework courts have outlined to evaluate severance motions. As explained above in this memorandum, courts have enumerated the general considerations to be taken into account in deciding whether severance is appropriate. These include the nature of the claims at issue, the overlap in evidence, and prejudice to the moving and non-moving

parties. Whether a party consents to the jurisdiction of a United States Magistrate Judge is not one of the factors.

Second, Wyeth's argument proves too much. Wyeth appears to argue that a party can escape its obligations to participate in a lawsuit already underway simply because it declines to consent to a Magistrate Judge who is already presiding over the action with the consent of the other parties. This is not the law. The paucity of legal support for Wyeth's position is evident from its incomplete description of *Guess v. Chenault*, 108 F.R.D. 446, 448 (N.D. Ind. 1985), on which Wyeth relies. That case does not stand for the proposition that a non-consenting defendant should be severed simply because he withholds consent. A review of the facts of the case makes this clear. The plaintiff, Mr. Guess, suffered injuries in an automobile accident and sued the other driver, Mr. Chenault, and Spector Freight Lines (presumably the driver's employer). Spector Freight lines filed for bankruptcy after the case was filed, resulting in the automatic stay of the action pursuant to 11 U.S.C. § 362. Three years after all parties consented to the jurisdiction of the Magistrate Judge, the plaintiff sought to amend his complaint to substitute an insurance company for the bankrupt Spector Freight Lines. The insurance company declined to consent to the Magistrate Judge. The Court, however, concluded that a further delay would be contrary to the interests of justice, and that it would not be prejudicial or unfair to proceed to trial on the claim between the two drivers. 108 F.R.D. at 449. The court then severed the claim against the insurance company, concluding that if the plaintiff were to win against the driver, he could seek to enforce the judgment against the insurance company, which could then raise any defenses it might have under the insurance policy. *Id.* at 450. The unusual circumstances of that case are not even remotely comparable to this case.

Second, given the procedural posture of the case, whether or not Wyeth wishes to consent is immaterial. In addition to the relatively early stage of discovery, this Court may preside over this case for all pretrial purposes (other than dispositive motions) no

matter what Wyeth decides. If Wyeth declines consent, the solution is for the case to be reassigned for dispositive motions and trial, not sliced up in a manner that is prejudicial to ARIAD's ability to present its case fully and fairly.

### D.    The Court Should Not Grant a Stay

Wyeth also argues for a stay. (Wyeth Motion at 10) In ruling on a motion for a stay, "a district court weighs the possible damage, hardship, and inequities to the parties to the lawsuit against the possibility that a stay will conserve resources and simplify the issues in question and the trial of the case." *Neomagic Corp. v. Trident Microsystems, Inc.*, 2001 WL 1064812, at *2 (D. Del. 2001) (holding that the reasons supporting a previously granted stay were no longer applicable, and lifting the stay).

Here, there is no possibility that a stay would "conserve resources" or "simplify the issues in question and the trial of the case." *Id.* Far from "conserv[ing] resources," requiring ARIAD to sue Wyeth separately would waste the resources of both the parties and the Court. *Id.* And, since the claims against Wyeth are so related to the claims against Amgen, it is difficult to see how holding two trials instead of one could "simplify" it. *Id.* In addition, the "damage, hardship, and inequit[y]" imposed on ARIAD would be considerable. As noted above, ARIAD is a small pharmaceutical company and has limited resources. Compared to ARIAD, companies like Amgen and Wyeth have basically limitless resources to litigate complex patent actions. The Court should not compound this disparity by forcing ARIAD to litigate the action twice.

Finally, in the absence of a severance, there is simply no reason for a stay. A new pre-trial schedule will be in place shortly. The revised schedule will easily give Wyeth the chance to participate fully in discovery and other pre-trial proceedings. There is no need for a stay.

## IV.    CONCLUSION

There is no cause to sever and stay the claims against Wyeth. Those claims were brought at the same time as those against Amgen, they are integrally related with each

other, and should proceed pursuant to the schedule in place for the action. ARIAD and

the Institutions respectfully requests that the Court deny Wyeth's motion.

ASHBY & GEDDES

*/s/ Lauren E. Maguire*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone: (302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Counsel for ARIAD Pharmaceuticals, Inc.,*
*Massachusetts Institute of Technology,*
*President & Fellows of Harvard College,*
*Whitehead Institute for Biomedical Research*

*Of Counsel:*

Morgan Chu
David I. Gindler
Elizabeth L. Rosenblatt
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Telephone: (310) 277-1010

Dated: June 18, 2007
181625.1