# YOUNG CONAWAY STARGATT & TAYLOR, LLP

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

MELANIE K. SHARP
DIRECT DIAL: (302) 571-6681
DIRECT FAX:   (302) 576-3333
msharp@ycst.com

P.O. BOX 391
WILMINGTON, DELAWARE 19899-0391

(302) 571-6600
(302) 571-1253 FAX
(800) 253-2234 (DE ONLY)
www.youngconaway.com

August 10, 2007

**BY E-FILE**
The Honorable Mary Pat Thynge
United States District Court of Delaware
844 North King Street
Wilmington, DE 19801

            Re:    *Amgen, Inc. et al.  v. ARIAD Pharmaceuticals, Inc.*
                   C. A. No.: 06-259 (MPT)

Dear Judge Thynge:

        I write in response to Your Honor's request, during the August 3, 2007 telephonic discovery conference, that Amgen provide authority on the narrow legal question of whether a court can consider the totality of the circumstances, and more specifically pre-suit activities and knowledge of the party seeking amendment, for purposes of assessing "undue delay" in the context of a motion for leave to amend.[1]  As the attached authorities confirm, courts can and frequently do consider the pre-suit activities and knowledge of the party seeking amendment in determining whether a delay in seeking to amend was "undue" or not.

        The following cases are attached:

        1.  *In re Adams Golf, Inc. Securities Litigation*, 381 F.3d 267, 280 (3rd Cir. 2004) ("The concept of 'undue delay' includes consideration of whether new information came to light or was available earlier to the moving party"; court affirmed that denial of amendment was not an abuse of discretion where plaintiffs had knowledge of facts such that they "could have included them in their original complaint.").

        2.  *Samick Music Corp. v. Delaware Music Indus., Inc.*, 1992 WL 39052 at *7 (D. Del., Feb. 12, 1992) (denying amended counterclaim based on undue delay because of defendants' knowledge of facts underlying the proposed counterclaim before the original action was commenced).

        3.  *Palmer v. Champion Mortgage*, 465 F.3d 24, 30-31 (1st Cir. 2006) ("In short, a request to amend -- especially a belated request -- requires the court to examine the totality of the circumstances and to exercise its informed discretion in constructing a balance of pertinent considerations"; court affirmed rejection of amendment based on totality circumstances,

---

[1]  The Court will recall that it sought law on this question in light of the facts indicating that ARIAD did have the necessary knowledge of Amgen's alleged infringement of the assay patents, and in fact accused Amgen's research and development activities of infringing these patents in February 2001. These facts, in light of the attached law illustrating that these facts can and should be considered by this Court, confirm that ARIAD's delay in seeking amendment was undue and, for this reason and others briefed and argued, leave to amend should be denied.

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Mary Pat Thynge
August 10, 2007
Page 2

including fact that "plaintiff was aware of the factual predicate on which her new theory rested before she brought suit.")

   4. *Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F. 1510, 1517-18 (1st Cir. 1989) ("A party's belated attempt to revise its pleadings requires that a court examine the totality of the circumstances and exercise sound discretion in light of the pertinent balance of equitable considerations"; court denied amendment because "[t]he facts upon which the proposed counterclaim rested were known to defendant all along").

   5. *Elite Entertainment, Inc. v. Khela Bros. Entertainment*, 227 FRD 444, 447 (E.D. Va. 2005) (denying amended counterclaim where defendants "easily could have brought claims ... in their first counterclaim, or sought leave to amend long before this late date"; court rejected argument that defendants had uncovered new factual support during discovery to justify delay, finding that defendants had all necessary knowledge to assert claim at the outset of the litigation).

   6. *McCarthy v. Painewebber, Inc.*, 127 FRD 130, 132-33 (N.D. Ill. 1989) (denying amendment where plaintiff "belatedly attempt[ed] to add new claims based on newly-asserted (though previously-known) facts"; although the original complaint had been filed more recently, court noted that six years had elapsed from the time the facts had occurred (and were in plaintiff's possession) and the filing of the proposed amendment).

   7. *First Savings and Loan Ins. Corp. v. Alexander*, 509 F. Supp. 834, 839 (D. Hawaii 1984) ("[I]f the amending party knew or should have known of the facts upon which the amendment is based at the time of the original pleading, then leave to amend should be denied unless there is excusable neglect or oversight"; court denied amendment because facts underlying proposed amendment "were well known to defendants when the original answers were filed").

   We have attempted to adhere to Your Honor's request that counsel simply submit authority on this narrow legal proposition in a single letter submission without extraneous argument or case law addressing other issues. Obviously, we stand ready to provide argument or additional case law if Your Honor requests.

                                          Respectfully,

                                          */s/ Melanie K. Sharp*

                                          Melanie K. Sharp (No. 2501)

cc:    Clerk of the Court (Hand Delivery)
       John G. Day, Esquire (via e-mail)
       Frederick L. Cottrell, III, Esquire (via e-mail)
       David I. Gindler, Esquire (via e-mail)
       Charles E. Lipsey, Esquire (via e-mail)

# EXHIBIT 1

▷
In re Adams Golf, Inc. Securities Litigation
C.A.3 (Del.),2004.

United States Court of Appeals,Third Circuit.
In re:  ADAMS GOLF, INC. SECURITIES
LITIGATION
F. Kenneth Shockley, M.D.;  David Shockley;  Todd
Tonore;  Zane Bianacci;  Patricia Craus;  Terry
Linville;  Larry Price;  Federated National Insurance
Company, on behalf of all others similarly situated,
Appellants.
No. 03-3945.

Argued May 25, 2004.
Filed Aug. 25, 2004.

**Background:**  Shareholders, as representatives of
uncertified class, sued manufacturer of golf clubs and
individual officers and directors thereof, and lead
underwriters for manufacturer's initial public offering
(IPO), alleging that manufacturer's registration
statement and prospectus were materially false and
misleading in violation of Securities Act. The United
States District Court for the District of Delaware,
Kent Jordan, J., granted defendants' motion to
dismiss, 176 F.Supp.2d 216. Shareholders appealed.

**Holdings:**  The Court of Appeals, Rendell, Circuit
Judge, held that:

(1) materiality of undisclosed gray market issue could
not be resolved at pleading stage;

(2) question of fact existed at pleading stage as to
whether manufacturer had duty to disclose gray
market issue;

(3) representation of prompt delivery and relatively
smaller retail inventories was not materially false or
misleading; and

(4) general, forward-looking registration statements
of manufacturer were not materially misleading.

Affirmed in part, reversed in part, and remanded.
West Headnotes
**[1] Federal Civil Procedure 170A** 🔑1831

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)5 Proceedings
                170Ak1827 Determination
                    170Ak1831 k.  Fact  Issues.  Most
Cited Cases
Materiality of undisclosed gray market issue could
not be resolved at pleading stage, on investors' claims
that corporate manufacturer of golf clubs, and
individual officers and directors thereof, and lead
underwriters for manufacturer's initial public offering
(IPO), made material misstatements or omissions in
registration  statements,  prospectuses,  and  other
solicitation  materials;  total  mix  of  information
available to reasonable investor may have been
altered by omission, that nationwide, discount retailer
had unauthorized possession of 5,000 of 235,000 of
corporation's golf clubs, in that such information may
have had significant consequences for corporation's
relationships with its authorized distributors, and
signaled trouble that might have been difficult to
overcome.  Securities Act of 1933, § 11, 12(a)(2), 15
U.S.C.A. § 77k, 77l(a)(2);  Fed.Rules Civ.Proc.Rule
12(b)(6), 28 U.S.C.A.

**[2] Securities Regulation 349B** 🔑25.21(2)

349B Securities Regulation
    349BI Federal Regulation
        349BI(B) Registration and Distribution
            349BI(B)4 Registration Statements
                349Bk25.17  False  Statements  or
Omissions;  Accuracy
                    349Bk25.21 Grounds of and Defenses
to Liability
                        349Bk25.21(2)  k.  Scienter,
Absolute or Strict Liability. Most Cited Cases

**Securities Regulation 349B** 🔑25.62(2)

349B Securities Regulation
    349BI Federal Regulation
        349BI(B) Registration and Distribution
            349BI(B)5  Prospectuses  and
Communications
                349Bk25.55  False  Statements  or
Omissions;  Accuracy
                    349Bk25.62 Grounds of and Defenses
to Liability

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

349Bk25.62(2) k. Scienter; Fault or Due Diligence. Most Cited Cases
The securities statutes prohibiting material misstatements or omissions in registration statements, prospectuses, and other solicitation materials are virtually absolute liability provisions, which do not require plaintiffs to allege that defendants possessed any scienter. Securities Act of 1933, § 11, 12(a)(2), 15 U.S.C.A. § 77k, 77l(a)(2).

**[3] Securities Regulation 349B** 🔑**60.28(11)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
              349Bk60.28 Nondisclosure; Insider Trading
                349Bk60.28(10) Matters to Be Disclosed
                  349Bk60.28(11) k. Materiality. Most Cited Cases
The standard test in securities law to determine the materiality of an omission is whether there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.

**[4] Federal Civil Procedure 170A** 🔑**1831**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)5 Proceedings
            170Ak1827 Determination
              170Ak1831 k. Fact Issues. Most Cited Cases

**Securities Regulation 349B** 🔑**25.35**

349B Securities Regulation
   349BI Federal Regulation
      349BI(B) Registration and Distribution
         349BI(B)4 Registration Statements
            349Bk25.35 k. Questions of Law or Fact; Jury Questions. Most Cited Cases

**Securities Regulation 349B** 🔑**25.75**

349B Securities Regulation
   349BI Federal Regulation

349BI(B) Registration and Distribution
      349BI(B)5 Prospectuses and Communications
         349Bk25.75 k. Questions of Law or Fact; Jury Questions. Most Cited Cases
Materiality in a securities case is ordinarily an issue left to the factfinder and is therefore not typically a matter for dismissal; only if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are not actionable as a matter of law. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[5] Securities Regulation 349B** 🔑**25.18**

349B Securities Regulation
   349BI Federal Regulation
      349BI(B) Registration and Distribution
         349BI(B)4 Registration Statements
            349Bk25.17 False Statements or Omissions; Accuracy
              349Bk25.18 k. In General. Most Cited Cases

**Securities Regulation 349B** 🔑**25.56**

349B Securities Regulation
   349BI Federal Regulation
      349BI(B) Registration and Distribution
         349BI(B)5 Prospectuses and Communications
            349Bk25.55 False Statements or Omissions; Accuracy
              349Bk25.56 k. In General. Most Cited Cases
A company's effort to manage a problem does not by itself discharge its obligation to inform investors of that problem, for the purpose of a claim that material misstatements or omissions were made in registration statements, prospectuses, and other solicitation materials. Securities Act of 1933, § 11, 12(a)(2), 15 U.S.C.A. § 77k, 77l(a)(2).

**[6] Federal Civil Procedure 170A** 🔑**1752.1**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)2 Grounds in General
            170Ak1752 Affirmative Defenses, Raising by Motion to Dismiss
              170Ak1752.1 k. In General. Most

381 F.3d 267                                                          Page 3
381 F.3d 267, Fed. Sec. L. Rep. P 92,898
**(Cite as: 381 F.3d 267)**

Cited Cases

An affirmative defense may not be used to dismiss a plaintiff's complaint. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[7] Federal Civil Procedure 170A ☞1752.1**

170A Federal Civil Procedure
   170AXI Dismissal
     170AXI(B) Involuntary Dismissal
      170AXI(B)2 Grounds in General
       170Ak1752 Affirmative Defenses, Raising by Motion to Dismiss
        170Ak1752.1 k. In General. Most Cited Cases

Defendants' negative causation theory, that lower share value did not result from any non-disclosure or false statement, was affirmative defense which could not be used at pleading stage to dismiss claim that registration statement and prospectus were misleading in failing to disclose grey market for issuer's golf equipment. Securities Act of 1933, § 11, 12(a)(2), 15 U.S.C.A. § 77k, 77l(a)(2); Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ☞1831**

170A Federal Civil Procedure
   170AXI Dismissal
     170AXI(B) Involuntary Dismissal
      170AXI(B)5 Proceedings
       170Ak1827 Determination
        170Ak1831 k. Fact Issues. Most Cited Cases

Whether failure of golf club manufacturer to disclose grey market for its clubs rendered misleading statements in its prospectus and registration statement touting its limited distribution arrangements was fact question, inappropriate for resolution on motion to dismiss for failure to state claim. Securities Act of 1933, § 11, 12(a)(2), 15 U.S.C.A. § 77k, 77l(a)(2); Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[9] Securities Regulation 349B ☞25.18**

349B Securities Regulation
   349BI Federal Regulation
     349BI(B) Registration and Distribution
      349BI(B)4 Registration Statements
       349Bk25.17 False Statements or Omissions; Accuracy
        349Bk25.18 k. In General. Most Cited Cases

**Securities Regulation 349B ☞25.56**

349B Securities Regulation
   349BI Federal Regulation
     349BI(B) Registration and Distribution
      349BI(B)5 Prospectuses and Communications
       349Bk25.55 False Statements or Omissions; Accuracy
        349Bk25.56 k. In General. Most Cited Cases

In order to make out prima facie violations of the securities statutes prohibiting material misstatements or omissions in registration statements, prospectuses, and other solicitation materials, plaintiffs must allege that an omitted material fact was required to be included by the securities laws or that its absence rendered statements in the prospectus misleading. Securities Act of 1933, § 11, 12(a)(2), 15 U.S.C.A. § 77k, 77l(a)(2).

**[10] Securities Regulation 349B ☞25.18**

349B Securities Regulation
   349BI Federal Regulation
     349BI(B) Registration and Distribution
      349BI(B)4 Registration Statements
       349Bk25.17 False Statements or Omissions; Accuracy
        349Bk25.18 k. In General. Most Cited Cases

**Securities Regulation 349B ☞25.56**

349B Securities Regulation
   349BI Federal Regulation
     349BI(B) Registration and Distribution
      349BI(B)5 Prospectuses and Communications
       349Bk25.55 False Statements or Omissions; Accuracy
        349Bk25.56 k. In General. Most Cited Cases

Representation of corporate golf club manufacturer, of prompt delivery and relatively smaller retail inventories, was not materially false or misleading, for purpose of claim that material misstatements or omissions were made in registration statements, prospectuses, and other solicitation materials, although corporation did not state that retailers generally had excess supplies of other companies' equipment; manufacturer was not duty-bound to disclose general industry-wide trends easily discernable from information already available in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

381 F.3d 267
381 F.3d 267, Fed. Sec. L. Rep. P 92,898
**(Cite as: 381 F.3d 267)**

public domain, and there was nothing contradictory or inconsistent about retailers with excess inventories in general and corporation's representation that those same retailers kept smaller inventory of corporation's clubs in particular. Securities Act of 1933, § 11, 12(a)(2), 15 U.S.C.A. § 77k, 77l(a)(2).

**[11] Securities Regulation 349B** 🗝️**25.18**

349B Securities Regulation
   349BI Federal Regulation
     349BI(B) Registration and Distribution
      349BI(B)4 Registration Statements
       349Bk25.17 False Statements or Omissions; Accuracy
        349Bk25.18 k. In General. Most Cited Cases

**Securities Regulation 349B** 🗝️**25.56**

349B Securities Regulation
   349BI Federal Regulation
     349BI(B) Registration and Distribution
      349BI(B)5 Prospectuses and Communications
       349Bk25.55 False Statements or Omissions; Accuracy
        349Bk25.56 k. In General. Most Cited Cases

General, forward-looking registration statements of corporate golf club manufacturer, that included sanguine prospects for golf industry and rising popularity of sport more generally, were not materially misleading, although manufacturer knew of retail over-supply that was affecting golf industry; vague expressions of hope by corporate managers were mitigated by discussion of several factors that could have caused poor financial results and those expressions otherwise were not actionable. Securities Act of 1933, § 11, 12(a)(2), 15 U.S.C.A. § 77k, 77l(a)(2).

**[12] Federal Civil Procedure 170A** 🗝️**851**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
     170AVII(E) Amendments
      170Ak851 k. Form and Sufficiency of Amendment. Most Cited Cases

**Federal Civil Procedure 170A** 🗝️**2651.1**

170A Federal Civil Procedure
   170AXVII Judgment

     170AXVII(G) Relief from Judgment
      170Ak2651 Grounds
       170Ak2651.1 k. In General. Most Cited Cases

Shareholders were not entitled to amend or alter judgment that dismissed their gray market and retail over-supply claims, so as to add mere five pages of new allegations to their 22 page complaint, since shareholders clearly relied upon their original pleading, and proposed amendments would not have remedied pleading deficiencies and would have been futile. Fed.Rules Civ.Proc.Rules 15, 59(e), 28 U.S.C.A.

**[13] Federal Courts 170B** 🗝️**817**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
       170Bk817 k. Parties; Pleading. Most Cited Cases

The applicable standard of review for a futility of amendment determination is for an abuse of discretion. Fed.Rules Civ.Proc.Rule 15, 28 U.S.C.A.

***270** Elizabeth W. Fox, Todd S. Collins [Argued], Berger & Montague, Philadelphia, PA, for Appellants.

Kevin G. Abrams, Richards, Layton & Finger, Wilmington, DE, Michael J. Biles, Jennifer R. Brannen, Jesse Z. Weiss, Paul R. Bessette [Argued], Kevin G. Abrams, Akin, Gump, Strauss, Hauer & Feld, Austin, TX, for Appellees Adams Golf Inc., B.H. Adams, Richard H. Murtland, Darl P. Hatfield, Paul F. Brown, Jr. Roland E. Casati, Finis F. Conner, and Stephen R. Patchin.

Robert K. Payson, Potter, Anderson & Corroon, Wilmington, DE, Michael J. Chepiga [Argued], Simpson, Thacher & Bartlett, New York, NY, for Appellees Lehman Bros. Holdings, Banc of America Securities LLC, and Ferris Baker Watts.

Before SCIRICA, Chief Judge, RENDELL and ALARCÓN,[FN*] Circuit Judges.

     FN* Honorable Arthur L. Alarcón, Senior Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

RENDELL, Circuit Judge.
In this securities case, plaintiff-shareholders brought an action under the Securities Act of 1933 against Adams Golf, Inc., a manufacturer of golf equipment,

and certain of its officers and underwriters. The plaintiffs contended that the Company's registration statement and prospectus contained materially false or misleading statements in violation of sections 11, 12(a)(2), and 15 of the Securities Act. Among other things, Adams Golf's public offering materials indicated that the Company sold its golf equipment exclusively to authorized retailers and that the golf industry was flourishing. In their complaint, the plaintiffs alleged that Adams Golf omitted information contrary to these representations, i.e., that unauthorized retailers were selling Adams Golf's golf clubs, and that retailers industry-wide were carrying an oversupply of golf equipment. Finding that neither the unauthorized retail nor the oversupply allegations stated a claim upon which relief could be granted, the District Court dismissed the action under Fed.R.Civ.P. 12(b)(6). *In re Adams Golf, Inc. Sec. Litig.,* 176 F.Supp.2d 216 (D.Del.2001). For the reasons that follow, we will affirm in part and reverse in part.

## I

## A

When Barney Adams founded Adams Golf in 1987, the Company was a golfing components supplier and a contract manufacturer. Over the years, it grew to become a designer and manufacturer of its own custom-fit golf clubs. After having much success by introducing a high-end golf club, called Tight Lies, the Company offered its shares to the public. On July 10, 1998, an Initial Public Offering ("IPO") of 5,575,000 shares of the Company's common stock was made at $16 per share, **271** accompanied by the requisite registration statement and prospectus.[FN1]

FN1. Originally, the plaintiffs in this action consisted of those who purchased directly from the defendant-underwriters during the IPO and those who purchased their shares from the secondary market soon after the IPO. Citing to *Gustafson v. Alloyd Co.,* 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) and *Ballay v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682 (3d Cir.1991), the District Court held that the plaintiffs who purchased Adams Golf shares on the public market did not have a private right of action under section 12(a)(2) of the 1933 Act. However, the District Court ruled that

those secondary market purchasers could sue under section 11 of the Act. These determinations have not been challenged by the parties and so we do not pass upon them.

In their complaint, the plaintiffs contend that the defendants misrepresented and omitted material facts in the registration statement and prospectus. First, the plaintiffs argue that the defendants failed to disclose that its revenues were artificially inflated by a "gray market" distribution of Adams Golf golf clubs. Second, the plaintiffs argue that the defendants failed to disclose the existence of an industry-wide oversupply of golf equipment. The facts with respect to these two sets of allegations will be explored in more detail.

### 1

Adams Golf sold its golf clubs only to authorized dealers. As its registration statement explained:
To preserve the integrity of its image and reputation, the Company limits its distribution to retailers that market premium quality golf equipment and provide a high level of customer service and technical expertise.... The Company believes its selective retail distribution helps its retailers to maintain profitable margins and maximize sales of Adams' products.

The registration statement made clear that, as part of its limited distribution arrangement, the Company "does not sell its products through price sensitive general discount warehouses, department stores or membership clubs."

Prior to the IPO, however, Adams Golf had learned that Tight Lies golf clubs were being sold by Costco, a discount warehouse. On June 9, 1998, one month before the registration statement's effective date, the Company issued a press release in which it acknowledged that an unauthorized dealer was selling its signature product. Indeed, the plaintiffs alleged that prior to the IPO, Costco possessed over 5,000 Tight Lies clubs in its inventory. In the press release, Adams Golf stated it was "concerned" about Costco's sale of the golf clubs "because Costco [was] not an authorized distributor." Concerned enough that, according to the press release, Adams Golf initiated legal proceedings, by filing a bill of discovery against Costco, to determine "whether Costco's claims that they had properly acquired Adams' Tight Lies fairway woods for resale were accurate." The plaintiffs further alleged that the

unauthorized distribution was not limited to Costco and included "sales by other unauthorized discount retailers and international gray market distributors."

This unauthorized inventory created a "gray market," according to the plaintiffs. The complaint defines "gray market" to simply refer to "the unauthorized distribution of the Company's products to discount retailers." The complaint sets out the several ostensible consequences of this gray market. The plaintiffs alleged that the Company initially experienced a rise in sales as products were diverted to the unauthorized distributors. According to their complaint, "[t]he short-term income generated by sales to the gray market also **\*272** skewed the Company's overall financial appearance, creating the false impression of heightened sales and profitability at the time of the IPO, according to the historical financial statements contained in the Registration Statement and the Prospectus." Seeking a better deal, consumers bought their Tight Lies clubs from cheaper, unauthorized sources. With their sales diminished, authorized dealers then reduced their orders for Adams Golf equipment. In time, the ultimate result for the Company was an overall drop in revenue.

About five months after the IPO, on January 7, 1999, Adams Golf issued a press release anticipating disappointing fourth quarter 1998 results. The Company stated that sales would continue to suffer as a result of the "gray market distribution of its products to a membership warehouse club." Further, according to the plaintiffs' complaint, Adams Golf acknowledged, in its Form 10-K filed in March of 1999, that despite its best efforts, a membership warehouse club had possession of its golf clubs, and that the Company "does not believe that the gray marketing of its product can be totally eliminated."

2

The complaint also states that by omitting any mention of an industry-wide glut of golf equipment carried by retailers, certain passages in Adams Golf's registration statement were materially misleading. Specifically, the plaintiffs refer to the statement that "[t]he Company believes its prompt delivery of products enables its retail accounts to maintain smaller quantities of inventory than may be required with other golf equipment manufacturers." Further, the plaintiffs argue that forward-looking statements contained in the offering materials, including the belief that "a number of trends are likely to increase

the demand for Adams' products" painted too rosy a picture of the golf industry, particularly in light of the problem of retail oversupply.[FN2]

> [FN2.] In particular, the offering materials indicated that:
> In 1997, wholesale sales of golf equipment in the U.S. reached an estimated $2.4 billion. Wholesale sales of golf clubs increased at an estimated compound annual growth rate of approximately 13% over the 5-year period from 1992-1997. The Company believes that a number of trends are likely to further increase the demand for Adams' products. These trends include: (i) significant growth in the number of golf courses; (ii) increasing interest in golf from women, junior, and minority golfers; (iii) the large numbers of golfers entering their 40s and 50s, the age when most golfers begin to play more often and increase their spending on the sport; (iv) the correspondingly large population of 'Echo Boomers,' who are beginning to enter their 20s, the age of when golfers generally take up the sport; and (v) the rapid evolution of golf club designs and materials.

The record indicates that oversupply did eventually come to adversely affect Adams Golf's bottom line. Indeed, the first quarter report for 1999 indicated that the Company had suffered disappointing financial results, partly owing to an "oversupply of inventory at the retail level, a condition that weakened club sales industry wide over the last 12 months, [and] has resulted in substantial reductions in retailer purchases."

B

The District Court granted the defendants' motion to dismiss for failure to state a claim upon which relief may be granted. *Adams Golf,* 176 F.Supp.2d at 238. The Court ruled as to both the gray market and the retail oversupply claims that Adams Golf's registration statement contained neither false, nor misleading statements,**\*273** nor any material omissions. In response, the plaintiffs filed a motion to amend its complaint pursuant to Fed.R.Civ.P. 59(e) and 15, which the District Court denied in a subsequent order. The plaintiffs timely appealed both rulings of the District Court. We have jurisdiction to consider this appeal pursuant to 28

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

U.S.C. § 1291.

