# YOUNG CONAWAY STARGATT & TAYLOR, LLP

MELANIE K. SHARP
DIRECT DIAL:   (302) 571-6681
DIRECT FAX:   (302) 576-3333
msharp@ycst.com

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

P.O. BOX 391
WILMINGTON, DELAWARE 19899-0391

(302) 571-6600
(302) 571-1253 FAX
(800) 253-2234 (DE ONLY)
www.youngconaway.com

August 10, 2007

**BY E-FILE**

The Honorable Mary Pat Thynge
United States District Court of Delaware
844 North King Street
Wilmington, DE 19801

Re:     *Amgen, Inc. et al.  v. ARIAD Pharmaceuticals, Inc.*
C. A. No.: 06-259 (MPT)

Dear Judge Thynge:

Per the Court's request at the August 3, 2007 hearing, this letter serves to advise the Court of the law surrounding the safe harbor provision of 35 U.S.C. § 271(e)(1) ("§ 271(e)(1)"), which is relevant to the proposed infringement allegations under the two assay patents that ARIAD seeks to add to this case.

In its proposed amended counterclaims and in its briefing on the pending motion, ARIAD has focused on Amgen's internal use of a "luciferase reporter gene assay." But as the Federal Circuit recently held, the safe harbor provision of § 271(e)(1) exempts from infringement uses of patented inventions that are "reasonably related" to the process of developing information for submission to a governmental agency such as the FDA, at least where such use is non-commercial in nature. *Integra Lifesciences, Ltd. v. Merck KGaA*, Nos. 2002-1052, 2002-1065, 2007 WL 214878 at *3 (Fed. Cir. July 27, 2007) (Exh. 1); *see also See Biogen, Inc. v. Schering AG*, 954 F. Supp. 391, 396-397 (D. Mass. 1996) (finding § 271(e)(1) not applicable where company had engaged in promotional commercial activities beyond what was required for FDA approval) (Exh. 2). One need look no further than ARIAD's own reply brief in support of its motion for leave to amend to see that it seeks to assert its two assay patents against internal Amgen activities that are *directly related* to the process of developing information for submission to the FDA. Indeed, ARIAD argued in that brief that "Amgen has even sought *FDA-approval* to use a luciferase reporter gene assay … to measure the biological activity of Kineret." (ARIAD Reply Br. at 6, fn. 3). Although information regarding this assay was being developed for submission to the FDA, it was never used in any commercial context. Amgen has never used this assay in conjunction with the release of any commercial lots of Kineret®. There can thus be no doubt that the activities that ARIAD seeks to accuse through its proposed amendment *are* protected under § 271(e)(1), this amendment would be futile, and this futility should be considered in denying ARIAD's belated motion for leave to amend.[1]

---

[1]   It bears emphasizing that the futility surrounding ARIAD's proposed amendment is heightened by the fact that the assessment of damages for any allegedly infringing non-commercial activities would be negligible given

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Mary Pat Thynge
August 10, 2007
Page 2

Section 271(e)(1) reads in pertinent part:

It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use or sale of drugs or veterinary biological products.

In *Merck KGaA v. Integra Lifesciences I, Ltd.,* the Supreme Court held that it was "apparent from the statutory text that § 271(e)(1)'s exemption from infringement extends to all uses of patented inventions that are reasonably related to the development and submission of *any* information under the FDCA [the Federal Food, Drug and Cosmetic Act]." 545 U.S. 193, 202 (2005) (emphasis in original) (Exh. 3); *see also Integra,* 2007 WL at *5. The FDCA is "a Federal law which regulates the manufacture, use or sale of drugs." *Merck,* 545 U.S. at 196. The scope of the § 271(e)(1) exemption was further clarified two weeks ago by the Federal Circuit upon remand from the Supreme Court. *See Integra,* 2007 WL 2142878. In *Integra,* the Federal Circuit held that the term "reasonably related" in the statute includes "uses in research that are conducted after the biological mechanism and physiological effect of a candidate drug have been recognized, such that if the research is successful it would appropriately be included in a submission to the FDA." 2007 WL at *3. In addition, such research must be directed towards submission to the FDA rather than to any overtly commercial activity. *See, e.g., Ortho Pharma. Corp. v. Smith,* 1990 WL 121353 at *23 (E.D. Pa. 1990) (noting that the § 271(e)(1) safe harbor does not "permit other uses, such as obtaining foreign premarketing approval and any promotional or commercial use in the U.S. or abroad.") (Exh. 4).

ARIAD's briefing in support of its motion identifies and relies upon documents detailing Amgen's FDA submission of a proposed test used to "measure the potency (biological activity)" of Kineret® prior to release. (*See* Ex. A to ARIAD's Reply in Support of its Motion for Leave to File Amended Counterclaims Asserting Additional Claims, at AM-AR0433119-64, at AM-AR0433123).[2] Although this assay was submitted to the FDA for approval, it was subsequently withdrawn, and has never been used in connection with the release of any

---

ARIAD's previous characterization of the relative unimportance of these earlier patents. *See* D.I. 70 (Hearing dated Sept. 11, 2006) ("Speaking very, very generally, the first patent ['374] and the second patent ['090] are more about *ways of identifying compounds* which affect the NF-kB pathway....," page 7, lns. 13-16, "...the '516 patent really was a very important patent because it talked about the use of compounds in drugs to modulate NF-kB activity as opposed to *just laboratory techniques* to find out whether or not a compound does in some way affect NF-kB activity." page 10, lns. 9-13.) (emphasis added). This futility is further highlighted by the fact that ARIAD has waited over 6 years to decide to sue Amgen for allegedly infringing the assay patents despite having been on notice of purported infringing activities during that entire time.

[2]    This document was submitted to the FDA to "supplement[] its Kineret® (anakinra) Biologics License with proposed changes to 2 analytical methods" in order to seek FDA-approval to use one of these methods for the purpose of conducting release assays to measure a biological activity (i.e., potency) of Kineret® product prior to release of the commercial product.

Y‌OUNG C‌ONAWAY S‌TARGATT & T‌AYLOR, LLP
The Honorable Mary Pat Thynge
August 10, 2007
Page 3

commercial lots of Kineret®. The assays identified by ARIAD as the basis for seeking leave to amend their pleadings therefore fall squarely into the safe harbor provision provided by § 271(e)(1): first, they were developed for submission to the FDA, and second, they were never used in a commercial context.[3] *See Merck*, 545 U.S. at 202 ("exemption from infringement extends to all uses of patented inventions that are reasonably related to the development and submission of any information under the FDCA"); *compare with Biogen*, 954 F. Supp. at 396-397 (actions including stockpiling and marketing of the product were sufficient to take Biogen "out of the safe harbor") (internal quotations omitted).

In short, the internal Amgen activities that ARIAD seeks to accuse of infringing its assay patents are exempt from infringement under § 271(e)(1). As a result, this Court should deny ARIAD's motion to amend because, in addition to all of the reasons previously set forth by Amgen, such an amendment would be futile.

Respectfully,

*/s/ Melanie K. Sharp*

Melanie K. Sharp (No. 2501)

cc:    Clerk of the Court (Hand Delivery)
       John G. Day, Esquire (via e-mail)
       Frederick L. Cottrell, III, Esquire (via e-mail)
       David I. Gindler, Esquire (via e-mail)
       Charles E. Lipsey, Esquire (via e-mail)

---

[3]    In its proposed amended complaint, ARIAD also alleges that Amgen's so-called "cellular imaging assays" infringe the '374 and '090 patents. ARIAD has never explained what it is referring to with this vague term, and did not even identify any particular Amgen "cellular imaging" activity as infringing when pressed to do so in the context of the briefing on its motion for leave to amend. Amgen is not aware that it has used any assays that would be properly classified as "cellular imaging assays," and, in any event, any use of such assays would be protected by § 271(e)(1).

# EXHIBIT 1

Westlaw.

H

Integra Lifesciences I, Ltd. v. Merck KGaA
C.A.Fed.,2007.
Only the Westlaw citation is currently available.
United States Court of Appeals,Federal Circuit.
INTEGRA LIFESCIENCES I, LTD. and The
Burnham Institute, Plaintiffs-Cross Appellants,
andTelios Pharmaceuticals, Inc., Plaintiff,
v.
MERCK KGaA, Defendant-Appellant,
andThe Scripps Research Institute and Dr. David A.
Cheresh, Defendants.
**Nos. 2002-1052, 2002-1065.**

July 27, 2007.

**Background:** Owner of patents for pharmacologically useful peptide sued competitor, researcher, and research institute for infringement and inducement of infringement. The United States District Court for the Southern District of California, James M. Fitzgerald, Senior District Judge, sitting by designation, entered judgment upon jury's finding of infringement and awarded damages. On appeal, the United States Court Of Appeals for the Federal Circuit, 331 F.3d 860, affirmed in part and reversed in part, finding that patent statute's safe harbor provision did not apply, and that patents covered peptides developed by competitor, but remanding for recalculation of damages. After granting certiorari, the Supreme Court, 545 U.S. 193, 125 S.Ct. 2372, vacated and remanded. Court of Appeals took up infringement issue on remand.

**Holdings:** The Court of Appeals, Newman, Circuit Judge, held that:

(1) challenged experiments met criteria of being reasonably related to research that, if successful, would have been appropriate to include in submission to Food and Drug Administration (FDA), and

(2) challenged experiments were not deprived of FDA exemption to patent infringement by their contribution to scientific knowledge.

Reversed.

Rader, Circuit Judge, filed opinion dissenting-in-part and concurring-in-part.

**[1] Patents 291 ☞260**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k260 k. Extent of Use. Most Cited Cases
Challenged experiments, all of which were conducted after discovery of anti-angiogenesis property of experimental arginine, glycine, and aspartic acid (RGD) peptide provided by competitor, met criteria of being reasonably related to research that, if successful, would have been appropriate to include in submission to Food and Drug Administration (FDA), and thus challenged experiments were within FDA exemption to patent infringement with regard to patents for pharmacologically useful peptide. 35 U.S.C.A. § 271(e)(1); 21 C.F.R. § 312.23(a).

**[2] Patents 291 ☞260**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k260 k. Extent of Use. Most Cited Cases
Food and Drug Administration (FDA) exemption to patent infringement includes experimentation on products that are not ultimately the subject of a FDA submission provided that the particular biological process and physiological effect had been identified and the work was reasonably related to that appropriate for inclusion in an investigational new drug (IND) application. 35 U.S.C.A. § 271(e)(1).

**[3] Patents 291 ☞260**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k260 k. Extent of Use. Most Cited Cases
Studies of compounds that are not ultimately proposed for clinical trials are within the Food and Drug Administration (FDA) exemption to patent infringement when there was a reasonable basis for identifying the compounds as working through a particular biological process to produce a particular

--- F.3d ----                                                    Page 2

--- F.3d ----, 2007 WL 2142878 (C.A.Fed.)

**(Cite as: --- F.3d ----)**

physiological effect. 35 U.S.C.A. § 271(e)(1).

**[4] Patents 291 🔑260**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k260 k. Extent of Use. Most Cited Cases
Food and Drug Administration (FDA) exemption to patent infringement applies to experiments conducted to determine the optimum candidate drug, including experiments with rejected candidates. 35 U.S.C.A. § 271(e)(1).

**[5] Evidence 157 🔑570**

157 Evidence
    157XII Opinion Evidence
        157XII(F) Effect of Opinion Evidence
            157k569 Testimony of Experts
                157k570 k. In General. Most Cited Cases
When an expert witness' statement of the law is incorrect, that view of the law cannot be relied upon to support the verdict.

**[6] Federal Courts 170B 🔑799**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)3 Presumptions
                170Bk799 k. Verdict. Most Cited Cases
The rule that a jury verdict is reviewed for support by " substantial evidence" does not mean that the reviewing court must ignore the evidence that does not support the verdict; court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[7] Patents 291 🔑260**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k260 k. Extent of Use. Most Cited Cases
Challenged experiments were not deprived of Food and Drug Administration (FDA) exemption to patent infringement by their contribution to scientific knowledge, since experiments were relevant to drug development and regulatory compliance. 35 U.S.C.A.

§ 271(e)(1).

On remand from the Supreme Court of the United States.

Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., of Washington, DC, for defendant-appellant Merck KGaA. With him on the brief were Thomas H. Jenkins, David A. Manspeizer, and Rachel H. Townsend. Of counsel on the brief were M. Patricia Thayer, Heller Ehrman White & McAuliffe, LLP, of San Francisco, CA; and William C. Rooklidge, Howrey Simon Arnold & White, LLP, of Irvine, CA. Of counsel was Esther H. Lim, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., of Washington, DC.

Mauricio A. Flores, Campbell & Flores LLP, of San Diego, CA, for plaintiffs-cross appellants Integra LifeSciences I, Ltd. and The Burnham Institute. With him on the brief were David M. Beckwith. Of counsel on the brief were Raphael V. Lupo, Mark C. Davis, and Natalia V. Blinkova, McDermott, Will & Emery, of Washington, DC. Of counsel was Donna M. Tanguay.

Kelly L. Morron, Schiff Hardin LLP, of New York, NY, for amicus curiae Association of the Bar of the City of New York. Of counsel on the brief was Charles E. Miller, Dickstein Shapiro Morin & Oshinsky LLP, of New York, NY.

Edward A. Pennington, Swidler Berlin LLP, of Washington, DC, for amicus curiae Bavarian Nordic A/S. With him on the brief was Robert C. Bertin. Of counsel was Li Westerlund, Director of Intellectual Property, of Kvistg<ard, Denmark.

Joshua D. Sarnoff, Glushko-Samuelson Intellectual Property Law Clinic, of Washington, DC, for amici curiae Consumer Project on Technology, Electronic Frontier Foundation, and Public Knowledge.

William R. Boudreaux, Eli Lilly and Company, of Indianapolis, Indiana, for amicus curiae Eli Lilly & Company. With him on the brief was Mark J. Stewart.

Lynn E. Eccleston, The Eccleston Law Firm, of Washington, DC, for amicus curiae Bar Association of the District of Columbia. With him on the brief was Susan M. Dadio, Buchanan Ingersoll PC, of Alexandria, VA.

Stanton T. Lawrence, III, Arnold & Porter, of Washington, DC, for amicus curiae Wyeth. With him on the brief were Paul J. Zegger and Todd A. Wagner.

Before NEWMAN, RADER, and PROST, Circuit

--- F.3d ----                                                                                    Page 3

--- F.3d ----, 2007 WL 2142878 (C.A.Fed.)

**(Cite as: --- F.3d ----)**

Judges.

NEWMAN, Circuit Judge.

**\*1** This case returns to us upon vacatur by the Supreme Court of the judgment of the Court's statutory construction of 35 U.S.C. § 271(e)(1). FN1 We received further briefing and argument, and now reverse the district court's judgment of infringement.

BACKGROUND

Reference is made to the prior opinions, *see* n. 1, for the history of this case, discussion of the science, and the issues and arguments raised at earlier stages of the litigation. The five patents in suit, owned by Integra Life Sciences Corporation, relate to certain peptides that contain the RGD sequence of amino acids, *viz.* the contiguous sequence of arginine (R), glycine (G), and aspartic acid (D) within a peptide chain. The patented inventions are described as demonstrating various cell interactions with the extracellular peptide matrix, including ways of promoting cell attachment, blocking cell attachment, and disrupting cell attachment. The validity of the Integra patents was sustained at trial but for one claim, and is not here at issue.

In activities preceding this litigation, Merck KGaA (a German company) and Scripps Research Institute were collaborating in research related to studies that Dr. David Cheresh and others at Scripps were conducting on the inhibition of angiogenesis.FN2 The development and growth of undesired blood vessels is a factor in several diseases, including solid tumor cancers, diabetic retinopathy, and rheumatoid arthritis. Dr. Cheresh, in the course of research using monoclonal antibodies, had discovered that angiogenesis is affected by blocking the <<alpha>>v<<beta>>3 integrin cell surface receptors on endothelial cells, thereby depriving the cells of blood. In 1994 Dr. Cheresh evaluated a cyclic RGD peptide that was provided by Merck, and found that it was effective in inhibiting angiogenesis. Merck and Scripps then entered into a sponsorship agreement directed to the goal of progressing, within three years, to clinical trials with human subjects. Clinical trials require the prior approval of the Food and Drug Administration, which is obtained through the mechanism of an Investigational New Drug (IND) application in accordance with FDA Regulations.

During the collaboration with Merck, Dr. Cheresh and others at Scripps conducted the experiments here charged with infringement. As the work proceeded

they studied the efficacy, mechanism of action, pharmacology, pharmacokinetics, and safety of three structurally related RGD peptides. The collaborators duly selected the peptide designated EMD 121974 as having optimum properties for development. In October 1998 the National Cancer Institute agreed to sponsor clinical trials for EMD 121974.

In 1996 Integra sued Merck, Scripps, and Dr. Cheresh for infringement of one or more of the five Integra patents, reportedly after failed negotiations. In the district court two principal defenses were presented: first, that the early scientific studies at Scripps on RGD peptides are not subject to patent infringement, based on the common law research exemption; and second, that the ensuing studies were conducted in furtherance of drug development and the projected clinical trials, and are exempt from infringement under the FDA Exemption (or " safe harbor" ) established by 35 U.S.C. § 271(e)(1):

**\*2** 35 U.S.C. § 271(e)(1). It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products.

As to the first defense, the district court ruled that all but one of the experiments conducted by Dr. Cheresh before 1995, that is, his initial studies of angiogenesis inhibition by the first cyclic RGD peptide provided by Merck (designated EMD 66203), were of the nature of basic scientific research and within the common law research exemption. No appeal was taken from this ruling, and these early experiments are not included in the subject matter charged with infringement. Although in the district court Scripps had argued that at least some of the ensuing studies were also shielded from infringement by the common law research exemption, this argument was not presented on appeal to the Federal Circuit or the Supreme Court, and is not at issue.

As to the second defense, the district court submitted to the jury the question of whether the challenged activities were protected by the FDA Exemption. The court instructed the jury as follows:

Merck contends that it does not infringe or induce the infringement of any of the patents-in-suit, based upon the Food and Drug Administration or " FDA" Exemption. To prevail on this defense, Merck must

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 4

prove by a preponderance of the evidence that it would be objectively reasonable for a party in Merck's and Scripps' situation to believe that there was a decent prospect that the accused activities would contribute, relatively directly, to the generation of the kinds of information that are likely to be relevant in the processes by which the FDA would decide whether to approve the product in question.
Each of the accused activities must be evaluated separately to determine whether the exemption applies.
Merck does not need to show that the information gathered from a particular activity was actually submitted to the FDA.

Neither side assigned error to this instruction, although Merck objected to the verdict form which grouped the accused activities such that if any one experiment were found not entitled to the FDA Exemption, infringement could be found by the jury. Although the parties continue to argue about this aspect, it is mooted by the Court's rulings and our conclusion in light thereof.

At the trial both sides presented expert testimony concerning the FDA Exemption, and argued theory, fact, and application of § 271(e)(1). Integra's position was that the FDA Exemption did not apply to the Scripps experiments or to most of them. Some of the experiments were with RGD peptides that were not the subject of an IND application, and Integra presented opinion testimony that most or all of the experiments could not be the basis of an IND application because the work did not conform to the Good Laboratory Practices protocols of the FDA, and in all events that the FDA Exemption at the IND stage applies only to studies of safety for administration to human subjects and thus did not include the majority of the experiments, which concerned the properties and mode of action but not the safety of the candidate angiogenesis inhibitor. Integra argued that the FDA Exemption must be narrowly construed, explaining that the purpose of § 271(e)(1) is to shield generic drug producers from patent infringement while they are preparing to enter the market on expiration of the patents on established products-a purpose quite removed from the activities for which Merck and Scripps were now seeking to invoke the Exemption.

*3 Merck and Scripps presented a contrary position as to all of these aspects. They argued, and their

witnesses testified, that § 271(e)(1) is not limited to studies of safety for human subjects, and that information about efficacy, pharmacology, pharmacokinetics, and mechanism of action is properly included in the IND application and thus subject to the FDA Exemption. They argued that the Exemption includes all of the studies conducted with all of the candidate RGD peptides, whether or not the particular compound was ultimately proposed for clinical trials with human subjects. They state that the kinds of studies conducted at Scripps were selected in consultation with FDA officials and other advisors, and were designed to comply with FDA requirements for the IND application.

The jury found infringement. The district court, sustaining the verdict, described the challenged experiments as " insufficiently direct to qualify" for the FDA Exemption, and referred specifically to Integra's expert's testimony that the purpose of requiring FDA approval of clinical trials is to assure the safety of an experimental drug for administration to human subjects; the court observed that many of the Scripps experiments were unrelated to human safety evaluations. The district court also referred to the expert testimony that for FDA approval of an IND application the studies must be carried out in accordance with the Good Laboratory Practices protocols established by the FDA, and that the Scripps experiments were not so conducted. The district court, observing various conflicts in the testimony presented by the parties, stated that it deferred to the credibility findings of the jury. A split panel of the Federal Circuit affirmed, holding that " the Scripps work sponsored by Merck was not clinical testing to supply information to the FDA, but only general biomedical research to identify new pharmaceutical compounds." *Integra,* 331 F.3d at 866.

In its presentation to the Supreme Court, Integra conceded that the information that was included in the IND application for clinical trials using the selected RGD peptide EMD 121974 was within the FDA Exemption. Thus the Court stated the question as follows:
This case presents the question whether uses of patented inventions in preclinical research, the results of which are not ultimately included in a submission to the Food and Drug Administration (FDA), are exempted from infringement by 35 U.S.C. § 271(e)(1).

--- F.3d ----                                                                                    Page 5

--- F.3d ----, 2007 WL 2142878 (C.A.Fed.)

**(Cite as: --- F.3d ----)**

*Merck,* 545 U.S. at 195. This was a narrower question than had been litigated in the district court and the Federal Circuit, and was limited to the infringement status of experiments using the RGD peptides that were not selected for clinical trials, and any studies using EMD 121974 that were not included in the IND application.

The Court, analyzing the statute, explained that § 271(e)(1) " exempted from infringement *all* uses of patented compounds ' reasonably related' to the process of developing information for submission" to the FDA. *Merck,* 545 U.S. at 206 (emphasis in original). The Court explained that " reasonably related" includes uses in research that are conducted after the biological mechanism and physiological effect of a candidate drug have been recognized, such that if the research is successful it would appropriately be included in a submission to the FDA:
**\*4** At least where a drugmaker has a reasonable basis for believing that a patented compound may work, through a particular biological process, to produce a particular physiological effect, and uses the compound in research that, if successful, would be appropriate in a submission to the FDA, that use is " reasonably related" to the " development and submission of information under ... Federal law." § 271(e)(1).

*Id.* at 207.

Before the Court, Integra had stressed that § 271(e)(1) was never intended as a broad authorization to investigators to infringe the patents of others, and that the statute should be strictly construed. On this remand Integra repeats this argument, observing that a significant amount of the accused experimental work was with RGD peptides that were not ultimately selected for clinical trials; Integra argues that these experiments constitute infringement even on the Court's construction of § 271(e)(1). Merck responds that the Court's consistent view has been that § 271(e)(1) warrants a liberal construction, and that the Court now explicitly held that the FDA Exemption is not limited to experiments whose results are actually submitted to the FDA, or to compounds that are ultimately selected for clinical authorization. Merck states that application of the Court's statutory interpretation to the experiments here at issue permits only one conclusion, and requires judgment of noninfringement as a matter of law.

All of the work here at issue was done after the initial recognition at Scripps of the " particular biological process" whereby the RGD peptide blocks the cell surface receptors, and the recognition of the " particular physiological effect" of angiogenesis inhibition. Integra summarized in its brief to the Court that " [by April 1994] Dr. Cheresh demonstrated that blocking the <<alpha>>v<<beta>>3 receptor would inhibit angiogenesis in tumors, depriving them of the blood supply they need to grow," Brief at 12, meeting the Court's criteria of recognition of biological and physiological properties. Merck points out that the property of angiogenesis inhibition by blocking a specific receptor was known to it and to Scripps before the first experiment that is charged with infringement, citing a letter from Dr. Cheresh to Merck dated June 24, 1994. Integra did not dispute this point; indeed, it stressed to the Court, as discussed *supra,* that by April 1994 Dr. Cheresh had demonstrated this angiogenesis inhibition in tumors, Integra citing a Cheresh publication in the journal *Science.* Integra does not dispute on this remand that the accused experiments produced information relevant to efficacy, mechanism of action, pharmacology, or pharmacokinetics.

The Court observed that the FDA Exemption is not directed to basic scientific research unrelated to development of a particular drug:
Basic scientific research on a particular compound, performed without the intent to develop a particular drug or a reasonable belief that the compound will cause the sort of physiological effect the researcher intends to induce, is surely not " reasonably related to the development and submission of information" to the FDA.

**\*5** *Id.* at 205-06. However, the Court did not thereby remove from the scope of the FDA Exemption all experiments that are not actually submitted to the FDA. The Court stated:It does not follow from this, however, that § 271(e)(1)'s exemption from infringement categorically excludes either (1) experimentation on drugs that are not ultimately the subject of an FDA submission or (2) use of patented compounds in experiments that are not ultimately submitted to the FDA.

*Id.* at 206. The Court remarked on " the reality that, even at late stages in the development of a new drug, scientific testing is a process of trial and error," *id.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

stating that:Properly construed, § 271(e)(1)'s safe harbor leaves adequate space for experimentation and failure on the road to regulatory approval....

*Id.* at 207. The Court thus rejected, as a matter of statutory interpretation, Integra's position that the Scripps experiments that were not included in the IND application, such as the experiments with the RGD peptides that were superceded by EMD 121974, are excluded from the FDA Exemption:There is simply no room in the statute for excluding certain information from the exemption on the basis of the phase of research in which it is developed or the particular submission in which it could be included.

*Id.* at 202. The Court held that if it was reasonable to believe that the compound under study may work in the intended use and that the experiments will produce the types of information that are relevant to an IND, then the FDA Exemption applies to studies that are appropriate for submission. *Id.* at 208. The Court summarized:§ 271(e)(1)'s exemption from infringement extends to all uses of patented inventions that are reasonably related to the development and submission of *any* information under the FDCA.... This necessarily includes preclinical studies of patented compounds that are appropriate for submission to the FDA in the regulatory process.

*Id.* at 202 (emphasis in original).

DISCUSSION

I

[1][2] The focus of this remand is to apply the Court's statutory interpretation and rulings of law to the facts of this case. Of particular significance to the issues requiring resolution is the Court's ruling that the FDA Exemption includes experimentation on products that are not ultimately the subject of an FDA submission, provided that the particular biological process and physiological effect had been identified and the work was reasonably related to that appropriate for inclusion in an IND application.

