# ASHBY & GEDDES

ATTORNEYS AND COUNSELLORS AT LAW

**500 DELAWARE AVENUE**

**P. O. BOX 1150**

**WILMINGTON, DELAWARE 19899**

TELEPHONE
302-654-1888

FACSIMILE
302-654-2067

August 10, 2007

The Honorable Mary Pat Thynge
United States District Court
844 North King Street
Wilmington, Delaware 19810

**VIA ELECTRONIC FILING**

Re:    *Amgen Inc. et al. v. ARIAD Pharmaceuticals, Inc.*, C.A. No. 06-259-MPT

Dear Judge Thynge:

At the discovery teleconference conducted on August 3, 2007, the Court requested that the parties provide additional information regarding ARIAD's motion for leave to add claims for infringement of the '374 and '090 patents—two patents in the same family as the '516 patent-in-suit. In particular, the Court directed the parties to submit relevant authorities on the question of whether the pertinent time frame for evaluating "undue delay" is the period *after* the filing of the action or can include events occurring *before* the filing of the action. At the hearing, ARIAD stated its belief that the pertinent time frame begins with the start of the action, and that a charge of undue delay must be examined in conjunction with any prejudice demonstrated to result from the proposed amendment. The cases support ARIAD's point of view.

The Third Circuit has expressly confirmed that the undue delay factor in the Rule 15 analysis "refers to delay **in the actual proceeding** in which the complaint occurs, not delay in bringing suit." *Boileau v. Bethlehem Steel Corp.*, 730 F.2d 929, 938-39 (3d Cir. 1984) (emphasis added). (Ex. A.) *Boileau* involved an action that arose out of a challenge to a 1972 state court consent decree. In June 1978, Ms. Boileau brought a petition in state court to strike the judgment, as well as an action in federal court seeking damages as a result of the decree. In October 1978, the district court stayed the federal action pending final resolution of the state court petition. Following the resumption of the federal proceeding in March 1982, plaintiff sought leave to amend to add new claims. In March 1983, the district court denied the motion as a result of "the delay in bringing action after the 1972 settlement." *Id.* at 938. The Third Circuit reversed, explaining that "the delay exception in amending the complaint refers to delay in the actual proceeding in which the complaint occurs, not delay in bringing suit. Thus *Foman* couples the delay consideration with prejudice to the opposing party. Here, no prejudice was alleged or proved, and since the plaintiff moved to amend her complaint during the time between the filing of the state lawsuit and the 1982 lifting of the stay on the federal litigation, there is no indication of prejudice." *Id.* at 939.

Later cases reiterate the legal principle from *Boileau* that "undue delay" is measured with respect to the actual proceedings in question, not an alleged pre-suit delay in bringing the claims

The Honorable Mary Pat Thynge
August 10, 2007
Page 2

that are the subject of the amendment. For example, in *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 n.10 (3d Cir. 2006), the Third Circuit again held an alleged pre-suit delay to be immaterial. (Ex. B.) There, the plaintiff was an injured merchant seaman who brought an admiralty action against his employers. During the action, the plaintiff sought to amend to add the United States as a party. The court first restated the Third Circuit's admonition in *Adams v. Gould Inc.*, 739 F.2d 858, 868 (3d. Cir. 1984), that "[d]elay alone is not sufficient to justify denial of leave to amend." *Arthur*, 434 F.3d at 204. The court then held that the delay was "neither so egregious nor unexplained as to warrant refusal of leave to amend. The original complaint was filed in May 2002 and the proposed amendment was filed in April 2003, less than a year later." *Id.* The court then specifically held that "[i]t is immaterial that Arthur waited for almost two years after the injuries at issue to file his complaint." *Id.* at 204 n.10 (citing *Boileau* and repeating "[T]he delay exception in amending the complaint refers to delay in the actual proceeding in which the complaint occurs, not delay in bringing suit."). *See also Lundy v. Adamar of New Jersey, Inc.*, 34 F.3d 1173, 1197 (3d Cir. 1994) (Becker, J., concurring in part and dissenting in part on a different issue) ("Moreover, this Court has repeatedly stated outright that unexcused delay unaccompanied by real detriment to the defendant or to the judiciary does not constitute undue delay. That is because undue delay refers solely to delay in the proceedings, not to delay in amending the pleadings.") (footnotes omitted, citing *Boileau*). (Ex. C.)

Cases from other district courts within the Third Circuit are to the same effect. *See General Motors Corp. v. United States*, No. Civ.A. 01-CV-2201, 2005 WL 548266, at *3 (D.N.J. Mar. 2, 2005) (environmental suit filed in 2001, motion to amend in December 2004 to add new claims granted; "When determining whether undue delay has occurred, a court must examine a delay in the proceedings, not a delay in amending the pleadings. [Citing *Boileau*.] In the Third Circuit, unexcused delay unaccompanied by real detriment to the defendant or the judiciary does not constitute undue delay.") (Ex. D); *Wausau Underwriters Ins. Co. v. Shisler*, 190 F.R.D. 341, 343-44 (E.D. Pa. 1999) (leave to amend granted in August 1999 to add a new defendant in action stemming from a December 1997 fire; court rejected argument that motion should be denied because plaintiff knew about the additional defendant within days of the fire) (Ex. E).

It bears repeating that no matter the period of time involved, delay alone will not justify denial of leave to amend unless the delay unduly prejudices the non-moving party, which as set forth in the briefs is not the case here. *See Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 520 (3d Cir. 1998) (reversing denial of leave to amend in the absence of a demonstration of "the way in which such a delay would have caused undue prejudice" to the non-moving party), superseded by statute on other grounds, 29 U.S.C. § 626; *Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1212 (3d Cir. 1984) (explaining that "[d]elay alone . . . is an insufficient ground upon which to deny a motion to amend" and emphasizing that "the touchstone is whether the non-moving party will be prejudiced if the amendment is allowed"); *see also Perfect Plastics Indus., Inc. v. Cars & Concepts, Inc.*, 758 F. Supp. 1080, 1081–82 (W.D. Pa. 1991) ("the mere passage of time between an original filing and an attempted amendment is not a sufficient reason for the denial of the motion"); *Digimarc Corp. v. Signum Techs. Ltd.*, 2001 WL 34043751, at *2 (D. Or. May 23, 2001) ("[D]elay, by itself, no matter how lengthy, is not a sufficient reason for a court to deny a motion for leave to amend.") (internal quotations omitted).

The Honorable Mary Pat Thynge
August 10, 2007
Page 3

It is certainly true, as some commentators have observed, that there are cases which have considered the movant's earlier knowledge of the claims at issue in connection with evaluating **other *Foman* factors**, such as good faith and motive for the amendment. 6 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1487 (2d ed. 1990) ("When the court inquires into the good faith of the moving party, it typically will take account of the movant's delay in seeking the amendment. As discussed more fully in the next section, although delay alone may not result in a denial of leave to amend, some courts have held that leave may be withheld if the moving party knew the facts on which the claim or defense sought to be added were based at the time the original pleading was filed and there is no excuse for his failure to plead them."). This is not a case, however, where there is any issue of bad faith or dilatory motive.

ARIAD promptly sought to add the '374 and '090 patents just *six weeks* after filing the original counterclaims and immediately after obtaining definitive information in discovery that supported the proposed amendment. Courts in this district have acknowledged that it is appropriate to seek leave to amend upon receipt of information in discovery that would satisfy a party's obligations to have a good faith basis to assert infringement claims under Rule 11 of the Federal Rules of Civil Procedure. *See CenterForce Techs., Inc. v. Austin Logistics Inc.*, 55 U.S.P.Q.2d 1124 (D. Del. 2000) (even though plaintiff had concerns about infringement for four years before the case was filed, leave was appropriately granted based on information learned in discovery because "[i]n light of Rule 11's mandate, the Court cannot conclude that CenterForce unduly delayed asserting a claim for infringement").[1] Moreover, in addition to the short time frames involved, the requested amendment is not being used to extend or otherwise delay this litigation.

ARIAD respectfully submits that there is no cause here to depart from the liberal policy of allowing amendments to pleadings such that claims on patents in the same patent family may be adjudicated efficiently and economically in the same proceeding. Any other result would not be in the interests of justice or judicial economy.

Respectfully,

*/s/ Steven J. Balick*

Steven J. Balick

cc:    All Counsel of Record

---

[1] During the teleconference, Amgen pointed to an article referenced in ARIAD's 2001 letter to suggest that ARIAD could have accused Amgen of infringement of the '374 and '090 patents earlier. That article (Ex. F), however, says nothing about assays performed by or at Amgen. Rather, the article is an academic paper from an Amgen funded institute at the University of Toronto about luciferase reporter gene assays done in Canada. The article does not even indicate which authors performed the assays. The Court should not penalize ARIAD for awaiting solid evidence from the alleged infringer itself and then moving to amend promptly upon receipt of that evidence.

# EXHIBIT A



730 F.2d 929                                                                                          Page 1
730 F.2d 929, 38 Fed.R.Serv.2d 1542
**(Cite as: 730 F.2d 929)**

United States Court of Appeals,
Third Circuit.
Leona P. BOILEAU, Appellant,
v.
BETHLEHEM STEEL CORPORATION, Bernard
V. O'Hare, Esq., Blank, Rome, Klaus &
Comisky, Joanne N. Casilio, Fernando P. Casilio and
John F. Casilio, Co-
partners t/a Frank Casilio & Sons, John Chilton,
Dorothy Lorraine Chilton,
Henry R. Bandelin, Merrile F. Bandelin, Willard H.
Renninger, Alice F.
Renninger, Stephen G. Doncevic, Mary D. Doncevic,
Donald F. Eismann, Helen O.
Eismann, Benjamin C. Queen and Norma L. Queen.
No. 83-1251.

Argued Nov. 15, 1983.
Decided March 28, 1984.
As Amended May 1, 1984.

Action was brought challenging consent judgment entered in state court. The United States District Court for the Eastern District of Pennsylvania, Edward N. Cahn, J., granted summary judgment for defendants, and plaintiff appealed. The Court of Appeals held that: (1) the action was not barred by state court's denial of petition to strike the judgment, and (2) District Court abused its discretion in denying motion to amend complaint on timeliness grounds where there was no showing of prejudice.

Vacated and remanded.

See also 290 Pa.Super. 461, 434 A.2d 1236.

West Headnotes

**[1] Judgment** 🔑**828.9(3)**
228k828.9(3) Most Cited Cases
        (Formerly 228k828(3.13))
Federal action challenging consent judgment entered in state court was not barred by state court's denial of petition to strike the judgment where the decision not to strike the judgment was not based on the merits of the claim asserted in the federal action and thus did not constitute full and fair adjudication.

**[2] Courts** 🔑**493(3)**
106k493(3) Most Cited Cases
Litigant may be denied federal forum for assertion of

federal constitutional rights if state tribunal has both recognized constitutional claims asserted and provided fair procedures for determining them.

**[3] Federal Civil Procedure** 🔑**840**
170Ak840 Most Cited Cases
District court's denial of request to amend complaint to add civil rights claim on timeliness grounds was abuse of discretion where no prejudice was alleged or proved. Fed.Rules Civ.Proc.Rules 15(a, c), 15 comment, 28 U.S.C.A.

**\*929** Cletus P. Lyman (argued), Richard A. Ash, Lyman & Ash, Philadelphia, Pa., for appellant.

John G. Harkins, Jr. (argued), Deborah F. Cohen, James M. Beck, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellees Bethlehem Steel Corp. and Blank, Rome, Comisky & McCauley.

James J. McCabe, Lewis R. Olshin, Duane, Morris & Heckscher, Philadelphia, Pa., for appellee Bernard V. O'Hare.

Before ADAMS, BECKER and VAN DUSEN, Circuit Judges.

**OPINION OF THE COURT**

PER CURIAM.

This appeal raises difficult questions concerning the appropriate forum for the adjudication of a challenge to a consent decree alleged to have violated the due process rights of the plaintiff. The difficulties arise from the need to evaluate complex and interrelated claims brought before state courts and a federal district court sitting in diversity jurisdiction. In particular, this appeal requires that we determine what preclusive effect a state court denial of a petition to strike a judgment should have on a related federal court diversity action and the procedural right of a party to amend a complaint to reflect intervening changes of decisional law. The district **\*930** court (a) held that a state court denial of a petition to strike barred diversity litigation on a collateral action, (b) denied a motion to amend the complaint, and (c) granted summary judgment for the defendants. We now vacate that judgment and remand this case for further proceedings.

I.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

730 F.2d 929
730 F.2d 929, 38 Fed.R.Serv.2d 1542
**(Cite as: 730 F.2d 929)**

The present action arises as a challenge to a consent decree between Bethlehem Steel and Henry Boileau, the husband of the plaintiff. Mr. Boileau was an employee of Bethlehem Steel between 1957 and 1971, reaching the position of manager of real estate and municipal services prior to his departure. According to his affidavit of August 16, 1978, Boileau was directed by Bethlehem Steel in 1968 to create a "slush fund" whereby corporate funds would "disappear" through a series of fictitious transactions and thereby become available for cash bribes. In his words, "I was responsible for bribery at all levels of government," particularly the city council aldermen of Chicago. App. at 228-29. [FN1]

> FN1. In a criminal proceeding growing out of an investigation of the diversion of corporate money to create slush funds, Bethlehem Steel pleaded guilty to a nine-count information charging the company with having paid bribes to obtain ship building contracts. *United States v. Bethlehem Steel,* No. 80-C-431 (S.D.N.Y., July 24, 1980).

According to Boileau, corporate funds were filtered through a number of companies which he set up to return untraceable cash to Bethlehem's coffers. [FN2] These transactions did not escape detection by the Internal Revenue Service, and on January 12, 1972, Boileau was indicted on four counts of tax evasion. *United States v. Boileau,* No. 72-17 (E.D.Pa.1972). Immediately thereafter, on January 14, 1972, Bethlehem, charging embezzlement of company funds, initiated proceedings in the Common Pleas Court of Bucks County, Pennsylvania, against Boileau and these companies, as well as other individuals. *Bethlehem Steel v. Tri State Industries, Inc., et al.,* No. 72- 355-05-1 (Ct.Common Pleas, Bucks County, 1972).

> FN2. Because the district court granted summary judgment for defendants Bethlehem and Blank, Rome, we are required to resolve disputed facts in the light most favorable to plaintiffs.

In his reply to Bethlehem's complaint, Boileau charged that the state court actions against him were instituted so that Bethlehem could avoid tax liability and forestall a threatened shareholder suit for diversion of corporate funds. Although Boileau claimed that all payments to his companies or to others were made with the authorization of his superiors, he nonetheless entered into a consent decree that ceded all his property to Bethlehem Steel. *Bethlehem Steel v. Tri State Industries, Inc.,* Nos. 72- 355-09-1, 72-356-09-2, 72-488-08- 5 (Ct. of Common Pleas, Bucks County, June 21, 1972).

The consent decree also transferred to Bethlehem Steel all the joint property of Boileau and his wife, Leona Boileau, the plaintiff in the present action. The crux of Mrs. Boileau's claim is that at the time judgment was entered she and her husband were separated and that her share of jointly held property was conveyed to Bethlehem without her knowledge, without her consent, and without due process of law. She asserts that she was not a party to the 1972 proceedings and that the property transferred to Bethlehem was traceable, at least in part, to her own savings and not to any funds that ever belonged to Bethlehem Steel.

According to Mrs. Boileau's affidavit of May 6, 1982, she and her husband first purchased land in Barrington, New Jersey on February 11, 1952; the purchase was made with the couple's joint savings. App. at 380-81. The Boileaus sold this property on June 18, 1958, and in 1961 purchased 99 acres of land in Northampton County, Pennsylvania. In 1965, the Boileaus sold ten acres of the Northampton property and purchased a Bucks County farm that was eventually conveyed to Bethlehem Steel, along with the remaining Northampton property. *Id.* These averments of Leona *931 Boileau are supported in full by the affidavit of Henry Boileau of May 7, 1982. App. at 382-85. Significantly, he adds that the final real estate purchase made by the couple in 1965 occurred *prior* to his involvement with any of the companies named in either the 1972 tax evasion indictment or the 1972 suit filed against him by Bethlehem Steel.

In her affidavit of August 25, 1978, Leona Boileau declared that she moved from Pennsylvania to Providence, Rhode Island on or about January 1, 1972. App. at 230. As of 1978, she worked as a clerical employee at Brown University, earning about $8,100 per year. She had lived with her sister since moving to Rhode Island, and, aside from the assets claimed in this law suit, she had property worth less than $400. *Id.* At the time the present lawsuit was filed in 1978, Mrs. Boileau was 62 years old.

## II.

Bethlehem Steel initiated an action in trespass and assumpsit against Henry Boileau in the Bucks County Common Pleas Court on January 14, 1972. On January 18, 1972, Bethlehem filed a second suit, this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

730 F.2d 929                                                                    Page 3
730 F.2d 929, 38 Fed.R.Serv.2d 1542
**(Cite as: 730 F.2d 929)**

one in equity, against Henry and Leona Boileau seeking a lien against their properties in Bucks and Northampton Counties equal in value to the funds that Bethlehem alleged Henry Boileau had diverted. In particular Bethlehem's complaint in the equity suit claimed:

> [Henry] Boileau has made or caused the defendants to make extensive expenditures, *inter alia,* for rare and expensive antiques, horses, real estate, travel and business enterprises, domestic and foreign investments, and deposits in bank accounts....

App. at 133. Mrs. Boileau was not named in the trespass and assumpsit action filed by Bethlehem. [FN3]

> FN3. For a reason that was not explained, the Bucks County deputy sheriff filed a return of service showing that Mrs. Boileau was served with writs of summons in trespass and assumpsit on January 29, 1972. Not only was Mrs. Boileau not named on the writs, she also claims to have been out of the state at the time. The deputy sheriff also filed a return of service for the equity summons on January 31. Mrs. Boileau denies ever having been served any summons concerning the equity proceeding. App. at 230.
>
> Moreover, Mrs. Boileau was dropped as a party defendant in Bethlehem Steel's amended complaint in equity filed March 16, 1972. App. at 119. She was restored to party status on May 24, 1972 in Bethlehem's amended complaint in equity. App. at 152. During the intervening period, Bethlehem proceeded with its equity suit against Mr. Boileau and the other named individuals and companies.

Mr. Boileau retained Bernard O'Hare, Esq., to represent him before the state court. Although Mrs. Boileau was not in Pennsylvania at the time and although she claims she was never served with process, Mr. O'Hare entered appearances on behalf of both Mr. and Mrs. Boileau. Mr. O'Hare subsequently acknowledged in court that Mrs. Boileau had not retained him and that his "appearance on behalf of Mrs. Boylou [sic] had been entered ... on the assumption that I was authorized to do so." App. at 203. Mrs. Boileau claims, "I never asked or authorized Attorney O'Hare to represent me in that action or in any other legal matter." Affidavit of Leona Boileau, July 25, 1978; App. at 223.

In June 1972, Mr. Boileau and attorney O'Hare appeared before Judge William Hart Rufe III of the Bucks County Court, together with Edwin P. Rome, Esq., of the law firm of Blank, Rome, Klaus & Comisky, and other lawyers representing Bethlehem Steel. Judge Rufe, referring to the complexity and magnitude of the cases, encouraged the parties to settle the controversy. On June 21, 1972, Mr. Boileau and Bethlehem announced to the court that they were prepared to consolidate the two actions and settle the entire matter. [FN4] The **\*932** settlement provided for the transfer of all property owned by Mr. and Mrs. Boileau to Bethlehem. [FN5] Judge Rufe entered judgment pursuant to the settlement on June 21.

> FN4. It appears that Mr. Boileau's decision not to contest this suit was premised, at least in part, upon his fear that any evidence he produced in his defense could be used against him in the criminal tax evasion case. The terms of the settlement may lend support to this hypothesis. The total amount the IRS claimed Boileau failed to report was $333,767.00, exposing him to a tax debt of $187,747.00. Presumably, the unreported amount was equal to the amount allegedly diverted from Bethlehem Steel. Yet the settlement was worth several times this amount. A plausible explanation may be found in the prison term of 20 years that Boileau faced in the criminal action.
>
> FN5. The court thanked the parties for "working out this very complex and difficult problem," adding "this is really saving us all a great deal of money...." App. at 188-189.

In her affidavit of July 25, 1978, Leona Boileau asserts the following:

3. Bethlehem Steel Corporation ("Bethlehem Steel") never served a complaint on me in the consolidated actions in Bucks County. I had no notice of the filing of the complaint against me before judgments were entered against me on June 21, 1972.

4. I now understand (but I did not know on or before June 21, 1972) that Bernard V. O'Hare, Esquire, filed a "praecipe for appearance" on February 18, 1972, purporting to appear on my behalf. I never asked or authorized Attorney O'Hare to represent me in that action or in any other legal matter.

5. I was not told of the proposal to have judgments entered against me prior to their entry on June 21, 1972, and I gave no consent to the entry of such

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

judgments in advance.

6. After the judgments were entered on June 21, 1972, in about July, 1972, I came from Providence, Rhode Island, to Pleasant Valley, Buck County, Pennsylvania at the request of my husband, Henry L. Boileau. Attorney O'Hare came to the home my husband and I had occupied before I moved to Rhode Island, and he told me for the first time that judgments had been entered against me in the Court of Common Pleas in Bucks County.

7. I protested that the entry of these judgments was without my knowledge or consent, that, up until that time, I was not aware of the allegations made against me by Bethlehem Steel, that the allegations were without any factual basis, that I refused in any manner to ratify these judgments after the fact, that Attorney O'Hare never represented me or had authority to act on my behalf, and that he had no authority in the future to represent me or act on my behalf.

8. Mr. O'Hare asked me to sign a release in favor of Bethlehem Steel, which he explained was part of the settlement worked out between Bethlehem Steel and my husband. I refused to sign this release.

App. at 222-24.

On July 17, 1972, Mr. O'Hare reported Mrs. Boileau's rejection of the terms of the consent decree to Bethlehem's counsel. Specifically, Bethlehem was informed that Mrs. Boileau would not agree to sign the deeds transferring her property to Bethlehem. According to a transcript of a hearing that took place before Judge Rufe on August 14, 1972, the parties had on July 21, 1972 alerted the court to Mrs. Boileau's refusal to participate. App. at 198. Judge Rufe designated August 14 as the date of the property transfer and directed the prothonotary of the court to convey the property in Mrs. Boileau's stead, should she not appear. The court's appointment of the prothonotary was pursuant to 21 Pa.Stat.Ann. § 53 (Purdon 1982) which provides:

In any proceedings at law or in equity, in any of the courts of this commonwealth having jurisdiction, if the said court shall order a conveyance to be executed by either of the parties to the said proceeding of his or her interest in any lands or tenements to any other party or person, and the party so ordered shall neglect or refuse to comply with the said order and make the said conveyance, or shall die, flee the jurisdiction, or become insane without having complied therewith, it shall be lawful for the said court to order and direct that such conveyance be made by the sheriff, prothonotary or clerk, or by a trustee specially

appointed for that purpose....

*933 At the August 14 hearing, the court was informed that no formal notice of that day's proposed conveyance had been served on Mrs. Boileau. App. at 204-208. Notwithstanding the lack of notice and Mr. O'Hare's specific disavowal of any authority to represent Mrs. Boileau, the court proceeded to direct conveyance of title of the Boileau's property to Bethlehem, except that the sheriff rather than the prothonotary was ordered to sign the deed on Mrs. Boileau's behalf. App. at 209.

III.

According to the record, there were no further proceedings in this case until 1978. On June 20 of that year Mrs. Boileau, represented by counsel for the first time in any of these proceedings, took two separate actions: she filed a petition to strike the judgment in the Bucks County Court of Common Pleas, and she filed the present diversity action in federal district court. In the federal court action, defendants moved for summary judgment or, alternatively, for a stay of the proceedings, pending resolution of the state court action. On October 16, 1978, the federal court denied the summary judgment motion, but, on motion of the defendants, stayed its proceeding, pending final resolution of the petition to strike the judgment in state court.

A.

Mrs. Boileau presented her petition to strike the judgment to Judge Rufe. She claimed, first, that she had never been served and therefore that the court lacked jurisdiction to enter judgment against her and, second, that an unauthorized appearance had been filed on her behalf by Mr. O'Hare. The court determined that under Pennsylvania law, a motion or petition to strike could only be considered on the basis of facts appearing on the face of the record and that no additional evidence could be admitted. *Lipshutz v. Plawa*, 393 Pa. 268, 141 A.2d 226 (1958). On the face of the record, the court concluded:

According to the Sheriff's return, the writ of summons in equity was served personally on Leona Boileau on January 31, 1972. Subsequently, Attorney Bernard V. O'Hare, Jr., entered an appearance on her behalf. Thus authorized, Attorney O'Hare negotiated a settlement agreement with Bethlehem on behalf of his clients. The agreement was submitted to and accepted by the Court and judgments were entered based thereon. Certain documents were later executed on her behalf, by order of Court, pursuant to statutory authority....

Leona Boileau's remaining challenges: that she

730 F.2d 929                                                                                          Page 5
730 F.2d 929, 38 Fed.R.Serv.2d 1542
**(Cite as: 730 F.2d 929)**

was never served with a complaint; that she never received notice of the proposed entry of judgments; that no evidence was presented to support the allegations of the complaint; that there exists no factual or legal basis for the judgments and that Mrs. Boileau never consented to entry of the judgments, would require the Court to go beyond the face of the record. As a result, these challenges are inappropriately brought by a petition to strike the judgments.

Order and Opinion of June 6, 1979; App. at 239-41.

On appeal, the Superior Court of Pennsylvania took a more cautious approach to the question of Bernard O'Hare's unauthorized representation of Mrs. Boileau and the validity of the ensuing consent decree. *Bethlehem Steel Corp. v. Tri State Industries, Inc.,* 290 Pa.Super. 461, 434 A.2d 1236 (1981). The Superior Court found that the entry of an unauthorized appearance was not a jurisdictional defect and, therefore, did not automatically render any subsequent judgment void; rather, it said the consent judgment was voidable only. The Superior Court acknowledged that there was no case law governing "voidable" as opposed to "void" consent judgments. By analogy, however, the Superior Court turned to petitions to strike unauthorized confessed judgments entered into by one party to a partnership. *See Sterle v. Galiardi Coal and Coke Co.,* 168 Pa.Super. 254, 77 A.2d 669 (1951). Under the confessed judgment case law, the effects on the non-consenting party in the partnership of an otherwise binding confessed *934 judgment could be voided upon timely and proper petition to the court. The confessed judgment doctrine, however, is premised upon the presumption of agency between partners acting in the name of a partnership. Despite the fact that the claimed absence of any relationship between Mr. O'Hare and Mrs. Boileau was the basis of the petition to strike and that this defeated any presumption of agency, the Superior Court proceeded to hold the doctrine of voidable judgments applicable to the present dispute. The Superior Court then accepted for the first time in a Pennsylvania case the tentative draft of the Restatement (Second) of Judgments that imposed a time bar to a petition to strike. Thus, the Superior Court held that Judge Rufe's dismissal of the petition to strike because of the lapse of time was not erroneous, significantly, it made no reference to the merits of the dispute or to an equitable action to open. The Pennsylvania Supreme Court affirmed without opinion.

### B.
The federal litigation arose in a different procedural

posture than the state court proceedings. Rather than appearing as a defendant seeking relief from a judgment allegedly entered improperly, as she did in the state proceeding, Leona Boileau in the federal case is a plaintiff seeking compensatory and punitive damages against Bethlehem, its attorneys, and Bernard O'Hare. [FN6] Federal jurisdiction was premised on the diversity of citizenship between Mrs. Boileau, a citizen of Rhode Island, and the Pennsylvania defendants. 28 U.S.C. § 1332 (1976). In addition, following the resumption of the federal proceeding in March 1982, Mrs. Boileau sought to amend her complaint to invoke federal question jurisdiction under 28 U.S.C. § § 1331 and 1343, based upon a claim that Bethlehem Steel, its attorneys, and Judge Rufe engaged in joint ventures violating Mrs. Boileau's civil rights protected by 42 U.S.C. § 1983.

> FN6. Mrs. Boileau also sought ejectment of those parties who purchased the contested land from Bethlehem Steel.

On March 14, 1983, the district court granted summary judgment in favor of Bethlehem Steel and Blank, Rome. The district court held Mrs. Boileau was barred by the res judicata effect of the state court judgments from pressing her claim against Bethlehem Steel and that collateral estoppel precluded relitigation of her entitlement to the real estate and the validity of the 1972 judgment. The district court--based solely upon "the protracted years of this complex litigation"--also exercised its discretion to deny Mrs. Boileau's motion to amend her complaint so as to state a cause of action under 42 U.S.C. § 1983. *Boileau v. Bethlehem Steel,* No. 78-2078 (E.D.Pa.1983) mem. op. at 15. The court expressed its belief that the § 1983 action was without merit; however its stated reasons for the denial of the amendment would appear to render this discussion dicta and therefore not controlling on the merits of the proposed amendment. [FN7]

> FN7. The court denied Bernard O'Hare's motion for summary judgment. This appeal follows from the district court's entry of judgment for Bethlehem Steel and Blank, Rome under Fed.R.Civ.Proc. 54(b).

### IV.
Mrs. Boileau's federal action against Bethlehem Steel and the other named defendants raises complex issues of overlapping rights and remedies between state and federal court proceedings as well as the threshold requirement of state action necessary for a

§ 1983 claim. Mrs. Boileau also alleges the potential compromising of state court impartiality through campaign contributions to candidates for the judiciary by certain defendants while litigation was pending. We need not address these difficult issues today, except insofar as they are directly relevant to the district court's grant of summary judgment. The limited inquiry before us is, rather, (1) whether the state court judgment should properly have precluded a federal hearing on the merits of Mrs. Boileau's claim, and **\*935** (2) whether the district court abused its discretion in not allowing amendment of the complaint.

### A.

The central question in evaluating the district court's grant of summary judgment is whether Mrs. Boileau had a "full and fair opportunity" to litigate the issues presented on this appeal on the merits before the state tribunals. *See Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 482, 102 S.Ct. 1883, 1898, 72 L.Ed.2d 262 (1982) (state court ruling must satisfy requirements of due process before it can be awarded full faith and credit); *Federated Dep't Stores v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1981) (final judgment on the merits basis for issue preclusion); *Allen v. McCurry,* 449 U.S. 90, 94-96, 101 S.Ct. 411, 414-15, 66 L.Ed.2d 308 (1980) (federal courts will adhere to principles of res judicata and collateral estoppel only when a final adjudication on the merits took place or could have taken place in state court); *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979).

We need not be detained by considerations of comity in this case. Federal court jurisdiction was invoked in the first instance based upon diversity of citizenship, thereby placing the district court in the same posture as a state court reviewing a collateral attack upon a prior state court judgment. *Trust Co. of Chicago v. Pennsylvania R.R. Co.,* 183 F.2d 640 (7th Cir.1950). Because federal courts sitting in diversity jurisdiction act as arbiters under state law, the comity or federalism concerns that might otherwise govern the relation of state and federal proceedings on collateral matters have little or no bearing here. The justification for diversity jurisdiction is to allow an out-of-state plaintiff to receive a fair and impartial trial in a suit against a favored party of the forum state. Certainly this case, which involves a Rhode Island plaintiff and a large Pennsylvania corporation as the defendant, is a paradigm for diversity jurisdiction under the impartial tribunal rationale.

Under *Allen v. McCurry,* "collateral estoppel [and res judicata] cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate the issue in the earlier case." 449 U.S. at 95, 101 S.Ct. at 415. Thus, *Allen* limits the effects of the preclusion doctrines to cases in which state courts "have recognized the constitutional claims asserted and provided fair procedures for determining them." *Id.* at 99, 101 S.Ct. at 417. *Allen* does not apply the doctrines of res judicata and collateral estoppel if state procedure in theory or practice was insufficient to allow full litigation of the constitutional claims pressed in the subsequent proceeding. *Id.* at 100-101, 101 S.Ct. at 417-18.

Mrs. Boileau challenges the adequacy of the state procedures on three separate grounds. First, she claims that the crux of her appeal rests on the failure of service that deprived the Bucks County court of *in personam* jurisdiction combined with the unauthorized entry of an appearance on her behalf by Mr. O'Hare. A legitimate exercise of jurisdiction by the state court and an authorized claim by Mr. O'Hare to represent Mrs. Boileau in settlement discussions, she avers, were necessary predicates to the state court's entry of judgment against her. However, because Mrs. Boileau proceeded by petition to strike, which, under Pennsylvania law, is limited to the facts on the record, and because improper service and an unauthorized entry of appearance would not appear on the face of the record, we must conclude that the state court proceedings did not constitute "full and fair" adjudication of the failure of service issue or the question of the unauthorized appearance entered by Mr. O'Hare and, therefore, did not resolve the merits of the dispute. Moreover, the governing Pennsylvania case law makes it clear that when a petition to strike is denied, there has been no adjudication on the merits of the dispute:

> **\*936** While it is true the court might have treated the rule as one to open judgment and proceeded accordingly (*Williams v. Notopolos,* 247 Pa. 554, 93 Atl. 610), it was not bound to do so, and, in absence of a motion to amend, made by defendant, the rule was properly discharged, and such order is not in any sense a decision on the merits pleadable in bar of the present proceedings.

*Bowman v. Berkey,* 259 Pa. 327, 103 A. 49, 51 (S.Ct.Pa.1918).

Defendants in this action contend that even if the petition to strike did not afford Mrs. Boileau a full and fair opportunity to adjudicate the validity of the 1972 consent decree on the merits, she was obligated

to file a motion to open in the state court. Ordinarily, where the federal action presents a collateral challenge to the validity of a state court ruling, this might be the case. We note, however, that the jurisdiction of the federal court was not invoked under a federal statute which allows for a challenge to the state court ruling. Rather, because Mrs. Boileau appears in federal district court under diversity jurisdiction, the federal tribunal stands in the same posture as a state court. Thus, there is no issue of failure to advance her claim in state court present here as an obstacle to federal court review. The filing of the federal action on the same day as the state court petition to strike preserved the federal diversity forum for adjudication on the merits of Mrs. Boileau's challenge to the 1972 consent order. [FN8]

> FN8. Under Pennsylvania common law the plaintiff had two procedural options to attack the 1972 state court judgment by matters outside the record. She could (1) file a petition to open in the state court of original jurisdiction; or (2) *collaterally* attack the 1972 judgment by filing an action to restrain the judgment in another Pennsylvania state court. By filing a diversity action in federal court, Mrs. Boileau, in effect, chose the second option (i.e. to collaterally attack the 1972 judgment), but brought the action in federal court pursuant to 28 U.S.C. § 1332.

[1] In view of these considerations, it appears that the district court in granting summary judgment did not sufficiently evaluate whether the prior adjudication resolved or could have resolved the merits of Mrs. Boileau's claims; moreover, it did not conduct a hearing to explore these issues in any respect. It simply stated:

> There is no doubt that there was a final judgment on the issue by the courts of Pennsylvania, and the plaintiff in this case was a party to the prior adjudication. The Bucks County court found that the plaintiff had a full and fair opportunity to litigate her claim in the state action and so stated in its opinion when the court denied her petition to strike the judgment.

*Boileau v. Bethlehem Steel,* No. 78-2078 (E.D.Pa.1983) mem. op. at 11. The district court did not deal in any way with Mrs. Boileau's claim that the state court judgment was not on the merits. Instead, it proceeded to hold that her right to challenge the judgments under Pennsylvania procedures "had been forfeited by the extensive passage of time." *Id.* As the district court acknowledged, however, less than

six years had elapsed from the entry of judgment in the Bucks County court to the filing of Mrs. Boileau's complaint in the federal diversity action. The district court thus contravened this Court's determination that under Pennsylvania law, "tort actions where bodily injury is not the gist of the complaint ... would be subject to the six-year limitation period of 12 P.S. § 31 [subsequently recodified as 42 Penna.Stat. § 5527]." *Davis v. United States Steel Supply,* 581 F.2d 335, 339 (3d Cir.1978).

[2] The second point raised by Mrs. Boileau flows directly from the first. Under *Allen,* a litigant may be denied a federal forum for the assertion of federal constitutional rights, if a state tribunal has both "recognized the constitutional claims asserted and provided fair procedures for determining them...." 449 U.S. at 99, 101 S.Ct. at 417. Mrs. Boileau's complaint in the federal action specifically alleged a lack of constitutionally mandated due process in the state proceedings prior to 1978. This constitutional claim was not adjudicated on **\*937** the merits under the Pennsylvania procedures available to consider a petition to strike a judgment because such adjudication would have required investigation beyond the face of the record.

Mrs. Boileau's third contention raises claims concerning the integrity of the state court proceedings. Whereas the first and second grounds challenge the "fullness" of the opportunity to litigate on the merits in the earlier proceedings as required by *Allen,* the third point questions the "fairness" component of the preclusion doctrine. [FN9] Mrs. Boileau's allegations challenge the fundamental integrity of the Pennsylvania state court system and, if accepted, would create a federal due process cause of action for every alleged victim of judicial impropriety in the state courts. This matter, however, need not be addressed by this Court, at least in the present stage of this appeal; indeed it is not clear that the matter was appropriately presented in the district court. Rather, having employed the diversity jurisdiction of the district court, Mrs. Boileau raised these allegations to forestall any res judicata/collateral estoppel effects of the prior adjudication. Since we hold that the district court erred on other independent grounds in its res judicata/collateral estoppel ruling, we do not reach the question whether this third point could, if substantiated, serve as an independent bar to the preclusion doctrines.

> FN9. Mrs. Boileau asserts that at or about the time the case was proceeding in the state

730 F.2d 929                                                                                                                    Page 8
730 F.2d 929, 38 Fed.R.Serv.2d 1542
(Cite as: 730 F.2d 929)

appellate courts, the defendant law firm--a defendant in the present action and counsel to defendant Bethlehem Steel in the state proceedings--contributed substantial funds to the election campaigns of state court judges, including several involved in the state court adjudication of this matter, and that at the same time the defendant law firm also represented one of the Justices of the Pennsylvania Supreme Court in various legal matters.

### B.

Mrs. Boileau sought to amend her complaint upon resumption of the federal suit based on intervening changes in decisional law applicable to § 1983 actions. When Mrs. Boileau's suit was originally filed in federal court the liability of private persons under § 1983 was governed by *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970):

Private persons, jointly engaged with state officials in the prohibited action, are acting "under color" of law for purposes of the statute. To act "under color" of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents, [quoting *United States v. Price,* 383 U.S. 787, at 794, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267 (1966).]

Subsequently, *Meyer v. Curran,* 397 F.Supp. 512 (E.D.Pa.1975) held that a private individual who was deemed to have acted under color of state law together with a state official enjoyed the full immunities of that state official. *Meyer* thus limited liability under *Adickes* when the state official enjoyed immunity. Since the state action in the present case involved a state court judge enjoying absolute immunity, *see Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 734-35, 100 S.Ct. 1967, 1975-76, 64 L.Ed.2d 641 (1980) (and cases cited therein), *Meyer* could be read as precluding a § 1983 action.

