# ASHBY & GEDDES

ATTORNEYS AND COUNSELLORS AT LAW

500 DELAWARE AVENUE

P. O. BOX 1150

WILMINGTON, DELAWARE 19899

TELEPHONE
302-654-1888

FACSIMILE
302-654-2067

August 10, 2007

The Honorable Mary Pat Thynge
United States District Court
844 North King Street
Wilmington, Delaware 19810

**VIA ELECTRONIC FILING**

**REDACTED
PUBLIC VERSION**

Re: *Amgen Inc. et al. v. ARIAD Pharmaceuticals, Inc.*, C.A. No. 06-259-MPT

Dear Judge Thynge:

We write on behalf of ARIAD in response to the Court's request during the discovery teleconference on August 3, 2007, for a letter discussing the scope of 35 U.S.C. § 271(e)(1), which sets forth an exemption from infringement liability under the Patent Act. This issue arose with respect to Amgen's suggestion, made for the first time during the teleconference, that it would move to dismiss any infringement claims under the '374 and '090 patents on the basis of § 271(e)(1).

### I. Background

Shortly before filing the motion to amend in May 2007, ARIAD learned during review of Amgen's document production that Amgen has used certain assays, or analytical methods, that infringe the '374 and '090 patents.

## REDACTED

### II. Applicable Legal Standards

#### A. The "Futility" Test

The § 271(e)(1) exemption is relevant to ARIAD's motion to amend only if it would render the proposed amendment "futile." In the context of a motion to amend, "'[f]utility' means that the [counterclaim], as amended, would fail to state a claim upon which relief could be granted. In assessing 'futility,' the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (citations omitted). "A motion to dismiss pursuant to Rule 12(b)(6) may be granted only if, accepting all well pleaded allegations in the [counterclaim] as true, and viewing

The Honorable Mary Pat Thynge
August 2, 2007
Page 2

them in the light most favorable to the [counterclaim] plaintiff, [counterclaim] plaintiff is not entitled to relief." *Id.* at 1420 (citation omitted). "[A] district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings," with an exception (which does not apply to ARIAD's allegations of patent infringement) for "document[s] integral to or explicitly relied upon in the complaint." *Id.* at 1426 (citations and internal quotations omitted). ARIAD's proposed amendment alleges facts sufficient to state a claim for infringement of the '374 and '090 patents—and Amgen does not contend otherwise in its opposition to ARIAD's motion to amend.

B.   **The Section 271(e)(1) Exemption**

Section 271(e)(1) provides that "[i]t shall not be an act of infringement to make, use, offer to sell, or sell ... a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products." The Food, Drug, and Cosmetic Act, which governs the submission of information regarding drugs to the Food and Drug Administration ("FDA"), is such a federal law.

In *Merck KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193 (2005), the Supreme Court interpreted the scope of § 271(e)(1) in the context of preclinical studies involving patented compounds. The patentee had asserted patents related to a class of compounds termed RGD peptides, which can be used to reverse tumor growth by binding to receptors called integrins on the surfaces of certain cells. *Id.* at 197. The accused infringer in the case performed laboratory testing of RGD peptides as potential drug candidates. *Id.* at 197-98.

The Supreme Court held that when "a drugmaker has a reasonable basis for believing that a patented compound may work, through a particular biological process, to produce a particular physiological effect, and uses the compound in research that, if successful, would be appropriate to include in a submission to the FDA, that use is 'reasonably related' to the 'development and submission of information under ... Federal law'" and exempt under § 271(e)(1). *Id.* at 207. Thus, while the § 271(e)(1) exemption does not depend on the success or failure of the experimentation or the actual submission of particular results to the FDA, the Supreme Court made clear that the exemption does not encompass all testing. *Id.* at 207. The Court drew the line based on whether the compounds tested were <u>known at the time</u> of testing to work through particular biological processes to produce a particular physiological effect. *Id.* Experimentation before having a reasonable belief that the compound will cause a particular physiological effect cannot be considered reasonably related to the development and submission of information to the FDA, and is therefore outside the exemption. *Id.* Similarly, if a drugmaker does not have a reasonable basis to believe information will be submitted or will be relevant to an FDA submission, then the exemption does not apply. *Id.* at 207-08.

The Supreme Court was also aware that if the § 271(e)(1) exemption is construed too broadly, inventors of useful research tools (for example, tools that are useful to identify or test potential drug candidates) could be completely deprived of the value of their inventions. The Court expressly stated that, since the RGD peptides were not research tools, its decision "need not—and do[es] not—express a view about whether, or to what extent, § 271(e)(1) exempts from infringement the use of 'research tools' in the development of information for the regulatory

The Honorable Mary Pat Thynge
August 2, 2007
Page 3

process." *Id.* at 205 n.7. RGD peptides were potential drugs, not tools used to discover or test potential drugs. *Id.* The Court vacated the prior Federal Circuit decision and remanded for consideration in light of its interpretation of 271(e)(1). *Id.* at 208.

The Federal Circuit just issued its opinion on remand on July 27, 2007, holding in a 2-1 decision that the experiments in question were within the scope of § 271(e)(1). *Integra Lifesciences I, Ltd. v. Merck KGaA*, 2007 WL 2142878, Case Nos. 2002-1052, 2002-1065 (Fed. Cir. July 27, 2007). The panel noted that all of the experimental work at issue in the case had been done <u>after</u> the recognition by the alleged infringers that RGD peptides reverse tumor growth by binding to integrins. *Id.* at *4. Therefore, the alleged infringers recognized that the RGD peptides worked through a particular biological process to produce a particular physiological effect, and the accused experimentation was conducted to determine the optimum drug candidate among the RGD peptides. *Id.* at *6. Such drug optimization experiments were within the exemption. *Id.* at *14.

