# YOUNG CONAWAY STARGATT & TAYLOR, LLP

MELANIE K. SHARP
DIRECT DIAL:   (302) 571-6681
DIRECT FAX:    (302) 576-3333
msharp@ycst.com

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

P.O. BOX 391
WILMINGTON, DELAWARE 19899-0391

(302) 571-6600
(302) 571-1253 FAX
(800) 253-2234 (DE ONLY)
www.youngconaway.com

December 5, 2007

**BY E-FILE**

The Honorable Mary Pat Thynge
United States District Court of Delaware
844 North King Street
Wilmington, DE 19801

Re:   *Amgen, Inc. et al. v. ARIAD Pharmaceuticals, Inc.*
C. A. No.: 06-259 (MPT)

Dear Judge Thynge:

I write on behalf of Amgen concerning ARIAD's refusal to produce documents relating to recantation by Dr. Thomas Kadesch of opinions he rendered on behalf of ARIAD regarding the validity of the '516 patent. Because the validity of the '516 patent is central to this case and is the subject of arguments ARIAD is making before the PTO in the reexamination, the discoverability of the requested documents is not even a close question. Specifically, Amgen requested Dr. Kadesch's deposition transcript, his expert report, corresponding exhibits and production made in litigation with Hoffman LaRoche, where Dr. Kadesch "unequivocally" recanted his '516 patent validity opinion previously made on behalf of ARIAD.[1]

By way of background, on April 27, 2006, Dr. Thomas Kadesch testified as an expert on behalf of ARIAD concerning the issues of written description and enablement in litigation against Eli Lilly & Co. (*ARIAD Pharms. v. Eli Lilly & Co.*, C.A. No. 02 CV 11280 (RWZ) (D. Mass.) -- "the Lilly matter"). Specifically, Dr. Kadesch testified at the jury trial that the '516 patent was valid under Section 112. (*See, e.g.*, Lilly Trial Tr. at pp 94 and 137, Ex. A.) More recently, on November 15, 2007, ARIAD cited extensively to Dr. Kadesch's trial testimony in post trial briefing in its attempt to salvage the jury's verdict on Section 112 issues. (*See* [ARIAD's] Opposition to Lilly's Renewed Motion For Judgment As A Matter Of Law Or, In The Alternative, A New Trial, at 5, 8-12, 18-21, 43, and 44, Ex. B.)

On June 21, 2007 (after trial of the Lilly matter and well before ARIAD submitted its post trial brief), Dr. Kadesch recanted his testimony in the Lilly matter. He was deposed in separate litigation between Amgen and F. Hoffmann-LaRoche et al. (*Amgen, Inc. v. F. Hoffmann-LaRoche*, C.A. No. 05-12237 (WGY) (D. Mass.) -- "the Roche matter") which does

---

[1] As a result of ARIAD's intransigence, Amgen has been forced to serve subpoenas for the Kadesch documents on third parties. The subpoena served on Hoffman LaRoche, Inc. on November 16, 2007 (D.I. 498) will likely be the subject of a motion to compel as soon as practicable, because Roche's counsel (who is also ARIAD's local counsel in the Lilly action), after communication with ARIAD's most recent lead counsel, appears to have adopted ARIAD's baseless relevance argument.

Young Conaway Stargatt & Taylor, LLP

The Honorable Mary Pat Thynge
December 5, 2007
Page 2

not involve the '516 patent. Counsel for F. Hoffman-LaRoche in the Roche matter is Kaye Scholer, the same counsel that represented ARIAD in the Lilly matter. According to pleadings in both the Roche and Lilly matters, Dr. Kadesch recanted his ARIAD trial testimony concerning the validity of the '516 patent, and, in doing so, proffered opinion testimony *contrary* to ARIAD's arguments of patentability before the PTO in reexamination. In fact, while ARIAD, pursuant to the reexamination of the '516 patent, has submitted Dr. Kadesch's expert report from the Lilly matter, they have failed to disclose to the PTO any of the more recent Kadesch materials from the Roche matter that contradict his prior testimony in the Lilly matter, such as his recantation of his validity opinions concerning written description contained in that report.

Dr. Kadesch's deposition in the Roche matter was improperly designated as "Highly Confidential" by counsel for Roche/ARIAD and ARIAD has refused to correct that designation. Counsel from Kaye Scholer improperly designated the entire Kadesch deposition transcript "Highly Confidential" under the Protective Order in the Roche matter. When asked for the basis of the designation, counsel responded, "I believe [the ARIAD] patent actually is in litigation currently with Amgen. So therefore, I am going to mark it – mark this deposition outside eyes only." (Docket No. 1063, Case No. 1:05 CV 12237-WGY, Ex. C) In designating the testimony confidential, counsel acted on behalf of ARIAD, not on behalf of Roche, and so admitted. ARIAD should not prevail with its attempt to bury this highly relevant and prejudicial evidence by hiding behind a protective order which all parties agree is inapplicable to the testimony at issue.

As Your Honor is aware, the '516 patent is currently in reexamination in the Merged Proceedings of Ex Parte Reexamination Control Nos. 90/007,503 (filed April 4, 2005) and 90/007,828 (filed December 2, 2005). In the reexamination, ARIAD has asserted arguments of patentability that rely upon priority and underlying written description arguments and has submitted and relies on Dr. Kadesch's expert report from the Lilly matter regarding these issues.

Dr. Kadesch's deposition testimony concerning issues relating to the '516 patent, and his expert report, exhibits and other related production in the Roche matter which place his deposition testimony in context, are plainly discoverable as they relate to the issues of invalidity and inequitable conduct in this action. The evidence is relevant to inequitable conduct – serious inequitable conduct concerns have been raised by ARIAD's attempt to bury this evidence which is indisputably material to the validity of the '516 patent in both this action and the reexamination. The testimony is further relevant to the validity of the '516 patent since the subject matter of his testimony, not his status, particularly because he has testified and recanted, governs discoverability.