II

[1] This Court reviews Rule 12(b)(6) dismissals *de novo,* accepting all well-pleaded allegations as true and drawing all reasonable inferences in favor of plaintiffs. *Anthony v. Council,* 316 F.3d 412, 416 (3d Cir.2003). We may not affirm unless we are certain that no relief could be granted under any set of facts which could be proven. *Id.* The District Court concluded that the plaintiffs' complaint was insufficient to state a claim against the defendants under sections 11 and 12(a)(2) of the 1933 Act.[FN3]

> FN3. Plaintiffs also brought claims under section 15 of the 1933 Act. A form of derivative liability, section 15 permits investors to recover, on a joint and several basis, from "control persons" who would be otherwise liable under sections 11 and 12(a)(2). 15 U.S.C. § 77*o*. But because the District Court dismissed the sections 11 and 12(a)(2) claims, it did not, nor need we, consider any issues related to control person liability.

The 1933 Act creates federal duties, particularly involving registration and disclosure, in connection with the public offering of securities. Sections 11 and 12(a)(2) impose civil liability for the making of materially false or misleading statements in registration statements and prospectuses. *See* 15 U.S.C. § § 77k, 77*l* (a)(2). In particular, section 11 involves material misstatements or omissions in registration statements, while section 12(a)(2) involves prospectuses and other solicitation materials.

To state a claim under section 11, plaintiffs must allege that they purchased securities pursuant to a materially false or misleading registration statement.[FN4] *Herman & MacLean v. Huddleston,* 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case."); *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 286 (3d Cir.1992).[FN5] To state a claim under section 12(a)(2), plaintiffs must allege that they purchased securities pursuant to a materially false or misleading "prospectus or oral communication."[FN6] The plaintiffs argue that both **\*274** their claims

concerning the gray market distribution and the existence of a retail oversupply meet the above pleading minima. Further, they contend that the District Court improperly denied their motion to amend the complaint, which they filed pursuant to Fed.R.Civ.P. 59(e) (motion to amend or alter the judgment) and Fed.R.Civ.P. 15 (motion to amend the pleadings). We consider each set of claims in turn.

> FN4. Section 11 provides a right of action to purchasers:
> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading....
> 15 U.S.C. § 77k(a).

> FN5. The requirements under section 11 stand in stark contrast to those of the Securities Exchange Act of 1934 (the "1934 Act"), which include a showing of reasonable reliance and scienter. Further, unlike claims brought under the anti-fraud provisions of the 1934 Act, claims under the 1933 Act that do not sound in fraud are not held to the heightened pleading requirements of Fed.R.Civ.P. 9(b). *Shapiro,* 964 F.2d at 288. Applying *Shapiro,* the District Court determined that the plaintiffs' complaint did not sound in fraud, a ruling that has not been cross-appealed by the defendants. Additionally, the District Court observed that the stringent pleading requirements imposed by Congress in the Private Securities Litigation Reform Act of 1995 apply to the 1934 Act alone. The District Court accordingly ruled that the plaintiffs' complaint was subject only to the liberal notice pleading standard of Fed.R.Civ.P. 8.

> FN6. Section 12(a)(2) provides that any defendant who:
> offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the

burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable ... to the person purchasing such security from him....

15 U.S.C. § 77*l.*

A

[2] The plaintiffs alleged that by omitting any mention of what they characterize as a gray market problem, Adams Golf rendered the registration statement false or misleading, specifically those claims concerning the Company's reliance on a network of authorized distributors. The District Court found that Costco's unauthorized possession of golf clubs did not constitute a material omission.[FN7] Adams Golf, 176 F.Supp.2d at 234 ("In sum, plaintiffs have not alleged support for their proposition that the fact that an unauthorized discount retailer had illegally obtained a number of Adams Golf clubs constituted a material risk at the time of the IPO, or a 'known trend' threatening the Company's future sales, that should have been disclosed."). Further, the Court determined that, in any event, the omission of any information regarding the gray market did not render the registration statement and prospectus false or misleading.

FN7. In addition to materiality, the District Court required the plaintiffs to show that an omission or misstatement was known to the Company at the time of the IPO. Adams Golf, 176 F.Supp.2d at 233 ("While the plaintiffs build their case around Adams Golf statements appearing after the IPO date, in order to state a claim for material omission, the plaintiffs [sic] allegations must identify that this alleged undisclosed material risk was *known* and material at the time of the IPO." (emphasis supplied)). This is not correct. Sections 11 and 12(a)(2) are virtually absolute liability provisions, which do not require plaintiffs to allege that defendants possessed any scienter. Huddleston, 459 U.S. at 382, 103 S.Ct. 683. As this Court has held:
There are substantial differences between the elements a plaintiff must establish under § 10 and Rule 10b-5 of the Securities Exchange Act of 1934 and under §§ 11 and 12(2) of the Securities Act of 1933. Under the former, the plaintiffs must plead not only that the defendants made material omissions

and/or misrepresentations, but also that they reasonably relied on them and that the defendants acted with knowledge or recklessness. In contrast, §§ 11 and 12(2) impose no such requirements. In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig., 7 F.3d 357, 369 n. 10 (3d Cir.1993) (internal citations omitted).

[3][4] Materiality is ordinarily an issue left to the factfinder and is therefore not typically a matter for Rule 12(b)(6) dismissal.[FN8] Weiner v. Quaker Oats Co., 129 F.3d 310, 317 (3d Cir.1997) ("[T]he emphasis on a fact-specific determination of materiality militates against a dismissal on *275 the pleadings."). "Only if the alleged misrepresentations or omissions are so *obviously unimportant* to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." Shapiro, 964 F.2d at 281 n. 11 (citing TSC Indus., 426 U.S. at 450, 96 S.Ct. 2126) (emphasis added). Although the District Court did not expressly reference this standard, its dismissal for failure to state a claim was proper only if the gray market and retail oversupply issues were plainly unimportant to a reasonable investor.

FN8. The standard test in securities law to determine the materiality of an omission is "whether there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.' " In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir.2002) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

To support its determination that the gray market claim lacked materiality, the District Court observed that Costco possessed what it considered a "limited number" of golf clubs at the time of the IPO. The defendants explain that these were 5,000 golf clubs out of 235,000, or roughly two percent of the golf clubs sold by Adams Golf that fiscal quarter. By itself, however, this figure does not persuade us that the fact was plainly immaterial. Were Costco to have had more than ten percent of the Company's golf clubs in its inventory, we might agree that the unauthorized inventory would be undoubtedly material. To illustrate the other extreme, if a discount retailer had just a handful of golf clubs, we

might conclude that a few errant fairway woods would be obviously immaterial to a reasonable investor. In contrast, the materiality of Costco's unauthorized inventory of several thousand Adams Golf golf clubs cannot be so easily divined. In order to make the "delicate assessments" involved in a materiality determination, *Shapiro,* 964 F.2d at 281 n. 11, we would need more information regarding, for example, the importance of the limited distribution arrangement to Adams Golf's business model and, perhaps, the nature of the golf club industry more generally. In a tightly competitive market, the maintenance of exclusivity among Adams Golf's network of authorized dealers may have been vital, and the Company's touting this mode of distribution seems to imply that it is. Indeed, in its registration statement, the Company indicated that its distribution system allowed it "to maintain profits and maximize sales of Adams Golf products." In light of such considerations, the possession of 5,000 golf clubs in the hands of a nationwide, discount retailer may have been material, since it may have "altered the 'total mix' of information" available to a reasonable investor. *NAHC,* 306 F.3d at 1331. But without further factual development, the answer to this materiality inquiry is far from plain.

The District Court also reasoned that the gray market problem was immaterial because it was an "isolated incident" and not part of a "known trend." *Adams Golf,* 176 F.Supp.2d at 234. But a fact need not be part of a pattern to be material. Even isolated incidents can result in immediate and negative consequences for a company. An aberrant event such as an oil tanker crash may nevertheless be material in the eyes of a reasonable investor in the unlucky oil company. Analogously, even if the unauthorized inventory of golf clubs was a one-time occurrence, it may have posed significant consequences for Adams Golf's relationships with its authorized distributors, and signaled trouble that might be difficult to overcome.

[5] Perhaps animated by this concern, the Company issued a press release on June 9, 1998, one month prior to going public, noting that it had filed an equitable bill of discovery to investigate the unauthorized inventory. According to the press release, "Adams Golf became concerned when it learned that Costco was selling **\*276** their Tight Lies fairway woods because Costco is not an authorized distributor." While not all company press releases publicize material information, we recognize that a company often chooses to issue an extraordinary press release when it needs to disseminate important

information to its investors. In light of this public acknowledgment of the unauthorized inventory and its announcement of legal action, and our obligation to draw all reasonable inferences in favor of the plaintiffs, we are hard pressed to see how the existence of 5,000 golf clubs for sale at a discounter, outside the protected distribution network, was unquestionably immaterial to a reasonable investor.[FN9]

> FN9. The District Court found that the "Bill of Discovery and the issuing of the press release [prior to the IPO) are consistent with the defendants [sic] contentions that it was in fact Adams Golf's policy not to authorize 'distribution of the Company's products to discount retailers.' " 176 F.Supp.2d at 233. Yet such "consistency" is not salient to a materiality inquiry. Adams Golf may have been working resolutely, in conformance with its stated policy, to solve its unauthorized inventory situation. But a company's effort to manage a problem does not by itself discharge its obligation to inform investors of that problem; if an event is material, the securities laws may require disclosure, notwithstanding the type of consistency identified by the District Court. If it were otherwise, companies could justify keeping quiet about significant corporate crises by simply noting that they were handling the situation in accordance with some previously stated management policy.

[6][7] On appeal, the defendants contend that the fact that the gray market was not material is reflected by the absence of any decline in share value when the market learned of it in the January 7, 1999 press release.[FN10] They rely on *In re Burlington Coat Factory Sec. Litig., Inc.,* 114 F.3d 1410 (3d Cir.1997), in which we observed that "to the extent that information is not important to reasonable investors, it follows that its release will have a negligible effect on the stock price." *Id.* at 1425. But *Burlington Coat Factory* was a **\*277** Rule 10b-5 case brought under the 1934 Act, which requires that plaintiffs plead loss causation, i.e., allege that the material misstatement or omission caused a drop in the stock price. Actions brought under the 1933 Act are, however, critically different. Under sections 11 and 12(a)(2), plaintiffs do not bear the burden of proving causation. It is the defendants who may assert, as an affirmative defense, that a lower share value did not result from any nondisclosure or false

statement. *See* 15 U.S.C. § § 77k(e), 77*l* (b). While a defendant may be able to prove this "negative causation" theory, an affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6).[FN11] *Doe v. GTE Corp.,* 347 F.3d 655, 657 (7th Cir.2003) ("[L]itigants need not try to plead around defenses.").

> FN10. The defendants also argue that the June 9, 1998 *pre*-IPO press release sought to inform the public of Costco's unauthorized inventory of Tight Lies clubs. They argue that if information regarding any gray market problem was placed in the public domain through its pre-IPO press release, the Company would have had no obligation to mention it in their offering materials. First, this contention of course contradicts the defendants' claim that the stock price did not drop after the investing public *first* learned of the gray market problem on January 7, 1999. Second, the cases relied upon by the defendants are inapposite. *See* Acme Propane, Inc. v. Tenexco, Inc., 844 F.2d 1317, 1323 (7th Cir.1988) (no obligation to disclose information on relevant state laws as statutes are in the public domain); *Rodman v. Grant Found.,* 608 F.2d 64, 70 (2d Cir.1979) (no obligation to disclose motivation of corporate officers to maintain corporate control and prevent hostile takeovers as such intentions are "universal."); *Seibert v. Sperry Rand Corp.,* 586 F.2d 949, 952 (2d Cir.1978) (no obligation to disclose labor difficulties when those problems were "reported countrywide in the press and on radio and television, were discussed in Congress, and were analyzed in published administrative and judicial opinions."). Costco's unauthorized inventory, announced in a single press release before the Company went public, was simply unlike the publicly known or available facts in the above cases. Further, we find that the defendants' citation to this Court's decision in *Klein v. General Nutrition Co.,* 186 F.3d 338 (3d Cir.1999), to be even further afield. *Klein* involved securities traded on the secondary market. We held that the market "promptly digested current information regarding GNC from all publicly-available sources and reflected that information in GNC's stock price." *Id.* at 338. But there is no indication that there

was any such efficient market in Adams Golf shares prior to the IPO. Accordingly, we cannot conclude that the pre-IPO press release in this case, issued a month before the offering materials were filed, was sufficient to inform the investing public of a gray market in Adams Golf equipment.

> FN11. In any event, while there was no effect to the stock in *Burlington Coat Factory,* here, after disclosure of the gray market in the January 7, 1999 press release, the number of Adams Golf shares traded jumped from 58,000 to 1.2 million, and resulted in a 17 percent decline in the stock price, though in absolute terms, this just represented a drop from $4.63 to $3.88.

Mindful of this Court's dismissal standard for immateriality, and our obligation to draw reasonable inferences in the plaintiffs' favor, we cannot agree with the District Court's conclusion that the gray market issue was obviously unimportant to a reasonable investor. Of course, ultimately, Costco's inventory of Tight Lies golf clubs may be found to be immaterial, but that is for a factfinder to determine in light of a developed record.

[8][9] A determination that information missing from a registration statement and prospectus is material does not end our analysis. We must also decide whether the issuer had the duty to disclose that material fact such that its omission made the statement misleading. *See* Zucker v. Quasha, 891 F.Supp. 1010, 1014 (D.N.J.1995) ("To avoid committing misrepresentation, a defendant is not required to disclose all known information, but only information that is 'necessary to make other statements not misleading.' " (quoting *Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 640 n. 16 (3d Cir.1989))). In order to make out prima facie violations of sections 11 and 12(a)(2), plaintiffs must allege that an omitted material fact was required to be included by the securities laws or that its absence rendered statements in the prospectus misleading. *See* 15 U.S.C. § 77k(a) (referring to "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading"); § 77*l* (referring to "an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading"). As noted above, the plaintiffs allege that the Company's

statements touting its limited distribution arrangements were false or misleading in light of the omitted gray market problem. While we agree with the District Court that none of these statements in the registration statement was technically false, we disagree with the Court's conclusion that the statements were obviously not misleading.

The relevant statements in the offering materials indicated that distribution was limited to certain retailers and that the Company "does not sell its products through price sensitive general discount warehouses." The District Court properly found that Costco's *unauthorized* possession of Adams Golf clubs could not be reasonably taken to make those statements false, for there was no allegation **\*278** that Adams Golf itself sold gold clubs to unauthorized retailers. But while technically true, those statements may have nevertheless led a reasonable investor to conclude that the selective distribution model was functioning properly, i.e., that this method was exclusive, and therefore that unauthorized retailers were not selling significant quantities of its Adams Golf merchandise. Reasonable minds could disagree as to whether the omitted fact of Costco's unauthorized possession, in addition to the alleged "sales by other unauthorized discount retailers and international gray market distributors," were necessary to make the statements regarding the Company's limited distribution not misleading. Accordingly, we will reverse the District Court's dismissal of the plaintiffs' gray market claims.

B

[10] We next turn to the plaintiffs' claims regarding an oversupply of golf equipment among retailers. As noted above, the plaintiffs contend that the omission of this oversupply rendered two sets of statements in the offering materials materially misleading: 1) the specific representation that "[t]he Company believes its prompt delivery of products enables its retail accounts to maintain smaller quantities of inventory than may be required with other golf equipment manufacturers"; and 2) the general forward-looking statements concerning the trends "likely to increase the demand" for Adams Golf products. We agree with the District Court that neither of these statements were materially misleading by the omission of these industry conditions.

Adams Golf's specific claims to nimble delivery and relatively smaller inventory were not rendered false

or misleading in light of any alleged industry-wide oversupply of golf equipment. The offering materials merely indicated that stores had fewer Adams Golf clubs in their inventories than the equipment of other manufacturers. The statement cannot reasonably be taken to mean that "Adams Golf retailers were *not* carrying excess inventory," as plaintiffs allege. Those retailers may very well have had bloated inventories. But they may have maintained a relatively smaller inventory of Adams Golf equipment while carrying a surplus of merchandise produced by Adams Golf's competitors. We find that plaintiffs' allegations concerning retailers' excess supplies of *other companies'* equipment simply cannot render false or misleading that portion of the registration statement concerning the retailers' smaller inventory of Adams Golf products.

While the plaintiffs may be able to prove their allegations that Adams Golf's rivals were suffering from retail oversupply and were taking "corrective action to address the industry-wide oversupply" problem at the time of Adams Golf's IPO, these allegations are of no moment. Whatever financial problems other manufacturers and retailers may have struggled with, the securities laws obligated Adams Golf to disclose material information concerning its own business and not necessarily the details relating to its competitors. *See* [Trump Casino, 7 F.3d at 375](#) (holding that "the issuer of a security [need not] compare itself in myriad ways to its competitors, whether favorably or unfavorably...."); [Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 517 (7th Cir.1989)](#) ("Issues or securities must reveal *firm-specific* information." (emphasis added)).

Further, the plaintiffs make much of the Company's April 12, 1999 press release, announcing financial results for the first quarter of 1999, in which, according to their complaint, "defendants disclosed that for at least 12 months-since well prior to **\*279** the IPO-there had been an 'oversupply of inventory at the retail level' on an industry-wide basis." Initially, we observe that Adams Golf was not duty-bound to disclose general industry-wide trends easily discernable from information already available in the public domain. *See* [Klein, 186 F.3d at 342](#) (determination of materiality takes into account "availability [of information] in the public domain"); [Whirlpool Fin. Corp. v. GN Holdings, Inc., 67 F.3d 605, 609 (7th Cir.1995)](#) ("The nondisclosure of ... industry-wide trends is not a basis for a securities fraud claim."); [Tenexco, 844 F.2d 1317, 1323-24](#) ("The securities laws require the disclosure of

information that is otherwise not in the public domain."). Moreover, all the April 12, 1999 press release seemed to acknowledge was that retailers of golf equipment had experienced generally sluggish sales for over a year. As discussed above, however, there is nothing contradictory or inconsistent about retailers with excess inventories in general and the Company's representation that those same retailers kept a smaller inventory of Adams Golf clubs in particular. Accordingly, we find that Adams Golf's representation of prompt delivery and relatively smaller retail inventories was not materially false or misleading. Moreover, the fact that looking backward, one perceives a trend does not necessarily mean that conditions were such that one year earlier the situation was sufficiently obvious or noteworthy.

[11] The plaintiffs also alleged that the retail oversupply affecting golf industry retailers also rendered misleading the forward-looking statements made in the registration statement. In particular, the plaintiffs argued that those forecasts were "misleading with respect to the prospects for growth in the golf industry." Those statements included sanguine prospects for the golf industry and the rising popularity of the sport more generally. But we have firmly held that "[c]laims that these kinds of vague expressions of hope by corporate managers could dupe the market have been almost uniformly rejected by the courts." *Burlington Coat Factory,* 114 F.3d at 1427.

Moreover, Adams Golf was not entirely upbeat about its future. The registration statement referred to a series of risks facing an investor, including the prospects of lagging demand for the Company's products, competitive products from rivals, unseasonable weather patterns that could diminish the amount of golf played, and an overall decline in discretionary consumer spending. Applying the "bespeaks caution" doctrine, this Court has held that meaningfully cautionary statements can render the alleged omissions or misrepresentations of forward-looking statements immaterial as a matter of law. *EP Medsystems, Inc. v. EchoCath, Inc.,* 235 F.3d 865, 873-75 (3d Cir.2000) (collecting cases). And here the cautionary statements relate directly to the claim on which plaintiffs allegedly relied; the general representations of better business ahead were mitigated by the discussion of the several factors that could have caused poor financial results. Accordingly, we agree with the District Court that plaintiffs' allegations regarding the forward-looking statements must also succumb to the motion to dismiss.

We conclude that the plaintiffs can prove no set of facts that would demonstrate that either the specific representation as to prompt delivery and retailers' inventory of Adams Golf equipment or the general forward-looking statements was materially misleading. As reasonable minds could not disagree on this issue, we affirm the District Court's dismissal of the plaintiffs' retail oversupply claims as a matter of law.

**\*280** C

[12] After the dismissal of their complaint, plaintiffs filed a motion under Fed.R.Civ.P. 59(e) to amend or alter the judgment so as to add new allegations by virtue of Fed.R.Civ.P. 15.[FN12] They sought to introduce "new" factual allegations about both the gray market and retail oversupply claims. The District Court denied the motion in a subsequent order, which ruling we review for abuse of discretion. *Cureton v. Nat'l Collegiate Athletic Ass'n,* 252 F.3d 267, 272 (3d Cir.2001).

> FN12. The plaintiffs had already amended their complaint once before. After filing their original complaint on June 11, 1999, the plaintiffs amended their complaint on May 17, 2000, the "Consolidated and Amended Class Action" complaint. It was this amended complaint that the District Court dismissed under Rule 12(b)(6).

But the purported new allegations consist not of new information, but, rather, information available at all times relevant to this action and facts not necessarily curative of the pleading problems at issue. With respect to the gray market claim, the plaintiffs merely furnished additional details, such as the extent of financial losses attributable to unauthorized distribution, none of which would have affected the substance of a Rule 12(b)(6) analysis. We note that insofar as these facts pertain to the claims concerning the gray market, the plaintiffs would be free to develop them on remand. With respect to the retail oversupply claim, the plaintiffs sought to add more detailed factual allegations seeking to show the existence of an industry-wide trend of excess inventory. This is also not helpful to their cause. In dismissing the oversupply claim, both our analysis and that of the District Court assumed the existence of such an oversupply. Whether or not we were to consider the new factual allegations, the plaintiffs'

oversupply allegations do not state a claim upon which relief could be granted.

We have held that "[w]here a timely motion to amend judgment is filed under Rule 59(e), the Rule 15 and 59 inquiries turn on the same factors." *Id.* These considerations include undue delay, bad faith, prejudice, or futility. *Alston v. Parker,* 363 F.3d 229, 236 (3d Cir.2004). The District Court found that the plaintiffs' motion to amend was unduly delayed and ultimately futile. The concept of "undue delay" includes consideration of whether new information came to light or was available earlier to the moving party. Here, as the District Court observed, plaintiffs could have introduced the allegations in the motion to amend long before the Court granted the motion to dismiss, and indeed could have included them in their original complaint filed in 1999. Plaintiffs relied at their peril on the possibility of adding to their complaint, but in doing so they clearly risked the prospect of the entry of a final dismissal order. Plaintiffs argue that they withheld the allegations so as to comply with the "short and plain statement" requirement of Fed.R.Civ.P. 8, citing to cases involving complaints in excess of 100 pages. *See, e.g., In re Westinghouse Sec. Litig.,* 90 F.3d 696, 703 (3d Cir.1996). Considering that the amendment would have added a mere five pages of allegations to the plaintiffs' twenty-two page complaint, we do not credit this argument and conclude that the District Court did not err in refusing to open the judgment of dismissal when plaintiffs clearly relied on "misplaced confidence" in their original pleading. *Cureton,* 252 F.3d at 274. Moreover, as the District Court reasoned, the proposed amendments would not have remedied the pleading deficiencies and would thus have been futile.

[13] Accordingly, we find that the District Court did not abuse its discretion in **\*281** dismissing the plaintiffs' motion under Rules 59(e) and 15. *Cf. Lorenz v. CSX Corp.,* 1 F.3d 1406, 1414 (3d Cir.1993) (finding that district court did not abuse its discretion in light of plaintiff's "unreasonable delay" and futility of proposed amendments). [FN13]

FN13. Plaintiffs contend that the applicable standard of review of futility determinations is *de novo,* relying upon our decision in *Burlington Coat Factory,* 114 F.3d at 1410, as adopting the standard employed by several of our sister courts of appeals, but we do need read *Burlington* as having done so. *See Freeman v. First Union Nat'l,* 329

F.3d 1231, 1234 (11th Cir.2003) ("[W]hen the district court denies the plaintiff leave to amend due to futility, we review the denial de novo because it is concluding that as a matter of law an amended complaint 'would necessarily fail.' " (quoting *St. Charles Foods, Inc. v. America's Favorite Chicken Co.,* 198 F.3d 815, 822 (11th Cir.1999))); *Inge v. Rock Fin. Corp.,* 281 F.3d 613, 625 (6th Cir.2002) ("When ... the district court denies the motion to amend on grounds that the amendment would be futile, we review denial of the motion de novo."); *United States ex rel. Gaudineer & Comito, L.L.P. v. Iowa,* 269 F.3d 932, 936 (8th Cir.2001); *Glassman v. Computervision Corp.,* 90 F.3d 617, 623 (1st Cir.1996). Accordingly, we decline the plaintiffs' invitation to chart a new course and consider the District Court's finding of futility for abuse of discretion.

### III

For the foregoing reasons, we will affirm the District Court's dismissal of the plaintiffs' claims relating to retail oversupply and we will reverse the dismissal of those claims relating to the gray market and remand for further proceedings consistent with this opinion.