All of the experiments charged with infringement were conducted for the purposes of determining the optimum candidate angiogenesis inhibitor and proceeding with commercial development of the selected candidate in compliance with regulatory

procedures, initially using three structurally related RGD peptides. Integra argues that Scripps' experiments on the two RGD peptides other than EMD 121974 are not within the FDA Exemption because the other peptides were not the subject of an IND application. This position is negated by the Court's holding that for a compound for which there was a reasonable basis for believing that it may have the desired biological property, research that " if successful would be appropriate for FDA submission" is within the FDA Exemption. *Merck,* 545 U.S. at 207. The Court placed this holding in the context of the uncertainties of scientific investigation: *6 In the vast majority of cases, neither the drugmaker nor its scientists have any way of knowing whether an initially promising candidate will prove successful over a battery of experiments. That is the reason they conduct experiments.... One can not know at the outset that a particular compound will be the subject of an eventual application to the FDA.

*Id.* at 206.

[3][4] The Court explained that the criterion of whether the experimental investigation of a patented compound is reasonably related to the development of information for submission to the FDA is established at the time of the experiment, and does not depend on the success or failure of the experimentation or actual submission of the experimental results. Thus studies of compounds that are not ultimately proposed for clinical trials are within the FDA Exemption, when there was a reasonable basis for identifying the compounds as working through a particular biological process to produce a particular physiological effect. On the Court's statutory interpretation, the FDA Exemption applies to experiments conducted to determine the optimum candidate drug, including experiments with rejected candidates. Applying this understanding of the statute, the Scripps experiments with the RGD compounds that were not taken to clinical trials did not become infringing when EMD 121974 was selected as the IND candidate.

[5] The Court also rejected Integra's position that the FDA Exemption, at the IND application stage, applies only to experiments conducted to show that the candidate drug can safely be administered to human subjects in clinical trials:
To the contrary, the FDA requires that applicants include in an IND summaries of the pharmacological,

--- F.3d ----                                                                                    Page 7

--- F.3d ----, 2007 WL 2142878 (C.A.Fed.)

**(Cite as: --- F.3d ----)**

toxicological, pharmacokinetic, and biological qualities of the drug in animals ... includ[ing] preclinical studies of a drug's efficacy in achieving particular results.

*Merck,* 545 U.S. at 203-04. The Court cited 21 C.F.R. § 312.23(a), which states, *inter alia,* that an IND should include information about the rationale for the drug, its structure, its toxicology, its mode of action, its effectiveness under different conditions, its side effects, its formulation, its administration, and like information. Integra's position at the trial was that safety is " almost the only concern of the FDA," Tr. at 3505, and that efficacy is not considered at the IND stage. Integra told the jury that the chicken embryo studies, which were the subject of many of the challenged experiments, are not relevant to human safety and thus are not eligible for application of the FDA Exemption. The Court held that this position is incorrect in law. FDA regulation 21 C.F.R. § 312.23(a)(8)(i) states that an IND must includeadequate information about pharmacological and toxicological studies of the drug involving laboratory animals or in vitro, [including the] pharmacological effects and mechanism(s) of action of the drug in animals, and information on the absorption, distribution, metabolism, and excretion of the drug, if known.

*7 Integra now presses the argument that even if its witness' position on this point were inaccurate, the jury verdict must be sustained because the jury could have believed his testimony and disbelieved the conflicting testimony presented by Merck. Integra argues that to the extent that conflicting evidence was before the jury, the jury could have found that only human safety data are relevant to FDA authorization of clinical trials, and that the other experiments were infringing. Thus Integra argues that the jury verdict must be sustained, for it is not disputed that most of the Scripps experiments were directed to obtaining information other than relevant to human safety. However, when an expert witness' statement of the law is incorrect, that view of the law cannot be relied upon to support the verdict. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 242, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) (" When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." ) The jury's verdict of infringement cannot be sustained on the incorrect position that

only experiments related to safety in humans are subject to the FDA Exemption at the IND application stage.

The Court also rejected Integra's argument that the FDA Exemption can apply only to studies that meet the FDA's " good laboratory practices" protocols. Citing the legislative and regulatory background contained in the *amicus curiae* brief filed by the United States, the Court observed that the FDA's Good Laboratory Practices regulations " do not apply to preclinical studies of a drug's efficacy, mechanism of action, pharmacology, or pharmacokinetics," and that " FDA regulations do not provide that even safety-related experiments not conducted in compliance with good laboratory practices regulations are not suitable for submission in an IND." *Merck,* 545 U.S. at 204-05. Although Scripps conceded that its laboratory did not meet the requirements of this protocol, the position presented at the trial was contrary to law.

Thus the Court expressly rejected the three legal grounds mentioned by the district court as its reasons for sustaining the jury verdict: the ground that the purpose of an IND application is to establish safety for administration to humans, such that experiments not directed to human safety do not have the protection of § 271(e)(1); the ground that only studies that meet the " good laboratory practices" protocol can be submitted to the FDA, thereby excluding the Scripps studies from § 271(e)(1); and the ground that experiments not included in an IND are not subject to the safe harbor of § 271(e)(1), whereby the Scripps experiments using other RGD peptides would be infringing. However, the Court did not undertake to review the accused experiments on the correct construction of § 271(e)(1), the Court observing that this had not yet been done through the standard appellate process. We thus review the issues presented on appeal, with application of the correct law.

## II

*8 Merck states that the experiments here challenged were designed in consultation with the FDA or with consultants experienced in FDA submissions. The accused experiments were divided into sixteen categories, as agreed by Integra and Merck, as follows with Merck's statement of the purpose of the experiment in parentheses:

• <<alpha>>v<<beta>>3 receptor binding assay (efficacy);

• angiogenesis chick chorioallantoic membrane (CAM) assay (efficacy, mechanism of action, and pharmacokinetics);

• angio-matrigel tests (efficacy and mechanism of action);

• cell adhesion assay (efficacy);

• chemotaxis assay (efficacy and mechanism of action);

• chick embryo pharmacokinetics assay (pharmacokinetics);

• fluorescence-activated cell sorting (FACS) analysis (mechanism of action and efficacy);

• rabbit pharmacokinetics assay (pharmacokinetics);

• tumor growth in severe combined immunodeficiency (SCID) mouse (efficacy, mechanism of action, pharmacology);

• tumor growth nude mouse assay (efficacy, pharmacology, pharmacokinetics, and mechanism of action);

• mice retina vasculo assay (efficacy, mechanism, pharmacology, and pharmacokinetics);

• rabbit cornea assay (pharmacokinetics and efficacy);

• mouse retina IF vasculogenesis assays (pharmacokinetics);

• rabbit arthritis experiments (efficacy, pharmacology, pharmacokinetics, safety and mechanism of action);

• mice arthritis experiments (efficacy).

• chick CAM tumor growth with melanoma cells (efficacy and mechanism of action). Merck Suppl. Br. at App. A. There is no factual dispute concerning these experiments and the information they produced.

Dr. Cherish testified that he supervised the work in

eleven of the above categories, and other witnesses testified as to the other categories. They explained how the tests were performed and the nature of the information learned. Dr. Kessler of Scripps explained that tests of efficacy were " to test whether or not a given drug could achieve a given effect in an animal ... pharmacokinetics to see how the potential drug would behave in a living system, how it's metabolized, how it's excreted, ... we tried to design experiments that would give us some insight into mechanisms as well." Tr. at 1831-34. The witnesses agreed that some of these tests also provided information relevant to human safety and toxicity. Integra does not dispute that these experiments all yielded information concerning efficacy, pharmacology, pharmacokinetics, and mechanism of action.

Integra argues, as it did at trial and before the Supreme Court, that all of this work except that related to safety in humans is outside of the FDA Exemption, and that all work that was not included in the IND application is outside of the FDA Exemption. Integra also argues that much of this work is properly viewed as " discovery-based research" and is not the " routine FDA-related work" that Integra states is the proper limit of § 271(e)(1) even on the Court's view of the statute. Integra takes particular issue with the angiogenesis chick CAM assay and the tumor growth chick CAM assay, which total 93 of the 180 accused experiments; Integra states that experiments with chick embryos do not necessarily or reliably predict safety or efficacy in humans. Integra also argues that experiments using chicken embryos relate to the threshold determination of whether angiogenesis is affected by the candidate drug, and thus is properly viewed as basic science and is not insulated by § 271(e)(1).

**\*9** The Court, responding to these same arguments, concluded that the challenged experiments " were designed to evaluate the suitability of each of the peptides as potential drug candidates.... Accordingly, the tests measured the efficacy, specificity, and toxicity of the particular peptides as angiogenesis inhibitors, and evaluated their mechanism of action and pharmacokinetics in animals." *Merck,* 545 U.S. at 198-99. Integra's expert Dr. Dedhar testified that the chick CAM experiments demonstrated " a substantial amount of inhibition or blockage of blood vessel growth with the RGD peptide," and that these experiments demonstrated the mechanism of action " by disrupting the interaction of endothelial cells with

Page 9

the extracellular matrix." Tr. at 910-937. Integra's expert Mr. Meyer testified that the chicken CAM assays were relevant to the " physical, chemical and biological characteristics" of the candidate drug. Tr. at S8469. Although Integra continues to argue that safety is the sole concern of the FDA Exemption, the Court resolved that question, and recognized the breadth of data obtained in these experiments and their relevance to FDA approval.

The Court did not discuss all of the experiments, but observed that " it will not always be clear to parties setting out to seek FDA approval for their new product exactly which kinds of information, and in what quantities, it will take to win that agency's approval." *Merck*, 545 U.S. at 207 (quoting *Intermedics, Inc. v. Vernitrex, Inc.,* 775 F.Supp. 1269, 1280 (N.D.Cal.1991), *aff'd,* 991 F.2d 808 (Fed.Cir.1993)). The evidence presented at trial was extensive as to how and why all of these experiments were performed. For example, Dr. Cheresh testified that after 1995 Scripps focused on testing the candidate RGD peptide on a diseased condition in animals, including developing chicken embryos, mice in which human tumor growth had been induced, and rabbits in which arthritis had been induced, in order to ascertain the effect of the candidate RGD peptide on the diseased condition.

There was testimony from several other Scripps scientists. For example, Dr. Brooks, who conducted the chicken CAM experiments and some of the mouse experiments, explained that the data related to efficacy, mechanism of action, pharmacology, and pharmacokinetics. Dr. Friedlander testified as to the effect of the test RGD peptide on proliferated blood vessels in mouse retina; Dr. Storgard as to the effect on proliferated blood vessels in the joints of mice and rabbits. Each witness was asked to review the protocols, results, and purposes of the accused experiments, and each witness testified that all of the experiments were related to obtaining information about efficacy, mechanism of action, pharmacology, pharmacokinetics, safety, or some combination thereof. Integra did not challenge the scientific conduct or purposes of the experiments, or the reasonableness or relevance of the experiments to the purposes of determining the properties of the angiogenesis inhibitor candidates. Even in its argument about Good Laboratory Practices, Integra presented no criticism of the procedures used or the information obtained and its relevance to drug development. Integra's argument was not directed to

the quality of the experiments or the validity of the information adduced, but to the absence of FDA certification as to all three RGD peptides. This aspect was ruled by the Court not to defeat the FDA Exemption.

**\*10** No challenge was raised to the conclusions presented by Merck's experts Dr. Bynum, Dr. Huston, and Mr. Armitage, that all of the tests were relevant to FDA submission as to the candidate that would be selected as optimal for clinical trials, the tests showing mechanism of action, efficacy, pharmacology, pharmacokinetics, and safety, and appropriate for meeting FDA regulatory requirements and for inclusion in an IND application. To the extent that there was cross-examination of these witnesses it was directed to general issues; for example, Integra asked Dr. Bynum whether the FDA cares about efficacy at the IND stage (his answer was " yes" ).

Witnesses testified about the relationship between the work done at Scripps and that done by Merck, for Integra argued that since Scripps was not ultimately responsible for filing the IND, only work done by Merck, not by Scripps, can claim the safe harbor of § 271(e)(1). However, the argument that much of the IND application preparation was done by Merck in Germany is irrelevant to the status of the Scripps work that is here charged with infringement. None of the evidence was challenged on scientific grounds, or the testimony as being incorrect or untrue. Instead, Integra argues that all of the Merck/Scripps employee and expert witnesses should be disqualified and their testimony ignored for purposes of review of the jury verdict, because they were " interested." Integra states that the jury could have disbelieved the entire testimony presented on behalf of Merck and Scripps, and that the rules of appellate review require that only evidence favoring the jury verdict be considered, and all else must be disregarded. Integra cites *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), for the proposition that a court, in reviewing a jury verdict, is required under Federal Rule 50 to disregard " all evidence favorable to the moving party that the jury was not required to believe," and *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627-28, 64 S.Ct. 724, 88 L.Ed. 967 (1944), to the effect that when a witness is interested this creates a credibility determination for the jury. Integra states that when the testimony of all of the witnesses on behalf of Merck is disregarded there is inadequate

--- F.3d ----                                                                 Page 10

--- F.3d ----, 2007 WL 2142878 (C.A.Fed.)

**(Cite as: --- F.3d ----)**

remaining support for a " safe harbor" ruling, even on the Court's statutory construction, and therefore that the jury verdict must be sustained.

[6] The rule that a jury verdict is reviewed for support by " substantial evidence" does not mean that the reviewing court must ignore the evidence that does not support the verdict. *See Reeves,* 530 U.S. at 150-51 (" in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record" ). The Court in *Reeves* stated that " [i]n the analogous context of summary judgment under Rule 56, we have stated that the court must review the record ' taken as a whole'," citing *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and observed that " the standard for granting summary judgment ' mirrors' the standard for judgment as a matter of law, such that ' the inquiry under each is the same'," citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250-251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus the Court pointed out that " the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence," *Reeves,* 520 U.S. at 150, but cautioning that " although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. *See* 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2529, p. 299 (2d ed.1995). That is, the court should give credence to the evidence favoring the nonmovant as well as that ' evidence supporting the moving party that is uncontradicted and unimpeached'." *Id.* (citations omitted).

**\*11** Applying these criteria, there was no evidence at trial in conflict with the evidence that all of the experiments here at issue were conducted after it had been discovered that a RGD peptide shrank tumors in an animal model; indeed, Integra so conceded to the Court. The primary Integra argument on this remand is that the FDA is interested only in safety data at the IND application stage; although that argument was unambiguously disposed of by the Court. At the jury trial, before the Court, and on this remand, Integra does not dispute that the accused experiments yielded data relating to efficacy, mechanism of action, pharmacology, or pharmacokinetics. At the trial the admissibility of the scientific evidence and its premises were not challenged.

Integra's cross-examination of Dr. Cheresh was not directed to his scientific work, but was limited to exploring his familiarity with FDA procedures and his laboratory's lack of Good Laboratory Practices certification. Although Integra states that Dr. Cheresh changed his position, between deposition and trial, concerning whether these experiments were for basic scientific studies or for obtaining FDA approval, this criticism was not directed to the validity of the information obtained. Dr. Friedlander was challenged on his understanding of Good Laboratory Practices certification, and Integra also states that Dr. Friedlander's testimony was inconsistent as to the purpose of the rabbit cornea assay experiments and mice-retina-vasculo experiments. However, Integra provides no explanation and cites no contrary testimony. We cannot discern an impeachment of credibility, and indeed the extensive testimony as to the scientific bases of the experiments performed and the information they produced was not challenged by any contrary witness.

Integra's only challenge to the credibility of the witnesses is that they were " interested" in that they were either employees or paid experts (a challenge to which neither side is immune). As we have observed, Integra presented no opposing evidence as to the experiments charged with infringement. Integra has not raised credibility considerations that could support ignoring the extensive uncontradicted scientific evidence. Merck states in its brief that " Integra *never* disputed the relevance of the accused experiments to these four topics [efficacy, mechanism of action, pharmacology, and pharmacokinetics], nor so much as cross-examined any of the ten witnesses on the subject. Nor did Integra present any affirmative evidence to dispute that each experiment currently before the Court was reasonably expected to yield evidence on at least one of these subjects. Even Integra's key scientific expert conceded that each of the experiments revealed information on how well the drug worked and by what mechanism." Merck Remand Brief at 14. Integra does not challenge these statements. When the issue of experimental purpose was presented to the Supreme Court, the Court concluded that " the tests measured the efficacy, specificity, and toxicology of the particular peptides." *Merck,* 545 U.S. at 198-99.

**\*12** Reviewing the proceedings at trial, Integra's principal argument to the jury was that the FDA Exemption is directed to tests to demonstrate safety

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for humans in clinical trials. The jury was told in closing argument that in considering an IND application " [s]afety at that point is the overriding, almost the only concern, of the FDA.... And [Mr. Meyer] emphasized over and over again how safety is the paramount thing...." Tr. at 3496. The jury was told: " Efficacy, as such, is not considered at that stage. Mechanism of action, same thing. The touchstone is safety." Tr. at 3505. The district court declined Merck's request to issue a corrective instruction. The evidence to this effect, shown by the Court to be incorrect, cannot support the jury verdict. *See Weisgram v. Marley Co.,* 528 U.S. 440, 454, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000) (" the authority of courts of appeal to direct the entry of judgment as a matter of law extends to cases in which, on excision of testimony erroneously admitted, there remains insufficient evidence to support the jury's verdict" ).

Integra also told the jury that the FDA Exemption applies only after there has been a final selection of the product that is proposed for clinical trials, stating that " Dr. Cheresh himself said that, at least four or five times, in the course of the trial, that they were trying to identify the best drug candidate. They weren't focused on FDA data approval for a particular drug." Tr. at 3616. This argument too was disposed of by the Court, which stated, in construing the statute, that " § 271(e)(1)'s safe harbor leaves adequate space for experimentation and failure on the road to regulatory approval." *Merck,* 545 U.S. at 207.

Reviewing the entirety of the record, *Reeves,* 530 U.S. at 151, and applying the criteria of judgment as a matter of law, *Liberty Lobby,* 470 U.S. at 251, in the absence of substantial evidence to support the verdict of infringement, judgment as a matter of law is rendered in favor of Merck.

### III

[7] Integra alternatively proposes that each of the Scripps experiments should be classified as either " discovery" or " routine," and that only those experiments devoid of discovery, and entirely routine, can be subject to the FDA Exemption. However, in the Court's explanation of the criteria of § 271(e)(1), the safe harbor does not depend on a distinction between " discovery" and " routine," but on whether the threshold biological property and physiological effect had already been recognized as to the candidate drug. The Court recognized that

experiments are run in order to learn information, whatever the stage of the research. *Merck,* 545 U.S. at 202. The variety of experimental activity that may apply to any specific biologic or physiologic investigation reinforces the fact-dependency of the inquiry. A Merck witness explained: " The transitions between research and development are often flowing transitions, and in the pre-phase it may have been a development project but not officially." (Testimony of Dr. Gabriele Noll.)

**\*13** In this case, all of the challenged experiments were performed after the discovery that a cyclic RGD peptide inhibited angiogenesis. Although Merck readily agrees that the scientists never lost interest in the scientific understanding of their observations, and agrees that the various experiments enhanced that understanding, this does not negate the relevance of the studies to drug development and regulatory compliance. That the experiments contributed to scientific knowledge does not deprive them of the safe-harbor benefit of § 271(e)(1) when the requirements therefor are met. *See Abtox, Inc. v. Exitron Corp.,* 122 F.3d 1019, 1030 (Fed.Cir.1997) (as long as the activity is reasonably related to obtaining FDA approval, a competitive party's or a patented invention's " intent or alternative uses are irrelevant to its qualification to invoke the section 271(e)(1) shield" ); *Amgen, Inc. v. Hoechst Marion Roussel, Inc.,* 3 F.Supp.2d 104, 107-08 (D.Mass.1998) (the safe harbor under 35 U.S.C. § 271(e)(1) permits a range of activities (such as animal testing, clinical trials, or chemical analysis), even when a party may have " ulterior motives or alternative purposes" that " may be related to FDA approval [or] other than, or in addition to, obtaining FDA approval." ); *cf. Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (a " reasonable relationship" is one that is not arbitrary or irrational).

The Court held and all parties agree that the RGD peptides were not used as a research tool.[FN3] The Court disposed of this aspect with the statement:
Respondents have never argued the RGD peptides were used at Scripps as research tools, and it is apparent from the record that they were not.... We need not-and do not-express a view about whether, or to what extent, § 271(a)(1) exempts from infringement the use of ' research tools' in the development of information for the regulatory process.

*Merck,* 545 U.S. at 205 n. 7.

Contrary to the position of our colleague in dissent, the Court's ruling and our application thereof casts no " large shadow" on the subject of " research tools." On remand to this court, the parties emphatically confirmed that research tools were not at issue. *See, e.g.,* Letter from Mauricio A. Flores, Counsel for Integra, to the panel (June 13, 2006) (" Integra agrees with Merck that this is not an appropriate case in which to make new law on the issue of whether patent claims to research tools (however that term may be defined) are excluded from the ambit of Section 271(e)(1). The Supreme Court has ruled that this case does not raise that issue. Its resolution is outside the Supreme Court's mandate. Integra has never argued, and does not now contend, that any of its claims at issue belong to a class of patent claims outside the reach of that statutory exemption." ). There is no " devastating impact on research tool inventions," dissent at 5; indeed, the issue is not present, and the criticism inapt.

### Conclusion

*14 On the entirety of the record, for the reasons we have discussed, there was not substantial evidence on which to sustain the jury verdict on application of the Court's statutory construction. The challenged experiments, all of which were conducted after discovery of the anti-angiogenesis property of the experimental RGD peptide provided by Merck, meet the criteria of being reasonably related to research that, if successful, would be appropriate to include in a submission to the FDA. This statutory construction both recognizes the nature of the scientific process and implements the legislative purpose of encouraging the development of new drugs. On application of the law of 35 U.S.C. § 271(e)(1), no reasonable jury could find other than that the challenged experiments are within the FDA Exemption. The district court's judgment of infringement is reversed.

### REVERSED

Opinion for the court filed by Circuit Judge NEWMAN. Dissenting-in-part and concurring-in-part opinion filed by Circuit Judge RADER.RADER, Circuit Judge, dissenting-in-part and concurring-in-part.
This decision casts a large shadow over patent protection by its overly expansive interpretation of

the 35 U.S.C. § 271(e)(1) exemption. In particular, this court today expands the exemption beyond the Supreme Court's limits on the provision to eliminate protection for research tool inventions. The Supreme Court stated " that § 271(e)(1)'s exemption from infringement extends to all uses of patented inventions that are reasonably related to the development and submission of any information under the [Federal Food, Drug and Cosmetic Act (FDCA) ]." *Merck KGaA v. Integra Lifesciences I, Ltd.,* 545 U.S. 193, 202, 125 S.Ct. 2372, 162 L.Ed.2d 160 (2005). Thus, the exemption covers activities that develop information that will ultimately be submitted to the FDA, not patented processes and tools beyond the scope of the " patented compounds" that the Supreme Court placed within the statutory exemption. In this case, two of the patents are research tools that deserve protection. This court should remand with instructions that the district court examine and protect these research tool patents.

Sadly this court does not even examine the patents at issue in this case. This court, noted for its emphasis on claims as definers of patent scope, ironically does not recite or analyze the claims of these patents in the slightest. Moreover this court speaks in broad terms about the experiments and results without specifying which patented compound or method was in use in the experiments. A careful examination of the patents shows that two of them have no application at all outside of a laboratory. If the patents in this case are not research tools, then of course this court could quickly construe the claims and show that they claim drugs or other products likely to undergo FDA clearance, not simply laboratory methods. Unfortunately even a cursory analysis of the patents (undertaken in this dissent) shows that two of them have no application outside the laboratory.

*15 Rather than construe the claims, usually the first task in any patent case, this court relies on a letter from one of the parties explaining that it does not wish to rely on the research tool exception. This supposedly authoritative letter appeared after the oral argument before this court in an attempt to rectify counsel's unresponsive performance. With the patents already expired, Integra may pursue a strategy to protect its entire multi-million-dollar verdict. If Integra had really not wished to rely on research tool patents, then it would not have asserted them in the first place. In any event, because four patents are part of this case, this court has a responsibility to construe their claims. By treating these research tools the same

as drugs potentially needing FDA clearance, this court's opinion poses a danger to the entire research tool industry.

I

After the Supreme Court " extend[ed] ... [the exemption] to all uses of patented inventions that are reasonably related to the [FDA clearance process]" , it explained that its decision " provides a wide berth for the *use of patented drugs* in activities related to the federal regulatory process." *Id.* (emphasis added). The Supreme Court then further explained:
At least where a drugmaker has a reasonable basis for believing that a *patented compound* may work, through a particular biological process, to produce a particular physiological effect, and *uses the compound* in research that, if successful, would be appropriate to include in a submission to the FDA, that use is ' reasonably related'  to the [exemption criteria]."

*Id.* at 207 (emphases added). In the next few sentences, the Court reiterates repeatedly that its decision affects " a *patented compound* in experiments that are not themselves included in a ' submission of information'  " and " uncertainties" in " selection of a *specific drug* " and " the *use of patented compounds* in preclinical studies." *Id.* at 207-208 (emphases added). Thus, the Supreme Court makes clear that its reading of the exemption applies to the selection and perfection of patented compounds in preclinical studies leading to FDA approval. The Supreme Court is not, however, addressing patented methods or processes-research tools-that measure, analyze, and assess the characteristics of those compounds during experimentation and development.

In other words, the Supreme Court reversed this court's earlier decision that would not have extended the exemption to embrace early experiments to find a drug candidate. Instead the Supreme Court extended the exemption back up the experimentation chain to include selection of particular species for FDA approval out of a patented genus. The Supreme Court did not, however, extend the exemption to encompass any method or process or other research tool that might be used in a pharmaceutical laboratory.

To drive this point home with more than repetition, the Supreme Court included an important footnote:
*16 We therefore need not-and do not-express a view

about whether, or to what extent, § 271(e)(1) exempts from infringement the use of " *research* tools"  in the development of information for the regulatory process.

*Id.* at 205 n. 7 (emphasis added). The Supreme Court simply did not intend to even address research tools, let alone, render research tools valueless for their one and only use-to test and ascertain information about candidate compounds.

The exemption's primary purpose is to permit generic manufacturers to perform research on drugs in the pipeline for FDA approval. According to the House Committee that initiated the provision, the exemption only deals with pre-market activity as " a limited amount of testing so that generic manufacturers can establish the bioequivalency of a generic substitute." H.R.Rep. No. 857, at 8, reprinted in 1984 U.S.C.C.A.N at 2692. The House Committee noted that the " nature of the interference with the rights of the patent holder"  would not be " substantial,"  but " de minimus." *Id.* at 2692, 2714. The Supreme Court extended this statutory exemption to reach as well activities reasonably related to that function. *Merck KGaA,* 545 U.S. at 202.

II

Sadly this court's devastating impact on research tool inventions is not even really evident on the face of the opinion. As noted, this court, celebrated for its attention to patent scope, does not analyze these claims. Even a passing examination of the claims leaves the unmistakable conclusion that two of the patents apply only to laboratory methods without any possibility of submission to the FDA. Two of the patents, under any definition, would be research tools.

An analysis of the patents in this case shows that Merck's use of the 525 and 997 patents may fall within the exemption as " reasonably related"  to the submission of FDA information. On the other hand, the 237 and 734 patents are research tools that deserve protection and bear little, if any, relationship to FDA processes.