In November 1980, during the stay of the federal proceedings, the Supreme Court by implication rejected the reasoning of *Meyer.* Under *Dennis v. Sparks,* 449 U.S. 24, 29-32, 101 S.Ct. 183, 187-88, 66 L.Ed.2d 185 (1980), the immunity of a state judge under § 1983 was held not to extend to private collaborators acting under color of state law. Moreover, *Lugar v. Edmondson Oil,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), found that when state foreclosure procedures are utilized by a private party acting with a state agent to seize property, such a seizure may constitute state action and therefore be actionable under § 1983. [FN10]

FN10. *Lugar* addressed the question whether a private party's invocation of Virginia's prejudgment attachment procedures was actionable under the "state action" requirement of the Fourteenth Amendment and the "under color of state law" requirement of § 1983. Under *Lugar,* "[i]f the challenged conduct ... constitutes state action as delimited by our prior decisions, then that conduct was also action under color of state law and will support a suit under § 1983." 457 U.S. at 935. Because the allegations in the proposed amended complaint concern the use of the state prothonotary signature procedure as well as joint action between Judge Rufe and the party defendants, it would appear that Mrs. Boileau has asserted a colorable claim under *Lugar.* The present panel of this Court entertains some differences over whether the challenged state procedures must be unconstitutional on their face or simply as applied in order to fall within the ambit of § 1983 claims defined by *Lugar.* Moreover, it is not clear whether the amended complaint challenges the underlying constitutionality of the Pennsylvania procedure or whether Mrs. Boileau simply claims a due process violation as that procedure was applied to her. In the absence of briefs or argument on these points, this issue is best left to the determination of the district court in the first instance.

**\*938** The district court denied Mrs. Boileau's motion to amend her complaint based upon the changes in decisional law, ruling that

the motion has been filed only after extended state court litigation and after the defendants had filed a motion for summary judgment. In my discretion, I do not feel it appropriate to permit the plaintiff to amend her complaint and to change her case at the last minute.

Mem. op. at 13.

[3] The issue before this Court is, therefore, whether the denial of the requested amendment of the complaint on timeliness grounds was an abuse of discretion by the trial court. We note as a preliminary matter that the stated basis for the denial of the amendment, the delay in the litigation, is a purely procedural decision by the trial court. There

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

730 F.2d 929                                                                                             Page 9
730 F.2d 929, 38 Fed.R.Serv.2d 1542
**(Cite as: 730 F.2d 929)**

was no examination of the merits of the proposed amendment necessary for the determination that time and tide had brought the plaintiff to the end of her litigation lifeline. Given that this ruling effectively foreclosed reaching the merits of Mrs. Boileau's claim, the district court's decision must be weighed against the concerns for fundamental justice that undergird the Federal Rules of Civil Procedure.

While leave to amend a complaint under Rule 15(a) of the Federal Rules of Civil Procedure is generally within the discretion of the trial court, "[c]ourts have shown a strong liberality ... in allowing amendments ...." 3 *Moore's Federal Practice* ¶ 15.08(2), quoted in *Heyl & Patterson Intern. v. F.D. Rich Housing,* 663 F.2d 419, 425 (3d Cir.1981). The leading Supreme Court case on this subject, *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), reflects the general presumption in favor of allowing a party to amend pleadings. The commentaries on Rule 15 amendments support not only a liberal interpretation of this rule, but specifically address the liberal use of Rule 15 to amend complaints so as to state additional causes of action. *See* Wright & Miller, *Federal Practice & Procedure* § 1474 (1975). In a matter brought before this Court, for example, a false arrest action in the Virgin Islands was amended at the close of plaintiff's evidence to add a cause of action for false imprisonment. Although decided under Rule 15(c), this Court upheld the amendments of the complaint even at that late hour. *Martin v. Virgin Islands National Bank,* 455 F.2d 985 (3d Cir.1972).

*Foman* does however allow the amendment of a complaint to be denied when one of an enumerated set of factors--including undue delay--is present; the district court in the present case held that the delay in bringing the action after the 1972 settlement was a ground for denying the motion to amend. The district court pointed to the fact that an answer to the pleadings had already been filed--specifically the defendant's motion for summary judgment in 1978. Although Rule 15(a) states that a party may amend a pleading once as a matter of course, this right ceases once the other side has delivered its responsive pleading. In Mrs. Boileau's case, however, this position obscures the fact that the summary judgment motion was filed in 1978 and was not acted upon. Instead, the case was stayed by the district court on defendants' motion, pending disposition of the state claim. Thus there was no harm **\*939** in a motion to amend when the state court proceeding ended. Similarly, the delay exception in amending the complaint refers to delay in the actual proceeding in which the complaint occurs, not delay in bringing suit. Thus *Foman* couples the delay consideration with prejudice to the opposing party. Here, no prejudice was alleged or proved, and since the plaintiff moved to amend her complaint during the time between the filing of the state lawsuit and the 1982 lifting of the stay on the federal litigation, there is no indication of prejudice.

The liberal rules of amendment of complaints are premised on the express concern for the "just, speedy, and inexpensive determination of every action." Fed.R.Civ.Proc. 1. While it is within the discretion of a trial judge to prevent the abusive use of amendment to delay or prolong litigation, it is quite a different matter for the discretionary denial of amendment to be used to preclude a plaintiff from the federal forum altogether. Particularly where the underlying claim involves the deprivation of fundamental constitutional rights, discretionary procedural measures should be cautiously employed when denying a litigant her day in court.

We must therefore conclude that the district court erred in not permitting an amendment of the complaint.

V.

For the foregoing reasons, the judgment of the district court will be vacated and the case remanded for further proceedings consistent with this opinion.

730 F.2d 929, 38 Fed.R.Serv.2d 1542

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B



United States Court of Appeals,
Third Circuit.
Edward ARTHUR, Appellant
v.
MAERSK, INC. d/b/a Maersk Line Ltd.;  Dyn Corp.
Technical Services d/b/a Dyn
Marine Services;  the United States of America.
**No. 04-3670.**

Argued Dec. 5, 2005.
Jan. 13, 2006.

**Background:**  Merchant seaman who sustained injuries while working aboard naval ships initially brought admiralty action against his employers, and later filed amended complaint asserting that the United States was liable owner of the ships. Following grant of summary judgment in favor of employers, and partial dismissal of claims against the United States based on statute of limitations, parties cross-moved for reconsideration. The United States District Court for the Eastern District of Pennsylvania, Harvey A. Bartle, J., 299 F.Supp.2d 431, granted motions in part, and denied motions in part. Seaman appealed.

  **Holdings:**  The Court of Appeals, Fisher, Circuit Judge, held that:
  (1) seaman was entitled to leave to amend complaint to include United States as owner of ships, and
  (2) amended complaint, adding the United States as the liable owner of the ships, would relate back to original complaint, for limitations purposes.
  Reversed and remanded.

  Van Antwerpen, Circuit Judge, filed dissenting opinion.

West Headnotes

**[1] Federal Civil Procedure** 170Ak833
170Ak833 Most Cited Cases
Federal rule of civil procedure providing for liberal approach to amendments to the pleadings ensures that an inadvertent error in pleading will not preclude a party from securing relief on the merits of a claim. Fed.Rules Civ.Proc.Rule 15(a, c), 28 U.S.C.A.

**[2] Federal Civil Procedure** 170Ak834
170Ak834 Most Cited Cases
Only when the equitable factors suggest that amendment to the pleadings would be unjust should the court deny leave to amend the pleadings. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[3] Federal Civil Procedure** 824
170Ak824 Most Cited Cases

**[3] Limitation of Actions** 127(1)
241k127(1) Most Cited Cases
Undue delay in filing an amended pleading is a reason to deny leave to amend but not to deny relation back. Fed.Rules Civ.Proc.Rule 15(a, c), 28 U.S.C.A.

**[4] Federal Civil Procedure** 840
170Ak840 Most Cited Cases
Upon finding that a plaintiff has unduly delayed in requesting leave to amend the pleadings, following a grant of plaintiff's motion for leave to amend, the proper course is for the district court to vacate its prior order granting leave to amend and then to strike the amended complaint. Fed.Rules Civ.Proc.Rule 15(a, c), 28 U.S.C.A.

**[5] Federal Civil Procedure** 824
170Ak824 Most Cited Cases

**[5] Federal Civil Procedure** 834
170Ak834 Most Cited Cases

**[5] Federal Civil Procedure** 851
170Ak851 Most Cited Cases
Among the factors that may justify denial of leave to amend the pleadings are undue delay, bad faith, and futility. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[6] Federal Civil Procedure** 824
170Ak824 Most Cited Cases
Delay alone is not sufficient to justify denial of leave to amend the pleadings. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[7] Federal Civil Procedure** 824
170Ak824 Most Cited Cases
At some point, a delay in requesting leave to amend the pleadings will become undue, placing an unwarranted burden on the court, and an unfair burden on the opposing party. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

434 F.3d 196
434 F.3d 196, 2006 A.M.C. 245, 63 Fed.R.Serv.3d 982
**(Cite as: 434 F.3d 196)**

Page 2

**[8] Federal Civil Procedure** 🔑**392**
170Ak392 Most Cited Cases

**[8] Seamen** 🔑**29(5.9)**
348k29(5.9) Most Cited Cases
Merchant seaman who initially brought admiralty action against employers, stemming from injuries allegedly suffered while working aboard naval ships, was not unduly dilatory in requesting leave to amend complaint to include United States as owner of ships, and thus, seaman was entitled to leave to amend; motion for leave to amend was filed less that one year after the original complaint, the delay was justified by seaman's lack of knowledge that the ships were owned by the United States and the employers' failure to timely disclose the agency contracts, which demonstrated that the United States owned the ships, seaman acted diligently in pursuing his claims against the United States once the ownership of the ships by the United States was disclosed, and the government was not prejudiced by seaman's delay in naming it as a defendant.  Jones Act, 46 App.U.S.C.A. § 688; Suits in Admiralty Act, § 2, 46 App.U.S.C.A. § 742; 46 App.U.S.C.A. § 781;  Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[9] Federal Civil Procedure** 🔑**824**
170Ak824 Most Cited Cases
There is no presumptive period in which a motion for leave to amend the pleadings is deemed timely or in which delay becomes undue.  Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[10] Federal Civil Procedure** 🔑**840**
170Ak840 Most Cited Cases
A period of 11 months from commencement of an action to the filing of a motion for leave to amend the complaint is not, on its face, so excessive as to be presumptively unreasonable.  Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[11] Federal Civil Procedure** 🔑**833**
170Ak833 Most Cited Cases
The liberality of the federal rule of civil procedure governing leave to amend the pleadings counsels in favor of amendment even when a party has been less than perfect in the preparation and presentation of a case.  Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[12] United States** 🔑**125(11)**
393k125(11) Most Cited Cases
The designation "U.S.N.S." on a ship is not dispositive as to the existence of an agency relationship between the ship operators and the United States, for purpose of seaman's admiralty action, arising from injuries while seaman was working aboard ship.  Suits in Admiralty Act, § 2, 46 App.U.S.C.A. § 742.

**[13] Limitation of Actions** 🔑**124**
241k124 Most Cited Cases
The United States knew or should have known that, but for a mistake concerning the identity of the proper party, it would have been named in merchant seaman's admiralty action originally filed against his employers, arising from injuries he allegedly sustained while working aboard naval ships, and thus, amended complaint, adding the United States as the liable owner of the ships, would relate back to original complaint, for limitations purposes; seaman mistakenly believed that the employers were the proper defendants when he filed original complaint, the United States had notice of the original complaint, and only reason that United States was not named in original complaint was because seaman lacked knowledge that United States owned the ships. Jones Act, 46 App.U.S.C.A. § 688; Suits in Admiralty Act, § 2, 46 App.U.S.C.A. § 742; 46 App.U.S.C.A. § 781;  Fed.Rules Civ.Proc.Rule 15(c)(3), 28 U.S.C.A.

**[14] Limitation of Actions** 🔑**124**
241k124 Most Cited Cases
An amendment naming a new party will relate back to the original complaint if the new party had adequate notice of the action and should have known that it would have been named in the original complaint but for a mistake, whether the mistake is based on lack of knowledge or mere misnomer. Fed.Rules Civ.Proc.Rule 15(c), 28 U.S.C.A.
**\*198** Brian P. McCafferty (Argued), Provost & Umphrey, Philadelphia, PA, for Appellant.

**\*199** A. Robert Degen (Argued), Fox Rothschild, Philadelphia, PA, for Appellees Maersk, Inc. and United States of America.

Michael B. Pullano, Weber, Gallagher, Simpson, Stapleton, Fires & Newby, Philadelphia, PA, Henry A. King (Argued), Michael L. Vincenzo, King, LeBlanc & Bland, New Orleans, LA, for Appellee Dyn Corp. Technical Services.

Before RENDELL, FISHER and VAN ANTWERPEN, Circuit Judges.

VAN ANTWERPEN, Circuit Judge, dissenting.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

434 F.3d 196                                                                                                      Page 3
434 F.3d 196, 2006 A.M.C. 245, 63 Fed.R.Serv.3d 982
**(Cite as: 434 F.3d 196)**

OPINION OF THE COURT

FISHER, Circuit Judge.

From the high seas comes a question of federal civil procedure. After suffering a series of injuries while working as a merchant seaman, Edward Arthur sued his employers, Maersk, Inc., and Dyn Marine Services of Virginia, Inc., [FN1] for negligence under the Jones Act, 46 U.S.C. app. § 688. Only later did he realize that, because the companies were operating as agents of the United States Navy, the only proper defendant in the case was the United States. He sought and was granted leave to file an amended complaint naming the United States as a party, and requested that this claim "relate back" to the original complaint to avoid a statute of limitations bar. The District Court acknowledged that the prerequisites for relation back under Federal Rule of Civil Procedure 15(c) had been satisfied, but nevertheless denied the request on the ground that Arthur had unduly delayed in seeking leave to amend. We conclude that this decision was in error, and will reverse.

> FN1. Dyn Marine is incorrectly identified in the complaint and caption of the case as "Dyn Corp. Technical Services."

## I.

From May 1999 through December 2000, Arthur worked on four different ships and suffered four similar injuries. On May 17, 1999, while employed by Maersk on board the "U.S.N.S. *Stalwart Tagos-1,"* Arthur sustained a knee injury when the ship "rolled" during a weekly lifeboat inspection. In early October 1999, while working for Maersk on the "U.S.N.S. *Capable,"* Arthur hurt his knee once again when the ship "rolled." On May 2, 2000, while employed by Dyn Marine aboard the "U.S.N.S. *Littlehales,"* Arthur suffered yet another knee injury when his foot became caught in a gap in the deck matting. Finally, on or about December 19, 2000, while employed by Maersk on the "U.S.N.S. *Assertive,"* Arthur aggravated his condition by climbing ladders and performing other tasks. These injuries resulted in significant medical expenses and rendered Arthur unable to return to work.

The four ships on which Arthur worked were operated by Maersk and Dyn Marine but were owned by the United States Navy. Contracts between the companies and the United States provided that the Navy would maintain control of the ships while the companies would offer day-to-day personnel and operational support. Maersk operated the *Stalwart Tagos-1, Capable,* and *Assertive;* Dyn Marine operated the *Littlehales.* The relationship between the companies and the Navy was reflected by the designation "U.S.N.S.," the official abbreviation for "United States Naval Ships." [FN2]

> FN2. *See* 32 C.F.R. § 700.406(c) ("Civilian manned ships, of the Military Sealift Command or other commands, designated 'active status, in service' shall be called 'United States Naval Ship' or 'U.S.N.S.' ").

**\*200** On May 16, 2002--more than two years after he had been injured on board the *Stalwart Tagos-1, Capable,* and *Littlehales* but less than two years after the incident on the *Assertive*--Arthur commenced a civil action against Maersk and Dyn Marine in the United States District Court for the Eastern District of Pennsylvania. He alleged that the companies, as the owners "and/or" operators of the vessels, had failed to maintain deck and other facilities and were liable for negligence under the Jones Act, 46 U.S.C. app. § 688. He also raised claims of unseaworthiness and for maintenance and cure.

The complaint was served in due course and answers were filed by September 2002. Neither the answer of Maersk nor that of Dyn Marine refers to the Navy's ownership of the vessels or the nature of the contracts under which the companies operated the ships. The only statement suggesting the government's connection to the case appears in one of Dyn Marine's affirmative defenses: "Pursuant to the Suits in Admiralty Act ... [and] the Suits in Public Vessels Act [Arthur] does not have a right of action against [Dyn Marine]." Both of these Acts provide a remedy against the United States, to the exclusion of all others, for a seaman injured on board a ship owned by or operated on behalf of the Navy. [FN3]

> FN3. *See* 46 U.S.C. app. § 742 ("In cases where if such vessel were privately owned or operated, or if such cargo were privately owned or possessed, or if a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States ...."); *id.* § 781 ("A libel in personam in admiralty may be brought against the United States ... for damages caused by a public vessel of the United States...."); *In re United States,* 367 F.2d 505, 511 (3d Cir.1966) (holding that, if operator of ship acts as an agent of the United States,

exclusive remedy of person injured on ship is against the United States), *cited with approval in Favorite v. Marine Pers. & Provisioning, Inc.*, 955 F.2d 382, 388 (5th Cir.1992); *see also* 46 U.S.C. app. § 745 ("[W]here a remedy is provided by this chapter it shall hereafter be exclusive of any other action by reason of the same subject matter against the agent or employee of the United States or of any incorporated or unincorporated agency thereof whose act or omission gave rise to the claim....").

A status conference was scheduled for October 15, 2002. Prior to the conference, counsel for Maersk submitted a status report indicating, as a "special comment," that the "[c]ase arises under Public Vessels Act." The topic was explored in greater detail during the conference itself. Counsel for Maersk and Dyn Marine "clearly made known their views that the United States, not their clients, was the proper defendant." The District Court urged the companies to file dispositive motions as soon as possible to address the issue and avoid the costs of litigation. It also established, upon agreement of the parties, a ten-day deadline for initial disclosures under Federal Rule of Civil Procedure 26(a)(1).

Neither Maersk nor Dyn Marine complied with the deadline. [FN4] Dyn Marine did not produce its initial disclosures until November 4, 2002, and Maersk did not make its disclosures until December 16, 2002. There were other problems as well. Dyn Marine's disclosures did not include a copy of the operational contract between the company and the Navy. Maersk's disclosures included the contract but were initially misdirected to referring counsel, based in Mobile, Alabama. They were not delivered to Arthur's lead counsel, in Philadelphia, Pennsylvania, until late December 2002, after the statute of limitations *201 for claims against the United States had expired.

> FN4. Arthur's initial disclosures were provided to opposing counsel on October 22, 2002, within ten days of the status conference.

Within a month, Maersk and Dyn Marine filed separate motions for summary judgment. Both were predicated on the same argument: that, because the ships were owned by and operated on behalf of the United States, Arthur's exclusive remedy for his injuries was an action against the United States. Copies of the operational contracts between the

companies and the United States--including the one with Dyn Marine that had not been previously disclosed--were attached in support of the motions.

Soon thereafter, on February 19, 2003, Arthur filed a motion to stay proceedings on summary judgment pending further discovery pursuant to Federal Rule of Civil Procedure 56(f). [FN5] His counsel asserted in an attached declaration that the operational contracts had not been timely disclosed and that additional discovery was required to determine whether the contracts supported the claimed defense. The District Court granted the request.

> FN5. *See* Fed.R.Civ.P. 56(f) ("Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.").

Depositions of company officials confirmed that the ships were owned by the United States and operated by Maersk and Dyn Marine under the operational contracts. The depositions also revealed that the United States had received notice of the action against Maersk and Dyn Marine in July 2002, soon after the original complaint had been served.

On April 14, 2003, Arthur filed a motion for leave to amend the complaint to add the United States as a party. The motion was granted by the District Court on May 6, 2003, and an amended complaint was filed on May 13, 2003. The amended complaint substantially repeats the allegations of the original complaint, but asserts that the United States is liable under the Suits in Admiralty Act, 46 U.S.C. app. § 742, and the Public Vessels Act, 46 U.S.C. app. § 781, for the negligence of its "agents," Maersk and Dyn Marine. Three days later, the District Court granted the companies' motions for summary judgment on the ground that Arthur's exclusive remedy was against the United States. [FN6]

> FN6. Arthur had requested that the District Court exclude the operational contracts from the record on summary judgment as a sanction against Maersk and Dyn Marine for the late disclosures. *See* Fed.R.Civ.P. 37(c)(1) ("A party that without substantial

justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed."). Without these contracts, it is arguable that the companies would not have been able to establish an agency relationship with the United States and, thus, would not have been entitled to summary judgment. *See, e.g., In re United States,* 367 F.2d at 511. The District Court declined to exclude the contracts without explanation, and Arthur challenges this decision on appeal. Based on our conclusion that remand is warranted on other grounds, we need not reach the issue.

 The United States, now the sole defendant, filed a motion to dismiss the complaint as barred by the two-year statute of limitations of the Suits in Admiralty Act, 46 U.S.C. app. § 745. Following briefing, the District Court granted the motion. It recognized that the new claim would be timely if the amendment was deemed to relate back to the original complaint, filed in August 2002, pursuant to Federal Rule of Civil Procedure 15(c). It also recognized **\*202** that all of the enumerated prerequisites for relation back had been satisfied. [FN7] Nevertheless, it held that relation back should be denied because Arthur was "unduly dilatory" in bringing his claim against the United States.

> FN7. The District Court determined that the claim in the amended complaint arose from the same transactions as those in the original complaint, *see* Fed.R.Civ.P. 15(c)(2), found that the United States had received notice of the action within the period authorized for service and would not "be prejudiced in maintaining a defense on the merits" if the case proceeded to trial, *see id.* 15(c)(3)(A), and assumed that the United States should have known that Arthur would have named it in the original complaint but for his "mistake" concerning the agency relationship between the private companies and the Navy, *see id.* 15(c)(3)(B).

 The District Court found that, as an "experienced merchant seaman," Arthur "knew or should have known" by the "U.S.N.S." designation that the ships were owned by and operated on behalf of the United States Navy and, thus, should have brought his claim against the United States originally. It also noted that

Maersk and Dyn Marine had raised the agency issue during the status conference in October 2002 and in their motions for summary judgment in January 2003 but that Arthur had not filed a motion for leave to amend until April 2003. It acknowledged that the companies may have been tardy in producing their contracts with the Navy, but admonished that Arthur should not have "wait [ed] until he ha[d] absolute certainty before moving to amend."

 The District Court concluded that "[a]ny mistake about the United States was clearly no longer a mistake as of the ... status conference," and that any delay thereafter could not be justified. It stated: "[B]ecause Arthur's motion to amend came too late, we will grant the motion of the United States to dismiss his ... claim[ ] as barred by the two-year statute of limitations of the Suits in Admiralty Act, 46 U.S.C. [a]pp. § 745." [FN8]

> FN8. The District Court had originally granted the motion on grounds that the statute of limitations was "jurisdictional" and that, because the United States had not been named as a party until May 2003-- more than two years after Arthur's final injury in December 2000--the lawsuit was barred notwithstanding application of Rule 15(c). It subsequently reconsidered this conclusion on motion by Arthur and held that, under *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), the limitations period was not jurisdictional and did not necessarily bar relation back of the amendment. Nevertheless, the District Court affirmed its prior ruling based on undue delay.

 This timely appeal followed. We have jurisdiction under 28 U.S.C. § 1291.

### II.

 [1] Federal Rule of Civil Procedure 15 embodies a liberal approach to pleading. *See, e.g., Bensel v. Allied Pilots Ass'n,* 387 F.3d 298, 310 (3d Cir.2004), *cert. denied,* 544 U.S. 1018, 125 S.Ct. 1976, 161 L.Ed.2d 856 (2005). Subsection (a) allows a party to amend a complaint upon leave of court and states that leave "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Subsection (c) provides that an amendment arising out of the same conduct as that alleged in the original complaint will normally "relate back" to the complaint for statute of limitations purposes. *Id.* 15(c). Combined, these provisions

ensure that an inadvertent error in pleading will not preclude a party from securing relief on the merits of a claim. *See, e.g., Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

[2] Leave to amend under subsection (a) and relation back under subsection (c), **\*203** while obviously related, are conceptually distinct. Leave to amend should be granted whenever "justice so requires." Fed.R.Civ.P. 15(a). This standard encompasses a broad range of equitable factors, including a party's delay in seeking leave to amend and any prejudice to the opposing party. *See Foman,* 371 U.S. at 182, 83 S.Ct. 227. Only when these factors suggest that amendment would be "unjust" should the court deny leave. *Id.*

The relation back inquiry is more circumscribed. Rule 15(c) enumerates three distinct prerequisites for an amendment to relate back to the original complaint: (1) the claims in the amended complaint must arise out of the same occurrences set forth in the original complaint, (2) the party to be brought in by amendment must have received notice of the action within 120 days of its institution, and (3) the party to be brought in by amendment must have known, or should have known, that the action would have been brought against the party but for a mistake concerning its identity. Fed.R.Civ.P. 15(c). Once these requirements are satisfied, Rule 15(c) instructs that the "amendment ... relates back to the date of the original pleading." *Id.; see also Varlack v. SWC Caribbean, Inc.,* 550 F.2d 171, 174-75 (3d Cir.1977); 6A Charles Alan Wright et al., *Federal Practice and Procedure* § 1498 (2d ed.1990).

[3] There is no allowance in Rule 15(c) for inquiry into a party's delay in moving for leave to amend. Such equitable considerations are relevant to whether leave to amend should be granted under Rule 15(a), *see Foman,* 371 U.S. at 182, 83 S.Ct. 227, but do not relate to any of the enumerated conditions of Rule 15(c), *see Lundy v. Adamar of N.J., Inc.,* 34 F.3d 1173, 1196-97 (3d Cir.1994) (Becker, C.J., concurring in part in the judgment and dissenting in part); *Anderson v. Deere & Co.,* 852 F.2d 1244, 1248 (10th Cir.1988); 6A Wright et al., *supra,* § 1498. "Undue delay" is a reason to deny leave to amend but not to deny relation back. *See Anderson,* 852 F.2d at 1248; 6A Wright et al., *supra,* § 1498; *see also Garvin v. City of Philadelphia,* 354 F.3d 215, 220 (3d Cir.2003); *Varlack,* 550 F.2d at 174-75.

[4] The District Court did not recognize this distinction. It assumed that all of the prerequisites

under Federal Rule of Civil Procedure 15(c) had been satisfied; yet, it denied relation back based on "undue delay." This was in error. [FN9] The proper course for the District Court, upon finding that Arthur had unduly delayed in requesting leave to amend, would have been to vacate its prior order granting leave to amend and then to strike the amended complaint. *Cf. Nieves-Luciano v. Hernandez-Torres,* 397 F.3d 1, 4 (1st Cir.2005) (noting that pre-trial orders from **\*204** which no interlocutory appeal may be taken "remain open to trial court reconsideration" until the entry of judgment) (quoting *Geffon v. Micrion Corp.,* 249 F.3d 29, 38 (1st Cir.2001)).

> FN9. The District Court may have been led astray by dicta in *Nelson v. County of Allegheny,* 60 F.3d 1010 (3d Cir.1995), in which we stated that relation back was properly denied when the plaintiffs, who had delayed for three years in moving to amend the complaint, could not establish that their failure to bring an earlier amendment was due to "mistake." *Id.* at 1014-15. Although this conclusion, like that of the District Court in this case, seems to import the "undue delay" factor of Rule 15(a) into the elements of Rule 15(c), the holding in *Nelson* was otherwise justified because the plaintiffs had been aware of their claims against the defendants at the time the case was commenced, but had decided not to sue them in the original complaint, *id.* at 1011. *See Garvin,* 354 F.3d at 221-22 ("[A]n amended complaint will not relate back if the plaintiff had been aware of the identity of the newly named parties when she filed her original complaint and simply chose not to sue them at that time."); 3 James Wm. Moore et al., *Moore's Federal Practice-- Civil* § 15.19[3][d] (3d ed. 1997) ("[A] conscious choice to sue one party and not another does not constitute a mistake and is not a basis for relation back.").

But it does not follow that the decision of the District Court must be reversed. We could still affirm if we conclude that the District Court's findings would support denial of leave to amend under Rule 15(a). Likewise, we may affirm if we determine as a matter of law that the prerequisites for relation back under Rule 15(c) have not been satisfied. *See Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.,* 85 F.3d 1098, 1107 (3d Cir.1996) ("[W]e may affirm a correct decision of the district court on grounds other than those relied upon by the district

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

court....").

### A.

[5] Leave to amend must generally be granted unless equitable considerations render it otherwise unjust. *Foman,* 371 U.S. at 182, 83 S.Ct. 227; *see also Lorenz v. CSX Corp.,* 1 F.3d 1406, 1414 (3d Cir.1993). Among the factors that may justify denial of leave to amend are undue delay, bad faith, and futility. *Lorenz,* 1 F.3d at 1414 (quoting *Foman,* 371 U.S. at 182, 83 S.Ct. 227). We have consistently recognized, however, that "prejudice to the non-moving party is the touchstone for the denial of an amendment." *Id.* (quoting *Cornell & Co. v. Occupational Safety & Health Review Comm'n,* 573 F.2d 820, 823 (3d Cir.1978)); *see also* 3 James Wm. Moore et al., *Moore's Federal Practice--Civil* § 15.15[2] (3d ed.1997); 6 Wright et al., *supra,* § 1488.

The District Court determined that the amended complaint presented a valid claim and that the United States would not suffer any prejudice if amendment was permitted. The District Court did not state, and the record does not suggest, that Arthur acted in bad faith or with improper motive. The only potential ground to deny leave to amend is undue delay.

[6][7] Delay alone is not sufficient to justify denial of leave to amend. *Adams v. Gould Inc.,* 739 F.2d 858, 868 (3d Cir.1984). "[H]owever, at some point, ... delay will become 'undue,' placing an unwarranted burden on the court ... [and] an unfair burden on the opposing party." *Id.,quoted in Cureton v. Nat'l Collegiate Athletic Ass'n,* 252 F.3d 267, 273 (3d Cir.2001). When a party fails to take advantage of previous opportunities to amend, without adequate explanation, leave to amend is properly denied. *Id.; see also Cureton,* 252 F.3d at 273 ("[T]he question of undue delay requires that we focus on the movant's reasons for not amending sooner.").

[8][9][10] Arthur's delay was neither so egregious nor unexplained as to warrant refusal of leave to amend. The original complaint was filed in May 2002 and the proposed amendment was filed in April 2003, less than a year later. [FN10] Without discounting the expense involved in litigating a case for eleven months, only one appellate court uncovered in our research has approved of denial of leave to amend based on a delay of less than one year. *See Wimm v. Jack Eckerd Corp.,* 3 F.3d 137, 141-42 (5th Cir.1993) (nine months); *cf. Jones v. Robinson Prop. Group, L.P.,* 427 F.3d 987, 994-95 (5th Cir.2005) (affirming denial of leave based on

delay of one year); *Lewis v. Fresne,* 252 F.3d 352, **\*205** 360 (5th Cir.2001) (same). There is, of course, no presumptive period in which a motion for leave to amend is deemed "timely" or in which delay becomes "undue." However, a period of eleven months from commencement of an action to the filing of a motion for leave to amend is not, on its face, so excessive as to be presumptively unreasonable. *See Roberson v. Hayti Police Dep't,* 241 F.3d 992, 996 (8th Cir.2001) (stating that delay of eleven months did not justify denial of leave to amend); *see also, e.g., Dubicz v. Commonwealth Edison Co.,* 377 F.3d 787, 793 (7th Cir.2004) (delay of eight months); *Tefft v. Seward,* 689 F.2d 637, 639-40 (6th Cir.1982) (delay of four years); *Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 644 F.2d 690, 694 (8th Cir.1981) (delay of two and a half years).

> FN10. It is immaterial that Arthur waited for almost two years after the injuries at issue to file his complaint. *See Boileau v. Bethlehem Steel Corp.,* 730 F.2d 929, 939 (3d Cir.1984) ("[T]he delay exception in amending the complaint refers to delay in the actual proceeding in which the complaint occurs, not delay in bringing suit.").

More importantly, Arthur has offered a justification for the delay: he did not know that the ships on which he had been injured were owned by and operated on behalf of the United States Navy. [FN11] This is borne out by the procedural history of this case. The original complaint names only Maersk and Dyn Marine as defendants, without suggesting the involvement of the United States. The answers to the complaint do not mention the agency relationship between the companies and the United States; indeed, the issue was not raised until the October status conference, when counsel for the companies suggested (without proof) that the United States was the proper defendant. The operational contracts confirming this allegation were not disclosed to Arthur until December 2002, after the statute of limitations had expired. Once Arthur's counsel verified these contracts and ensured that the United States had adequate notice of the cause of action, he filed the motion for leave to amend.

> FN11. *See Adams,* 739 F.2d at 867-68 (stressing importance of a "colorable excuse" for not amending earlier); *see also USX Corp. v. Barnhart,* 395 F.3d 161, 167-68 (3d Cir.2004) (same), *cert. denied,* --- U.S. ----, 126 S.Ct. 420, 163 L.Ed.2d 320 (2005); 3 Moore et al., *supra,* § 15.15[2]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(suggesting that amendment should be allowed if party offers reason for delay); 6 Wright et al., *supra*, § 1488 (same).

That the vessels were designated "U.S.N.S." does not, contrary to the government's position, necessarily mean that Arthur should have been aware of the agency relationship at the time the complaint was filed. Obviously, this designation suggests that the vessel is being operated on behalf of the United States, and would likely support a party's decision to file suit against the United States for injuries sustained thereon. However, it does not conclusively establish agency. *Cf. Favorite v. Marine Pers. & Provisioning, Inc.,* 955 F.2d 382, 388 (5th Cir.1992) (stating that designation of ship as "public vessel" is not determinative of control by United States). The only means by which a party can establish agency is through evidence demonstrating that the United States exercised a significant degree of control over the vessel's operations. *See id.; see also Alexander v. United States,* 63 F.3d 820, 823 (9th Cir.1995); *Servis v. Hiller Sys. Inc.,* 54 F.3d 203, 207- 09 (4th Cir.1995); *Wilson v. United States,* 23 F.3d 559, 561-62 (1st Cir.1994); *In re United States,* 367 F.2d 505, 511 (3d Cir.1966). Such evidence most often takes the form of operational contracts between the private company and the government. *See, e.g., Favorite,* 955 F.2d at 388.

The contracts between the companies in this case and the United States were not made available to Arthur until December 2002. Only through these contracts could Arthur finally credit the allegations of opposing counsel and conclude that the United States was indeed the proper party. Had the contracts been produced in October *206 2002--as they should have been--Arthur would have had sufficient time to file his claim against the United States before the expiration of the statute of limitations. The late disclosure denied Arthur this opportunity and required him to conduct additional discovery--and incur additional delay--to support his request for relation back.

Nothing in the record bespeaks the dilatory motive or repeated and unjustified failures to amend that we have previously characterized as warranting denial of leave. *See Adams,* 739 F.2d at 868. To the contrary, Arthur prosecuted his case in a fairly diligent manner. He served the complaint in a timely fashion, provided and requested discovery in accordance with the Federal Rules of Civil Procedure, and, after the operational contracts were disclosed, sought to confirm or deny the relationship between the companies and the United States. He filed the motion for leave to amend soon after he had secured evidence supporting his request for relation back of the claim against the United States. *Compare Oran v. Stafford,* 226 F.3d 275, 291 (3d Cir.2000) (noting that failure to prosecute case supported denial of leave to amend), *with Adams,* 739 F.2d at 867-68 (noting that plaintiff's diligent efforts to prosecute case supported grant of leave to amend). Even if Arthur, with the benefit of hindsight, could have named the United States prior to this time, his failure to do so cannot be viewed as so egregious as to render amendment inequitable. *Cf. Dubicz,* 377 F.3d at 793 (finding that delay of eight months did not support denial of leave to amend, even when attorney was negligent); *Tefft,* 689 F.2d at 639-40 (same, but delay of four years); *Buder,* 644 F.2d at 694 (same, but delay of two and a half years).

[11] The liberality of Rule 15(a) counsels in favor of amendment even when a party has been less than perfect in the preparation and presentation of a case. *See Foman,* 371 U.S. at 182, 83 S.Ct. 227; *Boileau v. Bethlehem Steel Corp.,* 730 F.2d 929, 938-39 (3d Cir.1984). It allows for misunderstandings and good-faith lapses in judgment, so long as the party thereafter acts reasonably and diligently. *Adams,* 739 F.2d at 868-69; *see also* 6 Wright et al., *supra*, § 1488 (stating that leave should be granted if delay was due to "oversight or excusable neglect"). Whether or not Arthur hypothetically could have deduced that the United States was the proper party at the outset of the case, the record demonstrates that he took affirmative steps soon thereafter to determine the identity of the proper party and to amend the complaint accordingly. His delay cannot be considered "undue."

We agree with the District Court that the United States was not prejudiced by Arthur's delay in seeking to amend the complaint. The government has not argued that the delay impaired its ability to defend against the suit or that it "was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the ... amendment [ ] been timely." *Bechtel v. Robinson,* 886 F.2d 644, 652 (3d Cir.1989) (quoting *Heyl & Patterson Int'l, Inc. v. F.D. Rich Hous.,* 663 F.2d 419, 426 (3d Cir.1981)). It received prompt notice of the commencement of this case and could have begun investigating Arthur's claim soon after it was filed. A "careless or myopic" decision on the part of the United States to initiate only "superficial investigatory practices," despite the likelihood that Arthur would later name it as a defendant, does not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

constitute prejudice for purposes of Rule 15(a). *See* 6 Wright et al., *supra,* § 1498; *see also Lundy,* 34 F.3d at 1189 n. 8 (Becker, C.J., concurring in part in the judgment and dissenting in part). **\*207** In the absence of cognizable prejudice to the United States, the District Court was obliged to grant Arthur leave to file the amended complaint. *See Adams,* 739 F.2d at 867-69; *Boileau,* 730 F.2d at 938-39; *see also Cureton,* 252 F.3d at 275.

### B.

That the District Court was required to grant leave to amend does not necessarily mean that dismissal of the claim against the United States was improper. The original complaint in this case, naming Maersk and Dyn Marine as defendants, was filed in May 2002, and the amended complaint, naming the United States as a party, was filed in May 2003. The statute of limitations for the claim against the United States expired in December 2002. [FN12] *See* 46 U.S.C. app. § 745. As such, this claim may proceed only if the amended complaint is deemed to relate back to the original complaint.

> FN12. This claim is the one related to Arthur's injuries on board the *Assertive,* in December 2000. The other injuries occurred more than two years prior to the filing of the complaint in this case and claims based thereon would not be timely even if relation back is recognized. *See* 46 U.S.C. app. § 745.