The majority of the Federal Circuit panel reiterated the Supreme Court's observation that research tool patents were not at issue in the case (and, indeed, the parties themselves agreed that research tool patents were not at issue). *Id.* at *13. In dissent, however, Judge Rader expressed the view that research tool patents were in fact at issue (despite the fact that the Supreme Court, the Federal Circuit judges in the panel majority, and the parties disagreed). *Id.* at *14. The dissent found the potential impact on research tool patents to be extremely troubling, because exempting use of research tool patents from infringement would be "devastating" to this important class of patented technology. *Id.* at *16. The dissent gave a hypothetical example that is particularly significant because it is identical to the situation faced by the inventors in the present litigation:

> Suppose a university professor or small independent research company invents and obtains a patent for a novel and extremely useful research tool. ... The only use of the invention tests other pharmaceutical compounds for effectiveness in fighting cancer. The invention does not itself fight cancer, but instead simply identifies the cancer fighting characteristics in other compounds. This patented invention would, of course, be of great use to the pharmaceutical industry. It would also benefit the public by identifying cancer treatments. The patent system of course would wish to protect this invention and give incentives for more investment in developing this kind of valuable research tool.

*Id.* at *18. Importantly, the Federal Circuit majority did not dismiss the dissent's concerns regarding the impact on research tool patents of an overly broad interpretation of § 271(e)(1). Instead, the majority called the dissent's criticism "inapt" because research tools were simply not at issue, and resolution of the question would have to wait for the appropriate case. *Id.* at *13.[1]

---

[1] In a decision pre-dating the Federal Circuit's recent decision in *Integra*, one district court interpreted § 271(e)(1) to exempt use of research tool patents from infringement. *Classen Immunotherapies, Inc. v. King Pharms., Inc.*, 466 F. Supp. 2d 621 (D. Md. 2006). The Maryland court explained its decision as follows: "The Supreme Court in *Merck* [*v. Integra*] specifically declined to rule

The Honorable Mary Pat Thynge
August 2, 2007
Page 4

### III. ARIAD's Amendment Is Not Futile Because It States Claims Of Infringement By Amgen's Uses Of The '374 And '090 Patents Upon Which Relief Could Be Granted

Although ARIAD has not yet been afforded anything approaching full discovery on Amgen's use of the patented analytical methods, the documents produced thus far reveal that Amgen will not be able to show that its activities fall within § 271(e)(1).

**REDACTED**

**REDACTED**

---

on whether use of 'research tools' was protected under § 271(e)(1). Although the [patented] process could be considered a 'research tool' the Court finds the extension of the safe harbor to cover the use of these tools warranted by the language of *Merck* and a plain reading of the statute." *Id.* at 625 n.2. This decision is inconsistent with the reasoning in the Federal Circuit's later decision. The issue of research tool patents remains unresolved and Judge Rader's concerns unaddressed.

The Honorable Mary Pat Thynge
August 2, 2007
Page 5

# REDACTED

Modulation of NF-kB activity can have a variety of physiological effects. For example, modulators of NF-kB activity are known to treat a number of diseases and disorders ranging from osteoporosis to severe bacterial infections to inflammatory disorders. Once again, follow-up research on identified chemicals must be performed to determine the physiological effects they may cause.

In addition, unlike *Integra*, this case involves research tool patents whose value lies in their use during laboratory testing. The '374 and '090 patents claim assays that are performed in the laboratory for identification and testing of compounds that modulate NF-kB activity. The patents do not claim the compounds themselves. The inventors developed the patented assay technology as part of their pioneering work on NF-kB. The '374 and '090 patents are valuable because the assays can identify compounds as drug leads that may be useful for development as treatments for the various disorders that result from abnormal NF-kB activity levels. The assays can also be used for potency testing.

If the 271(e)(1) exemption were interpreted to shield use of the '374 and '090 patents from infringement, the value of these patented research tools would be completely destroyed. As discussed by Judge Rader in his *Integra* dissent, the patent system is designed to encourage the development of inventions that provide benefits to the public. It would be a perverse result if an exemption designed to encourage drug development served as a disincentive to work on research tools that derive all their value from use in drug development. The '374 and '090 patents are examples of such research tools that should not be covered by the § 271(e)(1) exemption.

ARIAD's proposed amended pleading states a claim for infringement of the '374 and '090 patents. Amgen should not be permitted to short-circuit those claims under § 271(e)(1) at the pleading stage on an incomplete record. We appreciate Your Honor's attention to this matter.

Respectfully,

/s/ *Steven J. Balick*

Steven J. Balick

SJB/dmf

183094.1

cc:  David I. Gindler, Esquire (via electronic mail; w/attachments)
     Melanie K. Sharp, Esquire (by hand and via electronic mail; w/attachments)
     Marcus E. Sernel, Esquire (via electronic mail; w/attachments)
     Frederick L. Cottrell, III, Esquire (by hand and via electronic mail; w/attachments)
     Charles E. Lipsey, Esquire (via electronic mail; w/attachments)
     Robert D. Bajefsky, Esquire (via electronic mail; w/attachments)

# EXHIBITS A - E

# REDACTED IN THEIR ENTIRETY