Counsel for Amgen immediately notified ARIAD, through its counsel, of the import of Dr. Kadesch's testimony in the pending reexamination proceedings and of ARIAD's duty to disclose. On November 15 in this action, Amgen requested production of the Kadesch documents from ARIAD's lead counsel at Irell & Manella, LLP. (November 15, 2007 from McDole to Gindler, Ex. D) ARIAD resisted by letter that same day, demanding further explanation. (November 15, 2007 letter from LaMagna to McDole, Ex. E) On November 20,

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Mary Pat Thynge
December 5, 2007
Page 3

2007, Amgen responded and invited a meet and confer.  (November 20, 2007 letter from
Diamond to LaMagna, Ex. F)  ARIAD stood mute, at least as to Amgen and the PTO.  On
December 4, in response to Amgen's insistence, ARIAD's third set of counsel refused
production in this case on the grounds of relevance, and, like his predecessors, refused a
corrective disclosure to the PTO.  As a result, I certify pursuant to L.R. 7.1.1, that Amgen has
been unable to secure ARIAD's voluntary cooperation on this matter, necessitating the Court's
intervention.

Respectfully,

*/s/ Melanie K. Sharp*

Melanie K. Sharp (No. 2501)

MKS

cc:    Clerk of the Court (Hand Delivery)
       John G. Day, Esquire (via e-mail)
       Frederick L. Cottrell, III, Esquire (via e-mail)
       David I. Gindler, Esquire (via e-mail)
       David Greenwald, Esquire (via e-mail)
       Robert D. Bajefsky, Esquire (via e-mail)

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No.:1:02-cv-11280-RWZ


ARIAD PHARMACEUTICALS, INC.     )
MASSACHUSETTS INSTITUTE OF      )
TECHNOLOGY, THE WHITEHEAD       )
INSTITUTE FOR BIOMEDICAL RESEARCH)
and THE PRESIDENT AND FELLOWS OF )
HARVARD COLLEGE,                )
                Plaintiffs,     )
                                )
     - vs. -                    )
                                )
ELI LILLY & COMPANY,            )
                Defendants      )

                **********


                 JURY TRIAL
             DAY 13, First Session

        BEFORE THE HONORABLE RYA W. ZOBEL
        UNITED STATES DISTRICT COURT JUDGE


            United States District Court
         John J. Moakley U.S. Courthouse
                1 Courthouse Way
           Boston, Massachusetts  02210
                 April 27, 2006

                **********



        REPORTER:  LISA W. STARR, RPR,CRR,CSR
                Tel:  617.771.8336

Ariad v. Eli Lilly                      Day 13, Session 1

4-27-06

Page 9

1   Q.   Is this inconsistent with Lilly's own expert's testimony?

2   A.   I reviewed testimony by some of their witnesses, and I

3   believe it's the testimony by Dr. Bernard makes this exact

4   same point.

5   Q.   Dr. Prescott, you referred to testimony by one of Lilly's

6   experts.  Is this the testimony that you're referring to by

7   Dr. Bernard?

8   A.   It is.

9   Q.   And what is Dr. Bernard saying here during his trial

10  testimony?

11       THE COURT:   He said what he said.

12  Q.   And is this inconsistent with your opinion that you can

13  use high concentrations of a drug to study, in cell culture,

14  to study how that drug works?

15  A.   Yes.  But I specifically exempted NSAIDS from that

16  category because of my concern about them.

17       MS. CARSON:   PTX 1642, please.

18  Q.   And we're moving onto another class of compounds that

19  Lilly has asserted as prior art against Claims 80 and 95 of

20  the '516 patent.  Could you just explain this summary of your

21  opinion?

22  A.   I summarized the different types of studies with this

23  group of compounds called glucocorticoids.  I may slip and

24  call them other names like corticosteroids.  It refers to the

25  same groups.  Different types of papers cited, some of prior

Ariad v. Eli Lilly                           Day 13, Session 2

4-27-06

1          activity in NF-kappaB mediated gene expression in a

2          cell?"

3          My answer was:  ANSWER:  "Again, I will resort to an

4          answer that involves implicit in the field and with

5          respect to other work in the field, namely, with -- I

6          believe, I made a reference to VREL acting to

7          inhibit, showing that -- I think that was, if I'm not

8          mistaken it might have been Inder Verma or it could

9          have been Warner Greene, I'm not sure who it was, had

10         shown that VREL effectively operated as a dominant

11         interfering molecule for NF-kappaB.  And again, that

12         publication as I recall was in 1990 and that would

13         have preceded the filing of this application.  So I

14         think it's fair to say that there were dominantly

15         interfering molecules."

16    Q.   Doctor, are these claims to a method of inhibiting

17    NF-kappaB in cells?  (Indicating.)

18    A.   Yes, they are.

19    Q.   And did you consider that this was the scope of the claim

20    when you considered your opinions?

21    A.   From a scientific point of view as best I could, yes.

22    Q.   And that is what the scope of the claims is?

23    A.   That's correct.

24    Q.   Now, with regard to what is in the patent, Mr. Drutchas

25    says, well, forget about DNA, forget about protein, let's only

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, and THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, | Civil Action No. 02 CV 11280 RWZ |
| Plaintiffs, | U.S. District Judge Rya W. Zobel |
| v. | |
| ELI LILLY AND CO., | |
| Defendant. | |

**PLAINTIFFS' OPPOSITION TO LILLY'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL**

III.    **THE JURY HAD AMPLE EVIDENCE TO REASONABLY SUPPORT ITS VERDICT THAT ALL THE ASSERTED '516 PATENT CLAIMS ARE VALID**

    A.    **The Jury Acted Reasonably in Finding that Lilly Failed to Prove by Clear and Convincing Evidence that Any of the Asserted '516 Patent Claims Are Invalid for Lack of Written Description**

To satisfy the requirement for written description under 35 U.S.C. § 112, "the applicant must . . . convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention."[10] The written description doctrine evolved to ensure that one of skill in the art would not, after the filing of a patent application, overreach by later claiming that which had not been invented at the time of filing.[11] Both the specification as filed, as well as any originally filed claim, may each provide proof that the inventor was in possession of her invention.[12] Written description is a factual issue "that must be applied in the context of the particular invention and state of knowledge."[13]

Based on the specification, the original claims of the April 1989 application, and the testimony of the inventors and ARIAD's experts, the jury rejected Lilly's argument that the '516 patent fails to adequately describe any of the claimed methods and found that of all the asserted claims are entitled to an April 21, 1989 effective filing date. In particular, inventors Drs. Sharp and Maniatis, and ARIAD expert Dr. Kadesch, explained how the '516 patent, as understood by one of skill at the time, (1) provides a detailed description of the NF-κB pathway and the various specific steps along this pathway to which the claimed methods are directed; and (2) discloses functional and chemical information on various compounds that one could use to practice the

---

[10] *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991).

[11] *See Vas-Cath*, 935 F.2d at 1561.