C.A.3 (Del.),2004.
In re Adams Golf, Inc. Securities Litigation
381 F.3d 267, Fed. Sec. L. Rep. P 92,898

END OF DOCUMENT

# EXHIBIT 2





Samick Music Corp. v. Delaware Music Industries,
Inc.
D.Del.,1992.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
SAMICK MUSIC CORP., a California corporation,
Plaintiff,
v.
DELAWARE MUSIC INDUSTRIES, INC., et al.,
Defendants.
**Civ. A. No. 91-23-CMW.**

Feb. 12, 1992.

Allen M. Terrell, Jr., and David L. Zicherman of
Richards, Layton & Finger, Wilmington, for plaintiff.
Roger A. Akin and Christopher J. Curtin of Sawyer
& Akin, Wilmington, for defendants.

*OPINION*

CALEB M. WRIGHT, Senior District Judge.
**\*1** This action was commenced on January 14, 1991
by Samick Music Corporation ("Samick") against
Delaware Music Industries, Inc. ("DMI") and four
individual defendants. In essence, the complaint
alleges that DMI is liable for breach of contract and
the individual defendants are liable as they signed
guaranty agreements, in their personal capacities, to
obtain the floor plan financing which was allegedly
breached. (Docket Item 1). DMI and the individual
defendants filed a joint answer on March 13, 1991.
(Docket Item 9).

Presently before the Court is the defendants' motion
to amend their answer to include numerous
counterclaims not previously raised. The defendants'
motion to amend was filed on January 6, 1992 and,
while the motion was a "talking motion," no opening
brief was filed by the defendants. (Docket Item 35).
On January 21, 1992 the plaintiff filed its answering
brief and appendix. (Docket Item 36). On January
28, 1992, by way of letter, the defendants replied to
the plaintiff's brief.[FN1] (Docket Item 38). On
January 30, 1992 the plaintiff wrote the Court to
"address several of the more outrageous
misstatements made in defendants' Reply
Memorandum." (Docket Item 39). For the reasons
stated below, the defendants' motion to amend their
answer is denied.

*I. Factual and Procedural Background*

As previously noted, this action was commenced on
January 14, 1991. (Docket Item 1). An answer was
filed by the defendants on March 13, 1991 (Docket
Item 9) and a scheduling order was entered on April
4, 1991. (Docket Item 11). Pursuant to the
scheduling order discovery was to end on September
13, 1991. (Docket Item 11). Discovery was
undertaken by the parties but they failed to complete
it by the cutoff date and thus, on September 13, 1991
a stipulation and proposed order to amend the Rule
16(b) dates was submitted to the Court. (Docket Item
22). The Court granted the extension of the
scheduling order which provided for discovery to end
on November 22, 1991 and dispositive motions to be
filed by December 3, 1991.

The parties continued with discovery until it became
apparent that they would not be able to secure the
deposition of one person within the time allotted for
discovery. As a result, the parties submitted a
stipulation and proposed order to extend discovery
until January 30, 1992 for the sole purpose of
deposing this one individual, all other discovery
having been completed by the November 22, 1991
date. (Docket Item 34). The Court granted this
motion on November 25, 1991. The order indicated
that other dates would be extended in a like manner.
Thus, as the Court understood it, the deadline for
filing dispositive motions was extended until
February 13, 1992. Therefore, at the time the motion
to amend was filed, all discovery was completed with
the exception of deposing the one person for which
the extension was granted. Because of the nature of
the motion and the arguments made by the parties,
the Court finds it appropriate to briefly summarize
the parties positions on this motion.

**\*2** According to DMI, the motion to amend is for the
purpose of adding a counterclaim [FN2] which seeks
injunctive and declaratory relief as well as damages
concerning "another aspect of the relationship
between the parties." (Docket Item 35, ¶ 3). The
counterclaim is based on the defendants' allegations
that the plaintiff, while representing that the
soundboard of the pianos they sold were made
entirely of "spruce" or "Alaskan Sitka Spruce,"
actually Samick was manufacturing and selling

Not Reported in F.Supp.                                                                                            Page 2
Not Reported in F.Supp., 1992 WL 39052 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

pianos that had a soundboard made of a thin spruce veneer over a philippine mahogany core. (Docket Item 35, ¶ ¶ 11, 12, 15). As a result of this action by Samick the defendants contend they may be liable to their customers to whom they sold these pianos for Consumer Fraud pursuant to 6 Del.C. § 2513(a) and § 2543(a) and thus seek injunctive and declaratory relief. (Docket Item 35, Proposed Amended Answer, Fourth Counterclaim).

Further, defendant DMI seeks damages from Samick for allegedly violating the following: (1) 6 Del.C. § 2513(a) relating to consumer fraud, (2) 6 Del.C. § 2532(a), (2), (4), (5), (7), (9) and (12) which bars the use of deceptive trade practices, (3) for breach of an express warranty, and (4) 15 U.S.C. § 2310(d), commonly referred to as the Magnuson-Moss Act. According to the defendants, Samick is in violation of the above for intentionally or with reckless disregard for the truth, misrepresenting the composition of the soundboard of its pianos in connection with their sale and advertisement to DMI and the public. (Docket Item 35, Proposed Amended Answer).

According to the defendants' motion, the motion should be granted on the grounds of judicial economy. (Docket Item 35, ¶ 6). In support thereof, DMI states that the action is not time barred, that the parties have included this issue in all depositions to date, that the issue should be part of the trial as it may bear on the credibility of the plaintiff and that having trial on this issue in conjunction with the original complaint will not materially affect the length of the trial. (Docket Item 35, ¶ ¶ 6(a)-6(d)). Thus, according to DMI, Samick will not be prejudiced by permitting amendment. (Docket Item 35, ¶ 7).

Finally, the motion indicates "that this would be a compulsory counterclaim, since the facts arise from the same core of operative facts, eg. the sale of pianos to DMI by Samick." (Docket Item 35, ¶ 8). Thus, according to the defendant the Federal Rules of Civil Procedure would encourage amendment. [FN3] Finally, the defendant cites Rule 15 of the Federal Rules of Civil Procedure and emphasizes that amendment by leave of the Court shall be freely given when justice requires. (Docket Item 35, ¶ 9).

In response, the plaintiff argues that while leave to amend should be freely given, this does not mandate the Court to permit amendment in every case. (Docket Item 36, p. 10). Amendment of a complaint is generally not permitted when there is evidence of

"undue delay, bad faith or dilatory motive on the part of the movant, ... undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." (Docket Item 36, p. 10 citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)). Thus, the plaintiff contends that the motion to amend should be denied for at least three reasons: (1) the defendants have unduly delayed the filing of the motion, (2) permitting amendment at this late date will be highly prejudicial to Samick, and (3) the amendment would prove futile. (Docket Item 36, p. 11).

**\*3** As the first ground against permitting amendment the plaintiff argues that Rule 16(b) scheduling orders are at the heart of case management and without a specific showing of good cause should not be disregarded. (Docket Item 36, p. 12). Thus, in accord with the scheduling order, any amendments to the pleadings necessarily had to be made by June 14, 1991 and the plaintiffs failure to provide any good cause reason for failure to abide by this date should necessarily cause their motion to be denied. (Docket Item 36, pp. 12-13).

Further in support of its argument that the motion is untimely and thus should be denied, Samick contends that the defendant is met with the same burden of showing good cause pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. (Docket Item 36, p. 13). Samick contends, and the Court must agree, that the defendants failed to provide any explanation for their failure to file the proposed counterclaims at an earlier date. As a result, Samick alleges that the motion must be denied because the defendants have wholly failed to meet their burden to show good cause or to provide explanations as to why justice requires permitting the amendment. (Docket Item 36, p. 14).

Finally on this point, Samick contends that the defendants will be unable to make a showing of good cause and thus denial of the motion is appropriate. In so contending, Samick proposes that the purpose of Rule 15(a) is to permit amendment when the matters that are to be included were not known at the time the original pleading was filed and that is not the case here. (Docket Item 36, p. 15). According to Samick, the defendants knew of the essential facts in April of 1990, eight months before the filing of the complaint and one year before the filing of the original answer. (Docket Item 36, pp. 16-20). Thus, because the defendants failed to act on the knowledge they possessed until seven months beyond the date provided for amending pleadings in the Rule 16(b)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                              Page 3
Not Reported in F.Supp., 1992 WL 39052 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

scheduling order and two months after discovery had essentially ended, the Court should not permit amendment on the grounds of bad faith and dilatory tactics or failure to meet their burden of showing good cause in the delay of filing the amendment. (Docket Item 36, pp. 20-21).

Samick also contends that to permit amendment would result in prejudice to Samick and prejudice to the non-moving party is "the touchstone for the denial of a motion for leave to amend." (Docket Item 36, p. 22). In support thereof, Samick contends that the original complaint and answer allege a "simple debt collection action" with issues that are "simple and straightforward." (Docket Item 36, p. 22). Now, according to Samick, the defendants wish to introduce five counterclaims relating to alleged misrepresentations and fraudulent conduct on the part of Samick. (Docket Item 36, p. 23). Thus, what was once a simple action will now become a convoluted trial requiring evaluation of technical information through expert testimony and consideration of numerous state and federal statutes, not previously part of this case, will be required. (Docket Item 36, pp. 23-24). Samick urges, consistent with courts of other jurisdictions, that the Court deny the motion as it will introduce many new issues and enlarge the scope and complexity of the case after discovery has closed. (Docket Item 36, pp. 24-25).

**\*4** Further, Samick contends that because discovery has ended the introduction of these issues at this time will be unduly prejudicial to Samick as discovery on these issues was not pursued and it no longer has the right to conduct discovery. (Docket Item 36, pp. 26-27). Finally, with respect to discovery, Samick contends that if discovery is reopened in order to permit them an opportunity to defend these additional counterclaims they again will be prejudiced. (Docket Item 36, p. 29). In support of this argument Samick points to the additional discovery and the burden of this discovery that will result.

Further, and more compelling in the Court's view, Samick indicates that the original case is currently in pre-trial stages, discovery having ended and can proceed rapidly; if discovery is to be re-opened delay of a year or more may result. Thus, according to Samick, this simple debt collection action will be unnecessarily delayed by a substantial amount of time. (Docket Item 36, p. 32). All in all, Samick contends that the above factors all lead to the conclusion that Samick will be unduly prejudiced if the amendment is permitted. (Docket Item 36, pp. 33-36).

Samick also contends that the defendants' proposed counterclaims are futile and thus denial of the amendment is appropriate. (Docket Item 36, p. 37). Because the Court finds that the motion should be denied on other grounds previously mentioned, the specifics of this contention will not be addressed.

The reply memorandum of DMI indicates that the counterclaims should be permitted because all counterclaims, old and new are based on alleged misrepresentations by Samick and all claims should be resolved in one suit. (Docket Item 38, p. 1). Thus, defendant concludes, these issues should be permitted in the trial on the original complaint because "misrepresentation is part of this lawsuit and the evidence of the misrepresentations in the soundboard is consistent with the pattern of misrepresentation which the debt action is being defended upon." (Docket Item 38, p. 3).

Further, DMI argues that Samick is not prejudiced by permitting amendment of the answer at this stage. In so arguing DMI states:

It is ridiculous for Samick to complain that it is prejudice [sic] by this amendment. Samick knew of the existence of the problem of *its* misrepresentations concerning *its* soundboards, first, because its product literature is inconsistent with its manufacturing (the facts of which it must have known) and secondly because DMI notified them of the existence and importance of this issue prior to the on-set of the litigation. The necessary documents, production, drafting of advertising documents and knowledgeable personnel are all within Samick's custody and control.

In fact, Samick opened the door to the issue in this litigation by affirmatively questioning DMI personnel about it in the first two depositions taken in the case. That it is prejudicial to Samick's case does not mean that it is prejudicial to allowance of the amendment. Samick has not lost the ability to take discovery nor will Samick be held to answer a claim that is no longer within the period of limitations. Samick has had knowledge of the existence of the allegations as long as the defendants and since the evidence is in its possession, custody and control, have had greater access to it than defendants.

**\*5** Finally, discovery is not complete in any event. Discovery can be re-opened when justice requires despite the existence of a pre-trial order and justice so requires in this case.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1992 WL 39052 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

(Docket Item 38, p. 3, as in the original).

Finally, DMI indicates that justice requires permitting amendment of the answer and allowing discovery to be reopened.[FN4]  In support of this contention DMI states the following:

The facts of the grotesque nature of Samick's fraud in misrepresenting the composition of the most crucial component of the pianos it manufactures and sells, a component, the composition of which is a material factor in the decision to even buy one piano versus another and to pay the additional price required of a solid spruce or all spruce soundboard as advertised in Samick literature to the hundreds of Delawareans who purchased pianos through Samick and the thousands who have purchased Samick on the same misrepresentations throughout the United States should be sufficient in justice to require allowing the amendment to the complaint.

The liability that Samick's actions have exposed DMI to should in justice allow amendment to the complaint.  The threats and denials from Samick when challenged with this allegation *before suit was filed* should in justice justify amendment of the complaint.  Samick's denials continuing through this litigation until Mr. Brand's acknowledgement of the fraud perpetrated throughout the United States should, in justice, require amendment of the complaint.

In addition, Samick has known of the fraud since it perpetrated it through misrepresentations in Samick's catalogs and through its manufacture and distribution of products that it *knew* did not conform to those advertising representations.  Its knowledge and intentional concealment should, in justice, justify amendment of the complaint.  Moreover, all depositions taken to date have included the allegations concerning the soundboards.  This includes those taken by Samick's attorneys, which were the first depositions taken in the case.  It was not until November 20, 1991 that Jack Brand, a Samick employee, the Regional Sales Representative for the New York Region made any confirmation of the existence of the misrepresentation, and his knowledge of it and the fact that it occurred for a period measured in years, at the minimum.  Exhibit 6.

Finally, discovery is not complete.  Since Mr. Visceglie's deposition is still being scheduled and he is yet another Samick employee (former) with

important information concerning all of the issues in the complaint and the answer and counterclaim as well as the amended answer and counterclaims and Samick professed inability to have its former employee consent to cooperative depositions when in fact DMI has now secured that agreement, there will be no prejudice to Samick.

There is, furthermore, no prejudice to Samick on its debt count since, Delaware law provides for prejudgment and postjudgment interest on claims. Samick's brief attempts to thrust all responsibility for discovery delays on the defendants when in fact, some of the delays were necessitated by the availability of Samick personnel and counsel and the inability of either party to locate a former Samick employee.

*6 (Docket Item 38, pp. 4-5, as in the original). Thus, concludes DMI:

Whether or not there is liability in view of and the defense based on misrepresentation by Samick concerning the documents which were signed based on misrepresentation goes to the heart of the case and should include these additional issues as well in the interest of judicial economy.

For the foregoing reasons, DMI's motion for leave to amend the complaint should be granted and discovery should be re-opened to cure any of Samick's complaints of prejudice as a consequence of the pre-trial order.[FN5]

(Docket Item 38, p. 5, as in the original).

*II. Discussion*

Pursuant to Rule 13(f) and Rule 15 of the Federal Rules of Civil Procedure the defendants have requested leave to amend their answer to add five additional counterclaims.  As a preliminary matter, the Court notes that whether leave to amend a pleading is to be permitted is within the sound discretion of the Court.  *Zenith Radio Corp. v. Hazeltine,* 401 U.S. 321, 330 (1971);  *Foman v. Davis,* 371 U.S. 178, 182 (1962);  *Cornell & Co., Inc. v. Occupational Safety and Health Review Comm'n,* 573 F.2d 820, 823 (3d Cir.1978);  *Arch. Coatings Assoc. v. Applied Coatings Intern,* 103 F.R.D. 442, 444 (E.D.Pa.1984).

The United States Supreme Court in *Foman v. Davis* articulated the test for permitting amendment to a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                 Page 5
Not Reported in F.Supp., 1992 WL 39052 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

pleading under Rule 15(a) as follows:

In the absence of any apparent or declared reason-
such as undue delay, bad faith or dilatory motive on
the part of the movant, repeated failure to cure
deficiencies by amendments previously allowed,
undue prejudice to the opposing party by virtue of
allowance of the amendment, futility of amendment,
etc.-the leave sought should, as the rules require, be
"freely given."   Of course, the grant or denial of an
opportunity to amend is within the discretion of the
District Court, but outright refusal to grant the leave
without any justifying reason appearing for the denial
is not an exercise of discretion;   it is merely abuse of
that discretion and inconsistent with the spirit of the
Federal Rules.

*Foman*, 371 U.S. at 182.   Thus, it is incumbent on
the Court to determine, under the specific
circumstances of this case, whether amendment of
the answer is appropriate.

Initially it is the movant's burden to articulate some
satisfactory explanation why amendment should be
permitted when leave of the Court is required.   *Rose
Hall, Ltd. v. Chase Manhattan Overseas Banking,* 93
F.R.D. 858, 865 (D.C.Del.1982) ("In the instant case
it is not necessary for the Court to find that plaintiff
has acted in bad faith in seeking the amendment.   It
is clear that plaintiff has provided no satisfactory
explanation for its long delay in filing its motion to
amend.   Undue delay which is not satisfactorily
explained is equivalent to bad faith.").   In this case,
the Court finds that the movant has been wholly
unable to provide an adequate justification for failing
to raise the counterclaims earlier.

**\*7** The essential facts for any potential counterclaim
based on misrepresentations of the soundboard
composition were known to the defendants no later
than December 10, 1990 as evidenced by a letter
from a DMI representative (and defendant in this
suit) to Samick regarding this issue.   (Docket Item
37, A-186).   Further, the Court finds that the
essential facts underlying these allegations were
probably known to the defendants much earlier.   In
April, 1990 DMI received notice from the United
States Department of Agriculture that the sample
provided them was not spruce as Samick's literature
claimed.   (Docket Item 38, Exhibit 4).   Therefore,
insofar as the counterclaims are based on the
assertion that the literature claimed one thing and the
product contained another, DMI has been unable to
show this Court why they failed to raise the proposed
counterclaims until such a late date.

Further, Samick's allegation that a Samick employee
did not confirm the misrepresentation until
November 20, 1991 is unavailing.   (Docket Item 38,
p. 4).   The Court finds that the facts essential to
bring the counterclaim were known, as stated above,
sometime between April and December, 1990.   The
Court finds that DMI would not need, nor would
normally have, any admission by Samick regarding
the alleged discrepancy in composition and
advertising representations in order to bring a
counterclaim.   This would be a fact that, if ever,
would normally arise during discovery.   The Court
finds that undue delay in bringing this counterclaim
is present and the defendants have failed to provide
the Court with any reasonable explanation for the
delay.

As a further basis for denying this motion to amend
the Court finds that substantial prejudice to Samick
would result.   Unlike the issues presented in the
original complaint which are based on a breach of
contract and collection of debt, the issues sought to
be added at this stage are much more involved.   The
issues in the original complaint are nearing the trial
stage and to interject issues dealing with fraud and
misrepresentation of a very different character at this
stage would be prejudicial to the plaintiff.

Although DMI aggressively argues that discovery on
the issues in the proposed counterclaims has been
undertaken throughout the discovery phase the Court
cannot agree.   During some depositions references
were made to the alleged discrepancies in the
soundboard material and the representations in the
sales literature but this does not in any way constitute
discovery on these issues.   The Court finds that mere
inquiry into some of these issues would not, by any
standards, comprise discovery of the outstanding
issues.

DMI further tries to convince the Court that Samick
cannot claim prejudice because they knew of the
purported fraud and made inquiry during depositions
on these issues.   This is contrary to basic logic.
Even if the Court accepts DMI's position that Samick
knew of the alleged misrepresentations and they
inquired during some depositions into these matters,
one cannot make a leap then that they would not be
prejudiced (even if discovery were reopened) by the
need to defend a lawsuit they did not know would be
forthcoming.   The prejudice is obvious in the
protraction of time to have their claims heard and the
need for extensive discovery on these issues.
Although Samick may be entitled for pre and post-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                Page 6
Not Reported in F.Supp., 1992 WL 39052 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

judgment interest this cannot act to compensate them for the time it would take to get their claims before the Court.

**\*8** Finally, the Court is mindful that if a counterclaim is compulsory in nature, amendment is further encouraged. The only indication that this counterclaim is compulsory is DMI's bald assertion to that effect. (*See* Docket Item 35, ¶ 8 wherein the defendants state: "This would be a compulsory counterclaims, since the facts arise from the same core of operative facts, eg. the sale of pianos to DMI by Samick." *See also* Docket Item 38, p. 1 wherein the defendants, in citing Miller & Kane, *Federal Practice and Procedure: Civil 2d § 1430*, state: "Policy favors resolution of all claims in one suit; amendment allowed even after judgment; compulsory counterclaims are especially favored."). Again, the Court cannot agree.

The Court of Appeals for the Third Circuit has articulated the following test for determining if a counterclaims is compulsory or merely permissive:

*Great Lakes Rubber Corp. v. Herbert Cooper Co.,* 286 F.2d 631, 634 (3d Cir.1961), established that the operative question in determining if a claim is a compulsory counterclaim is whether it bears a logical relationship to an opposing party's claim.

[A] counterclaim is logically related to the opposing party's claim where separate trials on each of their respective claims would involve a substantial duplication of effort and time by the parties and the courts. Where multiple claims involve many of the same factual issues, or the same factual and legal issues, or where they are offshoots of the same basic controversy between the parties, fairness and considerations of convenience and of economy requires that the counterclaimant be permitted to maintain his cause of action. Indeed the doctrine of res judicata compels the counterclaimant to assert his claim in the same suit for it would be barred if asserted separately, subsequently.

Thus, a detailed analysis must be made to determine whether the claims involve: (1) many of the same factual issues; (2) the same factual and legal issues; or (3) offshoots of the same basic controversy between the parties. The *Great Lakes* analysis has been generally used by several federal courts as was noted by the Supreme Court in *Baker v. Gold Seal Liquors, Inc.,* 417 U.S. 467, 469, 94 S.Ct. 2504, 2506, n. 1, 41 L.Ed.2d 243 (1974).

*Xerox Corp. v. SCM Corp.,* 576 F.2d 1057, 1059 (3d Cir.1978).

The Sixth Circuit Court of Appeals has posited the test in a slightly different light. In order to determine whether such a relationship exists to find something to be a compulsory counterclaim that Court instructed the following questions to be answered:

(1) Is there a logical relationship between the two claims?

(2) Are the issues of fact and law raised by the claim and counterclaim largely the same?

(3) Would res judicata bar a subsequent suit on the counterclaim if the court were not to take jurisdiction?

(4) Would substantially the same evidence support or refute both the claim and the counterclaim?

**\*9** *In re Rebel Coal Company, Inc.,* 944 F.2d 320, 322 (6th Cir.1991) ( *citing Maddox v. Kentucky Fin. Co., Inc.,* 736 F.2d 380, 382 (6th Cir.1984)). If these questions could be answered affirmatively then the Court can conclude that a compulsory counterclaim is present. *Id.*

Regardless of the test applied in this case, the Court does not find the proposed claims to be compulsory in nature. The basic issues are completely separate, the facts to support each of the claims are separate, evidence that would need to be shown are dissimilar, res judicata would not bar a second suit on the proposed counterclaims and the only relationship between the two sets of claims is that they involve the same parties. There appears to be no logical relationship between the claims, facts, legal theories, or evidence thus, the Court concludes that the proposed counterclaims are not compulsory in nature and to deny the motion will not work an injustice on the defendants.[FN6]

*III. Conclusion*

For the foregoing reasons, defendants' motion to amend the answer will be denied. An appropriate order will be answered.

FN1. The Court notes that while the letter memorandum did not comply with the local

Not Reported in F.Supp.                                Page 7
Not Reported in F.Supp., 1992 WL 39052 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

rules of this Court, the letter was accepted by the Court and made part of the record. (Docket Item 38). Further, the plaintiff, by way of letter, indicated that they would not file a motion to strike although the letter memorandum did not comply with local rules and contained information that should have been included in the opposition's opening brief. (Docket Item 39).

FN2. Although reference throughout the motion to amend is to "a counterclaim" in fact five counterclaims based on the same operative facts are sought to be added by DMI.

FN3. The defendant refers to Rule 12 in the motion, however counterclaims are governed by Rule 13 and the language quoted by the defendant comes from Rule 13.

FN4. The heading of DMI's response is "Justice requires amendment of the complaint and allowing discovery to be re-opened." Further, in the text of this section the defendants state that given the facts justice would require permitting amendment of the complaint. The Court notes that the use of the word complaint by the defendants throughout this section was erroneous as the motion is to amend the answer. The Court has taken the argument presented as though requesting leave to amend the answer.

FN5. The Court assumes that any reference to a pre-trial order is actually meant to be a reference to the Rule 16(b) scheduling order as no pre-trial order has yet been filed in this case.

FN6. The defendants indicate in their opening papers that the action is not time barred. (Docket Item 35, ¶ 6(a)). Further, by letter to opposing counsel dated December 17, 1991 seeking agreement to this motion to amend, the defendants stated the following:
I am writing to request your agreement to the enclosed amendment to the answer and counterclaims filed in this case. As you can see, it brings the soundboard issue directly to bear in the litigation. I believe the Court would permit this amendment in the interest of judicial economy under Rules 13(f) and

15(a). Moreover, in the event a separate suit is necessary, I believe it could be consolidated with this action due to the discovery taken in this case.
Finally, a separate action would probably be brought as a class-action. In view of these reasons, please let me know your position concerning the proposed amendment within one week of the date of this letter.
(Docket Item 35, p. 8). Therefore, the Court concludes that the defendants have provided the Court with the clearest reasoning as to why denying this motion will not create an injustice. The statute of limitations has not run, they can bring a separate action and likely will do so as a class action. Thus, the Court concludes that, under these circumstances, the interests of justice do not require permitting amendment of the answer.