Although this court should have remanded to the district court to analyze the patents for their reasonable relationship to FDA submissions, a brief examination of the patents shows the tenuous relationship of the research tools to any FDA

processes. The 237 and 734 patents claim methods for specific laboratory experiments, not compounds subject to FDA processes. These inventive methods are pure research tools. For example, the 237 patent claims:

4. A *method for detaching animal cells from a substrate* to which they are bound in an Arg-Gly-Asp mediated manner, comprising contacting said bound cells with a solution containing non-naturally occurring peptide consisting essentially of the amino acid sequence Arg-Gly-Asp-Y, [wherein Y][sic] is any amino acid such that the peptide has cell-detachment activity.

8. A *method for detaching animal cells from a substrate* to which they are bound in an Arg-Gly-Asp mediated manner, comprising contacting said bound cells with a peptide consisting essentially of the amino acid sequence X-Arg-Gly-Asp-Y wherein X is zero to thirty amino acids and Y is one of thirty amino acids, such that the peptide has cell detachment promoting activity.

**\*17** *237 Patent* col. 10 ll.62-68, col. 11 l.16-col.12 l.5 (emphases added). The claims of the 237 patent begin: " A method for detaching animal cells from a substrate." A substrate is a laboratory medium for growing or maintaining organisms, tissues, or cell cultures. In this instance, as the specification explains, the substrate sustains cells that must be attached and detached for study and testing. In simple terms, this inventive method does not encompass any substances that enter the human body and need FDA clearance. This invention instead is simply a laboratory method facilitating study of cells on a substrate.

The 237 specification further characterizes the invention as a method to facilitate research by controlling the attachment or detachment of cells on substrates. 237 *Patent* col.4, ll.1-15. Also, the specification points out that " [t]his invention finds application in the production of cell lines *for research.*" *237 Patent* col.10 ll.34-37 (emphasis added). In the discussion section, the 237 patent explains use of the inventive method to control cell attachment according to time, rate, location, or amount. *237 Patent* col.9 ll.53-54.

Thus, this method operates only as a tool for research, not a " patented compound" for FDA approval. The patented method is analogous to a patent on a microscope; the microscope's sole use is as a tool for research. Clearly, a patent on an innovative microscope should not be rendered useless by the § 271(e)(1) exemption. Similarly, the 237 patent has only one use-as a research tool.

The 734 patent has only one claim:

1. A substantially purified cell surface receptor derived from mesenchymal tissue and capable of binding to a peptide containing the amino acid sequence Arg-Gly-Asp, comprising a glycoprotein composed of at least two polypeptides of about 115 and 125 kD, respectively, as determined by SDS-PAGE under reducing conditions which selectively binds to vitronectin, but not to fibronectin.

*734 Patent* col.6 ll.58-65. Similar to the 237 patent, the 734 patent covers a purified cell receptor. In the words of the patent, the 734 patent is " [a] method of isolating cell surface receptors utilizing a short peptide sequence bound to an affinity column." *734 Patent* Abstract. Purified cell receptors operate in a laboratory to determine compounds that will bind to it (and thus may be useful as drugs). Many pharmaceutical drugs work by binding to receptors on the surface of certain human cells. Therefore, a laboratory needs methods to study the binding process and to choose drug candidates. These purified cell receptors do not operate as " patented compounds" for FDA approval themselves, but rather as experimental targets to test for attachment characteristics. *734 Patent* col.1 ll.56-58. The regulation of cell growth and differentiation by selectively manipulating the research environment (i.e., cell types, cell functions) of the invention advances the state of the art of research in the laboratory environment. As such, this method of isolating cell surface receptors is only a tool to conduct research on biological and chemical systems.

**\*18** The 234 and 734 patents claim only methods for use in laboratory settings. As research tools, these patents deserve protection. As such, I respectfully dissent with respect to the 237 and 734 patents and would remand back to the district court to determine what portion of the damages judgment applies to the use of these protected research tools.

This court also needs to properly analyze the claims of the other two patents in this case. First, the 525 patent is a genus covering a large number of compounds. Representative claim 8 of the 525 patent reads:

8. A substantially pure peptide including as the cell-attachment-promoting constituent the amino acid

sequence Arg-Gly-Arg-R wherein R is Ser, Cys, Thr or other amino acid, said peptide having cell-attachmentpromoting activity, and said peptide not being a naturally occurring peptide.

*525 Patent* col.8 ll.50-55. As a patent covering a genus, the 525 patent is an invitation to find the beneficial species in a broad genus. A species within the broad genus of this patent could serve as a drug requiring FDA approval. The selection of a suitable species from a patented genus is apparently the situation which the Supreme Court placed within the § 271(e)(1) exemption. Thus, activities involving this patent could well fall within the exemption as defined by the Supreme Court. Indeed this court's opinion makes that finding. That finding should have been made by a district court in proper fact finding procedures, rather than at the appellate level, but at least the 525 invention may support a finding of activities within the exemption.

The 997 patent " contemplates a new composition, a polypeptide which alters the cell attachment activity of cells to various substrates independent of its binding to collagen, affects cell phagocytosis, and which consists essentially of an isolated tetrapeptide X-Arg-Gly-Asp-Ser-Y wherein X is H or one or more amino acids and Y is OH or one or more amino acids." *997 Patent* col.2 ll.21-27. This patent embraces a medical method with a compound having a RGD group. Although some fact-finding at the district court level would improve this court's understanding of this invention, it could apparently have a reasonable relationship to FDA processes. Thus, while I concur with the majority with respect to the 525 and 997 patents, this court might more wisely remand these patents and this case to ascertain the proper application of the Supreme Court's standards for the exemption.

                                  III

A hypothetical example will help illustrate the importance of protecting research tool patent rights. Suppose a university professor or small independent research company invents and obtains a patent for a novel and extremely useful research tool. This invention represents the work of a lifetime for its inventors and perhaps most of the research budget for the university department or the small company-perhaps millions of dollars in investment. The only use of the invention tests other pharmaceutical compounds for effectiveness in fighting cancer. The

invention does not itself fight cancer, but instead simply identifies the cancer fighting characteristics in other compounds. This patented invention would, of course, be of great use to the pharmaceutical industry. It would also benefit the public by identifying cancer treatments. The patent system of course would wish to protect this invention and give incentives for more investment in developing this kind of valuable research tool.

**\*19** Sadly today's opinion misreads the Supreme Court's decision. This court reads the Supreme Court's decision too broadly because it includes within the exemption the 237 and 734 patents, which are obviously research tools. This overbroad interpretation could obliterate all value for the hypothetical invention discussed above and with it the incentives for development of these inventions outside of the pharmaceutical industry itself. The pharmaceutical industry itself, of course, still needs these tools and will invest in their development, but outside that community, research tools will have no value. In other words, this opinion could shift all control of research and the patented tools that facilitate research to the insular pharmaceutical industry. Universities and independent researchers will have to understand that their work on research tools is likely to amount only to a charitable (but nondeductible) gift to the pharmaceutical industry.

The university professor or small company might expect a reward for the lifetime of labor and investment that produced the research tool. The inventor might also hope to use that reward to further his pioneer research. These benefits to the public and that inventor would flow from the patent's right to exclude that would produce reasonable royalties. However, under today's opinion, the exemption would swallow that lifetime of labor and investment because the nature of the use itself, without any concern for the object of the patented invention, would be the gauge upon which the exemption would be measured. *See Majority Opinion,* slip op. at 11. In effect, any use of the hypothetical invention would automatically translate to non-infringement based on this court's expansive application of 35 U.S.C. § 271(e)(1).

The Supreme Court in *Merck* did not expect such a broad result. Instead, as noted above, the Supreme Court specifically did not address " whether, or to what extent, § 271(e)(1) exempts from infringement the use of ' research tools' in the development of

--- F.3d ----                                                                                              Page 16

--- F.3d ----, 2007 WL 2142878 (C.A.Fed.)

**(Cite as: --- F.3d ----)**

information for the regulatory process." *Merck KGaA,* 545 U.S. at 205 n. 7. Thus, upon remand, this court has the responsibility to analyze carefully the claims and apply the exemption to protect the selection of "patented compounds" even in the preclinical stage, while continuing to protect research tools. This court has the responsibility to protect FDA processes and research tool patents alike.

IV

Lastly, this court does not need to address these issues in a vacuum. Several noted opinions from other courts of international distinction show the value of protecting research tools while exempting some activities from infringement. These decisions from other national courts examine research tools in more detail and fashion proper protections for these inventions. In particular, these decisions protect research tool inventions when used for their intended purpose while allowing experimentation to improve the tool itself. Jonathan McPherson, *The Impact of the Hatch-Waxman Act's Safe Harbor Provision on Biomedical Research Tools after Merck Kgaa v. Integra Lifesciences I, Ltd.,* 10 Mich. St. J. Med. & Law 369, 382-383 (2006). For example, in Germany, the statutory research exemption for patents finds its origin in Article 31 of the Community Patent Convention.[FN1] To paraphrase the law and a seminal case interpreting this law, these tools obtain protection when used to conduct research as specified by the invention, but fall within an experimental exemption when studied to learn their method of operation or to improve their operation. *See Klinische Versuche (Clinical Trials I),* Federal Supreme Court of Germany, July 11, 1995, [1997] R.P.C. 623; *Klinishe Versuche (Clinical Trials II),* Federal Supreme Court of Germany, April 17, 1998, [1998] R.P.C. 423.

**\*20** I concur in the result with respect to the 525 and 997 patents and respectfully dissent with respect to the 237 and 734 patents with a recommendation to remand to the district court for further analysis in view of the Supreme Court opinion.

FN1. *Merck KGaA v. Integra Lifesciences I, Ltd.,* 545 U.S. 193, 125 S.Ct. 2372, 162 L.Ed.2d 160 (2005), *vacating Integra Lifesciences I, Ltd. v. Merck KGaA,* 331 F.3d 860 (Fed.Cir.2003). The Federal Circuit had affirmed, other than the amount of damages, the judgment in *Integra*

*Lifesciences I, Ltd. v. Merck KGaA,* 96-CV-1307 (S.D.Cal. Mar. 26, 2001).

FN2. Angiogenesis is defined as "the development of the blood vessels." *The American Heritage Stedman's Medical Dictionary* 45 (Houghton Mifflin Co.1995).

FN3. The National Institutes of Health defines "research tools" as "tools that scientists use in the laboratory including cell lines, monoclonal antibodies, reagents, animal models, growth factors, combinatorial chemistry and DNA libraries, clones and cloning tools (such as PCR), methods, laboratory equipment and machines." 64 Fed.Reg. 72,090, 72092 n. 1 (Dec. 23, 1999).

FN1. The Community Patent Convention influences German patent law.

C.A.Fed.,2007.

Integra Lifesciences I, Ltd. v. Merck KGaA

--- F.3d ----, 2007 WL 2142878 (C.A.Fed.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

Westlaw.

954 F.Supp. 391                                                                                           Page 1
954 F.Supp. 391, 42 U.S.P.Q.2d 1681
**(Cite as: 954 F.Supp. 391)**

▷

Biogen, Inc. v. Schering AG
D.Mass.,1996.

United States District Court,D. Massachusetts.
BIOGEN, INC., Plaintiff,
v.
SCHERING AG, Berlex Laboratories, Inc. and Board
of Trustees of the Leland Stanford, Jr. University,
Defendants.
**C.A. No. 96-10916-MLW.**

Nov. 5, 1996.
As amended Dec. 4, 1996.

Producer of drug used to treat multiple sclerosis
brought action seeking declaration that drug did not
infringe competitor's patent and that patent was
invalid. On competitor's motion to dismiss, the
District Court, Wolf, J., held that: (1) court had
subject matter jurisdiction over declaratory action;
(2) producer was not protected from infringement suit
under statutory "safe harbor" provision; and (3)
action would not be dismissed as exercise of court's
discretion.

Denied.
West Headnotes
**[1] Declaratory Judgment 118A** 🔑**232**

118A Declaratory Judgment
  118AII Subjects of Declaratory Relief
    118AII(L) Patents
      118Ak231 Patents
        118Ak232 k. Validity of Patents. Most
Cited Cases

**Declaratory Judgment 118A** 🔑**233**

118A Declaratory Judgment
  118AII Subjects of Declaratory Relief
    118AII(L) Patents
      118Ak231 Patents
        118Ak233 k. Infringement of Patents.
Most Cited Cases
Party seeking declaration of patent invalidity or non-
infringement must prove both that defendant has
engaged in conduct creating reasonable apprehension
on declaratory plaintiff's part that it will face
infringement suit if it engages in activity in question
and that declaratory plaintiff has actually produced or

has actually prepared to produce potentially
infringing device; purpose of this two-part test is to
determine whether need for judicial attention is real
and immediate or is prospective and uncertain of
occurrence.

**[2] Declaratory Judgment 118A** 🔑**232**

118A Declaratory Judgment
  118AII Subjects of Declaratory Relief
    118AII(L) Patents
      118Ak231 Patents
        118Ak232 k. Validity of Patents. Most
Cited Cases

**Declaratory Judgment 118A** 🔑**233**

118A Declaratory Judgment
  118AII Subjects of Declaratory Relief
    118AII(L) Patents
      118Ak231 Patents
        118Ak233 k. Infringement of Patents.
Most Cited Cases
District court had subject matter jurisdiction over
drug producer's action seeking declaration that it did
not infringe competitor's patent and that patent was
invalid; producer's dealings with competitor and
competitor's statements to media created objectively
reasonable apprehension on part of producer that
competitor intended to enforce patent, and producer
had taken substantial steps toward marketing its drug.

**[3] Declaratory Judgment 118A** 🔑**232**

118A Declaratory Judgment
  118AII Subjects of Declaratory Relief
    118AII(L) Patents
      118Ak231 Patents
        118Ak232 k. Validity of Patents. Most
Cited Cases

**Declaratory Judgment 118A** 🔑**233**

118A Declaratory Judgment
  118AII Subjects of Declaratory Relief
    118AII(L) Patents
      118Ak231 Patents
        118Ak233 k. Infringement of Patents.
Most Cited Cases
Producer of drug used to treat multiple sclerosis was
not within statutory "safe harbor" provision

954 F.Supp. 391                                                                                                    Page 2
954 F.Supp. 391, 42 U.S.P.Q.2d 1681
**(Cite as: 954 F.Supp. 391)**

protecting certain acts related to development and submission of information for regulation of drugs from patent infringement suits, such that producer was not justified in seeking declaratory judgment of patent noninfringement and invalidity, as producer had spent significant amounts of money to stockpile and prepare to market drug upon approval by Food and Drug Administration (FDA); fact that FDA had not yet approved drug was not dispositive, as producer had taken concrete steps toward obtaining approval. 35 U.S.C.A. § 271(e)(1).

**[4] Patents 291 ⚷283(1)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k283 Defenses
                291k283(1) k. In General. Most Cited Cases

Drug producer's act of shipping drug samples produced in United States to foreign regulatory authorities was not related to Food and Drug Administration (FDA) requirements or other federal law and thus was outside statutory "safe harbor" provision protecting certain acts related to development and submission of information for regulation of drugs from patent infringement suits. 35 U.S.C.A. § 271(e)(1).

**[5] Declaratory Judgment 118A ⚷362**

118A Declaratory Judgment
    118AIII Proceedings
        118AIII(F) Hearing and Determination
            118Ak361 Dismissal Before Hearing
                118Ak362 k. Grounds for Involuntary Dismissal in General. Most Cited Cases

Drug producer's action seeking declaration that drug did not infringe competitor's patent and that patent was invalid would not be dismissed as exercise of court's discretion, notwithstanding patent infringement suit brought by competitor in another forum after declaratory judgment suit was filed; producer filed action but did not serve it on competitor until later in effort to avoid litigation if necessary, not solely as attempt at forum shopping, and circumstances did not overcome presumption favoring forum in first-filed action.

**Patents 291 ⚷328(2)**

291 Patents
    291XIII Decisions on the Validity, Construction,

and Infringement of Particular Patents
        291k328 Patents Enumerated
            291k328(2) k. Original Utility. Most Cited Cases
Cited.

**\*392** William F. Lee, David B. Bassett, Hale & Dorr, Boston, MA, Albert E. Fey, James F. Haley, Gerald J. Flattmann, Douglas J. Gilbert, Fish & Neave, New York City, for Biogen, Inc.

Arnold P. Messing, Eric J. Marandett, Choate, Hall & Stewart, Boston, MA, Doborah D. Borsinger, Berlex Laboratories, Assistant General Counsel, Wayne, NJ, for Berlex Laboratories.

James S. DeGraw, Ropes & Gray, Boston, MA, for Board of Trustees of the Leland Stanford, Jr. University.

*MEMORANDUM AND ORDER*
WOLF, District Judge.

I. INTRODUCTION

On May 3, 1996, Plaintiff Biogen, Inc. ("Biogen") filed this action seeking a declaration that its Avonex product does not infringe defendants' McCormick '567 patent (the " '567 Patent") and that the '567 Patent is invalid. Biogen did not, however, attempt to serve its complaint immediately on the defendants. On July 3, 1996, defendant Berlex Laboratories, Inc. ("Berlex") filed its own suit in the District of New Jersey, seeking monetary and injunctive relief against Biogen for alleged infringement of the '567 Patent. As a result, Biogen served its complaint two days later.

Berlex has moved for dismissal of Biogen's declaratory judgment action for lack of subject matter jurisdiction, claiming that no case or controversy existed at the time Biogen filed its suit. Alternatively, Berlex urges the court to exercise its discretion to dismiss the declaratory judgment action on the basis of Biogen's alleged improper forum shopping. Berlex's parent company and co-defendant Schering Aktiengesellschaft ("Schering AG") has filed a separate motion alleging that it is not a proper party to this action because it **\*393** holds no legally cognizable interest in the '567 Patent. As indicated at the hearing on October 9, 1996, since the parties have not fully briefed the issue of whether Schering AG is a proper party, the court will not address that issue at this time.

As explained below, the court finds that a case and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

954 F.Supp. 391                                                                                    Page 3
954 F.Supp. 391, 42 U.S.P.Q.2d 1681
**(Cite as: 954 F.Supp. 391)**

controversy existed on May 3, 1996 because Biogen had a reasonable apprehension that it would face an infringement suit by Berlex, and Biogen had made a substantial investment in developing Avonex and producing it for sale promptly after the anticipated approval of the United States Food and Drug Administration (the "FDA"), which occurred on May 17, 1996. In addition, the court finds that neither equitable factors nor the convenience of the defendant suffice to overcome the presumption that this litigation should be conducted in the forum of first filing. Accordingly, Berlex's motion to dismiss is being denied.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are either undisputed or established by a preponderance of the evidence. Berlex is a pharmaceutical corporation with headquarters in Wayne, New Jersey. It is a wholly-owned subsidiary of Schering AG, a German pharmaceutical company. Biogen is a corporation based in Cambridge, Massachusetts that specializes in biotechnology.

For a number of years both Schering AG/Berlex and Biogen have been doing research and developing products relating to the production of human beta interferon using recombinant DNA technology. Among these products are drugs intended for the treatment of multiple sclerosis. These include Biogen's Avonex, a beta interferon-based drug extracted from Chinese hamster ovary ("CHO") cells, and Berlex/Schering AG's Betaseron, another beta interferon drug produced using a different process not covered by the '567 Patent. Avonex and the '567 Patent are at issue in this case.

In the fall of 1993, Dr. Ulrich Kostlin of Schering AG approached Biogen about licensing Biogen's portfolio of patents related to beta interferon. Also discussed at that time was a mutual "unblocking" agreement which would permit each party to market its respective beta interferon products without fear of infringement suit by the other. These negotiations terminated in late 1993 without agreement.

On December 27, 1994, the '567 Patent issued to Berlex and the Board of Trustees of Leland Stanford, Jr. University ("Stanford"). By prior agreement, Berlex's rights in the patent vested at that time in Schering AG.

On January 12, 1995, the *New York Times* published an article headlined "Biogen's Share Price Drops in a Running Patent Battle." Plaintiff's Appendix of Deposition Transcripts and Exhibits ("Plaintiff's App."), Ex. 14. The article began by stating:

Firing a volley in a war over biotechnology patents, Schering AG, the German drug maker, said yesterday that it had been awarded exclusive rights in a process being used by Biogen, Inc. The announcement sent shares of Biogen tumbling.

*Id.* The article then quoted a Schering AG spokesman as stating that "the ['567 Patent] could block Biogen ... from making its version of beta interferon for the treatment of multiple sclerosis." *Id.*

Similarly, on January 26, 1995, the *Wall Street Journal* reported on what it characterized as the "patent dispute [between Schering AG and Biogen] over novel drugs for multiple sclerosis with a potential value of $1 billion in annual revenue." Plaintiff's App., Ex. 23. The article stated that:

The dispute heated up with Schering's surprise announcement that it holds rights to the U.S. and European patents covering technology Biogen uses to make beta interferon, its MS drug under development.

*Id.* In the article, Biogen denied it infringed the '567 Patent, and raised questions concerning its validity. *Id.* A Schering AG spokesman was quoted as saying that the company did not "plan to 'use [its] patents to block' Biogen from marketing beta interferon but foresees patent 'negotiations' between the companies." *Id.*

**\*394** On May 22, 1995 Biogen announced that it had submitted a Product License Application for its Avonex product to the FDA. Berlex promptly raised numerous objections to the approval of Avonex in letter briefs submitted to the FDA.

Also in the Spring of 1995, Biogen filed applications with foreign regulatory authorities for approval to market Avonex abroad. In connection with its foreign approval applications, Biogen sent samples of Avonex made in the United States to the pertinent foreign regulatory authorities.

In July 1995, Kostlin and Kenneth Bate of Biogen met to discuss issues related to Avonex and the '567 Patent. As foreshadowed by the January 1995 *Wall Street Journal* article, Kostlin suggested cross-licensing of the parties' respective beta interferon products and shared access to clinical data. In

954 F.Supp. 391                                                                                                Page 4
954 F.Supp. 391, 42 U.S.P.Q.2d 1681
**(Cite as: 954 F.Supp. 391)**

support of this suggestion Kostlin stated that export of Avonex produced in the United States would infringe Schering AG's '567 Patent and, therefore, could if necessary be prevented. At the July 1995 meeting, Bates told Kostlin that Schering AG's cross-licensing proposal was "unacceptable."

In the fall of 1995, and again in March 1996, Kostlin contacted Bate in an effort to resume the discussions which failed in July 1995. Biogen, however, was not receptive to these requests.

In the second half of 1995, Berlex and Schering AG began preparing a possible transfer of Schering AG's interest in the '567 Patent to Berlex in anticipation of possible litigation with Biogen. Such a transfer had the potential to simplify any litigation related to the '567 Patent by enabling Berlex to sue in its own name and reducing the risk that Schering AG would be deemed a necessary party.

In late 1995, Berlex began appearing before the FDA to oppose the approval of Avonex, and threatened to file suit to enjoin the FDA from approving Avonex if necessary. As a result, on April 25, 1996, the FDA instructed Biogen to speak with Berlex to attempt to avert litigation and settle the dispute concerning FDA approval of Avonex. On April 26, 1996, however, Berlex sued the FDA in the United States District Court for the District of Columbia seeking to enjoin approval of Avonex, as well as a declaratory judgment that such approval would be contrary to the Public Health Service Act, the Orphan Drug Act and the FDA's regulations. Biogen intervened in the action. On April 30, 1996, the court denied Berlex's request for a temporary restraining order.

Biogen filed the present action for declaratory judgment on May 3, 1996. However, no attempt to serve any of the defendants was made at that time. Biogen filed its suit because it expected that Berlex would sue it and Biogen wanted to conduct any litigation concerning Avonex and the '567 Patent in Massachusetts. Biogen did not immediately attempt to serve its complaint, however, because if its assumption that Berlex would sue proved to be incorrect, Biogen preferred not to litigate at all.

As directed by the FDA, Biogen also arranged to meet with defendants on May 16, 1996 to attempt to resolve the then-pending suit. Biogen did not, however, tell defendants that it was accepting their invitation to meet again because of an FDA directive. At the May 16, 1996 meeting Kostlin essentially outlined again the proposal Schering AG had made at

the July 1995 meeting. Biogen again rejected that proposal.

On the following day, May 17, 1996, the FDA approved Avonex as a treatment for multiple sclerosis. At that point Biogen had already spent in excess of $150 million developing Avonex and over $24 million stockpiling and preparing to sell the drug in anticipation of FDA approval. Biogen began selling Avonex promptly following the FDA's approval.

On May 21, 1996, Schering AG transferred the '567 Patent to Berlex in anticipation of a suit by Berlex against Biogen. On July 3, 1996, Berlex filed a patent infringement suit against Biogen in the District of New Jersey. On the same day, Biogen disclosed the existence of its own suit in a press release. Biogen served Berlex on July 5, 1996.

On October 7, 1996, Berlex's suit against the FDA was dismissed. On October 9, 1996, the motion to dismiss this case was **\*395** argued, after expedited discovery and briefing by the parties.

### III. DISCUSSION

#### A. *Standard for 12(b)(1) Motion to Dismiss*

"If a Rule 12(b)(1) motion denies or controverts the pleader's allegations of jurisdiction ... the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction." *Cedars-Sinai Medical Center v. Watkins,* 11 F.3d 1573, 1583 (Fed.Cir.1993), *cert. denied,* 512 U.S. 1235, 114 S.Ct. 2738, 129 L.Ed.2d 859 (1994). For purposes of such a motion, "the allegations in the complaint are not controlling ... and only uncontroverted factual allegations are accepted as true." *Id.* "All other facts underlying the controverted jurisdictional allegations are in dispute and are subject to fact-finding by the district court." *Id.* at 1584. "[T]he court has great latitude to direct limited discovery and to make such factual findings as are necessary to determine its subject matter jurisdiction." *Rivera-Flores v. Puerto Rico Telephone Co.,* 64 F.3d 742, 748 (1st Cir.1995).

Accordingly, in considering defendants' motion to dismiss for lack of subject matter jurisdiction, the court has looked beyond the pleadings to the affidavits and depositions submitted by the parties to determine whether the facts establish its jurisdiction over this action and, if so, whether it should exercise

its discretion to permit this case to proceed in the District of Massachusetts or dismiss it in favor of Berlex's action in New Jersey. *Id. See also Ernst & Young v. Depositors Economic Protection Corporation, 862 F.Supp. 709, 713 (D.R.I.1994), aff'd 45 F.3d 530 (1st Cir.1995).*

### B. *This Court Has Subject Matter Jurisdiction*

This court has subject matter jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201, and Article III, § 2 of the United States Constitution only if a case or controversy existed between the parties at the time the complaint was filed.   A party may not "obtain a declaratory judgment merely because it would like an advisory opinion on whether it would be liable for patent infringement if it were to initiate some merely contemplated activity." *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 736 (Fed.Cir.1988).*   Rather, "the conflict must be real and immediate." *Id. at 735.*

[1] A two-part test has been developed to distinguish cases impermissibly seeking advisory opinions from those presenting justiciable cases and controversies. A party seeking a declaration of patent invalidity or non-infringement must prove that:   (1) the defendant has engaged in conduct creating a reasonable apprehension on the declaratory plaintiff's part that it will face an infringement suit if it engages in the activity in question;   and (2) the declaratory plaintiff has actually produced or has actually prepared to produce the potentially infringing device. *GAF Building Materials Corp. v. Elk Corp., 90 F.3d 479, 481 (Fed.Cir.1996).*   The "purpose of the two-part test is to determine whether the need for judicial attention is real and immediate or is prospective and uncertain of occurrence." *BP Chemicals Ltd. v. Union Carbide Corp., 4 F.3d 975, 978 (Fed.Cir.1993)* (citations omitted).