Federal Rule of Civil Procedure 15(c) provides that an amendment naming a new party will relate back to the original complaint for statute of limitations purposes only if several prerequisites are satisfied: (1) the claim in the amended pleading must arise out of the "conduct, transaction, or occurrence" set forth in the original pleading; (2) within 120 days of institution of the action, the party to be brought in by amendment must have received "such notice of the ... action that the party will not be prejudiced in maintaining a defense on the merits"; and, (3) within 120 days of institution of the action, the party to be brought in by amendment must have known or should have known that, "but for a mistake concerning the identity of the proper party," the action would have been brought against that party. Fed.R.Civ.P. 15(c); *see also Garvin,* 354 F.3d at 220-21; *Varlack,* 550 F.2d at 174; 3 Moore et al., *supra,* § 15.19[3]; 6A Wright et al., *supra,* § 1498.

The District Court found, and the parties concede, that the claim against the United States arises out of

the same transactions as the claims in the original complaint. It is also undisputed that the United States received adequate notice of the action within 120 days of commencement of the case and would not be prejudiced if required to defend against the claim.

The sole question is whether the United States knew or should have known that, but for a "mistake" concerning the identity of the proper party, it would have been named in the original complaint. [FN13] *See* Fed.R.Civ.P. 15(c)(3)(B). The District Court assumed that Arthur's failure to name the United States qualified as a mistake. On appeal, the United States argues that, because Arthur was an experienced seaman who should have recognized by the designation "U.S.N.S." that the ships were public vessels, there is no basis on which to find that a "mistake" occurred.

> FN13. The language of Rule 15(c) plainly implies that the "mistake" must have occurred at the time the complaint was filed. *See* Fed.R.Civ.P. 15(c)(3)(B) (defining the "mistake" as one that affected the parties against whom the action would have been "brought"); *see also, e.g., Garvin,* 354 F.3d at 220-21; 6A Wright et al., *supra,* § 1498; *cf. supra* note 9 (discussing *Nelson v. County of Allegheny,* 60 F.3d 1010 (3d Cir.1995)).

[12] This argument fails for the reasons previously discussed. The designation "U.S.N.S." is not dispositive as to the existence of an agency relationship between **\*208** the ship operators and the United States. *Cf. Favorite,* 955 F.2d at 388 (stating that designation of ship as "public vessel" is not determinative of control by United States). At best, it simply suggests that further investigation may be warranted. That the ships bore this designation does not preclude a finding that Arthur was reasonably mistaken regarding the identity of the potentially liable party in this case.

[13] Indeed, the procedural history of this case supports a finding of mistake. The original complaint did not name the United States as a party, even though it would have been in Arthur's interest to do so. The answers to the complaint did not indicate that the United States owned the ships, and the companies did not allege that the United States was the proper defendant until October 2002. Documentary support for this assertion was not forthcoming for another two months, at which time

434 F.3d 196                                                                                                           Page 10
434 F.3d 196, 2006 A.M.C. 245, 63 Fed.R.Serv.3d 982
(Cite as: 434 F.3d 196)

Arthur sought additional discovery to support his claim against the United States. The only reasonable conclusion that can be gleaned from the record is that Arthur made a mistake as to the proper party when he filed the original complaint and that this mistake was not finally corrected until December 2002, after expiration of the statute of limitations. *Cf.* 6A Wright et al., *supra,* § 1498 (stating that a "plaintiff's own inexcusable neglect" in failing "to name the correct party," although "germane to the question of permitting an amendment," is not relevant to the satisfaction of the notice requirements of Rule 15(c)).

It is of no consequence that Arthur's mistake resulted from lack of knowledge, rather than mere misnomer. Although a majority of courts have held that only a "misnomer or misidentification" of an existing party can constitute a "mistake concerning the identity of the proper party" under Rule 15(c), *see, e.g., Barrow v. Wethersfield Police Dep't,* 66 F.3d 466, 469 (2d Cir.1995), *amended by* 74 F.3d 1366 (2d Cir.1996), [FN14] there is no linguistic basis for this distinction. *See Pavelic & LeFlore v. Marvel Entm't Group,* 493 U.S. 120, 123, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989) ("We give the Federal Rules of Civil Procedure their plain meaning."). A "mistake" is no less a "mistake" when it flows from lack of knowledge as opposed to inaccurate description. *See Webster's Third New International Dictionary* 1446 (1981) (defining "mistake" as "a wrong ... statement proceeding from faulty judgment, inadequate knowledge, or inattention"). Both errors render the plaintiff unable to identify the potentially liable party and unable to name that party in the original complaint. *See* 3 Moore et al., *supra,* § 15.19[3] [d]. Thus, both errors constitute a "mistake concerning the identity of the proper party" for purposes of Rule 15(c). *See Singletary v. Pa. Dep't of Corr.,* 266 F.3d 186, 200-01 & n. 5 (3d Cir.2001); *Varlack,* 550 F.2d at 174- 75; 3 Moore et al., *supra,* § 15.19[3][d]; 6A Wright et al., *supra,* § 1498. [FN15]

> FN14. *See also Powers v. Graff,* 148 F.3d 1223, 1226-27 (11th Cir.1998); *Jacobsen v. Osborne,* 133 F.3d 315, 320 (5th Cir.1998); *Cox v. Treadway,* 75 F.3d 230, 240 (6th Cir.1996); *Wilson v. United States,* 23 F.3d 559, 563 (1st Cir.1994) (citing *Worthington v. Wilson,* 8 F.3d 1253, 1256 (7th Cir.1993)); *W. Contracting Corp. v. Bechtel Corp.,* 885 F.2d 1196, 1201 (4th Cir.1989); *Wood v. Worachek,* 618 F.2d 1225, 1229-30 (7th Cir.1980).

> FN15. *See also* Fed.R.Civ.P. 15 advisory

committee's note-1966 (indicating that relation back is not limited to situations in which amendment simply "correct[s] a misnomer or misdescription of a defendant"); *cf. Leonard v. Parry,* 219 F.3d 25, 27-29 (1st Cir.2000) (upholding relation back of amendment naming the actual driver of the car as a defendant when plaintiff had mistakenly believed that the owner of the car was operating vehicle at time of accident); *G.F. Co. v. Pan Ocean Shipping Co.,* 23 F.3d 1498, 1504 (9th Cir.1994) (upholding relation back of amendment naming shipping company as defendant when plaintiff had mistakenly believed that a claims agent, rather than the shipping company, "owned, operated, and controlled" the boat).

**\*209** This interpretation accords with other provisions of Rule 15(c)(3), which authorize relation back of amendments that either (1) "change [ ] ... the naming of a party against whom a claim is asserted" or (2) "change [ ] the party ... against whom a claim is asserted." Fed.R.Civ.P. 15(c)(3). The first of these clauses permits relation back when an amendment corrects a misidentification of an existing party; the second applies when an amendment substitutes or adds a new party. *Lundy,* 34 F.3d at 1192-93 & n. 13 (Becker, C.J., concurring in part in the judgment and dissenting in part); 3 Moore et al., *supra,* § 15.19[3][d]. To limit relation back to cases involving misnomer, excluding cases in which the amendment adds a new party, would render the second clause of Rule 15(c)(3) superfluous. A broader interpretation of "mistake" is necessary to give full effect to both of these provisions. *See* 3 Moore et al., *supra,* § 15.19[3][d].

[14] An amendment naming a new party will relate back to the original complaint if the party had adequate notice of the action and should have known that it would have been named in the complaint but for a mistake--whether the mistake is based on lack of knowledge or mere misnomer. *Id.; see Varlack,* 550 F.2d at 174-75.

These prerequisites are satisfied here. The United States received notice within 120 days of commencement of the case that Arthur had brought claims against private companies for injuries sustained on public vessels. The reason that these claims were not brought against the United States, the only potentially liable party, was that Arthur did not recognize the agency relationship between the

companies and the Navy.

The United States should have known that it would have been named in the complaint but for this mistake. There is no basis to characterize Arthur's decision to sue his statutorily immune employers as litigation strategy, and nothing in the record suggests that the government viewed it in this manner. *See* 3 Moore et al., *supra*, § 15.19[3][d] ("[A] court ... should consider whether the new party knew that the failure to include it in the original complaint was an error rather than a deliberate strategy."). The United States undoubtedly knew that the claims in the complaint should have been brought against it; indeed, the operational contracts (drafted by the United States) recognize that Maersk and Dyn Marine "may become involved in ... litigation maintainable against the United States under the Public Vessels Act ... [and] the Suits in Admiralty Act" and require that the companies provide immediate notice of such an action and "cooperate with [g]overnment counsel [in] maintaining the defense." An employee of Dyn Marine confirmed that, in these types of cases, it is common for a private company to be named in the original complaint but later replaced with the United States, as the proper defendant.

The only reasonable conclusion permitted by the record is that the United States knew or should have known that, but for a "mistake concerning the identity of the proper party," it would have been named in the original complaint. *See Varlack,* 550 F.2d at 174-75 (stating that whether satisfaction of conditions of Rule 15(c) is a question of fact).

### III.

Leave to amend the complaint to add the United States as a party was warranted **\*210** under Federal Rule of Civil Procedure 15(a), and, because the prerequisites under Federal Rule of Civil Procedure 15(c) were satisfied, the amendment should have been deemed to relate back to the original complaint for statute of limitations purposes. The contrary decision of the District Court was in error.

Accordingly, the order of the District Court will be reversed and this case will be remanded for further proceedings consistent with this opinion.

VAN ANTWERPEN, Circuit Judge.

Because this case compels me to conclude that Arthur is not entitled to relation back of his claim against the Government, I cannot join in the Judgment of my colleagues. Arthur received abundant notice that the United States would be exclusively liable prior to the expiration of the statute of limitations; it cannot reasonably be posited that the United States knew or should have known that he was mistaken under Federal Rule of Civil Procedure 15(c)(3)(B), nor should he have had the opportunity to amend under Rule 15(a).

### I.

Regarding Arthur's motion to amend, filed April 14, 2003, the District Court noted that "[w]hen we were considering whether to allow the amendment, the United States was not then a party and thus not in a position to make its objections known." App. 28. In contrast to the majority, I read the District Court's opinion as reconsidering its grant to Arthur of leave to amend. We review decisions on motions under Fed.R.Civ.P. 15 to amend a complaint for abuse of discretion. *Dandrea v. Malsbary Mfg. Co.,* 839 F.2d 163, 166 (3d Cir.1988). As the majority notes, delay may become undue, and hence grounds for denial of leave to amend, where it "plac[es] an unwarranted burden on the court." *Cureton v. National Collegiate Athletic Ass'n,* 252 F.3d 267, 273 (3d Cir.2001). I cannot conclude as easily as they do that this case stripped the District Court of discretion to deny leave to amend. Given that Arthur knew or should have known that he had to sue the United States before the statute of limitations expired, the District Court was under no obligation to countenance his lack of diligence, and was within its discretion to deny his motion to amend.

### II.

Turning to the analysis under Rule 15(c), I am forced to conclude that Arthur has no claim to mistake. Beginning with the very name of the ship he worked aboard, the United States Naval Ship *Assertive,* Arthur and his attorney were on notice of its status as a Public Vessel within the Public Vessels Act ("PVA"), 46 U.S.C. app. § 781, and the Suits in Admiralty Act ("SAA"), 46 U.S.C. app. § 745. The Code of Federal Regulations directs that "[c]ivilian manned ships, of the Military Sealift Command or other commands, designated 'active status, in service' shall be called 'United States Naval Ship' or 'U.S.N.S.' " 32 C.F.R. § 700.406(c). Ships of "the Military Sealift Command or other commands" could not *but* be "public vessels" under any logical meaning of that term. [FN16] *See* 46 U.S.C. app. § 781. In **\*211** turn, it is settled that the exclusive remedy for those injured aboard public vessels is against the United States. *E.g., In re United States,* 367 F.2d 505, 511 (3d Cir.1966). Nevertheless, Arthur filed a

434 F.3d 196                                                                                    Page 12
434 F.3d 196, 2006 A.M.C. 245, 63 Fed.R.Serv.3d 982
**(Cite as: 434 F.3d 196)**

Complaint on May 16, 2002, naming Maersk and Dyn, but not the United States, as defendants.

> FN16. The majority's reliance on *Favorite v. Marine Personnel and Provisioning, Inc.,* 955 F.2d 382 (5th Cir.1992), for the proposition that the "U.S.N.S." designation is not dispositive of public vessel status is well-taken as a legal point. As a practical matter, however, it is difficult at best to conceive of a situation in which a ship with such a designation would not fall within the PVA. Research revealed no such scenario. I can only conclude that the designation all but guarantees public vessel status.

Arthur's refusal to timely sue the United States endured past any point where he could have been mistaken. At an October 15, 2002 status conference, occurring at least a month and a half before the statute of limitations ran in December 2002, Maersk and Dyn plainly asserted that they were the wrong parties. Arthur's attorney admits as much in his affidavit. App. 118, ¶ 7. Even earlier, Maersk's Answer raised as an affirmative defense that "Plaintiff's Complaint is barred by failure to join an indispensable party." App. 87, ¶ 45. Likewise, Dyn's Answer raised the defense more specifically, citing both the SAA and PVA as bars to its own liability. App. 96. Arthur knew enough to conclude that he should sue the United States before the expiration of the statute of limitations.

Rather than act to save his claims, however, Arthur sat by while the statute of limitations ran out. To be sure, he was not idle. He undertook an inexplicable course of discovery to unearth the obvious: that the United States had an agency relationship with Maersk and Dyn. He also notes that Maersk and Dyn were untimely in providing their contracts, which, he unconvincingly claims, were the sole means at that point of ascertaining the relationship with any certainty. [FN17] Even assuming that the Government's exclusive liability was not known by Arthur until he received the contracts and conducted further discovery, he could have amended within the statute of limitations.

> FN17. After he obtained the contracts in January 2003, Arthur inexplicably waited until April to file his motion to amend and relate back. This is indeed a generous liberty to take with an already-expired statute of limitations.

At oral argument, Arthur's counsel claimed that he would not add the United States without certainty of its liability for fear of Rule 11 sanctions. This rings hollow. His amendment would not have run afoul of Rule 11 because it would have been entirely proper based on what he knew prior to the expiration of the limitations period. And even if it *were* improper, the rule would have given him ample opportunity to correct any misstep before sanctions would be imposed. *See* Fed.R.Civ.P. 11(c)(1)(A) (Rule 11 motion shall not be filed with court until 21 days have elapsed from service and the "challenged ... claim ... is not withdrawn or appropriately corrected."). I cannot see what Arthur's counsel had to fear from preserving his client's claim by timely adding the United States, even if he did lack perfect certainty.

Further, assuming Arthur was actually unsure of the Government's liability, a ready means of preserving his claim was available. Rather than naming the United States, he could have amended the Complaint to include a "John Doe" or other unnamed defendant. This Circuit has interpreted Rule 15(c)(3)(B) to permit claims against "John Doe" defendants to relate back once a named party has been identified and added, where the other requirements of Rule 15(c) have been met, and the proper defendants are hard to ascertain. *Singletary v. Pennsylvania Dept. of Corr.,* 266 F.3d 186, 200-01 (3d Cir.2001) (citing *Varlack v. SWC Caribbean, Inc.,* 550 F.2d 171, 175 (3d Cir.1977)). *Contra, e.g., Barrow v. Wethersfield Police Dept.,* 66 F.3d 466, 469 (2d Cir.1995), *amended by* 74 F.3d 1366 (2d Cir.1996). Thus, our interpretation of Rule 15(c) would have **\*212** allowed Arthur to insert a "placeholder" party in his Complaint while he went about the task of assuaging whatever doubt he harbored as to the United States' amenability to suit. He did not avail himself of that procedure, and I do not think we can properly rescue him from his failure. Additionally, the majority's holding today undermines the holdings of this Court in *Singletary* and *Varlack:* litigants who find it difficult to ascertain the correct party to sue now need not even contemplate the existence of such putative parties by adding a "John Doe."

Unquestionably, we must construe the Federal Rules of Civil Procedure liberally to allow parties their day in court. *Lundy v. Adamar of New Jersey, Inc.,* 34 F.3d 1173, 1186 n. 5 (3d Cir.1994). But as the Supreme Court has observed, "they should not be expanded by disregarding plainly expressed limitations." *Schlagenhauf v. Holder,* 379 U.S. 104, 121, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964). Here, to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

434 F.3d 196, 2006 A.M.C. 245, 63 Fed.R.Serv.3d 982
**(Cite as: 434 F.3d 196)**

hold that Arthur was actually mistaken as to the proper party to sue, and entitled to relation back of his expired claim under Rule 15(c), strains that provision beyond its proper bounds. As the District of Columbia Circuit has written, "[i]n the adversarial system of litigation the plaintiff is responsible for determining who is liable for her injury and for doing so before the statute of limitations runs out; if she later discovers another possible defendant, she may not, merely by invoking Rule 15(c), avoid the consequences of her earlier oversight." *Rendall-Speranza v. Nassim,* 107 F.3d 913, 919 (D.C.Cir.1997). And as the majority rightly observes, its decision is at odds with the other Courts of Appeals to have considered this issue. *See Ish Yerushalayim v. United States,* 374 F.3d 89, 92 (2d Cir.2004); *Powers v. Graff,* 148 F.3d 1223, 1227 (11th Cir.1998); *Rendall-Speranza,* 107 F.3d at 919; *Wilson v. United States,* 23 F.3d 559, 563 (1st Cir.1994); *Worthington v. Wilson,* 8 F.3d 1253, 1256 (7th Cir.1993); *In re Kent Holland Die Casting & Plating, Inc.,* 928 F.2d 1448, 1449-50 (6th Cir.1991).

Furthermore, the prevailing--and contrary--interpretation of Rule 15(c) held by our sister circuits does not render inoperative a portion of Rule 15(c)(3), as my colleagues claim. They note that their "interpretation accords with other provisions of Rule 15(c)(3), which authorize the relation back of amendments that either (1) 'change[ ] ... the naming of a party against whom a claim is asserted' or (2) 'change[ ] the party ... against whom a claim is asserted.' " As noted above, Arthur could easily have changed a "party against whom a claim is asserted" by substituting the United States for an unnamed defendant. My reading of Rule 15(c)(3)(B)'s mistake requirement would permit changes to parties against whom claims are asserted where the litigant seeking amendment was actually mistaken.

For the foregoing reasons, I think the District Court's Order should be affirmed. I therefore respectfully dissent.

434 F.3d 196, 2006 A.M.C. 245, 63 Fed.R.Serv.3d 982

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C


34 F.3d 1173                                                                    Page 1
34 F.3d 1173, 29 Fed.R.Serv.3d 496
**(Cite as: 34 F.3d 1173)**

United States Court of Appeals,
Third Circuit.
Sidney LUNDY;  Claire Lundy, Appellants,
v.
ADAMAR OF NEW JERSEY, INC., t/a Trop World,
Defendant/Third Party Plaintiff,
v.
Dr. Domenic Frank CARLINO, individually;  Dr.
Domenic Frank Carlino, a
Professional Association, Third-Party Defendants.
**No. 93-5265.**

Argued Nov. 1, 1993.
Decided July 6, 1994.
Sur Petition for Rehearing Aug. 12, 1994.

Casino patron who suffered heart attack brought
action against casino owner.  The United States
District Court for the District of New Jersey, Jerome
B. Simandle, J., granted owner's motion for summary
judgment and denied patron's motion to amend
complaint to include physician as additional
defendant, and appeal was taken.  The Court of
Appeals, Stapleton, Circuit Judge, held that:  (1)
under New Jersey law, casino owner did not owe
duty to patron to have full-time on-site staff
physician capable of performing intubation;  (2)
under New Jersey law, casino owner did not
voluntarily assume duty to provide level of care
encompassing intubation of patron who suffered
heart attack by contracting with physician to have
intubation tube on premises;  (3) preexisting duty
exception to New Jersey's Good Samaritan Act did
not apply to subject casino owner to liability;  and (4)
amended complaint did not relate back to time of
filing of original complaint.

Affirmed.

Becker, Circuit Judge, filed opinion concurring in
part and dissenting in part.

West Headnotes

**[1] Federal Courts** 👈754.1
170Bk754.1 Most Cited Cases
Review of district court's decision on motion to add
party defendant was plenary.  Fed.Rules
Civ.Proc.Rule 15(c), 28 U.S.C.A.

**[2] Negligence** 👈282

272k282 Most Cited Cases
        (Formerly 272k8)
Generally, bystander has no duty to provide
affirmative aid to injured person, even if bystander
has ability to help;  in New Jersey, however,
existence of relationship between victim and one in
position to render aid may create duty to render
assistance.

**[3] Public Amusement and Entertainment**
👈87(1)
315Tk87(1) Most Cited Cases
        (Formerly 376k6(7.1) Theaters and Shows)
Under New Jersey law, casino owner did not owe
duty to have full-time on-site staff physician capable
of performing intubation of patron who suffered heart
attack.  Restatement (Second) of Torts § 314A.

**[4] Public Amusement and Entertainment**
👈87(1)
315Tk87(1) Most Cited Cases
        (Formerly 376k6(7.1) Theaters and Shows)
Under New Jersey law, casino owner did not
voluntarily assume duty to provide level of care
encompassing intubation of patron who suffered
heart attack by contracting with physician to have
intubation tube on premises. Restatement (Second) of
Torts § 324.

**[5] Public Amusement and Entertainment**
👈157
315Tk157 Most Cited Cases
        (Formerly 376k6(7.1) Theaters and Shows)
Preexisting duty exception to New Jersey's Good
Samaritan Act did not apply to subject casino owner
to liability for insufficiently assisting patron who
suffered heart attack;  preexisting duty was limited to
summoning aid and, in the interim, taking reasonable
first aid measures, and did not include duty to
provide medical equipment and personnel necessary
to perform intubation on patron.  N.J.S.A. 2A:62A-1.

**[6] Negligence** 👈284
272k284 Most Cited Cases
        (Formerly 272k8)
Purpose of New Jersey's Good Samaritan Act is to
encourage rendering of assistance to victims by
providing that voluntary rendering of aid will not
give rise to any liability that would not otherwise
exist. N.J.S.A. 2A:62A-1.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

34 F.3d 1173                                                                                          Page 2
34 F.3d 1173, 29 Fed.R.Serv.3d 496
**(Cite as: 34 F.3d 1173)**

**[7] Limitation of Actions** 🔑124
241k124 Most Cited Cases
Amended complaint naming physician as additional
defendant in negligence case did not relate back to
time of filing of original complaint under prior rule
governing relation back of pleadings, where
physician did not receive any notice of institution of
action within applicable statute of limitations.
Fed.Rules Civ.Proc.Rule 15(c), 28 U.S.C.(1988 Ed.).

**[8] Limitation of Actions** 🔑124
241k124 Most Cited Cases
Amended complaint naming physician as additional
defendant in negligence case did not relate back to
time of filing of original complaint under amended
version of relation-back rule, although physician
received notice of existence of the litigation within
120 days of filing of complaint;  physician would not
have been liable on theory advanced in original
complaint, and original complaint would not have led
physician to believe that plaintiffs intended to sue
him and then failed to do so because of mistake
concerning identity. Fed.Rules Civ.Proc.Rule 15(c),
28 U.S.C.A.

**[9] Limitation of Actions** 🔑124
241k124 Most Cited Cases
Amended complaint naming physician as additional
defendant in negligence case did not relate back to
time of filing of original complaint under New Jersey
law, and thus did not relate back under amended
federal relation-back rule, where physician received
notice of suit prior to expiration of statute of
limitations. Fed.Rules Civ.Proc.Rule 15(c)(1), 28
U.S.C.A.;  N.J.R. 4:9- 3.
 *1174 Andrew F. Napoli (Argued), Norman R.
Segal, Manchel, Lundy & Lessin, Philadelphia, PA,
for appellants.

 Stephen Hankin (Argued), Thomas F. Bradley,
Hankin, Sandson & Sandman, Atlantic City, NJ, for
appellee Adamar of New Jersey d/b/a TropWorld
Casino and Entertainment Resort.

 James P. Savio (Argued), Savio, Reynolds & Drake,
Absecon, NJ, for appellees-third-party defendants,
Dr. Dominic Frank Carlino and Dr. Dominic Frank
Carlino, a Professional Ass'n.

 BEFORE:   BECKER and STAPLETON, Circuit
Judges, and RESTANI, [FN*] Judge, United States
Court of International Trade.

                    FN* Honorable Jane A. Restani, Judge of

the United States Court of International
Trade, sitting by designation.

**OPINION OF THE COURT**

 STAPLETON, Circuit Judge:

 Appellant Sidney Lundy suffered a heart attack
while a patron at appellee's casino, TropWorld
Casino ("TropWorld"), in Atlantic City, New Jersey.
While he survived, Lundy was left with permanent
disabilities.   Lundy and his wife here appeal from a
summary judgment entered against them by the
district court.    Their appeal raises two issues:   (1)
what duty, if any, did TropWorld owe under New
Jersey law to provide medical care to Lundy, and (2)
whether the Lundys were entitled to amend their
complaint to include an additional defendant, Dr.
Dominic Carlino. [FN1]

                    FN1. The proposed amendment would have
                    added both Dr. Carlino and Dr. Domenic
                    Frank Carlino, a Professional Association.
                    For simplicity, we will refer to both as Dr.
                    Carlino.

 The district court held that TropWorld's duty is, at
most, to provide basic first aid to the patron when the
need becomes apparent and to take reasonable steps
to procure appropriate medical care.     Because the
court found no evidence that TropWorld was
negligent in carrying out this duty to Lundy, it
granted TropWorld's motion for summary judgment.
With regard to the Lundys' motion to amend, the
court found that the amendment would not relate
back to the time of the filing of the complaint under
Rule 15(c) and, accordingly, that the alleged claim
against Dr. Carlino would be barred by limitations.
We will affirm.

*I. FACTUAL BACKGROUND*
 On August 3, 1989, Lundy, a 66 year old man with a
history of coronary artery disease, was patronizing
TropWorld Casino.     *1175 While Lundy was
gambling at a blackjack table, he suffered cardiac
arrest and fell to the ground unconscious.    Three
other patrons quickly ran to Lundy and began to
assist him.     The first to reach him was Essie
Greenberg ("Ms. Greenberg"), a critical care nurse.
Ms. Greenberg was soon joined by her husband, Dr.
Martin Greenberg ("Dr. Greenberg"), who is a
pulmonary specialist.     The third individual who
aided Lundy did not disclose his identity, but he
indicated to Dr. Greenberg that he was a surgeon.
During his deposition, Dr. Greenberg stated that,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

34 F.3d 1173                                                                                              Page 3
34 F.3d 1173, 29 Fed.R.Serv.3d 496
**(Cite as: 34 F.3d 1173)**

when he first arrived on the scene, Lundy was unresponsive, not breathing, and without a pulse. Dr. Greenberg testified that he, his wife, and the surgeon immediately began to perform cardiopulmonary resuscitation ("CPR") on Lundy.

Meanwhile, the blackjack dealer at the table where Lundy had been gambling pushed an emergency "call" button at his table which alerted TropWorld's Security Command Post that a problem existed. The Security Command Post is electronically designed to designate the location from which such alarms are triggered and record the time that the alarm is sounded. The alarm was recorded as being received at 10:57 p.m. Noting that the source of the alarm was "Pit 3," a Security Command Post employee notified by phone the security post located on the casino floor near where Lundy had suffered his cardiac arrest. At 10:59 p.m., the Security Command Post employee sent radio directions to all of the guards on the casino floor requesting that they each go to Lundy's location.

A sergeant in TropWorld's security force and a TropWorld security guard arrived at the blackjack table apparently within fifteen seconds of their receiving the radio message from the Security Command Post. The Greenbergs and the unidentified surgeon were already assisting Lundy. Upon arriving, the security guard called the Security Command Post on her hand-held radio and requested that someone contact the casino medical station, which was located one floor above the casino. Several witnesses agree that Nurse Margaret Slusher ("Nurse Slusher"), the nurse who was on-duty at the casino medical station at the time, arrived on the scene within a minute or two of being summoned. As soon as Nurse Slusher arrived, she instructed the security guards to call for an ambulance. TropWorld's records indicate that an ambulance was summoned at 11:00 p.m.

Nurse Slusher brought with her an ambu-bag, [FN2] oxygen, and an airway. [FN3] She did not, however, bring an intubation kit [FN4] to the scene. Dr. Greenberg testified that he asked Nurse Slusher for one and she told him that it was TropWorld's "policy" not to have an intubation kit on the premises. Dr. Greenberg also noted that Nurse Slusher told him that she previously worked at a different casino which did have an intubation kit in its medical station, and that she had requested one here as well. Nurse Slusher testified at her deposition that some of the equipment normally found in an intubation kit was stocked in TropWorld's medical center, [FN5] but that she did

not bring this equipment with her because she was not qualified to use it.

> FN2. Dr. Greenberg testified that an ambu-bag is a "device that's utilized to assist in respiration when a person is either unable to breathe on his own or is having difficulty breathing.... It's usually a cylindrical-sort-of-shaped plastic bag with a face mask attached to it that is applied over the person's mouth and nose, and subsequent pressure on the bag will allow for air to be entered into the person's nose and mouth.... It's [a] purely mechanical [device]." App. 213-14.

> FN3. The device known as an airway is a plastic apparatus that keeps the mouth open and holds the tongue in place. App. 165.

> FN4. According to Dr. Greenberg, an intubation kit consists of equipment that is used to insert an endotracheal tube into an individual, thereby establishing a more efficient airway than that which can be established with an ambu-bag.

> FN5. Nurse Slusher testified that she did not bring either the laryngoscope or endotracheal tubes with her, which, according to Dr. Greenberg, are pieces of equipment normally found in an intubation kit.

Nurse Slusher proceeded to assist the three patrons in performing CPR on Lundy. Specifically, Nurse Slusher placed the ambu-bag over Lundy's face while the others took **\*1176** turns doing chest compressions. The ambu-bag was connected to an oxygen source. Dr. Greenberg testified that he was sure that air was entering Lundy's respiratory system and that Lundy was being adequately oxygenated during the period when he was receiving both CPR treatment and air through the ambu-bag. Dr. Greenberg went on to say that the only reason he had requested an intubation kit was "[t]o establish an airway and subsequently provide oxygen in a more efficient manner." App. 228.

The TropWorld Security Command Post radio log reflects that an Emergency Medical Technician ("EMT") unit arrived at TropWorld by ambulance at approximately 11:03 p.m. The EMT's report lists 11:02 p.m. as the time of arrival. Based on the fact that he performed CPR "for what seemed like an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

34 F.3d 1173                                                                                    Page 4
34 F.3d 1173, 29 Fed.R.Serv.3d 496
**(Cite as: 34 F.3d 1173)**

extensive amount of time," Dr. Greenberg estimated that "at least twenty minutes" elapsed between the time Lundy suffered cardiac arrest and the time the EMT unit arrived at Pit 3.    App. 220.

Upon the arrival of the EMT unit, a technician, with the help of the two doctor patrons, attempted to intubate Lundy using an intubation kit brought by the EMT unit.    Dr. Greenberg claimed that, due to Lundy's stout physique and rigid muscle tone, it was a very difficult intubation, and that there were at least a half dozen failed attempts before the procedure was successfully completed.    After intubation, Lundy regained a pulse and his color improved. According to EMT reports, the ambulance departed from TropWorld with Lundy at 11:27 p.m., and it arrived at the Atlantic City Medical Center, which is located less than one mile from TropWorld, at 11:29 p.m.

The Lundys filed this diversity action against TropWorld less than two weeks before the applicable statute of limitations expired on August 3, 1991. [FN6]  TropWorld filed an answer to the Lundys' complaint on September 12, 1991, along with a third-party complaint against a Dr. Carlino.  TropWorld alleged that, in the event it were held liable to the Lundys, it would be entitled to either contribution or indemnification from Dr. Carlino.

> FN6.  The applicable limitations period is two years.    *See* N.J.Stat.Ann. §  2A:14-2 (West 1987).

TropWorld had a contract with Dr. Carlino providing that he would run an in-house medical station to supply medical services for TropWorld's employees, guests, and patrons in cases of work-related injuries and injuries or sicknesses occurring on the premises. The contract required that Dr. Carlino provide a licensed physician on the casino premises for five hours each day, and a physician "on-call" for the rest of the day.  Any physician selected by Dr. Carlino was subject to dismissal by TropWorld for good cause only. Furthermore, Dr. Carlino was obligated to have a registered nurse present in the medical station during the hours that the casino was open. Each nurse was to be chosen by Dr. Carlino, but was subject to dismissal by TropWorld for any reason whatsoever.    The contract specifically stated that Dr. Carlino's status would be that of an independent contractor and the doctors and nurses at the station were to be employees of Dr. Carlino.    In August of 1989, Nurse Slusher was a registered, licensed nurse with over fifteen years of experience.

Dr. Carlino's contract with TropWorld required him to stock the medical station with certain designated medical hardware, including a Puritan-Bennett Manual Resuscitator (i.e. an ambu-bag with oxygen), intravenous solutions for cardiopulmonary resuscitation, a cardiac board, an oxygen cylinder with nasal canula and mask, and a laryngoscope with intubation tube. [FN7]   The contract, which was signed on December 11, 1987, required that medical services be performed for a period of two years in exchange for a flat fee from TropWorld.

> FN7.  According to Dr. Greenberg, these are all items that are typically included in an intubation kit.

According to the Lundys, they did not know that Nurse Slusher was employed by an organization other than TropWorld until TropWorld filed its third party complaint against Dr. Carlino on September 11, 1991.  By this time, however, the two-year statute of limitations had expired.    Eight months later, the Lundys filed a motion under Fed.R.Civ.P. 15(c) to amend their original complaint *1177 to add third party defendant Dr. Carlino as an original party defendant.    This motion was granted by a magistrate judge on July 8, 1992.

Upon the completion of discovery, TropWorld filed a motion for summary judgment which was joined by Dr. Carlino.    Dr. Carlino also filed an appeal from the order of the magistrate judge granting the Lundys' Rule 15(c) motion.    The district court granted the motion for summary judgment and reversed the magistrate's order granting the Rule 15(c) motion.

## II. THE DISTRICT COURT'S DECISION

The district court held that TropWorld had fulfilled its duty to Lundy under New Jersey law.   The court found that TropWorld had "immediately summoned medical attention for Mr. Lundy once it became aware of his need for it."    App. 651-52. Additionally, the court stated that "the very fact that TropWorld contracted with Dr. Carlino is evidence that it fulfilled its duty to aid injured patrons by having at least a registered nurse available, trained in emergency care, who could immediately size up a patron's medical situation and summon appropriate emergency medical personnel and equipment by ambulance to respond to the patrons (sic) emergency needs."  App. 652.  The court also found that the Lundys' case failed for "lack of proof of deviation from the standard of medical care."  [FN8] App. 655.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN8. The Lundys presented the court with a report from an expert which stated, *inter alia:*

(1) It is correct to say that intubation allowed for an improved exchange of oxygen that accounted for his improvement in color. (2) It is correct to say that, had the intubation equipment been available to the pulmonary physician who was doing CPR, Mr. Lundy's condition would have been better.

(3) It is also correct that, to a reasonable degree of medical certainty, had Mr. Lundy been intubated sooner, there would have been a decreased likelihood of harm.

The court found that even if it accepted the Lundys' expert's opinion as completely true, which it was required to do for the purposes of summary judgment, the expert in no way suggested that the standard of care that casino ownership must meet includes having an intubation kit on the premises.     The expert opinion addressed only causation and not duty.     App. 653-55.

Additionally, the court held that New Jersey's Good Samaritan Statute, N.J.Stat.Ann. § 2A:62A-1 (West 1993), shielded TropWorld and its employees from liability for any acts or omissions they took while rendering care in good faith to Lundy.     Finally, the court held that the casino could not be held liable for any of Nurse Slusher's actions because she was an employee of independent contractor Dr. Carlino, rather than an employee of TropWorld.

Turning to the Lundys' Rule 15 motion to add Dr. Carlino as a party defendant, the district court found that neither the version of Rule 15(c) in effect at the time of the filing of the Lundys' motion nor the subsequently amended version of that Rule permits a plaintiff, after the running of the statute of limitations, to add an entirely new defendant of whom the plaintiff had been unaware during the limitations period.     The court stated that Rule 15(c) "applies only to problems of misnomer and misidentification and not the addition of an entirely *different* party."     App. 632.     Furthermore, the court held that, even if Rule 15(c) were interpreted as permitting the addition of previously unidentified parties, the Lundys' amended complaint did not relate back to their original complaint because Dr. Carlino did not receive notice of a claim by the Lundys against him within the 120-day period as required by subsection (3) of the Rule.

[1] Our review of the district court's decision to grant summary judgment is plenary.     *Wheeler v. Towanda Area Sch. Dist.,* 950 F.2d 128, 129 (3d Cir.1991).     Because the district court's decision regarding the Rule 15(c) motion was based on the court's interpretation of the Federal Rules of Civil Procedure, we exercise plenary review of this decision as well. *International Union, UAW v. Mack Trucks, Inc.,* 917 F.2d 107, 110 (3d Cir.1990), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991). [FN9]

FN9. We exercise appellate jurisdiction over this case pursuant to 28 U.S.C. § 1291. The district court had subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 based on diversity of citizenship between the parties and an amount in controversy in excess of $50,000.

**\*1178** *III. TROPWORLD'S MOTION FOR SUMMARY JUDGMENT*

The Federal Rules of Civil Procedure state that a court may grant summary judgment only if there is no genuine issue as to any material fact and if the moving party is subject to judgment as a matter of law.     Fed.R.Civ.P. 56(c).     A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).     A fact is "material" when it "might affect the outcome of the suit under the governing law."     *Id.*     Disputes over facts which are irrelevant or unnecessary will not preclude a grant of summary judgment.     *Id.*

The initial burdens of informing the court of the basis for a motion for summary judgment and identifying the portions of the record which demonstrate the absence of a genuine issue of material fact fall on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).     If the moving party can satisfy these initial burdens, Rule 56(e) states that the nonmoving party "may not rest upon the mere allegations or denials of his [or her] pleadings, but his [or her] response ... must set forth specific facts showing that there is a genuine issue for trial." *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.) (citing Fed.R.Civ.P. 56(e)), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985). However, any reasonable inferences that can be drawn from the record must be viewed in the light most favorable to the party opposing the motion.     *Sorba v. Pennsylvania Drilling Co., Inc.,* 821 F.2d 200, 202-

34 F.3d 1173                                                                                                    Page 6
34 F.3d 1173, 29 Fed.R.Serv.3d 496
(Cite as: 34 F.3d 1173)

03 (3d Cir.1987), *cert. denied,* 484 U.S. 1019, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988).  It is with this standard in mind that we review the district court's decision to grant TropWorld's motion for summary judgment.