[12] *In re Gardner*, 480 F.2d 879, 879-80 (C.C.P.A. 1973); *accord LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1346 (Fed. Cir. 2005) ("an originally filed claim can provide the requisite written description to satisfy § 112").

[13] *Capon v. Eshhar*, 418 F.3d 1349, 1358 (Fed. Cir. 2005).

κB decoy molecules, it would have been routine and "easy" at the time to introduce such decoy molecules into cells in amounts sufficient to reduce NF-κB activity.[27]

Alternatively, the patent teaches blocking phosphorylation of IκB, the biochemical modification of IκB necessary for dissociation of the inhibitor protein from NF-κB.[28]  Blocking phosphorylation therefore prevents NF-κB from traveling to the nucleus, and consequently from binding to and turning on genes having NF-κB binding sites, such as cytokine genes.[29]

The patent also teaches that by producing large amounts of IκB in the cell, the large number of inhibitor IκB molecules will act as competitive blockers for any released NF-κB.  In other words, a sufficient number of IκB inhibitor molecules will keep NF-κB bound in the cytoplasm in an inactive form, with the net effect of preventing NF-κB from entering the nucleus and turning on genes.[30]

In an additional embodiment, the patent discloses use of a dominantly interfering molecule that recognizes and binds to NF-κB binding sites and blocks access to those sites.[31]  By preventing NF-κB from finding and binding to NF-κB binding sites within a gene it normally regulates, NF-κB can no longer turn on that gene.[32]

3.    **The '516 Inventors Were in Possession of the Full Scope of the Claimed Subject Matter as of the April 21, 1989 Date of the '436 Priority Application**

Dr. Kadesch testified that one of ordinary skill in the art would have found that the '516 patent inventors were in possession of the full scope of the subject matter of the asserted claims

---

[27] *Id.*  at 106:16-107:11 (Maniatis).

[28] *Id.* at 62:17:13-66:7 (Maniatis).

[29] *Id.*

[30] *Id.* at 72:16-73:7; 74:16-75:9 (Maniatis).

[31] *Id.* at 75:10-76:23 (Maniatis).

[32] *Id.*

as of the April 1989 filing date (of the '436 priority application).[33]  In support of his opinion, Dr. Kadesch referred to the '436 priority application, the '516 specification and the original claims, which were directed to methods involving negatively regulating (i.e., inhibiting), the activity of NF-κB.[34]

Dr. Kadesch explained that with respect to NF-κB decoy molecules, the '436 application provides essentially the same disclosure as that in the '516 patent in describing use of decoy molecules to inhibit NF-κB activity.[35]  In particular, the 1989 application included a disclosure of a consensus sequence for "binding sites for transcription factor NF-κB," along with a table of DNA sequences of what would be, in effect, decoy molecules.[36]  Based on common knowledge in the art at that time, such decoy molecules could be routinely synthesized and put into either cells (including human cells) or animals to carry out the claimed methods.[37]  Moreover, routine methods were available in the art to stabilize the decoy molecules so that they would not be degraded by intracellular enzymes.[38]

Likewise, Dr. Kadesch pointed out that the '436 application provides essentially the same disclosure as that in the '516 patent with regard to use of dominantly interfering molecules for reducing NF-κB activity.[39]  Dr. Kadesch explained that with respect to IκB, the '436 application clearly describes how IκB could be used as a specific inhibitor molecule to reduce NF-κB activity:  "a specific inhibitor molecule which is able to block, reduce or eliminate, NF-κB

---

[33] Trial Tr., Day 13 at 48:8-50:2 (Kadesch).

[34]  Id. at  48:8-50:2 (Kadesch); DTX 214 at 29.

[35] Trial Tr., Day 13 at 52:15-53:7; 93:19-94:3 (Kadesch); DTX 214 at 24-25, 28.

[36]  Id.

[37] Id. at 52:15-53:7; 93:19-98:5 (Kadesch).

[38] Id. at 97:4-18 (Kadesch).

[39] Id. at 98:6-20 ("Negative regulation can also be effected by the introduction of 'dominantly interfering' molecules . . . .  Furthermore, its occupation of the NF-κB binding site effectively blocks access to any intact NF-κB molecule which may be present in the cell."); DTX 214 at 30.

binding can be added to the biological system in an effective amount.  Preferably, this inhibitor is specific for NF-κB and does not interact with other cell constituents.  An example of such a molecule is IκB itself." [40]  In that regard, the methods for detecting, characterizing and purifying IκB disclosed by the application, in combination with routine knowledge in the art, would have allowed one to carry out such an approach by cloning the gene and introducing it into a cell.[41]

### 4.   The Jury Could Also Reasonably Rely on the Admissions of Lilly's Expert Dr. Latchman as Additional Evidence that the Asserted Claims Are Adequately Described

Lilly's expert Dr. Latchman, acknowledged that the asserted claims are all directed to methods and do not require or specify any particular compound.  Dr. Latchman conceded that through the originally filed claims, the '436 application expressly described methods for inhibiting NF-κB activity as of its April 1989 filing date.[42]   Moreover, Dr. Latchman agreed with Dr. Kadesch that the '516 patent describes several screening techniques, including mobility shift assays and reporter assays, that would have allowed the skilled practitioner to routinely identify and characterize additional compounds for use in the claimed methods such as small non-DNA molecules.[43]   Together, the express description of particular compounds and description of routine methods of identifying additional compounds for use in the claimed methods demonstrate that the inventors were in possession of the full scope of the asserted claims.

---

[40] Trial Tr., Day 13 at 62:2-12, 77:7-22; DTX 214 at 29.

[41] Trial Tr., Day 13 at 49:17-50:2; 94:4-8 (Kadesch).

[42] Trial Tr., Day 12 at 39:9-24 (Latchman).

[43] Trial Tr., Day 12 at 66:5-17; 38:11-22 (Latchman).

**C.      Lilly Fails to Provide Any Ground for Challenging the Jury's Verdict as Unreasonable**

Lilly's renewed motion is a bald attempt to relitigate many of the same arguments this Court rejected in finding Lilly's summary judgment motion on written description moot in view of the verdict.[44]  Misinterpreting the law of written description, Lilly contends that the '516 patent is invalid because it fails to describe any common structural characteristics shared by compounds that one could use in the claimed methods.[45]  Mischaracterizing the patent, Lilly argues that, aside from a purely functional description, the patent fails to provide any information about such inhibitors.[46]   As set forth below, Lilly's arguments fail on both counts.