D.Del.,1992.
Samick Music Corp. v. Delaware Music Industries, Inc.
Not Reported in F.Supp., 1992 WL 39052 (D.Del.)

END OF DOCUMENT

# EXHIBIT 3

Westlaw.

465 F.3d 24                                                                                                    Page 1
465 F.3d 24
**(Cite as: 465 F.3d 24)**

▷
Palmer v. Champion Mortg.
C.A.1 (Mass.),2006.

United States Court of Appeals,First Circuit.
Amy PALMER, Plaintiff, Appellant,
v.
CHAMPION MORTGAGE, Defendant, Appellee.
**No. 06-1246.**

Heard Sept. 12, 2006.
Decided Sept. 29, 2006.

**Background:** Debtor brought action against creditor
alleging that notice of right to rescind in non-
purchase-money-mortgage on residential dwelling
violated the Truth in Lending Act (TILA). The
United States District Court for the District of
Massachusetts, Reginald C. Lindsay, J., dismissed
complaint. Debtor appealed.

**Holding:**   The Court of Appeals, Selya, Circuit
Judge, held that notice of right to rescind was not
defective or confusing.

Affirmed.
West Headnotes
**[1] Consumer Credit 92B ☞50**

92B Consumer Credit
    92BII Federal Regulation
        92BII(B) Disclosure Requirements
            92Bk50 k. In General. Most Cited Cases
The Truth in Lending Act (TILA) requires creditors
to disclose clearly and accurately all the material
terms of a credit transaction.  Truth in Lending Act, §
102 et seq., 15 U.S.C.A. § 1601 et seq.

**[2] Consumer Credit 92B ☞36**

92B Consumer Credit
    92BII Federal Regulation
        92BII(A) In General
            92Bk36 k. Rescission Rights;  Liens on
Residences. Most Cited Cases
Notice of right to rescind in non-purchase-money-
mortgage on residential dwelling, which repeated
twice that debtor had three business days after receipt

of notice within which to rescind, was not defective
or confusing, even if it did mention a specific date,
and thus the notice did not trigger an extended three-
year rescission period; notice was identical in all
material respects to model form authored by Federal
Reserve Board, specific date was immediately
followed by parenthetical reading that rescission
must be mailed by midnight of third business day
following receipt of notice, and average consumer
would understand that rescission period was three
business days after receipt of notice.   Truth in
Lending Act, § 125(a), 15 U.S.C.A. § 1635(a).

**[3] Consumer Credit 92B ☞51**

92B Consumer Credit
    92BII Federal Regulation
        92BII(B) Disclosure Requirements
            92Bk51 k. Form and Sufficiency of
Disclosure in General. Most Cited Cases
A misleading disclosure is as much a violation of
Truth in Lending Act (TILA)as a failure to disclose at
all.  Truth in Lending Act, § 102 et seq., 15 U.S.C.A.
§ 1601 et seq.

**[4] Consumer Credit 92B ☞51**

92B Consumer Credit
    92BII Federal Regulation
        92BII(B) Disclosure Requirements
            92Bk51 k. Form and Sufficiency of
Disclosure in General. Most Cited Cases
Courts must evaluate the adequacy of Truth in
Lending Act (TILA)disclosures from the vantage
point of a hypothetical average consumer, a
consumer who is neither particularly sophisticated
nor particularly dense.  Truth in Lending Act, § 102
et seq., 15 U.S.C.A. § 1601 et seq.

**[5] Federal Civil Procedure 170A ☞928**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(I) Motions in General
            170Ak928 k. Determination. Most Cited
Cases
Unless the court has misapprehended some material
fact or point of law, a motion for reconsideration is
normally not a promising vehicle for revisiting a
party's case and rearguing theories previously
advanced and rejected.   Fed.Rules Civ.Proc.Rule

59(e), 28 U.S.C.A.

**[6] Federal Civil Procedure 170A** 🗝928

170A Federal Civil Procedure
  170AVII Pleadings and Motions
    170AVII(I) Motions in General
      170Ak928 k. Determination. Most Cited Cases
To obtain relief on a motion for reconsideration, the movant must demonstrate either that newly discovered evidence (not previously available) has come to light or that the rendering court committed a manifest error of law. Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

**[7] Federal Courts 170B** 🗝829

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
        170Bk829 k. Amendment, Vacation, or Relief from Judgment. Most Cited Cases
The Court of Appeals will not overturn the district court's denial of a motion for reconsideration absent an abuse of discretion.

**[8] Federal Civil Procedure 170A** 🗝1840

170A Federal Civil Procedure
  170AXI Dismissal
    170AXI(B) Involuntary Dismissal
      170AXI(B)5 Proceedings
        170Ak1839 Vacation
          170Ak1840 k. Grounds and Objections. Most Cited Cases
Plaintiff was not entitled to reconsideration of district court order dismissing her lawsuit, where motion for reconsideration reiterated plaintiff's same arguments earlier advanced which court had found wanting. Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

**[9] Federal Courts 170B** 🗝817

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
        170Bk817 k. Parties; Pleading. Most Cited Cases
The Court of Appeals reviews the denial of a request for leave to amend for abuse of discretion. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[10] Federal Civil Procedure 170A** 🗝840

170A Federal Civil Procedure
  170AVII Pleadings and Motions
    170AVII(E) Amendments
      170Ak839 Complaint
        170Ak840 k. Time for Amendment. Most Cited Cases
Plaintiff who requested leave to amend more than fifteen months after commencing action and more than nine months after initially amending complaint was not entitled to leave to amend; motion was based on new theory and plaintiff was aware of factual predicate on which new theory rested before she brought suit. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[11] Federal Civil Procedure 170A** 🗝830

170A Federal Civil Procedure
  170AVII Pleadings and Motions
    170AVII(E) Amendments
      170Ak828 Discretion of Court
        170Ak830 k. Time for Amendment. Most Cited Cases
A request for leave to amend, especially a belated request, requires the court to examine the totality of the circumstances and to exercise its informed discretion in constructing a balance of pertinent considerations. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**\*25** Christopher M. Lefebvre, with whom Family and Consumer Law Center was on brief, for appellant. W. Scott O'Connell, with whom Paul M. Lanagan and Nixon Peabody LLP were on brief, for appellee.

Before SELYA, Circuit Judge, SILER,[FN*] Senior Circuit Judge, and HOWARD, Circuit Judge.

    FN* Of the Sixth Circuit, sitting by designation.

SELYA, Circuit Judge.
This case requires us to determine whether a consumer's professed lack of comprehension of a notice of right to rescind alone suffices to pave the way for belated rescission under the Truth in Lending Act (TILA), 15 U.S.C. § § 1601-1667. The district court concluded that a bald assertion of subjective confusion did not trump the plain language of the disputed notice and dismissed the plaintiff's amended

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

465 F.3d 24                                                                    Page 3
465 F.3d 24
**(Cite as: 465 F.3d 24)**

complaint. The court then rebuffed the plaintiff's two-pronged endeavor either to obtain reconsideration or to restate her claim. This appeal followed. After careful consideration, we affirm.

# I. BACKGROUND

Because this appeal follows the granting of a motion to dismiss under Fed.R.Civ.P. 12(b)(6), we rehearse the facts as set forth in the plaintiff's amended complaint. *See Chongris v. Board of Appeals,* 811 F.2d 36, 37 (1st Cir.1987). Consistent with the case law, however, we eschew reliance on the pleader's rhetorical flourishes, including unsupported conclusions and assertions. *See id.;* *see also Centro Medico del Turabo, Inc. v. Feliciano de Melecio,* 406 F.3d 1, 5-6 (1st Cir.2005).

In March of 2003, plaintiff-appellant Amy Palmer obtained a debt-consolidation loan, secured by a mortgage on her residence, from defendant-appellee Champion Mortgage. The closing took place on March 28, 2003. The plaintiff executed, then and there, a promissory note, a mortgage, a TILA statement, and a settlement sheet. She left without receiving copies of any of these documents.

**\*26** Several days later, the plaintiff received by mail copies of the closing documents. Included among these papers was a notice of right to cancel (the Notice)-a notification required by the TILA. *See* 15 U.S.C. § 1635(a). In relevant part, the Notice informed the plaintiff that:
You have a legal right under federal law to cancel this transaction, without cost, within three (3) business days from whichever of the following events occurs last:
(1) the date of the transaction, which is MARCH 28, 2003; or (date)
(2) the date you received your Truth-in-Lending disclosures; or
(3) the date you received this notice of your right to cancel.

The Notice further provided: "If you cancel by mail or telegram, you must send the notice no later than midnight of APRIL 01, 2003 (or midnight of the third business day following the latest of the three (3) events listed above)."

Although the plaintiff cannot remember the specific date on which she received the documents, she alleges-and for present purposes we accept-that they arrived in early April of 2003, but after April 1. At

any rate, nothing happened for well over a year. Then, on or about August 6, 2004, the plaintiff notified Champion of her intent to rescind the transaction.

When Champion failed to respond to the plaintiff's importunings, she sued in federal district court. Her complaint alleged that the inclusion of the April 1 deadline was confusing and that, therefore, she retained the right to rescind the transaction under 15 U.S.C. § 1635, which provides for an extended three-year rescission period when a creditor fails to make one or more material disclosures required under the TILA.

After some procedural skirmishing, not relevant here, the plaintiff served an amended complaint. In tandem with the section 1635 claim, the amended complaint asserted that a right to rescind the transaction also existed under the TILA's state-law counterpart, Mass. Gen. Laws ch. 140D, § 32. Champion moved to dismiss on the ground that the amended complaint failed to state a cognizable claim. *See* Fed.R.Civ.P. 12(b)(6). The lower court allowed this motion, concluding that "[t]he Notice the plaintiff received clearly and conspicuously advised her of her right to cancel the transaction within three business days from the last to occur of three events, one of which was the date she received the notice of right to cancel." Thus, the court reasoned, the plaintiff had received the full complement of disclosures stipulated by the TILA and her belated attempt to rescind the transaction was time-barred.[FN2]

> [FN2]. Relatedly, the district court ruled that no claim inhered under the Massachusetts statute invoked by the plaintiff, because that statute was preempted by the TILA. Since the plaintiff does not challenge this ruling on appeal, we make no further mention of the state-law claim.

Undaunted, the plaintiff moved for reconsideration, *see* Fed.R.Civ.P. 59(e), or in the alternative, for leave to file a second amended complaint, *see* Fed.R.Civ.P. 15(a). The district court denied both entreaties. In refusing leave to amend, the court emphasized that the complaint had already been amended once and that the motion to dismiss had been pending for several months before the court disposed of it. This timely appeal followed.

# II. ANALYSIS

465 F.3d 24
465 F.3d 24
**(Cite as: 465 F.3d 24)**

Page 4

On appeal, the plaintiff contests the district court's allowance of Champion's motion to dismiss, as well as the denial of her requests for reconsideration and for leave *27 to file a second amended complaint.[FN3] We discuss these claims of error sequentially.

> FN3. In her brief, the plaintiff directs our attention to the incorrect termination of the case one day prior to the actual entry of judgment, in violation of Fed.R.Civ.P. 58(a)(1). We acknowledge that this technical bevue occurred, but in the circumstances of this case any error was patently harmless. The plaintiff is not, therefore, entitled to relief on this account. *See* Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 30 (1st Cir.2004).

**A. *The Motion to Dismiss.***

We review dismissals for failure to state a claim de novo, accepting all well-pleaded facts as true and giving the party who has pleaded the contested claim the benefit of all reasonable inferences. *See* Rogan v. Menino, 175 F.3d 75, 77 (1st Cir.1999). Thus, our primary task here is to determine whether, viewing the facts in the light most flattering to the plaintiff, she articulated an actionable TILA claim.

[1] We begin this inquiry with a synopsis of the relevant portions of the federal statute. Congress enacted the TILA in 1968 "to assure a meaningful disclosure of credit terms" and "to protect the consumer against inaccurate and unfair credit ... practices." 15 U.S.C. § 1601(a). To this end, the TILA requires creditors to disclose clearly and accurately all the material terms of a credit transaction. *See* Beach v. Ocwen Fed. Bank, 523 U.S. 410, 412, 118 S.Ct. 1408, 140 L.Ed.2d 566 (1998).

With respect to non-purchase-money mortgages on residential dwellings-the type of credit transaction at issue here-the TILA confers upon the debtor a right to rescind within three days of the transaction's consummation or three days from delivery of the material disclosures, whichever occurs later.[FN4] *See* 15 U.S.C. § 1635(a). The creditor also must clearly disclose this rescission right to the debtor. *See* 12 C.F.R. § 226.23(b)(1). Should a creditor fail to deliver any of the required material disclosures (including notice of the right to rescind), the debtor

may rescind at any time up to three years following the consummation of the transaction. *See* id. § 226.23(a)(3). If a creditor does not respond to a rescission request within twenty days, the debtor may file suit in federal court to enforce the rescission right. *See* Belini v. Wash. Mut. Bank, 412 F.3d 17, 20 (1st Cir.2005); *see also* 15 U.S.C. § 1635(b).

> FN4. It is unsettled whether Massachusetts citizens retain a rescission right under the TILA, given the statutory exemption granted to Massachusetts and the concomitant Federal Reserve regulations. *See* 15 U.S.C. § 1633; Belini v. Wash. Mut. Bank, 412 F.3d 17, 28 (1st Cir.2005). Inasmuch as the plaintiff has failed to state a valid claim for rescission under the TILA, *see* text *infra*, it is unnecessary for us to resolve this thorny issue.

[2][3] We move now from the general to the particular. The plaintiff in this case concedes that she received copies of all the material disclosures mandated under the TILA but alleges that the Notice was "defective" and "confusing." She points specifically to the inclusion of a date-certain deadline for rescission (April 1, 2003) and complains that the designated date already had passed by the time she received the Notice. Relying on our admonition that "a misleading disclosure is as much a violation of TILA as a failure to disclose at all," Barnes v. Fleet Nat'l Bank, 370 F.3d 164, 174 (1st Cir.2004) (quoting Smith v. Chapman, 614 F.2d 968, 977 (5th Cir.1980)), she asseverates that the confusing nature of the Notice triggered the extended three-year rescission period.

Champion readily concedes, as it must, that the Notice included an April 1 deadline for rescission. But it hastens to add that the Notice twice indicated in plain *28 language that, in the alternative, the debtor had three business days after *receipt* of the Notice within which to rescind. To strengthen its argument, Champion observes that the Notice is identical in all material respects to the model form authored by the Federal Reserve Board, and that other courts have found such adherence to be an impenetrable shield against TILA-based attacks. *See, e.g.,* Gibson v. Bob Watson Chevrolet-Geo, Inc., 112 F.3d 283, 286 (7th Cir.1997); Murphy v. Empire of Am., 583 F.Supp. 1563, 1566 (W.D.N.Y.1984); *see also* In re Porter, 961 F.2d 1066, 1076 (3d Cir.1992) (explaining that "use of an appropriate model form necessarily complies with the [TILA]"

(emphasis omitted)).    Based on the Notice's plain language and its adherence to the model form, Champion urges us to disregard the plaintiff's subjective state of mind and join the district court in holding the Notice adequate as a matter of law.

We find Champion's argument compelling. Although we are required to view the well-pleaded facts in the light most favorable to the plaintiff, we need not "swallow [her] invective hook, line, and sinker." *Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir.1996). As part and parcel of this approach, we must refrain from crediting her "bald assertions, unsupportable conclusions, and 'opprobrious epithets.' " *Chongris,* 811 F.2d at 37 (quoting *Snowden v. Hughes,* 321 U.S. 1, 10, 64 S.Ct. 397, 88 L.Ed. 497 (1944)); *accord Aulson,* 83 F.3d at 3. This methodology is particularly appropriate in the TILA context where we, like other courts, have focused the lens of our inquiry on the text of the disclosures themselves rather than on plaintiffs' descriptions of their subjective understandings. *See, e.g., Barnes,* 370 F.3d at 172-74 (examining the language of disputed disclosures in the face of plaintiff's claim that they were misleading); *Zamarippa v. Cy's Car Sales, Inc.,* 674 F.2d 877, 879 (11th Cir.1982) (noting that "it is unnecessary to inquire as to the subjective deception or misunderstanding of particular consumers" in determining whether a disclosure violates the TILA); *Bustamante v. First Fed. Sav. & Loan Ass'n,* 619 F.2d 360, 364 (5th Cir.1980) (applying objective standard in evaluating TILA claim).

[4] This emphasis on objective reasonableness, rather than subjective understanding, is also appropriate in light of the sound tenet that courts must evaluate the adequacy of TILA disclosures from the vantage point of a hypothetical average consumer-a consumer who is neither particularly sophisticated nor particularly dense. *See Smith v. Cash Store Mgmt., Inc.,* 195 F.3d 325, 327-28 (7th Cir.1999) (explaining that TILA disclosures should be viewed from the perspective of an ordinary consumer, not a federal judge); *see also Edmondson v. Allen-Russell Ford, Inc.,* 577 F.2d 291, 296 (5th Cir.1978) ("We must assess the adequacy of disclosure ... by the audience for which disclosure was intended."). Thus, we turn to the question of whether the average consumer, looking at the Notice objectively, would find it confusing. We conclude that she would not.

The Notice itself is annexed to the amended complaint and, therefore, is deemed fair game on a motion to dismiss. *See Centro Medico del Turabo,*

406 F.3d at 5; *Rodi v. S. New Engl. Sch. of Law,* 389 F.3d 5, 12 (1st Cir.2004); *In re Colonial Mortg. Bankers Corp.,* 324 F.3d 12, 15 (1st Cir.2003). It clearly and conspicuously indicates that the debtor can rescind "within three (3) business days from whichever of [three enumerated] events occurs last." Although the Notice does state in part that rescission has to occur "no later than midnight of APRIL 01, 2003," the plaintiff wrests this statement from its contextual moorings.    The statement is followed immediately**29** by a parenthetical reading "(or midnight of the third business day following the latest of the three (3) events listed above)." We fail to see how any reasonably alert person-that is, the average consumer-reading the Notice would be drawn to the April 1 deadline without also grasping the twice-repeated alternative deadlines.

This facial transparency is bolstered by the fact that the language of the Notice closely tracks the language of the model form. This is, at the very least, prima facie evidence of the adequacy of the disclosure.[FN5]    *See* 12 C.F.R. § 226 Supp. I, Intro. para.  1 ("Good faith compliance with [the Federal Reserve Board's] commentary affords protection from liability under [the TILA]."). Accordingly, we agree with the district court that the Notice was crystal clear and, thus, did not trigger an extended rescission right under the TILA.

> FN5. There is some statutory support for the proposition that adherence to a model form bars a TILA non-disclosure claim entirely. *See* 15 U.S.C. § § 1604(b), 1635(h), 1640(f). There is also some case law to that effect. *See, e.g., Bob Watson Chevrolet-Geo,* 112 F.3d at 286; *Murphy,* 583 F.Supp. at 1566. The case at hand does not require that we go that far, and so we leave for another day the question of whether such adherence invariably brings a creditor within a safe harbor.

If more were needed-and we doubt that it is-we note that accepting the plaintiff's argument might contravene the goals of the TILA. Holding all parties to the plain language of disclosures aids the due enforcement of the statutory requirements by ensuring that any consumer subject to a misleading disclosure may bring suit against the creditor. *See Chapman,* 614 F.2d at 971 (observing that "consumers who are aware of the true terms of a contract are more able to see that these terms are not clearly and conspicuously disclosed"). The flip side

465 F.3d 24
465 F.3d 24
**(Cite as: 465 F.3d 24)**

Page 6

of the coin, of course, is that any creditor who uses plain and legally sufficient language ought to be held harmless. In other words, courts ought not to invent ambiguities that do not in fact exist.

The plaintiff attempts to circumvent this relatively straightforward analysis by citing a raft of cases in which notices of rescission rights were found wanting. In each of those cases, however, the notice was either given prior to the closing and phrased so that the rescission deadline expired before the loan closed, *see, e.g., Jackson v. Grant,* 890 F.2d 118, 122 (9th Cir.1989); *Basnight v. Diamond Developers, Inc.,* 146 F.Supp.2d 754, 758 (M.D.N.C.2001); *In re Vickers,* 275 B.R. 401, 404-05 (Bankr.M.D.Fla.2001), or stated only a single fixed rescission deadline that had elapsed prior to delivery of the notice, *see, e.g., In re Bell,* 309 B.R. 139, 157 (Bankr.E.D.Pa.2004), or stated no rescission deadline whatsoever, *see, e.g., Semar v. Platte Valley Fed. Sav. & Loan Ass'n.,* 791 F.2d 699, 702 (9th Cir.1986); *Reynolds v. D & N Bank,* 792 F.Supp. 1035, 1038 (E.D.Mich.1992); *Johnson v. Thomas,* 342 Ill.App.3d 382, 276 Ill.Dec. 669, 794 N.E.2d 919, 931 (2003). The Notice here does not suffer from any of these infirmities.

That ends this aspect of the matter. Because we find the Notice clear and adequate, and because the plaintiff otherwise concedes receiving all the required disclosures, her right of rescission under the TILA had long expired by the time she commenced this action. Accordingly, the district court did not err in dismissing the action on the ground that the plaintiff's TILA claim was time-barred.

### B. *The Motion for Reconsideration.*

[5][6][7] We need not linger long over the plaintiff's objection to the denial of her **\*30** motion for reconsideration. The granting of a motion for reconsideration is "an extraordinary remedy which should be used sparingly." 11 Charles Alan Wright et al., Federal Practice and Procedure § 2810.1 (2d ed.1995). Unless the court has misapprehended some material fact or point of law, such a motion is normally not a promising vehicle for revisiting a party's case and rearguing theories previously advanced and rejected. *See In re Sun Pipe Line Co.,* 831 F.2d 22, 24-25 (1st Cir.1987). To obtain relief, the movant must demonstrate either that newly discovered evidence (not previously available) has come to light or that the rendering court committed a manifest error of law. *See Marie v. Allied Home*

*Mortg. Corp.,* 402 F.3d 1, 7 n. 2 (1st Cir.2005). The standard of appellate review is correspondingly deferential: we will not overturn the district court's denial of a motion for reconsideration absent an abuse of discretion. *See Iverson v. City of Boston,* 452 F.3d 94, 104 (1st Cir.2006); *In re Sun Pipe Line,* 831 F.2d at 25.

[8] Here, the plaintiff's motion for reconsideration did no more than reiterate the arguments she earlier had advanced, claiming somewhat counterintuitively that the district court had "overlooked" her allegation that the Notice was confusing. Since the court had not overlooked that allegation but, rather, had found it wanting, the motion was denied. We discern no hint of error.

### C. *The Request for Leave to Amend.*

[9] As a last-ditch measure, the plaintiff contests the district court's refusal to allow her to file a second amended complaint. We review this ruling for abuse of discretion. *James v. Watt,* 716 F.2d 71, 77-78 (1st Cir.1983). In conducting that review, we "will defer to the district court's hands-on judgment so long as the record evinces an adequate reason for the denial." *Aponte-Torres v. Univ. of P.R.,* 445 F.3d 50, 58 (1st Cir.2006).

[10] In this instance, there is a temporal wrinkle: the plaintiff requested further leave to amend only *after* the district court dismissed her first amended complaint. If made subsequent to the entry of judgment, such requests, whatever their merit, cannot be allowed unless and until the judgment is vacated under, say, Fed.R.Civ.P. 60. *See* 6 Federal Practice and Procedure, *supra,* § 1489 (2d ed.1990). Here, no such vacation occurred.

We need not probe this point too deeply. The record below is tenebrous as to timing, *see supra* note 2, and it is arguable that the plaintiff's request to amend antedated the formal entry of judgment. But even if we assume for argument's sake that the vacation-of-judgment barrier does not pertain, that assumption would not salvage the plaintiff's cause. In that event, the district court would have had to evaluate the plaintiff's request under the liberal standard of Fed.R.Civ.P. 15(a). Even so, we nevertheless would uphold the district court's rejection of the request to amend.

[11] Our analysis is as follows. Amendments may be permitted pre-judgment, even after a dismissal for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

failure to state a claim, and leave to amend is "freely given when justice so requires." Fed.R.Civ.P. 15(a). That is not to say, however, that a district court lacks authority to deny a request to amend. In appropriate circumstances-undue delay, bad faith, futility, and the absence of due diligence on the movant's part are paradigmatic examples-leave to amend may be denied. *See* Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). In short, a request to amend-especially a belated request-requires the court to examine **\*31** the totality of the circumstances and to exercise its informed discretion in constructing a balance of pertinent considerations. *See* Quaker State Oil Ref. Corp. v. Garrity Oil Co., 884 F.2d 1510, 1517 (1st Cir.1989).