With regard to the first prong of the test, no express charge of infringement or threat of suit is required. Rather, a reasonable apprehension of suit "may be induced by subtler conduct if that conduct rises 'to a level sufficient to indicate an intent [on the part of the patentee] to enforce its patent,' i.e. to initiate an infringement action." *EMC Corp. v. Norand Corp., 89 F.3d 807, 811 (Fed.Cir.1996)* (quoting *Shell Oil Company v. Amoco Corporation, 970 F.2d 885, 887 (Fed.Cir.1992)).*   In making this determination, the court must consider the "totality of the circumstances." *Arrowhead, 846 F.2d at 736. See also Maryland Casualty Company v. Pacific Coal &*

*Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941); EMC, 89 F.3d at 812 (Fed.Cir.1996)* ("inquiry does not turn on whether the parties have used particular 'magic words' ").   The test is objective and must be applied to the facts as they existed and were known to the plaintiff when the complaint was filed. *Arrowhead, 846 F.2d at 736.*

**\*396** Similarly, with regard to the second prong, a declaratory plaintiff need not have actually produced or be selling the product at issue as long as it has engaged in "present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." *BP Chemicals Ltd., 4 F.3d at 978.*

[2] With regard to the first prong of the test, as of May 3, 1996 defendants' conduct and the entire course of dealing between the parties created an objectively reasonable apprehension on the part of Biogen that the defendants intended to enforce their '567 Patent by means of an infringement suit.   As described earlier, on at least two occasions Schering AG representatives reportedly claimed that the '567 Patent could block the production or export of Avonex, thus in effect charging infringement.   The media viewed these statements not only as evidence of a "patent dispute," Plaintiff's App. Ex. 24, but as part of a "battle" or "war" for a very lucrative market. *Id.,* Ex. 14.   At the July 1995 meeting, Schering AG's representative stated a preference for a licensing arrangement, but also expressed a willingness to take action to enforce the '567 Patent if negotiations failed.   Plaintiff's App., Ex. 22.   Those negotiations did fail.   After that meeting, despite some attempts by defendants to resume the dialogue, their conduct became increasingly hostile.   Berlex attempted to block FDA approval of Avonex, filing suit to do so in April 1996.   This course of conduct was sufficient to "indicate an intent on the part of [the defendants] to enforce [their] patent" by filing a suit alleging patent infringement if its other efforts to keep Avonex from the market failed. *EMC, 89 F.3d at 811.*   Thus, based on the totality of the circumstances known to Biogen on May 3, 1996, it had a reasonable apprehension that defendants would sue to enforce their patent in an effort to prevent the marketing of Avonex.

Contrary to defendants' contention, this conclusion is not qualified because Biogen was on May 3, 1996 immune from suit by virtue of the "safe harbor" provision of 35 U.S.C. § 271(e)(1) and, therefore, knew it could not then be sued by defendants.   As described below, Biogen knew that its substantial and

954 F.Supp. 391                                                                              Page 6
954 F.Supp. 391, 42 U.S.P.Q.2d 1681
**(Cite as: 954 F.Supp. 391)**

expensive effort to produce Avonex for sale in anticipation of FDA approval, as well as its submission of the product for foreign approval, took it out of the safe harbor as of May 3, 1996.

The reasonableness of Biogen's apprehension of suit on May 3, 1996 is reinforced by what has occurred and what has been disclosed since that date. Discovery in this case has indicated that in late 1995 defendants began planning to transfer the '567 Patent from Schering AG to Berlex in anticipation of litigation with Biogen. Moreover, Berlex filed suit in July 1996, suggesting the reasonableness of Biogen's belief on May 3, 1996 that defendants would do so if, as anticipated, Biogen again refused the cross-licensing arrangement it had rejected in July 1995.

Biogen has also satisfied the second prong of the case or controversy test because as of May 3, 1996 it had actually produced Avonex for sale in anticipation of receiving the FDA's approval and taken other concrete steps to market the drug promptly. The company had invested more than $150 million in research and development concerning Avonex, and had spent another $24 million to stockpile and prepare to market the drug.

Accordingly, Biogen had by May 3, 1996 clearly manifested by its actions its intent to market Avonex as soon as possible. Thus, it was not then seeking an advisory opinion on whether it would infringe the '567 Patent if it initiated "some merely contemplated activity." *Arrowhead, 846 F.2d at 736*. Rather, its need for a decision was "real and immediate." *Id.*

[3][4] Contrary to the defendants' claim, on May 3, 1996 Biogen was not within the "safe harbor" which would immunize it from suit by defendants pursuant to 35 U.S.C. § 271(e)(1) and, therefore, arguably make it inappropriate to permit Biogen to initiate suit. This provision exempts from infringement only actions taken "*solely* for uses reasonably related to the development and submission of information under a federal law which regulates the manufacture, use, or sale of drugs ..." 35 U.S.C. § 271(e)(1) (emphasis added). Biogen had done far more than merely do clinical trials for submission to the *397 FDA, it had spent $24 million to stockpile and prepare to market Avonex immediately upon the anticipated, imminent FDA approval in order to access promptly the lucrative market for beta interferon drugs to combat multiple sclerosis. These actions took Biogen out of the "safe harbor," made it subject to suit as of May 3, 1996, and gave it standing

to sue itself. *Infinitech v. Vitrophage, Inc.,* 842 F.Supp. 332, 337-38 (N.D.Ill.1994); *Farmaceutisk Laboratorium Ferring A/S v. Solvay Pharmaceuticals, Inc.,* 25 U.S.P.Q. 1344, 1349-51, 1992 WL 421542 (N.D.Georgia, 1992).[FN1]

> FN1. Biogen's shipment of Avonex samples produced in the United States to foreign regulatory authorities was not related to FDA requirements or other federal law and, therefore, was outside the statutory exemption. *NeoRX v. Immunomedics, Inc.,* 877 F.Supp. 202, 207 (D.N.J.1994). *See also Scripps Clinic & Research Found. v. Genentech, Inc.,* 666 F.Supp. 1379, 1396 (N.D.Cal.1987) (uses of product "serving multiple purposes unrelated to meeting FDA requirements," including the "preparation of Genentech's application for a European patent," are beyond the protection of § 271(e)(1)). Berlex and Schering AG cite *Intermedics, Inc. v. Ventritex, Inc.,* 775 F.Supp. 1269, 1281 (N.D.Cal.1991), *aff'd,* 991 F.2d 808 (Fed.Cir. Feb. 22, 1993) (unpublished disposition) for the proposition that "the submission of *clinical testing data* in support of a foreign regulatory filing not fall outside § 271(e)(1)." Memorandum in Response to Biogen's Memorandum to Clarify Record on "Safe Harbor" Provision at 2. It is important to recognize, however, that the *Intermedics* court merely found that sending clinical testing data, rather than *samples,* was not an act of infringement; therefore, it was not necessary for the court to rely upon any safe harbor analysis. The instant case is distinguishable from *Intermedics* because Biogen sent samples of Avonex abroad. *See NeoRX,* 877 F.Supp. at 207; *Scripps Clinic,* 666 F.Supp. at 1396.

The fact that the FDA had not yet approved Avonex does not qualify this conclusion. As the court in *Infinitech* said in rejecting a similar claim that the lack of FDA approval was fatal to a finding of a case and controversy:

While [plaintiff] may not have [had] the present ability to market [its product], it ha[d] embarked upon a protracted and costly process of obtaining regulatory approval. [Plaintiff's] conduct thus evinces the kind of 'concrete steps' or 'meaningful preparation' needed to establish an actual controversy

954 F.Supp. 391                                                                                              Page 7
954 F.Supp. 391, 42 U.S.P.Q.2d 1681
**(Cite as: 954 F.Supp. 391)**

under 'all the circumstances.'

842 F.Supp. at 337-38 (quoting *BP Chemicals,* 4 F.3d at 978). *See also Solvay,* 25 U.S.P.Q.2d at 1349-51.[FN2]

> FN2. Like *Infinitech* and *Solvay,* the instant case is distinguishable from those in which courts have found the safe harbor provision to bar a declaratory judgment suit because of the alleged infringer's *de minimis* activities. *See Intermedics,* 775 F.Supp. at 1289-90 (if in the future defendant "engages in non-*de minimis* activities that are **not reasonably related** to securing FDA approval ... plaintiff can revive its patent infringement claims"); *Upjohn Co. v. Monsanto Co.,* 1992 WL 792837, at *4, 1992 U.S. Dist. LEXIS 14917, at *11-13 (W.D.Mich. June 30, 1992) (plaintiff's claims for non-infringement and invalidity were not ripe for judicial review because plaintiff had not yet sought FDA approval and "preliminary steps to FDA approval ... [did] not rise to the level of possibly infringing activity"); *Zenith Laboratories, Inc. v. Bristol-Myers Squibb Co.,* 24 U.S.P.Q.2d 1641, 1646, 1991 WL 267892 (D.N.J.1991) (controversy not ripe where both the intent and the ability of the declaratory judgment plaintiff to market the potentially infringing product depended upon "a number of contingent factors," including FDA approval, **commercial** prospects, and plaintiff's ability to secure an FDA-approved supplier).

### C. *Dismissal of the Case is not Appropriate as an Exercise of Discretion*

The finding that subject matter jurisdiction exists does not end the inquiry concerning the defendants' motion to dismiss. As the Supreme Court recently affirmed, the Declaratory Judgment Act accords district courts "a unique breadth of ... discretion to decline to enter a declaratory judgment." *Wilton v. Seven Falls Co.,* 515 U.S. 277, ----, 115 S.Ct. 2137, 2143, 132 L.Ed.2d 214 (1995). Such discretion is not unfettered, however, and must be exercised in accordance with the principles of the Declaratory Judgment Act and sound judicial administration. *EMC,* 89 F.3d at 813-14.

[5] The defendants urge the court to exercise its discretion to decline to hear this action. To do

otherwise, they argue, would reward inequitable behavior by Biogen in filing its suit in the midst of ongoing negotiations and then concealing the existence of that suit "solely for the tactical purpose of forum shopping." Berlex Mem., p. 18. This argument, however, is not persuasive. When **\*398** Biogen filed its suit on May 3, it had a reasonable apprehension of an infringement action by Berlex, but such suit was not then certain. Biogen's decision to file but not to serve its suit immediately manifested a desire on its part both to avoid litigation if at all possible and to attempt to secure the convenience of a Massachusetts forum if litigation was required. In these circumstances, it would not be inequitable to have this dispute litigated in Massachusetts.

More specifically, "[t]he general rule favors the forum of the first-filed action, whether or not it is a declaratory action. Exceptions, however, are not rare, and are made when justice or expediency requires, as in any issue of choice of forum.... There must, however, be sound reasons that would make it unjust or inefficient to continue the first-filed action." *Genentech, Inc. v. Eli Lilly,* 998 F.2d 931, 937-38 (Fed.Cir.1993) (citations omitted). *See also Kahn v. General Motors,* 889 F.2d 1078, 1081 (Fed.Cir.1989). In this case, the facts and equitable factors are insufficient to overcome the presumption in favor of the forum in the first-filed case.

Defendants do not contend that the convenience of the parties or the witnesses justifies dismissing this case in favor of Berlex's action in New Jersey. As they recognize, all parties are substantial entities, fully capable of litigating in Massachusetts or New Jersey, although Massachusetts is more convenient for Biogen and New Jersey is more convenient for Berlex.

Defendants ardently argue, however, that this case is analogous to *Davox Corporation v. Digital Systems International, Inc.,* in which this court exercised its discretion to dismiss a case seeking a declaratory judgment concerning possible patent infringement "because it would be inappropriate to reward-and indeed abet-conduct which is inconsistent with the sound policy of promoting extrajudicial dispute resolution, and conservation of judicial resources." 846 F.Supp. 144, 148 (D.Mass.1993). However, retaining jurisdiction of this case in Massachusetts is actually consistent with the rationale of *Davox* rather than contrary to it.

In *Davox,* the defendant notified the declaratory plaintiff, Davox, by letter that it viewed the plaintiff's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

product as infringing, and invited the plaintiff to respond to its concerns. 846 F.Supp. at 146-47. While Davox represented that it was willing to enter into discussions to resolve the matter, it in fact filed a preemptive action for declaratory judgment. *Id.* at 148. Despite the fact that the defendant's letters were "ominous enough to generate a reasonable apprehension of lawsuit," this court declined to exercise jurisdiction, finding that to do so would allow the plaintiff "to take advantage of the fact that [the defendant] responsibly deferred filing ... expensive litigation and, indeed, was perhaps misled into believing it would not be prejudiced by doing so by [plaintiff's] responses to its letters." *Id.* As plaintiff's conduct was "inconsistent with the strong public policy discouraging unnecessary litigation," this court stated that it did not want to reward Davox's inequitable conduct or encourage potential victims of infringement like Digital to sue prematurely and perhaps unnecessarily. *Id.* at 149. Thus, Davox's case was dismissed.

As discussed earlier, in the instant case, Biogen had a proper basis for bringing its suit on May 3, 1996. Its decision to defer serving it, despite its reasonable apprehension that defendants would bring their own suit and probable understanding that Biogen's claim to the priority of the first-filed forum would be eroded by the fact that its action was not the first served, actually minimized the risk of unnecessary litigation; if Biogen's prediction was not prophetic and it was never sued, it could have declined to serve its complaint, and litigation would have been averted.

Similarly, the instant case is distinguishable from the decision in *EMC* to dismiss the first-filed case because of inequitable conduct. 89 F.3d at 815. In *EMC,* the plaintiff was found to have "abuse[d] the declaratory judgment device to obtain a more favorable bargaining position in its ongoing negotiations with the patentee and also to undermine the value of the patent so as to impede its sale or licensing to a third party." *Id.* at 814. Thus, it was appropriate to dismiss the case in favor of a forum more convenient to the patentee, which had been lulled into deferring**399** its possible suit based on EMC's representations regarding its interest in negotiating rather than litigating. *Id.* at 807.

While defendants' irritation at not being informed at the May 16, 1996 meeting that this suit had been filed is understandable, this is not a factor that is sufficiently serious to justify penalizing Biogen for its restraint in pursuing litigation by deferring service of its complaint. In the instant case, Biogen did not

agree to the May 16, 1996 meeting with defendants for the purpose of lulling defendants into delaying suit so Biogen could sue first. Biogen acceded to the April 25, 1996 request by the FDA that it talk to Berlex. The scheduling of the meeting Berlex had been unsuccessfully seeking may have had the effect of influencing Berlex to slow down its preparations to sue. However, it is clear that either party could have properly filed suit immediately after May 17, 1996, when the parties' meeting had again failed to generate an agreement and the FDA had approved Avonex for sale. Defendant did not do so for another six weeks.[FN3] Had Biogen filed or served the instant case on May 18, 1996, the motion to dismiss would obviously be without merit. In view of the court's finding that a justiciable case and controversy existed on May 3, 1996, Biogen's delay in serving its complaint in order to assure that it would not be unnecessarily launching litigation does not alter the conclusion that it would be inappropriate for this court to exercise its discretion to dismiss this case.

FN3. Even assuming, without finding, that Biogen's willingness to meet on May 16, 1996 lulled defendants into deferring suit, it did so at most for about three weeks. Although defendants had since 1995 been taking steps in contemplation of possible litigation, including preparing to transfer the '567 Patent to Berlex, they did not sue Biogen until six weeks after the renewed discussions failed and the FDA approved Avonex. Thus, the three weeks that defendants were arguably lulled into not filing suit is not material.

IV. ORDER

For the foregoing reasons, it is hereby ORDERED that:

1. Defendants' motion to dismiss (Docket No. 10) is DENIED.

2. The parties shall respond to the attached Scheduling Conference Order and include a proposed schedule for completing the briefing of Schering AG's motion to dismiss.

3. A scheduling conference will be held on December 4, 1996 at 2:30 p.m.

**400** UNITED STATES DISTRICT

954 F.Supp. 391
954 F.Supp. 391, 42 U.S.P.Q.2d 1681
**(Cite as: 954 F.Supp. 391)**

COURTDISTRICT OF MASSACHUSETTS

## V. Civil Action

### NOTICE OF SCHEDULING CONFERENCE

An initial scheduling conference will be held in Courtroom No. 5, on the 12th flr.at ____ p.m. on ____ in accordance with Fed. R. Civ. P. 16(b) and Local Rule 16.1. The court considers attendance of the senior lawyers ultimately responsible for the case and compliance with sections (B), (C), and (D) of Local Rule 16.1[1] to be of the utmost importance. Counsel may be given a continuance only if actually engaged on trial. Failure to comply fully with this notice and with sections (B), (C), and (D) of Local Rule 16.1 may result in sanctions under Local Rule 1.3. Counsel for the plaintiff is responsible for ensuring that all parties and/or their attorneys, who have not filed an answer or appearance with the court, are notified of the scheduling conference date.

MARK L. WOLF
United States District Judge

Date:

By: _____
Deputy Clerk

---

[1] These sections of Local Rule 16.1 provide:

(B) Obligation of counsel to confer. Unless otherwise ordered by the judge, counsel for the parties shall, pursuant to Fed.R.Civ.P. 26(f), confer no later than fourteen (14) days before the date for the scheduling conference for the purpose of:

(1) preparing an agenda of matters to be discussed at the scheduling conference;

(2) preparing a proposed pretrial schedule for the case that includes a plan for discovery, and

(3) considering whether they will consent to trial by magistrate judge

(C) Settlement proposals. Unless otherwise ordered by the judge, the plaintiff shall present written settlement proposals to all defendants no later than ten (10) days before the date for the scheduling conference. Defense counsel shall have conferred with their clients on the subject of settlement before the scheduling conference and be prepared to respond to the proposals at the scheduling conference.

(D) Joint statement. Unless otherwise ordered by the judge, the parties are required to file, no later than five (5) business days before the scheduling conference and after consideration of the topics contemplated by Fed.R.Civ.P. 16(b) and 26(f), a joint statement containing a proposed pretrial schedule, which shall include

(1) a joint discovery plan scheduling the time and length for all discovery events, that shall

(a) conform to the obligation to limit discovery set forth in Fed. R. Civ. P. 26(b), and

(b) take into account the desirability of conducting phased discovery in which the first phase is limited to developing information needed for a realistic assessment of the case and, if the case does not terminate, the second phase is directed at information needed to prepare for trial; and

(2) a proposed schedule for the filing of motions; and

(3) certifications signed by counsel and by an authorized representative of each party affirming that each party and that party's counsel have conferred

(a) with a view to establishing a budget for the costs of conducting the full course—and various alternative courses—of the litigation; and

(b) to consider the resolution of the litigation through the use of alternative dispute resolution programs such as those outlined in Local Rule 16.4

To the extent that all parties are able to reach agreement on a proposed pretrial schedule, they shall so indicate. To the extent that the parties differ on what the pretrial schedule should be, they shall set forth separately the items on which they differ and indicate the nature of that difference. The purpose of the parties' proposed pretrial schedule or schedules shall be to advise the judge of the parties' best estimates of the amounts of time they will need to accomplish specified pretrial steps. The parties' proposed agenda for the scheduling conference, and their proposed pretrial schedule or schedules, shall be considered by the judge as advisory only.

(Schedcnf.ntc - 03/95)                                                                    [ntchrg. schedcnfddl.]

---

D.Mass.,1996.
Biogen, Inc. v. Schering AG
954 F.Supp. 391, 42 U.S.P.Q.2d 1681

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3



545 U.S. 193, 125 S.Ct. 2372, 162 L.Ed.2d 160, 73 USLW 4468, 74 U.S.P.Q.2d 1801, 05 Cal. Daily Op. Serv. 5026, 2005 Daily Journal D.A.R. 6861, 18 Fla. L. Weekly Fed. S 394

**(Cite as: 545 U.S. 193, 125 S.Ct. 2372)**

Merck KGaA v. Integra Lifesciences I, Ltd.
U.S.,2005.

Supreme Court of the United States
MERCK KGAA, Petitioner,
v.
INTEGRA LIFESCIENCES I, LTD., et al.
No. 03-1237.

Argued April 20, 2005.
Decided June 13, 2005.

**Background:** Owner of patents for pharmacologically useful peptide sued competitor, researcher, and research institute for infringement and inducement of infringement. The United States District Court for the Southern District of California, James M. Fitzgerald, Senior District Judge, sitting by designation, entered judgment upon jury's finding of infringement and award of damages. On appeal, the United States Court Of Appeals for the Federal Circuit, 331 F.3d 860, affirmed in part and reversed in part, finding that patent statute's safe harbor provision did not apply, and that patents covered peptides developed by competitor, but remanding for recalculation of damages.

**Holdings:** On grant of certiorari, the Supreme Court, Justice Scalia, held that:

(1) exemption set forth by patent statute's safe harbor provision, stating that uses of patented invention in manner reasonably related to development and submission of information under Federal law which regulates the use of drugs do not constitute infringement, includes preclinical studies of patented compounds that are appropriate for submission to the Food and Drug Administration (FDA) in the regulatory process;

(2) exemption is not limited to only preclinical data pertaining to safety of drug in humans; and

(3) exemption does not categorically exclude either experimentation on drugs that are not ultimately the subject of an FDA submission or the use of patented compounds in experiments that are not ultimately

submitted to the FDA.

Vacated and remanded.
West Headnotes
**[1]** Patents 291 ⌘260

291 Patents
   291XII Infringement
      291XII(A) What Constitutes Infringement
         291k260 k. Extent of Use. Most Cited Cases
The Federal Food, Drug, and Cosmetic Act (FDCA) is a " Federal law which regulates the manufacture, use, or sale of drugs," within meaning of patent statute's safe harbor provision stating that uses of patented invention in manner reasonably related to " development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs" do not constitute patent infringement. Federal Food, Drug, and Cosmetic Act, §§ 1 et seq., 505(a), 21 U.S.C.A. §§ 301 et seq., 355(a); 35 U.S.C.A. § 271(e)(1).

**[2]** Patents 291 ⌘260

291 Patents
   291XII Infringement
      291XII(A) What Constitutes Infringement
         291k260 k. Extent of Use. Most Cited Cases
Safe harbor provision of patent statute stating that uses of patented invention in manner reasonably related to " development and submission of information under a Federal law which regulates" the use of drugs do not constitute patent infringement provides a wide berth for the use of patented drugs in activities related to the federal regulatory process. 35 U.S.C.A. § 271(e)(1).

**[3]** Patents 291 ⌘260

291 Patents
   291XII Infringement
      291XII(A) What Constitutes Infringement
         291k260 k. Extent of Use. Most Cited Cases
Exemption from infringement set forth by safe harbor provision of patent statute stating that uses of patented invention in manner reasonably related to " development and submission of information under a Federal law which regulates" the use of drugs do not

125 S.Ct. 2372                                                                                        Page 2

545 U.S. 193, 125 S.Ct. 2372, 162 L.Ed.2d 160, 73 USLW 4468, 74 U.S.P.Q.2d 1801, 05 Cal. Daily Op. Serv.
5026, 2005 Daily Journal D.A.R. 6861, 18 Fla. L. Weekly Fed. S 394

**(Cite as: 545 U.S. 193, 125 S.Ct. 2372)**

constitute infringement extends to all uses of patented inventions that are reasonably related to the development and submission of any information under the Federal Food, Drug, and Cosmetic Act (FDCA). Federal Food, Drug, and Cosmetic Act, § 1 et seq., 21 U.S.C.A. § 301 et seq.; 35 U.S.C.A. § 271(e)(1).

**[4] Patents 291 ⟷317**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k260 k. Extent of Use. Most Cited Cases

Exemption from infringement set forth by safe harbor provision of patent statute stating that uses of patented invention in manner reasonably related to " development and submission of information under a Federal law which regulates" the use of drugs do not constitute infringement necessarily includes preclinical studies of patented compounds that are appropriate for submission to the Food and Drug Administration (FDA) in the regulatory process; information is not excluded from the exemption on the basis of the phase of research in which it is developed or the particular submission in which it could be included. 35 U.S.C.A. § 271(e)(1).

**[5] Patents 291 ⟷260**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k260 k. Extent of Use. Most Cited Cases

Exemption set forth by patent statute's safe harbor provision, stating that uses of patented invention in manner reasonably related to " development and submission of information under a Federal law which regulates" the use of drugs do not constitute infringement, is not limited, with respect to preclinical data, to only preclinical data pertaining to safety of drug in humans; although regulation indicates that primary objective in reviewing investigational new drug application (IND), which seeks permission to conduct clinical trials, is to assure safety and rights of subjects, Food and Drug Administration (FDA) also requires applicants to include in an IND summaries of the pharmacological, toxicological, pharmacokinetic, and biological qualities of the subject drug in animals, and such information is primarily obtained through preclinical studies. 35 U.S.C.A. § 271(e)(1); 21 C.F.R. §§ 312.22(a), 312.23(a)(5).

**[6] Health 198H ⟷317**

198H Health
    198HI Regulation in General
        198HI(E) Drugs; Medical Devices and Instruments
            198Hk315 Applications and Approvals
                198Hk317 k. New Drugs. Most Cited Cases

When acting upon investigational new drug application (IND), which seeks permission to conduct clinical trials for particular drug, Food and Drug Administration (FDA) does not evaluate safety of proposed clinical experiments in a vacuum, but asks whether the proposed clinical trial poses an unreasonable risk; this assessment involves a comparison of the risks and the benefits associated with the proposed clinical trials, and relevant information necessarily includes preclinical studies of a drug's efficacy in achieving particular results. Federal Food, Drug, and Cosmetic Act, § 505(i)(3)(B)(i), 21 U.S.C.A. § 355(i)(3)(B)(i); 21 C.F.R. §§ 312.23(a)(8), 56.111(a)(2).

**[7] Health 198H ⟷317**

198H Health
    198HI Regulation in General
        198HI(E) Drugs; Medical Devices and Instruments
            198Hk315 Applications and Approvals
                198Hk317 k. New Drugs. Most Cited Cases

Food and Drug Administration (FDA) requirement that preclinical studies be conducted under good laboratory practices applies only to experiments on drugs to determine their safety, not to preclinical studies of a drug's efficacy, mechanism of action, pharmacology, or pharmacokinetics. 21 C.F.R. §§ 58.1(a), 58.3(d), 312.23(a)(8)(iii).

**[8] Health 198H ⟷317**

198H Health
    198HI Regulation in General
        198HI(E) Drugs; Medical Devices and Instruments
            198Hk315 Applications and Approvals
                198Hk317 k. New Drugs. Most Cited Cases

Safety-related experiments on drugs that are not conducted in compliance with good laboratory

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

545 U.S. 193, 125 S.Ct. 2372, 162 L.Ed.2d 160, 73 USLW 4468, 74 U.S.P.Q.2d 1801, 05 Cal. Daily Op. Serv. 5026, 2005 Daily Journal D.A.R. 6861, 18 Fla. L. Weekly Fed. S 394

**(Cite as: 545 U.S. 193, 125 S.Ct. 2372)**

practices regulations promulgated by the Food and Drug Administration (FDA) may be submitted in an investigational new drug application (IND), if such studies include a brief statement of the reason for the noncompliance. 21 C.F.R. § 312.23(a)(8)(iii).