The Lundys cannot, and do not, claim that TropWorld was responsible in any way for Mr. Lundy's medical emergency.  Nor do they claim that TropWorld breached a duty to procure competent aid from the outside with reasonable expedition.  Rather, as we understand it, the Lundys advance two theories of liability against TropWorld.  First, the relationship between a casino and its patrons gives rise to a duty to provide medical care, and TropWorld breached this duty when it failed to have on-site the equipment and skilled personnel necessary to perform an intubation.  Second, TropWorld breached a voluntarily assumed duty by failing to provide Dr. Greenberg, upon his request, with the laryngoscope with intubation tube that was available in the medical station. We will address each theory in turn. Because there are no New Jersey Supreme Court cases which clearly delineate the duties owed by casino ownership to patrons suffering medical emergencies, we must predict how that court would rule on this question.  *Kleinknecht v. Gettysburg College,* 989 F.2d 1360, 1366 (3d Cir.1993).

### A.

[2][3] Generally, a bystander has no duty to provide affirmative aid to an injured person, even if the bystander has the ability to help.  *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 56, at 375 (5th ed. 1984).  New Jersey courts have recognized, however, that the existence of a relationship between the victim and one in a position to render aid may create a duty to render assistance. *See, e.g., Praet v. Borough of Sayreville,* 218 N.J.Super. 218, 527 A.2d 486, 489 (App.Div.1987). In *Szabo v. Pennsylvania R.R. Co.,* 132 N.J.L. 331, 40 A.2d 562 (Err. & App.1945), for example, New Jersey's highest court held that, in the absence of a contract or statute, an employer generally has no duty to provide medical service to treat an ill or injured employee, even if the illness or injury was the result of the employer's negligence.  However, if the employee, while engaged in the work of his or her employer, sustains an injury rendering him or her helpless to provide for his or her own care, the employer must secure medical care for the employee. *Id.,* 40 A.2d at 563.  If a casino owner in New Jersey owes no greater duty to its patrons than an employer owes its employees while they are engaged in the employer's business, we think **\*1179** it clear that

TropWorld did not fail in its duty to render assistance.

The Lundys insist, however, that TropWorld had a duty beyond that recognized in *Szabo.*  They urge specifically that the Supreme Court of New Jersey would adopt the rule set forth in the *Restatement (Second) of Torts* § 314A (1965).  Section 314A states in pertinent part:

(1) A common carrier is under a duty to its passengers to take reasonable action

(a) to protect them against unreasonable risk of physical harm, and

(b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.

(2) An innkeeper is under a similar duty to its guests.

(3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.

We think it likely that the Supreme Court of New Jersey would accept the principles enunciated in § 314A and would apply them in a case involving a casino and one of its patrons.  We need not so hold, however.  The pertinent commentary following § 314A indicates that the duty "to take reasonable action ... to give ... first aid" in times of emergency requires only that carriers, innkeepers and landowners procure appropriate medical care as soon as the need for such care becomes apparent and provide such first aid prior to the arrival of qualified assistance as the carrier's, innkeeper's or landowner's employees are reasonably capable of giving. Clearly, the duty recognized in § 314A does not extend to providing all medical care that the carrier or innkeeper could reasonably foresee might be needed by a patron.  Specifically, the commentary states:

f. The defendant ... [i]n the case of an ill or injured person ... will seldom be required to do more than give such first aid as he reasonably can, and take reasonable steps to turn the sick man over to a physician, or to those who will look after him and see that medical assistance is obtained.

Nurse Slusher was a registered, licensed nurse who had been trained in emergency care and who had fifteen years of nursing experience.  The uncontradicted evidence was that, despite this training and experience, she was not competent to perform an intubation.  It necessarily follows that the duty which the Lundys insist the New Jersey Supreme Court would recognize in this case would require casinos to provide a full-time on-site staff

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

physician. Certainly, maintaining on a full-time basis the capability of performing an intubation goes far beyond any "first aid" contemplated by § 314A. We are confident the New Jersey Supreme Court would decline to impose liability on TropWorld for failing to maintain that full-time capability.

### B.

[4] The Lundys further claim that, even if there would otherwise be no duty to provide a level of care encompassing intubation, TropWorld voluntarily assumed a duty to provide such care and breached that duty by negligently failing to provide it. As we understand the argument, TropWorld voluntarily assumed this duty in two ways. First, by contracting with Dr. Carlino to have a laryngoscope with intubation tube on the premises, TropWorld voluntarily assumed the duty of having it available for use on request. Second, by voluntarily undertaking to assist Mr. Lundy, TropWorld assumed a duty to use due care in providing that assistance and breached this duty when Nurse Slusher failed to bring the laryngoscope with intubation tube to Dr. Greenberg. In connection with this second argument, the Lundys rely upon the principles outlined in § 324 of the *Restatement (Second) of Torts* which provides:

> One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by
>
> (a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or
>
> (b) the actor's discontinuing his aid or protection, if by so doing he leaves the **\*1180** other in a worse position than when the actor took charge of him.

As we have indicated, TropWorld's medical center, as a result of its contract with Dr. Carlino, did have a laryngoscope with intubation tube as part of its inventory of equipment. Nurse Slusher did not bring this equipment with her when she was summoned to Pit 3, however. She brought only that equipment that she was qualified to use: the ambu-bag, oxygen, and an airway. At some point after her arrival on the scene, Dr. Greenberg asked for an intubation kit. While the Lundys do not expressly so state, we understand their contention to be that Nurse Slusher should have returned to the medical center at this point and retrieved the intubation tube for Dr. Greenberg's use and TropWorld is liable for her failure to do so. They suggest that her failure to do so was the result of an ill-considered TropWorld policy that she was not permitted to use intubation

equipment.

We reject the notion that TropWorld, by contracting with Dr. Carlino, voluntarily assumed a duty to Mr. Lundy it would not otherwise have had. The Lundys have referred us to no New Jersey case law supporting this proposition and we have found none.

[5] The Lundys' argument based on § 324 of the *Restatement,* ignores the fact that the principles restated therein have been materially altered by New Jersey's Good Samaritan Act, § 2A:62A-1 N.J.Stat.Ann. That Act provides that anyone "who in good faith renders emergency aid at the scene of an ... emergency to the victim ... shall not be liable for any civil damages as a result of acts or omissions by such person in rendering the emergency care." We believe the Supreme Court of New Jersey would hold that this mandate protects TropWorld from liability in the situation before us.

The Lundys do not, and cannot, assert that there was bad faith here. [FN10] Rather, they seek to avoid the effect of New Jersey's Good Samaritan Act by relying on what is known as the "preexisting duty" exception to the Act. Under this exception, the Act provides no immunity from liability if the duty allegedly breached by the volunteer was a duty that existed prior to the voluntary activity. *See, e.g., Praet v. Borough of Sayreville,* 218 N.J.Super. 218, 527 A.2d 486 (1987) (police officers who have a preexisting duty to render emergency assistance to a motorist trapped in a car may be held liable for failing to extricate motorist and prevent fire). We do not believe the preexisting duty exception is applicable under New Jersey law in a situation, like the present one, where the preexisting duty is a limited one and the alleged negligence is the failure to provide a level of assistance beyond that required by the preexisting duty.

> FN10. Nurse Slusher's refusal to retrieve the intubation kit from her office does not constitute bad faith. Indeed, the record paints a picture of a good faith effort to revive Lundy and to maintain his respiration and pulse pending the arrival of the emergency medical technicians. The purpose of the Act is precisely to promote such commendable gratuitous undertakings as that exemplified by TropWorld. *See Praet,* 527 A.2d at 489 ("[T]he grant of legislative immunity to a volunteer was designed, simply and obviously, to encourage gratuitous assistance by those

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

34 F.3d 1173
34 F.3d 1173, 29 Fed.R.Serv.3d 496
**(Cite as: 34 F.3d 1173)**

who have no legal obligation to render it."); *id.,* 527 A.2d at 488 (" 'The purpose of [the Act] is to encourage the rendering of aid to injured persons at the scene of an accident or emergency without fear of civil liability.' ") (quoting legislative history of original bill).

[6] We think this becomes apparent when one focuses on the purposes of the Good Samaritan Act and the preexisting duty exception and on the nature of the preexisting duty in this case. The purpose of the Good Samaritan Act is to encourage the rendering of assistance to victims by providing that the voluntary rendering of aid will not give rise to any liability that would not otherwise exist. The preexisting duty exception recognizes that fulfillment of this objective of the statute can be accomplished without the eradication of preexisting duties.

Nurse Slusher had no preexisting duty to Lundy apart from her role as an employee of TropWorld (or, arguably, as an employee of an independent contractor of TropWorld). Nurse Slusher, if she had been a fellow patron, for example, would have had no preexisting duty obligation and she would have been fully protected by the Good Samaritan Act. Thus, the only relevant preexisting **\*1181** duty for purposes of applying the Act under New Jersey law is the preexisting duty owed by TropWorld to Mr. Lundy. That preexisting duty, as we have seen, was a duty limited to summoning aid and, in the interim, taking reasonable first aid measures. It did not include the duty to provide the medical equipment and personnel necessary to perform an intubation. It follows, we believe, that Nurse Slusher's conduct with respect to the providing or withholding of the intubation equipment on the premises was not conduct with respect to which she or TropWorld owed a preexisting duty to Lundy. It further follows that, if TropWorld is responsible for the assistance voluntarily provided by Nurse Slusher, it is protected by the Act from liability arising from her alleged negligence in failing to provide that intubation equipment. [FN11] Accordingly, we conclude that TropWorld's motion for summary judgment was properly granted.

> FN11. At times, the Lundys appear to be arguing that TropWorld, by putting intubation equipment on its premises, voluntarily assumed a duty beyond its preexisting duty to take reasonable first aid measures and that TropWorld is, accordingly, liable for a breach of that voluntarily assumed duty. If the Lundys do

so argue, we believe there are two answers. First, the Good Samaritan Act would protect TropWorld from liability arising from its voluntary activity. Second, a decision voluntarily to provide intubation equipment for the use of physician employees of an independent contractor who were known to be qualified to use it does not constitute a decision voluntarily to provide such equipment to strangers who volunteer assistance at the site of an emergency. These decisions involve distinctly different considerations, and we are confident that the Supreme Court of New Jersey would not regard them as equivalent.

### IV. THE LUNDYS' MOTION TO AMEND

Rule 15(c) sets forth the circumstances under which an amendment to a pleading will relate back to the date of the original pleading for limitations purposes. Prior to December 1, 1991, an amendment that "change[d] the party against whom a claim was asserted" related back to the date of the original complaint only if (1) "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading," (2) within the period provided for commencing an action against the new party, the new party received such notice of the institution of the action that the new party would not be prejudiced in maintaining a defense on the merits, and (3) within that same period, the new party knew or should have known that "but for a mistake concerning the identity of the proper party," the action would have been originally filed against him or her. An amendment to Rule 15(c) which became effective on December 1, 1991, changed the second and third of these requirements by deleting the references to the period for commencement of an action and by substituting "the period provided by Rule 4(j) for the service of the summons and complaint." Rule 4(j) provides that if the summons and complaint are not served "within 120 days after the filing of the complaint and the party on whose behalf such service was required cannot show good cause why service was not made within that period, the action shall be dismissed." The Lundys contend that their amended complaint adding Dr. Carlino relates back to the date of the original complaint under the amended version of Rule 15(c) because all of the requirements of the rule were met within 120 days of the filing of their original complaint. [FN12]

> FN12. This case accordingly does not involve the issue of the circumstances under

34 F.3d 1173                                                                                    Page 9
34 F.3d 1173, 29 Fed.R.Serv.3d 496
**(Cite as: 34 F.3d 1173)**

which the period for applying the second and third requirements may be longer than 120 days. Specifically, the Advisory Committee Notes following Rule 15 state that "this rule allows not only the 120 days specified in [Rule 4] but also any additional time resulting from any extension ordered by the court pursuant to that rule, as may be granted, for example, if the defendant is a fugitive from service of the summons." Here, the Lundys do not suggest that Dr. Carlino's knowledge was greater at some other potentially relevant point than it was during the 120 day period.

 The 1991 amendment also added to Rule 15(c) a new subsection (c)(1) providing that an "amendment of the pleadings relates back to the date of the original pleading when (1) relation back is permitted by the law that provides the statute of limitations applicable to the action." The Lundys urge that this provision is applicable to all amended complaints, **\*1182** including those that change the party against whom a claim is asserted. We accept this contention for present purposes.

 Because the current version of Rule 15(c) came into effect after the original complaint was filed here, but while the case was still pending, there is some question as to whether the previous version of the rule governs, or whether the current version of the rule should be retroactively applied. However, because we believe that the Lundys' attempted amendment would not relate back to their original complaint under either version of Rule 15(c), we need not answer the question of retroactivity.

 [7] Dr. Carlino did not receive any notice of the institution of the Lundys' action within the applicable statute of limitations, which expired on August 3, 1991. Therefore, the Lundys' amendment would clearly not relate back to the original complaint if the previous version of Rule 15(c) applies.

 [8] Analysis under the current version of Rule 15(c) is a bit more complicated, yet it leads us to the same result. The complaint was filed on July 22, 1991, which was about two weeks before the expiration of the statute of limitations on August 3, 1991. The one hundred and twentieth day after the filing was November 19, 1991. The Lundys correctly point out that Dr. Carlino had received TropWorld's cross-claim on September 12, 1991 and had thus become aware of the existence of the suit at that time. The Lundys further stress that Dr. Carlino answered the

cross-claim on October 18, 1991, and undoubtedly had reviewed their original complaint prior to filing that answer. It is their original complaint that the Lundys insist put Dr. Carlino on notice that "but for a mistake concerning identity of the proper party," the action would have been brought against him. Accordingly, we turn to that relatively brief complaint.

 After identifying the parties and making the necessary jurisdictional allegation, the Lundys' complaint reads in relevant part:

  2. At all times material hereto, Defendant acted, and failed to act, by and through its agents, servants, work persons and employees in the course and scope of employment.

  3. On or about August 3, 1989, while Plaintiffs were business invitees lawfully on Defendant's premises, Plaintiff, Sidney Lundy, suffered a cardiac arrest.

  4. At all time [sic] material hereto, Defendant, as the owner in possession of a hotel, restaurant and gambling complex open to the public, was under a duty to its business invitees to have proper first aid facilities and personnel available to its business invitees and was also under a duty to its business invitees to take reasonable action to render first aid to such business invitees, when necessary.

  5. At all time material hereto, Defendant knew, and had reason to know, that Plaintiff had suffered a cardiac arrest and required first aid, oxygen and other medical attention.

  6. Defendant negligently, recklessly and carelessly failed to perform its duty to Plaintiff by failing to have such emergency-first aid facilities, oxygen or medical personnel available.

  7. Although Defendant telephoned for an ambulance to take Plaintiff to the hospital, it otherwise rendered no first aid or emergency medical treatment whatsoever to Plaintiff, despite his crucial need for same.

  8. Due to all the foregoing, Defendant increased the likelihood of harm to the Plaintiff.

  9. Due to all the foregoing, Defendant negligently, recklessly and carelessly caused serious and permanent bodily injuries to Plaintiff and caused aggravation and exacerbation of Plaintiff's injuries and hypoxic encephalopathy.

 App. 10-11.

 We agree with the Lundys that Dr. Carlino received notice of the existence of the litigation within 120 days of the filing of the complaint. We cannot agree, however, with their position that during that period he "knew or should have known that, but for a

34 F.3d 1173                                                                                                    Page 10
34 F.3d 1173, 29 Fed.R.Serv.3d 496
**(Cite as: 34 F.3d 1173)**

mistake concerning the identity of the proper party, the action would have been brought **\*1183** against" him.  Like the district court, we conclude to the contrary. [FN13]

> FN13. The magistrate judge concluded that Dr. Carlino had reason to believe the Lundys, but for a mistake concerning the identity of the proper party, would have sued him.  Accordingly, the magistrate judge granted the Lundys' motion to amend under Rule 15.  This ruling was dispositive of Dr. Carlino's statute of limitations defense and the district court, accordingly, was free to rule *de novo* on the issue presented by this third requirement of Rule 15(c). Fed.R.Civ.P. 72(b).  We review the district court's finding on that issue under a clearly erroneous standard.  *Varlack v. SWC Caribbean, Inc.,* 550 F.2d 171, 174 (3d Cir.1977).  While the district court described the magistrate judge's conclusion as "clearly erroneous," it owed no deference to that conclusion.  Nor do we.  We do not disagree, however, with the district court's characterization of the magistrate judge's conclusion as being "clearly erroneous."

The Lundys' complaint asserted a claim against TropWorld on the theory that  "as the owner in possession of a ... gambling complex open to the public" it had a duty to its business invitees that it breached by (1) failing to have "emergency-first aid facilities, oxygen or medical personnel available" and (2) by rendering "no first aid or emergency medical treatment whatsoever" to Mr. Lundy.  This may or may not have appeared to Dr. Carlino to be a viable theory of liability against TropWorld.  Clearly it must have communicated to him that the Lundys intended to sue someone else.  Dr. Carlino would not have been liable under the theory advanced in the complaint, however, and we perceive no reason why it should have led Dr. Carlino to believe the Lundys intended to sue him and had failed to do so because of a mistake concerning identity. [FN14]

> FN14. This case does not require us to decide whether Rule 15(c) applies in a situation where a proposed defendant should have known that, but for a mistake concerning the identity of the proper party, the plaintiff would have sued both the original defendant and the proposed defendant.  We may assume that Rule 15(c) does cover such a situation.  Dr. Carlino's

only information, during the relevant period, concerning the Lundys' intent in filing their complaint was the information contained in that complaint.  The Lundys there complained *only* about an alleged failure to provide emergency equipment and personnel and about an alleged failure to provide any "emergency medical treatment whatsoever." These allegations provide a basis for claims by the Lundys against TropWorld and possibly cross-claims by TropWorld against Dr. Carlino for breach of contract. However, the Lundys have suggested no legal theory under which these allegations could provide a basis for a claim by the Lundys against Dr. Carlino.  If there be such a theory, it is sufficiently creative that we do not believe Dr. Carlino should be held to have anticipated it.  As the district court stressed, there is *no* allegation in the Lundys' complaint that treatment of Mr. Lundy was undertaken by an employee of TropWorld who provided such treatment negligently. Accordingly, we are not faced with the issue of whether Dr. Carlino should have known that, but for a mistake concerning the identity of the employer of an employee alleged to be negligent in the complaint, the Lundys should have sued both TropWorld and Dr. Carlino.

Where there is a basis for the plaintiff to assert liability against the party or parties named in a complaint and there is no reason for another party to believe that the plaintiff did anything other than make a deliberate choice between potential defendants, courts have consistently held that the third requirement of Rule 15(c)(3) is not met.  *See, e.g., Lovelace v. O'Hara,* 985 F.2d 847 (6th Cir.1993) (complaint alleges theory of liability against public officer in official capacity;  no basis for believing claim against official in individual capacity intended);  *Hernandez Jimenez v. Calero Toledo,* 604 F.2d 99, 103 (1st Cir.1979) ("appellees could very well have believed that they were not named as parties in the original action for tactical reasons or because appellant lacked evidence of their alleged participation in the conspiracy when he filed the complaint");  *Great Northeastern Lumber & Millwork Corp. v. Pepsi-Cola Metropolitan Bottling Co., Inc.,* 785 F.Supp. 514, 516 (E.D.Pa.1992) (manufacturer of component part in product liability situation "may have believed plaintiff made a deliberate choice rather than a 'mistake' in deciding not to join [it]").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

34 F.3d 1173                                                                                                    Page 11
34 F.3d 1173, 29 Fed.R.Serv.3d 496
**(Cite as: 34 F.3d 1173)**

This is such a case.  The complaint gave Dr. Carlino no reason during the relevant period to believe that the Lundys had intended to sue him. Indeed, after TropWorld filed a cross-claim against him on September 12, 1991, and the Lundys failed during the remaining 51 days of the 120 day period to amend to join him, Dr. Carlino had affirmative reason to believe that the Lundys did not wish to assert liability against him.

 **\*1184** [9] Finally, we turn to the Lundys' contention that, because their amended complaint against Dr. Carlino relates back under New Jersey law, we should hold that it relates back here under the provisions of Rule 15(c)(1), as amended in 1991.

 Rule 4:9-3 of the New Jersey Rules of Court states:
 **When Amendments Relate Back**
 Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading; but the court, in addition to its power to allow amendments may, upon terms, permit the statement of a new or different claim or defense in the pleading.    An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, *within the period provided by law for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him.*
 (emphasis added).    This provision is virtually identical to the original version of Rule 15(c).   Like that Rule, New Jersey's Rule 4:9-3 requires that for an amendment changing, or, presumably, adding a party to relate back, the new party must receive notice of the institution of the action prior to the running of the applicable statute of limitations.   *See Townsend v. Great Adventure*, 178 N.J.Super. 508, 429 A.2d 601, 607 (App.Div.1981) (an amendment adding an additional defendant did not relate back to the original complaint pursuant to Rule 4:9-3 when there was "no showing that [the new defendant] received notice within [the applicable statute of limitations] that any action had been instituted by [plaintiff] against any person for his injuries and losses.").   Because Dr. Carlino did not receive any

notice of the Lundys' suit prior to the expiration of the statute of limitations, the Lundys' amendment does not relate back to their original complaint under New Jersey law. Accordingly, we reject the Lundys' argument that their claim against Dr. Carlino relates back to the date of their original complaint under Fed.R.Civ.P. 15(c), as amended in 1991.

*V. CONCLUSION*
 The judgment of the district court will be affirmed.

 BECKER, Circuit Judge, concurring in part of the judgment and dissenting in part.

 Federal Rule of Civil Procedure 15(c) was amended in 1991 "to prevent parties against whom claims are made from taking unjust advantage of otherwise inconsequential pleading errors to sustain a limitations defense." Fed.R.Civ.P. 15, advisory committee's note--1991 amendment.   I believe that the majority has lost sight of the motivation behind the 1991 amendment to Rule 15 as well as of the plain meaning of that Rule, and thereby has deprived the plaintiff of his day in court on the basis of a mere technicality.    I respectfully dissent from Part IV of the majority's opinion.

 I concur with the majority, however, that Trop World was entitled to summary judgment on the issue of whether it breached a duty toward Lundy by not having more medical equipment and/or medically-trained personnel available in case of emergency, and hence I concur in much of Part III. However, I write separately on the issue of Trop World's duties toward Lundy because I disagree with the majority's conclusion that the New Jersey Supreme Court would rule that, even had Trop World been Nurse Slusher's employer, Trop World would still be entitled to summary judgment.   While I agree with the majority that Trop World is not liable for Nurse Slusher's conduct only because she was employed by an independent contractor, I must discuss this point because if the majority is correct Dr. Carlino and Dr. Carlino, P.A. might be entitled to summary judgment even if they had been named as defendants **\*1185** from day one.   [FN1]

>    FN1. Lundy has not appealed the district court's rulings that Dr. Carlino and Dr. Carlino, P.A. were independent contractors and that this case does not fit into the exceptions New Jersey recognizes to nonliability for an independent contractor's conduct.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

34 F.3d 1173                                                                                          Page 12
34 F.3d 1173, 29 Fed.R.Serv.3d 496
**(Cite as: 34 F.3d 1173)**

I. The 1991 Amendment of Rule 15(c)
On April 30, 1991, the Supreme Court recommended an amendment to Rule 15(c) [FN2] and at the same time proposed an effective date of December 1, 1991. The stimulus behind the amendment was the harsh result in *Schiavone v. Fortune,* 477 U.S. 21, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986).    In that case the plaintiffs had filed a timely libel complaint against "Fortune" rather than against "Time, Incorporated", the owner of the Fortune trademark.    Time's registered agent had, based on the misnomer in the complaint, refused plaintiffs' service a short time after the statute of limitations expired, but within the time allowed for serving the summons and complaint. The plaintiffs served their amended complaint containing the defendant's correct name about two months later.

> FN2. The Rule now provides in pertinent part:
> **Relation Back of Amendments.**    An amendment of a pleading relates back to the date of the original pleading when
>
> .    .    .    .    .
>
> (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or
> (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.
> Fed.R.Civ.Proc. 15(c).    The time period provided by Rule 4(m) is 120 days, subject to extensions for good cause shown.    *See* Fed.R.Civ.P. 4(m).

Confronted with the plain language of Rule 15(c), the Supreme Court held that the plaintiffs' claim against Time was time-barred. [FN3]    It took the Rule's straightforward text to mean that the plaintiffs could not relate back the amendment of the defendant's name on the complaint unless the "new"

defendant had notice of the suit prior to the expiration of the statute of limitations.    *See* 477 U.S. at 30, 106 S.Ct. at 2384 ("We do not have before us a choice between a 'liberal' approach toward Rule 15(c), on the one hand, and a 'technical' interpretation of the Rule, on the other hand.    The choice, instead, is between recognizing or ignoring what the Rule provides in plain language.    We accept the Rule as meaning what it says.").

> FN3. The Rule as it existed then provided that " '[a]n amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, *within the period provided by law for commencing the action* against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him.' " *Schiavone,* 477 U.S. at 24 n. 5, 106 S.Ct. 2381 n. 5 (quoting Fed.R.Civ.P. 15(c) (1990)) (emphasis supplied).

The Supreme Court recognized the spartan and admittedly arbitrary consequences of its holding and, acting on the recommendation of the Advisory Committee on Civil Rules and the Standing Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, soon thereafter recommended the aforementioned amendment to Rule 15(c), which Congress approved. The advisory committee, whose notes are accorded significant weight, *see Schiavone,* 477 U.S. at 31, 106 S.Ct. at 2385, explained that the new rule was designed

> to prevent parties against whom claims are made from taking unjust advantage of otherwise inconsequential pleading errors to sustain a limitations defense.

\*    \*    \*    \*    \*    \*

Paragraph (c)(3) ... has been revised to change the result in *Schiavone v. Fortune, supra,* with respect to the problem of a misnamed defendant.    An intended defendant who is notified of an action within the period allowed by Rule 4(m) for service of a summons and complaint may not under the revised rule defeat the action on account of a defect in the pleading with respect to the defendant's name, provided **\*1186** that the requirements of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

clauses (A) and (B) have been met. If the notice requirement is met within the Rule 4(m) period, a complaint may be amended at any time to correct a formal defect such as a misnomer or misidentification. On the basis of the text of the former rule, the Court reached a result in *Schiavone v. Fortune* that was inconsistent with the liberal pleading practices secured by Rule 8.

Fed.R.Civ.P. 15, advisory committee note--1991 amendment.

The fact that the result the Supreme Court reached in *Schiavone* led it shortly to amend the Rule is a sure reminder of the liberality of federal pleading practices. This liberality is expressed throughout the Rules [FN4] and is enshrined in a long and distinguished history. [FN5]

> FN4. *See, e.g.,* Fed.R.Civ.P. 1 ("These rules ... shall be construed and administered to secure the *just,* speedy, and inexpensive determination of *every* action." (emphasis supplied)); *id.* 8(f) ("*All* pleadings shall be so construed as to do substantial justice." (emphasis supplied)); *id.* 61 ("The court at *every* stage of the proceeding must disregard *any* error or defect in the proceeding which does not affect the substantial rights of the parties." (emphasis supplied)).

> FN5. *See, e.g., Torres v. Oakland Scavenger Co.,* 487 U.S. 312, 316, 108 S.Ct. 2405, 2408, 101 L.Ed.2d 285 (1988) ("[T]he requirements of the rules of procedure should be liberally construed and ... 'mere technicalities' should not stand in the way of consideration of a case on its merits [.] "); *Surowitz v. Hilton Hotels Corp.,* 383 U.S. 363, 373, 86 S.Ct. 845, 851, 15 L.Ed.2d 807 (1966) ("If rules of procedure work as they should in an honest and fair judicial system, they not only permit, but should as nearly as possible guarantee that bona fide complaints be carried to an adjudication on the merits."); *Foman v. Davis,* 371 U.S. 178, 181, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) ("It is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of ... mere technicalities."); *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957) ("The Federal Rules [of Civil Procedure] reject the approach that pleading is a game of skill in which one misstep by

counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits."); *Maty v. Grasselli Chem. Co.,* 303 U.S. 197, 200, 58 S.Ct. 507, 509, 82 L.Ed. 745 (1938) ("Pleadings are intended to serve as a means of arriving at fair and just settlements of controversies between litigants. They should notse barriers which prevent the achievement of that end."); *see also* 2A JAMES WM. MOORE & JO D. LUCAS, MOORE'S FEDERAL PRACTICE ¶ 8.02, at 8-10 (2d ed. 1994) ("The real importance of the pleading rules is that they make pleadings, in and of themselves, relatively unimportant. Cases are to be decided on the merits."); 2 *id.* ¶ 1.13[1], at 1-59 ("[Rule 1] sets a theme of liberality in the application of the procedural rules and fosters the principle that the outcome of cases should turn on their merits rather than on technical issues of pleading and procedure."); 3 *id.* § 15.15 [2], at 15-146 ("The general philosophy of the pleading rules is that they should give fair notice, should be liberally construed, be subject to liberal amendment, and that decisions should be on the merits and not on technical niceties of pleading." (footnotes omitted)); 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1286, at 558- 59 (2d ed. 1990) ("[A]n inadvertent mistake in a pleading will not be held against the pleader if another party has not been misled by the mistake or otherwise prejudiced."); 4 *id.* § 1029, at 118 ("The federal rules are designed to discourage battles over mere form and to sweep away needless procedural controversies that either delay a trial on the merits or deny a party his day in court because of technical deficiencies.").

A. *Retrospective Operation of the 1991 Amendment*

Since Lundy conceded that the old Rule 15(c), which was in effect at the time he filed his complaint, would have barred his action against Dr. Carlino and Dr. Carlino, P.A. (collectively "the Carlinos"), the first question I must consider is whether the amendment applies retrospectively to cases pending in the district court at the time the amendment became effective.

Most courts of appeals have held that the amendment should normally operate retrospectively. *See Woods*

*v. Indiana University-Purdue University at Indianapolis,* 996 F.2d 880, 886 (7th Cir.1993); *Garvey v. Vaughn,* 993 F.2d 776, 778, 783 n. 17 (11th Cir.1993); *Skoczylas v. Federal Bureau of Prisons,* 961 F.2d 543, 545-46 (5th Cir.1992); *Hill v. United States Postal Serv.,* 961 F.2d 153, 155-56 (11th Cir.1992); *Bayer v. United States Dep't of Treasury,* 956 F.2d 330, 334-35 (D.C.Cir.1992). The Supreme Court, as authorized by the Enabling Act, 28 U.S.C.A. § 2074 (Supp.1993), ordered the amended rule to be applied to all pending cases if "just *1187 and practicable." [FN6] There certainly is no practicability objection to its retrospective operation. Thus the only remaining question is whether it would be "just" to apply the rule retrospectively.

> FN6. Specifically, the Supreme Court's order states that the amendments to the Federal Rules of Civil Procedure "shall take effect on December 1, 1991, and shall govern all proceedings in civil actions thereafter commenced and, *insofar as just and practicable, all proceedings in civil actions then pending." Order Re: Amendments to Federal Rules of Civil Procedure,* 111 S.Ct. Preface 813 (April 30, 1991) (emphasis supplied). Congress delegated to the Supreme Court the authority to make changes in the Rules retrospective:
> [Proposed rules of the Supreme Court] shall take effect no earlier than December 1 of the year in which such rule is [transmitted to Congress] unless otherwise provided by law. The Supreme Court may fix the extent such rule shall apply to proceedings then pending, except that the Supreme Court shall not require the application of such rule to further proceedings then pending to the extent that, in the opinion of the court in which such proceedings are pending, the application of such rule in such proceedings would not be feasible or would work injustice, in which event the former rule applies.
> 20 U.S.C.A. § 2074(a) (Supp.1993).

Without oversimplifying, the justice of retrospective operation has already largely been accounted for in the context of Rule 15(c)(3) by the very terms of the Rule. That is, insofar as the Rule demands an inquiry into "prejudice" to and "knowledge" of the party to be added, it is safe to dispense with the justness inquiry at the retrospectivity stage of the analysis. *See Woods,* 996 F.2d at 886. Simply put, if the party to be added had notice and is not

prejudiced, and knew or should have known that it was an intended party, it would not be unjust to apply the new rule retrospectively to that party. These considerations lead me to conclude that Rule 15(c) retrospectively applies to this case. [FN7]

> FN7. Only two courts of appeals' decisions have declined to apply the amendment to Rule 15(c) retrospectively, *Diaz v. Shallbetter,* 984 F.2d 850, 853 (7th Cir.1993) and *Freund v. Fleetwood Enterprises, Inc.,* 956 F.2d 354, 363 (1st Cir.1992). But in *Woods,* a different panel of the Seventh Circuit determined to give effect to the Supreme Court's directive to apply the amended Rule to all pending cases "insofar as just and practicable" by essentially confining *Diaz* to cases in which the district court had dismissed the entire complaint prior to the effective date of the amendment. The court of appeals held that Rule 15(c) would apply retrospectively to all cases pending in the district courts on December 1, 1991. 996 F.2d at 885-86.
> *Freund* was decided as it was by virtue of its odd assortment of facts, in light of which retrospective operation would have worked a "manifest injustice." The court of appeals emphasized that (1) the plaintiff had lost a full jury trial involving almost the same issues against some other defendants and there was no reason to think a second trial's outcome would differ; and (2) it would likely have concluded its appellate review before the amendment took effect on December 1, 1991 had the plaintiff presented his "weak" arguments on appeal "in a more forthright manner." 956 F.2d at 363.
> The common thread coursing through both *Diaz* and *Freund* is the fact that proceedings in the district court had terminated prior to the effective date of the amendment. Since this special circumstance is missing here, even assuming *Diaz* and *Freund* are persuasive, they are inapposite.

### B. *Application of the Amended Rule*

For an amendment to relate back under Rule 15(c), the party seeking the amendment must show that "the party to be brought in by amendment (A) has received such *notice* of the institution of the action that the party will not be *prejudiced* in maintaining a defense on the merits, and (B) knew or should have known that, but for a *mistake* concerning the identity

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

34 F.3d 1173                                                                                                    Page 15
34 F.3d 1173, 29 Fed.R.Serv.3d 496
**(Cite as: 34 F.3d 1173)**

of the proper party, the action would have been brought against the party." Fed.R.Civ.P. 15(c)(3) (emphasis supplied).    Although the majority dismisses Lundy's complaint against the Carlinos on the "mistake" prong, I will in the interest of thoroughness discuss notice and prejudice in proper order and then turn to the question of what the Carlinos knew or should have known.

1. *Did the Carlinos Receive Adequate Notice?*
 The question whether the Carlinos received adequate notice is comprised of two subissues: (i) may notice by a codefendant ever satisfy the notice requirement of Rule 15(c)? and (ii) was there in fact sufficient notice to the Carlinos within the 120-day **\*1188** extension that Lundy had instituted an action?

 The interesting notice issue in this case is whether notice can be supplied by an original defendant who files a cross-claim against the newly named defendant;  in general, the question is whether the plaintiff must actually serve a summons and complaint on the newly named defendant before the expiration of the 120 day period.  I believe, contrary to the decision by the district court, that the fact that the Carlinos received notice from a third party should not be dispositive, "since it is unwise to place undue emphasis on the particular way in which notice is received."  6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 1497, at 93 (2d ed. 1990).

 This Court has seldom spoken on the meaning of "notice" in context of Rule 15(c).  We have held that notice of the institution of the action implies more than notice of the event giving rise to the cause of action, *Bechtel v. Robinson,* 886 F.2d 644, 652 n. 12 (3d Cir.1989), and that much cannot be doubted as Rule 15(c) by its terms requires "notice of the *institution of the action* " (emphasis supplied).  A strict interpretation of notice was rendered under the pre-1991 incarnation of Rule 15(c) in *Williams v. Army & Air Force Exchange Service,* 830 F.2d 27 (3d Cir.1987), in which the plaintiff had filed a Title VII complaint against a federal agency rather than its head.  This Court stated in a footnote that plaintiff's inquiries with the defendant agency did not place it on "notice" "[b]ecause *only* service constitutes notice." 830 F.2d at 30 n. 2 (emphasis supplied).

 I think service by a third party defendant satisfies even the strict standard of *Williams,* assuming that part of the case remains good law after the 1991 amendment and in light of its possible inconsistency

with the earlier case of *Varlack v. SWC Caribbean, Inc.,* 550 F.2d 171, 175 (3d Cir.1977).  All that matters according to the terms of the Rule is satisfactory notice that the plaintiff has *instituted an action,* not actual service naming the defendant.  *See Varlack,* 550 F.2d at 175 (holding that the district court did not commit clear error when it held defendant had adequate notice of the lawsuit when he coincidentally saw a copy of the complaint naming both the restaurant where he was a manager and an unknown employee as defendants within the limitations period, because he knew that the "unknown employee" referred to him); 6A WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1498, at 129-30 (arguing in context of third-party practice like that involved here that "the better practice is to determine the propriety of amendment in light of the Rule 15(c) notice requirements").

 The language of amended Rule 15(c) and the advisory committee's notes undergird my view.  Had the drafters of Rule 15(c) contemplated that only actual service with a complaint and summons naming the party to be added would suffice, they could have avoided the precise but complex language they actually used and simply provided in its stead that an amendment changing a party would relate back if within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment is in fact properly served according to Rule 4.  This they did not do.  Rule 15(c) by its terms requires only sufficient notice such "that the party will not be prejudiced in maintaining a defense on the merits."

 The advisory committee note to the 1991 amendment--which, of course, postdates *Williams*-- states that "[i]f the notice requirement is met within the Rule 4(m) period, a complaint may be amended *at any time* to correct a formal defect such as a misnomer or misidentification" (emphasis supplied).  Although the advisory committee note does not explicitly mention service of process, it follows from the fact that the plaintiff cannot properly serve a party with process until the complaint names that party as a defendant (a predicate to the misnomer line of cases) that the note envisions that the plaintiff may, assuming appropriate notice is provided within the Rule 4(m) period, serve the defendant at any time, including after the expiration of the Rule 4(m) period.  That is, a party may amend its pleadings to add a party although the party to be added was not actually served by the amending party with a **\*1189** complaint and summons within the Rule 4(m) period.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Having decided that actual service by the plaintiff is not a prerequisite under Rule 15(c)(3), the question then becomes what notice *is* sufficient to convey to the defendant the knowledge that the plaintiff has instituted an action. "The conclusion of a growing number of courts and commentators is that sufficient notice may be deemed to have occurred where a party who has some reason to expect his potential involvement as a defendant hears of the commencement of litigation through some informal means." *Kinnally v. Bell of Pa.,* 748 F.Supp. 1136, 1141 (E.D.Pa.1990); *see, e.g., Berndt v. Tennessee,* 796 F.2d 879, 884 (6th Cir.1986) (notice need not be formal); *Eakins v. Reed,* 710 F.2d 184, 187-88 (4th Cir.1983) (same); *Kirk v. Cronvich,* 629 F.2d 404, 407-08 (5th Cir.1980) (same); *Swartz v. Gold Dust Casino, Inc.,* 91 F.R.D. 543, 547 (D.Nev.1981) ("The notice of the institution of the lawsuit required by Rule 15(c) need not be formal."). I need not go so far as to embrace *Kinnally* 's liberal interpretation in this case, however, as the Carlinos actually received formal notice of Lundy's institution of a lawsuit when Trop World, within the period provided by Rule 4(m), served on them its Third Party Complaint with Lundy's Complaint attached to it.