To meet the written description requirement, the applicant is not limited to the disclosure of structure as opposed to function.[47]  The Federal Circuit has cited with approval written description guidelines issued by the Patent Office:

> The [PTO] guidelines state that the written description requirement of 35 U.S.C. § 112 ¶ 1 can be met by "showing that an invention is complete by disclosure of sufficiently detailed, relevant identifying characteristics . . . i.e., complete or partial structure, other physical and/or chemical properties, functional characteristics when coupled with a known or disclosed correlation between function and structure, or some combination of such characteristics."[48]

Plainly, the written description inquiry allows consideration of function in the context of other disclosures in the specification, such as the physical and chemical properties of a disclosed inhibitor.

---

[44] *See* D.I. 176, 198, 210; 7/11/2006 Order.

[45] Lilly Br. at 11.

[46] *Id.*

[47] *See, e.g., Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 323 F.3d 956, 964 (Fed. Cir. 2002) ("It is not correct, however, that all functional descriptions of genetic material fail to meet the written description requirement."); *Univ. of Rochester v. G.D. Searle & Co.*, 249 F. Supp. 2d 216, 227 (W.D.N.Y. 2003) ("I do not hold that it is a sine qua non that the patent set forth the exact chemical structure of the compounds in question.").

[48] *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1072 (Fed. Cir. 2005) (quoting PTO Written Description Guidelines, 66 Fed. Reg. 1099, 1106 (Jan. 5, 2001)); *see also Enzo Biochem Inc. v. Gen-Probe, Inc.*, 323 F.3d 956, 964 (Fed. Cir. 2002) (adopting written description standard from the PTO Guidelines).

This requirement is more than satisfied here.  Not only does the '516 patent expressly provide a structural description of specific inhibitor molecules to be used in the claimed methods (i.e., inhibitor decoy molecules comprising particular DNA sequences), but it also provides screening methods that permit identification and characterization of substances capable of modulating NF-κB activity under particular conditions.[49]  Based on the inventors' disclosure that one would reduce NF-κB activity in the cell by blocking specific but different biochemical steps in the cell, it "makes total sense" that one of skill at the time reading the patent would have expected such inhibitor molecules to be structurally diverse.[50]

Lilly further implies that adequate description of the asserted claims can only be met by an express structural description of all the various compounds suitable for the claimed methods, including pharmaceuticals.  There is no such requirement.  "An applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention."[51]  Nor does adequate description require an applicant to have actually practiced the embodiments the specification discloses.[52]  Rather, the written description inquiry focuses on whether the specification discloses the invention in sufficient detail such that one of ordinary skill in the art would recognize that the inventor possessed the claimed invention.[53]  Here, the asserted claims do not require use of any pharmaceutical composition.  The claimed subject matter is directed to methods acting in a cell, not compounds that may be approved or

---

[49] Trial Tr., Day 13 at 110:1-114:15 (Kadesch) (also indicating that issue was specifically raised during prosecution).

[50] *Id.* at 110:1-113:11 (Kadesch).

[51] *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1365 (Fed. Cir. 2003) (citing *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001)).

[52] *See Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916 (Fed. Cir. 2004).

[53] *See Vas-Cath*, 935 F.2d at 1563; *see also Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 126 F. Supp. 2d 69, 150 (D. Mass. 2001), *aff'd in part, vacated in part on other grounds*, 314 F.3d 1313 (Fed. Cir. 2003).

1.    **The '516 Patent Teaches How to Use the Claimed Methods Without Undue Experimentation**

The jury heard testimony from the '516 patent inventors, as well as Dr. Kadesch, that in light of the advanced state of the art and substantial guidance the patent provides, one of skill would have been able to routinely practice the asserted claims using either the compounds the patent discloses as inhibitor molecules, or additional compounds that one could predictably identify and characterize by routinely screening candidate molecules using assays the patent describes.   Combining the disclosure of the '516 patent with routine knowledge in the art, one could successfully practice the asserted claims without undue experimentation.[79]

Lilly faults Dr. Kadesch's analysis as not having specifically considered whether the claims encompass human therapy.[80]   Lilly's criticism, however, is misplaced in that the claims do not specifically claim or require any therapeutic effect or treatment.  In considering enablement, Dr. Kadesch properly took into account the scope of the claims, which Dr. Kadesch considered as directed to methods of inhibiting NF-κB in cells, including methods applied to human cells and to cells in an animal (i.e., in the body).[81]  As discussed below, Dr. Kadesch explained that the patent would have provided more than sufficient guidance for one of skill to practice such techniques in such cells without undue experimentation.  Whether the patent discloses specific improvements to these techniques that one might use to achieve particular clinical results is irrelevant to the enablement analysis.[82]

In support of his opinion, Dr. Kadesch highlighted those portions of the disclosure describing the various approaches for carrying out the claimed methods, as well as various post-

---

[79] *Id.* at 77:23-78:1; 94:4-19; 100:3-13.

[80] Lilly Br. at 22; Trial Tr., Day 13 at 116:11-24 (Kadesch).

[81] Trial Tr., Day 13 at 94:4-19, 137:16-23 (Kadesch);

[82] *Engel Indus. v. Lockformer Co.*, 946 F.2d 1528, 1531 (Fed. Cir. 1991) ("Unclaimed subject matter is not subject to the disclosure requirements of § 112."); *Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1361 (Fed. Cir. 1998).

filing examples showing successful use of those approaches.[83]  For example, Dr. Kadesch

explained that, based on the patent's disclosure of decoy molecules in combination with the

common knowledge in the art, one of skill could have routinely made and introduced such decoy

molecules into cells to practice the claimed methods.[84]  In this regard, post-filing studies can

provide independent and objective substantiation of enablement.[85]  Here, such post-filing art

demonstrated that scientists skilled in the art were able to successfully apply the teachings of the

patent to practice the claimed methods.  For example, Dr. Kadesch pointed out post-filing studies

indicating that decoy molecules were successfully used to inhibit NF-κB activity in cells, using

the same methods taught in the '436 application and technology available in 1989.[86]  As Dr.

Kadesch explained, use of such decoy molecules at that time "did not involve undue

experimentation, by any means."[87]  Based on this evidence, the jury was entirely reasonable in

finding that the '516 patent enabled all the asserted claimed methods.