On this occasion, the plaintiff made her request for leave to amend more than fifteen months after commencing her action and more than nine months after initially amending her complaint. Her proposed second amendment sought to assert a new theory based on the timing of Champion's disbursement of the loan proceeds. This is not an instance in which newly discovered evidence, not previously available, suddenly came to light; the plaintiff was aware of the factual predicate on which her new theory rested before she brought suit. Considering the totality of the circumstances, we conclude that the district court had sufficient reason to reject the plaintiff's belated attempt to amend her complaint yet again. Consequently, we find no abuse of the district court's wide discretion.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, we hold that, as a matter of law, the notice of right to cancel provided by Champion complied with the applicable TILA requirements. The plaintiff's statutory right to rescind therefore expired three days after she received the Notice, and the district court did not err in dismissing her TILA claim as time-barred. By like token, the district court did not abuse its discretion either in denying the plaintiff's motion for reconsideration or in refusing to grant her leave to file a second amended complaint.

*Affirmed.*

C.A.1 (Mass.),2006.
Palmer v. Champion Mortg.
465 F.3d 24

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

884 F.2d 1510                                                                    Page 1
884 F.2d 1510, 14 Fed.R.Serv.3d 864
**(Cite as: 884 F.2d 1510)**

▷

**Quaker State** Oil Refining Corp. v. **Garrity** Oil Co.,
Inc.
C.A.1 (Mass.),1989.

United States Court of Appeals,First Circuit.
**QUAKER STATE** OIL REFINING
CORPORATION, Plaintiff, Appellee,
v.
**GARRITY** OIL COMPANY, INC., Defendant,
Appellant.
**QUAKER STATE** OIL REFINING
CORPORATION, Plaintiff, Appellant,
v.
**GARRITY** OIL COMPANY, INC., Defendant,
Appellee.
**Nos. 89-1258, 89-1296.**

Heard Aug. 4, 1989.
Decided Sept. 14, 1989.

Manufacturer brought action against former
distributor to recover balance due on unpaid invoices
and promissory notes and alleging unfair trade
practices. Former distributor filed counterclaims
alleging unfair competition, breach of contract, and
interference with contractual and prospective
business relations. The United States District Court
for the District of Massachusetts, Joseph L. Tauro, J.,
granted summary judgment in favor of manufacturer.
Former distributor appealed. The Court of Appeals,
Selya, Circuit Judge, held that: (1) former
distributor's withholding of sums immediately due on
trade debt and promissory notes, coupled with
prosecution of counterclaims, was not a form of
extortion sufficient to warrant liability under
Massachusetts law for unfair trade practices; (2)
Massachusetts law on prejudgment interest applied;
and (3) former distributor was not entitled to amend
counterclaim.

Affirmed.
West Headnotes
**[1]** **Federal Courts 170B** 🔑766

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk763 Extent of Review Dependent
on Nature of Decision Appealed from

170Bk766 k. Summary Judgment.
Most Cited Cases
Because grant of summary judgment calls into play a
legal standard-saying, in effect, there is no fact-
specific controversy which must be resolved in order
to decide case-appellate review is plenary.

**[2]** **Antitrust and Trade Regulation 29T**
🔑135(1)

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(A) In General
            29Tk133 Nature and Elements
                29Tk135 Practices Prohibited or
Required
                    29Tk135(1) k. In General;
Unfairness. Most Cited Cases
        (Formerly 382k861 Trade Regulation)
Claim for unfair trade practices under Massachusetts
law must show that defendant's actions fell within at
least penumbra of some common-law, statutory, or
other established concept of unfairness, or were
immoral, unethical, oppressive or unscrupulous, and
resulted in substantial injury to competitors or other
businessmen. M.G.L.A. c. 93A, § 1 et seq.

**[3]** **Antitrust and Trade Regulation 29T**
🔑146(1)

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(A) In General
            29Tk139 Persons and Transactions Covered
Under General Statutes
                29Tk146 Trade or Commerce; Business
Activity
                    29Tk146(1) k. In General. Most Cited
Cases
        (Formerly 382k862.1 Trade Regulation)

**Antitrust and Trade Regulation 29T** 🔑179

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(B) Particular Practices
            29Tk179 k. Other Particular Practices. Most
Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

884 F.2d 1510                                                                                    Page 2
884 F.2d 1510, 14 Fed.R.Serv.3d 864
**(Cite as: 884 F.2d 1510)**

(Formerly 382k862.1  Trade Regulation)
Former distributor's withholding of sums due plaintiff
on trade debt and promissory notes, coupled with its
prosecution of counterclaims, was not a form of
"extortion" sufficient to warrant liability under
Massachusetts law for unfair trade practices;  there
was no satisfactory showing that nonpayment was
aimed at pressuring plaintiff into doing something in
the conduct of any ongoing trade or commerce and
whether or not counterclaims now appeared futile,
former distributor had right to test them through
litigation. M.G.L.A. c. 93A, § § 1 et seq., 2.

**[4] Interest 219 ☞2**

219 Interest
    219I Rights and Liabilities in General
        219k2 k. What Law Governs. Most Cited
Cases
Massachusetts law, rather than Pennsylvania law,
applied to determine appropriate prejudgment interest
rate in action to recover balances due on unpaid
invoices and promissory notes, although defendant
contended that distributorship agreements between
plaintiff and defendant were to be governed by
Pennsylvania law;  claims were not based on
covenants in distributorship agreement but on
separate, distinct instruments, defendant was
Massachusetts corporation with its principal place of
business there, and goods wound up in Massachusetts
and were resold there while invoices were sent to
defendant in Massachusetts. M.G.L.A. c. 231, § 6C.

**[5] Contracts 95 ☞312(1)**

95 Contracts
    95V Performance or Breach
        95k312 Acts or Omissions Constituting Breach
in General
            95k312(1) k. In General. Most Cited Cases

**Torts 379 ☞241**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)2 Particular Cases
                379k241 k. Business Relations or
Economic Advantage, in General. Most Cited Cases
                    (Formerly 379k12, 379k10(3))

**Torts 379 ☞242**

379 Torts

379III Tortious Interference
    379III(B) Business or Contractual Relations
        379III(B)2 Particular Cases
            379k242 k. Contracts in General. Most
Cited Cases
                (Formerly 379k12, 379k10(3))

**Antitrust and Trade Regulation 29T ☞50**

29T Antitrust and Trade Regulation
    29TII Unfair Competition
        29TII(A) In General
            29Tk49 Practices Involving Particular
Relationships
                29Tk50 k. In General. Most Cited Cases
                    (Formerly 382k403  Trade Regulation)
Manufacturer did not commit unfair competition,
breach of contract, or interfere with contractual and
prospective business relations of nonexclusive
distributor;  manufacturer had no duty to take sides in
dispute between distributors vying for custom or to
pass judgment upon distributors' respective ethics,
and there was no showing that manufacturer assisted
others in efforts to steal customers of defendant
distributor and to perform other nefarious tricks.

**[6] Federal Civil Procedure 170A ☞824**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak824 k. Time for Amendment in
General. Most Cited Cases
While leave to amend shall be freely given when
justice so requires, party seeking benefit of rule's
liberality has obligation to exercise due diligence;
unseemly delay, in combination with other factors,
may warrant denial of suggested amendment.
Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[7] Federal Civil Procedure 170A ☞824**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak824 k. Time for Amendment in
General. Most Cited Cases
Party's belated attempt to revise its pleadings requires
that court examine totality of circumstances and
exercise sound discretion in light of pertinent balance
of equitable considerations. Fed.Rules Civ.Proc.Rule
15(a), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ☞847**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak844 Answer
                170Ak847 k. Counterclaim. Most Cited
Cases
Defendant was not entitled to leave to amend
counterclaim for the fifth time; defendant's tardiness
in filing amendment was extreme, facts upon which
proposed counterclaim rested were known to
defendant all along, and great deal of discovery had
taken place without reference to new theory, thus
prejudicing plaintiff. Fed.Rules Civ.Proc.Rule 15(a),
28 U.S.C.A.

*1511 Robert G. Levy, with whom Berryl A. Speert,
Frank, Bernstein, Conaway & Goldman, Brian W.
LeClair, Ann Johnston, and Fordham & Starrett,
Boston, Mass., were on brief for Garrity Oil Co., Inc.
Donald B. Gould, with whom Hilary S. Schultz,
Robert M. Duffy, and Goodwin, Procter & Hoar,
Boston, Mass., were on brief for Quaker State Oil
Refining Corp.

Before BOWNES, TORRUELLA and SELYA,
Circuit Judges.
SELYA, Circuit Judge.
Invoking diversity jurisdiction, 28 U.S.C. § 1332(a),
Quaker State Oil Refining Corporation (QSOR) sued
a former distributor, defendant Garrity Oil Company
(Garrity), in the United States District Court for the
District of Massachusetts. Disenfranchised and
disaffected, Garrity counter-sued. The district court
ended the hostilities short of trial and the belligerents
both appeal. We affirm.

I. BACKGROUND

Certain basic facts brook no disagreement. For
several years, Garrity was an authorized nonexclusive
distributor for plaintiff. In 1984, its sales of QSOR's
products began to decline. Eventually, a QSOR
executive, Monterosso, sent word that a second
distributor might be appointed in Essex County,
Massachusetts (a part of Garrity's territory).
Defendant requested and received a six-month
reprieve. But, *1512 the business drain was not
stanched. In July 1985, QSOR named Quality
Lubricants (Quality) as an additional distributor.

Garrity was upset no little and quite some-
particularly since Quality's principals, William

Coletti and Francis Mills, were Garrity's ex-
employees. Only the previous month, Garrity had
filed a state court suit against Coletti and Mills,
alleging unfair competition and worse.[FN1] Thereafter,
the tension mounted as Garrity's sales continued to
decline-a drop which the firm attributed not only to
Quality's improper activities, but to the complicity
therein of Michael Sugrue, a QSOR employee.
Garrity continued to order products and handle the
line, but began ignoring plaintiff's billings and no
longer honored a half-dozen promissory notes
evidencing loans made by QSOR to defendant during
happier times.

    FN1. In that action, Garrity claimed that
    Coletti and Mills acted unscrupulously in a
    multitude of ways, e.g., employing a trade
    name ("Sure Oil") deceptively similar to the
    trade name ("Shore Sales") utilized by
    Garrity in Essex County and environs;
    pilfering and using without authorization the
    Shore Sales customer list; and disparaging
    Garrity in the marketplace.

Cutting off the flow of cash in this fashion produced
a fairly predictable result: in 1986, QSOR sued
Garrity to recover the balances due on a variety of
unpaid invoices (count 1) and promissory notes
(count 2). The complaint was subsequently amended
to allege unfair trade practices violative of
Mass.Gen.L. ch. 93A (count 3). Garrity responded
with counterclaims positing unfair competition,
breach of contract, and interference with both
contractual and prospective business relations.[FN2]
More than thirty months of skirmishing ensued,
requiring over one hundred entries on the district
court docket.

    FN2. Technically, defendant pled one
    counterclaim containing four counts. For
    ease in reference, we treat the assertions as
    comprising four separate counterclaims.

We see no purpose in retracing the parties' steps in
exquisite detail. The denouement occurred when
QSOR's motion for summary judgment on all claims
and counterclaims was heard and decided. At that
time, the district court determined the entire
controversy: it granted summary judgment in
QSOR's favor on counts 1 and 2 (the invoice and
promissory note claims), QSOR v. Garrity, No. 86-
1446-T, slip op. at 4-5 (D.Mass. Jan. 30, 1989)
(D.Ct.Op.), and on the four counterclaims, id. at 6-13.

The court denied the motion as to count 3, instead entering judgment in defendant's favor, *sua sponte,* on that claim. *Id.* at 5-6. In a separate order entered the same day, the court refused to allow defendant to add a fifth counterclaim. Plaintiff then successfully sought prejudgment interest, the district court obliging on the authority of Mass.Gen.L. ch. 231, § 6C (1985).

On these appeals, not every determination of the district court is challenged. QSOR finds fault only with the abrupt termination of its chapter 93A claim. Garrity assigns error to (1) use of Massachusetts' prejudgment interest rule, (2) interdiction of the four counterclaims, and (3) denial of leave to add the proposed fifth counterclaim. We limit our inquiry to these specifications.

## II. SUMMARY JUDGMENT STANDARD

The yardstick by which allowance of summary judgment must be measured is not in doubt. Summary judgment is warranted only if:
[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Though the movant's task is daunting, the nonmovant has a threshold burden to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A "genuine" dispute requires more than suspicion or bluster. "The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve **\*1513** at an ensuing trial." *Mack v. Great Atlantic & Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989). The disagreement must also be material: "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original); *see also Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976).

[1] Because the grant of summary judgment calls into play a legal standard-saying, in effect, "there is no fact-specific controversy which must be resolved in order to decide this case"-appellate review is plenary.

We can affirm the judgment below "only if we are fully satisfied that there is no genuine dispute as to any relevant fact issue and that the [prevailing party] is, as a matter of law, due the relief which the district court awarded." *Advance Financial Corp. v. Isla Rica Sales, Inc.,* 747 F.2d 21, 26 (1st Cir.1984). In conducting this tamisage, we must grant the benefit of any genuinely disputed datum, and all reasonable inferences plausibly extractable from properly documented facts of record, to the nonmovant. *Mack,* 871 F.2d at 181; *Greenberg v. Puerto Rico Maritime Shipping Auth.,* 835 F.2d 932, 934 (1st Cir.1987).

Mindful of this astrictive standard, we examine the parties' appeals.

## III. QUAKER STATE'S APPEAL

Count 3 contended that Garrity's withholding of the sums admittedly due on the trade debt and promissory notes, coupled with its prosecution of the counterclaims, was a form of "extortion" sufficient to warrant chapter 93A liability. The district court disagreed. QSOR does not contest the court's power to grant summary judgment *sua sponte,* nor could it do so. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1985); *Jardines Bacata, Ltd. v. Diaz-Marquez,* 878 F.2d 1555, 1560-61 (1st Cir.1989). The only bona fide issue is whether that power was exercised properly according to the rigorous protocol of Rule 56. *See Donate-Romero v. Colorado,* 856 F.2d 384, 386 (1st Cir.1988).

[2] Litigation under Mass.Gen.L. ch. 93A is rampant, but a common refrain has developed. "The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings v. Forbes & Wallace, Inc.,* 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153 (1979); *see also Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 515-16 (1st Cir.1988) (unscrupulous or unethical conduct usually required); *Williams v. Arndt,* 626 F.Supp. 571, 581-82 (D.Mass.1985) (similar). In other words, a chapter 93A claimant must show that the defendant's actions fell "within at least the penumbra of some common-law, statutory, or other established concept of unfairness," or were "immoral, unethical, oppressive or unscrupulous," and resulted in "substantial injury ... to competitors or other businessmen." *PMP Associates, Inc. v. Globe Newspaper Co.,* 366 Mass. 593, 321 N.E.2d 915, 917 (1975); *accord Pepsi-Cola*

*Metro. Bottling Co. v. Checkers, Inc.,* 754 F.2d 10, 17-18 (1st Cir.1985); *Levings,* 396 N.E.2d at 153.

[3] When a party moves for summary judgment and the court, *sua sponte,* grants judgment the other way, the usual approach to appellate oversight of Rule 56 orders must be inverted. On count 3, therefore, we view the record in the light most flattering to QSOR (the summary judgment loser). So viewed, we do not think that Garrity's conduct-withholding funds and countersuing-was intolerable or sank to the depths of miscreancy required for liability under the statute. No one seriously disputes that Garrity had been damaged or that it had a reasonable basis for suing Coletti and Mills. Given the full panoply of circumstances, it was not preposterous to think that QSOR might be part of the problem. Though Garrity erred in evaluating the strength and prospects of its case, there was a basis for founded suspicion. The mere fact that defendant did not prevail on its counterclaims **\*1514** is no signal that the counterclaims were groundless. Moreover, even if rooted more in hope than reason, there is no indication that Garrity's actions were motivated by any pernicious purpose collateral to winning the suit and ensuring payment of damages sustained. There was no documented attempt at wrongful exaction of something apart from defendant's due, ergo, no "extortion" (or anything sufficiently resembling it). As the court below stated, "a wrongful set-off, without more, cannot violate ch. 93A." D.Ct.Op. at 6. And as we explain below, there was no "more."

First, there has been no satisfactory showing that nonpayment was aimed at pressuring QSOR into doing something "in the conduct of any [ongoing] trade or commerce." Mass.Gen.L. ch. 93A, § 2 (1984); *see Stromberg v. Costello,* 456 F.Supp. 848, 850-51 (D.Mass.1978). Second, although the cases which dot the chapter 93A landscape tend to be fact-specific, even *sui generis,* we think they are generally supportive of the proposition that a setoff which proved unwarranted could not, in and of itself, be classified as abridging some established concept of mercantile fairness. *Compare, e.g., Stromberg,* 456 F.Supp. at 851 (pressure or coercive threat, causally linking use of legal remedy to course of business dealings, required for chapter 93A violation) (dicta); *Datacomm Interface, Inc. v. Computerworld, Inc.,* 396 Mass. 760, 489 N.E.2d 185, 195 (1986) (groundlessness of claim is not an element of abuse of process); *Whitinsville Plaza, Inc. v. Kotseas,* 378 Mass. 85, 390 N.E.2d 243, 251 (1979) (breach of contract, standing alone, does not constitute a chapter 93A violation); *Cohen v. Hurley,* 20 Mass.App. 439,

480 N.E.2d 658, 660 (1985) (no abuse of process where claim frivolous if brought only to defeat opponent in court); *see also Broadway Management Services, Ltd. v. Cullinet Software, Inc.,* 652 F.Supp. 1501, 1504 (D.Mass.1987) (litigating with concurrent intent to burden defendant with cost is not abuse of process without collateral motive or design to coerce); *Jones v. Brockton Public Markets, Inc.,* 369 Mass. 387, 340 N.E.2d 484, 485 (1975) (no cause of action absent use of process for ulterior or illegitimate purpose); *cf. Pepsi-Cola,* 754 F.2d at 18 (withholding of monies legally owed to achieve some extortionate goal transgresses chapter 93A).

Whether or not the counterclaims now appear futile, Garrity had the right to test them through litigation. It had a correlative right to assert its theory of setoff. QSOR does not contend before us that withholding of the funds was accomplished with a coercive design directed to "the conduct of any [ongoing] trade or commerce." Mass.Gen.L. ch. 93A, § 2. Under the circumstances, summary judgment was appropriate on the chapter 93A claim.

### IV. GARRITY'S APPEAL

We turn now to Garrity's three-pronged appeal, dealing separately with each furculum.

#### A. *Prejudgment Interest.*

[4] We believe that the district court's decision to apply Massachusetts' prejudgment interest statute (rather than Pennsylvania law, as defendant wanted) was correct.[FN3] Sitting in diversity jurisdiction, the judge was bound to look initially to the forum's choice-of-law principles, that is, to apply the law which a state court in Massachusetts would apply. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Union Mut. Life Ins. Co. v. Chrysler Corp.,* 793 F.2d 1, 16 (1st Cir.1986); *Advance Financial,* 747 F.2d at 28. In the Commonwealth, a decision about which law to apply vis-a-vis prejudgment interest presents a substantive, not a procedural, question; thus, Massachusetts would not automatically invoke its own statute. *See* **\*1515***Morris v. Watsco, Inc.,* 385 Mass. 672, 433 N.E.2d 886, 889-90 (1982); Restatement (Second) of Conflict of Laws § 187(1) (1971).

FN3. The dollar difference is substantial.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The applicable Massachusetts rate is 12%. Mass.Gen.Law ch. 231, § 6C (1985). In Pennsylvania, the prejudgment interest rate in suits to recover contract damages appears to be 6%. See 41 Pa.Stat. § 202 (1974); Petersen v. Crown Financial Corp., 661 F.2d 287, 292 (3d Cir.1981) (applying Pennsylvania law); Daset Mining Corp. v. Indus. Fuels Corp., 326 Pa.Super. 14, 473 A.2d 584, 594-95 (1984).

Here, the parties did not choose in advance which body of law would apply; the invoices and notes were noncommittal on the subject. In the absence of predesignation, choice of law was governed by the tenets elucidated in *Travenol Laboratories, Inc. v. Zotal, Ltd.*, 394 Mass. 95, 474 N.E.2d 1070 (1985). *Travenol* involved nonpayment of invoices silent as to controlling law. The Supreme Judicial Court decided that Massachusetts law applied, relying on the Restatement view that courts should apply the "law of the state where under the terms of the contract the seller is to deliver the chattel unless, with respect to the particular issue, some other state has a more significant relationship" in light of general choice-of-law considerations. *Id.* 474 N.E. at 1073 (citing Restatement). In this case, notwithstanding Garrity's claim that the goods were shipped "F.O.B. Oil City, Pennsylvania"-a claim disputed by QSOR-the district court resorted to Massachusetts law, apparently determining that Massachusetts had a more significant relationship to the matters in question.

This court reviews choice-of-law assessments *de novo*. Kukias v. Chandris Lines, 839 F.2d 860, 861 (1st Cir.1988); Diamond International Corp. v. Allstate Ins. Co., 712 F.2d 1498, 1500-02 (1st Cir.1983). Taking a fresh look, as we must, it seems plain that Massachusetts has the highest relative interest in the controversy and in the issue of prejudgment interest. Garrity is a Massachusetts corporation. Its principal place of business is there, as are substantially all its assets and most of its operations. The goods wound up in Massachusetts and were, by and large, resold there. The invoices were sent to Garrity in the Commonwealth. The loans evidenced by the promissory notes were made so that Garrity could establish, maintain, and/or expand its business interests (which, in turn, were centered in Massachusetts). The conduct which assertedly gave rise to Garrity's right of setoff occurred in Massachusetts. And, defendant had no substantial contacts with Pennsylvania.

Clearly, then, the forum state was also the center of gravity of the trade debt and loan matters. Because no other state had an equally significant relationship to the transactions in question, it was appropriate to apply Massachusetts' prejudgment interest rule. *See Travenol*, 474 N.E.2d at 1073; *see also* Restatement (Second) of the Conflict of Laws § 6, 191 (1971); *Roy v. Star Chopper Co.*, 584 F.2d 1124, 1135 (1st Cir.1978) (a district court sitting in diversity jurisdiction should ordinarily apply forum state's prejudgment interest rule).

Garrity's arguments in favor of Pennsylvania are unpersuasive. Principally, Garrity points to the distributorship agreements between it and QSOR, all of which recite that they are to be governed by Pennsylvania law. The problem with this argument is that the claims contained in counts 1 and 2, and reduced to judgment, were not based on covenants in the distributorship agreements but on separate, distinct instruments: invoices and promissory notes. The distributorship agreements do not specify the terms of any particular purchases, sales, deliveries, or loans between the parties, nor do they embody Garrity's obligations anent any of the claims *sub judice*. Had the parties intended the choice-of-law stipulation to have effect beyond the contours of the distributorship contracts, they would doubtless have so provided. They did not do so-and we have no warrant to rewrite their arrangement. *See RCI Northeast Services Div. v. Boston Edison Co.*, 822 F.2d 199, 204-05 (1st Cir.1987) (unbefitting for courts to accomplish by judicial fiat what sophisticated contracting parties chose to eschew); *New England Structures, Inc. v. Loranger*, 354 Mass. 62, 234 N.E.2d 888, 893 (1968) (inappropriate for court to imply contract provision when parties would naturally have been expected to include it, had that been their intention).

B. *The Counterclaims.*

We need not linger long over Garrity's original quadrat of counterclaims. Although four separate theories were pled, *see supra* at 3, the counterclaims sounded **\*1516** a common theme: that QSOR participated in, and was guilty of, some actionable misconduct toward defendant. Because Garrity would have borne the devoir of persuasion at a trial of the counterclaims, the jurisprudence of Rule 56 teaches that it was Garrity's obligation in opposing QSOR's motion to show affirmatively the existence of some genuine and material factual controversy on the causes of action asserted therein. *Celotex*, 477

U.S. at 322-23, 106 S.Ct. at 2552-53; *Paterson-Leitch Co. v. Massachusetts Municipal Wholesale Elec. Co.,* 840 F.2d 985, 992 (1st Cir.1988). Despite ample opportunity for wide-ranging discovery, defendant defaulted on this obligation.

[5] Garrity offers five specific instances in which QSOR supposedly ran afoul of legal obligations. These claims fall into three discrete groupings. Certain of them-*e.g.,* that Monterosso knew of Coletti's plan to use the name "Sure Oil" and did not advise Garrity; that Garrity told QSOR that Coletti and Mills were competing unfairly, but QSOR did nothing-are legally irrelevant. Plaintiff had no duty to take sides in a dispute between two distribution companies vying for custom, or to pass judgment upon the distributors' respective ethics (or lack thereof), or to act as a guardian of someone else's corporate morals. The second set of claims-*e.g.,* that QSOR unfairly characterized Garrity's performance during the six-month "probationary" period-concerns matters that are both irrelevant and unsupported. From the start, Garrity's relationship with QSOR was nonexclusive; plaintiff had an absolute right to appoint other distributors within the territory. That it gave Garrity a grace period at all was an act of largesse. And in any event, the record reflects no actionable unfairness on QSOR's part during the six-month hiatus.

The last grouping comprises claims which, unlike the first two, involve material facts-but the nisi prius roll does not reveal *genuine* disputes as to them. Garrity asserts that QSOR, particularly through Sugrue, actively assisted Coletti and Mills in efforts to steal customers and to perform other nefarious tricks. On this record, the assertion seems all cry and no wool. While there was admittedly evidence of cozenage on the part of the ex-employees, there was simply no factual demonstration adequate to bear out the accusation that QSOR was in league with them in an improper way.