**[9]** Patents 291 🔑260

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k260 k. Extent of Use. Most Cited Cases
Basic scientific research on a particular compound, performed without the intent to develop a particular drug or a reasonable belief that the compound will cause the sort of physiological effect the researcher intends to induce, is not " reasonably related to the development and submission of information" to the Food and Drug Administration (FDA), for purpose of exemption set forth by patent statute's safe harbor provision, stating that uses of patented invention in manner reasonably related to development and submission of information under Federal law which regulates the use of drugs do not constitute infringement. 35 U.S.C.A. § 271(e)(1).

**[10]** Patents 291 🔑260

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k260 k. Extent of Use. Most Cited Cases
Exemption set forth by patent statute's safe harbor provision, stating that uses of patented invention in manner reasonably related to " development and submission of information under a Federal law which regulates" the use of drugs do not constitute infringement, does not categorically exclude either (1) experimentation on drugs that are not ultimately the subject of a submission to the Food and Drug Administration (FDA) or (2) use of patented compounds in experiments that are not ultimately submitted to the FDA; rather, under certain conditions, the exemption is sufficiently broad to protect the use of patented compounds in both situations. 35 U.S.C.A. § 271(e)(1).

**[11]** Patents 291 🔑260

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k260 k. Extent of Use. Most Cited Cases

Where a drugmaker has a reasonable basis for believing that a patented compound may work, through a particular biological process, to produce a particular physiological effect, and uses the compound in research that, if successful, would be appropriate to include in a submission to the Food and Drug Administration (FDA), that use is " reasonably related to the development and submission of information under Federal law," within meaning of safe harbor provision of patent statute stating that uses of patented invention in manner reasonably related to development and submission of information under Federal law which regulates the use of drugs do not constitute infringement. 35 U.S.C.A. § 271(e)(1).

**[12]** Patents 291 🔑260

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k260 k. Extent of Use. Most Cited Cases
For purpose of exemption set forth by patent statute's safe harbor provision, stating that uses of patented invention in manner reasonably related to " development and submission of information under a Federal law which regulates" the use of drugs do not constitute infringement, the relationship of the use of a patented compound in a particular experiment to the development and submission of information to the Food and Drug Administration (FDA) does not become more attenuated, or less reasonable, simply because the data from that experiment are left out of the submission that is ultimately passed along to the FDA. 35 U.S.C.A. § 271(e)(1).

Patents 291 🔑328(2)

291 Patents
    291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
        291k328 Patents Enumerated
            291k328(2) k. Original Utility. Most Cited Cases
4,789,734, 4,792,525, 4,879,237, 4,988,621, 5,695,997. Cited.
**\*\*2375 \*193** *Syllabus* FN*

    FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S.

125 S.Ct. 2372                                                                                                    Page 4

545 U.S. 193, 125 S.Ct. 2372, 162 L.Ed.2d 160, 73 USLW 4468, 74 U.S.P.Q.2d 1801, 05 Cal. Daily Op. Serv. 5026, 2005 Daily Journal D.A.R. 6861, 18 Fla. L. Weekly Fed. S 394

**(Cite as: 545 U.S. 193, 125 S.Ct. 2372)**

321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

It is not " an act of [patent] infringement to ... use ... or import into the United States a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the ... use ... of drugs." 35 U.S.C. § 271(e)(1). The Federal Food, Drug, and Cosmetic Act of 1938 (FDCA) is such a law. Under the FDCA, a drug maker must submit research data to the Food and Drug Administration (FDA) in an investigational new drug application (IND) when seeking authorization to conduct human clinical trials, and in a new drug application (NDA) when seeking authorization to market a new drug. Respondents filed a patent-infringement suit, claiming, *inter alia,* that petitioner had willfully infringed their patents by supplying respondents' RGD peptides to other defendants for use in preclinical research. Petitioner answered, among other things, that § 271(e)(1) exempted its actions from infringement. The jury found otherwise and awarded damages. In post-trial motions, the District Court affirmed the jury's award and denied petitioner's motion for judgment as a matter of law. The Federal Circuit affirmed that denial, finding that § 271(e)(1)'s safe harbor did not apply. It reversed the District Court's refusal to modify the damages award and remanded for further proceedings.

**\*\*2376** *Held:* The use of patented compounds in preclinical studies is protected under § 271(e)(1) at least as long as there is a reasonable basis to believe that the compound tested could be the subject of an FDA submission and the experiments will produce the types of information relevant to an IND or NDA. The statutory text makes clear that § 271(e)(1) provides a wide berth for the use of patented drugs in activities related to the federal regulatory process, including uses reasonably related to the development and submission of any information under the FDCA. *Eli Lilly & Co. v. Medtronic, Inc.,* 496 U.S. 661, 665-669, 110 S.Ct. 2683, 110 L.Ed.2d 605. This necessarily includes preclinical studies, both those pertaining to a drug's safety in humans and those related to a drug's efficacy and mechanism of action. Additionally, § 271(e)(1) exempts from infringement the use of patented compounds in preclinical research, even when the patented compounds do not themselves become the subject of an FDA submission. **\*194** The " reasonable relation" requirement cannot be read effectively to limit § 271(e)(1)'s stated protection of activities leading to

FDA approval for all drugs to those activities leading to FDA approval for generic drugs. Similarly, the use of a patented compound in experiments not themselves included in a " submission of information" to the FDA does not, standing alone, render the use infringing. Because the Federal Circuit applied the wrong standard in rejecting petitioner's challenge to the jury's finding that petitioner failed to show that its activities were covered by § 271(e)(1), the trial evidence has yet to be reviewed under the standard set forth in the jury instruction, and developed in more detail here. Pp. 2380-2384.

331 F.3d 860, vacated and remanded.

SCALIA, J., delivered the opinion for a unanimous Court.

E. Joshua Rosenkranz, New York City, for petitioner. Daryl Joseffer, Washington, DC, for the United States as amicus curiae, by special leave of the Court, supporting the petitioner.
Mauricio A. Flores, San Diego, CA, for respondents.
Donald R. Dunner, Thomas H. Jenkins, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., Washington, D.C., E. Joshua Rosenkranz, Counsel of Record, M. Patricia Thayer, James N. Czaban, Gina M. Parlovecchio, Nishita Doshi Heller Ehrman LLP, New York City, for petitioner.
Mauricio A. Flores, McDermott Will & Emery LLP, Irvine, CA, David M. Beckwith, McDermott Will & Emery LLP, San Diego, CA, Raphael V. Lupo, Counsel of Record, Cathryn Campbell, Mark G. Davis, M. Miller Baker, Richard B. Rogers, McDermott Will & Emery LLP, Washington, D.C., for Respondents.For U.S. Supreme Court briefs, see:2005 WL 389070 (Pet.Brief)2005 WL 682089 (Resp.Brief)2005 WL 828263 (Reply.Brief)
Justice SCALIA delivered the opinion of the Court.
**\*195** This case presents the question whether uses of patented inventions in preclinical research, the results of which are not ultimately included in a submission to the Food and Drug Administration (FDA), are exempted from infringement by 35 U.S.C. § 271(e)(1).

I

It is generally an act of patent infringement to " mak[e], us[e], offe[r] to sell, or sel[l] any patented invention ... during **\*\*2377** the term of the patent therefor." § 271(a). In 1984, Congress enacted an exemption to this general rule, see Drug Price

125 S.Ct. 2372                                                                 Page 5

545 U.S. 193, 125 S.Ct. 2372, 162 L.Ed.2d 160, 73 USLW 4468, 74 U.S.P.Q.2d 1801, 05 Cal. Daily Op. Serv.
5026, 2005 Daily Journal D.A.R. 6861, 18 Fla. L. Weekly Fed. S 394

**(Cite as: 545 U.S. 193, 125 S.Ct. 2372)**

Competition and Patent Term Restoration Act of
1984, § 202, 98 Stat. 1585, as amended, 35 U.S.C. §
271(e)(1), which provides:
" It shall not be an act of infringement to make, use,
offer to sell, or sell within the United States or import
into the United States a patented invention (other
than a new animal drug or veterinary biological
product (as those terms are used in the Federal Food,
Drug, and Cosmetic Act and the Act of March 4,
1913) ...) solely for uses reasonably related to the
development and submission of information under a
Federal law which regulates the manufacture, use, or
sale of drugs ...."

[1] *196 The Federal Food, Drug, and Cosmetic Act
(FDCA), ch. 675, 52 Stat. 1040, as amended, 21
U.S.C. § 301 et seq., is " a Federal law which
regulates the manufacture, use, or sale of drugs." See
21 U.S.C. § 355(a); Eli Lilly & Co. v. Medtronic,
Inc., 496 U.S. 661, 665-666, 674, 110 S.Ct. 2683,
110 L.Ed.2d 605 (1990). Under the FDCA, a
drugmaker must submit research data to the FDA at
two general stages of new-drug development. FN1
FIRST, A DRUGMAKER must gain authorization to
conduct clinical trials (tests on humans) by
submitting an investigational new drug application
(IND). See 21 U.S.C. § 355(i); 21 CFR § 312.1 et
seq. (2005). FN2 The IND must describe " preclinical
tests (including tests on animals) of [the] drug
adequate to justify the proposed clinical testing." 21
U.S.C. § 355(i)(1)(A); see 21 CFR §§ 312.23(a)(5)
and (a)(8) (specifying necessary information from
preclinical tests). Second, to obtain authorization to
market a new drug, a drugmaker must submit a new
drug application (NDA), containing " full reports of
investigations which have been made to show
whether or not [the] drug is safe for use and whether
[the] drug is effective in use." 21 U.S.C. § 355(b)(1).
Pursuant to FDA regulations, the NDA must include
all clinical studies, as well as preclinical studies
related to a drug's efficacy, toxicity, and
pharmacological properties. See 21 CFR §§
314.50(d)(2) (preclinical studies) and (d)(5) (clinical
studies).

FN1. Drugmakers that desire to market a
generic drug (a drug containing the same
active ingredients as a drug already
approved for the market) may file an
abbreviated new drug application (ANDA)
with the FDA. See 21 U.S.C. § 355(j). The
sponsor of a generic drug does not have to
make an independent showing that the drug

is safe and effective, either in preclinical or
clinical studies. See § 355(j)(2)(A). It need
only show that the drug includes the same
active ingredients as, and is bioequivalent to,
the drug that it is mimicking. See §§
355(j)(2)(A)(ii) and (iv); § 355(j)(8)(B).

FN2. We cite the current versions of federal
statutes and regulations. The provisions
cited are materially unchanged since the
period of petitioner's alleged infringement.

*197 II

A

Respondents Integra Lifesciences I, Ltd., and the
Burnham Institute, own five patents related to the
tripeptide sequence Arg-Gly-Asp, known in single-
letter notation as the " RGD peptide." U.S. Patent
Nos. 4,988,621, 4,792,525, 5,695,997, 4,879,237, and
4,789,734, Supp.App. SA11-SA19. The RGD peptide
promotes     cell   adhesion   by   attaching   to
<<alpha>>V<<beta>>3   integrins,   receptors
commonly located on the outer surface of certain
endothelial   cells.   331   F.3d   860,   862-863
(C.A.Fed.2003).

Beginning in 1988, petitioner Merck KGaA provided
funding for angiogenesis research conducted by Dr.
David Cheresh at the Scripps Research Institute
(Scripps). Telios Pharmaceuticals, et al. **2378 v.
Merck KGaA, et al., Case No. 96-CV-1307 (S.D.Cal.,
Sept.9, 1997), App. 30a. Angiogenesis is the process
by which new blood vessels sprout from existing
vessels; it plays a critical role in many diseases,
including solid tumor cancers, diabetic retinopathy,
and rheumatoid arthritis. 331 F.3d, at 863. In the
course of his research, Dr. Cheresh discovered that it
was possible to inhibit angiogenesis by blocking the
<<alpha>>V<<beta>>3 integrins on proliferating
endothelial cells. Ibid. In 1994, Dr. Cheresh
succeeded in reversing tumor growth in chicken
embryos, first using a monoclonal antibody (LM609)
he developed himself and later using a cyclic RGD
peptide (EMD 66203) provided by petitioner. FN3
App. 190a. Dr. Cheresh's discoveries were announced
in leading medical journals and received attention in
the general media. See Altman, Scientists Report
Finding a Way to Shrink Tumors, N.Y. Times, Dec.
30, 1994, p. A1; Brooks, et al., Integrin
<<alpha>>V<<beta>>3 *198 Antagonists Promote
Tumor Regression by Inducing Apoptosis of

545 U.S. 193, 125 S.Ct. 2372, 162 L.Ed.2d 160, 73 USLW 4468, 74 U.S.P.Q.2d 1801, 05 Cal. Daily Op. Serv. 5026, 2005 Daily Journal D.A.R. 6861, 18 Fla. L. Weekly Fed. S 394

**(Cite as: 545 U.S. 193, 125 S.Ct. 2372)**

Angiogenic Blood Vessels, 79 Cell 1157 (Dec. 30, 1994); Brooks, Clark, and Cheresh, Requirement of Vascular Integrin <<alpha>>V<<beta>>3 for Angiogenesis, 264 Science 569 (Apr. 22, 1994).

> FN3. In the proceedings below, the Court of Appeals held that respondents' patents covered the cyclic RGD peptides developed by petitioner. 331 F.3d 860, 869 (C.A.Fed.2003). Petitioner does not contest that ruling here.

With petitioner's agreement to fund research at Scripps due to expire in July 1995, Dr. Cheresh submitted a detailed proposal for expanded collaboration between Scripps and petitioner on February 1, 1995. App. 95a-107a. The proposal set forth a 3-year timetable in which to develop " integrin antagonists as angiogenesis inhibitors," *id.,* at 105a, beginning with *in vitro* and *in vivo* testing of RGD peptides at Scripps in year one and culminating with the submission of an IND to the FDA in year three, *id.,* at 106a-107a. Petitioner agreed to the material terms of the proposal on February 20, 1995, *id.,* at 124a-125a, and on April 13, 1995, pledged $6 million over three years to fund research at Scripps, *id.,* at 126a. Petitioner's April 13 letter specified that Scripps would be responsible for testing RGD peptides produced by petitioner as potential drug candidates but that, once a primary candidate for clinical testing was in " the pipeline," petitioner would perform the toxicology tests necessary for FDA approval to proceed to clinical trials. *Id.,* at 127a; see 21 CFR § 312.23(a)(8)(iii) (2005) (requirement that " nonclinical laboratory study" include a certification that it was performed under good laboratory practices); see also § 58.3(d) (2005) (defining " [n]onclinical laboratory study" ). Scripps and petitioner concluded an agreement of continued collaboration in September 1995. Case No. 96-CV-1307, App. 31a.

Pursuant to the agreement, Dr. Cheresh directed *in vitro* and *in vivo* experiments on RGD peptides provided by petitioner from 1995 to 1998. These experiments focused on EMD 66203 and two closely related derivatives, EMD 85189 and EMD 121974, and were designed to evaluate the suitability of each of the peptides as potential drug candidates. 331 F.3d, at 863. Accordingly, the tests measured the efficacy, *199 specificity, and toxicity of the particular peptides as angiogenesis inhibitors, and evaluated their mechanism of action and pharmacokinetics in

animals. *Ibid.* Based on the test results, Scripps decided in 1997 that EMD 121974 was the most promising candidate for testing in humans. *Ibid.* Over the same period, Scripps performed similar tests on LM609, a monoclonal antibody developed by Dr. Cheresh.FN4 App. **2379 277a, 285a-298a. Scripps also conducted more basic research on organic mimetics designed to block <<alpha>>V<<beta>>3 integrins in a manner similar to the RGD peptides, *id.,* at 223a-224a; it appears that Scripps used the RGD peptides in these tests as " positive controls" against which to measure the efficacy of the mimetics, *id.,* at 188a.

> FN4. Scripps licensed the patent for the monoclonal antibody to Ixsys, a California biotechnology company. App. 271a. Based on research conducted at Scripps and at Ixsys in consultation with Dr. Cheresh, an IND application for a humanized version of the antibody called Vitaxin was filed with the FDA on December 30, 1996. *Id.,* at 271a-274a, 404a. In addition to toxicology tests, the application included information from Dr. Cheresh's *in vitro* and *in vivo* experiments related to the antibody's mechanism of action and efficacy as an inhibitor of angiogenesis. *Id.,* at 399a-404a. Ixsys began clinical testing of the antibody as an angiogenesis inhibitor in February 1997. *Id.,* at 304a.

In November 1996, petitioner initiated a formal project to guide one of its RGD peptides through the regulatory approval process in the United States and Europe. *Id.,* at 129a. Petitioner originally directed its efforts at EMD 85189, but switched focus in April 1997 to EMD 121974. Case No. 96-CV-1307, App. 31a. Petitioner subsequently discussed EMD 121974 with officials at the FDA. *Id.,* at 397a. In October 1998, petitioner shared its research on RGD peptides with the National Cancer Institute (NCI), which agreed to sponsor clinical trials. *Id.,* at 214a-217a. Although the fact was excluded from evidence at trial, the lower court's opinion reflects that NCI filed an IND for EMD 121974 in 1998. 331 F.3d, at 874 (Newman, J., dissenting).

**\*200 B**

On July 18, 1996, respondents filed a patent-infringement suit against petitioner, Scripps, and Dr. Cheresh in the District Court for the Southern District

125 S.Ct. 2372                                                    Page 7

545 U.S. 193, 125 S.Ct. 2372, 162 L.Ed.2d 160, 73 USLW 4468, 74 U.S.P.Q.2d 1801, 05 Cal. Daily Op. Serv. 5026, 2005 Daily Journal D.A.R. 6861, 18 Fla. L. Weekly Fed. S 394

**(Cite as: 545 U.S. 193, 125 S.Ct. 2372)**

of California. Respondents' complaint alleged that petitioner willfully infringed and induced others to infringe respondents' patents by supplying the RGD peptide to Scripps, and that Dr. Cheresh and Scripps infringed the same patents by using the RGD peptide in experiments related to angiogenesis. Respondents sought damages from petitioner and a declaratory judgment against Dr. Cheresh and Scripps. *Id.,* at 863. Petitioner answered that its actions involving the RGD peptides did not infringe respondents' patents, and that in any event they were protected by the common-law research exemption and 35 U.S.C. § 271(e)(1). 331 F.3d, at 863.

At the conclusion of trial, the District Court held that, with one exception, petitioner's pre-1995 actions related to the RGD peptides were protected by the common-law research exemption, but that a question of fact remained as to whether petitioner's use of the RGD peptides after 1995 fell within the § 271(e)(1) safe harbor. With the consent of the parties, the District Court gave the following instruction regarding the § 271(e)(1) exemption:

" To prevail on this defense, [petitioner] must prove by a preponderance of the evidence that it would be objectively reasonable for a party in [petitioner's] and Scripps' situation to believe that there was a decent prospect that the accused activities would contribute, relatively directly, to the generation of the kinds of information that are likely to be relevant in the processes by which the FDA would decide whether to approve the product in question.

" Each of the accused activities must be evaluated separately to determine whether the exemption applies.

**\*201** " [Petitioner] does not need to show that the information gathered from a particular activity was actually submitted to the FDA." App. 57a.

**\*\*2380** The jury found that petitioner, Dr. Cheresh, and Scripps infringed respondents' patents and that petitioner had failed to show that its activities were protected by § 271(e)(1). It awarded damages of $15 million.

In response to post-trial motions, the District Court dismissed respondents' suit against Dr. Cheresh and Scripps, but affirmed the jury's damage award as supported by substantial evidence, Civ. Action No. 961307 JMF (SD Cal. Mar. 26, 2001), App. to Pet. for Cert. 52a, and denied petitioner's motion for judgment as a matter of law, Civ. Action No. 96CV-1307 JMF (SD Cal., Mar. 6, 2001), App. to Pet. for

Cert. 50a. With respect to the last, the District Court explained that the evidence was sufficient to show that " any connection between the infringing Scripps experiments and FDA review was insufficiently direct to qualify for the [§ 271(e)(1) exemption]." *Id.,* at 49a.

A divided panel of the Court of Appeals for the Federal Circuit affirmed in part, and reversed in part. The panel majority affirmed the denial of judgment as a matter of law to petitioner, on the ground that § 271(e)(1)'s safe harbor did not apply because " the Scripps work sponsored by [petitioner] was not clinical testing to supply information to the FDA, but only general biomedical research to identify new pharmaceutical compounds." 331 F.3d, at 866. It reversed the District Court's refusal to modify the damages award, and remanded for further proceedings.[FN5] *Id.,* at 872. Judge Newman dissented on both points. See *id.,* at 874, 877. The panel unanimously affirmed the District Court's ruling **\*202** that respondents' patents covered the cyclic RGD peptides developed by petitioner. *Id.,* at 868-869; *id.,* at 873, n. 7 (Newman, J., dissenting). We granted certiorari to review the Court of Appeals' construction of § 271(e)(1). 543 U.S. 1041, 125 S.Ct. 823, 160 L.Ed.2d 609 (2004).

> FN5. On remand, the District Court reduced the damages award to $6.375 million. Civ. Action No. CV.96 CV 1307-B(AJB), 2004 WL 2284001, \*1 (SD Cal., Sept. 7, 2004).

### III

[2] As described earlier, 35 U.S.C. § 271(e)(1) provides that " [i]t shall not be an act of infringement to ... use ... or import into the United States a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the ... use ... of drugs." Though the contours of this provision are not exact in every respect, the statutory text makes clear that it provides a wide berth for the use of patented drugs in activities related to the federal regulatory process.

[3][4] As an initial matter, we think it apparent from the statutory text that § 271(e)(1)'s exemption from infringement extends to all uses of patented inventions that are reasonably related to the development and submission of *any* information under the FDCA. Cf. *Eli Lilly,* 496 U.S., at 665-669, 110 S.Ct. 2683 (declining to limit § 271(e)(1)'s

125 S.Ct. 2372　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 8

545 U.S. 193, 125 S.Ct. 2372, 162 L.Ed.2d 160, 73 USLW 4468, 74 U.S.P.Q.2d 1801, 05 Cal. Daily Op. Serv. 5026, 2005 Daily Journal D.A.R. 6861, 18 Fla. L. Weekly Fed. S 394

**(Cite as: 545 U.S. 193, 125 S.Ct. 2372)**

exemption from infringement to submissions under particular statutory provisions that regulate drugs). This necessarily includes preclinical studies of patented compounds that are appropriate for submission to the FDA in the regulatory process. There is simply no room in the statute for excluding certain information from the exemption on the basis of the phase of research in which it is developed or the particular submission in which it could be included.[FN6]

> FN6. Although the Court of Appeals' opinion suggests in places that § 271(e)(1)'s exemption from infringement is limited to research conducted in *clinical* trials, see 331 F.3d, at 866, we do not understand it to have adopted that position. The Court of Appeals recognized that information included in an IND would come within § 271(e)(1)'s safe harbor. *Ibid.* Because an IND must be filed *before* clinical trials may begin, such information would necessarily be developed in preclinical studies.

**2381 [5] *203 Respondents concede the breadth of § 271(e)(1) in this regard, but argue that the only preclinical data of interest to the FDA is that which pertains to the safety of the drug in humans. In respondents' view, preclinical studies related to a drug's efficacy, mechanism of action, pharmacokinetics, and pharmacology are not reasonably included in an IND or an NDA, and are therefore outside the scope of the exemption. We do not understand the FDA's interest in information gathered in preclinical studies to be so constrained. To be sure, its regulations provide that the agency's " primary objectives in reviewing an IND are ... to assure the safety and rights of subjects," 21 CFR 312.22(a) (2005), but it does not follow that the FDA is not interested in reviewing information related to other characteristics of a drug. To the contrary, the FDA requires that applicants include in an IND summaries of the pharmacological, toxicological, pharmacokinetic, and biological qualities of the drug in animals. See § 312.23(a)(5); Department of Health and Human Services, Guidance for Industry, Good Clinical Practice: Consolidated Guidance 45 (Apr.1996) (" The results of all relevant nonclinical pharmacology, toxicology, pharmacokinetic, and investigational product metabolism studies should be provided in summary form. This summary should address the methodology used, the results, and a discussion of the relevance of the findings to the

investigated therapeutic and the possible unfavorable and unintended effects in humans" ). The primary (and, in some cases, only) way in which a drugmaker may obtain such information is through preclinical *in vitro* and *in vivo* studies.

[6] Moreover, the FDA does not evaluate the safety of proposed clinical experiments in a vacuum; rather, as the statute and regulations reflect, it asks whether the proposed clinical trial poses an " unreasonable risk." 21 U.S.C. § 355(i)(3)(B)(i); see also 21 CFR § 312.23(a)(8) (2005) (requiring applicants to include pharmacological and toxicological studies that serve as the basis of their conclusion that clinical *204 testing would be " reasonably safe" ); § 56.111(a)(2) (2004) (providing that the Institutional Review Boards that oversee clinical trials must consider whether the " [r]isks to subjects are reasonable in relation to anticipated benefits" ). This assessment involves a comparison of the risks and the benefits associated with the proposed clinical trials. As the Government's brief, filed on behalf of the FDA, explains, the " FDA might allow clinical testing of a drug that posed significant safety concerns if the drug had a sufficiently positive potential to address a serious disease, although the agency would not accept similar risks for a drug that was less likely to succeed or that would treat a less serious medical condition." Brief for United States as *Amicus Curiae* 10. Accordingly, the FDA directs that an IND must provide sufficient information for the investigator to " make his/her own unbiased risk-benefit assessment of the appropriateness of the proposed trial." Guidance for Industry, *supra,* at 43. Such information necessarily includes preclinical studies of a drug's efficacy in achieving particular results.