In sum, given the close interrelationship between notice and prejudice generally and in Rule 15(c) specifically, at least when the newly named defendant has received formal notice of the commencement of the action, albeit via a cross-complaint, I conclude that such notice will satisfy Rule 15(c)'s notice requirement if the defendant is not prejudiced in maintaining a defense on the merits. *Cf.* 6A WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1498, at 123 ("A finding that notice, although informal, is sufficient ... frequently [depends] upon determining whether the party to be added would be prejudiced by allowing relation back under the circumstances of the particular case."). This approach resists elevating technicalities over substance and defeating the policy that " 'mere technicalities' ... not stand in the way of consideration of a case on its merits." *Torres v. Oakland Scavenger Co.,* 487 U.S. 312, 316, 108 S.Ct. 2405, 2408, 101 L.Ed.2d 285 (1988).

I consider next whether the Carlinos would be prejudiced in defending against Lundy's tort claim.

### 2. *Would the Carlinos Be Prejudiced?*

The Carlinos argue in their brief that they would be prejudiced (although at oral argument they conceded there would be no prejudice) because their initial

involvement in the case was simply to defend a contractual claim for indemnity and that to now "begin [a] defense on a negligence theory would require a completely different legal strategy as well as discovery and investigation, all of which [Lundy] has already completed." Br. of Third Party Appellee at 8, 12-13. Nonbinding case law would support this contention (if it were true): prejudice may be established even though the defendant knows about and is involved in other, related actions if the defendant's lack of knowledge of that action led it to conduct a factual inquiry different from the one it would have conducted had it known of that action. *See Craig v. United States,* 413 F.2d 854 (9th Cir.), *cert. denied,* 396 U.S. 987, 90 S.Ct. 483, 24 L.Ed.2d 451 (1969). [FN8]

> FN8. *Cf. Bechtel,* 886 F.2d at 652 (holding that to show prejudice the party opposing the amendment of a complaint "must show that it was unfairly disadvantaged or deprived of the opportunity to present *facts or evidence* which it would have offered had the ... amendments been timely" (internal quotation omitted) (emphasis supplied)), *quoted in Dole v. Arco Chem. Co.,* 921 F.2d 484, 488 (3d Cir.1990); *Evans Prods. Co. v. West Am. Ins. Co.,* 736 F.2d 920, 923 (3d Cir.1984) ("The principal test for prejudice ... is whether the opposing party was denied a fair opportunity to defend and to offer additional evidence...." (citations omitted)); *Deakyne v. Commissioners of Lewes,* 416 F.2d 290, 300 n. 19 (3d Cir.1969) ("Prejudice under [Rule 15] means undue difficulty in prosecuting a lawsuit as a result of a change of tactics or theories on the part of the other party."); *see also* 6A WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1498, at 126 ("[C]ourt[s] should not give special treatment to the careless or myopic added defendant whose alleged prejudice results from his own superficial investigatory practices or poor preparation of a defense. But at least when the facts relevant to one possible claimant do require a substantially different and more burdensome investigatory effort or when the initial action is not sufficiently serious to warrant a full-fledged investigation, a party should be able to rely on the statute of limitations when that claimant does not interpose his claim in time.").

**\*1190** The issue of prejudice, being primarily a

question of fact, should be resolved by the district court in the first instance. *See Woods,* 996 F.2d at 886.    In this case, the magistrate judge was responsible for initially deciding Lundy's Motion to Add Carlino as Original Party Defendants.    In granting the motion, the magistrate judge rejected the Carlinos' argument that they would be prejudiced if added as defendants (*see* App. 466a-69a (Letter Br. of Third Party Defendant, at 2-4 (June 22, 1992))), finding instead that the "Carlino[s] will not be prejudiced by the amended complaint because as third party defendants, they have already engaged in the preparation of a defense in this action." Mem.Op., Civ. No. 91-3183(WGB), at 7 (D.N.J. July 7, 1992) (Rosen, Mag. J.), *in* App. at 477a.    Given the overwhelming support in the record for the magistrate judge's conclusion, [FN9] I agree that the Carlinos suffered no prejudice on account of Lundy's belated attempted amendment of his complaint to name them as defendants. [FN10]

> FN9. Substantial support for the magistrate judge's conclusion that the Carlinos were not prejudiced exists on both factual and legal grounds: there is not a great difference, if any, between Trop World's third party cross-claims and Lundy's negligence claims.    The amounts at stake are identical because Trop World sought full indemnification.    *See* App. 22a, 23a (Third Party Complaint, First Count ¶ 2; *id.,* Third Count, ¶ 2). Moreover, the legal issues the Carlinos needed to research and the facts they needed to investigate were substantially the same because Trop World sought contribution from the Carlinos as a joint tortfeasor pursuant to the New Jersey Joint Tortfeasors Contribution Act, 2A N.J.STAT.ANN. § 53A-3 (1993), *see* App. 22a (Third Party Complaint, Second Count ¶ 2), and because the Carlinos asserted a cross-claim predicated on the New Jersey Comparative Negligence Act, 2A N.J.STAT.ANN. § 15-5.1 (1993), see App. 43a-44a (Answer to Third Party Complaint at 4-5).    Both Trop World's contribution claim and the Carlinos' comparative negligence cross-claim required the Carlinos to address the substance of Lundy's complaint and to discover the facts underlying it.
>
> There is also ample support for the magistrate judge's conclusion that the Carlinos had actually engaged in the preparation of a defense in the action that did not differ substantially from what their

defense would have been had Lundy originally named them as defendants.    Most importantly, the Carlinos' counsel attended all the depositions taken by the original parties.    *See* App. 140a-41a (Nurse Slusher);    App. 173a-74a (Maryann Strang);    App. 201a-03a (Dr. Greenberg);    App. 233a-35a (Mrs. Greenberg);    App. 246a-47a (Verna Ayo).

> FN10.  Of particular relevance to prejudice in a case such as this are the goals sought to be protected by statutes of limitations.    *See* Fed.R.Civ.P. 15(c), advisory committee's notes--1966 amendment ("Relation back is intimately connected with the policy of the statute of limitations.").    On this note the Supreme Court has informed us that
>
> [s]tatutes of limitations are primarily designed to assure fairness to defendants.    Such statutes "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.    The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." *Order of R.R. Telegraphers v. Railway Express Agency, Inc.,* 321 U.S. 342, 348-49, 64 S.Ct. 582, 586 [88 L.Ed. 788] (1944). Moreover, the courts ought to be relieved of the burden of trying stale claims when a plaintiff has slept on his rights.
>
> *Burnett v. New York Cent. R.R. Co.,* 380 U.S. 424, 428, 85 S.Ct. 1050, 1054, 13 L.Ed.2d 941 (1965);    *see National Iranian Oil Co. v. Mapco Int'l, Inc.,* 983 F.2d 485, 493 (3d Cir.1992).    Since the exact same evidence, memories, and witnesses are pertinent to Lundy's original Complaint and Trop World's Third Party Complaint as would be pertinent to Lundy's Amended Complaint against the Carlinos, and since the district court was burdened with the claim and cross-claim already, none of the interests sought to be protected by the applicable statute of limitations would be abridged were Lundy allowed to amend his complaint to name the Carlinos as defendants.

Based on the foregoing, I conclude that the elements

34 F.3d 1173
34 F.3d 1173, 29 Fed.R.Serv.3d 496
**(Cite as: 34 F.3d 1173)**

Page 18

of Rule 15(c)(3)(A) have all been met. It remains to be seen if the same holds for the elements of Rule 15(c)(3)(B).

**\*1191** *3. Should the Carlinos Have Known Lundy Was Mistaken About Their Identity?*

a. *Was Sufficient Notice Provided by the Third-Party Complaint?*

In order for an amendment under Rule 15(c)(3) to relate back, the party seeking the amendment must also demonstrate that "the party to be brought in by amendment ... (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party." Fed.R.Civ.P. 15(c)(3)(B). The mistaken identity issue here can be separated into two subissues: (i) is mistaken identity limited to cases of misnomer or improper naming or does it also extend to cases where the plaintiff was mistaken about the identity of a separate defendant? and (ii) did the Carlinos know, or should they have known, that but for a mistake they would have been named as defendants from the outset? The majority disposes of Lundy's claims without reaching the merits ostensibly because "Dr. Carlino [had] no reason during the relevant period to believe that the Lundys had intended to sue him." Maj.Op. at 1183.

Lundy contends that on a fair reading of Paragraphs 2 and 4-8 of his Complaint, [FN11] the Carlinos knew or should have known that the claims were equally applicable to them and that, but for a mistake concerning the employer of Nurse Slusher, that Lundy would have named the Carlinos as defendants from the outset of the litigation. Br. of Appellant at 37. Agreeing, the magistrate judge ruled that within the 120-day allowance of (then) Rule 4(j) the Carlinos "should have been aware that but for a mistake concerning the appropriate employer of Ms. Slusher, the initial action would have been brought directly against [them]." Mem.Op., Civ. No. 91-3183(WGB), at 7 (D.N.J. July 7, 1992) (Rosen, Mag. J.), *in* App. at 477a. The district court purported to subject the magistrate judge's ruling that the Carlinos should have known they were intended defendants to the "clearly erroneous or contrary to law" standard of Federal Rule of Civil Procedure 72(a). Mem.Op. at 14- 15 (App. 622a-23a); *see Snow Machines, Inc. v. Hedco, Inc.,* 838 F.2d 718, 727-28 (3d Cir.1988).

FN11. These paragraphs allege:
2. At all times material hereto, Defendant acted, and failed to act, by and through its

agents, servants, work persons and employees in the course and scope of employment.

.   .   .   .   .

4. At all times material hereto, Defendant, as the owner in possession of a hotel, restaurant and gambling complex open to the public, was under a duty to its business invitees to have proper first aid facilities and personnel available to its business invitees and was also under a duty to its business invitees to take reasonable action to render first aid to such business invitees, when necessary.
5. At all time[s] material hereto, Defendant knew, and had reason to know, that Plaintiff had suffered a cardiac arrest and required first aid, oxygen and other medical attention.
6. Defendant negligently, recklessly and carelessly failed to perform its duty to Plaintiff by failing to have such emergency-first aid facilities, oxygen or medical personnel available.
7. Although Defendant telephoned for an ambulance to take Plaintiff to the hospital, it otherwise rendered no first aid or emergency medical treatment whatsoever to Plaintiff, despite his crucial need for same.
8. Due to all the foregoing, Defendant increased the likelihood of harm to the Plaintiff.
App. 10a-11a (Complaint).

Laboring under what it believed to be a "clearly erroneous" standard of review as to the facts, the district court reversed the magistrate judge's conclusion *purely on legal grounds.* [FN12] In particular, the district court **\*1192** held that Rule 15(c)(3) does not allow a party to add a "new defendant," but instead allows only the correction of a "misidentification of a defendant." Mem.Op. at 22, 24-25 (App. at 630a, 632a-33a). As developed *infra* at 1181-82, ruling is contrary to precedent binding on the district court, and the majority does not hold otherwise, *see* Maj.Op. at 1183 n. 14. Alternatively, the district court concluded that a Third Party Complaint cannot as a matter of law suffice to put the party to be added on notice that the plaintiff had made a mistake of identity. *See* Mem.Op. at 23-25. I have explained my reasons for disagreeing with this conclusion *supra* in Part I.B.1.

FN12. While the district court did describe the magistrate judge's conclusion that Rule 15(c)(3) had been satisfied as being "clearly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

erroneous," *see* Maj.Op. at 1183 n. 13; Mem.Op. at 25, the context of the sentence leaves no doubt that the court was referring to the magistrate judge's conclusions of *law*, not his factual findings. The majority does not indicate otherwise. *See* Maj.Op. at 1177 ("Because the district court's decision regarding Rule 15(c) was based on the court's interpretation of the Federal Rules of Civil Procedure, we exercise plenary review of this decision...."). I am puzzled, then, by the majority's assertion that it owes "no deference" to the magistrate judge's findings of fact. *See* Maj.Op. at 1183 n. 13. Insofar as the district court adopted (that is, did not disapprove of) the magistrate judge's findings of fact, we review them for clear error. That is, while the district court may review the magistrate judge's findings of fact *de novo* under Federal Rule of Civil Procedure 72(b), an appellate court may not, for the obvious reason that we are reviewing the district court's, not the magistrate judge's, findings of fact, and such review is governed by the clearly erroneous standard.

The majority does not rest its conclusion on either of these two legal grounds, though. Since the district court left the magistrate judge's finding of fact undisturbed (that is, adopted it as correct for our purposes), as the majority acknowledges, *see* Maj.Op. at 1183 n. 14, we are to review the factual conclusion that the Carlinos should have known that they were intended defendants for clear error. *See Varlack v. SWC Caribbean, Inc.,* 550 F.2d 171, 174 (3d Cir.1977) (establishing that the question of whether the conditions of Rule 15(c), including whether the party to be added "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him," have been met is a question of *fact* subject to review for *clear error* ). Accordingly, the majority seems to be holding that the magistrate judge clearly erred in his finding, *see* Maj.Op. at 1183 n. 14, although it fails to point to any contrary evidence in the record besides the allegations in Lundy's Complaint and Lundy's delay.

### (1) Adding a Party Under Rule 15(c)(3)(B)

Regarding the first issue, Rule 15(c) on its face applies to the changing of a party, not just to correcting a misnomer. The plain language of the rule states that the requirements of Rule 15(c)(3) apply to "amendment[s] chang [ing] the party *or* the naming of the party" and therefore Rule 15(c) most

clearly contemplates that changing a party can relate back. Since the Rule on its face draws no distinction between the two scenarios, I feel constrained to conclude that Rule 15(c)(3) allowed Lundy to relate back the *addition* of the Carlinos as defendants. *See Business Guides, Inc. v. Chromatic Communications Enters., Inc.,* 498 U.S. 533, 540, 111 S.Ct. 922, 928, 112 L.Ed.2d 1140 (1991) (holding that courts are to " 'give the Federal Rules of Civil Procedure their plain meaning' " (quoting *Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 123, 110 S.Ct. 456, 458, 107 L.Ed.2d 438 (1989))).

Adding a party is essentially no different from changing a party. The minor difference between the addition and the replacement of a party is whether the original defendant is dismissed in addition to the new defendant being added, which is not *ipso facto* conclusive as to what the defendant to be added knew or should have known concerning whether the plaintiff was mistaken about the newly-added defendant's identity. Most courts have thus held that a new party may be added or substituted for another. [FN13] **\*1193** Most importantly, this Circuit has interpreted Rule 15(c) to allow for the *addition* of a new party. *See Bloomfield Mech. Contracting, Inc. v. Occupational Safety & Health Review Comm'n,* 519 F.2d 1257, 1262 (3d Cir.1975) (explaining, in the context of the *addition* of other parties, that the purpose of Rule 15(c) "is to ameliorate the effect of a statute of limitations where the plaintiff has sued the *wrong party* but where the right party has had adequate notice of the institution of the action" (emphasis supplied)).

> FN13. *See Garvey,* 993 F.2d at 778 n. 6, 783 n. 17 (allowing plaintiff to amend his complaint to add the United States as a defendant under the Federal Tort Claims Act where plaintiff had initially sued individual federal officials under a *Bivens* theory); *Fromson v. Citiplate, Inc.,* 886 F.2d 1300, 1303-04 (Fed.Cir.1989) (allowing the plaintiff to relate back the amendment of his complaint to add the two owners of a corporation which already was a defendant as defendants); *Berndt,* 796 F.2d at 883-84 (allowing the plaintiff to substitute state officials for the state and a state agency in a § 1983 case); *Itel Capital Corp. v. Cups Coal Co.,* 707 F.2d 1253, 1258 & n. 9 (11th Cir.1983) (allowing the plaintiff to relate back the amendment of his complaint to add a new defendant after the limitations period had expired: "we read the word 'mistake' in

Rule 15(c) liberally."); *Heinly v. Queen,* 146 F.R.D. 102, 107 (E.D.Pa.1993) ("The 'mistake condition' in [the] third element is not limited to cases of misnamed or misdescribed parties, rather the Rule is widely-understood to allow the addition of new parties that were never originally named or described." (citing *Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc.,* 801 F.Supp. 1450, 1457 (E.D.Pa.1992)); *Smith v. TW Servs., Inc.,* 142 F.R.D. 144, 149-50 (M.D.Tenn.1991) (allowing plaintiff to add a separate defendant not named in the initial complaint); *Swartz,* 91 F.R.D. at 547 (holding that a "new defendant should have known that but for a mistake concerning identity the action would have been brought against him ... 'whenever a party who may be liable for the actionable conduct alleged in the Complaint was omitted as a party defendant.' " (quoting *Williams v. Avis Transp. of Can., Ltd.,* 57 F.R.D. 53, 55 (D.Nev.1972))); 6A WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1498, at 126-29 ("The word 'changing' [in Rule 15(c) ] has been liberally construed by the courts, so that amendments simply *adding* or dropping parties, as well as amendments that actually substitute defendants, fall within the ambit of the rule.... [T]here is no justification for a restrictive interpretation of the word 'changing' that would require a plaintiff to choose among defendants." (emphasis supplied)); *cf. Loudenslager v. Teeple,* 466 F.2d 249, 250-51 (3d Cir.1972) (allowing the plaintiff to amend his complaint to substitute the personal representative of the decedent's estate for the decedent); *see also* 6A WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1498, at 103-04 (stating that Rule 15(c) "alters the general rule that new parties ... cannot be *added* to an action by amendment after the applicable limitations period has expired" (emphasis supplied)), *cited with approval in Bloomfield Mech. Contracting, Inc. v. Occupational Safety & Health Review Comm'n,* 519 F.2d 1257, 1262 (3d Cir.1975); *Dandrea v. Malsbary Mfg. Co.,* 839 F.2d 163, 166 (3d Cir.1988) (deciding whether plaintiff's amendment changed the party or merely updated the party's name); *Mitchell v. Hendricks,* 68 F.R.D. 564 (E.D.Pa.1975) (allowing plaintiff's

amendment of his complaint to relate back where plaintiff mistakenly named the wrong person as the defendant and the newly named defendant had received informal notice of plaintiff's initial complaint). *But cf. Worthington v. Wilson,* 8 F.3d 1253, 1256-57 (7th Cir.1993) (reading Rule 15(c) to exclude naming a different party "due to a lack of knowledge as to their identity" rather than as to their correct name); *Campbell v. Ward,* 792 F.Supp. 1150, 1153 (E.D.Mo.1992) (same); *Wells v. HBO & Co.,* 813 F.Supp. 1561, 1567 (N.D.Ga.1992) (denying plaintiff's motion to amend complaint where plaintiff had deliberately not sued a party whose identity plaintiff had known from the outset).

The many other courts to have recognized the "identity of interest" exception to Rule 15(c) have also necessarily held that Rule 15(c) allows for the addition of a party, rather than only for the correction of a party's name. *See, e.g., In re Allbrand Appliance & Television Co.,* 875 F.2d 1021, 1025 (2d Cir.1989). *See generally* Wright et al., Federal Practice and Procedure § 1459.

 Allowing for the addition of a new party is particularly compelling in circumstances where, as here, the need for the addition was caused by the plaintiff's misunderstanding concerning the fact that two separate legal entities were operating within the same physical structure. Certainly the separate legal entity (in this case the Carlinos), especially when it is not normally expected to be engaged at the premises (as presently is the case), has reason to know that it has not been named because of ignorance of its separate legal existence. That is true even more so in a case such as this where the plaintiff was unconscious during the happening of the relevant events and hence obviously could not have been aware of such legal niceties.

### (2) *What the Carlinos Should Have Known*

 As to the second subissue, concerning what the Carlinos knew or should have known, Lundy asserts that the Carlinos should have known that, but for Lundy's mistake concerning Nurse Slusher's employer, Lundy would have named them as defendants when he first filed his complaint. I agree with Lundy that the magistrate judge did not clearly err. First, Lundy's Complaint indicated that he was proceeding under a theory of *respondeat superior.* *See* App. 10a (Complaint ¶ 2). Given the lax nature

of notice pleading under the Federal Rules of Civil Procedure [FN14] and the circumstance that Lundy**1194** was without his faculties during the relevant time frame, it was not incumbent upon Lundy to name the particular employees involved and not involved in his medical emergency, the majority's implications notwithstanding, *see* Maj.Op. at 1183 n. 14 (apparently conceding that, had Lundy expressly named Nurse Slusher, the Carlinos should have known of the mistake).

> FN14. Federal pleading rules rely only on "notice pleading." *See* Fed.R.Civ.P. 8(a)(2) (a complaint shall set forth "a *short* and *plain* statement of the claim showing that the pleader is entitled to relief" (emphasis supplied)). The Supreme Court rehearsed the proper role of pleadings in *Conley v. Gibson,* 355 U.S. 41, 47-48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957):
> [T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" [, Fed.R.Civ.P. 8(a)(2),] that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.... Such simplified "notice pleading" is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues.... The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.
> *Id.* (citation substituted for footnote); *see Universe Tankships, Inc. v. United States,* 528 F.2d 73, 75 (3d Cir.1975) (notice pleading requires a party only to "disclose adequate information as the basis of his claim for relief" (internal quotation omitted)); *see also, e.g., Quinones v. United States,* 492 F.2d 1269, 1273 (3d Cir.1974) (" 'a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief' " (quoting *Conley,* 355 U.S. at 45-46, 78 S.Ct. at 102)). The Appendix of Forms to the Federal Rules

of Civil Procedure, Form 9, is illustrative of the bare-bones allegations recommended by the Rules in a negligence action. That form calls for an "[a]llegation of jurisdiction," a *brief* description of the underlying event, a *brief* description of plaintiff's injuries, and a prayer for relief. For this reason I remonstrate that the majority in effect relies on the fact that Lundy complied with the lax standards established by the Rules, rules designed to prevent errors in pleading technicalities from displacing resolutions on the merits, to argue that the plaintiff did not provide adequate notice. To the contrary, I find these lax standards important because the Carlinos should have known that under the federal rules Lundy was *not* bound by the exact allegations or the precise theories encapsulated in his Complaint, and thus they could not have reasonably relied on other theories of liability, additional facts, or additional parties not being added later. In sum, the philosophy of federal notice pleading is an essential backdrop when adjudging what a potential defendant "should have known," and what the Carlinos "should have known" when they were served with a copy of Lundy's complaint even though no employee of theirs was specifically named therein.

In addition, Lundy alleged that the substance of Trop World's negligence was its failure to provide proper first aid facilities and medical treatment. *See* App. 11a (Complaint ¶ ¶ 5-7). Thus, had Nurse Slusher and Dr. Carlino been employees of Trop World instead of independent contractors, anyone would immediately conclude that Trop World should have known that in his complaint Lundy alleged that Nurse Slusher's and/or Dr. Carlino's negligence caused Lundy's injuries. The fact that another entity was Nurse Slusher's employer does not take much away from the force of the conclusion that her employer was fully implicated in the lawsuit. Since the Carlinos knew that *they* and not Trop World were responsible for Nurse Slusher and the medical facilities at Trop World, the Carlinos should have known that (1) Nurse Slusher's alleged negligence and Trop World's alleged negligent failure adequately to prepare for medical emergencies was the gravamen of Lundy's complaint (the merits of this claim are, of course, irrelevant at this juncture); (2) Lundy was simply confused about the employer of Nurse Slusher; and (3) Lundy was unaware that Trop World had delegated to the Carlinos the

34 F.3d 1173                                                                                          Page 22
34 F.3d 1173, 29 Fed.R.Serv.3d 496
**(Cite as: 34 F.3d 1173)**

responsibility to provide medical care to patrons and guests. Had the Carlinos, charged with familiarity with the events of that evening, genuinely considered whether they were intended defendants when served by Trop World, they would have concluded "very likely," and I think that satisfies Rule 15(c)(3)(B).

 In my view, no competent attorney cognizant of the federal rules reading Lundy's complaint and aware of the facts as known to the Carlinos would have thought the Carlinos were completely off the hook. One cannot expect Lundy to have possessed the prescience to discover that Nurse Slusher was an independent contractor rather than an employee *before* filing his complaint. The majority does not suggest why the Carlinos could reasonably *expect* that Lundy knew this fact and was merely making a "strategic" choice not to sue the responsible entity. It will be when this opinion is filed that the Carlinos for the first time since receiving Trop World's Third Party Complaint will be able to breathe a sigh of relief.

 **\*1195** The cases the majority relies upon are readily distinguishable. *Lovelace v. O'Hara,* 985 F.2d 847, 850-51 (6th Cir.1993) held that the defendant in an action under 42 U.S.C.A. § 1983 (1981) had no reason to believe that the plaintiff would amend her complaint to sue him in his individual capacity because the plaintiff's original complaint unequivocally "evidence[d] an intentional choice ... to bring an official capacity suit." There the plaintiff had known of the defendant's identity and exact involvement in the events responsible for the case all along. Moreover, the court stressed that the amendment would have prejudiced the defendant, since the amendment would have exposed the defendant to personal liability, altered the elements of recovery and defense, and required major changes in pleading, discovery, trial preparation, and selection of witnesses. Similarly, in *Curry v. Johns-Manville Corp.,* 93 F.R.D. 623, 626-27 (E.D.Pa.1982) the court held that a third-party claim by the original defendant did not provide the third-party defendant with reason to know that plaintiff may sue it where plaintiff *actually knew* the identity of the third-party defendant and its part in the underlying events long before the expiration of the statute of limitations. Those cases share the common rationale that, where the defendant that the plaintiff seeks to add knew that the plaintiff was aware long before the statute of limitations expired both of that defendant's particular role in the underlying events and of its separate legal identity, that defendant was reasonably led to believe that the plaintiff deliberately chose not to name it as a

defendant from the outset. That rationale is inapposite to this case.

### b. *The Matter of Lundy's Delay in Amending His Complaint*

 Moreover, I am driven to conclude that Lundy's lengthy, unexcused delay in amending his complaint does not affect the analysis of whether the Carlinos should have known that, but for a mistaken identity, Lundy would have named them in his original complaint. Although the Carlinos do not phrase it as such, they essentially argue that Lundy inexcusably neglected to name them as defendants for approximately eight months after Lundy learned that the Carlinos were Trop World's independent contractors. *See* Br. of Third Party Appellee at 8-9, 13. [FN15] The district court espoused a similar legal theory, and the majority also seems to latch onto it. *See* Maj.Op. at 1183; Slip Op. at 23, *in* Br. of Appellant at 67.

> FN15. There is no denying that Lundy was sluggish amending his complaint. The record shows that on September 12, 1991, Trop World filed its Third Party Complaint against the Carlinos. *See* App. 21a-39a. A cursory reading of the attached Contract for Medical Services, particularly in light of the common knowledge that medical doctors are often independent contractors, would have revealed to a reasonable attorney that the Carlinos were independent contractors who were responsible for providing nursing services at Trop World during the time that Nurse Slusher provided medical assistance to Lundy. *See* App. 29a, 34a (Contract for Medical Services at 2, 7). Moreover, on both December 26 and December 31, 1991, the Carlinos' counsel informed Lundy's counsel that Nurse Slusher no longer worked for the *Carlinos.* App. 455a (Letter of 12/26/91); *id.* 456a (Letter of 12/31/91). Finally, Lundy deposed Nurse Slusher and the Greenbergs in mid March, 1992. Nevertheless, Lundy did not seek to amend his complaint to add the Carlinos as defendants until May 28, 1992, about eight months after Lundy should have known that the Carlinos were independent contractors, about five months after he should have known that the Carlinos employed Nurse Slusher, and over two months after he had actual knowledge of Nurse Slusher's employment situation.
> At oral argument Lundy tried to explain

away the delay by reference to his fear of Rule 11 sanctions. *See* Fed.R.Civ.P. 11 (authorizing sanctions against parties asserting groundless claims). But that does not illuminate the reason for the two-month delay after Lundy had deposed his final fact witness. Moreover, that answer does not explain why there was any more reason to fear Rule 11 sanctions for naming the Carlinos, already parties to the litigation, as defendants as opposed to naming Trop World as a defendant when he initiated his suit.

Some courts of appeals specifically include undue delay as a component of the "should have known" prong of the Rule 15(c) analysis. But those cases are in the main very different, because in them the parties to be added never had notice during the Rule 4(m) period that they were intended defendants in the action in question, and the plaintiff's procrastination **\*1196** occurred during the limitations period. [FN16]

> FN16. *See Keller v. Prince George's County,* 923 F.2d 30, 34 (4th Cir.1991) (reasoning that because plaintiff did not file a complaint against the defendants before the running of the limitations period, although she was aware of their identity and involvement from the day the underlying events occurred, they had no reason to suspect that but for a mistake as to their identity she would have originally named them); *Kilkenny v. Arco Marine Inc.,* 800 F.2d 853, 856-57 (9th Cir.1986) (refusing to allow plaintiff to name the original defendant's subsidiaries as defendants in an untimely amendment because the subsidiaries had no reason to know plaintiff was mistaken about their identity: the plaintiff had been informed by the original defendant two years before the statute of limitations ran that the subsidiaries were probably the proper defendants and the plaintiff had sued the subsidiaries in another forum, which suit was dismissed after 14 months (nine months before the running of the statute of limitations) for lack of prosecution), *cert. denied,* 480 U.S. 934, 107 S.Ct. 1575, 94 L.Ed.2d 766 (1987).

More on point is *Seber v. Daniels Transfer Co.,* 618 F.Supp. 1311, 1313-14 (W.D.Pa.1985). There the court allowed the plaintiff to relate back his second amended complaint filed on August 6, 1984, to the date of his original complaint, March 30, 1984. The statute of limitations on plaintiff's age discrimination claim expired on April 1, 1984. The court found there was no "undue delay" despite the four months it took plaintiff to amend his complaint because "counsel underwent a contentious period of discovery during which it may have been difficult to identify all responsible parties and their positions." *Id.* at 1314. The court did not find the delay dispositive, but held instead that the "plaintiff here may take advantage of a rule designed to prevent overly technical applications of the statute of limitations where it appears that responsible parties will not be unfairly prejudiced in defending against an otherwise untimely lawsuit." *Id.*

As the Court of Appeals for the Tenth Circuit sagaciously pointed out in *Anderson v. Deere & Co.,* 852 F.2d 1244, 1247-50 (10th Cir.1988), [FN17] so long as the defendant had notice, was not prejudiced, and should have known of plaintiff's mistake within 120 days of the expiration of the statute of limitations, the language of Rule 15(c) does not distinguish between timely and untimely amendments. *See* Fed.R.Civ.P. 15(c) advisory committee note-- 1991 amendment (assuming the other requirements are met, "a complaint may be amended *at any time* to correct a formal defect such as a misnomer or misidentification" (emphasis supplied)). Conspicuously absent from Rule 15(c) is any hint that the complaint must be amended within the Rule 4(m) period--it speaks only of notice, lack of prejudice, and reason to know of a mistake within that time frame. *See supra* at 1179. Obviously receipt of service after amendment of the complaint would provide all three, but it is not a prerequisite. The courts to hold otherwise neglect the liberal policy supporting the Rules and essentially punish the plaintiff when no prejudice or harm results to the defendant.

> FN17. *Anderson* held that the district court improperly refused to allow plaintiffs to relate back their amendment of their complaint to name the parent of the original defendants as a defendant. The plaintiffs had learned of the parent's identity only after the limitations period had expired, but then they failed to seek to amend their complaint for nine months and waited an additional two months to serve the new defendant.

Rule 15(c) is subject to Rule 15(a), which provides that a court shall freely give leave for a party to amend its pleadings "when justice so requires." That

subsection, not Rule 15(c), is the correct one to deal with the delay aspect of the amendment.  No doubt undue delay causing prejudice could bar Lundy from amending his complaint to add a newly-named defendant under Rule 15(a) because in such situations justice would not require it.  *See, e.g., Adams v. Gould Inc.,* 739 F.2d 858, 867-68 (3d Cir.1984) ("[U]nder the liberal pleading philosophy of the federal rules as incorporated in Rule 15(a), an amendment should be allowed whenever there has not been undue delay, bad faith on the part of the plaintiff, or prejudice to the defendant as a result of the delay.").  This Court has often held that, absent undue or substantial prejudice, an amendment should be allowed under Rule 15(a) unless "denial [can] be grounded in bad faith or dilatory motive, *truly undue or unexplained delay,* repeated failure to cure deficiency by amendments previously allowed, or futility of amendment." *Bechtel v. Robinson,* 886 F.2d *1197 644, 652-53 (3d Cir.1989) (internal quotation omitted); *Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of V.I., Inc.,* 663 F.2d 419, 425 (3d Cir.1981) (same), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982).

 Similar in result is *Skehan v. Board of Trustees,* 590 F.2d 470 (3d Cir.1978), *cert. denied,* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979), in which the district court had not even addressed Rule 15(c) since it refused to allow an amendment under Rule 15(a) regardless of whether Rule 15(c) would countenance it.  There we held that "[a]lthough district courts are required to allow amendments under the terms of [Rule 15(a) ], certain factors, such as *undue prejudice* to the other party and *undue delay* by the movant, have been found to establish sufficient justification for the denial of such motions." *Id.* at 492 (emphasis supplied). [FN18]  That is because "prejudice to the nonmoving party is the touchstone for the denial of the amendment." *Arco Chem. Co.,* 921 F.2d at 488 (quoting *Bechtel,* 886 F.2d at 652) (internal quotations omitted);  *see Evans Prods. Co. v. West Am. Ins. Co.,* 736 F.2d 920, 923 (3d Cir.1984) ("The primary consideration in determining whether leave to amend under Fed.R.Civ.P. 15(b) should be granted is prejudice to the opposing party.").     But as discussed above, *see supra* Part I.B.2, the Carlinos were not prejudiced by Lundy's delay.

FN18. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (holding that absent "*undue delay,* bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously

allowed, *undue prejudice* to the opposing party by virtue of the amendment, futility of the amendment, etc.," leave to amend should be freely given (emphasis supplied)); *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1414 (3d Cir.1993) ("In the absence of substantial or undue prejudice, denial instead must be based on bad faith or dilatory motives, *truly undue or unexplained delay,* repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment." (emphasis supplied)) (affirming district court's denial of an amendment sought three years after initiation of the action, at which time plaintiff already knew most of the relevant facts, and two years after her second amendment of the complaint, at which time she probably knew all the facts);  *see also* 3 JAMES WM. MOORE & RICHARD D. FREER, MOORE'S FEDERAL PRACTICE ¶ 15.08[2], at 15-49 (2d ed. 1993) (stating that leave to amend should not be granted if the moving party has acted for the purpose of delay, the opposing party will be unduly prejudiced, or the trial of the issues will be unduly delayed);  *id.* ¶ 15.08[4], at 15-69 to -75 ("The most common reasons for denying leave to amend are that the amendment will result in *undue prejudice* to the other party, is *unduly delayed,* is offered in bad faith or for dilatory purposes, or that the party has had sufficient opportunity to state a claim but has failed" (emphasis supplied, footnotes omitted)).

 Moreover, this Court has repeatedly stated outright that unexcused delay unaccompanied by real detriment to the defendant or to the judiciary does not constitute undue delay. [FN19]  That is because undue delay refers solely to delay in the proceedings, not to delay in amending the pleadings. [FN20] The animating spirit of Rule 15, in short, does not sanction a ruling that would punish a party for delaying an amendment to the complaint. *1198 *See Anderson,* 852 F.2d at 1248-49 & n. 15 (suggesting, though, that Rule 11 sanctions may be appropriate).

FN19. *See Cornell & Co., Inc. v. Occupational Safety & Health Comm'n,* 573 F.2d 820, 823 (3d Cir.1978) ("Delay alone ... is an insufficient ground to deny an amendment, unless the delay unduly prejudices the non-moving party."); *Adams,* 739 F.2d at 868 ("The passage of time,

without more, does not require that a motion to amend a complaint be denied; however, at some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party."); *Deakyne v. Commissioners of Lewes,* 416 F.2d 290, 300 n. 19 (3d Cir.1969) ("We do not believe delay alone is a sufficient measure of prejudice[;] the element of delay is pertinent only to the extent that it combines with some extrinsic occurrence which brings about actual and significant prejudice to the opponent." (internal quotation omitted)); *see also* 3 JAMES WM. MOORE & JO D. LUCAS, MOORE'S FEDERAL PRACTICE ¶ 15.08 [4], at 15-76 (2d ed. 1994) ("It should be emphasized, however, that while laches and unexcused delay may bar a proposed amendment, delay alone, regardless of its length, is not enough to bar it if the other party is not prejudiced.").

FN20. *See Boileau v. Bethlehem Steel Corp.,* 730 F.2d 929, 939 (3d Cir.1984) ("[T]he delay exception in amending the complaint refers to delay in the actual proceeding in which the complaint occurs, not delay in bringing suit."), *cert. denied,* 469 U.S. 871, 105 S.Ct. 221, 83 L.Ed.2d 150 (1984); *Adams,* 739 F.2d at 868-69 (stating that "undue delay" refers to placing "an unwarranted burden on the court" and holding that plaintiff's delay in amending the complaint to add a new legal theory until after defendant was granted summary judgment by this Court on an interlocutory appeal did not constitute "undue delay").

To summarize, in this case the Carlinos suffered no actual prejudice, and, the amendment having occurred before trial was scheduled, there was no undue delay in the proceedings. Hence Lundy's delay in amending his complaint to name the Carlinos as defendants is completely beside the point. Consequently, I conclude that the district court should have allowed Lundy to amend his complaint to add the Carlinos as original party defendants. [FN21]

FN21. I agree with the majority's reading of New Jersey law concerning relation back of pleading amendments, see Maj.Op. at 1183-84; *see Lawlor v. Cloverleaf Memorial Park,*

*Inc.,* 56 N.J. 326, 266 A.2d 569, 576-79 (1970); *Greco v. Valley Fair Enters.,* 105 N.J.Super. 582, 253 A.2d 814, 815-16 (App.Div.1969); *De Sisto v. City of Linden,* 80 N.J.Super. 398, 193 A.2d 870, 874-75 (Law Div.1963), and thus concur that Lundy has not brought himself within Rule 15(c)(1).

As a final note on the delay factor, it has not eluded me that the Carlinos were intent on not getting themselves involved in this lawsuit. At no time did they seek or receive assurances that Lundy would not add them as defendants. For this reason, I do not believe the delay was material to what the Carlinos should have known: once having been put on notice during the limitations period, the absence of a quick amendment did not take them off notice. *Cf. Kilkenny,* 800 F.2d at 857 (plaintiff was informed of the proper defendants long before expiration of the limitations period) ("A plaintiff's failure to amend its complaint to add a defendant after being notified of a mistake concerning the identity of a proper party ... *may* cause the unnamed party to conclude that it was not named because of strategic reasons rather than as a result of plaintiff's mistake." (emphasis supplied)); *Potts v. Allis-Chalmers Corp.,* 118 F.R.D. 597, 608-09 (N.D.Ind.1987) (same).