 In this regard, it was entirely reasonable for the jury to credit Dr. Kadesch's testimony

that the relative skill of those in the art in the field of the invention was extremely high.  By

1989, those skilled in the art "brought to the table" extensive background knowledge of

methodology and techniques useful in carrying out the claimed invention.[88]  For example, such

information was routinely available in a number of widely-used laboratory manuals that provided

---

[83] Trial Tr., Day 13 at 94:20-25.

[84] *Id.* at 94:4-19.

[85] *See Amgen v. HMR/TKT*, 314 F.3d at 1336-37 (party may rely on post-filing publications to show enablement).

[86] Trial Tr., Day 13 at 95:1-97:17; DTX 257 at 997, 999.

[87] *Id.* at 97:23-98:3.  Lilly trumpets testimony from Dr. Maniatis that, as of 1991, he himself had not prepared a decoy molecule (or a dominantly interfering molecule), *see* Lilly Br. at 7.  However, this was not because of any failed attempt but merely because he had no interest in developing such molecules.  This therefore does not bear on whether one of skill in the art could have practiced the asserted claims.  Trial Tr., Day 3 at 106:10, 107:20-23.

[88] Trial Tr., Day 13 at 54:11-61:13. (Kadesch)

detailed guidance on various aspects of recombinant DNA technology.[89] Virtually every laboratory doing work in the field in 1989 had copies of these "cookbooks," and persons of skill in the art would have been familiar with their teachings.[90] Accordingly, one of skill would have been educated in the use of standard techniques in the art such as the cloning of DNA and purifying of proteins.[91] Moreover, by 1989, use of recombinant DNA technology was greatly facilitated by the automated chemical synthesis of DNA sequences.[92]

Similarly, Dr. Kadesch testified that one of skill in 1989 could have combined the teachings of the patent with the teachings of the art to practice the use of dominantly interfering molecules to inhibit NF-κB.[93] Again, support for his conclusion is evidenced by post-filing examples showing successful use of a mutant form of NF-κB to "dominantly interfere with the ability of NF-kappa B to function."[94] Although Lilly factually disputes that the papers Dr. Kadesch cited do not describe a dominantly interfering molecule, such factual disputes must be resolved in ARIAD's favor, as the jury could reasonably credit Dr. Kadesch's testimony that these papers did so.[95]

Dr. Kadesch further testified that the disclosure of the '516 patent, as reflected in the '436 priority application, would have provided ample guidance to one of skill in 1989 to practice the claimed methods without undue experimentation by introducing IκB into the cell, for example by introducing and expressing the gene for IκB. In particular, one could have obtained the IκB gene

---

[89] Such standard treatises included a widely-used molecular biology manual authored by Dr. Maniatis. *See* Trial Tr., Day 13 at 54:19–55:2, 56:22–57:2; *see also* PTX 763.

[90] Trial Tr., Day 13 at 55:2-14, 57:3-10. (Kadesch)

[91] *Id.* at 55:17–56:5; 73:17–74:6.

[92] *Id.* at 60:3–61:13.

[93] *Id.* at 102:4-10.

[94] *Id.* at 100:17-101:3.

[95] Lilly Br. at 7 n.5.

by purifying the IκB protein using assays disclosed in the 1989 application, and used that protein to clone the gene through well established techniques.[96]  Moreover, as Dr. Kadesch testified, by 1989, introducing genes into cells was a "fairly standard procedure."[97]  Based on all the above evidence, the jury could have reasonably found the asserted claims are enabled.

### 2.    The Jury Was Properly Instructed Regarding Enablement

Lilly faults the Court for failing to explicitly instruct the jury that the disclosure must enable "the *full scope* of the claim, which covers *all* methods of inhibiting NF-κB in all eukaryotic cells," and that it "is not enough that one skilled in the art could inhibit NF-κB by *some* method following the teachings of the '516 patent."[98]  However, Lilly mischaracterizes the Court's instruction and misconstrues what the law requires.  The Court correctly explained that "[e]nablement means that the text of the patent must contain enough detail . . . to teach a person skilled in the field at the time the patent was filed *to make and use the invention* without excessive experimentation."[99]  The Court's instruction properly reflects the law and at least two widely-used model jury instructions.[100]  In essence, Lilly's theory would require the disclosure of every embodiment of the claims, including all future embodiments.  However, that is not the law: "An applicant is not required to describe in the specification every conceivable and possible

---

[96] *Id.* at 77:23-78:1.  Dr. Kadesch also testified that in 1991 one could have directly synthesized an inhibitor molecule based on information added in the 1991 application (e.g., the sequence depicted in Figure 43) or by contacting authors of published papers identifying the IκB sequence.  However, as the jury found that the asserted claims are entitled to an April 1989 filing date (and therefore enabled as of that date), Figure 43 did not enter into the jury's finding of enablement.

[97] *Id.* at 103:7-14.  Lilly's attack on the credibility of Dr. Kadesch's testimony (Lilly Br. at 5) is misplaced in the context of a renewed motion for JMOL.  *See, e.g., Zimmerman v. Direct Fed. Credit Union,* 262 F.3d 70, 75 (1st Cir.2001) (A JMOL is only "granted when, after examining the evidence of record *and drawing all reasonable inferences in favor of the nonmoving party*, the record reveals no sufficient evidentiary basis for the verdict.").

[98] Lilly Br. at 23 (emphasis in original).

[99] Trial Tr., Day 14 at 19-23; *see Amgen v. HMR/TKT* 314 F.3d at 1334.

[100] *See, e.g.,* N.D. Cal. Model Patent Jury Instructions (Oct. 9, 2007) (disclosure must "enable a person of ordinary skill in the field *to make and use the invention*") (attached hereto as Ex. A); AIPLA Model Patent Jury Instructions (2005) (attached as Ex. B); *see also Amgen Inc. v. Chugai Pharm. Co.,* 927 F.2d 1200, 1213 (Fed. Cir. 1991) (the "disclosure [must be] sufficient to enable one skilled in the art *to carry out the invention*").