To be sure, Garrity pinpoints a series of telephone calls made between certain persons, and certain telephones, some involving telephone numbers assigned to firms named in Shore Sales' confidential customer list. The proof was sufficient to infer that calls took place and perhaps to infer the identity of the speakers-but the calls' contents are unknown. Garrity nowhere showed any tortious action on the part of QSOR personnel during these calls or proved in any way that the calls unlawfully contributed to its loss of custom. A vital link in the chain of proof was missing.

Put in more generic terms, defendant at most demonstrated the presence of smoke, not fire. Nor could inference, in this instance, supply the spark. Though never certain, inference can sometimes be plain enough to justify a finding of fact. But, creditable inferences must rest on solid, fact-specific footings. When, as here, inference pyramids upon itself, it becomes too conjectural to be accorded probative value. And because inference piled upon inference was incapable of bridging the chasmal gap in defendant's case, all that remained were the very sort of "unsupported allegations and speculations" that we have consistently held inadequate to block summary judgment. *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988); *see also Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Too much was left to the imagination.

We need go no further. We have painstakingly scoured the mountain of papers assembled during protracted pretrial discovery. Having endured this exercise, we find the district court's careful summary of the disputed facts, and of the shortfall in defendant's proffer, D.Ct.Op. at 6-13, to be valid-so much so that it would be pleonastic for us to cover the same terrain. We **\*1517** therefore limit our contribution to what we have already written and affirm the entry of summary judgment on the four counterclaims for substantially the reasons stated in the opinion below.

### C. *Leave to Amend.*

The last issue presented for our perscrutation involves the district court's refusal to permit Garrity to serve a fifth counterclaim out of time. The rudiments are these. Suit was commenced in the district court on May 9, 1986. On June 27, Garrity's counterclaims were filed. Almost two years went by before Garrity, on May 5, 1988, moved to add the fifth counterclaim. [FN4] By that time, virtually all discovery had been undertaken or at least noticed. A magistrate allowed the amendment and QSOR immediately moved for district court reconsideration. The court's order, entered January 30, 1989, stated simply: "Plaintiff's motion for reconsideration of the Magistrate's ruling of September 9, 1988, allowing an amendment to the counterclaim, is hereby allowed. The Magistrate's ruling is hereby vacated." Although a magistrate's ruling on a nondispositive pretrial matter may be reconsidered and reversed by the district judge only if clearly erroneous or contrary to law, 28 U.S.C. § 636(b)(1)(A) (1982), we believe

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

884 F.2d 1510                                                                    Page 8
884 F.2d 1510, 14 Fed.R.Serv.3d 864
**(Cite as: 884 F.2d 1510)**

the district court acted appropriately in this instance.[FN5] We explain briefly.

> FN4. Garrity suggests that it put QSOR on notice of the underlying claim in the joint pretrial memorandum filed on November 2, 1987. That may be so. But, the fact remains that plaintiff had no reason to take Garrity's comments as anything more than mere badinage unless and until a motion to amend was actually filed. That did not take place until May 5, 1988.

> FN5. The magistrate's order was cryptic. She made no findings and offered no hint as to her reasons for believing the late amendment to be justified. Under such circumstances, the order was divested of its usual force, and the district judge was entitled to discount it to some degree. *Cf. Spiegel v. Trustees of Tufts College, 843 F.2d 38, 43-44 (1st Cir.1988)* (occasion for appellate deference to district court's Rule 54(b) certification disappears when court has neither made specific findings nor outlined its reasoning); *Webb v. Califano, 468 F.Supp. 825, 829 (E.D.Cal.1979)* (suggesting that magistrate's findings indicate "depth" of work and may vary extent of judge's review).

The proposed counterclaim sounded in quantum meruit. We quote its central averments *in extenso:*
Since at least as early as the fall of 1985 and continuing to the present time, Quaker State has used Garrity Oil's equipment, without Garrity Oil's permission, to service its large national account customers. Quaker State distributor ... Quality Lubricants, with Quaker State's acquiescence, has delivered and continues to deliver in behalf of Quaker State, large quantities of Quaker State products into tanks and pumps owned by Garrity Oil and located on the premises of large Quaker State customers.... Other Quaker State distributors ... have also delivered and continue to deliver, with Quaker State's authorization, Quaker State products into Garrity Oil's equipment....

Record Appendix at 65-66. The counterclaim, then, was only peripherally related to other matters at issue and was permissive rather than compulsory. *See Fed.R.Civ.P. 13(b).*

[6][7] While leave to amend "shall be freely given

when justice so requires," *Fed.R.Civ.P. 15(a),* parties seeking the benefit of the rule's liberality have an obligation to exercise due diligence; unseemly delay, in combination with other factors, may warrant denial of a suggested amendment. *See Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); Imperial Enterprises, Inc. v. Fireman's Fund Ins. Co., 535 F.2d 287, 293 (5th Cir.1976).* A party's belated attempt to revise its pleadings requires that a court examine the totality of the circumstances and exercise sound discretion in light of the pertinent balance of equitable considerations. *See, e.g., T.J. Stevenson & Co. v. 81,193 Bags of Flour, 629 F.2d 338, 370-71 (5th Cir.1980)* (discussing omitted counterclaim).

[8] Here, the relevant indicators point uniformly toward disallowance. Garrity's tardiness was extreme. The facts upon which the proposed counterclaim rested **\*1518** were known to defendant all along. Only two months remained in an already extended discovery period, and plaintiff was obliged to move for summary judgment within three weeks, or waive the chance. A great deal of discovery had taken place without reference to the neoteric theory, thus prejudicing QSOR. Most important, defendant never proffered a satisfactory explanation for its delay. In our estimation, there was ample reason to bar the late-emerging counterclaim. *Cf. Hayes v. New England Millwork Distributors, Inc., 602 F.2d 15, 19-20 (1st Cir.1979)* (two-year delay sufficient to support denial of amendment where movant has not carried burden of explaining delay). And, because the relevant factors tipped the scales so heavily, the district court was within its proper domain in deciding that a mistake had been made by the magistrate.

V. CONCLUSION

Inasmuch as we believe that the district court committed no legal error, the judgment below will be *Affirmed.* Each party shall bear its own costs.

C.A.1 (Mass.),1989.
Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc.
884 F.2d 1510, 14 Fed.R.Serv.3d 864

END OF DOCUMENT

# EXHIBIT 5

Elite Entertainment, Inc. v. Khela Brothers
Entertainment
E.D.Va.,2005.

United States District Court,E.D. Virginia,
Alexandria Division.
ELITE ENTERTAINMENT, INC., et al., Plaintiffs,
v.
KHELA BROTHERS ENTERTAINMENT, et al.,
Defendants.
No. 1:04CV764.

May 13, 2005.

**Background:** In dispute over concert promotion
rights, plaintiffs moved to strike defendants' amended
counterclaim.

**Holdings:** The District Court, Ellis, J., held that:

(1) amended counterclaim was not permissible as a
matter of right, and

(2) defendants were not entitled to leave to amend
their counterclaim.

Motion granted.
West Headnotes
**[1] Federal Civil Procedure 170A** 🔑**852.1**

170A Federal Civil Procedure
  170AVII Pleadings and Motions
    170AVII(E) Amendments
      170Ak852 Effect of Amendment
        170Ak852.1 k. In General. Most Cited
Cases
Amended response may be filed to amended
complaint without leave only when the amended
complaint changes the theory or scope of the case,
and then, the breadth of the changes in the amended
response must reflect the breadth of the changes in the
amended complaint; thus, if major changes are
made to the complaint, then major changes may be
made to the response. Fed.Rules Civ.Proc.Rule 15,
28 U.S.C.A.

**[2] Federal Civil Procedure 170A** 🔑**847**

170A Federal Civil Procedure
  170AVII Pleadings and Motions
    170AVII(E) Amendments
      170Ak844 Answer
        170Ak847 k. Counterclaim. Most Cited
Cases
Amended counterclaim seeking to add six new claims
under four new theories of liability, filed in response
to plaintiffs' fourth amended complaint, was not
permissible as a matter of right; fourth amended
complaint did not add any new claims nor did it
expand the scope or theory of the case, but instead
eliminated most of the claims alleged in the third
amended complaint, and streamlined plaintiffs'
factual allegations. Fed.Rules Civ.Proc.Rule 15, 28
U.S.C.A.

**[3] Federal Civil Procedure 170A** 🔑**845**

170A Federal Civil Procedure
  170AVII Pleadings and Motions
    170AVII(E) Amendments
      170Ak844 Answer
        170Ak845 k. Time for Amendment.
Most Cited Cases

**Federal Civil Procedure 170A** 🔑**847**

170A Federal Civil Procedure
  170AVII Pleadings and Motions
    170AVII(E) Amendments
      170Ak844 Answer
        170Ak847 k. Counterclaim. Most Cited
Cases
Defendants were not entitled to leave to amend their
counterclaim to add six new claims under four new
theories of liability in response to plaintiffs' fourth
amended complaint; 10-month delay in seeking
amendment was unwarranted, given defendants'
failure to identify any facts learned of during
discovery that they did not know at the outset of the
litigation or when they filed their original
counterclaim, and permitting amendment would have
unfairly prejudiced plaintiffs by requiring them to
respond to claims that were not raised earlier in the
litigation. Fed.Rules Civ.Proc.Rules 13(f), 15(a), 28
U.S.C.A.

**[4] Federal Civil Procedure 170A** 🔑**824**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(E) Amendments
         170Ak824 k. Time for Amendment in General. Most Cited Cases

**Federal Civil Procedure 170A ⟜834**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(E) Amendments
         170Ak834 k. Injustice or Prejudice. Most Cited Cases

**Federal Civil Procedure 170A ⟜851**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(E) Amendments
         170Ak851 k. Form and Sufficiency of Amendment. Most Cited Cases
The following factors guide a court's determination of whether a motion to amend should be granted: (1) undue delay; (2) bad faith; (3) futility of amendment; and (4) prejudice to the opposing party.
Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ⟜824**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(E) Amendments
         170Ak824 k. Time for Amendment in General. Most Cited Cases

**Federal Civil Procedure 170A ⟜834**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(E) Amendments
         170Ak834 k. Injustice or Prejudice. Most Cited Cases

**Federal Civil Procedure 170A ⟜851**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(E) Amendments
         170Ak851 k. Form and Sufficiency of Amendment. Most Cited Cases
Delay alone is not enough to support denial of leave to amend; it must be accompanied by prejudice, bad faith, or futility. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**\*445** Rajesh Bhandari, Sharma & Bhandari, Annandale, VA, Robert Powel Trout, Trout & Richards PLLC, Washington, DC, for Plaintiffs.
Lowry Jock Miller, Cyron & Miller LLP, Alexandria, VA, for Defendants.
Jagroop Singh Khela, Selma, CA, pro se.

*ORDER*

ELLIS, District Judge.
In this dispute over concert promotion rights, the parties over several months and ultimately with the aid of new counsel, have whittled down and refined their claims through a series of complaints, amended complaints, and counterclaims. Although the already-twice-extended period for discovery is nearly expired and the matter is scheduled for trial scarcely seven weeks from now,[FN1] defendants on April 27, 2005 filed an amended counterclaim without seeking leave to do so, alleging four additional counterclaims never previously alleged. Defendants' original counterclaim, filed on December 27, 2004, alleged (i) three breach of contract claims and (ii) one claim for tortious interference with active or prospective business relations. In defendants' amended counterclaim,[FN2] they **\*446** seek to add six new claims under four new theories of liability: (i) unjust enrichment, (ii) fraud, (iii) common counts, and (iv) an action for accounting. They also seek additional forms of relief not included in their original counterclaim, namely restitution and punitive damages.

FN1. The discovery deadline, originally set to expire on February 11, 2005 and extended through April 7, 2005, was extended a second time "as a matter of grace" at the April 14, 2005 pretrial conference and is now set to expire on June 3, 2005. *See Elite Entm't, Inc. v. Khela Bros. Entm't,* Case No. 1:04cv764, 2005 WL 1147774 (E.D.Va. May 13, 2005) (Order). Also at the pretrial conference, the matter was scheduled for trial on July 5, 2005. *See id.*

FN2. Defendants have filed two amended counterclaims. The first, filed on April 27, 2005 without leave of court, contained several errors. First, it listed in its opening paragraph two additional claims for (i) bad faith existence of contract and (ii) negligence, which defendants ultimately abandoned and did not intend to include in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

227 F.R.D. 444                                                                                              Page 3
227 F.R.D. 444
(Cite as: 227 F.R.D. 444)

the amended counterclaim. Second, the first amended counterclaim contained certain numerical errors. Thus, on May 9, 2005, defendants filed a second amended counterclaim to correct these errors. In the same filing, they sought leave to file the amended counterclaims.

According to defendants, they filed the amended counterclaim in response to plaintiffs' fourth amended complaint, which plaintiffs were given leave to file as a matter of grace after plaintiffs retained new counsel so that plaintiffs could simplify the pleadings and claims in anticipation of trial. *See Elite Entm't, Inc. v. Khela Bros. Entm't,* Case No. 1:04cv764, 2005 WL 1147774 (E.D.Va. May 13, 2005) (Order). Specifically, plaintiffs in their fourth amended complaint removed most of the claims they had previously pled and re-alleged only claims for breach of contract and unjust enrichment, which claims were included in every previous version of the complaint.

The matter is now before the Court on plaintiffs' motion to strike defendants' amended counterclaim. In response, defendants argue that they are entitled to amend their counterclaims as of right because their amended counterclaim was filed in response to plaintiffs' fourth amended complaint. In the alternative, defendants seek leave to amend their counterclaim. For the reasons that follow, plaintiffs' motion to strike the amended counterclaims must be granted and defendants' motion for leave to amend must be denied with the narrow exception that they may amend to simplify and clarify factual allegations by conforming their counterclaim to the evidence learned during discovery.

[1] No appellate court has squarely addressed whether counterclaims filed in response to an amended complaint pursuant to Rule 15, Fed.R.Civ.P., must be permitted as of right or only with leave of court. And district courts have taken variant positions on the issue. *See, e.g., Uniroyal Chem. Co. v. Syngenta Crop Prot., Inc.,* 2005 WL 677806, 2005 U.S. Dist. LEXIS 4545 (D.Conn.2005) (discussing three competing approaches and adopting "moderate" view). Courts that have interpreted the rule permissively have held that once a plaintiff amends a complaint, the defendant always has a right to amend to bring new counterclaims, without regard to the scope of the amendments. *See, e.g., American Home Prod. Corp. v. Johnson & Johnson,* 111 F.R.D. 448, 453 (S.D.N.Y.1986) (holding that a defendant is entitled to respond to an amended complaint even

with "eleventh-hour" additions). Courts that have interpreted the rule narrowly have held that an amended counterclaim must be confined specifically to responses that are related to changes in the amended complaint. *See, e.g., Nolan v. City of Yonkers,* 1996 WL 120685, at *4, 1996 U.S. Dist. LEXIS 3221, at *4 (S.D.N.Y.1996) ("Defendants [do] not have a right to assert new counterclaims unrelated to the amendment in their answers ... in the same way that they had a right to assert counterclaims in their original answer."). Yet, the moderate, and most sensible, view is that an amended response may be filed without leave only when the amended complaint changes the theory or scope of the case, and then, the breadth of the changes in the amended response must reflect the breadth of the changes in the amended complaint.[FN3] Thus, if major changes are made to the complaint, then major changes may be made to the response. *Uniroyal,* 1996 WL 120685, at *4, 2005 U.S. Dist. LEXIS 4545, at *5. Not only is this moderate approach predominant in the caselaw,[FN4] the requirement that an **447** amended response reflect the change in theory or scope of the amended complaint is consistent with Rule 15's requirement that an amended pleading must "plead in response" to the amended pleading. *See id. at 1996 WL 120685, at *4-5, 2005 U.S. Dist. LEXIS 4545, at *5-6.* Commentators also agree that the moderate view is the appropriate view. In the view of one prominent commentator, Professor James Moore, "[n]ormally, a party responding to an amended pleading must 'plead in response' to the amended pleading, and must request leave of court if it wishes to add any new counterclaims in its response to the amended pleading." *See* 3 James W. Moore, et al., Moore's Federal Practice § 15.17[6] (3d ed.1997). Yet, "when a plaintiff's amended complaint changes the theory of the case, it would be inequitable to require leave of the court before the defendant could respond with appropriate counterclaims." *Id.*

> FN3. *See, e.g., Uniroyal,* 2005 WL 677806, at *4, 2005 U.S. Dist. LEXIS 4545, at *4-5 ("The underlying premise to this approach is what is good for the goose is good for the gander."); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 831-32 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347, 2000 WL 84400 (8th Cir.1997) (defendant permitted to add new counterclaim without leave of court when plaintiff filed amended complaint that greatly expanded both factual allegations and scope of plaintiff's claims); *Digital*

227 F.R.D. 444                                                                                   Page 4
227 F.R.D. 444
**(Cite as: 227 F.R.D. 444)**

*Privacy, Inc. v. RSA Security, Inc.,* 199
F.Supp.2d 457, 459 n. 2 (E.D.Va.2002);
*E.E.O.C. v. Morgan Stanley & Co., Inc.,* 211
F.R.D. 225, 227 (S.D.N.Y.2002) ("If every
amendment, no matter how minor or
substantive, allowed defendants to assert
counterclaims or defenses as of right, claims
that would otherwise be barred or precluded
could be revived without cause. This would
deprive the Court of its ability to effectively
manage the litigation.").

FN4. *See id.* at 2005 WL 677806, at 5, 2005
U.S. Dist. LEXIS 4545, *6-7 (citing cases)

[2] This principle applied here points persuasively to
the conclusion that defendants' amended
counterclaim is not permissible as a matter of right.
Significantly, plaintiffs' fourth amended complaint
did not add any new claims nor did it expand the
scope or theory of the case; to the contrary, plaintiffs
eliminated most of the claims alleged in the third
amended complaint, re-alleging only the breach of
contract and unjust enrichment claims they had
included in every version of their complaint, and
streamlined their factual allegations. In contrast,
defendants seek to add six new claims under four
new theories of liability and two new claims for
relief, including punitive damages. To be sure,
defendants are entitled to file an amended
counterclaim "in response to" plaintiffs' amended
complaint if they wish to clarify and simplify the
factual allegations contained therein or to remove
claims previously alleged. What they may not do as
of right, however, is amend their counterclaim to
bring new claims never previously alleged. Because
the fourth amended complaint did not expand the
scope or theory of the case, defendants are not
entitled to raise without cause additional claims they
failed to raise previously or to expand the scope of
the case.

[3][4][5] In the alternative, defendants argue that if
they may not amend their counterclaim as of right,
then they are entitled to leave of court to do so. *See*
Rule 13(f), Fed. R.Civ. P., ("When a pleader fails to
set up a counterclaim through oversight,
inadvertence, or excusable neglect, or when justice
requires the pleader may by leave of court set up the
counterclaim by amendment."). While it is true that
Rule 15(a) requires that leave to amend "be freely
given when justice so requires," leave is not
warranted here. *See* Rule 15(a), Fed.R.Civ.P. The
following factors guide a court's determination of
whether a motion to amend should be granted: (1)

undue delay; (2) bad faith; (3) futility of
amendment; and (4) prejudice to the opposing party.
*Edwards v. City of Goldsboro,* 178 F.3d 231 (4th
Cir.1999). Delay alone is not enough; it must be
accompanied by prejudice, bad faith, or futility. *Id.*

Here, unwarranted delay is manifest. Defendants
easily could have brought their claims for unjust
enrichment, fraud, common counts, and action for
accounting in their first counterclaim, or sought leave
to amend long before this late date. Although
defendants allege that they have uncovered new
factual support during discovery to warrant the
introduction of these new legal theories (indeed
counsel even filed an affidavit attesting to this claim
[FN5]), they never identify with particularity any fact
they have learned during discovery that they did not
know at the outset of the litigation ten months ago or
when they filed their original counterclaim in
December 2004. Indeed, most of plaintiffs' new
claims are merely alternative versions of liability that
could have been identified with reasonable diligence
earlier in the litigation. Nor did defendants request
leave to file an amended counterclaim earlier in the
litigation, either in response to plaintiffs' third
amended complaint filed in February 2005 or at the
April 14, 2005 pretrial conference, a substantial
portion of which was devoted to narrowing the issues
in this case.

FN5. Counsel for defendants filed an
affidavit attesting that "new information has
been received by me throughout the course
of this case ... in the course of discovery,
including from Plaintiffs/Counterdefendants;
and it has been received by way of other
sources, including from my clients'
accountants in the UK and California."

**\*448** This unwarranted delay, without more, is of
course an insufficient basis to refuse leave to amend.
But there is more; there is plain prejudice to
plaintiffs. To permit the addition of these entirely
new claims when the twice-extended period for
discovery is now nearly expired, and less than two
months prior to trial would unfairly prejudice
plaintiffs by requiring them to respond to claims that
were not raised earlier in the litigation, leaving little
time for discovery on these new claims or for
preparation for trial. Defendants argue that the
prejudice that will be suffered by plaintiffs is no
different from the prejudice done to defendants by
the filing of the fourth amended complaint. This is
not so; in fact, plaintiffs eliminated claims; if

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

227 F.R.D. 444
227 F.R.D. 444
**(Cite as: 227 F.R.D. 444)**

Page 5

anything, therefore, the filing of the fourth amended complaint made it easier for defendants to complete discovery and prepare for trial. This is not the case with defendants' attempt to add additional new counterclaims and to expand the scope and theory of liability near the end of discovery and weeks before trial. Thus, defendants' motion for leave to amend must be denied insofar as it seeks leave to add new claims or requests for relief.

Accordingly, for these reasons and for the reasons stated from the bench,

It is **ORDERED** that plaintiffs' motion to strike defendants' amended counterclaim is **GRANTED**.

It is further **ORDERED** that defendants' motion for leave to file an amended counterclaim is **GRANTED** in part and **DENIED** in part. It is **GRANTED** insofar as defendants may have leave to file an amended counterclaim that clarifies any factual allegations pertinent to the claims alleged in the existing counterclaim in light of the evidence uncovered during discovery. It is **DENIED** in all other respects, including that defendants may not have leave to file an amended counterclaim that alleges any new claims or additional requests for relief.

The Clerk is directed to send a copy of this Order to all counsel of record.

E.D.Va.,2005.
Elite Entertainment, Inc. v. Khela Brothers Entertainment
227 F.R.D. 444

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6

127 F.R.D. 130                                                                                          Page 1
127 F.R.D. 130
**(Cite as: 127 F.R.D. 130)**

McCarthy v. PaineWebber, Inc.
N.D.Ill.,1989.

United States District Court, N.D. Illinois, Eastern
Division.
Daniel F. McCARTHY, etc., Plaintiff,
v.
PAINEWEBBER, INC., et al., Defendants.
**No. 85 C 3328.**

June 12, 1989.

Investor brought action to recover damages for
brokerage firm's handling of commodities trading
account. Investor moved to amend complaint to add
churning claim and claim for prejudgment interest
and to withdraw second count. The District Court,
Shadur, J., held that investor unduly and inexcusably
delayed motion to add churning claim.

Motion granted in part and denied in part.
West Headnotes
**[1] Federal Civil Procedure 170A** ⚷840

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak839 Complaint
                170Ak840 k. Time for Amendment.
Most Cited Cases
Amendment to complaint to add claim for
prejudgment interest and to withdraw allegations of
unauthorized trading in commodities trading account
could be allowed after responsive pleading, where
informal consent was given, and where changes did
not effect readiness of case for trial. Fed.Rules
Civ.Proc.Rule 15(a), 28 U.S.C.A.; 18 U.S.C.A. § §
3161 et seq., 3162, 3164.

**[2] Federal Civil Procedure 170A** ⚷840

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak839 Complaint
                170Ak840 k. Time for Amendment.
Most Cited Cases
Investor's failure for nearly four years to move for
amendment to add churning count to complaint was
undue delay justifying denial of motion after

discovery was closed, final pretrial order had been
filed, and final pretrial conference had been held;
investor previously knew facts on which churning
claim was based and offered no valid reason for not
asserting new claims earlier; additional discovery
would be required on new claim; and nothing in
existing complaint put defendants on notice of
specific transaction sought to be put at issue in new
claim. Commodity Exchange Act, § § 1-23, as
amended, 7 U.S.C.A. § § 1-26; Fed.Rules
Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[3] Limitation of Actions 241** ⚷127(12)

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(H) Commencement of Proceeding;
Relation Back
            241k127 Amendment of Pleadings
                241k127(11) Amendment Introducing
New Cause of Action
                    241k127(12) k. Nature of Action in
General. Most Cited Cases
Investor's proposed, amended complaint to add
allegations of churning of commodities trading
account did not relate back to earlier complaint;
investor waited nearly four years after filing of
original complaint, previously knew facts on which
churning claim was based, and sought amendment
after discovery had closed, final pretrial order had
been filed, and final pretrial conference had been
held. Fed.Rules Civ.Proc.Rule 15(c), 28 U.S.C.A.

**\*130** Arthur M. Holtzman, Donald J. Moran, Anita
K. Modak-Truran, Pedersen & Houpt, Chicago, Ill.,
for plaintiff.
Michael B. Roche, James D. Adducci, Schuyler,
Roche & Zwirner, Chicago, Ill., for defendants.