[7][8] Respondents contend that, even accepting that the FDA is interested in preclinical research concerning drug characteristics other than safety, the experiments in question here are necessarily **2382 disqualified because they were not conducted in conformity with the FDA's good laboratory practices regulations. This argument fails for at least two reasons. First, the FDA's requirement that preclinical studies be conducted under " good laboratory practices" applies only to experiments on drugs " to determine their safety," 21 CFR § 58.3(d). See 21 CFR § 58.1(a); § 312.23(a)(8)(iii) (2005) (only " nonclinical laboratory study subject to the good laboratory practice regulations under part 58" must certify compliance with good laboratory practice regulations). The good laboratory practice regulations

545 U.S. 193, 125 S.Ct. 2372, 162 L.Ed.2d 160, 73 USLW 4468, 74 U.S.P.Q.2d 1801, 05 Cal. Daily Op. Serv. 5026, 2005 Daily Journal D.A.R. 6861, 18 Fla. L. Weekly Fed. S 394

**(Cite as: 545 U.S. 193, 125 S.Ct. 2372)**

do not apply to preclinical studies of a drug's efficacy, mechanism of action, pharmacology, or pharmacokinetics. Second, FDA regulations do not provide that even safety-related experiments not conducted in compliance **\*205** with good laboratory practices regulations are not suitable for submission in an IND. Rather, such studies must include " a brief statement of the reason for the noncompliance." *Ibid.*

The Court of Appeals' conclusion that § 271(e)(1) did not protect petitioner's provision of the patented RGD peptides for research at Scripps appeared to rest on two somewhat related propositions. First, the court credited the fact that the " Scripps-Merck experiments did not supply information for submission to the [FDA], but instead identified the best drug candidate to subject to future clinical testing under the FDA processes." 331 F.3d, at 865; see also *id.,* at 866 (similar). The court explained: " The FDA has no interest in the hunt for drugs that may or may not later undergo clinical testing for FDA approval. For instance, the FDA does not require information about drugs other than the compound featured in an [IND] application. Thus, the Scripps work sponsored by [petitioner] was not ' solely for uses reasonably related to' clinical testing for FDA." *Ibid.*

Second, the court concluded that the exemption " does not globally embrace all experimental activity that at some point, however attenuated, may lead to an FDA approval process." *Id.,* at 867.FN7

> FN7. The Court of Appeals also suggested that a limited construction of § 271(e)(1) is necessary to avoid depriving so-called " research tools" of the complete value of their patents. Respondents have never argued the RGD peptides were used at Scripps as research tools, and it is apparent from the record that they were not. See 331 F.3d, at 878 (Newman, J., dissenting) (" Use of an existing tool in one's research is quite different from study of the tool itself" ). We therefore need not-and do not-express a view about whether, or to what extent, § 271(e)(1) exempts from infringement the use of " research tools" in the development of information for the regulatory process.

[9][10] We do not quibble with the latter statement. Basic scientific research on a particular compound, performed without **\*206** the intent to develop a particular drug or a reasonable belief that the compound will cause the sort of physiological effect the researcher intends to induce, is surely not " reasonably related to the development and submission of information" to the FDA. It does not follow from this, however, that § 271(e)(1)'s exemption from infringement categorically excludes either (1) experimentation on drugs that are not ultimately the subject of an FDA submission or (2) use of patented compounds in experiments that are not ultimately submitted to the FDA. Under certain conditions, we think the exemption is sufficiently broad to protect the use of patented compounds in both situations.

As to the first proposition, it disregards the reality that, even at late stages in the development of a new drug, scientific testing is a process of trial and error. In the **\*\*2383** vast majority of cases, neither the drugmaker nor its scientists have any way of knowing whether an initially promising candidate will prove successful over a battery of experiments. That is the reason they conduct the experiments. Thus, to construe § 271(e)(1), as the Court of Appeals did, not to protect research conducted on patented compounds for which an IND is not ultimately filed is effectively to limit assurance of exemption to the activities necessary to seek approval of a generic drug: One can know at the outset that a particular compound will be the subject of an eventual application to the FDA only if the active ingredient in the drug being tested is identical to that in a drug that has already been approved.

[11] The statutory text does not require such a result. Congress did not limit § 271(e)(1)'s safe harbor to the development of information for inclusion in a submission to the FDA; nor did it create an exemption applicable only to the research relevant to filing an ANDA for approval of a generic drug. Rather, it exempted from infringement *all* uses of patented compounds " reasonably related" to the process of developing information for submission under *any* federal law regulating the manufacture, use, or distribution of drugs. See **\*207***Eli Lilly,* 496 U.S., at 674, 110 S.Ct. 2683. We decline to read the " reasonable relation" requirement so narrowly as to render § 271(e)(1)'s stated protection of activities leading to FDA approval for all drugs illusory. Properly construed, § 271(e)(1) leaves adequate space for experimentation and failure on the road to regulatory approval: At least where a drugmaker has a reasonable basis for believing that a patented

545 U.S. 193, 125 S.Ct. 2372, 162 L.Ed.2d 160, 73 USLW 4468, 74 U.S.P.Q.2d 1801, 05 Cal. Daily Op. Serv. 5026, 2005 Daily Journal D.A.R. 6861, 18 Fla. L. Weekly Fed. S 394

**(Cite as: 545 U.S. 193, 125 S.Ct. 2372)**

compound may work, through a particular biological process, to produce a particular physiological effect, and uses the compound in research that, if successful, would be appropriate to include in a submission to the FDA, that use is " reasonably related" to the " development and submission of information under ... Federal law." § 271(e)(1).

[12] For similar reasons, the use of a patented compound in experiments that are not themselves included in a " submission of information" to the FDA does not, standing alone, render the use infringing. The relationship of the use of a patented compound in a particular experiment to the " development and submission of information" to the FDA does not become more attenuated (or less reasonable) simply because the data from that experiment are left out of the submission that is ultimately passed along to the FDA. Moreover, many of the uncertainties that exist with respect to the selection of a specific drug exist as well with respect to the decision of what research to include in an IND or NDA. As a District Court has observed, " [I]t will not always be clear to parties setting out to seek FDA approval for their new product exactly which kinds of information, and in what quantities, it will take to win that agency's approval." *Intermedics, Inc. v. Ventritex, Inc.,* 775 F.Supp. 1269, 1280 (N.D.Cal.1991), aff'd, 991 F.2d 808 (C.A.Fed.1993). This is especially true at the preclinical stage of drug approval. FDA regulations provide only that " [t]he amount of information on a particular drug that must be submitted in an IND ... depends upon such factors as the novelty of the drug, the extent to which it has been studied previously, the known or **\*208** suspected risks, and the developmental phase of the drug." 21 CFR § 312.22(b). We thus agree with the Government that the use of patented compounds in preclinical studies is protected under § 271(e)(1) as long as there is a reasonable basis for believing that the experiments will produce " the types of information that are relevant to **\*\*2384** an IND or NDA." Brief of United States as *Amicus Curiae* 23.

\* \* \*

Before the Court of Appeals, petitioner challenged the sufficiency of the evidence supporting the jury's finding that it failed to show that " all of the accused activities are covered by [§ 271(e)(1) ]." App. 62a. That court rejected the challenge on the basis of a construction of § 271(e)(1) that was not consistent

with the text of that provision or the relevant jury instruction.[FN8] Thus, the evidence presented at trial has yet to be reviewed under the standards set forth in the jury instruction, which we believe to be consistent with, if less detailed than, the construction of § 271(e)(1) that we adopt today. We decline to undertake a review of the sufficiency of the evidence under a proper construction of § 271(e)(1) for the first time here. Accordingly, we vacate the judgment of the Court of Appeals and remand the case for proceedings consistent with this opinion.

> FN8. The relevant jury instruction provided only that there must be a " decent prospect that the accused activities would contribute, relatively directly, to the generation of the kinds of information that are likely to be relevant in the processes by which the FDA would decide whether to approve the product in question." App. 57a. It did not say that, to fall within § 271(e)(1)'s exemption from infringement, the patented compound used in experimentation must be the subject of an eventual application to the FDA. And it expressly rejected the notion that the exemption only included experiments that produced information included in an IND or NDA. *Ibid.*

*It is so ordered.*

U.S.,2005.
Merck KGaA v. Integra Lifesciences I, Ltd.
545 U.S. 193, 125 S.Ct. 2372, 162 L.Ed.2d 160, 73 USLW 4468, 74 U.S.P.Q.2d 1801, 05 Cal. Daily Op. Serv. 5026, 2005 Daily Journal D.A.R. 6861, 18 Fla. L. Weekly Fed. S 394

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

Westlaw.

Not Reported in F.Supp.                                                                                      Page 1

Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977

**(Cite as: Not Reported in F.Supp.)**

▷

Ortho Pharmaceutical Corp. v. Smith

E.D.Pa.,1990.

United States District Court, E.D. Pennsylvania.
ORTHO PHARMACEUTICAL CORPORATION,
Plaintiff,
v.
Herchel SMITH, American Home Products
Corporation, and Wyeth-Ayerst Laboratories,
Defendants.
AMERICAN HOME PRODUCTS CORPORATION,
Counterclaim Plaintiff,
v.
JOHNSON & JOHNSON, Counterclaim Defendant.
**CIV. A. No. 90-0242.**

*FINDINGS*
*OF FACT*

Aug. 17, 1990.

Albert G. Bixler, Daniel Segal, Hangley, Connolly, Epstein Chico, Foxman & Ewing, Philadelphia, Pa., Stephen B. Judlowe, Marguerite Del Valle, Joseph Mazzarese, Hopgood, Calimafde, Kalil Blaustein & Judlowe, New York City, pro hac vice, Dennis J. Mondolino, for plaintiff.

Steven R. Petersen, Michael T. Scott, Reed, Smith, Shaw & McClay, Philadelphia, Pa., Paul H. Heller, Kenyon & Kenyon, New York City, pro hac vice, for American Home Products Corporation.*TABLE OF CONTENTS*

| | | |
|---|---|---|
| I. | The Non-Obviousness of Claims 5, 19, 40, and 43 of the '322 Patent. | 1 |
| | A. Ortho's In-House and Outside Counsel Did Not Find Claims 5, 19, 40 and 43 of the '322 Patent Obvious. | 1 |
| | B. The Scope and Content of the Prior Art of Steroid Hormones. | 2 |
| | 1. Steroids. | 2 |

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977
**(Cite as: Not Reported in F.Supp.)**

Case 1:06-cv-00259-MPT    Document 379-2    Filed 08/10/2007    Page 41 of 63

Page 2

|   | 2. | Steroid Sex Hormones. | 3 |
|   | 3. | The Prior Art Asserted by Plaintiff Ortho. | 4 |
|   | 4. | Prior Art Synthesis of 13-Ethyl Gon-4-Enes. | 5 |
|   | 5. | Structure-Activity Relationships in the Steroid Sex Hormones. | 6 |
|   | C. | The Differences Between the Claimed Invention and the Prior Art. | 9 |
|   | D. | Secondary Considerations of Non-Obviousness: Commercial Success. | 12 |
| II. | Double Patenting. | | 15 |
| III. | Inequitable Conduct. | | 19 |
| IV. | Infringement. | | 23 |
|   | A. | Ortho Has Admitted Infringement of Claims 40 and 43. | 23 |
|   | B. | Claims 5 | 23 |

and 19 Are
Infringed
Under the
Doctrine of
Equivalents
.

1.          Norgestimat   24
            e Was
            Created
            From
            Norgestrel.

2.          Norgestimat   24
            e Is
            Converted
            to
            Norgestrel
            and
            Norgestrel
            Acetate in
            the Body,
            Which Are
            Responsible
            for the
            Progestatio
            nal Activity
            of
            Norgestimat
            e.

3.          Norgestimat   27
            e Functions
            in the Same
            Way as
            Norgestrel
            in Oral
            Contracepti
            ves to Give
            the Same
            Result.

C.          Infringemen
            t Under 35
            U.S.C. §
            271(e)(1).
            28

D.          Willful
            Infringemen

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 4
Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977
**(Cite as: Not Reported in F.Supp.)**

|       |      |                                                    |    |
|-------|------|----------------------------------------------------|----|
|       |      | t. 30                                              |    |
|       | E.   | Johnson & Johnson has Committed Act of Infringement. | 30 |
| CONCLUSIONS OF LAW. | | | 31 |
| I.    | Validity. | | 32 |
|       | A.   | Burdens and Presumptions. | 32 |
|       | B.   | Obviousness. | 34 |
|       |      | 1.   The Legal Standard. | 34 |
|       |      | 2.   Objective Criteria of Non-Obviousness. | 34 |
|       |      | 3.   Obviousness and Chemical Compounds. | 35 |
|       |      | 4.   Policy Considerations. | 36 |
| C.    | Double-Patenting. | | 38 |
| II.   | Inequitable Conduct. | | 42 |
| III.  | Infringement. | | 44 |
|       | A.   | Burdens and Presumptions. | 44 |
|       | B.   | The | 45 |

Not Reported in F.Supp.    Page 3
Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977
**(Cite as: Not Reported in F.Supp.)**

| | Doctrine of Equivalents. | |
|---|---|---|
| C. | 35 U.S.C. § 271(e)(1). | 45 |
| D. | No Willful Infringement. | 47 |
| E. | Johnson & Johnson Has Infringed the '322 Patent. | 48 |

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*
NEWCOMER, Senior District Judge.

*FINDINGS OF FACT.*

I. *The Non-Obviousness of Claims 5, 19, 40, and 43 of the '322 Patent.*

**\*1** A. *Ortho's In-House and Outside Counsel Did Not Find Claims 5, 19, 40 and 43 of the '322 Patent Obvious.*

1. During his deposition, shortly before trial, Mr. Lambert, J. & J's in-house patent counsel testifying as a Rule 30(b)(6) witness on the subject of Ortho's defenses and contentions, admitted that Ortho knew of no prior art which taught or suggested claims 5, 19, 40, or 43 of the '322 patent.

Q. Is there any combination of publications which you say suggest the subject matter of Claim 5?

A. You have already asked me if any of them suggest Claim 5. If none of them suggest Claim 5, how can they in combination suggest Claim 5?

Q. That is my understanding also, but I have to cover it. Does any combination of the publications suggest the subject matter of Claim 19?

A. No.

...

Q. What combination of publications or patents suggests the subject matter of Claims 40 or 43?

A. Let me rephrase the answer. I believe that the prior art is relevant to those claims. I can't say they suggest the specific subject matter, but they are certainly relevant to the subject matter. (Dep. Lambert 28, 58-60).

Mr. Lambert has been involved with patent questions on norgestimate since 1973. (Dep. Lambert 4/7/90 70).

2. Dressler, Goldsmith, Clement, Gordon & Shore, Ltd., the firm of Dr. Gamson (a patent expert for Ortho at trial), gave J & J a series of opinions on the subject of validity from 1976 to 1990. (Exhs. D-202, D-203, D-204, D-344). Its first opinion on the validity of the '322 patent was issued in 1977. Dr. Gamson's firm stated:

Our conclusion of validity with respect to claims 7, 19, 28, 35, and 36 of U.S. Patent 3,959,322 is not restricted to validity with respect to the aforementioned Belgian patents. We believe that the subject matter of these claims is also patentable over any prior art we know of including the Bachmann et al. and Marker articles called to the attention of the Examiner by the attorneys for Hughes et al., as discussed above. (Exh. P-203, at 31).

Narrow claims 7, 19, 28, 35 and 36 of U.S. Patent 3,959,'322 are specific to Norgestrel and to a limited class of compounds including Norgestrel. These narrow claims are valid over any prior art known to us (Exh. P-

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977
(Cite as: Not Reported in F.Supp.)

203, at 3).

3. The author of the opinion was aware of the prior art norethindrone as well as the Fieser and Fieser reference. (Exh. P-203 at 21-22). No different opinion on this issue of validity was prepared subsequently although the issue of defenses to the '322 patent was raised in another opinion in 1990. (Tr. Gamson 433, Exh. P-344).

B. *The Scope and Content of the Prior Art of Steroid Hormones.*

1. *Steroids*

4. Steroids comprise a class of chemical compounds which has a distinctive four ring structure of three hexagonal rings of carbon atoms (the "six-membered rings") and one pentagonal ring (the "five member ring") all fused together in a substantially linear shape. The three hexagonal rings are lettered A, B and C; the five membered ring is D. The 17 carbon atoms which make up the four rings are numbered 1-17; a single carbon atom with 3 attached hydrogen atoms (a "methyl group") at position C-13 is numbered 18. The steroid molecule is basically a flat plane. The top side (above the plane) is called the "B" face; the bottom side (below the plane) is called the "a" face. (Exhs. P-105; D-314). All the claims of the '322 patent are directed to "13-ethyl gon-4-enes," that is, steroids with a gonane skeleton having an ethyl group at the 13 position, and a double bond at the 4 position. The claims at issue in this litigation all also have a 17B-hydroxy or 17B-acetate, and a 17a-ethynyl group. The claims in issue are 5, 19, 40 and 43. (Exh. P-105, P-111; D-314, D-334).

*2 5. Steroids can be made or "synthesized" by two principal methods: total synthesis, starting from scratch, from commercially available chemicals, and partial synthesis, or synthesis from pre-formed steroids or steroid pieces. Total synthesis is a very involved procedure. The steroid molecule must be carefully built-up piece by piece, through a dozen or more steps from which each desired material must be separated and identified. (Tr. Hughes 538-39, 542 Exh. D-338).

2. *Steroid Sex Hormones*

6. Hormones are chemicals found in the body which are produced in one part of the body, and deliver a message to another part of the body. Hormones deliver their message by binding to a cellular receptor (the "receptor site") whereupon the complex of hormone bound to the receptor causes further physiological changes to occur. The binding of a hormone to a receptor can be likened to a key fitting into a lock. Just as a key must have precisely the right shape to fit into a particular lock, so a hormone must have the proper shape to fit into a receptor. (Tr. Torig 590-91).

7. There are three classes of sex hormones. All have similar structures, including a methyl group at C-13. Nevertheless, the three steroids, progesterone, testosterone and estradiol, all have vastly different biological properties, and each binds only to its own receptor. Progesterone and estradiol are female sex hormones, regulating the female reproductive cycle, while testosterone is the male sex hormone, which also has anabolic (i.e., muscle-building) characteristics. The small structural differences between these hormones can be contrasted to their enormous biological differences: the difference between boys and girls. (Tr. Rorig 590-91).

3. *The Prior Art Asserted by Plaintiff Ortho*

8. Ortho asserted that the '322 patent was obvious in view of two prior art references: *Steroids* by Fieser and Fieser, a 1959 treatise on the chemistry and properties of steroids (Exh. P-98), which discloses the compound norethindrone, having a methyl group at the 13-position, and Belgian patents 595,384 through 595,388 (Exhs. P-80-P-84), by Smith and Hughes, which disclosed certain C-13 polycarbon steroids, specifically "(±) 8,14-dehydro-18-homo-estrone methyl ether". (or, more simply, the "Belgian intermediate"). (Exh. P-117; Tr. Doorenbos 171-72, 182-83). The *Steroids* treatise was cited by the Patent Office Examiner as a reference during the proceedings for the '911 patent. (Tr. Doorenbos 234-35).

9. Norethindrone was known to be a progestin. However, there was no known way of transforming norethindrone into norgestrel (i.e., adding a carbon atom to the C-13 methyl group of norethindrone). (Tr. Hughes 553, Rorig 605, Doorenbos 242-43). During the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977
(Cite as: Not Reported in F.Supp.)

Case 1:06-cv-00259-MPT    Document 379-2    Filed 08/10/2007    Page 46 of 63
Page 7

proceedings for the '322 patent, the Patent Office concluded that norgestrel and related compounds were patentable over norethindrone. (Tr. Bjorge 919, Exhibit P-57, ¶ 8).

10. The Belgian patent does not disclose any 13-ethyl gon-4-enes. There are at least six major structural differences between the Belgian product and norgestrel. (Tr. Doorenbos 265-70; Rorig 623-624) And, in the 1950s and early 1960s, there was no known way of

| Position | '322 Patent Claim 5 | Belgian Pat. 595,385 |
|---|---|---|
| 3 | ketone | methoxy |
| 8 | saturated | unsaturated |
| 14 | saturated | unsaturated |
| 17 | ethynyl and hydroxy | ketone |
| A ring | single unsaturation at the 4 position | triple unsaturation |

(Tr. Rorig 623-624).

**\*3** 4. *Prior Art Synthesis of 13-Ethyl Gon-4-enes*

11. The court finds that prior to the invention of Smith and Hughes no one had made any 13-ethyl gon-4-enes (Tr. Rorig 594-595). Since all the natural steroids are 13-methyl steroids, synthesis of a 13-ethyl gon-4-ene required a total synthesis. (Tr. Rorig 593-594, 603-606).

5. *Structure-Activity Relationships in the Steroid Sex Hormones*

12. There are two types of drug activity: structurally specific and structurally non-specific. With drugs which exhibit structurally non-specific activity, binding to a cellular receptor is not important, and was not believed to be important in 1960. As Professor Doorenbos explained in 1960 (Exh. P-99),

structurally specific activity is dependent upon factors such as the presence or absence of certain groups, intramolecular distances, and the shape of the molecule. Activity is not easily correlated with any physical property, and small changes in structure often lead to

transforming the Belgian intermediate into norgestrel. Furthermore, nothing was said about the biological properties of the Belgian intermediate in the Belgian patent. (Tr. Rorig 624). For example, comparing the structures of claim 5 and the Belgian patent:

great changes in activity. Structurally specific activity appears to be dependent upon the interaction of the drug with a cellular receptor. (emphasis added).

Steroid hormones exhibit structurally specific activity. (Tr. Rorig 609-10). The structural specificity of steroid hormones meant that in the 1950s and early 1960s one could not predict the effect of small structural changes on the biological activity of steroid hormones. (Tr. Rorig 610).

13. Dr. Howard J. Ringold, the director of chemical research for Syntex laboratories, one of the leading pharmaceutical houses involved in progestin and oral contraceptive research during the 1950s and early 1960s, and which invented norethindrone (Exh. P-98 at 591), gave a presentation at a conference on steroid hormones, which was published in 1961. In his paper, Dr. Ringold summarized the state of the art of correlating the structure of steroids with their activity as follows:

During the past ten years, many hundreds of new steroids have been synthesized. Many of these are analogues of naturally occurring hormones. Some of

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977

(Cite as: Not Reported in F.Supp.)

these compounds have surpassed their basic prototype in biological activity, some have been less active, while many have exhibited types of normal activity completely unexpected on the basis of compound structure. The desire of the steroid chemist to tailor design and synthesize compounds to meet specific biological or clinical needs however is still far short of realization. Most, if not all, of the major discoveries in the steroid field leading to the substances with clinically more desirable biological properties have been accidental. (Tr. Rorig 614).

The court finds this contemporaneous characterization of steroid discoveries as being "accidental" more credible than hindsight assertions of predictability made more than thirty years afterwards.

14. Dr. Rorig presented an extensive series of exhibits showing what chemists in the 1950s and 1960s knew of the effect of changing from a methyl to an ethyl group at various positions in the steroid nucleus. (Exhs. D-316-21). Changing from a methyl group to an ethyl group at the 17 position decreased the androgenicity in 17-alkyl 19-nordihydrotestosterones and in 17-alkyl testosterones. (Exhs. D-316-17). Changing the 6B methyl group to an ethyl group in a series of ethisterones rendered the molecule completely inactive as a progestin. (Exh. D-318).

*4 Similarly, changing the 21-alkyl group from a methyl to an ethyl reduced the progestational activity. (Exh. D-319); changing from a 2a methyl group to an ethyl group completely deactivated hydrocortisone (Exh. D-320), and changing from a 16a methyl to an ethyl decreased the activity of an anti-inflammatory agent by a factor of more than 20. (Exh. D-321). These results, known to chemists in the 1950s and early 1960s, suggested that replacing a methyl group with an ethyl group tended to decrease activity of steroid hormones.

15. Norgestrel and Norgestimate are progestins. In 1960, after stating that the state of the art did not allow accurate predictions of steroid activity (Tr. Rorig at 615), Dr. Ringold presented his hypothesis as to the shape of the progestin receptor lock and the progestin key which fits into that lock. He stated that:

Consideration of the progestational activity of a number

of modified gestogens has lead us to propose that the "active" side of these derivatives is the a-face and the interaction at the target site where the steroid is bound must be with a B-face of the progestational agent in order for the steroid to exhibit its basic effect. (Tr. Rorig 613-615).

16. According to Dr. Ringold's 1960 hypothesis, progestin activity required tight binding between the B-face of the progestin and the receptor. (Tr. Rorig 613-615). The 13-ethyl group in norgestrel, which is larger than the 13-methyl group of norethindrone, is pointing straight up from the B-face. (Exh. D-313). Dr. Ringold's theory would have predicted that 13-ethyl progestins would be less active than the natural 13-methyl compounds. (Tr. Rorig 619).

17. Dr. Victor Drill was the head of G.D. Searle's biological research and Dr. Byron Riegel was the head of Searle's chemical research in the 1950s and early 1960s. In 1957 they presented a paper at the Laurentian Conference on Steroid Research, a regular conference of eminent steroid scientists, at which the most recent developments in steroid research were discussed. They concluded:

It is obvious that activities can be separated by simple changes in structure and, secondly, that effects of structural change on endocrine activity cannot be predicted. (Tr. Rorig 638-39).

18. Dr. Doorenbos, Ortho's technical expert, did not disagree with the unpredictability in 1960 of steroid activity. Dr. Doorenbos testified that there was a general theory-not directed to steroids-under which it was believed that "there is the potential of increased activity." (Tr. Doorenbos 183). In some examples, the peak was with methyl; in some with higher homologues. However, as Dr. Doorenbos admitted, in steroids larger groups can unpredictably interfere with binding to the receptor site:

A. ... In literature, when people talk about steroids ... where larger groups were not active ... one of the hypotheses is that it's interfering with the absorption at that receptor site. And those things you can't predict. At least could not back in 1960. (Tr. Doorenbos 283).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977
**(Cite as: Not Reported in F.Supp.)**

**\*5** 19. Dr. Doorenbos also admitted that the effects of structural change on hormone activity could not be predicted generally:

Q. And do you agree that the effects of structural change on endocrine activity cannot be predicted?

A. In the broad sense I would agree. You can anticipate and make educated guesses, but you never know for certain until the product is made and tested. (Tr. Doorenbos 291).

C. *The Differences Between the Claimed Invention and the Prior Art.*

20. Dr. Doorenbos testified that norgestrel was obvious from norethindrone, alone or in combination with the Belgian patents. His conclusion was based on a consideration only of the structures of the two molecules. However, Dr. Doorenbos did not consider the claimed compounds as a whole-in particular, he failed to consider the differences between the properties of norethindrone and norgestrel. (Tr. Doorenbos 300).

21. Although Dr. Doorenbos said it would be easy to modify the prior art syntheses to make norgestrel, no one did so prior to Smith and Hughes, and Dr. Rorig pointed out the difficulties that would have arisen due to unwanted side reactions and formation of isomers, even if one conceived of attempting to do so in the first place. (Tr. Rorig 600-602). [Dr. Doorenbos and his students never made a steroid by total synthesis (Tr. Doorenbos 244, 250).]

22. Biologically, the claimed compounds have properties which were unpredicted by, and unexpected in light of, the prior art. Whereas the prior art steroids with ethyl groups attached to the nucleus at various positions were generally less active than the corresponding methyl compounds, the 13-ethyl compounds of Smith and Hughes are generally more active. For example, norgestrel (specifically claimed by claim 5, and covered by generic claims 40 and 43 of the '322 patent) is approximately 100 times more potent than norethindrone (Exh. D-325); norgestrel acetate (specifically claimed as claim 19, and covered by generic claims 40 and 43) is 60 times more potent than the corresponding 13-methyl compound norethindrone

acetate (Exh. D-323). Other 13-ethyl gon-4-enes which fall within the scope of claims 40 and 43 are also unexpectedly more potent than the corresponding methyl compounds. 21-choronorgestrel is almost 4 times more potent than the corresponding methyl compound (Exh. D-323), and norgestimate is roughly 3.5 times as potent as the corresponding methyl compound. (Exh. D-329). Two other 13-ethyl gon-4-enes which were recently marketed in oral contraceptives in Europe, gestodene and desogestrel, are more potent than the corresponding methyl compounds. (Exhs. D-326 and D-327).