Moreover, considering the parties' repeated and close interactions, the Carlinos could easily have set their minds at ease, but did not, perhaps in the hope that they would obtain the outcome the majority now hands them. Hence I do not agree with the majority that the Carlinos' suspicions evaporated over time (even assuming that were relevant), or, indeed, with its hyperbole that the Carlinos "had affirmative reason to believe that the Lundys did not wish to assert liability against [them]." Maj.Op. at 1183.

Based on the foregoing, I would vacate the district court's order and decision denying Lundy's motion to relate back the amendment of his pleadings to add the Carlinos as original party defendants, and remand with instructions to reconsider the magistrate judge's recommendation using the proper legal standards.

## II. DUTIES A LANDOWNER OWES A BUSINESS INVITEE IN NEW JERSEY

Although I concur with the majority in its disposition of Lundy's claim against Trop World in Part III.A of the majority opinion, I write separately to express my disagreement with the majority's conclusion in Part III.B that under New Jersey tort law Trop World would be entitled to summary judgment even if

Nurse Slusher had been its employee. *See* Maj.Op. at 1179-80, 1180-81. Although the precise holding reached by the majority escapes me, *see infra* at 1191-92, the majority appears to conclude that Trop World fully satisfied its duties toward Lundy when it called for emergency help.

Because I conclude that Trop World was under a duty to take *reasonable affirmative steps* to assist Lundy when he suffered a cardiac arrest *in addition to* summoning emergency care, a position the majority at points appears to accept hypothetically to be the law, *see* Maj.Op. at 1179-80, 1180-81, I do not believe that New Jersey's Good Samaritan Act, 2A N.J.Stat.Ann. § 62A-1, would shield Trop World (according to the majority's hypothetical) from liability were it Nurse Slusher's employer, or the Carlinos from liability had they effectively been made defendants in this case. I also believe that the question whether Nurse Slusher behaved reasonably under the circumstances when she refused to retrieve the intubation kit from her office when Dr. Greenberg requested it is a question a jury should answer.

**\*1199** A. *General Principles of New Jersey Tort Law*
Absent a duty, a party cannot be held liable for negligent conduct under principles of New Jersey negligence law. *See Weinberg v. Dinger,* 106 N.J. 469, 524 A.2d 366, 373-74 (1987). In New Jersey, the question whether a duty exists is a matter of law and rests largely on questions of fairness and public policy. *Cheng Lin Wang v. Allstate Ins. Co.,* 125 N.J. 2, 592 A.2d 527, 534 (1991); *Kelly v. Gwinnell,* 96 N.J. 538, 544, 476 A.2d 1219, 1222 (1984). " 'The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.' " *Cheng Lin Wang,* 592 A.2d at 534 (quoting *Kelly,* 96 N.J. at 544, 476 A.2d at 1222). I bear in mind that the New Jersey Supreme Court values flexibility, *see Wytupeck v. Camden,* 25 N.J. 450, 462, 136 A.2d 887 (1957), and that in New Jersey the question whether or not a duty exists will depend on the facts of each case, *Cheng Lin Wang,* 592 A.2d at 534.

New Jersey has set the standard of care a landowner owes another based on the relationship or status between the parties. *See Snyder v. I. Jay Realty Co.,* 30 N.J. 303, 153 A.2d 1, 5 (1959). New Jersey distinguishes among invitees, who "first come by invitation, express or implied;" licensees, "who are not invited but whose presence is suffered;" and trespassers, who "are neither invited nor suffered." *Id.* (internal quotations omitted). All parties agree that Lundy was a business invitee. *See* Br. of

Appellant at 17; Br. of Appellee at 13. With this background in mind, I will tackle the formidable question whether a jury could find that the Carlinos (or Trop World, assuming it was Nurse Slusher's employer) breached a standard of care they owed to Lundy. [FN22]

> FN22. I note that Lundy has not proffered any evidence that Trop World advertised the availability of medical services on the premises and that he patronized Trop World on that basis. Thus the majority does not consider to what extent, if any, these factors would influence the analysis of Trop World's duties or the application of New Jersey's Good Samaritan Act. On a similar note, Lundy has also not claimed he was an intended third party beneficiary of the contract formed between Trop World and the Carlinos, and so that issue is not before this Court either.

### B. *Duties Arising from the Landowner-Invitee Relationship*
Neither the parties nor I has found any decision by the New Jersey Supreme Court, or any other New Jersey court, treating the question presented, namely, the scope of a business' duty, if any, to aid or assist a business invitee when an invitee requires emergency aid through no fault of the landowner. [FN23] In this predicament I cannot help but resort to treatises and decisions in sister jurisdictions to divine how the New Jersey Supreme Court would rule, keeping in mind its general policies toward tort liability. [FN24]

> FN23. In *Adamowicz v. Claridge at Park Place, Inc.,* 522 N.Y.S.2d 884, 135 A.D.2d 769 (1987), the New York Supreme Court, Appellate Division, purported to apply New Jersey law when it held in a case much like this one that a casino/hotel owed "no duty, either at common law or by statute, rule, or code, ... to render aid to a sick patron." 522 N.Y.S.2d at 885. The court, however, did not bother to cite a single New Jersey statute or case, or, for that matter, any sister state's law or other legal authority in support of its conclusion. Such "authority" is singularly unpersuasive.

> FN24. *Cf. Moody v. Security Pac. Business Credit, Inc.,* 971 F.2d 1056, 1063 (3d Cir.1992) ("[w]here Pennsylvania law is silent, we may look to the law in other jurisdictions"); *Pennsylvania Glass Sand*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1167 (3d Cir.1981) (we may consider "[t]he policies underlying the applicable legal doctrines, the doctrinal trends indicated by these policies, and the decisions of other courts," and may additionally "consult treatises, the Restatement, and the works of scholarly commentators"); *McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657, 663 (3d Cir.1980) ("In sum, a federal court attempting to forecast state law must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data."), *cert. denied,* 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980).

 As the majority notes, the early common law of England, later transposed to the United States, did not recognize a duty to rescue or assist another who was too ill to take care of him- or herself. A sense of rugged individualism combined with the harsh realities of industrialization formed an impenetrable shield of immunity around all who failed to help, even those who could, with the greatest **\*1200** of ease, prevent the most violent and senseless of deaths. Over the years, as commentators decried these decisions as revolting and an outrage to the moral conscience, courts worked widening inroads on that antiquated and perverse doctrine.

 The clearly prevailing view today is that social policy justifies the imposition of a duty to act if one of a burgeoning group of special relationships exists between the parties. *See generally* W. PAGE KEETON ET AL., THE LAW OF TORTS § 56, at 373-76 (5th ed. Lawyers ed. 1984); 3 FOWLER V. HARPER ET AL., THE LAW OF TORTS § 18.6, at 718-21 (2d ed. 1986). Absent such a special relationship, the unquestionably widely prevailing view still is that there is no duty to rescue the helpless. *See, e.g.,* Rest.2d Torts § 314 & cmt. *c* (1965). *See generally* Jay Silver, *The Duty to Rescue: A Reexamination and Proposal,* 26 Wm. & Mary L. Rev. 423 (1985).

 The special relationship bearing on this case is that between a business and an invitee. *See supra* at 1191. The Restatement (Second) of Torts § 314A [FN25] succinctly explains the business' duty in that context:

> FN25. Section 314A has met with astounding success: the great majority of the cases mentioned in this section handed

down after 1965 adopt it or cite it with approval. Incidentally, the lone published New Jersey case to reference § 314A, albeit tangentially, did so approvingly. *See McIntosh v. Milano,* 168 N.J.Super. 466, 403 A.2d 500, 509 (Law Div.1979).

> (1) A common carrier is under a duty to its passengers to take *reasonable action*
> (a) to protect them against unreasonable risk of physical harm, and
> (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.

> .    .    .    .    .

> (3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.

Rest.2d Torts § 314A (emphasis supplied). The essential imperative to be drawn from this language is the directive of "reasonable action."

 Contrary to the apparent holding of the majority, *see infra* at 1191-1192, I deduce from the case law that "reasonable action" may exceed the mere summoning of emergency care. The modern, general common law recognizes that, where the law imposes a duty to rescue, in harmony with general principles of negligence law it demands of those subject to the duty of reasonable care under the circumstances. *See* KEETON ET AL., THE LAW OF TORTS § 56, at 377. For example, one renowned commentator writes that the one owing the duty "will seldom be required to do more than *give such first aid as he reasonably can,* and take reasonable steps to turn the sick person over to a doctor or to those who will look after him until one can be brought." *Ibid.* (emphasis supplied); *accord* Rest.2d Torts § 314A cmt. *f.* [FN26]

> FN26. Comment *f* to § 314A of the Restatement provides:
> The defendant ... is not required to take any action beyond that which is *reasonable under the circumstances.* In the case of an ill or injured person, he will seldom be required to do more than *give such first aid as he reasonably can,* and take reasonable steps to turn the sick man over to a physician, or to those who will look after him and see that medical assistance is obtained.
> Rest.2d (Torts) § 314A cmt. *f* (emphasis supplied); *see id.* illus. 1, 5, 7.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

34 F.3d 1173                                                                                          Page 28
34 F.3d 1173, 29 Fed.R.Serv.3d 496
**(Cite as: 34 F.3d 1173)**

Based on these sources, I believe that the New Jersey Supreme Court would recognize that a business owes its invitees a duty thus circumscribed. But I cannot canvass only learned works, but must sojourn forth beyond New Jersey's frontiers to survey its sister jurisdictions in order to gain a sense of how this duty has played out in similar situations. Though I have located no case on all fours with the one *sub judice,* the cases I have found generally support the views of the commentators and the Restatement quoted above, and many are close enough to provide fruitful guidance. I enumerate them in the margin. [FN27]

FN27. An early landmark decision departing from the traditional hesitation by courts to impose an affirmative legal duty to act was handed down by the Minnesota Supreme Court in the celebrated case of *Depue v. Flateau,* 100 Minn. 299, 111 N.W. 1, 3 (1907) (holding that the defendant, who was visited by a business-invitee who took ill during his visit, owed the invitee a duty to take reasonable steps to assure the plaintiff's well-being if the defendant appreciated plaintiff's condition; to satisfy his duty, the defendant need not necessarily have entertained the plaintiff through the night-- although if reasonable under the circumstances he should have--but had only to do what was reasonably possible given the situation, such as contacting his neighbors or summoning care). Courts have in the time since imposed other reasonable obligations besides summoning aid on businesses. *See, e.g., Estate of Starling v. Fisherman's Pier, Inc.,* 401 So.2d 1136, 1138 (Fla.Dist.Ct.App.1981) (holding in a case where a proprietor had knowingly left an inebriated man lying alone and unconscious on a pier near the water that a proprietor has a duty to safeguard a customer upon its premises whom it knows is exposed to extreme hazards, even if the customer brought the hazard upon himself; the customer had fallen into the ocean and drowned), *petition denied,* 411 So.2d 381 (Fla.1981); *Lloyd v. S.S. Kresge Co.,* 85 Wis.2d 296, 270 N.W.2d 423, 426 (Ct.App.1978) (holding that a business which, although it was freezing cold outside, refused to let a customer it knew or should have known to be ill remain in the store for ten minutes after closing while she waited for her ride, could be liable for negligence

because it had to take reasonable steps to shelter a customer); *L.S. Ayres & Co. v. Hicks,* 220 Ind. 86, 40 N.E.2d 334, 336-38 (1942) (holding that, while a business must not attend a dangerous instrumentality on its premises, a business must act reasonably once alerted to the danger of an ongoing injury to an invitee if the aggravation of the injury is caused by the business' instrumentality, although the fact of the injury cannot be attributed to any negligence on its part; a child had fallen and caught his fingers between the steps and comb on the floor at the base of an escalator); *Connelly v. Kaufmann & Baer Co.,* 349 Pa. 261, 37 A.2d 125, 127 (1944) (same).

Faced with scenarios evoking the duty actually to provide medical care, courts have consistently imposed on a business a standard of care satisfied by reasonable steps to summon medical aid and take other reasonable action to ameliorate the injury, but no more. *See, e.g., Applebaum v. Nemon,* 678 S.W.2d 533, 535-37 (Tex.Ct.App.1984) (holding that the daycare-child relationship imposed upon the daycare a common law duty "to render *reasonable assistance* to a child in its custody who becomes imperiled" and that "[i]n most circumstances the defendant will not be required to do more than administer whatever initial aid *he reasonably can and knows how to do,* and take reasonable steps to place the injured person in the hands of a competent physician" (emphasis supplied); the daycare center was not obligated to have present medically trained employees who could administer CPR, a relatively simple first aid technique to learn and administer, or other medical assistance in times of emergency, and it had no duty to train its employees to deal with a medical emergency effectively); *see also Baca v. Baca,* 81 N.M. 734, 472 P.2d 997, 1001-02 (Ct.App.1970) (holding that a bar which had turned a customer injured in a bar room brawl over to the police's custody as a drunk without troubling to inform them of his serious injuries may have breached its "duty to take reasonable care of him"). A common contemporary occurrence in which courts have directly addressed whether a business is required to provide minimal first aid-- typically the Heimlich Maneuver--or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

whether its duty is satisfied simply by taking reasonable steps such as promptly calling for emergency help is in restaurant choking cases. Although, like CPR, the Heimlich Maneuver is a relatively simple yet astonishingly successful emergency technique, influenced by the infrequency of fatal chokings and the rapid employee turnover common to restaurant work, the clear majority rule is that there is no duty to provide emergency treatment. *See Drew v. LeJay's Sportsmen's Cafe, Inc.,* 806 P.2d 301, 305-06 (Wyo.1991); *Coccarello v. Round Table of Coral Gables, Inc.,* 421 So.2d 194, 195 (Fla.Dist.Ct.App.1982) (per curiam); *Parra v. Tarasco, Inc.,* 230 Ill.App.3d 819, 172 Ill.Dec. 516, 518, 522-23, 595 N.E.2d 1186, 1188, 1192- 93 (1992) (relying on a statute shielding restaurants from liability for failing to so aid choking patrons); *Breaux v. Gino's, Inc.,* 153 Cal.App.3d 379, 200 Cal.Rptr. 260, 261-62 (1984) (same); *Acosta v. Fuentes,* 150 Misc.2d 1013, 571 N.Y.S.2d 666, 667-68 (N.Y.Sup.Ct.1991) (same). *But see City Nat'l Bank v. 4000 Restaurant, Inc.,* 372 So.2d 1146, 1147 (Fla.Dist.Ct.App.1979) (Anstead, J., dissenting).

Equally instructive are cases that have found no breach of a duty on the part of a business toward its invitees. *See Traudt v. City of Chicago,* 98 Ill.App.2d 417, 240 N.E.2d 188, 191 (1968) (holding that an airport had no duty to maintain "safety appurtenances and appliances" which it could employ to save drowning pilots, although it was foreseeable if not highly probable that, given the airport's location, some plane would crash into the surrounding lake); *Harold's Club v. Sanchez,* 70 Nev. 518, 275 P.2d 384, 386-87 (1954) (holding that a casino had no duty to commit a "privileged battery" to prevent an inebriated patron from riding upon an escalator, even if an injury appeared to be likely); *Dumka v. Quaderer,* 151 Mich.App. 68, 390 N.W.2d 200, 203-04 & n. 2 (1986) (holding that a business had no duty to aid or assist a customer who entered the premises in an inebriated condition and that the business violated no duty when it ordered the customer to leave, accompanied by his friends, and when it took no steps to assist him when it later learned that his friends had returned to the establishment, leaving him exposed to danger), *appeal*

*denied,* 426 Mich. 861 (1986).

**\*1201** Although, as already stated, no New Jersey case directly on point has been found, some older, related decisions confirm that the New Jersey Supreme Court would likely announce the duties as I have described them. The most pertinent case is *Szabo v.* **\*1202** *Pennsylvania R.R. Co.,* 132 N.J.L. 331, 40 A.2d 562 (1945), in which the predecessor court to the New Jersey Supreme Court pinpointed the standard of care an employer owes an employee:

> It is conceded that in this and other jurisdictions the law is, that in the absence of a contract or a statute, there rests no duty upon an employer to provide medical service or other means of cure to an ill, diseased or injured employee, even though it result[s] from the negligence of the master.
>
> In our judgment there is a sound and wise exception to this rule, founded upon humane instincts.
>
> That exception is, that where one engaged in the work of his master receives injuries, whether or not due to the negligence of the master, rendering him helpless to provide for his own care, dictates of humanity, duty and fair dealing require that the master put in the reach of such stricken employee such medical care *and other assistance* as the emergency, thus created, may in reason require, so that the stricken employee may have his life saved or may avoid further bodily harm. This duty arises out of strict necessity and urgent exigency. It arises with the emergency and expires with it.

*Szabo,* 40 A.2d at 562 (citations omitted) (emphasis supplied); *accord Lanier v. Kieckhefer-Eddy Div. of Weyerhaeuser Timber Co.,* 84 N.J.Super. 282, 201 A.2d 750, 753-54 (1964). The court explained that, while the foreman "was not called upon to correctly diagnose decedent's particular ailment," he should have known of decedent's inability to care for himself, and it was a question for the jury whether the employer breached his duty by simply delivering decedent to his home, where he was left helpless and alone, instead of to his family, a physician, or a hospital. *See Szabo,* 40 A.2d at 562- 63; *accord Burns v. Bakelite Corp.,* 17 N.J.Super. 441, 86 A.2d 289, 290-91, *certif. denied,* 9 N.J. 335, 88 A.2d 366 (1952). I read *Szabo* and its progeny as fully in support of my view that, under New Jersey Law, a business has a duty to summon medical aid *and take other reasonable steps to assist* its invitees who fall helplessly ill, but not actually to prepare for such contingencies or to provide medical aid beyond the pre-existing abilities of those who happen to be present.

34 F.3d 1173                                                                    Page 30
34 F.3d 1173, 29 Fed.R.Serv.3d 496
**(Cite as: 34 F.3d 1173)**

I therefore conclude that the New Jersey Supreme Court would, if presented with a case like this one, hold that the business owed the invitee a (preexisting) duty to summon medical aid reasonably promptly *and to take other reasonable steps under the circumstances* to save its invitees from emergencies beyond the invitee's or his or her companions' capacity to ward off, but would not further require the business to afford the invitee first aid or emergency medical care or equipment beyond that which happens to be reasonably available at the time of the emergency. [FN28]

> FN28. I do not believe that the New Jersey Supreme Court would hold that Trop World had a duty to maintain emergency medical equipment, such as an intubation kit, on its premises in the first instance. My conclusion that there is a jury question in this case derives solely from the observation that Trop World did, in fact, have an intubation kit on the premises, and hence the only question is whether it would have been reasonable under the circumstances for Nurse Slusher to bring it to Dr. Greenberg, who had manifested his capacity to use it, once he requested it. This does not punish Trop World for maintaining such equipment on its premises, but merely implements the general negligence doctrine that one must act reasonably *under the circumstances;* the coincidental presence nearby of a lifesaving device is simply one of the relevant circumstances a jury may consider.

As already said, I agree with the majority, in light of the arguments raised in Lundy's brief, that Trop World did not breach its duty to summon medical assistance promptly. [FN29] But I am far less convinced that Nurse Slusher acted reasonably in refusing to fetch the intubation kit located close by when Dr. Greenberg requested it, enough so that I **\*1203** believe a jury should be empaneled to consider this point.

> FN29. Even though the majority mentions Dr. Greenberg's testimony that it took about twenty minutes for the ambulance to arrive, *see* Maj.Op. at 1175-76, I in no way suggest that a seventeen minute delay (twenty minutes less the three minutes from the time it was summoned it took the ambulance to arrive) before summoning medical care would be reasonably prompt under the circumstances: that issue is simply not

before us.

The pertinent facts established by the deposition testimony are as follows. An intubation kit, or at least enough of the equipment to make do, was inventoried in Nurse Slusher's office, one floor above the pit where Lundy lay fighting for his life. App. at 217a (Dep. of Dr. Greenberg); App. at 153a, 154a-55a (Dep. of Nurse Slusher). After Nurse Slusher arrived at the scene, Dr. Greenberg identified himself as a doctor and requested an intubation kit. App. at 212a, 215a (Dep. of Dr. Greenberg); App. at 241a-42a (Dep. of Mrs. Greenberg). Nurse Slusher responded that Trop World policy prevented her from employing an intubation kit, and she apparently misrepresented that no intubation kit was on the premises. App. at 216a (Dep. of Dr. Greenberg); App. at 241a-42a (Dep. of Mrs. Greenberg). Because there were two doctors and another registered nurse in attendance, App. at 159a, 161a-62a (Dep. of Nurse Slusher), and because the other registered nurse alternated using the ambu-bag on Lundy with Nurse Slusher, App. at 240a-41a (Dep. of Mrs. Greenberg), a jury could reasonably conclude that someone other than Nurse Slusher could have operated her ambu-bag while she made haste to secure the intubation kit such a short distance away from a dying man.

Of course, insofar as Trop World was under no preexisting duty to render first aid to Lundy in the first place, to the extent it did so New Jersey's Good Samaritan Act would shield it from liability (so long as it acted in good faith). *See* Maj.Op. at 1179-80. Again, I emphasize that I think there is a jury question of negligence here only because a jury *could* view getting the intubation kit from the office and handing it to Dr. Greenberg to be a reasonable step (and hence one which would fall within its "preexisting duty"), as it does not encompass rendering first aid beyond the actual preexisting ability of anyone present in the normal course of things to perform. That is, if the jury were to view that step as reasonable in light of the proximity of the intubation kit and the medical emergency at hand, then Trop World would have been under a "preexisting duty" to take that step, and the Good Samaritan Act would not shelter its failure to do so. *See Praet v. Borough of Sayreville,* 218 N.J.Super. 218, 527 A.2d 486, 489 (1987) (holding that the Good Samaritan Act does not immunize "one who has either a contractual, relational, or a *transactional duty* to render assistance" (emphasis supplied)). Here, Nurse Slusher did not retrieve the intubator kit available to her when Dr. Greenberg requested it, an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

act which would not itself comprise the furnishing of medical care but which a jury could reasonably consider to be simply a reasonable step not too dissimilar from summoning emergency care.

I am puzzled by the majority's opinion in this respect. First, it seems to assume, for the sake of argument, that Trop World owed Lundy the "preexisting duty" to "provide such first aid prior to the arrival of qualified assistance as the [casino's] employees are reasonably capable of giving." Maj.Op. at 1179-80. Moreover, operating under its hypothetical that Nurse Slusher was a Trop World employee, it assigns those same duties to Nurse Slusher. Maj.Op. at 1180-81. But then it decides that Nurse Slusher's assumed duty to "provide such first aid" as she was "reasonably capable of giving" does not include running up a flight of stairs to retrieve a medical device for a doctor attending a critically ill patient. *See* Maj.Op. at 1180-81.

Although the majority does not spell it out, I surmise that it did not mean to say that Nurse Slusher was not "reasonably capable" of running up a flight of stairs to retrieve the potentially life-saving intubation kit. Thus, it must have concluded Nurse Slusher breached no duty toward Lundy because, as a matter of law, it is not "first aid" for a nurse to retrieve a nearby medical instrument for a doctor in an emergency. That conclusion, however, leaves me perplexed, even leaving aside any notion of "the greater includes the lesser" (that is, that the greater duty to provide reasonable first aid includes the lesser duty to take reasonable steps other than the provision of minimal emergency medical care, *see supra* at 1200 n. 27 (discussing cases)). I simply do not understand why the majority concludes as a matter of law that **\*1204** Nurse Slusher breached no "preexisting duty" toward Lundy.

Based on the fact pattern in this case, I conclude that a jury should properly determine whether Nurse Slusher's employer (by operation of *respondeat superior* ) acted reasonably under the circumstances as described or whether it breached its duty toward Lundy. Accordingly, I respectfully dissent from the majority's contrary conclusion.

### III. CONCLUSION

Because I believe that Rule 15(c) authorizes the relation back of amendments adding a new party and that the Carlinos were afforded proper notice of the institution of this action when served with Lundy's Complaint by Trop World in its Third-Party Complaint, I would reverse the district court's

contrary legal conclusions and remand for its reconsideration using the correct legal standard of the magistrate judge's findings of fact and conclusions of law. Therefore I respectfully dissent from the majority's judgment affirming the district court's refusal to permit Lundy to amend his Complaint to relate back his addition of the Carlinos as defendants.

I also note my disagreement with the majority's conclusion that, even were Trop World Nurse Slusher's employer, it would be entitled to summary judgment. Nevertheless, because Nurse Slusher was employed by an independent contractor (the Carlinos), and because Lundy has not appealed the district court's ruling that under New Jersey law Trop World could not be held accountable for their conduct, I concur with the majority's judgment that Trop World is entitled to summary judgment.

### SUR PETITION FOR REHEARING
Aug. 12, 1994

BEFORE: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, and McKEE, Circuit Judges, and RESTANI, [FN*] Judge, United States Court of International Trade.

> FN* Honorable Jane A. Restani, Judge of the United States Court of International Trade, sitting by designation.

The petition for rehearing filed by appellants in the above-entitled case having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.

• Sidney LUNDY and Claire Lundy, Appellants-Plaintiffs, v. ADAMAR OF NEW JERSEY, INC., t/a Trop World, Appellee-Defendant-Third Party Plaintiff, Dr. Dominic Frank CARLINO and Dr. Dominic Frank Carlino, a Professional Association, Appellees-Third Party Defendants., 1993 WL 13013155 (Appellate Brief) (C.A.3 June 16, 1993), Brief for Appellants, Sidney Lundy and Claire Lundy

• Sidney LUNDY and Claire Lundy, Appellants-Plaintiffs, v. ADAMAR OF NEW JERSEY, INC. t/a

34 F.3d 1173
34 F.3d 1173, 29 Fed.R.Serv.3d 496                                                          Page 32
**(Cite as: 34 F.3d 1173)**

Trop      World,      Appellee-Defendant/Third-
PartyPlaintiff, Dr. Dominic Frank CARLINO and Dr.
Dominic Frank Carlino, a Professional Association
Appellees-Third  Party  Defendants.,  1993  WL
13013153 (Appellate Brief) (C.A.3 July 15, 1993),
Brief for Appellee-Third Party Defendants, Dr.
Dominic Frank Carlino and Dr. Dominic Frank
Carlino, a Professional Association

•Sidney LUNDY and Claire Lundy, Appellants-
Plaintiffs, v. ADAMAR OF NEW JERSEY, INC.,
d/b/a Tropworld Casino and Entertainment Resort,
Appellee-Defendant/Third   Party   Plaintiff,   Dr.
Dominic Frank CARLINO and Dr. Dominic Frank
Carlino, a Professional Association, Appellees-Third
Party Defendants., 1993 WL 13013154 (Appellate
Brief) (C.A.3 July 16, 1993), Brief of Appellee,
Adamar of New Jersey, d/b/a Tropworld Casino and
Entertainment Resort

 34 F.3d 1173, 29 Fed.R.Serv.3d 496

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D



Not Reported in F.Supp.2d                                                Page 1
Not Reported in F.Supp.2d, 2005 WL 548266 (D.N.J.)
**(Cite as: 2005 WL 548266 (D.N.J.))**

Only the Westlaw citation is currently available.

United States District Court,
D. New Jersey.
GENERAL MOTORS CORP., Plaintiff,
v.
UNITED STATES OF AMERICA, et al, Defendants.
**No. Civ.A. 01-CV-2201 (D.**

March 2, 2005.
John McGahren, Latham & Watkins, Newark, NJ,
for Plaintiff.

Steven E. Rusak, Kenneth C. Amaditz, US
Department of Justice, Washington, DC, Anthony J.
Labruna, Jr., US Attorney's Office, Newark, NJ, for
Defendants.

OPINION

CAVANAUGH, J.

 **\*1** This matter comes before the Court upon motion
by Defendants the United States of America, et al,
("the Government"), for judgment on the pleadings
pursuant to Fed.R.Civ.P. 12(c) and upon motion by
Plaintiff General Motors Corp. ("Plaintiff") to amend
its Complaint pursuant to Fed.R.Civ.P. 15(a). The
Court heard oral argument on these matters on
February 28, 2005. After carefully considering the
submissions and arguments of the parties and based
upon the following, it is the finding of this Court that
the Government's motion is denied and Plaintiff's
motion is granted.

## I. BACKGROUND

 GMC filed this lawsuit against the Government on
May 7, 2001, seeking contribution from the
Government under § 113(f) of the Comprehensive
Environmental Response, Compensation, and
Liability Act ("CERCLA"), 42 U.S.C. § 9613(f).
Section 113(f) allows persons who have undertaken
efforts to clean up properties contaminated by
hazardous substances to seek contribution from other
parties liable under CERCLA. Section 113(f)(1)
[FN1] specifies that a party may seek contribution
"during or following any civil action" under
CERCLA § 106 or § 107(a).

    FN1. The statute reads, in relevant part:

    "Any person may seek contribution from
    any other person who is liable or potentially
    liable under section 9607(a) of this title,
    during or following any civil action under
    such section 9606 of this title or under
    section 9607(a) of this title....Nothing in this
    subsection shall diminish the right of any
    person to bring an action for contribution in
    the absence of a civil action under section
    9606 of this title or section 9607 of this
    title."

 CERCLA § 104 provides that the Government may
cleanup contaminated areas itself, and § 106
provides that it may compel any responsible parties
to perform the cleanup. In either case, § 107 allows
the Government to recover its costs. Section 107(a)
lists four classes of potentially responsible persons
("PRPs") which shall be liable for "all costs of
removal or remedial action incurred by the United
States Government." § 107(a)(4)(A). Private parties
who are not PRPs and voluntarily perform cleanup of
contaminated areas also may recover costs from
PRPs under § 107(a)(4)(B). However, many Circuits
are divided over the question of whether a PRP that
has voluntarily incurred response costs but is not
subject to suit may bring a § 107(a)(4)(B) action
against other PRPs. In the Third Circuit, §
107(a)(4)(B) cost recovery actions by PRPs are
prohibited. *New Castle County v. Haliburton NUS
Corp.,* 111 F.3d 1116, 1121 (3d Cir .1997).

 GMC's claim here arises out of cleanup costs it
incurred at fifteen industrial sites in various states.
(*See* Compl. at ¶ ¶ 2, 4, 19-57, 71.) GMC alleges that
the Government owned, operated, or disposed of
hazardous substances at these sites, thus rendering
the Government partly responsible under CERCLA
for the costs of cleaning up these sites. (*See Id.* at ¶ ¶
3, 12-18, 58-60, 69-70.) The Government contends
that to date, no party has taken any action against
GMC under § 106 or § 107(a) with respect to these
sites. [FN2] (*See* Gov't Br. in Supp. of Mot. for J. on
Pleadings at 9.) Since the filing of the Complaint,
GMC and the Government have reached several
partial settlement agreements resulting in dismissal of
the claims relating to all but two of the sites at issue.
However, in March 2004, the Government took the
position that it was not liable to GMC for
contribution under § 113(f)(1) of CERCLA, as
GMC's suit had not been instituted "during or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 2
Not Reported in F.Supp.2d, 2005 WL 548266 (D.N.J.)
**(Cite as: 2005 WL 548266 (D.N.J.))**

following any civil action under" § 106 or § 107(a). 42 U.S.C. § 9613(f)(1).

> FN2. At oral argument, GMC for the first time asserted that a § 107(a) action had been instituted against it by the Environmental Protection Agency seeking response costs incurred at one of the sites at issue, Willow Run. To the extent that such an action exists to meet the requirements of § 113(f)(1), GMC's suit here with respect to Willow Run would not be barred by *Aviall* (discussed in greater detail below). As neither party has briefed nor raised this issue before, the Court makes no findings with respect to the accuracy of GMC's claim. However, GMC will be permitted to amend its Complaint to allege the existence of a § 107 action as a prerequisite to its § 113(f)(1) claim.

The Government's change in stance on its liability coincided with the proceeding of similar litigations around the country about the scope of § 113(f)(1). A number of Courts of Appeals split on the question of whether a PRP such as GMC, which has incurred cleanup costs, is permitted to sue another PRP for contribution under § 113(f)(1) in the absence of an action under § 106 or § 107(a). On January 9, 2004, the U.S. Supreme Court granted certiorari to a Fifth Circuit case, *Cooper Industries, Inc. v. Aviall Services, Inc.,* to resolve the issue. Accordingly, the Government submitted a motion for judgment on the pleadings on June 4, 2004, contending that GMC was not entitled to relief under § 113(f)(1) since no action had been taken under § 106 or § 107(a). (*See* Gov't Br. in Supp. at 9.) The Government also sought a stay of this action pending the determination of the Supreme Court in *Aviall,* which GMC opposed. No stay was entered, and no action was taken by this Court on the Government's motion for judgment on the pleadings.

**\*2** On December 13, 2004, the Supreme Court issued its decision in *Cooper Industries, Inc. v. Aviall Services, Inc.,* determining that a party was not entitled to bring a contribution action under § 113(f)(1) if it has not been the target of a § 106 or § 107(a) action. --- U.S. ----, ----, 125 S.Ct. 577, 584, 160 L.Ed.2d 548 (2004). The decision by the Supreme Court is seemingly dispositive of the issue included in the Government's motion for judgment on the pleadings, though GMC has refused to concede that point. GMC promptly moved to amend the Complaint on December 16, 2004, so as to bring its

action under CERCLA § 107(a)(4)(B).

## II. *DISCUSSION*

A. *Government's Motion for Judgment on the Pleadings*

### 1. Standard of Review--Rule 12(c)

A motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) is treated under the same standard as a motion to dismiss under Fed.R.Civ.P. 12(b)(6). *Fields v. Schaffer,* 2005 WL 78928, \*1 (E.D.Pa.2005). A 12(c) motion will only be granted where the moving party has established that no material issue of fact remains to be resolved, and that the movant is entitled to judgment as a matter of law. *See Institute for Scientific Info., Inc. v. Gordon and Breach, Science Publishers, Inc.,* 931 F.2d 1002, 1005 (3d Cir.1991). In making such a determination, a court must view the facts and inferences to be drawn from the pleadings in the light most favorable to the non-moving party. *Fields,* 2005 WL 78928 at \*1.

### 2. GMC's Claims under CERCLA § 113(f)

The Government correctly contends that the recent *Aviall* holding explicitly resolves that a contribution action under § 113(f)(1) may not be brought in the absence of a previous or pending § 106 or § 107(a) action. *Aviall,* --- U.S. ----, ----, 125 S.Ct. 577, 584, 160 L.Ed.2d 548 (2004) ( "section 113(f)(1) authorizes contribution claims only 'during or following' a civil action under § 106 or § 107(a), and it is undisputed that [Plaintiff] has never been subject to such an action. [Plaintiff] therefore has no § 113(f)(1) claim"). Consequently, the Complaint against the Government filed by GMC under § 113(f)(1) fails to state a claim as it alleges no previous action taken against it under § 106 or § 107(a). The Government is entitled to judgment as a matter of law on the basis of GMC's original pleadings.

However, due to the intervening interpretation of the Supreme Court, effectively eliminating GMC's claim under § 113(f)(1), this Court should examine whether GMC's proposed amendment may preserve its cause of action. *See Flaherty v. United Engineers & Constructors, Inc.,* 213 F.Supp. 835, 838 - 839 (D.C.Pa.1961) (permitting amendment where it "was offered within eighteen months after a substantial change in the interpretation of the [relevant statute] was effected by [a higher court's] decision") *System Federation No. 152, Ry. Emp. Dept. AFL-CIO v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 548266 (D.N.J.)
**(Cite as: 2005 WL 548266 (D.N.J.))**

*Pennsylvania R. Co.,* 272 F.Supp. 971, 974 (D.C.N.Y.1967) (granting leave to amend even though motion not filed until six months after Supreme Court's decision; delay not excessive, in view of the liberality to permit amendment of pleadings, "particularly for the purpose of interposing an intervening change in the law"). Here, GMC filed its motion to amend within four days of the intervening change in the interpretation of CERCLA, well within the time permitted in the *Flaherty* and *System Federation No. 152* cases cited above.

B. *GMC's Motion to Amend the Complaint*

1. Standard of Review--Rule 15(a)

**\*3** A motion to amend a complaint is governed by Fed.R.Civ.P. 15(a). Leave to amend should be "freely given when justice so requires." Courts within the Third Circuit apply a very liberal standard in considering whether to grant leave to amend a complaint. *Dole v. Arco Chem. Co.,* 921 F.2d 484 (3d Cir.1990). However, a court may deny a plaintiff leave based on factors including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by allowance of the amendment, futility of amendment, etc." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Here, the Government opposes GMC's proposed amendment on the grounds that it is futile and untimely, but has not offered any prejudice it will suffer if GMC were to amend. (*See* Gov't Br. in Opp'n to Mot. to Amend at 2.)

Futility is analyzed under the same standard of legal sufficiency as a motion to dismiss under Fed.R.Civ.P. 12(b)(6). *SmithKline Beecham Corp. v. Geneva Pharmaceuticals, Inc.,* 287 F.Supp.2d 576, 580-581 (E.D.Pa.2002). Under the 12(b)(6) standard, leave to amend should not be denied as futile unless the proposed amended complaint would fail to state a claim upon which relief can be granted. When reviewing a claim of futility, the court assumes the truth of all the complaint's factual allegations. *Id.*

When determining whether undue delay has occurred, a court must examine a delay in the proceedings, not a delay in amending the pleadings. *See, e.g., Boileau v. Bethlehem Steel Corp.,* 730 F.2d 929, 939 (3d Cir.1984). In the Third Circuit, unexcused delay unaccompanied by real detriment to the defendant or the judiciary does not constitute undue delay. *Wausau Underwriters Ins. Co. v.*

*Shisler,* 190 F.R.D. 341, 343 (E.D.Pa.1999) (*citing Cornell & Co., Inc. v. Occupational Safety & Health Review Comm'n,* 573 F.2d 820, 823 (3d Cir.1978)). However, at some point, the delay will become "undue," placing an unwarranted burden on the court, or will become "prejudicial," placing an unfair burden on the opposing party. *Adams v. Gould, Inc.,* 739 F.2d 858, 868 (3d Cir.1984).

The Government has not alleged any prejudice it will suffer. Similarly, the Court can see no detriment to itself caused by permitting an amendment. As such, the only ground for denying GMC leave to amend is the alleged futility of GMC's new claims under § 107(a).

2. GMC's Possible Claims under CERCLA § 107(a)

GMC asserts that the Supreme Court in *Aviall* left open two possible theories of the Government's liability under § 107(a). First, *Aviall* suggests that an action for recovery of costs under § 107(a)(4)(B) is still available to a party unable to meet the procedural requirements of § 113(f)(1). --- U.S. at ---- - ----, 125 S.Ct. at 584-85. However, GMC concedes that the Third Circuit Court of Appeals has already precluded that course of action for a PRP. *New Castle County,* 111 F.3d at 1120.