The "clear weight of the evidence" must support setting aside a jury's verdict.[202] If "reasonable people could disagree" as to the outcome of the case, a motion for new trial must be denied.[203]

Lilly argues that the Court's findings in the bench trial demonstrate that Figure 43 does not provide the correct amino acid sequence of an IκB, and that alleged errors in Dr. Kadesch's testimony about Figure 43 warrant a new trial. This plainly overstates the significance of the testimony. Such allegedly false testimony cannot be considered prejudicial if that testimony could not have affected the jury's ultimate verdict.[204] Here, the jury found that the asserted claims were fully enabled and described by the April 1989 filing date of the '436 application, before Figure 43 was included.[205] As the jury verdict did not depend on any allegedly erroneous testimony about Figure 43, such testimony could not have led to any prejudice.[206]

Furthermore, for "false evidence" to justify a new trial, it "must clear a high hurdle" and rise to the level of fraud.[207] To show fraud, it must be demonstrated, by clear and convincing evidence, "that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability to impartially adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or

---

[202] *See, e.g., Fonten Corp. v. Ocean Spray Cranberries., Inc.*, 469 F.3d 18, 23 (1st Cir. 2006); *Doherty v. Doherty Ins. Agency, Inc.*, 878 F.2d 546, 550-51 (1st Cir. 1989).

[203] *Polycarbon Indus., Inc. v. Advantage Engineering, Inc.*, 260 F. Supp. 2d 296, 303 (D. Mass. 2003) (where reasonable people could disagree, "I do not find it appropriate to substitute my judgment for that of the jury").

[204] *See U.S. v. Soto-Beniquez,* 356 F.3d 1, 35 (1st Cir. 2004).

[205] Among the evidence the jury considered and could have reasonably credited was testimony that, based on the disclosure in the patent teaching purification and characterization of IkB, one of skill could have independently cloned the IkB gene without relying on the Figure 43 sequence. (*See, e.g.,* Trial Tr., Day 13 at 61:14–62:12 (Kadesch)).

[206] Indeed, *Ahern v. Scholz*, 85 F.3d 774, 780 (1st Cir. 1996), relied upon by Lilly, held the district court did not abuse its discretion by denying a motion for a new trial, despite the fact that there – unlike here – the false statement at issue was material and undisputed. *See id*. at 780 ("Ultimately, we find that the jury's verdict was not against the clear weight of the evidence.").

[207] *See Colon-Millin v. Sears Roebuck de Puerto Rico, Inc.*, 455 F.3d 30, 37 (1st Cir. 2006); *cf. Antevski v. Wolkswagenwerk Aktiengesellschaft*, 4 F.3d 537, 540 (7th Cir. 1993).

defense."[208]   Here, Lilly's mere conjecture that "it *appears* that Dr. Kadesch *may have known* about the sequence errors" cannot establish fraud.[209]   As the fact-finder in the bench trial, the Court was entitled to weigh all the testimony at that proceeding.   That the Court chose not to credit certain evidence does not, as Lilly argues, discredit the jury verdict.   Moreover, to the extent the Court's findings at the bench trial allegedly conflict with some of the previous testimony Dr. Kadesch provided, this does not render his testimony before the jury "false."   At the jury trial, Lilly had every opportunity to rebut Dr. Kadesch's testimony through its own witnesses, cross-examination and closing argument.   Having failed to dispute his testimony there, Lilly cannot belatedly bring new arguments through the back door of the bench trial.

### B.    The Court's Evidentiary Exclusions Were Proper and Cannot Support Lilly's Motion for a New Trial

Lilly argues that it is entitled to a new trial because it was prejudiced by this Court's wrongful exclusion of three articles co-authored by one the '516 inventors, which Lilly alleges are relevant to its anticipation attack on the '516 patent.[210]   None of these articles, however, constitute prior art.   All were published many years after the April 1989 filing date of the '436 application.   Lilly argues that, while hearsay, these articles should have been admissible under various exceptions to the hearsay rule.   Lilly now admits, however, that it did not offer the articles for the truth of what they state, but only to demonstrate "state of mind."[211]

---

[208] *Colon*, 455 F.3d at 37 (quoting *Perez-Perez v. Popular Leasing Rental, Inc.*, 993 F.2d 281, 285 (1st Cir. 1993)).

[209] Lilly Br. at 23 (emphasis added).  *See Perez-Perez*, 993 F.2d at 285 ("the district court properly denied so much of defendants' motion as was based on speculative and unsubstantiated allegations of perjury).  Further, Lilly admits that Dr. Kadesch "offered the qualification that it would require 'slight modifications' to make the gene."

[210] Lilly Br. at 43.  The exhibits in question (DTX 24S, DTX 25, and DTX 473) are all written by Dr. Baldwin, an inventor of the '516 patent.  Each was published well after Dr. Baldwin's association with Massachusetts Institute of Technology ended in 1989.  Lilly twice briefed the Court on the admissibility of these references prior to and during trial.  *See* D.I. No. 265, D.I. No. 287.

[211] Lilly Br. at 42 (referencing D.I. No. 281 at 7:20-15:24; Trial Tr., Day 9 at 50:19-51:8, 55:19-56:5).

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| AMGEN INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 05-12237 WGY |
| v. | ) | |
| | ) | |
| | ) | |
| F. HOFFMANN-LAROCHE | ) | |
| LTD., a Swiss Company, ROCHE | ) | |
| DIAGNOSTICS GmbH, a German | ) | |
| Company and HOFFMANN LAROCHE | ) | |
| INC., a New Jersey Corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |

## AMGEN'S MOTION TO REMOVE THE "CONFIDENTIAL" DESIGNATION FROM THE JUNE 21, 2007 DEPOSITION TRANSCRIPT OF ROCHE'S EXPERT DR. THOMAS KADESCH

Defendants have misused the confidentiality provisions of the Protective Order entered by this Court in this case to hide non-confidential material information disclosed by one of their experts during his deposition. Consequently, Amgen respectfully requests that, pursuant to paragraph 8 of the Protective Order, the designation of the transcript of the June 21, 2007, deposition of Defendants' expert, Dr. Thomas Kadesch, as "Confidential" or "Highly Confidential" be removed.