MEMORANDUM OPINION AND ORDER
SHADUR, District Judge.
Daniel McCarthy ("McCarthy"), doing business as
McCarthy Cattle Company, has sued PaineWebber,
Inc. ("PaineWebber") and Thomas Downs
("Downs") on a myriad of claims. In addition to
charging both defendants with violations of the
Commodities Exchange Act ("CEA"), 7 U.S.C. § §
1-26, McCarthy asserts several pendent claims:
Illinois common law fraud, violations of the Illinois
Consumer Fraud and Deceptive Business Practices

Act ("Illinois Act"), breach of contract and negligence.

Now-nearly four years after first bringing suit-McCarthy has filed a motion under Fed.R.Civ.P. ("Rule") 15(a) to allow **131** further amendments to his Third Amended Complaint ("TAC"). According to his own characterization (P. Motion To Amend 1), his proposed Fourth Amended Complaint ("FAC") "add[s] an additional count on Churning (April, May and June 1983), and claims for prejudgment interest; and withdraw[s] the cause of action asserted in Count Two [of the TAC]-unauthorized trading [while] retaining Count Two's factual allegations." For the reasons stated in this memorandum opinion and order, only the lesser part of the proposed amendment is allowed.

*Procedural History*

McCarthy filed his original complaint April 9, 1985, based on activities that had occurred roughly two years earlier (between December 1982 and June 1983) in a commodities trading account handled by PaineWebber and Downs. Essentially McCarthy claimed defendants (1) had misrepresented both the way the account would be handled and the account's prospects for making money and (2) had cheated and defrauded McCarthy in the process. Three amended pleadings followed: an Amended Complaint filed May 30, 1985, a Second Amended Complaint filed June 22, 1987 and the TAC filed November 15, 1988 (the latter adding a negligence count).

As always with cases on its calendar, this Court monitored the progress of discovery by a periodic series of status hearings, ultimately setting the close of discovery at a date that both sides' counsel confirmed would provide ample time for that purpose (in this instance December 30, 1988). During the course of discovery defendants had deposed both McCarthy and his securities law expert. Again consistently with this Court's regular practice, the filing of a final pretrial order ("FPTO") was scheduled shortly after the close of discovery (the FPTO was timely filed on February 22, 1989), promptly followed by a final pretrial conference (held February 27). In accordance with this Court's invariable practice when such a conference confirms the FPTO is in proper form and reflects the case's full readiness for trial, the action was then given its appropriate priority on the trial calendar.[FN1]

FN1. With rare exceptions where special circumstances require different treatment, this Court schedules civil cases for trial in the sequence in which they have reached the FPTO stage. By definition, then, some time lag must always exist between the FPTO's filing and the date of trial, and the priority mandated for criminal trials by the Speedy Trial Act (18 U.S.C. § § 3161, 3162 and 3164) also necessarily renders the length of that gap somewhat unpredictable. But it should be obvious that the mere existence of such a time lag cannot support a party's freedom to keep changing the shape of a lawsuit and thus forcing further delays in priority, else Zeno's Paradox would operate to prevent the litigation arrow from ever reaching the ultimate target of trial.

Two weeks later McCarthy moved to amend his complaint once again. Among other changes the proposed FAC would add a count alleging churning in McCarthy's account during 19 days in April 1983, 16 days in May 1983 and 6 days in June 1983. Although TAC Count Three already contains a churning claim, it involves only one day in May and one day in June.[FN2] McCarthy's proposed new churning count seeks an additional $63,000 in damages (corresponding to PaineWebber's commission for the alleged churning transactions).

FN2. TAC Count Five also contains a churning claim for certain days in March 1983. Both the Count Three and Count Five claims have been in this lawsuit from the very beginning (the original Complaint filed in April 1985 included the same allegations).

*Application of the Relevant Standards*

Rule 15(a) permits a party to amend a pleading once as a matter of course before service of a responsive pleading, then adds:
Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

Under the circumstances the last-quoted clause of course controls the current motion.

[1][2] Inasmuch as D. Mem. 4 informally consents to the amendments involving the new prejudgment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

interest claim and **\*132** withdrawal of count 2, and because those changes do not affect the case's readiness for trial, those amendments will be allowed as a matter of course. This opinion need address only the objected-to amendment-the new churning count.

Trial courts are given broad discretion as to whether to grant leave to file amended pleadings under Rule 15(a) (*Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971)). But the liberal approach mandated by the Rule's standard ("freely given when justice so requires") reflects a policy that cases should generally be decided on the merits and not on the basis of technicalities (*Stern v. United States Gypsum, Inc.,* 547 F.2d 1329, 1334 (7th Cir.1977), citing *Fuhrer v. Fuhrer,* 292 F.2d 140, 143 (7th Cir.1961)).

McCarthy seeks to invoke the *Fuhrer* generalization quoted in *Stern, id.:*
Leave to amend should be freely given unless it appears to a certainty that plaintiff would not be entitled to any relief under any state of facts which could be proved in support of his claim.

That standard may well dictate the result when a plaintiff is amending a complaint that failed in its original attempt to state a claim (the situation discussed in *Stern* ). But other factors obviously come into play where, as here, a plaintiff belatedly attempts to add new claims based on newly-asserted (though previously-known) facts. As *Feldman v. Allegheny International, Inc.,* 850 F.2d 1217, 1225 (7th Cir.1988), citing *Textor v. Board of Regents,* 711 F.2d 1387 (7th Cir.1983), recently re-emphasized:Leave to amend may be denied when it would prejudice the parties or cause undue confusion or delay in the litigation.

P.R.Mem. 4 argues that delay *alone* may not justify denying a motion to amend-prejudice to the nonmovant must also be shown. But on that score the seminal teaching is that in *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (emphasis added):
In the absence of *any* apparent or declared reason-*such as undue delay,* bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, *undue prejudice* to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave sought should, as the rules require, be

"freely given."

Thus "undue delay" and "undue prejudice" are stated in the disjunctive rather than the conjunctive, and the clear sense of *Foman* is that a distinction must be made between delay and *undue* delay. *Tamari v. Bache & Co. (Lebanon S.A.L.),* 838 F.2d 904, 909 (7th Cir.1988) has observed insightfully that although a great many cases cite the truism that delay alone is not enough, "the longer the delay, the greater the presumption against granting leave to amend"-a longer delay increases the likelihood that such delay is inexcusable and that granting leave would further delay the suit and "impair the public interest in the prompt resolution of legal disputes." *Tamari, id.* concluded that if extreme "delay itself may be considered prejudicial." This Court has previously found that undue delay in proposing amendments may alone be sufficient reason to deny leave to amend (see *National Union Fire Insurance Co. of Pittsburgh, Pa. v. Continental Illinois Corp.,* 658 F.Supp. 781, 786 (N.D.Ill.1987)).

Here nearly four years have elapsed between the original Complaint and the motion for leave to file the FAC-and the amended claim relates to events that occurred a full *six* years ago! Knowledge of the transactions alleged in the FAC to reflect churning was surely in McCarthy's possession shortly after they occurred. Nor is this a situation in which churning is a concept that has just come to McCarthy's attention-as already stated, the existing pleading has already asserted such a claim.

[3] McCarthy offers no valid reason for not asserting the new claims earlier. Instead P.Mem. 2 somewhat disingenuously says the real issues of the case have now been discovered through *defendants* ' deposition of McCarthy's securities expert! It is hardly defendants' responsibility to clarify facts already in McCarthy's possession so that he or his lawyer may better understand**\*133** his causes of action. McCarthy should have asserted any claim based on the complained-of transactions when they became known to him. Were he to file a new suit based on those transactions today, he would find himself time-barred and out of luck (see 7 U.S.C. § 25(c), imposing a two-year limitations period on private causes of action accruing under the CEA after January 11, 1983). Under the circumstances here McCarthy does not merit the relation-back benefits of Rule 15(c), given the extraordinary delay involved and the case's readiness for trial.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

If McCarthy were instead merely suggesting that defendants have had an opportunity for full discovery on the issues in the added churning claim, that too is disingenuous. For analytical purposes churning may be looked at in the terms stated by this Court in *Griswold v. E.F. Hutton & Co., 622 F.Supp. 1397, 1407 (N.D.Ill.1985)*:

Churning is a broker's trading for the purpose of generating commission fees without regard to the client's investment objectives. *Hecht v. Harris, Upham & Co., 283 F.Supp. 417, 435 (N.D.Cal.1968), aff'd as modified, 430 F.2d 1202 (9th Cir.1970)* stated the classic definition:

Churning cannot be and need not be, established by any one precise rule or formula. The essential question of fact for determination is whether the volume and frequency of transactions, considered in the light of the nature of the account and the situation, needs and objectives of the customer, have been so "excessive" as to indicate a purpose of the broker to derive profit for himself while disregarding the interests of the customer.

Although defendants have had ample opportunity to depose plaintiff and his expert as to his "needs and objectives," that is not enough. All the transactions must be "considered in the light of the nature of the account and the situation" of the customer as well. Whether each transaction was authorized by McCarthy and what McCarthy thought or did afterwards about each transaction is clearly relevant to a churning claim.

Nothing in the existing TAC put defendants on notice of the specific transactions sought to be put at issue in the new claim. Hence they cannot be said to have completed adequate discovery. P.R.Mem. 2 tacitly admits that by noting that during discovery defendants did in fact inquire about *some* (but by no means *all* ) of the trading newly sought to be placed in issue now.[FN3]

   [FN3.] Somewhat bizarrely, P.R.Mem. 2 also quotes McCarthy's response to a request to admit:

   Mr. Daniel F. McCarthy cannot identify any specific trades made in the McCarthy Cattle Company account at PaineWebber, Inc. which he claims were made without his prior knowledge and approval, other than those trades he has previously identified at his deposition.

   At best this Court fails to see how that proves no new discovery is necessary. At

worst the statement sounds like an admission that the new claim may be, in part or in its entirety, frivolous and baseless.

There is thus no question that additional discovery would be required on the new claim. That would necessarily mean a delay in the trial, which had been anticipated to take place this summer or fall.[FN4] Though the added discovery might not be extraordinary in scope, the resulting trial delay could well be highly disproportionate to the delay involved in the discovery alone. [FN5] In **\*134** all events, the situation must be dealt with in light of the fact that McCarthy now seeks to sue on facts known years ago. This Court finds both the statement and logic in *Hayes v. New England Millwork Distributors, Inc., 602 F.2d 15, 19-20 (1st Cir.1979)* (citations omitted) persuasive (though not of course binding):

   [FN4.] Added complexity in scheduling for trial is involved in a case such as this, which the parties have estimated as requiring three weeks to try. Because jurors are called to serve in this district for roughly month-long periods beginning with the first Monday of each month, this Court always sets protracted trials to begin just after that first Monday (thus minimizing the prospect that a juror's service will extend well beyond the month for which he or she is required to serve). That lesser flexibility for the longer trial necessarily modifies the strict priority system adverted to in n. 1. In any event, the time spent in the briefing and decision of the current motion has (of course) already affected the case's trial setting somewhat.

   [FN5.] As already explained in n. 1, other cases that have newly reached the close-of-discovery-and-FPTO stage after this one have properly been placed on lower rungs in the litigation ladder establishing priority for trial. But if a meaningful reopening of discovery here were forced by McCarthy's proposed new amendment, this Court's view of proper calendar management and fairness to other litigants would demand that such other cases-plus any other cases that arrive at the same stage of readiness for trial before discovery in this case is *truly* completed-should occupy higher rungs on the priority ladder. Any other treatment would improperly reward a litigant such as McCarthy for his unjustified delay in the

tardy assertion of a claim that forces the new discovery (while penalizing defendants such as PaineWebber and Downs, who are also entitled to earn repose by having the claims on which they are being sued brought to trial as promptly as possible). Moreover, *any* delay caused by reopened discovery (whether or not the principle just explained is to be followed) creates the risk of a far greater delay forced by the interposition of a newly-brought criminal case whose early trial date is compelled by the Speedy Trial Act. As this Court regularly tells lawyers when it sets a civil case trial date at a post-FPTO pretrial conference:

Your trial date is firm, subject to the possibility that it may be preempted by a criminal case that hasn't yet reached indictment.

And much the same caveat is contained in this Court's standard minute order used to set the trial date for a civil case that has reached the same stage.

[W]here, as here, a considerable period of time has passed between the filing of the complaint and the motion to amend, courts have placed the burden upon the movant to show some "valid reason for his neglect and delay."

See also *Chitimacha Tribe of Louisiana v. Harry L. Laws Co.,* 690 F.2d 1157, 1163 (5th Cir.1982).

McCarthy has failed to meet that burden in any way-he has given no reason for waiting until discovery had closed, the FPTO had been filed, the final pretrial conference had been held and only the actual setting for trial remained. That kind of timing is the hallmark of undue delay where (as here) defendants must return to prepare additional discovery and defenses.

*Knapp v. Whitaker,* 757 F.2d 827, 849 (7th Cir.1985) has affirmed a denial of leave to amend where plaintiff had waited a year to seek such leave after discovery had closed and the FPTO had been entered, and no reason was offered for the undue delay.[FN6] *Knapp, id.* noted that granting leave would clearly prejudice defendants who had invested a year preparing their defenses without notice of the new claim. Other cases from our Court of Appeals reflecting similar facts and results include *Kleinhans v. Lisle Savings Profit Sharing Trust,* 810 F.2d 618, 625 (7th Cir.1987) (amendment filed with no explanation after discovery closed, requiring additional discovery); *Kirby v. P.R. Mallory & Co.,*

489 F.2d 904, 912 (7th Cir.1973) (amendment filed with no explanation two years after plaintiff's knowledge of the facts, requiring additional discovery and new FPTO). This Court has reached the same conclusion on similar facts in *Excalibur Oil, Inc. v. Sullivan,* 659 F.Supp. 1539, 1549 (N.D.Ill.1987), where plaintiff was found guilty of undue and inexcusable delay in waiting two years to amend and "provided not a single attempted justification for its delay," even though it was aware of the facts before the original filing. McCarthy must be viewed as equally guilty of undue and inexcusable delay in waiting four years to file his additional churning claim.

FN6. Denials of leave to amend are reviewed on the lenient abuse-of-discretion standard (*Feldman,* 850 F.2d at 1225).

*Conclusion*

McCarthy is granted leave to add his claim for prejudgment interest and to withdraw his claim for unauthorized trading. Leave to add his new churning claim is denied.

This case is set for trial (in accordance with the priority principles stated in nn. 1 and 4) at 9:45 a.m. October 4, 1989. All remaining pretrial procedures will conform to the following timetable:

1. Any motions in limine and supporting memoranda must be filed 28 days before trial, with responsive memoranda due 14 days before trial.

2. Trial briefs, jury instructions (jointly prepared if at all possible) and voir dire questions must be filed 21 days before trial.

N.D.Ill.,1989.
McCarthy v. PaineWebber, Inc.
127 F.R.D. 130

END OF DOCUMENT

# EXHIBIT 7

First Sav. and Loan Ins. Corp. v. Alexander
D.C.Hawaii,1984.

United States District Court,D. Hawaiʻi.
FIRST SAVINGS AND LOAN INSURANCE
CORPORATION, a federal corporation, Plaintiff,
v.
Denis D. ALEXANDER, Clifford K. Fujiwara,
Glenn K. Okada, William E. Takabayashi, Richard
A. Cooke, Jr., Michael Provan, and Henry K.F.
Kersting, Defendants.
FIRST HAWAIIAN BANK, Plaintiff,
v.
Denis D. ALEXANDER, Richard A. Cooke, Jr.,
Clifford K. Fujiwara, Glenn K. Okada, William E.
Takabayashi, Henry K.F. Kersting, Michael Provan,
and Paul Simplson, Defendants.
**Civ. Nos. 82-0299, 82-0090.**

July 9, 1984.

Two actions were brought against directors of an
insolvent bank alleging mismanagement. The cases
were consolidated for trial. Thereafter, the directors
sought leave to amend the original answers to include
further defenses, cross claim, counterclaims and
third-party claims and bring in new parties.
Plaintiffs requested a discovery conference order
limiting discovery and tentatively identifying the
issues for discovery purposes. The District Court,
Pence, J., held that there was no duty on part of
Federal Savings Loan Insurance Corporation, Federal
Home Loan Bank Board, Federal Home Loan Bank
or the United States to warn defendants of either the
unsavory financial reputation of one director or of
loan by bank secured by bank's stock, thus,
defendants would not be granted leave to amend their
answer to allege counterclaim against the federal
defendants for failure to warn, which claim could be
characterized as a negligent misrepresentation claim,
since such allegations failed to state a claim upon
which relief could be granted; furthermore, claim for
negligent misrepresentation was barred by Federal
Torts Claims Act.

Order in accordance with opinion.
West Headnotes
**[1] Federal Civil Procedure 170A ⟅⟆242**

170A Federal Civil Procedure

170AII Parties
170AII(F) Permissive Joinder
170AII(F)1 In General
170Ak242 k. Common Question of Law
or Fact. Most Cited Cases

**Limitation of Actions 241 ⟅⟆124**

241 Limitation of Actions
241II Computation of Period of Limitation
241II(H) Commencement of Proceeding;
Relation Back
241k124 k. Intervention or Bringing in New
Parties. Most Cited Cases
If an amendment adds a party to the action, the claim
asserted against such party must have arisen out of
the conduct, transaction, or occurrence set forth in the
original pleading, and if so the amendment relates
back to the date of the original pleading. Fed.Rules
Civ.Proc. Rule 15(a, c), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⟅⟆833**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(E) Amendments
170Ak833 k. Liberality in Allowing
Amendment. Most Cited Cases

**Federal Civil Procedure 170A ⟅⟆834**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(E) Amendments
170Ak834 k. Injustice or Prejudice. Most
Cited Cases
Leave to freely amend is not warranted if there would
be substantial prejudice to opposing party or the
proposed amendments would fail to state a claim
upon which relief could be granted. Fed.Rules
Civ.Proc. Rule 15(a), 28 U.S.C.A.

**[3] United States 393 ⟅⟆78(10)**

393 United States
393V Liabilities
393k78 Torts
393k78(5) Nature of Act or Claim
393k78(10) k. Property Damage in
General. Most Cited Cases
There was no duty on part of Federal Savings Loan

Insurance Corporation, Federal Home Loan Bank Board, Federal Home Loan Bank or the United States to warn directors of savings and loan institution of unsavory financial reputation of certain person or of loan by bank to association secured by association's stock.  28 U.S.C.A. § 2680(h);  Fed.Rules Civ.Proc. Rule 15(a), 28 U.S.C.A.

**[4]** United States 393 ☞78(5.1)

393 United States
   393V Liabilities
      393k78 Torts
         393k78(5) Nature of Act or Claim
           393k78(5.1) k. In General. Most Cited Cases

(Formerly 393k78(5))

No counterclaim or third-party claim alleging negligent misrepresentation on the part of the United States or its agents can be asserted against government parties.  28 U.S.C.A. § § 1346, 2671 et seq., 2680(h).

**[5]** United States 393 ☞78(5.1)

393 United States
   393V Liabilities
      393k78 Torts
         393k78(5) Nature of Act or Claim
           393k78(5.1) k. In General. Most Cited Cases

(Formerly 393k78(5))

Allegation by directors of failed savings and loan institution that the Federal Savings Loan Insurance Corporation, Federal Home Loan Bank Board, Federal Home Loan Bank or the United States failed to warn directors of unsavory financial reputation of certain person and of bank loan to association secured by association's stock was but a claim for misrepresentation or failure to disclose and, as such, was barred by the Federal Tort Claims Act.  28 U.S.C.A. § § 1346, 2671 et seq., 2680(h).

**[6]** Federal Civil Procedure 170A ☞827

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(E) Amendments
         170Ak827 k. Leave of Court in General.
Most Cited Cases

If amending party knew or should have known the facts upon which amendment is based at time of original pleading, then leave to amend should be denied unless there is excusable neglect or oversight.

Fed.Rules Civ.Proc. Rule 15(a), 28 U.S.C.A.

**[7]** Federal Civil Procedure 170A ☞845

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(E) Amendments
         170Ak844 Answer
           170Ak845 k. Time for Amendment.
Most Cited Cases

Federal Civil Procedure 170A ☞847

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(E) Amendments
         170Ak844 Answer
           170Ak847 k. Counterclaim. Most Cited Cases

Directors of a bank against whom actions were brought for misrepresentation would not be granted leave to amend their answer to assert counterclaims based on facts well known to them when the original answers were filed where directors did not provide any reasons for their neglect in pursuing those claims earlier.  Fed.Rules Civ.Proc. Rule 15(a), 28 U.S.C.A.

**[8]** United States 393 ☞78(8)

393 United States
   393V Liabilities
      393k78 Torts
         393k78(5) Nature of Act or Claim
         393k78(8) k. Negligence in General.
Most Cited Cases

Once government undertakes an operative task, it cannot act negligently without liability.

**[9]** Federal Civil Procedure 170A ☞847

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(E) Amendments
         170Ak844 Answer
           170Ak847 k. Counterclaim. Most Cited Cases

Federal Savings and Loan Insurance Corporation, which actually managed the insolvent bank as receiver for only a period of four hours, could not possibly have been negligent in operating the bank; thus, directors of the bank, against whom actions for mismanagement had been brought, would not be granted leave to amend their answer to raise a counterclaim against the FSLIC and the United States

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

590 F.Supp. 834
590 F.Supp. 834
**(Cite as: 590 F.Supp. 834)**

Page 3

alleging they mismanaged the bank in their roles as receiver where they failed to allege any specific negligent acts.   Fed.Rules Civ.Proc. Rule 15(a), 28 U.S.C.A.

**[10] Federal Civil Procedure 170A ⚷→847**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
     170AVII(E) Amendments
      170Ak844 Answer
       170Ak847 k. Counterclaim. Most Cited Cases

Directors of a bank, against whom actions for mismanagement had been brought, would not be granted leave to amend their answers to assert counterclaims that bank participated in an illegal compensating balance scheme with assignee of its stockholders' claims, causing the liquidity crisis which put bank into insolvency and receivership since delay by directors in bringing such a counterclaim was prejudicial to plaintiff-assignee. Fed.Rules Civ.Proc. Rule 15(a), 28 U.S.C.A.

**[11] Federal Civil Procedure 170A ⚷→847**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
     170AVII(E) Amendments
      170Ak844 Answer
       170Ak847 k. Counterclaim. Most Cited Cases

Defendants' allegations to effect that imposition and conduct of receivership was void of due process did not arise out of the same transaction and occurrences as the original pleadings alleging that directors of a bank had mismanaged the bank and therefore defendants would not be granted leave to amend their answers to raise the claims.   Fed.Rules Civ.Proc. Rule 15(a), 28 U.S.C.A.; Home Owners' Loan Act of 1933, § 5, 12 U.S.C.A. § 1464; National Housing Act, 12 U.S.C.A. § 1729;   U.S.C.A. Const.Amend. 14.

**[12] Federal Civil Procedure 170A ⚷→1271**

170A Federal Civil Procedure
   170AX Depositions and Discovery
     170AX(A) In General
      170Ak1271 k. Proceedings to Obtain. Most Cited Cases

Burden of persuasion that matters sought to be discovered are not relevant falls on party opposing such discovery and once that burden is satisfied, the party seeking discovery may not rest merely on assertion that it is designed to lead to relevant information but must produce some evidence that the area to be precluded is, in fact, relevant.   Fed.Rules Civ.Proc. Rule 26(b), 28 U.S.C.A.

**[13] Federal Civil Procedure 170A ⚷→1272.1**

170A Federal Civil Procedure
   170AX Depositions and Discovery
     170AX(A) In General
      170Ak1272 Scope
       170Ak1272.1 k. In General. Most Cited Cases

    (Formerly 170Ak1272)

Directors of insolvent bank, against whom actions for mismanagement had been brought, were not entitled to take discovery into certain areas as to which plaintiffs met burden of showing that the matters sought to be discovered were not relevant but would be entitled to institute discovery into arrangements, if any, made by plaintiffs with respect to disbursement of monies recovered in the actions for any assignment of rights or recovery against any of the defendants and concerning management or mismanagement of the bank prior to date when they first took over as directors since those matters were relevant to the issues.   Fed.Rules Civ.Proc. Rule 26(b), 28 U.S.C.A.

**\*836** Steven H. Levinson, Diane D. Hastert, Honolulu, Hawaii, for plaintiffs.

Alexander C. Marrack, Honolulu, Hawaii, for Richard A. Cooke, Jr.

John A. Chanin, Honolulu, Hawaii, for Clifford K. Fujiwara.

Walter G. Chuck, W. Gregory Chuck, Honolulu, Hawaii, for Glenn K. Okada and William E. Takabayashi.

Thomas P. Dunn, Honolulu, Hawaii, for Henry K.F. Kersting.

George W. Brandt, Gail M. Kang, Lyons, Hagerman & Brandt, Honolulu, Hawaii, for Denis D. Alexander.

OPINION AND ORDER

PENCE, District Judge.

On February 25, 1980, the State of Hawaii placed First Savings and Loan Association ("First Savings") in receivership.   The Federal Home Loan Bank Board ("FHLBB") federalized that receivership and appointed the Federal Savings and Loan Insurance Corporation ("FSLIC") as receiver.   Pursuant to that receivership, FSLIC sold the assets and liabilities of First Savings to First Federal Savings and Loan

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

590 F.Supp. 834
590 F.Supp. 834
**(Cite as: 590 F.Supp. 834)**

Page 4

Association ("First Federal") on February 25, 1980.