23. The 13-ethyl gon-4-enes also exhibit an improved separation of biological activity over the 13-methyl compounds. Progestin analogs can exhibit androgenic effects, at least at very large doses in the laboratory. Separation of activity refers to the differences in dosages required to see a desirable effect and an undesirable effect. (Tr. Goldzieher 818, Phillips 991). Norgestrel exhibits more than 20 times better separation of desirable progestational effects and androgenic effects than norethindrone. (Exh. D-325). Similarly, gestodene exhibits a separation of activities twice that of the 13-methyl compound, as does 3-keto desogestrel. (Exhs. D-326 and D-327).

**\*6** The court finds that the above separations of desirable and undesirable activity were not predictable from the prior art. (Tr. Rorig 647, 650). Even in 1990, Ortho's rebuttal witness Dr. Phillips could not predict the properties of norgestrel acetate from the corresponding 13-methyl compound:

Q. ... The binding affinity of norgestrel acetate could not be predicted from the binding affinity for norethindrone acetate?

A. No. Without a significant structure activity relationship database, I would not be able to predict whether or not the addition of an acetate to a steroid might change any given biological activity. (Dep. Phillips 159-160).

24. Finally, norgestrel, unlike other oral contraceptives, does not exhibit a first-pass effect. This means that, while other oral contraceptives are partially chewed up in the liver before they get to the bloodstream, almost

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00259-MPT    Document 379-2    Filed 08/10/2007    Page 49 of 63

Not Reported in F.Supp.                                                                                     Page 10
Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977
**(Cite as: Not Reported in F.Supp.)**

all of the noregestrel is available for hormonal action. (Tr. Goldzieher 834). Larger doses of drugs exhibiting a first-pass effect are required, because the first pass effect is extremely variable among different patients. Oral contraceptives containing norgestrel-but not norethindrone-can thus be designed to give good cycle control without excess medication. (*Id.*)

D. *Secondary Considerations of Non-Obviousness: Commercial Success.*

25. Prior to the introduction of defendants' first norgestrel-containing oral contraceptive (Ovral) in the U.S., all commercially available oral contraceptives included progestational agents derived from natural sources. (Tr. Hughes 538).

26. Since their introduction in 1968 into the U.S. market, U.S. sales of norgestrel products have been approximately 2.8 billion dollars. (Tr. Bogash 711). During the period 1968-1972, the market share for Ovral rapidly increased from approximately 2.5 percent of the U.S. oral contraceptive market in 1968 to over 20 percent of the market by 1972. Several years later, norgestrel products reached a level of over 30 percent of the U.S. market, at which point sales have leveled off. The percentage of new prescriptions being written for Ovral by 1972 likewise increased rapidly to close to 30 percent of the new prescriptions written in the U.S., while a number of competitors saw their percentage of new prescriptions for their products (containing progestins derived from natural sources) plummet. (Tr. Bogash 709). Norgestrel-containing oral contraceptive products are commercially available from Wyeth in the U.S. under the trademarks Ovral, Lo/Ovral, Ovrette, Nordette and Triphasil. (Tr. Bogash 702-711).

27. Defendant American Home Products sublicensed Schering A.G. to make use of, and sell, norgestrel-related products outside the U.S. in 1965. At that time, Schering A.G. was already the single largest hormonal manufacturing and research and development company in the world, and controlled 55 percent of the market for oral contraceptives in Europe. Norgestrel and norgestrel-related products comprise about 80 percent of the total foreign oral contraceptive market. (Tr. Bogash 696, 704; Exhibit 271L, ¶ 17).

*7 28. The court finds that the commercial success of norgestrel products is primarily due to its merits as a progestational agent. Its success in the marketplace is extraordinary and is a strong indication of its benefits over prior progestational agents. A further indication of the benefits of norgestrel is the fact that it achieved its market share in the face of stiff competition from established oral contraceptive products. (Tr. Bogash 706-07).

29. All new oral contraceptives which have come onto the market after the introduction of norgestrel-containing products include a progestin having an ethyl group at the 13 position. Like norgestimate, which is within the scope of claims 40 and 43 of the '322 patent, and which is currently being marketed abroad, gestodene and desogestrel are 13-ethyl gon-4-enes which fall within the scope of claims 40 and 43. (Exh. P-113; Exh. D-271L; Tr. Phillips 1011-13).

30. The court finds that the pharmaceutical industry has, despite Ortho's vigorous arguments to the contrary, acquiesced in the validity of the '322 patent. A substantial number of large pharmaceutical companies were doing research in the steroid field, resulting in numerous interferences with the Smith-Hughes invention, and none of those companies ever introduced norgestrel or a norgestrel derivative in the U.S. Also, a sublicense in the U.S. has been granted under the patents in suit to Berlex Laboratories. (Dep. Berg. 62-69).

31. The court further finds that Claims 5, 19, 40, and 43 of the '322 Patent were not obvious.

II. *Double Patenting*

32. It is undisputed that AHP's norgestrel product will enjoy no more than 17 years of patent protection. (Tr. Gamson 433-35).

33. Ortho has not alleged that the subject matter of claims 5, 19 and 40 of the '322 patent would have been obvious over (or even overlap) the claimed subject matter of any of the references upon which it relies.

34. Ortho argues that claims of the '081 and '909 patents render claim 43 of the '322 patent invalid for double

Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977
**(Cite as: Not Reported in F.Supp.)**

patenting. However, the compounds of the claims of the '081 and '909 patents, as illustrated in Plaintiff's Exhibits 128-B and 128-C, are not gon-4-enes and were considered by the Patent Office to be independent and distinct from the gon-4-enes of the '322 patent. That conclusion was not challenged by any expert at trial. Those compounds do not fall within the scope of claims 1, 40 or 43 of the '322 patent. (Tr. Gamson 436, Bjorge 870-71).

35. There is no evidence that the claims of the '081 and '909 patents would have been obvious from claim 43 of the '322 patent or that claim 43 of the '322 patent would have been obvious from the claims of the '081 or '909 patents.

36. Ortho also argues that claim 1 of the '322 patent is invalid for double patenting over U.S. Patent No. 3,502,699 (the '699 patent). However, the claims of the '699 patent do not disclose or suggest claims 1, 5, 19, 40 or 43 of the '322 patent, as admitted by Ortho's own expert. (Tr. Doorenbos 264-65). In addition, there is no evidence in the record that the claims of the '322 patent disclose or suggest the claims of the '699 patent.

**\*8** 37. The terminal disclaimer voluntarily filed in the prosecution of the '322 patent prosecution merely fixes an earlier date certain upon which that patent expires- November 26, 1991. (Exh. P-19; Tr. Bjorge 873). The court finds that the disclaimer does not operate to tie the validity of the '322 patent to the validity of the '911 patent or any other patent. (Tr. Bjorge 874). Therefore, even if the '911 patent were invalidated for double patenting, the '322 patent would not be invalidated as a result.

38. During the course of obtaining the '911 patent, the Patent Office issued restriction requirements that led to certain subject matter being designated as independent and distinct inventions and thus placed in separately filed applications that later issued as United States Patent Nos. 3,391,165 ('165 patent), 3,407,217 ('217 patent), 3,417,081 ('081 patent), and 3,547,909 ('909 patent). (Exh. P-18; Tr. Gamson 383-84, 398, 436). Pursuant to 35 U.S.C. § 121, none of these four patents can be used as a basis for invalidating the '911 patent for double patenting.

39. Ortho argues that when the restriction requirements were made, original claim 1 was limited to compounds having an aromatic A-ring, and that amendment of the claims should result in a forfeiture of the benefits of 35 U.S.C. § 121. The scope of original claim 1 of the '911 patent encompassed compounds having an aromatic A-ring as well as compounds having a nonaromatic A-ring according to established authorities, usage in issued patents and deposition testimony of those involved in obtaining the patent. (Tr. Rorig 582-589, 667-71,-Dep. Smith 117-19,-Dep. Bellino 75, Tr. Doorenbos 278,-Exhs. D-211, D-212, D-343).

40. The Examiner of the '911 application, Henry French, was an experienced examiner who also examined each of the other applications leading to the patents upon which Ortho now relies for its double patenting contentions. (Tr. Gamson 466-68; Bjorge 864, 891-92). Ortho's own patent expert testified that Examiner French knew which claims were issuing and which claims were being put into which cases. (Tr. Gamson 467-68). In fact, Mr. French was specifically made aware of the claims kept in the '911 case and the claims kept in the '714 case (the very claims Ortho bases its cyclopentanophenanthrene argument on). (Tr. Gamson 468).

41. Since claim 1 of the '911 application did not materially change in scope during prosecution (see Dep. Bellino 99 11. 4-8), and particularly in view of the Examiner French's full knowledge of all pertinent circumstances, AHP is entitled to the benefits of 35 U.S.C. § 121.

42. Even if the '911 patent were not entitled to the benefit of 35 U.S.C. § 121, the '911 patent claims would not have been obvious from the claims of the '165 patent, the '217 patent, the '081 patent, the '909 patent or U.S. Patent 3,519,714 (the '714 patent), as Ortho's own expert admitted. (Tr. Doorenbos 262-63).

43. The court finds that there is no evidence in the record to even question the statutory presumption that the claims of the '165 patent, the '217 patent, the '081 patent, the '909 patent or the '714 patent would not have been obvious from the '911 patent claims.

**\*9** 44. Ortho received opinions of counsel dated January

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977
(Cite as: Not Reported in F.Supp.)

1, 1976, January 22, 1976, April 18, 1977, and January 11, 1990 concerning validity of the '911 and '322 patents. (Exhs. P-202, P-203, P-204; Exh. D-344). None of these opinions mentioned double patenting as a possible basis for invalidity, even though all the Smith and Hughes patents now relied on by Ortho were available at all pertinent times. (Tr. Gamson 433).

45. Throughout the entire preliminary injunction proceedings in this litigation Ortho never raised double patenting as a potential invalidity defense. Ortho's responses to AHP's First Set of Interrogatories, filed on or about March 12, 1990, set forth Ortho's contentions concerning validity. Double patenting was not mentioned. (Exh. D-271I). AHP deposed Benjamin Lambert, a J & J patent attorney, on April 27, 1990 pursuant to Fed.R.Civ.P. 30(b)(6) in an attempt to determine Ortho's invalidity contentions for trial. (Dep. Lambert 4/27/90). Double patenting was not raised. It was not until the eve of trial that Ortho finally raised this last minute defense.

46. None of the double patenting references Ortho relies on are available as prior art for anticipation purposes. They are only available, if at all, for use in an obviousness-type double patenting inquiry. (Tr. Bjorge 937-38).

### III. *Inequitable Conduct*

47. At the time the application for the '911 patent was filed, patent examiners would review the oath with the particular purpose of seeing whether early issuing patents in foreign countries were referred to therein. (Tr. Bjorge 854).

48. A Belgian patent issues and is published a very short time after it is filed, i.e., six months or less, from its filing date. The quick publication of Belgian patents was known to examiners during the period in which the '911 patent was prosecuted. Belgian patents were a prime source of prior art information for Patent Examiners. (Tr. Bjorge 855-859; Gamson 441-42; Exh. D-267).

49. The Oath which was filed with the application which led to the '911 patent included a section citing a number of related foreign patents and a separate section

citing a number of related foreign applications. (Exh. P-18 at 368-374; Exh. D-273A).

50. The Belgian patents cited in the oath are identified by country, patent number and filing date. Immediately prior to this section, the oath (for the '911 patent) states that "the said invention has not been patented before the date of said application in any country foreign to the United States on an application filed by us or our legal representatives or assigns more than twelve months prior to said applications, except as follows:". Belgian patent Nos. 595,384; 595,385 and 595,386 are cited immediately after this statement. Thus, the court finds that the subject matter of the Belgian patents is clearly identified as the invention of Smith and Hughes-i.e., a polycarbon alkyl group at C-13. The filing date of these Belgian patents is stated as September 23, 1960. (Exh. P-18 at 368; Exh. D-273A; Tr. Gamson 444).

**\*10** 51. The stated filing date of these Belgian patents would have indicated a publication date of March 1961 to a patent Examiner. (Tr. Bjorge 856-860; Exh. D-267).

52. When the Examiner was searching for prior art, foreign patent references such as these Belgian patents were available to him, as well as translations of the same. (Tr. Bjorge p. 860-861). Copies of all of the British patent applications that Smith and Hughes relied on for priority purposes were provided to the Patent Office. (Exh. P-18 at 510-11). Each of the Belgian patents are stated to be based on the Smith and Hughes British patent applications. (Exh. P-8, pp. 1-2).

53. Belgian patent No. 595,386 was also cited in an amendment filed during the course of the proceedings for the '911 patent. This amendment, which was "suggested by the Examiner," added an additional claim for the purpose of declaring an interference. It is noted in this paragraph that Belgian patent 595,386 had an effective date of March 23, 1961. A copy of this Belgian patent was submitted along with this Amendment. The Belgian patent stood out as the sole reference cited in this letter amendment. (Tr. Bjorge 862; Exh. P-18 between 453 and 454 and 502-3; Exh. D-273B).

54. The Belgian patents were brought to the attention of

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977
(Cite as: Not Reported in F.Supp.)

Page 13

the Patent Office on another occasion, in a reply brief filed during one of the four interference proceedings in which the '911 patent was involved. The brief cites three Belgian patents as prior art against third parties showing a method of the total synthesis of a species of a C-13 polycarbon steroid of the type relied upon by plaintiff as an alleged anticipation of claims 1-4 of the '911 patent. The brief on page 4 sets forth a specific compound which has a propyl group at the C-13 position which can be made by the process of the Belgian patent:

It can also be prepared from (±)-8-dehydro-13-n-propyl-oestradiol 3-methyl ether according to the method of British Application 32671/60 ... a method for the total synthesis of the latter compound being known in the prior art. (Belgium Patents 595,384; 595,385; 595,386 and 600,244, all open for public inspection prior to 1961 Oct. 19). (Tr. Bjorge 862-864; Exh. D-250A).

55. During the four interferences in which application for the '911 patent was involved, the citation of prior art to the Patent Office was appropriate. Prior art was considered by the primary examiner during the interference (Tr. Bjorge 934), including Belgian and other patents and publications available in 1961. (Exh. D-250B).

56. Defendant American Home Products' in-house patent counsel, who had overall responsibility for the procurement of the '911 patent, testified that he was sure that he and outside counsel who assisted in the procurement of the '911 patent had done everything they could within the rules and law and never did anything to deceive or conceal anything. To this, plaintiff's counsel responded that no implication was being made that Dr. Bellino did anything to deceive. (Dep. Bellino 141).

*11 57. The issue of when Hughes and Smith made their invention was raised several times during the interference proceedings in connection with obtaining the '911 patent. Hughes and Smith conceived of their invention in the period of 1959 to 1960, as stated in several papers filed in the Patent Office, well prior to the date of the Belgian patents were published. (Exhs. P-18 379-80, 424-27, 441, 453; D-250A, B, C, D and

E). Despite the fact that others attacked the Smith and Hughes application based on foreign patents and publications dated 1961 (Exh. D-250B), none raised these Belgian patents as a bar to patentability.

58. Although the issue of when Smith and Hughes made their invention was raised in the Patent Office proceedings, and although third parties had the opportunity to, and did cite subsequently issued references, the Patent Office officials concluded that there was no impediment to the issuance of the '911 patent and there is no evidence that AHP considered the Belgian patents a bar to patentability any more than did the Patent Office or third parties.

59. Ortho has also sought to raise a new issue of inequitable conduct at trial which was not raised prior to trial or in plaintiff's case in chief. Ortho contends that defendant engaged in inequitable conduct by not including in an affidavit a single piece of published data relating to the androgenic effects of norgestrel (published in 1963, Exh. P-193) when presenting favorable progestin data to the Patent Office during the proceedings which led to the issuance of the '322 patent. (Tr. 955-56).

60. The court finds that the uncontroverted testimony of the defendants' experts weighs strongly on this issue. Dr. Rorig testified that although androgenic activity is increased slightly in moving from the methyl to the ethyl moiety, the ethyl compounds show a substantially greater separation between progestational and androgenic activities, thereby enhancing the desirable properties of the claimed compounds. (Tr. Rorig 648-650, 653, 662). Dr. Goldzieher testified that the androgenic side effects of norgestrel as well as norgestimate have no clinical significance. (Tr. Goldzieher 821-826). Mr. Bjorge testified that the androgenic data should not be presumed to be material, and that absent its materiality, there was no inequitable conduct. (Tr. Bjorge 910). There was no testimony, nor any expert opinion, on any intent to deceive.

IV. *Infringement*

A. *Ortho Has Admitted Infringement of Claims 40 and 43*

Not Reported in F.Supp.    Page 14
Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977
**(Cite as: Not Reported in F.Supp.)**

61. Ortho has admitted infringement of claims 40 and 43. (Ortho's Response to AHP's First Set of Requests to admit Nos. 6 and 7, Exh. D-271L; Tr. Gamson 426; Dep. Lambert 36-38).

B. *Claims 5 and 19 are Infringed Under the Doctrine of Equivalents*

1. *Norgestimate Was Created From Norgestrel*

62. Norgestimate was initially made from norgestrel by Dr. Arvin Shroff of Ortho, who was identified as the inventor of norgestimate. (Exh. D-25, 29; Exh. P-239). Dr. Shroff did not know how to make norgestrel; he used a bottle of norgestrel he had obtained from his stockroom. He used basic laboratory techniques known to undergraduate students in the 1950s, and the whole process took less than a day. (Dep. Shroff 30-33, 101; Exh. D-19 at 89-91; Tr. Rorig 602-604; Tr. Doorenbos 238-39). Dr. Shroff also made the corresponding 13-methyl compound, norethindrone acetate oxime, which is covered by the same Ortho patent which covers norgestimate. (Dep. Shroff 27; Exh. D-31, claim 2). The 13-methyl compound was tested by Ortho and discarded in favor of norgestimate, the 13-ethyl compound. (Exh. D-244 at 21-22). Steroidal oximes were known to be able to exhibit hormonal activity. (Exh. D-197, column 3, lines 20-25). Dr. Shroff obtained three patents covering norgestimate. (Exhs. D-25, D-29, D-31). The first issued in 1970 (Exh. D-29), and the last expires in 1994. (Exh. D-25).

**\*12** 2. Norgestimate Is Converted to Norgestrel and Norgestrel Acetate in the Body, Which Are Responsible for the Progestational Activity of Norgestimate

63. In 1984, Alton, at Ortho, prepared an internal report on the urinary metabolites of norgestimate (Exh. D-23), and published some of the data. (Exh. D-104). Norgestimate is rapidly and extensively metabolized

| Norgestrel oxime | 10.6% | ± | 1.8% |
|---|---|---|---|
| Norgestrel acetate | 9.5% | ± | 1.7% |
| Norgestrel | 15.4% | ± | 5.4% |

The amount of norgestimate could not be accurately

(broken down) in the body to a variety of "metabolites." (Tr. Jusko 732, 735; Exhs. D-23 at pages 12-13, D-295, D-305, D-307).

64. Hormone metabolites can be extracted from the urine of women following oral administration of either norgestrel or norgestimate. The urinary metabolite patterns show similarities from which it can be concluded that norgestimate is being metabolized to norgestrel in a woman's body, and norgestrel is further being metabolized. (Tr. Jusko 734-36; Exh. D-305).

The results of this study suggest that the biotransformation of norgestimate is comparable to that of norgestrel ... norgestrel was recovered in urine following the oral administration of both norgestrel and norgestimate. The relative amounts of norgestrel, however, were different. ... This difference, however, as well as other minor differences, are probably not significant. (Exh. D-23 at page 13).

65. A hormone (or its metabolites) deliver their chemical message by being transferred through the blood stream ("serum") to the receptor site. (Tr. Jusko 785). The activity of a hormone (or its metabolites) is the product of its potency times its concentration. (Tr. Jusko 788; Exh. D-296). A hormone which is not present in the bloodstream cannot function as a hormone. (Tr. Jusko 747).

66. Ortho conducted an experiment in 1977 to measure the levels of norgestimate's metabolites in the blood. (Exh. D-107). Using state-of-the-art techniques (Tr. Jusko 740; Dep. Phillips 86), Ortho determined that norgestimate's three pharmacologically active metabolites were present in the following amounts:

measured because of interference with other metabolites. At most, it could have been 6.2% ± 1.5%.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977
**(Cite as: Not Reported in F.Supp.)**

It could have been zero. (Tr. Jusko 739). Norgestrel acetate is the species of claim 19; norgestrel is the species claimed in claim 5.

67. In 1989 Ortho measured the amount of norgestimate in the bloodstream of women who had been given norgestimate. It was minuscule at best (less than 0.4% that of a comparable dose of norgestrel) and had completely disappeared from the blood stream within 6 hours. (Tr. Jusko 743-745; Exh. D-187 at 28).

68. Dr. Jusko calculated the progestational effect of the low levels of norgestimate and norgestrel oxime present in the blood by multiplying the low concentrations times the relative potencies measured by Ortho. (Tr. Jusko 751; Exhs. D-296, D-335), and comparing those effective concentrations to the known effective concentration of norgestrel. (Tr. Jusko 752-3). He concluded that the amount of norgestimate and norgestrel oxime is too small to account for the biological activity or norgestimate (Tr. Jusko 788, 753, 793), and that the activity of norgestimate is primarily due to norgestrel and norgestrel acetate (Tr. Jusko 768), and in fact, up to 85% of the activity is due to norgestrel acetate. (Id. 753).

**\*13** Q. What do you conclude from the data on Exhibit 296?

A. If you see the concentrations of norgestrel, how high they are, and then assess how low the concentrations or norgestimate and norgestrel oxime are when related as the effective concentration, one would conclude that there isn't sufficient amount of progestin from these two compounds to account for the activity or norgestimate.

Q. What in your opinion is causing the progestational activity of ingested-of norgestimate which a woman takes orally?

A. Based on the metabolic data that we covered previously, I would conclude that it's got to be the norgestrel and the norgestrel oxime that makes up the difference.

Q. And norgestrel acetate, is that also part-

A. I'm sorry. And norgestrel acetate is what I meant that

makes up the difference.

Q. How much of the activity or norgestimate oral contraceptive do you believe is due to norgestrel and norgestrel acetate?

A. Because of the differential of the curves in the diagram, my estimate is that it may be as much as 85 percent of the dose must be accounted for from the activity of norgestrel and norgestrel acetate.

Q. Is it your understanding that norgestrel oxime is in fact the active ingredient of norgestimate?

A. No. It's one of several active compounds.

Q. It's one of several. Do you consider it to be a primary source of progestational activity of norgestimate?

A. No, it's too weak to be a primary source. The primary sources would have to be norgestrel or norgestrel acetate. (Tr. Jusko 752-753, 768).

Dr. Jusko's analysis and opinions were not rebutted.

3. Norgestimate Functions in the Same Way as Norgestrel in Oral Contraceptives to Give the Same Result

69. Progestins, such as Ortho's norgestimate and Wyeth's norgestrel, function in three ways in an oral contraceptive. First, they shut down the production of two other hormones, FSH and LH, in the hypothalamus and pituitary gland, preventing ovulation. Second, they change the lining of the endometrium so that it is less favorable to the implantation of a fertilized egg. (Tr. Goldzieher 803). Both norgestimate and norgestrel function in the same way. (Id.; Ortho's response to AHP's Interrogatory No. 20; Exh. D-271I).

The mechanism of action of norgestimate and norgestrel is the same: they both bind to progestational receptors and induce a progestational response. (Exh. D-271I at 14).

70. There are a number of pre-clinical tests which measure the activity of a compound as a progestin. In test after test for measuring progestins, norgestrel and norgestimate functioned as progestins to give

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977
**(Cite as: Not Reported in F.Supp.)**

substantially the same overall result, as admitted by Ortho and confirmed by Dr. Goldzieher. (See generally Exh. D-300; Tr. Goldzieher 805-818; Exhs. D-133, D-172, D-153, D-155, D-164, D-182).

71. While progestins can exhibit androgenic effects in pre-clinical tests, they do not do so clinically in combination oral contraceptives. (Tr. Goldzieher 818).

**\*14** 72. Typically, progestins exhibit a separation of progestational and androgenic activity. (*Id.*) This means that at some low dose the progestin will exhibit progestational activity, whereas at a higher dose it may exhibit androgenic activity. (Tr. Phillips 992-995). If the separation of activity is high enough, no androgenic effect will be observed at the low progestational dose. (Tr. Goldzieher 807, 818-832, 838-842; Exhs. D-133, D-177).

73. Overall, norgestimate and norgestrel perform essentially the same function in essentially the same way, with essentially identical results in oral contraceptives. (Tr. Goldzieher 832; Tr. Jusko 768, 753).

C. *Infringement Under 35 U.S.C. § 271(e)(1)*

74. On June 4, 1990, this court preliminarily ordered that J & J and Ortho be enjoined from transmitting to any foreign affiliate or third party any data based on the manufacture, use, or sale of norgestimate, and from profiting from the use of such data except to submit it to the United States Food and Drug Administration.

75. In 1986, J & J's foreign affiliate, Cilag A.G., received approval to market norgestimate in Germany (Exh. D-113 at 3). In 1987 the BGA, the German drug regulatory agency, requested that Cilag conduct certain animal studies using norgestimate. Ortho requested that Hazelton Laboratories, located in the United States, use norgestimate to generate the requested data. The data were then filed with the BGA in Germany, and with the FDA in the U.S. (Exh. P-271M, ¶ 4(c); Tr. Phillips 1014).

76. Ortho has had a policy of sending any information it submits to the FDA under its New Drug Application ("NDA") to foreign affiliates of J & J for their use in

seeking registration in their countries. (Dep. Hilke 48). In addition, data developed for purposes of a foreign registration is also sent to the FDA, regardless of whether or not such testing is needed for FDA approval. (Dep. Barba 19; Exh. D-57, D-72). Clinical, toxicology, pharmacology, drug distribution, absorption, mutagenic and preclinical data have been sent to foreign affiliates of J & J. (Exh. P.271L, ¶ s 18-24).

77. The court finds that Ortho has used test data submitted to the FDA for promotional and marketing purposes in the United States and overseas. (Dep. O'Neil 27; Exhs. D-12, D-13, D-45, D-50, D-86, D-87, D-97, D-106).

D. *Willful Infringement*

78. On February 6, 1976 and April 18, 1977, Ortho received opinions from patent counsel to the effect that both the '911 and '322 patents were, in their opinion, invalid and unenforceable. (Gamson Tr. 419-427; PX-202, 203).

79. Ortho relied upon the opinion of counsel. The court finds that the infringement by Ortho was not willful and that no circumstances exist to warrant a finding that Ortho's actions were exceptional.

E. *Johnson & Johnson has Committed Acts of Infringement*

80. Pharmaceutical Research Institute is also referred to as the R.W. Johnson Institute. (Dep. Hilke 1/24/90 9). PRI departments include clinical research, drug metabolism, drug safety and pharmaceutical research. PRI conducts basic research and clinical studies for Ortho and does whatever is necessary for norgestimate to be registered with the FDA and to be manufactured. PRI is also responsible for presenting the results of clinical trials at medical meetings. (Dep. Hilke 1/24/90 13-16; Dep. Barba 1/24/90 21-22).