**\*4** Second, GMC argues that the Court specifically left open the question whether an implied right of contribution exists under § 107 for PRPs. *Aviall,* --- U.S. at ----, 125 S.Ct. at 586 ("we decline to decide whether Aviall has an implied right to contribution under § 107"). Within this District, that question has been decided in the negative. *See E.I. DuPont DeNemours & Co. v. U.S.A.,* 297 F.Supp.2d 740 at 746-47 (2003) (Martini, J.). [FN3] *DuPont,* though decided before *Aviall,* reached essentially the same conclusion--no action for contribution may be brought under § 113(f) in the absence of a preceding § 106 or § 107(a) action. *DuPont* based its holding on a decision by the Third Circuit, *In re Reading,* 115 F.3d 1111 (3d Cir.1997), which presented a similar, though not identical, question. *Reading* involved a PRP that had already been sued under § 107(a) and was attempting to assert causes of action for contribution against another PRP under both § 107(a)(4)(B) and § 113(f). The Third Circuit, in denying the claim under § 107(a)(4)(B), held that Congress' creation of § 113(f) replaced any judicially created right to contribution under § 107(a)(4)(B). [FN4] *Reading,* 115 F.3d at 1120.

FN3. *DuPont* is currently on appeal before

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Third Circuit, though the matter has not yet been fully briefed or argued.

FN4. Congress enacted § 113 in 1986, in response to the creation by several federal courts of an implied right to contribution under § 107.

Here, GMC argues that this Court should limit *Reading* to its specific facts--namely, a case where a § 107(a) action has already been filed--and find that a party who has not been sued under § 106 or § 107(a) may still seek relief under the judicially created right to contribution. (*See* Pl. Rep. Br. in Supp. of Mot. to Amend at 4.) GMC contends that, because *Reading* is distinguishable, and the *Aviall* majority decided not to reach the question of whether an implied right to contribution survives the enactment of § 113, it is appropriate for this Court to hold open the possibility that such a right still exists. (*See Id.*) The Government counters that *Reading* expressed unequivocally that § 113 is the sole means for seeking contribution open to a PRP, and this Court is bound by that holding. *Reading,* 115 F.3d at 1120.

While GMC's contention that *Reading* is distinguishable from the facts of the instant case may be correct in concept, in practice it appears to be a distinction without a difference. Additionally, though *Aviall* did refrain from deciding the issue at hand here, the Supreme Court specifically noted that it "has visited the subject of implied rights of contribution before" and cited two cases refusing to recognize implied or common law rights to contribution in other federal statutes. *Aviall,* --- U.S. at ----, 125 S.Ct. at 586 (*see Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 638-647, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) (finding no implied or common law right to contribution in the Sherman Act or the Clayton Act); *Northwest Airlines, Inc. v. Transport Workers,* 451 U.S. 77, 90-99, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981) (finding no implied or common law right to contribution in Equal Pay Act or Title VII of Civil Rights Act)). Consequently, however tempted this Court might be to offer its own interpretation to the growing body of CERCLA case law, the above factors counsel it against such a course. Ample reasons exist to conclude that granting GMC leave to amend its Complaint to assert a contribution claim under § 107(a)(4)(B) would be futile under controlling Third Circuit law.

**\*5** However, the *DuPont* decision is currently on appeal, providing the Third Circuit with a chance to reexamine existing CERCLA precedent in light of *Aviall* and to clarify the reach of the *Reading* holding. As such, and in consideration of the fact that the Government has not offered any prejudice to it resulting from an amendment, this Court determines that GMC may amend its complaint to assert a claim under CERCLA § 107(a)(4)(B), or to allege the existence of a previous or pending § 106 or § 107(a) claim against it which would satisfy the requirements of § 113(f)(1). To the extent that the Third Circuit takes the opportunity presented by the *DuPont* appeal to make clear the availability or non-availability of an implied right to contribution, the Government may proceed accordingly with any motions respecting the amended Complaint. The Court notes that it is not concluding that GMC in fact has a viable cause of action under § 107(a)(4)(B) sufficient to survive a motion to dismiss; instead, the Court finds there is simply not any harm in permitting the amendment until further instruction from the Court of Appeals in this complex area of federal law. Finally, as the Court has granted GMC leave to amend its Complaint, the Government's motion for judgment on the pleadings accordingly should be denied as moot.

## CONCLUSION

For the reasons stated, it is the finding of this Court that Plaintiff's motion to amend the Complaint is granted. Also, the Government's motion for judgment on the pleadings is denied as moot. An appropriate Order accompanies this Opinion.

Not Reported in F.Supp.2d, 2005 WL 548266 (D.N.J.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E


United States District Court,
E.D. Pennsylvania.
WAUSAU UNDERWRITERS INSURANCE
COMPANY, as subrogee of Halpern and
Company, Inc. and Green Circuits, Inc.
v.
William SHISLER.
**No. CIV.A. 98-5145.**

Dec. 1, 1999.

Insurer, as subrogee of owner and lessee of commercial facility which caught fire, brought negligence action against facility employee. Insurer moved to amend complaint to add maintenance company as a defendant. The District Court, Hutton, J., held that leave to amend was warranted.

Motion granted.

West Headnotes

**[1] Federal Civil Procedure** ☛834
170Ak834 Most Cited Cases

**[1] Federal Civil Procedure** ☛840
170Ak840 Most Cited Cases

**[1] Federal Civil Procedure** ☛851
170Ak851 Most Cited Cases
Leave to amend complaint may be properly denied where there exists undue delay, bad faith or dilatory motive on part of the movant, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of amendment. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[2] Federal Civil Procedure** ☛849
170Ak849 Most Cited Cases
It is an abuse of discretion if the district court refuses to grant leave to amend a complaint without providing a reason for its decision. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[3] Federal Civil Procedure** ☛392
170Ak392 Most Cited Cases
Leave to amend insurer-subrogee's negligence complaint against employee of commercial facility that suffered fire damage, in order to add maintenance company as a defendant, was warranted; previous letter from insurer gave company notice that

it would be sued, and company's president inspected facility after fire, indicating that he expected company to be sued. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[4] Federal Civil Procedure** ☛840
170Ak840 Most Cited Cases
For purposes of obtaining leave to amend complaint, "undue delay" refers to delay in the proceedings, not to delay in amending the pleadings. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.
**\*341** Elliott R. Feldman, Cozen & O'Connor, Philadelphia, PA, for Wausau Underwriters Insurance Company, plaintiff.

John C. Farrell, Kenneth S. Fair, Philadelphia, PA, Eric A. Weiss, Jonathan D. Weiss, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, PA, for William Shisler, defendant.

Gregory J. Kelley, PA, Joseph A. Daly, Kelly, McLaughlin & Foster, Philadelphia, PA, for Green Circuits, Inc., Halpern and Company, Inc., third-party defendants.

John C. Farrell, Marshall, Dennehey, Warner, Coleman and Goggin, Philadelphia, PA, for Myers Maintenace Co., defendant.

*MEMORANDUM AND ORDER*

HUTTON, District Judge.

Presently before the Court are the Motion for Leave to File an Amended Complaint of Wausau Underwriters Insurance Company ("Wausau" or "Plaintiff"), as subrogee of Halpern and Company ("Halpern"), Inc. and Green Circuits, Inc. ("Green") (Docket No. 25) and William Shisler's ("Shisler" or "Defendant") response thereto (Docket No. 27). Also before the Court are Defendant's Motion for Leave to Extend Summary Judgment Motion Deadline until October 15, 1999 (Docket No. 31) and Plaintiff's response thereto (Docket No. 32). For the reasons stated hereafter, Plaintiff's Motion is **GRANTED** and Defendant's Motion is **DENIED as moot**.

**I. BACKGROUND**
On September 28, 1998, Plaintiff, as subrogee of Halpern and Green Circuits filed a Complaint against

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendant Shisler.  Plaintiff's Complaint alleged the following facts.  **\*342** On December 3, 1997, a fire occurred at a facility owned by Halpern and leased to Green, which is located at 1260 North 31st Street, Philadelphia, Pennsylvania.  The fire caused damage to the real and personal property of Halpern and Green.

Wausau is the subrogee of Green and Halpern. Wausau provided first party insurance coverage for Halpern and Green for damages sustained in the fire. Under the terms of the insurance policy, Wausau paid money to Halpern and Green for losses sustained as a result of the fire.  By payment of insurance proceeds to Green and/or Halpern, Wausau became subrogated to the rights of Green and Halpern to recover its losses from a potentially responsible third-party, i.e., someone other than Green and Halpern.  The damage sustained by Halpern and Green were caused by Shisler's negligence and breach of contract.

On October 29, 1998, Shisler filed his Answer and Affirmative Defenses.  Shisler alleged that he was not labile to Wausau.  He claimed that at all times he was acting as the employee, borrowed servant, servant, or agent of Green and/or Halpern, and that if he were negligent, then his negligence is imputed to Green and/or Halpern and Wausau.  Shisler asserted that Green, Halpern, and/or Wausau were contributorily and/or comparatively negligent.

On November 5, 1998, Shisler filed a Third-Party Complaint against Green and Halpern.  The Third-Party Complaint alleges the following facts.  On or about November 11, 1997, Green and/or Halpern hired Shisler to work as a foreman on their second shift.  Green and/or Halpern trained, instructed, and supervised Shisler's work.  Shisler was under their control at all relevant times with respect to the method and manner in which he worked for them. Shisler acted as the employee, borrowed servant, servant, or agent of Green and/or Halpern.

On December 3, 1997, a fire occurred purportedly causing damage to the property of Green and Halpern as well as business interruption losses.  The fire and the claimed damages sustained by Wausau, Green, and Halpern were allegedly caused by the carelessness and negligence of Third-Party Defendants Green and Halpern.  Third-Party Defendants Green and Halpern are solely liable to Plaintiff Wausau.  Green and/or Halpern are solely liable to Plaintiff Wausau jointly and severally or in the alternative, liable to Defendant and Third-Party Plaintiff Shisler for indemnification and/or

contribution.

On February 22, 1999, the Third-Party Defendants filed the instant motion moving the Court to dismiss the Third-Party Complaint.  On March 2, 1999, the Plaintiff filed an Answer to this motion.  In its Answer, Wausau states that it does not oppose the relief sought by the Third-Party Defendants.  On March 23, 1999, Defendant and Third-Party Plaintiff Shisler filed his Answer to the motion to dismiss his Third-Party Complaint.  The Third-Party Defendants filed a Reply Brief on March 31, 1999.  On July 21, 1999, the Court granted Third-Party Defendants' Motion to Dismiss and dismissed Defendant's Third-Party Complaint against Halpern and Green.

On August 8, 1999, Plaintiff filed the instant Motion for Leave to File an Amended Complaint.  Plaintiff seeks to add Meyers Maintenance Company ("MMC") as a defendant.  Defendant filed an Answer to Plaintiff's Motion on August 20, 1999. On September 22, 1999, Defendant filed a Motion for Leave to Extend Summary Judgment Motion Deadline until October 15, 1999.

## II. *DISCUSSION*
### A. *Legal Standard for Motion for Leave to Amend Complaint*

[1] Federal Rule of Civil Procedure 15(a) provides as follows:

> Amendments. A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed on the trial calendar, the party may also amend it at any time within 20 days after it is served.  Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and **\*343** leave shall be freely given when justice so requires.  A party shall plead in response to an amended complaint within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be longer, unless the court otherwise orders.

> Fed.R.Civ.P. 15(a).  Motions to amend under Rule 15(a) may be filed to cure a defective pleading, to correct insufficiently stated claims, to amplify a previously alleged claim, to change the nature or theory of the case, to state additional claims, to increase the amount of damages sought, to elect different remedies, or to add, substitute or drop parties to the action.  6 Charles Alan Wright, Arthur

190 F.R.D. 341                                                                                                    Page 3
190 F.R.D. 341, 46 Fed.R.Serv.3d 672
**(Cite as: 190 F.R.D. 341)**

R. Miller, Mary Kay Kane, *Federal Practice and Procedure:* Civil 2d § 1474 (1990). *See Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 569 (3d Cir.1976) (district court improperly denied amendment to add claims and substitute parties), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). It must be noted that in considering such a motion, Rule 15(a) expressly demands that "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Leave to amend may be properly denied, however, where there exists "undue delay, bad faith or dilatory motive on part of the movant ... undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment ...." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

 The Third Circuit stated that the "potential for undue prejudice [to the non-moving party] is 'the touchstone for the denial of the leave to amend.' " *Coventry v. United States Steel Corp.,* 856 F.2d 514, 519 (3d Cir.1988) (quoting *Cornell & Co., Inc. v. Occupational Safety & Health Review Comm'n,* 573 F.2d 820, 823 (3d Cir.1978)); *Howze v. Jones & Laughlin Steel Corp.,* 750 F.2d 1208, 1212 (3d Cir.1984) (same). One potential source of prejudice to the defendant is undue delay which, as interpreted by the Third Circuit, refers to delay in the proceedings, not to delay in amending the pleadings. *See, e.g., Boileau v. Bethlehem Steel Corp.,* 730 F.2d 929, 939 (3d Cir.1984). Moreover, the Third Circuit explained that unexcused delay unaccompanied by real detriment to the defendant or the judiciary does not constitute undue delay. *See, e.g., Cornell & Co., Inc. v. Occupational Safety & Health Review Comm'n,* 573 F.2d 820, 823 (3d Cir.1978). In *Adams v. Gould, Inc.,* 739 F.2d 858 (3d Cir.1984), the Third Circuit expressly set forth the legal standard for undue delay and potential prejudice:

> The passage of time, without more, does not require that a motion to amend a complaint be denied; however, at some point, the delay will become "undue," placing an unwarranted burden on the court, or will become "prejudicial," placing an unfair burden on the opposing party.... The question of undue delay, as well as the question of bad faith, requires [the court to] focus on the plaintiff['s] motives for not amending [the] complaint ... earlier; the issue of prejudice requires [the court to] focus on the effect on the defendant.

*Id.* at 868. The Third Circuit also stated that "ordinarily delay alone is not a basis to deny a motion to amend." *United States v. Duffus,* 174 F.3d 333, 337 (3d Cir.1999) (citations omitted).

 [2] Otherwise, while leave to amend is left to the sound discretion of the trial court, *Gay v. Petsock,* 917 F.2d 768, 772 (3d Cir.1990), is it an abuse of discretion if the district court refuses to grant leave to amend without providing a reason for its decision. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

### 1. *Plaintiff's Motion for Leave to Amend Complaint*

 [3] Plaintiff seeks to amend its Complaint to add MMC as a defendant to the instant lawsuit. Plaintiff assets that MMC should be added as a defendant for the following reasons: (1) new theories or claims are not presented; (2) the discovery process will not be prolonged or complicated; and (3) undue prejudice to the Defendant will not result. (*See* Mem. of Law in Supp. of Pl.'s Mot. for Leave to File an Amend. Compl. at 2.).

 Defendant, on the other hand, argues that Plaintiff's Motion should be denied for the following reasons: (1) Plaintiff offers no explanation**\*344** for the late joinder of MMC although it knew about MMC within days of the December 3, 1997 fire; (2) Defendant has already been sued and does not see how adding MMC will be beneficial to the instant lawsuit; and (3) MMC will be prejudiced in its defense given the late date of Plaintiff's Motion for Leave to Amend.

 The Court cannot disregard, however, the liberality of the policy regarding Rule 15(a) amendments. That is, the Court is cognizant that leave to amend shall be freely granted where justice so requires.

 The Court finds that the documents produced by Defendant in support of his Answer to the instant Motion ultimately favor Plaintiff's position because they indicate that "real detriment" to Defendant or the Court is unlikely. For example, the documents include a letter written by Plaintiff's counsel, Elliott Feldman. Said letter, dated December 9, 1999, expressly informed Bill Meyers ("Meyers"), the president of MMC, that "it is [Plaintiff's] intention to seek reimbursement from [MMC] for all property losses sustained in the fire." (*See* Answer of Def. William Shisler to the Motion for Leave, Ex. A). Thus, while Plaintiff's original Complaint failed to name MMC as a defendant, MMC was on notice that it would be sued.

 Another letter indicates that Meyers actually inspected the "fireground" and took photographs of the burned premises and its damaged contents. (*See* Answer of Def. William Shisler to the Motion for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

190 F.R.D. 341

Page 4

190 F.R.D. 341, 46 Fed.R.Serv.3d 672

**(Cite as: 190 F.R.D. 341)**

Leave, Ex. A). The Court finds it perplexing that Meyers would have desired and/or been permitted to inspect the "fireground" had he not expected Plaintiff to sue his company. Said notice strongly mitigates against any claims of prejudice presented by Defendant.

[4] The Court is guided by the Third Circuit's statement that undue delay refers to delay in the proceedings, not to delay in amending the pleadings. *See, e.g., Boileau v. Bethlehem Steel Corp.,* 730 F.2d 929, 939 (3d Cir.1984). Thus, while Plaintiff filed the instant Motion less than two months before the close of discovery but several months before the applicable statute of limitations tolled, the Court does not conclude that MMC will be prejudiced by being named as a defendant in the instant lawsuit. To ensure that MMC and Defendant will not be prejudiced, however, the Court will amend its Scheduling Order of January 22, 1999, thereby allowing all parties more time to conduct discovery. Accordingly, Plaintiff's Motion is granted. [FN1]

> FN1. In granting Plaintiff's Motion, the Court will extend the discovery deadlines heretofore established by issuing an Amended Scheduling Order. Accordingly, as the date of this Memorandum and Order postdates the relief requested by Defendant in his Motion for Leave to Extend Summary Judgment Motion Deadline until October 15, 1999, Defendant's Motion is denied as moot. Moreover, Defendant filed a Motion for Summary Judgment on October 15, 1999. Defendant will be allowed, however, to supplement or replace his current Motion for Summary Judgment in accordance with the Amended Scheduling Order.

An appropriate Order follows.

### ORDER

AND NOW, this 1st day of December, 1999, upon consideration of the Motion for Leave to File an Amended Complaint of Plaintiff Wausau Underwriters Insurance Company, as subrogee of Halpern and Company, Inc. and Green Circuits, Inc. (Docket No. 25) and Defendant William Shisler's response thereto (Docket No. 27), and Defendant's Motion for Leave to Extend Summary Judgment Motion Deadline until October 15, 1999 (Docket No. 31) and Plaintiff's response thereto (Docket No. 32), IT IS HEREBY ORDERED that:

(1) Plaintiff's Motion for Leave to File an Amended

Complaint is **GRANTED**; and

(2) Defendant's Motion for Leave to Extend Summary Judgment Motion Deadline until October 15, 1999, is **DENIED as moot.**

190 F.R.D. 341, 46 Fed.R.Serv.3d 672

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

The EMBO Journal Vol. 19 No. 18 pp. 4976–4985, 2000

# Deficiency of T2K leads to apoptotic liver degeneration and impaired NF-κB-dependent gene transcription

Madeleine Bonnard, Christine Mirtsos, Shinobu Suzuki, Kevin Graham, Jianing Huang[1], Michelle Ng, Annick Itié, Andrew Wakeham, Arda Shahinian, William J. Henzel[2], Andrew J. Elia, Wendy Shillinglaw[2], Tak W. Mak, Zhaodan Cao[1] and Wen-Chen Yeh[3]

Amgen Institute, Ontario Cancer Institute and the Department of Medical Biophysics, University of Toronto, 620 University Avenue, Toronto, Ontario, Canada M5G 2C1, [1]Tularik Incorporation, 2 Corporate Drive, South San Francisco, CA 94080 and [2]Genentech Incorporation, 460 Point San Bruno Boulevard, South San Francisco, CA 94080, USA

[3]Corresponding author
e-mail: wyeh@amgen.com

Induction of NF-κB-dependent transcription requires phosphorylation and subsequent degradation of I-κB, an inhibitor of NF-κB, followed by nuclear translocation and DNA binding of NF-κB. Tumor necrosis factor receptor-associated factor 2 (TRAF2) plays a role in NF-κB activation in response to cytokines such as tumor necrosis factor α (TNFα). In this study, we purified and characterized a novel kinase (T2K, also known as TBK1 or NAK), which associates with TRAF2 and exhibits kinase activity towards I-κBα in vitro. The physiological function of T2K was investigated using T2K-deficient mice. Heterozygotes appear normal, but t2k−/− animals die at ~E14.5 of massive liver degeneration and apoptosis. Nevertheless, hematopoietic progenitors from T2K-deficient fetal liver support normal lymphocyte development. Furthermore, t2k−/− embryonic fibroblasts and thymocytes do not display increased sensitivity to TNFα-induced apoptosis. In response to either TNFα or IL-1 induction, t2k−/− embryonic fibroblasts exhibit normal degradation of I-κB and κB-binding activity. However, NF-κB-directed transcription is dramatically reduced. These results demonstrate that, like I-κB kinase β and the RelA subunit of NF-κB, T2K is critical in protecting embryonic liver from apoptosis. However, T2K has a unique role in the activation of NF-κB-directed transcription, apparently independent of I-κB degradation and NF-κB DNA binding.
Keywords: apoptosis/I-κB kinase/NF-κB/T2K/TNF signaling

## Introduction

Rel-family NF-κB transcription factors, including the prototypical RelA–p50 heterodimer, are critical regulators of genes involved in immune and inflammatory responses, as well as protecting against apoptosis (Ghosh et al., 1998;

Foo and Nolan, 1999). NF-κB is normally sequestered in the cytoplasm of resting cells, where it is bound to I-κB inhibitory proteins (I-κBα, I-κBβ and I-κBε). This interaction masks the nuclear localization signal of NF-κB, preventing its nuclear translocation (Ghosh et al., 1998). Various extracellular stimuli, including pro-inflammatory cytokines such as tumor necrosis factor α (TNFα) and interleukin-1 (IL-1), virus infection, lipopolysaccharide (LPS) and lymphocyte activation, result in the phosphorylation of I-κB proteins on two conserved serine residues (Ser32 and -36 on I-κBα, and Ser19 and -23 on I-κBβ) (Ghosh et al., 1998). This phosphorylation targets I-κB for ubiquitylation and subsequent proteosome-mediated degradation, resulting in the release of NF-κB. NF-κB then translocates to the nucleus where it binds to specific κB sites in promoter sequences and activates transcription (Ghosh et al., 1998).

Phosphorylation of I-κB in response to extracellular stimuli is carried out by the I-κB kinase (IKK) complex, which is comprised of (at least) two catalytic subunits, IKKα and IKKβ (DiDonato et al., 1997; Mercurio et al., 1997; Regnier et al., 1997; Woronicz et al., 1997; Zandi et al., 1997), as well as the modulator NEMO (NF-κB essential modulator) (Rothwarf et al., 1998; Yamaoka et al., 1998). Although IKKα and IKKβ appear to have analogous activities in vitro, IKKα- and IKKβ-deficient mice have dramatically different phenotypes. IKKα−/− mice exhibit severe limb and skin abnormalities. Surprisingly, the induction of NF-κB in ikkα−/− murine embryonic fibroblasts (EFs) by either TNFα or IL-1 is normal (Hu et al., 1999; Takeda et al., 1999). In contrast, the phenotype of IKKβ-deficient mice resembles that of relA−/− mice (Beg et al., 1995) but is more severe. IKKβ−/− animals display massive liver degeneration due to apoptosis and die between E12.5 and E14.5 (Q.Li et al., 1999b; Z.W.Li et al., 1999; Tanaka et al., 1999). IKKβ−/− EFs show enhanced sensitivity to TNFα-induced apoptosis, and NF-κB activation in response to TNFα and IL-1 is significantly reduced compared with the wild type (Q.Li et al., 1999b; Z.W.Li et al., 1999; Tanaka et al., 1999). These results indicate that it is IKKβ that mediates responses to TNFα and IL-1 (Q.Li et al., 1999b; Z.W.Li et al., 1999; Tanaka et al., 1999), while IKKα may respond to an as yet uncharacterized morphogenetic signal (Hu et al., 1999; Q.Li et al., 1999a; Takeda et al., 1999). The phenotype of NEMO-deficient mice is similar to that of ikkβ−/− animals, although even more severe. Mutant mice display massive liver degeneration due to apoptosis and die between E12.5 and E13 (Makris et al., 2000; Rudolph et al., 2000). EFs from nemo−/− embryos show enhanced sensitivity to TNFα-induced apoptosis, and NF-κB activation in response to TNFα and IL-1 is dramatically reduced compared with wild-type EFs, demonstrating that NEMO is an essential component of

©European Molecular Biology Organization

the IKK complex (Makris *et al.*, 2000; Rudolph *et al.*, 2000).

Members of the TNF receptor-associated factor (TRAF) family of adaptor proteins are involved in coupling stimulation of receptors for pro-inflammatory cytokines, such as the IL-1 receptor (IL-1R) and the TNF receptors (TNFRs) to NF-κB activation, and other downstream events (Arch *et al.*, 1998). TRAF2 plays a critical role in signal transduction mediated by both TNFR1 and TNFR2, and has been implicated in TNFα-induced activation of NF-κB and the stress-activated protein kinase (SAPK/JNK) (Rothe *et al.*, 1995; Liu *et al.*, 1996; Lee *et al.*, 1997; Natoli *et al.*, 1997; Yeh *et al.*, 1997). Similarly, TRAF6 is important for the transduction of IL-1-induced signals, including those resulting in NF-κB activation (Cao *et al.*, 1996b; Lomaga *et al.*, 1999). However, the signaling pathway linking the TRAF proteins to NF-κB activation remains to be defined. A MAP-3K homolog termed NF-κB-inducing kinase (NIK) has been shown to bind both TRAF2 and TRAF6, linking these adaptors to downstream signaling (Song *et al.*, 1997). However, recent studies highlighting the role of NIK in lymph node organogenesis and B-lymphocyte activation indicate that the function of NIK may be restricted to certain cell types, implying that additional molecules must also be involved in regulating NF-κB activation downstream of TRAF proteins (Shinkura *et al.*, 1999; Garceau *et al.*, 2000).

In this report, we describe the characterization of a novel TRAF2-associated kinase, T2K, and study its physiological function by gene targeting. T2K-deficient mice die of liver apoptosis, but *t2k−/−* EFs show normal sensitivity to TNFα-induced apoptosis, and normal I-κB degradation and NF-κB DNA binding in response to TNFα or IL-1 stimulation. Nevertheless, NF-κB-directed transcription in response to these pro-inflammatory cytokines is reduced in *t2k−/−* EF cells. These results indicate that T2K is critical in protecting embryonic liver from massive apoptosis, and that T2K may regulate NF-κB activation in a way that is distinct from the process involving I-κB degradation.

## Results

### Isolation of T2K

Since TRAF2 plays a role in the activation of NF-κB, it seemed reasonable that TRAF2 might interact, directly or indirectly, with a mediator involved in the signaling cascade leading to activation of the transcription factor. We investigated this possibility using the 293 cell line stably expressing a FLAG-tagged TRAF2 molecule. TRAF2 and associated proteins were immunoprecipitated and assayed for kinase activity by determining their ability to phosphorylate I-κBα *in vitro*. A kinase activity was indeed identified in TRAF2 complexes that could phosphorylate I-κBα *in vitro*. After further purification by gel filtration and monoQ column chromatography, the amino acid sequence of the putative kinase was determined and used to search EST sequences held in the National Center of Biological Information. A matching EST sequence (R19830) was used to clone a full-length cDNA encoding a putative protein kinase, which was named T2K. Both recombinant T2K and immunoprecipi-



Fig. 1. Identification of a TRAF2-associated kinase (T2K). (A) TRAF2 complexes or recombinant T2K were used in *in vitro* kinase assays to assess the phosphorylation of peptide substrates encompassing amino acids 25–41 of either wild-type or mutated I-κBα (mutated amino acids are underlined). (B) Co-immunoprecipitation of endogenous T2K. Extracts of 293 cells either left untreated or stimulated with 100 ng/ml TNFα for 10 min were incubated with pre-immune rabbit serum or rabbit anti-serum specific for either IKKβ, TRAF2 or TRAF6 monoclonal antibody followed by western blotting using antiserum specific for recombinant T2K.

tated TRAF2 complexes could phosphorylate a wild-type I-κBα peptide (25–41) and a mutant peptide in which Ser32 was mutated to Ala, but not an altered pepide in which Ser36 was mutated to Ala (Figure 1A). These results indicate that the kinase activity is specific for Ser36 of I-κBα. Furthermore, since both recombinant T2K and the immunoprecipitated TRAF2 complexes had the same substrate specificity, T2K is likely to account for the kinase activity detected in the TRAF2 complexes. The identity of T2K was further confirmed by western blot analysis in which polyclonal rabbit antiserum raised against recombinant T2K recognized a band of ~80 kDa only in anti-TRAF2 immunoprecipitates of untransfected 293 cells, not in anti-IKKβ or anti-TRAF6 immuno-precipitates (Figure 1B). While this manuscript was in preparation, two groups reported the isolation of molecules identical to T2K. Tojima *et al.* (2000) reported cloning of a cDNA encoding a kinase, called NAK, capable of phosphorylating IKKβ and I-κBα Ser36 *in vitro*. In addition, Pomerantz and Baltimore (1999) reported the cloning of a cDNA encoding TANK-binding kinase 1 (TBK1). TANK (I-TRAF) is a TRAF-binding protein with both stimulatory and inhibitory properties that has been implicated in NF-κB activation (Cheng and Baltimore, 1996; Rothe *et al.*, 1996). These researchers also observed that TBK1/T2K is a kinase capable of forming a complex with TANK and TRAF2 (Pomerantz and Baltimore, 1999), consistent with our findings.

M.Bonnard *et al.*



**Fig. 2.** Targeted disruption of the murine *t2k* gene. (A) Top, a portion of the endogenous *t2k* locus containing three exons (shown as solid boxes). Middle, the targeting vector. Bottom, the mutant locus resulting from homologous recombination. The *Sac*I (S) restriction site and the flanking probe used to detect homologous recombination are indicated. (B) Genomic Southern blot of *Sac*I-digested DNA from E13.5 embryos of the genotypes indicated, showing the 6.6 kb wild-type band and the 14.6 kb mutant band detected by the flanking probe in (A). (C) Genotyping by PCR of DNA from E13.5 embryos using the primers described in Materials and methods. (D) Northern blot analysis of T2K RNA expression in E13.5 EFs of the genotypes indicated. The cells were either left untreated or stimulated with 10 ng/ml TNFα for the time points indicated.

## Generation of T2K-deficient mice

To characterize the function of T2K *in vivo*, we disrupted the murine *t2k* gene in embryonic stem (ES) cells, using a targeting vector designed to replace exons 1 and 2 of the endogenous locus with a PGK-neo cassette (Figure 2A). Correctly targeted ES cell clones were identified by Southern blotting and injected into C57BL/6 blastocysts to generate chimeric mice. Male chimeras with germline transmission were utilized to generate *t2k*+/− animals, which were interbred to generate *t2k*−/− mice. Genotypes were confirmed by Southern blotting (Figure 2B) and PCR analysis (Figure 2C). Although *t2k*+/− mice appeared normal and were fertile, no viable homozygous mutant mice were observed in the first 111 pups derived from *t2k*+/− intercrosses, suggesting that T2K deficiency results in embryonic lethality. EFs were subsequently derived from early mutant embryos and total RNA was prepared for northern blot analysis. The results confirmed the absence of detectable T2K mRNA in *t2k*−/− cells (Figure 2D).

## Liver degeneration in T2K-deficient embryos

Embryos from timed matings of *t2k*+/− animals were analyzed to determine the time of lethality (Table I). Offspring of all three expected genotypes were present at the normal Mendelian ratio until E14.5 when *t2k*−/− embryos appeared pale and exhibited dramatic liver degeneration (Figure 3A–D). Development of all other organs appeared normal. Histological analysis of embryo sections revealed liver hemorrhage and severe tissue loss (Figure 3C–F). To determine whether the liver degeneration was attributable to apoptosis, TUNEL assays were performed on sections of E12.5, E13.5 and E14.5 wild-type and mutant embryos. Sections of wild-type livers at

**Table I.** Genotypes of embryos derived from *t2k*+/− intercrosses

| Stage | +/+ | +/− | −/− | | Total |
|-------|-----|-----|--------|----------|-------|
| | | | Normal | Abnormal | |
| E12.5 | 8 | 26 | 6 | 0 | 40 |
| E13.5 | 36 | 82 | 19 | 21 | 158 |
| E14.5 | 17 | 28 | 4 | 12 | 61 |
| E15.5 | 10 | 20 | 0 | 4[a] | 34 |

[a]In resorption.

any of these stages showed very few TUNEL-positive cells (Figure 3G and data not shown). In contrast, while sections of E12.5 *t2k*−/− embryos appeared normal, livers of E13.5 *t2k*−/− embryos displayed mild, focal liver degeneration and apoptosis (data not shown). By E14.5, extensive apoptosis was detected throughout liver sections of *t2k*−/− embryos (Figure 3H), indicating that apoptosis is a major cause of liver degeneration in these mutants, and consequently, of embryonic death. The liver apoptosis occurring in the absence of T2K was strikingly similar to that observed in *nemo*−/−, *ikkβ*−/− and *relA*−/− animals (Beg *et al.*, 1995; Q.Li *et al.*, 1999b; Z.W.Li *et al.*, 1999; Tanaka *et al.*, 1999; Rudolph *et al.*, 2000), prompting us to speculate that T2K might be involved in the activation of NF-κB.

## Normal sensitivity of thymocytes and EFs to TNFα-induced apoptosis

Stimulation of TNFR1 results in signal transduction that contributes both to apoptosis and cell survival (Hsu *et al.*, 1996b; Yeh *et al.*, 1999). TRAF2 and NF-κB play



**Fig. 3.** Massive liver apoptosis in the absence of T2K. (A and B) Low power view of E14.5 wild-type (A) and *t2k*−/− (B) embryos. (C–F) Histological analysis of E14.5 liver sections. Views of H&E staining of wild-type (C and E) and mutant (D and F) livers at either low (C and D) or high (E and F) magnification are shown. (G and H) Enhanced apoptosis in livers of E14.5 T2K-deficient embryos. TUNEL assays were performed on sections of wild-type (G) and mutant (H) E14.5 embryos. A high power view of the liver is shown in both cases.

important roles in the survival pathway, as shown by the finding that *relA*−/−, *ikkβ*−/−, *nemo*−/− and *traf2*−/− cells display enhanced sensitivity to TNFα-induced apoptosis. Wild-type EFs are resistant to treatment with TNFα alone, but *relA*−/−, *nemo*−/− and *ikkβ*−/− EFs are exquisitely sensitive to TNFα-induced cell death (Beg *et al.*, 1995; Q.Li *et al.*, 1999b; Z.W.Li *et al.*, 1999; Tanaka *et al.*, 1999; Rudolph *et al.*, 2000). TRAF2-deficient EFs are mildly sensitive to apoptosis induced by TNFα, but exhibit a dramatic increase in sensitivity in the presence of TNFα combined with low concentrations of the protein synthesis inhibitor cycloheximide (Yeh *et al.*, 1997). At higher concentrations, cycloheximide can also render wild-type EFs sensitive to TNFα treatment. In this context, we assessed the response of *t2k*−/− EFs to TNFα alone or in combination with various concentrations of cyclo-heximide. Sensitivity to staurosporine was used as a positive control. T2K-deficient EFs behaved like wild-type EFs rather than *relA*−/−, *ikkβ*−/−, *nemo*−/− or *traf2*−/− EFs, being resistant to apoptosis induced by TNFα at all but the highest concentrations of cycloheximide (Figure 4A).

The importance of the role of TRAF2 in protection against TNFα-induced apoptosis was highlighted further by the demonstration that *traf2*−/− thymocytes undergo enhanced apoptosis in response to TNFα (Yeh *et al.*, 1997). In order to obtain *t2k*−/− thymocytes to assess their sensitivity to apoptotic stimuli, we used fetal liver cells from either wild-type or *t2k*−/− E12.5 to reconstitute the lymphoid compartment of irradiated *rag1*−/− mice. Bone marrow, thymus, lymph nodes, spleens and peripheral

M.Bonnard *et al.*

blood of all reconstituted animals had normal proportions of immature, and mature, T- and B-cell populations (data not shown). T2K-deficient double positive (DP) thymocytes were as sensitive as wild-type DP thymocytes to dexamethasone-induced apoptosis. In contrast to *traf2−/−* DP thymocytes, *t2k−/−* DP thymocytes were as resistant to TNFα treatment as were wild-type DP thymocytes (Figure 4B).

Importantly, the embryonic lethality and liver apoptosis of animals lacking either RelA or IKKβ can be attributed



**Fig. 4.** Normal sensitivity of thymocytes and EFs to TNFα-induced cell death in the absence of T2K. (A) TNFα-induced apoptosis of EFs. Wild-type and T2K-deficient EFs were either left untreated or stimulated with staurosporine (2 μM) or TNFα (10 ng/ml) in combination with the indicated concentrations of cycloheximide for 18 h. Cells were harvested and stained for viability as described in Materials and methods. Values shown are the percentage of viable cells after treatment relative to untreated controls. Individual treatments were measured in triplicate. (B) TNFα-induced apoptosis of CD4+CD8+ (DP) thymocytes. Thymocytes from the reconstituted mice described in the text were cultured at 37°C for 20 h in the presence of either 1 μM dexamethasone or the indicated concentrations of TNFα. Cell viability was determined by 7-amino actinomycin D (7-AAD) staining. Results are expressed as the percentage of total viable DP cells remaining after treatment relative to the untreated control of the same genotype. Individual treatments were measured in quadruplicate.

to TNFR1 signaling. Thus, animals lacking both RelA and TNFR1 (Beg and Baltimore, 1996), like those lacking both IKKβ and TNFR1 (Q.Li *et al.*, 1999b), develop to term. Results from Table II show that six of the first 94 pups born from intercrossing *t2k+/− tnfr1+/−* mice were *t2k−/− tnfr1−/−* mice (expected Mendelian ratio 6.4%, 1:16). These double mutant animals developed to term rather than dying at ~E14.5. The apparent rescue of embryonic lethality by inactivation of the TNFR1 gene supports the hypothesis that embryonic lethality of *t2k−/−* animals is due to TNFα-induced liver apoptosis, and that T2K is an important mediator in TNFR1 signaling. Together, these results indicate that although T2K plays an important role in protection against TNFα-induced apoptosis, it is dispensable for resistance of certain cell types, such as thymocytes and EFs, to TNFα-induced apoptosis.