On June 21, 2007, Amgen deposed Dr. Kadesch regarding his expert opinions in this case. Dr. Kadesch testified, consistent with his expert report, that he believes Dr. Lin's patents are invalid under Section 112. During his deposition, Dr. Kadesch was also questioned about his testimony last year on behalf of ARIAD Pharmaceuticals, Inc. (which was also represented by Defendants' lead counsel here, Ms. Ben-Ami), in a jury trial before Judge Zobel (*ARIAD Pharmaceuticals et al. v. Eli Lilly & Co.*, Civil Action No. 02 CV 11280 (RWZ)). In the ARIAD

case, Dr. Kadesch testified that ARIAD's patent was valid under Section 112. Consistent with

that testimony, the jury found in favor of ARIAD, and final judgment was entered for ARIAD

yesterday.[1]

     During his June 21 deposition -- unable to reconcile his ARIAD testimony with his

opinions regarding Section 112 issues in this case -- Dr. Kadesch unequivocally recanted his

ARIAD trial testimony.[2] In a transparent attempt to hide his recantation from the ARIAD court

and the U.S. Patent Office (where the ARIAD patent is currently in re-examination), counsel for

Roche immediately designated the entire deposition transcript "Highly Confidential" under the

Protective Order in this case. When asked for the basis of the designation, Roche's counsel

responded simply that "I believe [the ARIAD] patent actually is in litigation currently with

Amgen.[3] So therefore, I am going to mark it – mark this deposition outside eyes only."[4]

     Amgen's counsel pointed out at the time, and in a subsequent letter, that the basis for the

designation is improper, and requested that the designation be removed.[5] Mr. Suh simply ignored

several subsequent requests by Amgen's counsel to further meet and confer on the issue.[6]

     The designation of this transcript as "Confidential" – much less "Highly Confidential" --

is wholly improper: Dr. Kadesch's testimony does not relate in any way to confidential

information of any party, much less "Highly Confidential" information as defined by the

Protective Order in this action. His opinions regarding the validity of the ARIAD patent, about

---

[1] Exhibit 1 (*ARIAD Pharmaceuticals et al. v. Eli Lilly & Co.*, Civil Action No. 02 CV 11280 (RWZ) (D. Mass., Sept. 10, 2007) (Docket No. 417) ("*Ariad v. Lilly*").

[2] Exhibit 2 (June 21, 2007 Deposition Transcript of Thomas R. Kadesch, Ph.D.) at 257:21–270:16.

[3] Amgen sued ARIAD in 2006 to invalidate ARIAD's patent (U.S. Pat. No. 6,410,516) and contends that the ARIAD patent is invalid under Section 112.

[4] Exhibit 2 at 283:11-20.

[5] *See*, *e.g.*, Exhibit 2 at 283:21-25 and Exhibit 3 (Letter from Flowers to Suh of 7/2/07).

[6] Exhibit 4 (E-mail from Flowers to Suh of 8/9/07).

which he was questioned in his June 21 deposition, are already public – he testified in open court on behalf of ARIAD on those very issues in the *ARIAD v. Eli Lilly* case before Judge Zobel in April of 2006.[7] Dr. Kadesch's expert report from that case, about which he was also questioned on June 21, is publicly available on the PACER system.[8]

Not only is Dr. Kadesch's recantation of his ARIAD opinion relevant to the weakness of Roche's Section 112 attack on Dr. Lin's patents here, it is highly material to the ongoing proceedings relating to the ARIAD patent. To prevent a miscarriage of justice, Amgen respectfully requests that the Court order that the improper designation be removed pursuant to paragraph 8 of the Protective Order.

Roche has not and cannot meet its burden under the Protective Order for maintaining the designation. The designation must be removed to ensure that the ARIAD court and the U.S. Patent and Trademark Office has this testimony, which is highly material to the validity of the ARIAD patent. This Court should put an end to the improper "hide the ball" tactics of Roche's (and ARIAD's) counsel.

---

[7] Exhibit 5 (selected pages from Trial Transcript, Day 13, 2nd Session, in *Ariad v. Lilly* (April 27, 2006).

[8] Exhibit 6 (Rule 26(A)(2) Rebuttal Report of Thomas R. Kadesch, *Ariad v. Lilly*, (D. Mass., Feb. 3, 2006) (Docket Nos. 198-16 & 198-17)).

Respectfully Submitted,

AMGEN INC.,
By its attorneys,


_____/s/ *Michael R. Gottfried*_____

Of Counsel:

STUART L. WATT
WENDY A. WHITEFORD
MONIQUE L. CORDRAY
DARRELL G. DOTSON
KIMBERLIN L. MORLEY
ERICA OLSON
AMGEN INC.
One Amgen Center Drive
Thousand Oaks, CA   91320-1789
(805) 447-5000

D.DENNIS ALLEGRETTI (BBO#545511)
MICHAEL R.GOTTFRIED (BBO#542156)
PATRICIA R. RICH (BBO# 640578)
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA  02210
Telephone:    (857) 488-4200
Facsimile:    (857) 488-4201

LLOYD R. DAY, JR.
DAY CASEBEER
  MADRID & BATCHELDER LLP
20300 Stevens Creek Boulevard, Suite 400
Cupertino, CA  95014
Telephone:    (408) 873-0110
Facsimile:    (408) 873-0220

WILLIAM GAEDE III
McDERMOTT WILL & EMERY
3150 Porter Drive
Palo Alto, CA 94304
Telephone:    (650) 813-5000
Facsimile:    (650) 813-5100

KEVIN M. FLOWERS
MARSHALL, GERSTEIN & BORUN LLP
233 South Wacker Drive
6300 Sears Tower
Chicago IL 60606
Telephone:    (312) 474-6300
Facsimile:    (312) 474-0448

September 13, 2007

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1**

I certify that counsel for the parties have conferred in an attempt to resolve or narrow the issues presented by this motion and no agreement was reached.

*/s/ Michael R. Gottfried*
Michael R. Gottfried

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of electronic filing and paper copies will be sent to those indicated as non-registered participants on September 13, 2007.

*/s/ Michael R. Gottfried*
Michael R. Gottfried

# EXHIBIT D

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Jamie H. McDole
To Call Writer Directly:
312 861-2048
jmcdole@kirkland.com

312 861-2000

www.kirkland.com

Facsimile:
312 861-2200

November 15, 2007

**VIA E-MAIL**

David I. Gindler
Irell & Manella
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067-4276

Re:    Re: *Amgen et al. v. ARIAD Pharmaceuticals, Inc.*

Dear David:

We remain concerned regarding ARIAD's failure to timely provide discovery in this case. ARIAD is of course obligated under the Federal Rules to timely supplement its discovery, including document production. We have previously raised this issue many times, the latest being in the context of ARIAD's failure to timely produce reexamination materials. Now, it appears that ARIAD has produced excerpts of the deposition transcripts of Dr. Thomas Kadesch from *Amgen Inc. v. F. Hoffman-La Roche Ltd., Civil Action No.* 05-122237 (WGY) (D. Mass) to Eli Lilly in *ARIAD Pharmaceuticals, Inc. et al v. Eli Lilly And Company*, (CA No. 02-11280), yet has failed to produce these same materials to the Amgen Entities.