First Savings, through its directors, filed two suits against FSLIC and others, one on February 26, 1980 and the other on May 7, 1981, alleging that the receivership was improper and illegal. Both suits were dismissed. *See* **\*837***First Savings & Loan Association, et al. v. First Federal Savings & Loan Association of Hawaii, et al., 547 F.Supp. 988 (D. Hawaii 1982)*; *First Savings & Loan Association v. First Federal Savings & Loan Association et al., 531 F.Supp. 251 (D. Hawaii 1981)*.

On February 24, 1982, the First Hawaiian Bank ("FHB"), as the assignee of the claims of the First Savings stockholders, filed suit against the directors of First Savings at the time of the receivership. The suit alleged, primarily, that the directors had mismanaged First Savings to the detriment of First Savings and the stockholders.

FSLIC filed suit against the directors on June 9, 1982, on substantially the same grounds alleged in the FHB action. The FSLIC and FHB actions were consolidated on August 18, 1982. Answers to the complaints were filed by all the defendants except three by July 19, 1982. A default judgment has been entered against one of the defendants, Michael Provan, and two other defendants, Okada and Takabayashi, were given leave to file their Answers by Order of the Court of April 11, 1984.

Defendants Fujiwara, Alexander, Cooke, Okada, and Takabayashi now seek leave to amend their original Answers to include further defenses, cross-claims, counterclaims and third-party claims and bring in new parties, i.e., Federal Home Loan Bank Board ("FHLBB") and Federal Home Loan Bank-Seattle ("FHLB-S").

Defendants move for leave to amend their answers to the complaints. Plaintiffs request a discovery conference order limiting discovery and tentatively identifying the issues for discovery purposes, i.e., and order from this court precluding the defendants from inquiring into the twenty (20) areas listed in Appendix A.

*1. Motion for Leave to Amend Answers to the Complaints*

Defendants now desire to add various counterclaims and third-party claims in the consolidated actions. In essence, these new claims charge plaintiffs and

various third parties with the following:

1. Knowledge of defendant Henry Kersting's unsavory reputation with respect to other savings and loan associations and failure to divulge this information to the defendants;

2. Mismanagement of First Savings in the role of receivership;

3. Pre- and post-receivership bad faith, arbitrariness and capriciousness in dealing with First Savings and the defendants;

4. Knowledge of FHB loan to First Savings secured by First Savings stock and failure to warn defendants of this loan transaction;

5. Knowledge of or participation by FHB in an illegal compensating balance scheme with First Savings which caused the liquidity crisis that forced First Savings into insolvency and the ensuing receivership; and

6. Unconstitutionality of 12 U.S.C. § § 1464 and 1729, on their face and as applied to defendants, in that they operated to deprive First Savings and defendants of valuable property rights without due process of law, in violation of the Fifth Amendment.

[1] F.R.Civ.P. 15(a) permits a party to amend his pleadings by leave of court after 20 days have passed since the filing of the original pleadings. Rule 15(a) states that "leave shall be freely given when justice so requires." If an amendment adds a party to the action, the claim asserted against such party must have arisen out of the "conduct, transaction, or occurrence set forth in the original pleading", and if so, the amendment relates back to the date of the original pleading. Rule 15(c).

[2] On their face, the proposed amendments do state claims that arose out of the original transaction, i.e., the failure and insolvency of First Savings. However, leave to freely amend is not warranted if there would be substantial prejudice to the opposing party or the proposed amendments would fail to state a claim upon which relief could be granted.

[3] Under these conditions, the following proposed amendments cannot be added to defendants' original answers:
**\*838** (A) Defendants' claims that FSLIC, FHLBB, FHLB-S, FHB and the United States failed to warn defendants of Henry Kersting's reputation and/or the

590 F.Supp. 834
590 F.Supp. 834
**(Cite as: 590 F.Supp. 834)**

FHB loan secured by First Savings stock ("FHB loan").

These allegations fail to state a claim upon which relief can be granted, for two reasons. First, defendants allege negligent misrepresentation on the part of the United States and the various federal agencies. Under the Federal Tort Claims Act no action can be maintained against the government or its agents for negligent misrepresentation. Second, plaintiffs and proposed third-party defendants (FHLBB, FHLB-S, United States) did not have a duty to warn defendants of either Henry Kersting's unsavory financial reputation or of the FHB loan to First Savings.

[4][5] Assuming defendants' facts to be true, they merely allege that FSLIC and others were negligent in not informing defendants of Kersting's questionable activities in the past. The gravamen of this claim is negligent misrepresentation, which is excepted from the Federal Torts Claim Act (FTCA) under 28 U.S.C. § 2680(h), which states, in pertinent part, that the FTCA does not apply to "(h) any claim arising out of ... misrepresentation, deceit ...." The United States has not consented to be sued for misrepresentation or deceit. Thus, no counterclaim or third party claim alleging negligent misrepresentation on the part of the United States or its agents can be asserted against the government parties. Defendants' allegation that the plaintiffs and others failed to warn them of Kersting and the FHB loan is but a claim for misrepresentation or failure to disclose and, as such, is barred by § 2680(h) of the FTCA. _Redmond v. United States, Securities and Exchange Commission,_ 518 F.2d 811 (7th Cir.1975); _City and County of San Francisco v. United States,_ 615 F.2d 498 (9th Cir.1980).

In addition, even if defendant's claims could be construed as alleging a cause of action other than negligent misrepresentation, such claims still fail to state a claim upon which relief can be granted. The government agencies had no duty to warn defendants of Kersting or the FHB loan. _In Re Franklin National Bank Securities Litigation,_ 445 F.Supp. 723, _aff'd on rehearing,_ 449 F.Supp. 574 (E.D.N.Y.1978); _Emch v. United States,_ 630 F.2d 523, 527 (9th Cir.1980), _cert. denied,_ 450 U.S. 966, 101 S.Ct. 1482, 67 L.Ed.2d 614 (1981); _First State Bank of Hudson County v. United States,_ 599 F.2d 558 (3d Cir.1979), _cert. denied,_ 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 (1980).

Thus, as a matter of law, this court finds that there was no duty on the part of FSLIC, FHLBB, FHLB-S, or the United States to warn defendants of either the unsavory financial reputation of Henry Kersting, or the loan by FHB secured by First Savings' stock. Therefore, this claim does not and cannot state a claim upon which relief can be granted. The motion to amend is hereby DENIED.
(B) Defendants' claims that FHB also had a duty to warn defendants of Kersting and the FHB loan.

Defendants' new allegations run up against the very valid contention by FHB that it is too late in these proceedings for the defendants to bring such matters before the court. It is difficult for this court to believe that the defendants did not know, or should not have known, about the loan by FHB secured by First Savings stock until now. This loan transaction took place years _before_ First Savings was placed into receivership. Directors of banks have a duty to inform themselves of these types of transactions. _Atherton v. Anderson,_ 99 F.2d 883, 889-90 (6th Cir.1938). _See also Joy v. North,_ 692 F.2d 880, 896 (2nd Cir.1982), _cert. denied,_ 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983).[FN1] In addition, **839 defendants have not supported, by affidavit or otherwise, the allegation that FHB was aware of Kersting's reputation.

> FN1. The court in _First State Bank of Hudson County, supra_ at 562, recognized as a general principle of banking law that a director of a bank is personally liable for any resulting loss "[i]f, through recklessness and inattention to the duties confided to him, frauds and misconduct are perpetrated by other officers and agents or codirectors, which ordinary care on his part would have prevented," _citing_ 1 Michie on Banks and Banking, ch. 3, § 63.

[6] The decision to grant leave to amend is discretionary. Delay by a party seeking leave to amend a complaint or pleading may not alone foreclose amendment, but if prejudice results to another party, then leave to amend may be denied. In addition, if the amending party knew or should have known the facts upon which the amendment is based at the time of the original pleading, then leave to amend should be denied unless there is excusable neglect or oversight. _See Jordon v. County of Los Angeles,_ 669 F.2d 1311 (9th Cir.1982), _vacated on other grounds,_ 459 U.S. 810, 103 S.Ct. 35, 74

590 F.Supp. 834
590 F.Supp. 834                                                                                    Page 6
**(Cite as: 590 F.Supp. 834)**

L.Ed.2d 45 (1982).

[7] In the present proceeding, FHB has alleged that it will be severely prejudiced should these counterclaims be permitted. In addition, FHB points out that these claims and the facts surrounding them, were well known to the defendants when the original answers were filed, almost two years ago. Defendants have not provided any reasons for their neglect in pursuing these claims earlier. Therefore, this court finds that it would prejudice the plaintiff, FHB, to permit these counterclaims against it. Leave to amend to permit these counterclaims is therefore DENIED.

(C) Defendants' claims against FSLIC and the United States, alleging they mismanaged the bank in their roles as receiver.

These new allegations fail to state a claim upon which relief can be granted. [FN2]

>    FN2. Before dispensing with the proposed claims, it must be noted that this court rejects plaintiffs' procedural argument that such claims are barred by § 2401(b), which requires administrative exhaustion before claims against the United States or its agents may be brought into court. These particular claims are counter or third-party claims, hence under § 2675(a), defendants need not meet the requirement of administrative exhaustion.

[8] There is a distinction between discretionary or policy functions and operational functions. Once the government undertakes an operative task, it cannot act negligently without liability. *In Re Franklin Securities* involved the FDIC actually taking over the day-to-day control of a bank in receivership. The court held that this was not a discretionary function any longer, but was operational in nature. Thus, the FDIC could not act negligently and escape liability. 445 F.Supp. at 735.

In *Guild v. United States,* a key distinction was noted by the court between performance of operational tasks and communication of information. 685 F.2d 324, 325 (9th Cir.1982). The government was held liable for injuries relating to the negligence in performance of a task, even if misrepresentations were collaterally involved. *Id.* at 326.

[9] In the instant matter, while FSLIC, and hence the

United States, did actually manage the bank as receiver, FSLIC only acted as such for a period of four (4) hours. In such a short time period, this court cannot here envision how FSLIC could possibly have been negligent in *operating* First Savings. Indeed, defendants do not allege any specific negligent acts on the part of FSLIC as a receiver. Under these factual circumstances, therefore, defendants have failed to state a claim upon which relief could be granted, hence leave to amend to include such a claim is DENIED.

(D) Defendants' claims that FSLIC evidence pre- and post-receivership bad faith, arbitrariness or capriciousness in dealing with the defendants and First Savings.

These allegations are extremely broad, vague, and fail to state a claim upon which relief can be granted.

While *In Re Franklin Securities* suggests that allegations of grossly arbitrary or capricious actions on the part of the government state a claim for relief under the FTCA, 445 F.Supp. at 734, that statement was in the context of the FDIC mismanaging **840** a bank as a receiver. This aspect of FSLIC acting as a receiver has been discussed immediately above, in (C). Defendants give no indication whatsoever of what acts of FSLIC were arbitrary or capricious. At this late date, such vague counterclaims cannot be permitted. To allow such a claim to be brought would, in essence, allow defendants to go on a "fishing expedition" in attempts to discover "possible" bad faith actions by FSLIC.

(E) Defendants' claims that FHB participated in an illegal compensating balance scheme with First Savings, causing the liquidity crisis which put First Savings into insolvency and receivership.

[10] These allegations are proposed so late in this action as to be prejudicial to FHB. As was previously observed, the delay by the defendants in bringing this type of counterclaim is very prejudicial to FHB. Defendants do not explain the delay, except to assert that they recently discovered this compensating balance scheme while sifting through thousands of documents. Again, the record discloses that several of the defendants knew of the compensating balance transaction before February 25, 1980, and all of the defendants, as directors of First Savings, *should have known* of this allegedly illegal transaction with FHB. To allow such a claim now would bring forth a tremendous amount of discovery and would be extremely prejudicial to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FHB. Therefore, leave to amend to include such a claim is DENIED.

(F) Defendants' claims that 12 U.S.C. § § 1464 and 1729 are unconstitutional.

[11] These allegations do not arise out of the same transaction and occurrences as the original pleadings. Plaintiffs are suing defendants for mismanagement of First Savings. That defendants felt the imposition and conduct of the receivership was void of due process does not go to the merits of plaintiffs' claims. Indeed, such an argument does not relate to the claim of mismanagement at all.

If there were any merit therein, defendants should have brought these claims at the time they filed their original answers. Defendants had ample opportunity to do so. These constitutional claims may not now be properly brought as part of the issues in this case. The motion to amend to set forth such claims is DENIED.

### 2. *Motion for Discovery Conference Order*

Plaintiffs seek a discovery conference order pursuant to F.R.Civ.P. 26(f) which encompasses requests for limitations on proposed discovery. Plaintiffs propose that discovery into the areas listed in Appendix A be precluded. Defendants argue that those "precluded" areas, as designated by plaintiffs, are relevant to the issues in the case or designed to lead to relevant material.

[12] While F.R.Civ.P. 26(b) allows a very broad scope of discovery, the burden of persuasion that matters sought to be discovered are not relevant falls on the party opposing such discovery. Once that burden is satisfied, the party seeking discovery may not rest merely on the assertion that it is designed to lead to relevant information but must produce some evidence that the area to be precluded is, in fact, relevant.

[13] Here, plaintiffs have met this burden of showing irrelevancy and, except as to numbers 5 and 18, defendants have not shown any evidence to the contrary. All parties are hereby precluded from instituting discovery into the following areas (numbers refer to the numbered paragraphs in Appendix A):

1. All matters concerning the propriety of the institution and conduct of the First Savings receivership established by the State of Hawaii and

"federalized" by the Federal Home Loan Bank Board.

This area of information is immaterial to the issues raised by the pleadings, and it does not appear to lead to any relevant or admissible evidence.

2. Federal regulatory investigation of Investors Financial Corporation holding company application and all matters relating thereto.

**\*841** This information has already been given regarding the investigation of Investors Financial Corporation, except as to certain individuals, unspecified by defendants. If defendants, at a later date, specify whom they wish to depose and why, then this court will consider such issues at that time.

3. The original purchase of First Savings stock by a pilot group represented by Henry Kersting and all related matters, including, but not limited to, a loan transaction by which FHB financed the purchase of approximately 90% of First Savings stock, the process by which FHB obtained assignments of the causes of action of certain of the stockholders against the former directors and officers of First Savings.

This court has previously ruled that the FHB loan and the assignment of the shareholders' rights of First Savings to FHB were irrelevant. Nothing has been produced by defendants to alter that finding of irrelevancy.

4. Relationships, agreements, correspondence or communications of any nature at any time, if any, between or on behalf of FSLIC and FHB, Kersting, Alexander, Weisman, Slaton, Dunn, Nevels, and/or Provan, except with respect to the day-to-day operations of First Savings.

Defendants argue that discovery into this area would result in evidence of collusion between plaintiffs and certain defendants, thus precluding jurisdiction by this court over these consolidated cases.

A collusive action is a contrived case in which there is no actual dispute between the parties, and one party controls the litigation so as to bring about a predetermined result. *First National Bank in Mena v. Nowlin,* 374 F.Supp. 1037, 1038, n. 1 (E.D.Ark.1974), *aff'd,* 509 F.2d 872 (8th Cir.1975). [FN3] A controversy as to the liability of defendants for the demise of First Savings certainly exists. The court has already ruled that it has jurisdiction over the

present action. As such, not only would the requested discovery be onerous and burdensome to the plaintiffs, it would not lead to any relevant or admissible evidence.

> FN3. The fact that some defendants might concede the plaintiffs' case does not destroy the controversy when other defendants remain in active dispute. *Goosby v. Osser, 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973).*

6. Projections, reports, studies, surveys, summaries or "scenarios", if any, prepared by or relied upon by FHLBB, FHLB-S, and/or FSLIC at any time with respect to long term residential mortgage loans, time-deposit accounts for member institutions, certificates of deposit other than jumbo certificates, jumbo certificates for various terms, interest rates charged by any Federal Home Loan Bank to member institutions for various terms.

It is entirely up to FSLIC and FHLBB when to lend any member institutions any money or when to put them into receivership. These actions are within these agencies' discretion. Every time such an action is taken, it perforce is based upon the particular facts of the then existent situation; no two situations are alike. As such, no information gleaned from discovery into this area would have any bearing on whether the defendant directors mismanaged First Savings. This area is immaterial to the issues involved in this action.

7. Authors, spokespersons, agents or representatives of FHLB-S, FHLBB and/or FSLIC who have been authorized to speak on or write publicly regarding "regulatory policy matters" during the years 1978 to the present.

This court is satisfied that such a discovery request would not lead to any relevant material. How FSLIC deals with one institution has no relevance as to how it deals with other institutions. In addition, such open-ended discovery would be a great burden on plaintiffs.

8. Authored reports, speeches, or press releases, if any, written or otherwise made by authors, spokespersons, agents and/or representatives on behalf of FHLB-S, FHLBB, and/or FSLIC during the years 1978 to the present with **\*842** respect to the effect of upward interest rate trends upon member institutions, the effect of state usury laws, efforts by member institutions to sell loans on the secondary market or by private placement; desirability to enforce FHLBB and FSLIC regulations differentially between big and small member institutions or according to their size; the effect of bunching regulations contained in 12 C.F.R. § 526.10 upon member institutions' operations and compliance therewith; policies governing availability and use of advances from FHLBB; FHLBB or FSLIC guidelines for imposing receiverships; disintermediation or other problems affecting financial resources of member institutions.

Not only would such a discovery request be exceedingly onerous to plaintiffs, it would not lead to any relevant evidence. This court must emphatically stress that it is the *particular* facts of any particular situation that determine how FSLIC or FHLBB deal with member institutions. That FSLIC or FHLBB dealt with one member institution in one manner is not evidence of illegal or discriminatory treatment of another member institution dealt with in a different manner. For these reasons, such discovery is properly precluded.

9. All matters of any nature respecting "bunching" regulations other than application of same to First Savings during the period from March 1978 through February 1980.

10. All matters concerning regulatory violations of any nature of member institutions, other than First Savings, for any time period.

11. Assistance agreements and all matters related thereto, entered into between FHLBB, FHLB-S, and/or FSLIC and any member institution, other than First Savings, for any time period.

12. Efforts, if any, by FHLB-S, FHLBB and/or FSLIC to offer for sale or otherwise "shop" any member institution, other than First Savings, during any time period.

13. FHLB-S, FHLBB and/or FSLIC investigation or review, if any, of persons who own, manage or are affiliated with, or otherwise control member institutions at any time, including, but not limited to, Kersting and Alexander.

14. Requirements, if any, for the use by any regulatory agency of spread assistance agreements, income capital certificates, assistance agreements, emergency credit.

15. Records, if any, maintained by FHLB-S, FHLBB and/or FSLIC with respect to persons who have been involved with insolvent member institutions.

16. Ways, if any, by which FHLB-S, FHLBB and/or FSLIC communicate information to the directors, officers, or owners of a member institution pertaining to an individual's questionable ability to operate or

control a member institution.
17. Mechanisms, if any, used by FHLB-S, FHLBB and/or FSLIC to inform state regulatory agencies of information concerning an individual's qualifications to manage or control a member institution.
19. Receiverships and/or insolvencies of member institutions, other than First Savings, at any time.
20. Federal regulatory activities of any nature at any time with respect to member institutions other than First Savings.

The same ruling as that respecting the discovery previously precluded applies to numbers 9-20. Such discovery requests are too broad, too burdensome and irrelevant to the issues in this action.

As to the discovery requested in paragraph 13, *supra*, this court emphasizes that FSLIC, FHLBB or FHLB-S had no duty to warn the directors of First Savings of other directors' evil tendencies. Any discovery into the internal mechanisms by which FSLIC or FHLBB investigates directors of member institutions is thus irrelevant.

There are, however, two areas of discovery which plaintiffs have requested be **\*843** precluded that this court finds relevant to the pending action.
5. Arrangements, if any, made by the plaintiffs with respect to the disbursements of monies recovered in these consolidated matters or any assignment of any rights of recovery against any of the defendants.

The interest of a witness in the outcome of a case obviously affects the credibility of his testimony. However, though the issue of credibility may be of vital importance and ultimately determine the outcome of a lawsuit, it may not necessarily be relevant to the subject matter of the litigation. Under the present circumstances, the credibility of certain witnesses obviously would be relevant to the subject matter of the case. *See United States v. International Business Machines Corp., 84 F.R.D. 651 (S.D.N.Y.1979).* This court is satisfied that defendants have proffered more than a general allegation of relevancy. Thus, defendants have overcome plaintiffs' specific objections to discovery of agreements between plaintiffs and defendants.

Defendants may obtain copies of any agreements between plaintiffs and any other person which might result in a recovery by any defendant should the plaintiffs succeed in this action. This order is for the purpose of enabling defendants to attack the

credibility of certain witnesses, i.e., co-defendants.
18. The management or mismanagement of First Savings prior to March 1978, if any.

Defendants must be allowed discovery into this area in order to ascertain the condition of First Savings when defendants first took over as directors. Such discovery goes to the value of First Savings and would be a basis for challenging the experts on such value.

IT IS SO ORDERED.

APPENDIX A

1. All matters concerning the propriety of the institution and conduct of the FS receivership established by the State of Hawaii and "federalized" by the Federal Home Loan Bank Board ("FHLBB");

2. Federal regulatory investigation of an Investors Financial Corporation ("IFC") holding company application and all matters relating thereto;

3. The original purchase of FS stock by a pilot group represented by Henry Kersting ("Kersting") and all related matters, including, but not limited to, a loan transaction by which FHB financed the purchase of approximately 90% of FS' stock, the process by which First Hawaiian Bank obtained assignments of the causes of action of certain of the stockholders against the former directors and officers of First Savings & Loan;

4. Relationships, agreements, correspondence, or communications of any nature at any time, if any, between or on behalf of the FSLIC and FHB, Kersting, Denis Alexander ("Alexander"), Lawrence Weisman, Randolph Slaton, Thomas Dunn, Luman Nevels, and/or Michael Provan, except with respect to the day-to-day operations of FS;

5. Arrangements, if any, made by the plaintiffs with respect to the disbursements of monies recovered in these consolidated matters or any assignment of any rights of recovery against any of the defendants;

6. Projections, reports, studies, surveys, summaries or "scenarios", if any, prepared by or relied upon by the FHLBB, the Federal Home Loan Bank-Seattle ("FHLB-S"), and/or the FSLIC at any time with respect to long term residential mortgage loans, time-deposit accounts for member institutions, certificates

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of deposit other than jumbo certificates, jumbo certificates for various terms, interest rates charged by any Federal Home Loan Bank to member institutions for various terms;

7. Authors, spokespersons, agents or representatives of the FHLB-S, FHLBB and/or FSLIC who have been authorized to speak on or write publicly regarding "regulatory policy matters" during the years 1978 to the present;

**\*844** 8. Authored reports, speeches, or press releases, if any, written or otherwise made by authors, spokespersons, agents and/or representatives on behalf of the FHLB-S, FHLBB and/or FSLIC during the years 1978 to the present with respect to the effect of upward interest rate trends upon member institutions, the effect of state usury laws; efforts by member institutions to sell loans on the secondary market or by private placement; desirability to enforce FHLBB and FSLIC regulations differentially between big and small member institutions or according to their size; the effect of bunching regulations contained in 12 C.F.R. § 526.10 upon member institutions' operations and compliance therewith; policies governing availability and use of advances from the FHLB; FHLB, FHLBB or FSLIC guidelines for imposing receiverships; disintermediation or other problems affecting financial resources of member institutions;

9. All matters of any nature respecting "bunching" regulations other than application of same to FS during the period from March 1978 through February 1980;

10. All matters concerning regulatory violations of any nature of member institutions, other than FS for any time period;

11. Assistance agreements and all matters related thereto, entered into between the FHLB, FHLBB and/or FSLIC and any member institution, other than FS, for any time period;

12. Efforts, if any, by the FHLB, FHLBB and/or FSLIC to offer for sale or otherwise "shop" any member institution, other than FS, during any time period;

13. FHLB-S, FHLBB and/or FSLIC investigation or review, if any, of persons who own, manage or are affiliated with, or otherwise control membr institutions at any time, including, but not limited to, Kersting and Alexander;

14. Requirements, if any, for the use by any regulatory agency of spread assistance agreements, income capital certificates, assistance agreements, emergency credit;

15. Records, if any, maintained by the FHLB, FHLBB and/or FSLIC with respect to persons who have been involved with insolvent member institutions;

16. Ways, if any, by which the FHLB, FHLBB and/or the FSLIC communicate information to the directors, officers, or owners of a member institution pertaining to an individual's questionable ability to operate or control a member institution;

17. Mechanisms, if any, used by the FHLB, FHLBB and/or FSLIC to inform state regulatory agencies of information concerning an individual's qualifications to manage or control a member institution;

18. The management or mismanagement of FS prior to March 1978, if any;

19. Receiverships and or insolvencies of member institutions, other than FS, at any time; and

20. Federal regulatory activities of any nature at any time with respect to member institutions other than FS.

D.C.Hawaii,1984.
First Sav. and Loan Ins. Corp. v. Alexander
590 F.Supp. 834

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.