**\*15** 81. PRI is responsible for sending NDA information to affiliate European companies seeking registration in their countries, and providing regulatory support to Cilag (J & J's European subsidiary) in a number of areas including pharmacology, drug distribution, drug metabolism, and pharmaceutical

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977
**(Cite as: Not Reported in F.Supp.)**

development. (Dep. Hilke 3/28/90 48, 52-55; Exh. D-56).

82. Mr. Benjamin Lambert is a patent attorney employed by J & J who provides patent legal services to Ortho, including advice about the '322 patent. (Tr. Gamson 422-423; Dep. Lambert 1/24/90 4).

83. J & J has admitted that Ortho made a norgestimate-containing oral contraceptive and that PRI participated in obtaining FDA approval for the product. (J & J's Answer to AHP's Counterclaim ¶ 11).

### CONCLUSIONS OF LAW

The Court's earlier holdings on the issues considered on the hearing for the preliminary injunction in this matter are adhered to, except as modified herein. *Yonkers Raceway v. Standardbred Owners Ass'n.,* 21 F.R.D. 3, 6 (S.D.N.Y.1957).

This court will not consider any of the questions decided on the hearing for a preliminary injunction as res judicata. They are open for review, but they should be adhered to, unless it clearly appears that an error was committed, or that additional facts were brought out at the trial which demand a modification or reversal of the views expressed at the preliminary hearing.

*See also, Travelers International AG v. TransWorld Airlines,* 722 F.Supp. 1087, 1090 (S.D.N.Y.1989), *Independent News Co. v. Williams,* 273 F.Supp. 375, 376 (E.D.Pa.1967).

### I. *Validity*

#### A. *Burdens and Presumptions*

1. The Patent Statute, 35 U.S.C. § 282, is unambiguous:

"A patent shall be presumed valid ... [T]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."

Accordingly, a patent is born valid. *Roper Corp. v. Litton Systems, Inc.,* 757 F.2d 1266, 1270 (Fed.Cir.1985). *See also Datascope Corp. v. SMEC, Inc.,* 776 F.2d 320, 323 (Fed.Cir.1985). Each claim of the patent is presumed valid independently of every

other claim. *Preemption Devices, Inc. v. Minnesota Mining and Mfg. Co.,* 732 F.2d 903, 907 (Fed.Cir.1984).

2. Defendants' burden of proving invalidity is a heavy one, and must be carried by clear and convincing evidence proving facts compelling a conclusion of invalidity. *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1375 (Fed.Cir.1986), *cert. denied,* 480 U.S. 947 (1987); *SSIH Equipment, S.A. v. U.S. Inter. Trade Comm'n,* 718 F.2d 365, 375 (Fed.Cir.1983).

3. "Clear and convincing evidence" is "evidence which produces in the mind of the trier of fact 'an abiding conviction that the truth of [the] factual contentions are 'highly possible.' " *Buildex, Inc. v. Kason Indus., Inc.,* 849 F.2d 1461, 1463 (Fed.Cir.1988) (quoting *Colorado v. New Mexico,* 467 U.S. 310, 316 (1984).

4. Patentees do not have any burden to prove any facts compelling a conclusion of validity, *Fromson v. Advance Offset Plate, Inc.,* 755 F.2d 1549, 1555, (Fed.Cir.1985) and the court need not make such a finding. *Jones v. Hardy,* 727 F.2d 1524, 1528-29 (Fed.Cir.1984).

**\*16** 5. The party asserting invalidity not only has the procedural burden of proceeding first and establishing a prima facie case, but the burden of persuasion on the merits remains with that party until final decision. *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1534 (Fed.Cir.1983).

6. The infringer's already heavy burden of proving invalidity is more difficult to overcome when the evidence relied upon consists only of the prior art considered by the patent Examiner or when the prior art asserted is no better than that which was before the Examiner when he decided to grant the patent. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1359 (Fed.Cir.1984). *Panduit Corp. v. Dennison Mfg. Co.,* 774 F.2d 1087, 1096, *cert. granted, vacated,* 475 U.S. 1809, *on remand,* 810 F.2d 1561, *cert. denied* 481 U.S. 1052 ("Nor is it the court's role to start from scratch, as a surrogate Examiner, to referee *de novo* a dispute on the validity of the question."); *Polaroid v. Eastman Kodak Co.,* 789 F.2d 1556, 1560

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 18
Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977
**(Cite as: Not Reported in F.Supp.)**

(Fed.Cir.), *cert. denied,* 479 U.S. 850 (1986).

7. Mr. Gamson, Ortho's witness on double patenting, was also Ortho's counsel on the subject of this litigation up to the present and zealously represented his client to the limit of the law. (Tr. Gamson 454). It is error to invalidate a patent on the opinion of a lawyer associated with a party. *Universal Athletic Sales Co. v. American Gym,* 546 F.2d 530, 540 and n. 27 (3d Cir.1976) ("[T]he district court erred when it placed controlling weight as to patent validity, on the opinions of a lawyer associated with defense counsel. In so holding, we express doubt that the heavy presumption of patent validity can be overcome by the testimony of an attorney on behalf of his client.")

B. *Obviousness*

1. *The Legal Standard*

8. In *Graham v. John Deere Co.,* 383 U.S. 1, 17 (1966), the Supreme Court set forth the basic framework for analyzing obviousness:

Under Section 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in pertinent art resolved. Against this background, the obviousness or nonobvious-ness of the subject matter is determined.

2. *Objective Criteria of Non-Obviousness*

9. The marketplace response to a patented invention often provides a significant indication of the non-obviousness of an invention. *See Graham,* 383 U.S. 1, 17-18. In such cases, "secondary considerations" supply objective evidence of how a patent is viewed by those directly interested in a patented product. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387, 1391 (Fed.Cir.), *cert. denied,* 109 S.Ct. 395 (1988). These secondary considerations, which include commercial success, long-felt need for the invention, failure of others, and acquiescence of the industry, are an essential and integral part of determining obviousness. *Alco Standard Corp. v. Tennessee Valley Authority,* 808 F.2d 1490, 1498 (Fed.Cir.1986). A license indicates a decision to pay tribute to the

invention. *See In re Geiger,* 815 F.2d 686 (Fed.Cir.1987). Once the patentee shows significant sales of the patented product the burden of rebuttal is on the challenger to show that the commercial success was due to extraneous factors other than the merit of the patented invention, *Demaco* 851 F.2d at 1392-93.

**\*17** 10. The objective indicia of nonobviousness (the "secondary considerations" of Graham) are usually the most important items of evidence available and are properly viewed as a "fourth" factual inquiry in the *Graham v. Deere* investigation. *Simmons Fastener Corp. v. Illinois Tool Works, Inc.,* 739 F.2d 1573, 1575 (Fed.Cir.1984), *cert. denied* 471 U.S. 1065 (1985).

"[S]econdary considerations may be the most pertinent, probative, and revealing evidence available to the decision maker in reaching a conclusion on the obviousness/non-obviousness issue....

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.,* 776 F.2d 281, 306 (Fed.Cir.1985), *cert. denied,* 475 U.S. 1017 (1986).

3. *Obviousness and Chemical Compounds*

11. Chemical compounds and their properties are inseparable and there is no basis in law for ignoring any property in making a comparison. *Jones v. Hardy,* 727 F.2d 1524, 1528-30 (Fed.Cir.1983); *In re Papesch,* 315 F.2d 381 (CCPA 1963).

Section 103 says, inter alia, 'The subject matter as a whole would have been obvious....' Nothing is said about 'obvious to try.' Consideration of the subject mater 'as a whole' in chemical cases requires comparison of properties, pharmaceutical or otherwise, as well as comparison of chemical structures.

*In re Huellmantel,* 324 F.2d 998 (CCPA 1963). "If the patent law were to define a drug solely by its chemical structure, few new drugs would be patentable." *Eli Lilly and Co. v. Premo Pharmaceutical Labs,* 630 F.2d 120, 127 (3d Cir.), *cert. denied,* 449 U.S. 1014 (1980) (upholding Eli Lilly's patent on a pharmaceutical).

12. New chemical compounds are entitled to patent protection if their properties are unexpectedly different

Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977
**(Cite as: Not Reported in F.Supp.)**

from, or superior to, those of compounds described in the prior art. *See, e.g., In re Chupp,* 816 F.2d 643, 645-46 (Fed.Cir.1987).

13. The properties of the new compound need not be completely different from those of the prior art to merit patent protection. Rather, it is sufficient to produce "[e]vidence that (the) compound is unexpectedly superior in one of a spectrum of common properties...." *In re Chupp,* 816 F.2d at 646; *Accord Eli Lilly & Co. v. Premo Pharmaceutical Laboratories,* 630 F.2d 120, 131 (3d Cir.), *cert. denied,* 449 U.S. 1014 (1980). Such superiority need not consist of properties lacking in the prior art compounds. *Id.* If the superior property of the new drug has led to its acceptance in the medical community, the compound's superior property is a "significant enough contribution to be deserving of a patent." *United States v. Ciba-Geigy Corp,* 508 F.Supp. 1157, 1169 (D.N.J.1979).

4. *Policy Considerations*

14. The policy rationales behind the patent statutes generally apply with even greater strength in the case of drug patents. It is in the public interest to protect the pharmaceutical industry's investment into the discovery of new drugs.

**\*18** As the record in this case indicates, the development and perfection of new drugs frequently requires the devotion of years of research time and the expenditure of millions of dollars.... Unless this type of an investment of human and capital resources is rewarded by some form of patent protection, companies such as Eli Lilly might well choose not to undertake such large expenditures and instead devote themselves to other endeavors. To the extent this occurs, resources would be diverted from activity that is socially beneficial-the development of new drugs. As one commentator has put it, 'Viewed in these terms, the patent grant ... functions as a means of raising the expected return to be gained from basic drug research sufficiently to overcome the investor firm's risk aversion and induce it to invest additional funds in research instead of alternative investment opportunities such as production process improvement programs, advertising, increased customer service, or the like.'

*Eli Lilly and Co. v. Premo Pharmaceutical Laboratories,* 630 F.2d 120, 137-38 (3d Cir.), *cert. denied,* 449 U.S. 1014 (1980) (footnote omitted).

The public likewise has an interest in promoting large numbers of drugs which perform the same basic function, so that alternatives are available for individual therapy.

Knowledge of the pharmacological activity of any compound is obviously beneficial to the public. It is inherently faster and easier to combat illnesses and alleviate symptoms when the medical profession is armed with an arsenal of chemicals having known pharmacological activities. Since it is crucial to provide researchers with an incentive to disclose pharmacological activities in as many compounds as possible, we conclude that adequate proof of any such activity constitutes a showing of practical utility. *Nelson v. Bowler,* 626 F.2d 853, 883 (CCPA 1980).

*Accord Cross v. Iizuka,* 753 F.2d 1040, 1044 (Fed.Cir.1985).

C. *Double-Patenting*

15. There are two types of double patenting: (1) same invention double patenting and (2) obviousness-type double patenting. *In re Longi,* 759 F.2d 887, 892 (Fed.Cir.1985). Ortho does not allege same invention double patenting in this case. (Tr. Gamson 457).

In the latter situation ("obviousness"-type), the test is whether the subject matter of the claims of the patent sought to be invalidated would have been obvious from the subject matter of the other patent, and vice versa. In considering that question, the disclosure of the "reference" patent may not be used as prior art.

*Carman Indus., Inc. v. Wahl,* 724 F.2d 932, 940 (Fed.Cir.1983); *See also Phillips Petroleum Co. v. United States Steel Corp.,* 604 F.Supp. 555 (D.Del.1985), *later proceeding,* 673 F.Supp. 1278 (D.Del.1987), *aff'd* 865 F.2d 1247 (Fed.Cir.1989).

16. The presumption of validity not only applies to double patenting allegations, it imposes "a heavy burden of proof on one seeking to show double

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977
(Cite as: Not Reported in F.Supp.)

patenting." *Carman Indus., 724 F.2d at 940.* That burden is even more difficult to overcome where, as here, the same Examiner allowed each of the patents at issue. 2 Rosenberg, *Patent Law Fundamentals,* § 1505, at 15-88.8 (1990).

**\*19** 17. There can be no obviousness-type double patenting where there is no determination of obviousness. The court, in *Studiengesellschaft Kohle mbh v. Northern Petrochemical Co., 784 F.2d 351 (Fed.Cir.) cert. dismissed, 478 U.S. 1028 (1986),* dealt with just such a situation:

The district court made no findings as to obviousness-type double patenting. We agree with SGK that Northern Petrochemical offered *no evidence* of the scope and content of the pertinent art, other than the '115 patent, the level of skill in the art, or what would have been obvious to a person skilled in the art. *Consequently, we hold that obviousness-type double patenting is not involved in this case. Id.* at 355 (emphasis added).

The issue on double patenting is obviousness, not merely whether the claims of one patent dominates the claims of another. *In re Kaplan 789 F.2d 1574, 1577 (Fed.Cir.1986)* (" 'domination' which by itself does not give rise to 'double patenting' ").

18. Ortho's attempts to tie the validity of claim 1 of the '322 patent as well as the claims of the '911 patent to the validity of claims 5, 19, 40 and 43 of the '322 patent run contrary to the explicit directives of 35 U.S.C. § 282.

Each claim of a patent (whether in independent, dependent or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent on an invalid claim.

35 U.S.C. § 282. Each claim of a patent is considered its own invention, and must be proven invalid independent of the validity of any other claims or patents. *See Shelcore, Inc. v. Durham Indus., Inc., 745 F.2d 621, 625 (Fed.Cir.1984).* (It is a "requirement at trial that a party challenging the validity of a claim, absent a pretrial agreement or stipulation, must submit evidence

supporting a conclusion of invalidity of *each* claim the challenger seeks to destroy.") (emphasis in original). *Ashland Oil, Inc. v. Delta Oil Prods. Corp., 685 F.2d 175, 178 (7th Cir.1982)* (where only some claims of patent are proven invalid for double patenting, it is reversible error to invalidate other claims of the patent), *cert. denied, 460 U.S. 1081 (1983).*

19. Matter not within the scope of a claim is often cited and used to show support for that claim under 35 U.S.C. § 112. *See, e.g., Heymes v. Takaya, 6 U.S.P.Q.2d 1448, 1452 (P.T.O. Bd.Pat.App. & I.), reconsideration denied, 6 U.S.P.Q.2d 2055 (P.T.O. Bd.Pat.App. & I. 1988).* Specific embodiments of the invention of a claim may be found in the disclosure *considered as a whole. In re Honn, 364 F.2d 454, 460 (C.C.P.A.1966).*

20. AHP is entitled to the benefits of 35 U.S.C. § 121, which provides that when the Patent Office requires restriction between several groups of claims, and divisional applications are filed as a consequence, the resulting patents are not available for an obviousness-type double patenting defense against each other.

**\*20** 21. Even if the '911 patent were invalid for double patenting, the '322 patent would not be invalidated as a result. While the '322 patent is terminally disclaimed to expire on the same date that the '911 patent is set to expire, the validity of the '322 patent is not inextricably tied to the validity of the '911 patent. All patents are presumed valid under 35 U.S.C. § 282, not just those patents which do not have a terminal disclaimer. *Bausch & Lomb, Inc. v. Barnes-Hind Hydrocurve, Inc., 796 F.2d 443 (Fed.Cir.1986), cert. denied, 484 U.S. 823 (1987).* Invalidity cannot be imposed merely because a related patent may be invalid.

22. Judge Learned Hand spoke to the above issue in *H.C. White Co. v. Morton E. Converse & Son Co., 20 F.2d 311 (2d Cir.), cert. denied, 275 U.S. 547 (1927).*

Whatever may be the result if throughout the granted term the inventor had the enjoyment of his apparent monopoly, it seems to us that, when his patent is declared invalid before its expiry, the consideration fails and the counter consideration moving from the inventor-i.e., the dedication of the disclosure-may be revoked. There being no chance for apportionment of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977
(Cite as: Not Reported in F.Supp.)

the dedication, *it ought not therefore be held that a subsequent and valid patent is itself invalidated because of the original dedication.*

20 F.2d at 314 (emphasis added). *See also Shelcore, supra,* 745 F.2d 621 (later design patent terminally disclaimed over earlier utility patent; even where 12 of the 13 claims of utility patent were invalidated, design patent no invalid *Gemveto Jewelry Co. v. Jeff Cooper Inc.,* 694 F.Supp. 1085 (S.D.N.Y.1988) (later issued patent terminally disclaimed over earlier patent; even where later patent was invalidated, earlier patent remained valid *aff'd without op.,* 884 F.2d 1399 (Fed.Cir.1989).

23. The court concludes, on the basis of the foregoing, that the plaintiff in this case has failed to prove by clear and convincing evidence that the defendants' patent is invalid. Accordingly, the court finds that the defendants' patent remains valid and must be accorded the protection enjoyed by all valid patents until their full term has expired.

## II. *Inequitable Conduct*

24. Inequitable conduct must be proved by clear and convincing evidence, and the party asserting it carries a heavy burden. *Kimberly-Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 1454 (Fed.Cir.1984); *Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1151 (Fed.Cir.1983); *Environmental Designs, Ltd. v. Union Oil Co. of Cal.,* 713 F.2d 693, 698 (Fed.Cir.1983) *cert. denied,* 464 U.S. 1043 (1984).

25. A finding of inequitable conduct during the prosecution of a patent requires proof by clear and convincing evidence of both (1) the materiality of the prior art withheld from the patent examiner; and, (2) an intent to deceive the examiner. *Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 991-3, (Fed.Cir.1988); *FMC Corp. v. Manitowoc Co.,* 835 F.2d 1411, 1415, (Fed.Cir.1987).

*\*21* 26. "To be guilty of inequitable conduct, one must have intended to act inequitably." Thus, one who alleges a "failure to disclose" form of inequitable conduct must offer clear and convincing proof of failure of the applicant to disclose art or information resulting

from an intent to mislead the PTO. *In re Harita,* 847 F.2d 801, 809 (Fed.Cir.1988). Even conduct that amounts to "gross negligence" does not of itself justify an inference of intent to deceive. *Kingsdown Medical Consultants, Ltd., et al. v. Hollister, Inc.,* 863 F.2d 867, 876 (Fed.Cir.1988), *cert. denied* 109 S.Ct. 2068 (1989).

27. Absent intent to withhold information, it is not controlling whether the reference is found to anticipate or otherwise to be material. *Allen Organ Co. v. Kimball Int'l., Inc.,* 839 F.2d 1556, 1568 (Fed.Cir.), *cert. denied* 109 S.Ct. 132 (1988). Inequitable conduct cannot lie when "applicant's failure to disclose art or information did not result from an intent to mislead the PTO. *FMC v. Manitowoc,* 835 F.2d at 1415.

28. The involved conduct, viewed in light of all of the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive. *Kingsdown, supra.*

29. Inequitable conduct is a much-abused and too often last-resort allegation. *Preemption Devices v. Minn. Min & Mfg. Co.,* 732 F.2d 903, 908 (Fed.Cir.1984). As in many patent cases, the issue of inequitable conduct deflects the court's attention from the issues of validity and infringement. *In re: Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,* 538 F.2d 180, 196 (8th Cir.1976) *cert. denied,* 429 U.S. 1040 (1977). An infringement defendant in complex litigation should not be permitted to sidestep these main issues by nit-picking the patent file in every minute respect with the effect of trying the patentee personally, rather than the patent. *Id.* As recently stated:

[T]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague. Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds, to represent their client's interest adequately, perhaps. They get anywhere with the accusation in but a small percentage of cases.

*Burlington Indus., Inc. v. Dayco Corp.,* 849 F.2d 1418, 1422 (Fed.Cir.1988).

30. After careful review of all the evidence presented,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the court concludes that plaintiff has failed to demonstrate that defendants engaged in inequitable conduct.

### III. *Infringement*

#### A. *Burdens and Presumptions*

31. Infringement is a question of fact. *Windsurfing Int'l, Inc. v. AMF, Inc., 782 F.2d 995 (Fed.Cir.), cert. denied, 477 U.S. 905 (1986).* Infringement is established by a preponderance of the evidence. *Jamesburg Corp. v. Litton Indus. Prods., Inc., 756 F.2d 1556, 1564 (Fed.Cir.1985).*

#### B. *The Doctrine of Equivalents*

**\*22** 32. A claim is infringed under the doctrine of equivalents if the accused product does substantially the same work in substantially the same way to achieve substantially the same result as the patented invention. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605 (1950).* The Supreme Court has described the doctrine of equivalents thus:

But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing.... Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system. The doctrine of equivalents evolved in response to this experience.

.. The theory on which it is founded is that "if two devices do the same work in substantially the same way, and accomplish substantially the same result they are the same, even though they differ in name, form or shape." [citing cases]. The doctrine operates not only in favor of the patentee of a pioneer or primary invention, but also for the patentee of a secondary invention consisting of a combination of old ingredients which produce new and useful results, [citing cases], although

the area of equivalence may vary under the circumstances. *339 U.S. at 607-08* (footnote omitted).

33. The doctrine of equivalents prevents an infringer from stealing the fruits of anothers' invention by taking the gist of his invention while narrowly skirting the words of the claim. *Laitram Corp. v. Cambridge Wire Cloth Co., 863 F.2d 855, 857 (Fed.Cir.1988), cert. denied, 109 S.Ct. 2069 (1989).*

[T]he doctrine, in a proper case, 'temper[s] unsparing logic and prevent[s] an infringer from stealing the benefits of an invention.' In that sense, the doctrine recognizes a fact of the real business world: words are not misappropriated; claimed inventions are. *Id.* (citations omitted).

34. After careful review of all evidence and testimony presented in this case, the court is compelled to conclude that defendants have successfully demonstrated by a preponderance of the evidence that the plaintiff has infringed defendants' patent.

#### C. *35 U.S.C. § 271(e)(1)*

35. Injunctive relief against a patent infringer is the norm. *KSM Fastening System, Inc. v. H.A. Jones Co., 776 F.2d 1522, 1524 (Fed.Cir.1985).* Without the right to obtain an injunction, a patentee's right to exclude others would be worth only a fraction of its intended value, which would sharply diminish the incentive to create and innovate intended by the patent statute. *Smith Int'l., Inc. v. Hughes Tool Co., 718 F.2d 1573, 1577-8 (Fed.Cir.1983), cert. denied, 464 U.S. 996 (1989).*

**\*23** 36. Uses of a patented invention not "solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs" is an act of infringement. *35 U.S.C. § 271(e)(1).* The statute does not permit other uses, such as obtaining foreign premarketing approval and any promotional or commercial use in the U.S. or abroad. The intent of this statute was narrowly limited by Congress to permitting generic manufacturers to establish the bioequivalency of a generic substitute drug. *Scripp's Clinic & Research Foundation v. Genentech, 666 F.Supp. 1379, 1396 (N.D.Cal.1987); American Standard, Inc. v. Pfizer Inc.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977
(Cite as: Not Reported in F.Supp.)

Page 23

722 F.Supp. 86, 103 (D.Del.1989).

37. The scope of the injunction should be sufficiently broad to prohibit all activities relating to the use of norgestimate by Ortho and J & J except those activities solely for uses reasonably related to obtaining FDA approval, as provided by 35 U.S.C. § 271(e)(1). *Eli Lilly and Co. v. Medtronic Inc.*, 14 U.S.P.Q.2d 1352 (E.D.Pa.1990), *aff'd. on other grounds,* 1990 U.S. Lexis 3184 (U.S. Jun 18, 1990) (LEXIS, GenFed library, Dist File).

D. *No Willful Infringement*

38. 35 U.S.C. § 285 permits a court in exceptional cases to award attorney's fees to the prevailing party in a patent dispute.

39. A finding of willfulness requires a consideration of the "totality of the circumstances," including whether or not the alleged infringer exercised due care to determine whether there is infringement. *Spindelfabrik Suessen-Schurr v. Schubert & Salzer,* 829 F.2d 1075, 1084 (Fed.Cir.1987), *cert. denied,* 484 U.S. 1063 (1988). *Underwater Devices Inc. v. Morrison Knudsen Co.,* 717 F.2d 1380, 1381-90 (Fed.Cir.1983) ("where ... a potential infringer has actual notice of another's patent rights, he has an affirmative duty to exercise due care to determine whether or not he is infringing ... [the opinion of counsel here was inadequate for reasons which included an inadequate infringement analysis]" ).

40. In order to prove willful infringement, a showing by clear and convincing evidence under all the facts and circumstances must be present to determine willful disregard of the patent in suit. *Underwater Devices, Inc. v. Morrison-Knudsen Co.,* 717 F.2d 1380, 1389-90 (Fed.Cir.) *cert. dismissed,* 474 U.S. 976 (1985).

41. There is no willful infringement when the accused infringer reasonably relied upon an opinion of counsel-even if that opinion is ultimately proved wrong after trial. *Kloster Speedsteel AB v. Crucible Inc.,* 793 F.2d 1565, 1579 (Fed.Cir.1986), *modified,* 231 U.S.P.Q. 160 (Fed.Cir.1986) *cert. denied* 479 U.S. 1034 (1987).

42. The court concludes that Ortho obtained and reasonably relied upon opinions rendered by counsel.

There was no willful infringement.

E. *Johnson & Johnson has Infringed the '322 Patent*

43. Section 271(a) of the Patent Statute states, in pertinent part: "[W]hoever without authority makes, uses, or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a).

*24 44. Section 271(b) states: "Whoever actively induces infringement shall be liable as an infringer." 35 U.S.C. § 271(b).

45. The court further concludes that whereas Ortho and J & J's PRI used norgestimate during the term of the '322 patent, both are infringing the '322 patent and have induced infringement.

An appropriate Order follows.

ORDER

AND NOW, this 17th day of August, 1990, following the conclusion of a bench trial in this matter, and in accordance with the foregoing Findings of Fact and Conclusions of Law, it is hereby Ordered as follows:

1. Plaintiff Ortho Pharmaceutical Corporation, and Johnson & Johnson, are ENJOINED from making, using or selling any product containing the chemical compound norgestimate in violation of defendant American Home Product's '322 Patent UNTIL the expiration of the defendant's '322 Patent in November of 1991. The single exception to this is that Ortho Pharmaceutical and Johnson & Johnson MAY engage in activities with respect to norgestimate RELATED SOLELY for uses reasonably related to obtaining FDA approval, as provided by 35 U.S.C. § 271(e)(1).

2. Plaintiff's and Defendants' cross-motions for attorney's fees are DENIED.

Judgment is hereby ENTERED in FAVOR of Defendants Herchel Smith, American Home Products Corporation, and Wyeth-Ayerst Laboratories and AGAINST Plaintiff Ortho Pharmaceutical Corporation.

**AND IT IS SO ORDERED.**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 24
Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.), 18 U.S.P.Q.2d 1977
**(Cite as: Not Reported in F.Supp.)**


E.D.Pa.,1990.
Ortho Pharmaceutical Corp. v. Smith
Not Reported in F.Supp., 1990 WL 121353 (E.D.Pa.),
18 U.S.P.Q.2d 1977

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.