### Normal I-κBα phosphorylation/degradation and κB-binding activity in t2k−/− cells

Given the ability of T2K to phosphorylate I-κBα *in vitro*, and the similarities in liver phenotype observed in *t2k−/−*, *relA−/−*, *nemo−/−* and *ikkβ−/−* mice, we investigated various steps leading to activation of NF-κB-dependent transcription in *t2k−/−* EFs. Cytoplasmic and nuclear protein extracts were prepared from wild-type and T2K-deficient EFs stimulated with either TNFα or IL-1 for 1, 3, 9, 27 or 90 min. Phosphorylation of Ser32 and degradation of I-κBα, I-κBβ and I-κBε were assessed by probing western blots of cytoplasmic extracts with either a phospho-I-κBα-specific antibody, or I-κBα-, I-κBβ- and I-κBε-specific antibodies, respectively. Rapid phosphorylation of I-κBα Ser32, comparable to that in the wild type, was observed in *t2k−/−* EFs in response to either TNFα or IL-1 (Figure 5A). Degradation of I-κBα (Figure 5A), I-κBβ and I-κBε (data not shown) in response to either stimulus was also normal in the mutant cells.

NF-κB DNA binding activity in nuclear extracts of wild-type and *t2k−/−* EFs was then assessed by electrophoretic mobility shift assay (EMSA) using a labeled oligonucleotide containing κB binding sites. Stimulation with either TNFα or IL-1, as above, resulted in a rapid induction of κB binding activity in nuclear extracts from cells of both genotypes (Figure 5B). Together these data show that, at least in EFs, T2K is not essential for either phosphorylation-induced degradation of I-κB or NF-κB DNA binding in response to TNFα or IL-1.

To assess the contribution of RelA to the κB DNA binding activity observed in Figure 5B, nuclear extracts from either wild-type or *t2k−/−* EFs, stimulated with either TNFα or IL-1, were pre-incubated with RelA-specific Ab prior to EMSA analysis. The κB DNA binding activity induced by either cytokine was reactive to the RelA-specific antibody, causing a *supershift* (Figure 5C). Furthermore, RelA-reactive κB DNA binding activity could account for the majority of the activity detected in

**Table II.** Genotypes of embryos derived from *t2k+/− tnfr1+/−* intercrosses

| *t2k+/+ tnfr1+/+* | *t2k+/+ tnfr1+/−* | *t2k+/+ tnfr1−/−* | *t2k+/− tnfr1+/+* | *t2k+/− tnfr1+/−* | *t2k+/− tnfr1−/−* | *t2k−/− tnfr1+/+* | *t2k−/− tnfr1+/−* | *t2k−/− tnfr1−/−* | Total |
|---|---|---|---|---|---|---|---|---|---|
| 6 | 18 | 12 | 16 | 18 | 18 | 0 | 0 | 6 | 94 |
| 6.4% | 19.1% | 12.8% | 17% | 19.1% | 19.1% | | | 6.4% | 100% |



Fig. 5. Normal I-κBα phosphorylation, degradation and NF-κB DNA binding activity in *t2k⁻/⁻* EFs. (A) I-κBα phosphorylation/degradation. Wild-type and T2K-deficient EFs were treated with either TNFα (10 ng/ml) or IL-1β (10 ng/ml) for the times indicated. Cytoplasmic extracts were analyzed by western blotting using monoclonal antibodies specific for either phospho-I-κBα (top), I-κBα (middle) or the loading control actin (bottom). (B) κB binding activity. Wild-type and *t2k⁻/⁻* EFs were incubated with either mouse recombinant TNFα (10 ng/ml) (top) or IL-1β (10 ng/ml) (bottom) for the times indicated. NF-κB activation by EMSA as described in Materials and methods. For both (A) and (B), one result representative of three independent experiments is shown. (C) RelA binding activity. Wild-type and *t2k⁻/⁻* EFs were incubated with 10 ng/ml of either mouse recombinant TNFα or IL-1β for 27 min. RelA binding activity was assessed by incubation of 10 µg of nuclear extract with RelA-specific antibody followed by electrophoretic mobility supershift assay, as described in Materials and methods.



Fig. 6. Impaired NF-κB-dependent gene expression in *t2k⁻/⁻* EFs. (A) Impaired transactivation of NF-κB-dependent reporter activity in *t2k⁻/⁻* EFs. Wild-type and *t2k⁻/⁻* EFs were transfected with the pELAM-luc reporter and CMV-lacZ vectors. After stimulation with 10 ng/ml TNFα or IL-1, or 100 ng/ml PDGF for the times indicated, lysates were assayed for luciferase activity as described in Materials and methods. Individual treatments were measured in triplicate, and results representative of four independent experiments are shown. (B) Impaired induction of the endogenous NF-κB target genes ICAM-1 and TLR-2. Wild-type and *t2k⁻/⁻* EFs were stimulated with 10 ng/ml TNFα or IL-1 for the times indicated followed by northern blot analysis of 20 µg of total RNA using a ³²P-labeled random priming probe corresponding to the full-length ICAM-1 or TLR-2 cDNA. GAPDH expression was analyzed to control for RNA loading. In the bottom panel, wild-type and *relA⁻/⁻* EFs were stimulated with 10 ng/ml for the times indicated followed by northern blot analysis of 2 µg of mRNA, as above.

extracts from both wild-type and *t2k⁻/⁻* EFs (Figure 5C), indicating that T2K is *not* essential for RelA DNA binding in response to TNFα or IL-1.

### Impaired NF-κB-dependent gene expression in *t2k⁻/⁻* cells

NF-κB-dependent gene expression was assessed both by a reporter assay and by northern blot analysis of the expression of endogenous NF-κB target genes. To assess reporter activity, protein extracts were prepared from wild-type and T2K-deficient EFs that had been transfected with either the NF-κB-dependent E-selectin promoter-luciferase (pELAM-luc) or the 6XκB promoter-luciferase (6XκB-luc) reporter construct, and stimulated with TNFα,

IL-1 or PDGF for 2 or 6 h. An expression vector encoding the β-galactosidase gene was co-transfected as a control for transfection efficiency. A robust induction of pELAM-luc reporter activity was observed in wild-type EFs stimulated for 2 h with either TNFα or IL-1. However, pELAM-luc activity was only marginally induced in *t2k⁻/⁻* EFs (Figure 6A). After 6 h stimulation with TNFα or IL-1, reporter activity in wild-type EFs was increased a total of 18- and 11-fold, respectively, compared with untreated controls. In contrast, only a 3-fold induction of reporter activity was observed in T2K-deficient cells after 6 h with either TNFα or IL-1 (Figure 6A).

Results from the T2K/NAK study (Tojima *et al.*, 2000) highlighted a role for T2K/NAK in PDGF-mediated NF-κB activation, prompting us to compare PDGF-induced NF-κB-dependent reporter activity in wild-type and *t2k⁻/⁻* EFs. The maximum induction of pELAM-luc reporter activity observed in wild-type EFs in response to PDGF stimulation (after 2 h) was much weaker (3.3-fold)

than that observed in response to either TNFα or IL-1. Furthermore, the reporter activity induced in *t2k⁻/⁻* EFs in response to PDGF stimulation was only slightly lower (1.4-fold) than wild-type controls. After 6 h of PDGF stimulation, both wild-type and *t2k⁻/⁻* EFs exhibit weak and comparable reporter activity (Figure 6A). Similar results were obtained with all the above stimuli using the 6XκB-luc reporter construct (data not shown).

We next assessed induction of endogenous NF-κB target gene expression in the absence of T2K. To this end, RNA samples prepared from wild-type and T2K-deficient EFs that had been stimulated with IL-1 or TNFα for 0.5, 2, 6, 12 or 24 h were subjected to northern blot analysis to assess the levels of Toll-like receptor-2 (TLR-2) and intercellular adhesion molecule-1 (ICAM-1). To confirm that TLR-2 is indeed an NF-κB target, we compared mRNA expression of TLR-2 in wild-type and *relA⁻/⁻* EFs. The levels of mRNA for TLR-2 are strongly induced after 2 h of TNFα stimulation in wild-type cells, but there is no detectable TLR-2 mRNA in the absence of RelA (Figure 6B). Furthermore, the levels of TNFα-induced mRNA for TLR-2 were significantly reduced in *t2k⁻/⁻* EFs compared with wild-type controls. Moreover, the levels of mRNA for the NF-κB target gene ICAM-1 (Chen *et al.*, 1995) induced after 2 h of IL-1 (Figure 6B, right) or TNFα (data not shown) stimulation were also substantially reduced in *t2k⁻/⁻* EFs compared with wild-type controls. Together, these results indicate that T2K-deficient EFs are impaired in expression of certain NF-κB-dependent genes induced by pro-inflammatory cytokines.

## Discussion

In this study, we have demonstrated that, like IKKβ, NEMO and the RelA subunit of NF-κB, T2K is crucial in protecting embryonic liver from devastating apoptosis. However, analysis of NF-κB activation in EFs indicates that, in contrast to these mediators, T2K plays a novel role in the activation of NF-κB-dependent transcription, independently of I-κBα phosphorylation and κB DNA binding. Much attention has been focused on the process by which extracellular signals induce phosphorylation of I-κB by the IKK complex, leading to degradation of I-κB and release of NF-κB from cytoplasmic sequestration. However, I-κB phosphorylation is not the sole means of regulating NF-κB transcriptional activity. Several recent studies have demonstrated that signal-induced phosphorylation of the RelA subunit of NF-κB is critical for the induction of NF-κB-dependent transcription (Bird *et al.*, 1997; Zhong *et al.*, 1997, 1998; Wang and Baldwin, 1998; Anrather *et al.*, 1999; Egan *et al.*, 1999; Sizemore *et al.*, 1999). In fact, signals such as TNFα, LPS and IL-1, which induce phosphorylation of I-κB proteins, can also cause phosphorylation of NF-κB proteins (Bird *et al.*, 1997; Zhong *et al.*, 1997; Wang and Baldwin, 1998; Egan *et al.*, 1999; Sizemore *et al.*, 1999). Importantly, while the inducible phosphorylation of RelA increases the transcriptional activity of NF-κB, it does not appear to affect its nuclear translocation or DNA binding activity (Wang and Baldwin, 1998). Therefore, it is possible that T2K may regulate the trans-activation potential of NF-κB through phosphorylation of NF-κB proteins, either directly or indirectly.

It is also possible that T2K plays a role in inducing coactivators of NF-κB-dependent transcription. Previous studies have shown that LPS-induced phosphorylation of RelA Ser276 stimulates trancriptional activity by promoting the interaction of NF-κB with the coactivator CBP/p300 (Zhong *et al.*, 1998). Different stimuli, including LPS and TNFα, induce phosphorylation of RelA on different residues (Zhong *et al.*, 1997, 1998; Wang and Baldwin, 1998), implying that different coactivators, with distinct effects on different promoters, may be recruited to the transcriptional complex. Of note in this context is that while the results presented in this study demonstrate that T2K is critical in NF-κB-dependent transcription, expression of certain NF-κB target genes such as I-κBα and IL-6 does not seem to be affected by the lack of T2K. In protein extracts from cells stimulated with either TNFα or IL-1, I-κBα is first degraded, then re-expressed at comparable levels and with similar kinetics in wild-type and T2K-deficient EF cells (Figure 5A). Furthermore, IL-1-induced expression of IL-6 by *t2k⁻/⁻* EFs is comparable to that of wild-type EFs (data not shown). These seemingly paradoxical results are consistent with a role for T2K as a gene-specific regulator of NF-κB-dependent transcription.

The role of T2K in activation of NF-κB may be, in part, independent of its kinase activity, as is the case for RIP and IRAK, components of the TNFR1 and IL-1 receptor signaling complexes, respectively (Cao *et al.*, 1996a; Hsu *et al.*, 1996a; Knop and Martin, 1999; Vig *et al.*, 1999). Results from the study by Pomerantz and Baltimore (1999) indicated that a mutated form of TBK1/T2K in which the kinase activity was abrogated was able to inhibit TANK-mediated NF-κB reporter activity, but not that induced by TNFα, IL-1 or CD40. The study by Tojima *et al.* (2000) also shows that a kinase-inactive form of NAK/T2K is unable to inhibit TNFα- and IL-1-induced NF-κB reporter activity. While the precise role of TANK in NF-κB activation remains to be elucidated, these data suggest that the function of TBK1/T2K in TNFα- or IL-1-induced NF-κB-dependent transcription may be partially independent of its kinase activity.

The phenotype of *t2k⁻/⁻* animals has striking similarities to that of *nemo⁻/⁻*, *ikkβ⁻/⁻* or *relA⁻/⁻* animals, since all these animals die of profound liver degeneration and apoptosis during embryonic development (Beg *et al.*, 1995; Q.Li *et al.*, 1999b; Z.W.Li *et al.*, 1999; Tanaka *et al.*, 1999; Rudolph *et al.*, 2000). Furthermore, like *ikkβ⁻/⁻* or *relA⁻/⁻* animals, embryonic lethality and liver apoptosis of *t2k⁻/⁻* can be attributed to TNFR1 signaling (Beg and Baltimore, 1996; Q.Li *et al.*, 1999b). However, there are some important differences. RelA-deficient, *nemo⁻/⁻* or *ikkβ⁻/⁻* EF cells exhibit enhanced sensitivity to TNFα-induced apoptosis, implying that the liver cell death observed in these mutant animals can be attributed to a lack of NF-κB-mediated protection from TNFα-mediated cytotoxicity (Beg and Baltimore, 1996; Q.Li *et al.*, 1999b; Z.W.Li *et al.*, 1999; Tanaka *et al.*, 1999; Rudolph *et al.*, 2000). In contrast, *t2k⁻/⁻* EFs are not sensitive to TNFα-induced apoptosis, even in the presence of moderate concentrations of cycloheximide. These results suggest that there may be cell type-specific molecules involved in both the activation of NF-κB-dependent transcription and protection against TNFα-mediated cytotoxicity. Thus, the uncoupling of cytoprotection in fetal liver and EFs may be caused by

differential roles of T2K in different cell types. Alternatively, mediators such as T2K may have partially redundant functions that can be compensated for by other molecules in some cell types. Further investigation is required to address these possibilities.

Two independent studies published during the preparation of this manuscript reported the identification and characterization of a novel kinase termed IKKi or IKKε (Shimada *et al.*, 1999; Peters *et al.*, 2000). IKKε/i is 48% identical and 64% similar to T2K, and is activated by several inducers of NF-κB, including LPS and phorbol 12-myristate 13-acetate (PMA) (Shimada *et al.*, 1999; Peters *et al.*, 2000). While IKKε/i can phosphorylate I-κBα Ser36 *in vitro*, it apparently functions *in vivo* as part of a larger complex (which does not include IKKα/β) that can phosphorylate both Ser32 and Ser36 of I-κBα in response to PMA (Peters *et al.*, 2000). Furthermore, a kinase-inactive form of IKKε/i inhibited NF-κB reporter activity induced by PMA or a T-cell activation stimulus, but not that induced by TNFα or IL-1 stimulation (Peters *et al.*, 2000). T2K and IKKε/i may thus have partially overlapping functions, but additional studies are needed to determine whether there is a functional relationship between these two kinases *in vivo*.

In conclusion, in this study we have isolated and characterized T2K, a novel kinase associated with TRAF2 that is essential for the protection of embryonic liver from apoptosis. Analysis of T2K-deficient EF cells has shown that T2K plays a unique role in NF-κB transcriptional activation in response to pro-inflammatory cytokines that is at least partly independent of I-κB degradation and κB binding. Further studies of the role of T2K in NF-κB transcriptional activation will help define the molecular network governing this important process.

## Materials and methods

### Identification and purification of T2K

Cells of the 293 cell line stably expressing FLAG-tagged TRAF2 were lysed in lysis buffer [50 mM HEPES pH 7.6, 250 mM NaCl, 1 mM EGTA, 1 mM dithiothreitol (DTT), protease inhibitor cocktail (Boehringer Mannheim), 20 mM β-glycerophosphate, 1 mM sodium orthovanadate, 5 mM *p*-nitrophenyl phosphate, 10% glycerol, 0.1% NP-40] for 20 min on ice. After centrifugation of lysates at 100 000 *g* for 30 min, supernatants were incubated with anti-FLAG M2 beads (Sigma; 10 μl/ml of cell lysate) overnight at 4°C with rocking. M2 beads were washed extensively in lysis buffer and used as 'TRAF2 complexes' in kinase assays as described below. The kinase activity found to phosphorylate recombinant I-κBα was purified first by gel filtration, and then by monoQ column chromatography. The peptide sequence of a protein band of ~80 kDa that co-fractionated with I-κBα kinase activity was used to identify several EST sequences in the National Center of Biological Information (Bethesda, MD). One EST sequence (R19830) was used to clone a full-length cDNA encoding an apparent protein kinase that we named T2K. The same kinase has been identified as TANK-binding kinase (I-TRAF) and named as TANK-binding kinase (TBK1) (Pomerantz and Baltimore, 1999) (DDBJ/EMBL/GenBank accession No. AF191839).

### Co-immunoprecipitation

Recombinant T2K was generated in *Escherichia coli* (BL21) and used to induce the production of a rabbit polyclonal anti-T2K antiserum using standard protocols. For co-immunoprecipitations, 1 × 10^7 293 cells were either left untreated or treated for 5 min with I-κBα (recombinant mouse TNFα; R&D Systems Inc.). Cells were harvested, lysed as above and centrifuged at 100 000 *g* for 30 min to yield extracts used in experiments. Extract samples (1.0 ml; 10^7 cell equivalents) were incubated with 1 μl of either control pre-immune rabbit serum or rabbit

antisera specific for either IKKβ, TRAF6 (generated as described above) or TRAF2 (generated against a peptide derived from TRAF2 73–106 amino acids) and 10 μl of protein A–Sepharose beads (Pharmacia) overnight at 4°C with rocking. After washing, the beads were boiled in 20 μl of SDS sample buffer and 10 μl of the eluate were fractionated by 10% SDS–PAGE followed by western blotting with the rabbit polyclonal antiserum to T2K. The reactive bands were detected with horseradish peroxidase-conjugated protein A (Bio-Rad) and an enhanced chemiluminescence sytem (Amersham) used according to the manufacturer's instructions.

### Kinase assays

TRAF2 complexes (from 10^7 cell equivalents) bound to anti-FLAG M2 beads were washed extensively, then eluted using 20 μl of FLAG peptide in lysis buffer at 200 μg/ml. The eluate (10 μl) was incubated at 37°C for 30 min with 1 μg of bacterially expressed I-κBα (1–250 amino acids) as substrate in a 20 μl kinase reaction mixture containing 20 mM HEPES pH 7.6, 125 mM NaCl, 1 mM EGTA, 1 mM DTT, 10 mM MgCl₂, protease inhibitor cocktail (Boehringer Mannheim), 20 mM β-glycerophosphate, 1 mM sodium orthovanadate, 5 mM *p*-nitrophenyl phosphate and [γ-³²P]ATP. The reactions were stopped by adding 10 μl of SDS sample buffer. Phosphorylated proteins were resolved by SDS–PAGE and visualized by autoradiography. To determine kinase activity toward wild-type and mutant I-κBα-derived peptides, FLAG-tagged T2K was transiently expressed in 293 cells and immunopurified with M2 beads. Approximately 0.2 μg of recombinant T2K were incubated with 50 μM I-κBα-derived peptides in a 20 μl kinase assay as described above. The phosphorylated peptides resolved on a pre-cast tricine gel (Bio-Rad) and visualized by autoradiography.

### Generation of t2k⁻/⁻ mice by gene targeting

A genomic DNA clone for *t2k* was isolated by screening a 129/J mouse genomic DNA library using a probe derived from the 5′ end of the human *t2k* cDNA. The targeting construct was designed to replace most of exon 1, all of exon 2 and the intervening intron with the PGK-*neo* gene cassette in reverse orientation to the endogenous *t2k* gene. The linearized targeting construct was transfected into E8 cells (E14 clone, derived from 129/Ola mouse embryos) by electroporation as described previously (Yeh *et al.*, 1997). Neomycin-resistant ES clones were selected in 300 μg/ml G418 (Gibco-BRL) in Dulbecco's modified Eagle's medium (DMEM) supplemented with 15% fetal bovine serum and leukemia inhibitory factor. Homologous recombinants were identified by PCR and further analyzed by Southern blot hybridization using the flanking probe depicted in Figure 2A or a *neo*-specific probe. Chimeric mice were produced by microinjection of heterozygous ES cells into E3.5 C57BL/6J blastocysts that were subsequently transferred to CD1 pseudopregnant foster mothers. Male chimerae were backcrossed with C56BL/6J females and germline transmission in F₁ *t2k*⁺/⁻ mice was verified by Southern blot analysis. Heterozygous mice were interbred to obtain *t2k*⁻/⁻ mice. Genotyping of the F₂ mice was performed by PCR on tail genomic DNA and verified by Southern blot analysis. The primer 5′-GGCTCT-CTGTTCAGTTAGGATGTCAA-3′ was used in conjunction with either the primer 5′-TTCTCATTGTCTTACGAGATGTGG-3′ for the wild-type *t2k* allele, or the primer 5′-AGAGGCCACTTGTGTAGCGCC-AAGTGCC-3′ for the mutant allele. Mice were maintained in the animal facility of the Ontario Cancer Institute in accordance with its ethical guidelines.

### Histology

Embryos were fixed with 4% buffered formalin at 4°C for 12 h and embedded in paraffin. Sections were stained with hematoxylin and eosin (H&E) according to standard protocols. For apoptosis determination, TUNEL (terminal deoxytransferase-mediated deoxyuridine triphosphate nick-end labeling) assays were performed using an *in situ* cell death detection kit (Boehringer Mannheim) according to the manufacturer's instructions.

### Adoptive transfer and flow cytometry

Six-week-old *rag1*⁻/⁻ mice were purchased from Taconic. Prior to cell transfer, recipient mice were irradiated once with 900 rads of γ-rays. Approximately 2 × 10^6 freshly isolated fetal liver cells from E12.5 *t2k*⁺/⁺ or *t2k*⁻/⁻ embryos were injected intravenously into recipients. After transfer, mice were treated with Clavulin-125F (1.25 mg/ml; SmithKline Beecham) for 2 weeks and monitored daily for survival.

### Apoptosis assays

Single-cell suspensions of thymocytes were prepared as previously described (Amakawa *et al.*, 1996) from *rag1*$^{-/-}$ mice 6 weeks after reconstitution with E12.5 fetal liver, and cells were plated at $5 \times 10^6$ cells/ml in 96-well plates in RPMI supplemented with 5% fetal bovine serum and containing either no apoptotic stimulus, or dexamethasone (1 µM; Sigma) or TNFα at 1.0, 10 or 100 µg/ml. After 20 h incubation at 37°C in 5% $CO_2$, the cells were harvested and stained with PE-labeled anti-CD8α, FITC-labeled anti-CD4 (both from Pharmingen) and 1 µg/ml of the vital dye 7-AAD (Sigma), and analyzed by flow cytometry as previously described (Nishina *et al.*, 1997). The proportions of viable DP (CD4$^+$CD8$^+$) thymocytes were displayed on a dot plot, gating on the 7-AAD negative population. Individual treatments were measured in quadruplicate.

EFs ($1.2 \times 10^5$) were plated onto 6-well plates in DMEM supplemented with 10% fetal bovine serum and β-mercaptoethanol. After 24 h incubation, TNFα (10 ng/ml) alone or TNFα in combination with the concentrations of cycloheximide (Sigma) indicated in Figure 4C was added to induce cell death. After 18 h culture, cells were harvested, stained with propidium iodide (PharMingen) and analyzed by flow cytometry to determine cell viability.

### Gel mobility shift assay and western blot analysis

Nuclear and cytoplasmic extracts were harvested from EF cells according to previously described protocols (Pfeffer *et al.*, 1993). Recombinant mouse TNFα and IL-1β were purchased from R&D Systems Inc. The Bio-Rad protein assay was used to adjust for equal amounts of nuclear or cytoplasmic proteins in each sample. For supershift EMSA, nuclear extracts were pre-incubated with 1 µg of RelA-specific antibody for 15 min at room temperature prior to EMSA analysis. Nuclear extracts were utilized in gel mobility shift assay, as previously described (Yeh *et al.*, 1997). Cytoplasmic extracts were utilized in western blotting and were incubated with anti-phospho-I-κBα antibody, anti-I-κBα antibody (both from New England Biolabs) or anti-actin antibody (Fisher Scientific).

### Reporter assays

Cells were plated at $1.3 \times 10^5$ in 6-well plates 24 h prior to transfection using the polycationic transfection reagent Superfect (Qiagen), with a total of 2 µg of DNA. In order to normalize results to transfection efficiency, each transfection included 0.2 µg of CMV-lacZ, which constitutively expresses β-galactosidase (Shu *et al.*, 1997), in addition to either the pELAM-luc reporter, which has been previously described (Hsu *et al.*, 1996b), or empty parental expression vector as the control. The medium was changed after 3 h, and 42 h after transfection cells were stimulated with 10 ng/ml TNF-α or IL-1β, or 100 ng/ml PDGF. After 2 or 6 h, cells were washed twice with phosphate-buffered saline and lysed in 200 µl of reporter lysis buffer (Promega) at room temperature for 30 min. Luciferase activity in 5 µl of extract was measured immediately using the Luciferase Assay System (Promega) and a luminometer (BioOrbiter, Mandel Scientific) according to the manufacturers' instructions. β-galactosidase activity was determined in 5 µl of extract with 4 mg/ml ONPG (*o*-nitrophenyl-β-galactopyranoside; Sigma) in 0.067 M sodium phosphate buffer pH 7.5 by measuring the optical density at 420 nm. Fold stimulation of reporter activity was calculated for each sample by dividing the luciferase activity in the experimental sample (normalized to β-galactosidase activity) by the luciferase activity in the unstimulated control.

### Acknowledgements

The authors thank Hien Chau, Seiko Sugimoto and Jennifer Tsang for excellent technical assistance, and Dr David Goeddel and members of W.-C.Y.'s laboratory for helpful discussions. We also thank Mary Saunders for scientific editing and Irene Ng for administrative assistance. This work was supported in part by the National Cancer Institute of Canada (NCIC) with funds from the Terry Fox Run (#010028, W.-C.Y.).

### References

Amakawa,R. *et al.* (1996) Impaired negative selection of T cells in Hodgkin's disease antigen CD30-deficient mice. *Cell*, **84**, 551–562.
Anrather,J., Csizmadia,V., Soares,M.P. and Winkler,H. (1999) Regulation of NF-κB RelA phosphorylation and transcriptional

activity by p21(ras) and protein kinase Cζ in primary endothelial cells. *J. Biol. Chem.*, **274**, 13594–13603.
Arch,R.H., Gedrich,R.W. and Thompson,C.B. (1998) Tumor necrosis factor receptor-associated factors (TRAFs)—a family of adapter proteins that regulates life and death. *Genes Dev.*, **12**, 2821–2830.
Beg,A.A. and Baltimore,D. (1996) An essential role for NF-κB in preventing TNF-α-induced cell death. *Science*, **274**, 782–784.
Beg,A.A., Sha,W.C., Bronson,R.T., Ghosh,S. and Baltimore,D. (1995) Embryonic lethality and liver degeneration in mice lacking the RelA component of NF-κB. *Nature*, **376**, 167–170.
Bird,T.A., Schooley,K., Dower,S.K., Hagen,H. and Virca,G.D. (1997) Activation of nuclear transcription factor NF-κB by interleukin-1 is accompanied by casein kinase II-mediated phosphorylation of the p65 subunit. *J. Biol. Chem.*, **272**, 32606–32612.
Cao,Z., Henzel,W.J. and Gao,X. (1996a) IRAK: a kinase associated with the interleukin-1 receptor. *Science*, **271**, 1128–1131.
Cao,Z., Xiong,J., Takeuchi,M., Kurama,T. and Goeddel,D.V. (1996b) TRAF6 is a signal transducer for interleukin-1. *Nature*, **383**, 443–446.
Chen,C.C., Rosenbloom,C.L., Anderson,D.C. and Manning,A.M. (1995) Selective inhibition of E-selectin, vascular cell adhesion molecule-1 and intercellular adhesion molecule-1 expression by inhibitors of IκB-α phosphorylation. *J. Immunol.*, **155**, 3538–3545.
Cheng,G. and Baltimore,D. (1996) TANK, a co-inducer with TRAF2 of TNF- and CD40L-mediated NF-κB activation. *Genes Dev.*, **10**, 963–973.
DiDonato,J.A., Hayakawa,M., Rothwarf,D.M., Zandi,E. and Karin,M. (1997) A cytokine-responsive IκB kinase that activates the transcription factor NF-κB. *Nature*, **388**, 548–554.
Egan,L.J., Mays,D.C., Huntoon,C.J., Bell,M.P., Pike,M.G., Sandborn, W.J., Lipsky,J.J. and McKean,D.J. (1999) Inhibition of interleukin-1-stimulated NF-κB RelA/p65 phosphorylation by mesalamine is accompanied by decreased transcriptional activity. *J. Biol. Chem.*, **274**, 26448–26453.
Foo,S.Y. and Nolan,G.P. (1999) NF-κB to the rescue: RELs, apoptosis and cellular transformation. *Trends Genet.*, **15**, 229–235.
Garceau,N., Kosaka,Y., Masters,S., Hambor,J., Shinkura,R., Honjo,T. and Noelle,R.J. (2000) Lineage-restricted function of NF-κB-inducing kinase (NIK) in transducing signals via CD40. *J. Exp. Med.*, **191**, 381–386.
Ghosh,S., May,M.J. and Kopp,E.B. (1998) NF-κB and Rel proteins. *Annu. Rev. Immunol.*, **16**, 225–260.
Hsu,H., Huang,J., Shu,H.B., Baichwal,V. and Goeddel,D.V. (1996a) TNF-dependent recruitment of the protein kinase RIP to the TNF receptor-1 signaling complex. *Immunity*, **4**, 387–396.
Hsu,H., Shu,H.B., Pan,M.G. and Goeddel,D.V. (1996b) TRADD–TRAF2 and TRADD-FADD interactions define two distinct TNF receptor 1 signal transduction pathways. *Cell*, **84**, 299–308.
Hu,Y., Baud,V., Delhase,M., Zhang,P., Deerinck,T., Ellisman,M., Johnson,R. and Karin,M. (1999) Abnormal morphogenesis but intact IKK activation in mice lacking the IKKα subunit of IκB kinase. *Science*, **284**, 316–320.
Knop,J. and Martin,M.U. (1999) Effects of IL-1 receptor-associated kinase (IRAK) expression on IL-1 signaling are independent of its kinase activity. *FEBS Lett.*, **448**, 81–85.
Lee,S.Y., Reichlin,A., Santana,A., Sokol,K.A., Nussenzweig,M.C. and Choi,Y. (1997) TRAF2 is essential for JNK but not NF-κB activation and regulates lymphocyte proliferation and survival. *Immunity*, **7**, 703–713.
Li,Q., Lu,Q., Hwang,J.Y., Buscher,D., Lee,K.F., Izpisua-Belmonte,J.C. and Verma,I.M. (1999a) IKK1-deficient mice exhibit abnormal development of skin and skeleton. *Genes Dev.*, **13**, 1322–1328.
Li,Q., Van Antwerp,D., Mercurio,F., Lee,K.F. and Verma,I.M. (1999b) Severe liver degeneration in mice lacking the IκB kinase 2 gene. *Science*, **284**, 321–325.
Li,Z.W., Chu,W., Hu,Y., Delhase,M., Deerinck,T., Ellisman,M., Johnson,R. and Karin,M. (1999) The IKKβ subunit of IκB kinase (IKK) is essential for NF-κB activation and prevention of apoptosis. *J. Exp. Med.*, **189**, 1839–1845.
Liu,Z.G., Hsu,H., Goeddel,D.V. and Karin,M. (1996) Dissection of TNF receptor 1 effector functions: JNK activation is not linked to apoptosis while NF-κB activation prevents cell death. *Cell*, **87**, 565–576.
Lomaga,M.A. *et al.* (1999) TRAF6-deficiency results in osteopetrosis and defective interleukin-1, CD40 and LPS signaling. *Genes Dev.*, **13**, 1015–1024.
Makris,C., Godfrey,V.L., Krahn-Senftleben,G., Takahashi,T., Roberts, J.L., Schwartz,T., Feng,L., Johnson,R.S. and Karin,M. (2000) Female mice heterozygous for IKKγ/NEMO deficiencies develop a

dermatopathy similar to the human X-linked disorder incontinentia pigmenti. *Mol. Cell*, **5**, 969–979.

Mercurio,F. *et al.* (1997) IKK-1 and IKK-2: cytokine-activated IκB kinases essential for NF-κB activation. *Science*, **278**, 860–866.

Natoli,G., Costanzo,A., Ianni,A., Templeton,D.J., Woodgett,J.R., Balsano,C. and Levrero,M. (1997) Activation of SAPK/JNK by TNF receptor 1 through a noncytotoxic TRAF2-dependent pathway. *Science*, **275**, 200–203.

Nishina,H. *et al.* (1997) Stress-signaling kinase Sek1 protects thymocytes from apoptosis mediated by CD95 and CD3. *Nature*, **385**, 350–353.

Peters,R.T., Liao,S.-M. and Maniatis,T. (2000) IKKε is part of a novel PMA-inducible IκB kinase complex. *Mol. Cell*, **5**, 513–522.

Pfeffer,K. *et al.* (1993) Mice deficient for the 55 kd tumor necrosis factor receptor are resistant to endotoxic shock, yet succumb to *L.monocytogenes* infection. *Cell*, **73**, 457–467.

Pomerantz,J.L. and Baltimore,D. (1999) NF-κB activation by a signaling complex containing TRAF2, TANK and TBK1, a novel IKK-related kinase. *EMBO J.*, **18**, 6694–6704.

Regnier,C.H., Song,H.Y., Gao,X., Goeddel,D.V., Cao,Z. and Rothe,M. (1997) Identification and characterization of an IκB kinase. *Cell*, **90**, 373–383.

Rothe,M., Sarma,V., Dixit,V.M. and Goeddel,D.V. (1995) TRAF2-mediated activation of NF-κB by TNF receptor 2 and CD40. *Science*, **269**, 1424–1427.

Rothe,M., Xiong,J., Shu,H.B., Williamson,K., Goddard,A. and Goeddel, D.V. (1996) I-TRAF is a novel TRAF-interacting protein that regulates TRAF-mediated signal transduction. *Proc. Natl Acad. Sci. USA*, **93**, 8241–8246.

Rothwarf,D.M., Zandi,E., Natoli,G. and Karin,M. (1998) IKK-γ is an essential regulatory subunit of the IκB kinase complex. *Nature*, **395**, 297–300.

Rudolph,D., Yeh,W.C., Wakeham,A., Rudolph,B., Nallainathan,D., Potter,J., Elia,A.J. and Mak,T.W. (2000) Severe liver degeneration and lack of NF-κB activation in NEMO/IKKγ-deficient mice. *Genes Dev.*, **14**, 854–862.

Shimada,T., Kawai,T., Takeda,K., Matsumoto,M., Inoue,J., Tatsumi,Y., Kanamaru,A. and Akira,S. (1999) IKK-i, a novel lipopolysaccharide-inducible kinase that is related to IκB kinases. *Int. Immunol.*, **11**, 1357–1362.

Shinkura,R., Kitada,K., Matsuda,F., Tashiro,K., Ikuta,K., Suzuki,M., Kogishi,K., Serikawa,T. and Honjo,T. (1999) Alymphoplasia is caused by a point mutation in the mouse gene encoding NF-κB-inducing kinase. *Nature Genet.*, **22**, 74–77.

Shu,H.B., Halpin,D.R. and Goeddel,D.V. (1997) Casper is a FADD- and caspase-related inducer of apoptosis. *Immunity*, **6**, 751–763.

Sizemore,N., Leung,S. and Stark,G.R. (1999) Activation of phosphatidylinositol 3-kinase in response to interleukin-1 leads to phosphorylation and activation of the NF-κB p65/RelA subunit. *Mol. Cell. Biol.*, **19**, 4798–4805.

Song,H.Y., Regnier,C.H., Kirschning,C., Goeddel,D. and Rothe,M. (1997) Tumor necrosis factor (TNF)-mediated kinase cascades: bifurcation of NF-κB and c-jun N-terminal kinase (JNK/SAPK) pathways at TNF receptor-associated factor 2. *Proc. Natl Acad. Sci. USA*, **94**, 9792–9796.

Takeda,K. *et al.* (1999) Limb and skin abnormalities in mice lacking IKKα. *Science*, **284**, 313–316.

Tanaka,M., Fuentes,M.E., Yamaguchi,K., Durnin,M.H., Dalrymple,S.A., Hardy,K.L. and Goeddel,D.V. (1999) Embryonic lethality, liver degeneration and impaired NF-κB activation in IKK-β-deficient mice. *Immunity*, **10**, 421–429.

Tojima,Y. *et al.* (2000) NAK is an IκB kinase-activating kinase. *Nature*, **404**, 778–782.

Vig,E., Green,M., Liu,Y., Donner,D.B., Mukaida,N., Goebl,M.G. and Harrington,M.A. (1999) Modulation of tumor necrosis factor and interleukin-1-dependent NF-κB activity by mPLK/IRAK. *J. Biol. Chem.*, **274**, 13077–13084.

Wang,D. and Baldwin,A.S.,Jr (1998) Activation of NF-κB-dependent transcription by TNFα is mediated through phosphorylation of RelA/ p65 on serine 529. *J. Biol. Chem.*, **273**, 29411–29416.

Woronicz,J.D., Gao,X., Cao,Z., Rothe,M. and Goeddel,D.V. (1997) IκB kinase-β: NF-κB activation and complex formation with IκB kinase-α and NIK. *Science*, **278**, 866–869.

Yamaoka,S., Courtois,G., Bessia,C., Whiteside,S.T., Weil,R., Agou,F., Kirk,H.E., Kay,R.J. and Israel,A. (1998) Complementation cloning of NEMO, a component of the IκB kinase complex essential for NF-κB activation. *Cell*, **93**, 1231–1240.

Yeh,W.C. *et al.* (1997) Early lethality, functional NF-κB activation and increased sensitivity to TNF-induced cell death in TRAF2-deficient mice. *Immunity*, **7**, 715–725.

Yeh,W.C., Hakem,R., Woo,M. and Mak,T.W. (1999) Gene targeting in the analysis of mammalian apoptosis and TNF receptor superfamily signaling. *Immunol. Rev.*, **169**, 283–302.

Zandi,E., Rothwarf,D.M., Delhase,M., Hayakawa,M. and Karin,M. (1997) The IκB kinase complex (IKK) contains two kinase subunits, IKKα and IKKβ, necessary for IκB phosphorylation and NF-κB activation. *Cell*, **91**, 243–252.

Zhong,H., SuYang,H., Erdjument-Bromage,H., Tempst,P. and Ghosh,S. (1997) The transcriptional activity of NF-κB is regulated by the IκB-associated PKAc subunit through a cyclic AMP-independent mechanism. *Cell*, **89**, 413–424.

Zhong,H., Voll,R.E. and Ghosh,S. (1998) Phosphorylation of NF-κB p65 by PKA stimulates transcriptional activity by promoting a novel bivalent interaction with the coactivator CBP/p300. *Mol. Cell*, **1**, 661–671.

*Received May 11, 2000; revised and accepted July 24, 2000*