We request that ARIAD immediately produce these excerpts from Dr. Kadesch's deposition transcripts. Given that these documents have already been produced to Eli Lilly, we expect that ARIAD can email this production to my attention no later than the close of business today. Also, please promptly (by November 21, 2007) produce the entirety of Dr. Kadesch's deposition transcript as well as his expert report(s) and corresponding exhibits.

Sincerely,

Jamie McDole

London        Los Angeles        Munich        New York        San Francisco        Washington, D.C.

# EXHIBIT E

IRELL & MANELLA LLP
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

840 NEWPORT CENTER DRIVE, SUITE 400
NEWPORT BEACH, CA  92660-6324
TELEPHONE (949) 760-0991
FACSIMILE (949) 760-5200

1800 AVENUE OF THE STARS, SUITE 900
**LOS ANGELES, CALIFORNIA  90067-4276**

TELEPHONE (310) 277-1010
FACSIMILE (310) 203-7199
WEBSITE:  www.irell.com

**WRITER'S DIRECT**
TELEPHONE (310) 203-7123
FACSIMILE (310) 712-3193
rlamagna@irell.com

November 15, 2007

<u>**VIA E-MAIL**</u>

Jamie McDole
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL  60601

    Re: <u>Amgen Inc. v. ARIAD Pharmaceuticals, Inc. and related counterclaims.</u>

Dear Jamie:

   I write in response to your letter of November 15, 2007 to David Gindler.  We continue to disagree with your characterization of ARIAD's and the Institutions' document production efforts as anything but diligent.

   Regarding your request, please explain why Amgen feels that it is entitled to the discovery of deposition transcripts filed under seal in a case that does not involve either Enbrel or Kineret and in which neither ARIAD nor the Institutions were parties.  Likewise, please explain on what basis Amgen believes ARIAD is able to or required to "produce the entirety of Dr. Kadesch's deposition transcript as well as expert report(s) and corresponding exhibits" from the Hoffman-LaRoche case.

        Sincerely,

        */s/ Raymond LaMagna*

        Raymond LaMagna

RL:rl

cc:  Counsel of Record

# EXHIBIT F

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

777 South Figueroa Street
Los Angeles, CA 90017-5800

Drew Diamond
To Call Writer Directly:                    213-680-8400                              Facsimile:
213-680-8217                                                                         213-680-8500
ddiamond@kirkland.com                    www.kirkland.com

November 20, 2007

**VIA E-MAIL**

Ray LaMagna, Esq.
Irell & Manella LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067-4276

        **Re:**    *Amgen et al. v. ARIAD et al. -- D. Del. Civil Action No. 06-259-(MPT)*

Dear Ray:

      I write in response to your November 15, 2007 letter to Jamie McDole. We requested both the excerpts of Dr. Kadesch's deposition transcript from the Roche case that ARIAD produced to Lilly and the full copy and exhibits to that deposition. While it appears you are maintaining for now your refusal to produce the full transcript and exhibits, please produce immediately the excerpts that ARIAD has already produced to Lilly.

      In your letter, you requested that we "explain on what basis Amgen believes ARIAD is able to or required to 'produce the entirety of Dr. Kadesch's deposition transcript as well as expert report(s) and corresponding exhibits' from the Hoffman-LaRoche case." We respond as follows.

      As you know, on April 27, 2006, Dr. Thomas Kadesch testified as an expert on behalf of ARIAD concerning the issues of written description and enablement in litigation proceedings against Eli Lilly & Co. (*ARIAD Pharms. v. Eli Lilly & Co.*, Civil Action No. 02 CV 11280 (RWZ) (D. Mass.) -- "the Lilly matter"). Dr. Kadesch testified that the '516 patent was valid under Section 112. ARIAD's recently-filed Opposition to Lilly's Renewed Motion For Judgment As A Matter Of Law Or, In The Alternative, A New Trial attempts to support the jury's verdict on Section 112 issues by extensive citation to Dr. Kadesch's trial testimony.

      As you also know, Dr. Kadesch was deposed on June 21, 2007 in separate litigation proceedings between Amgen and F. Hoffmann-LaRoche et al. (*Amgen, Inc. v. F. Hoffmann-LaRoche*, Civil Action No. 05-12237 (WGY) (D. Mass.) -- "the Roche matter"). According to pleadings from both the Roche and Lilly matters, Dr. Kadesch recanted his ARIAD trial

London        Los Angeles        Munich        New York        San Francisco        Washington, D.C.

# KIRKLAND & ELLIS LLP

Ray LaMagna
November 20, 2007
Page 2

testimony and in doing so proffered opinion testimony contrary to ARIAD's arguments of patentability before the PTO in reexamination.

Roche was represented at that deposition by Kaye Scholer, who was also ARIAD's lead counsel in the concurrent Lilly matter. Counsel from Kaye Scholer improperly designated the entire deposition transcript "Highly Confidential" under the Protective Order in the Roche matter. When asked for the basis of the designation, counsel responded, "I believe [the ARIAD] patent actually is in litigation currently with Amgen. So therefore, I am going to mark it -- mark this deposition outside eyes only." [Docket No. 1063, Case No. 1:05 CV 12237-WGY] In designating the testimony confidential, counsel acted on behalf of its client ARIAD, not on behalf of Roche, and so admitted.

The '516 patent is currently in reexamination in the Merged Proceedings of Ex Parte Reexamination Control Nos. 90/007,503 (filed April 4, 2005) and 90/007,828 (filed December 2, 2005). In the reexamination, ARIAD has asserted arguments of patentability that rely upon priority and underlying written description arguments and has submitted Dr. Kadesch's expert report from the Lilly matter regarding these issues.

Counsel for Amgen notified Kaye Scholer of the import of Dr. Kadesch's testimony in the pending reexamination proceedings and of ARIAD's duty to disclose. In response, counsel for ARIAD, not only failed to disclose the substance of his testimony to the Examiner but also prevented others from doing so by refusing to remove the improper designation.

Amgen and the PTO should have the ability to evaluate Dr. Kadesch's testimony from the Roche matter, both to evaluate issues of invalidity and issues of inequitable conduct and unenforceability. As Dr. Kadesch's expert report and the exhibits from his deposition provide necessary context for his recantation of his trial testimony, they should be provided immediately as well.

If ARIAD refuses to produce these materials, I am available to meet and confer on this matter at your earliest convenience.

Best regards,

*/s/ Drew Diamond*

Drew Diamond