**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX RHODE ISLAND CORPORATION,<br><br>    Plaintiffs,<br><br>    v.<br><br>ARIAD PHARMACEUTICALS, INC., and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,<br><br>    Defendants.<br><br>ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,<br><br>    Counterclaim Plaintiffs,<br><br>    v.<br><br>AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION, and WYETH,<br><br>    Counterclaim Defendants. | C.A. No. 06-259-MPT |

**DECLARATION OF DAVID GREENWALD IN SUPPORT OF**
**DEFENDANTS/COUNTERCLAIM-PLAINTIFFS ARIAD'S AND THE INSTITUTIONS'**
**RESPONSE TO PLAINTIFFS/COUNTERCLAIM-DEFENDANTS' MOTION FOR**
**LEAVE TO AMEND THEIR REPLY TO AMENDED COUNTERCLAIMS**

ASHBY & GEDDES
Steven J. Balick (#2403)
John G. Day (#2114)
Lauren E. Maguire (#4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150,
Wilmington, Delaware 19899
Telephone: 302-654-1888

*Counsel for ARIAD Pharmaceuticals, Inc.,*
*Massachusetts Institute of Technology, The President*
*and Fellows of Harvard College, The Whitehead*
*Institute for Biomedical Research*

December 27, 2007

I, David Greenwald, declare as follows:

1.     I am a partner at Cravath, Swaine & Moore LLP, counsel for ARIAD Pharmaceuticals, Inc., the Massachusetts Institute of Technology, the President & Fellows of Harvard College, and the Whitehead Institute for Biomedical Research (collectively, "ARIAD and the Institutions"). I have personal knowledge of the facts set forth in this Declaration. I make this Declaration in support of ARIAD's and the Institutions' response to the motion submitted by plaintiffs/counterclaim-defendants Amgen, Inc., Immunex Corporation, Amgen USA, Inc., Amgen Manufacturing, Ltd., and Immunex Rhode Island Corp. (collectively, "Amgen") to amend their Reply to Defendants' Amended Counterclaims.

2.     Attached hereto as Exhibit A is a true and correct copy of the complaint in ARIAD Pharmaceuticals, Inc. v. Eli Lilly & Co., Civil Action No. 02 CV 11280 (D. Mass. June 25, 2002).

3.     Attached hereto as Exhibit B is a true and correct copy of the answer in ARIAD Pharmaceuticals, Inc. v. Eli Lilly & Co., Civil Action No. 02 CV 11280 (D. Mass. May 27, 2003).

4.     Attached hereto as Exhibit C is a true and correct copy of the April 4, 2005 Eli Lilly & Co. Request for Ex Part Reexamination of Patent No. 6,410,516.

5.     Attached hereto as Exhibit D is a true and correct copy of the October 21, 2005 Rule 26(a)(2) Rebuttal Report of Thomas R. Kadesch, Ph.D. from ARIAD Pharmaceuticals, Inc. v. Eli Lilly & Co., Civil Action No. 02 CV 11280 (D. Mass. Oct. 21, 2005).

6.    Attached hereto as Exhibit E is a true and correct copy of the Trial Transcript from <u>ARIAD Pharmaceuticals, Inc. v. Eli Lilly & Co.</u>, Civil Action No. 02 CV 11280 (D. Mass. April 27, 2006).

7.    Attached hereto as Exhibit F is a true and correct copy of Jury Verdict in <u>ARIAD Pharmaceuticals, Inc. v. Eli Lilly & Co.</u>, Civil Action No. 02 CV 11280 (D. Mass. April 28, 2006).

8.    Attached hereto as Exhibit G is a true and correct copy of the Order in <u>ARIAD Pharmaceuticals, Inc. v. Eli Lilly & Co.</u>, Civil Action No. 02 CV 11280 (D. Mass. July 6, 2007).

9.    Attached hereto as Exhibit H is a true and correct copy of the deposition transcript of Thomas R. Kadesch, Ph. D. from <u>Amgen Inc. v. F. Hoffmann-La Roche, Ltd.</u>, Civil Action No. 05 CV 12237 (D. Mass. June 21, 2007).

10.    Attached hereto as Exhibit I is a true and correct copy of a Protective Order entered in <u>Amgen Inc. v. F. Hoffmann-La Roche, Ltd.</u>, Civil Action No. 05 CV 12237 (D. Mass. Dec. 21, 2006).

11.    Attached hereto as Exhibit J is a true and correct copy of the Order in <u>ARIAD Pharmaceuticals, Inc. v. Eli Lilly & Co.</u>, Civil Action No. 02 CV 11280 (D. Mass. Mar. 3, 2004).

12.    Attached hereto as Exhibit K is a true and correct copy of the December 13, 2007 Letter from Pat Carson to David Greenwald authorizing disclosure of Dr. Kadesch's testimony from the Roche case to the PTO.

13.    Attached as Exhibit L is a true and correct copy of the docket entry for the Order denying Amgen's motion to remove the confidential designation from the June 21,

2007 deposition transcript of Thomas Kadesch, from <u>Amgen Inc. v. F. Hoffmann-La Roche, Ltd.</u>, Civil Action No. 05 CV 12237 (D. Mass. October 1, 2007).

14.     Attached as Exhibit M is a true and correct copy of the November 2, 2007 letter from Patricia A. Carson to Laura P. Masurovsky.

15.     Attached as Exhibit N is a true and correct copy of the November 5, 2007 letter from Laura P. Masurovsky to Patricia A. Carson.

16.     Attached as Exhibit O is a true and correct copy of the December 13, 2007 Information Disclosure Statement filed by ARIAD.

17.     I declare under penalty of perjury that the foregoing is true and correct.


Executed:    December 27, 2007
             New York, New York

David Greenwald, Esq.

# Exhibit A

# UNITED STATES DISTRICT COURT
# FOR THE
# DISTRICT OF MASSACHUSETTS

**02 CV 1 1 2 8 0 RWZ**

| | |
|---|---|
| **ARIAD PHARMACEUTICALS, INC.,** ) | |
| **MASSACHUSETTS INSTITUTE OF** ) | |
| **TECHNOLOGY, THE WHITEHEAD INSTITUTE** ) | No. _____ |
| **FOR BIOMEDICAL RESEARCH, and THE** ) | |
| **PRESIDENT AND FELLOWS OF HARVARD** ) | |
| **COLLEGE** ) | |
| ) | |
| ) | **Jury Trial Demanded** |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **ELI LILLY & CO.,** ) | |
| ) | |
| **Defendant.** ) | |

RECEIPT # 40085
AMOUNT $ 150.00
SUMMONS ISS. 412
LOCAL RULE 4.1
WAIVER OF SERV.
MCF ISSUED
AO 120 OR 121
BY DPTY CLK. JES
DATE 6/25/02

**COMPLAINT**

Plaintiffs ARIAD Pharmaceuticals, Inc. ("ARIAD"), Massachusetts Institute of Technology ("M.I.T."), the Whitehead Institute for Biomedical Research ("THE WHITEHEAD INSTITUTE"), and the President and Fellows of Harvard College ("HARVARD") (hereinafter collectively referred to as "Plaintiffs"), through their attorneys, for their Complaint against Defendant Eli Lilly & Co. ("Lilly"), allege as follows:

## NATURE OF THE ACTION

1.      This is a patent infringement action against Lilly based on Lilly's activity in connection with its Xigris® and Evista® products covered by claims of Plaintiffs' United States Patent No. 6,410,516 ("the '516 patent"), entitled "Nuclear Factors Associated With Transcriptional Regulation." A copy of the patent is attached as Exhibit 1.



2.      Plaintiffs seek monetary damages, including but not limited to a reasonable royalty for Defendant Lilly's current and future infringement of the '516 patent.

## PARTIES, JURISDICTION AND VENUE

3.      ARIAD is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 26 Landsdowne Street, Cambridge, Massachusetts.

4.      M.I.T is a co-educational, privately endowed research university located at 77 Massachusetts Avenue, Cambridge, Massachusetts.

5.      THE WHITEHEAD INSTITUTE is a non-profit research and education institute located at Nine Cambridge Center, Cambridge, Massachusetts. It is affiliated with M.I.T in its teaching activities, but is wholly responsible for its own research programs, governance, and finance.

6.      HARVARD is a co-educational, privately endowed research university located at Massachusetts Hall, Cambridge, Massachusetts.

7.      Upon information and belief, Defendant Lilly is a corporation organized and existing under the laws of the State of Indiana with its principal place of business located at Lilly Corporate Center, Indianapolis, Indiana. Lilly does substantial business in this judicial district.

8.      This is an action for patent infringement under the Patent Act of the United States, 35 U.S.C. § 100 *et seq.*, including §§ 271 and 281. This Court has subject matter jurisdiction over this patent infringement action pursuant to 28 U.S.C. § 1338(a).

9.      Venue is proper in this judicial district pursuant to §§ 1400(b) and 1391(c).

## FACTUAL BACKGROUND

10.     Living cells respond to a vast array of different signals in their environment, including natural regulatory factors (e.g. hormones) and harmful factors (e.g. toxins). A primary way that cells respond to such signals is through intricate networks of signaling proteins inside the cell, which act as "messengers" to regulate expression of genes that are critical for normal cell function. Normal cell signaling and gene regulation are both controlled at a molecular level by specific interactions of these "messenger" proteins with other proteins and DNA. Identifying these "messenger" proteins and how they function is a crucial step in developing drugs for treating diseases associated with abnormal cell signaling and gene regulation.

11.     The invention of the '516 patent arose from a collaboration between research groups at three of the world's leading biomedical research institutions, M.I.T., THE WHITEHEAD INSTITUTE, and HARVARD. The collaboration was directed by three distinguished scientists, Dr. David Baltimore, Nobel Laureate and former director of THE WHITEHEAD INSTITUTE, Dr. Phillip Sharp, also a Nobel Laureate and now Institute Professor at M.I.T., and Dr. Thomas Maniatis, Thomas H. Lee Professor of Molecular and Cellular Biology at HARVARD.

12.     In the mid 1980s, Dr. Baltimore and his colleagues identified a "messenger" protein, which they named "NF-KB." As discussed in the '516 patent specification, Dr. Baltimore and his colleagues initially believed that NF-KB was only found in certain cells known as "B cells" and, therefore, had a limited role in cell signaling and gene regulation.

13.     Extensive studies on NF-KB carried out by the named inventors in Dr. Baltimore's laboratory at THE WHITEHEAD INSTITUTE and the other co-inventors in Dr. Sharp's laboratory at M.I.T. and Dr. Maniatis' laboratory at HARVARD led to the surprising discovery, described in the '516 patent, that NF-KB is found in "many, if not all, cell types and that it acts as an intracellular messenger capable of playing a broad role in gene regulation as a mediator of inducible signal transduction." ('516 patent col. 2, lines

- 3 -

29-31.) Most significantly, through the work disclosed in the '516 patent, the inventors also showed how the NF-KB cell-signaling pathway could be regulated and used for medical and therapeutic applications.

14.    ARIAD, since its founding in 1991, has been engaged in research and development of pharmaceutical products that regulate cell signaling pathways and gene function. ARIAD's drug discovery program is aimed at developing small-molecule drugs to inhibit or block disease-related abnormal cell-signaling and to control gene function and cell-signaling.

15.    In part for his preeminent contribution to the cell-signaling field and the relevance of this expertise to ARIAD's research and development program, ARIAD invited, and Dr. Baltimore agreed, to join ARIAD's board of scientific and medical advisors as a founding member.

16.    In 1986, the first of a series of U.S. patent applications relating to the NF-KB research spearheaded by Dr. Baltimore and various of his co-inventors was filed.  Through extensive prosecution, during which the Patent Office carefully scrutinized the claimed subject matter for compliance with the statutory requirements for patentability, the Patent Office awarded the inventors several patents claiming various, separate aspects of this pioneering technology.  The '516 patent asserted herein, is the most recent patent to issue of this family of patents.

## THE PATENT-IN-SUIT

17.    On June 25, 2002, the '516 patent, entitled "Nuclear Factors Associated With Transcriptional Regulation," with claims that cover methods of treating human disease by regulating NF-KB activity, was duly and legally issued to Baltimore *et al.* and assigned to M.I.T. THE WHITEHEAD INSTITUTE, and HARVARD.

18.    Based on a license agreement executed in 1991, ARIAD is the exclusive licensee from M.I.T., THE WHITEHEAD INSTITUTE, and HARVARD of the '516 patent, which presents claims directed to

one aspect of the pioneering technology discovered by the inventors, i.e., the use of drugs that regulate NF-KB cell signaling.

## LILLY'S INFRINGEMENT OF THE '516 PATENT

19.     Upon information and belief, Lilly is engaged in the manufacture, importation, use, sale and/or offers of sale, and promotion of pharmaceutical products marketed under the brandname Evista®.

20.     Upon information and belief, Evista® is a form of the selective estrogen receptor modulator raloxifene hydrochloride, and was approved for sale by the United States Food and Drug Administration on or about December 10, 1997, for the prevention and treatment of osteoporosis in postmenopausal women.

21.     Upon information and belief, a molecular basis for the action of Evista® in treating osteoporosis has been demonstrated to occur through the modulation of NF-KB activity.  Some of these findings were published by Lilly scientists in a World Intellectual Property Organization Patent Application entitled "Methods of Modulating NF-KB Transcription Factor" and bearing publication number WO 96/40137.  A copy of this patent application is attached as Exhibit 2.

22.     Upon information and belief Lilly is engaged in the manufacture, importation, use, sale and/or offers of sale and promotion of pharmaceutical products marketed under the brandname Xigris®.

23.     Upon information and belief, Xigris® is a form of recombinant human activated protein C, and was approved for sale by the United States Food and Drug Administration on or about November 21, 2001, for the reduction of mortality in human adult patients with severe sepsis who have a high risk of death.

24.     Upon information and belief, a molecular basis for the action of Xigris® in treating septic shock has been demonstrated to occur through the inhibition of NF-KB activity.  These findings were published

- 5 -

by Lilly scientists in papers by Joyce *et al.*, J. Biol. Chem., 276: 11199-11203, 2001 and Crit. Care Med. 30:S288-S293, 2002. Copies of these papers are attached as Exhibits 3 and 4.

25.     Plaintiffs have suffered and will continue to suffer damages as a result of Lilly's infringing activities.

26.     Plaintiffs have previously sought to initiate discussions with Lilly concerning a license to Plaintiffs' NF-KB patent estate.  Defendant Lilly has failed to respond to these efforts.

## COUNTS

### Count 1 – Patent Infringement of the '516 Patent

27.     Paragraphs 1-26 of this Complaint are incorporated by reference as if stated fully herein.

28.     Defendant Lilly, by engaging in the unauthorized manufacture, importation, use, sale and/or offers for sale of raloxifene hydrochloride in the United States, including pharmaceutical products marketed as Evista®, has committed acts of direct, contributory and/or induced infringement of claims 69-72, 80, 82, 84, 85 and 93-96 of the '516 patent.

29.     Defendant Lilly, by engaging in the unauthorized manufacture, importation, use, sale and/or offers for sale of recombinant human activated protein C in the United States, including pharmaceutical products marketed as Xigris®, has committed acts of direct, contributory and/or induced infringement of claims 14, 15, 144-146, and 154-156 of the '516 patent.

30.     Defendant Lilly has offered for sale, sold and/or imported raloxifene hydrochloride into the United States, including pharmaceutical products marketed as Evista®, with knowledge that such products have a molecular basis of action through the modulation of NF-KB activity and are especially made or adapted for use in an infringment of the '516 patent.  Evista®, which constitutes a material part of the invention, is not a staple article or commodity of commerce suitable for substantial non-infringing

- 6 -

use. By its actions, Defendant Lilly is actively and knowingly inducing infringement of claims 69-72, 80, 82, 84, 85 and 93-96 of the '516 patent.

31.     Defendant Lilly has offered for sale, sold and/or imported recombinant human activated protein C into the United States, including pharmaceutical products marketed as Xigris®, with knowledge that such products have a molecular basis of action through the inhibition of NF-KB activity and are especially made or adapted for use in an infringement of the '516 patent. Xigris® which constitutes a material part of the invention, is not a staple article or commodity of commerce suitable for substantial non-infringing use. By its actions, Defendant Lilly is actively and knowingly inducing infringement of claims 14, 15, 144-146, and 154-156 of the '516 patent.

32.     Plaintiffs have suffered and will continue to suffer damages as a result of Defendant's infringing activities.

WHEREFORE, Plaintiff respectfully request that the Court:

A.     Award to Plaintiffs damages adequate to compensate Plaintiffs for infringement of the '516 patent, but in no event less than a reasonable royalty, together with interest and costs.

B.     Enter an order declaring this an exceptional case pursuant to 25 U.S.C. § 285 and award to Plaintiffs reasonable attorney fees;

and,

C.     Grant to Plaintiffs such other and further relief as may be just and appropriate.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs respectfully demand a trial by jury on all issues that are properly triable to a jury in this action.

BROMBERG & SUNSTEIN LLP

By: _Lee Carl Bromberg_

Lee Carl Bromberg, BBO# 058480
Kerry L. Timbers, BBO# 552293
Anne Marie Longobucco, BBO#649299
125 Summer Street
Boston, MA 02110-1618
Tel: (617) 443-9292

CLIFFORD CHANCE ROGERS & WELLS LLP

Leora Ben-Ami
Thomas F. Fleming
Patricia A. Carson
200 Park Avenue
New York, NY, 10166
(212) 878-8000

Attorneys for Plaintiffs ARIAD Pharmaceuticals, Inc., Massachusetts Institute of Technology, the Whitehead Institute for Biomedical Research, and the President and Fellows of Harvard College

02695/00501 206781.1

- 8 -

# Exhibit B

**ORIGINAL**

# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, and THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE<br><br>    Plaintiffs,<br>  v.<br><br>ELI LILLY AND COMPANY,<br><br>    Defendant. | Civil Action No. 02 CV 11280 RWZ<br><br>**U.S. District Judge**<br>**Rya W. Zobel** |

## ELI LILLY AND COMPANY'S ANSWER TO PLAINTIFFS' COMPLAINT AND COUNTERCLAIMS

Defendant, Eli Lilly and Company ("Lilly"), responds to the Complaint of Plaintiffs ARIAD Pharmaceuticals, Inc. ("ARIAD"), Massachusetts Institute of Technology ("M.I.T."), the Whitehead Institute for Biomedical Research ("THE WHITEHEAD INSTITUTE"), and the President and Fellows of Harvard College ("HARVARD") (hereinafter collectively referred to as "Plaintiffs") as follows:

## NATURE OF THE ACTION

1. This is a patent infringement action against Lilly based on Lilly's activity in connection with its Xigris® and Evista® products covered by claims of Plaintiffs' United States Patent No. 6,410,516 ("the '516 patent"), entitled "Nuclear Factors Associated With Transcriptional Regulation." A copy of the patent is attached as Exhibit 1.

**Answer to Paragraph 1 of the Complaint:**

Lilly admits that Plaintiffs' Complaint alleges claims based on the patent laws. Lilly further admits that a copy of United States Patent No. 6,410,516 ("the '516 patent"), entitled "Nuclear Factors Associated With Transcriptional Regulation" was attached to the Complaint as Exhibit 1. Lilly denies Xigris® and Evista® are covered by any valid claims of the '516 patent. Lilly denies each and every remaining allegation contained in paragraph 1 of the Complaint, and specifically denies that Plaintiffs have any claim against Lilly for patent infringement.

2. Plaintiffs seek monetary damages, including but not limited to a reasonable royalty for Defendant Lilly's current and future infringement of the '516 patent.

**Answer to Paragraph 2 of the Complaint:**

Lilly admits that Plaintiffs' Complaint seeks monetary damages. Lilly denies each and every remaining allegation contained in paragraph 2 of the Complaint.

## PARTIES, JURISDICTION AND VENUE

3. ARIAD is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 26 Landsdowne Street, Cambridge, Massachusetts.

**Answer to Paragraph 3 of the Complaint:**

Lilly is without information sufficient to admit or deny the allegations contained in Paragraph 3 of the Complaint, and therefore denies each and every allegation contained in paragraph 3 of the Complaint.

4. M.I.T is a co-educational, privately endowed research university located at 77 Massachusetts Avenue, Cambridge, Massachusetts.

**Answer to Paragraph 4 of the Complaint:**

Lilly is without information sufficient to admit or deny the allegations contained in Paragraph 4 of the Complaint, and therefore denies each and every allegation contained in paragraph 4 of the Complaint.

5. THE WHITEHEAD INSTITUTE is a non-profit research and education institute located at Nine Cambridge Center, Cambridge, Massachusetts. It is affiliated with M.I.T in its teaching activities, but is wholly responsible for its own research programs, governance, and finance.

**Answer to Paragraph 5 of the Complaint:**

Lilly is without information sufficient to admit or deny the allegations contained in Paragraph 5 of the Complaint and therefore denies each and every allegation contained in paragraph 5 of the Complaint..

6. HARVARD is a co-educational, privately endowed research university located at Massachusetts Hall, Cambridge, Massachusetts.

**Answer to Paragraph 6 of the Complaint:**

Lilly is without information sufficient to admit or deny the allegations contained in Paragraph 6 of the Complaint and therefore denies each and every allegation contained in paragraph 6 of the Complaint..

7. Upon information and belief, Defendant Lilly is a corporation organized and existing under the laws of the State of Indiana with its principal place of business located at Lilly Corporate Center, Indianapolis, Indiana. Lilly does substantial business in this judicial district.

**Answer to Paragraph 7 of the Complaint:**

Lilly admits that it is a corporation organized and existing under the laws of the

State of Indiana with its principal place of business located at Lilly Corporate Center,

Indianapolis, Indiana. Lilly admits that it does business in this judicial

district. Lilly denies each and every remaining allegation contained in paragraph 7.

> 8. This is an action for patent infringement under the Patent Act of the United States, 35 U.S.C. § 100 *et seq.*, including §§ 271 and 281. This Court has subject matter jurisdiction over this patent infringement action pursuant to 28 U.S.C. § 1338(a).

**Answer to Paragraph 8 of the Complaint:**

Paragraph 8 of Plaintiffs' Complaint merely purports to describe the nature of the

action brought by Plaintiffs. To the extent an answer is required, Lilly admits that

Plaintiffs base their claims on the patent laws of the United States 35 U.S.C. § 100 *et*

*seq.*, including §§ 271 and 281. Except as so admitted, Lilly denies each and every

remaining allegation contained in paragraph 8 of the Complaint, and specifically denies

that Plaintiffs have any claim against Lilly for patent infringement. Lilly does not contest

the Court's subject matter jurisdiction pursuant to 28 U.S.C. § 1338(a).

> 9. Venue is proper in this judicial district pursuant to §§ 1400(b) and 1391(c).

**Answer to Paragraph 9 of the Complaint:**

Lilly does not contest that venue is proper in this judicial district pursuant to 28

U.S.C. §§ 1400(b) and 1391(c).

## FACTUAL BACKGROUND

10. Living cells respond to a vast array of different signals in their environment, including natural regulatory factors (e.g. hormones) and harmful factors (e.g.

4

toxins). A primary way that cells respond to such signals is through intricate networks of signaling proteins inside the cell, which act as "messengers" to regulate expression of genes that are critical for normal cell function. Normal cell signaling and gene regulation are both controlled at a molecular level by specific interactions of these "messenger" proteins with other proteins and DNA. Identifying these "messenger" proteins and how they function is a crucial step in developing drugs for treating diseases associated with abnormal cell signaling and gene regulation.

**Answer to Paragraph 10 of the Complaint:**

Lilly admits that living cells respond to a vast array of different signals in their environment. Except as so admitted, Lilly cannot admit or deny the remaining allegations contained in paragraph 10 of the Complaint to the extent paragraph 10 does not contain allegations of fact. To the extent paragraph 10 of the Complaint does contain additional allegations of fact, Lilly denies each and every such allegation.

11.    The invention of the '516 patent arose from a collaboration between research groups at three of the world's leading biomedical research institutions, M.I.T., THE WHITEHEAD INSTITUTE, and HARVARD. The collaboration was directed by three distinguished scientists, Dr. David Baltimore, Nobel Laureate and former director of THE WHITEHEAD INSTITUTE, Dr. Phillip Sharp, also a Nobel Laureate and now Institute Professor at M.I.T., and Dr. Thomas Maniatis, Thomas H. Lee Professor of Molecular and Cellular Biology at HARVARD.

**Answer to Paragraph 11 of the Complaint:**

Lilly is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 11 of the Complaint and therefore denies each and every allegation contained in paragraph 11 of the Complaint.

12. In the mid 1980s, Dr. Baltimore and his colleagues identified a "messenger" protein, which they named "NF-KB." As discussed in the '516 patent specification, Dr. Baltimore and his colleagues initially believed that NF-KB was

only found in certain cells known as "B cells" and therefore, had a limited role in cell signaling and gene regulation.

**Answer to Paragraph 12 of the Complaint:**

Lilly is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12 of the Complaint and therefore denies each and every allegation contained in paragraph 12 of the Complaint.

13. Extensive studies on NF-KB carried out by the named inventors in Dr. Baltimore's laboratory at THE WHITEHEAD INSTITUTE and the other co-inventors in Dr. Sharp's laboratory at M.I.T. and Dr. Maniatis' laboratory at HARVARD led to the surprising discovery, described in the '516 patent, that NF-KB is found in "many, if not all, cell types and that it acts as an intracellular messenger capable of playing a broad role in gene regulation as a mediator of inducible signal transduction." ('516 patent col. 2, lines 29-31.) Most significantly, through the work disclosed in the '516 patent, the inventors also showed how the NF-KB cell-signaling pathway could be regulated and used for medical and therapeutic applications.

**Answer to Paragraph 13 of the Complaint:**

Lilly is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13 of the Complaint and therefore denies each and every allegation contained in paragraph 13 of the Complaint.

14. ARIAD, since its founding in 1991, has been engaged in research and development of pharmaceutical products that regulate cell signaling pathways and gene function. ARIAD's drug discovery program is aimed at developing small-molecule drugs to inhibit or block disease-related abnormal cell-signaling and to control gene function and cell-signaling.

**Answer to Paragraph 14 of the Complaint:**

Lilly is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 14 of the Complaint and therefore denies each and every allegation contained in paragraph 14 of the Complaint.

15. In part for his preeminent contribution to the cell-signaling field and the relevance of this expertise to ARIAD's research and development program, ARIAD invited, and Dr. Baltimore agreed, to join ARIAD's board of scientific and medical advisors as a founding member.

**Answer to Paragraph 15 of the Complaint:**

Lilly is without knowledge or information sufficient to form a belief as to the

truth of the allegations contained in paragraph 15 of the Complaint and therefore denies

each and every allegation contained in paragraph 15 of the Complaint.

16. In 1986, the first of a series of U.S. patent applications relating to the NF-KB research spearheaded by Dr. Baltimore and various of his co-inventors was filed. Through extensive prosecution, during which the Patent Office carefully scrutinized the claimed subject matter for compliance with the statutory requirements for patentability, the Patent Office awarded the inventors several patents claiming various, separate aspects of this pioneering technology. The '516 patent asserted herein, is the most recent patent to issue of this family of patents.

**Answer to Paragraph 16 of the Complaint:**

Lilly admits that the '516 patent claims priority as a continuation-in-part of

United States Patent Application Serial Number 06/871,441 filed January 9, 1986. Lilly

denies each and every remaining allegation contained in paragraph 16 of the Complaint.

## THE PATENT-IN-SUIT

17. On June 25, 2002, the '516 patent, entitled "Nuclear Factors Associated With Transcriptional Regulation," with claims that cover methods of treating human disease by regulating NF-KB activity, was duly and legally issued to Baltimore *et al.* and assigned to M.I.T., THE WHITEHEAD INSTITUTE, and HARVARD.

**Answer to Paragraph 17 of the Complaint:**

Lilly admits United States Patent No. 6,410,516 ("the 516 patent") states on its face that it issued on June 25, 2002. Lilly admits that the inventors named on the face of United States Patent No. 6,410,516 are Baltimore *et al.* Lilly admits that the Assignees named on the face of United States Patent No. 6,410,516 are M.I.T., THE WHITEHEAD INSTITUTE, and HARVARD, but Lilly is without knowledge or information sufficient to form a belief as to whether or when the '516 patent was assigned to M.I.T., THE WHITEHEAD INSTITUTE, and HARVARD and therefore denies such allegation. Otherwise, Lilly denies each and every remaining allegation contained in paragraph 17 of the Complaint.

18. Based on a license agreement executed in 1991, ARIAD is the exclusive licensee from M.I.T., THE WHITEHEAD INSTITUTE, and HARVARD of the '516 patent, which presents claims directed to one aspect of the pioneering technology discovered by the inventors, i.e., the use of drugs that regulate NF-KB cell signaling.

**Answer to Paragraph 18 of the Complaint:**

Lilly is without knowledge or information sufficient to form a belief as to the existence of a license agreement between ARIAD, M.I.T., THE WHITEHEAD INSTITUTE and HARVARD, or whether such an agreement was executed in 1991, and therefore denies such allegation. Lilly denies each and every remaining allegation contained in paragraph 18 of the Complaint.

## LILLY'S INFRINGEMENT OF THE '516 PATENT

19. Upon information and belief, Lilly is engaged in the manufacture, importation, use, sale and/or offers of sale, and promotion of pharmaceutical products marketed under the brandname Evista®.

**Answer to Paragraph 19 of the Complaint:**

Lilly admits that it is engaged in the manufacture, use, sale and/or

offers of sale, and promotion of raloxifene hydrocholoride marketed under the brandname

Evista®.    Except as so admitted, Lilly denies each and every remaining allegation.

> 20.  Upon information and belief, Evista® is a form of the selective estrogen
> receptor modulator raloxifene hydrochloride, and was approved for sale by the
> United States Food and Drug Administration on or about December 10, 1997, for
> the prevention and treatment of osteoporosis in postmenopausal women.

**Answer to Paragraph 20 of the Complaint:**

Lilly admits that Evista® is a form of the selective estrogen receptor modulator

raloxifene hydrocholoride, and was approved for sale by the United States Food and Drug

Administration in December 1997 for the prevention and treatment of osteoporosis in

postmenopausal women.  Except as so admitted, Lilly denies each and every remaining

allegation.

> 21.  Upon information and belief, a molecular basis for the action of Evista® in
> treating osteoporosis has been demonstrated to occur through the modulation of
> NF-KB activity.  Some of these findings were published by Lilly scientists in a
> World Intellectual Property Organization Patent Application entitled "Methods of
> Modulating NF-KB Transcription Factor" and bearing publication number WO
> 96/40137.  A copy of this patent application is attached as Exhibit 2.

**Answer to Paragraph 21 of the Complaint:**

Lilly admits that Lilly scientists are named as inventors on the World Intellectual

Property Organization Patent Application entitled "Methods of Modulating NF-KB

Transcription Factor."  Lilly admits that the patent application bears publication number

WO 96/40137.  Lilly admits that World Intellectual Property Organization Patent

Application entitled "Methods of Modulating NF-KB Transcription Factor" claimed

methods of modulating NF-KB transcription factor comprising administering to a human in need of an effective amount of a certain compound. Lilly further admits that a copy of the World Intellectual Property Organization Patent Application entitled "Methods of Modulating NF-KB Transcription Factor" and bearing publication number WO 96/40137 was attached to the Complaint as Exhibit 2. Lilly denies each and every remaining allegation in paragraph 21 of the Complaint. Except as so admitted, Lilly denies each and every remaining allegation.

> 22. Upon information and belief Lilly is engaged in the manufacture, importation, use, sale and/or offers of sale and promotion of pharmaceutical products marketed under the brandname Xigris®.

**Answer to Paragraph 22 of the Complaint:**

Lilly admits that it is engaged in the manufacture, use, sale and/or offers of sale, and promotion of a form of recombinant human activated protein C marketed under the brandname Xigris®. Except as so admitted, Lilly denies each and every remaining allegation.

> 23. Upon information and belief, Xigris® is a form of recombinant human activated protein C, and was approved for sale by the United States Food and Drug Administration on or about November 21, 2001, for the reduction of mortality in human adult patients with severe sepsis who have a high risk of death.

**Answer to Paragraph 23 of the Complaint:**

Lilly admits that Xigris® is a form of recombinant human activated protein C, and was approved for sale by the United States Food and Drug Administration on or about November 21, 2001 for the reduction of mortality in human adult patients with severe sepsis who have a high risk of death. Except as so admitted, Lilly denies each and

every remaining allegation.

> 24. Upon information and belief, a molecular basis for the action of Xigris® in treating septic shock has been demonstrated to occur through the inhibition of NF-KB activity. These findings were published by Lilly scientists in papers by Joyce *et al.*, J. Biol. Chem., 276: 11199-11203, 2001 and Crit. Care Med. 30:S288-S293, 2002. Copies of these papers are attached as Exhibits 3 and 4.

**Answer to Paragraph 24 of the Complaint:**

Lilly admits that Lilly scientists published papers in J. Biol. Chem., 276: 11199-11203, 2001 and Crit. Care Med. 30:S288-S293, 2002. Lilly admits that copies of Joyce *et al.*, J. Biol. Chem., 276: 11199-11203, 2001 and Crit. Care Med. 30:S288-S293, 2002 were attached to the Complaint as Exhibits 3 and 4 respectively. Lilly denies each and every remaining allegation in paragraph 24 of the Complaint.

> 25. Plaintiffs have suffered and will continue to suffer damages as a result of Lilly's infringing activities.

**Answer to Paragraph 25 of the Complaint:**

Lilly denies each and every allegation contained in paragraph 25 of the Complaint.

> 26. Plaintiffs have previously sought to initiate discussions with Lilly concerning a license to Plaintiffs' NF-KB patent estate. Defendant Lilly has failed to respond to these efforts.

**Answer to Paragraph 26 of the Complaint:**

Lilly admits that one or more of Plaintiffs contacted Lilly with respect to other patents in their portfolio. Lilly denies that Plaintiffs have sought to initiate discussions with Lilly concerning the '516 patent-in-suit. Lilly denies each and every remaining allegation in paragraph 26 of the Complaint.

## COUNTS

### Count 1 – Patent Infringement of the '561 Patent

27. Paragraphs 1-26 of this Complaint are incorporated by reference as if stated fully herein.

**Answer to Paragraph 27 of the Complaint:**

Lilly incorporates herein by reference its responses to paragraphs 1-26 of the

Complaint.

28. Defendant Lilly, by engaging in the unauthorized manufacture, importation, use, sale and/or offers for sale of raloxifene hydrochloride in the United States, including pharmaceutical products marked as Evista®, has committed acts of direct, contributory and/or induced infringement of claims 69-72, 80, 82, 84, 85 and 93-96 of the '516 patent.

**Answer to Paragraph 28 of the Complaint:**

Lilly denies each and every allegation contained in paragraph 28 of the

Complaint.

29. Defendant Lilly, by engaging in the unauthorized manufacture, importation, use, sale and/or offers for sale of recombinant human activated protein C in the United States, including pharmaceutical products marketed as Xigris®, has committed acts of direct, contributory and/or induced infringement of claims 14, 15, 144-146, and 154-156 of the '516 patent.

**Answer to Paragraph 29 of the Complaint:**

Lilly denies each and every allegation contained in paragraph 29 of the

Complaint.

30. Defendant Lilly has offered for sale, sold and/or imported raloxifene hydrochloride into the United States, including pharmaceutical products marketed as Evista®, with knowledge that such products have a molecular basis of action through the modulation of NF-KB activity and are especially made or adapted for

12

use in an infringment of the '516 patent. Evista®, which constitutes a material part of the invention, is not a staple article or commodity of commerce suitable for substantial non-infringing use. By its actions, Defendant Lilly is actively and knowingly inducing infringement of claims 69-72, 80, 82, 84, 85 and 93-96 of the '516 patent.

**Answer to Paragraph 30 of the Complaint:**

Lilly admits that it has offered for sale, sold and/or imported raloxifene

hydrochloride into the United States, including pharmaceutical products marketed as

Evista®. Lilly denies each and every remaining allegation contained in paragraph 30 of

the Complaint.

31. Defendant Lilly has offered for sale, sold and/or imported recombinant human activated protein C into the United States, including pharmaceutical products marketed as Xigris®, with knowledge that such products have a molecular basis of action through the inhibition of NF-KB activity and are especially made or adapted for use in an infringement of the '516 patent. Xigris® which constitutes a material part of the invention, is not a staple article or commodity of commerce suitable for substantial non-infringing use. By its actions, Defendant Lilly is actively and knowingly inducing infringement of claims 14, 15, 144-146, and 154-156 of the '516 patent.

**Answer to Paragraph 31 of the Complaint:**

Lilly admits that it has offered for sale, sold and/or imported recombinant human

activated protein C into the United States, including pharmaceutical products marketed as

Xigris®. Lilly denies each and every remaining allegation contained in paragraph 31 of

the Complaint.

32. Plaintiffs have suffered and will continue to suffer damages as a result of Defendant's infringing activities.

**Answer to Paragraph 32 of the Complaint:**

Lilly denies each and every allegation contained in paragraph 32 of the

Complaint. Lilly specifically denies that the Plaintiffs are entitled to their requested

relief.

13

## AFFIRMATIVE AND OTHER DEFENSES

### FIRST AFFIRMATIVE DEFENSE
#### Non-infringement

34. Lilly does not infringe any valid claim of United States Patent No. 6,410,516.

### SECOND AFFIRMATIVE DEFENSE

#### Patent Invalidity

35. The claims of United States Patent No. 6,410,516 are invalid for failing to meet the requirements of one or more of the provisions of 35 U.S.C §§ 101, 102, 103 and/or 112.

36. U.S. Patent No. 6,410,516 is invalid for the prosecution form of laches.

### THIRD AFFIRMATIVE DEFENSE

#### Patent unenforceability for Inequitable Conduct

37. United States Patent No. 6,410,516 is unenforceable as the result of the inequitable conduct during the prosecution of the application that issued as the '516 patent. The Plaintiffs and/or their representatives committed inequitable acts that misled the Patent and Trademark Office. In particular, persons associated with the filing and prosecution of the application on Plaintiffs' behalf, having knowledge of the United States Patent No. 4,418,068 ("the Jones Patent"), willfully or with gross negligence failed to disclose the Jones patent to the Patent and Trademark Office during prosecution and, therefore violated their duty of disclosure under 37 CFR 1.56.

38. Plaintiffs, through their attorneys, filed this action on June 25, 2002, the very day that the '516 patent in suit issued. The persons associated with the filing and prosecution of the application that matured as the '516 patent were, on information and belief, aware of the complaint in this action and the references cited therein prior to June 25, 2002, and thus prior to the issuance of the '516 patent. Plaintiffs and their attorneys attached to the complaint in this action as "Exhibit 2" a World Intellectual Property Organization Patent Application 96/40137 entitled "Methods of Modulating NF-KB Transcription Factor." ("WO application"). The Jones Patent, which discloses the administration of raloxifene hydrochloride before the priority dates for the '516 patent, was incorporated by reference in that application. (See p. 4 lines 10-14 of the WO application). Thus, the persons associated with the filing and prosecution of the application that issued as the '516 patent, including Plaintiffs and their attorneys, knew or should have known of the prior art Jones patent before the issuance of the '516 patent, yet failed to disclose it to the U.S. Patent and Trademark Office.

39. The Jones Patent discloses the use of raloxifene hydrochloride as "pharmaceuticals for antiestrogen and antiandrogen therapy" in the treatment of mammary and prostatic tumors. This prior art reference specifically describes administering "an effective dose of a compound as described to a subject suffering from such a condition or at risk of suffering from such condition." (Jones Patent, col. 1, lines 33-37). The Jones Patent describes giving such formulations to mammals (cols. 28 et seq.) and teaches administration to humans of up 1000 mg/day of raloxifene hydrochloride (col. 38 et seq.), well in excess of the preferred range taught by the WO application.

15

40. Plaintiffs and their counsel attached the WO application as evidence that the administration of raloxifene hydrochloride, as taught in the prior art Jones Patent, "modulat[es] NF-κB activity." Complaint, ¶ 21. The WO application itself states that raloxifene hydrochloride is "effective in blocking the action of the important cellular regulatory molecule NF-κB." (WO application, p. 12). As such, the Jones Patent is clearly material prior art that anticipates one or more of the claims of the '516 patent.

41. Moreover, on information and belief, plaintiffs, one or more of the inventors, and/or their attorneys were clearly aware of a variety of articles that teach that the inhibition of NF-κB is an inherent property of a number of compounds that were commonly administered in the prior art. Indeed, the inherency of NF-κB modulation in many of these prior art compounds was described by one of the co-inventors in a review article published while the application was still pending, Baldwin AS Jr., *Series Introduction: the transcription factor NF-kB and human disease*, J. Clin. Invest., Jan; 107(1):3-6 (2001). *See also* E. Kopp and S. Ghosh, *Inhibition of NF-κB by Sodium Salicylate and Aspirin,* SCIENCE 265: 956-959 (1994) (Aspirin), Yumi Yamamoto, et al., *Sulindac Inhibits Activation of the NF-κB Pathway*, 274 J. BIOL. CHEM. 27307 (1999) (Sulindac and its metabolites); Albert S. Baldwin, Jr., *The NF-κB and IκB Proteins: New Discoveries and Insights*, 14 ANN. REV. IMMUNOL. 649, 671 (1996) (Prednisone and other Glucocorticoids); N. Auphan, J. DiDonato, C. Rosette, A. Helmberg and M. Karin, Immunosuppression by Glucocorticoids: Inhibition of NF-κB Activity Through Induction of IκB Synthesis, Science, Vol. 270:286-290 (1995) (same); Albert S. Baldwin, Jr., *The NF-κB and IκB Proteins: New Discoveries and Insights*, 14 ANN. REV. IMMUNOL. 649, 671 (1996) (Cyclosporin A); Kye-Im Jeon, Jae-Yeon Jeong and Dae-Myung Jue, *Thiol-*

16

*reactive Metal Compounds Inhibit NF-κB Activation By Blocking IκB kinase*, J. Immunol. 164 (11): 5981-5989 (June 1, 2000) (Gold Compounds); Luis Miguel Blanco-Colio, et al., *Red Wine Intake Prevents Nuclear Factor-κB Activation in Peripheral Blood Mononuclear Cells of Healthy Volunteers During Postprandial Lipemia*, CIRCULATION, 102: 1020 (2000) (Red Wine); Fajun Yang, et al., Green Tea Polyphenols Block Endotoxin-Induced TNF-Production and Lethality in a Murine Model, 128 J. Nutr. 2334 (1998) (Green Tea); Suppression of Lipopolysaccharide-Induced Nuclear Factor-κB Activity by Theaflavin-3,3'-Digallate from Black Tea and Other Polyphenols through Downregulation of IκB Kinase Activity in Macrophages, 59 Biochem. Phamacol. 357 (2000) (Black Tea); M.M. Manson, et al., *Modulation of signal-transduction pathways by chemopreventive agents*, 28 BIOCHEM. SOC. TRANS. 7 (2000) (Turmeric); and Nagaotshi Ide and Benjamin H.S. Lau, Garlic Compounds Minimize Intracellular Oxidative Stress and Inhibit Nuclear Factor-κB Activation, 131 J. Nutr. 1020S (2001) (Garlic). None of these references, though clearly material to the prosecution of the application that issued as the '516 patent, were disclosed to the examiner.

42. Thus, persons associated with the filing and prosecution of the application that led to the '516 patent, including Plaintiffs, the inventors, and their attorneys, were clearly aware of the Jones Patent and/or other prior art references and their high materiality to the patent application examination process during the pendency of the prosecution of that application. This material information is not cumulative, and thus should have been disclosed. Therefore, the '516 patent is unenforceable as the result of inequitable conduct.

17

## COUNTERCLAIMS FOR DECLARATORY RELIEF

43. Defendant and counterclaimant, Lilly asserts this counterclaim against Plaintiffs and Counterdefendants ARIAD, M.I.T, THE WHITEHEAD INSTITUTE, and HARVARD and avers as follows:

## JURISDICTION AND VENUE

44. This action arises under the patent laws of the United States, 35 U.S.C. §§ 1 et seq. This Court has original jurisdiction under 28 U.S.C. §§1331, 1338(a) and Fed. R. Civ. P. 13(a). Counterclaimant Lilly seeks declaratory judgment pursuant to Sections 2201 and 2202 of Title 28 of the United States Code.

45. There is an actual controversy within this judicial district arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, and Declaratory Judgments Act, 28 U.S.C. §§ 2201 *et seq.*, between Counterclaimant and Counterdefendants. Plaintiffs initiated this action against Lilly, alleging infringement by Lilly of United States Patent No. 6,410,516. An actual controversy exists at least by virtue of Plaintiffs' Complaint and Lilly's Answer thereto, asserting non-infringement, and invalidity of the patent in suit.

46. Venue for these Counterclaims is proper under 28 U.S.C. § 1391 (b) and (c) and 1400 (b).

**PARTIES**

47. Upon information and belief based upon representations made in Plaintiff's Complaint, ARIAD is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 26 Landsdowne Street, Cambridge, Massachusetts.

48. Upon information and belief based upon representations made in Plaintiff's Complaint, M.I.T is a co-educational, privately endowed research university located at 77 Massachusetts Avenue, Cambridge, Massachusetts.

49. Upon information and belief based upon representations made in Plaintiff's Complaint, THE WHITEHEAD INSTITUTE is a non-profit research and education institute located at Nine Cambridge Center, Cambridge, Massachusetts.

50. Upon information and belief based upon representations made in Plaintiff's Complaint, HARVARD is a co-educational, privately endowed research university located at Massachusetts Hall, Cambridge, Massachusetts.

51. Defendant Lilly is a corporation organized and existing under the laws of the State of Indiana with its principal place of business located at Lilly Corporate Center, Indianapolis, Indiana.

52. U.S. Patent No. 6,410,516, which issued June 25, 2002, references on its face a priority date of January 9, 1986, more than sixteen years prior.

53. Plaintiffs have charged Lilly with infringement of United States Patent No. 6,410,516, for the sale of products whose active ingredients were taught for administration in humans in patent applications filed before the earliest claimed priority date of the '516 patent.

19

54. Plaintiffs did not seek to add the claims asserted against Lilly's accused products to the patent application that issued as the '516 patent until after Lilly had commercialized its accused products.

## COUNTERCLAIM I – NON-INFRINGEMENT AND INVALIDITY

55. Lilly has not infringed any valid claim of United States Patent No. 6,410,516 in any way, i.e., directly, contributorily, or by inducement. Therefore, Lilly is entitled to a judicial declaration that Lilly has not and does not infringe United States Patent No. 6,410,516.

56. United States Patent No. 6,410,516 is invalid for failure to comply with one or more of the requirements, conditions and provisions set forth in at least 35 U.S.C. §§ 101, 102, 103, and/or 112. Therefore, Lilly is entitled to a judicial declaration that the United States Patent No. 6,410,516 is invalid and unenforceable.

57. United States Patent No. 6,410,516 is invalid for the prosecution form of laches.

## COUNTERCLAIM II - UNENFORCEABILITY

58. Lilly incorporates by reference the fact and allegations set forth in Paragraphs 37-42, supra.

59. United States Patent No. 6,410,516 is unenforceable due to inequitable conduct. Therefore, Lilly is entitled to a judicial declaration that the United States Patent No. 6,410,516 is unenforceable.

20

## RELIEF REQUESTED

WHEREFORE, defendant-counterclaimant Lilly prays for judgment and relief against Plaintiff-counterdefendants, ARIAD, M.I.T, THE WHITEHEAD INSTITUTE, and HARVARD including:

(A)    A dismissal with prejudice of Plaintiffs' Complaint and a denial of plaintiffs' claims for relief against defendant-counterclaimant Lilly.

(B)    A declaration that defendant-counterclaimant has not infringed any valid claim of United States Patent No. 6,410,516.

(C)    A declaration that United States Patent No. 6,410,516 is invalid.

(D)    A declaration that United States Patent No. 6,410,516 is unenforceable.

(E)    An injunction permanently preventing counterdefendants from asserting or enforcing United States Patent No. 6,410,516 against Lilly and/or purchasers or users of Lilly products.

(F)    Judgment that this is an exceptional case and that defendant-counterclaimant be awarded costs, expenses and reasonable attorney's fees pursuant to 35 U.S.C. §285.

(G)    Awarding such other and further relief as this Court may deem just and proper.

May 27, 2003

Respectfully submitted,

Paul H. Berghoff
Grantland G. Drutchas
David M. Frischkorn
McDonnell Boehnen Hulbert
& Berghoff
300 S. Wacker Drive
Chicago, Illinois 60606
Tel:    (312) 913-0001
Fax:    (312) 913-0002

Lawrence R. Robins
Finnegan, Henderson,
Farabow, Garrett & Dunner
55 Cambridge Parkway
Cambridge, MA 02142
Phone: 617-452-1660
Fax:    617-452-1666

# CERTIFICATE OF SERVICE

I, Jenny E. Macioge, hereby certify that on May 27, 2003, a true and correct copy

of the foregoing was served by the indicated means to the persons at the addresses listed:

ELI LILLY and COMPANY'S ANSWER TO PLAINTIFFS' COMPLAINT AND

COUNTERCLAIMS

Lee Carl Bromberg
Kerry L. Timbers
Anne Marie Longobucco
BROMBERG & SUNSTEIN LLP
125 Summer Street
Boston, MA 02110

☒ Via First Class Mail
☐ Via Hand Delivery
☐ Via Overnight Courier
☒ Via Facsimile

Leora Ben-Ami
Thomas F. Fleming
Patricia A. Carson
CLIFFORD CHANCE ROGERS & WELLS
200 Park Avenue
New York, NY 10166

☒ Via First Class Mail
☐ Via Hand Delivery
☐ Via Overnight Courier
☒ Via Facsimile

Jenny E. Macioge

FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
55 Cambridge Parkway
Cambridge, MA 02142
TEL: 617-452-1625

# Exhibit C

Doc Code:

PTO/SB/57 (09-04)
Approved for use through 04/30/2007. OMB 0651-0033
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

(Also referred to as FORM PTO - 1465)

# REQUEST FOR *EX PARTE* REEXAMINATION TRANSMITTAL FORM

Address to:

**Mail Stop *Ex Parte* Reexam**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, VA 22313-1450**

**Attorney Docket No.** 05-280

**Date:** April 4, 2005

1. ☒ This is a request for *ex parte* reexamination pursuant to 37 CFR 1.510 of patent number   6,410,516
issued June 25, 2002                      . The request is made by:

4660  U.S. PTO
90007503

☐ patent owner.        ☒ third party requester.

2. ☒ The name and address of the person requesting reexamination is:

Grantland G. Drutchas, Reg. No. 32,565

McDonnell Boehnen Hulbert & Berghoff LLP

300 S. Wacker Drive, Suite 3100, Chicago, IL 60606

04/04/05

3. ☒  a. A check in the amount of $ 2520.00_____ is enclosed to cover the reexamination fee, 37 CFR 1.20(c)(1);

☒ b. The Director is hereby authorized to charge the fee as set forth in 37 CFR 1.20(c)(1)
to Deposit Account No. 13-2490_____(submit duplicative copy for fee processing); or

☐ c. Payment by credit card. Form PTO-2038 is attached.

4. ☒  Any refund should be made by ☐ check or ☒ credit to Deposit Account No. 13-2490____.
37 CFR 1.26(c). If payment is made by credit card, refund must be to credit card account.

5. ☒ A copy of the patent to be reexamined having a double column format on one side of a separate
paper is enclosed. 37 CFR 1.510(b)(4)

6. ☐ CD-ROM or CD-R in duplicate, Computer Program (Appendix) or large table
   ☐ Landscape Table on CD

7. ☐ Nucleotide and/or Amino Acid Sequence Submission
*If applicable, items a.-c. are required.*

a. ☐ Computer Readable Form (CRF)
b. Specification Sequence Listing on:
   i ☐ CD-ROM (2 copies) or CD-R (2 copies); **or**
   ii ☐ paper
c. ☐ Statements verifying identity of above copies

8. ☐ A copy of any disclaimer, certificate of correction or reexamination certificate issued in the patent is
included.

9. ☒ Reexamination of claim(s) 1-18, 20-43, 47-51, 53-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, 182-186, 192-193, 197-202

10. ☒ A copy of every patent or printed publication relied upon is submitted herewith including a listing
thereof on Form PTO-1449 or equivalent.

11. ☐ An English language translation of all necessary and pertinent non-English language patents and/or
printed publications is included.

[Page 1 of 2]

This collection of information is required by 37 CFR 1.510. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to
process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 2 hours to complete, including
gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount
of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark
Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND
TO: Mail Stpe *Ex Parte* Reexam, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Doc Code:

PTO/SB/57 (09-04)
Approved for use through 04/30/2007. OMB 0651-0033
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

12. ☒    The attached detailed request includes at least the following items:

     a.    A statement identifying each substantial new question of patentability based on prior patents and printed publications. 37 CFR 1.510(b)(1)

     b.    An identification of every claim for which reexamination is requested, and a detailed explanation of the pertinency and manner of applying the cited art to every claim for which reexamination is requested. 37 CFR 1.510(b)(2)

13. ☐    A proposed amendment is included (only where the patent owner is the requester). 37 CFR 1.510(e)

14. ☒    a. It is certified that a copy of this request (if filed by other than the patent owner) has been served in its entirety on the patent owner as provided in 37 CFR 1.33(c).
     The name and address of the party served and the date of service are:

     **Matthew P. Vincent**

     **Fish & Neave IP Group**

     **Ropes & Gray, One International Place, Boston, MA 02110-2624**

     Date of Service: _____ **April 4, 2005** _____ ; or

     ☐   b. A duplicate copy is enclosed since service on patent owner was not possible.

15. ☒   Correspondence Address: Direct all communication about the reexamination to:

     ☒   The address associated with Customer Number:      20306

     **OR**

| ☐ Firm or Individual Name | |
|---|---|
| Address | |
| City | State | Zip |
| Country | |
| Telephone | Fax |

16. ☒   The patent is currently the subject of the following concurrent proceeding(s):

     ☐ a. Copending reissue Application No. _____
     ☐ b. Copending reexamination Control No. _____
     ☐ c. Copending Interference No. _____
     ☒ d. Copending litigation styled:

Ariad Pharmaceuticals, Inc., Massachusetts Institute of Technology, The Whitehead

Institute for Biomedical Research, and the President and Fellows of Harvard College,

v Eli Lilly and Company, US Dist. Court for the Dist. of MA, Action No. 02 CV 11280 RWZ (2002)

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

| Authorized Signature | April 4, 2005 |
|---|---|
| Authorized Signature | Date |
| **Grantland G. Drutchas** | **32,565** | ☐ For Patent Owner Requester |
| Typed/Printed Name | Registration No. | ☒ For Third Party Requester |

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
(Case No. 05-280)

| | |
|---|---|
| In re U.S. Patent No. 6,410,516 ) | |
| ) | |
| Date of Issue:      June 25, 2002 ) | |
| ) | |
| Name of Patentee:    David Baltimore et al. ) | |
| ) | |
| Serial No.:    08/464,364 ) | Group Art Unit: Not Yet Assigned |
| ) | |
| Filed:    June 5, 1995 ) | Examiner: Not Yet Assigned |
| ) | |
| Assignees:    President and Fellows of Harvard ) | Box:   *Ex Parte* Reexam |
|       College, Massachusetts Institute ) | |
|       of Technology, Whitehead Institute ) | |
|       For Biomedical Research ) | |
| ) | |
| Title:   **NUCLEAR FACTORS ASSOCIATED** ) | |
|       **WITH TRANSCRIPTIONAL** ) | |
|       **REGULATION** ) | |
| ————————————————— ) | |

## REQUEST FOR REEXAMINATION
## PURSUANT TO 35 U.S.C. § 302

Mail Stop Ex Parte Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

     Eli Lilly and Company ("Lilly") submits this Request for Reexamination of claims 1-18,

20-43, 47-51, 53-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-140, 144-150, 154-160,

164-168, 172-178, 182, 186, 192-193, 197-201 of U.S. Patent No. 6,410,516 ("the '516 patent")

(Exhibit A) pursuant to 35 U.S.C. § 302. This Request is supported by the attached prior art that

establishes substantial new questions of patentability of these claims.

# TABLE OF CONTENTS

I.     Introduction............................................................................................................1

II.    RELATED PENDING LITIGATION ..............................................................5

III.   Statements of Substantial New Questions of Patentability................................6
       A.    The Subject Claims are Expressly Anticipated Under 35 U.S.C. § 102(b),
             or Alternatively Rendered Obvious Under 35 U.S.C. § 103 .................................6
             1.    Cyclosporin A References ...........................................................6
             2.    Protein Kinase C Inhibitor References .........................................7
       B.    Even if the Subject Claims Are Entitled to a Priority Date Before 1991, the
             Subject Claims are Inherently Anticipated Under 35 U.S.C. §102(b), or
             Alternatively Rendered Obvious Under 35 U.S.C. § 103.........................................7
             1.    Cyclosporin A References ...........................................................7
             2.    Vitamin D (Calcitriol) References ................................................8
             3.    5-ASA References ......................................................................8
             4.    Glucocorticoid References...........................................................8
             5.    Antibiotics Targeted to Gram Negative Bacteria References.....................9
             6.    Red Wine References ................................................................10

IV.    Background.............................................................................................................10
       A.    The Natural Mechanism ................................................................................10
       B.    The Claims of the '516 Patent .......................................................................12
             1.    Virtually all of the claims require a single functional step of
                   "reducing NF-κB activity . . . in cells," typically in response to
                   some type of external influence.  There are only three exceptions:...........13
             2.    Some claims indicate that NF-κB activity is reduced in specified
                   ways:.................................................................................13
             3.    All claims recite the effect caused by reducing NF-κB activity:..............13
             4.    Some of the claims specify certain cell types:...............................14
       C.    Under 35 U.S.C § 132, None Of The Applications Filed Before November
             13, 1991 Support The Claims At Issue In The '516 Patent ...................................15

V.     Detailed Description Of The SNQ of Patentability ..........................................20
       A.    The Subject Claims are Expressly Anticipated Under 35 U.S.C. § 102(b),
             or Alternatively Rendered Obvious Under 35 U.S.C. § 103 .................................20
             1.    Cyclosporin A References:  *Emmel*, *Schmidt*, and *Brini* Expressly
                   Anticipate or Alternatively Render Obvious the Subject Claims...............20
             2.    Protein Kinase C Inhibitor References: *Meichle* and *Shirakawa*
                   Expressly Anticipate or Render Obvious the Subject Claims ...................22

B.     Even if the Subject Claims Are Entitled to a Priority Date Before 1991, the Subject Claims are Inherently Anticipated Under 35 U.S.C. §102(b), or Alternatively Rendered Obvious Under 35 U.S.C. § 103....................................24

       1.    Cyclosporin A References ..........................................................26

       2.    Vitamin D (Calcitriol) References ............................................34

       3.    5-ASA References ......................................................................37

       4.    Glucocorticoid References........................................................39

       5.    Antibiotic References ................................................................43

       6.    Red Wine References ................................................................45

       7.    Additional Compounds.............................................................50

VI.    Conclusion........................................................................................................52

**Table of Prior Art Relied Upon**

**Cyclosporin A References**

| Reference No. | Reference (Short Citation) | Reference (Full Citation) |
|---|---|---|
| 1 | *Emmel* | Emmel et al., *Cyclosporin A Specifically Inhibits Function of Nuclear Proteins Involved in T Cell Activation*, Science, 246: 1617-20 (December, 1989) |
| 2 | *Schmidt* | Schmidt et al., *Inducible Nuclear Factor Binding to the κB Elements of the Human Immunodeficiency Virus Enhancer in T Cells Can be Blocked by Cyclosporin A In a Signal-Dependent Manner*, J. of Virology, 64:4037-4041 (August 1990) |
| 3 | *Brini* | Brini et al., *Cyclosporin A Inhibits Induction of IL-2 Receptor α Chain Expression by Affecting Activation of NF-κB-Like Factor(s) in Cultured Human T Lymphocytes*, Eur. Cytokine Net., 1:131-139 (September 1990) |
| 4 | *PDR 1985* | The Physician's Desk Reference, 1811-13 (1985 Ed.) |
| 5 | *Griffith I* | Griffith et al., *Cardiac Transplantation with Cyclosporin A and Prednisone*, Ann. Surg. 196:324-329 (September 1981) |
| 6 | *Griffith II* | Griffith et al., *Targeted Blood Levels of Cyclosporine for Cardiac Transplantation*, J. Thorac. Cardiovasc. Surg. 99:952-957 (December, 1984) |
| 7 | *Baldwin I* | Baldwin, *The NF-κB and IκB Proteins: New Discoveries and Insights*, Annu. Rev. Immunol. 14:649-81 (1996) |
| 8 | *Baldwin II* | Baldwin, *The Transcription Factor NF-κB and Human Disease*, J. Clin. Invest. 107:3 (January 2001) |
| 9 | *Baeuerle I* | Baeuerle, *The Inducible Transcription Activator NF-κB: Regulation by Distinct Protein Subunits*, Biochimica et Biophysica Acta, 1072:63-80 (1991) |
| 10 | *Baeuerle II* | Baeuerle and Henkel, *Function and Activation of NF-κB in the Immune System*, Ann. Rev. Immunol., 12:141-79 (1994) |
| 11 | *Reed* | Reed et al., *Effect of Cyclosporin A and Dexamethasone on Interleukin 2 Receptor Gene Expression*, J. Immunol. 137:150-154 (July 1986) |
| 12 | *Krönke* | Krönke et al., *Cyclosporin A Inhibits T-Cell Growth Factor Gene Expression At the Level of Gene Expression*, Proc. Natl. Acad. Sci. USA 81:5214-5218 (August 1984) |

## Table of Prior Art Relied Upon (cont.)

### Cyclosporin A References (cont.)

| Reference No. | Reference (Short Citation) | Reference (Full Citation) |
| --- | --- | --- |
| 13 | *Siebenlist* | Siebenlist et al., *Promoter Region of Interleukin-2 Gene Undergoes Chromatin Structure Changes and Confers Inducibility on Chloramphenicol Acetyltransferase Gene During Activation of T Cells*, Molecular and Cell Biol. 6:3042-3049 (Sept. 1986) |
| 14 | Hölschermann | Hölschermann et al., *Cyclosporin A Inhibits Monocyte Tissue Factor Activation in Cardiac Transplant Recipients*, Circulation, 96:4232-4238 (December, 1997) |
| 15 | *Alkalay* | Alkalay, et al., *In Vivo Stimulation of I$\kappa$B Phosphorylation is Not Sufficient to Activate NF-$\kappa$B*, Mol. Cell Biol. 15:1294-1301 (1995) |
| 16 | *Hoyos* | Hoyos et al., *Kappa B-Specific DNA Binding Proteins: Role in the Regulation of Human Interleukin-2 Gene Expression*, Science 244:457-460 (April 1989) |

### Protein Kinase C Inhibitor References

| Reference No. | Reference (Short Citation) | Reference (Full Citation) |
| --- | --- | --- |
| 17 | *Meichle* | Meichle et al., *Protein Kinase C-Independent Activation of Nuclear Factor $\kappa$B by Tumor Necrosis Factor*, J. Biol. Chem. 265:8339-8343 (May 15, 1990) |
| 18 | *Shirakawa* | Shirakawa et al., *In vitro Activation and Nuclear Translocation of NF-$\kappa$B Catalyzed by Cyclic AMP-Dependent Protein Kinase and Protein Kinase C*, Mol. And Cell. Biol., 9: 2424-2430 (June 1989) |

### Vitamin D (Calcitriol) References

| Reference No. | Reference (Short Citation) | Reference (Full Citation) |
| --- | --- | --- |
| 19 | *Tsoukas* | Tsoukas, *et al. 1,25-Dihydroxyvitamin D$_3$: A Novel Immunoregulatory Hormone*, Science 224:1438-40 (June 1984) |

i

## Table of Prior Art Relied Upon (cont.)

| 20 | Manolagas | Manolagas et al., *The Anti-Proliferative Effect of Calcitriol on Human Peripheral Blood Mononuclear Cells*, JCE&M, 63:394-400 (1986) |
| 21 | Yu | Yu et al., *Down-regulation of NF-κB Protein Levels in Activated Human Lymphocytes by 1,25-Dihydroxyvitamin D₃*, Proc. Natl. Acad. Sci., 92:10990-10994 (November, 1995) |

## Vitamin D (Calcitriol) References (cont.)

| Reference No. | Reference (Short Citation) | Reference (Full Citation) |
|---|---|---|
| 22 | Lemire I | Lemire et al., *1,25-Dihydroxyvitamin D₃ Suppresses Proliferation and Immunoglobulin Production by Normal Human Peripheral Blood Mononuclear Cells*, J. Clin. Invest., 74:657-661 (August 1984) |
| 23 | Lemire II | Lemire et al., *1,25-Dihydroxyvitamin D₃ Suppresses Human T Helper/Inducer Lymphocyte Activity in Vitro*, J. Immunol., 134:3032-3035 (May 1985) |
| 24 | Rigby I | Rigby et al., *Inhibition of T Lymphocyte Mitogenesis by 1,25-Dihydroxyvitamin D3 (Calcitriol)*, J. Clin. Invest. 74:1451-1455 (October, 1984) |
| 25 | Rigby II | Rigby et al., *The Effects of 1,25-Dihydroxyvitamin D3 on Human T Lymphocyte Activation and Proliferation: A Cell Cycle Analysis*, J. Immunol. 135:2279-2286 (October 1985) |
| 26 | Colston | Colston et al., *1,25-Dihydroxyvitamin D₃ and Malignant Melanoma: The Presence of Receptors and Inhibition of Cell Growth in Culture*, Endocrinology 108:1083-1086 (1981) . |
| 27 | Semmler | Semmler, *The Synthesis of 1α,25-Dihydroxycholecalciferol – A Metabolically Active Form of Vitamin D₃*, Tetrahedron Lett. 40:4147-50 (1972) |
| 28 | Holick | Holick, *Identification of 1α,25-Dihydroxycholecalciferol, a Form of Vitamin D₃ Metabolically Active in the Intestine*, P.N.A.S. 68:803 (1971) |
| 29 | Norman | Norman, *1,25-Dihydroxycholecalciferol: Identification of the Proposed Active Form of Vitamin D₃ in the Intestine*, Science 173:51-54 (1971) |

ii

## Table of Prior Art Relied Upon (cont.)

| 30 | *Lawson* | Lawson, *Identification of 1,25-Dihydroxycholecalciferol, a New Kidney Hormone Controlling Calcium Metabolism*, Nature 230:228-30 (1971) |
|----|----------|------|
| 31 | *Adams* | Adams, et al., *1α,25-Dihydroxycholecalciferol Inhibits Apoptosis in C3H10T1/2 Murine Fibroblast Cells Through Activation of Nuclear Factor κB*, Am. Soc. Nut. Sci. 134:2948 (2004) |
| 32 | *Ebert* | Ebert, et al., *Down-Regulation by Nuclear Factor κB of Human 25-Hydroxyvitamin D₃ 1α-Hydroxylase Promoter*, Mol. Endocrinology 18:2440-50 (2004) |
| 33 | *Berry* | Berry, et al., *1α,25-Dihydroxyvitamin D₃ Stimulates Phosphorylation of IκBα and Synergizes with TPA to Induce Nuclear Translocation of NF-κB During Monocytic Differentiation of NB4 Leukemia Cells*, Exp. Cell Res. 272, 176-84 (2002) |
| 34 | *Xing* | Xing, et al., *Distinctive Dendritic Cell Modulation by Vitamin D₃ and Glucocorticoid Pathways*, Biochem. and Biophys. Res. Comm. 297:645-652 (2002) |
| 35 | *Komine* | Komine, et al., *The Action of a Novel Vitamin D₃ analogue, OCT, on Immunomodulatory Function of Keratinocytes and Lymphocytes*, Arch. Dermatol. Res. 291:500-06 (1999) |
| 36 | *Harant* | Harant, et al., *1α,25-Dihydroxyvitamin D₃ Decreases DNA Binding of Nuclear Factor-κB in Human Fibroblasts*, FEBS Lett. 436:329-34 (1998) |
| 37 | *Harant* | Harant, et al., *1α,25-Dihydroxyvitamin D₃ and a Variety of Its Natural Metabolites Transcriptionally Repress Nuclear-Factor-κB-Mediated Interleukin-8 Gene Expression*, Eur. J. Biochem., 250:63-71 (1997) |
| 38 | *Provvedini* | Provvedini, et al., *1,25 dihydroxyvitamin D₃ Receptors in Human Leukocytes*, Science, 221:1181-83 (1983) |

## Table of Prior Art Relied Upon (cont.)

### 5-ASA References

| Reference No. | Reference (Short Citation) | Reference (Full Citation) |
|---|---|---|
| 39 | *Dew* | Dew et al., *Maintenance of Remission in Ulcerative Colitis With 5-Amino Salicylic Acid in High Doses By Mouth*, Br. Med. J. 287:23-24 (July 1983) |
| 40 | *Bantel* | Bantel et al., *Mesalazine Inhibits Activation of Transcription Factor NF-κB in Inflamed Mucosa of Patients with Ulcerative Colitis*, Amer. J. of Gastroenterology 287:3452 (2000) |
| 41 | *Yan* | Yan and Polk, *Aminosalicylic Acid Inhibits IκB Kinase α Phosphorylation of IκBα in Mouse Intestinal Epithelial Cells*, J. Biol Chem. 274:366631-36 (1999) |

### Glucocorticoid References

| Reference No. | Reference (Short Citation) | Reference (Full Citation) |
|---|---|---|
| 42 | *PDR 1970* | Physicians' Desk Reference (1970 Ed.) |
| 43 | *Lefring* | Lefring and Neugebauer, *Steroid Controversy in Sepsis and Septic Shock: A Meta-Analysis*, Crit. Care. Med., 23:1294-1303 (July 1995) |
| 44 | *Nagasawa* | Nagasawa et al., *Induction of Human Malignant T-Lymphoblastic Cell Lines Molt-3 and Jurkat by 12-O-Tetradecaoylphorbol-13-Acetate: Biochemical, Physical and Morphological Characterization*, J. Cell. Phys. 109:181-192 (1981) |
| 45 | *Rovera* | Rovera et al., *Induction of Differentiation in Human Promeolytic Leukemia Cells by Tumor Promoters*, Science 204:868-970 (1979) |
| 46 | *Auphan* | Auphan et al., *Immunosuppression by Glucocorticoids: Inhibition of NF-κB Activity Through Induction of IκB Synthesis*, Science 270:286-290 (1995) |
| 47 | *Scheinman I* | Scheinman et al., *Characterization of Mechanisms Involved in Transrepression of NF-κB by Activated Glucocorticoid Receptors*, Mol. Cell. Biol. 15:943-53 (February 1995) |

**Table of Prior Art Relied Upon (cont.)**

| 48 | *Scheinman II* | Scheinman et al., *Role of Transcriptional Activation of IκBα in Mediation of Immunosuppression by Glucocorticoids,* Science 270:283-186 (October 1995) |
| 49 | *Mukaida* | Mukaida et al., *Novel Mechanism of Glucocorticoid-mediated Gene Repression,* J. Biol Chem. 269:13289-95 (May 1994) |

## Antibiotic References

| Reference No. | Reference (Short Citation) | Reference (Full Citation) |
|---|---|---|
| | *PDR 1970* | Physicians' Desk Reference (1970 Ed.) |
| 50 | *Galdiero* | Galdiero et al., *Porins From* Salmonella Enterica *Serovar Typhimurium Induce TNF-α, IL-6 and IL-8 Release By CD14-Independent And CD11a/CD18-Dependent Mechanisms,* Microbiology, 147:2697-2704 (2001) |
| 51 | *Yang* | Yang et al., *Toll-Like Receptor-2 Mediates Lipopolysaccharide-Induced Cellular Signaling,* Nature 395, 284–288 (1998) |
| 52 | *Mori* | Mori et al., *Activation of the Interleukin-10 Gene In The Human T Lymphoma Line Hut78: Identification And Characterization Of NF-kB Binding Sites In The Regulatory Region of the Interleukin-10 Gene.,* Eur. J. Haematol. 59:162-170 (1997) |

## Red Wine References

| Reference No. | Reference (Short Citation) | Reference (Full Citation) |
|---|---|---|
| 53 | *Bible* | Various excerpts from the Bible, King James Version (1611) |
| 54 | *St. Leger* | St. Leger et al., *Factors Associated with Cardiac Mortality in Developed Countries With Particular Reference to the Consumption of Wine,* The Lancet, 1017-1020 (May 1979) |
| 55 | *Dobrilla* | Dobrilla et al., *Is Ethanol Metabolism Affected by Oral Administration of Cimetidine and Ranitidine at Therapeutic Doses?* Hepato-Gastroenterol., 31:35-37 (February 1984) |
| 56 | *Jones* | Jones, *Elimination Half-Life of Methanol During Hangover,* Pharm. & Tox. 60:217-220 (March 1987) |
| 57 | *Blanco-Colio* | Blanco-Colio et al., *Red Wine Intake Prevents Nuclear Factor-κB Activation in Peripheral Blood Mononuclear Cells of Healthy Volunteers During Postprandial Lipemia,* Circulation, 102:1020-1026 (August 2000) |

v

## Table of Prior Art Relied Upon (cont.)

| 58 | Holmes-McNary/Baldwin | Holmes-McNary and Baldwin, *Chemopreventive Properties of trans-Resveratrol are Associated with Inhibition of Activation of the IκB Kinase*, Cancer Res., 60:3477-483 (July 2000) |
| 59 | Manna | Manna et al., *Resveratrol Suppresses TNF-Induced Activation of Nuclear Transcription Factors NF-κB, Activator Protein-1, and Apoptosis: Potential Role of Reactive Oxygen Intermediates and Lipid Peroxidation*, J. of Immunol., 164:6509-6519 (2000) |

## Additional References

| Reference No. | Reference (Short Citation) | Reference (Full Citation) |
| --- | --- | --- |
| 60 | Weissmann | Weissmann, *Aspirin*, Sci. American, 84-90 (January 1991) |
| 61 | Kopp | Kopp and Ghosh, *Inhibition of NF-κB by Sodium Salicylate and Aspirin,* Science 265:956-959 (August 1994) |
| 62 | Bayer web page | Bayer web page |
| 63 | PDR 1980 | Physicians' Desk Reference (1980 Ed.) |
| 64 | Yamamoto | Yamamoto, *et al., Sulindac Inhibits Activation of the NF-κB Pathway*, J. Biol. Chem. 274:27307 (1999) |
| 65 | Richards | Richards et al., *Gold and Its Relationship to Neurological/Glandular Conditions*, International Journal of Neuroscience, 112:31-53 (2002) |
| 66 | Jeon | Jeon, *et al., Thiol-reactive Metal Compounds Inhibit NF-κB Activation by Blocking IκB kinas*e, J. Immunol. 164:5981-5989 (June, 2000) |
| 67 | www.tea.co.uk | Chinese Legend, www.tea.co.uk |
| 68 | Yang | Yang, *et al., Green Tea Polyphenols Block Endotoxin-Induced Tumor Necrosis Factor-Production and Lethality in a Murine Model*, 128 J. Nutr. 2334 (1998) |
| 69 | Black Tea | Pan, *Suppression of Lipopolysaccharide-Induced Nuclear FactorκB Activity by Theaflavin-3,3'-Digallate from Black Tea and Other Polyphenols through Downregulation of IκB Kinase Activity in Macrophages*, Biochem. Phamacol. 59:357 (2000) |
| 70 | Tumeric | Turmeric Monograph, Nutrisana International |
| 71 | Singh | Singh and Aggarwal, J. Biol Chem. 270:24995-2500 (1995) |

vi

## Table of Prior Art Relied Upon (cont.)

| 72 | *Manson* | M.M. Manson, et al., *Modulation of signal-transduction pathways by chemopreventive agents*, 28 Biochem. Soc. Trans. 7, 9 (2000) |
| 73 | *Pliny, Virgil* | Pliny's Natural History, XIX, 34; Virgil's Eclogues; www.Botanical.com |
| 74 | *Ide* | Ide and Lau, *Garlic Compounds Minimize Intracellular Oxidative Stress and Inhibit Nuclear Factor-κB Activation*, 131 J. Nutr. 1020S (2001) |

# I.   INTRODUCTION

The claims of the '516 patent all relate to methods of reducing or otherwise modifying NF-κB activity in cells in order to achieve a variety of claimed results. NF-κB is a naturally occurring transcription factor that affects gene expression in response to extracellular stimuli. For example, claim 1 of the '516 patent reads as follows:

> 1. A method for inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-κB, the method comprising reducing NF-κB activity in the cell such that expression of said gene is inhibited.

The only method step identified in this claim, and in each of the claims at issue, is the wholly functional step of "reducing NF-κB activity."[1] In this regard, the claims are so broad as to encompass numerous prior art methods employing compounds now known to necessarily modulate NF-κB activity. Indeed, the prior art references cited herein either expressly or inherently disclose the use of a variety of prior art compounds as reducing NF-κB activity and resulting gene expression – references that, had they been cited and considered, would have compelled the Examiner to reject the claims. Thus, this reexamination request raises substantial new questions of patentability (SNQ) under 35 U.S.C. § 102 and/or § 103.

Patentees explicitly acknowledged that compounds identified through the application of assays taught in the '516 patent inherently possessed the ability to reduce NF-κB activity and inhibit concomitant gene expression. Indeed, Patentees argued that their method claims need not

---

[1] The exception is claim 7 and dependent claims 81, 83, and 85-87, which require "modifying NF-κB activity."

identify the actual structure of an inhibitory agent because disclosure of an assay suitable for measuring the activity in question was sufficient to describe the agent itself: "it is appropriate . . . to have defined the method of use with reference to agents identified or characterized by their method of selection or identification, as that *inherently defines characteristic properties of useful agents*." '516 patent file history, Response and Amendment, mailed September 12, 2001, p. 8. (emphasis added). However, while Patentees acknowledged the inherent properties of such agents, they never disclosed, and the Examiner never considered, that the use of such agents was publicly described prior to the filing of the applications leading to the '516 patent.

In that regard, the extrinsic references cited herein essentially repeat the methods of using various compounds as was taught in the prior art references discussed herein. The extrinsic references then used the very tests taught in the '516 patent to measure the inherent characteristic properties of various prior art compounds, that is the effect of such compounds on NF-κB activity and concomitant gene expression when used as taught in the prior art. The results of these tests confirm that the use of these compounds as taught in the prior art references reduced NF-κB activity as called for by the claims, and met each of the limitations of the claims that are the subject of this reexamination request. The prior art references describing the use of these compounds, inherently anticipate the subject claims.

Cyclosporin A is a particularly good example. The administration of Cyclosporin A to humans was taught to minimize organ transplant rejection since the early 1980's, as demonstrated by the attached prior art references. More recent testing under the same conditions taught in these prior art references confirms that the administration of Cyclosporin A to humans necessarily reduced NF-κB activity. Additional prior art references teach the use of Cyclosporin

A in cell cultures under conditions that likewise are now recognized to have reduced NF-κB activity in those cell cultures. The direct correspondence between conditions used in the prior art references and the extrinsic references confirms, as discussed below and in the accompanying declaration of Dr. Stavros Manolagas (Exhibit J), that the administration of Cyclosporin A as taught in the prior art references necessarily reduced NF-κB activity and concomitant gene expression.

Furthermore, several references that were published more than a year before the last continuation-in-part filing date in this application (November 13, 1991) explicitly disclose that Cyclosporin A reduces NF-κB activity. Such references expressly anticipate the claims at issue because the granted claims have an effective filing date of no earlier than November 13, 1991 under 35 U.S.C. § 132.

Similarly, other references discussed herein disclosed the prior use of various other compounds in humans or cell cultures in such a way that reducing NF-κB activity as called for by the claims was either expressly disclosed or, through subsequent study, has now been recognized to necessarily have had such effect. Such references disclosed, *inter alia*, the use of calcitriol (the active metabolite of Vitamin D), 5-aminosalicylic acid (5-ASA), dexamethasone, and red wine, all of which necessarily reduce NF-κB activity. Antibiotics – including gentamicin, erythromycin, and tetracycline, are also now recognized as having necessarily reduced NF-κB activity in instances of gram-negative infection. By eliminating the source of lipopolysaccharide ("LPS") (i.e., gram negative bacteria), these antibiotics reduce LPS-induced NF-κB activity and cytokine expression.

3

Just to make clear the impact of the claims at issue, a person who takes any of these compounds, as taught in the attached prior art references – including Cyclosporin A used to prevent transplant rejection since the early 1980's, 5-ASA used since the 1980's to treat ulcerative colitis, dexamethasone used since the 1960's to treat rheumatoid arthritis, antibiotics used since at least 1964 to treat gram-negative infection, or red wine as taught in the *Bible* – would now be infringing the claims at issue in this reexamination request. If these claims were allowed to stand, such a person would be subject to an injunction or a royalty payment simply for using agents as they have been used in the same way since before the discovery of NF-κB (which, in some instances, may be for decades, centuries, or millenia).

The Federal Circuit addressed the identical situation in *In re Cruciferous Sprout Litigation*, 310 F.3d 1343, 1351 (Fed. Cir. 2002). In *Cruciferous*, as in the instant case, the patentee had discovered an inherent characteristic property of a prior art compound, specifically, that sprouts contain compounds that have anti-cancer properties and that certain types of sprouts are particularly rich in those compounds. *Id.* The patentees' claims were directed to the cultivation and use of those sprouts as food for the purpose of providing a "chemoprotective effect" to the recipient thereof. Even though the Court acknowledged that the patentee may have, indeed, been the first to recognize the chemoprotective properties of the sprouts, and that a "food product" made using these sprouts may help prevent cancer, *the prior art cultivation and consumption of the claimed sprouts by humans (even without knowing their use as chemoprotective agents) rendered these claims invalid. Id.* at 1350-1351. Patentees here have identified, by means of their assays, a characteristic property that has now been found to be

present in the prior art administration of compounds such as Cyclosporin A, calcitriol, 5-ASA, dexamethasone, antibiotics, and even red wine.

A further significant public interest is at stake because of the stifling effect of the '516 patent claims on the future development of pharmaceuticals. This public interest also supports the need for reexamination of this patent given the clear over-breadth of the claims of the '516 patent. Upon issuance of the '516 patent, the exclusive licensee, ARIAD Pharmaceuticals, notified at least fifty companies that either have products on the market or are developing new pharmaceuticals that purportedly work via the NF-κB pathway. *See* Begley and Johannes, *ARIAD Patent Spurs Legal Battle Between Biotech Firm, Eli Lilly*, Wall Street Journal, June 26, 2002 (Exhibit B). Even Stuart Schreiber, a Harvard Professor, co-founder of ARIAD Pharmaceuticals, and the current Chair of ARIAD's Board of Scientific and Medical Advisors, has admitted concerns over the broad scope of this '516 patent and its effect on innovation in drug discovery. Joanna Ownes, *Stuart Schreiber: Biology from a Chemist's Perspective*, Drug Discovery Today 9:299-303, 303 (April 2004) (Exhibit C) ("I am concerned about this; it doesn't feel right to me. I have always believed in maximizing freedom to operate and in the level playing field model of drug discovery.").

## II.    RELATED PENDING LITIGATION

The '516 patent has been asserted against Eli Lilly and Company (Lilly) by the Assignees and ARIAD Pharmaceuticals in the United States District Court for the District of Massachusetts, Civil Action No. 02 CV 11280 RWZ (2002) ("the Massachusetts litigation") for the manufacture and sale of two products, Evista® (raloxifene hydrochloride) and Xigris® (recombinant human

activated Protein C), the active ingredients of which both were discovered and disclosed for human therapy prior to the discovery of NF-κB. That litigation is currently pending.

Lilly is also seeking a stay of that lawsuit pending resolution of this reexamination, and therefore requests prompt action in this proceeding.

## III.    STATEMENTS OF SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY

This Request for Reexamination of at least claims 1-18, 20-43, 47-51, 53-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, 182,186, 192-193, 197-201 of the '516 patent is premised on SNQ of patentability of those claims as set forth below.[2]

### A.    The Subject Claims are Expressly Anticipated Under 35 U.S.C. § 102(b), or Alternatively Rendered Obvious Under 35 U.S.C. § 103

#### 1.    Cyclosporin A References

*Emmel, Schmidt*, and *Brini* each expressly disclosed, more than one year before the November 13, 1991 effective filing date of the '516 patent, administration of Cyclosporin A to induced cells that substantially reduced NF-κB activity in those cells in accordance with the claims in question. Such determination was made utilizing the very assays taught in the '516 patent. As such, these references raise SNQ of patentability under 35 U.S.C. § 102 or § 103 for at least claims

---

[2] Lilly asserts that many of the claims that are not explicitly the subject of this request for reexamination are also anticipated by inherency by the various prior art references cited herein. Lilly identified the '516 claims that are the subject of this request for reexamination because the extrinsic evidence presented herein unambiguously demonstrates that the methods described in the prior art references are now recognized to have necessarily and inherently reduced NF-κB activity and resulting gene expression as called for by those claims.

1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201 of the '516 patent.

### 2.     Protein Kinase C Inhibitor References

*Meichle* and *Shirakawa* each expressly disclosed, more than one year before the November 13, 1991 effective filing date of the '516 patent, reduction of NF-κB activity in induced cells using agents that inhibit the naturally occurring enzyme Protein Kinase C.  As such, these references raise SNQ of patentability under 35 U.S.C. § 102(b) or § 103 for at least claims 1-9, 11, 20-21, 25-29, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201 of the '516 patent.

### B.     Even if the Subject Claims Are Entitled to a Priority Date Before 1991, the Subject Claims are Inherently Anticipated Under 35 U.S.C. §102(b), or Alternatively Rendered Obvious Under 35 U.S.C. § 103

### 1.     Cyclosporin A References

Long before the first possible effective filing date of the '516 patent, prior art references including the *PDR (1985)*, *Griffith I*, *Griffith II*, *Reed*, *Krönke* , and *Siebenlist* each inherently disclosed, as discussed below and in the Manolagas declaration submitted herewith (Exhibit J), that Cyclosporin A necessarily reduced NF-κB activity and concomitant gene expression in accordance with the claims in question.  Such determination is apparent from the disclosures of *Hölschermann*, *Schmidt*, *Emmel*, and *Brini*, which utilized the very assays taught in the '516 patent to confirm the inhibitory effect of Cyclosporin A on NF-κB activity and gene expression when administered as taught in these prior art references.  Thus, these prior art references raise SNQ of patentability under 35 U.S.C. § 102(b) or § 103 for at least claims 1-2, 6-9, 20-29, 31-40, 53-54, 58-62, 64-73, 75-86 and 88-97 of the '516 patent.

7

### 2.    Vitamin D (Calcitriol) References

Calcitriol, chemical name 1,25-dihydroxyvitamin $D_3$, is the active form of vitamin D. In addition to having been administered as vitamin D to humans for decades, and naturally produced in cells since time immemorial, calcitriol has also been studied for its anti-tumor activities. As discussed below and in the Manolagas declaration, the use of calcitriol as disclosed in prior art references *Tsoukas, Manolagas*, *Lemire I*, *Lemire II*, *Rigby I*, and *Rigby II* has now been conclusively shown by extrinsic evidence, including especially *Yu*, to necessarily reduce NF-κB activity as called for by the claims. As such, these references raise SNQ of patentability under 35 U.S.C. § 102(b) or § 103 for at least claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 of the '516 patent.

### 3.    5-ASA References

5-Aminosalicylic acid, or 5-ASA, is a particular form of salicylate. 5-ASA is the active moiety in sulfasalazine, which has been administered since the 1950's for ulcerative colitis, a form of inflammatory bowel disease or IBD. 5-ASA alone has been administered primarily for the treatment of ulcerative colitis since the 1970's. Today, ulcerative colitis, is widely recognized as being associated with NF-κB activation. The cited references disclose that the use of 5-ASA necessarily resulted in NF-κB activity reduction as called for by the claims. As such, these references raise SNQ of patentability under 35 U.S.C. § 102 or § 103 for at least claims 1-2, 5-9, 20-29, 31-40, 53-62, 64-73, 75-86, and 88-97 of the '516 patent.

### 4.    Glucocorticoid References

Glucocorticoids – a large class of pharmaceutical agents, including for example dexamethasone, long used to control inflammation in various disease states such as rheumatoid

8

arthritis – are now recognized to necessarily reduce NF-κB activity in cells under conditions taught in the prior art. The references cited herein raise SNQ of patentability under 35 U.S.C. § 102 or § 103 for at least claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 of the '516 patent.

##### 5.    Antibiotics Targeted to Gram Negative Bacteria References

In view of the voluminous references relating to the administration of antibiotics for use against gram negative bacterial infections, just a few illustrative examples are cited herein in the Table of Prior Art Relied Upon. Antibiotics, including erythromycin, gentamicin, and tetracycline, have been administered for decades before the discovery of NF-κB to treat gram negative bacterial infections. Gram negative bacteria, such as *E. coli, Salmonella, Pseudomonas aeruginosa, Shigella, V. Parvulla,* and *H. pertussis* produce a compound known as lipopolysaccharide, or LPS. When LPS comes into contact with cells in the human body, it is now known to induce NF-κB activity and, in turn, increase the production of cytokines that are regulated at least in part by NF-κB. Antibiotics fight infection by killing the bacteria. As discussed in ¶¶ 33-40 of the Manolagas declaration, the use of antibiotics to kill bacteria reduces the amount of LPS and consequently reduces NF-κB activity and concomitant cytokine production. As such, these references constitute invalidating art under 35 U.S.C. § 102 or § 103 for the subject claims reciting LPS-induced NF-κB activity, i.e., at least claims 1-2, 5-10, 12-18, 20-21, 25-32, 36-41, 53-54, 58-65, 69-76, 80-89, 93-100, 104-105, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, and 182-186 of the '516 patent.

6.    **Red Wine References**

A multitude of prior art references – ranging from the *Bible* to *St. Leger* – establish the medicinal value of red wine consumption.  This effect is now recognized as being at least in part a result of red wine's inhibitory effect on NF-κB.  Indeed, references cited herein establish under very controlled studies that typical and customary consumption of red wine as taught in prior art references necessarily reduce NF-κB activity and resulting gene expression.  As such, these references raise SNQ under 35 U.S.C. § 102 or § 103 for at least claims 1-2, 6-9, 20-21, 25-32, 36-41, 64-65, 69-76, 80-89, 93-98 of the '516 patent.


IV.    <u>BACKGROUND</u>

On June 25, 2002, the '516 patent, titled "Nuclear Factors Associated with Transcriptional Regulation" issued to the assignees, the President and Fellows of Harvard College, the Massachusetts Institute of Technology, and the Whitehead Institute For Biomedical Research. The '516 patent issued from application serial number 08/464,364 filed on June 5, 1995.

A.    **The Natural Mechanism**

The '516 patent relates to the discovery of a naturally occurring protein named nuclear factor κB, or NF-κB, that regulates gene expression in response to extracellular stimuli.

As described in a declaration submitted by Dr. David Gilmore, an expert for the current assignees of the '516 patent in the pending litigation against Lilly, "[c]ells of higher animals have a complex system of proteins that enables them to respond to signals from other cells and to changes in their environment, for example, invasion by foreign organisms such as viruses or

10

bacteria." Gilmore Decl., ¶ 7 (Exhibit D).  In such cells, in Nature, when a cell receptor is

activated by binding to such a signal, "it triggers a complex cascade of protein interactions inside

a cell that ultimately leads to a change in the activity of the cell."  *Id.* at ¶ 8.  The activation or

inactivation of key enzymes leads, in turn, "to the switching on and off of specialized proteins

called transcription factors.  Transcription factors are proteins that act in the nucleus at the level

of DNA to regulate the expression of genes, by increasing or decreasing their expression levels."

*Id.*  NF-κB is one of these transcription factors, and its discovery is discussed in the '516 patent.

NF-κB acts as a cellular messenger in a wide variety of cell types, *see id.* at ¶ 11, and regulates

the expression of more than 300 genes.  NF-κB is also reputed to play a pivotal role in the

pathology of a wide range of diseases, including those involving immune and inflammatory

responses.  *See id.* at ¶ 12.

As described by Dr. Gilmore, the name "NF-κB" arises out of an early misconception by

Dr. Baltimore and others as to the function of the transcription factor.  "The Baltimore '516

patent inventors first identified NF-κB in the course of research to determine how the expression

of immunoglobulin genes was regulated; namely, NF-κB was identified as a transcription factor

that regulated the expression of the gene encoding the kappa immunoglobulin gene in specialized

immune cells, called B cells."  *Id.* at 10.  The specification of the '516 patent contains remnants

from applications filed when this early misconception was still current (NF-κB at this stage was

referred to as κ3):

> [T]wo [of the factors that bind to transcriptional regulatory DNA elements
> of Ig genes] IgNF-B and κ-3 (hereinafter NF-κB) are lymphoid cell
> specific.

'516 Patent, Col. 1, lines 65-66.

11

> NF-κB (previously referred to as Kappa-3) binds only to the Ig light chain
> enhancer. The binding is mediated by the sequence TGGGATTCCCA.
> The factor initially was characterized as lymphoid cell specific and also as
> lymphoid stage specific; that is, work showed that it is expressed only by
> mature B-cells.

'516 Patent, Col. 12, lines 18-23. As discussed in portions of the specification added in later

continuation-in-part applications, the Patentees purportedly discovered that NF-κB was an

inducible factor in many cell types. *See, e.g.*, Col. 12, lines 25-35.

In addition, at some point between the discovery of the transcription factor and 1991,

when the last continuation-in-part application was filed, Patentees purportedly discovered that, in

Nature, NF-κB was bound to a natural inhibitor in the cell cytoplasm, which they termed "IκB"

for inhibitor of NF-κB. Although Patentees were unaware of the mechanism, they postulated that

IκB was altered (by what is now understood as phosphorylation and ubiquitination), leaving NF-

κB free to translocate to the nucleus, bind to DNA recognition sites, and increase expression of

genes downstream from those recognition sites:

> NF-κB is initially located in the cytoplasm in a form unable to bind
> DNA because it is complexed with I-κB. Various inducers then
> cause an alteration in I-κB allowing NF-κB to be released from the
> complex. Free NF-κB then travels to the nucleus and interacts with
> its DNA recognition sites to facilitate gene transcription.

'516 Patent, Col. 16, lines 23-28. The first application that contained any purported amino acid

or DNA sequence for IκB was the November 1991 application          .

## B.    The Claims of the '516 Patent

In spite of the large number of claims in the '516 patent, all of the claims at issue are

closely interrelated, and break down into four relatively straightforward categories. A review of

these categories may be helpful in the Examiner's understanding that all of the claims that are the

subject of this reexamination request (1) call for the same single step of reducing NF-κB activity,

and (2) encompass literally all methods, new or old, of reducing NF-κB activity:

      1.      **Virtually all of the claims require a single functional step of "reducing NF-κB activity . . . in cells," typically in response to some type of external influence. There are only three exceptions:**

- Claim 7 and its dependent claims, claims 81, 83, and 85-87 call for "altering NF-κB activity" instead of "reducing NF-κB activity."

- Claim 19 and its dependent claims, claims 187-190, call for "inhibiting one or more of: (a) modification of an IκB protein which reduces binding to NF-κB, (b) degradation of an IκB protein, or (c) dissociation of NF-κB-IκB complexes."

- Claim 203 calls for "introducing a nucleic acid decoy molecule into the cell in an amount sufficient to inhibit expression of the gene, which decoy includes a NF-κB binding site that binds to NF-κB."

      2.      **Some claims indicate that NF-κB activity is reduced in specified ways:**

- "reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB" (e.g., claims 25, 36, 47, and the like);

- "decreasing the level of NF-κB not bound in an NF-κB:IκB complex" (e.g., claims 20, 31, 42, and the like);

- "inhibiting the passage of NF-κB into the nucleus of cells" (e.g., claims 21, 32, 43, and the like);

- "inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB" (e.g., claims 22, 33, 44, and the like);

- "inhibiting degradation of an IκB protein" (e.g., claims 23, 34, 45, and the like);

- "inhibiting dissociation of NF-κB:IκB complexes" (e.g., claims 24, 35, 46, and the like).

      3.      **All claims recite the effect caused by reducing NF-κB activity:**

- "such that expression of said gene [whose transcription is regulated by NF-κB] is inhibited" (claims 1 and 2 and their dependent claims);

13

- "such that expression of said viral gene [whose transcription is regulated by NF-κB] is reduced" (claim 3 and its dependent claims);

- "such that expression of said cytokine gene [whose transcription is regulated by NF-κB] is reduced" (claim 5 and its dependent claims);

- "such that NF-κB-mediated intracellular signaling is diminished" (claim 6 and its dependent claims);

- "such that NF-κB-mediated effects of external influences are" modified or reduced (claims 7 and 8 and their dependent claims);

- "such that expression of said genes [which are activated by extracellular influences] is reduced" (claim 9 and its dependent claims);

- "so as to reduce bacterial lipopolysaccharide-induced gene expression in the mammalian cells" (claims 10, 13 and 16 and their dependent claims);

- "so as to reduce virus-mediated gene expression in the mammalian cells" (e.g., claim 11 and its dependent claims);

- "so as to reduce bacterial lipopolysaccharide-mediated stimulation of the immune cells" (claim 12 and its dependent claims);

- "so as to reduce bacterial lipopolysaccharide-induced expression of said cytokines in the cells" (claim 14 and its dependent claims);

- "so as to reduce bacterial lipopolysaccharide-induced expression of Tumor Necrosis Factor-α in the cells" (claim 15 and its dependent claims);

- "so as to reduce bacterial-induced NF-κB signaling in the cells" (claim 17 and its dependent claims);

- "so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells" (claim 18 and its dependent claims);

**4.    Some of the claims specify certain cell types:**

- eukaryotic cells (e.g., claims 1, 2, 5, 7, 9, 19, and the like);

- mammalian cells (e.g., claims 10-15, 26, 37, 48, 70, 82, 94, and the like);

- human cells (e.g., claims 27, 38, 49, 71, 84, 95, 145, 155, and the like);

- immune cells (e.g., claims 12, 16, 28, 39, 50, 61, 72, 85, and the like);

14

- lymphoid cells (e.g., claims 29, 40, 62, 73, 86, 97, 107, 108, and the like);

- liver cells (e.g., claims 30, 41, 63, 74, 87, 98, and the like).

During prosecution of the '516 patent and the Massachusetts Litigation, Patentees have argued for a broad claim construction for each of the above terms. The Court's order on claim construction is attached hereto as Exhibit E.

C.    **Under 35 U.S.C § 132, None Of The Applications Filed Before November 13, 1991 Support The Claims At Issue In The '516 Patent**

The '516 patent is actually an amalgam of several separate patent application families, many identifying disparate Patentee-inventors, with David Baltimore as the only common inventor identified on all applications. The various applications were filed between January 9, 1986 and November 13, 1991, when the last continuation-in-part application was filed. After November 1991, only continuation and divisional applications were filed. Moreover, on September 12, 2001, the Applicants deleted all pending claims, and submitted an entirely new set of claims in the '364 application, which issued, with modification, as the '516 patent claims. '364 application, Response to Office Action (September 12, 2001) (Paper No. 43). There is no evidence in the record that the Examiner reviewed these claims to determine whether they constituted new matter, or considered the effective filing date for these claims. None of the pre-November 1991 applications teaches or describes any methods of reducing NF-κB activity _**in cells**_ as called for by all of the claims of the '516 patent. As such, under 35 U.S.C. § 132, the earliest effective filing date that the '516 patent can be afforded is November 13, 1991.

15

Figure 1 below shows the relationship of the various applications in the extended family. All of the applications stem from three separate applications, S.N. 06/817,441, filed January 9, 1986 ("the '441 application"), S.N. 06/946,365, filed December 24, 1986 ("the '356 application), and S.N. 07/162,680, filed March 1, 1988 ("the '680 application"). These applications, or their descendants, were combined within one omnibus continuation-in-part application, S.N. 07/791,898, filed November 13, 1991 ("the '898 application"). Thereafter, the Patentees filed a file-wrapper-continuation application, S.N. 08/418,266 ("the '266 application"). A divisional application of the '266 application, S.N. 08/464,364 ("the '364 application"), ultimately resulted in the '516 patent.



16

Early in the prosecution of the '364 application, the Examiner gave Patentees the benefit the March 1, 1988 application with respect to the claims that were then pending in the application. Office Action, January 7, 1997 ('364 application, Paper No. 7). However, in September 2001, the Patentees cancelled all of the existing claims, and submitted an entirely new slate of claims. Response to Office Action, September 12, 2001 ('364 application, Paper No. 43). The Examiner never addressed the effective filing date for these claims. The March 1, 1988 application, in particular, does not provide support for the issued claims.[3]

All of the claims in the '516 patent encompass reducing NF-κB activity in cells in humans, in other words, human therapy. As found by the District Court in the Massachusetts action (with respect to the '516 patent claims asserted in that litigation) in its Order on claim construction, "These claims encompass methods wherein NF-κB is modulated in cells, wherever they may be found." Exhibit E. Indeed, Plaintiffs have asserted the claims of this patent against the administration of two Lilly products in human therapy, Evista® and Xigris®. None of the pre-November, 1991 applications, however, discloses any method for reducing NF-κB activity in cells in human therapy.

---

[3] The '680 application discusses ***inducing*** NF-κB activity in cells, for example, by using TPA (*see, e.g.,* the '680 application, p. 16), but in no way even mentions a method for ***reducing*** NF-κB activity in cells. To the contrary, the only reference in that application to the reduction of NF-κB activity is the postulation that there may be some form of natural inhibitor. "It seems that the appearance of binding activity ***may be due to separation of NF-κB from an inhibitor.***" '680 application, p. 17 (emphasis added). The '680 application does not contain a discussion of whether or how the natural inhibitor, later coined IκB, could be used to inhibit NF-κB activity. Nor does it contain an assertion that methods for reducing NF-κB activity in general were contemplated.

In the pre-November, 1991 applications, IκB, the natural inhibitor of NF-κB, was identified as a protein, but no amino acid sequence or DNA sequence was given.[4]  Nor were any deposits containing the DNA sequence encoding IκB ever made or referenced in the patent specification at any time.  Even assuming that IκB could be purified sufficiently based on what is disclosed in these earlier applications, none of these applications disclosed how to administer a purified protein such as IκB to a cell, much less how to deliver such a protein to a cell within a human.

The only other inhibitors of NF-κB activity mentioned in the specification of any of these pre-November 1991 applications – even hypothetically – were decoy molecules and dominantly interfering molecules.  *See, e.g.,* S.N. 07/341,436, pp. 29-30 (April 21, 1989 application).  But the Applicants did not disclose in these applications any methods for delivering these molecules for human therapy.  Indeed, the technology arguably does not exist even today, fifteen (15) years after the last filing date of these pre-November 1991 applications.  *See* Juengst, *What Next for Human Gene Therapy?*, BMJ, 326:1410-11 (2003); Check, *Cancer Risk Prompts US to Curb*

---

[4] A purported DNA sequence and amino sequence for IκB was not disclosed until the November 1991 application (Fig. 43).  Even this sequence is not, however, IκB, but an avian protein, pp40.  Because of this error, Plaintiffs withdrew Fig. 43 from two related applications, S.N. 08/418,266 ("the '266 application," which issued as U.S. Patent No. 5,804,374) and S.N. 08/463,397 ("the '397 application," which issued as U.S. Patent No. 6,150,090), during prosecution of those applications, ***but failed to withdraw Fig. 43 from this application.***  "It has recently come to Applicants' Attorney's attention that Figure 43 is not the nucleotide sequence of IκB-α but the nucleotide sequence of pp40 rel-associated protein."  '266 application, Amendment Under 37 C.F.R. §1.312(b), p. 20 (September 11, 1997) (Paper No. 38).  Applicants' Attorney used this identical language in deleting Fig. 43 two and a half years later before issuance in the '397 application.  *See* '397 application, Petition Under 37 C.F.R. §1.312(b), p. 22 (January 12, 2000) (Paper No. 31).  Although prosecution on the application for the '516 patent was proceeding throughout this entire time range, no explanation was given for the failure to inform the examiner that Fig. 43 was in error or delete it from this application.

*Gene Therapy*; Nature, 422:7 (2003); Rosenberg, *et al.*, *Gene Therapist, Heal Thyself*, Science, 287:1751 (2000); Friedmann, *Principles for Human Gene Therapy Studies*; Science, 287:2163-65 (2000); Anderson, *Human Gene Therapy*, Nature, 392:25-30 (1998); Verma *et al.*, *Gene Therapy – Promises, Problems, and Prospects*, Nature, 389:239-42 (1997); Touchette, *Gene Therapy: Not Ready for Prime Time,* Nat. Med., 2(1):7-8 (1996).

Moreover, certain claims contain additional limitations that are not supported by the pre-November 1991 applications.  For example, none of the pre-November 1991 applications disclose how, in cells, to "reduce[e] binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB" (e.g., claims 25, 36, 47, 69, 80, 93, 144, and 154).  Similarly, some of the claims call for "inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB" (e.g., claims 22, 33, and 44), "inhibiting degradation of an IκB protein" (e.g., claims 23, 34, and 45), or "inhibiting dissociation of NF-κB:IκB complexes" (e.g., claims 24, 35, and 46).  None of these limitations is disclosed in any of the pre-November, 1991 applications, however, and thus also constitute new matter.

Again, the pre-November 1991 applications do not even disclose the sequence or structure of the natural inhibitor or that it can be modified or degraded, let alone the concept that NF-κB activity can be reduced by inhibiting modification, degradation, or dissociation of IκB. The pre-November 1991 applications provide no support whatsoever for any of the claims at issue in this reexamination request.  Thus, all of the added claims constitute added matter and are to be examined in view of the prior art in existence as of November 1991.

19

## V.    DETAILED DESCRIPTION OF THE SNQ OF PATENTABILITY

### A.    The Subject Claims are Expressly Anticipated Under 35 U.S.C. § 102(b), or Alternatively Rendered Obvious Under 35 U.S.C. § 103

#### 1.    Cyclosporin A References: *Emmel*, *Schmidt*, and *Brini* Expressly Anticipate or Alternatively Render Obvious the Subject Claims

Three references dated only a few months apart, *Emmel*, *Schmidt*, and *Brini*, each disclose that Cyclosporin A reduces NF-κB in cells and, therefore, reduces NF-κB-regulated gene expression.

*Schmidt*, in particular, used the Electrophoretic Mobility Shift Assay ("EMSA") disclosed in the '516 patent to measure NF-κB activity to determine that "PHA-mediated induction of complexes binding to the κB enhancer was completely abrogated by [1 μg/ml] CsA (Fig. 1, lane 6; no B or A shifts). . . ." *Id.* at 4038.[5]    Schmidt confirmed these results using an NF-κB CAT reporter assay.    In the CAT reporter assay, *Schmidt* transfected Jurkat cells with a CAT gene that was regulated by an NF-κB enhancer region containing two NF-κB binding sites derived from the HIV enhancer region.[6]    As depicted in Fig. 4, "CsA inhibited the PHA-derived activation signal but not the PMA signal." *Id.* at 4039.    Thus, *Schmidt* showed that Cyclosporin A reduced PHA-induced NF-κB activity and, therefore, reduced the expression of a gene (CAT) that was regulated by NF-κB.    In addition, because *Schmidt* used the HIV LTR, *Schmidt* demonstrated that Cyclosporin A reduced the expression of viral genes, thereby anticipating claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193, and 197-201.    At the very least, *Schmidt* rendered

---

[5] *Schmidt* also found, by contrast, that induction of NF-κB activity with a different inducer, PMA, was not affected by Cyclosporin A.  *Id.*

[6] The CAT reporter assay is described in the '516 patent, for example at Col. 17, line 66 – Col. 18, line 23.    Notably, like *Schmidt*, the CAT assay as described in the '516 patent also used the

these claims obvious in light of the fact that the HIV LTR is responsible for regulating the expression of viral (HIV) genes.

Similarly, *Emmel* described both an NF-κB binding assay (i.e., EMSA) and a CAT reporter assay for measuring NF-κB activity in Jurkat cells. Like *Schmidt, Emmel* described the effects of Cyclosporin A on Jurkat cells that had been induced with PHA and PMA. As shown in Figure 3, 0.01-1 μg/ml (10-1000 ng/ml) Cyclosporin A was found to reduce NF-κB binding activity. In the CAT reporter assay, cells again were transfected with a CAT reporter gene that had specifically been engineered to be regulated by the HIV LTR, i.e., the gene had an NF-κB binding site incorporated into its regulatory region. As shown in Figure 2D, Cyclosporin A significantly reduced NF-κB activity at these same concentrations, thereby reducing the NF-κB-mediated expression of CAT.

Likewise, *Brini* disclosed the use of 1 μg/ml Cyclosporin A in human PBM cell cultures (peripheral blood T-lymphocytes) that had been induced with PHA. *Brini* assessed NF-κB activity in an EMSA (Fig. 5) using the same HIV-1 LTR site used in the '516 patent to assess NF-κB activity and binding, *see* '516 patent, columns 17-18. *Brini* concluded that "CsA reduced the PHA-induced binding of transacting factors from T-cells and κB-like sequences which are present in the IL-2Rα gene and in the HIV-1 LTR (Figs. 3 and 4)." *Id.* at 137.

*Brini* also reported the effect of Cyclosporin A on expression levels of IL-2 Receptor-α, which is taught by the '516 patent to be regulated by PHA-induced NF-κB activity in T-cells. Col. 17, lines 21-24. ("NF-κB is induced in T-cells by a trans- activator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-2 receptor α gene and possibly the IL-2 gene.")

---

NF-κB binding sites on the HIV enhancer.

21

> We have examined the effect and potential mechanism of Cyclosporin A (CsA) on the Interleukin-2 receptor alpha chain (IL-2Rα) expression in human T-lymphocytes. CsA pretreatment of PHA-activated T-cells led to 30-50% decrease in Tac antigen surface expression and a concomitant decrease in the steady state IL-2Rα mRNA levels.

*Id.* at 131 (Abstract). Compare '516 patent, col. 17, lines 21-24 ("NF-κB is induced in T-cells by a transactivator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-2 receptor α gene and possibly the IL-2 gene.").

Thus, *Schmidt*, *Emmel*, and *Brini* each described the use of Cyclosporin A at concentrations that reduce NF-κB activity and reduce NF-κB-regulated gene expression. As such, as shown in more detail in Exhibit G-1, these references expressly anticipate at least claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 of the '516 patent. In addition, because *Schmidt*, *Emmel*, and *Brini* all utilized the HIV LTR, they demonstrated that Cyclosporin A reduced the expression of viral genes, thereby anticipating claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193, and 197-201. At the very least, these references render such claims obvious in light of the fact that the HIV LTR is responsible regulating the expression of viral (HIV) genes. Moreover, even if the '516 patent is afforded an effective filing date before November 13, 1991 these references provide extrinsic evidence of inherent anticipation as discussed below.

## 2. Protein Kinase C Inhibitor References: *Meichle* and *Shirakawa* Expressly Anticipate or Render Obvious the Subject Claims

*Meichle* and *Shirakawa* expressly disclose the prior art reduction of NF-κB activity in induced cells using Protein Kinase C inhibitors:

*Meichle* conducted an analysis of various protein Kinase C inhibitors and their effect on both PMA- and TNF-induced NF-κB activity in Jurkat cells. Using an EMSA (binding assay) similar to that disclosed in the '516 patent, *Meichle* found that Protein Kinase C Inhibitor H8 reduced PMA-induced NF-κB activity in these cells (Fig. 3, lane 7). Other inhibitors also were shown to reduce NF-κB activity, including Protein Kinase C Inhibitor H7 (Fig. 2B, lanes 3 vs. 5) and Staurosporine (Fig. 2B, lanes 6 and 7).

*Shirakawa* performed similar tests with Protein Kinase C Inhibitor H8 on cells that had been induced with IL-1. The authors first demonstrated that IL-1 induced NF-κB activity in 70Z/3 cells as reflected by EMSA and CAT reporter assays. *Id.* at 2425 (Figure 1), 2426 (Figure 2). They then confirmed that Protein Kinase Inhibitor H8 reduced NF-κB activity in both the binding assays and reporter assays, and, importantly, reduced the resulting CAT gene expression. *Id.* In the EMSA, they found that "[t]he induction by IL-1 was abolished by treatment of cells with H8 (Fig. 2A, lane 5)." *Id.* at 2426. Similarly, using the CAT reporter assay, they found that when cells were treated with H8, "IL-1-induced κ immunoglobulin expression was markedly inhibited . . . ." *Id.* at 2435. This was consistent with results using other assay methods, such as flow cytofluorometry, which measured the actual production of proteins enhanced by NF-κB. "H8 also inhibited IL-1-induced κ immunoglobulin protein expression . . ." *Id.* These results were confirmed in another cell line, designated YT. *Id.* at 2436 ("As was the case in 70Z/3 cells, NF-κB activation was markedly inhibited by H8 in YT cells (Fig. 2B, lane 9).")

Thus, *Meichle* and *Shirakawa* teach the use of Protein Kinase Inhibitor H8, among others, to reduce NF-κB-mediated gene transcription by reducing NF-κB activity and reducing binding of NF-κB to NF-κB binding sites. As such, as shown in more detail in the table in Exhibit G-2,

23

these references expressly anticipate at least claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, and 93-97 of the '516 patent. In addition, because *Meichle* used the HIV LTR, *Meichle* rendered claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193, and 197-201 obvious in light of the fact that the HIV LTR is responsible for regulating the expression of viral (HIV) genes.

**B.    Even if the Subject Claims Are Entitled to a Priority Date Before 1991, the Subject Claims are Inherently Anticipated Under 35 U.S.C. §102(b), or Alternatively Rendered Obvious Under 35 U.S.C. § 103**

Even assuming, *arguendo*, that Patentees are entitled to an earlier effective filing date than November 13, 1991 for any of the claims at issue in this reexamination request, the claims are still invalid under the doctrine of anticipation by inherency. "Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed functions, it anticipates." *Atlas Powder Co. v. IRECO, Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999). Moreover,

> the discovery of a previously unappreciated property of a prior art composition *or of a scientific explanation for the prior art's functioning*, does not render the old composition patentably new to the discoverer." An inherent structure, composition or function is not necessarily known. . . . Insufficient prior understanding of the inherent properties of a known composition does not defeat a finding of anticipation.

*Id.* (emphasis added).

There is no requirement, however, that a person of ordinary skill in the art would have recognized the inherent disclosure *at the time of the invention*, but only that the matter is in fact inherent in the prior art reference. *Toro Company v. Deere & Co.*, 355 F.3d 131 (Fed. Cir. 2004) (" For inherent anticipation, the '516 patent must have sufficiently described and enabled at least

24

one embodiment that necessarily featured or resulted in the subject matter embraced by [the limitation] but _neither description nor contemporaneous recognition of these necessary features or results was required_") (emphasis added); *Schering Corp. v. Geneva Pharm. Inc.*, 339 F. 3d 1373, 1377 (Fed. Cir. 2003) ("The record shows that DCL necessarily and inevitably forms from loratidine under normal conditions. . . . [T]his court's precedent does not require a skilled artisan to recognize the inherent characteristic in the prior art that anticipates the claimed invention."). Stated another way, the prior art references need not have disclosed or recognized the claimed functions; indeed, they can remain unrecognized until _after_ the patentee's discovery and filing of a patent application, yet anticipate the claimed invention. That is, a reference will anticipate _even though it is silent about an inherent characteristic_. *See, e.g., Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264 (Fed. Cir. 1991).

Importantly, the Federal Circuit explicitly stated, "such [silence] in the reference may be filled with recourse to extrinsic evidence." *Id.* at 1268. *See also EMI Group North America, Inc. v. Cypress Semiconductor Corp.*, 268 F.3d. 1342, 1351 (Fed. Cir 2001), and *Atlas Powder Co. v. IRECO Inc.*, 190 F.3d. 1342, 1347 (Fed. Cir. 1999). Furthermore, the critical date of the extrinsic evidence that is relied upon to show that a characteristic not disclosed in the reference is inherent need not antedate the filing date. MPEP § 2131.01.

Further, the MPEP §2112 (V), provides that once a reference's teaching is shown to provide evidence or reasoning tending to show inherency then the burden shifts to the Applicant to show an unobvious difference. As will be explained in the detailed description of the references that follows, the teachings and reasonings clearly show inherency.

25

1.    **Cyclosporin A References**

Various prior art Cyclosporin A references describing the administration of Cyclosporin

A to humans or its use in human cell cultures inherently anticipate the subject claims.  Indeed,

the ability of Cyclosporin A, as administered in the prior art, to reduce NF-κB activity is well

recognized.  As acknowledged by one of the Patentees, Dr. Albert Baldwin, "Cyclosporin A

(CsA) and rapamycin, both important immunosuppressants that target T cells, inhibit the

activation of NF-κB induced in T cells by different mechanisms.  CsA blocks the activation of

NF-κB in response to the engagement of the T cell receptor."  *Baldwin I*, pp. 671-72.  Another of

the Patentees has confirmed the effect of Cyclosporin A on NF-κB activity in T cells:

> Experiments with the immunosuppressive drug Cyclosporin A and FK 506
> suggest that the activation of NF-κB in T cells involves two separate
> pathways. . . .  Only the calcium dependent pathway is sensitive towards
> Cyclosporin A and FK 506.

*Bauerle I*, p 76.

Thus, Cyclosporin A is clearly recognized as reducing NF-κB activity and resulting gene

expression.  The references discussed in more detail below confirm that Cyclosporin A

necessarily reduced NF-κB activity and resulting gene expression under the very conditions

disclosed in the prior art.

a)  **Cyclosporin A in Cardiac Transplant Patients**

Among numerous prior art references, at least *PDR 1985*, p. 1811-13, *Griffith I,* and

*Griffith II*, report the *in vivo* administration of Cyclosporin A to cardiac transplant patients.  *PDR*

*1985* teaches that Cyclosporin A should be administered before and after surgery for 1-2 weeks at

a dose of about 15 mg/kg/d, followed by a decrease of 5% per week to a final level of 5-10

26

mg/kg/day. *PDR 1985* also taught that when monitoring whole blood levels, a 24-hour trough

value of 250-800 ng/ml Cyclosporin appeared to minimize side effects and rejection events.

*Griffith I* reports the administration of 4-10 mg/kg/d of Cyclosporin A (average 8 mg/kg/d);

*Griffith II* reports the administration of 2-30 mg/kg/d (average 7.5-8 mg/kg/d) to obtain a targeted

blood level of Cyclosporin of about 1000 ng/ml.

     *Hölschermann* provides extrinsic evidence that *PDR 1985*, *Griffith I*, and *Griffith II*

inherently anticipate the subject claims. *Hölschermann* essentially repeated the tests disclosed in

*Griffin I* and *Griffith II*, administering 3.4 ± 0.4 mg/kg/day Cyclosporin A to cardiac transplant

patients, resulting in blood levels of 681 ± 176 ng/ml. PBM cells were isolated from the blood of

the patients before and after Cyclosporin A therapy, and nuclear extracts from the cells were

prepared. *Id. Hölschermann* then conducted an EMSA using the nuclear extracts. (*see* Figure 4)

the same assay format taught by the '516 patent for determining whether compounds (i) reduce

NF-κB activity and (ii) reduce binding of NF-κB to NF-κB recognition sites. *See* '516 patent,

Col. 18, line 52 – Col. 20, line 25.

     *Hölschermann* unequivocally confirms that the administration of Cyclosporin A to

cardiac patients as taught by the prior art *PDR 1985* and *Griffith* references necessarily and

always reduced NF-κB activity (and binding of NF-κB to NF-κB recognition sites):

> In cells obtained from transplant recipients during low baseline CsA blood
> levels (before CsA administration), strong NF-κB binding activity was
> detected (Fig. 4), whereas cells separated from blood in the presence of
> high CsA concentrations exhibited decisively reduced NF-κB binding
> activity. Specificity of the binding reaction was shown by the competition
> with unlabeled consensus oligonucleotides.

*Id.* at 4236. *Hölschermann* also showed that the administration of Cyclosporin A to these

patients as taught in the prior art *PDR 1985* and *Griffith* references also reduced TF gene transcription, which is recognized as being regulated by NF-κB. "Indeed, the marked activation of the NF-κB transcription factor, which is known to play a major role in the regulation of the TF gene, was prevented in the presence of high CsA blood concentrations." *Id.* at 4237. Thus, Cyclosporin A, as administered in the prior art *PDR 1985* and *Griffith* references,

- inhibited expression of a gene whose transcription is regulated by NF-κB (claims 1 and 2 and their dependent claims);
- diminished NF-κB-mediated intracellular signaling (claim 6 and its dependent claims); and
- reduced NF-κB-mediated effects of external influences (claims 7 and 8 and their dependent claims).

Because Cyclosporin A was shown to reduce binding of NF-κB in an EMSA, which measures binding of NF-κB to NF-κB recognition sites, *Holschermann* confirms that the prior art administration of Cyclosporin A to cardiac patients reduces NF-κB activity by

- "reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB" (e.g., claims 25, 36, 47, 58)

Furthermore, because unbound NF-κB translocates to the nucleus, the reduced binding activity in the nucleus of cells reflected in *Holschermann* means that Cyclosporin A, as administered in *PDR 1985* as well as *Griffith I* and *II*, necessarily reduced NF-κB activity by

- "decreasing the level of NF-κB not bound in an NF-κB-IκB complex" (e.g., claims 20, 31, 42, 53); and

- "inhibiting the passage of NF-κB into the nucleus of cells (e.g., claims 21, 32, 43, 54);

28

Thus, each of these claims is inherently anticipated by the *PDR 1985*, *Griffith I*, and *Griffith II*.

Furthermore, as *Hölschermann* indicates, Cyclosporin A is recognized as being able to "abolish the inducible phosphorylation and degradation of the cytoplasmic inhibitor protein I-κB." *Id.* at 4237 (citing *Alkalay*). *Hölschermann* confirms that this effect on degradation of IκB is the mechanism by which Cyclosporin A reduced NF-κB activity in these cardiac patients. Thus, Cyclosporin A administered as taught in *PDR 1985* as well as *Griffith I* and *Griffith II* reduces NF-κB activity as claimed in many of the remaining claims as well:

- "inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB" (e.g., claims 22, 33, 44, 55);

- "inhibiting degradation of an IκB protein." (e.g., claims 23, 34, 45, 56);

Thus, each of these claims is also inherently anticipated by the administration of Cyclosporin A as taught in the prior art *Griffith I* and *Griffith II* references.

Finally, *PDR 1985* and the *Griffith* references teach administration of Cyclosporin A to human patients, thereby reducing NF-κB activity in those patients' PBM cells as demonstrated by *Hölschermann*. The PBM cells affected in patients to whom administration of Cyclosporin A was taught in *PDR 1985*, *Griffith I*, and *Griffith II* were (1) eukaryotic cells (e.g., claims 1, 2, 5, 7, 9 and 19;); (2) mammalian cells (e.g., claims 10-15, 26, 37, 48, 70, 82 and 94); (3) human cells (e.g., claims 27, 38, 49, 71, 84, 95, 145 and 155); (4) immune cells (e.g., claims 12, 16, 28, 39, 50, 61, 72, 85, 146 and 156); and (5) lymphocyte cells (e.g., claims 29, 40, 62, 73, 86, 97, 107 and 108,).[7] As such, *PDR 1985*, *Griffith I,* and *Griffith II* clearly anticipate each of these claims

---

[7] "The resulting population, called peripheral blood mononuclear cells, consists mainly of lymphocytes and monocytes." Janeway C., *et al.*, Immunobiology, p. 635 (5th Ed. 2001)

as well.

The dosage and blood levels of Cyclosporin A shown by *Holschermann* to reduce NF-κB

activity is slightly lower than the dosages and blood levels of Cyclosporin A taught in *PDR 1985*,

*Griffith I,* and *Griffith II.* As such, an even greater reduction in NF-κB activity would result from

the prior art administration of Cyclosporin A to patients as described these references than shown

in *Holschermann.* Moreover, regardless whether the effect of Cyclosporin A in reducing NF-κB

activity and resulting monocyte TF activation is direct (by directly affecting monocytes) or

indirect (by interfering with stimulatory lymphocytes), *Holschermann* shows that Cyclosporin A,

as administered in the prior art references reduces NF-κB activity and resulting TF gene

expression. Thus, its administration to cardiac transplant patients as taught in *PDR 1985*,

*Griffith I,* and *Griffith II* anticipates at least claims 1-2, 6-9, 20-28, 31-39, 64-72, 75-85, 88-96 of

the '516 patent, as set forth in more detail in Exhibit H-1.

### b) Cyclosporin A in Human PBM Cell Cultures

The *in vivo* effect of Cyclosporin A in reducing NF-κB activity in human PBM cells is

confirmed by tests using Cyclosporin A in human PBM cell cultures. For example, *Reed* taught

the prior art use of Cyclosporin A in human PBM cell cultures that had been induced with PHA.

Using the same inducer, the same human immune cells, and the same concentration of

Cyclosporin A, *Brini* showed that Cyclosporin A reduced NF-κB activity and NF-κB-mediated

IL-2 Receptor-α gene expression in PBM cells.[8] As such, Cyclosporin A, as administered in the

---

(Garland Pub.) (emphasis in original).

[8] The '516 patent confirms the IL-2 receptor-α (IL-2Rα") gene is regulated by PHA-induced NF-κB activity in T-cells. Col. 17, lines 21-24. ("NF-κB is induced in T-cells by a trans- activator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-2 receptor α gene and possibly the IL-2 gene.")

30

prior art *Reed* reference necessarily and inherently reduced both NF-κB activity and NF-κB-mediated gene expression in human PBM cells.

In particular, *Reed* teaches that Cyclosporin A (1 μg/ml) significantly reduced PHA induced IL-2Rα gene transcription (Figs. 1 and 2) and Tac antigen surface expression (Fig. 3b) in human PBM cells:

> The data presented here demonstrate that CsA and DEX concentrations that inhibited PHA-induced proliferation by about 80 to 90% diminished by about 50% (on average) the expression of receptors for IL-2 on PBMC. This inhibition of IL 2 receptor expression occurred at least in part at a pretranslational level and involved a reduction in both high affinity and low affinity forms of the receptor.

*Reed* at 152. *Reed* also found that Cyclosporin A reduced IL-2 gene transcription: "1 μg/ml CsA and $10^{-4}$ M DEX completely blocked the PHA-induced accumulation of mRNA for IL 2 (Fig. 2)." *Id.* at 151.

Several years later, *Brini* also looked at the effect of Cyclosporin A on IL-2 Receptor-α production and Tac antigen surface expression and confirmed *Reed's* results:

> These results are in accordance with Reed et al., who found that CsA inhibits Tac induction in mitogen-activated PBMC. The CsA-mediated reduction in Tac antigen expression on T-Cells was reflected by a decrease in the steady state mRNA levels of the IL-2Rα chain (Figure 2).

*Brini* at 137 (citations omitted). *Brini* then went on, however, to show that Cyclosporin A, as administered in the prior art, reduced binding of NF-κB to NF-κB recognition sites for more than one NF-κB-meditated gene:

> CsA reduced the PHA-induced binding of transacting factors  from T-cells and κB-like sequences which are present in the IL-2Rα gene and in the HIV-1 LTR (Figures 3 and 4).

*Id.* at 137. Notably, *Brini* assessed NF-κB activity in an EMSA (Fig. 5) using the same HIV-1

LTR site as used by the '516 patent to assess NF-κB activity and binding. *Compare Brini* at 132

(Material and Methods), with '516 patent, at col. 37, Table 2 (HIV-1 sequence). *See also* '516

patent, at col. 17, line 66-col. 18, line 15. As such, *Brini* concluded that Cyclosporin A regulated

IL-2Rα gene expression by reducing activation of NF-κB:

> Taken together, these results suggest that one of the effects of CsA in the
> regulation of the IL-2Rα chain expression in human peripheral T
> lymphocytes is on the activation of sequence specific DNA-binding
> proteins which recognize sequences containing the NF-κB binding site.

*Id.* at 137. This conclusion was based on their own studies, as well as closely related studies that

demonstrated that Cyclosporin A reduced NF-κB activity in another human T-cell line, Jurkat,

discussed below. Thus, *Brini* and the related human T-cell culture studies discussed below

confirm that Cyclosporin A necessarily and inherently reduced NF-κB activity and resulting gene

expression in PBM cell cultures as taught in *Reed*, thus anticipating at least claims 1-2, 5-9, 20-

21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97. A claim

element-by-element comparison is attached as Exhibit H-2.

### c) Cyclosporin A in Human T-Cells

The effect of Cyclosporin A on reduction of NF-κB activity as administered in the prior

art is also confirmed by tests involving the use of Cyclosporin A in human T-cell (Jurkat)

cultures, including two prior art references, *Krönke* and *Siebenlist*. Using the same inducers, the

same human immune cells, and the same concentration of Cyclosporin A taught in *Krönke* and

*Siebenlist*, *Schmidt* and *Emmel* provide confirming extrinsic evidence that the use of Cyclosporin

A in Jurkat cells reduced NF-κB activity. Thus, Cyclosporin A is clearly recognized to have

necessarily and inherently reduced NF-κB activity and resulting gene expression in those cells as

32

called for by the subject claims.

*Krönke* and *Siebenlist* each disclosed the use of PHA (1 μg/ml) and PMA (50 ng/ml) to induce human T-cells (Jurkat cells). These compounds are described in the '516 patent as being inducers of NF-κB activity. *See, e.g.,* '516 patent, Col. 33, lines 52-59. *Krönke* and *Siebenlist* also report the effect of 1 μg/ml Cyclosporin A (among other concentrations) on the cell cultures. Both references report that IL-2 (also known as "TCGF") gene transcription and/or expression was increased with administration of the NF-κB inducers PHA and PMA, and that such induced IL-2 gene expression was reduced by Cyclosporin A. *Krönke,* p. 5217 ("The results of our study demonstrate that TCGF [IL-2] mRNA accumulation in induced Jurkat cells is diminished by CsA in a dose-dependent manner and that CsA acted by blocking TCGF mRNA transcription."); *Siebenlist,* p. 3044, Fig. 2 ("CsA at 1 μg/ml . . . prevented IL-2 message induction.")[9]

Using the same conditions and the same assay formats described in the '516 patent – an EMSA and a CAT reporter assay – the *Schmidt* reference clearly demonstrates that Cyclosporin A used as disclosed in *Krönke* and *Siebenlist* reduced NF-κB activity in Jurkat cell cultures. *Schmidt* reported that "PHA-mediated induction of complexes binding to the κB enhancer was completely abrogated by CsA (Fig. 1, lane 6; no B or A shifts). . . ." *Id.* at 4038. *Schmidt* reported, however, that there were inducers of NF-κB, which had different mechanisms of induction than PHA-induction, for which Cyclosporin A had no effect. Specifically, *Schmidt* found that PMA-mediated induction of NF-κB activity was not affected by Cyclosporin A. The

---

[9] The Il-2 gene is now recognized as being regulated at least in part by NF-κB. *See* Hoyos et al., *Kappa B-Specific DNA Binding Proteins: Role in the Regulation of Human Interleukin-2 Gene Expression,* Science 244:457-460 (April 1989). *See also* Baldwin I, Bauerle, and Schmidt at 4037 ("κB nuclear factor-binding elements also play important roles in the activation of the gene coding for IL-2 and other genes in T cells.")

33

NF-κB CAT reporter assay confirmed this data, as depicted in Figure 4. "CsA inhibited the PHA-derived activation signal but not the PMA signal." *Id.* at 4039.[10]

Similarly, *Emmel* describes the effect of 1 μg/ml of Cyclosporin A on NF-κB activity in Jurkat cells that had been induced with both PHA and PMA. As shown in Figure 1, 1 μg/ml Cyclosporin A, among other concentrations, reduced NF-κB binding activity. *Emmel* at 1618. ("NF-κB binding was reduced 10-20% in nuclear extracts of CsA-treated cells"). Furthermore, a CAT assay confirmed these results, as shown in Figure 2D. *Id.* That figure demonstrates that Cyclosporin A significantly reduced NF-κB activity at the same 1 μg/ml concentration taught in *Krönke* and *Siebenlist*, as shown by the reduced expression of the NF-κB-regulated CAT gene in those cells. Thus, as discussed above and in the attached Manolagas Decl., ¶¶ 25-32 (Exhibit J), *Schmidt* and *Emmel* confirm that *Krönke* and *Siebenlist*, which disclose the inhibitory effect of Cyclosporin A on NF-κB activity in Jurkat cell cultures, anticipate claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97 of the '516 patent (as shown in Exhibit H-3, attached).

## 2.    Vitamin D (Calcitriol) References

Calcitriol, chemical name 1,25-dihydroxyvitamin $D_3$, is the active form of vitamin D. *See, e.g., Colston.* Although it has been administered as vitamin D to humans for decades, and

---

[10] The similarity of conditions between both of the prior art *Siebenlist* and *Kronke* references and the *Schmidt* reference that established that Cyclosporin A reduces NF-κB activity in these Jurkat cell cultures is hardly surprising. Each of these studies was performed at the NIH. Two of the papers – *Siebenlist* and *Schmidt* – share a common author (Dr. Siebenlist). Thus, Patentees cannot argue any significant variability of conditions that could possibly prevent a finding of anticipation by inherency.

naturally produced in cells since time immemorial, calcitriol has recently been studied for its

anti-tumor activities. *Id.* Notably, there are numerous prior art publications that report the study

of calcitriol in various human cell cultures, including human Jurkat leukemic cells and peripheral

blood monocyte ("PBM") cells, including *Tsoukas, Lemire I, Lemire II, Rigby I, and Rigby II.*

Calcitriol has been conclusively shown to reduce NF-κB activity in such cell cultures by *Yu*.

Thus, these prior art references anticipate at least claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-

54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97 of the '516 patent.

   *Tsoukas* teaches the use of at least $10^{-8}$ M calcitriol in PBM cells that have been induced

by PHA. *Tsoukas* at 1438. Manolagas repeated these tests and confirmed that a more recent

reference, *Yu*, shows that NF-κB activity is ***necessarily*** reduced in PBM cells under the exact

conditions specified prior art in the *Tsoukas* and Manolagas references. Specifically, *Yu*

demonstrated that $10^{-8}$ M calcitriol reduced NF-κB activity that had been induced by PHA in

both PBM cells (Fig. 5) and Jurkat cells (Fig. 6). Additionally, *Yu* describes the use of a CAT

assay to confirm that calcitriol reduced NF-κB-regulated gene transcription (Fig. 6). Again, the

similarity of conditions for administration of calcitriol to induced PBM cells in these three

references is not surprising, as Dr. Manolagas was a co-author of each of them. Indeed, the Dr.

Manolagas states that he utilized the same conditions in Yu as he did in his prior art references.

Manolagas Decl., at ¶¶ 7-24. As such, the administration of calcitriol to these induced PBM cells

taught in his prior art references is now clearly recognized to have necessarily and inherently

reduced NF-κB activity in these cells. A claim element-by-element comparison of *Tsoukas and*

*Manolagas* is provided in Exhibit H-4. Like Dr. Manolagas' prior art references, the *Lemire*

prior art references also taught the use of calcitriol in PHA-induced human cells under conditions

35

that are now recognized as reducing NF-κB activity, as demonstrated by *Yu*. Specifically, *Lemire I* reports, *inter alia*, that $10^{-8}$ M calcitriol significantly reduced DNA synthesis in PHA-induced PBM cells *Lemire I* at 659 (Fig. 2 and Table II). *Lemire II* also taught the use of $10^{-8}$ M calcitriol in PHA-induced PBM cells and reported a significant reduction of DNA synthesis by PHA-induced T lymphocytes *Lemire II* at 3033 (Table I). Furthermore, as noted in *Lemire II*, calcitriol caused "a dramatic and specific reduction of IL 2 production by activated PBM." *Id.* at 3034. Although the mechanism may not have been known at the time of these publications, *Yu* now confirms that calcitriol necessarily and inherently reduced NF-κB activity in these induced cells under these conditions, thus reducing the expression of NF-κB-regulated proteins.[11] Thus, as shown on an element-by-element basis in Exhibit H-5, the *Lemire* references anticipate at least claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97 of the '516 patent.

Similarly, *Rigby I* and *Rigby II* also taught the use of calcitriol in PBM cells that had been induced with PHA. *See Rigby I* at 1452-53 (Fig. 1 and Fig. 3); *Rigby II* at 2282, Fig. 2 (10 nM data point)). Like *Lemire II*, *Rigby I* demonstrated that $10^{-8}$ M calcitriol significantly reduced the level of IL-2 production in PHA-induced cells. *Rigby I* at 1453, Fig. 3). As with the *Tsoukas, Manolagas* and *Lemire* references, the *Yu* reference again confirms that NF-κB activity was reduced in the cells treated in *Rigby I* and *Rigby II*, which resulted in reduced gene expression. Thus, as shown on an element-by-element basis in Exhibit H-6, the *Rigby* references anticipate these same claims of the '516 patent.

---

[11] As noted above at footnote 9, the Il-2 gene is now recognized as being regulated at least in part by NF-κB.

Thus, as discussed by Dr. Manolagas in his declaration, the administration of calculated as taught in each of those prior art references has been confirmed by the *Yu* study to necessarily and inherently have reduced NF-κB activity and the resulting NF-κB-mediated gene expression.

### 3.    5-ASA References

5-Aminosalicylic acid, or 5-ASA, is a specific compound of the general class of compounds known as salicylates. 5-ASA is the active moiety in sulfasalazine, which itself has been administered for ulcerative colitis since the 1950's. As described in *Dew,* 5-ASA alone has been administered primarily for the treatment of ulcerative colitis since the 1980's. Ulcerative colitis, an inflammatory bowel disease, is widely recognized as being associated with NF-κB activation. *Baldwin II* (Table 1). *Bantel*, which reports the results of *in vivo* tests in human patients within the same dosage range in *Dew* for the same indication described in *Dew* (i.e., ulcerative colitis), showed that such administration of 5-ASA reduced NF-κB activity in the cells of those patients. Moreover, as discussed below, the Patentees admitted during prosecution that 5-ASA reduces NF-κB activity as claimed in the '516 patent claims at issue.

Specifically, *Dew* teaches the oral administration (up to 4.4 g/day) of a delayed release formulation of 5-ASA to ulcerative colitis patients. *Bantel,* likewise, administered a delayed release formulation of 5-ASA (under the tradename Mesalazine) at dosages ranging from 1.4 to 4.5 g/day of 5-ASA to such patients and used immunostaining of tissue samples taken from those patients before and after treatment with 5-ASA to measure NF-κB activity.[12] *Bantel* at 3453.

---

[12] *Bantel* used an antibody to detect the p65 subunit of NF-κB, which would otherwise be masked by bound IκB.

*Bantel* found that (1) NF-κB activity is increased in patients with ulcerative colitis, and (2) therapeutic administration of 5-ASA as taught in *Dew* effectively reduced NF-κB activity in these patients. *Id.* at 3454-55. As such, "5-ASA is a potent inhibitor of NF-κB activation *in vivo*," at dosage levels and under the same conditions taught in *Dew*. *Id.* at 3456.

At dosages of 3 g/day (well below the highest taught in *Dew*), *Bantel* found that 5-ASA treatment in patients with ulcerative colitis "almost completely abrogated NF-κB activation." *Id.* at 3455 (Figure 3 legend). Indeed, *Bantel* concludes,

> We clearly demonstrate an inhibitory effect of 5-ASA on NF-κB activation in [ulcerative colitis] patients that was in agreement with clinical observations, such as the improvement of inflammatory symptoms including abdominal pains and diarrhea, and endoscopic observations including tissue damage. Before 5-ASA therapy, tissue sections of patients with active ulcerative colitis showed areas of inflammation with NF-κB-positive epithelial cells and macrophages. After 5-ASA treatment, cells containing activated NF-κB were mostly completely absent.

*Id.* at 3456. Thus, the administration of 5-ASA taught in *Dew* for ulcerative colitis inherently and necessarily reduces NF-κB activity in cells as called for by the claims of the '516 patent.

This conclusion is in fact supported by arguments presented by the Patentees themselves during prosecution of the '516 patent. In response to a rejection under 35 U.S.C. § 112 in the '364 application, Patentees submitted a declaration by one of the inventors, David Baltimore. Baltimore Decl. (February, 2001) (Exhibit F) ("Baltimore"). Dr. Baltimore directed the Examiner to consider the *Yan* reference as conclusively demonstrating that 5-ASA reduces NF-κB activity as called for by the claims: "Treatment of cells with such compounds as . . . 5-aminosalicylic acid . . . inhibits NF-κB mediated gene expression by a mechanism which

38

includes inhibition of phosphorylation of IκB proteins." Baltimore, *supra*, ¶ 9 (citations omitted) (citing Yan).[13]

As shown on an element-by-element basis in the table attached as Exhibit H-7, the administration of 5-ASA as taught in the prior art *Dew* reference is now recognized as **_necessarily_** reducing NF-κB activity and, thus, anticipating at least claims 1-2, 5-9, 20-29, 31-40, 53-62, 64-73, 75-86, and 88-97.

### 4.    Glucocorticoid References

Like 5-ASA , glucocorticoids – that have been used since at least the 1950s to control inflammation in various disease states, including rheumatoid arthritis and  – are now known to reduce NF-κB activity in cells at dosage levels taught in the prior art.  As confirmed again by Dr. Baldwin in his 1996 review article, glucocorticoids have been shown to reduce NF-κB activity in two ways, by "directly interact[ing] with and inhibit[ing] activated NF-κB subunits" and "by upregulating IκBα protein levels . . . to block nuclear translocation of NF-κB and DNA-binding." *Baldwin I*, p. 671.

Dexamethasone is a specific glucocorticoid compound used in the prior art to treat a number of inflammatory rheumatic and allergic conditions, including asthma and arthritis. Dexamethasone was used in patients to treat bacterial infections in 1952, *see, e.g.*, *Lefring* (and references cited therein) and approved for human use in 1958 under the trade name Decadron®. *1970 PDR.*

---

[13] The Patentees did not, however, disclose to the Examiner that 5-ASA was a prior art compound administered to humans for more than a decade before Patentees' discovery, as shown by the *Dew* reference.

Separate and apart from this administration to humans, dexamethasone has been the subject of a substantial amount of testing in cell cultures in the prior art. *Nagasawa* taught the induction of human leukemic T-cells (MOLT-3) by TPA, followed by the administration of $10^{-6}$ M (1 μM) dexamethasone. *See Nagasawa* at 185, Table 2. Similarly, *Rovera* taught the induction of human leukemic cells (promyelocytes and mature myeloid cells) with TPA, also followed by administration of $10^{-6}$ M dexamethasone. *See Rovera* at 869, Table 1. Several publications cited by Dr. Baldwin in his 1996 review article (*Baldwin I*) demonstrate that dexamethasone is recognized to have ***necessarily*** reduced NF-κB activity in induced cells. *See Scheinman I*; Sc*heinman II*; *Auphan*; and *Mukaida*. Notably, the two *Scheinman* publications were co-authored by Dr. Baldwin.

Each of these references provides extrinsic evidence that the *1970 PDR* and the studies described in *Lefring, Nagasawa* and *Rovera* inherently anticipate the subject claims, demonstrating that dexamethasone reduces NF-κB activity and concomitant gene expression as called for by the claims. An element-by-element comparison of the claims to the *Nagasawa* and *Rovera* references confirms that these references anticipate at least claims 1-2, 5-9, 20-21, 25-29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97 of the '516 patent.

### a) Extrinsic Evidence of Inherency as Provided by *Auphan*

*Auphan* describes methods for reducing NF-κB activity in an induced leukemic T-cell line at the same $10^{-6}$ M concentration of dexamethasone taught by *Nagasawa* and *Rovera*. First, *Auphan* induced human leukemic T cells (Jurkat strain) or murine T cells (FJ8.1) with TPA as described in *Nagasawa* and *Rovera* and used an EMSA, as described in the '516 patent, to

40

demonstrate NF-κB activity. *See Auphan* at 287-288. *Auphan* then exposed the cells to $10^{-6}$ M

(1 μM) dexamethasone. *Id. Auphan* reports that dexamethasone clearly reduced NF-κB activity:

> Electrophoretic mobility-shift assays (EMSAs) revealed that both AP-1
> and NF-κB DNA binding activities were elevated in nuclear extracts of
> activated [FJ8.1] cells (Fig. 1C). DEX inhibited induction of NF-κB
> binding activity and reduced the amount of AP-1 binding activity . . . .
> DEX also inhibited induction of NF-κB in mouse T lymphocytes in vivo
> (Fig. 1D).
>
> &#42; &#42; &#42;
>
> Inhibition of NF-κB activation by DEX . . . was also observed in a Jurkat
> human T cell leukemia line stably transfected with a GR expression vector
> (Fig. 2A). . . .Inhibition of NF-κB activity was also observed in cells
> stimulated by either 12-o-tetradecanoryl-phorbal 13-acetate (TPA) alone or
> by tumor necrosis factor (TNF-α).

*Id.* (citations omitted). As Dr. Baldwin noted, *Auphan* demonstrates that glucocorticoids

"involves the transcriptional activation of the IκBα gene" in these human leukemic cells and

therefore, "by upregulating IκBα protein levels, function to block nuclear translocation of NF-κB

and DNA-binding."[14] *Baldwin I* at 671.

### b) Extrinsic Evidence of Inherency as Provided by *Scheinman I* and *Scheinman II*

*Scheinman I* and *Scheinman II* provide extrinsic evidence that the *1970 PDR and* the

studies described in *Lefring, Nagasawa*, and *Rovera* inherently anticipate the subject claims.

Each *Scheinman* publication confirms that dexamethasone, as used in the prior art, reduces NF-

κB activity. In particular, *Scheinman I* evaluated the effect of $10^{-7}$ M dexamethasone on NF-κB

activity in human epithelial (HeLa) cell cultures, *Scheinman I* at 944. NF-κB activity was

---

[14] As discussed below, Dr. Baldwin's own results as reported in his Science reference
(*Scheinman II*, discussed below) confirmed this mechanism for glucocorticoid action.

41

measured in at least two assay formats disclosed in the specification of the '516 patent – EMSA

and reporter assays. Immunological assays, such as Western blot assays were also used. As

shown in Figures 1A and B, Figure 4, and Figure 7, dexamethasone reduced endogenous NF-κB

activity in cells. "Pretreatment with DEX resulted in a profound loss of TNF-α-induced NF-κB

as well as p50 homodimer (KBF1) gel shift activity (Fig. 7B, lane 3). Similar data were obtained

by treating cells with IL-1 (data not shown)." *Id.* at 949.

      *Scheinman I* concluded that dexamethasone reduces NF-κB activity by two distinct

avenues:

> We show that GR can physically interact with NF-κB subunits and also
> block their ability to bind DNA. In addition, we present new data showing
> that dexamethasone (DEX) treatment of HeLa cells causes a significant
> reduction in nuclear p65 protein levels. Thus, glucocorticoids are also able
> to inhibit NF-κB activity by a novel mechanism involving a block of
> cytokine-induced nuclear translocation.
>                       \* \* \*
> With EMSA analysis, we found that DEX treatment caused a marked
> reduction in the ability of NF-κB/Rel subunits to bind DNA despite the
> presence of equal amounts of NF-κB subunit protein in the EMSA DNA-
> binding reaction mixtures (Fig. 5, EMSA).

*Id.* at 944, 948.

      Similarly, the *Scheinman II* reference demonstrates that dexamethasone, at the same $10^{-7}$

M concentration as *Scheinman I* (and at a 10-fold lower concentration than taught in *Nagasawa*

and *Rovera*), reduces NF-κB activity as called for by the claims that are the subject of this

reexamination request. *Scheinman II* confirmed the *Auphan* conclusion that dexamethasone

inhibits TNF-α-induced NF-κB activity, at least in part, by inducing the transcription of the IκBα

gene:

> Together, these data indicate that DEX treatment induces the transcription
> of the IκBα gene. This induction results in the increased synthesis of the

42

IκBα protein. This increase in protein synthesis leads to the rapid turnover of IκBα protein associated with preexisting NF-κB complexes. In the presence of an activator such as TNF-α, newly released NF-κB reassociates with the DEX-induced IκBα and thus reduces the amount of NF-κB translocating to the nucleus.

*Id.* at 286.

### c) Extrinsic Evidence of Inherency as Provided by *Mukaida*

*Mukaida* provides extrinsic evidence that the *1970 PDR*, the studies described in *Lefring*, *Nagasawa*, and *Rovera* inherently anticipate the subject claims. *Mukaida* observed that IL-8 production was mediated by NF-κB in all cells they previously examined. *Mukaida* at 13284. In those cells, dexamethasone inhibited NF-κB-regulated IL-8 production by more than 60% at concentrations equal to and higher than $10^{-8}$ molar. *Id.* at 13290.

Thus, the use of dexamethasone in cells induced by TPA under the conditions taught by *Nagasawa* and *Rovera* is now recognized as clearly and necessarily reducing NF-κB activity as called for by the subject claims of the '516 patent.

### 5.    Antibiotic References

Antibiotics, including erythromycin, gentamicin, and tetracycline, have been administered for decades before the discovery of NF-κB to treat gram negative bacterial infections. Gram negative bacteria, such as *E. coli, Salmonella, Pseudomonas aeruginosa, Shigella, V. parvula,* and *H. pertussis* produce a compound known as lipopolysaccharide, or LPS. When LPS comes into contact with cells in the human body, it is now known to induce NF-κB activity and, in turn, increase the production of cytokines that are regulated by NF-κB activity. Cytokines whose genes

43

are regulated by NF-κB (at least in part) include TNF-α, IL-2, IL-6, IL-8 and IL-10.  *E.g., Galdiero*;

*Yang*; and *Mori*.  Thus, the use of antibiotics as taught in a variety of prior art references –

including, *inter alia*, the *1970 PDR* – to treat gram negative infections would thus necessarily

reduce NF-κB activity and thereby reduce the expression of LPS-induced (and NF-κB-regulated)

cytokines.  As such, the *1970 PDR* anticipates claims 1-2, 5-10, 12-18, 20-21, 25-32, 36-41, 53-54,

58-65, 69-76, 80-89, 93-100, 104-105, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168,

172-178 and 182-186 of the '516 patent.

Once produced by gram negative bacteria, LPS activates NF-κB, which translocates to the

nucleus and binds to the NF-κB recognition sites on genes that are regulated at least in part by

NF-κB.  *E.g.,* '516 patent, Col. 2, lines 54-57 ("Release of active NF-κB from the IκB-NF-κB

complex has been shown to result from stimulation of cells by a variety of agents, such as

bacterial lipopolysaccharide . . . .").  In treating gram negative bacterial infections, antibiotics are

recognized function by killing or interfering with normal function of the bacteria and thereby

ultimately reduce bacterial production of LPS.  Manolagas Decl., ¶¶ 33-40.  By reducing LPS

production, the antibiotics necessarily reduce NF-κB activity and the concomitant expression of

NF-κB-regulated cytokines in cells.

The *1970 PDR* teaches the administration of a variety of antibiotics to treat gram negative

bacterial infections.  Erythromycin, for example, is taught as being active against *H. pertussis*,

among other gram negative bacteria.  *Id.* at 1379.  Gentamicin sulfate, under the trade name

Garamycin®, was taught for the treatment of infections caused by gram negative bacteria

*Pseudomonas aeruginosa, Aerobater aerogenes, E. coli, Proteus vulgaris,* and *Klebsiella*

*pneumoniae.  Id.* at 1167.  Tetracycline is a broad spectrum antibiotic that was taught for

44

administration, under the trade name Sumycin®, for treatment of infections caused by a wide variety of gram negative bacteria, including *E. coli* and *Shigella*. *Id.* at 1309.

By blocking LPS that reaches the cell, the administration of these antibiotics as taught in the *1970 PDR* would necessarily reduce NF-κB activity in cells in the human body, and thereby reduce the expression of cytokines. Manolagas Decl., ¶ 40. As noted in *Galdiero*, "The lowest concentration of LPS able to induce cytokine release was 10 ng ml$^{-1}$." Galdiero, *supra*, at 2700. Thus, using antibiotics to eliminate the underlying bacterial infection and reduce circulating LPS levels would completely abrogate NF-κB-mediated cytokine production.

In treating gram negative infections as taught in *1970 PDR*, these antibiotics (among many others not cited herein) reduce NF-κB activity and reduce NF-κB-mediated expression of cytokines that have been induced by LPS, such as TNF-α, IL-6, IL-8 and IL-10. As such, as shown on an element-by-element basis in Exhibit H-10, *1970 PDR* entries for such antibiotics would inherently anticipate the subject claims requiring LPS-induced NF-κB activity.

### 6.    Red Wine References

A multitude of prior art references teach and evidence the consumption of red wine for medicinal, and other more or less noble purposes, in copious amounts. The consumption of red wine, in particular, is described in several passages of the *Bible*.[15] King James Version (1611).

---

[15] **Luke 10:34**  And went to *him*, and bound up his wounds, pouring in oil and wine, and set him on his own beast, band brought him to an in and took care of him.

**1 Timothy 5:23**  Drink no longer water, but use a little wine for thy stomach's sake and thine often infirmities.

**Isaiah 27:2**  In that day sing ye unto her, A vineyard of red wine.

More recently, a study conducted in the late 1970's comparing cardiac problems with factors such as wine, cigarette, and fat consumption obtained a surprising result: France, the country with the highest per capita consumption of wine and a very high per capita consumption of fats, had the lowest rate of cardiac-disease related deaths. *St. Leger*. This effect became known as the "French Paradox." As discussed in more detail below, and as admitted by Patentees, the French Paradox is now recognized as being at least in part a result of red wine's inhibitory effect on NF-κB and resulting gene expression.

It is important to point out that the Federal Circuit Court was presented with this very same fact pattern in *In re Cruciferous Sprout Litigation*, 310 F.3d 1343, 1351 (Fed. Cir. 2002). As in *Cruciferous*, the present Patentees have not invented new pharmaceutical compounds or new methods for using such compounds. They have simply discovered that, in nature, many cells transmit extracellular signals through NF-κB. Therefore the subject claims, which call for the reduction of NF-κB activity in cells, is inherently anticipated through the centuries old practice of consuming red wine.

*Dobrilla* and *Jones*, like *St. Leger*, have carefully studied the effects of consuming red wine and foods. In each of these studies, substantial amounts of red wine (20-33 fluid ounces and 33-50 fluid ounces, respectively) were given with fatty foods (ham sandwich and potato chips and cheese, respectively).

---

**Psalms 75:8** For in the hand of the LORD there is a cup, and the wine is red; it is full of mixture; and he poureth out of the same: but the dregs thereof, all the wicked of the earth shall wring them out, and drink them.

**Proverbs 23:31** Look not thou upon the wine when it is red, when it giveth his colour in the cup, when it moveth itself aright.

46

*Blanco-Colio* provides extrinsic evidence that *St. Leger, Dobrilla* and *Jones* inherently anticipate the subject claims. The *Blanco-Colio* study determined that just 4-8 fluid ounces of red wine[16] – significantly less than consumed in *Dobrilla, Jones* or *St. Leger* – taken with fatty foods, were sufficient to reduce NF-κB activity that had been induced by the triglycerides resulting from such fatty foods. *Blanco-Colio* at 1023, Fig. 2. The authors isolated PBM cells from volunteers at various time points after the food and wine consumption. *Id.* at 1021. NF-κB activity initially increased, induced by post-prandial lipemia (the result of the triglyceride-rich lipoproteins consumed). *Id.* at 1022. After 6-9 hours, patients receiving red wine saw a significant reduction in NF-κB activity:

> In conclusion, red wine intake, but not another form of alcohol beverage intake (vodka), prevents NF-κB activation in PBMCs elicited in healthy volunteers by postprandial lipemia. Because NF-κB activation is involved in the pathogenesis of atherosclerotic lesions, the inhibitory effect of red wine on NF-κB activation provides a further explanation of the beneficial effects of red wine intake in cardiovascular disease.

*Id.* at 1025. Thus, the reduction in NF-κB activity caused by red wine consumption (certainly at levels within the range of common intake) necessarily and always reduces the expression of NF-κB-regulated proteins that are involved in the development of

---

[16] *Blanco-Colio* reports a reduction in NF-κB activity in male subjects that were administered 84 kcal/m$^2$ red wine, and female subjects that were administered 50 kcal/m$^2$. According to Webster's New World Medical Dictionary, the average body surface area for males is 1.9 m$^2$, whereas the average body surface area for females is 1.6 m$^2$, which yields a range of 80-160 kcal. As red wine contains approximately 20 kcal (nutritional calories) per fluid ounce (*see e.g.,* http://www.healthyweightforum.org/eng/calorie-counter), a range of approximately 4-8 fluid ounces were administered to the subjects in *Blanco-Colio*, substantially below the amounts administered in the prior art as described in St. Leger, Dobrilla or Jones. (Alternatively, Blanco-Colio provides the gram/m$^2$, which could be used to determine the number of ounces as well, as wine has the same approximate density as water.)

47

atherosclerotic lesions.

The recognized inherent effects of red wine on NF-κB activity are attributed to the flavonoids and other compounds contained in red wine, including resveratrol ("Res"). Dr. Baldwin, one of the Patentees, has published a report confirming that resveratrol is recognized as a potent inhibitor of NF-κB activity and resulting gene expression:

> Res was shown to be a potent inhibitor of both NF-κB activation and NF-κB-dependent gene expression through its ability to inhibit IκB kinase activity, the key regulator in NF-κB activation, likely by inhibiting an upstream signaling component. In addition, Res blocked the expression of mRNA-encoding monocyte chemoattractant protein-1, a NF-κB-regulated gene.

*Holmes-McNary/Baldwin* at 3477. Moreover, Patentees' own publications have confirmed that the inhibitory effect of compounds in red wine, such as resveratrol, on NF-κB activity is largely responsible for the French Paradox:

> Extensive data are now accumulating that dietary constituents can strongly influence the potential for disease outcome. In epidemiological studies, Red wine consumption was shown to have numerous protective effects, and Res has been shown to be responsible for those beneficial effects. In particular, a phenomenon defined as the "French paradox" has emerged, which is the association of reduced mortality from coronary disease and breast cancer. Although it is well established that naturally occurring compounds function as chemopreventive agents, the physiological mechanisms of these dietary constituents as extracellular signals involved in transcription activation are only presently emerging.

*Id.* at 3481 (citations omitted). Thus, Patentees' own publication confirms the results on NF-κB activity that were disclosed in *Blanco-Colio* and helps to explain the mechanism by which red wine constituents ***necessarily*** inhibit NF-κB activity.

*Manna* also provides extrinsic evidence that *St. Leger, Dobrilla* and *Jones* inherently anticipate the subject claims. Similar to *Blanco-Colio, Manna* looked at the effect of resveratrol

48

on NF-κB induced by a wide range of inducers, including TNF and LPS, and in a wide range of

cells. *Id.* at 6511, 6514. Their conclusion affirmed that resveratrol, as found in red wine,

reduced NF-κB activity and NF-κB-mediated gene transcription in all cell types and with all

inducers tested:

> We found that resveratrol is indeed a potent inhibitor of TNF-induced
> activation of NF-κB, and this inhibition is not cell type specific. The
> suppression is observed in both normal and tumor cells. Besides TNF,
> resveratrol also blocked NF-κB activation induced by a wide variety of
> other inflammatory agents. NF-κB-dependent report gene transcription
> was also suppressed by resveratrol.

*Id.* at 6516. *See also id.* at 6512-6513, Figs. 2, 4 and 5. Moreover, the effects of resveratrol

were found at concentrations that are achievable by administration of red wine:

> Considering that each gram of fresh grape skin contains 50-100 μg (200-
> 400 μM) resveratrol and red wine has 1.5-3 mg/L, this suggests that
> resveratrol concentration used in our studies is achievable *in vivo* by
> consumption of grapes or wine.

*Id.* at 6517 (citations omitted).

In short, any time someone, over the last several hundred or thousand years, drank even a

moderate amount of red wine with food containing significant fats (e.g., the typical French diet)

they were reducing NF-κB activity that had been induced by the fat content in the food, and

reducing the concomitant gene expression. The consumption of red wine as taught in *Dobrilla*

and *Jones* thus ***necessarily and always*** reduced NF-κB activity and concomitant NF-κB-

mediated gene expression.

The table in Exhibit H-9 sets forth, on an element by element basis, how at least claims 1-

2, 6-9, 20-21, 25-32, 36-41, 64-65, 69-76, 80-89 and 93-98 are inherently anticipated by *St. Leger*,

*Dobrilla*, and *Jones* (not to mention the *Bible*!).

49

### 7.    Additional Compounds

There are numerous additional examples of compounds that existed and were administered to humans prior to the earliest effective filing date of the '516 patent which are now known to reduce NF-κB activity as required by the claims at issue in this Reexamination request.  The table attached as Exhibit I offers numerous, albeit non-exhaustive, examples of such well-known compounds.  In fact, for a more complete and up-to-date list of compounds which are reported to inhibit NF-κB, the Examiner is directed to the NF-κB.org website, specifically http://people.bu.edu/gilmore/nf-kb/inhibitors/index.html.[17]

For example, Aspirin, whose active ingredient is acetylsalicylic acid, is a powerful non-steroidal anti-inflammatory drug ("NSAID") first made commercially available in 1899.  *See Weissmann.*  In recent years, scientists have discovered that "NF-κB activity is inhibited by sodium salicylates and aspirin." *Kopp.*  The active ingredient in aspirin, acetylsalicylic acid, and its equivalents have been known to effect fever reduction and pain relief since as early as 400 B.C.  *See, e.g., Bayer web page.*  In 1897, Felix Hoffman, a chemist for Bayer, developed a formulation of acetylsalicylic acid that he used to treat his father's rheumatism.  *Id.*  Bayer subsequently began to distribute aspirin commercially in 1899 and it was rapidly adopted becoming the largest selling drug in the world.  *Id.*  Aspirin was used in the prior art at lower doses to reduce pain or fever, and was also used at "much higher doses (four to eight grams a day) [to] reduce the redness and

---

[17] Lilly alerts the Examiner to the existence of this website merely as a courtesy to the Examiner as the site lists numerous prior art compounds and provides hyperlinks to references establishing that those compounds reduce NF-κB activity.  Lilly does not assert that this list is exhaustive, however.  This website is maintained by Dr. Gilmore, who, as noted above, is serving as an expert for Plaintiffs in the Massachusetts' litigation.

swelling of joints in diseases such as rheumatic fever, gout, and rheumatoid arthritis." *Weissmann* at 84 (and prior art references cited therein). In fact, the observation that salicylates, such as Aspirin, reduced NF-κB activity occurred at such physiological concentrations as "are maintained in the plasma for treatment of chronic inflammatory states like arthritis." *Kopp* at 958.

In addition to Aspirin, other salicylates have now been demonstrated to reduce NF-κB activity. For example, Sulindac is an NSAID marketed under the brand name Clinoril®. Merck introduced Clinoril for the treatment of rheumatoid arthritis in the late 1970's. *See, e.g., PDR 1980.* Much like aspirin, sulindac has been shown to effect translocation of NF-κB from the cytoplasm to the cell nucleus, thereby reducing transcription of certain NF-κB-mediated genes. *Yamamoto.*

Gold compounds are another example of compounds that have been used decades before the earliest priority date as a treatment of rheumatoid arthritis. *Richards* (citing Forester, J., *Rheumatoid arthritis and its treatment by gold salts*, JOURNAL OF LABORATORY AND CLINICAL MEDICINE, 20, 827-840. (1935)). These compounds have also been found to inhibit NF-κB activity. *Jeon.*

Moreover, in addition to Red Wine, other dietary components that have been used for decades, and even centuries, before the earliest possible filing date of the '516 patent have now been demonstrated to reduce NF-κB activity. According to Chinese legend, tea was discovered in 2737 B.C. by the Chinese Emperor Shen Nung, a scholar and herbalist. The first book on tea, a three volume treatise named "Ch'a Ching," was written by the Chinese author Lu Yu in approximately 780 AD. Since that time, tea has been used around the world for its medicinal properties and has become a major part of many Asian and Western cultures. *See www.tea.co.uk.* Recent studies have shown that components of both black tea and green tea inhibit the NF-κB

51

pathway. *See Yang, Black Tea.*

Further, Turmeric, which has been used as an Indian medicinal for a long period of time, is mentioned in an Assyrian herbal description dating from about 600 B.C. Turmeric Monograph, Nutrisana International. Indian researchers have discovered that turmeric has anti-inflammatory properties, based on the action of the component curcumin. Recent studies have shown that curcumin works to inhibit the NF-κB pathway. *See Singh.* In that study, the authors demonstrated that curcumin, a "powerful anti-inflammatory," inhibits NF-κB activation. *See Manson.*

Similarly, garlic, one of the most commonly used spices in the world, has also been used for its medicinal purposes for thousands of years, dating back to at least the Egyptians. Writings describing its health benefits go back to the time of Pliny. *See Pliny, Virgil.* Recent studies have shown that a component of aged garlic extract, S-allylcysteine, also works to inhibit the NF-κB pathway. *See Ide.* In this study, the authors demonstrated that S-allylcysteine inhibited activation of NF-κB by TNF-α in human endothelial cells. *Id.* at 1025S.

## VI.  CONCLUSION

As discussed above, a variety of prior art references teach that compounds are capable of reducing NF-κB activity and concomitant gene expression. These references, published more than a year prior to the November 13, 1991 effective filing date of the application that issued as the '516 patent, expressly anticipate (or render obvious) the claims of the '516 patent that are the subject of this reexamination request.

Furthermore, the remaining prior art references cited above inherently anticipate the claims

of the '516 patent that are the subject of this reexamination request. As in *Cruciferous*, the present

Patentees have not invented new pharmaceutical compounds or new methods for administration

of such compounds; they have simply discovered that, in nature, many cells transmit extracellular

signals through NF-κB. The claims, which call for the reduction of NF-κB activity in cells,

merely recite a property inherent in the use of many prior art pharmaceuticals and other

compounds all of which have not been discussed here.

Indeed, the situation presented here is a *stronger* case for inherency than in *Cruciferous*.

That is, in *Cruciferous* the prior art consumption of the sprouts was unrelated to their unrecognized

properties, i.e., people ate sprouts because they were hungry, not because of their anti-cancer effect.

Whereas, in the instant case, prior art use of many of the compounds discussed herein is for the

same purpose as they are used today. It simply turns out that their benefits can now be explained in

part from the mechanism claimed by Patentees - the reduction of NF-κB activity. Even the

beneficial effects of red wine – long considered as a digestive aid and recognized as having

medicinal properties – is explained, at least in part, by its effects on NF-κB.

As discussed in detail above, the references cited in this reexamination request

conclusively show that the administration of compounds such as Cyclosporin A, 5-ASA,

calcitriol, dexamethasone and antibiotics – to either humans or human cell cultures – was in the

prior art. And, that these prior art references evidence and teach that, regardless of whether those

of ordinary skill recognized it at the time, the administration of these compounds is now

recognized to have necessarily reduced NF-κB activity as claimed in the '516 patent. Patentees,

like the patentee in *Cruciferous Sprouts*, only discovered a natural biological mechanism that has

proven to be inherent in the use of a wide variety of prior art compounds.  As such, the prior art use of these compounds anticipate the subject claims of the '516 patent.

For these reasons, favorable consideration and grant of Lilly's Request for Reexamination of the '516 patent claims 1-18, 20-43, 47-51, 53-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, 182, 186, 192-193, 197-201 is, therefore, courteously solicited.

Respectfully submitted,

Dated: <u>April 4, 2005</u>

Grantland G. Drutchas
Reg. No. 32,565
McDONNELL BOEHNEN HULBERT &
BERGHOFF

300 South Wacker Drive, Suite 3200
Chicago, Illinois 60606
Telephone No. 312-913-0001
Facsimile No. 312-913-0002

54

## <u>Certification Pursuant to 37 C.F.R. 1.510(b)(5)</u>

A copy of this request has been serve in its entirety on the patent owner at the address as

provided for in 37 C.F.R. 1.33(c) as set forth below:

Matthew P. Vincent
Fish & Neave IP Group
Ropes & Gray
One International Place
Boston, MA  02110-2624

Grantland G. Drutchas
Reg. No. 32,565

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ARIAD PHARMACEUTICALS, INC.,
MASSACHUSETTS INSTITUTE OF
TECHNOLOGY, THE WHITEHEAD
INSTITUTE FOR BIOMEDICAL RESEARCH,
and THE PRESIDENT AND FELLOWS OF
HARVARD COLLEGE

               Plaintiffs,

     v.

ELI LILLY AND CO.,

               Defendants.

Civil Action No. 02 CV 11280 RWZ

U.S. District Judge Rya W. Zobel

## RULE 26(A)(2) REBUTTAL REPORT OF THOMAS R. KADESCH, Ph.D.

I, Thomas R. Kadesch, Ph.D., submit the following report on behalf of ARIAD

Pharmaceuticals, Inc., Massachusetts Institute of Technology, The Whitehead Institute for

Biomedical Research, and The President and Fellows of Harvard College (collectively "Ariad")

Plaintiffs in this action.

### I.    Introduction

1. I have been asked to prepare a report on certain issues related to the validity of U.S.

Patents No. 6,410,516 ("the '516 patent"), including a rebuttal to certain opinions expressed in

the reports of Drs. David Latchman (hereinafter "Latchman") and Peter Barnes (hereinafter

"Barnes"), served on behalf of defendant Eli Lilly & Co. ("Lilly") on September 9, 2005.

2. I anticipate testifying as an expert at trial based on the opinions expressed herein.

These opinions are based upon the information I have received so far. They may be

supplemented or modified if I receive additional information. They may also be supplemented to

reply to additional information or opinions provided by Lilly (or by witnesses retained by Lilly), and issues that may arise at trial.

3. If requested to do so, I expect to testify at trial or court hearings regarding my opinions and as to the pertinent underlying facts and information. I may provide to the Court and jury a tutorial on relevant technology implicated by the asserted claims and expect that I may use visual aides, such as graphics, charts, pictures, diagrams, animations and physical objects to help illustrate, demonstrate, and explain the technology, my testimony, and any opinions asserted in this or any other report I may submit.

## II.    Qualifications

4. My qualifications for providing this report are based on my experience in the field of molecular biology and academia. I have been working independently in the field of molecular biology for over 20 years. My curriculum vitae is attached hereto as Exhibit A, and includes a list of all publications authored or co-authored by me during the past ten years.

5. I am currently Professor of Genetics at the University of Pennsylvania School of Medicine in Philadelphia, Pennsylvania. I received my B.S. in Biochemistry in 1975 from the University of California at Santa Barbara and my Ph.D. in Biochemistry in 1980 from the University of California at Berkeley, working with Dr. Michael Chamberlin on the enzymology of transcription in bacterial cells. I carried out 3 years of postdoctoral training in the Department of Biochemistry at Stanford University, working with Dr. Paul Berg, Nobel Laureate, on transcriptional regulation in mammalian cells. I have been on the faculty at Penn since 1984.

6. My research focuses on the regulation of transcription in mammalian cells. Notably, from the mid-1980's to mid-1990's my laboratory carried out the initial cloning and characterization of several novel DNA binding proteins (transcription factors) so I am well-qualified to judge the state of the field at the time of the '516 patent. The impact of my work has

been recognized through its publication in high-impact scientific journals and through invitations to speak both nationally and internationally. I have also taught, for the past 20 years, the advanced graduate student seminar on gene expression and the section on transcriptional control in the introductory survey course required of all first year students in our graduate program. Thus, I have a broad knowledge and appreciation of the transcription literature, including those papers on NF-$\kappa$B, which led to in the '516 patent.

7. From 1992-1996 I served as Editor of the scientific journal Molecular and Cellular Biology. This is a top-tier journal from the American Society of Microbiology that publishes papers of extremely high quality. My responsibility as Editor was to handle those submitted papers in the area of transcriptional regulation.

III.     **Compensation & Prior Testimony**

8. My rate of compensation for my work in this civil action is $ 500 per hour. My compensation is not dependent upon the outcome of this case.

9. I have not testified as an expert at trial or by deposition in the past four years.

IV.     **Materials Reviewed**

10. In preparing this report, I reviewed the claims, specifications, and prosecution file histories of the '516 patent, especially the file of Application Serial No 08/464,364 (the '364 application) and Application Serial No. 07/341,436 ("the '436 application"). I have also reviewed relevant legal documents, including among others, the Claim Construction Order of March 3, 2004 and deposition transcripts of the named inventors of the '516 patent (Baltimore Inventors). In forming my opinions, I have also relied upon the publicly available scientific literature on issues relevant to this report, my professional experience, and specifically the articles and other materials cited within this report and listed in Exhibit B.

3

V.     <u>My Understanding of the Legal Principles Involved</u>

11. I understand that Ariad is asserting claims 14, 69, 71, 72, 80, 84, 85, 93 - 96, 144 - 146 of the '516 patent (the asserted claims) against Lilly.  The language of these claims is included in Section X below.  I understand that the sufficiency of a patent disclosure is measured from the perspective of a hypothetical person "of ordinary skill in the art" as of the patent filing date; and that person is charged with knowledge of the entire body of prior art in the field.

12. I understand that the specification of a patent must teach one of ordinary skill in the art to make and use the full scope of a claimed invention without undue experimentation in order to meet the enablement requirement set forth in 35 U.S.C. § 112. I understand that several factors are relevant to whether or not the amount of experimentation is undue, including:  (a) the quantity of experimentation necessary to practice the claimed invention; (b) the amount of direction or guidance provided in the specification; (c) the presence or absence of working examples in the specification; (d) the nature of the invention; (e) the state of the prior art at the time the application was filed; (f) the relative skill of those in the art at the time the application was filed; (g) the predictability/unpredictability of the art; and (h) the breadth of the patent claims.

13. I understand that the enablement inquiry is generally based on the state of the art at the time of filing but that post-filing developments can be considered to the extent they may support or refute the existence of an enabling disclosure at the time the application was filed.  I understand that the enablement requirement does not require that the specification describe all possible applications of the claimed inventions, but rather asks whether one of skill in the art could use the disclosure of the specification to practice the claimed invention without undue experimentation.

4

14. I also understand that the written description requirement of 35 U.S.C. §112, paragraph 1, requires that the patent specification describe the claimed invention in sufficient detail that an ordinarily skilled scientist can reasonably conclude that the inventor had possession of the claimed invention. I further understand that compliance with the written description inquiry is determined by comparing the disclosure of the specification with the invention as set forth in the patent claims.

15. I understand that disclosure of any relevant identifying characteristics, i.e., structure or other physical and/or chemical properties, or functional characteristics coupled with a known or disclosed correlation between function and structure, or a combination of such identifying characteristics, may be sufficient to satisfy the written description requirement. I further understand that a claimed genus is adequately described when one of ordinary skill can recognize that the applicant was in possession of the necessary common attributes or features of the elements possessed by the members of the genus. I have also been advised that information which is known in the art need not be described in detail in the specification. It is my understanding that the specification need not describe future technological developments.

16. I understand that 35 U.S.C. §112, paragraph 2, requires that the specification of a patent conclude with claims that particularly point out and distinctly claim the subject matter of the invention. I understand that the requirement is objective and looks to whether the scope of the claim is clear to a hypothetical person possessing the ordinary level of skill in the pertinent art rather than considering the views of the applicant.

17. I understand that the Court's claim construction sets forth the controlling definition of many of the terms used in the asserted claims of the patent-in-suit and that the remaining terms are defined according to the parties' agreed upon construction or given ordinary meaning.

5

VI.     **Overview of the Patents and Technology At Issue**

18. I expect to testify on the general concepts of cellular and molecular biology, as such concepts are described in standard biology textbooks, as well as the specific technology described and taught by the Baltimore Inventors.

A.     **Cells From All Organisms Contain Molecules Which Carry Out Critical Functions.**

19. Cells can be classified as either prokaryotic or eukaryotic. Eukaryotic cells have a nucleus which is an internal compartment of the cell where DNA is stored. A membrane separates the nucleus from the rest of the cell's cytoplasm. The cytoplasm is separated from its surrounding environment by an outer membrane. Each living cell is composed of numerous molecules and chemicals that direct the functions of the cell. Among the most critical cellular building blocks are molecules known as DNA, RNA and proteins.

B.     **Life's Master Molecules: DNA, RNA and Protein and the Central Dogma**

a.     **DNA: Master Blueprint**

20. Deoxyribonucleic acid ("DNA") molecules carry key hereditary information and serve as the cell's source of genetic information. DNA is formed by two strands of nucleotides joined together by hydrogen bonds and twisted into a double helical structure. There are four different nucleotides that present on strands of DNA - adenine ("A"), guanine ("G"), cytosine ("C"), and thymine ("T"). Each nucleotide pairs with a single other nucleotide on the opposite nucleotide strand of the DNA double helix, i.e. A always pairs with T, and G always pairs with C. The two nucleotide strands of DNA are therefore said to be complementary. DNA is often depicted simplistically as a linear structure read from left to right. By convention, the left end is referred to as the 5' end and the right end is called the 3' end.

6

21. The nucleotide sequences of DNA direct the production of proteins by the cell, such that the correct protein is produced in the proper amount and at the proper time to support necessary functions of the cell. Certain regions of nucleotides in the cell's DNA regulate the expression of proteins while other regions direct the structure of the resulting protein. The particular nucleotide sequence comprising the regulatory regions and that encoding a specific protein is commonly referred to as a "gene."

b.   RNA: the Information Carrier

22. Ribonucleic acid ("RNA") molecules also exist in the cellular environment and function to carry genetic information from DNA to other cellular molecules. Like DNA, RNA is made of a sequence of connected nucleotides; however, RNA consists of only a single nucleotide strand, unlike DNA which has two strands. RNA also has four nucleotide bases - the nucleotides adenine, guanine and cytosine (used in DNA) and uracil ("U") in place of thymine in DNA. "U" and "T" convey the same genetic information and, by convention, "T" is often used to indicate both DNA and RNA sequences.

23. The single RNA nucleotide strand can pair with complementary RNA and DNA molecules, A pairing with T and G pairing with C. Some RNA molecules act as "messengers" that transfer the genetic information encoded by DNA molecules to the cellular molecules that make proteins. This type of RNA is therefore called messenger RNA ("mRNA").

c.   Protein: Structural Building Blocks and Functional Enzymes.

24. The proteins produced by cells are essential to all living things. All cellular proteins are built of connected strings of twenty possible amino acids combined in various orders. This chain of amino acids is often called a polypeptide. Polypeptide lengths range from a few amino acids to thousands of amino acids. The amino acid chain of a polypeptide assumes a three

7

dimensional structure determined by its sequence, length and environment. The determined structures are flexible, which allows a protein to have more than one stated conformation.

25. Amino acids are specified by groups of three nucleotides known as "codons". Each codon, with the exception of stop codons, corresponds to one of the twenty possible amino acids that form a protein. The relationship between the nucleotide building blocks of DNA and RNA and the amino acids that form polypeptides is called "the genetic code." The three nucleotides of a codon are read together during the process of translation, which converts nucleic acid sequence to amino acid sequence.

26. Cells use the information conveyed by the genetic code to regulate cellular functions by expressing proteins. The nucleotide sequence "ATG" is the most common "initiation codon" and signals the "starting place" for synthesis of a protein. The "stop codons" that terminate translation and expression are TAG, TAA and TGA. The nucleotide sequence that falls between the initiation codon and the stop codon defines the "structural gene" that is translated into a protein according to the specific relationships defined by the genetic code.

27. The four possible nucleotides (A, C, G and T) can form 64 possible three nucleotide codon sequences; however, there are only 20 possible amino acids that can be made. Therefore, the genetic code is called "degenerative" because most amino acids can be specified by more than one three nucleotide codon. For example, four different codons (TTA, TTC, TTG and TTT) code for the amino acid serine. However, the reverse is not true - each codon specifies only a single amino acid.

      d.    <u>The Central Dogma: DNA→ RNA→ protein</u>

28. The "central dogma" refers to the universal process for the flow of genetic information from DNA to RNA to protein to which all living organisms share. Prior to 1989, it

had been established that organisms as different as bacteria and mammals share the same genetic code.

29. All living cells therefore follow the same process for "gene expression," which refers to the cellular mechanisms that read the genetic information encoded by a nucleotide sequence to produce the specified protein. This commonly shared mechanism follows a two step process: (1) transcription, and (2) translation.

a.     Transcription

30. In the first step of gene expression, the nucleotide sequence of DNA is "transcribed" (or copied) into an intermediate mRNA molecule by a cellular component called RNA polymerase. RNA polymerase functions by binding to certain specific nucleotides in the DNA sequence known as promoters. The promoter is a start signal at the beginning of a gene which, by binding RNA polymerase, directs the RNA polymerase to initiate synthesis of mRNA at a specific position and on a specific strand of the DNA template. The resulting mRNA copy carries the genetic information encoded by the DNA molecule to the molecular machinery of the cell responsible for protein synthesis.

31. Nucleotide sequences within the promoter (and sometimes elsewhere in a gene) that direct the activity and function of RNA polymerase are part of the regulatory system which functions to regulate gene expression by acting as "on" and "off" switches, and are collectively known as the "control regions." The different parts of the control regions are referred to as "regulatory elements." When a DNA sequence is depicted linearly, the sequences comprising the control regions are usually, but not always, found adjacent to the side of the coding region of the gene. By the early 1980's, a number of studies had established the nucleotide sequences that were necessary for the initiation of transcription.

9

32. Transcriptional regulatory elements or DNA work in conjunction with proteins known as "transcription factors". The association and dissociation of transcription factors to regulatory elements of a gene controls, or regulates the expression of the gene. Many genes require the binding of a number of different, very specific factors to initiate transcription. Other genes are more promiscuous and transcription can be initiated by a number of different types of factors. Proper arrangement of transcription factors on the regulatory elements is necessary for transcription but not sufficient. The DNA - transcription factor complex must be able to recruit and activate RNA polymerase or else transcription will not occur. The Baltimore Inventors explained how a certain transcription factor, the nuclear transcription factor kappa B (NF-κB) regulates the expression of genes that have a κB element in their control region (discussed below).

### b.      Translation

33. The second step in gene expression is translation. During translation, complex cellular molecules composed of proteins and RNA molecules, called "ribosomes," translate the information carried by mRNA. Ribosomes function to "read" the nucleotide sequences of the mRNA codons to assemble the corresponding amino acids into a polypeptide chain. Just as with the preceding step of transcription, translation requires an element of the control region, known as the ribosome binding site, which functions as an "on switch." The most common "start" signal in the mRNA codon sequence is AUG (encoded in DNA as "ATG") which corresponds to the amino acid methionine. Virtually all polypeptide sequences therefore begin with an N-terminal methionine residue (N-Met).

### C.      The Tools of Molecular Biology in 1989

#### a.      DNA Technology

10

34. Recombinant DNA research was made possible in the early 1970's by molecular biologists who developed a wide variety of molecular "tools" to manipulate DNA. These included specialized proteins called enzymes which had a variety of useful functions: for example, cutting DNA at specific nucleotides, ligating cut DNA molecules together, or making DNA or RNA by enzymatic means. These tools allowed the practice of "cloning," which is defined as the process of making numerous, identical copies of a nucleotide sequence of DNA. By 1989, foreign DNA could be introduced into host cells using standard techniques known in the art. Therefore, once the DNA fragment to be cloned had been obtained it could be inserted into a cloning vehicle, such as a plasmid.

35. Plasmids are small, circular pieces of DNA that are naturally found inside bacteria, and which can be removed from their natural bacterial hosts, molecularly modified (for example by the insertion of a fragment of DNA to be cloned), and introduced into other bacteria. The biochemical machinery of the bacterial host cell can then be exploited to replicate the plasmid (including the introduced DNA fragment), thus producing many copies of the cloned DNA fragment.

36. By using a control region endogenous to and recognized by a host cell, those skilled in the art could further modify plasmids and use them to express cloned foreign genes. By utilizing the host's own machinery, foreign genes could be expressed in human cells.

37. By at least 1989, one of skill would have had available various techniques for manipulating recombinant DNA, which could have been used to construct plasmids. For example, such methodology included techniques for inserting DNA into plasmids and methods for introducing those "recombinant" plasmids into human host cells. The techniques which were routine to molecular biologists in the 1980s that I have discussed and others are described in

11

detail in laboratory manuals such as Maniatis et al. (1989) Molecular Cloning; A Laboratory Manual, Cold Springs Harbor Laboratory Press, N.Y., Vol. 1-3; and earlier published editions. (The editor is a named inventor on the '516 patent).

b.    Synthetic Gene Construction

38. The methodology of synthetic gene construction is well known in the art. See Brown, et al. (1979) Methods in Enzymology, Academic Press, N.Y., Vol. 68, pgs. 109-151. DNA sequences that encode particular protein molecules may be designed based on the amino acid sequences of the desired proteins. Once designed, the sequence itself may be generated using conventional DNA synthesizing apparatus. See U.S. Patent Nos. 5,500,365, 5,625,136 for examples of the construction of synthetic genes.

39. It was also well known in the art prior to 1989 that to effect the expression of protein molecules in a cell, one inserts the engineered synthetic DNA sequence in any one of many appropriate recombinant DNA expression vectors through the use of appropriate restriction endonucleases, which are enzymes that cut DNA. Restriction endonuclease cleavage sites are engineered into either end of the DNA to facilitate isolation from, and integration into, known amplification and expression vectors. The particular endonucleases employed will be dictated by the restriction endonuclease cleavage pattern of the parent expression vector to be employed. The choice of restriction sites is chosen so as to properly orient the coding sequence with control sequences to achieve proper expression of the protein of interest. The coding sequence must be positioned so as to be in proper reading frame with the promoter and ribosome binding site of the expression vector, both of which are functional in the host cell in which the protein is to be expressed. So as to achieve efficient transcription of the synthetic gene, said gene must be operably associated with a promoter region/control region. Therefore, the promoter

12

region/control region of the synthetic gene is placed in the same sequential orientation with respect to the ATG start codon of the synthetic gene.

40. A variety of expression vectors derived from viruses and plasmids useful for transforming prokaryotic and eukaryotic cells are well known in the art.  A number of useful vectors were identified to the USTPO during the prosecution of the '516 patent.  ('364 application Response and Amendment, September 1999, p.7, ADL 0000702)

    c.  Screening & Assays

41. Use of high throughput assays to screen binding interactions was routinely performed in the art in 1989.  Following the '516 specification, it would have been a routine matter to identify reagents that block binding of NF-κB to NF-κB recognition sites.  A large number of candidate molecules were available for screening at the filing date of the invention.  See e.g. (Horuk 1989; Scott 1990).  Such molecules include peptides and peptide mimetics, members of combinatorial libraries, as well as large numbers of small organic molecules and natural products, including fermentation broths, all of which were available for drug screening.

42. Combinatorial approaches for generating large libraries including phage display methods were also known.  (Scott 1990; see also WO/9002809).

43. Another mass screening procedure that could be applicable to both peptides and other molecules is disclosed in WO/9015070.

44. Screening of libraries of peptides or other compounds can typically identify library members that have specific affinity for a given target without any prior knowledge of the molecular structure needed for binding.

    D.  The Baltimore et al. Invention

45. I expect to testify about the discovery of NF-κB, the invention of the '516 patent and the contributions to the field made by the Baltimore Inventors, including how NF-κB works in

13

cells to regulate gene expression and how drugs can be used to intervene in the NF-κB signaling

pathway to reduce gene expression. I may explain and summarize the written description of the

'516 patent from the perspective of one of ordinary skill in the art, and the prosecution history of

the applications giving rise to the United States Patent and Trademark Office (USPTO) granting

of the '516 patent.

46. The Baltimore Inventors described the mechanism by which NF-κB regulates the

expression of genes. In resting cells NF-κB resides in the cytoplasm bound to another protein

inhibitor of NF-κB, called IκB by the Baltimore Inventors. Stimulation of cells by agents acting

on the outside surface of the cell membrane induces a cascade of intracellular kinases that

phosphorylate IκB. A kinase is an enzyme that adds a phosphate group to a protein that can alter

the conformation/structure of the modified protein. Once phosphorylated, IκB is disassociated

from NF-κB and degraded. The unbound NF-κB is then free to translocate to the nucleus of the

cell, where it can interact with the cell's DNA. In the nucleus NF-κB recognizes the κB

elements on genes where it binds and promotes transcription.

47. Having explained this remarkable mechanism of how gene expression in the nucleus

is induced by external influences, the Baltimore Inventors were able to describe methods by

which one of skill in the art could affect NF-κB mediated gene expression. They state:

> As a result of this finding, it is now possible to alter or modify the activity
> of NF-κB as an intracellular messenger and, as a result, to alter or modify
> the effect of a variety of external influences, referred to as inducing
> substances, whose messages are transduced within cells through NF-κB
> activity. Alteration or modification, whether to enhance or reduce NF-κB
> activity or to change its binding activity (e.g., affinity, specificity), is
> referred to herein as regulation of NF-κB activity. The present invention
> relates to a method of regulating or influencing transduction, by NF-κB, of
> extracellular signals into specific patterns of gene expression and, thus, of
> regulating NF-κB-mediated gene expression in the cells and systems in
> which it occurs.

14

In particular, the present invention relates to <u>a method of regulating</u> (enhancing or diminishing) the activity of NF-κB in cells in which it is present and capable of acting as an intracellular messenger, as well as to <u>substances or composition useful in such a method.</u> Such methods and compositions are designed to make use of the role of NF-κB as a mediator in the expression of genes in a variety of cell types. The expression of a gene having a NF-κB binding recognition sequence can be regulated, either positively or negatively, to provide for increased or decreased production of the protein whose expression is mediated by NF-κB. NF-κB-mediated gene expression can also be selectively regulated by altering the binding domain of NF-κB in such a manner that binding specificity and/or affinity are modified. . . . As a result of the present invention, cellular interactions between NF-κB and a gene or genes whose expression is mediated by NF-κB activity and which have, for example, medical implications (e.g., NF-κB/cytokine interactions; NF-κB/HTLV-I tax gene product interactions) can be altered or modified.

('516 patent, col. 3, line 59 - col. 4, line 28). One of skill in the art would recognize that the '516 patent describes methods to modify and alter the normal signaling pathways that the Baltimore Inventors discovered.

48. There are specific disclosures of the claimed methods which support my opinion on written description and enablement. For example the column 35 line 39 through column 38 line 24 provides information that one of ordinary skill in that art would recognize and understand to be an invention.

Methods and compositions of the present invention are based on use of the role of NF-κB as a second messenger, or mediator, in the expression of genes in a wide variety of cell types. <u>The expression of a gene having an NF-κB binding recognition sequence can be positively or negatively regulated to provide, respectively, for increased or decreased production of the protein whose expression is mediated by NF-κB.</u> Furthermore, genes which do not, in their wild type form, have NF-κB, recognition sequences can be placed under the control of NF-κB by inserting NF-κB binding site in an appropriate position, using techniques known to those skilled in the art.

('516 patent, col. 35, lines 42-53).

15

49. It is expressly stated that the invention is related to "agents or drugs which enhance or block the activity of NF-κB or of the NF-κB inhibitor (e.g. IκB)". ('516 patent col. 3, lines 23-26).

50. There is not only a single means of reducing NF-κB activity described in the '516 patent. From reading the specification of the '516 patent one of skill in the art understands that there is more than one place to intervene in the multistep mechanism described by the '516 patent.

51. I disagree with some of the statements made by Dr. Barnes in his "NF-κB Tutorial" (Barnes § III). First, there is at least one well-publicized example of an effective drug has been rationally designed to work on reducing NF-κB activity based on the teachings of the '516 paper. The drug, molecule PS-341, inhibits NF-κB mediated gene expression by a mechanism which includes inhibition of proteins that mediate IκB degradation. (Palombella 1998). Second, his analogy to cancer cells misses the point. To illustrate, we can imagine at least three classes of drug that could inhibit overall NF-κB activity. The first of these would include PS-341 and comprise those compounds that sustain IκB activity. The second would include those that specifically inhibit binding of NF-κB once it enters the nucleus (e.g. decoys and dominant negative NF-κBs). The third, not specifically illustrated in the patent, would be drugs that inhibit NF-κB activity, even when it's bound to DNA (e.g. "squelching" proteins). (Gill and Ptashne 1988).

52. In further response to Dr. Barnes I may explain that the asserted claims are directed to reducing NF-κB activity that is induced from external influences such as LPS. The methods are not directed to completely blocking all levels of NF-κB activity in all cells. To imply that drugs that work by intervening in a function necessary to normal cells as well as diseased cells are

16

useless is misleading. Many modern cancer chemotherapeutic drugs work by inhibiting cell division, a necessary function of both normal and cancerous cells. Drugs that work by this mechanism can be administered at a dose so as to effectively prevent cancer cells from multiplying and spreading throughout the body, without killing all the cells. Side effects from these drugs include hair loss and gastrointestinal irritation because the normal cells in those systems require frequent cell division. By analogy, inhibitors of NF-κB can be given at doses that would be clinically effective.

VII.    **Person of Ordinary Skill in the Art**

53. As discussed above, the '516 patent relates to a field of molecular biology which is often referred to as gene regulation. People working on gene regulation in the late 1980s and early 1990s most often held advanced doctorate level degrees in biology, chemistry or related fields and most would have had three or more years of post-doctoral training. A person at this level of experience does not need a great deal of guidance in performing molecular biology experiments and would not expect detailed explanations of existing technology to be included in scientific publications. A person of skill in the art would be able to isolate native proteins from cells, clone genes, synthesize genes, and express foreign genes in mammalian cells. Furthermore a person of skill in the art would have had expertise to measure activity of transcription factors with artificial reporter constructs.

54. In reaching an opinion on the level of skill in the art I have considered the education and experience of the Baltimore Inventors in the late 1980s time frame. I have also taken into consideration the level of skill of people I knew to be working in the molecular biology field between 1985 and 1995. The USPTO examiner noted, "the relative skill of those in the art of gene regulation is high". ('364 application, Office Action, July 1998, pp. 7, 17, ADL 0000548, ADL 0000558).

17

55. I note that Dr. Barnes states, without explanation or further specificity, that he is "prepared to respond to questions about what was generally known in the art by persons of ordinary skill as of the relevant dates about one particular transcription factor, NF-κB, its natural inhibitor, IκB and address inaccuracies that may be raised by Plaintiffs in their tutorial." (Barnes p.3). If in the future, Dr. Barnes were to disclose his specific opinions regarding persons of ordinary skill in the art then I may supplement this rebuttal report to address his opinions directly.

## VIII.  Enablement

### A.    The Asserted Claims Are Enabled Because the Specification Provides the Skilled Practitioner with Sufficient Guidance to Make and Use the Claimed Methods Without Undue Experimentation.

56. Given the state of the art at the time the '516 patent was filed, the skilled practitioner would have a number feasible alternatives for practicing the methods of the asserted claims. (*See, e.g.* '364 application, Office Action, March 17, 1999, p.8, ADL 0000618).

#### a.    Small Molecules Were Available for Use in the Claims

57. One of ordinary skill in the art following the teachings of the patent can find substances that may be useful in therapy of diseases associated with overactivity of a transcriptional regulatory factor ('516 patent col. 34, line 66 - col. 35, line 12). It was understood from the specification that NF-κB – dependent gene expression can be inhibited in vitro. (*See* Ray 1995).

58. By at least 1989 screening and assay techniques were available for identification of compounds with specific biological activities. I expect to testify that those skilled in the art would be able to carry out a variety of different drug screening assays based on the disclosure and experience developed in the art, including for example, detecting inhibitors of protein phosphorylation, detecting inhibitors of protein degradation, detecting inhibitors of

18

protein:protein interactions, detecting inhibitors of protein localization in a cell, detecting inhibitors of protein:DNA interactions. As the attorneys for the Baltimore Inventors explained to the USPTO, formats for these types of screens were recognized in the art. ('364 application, Amendment and Response, January 27, 1999, p.13, ADL 0000582).

59. For example, a microtiter assay has been used to examine the effect of a series of structurally diverse histamine type II (H2) receptor antagonists on histamine-mediated immune suppression. Human peripheral blood lymphocytes were placed in 96 well microtiter plates, and pytohaemagglutinin M was added. Cells were incubated with test drugs for 72 hours, and pulsed with [3H]-thymidine for the last 16 hours. Cells were harvested on an automated multiple sample harvester and cell-associated radioactivity was determined by scintillation counting. (Badger 1984). With the information disclosed in the '516 patent a screen of this type could be adapted for the purpose of identifying NF-κB inhibitors.

60. In the prosecution of the '516 patent, a review article that describes the general state of combinatorial protein libraries throughout the late 1980's was brought to the attention of USPTO. (Gallop 1994; '364 application, Amendment and Response June 11, 1998, ADL 0000517-0000540).

61. Screens based on the '516 patent have been employed to identify inhibitors of NF-κB. (Gehrt 1998; Fiedler 1998; '364 application Amendment and Response January 27, 1999, ADL 0000579-0000608). Following the disclosed teachings of the '516 patent on the mechanism of NF-κB activation, which included the phosphorylation of IκB and the subsequent proteolytic degradation of the modified IκB, those skilled in the art are able to identify a number of other substances capable of reducing NF-κB activity.

62. In addition to PS-341 noted above, emodin, when properly administered, is capable of inhibiting NF-κB mediated gene expression by a mechanism which includes inhibition of degradation of IκB proteins. (Kumar 1998; *see also* Meng 1999 and Fenteany 1995 for other proteosome inhibitors).

63. The compound helenalin, of the sesquiterpene lactone class of compounds has been reported to inhibit NF-κB mediated gene expression in certain circumstances by a process which includes irreversible alkylation of NF-κB in order to inhibit the DNA binding activity of NF-κB. (Lyss 1998).

64. These and/or other small molecules like these compounds could have entered a drug development pipeline and, if not eliminated for other reasons, been developed into drugs which work through the methods claimed in the patent. By 1989 the steps taken to develop a drug were well defined and routinely applied.

65. The USPTO examiner "agreed that the experimental techniques disclosed in the specification that were used to elucidate the mechanism of NF-κB regulation could be readily adapted by the skilled artisan to screen for agents which alter NF-κB and IκB activity." The USPTO examiner "further agreed that the specification does suggest that agents which regulate these two proteins could be screened for." ('364 application, Office Action March 17 1999, p.5, ADL 0000615). I concur with these statements.

   b.    The Disclosure of IκB Supports the Enablement of the Claims

66. The specification of the '516 patent discloses that the mechanism of NF-κB activation is due to IκB being phosphorylated and subsequently degraded by proteolysis. A number of references recognize the Baltimore Inventors for describing this mechanism. (See references cited in paragraph 10 of Baltimore Declaration signed September 14, 1999, ADL 0000627). The patent suggests that the one of the kinases responsible for phosphorylation is Protein Kinase

C, a specific kinase activated by phorbol esters that also activate NF-κB. The '516 patent references Protein Kinase C at several points. (See '516 patent, col. 27, lines 1-8; col. 30, lines 60-65; col. 31, lines 7-10; col. 31, lines 15-23; col. 31, lines 30-34; col. 33, lines 52-56; col. 71, lines 42-50; col. 72, lines 12-18; col. 72, lines 24-29; col. 76, lines 17-21; col. 76, lines 54-57; col. 76, line 58 – col. 77, line 3.)

67. Reading the '516 patent as a whole, with particular focus on the references to Protein Kinase C, provides a clear direction to screen for kinase inhibitors as a way to identify compounds that could inhibit NF-κB activity and be used in the asserted claims.

68. I expect to testify that

> the art taught a number of assays for detecting changes in phosphorylation of intracellular proteins upon treatment of a cell with a small organic molecule, protein, or other agent likely to be tested in a drug screening assay. See, for example, Auberger et al. *Regulation of protein phosphorylation by polyamines in hepatocytes. Studies using two effectors: amiloride and natural aliphatic polyamines* Biochimie (1985) 67:1125-32; Malkinson et al., *Decrease in the protein kinase C-catalyzed phosphorylation of an endogenous lung protein* (Mr 36,00) *following treatment of mice with the tumor-modulatory agent butylated hydroxytoluene* Cancer Res (1985) 45:5751-6; and Robinson and Dunkley, *Altered protein phosphorylation in intact rat cortical synaptosomes after in vivo administration of fluphenazine* Biochem Pharmacol (1987) 36:2203-8. One skilled in the art would recognize that these and other prior art techniques for detecting protein phosphorylation could be adapted for use in the present invention as assays for identifying agents which inhibit or potentiate IκB phosphorylation

('346 application, Amendment and Response, June 1998, ADL 0000517-0000540).

69. Following the disclosure of the '516 patent and the scientific articles cited throughout the specification, one of skill in the art would be able to obtain a clone of IκB using well-established routine techniques. The patent teaches that IκB is a protein; therefore, one of skill in the art would know that there is necessarily a gene which encodes it. ('516 patent, Examples 10 - 14). Obtaining the gene would only require technology taught by the '516 patent or already

known in the art in 1989. (*See* '516 patent col. 32, lines 28-40). Indeed, Bose and coworkers identified a protein, designated pp40, based on its stable interaction with v-Rel and c-Rel. (Tung 1988). Using standard biochemical and molecular biological techniques they purified pp40, generated an antiserum, and cloned its cDNA. (Davis 1991). It turned out to be the chicken homologue of MAD-3. One skilled in the art could have easily looked for proteins that stably interacted with mammalian c-Rel and cloned their corresponding cDNAs using methods analogous to those employed by Bose. Their function as IκB proteins could have been confirmed using the teachings of the '516 patent. (*see* Haskill 1991; Davis 1991).

70. As directed by the patent, an "IκB gene can be incorporated into an appropriate vector … and introduced into cells in which NF-κB activity is to be inhibited (partially or totally)." One of ordinary skill could accomplish this with only routine experimentation. It has been shown that overexpression of IκB can inhibit NF-κB-dependent gene transcription both *in vitro* and *in vivo*. (Cai 1997; Esslinger 1997).

71. I expect to testify that protein defined in Figure 43 is an IκB-like molecule. (Davis 1991; Haskill 1991). If the gene described in Figure 43 were over expressed in a human cell NF-κB activity could be reduced.

72. Techniques for domain mapping of proteins were available in the art. Given the functional description of IκB, those skilled in the art were able to identify the domains or fragments of IκB that are responsible for NF-κB binding and NF-κB release. A number of references describing combinatorial techniques for generating and processing large library variants of a protein were brought to the attention of the USPTO. ('364 application, Amendment and Response, June 11, 1998, ADL 0000517-0000540). For example, Cunningham 1989;

22

McKnight 1982; Meyers 1986; Leung 1989; Miller 1992; and Bass 1990 all describe technology that was routine in the art in 1989 that could be used to generate and identify variants of IκB.

73. One of skill in the art could make IκB-like molecules which are constitutively active for having a higher affinity for NF-κB or resistance to degradation in the cytoplasm. The protein domains involved in inducible and basal degradation of IκB in intact cells has been determined using routine experimentation. (Krappman 1996; '364 application Amendment and Response of June 11, 1998, ADL 0000517-0000540).

74. A successful strategy using an IκB variant to reduce NF-κB activity has been employed as a result of the disclosure in the '516 patent. (Brown 1995). To accomplish this, Brown et al. introduced deletions and point mutations into the DNA encoding IκB-α, and transfected the mutated DNA into cells. In one series of experiments, these authors used Ntera-2 cells, which do not express high levels of NF-κB or IκB. Co-transfection of the p65 subunit of NF-κB and either wild-type or mutant IκB-α resulted in inhibition of expression of a κB-sensitive reporter gene. Importantly, in cells stimulated with PMA and ionomycin, inhibition of NF-κB transactivation was relieved (i.e., disinhibited) by transfection of wild-type IκB-α, but not by transfection of IκB-α with mutations (i.e., Ser$^{32}$ ---> and Ala or Ser$^{36}$ ---> Ala) which prevented phosphorylation and proteolysis. Thus, mutated IκB can be used to reduce NF-κB activity. (*See also* McKinsey 1997).

c. Dominantly Interfering Molecules and Decoy Molecules Support Enablement of the Claims

75. The concepts of decoy molecules and dominantly interfering molecules as described in the '516 patent are closely related and well understood in the art. They stem conceptually from basic biochemistry and enzymology. Both types of molecule can be viewed as competitive inhibitors, but acting through slightly different mechanisms. The activation of transcription via

DNA binding proteins can be viewed most easily as an ordered, two-step process: binding of the protein to the regulatory element (DNA) of a gene target followed by the stimulation of transcription through the recruitment or activation of RNA polymerase. The process can be inhibited at either step. (Trepicchio 1993).

76. In teaching the use of decoy molecules the '516 patent exploits this concept. In a cell NF-$\kappa$B binds to the regulatory region of a gene. Given that this occurs in the context of over 3 billion base pairs of DNA with a limited amount of NF-$\kappa$B, the binding to one particular gene target must be highly specific. If, however, one introduces a sufficient number of copies of a small piece of DNA capable of binding NF-$\kappa$B, but not linked to a gene, the cell's NF-$\kappa$B will also bind to this "decoy," thus reducing the effective amount of NF-$\kappa$B available for binding the normal gene target and reducing the apparent overall activity of NF-$\kappa$B.

77. A number of papers describing the use of NF-$\kappa$B decoys were brought to the attention of the USPTO during the examination of the '516 patent. ('364 application, Amendment and Response June 1998, p.21-22, ADL 0000537-0000538). The articles by Morishita et al. 1997 and Sawa et al. 1997 demonstrate the decoy concept described in the '516 patent. Decoy molecules that inhibit NF-$\kappa$B, as taught in the '516 patent, have been demonstrated *in vitro* and *in vivo*. (Kawamura 2001; Cho Chung U.S. Patent No. 6,060,310). Modified oligonucleotides as a means of inhibiting NF-$\kappa$B function have been described. (Khaled 1998; Tomita 1998). In fact, Lilly scientists have also published on the use of DNA decoy oligonucleotides against NF-$\kappa$B to reduce induced NF-$\kappa$B activity. (Du 2005).

78. The patent office examiner recognized that NF-$\kappa$B decoy molecules were enabled by the specification, in view of the art. The examiner wrote on one of occasion (there were others) that

> The post-filing date art submitted by the applicants contains several teachings of the effective use of nucleic acid decoy molecules and expression of full length IκB in cultured cells to block NF-κB activation to inhibit the transcription of genes containing NF-κB binding site, including the HIV LTR, as was taught in the specification. This is deemed to substantiate the disclosure of the present application in terms of using full length IκB or a decoy nucleic acid to inhibit the expression of HIV DNA in isolated cells infected with HIV.

('364 application, Office Action July 1998, p.18-19, ADL 0000559-0000560; *see also* Office Action, August 2000, p.9, ADL 0000831).

79. Dominantly interfering molecules take advantage of the observation that most transcription factors have separable DNA binding domains (DBDs) and "transcriptional activation" domains (TADs). That is, one part of the protein is used for DNA binding, while the other instructs the RNA polymerase. If the DBD is disrupted the transcription factor cannot bind DNA and, hence, will not activate transcription. If the TAD is disrupted, the protein will bind DNA, but cannot instruct the RNA polymerase to initiate transcription. Such a version of the transcription factor c-Jun was shown to block the activity of a variety of cancer-causing genes, implicating a role for the normal c-Jun protein in these processes. (Lloyd 1991). The '516 patent exploits this latter concept and proposes the use of such "dominantly interfering" versions of NF-κB to block access by the cell's normal NF-κB to its target genes, thus reducing the level of target gene activation. Indeed, v-Rel, a naturally occurring oncogenic version of c-Rel encoded by an avian virus, lacks the corresponding c-Rel activation domain (which is distinct from the DBD) and can be used in appropriate methods to inhibit NF-κB-mediated gene activation. (Ballard 1990). This finding is conceptually identical to what is taught in the '516 patent.

80. Persons skilled in the art have also exploited the fact that the DNA binding domains are distinct from the activating domains, to make dominant negative mutants as taught by the

25

'516 patent. Specifically, they constructed p50 subunits with either deletions or point mutations which formed heterodimers with RelA, but interfered with DNA binding. These mutant proteins functioned as inhibitors of NF-$\kappa$B activity. (Logeat 1991; Bressler 1993).

81. Cell permeable peptide inhibitors of NF-$\kappa$B activity are known. (Fujihara 2000).

**B.    The Latchman and Barnes Reports Provide No Clear and Convincing Basis for Establishing the Asserted Claims of the '516 Patent Are Not Enabled**

82. I have considered the arguments and the references included in the Latchman and Barnes reports. The reports do not provide a clear and convincing basis for concluding that one of ordinary skill in the art in 1989 would require more than routine experimentation to practice the claims. For example there is no basis to suggest that a person of skill in the art in 1989 could not reduce the level of expression of genes, such as cytokine genes, which are activated by extracellular influences, such as LPS, by reducing binding of NF-$\kappa$B to NF-$\kappa$B recognition sites.

83. Whether or not the sequence in Figure 43 of the '516 patent is I$\kappa$B-$\alpha$ is unimportant to whether one of skill in the art could practice the claims. (See Latchman para. 26). As discussed above, given the structural and complete functional characterization of I$\kappa$B as an inhibitor of NF-$\kappa$B mediated gene expression those of skilled in the art would be able to obtain a clone, and over express an I$\kappa$B and super I$\kappa$B molecules in cells to practice the claimed method.

84. Techniques for introducing proteins and nucleic acids into cells were available prior to 1989. One of the more common techniques involves the use of liposomes. (Nicolau 1984; Boda 1987; Reisine 1985; *see also* Roozemond 1987; for other methods *see* Berns 1984 and Gesner 1988; for an example of administration of DNA in liposomes *see* Nabel 1996).

85. Gene therapy is not recited in the asserted claims. However, at the time the '516 patent was filed people of skill in the art thought that gene therapy would be possible in the near future. The first cell culture model of gene therapy was published by Mulligan and Berg in

26

1980. Much of the work since that time has involved the perfection of viral vectors, stable transgene expression and delivery protocols. Although work with humans has been restricted to clinical trials and has suffered some notable setbacks, work in dogs has been much more encouraging, leading, for example, to an effective therapy for hemophilia (Arruda 2005). Nevertheless, in my reading and understanding of the asserted claims there is no requirement to practice gene therapy. (Claim Construction Order).

86. I have seen patents from Lilly that purport to show that gene therapy is a practicable approach to deliver proteins. For example U.S. Patent 6,841,371 states

> Gene Therapy--A therapeutic regime which includes the administration of a vector containing DNA encoding a therapeutic protein, directly to affected cells where the therapeutic protein will be produced. Target tissue for gene delivery include, for example, skeletal muscle, vascular smooth muscle, and liver. Vectors include, for example, plasmid DNA, liposomes, protein-DNA conjugates, and vectors based on adenovirus or herpes virus. Gene therapy has been described, for example, by Kessler et al., PNAS, USA, 93:14082-87, 1996.

('371 patent col.6, lines 41-50)

87. That gene therapy was credible to a person of skill in that art in the mid 1980's is supported by the fact that the National Institutes of Health NIH adopted gene therapy guidelines in September 1985, "Points to Consider in the Design and Submission of Human Somatic-Cell Gene Therapy". (For a discussion of the guidelines see Roberts *The New York Times* September 29, 1985).

IX.    <u>Written Description</u>

A.    <u>The Specification of the '516 Patent Contains and Adequate Written Description of the Asserted Claims Because It Demonstrates that the Baltimore Inventors Were in Possession of the Claimed Methods at the Time of Filing.</u>

88. The '516 patent specification and earlier applications (see discussion below on earlier filed applications), describe methods of reducing induced NF-$\kappa$B activity in cells to reduce the expression of NF-$\kappa$B regulated genes. The description clearly allows one of ordinary skill in art to recognize that the Baltimore Inventors invented what is claimed. It allows one skilled in the art to visualize himself or herself practicing the claimed methods. In forming my opinion of have considered the specification of the '516 patent as a whole giving weight to all of the words, structures, figures, diagrams, and formulas.

89. For many of the same reasons that the specification enables one of skill in the art to practice the claims, the specification provides a written description. Therefore, the reader is referred to my discussion on enablement above for further support of my reasons. In particular one of ordinary skill in the art reading the specification finds a detailed description of:

- the mechanism of NF-$\kappa$B activation, (see above ¶¶ 46-52);

- I$\kappa$B as an inhibitor of NF-$\kappa$B, (see above ¶¶ 66-74);

- assays for the analysis of protein DNA interactions, (see above ¶¶ 57-65);

- decoy molecules, (see above ¶¶ 75-78);

- dominantly interfering molecules, (see above ¶¶ 79-81).

90. In addition to being enabling to those of ordinary skill in the art the disclosure clearly sets forth the limitations of the asserted claims.

a.    <u>The specification describes that NF-$\kappa$B mediated intracellular signaling is induced by external influences, including LPS.</u>

91. The '516 patent explains that the transcription factor NF-κB is "inducible" ('516 patent col. 2, lines 28-31; col. 10, lines 30-56), that it acts as an "intracellular transducer of external influences" ('516 patent col. 2, lines 39-40), such as virus infection or the treatment of cells with double-stranded RNA ('516 patent col. 2, lines 42-43), and that stimulation can be from extra cellular influences such as lipopolysaccharide, extracellular polypeptides and from chemical agents such as phorbol esters, which stimulate intracellular kinases that, under appropriate circumstances, can activate NF-κB. ('516 patent col. 2, lines 54-59). Inducibility of NF-κB activity by external influences is demonstrated by least Example 8 ('516 patent col. 68, line 30 - col. 73, line 55), which shows experimentally that, among other things, cells which had been stimulated with PHA or PMA, under the conditions disclosed, contained detectable levels of NF-κB and that co-stimulation cells showed higher levels of the factor (e.g. '516 patent col. 73, lines 1-6). The combination of agents that can, under certain conditions, induce NF-κB activity is described. ('516 patent col. 33, lines 52 - 59) That NF-κB is inducible is further exemplified in Example 15 ('516 patent col. 78, line 43 - col. 82, line 4).

92. That NF-κB activity is induced by external influences is supported by the description of the role of NF-κB in cytokine gene regulation in the specification ('516 patent col. 12, line 56 - col. 14, line 54) and by the description that NF-κB acts as an intracellular messenger in inducible systems ('516 patent col. 15, line 54 - col. 17, line 52).

     b.     <u>The specification describes genes that are activated through NF-κB mediated intracellular signaling.</u>

93. The '516 patent teaches that certain genes are "transcriptionally regulated by NF-κB." For example it is shown that NF-κB "stimulates transcription of genes encoding kappa immunoglobulins in B lymphocytes" ('516 patent col. 2, lines 23-25) and that NF-κB positively regulates the human β-interferon (β-IFN) gene, ('516 patent col. 2, lines 34-35) and controls the

expression of HIV ('516 patent col. 2, lines 44-45; *see also* col. 10, lines 30-56; col. 17, line 53 through col. 18, line 51). MHC gene has an NF-κB recognition sequence. ('516 patent col. 13, line 54 – 65) Under appropriate conditions, human cells can be stimulated to produce IL-2 by the combined influence of PHA and PMA. ('516 patent col. 72, line 44 – 48; *see also* discussion below on LPS induced expression of cytokines in mammalian cells. ¶¶ 100-103.

      c.    The specification describes "reducing NF-KB activity"

94. The '516 patent discloses that the invention relates to NF-κB inhibitors. ('516 patent col. 3, lines 23-26; col. 37, line 43 through col. 38, line 23).

95. Decoy and dominantly interfering molecules are taught by the '516 patent as agents that could be used to reduce NF-κB activity. ('516 patent col. 4, line 29 - 52). As discussed above, those of skill in the art understood the concepts of competitive binding and therefore would recognize that decoy molecules and dominantly interfering molecules as described in the '516 patent can be useful for reducing NF-κB activity. ('516 patent col. 37, line 64 through col. 38, line 25).

96. The patent suggests that NF-κB activation depends on protein kinase C. ('516 patent col. 31, line 10 - 56; col. 72, lines 12-26). One of skill in the art would recognize that an appropriate inhibitor of PKC could be used to reduce phorbol ester induced NF-κB activity.

      d.    The specification describes diminished NF-KB mediated intracellular signaling, modified NF-KB mediated effects of external influences, and reduced expression of genes.

97. One of ordinary skill in the art would recognize that, as described in the '516 patent:

> the data are consistent with a molecular mechanism of inducible gene expression by which a cytoplasmic transcription factor-inhibitor complex is dissociated by the action of TPA, presumably through activation of protein kinase C. The dissociation event results in activation and apparent nuclear translocation of the transcription factor.

('516 patent col. 27, line 1 - 7).

e.     The specification describes "binding of NF-κB to NF-κB recognition sites"

98. The '516 patent describes "NF-κB recognition sites" as recited in the claims. ('516 patent col. 12, lines 18-20). Table 2 provides examples of specific nucleotide sequences from known genes that are "recognized" by NF-κB as well as a consensus sequence derived by the Baltimore Inventors which allows one of skill in the art to identify NF-κB binding sites in other genes ('516 patent col. 35, line 54 through col. 35, line 23; col. 37, lines 1 - 43).

99. There is also a description of a DNA binding assay which is useful to determine if a substance is capable of reducing binding of NF-κB to NF-κB recognition sites ('516 patent col. 18, line 52 through col. 20, line 25).

**B.     The Specification of the '516 Patent Contains an Adequate Written Description of the Asserted Claims Because It Describes the Induction of Cytokine Genes with Lipopolysaccharide.**

100.     A person of skill in the art reading the '516 patent understands that expression of a gene is dependent on a number of different processes, including but not limited to transcription factor activation of the gene.  Within the realm of transcription regulators, in many instances more than the NF-κB transcription factor is required to allow gene expression; some genes require further release from a repressor factor.  The "theme of multiple signals" is exemplified by the cytokine β-INF gene.  ('516 patent col. 16, line 64).  The '516 patent teaches that virus-induced expression of the β-INF gene involves the activation of NF-κB and that NF-κB is induced by LPS (see below). The fact that β-INF transcription depends on additional regulatory elements does not negate the necessary role that NF-κB has in regulating its transcription.  It would be incorrect to conclude from the statements in the patent that LPS cannot induce expression of β-INF under any conditions.  Certainly one expects from the teachings of the patent that in the presence of stimuli that operate to activate through PRDI and release repression

31

at NRDI that LPS would induce expression of β-INF. To one of skill in the art there is a clear teaching that the expression of β-INF can be induced by LPS under conditions that satisfy the other transcription regulatory requirements of that gene.

101.    The '516 patent teaches that lipopolysaccharide (LPS) induces the disassociation of NF-κB from IκB and translocation of NF-κB into the nucleus. Once NF-κB is present in the nucleus it can function as a transcription factor at any available recognition site. Given functional NF-κB in the nucleus, whether or not the expression of an NF-κB regulated gene is expressed may depend on the availability of other factors and conditions. (Lenardo 1989).

102.    With the benefit of the '516 patent one of skill in the art at the time would recognize that cytokine genes having a κB control element in the promoter may very well be expressed in response to LPS. Perhaps not under all conditions but certainly under the right conditions where all other necessary factors are present, LPS does induce the expression of cytokines. In fact, IL-2 expression is regulated by NF-κB as the Baltimore Inventors described in the '516 patent. (Hoyos 1989). Expression of other cytokines, such as IL-1 and TNF-α, are induced by LPS and that induction is augmented by other influences. (Shakhov 1990; Schindler 1990).

103.    An important additional issue to recognize with respect to genes regulated by NF-κB concerns the distinction between necessary and sufficient. Although a gene, such as that encoding β-INF or those encoding other cytokines, may not be activated by treating cells with LPS alone (NF-κB is sufficient), inhibitors of NF-κB may very well block induction of the gene upon, for example, virus infection (NF-κB is necessary). Thus, the relevance of an NF-κB binding site in a promoter/control region of a gene does not require that the gene be induced by

32

LPS alone, but its expression may be inhibited by NF-κB inhibitors.  This concept is exemplified by the β-INF promoter/control region and is taught in the '516 patent.

**C.     The USPTO Found Support in the Specification and the Art for the Asserted Claims.**

104.     Support for the claims was reviewed by the Patent Office during the prosecution of the '516 patent.  For example the information provided to USPTO in June 1995 show where certain claim language is supported in the specification. ('364 application, Amendment and Response, June 10, 1998, pp.9-12, ADL 0000525-0000528).  Also, attorneys for the Baltimore Inventors explained to the USPTO where support for use of assays can be found in the specification:

- at page 6, the specification states that the invention relates to *"drugs which enhance or block the activity of NF-κB or of the NF-κB inhibitor (e.g., IkB)"*;

- at page 7, the specification states *"the subject invention further relates to methods of regulating (including or preventing) activation of NF-κB, controlling expression of the immunoglobulin kappa light chain gene and other genes whose expression is controlled by NF-κB"*;

- at page 8, the specification states *"[a]lterations or modification, whether to enhance or reduce NF-κB activity or to change its binding activity (e.g., affinity, specificity), is referred to herein as regulation of NF-κB activity"*;

- at page 9, the specification states *"the cloned genes permit development of assays to screen for agonists or antagonists of gene expression and/or of the factors themselves.  Further, because the binding site for NF-κB in the kappa gene is clearly defined, an assay for blockers or inhibitors of binding is available, as is an assay to determine whether active NF-κB is present"*;

> The examiner's attention is also directed to page 23:lines 2-29, page
> 55:lines 5-16, page 74:lines 1-14; page 87:line 1 - page 88:line 17 and
> claims 57-63 as originally filed. These and other teachings of the instant
> application provide ample guidance and sufficient written description for
> the pending claims.

('364 Application, Amendment and Response January 14, 1999, p.13, ADL 0000602).

105.    In an April 1998 interview with the USPTO examiner the Applicants attorneys

discussed the support in the application ('364 application, Examiner Interview Summary, April

7, 1998, ADL 0000495). The details of the discussion were memorialized in a subsequent paper.

I expect to testify that the description of the specification and the state of the art were accurately

represented to the USPTO. ('364 application Amendment and Response June 11, 1998, p.17-23,

ADL 0000533-0000539). The examiner agreed that the cited references were sufficient to show

that the use of full length IκB and decoy nucleic acids could be used to inhibit NF-κB activation

in cells. ('364 application, Office Action, July 1998, p.14, ADL 0000530).

106.    In a Response and Amendment in application number USSN 08/464,364 (the

'364 application) sent to the USPTO on September 12, 2001, applicants made citations to the

specification to show support for the amended claims. ('364 application Response and

Amendment, September 12, 2001, p.5-6, ADL 0000878-0000879). The response to the

September 12, 2001 Amendments by the USPTO Examiner was a "Notice of Allowability", in

which the Examiner wrote:

> Examiner has reviewed the last response and accompanying references
> which provide substantiating examples of the claimed methods. The
> claims are deemed allowable in view of applicants' withdrawal of the
> remaining pending claims to expedite prosecution and their agreement to
> make several language changes of a formal nature.

('364 application, Examiner's Amendment, October 4, 2001, p.30, ADL 0000952).

107.    In addition to parts of the specification which Applicants pointed to in the

prosecution history, and the USPTO accepted, I have found several other passages in the

specification of the '516 patent arising from the '354 application and its predecessor applications to support my opinion that a person of ordinary skill in the art in the late 1980s timeframe would recognize that the Baltimore Inventors invented what is claimed in the '516 patent. Citations to the most relevant passages are included in a Table in Section V below.

### D. <u>Priority Applications</u>

108.    I have reviewed the file history of the '516 patent. I expect to testify that earlier filed ("priority") applications support the asserted claims of the '516 patent. The USPTO accorded an effective filing date of March 1, 1988. ('364 application, Office Action, January 1997, p.3, ADL 0000449). Below, I have summarized some of additions made to the specification at particular stages of the prosecution.

109.    Application Serial No. 07/318,901 ("the '901 application") was filed on March 3, 1989. The application includes figures that characterize IκB as a 60 to 70 kD protein. The specification discloses that NF-κB exists as a heterodimer with a molecular weight of 120 to 130kD, composed of NF-κB, with a molecular weight of 55 to 62kD, and IκB, with a molecular weight of 60 to 70 kD. The specification further describes the reversibility and kinetics of the inactivation of NF-κB. The specification also discloses that NF-κB is activated by phosphorylation of the NF-κB-IκB complex resulting in NF-κB activity. ('901 application, pp. 7-8, 23-34). The specification demonstrates that NF-κB can be activated in a variety of cells including T cell lines (H9, Jurkat), fibroblasts, human kidney cells, and a variety of murine tissues. ('901 application, pp. 22-23).

110.    Application Serial No. 07/341,436 ("the '436 application") was filed on April 21, 1989. The application discloses that NF-κB plays a role in cytokine regulation, which was studied by using β-IFN gene expression. In particular, the specification demonstrates that NF-κB interacts at the gene element PRDII. The inventors observed a correlation between NF-κB

binding and induction of $\beta$-IFN. Further, mutations to the PRDII binding site decrease $\beta$-IFN gene inducibility. The specification also discloses that NF-$\kappa$B appears to play a prominent role in the interactions between cytokines IL-1 and TNF-$\alpha$ and NF-$\kappa$B binding. By altering or modifying NF-$\kappa$B activity one of skill in the art can produce medical effects, e.g., by affecting cytokine interactions. ('436 application, pp. 5-6, 10-23). The disclosure demonstrates that NF-$\kappa$B activity can be affected by crude preparations of I-$\kappa$B, which, under the circumstances disclosed, effectively inhibit binding of NF-$\kappa$B. ('436 application, pp.10-23). The specification also discloses other methods of positively or negatively regulating expression of genes controlled by NF-$\kappa$B, in particular, by increasing or decreasing the availability of NF-$\kappa$B. The specification referenced Singh et al 1988, which discloses an assay that can be used to identify molecules that will bind to NF-$\kappa$B binding sites. The application lists a consensus binding site for NF-$\kappa$B derived from the examination of sequences of numerous genes regulated by NF-$\kappa$B. Additionally, in a prophetic example, the specification teaches that I$\kappa$B may be used to reduce NF-$\kappa$B activity by introducing appropriate amounts of I$\kappa$B into a cell. The specification also discloses the use of decoy molecules and dominantly interfering molecules to regulate NF-$\kappa$B activity. ('436 application, pp. 23-30).

111.   I expect to testify that '436 application has enough of the disclosure found in the '516 patent that the asserted claims are enabled and described by this application.

112.    I may supplement this report in response to any contentions raised by the defendant on the issue of written description, enablement and priority. I may also supplement this report as new information becomes available to me. I may testify in rebuttal regarding issues addressed by the defendant's experts.

Date  10/21/05

Thomas Kadesch

37

**X.     Asserted Claims of the '516 Patent**

| No. | '516 Patent Claim |
|---|---|
| 14. | A method for reducing bacterial lipopolysaccharide-induced expression of cytokines in mammalian cells, which method comprises reducing NF-κB activity in the cells so as to reduce bacterial lipopolysaccharide-induced expression of said cytokines in the cells. |
| 69. | The method of claim 6 [for diminishing induced NF-κB-mediated intracellular signaling comprising reducing NF-κB activity in cells such that NF-κB-mediated intracellular signaling is diminished] wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes transcriptionally regulated by NF-κB. |
| 71. | The method of claim 6 carried out on human cells |
| 72. | The method of claim 70 or 71, carried out on immune cells. |
| 80. | The method of claim 8 [for modifying effects of external influences on a eukaryotic cell, which external influences induce NF-κB-mediated intracellular signaling, the method comprising reducing NF-κB activity in the cells such that NF-κB-mediated effects of external influences are modified] wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB. |
| 84. | The method of claim 8, carried out on human cells. |
| 85. | The method of any of claims 81-84, carried out on immune cells. |
| 93. | The method of claim 9 [for reducing, in eukaryotic cells, the level of expression of genes which are activated by extracellular influences which induce NF-κB-mediated intracellular signaling, the method comprising reducing NF-κB activity in the cells such that expression of said genes is reduced] wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB. |
| 94. | The method of claim 9, carried out on mammalian cells. |
| 95. | The method of claim 9, carried out on human cells. |
| 96. | The method of claim 94 or 95, carried out on immune cells. |
| 144. | The method of claim 14 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB. |
| 145. | The method of claim 14, carried out on human cells. |
| 146. | The method of claim 14 or 145, carried out on immune cells. |

XI.     <u>Support in the Specification of of the '516 Patent for Asserted Claims</u>

| '516 Patent Claim No. | Support |
|---|---|
| 14.  A method for reducing bacterial lipopolysaccharide-induced expression of cytokines in mammalian cells, which method comprises reducing NF-κB activity in the cells so as to reduce bacterial lipopolysaccharide induced expression of said cytokines in the cells. | '516 specification col. 2, lines 27-43; col. 3. line 59-col. 4, line 19; col. 4, lines 23-28; col. 9, line 1-col.10, line 15; col. 12, line 36-col. 13, line 3; col. 13, line 13-col. 14, line 54; col. 15, lines 3-36; col. 15, line 54-col. 17, line 52; col. 35, lines 43-60; col. 36, lines 1-11; col. 36, lines 40-67; col. 37, lines 1-col.-38, line 22 (also discussed at col. 31, line 57-col. 32, line 28); col. 78, lines 43-col. 82, line 11; col. 6, lines 5-55; col. 7, line 1-col. 8, line 67; col. 17, line 53-col. 18, line 24; col. 22, line 9-col. 24, line 46; col. 24, line 57-col. 29, line 46; col. 29, line 57-col. 31, line 56; col. 35, lines 13-42; col. 73, line 57-col. 74, line 50; col. 76, line 11-col. 78, line 42; col. 18, line 52-col. 20, line 25; col. 49, line 63-col. 51, line 41, and generally col. 4, line 54-col. 5, line 44, and generally col. 5, line 59-col. 6, line 4; col. 31, line 57-col. 32, line 63; and all Figures specifically cited in these sections; incorporating disclosure from prior applications, specifically:<br><br>'436 application: page 1, line 15-page 3, line 27; page 4, line 15 - page 6, line 8; page 6, lines 13-19; Figures 1 through 4, including "Brief Descriptions" page 6, line 20-page 9, line 24; "Detailed Description of the Invention", page 9, line 25-page 11, line 20; in particular, page 12, line 1-page 16, line 2; page 16, line 21-page 17, line 29; page 18, line 18-page 22, line 11; in particular, page 22, line 12-page 23, line 21; "Use of Methods and Compositions of the Present Invention", page 23, line 22-page 24, line 15, page 24, line 25-page 25, line 4, page 26, line 5-page 27, line 5; page 28 (Table I), page 29, line 1-page 30, line 23; in particular page 30, line 26-page 39, line 21; page 39, line 23-page 45, line 8; and all Figures specifically cited in these sections;<br><br>'901 application: page 2, line 4-page 3, line 9; "Summary of the Invention" page 3, line 10-page 4, line 5; "Brief Description of the Drawings," page 4, line 6-page 5, line 31, page 6, line 13-page 10, line 24, "Detailed Description of the Drawings" page 10, line 25-page 12, line 27; page 13, line 1-page 18, line 15; page 18, line 27-page 29, line 32; page 30, line 12-page |

| '516 Patent Claim No. | Support |
|---|---|
| | 34, line 32; page 35, line 1-page 36, line 8; page 38, line 5-page 39, line 5;  page 39, line 9-page 40, line 7; page 43, line 7-page 48, line 15 and all Figures specifically cited in these sections;

'173 application: page 12, line 6-page 16, line 5; page 53, line 10-page 57, line 18, and generally, page 24, line 1-page 34, line 14; and all Figures specifically cited in these sections;

'680 application: page 1, line 29-page 3, line 4; "Summary of the Invention" page 3, lines 5-30; "Brief Description of the Drawings," page 4, line 1-page 5, line 25; Figs. 1-3; 5-9; page 6, line 6- page 12, line 29, page 13, line 22-page 19, line 8; page 21, line 5-page 24, line 8, page 25, line 7-page 27, line 6; and all Figures specifically cited in these sections.

Additionally, disclosure relating to underlying science, as well as background to the invention, corresponding to prior applications incorporated by reference in the above applications, may be found in portions of the '516 specification (including Figures cited to) as follows:

'516 specification, col. 4, lines 29-49; col. 4, line 55-col. 5, line 44, col. 5, line 58-col. 6, line 4; col. 10, line 57-col. 11, line 23; col. 20, line 26-col. 22, line 9; col. 33, line 60-col. 35, line 12; col. 38, line 28-col. 42, line 34; col. 46, line 35-col. 49, line 61; col. 52, line 64-col. 54, line 30; col. 56, line 22-col. 57, line 42; col. 68, line 30-col. 73, line 56; col. 74, line 52-col. 76, line 9. |
| 69. The method of claim 6 [for diminishing induced NF-κB-mediated intracellular signaling comprising reducing NF-κB activity in cells such that NF-κB-mediated intracellular signaling is diminished] wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes transcriptionally regulated by NF-κB. | '516 specification col. 2, lines 27-43; col. 3. line 59-col. 4, line 19; col. 4, lines 23-28; col. 9, line 1-col.10, line 15; col. 12, line  36-col. 13, line 3; col. 13, line 13-col. 14, line 54; col. 15, lines 3-36; col. 15, line 54-col. 17, line 52; col. 35, lines 43-60; col. 36, lines 1-11; col. 36, lines 40-67; col. 37, lines 1-col. 38, line 22 (also discussed at col. 31, line 57-col. 32, line 28); col. 78, lines 43-col. 82, line 11; col. 6, lines 5-55; col. 7, line 1-col. 8, line 67; col. 17, line 53-col. 18, line 24; col. 22, line 9-col. 24, line 46; col. 24, line 57-col. 29, line 46; col. 29, line 57-col. 31, line 56; col. 35, lines 13-42; |

| '516 Patent Claim No. | Support |
|---|---|
|  | col. 73, line 57-col. 74, line 50; col. 76, line 11-col. 78, line 42; col. 18, line 52-col. 20, line 25; col. 49, line 63-col. 51, line 41, and generally col. 4, line 54-col. 5, line 44, and generally col. 5, line 59-col. 6, line 4; col. 31, line 57-col. 32, line 63; and all Figures specifically cited in these sections; incorporating disclosure from prior applications, specifically: |
|  | '436 application: page 1, line 15-page 3, line 27; page 4, line 15 - page 6, line 8; page 6, lines 13-19; Figures 1 through 4, including "Brief Descriptions" page 6, line 20-page 9, line 24; "Detailed Description of the Invention", page 9, line 25-page 11, line 20; page 12, line 1-page 16, line 2; page 16, line 21-page 17, line 29; page 18, line 18-page 23, line 21; "Use of Methods and Compositions of the Present Invention", page 23, line 22-page 24, line 15, page 24, line 25-page 25, line 4, page 26, line 5-page 27, line 5; page 28 (Table I), page 29, line 1-page 30, line 23; generally page 30, line 26-page 39, line 21; page 39, line 23-page 45, line 8; and all Figures specifically cited in these sections; |
|  | '901 application: page 2, line 4-page 3, line 9; "Summary of the Invention" page 3, line 10-page 4, line 5; "Brief Description of the Drawings," page 4, line 6-page 5, line 31, page 6, line 13-page 10, line 24, "Detailed Description of the Drawings" page 10, line 25-page 12, line 27; page 13, line 1-page 18, line 15; page 18, line 27-page 29, line 32; page 30, line 12-page 34, line 32; page 35, line 1-page 36, line 8; page 38, line 5-page 39, line 5; page 39, line 9-page 40, line 7; page 43, line 7-page 48, line 15 and all Figures specifically cited in these sections; |
|  | '173 application: page 12, line 6-page 16, line 5; page 53, line 10-page 57, line 18, and generally, page 24, line 1-page 34, line 14; and all Figures specifically cited in these sections; |
|  | '680 application: page 1, line 29-page 3, line 4; "Summary of the Invention" page 3, lines 5-30; "Brief Description of the Drawings," page 4, line 1-page 5, line 25; Figs. 1-3; 5-9; page 6, line 6- page 12, line 29, page 13, line 22-page 19, line 8; page 21, line 5-page |

| '516 Patent Claim No. | Support |
|---|---|
| | 24, line 8, page 25, line 7-page 27, line 6; and all Figures specifically cited in these sections.<br><br>Additionally, disclosure relating to underlying science, as well as background to the invention, corresponding to prior applications incorporated by reference in the above applications, may be found in portions of the '516 specification (including Figures cited to) as follows:<br><br>'516 specification, col. 4, lines 29-49; col. 4, line 55-col. 5, line 44, col. 5, line 58-col. 6, line 4; col. 10, line 57-col. 11, line 23; col. 20, line 26-col. 22, line 9; col. 33, line 60-col. 35, line 12; col. 38, line 28-col. 42, line 34; col. 46, line 35-col. 49, line 61; col. 52, line 64-col. 54, line 30; col. 56, line 22-col. 57, line 42; col. 68, line 30-col. 73, line 56; col. 74, line 52-col. 76, line 9. |
| 71. The method of claim 6 carried out on human cells. | See response to claim 69, and in particular, '516 specification col. 27, lines 27-43; col. 12, lines 57-col. 13, line 3; col. 13, lines 13-29; col. 17, lines 19-52; col. 37, lines 1-42; col. 49, line 62-col. 51, line 40; col. 78, line 43-col. 79, line 10; col. 79, line 64-col. 80, line 19; col. 81, lines 9-45;<br><br>(for example, see '436 application, page 4, line 15-page 5, line 6; page 11, lines 4-20;page 12, lines 1-19; page 22, line 12-page 23, line 21; page 28; page 31, line 1-page 32, line 2; page 34, line 5-page 35, line 2, page 37, line 8-page 38, line 20)<br><br>(for example, see '901 application, page 3, line 10-page 4, line 5; Fig. 6, page 6, lines 16-18; Fig. 14, page 10, lines 5-24; page 20, line 17-page 23, line 12; page 35, line 1-page 36, line 8; page 38, line 5-page 39, line 5, Example 6)<br><br>(for example, see '173 application, page 53, line 10-page 57, line 18)<br><br>(for example, see '680 application, page 6, line 6-page 7, line 25; page 25, line 8-page 27, line 6). |
| 72. The method of claim 70 or 71. | See response to claim 69, and in particular, '516 |

| '516 Patent Claim No. | Support |
|---|---|
| carried out on immune cells. | specification col. 27, lines 27-43; col. 12, lines 57-col. 13, line 3; col. 13, lines 13-29; col. 13, line 66-col. 14, line 33; col. 17, lines 19-52; col. 37, lines 1-42; col. 78, line 43-col. 79, line 10; col. 79, line 64-col. 80, line 19; col. 81, line 9-col. 82, line 11;<br><br>(for example, see '436 application, page 4, line 15-page 5, line 6;  page 11, lines 4-20; page 12, lines 1-19; page 13, line 29-page 16, line 2; page 22, line 12-page 23, line 21; page 28; page 31, line 1-page 32, line 2; page 34, line 5-page 35, line 2, page 37, line 8-page 39, line 21)<br><br>(for example, see '901 application, page 3, line 10-page 5, line 31; Figs. 1-3; Figs. 5-13, page 6, line 13-page 10, line 4; page 10, line 25-page 20, line 16; page 20, line 17-page 30, line 28; page 32, line 6-page 36, line 8; page 38, line 5-page 39, line 5, Examples 1, 3-5)<br><br>(for example, see '173 application, page 53, line 10-page 57, line 18)<br><br>(for example, see '680 application, page 6, line 6-page 7, line 25; page 18, line 1-page 19, line 8). |
| 80.  The method of claim 8 [for modifying effects of external influences on a eukaryotic cell, which external influences induce NF-κB-mediated intracellular signaling, the method comprising reducing NF-κB activity in the cells such that NF-κB-mediated effects of external influences are modified] wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB. | '516 specification col. 2, lines 27-43; col. 3. line 59-col. 4, line 19; col. 4, lines 23-28; col. 9, line 1-col.10, line 15; col. 12, line  36-col. 13, line 3; col. 13, line 13-col. 14, line 54; col. 15, lines 3-36; col. 15, line 54-col. 17, line 52; col. 35, lines 43-60; col. 36, lines 1-11; col. 36, lines 40-67; col. 37, lines 1-col. 38, line 22 (also discussed at col. 31, line 57-col. 32, line 28); col. 78, lines 43-col. 82, line 11; col. 6, lines 5-55; col. 7, line 1-col. 8, line 67; col. 17, line 53-col. 18, line 24; col. 22, line 9-col. 24, line 46; col. 24, line 57-col. 29, line 46; col. 29, line 57-col. 31, line 56; col. 35, lines 13-42; col. 73, line 57-col. 74, line 50; col. 76, line 11-col. 78, line 42; col. 18, line 52-col. 20, line 25; col. 49, line 63-col. 51, line 41, and generally col. 4, line 54-col. 5, line 44, and generally col. 5, line 59-col. 6, line 4; col. 31, line 57-col. 32, line 63; and all Figures specifically cited in these sections; incorporating disclosure from prior applications, specifically: |

| '516 Patent Claim No. | Support |
|---|---|
|  | '436 application: page 1, line 15-page 3, line 27; page 4, line 15 - page 6, line 8; page 6, lines 13-19; Figures 1 through 4, including "Brief Descriptions" page 6, line 20-page 9, line 24; "Detailed Description of the Invention", page 9, line 25-page 11, line 20; page 12, line 1-page 16, line 2; page 16, line 21-page 17, line 29; page 18, line 18-page 23, line 21; "Use of Methods and Compositions of the Present Invention", page 23, line 22-page 24, line 15, page 24, line 25-page 25, line 4, page 26, line 5-page 27, line 5; page 28 (Table I), page 29, line 1-page 30, line 23; generally page 30, line 26-page 39, line 21; page 39, line 23-page 45, line 8; and all Figures specifically cited in these sections;<br><br>'901 application: page 2, line 4-page 3, line 9; "Summary of the Invention" page 3, line 10-page 4, line 5; "Brief Description of the Drawings," page 4, line 6-page 5, line 31, page 6, line 13-page 10, line 24, "Detailed Description of the Drawings" page 10, line 25-page 12, line 27; page 13, line 1-page 18, line 15; page 18, line 27-page 29, line 32; page 30, line 12-page 34, line 32; page 35, line 1-page 36, line 8; page 38, line 5-page 39, line 5; page 39, line 9-page 40, line 7; page 43, line 7-page 48, line 15 and all Figures specifically cited in these sections;<br><br>'173 application: page 12, line 6-page 16, line 5; page 53, line 10-page 57, line 18, and generally, page 24, line 1-page 34, line 14; and all Figures specifically cited in these sections;<br><br>'680 application: page 1, line 29-page 3, line 4; "Summary of the Invention" page 3, lines 5-30; "Brief Description of the Drawings," page 4, line 1-page 5, line 25; Figs. 1-3; 5-9; page 6, line 6- page 12, line 29, page 13, line 22-page 19, line 8; page 21, line 5-page 24, line 8, page 25, line 7-page 27, line 6; and all Figures specifically cited in these sections.<br><br>Additionally, disclosure relating to underlying science, as well as background to the invention, corresponding to prior applications incorporated by reference in the above applications, may be found in portions of the |

| '516 Patent Claim No. | Support |
|---|---|
| | '516 specification (including Figures cited to) as follows:<br><br>'516 specification, col. 4, lines 29-49; col. 4, line 55-col. 5, line 44, col. 5, line 58-col. 6, line 4; col. 10, line 57-col. 11, line 23; col. 20, line 26-col. 22, line 9; col. 33, line 60-col. 35, line 12; col. 38, line 28-col. 42, line 34; col. 46, line 35-col. 49, line 61; col. 52, line 64-col. 54, line 30; col. 56, line 22-col. 57, line 42; col. 68, line 30-col. 73, line 56; col. 74, line 52-col. 76, line 9. |
| 84.  The method of claim 8, carried out on human cells. | See response to claim 80, and in particular, '516 specification col. 27, lines 27-43; col. 12, lines 57-col. 13, line 3; col. 13, lines 13-29; col. 17, lines 19-52; col. 37, lines 1-42; col. 49, line 62-col. 51, line 40; col. 78, line 43-col. 79, line 10; col. 79, line 64-col. 80, line 19; col. 81, lines 9-45;<br><br>(for example, see '436 application, page 4, line 15-page 5, line 6; page 11, lines 4-20;page 12, lines 1-19; page 22, line 12-page 23, line 21; page 28; page 31, line 1-page 32, line 2; page 34, line 5-page 35, line 2, page 37, line 8-page 38, line 20)<br><br>(for example, see '901 application, page 3, line 10-page 4, line 5; Fig. 6, page 6, lines 16-18; Fig. 14, page 10, lines 5-24; page 20, line 17-page 23, line 12; page 35, line 1-page 36, line 8; page 38, line 5-page 39, line 5, Example 6)<br><br>(for example, see '173 application, page 53, line 10-page 57, line 18)<br><br>(for example, see '680 application, page 6, line 6-page 7, line 25; page 25, line 8-page 27, line 6). |
| 85.  The method of any of claims 81-84, carried out on immune cells. | See response to claim 80, in particular, '516 specification col. 27, lines 27-43; col. 12, lines 57-col. 13, line 3; col. 13, lines 13-29; col. 13, line 66-col. 14, line 33; col. 17, lines 19-52; col. 37, lines 1-42; col. 78, line 43-col. 79, line 10; col. 79, line 64-col. 80, line 19; col. 81, line 9-col. 82, line 11;<br><br>(for example, see '436 application, page 4, line 15-page |

| '516 Patent Claim No. | Support |
|---|---|
| | 5, line 6; page 11, lines 4-20;page 12, lines 1-19; page 13, line 29-page 16, line 2; page 22, line 12-page 23, line 21; page 28; page 31, line 1-page 32, line 2; page 34, line 5-page 35, line 2, page 37, line 8-page 39, line 21)

(for example, see '901 application, page 3, line 10-page 5, line 31; Figs. 1-3; Figs. 5-13, page 6, line 13-page 10, line 4; page 10, line 25-page 20, line 16; page 20, line 17-page 30, line 28; page 32, line 6-page 36, line 8; page 38, line 5-page 39, line 5, Examples 1, 3-5)

(for example, see '173 application, page 53, line 10-page 57, line 18)

(for example, see '680 application, page 6, line 6-page 7, line 25; page 18, line 1-page 19, line 8). |
| 93.  The method of claim 9 [for reducing, in eukaryotic cells, the level of expression of genes which are activated by extracellular influences which induce NF-κB-mediated intracellular signaling, the method comprising reducing NF-κB activity in the cells such that expression of said genes is reduced] wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB. | '516 specification col. 2, lines 27-43; col. 3. line 59-col. 4, line 19; col. 4, lines 23-28; col. 9, line 1-col.10, line 15; col. 12, line 36-col. 13, line 3; col. 13, line 13-col. 14, line 54; col. 15, lines 3-36; col. 15, line 54-col. 17, line 52; col. 35, lines 43-60; col. 36, lines 1-11; col. 36, lines 40-67; col. 37, lines 1-col. 38, line 22 (also discussed at col. 31, line 57-col. 32, line 28); col. 78, lines 43-col. 82, line 11; col. 6, lines 5-55; col. 7, line 1-col. 8, line 67; col. 17, line 53-col. 18, line 24; col. 22, line 9-col. 24, line 46; col. 24, line 57-col. 29, line 46; col. 29, line 57-col. 31, line 56; col. 35, lines 13-42; col. 73, line 57-col. 74, line 50; col. 76, line 11-col. 78, line 42; col. 18, line 52-col. 20, line 25; col. 49, line 63-col. 51, line 41, and generally col. 4, line 54-col. 5, line 44, and generally col. 5, line 59-col. 6, line 4; col. 31, line 57-col. 32, line 63; and all Figures specifically cited in these sections; incorporating disclosure from prior applications, specifically:

'436 application: page 1, line 15-page 3, line 27; page 4, line 15 - page 6, line 8; page 6, lines 13-19; Figures 1 through 4, including "Brief Descriptions" page 6, line 20-page 9, line 24; "Detailed Description of the Invention", page 9, line 25-page 11, line 20; page 12, line 1-page 16. line 2: page 16, line 21-page 17, line |

| '516 Patent Claim No. | Support |
|---|---|
| | 29; page 18, line 18-page 23, line 21; "Use of Methods and Compositions of the Present Invention", page 23, line 22-page 24, line 15, page 24, line 25-page 25, line 4, page 26, line 5-page 27, line 5; page 28 (Table I), page 29, line 1-page 30, line 23; generally page 30, line 26-page 39, line 21; page 39, line 23-page 45, line 8; and all Figures specifically cited in these sections;<br><br>'901 application: page 2, line 4-page 3, line 9; "Summary of the Invention" page 3, line 10-page 4, line 5; "Brief Description of the Drawings," page 4, line 6-page 5, line 31, page 6, line 13-page 10, line 24, "Detailed Description of the Drawings" page 10, line 25-page 12, line 27; page 13, line 1-page 18, line 15; page 18, line 27-page 29, line 32; page 30, line 12-page 34, line 32; page 35, line 1-page 36, line 8; page 38, line 5-page 39, line 5; page 39, line 9-page 40, line 7; page 43, line 7-page 48, line 15 and all Figures specifically cited in these sections;<br><br>'173 application: page 12, line 6-page 16, line 5; page 53, line 10-page 57, line 18, and generally, page 24, line 1-page 34, line 14; and all Figures specifically cited in these sections;<br><br>'680 application: page 1, line 29-page 3, line 4; "Summary of the Invention" page 3, lines 5-30; "Brief Description of the Drawings," page 4, line 1-page 5, line 25; Figs. 1-3; 5-9; page 6, line 6- page 12, line 29, page 13, line 22-page 19, line 8; page 21, line 5-page 24, line 8, page 25, line 7-page 27, line 6; and all Figures specifically cited in these sections.<br><br>Additionally, disclosure relating to underlying science, as well as background to the invention, corresponding to prior applications incorporated by reference in the above applications, may be found in portions of the '516 specification (including Figures cited to) as follows:<br><br>'516 specification, col. 4, lines 29-49; col. 4, line 55-col. 5, line 44, col. 5, line 58-col. 6, line 4; col. 10, line 57-col. 11, line 23; col. 20, line 26-col. 22, line 9; col. 33, line 60-col. 35, line 12; col. 38, line 28-col. 42, line |

| '516 Patent Claim No. | Support |
|---|---|
| | 34; col. 46, line 35-col. 49, line 61; col. 52, line 64-col. 54, line 30; col. 56, line 22-col. 57, line 42; col. 68, line 30-col. 73, line 56; col. 74, line 52-col. 76, line 9. |
| **94 & 95.** The method of claim 9, carried out on human cells. | See response to claim 93, and in particular, '516 specification col. 27, lines 27-43; col. 12, lines 57-col. 13, line 3; col. 13, lines 13-29; col. 17, lines 19-52; col. 37, lines 1-42; col. 49, line 62-col. 51, line 40; col. 78, line 43-col. 79, line 10; col. 79, line 64-col. 80, line 19; col. 81, lines 9-45;<br><br>(for example, see '436 application, page 4, line 15-page 5, line 6; page 11, lines 4-20;page 12, lines 1-19; page 22, line 12-page 23, line 21; page 28; page 31, line 1-page 32, line 2; page 34, line 5-page 35, line 2, page 37, line 8-page 38, line 20)<br><br>(for example, see '901 application, page 3, line 10-page 4, line 5; Fig. 6, page 6, lines 16-18; Fig. 14, page 10, lines 5-24; page 20, line 17-page 23, line 12; page 35, line 1-page 36, line 8; page 38, line 5-page 39, line 5, Example 6)<br><br>(for example, see '173 application, page 53, line 10-page 57, line 18)<br><br>(for example, see '680 application, page 6, line 6-page 7, line 25; page 25, line 8-page 27, line 6). |
| **96.** The method of claim 94 or 95, carried out on immune cells. | See response to claim 93, and in particular, '516 specification col. 27, lines 27-43; col. 12, lines 57-col. 13, line 3; col. 13, lines 13-29; col. 13, line 66-col. 14, line 33; col. 17, lines 19-52; col. 37, lines 1-42; col. 78, line 43-col. 79, line 10; col. 79, line 64-col. 80, line 19; col. 81, line 9-col. 82, line 11;<br><br>(for example, see '436 application, page 4, line 15-page 5, line 6; page 11, lines 4-20;page 12, lines 1-19; page 13, line 29-page 16, line 2; page 22, line 12-page 23, line 21; page 28; page 31, line 1-page 32, line 2; page 34, line 5-page 35, line 2, page 37, line 8-page 39, line 21)<br><br>(for example, see '901 application, page 3, line 10-page |

| '516 Patent Claim No. | Support |
|---|---|
|  | 5, line 31; Figs. 1-3; Figs. 5-13, page 6, line 13-page 10, line 4; page 10, line 25-page 20, line 16; page 20, line 17-page 30, line 28; page 32, line 6-page 36, line 8; page 38, line 5-page 39, line 5, Examples 1, 3-5)

(for example, see '173 application, page 53, line 10-page 57, line 18)

(for example, see '680 application, page 6, line 6-page 7, line 25; page 18, line 1-page 19, line 8). |
| 144.  The method of claim 14 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB. | '516 specification col. 2, lines 27-43; col. 3. line 59-col. 4, line 19; col. 4, lines 23-28; col. 9, line 1-col.10, line 15; col. 12, line 36-col. 13, line 3; col. 13, line 13-col. 14, line 54; col. 15, lines 3-36; col. 15, line 54-col. 17, line 52; col. 35, lines 43-60; col. 36, lines 1-11; col. 36, lines 40-67; col. 37, lines 1-col. 38, line 22 (also discussed at col. 31, line 57-col. 32, line 28); col. 78, lines 43-col. 82, line 11; col. 6, lines 5-55; col. 7, line 1-col. 8, line 67; col. 17, line 53-col. 18, line 24; col. 22, line 9-col. 24, line 46; col. 24, line 57-col. 29, line 46; col. 29, line 57-col. 31, line 56; col. 35, lines 13-42; col. 73, line 57-col. 74, line 50; col. 76, line 11-col. 78, line 42; col. 18, line 52-col. 20, line 25; col. 49, line 63-col. 51, line 41, and generally col. 4, line 54-col. 5, line 44, and generally col. 5, line 59-col. 6, line 4; col. 31, line 57-col. 32, line 63; and all Figures specifically cited in these sections; incorporating disclosure from prior applications, specifically:

'436 application: page 1, line 15-page 3, line 27; page 4, line 15 - page 6, line 8; page 6, lines 13-19; Figures 1 through 4, including "Brief Descriptions" page 6, line 20-page 9, line 24; "Detailed Description of the Invention", page 9, line 25-page 11, line 20; page 12, line 1-page 16, line 2; page 16, line 21-page 17, line 29; page 18, line 18-page 23, line 21; "Use of Methods and Compositions of the Present Invention", page 23, line 22-page 24, line 15; page 24, line 25-page 25, line 4, page 26, line 5-page 27, line 5; page 28 (Table I), page 29, line 1-page 30, line 23; generally page 30, line 26-page 39, line 21; page 39, line 23-page 45, line 8; and all Figures specifically cited in these sections; |

| '516 Patent Claim No. | Support |
|---|---|
|  | '901 application: page 2, line 4-page 3, line 9; "Summary of the Invention" page 3, line 10-page 4, line 5; "Brief Description of the Drawings," page 4, line 6-page 5, line 31, page 6, line 13-page 10, line 24, "Detailed Description of the Drawings" page 10, line 25-page 12, line 27; page 13, line 1-page 18, line 15; page 18, line 27-page 29, line 32; page 30, line 12-page 34, line 32; page 35, line 1-page 36, line 8; page 38, line 5-page 39, line 5;  page 39, line 9-page 40, line 7; page 43, line 7-page 48, line 15 and all Figures specifically cited in these sections;<br><br>'173 application: page 12, line 6-page 16, line 5; page 53, line 10-page 57, line 18, and generally, page 24, line 1-page 34, line 14; and all Figures specifically cited in these sections;<br><br>'680 application: page 1, line 29-page 3, line 4; "Summary of the Invention" page 3, lines 5-30; "Brief Description of the Drawings," page 4, line 1-page 5, line 25; Figs. 1-3; 5-9; page 6, line 6- page 12, line 29, page 13, line 22-page 19, line 8; page 21, line 5-page 24, line 8, page 25, line 7-page 27, line 6; and all Figures specifically cited in these sections.<br><br>Additionally, disclosure relating to underlying science, as well as background to the invention, corresponding to prior applications incorporated by reference in the above applications, may be found in portions of the '516 specification (including Figures cited to) as follows:<br><br>'516 specification, col. 4, lines 29-49; col. 4, line 55-col. 5, line 44, col. 5, line 58-col. 6, line 4; col. 10, line 57-col. 11, line 23; col. 20, line 26-col. 22, line 9; col. 33, line 60-col. 35, line 12; col. 38, line 28-col. 42, line 34; col. 46, line 35-col. 49, line 61; col. 52, line 64-col. 54, line 30; col. 56, line 22-col. 57, line 42; col. 68, line 30-col. 73, line 56; col. 74, line 52-col. 76, line 9. |
| 145.  The method of claim 14, carried out on human cells. | See response to claim 14, and in particular, '516 specification col. 27, lines 27-43; col. 12, lines 57-col. 13, line 3; col. 13, lines 13-29; col. 17, lines 19-52; col. |

| '516 Patent Claim No. | Support |
|---|---|
| | 37, lines 1-42; col. 49, line 62-col. 51, line 40; col. 78, line 43-col. 79, line 10; col. 79, line 64-col. 80, line 19; col. 81, lines 9-45; <br><br>(for example, see '436 application, page 4, line 15-page 5, line 6; page 11, lines 4-20;page 12, lines 1-19; page 22, line 12-page 23, line 21; page 28; page 31, line 1-page 32, line 2; page 34, line 5-page 35, line 2, page 37, line 8-page 38, line 20) <br><br>(for example, see '901 application, page 3, line 10-page 4, line 5; Fig. 6, page 6, lines 16-18; Fig. 14, page 10, lines 5-24; page 20, line 17-page 23, line 12; page 35, line 1-page 36, line 8; page 38, line 5-page 39, line 5, Example 6) <br><br>(for example, see '173 application, page 53, line 10-page 57, line 18) <br><br>(for example, see '680 application, page 6, line 6-page 7, line 25; page 25, line 8-page 27, line 6). |
| 146.  The method of claim 14 or 145, carried out on immune cells. | See response to claim 14, and in particular, '516 specification col. 27, lines 27-43; col. 12, lines 57-col. 13, line 3; col. 13, lines 13-29; col. 13, line 66-col. 14, line 33; col. 17, lines 19-52; col. 37, lines 1-42; col. 78, line 43-col. 79, line 10; col. 79, line 64-col. 80, line 19; col. 81, line 9-col. 82, line 11; <br><br>(for example, see '436 application, page 4, line 15-page 5, line 6; page 11, lines 4-20;page 12, lines 1-19; page 13, line 29-page 16, line 2; page 22, line 12-page 23, line 21; page 28; page 31, line 1-page 32, line 2; page 34, line 5-page 35, line 2, page 37, line 8-page 39, line 21) <br><br>(for example, see '901 application, page 3, line 10-page 5, line 31; Figs. 1-3; Figs. 5-13, page 6, line 13-page 10, line 4; page 10, line 25-page 20, line 16; page 20, line 17-page 30, line 28; page 32, line 6-page 36, line 8; page 38, line 5-page 39, line 5, Examples 1, 3-5) <br><br>(for example, see '173 application, page 53, line 10- |

| '516 Patent Claim No. | Support |
|---|---|
|  | page 57, line 18) <br><br> (for example, see '680 application, page 6, line 6-page 7, line 25; page 18, line 1-page 19, line 8). |

XII.    **Materials Considered for Opinions**

A.    **Depositions**

Baeuerle, Patrick; December 1, 2004.

Baldwin, Albert S., Jr.; October 26, 2004.

Baltimore, David; August 23, 2004.

Fan, Chen-Ming; October 21, 2004.

Lebowitz, Jonathan; June 28, 2004.

Lenardo, Michael J.; October 22, 2004.

Maniatis, Thomas P.; November 10, 2004.

Sen, Ranjan; October 12, 2004.

Sharp, Phillip A.; November 9, 2004.

Singh, Harinder; June 30, 2004.

B.    **Case Documents**

Answer

Complaint, June 25, 2002

Latchman Report

Barnes Report

Memorandum of Decision and Order, March 3, 2004 (Claim Construction)

Plaintiffs Ariad Pharmaceuticals, Inc et al. Third Supplemental Response to Eli Lilly & Co.'s First Set of Rule 33 Interrogatories (Nos. 1-5)

U.S. Pat. No. 5,50,365

U.S. Pat. No. 5,625,136

U.S. Pat. No. 5,804,374

U.S. Pat. No. 5,939,421

U.S. Pat. No. 6,060,310

U.S. Pat. No. 6,410,516

U.S. Pat. No. 6,841,371

U.S. Ser. No. 06/817,441, filed Jan. 9, 1986

U.S. Ser. No. 06/946,365, filed Dec. 24, 1986

U.S. Ser. No. 07/162,680, filed Mar. 1, 1988

U.S. Ser. No. 07/155,207, filed Feb. 12, 1988

U.S. Ser. No. 07/280,173, filed Dec. 5, 1988

U.S. Ser. No. 07/318,901, filed Mar. 3, 1989

U.S. Ser. No. 07/341,436, filed Apr. 21, 1989

U.S. Ser. No. 07/791,898, filed Nov. 13, 1991

U.S. Ser. No. 08/464,364, filed Jun. 5, 1995

WO/9002809

WO/9015070


## C.    Publications and Patents

1. Arruda et al. "Regional intravascular delivery of AAV-2-F.IX to skeletal muscle achieves long-term correction of hemophilia B in a large animal model" Blood (2005) 105(9):3458-64.

2. Badger et al. "Reversal of Histamine-Mediated Immunosuppression by Structurally Diverse Histamine Type II (H2) Receptor Antagonists" Int. J. Immunopharmac. (1984) 6(5):467-473.

3. Ballard et al. "The v-rel oncogene encodes a kappa B enhancer binding protein that inhibits NF-kappa B function." Cell (1990 Nov. 16) 63(4):803-14.

4. Bass et al. Proteins Structure, Function and Genetics (1990) 8:309-314.

5. Berns et al. "Fluorescent ligands, used in histocytochemistry, do not discriminate between estrogen receptor-positive and receptor-negative human tumor cell lines" Breast Cancer Res Treat. (1984) 4(3):195-204.

6. Boda et al. "Interaction of Protein- and DNA-Loaded Liposomes with Sperm Cells" Folia Biol (Praha) (1987) 33(2):93-97.

7. Bressler et al. "Mutational Analysis of the p50 Subunit of NF-$\kappa$B and Inhibition of NF-$\kappa$B Activity by *trans*-Dominant p50 Mutants" J. Virol. (1993) 67:288-293.

8. Brown et al. "Control of I kappa B-alpha proteolysis by site-specific, signal-induced phosphorylation," Science. 1995 Mar 10; 267(5203):1485-1488.

9. Brown, et al. Methods in Enzymology, Vol. 68, New York: Academic Press, (1979) pgs. 109-151.

10. Cai et al. "I$\kappa$B$\alpha$ Overexpression in Human Breast Carcinoma MCF7 Cells Inhibits Nuclear Factor-$\kappa$B Activation but Not Tumor Necrosis Factor-$\alpha$-Induced Apoptosis" J Biol Chem. (1997) 272(1):96-101.

11. Cunningham et al. "High Resolution Epitope Mapping of hGH-Receptor Interactions by Alanine-Scanning Mutagenesis" Science (1989) 244:1081-1085.

12. Davis et al. "Rel-Associated pp40: An Inhibitor of the Rel Family of Transcription Factors" Science (1991) 253: 1268-1271.

13. Du et al. "NF-κB mediates amyloid β peptide-stimulated activity of the human apolipoprotein E gene promoter in human astroglial cells" Molecular Brain Research (2005) 136:177-188.

14. Esslinger et al. "Abnormal T Lymphocyte Development Induced by Targeted Overexpression of IκBα" J Immunol. (1997) 158(11):5075-8.

15. Fenteany et al. "Inhibition of Proteasome Activities and Subunit-Specific Amino-Terminal Threonine Modification by Lactacystin" Science (1995) 268:5211.

16. Fiedler et al. "Inhibition of TNF-α-induced NF-κB Activation and IL-8 Release in A549 Cells with the Proteasome Inhibitor MG-132" Am. J. Resp. Cell Mol. Biol. (1998) 19:259.

17. Fujihara et al. "A D-Amino Acid Peptide Inhibitor of NF-kB Nuclear Localization is Efficacious in Models of Inflammatory Disease" J Immunology (2000) 165:1004.

18. Gallop et al. "Applications of Combinatorial Technologies to Drug Discovery. 1. Background and Peptide Combinatorial Libraries" J. Med. Chem. (1994) 37:1233.

19. Gehrt et al. "Cycloepoxydon, 1-Hydroxy-2-hydroxymethyl-3-pent-1-enylbenzene and 1-Hydroxy-2-hydroxymethyl-3-pent-1,3-dienylbenzene, New Inhibitors of Eukaryotic Signal Transduction" J. Antibiotics (1998) 51:455-463.

20. Gesner et al. "Specific Binding, internalization and degradation of human recombinant interleukin-3 by cells of the acute myelogenous, leukemia line, KG-1" J Cell Physiol. (1988) 136(3): 493-499.

21. Gill & Ptashne "Negative effect of the transcriptional activator GAL4" Nature (1988) 334:721-724.

22. Haskill et al. "Characterization of an Immediate-Early Gene Induced in Adherent Monocytes That Encodes IκB-like Activity" Cell (1991) 65:1281-1289.

23. Horuk, Richard "A rapid and direct method for the detection and quantification of interleukin-q receptors using 96 well filtration plates" J Immunological Methods (1989) 119:255-258.

24. Hoyos "Kappa B-specific DNA binding proteins: role in the regulation of human interleukin-2 gene expression," Science (1989) 244(4903):457-60.

25. Kawamura et al. "Intravenous injection of oligonucleotides.." Gene Therapy (2001) 905-912.

26. Khaled et al. "Use of phosphorothionate-modified oligodeoxynucleotides to inhibit NF-κB expression and lymphocyte function," Clin. Immunology and Immunopathology (1998) 86:170-179.

27. Krappman et al. "Different mechanisms control signal-induced degradation and basal turnover of the NF-κB inhibitor IκBα in vivo" EMBO J. (1996) 15(23):67176.

28. Kumar et al. "Emodin (3-methyl-1,6,8-trihydroxyanthraquinone) inhibits TNF-induced NF-κB activation, IκB degradation, and expression of cell surface adhesion proteins in human vascular endothelial cells" Oncogene (1998) 17:913-918.

29. Lenardo & Baltimore "NF-κB: A Pleiotropic Mediator of Inducible and Tissue-Specific Gene Control" Cell (1989) 58:227-229.

30. Leung Methods Cell Mol. Biol. (1989) 1:11-19.

31. Lloyd et al. "Transformation suppressor activity of a Jun transcription factor lacking its activation domain" Nature (1991) 352(6336):635-8.

32. Logeat et al. "Inhibition of transcription factors belonging to the rel/NF-κB family by a transdominant negative mutant" EMBO J (1991) 10(7):1827-32.

33. Lyss et al. "The Anti-inflammatory Sesquiterpene Lactone Helenalin Inhibits the Transcription Factor NF-κB by Directly Targeting p65" JBC (1998) 272(50): 33508-33516.

34. Maniatis et al. Molecular Cloning: A Laboratory Manual, Vol. 1-3, New York: Cold Springs Harbor Laboratory Press, 1989.

35. McKinsey et al. "Phosphorylation of the PEST Domain of the IκBβ Regulates the Fuction of NF-κB/IκBβ Complexes" J. Biol. Chem. (1997) 272:22377.

36. McKnight & Kingsbury "Transcriptional Control Signals of a Eukaryotic Protein-Coding Gene" Science (1982) 232:316.

37. Meng et al. "Epoxomicin, a potent and selective proteasome inhibitor, exhibits in vivo antiinflammatory activity" Proc Natl Acad Sci USA (1999) 96:10403-10408.

38. Myers Science (1986) 232:316.

39. Miller et al. "A Short Course in Bacterial Genetics" Cold Spring Harbor (review), 1992.

40. Morishita et al. "In vivo transfection of cis element "decoy" against nuclear factor-κB binding site prevents myocardial infarction" Nature Med. (1997) 3:894-899.

41. Nabel et al. "Immune response in human melanoma after transfer of an allogeneic class I major histocompatibility complex gene with DNA-liposome complexes" (1996) P.N.A.S. 93 15388-15393.

42. Nicolau et al. "Liposomes for gene transfer and expression *in vivo*" Ciba Found. Sym. (1984) 103: 245.

43. Palombella et al. "Role of the proteasome and NF-$\kappa$B in streptococcal cell wall-induced polyarthritis" Proc Natl Acad Sci USA (1998) 95:15671-15676.

44. Ray et al. "Cloning of a Differentially Expressed I$\kappa$B-related Protein" J. Biol. Chem. (1995) 270(18):10680-10685.

45. Reisine et al. "Corticotropin-releasing factor-induced adrenocorticotropin hormone release and synthesis is blocked by incorporation of the inhibitor of cyclic AMP-dependent protein kinase into anterior pituitary tumor cells by liposomes" Proc. Natl. Acad. Sci. (1985) 82:8261-8265.

46. Roberts "Ideas and Trends: A Step Closer to Gene Transplants" *The New York Times* September 29, 1985 (Sec.4, Pg.6, Col.1).

47. Roozemond et al. "Lysis of Natural Killer-Sensitive and -Resistant Tumor Cells by Natural Killer Cytotoxic Factors (NKCF)-Containing Liposomes" Immunobiology (1987) 176: 35-46.

48. Sawa et al. "A Novel Strategy for Myocardial Protection Using In Vivo Transfection of *cis* Element "Decoy" Against NF$\kappa$B Binding Site: Evidence for a Role of NF$\kappa$B in Ischemia-Reperfusion Injury" Circulation (1997) 96(9):280-284.

49. Schindler et al. "IL-1 Induces IL-1: IV. IFN-$\gamma$ Suppresses IL-1 but Not Lipopolysaccharide-Induced Transcription of IL-1" J Immunol. (1990) 144(6):2216-22.

50. Scott & Smith "Searching for Peptide Ligands with an Epitope Library" Science (1990) 249(4967):386-390.

51. Shakhov et al. "$\kappa$B-Type Enhancers are Involved in Lipopolysaccharide-Mediated Transcriptional Activation of the Tumor Necrosis Factor $\alpha$ Gene in Primary Macrophages" J Exp Med. (1990) 171(1): 35-47.

52. Sun "Gene Therapy Guidelines Approved" Science (1985) 230:302.

53. Tomita et al. "Transcription factor decoy for nuclear factor-$\kappa$B inhibits tumor necrosis factor-$\alpha$-induced expression of interleukin-6 and intracellular adhesion molecule-1 in endothelial cells" J. Hypertension (1998) 16(7):993-1000.

54. Treppicchio "IGH minisatellite suppression of USF-binding-site- and E mu-mediated transcriptional activation of the adenovirus major late promoter." Nucleic Acids Res. (1993) 21(4):977-85.

55. Tung et al. "The v-rel oncogene product is complexed to a 40-kDa phosphoprotein in transformed lymphoid cells" Proc Natl Acad Sci (1988) 85(8):2479-83.

## CERTIFICATE OF SERVICE

I, Denise Lopez, hereby certify that on October 21, 2005, true and correct copies of the Rule 26(a)(2) Report of Bert Spilker, Ph.D., M.D. with attached CD, the Rule 26(a)(2) Rebuttal Report of George R. Stark, Ph.D. with attached CD, the Rule 26(a)(2) Rebuttal Report of Thomas R. Kadesch, Ph.D. with attached CD, the Expert Report of Jeffrey V. Ravetch, M.D., Ph.D. with attached CD, and the Expert Report of Dr. Stephen Prescott with Attached CD, were served by the indicated means to the persons at the addresses listed:

Grantland Drutchas
    (via Federal Express and e-mail)
McDonnell Boehnen Hulbert & Berghoff
300 South Wacker Drive
Chicago, IL 60606-6709
Phone: (312) 913-0001
Fax: (312) 913-0002

Denise Lopez

Exhibit E

37

1  learning how to interpret the literature, and learning how to
2  do the type of experiments that would be required.
3          MS. BEN-AMI:  So we have that a little out of order,
4  but I think everyone agrees that will be our standard.
5  Q.    Now back to you, Doctor.
6          THE COURT:  Members of the jury, this is an
7  important concept.  I didn't mean to diminish it in any way.
8  But as I was working on the instructions that I'm going to
9  give you, it just seemed to me that there wasn't any dispute
10 about this particular issue.  So now we understand.
11         MS. BEN-AMI:  It's important to understand what that
12 person is.
13         THE COURT:  Right.
14 Q.    So, Doctor, just to give the jury some background, would
15 you tell the jury a little bit about yourself, your training?
16 A.    Yes.  I was trained primarily in California.  I started
17 at the University of California at Santa Barbara as an
18 undergraduate and got my B.S. in biochemistry.
19         I then went on to the University of California at
20 Berkeley to do my Ph.D. training.  I also got a Ph.D. in
21 biochemistry.
22         I then went onto Stanford University where I did my
23 post-doctoral training in the lab of Paul Berg, who at that
24 time had just won the Nobel Prize, so it was a very exciting
25 and stimulating environment at Stanford.  I spent three years

38

1  at Stanford.
2          I then was jointly recruited to the University of
3  Pennsylvania by the Department of Genetics and the Howard
4  Hughes Medical Institute, and I'm currently a professor of
5  genetics at the University of Pennsylvania, where I've been
6  for the last twenty-one years.
7  Q.    And what type of research do you do?
8  A.    Well, I do a number of things, obviously, as a professor
9  there.  The primary one is to conduct research.  I run a
10 research lab, and I do the type of experiments you've heard
11 about in the time frame of 1989-early nineties, I was actually
12 competing with the labs of Dr. Sharp and Dr. Baltimore.
13         And so, I was very interested in the types of
14 regulatory genes that would turn on and off antibody genes.
15 So I was very familiar with the literature.  I would go to
16 scientific meetings where these issues would be discussed.
17         I also teach.  That's an important part of my job
18 description.  It's something I really enjoy doing.  And during
19 the early nineties, I was also an editor of a journal called
20 Molecular and Cellular Biology.  This was a very high-profile
21 journal that publishes many papers on transcriptional
22 regulation.
23 Q.    Let me stop here and ask you to open your binder and look
24 at PTX 406.
25 A.    Yes.

39

1  Q.    If we look down at the bottom of the first page, can you
2  tell us about your work as an editor, of being on the
3  editorial board?
4  A.    So these are positions that are not volunteer positions.
5  You are asked to join the editorial board of these journals
6  because you're recognized in certain areas.  But then as an
7  editor, this is also a very prestigious position in the sense
8  that you are recognized by your peers to be able to do the job
9  as editor.
10         What that involves is to receive submitted
11 manuscripts, to send them to referees to establish whether the
12 manuscripts are of high quality.  Then as an editor you have
13 to interpret the reviews of those manuscripts and come up with
14 a verdict, in a sense, to tell the author whether the paper is
15 going to be accepted, rejected, or whether the authors have to
16 modify the paper before they can get it published.
17         So, every week I may have handled twenty to thirty
18 papers a month, which was quite a bit of work.  And I had to
19 come up with an assessment of whether these publications were
20 of high enough scientific quality to merit publication in that
21 journal.
22         MS. BEN-AMI:  Now, with that in mind, your Honor, I
23 would like to offer Dr. Kadesch as an expert in molecular
24 biology.
25         MR. DRUTCHAS:  No objection.

40

1  Q.    Now, can you just give the jury an overview about what
2  are going to be the topics that you are going to discuss
3  today?
4  A.    I was asked to review generally two things:  The 1989
5  application, in addition to the '516 patent and, in general
6  terms, to decide whether or not these were adequately
7  described and whether or not the patents were enabled; that
8  is, whether you could do the experiments that were proposed in
9  these patents.
10 Q.    And now, have you looked at Claim 80 and Claim 95, Claim
11 144, Claim 145?
12 A.    Yes, I have.
13 Q.    And as a scientist, are they clear to you?
14 A.    Yes.
15 Q.    And do you understand what's within them and outside of
16 them?
17 A.    Yes, I do.
18 Q.    Now, to go ahead and understand whether --  strike that.
19         When you were doing your analysis of whether there
20 was sufficient written description and sufficient enablement,
21 did you make any assumptions or understandings of what the
22 test was?
23 A.    Yes, I did.  I understood that it was important to
24 understand what someone of ordinary skill in the art could do,
25 and I also understood that it was very important to take into

41

1  account the prior art that somebody of ordinary skill would
2  know of prior to reading the claims in the patent.
3  Q.  All right.  So let's look at PTX 1598, please.
4      MR. DRUTCHAS:  Your Honor, if we may approach, I
5  have an objection with respect to several of these slides that
6  we think are basically trying to state the law.  Of course,
7  that's what you'll be doing in your jury instructions.
8      MS. BEN-AMI:  These are the assumptions he made
9  based on his understanding, just like Dr. Latchman put up a
10 slide with eight factors that he said were the law.
11     THE COURT:  May I see what you have there?
12     MS. BEN-AMI:  Sure.
13     (Side-bar conference off the record).
14     THE COURT:  Members of the jury, what we're hung up
15 on is whether legal propositions are being put before the
16 witness that he is now trying to fill in with his
17 understanding of the science.  And we have agreed not to put
18 these on the board because I will have to tell you what the
19 law is.  I have to figure out what the law is and then tell
20 you what the law is.
21     In the meantime, to the extent that the witness makes
22 certain assumptions, they may or may not be attacked by the
23 cross examiner, but the same applies that I've told you
24 before, if the assumptions are not based on the correct law or
25 they're not based on the facts as you find them, then the

42

1  ultimate conclusion is not worth very much to you.
2      So, listen carefully to the assumptions and to the
3  extent they may or may not be undermined on cross examination
4  or disputed by me when I tell you what the law is.  I know
5  that's a huge task, but nonetheless, you're up to it.
6  Q.  You're here to give scientific opinions?
7  A.  Thank goodness.
8  Q.  But we need some context for those scientific opinions.
9  We need to have some idea what we're talking about?
10 A.  I would hope so, yes.
11 Q.  And so, looking at your copy -- do you have PTX -- he
12 doesn't have them.
13     Doctor, what, as you're going through and explaining
14 written description, just as an overview, what do you
15 understand the task is?
16 A.  The task, as I understand it, again, written description
17 is not a term we use in science.  But my understanding of what
18 written description is is whether or not the inventors were in
19 possession of their invention.  Did they adequately describe
20 it in the sense that they owned it, in a sense.
21 Q.  And what about enablement?  From a scientific view,
22 having read these things, what is enablement as you understand
23 it?
24 A.  Well, we saw an example of that where in the last
25 testimony there was a reference to how something was done.

43

1  And basically, as a scientist, when you read a scientific
2  paper, there are descriptions of how the experiments were
3  done, and these are intended to allow people to repeat the
4  experiments themselves if they choose to.
5      And so, within this application, I used that same
6  sort of benchmark in the sense that could these claims have
7  been practiced and was there sufficient description of what
8  they were talking about so that I could have practiced those
9  claims.
10 Q.  And the time frame we're looking at is 1989 to 1991?
11 A.  Yes.
12 Q.  So, when you look at the patent application and you're
13 now imagining, you're back in 1989, 1991, right?
14 A.  Yes.
15 Q.  And you're doing that, are you allowed, since you're the
16 person -- first of all, let me stop.
17     The person of ordinary skill in the art is actually a
18 hypothetical person, right?
19 A.  Yes.  This is, again, where I think maybe the law differs
20 from science.  We don't deal with hypothetical people, and the
21 law clearly does.
22     What's interesting here is that this hypothetical
23 person, as I understand it, knows all of the literature, and
24 they would maybe have the ability to do a number of
25 techniques.

44

1      THE COURT:  Well, it's that person we talked about a
2  moment ago.
3      MS. BEN-AMI:  Yes.  It's not a real person; it's a
4  hypothetical.
5      THE COURT:  I understand that.
6      MR. DRUTCHAS:  Part of the problem, your Honor, is
7  there's obviously different standards with respect to what
8  that hypothetical person knows with respect to enablement or
9  written description.  It's a question that I'm not going to be
10 able to cross this witness on, your Honor.
11     THE COURT:  You're saying there's a different
12 standard for a person skilled in the art --
13     MR. DRUTCHAS:  Written description requires that the
14 entire content be contained within the four corners of the
15 document.
16     MS. BEN-AMI:  That's not right.
17     MR. DRUTCHAS:  Whereas enablement, they're allowed
18 to perhaps take advantage of other prior art or post art that
19 may help inform the person of ordinary skill in the art.  So
20 the ordinary skill in the art doesn't change --
21     THE COURT:  What the person can use.
22     MS. BEN-AMI:  That's not right.
23     MR. DRUTCHAS:  -- what the person can use.  That's
24 where we have differences.  We hope the jury instructions will
25 clarify.

45

1       MS. BEN-AMI:   This is really --
2       THE COURT:   Ms. Ben-Ami, please don't do that.
3       MR. DRUTCHAS:   Having the witness here testify as to
4   what the law is is something that I think is going to be very
5   difficult to try to correct on cross and we're not even going
6   to be able to address until you give the jury instructions,
7   your Honor.
8       THE COURT:   Now, is it not the case that with
9   respect to enablement the person skilled in the art who is
10  looking at the patent can go not only to the patent but to a
11  bunch of other sources and use his own knowledge to figure it
12  out?
13      MS. BEN-AMI:   That is correct.
14      THE COURT:   Now, with respect to written
15  description, we're talking the patent itself.
16      MS. BEN-AMI:   The patent does not teach, need not
17  teach, and preferably omits that which is known in the art,
18  written description law.
19      MR. DRUTCHAS:   It's not the entire scope of prior
20  art, your Honor.
21      THE COURT:   No, but you need to look at the
22  invention itself, at the disclosure of the invention itself,
23  in the patent.  Obviously, you don't leave your skill behind.
24      MS. BEN-AMI:   Right.  And the skill is what's
25  conventional in the art.  That's what the hypothetical person

46

1   does.
2       THE COURT:   Right.  But you don't go and look at a
3   whole bunch of references and decide then.  It is what this
4   highly skilled person knows.
5       MS. BEN-AMI:   What the highly skilled person knows
6   is what's conventional in the art.  So how do you show what's
7   conventional in the art?  You look at what was known in the
8   art.
9       THE COURT:   But you look at the whole thing, but you
10  don't cite specific references.  It's what the person knows
11  from having practiced in this field.
12      MS. BEN-AMI:   Yes, but to prove what the person
13  knows, you have to be able to say what was known.
14      THE COURT:   I'm not sure that I follow that.  I
15  mean, the person is already there, fully skilled, fully
16  knowledgeable.
17      MS. BEN-AMI:   Yes.
18      THE COURT:   So we're not going to cite any specific
19  references that inform that person's review of this patent.
20      MS. BEN-AMI:   Okay, but that person then knows these
21  things.
22      THE COURT:   Yes.
23      MS. BEN-AMI:   So we can talk about what that person
24  knows.
25      MR. DRUTCHAS:   Your Honor, for written description,

47

1   one can't even incorporate by reference a document that is
2   specifically cited in the patent application.  They're now
3   going into documents that were never cited in the application.
4       THE COURT:   They're not doing that.
5       MR. DRUTCHAS:   Thank you, your Honor.
6       MS. BEN-AMI:   For enablement we can do that.
7       THE COURT:   Yes.
8       MS. BEN-AMI:   And for written description we can
9   talk about what the ordinary skilled person knew.
10      THE COURT:   You've already defined that ordinary
11  skilled person.
12      MS. BEN-AMI:   So now I'm not certain it's all clear,
13  but we'll carry on.
14  Q.   When you heard what Dr. Latchman testified, did he talk
15  about what was known in the art?
16  A.   Either directly or indirectly, yes.
17  Q.   Now, you heard Dr. Latchman say that he didn't think that
18  the patent was enabled, and he didn't think that it described
19  the invention.  Do you recall that?
20  A.   Yes.
21  Q.   Do you agree or disagree?
22  A.   I disagree.
23  Q.   And what do you think the source of the disagreement is?
24  A.   Well, again, I'm speaking broadly.  I think that there
25  are two general areas where Dr. Latchman and I would disagree.

48

1   One is what the person of ordinary skill in the art actually
2   is, who that person is and what that person knows, and what
3   that person is capable of doing.
4       The second is what was known in the art at the time,
5   what was known and, as a consequence, you would have in your
6   mind as you read the claims and thereby use that information
7   in order to practice the claims.
8   Q.   Now, have you read the '516 patent?
9   A.   I have read the '516 patent.
10  Q.   And have you --
11      THE COURT:   All of it?
12      THE WITNESS:   Yes, yes.
13      MS. BEN-AMI:   Someone has to.
14      THE WITNESS:   No one asked me if it was fun to read.
15  Q.   Have you read the 1989 application, Doctor?
16  A.   I've also read that word for word.
17  Q.   You haven't memorized it, though?
18  A.   No.
19  Q.   Now, based on your review of these documents and your
20  understanding as to what someone skilled in the art would know
21  in the time frame 1989 to 1991, have you drawn any conclusions
22  regarding the sufficiency of the disclosure, first we'll say
23  of the '516 patent?
24  A.   Yes.  I think it was sufficient.
25  Q.   And was it sufficient to show that the inventors were in

49

1 possession of the invention that's claimed in the four claims
2 we're talking about here?
3   A.   As I understand the law, yes, it was.
4   Q.   And in your opinion, can you tell us, putting yourself
5 back into 1991 for the moment, based on the conventional
6 knowledge in the art, in your opinion would someone of
7 ordinary skill in the art as defined understand that the
8 inventors had really invented what they said?
9   A.   Absolutely.
10   Q.   And that's based on what was conventional and known in
11 the art at the time?
12   A.   Yes, and the description of the patent itself.
13   Q.   Now, let's look at the 1989 application for a moment.
14 Same question.
15       Let me just back up for a second. No, let's just
16 look at the 1989 application for the moment.
17       In your opinion, does the 1989 application, going
18 back in time, imagining someone with skill in the art had
19 looked at it in 1989, given the conventional knowledge at the
20 time, in your opinion would that have shown that the inventors
21 were in possession of the claimed invention?
22   A.   Yes.
23   Q.   And that's based on your understanding of what was known
24 at the time?
25   A.   That was certainly a big part, yes.

50

1   Q.   Plus what's in the application?
2   A.   Yes.
3       MS. BEN-AMI:   Can I have DTX 214, please -- can I
4 have PTX 1635?
5   Q.   Doctor, this is an excerpt from the April '89
6 application.
7   A.   Yes, it is.
8   Q.   Do you have PTX 16 -- you have DTX 214?
9   A.   I'm not sure. Yes, here it is.
10   Q.   Could you pull it out of there and just show to the jury
11 what you're looking at so the jury has some idea so when you
12 look at excerpts we see what the real thing is.
13       And that's the April '89 application?
14   A.   Yes, it appears so.
15   Q.   So you read that?
16   A.   Yes.
17   Q.   And now, looking at what is in the back of the claim, in
18 the back of this application, Doctor, could you show the jury
19 page 49, 50, 51, 52? Can you just show the jury what's at the
20 back?
21   A.   Did you say 49 and 50?
22   Q.   Yes, where the claims were.
23   A.   Well, here's page 49.
24   Q.   Can you tell the jury what that is?
25   A.   So, this is a listing of the claims that the patent, the

51

1 application uses, describes.
2   Q.   So, looking at the original applications as filed in
3 April 1989, did the applicants at that time say that they had
4 invented a method of inhibiting NF-kappaB?
5   A.   Yes, they did.
6   Q.   And is that reflected in the actual application itself?
7   A.   Yes, it is.
8   Q.   So, it's not something that was made up in 2000 or 2001?
9   A.   No.
10   Q.   It was in the actual application in 1989?
11   A.   Yes, it was.
12   Q.   Now, do the original claims as reflected in 1989 have any
13 influence on your opinion?
14       MR. DRUTCHAS:   Your Honor, I've been giving Ms.
15 Ben-Ami quite a bit of leeway before objecting. All of these
16 questions have been leading, about the last twenty questions.
17       THE COURT:   Okay. Go ahead. Don't lead.
18   Q.   Can you tell us whether or not this portion of the
19 application tells you anything related to your opinion?
20       MR. DRUTCHAS:   Again, these are still leading
21 questions, your Honor. The question is what is his opinion
22 not can you tell us whether or not.
23       THE COURT:   You know, with experts it really is less
24 important not to lead than with a fact witness.
25       MS. BEN-AMI:   I appreciate the concept of no leading

52

1 now with the final last witness, your Honor.
2   A.   Could you repeat your question, please? I'm sorry.
3   Q.   In deciding whether the April 1989 application provides
4 sufficient written description, what did you rely on?
5   A.   I relied on what was in the application itself,
6 obviously.
7   Q.   And are these claims in the application?
8   A.   Yes, the claims are in the application. They essentially
9 sum up what the application is about.
10   Q.   And could we look at Claim 18 and 19 in the back of that
11 application?
12   A.   Yes.
13       MS. BEN-AMI: And could we have PTX 1636?
14   Q.   Can you explain to the jury what this is?
15   A.   Well, this is one of the claims. I can read it for you,
16 if you would like, but it basically involves negatively
17 regulating the activity of NF-kappaB, as we've been
18 discussing, I guess you guys have been discussing for the last
19 three weeks.
20   Q.   And can you tell us what those G's and all of that is?
21   A.   Well, that is the binding site, in this case presented as
22 a consensus of what the average binding site would look like,
23 not necessarily specific binding site.
24       Those Y's, for example, are pyrimidines, and that can
25 be one of two different types of bases. So that's clearly not

Exhibit F



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 02-11280-RWZ

ARIAD PHARMACEUTICALS, INC.,
MASSACHUSETTS INSTITUTE OF TECHNOLOGY,
THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,
and THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE

v.

ELI LILLY & COMPANY

## QUESTIONS TO THE JURY ON SPECIAL VERDICT

April 28, 2006

ZOBEL, D.J.

**INFRINGEMENT**

**Evista**

1 (a)   Does a patient who takes Evista in accordance with the product label for

prevention and/or treatment of osteoporosis infringe claim 80 and/or claim 95 of the

'516 patent?

Claim 80:   YES___ X___   NO_____

Claim 95:   YES___ X___   NO_____

If the answer is YES as to one or both claims, please answer the corresponding

part of Questions 1 (b) and 1 (c).

If the answer is NO as to both claims, please answer next Question 2 (a).

### Inducement to Infringe

1 (b) Did defendant Eli Lilly induce infringement of claim 80 and/or claim 95 by selling or causing a third party to sell Evista to such patients?

Claim 80:    YES___✓___    NO_____

Claim 95:    YES___✓___    NO_____

### Contributory Infringement

1 (c) Did defendant Eli Lilly contributorily infringe claim 80 and/or claim 95 by selling or causing a third party to sell Evista?

Claim 80:    YES___✗___    NO_____

Claim 95:    YES___✓___    NO_____

## Xigris

2 (a) Does a patient who takes Xigris in accordance with the product label for treatment of severe sepsis infringe claim 144 and/or claim 145?

Claim 144:    YES___✗___    NO_____

Claim 145:    YES___✗___    NO_____

If the answer is YES as to one or both claims, please answer the corresponding part of Questions 2 (b) and 2 (c).

If the answer is NO as to both claims, please answer next Question 3.

### Inducement to Infringe

2 (b) Did defendant Eli Lilly induce infringement of claim 144 and/or claim 145 of the '516 patent by selling or causing a third party to sell Xigris?

Claim 144:    YES___✗___    NO_____

Claim 145    YES___✗___    NO_____

2

Contributory Infringement

2 (c) Did defendant Eli Lilly contributorily infringe claim 144 and/or claim 145 by selling or causing a third party to sell Xigris?

Claim 144:  YES___X___    NO_____

Claim 145:  YES___X___    NO_____

Please answer next Questions 3 and 4 through 7 as to all claims.

## VALIDITY

Filing Date

3.  The effective filing date of the '516 patent is

a)  April 21, 1989        ___X___

b)  November 13, 1991    _____

Anticipation

4.  Are one or more of the asserted claims of the '516 patent invalid because the claimed process was anticipated by a single prior art publication or reference?

Claim 80:   YES_____    NO___X___

Claim 95:   YES_____    NO___X___

Claim 144:  YES_____    NO___X___

Claim 145:  YES_____    NO___X___

5.  Are one or more of the asserted claims of the '516 patent invalid because the claimed process was anticipated by prior public use?

Claim 80:   YES_____    NO___X___

Claim 95:   YES_____    NO___X___

Claim 144:  YES_____    NO___X___

3

Claim 145:   YES_____      NO___X___

Enablement

6. Are one or more of the asserted claims of the '516 patent invalid for failing to

satisfy the enablement requirement?

Claim 80:    YES_____      NO___X___

Claim 95:    YES_____      NO___X___

Claim 144:   YES_____      NO___X___

Claim 145:   YES_____      NO___X___

Written Description

7. Are one or more of the asserted claims of the '516 patent invalid for failure to

satisfy the written description requirement?

Claim 80:    YES_____      NO___X___

Claim 95:    YES_____      NO___X___

Claim 144:   YES_____      NO___X___

Claim 145:   YES_____      NO___X___

If you found infringement of one or more claims and also that those claims are

valid, please answer next the questions concerning damages. That is, if you

answered YES to one or more parts of Questions 1 and 2, and NO to each

corresponding part of Questions 3 through 7, please answer next the

corresponding questions concerning damages.

If you found either no claims to be infringed by answering NO to all parts of

Questions 1 and 2, or if you found all infringed claims  to be invalid by answering

YES to all parts of Questions 3 through 8, please return your verdict to the court.

4

## DAMAGES

### Reasonable Royalty

8. What is the reasonable royalty for infringement of any valid claim?

_2.3_ %

### Evista

9 (a) What amount of Evista Net Sales should serve as the royalty base for computing damages?

$ _2,418,553,338.00_

9 (b) The amount of damages attributable to Evista sales is

$_____

### Xigris

10 (a) What amount of Xigris sales should serve as the royalty base for computing damages?

$ _415,513,335.00_

10 (b) The amount of damages attributable to Xigris sales is

$_____

### Pre-Judgment Interest

11 (a) Should pre-judgment interest by awarded on the amounts determined in Questions 9 (b) and 10 (b)?

YES_____    NO__X____

If the answer to Question 11 (a) is YES, please answer Question 11 (b).

If the answer to Question 11 (a) is NO, please return your verdict to the court.

11 (b) The rate of pre-judgment interest is _____%

_5-4-06_
DATE

_Janie E. Crassman_
FOREPERSON'S SIGNATURE

5

## MEANING OF CLAIM TERMS

| Term | Court's Construction |
|------|----------------------|
| Reducing NF-κB Activity | Decreasing the function of NF-κB to act as an intracellular messenger that regulates transcription of particular genes, in response to certain stimuli |
| Reducing Binding of NF-κB to NF-κB Recognition Sites on Genes Which Are Transcriptionally Regulated by NF-κB | Decreasing binding of NF-κB to DNA sequences specifically recognized by NF-κB, where such DNA sequences are in genes whose transcription is regulated by increasing or decreasing NF-κB activity, and where binding denotes a chemical and/or physical interaction between NF-κB and specific DNA sequences. |
| So As to Reduce Bacterial Lipopolysaccharide-Induced Expression of Said Cytokines in the Cells | To decrease expression of cytokines in the cells, where expression of those cytokines is caused by bacterial lipopolysaccharide and where expression refers to the process by which the cell interprets its genetic information to make proteins |
| Immune Cells | Specialized cells that defend the body against infection. Immune cells are present in all body tissues, the blood stream, and the lymphatic system, and derive from a common precursor cell known as a hematopoietic stem cell. They include T cells, B cells, natural killer cells, monocytes and other monocyte derivatives, macrophages, neutrophils, eosinophils, mast cells, and basophils. Although these cells typically function to eliminate harmful foreign invaders, immune cells occasionally mistake the body's own tissues as non-self (causing autoimmune disease) or attack harmless foreign substances or donated organs (causing allergy or organ rejection). |

The parties have agreed to the definitions of the following terms:

| NF-κB | a protein factor that;<br>(a) resides in the cytoplasm as an inactive precursor bound to an IκB inhibitor protein;<br>(b) when released from the inhibitor, travels to the nucleus of the cell;<br>(c) once in the nucleus, functions to turn on transcription of certain genes by binding to specific DNA recognition sequences in those genes |
|---|---|
| A method for . . . in cells | These claims encompass methods wherein NF-κB is modulated in cells, regardless of where they are found. |

| NF-κB mediated intracellular signaling | Molecular communication within cells effected by, or conveyed through, NF-κB |
|---|---|
| Such that NF-κB-mediated effects of external influences are modified | Changing or altering effects that are both caused by an inducing substance outside the cell and are conveyed through NF-κB |
| Cytokines | Secreted polypeptides (proteins) that affect the functions of other cells, and which are important for the interactions between cells in the immune response. There are many different cytokines, one example of which is TNF-$\alpha$. |
| Activated by extracellular influences | Stimulated by one or more inducing substances outside the cell |

# Exhibit G

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 02-11280-RWZ

ARIAD PHARMACEUTICALS, INC.,
MASSACHUSETTS INSTITUTE OF TECHNOLOGY,
THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,
and THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE

v.

ELI LILLY & CO.

FINDINGS OF FACTS AND CONCLUSIONS OF LAW

July 6, 2007

ZOBEL, D.J.

**Table of Contents**

I.    Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

II.   Background of the Case  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
      A.    Ariad's Invention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
      B.    Obtaining Allowance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
      C.    Lilly's Drugs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
      D.    Commencement of Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
      E.    The Jury Trial  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
      F.    Post-Verdict Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
      G.    The Bench Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

III.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
      A.    Validity of the Patent Under 35 U.S.C. § 101  . . . . . . . . . . . . . . . . . . . .  11
            1. Exceptions to Patentable Processes . . . . . . . . . . . . . . . . . . . . . . .  12
            2. The Autoregulatory Loop Theorizes a Reduction in NF-κB Activity  .  14
                  a. Support for the Existence of the Autoregulatory Loop  . . . . . .  15
                  b. Testimony of Ariad's Expert, Dr. Ravetch . . . . . . . . . . . . . . . .  17
                  c. Cross-Examination of Dr. Latchman . . . . . . . . . . . . . . . . . . . .  18
                  d. There Is Insufficient Evidence to Invalidate the Patent  . . . . .  19
      B.    Inequitable Conduct During Prosecution of the '516 Patent . . . . . . . . .  20

1. The Legal Standard for Inequitable Conduct . . . . . . . . . . . . . . . . . . 20
    a.  Materiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    b.  Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
2.     The Allegedly Withheld Information . . . . . . . . . . . . . . . . . . . . . . . 23
    a.  Errors in Figure 43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    b.  References Showing Inherent Anticipation . . . . . . . . . . . . . 24
3.     The Materiality of the Errors and Omissions in Figure 43 . . . . . 25
    a. The Description of Figure 43 Is Incorrect . . . . . . . . . . . . . . . 25
    b. Figure 43 Is Incomplete . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    c. Figure 43 Is Material Despite Its Late Addition to the Application
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    d. Figure 43 Is Not Cumulative . . . . . . . . . . . . . . . . . . . . . . . . . 29
    e. The Errors in Figure 43 Are Material Under Both Standards . 30
4.     The Materiality of the Prior Art References . . . . . . . . . . . . . . . . 32
    a. The Cited References Are Not Cumulative . . . . . . . . . . . . . 33
    b. Recognition Requirement for Inherent Anticipation . . . . . . . 37
5.     Evidence of Intent Concerning the Errors in Figure 43 . . . . . . . 40
    a. The Prosecuting Firm and Attorney History of the '516 Patent
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    b.  Evidence of Intent by Hausdorff . . . . . . . . . . . . . . . . . . . . . . 43
    c.  Evidence of Intent by Vincent . . . . . . . . . . . . . . . . . . . . . . . . 44
    d.  Evidence of Intent by Clauss . . . . . . . . . . . . . . . . . . . . . . . . 45
        (1) Clauss' Testimony on Materiality . . . . . . . . . . . . . . . . . 45
        (2) Clauss' Response to Office Action . . . . . . . . . . . . . . . 46
6.     Evidence of Inventor Baldwin's Intent to Conceal References . . 48
C.    Lilly's Prosecution Laches Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
  1.     The Legal Standard for a Finding of Prosecution Laches . . . . . 50
  2.     Analysis of Delays in the Prosecution of the '516 Patent . . . . . . 51
    a. Requirement to File an Appeal . . . . . . . . . . . . . . . . . . . . . . . . 52
    b. Six Month Response to Office Actions . . . . . . . . . . . . . . . . . 53
    c. The Pre-'898 Applications . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
    d. Post Development Applications . . . . . . . . . . . . . . . . . . . . . . . 54
        (1) Prejudice to Public Rights . . . . . . . . . . . . . . . . . . . . . . 55
    e. Use of Transitional Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

IV.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

I.    **Introduction**

Plaintiffs Ariad Pharmaceuticals, Inc., Massachusetts Institute of Technology, the Whitehead Institute for Biomedical Research, and the President and Fellows of Harvard College (collectively "Ariad"), owners and assignees of U.S. Patent No. 6,410,516 ("the '516 patent"), "Nuclear Factors Associated With Transcriptional Regulation," complain that defendant Eli Lilly & Co. ("Lilly") infringed it.  Following a fourteen-day trial in April 2006, a jury found that the four asserted claims were valid against anticipation, enablement and written description defenses, and that use of Lilly's Evista and Xigris products infringed the patent.  The jury awarded plaintiffs damages in excess of $65 million.

The parties agreed that certain additional defenses were to be tried to the court. Lilly asserts that the '516 patent is invalid because it attempts to claim non-patentable subject matter under 35 U.S.C. § 101.  Even if the patent is valid, Lilly argues (1) that it cannot be enforced because of inequitable conduct by plaintiffs during the prosecution of the patent, or in the alternative; (2) that plaintiffs are estopped from recovering for any infringement because they unreasonably delayed prosecution of the patent.[1] Following a second trial focused on these issues, I find that: (1) the four claims

---

[1] Lilly also indicated in an August 1, 2006, pre-bench trial status conference that it believed the '516 patent claims asserted in this case are invalid because they do not satisfy the definiteness requirement of 35 U.S.C. § 112.  However, neither its pretrial brief (Docket # 362) nor its proposed findings of facts (Docket # 397) discusses this issue.  In addition, Lilly presented no evidence or argument on the issue of indefiniteness during the bench trial.  Therefore, I do not address the indefiniteness of the claims further in this opinion.

asserted are patentable; (2) Lilly has not proven inequitable conduct during patent prosecution; and (3) Ariad did not unreasonably delay prosecution of the '516 patent. Accordingly, the jury award stands.

## II.    Background of the Case

### A.    Ariad's Invention

In the mid-1980s, scientists at the Massachusetts Institute of Technology, the Whitehead Institute for Biomedical Research, and Harvard University ("plaintiff institutions") identified a protein called Nuclear Factor Kappa B ("NF-κB"). Present in the cytoplasm of many different cell types, NF-κB is what is known as a transcription factor, a protein that affects gene expression.[2] In the inactive state, NF-κB binds in the cytoplasm with another protein, Inhibitor Kappa B ("IκB"), to form a multi-protein complex.[3] When NF-κB is activated by various stimuli external to the cell, the complex dissociates and free NF-κB is released. This free NF-κB then travels into the cell nucleus and binds there to specific DNA sequences, causing the cell to produce proteins that are associated with many diseases, including cancer, AIDS, sepsis, and atherosclerosis. Inhibiting this process has enormous and wide-ranging therapeutic effects.

---

[2] Gene expression is the process in which a gene's DNA sequence is converted into a protein in a cell. Transcription refers to the step in this process by which a messenger RNA molecule is synthesized on the DNA template to transfer genetic information from the DNA to the RNA. Stedman's Medical Dictionary (27th ed. 2000).

[3] There are several IκB proteins, including IκB-α and IκB-β, that bind to NF-κB and inhibit its activity. (Defendant's Trial Exhibit ("DTX") 24-S at 653-54.)

The inventors filed a patent application on their invention.  After a sixteen year trek through the United States Patent and Trademark Office (the "PTO") littered with abandoned, divisional and continued applications, they were granted the '516 patent on June 25, 2002.[4]  Throughout much of the prosecution history of the '516 patent, questions concerning enablement under 35 U.S.C. § 112 delayed allowance,[5] in many instances because the claims called for the use of an "agent" or "substance" to effect a reduction or alteration in the level of NF-κB activity in the cell.  The PTO repeatedly rejected these claims because it said that the specification did not adequately describe all possible agents or substances encompassed by the claims.

### B.    Obtaining Allowance

_____

[4] The complexity of the prosecution of the '516 patent is captured in the Related Applications section:

This application is a division of application Ser. No. 08/418,266 filed Apr. 6, 1995, U.S. Pat. No. 5,804,374 which is a continuation of U.S. Ser. No. 07/791,898, filed Nov. 13, 1991, abandoned which is a continuation-in-part of U.S. Ser. No. 06/946,365, filed Dec. 24, 1986, abandoned and of U.S. Ser. No. 07/318,901, filed Mar. 3, 1989, abandoned and of U.S. Ser. No. 07/162,680, filed Mar. 1, 1988, abandoned and of U.S. Ser. No. 07/341,436, filed Apr. 21, 1989, abandoned and of U.S. Ser. No. 06/817,441, filed Jan. 9, 1986, abandoned and of U.S. Ser. No. 07/155,207, filed Feb. 12, 1988, abandoned and of U.S. Ser. No. 07/280,173, filed Dec. 5, 1988, abandoned.

('516 Patent col.1 ll.5-17.)  Plaintiffs claim the benefit of priority of all of these applications and incorporate all of them by reference into the '516 patent.

[5] Title 35 U.S.C. § 112 states: "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

On August 10, 2000, the primary examiner of the '516 application, Dr. Robert Schwartzman ("Schwartzman"), rejected all but one claim of the pending application as not adequately describing the agents used in claims drawn to methods requiring "an agent which has an effect on . . . NF-κB and/or IκB."  (DTX 2 at ADL823-33, ADL825.)[6] In response, Ariad sent the PTO a reply on September 12, 2001, canceling all previous claims.  It replaced the canceled claims with a new set of claims, 158-87, that did not require the use of agents to practice the claimed methods, along with six new claims, 188-93, that did include a limitation for the "administration of an agent . . ." to implement the method of claims 158-75.  (Id. at ADL872-88, ADL876-78.)  Two days later, in a telephone interview with Examiner David Guzo ("Guzo"),[7] Ariad's attorney authorized an examiner's amendment to, inter alia, cancel claims 188-193, the claims requiring the use of an agent.  (Id. at ADL923-53, ADL924.)  The remaining claims were subsequently allowed as amended by Guzo on October 4, 2001.  (Id. at ADL923.)

The allowed claims broadly cover a method of inhibiting the expression of a gene whose transcription is regulated by NF-κB in a eukaryotic cell.[8]  The only step required to practice the broadest patented method is to "reduc[e] NF-κB activity in the

---

[6] Pages in exhibit DTX 2, the '516 patent prosecution history, are marked in the form "ADL0000XXX."  In citations to DTX 2, the court has dropped the leading zeros in each page number.

[7] Examiner Guzo was supervised by Examiner Schwartzman.

[8] A eukaryotic cell is a cell containing a nucleus and is typical of all multi-celled organisms as well as some single-celled organisms.

cell such that the expression of said gene is inhibited."[9]  No particular agent or substance need be used, nor any particular step(s) performed, to reduce NF-κB activity in order to practice the invention.

### C.    Lilly's Drugs

Prior to the initial discoveries by the research team at plaintiff institutions, defendant Lilly applied for patents on two compounds, raloxifene hydrochloride and recombinant human activated Protein C ("aPC").[10]  As it happens, these two compounds inhibit NF-κB activity, although Lilly did not know this when it obtained its patents.  Lilly began marketing raloxifene hydrochloride under the brand name Evista to treat osteoporosis and has been selling aPC under the name Xigris to treat severe sepsis.  At the molecular level, these drugs treat osteoporosis and severe sepsis, respectively, by inhibiting NF-κB activity.

### D.    Commencement of Litigation

On the same day that the '516 patent was granted, Ariad filed the instant suit against defendant Lilly, alleging that Lilly's sales and marketing of Evista and Xigris constituted indirect infringement of twenty claims of the '516 patent.  Lilly filed a Combined Motion to Dismiss and Motion for Summary Judgment of Invalidity, contending that the earlier patents on its compounds anticipated the '516 patent and

---

[9] See '516 Patent claim 1 ("1. A method for inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-κB, the method comprising reducing NF-κB activity in the cell such that expression of said gene is inhibited.") (emphasis added).

[10] Raloxifene hydrochloride is covered by United States Patent No. 4,418,068, issued Nov. 29, 1983.  The patent for aPC is No. 4,775,624, issued Oct. 4, 1988.

that the methods necessary to practice the '516 patent were not enabled by the written description. I denied the motion but noted that the problem of enablement was troubling, given the broad claim language and the question whether the patent described actual methods for inhibiting NF-κB activity. Ariad Pharmaceuticals, Inc. v. Eli Lilly & Co., Civ. No. 02-11280, 2003 WL 21087115, at *1 (D. Mass. May 12, 2003) (Docket # 33).

Late in the discovery process, Lilly petitioned the PTO to reexamine the '516 patent pursuant to 35 U.S.C. § 302,[11] arguing that a large number of the patent's claims "encompassed numerous prior art methods employing compounds now known to necessarily modulate NF-κB activity." Lilly Request for Reexamination, Case No. 05-280, April 4, 2005, at 1. Lilly moved to stay the litigation pending the outcome of the PTO's reexamination, a motion I subsequently denied, as I was not persuaded that reexamination would simplify the issues for trial. Ariad Pharmaceuticals, Inc. v. Eli Lilly and Company, Civ. No. 02-11280, 2005 WL 1342721, at *1 (D. Mass. June 06, 2005) (Docket # 149). Lilly renewed its motion on January 17, 2006, after the PTO granted the reexamination request. I again denied the motion, and the case went to trial in April 2006.

### E.     The Jury Trial

After a fourteen-day trial, the jury determined that none of the four claims

---

[11] Title 35 U.S.C. § 302 provides in pertinent part: "Any person at any time may file a request for reexamination by the Office of any claim of a patent on the basis of any prior art cited under the provisions of section 301 of this title . . . ." 35 U.S.C. § 302 (2002).

ultimately asserted were anticipated, either by prior art or public use, and it found all

the asserted claims adequately enabled and the written description adequate. The jury

further found that a user of Evista directly infringed claims 80 and 95 of the '516 patent

and that a user of Xigris directly infringed claims 144 and 145 of the patent.[12]  It also

found Lilly liable for inducing infringement and contributory infringement by selling the

two drugs. The jury determined the effective filing date of the patent to be April 21,

_____

[12] The four '516 patent claims found infringed (emphasized and grouped with the claims on which they depend) are:

7. A method for modifying effects of external influences on a eukaryotic cell, which external influences induce NF-κB -mediated intracellular signaling, the method comprising altering NF-κB activity in the cells such that NF-κB-mediated effects of external influences are modified.

8. The method of claim 7, wherein NF-κB activity in the cell is reduced.

80. The method of claim 8 wherein reducing NF-κB activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

9. A method for reducing, in eukaryotic cells, the level of expression of genes which are activated by extracellular influences which induce NF-κB -mediated intracellular signaling, the method comprising reducing NF-κB activity in the cells such that expression of said genes is reduced.

95. The method of claim 9, carried out on human cells.

14. A method for reducing bacterial lipopolysaccharide-induced expression of cytokines in mammalian cells, which method comprises reducing NF-κB activity in the cells so as to reduce bacterial lipopolysaccharide-induced expression of said cytokines in the cells.

144. The method of claim 14 wherein reducing NF-κB  activity comprises reducing binding of NF-κB to NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB.

145. The method of claim 14, carried out on human cells.

9

1989, and awarded Ariad a royalty of 2.3% on combined sales by Lilly of over $2.83 billion, or over $65 million in damages, as of May 4, 2006.

### F.    Post-Verdict Motions

Lilly contends that this award must be set aside because either the '516 patent is invalid, as it claims subject matter not allowed under 35 U.S.C. § 101,[13] or because the patent cannot be enforced as plaintiffs committed a culpable breach of the duty of disclosure and unreasonably delayed prosecution.  The parties agree that these issues raise questions of fact and law for the court.  See Arrhythmia Research Technology v. Corazonix Corp., 958 F.2d 1053, 1055 (Fed. Cir. 1992) ("Whether a claim is directed to statutory subject matter is a question of law."); Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found., LP, 422 F.3d 1378, 1385 (Fed. Cir. 2005) ("[Prosecution laches] is to be decided as a matter of equity, subject to the discretion of a district court before which the issue is raised.").

### G.    The Bench Trial

A four-day bench trial addressing these issues began on August 7, 2006. Shortly before the commencement of that trial, the PTO, on August 2, 2006, issued a first Office Action in the merged ex parte reexamination proceeding that rejected 160 of the claims in the '516 patent, including the four at issue in this case.[14]  (Office Action in

---

[13] Title 35 U.S.C. § 101 states: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."

[14] In May 2006, the PTO merged Lilly's request for reexamination with a reexamination request of the '516 patent by Bawa Biotechnology Consulting, LLC.

Ex Parte Reexamination, Patent 6410516, August 2, 2006 (DTX 973A).)  The PTO

based its rejections partially on a determination that the claims were inherently

anticipated by certain prior art references listed in a review article co-authored by Dr.

Albert Baldwin ("Baldwin"), one of the inventors of the '516 patent.[15]  In its claim of

inequitable conduct, Lilly also charged Baldwin with intentionally withholding this

information from the PTO.

     I examine each of Lilly's defenses below.

## III.   Discussion

### A.   Validity of the Patent Under 35 U.S.C. § 101

     In Lilly's view, the '516 patent claims subject matter not allowed under 35 U.S.C.

§ 101 and is therefore invalid.  Specifically, it contends that the claims encompass the

NF-κB-IκB autoregulatory loop (the "Autoregulatory Loop"), a natural process in cells

that operates to reduce the activity of NF-κB.  Because natural phenomena are

excluded from patentable subject matter, it argues that any '516 claims encompassing

the Autoregulatory Loop are invalid and cannot be enforced.

     Ariad's response is that the '516 patent does not claim a natural phenomenon

because, inter alia, (1) the patent claims a process, subject matter specifically allowed

by statute; and (2) the Autoregulatory Loop is only a theory and has not been proven to

exist in human cells in vivo.  (Docket # 398 ¶ 618.)  While not all processes are

---

[15] The PTO's rejection of Ariad's claims does not end the re-examination.
Rather, it is merely an early step in the process.  Ariad may respond to the prior art,
propose amendments to its claims, or appeal the PTO's decision.  See 35 U.S.C. §§
301-306.

patentable, I find that Lilly has failed to show that the proposed model of the Autoregulatory Loop actually exists in nature and thus that a natural phenomenon is encompassed by the '516 patent's claims.

### 1. Exceptions to Patentable Processes

Ariad insists that an analysis of the scope of the patent's claims is not relevant to a determination of whether the patent claims unpatentable subject matter.  It argues that because the '516 patent claims describe the transformation of the activity state in cells, they meet the definition of a process, subject matter specifically allowed under 35 U.S.C. § 101, and the subject matter analysis ends.  In its view, any consideration of the scope of the claims only affects whether the claims are anticipated or properly disclosed, issues already decided in its favor by the jury.  (See Docket # 398 ¶¶ 572-83, 597-602.)  This position, however, oversimplifies the law.

Congress has broadly defined the subject matter that can be protected by patent.  Title 35 U.S.C. § 101 states simply that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter . . . may obtain a patent therefore . . . ."  The Committee Reports accompanying the Patent Act of 1952 emphasized the breadth of this statutory subject matter as "includ[ing] anything under the sun that is made by man."  Diamond v. Dier, 450 U.S. 175, 182 (1981) (quoting S. Rep. No.1979, 82d Cong., 2d Sess., 5 (1952); H.R. Rep. No.1923, 82d Cong., 2d Sess., 6 (1952)).  "Process," as used in the statute, is synonymous with

12

"method"[16] and means "a mode of treatment of certain materials to produce a given result." Id. at 182.

Three exceptions exist, however, to the general principle that any process is eligible for patent protection: "laws of nature, natural phenomena, and abstract ideas." Id.  "The rule that the discovery of a law of nature cannot be patented rests, not on the notion that natural phenomena are not processes, but rather on the more fundamental understanding that they are not the kind of 'discoveries' that the statute was enacted to protect." Parker v. Flook, 437 U.S. 584, 593 (1978).  A process, however, is not unpatentable merely because it contains a law of nature; a process employing a law of nature or natural phenomena in a useful way may be protected by patent.  Id. at 592 (distinguishing Morse's invalid claim, broadly covering the use of electromagnetism to print at a distance, from Neilson's allowed claim for a machine applying the principle that heated air increases the intensity of the heat in a blast furnace).  The court must examine what is sought to be patented in order to determine whether it falls within one of the statutory exceptions.  This determination occurs before any consideration whether that discovery meets the requirements for patentability under 35 U.S.C. §§ 102, 103 and 112.[17]  Id. at 593 ("The obligation to determine what type of discovery is

---

[16] See 35 U.S.C. § 100(b) ("The term 'process' means process, art or method . . .").

[17] Ariad's reliance on statements by the Federal Circuit disavowing scope as relevant to section 101 analysis is misplaced.  The discussion cited by Ariad in State Street concerned whether § 101 prevented the inventor from claiming so broadly as to block other potential inventions, not subject matter; the court had already considered subject matter and concluded that the claims were not directed toward "an unpatentable abstract idea."  State Street Bank & Trust Co. v. Signature Fin. Group, Inc., 149 F.3d

sought to be patented must precede the determination of whether that discovery is, in fact, new or obvious.").

Therefore, the asserted claims must be examined to see if they encompass any of these exceptions. If Ariad's claims are drafted so broadly that they encompass a natural process, they are invalid for claiming unpatentable subject matter.

### 2. The Autoregulatory Loop Theorizes a Reduction in NF-κB Activity

As noted above, Lilly argues that Ariad's asserted claims encompass a natural phenomenon, the Autoregulatory Loop. Lilly's scientific expert, Dr. David Latchman ("Latchman") described the Autoregulatory Loop as a natural process by which the activity of NF-κB in a cell is controlled by IκB-α via negative feedback. (Trial Tr. Day 1, 48:23-52:1.)[18] This process is triggered when an external stimulus causes NF-κB to disassociate from IκB in the cytoplasm of the cell. Free NF-κB then moves into the nucleus and binds to the cell's DNA. The bound NF-κB stimulates the production of

---

1368, 1374-77 (Fed. Cir. 1998) (refusing to find as unpatentable claims which, it was argued, were "sufficiently broad[] to foreclose virtually any computer-implemented accounting method . . . ."). The issue in <u>SmithKline</u> concerned whether the inevitable production of a previously patented synthetic substance as a by-product of the manufacture of a newly discovered man-made compound should be considered "naturally occurring" under § 101. <u>SmithKline Beecham Corp. v. Apotex Corp.</u>, 403 F.3d 1331, 1342 (Fed. Cir. 2005). In neither case was the court simply considering whether the scope of the claims at issue encompassed a natural phenomenon. <u>Cf.</u> <u>In re Bergstrom</u>, 427 F.2d 1394, 1401 (C.C.P.A. 1970) (noting "appellants have neither merely discovered, nor <u>claimed sufficiently broadly</u> to encompass, what has previously existed in fact in nature's storehouse, albeit unknown," in concluding patented substance was not naturally occurring) (emphasis added).

[18] Citations to "Trial Tr." refer to the bench trial held August 7 through August 10, 2006.

various proteins in the cytoplasm, including certain cytokines,[19] but it also causes the

production of new IκB.  This newly produced IκB reenters the nucleus of the cell and

removes the bound NF-κB from the DNA, deactivating it and terminating production of

the gene for the induced proteins.  The deactivated NF-κB/IκB complex then moves out

into the cytoplasm completing the regulatory loop.  The NF-κB that was activated by the

external stimulus has been deactivated by the IκB that it caused to be generated,

naturally terminating the externally induced response.  (Id.; see also DTX 3037

(demonstrative video).)

### a. Support for the Existence of the Autoregulatory Loop

The possibility of an NF-κB--IκB regulatory loop was unknown in 1991 when the

'516 specification was initially submitted to the PTO and thus is not described in the

issued patent.[20]  (See DTX 33, ADL14830-ADL15018 (specification filed Nov. 13, 1991

with application 07/791,898).)  Latchman testified that reports on the existence of the

Autoregulatory Loop first appeared in three papers published in 1993. (Trial Tr. Day 1,

99:17-100:9.)  He cited a number of more recent articles as also supporting his

description of the Autoregulatory Loop, including a 1996 review paper by co-inventor

---

[19] Cytokines are secreted proteins that affect the functions of other cells and which are important for the interactions between cells in the immune response. (Docket # 69, 12 n.9; Hr'g Tr., 57:9-11, Jan. 13, 2004.)

[20] The 1991 application was a continuation-in-part of an earlier application, 07/341,436, which was ultimately abandoned.  The jury found the effective filing date of the '516 patent to be April 21, 1989, the date of this earlier application.

Baldwin.  (Id. at 54:22-589:19; DTX 24-S.)[21]  Latchman also discussed at length an

article by Ting & Endy describing the operation of the Autoregulatory Loop.  (Trial Tr.

Day 1, 60:5-75:10; DTX 469A.)[22]  This paper was published as a "Perspective" article to

comment on a longer article, published in the same issue of Science, authored by Dr.

Alexander Hoffman ("Hoffman") and, inter alia, co-inventor Dr. David Baltimore

("Baltimore").  (DTX 469.)[23]

As explained by Latchman, Ting & Endy described the operation of the

Autoregulatory Loop based on Hoffman's experiments comparing cells from natural

mice ("wild type") with cells from genetically engineered "knockout" mice.  These so-

called "knockout cells" have copies of the gene for IκB inactivated, so that there is no

functional IκB-α in the cells.  (Trial Tr. Day 1, 58:2-10, 64:13-17.)  In wild type cells, a

temporary external stimulus of TFN[24] results in only a short period in which NF-κB is

present in the nucleus of the cell and in no production of RANTES, a gene activated

only after prolonged exposure to NF-κB.  The induced active NF-κB is quickly

deactivated by new IκB-α produced by the binding of the NF-κB to the DNA before the

---

[21] Albert Baldwin, Jr., The NF-κB and IκB Proteins: New Discoveries and Insights, 14 Ann. Rev. Immunol. 649, 666 (1996) ("These results indicate that NF-κB and IκB are components of a mutual regulatory system in which the levels of one regulatory component control the activity or quantity of the other.").

[22] Alice Y. Ting & Drew Endy, Decoding NF-κB Signaling, 298 Science 1189 (2002) ("Ting & Endy").

[23] Hoffmann et al., The IκB-NF-κB Signaling Module: Temporal Control and Selective Gene Activation, 298 Science 1241 (2002).

[24] TFN is an inducer cytokine used by Hoffman to switch on NF-κB.  (Trial Tr. Day 1, 64:21-23.)

RANTES gene is expressed. In knockout cells without the ability to produce IκB-α, a temporary external stimulus of TFN results in a prolonged period in which NF-κB is present in the nucleus of the cell and in the eventual production of the RANTES gene. (Id. at 64:11-69:24.) Unlike the wild type, the level of NF-κB bound in the nucleus of the knockout cell is not reduced by the production of IκB-α, allowing time for the RANTES gene to be induced. In Latchman's opinion, this demonstrates the ability of the Autoregulatory Loop to inhibit induced gene expression. (Id. at 69:25-70:3.) Latchman described the results of additional experiments in which the external stimulus was sustained over a period of time. Even with a continuous stimulus, he asserted that the Autoregulatory Loop operates to reduce the level of NF-κB mediated gene expression in the wild cells, albeit in an oscillatory fashion. (Id. at 66:10-23, 73:15-74:10.)

### b. Testimony of Ariad's Expert, Dr. Ravetch

Ariad's expert, Dr. Jeffrey Ravetch ("Ravetch"), objected to Latchman's conclusion that the Autoregulatory Loop has been proven to exist in living cells. (Trial Tr. Day 3, 10:17-21.) He described the Autoregulatory Loop as a simplified model that poorly explains the experimental data. (Id. at 17:13-18:7.) In his opinion, there are multiple positive and negative regulatory loops operating in cells which, in the aggregate, create the results seen in experimental assays such as those conducted by Hoffman et al. Ravetch rejected the view that just one loop explains the activity of NF-κB in the cell. (Id. at 9:2-12.) The patent claims a reduction of NF-κB in cells, which Ravetch sees as encompassing the net effect of all events, both positive and negative,

which occur when a stimulus influences the cell.  (Trial Tr. Day 3, 16:2-21.)

In addition, Ravetch testified that experiments using cells from knockout mice are conceptually flawed because they assume all other processes in the cell operate the same in the absence of the missing feature, an assumption he believes to be untrue.  (Id. at 13:4-14.)  Therefore, conclusions from these simplified models cannot be extrapolated back to normal cells because they do not take into consideration effects of the other components operating out of their normal context.  (Id. at 13:21-14:4; see also id. at 30:19-32.)  His opinion was that the scientific community has "established a model for the Autoregulatory Loop" to account for certain observations, but "there is considerable dispute and ongoing study to define its role in the NF-κB signaling pathway."  (Id. at 42:9-21.)  Ravetch also disputed that numerous scientific articles showed an acceptance by the scientific community of the existence and operation of the Autoregulatory Loop.[25]  (See Trial Tr. Day 4, 55:7-70:3.)  The articles, in his view, attempt to explain observations of experiments conducted with knockout mice, but the results are inconclusive because of the difficulties in interpreting signal transduction systems where the system has multiple interacting components.  (Id. at 73:9-12; see also Trial Tr. Day 3, 32:11-21 (describing a paper in which the authors note their experimental observations are not consistent with the model proposed for the

_____

[25] At the bench trial, I initially reserved judgment on whether the articles on which Dr. Ravetch was cross-examined were admissible.  (See Trial Tr. Day 4, 55:6-9, 59:8-13.)  In response, Lilly's attorney laid the foundation with the witness to admit the portions read into the record under the hearsay exception for learned treatises.  Fed. R. Evid. 803(18) (allowing statements contained in scientific periodicals, established as a reliable authority by the testimony of an expert witness, to be read into evidence).  Therefore, this portion of Ravetch's testimony is admitted.

Autoregulatory Loop); id. at 34:2-36:15 (discussing a paper suggesting that a more complex model is necessary to explain the processes occurring in living cells).) Ravetch noted that, far from there being a settled theory congruent with the experimental data, there is still significant ongoing research attempting to explain the complex phenomena taking place within the cell.  (Trial Tr. Day 3, 23:4-7.)

Finally, Ravetch pointed out that the patent claims processes in living cells, while Latchman's opinion relied on in vitro research, such as the Hoffman paper (as described by Ting & Endy) to reach his conclusions concerning the Autoregulatory Loop.  (See id. at 36:21-37:3.)

### c. Cross-Examination of Dr. Latchman

On cross-examination, Latchman agreed that the experiments summarized by Ting & Endy were conducted in vitro on cell extractions, not in vivo.  (Trial Tr. Day 1, 134:11-18, 140:2-7.)  He also acknowledged that at his deposition he described the results of their research as "a step along the road," but not determinative of how IκB-α works in the human body.  (Id. at 148:8-23.)  In addition, he admitted that there were discrepancies between the computer model of the Autoregulatory Loop proposed by Ting & Endy and the Hoffman empirical data.  (Id. at 155:11-156:6.)  Latchman also noted that the computer models of the Autoregulatory Loop are "continually being refined and [that] Hoffman [] published a paper as recently as two or three months ago in which he's changed the model again."  (Id. at 156:6-10.)

### d. There Is Insufficient Evidence to Invalidate the Patent

The '516 patent is "presumed valid."  35 U.S.C. § 282.  In the instant case, Lilly

19

has the burden of proving facts by clear and convincing evidence showing that the patent is invalid. North Am. Vaccine v. American Cyanamid Co., 7 F.3d 1571, 1579 (Fed. Cir. 1993). Lilly has not met this burden.

While the evidence shows that there has been significant scientific research over more than a decade into the operation of the NF-κB signaling pathway, it has not established that the simplified model of the Autoregulatory Loop proffered by Latchman operates in vivo in normal cells. Latchman admits that, not only does the current model not fully explain the experimental data, but that the model is continually being refined, even to the present day. Scientists are conducting ongoing research to attempt to more fully explain what happens in cells when subjected to various external stimuli. Ravetch described a complex system of multiple feedback loops, all interacting, to effect the changes in gene expression claimed by the patent. In addition, the experimental data described in the literature has been collected using knockout cells in vitro that have not been shown to operate in all other respects as normal cells. The experimental data cannot be fully explained by the current model.

Therefore, I credit Dr. Ravetch's testimony that the Autoregulatory Loop is "an incomplete model . . . subject to a significant amount of ambiguity and inconsistency" (Trial Tr. Day 4, 50:2-6) and find that Lilly has failed to prove by clear and convincing evidence that the Autoregulatory Loop exists in living cells in a way that is encompassed by Ariad's claims.

### B.    Inequitable Conduct During Prosecution of the '516 Patent

Lilly asserts that Ariad, the inventors, and/or their attorneys failed to disclose to

20

the PTO material prior art that demonstrates inherent anticipation of the '516 patent and also failed to disclose material errors in a figure contained in the patent. Although I agree with Lilly that the information that was not disclosed is material, Lilly has failed to prove by clear and convincing evidence the requisite intent necessary to find inequitable conduct and render the patent unenforceable.

### 1. The Legal Standard for Inequitable Conduct

The patent application process is conducted <u>ex parte</u> by inventors and their representatives. Applicants have a duty to prosecute applications with candor, good faith, and honesty. <u>Duro-Last, Inc. v. Custom Seal, Inc.</u>, 321 F.3d 1098, 1099 (Fed. Cir. 2003); <u>see also</u> 37 C.F.R. § 1.56 ("Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [Patent] Office."). When coupled with an intent to deceive or mislead the PTO, a breach of this duty constitutes inequitable conduct, which renders the patent unenforceable. <u>Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.</u>, 326 F.3d 1226, 1233 (Fed. Cir. 2003). An applicant breaches this duty by making affirmative misrepresentations of material facts, failing to disclose material information, or submitting false material information. <u>Duro-Last</u>, 321 F.3d at 1099.

The Federal Circuit requires that a party asserting inequitable conduct show by "clear and convincing evidence" the elements of materiality and intent to deceive. <u>Burlington Industries, Inc. v. Dayco Corp.</u>, 849 F.2d 1418, 1422 (Fed. Cir. 1988) (expressing concern about "the habit of charging inequitable conduct in almost every major patent case"). The analysis of inequitable conduct is a two-step process. First

the court must determine, as a threshold matter, if both the materiality of the information and the intent to deceive have been established. <u>Bristol-Myers</u>, 326 F.3d at 1234. Once the court has determined that the factual basis for materiality and intent exist, it must "weigh them to determine whether the equities warrant a conclusion that inequitable conduct occurred." <u>Id.</u> (quoting <u>Molins PLC v. Textron, Inc.</u>, 48 F.3d 1172, 1178 (Fed. Cir. 1995)). This balancing means that a greater showing of one factor can compensate for a lesser showing of the other. <u>Id.</u>

### a. Materiality

Information is material "where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow an application to issue as a patent." <u>Digital Control, Inc. v. Charles Mach. Works</u>, 437 F.3d 1309, 1315 (Fed. Cir. 2006) (citing 37 C.F.R. § 1.56 (1977)); <u>accord</u> <u>Bristol-Myers</u>, 326 F.3d at 1234; <u>Molins</u>, 48 F.3d at 1179 n.8. Under this standard, information can be material even though disclosure of it would not render the invention unpatentable. <u>Digital Control</u>, 437 F.3d at 1318. However, information that is merely cumulative or less pertinent than material considered by the examiner is not material in an inequitable conduct analysis. <u>Molins</u>, 48 F.3d at 1179.[26]

---

[26] In 1992, the PTO revised 37 C.F.R. § 1.56 to create a narrower definition of materiality:

[I]nformation is material to patentability when it is not cumulative to information already of record or being made of record in the application, and

(1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

### b. Intent

That the withheld information is material, by itself, is inadequate to prove

inequitable conduct.  There must also be a showing that the information was withheld

with an intent to deceive or mislead the PTO.  <u>Allen Organ Co. v. Kimball Int'l., Inc.</u>, 839

F.2d 1556 (Fed. Cir. 1988) ("[M]ateriality does not presume intent, which is a separate

and essential component of inequitable conduct.").  "Intent to deceive can not be

inferred solely from the fact that information was not disclosed; there must be a factual

basis for a finding of deceptive intent."  <u>Hebert v. Lisle Corp.</u>, 99 F.3d 1109, 1116 (Fed.

Cir. 1996).  However, intent to deceive or mislead the PTO can rarely be shown by

direct evidence, it is usually inferred from the facts.  <u>Bristol-Myers</u>, 326 F.3d at 1239.

"[T]he involved conduct, viewed in light of all the evidence, including evidence of good

faith, must indicate sufficient culpability to require a finding of intent to deceive."  <u>Digital</u>

<u>Control</u>, 437 F.3d at 1319 (internal quotations and citations deleted).  Mere error, even

conduct that amounts to gross negligence, is not adequate to establish an intent to

deceive.  <u>Molins</u>, 48 F.3d at 1181.  Where the alleged conduct is the nondisclosure of

---

   (2) It refutes, or is inconsistent with, a position the applicant takes in:
   (i) Opposing an argument of unpatentability relied on by the Office, or
   (ii) Asserting an argument of patentability.

37 C.F.R. § 1.56(b) (1992).  Until recently, it was unclear if the Federal Circuit intended
the PTO's 1992 updated definition of materiality to supplant existing case law.  <u>See</u>,
<u>e.g.</u>, <u>Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Inc.</u>, 394 F.3d 1348, 1353
(Fed. Cir. 2005) (applying the amended Rule 56 where the patent was prosecuted after
the effective date of the rule change); <u>Purdue Pharma L.P. v. Endo Pharm. Inc.</u>, 438
F.3d 1123, 1129 (Fed. Cir. 2006) (same).  In <u>Digital Control</u>, however, the court made it
clear that the 1992 revision did not replace the "reasonable examiner" standard, rather
it supplemented it.  <u>Digital Control</u>, 437 F.3d at 1316.  The Federal Circuit explained
that the new Rule 56 standard provides an <u>additional</u> test for materiality.  <u>Id.</u>

information, there must be clear and convincing evidence that the applicant made a deliberate decision to withhold the information from the PTO.  Id.

### 2. The Allegedly Withheld Information

According to Lilly, two errors made during prosecution of the '516 patent meet the threshold standard for materiality: (1) information that was incorrect was not provided to the PTO; and (2) references relevant to inherent anticipation of the claims were not disclosed.[27]

### a. Errors in Figure 43

First, Lilly points to figure 43, three pages depicting a lengthy nucleotide sequence consisting of the letters A, C, G and T.  The central portion of the sequence has sequential groups of these letters identified by an additional single letter below each group of three representing the amino acid sequence.  ('516 Patent fig.43.)  The Brief Description of the Drawings describes this figure as "the nucleotide sequence and the amino acid sequence of IκB-α."  (Id. col.10 ll.16-17.)  The only reference in the specification to figure 43 states: "The nucleotide sequence of the IκB-α gene and the amino acid sequence of IκB-α are shown in FIG. 43." (Id. col.28 ll.16-17.)  Lilly argues that one skilled in the art reading the patent would expect figure 43 to describe the DNA and amino acid sequence for mammalian, specifically murine (mouse), IκB-α.

---

[27] An invention is patentable only if no relevant prior art contains all of the claimed elements.  If all of the claimed elements are disclosed in a single reference, that prior art expressly anticipates the invention.  If particular elements are missing but necessarily present in the prior art, that reference inherently anticipates the invention.  Perricone v. Medicis Pharm. Corp., 432 F.3d 1368, 1375 (Fed. Cir. 2005); see also Herbert Schwartz, Patent Law and Practice § 4.I.C.1. (5th ed. 2006).

However, figure 43 actually shows the sequence of an avian (chicken) protein called pp40.  In addition, Lilly claims that the figure is incomplete and only shows portions of the amino acid sequence of pp40.  Ariad counters that pp40 is an IκB-α protein, therefore there is no error in the identification of the figure, much less a material misrepresentation.  As discussed below, I agree with Lilly that the fact that figure 43 does not represent mammalian DNA meets the threshold standard of materiality necessary to proceed with an evaluation of inequitable conduct.  In addition, I find that the sequence in the figure is indeed incomplete as alleged by Lilly.

### b.  References Showing Inherent Anticipation

Second, Lilly avers that Ariad failed to disclose references relevant to inherent anticipation of the claims in the '516 patent.  Specifically, Lilly argues that after the patent application was filed, at least one of the inventors published both a review article and a paper describing a number of prior art compounds as inhibitors of NF-κB activity.  Lilly claims that Ariad had a duty to disclose this information to the PTO.  It points to the results of the recent reexamination of the '516 patent, in which the PTO invalidated the claims at least partially on a determination that the claims were inherently anticipated by these references, as showing the materiality of the information withheld.  Because I do not find the information withheld was merely cumulative, as Ariad suggests, I conclude it is material.

### 3.   The Materiality of the Errors and Omissions in Figure 43

### a. The Description of Figure 43 Is Incorrect

Ariad does not dispute that figure 43 represents the nucleotide sequence of avian pp40, not mammalian IκB-α.  (See Docket # 398 ¶ 275.)  However, it insists that describing pp40 in figure 43 as "the IκB-α gene" is neither incorrect nor misleading and therefore cannot support a claim of inequitable conduct.  This conclusion is based on Ariad's assertion that "the term IκB-α refers to a family of proteins" capable of inhibiting NF-κB and that "the scientific community has reached a consensus that pp40 is an IκB-α protein."  (Id. ¶¶ 262, 256.)  Ariad further argues that the depiction of avian pp40 in figure 43 is not misleading because the methods claimed in the '516 patent are not limited to mammalian cells.[28]  It points to text in the '516 specification explicitly describing the use of pp40, along with mammalian MAD-3, as potential sources for DNA used to negatively regulate NF-κB activity in cells (and thus practice the patented method) in support of this argument.  ('516 Patent col.32 ll.11-40.)

Ariad's argument is disingenuous.  While the '516 claims do broadly cover both mammalian and non-mammalian cells, the specification describes the inventors' work using a mammalian cell line.  ('516 Patent col.22 l.23 - col.28 l.18.)  The Detailed

---

[28] This assertion is correct.  Under the doctrine of claim differentiation the '516 claims must encompasses avian and other non-mammalian cells.  See Phillips v. AWH Corp., 415 F.3d 1303, 1315 (Fed. Cir. 2005) "[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").  Compare, e.g., '516 Patent claim 9 ("A method for modifying effects of external influences on a eucaryotic cell [characteristic of all life forms except primitive microorganisms] . . ."), with id. claim 94 ("The method of claim 9, carried out on mammalian cells.").

Description of the Invention leading up to the only paragraph referencing figure 43 begins, "[t]he following is a description of the . . . discovery of the NF-κB inhibitor IκB . . ." (Id. col.10 ll.46-52).  What then follows is a lengthy discussion of the discovery and isolation of IκB-α from a murine cell line called 70Z/3.  (Id. col.22 l.23 - col.28 l.18.)  The sole mention of figure 43 (describing it as "IκB-α") occurs in the text directly following a sentence describing how the inventors determined the characteristics of the IκB they isolated from this murine cell line.  (Id. col.28 ll.14-18.)  The obvious conclusion is that both sentences refer to the same protein.

One column later, the patent explicitly refers to "IκB prepared from the mouse [] cell line . . . ." (Id. col.29 ll.33-34.)  A page later, the specification states: "[as] a result of the work described herein, the IκB gene is now available . . . ." (Id. col.31 ll.57-58 (emphasis added).)  Latchman testified that in November 1991 when the application containing figure 43 was filed, pp40 was characterized as "an IκB-α like molecule."  It was not until several years later that pp40 was referred to simply as IκB-α.  (Trial Tr. Day 1, 98:7-99:16.)  Furthermore, while the terms "human," "mammalian," "murine," "mouse," and "70Z/3" occur throughout the specification, "avian" and "chicken" do not appear at all, and "pp40" appears only once.  Based on these facts, I find that a reasonable examiner would believe the sequence depicted in figure 43 to represent the nucleotide sequence and the amino acid sequence of murine IκB-α, not avian pp40.

### b. Figure 43 Is Incomplete

Latchman also testified that figure 43 is incomplete and does not show the correct full amino acid sequence even of pp40.  In particular, he stated that figure 43

shows an amino acid sequence that has 82 amino acids at the beginning of the figure

that are not present in pp40, but it is missing 56 amino acids at the end, for which are

substituted 10 amino acids that are not present in pp40. (<u>Id.</u> at 106:4-20.)  The missing

region corresponds to a portion of IκB-α necessary to inhibit DNA binding of NF-κB.

(<u>Id.</u>)  Based on a comparison of figure 43 with the published sequence of pp40, I credit

Latchman's testimony.[29]  Because there is no evidence that Ariad was aware of this

error while prosecuting the '516 patent, the error does not affect the issue of intent in

evaluating inequitable conduct.  <u>See</u> <u>M. Eagles Tool Warehouse, Inc. v. Fisher Tooling</u>

<u>Co.</u>, 439 F.3d 1335, 1341 (Fed. Cir. 2006) ("In an inequitable conduct determination

based upon a nondisclosure, the applicant must know, or should have known, of the

materiality of the reference for an inference of intent.").  However, it does increase the

---

[29] During the bench trial, Ariad moved to strike Latchman's testimony concerning
the error in figure 43, arguing it was not previously disclosed in his expert report.  (Trial
Tr. Day 1, 106:21-22.)  However, in its proposed findings of fact, Ariad did not contest
his conclusions nor did it claim that figure 43 is correct, rather it attacked Latchman's
credibility for failing to recognize this error previously and recommended that the court
"find that Figure 43 corresponds to pp40 as Latchman originally testified."  (Docket #
398 ¶¶ 273-75.)  Ariad further asserts that "[t]here is no way to authenticate Latchman's
analysis [comparing the sequences in figure 43 to the identical sequence presented in
the Davis (1991) journal article]."  (<u>Id.</u> ¶¶ 281-82.)  However, in a separate section of its
proposed findings, arguing that the information concerning figure 43 was merely
cumulative, Ariad suggests that "[having] copies of [] Davis (1991) . . . , the patent
examiner responsible for the examination of the '516 patent had available to him all the
relevant information necessary to compare the sequences in figure 43 with the
sequences disclosed for pp40 in Davis . . . ."  (<u>Id.</u> ¶ 251.)  Taking Ariad up on its offer,
the court compared the amino acid sequences shown in figure 43 and Davis (1991),
Fig. 3., and finds that Latchman's testimony accurately described figure 43 as not
showing the correct amino acid sequence of pp40.  Having performed this tedious
comparison, the court further credits Latchman's testimony that a skilled reader would
not have checked the sequences in figure 43 against the published references.  (Trial
Tr. Day 1, 105:14-15.)

materiality of the error, because it means that the amino acid sequence shown cannot

be used as described in the '516 patent to reduce the activity of NF-κB.

### c. Figure 43 Is Material Despite Its Late Addition to the Application

Ariad suggests that since figure 43 was added to the application in 1991, after

the 1989 filing date established by the jury, it is not necessary to the invention and

therefore cannot be material, even if wrong.  This argument fails under either standard

for materiality.  Under the "reasonable examiner" standard, the information does not

have to preclude patentability to be material.  E.g., Digital Control, 437 F.3d at 1318;

Bristol-Myers, 326 F.3d at 1237.  Even under the stricter standard promulgated by the

PTO in 1992, information that "is inconsistent with, a position the applicant takes in: . . .

(ii) Asserting an argument of patentability" is material.  37 C.F.R. § 1.56(b) (1992).  As

discussed infra, p. 30, Ariad responded to a PTO section 112 rejection by pointing to

the disclosure of IκB-α as enabling of its claims, thus "asserting an argument of

patentability."  Therefore, the error is material regardless of the patent filing date.[30]

---

[30] In addition, the standards of proof to establish the filing date differ between patent prosecution and a jury trial on validity.  At trial, the patent '516 was presumed valid and the defendant had the burden to show invalidity by "clear and convincing evidence."  E.g., Oakley, Inc. v. Sunglass Hut Int'l, 316 F.3d 1331, 1339 (Fed. Cir. 2003); 35 U.S.C. § 282 (2002).  During prosecution, however, the examiner uses a preponderance of the evidence standard, and in some cases the burden is shifted to the applicant to prove the claims are patentable.  See 37 C.F.R. § 1.56 (2006) (describing preponderance of the evidence as the standard to evaluate unpatentability in determining materiality); Manual of Patent Examining Procedure ("MPEP") § 2112(V.) (shifting the burden of proof to applicant after an inherency rejection under 35 U.S.C. § 102 or a "prima facie obviousness" rejection under 35 U.S.C. § 103); see also (Office Action in Ex Parte Reexamination, Patent 6410516, August 2, 2006 (DTX 973A) at 8) ("[T]he existence of a final court decision of claim validity in view of the same or different prior art does not necessarily mean that no new question is present, because of the different standards of proof employed by the Federal District Courts and the

### d. Figure 43 Is Not Cumulative

Finally, Ariad's argument that any disclosure of the error in figure 43 was merely cumulative, because the examiner could have compared the sequence in the patent application with Davis (1991), Fig. 3, is unpersuasive. (Plaintiffs' Trial Exhibit ("PTX") 143.)[31]  Indeed, as discussed supra, note 29, I find it unreasonable to expect the examiner to compare the sequences.  In any case, since figure 43 is not identical to the figure showing pp40 in Davis, even if the examiner had compared the sequences he would not necessarily have realized that figure 43 was an incorrect sequence of pp40 and not the sequence of murine IκB.  Id.

Ariad also suggests the information is cumulative because one of the examiners of the '516 patent, Dr. Schwartzman, was also the primary examiner of the application that issued as the '090 patent.  (Docket # 398 ¶ 239-40.)  It notified Dr. Schwartzman during the prosecution of the '090 patent that an identical figure in the '090 application was "not the nucleotide sequence of IκB-α but the nucleotide sequence of pp40 rel-associated protein."  (Id.)  Presumably, Ariad believes that the examiner should sua sponte have applied this information to the examination of the '516 patent as well.  The duty of candor and good faith exists to ensure that patent applicants provide accurate material information to the PTO so that the examiner can efficiently and effectively assess their claims.  The duty of candor is not so lax that it requires an examiner to

---

Office.").

[31] Nathan Davis, et al., Rel-Associated pp40: An Inhibitor of the Rel Family of Transcription Factors, 253 Science 1268, 1270 (1991).

compare nucleotide sequences or to track what figures are shared between divisional applications.  See also Armour & Co. v. Swift & Co., 466 F.2d 767, 779 (7th Cir. 1972) ("[W]e think that it is unfair to a busy Examiner . . . to assume that he retains details of every pending file in his mind when he is reviewing a particular application.").  Therefore, I decline to find that information concerning the errors in figure 43 is merely cumulative on that basis.

### e. The Errors in Figure 43 Are Material Under Both Standards

To determine the materiality of the error in figure 43, it is necessary to consider what information the examiner relied on in examining the '516 application during its prosecution.  The prosecution history shows that the examiner expressed concern on multiple occasions that the '516 application either did not satisfy the written description requirement or was not enabled.  (See, e.g., DTX 2 at ADL611-21, ADL613 (March 11, 1999 PTO Office Action rejecting twenty claims as "containing subject matter which was not described in the specification in such a way as to enable one skilled in the art . . . to make and/or use the invention."); id. at ADL478-88, ADL480 (October 1997 Office Action rejecting claims for lack of enablement and written description); id. at ADL447-55, ADL450-35 (January 1997 Office Action rejecting claims for lack of enablement); id. at ADL822-33, ADL824-25.)  In a July 1998 Office Action, the examiner rejected several claims because the specification failed to teach how to purify either the NF-κB or IκB protein.  Ariad responded that "the present application teaches how to make recombinant forms of the proteins."  (Id. at ADL570-88, ADL585.)  In response to the October 1997 Office Action, the applicants argued that there was adequate disclosure

31

to support, <u>inter alia</u>, that the "artificial induction of IκB could be used as a means of inhibiting NF-κB activities as its regulation of gene transcription."  (<u>Id.</u> at ADL517-40, ADL529.)

        These rejections and Ariad's responses show that the DNA sequence of IκB-α was material because Ariad asserted in an argument for patentability that it taught how to make the protein and thus enabled their claims.  The correct sequence information was also necessary in order to incorporate IκB-encoding DNA into the appropriate vector for gene therapy as described by the '516 patent.  ('516 Patent col.32 ll.12-63.) While pp40 is an inhibitor of NF-κB in chickens, it is not clear that it operates similarly in mammals.  (Trial Tr. Day 1, 123:2-5.)  Latchman testified that in order to have the greatest chance for success in human gene therapy, it is important "to have as much going for you as possible."  (<u>Id.</u> at 101:14-23.)  In particular, he warned that using a gene from a non-mammalian species is "more likely to raise an immune reaction and the protein is likely to have functional differences."  (<u>Id.</u>)  Thus, the information that the sequence showed avian pp40 and therefore was less likely to enable the claimed method without undue experimentation, would have been of interest to a reasonable examiner, particularly here where enablement was an issue.  <u>Cf.</u> <u>Regents of Univ. of Cal. v. Eli Lilly & Co.</u>, 119 F.3d 1559, 1567 (Fed. Cir. 1997) (finding the disclosure of rat cDNA inadequate to fulfill the written disclosure requirement of a patent claiming human insulin-encoding cDNA).  Finally, even if I accept Ariad's claim that pp40 is an IκB and thus could be used to make or use the invention, the sequence in figure 43 is not the correct sequence of pp40 as shown in Davis (1991).  (PTX 143.)  For these

reasons, I find that the error in figure 43 is material.

### 4.  The Materiality of the Prior Art References

Lilly also alleges that Ariad intentionally withheld certain references from the

PTO during prosecution of the '516 patent that were material to the question of inherent

anticipation.  "A patent is invalid for anticipation if a single prior art reference discloses

each and every limitation of the claimed invention."  Schering Corp. v. Geneva

Pharms., Inc., 339 F.3d 1373, 1377 (Fed. Cir. 2003).  Even if a limitation of the claimed

invention is missing in the prior art reference, the patent may still be anticipated if "the

missing characteristic is necessarily present, or inherent, in the single anticipating

reference."  Id.  Lilly points to several post-filing references related to the effects on NF-

κB activity of various compounds known before the filing date of the patent that it

believes should have been provided to the PTO.  Specifically, it cites several articles by

co-inventor Baldwin, including:

> Baldwin, A.S., The NF-κB and IκB Proteins: New Discoveries and Insights, Annu. Rev. Immunol. 14:649-81 (1996) (DTX 24-S);
>
> Baldwin, A.S., The Transcription Factor NF-κB and Human Disease, J. Clinical Investigation 107(1):3-6 (2001) (DTX 25);
>
> Scheinman et al., Role of Transcriptional Activation of IκB-α in Mediation of Immunosuppression by Glucocomcoids, Science 270:283-286 (1995) (DTX 28); and
>
> Holmes-McNary, M. and Baldwin, A.S., Chemoprotective Properties of trans-Resveratrol Are Associated with Inhibition of Activation of the IκB Kinase, J. Cancer Research 60:3477-3483 (2000) (DTX 473),

("the Baldwin references") as well as the relevant references cited in them as disclosing

that glucocorticoids, salicylates, cyclosporin A, and resveratrol (Res) – an active

ingredient in red wine – all inhibit NF-κB activity.  (DTX 24-S at 671; DTX 25 at 4; DTX 28 at 283; DTX 473 at 3481-82.)  When these references were brought to the PTO's attention in the reexamination proceedings, the PTO invalidated the claims at issue in this case as being inherently anticipated.  (Office Action in Ex Parte Reexamination, Patent 6410516, August 2, 2006 (DTX 973A).)  Lilly argues this demonstrates under both the "reasonable examiner" and stricter "prima facie case of unpatentability" standards that the references were material.  See Molins, 48 F.3d at 1179 (noting that "the result of a PTO proceeding that assesses patentability in light of information not originally disclosed can be of strong probative value in determining whether the undisclosed information was material").

Ariad's counters that these references: (1) were not material because they were cumulative to material already provided to the examiner; and (2) even if they were not cumulative, they were not material because the law at the time included a contemporaneous recognition requirement that one of ordinary skill would have had to recognize the missing information inherently disclosed.[32]

### a. The Cited References Are Not Cumulative

First, Ariad points to a 1994 paper by Ulrich Siebenlist ("Siebenlist 1994") (DTX 2 at ADL649-73)[33] provided to the PTO as an exhibit to a declaration (id. at ADL625-

---

[32] Ariad also argues that the references cannot be material because the jury found they do not make the asserted claims unpatentable.  (Docket # 398 ¶ 48.)  As discussed supra p. 21, the standards for materiality do not preclude information from being material even if the claims are ultimately found to be valid.

[33] Siebenlist et al., Structure, Regulation and Function of NF-κB, 10 Ann. Rev. Cell. Biol. 405-55 (1994).

27) by one of the inventors of the '516 patent, Dr. Baltimore.  This first declaration was

submitted in support of Ariad's response to a March 17, 1999 PTO Final Office Action

rejecting all pending claims for failing to satisfy the enablement requirement of 35

U.S.C. § 112.  (<u>See</u> <u>id.</u> at ADL610-21, ADL613; ADL697-704, ADL700.)  The copy of

the first Baltimore declaration in the PTO prosecution history contains the handwritten

notation, "Considered 11/19/99," followed by Examiner Schwartzman's initials.[34]

Siebenlist 1994 includes brief discussions relevant to inherent anticipation

including: (1) that cyclosporin A blocks activation of NF-κB (citing Schmidt et al. 1990)

(<u>id.</u> at ADL661); and (2) that the actions of steroids, including glucocorticoids, could be

explained by their complexing with NF-κB (citing Ray & Perfontaine 1994) (<u>id.</u> at

ADL664).  While Siebenlist 1994 does not mention resveratrol specifically, it does

discuss the inhibition of NF-κB activation by antioxidants.  (<u>Id.</u> at ADL659.)  Ariad

argues this is an adequate disclosure of resveratrol because it is an antioxidant.

Next, Ariad points to the response to an August 11, 2000 Office Action that it

sent to Examiner Schwartzman on September 12, 2001.  (<u>Id.</u> at ADL872-92.)  Again,

Ariad included a declaration by inventor Baltimore along with 100 pages of attached

references.  Baltimore described several classes of compounds that "are able to affect

---

[34] The initials are indecipherable, however they appear similar to those of the
examiner who initialed the '516 patent search history.  (<u>See</u> DTX 2 at ADL4.)
Furthermore, the notation on the first Baltimore declaration was dated the same day
Examiner Schwartzman signed an Office Action responding to the arguments made in
the Ariad September 21, 1999, response that included the declaration.  (<u>See</u> DTX 2 at
ADL707-16, ADL716.)  Finally, Matthew Vincent, the patent attorney for Ariad
prosecuting the '516 patent, testified that he recognized the initials as those of
Examiner Schwartzman.  (Trial Tr. Day 3, 53:18-25.)  Based on this evidence, I find that
the initials on the first Baltimore declaration are Schwartzman's.

NF-κB gene expression" including salicylates (citing, but not providing, a 1999 paper by Yan et al.).[35]  (Id. at ADL894-97, ADL895-96.)  This response included a copy of a 2000 paper by Fujihara ("Fujihara 2000")[36] citing an number of NF-κB inhibitors previously described including glucocorticoids, aspirin and antioxidants.  (Id. at ADL904-12, ADL904.)

Less than a month later, on October 4th, Examiner Guzo allowed the amended claims noting that he "ha[d] reviewed the last response and accompanying references which provide substantiating examples of the claimed methods."  (Id. at ADL923-53, ADL952.)  Ariad asserts that this language indicates that the examiner considered the post-filing references, including Fujihara 2000, and was aware of the 1999 Yan paper. Because these references, taken together, disclose use of the same prior art compounds as the references advanced by Lilly, Ariad argues that the withheld references are merely cumulative, and thus cannot be material.

Lilly's response is that the Baltimore declarations and accompanying references were provided only to contest claim rejections based on the written description and enablement requirements.  While the PTO did accept the references submitted in support of the applicant's response to the Office Action without an Information

---

[35] Yan et al., Aminosalicylic Acid Inhibits IκB Kinase α Phosphorylation of IκBα in Mouse Intestinal Epithelial Cells, 274 J. Biol. Chem. 36631 (1999).

[36] Fujihara et al., A D-Amino Acid Peptide Inhibitor of NF-κB Nuclear Localization is Efficacious in Models of Inflammatory Disease, 165 J. Immunol. 1004 (2000).

36

Disclosure Statement ("IDS"), the Manual of Patent Examining Procedure ("MPEP")[37] at

the time implied that the references would only be reviewed for the specific issue being

advocated.[38]  In addition, Ariad's response to the Office Action only discussed why the

provided references were relevant to the adequacy of the '516 disclosure, not to

inherent anticipation.  Ariad's patent attorney for the '516 application, Dr. Matthew

Vincent ("Vincent"), confirmed that Ariad did not read the publications at the time "with

any appreciation that someone might argue that they were relevant to inherent

---

[37] "The MPEP is commonly relied upon as a guide to patent attorneys and patent
examiners on procedural matters. While the MPEP does not have the force of law, it is
entitled to judicial notice as an official interpretation of statutes or regulations as long
as it is not in conflict therewith."  Molins PLC v. Textron, Inc., 48 F.3d 1172, 1180 n.10
(Fed. Cir. 1995) (internal citations and quotations marks omitted).

[38] References normally must be submitted with an IDS to be considered by the
PTO.  See 37 C.F.R §§ 1.97, 1.98.  The MPEP at the time of the '516 prosecution
provided an exception for references submitted with an Office Action response, in
pertinent part as follows:

> To the extent that a document is submitted as evidence directed to an
> issue of patentability raised in an Office action, and the evidence is timely
> presented, applicant need not satisfy the requirements of 37 CFR 1.97
> and 37 CFR 1.98 in order to have the examiner consider the information
> contained in the document relied on by applicant. In other words,
> compliance with the information disclosure rules is not a threshold
> requirement to have information considered when submitted by applicant
> to support an argument being made in a reply to an Office action.

MPEP § 609 C (3) (7th ed. July 1998) (emphasis added).  The next edition of the MPEP
added a sentence to this exception to make it clear that the PTO only considered the
reference for the issue proffered.  MPEP § 609.05(c) (8th ed., rev. 5, Aug. 2006)
("[C]onsideration by the examiner of the document submitted as evidence directed to
an issue of patentability raised in the Office action is limited to the portion of the
document relied upon as rebuttal evidence; the entirety of the document may not
necessarily be considered by the examiner.").

anticipation." (Trial Tr. Day 3, 107:25-108:4.)  The PTO Notice of Allowability notes

that the examiner amendments to the claims proposed by Ariad were authorized in a

telephone interview with Vincent on September 14, 2001, only two days after the

examiner received the 100-page document.  (DTX 2 at ADL924.)  Mr. Lieberstien,

Lilly's patent expert, testified that this kind of examiner's amendment normally means

allowance of the claims.  (Trial Tr. Day 2, 105:12-17.)  Lilly further notes that the

sections of Siebenlist 1994 relevant to inherent anticipation are twenty pages removed

from the sections Ariad drew to the attention of the examiner in the first Baltimore

declaration.  It points out that there is no evidence in the prosecution history that the

examiner was aware of the information in Siebenlist 1994 and Fujihara 2000 describing

prior art compounds.  Finally, none of these references specifically mentions the use of

resveratrol or red wine; rather they only discuss the more general use of antioxidants to

inhibit NF-κB activity.

Given the limited purpose for which the references were proffered, the fact that

they were not listed in an IDS, the exceedingly short time between the receipt of the

second Baltimore declaration and the examiner's amendments suggesting allowance,

and the lack of specific reference to resveratrol or red wine, I do not find that the

Baltimore declarations and attachments adequately disclosed the prior art compounds

described in the Baldwin references.  Therefore, the Baldwin references are not merely

cumulative and thus may be material in an analysis of inequitable conduct.

### b. Recognition Requirement for Inherent Anticipation

Even if the Baldwin references are not merely cumulative, Ariad insists that a

38

reasonable examiner would not have considered them material because at the time the PTO had a recognition requirement for inherent anticipation.  Under this doctrine, a reference does not inherently anticipate an invention unless it both necessarily includes the missing element and that missing element would be recognized as necessarily included by a person of ordinary skill <u>at the time</u>.  In support of its position, Ariad points to instructions to the examiner on inherent anticipation in the edition of the MPEP in effect at the time of the '516 prosecution:

> To establish inherency, the extrinsic evidence must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill.

MPEP § 2112 (7th ed. July 1998) (citing <u>In re Robertson</u>, 169 F.3d 743, 745 (Fed. Cir. 1999) (internal quotations omitted).  Ariad contrasts this language with the subsequent edition of the MPEP, which explicitly states that contemporaneous recognition is not a requirement for inherent anticipation.[39]  It argues that this shows that a change in the PTO's position on inherent anticipation occurred after the prosecution of the '516 patent which eliminated the recognition requirement.  (<u>See</u> Docket # 398 ¶¶ 121-124.)

The difficulty with this argument is that the 7th edition of the MPEP did not require contemporaneous recognition, only an ultimate recognition of the inherency, and it is not in conflict with the additional guidance provided in the later edition.

---

[39] <u>See</u> MPEP § 2112 (II.) (8th ed., rev. 5, Aug. 2006) ("There is no requirement that a person of ordinary skill in the art would have recognized the inherent disclosure <u>at the time of invention</u>, but only that the subject matter is in fact inherent in the prior art reference.") (emphasis in original) (citing <u>Schering Corp. v. Geneva Pharm. Inc.</u>, 339 F.3d 1373, 1377 (Fed. Cir. 2003)).

Moreover, with one exception, the cases relied upon by Ariad, while requiring recognition by persons of ordinary skill, are silent as to whether that recognition must be contemporaneous with the date of the reference.  See Robertson, 169 F.3d at 745. ("the extrinsic evidence must make clear that the missing descriptive matter . . . would be so recognized by persons of ordinary skill") (internal quotations removed); Continental Can Co. v. Monsanto Co., 948 F.2d 1264, 1268, (Fed. Cir. 1991) (same); Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc., 34 F.3d 1048, 1052 (Fed. Cir. 1994) ("EMS was required to prove . . . and that it would be so recognized by persons of ordinary skill.").  The sole exception that explicitly required contemporaneous recognition is Elan.  Elan Pharms., Inc. v. Mayo Found. for Med. Educ. & Research, 304 F.3d 1221 (Fed. Cir. 2002) ("[I]t must be shown that the undisclosed information was known to be present in the subject matter of the reference."), vacated 314 F.3d 1299 (Fed. Cir. 2002), and superceded 346 F.3d 1051 (Fed. Cir. 2003).  However, that decision was vacated and the new decision does not contain a similar requirement. (Id.)  Also, as Lilly points out, Elan was decided after the '516 patent issued, so it could not have been considered by the examiner as a statement of the law at the time of the '516 prosecution.  I note that Schering, the case cited in the 8th edition of the MPEP, explicitly rejected both the holding in Elan and Ariad's reading of Continental Can as requiring contemporaneous recognition.  Schering, 339 F.3d at 1377.

In addition, the examiner of the '516 patent continued to reject a claim even after Ariad argued that there was no contemporaneous recognition in the reference to support the examiners inherent anticipation rejection.  In that instance, Ariad asserted

40

that the reference Wall et al. could not be prior art because it did not "teach or suggest that NF-κB is a trans-acting nuclear factor, nor do they teach or suggest that NF-κB binds to the enhancer of the κ gene." (DTX 2 at ADL470-71.)  The examiner, in maintaining the rejection, stated that "[a]lthough these references do not teach the NF-κB--IκB-α complex, the role of NF-κB as a transcription factor or the presence of NF-κB binding sites in the expressed genes, these are inherent properties of the cells and the genes." (DTX 2 at ADL486.)  This indicates that the examiner of the '516 patent did not accept Ariad's argument that there was a contemporaneous recognition requirement for inherent anticipation.  Thus, the case law and the '516 examiner's actions support Lilly's position that a reasonable examiner would not reject references describing use of the prior art compounds because of a lack of contemporaneous recognition of their mode of action.

I therefore find that the Baldwin references are material because: (1) they disclose references pertaining to prior art compounds that the examiners, on reexamination, found were material to the issue of patentability; (2) they are not cumulative to references provided during the prosecution of the '516 patent, and; (3) a reasonable examiner, at the time of the prosecution of the '516 patent, would not have believed there was a contemporaneous recognition requirement for inherent anticipation.

### 5.   Evidence of Intent Concerning the Errors in Figure 43

Lilly argues that Ariad's patent attorneys were not only aware that figure 43 was not the sequence of IκB-α as described, but also that the information was material to

41

the asserted claims. In addition, Lilly suggests that Ariad had a strong motivation to conceal this information because disclosure might have required Ariad to refile the application and lose the benefit of the transitional rules. Without the benefit of the transitional rules, the patent would have expired on January 9, 2006, twenty years from its original filing date, rather than seventeen years from issuance, in 2019. Lilly asserts that the failure to inform the PTO of the error, coupled with the desire to secure an additional thirteen years of patent monopoly, provides adequate circumstantial evidence of an intent to conceal material information and justify a finding of inequitable conduct. (See Docket # 397 ¶¶ FF110-18.)

### a. The Prosecuting Firm and Attorney History of the '516 Patent

The complexity of the prosecuting attorney history of the '516 patent rivals that of its PTO prosecution history. Figure 43, identified as "the nucleotide sequence and the amino acid sequence of IκB-α," was added as new matter in application 07/791,898, a continuation-in-part of several earlier Ariad applications, filed November 13, 1991. (DTX 33 at ADL14822, 14851.) This application was eventually abandoned, but not before a continuation application, 08/418,266 ("the '266 application"), also containing figure 43 was filed on April 6, 1995. The '266 application spawned two divisional applications containing figure 43, 08/463,397 ("the '397 application") and 08/464,364, which issued as the '516 patent.[40] (See DTX 3300 (demonstrative exhibit

---

[40] A divisional application is a type of continuation patent application. An applicant is only allowed to claim one invention in a patent. If the PTO determines that an application contains more than one invention, it issues a restriction requirement and the applicant must either abandon all but one invention or create one or more divisional applications to pursue the other inventions in separate applications. See generally

showing the '516 patent family lineage).)  The '266 application eventually issued as

U.S. Patent No. 5,804,374 on September 8, 1998.  After the claims were allowed, but

before the patent issued, figure 43 was deleted from the '266 application.  At that time

the applications were being prosecuted by the firm of Hamilton, Brooks, Smith &

Reynolds, P.C.  Lisa Warren ("Warren"), an attorney associated with that firm, filed an

amendment with the PTO on September 15, 1997, to remove figure 43 and more than

30 other figures.  (DTX 34 at ADL15351-71.)  Warren explained in the amendment that

the applicants did not believe the deleted figures were necessary for an understanding

of the invention.  (Id. at 15370.)  However, she also noted that "[i]t has recently come to

the Applicants' Attorneys' attention that figure 43 is not the nucleotide sequence of IκB-

α but the nucleotide sequence of pp40 rel-associated protein."  (Id.)  This information

apparently had been provided by Ariad employee Sharon Hausdorff ("Hausdorff").

(See Clauss Dep. Tr., 44:18-22, 62:2-6.)  The PTO subsequently disapproved the

request to amend due to confusion over the adequacy of the amendment.  (DTX 34 at

ADL15341.)

In late 1997, after this amendment was filed, but before it had been denied by

the PTO, responsibility for prosecution of the outstanding applications was transferred

to the firm of Foley, Hoag & Elliot LLP ("Foley Hoag").  (Id. at ADL15373.)  Dr. Isabelle

Clauss ("Clauss") was responsible for the day-to-day work on the applications.

However, Clauss had only limited recognition to prosecute patents for others before the

---

Herbert Schwartz, Patent Law and Practice § 2.III.D.6.c. (5th ed. 2006).

PTO.[41]  She worked with Vincent, who was the attorney at Foley Hoag responsible for

the overall strategy for the prosecution of the Ariad applications.  (Trial Tr. Day 3,

44:16-25, 89:13-25.)  Vincent, an associate only three years her senior, testified that he

provided guidance to Clauss and reviewed "substantive papers" she submitted to the

PTO, as well as any other paper she brought to his attention.  (Id. at 90:19-23.)

However, Clauss would have handled "ministerial" actions, such as resubmitting

documents, responding to requests for references and some amendments, on her own.

(Id. at 91:2-12).  On March 6, 1998, Clauss re-filed the previously disapproved

amendment signed by Warren cancelling, inter alia, figure 43 and containing the

admission that "Figure 43 is not the nucleotide sequence of IκB-α."  (DTX 34 at

ADL15343-44.)  The PTO approved the resubmitted amendment and the patent on the

'266 application issued without figure 43.

On January 12, 2000, after the claims were allowed on the divisional '397

application but before issuance, Clauss filed an amendment to delete the same figures

that had been deleted in the '266 application, including figure 43.  The statement "[i]t

has recently come to the Applicants' Attorneys' attention that figure 43 is not the

nucleotide sequence of IκB-α but the nucleotide sequence of pp40 rel-associated

protein" appeared on the last page of the amendment, the same page bearing Clauss'

signature.  (DTX 131 at ADL3629.)  Again, this information apparently had been

provided by Ariad's Hausdorff.  (See Clauss Dep. Tr., 44:18-22.)  The PTO approved

---

[41] Clauss was granted limited recognition as a resident alien to prepare and
prosecute patent applications under 37 C.F.R. § 10.9(b).  (See DTX 34 at ADL15345.)

the amendment and this patent also issued without figure 43.

In the beginning of 2001, Vincent moved his practice from Foley Hoag to Ropes & Gray LLP. The outstanding Ariad applications were transferred about the same time. (Trial Tr. Day 3, 44:1-6, 46:16-24.) Clauss remained at Foley Hoag and did no further work on any Ariad patent applications. The '516 patent ultimately issued on June 25, 2002. Lilly argues that the failure of Hausdorff, Vincent and Clauss to disclose the error in figure 43 to the PTO meets the threshold standard for intent necessary to consider a claim of inequitable conduct.

### b. Evidence of Intent by Hausdorff

Lilly's allegations fail as to Hausdorff. Hausdorff clearly was aware of the error, since she provided the information that figure 43 was incorrect in the '266 and '397 applications to the prosecuting attorneys. However, absent any showing that she intended the same information to be withheld on the '516 application, I cannot find an intent to mislead. It is troubling that PTO records show Hausdorff accompanied Vincent on two in-person interviews with Examiner Schwartzman during the prosecution of the '516 patent and after the figure had been removed from the other two patents. (See Interview Summary, April 7, 1998 (DTX2 at ADL495); Interview Summary, Jan. 26, 1999 (id. at ADL609).) However, Vincent's testimony did not establish that issues relevant to the figure were discussed or that Hausdorff intentionally withheld information. (Trial Tr. Day 3, 48:10-24.) She had previously disclosed the error to Clauss (who was not present at either PTO interview). As the representative of the client, she may have expected the patent attorneys at Foley Hoag to determine what

45

information was relevant to discuss with the examiner.[42]

### c.  Evidence of Intent by Vincent

Lilly's allegations against Vincent rest solely on the deposition testimony of

Clauss.[43]  Clauss, not Vincent, signed both the '266 amendment resubmittal and the

'397 amendment, each of which admitted the error in the figure.  Vincent testified that

neither Clauss nor anyone else indicated to him that there was an issue with figure 43

during the pendency of the application for the '516 patent.  (Trial Tr. Day 3,

64:25-65:3.)  This is in conflict with Clauss' testimony, in which she stated that she

discussed the issue regarding figure 43 with him.[44]  (See Clauss Dep. Tr., 57:18-22.)

However, I find his testimony credible and therefore conclude that he did not conceal

the error in figure 43, intentionally or otherwise.

### d.  Evidence of Intent by Clauss

Lilly's strongest evidence of misconduct is Clauss' failure to inform the PTO of

the error in figure 43, but ultimately this too fails to rise to clear and convincing proof of

---

[42] In its proposed findings of facts, Lilly describes Hausdorff as "a patent agent at Ariad," however, it fails to cite to evidence in support of this description.  (Docket #  397 ¶ FF119.)  Even assuming she was a registered patent agent, there is still insufficient evidence to conclude that Hausdorff intentionally withheld the information concerning figure 43 from the PTO.

[43] Dr. Clauss did not testify at the bench trial; only a copy of her deposition testimony was available to the court.

[44] Clauss' testimony on the issue is, at best, equivocal.  She was uncertain about the time the conversations took place (Clauss Dep. Tr., 58:1-12), which patent applications they related to (id. at 58:13-19), whether the discussions included figure 43 being in error (id. at 68:5-19) or whether Vincent had seen the resubmittal to the PTO.  (Id. at 56:4-12.)

46

intent.  Clauss testified that she expected figure 43 to be canceled in the '516

application at some point.  However, it was standard practice at Foley Hoag to

"prepare[] the figures once the case [was] indicated as allowable" to save money.

(Clauss Dep. Tr., 64:14-18, 67:1-10.)  This was the approach taken with the '266 and

the '397 patents.  The '516 application was transferred to Ropes & Gray before the

claims were allowed, therefore Clauss was no longer involved at the time she would

normally have been expecting the figure to be corrected.  Lilly asserts, however, that

Clauss had a duty to inform the PTO of the error earlier than allowance because she

"made arguments for patentability based on the disclosure of IκB and/or IκB-encoding

DNA."  (Docket # 402 ¶ CF291.)  It points to two separate responses to PTO Office

Actions to support this claim.

### (1) Clauss' Testimony on Materiality

First, Lilly cites a response filed June 10, 1998, in which Vincent stated that the

application provided "ample evidence . . . to fully enable those skilled in the art to

practice the invention with respect to activation of expression of IκB."  (Docket # 397 ¶

FF97.)  Clauss admitted that, when this response was filed, the then existing claims

called for an agent affecting NF-κB activity that consisted of all or a portion of DNA

encoding IκB or all or a portion of IκB.  (Clauss Dep. Tr., 72:16-73:12.)  Clauss testified

that she "[p]robably" considered figure 43 material to those claims.  (Id. at 72:16-73:12.)

However, this response was signed by Vincent, not Clauss.[45]  In addition, the

_____

[45] Dr. Clauss' signature appears only on the response attesting to the
"Certification of Facsimile."  (DTX 2 at ADL517.)

response not only canceled the claims calling for an agent based on the sequence information of figure 43, but the remainder of the paragraph cited by Lilly discussed the binding of the NF-κB-IκB-α complex in general and not the use of an agent based on the sequence of IκB-α.  (DTX 2 at ADL529; <u>compare</u> <u>id.</u> at ADL465, claims 90, 92, <u>with</u> <u>id.</u> at ADL519 (canceling same).)  Therefore, Clauss' admission that figure 43 was material to claims 90 and 92 does not establish an intent to mislead.  These two claims, forwarded from the previous patent attorneys and which made the error in figure 43 material, were being canceled in the response filed by Foley Hoag.

### (2) Clauss' Response to Office Action

A little over a year later, on September 17, 1999, Clauss responded to a final PTO Office Action and defended the sufficiency of the disclosure with regard to gene therapy, explaining that an "expression vector containing IκB-encoding DNA can be introduced into an individual" and that "IκB itself . . . can also be introduced into cells to inhibit NF-κB . . . ."  (DTX 2 at ADL702.)  Lilly correctly points out that the only disclosure in the specification of such "IκB encoding DNA" is purportedly found in figure 43.  In addition, it asserts that Clauss was aware that the figure was not IκB-α when she defended the specification, and she was also aware that Ariad would lose the benefit of the longer patent term if they had to re-file the application.

Like Hausdorff's silence at PTO interviews, Clauss' failure to inform the PTO in September 1999 of the error in figure 43 is troubling.  However, this is a single error in a long and complicated patent prosecution.  It is easy in hindsight to portray a failure to act as something more than a mistake, oversight or negligence.  <u>Molins</u>, 48 F.3d at

1181 (expressing concern about "the ease with which a relatively routine act of patent prosecution can be portrayed as intended to mislead or deceive.").  I do not find that Lilly has met its burden to show by clear and convincing evidence that Clauss made a deliberate decision to withhold the information from the PTO.  Compare M. Eagles, 439 F.3d at 1341 ("[A] failure to disclose a prior art device to the PTO, where the only evidence of intent is a lack of a good faith explanation for the nondisclosure, cannot constitute clear and convincing evidence sufficient to support a determination of culpable intent."), with Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Inc., 394 F.3d 1348, 1354 (Fed. Cir. 2005) (finding intent where applicant withheld relevant prior art for the PTO while at the same time disclosing it to the Food and Drug Administration in seeking approvals to sell device covered by patent).

Even though the error in figure 43 was material, Lilly has failed to meet the threshold showing necessary to prove intent and thus has failed to prove inequitable conduct.

### 6.  Evidence of Inventor Baldwin's Intent to Conceal References

The elements of inequitable conduct predicated on a failure to disclose material prior art are identical to those discussed supra, p. 21, Lilly must show by clear and convincing proof both (1) knowledge by the applicant of the prior art and its materiality; and (2) an intent to mislead the PTO.  Molins, 48 F.3d at 1178; M. Eagles, 439 F.3d at 1341.  Lilly identifies only Dr. Baldwin as possessing both the knowledge and intent necessary to meet the threshold for inequitable conduct.  (See Docket # 397 ¶¶ FF139-49.)  In particular, it argues that Baldwin was aware of his duty to disclose yet

49

intentionally failed to disclose the information on known NF-κB inhibitors based on his

deposition testimony:

> Q. Did you at any time consider disclosing your findings regarding
> Resveratrol in those experiments to the United States Patent Office?
>
> A. I mean I -- I considered it, but I -- again, I feel like that one would
> inundate the patent office with every report of -- of things that affect
> NF-κB one way or the other. It's -- you can do a search on NF-κB
> and it's endless.
>
> Q. Why is it you considered disclosing your findings regarding the
> effect of Resveratrol in your experiments to the United States
> Patent Office?
>
> A. Well, we signed -- we signed this document that says that was our
> obligation to do so at some point.

(Baldwin Dep. Tr. 171:16-172:5.)  This is a slender thread on which to hang a claim of

inequitable conduct.  Ultimately, it fails because Lilly has not established that Baldwin

was aware of the materiality of the withheld information.

There is no question that Baldwin was aware of the prior art, he was a co-author

of the papers describing it.  No evidence, however, suggests that Baldwin was aware of

the materiality of the information in the legal sense.  Baldwin is a scientist, not a patent

attorney.  His testimony admits to knowledge of his general duty to disclose "findings

regarding [his] experiments," but Lilly fails to show that he had any understanding that

a few short references to prior art compounds in a review paper had relevance to

inherent anticipation or that he was aware that they had not already been disclosed.  In

order to show the necessary intent, Lilly would first have to show that Baldwin not only

understood the need to disclose, but understood not only the concept of inherent

anticipation, but also that there was no need for contemporaneous recognition. Without such a showing, there is no reason to believe that Baldwin would understand, for example, that his statement that glucocorticoids had been used "for decades" could be relevant to the patent on his co-discovery of the mechanism by which NF-κB and IκB-α interact to suppress the expression of certain genes. A plain reading of Baldwin's testimony only admits to an understanding of the need to disclose the results of his current experiments, not his knowledge of the historical use of the same compounds.

Since the evidence fails to establish either knowledge of materiality or a motive to conceal, Baldwin's decision not to disclose background information concerning his current research is insufficient to prove by clear and convincing evidence an intent to deceive the PTO, and thus inequitable conduct.

C.    Lilly's Prosecution Laches Defense

Lilly asserts that the sixteen-year delay between the initial filing of the application that eventually became the '516 patent and its issuance is unreasonable and unexplained, and resulted in material prejudice to the public and to litigants. It therefore argues that the '516 patent is unenforceable under the equitable defense of prosecution laches. This defense is based on the theory that a patent applicant should not be allowed to abuse the procedures for obtaining a patent in a way that unreasonably extends the patent grant and delays the release of the patented technology into the public domain.[46]

───────────────

[46] Prior to June 1995, patent owners who experienced a long examination period before the patent issued in effect obtained an extension of the term of their patent grant. This occurred because the term of the patent grant was seventeen years from

### 1.    The Legal Standard for a Finding of Prosecution Laches

Obtaining a patent is often a lengthy process, with an average pendency in 2006

between application and either abandonment or grant of a U.S. Patent of over thirty-

one months.[47]  An inventor can deliberately extend the examination period while

preserving the original priority date through a number of techniques, including

responding to PTO actions as slowly as possible, filing continuation applications,

and/or abandoning and refiling applications.

Federal courts have long recognized that excessive delay by an inventor in the

prosecution of a patent may render it unenforceable.  See Woodbridge v. United

States, 263 U.S. 50, 63 (1923); Webster Elec. Co. v. Splitdorf Elec. Co., 264 U.S. 463,

466 (1924).  However, a series of recent Federal Circuit decisions make clear that the

_____

the date of issuance; however a patent owner is granted priority on his or her invention
from at least the date of application.  Thus, a patent owner who experienced a long
examination period could potentially reap the rewards of a larger pool of infringing
defendants or a larger market from which to collect royalties.

In 1994 Congress changed the patent term from seventeen years from date of
issuance to twenty years from date of application.  This greatly reduced the ability of
patent holders to create so-called "submarine" patents, that is, patented technology
that remains unpublished until it surfaces years after application and surprises the
market and effectively eliminates the issue of prosecution laches for patent applications
filed after June 7, 1995.  See Uruguay Round Agreements Act, Pub. L. No. 103-465,
108 Stat. 4809, codified at 35 U.S.C. § 154(a)(2).  In addition, prior to 1999 patent
applications were kept confidential by the PTO, with the result that potential infringers
had no notice of a pending patent during its pendency.  The 1999 American Inventors
Protection Act provided for the publication of many patent applications 18 months after
filing, giving potential infringers notice of pending patents in some cases.  See Pub. L.
No. 106-113, 113 Stat. 1501, codified at 35 U.S.C. § 122(b).

[47] See U.S. Patent and Trademark Office, Performance and Accountability
Report (Fiscal Year 2006) at 22, available at
http://www.uspto.gov/web/offices/com/annual/ (last visited July 2, 2007).

defense of prosecution laches will only succeed in extraordinary circumstances.  See Symbol Techs. Inc. v. Lemelson Med., 277 F.3d 1361 (Fed. Cir. 2002) ("Symbol I"); Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found., L.P., 301 F. Supp. 2d 1147 (D. Nev. 2004) ("Symbol II"); Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found., LP, 422 F.3d 1378, 1385 (Fed. Cir. 2005) ("Symbol III") (collectively the "Symbol Cases").  It is not enough for a defendant to show sequential divisional applications on various aspects of the invention, nor is it enough to merely show refiling of rejected claims or the use of continuation applications to add new subject matter. See Symbol III, 422 F.3d at 1385.  On the other hand, extreme delay extending the application process from 18 to 39 years, filing an application after allowance to postpone issuance, or repetitive filings that show a pattern of unjustifiably drawn out prosecution may constitute abuse of the patent system such as to amount to prosecution laches.  Id. at 1386.

### 2.  Analysis of Delays in the Prosecution of the '516 Patent

Lilly alleges that Ariad and/or their attorneys took advantage of PTO procedural rules to delay prosecution of the '516 patent in a manner that requires equitable relief from this court.  Because there is no evidence that Ariad violated any specific rule or that it intentionally delayed prosecution of the '516 patent, Lilly asks this court to examine the "totality of the circumstances" to conclude that there was unreasonable and unexplained delay sufficient to trigger laches.  Symbol III, 422 F.3d at 1385.  In particular, Lilly points to: (1) Ariad's refiling of continuation applications rather than appealing the PTO's final rejection of claims; (2) extending the time to respond to office

53

actions to the maximum six-month period allowed by statute; (3) prosecuting the claims

to the invention in multiple applications and abandoning those attempts when the

claims were rejected by the PTO; and (4) Ariad's use of transitional rules to avoid a

shortened patent term.

### a. Requirement to File an Appeal

Lilly has cited no authority to support its assertion that an applicant's decision to

abandon an application and file a continuation application, rather than appeal the

examiner's rejection of its claims, is an indication of unreasonable and unexplained

delay in prosecution. Indeed, the continued examination of applications is expressly

provided for by statute[48] and described as an alternative to appeal by the PTO. MPEP

§ 706.07(h) (8th ed., rev. 5, Aug. 2006) ("If an applicant files a request for continued

examination under this section after appeal, . . . it will be treated as a request to

withdraw the appeal and to reopen prosecution of the application"). Lilly asserts that

an appeal would have expedited prosecution and that "[t]here must be an obligation to

take a timely appeal." (Def.'s Pre-Trial Br. (Docket # 362) at 19.) In the absence of

evidence or case law to support these contentions, I decline to find that a decision not

to appeal a final rejection constitutes an unreasonable or unexplained delay in

prosecution.[49]

---

[48] See 35 U.S.C. § 132 ("Notice of rejection; reexamination.").

[49] The accuracy of Lilly's assertion that an appeal would have expedited
prosecution is dubious. The Practising Law Institute advises practitioners receiving a
final rejection to file a continuation application because, "[t]he backlog at the Board of
Patent Appeals is often several years. . . . If, after the occurrence of one or more
in-person interviews with an examiner (and supervising examiner if possible), as well

### b. Six Month Response to Office Actions

Lilly next claims that Ariad's use of the full six-month period provided by statute (35 U.S.C. § 133; see also MPEP § 710.02(a)(1)) to respond to Office Actions, rather than responding in the shortened regulatory period of three-months set by the PTO (MPEP § 710.02(b)), should be considered evidence of unreasonable delay. Again, Lilly fails to cite any support for this proposition, nor does it show that use of the full six-month period is unusual or atypical in patent prosecution generally. Rather, Lilly proposes that the additional time taken by Ariad in responding to the PTO compounds the other unreasonable delays they allege in prosecuting the patent. Because I do not find the total time to prosecute the '516 patent unreasonable (see infra), the use of the full statutory period to respond to Office Actions is not unreasonable.

### c. The Pre-'898 Applications

Finally, Lilly points to the number of abandoned and refiled applications concerning the subject matter of the '516 patent as evidence of unreasonable and unexplained delay. Specifically, Lilly points to the sixteen-year delay and the eight abandoned applications between the first Ariad application and the issuance of the '516 patent. Between January 1986 and April 21, 1989, the date found by the jury to be the effective filing date of the '516 patent, Ariad filed seven patent applications. These seven applications were eventually abandoned after being consolidated into the

---

as the filing of one or more continuation applications, it is clear that an important application will never get allowed by the examiner, it may be worth filing the appeal if the applicant is willing to wait for years." Jeffrey R. Kuester, Prosecuting a Patent That Holds up in Litigation (or, Destroying a Patent Unaware), 669 PLI/Pat 1033, 1070 (West 2001).

07/791,898 application, filed November 31, 1991.  Ariad describes the filing of these

continuation-in-part applications as reasonable in order to "add further material

regarding the inventors' ongoing work with NF-κB, which had rapidly advanced the

field."  (Pls.' Supl. Trial Brief (Docket # 360) at 20 n.14.)  The Federal Circuit

specifically noted that such filings are common and justified as the development of an

invention progresses.  Symbol III, 422 F.3d at 1385.  Therefore, I do not find the

applications prior to the '898 application to be unreasonable or unexplained under

these circumstances.

### d. Post Development Applications

Thirteen months after the '898 application was filed, the examiner issued a

restriction requirement, finding the original claims were directed toward multiple

inventions.  (See DTX33 at ADL15159-70, ADL15166.)  Ariad elected to pursue a

subset of its claims that addressed a method of inducing gene expression.  (Id.)  The

examiner ultimately rejected all pending claims in a final Office Action dated July 6,

1994.  (Id. at ADL15222-30.)  Rather than appealing this decision, Ariad chose to file a

continuation application, 08/418,266, on April 6, 1995.  The inventions contained within

this application eventually resulted in three U.S. patents: (1) 5,804,375,  issued

September 8, 1998 claiming methods of identifying an antagonist of gene transcription;

(2) 6,150,090, issued November 21, 2000, claiming an improved assay for protein-DNA

binding; and (3) the '516 patent, issued June 25, 2002.  (DTX 3300.)

### (1) Prejudice to Public Rights

While prejudice to intervening public and private rights is a factor in determining laches, Ariad diligently, albeit serially, pursued the '898 application to obtain three patents on the inventions disclosed.  Nothing in the statute or regulations requires that an applicant pursue all of his or her inventions in parallel.  Indeed, the granting of the first patent might well be necessary for an inventor with limited resources to fund the prosecution of the remaining claims.  Here, the time between each of the three patents granted was only two years, and specification was public for only four years while the scope of the claims was uncertain.  This is a far cry from the almost 30-year period of uncertainly between the disclosures first made public by Lemelson in his 1962 and 1963 patents and the claims finally granted in 1989 and the early 1990s on those same disclosures.  See Symbol II, 301 F. Supp. 2d at 1155-56.  In addition, there is no evidence that Ariad specifically tailored its claims to cover intervening inventions by Lilly or others as the court found Lemelson had done with his late 1980s and 1990s claims.  Id. at 1156.  Given Ariad's diligent pursuit of the three patents eventually granted, I do not find the four-year period, during which the scope of what was to be claimed and what was to be dedicated to the public was uncertain, unreasonable or unexplained.

### e. Use of Transitional Rules

Lilly also suggests that Ariad's use of a provision in the 1995 transitional rules that allowed it to maintain a seventeen-year patent term from date of grant and their petitioning the examiner to withdraw his final rejection of their application to avoid loss

of potential patent term should be considered in the determination of prosecution laches.  However, Ariad's desire to obtain the maximum term for its patent grant, particularly when the rules were being changed, is neither unreasonable nor unexplained.  Indeed, Congress recognized the potential unfairness of changing the rules mid-stream and provided for transitional rules available to all inventors in similar circumstances.[50]  Therefore, I do not find Ariad's actions to maximize the term of their patent grant under the transitional rules relevant to determining laches.

Nothing in the prosecution history of the '516 patent shows the kind of willful conduct and deliberate delay by Lemelson found by the court to require equitable relief in Symbol II.[51]  While the prosecution of the '516 patent involved multiple applications, numerous interactions with the PTO and the significant passage of time, the inventors

---

[50] Title 35 U.S.C. § 154(c)(1) (2002) ("The term of a patent that is in force on or that results from an application filed before the date that is 6 months after the date of the enactment of the Uruguay Round Agreements Act shall be the greater of the 20-year term as provided in subsection (a), or 17 years from grant.").

[51] It appears that Lemelson's conduct in the Symbol Cases represents the only time a district court found a prosecution delay unreasonable and unexplained enough to trigger prosecution laches.  See Kothmann Enters., Inc. v. Trinity Indus., Inc., 2006 WL 89838, at *31 (S.D. Tex. Jan. 13, 2006) (comparing Symbol II to six cases with prosecution delays ranging between seven and fifteen years, but where laches was not found).  While Lilly traces the prosecution history of the '516 patent in excruciating detail, it fails to provide any evidence showing that this history was atypical of patents in its field or of similar scope.  The thirteen years between the '486 application, found by the jury to be the effective date of the '516 patent and its issuance, is significantly less than the 18- to 39-year delay in the Symbol Cases.  In addition, there is no evidence that Ariad refiled applications after its claims were allowed; rather, it pursued its inventions in the face of multiple rejections of most of its claims.  Cf. Symbol III, 422 F.3d at 1385 ("[R]efiling an application solely containing previously-allowed claims for the business purpose of delaying their issuance can be considered an abuse of the patent system.").

were seeking broad patent protection on evolving discoveries involving many inventions.  Lilly has failed to show that this conduct was unreasonable or unexplained under the circumstances.  This court does not find prosecution laches that would bar enforcement of the '516 patent.

## IV.     Conclusion

Because the four claims found infringed by the jury do not encompass unpatentable subject matter and the patent is not invalid due to inequitable conduct or prosecution laches, the '516 patent is valid and enforceable.

Judgment may be entered for plaintiffs in accordance with the verdict of the jury and the court's findings of fact and conclusions of law.


_____July 6, 2007_____                    _____/s/Rya W. Zobel_____
            DATE                                        RYA W. ZOBEL
                                          UNITED STATES DISTRICT JUDGE

59

# Exhibit H

Kadesch, Thomas R.                                          6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-12237 WGY


AMGEN, INC.,                  ) DEPOSITION OF:
                              ) DR. THOMAS R. KADESCH
                              )
              Plaintiff,      )
                              )
        vs.                   )**CONFIDENTIAL**
                              )**RESTRICTED ACCESS***
                              ***OUTSIDE COUNSEL'S EYES
F. HOFFMANN-LA ROCHE LTD., a  )ONLY****
Swiss Company, ROCHE          )
DIAGNOSTICS GmbH, a German    )
Company, and HOFFMANN-LA      )
ROCHE, INC., A New Jersey     )
Corporation,                  )
                              )
              Defendants.     )


        TRANSCRIPT of the stenographic notes of the

proceedings in the above-entitled matter, as taken by

and before LISA FORLANO, RMR, CRR, CSR, CLNR, Notary

Public, held at the offices of Duane, Morris, 1540

Broadway, New York, New York, on Thursday, June 21,

2007, commencing at 9:08 a.m.

Confidential                              R000001

Kadesch, Thomas R.                                          6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

---

**Page 2**

1    A p p e a r a n c e s :
2
3        MARSHALL, GERSTEIN & BORUN LLP BORUN
         BY:  KEVIN M. FLOWERS, Ph.D., ESQUIRE
4            CULLEN PENDLETON, Ph.D., ESQUIRE
         233 South Wacker Drive
5        6300 Sears Tower
         Chicago, Illinois  60606-6357
6        (312) 474-6300
         e-mail: Kflowers@marshallip.com
7        Attorneys for Plaintiffs, Amgen
8
9        KAYE SCHOLER LLP
         BY:  HOWARD S. SUH, ESQUIRE
10           ABIGAIL LANGSAM, ESQUIRE
         425 Park Avenue
11       New York, New York  1022-3598
         (212) 836-7031
12       e-mail: Hsuh@kayescholer.com
         Attorneys for Defendant F. Hoffmann-La Roche
13
14
15       Also present:  Nicholas Guzman, Videographer
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1            I N D E X
2
3    WITNESS                          PAGE
4    THOMAS R. KADESCH,
5    By Mr. Flowers                    6
6    By Mr. Suh                       271
7
8            E X H I B I T S
9    Kadesch-1  Expert Report of Dr. Thomas Kadesch    17
         dated 4/6/07
10
11   Kadesch-2  Supplemental Expert Report of Dr.      71
         Thomas Kadesch
12   Kadesch-3  Decision in Amgen versus Hoechst Marion  95
         Roussel, 126 FSupp.2d 69
13
14   Kadesch-4  Second Supplemental Expert Report of   117
         Dr. Thomas Kadesch
15   Kadesch-5  Document entitled Immunoreactive       168
         erythropoietin in serum by P. Mary Cotes
16
17   Kadesch-6  Publication by Sherwood & Goldwasser,  172
         1979
18   Kadesch-7  Publication titled Radioimmunoassay    183
         of Erythropoietin
19
20   Kadesch-8  Article entitled Serum Concentrations  193
         of Erythropoietin Measured by Radioimmunoassay in
         Hematologic Disorders and Chronic Renal Failure
21
22   Kadesch-9  Radioimmunoassay for erythropoietin;   209
         serum levels in normal human subjects and patients
         with hemopoietic disorders article
23
24   Kadesch-10 Structural Characterization of Human   223
         Erythropoietin article
25

---

**Page 4**

1            E X H I B I T S (CONTINUED)
2    Kadesch-11 Letter to Patricia Carson to Deborah   228
         Fishman dated February 7, 2007
3
4    Kadesch-12 Article on Recombinant Human           241
         Erythropoietin Produced by Namalwa Cells
5    Kadesch-13 '349 Patent                            247
6    Kadesch-14 Paper - The Rouse sarcoma virus long   252
         terminal repeat is a strong promoter when introduced
7        into a variety of eukaryotic cells by DNA-mediated
         transfection, AM-ITC-00980021 - AM-ITC-00980025
8
         Kadesch-15 Paper - Expression of a Beta Globin  255
9        Gene Is Enhanced by Remote SV40 DNA Sequences
10   Kadesch-16 Rule 26(A)(2) Rebuttal Report of       257
         Thomas R. Kadesch, Ph.D.
11
         Kadesch-17 U.S. Patent No. 6,410,516           257
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 5**

1        VIDEO OPERATOR:  Good morning, this
2    begins tape number one of Volume I in the
3    videotape deposition of Dr. Thomas R. Kadesch
4    on Friday -- correction, Thursday, June 21,
5    2007 in the matter of Amgen, Inc. Plaintiff
6    versus H. Hoffmann-La Roche, Limited, et al,
7    Defendants.
8        This case was filed in the United
9    States District Court for the District of
10   Massachusetts, Index No. 05-12237.
11       The time on the record is now 9:08 a.m.
12       My name is Nicholas Guzman.  I'll be
13   the legal video specialist on behalf of
14   LiveNote World Services.
15       The Certified Court Reporter today is
16   Lisa Forlano of Rosenberg & Associates, also
17   on behalf of LiveNote World Services today
18   located at 221 Main Street, Suite 1250, San
19   Francisco, California, 94105, phone number
20   415-321-2300.
21       Today's deposition is being held on
22   behalf of the Plaintiff and is being held at
23   the law offices of Duane Morris, LLP, located
24   at 1540 Broadway, New York, New York, 10036.
25       At this time, I'll ask counsel to

---

2  (Pages 2 to 5)

Page 6

1    please introduce themselves for the record.
2        MR. FLOWERS:  Kevin Flowers from
3    Marshall, Gerstein & Borun in Chicago for
4    Plaintiff, Amgen.
5        Cullen Pendleton, also from Marshall
6    Gerstein & Borun representing Amgen.
7        MR. SUH:  Howard S. Suh from the law
8    firm of Kaye Scholer, LLP.  With me is my
9    colleague, Abigail Langsam, also form Kay
10   Scholer representing Roche entities, as well
11   as the witness, Dr. Kadesch.
12       VIDEO OPERATOR:  Okay.  Will the court
13   reporter please swear in the witness.
14       DR. THOMAS R. KADESCH, having been duly
15   sworn, was examined and testified as follows:
16       VIDEO OPERATOR:  Counsel, you may
17   proceed.
18   BY MR. FLOWERS:
19   Q    Good morning, Dr. Kadesch.
20   A    Good morning.
21   Q    Again, my name is Kevin Flowers and I
22   represent Amgen in this case.
23       Have you ever been deposed before?
24   A    Yes.
25   Q    When was the first time you were

Page 7

1    deposed?
2    A    The first and only time I've been
3    deposed was -- I'm trying to think, a little over a
4    year ago, year and a half ago.
5    Q    So 2005?
6    A    It was maybe December, 2005.
7    Q    And why were you deposed in December of
8    2005?
9    A    I was part of a case involving Ariad
10   and Eli Lilly and I was an expert witness.
11   Q    Have you ever been an expert witness in
12   any case other than the Ariad versus Lilly case?
13   A    No.
14   Q    Have ever been a witness in any legal
15   matter other than the Ariad versus Lilly case?
16   A    No.
17   Q    Did you testify at trial in the Ariad
18   versus Lilly case?
19   A    Yes.
20   Q    When did you testify at trial?
21   A    That was a little less than a year ago.
22   Q    How long did you testify in that case?
23   A    How long in terms of --
24   Q    Duration.
25   A    How long was I on the stand?

Page 8

1    Q    Yes.
2    A    I think it was two and a half hours.
3    Q    So it sounds like you're familiar with
4    testifying and deposition at least from your one
5    experience, so I won't go through all the details,
6    but as you know, I'm going to be asking you a series
7    of questions.  If you understand my question, you
8    should give me a verbal answer.
9        Mr. Suh may interpose an objection, but
10   unless he instructs you not to answer, you should go
11   ahead and answer my questions.  Obviously, the
12   record could be garbled if we try to talk over each
13   other.  If you don't let me finish my question
14   before you start answering or if I start asking you
15   a question before you're done, then the court
16   reporter has a hard time getting down both of our
17   words for the record which the Judge and the jury
18   might want to hear.  And the videotape might not be
19   so clear.  So if you could wait until I'm done to
20   start your answer, I'll try and wait until you're
21   done to start my next question.
22       MR. SUH:  That should also apply to my
23   objections.  You should wait until I make my
24   objections before you answer.
25       THE WITNESS:  Okay.

Page 9

1        MR. FLOWERS:  I'm not so concerned with
2    that, but to be fair to Howard.
3        MR. SUH:  Okay.
4    BY MR. FLOWERS:
5    Q    I'll try to take a break every hour
6    because I get tired.  I know witnesses get tired.
7    So if you get tired before an hour is up, and before
8    I say anything about a break, certainly feel free to
9    let me know that you want to take a break and we'll
10   just do that.  I'm always happy to get a break.  If
11   you need any water or anything, obviously, let us
12   know.
13       A funny series of questions.  Do you
14   have any medical questions that might prevent you
15   from understanding questions that are asked of you?
16   A    No.
17   Q    Any medical conditions that might
18   prevent you from providing an answer to a question
19   that's asked?
20   A    No.
21   Q    Are you on any medications that might
22   hinder your memory?
23   A    No.
24   Q    Have you ever been convicted of a
25   felony?

3  (Pages 6 to 9)

Kadesch, Thomas R.                                                  6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 10

1    A    No.
2    Q    Have you ever been convicted of any
3 crime involving dishonesty?
4    A    No.
5    Q    Have you ever been charged with a
6 crime?
7    A    When I was 17.  Does that count?
8    Q    Maybe.  We don't need to go into that.
9    A    I wasn't charged, I don't think,
10 formally.
11   Q    Me, neither.  Any reason you can think
12 of why you wouldn't be able to testify truthfully
13 and fully today in response to my questions?
14   A    No.
15   Q    In the Ariad versus Lilly case, which
16 party did you testify on behalf of?
17   A    Ariad.
18   Q    And in general, what were your opinions
19 in that case that you provided?
20   A    In general, I don't --
21   Q    You put in an expert report?
22   A    Yes.  There are many opinions, so in
23 general?
24   Q    Can you provide a general description
25 of the nature of the opinions that you offered?

Page 11

1    A    I was asked to supply opinions as to
2 the validity of the patent in question.
3    Q    And do you remember what aspects of the
4 validity you opined on?
5    A    My recollection was I was opining on
6 whether the patent was enabled and whether there was
7 appropriate written description.
8    Q    Anything else you remember?
9    A    Those were the two major areas.
10   Q    Do you remember what your hourly rate
11 was on that case?
12   A    Yes.
13   Q    What was it?
14   A    It was 500 an hour.
15   Q    Did you -- I think I asked you before
16 and maybe you said it, but did you submit an expert
17 report in that case?
18   A    Yes.
19   Q    You only submitted one?
20   A    I don't remember how many I submitted
21 quite frankly.
22   Q    Have you ever worked as a scientific
23 consultant for any company?
24   A    No.
25   Q    Thus far in this case, how many hours

Page 12

1 have you worked?
2    A    I'm not sure of the exact number, but I
3 would guess it's on the order of 30.  I haven't
4 looked at my -- I haven't added them up recently, so
5 that's a guesstimate.
6    Q    Have you submitted any kind of an
7 invoice for your time?
8    A    No.
9    Q    Of the roughly 30 hours that you
10 recall, how much of that time was actually spent
11 working on your expert reports?
12   A    Probably about half.
13   Q    And what did you do during the other
14 half of the time?
15   A    Mostly reading and research.
16   Q    And when you say research, what do you
17 mean?
18   A    Reading manuscripts, reading other
19 peoples' reports, primarily, reading the patent.
20   Q    And when you say the patent, do you
21 mean the '349 Patent?
22   A    The '349 Patent and the '008 Patent.
23 And there was another one.  There was a third
24 patent.  I forget the number.
25   Q    Of the roughly 30 hours that you've

Page 13

1 spent, how much of that time was actually spent
2 meeting with lawyers?
3    A    Probably about 12 hours.
4    Q    Of the papers that you've cited in your
5 expert reports, of the published papers --
6    A    Uh-huh.
7    Q    -- or as I think you referred to them,
8 manuscripts, how many of those papers did you bring
9 to the lawyers' attention as opposed to them
10 bringing a paper to your attention?
11   A    Oh, it would be hard to know exactly
12 what that number is.  There was a mixture of both
13 where they would bring my attention to certain
14 papers and I would bring -- I really don't know what
15 even the fraction would be.
16   Q    Did anyone help you in doing any
17 research to find manuscripts for your work in this
18 case other than the lawyers, I mean?
19   A    Other than the lawyers?
20   Q    Other than the lawyer, sorry, I
21 rephrased it?
22   A    No, no.
23   Q    So do you have a signed Expert
24 Consulting Agreement in this case?
25   A    I believe -- I'm not sure what it's

4 (Pages 10 to 13)

Confidential                                                        R000004

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 14

1  called exactly, but yeah, I do.
2      Q     And is that with Kaye Scholer or is
3  that with Roche?
4      A     I believe it's with Kaye Scholer.
5      Q     When were you first contacted about
6  working on this case?
7      A     I'm not sure of the exact time, but I
8  think it was either late fall or early winter.
9      Q     Of?
10     A     This past year. Less than a year ago.
11     Q     So in 2006?
12     A     If it was late fall, yeah.
13     Q     And who contacted you?
14     A     I think it was Howard Suh, but it may
15  have been Chris Jagoe.
16     Q     And had you worked with Howard before?
17     A     No.
18     Q     Had you worked with Chris Jagoe before?
19     A     Yes.
20     Q     Was that on the Ariad case?
21     A     Yes.
22     Q     Have you ever received any research
23  funding from Roche or a Roche entity?
24     A     No.
25     Q     So you don't currently receive any

Page 15

1  funding from Roche?
2      A     No, I do not.
3      Q     Have you ever worked with Roche in any
4  respect other than on this case?
5      A     No.
6      Q     What did you do to prepare for this
7  deposition?
8      A     Well, other than being familiar with
9  the arguments and preparing expert reports, I was
10  together with Howard and Abby yesterday and we kind
11  of went over the thought processes, my arguments and
12  just thought hard about -- about them, make sure
13  that they were clear in our own heads -- my head.
14     Q     That's all we can be responsible for.
15        Did you review any deposition
16  transcripts?
17     A     No.
18     Q     Have you reviewed any deposition
19  transcripts as part of your work in this case?
20     A     Only in as much as some of the
21  citations of those depositions that are in my expert
22  reports.
23     Q     So in preparing for your deposition
24  today you didn't go back and review any transcripts?
25     A     No.

Page 16

1      Q     Other than reviewing actual
2  transcripts, did you discuss the content of any
3  depositions in preparing for your deposition?
4      A     Only in as much as what I put in my
5  expert reports.
6      Q     So is there anything that you reviewed
7  in preparation for your deposition today that's not
8  cited in your expert reports?
9      A     In terms of -- I'm sorry, repeat the
10  question.
11     Q     In terms of preparing for your
12  deposition today, did you review anything that is
13  not cited in your expert reports?
14     A     I don't think so.
15     Q     How much time did you spend yesterday
16  with the lawyers for Roche?
17     A     Maybe eight hours, eight to nine hours.
18     Q     So as we go through the deposition
19  today, I may use some shorthand terms. I want to
20  make sure they're acceptable to you. Instead of
21  saying erythropoietin every time, I might just say
22  EPO, if that's okay?
23     A     That's okay.
24     Q     And you can do the same obviously.
25  Instead of saying radioimmunoassay every time, I

Page 17

1  might say RIA.
2      A     Okay.
3      Q     Instead of saying radioimmunoassay to
4  measure the amount of EPO in a sample, I might say
5  an EPO RIA or an RIA to measure EPO, that's okay?
6      A     Uh-huh.
7      Q     If I use any kind of shorthand or
8  jargon that you don't understand, obviously, just
9  let me know and I'll clarify. Like I said, in any
10  case if you don't understand my question, obviously
11  say something and I'll try to clarify.
12     A     Uh-huh.
13     Q     Let me go ahead and mark the ostensible
14  topic of your depositions today. If we can mark
15  this as Kadesch-1. It's an Expert Report of
16  Dr. Thomas Kadesch and it bears the date of April 6,
17  2007.
18        (Expert Report of Dr. Thomas Kadesch
19  dated 4/6/07 was marked Kadesch-1 for
20  identification.)
21  BY MR. FLOWERS:
22     Q     So Dr. Kadesch, I'll represent to you
23  that this is an expert report that we received from
24  the Roche attorneys.
25     A     Uh-huh.

5 (Pages 14 to 17)

Confidential                                           R000005

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 18

1    Q    To the best of our ability, we have
2 produced it as this Exhibit 1 in the form that it
3 was given to us. If you look on Page 20, as I said,
4 it's got a date of April 6, 2007 and I'll ask you,
5 is that your signature above the signature line?
6    A    Yes, it is. Yes.
7    Q    And you recall this document?
8    A    Yes, I do.
9    Q    Did you look at this document
10 yesterday?
11    A    Yes.
12    Q    How much of this document, if any, did
13 you draft?
14    A    There are three documents I submitted,
15 so I have to make sure. Each one was slightly
16 different. I drafted -- again, it's hard to know
17 exactly how much because it's an iterative process,
18 as you know, and I would say when you say draft, is
19 that like the first draft?
20    Q    Yeah, let's start with the first draft.
21 Who drafted the first draft?
22    A    Well, there was -- there were parts of
23 it that I drafted the first draft and there were
24 parts of it that I didn't. I would say about half.
25    Q    Obvious answer, but who wrote the other

Page 19

1 half?
2    A    In terms of the draft, I think it was
3 Matthew MacFarlane.
4    Q    Did you actually type in any of the
5 first draft on your computer?
6    A    No.
7    Q    So how did your half of the first draft
8 come into being?
9    A    Dictation.
10    Q    Who did you dictate to?
11    A    Abby.
12    Q    Did you do that in person or over the
13 phone?
14    A    In person.
15    Q    I know it's a 20-page document of text,
16 but is there any particular portion of that text
17 that you remember drafting in the first draft, any
18 particular sections?
19    A    Yes.
20    Q    What sections?
21    A    I believe it was the section primarily
22 dealing with vertebrate cells and I believe there's
23 a section here on promotors. I'm not sure. But
24 that section.
25    Q    If you turn to the -- I guess the

Page 20

1 second page of the document, it's got a little i at
2 the bottom as a page number.
3    A    Uh-huh.
4    Q    So it's Table of Contents. So would
5 you say that Section 7, Invalidity, Non-Enablement
6 and Lack of Written Description.
7    A    Yes.
8    Q    Is that the section that you drafted
9 the first draft?
10    A    Uh-huh, yes.
11    Q    And Section 8, Opinions Regarding
12 Overbreadth of Vertebrate Cells, is that a section
13 that you drafted in first draft?
14    A    I'm sorry, say it again.
15    Q    Did you draft that section in the first
16 draft?
17    A    Section 8?
18    Q    Yes.
19    A    Yes.
20    Q    Sorry to work backwards, but Section 6,
21 Invalidity Due Indefiniteness. I think we can say
22 that relates to indefiniteness of radioimmunoassay?
23    A    Right.
24    Q    Is that a section that you drafted?
25    A    No.

Page 21

1    Q    And who drafted that?
2    A    Matthew MacFarlane.
3    Q    So what was the iterative process that
4 you went through in regard to this report? I think
5 you said it was an iterative process.
6    A    Right, so I met with -- with Abby and
7 we discussed the issue of the patent in respect
8 to -- with respect to vertebrate cells and we
9 discussed the arguments for that and then, as I
10 said, I pretty much dictated the draft of that.
11      With respect to the part that Matthew
12 MacFarlane drafted, after that same meeting with
13 Abby, he and I discussed the issues having to do
14 with the RIA and he then sent me a draft after I
15 left the Kaye Scholer offices and we went back and
16 forth in terms of the content of that section.
17    Q    In regard to the RIA section, if we can
18 call it that, Section 6 of the report.
19    A    Uh-huh.
20    Q    I asked you before about whether you
21 had brought any published articles to the attention
22 of the lawyers versus them bringing an article to
23 your attention. For the RIA section, did you bring
24 any articles to the attention of the lawyers?
25    A    No.

6 (Pages 18 to 21)

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 22

1      Q    If you go in this report for -- let's
2  see, I guess it would be about Page 22 starts your
3  curriculum vitae and that goes on for several pages
4  until Exhibit B.  Is there anything that you know of
5  that you would add to this curriculum vitae that has
6  occurred or been published since February 27, 2007?
7      A    No.
8      Q    No new manuscript submitted for
9  publication since February, 2007?
10     A    No.
11     Q    No awards or honors or membership in
12 societies new since February, 2007?
13     A    No.
14     Q    You haven't taken on any additional
15 appointments since February, 2007?
16     A    Not that I'm aware of.
17     Q    After that is Exhibit B, which is
18 headed Documents Reviewed by Kadesch.  I'll try not
19 to call you Kadesch today.
20     A    That's okay.
21     Q    You didn't compile this list, I assume,
22 correct?
23     A    No.
24     Q    After that, there's Exhibit C.  It says
25 Kadesch Exhibit C, demonstrative numbers and then

Page 23

1  there's a list of numbers there and then behind that
2  you'll find we have tried to compile all of the
3  demonstratives based on the numbers that were
4  provided by Roche and also by printing out the
5  stills from the animations that were provided by
6  Roche.  As best we could tell, those demonstratives,
7  as we call them, associated with your first expert
8  report, --
9      A    Right.
10     Q    -- we have compiled them here and one
11 thing I would like to do is to just go through these
12 with you to find out how these might -- I believe
13 the word you used is illustrate your testimony at
14 trial.
15     A    Okay.
16     Q    In Paragraph 15 of your April 6 report,
17 you said I may also use certain graphic or
18 demonstrative materials to illustrate my testimony
19 at trial, including those materials attached to
20 Exhibit C to illustrate the opinions set forth in my
21 report.
22          So I'd like to ask you some questions
23 about those.
24          First of all, who prepared the
25 demonstratives?

Page 24

1      A    Kaye Scholer.
2      Q    Did you -- did you work with somebody
3  at Kaye Scholer to prepare the demonstratives?
4      A    These particular demonstratives, no.
5      Q    Did you review drafts of these
6  demonstratives before they were submitted with your
7  report?
8      A    No.
9      Q    When did you first see these
10 demonstratives as they appear here and again, these
11 are -- they appear here as they were provided to
12 Amgen, so these are the final versions as far as we
13 know.
14     A    I don't remember exactly when I first
15 saw them.  I'm assuming I saw them prior to my
16 signing the report, but I don't remember the exact
17 time that I saw them.
18     Q    So if you can -- if you can go to the
19 first demonstrative there.  I think you have it
20 open.  It's got a little 146 in the lower right-hand
21 corner.
22     A    Uh-huh.
23     Q    How will you use this to illustrate
24 your testimony at trial?
25     A    I will not.

Page 25

1      Q    Why?
2      A    I think this was inserted in error,
3  quite frankly.
4      Q    So I take it that you have no opinions
5  regarding the effect of RC1 tumors on athymic nude
6  mice.
7      A    I do not.
8      Q    If you turn to the next page, there's a
9  number 147 in the lower right-hand corner.
10     A    Uh-huh.
11     Q    How will you use this demonstrative to
12 illustrate your testimony at trial or illustrate
13 your opinions?
14     A    Very generally to just outline what an
15 in vivo biological assay looks like.
16     Q    How did you come to an understanding of
17 what an in vivo biological assay looks like?
18          MR. SUH:  Objection, vague.  Go ahead,
19 Doctor.
20 BY MR. FLOWERS:
21     Q    Well, let me start over.
22     A    I'm not sure I understand the question.
23     Q    Let me start over.  Do you have an
24 understanding of what an in vivo biological assay
25 looks like?  I believe those were the words you

7 (Pages 22 to 25)

Kadesch, Thomas R.                                            6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 26

```
1   used.
2       A    Yes, I do.
3       Q    And what is your understanding?
4       A    My understanding of this, what this
5   assay --
6       Q    Let's focus on this demonstrative.
7       A    Uh-huh.
8       Q    What does this demonstrative represent?
9       A    This demonstrative represents an in
10  vivo biological assay that is used to define a unit
11  and in this particular case, it is related to
12  injecting EPO into a mouse that has been subjected
13  to a low atmospheric pressure and the EPO in this
14  case gives rise to an increase in hemoglobin
15  synthesis through the production of red blood cells
16  and that is then measured by the uptake of iron.
17      Q    Why is the -- why is a mouse subjected
18  to a low atmospheric pressure in this assay?
19      A    Because it inhibits erythrocyte
20  development.
21      Q    And why is that?
22      A    Oh, I don't know.
23      Q    Why is that important?
24      A    Well, because to measure EPO, and if
25  you want to stimulate the production of hemoglobin,
```

Page 27

```
1   you want to start off as a low -- a low
2   concentration so that you can measure a good dose
3   response.
4       Q    So you want to start off at a low
5   concentration of hemoglobin?
6       A    Yes.
7       Q    Does that mean that you want to start
8   off at a low concentration of red blood cells?
9       A    I'm not sure.  In terms of the details
10  of this assay, in terms of the details, I -- I have
11  not done one of these assays and so I'm taking on,
12  you know, just the way these are described in terms
13  of promoting the uptake of iron.
14      Q    And so how did you come -- how did you
15  come to that understanding?  You say just the way
16  these are described, how did you come to an
17  understanding of how this assay is performed?
18      A    Well, pretty much what's shown here in
19  terms of measuring the uptake of iron, which is
20  incorporated in the hemoglobin which I know just
21  from basic biochemistry and understand that this is
22  carried out in an animal and that EPO leads to the
23  increase in iron uptake.
24      Q    And my question is how did you come to
25  that understanding, what you just said?
```

Page 28

```
1       A    My general knowledge of hematopoieses,
2   my general knowledge of what EPO does to red blood
3   cells and the production of red blood cells and my
4   general understanding of the fact that iron is
5   incorporated into hemoglobin.
6       Q    In terms of how the assay is actually
7   performed, how did you come to that understanding?
8   Was it from this slide?
9       A    No, no, no.
10      Q    Okay.  How did you come to that
11  understanding?
12      A    Just in general in terms of reading
13  about in vivo assays for EPO, what I know about EPO
14  is that it stimulates red blood cell formation.  I
15  know that people perform assays in mice where they
16  inject various hormones and they can have a readout
17  in terms of following the increase in red blood cell
18  number.
19      Q    And any particular scientific
20  publications that you relied on for that?
21      A    Not that I remember any particular
22  ones, but there are many references to in vivo
23  assays and one has kind of a general fundamental
24  understanding of what those kinds of things measure.
25      Q    So in -- in -- strike that.
```

Page 29

```
1          If you use this demonstrative to
2   illustrate your testimony at trial, will you use
3   this demonstrative in conjunction with any
4   scientific publication?
5       A    No.
6       Q    In terms of your understanding of how
7   this in vivo biological assay works or is performed,
8   did you have an understanding of that before you
9   started working on this current case?
10      A    I knew that EPO stimulated red blood
11  cell development and I know that red blood cell
12  development can be monitored in mice and so the
13  specifics -- in terms of the specifics of the assay,
14  in terms of, you know, measuring that with iron
15  uptake, I didn't know that.
16      Q    Do you know when this type of assay
17  that's shown in this Demonstrative 147, when it was
18  developed?
19      A    No.
20      Q    Do you know who developed it?
21      A    My understanding from reading the
22  expert reports, Dr. Goldwasser might have been
23  affiliated with this assay in terms of refining it.
24  I'm not sure if he developed it.
25      Q    You said from reading the expert
```

8 (Pages 26 to 29)

Confidential                                            R000008

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 30

1    reports. Whose expert reports?
2        A    I'm not sure which one.
3        Q    Do you recall generally whose expert
4    reports you've reviewed in this case?
5        A    I reviewed a number, but to different
6    degrees in terms of paying attention. MaGlowin's.
7        Q    Me, too.
8        A    Goldwasser's, Berk's, Lodish's,
9    Capra's.
10       Q    Did you review Dr. Fromm's expert
11   report?
12       A    Yes, I did.
13       Q    So would you consider yourself to be --
14   well, strike that.
15           Would your peers consider you to be an
16   expert on this type of exhypoxic polycythemic mouse
17   assay?
18       A    No.
19       Q    Do you consider yourself to be an
20   expert on this type of assay?
21       A    This particular -- well, when you say
22   type of assay, I understand what an in vivo assay is
23   and how that's different from an in vitro assay. In
24   terms of this particular assay, no.
25       Q    Let me ask you, my colleague,

Page 31

1    Dr. Pendleton, wants to know, in the upper
2    right-hand corner of this Demonstrative 147, there's
3    a graph shown. On the left-hand side it says
4    percent iron 59 incorporation. On the bottom axis
5    it says EPO sampled dilution factor.
6            What does EPO sampled dilution factor
7    represent there?
8        A    My assumption is that the EPO sampled
9    dilution factor simply involves taking a -- let's
10   say for the standard, a known amount of EPO and
11   putting in higher levels of dilution into the assay
12   or lower levels as this would, you know, indicate.
13       Q    In that graph, there are two -- I'm
14   trying to think what the words are. There's a line
15   coming from the Y axis and a line coming up from the
16   X axis that intersects the approximate mid point of
17   the linear portion of the curve labeled standard.
18           Do you see what I'm referring to?
19       A    Uh-huh.
20       Q    What does that represent?
21       A    In any assay, the only time you have
22   meaningful data is when you have a dose response
23   that's linear. Which means that the assay is
24   responding to the amount of sample you have or the
25   amount of anything you're measuring. And hence, the

Page 32

1    mid point of that linear part of the curve is what
2    you can trust as being valid in terms of generating
3    a number.
4        Q    Why?
5        A    Why? Because for any -- that's basic
6    enzymology that any time you want to provide a
7    number, it's per unit something and that means
8    you're dealing with a ratio and that ratio has to be
9    proportional, or otherwise, it's a meaningless
10   number. For example, if you're on the part of the
11   curve that is flat, that doesn't generate any
12   meaningful data.
13       Q    So if your sample gives a value that's
14   outside of that linear portion of the dose response
15   curve, --
16       A    Uh-huh.
17       Q    It has no meaning -- it has no useful
18   meaning?
19       A    It has no useful meaning.
20       Q    So what do you do if your sample gives
21   you a value that's outside the linear portion of the
22   dose response curve?
23           MR. SUH:  Objection, vague.
24           THE WITNESS:  I would say to a graduate
25   student find the dose where it's linear.

Page 33

1    BY MR. FLOWERS:
2        Q    So would that involve diluting the
3    sample?
4        A    It might, yes.
5        Q    Or concentrating the sample?
6        A    Possibly concentrating it.
7        Q    So in this graph, in the upper
8    right-hand portion of Demonstrative 147, as I said
9    and you charitably agreed, there are lines from the
10   X and Y axis that intersect the standard curve?
11       A    Yes.
12       Q    And there's a dashed line coming up
13   from the X axis and a dashed line coming over from
14   the Y axis that intersects the unknown labeled
15   curve?
16       A    Uh-huh.
17       Q    Is there a significance, the difference
18   between where those two lines intersect the EPO
19   sampled dilution factor axis?  I'm just trying to
20   figure out what the point of this graph is.
21       A    Oh.
22       Q    Maybe I should have just asked that.
23       A    Maybe so. When you have a standard --
24   basically, it's the idea of a standard curve and the
25   standard curve is what you compare your unknown to

9  (Pages 30 to 33)

Confidential                                              R000009

Kadesch, Thomas R.                          6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 34

1   and that allows you to draw some conclusions about
2   what is in your unknown and what concentration it
3   is. And in this particular case, you can say that
4   the unknown, there's less let's say it's EPO, EPO
5   than in the standard.
6        Q    Why?
7        A    Because it takes more of it to generate
8   the same response. So if you want a 50 percent
9   response or percent FE incorporation, if you want to
10  match let's say at that level that is just above the
11  second grid line there, you can see that to get that
12  amount of iron incorporation, you need more of your
13  unknown.
14       Q    Is it -- is it standard practice to
15  plot a separate dose response curve for your unknown
16  than your standard?
17       A    Absolutely.
18       Q    So is it your opinion that in an assay
19  such as this, you would not plot -- you would not
20  plot values for your unknown based on the standard
21  dose response curve?
22            MR. SUH: Objection, vague.
23            THE WITNESS: I'm not sure I know what
24       you're asking, quite frankly.
25  BY MR. FLOWERS:

Page 35

1        Q    So in this graph, it appears to me at
2   least to show separate dose response curve for your
3   unknown than from your standard and my question to
4   you is is it -- is it the standard practice that you
5   don't plot the unknown value or the value for your
6   unknown based on the dose response curve for your
7   standard?
8            MR. SUH: Objection to form, lacks
9       foundation. Go ahead, Doctor.
10           THE WITNESS: I'm still trying to
11      understand your question. In an assay, you
12      plot a dose response curve for a standard.
13  BY MR. FLOWERS:
14       Q    And that's what you call a standard
15  curve?
16       A    That's what you call a standard curve.
17  You plot a dose response curve for your unknown and
18  you use that to make sure you're in the linear
19  range. You typically don't use a single point for
20  your unknown. You make sure you're in this linear
21  range so you can plot things as ratios, per mL, per
22  whatever, and then you compare that to your standard
23  curve and then you draw conclusions in terms of how
24  much, in this case, EPO, would be in your unknown.
25       Q    To determine how much EPO is in your

Page 36

1   unknown -- strike that, start over.
2            For this graph on Demonstrative 147,
3   does the X axis, which is labeled EPO sampled
4   dilution factor, does that represent or is that
5   meant to represent how much EPO is in the sample?
6        A    No. It represents how much sample you
7   use.
8        Q    So from this graph, if you were trying
9   to determine how much EPO is in the unknown sample,
10  how do you do that?
11       A    In this particular case, and with all
12  types of standard curves of this type, you would
13  conclude that the amount of EPO, when you get to
14  the -- just past the third grid along the X axis is
15  equivalent to the amount of EPO that you have in the
16  standard when you have roughly two grids worth of
17  sample. So I would argue that this is the unknown.
18  You need 50 percent more -- well, let me correct
19  that. The amount of EPO in the unknown where you
20  have the dilution factor that is represented by the
21  third grid is equivalent to the amount of EPO in the
22  standard which is known in terms of the second grid
23  amount.
24       Q    In the papers that you have reviewed in
25  this case --

Page 37

1        A    Uh-huh.
2        Q    -- and in particular any paper that
3   depicted an exhypoxic polycythemic mouse assay, did
4   you find any graph like the graph shown in
5   Demonstrative 147?
6        A    No.
7        Q    In this case, have you reviewed papers
8   that described exhypoxic polycythemic mouse assays?
9        A    I've reviewed papers that mention in
10  vivo assays. I don't recall if they specifically
11  mentioned this particular assay, you know, exhypoxic
12  polycythemic mice.
13       Q    Which leads me back to the question,
14  how do you know -- well, which leads me back to the
15  question, do you know how those who are experts in
16  the exhypoxic polycythemic mouse assay determined
17  the values for EPO in unknown samples based on dose
18  response curves for standards?
19           MR. SUH: Objection, vague, lacks
20      foundation.
21           THE WITNESS: My assumption is that
22      this is based on basic biochemical principles.
23      As a first year graduate student, you learn
24      about assays and you learn about lineality and
25      you learn about how to calculate an unknown

10 (Pages 34 to 37)

Confidential                                R000010

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 38

1    based on a standard.  So for any assay,
2    whether it's in vivo, in vitro, or as I'm sure
3    we'll get into, an RIA, you have no
4    information for an unknown unless you have a
5    standard curve.  And so in terms of
6    publications, it's rare that you see a
7    standard curve.  With RIAs, I see many more
8    standard curves in the literature, which is
9    interesting to me that they would bother
10   showing those, but for this type of assay, you
11   would not see that type of graph typically in
12   a publication.
13   BY MR. FLOWERS:
14       Q    On the graph on Demonstrative 147 on
15   the X axis, EPO sampled dilution factor, is the --
16   as you move to the right on that X axis, is that
17   meant -- is that meant to represent a less
18   concentrated sample or a more concentrated sample?
19       A    As you move to the right?
20       Q    Yes.
21       A    More concentrated.
22       Q    So as you move to the right, a less --
23   a lower EPO sample dilution factor?
24       A    It's like double negatives.  I
25   apologize for this -- this label.  As I said, I

Page 39

1    didn't make the graph.  It may be easier to
2    represent this simply more sample going from left
3    to right.
4        Q    In papers you've reviewed that describe
5    an exhypoxic polycythemic mouse assay, did you find
6    in any of those papers that the amount of EPO in the
7    unknown sample tested in the assay was determined
8    based on plotting a separate dose response curve for
9    the unknown sample?
10       A    I assume that this is standard practice
11   for any assay if one is a good biochemist.  As I
12   said, in early training in biochemistry, this is
13   what you're taught.  If someone is giving a value
14   for any assay, whether it's in vivo, in vitro and
15   they say -- they give a certain value for the amount
16   of EPO, whether it's the amount of EPO, the amount
17   of enzyme, anything, one has to assume that they are
18   in the linear range of their assay.  The only way to
19   know if you're in the linear range of your assay is
20   to do a dose response.
21       Q    To do a dose response curve using your
22   standard?
23       A    Your standard and your unknown.
24       Q    So in your opinion, for the exhypoxic
25   polycythemic mouse assay, it would be inappropriate

Page 40

1    to determine the amount of EPO in your unknown
2    without doing a separate dose response curve for
3    your unknown?
4        A    That's correct.
5        Q    So in your view, it would be
6    inappropriate to determine the amount of EPO in your
7    unknown sample simply by plotting the percent iron
8    incorporation of your unknown sample on the standard
9    dose response curve?
10            MR. SUH:  Objection.
11            THE WITNESS:  I don't understand that
12   question.
13   BY MR. FLOWERS:
14       Q    Is it your view that in an exhypoxic
15   polycythemic mouse assay it would be inappropriate
16   to determine the amount of EPO in your unknown
17   sample simply by plotting the percent iron
18   incorporation generated by a certain amount of your
19   unknown sample by plotting that on the standard dose
20   response curve?
21            MR. SUH:  Objection.
22            THE WITNESS:  If I understand your
23   question, I think it would be inappropriate.
24   The -- in any good biological assay, as I said
25   before, it's very important to have some sort

Page 41

1    of dose response curve to confirm that you're
2    in the linear part of the assay.  That does
3    not mean that you need to, for example,
4    generate an entire curve that I've shown here.
5    Rather, if you take two different amounts of
6    let's say unknown EPO and you show that the
7    response you elicit again in any assay is
8    half, if you use half the amount or double, if
9    you use double the amount, then you can
10   conclude that you're on the linear part of the
11   scale.
12   BY MR. FLOWERS:
13       Q    And when you say that, you mean for
14   your unknown sample?
15       A    For your unknown sample.
16       Q    Is that true for in vitro EPO assays?
17       A    Absolutely.
18       Q    Is that true for EPO radioimmunoassays?
19       A    Absolutely.
20       Q    If you turn to the next demonstrative,
21   No. 148 in the lower right-hand corner.  I'll try to
22   ask you the same questions.
23            Who prepared this demonstrative?
24       A    Kaye Scholer.
25       Q    Did you have any input into the

11 (Pages 38 to 41)

Confidential                                        R000011

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 42

1    drafting of this demonstrative?
2        A    No.
3        Q    Is this a demonstrative that you will
4    use to illustrate your testimony at trial?
5        A    I might.
6        Q    And how will you use this demonstrative
7    to illustrate your testimony at trial?
8        A    Again, to dispense with the upper
9    right-hand curve making exactly the same point, with
10   any assay, you have a standard curve, then you have
11   an unknown and with respect to the unknown, it's
12   important that you are in the linear range of
13   response and that's simply what's depicted here.  In
14   this case, though, the assay is different.  Some
15   people refer to this as an in vitro assay.  But in
16   this particular case, you're looking at the ability
17   of EPO to stimulate the formation of what are called
18   CFUEs or erythroid-based colonies in a mixture of
19   hematopoietic cells in this case depicted as bone
20   marrow cells.
21       Q    What does this relate to in your
22   April 6 expert report?  What opinion will this
23   illustrate in your April 6 expert report?
24       A    My recollection of the April 6 expert
25   report was that I don't recall at the moment

Page 43

1    referring to this assay in the April 6 expert
2    report.
3        Q    And if you need to, obviously, it's in
4    Exhibit 1, the expert report, so if you need to look
5    at that, go ahead.  I am particularly curious and
6    I'll ask the same thing because I neglected to ask
7    it about Demonstrative 147, but I am particularly
8    interested in finding out if you testify at trial
9    what opinion in your April 6 report you would
10   illustrate using this Demonstrative 148?
11       A    148, only that there are different
12   types of assays to measure EPO.
13       Q    And is that also true for Demonstrative
14   147, the previous page?
15       A    Yes.
16       Q    How did you come to an understanding of
17   how, if it's fair to call this Demonstrative 148,
18   what's represented here, an in vitro EPO assay, how
19   did you come to an understanding of this?
20       A    I've known about this assay for a long
21   time.
22       Q    Why?
23       A    I used to work in the field of
24   developmental immunology and specifically with
25   respect to the regulation of B lymphocyte formation,

Page 44

1    but affiliated with this type of work is the area of
2    hematopoieses in general and so when I went to
3    meetings, in my own readings, there would be a lot
4    of discussion about the regulation and the synthesis
5    of other cell types in the blood.  And so CFUEs,
6    that was something that's been in my vocabulary for
7    many years.
8        Q    Okay.
9             If you could turn to the next page.
10   I'll represent to you that this was a demonstrative
11   that was provided or was identified as being
12   associated with your report.  Is this a
13   demonstrative that you will rely upon to illustrate
14   your testimony at trial?
15       A    I want to make sure we're on the same
16   one.  I can't see the number on this one.  This one
17   with four lines?
18       Q    I don't think this was numbered.
19   There's no number that appeared on this
20   demonstrative itself.
21       A    This is the one with the four curves?
22       Q    Yes.  So at the top it says RIA Versus
23   Bioactivity Three Unknowns.
24             How will you use this demonstrative to
25   illustrate your testimony at trial?

Page 45

1        A    So this is a type of dose response
2    curve you get with an RIA and again, in much the
3    same way we've discussed standard curves for the in
4    vitro and in vivo assays, the CFUE assays and the in
5    vivo assays, this is a dose response curve for
6    standards in an unknown, two unknowns, in RIA assay.
7        Q    And this is a purely hypothetical.  Is
8    this meant to be a representation of a purely
9    hypothetical experiment?
10       A    Yes.
11       Q    In the lower right-hand corner, the
12   legend has a -- I'm color blind, so it's difficult
13   for me, what appears to be a light blue line and
14   then Standard 1 (1X)?
15       A    Wait, I'm sorry.
16       Q    At the top it says Standard 1?
17       A    The top one, Standard 1.
18       Q    1X?
19       A    Yeah.
20       Q    And then there's a colored line
21   associated with that?
22       A    Light blue.
23       Q    And that's the line that is the second
24   from the left, correct?
25       A    Yes, that's correct.

12  (Pages 42 to 45)

Kadesch, Thomas R.                                  6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 46

1      Q      On the graph?
2      A      Uh-huh.
3      Q      What is the Standard 1 (1X) meant to
4   represent?
5      A      That is a known amount of EPO in this
6   case.  Although, this is just general for RIAs and
7   let's assume it's for EPO.
8      Q      Okay.
9      A      Again it's a dose response curve for a
10  certain concentration of EPO.
11     Q      What is the 1X meant to represent?
12     A      A relative amount that is 1 as opposed
13  to the 10X, which is, let's say, 10 times more
14  concentrated.
15     Q      So is that just meant to represent a
16  concentration?
17     A      A certain concentration of a standard,
18  yes.
19     Q      And not to mix terms, but is that a
20  concentration in units?
21     A      No.  1X simply is a relative amount,
22  relative concentration relative to the Standard 1
23  that is 10X.
24     Q      So the Standard 1 (10X), is that, meant
25  to simply represent a 10-fold more concentrated

Page 47

1   preparation of the same standard?
2      A      Yes.
3      Q      And is that meant to represent that
4   everything in that preparation is 10-fold more
5   concentrated, every solute, if we could describe it
6   as such?
7      A      No.
8      Q      What is it meant to represent,
9   specifically?
10     A      Typically, in that type of situation,
11  you would dilute the sample in whatever buffer it
12  was normally in, so everything would be the same
13  except for the concentration in this case of EPO.
14     Q      If you diluted the sample in whatever
15  buffer it was normally in, then -- then all of the
16  solutes would become less concentrated, correct?
17     A      The solutes are the buffer.
18     Q      The solutes are the particles in the
19  solvent, correct, so in the buffer, correct?
20     A      I'm sorry, let me just explain.  I'm
21  getting tangled up here.  If you have a solution of
22  150 millimolar sodium chloride and EPO is found in
23  that, if you wanted to dilute that 10-fold, you
24  would dilute it 10-fold in a solution of a 150
25  millimolar sodium chloride.  So the solvent would be

Page 48

1   the same.  The solute, I guess in this case EPO, if
2   you want to call it a solute, would be 10-fold less
3   concentrated than 1X.
4      Q      So in this demonstrative, does -- is
5   the -- is the viewer to understand that the standard
6   represented in this legend by Standard 1 is a pure
7   standard?  It has no other proteins in it?
8          MR. SUH:  Objection, form.  Go ahead.
9          THE WITNESS:  I don't know.  Not
10         necessarily.
11  BY MR. FLOWERS:
12     Q      In an EPO RIA, does the standard have
13  to be pure, pure EPO to represent or to allow one to
14  conduct a valid RIA?
15         MR. SUH:  Objection, vague.
16         THE WITNESS:  One can conduct an RIA on
17         anything you want, as long as you understand
18         what the limitations of the RIA are.
19         Specifically, with respect to what you're
20         measuring.  So when you say pure EPO, it
21         depends on what you want to conclude.
22  BY MR. FLOWERS:
23     Q      If you want to determine the amount of
24  EPO in a sample that you're testing in the EPO RIA,
25  does the standard EPO have to be a pure preparation

Page 49

1   of EPO?
2          MR. SUH:  Same objection.
3          THE WITNESS:  I don't believe it does.
4   BY MR. FLOWERS:
5      Q      Why do you say that?
6      A      Why, it is better if it is.  That's the
7   ideal case.  Because of the nature of the RIA, and
8   the way one employs antibody, ideally you would have
9   a situation in the standard where the antibody isn't
10  picking up any other proteins or any fragments of
11  EPO, et cetera.  So the more pure these -- the
12  preparation is, the more confident you can be that
13  the assay is a legitimate assay.
14         MR. FLOWERS:  We have to take a break
15         for the video.
16         VIDEO OPERATOR:  This concludes tape
17         number one of the videotape deposition of
18         Dr. Thomas R. Kadesch on June 21, 2007.
19         The time is 10:07 a.m. and we're off
20         the record.
21         (Brief recess.)
22         VIDEO OPERATOR:  This begins tape
23         number two in the videotape deposition of
24         Dr. Thomas R. Kadesch on June 21, 2007.
25         The time is 10:14 a.m. and we're back

13  (Pages 46 to 49)

Kadesch, Thomas R.                                          6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 50

1    on the record.
2    BY MR. FLOWERS:
3        Q     Dr. Kadesch, the title of this
4    demonstrative that we've been looking at is RIA
5    Versus Bioactivity Three Unknowns.
6            What's the significance of the title
7    RIA Versus Bioactivity?
8        A     The -- that relates primarily to the
9    standards and the standards are established based on
10   bioactivity. What I mean by bioactivity are -- is
11   primarily the in vivo assay.
12       Q     This demonstrative we've been looking
13   at, is this demonstrative meant to mean anything
14   more the standards and can give
15   different dose response curves in an RIA?
16       A     In this particular case, the standards
17   are the same and the dose response curves in those
18   cases are a consequence merely of the dilution of
19   one versus another. You'll see that along the X
20   axis, it's units per mil and so obviously, if you
21   dilute something 10-fold, you're going to get a
22   units per mil that is 10-fold less. So that's the
23   only point in terms of the bioactivity -- the
24   relative bioactivity of those two standards. And
25   that's correct, the unknown -- unknown one and

Page 51

1    unknown two will also give a dose response. This,
2    though, isn't ideally labeled because in the case of
3    the unknowns, that shouldn't be units per mil, it
4    should simply be milliliters. The units per mil
5    really relates to the standards.
6        Q     And is that because you couldn't plot
7    an unknown amount of EPO on an X axis representing
8    units of EPO per mil?
9        A     Correct.
10       Q     Until you actually determine how much
11   EPO is in the unknowns?
12       A     That's correct. So often times with a
13   RIA, in the literature, you see an additional X axis
14   that simply describes, you know, how much of the
15   unknown in terms of overall volume you're adding.
16   So this is not ideally labeled.
17       Q     If you turn to the next demonstrative,
18   which has five curves. Is this simply meant to
19   represent the addition of a third unknown dose
20   response curve?
21       A     That's correct.
22       Q     And is everything that you said about
23   the previous demonstrative applicable to this
24   demonstrative?
25       A     Yes.

Page 52

1        Q     Okay, so we don't have to go through it
2    again.
3            If you turn to the next demonstrative,
4    which has a little mouse being poked with a syringe
5    on it. Are we on the same page?
6        A     Uh-huh.
7        Q     It has three dose response curves and
8    then two very faint dose response curves?
9        A     Uh-huh, yes.
10       Q     We're on the same page?
11       A     Yes.
12       Q     What is this demonstrative meant to
13   represent?
14       A     It merely is meant to represent that
15   those standard curves are linked to the bioassay,
16   meaning that the bioassay in this case is the mouse
17   assay and that in terms of units per mL, those
18   standards, that's where that units number comes
19   from.
20       Q     And when you say the mouse assay, you
21   mean the mouse exhypoxic polycythemic assay?
22       A     Correct.
23       Q     Other than the addition of the
24   indication of the linkage of units to the mouse
25   assay, is everything that you said about the first

Page 53

1    two demonstratives applicable to this demonstrative?
2        A     Yes.
3        Q     If you go to the next demonstrative.
4    What is this meant to represent?
5        A     Basically the same thing except with
6    the other standard curve that that is also -- that
7    standard curve is linked in a sense by definition to
8    the mouse assay.
9        Q     And on Standard 1(1x), at least it
10   appears to me that the actual bioactivity from the
11   mouse assay for that preparation is 8 units per mL?
12       A     Uh-huh.
13       Q     And for Standard 1(10x), the actual
14   bioactivity in the mouse assay is 80 units per mL,
15   correct?
16       A     Right.
17       Q     And is that simply the result of -- in
18   this hypothetical, is that simply the result of the
19   fact that Standard 1(10x) is a 10x more concentrated
20   preparation of the same standard?
21       A     That's correct.
22       Q     I take it that's not meant to represent
23   that the individual EPO molecules in the Standard
24   1(10x) preparation are intrinsically 10 times more
25   active in the bioassay than in the Standard 1(1x)

14 (Pages 50 to 53)

Confidential                                    R000014

Kadesch, Thomas R.                                          6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 54

1  preparation?
2      A     Your assumption is correct.
3      Q     If you go to the next demonstrative.
4  Let me ask, did you ever -- did you ever get a set
5  of these demonstratives that had numbers on them?
6      A     Not that I'm aware of.  I don't pay
7  attention to numbers.  I'm sorry.
8      Q     What is this demonstrative meant to
9  represent?  It's got -- it's got the two mice like
10  the previous demonstrative and then it's got a
11  question mark in the lower left-hand corner?
12      A     Right.  So in the case of the RIA,
13  similarly to the in vivo assays and the standard
14  curves we generated earlier, one has to make sure
15  you're in the linear part of the assay and that's
16  shown here with the unknown -- with the standards
17  and the unknown and so you want to, for example, as
18  long as you're in the linear range of the assay and
19  those curves are parallel, let's say you identify a
20  percent of inhibition of 50 percent as a good place
21  to draw your conclusions vis-a-vis the amount of
22  activity you have in the sample.  Now, with the
23  unknown, you would argue that the amount of units in
24  the unknown for a certain amount of milliliters
25  would correspond at 50 percent of emission to a

Page 55

1  certain amount of activity and you simply look down
2  the X axis and you would say my activity is
3  predicted to be according to these standard curves
4  five units per milliliter -- is that right, yeah,
5  five units per milliliter.
6      Q     Now, as you said before for the other
7  demonstratives, in reality for the unknowns, the X
8  axis would represent milliliters?
9      A     Right.
10      Q     Of sample, correct?
11      A     Uh-huh.
12      Q     And so in reality in conducting an EPO
13  RIA, when you were trying to determine how much EPO
14  is in your unknown sample one in this case, you
15  would determine that by taking a percent inhibition
16  value, determine for the unknown one, a certain
17  number of mLs of the unknown one sample?
18      A     Yes.
19      Q     And you would then extrapolate from the
20  50 percent inhibition point on your standard dose
21  response curve down to the units per mL point on
22  your X axis for the standard, correct?
23      A     That's correct.  That's correct.
24      Q     And if you did that for the Standard 1
25  (10x), if you plotted -- if you plotted the percent

Page 56

1  inhibition of your unknown Sample 1 against the dose
2  response curve of your 10x Standard 1, you could
3  compare that to plotting your percent inhibition of
4  your -- of your unknown Sample 1 against the
5  Standard 1(1x) standard curve simply by accounting
6  for the dilution factor of the two standards,
7  correct?
8      A     To a first approximation, that's true,
9  but I will -- I will say in reality that you want to
10  make sure that it's preferable to dilute the
11  standard in such a way that it better resembles the
12  actual dose response you're getting from your
13  unknown in terms of where you are on the curve.  You
14  want -- you want to assure that the dilution was
15  such that the assay is still responding
16  appropriately.
17      Q     So you want to make sure that or at
18  least you want to try to have the dilutions of both
19  your unknown sample and your standard relative to
20  each other such that the unknown sample percent
21  inhibition value will fall on the linear portion of
22  the standard dose response curve?
23      A     Yes, exactly.
24      Q     So -- and all of this is done through
25  dilution, whether it's of your standard preparation

Page 57

1  or it's of your unknown sample, you account for this
2  by diluting either one of those or both of those?
3      A     Yes.
4      Q     And I want to make sure, again, the
5  Standard 1(1x) and the Standard 1(10x), it's the
6  same EPO?
7      A     Yes.
8      Q     It's just diluted?
9      A     It's diluted.
10      Q     So in this demonstrative, if you
11  plotted your unknown sample on the Standard 1(1x)
12  dose response curve and then dropped down to the X
13  axis for units per mL, that would give you a value
14  of five units per mL for your unknown sample 1?
15      A     That's correct.
16      Q     And if you plot that against your
17  Standard 1(10x) dose response curve, you would drop
18  down to 80 units per mL, but that's a difference
19  accounted for by dilution, correct?
20      A     That's correct.
21      Q     If you go to the next demonstrative.
22  What is this meant to represent?
23      A     This is meant to represent that whereas
24  the standards are linked by definition to the value
25  of units as per the in vivo assay, the unknown, to

15  (Pages 54 to 57)

Confidential                                    R000015

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 58

1   link that requires a major assumption and that is
2   what you've touched on before, that the quality of
3   EPO in your unknown sample is similar to the
4   standard. And this is simply to depict that you
5   might have a surprising result if you took your
6   unknown and applied it to the bioassay. In this
7   case, the predicted value is five units per mL and
8   you might find that the actual value is 10 units per
9   mL. And that simply illustrates that those values
10  might be different for an unknown.
11      Q    When you say the quality of EPO in your
12  unknown sample is similar to the standard, what do
13  you mean?
14      A    Well, there are a number of things that
15  I can mean by that. The standard, for example,
16  could be of low quality in the sense that let's say
17  that there is EPO in there that's inactive, and so
18  that will not be picked up in a bioassay in inactive
19  EPO by definition in terms of what EPO is supposed
20  to do. It could have EPO fragments in it that are
21  picked up by the antibody, but not by any response
22  in the mouse. In this particular case, which is not
23  necessarily the example I would have chosen here for
24  this demonstrative if I had designed this
25  demonstrative. In this particular case, it would

Page 59

1   appear that your sample has a higher quality of EPO
2   than your standard. It's a less inactive EPO, for
3   example. Of course it can work the other way
4   around.
5       Q    What do you mean?
6       A    Well, for example, your predicted
7   sample has a concentration of five units per mL and
8   you might more typically find that in terms of its
9   bioassay it's much less, let's say one unit per mL.
10      Q    So what's the significance of this in
11  regards to your opinions in your expert report?
12      A    The significance of this is that you
13  cannot use the RIA to determine the number of units
14  of EPO. You cannot use an RIA to determine the
15  number of units of EPO in a sample.
16      Q    When you say to determine the number of
17  units of EPO in a sample, you mean the number of
18  units that that EPO sample would yield in a
19  bioassay?
20      A    Correct.
21      Q    So are your opinions related to RIA
22  predicated on that point that an RIA assay does not
23  tell you how many units of EPO your unknown sample
24  would have in a bioassay?
25      A    That's correct.

Page 60

1       Q    Let's go to the next demonstrative.
2   Now, without going through all the same questions.
3   Is there anything new, anything different that you
4   would say about this demonstrative other than that
5   you're using a different unknown which has a
6   different value?
7       A    No, nothing different.
8       Q    So if we go through the remainder of
9   these demonstratives where you look at the unknown
10  two, and then unknown three, does this series of
11  demonstratives simply represent that your different
12  unknown samples would have different values in the
13  RIA and might have different values in a bioassay?
14      A    Correct.
15      Q    And that the RIA value does not tell
16  you what the actual bioactivity of the sample would
17  be?
18      A    That's correct.
19      Q    And I just want to make sure, these --
20  the experiments that are depicted in these
21  demonstratives, they're not based on an actual
22  experiment conducted in real life? These are
23  hypotheticals?
24      A    These are hypotheticals.
25      Q    Okay. If you turn to the next

Page 61

1   demonstrative. Well, sorry, if you turn to the
2   demonstrative in the set, the next one has a
3   different title. It's RIA versus enzyme activity.
4       A    That's correct.
5       Q    Do you see where I am?
6       A    Uh-huh.
7       Q    It has two curves on a graph?
8       A    Yes.
9       Q    Okay, we're at the same place. What is
10  this meant to represent?
11      A    This represents exactly the same point
12  using an enzyme as an example which might be a
13  little bit easier to understand conceptually.
14      Q    EPO is not an enzyme, correct?
15      A    That's correct.
16      Q    Is this -- is this demonstrative and
17  the demonstratives following it that are titled RIA
18  Versus Enzyme Activity One Unknown, do you expect to
19  rely upon these demonstratives to illustrate your
20  testimony at trial?
21      A    Perhaps.
22      Q    So you expect that you might testimony
23  about an RIA conducted on an enzyme preparation?
24      A    Only in the sense that it might be
25  easier for -- for example, a jury to understand how

16 (Pages 58 to 61)

Confidential                                    R000016

Page 62

1  an enzyme works as opposed to how a hormone works.
2      Q    You're optimistic.
3      A    I said might.
4      Q    So this first demonstrative that I
5  believe we're both opened to here.  This simply lays
6  out two dose response curves for an RIA conducted on
7  a standard preparation of an enzyme?
8      A    Yes.
9      Q    And the legend which says Standard
10  1(1x) and Standard 1(10x), again, does that simply
11  represent a dilution of the same standard enzyme
12  preparation?
13      A    That's correct.
14      Q    So they differ only in their dilution?
15      A    That's correct.
16      Q    If you look through the next one, two,
17  three, four, five, -- five demonstratives all
18  bearing the title RIA versus enzyme activity, one
19  unknown, are the principles -- well, -- do you
20  expect to use these demonstratives to illustrate the
21  same essential opinions that you would use the
22  demonstratives titled RIA Versus Bioactivity Three
23  Unknowns to illustrate?
24      A    I would use them -- I'm not sure what
25  you mean by essential opinions.  I would use them to

Page 63

1  demonstrate the same issues of not being able to use
2  an RIA to determine bioactivity.
3      Q    Just in the context of an enzyme as
4  opposed to a hormone?
5      A    That's correct.
6      Q    And when we come to the next
7  demonstrative, which is titled RIA Versus Enzyme
8  Activity Three Unknowns and there are one, two,
9  three, four, five, six, seven, eight, nine, ten,
10  eleven, twelve, thirteen, fourteen, fifteen,
11  sixteen -- twenty demonstratives, I believe, with
12  that title?
13      MR. SUH:  I think that's right.
14  BY MR. FLOWERS:
15      Q    Again, are these -- are all of these
16  demonstratives going to be used by you at trial to
17  demonstrate the same issues of not being able to use
18  RIA to determine bioactivity?
19      A    Possibly.
20      Q    Is there any other issue that you would
21  illustrate using these demonstratives titled RIA
22  Versus Enzyme Activity Three Unknowns?
23      A    Not that I can think of.
24      Q    These two sets of demonstratives
25  dealing with RIA Versus Enzyme Activity, again, are

Page 64

1  these all just hypotheticals?
2      A    Yes.
3      Q    They're not based on any actual
4  experimental data, real life experiments that were
5  conducted?  Let me back up and ask you a different
6  question.
7          These two sets of demonstratives, and I
8  know it's compound, these two sets of demonstratives
9  are not meant to reflect the results of an actual
10  real life experiment that has been conducted?
11  They're meant to illustrate concepts?
12      A    They're meant to illustrate concepts,
13  but on the other hand, I have firsthand experience
14  with the concept involving in the latter
15  demonstratives, the enzyme demonstratives, in the
16  sense that I was trained as a biochemist and I used
17  to purify enzymes.  And simply the notion that you
18  would use an RIA to tell my thesis advisor how much
19  enzyme you'd purified, he would not have appreciated
20  that as an assay for his favorite enzyme.
21      Q    So in your career, have you ever used
22  an RIA to quantitate the amount of enzyme in a
23  preparation?
24      A    No.
25      Q    Have you -- have you ever used an RIA

Page 65

1  to quantitate the amount of any molecule in a
2  preparation?
3      A    No.
4      Q    Have you ever performed an RIA?
5      A    No.
6      Q    Has anyone in your laboratory performed
7  an RIA in your laboratory?
8      A    I don't recall.
9      Q    Do you believe one or the other?
10      A    I doubt it.
11      Q    Why?
12      A    Because in terms of measuring enzyme
13  activity, it would not be a method of choice.  So
14  I'm not sure why someone would choose to do that.  I
15  don't see every experiment that goes on in my lab,
16  so that's why I say I can't say for certain that no
17  one in my lab has ever done it.  And so that's --
18  you know, that's why I'll say that I don't think
19  it's been done.
20      Q    So are you recognized by your peers as
21  an expert regarding the use of immunoassays?
22      A    No.
23      Q    So do you consider yourself to be an
24  expert in regard to the use of immunoassays?
25      A    I'm an expert in regards to what they

17 (Pages 62 to 65)

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 66

1   measure and what they can't measure.
2       Q    In particular, are you recognized by
3   your peers as an expert regarding radioimmunoassays?
4       A    I would be regarded as an expert in the
5   eyes of my peers in terms of the concepts of assays,
6   the biochemical assays, but in terms of
7   radioimmunoassays per se, no.
8       Q    Have you ever included data from an RIA
9   in one of your publications?
10      A    No.
11      Q    Are you considered by your peers to be
12  an expert regarding EPO?
13      A    The -- expert is a relative term, I
14  believe. Do I work on EPO, no. Do I know about
15  EPO, much more than many people. Do I understand
16  the concept of what EPO does, yes.
17      Q    You've never used an RIA to measure the
18  amount of EPO in a sample, correct?
19      A    No.
20      Q    Have you ever supervised anyone else in
21  performing an RIA to measure EPO in a sample?
22      A    No.
23      Q    Have you ever designed an RIA to
24  measure EPO in a sample?
25      A    No.

Page 67

1       Q    Have you ever supervised anyone else in
2   designing an RIA to measure an EPO in a sample?
3       A    No.
4       Q    Are you recognized by your peers as an
5   expert in regard to antibodies?
6       A    It's a relative -- expert is a relative
7   term, but I know a lot about antibodies.
8       Q    So do you consider yourself to be an
9   expert regarding antibodies?
10      A    Yes.
11      Q    Why?
12          MR. SUH: Objection, vague.
13          THE WITNESS: Well, for the same reason
14      I know a lot about hematopoieses, I used to
15      study transcription of the immunoglobulin
16      heavy chain gene, which is a gene that
17      generates part of an antibody.
18  BY MR. FLOWERS:
19      Q    So you would consider yourself an
20  expert regarding the molecular biology of the
21  expression of the antibodies?
22      A    Absolutely.
23      Q    Are you considered by your peers to be
24  an expert regarding the epitopes recognized by
25  antibodies?

Page 68

1           MR. SUH: Objection, lacks foundation.
2           THE WITNESS: Again, the issue of
3   expert is a relative term. I know a lot about
4   antibodies. We use antibodies all the time in
5   the lab and so I have to know a fair amount
6   about what they do and how they recognize
7   epitopes. Do I study specifically the details
8   of how antibodies recognize epitopes, when a
9   crystallographer who crystallizes antibody
10  epitope interactions, no, but compared to a
11  lot of people in my department that don't use
12  antibodies at all, yes, I'm an expert.
13  BY MR. FLOWERS:
14      Q    So would you be considered by your
15  peers to be an expert regarding the epitopes
16  recognized by antibodies that react with EPO?
17      A    No.
18      Q    Are you recognized by your peers as an
19  expert regarding processes for the production of
20  EPO, particularly?
21      A    No. Well, can I qualify that
22  statement?
23      Q    I can't stop you.
24      A    The -- I know a lot about EPO
25  production in terms of its transcriptional

Page 69

1   regulation as measured by -- as a consequence of
2   hypoxia, for example.
3       Q    And how did you come to that?
4       A    I know a lot about transcription and I
5   follow the literature, so I know a lot about gene
6   expression.
7       Q    So have you ever -- have you ever
8   published a paper discussing the transcriptional
9   regulation of the EPO gene?
10      A    Not discussing it, no.
11      Q    Have you conducted research in your
12  laboratory regarding the transcriptional regulation
13  of the EPO gene?
14      A    Only indirectly in as far as the
15  transcriptional regulators of the EPO gene are a
16  family of proteins that I was initially involved in
17  defining and in the sense that, for example, a
18  transcription factor called HIF 1 alpha is a member
19  of the family that I helped define and so in the
20  context of studying it I think it would be more
21  appropriate to say that the people that study the
22  transcriptional regulation of EPO rely on my work.
23  So they are related.
24      Q    But you yourself have never studied the
25  EPO gene?

18 (Pages 66 to 69)

Confidential                                    R000018

Kadesch, Thomas R.                                          6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 70

1    A    No.
2    Q    Do you consider yourself to be an
3  expert regarding the processes for the production of
4  recombinant EPO?
5    A    Yes.
6    Q    And have you ever conducted any actual
7  scientific experimentation relating to the
8  production of recombinant EPO?
9    A    No.
10   Q    Do you have any experience with CHO
11 cells, Chinese hamster ovary cells?
12   A    Yes.
13   Q    And do you have any experience with
14 Chinese hamster ovary cells that have been
15 genetically engineered to produce recombinant
16 proteins?
17   A    I have to qualify that. Well, I have
18 to -- I'll answer that question in the context of
19 what I do know about CHO cells. When I was a
20 post-doctoral fellow, I used CHO cells to express
21 recombinant proteins.
22   Q    Which recombinant proteins?
23   A    HGPRT, beta galactic sitace and perhaps
24 other.
25   Q    And did you use CHO cells to produce

Page 71

1  any recombinant human proteins from human genes?
2    A    Possibly beta globin. This was a long
3  time ago.
4    Q    Do you have any experience with CHO
5  cells that have been genetically engineered to
6  produce recombinant EPO?
7    A    No.
8    Q    Do you have any experience with Roche's
9  DN23 alpha 3 cells?
10   A    I don't know what those cells are.
11       MR. FLOWERS: Let me ask the court
12 reporter to mark as Kadesch-2 a document
13 bearing the title Supplemental Expert Report
14 of Dr. Thomas Kadesch.
15       Again, I'll represent to you that this
16 document is in the form that we received it
17 from the attorneys for Roche.
18       (Supplemental Expert Report of Dr.
19 Thomas Kadesch was marked Kadesch-2 for
20 identification.)
21 BY MR. FLOWERS:
22   Q    On -- they don't have page numbers on
23 this one, but just before -- it's a couple of pages
24 before the tab marked Exhibit A, if you could verify
25 for me that your signature appears above your name

Page 72

1  and the date May 1, 2007.
2    A    Yeah, in the form that it is.
3    Q    Did you receive this document in its
4  shall we say final form that was submitted in this
5  case on May 1, 2007?
6    A    Oh, I don't remember what exact day it
7  was. Assuming if that's the day I signed it, then
8  that's the day it was.
9    Q    You actually signed the complete
10 report?
11   A    Yeah.
12   Q    You got a copy of the complete report
13 and you signed it on this page?
14   A    Yeah.
15   Q    I want to ask you a few questions
16 similar to what I asked you about the first report,
17 Exhibit 1.
18   A    Uh-huh.
19   Q    If you go to the second page of the
20 document with the page number little i, Table of
21 Contents?
22   A    Yes.
23   Q    Do you see that? There are two
24 sections, 3 and 4 setting out opinions. The
25 Section 3 invalidity, lack of written description,

Page 73

1  did you -- did you draft the first draft of that
2  section?
3    A    No.
4    Q    Who drafted that?
5    A    I believe it was Chris Jagoe.
6    Q    Section 4, Invalidity Indefiniteness
7  Based on the Phrase Capable of Producing. Did you
8  draft the first draft of that section?
9    A    No.
10   Q    Who drafted that section?
11   A    I believe that was also Chris Jagoe.
12   Q    This document was submitted to us on
13 May 1, 2007. What was the genesis -- strike that.
14       In your mind, why did you submit a
15 supplemental expert report on May 1?
16       MR. SUH: Objection, vague.
17       THE WITNESS: Do you want to know why I
18 submitted it or why did I submit it on May 1?
19 BY MR. FLOWERS:
20   Q    Let's start with why did you submit it?
21   A    In discussions with Chris Jagoe, and
22 again discussing the requirements of patents as far
23 as written description and indefiniteness go, we
24 discussed the issues having to do with what the
25 patent did and did not provide and we discussed the

19 (Pages 70 to 73)

Confidential                                          R000019

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 74

1  issues that were ultimately written down in this
2  report and we talked about different issues that
3  would be needed to make the argument. At that
4  point, Chris generated a draft and we went through
5  again an iterative process to -- to make sure it was
6  correct and something, you know, I certainly agreed
7  with.
8      Q    When did you start that process? When
9  did you start talking to Mr. Jagoe about the issues
10  in this supplemental report?
11     A    I don't remember.
12     Q    Was it after you submitted your first
13  report on April 6?
14     A    It probably was, but I'm not certain.
15     Q    My question goes to the opinions that
16  you set forth in this supplemental report, why
17  didn't you just put those in your first report?
18     A    The way that I've been retained in this
19  case, of course I don't -- I don't pretend to set
20  out the legal arguments based on the patent. I
21  don't look at the patent and then say -- call up
22  Kaye Scholer and say here are the issues with this
23  patent. As I said before, it's an iterative process
24  where they contact me and we discuss various
25  arguments in terms of validity and I in a sense will

Page 75

1  leave it up to the lawyers to establish the legal
2  grounds on which they want to address the case. So
3  in terms of why I didn't put it in my initial report
4  is because I let them establish what the legal
5  arguments -- what are the best legal arguments that
6  suit their points and as a consequence, then I will
7  have discussions about those arguments when they
8  come up.
9      Q    So is it fair to say that essentially
10  the opinions in this report you didn't put in your
11  first report because the lawyers hadn't brought
12  these issues to your attention from a legal
13  perspective until after your first report was
14  already submitted?
15     A    I think that's a fair representation.
16  It's hard for me to know exactly what was in their
17  heads in terms of how they wanted to formulate their
18  arguments, but that would be a fair -- probably a
19  fair representation.
20     Q    If you turn to Exhibit B in Exhibit 2.
21  There's a series of demonstratives again.
22     A    Uh-huh.
23     Q    I'd just like to go through these with
24  you because I believe again in this report -- let me
25  just ask you -- let me just ask you, are these

Page 76

1  demonstratives intended to illustrate the opinions
2  that you provide in this supplemental expert report?
3      A    Yes.
4      Q    And do you expect to rely upon these
5  demonstratives to illustrate your opinions and your
6  testimony at trial?
7      A    Possibly.
8      Q    Why do you say possibly?
9      A    My understanding of how a trial works
10  is that not all of the experts are asked to testify
11  on every issue that they opine on, so that's why I
12  say possibly.
13     Q    So if you testify about the opinions
14  set out in this supplemental expert report at trial
15  in this case, --
16     A    Okay.
17     Q    -- do you expect to rely upon these
18  demonstratives to illustrate those opinions and that
19  testimony?
20     A    I expect to, yes.
21     Q    The first demonstrative, it's got TK1
22  in the lower right-hand corner.
23     A    Uh-huh.
24     Q    What is this meant to represent?
25     A    The difficulty it is -- how difficult

Page 77

1  it is to simply by looking at DNA sequence to
2  identify transcriptional regulatory elements.
3      Q    And what is the significance of that in
4  respect to the opinions that you offer in your
5  supplemental report?
6      A    The -- they relate to the idea that the
7  Lin patent did not describe the EPO promoter.
8      Q    How do they relate to that idea?
9      A    As I recall, although my recollection
10  of every sentence in the patent is not on the tip of
11  my tongue, they make the comment that by looking at
12  the sequence five prime of the translational start
13  site, they did not recognize any obvious promoter
14  elements. In the timeframe of 1983, '84, there were
15  very few elements that would have been recognizable
16  anyway and this demonstrative is simply meant to say
17  that even today it's very difficult to do that just
18  by looking at sequence.
19     Q    The next demonstrative, which bears TK2
20  in the lower right-hand corner. What is this
21  demonstrative meant to represent?
22     A    The same point.
23     Q    In what I take to be the title of the
24  article, which is pictured in this demonstrative, it
25  refers to human and mouse orthologous pairs?

20  (Pages 74 to 77)

Confidential                                        R000020

Kadesch, Thomas R.                                        6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 78

1    A    Uh-huh.
2    Q    What is that?
3    A    Orthologs are genes that are related
4  let's say between two different species that are not
5  yet shown to be homologous.  So orthologous in this
6  case is a term that is applied to something that
7  might be homologous, but isn't yet shown to be.
8  Homologous in this case pertains only to genes that
9  shared the same function between mouse and human.
10 Orthologs are genes that look alike, but aren't
11 necessarily sharing the exact function.
12   Q    Is it -- this demonstrative also refers
13 to a core promoter region.  Was it necessary in 1983
14 to identify the core promoter region of a promoter
15 that one would use to drive expression of the EPO
16 gene to determine whether that promoter was present
17 in human DNA, human genomic DNA?
18   A    The core promoter region is a term that
19 evolved after 1984, but is really the part of the
20 promoter that Lin would have been looking for.  The
21 core promoter region is typically viewed as the
22 region of the promoter that is around the
23 transcriptional start site and in the timeframe of
24 1984 that's what people were really focusing on.
25 It's since been identified as its kind of own entity

Page 79

1  from the point of view that it is now considered to
2  be part -- only part of what might be comprising
3  promoter sequences.  But that's what Lin would be --
4  had been looking for.
5    Q    In order to determine whether a
6  promoter is a human promoter or a non-human
7  promoter, you could determine that -- one way to
8  determine that would be to take your promoter DNA
9  and see if it hybridizes under stringent conditions
10 to any DNA in the human genome, correct?
11        MR. SUH:  Objection to form, lacks
12 foundation.
13        THE WITNESS:  I'm not sure I
14 understand.  It was a long question.
15 BY MR. FLOWERS:
16   Q    If I wanted to determine whether a
17 piece of human DNA containing a promoter is a human
18 promoter, I could determine that by seeing if that
19 promoter DNA hybridizes to a complementary sequence
20 in the human genome, correct?
21        MR. SUH:  Objection.
22        THE WITNESS:  Again, that question is
23 complicated in the sense that it involves a
24 number of assumptions that I'm not sure you're
25 making or not.  If you have a sequence you

Page 80

1  know is a promoter --
2  BY MR. FLOWERS:
3    Q    Yes, assume that for this question,
4  yes.
5    A    Are we assuming that a timeframe of
6  1984?
7    Q    In 1984, you can assume that, yes.
8    A    So not today?
9    Q    Not today.
10   A    In 1984, if someone had a sequence of
11 DNA, first of all, they would have probably had a
12 fairly good idea of where it came from.  These don't
13 appear in the test tube spontaneously.
14   Q    Fair enough.
15   A    So the first thing you would want to
16 know is did this come from human DNA or mouse DNA or
17 viral DNA and so that -- in order to answer your
18 question, the first pass would not be to hybridize
19 it back to human DNA, but rather just to ask where
20 it came from.
21   Q    So I'm making it too complicated.
22   A    Yes.
23   Q    So if you had a promoter that came from
24 the mouse genome, then that's not a human promoter?
25   A    Correct.

Page 81

1    Q    Okay, all right.  Let's go back to the
2  demonstratives.  The next demonstrative, Amgen at
3  the FDA admitted not being able to identify
4  regulatory agents in the EPO gene.
5        How will you use this demonstrative to
6  illustrate your testimony at trial?
7    A    Simply what it says.  I think that
8  the -- the point I'm making in my expert report is
9  that the promoter of the EPO gene had not been
10 identified and this is a document, obviously not one
11 that I dredged up, but rather it was pointed out to
12 me that it basically acknowledges that.
13   Q    You would agree that once Lin
14 identified the DNA encoding EPO, the genomic
15 sequence, the EPO gene, that one of ordinary skill
16 in 1983 or 1984 would have been able to use that to
17 determine the upstream portions of DNA adjacent to
18 the DNA encoding EPO?
19        MR. SUH:  Objection to form, lacks
20 foundation.  Go ahead.
21        THE WITNESS:  What you said is true.
22 Of course, you can identify -- once you
23 identify the coding sequence, you can identify
24 sequences that are upstream.  What those
25 sequences are --

                              21  (Pages 78 to 81)

Confidential                                    R000021

Kadesch, Thomas R.                                      6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 82

1   BY MR. FLOWERS:
2       Q    You would have to sequence the DNA?
3       A    You'd have to sequence and to be able
4   to identify what they are functionally, you'd have
5   to do some sort of test.
6       Q    You would agree that Dr. Lin's patent
7   claims in this case don't claim the human EPO
8   promoter, correct?
9       A    The claims do not claim the promoter.
10      Q    Let me go back to my earlier question.
11  If you didn't know where your promoter sequence came
12  from, you have a promoter that you want to use to
13  drive expression of human EPO in a vertebrate cell,
14  for example.
15      A    Okay.
16      Q    If you didn't know where that promoter
17  sequence came from for some reason --
18      A    This is a hypothetical?
19      Q    Hypothetical.
20      A    Okay.
21      Q    You don't know whether it came from a
22  mouse genome or a rat genome or a viral genome, for
23  example, you could determine whether that sequence
24  was present in the human genome, the normal human
25  genome by hybridization techniques, correct?

Page 83

1       MR. SUH:  Objection, form, lacks
2   foundation, lack of scope.
3       THE WITNESS:  That would be an
4   appropriate approach, yes.
5   BY MR. FLOWERS:
6       Q    Okay.  So it's a more complicated way
7   of doing it than just seeing where your promoter
8   came from, but you could do it that way?
9       A    Yes.
10      Q    Told you.  All right.  The next
11  demonstrative -- I'm not always wrong, the next
12  demonstrative, TK4.
13      A    Yes.
14      Q    Patent office rejected claims for
15  non-transformed cells.  How will you use this
16  demonstrative to illustrate your testimony at trial?
17      A    Let me think about this.
18      Q    I have to admit, I was stumped by it.
19      A    I am stumped as well.  I don't recall
20  how I will use this.
21      Q    Does -- do non-transformed cells, in
22  your mind, have anything to do with Dr. Lin's
23  claims?
24      A    My understanding is that there is
25  language in this litigation that is, from my view,

Page 84

1   contorted.
2       Q    Claim language you mean?
3       A    Yes.  That resulted from, again -- my
4   recollection of the details is vague.  Not even my
5   recollection, my knowledge of the recollection is
6   vague, but there was a case having to do with, I
7   believe, TKT, the consequence from which some
8   additional language was put into this that is not
9   the way I typically speak and so I think, my guess
10  is this is somehow related to that in terms of
11  non-transformed.  Obviously in the case --
12  transformed, the word has usually two different
13  meanings.  One is cells that stably express foreign
14  DNA.  The other is transformed in the sense of kind
15  of from the point of view of on the genesis, namely,
16  they will grow without appropriate controls.  So my
17  guess in this case, I'm sorry that I don't recall
18  exactly why I put this in there, in terms of
19  non-transformed, I suspect that relates more to the
20  TKT case and the language.
21      Q    It's not your opinion that Dr. Lin's
22  claims cover non-transformed cells, non-transformed
23  in the sense of expressing formed DNA or not
24  expressing formed DNA as the case may be?
25      A    My recollection of the claims being

Page 85

1   what it is, I don't recall specifically with respect
2   to non-transformed.
3       Q    So you don't expect to offer an opinion
4   that his claims cover cells that haven't been
5   genetically engineered, if I can use that term?
6       A    I don't anticipate talking about that,
7   no.
8       Q    The next demonstrative, TK5.  How do
9   you expect to use this demonstrative to illustrate
10  your testimony at trial?
11      A    This is related to what we were talking
12  about earlier, namely, these are the sequences that
13  Dr. Lin identified that exist five prime to the
14  translational start site and as pointed out by
15  Dr. Lin that they did not recognize any promoter
16  elements in these sequences and from my point of
17  view, there are no experiments that address whether
18  or not there is an EPO promoter within those
19  sequences, either.
20      Q    You mean no experiments described in
21  Dr. Lin's patent?
22      A    That's correct.
23      Q    The next demonstrative, TK6?
24      A    Yes.
25      Q    How do you expect to use this to

22 (Pages 82 to 85)

Confidential                                      R000022

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 86

1    illustrate your testimony at trial?
2        A    This is simply a teaching demonstrative
3    that basically identifies what a typical or classic
4    gene structure might look like.
5        Q    So this is a Type II gene?
6        A    Class 2 gene.
7        Q    Class 2 gene, sorry.  So not all genes
8    look like this?
9        A    No.
10       Q    Does the EPO gene conform to this
11   pattern or this anatomy?
12       A    I don't know.
13       Q    The next demonstrative, TK7, how do you
14   expect to use this to illustrate your testimony at
15   trial?
16       A    Again, this is a teaching demonstrative
17   that just basically shows the generation of a
18   polypeptide from DNA.
19       Q    This is titled Flow of Genetic
20   Information.  Does this flow of genetic information
21   occur in all vertebrate cells?
22       A    Yes.
23       Q    Are there any vertebrate cells you know
24   of that don't utilize this flow of genetic
25   information?

Page 87

1        A    No.
2        Q    If you go to the next slide, TK8,
3    titled Transcription.  Is this again just a teaching
4    slide?
5        A    This is a teaching slide.
6        Q    And do all vertebrate cells use this
7    method of transcription?
8        A    Yes.
9        Q    Are there any vertebrate cells that
10   don't use this method of transcription?
11       A    No.
12       Q    The next demonstrative, TK9, RNA
13   Processing.  Again, is this just a teaching slide?
14       A    This is a teaching slide.
15       Q    And the same questions, do all
16   vertebrate cells use this method of RNA processing?
17       A    Generally speaking, yes.
18       Q    So are there vertebrate cells that
19   don't use this general method of RNA processing?
20       A    No.
21       Q    TK10, the next demonstrative.  Again,
22   just a teaching slide?
23       A    This is a teaching slide.
24       Q    Not specific to EPO?
25       A    Not specific to EPO.

Page 88

1        Q    And again, this says a review of the
2    molecular anatomy of a eucaryotic gene and its
3    transcript.
4        A    Yes.
5        Q    Do all vertebrate cells utilize this
6    process that's illustrated here?
7        A    They can, yes.
8        Q    Are there any vertebrate cells that
9    never use this process?
10       A    No.
11           MR. FLOWERS:  I think we have to break
12   for the tape again.
13           VIDEO OPERATOR:  This concludes tape
14   number two of the videotape deposition of
15   Dr. Thomas R. Kadesch on June 21, 2007.
16           The time is 11:12 a.m. and we're off
17   the record.
18           (Brief recess.)
19           VIDEO OPERATOR:  This begins tape
20   number three in the videotape deposition of
21   Dr. Thomas R. Kadesch on June 21, 2007.
22           The time is 11:21 a.m. and we're back
23   on the record.
24   BY MR. FLOWERS:
25       Q    Dr. Kadesch, if you go to TK11, the

Page 89

1    next demonstrative.
2        A    Yes.
3        Q    How do you expect to use this
4    demonstrative to illustrate your testimony at trial?
5        A    Again, this is a teaching demonstrative
6    that basically also addresses the flow of genetic
7    information.
8        Q    And is this -- is this meant to be
9    specific to EPO, the EPO gene?
10       A    No.
11       Q    And does this process occur in all
12   vertebrate cells?
13       A    Yes, it does.
14       Q    If you go to the next demonstrative,
15   TK12, the same questions.  How do you expect to use
16   this to illustrate your testimony at trial?
17       A    Same idea, teaching demonstrative.
18   There's a little twist that this one has, that the
19   other -- the previous TK11 also has, which addresses
20   the concept of an enhancer sequence, which is a
21   sequence of DNA that can be located far away from
22   the start of transcription for a gene and regulate
23   its expression.
24       Q    Do all promoters have distal elements?
25       A    No.

23  (Pages 86 to 89)

Confidential                                          R000023

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 90

1    Q     And do enhancer sequences initiate
2  transcription of a gene?
3    A     They promote transcriptional
4  initiation. They don't initiate per se.
5    Q     So -- so an enhancer sequence doesn't
6  initiate and control transcription?
7    A     Let me be clear. Typically, to a first
8  approximation, an enhancer sequence would work in
9  collaboration with a core promoter sequence. The
10  core promoter sequence may have very limited
11  activity on its own, but the core promoter sequence
12  would establish where transcription is initiated.
13  The enhancer sequence would make that process more
14  efficient or more rapid and hence, the enhancer
15  sequence does regulate -- can regulate expression of
16  a gene and have profound effects on whether a core
17  promoter is active or not.
18    Q     But an enhancer sequence can't initiate
19  transcription on its own, correct?
20    A     It is typically viewed as inert when it
21  comes to transcriptional initiation per se, but
22  certainly in the timeframe of the 1984 period, it
23  was viewed as being inert in terms of
24  transcriptional initiation.
25    Q     Does the EPO gene have distal enhancer

Page 91

1  sequences?
2    A     I don't know.
3    Q     Let's go to the next demonstrative,
4  TK13, and how do you expect to use this to
5  illustrate your testimony at trial?
6    A     Again, it's the teaching demonstrative
7  that illustrates that regulatory elements comprise
8  nucleotide sequences both with respect to the
9  promoter and the enhancer and again, it's a teaching
10  demonstrative that would hope to teach very
11  fundamental concepts of nucleotide sequence to a
12  jury.
13    Q     Is this demonstrative meant to teach to
14  a jury that enhancers all have the same nucleotide
15  sequence?
16    A     No.
17    Q     The same question for promoters?
18    A     That's correct.
19    Q     TK14, the next demonstrative. No
20  surprises here. How do you expect to use this to
21  illustrate your testimony at trial?
22    A     This simply gives an example of again,
23  in this case, a hypothetical gene, but there are
24  examples of genes such as this where the promoter is
25  located perhaps tens of thousands of bases from the

Page 92

1  coding region of the gene.
2    Q     TK -- TK10 through TK14 that we've just
3  looked at, do those demonstratives or sorry, do you
4  expect to use those demonstratives to illustrate
5  your opinions in your supplemental expert report
6  about a written description regarding non-human DNA
7  sequences which control transcription?
8    A     Yes.
9    Q     And how are they relevant?
10    A     The relevance has to do with whether
11  the -- whether Lin was in possession of non-human
12  DNA sequences that control transcription. My
13  understanding is he uses one example of the SV40
14  promoter to drive EPO, but there's no other example
15  of a promoter that is used to drive EPO. The
16  inclusion of sequences five primed to the
17  translational start site on its own is not -- does
18  not fall under the definition, as I understand it,
19  of written description in the sense that he does not
20  describe an EPO promoter, so he does not describe
21  any promoter other than SV40.
22    Q     And is that the basis for your argument
23  that there's inadequate written description for the
24  phrase or phrases like non-human DNA sequences which
25  control transcription?

Page 93

1    A     That's correct.
2    Q     You pointed out in your report and just
3  now you pointed out your view that Dr. Lin only
4  described one non-human promoter. In your view, how
5  many non-human promoters did Dr. Lin need to
6  describe in order to have adequate written
7  description to support his claims?
8    A     The -- I don't -- I don't have a
9  specific number that I think he should have
10  described. I think this is a point that is a legal
11  issue having to do with written description and I'm
12  not an expert in legal opinion. My -- the point in
13  my expert report is simply to point out the fact
14  that he describes a single promoter. My
15  understanding of written description, if you're
16  going to claim non, you know, human DNA that is not
17  the EPO promoter, it seems that it would be
18  reasonable to expect description of more than just a
19  viral promoter to be in possession of again looking
20  at the claim language, to be in possession of
21  promoters that are non-EPO promoter, non-human and I
22  don't see as -- one example of that is being in
23  possession.
24    Q     How many different types of non-human
25  promotors, how many different categories?

24  (Pages 90 to 93)

Kadesch, Thomas R.                                          6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 94

1          MR. SUH:  Objection, compound, asked
2      and answered.
3   BY MR. FLOWERS:
4      Q    Let's start over.  How many different
5   categories of non-human promoters do you think
6   Dr. Lin needed to describe in order to have adequate
7   written description for his claims?
8          MR. SUH:  Objection, asked and
9      answered.  Go ahead, Doctor.
10         THE WITNESS:  As I -- as I said, the --
11     one purpose of my expert report was to point
12     out that Dr. Lin had described -- given no
13     examples of non-human, non-viral promoter
14     sequences, viral promoters represent certainly
15     one category of promoter and again, depending
16     upon how one defines category, one could come
17     up with many, many, many categories of
18     promotors, but I would have expected a
19     description of at least one non-viral promoter
20     that could drive transcription if the claim
21     language insisted on being in possession or
22     implied that he was in possession of all
23     non-human promoter sequences.
24         MR. FLOWERS:  I'm going to ask the
25     court reporter to mark as Kadesch Exhibit 3 a

Page 95

1   copy of the Decision in Amgen versus Hoechst
2   Marion Roussel, 126 FSupp.2d 69.
3          (Decision in Amgen versus Hoechst
4      Marion Roussel, 126 FSupp.2d 69 was marked
5      Kadesch-3 for identification.)
6   BY MR. FLOWERS:
7      Q    Let me ask you, have you reviewed any
8   part of that decision from the TKT case, the HMR TKT
9   case?
10     A    As I stated earlier, I am aware that
11  there was a litigation.  I am familiar only in
12  outline with what TKT's technology was trying to
13  accomplish and I'm aware that because of that
14  litigation, that some of this language was inserted
15  having to do with non-EPO promoters, et cetera.  But
16  that's about it.  I really haven't reviewed this
17  case.
18     Q    If I could ask you to turn to Page 147.
19  It's in the upper right-hand corner of Exhibit 3.
20     A    Okay.
21     Q    And in the right-hand column, with the
22  subheading No. 2, written description, ask you to
23  look at the last sentence in that column carrying
24  over to Page 148, which reads:  Judge Young states
25  here, thus Section 112 requires this court to

Page 96

1   determine whether Amgen's specification, considered
2   as a whole, conveys to one of ordinary skill in the
3   art either explicitly or inherently that Dr. Lin
4   invented the subject matter claimed in the
5   patents-in-suit.
6          Do you see that?
7      A    Yes, I'm sorry.
8      Q    And you'd agree with that, correct?
9          MR. SUH:  Objection, vague.
10         THE WITNESS:  I agree that that's what
11     it says.
12  BY MR. FLOWERS:
13     Q    And you would agree with Judge Young
14  that that's what Section 112, the written
15  description requirement require, right?
16     A    I didn't know what Section 112 was.
17     Q    Sorry.
18     A    Could you back up possibly.
19     Q    Let me just make sure.  If you could
20  keep that open, but go back to Exhibit 1, which is
21  your first expert report.
22     A    Okay.
23     Q    Go to Page 7, Paragraph 28.
24     A    Oh, okay.
25     Q    Or Page 6, the previous page at the

Page 97

1   bottom.  I just want to make sure.  You've read
2   Section 112?
3      A    This was -- as I said, this document
4   was a collaborative effort and so I've been
5   described, counsel has described to me what written
6   description is.  This portion obviously was written
7   not by me.  I don't have this memorized, the
8   Section 112 that describes written description.
9      Q    Okay.  So in your first expert report,
10  Exhibit 1 here, this legal background section
11  starting on Page 6, carrying over to Page 7 and
12  finishing on Page 8, that was written by the
13  lawyers?
14     A    Yes.
15     Q    And what's here is what -- essentially
16  what you were told by the lawyers?
17     A    Yes.
18     Q    Okay.  All right.
19         In your first report, Exhibit 1, page
20  7.
21     A    Yes.
22     Q    You talk about the written description
23  requirement?
24     A    Uh-huh.
25     Q    In Paragraph 29.

25 (Pages 94 to 97)

Kadesch, Thomas R.                                          6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 98

1    A    Yes.
2    Q    You say the patent must have sufficient
3  detail that a skilled scientist would note that the
4  inventor was in possession of the entirety of his or
5  her invention at the time of the filing of the
6  application.
7    A    Yes.
8    Q    In that sentence when you refer to the
9  in position of the entirety of his or her invention,
10  what does that mean to you?
11    A    What it means to me is to put it in lay
12  language, if I may, know what they're talking about
13  and describe something in such a way that someone of
14  ordinary skill in the art would appreciate that they
15  knew what they were talking about and be able to
16  practice the claims in a way that it would be
17  commensurate with the -- that assumption.  That is
18  they know what they're talking about, that one could
19  take, again, in this case, a non-equal promoter and
20  practice the claims.
21    Q    Is it your opinion that in 1984 one
22  could not have taken, for example, Dr. Lin could not
23  have taken a non-human EPO promoter and practiced
24  his claims in the '349 Patent?
25    A    He might have been able to, but he

Page 99

1  might not have been able to and I'll give an example
2  to illustrate my point.  Dr. Lodish in one of his
3  rebuttals describes I think it's four non-viral
4  promotors or control sequences that could have been
5  used and by giving these examples, he makes the
6  point that this was in the art.  One of the examples
7  he gives was immunoglobulin heavy chain enhancer and
8  I think as I pointed out in one of my rebuttal
9  reports, my most recent one, this was an enhancer
10  that was only active in B lymphocytes, so it would
11  have been very, very difficult to practice the
12  claims in all the vertebrate cells, impossible to
13  practice the claims in all vertebrate cells, and the
14  number of cells that you could practice were very
15  limited and very difficult to work with.
16        Another example he gives was the beta
17  globin promoter.  Again, from the point of view of
18  someone of ordinary skill in the art would have
19  appreciated that.  The beta globin promoter was
20  inactive unless it was linked to a strong enhancer.
21  So again, using the beta globin promoter as an
22  example of a non-viral, non-EPO promoter would not
23  have gotten anyone very far.
24        The two other examples he gives were
25  metallothionein and beta interferon.  I'm not aware

Page 100

1  of any literature that suggests that those
2  promotors, in addition to the fact that they have to
3  be activated by external queues, that those
4  promoters would have supplied sufficient expression
5  of EPO to practice the claims and so I disagree with
6  Dr. Lodish's statements that, and particularly the
7  examples he gives, which were well-characterized
8  promotors in the timeframe of 1984.  I mean it
9  illustrates my point that those really could not
10  have easily been used to practice the claims and so
11  I think that the notion that Dr. Lin was in
12  possession is not correct because again, the
13  examples of promoters that were available would not
14  have been useful to practice the claims.
15    Q    So is it your opinion that there were
16  not non-human EPO promoters available in 1984 to
17  practice the claims?
18    A    There were viral promoters, but apart
19  from viral promotors, there were promotors, but
20  there was no indication that they could have been
21  used to practice the claims.
22    Q    I didn't see in your expert reports any
23  example of, for example, a viral promoter that was
24  known in 1984 that could not be used to drive
25  expression in a vertebrate cell of the EPO gene.

Page 101

1        MR. SUH:  Objection, form.
2  BY MR. FLOWERS:
3    Q    Do you provide such an example?
4    A    I don't provide an example of a viral
5  promoter.
6    Q    Okay.  And it's not your opinion that
7  there were no examples of non-viral promoters that
8  could be used to drive expression of the EPO gene in
9  a vertebrate cell, correct?
10        MR. SUH:  Objection to form, lacks
11  foundation.
12        THE WITNESS:  In the 1984 timeframe,
13  there were a lot of people experimenting and
14  characterizing promoters of all types.  In the
15  1984 timeframe, there were very few promoters,
16  non-viral promotors, that had been
17  characterized with any detail.  Viral
18  promotors were the best characterized.  So I
19  forget what your question was exactly.  There
20  were no -- to my recollection, there were no
21  good examples of non-viral promoters that
22  would have clearly, to someone of ordinary
23  skill in the art, been used to practice the
24  claims.
25  BY MR. FLOWERS:

26  (Pages 98 to 101)

Confidential                                               R000026

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 102

1    Q    How would one -- how would one
2  determine if a non-human EPO promoter was able to
3  drive expression of the EPO gene in a vertebrate
4  cell to satisfy Dr. Lin's claims?
5    A    So the -- the first thing one has to do
6  is to identify the promoter and typically what
7  people did was to start looking, as Dr. Lin did,
8  five prime to a coding region or five prime to a
9  known transcriptional start site. This would
10  require the gene being in hand and genomic DNA being
11  cloned and to first identify the sequence, second to
12  identify the transcription start site so one would
13  look -- know where to look for a core promoter and
14  then to do a series of functional experiments to
15  show that where the promoter was by putting these in
16  what were called reporter plasmids and simply ask if
17  one in the appropriate cell type could generate
18  promoter activity. And, of course, one would then
19  apply this to EPO and ask if one could generate
20  using that promoter sufficient quantities of EPO to
21  practice the claims.
22    Q    And one of ordinary skill in 1983, 1984
23  knew how to carry out that process you just
24  described, correct?
25         MR. SUH: Objection to form.

Page 103

1         THE WITNESS: Yes.
2  BY MR. FLOWERS:
3    Q    Are you aware of an instance following
4  Dr. Lin's inventions in which scientists attempted
5  to use a non-human EPO promoter to express a human
6  EPO gene in a vertebrate cell and failed?
7    A    I'm sorry, I need to make sure I'm
8  clear on your question. You said non-human EPO
9  promoter?
10    Q    Yes.
11    A    So the EPO promoter, for example, a
12  mouse EPO promoter?
13    Q    I'm sorry, a non-human EPO promoter.
14  It's hard to do without your hands.
15    A    Right.
16    Q    A promoter that is not the human EPO
17  promoter.
18    A    Okay, so could you repeat your question
19  then?
20    Q    Are you aware of any instance following
21  Dr. Lin's inventions in which a scientist attempted
22  to express human EPO in a vertebrate cell using a
23  non-human EPO promoter and failed?
24    A    No.
25    Q    So you certainly don't point out any

Page 104

1  such example in your expert reports?
2         MR. SUH: Objection, argumentative.
3         THE WITNESS: I pointed out the problem
4  with such a promoter that Dr. Lodish would
5  have -- might have used. Namely, the beta
6  globin promoter where the experiment wouldn't
7  even have to be done by me because I would
8  know that it wouldn't work because that
9  promoter was not -- would not drive
10  transcription of the EPO gene.
11  BY MR. FLOWERS:
12    Q    Without -- I'm sorry, I didn't mean to
13  interrupt.
14    A    Without a strong enhancer like the SV40
15  enhancer.
16    Q    And that was known in 1984 about the
17  beta globin promoter, correct?
18         MR. SUH: Objection, vague.
19         THE WITNESS: Yes.
20  BY MR. FLOWERS:
21    Q    It had been published?
22    A    It had been published.
23    Q    Are you aware of any example after
24  Dr. Lin's inventions when a scientist attempted to
25  express the human EPO gene in a vertebrate cell

Page 105

1  using a viral promoter and failed?
2    A    I'm not aware of failed experiments
3  typically. Many failed experiments are not
4  published for obvious reasons, so I'm not aware of
5  any, but I should provide the condition that I'm not
6  aware of such things would be in the public domain.
7    Q    You are aware, on the other hand, that
8  after Dr. Lin's inventions, that other scientists
9  were able to use non-human EPO promoters and viral
10  promoters to express the human EPO gene in
11  vertebrate cells, correct?
12         MR. SUH: Objection to form, lacks
13  foundation.
14         THE WITNESS: I'm not aware of those
15  publications.
16  BY MR. FLOWERS:
17    Q    So I take it, then, you didn't do
18  research in the course of preparing your expert
19  reports to find out whether other scientists had
20  succeeded in expressing human EPO gene in vertebrate
21  cells using such promoters after Dr. Lin's
22  inventions?
23         MR. SUH: Objection to form, lacks
24  foundation.
25  BY MR. FLOWERS:

27 (Pages 102 to 105)

Confidential                                    R000027

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 106

1    Q    I just want to make sure whether you
2   searched for it and didn't find it or whether you
3   didn't search for it?
4    A    I didn't search for it.
5    Q    Okay.  And you would agree -- you would
6   agree that a claimed genoise is adequately described
7   when one of ordinary skill can recognize that the
8   applicant is in possession of the necessary common
9   attributes or features of the elements possessed by
10  the members of the genoise, correct?
11         MR. SUH:  Objection.  Objection to
12  form, lacks foundation.
13         THE WITNESS:  I would not disagree with
14         that statement.
15  BY MR. FLOWERS:
16   Q    And you would agree that information
17  which is known in the art need not be described in
18  detail in the specification in order to satisfy the
19  written description requirement?
20         MR. SUH:  Same objection, calls for a
21         legal conclusion.
22         THE WITNESS:  Detail is a -- is a term
23         that can be argued on either side and whereas
24         that statement is true from one point of view,
25         it might have been untrue from a different

Page 107

1   point of view in terms of what adequate detail
2   really is.  My sense is that that's the issue
3   we're discussing at the moment, what is
4   adequate and what is sufficiently detailed.
5   BY MR. FLOWERS:
6    Q    Do you recall having made a statement
7   in the past that information which is known in the
8   art need not be described in detail in the
9   specification?
10   A    I may have made that statement.
11   Q    Do you disagree with that statement
12  now?
13   A    I don't disagree with it.
14   Q    And you would agree also that the
15  specification need not describe future technological
16  developments, correct?
17   A    I don't disagree with that statement,
18  either.
19   Q    If you could -- if you could turn back
20  I think you still have open Exhibit 3, that decision
21  in the TKT case by Judge Young?
22   A    Yes, yes.
23   Q    You understand that Judge Young is our
24  judge in this case, correct?
25   A    No.

Page 108

1    Q    So are you aware that Judge Young made
2   findings of fact and entered conclusions of law in
3   the Amgen versus TKT decision that you have before
4   you in Exhibit 3 finding that the claims of the '349
5   Patent have adequate written descriptive report in
6   Dr. Lin's specification?
7    A    I was not aware of that.
8    Q    If you could turn to Pages 152 to 154.
9   You see on Page 152 in the left-hand column towards
10  the bottom under Subheading C, '349 Patent?
11   A    Yes.
12   Q    That portion of the opinion carries
13  over to Page 154 at the top where Judge Young goes
14  on to make findings on the '933 patent.
15         Have you looked at these pages in this
16  decision?
17   A    No.
18   Q    In Exhibit 2, your supplemental report,
19  you refer to Judge Young's decision in the Amgen
20  versus TKT case.  It's Paragraph 16 and 17.
21   A    In which report?
22   Q    In your second -- sorry, in your
23  supplemental expert report, which I believe is
24  Exhibit 2.
25   A    Could you point that out, what page,

Page 109

1   please?
2    Q    As soon as I can find my own copy.
3   There's no page numbers in Exhibit 2, but Paragraph
4   16 and 17, particularly Paragraph 16.  And then
5   Footnote 1 on that page.  Again, I apologize if I
6   asked you this before.
7    A    Right.
8    Q    But in referring to this case, which
9   you referred to as Amgen-1, this decision that's
10  before you as Exhibit 3, did you only look at, for
11  example, Page 118 of the decision or did you read
12  any portion of the decision that I've just shown you
13  in Exhibit 3 between Pages 152 and 154?
14   A    This is a reference that I did not
15  myself insert in support of this statement.  This
16  paragraph was discussed with counsel, with perhaps
17  Chris Jagoe and basically he was -- he was
18  instructing me about what the Court had said and I
19  agreed with that statement and therefore, -- but I
20  left it up to him to put in the reference.  I don't
21  read all the references of things I cite.
22   Q    Okay.  So did you consider this portion
23  of Judge Young's decision in the TKT case, from
24  Pages 152 to 154 in coming to the opinions that you
25  set out in your expert reports in this case?

28  (Pages 106 to 109)

Kadesch, Thomas R.                                      6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 110

1     A    No.
2     Q    If you look on Page 152 in Exhibit 3,
3  the decision.
4     A    153? I'm sorry.
5     Q    Page 152.  Okay, you got that.  Down
6  towards the bottom.  Do you see the sentence it says
7  because the specification provides sufficient
8  description?
9     A    Are we on the left or right-hand side?
10    Q    I'm sorry, first column, left-hand
11 column towards the bottom under '349 Patent.
12    A    Yes, okay.
13    Q    The last sentence beginning in that
14 column carrying over to the next column, the right
15 column, it says:  Because the specification provides
16 sufficient description of the claimed inventions to
17 give notice to one of ordinary skill in the art as
18 of 1984 that Dr. Lin actually possessed the
19 inventions, TKT's written description attack fails
20 here as well.
21         Do you see that?
22    A    I do see that.
23    Q    Do you disagree with Judge Young's that
24 Dr. Lin's specification provides sufficient
25 description of the claimed inventions in the '349

Page 111

1  Patent?
2     A    As far as what I do and don't know
3  about the specifics of the TKT case, which as I said
4  earlier, seemed to promote the use of lay -- kind of
5  non-lay language, I would have to disagree with the
6  Judge in this case.
7     Q    So if you, again, on Page 152, in the
8  second column, right-hand column, in the first
9  paragraph there Judge Young points to a description
10 in the brief summary of Dr. Lin's patent that
11 vertebrate cells that could be propagated --
12    A    How far down are we?
13    Q    Just to the top of the column, but
14 continuing down through that column, Judge Young
15 describes that the specification amounts as in the
16 brief summary and he sets out this quote from
17 Dr. Lin's patent and then he states below that,
18 quote, various passages of the specification go on
19 to describe certain aspects of the EPO-producing
20 cells and then he goes through the examples of the
21 '349 Patent as to what they describe, including,
22 towards the bottom of that column, the description
23 of the SV40 promoter as a type of non-human
24 transcription control DNA sequence that an artisan
25 might use to cause the expression of the EPO gene

Page 112

1  and it goes on to talk about Example 5 and Figure 6
2  of the structural confirmation of the gene.  He goes
3  on in the paragraph from Page 152 to 153 discussing
4  the disclosure in Example 10.  I'll just give you a
5  moment to look at that.
6     A    Do you want me to read the whole thing
7  or are you going to ask a question based on --
8     Q    Better way.  Why don't you go ahead and
9  read those columns on Page 152 through 153.
10    A    Should I start with the '349 Patent?
11    Q    Yes.
12    A    And read for how long?
13    Q    Until you get to the top of Page 154.
14    A    Okay.  That's probably best.
15    Q    Yes.
16    A    Uh-huh, okay, I've finished reading it.
17    Q    So in column -- the right-hand column
18 --
19    A    I'm sorry, I just closed the page.
20    Q    Page 153, right-hand column, middle of
21 the column, it says:  According to these experts,
22 based on the disclosures contained in the patent,
23 one skilled in the art in 1984 would have understood
24 that Dr. Lin possessed vertebrate cells that could
25 have be propagated in vitro in culture, comprised

Page 113

1  non-human transcription control DNA sequences that
2  controlled the transcription of DNA encoding human
3  erythropoietin and produced human erythropoietin at
4  the levels recited in the claims of the '349 Patent.
5  In particular, the specification describes specific
6  examples of cells containing DNA vectors that
7  contain a non-human DNA transcription controlled
8  sequence, the SV40 viral promotor enhancer, that is
9  functional in vertebrate and mammalian cells.
10 Furthermore, it was a matter of common knowledge to
11 one of ordinary skill in the art in 1984 that many
12 different transcription control sequences could be
13 used to make the claimed cells.  In light of this
14 testimony and the extensive description contained in
15 the specification, the Court finds that TKT has
16 failed to prove by clear and convincing evidence
17 that the claims of the '349 Patent are invalid for
18 lack of written description.
19         Do you disagree with Judge Young on
20 these points?
21         MR. SUH:  Objection, calls for a legal
22 conclusion, asked and answered.  Go ahead,
23 Doctor.
24         THE WITNESS:  First of all, again, the
25 condition that I don't really understand what

29 (Pages 110 to 113)

Confidential                                    R000029

Kadesch, Thomas R.                                        6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 114

1    the TKT arguments were and so this is couched
2    in the context of the TKT argument. With that
3    proviso, with all due respect to Judge Young,
4    I disagree with his conclusions.
5  BY MR. FLOWERS:
6    Q    So you disagree that the specification
7  describes specific examples of cells containing DNA
8  vectors that contain a non-human DNA transcription
9  control sequence, the SV viral -- the SV40 viral
10 promoter enhancer that is functional in vertebrate
11 and mammalian cells?
12   A    Those are not conclusions. Those are
13 statements of fact.
14   Q    Do you disagree that it was a matter of
15 common knowledge to one of ordinary skill in the art
16 in 1984 that many different transcription control
17 sequences could be used to make the claimed cells?
18       MR. SUH: Same objection, asked and
19   answered.
20       THE WITNESS: I disagree, yes. As
21   we've been discussing, particularly with
22   respect to non-viral promotors, there were not
23   many examples. And again, my argument was the
24   examples that Dr. Lodish provided were
25   problematic for the reasons I already

Page 115

1    discussed. There weren't many promotors,
2    non-viral promoters that could have been used
3    by ordinary skill in the art.
4  BY MR. FLOWERS:
5    Q    There were many viral promoters that
6  one of ordinary skill in the art could have used,
7  correct?
8    A    There were maybe at most a half a
9  dozen.
10   Q    Six?
11   A    That's what a half dozen is.
12   Q    Okay, so it's your opinion that there
13 were only six viral promoters known --
14   A    No, I said at most.
15   Q    So six or fewer, -- let's start over.
16 So it's your opinion that there were at most six
17 viral promoters known to one of ordinary skill in
18 the art in 1984 that they could have used to drive
19 expression of the EPO gene in vertebrate cells?
20       MR. SUH: Objection, mischaracterizes
21   testimony, lacks foundation. Go ahead.
22       THE WITNESS: I have not looked at the
23   literature at the time. My recollection of
24   the literature was that it would be reasonable
25   to guess around six. I don't want to be held

Page 116

1    to that number.
2  BY MR. FLOWERS:
3    Q    Okay.
4    A    And I don't want to have to recite
5  which ones they were.
6    Q    Okay. In your expert reports I didn't
7  find any example of viral promoters that you believe
8  would not have worked to drive expression of the EPO
9  gene in a vertebrate cell in 1984?
10       MR. SUH: Objection, asked and
11   answered.
12       THE WITNESS: Is there a question?
13 BY MR. FLOWERS:
14   Q    Am I correct in that?
15   A    Yes.
16   Q    Okay, you can put those exhibits aside
17 for a moment. Just because it's so much fun --
18       MR. SUH: What's fun?
19       MR. FLOWERS: You haven't been having
20   fun, Howard?
21       MR. SUH: No, it's not my idea of fun.
22       MR. FLOWERS: Let me just ask the court
23   reporter to mark as Kadesch Exhibit 4 a
24   document entitled Second Supplemental Expert
25   Report of Dr. Thomas Kadesch.

Page 117

1        (Second Supplemental Expert Report of
2    Dr. Thomas Kadesch was marked Kadesch-4 for
3    identification.)
4  BY MR. FLOWERS:
5    Q    I'll represent to you that this is the
6  version of the document that was supplied to us on,
7  I believe, June 13. The report itself is 30 pages
8  long and on Page 30, could you confirm for me that
9  that's your signature?
10   A    Yes.
11   Q    I didn't ask you before on the other
12 reports, but you signed this to indicate your
13 agreement with everything in it, correct?
14   A    Yes.
15   Q    And perhaps to your regret today, you
16 did submit some demonstratives along with this
17 report which are in Exhibit B?
18   A    Yes.
19   Q    I'll try to go through this as quickly
20 as possible.
21       The first demonstrative in Exhibit B in
22   this Exhibit 4 is entitled the Central Dogma and is
23   this what you've been referring to as a teaching
24   demonstrative?
25   A    This would be a teaching demonstrative,

30 (Pages 114 to 117)

Confidential                                        R000030

Kadesch, Thomas R.                                        6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 118

1   yes.
2      Q    And is this -- does this Central Dogma
3   as shown in this demonstrative, is this true?  Does
4   this operate in all vertebrate cells?
5      A    All cells period.
6      Q    All cells period, okay.
7      A    Yeah.
8      Q    The next demonstrative in this set is
9   entitled Indefiniteness of The erythropoietin RIA.
10  I said I was going to try to go through as quickly
11  as possible.  This one slows me down a little bit on
12  the highway of depositions.
13             MR. SUH:  It's pretty impressive, huh?
14  BY MR. FLOWERS:
15     Q    Do you expect to use this demonstrative
16  to illustrate your opinions at trial?
17     A    Yes.
18     Q    And how does this demonstrative
19  illustrate your opinions?
20     A    This demonstrative is really a series
21  of demonstratives that makes an argument and it
22  again in a sense uses an analogy where the
23  automobile is a metaphor for a molecule of EPO and
24  this basically likens the RIA to a measurement of
25  car presence and what can be interpreted by what is

Page 119

1   read out in an RIA and what can't.
2      Q    So in these demonstratives, all of
3   which are entitled Indefiniteness of the
4   Erythropoietin RIA, the automobiles represent --
5   represent the molecule of EPO in an unknown sample?
6      A    To be precise, EPO polypeptide.
7      Q    Okay.  All right.  And this first
8   demonstrative has a subheading Standard (purified
9   uEPO)?
10     A    Yeah.
11     Q    Closed parens. So all of the cars on
12  this demonstrative are meant to represent EPO
13  polypeptides in a standard preparation of purified
14  urinary EPO?
15     A    That's correct.
16     Q    Okay.  And the numbers on the roofs of
17  the cars represent what?
18     A    Horsepower.
19     Q    And why did the different cars have
20  different horsepower numbers on the roofs?
21     A    Just to be fair, in the sense that even
22  purified EPO wouldn't be necessarily composed of EPO
23  polypeptides that are exactly the same as each
24  other.  There might be in reality different --
25  slightly different modifications, et cetera or

Page 120

1   different -- slightly different folding structures
2   that would give rise to small differences in its
3   bioactivity.  The bioactivity in this case is now
4   related to horsepower of the car.
5      Q    So the numbers on top of the cars
6   represent each polypeptide's biological activity in
7   a bioassay?
8      A    Yes.
9      Q    And next to the cars on the highway,
10  the demonstrative says 200 horsepower per bumper?
11     A    Yes, that's the average for that
12  selection of cars.
13     Q    What does that mean, 200-horsepower per
14  bumper?
15     A    It is used as an example to again, in
16  this case, it's a hypothetical analogy that would
17  say that on average if you were to, you know, let's
18  say inject in this case 10 cars or 10 molecules,
19  let's say, of EPO into a mouse, you would get a
20  certain readout that would look as though it was
21  200-horsepower per molecule or let's say a certain
22  number of units.  But that unit measurement is
23  really an average of what you've injected.
24     Q    Okay.  So the 200-horsepower per bumper
25  is the average units determined by bioassay --

Page 121

1      A    Yes.
2      Q    -- for the EPO polypeptides in the
3   standard preparation of the urinary?
4      A    Yes.
5      Q    What is the significance of the red
6   bumpers?
7      A    The significance of the red bumpers is
8   -- well, if we could take the analysis in reverse,
9   let's say you took the equivalent of a certain
10  amount of EPO and in this case depicted by a certain
11  number of cars, in this case ten, and you identify a
12  certain amount of bioactivity and that in this case
13  is depicted by 200.  The red bumpers are now related
14  to the EPO or the RIA assay in the sense that an RIA
15  assay utilizes an antibody, and for sake of
16  illustration here, the antibody in this case is
17  recognizing the portion of the EPO protein that is
18  represented by the bumper of the car.
19     Q    So on the left-hand side in the legend
20  where it says equals epitope, that means the bumper
21  equals the epitope recognized by the antibody used?
22     A    That's correct.
23     Q    Is there any significance to the
24  highway, the road?
25     A    No.

31 (Pages 118 to 121)

Confidential                                    R000031

Kadesch, Thomas R.                                     6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 122

1    Q    The next demonstrative also titled
2  Indefiniteness of the Erythropoietin RIA, subheading
3  Unknown 1 (Serum Containing EPO), why is that
4  subheading there?
5    A    That's an example of an unknown that
6  you might want to measure EPO concentration in.
7    Q    So you might want to measure EPO
8  concentration in serum?
9    A    Yes.
10   Q    And overall, what is this demonstrative
11 meant to represent?
12   A    The demonstrative is represented -- is
13 intended to represent the idea that the EPO in serum
14 might deviate from the EPO in highly -- in a highly
15 purified standard and that deviation is depicted
16 metaphorically here using again the car analogy
17 where the polypeptides of EPO may have -- some may
18 have good biological activity, some may be misfolded
19 or let's say deglycosylated and therefore represent
20 molecules with no bioactivity and that's illustrated
21 by these two cars on the side of the road that have
22 zero horsepower.  They might be polypeptides, but
23 conceivably they might have no activity.  Yet, they
24 would still possess the epitopes that would be
25 recognized by the RIA, namely the bumpers.

Page 123

1    Q    So is the -- is the point of this slide
2  again that an RIA cannot be used to determine the
3  biological activity of the EPO in a sample?
4    A    Yes.
5    Q    At the lower right it says see Sherwood
6  and Goldwasser '79.  What's the significance of
7  that?
8    A    I don't know.
9    Q    The next slide, this has a subheading
10 Unknown 2 (fragments, non- bioactive EPO) and then
11 it has a junkyard sign saying junkyard.  What's
12 the -- well, let me ask you this, how will you use
13 this demonstrative to illustrate your opinions at
14 trial?
15   A    This will be used to illustrate the
16 extreme case where the RIA may be recognizing a
17 sample of EPO that is completely inactive.  In this
18 particular case, again, it's a metaphor for the RIA.
19 In this case, the EPO is biologically inactive, yet
20 it might be measurable with an RIA.  So it's an
21 extension of the previous slide, but an extreme
22 case.
23   Q    So -- but this extreme case, again,
24 represents the idea that an RAI can't be used to
25 measure the biological activity of EPO in a

Page 124

1  bioassay?
2    A    That's correct.
3    Q    And are you aware of any -- any
4  scientific literature, any published paper that
5  describes this situation where the EPO in a sample
6  being measured in an RIA has no biological activity
7  whatsoever?
8    A    As I said, it's an example that's used
9  to represent an extreme case, but I will say that my
10 recollection of the patent itself describes either
11 the lack of or very low biological activity of EPO
12 if it's produced in bacteria.
13       MR. FLOWERS:  We need to break for the
14 tape.
15       VIDEO OPERATOR:  This concludes tape
16 number three in the videotape deposition of
17 Dr. Thomas R. Kadesch on June 21, 2007.
18       The time is 12:20 p.m. and we're off
19 the record.
20       (Brief recess.)
21       VIDEO OPERATOR:  This begins tape
22 number four in the videotape deposition of
23 Dr. Thomas R. Kadesch on June 21, 2007.
24       The time is 12:27 p.m. and we're back
25 on the record.

Page 125

1  BY MR. FLOWERS:
2    Q    Dr. Kadesch, are you -- are you aware
3  of any instance in which an RIA has detected
4  fragments of EPO in a sample of EPO?
5    A    I am aware that certain antibodies will
6  detect portions of the EPO protein and if one were
7  to express those portions of the EPO protein in
8  culture media or any other way, the RIA would be
9  able to pick those up.  Whether -- I don't think
10 I've seen an RIA that actually does that experiment
11 where they specifically generate fragments and using
12 that RIA to detect it.
13   Q    And in your expert reports, you didn't
14 point to any actual experimental data showing that
15 any cell has ever produced a fragment of EPO,
16 correct?
17       MR. SUH:  Objection to form.  Go ahead.
18       THE WITNESS:  In my expert report, I
19 did not point to any experimental data that
20 specifically identified a cell that was
21 expressing fragments.
22 BY MR. FLOWERS:
23   Q    And you're not actually aware of any
24 cell that has been found to express EPO fragments,
25 correct?

LiveNote World Service    800.548.3668 Ext. 1

Confidential                                    R000032

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 126

1        MR. SUH:  Objection to form.
2        THE WITNESS:  I'm not aware of any cell
3    that has been shown -- that's correct.
4    BY MR. FLOWERS:
5        Q    It's not a trick question.  I just want
6    to make sure.
7        A    No, I know.
8        Q    Let's go back to this demonstrative we
9    were looking at before the break, Unknown, Unknown
10    2.  On the right-hand side, it says activity per
11    standard 200-horsepower per bumper.
12        A    Uh-huh.
13        Q    I never thought I would be saying that.
14    And then below that, it says actual activity, zero
15    horsepower per bumper.  What is the significance of
16    that?
17        A    That's also the significance that
18    extends from the previous demonstrative where again
19    the standard is the standard, not depicted here, but
20    in this particular case, it would -- again, the car
21    representing EPO, it has zero activity.  This could
22    be fragments as depicted by the bumper that's off
23    the car, fragments as depicted by the car that seems
24    to be cut in half.  Yet again, all of these
25    representative polypeptides of cars contain an

Page 127

1    intact bumper except for the one in the middle there
2    and so that they would be picked up in an RIA.
3        Q    And you're not aware of any
4    experimental data, actual experimental data showing
5    that a fragment of human EPO produced by a
6    vertebrate cell contained an epitope that could be
7    recognized by an antibody that recognizes intact
8    human EPO, correct?
9        MR. SUH:  Objection to form.
10        THE WITNESS:  Antibodies do not
11    recognize intact proteins per se.  They
12    recognize portions of proteins.
13    BY MR. FLOWERS:
14        Q    Understood, an antibody recognizes an
15    epitope?
16        A    Yes.
17        Q    Or perhaps more than one epitope.  But
18    you're not aware -- I just want to make sure, you're
19    not aware of any experiment that's actually been
20    done where an antibody that recognizes full length,
21    intact human EPO has recognized a fragment of human
22    EPO, correct?
23        A    Not exactly correct.  Again, as I said
24    before, certain, for example, monoclonal bodies can
25    be shown to show very discrete portions of a

Page 128

1    protein.  The conclusion that one would draw from
2    that observation would be that they recognize
3    fragments and in fact, if you're going to map the
4    epitope that a monoclonal antibody or any antibody
5    preparation will recognize, it's necessary to
6    express the protein as fragments to identify exactly
7    where the antibody on it.  So I don't think -- even
8    though I did not cite specific data that showed such
9    mapping experiments, it seemed to me if one wanted
10    to map the epitopes that antibodies recognize one
11    would have to generate fragments to do that mapping
12    experiment and therefore, yes, the antibody would
13    have to recognize fragments.  Whether that was done
14    in the context of an RIA, whether it was done in the
15    context of CHO cells expressing fragments, I don't
16    know, but it's very clear that when you have
17    antibodies that recognize specific fragments and
18    those fragments, specific portions of the protein,
19    the only way to really do that experiment is to map
20    the portion of the protein that's recognized by
21    expressing fragments.
22        Q    I understand that's your opinion.  My
23    question is much simpler.
24        A    Okay.
25        Q    My question is you don't point to any

Page 129

1    actual experiment in which it has been shown that an
2    antibody that recognizes full length intact human
3    EPO recognized a fragment of human EPO?
4        A    I do not point to a specific
5    experiment.
6        Q    Are you aware of such an experiment
7    where that's actually been shown?
8        A    As I said, my feeling is that
9    experiments like that must have been done in order
10    to map the epitopes that, for example, monoclonal
11    antibodies scans EPO would recognize.  So even
12    though I have not pointed out those specific
13    references where those experiments were done, my
14    interpretation of those conclusions would require
15    that the experimenter generate fragments and do
16    those types of experiments.
17        Q    Again, my question is much simpler,
18    though.
19        A    Okay.
20        Q    I just want to make sure that you
21    haven't pointed to and you're not relying upon any
22    specific, actual experiment showing that in an RIA,
23    an antibody that recognizes full length, intact
24    human EPO has recognized a fragment of human EPO?
25        MR. SUH:  Objection, asked and

33 (Pages 126 to 129)

Confidential                                          R000033

Kadesch, Thomas R.                                6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 130

1  answered.
2      THE WITNESS:  In my reports I have not
3  pointed out a specific experiment where that
4  was done, that's correct.
5  BY MR. FLOWERS:
6      Q    And you're not aware of any such
7  experiment, correct, that experiment?
8      A    I'm not aware of that experiment.
9      Q    The next demonstrative has a factory
10 (CHO cells) at the top.  See where I am?
11     A    Yes.
12     Q    Where is this meant to represent?
13     A    This basically extends the analogy
14 to -- let's say the unknowns being from serum, they
15 come from a specific factory that's been identified
16 here as CHO cells.
17     Q    So this demonstrative at trial you
18 would rely upon to illustrate the same concepts as
19 in the previous demonstratives that we've just been
20 looking at, only in the context of EPO produced by
21 CHO cells?
22     A    That's correct.
23     Q    Anything different other than that in
24 regards to this demonstrative as opposed to the
25 demonstratives we were just looking at?

Page 131

1      A    No.
2      Q    The next demonstrative has Factory of
3  (CHO cells) at the top again.  There seems to be a
4  global warming emission coming from the factory in
5  terms of black smoke.  I'm not sure if they're
6  trying to elect a Pope, but -- and then there's a
7  great number of cars below.
8      What is this meant to represent?
9      A    So -- the artist clearly had fun with
10 this one, but seriously, it does, it represents a
11 situation where the factory has been asked to
12 generate more cars that it can adequately generate
13 with high quality control.  As a consequence, the
14 cars or let's say in the case of the CHO cells, the
15 EPO, is more heterogenous.  It may all contain the
16 red bumper.  Those would be recognized in the RIA,
17 but there's a high level of variability in terms of
18 the quality of the cars that are generated, in this
19 case, analogous to the quality of the EPO that may
20 be produced as measured by biological activity.
21     Q    So is the point of this demonstrative,
22 a central point that you would make from this
23 demonstrative again that an RIA cannot be used to
24 determine the actual bioactivity in a bioassay of a
25 sample of EPO?

Page 132

1      A    That's correct.
2      Q    And let me just follow up on my earlier
3  question.  In regards to this demonstrative and what
4  you're showing here with the hypothetical about the
5  CHO cells, it is a hypothetical, right?  You're not
6  aware of any CHO cell that's actually been shown to
7  produce fragments of recombinant EPO, correct?
8      A    This is not limited to fragments.
9  There are some cases of fragments here, but there
10 are also cases of cars that appear to be, you know,
11 intact, but have no biological activity.
12     Q    Let me start with my simple question.
13 Are you aware -- I'll phrase it this way, you're not
14 aware in fact of any actual experimental data
15 showing that a CHO cell produces fragments of EPO,
16 correct?
17     MR. SUH:  Objection, asked and
18 answered.
19     THE WITNESS:  That's correct.
20 BY MR. FLOWERS:
21     Q    And in fact you're not aware of any
22 actual experimental data that shows that a CHO cell
23 has produced recombinant EPO that is not intact
24 recombinant EPO?
25     A    It depends on what you define as

Page 133

1  intact.  If you mean by intact as biologically
2  active, then there are data within the patent that
3  would argue that a CHO cell can turn out
4  biologically inactive EPO.
5      Q    In terms of when I say intact, I'm
6  talking about an EPO polypeptide, a human EPO
7  polypeptide that has an epitope recognized by an
8  antibody used in an RIA.  You're not aware of any
9  actual experimental data showing that a CHO cell has
10 produced an EPO polypeptide that is not the full
11 intact full length EPO polypeptide, but is still
12 recognized by an antibody in an RIA?  No actual
13 experimental data?
14     A    No experimental data that shows the
15 production of EPO fragments per se, that's correct.
16     Q    If you can -- we'll skip over some of
17 the next demonstratives which appeared just to be
18 copies of claims.  And I'm interested in the
19 demonstrative entitled '349 Patent Process of Claim
20 7 Vertebrate Cells of Claim 1 at the top.
21     Do you see that?
22     A    Uh-huh.
23     Q    And is this -- is this demonstrative
24 simply incorporating the limitations of Claim 1 into
25 the recited process of Claim 7?

34  (Pages 130 to 133)

Confidential                                R000034

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 134

1    A    I believe that's what it is.
2    Q    That was your intent in using this?
3    A    I believe so, yes.
4    Q    Were you intending to use this
5    demonstrative for any other purpose than to show
6    that?
7    A    I don't believe so.
8    Q    You'd agree that the Claim 7 in the
9    '349 Patent, one of the limitations of that is that
10   it's a process for producing erythropoietin,
11   correct?
12   A    Yes.
13   Q    So in your mind, it's fair to say that
14   this claim is directed to and covers the process
15   that one uses to make erythropoietin?
16   MR. SUH:  Objection to form.
17   BY MR. FLOWERS:
18   Q    It's not a trick question, I just want
19   to make sure we're --
20   A    I believe that's correct.
21   Q    Okay.  And Claim 7 also is limited to
22   growing vertebrate cells that are used to make EPO
23   under suitable nutrient conditions, correct?
24   A    Yes.
25   Q    And you understand that Judge Young has

Page 135

1    already construed that term, under suitable nutrient
2    conditions, correct?
3    A    I'm not aware of Judge Young's ruling
4    on that.
5    Q    Okay.  So you didn't consider his
6    construction of suitable nutrient conditions when
7    arriving at the opinions expressed in your expert
8    reports?
9    A    That's correct.
10   Q    And you understand that Claim 7 in the
11   '349 Patent, when it uses the term which are --
12   well, you understand that Claim 7 of the '349 Patent
13   essentially contains the limitation that the
14   vertebrate cells are capable upon growth and culture
15   of producing erythropoietin, correct?
16   A    Yes.
17   Q    And you understand that that
18   limitation, that the cells are capable upon growth
19   and culture of producing erythropoietin is in the
20   context of the process for producing erythropoietin
21   that's also a limitation of '349, Claim 7, correct?
22   A    I believe that's correct.
23   Q    If you go to the next demonstrative, it
24   starts with Dr. McLawhon Confirms that RIA Can
25   Recognize Hormone Fragments.  This is, as I

Page 136

1    understand it, a quote from the rough transcript of
2    Dr. McLawhon's deposition?  You understand that?
3    A    That's what I was told.
4    Q    You didn't go back to the transcript
5    and look this up yourself, I take it?
6    A    No.
7    Q    Now, in this portion of his deposition
8    testimony, which I believe actually is the same as
9    what's in the final transcript, in fact when asked
10   about whether what's reacting with the antibody
11   could be a fragment, Dr. McLawhon said that's
12   speculation, correct?
13   MR. SUH:  Objection, the document
14   speaks for itself.
15   THE WITNESS:  That's what's written
16   here, yes.
17   BY MR. FLOWERS:
18   Q    And, in fact, Dr. McLawhon, in this
19   portion of his testimony, and feel free to read it,
20   of course, he doesn't refer to any fragments as
21   being recognized by the antibody, correct?
22   A    He doesn't refer to fragments in this
23   testimony, no.
24   Q    And in the next demonstrative, Dr.
25   McLawhon Confirms that RIA Can Recognize EPO

Page 137

1    Fragments.  That's a title.
2    Do you see that?
3    A    Uh-huh.
4    Q    And in this testimony that's quoted
5    here, Dr. McLawhon doesn't refer to any EPO
6    fragments, does he?
7    A    Let me read it.  He does not use the
8    word fragment.
9    Q    In the next demonstrative entitled
10   Dr. Goldwasser Testified that RIA is Insufficient to
11   Distinguish between EPO and Fragments of EPO?
12   A    Yes.
13   Q    In this -- well, let me know when you
14   have had a chance to read it.
15   A    Okay.
16   Q    In this testimony, Dr. Goldwasser said
17   that the RIA would tell you that there was an
18   immunologically reactive material that was not
19   called EPO if you put something into the RIA that
20   was of small molecular size, correct?
21   A    That's correct.
22   Q    Okay.  So let's skip forward actually.
23   The rest of these are just quotes as well.  I want
24   to go to the bag of blocks being scanned --
25   A    Yes.

35 (Pages 134 to 137)

Confidential                                    R000035

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 138

1    Q    -- for something.  And let's start with
2    the first bag of blocks being scanned for something.
3    There's no number on these.  We're on the same page.
4    What are these demonstratives showing on a white bag
5    tied with some rope and what I take to be a scanner
6    or a portable razor on the left-hand side of the
7    page.  I'm not sure which.
8    A    As you can see, it's not portable
9    because it has a wire attached to it.
10   Q    Mine plugs in to recharge.  It looks
11   like a Norelco, but I'm not sure.
12   A    That's what I have.  Let me introduce
13   my response to these demonstratives and obviously,
14   and you have read the reports.  This is an example
15   that is expanded upon and described in
16   Dr. Zaroulis's expert report.  And I looked these
17   over.  They were not generated specifically for my
18   report, but I thought that they illustrated the
19   point sufficiently to not eliminate them from my
20   report.
21   Q    If I recall correctly, these were
22   actually in Dr. Flintoff's report.
23   A    Oh, perhaps it was Dr. Flintoff.
24   Q    Let me ask you this, are you adopting
25   Dr. Zaroulis's opinions regarding RIA as your own?

Page 139

1    A    No.
2    Q    Are you regarding -- are you adopting
3    Dr. Flintoff's arguments and opinions about RIA for
4    your own?
5    A    No.
6    Q    Are you adopting any of Dr. Flintoff's
7    arguments as your own?
8    A    No.
9    Q    So tell me -- tell me what this slide,
10   and you can tell me what the series of the slides
11   with the bag and the blocks and the Norelco razor
12   are meant to represent.
13   A    Let me -- I think it's easier to
14   describe them in context as opposed to one at a
15   time.  The bag, as I recall, and again I read those
16   other reports very, very quickly and very briefly.
17   And remember only that this bag analogy was used
18   because I find analogies fascinating.  The idea here
19   is that a bag can have many shapes, and the argument
20   that was either Flintoff or Zaroulis was using was
21   that depending upon how you detect the objects in
22   the bag, you may come to very different conclusions
23   about what is in the bag.  In this particular case,
24   I believe the -- the idea is that if you have a bag
25   that is filled with squares which have four sharp

Page 140

1    edges, you can draw certain conclusions about how
2    many squares are in the bag by how many sharp edges
3    you measure.  Again, it's analogous to the car
4    analogy, or metaphor, but obviously if you have a
5    triangle and an unknown, then you might detect a
6    sharp edge, then you might identify as a square, but
7    not knowing it's a triangle, you would draw, you
8    know, an incorrect conclusion about what's in the
9    bag.
10   Q    This analogy depends on there being
11   something other than squares in the bag, correct?
12   A    That's correct.
13   Q    If there's nothing but squares in the
14   bag, then you're measuring squares?
15   A    That's correct.
16   Q    And if this is analogized to or meant
17   to be an analogy for an RIA to measure EPO, if
18   what's in the sample being measured in the RIA is
19   intact full length EPO polypeptides, then the RIA is
20   measuring EPO, correct?
21   A    If that were true, yes.
22   Q    So on the next demonstrative, I just
23   want to make sure I'm not completely confused about
24   this.  Well, on these series of demonstratives, the
25   device on the left, is that meant to represent

Page 141

1    anything in particular?  I just want to make sure
2    that this isn't meant to represent an RIA or an
3    antibody or something relevant to your report or
4    something generic?
5    A    I believe it's -- well, an RIA, since
6    it includes an antibody, it would be used to
7    represent an antibody.
8    Q    And on the next demonstrative, sorry, I
9    skipped back on that.  The next one has a bag
10   stamped standard, so this -- is this to represent
11   that in a standard preparation all of the squares
12   here are intact EPO polypeptides?
13   A    Yes.
14   Q    And the next slide or demonstrative are
15   two bags, one stamped standard, one stamped
16   international standard.  What's the significance of
17   this?  I don't want to speculate.
18   A    Well, again, in my -- in my report, I
19   don't draw -- I don't mention standard versus
20   international standards, but my understanding of the
21   RIA literature is that there are international
22   standards and there are other standards that are not
23   international standards.  One assumes that they are
24   equivalent in terms of what they're measuring, that
25   they are pure EPO and that they might be pure

36 (Pages 138 to 141)

Kadesch, Thomas R.                                      6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 142

1 biologically active EPO as well.
2     Q     Why do you say that one assumes that?
3 I mean let me put context on that.  You know as a
4 matter of fact, don't you, that in the prior art
5 before 1984 that those skilled in this art of EPO
6 RIAs were using standards that were not pure EPO,
7 correct?
8     A     Yes.
9     Q     So a standard that one of ordinary
10 skill would have used in an EPO RIA in 1983, for
11 example, would not have required the use of a
12 purified preparation of EPO as a standard, correct?
13     A     That's correct.
14     Q     Okay.  All right.  So I just wanted to
15 make that clear.
16     A     Yeah.
17     Q     Is there anything else that you would
18 say about this demonstrative at trial other than
19 what you've already said?
20     A     No.
21     Q     The next demonstrative has an equal
22 sign between the standard bag and the international
23 standard bag.  What is that meant to represent?
24     A     As I said before, I believe it's
25 representing the idea that it is assumed that the

Page 143

1 standard and the international standard are
2 comparable in terms of what they contain.
3     Q     So, and this goes back to my earlier
4 question.  When you say comparable in terms of what
5 they contain, what do you mean by that?
6     A     I believe the assumption is that in
7 terms of -- standards are -- should be linked back
8 to biological activity which measures units.  The
9 assumption that if you're going to generate another
10 standard, even though it doesn't have to be pure,
11 the assumption if it's going to be a quality
12 standard is that it contains roughly the same amount
13 or the same quality of EPO in it.  It doesn't have
14 to be pure, but the EPO in it has to be of
15 comparable quality.  When this relates back to an
16 RIA, you would hope that the standard, the
17 international standard, for example, would have,
18 let's say, just for the sake of argument all of the
19 EPO in that standard one would hope is biologically
20 active.  Of course you can't know that for sure, but
21 you would hope that that's the case.
22     Q     Is that reflected in that sample's
23 specific activity?
24     A     No.  Unless it's pure.  It can be
25 reflected in the sample's specific activity if it's

Page 144

1 a pure preparation.  We've already discussed often
2 times these are not pure preparations.  If you want
3 to develop a different standard, use a different
4 standard, one that comes to mind in the literature
5 is this Cal 1 standard that I've seen.  One would
6 hope that the amount -- the quality of the EPO in
7 that standard is similar.  As a consequence, one
8 would expect it to respond similarly to the
9 international standard when you compare, for
10 example, RIA units to biological activity.  If
11 that's true, then those standards would be
12 equivalent.
13     Q     But as a matter of fact, you're aware
14 that in the prior art before 1984, those persons of
15 skill working in this are the -- of EPO RIAs were
16 using standards that were not equivalent in terms of
17 biological activity in a bioassay to the
18 international standards, correct?
19          MR. SUH:  Objection to form, lacks
20 foundation.  Go ahead, Doctor.
21          THE WITNESS:  I'm not specifically
22 aware.  I'm aware of the use of different
23 standards.  I don't know if those standards --
24 I don't know the literature in which those
25 standards were compared to one another and

Page 145

1     shown to respond differently in a bioassay
2     versus an RIA.
3 BY MR. FLOWERS:
4     Q     If we can just try to get through these
5 remaining demonstratives on this issue.  The next
6 demonstrative looks -- what is this meant to
7 represent?
8     A     Again, it's measuring the edges in a
9 standard.
10     Q     And again here, all of the EPO in the
11 standard is the same?
12     A     Yes.
13     Q     Anything else that you would say about
14 this slide?
15     A     No.
16     Q     And the next slide with the question
17 mark on the back?
18     A     Is your unknown.
19     Q     Anything else that you would say about
20 this slide?
21     A     No.
22     Q     Okay, the next slide has a bag with
23 squares again?
24     A     Uh-huh.
25     Q     What is this meant to represent?

37 (Pages 142 to 145)

Confidential                                      R000037

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 146

1    A    I'm not sure.
2    Q    I'm not either.  Let's skip over that.
3         The next slide again a bag with
4    squares?
5    A    A bag with squares and triangles.  Oh,
6    I'm sorry, same.
7    Q    The same thing?
8    A    Yeah, I believe this is part of an
9    animation, so I'm not sure how the animation fits
10   into this because I haven't seen the animation.
11   Q    Next we get to a slide with a bag with
12   some squares and some triangles.  What is this meant
13   to represent?
14   A    Again, that an unknown may represent a
15   mixture of proteins.
16   Q    And is the fact -- the squares
17   represent EPO, correct?
18   A    Yes.
19   Q    And the squares represent EPO that's
20   recognized by the antibody in the RIA?
21   A    Yes.
22   Q    So the squares have an epitope that's
23   recognized?
24   A    That's correct.
25   Q    Is the fact that these triangles here

Page 147

1    are triangles, is that meant to represent that these
2    also have the same epitope as the squares?
3    A    Yes.
4    Q    Different shape, but the same epitope?
5    A    Yes.  The epitope in this case being
6    the straight edge.
7    Q    The next demonstrative, three bags.
8    It's Christmas.  What is this meant to represent?
9    A    That you can have -- this extends that
10   analogy in the sense that you can have not just
11   triangles, but you can also have a bag, you know,
12   of, in this case, gray circles.  You can have
13   hexagons and triangles.
14   Q    And the bag on the right?
15   A    The bag on the right is, I'm assuming
16   that what is meant to depict is that is EPO
17   that is a different shape.  So in other words, you
18   can have rectangles that are gray that may be
19   different proteins that share the same epitope or
20   that are picked up by the antibody, let's say, and
21   the antibody in this case might be a polyclonal
22   antibody that recognizes not just EPO, but
23   additional things.  In the case of the bag on the
24   right, that would be EPO -- EPO -- all relating to
25   EPO polypeptide and not foreign proteins.

Page 148

1    Q    And the little red semi-circles, what
2    do those represent?
3    A    I believe those represent antibody
4    binding, but I'm not sure.
5    Q    Okay.  Is there anything else that you
6    would say about this at trial?
7    A    No.
8    Q    And finally, I think it's the last of
9    the bag slides.  A bag with octagons, Ls, triangles,
10   what is this meant to represent?
11   A    Again, I think this represents the idea
12   that you can have proteins that have a lot of
13   straight edges, but have very different shapes.
14   Q    And does the fact that this bag doesn't
15   contain any squares have significance?
16   A    Yes.
17   Q    What's the significance?
18   A    It contains no active EPO.
19   Q    And so how would you use this slide to
20   illustrate your testimony at trial?
21   A    That you would be picking up edges, but
22   that would be a bag that has zero activity.
23   Q    So zero?
24   A    Biological activity.
25   Q    Is it meant to represent that you would

Page 149

1    have no EPO in the sample or just no EPO biological
2    activity?
3    A    No active EPO.
4    Q    So are these -- are these shapes in
5    this bag meant to represent EPO?
6    A    For the original intent of this
7    demonstrative, I don't know.  If I were to describe
8    this, I would describe these as not EPO.
9    Q    Okay.  Is there anything else that you
10   would say about this at trial?
11   A    No.
12   Q    And the next -- the next demonstrative
13   is what we called the hand in a box analogy?
14   A    Yes.
15   Q    What is this meant to represent?
16   A    Again, this is a different way of
17   measuring, but if you -- if your finger was the
18   antibody and you were having a hands-on experiment
19   in this case as opposed to something that was
20   detected by this scanner, this is maybe more real
21   life-type depiction or something that a jury could
22   relate to.
23   Q    And so here is the -- the straight edge
24   is meant to represent epitopes?
25   A    Yes.

38 (Pages 146 to 149)

Confidential                                        R000038

Page 150

1    Q    And is there EPO in this box?  Is it
2  meant to be EPO?
3    A    Yes, yes.
4    Q    Is all of it meant to be EPO?
5    A    I would choose the cube to be EPO.
6    Q    Is there anything else that you would
7  say about this at trial?
8    A    No.
9    Q    There's a series of slides here --
10 sorry, demonstratives following this that looks to
11 be the interior of a car with a rearview mirror, is
12 that right?
13   A    Yes.
14   Q    A driver?
15   A    Yes.
16   Q    And some lights in the rearview mirror?
17   A    Yes.
18   Q    Perhaps you can tell me what this
19 series of slides is meant to represent?
20   A    This series of slides, from my
21 understanding, is actually a video and it uses
22 the -- I believe it's close encounters of the third
23 kind as the basis of the analogy or if you've seen
24 the movie Richard Dreyfus sees two lights in his
25 rearview mirror, motions the car to pass and it

Page 151

1  turns out to be a spaceship and so this
2  demonstrative is meant to illustrate the fact that
3  just because you see two lights in the back of your
4  rearview mirror doesn't mean you know what you're
5  looking at.  And so this argues again, to extend
6  this analogy yet to a third metaphor, that your
7  ability to detect something physically as in two
8  lights, straight edges on a cube or a bumper on a
9  car doesn't say anything about what you're actually
10 measuring in terms of units or what really you're
11 looking at.
12   Q    And this analogy again assumes or
13 depends upon there being something other than an
14 automobile on the road behind you, correct?
15   A    Yes.  Yes.
16   Q    And this series of slides or an
17 animation ends with an alien spacecraft?
18   A    That's correct.
19   Q    And that's -- that's a hypothetical,
20 correct?
21   A    One would hope.
22   Q    I just want to make sure.
23        And that is a hypothetical in the same
24 way that fragments of EPO produced by CHO cells is
25 hypothetical, correct?  We don't have any

Page 152

1  experimental data showing that CHO cells have
2  produced fragments of EPO, correct?
3        MR. SUH:  Objection.
4        THE WITNESS:  We don't have any direct
5  evidence that fragments of EPO are produced by
6  CHO cells.
7  BY MR. FLOWERS:
8    Q    And you don't have any evidence that
9  alien spacecraft are following cars, correct?
10   A    Yes.
11   Q    At least I don't.
12        The next slide or demonstrative appears
13 to be a plate of cells, a test tube and a vial of
14 EPO, correct?
15   A    Yes.
16   Q    What is this meant to represent?
17   A    This simply represents the three
18 different types of assays, you know, that are used
19 in the sense that you have an EPO producing cells --
20 I'm sorry, EPO producing cells and cultures, those
21 are meant to represent CHO cells, for example.  You
22 then extract from that condition medium, which is
23 the supernatant fluid of the culture, which contains
24 a number of different proteins in addition to bona
25 fide biologically active EPO and then the difficulty

Page 153

1  in comparing that to a known standard, which
2  presumably is highly purified EPO.
3    Q    And is that same difficulty present if
4  the EPO standard is not a purified preparation of
5  EPO?
6    A    No.
7    Q    And is this demonstrative, or if you
8  testify and rely upon this to illustrate your
9  testimony at trial, is this demonstrative meant to
10 illustrate something different than the previous
11 slides?
12   A    No.  It simply serves as a summary.
13   Q    And again, whatever you would say about
14 this demonstrative would depend on there being
15 something in the condition medium other than EPO
16 that's recognized by the antibody used in an RIA, is
17 that correct?
18   A    It depends on what you call EPO because
19 there's EPO polypeptide.  It would be EPO fragments,
20 perhaps.  There could be EPO that's not
21 appropriately modified and hence are misfolded and
22 so --
23   Q    But your reliance on this demonstrative
24 at trial still depends, as we've talked about for
25 the others, it still depends on there being

39 (Pages 150 to 153)

Confidential                                    R000039

Kadesch, Thomas R.                                        6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 154

1   something in that vial other than EPO polypeptide as
2   you've used the term?  I think we've been using
3   that.
4       A    No, it doesn't depend on that.  That's
5   illustrated here for illustration purposes only, but
6   you can conceivably have a preparation or somebody,
7   let's say, partially purify from a condition media
8   that has nothing but an EPO polypeptide that could
9   have EPO fragments appropriately modified and folded
10  EPO and misfolded EPO.  Again, you know, when I was
11  purifying RNA polymerase as a graduate student, we
12  had lots of examples where we had homogeneous
13  preparations of RNA polymerase, a lot of it wasn't
14  active.
15      Q    I just want to make sure, you don't in
16  your expert reports point to any actual experimental
17  evidence that CHO cells, for example, or any other
18  cell for that matter has produced misfolded EPO,
19  human EPO, correct?
20          MR. SUH:  Objection to form.
21          THE WITNESS:  That's correct.
22  BY MR. FLOWERS:
23      Q    And you don't point to any actual
24  experimental evidence that CHO cells or any other
25  cell has produced improperly processed EPO, correct?

Page 155

1       A    I have pointed to evidence in the
2   patent that shows discrepancies between the results
3   obtained with an RIA and the results obtained with
4   an in vivo assay.  Those discrepancies would be most
5   easily interpreted as there being differences in the
6   quality of the EPO such that the in vivo activity
7   were compromised.  The most reasonable explanation
8   is that the EPO that's compromised is -- that
9   comprising is due to something like misfolding the
10  generation of protein fragments or inappropriate
11  modification.
12      Q    The most reasonable conclusion would be
13  that the glycosylation wasn't sufficient to provide
14  in vivo biological activity for those molecules,
15  isn't it?
16          MR. SUH:  Objection to form.
17          THE WITNESS:  I am not issuing opinions
18  on EPO glycosylation per se.
19  BY MR. FLOWERS:
20      Q    But we have no evidence, and you've
21  pointed to no experimental evidence that in fact any
22  cell has produced improperly folded or fragmented
23  EPO polypeptide, correct?
24          MR. SUH:  Same objection.
25  BY MR. FLOWERS:

Page 156

1       Q    We just don't have that evidence, do
2   we?
3       A    We don't have the direct evidence, but
4   I would imagine that people of ordinary skill with
5   biochemistry understands that whenever you take a
6   protein outside of its natural environment, and
7   condition media certainly be outside of its natural
8   environment, one always has to be aware that that
9   protein may be misfolded.
10      Q    That's a hypothesis?
11          MR. SUH:  Objection.
12  BY MR. FLOWERS:
13      Q    That that protein could be misfolded in
14  the exersolular media?
15      A    Absolutely.
16      Q    And how would you test that?  How would
17  you test that hypothesis to see if it were true?
18      A    The -- it's a process -- often times
19  it's a process of elimination.  For example, if you
20  see that there's a difference, again, as I've
21  pointed out in the patent itself, if there's a
22  difference in two different assays that measure a
23  protein amount, if you see a difference in the
24  amount of protein versus the amount of protein that
25  would be predicted in an in vivo assay, then you

Page 157

1   would conclude that there's something wrong with the
2   protein preparation because it's not giving a
3   biological readout that is commensurate with the
4   amount of protein you're measuring.  You then
5   imagine that that could be a consequence of several
6   different possibilities, one of which would be the
7   production of protein fragments.  Another would be
8   the production of improperly folded protein and the
9   other would be the production of inappropriately
10  modified protein.  One could look at the
11  glycosylation presumably and ask if the
12  glycosylation could pose a problem.  One could look
13  for the production of fragments.  And again, one
14  could hone in a problem using those kinds of
15  approaches.
16      Q    How would you look for or how would you
17  determine if the cell were producing fragments of
18  EPO as opposed to the EPO polypeptide?
19      A    In the context of an RIA that gave
20  predicted amounts of EPO that were higher than one
21  measured in vivo, one anticipated outcome is that
22  the antibody or the serum used to do the RIA would
23  be able to pick up the relevant fragments.  In other
24  words, the antibody is picking up more material than
25  is recognized in the in vivo assay.  One could do a

LiveNote World Service    800.548.3668 Ext. 1

Page 158

1  western blot where one runs protein samples out on a
2  gel and you can detect fragments very easily, you
3  know, with antibody because they would migrate more
4  quickly through the gel.  And one might expect to
5  see something other than a single polypeptide chain.
6       Q    Using that technique to detect
7  fragments would require that the fragments contain
8  the epitope recognized by the antibody, correct?
9       A    That's correct.
10      Q    So that that technique couldn't be used
11 to detect any fragments of EPO?
12      A    That's correct.
13      Q    Only those that would actually contain
14 the same antibody recognized, right?  Same epitope,
15 sorry, start over, only fragments that contain the
16 same epitope recognized by the antibody?
17      A    That's correct.
18      Q    If we go to the next slides, the next
19 demonstratives, Radioimmunoassay RIA to Determine
20 EPO Concentration.  There are three slides here in
21 this series.
22           What are these meant to represent?
23 Let's start with the first one.
24      A    Well, let me introduce these a little
25 bit by saying that these are demonstratives that

Page 159

1  were generated by Kaye Scholer that I may not agree
2  with in terms of ideal representation of what is
3  shown here.  My understanding also is that the
4  left-hand portion of these demonstratives is -- are
5  figures that were part of Amgen's arguments.  So I
6  think that that -- my understanding is the way these
7  were generated was to use Amgen's figures and then
8  to modify them by adding additional panels to the
9  right.
10      Q    Okay.  So what's your understanding of
11 what's shown on the left?
12      A    What's shown on the left is an attempt
13 to depict schematically what a RIA does at a
14 molecular level.  And emphasis on the word attempt.
15      Q    Is there anything that you disagree
16 with?
17      A    One of the key features of an RIA is
18 that you have limiting antibody and depicted here is
19 what appears to be an equal molar, an equal amount
20 of antibody as compared to the radio actively
21 labeled EPO, the EPO standard or the unknown EPO.
22 That's one example.  The other problem is that this
23 is not the way antibodies which are often depicted
24 as little Ys like that actually bind their epitopes.
25      Q    Okay.  How do they actually bind their

Page 160

1  epitopes?
2       A    They actually hug it, so they use both
3  of those arms of the Y to interact.
4       Q    And in the right-hand panel, what does
5  that represent?
6       A    That's a schematic depiction of the
7  idea that an EPO fragment could also be bound by
8  that antibody in the same fashion.
9       Q    If it contains the same epitope as the
10 intact EPO, correct?
11      A    Yes, correct.
12      Q    And if it doesn't contain the same
13 epitope as the intact EPO, it won't be bound by the
14 antibody?
15      A    That's correct.
16      Q    Is there anything else that you would
17 say about this at trial?
18      A    No.
19      Q    The next slide appears to be -- well,
20 I'll ask you.  What's the difference between this
21 slide and the first slide?
22      A    It's slightly different in the sense
23 that often times antisera are -- that are used in
24 RIAs are not pure preparations of antibody.  They
25 recognize only one protein.  They can be mixtures

Page 161

1  and so in this particular case it can depict two
2  different things, either the antibody itself or the
3  antibody mixture is capable of recognizing
4  additional proteins, although that's typically not a
5  problem in RIAs.  What this shows is that sometimes
6  even monoclonal antibodies that recognize very
7  specific parts of an antibody, in this case EPO,
8  might bind similar epitopes that are found
9  coincidently on other proteins.  And in those
10 particular instances, that would interfere with the
11 RIA because you would not be measuring the activity
12 of only EPO.  You also would be measuring the effect
13 of the impure protein that happens to cross react
14 with your antibody.
15      Q    So what would be required of the other
16 proteins?  What would the other proteins have to
17 have that would allow them to be recognized by the
18 antibody being used in the EPO RIA?
19      A    They would have to have epitopes that
20 in structure, once the protein is folded perhaps,
21 that is similar enough to the structure that's found
22 on EPO to be able to bind to the same antibody.
23      Q    And that would be based on what aspect
24 of the other proteins' structure?
25      A    A number of things, their shape.

41 (Pages 158 to 161)

Confidential                              R000041

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 162

1  Antibodies can recognize, depending upon the
2  antibody, very different aspects of protein
3  structure. Some antibodies will recognize primary
4  sequence, primary amino acid sequence. Some
5  antibodies recognize a combination of sequence and,
6  for example, a side chain, whether it's a phosphate
7  group or a glycosylated side chain group. Other
8  antibodies recognize very general shapes that are
9  generated by protein structure.
10     Q    In your -- in your expert reports, do
11  you point to any actual experimental data showing
12  that any antibody that's been used in any EPO RIA
13  has recognized anything other than EPO?
14     A    What I've referenced is a case where an
15  EPO antibody was used to detect a protein that was
16  purported to be EPO because of its cross reactivity
17  with the antibody that most likely was not EPO at
18  all. There was no follow up. I think there was a
19  document that Amgen didn't believe that the
20  identified protein was EPO, yet one doesn't dispute
21  that the antibody that was used or the antiserum
22  that was used was also an antiserum that was
23  generated against EPO. Otherwise, it wouldn't have
24  been called an anti-EPO antiserum. And so that's a
25  case where either this protein by coincidence just

Page 163

1  happened to have an epitope that looked like when it
2  was expressed in cells, that looked like something
3  that was EPO and hence, cross reacts with the
4  antibody or that, and I don't recall if they used a
5  monoclonal antibody or a polyclonal serum, reacted
6  with something else that was in some other antibody
7  that was in the mixture.
8     Q    In that situation you're talking about,
9  was that human EPO that was being -- was that an
10  experiment conducted in the Amgen?
11     A    I don't believe so.
12     Q    Was that the -- was that the experiment
13  in Sophia Lee Wang's lab?
14     A    That rings a bell, yes.
15     Q    Can we go to the last of these
16  demonstratives? And if you could just explain how
17  you will use this to illustrate your testimony at
18  trial?
19     A    This combines the features of the two
20  previous demonstratives into one slide.
21     Q    So you wouldn't say anything more about
22  this than you've said about the previous two?
23     A    No.
24         MR. FLOWERS: We have very little time
25  left on the tape, so it seems like an

Page 164

1  opportune time to break.
2         VIDEO OPERATOR: This concludes tape
3  number four of the videotape deposition of
4  Dr. Thomas R. Kadesch on June 21, 2007.
5         The time is 1:24 p.m. and we're off the
6  record.
7         (Lunch recess.)
8         VIDEO OPERATOR: This tape begins tape
9  number five in the videotape of Dr. Thomas R.
10  Kadesch on June 21, 2007 and the time is
11  2:07 p.m. and we're back on the record.
12  BY MR. FLOWERS:
13     Q    Dr. Kadesch, prior to 1984,
14  radioimmunoassays for measuring EPO in samples had
15  been described in the scientific literature,
16  correct?
17     A    I believe so.
18     Q    And, in fact, prior to 1984 there were
19  a number of radioimmunoassays for measuring EPOs in
20  the scientific literature, correct?
21     A    That's correct.
22     Q    And obviously there were reports in the
23  scientific literature of the results of
24  radioimmunoassays to measure EPO in samples,
25  correct?

Page 165

1     A    That's correct.
2     Q    In your expert reports dealing with the
3  RIA issues, you only cited a single paper that was
4  published prior to 1984 that even mentions an EPO
5  RIA, correct?
6         MR. SUH: Objection to form, lacks
7  foundation.
8  BY MR. FLOWERS:
9     Q    The Cotes paper from 1982?
10     A    I did reference the Cotes paper.
11     Q    When you wrote your or when you
12  submitted your April 6 expert report in this case,
13  were you aware that Dr. Garcia and Sherwood and
14  Goldwasser had published papers back in 1979
15  describing radioimmunoassays to measure EPO in
16  samples?
17     A    Was I aware, not that I recall.
18     Q    Do you recall that the Cotes 1982 paper
19  that you cite in your expert report cites the
20  Sherwood and Goldwasser and Garcia papers from 1979?
21     A    I don't recall what the references are
22  in that paper.
23     Q    When you read the Cotes paper, did you
24  look to see what papers were cited regarding other
25  radioimmunoassay publications?

42 (Pages 162 to 165)

Confidential                                    R000042

Kadesch, Thomas R.                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 166

```
1        A    I probably looked at some of them, but
2   I don't recall exactly which ones I looked at.
3        Q    So other than the Cotes 1982 paper, you
4   didn't consider any pre-1984 publications describing
5   radioimmunoassays for EPO in coming to the opinions
6   expressed in your expert reports, correct?
7            MR. SUH:  Objection to form, lacks
8   foundation.
9            THE WITNESS:  No.
10  BY MR. FLOWERS:
11       Q    No, you didn't consider any other
12  papers?
13           MR. SUH:  Same objection.
14  BY MR. FLOWERS:
15       Q    In coming to your opinion?
16       A    That's correct.
17       Q    Now, it's your understanding from your
18  work in this case and in the area at case that one
19  of ordinary skill, one of ordinary skill in 1983 or
20  1984 is presumed to have knowledge of the prior art
21  scientific publications, correct?
22           MR. SUH:  Objection to form.
23           THE WITNESS:  That's correct.
24  BY MR. FLOWERS:
25       Q    And you'd agree that in 1984, one of
```

Page 167

```
1   ordinary skill in the art would have been able to
2   understand the descriptions of radioimmunoassays for
3   EPO in the prior art literature, correct?
4        A    That's correct.
5        Q    And one of ordinary skill in 1984 would
6   have been able to consult the scientific literature
7   describing radioimmunoassays for EPO in order to
8   learn how such assays were to be performed, correct?
9            MR. SUH:  Same objection.
10           THE WITNESS:  That's correct.
11  BY MR. FLOWERS:
12       Q    And one of ordinary skill in 1984 would
13  have looked to the prior art scientific literature
14  to learn the terminology that was used regarding
15  radioimmunoassays for EPO, correct?
16       A    Among other things, that would be
17  correct.
18           MR. SUH:  Objection to form, go ahead.
19           THE WITNESS:  Among other things,
20       that's correct, but not exclusively.
21  BY MR. FLOWERS:
22       Q    The descriptions of radioimmunoassays
23  in the prior art, instructed those of ordinary skill
24  in how the results of radioimmunoassays for EPO were
25  to be reported, correct?
```

Page 168

```
1            MR. SUH:  Objection to form, lacks
2   foundation, vague.
3            THE WITNESS:  I don't think they
4   instructed.  They perhaps established a
5   certain standard for how those results were
6   reported, but I don't think they instructed
7   people in terms of how they must be reported.
8   BY MR. FLOWERS:
9        Q    Fair enough.  Fair enough.  Okay.
10           MR. FLOWERS:  I'll ask the court
11  reporter to mark as the next exhibit,
12  Kadesch-5, a document entitled Immunoreactive
13  erythropoietin in serum by P. Mary Cotes,
14  C-O-T-E-S.
15           (Document entitled Immunoreactive
16  erythropoietin in serum by P. Mary Cotes was
17  marked Kadesch-5 for identification.)
18  BY MR. FLOWERS:
19       Q    Dr. Kadesch, you've been handed what's
20  been marked as Exhibit No. 5, the Cotes paper from
21  1982.  Do you recognize this paper?
22       A    Vaguely, yes.
23       Q    This is the paper that you cite -- one
24  of the papers that you cite in your April 6 expert
25  report, correct?
```

Page 169

```
1        A    Uh-huh, that's correct.
2        Q    Before you submitted your April 6
3   report, did you read the Cotes paper?
4        A    I did not.
5        Q    But you understand that this paper
6   provides a description of a radioimmunoassay to
7   measure EPO in samples, correct?
8        A    That's correct.
9        Q    Have you read the Cotes paper since
10  submitting your April 6 report?
11       A    I think I read it maybe a week ago.
12       Q    And did you understand the description
13  of the radioimmunoassay for erythropoietin described
14  in this paper?
15       A    As presented in this paper, yes.
16       Q    If you turn to Page 429, the second
17  full paragraph.  It's a short one under the heading
18  standard.
19       A    Uh-huh.
20       Q    In the experiments in the
21  radioimmunoassays reported in this paper, the first
22  and second international reference preparations for
23  erythropoietin were used as standards, correct?
24       A    That's correct.
25       Q    And that's what's referred to here as
```

43 (Pages 166 to 169)

Confidential                        R000043

Page 170

1    the first and second IRP?
2        A    Yes.
3        Q    If you -- well, let me just ask, the
4    first and second IRPs did not have the same specific
5    activity, correct?
6        A    I don't recall.
7        Q    If you look on Page 428 under Materials
8    and Methods?
9        A    Yes.
10       Q    That first full paragraph there, in the
11   last sentence says the biological potencies of these
12   preparations were respectively 1, 5, 70, 5,290 and a
13   1,000-units per milligram of peptide by bioassay in
14   vivo and you see up at the first sentence, I did it
15   backwards -- you see at the first sentence it refers
16   to the First and Second and International Reference
17   Preparations of Erythropoietin?
18       A    Yes.
19       Q    So these First and Second International
20   Reference Preparations of erythropoietin did not
21   have the same biologic activity, correct?
22       A    That's correct.
23       Q    Now, in this paper, Dr. Cotes reported
24   that the dose response curves for first and second
25   IRP were essentially identical, correct?

Page 171

1        A    You'll have to point me to the proper
2    place where she says that, but I'll -- I don't have
3    the paper memorized, I apologize.
4        Q    Neither do I.
5        A    Okay.
6        Q    But I have notes to help me.
7        A    Yes.
8        Q    So you're at a disadvantage.  Page 431
9    under specificity of the assay system, the first
10   full paragraph there.  It says three preparations of
11   human urinary EP or EPO purified to different
12   extents, the first and second IRP and M-7-72-2 gave
13   parallel dose-response curves.  Those for the first
14   and second IRP were essentially identical, but that
15   for the highly purified preparation M-7-72-2 was
16   shifted to the left and it goes on.
17       A    That's right.
18       Q    So the first and second IRPs
19   essentially gave identical dose response curves,
20   correct?
21       A    That's correct.
22       Q    And in this paper, Dr. Cotes reported
23   the results of the RIAs that were conducted in terms
24   of milli-units per milliliter of sample, correct?
25       A    That's how she reported them, correct.

Page 172

1        MR. FLOWERS:  I'll ask the court
2    reporter to mark as Kadesch-6 a publication by
3    Sherwood and Goldwasser, 1979, entitled a
4    Radioimmunoassay for Erythropoietin.
5        (Publication by Sherwood & Goldwasser,
6    1979, was marked Kadesch-6 for
7    identification.)
8    BY MR. FLOWERS:
9        Q    Dr. Kadesch, you've been handed what's
10   been marked as Kadesch Exhibit 6.  Do you recognize
11   this paper?
12       A    I do not.
13       Q    So you've not seen this paper before?
14       A    I don't recall seeing it.
15       Q    Okay.  I take it, then, you didn't
16   consider this paper in forming the -- the opinions
17   that are set forth in your expert report?
18       A    That's correct.
19       Q    Recognizing that you haven't seen it
20   before, can you confirm that this paper describes a
21   radioimmunoassay for erythropoietins?  I'm going out
22   on a limb here.
23       MR. SUH:  Objection.  Go ahead.
24       THE WITNESS:  That is the title of the
25   paper.

Page 173

1    BY MR. FLOWERS:
2        Q    Now, do you see that this paper was
3    published in the journal Blood in 1979?
4        A    Yes.
5        Q    And so this paper would have been
6    available to one of ordinary skill in the art?
7        A    Correct.
8        Q    In 1983, 1984, correct?
9        A    Correct.
10       Q    And so the radioimmunoassay for
11   erythropoietin described in this paper would have
12   been available to one of ordinary skill in the art
13   in 1983 and 1984?
14       A    That's correct.
15       Q    If you look under materials and methods
16   on the first -- well, second page of the document,
17   first page of the paper, it says purification of
18   erythropoietin.
19       A    Right.
20       Q    Do you see that?
21       A    Uh-huh.
22       Q    It says the purification of pure EPO
23   has been described by Miyake, et al and Fraction II
24   alfa-EPO eluted from a hydroxylapatite column with
25   one millimolar phosphate buffer at a potency of

44 (Pages 170 to 173)

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 174

1  70,400 units per milligram protein based on the
2  activity of the International Reference Preparation.
3  And then the last sentence says this preparation was
4  used for radiolabeling and as a standard.
5        Do you see that?
6      A    I do see that.
7      Q    Do you know -- do you have an
8  understanding as to what that means that the
9  preparation of pure EPO had a potency of 70,400
10 units per milligram protein based on the activity of
11 the International Reference Preparation?
12     A    That statement alone in isolation, no,
13 I do not.
14     Q    But one of ordinary skill in 1983, 1984
15 looking at this paper would have understood that
16 pure preparation of urinary EPO having a potency of
17 70,000 units per milligrams protein could be used as
18 a standard in an EPO RIA, correct?
19     A    If it had been measured in a bioassay,
20 yes.
21     Q    So is it your opinion that if -- only
22 if that preparation had been analyzed in an in vivo
23 bioassay that one could use that as a standard in an
24 RIA in 1983?
25     A    That would have been the practice of

Page 175

1  doing good science.  If you're going to claim
2  something has units, then you have to measure
3  something in units.
4      Q    So is it your opinion that if the
5  Miyake preparation had been analyzed in an RIA where
6  the International Reference Preparation was used as
7  a standard, that one could not determine and report
8  the number of units in the Miyake preparation?
9      A    If one holds to a high biochemical
10 standard, one should not report something in units
11 that has not been assessed in terms of units.  So
12 you can compare something to a standard, but as I've
13 said before, if that standard is expressed in terms
14 of units, then one makes certain assumptions in
15 order to express the other standard, the Miyake
16 sample, for example, units and one makes certain
17 assumptions.  So to answer your question, yes, one
18 can do that, but whether it represents good
19 biochemistry I would doubt.
20     Q    If you turn to Page 890 in this paper
21 and you look at Figure 5 at the top of the page.
22     A    Yes.
23     Q    Figure 5, the caption says
24 radioimmunoassay of human serum.  Two sera from
25 anemic patients were compared with standard human

Page 176

1  erythropoietin.
2        Do you see that?
3      A    Uh-huh, yes.
4      Q    And do you understand that figure to
5  represent the results of an RIA?
6      A    Yes.
7      Q    And on the X axis along the bottom, the
8  designation is in milli units of EPO, correct?
9      A    Yes.
10     Q    Now, this is a publication by
11 Dr. Eugene Goldwasser?
12     A    That's correct.
13     Q    Are you familiar with Dr. Goldwasser?
14     A    Do I know him?
15     Q    Have ever met him?
16     A    I've never met him.
17     Q    Had you heard about him before this
18 case?
19     A    No.
20     Q    By reporting the results of this RIA in
21 this paper in terms of milli units, would you say
22 that Dr. Goldwasser was not practicing good
23 biochemistry?
24     A    My understanding of this figure by
25 looking at it for the first time is my impression is

Page 177

1  that there are two units given here.  One is milli
2  units of EPO, which is I'm assuming the standard
3  curve and then you have in this figure another unit,
4  which is microliters of serum.  As I said before, an
5  appropriate standard would be referenced in the
6  context of biological units.  If this is the -- the
7  International Reference Standard, then it's my
8  understanding that that was in fact measured in
9  terms of units and so it's appropriate to use units
10 for that curve.  That's the filled circles.  And my
11 understanding of what this represents is that there
12 is again another X axis, which is microliters of
13 serum which does not say anything about units per
14 se.
15     Q    If you turn to Table 2 on the next
16 page, Page 891.  It's titled Assay of Human Serum
17 Samples.  And would you agree that this table in the
18 Sherwood and Goldwasser paper is reporting the
19 results of their RIA experiments to measure EPO in
20 human serum samples in terms of units of
21 erythropoietin per milliliter?
22     A    Let me just read the -- I have to read
23 this before I want to respond.
24     Q    Sure.
25     A    In the -- there's two columns.  One is

                                    45  (Pages 174 to 177)

Confidential                                           R000045

Kadesch, Thomas R.                                              6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 178

1   the bioassay, which measures directly units per
2   milliliter of protein and then the RIA, which is
3   also shown in units of per milliliter of protein and
4   my understanding of this table is that it is an
5   attempt under these conditions to show that the
6   units as determined by an RIA can or cannot be
7   equated to units in a bioassay. And therefore, do
8   or do not have meaning.
9      Q    So if you look back to Page 890.
10     A    Yes.
11     Q    The first line of the text says the
12  results, Table 2, showed that A, the EPO titre of
13  normal serum can be measured by RIA. And then down
14  --
15     A    Yes.
16     Q    -- where it says D, in six cases there
17  was a reasonable correspondence between titers
18  obtained by RIA and by bioassay and then in e, in
19  two patients with chronic renal disease, the titre
20  obtained by RIA was very much higher than that by
21  bioassay?
22     A    I see that, that's correct.
23     Q    So the authors were describing Table 2
24  as representing that the EPO titre of serum can be
25  measured by RIA, correct?

Page 179

1      A    That's what they say in their paper.
2      Q    And they were expressing those results
3   in terms of units of erythropoietin per milliliter
4   of serum in Table 2, correct?
5      A    That's what they those to do.
6      Q    Now, would you say there that
7   Dr. Goldwasser was not practicing good biochemistry
8   by reporting the units -- by reporting the units of
9   the RIA in terms of units of erythropoietin per mL?
10     A    He has not -- to answer your question
11  very bluntly, yes. He is not practicing good
12  biochemistry.
13     Q    Now, are you aware whether
14  Dr. Goldwasser was -- was considered a leader in the
15  field of erythropoietin research in 1983, 1984?
16     A    It's come to my understanding that he
17  was a leader.
18     Q    And so one of ordinary skill in the art
19  would have been aware of that?
20     A    Perhaps.
21     Q    One of ordinary skill had looked at the
22  Sherwood and Goldwasser 1979 paper, Exhibit 6, one
23  of ordinary skill would have understood that those
24  in the field of erythropoietin research were
25  reporting the results of RIA assays in terms of

Page 180

1   units of erythropoietin, correct?
2          MR. SUH: Objection to form. Go ahead.
3          THE WITNESS: Someone of ordinary skill
4   in the field would not have used these papers
5   as the sole resource for understanding or
6   trying to understand what an RIA measured.
7   One point of view, which is illustrated by
8   this paper and by several other papers in the
9   field is that RIA does measure units, but I'm
10  assuming that someone such as myself, who
11  would be trying to practice these claims, for
12  example, would also have been trained as a
13  biochemist and known the first principles --
14  first principles of enzymology and in that
15  context, there's a disconnect between what one
16  assumes is practiced in the field and what one
17  considers to be rigorous biochemistry. And
18  the two don't necessarily -- are not
19  necessarily compatible in this case. It's my
20  understanding that the RIA represents a very,
21  very important advance over the in vivo
22  assays, but the price of that advance, namely
23  convenience and cost is often times
24  compromised by the fact that you're making
25  many, many assumptions and so, in fact, the

Page 181

1   convenience, the price you pay for convenience
2   in this case is a -- diminishing in the rigor
3   of the biochemical analysis. And so someone
4   of ordinary skill in the art may also have
5   recognized that there was a problem here and
6   that they may choose not to compromise their
7   own sense of biochemical rigor with simply the
8   convenience of an assay that is -- has been
9   established in the EPO field.
10  BY MR. FLOWERS:
11     Q    And that same assay, the
12  radioimmunoassay and the standard of reporting the
13  results of a radioimmunoassay for EPO in terms of
14  units was also followed by Dr. Lin in the '349
15  Patent, correct?
16     A    That's correct.
17     Q    So one of ordinary skill not only would
18  have seen papers such as the Sherwood and Goldwasser
19  paper in 1979 reporting the results of an RIA in
20  terms of units of erythropoietin, they also would
21  have seen that in Dr. Lin's '349 Patent, correct?
22     A    That's correct.
23     Q    They also would have seen that in the
24  Cotes 1982 paper, which we've marked as Exhibit 5
25  here?

                                46 (Pages 178 to 181)

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 182

1    A    That's correct.
2    Q    You can put that to the side.
3 Actually, since you've still got it open, let me ask
4 one more question.  If you look on that same page
5 where you were looking, there's also Table 3 down
6 below and it says comparison of RIA, marrow cell
7 culture assay and in vivo assay for erythropoietin.
8        Do you see that?
9    A    Yes.
10   Q    And Dr. Goldwasser and Dr. Sherwood
11 were reporting the results of not only the RIA, but
12 also the marrow cell culture assay and the in vivo
13 assay, all in terms of erythropoietin per
14 milliliter, correct?
15   A    That's correct.
16   Q    So one of ordinary skill looking at
17 this paper would have understood that the term units
18 per milliliter was not used exclusively for the --
19 for the in vivo bioassay, it was also used for the
20 in vitro assay and the RIA assay, is that correct?
21   A    As I said in my response --
22 well, first of all, I'll digress by applauding
23 Dr. Goldwasser in making an attempt to compare the
24 assays, but as I said, the habit in a field of using
25 certain assumptions isn't necessarily founded in

Page 183

1 good biochemistry.  And so on one hand, perhaps the
2 field was in the habit of being somewhat lazy or
3 lacking a certain level of rigor in terms of what
4 units really means and I can't speak for the EPO
5 field in this case, nor am I going to try to defend
6 them in terms of what their practices were, but as I
7 said before, someone of ordinary skill in the art is
8 also going to recognize, you know, what the term
9 unit should really mean and appreciate that the RIA
10 is not measuring units and so may skip over a paper
11 like this and say, well, this was just what the
12 standard in the field was, but I would argue that
13 that standard is low.
14   Q    The RIA was not measuring units of EPO
15 as determined in a bioassay, not measuring units of
16 biological activity of EPO, is that what you were
17 saying?
18   A    That's correct.
19   Q    Now you can put it aside.
20   A    All right.
21       MR. FLOWERS:  I'll ask the court
22 reporter to mark as Exhibit 7, Kadesch-7, a
23 document which is a publication by Garcia,
24 Sherwood and Goldwasser in the Journal of
25 Blood Cells in 1979.  It's titled

Page 184

1 Radioimmunoassay of Erythropoietin.
2       (Publication titled Radioimmunoassay of
3 Erythropoietin was marked Kadesch-7 for
4 identification.)
5 BY MR. FLOWERS:
6    Q    Have seen this document before?
7    A    No.
8    Q    So you didn't consider this paper in
9 coming to the opinions that you set out in your
10 expert reports?
11   A    No, I did not.
12   Q    Would you agree that this paper
13 describes a radioimmunoassay for measuring
14 erythropoietin in samples?
15   A    The same answer to the previous
16 question about the previous paper, I would imagine
17 yes, and it's about that since it's in the title.
18   Q    And again, based on its publication
19 date, this paper would have been available to one of
20 ordinary skill in the art?
21   A    That's correct.
22   Q    If you look at the abstract on the
23 first page, the fourth sentence down, it's at the
24 seventh -- the sixth line, it says the second
25 International Reference Preparation of human

Page 185

1 erythropoietin is used as a standard?
2    A    Yes.
3    Q    And from this paper, one of ordinary
4 skill in 1983 would have understood that the second
5 IRP could be used as a standard in a
6 radioimmunoassay to measure EPO?
7    A    That's correct.
8    Q    And the specific activity of the second
9 IRP you know is less than one units per milligram,
10 correct?
11   A    I don't recall, but I'll take your word
12 for it.
13   Q    In Exhibit 1, your April 6 report, at
14 Paragraph 39 you make reference to that.  So I don't
15 know if you want to look at that.
16   A    That's fine.  I just don't recall
17 offhand.
18   Q    Now, the second IRP that was used in
19 the RIA assay in this publication by Garcia, et al
20 is not the same as the pure urinary EPO preparation
21 that was used in the Sherwood and Goldwasser 1979
22 paper we just looked at.  That's Exhibit 6, correct?
23   A    I'll take your word for it.  Having not
24 seen the papers, I don't want to draw conclusions
25 based on memory since I have no memory.

47 (Pages 182 to 185)

Confidential                                    R000047

Kadesch, Thomas R.                                          6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 186

1    Q    The Sherwood and Goldwasser paper we
2  looked at a few minutes ago, that is where they had
3  the 70,400 units per milligram purified and ordinary
4  EPO of Miyake?
5    A    But then that, it was in reference to
6  the IRP, some IRP, so there was a question, as you
7  recall, in terms of what those 70,000 units meant
8  and I had to assume that that was measured not by
9  RIA, but by some sort of bioassay.
10   Q    Okay.  All right.
11   A    But one would -- I concede that the
12  specific activity of the two standards might be
13  different.
14   Q    If you turn to Page 410 in this Garcia,
15  et al paper.  It's talking about Figure 4, which is
16  on the next page, the last paragraph there.  It's
17  talking about Figure 4.  It says results were
18  presented showing that dilutions of the pure
19  erythropoietin, 70,000 units pure milligrams of
20  protein and a crude extract of human urinary
21  erythropoietin (20 units per milligram) both show a
22  parallel relationship with the second International
23  Reference Preparation of human erythropoietin.
24       Do you see that?
25   A    I see that.

Page 187

1    Q    And in Figure 4 on the next page, 411,
2  it does show a parallel dose relationship amongst
3  those different preparations of erythropoietin,
4  correct?
5    A    That's correct.
6    Q    And then back on Page 410 in the
7  paragraph we were looking at at the bottom of the
8  page, if you look at the last two sentences in that
9  paragraph, it says thus pure erythropoietin is not
10  required as the standard reference preparation.
11  Indeed a pool of well titered serum with a high
12  erythropoietin concentration should serve as an
13  ideal standard preparation.
14       Do you see that?
15   A    Yes, I see it.
16   Q    So one of ordinary skill in 1983 or
17  1984 looking at this paper and looking at this
18  paragraph and the sentence I just read would have
19  understood that a serum sample titered in an RIA
20  could be used as an ideal standard preparation for
21  radioimmunoassay, correct?
22   A    It could be, yes.
23   Q    And that's even though the serum sample
24  had not been measured or assayed in an in vivo
25  bioassay, correct?

Page 188

1    A    That's not correct.
2    Q    Let me put it this way, one reading
3  this paper, in particular the portions I've pointed
4  you to, would have understood that that serum
5  sample, that serum preparation could be used as a
6  standard in an EPO RIA without any assumptions about
7  the specific activity of that serum sample, correct?
8    A    The specific activity isn't a measure
9  in a crude preparation of the quality of EPO in a
10  sample.  It also takes into account the amount of --
11  the amount of contaminating protein.  So the -- as I
12  said, for a standard, ideally you want high quality
13  EPO.  You want high quality EPO that behaves
14  similarly to let's say an International Reference
15  Standard and you confirm that with the bioassay.  It
16  doesn't have to be pure.  It just has to perform
17  well in an RIA.  And so it can have a low specific
18  activity and still respond well in an RIA.
19   Q    And one indication of that is that it
20  gives a parallel dose response curve with the
21  International Reference Preparation?
22   A    That's one -- that's one evaluation,
23  but again, you cannot equate units unless you
24  measure units.  So you can't all of a sudden come up
25  with a standard because I could take the same serum,

Page 189

1  boil it and I might get exactly the same RIA
2  results, but anyone would know that that boiled
3  serum, even though it responds in parallel with a
4  known standard is not going to have any active
5  erythropoietin in it, so --
6    Q    Any EPO that's going to be active in a
7  bioassay?
8    A    In a bioassay, that's correct.  So
9  again, the assumption is a dangerous one in the
10  sense that by that example, if you boil serum,
11  you're probably going to destroy the EPO.  Yet to
12  make -- draw conclusions about how many units of EPO
13  are in that serum is dangerous because as I said,
14  chances are, if you boil it, you're going to kill
15  it.  So to express that in terms of units per
16  milliliter or units in reference to any sort of
17  standard makes severe assumptions about what the
18  definition of a unit is.  And the unit, as I
19  understand a unit, is a measure of a bioassay, not
20  an RIA.
21   Q    If you look on Page 411, which I think
22  you have open then.
23   A    Yes.
24   Q    Under preliminary radioimmunoassay
25  results, the second paragraph, it says:  In the

48  (Pages 186 to 189)

Confidential                                          R000048

Kadesch, Thomas R.                                6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 190

1  present radioimmunoassay a sample from a pool of
2  normal male serum gave a value of 23-milliunits per
3  mL, whereas a sample from a pool of normal female
4  serum gave 21-milliunits per mL.
5      Do you see that?
6  A   I see that.
7  Q   So again they're reporting the results
8  of assays of unknown samples in terms of milliunits
9  per mL or in terms of units, correct?
10 A   That's what they've chosen to do in
11 this paper.
12 Q   Do you know whether Dr. Garcia or
13 Sherwood or Dr. Goldwasser was beyond the level or
14 ordinary skill in the art?
15 A   This gets to a discussion of which art
16 you're talking about.  I think it would be fair to
17 say I can't speak for Sherwood or Garcia, but
18 certainly in the case of Dr. Goldwasser, he knew a
19 lot about EPO.  I have to say, though, that from
20 looking at these papers, he was not practicing
21 rigorous biochemistry in defining or interpreting a
22 serum sample to have a certain number of units in it
23 without carrying out a bioassay.
24 Q   But again, that's dependent on your
25 view that -- that an RIA cannot be used to indicate

Page 191

1  the activity of an EPO sample in a bioassay?
2  A   That's correct.
3  Q   Earlier you mentioned boiling EPO and
4  that it might have no activity in a bioassay?
5  A   That's correct.
6  Q   But it might give activity in an RIA
7  assay?
8  A   That's correct.
9  Q   That's purely a hypothetical construct,
10 correct?
11 A   No, I can boil EPO.  It's not a
12 hypothetical.
13 Q   True enough, you could boil EPO, but
14 you haven't boiled EPO and shown that it's still
15 recognized in an RIA, correct?
16 A   There would be no reason to think it
17 wouldn't be depending upon the antibody one used.
18 Q   What are the assumptions upon which you
19 base that?
20 A   Antibodies can recognize and often do
21 recognize small epitopes that are not lost when the
22 protein is denatured.  So, for example, the entire
23 use of western hybridization for detecting proteins
24 detects denatured proteins with antibody.  And so in
25 those cases, many antibodies recognize, and I would

Page 192

1  say probably even most antibodies recognize both
2  native and denatured protein.
3  Q   So it's your viewpoint that most
4  antibodies recognize linear polypeptide sequences?
5  A   I didn't say that.  I think I said can.
6  Q   You said -- so you would say probably
7  even most antibodies recognize both native and
8  denatured protein?
9  A   With the experience with the antibodies
10 that I use in my lab, yes, antibodies often
11 recognize both native and denatured proteins.  Some
12 do not.  Some recognize only native proteins.  Some
13 recognize primarily denatured proteins.  So it
14 really depends.
15 Q   Just to clear up an answer to my
16 earlier question when I asked you whether you had
17 ever actually boiled EPO and then tried to recognize
18 it with an antibody, you've never done that,
19 correct?
20 A   That's correct.
21     MR. FLOWERS:  I'll ask the court
22 reporter to mark as Kadesch Exhibit 8 a
23 document, the first author, Charles Zaroulis
24 published in the American Journal of
25 Hematology in 1981.  It's entitled Serum

Page 193

1  Concentrations of Erythropoietin Measured by
2  Radioimmunoassay in Hematologic Disorders and
3  Chronic Renal Failure.  It bears the Bates
4  numbers AM-ITC 00983265 through 983274.
5     (Article entitled Serum Concentrations
6  of Erythropoietin Measured by Radioimmunoassay
7  in Hematologic Disorders and Chronic Renal
8  Failure was marked Kadesch-8 for
9  identification.)
10 BY MR. FLOWERS:
11 Q   So again, the first question is have
12 you ever seen this document before?
13 A   No, I have not.
14 Q   And I take it, then, you didn't
15 consider this paper in coming to the opinions
16 expressed in your expert reports?
17 A   That's correct.
18 Q   Would you be able to confirm for me
19 that this paper describes a radioimmunoassay for
20 measuring EPO in samples?
21 A   Inasmuch as the radioimmunoassay is in
22 the title, yes.
23 Q   If you look on the first page of this
24 paper in the abstract, it states that the RIA for EP
25 or EPO described in this investigation can detect

49 (Pages 190 to 193)

Kadesch, Thomas R.                                          6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 194

1    five milliunits per mL of EPO in the assay tube.
2    The serum concentration of EPO in normal individuals
3    range from less than 18 to 84-milliunits per mL with
4    a mean value of 29-milliunits per mL.
5         Do you see that?
6    A    Yes, I do.
7    Q    So Dr. Zaroulis in this 1981 paper was
8    expressing the results of an RIA in terms of units
9    of EPO, correct?
10   A    I have to read it, I'm sorry.  There's
11   nothing in the abstract that says how he measured
12   units in this case, whether he relied on the RIA or
13   not.  The abstract isn't specific about that.  He
14   simply describes the difference in terms of
15   sensitivities of the RIA versus the in vivo assay.
16   Q    Now, if you go down one more sentence,
17   it says in this RIA, patients with polycythemia vera
18   had consistently undetected EPO concentrations?
19   A    I'm sorry, I stand corrected, yes.  I
20   haven't read that far down.
21   Q    I recognize you haven't seen this
22   before, so take the time you need.
23   A    Yeah.  Okay.
24   Q    But let me ask you again.  In this
25   paper that Dr. Zaroulis published in 1981, he also

Page 195

1    like Garcia, like Sherwood, like Cotes, like
2    Goldwasser, he also reported the results of the RIA
3    to measure EPO in terms of units of EPO, correct?
4    A    That's correct.
5    Q    So as with the Cotes paper from 1982
6    and the Sherwood and Goldwasser paper from 1979 and
7    the Garcia, Sherwood and Goldwasser paper from 1979,
8    one of ordinary skill in 1983 or 1984 looking at
9    Dr. Zaroulis's paper from 1981 would have understood
10   that those practicing in this field of
11   erythropoietin were reporting the results of
12   radioimmunoassays for EPO in terms of units,
13   correct?
14        MR. SUH:  Objection to form, lacks
15   foundation.
16        THE WITNESS:  Again, one of ordinary
17   skill, as I mentioned before, would have
18   realized that there is a discrepancy in the
19   concept of trying to use an assay that
20   measures amount of protein with an assay that
21   measures biological activity so that one of
22   ordinary skill would have been able to
23   recognize that there was a problem and that
24   there were very critical assumptions that were
25   being made by Drs. Garcia, Wasserman and in

Page 196

1    this case Zaroulis in providing the results of
2    an RIA using units.  They would have
3    appreciated that there is an inconsistency in
4    terms of what these assays measure and realize
5    that there was -- there were very fundamental
6    assumptions being made in these experiments.
7    The assumptions is -- the assumption is that
8    you can relate an RIA to units.  I think that
9    this would have been made less problematic if
10   in Dr. Goldwasser's original papers he didn't
11   necessarily equate RIA to units, but used some
12   other description of what they were measuring.
13   The problem comes -- enters when you have to
14   make assumptions about what two different
15   assays that measure two very different things
16   are -- how they correlate and again, the RIA
17   is a very convenient assay, but in all of
18   these cases, the price you pay for that
19   convenience is a lack of biochemical rigor and
20   the issue really is does someone of ordinary
21   skill in the art, do they have to answer to a
22   certain level of biochemical rigor or do they
23   simply, in a sense, throw in the towel of
24   convenience and use nomenclature and
25   assumptions that are described in many of

Page 197

1    these papers.
2    BY MR. FLOWERS:
3    Q    So what you just said, however, depends
4    on an assumption that one of ordinary skill in 1983
5    or 1984 reading these papers we've been looking at
6    about radioimmunoassays for EPO, that they would
7    have been looking to the results of an RIA to
8    measure EPO to indicate activity in a bioassay or to
9    indicate the in vivo biological activity of the EPO,
10   correct?
11   A    No.  They would have been looking at
12   the RIA to be some readout of the amount of protein
13   that's in the test tube, but not necessarily its
14   activity.
15   Q    The amount that could be determined by
16   an RIA, correct, not the amount that could be
17   determined in a bioassay?
18   A    That's correct.
19   Q    And when they read the '349 Patent of
20   Dr. Lin, they would have been looking at the same
21   thing, correct?
22   A    That's correct.
23   Q    And when they're looking at the claims
24   in the '349 Patent and they see the term units of
25   erythropoietin there as determined by RIA, they

50  (Pages 194 to 197)

Confidential                                         R000050

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 198

1  would have been looking at the same thing, correct?
2      A    But they also would have realized that
3  that statement had an internal inconsistency because
4  units by RIA from anyone that understands how an RIA
5  is done they would have seen that as being a
6  contradiction in terms.
7      Q    But they would have seen these prior
8  art papers, all of which are reporting
9  radioimmunoassays for EPO in terms of units, they
10 would have seen Dr. Lin's specification in his
11 patent reporting the results of RIA in terms of
12 units and they would have seen the 349 claims
13 telling one to look to units as determined by
14 radioimmunoassay for the EPO being produced by
15 vertebrate cells and there's no inconsistent there.
16     MR. SUH: Objection, compound, lacks
17 foundation, vague.
18     THE WITNESS: I disagree with you. I
19 disagree that there's no inconsistency.
20 BY MR. FLOWERS:
21     Q    Let me make sure we're talking about
22 the same thing.
23     MR. SUH: I'm sorry, you've got to let
24 him finish his answer.
25     THE WITNESS: So the -- let me give you

Page 199

1  an analogy. Well, let me give you something
2  that's maybe even -- I was trained as an
3  enzymologist and I understand what assays can
4  and cannot do. I understand their
5  limitations. If I had gone to my thesis
6  advisor and say, hey Mike, I have purified RNA
7  polymerase and it's got this many units by
8  RIA, he would have kicked me out of the lab.
9  He would have said I've taught you nothing
10 because there's no way to measure units by an
11 RIA. You measure an amount of protein. Unit
12 is a reflection of the amount of active
13 protein in the sample. And RIA measures mass.
14 It's like taking any sort of assay, a Bradford
15 assay that's often used to measure the amount
16 of protein in a sample and even if you had a
17 purified sample and carried out a Bradford
18 assay, which is, you know, not completely
19 dissimilar from an RIA, it measures the amount
20 of protein and all of a sudden start equating
21 Bradford assays to units, people would think
22 you were crazy. So -- or let's say not crazy,
23 but that you lacked a certain level of
24 scientific rigor. The fact that, as I've said
25 over and over again, the fact that many people

Page 200

1  working in this field used, for want of a
2  better term, an abbreviation for convenience,
3  an assay like the Bradford assay, it is a very
4  convenient assay for measuring the amount of
5  protein. The fact that they equated that with
6  units I can't speak for why they did it, but I
7  can say that it lacks biochemical rigor
8  because the amount of protein cannot be
9  equated to activity no matter how you try to
10 rationalize -- to rationalize it by saying,
11 well, look in the literature. There's a lot
12 examples of people doing this. You can look
13 in the literature and find all kinds of
14 examples of less than highly rigorous science
15 as well. So just because it's in the
16 literature, just because it's being practiced
17 by people that are considered to be leaders in
18 the field doesn't make it biochemically
19 rigorous. And so the argument I'm making is
20 simple that the RIA cannot measure units
21 period, nor does it pretend to. The notion
22 that it does is simply for convenience and
23 it's -- you really take a hit in biochemical
24 rigor when you start doing that and that's the
25 point I'm making and that's why somebody of

Page 201

1  ordinary skill would see this internal
2  inconsistency and really wonder what a unit
3  was really measuring.
4  BY MR. FLOWERS:
5      Q    That's where I -- I think we're almost
6  done with the tape anyway. Let's take a quick break
7  while he changes the tape.
8      VIDEO OPERATOR: This concludes tape
9  number five in the videotape deposition of
10 Dr. Thomas R. Kadesch on June 21, 2007.
11     The time is 3:07 and we're off the
12 record.
13     (Brief recess.)
14     VIDEO OPERATOR: This begins tape
15 number six in the videotape deposition of
16 Dr. Thomas R. Kadesch on June 21, 2007.
17     The time is 3:14 p.m. and we're back on
18 the record.
19 BY MR. FLOWERS:
20     Q    Dr. Kadesch, you're not suggesting that
21 the authors of these papers, Dr. Goldwasser and
22 Dr. Garcia, Dr. Sherwood, Dr. Zaroulis, you're not
23 suggesting that they thought that they were
24 measuring bioactivity of their EPO samples in the
25 radioimmunoassay, are you?

51 (Pages 198 to 201)

Confidential                                      R000051

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 202

1         MR. SUH:  Objection to form, lacks
2    foundation.
3         THE WITNESS:  I don't know what they
4    were thinking.
5    BY MR. FLOWERS:
6    Q    You're not suggesting that one of
7    ordinary skill looking at these papers would have
8    thought that the authors were measuring bioactivity
9    of their EPO samples in the RIAs that are described
10   in these papers?
11        MR. SUH:  Same objection.
12        THE WITNESS:  I can't speak to what
13   somebody of ordinary skill would have thought
14   that they were thinking.
15   BY MR. FLOWERS:
16   Q    So you're not suggesting that one of
17   ordinary skill would have actually thought that the
18   authors of these papers were using the RIA to
19   measure the bioactivity of the EPO in their samples?
20        MR. SUH:  Same objection.
21        THE WITNESS:  The manuscript by
22   Goldwasser.  I forget the first author.  I
23   don't remember which one it was, where
24   Dr. Goldwasser uses an RIA and uses an in vivo
25   bioassay and establishes appropriately the

Page 203

1    relation of the two assays.  That to me is --
2    represents a certain rigor because you want to
3    make sure that you're not making assumptions
4    that are not appropriate to make and I think
5    that in that paper he demonstrated that he
6    didn't want to take anything for granted and
7    therefore, compared the two values and my
8    recollection, again, having only seen the
9    paper for the first time today was that in the
10   abstract he mentions in certain cases there
11   was good agreement between the two assays and
12   then in another case, I forget what specific
13   case it was, but there was not good agreement.
14   If he had done the latter two samples first
15   and those happened to be the norm, then the
16   entire field might be different in a sense
17   that no, the RIA is a terrible prognosticator
18   of in vivo bioassay.  I think in some cases,
19   the assumption is reasonable and it turns out in
20   many cases that when you look at EPO in serum,
21   in the cases that I've seen where the
22   comparisons are made, there is good agreement
23   between the assumption of the RIA using an IRP
24   and what you get in terms of RIA versus in
25   vivo assay.  The assumptions, and if that were

Page 204

1    generally accepted in the field, if every,
2    every case where somebody compared in serum
3    the results of a bioassay and what they would
4    have predicted from an RIA with the
5    assumptions and found that always agreed, then
6    I think somebody of ordinary skill would have
7    assumed, yeah, maybe the RIA to a first
8    approximation with a minimum number of
9    assumptions is a good substitute for an in
10   vivo assay.  However, under conditions where
11   there are many more unknowns, particularly the
12   case for the Lin patent where all of a sudden
13   you're making EPO in a completely foreign
14   environment, the assumptions become huge.  As
15   a consequence, the level of scientific rigor
16   needs to be elevated and you can't assume that
17   what a CHO cell is going to produce looks
18   anything like what you find of EPO in serum.
19   So as a consequence, when you exit the kind of
20   normal protected and well-defined environment
21   of let's say serum, then all of a sudden all
22   assumptions are off and again, even within
23   serum, there are certain assumptions as I
24   pointed out that Dr. Goldwasser says in one of
25   his abstracts that there was good agreement in

Page 205

1    some cases, not good agreement in other cases,
2    so it makes you pause to say what is the RIA
3    really measuring.  But when you all of a
4    sudden extend the situation to a completely
5    foreign environment where you're asking the
6    question whether CHO cells can actually make
7    biologically active EPO, the RIA becomes very,
8    very -- it's a preliminary result in a sense
9    that it says, okay, I've been able to make
10   immunoreactive material -- the CHO cells can
11   make immunoreactive material and that's all it
12   says.  It says nothing about units.  And so
13   again, I think in the case of serum, the cases
14   I've seen, there are often, but not
15   exclusively, there often is good agreement
16   between the RIA, the particular RIA result
17   using an IRP and a true in vivo bioassay.  But
18   all of a sudden when you -- when you go to a
19   cell culture system when you're not even sure
20   the cells can make fully polypeptide, and
21   that's an assumption, to use an RIA as a
22   measure of units is just not very rigorous
23   science and I think that again, for all the
24   reasons I've stated before, somebody of
25   ordinary skill would realize that there were

52  (Pages 202 to 205)

Confidential                                    R000052

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 206

1  huge assumptions that were being made and as a
2  consequence the use of -- even the use of the
3  phrase EPO as measured, you know, units by RIA
4  is basically a meaningless phrase because it
5  doesn't say anything unless you actually do
6  the experiments.  Now, as I pointed out in my
7  last report, the patent actually gives
8  examples where the numbers start to deviate
9  and so you realize that the RIA is not
10 measuring units at all.  It's pretty clear.
11 And so again, in terms of what someone
12 practicing the claim is expecting to see and
13 how they, for example, determine whether
14 they're infringing, it's very hard to
15 determine that because the definition of units
16 really has to be held to a high standard where
17 people know exactly what the inventor is
18 talking about.  In the case of an RIA it's
19 very unclear what the inventor is talking
20 about.
21 BY MR. FLOWERS:
22   Q    He was talking about the number of
23 units as determined in an RIA, correct?
24   A    But that, as I said before, what
25 analogy can I use, the number of marbles as

Page 207

1  determined by eyeball -- I mean it's a meaningless
2  phrase.  It has no -- it's internally inconsistent.
3    Q    So in your opinion, these authors,
4  Dr. Goldwasser and Dr. Zaroulis and Dr. Garcia and
5  Dr. Sherwood and Dr. Cotes who were publishing the
6  papers on radioimmunoassays for EPO were -- were
7  just not being rigorous in their terminology?
8    A    In the example where Goldwasser
9  compares the RIA to in vivo assays he was being very
10 rigorous.  In the cases -- in the papers where they
11 don't make those comparisons, yes, they're not being
12 rigorous in their terminology.
13   Q    Even in the paper where Dr. Goldwasser
14 and Dr. Sherwood were comparing the number of units
15 as determined by RIA with the number of units as
16 determined by the in vivo bioassay, they were still
17 reporting the number of units as determined by RIA
18 and determining the number of units as determined by
19 bioassay by doing the bioassay, correct?
20   A    Well, as you've just -- as you've just
21 illustrated, it becomes a circuit of argument and
22 whether you decide to impose yourself within that
23 circuit of argument, it's your choice, but a circuit
24 of argument cannot be used -- is not scientifically
25 rigorous.  To say that, since they used units per

Page 208

1  mL, then that de facto means they were using units
2  per mL in their terminology.  Of course that's true.
3  The question is does the -- does the terminology
4  have any meaning and so it seems to me that if the
5  terminology lacks meaning, then it's not useful.
6  It's indefinite.  And that's basically my point in
7  terms of my report.  I find that the phrase units as
8  determined by radioimmunoassay with respect to
9  what's being produced, presumably we're measuring
10 erythropoietin.  Erythropoietin, my understanding
11 is, defined.  It is biologically active.  So if
12 you're saying that you are measuring biologically
13 active erythropoietin by an assay that can't measure
14 biologically active erythropoietin, then that --
15 then that sentence or that term has no internal
16 meaning.  Okay?  And so in a sense that a patent as
17 my understanding needs to be definite in terms of
18 what it's describing, I'm saying that the measure of
19 erythropoietin (biologically active protein by
20 radioimmunoassay has -- is internally inconsistent
21 and has no true meaning.  That's the argument I'm
22 making.
23   Q    So that's premised on your belief that
24 units cannot be used to refer to the results of a
25 radioimmunoassay?

Page 209

1    A    It's not a belief.  It's just -- it's
2  rigorous biochemistry.
3    Q    It's your opinion?
4    A    It's my opinion, certainly.
5        MR. FLOWERS:  Let me ask the court
6  reporter to mark as Kadesch Exhibit 9 a
7  publication by Rege, R-E-G-E and Brookins and
8  James Fisher from 1982.  It's entitled A
9  radioimmunoassay for erythropoietin; serum
10 levels in normal human subjects and patients
11 with hemopoietic disorders.
12       (Radioimmunoassay for erythropoietin;
13       serum levels in normal human subjects and
14       patients with hemopoietic disorders article
15       was marked Kadesch-9 for identification.)
16 BY MR. FLOWERS:
17   Q    My question is have you ever seen this
18 paper before?
19   A    No, I have not.
20   Q    You see the third author here is James
21 Fisher.
22       Do you see that?
23   A    Yeah.
24   Q    Are you aware that Dr. Fisher is an
25 expert for Roche in this case?

53  (Pages 206 to 209)

Confidential                                    R000053

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 210

1   A    No.
2   Q    I take it that you didn't consider this
3   paper in forming the opinions that are set out in
4   your expert reports?
5   A    That's correct.
6   Q    You can put that to the side.
7   A    I'm done with this.
8   Q    Yeah.
9        If you turn back to Exhibit 1, your
10  first expert report.
11  A    I don't remember which one is which.
12  Kadesch-2, Kadesch-4, Kadesch-3.  Is it Kadesch-2?
13       MR. SUH:  Kadesch-1.
14  BY MR. FLOWERS:
15  Q    It should be Kadesch-1, your first
16  expert report from April.
17       MR. SUH:  I think that's it.
18  BY MR. FLOWERS:
19  Q    If you turn to Paragraph 37 in that
20  report.
21       You say in the third or fourth
22  sentence, four lines down, the principle of the
23  assay is that a protein present in a sample can
24  compete with a radioactive version of the protein
25  for binding to the antibody.

Page 211

1   A    Yes.
2   Q    The more protein present in the sample,
3   the more radioactive protein that is needed to
4   compete the antibody away.
5        Do you see that?
6   A    Yes.
7   Q    In performing the radioimmunoassay, the
8   radioactive tracer EPO is added in fixed quantities
9   to the reactions, correct?
10  A    That's correct.
11  Q    And the amount of the radioactive
12  tracer EPO that is displaced from the antibody
13  binding site of the unknown sample is reflected by
14  the decrease in radioactivity bound to the antibody,
15  correct?
16  A    That's correct.
17  Q    You can put that to the side.  You can
18  put that to the side.  If you could, however, pull
19  out Exhibit 4, which is your second supplemental
20  report.
21       Do you have there Exhibit 4?
22  A    Yeah.
23  Q    In this report, starting at Page 20,
24  you discuss protein sequencing and I wanted to ask
25  you why did you choose to submit a second

Page 212

1   supplemental expert report discussing protein
2   sequencing?
3        MR. SUH:  Objection, vague.
4        THE WITNESS:  The conversation I was
5   having with Kaye Scholer, basically they asked
6   me if I had any opinions about the expert
7   report of Fromm, Mike Fromm, and I read
8   Dr. Fromm's report and I agreed with some of
9   it.  And so the question was specifically
10  whether or not I would be able to defend
11  Dr. Fromm's opinions and I said only to the
12  point that I agree with them.  And I think
13  that again, from the point of view of Kaye
14  Scholer, I don't determine what their legal
15  strategies are, but they asked if I would
16  submit an additional report to discuss these
17  issues.
18  BY MR. FLOWERS:
19  Q    Was there any reason why you couldn't
20  discuss protein sequencing in your first report back
21  in April?
22  A    Again, as I said just now and as I said
23  earlier in my deposition, I don't typically decide
24  what the content of my report should be based on
25  legal strategies.  As a consequence, typically what

Page 213

1   happens and I'm sure this happens -- well, I'm not
2   sure, but I suspect it happens with all experts is
3   that legal strategies are defined and then the
4   experts that can defend those legal strategies are
5   identified and consulted.  The -- my understanding
6   of the way this works is that legal strategies can
7   evolve and that's about as much as I know how to say
8   and so as a consequence, not everything that is in
9   the original reports of any consultant are
10  necessarily the final word in terms of what they
11  want those consultants to opine on.
12  Q    I just want to make sure from a
13  scientific perspective in terms of your scientific
14  expertise.
15  A    Yes.
16  Q    You would have been able to opine on
17  these same issues in April of 2007, to correct, to
18  the extent that you opine on them in this second
19  supplemental report?
20  A    Yes, of course.
21  Q    So it was up to the lawyers as to when
22  you were going to submit a report dealing with these
23  protein sequencing issues?
24  A    I let the lawyers determine strategy,
25  yes.

54  (Pages 210 to 213)

LiveNote World Service    800.548.3668 Ext. 1

Confidential                                        R000054

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 214

1    Q    And in your view, it wasn't something
2  that Amgen or an Amgen expert said that suddenly
3  caused you to want to opine about protein
4  sequencing?
5    A    There was an issue, and I can't
6  remember exactly when I saw it, there were
7  discussions earlier on about whether Dr. Lai was a
8  co-inventor of the patent and I think I was involved
9  in conversations where that was discussed much
10  earlier than I had been asked to opine about this in
11  a sense that my understanding is Dr. Lai was the
12  person that did a lot of the protein sequencing and
13  had tried through a couple of protests to be listed
14  as a co-inventor and was denied by the patent
15  office. Inasmuch as my thinking about protein
16  sequencing and its role in this project, it was
17  clear that the -- from the get-go obviously that the
18  patent and the discovery depended upon protein
19  sequencing and yet from the case of the -- from
20  Amgen and the patent office, the person that
21  did that sequencing was not listed as a co-inventor.
22  So I was aware of that prior to my being asked to
23  submit a final report.
24    Q    I understand.  I just wanted to make
25  sure that you weren't submitting opinions about

Page 215

1  protein sequencing in order to reply to an Amgen
2  expert who was rebutting your prior opinion?  It
3  wasn't a situation where --
4    A    No, no, not that I recall.  I was just
5  simply saying that there was context beyond what I
6  had initially said.
7    Q    I understand.  And context beyond what
8  you had put in your original expert report?
9    A    That's correct.  Would it be possible
10  for me to take a bathroom break?
11    Q    Sure.
12    VIDEO OPERATOR:  The time is 3:37 p.m.
13  and we're off the record.
14    (Brief recess.)
15    VIDEO OPERATOR:  The time is 3:42 p.m.
16  and we're back on the record.
17  BY MR. FLOWERS:
18    Q    Dr. Kadesch, in 1983 you were not --
19  you were not skilled in the art of protein
20  sequencing, were you?
21    A    That's correct.
22    Q    And today, you're not a recognized
23  expert in the art of protein sequencing, correct?
24    A    That's correct.
25    Q    And I wanted to ask you a few questions

Page 216

1  about the experience you've had with protein
2  sequencing and when I ask you these questions, I'm
3  interested in any hands-on experience that you've
4  had as well as any experience you've had supervising
5  someone else.  So if you can include that in your
6  answers, I would appreciate that.  You've never
7  attempted to determine the complete sequence of a
8  protein, have you?
9    A    That's correct.
10    Q    And you've never used a spinning cup
11  type sequencer, correct?
12    A    That's correct.
13    Q    And you've not used a gas phase
14  sequencer, correct?
15    A    That's correct.
16    Q    You haven't performed solid phase
17  protein sequencing, correct?
18    A    That's correct.
19    Q    And you haven't performed normal Edman
20  degradation protein-type sequencing?
21    A    That's correct.
22    Q    And you haven't used any other type of
23  chemical reaction to identify a specific amino acid
24  in a protein, correct?
25    A    That's not correct.  I've generated

Page 217

1  tryptic fragments of proteins and analyzed them on
2  2D gels and tried to identify sites of protein
3  modification.
4    Q    You haven't taught students how to
5  perform protein sequencing, correct?
6    A    That's correct.
7    Q    And the knowledge you have of protein
8  sequencing is derived from reading the literature?
9    A    That's correct.
10    Q    Had you studied protein sequencing
11  techniques before becoming involved in this
12  litigation?
13    A    My knowledge of protein sequencing
14  techniques, I did not start studying protein
15  sequencing techniques in response to becoming
16  involved in this litigation.  So my understanding of
17  protein sequencing techniques is similar now as it
18  was, you know, ten years ago.
19    Q    You haven't interpreted an HPLC
20  chromatogram to determine an amino acid cleaved from
21  a protein using Edman degradation?
22    A    In my lab?
23    Q    Correct.
24    A    No.
25    Q    Okay.  And you haven't purified

55 (Pages 214 to 217)

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 218

1  peptides for amino acid sequencing purposes, have
2  you?
3      A    No.
4      Q    And you haven't used techniques to
5  overcome end terminal blockage of a protein or a
6  peptide for sequencing analysis, have you?
7      A    No.
8      Q    And so you wouldn't know the amount of
9  material that one of ordinary skill in 1983 would
10  have needed to use to overcome end terminal blockage
11  of a protein for a protein sequencing?
12          MR. SUH:  Objection to form, vague.
13          THE WITNESS:  Personally, no.
14  BY MR. FLOWERS:
15      Q    And you haven't sequenced a protein to
16  identify a cysteine residue in that protein, have
17  you?
18      A    That's correct.
19      Q    And you wouldn't be able to tell us how
20  much material you would need in terms of a protein
21  in order to identify a cysteine using protein
22  sequencing, correct?
23      A    That's correct.
24      Q    And you've never tried to determine the
25  identity of a glycosylated amino acid in a protein

Page 219

1  undergoing protein sequencing, correct?
2      A    That's correct.
3      Q    And the same is true for a proline
4  residue?
5      A    That's correct.
6      Q    And the same would be true for a
7  tryptophan residue?
8      A    That's correct.
9      Q    And the same would be true for a
10  methylamine residue?
11      A    That's correct.
12      Q    So you wouldn't be able to tell us how
13  much material of one of ordinary skill would have
14  needed in 1983 in order to determine the identity of
15  a glycosylated amino acid or a proline residue or a
16  tryptophan residue or a methylamine residue in a
17  protein undergoing protein sequencing?
18      A    That's correct.
19          MR. SUH:  Objection, go ahead.
20  BY MR. FLOWERS:
21      Q    And you've never had the experience of
22  trying to determine the identity of an amino acid
23  residue in a protein over the background experienced
24  in protein sequencing techniques, correct?
25      A    That's correct.

Page 220

1      Q    Now, without an accurate amino acid
2  residue sequence for human urinary erythropoietin in
3  1983, one of ordinary skill would not have been able
4  to synthesize complete gene encoding erythropoietin,
5  correct?
6      A    That's correct.
7      Q    And one of ordinary skill wouldn't have
8  been able to obtain expression of a synthetic gene
9  encoding erythropoietin, correct?
10          MR. SUH:  Objection.
11          THE WITNESS:  That's correct.
12  BY MR. FLOWERS:
13      Q    If one of ordinary skill in 1983
14  attempting to sequence the complete human urinary
15  erythropoietin protein had misidentified cysteine
16  residue in the sequence, the polypeptide that would
17  result from using that protein sequence to make a
18  synthetic gene would likely have had -- would likely
19  yield a protein with a different confirmation?
20          MR. SUH:  Objection, vague.
21  BY MR. FLOWERS:
22      Q    Than authentic erythropoietin, correct?
23          MR. SUH:  Objection, vague, lacks
24  foundation.
25          THE WITNESS:  I don't know.

Page 221

1  BY MR. FLOWERS:
2      Q    In your second supplemental report,
3  which -- Exhibit 4?
4      A    Yes.
5      Q    In Paragraph 45, towards the bottom of
6  that paragraph you said: I note that Dr. Goldwasser
7  was in possession of 8-milligrams of purified EPO at
8  the time of the filing of the Lin patents.
9          What's the basis for that
10  understanding?
11      A    Conversation with client and based on
12  my understanding of what the Fromm report mentioned.
13  Of course I didn't know that firsthand because I
14  didn't know Dr. Goldwasser.
15      Q    In October of 1983, you'll agree that
16  there were no published reports in the scientific
17  literature of the chemical synthesis of a complete
18  gene encoding a glycoprotein, correct?
19          MR. SUH:  Objection to form.
20          THE WITNESS:  I don't know if there
21  were none.
22  BY MR. FLOWERS:
23      Q    In October of 1983, would you agree
24  that there were no published scientific reports
25  describing the expression of a wholly synthetic gene

                                    56 (Pages 218 to 221)

Confidential                                    R000056

Kadesch, Thomas R.                                        6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 222

1   encoding a glycoprotein in a vertebrate cell?
2        MR. SUH: Objection to the form, lacks
3   foundation.
4        THE WITNESS: I don't know if there
5   were none.
6   BY MR. FLOWERS:
7        Q    Are you aware of any prior to 1984?
8        A    The way in which the question was
9   phrased is I don't want to say there were none if
10  there happened to be any, so just to be fair. Could
11  you repeat the question, were there any synthesized
12  genes that expressed glycoproteins?
13       Q    Were there any published scientific
14  papers describing the expression of a wholly
15  synthetic gene encoding a glycoprotein in a
16  vertebrate cell?
17       A    I'm not aware of any.
18       Q    As of October, 1983, are you aware that
19  there were any published reports of linking a signal
20  peptide from protein -- we'll call it Protein A to
21  the secreted portion of a protein we'll call Protein
22  B to obtain successful expression and secretion of
23  Protein B in a vertebrate cell?
24       MR. SUH: Objection to form, lacks
25  foundation.

Page 223

1        THE WITNESS: I'm not aware of any
2   specific examples of that experiment, no.
3   BY MR. FLOWERS:
4        Q    So you're not aware of any published
5   papers by 1983 reporting a hybrid signal peptide
6   protein construct for expression in a vertebrate
7   cell?
8        A    That's correct.
9        MR. FLOWERS: I'll ask the court
10  reporter to mark as Exhibit 10 a paper from
11  the Journal of Biological Chemistry, first
12  author Lai, L-A-I, published in 1986.
13       (Structural Characterization of Human
14  Erythropoietin article was marked Kadesch-10
15  for identification.)
16  BY MR. FLOWERS:
17       Q    The first question is, do you recognize
18  this paper?
19       A    Yes, I do.
20       Q    And did you review this paper in
21  developing the opinions in your expert reports?
22       A    Yes, I did.
23       Q    When was the last time you looked at
24  this paper?
25       A    A week ago.

Page 224

1        Q    And did you read the paper?
2        A    I read it very briefly, very quickly.
3        Q    Now, the Lai authors in carrying out
4   the studies reported in this paper consulted the DNA
5   sequence of human erythropoietin, correct?
6        A    I don't know.
7        Q    Do you recall that the authors of
8   Exhibit 10, the Lai paper used a sequencing program
9   from the Applied Biosystems Company?
10       A    I don't know what program they used.
11       Q    You would agree that the authors of the
12  Lai paper did not obtain any sequencing data for the
13  cysteine at Position 7, correct?
14       A    I don't recall.
15       Q    If you look at Page 3121 in Table 2.
16       A    3121 -- sorry.
17       Q    It's the very last page all the way at
18  the back. One more page.
19       A    All the way back.
20       Q    Did you look at this table the last
21  time you looked at the paper?
22       A    Actually, I did not.
23       Q    Well, I won't belabor it, but can you
24  confirm for me that they did not obtain any
25  sequencing data for the cysteine at Position 7 based

Page 225

1   on Table 2?
2        A    That would appear to be the case.
3        Q    And the same is true for the asparagine
4   at Position 24?
5        A    It would also appear to be the case.
6        Q    And the same is true for the cysteine
7   at Position 29?
8        A    That would also appear to be the case.
9        Q    And the Lai authors did not obtain any
10  sequencing data for the histamine residue at
11  Position 32?
12       A    That would appear to be the case as
13  well.
14       Q    And the Lai authors didn't obtain any
15  sequencing data for the cysteine at Position 33?
16       A    That's correct.
17       Q    And the Lai authors didn't obtain any
18  sequencing data for the asparagine at Position 38,
19  correct?
20       A    That appears to be the case.
21       Q    And the Lai authors didn't obtain any
22  sequencing data for the serine at Position 126,
23  correct?
24       A    That would also be -- appear to be
25  correct.

57 (Pages 222 to 225)

Confidential                                        R000057

Kadesch, Thomas R.                                      6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 226

1    Q    And the Lai authors didn't obtain any
2  sequencing data for the cysteine at Position 161,
3  correct?
4    A    That appears to be the case.
5    Q    The Lai authors didn't obtain any
6  sequencing data for the arginine at Position 166,
7  correct?
8    A    166?
9    Q    166, correct.
10   A    I'm not exactly sure how this table was
11 generated, but it doesn't look like there was a
12 discrepancy.
13   Q    It may be my mistake.  Okay.  All
14 right.
15        And the Lai authors also confirmed
16 their sequencing data using the DNA sequence of the
17 human gene, correct?
18        MR. SUH:  Objection, asked and
19    answered.  Go ahead.
20        THE WITNESS:  I'd have to look at the
21    paper to see exactly what they used to
22    confirm.
23 BY MR. FLOWERS:
24   Q    For example, if you look on the first
25 the paper, right-hand column, second full paragraph,

Page 227

1  the last sentence, in addition, our data for these
2  positions are confirmed by the DNA sequence of the
3  human gene?
4    A    Yes, yes.
5    Q    So you would agree that the Lai authors
6  confirmed their putative protein sequencing results
7  using the DNA sequence for the gene?
8    A    Yes.
9    Q    And that DNA sequence wasn't available
10 before Dr. Lin's inventions starting in 1983,
11 correct?
12   A    That's correct.
13   Q    You can put that to the side.
14        Are you aware that the Roche Defendants
15 used their DN23 alfa 3, DN23 alfa 3 cell line for
16 production of recombinant human EPO?
17        MR. SUH:  Objection, lacks foundation,
18    vague.
19        THE WITNESS:  As I told you this
20    morning, I'm not aware of what that cell line
21    is.
22 BY MR. FLOWERS:
23   Q    So is there anything that you can tell
24 me about Roche's DN23 alfa 3 cell line?
25        MR. SUH:  Objection, vague.

Page 228

1        THE WITNESS:  No.
2  BY MR. FLOWERS:
3    Q    Are you aware that the Roche Defendants
4  offered to stipulate that their cells are capable of
5  producing in excess of 100 units of erythropoietin
6  per million cells in 48 hours as determined by
7  radioimmunoassay?
8        MR. SUH:  Objection, lacks foundation,
9    assumes facts not into evidence.
10        THE WITNESS:  I'm not aware of the
11    claims that Roche has made.
12        MR. FLOWERS:  I'll ask the court
13    reporter to mark as Kadesch Exhibit 11 a
14    letter from Pat -- Patricia Carson to Deborah
15    Fishman dated February 7, 2007.
16        (Letter to Patricia Carson to Deborah
17    Fishman dated February 7, 2007 was marked
18    Kadesch-11 for identification.)
19 BY MR. FLOWERS:
20   Q    So Dr. Kadesch, my question is whether
21 you've ever seen this letter or the attachment?
22   A    I have not seen the letter.  I have not
23 seen the attachment.
24   Q    I just want to make sure that this
25 attachment doesn't refresh your recollection as to

Page 229

1  whether you were aware that Roche had stipulated
2  that the cell satisfied the limitations of the '349
3  Patent claims?
4        MR. SUH:  Objection, lacks foundation.
5        THE WITNESS:  As I said before, I have
6    not seen this and it does not refresh any
7    memory that I recall.
8  BY MR. FLOWERS:
9    Q    Okay, you can put that to the side.
10        If you go back to Exhibit 1, your first
11 expert report, if you turn to Page 7.  We looked at
12 this before, Paragraph 28.  See, I expect to testify
13 that the claims of the '349 Patent are not enabled
14 because in 1983, 1984 it would have taken --
15   A    I'm sorry, I may be looking at the
16 wrong thing.
17   Q    Page 7, Exhibit 1.
18   A    Paragraph 28.  Oh, I see.
19   Q    I'm sorry, it's in the middle of the
20 paragraph.
21   A    Got you, sorry.
22   Q    It would have taken more than routine
23 experimentation for a person of ordinary skill in
24 the art to practice Amgen's alleged invention on any
25 significant portion of vertebrate or mammalian

58  (Pages 226 to 229)

Confidential                                           R000058

Kadesch, Thomas R.                                      6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 230

1  cells.
2        Do you see that?
3     A    Yes.
4     Q    What is the routine experimentation
5  that you believe it would have taken for a person of
6  ordinary skill in the art to practice Dr. Lin's
7  inventions claimed in the '349 Patent?
8     A    Well, the key term there is significant
9  portion of vertebrate or mammalian cells.  At the
10  time -- in the timeframe of 1983, '84, there were
11  maybe a handful of cells that were used to transfect
12  plasma DNA into, CHO cells, COS cells, CB1 cells,
13  HeLa cells, but there were a very limited number and
14  the techniques for introducing -- productively
15  introducing plasma DNA into a variety of cells was
16  very problematic.  It would be lymphocytes, for
17  example, which I mentioned earlier.  It was very
18  difficult to get significant amounts of expression
19  in those cells.
20        Similarly, with all primary cell lines
21  or primary cells that people had looked at at that
22  time, it was very difficult to get DNA into them and
23  so the general view was that there were no
24  guarantees in terms of whether any particular type
25  of vertebrate cell would be able to take up plasma

Page 231

1  DNA.  Even though the technology has developed since
2  then, there is still cell lines that are used very
3  routinely or it's still very, very difficult to get
4  plasma DNA into them and it's not known why.  3T3L1
5  cells, for example, which is a fibroblast line that
6  can differentiate into adipocytes.  People still do
7  not get plasma DNA into those cells and they don't
8  understand why.  So I think it's fair to say in the
9  timeframe of 1983, '84, all bets were off and nobody
10  assumed anything in terms of whether a vertebrate
11  cell, outside of the few that I mentioned, and
12  perhaps a few more could readily take up DNA and
13  express it.
14     Q    In your opinion, would it have required
15  undue experimentation for one of ordinary skill in
16  1983, 1984 to have determined whether a vertebrate
17  cell was able to take up DNA, a plasmid, for
18  example?
19        MR. SUH:  Objection, lacks foundation,
20     vague.  Go ahead.
21        THE WITNESS:  The ability to ask if an
22     experiment works would have been relatively
23     easy.  If the experiment did not work in a
24     particular type of cell and one wanted to
25     develop conditions where it would work, it

Page 232

1  might be very, very difficult.  As I said,
2  techniques for introducing plasmids into DNA
3  have been developed over the last 20 years
4  with many significant improvements, but that's
5  been a time -- that's been a timeframe of 20
6  years where those technologies have -- have
7  developed and as I said, in some cases, there
8  are certain cell lines that still those
9  technologies don't even work.  So in terms of
10  my statement, a significant portion of
11  vertebrate or mammalian cells, again in the
12  timeframe of '83, '84 one could determine
13  whether it didn't work, but to actually
14  practice the claims may have required a very
15  large amount of experimentation if one wanted
16  to ensure that let's say an unknown or an
17  untried cell type needed to be used or wanted
18  to be used.
19  BY MR. FLOWERS:
20     Q    One of ordinary skill in 1983 or 1984
21  would have understood what cells fell within the
22  scope of the term vertebrate cells, correct?
23        MR. SUH:  Objection to form.
24        THE WITNESS:  Well, cells derived from
25     organisms having a backbone.

Page 233

1  BY MR. FLOWERS:
2     Q    One of ordinary skill would have
3  understood that in 1983?
4     A    Sure.
5     Q    And you agree that Dr. Lin did
6  adequately enable one of ordinary skill in 1983,
7  1984 to practice his inventions in CHO cells, for
8  example?
9        MR. SUH:  Objection to form.
10        THE WITNESS:  That's correct.
11  BY MR. FLOWERS:
12     Q    Are there any specific vertebrate cells
13  you could point to where you can also point to
14  evidence that one of ordinary skill in the art could
15  not have practiced Dr. Lin's claims in those cells?
16     A    Yes, I mentioned the 3T3L1 cell line,
17  the ones that can differentiate into adipocytes.
18  They grow very much like CHO cells do in culture.
19  There's no special requirements in terms of the
20  nutrients, yet no one would have been able to
21  practice those claims even today without using
22  special delivery vectors.  Would someone be able to
23  practice the claims as described by Dr. Lin?
24     Q    And was that known in 1983?
25     A    I believe it was.

59  (Pages 230 to 233)

Confidential                              R000059

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 234

1      Q    And was that known in 1983 for any
2   recombinant protein expression?
3          MR. SUH:  Objection, vague.
4          THE WITNESS:  My understanding of the
5      problem with -- so 3T3L1 cells are a very
6      popular cell to use for people that are
7      interested in adipogeneisis.  And so I think
8      -- I'm not sure exactly when they were
9      described.  But as I said, my understanding is
10     the problem is getting the DNA into the cells
11     and why they're refractory, no one knows.  So
12     if you can't get the DNA into the cells,
13     you're not going to get anything expressed in
14     those cells, anything recombinant.
15  BY MR. FLOWERS:
16     Q    I know we touched on this earlier
17  today, much earlier today.  I wanted to ask you in
18  Paragraph 28 where we were just looking in Exhibit
19  1, you refer to the ability to practice Dr. Lin's
20  inventions on any significant portion of vertebrate
21  or mammalian cells and so I'm trying find, what did
22  you mean by a significant portion?
23     A    As I -- as I said before in terms of
24  our discussion of the number of promoters, my
25  understanding of the claim in the patent language is

Page 235

1   for all vertebrate cells or vertebrate cells
2   compromising the entirety of vertebrates and in the
3   context of that language, my sense is that a few
4   cell lines or certainly two in his case, two or
5   three did not even come close to -- in fact, all he
6   used were mammalian cells and so to have the
7   languages brought as vertebrate cells when he only
8   uses mammalian cell lines seems too broad.  He
9   doesn't have an example of any non-mammalian cell
10  type where he gets productive expression.
11     Q    So in order to enable his claims in
12  '349 Patent is it your opinion that Dr. Lin had to
13  exemplify, have a working example of expression of
14  EPO, recombinant EPO in a non-mammalian cell line?
15     A    My understanding of the law, not being
16  a lawyer, is that if you want to claim mammalian
17  cells, then the examples he gave in mammalian cells
18  -- again, it was only two types, but that might
19  satisfy the written description.  The fact that the
20  claims specify vertebrate cells as opposed to
21  mammalian cells would tell me again through my
22  interpretation of the law that it has to go beyond
23  mammalian because vertebrates certainly encompass a
24  lot more species than just mammals and hence, the
25  broadness of that claim, which is very specific, I

Page 236

1   think, should have required Dr. Lin to practice it
2   outside of mammalian cells.
3      Q    If you assume for the purposes of the
4   enablement analysis that the standard is whether one
5   of ordinary skill in the art in 1983 or 1984 with
6   Dr. Lin's patent specification and its teachings in
7   hand could have selected an appropriate vertebrate
8   cell expression system to make recombinant EPO,
9   would that change your opinion?
10     A    It depends on what you mean by that.
11  When you say vertebrate cell, do you mean mammalian
12  cells or do you mean non-mammalian?
13     Q    It would include non-mammalian.
14     A    Dr. Lin did not provide any teaching
15  from what I can tell in terms of teaching someone
16  how to practice his claims in non-mammalian cells,
17  vertebrate cells that are non-mammalian and this is
18  tied to the issue at the time in 1983, '84 that it
19  was not assumed that cells were easy to transfect
20  with plasma DNA.  And so the idea that non-mammalian
21  cells would act similarly to mammalian cells would
22  have been an assumption at the time and there was no
23  teaching of the patent that would describe how to
24  overcome that potential problem.
25     Q    In your expert report, I didn't find

Page 237

1   any evidence cited that showed that a non-mammalian
2   vertebrate cell in some way is different from a
3   mammalian vertebrate cell in terms of how one goes
4   about transfecting DNA into the cell?
5          MR. SUH:  Objection to form, lacks
6      foundation.
7   BY MR. FLOWERS:
8      Q    Did you cite any such evidence?
9      A    I did not cite evidence.
10     Q    Is there a mechanistic difference
11  between mammalian cells and non-mammalian cells in
12  the way that the cell takes up transfected DNA?
13     A    I'm not aware of a study that's
14  compared the two.
15     Q    In terms of integration into the genome
16  of a cell, is there a mechanistic difference between
17  non-mammalian cells -- I think we need to take a
18  break to change the tape.
19          VIDEO OPERATOR:  This concludes tape
20     number six in the videotape deposition of
21     Dr. Thomas R. Kadesch on June 21, 2007.
22          The time is 4:17 p.m. and we're off the
23     record.
24          (Brief recess.)
25          VIDEO OPERATOR:  This begins tape

60  (Pages 234 to 237)

Confidential                                    R000060

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 238

1    number seven in the videotape deposition of
2    Dr. Thomas Kadesch on June 21, 2007.
3        The time is 4:42 p.m. and we're back on
4    the record.
5    BY MR. FLOWERS:
6    Q    Dr. Kadesch, I'll withdraw that partial
7    question I asked you before the break.
8        Do non-mammalian cells integrate DNA
9    into their genome in a fundamentally different way
10   than non-mammalian cells do?
11   A    I wouldn't say it would be
12   fundamentally different.
13   Q    Do non-mammalian cells carry out the
14   initiation of transcription in a fundamentally
15   different way than mammalian cells do?
16   A    It depends if you're talking about
17   vertebrate or non-vertebrate cells.
18   Q    Just -- good point.  All my questions
19   are about vertebrate cells.
20   A    Okay.
21   Q    So I'll try to be more precise.  Do
22   non-mammalian vertebrate cells carry out initiation
23   of transcription in a fundamentally different way
24   than mammalian cells?
25   A    Not that I'm aware of.

Page 239

1    Q    Do non-mammalian vertebrate cells carry
2    out transcription in a different -- fundamentally
3    different way than mammalian cells do?
4    A    Not that I'm aware of.
5    Q    Is there any aspect of the methods
6    required to practice Dr. Lin's '349 Patent Claim 7
7    that is fundamentally different in non-mammalian
8    vertebrate cells than in mammalian cells?
9        MR. SUH:  Objection, vague.
10       THE WITNESS:  If -- if one were to
11   answer that question in 1983, the answer might
12   be different than it would be in 2007.  In
13   1983, this was all highly speculative in terms
14   of how people defined promotors, how people
15   defined species' specificity.  There were
16   cases when the SV40 promoter, for example,
17   was compared in its activity to -- which is
18   SV40 promoter is basically primate -- a
19   primate virus compared to a mouse virus and
20   shown that depending upon whether you
21   expressed the promoter in a human versus a
22   mouse cell, it would change relative activity
23   relative to the mouse promoter.  So in that
24   timeframe, there was an appreciation for the
25   possibility that not only would there be

Page 240

1    differences between mammalian promoters and
2    how they functioned in terms of the details,
3    activity, et cetera, the notion that there
4    might be differences between mammalian cells
5    and, for example, chicken cells was considered
6    to be probably almost likely in that
7    timeframe.  So I think the issue here is in
8    the 1983, '84 timeframe there were many, many,
9    many unknowns.  The structure of promoters was
10   just being elucidated and the comparison
11   between, for example, mouse and human
12   promoters was just starting.  In hindsight,
13   looking back on this in 2007, I think it's
14   fair to say in answer to your previous set of
15   questions that there's turned out to be no
16   fundamental differences between what happens
17   in a chicken cell, for example, versus a mouse
18   cell.  And that the transcription factors that
19   regulate expression of genes and again, this
20   wasn't elucidated until the late eighties and
21   early nineties, were remarkably similar.  The
22   expectation in 1983 and '84, however, was
23   very, very different and the book was open and
24   unwritten in terms of what people would expect
25   to find.

Page 241

1    BY MR. FLOWERS:
2    Q    Are you aware of an example of a viral
3    promoter that is constitutively active in mammalian
4    cells, but is not active in non-mammalian vertebrate
5    cells?
6    A    Not that I'm aware.
7        MR. FLOWERS:  I'll ask the court
8    reporter to mark as Exhibit -- Kadesch Exhibit
9    12 a paper by Yanagi, et al published in DNA
10   in 1989 entitled Recombinant Human
11   Erythropoietin Produced by Namalwa,
12   N-A-M-A-L-W-A Cells.
13       (Article on Recombinant Human
14   Erythropoietin Produced by Namalwa Cells was
15   marked Kadesch-12 for identification.)
16   BY MR. FLOWERS:
17   Q    This is --
18       MR. FLOWERS:  Mr. Suh, this is a clean
19   copy of an article that has been produced in
20   this case bearing Bates numbers
21   AM-ITC-00298945 through 53 just for the
22   record.
23       MR. SUH:  Okay.  The copy that was
24   produced with those Bates numbers was not that
25   easy to read.

61 (Pages 238 to 241)

Confidential                                      R000061

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 242

1   BY MR. FLOWERS:
2       Q    Dr. Kadesch, have you ever seen this
3   document before?
4       A    No.
5       Q    So I take it that you weren't aware of
6   this publication when you rendered your opinions in
7   your expert reports?
8       A    That's correct.
9       Q    When you were working on your expert
10  reports in this case, did you search for any
11  publications in the scientific literature that
12  showed whether other groups had been successful in
13  expressing recombinant human EPO in vertebrate cells
14  other than Dr. Lin?
15      A    My recollection is that there was a --
16  I forget, it was a Boston group that published the
17  cloning of EPO around the same time.
18      Q    Did you do any independent literature
19  research to find if there were any other groups that
20  had successfully expressed recombinant human EPO in
21  vertebrate cells?
22      A    No.
23      Q    So in this paper, Yanagi, et al, they
24  described the use of Namalwa cells to express
25  recombinant human EPO, is that correct?

Page 243

1       A    That's correct.
2       Q    And what is a Namalwa cell?
3       A    It's a human B-lymphoblastoid cell
4   line.
5       Q    And if you look on the first page of
6   this, in the first sentence of the second column, it
7   says the technology of industrial skill culture of
8   this cell line has been well established.
9            Do you see that?
10      A    Wait, first column where?
11      Q    Second column, right-hand column, top,
12  the first full sentence.
13      A    Yes, I see it, uh-huh.
14      Q    And on the second page, if you turn to
15  the second page of this paper, top of the left-hand
16  column, Yanagi describes linking an SV40 promoter to
17  the DNA encoding EPO in a vector, correct?
18      A    Yes.
19      Q    And that's what Dr. Lin did in the '349
20  Patent, correct?
21      A    Essentially, yes.
22      Q    And if you look on the same page, a
23  little bit further down under assay for EPO, Yanagi
24  describes the use of in vitro, in vivo and RIA
25  assays to detect the erythropoietin expressed by his

Page 244

1   cells, correct?
2       A    Yes.
3       Q    Now, it's your opinion, as we've
4   discussed today, that units of EPO means units of
5   biological activity, correct?
6       A    That's correct.
7       Q    And that's the only meaning of the
8   term?
9       A    Yes.
10      Q    If you turn to Page 423 and if you look
11  at Figure 4 in the upper right-hand corner.  That's
12  entitled in vivo activity of urinary and recombinant
13  erythropoietins, correct?
14      A    Yes.
15      Q    And that -- the graph above expresses
16  the amounts of EPO in the samples in terms of units
17  of EPO, correct?
18      A    That's correct.
19      Q    If you look in the caption for Figure 4
20  on Page 423, the last sentence says:  The EPO unit
21  was standardized by radioimmunoassay.
22           Do you see that?
23      A    Yes, I do.
24      Q    So the Yanagi authors describe the
25  standardization of the units for EPO here as being

Page 245

1   carried out using a radioimmunoassay, correct?
2       A    That's correct.
3       Q    You can put this to the side actually.
4            Let me ask, is there any reason in your
5   mind why one of ordinary skill would have chosen
6   non-mammalian vertebrate cells to express
7   recombinant human EPO in 1983 or 1984?
8       A    No.
9       Q    For example, is there any reason why
10  one of ordinary skill in 1984 would have chosen to
11  express recombinant human EPO in a fish cell?
12      A    Not that I'm aware of.
13      Q    Have you ever tried to express a
14  protein in a fish cell?
15      A    No.
16      Q    In a reptile cell?
17      A    No.
18      Q    In an amphibian cell?
19      A    Yes.
20      Q    What kind of amphibian cell?
21      A    A frog oocyte.
22      Q    Have you ever tried to express a
23  recombinant protein in a cell line derived from an
24  amphibian?
25      A    No.

62  (Pages 242 to 245)

Confidential                                    R000062

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 246

1    Q    Any particular reason why you haven't
2  tried to express proteins in cell lines derived from
3  fish or reptiles or amphibians?
4    A    My work is restricted to mammalian
5  systems.
6    Q    That's a good reason.
7        In your expert reports, you offer
8  opinions about the meaning of the term capable of or
9  capable upon growth and culture of producing, for
10  example, correct?
11    A    Yes.
12    Q    Are you aware that Roche didn't ask the
13  Court to construe those terms involving capable of?
14        MR. SUH:  Objection, lacks foundation,
15  assumes facts not in evidence.
16        THE WITNESS:  I'm not aware of what
17  Roche did in terms of the language.
18  BY MR. FLOWERS:
19    Q    Did you ever inquire as to whether the
20  parties had sought construction of the terms,
21  capable of terms?
22    A    No.
23        MR. FLOWERS:  Let me just ask the court
24  reporter to mark as Kadesch Exhibit 13 a copy
25  of the '349 Patent.

Page 247

1        ('349 Patent was marked Kadesch-13 for
2  identification.)
3  BY MR. FLOWERS:
4    Q    What I'm interested in looking at,
5  Dr. Kadesch, are the claims.  So a couple pages from
6  the back.
7    A    Okay.
8    Q    Column 38, in particular, Claim 7 at
9  the bottom of that column.
10    A    Uh-huh.
11    Q    I know this has been reproduced several
12  places, a couple pages reproduced.  I thought we'd
13  look at the real deal in talking about it.
14        You're aware that Amgen is only
15  asserting Claim 7 against Roche, correct?
16    A    That's my understanding.
17    Q    And Amgen is not asserting infringement
18  of Claims 1 through 6 of the '349 Patent, you're
19  aware of that, correct?
20    A    To be very truthful, I get confused in
21  exactly the language that's used to describe exactly
22  what's being infringed because I find it difficult
23  to understand completely how one claim depends on
24  the other, quite frankly, and so I don't want to
25  answer your question other than the way I have.  I'm

Page 248

1  not aware that they're, you know, arguing Claims 1
2  through 6.  But inasmuch Claim 7 encompasses Claims
3  1 through 6, it may be a legal distinction.
4    Q    But you understand that Claim 7
5  incorporates the limitations of Claims 1 through 6?
6    A    Yes.
7    Q    And that in order to infringe Claim 7,
8  one would have to satisfy the limitations not only
9  expressly recited in Claim 7, but also the
10  limitations of any one of Claims 1 through 6,
11  correct?
12    A    That's my understanding.
13    Q    And so to the extent that you're
14  interpreting the language in any of Claims 1 through
15  6, you're interpreting the language for the purposes
16  of this case in the context of Claim 7?
17    A    I believe that's true.
18    Q    So in order to infringe Claim 7, any
19  cell that satisfies any Claims 1 through 6 has to be
20  used in the process for producing erythropoietin in
21  Claim 7, correct?
22    A    Say that again.  And can you possibly
23  say it more slowly.  I want to reiterate that
24  this -- I can speak in my language very quickly and
25  it may seem obvious to me and I think in the same

Page 249

1  way that attorneys have a way of describing patent
2  conditions in a way that seems obvious to them, but
3  the language is not as clear as it may seem to you.
4    Q    That's how we try to justify our
5  existence.
6    A    Exactly.
7    Q    In order to infringe Claim 7 --
8    A    Yeah.
9    Q    -- a cell that satisfies any of Claims
10  1 through 6 has to be used in the process for
11  producing erythropoietin that's recited in Claim 7?
12    A    Okay, yes.
13    Q    You would agree with that?
14    A    Uh-huh.
15    Q    So you would agree that in order to
16  infringe Claim 7 any cell that was capable of
17  carrying out the production of EPO as recited in any
18  of Claims 1 through 6 --
19    A    Yes.
20    Q    -- would have to do so in the process
21  of producing erythropoietin that's recited in Claim
22  7?
23        MR. SUH:  Objection to form.  Go ahead.
24        THE WITNESS:  I think that's correct.
25  BY MR. FLOWERS:

63 (Pages 246 to 249)

Confidential                                          R000063

Kadesch, Thomas R.                          6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 250

1      Q    I'll back up to an earlier topic here.
2  It's correct that the mouse beta globin promoter was
3  known in 1983, correct?
4      A    Its true characterization I don't think
5  was until 1984, possibly '85.  It was -- it was
6  roughly known, roughly mapped out in '83.
7      Q    And I'm going to ask you a series of
8  questions about a series of promotors.
9      A    Okay.
10     Q    And in the context of these questions,
11 when I say it was -- when I say it was known, I'm
12 asking whether it was known or characterized
13 sufficiently that it could be used to express a
14 protein in a cell, it could be used in a recombinant
15 construct.
16     A    Okay.
17     Q    So its location, a fragment of DNA
18 containing the promoter was known --
19     A    Okay.
20     Q    -- by 1984.
21     A    Okay.
22     Q    That's what I'm asking.
23     A    Okay.
24     Q    So the human Interferon promoter was
25 known in that way by 1984, correct?

Page 251

1      A    Yes.
2      Q    And the mouse metallothionein promoter
3  was known in that respect by 1984, correct?
4      A    Yes.
5      Q    And the mouse immunoglobulin heavy
6  chain enhancer was known in that respect by 1984?
7      A    Bear in mind that that's not a
8  promoter.
9      Q    But it was known in that respect,
10 correct?
11     A    Yes.
12     Q    The Hepatitis B gene S promoter was
13 known by 1984?
14     A    I don't know.
15     Q    The polyoma virus promotors were known
16 by 1984?
17     A    That's correct.
18     Q    The herpes simplex virus thymidine
19 kinase gene promoter was known by 1984, correct?
20     A    Yes.
21     Q    The Maloney sarcoma virus promoter was
22 known by 1984?
23     A    That's correct.
24     Q    The mouse mammary tumor virus promoter
25 was known by 1984?

Page 252

1      A    That's correct.
2      Q    The adeno virus E2 promoter was known
3  by 1984, correct?
4      A    Probably.
5      Q    Promoters from the Harvey sarcoma virus
6  were known by 1984, correct?
7      A    I believe so.  Probably again.
8      Q    And promoters from the Ralph sarcoma
9  virus were known by 1984, correct?
10     A    Yes.
11          MR. FLOWERS:  I'll ask the court
12 reporter to mark as Exhibit 13 --
13          MR. SUH:  14.
14          MR. FLOWERS:  As Exhibit 14 a paper by
15 Cornelia Gorman and her co-authors published
16 in the proceedings of the National Academy of
17 Science in 1982.
18          (Paper - The Rouse sarcoma virus long
19 terminal repeat is a strong promoter when
20 introduced into a variety of eukaryotic cells
21 by DNA-mediated transfection, AM-ITC-00980021
22 - AM-ITC-00980025 was marked Kadesch-14 for
23 identification.)
24 BY MR. FLOWERS:
25     Q    Dr. Kadesch, have you ever seen this

Page 253

1  paper before?
2      A    Yes, I have actually.
3      Q    And do you recall when was the last
4  time you saw it?
5      A    Probably around 1983.
6      Q    And is there a reason why you remember
7  in particular having seen this paper?
8      A    Because I was attuned to publications
9  on promoters and this one I remember.  Because I
10 knew Bruce Howard personally.
11     Q    This paper describes the ability of the
12 Rous sarcoma virus promoter to promote initiation of
13 transcription in a variety of eukaryotic cells,
14 correct?
15     A    That's correct.
16     Q    For example, in the abstract, if you
17 look down the sixth line, there's a sentence that
18 says we find that the LTR directs relatively high
19 levels of CAT synthesis within 48 hours after
20 calcium, phosphate, mediated introduction of this
21 plasmid into CV1 monkey kidney cells, chicken embryo
22 fibroblasts, Chinese hamster ovary cells, HeLa cells
23 or mouse NIH/3T3 cells.
24          Do you see that?
25     A    That's correct.

64  (Pages 250 to 253)

Confidential                                R000064

Kadesch, Thomas R.                                          6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 254

1    Q    And the Rouse sarcoma virus LTR
2 promoter drives transcription in all of those
3 different kind of human monkey, hamster, mouse and
4 chicken cells, correct?
5    A    That's correct.
6    Q    Are you aware of any vertebrate cell in
7 which the Rous sarcoma virus promoter does not drive
8 transcription?
9    A    I'm not aware, no.
10    Q    So a couple of sentences after the --
11 well, actually the next sentence after the one I
12 just read says the level of CAT synthesis is
13 three-fold higher in CV-1 cells and up to ten-fold
14 higher in HeLa and mouse NIH/3T3 cells and then
15 after transfection with a related vector PSV2 CAT
16 carrying CAT sequences under control of the SV40
17 early promoter.
18        Do you see that?
19    A    That's correct.
20    Q    So by 1983, 1984, it was known that the
21 SV40 promoter drives transcription in human and
22 monkey and hamster and mouse and chicken cells,
23 correct?
24    A    That's correct.
25    Q    Are you aware of any vertebrate cell in

Page 255

1 which the SV40 promoter does not drive
2 transcription?
3    A    No.
4    Q    You can put that to the side.
5        MR. FLOWERS: I'll ask the court
6 reporter to mark as Exhibit 15 a paper by
7 Julian Banerji and Walter Schaffner published
8 in Cell in 1981 entitled Expression of a Beta
9 Globin Gene Is Enhanced by Remote SV40 DNA
10 Sequences.
11        (Paper - Expression of a Beta Globin
12        Gene Is Enhanced by Remote SV40 DNA Sequences
13        was marked Kadesch-15 for identification.)
14 BY MR. FLOWERS:
15    Q    Dr. Kadesch, you've been handed Exhibit
16 15, a copy of the 1981 paper by Banerji, et al from
17 the journal Cell.
18    A    Yes.
19    Q    Have you seen this reference before?
20    A    Yes, I have.
21    Q    And do you recall when was the last
22 time you saw it?
23    A    Probably 1982.
24    Q    Did you consider this reference in
25 developing the opinions expressed in your expert

Page 256

1 reports?
2    A    Yes, I did.
3    Q    And which opinions -- I'm sorry, for
4 which opinions did you consider this paper?
5    A    In response to Lodish's use of the beta
6 globin promoter as an example of a promoter that can
7 drive expression and my response and I think my last
8 report was that it required a strong enhancer --
9    Q    Okay.
10    A    -- to be expressed.
11    Q    And so I think I asked you before
12 whether it was known in 1983 that the beta globin
13 promoter requires that enhancer sequence. Is this
14 the paper that establishes that?
15    A    Absolutely.
16    Q    And this Banerji, et al paper also
17 establishes that the SV40 enhancer can enhance
18 transcription of genes in HeLa cells, correct?
19        MR. SUH: Objection.
20        THE WITNESS: I forget what kind of
21    cells they use, but I'm sure --
22 BY MR. FLOWERS:
23    Q    The second column under Results.
24    A    Well, I was going to look at the
25 Materials and Methods.

Page 257

1    Q    Okay.
2    A    Yeah, HeLa cells.
3    Q    If you look on Page 305 of this paper.
4    A    Uh-huh.
5    Q    The first -- left-hand column, bottom,
6 it talks about the polyoma virus containing a
7 functional counterpart to the SV40 72 base power
8 repeat.
9    A    Yes.
10    Q    And indicates that these authors found
11 that it enhances rapid beta-globin gene expansion,
12 correct?
13    A    Yeah, unpublished data.
14    Q    By 1984 was it known that the polyoma
15 virus sequence also acted as an enhancer for the
16 beta-globin gene promoter?
17    A    Yes.
18        MR. FLOWERS: Let me ask the court
19 reporter to mark as Exhibit 16 --
20        MR. SUH: 16.
21        MR. FLOWERS: Thank you -- a document
22 entitled Rule 26(A)(2) Rebuttal Report of
23 Thomas R. Kadesch, Ph.D.
24        (Rule 26(A)(2) Rebuttal Report of
25 Thomas R. Kadesch, Ph.D. was marked Kadesch-16

65  (Pages 254 to 257)

Confidential                                          R000065

Kadesch, Thomas R.                                6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 258

1  for identification.)
2      MR. FLOWERS:  And as Exhibit 17, a U.S.
3  Patent No. 6,410,516 issued to the inventors
4  David Baltimore and a cast of characters.
5      (U.S. Patent No. 6,410,516 was marked
6  Kadesch-17 for identification.)
7  BY MR. FLOWERS:
8      Q    Dr. Kadesch, you've been handed the
9  document that's been marked as 16, Kadesch-16.  Can
10 you tell me what that is?
11     A    This was something that I generated in
12 response to the litigation we were talking about
13 earlier, namely Ariad -- between Ariad and Eli
14 Lilly.
15     Q    So this is an expert report that you
16 submitted in that case?
17     A    Yes.
18     Q    And on Page 37 of Exhibit 16, it bears
19 your signature and a date of October 21, 2005.
20     A    Yes.
21     Q    Did you sign that to indicate that you
22 agreed with everything in the document?
23     A    Yes.
24     Q    Do you have any reason to believe that
25 your opinions have changed from what they were in

Page 259

1  this document?
2      A    I don't know.
3      Q    In this expert report you offered
4  opinions about the validity of Exhibit 17, the '516
5  patent to Baltimore, correct?
6      A    That's correct.
7      Q    And in this Exhibit 16 you refer to the
8  inventors on the '516 patent as the Baltimore
9  inventors, correct?
10     A    Maybe.  I don't recall firsthand.
11     Q    If you look at Paragraph 10, which is
12 on Page 3 at the bottom.
13     A    Okay.
14     Q    Right in the middle of the paragraph,
15 the named inventors of the '516 patent, Baltimore
16 inventors.
17     A    Okay.
18     Q    Just so you know what terms I'm using.
19     A    That's fine.
20     Q    The '516 patent relates to NF Kappa B,
21 correct?
22         MR. SUH:  Objection, lacks foundation.
23         THE WITNESS:  That's correct.
24 BY MR. FLOWERS:
25     Q    And does NF Kappa B -- well, let me ask

Page 260

1  you, what is NF Kappa B briefly?
2      A    NF Kappa B is a transcription factor
3  that was initially identified as capable of
4  activating the human A-globulin light chain
5  expression.
6      Q    Does NF Kappa B exist in all eucaryotic
7  cells?
8      A    The -- it's understood that NF Kappa B
9  exists.  It was initially defined as a DNA binding
10 activity.  As a DNA binding activity, it doesn't
11 exist in all cells, but the proteins that comprise
12 the active form do.
13     Q    So I just want to make sure we're
14 clear, I was asking whether it exists in all
15 eucaryotic cells?
16     A    No, it does not.
17     Q    In the '516 Patent, Exhibit 17.
18     A    Yeah.
19     Q    How many eucaryotic cells did the
20 Baltimore inventors describe as containing NF Kappa
21 B protein?
22     A    I don't remember.
23     Q    Let me ask you this, are the NF Kappa B
24 proteins in eucaryotic cells all the same?
25     A    I will try to clarify this and make

Page 261

1  maybe this line of questioning easier.  NF Kappa B
2  does not exist in yeast.  Yeast is a type of
3  eucaryotic cell.
4      Q    Does NF Kappa B protein exist in insect
5  cells?
6      A    I don't know.
7      Q    What about in plants?
8      A    I'm sorry, may I back up?
9      Q    Sure.
10     A    A protein that's similar to NF Kappa B
11 exists in insect cells.  There are some differences
12 in terms of how its regulated.  With respect to
13 plant cells, I'm not certain.
14     Q    Does NF Kappa B exist in reptilian
15 cells?
16     A    I think it does.
17     Q    Would you be considered an expert on NF
18 Kappa B?
19     A    Yes.
20     Q    Does NF Kappa B exist in mollusks?
21     A    I don't know.
22     Q    I don't either.  Does NF Kappa B exist
23 in arachnid cells?
24     A    I don't know.
25     Q    Does it exist in bird cells?

66 (Pages 258 to 261)

Kadesch, Thomas R.                                6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 262

1    A    Yes.
2    Q    Does it exist in amphibian cells?
3    A    I think so.
4    Q    And last but not least, does it exist
5    in mammalian cells?
6    A    Yes.
7    Q    What types of genes do the NF Kappa B
8    proteins regulate in eucaryotic cells?
9    A    They regulate a whole host of genes.
10   There's no type of genes.
11   Q    So can you say how many genes are
12   regulated by NF Kappa B?
13   A    The experiment hasn't been done.
14   Q    As an expert on NF Kappa B, can you
15   estimate?
16   A    No.
17   Q    Just in terms of background, what are
18   eucaryotic cells?
19   A    What are eucaryotic cells, eucaryotic
20   cells are cells that -- eucaryotic cells are
21   distinguished from procaryotic cells in the sense
22   that they typically contain a nucleus and a
23   mitochondrion.
24   Q    Do -- does the eucaryotic kingdom
25   encompass mammals, reptiles, insects, plants,

Page 263

1    mollusks, arachnids and birds?
2    A    Yes.
3    Q    Does the NF Kappa B protein or do the
4    NF Kappa B proteins regulate a large number of
5    genes? You said a whole host.
6    A    Yes, a large number, yeah.
7    Q    A large number of different types of
8    genes?
9    A    Yes.
10   Q    And a large number of different types
11   of cells?
12   A    Yes.
13   Q    Do you know how many of those genes are
14   described in the '516 Patent, the Baltimore patent?
15   A    I believe there are maybe, I forget, as
16   I recall, there's a -- I believe it's Table 2 in
17   that patent. I may be right, I might be wrong.
18   Where they give examples of NF Kappa B regulatory
19   elements in a number of different genes.
20        MR. SUH: You've got a good memory.
21        THE WITNESS: Is it Table 2?
22        MR. SUH: I think so.
23   BY MR. FLOWERS:
24   Q    I'm sorry, where is it?
25        MR. SUH: Column 37.

Page 264

1        THE WITNESS: Shall we say I had
2    nightmares about Table 2 and it's forever
3    etched in my memory? Yes, Table 2, Column 37.
4    BY MR. FLOWERS:
5    Q    And the examples of the genes regulated
6    by NF Kappa B here are from humans, yes?
7    A    No. Some are mouse.
8    Q    I didn't mean exclusively. Includes
9    human?
10   A    Yes.
11   Q    And mouse?
12   A    Yes.
13   Q    And viral genes?
14   A    I think so, yeah, CMV. C, M as in man,
15   V as in virus.
16   Q    Any other kinds of genes other than
17   human mouse and viral genes disclosed here?
18   A    No.
19   Q    If you go back to your expert report,
20   Exhibit 16 and you look at Paragraph 88, you offered
21   an opinion that the '516 Patent, the Baltimore
22   patent provided a sufficient written description of
23   the claimed inventions to establish that the
24   Baltimore inventors were in possession of the full
25   scope of their invention, correct?

Page 265

1    A    That's what I say here, yes.
2    Q    And the claims that you are opining on
3    in the '516 Patent, they begin in Column 82 and go
4    all the way through Column 90 of the '516 Patent?
5    A    Yes.
6    Q    For example, Claim 1 is directed to or
7    encompasses all eucaryotic cells, correct?
8    A    Yes.
9    Q    And Claim 6, for example, is just
10   directed to cells?
11        MR. SUH: Objection, vague.
12   BY MR. FLOWERS:
13   Q    Correct?
14   A    Yes.
15   Q    It's not limited in any way, just
16   cells?
17   A    That's correct.
18   Q    And because it's not limited in any
19   way, it encompasses all cells in the animal kingdom?
20        MR. SUH: Objection to form.
21   BY MR. FLOWERS:
22   Q    Correct?
23   A    Yeah.
24   Q    And that would be millions and millions
25   and millions of different types of cells?

67  (Pages 262 to 265)

Kadesch, Thomas R.                                6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 266

1    A    That's correct.
2    Q    And even Claim 1 in being limited to
3 the eucaryotic cells, that would be millions and
4 millions of cells?
5    A    That's correct.
6    Q    How many different types of eucaryotic
7 cells are there, any idea?
8    A    No.
9    Q    But you would agree -- I think you just
10 did, at least millions of types of cells?
11   A    Sure.
12   Q    In terms of eucaryotic organisms, there
13 are at least several million different species,
14 correct?
15   A    Terrific.
16   Q    And can you tell me, we looked at the
17 genes that are disclosed as being regulated by NF
18 Kappa B in the '516 Patent, that's at Table 2 at
19 Column 37, can you tell me how many eucaryotic cells
20 the '516 Patent describes as -- describes that one
21 can carry out the invention?
22   A    I don't remember.
23   Q    Would you agree that it's a fairly
24 small number of cells, on the order of a dozen or
25 so?

Page 267

1         MR. SUH:  Objection, form, vague.
2         THE WITNESS:  If I went back and looked
3    at the patent, I would not be surprised if it
4    were in that range.
5 BY MR. FLOWERS:
6    Q    So a handful of cells, correct?
7    A    Yeah.  If you have 12 fingers on each
8 hand.
9    Q    So in Exhibit 16, particularly in
10 Paragraph 88, which is on Page 28.
11   A    Yes.
12   Q    You offer the opinion that the
13 description in the '516 Patent, which I think we've
14 agreed discloses the use of the invention in a
15 handful of genes or for a handful of genes and a
16 handful of cells clearly allowed one of ordinary
17 skill in the art to recognize that the Baltimore
18 inventors invented what is claimed and that includes
19 -- what is claimed would include the practice of the
20 inventions and millions upon millions, in fact, all
21 cells in the animal kingdom, correct?
22        MR. SUH:  Objection to form, lacks
23 foundation.
24        THE WITNESS:  That's correct.
25 BY MR. FLOWERS:

Page 268

1    Q    And in fact, Claim 6 of the '516
2 includes not only cells in the animal kingdom, but
3 all living cells, correct, which would include
4 bacteria and plants?
5    A    It is my current understanding of what
6 that claim would involve.
7    Q    And so it was your opinion based on the
8 handful of genes and cells in the '516 Patent there
9 was adequate written description for practice of the
10 inventions in the '516 Patent in all living cells?
11        MR. SUH:  Same objection.
12 BY MR. FLOWERS:
13   Q    Correct?
14   A    I didn't consider that issue
15 specifically when I opined here in this document
16 from the Ariad/Lilly case.
17   Q    But you understood that what was being
18 claimed in the '516 Patent were methods for
19 practicing the inventions in all cells, all living
20 cells?
21   A    This is something that I did not
22 consider.  This aspect of the case I did not
23 consider when I wrote this opinion for the Ariad
24 case.
25   Q    You at least considered, for example,

Page 269

1 with regard to Claim 1 in the '516 Patent that the
2 claims were directed to the practice of the method
3 in all eucaryotic cells, correct?
4    A    I did not consider it to be all
5 eucaryotic cells.  As the claim was written, it just
6 says eucaryotic cells.  It doesn't say all
7 eucaryotic cells.  So my understanding of -- my
8 understanding of written description for the '516
9 Patent was not from the point of view of someone
10 with legal expertise where I would interpret those
11 claims the way I interpret the claims for the
12 current patent, the '349 Patent.  And the reason for
13 that is that in terms of claim language, shall we
14 say I've come to understand the necessity for claim
15 language in a way that I didn't appreciate with the
16 '516 Patent.  If I had been asked the same series of
17 questions around the '516 Patent, I would have said
18 that the '516 Patent, as it's stated, cannot claim
19 all cells.
20   Q    And cannot claim all eucaryotic cells?
21   A    That's correct.
22   Q    So there's not an adequate written
23 description in the '516 Patent to support the claims
24 that are drawn to all eucaryotic cells?
25        MR. SUH:  Objection.

                                    68  (Pages 266 to 269)

Confidential                                    R000068

Page 270

1    THE WITNESS:  That would have been my
2  conclusion if I were to compare these two
3  documents at the same time, yes.
4  BY MR. FLOWERS:
5    Q    Your report and the '516 Patent, those
6  two documents?
7    A    Yes.  No, no, the claims in the '349
8  Patent as compared to the claims in the '516 Patent.
9  Shall I elaborate?
10    Q    I just want to make sure I understand.
11  As you sit here today, do you agree that the '516
12  Patent claims have adequate written descriptive
13  support?
14    A    For --
15    Q    For all eucaryotic cells?
16    A    No.
17    Q    As you sit here today, do you believe
18  that the '516 Patent claims have adequate written
19  descriptive support for -- strike that.
20    MR. FLOWERS:  Let's take a break and
21  we'll see if we can't finish up.
22    MR. SUH:  Actually, before we go off
23  the record, I'm going to object to the whole
24  line of questioning with respect to the '516
25  Patent, as well as to the expert report

Page 271

1  submitted in the Ariad versus Eli Lilly case
2  as being outside the scope of the expert
3  report submitted in this case.  So I'll just
4  mark that as a record.
5    VIDEO OPERATOR:  This concludes tape
6  number seven in the videotape of Dr. Thomas
7  Kadesch on June 21, 2007.
8    The time is 5:16 p.m. and we are off
9  the record.
10    (Brief recess.)
11    VIDEO OPERATOR:  This begins tape
12  number eight in the videotape of Dr. Thomas R.
13  Kadesch on June 21, 2007.
14    The time is 5:21 and we're back on the
15  record.
16    MR. FLOWERS:  Dr. Kadesch, Amgen has no
17  further questions for you at this time.  I
18  thank you for your time.
19    THE WITNESS:  Oh, thank you.
20    MR. SUH:  Actually, Roche has a few
21  questions.
22  BY MR. SUH:
23    Q    Dr. Kadesch, my name is Howard Suh.  I
24  introduced myself on the record earlier and I
25  represent the Roche entities as Defendants.

Page 272

1    Dr. Kadesch, can you please take out
2  Exhibit 5, which Amgen's counsel marked as the Cotes
3  article, Immunoreactive erythropoietin in serum.
4    A    Yes.
5    Q    And specifically, I want to direct your
6  attention to Page 437 of this publication.
7    A    Okay.
8    Q    On Page 437, right above the
9  acknowledgements, there's a last paragraph.  It says
10  in conclusion.
11    Do you see that?
12    A    In -- yes.
13    Q    And about a few lines down there's a
14  sentence that starts with bioassays and
15  immunoassays.
16    Do you see that?
17    A    Yes.
18    Q    That states:  Bioassays and
19  immunoassays respectively reflect functional and
20  structural characteristics of erythropoietin and
21  estimates by these two different types of system are
22  unlikely to be identical.  For example, precursors
23  and degradation products of erythropoietin as well
24  as the native serum hormone, which is itself almost
25  certainly heterogeneous may react in a

Page 273

1  radioimmunoassay.
2    Do you see that?
3    A    I do see that.
4    Q    Can you explain to me what the author
5  is referring to there?
6    A    Well, as I said throughout the day,
7  that the bioassay is a -- an assay for functional
8  erythropoietin, whereas the radioimmunoassay picks
9  up the presence of the protein, but not necessarily
10  an active protein or a full-length protein as I've
11  described earlier today.
12    Q    So, Doctor, does Exhibit 5, which Amgen
13  marked as the Cotes article, is that particular
14  statement within Exhibit 5 consistent with your view
15  that and RIA can pick up say, for example, fragments
16  of erythropoietin?
17    A    Yes.
18    Q    And that's a hypothesis that you have,
19  right?
20    A    That's correct.
21    Q    And it's a hypothesis that's also
22  shared by Cotes, et al, in Exhibit 5?
23    MR. FLOWERS:  Objection, lacks
24  foundation.
25    THE WITNESS:  It's not Cotes et al,

69 (Pages 270 to 273)

Confidential                                    R000069

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 274

1     it's just Cotes.
2  BY MR. SUH:
3     Q    Cotes?
4     A    Yes.
5     Q    And why don't we go in order.  Why
6  don't we look at Exhibit 6, which is the article in
7  the Blood publication.  I think this one is authored
8  by Sherwood and Goldwasser.
9     A    Yes.
10    Q    Mr. Flowers asked you a series of
11 questions with respect to the RIA results in this
12 publication.
13         Do you recall that?
14    A    Yes.
15    Q    I want to direct your attention to Page
16 892 of this publication.
17    A    Yes.
18    Q    There's a paragraph -- about the second
19 full paragraph.  It starts with intact.
20         Do you see that?
21    A    Yes, I do.
22    Q    I'll read it into the record.  It says:
23 Intact biologic activity of EPO is not necessary for
24 its immunologic activity, substitution of iodine on
25 the tyrosine residues of EPO by means of the Iodogen

Page 275

1  method, or on the free amino groups by the
2  Bolton-Hunter method, results in loss of
3  biological -- biologic activity (unpublished data);
4  the displacement curves found with these two
5  differently labeled EPO preparations, however, are
6  parallel and show essentially identical 50 percent
7  displacement points, Figure 3.
8         Do you see that?
9     A    I do see that.
10    Q    Can you explain to me what the
11 significance of that paragraph is?
12    A    Well, I think if you just look at the
13 topic sentence, the intact biologic activity of EPO
14 is not necessary for its immunologic activity.  So
15 again, immunologic activity in this case is the
16 radioactivity based on radioimmunoassay, whereas,
17 what they're saying is the intact biological
18 activity of EPO is not necessary for that to show
19 positive.  And then they go on to say when they
20 modify EPO, they get slightly different amounts of
21 activity so that what they're doing is they're
22 modifying EPO for an RIA and that itself can affect
23 the overall biologic activity.
24    Q    So is this also consistent with your
25 view that an RIA cannot distinguish between

Page 276

1  erythropoietin that is biologically active and EPO
2  that is not biologically active?
3     A    Yes, it is.
4     Q    And actually if you stay with that
5  paragraph, the next paragraph also says, excuse me,
6  I have a cold, similarly, removal of sialic acid
7  residues does not alter the immunoreactivity of EPO.
8  This was shown by Garcia and by our finding that the
9  displacement curve for asialoepo is parallel to that
10 found for the native hormone, Figure 6.
11         Do you see that?
12    A    Yes, I do.
13    Q    Do you have an understanding of the
14 removal of sialic acid when using erythropoietin
15 biologically inactive?
16    A    That's my understanding, yes.
17    Q    So what is the significance of that
18 particular statement?
19    A    Well, the fact that you can remove
20 sugars and you do not alter the readout of an RIA,
21 but you dramatically inhibit the readout in a
22 bioassay.
23    Q    And with respect to that prior sentence
24 I just read into the record, the reference to
25 Garcia, do you see it has a Footnote 7?

Page 277

1     A    Yes.
2     Q    And if we look at the references on the
3  next page, it makes reference to a Garcia 1972
4  publication, correct?
5     A    That's correct.
6     Q    And Doctor, sticking with Exhibit 6, if
7  you look at Table 3, which is on Page 891, I believe
8  Mr. Flowers asked you a series of questions with
9  respect to this table, but do you see how in this
10 particular table the in vivo assay data, at least
11 with respect to PHA 2, PHA3, PHA5, PHA6, Alcohol 2,
12 Alcohol 3 is different, is lower than the results
13 for RIA?
14         MR. FLOWERS:  Objection, leading.
15         THE WITNESS:  That's true for Alcohol
16    2, but not Alcohol 3.  It's true for PHA2
17    through 6 and Alcohol 2, but does not appear
18    to be the case significantly for Alcohol 3.
19 BY MR. SUH:
20    Q    You're absolutely right and I stand
21 corrected.  Do you have an understanding as to why
22 there could be a discrepancy between the in vivo
23 assay versus the RIA with respect to these results?
24    A    I think it's stated in the previous
25 exhibit that the RIA is able to pick up fragments or

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 278

1  degradation I think was the proper term.
2      Q    Let's move onto the next exhibit that
3  Mr. Flowers marked, Exhibit 7, which is the Garcia,
4  Sherwood, Goldwasser publication on blood cells.
5          Do you have that in front of you,
6  Doctor?
7      A    I do.
8      Q    And just sticking with the abstract.
9  About six lines from the bottom there's a sentence
10 which starts Sera from anemic individuals.
11         Do you see that?
12     A    Yes.
13     Q    It says Sera from anemic individuals
14 not only give rise to high radioimmunoassay values,
15 but also show a parallel relationship with the
16 erythropoietin standard when halving -- halving as
17 in half, dilutions or analyzed and then it says
18 desialated erythropoietin is also activated with the
19 same parallelism.
20         Do you see that?
21     A    Yes, I do.
22     Q    Do you have an understanding of what
23 the significance of what desialated erythropoietin
24 is also being reactive is?
25     A    Again, that's exactly what we stated

Page 279

1  earlier, namely, the desialated protein can be
2  monitored in a radioimmunoassay, but my
3  understanding is that the desialated erythropoietin
4  is not active in a bioassay.
5      Q    Okay and if we can go to Page 411 in
6  this particular publication.
7      A    Yes.
8      Q    Right above the results sections, the
9  article states: We have also noted that desialated
10 erythropoietin reacts with anti-erythropoietin with
11 the same avidity as does intact erythropoietin.
12 This observation was also true in an earlier
13 radioimmunoassay attempt.
14         Do you see that?
15     A    I do see that.
16     Q    And it has a reference to number two
17 and do you see how number two under the references
18 relates to a Garcia 1972 publication?
19     A    Yes, I do.
20     Q    With respect to this particular
21 statement I just read into the record, is this
22 consistent with your opinion that an RIA will detect
23 material that is less than the full intact
24 erythropoietin?
25         MR. FLOWERS:  Objection, leading.

Page 280

1          THE WITNESS:  I wouldn't use that
2  phrase.  I would say it's -- I'm sorry, could
3  you repeat the question?
4  BY MR. SUH:
5      Q    Yeah, is it consistent with your
6  opinion that an RIA will detect material that is
7  less than -- let's see the word here, less than the
8  full intact erythropoietin?
9          MR. FLOWERS:  Objection, leading.
10         THE WITNESS:  Less than in terms of
11 biological activity, yes.
12 BY MR. SUH:
13     Q    On Page 414 of this Garcia article, the
14 last paragraph, it states:  The removal of all the
15 problems that existed with the previous
16 erythropoietin radioimmunoassay has been
17 accomplished with only one essential change, i.e.
18 the use of pure erythropoietin for the labeled
19 reactant.  The anti-erythropoietin antiserum used
20 throughout the work with both radioimmunoassays has
21 remained unchanged.  One cannot leave these data,
22 however, without speculating on the reasons for the
23 differences observed.  The high values previously
24 seen in the serum from anephric patients were
25 probably due to certain non-erythropoietin materials

Page 281

1  which exist in high concentration and to the
2  presence of similarly labeled contaminants which had
3  not been removed by the procedure employed.
4          Do you see that?
5      A    I do.
6      Q    Does that indicate to you that at least
7  the authors of this particular publication, Garcia,
8  Sherwood and Goldwasser were hypothesizing that the
9  radioimmunoassay was picking up things that were not
10 necessarily erythropoietin?
11         MR. FLOWERS:  Objection, leading.
12         THE WITNESS:  I'm not sure what that
13 paragraph means.  I'd have to -- as I said
14 earlier, I have not read this paper, and so I
15 don't want to take something out of the -- in
16 the discussion out of context and so I'd have
17 to really look at the data to see exactly what
18 they're referring to.
19 BY MR. SUH:
20     Q    Sure.  Dr. Kadesch, do you recall
21 earlier today Mr. Flowers was asking you about
22 whether you had seen any evidence with respect to
23 whether denatured erythropoietin could be detected
24 by radioimmunoassay?
25     A    Yes, I remember that.

71 (Pages 278 to 281)

Confidential                                    R000071

Kadesch, Thomas R.                                          6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 282

1    Q    I want to direct your attention to
2  what's been marked as Exhibit 4, your second
3  supplemental exhibit -- second supplemental expert
4  report.
5    A    Yes.
6    Q    And in particular, if I could direct
7  your attention to Paragraph 36.
8    A    Okay.
9    Q    Can you take some time to review
10 Paragraph 36 and Paragraph 37 for me?
11   A    36 is referring to denatured
12 erythropoietin and Paragraph 37 refers to again
13 denatured erythropoietin.
14   Q    And at least with respect to testimony
15 that Amgen's expert -- I'm sorry, Amgen's employee,
16 Dr. Elliott stated, did he not testify that there
17 was a particular erythropoietin antibody that was
18 detecting denatured erythropoietin?
19        MR. FLOWERS:  Objection, leading.
20        THE WITNESS:  The testimony would
21     suggest that he does describe exactly that.
22 BY MR. SUH:
23   Q    And moreover, in Paragraph 37, do you
24 see that there is a discussion of an Elliott
25 publication called Isolation and Characterization of

Page 283

1  Confirmation Sensitive Antierythropoietin Monoclonal
2  Antibodies.
3        Do you see that?
4    A    Yes, I do see that.
5    Q    Does that suggest to you that this same
6  9G8A antibody was being used in RIA to detect
7  denatured erythropoietin?
8        MR. FLOWERS:  Objection, leading.
9        THE WITNESS:  Yes, I see that.  I would
10     conclude that, yes.
11        MR. SUH:  I have no further questions
12     at this time, but I'd like to actually mark
13     the transcript outside counsel's eyes only to
14     the extent that Amgen counsel has actually
15     raised issues with respect to the -- issues
16     with respect to the Ariad patent.  I believe
17     that patent actually is in litigation
18     currently with Amgen.  So therefore, I am
19     going to mark it -- mark this deposition
20     outside eyes only.
21        MR. FLOWERS:  We object to that
22     designation.  There's no basis for it.  The
23     patent that was marked as an exhibit and the
24     testimony that was given was based on publicly
25     available documents.

Page 284

1        MR. SUH:  Sure.  That's fine.
2        MR. FLOWERS:  Amgen has no questions at
3  this time.
4        VIDEO OPERATOR:  This concludes tape
5  number 8.  It also concludes Volume 1 of the
6  videotape deposition of Dr. Thomas R. Kadesch
7  on June 21, 2007 in the matter of Amgen, Inc.,
8  Plaintiff versus F. Hoffmann-La Roche,
9  Limited, et al., Defendants, Index No.
10 05-12237.
11        The time is 5:39 p.m. and we're off the
12 record.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 285

1        J U R A T
2
3    I, DR. THOMAS R. KADESCH, the witness herein, the
4  foregoing testimony of the pages of this deposition,
5  do hereby certify it to be a true and correct
6  transcript, subject to the corrections, if any, shown
7  on the attached page.
8
9
10        DR. THOMAS R. KADESCH
11
12
13
14
15 Subscribed and Sworn to before me
16 this _____ day of    2007.
17
18 Notary Public
19
20
21
22
23
24
25

72  (Pages 282 to 285)

Confidential                                          R000072

Kadesch, Thomas R.                                    6/21/2007
CONFIDENTIAL -- OUTSIDE COUNSEL'S EYES ONLY

Page 286

```
1   STATE OF        )
2   COUNTY OF       )
3       I wish to make the following changes, for
4   the following reason:
5   PAGE   LINE
6   ____  ____   CHANGE: _____
7   ____  ____   REASON: _____
8   ____  ____   CHANGE: _____
9   ____  ____   REASON: _____
10  ____  ____   CHANGE: _____
11  ____  ____   REASON: _____
12  ____  ____   CHANGE: _____
13  ____  ____   REASON: _____
14  ____  ____   CHANGE: _____
15  ____  ____   REASON: _____
16  ____  ____   CHANGE: _____
17  ____  ____   REASON: _____
18  ____  ____   CHANGE: _____
19  ____  ____   REASON: _____
20  ____  ____   CHANGE: _____
21  ____  ____   REASON: _____
22  ____  ____   CHANGE: _____
23  ____  ____   REASON: _____
24  ____  ____   CHANGE: _____
25  ____  ____   REASON: _____
```

Page 288

```
1            C E R T I F I C A T I O N
2
3       I, LISA FORLANO, a Certified Realtime
4   Reporter, Certified Court Reporter and Notary
5   Public, do hereby certify that I reported the
6   deposition in the above-captioned matter, that
7   the said witness was duly sworn by me; that
8   the foregoing is a true and correct transcript
9   of the stenographic notes of testimony taken
10  by me in the above-captioned matters.
11      I further certify that I am not an
12  attorney or counsel for any of the parties,
13  not a relative or employee of any attorney or
14  counsel connected with the action, nor
15  financially interested in the action.
16
17      LISA FORLANO, CRR, CCR #XI01143
18
19  DATED:  June 25, 2007
20
21
22
23
24
25
```

Page 287

```
1   PAGE  LINE
2   ____  ____   CHANGE: _____
3   ____  ____   REASON: _____
4   ____  ____   CHANGE: _____
5   ____  ____   REASON: _____
6   ____  ____   CHANGE: _____
7   ____  ____   REASON: _____
8   ____  ____   CHANGE: _____
9   ____  ____   REASON: _____
10  ____  ____   CHANGE: _____
11  ____  ____   REASON: _____
12  ____  ____   CHANGE: _____
13  ____  ____   REASON: _____
14  ____  ____   CHANGE: _____
15  ____  ____   REASON: _____
16  ____  ____   CHANGE: _____
17  ____  ____   REASON: _____
18  ____  ____   CHANGE: _____
19  ____  ____   REASON: _____
20  ____  ____   CHANGE: _____
21  ____  ____   REASON: _____
22  ____  ____   CHANGE: _____
23  ____  ____   REASON: _____
24
25
```

Page 289

```
1            June 25, 2007
2   Kaye Scholer LLP
    425 Park Avenue
3   New York, New York  1022-3598
4   ATTN:  Howard Suh, Esquire
5   RE:  Amgen vs. Roche
6   Dear Mr. Suh:
7
        Enclosed please find a copy of the
8   deposition transcript of Dr. Kadesch's testimony taken
    June 25, 2007, in the above-entitled matter.
9       Please have Dr. Kadesch review the deposition
    testimony, making any changes or corrections on a
10  separate errata sheet.  After doing so, please have
    the witness sign the original jurat before a Notary
11  Public.
        Within 60 days of reading and signing, please
12  return the transcript to LiveNote World Service,
    221 Main Street, Suite 1250, San Francisco,
13  California, 94105.
14      Thank you for your anticipated
    cooperation.
15
16      Very truly yours,
17
18      Lisa Forlano, CCR, CRR, RMR, CLNR
19
20
21
22
23
24
25
```

73 (Pages 286 to 289)

LiveNote World Service    800.548.3668 Ext. 1

# Exhibit I

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| AMGEN INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No.: 05 Civ. 12237 WGY |
| | ) | |
| F. HOFFMANN-LA ROCHE LTD, ROCHE | ) | |
| DIAGNOSTICS GmbH, and HOFFMANN- | ) | |
| LA ROCHE INC., | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**PROTECTIVE ORDER**

**WHEREAS**, documents and information may be sought, produced or exhibited by and among the parties to the above captioned proceeding, which relate to trade secrets or other confidential research, development or commercial information, the Court finds that good cause exists for the entry of the following protective order in this action pursuant to Rule 26(c) of the Federal Rules of Civil Procedure in order to provide access by the parties to such confidential information, subject to certain protective provisions set forth herein.  The parties to this action are Plaintiff AMGEN INC. ("Amgen"), and Defendants F. HOFFMANN-LA ROCHE LTD, ROCHE DIAGNOSTICS GmbH, and HOFFMANN-LA ROCHE INC. ("Defendants") (hereinafter, collectively "the Parties").

**IT IS HEREBY ORDERED THAT:**

1.    This Protective Order shall apply to all information, including but not limited to deposition testimony, documents and things subject to discovery and produced by or otherwise obtained from either a party or non-party in discovery in this action ("Discovery Materials").

For purposes of this Protective Order, any party or non-party producing Discovery Materials in this case shall be known as a "Supplier."

2.      Discovery Materials that contain confidential business information may be designated as "Confidential Material."  Confidential Material may include information which has not been made public and which concerns or relates to the trade secrets, processes, operations, style of work, communications or apparatus, or to the production, sales, shipments, purchases, transfers, identification of customers, inventories, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or other organization, the disclosure of which information is likely to have the effect of causing harm to the Supplier.

3.      Discovery Materials may be designated as "Highly Confidential Material" pursuant to the terms of this paragraph.  Discovery Materials designated as Highly Confidential Material shall be limited to (a) on-going and future clinical trials and communications with regulatory authorities regarding such trials; (b) on-going labeling negotiations for any therapeutic product pending but not yet approved for sale by a regulatory authority; and (c) active and on-going research and development of any therapeutic product for which no regulatory approval has yet been sought.  Defendants may within 10 days of this Order designate as Highly Confidential documents previously produced in the proceeding before the International Trade Commission captioned *In the Matter of Certain Products and Pharmaceutical Compositions Containing Recombinant Human Erythropoietin*, Inv. No. 337-TA-568, that are within the definition of "Highly Confidential Material" set forth in this paragraph and that are not contained in the BLA and INDs identified in Paragraph 4 and are not duplicative of information contained therein, to the extent that any such documents exist.

4.      Defendants' pending Biological License Application ("BLA") for CERA and Investigational New Drug Applications ("INDs") for CERA may be designated as "Restricted Access Confidential BLA/IND Material" and shall not be disclosed except to the persons identified in Paragraph 10 subject to the following procedures and conditions:

a.      Defendants have produced or will produce one paper copy of the subject INDs and BLA;

b.      Defendants have produced or will produce 10 fully text searchable CD copies of the INDs and BLA (which Amgen's counsel will not electronically reproduce);

c.      the CDs and single hard copy will be maintained by outside counsel of record and/or designated in-house counsel in one or more locked rooms in one or more office buildings, commercial storage facilities or other secure non-residential facilities not on Amgen's premises, and a log will be maintained to identify each person who has been given access to said materials, which access shall be limited to the individuals identified in paragraph 10; and

d.      the CDs will be reviewed on stand-alone, non-networked computers.

The provisions of this paragraph shall apply to Defendants' prior production of such documents in the proceeding before the International Trade Commission captioned *In the Matter of Certain Products and Pharmaceutical Compositions Containing Recombinant Human Erythropoietin*, Inv. No. 337-TA-568; and shall also apply to any subsequent productions, if any, of these documents in another form by Defendants.

5.      Any Discovery Materials submitted, either voluntarily or pursuant to order, in this action, which are asserted by any Supplier to contain or constitute Confidential Material, Restricted Access Confidential BLA/IND Material, or Highly Confidential Material (collectively, "Confidential Discovery Material") shall be so designated by such Supplier, as set forth in subparagraphs (a)–(d) below and shall be segregated from other information being submitted.

a.      Documents designated as Highly Confidential Material shall be clearly and prominently marked on their face with the legend: "**HIGHLY CONFIDENTIAL– OUTSIDE COUNSELS' EYES ONLY**" or a comparable notice.  Documents designated as "Restricted Access Confidential BLA/IND Material" shall be clearly and prominently marked on their face with the legend:  "**RESTRICTED ACCESS CONFIDENTIAL BLA/IND - LOCKED ROOM ACCESS ONLY**" or a comparable notice.  Documents designated as Confidential Material shall be clearly and prominently marked on their face with the legend **"CONFIDENTIAL"** or a comparable notice.

b.      Interrogatory answers or other responses to written discovery and information contained therein shall be designated as Confidential Discovery Material by means of a statement at the conclusion of each answer specifying the Confidential Discovery Material contained therein or by other means that clearly indicate what portion of the answer or information is considered Confidential Discovery Material and by placing the legend referenced in subpart (a) above on the front of any set of interrogatory answers containing such Confidential Discovery Material.

c.      Deposition testimony and transcripts including exhibits attached thereto shall be treated as Confidential Material, unless otherwise designated as Highly Confidential or Restricted Access Confidential BLA/IND Material. Counsel may designate all or portions of the transcript and exhibits used therein as Highly Confidential or Restricted Access Confidential BLA/IND Material at any time during the deposition and for a period of five (5) business days following receipt of the transcript by counsel for the deponent.  In-house counsel shall not have access to such transcripts or exhibits until after the expiration of said five (5) business days and provided that the designation has not been changed to Highly Confidential or Restricted Access Confidential BLA/IND Material.  In-house counsel of a party may attend any deposition of a party or non-party witness, provided that the in-house counsel upon notice will leave the deposition room while another party or non-party's Highly Confidential information or an exhibit containing the same is the subject of the examination or testimony.

d.      In the event that a Supplier produces or discloses Confidential Discovery Material without designating it as Confidential Discovery Material prior to or contemporaneously with such production or disclosure, and thereafter determines that it inadvertently failed to designate Discovery Material as Confidential Discovery Material, it may do so by giving notice to all receiving parties, who thereafter shall treat the Confidential Discovery Material as such pursuant to the provisions of this Order.

6.      When any Confidential Discovery Material is included in an authorized transcript of a deposition or exhibits thereto, arrangements shall be made with the court reporter taking the deposition to bind such portions and separately label them "**[Supplier] HIGHLY CONFIDENTIAL MATERIAL – OUTSIDE COUNSELS' EYES ONLY, SUBJECT TO PROTECTIVE ORDER**," "**[Supplier] RESTRICTED ACCESS CONFIDENTIAL BLA/IND - LOCKED ROOM ACCESS ONLY**" or "**[Supplier], CONFIDENTIAL MATERIAL, SUBJECT TO PROTECTIVE ORDER,**" respectively.  Before a court reporter receives any such Confidential Discovery Material, he or she shall have first read this Order and shall have agreed in writing to be bound by the terms thereof.  Alternatively, he or she shall sign the agreement included as Attachment C hereto.  Copies of each such signed agreement shall be provided to the Supplier of the Discovery Materials at issue.

7.      Any Discovery Materials designated as Confidential Discovery Material are to be treated as such until and unless the parties agree in writing to the contrary or there is a ruling by the Court pursuant to a challenge to the designation pursuant to Paragraph 8 below.

8.      If a party to this Order disagrees, in full or in part, with a Supplier's designation of Confidential Discovery Material, such party may notify the Supplier in writing stating the basis for its disagreement, and the Supplier shall thereafter state the basis for the designation and confer in good faith as to the designation of the Discovery Material.  If the parties are unable to reach agreement on the proper designation of the Discovery Material, either party may move to re-classify Confidential Discovery Material pursuant to the terms of this Order.

9.      In the absence of written permission from the Supplier or an order by the Court, any Highly Confidential Material pursuant to Paragraph 3 **shall not be disclosed to any person** other than:

a.  outside counsel of record for parties to this action, including necessary paralegal, litigation support (including outside document management and courtroom graphics consultants), secretarial and clerical personnel assisting such counsel;

b.  qualified persons translating, recording or transcribing testimony involving Highly Confidential Material and necessary stenographic and clerical personnel thereof;

c.  experts, consultants, and their staff who are employed by outside counsel under Paragraph 9(a) for the purposes of this litigation (provided they are not employed by a party to this proceeding or by a licensee of a party to this proceeding); and

d.  the Court and the Court staff, in accordance with the Court's rules, procedures and orders for handling confidential information.

10.  In the absence of written permission from the Supplier or an order by the Court,

any Confidential Material **shall not be disclosed to any person** other than:

a.  the persons identified in subparagraphs 9(a)–(d) above; and

b.  the following four (4) Amgen in-house counsel who have each been admitted or will be admitted *pro hac vice* in this action (and their paralegal, litigation support, secretarial and clerical personnel):

1.  Wendy A. Whiteford

2.  Monique L. Cordray

3.  Darrell G. Dotson

4.  to be identified at a later date by Amgen

c.  the following four (4) Defendants in-house counsel who have each been admitted or will be admitted *pro hac vice* in this action (and their paralegal, litigation support, secretarial and clerical personnel):

1.  George W. Johnston

2.  Patricia Rocha-Tramaloni

3.  Nancy DiLella

4.  to be identified at a later date by Defendants

11.    Confidential Discovery Material shall not be made available to any individual identified in Paragraphs 9(a) and (c), or 10(b) and (c) unless he or she has first read and agreed in writing (as set forth in Attachment A) to be bound to terms of this Order.

12.    Each outside counsel seeking access to confidential business information shall agree in writing (per Attachment A) to be bound by the terms of the Protective Order.  Outside counsel's clerical and support personnel (other individuals identified in Paragraph 9(a) except any outside litigation support) need not sign.  Each in-house counsel who wishes to have access to Confidential Materials shall review and agree in writing (per Attachment B) to be bound by the Protective Order.  Notwithstanding the access restrictions in Paragraph 4, in-house counsel may maintain the following documents containing Restricted Access Confidential BLA/IND Material of another party received pursuant to this Protective Order either in a locked room pursuant to Paragraph 4(c) or under lock and key, such as in a locked room or filing cabinet, at any location: documents filed with the Court in this proceeding, deposition transcripts (but not exhibits) in this proceeding, expert reports (but not exhibits) in this proceeding, interrogatory answers in this proceeding, admissions in this proceeding, and drafts of any of the foregoing.  All agreements to be bound by the terms of this Protective Order shall be served on all non-parties who have theretofore produced Confidential Discovery Material.  Each counsel identified in paragraph 10 above may utilize Discovery Materials produced under the terms of this order for purposes of this litigation, including to generate work product, draft motions, prepare for depositions, work with experts, draft expert reports and to otherwise prepare the case for trial. Without limiting the generality of the foregoing, the parties agree that Restricted Access BLA/IND Material may be shown to Amgen's experts at their offices, consistent with the terms of Paragraph 13 hereof, provided that those materials are not left with the experts and further

provided that such materials remain in the custody and control of Amgen's counsel of record designated pursuant to this Protective Order at all times.

13.     Not less than ten (10) business days before the initial disclosure of any Confidential Discovery Material to a proposed expert or consultant in accordance with Paragraph 9(c) above, the party proposing to disclose designated information to said expert or consultant shall notify the Supplier in writing of the name of the expert or consultant, provide a signed copy of Attachment A, and a current curriculum vitae of the expert or consultant.  If, within 10 business days of such notice, the Supplier objects to the disclosure of such Confidential Discovery Material to the proposed expert or consultant, it shall notify the other party in writing of its objection and the grounds therefor.[1]  The parties will meet and confer in good faith to resolve the dispute within 3 days of notification by the Supplier.  If the parties are unable to reach agreement, the party proposing to disclose designated information to the expert or consultant may seek a ruling from the Court permitting such disclosure.

14.     No document shall be filed in Court under seal absent allowance of a particularized motion to seal that would be allowed only if the filing includes a trade secret.  A party seeking to file another party's Confidential Discovery Material shall serve its papers on the Supplier and shall file a notice of service with the Court.  The Supplier shall then have two (2) Court days in which to either consent to the request to file said information in the public record or to seek leave of the Court pursuant to Local Rule 7.2 to file such papers under seal as set forth

---

[1]  The parties disagree as to whether it would be appropriate to disclose Confidential Discovery Material to a proposed expert or consultant who is employed by or affiliated with (a) a competitor of the Parties in the markets which are the subject of this action, or (b) any domestic or foreign manufacturer, wholesaler, retailer, or distributor of products and pharmaceutical compositions containing recombinant human erythropoietin.  Each party preserves its rights with respect to this issue.

above.  The parties shall cooperate in good faith to obtain a prompt ruling on any motion for

leave to file under seal pursuant to this paragraph, including by filing any opposition within two

(2) Court days of the motion.  [If ordered by Court:  The Supplier must seek leave of the Court

for opposition's papers to be filed under seal.  The burden is on the Court to grant leave within 3

court days or the documents will be made public.]

15.    If Confidential Discovery Material is disclosed to any person other than in the

manner authorized by this protective order, the party responsible for the disclosure must

immediately bring all pertinent facts relating to such disclosure to the attention of the Supplier

and, without prejudice to other rights and remedies of the Supplier, make every effort to prevent

further disclosure by it and by the person who was the recipient of such information.

16.    This Protective Order does not affect the right of any party or non-party to refuse

to disclose information properly subject to the attorney-client privilege or the attorney work

product doctrine.  To that end, each party or non-party may produce its documents in redacted

form, redacting only information which is irrelevant or is subject to a claim of attorney-client

privilege or work-product immunity.  The party or non-party so producing a document in

redacted form shall make the notation "REDACTED" (or comparable notice) on each redacted

portion of the document.  In addition, each "REDACTED" (or comparable) notation must

include a separate notation identifying the basis for that redaction (*i.e.,* privilege or relevance).

Receiving counsel shall not have the right to custody of the original un-redacted documents or a

copy thereof.  In the event of disagreement, receiving counsel shall identify those redacted areas

of the documents which should not be redacted and shall state why such areas should not be

redacted.  In the event the producing party or non-party continues to refuse to produce the

document(s) in unredacted form, counsel of the receiving party may seek a determination by the Court that such documents or portions thereof should be produced in unredacted form.

17.      If a party or non-party inadvertently produces or discloses information that is subject to attorney-client privilege and/or attorney-work product immunity, or other applicable privilege, it may request in writing within ten business (10) days of learning of such inadvertent production or disclosure that the information inadvertently produced or disclosed be returned or destroyed.  Such inadvertent production shall not constitute or be construed as a waiver of any applicable privilege either to the information or subject matter of the disclosure.  The request must state the nature of the privilege and/or immunity claimed for the inadvertently produced or disclosed information.  Upon receipt of such request, the party or non-party in receipt of such information shall in good faith attempt to retrieve all copies of such information and shall return or destroy the information (and shall to the extent possible destroy any notes relating to the information subject to the request).  No party or non-party that received the inadvertently produced or disclosed information under the provisions of this Order may argue that the privilege or immunity has been waived as a result of the inadvertent production or disclosure, nor may that party use any information contained in or obtained from such inadvertent production in this action or for any purpose.  If the receiving party or non-party wishes to challenge the propriety of the claim of privilege or immunity, it may do so only after first fully complying with the requirements of this paragraph.

18.      Nothing in this Order shall be deemed to place any restrictions on any party, non-party or its attorneys with respect to access and use and disposition of a party's own Confidential Discovery Material, nor abridge the right of any person to seek judicial review or to pursue other appropriate judicial action with respect to any ruling made by the Court concerning the issue of

the status of Discovery Material designated as Confidential Discovery Material. In addition, nothing in this Order shall place a restriction on either party or its attorneys with respect to sharing a Supplier's Confidential Discovery Material with a Supplier's current or former employee who was an author or recipient of such documents.

19.    Upon final termination of this action, including any appeal thereof, each party that is subject to this Order shall destroy or return to the Supplier within thirty (30) days all Confidential Discovery Material designated in accordance with Paragraphs 2-4 above, including all copies of such materials or information which may have been made. Copies of all pleadings or other papers filed under seal containing or disclosing Confidential Discovery Material shall be destroyed; provided however, that outside counsel of record for each of the parties may retain one (1) paper and one (1) electronic copy of such pleadings or other papers solely for the purpose of preserving a file in this matter. If destroyed rather than returned, the party destroying shall so verify in writing. Receipt of material returned to the Supplier shall be acknowledged in writing.

20.    Within thirty (30) days of the final termination of the action, including any appeal thereof, copies of Confidential Discovery Material that is in the hands of experts or consultants under Paragraph 9(c) must be retrieved or destroyed.

21.    The parties acknowledge that this Protective Order is binding upon them, and agree to treat any Confidential Discovery Material disclosed to them Pursuant to this Protective Order in accordance with its terms. The parties further agree that this Protective Order may be enforced by a Supplier at any time, including after the termination of this action.

22.    The Court retains jurisdiction for purposes of enforcing the terms of this Order at any time.

23.    The parties may move to amend this Order for good cause shown at any time.

PLAINTIFF AMGEN INC.
By its attorneys,

Of Counsel:                          /s/ Michael R. Gottfried
Stuart L. Watt                       Michael R. Gottfried (BBO#542156)
Wendy A. Whiteford                   D. Dennis Allegretti (BBO#545511)
Monique L. Cordray                   DUANE MORRIS LLP
Darrell G. Dotson                    470 Atlantic Avenue, Suite 500
MarySusan Howard                     Boston, MA 02210
Kimberlin L. Morley                  Telephone: (617) 289-9200
AMGEN INC.                           Facsimile: (617) 289-9201
One Amgen Center Drive
Thousand Oaks, CA 91320-1789         Lloyd R. Day, Jr. (*pro hac vice*)
Telephone: (805) 447-5000            David A. Madrid (*pro hac vice*)
                                     Linda A. Sasaki-Baxley (*pro hac vice*)
                                     Deborah E. Fishman (*pro hac vice*)
                                     DAY CASEBEER MADRID &
                                     BATCHELDER LLP
                                     20300 Stevens Creek Boulevard, Suite 400
                                     Cupertino, CA 95014
                                     Telephone: (408) 873-0110
                                     Facsimile: (408) 873-0220

                                     William G. Gaede III (*pro hac vice*)
                                     McDERMOTT WILL & EMERY
                                     3150 Porter Drive
                                     Palo Alto, CA 94304
                                     Telephone: (650) 813-5000
                                     Facsimile: (650) 813-5100

                                     Kevin M. Flowers (*pro hac vice*)
                                     Thomas I. Ross (*pro hac vice*)
                                     MARSHALL, GERSTEIN & BORUN LLP
                                     233 South Wacker Drive
                                     6300 Sears Tower
                                     Chicago IL 60606
                                     Telephone: (312) 474-6300
                                     Facsimile: (312) 474-0448

DEFENDANTS, by their attorneys,

/s/ Julia Huston
Lee Carl Bromberg (BBO# 058480)
Julia Huston (BBO# 562160)
Keith E. Toms (BBO# 663369)
BROMBERG & SUNSTEIN LLP
125 Summer Street
Boston, MA 02110
Tel: (617) 443-9292

and

Leora Ben-Ami (*pro hac vice*)
Patricia A. Carson (*pro hac vice*)
Thomas F. Fleming (*pro hac vice*)
Howard Suh (*pro hac vice*)
Peter Fratangelo (BBO# 639775)
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022
Tel: (212) 836-8000

SO ORDERED on this 21st day of December, 2006.

SO ORDERED:
/s/William G. Young
_____
The Honorable William G. Young
United States District Court
District of Massachusetts

ATTACHMENT A

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| AMGEN INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No.: 05 Civ. 12237 WGY |
| | ) | |
| F. HOFFMANN-LA ROCHE LTD, ROCHE | ) | |
| DIAGNOSTICS GmbH, and HOFFMANN- | ) | |
| LA ROCHE INC., | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## AGREEMENT TO ABIDE BY PROTECTIVE ORDER

The undersigned represents that he or she is affiliated with [Plaintiff Amgen, Inc.]
[Defendants F. Hoffman-La Roche Ltd, Roche Diagnostics GmbH, and Hoffman-LaRoche Inc.],
in the above captioned matter. The undersigned is involved in this litigation as

_____[*e.g.*, outside counsel, expert or consultant retained by outside counsel]. If
an attorney, the undersigned is admitted in _____[all jurisdictions].
The undersigned has read the Protective Order issued on _____ by the Honorable
William G. Young in this matter, and in accordance with that Order, hereby agrees:

    (1)        To be bound by the terms of the Protective Order;

    (2)        Not to reveal Confidential Discovery Material under this Protective Order

             to anyone other than another person authorized to have access to it

             pursuant to Paragraphs 9 and 10 of the Protective Order;

    (3)        To comply with the procedures set forth in Paragraph 4 of the Protective

             Order with respect to Restricted Access Confidential BLA/IND Material;

(4)         To use such Confidential Discovery Material solely for purposes of this

litigation, unless permission is received from the Supplier, or the Court, to

use it for other purposes.

Respectfully submitted,

Dated:                                   _____
                                         Name
                                         Employer
                                         Address

ATTACHMENT B

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

AMGEN INC.,                              )
                                         )
                    Plaintiff,         )
                                         )
          v.                          )     Civil Action No.: 05 Civ. 12237 WGY
                                         )
F. HOFFMANN-LA ROCHE LTD, ROCHE          )
DIAGNOSTICS GmbH, and HOFFMANN-          )
LA ROCHE INC.,                           )
               Defendants.        )
                                         )
                                         )

## IN-HOUSE COUNSEL AGREEMENT TO ABIDE BY PROTECTIVE ORDER

The undersigned represents that he or she is affiliated with [Plaintiff Amgen, Inc.] [Defendants F. Hoffman-La Roche Ltd, Roche Diagnostics GmbH, and Hoffman-La Roche Inc.], in the above captioned matter. The undersigned is involved in this litigation as an attorney and is admitted to practice in _____[all jurisdictions]. The undersigned has read the Protective Order issued on _____ by the Honorable William G. Young in this matter, and in accordance with that Order, hereby agrees:

      (1)         To be bound by the terms of the Protective Order;

      (2)         Not to reveal Confidential Material or Restricted Access Confidential BLA/IND Material under this Protective Order to anyone other than another person authorized to have access to it pursuant to Paragraphs 9 and 10 of the Protective Order;

(3)      To use such Confidential Material or Restricted Access Confidential
BLA/IND Material solely for purposes of this litigation, unless permission
is received from the Supplier, or the Court, to use it for other purposes;

(4)      To maintain the following documents containing such Restricted Access
Confidential BLA/IND Material under lock and key, such as in a locked
room or filing cabinet, at any location:  documents filed with the Court in
this proceeding, deposition transcripts (but not exhibits) in this
proceeding, expert reports (but not exhibits) in this proceeding,
interrogatory answers in this proceeding, admissions in this proceeding,
and drafts of any of the foregoing.

(5)      To comply with the procedures set forth in Paragraph 4 of the Protective
Order with respect to Restricted Access Confidential BLA/IND Material;

(6)      Acknowledges that he/she is not permitted access to any other party's
materials designated as Highly Confidential Material without consent of
the Supplier or an order of the Court;

(7)      Not to participate in or supervise patent prosecution or engage in any
competitive decision-making with respect to any ESP (any erythropoiesis-
stimulating protein, including EPO, peg-EPO, and EPO analog) for one
year after the conclusion of the lawsuit.

Respectfully submitted,


Dated:                                    _____
                                          Name
                                          Employer
                                          Address

ATTACHMENT C

**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| AMGEN INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No.: 05 Civ. 12237 WGY |
| | ) | |
| F. HOFFMANN-LA ROCHE LTD, ROCHE | ) | |
| DIAGNOSTICS GmbH, and HOFFMANN- | ) | |
| LA ROCHE INC., | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

NONDISCLOSURE AGREEMENT FOR REPORTER/STENOGRAPHER/TRANSLATOR

I, _____, do solemnly swear that I will not divulge any information communicated to me in any confidential portion of the action or hearing in the above action except as permitted in the Protective Order issued in this case. I will not directly or indirectly use, or allow the use of such information for any purpose other than that directly associated with my official duties in this case.

Further, I will not by direct action, discussion, recommendation, or suggestion to any person reveal the nature of content of any information communicated during any confidential portion of the action or hearing in this case.

I also affirm that I do not hold any position or official relationship with any of the participants in said action.

Signed_____
Dated_____
Firm or affiliation

03099/00501  589460.1

Exhibit J

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 02-11280-RWZ

ARIAD PHARMACEUTICALS, INC., *et al.*

v.

ELI LILLY & CO.

MEMORANDUM OF DECISION AND ORDER

March 3, 2004

ZOBEL, D.J.

Plaintiffs Ariad Pharmaceuticals, Inc., Massachusetts Institute of Technology, the Whitehead Institute for Biomedical Research, and the President and Fellows of Harvard College allege that defendant Eli Lilly & Co. has infringed United States Patent No. 6,410,516 ("the '516 patent"), "Nuclear Factors Associated With Transcriptional Regulation."  The parties disagree about the proper definition of four terms in the claims in issue.

The construction of patent claims is a matter of law for this Court to decide. Markman v. Westview Instruments, Inc., 517 U.S. 370, 388-89 (1996).  Normally, "there is a strong presumption that the ordinary and accustomed meaning of a claim term governs its construction."  Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp., 320 F.3d 1339, 1347 (Fed. Cir. 2003).  However, the presumption may be overcome if the patent specification or prosecution history "clearly and deliberately set[s] forth" a different meaning.  K-2 Corp. v. Salomon S.A., 191 F.3d 1356, 1363 (Fed. Cir. 1999); Boehringer,

320 F.3d at 1347. Such a circumstance arises where "the patentee has chosen to be his or her own lexicographer by clearly setting forth an explicit definition for a claim term" or "where the term or terms chosen by the patentee so deprive the claim of clarity that there is no means by which the scope of the claim may be ascertained from the language used." Johnson Worldwide Associates, Inc. v. Zebco Corp., 175 F.3d 985, 990 (Fed. Cir. 1999). If the intrinsic evidence fails to resolve ambiguity in the claim language, evidence extrinsic to the patent file and history such as expert and inventor testimony, dictionaries, and technical treatises and articles may be considered "to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1584 (Fed. Cir. 1996).

Having considered in light of the applicable legal standard the parties' written submissions as well as the argument of counsel at a hearing held on January 13, 2004, the Court construes the disputed claim terms as follows:

| Term | Court's Construction |
|---|---|
| Reducing NF-κB Activity | Decreasing the function of NF-κB to act as an intracellular messenger that regulates transcription of particular genes, in response to certain stimuli |
| Reducing Binding of NF-κB to NF-κB Recognition Sites on Genes Which Are Transcriptionally Regulated by NF-κB | Decreasing binding of NF-κB to DNA sequences specifically recognized by NF-κB, where such DNA sequences are in genes whose transcription is regulated by increasing or decreasing NF-κB activity, and where binding denotes a chemical and/or physical interaction between NF-κB and specific DNA sequences. |

2

| So As to Reduce Bacterial Lipopolysaccharide-Induced Expression of Said Cytokines in the Cells | To decrease expression of cytokines in the cells, where expression of those cytokines is caused by bacterial lipopolysaccharide and where expression refers to the process by which the cell interprets its genetic information to make proteins |
|---|---|
| Immune Cells | Specialized cells that defend the body against infection.  Immune cells are present in all body tissues, the blood stream, and the lymphatic system, and derive from a common precursor cell known as a hematopoietic stem cell.  They include T cells, B cells, natural killer cells, monocytes and other monocyte derivatives, macrophages, neutrophils, eosinophils, mast cells, and basophils. Although these cells typically function to eliminate harmful foreign invaders, immune cells occasionally mistake the body's own tissues as non-self (causing autoimmune disease) or attack harmless foreign substances or donated organs (causing allergy or organ rejection). |

The parties have agreed to the definitions of the following terms:

| NF-κB | a protein factor that;<br>  (a) resides in the cytoplasm as an inactive precursor bound to an IκB inhibitor protein;<br>  (b) when released from the inhibitor, travels to the nucleus of the cell;<br>  (c) once in the nucleus, functions to turn on transcription of certain genes by binding to specific DNA recognition sequences in those genes |
|---|---|
| A method for . . . in cells | These claims encompass methods wherein NF-κB is modulated in cells, regardless of where they are found. |

3

| NF-κB mediated intracellular signaling | Molecular communication within cells effected by, or conveyed through, NF-κB |
| Such that NF-κB-mediated effects of external influences are modified | Changing or altering effects that are both caused by an inducing substance outside the cell and are conveyed through NF-κB |
| Cytokines | Secreted polypeptides (proteins) that affect the functions of other cells, and which are important for the interactions between cells in the immune response. There are many different cytokines, one example of which is TNF-α. |
| Activated by extracellular influences | Stimulated by one or more inducing substances outside the cell |

_____
             DATE

/s/ Rya W. Zobel
_____
RYA W. ZOBEL
UNITED STATES DISTRICT JUDGE

4

# Exhibit K



KAYE SCHOLER LLP

Patricia A. Carson
212 836-7466
Fax 212 836-6355
pcarson@kayescholer.com

425 Park Avenue
New York, New York 10022-3598
212 836-8000
Fax 212 836-8689
www.kayescholer.com

December 13, 2007

David Greenwald
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY 10019-7475
Phone: (212) 474-1922
Fax:  (212) 474-3700

Dear David:

In response to your request,  Roche has authorized submission of Dr. Thomas Kadesch's
deposition testimony taken in the Boston patent litigation between Amgen and Roche (Civil
Action No. 05-12237 WGY) to the U.S. PTO in connection with the reexamination proceeding
involving U.S. Patent No. 6,410,516.

Best regards,

Pat Carson

31579679.DOC

NEW YORK    CHICAGO    LOS ANGELES    WASHINGTON, D.C.    WEST PALM BEACH    FRANKFURT    LONDON    SHANGHAI

Exhibit L

**United States District Court**
**District of Massachusetts (Boston)**
**CIVIL DOCKET FOR CASE #: 1:05-cv-12237-WGY**

Amgen Inc. v. F. Hoffmann-LaRoche LTD et al
Assigned to: Judge William G. Young
related Case: 1:97-cv-10814-WGY
Case in other court: First Circuit, 07-01096
Cause: 28:1338 Patent Infringement

Date Filed: 11/08/2005
Jury Demand: Defendant
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Intervenor Plaintiff**

**Ortho Biotech Products, L.P.**
*TERMINATED: 10/20/2006*

represented by **Erik Haas**
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036-6710
212-336-2000
Fax: 212-336-2386
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eugene M. Gelernter**
Patterson, Belknap, Webb & Tyler
1133 Avenue of the Americas
New York, NY 10036
212-336-2000
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard O. Jackson**
Patterson, Belknap, Webb & Tyler, LLP
133 Avenue of the Americas
New York, NY 10036
212-336-2000
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven A. Zalesin**
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036-6710
212-336-2110
Fax: 212-336-2222
Email: sazalesin@pbwt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David L. Ferrera**
Nutter, McClennen & Fish, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2699
617-439-2000

| | | | |
|---|---|---|
| | | *Catlin's Experiment*. (Gottfried, Michael) (Entered: 10/01/2007) |
| 10/01/2007 | 1213 | Opposition re 1205 MOTION in Limine *Defendants' Motion in Limine to Preclude Amgen from presenting Testimony of Attorney Ian Crawford* filed by Amgen Inc.. (Gottfried, Michael) (Entered: 10/01/2007) |
| 10/01/2007 | 1214 | Emergency MOTION To Preclude Amgen From Publicly Disclosing Roche's Trade Secrets Without Prior Notice to Roche by F. Hoffmann-LaRoche LTD.(Huston, Julia) (Entered: 10/01/2007) |
| 10/01/2007 | 1215 | DECLARATION re 1214 Emergency MOTION To Preclude Amgen From Publicly Disclosing Roche's Trade Secrets Without Prior Notice to Roche *By Julia Huston* by F. Hoffmann-LaRoche LTD. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D)(Huston, Julia) (Entered: 10/01/2007) |
| 10/01/2007 | 1216 | *Opposition/* Response by Amgen Inc. to 1204 Brief *Roche's Bench Memorandum Regarding Expected Cumulative Testimony by Amgen's Expert Carlo Brugnara*. (Rich, Patricia) (Entered: 10/01/2007) |
| 10/01/2007 | 1217 | MOTION to Admit Exhibits into Evidence by Amgen Inc.. (Attachments: # 1 Exhibit A# 2 Exhibit B)(Gottfried, Michael) (Entered: 10/01/2007) |
| 10/01/2007 | 1218 | MOTION to Admit Exhibit BWZa into Evidence by Amgen Inc..(Gottfried, Michael) Additional attachment(s) added on 10/3/2007 (Paine, Matthew). Modified on 10/3/2007 (Paine, Matthew). (Entered: 10/01/2007) |
| 10/01/2007 | | Judge William G. Young : Electronic ORDER entered. "Denied. The deposition is to be returned to the parties." 1063 Motion to Remove the "Confidential" Designation from the June 21, 2007 Deposition Transcript of Roche's Expert Dr. Thomas Kadesch. (Paine, Matthew) (Entered: 10/01/2007) |
| 10/01/2007 | 1219 | MOTION to Streamline and Expedite the Live Testimony of Dr. Thomas Strickland by Amgen Inc.. (Rich, Patricia) (Entered: 10/01/2007) |
| 10/01/2007 | 1220 | DECLARATION re 1219 MOTION to Streamline and Expedite the Live Testimony of Dr. Thomas Strickland *of Patricia R. Rich* by Amgen Inc.. (Attachments: # 1 Exhibit A)(Rich, Patricia) (Entered: 10/01/2007) |
| 10/01/2007 | | Judge William G. Young : Electronic ORDER entered. denying re 1182 BRIEF: *Defendants' Motion in Limine to Restrict Goldwasser To Testifying Only to Opinions Consistent With His Expert Report* by F. Hoffmann-LaRoche LTD, Hoffmann LaRoche Inc.(Paine, Matthew) (Entered: 10/01/2007) |
| 10/01/2007 | | Judge William G. Young : Electronic ORDER entered granting 1209 Motion for Clarification "Actually, this is a motion for reconsideration. Upon reconsideration, exhibit NZR is admitted but PRX is not." (Smith, Bonnie) (Entered: 10/01/2007) |
| 10/01/2007 | | Judge William G. Young : Electronic ORDER entered entered 1214 Motion to preclude Amgen from publicly disclosing Roche's trade secrets... "Treated as a motion for clarification, the Court simply ordered that nothing further be submitted to it under seal or for in camera review. Otherwise, all prior orders remain in full force and effect." (Smith, Bonnie) (Entered: 10/01/2007) |
| 10/01/2007 | | Motions terminated: 1214 Emergency MOTION To Preclude Amgen From Publicly Disclosing Roche's Trade Secrets Without Prior Notice to Roche filed by F. Hoffmann-LaRoche LTD. (Smith, Bonnie) (Entered: 10/01/2007) |
| 10/01/2007 | | Judge William G. Young : Electronic ORDER entered. re 1204 Brief filed by Hoffmann LaRoche Inc., F. Hoffmann-LaRoche LTD, Roche Diagnostics GmbH The motion to preclude is Denied. (Smith, Bonnie) (Entered: 10/01/2007) |
| | | |

# Exhibit M

# KAYE SCHOLER LLP

Patricia A. Carson
212 836-7466
Fax 212 836-6327
pcarson@kayescholer.com

425 Park Avenue
New York, New York 10022-3598
212 836-8000
Fax 212 836-8689
www.kayescholer.com

November 2, 2007

**VIA FAX AND EMAIL**
Laura P. Masurovsky
Finnegan, Henderson, Farabow,
Garrett & Dunner, L.L.P
901 New York Ave., N.W.
Washington, D.C. 20001

Re:     Ariad v. Lilly, Civil Action No. 02-11280 RWZ

Dear Laura:

This letter is to follow up on yesterday's correspondence regarding Lilly's request for Dr. Thomas Kadesch's deposition testimony from the Amgen v. Roche litigation and Lilly's Rule 60(b) motion filed on October 30th regarding that testimony.

Since only a handful of pages of the deposition transcript addresses questions directed to the '516 patent, we assume that Lilly is seeking only those pages and not the entire transcript. As to that portion of the transcript, since Dr. Kadesch's testimony is Roche confidential information, we will produce the allegedly relevant testimony as third party confidential information subject to Judge Zobel's protective order dated July 14, 2004, and subject to the restrictions set forth in the following paragraph of this letter.

Notwithstanding the language of the July 14, 2004 protective order allowing designated in-house counsel access to "confidential information," Lilly must agree and affirm that (i) Dr. Kadesch's transcript and testimony will be maintained as "outside counsel's eyes only" and will not be disclosed to anybody other than outside counsel currently of record in the above-identified litigation[1]; (ii) will be used *solely* for purposes of the above-identified litigation as set forth in section II. 2. of the July 14th protective order; and (iii) that any counsel to whom the transcript and testimony is made available is not currently and will not in the future be involved in or participate in any way in any Patent Office proceeding involving U.S. Patent No.

---

[1] Paragraph 7(c) of the July 14, 2004 protective order allows the parties to agree upon a more restricted level of disclosure than that set forth under the "Confidential" designation.

31562176.DOC

NEW YORK   CHICAGO   LOS ANGELES   WASHINGTON, D.C.   WEST PALM BEACH   FRANKFURT   LONDON   SHANGHAI

KAYE SCHOLER LLP

Laura P. Masurovsky                    2                    November 1, 2007

6,410,516 or any litigation involving that patent, other than the above-identified litigation. Your signature below will confirm Lilly's acceptance and assurance of compliance with these terms.

        Upon receipt of a countersigned copy of this letter we will promptly send the portion of Dr. Kadesch's deposition testimony at issue to you. As I pointed out during our call and in my letter yesterday, we are confident that your review will reveal that Dr. Kadesch in no way recanted or contradicted his Ariad testimony, confirming that Lilly's Rule 60(b) motion should properly be withdrawn.


Sincerely,


_(signature)_


Signature below confirms agreement with foregoing terms and conditions


_____

Counsel for Lilly


31562176.DOC

Exhibit N



**FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP**

901 New York Avenue, NW ■ Washington, DC 20001-4413 ■ 202.408.4000 ■ Fax 202.408.4400
www.finnegan.com

# FACSIMILE TRANSMITTAL

## <u>TO</u>

Name:   Patricia A. Carson

Company:  Kaye Scholer LLP

Fax Number:  (212) 836-8689

Subject:  Ariad et al. v. Eli Lilly

Date:  11/05/2007

Phone Number:   212) 836-7466

Total Pages (including cover):   2

Confirmation Copy to Follow:   N

## <u>FROM</u>

Name:  Laura Masurovsky

Phone Number:   202.408.4043

Verified by:   J. Parks

Our File No.:   [Text]

## <u>MESSAGE</u>

Please see attached letter.

**If there is a problem with this transmission, notify the sender at the number above.**

**This facsimile is intended only for the individual to whom it is addressed and may contain information that is privileged, confidential, or exempt from disclosure under applicable law. If you have received this facsimile in error, please notify the sender immediately by telephone (collect), and return the original message by first-class mail to the above address.**



**FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP**

901 New York Avenue, NW ▪ Washington, DC 20001-4413 ▪ 202.408.4000 ▪ Fax 202.408.4400
www.finnegan.com

LAURA P. MASUROVSKY
202.408.4043
laura.masurovsky@finnegan.com

November 5, 2007

***Via Facsimile***

Patricia A. Carson, Esq.
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022

      <u>*Ariad et al. v. Eli Lilly*</u>

Dear Patricia:

      Thank you for your letter of November 2, 2007. As we had offered in an e-mail communication to Ms. Ben-Ami and Mr. Fleming before Lilly filed its motion, Lilly agrees to treat the deposition transcript of Dr. Kadesch, containing testimony given in the matter of *Amgen v. Roche,* in accordance with the terms of the Protective Order in *Ariad v. Lilly,* and with the further restriction that access to such transcript be limited to outside counsel. To the extent your letter attempts to add further limitations not required by the Protective Order, we do not agree.

      Moreover, given counsel's representation in a pleading subject to Rule 11 that your expert recanted his testimony in *Ariad v. Lilly,* and the importance of that expert's testimony to the multi-million dollar verdict at issue, it is only fair and reasonable for you provide us with the complete deposition rather than selected pages.

      Please reconsider your position and promptly provide Dr. Kadesch's full deposition transcript.

                 Sincerely,

                 Laura P. Masurovsky

                 Laura P. Masurovsky

# Exhibit O

**MERGED REEXAMINATION**                    Docket No. 74753/JPW/GJG

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

**Merged Proceedings Pursuant To May 4, 2006 Order Of:**

*Ex Parte*
**Reexamination Control No. 90/007,503, filed April 4, 2005,**
     **And**
*Ex Parte*
**Reexamination Control No. 90/007,828, filed December 2, 2005.**

Patentees:        David Baltimore, Ranjan Sen, Phillip A. Sharp,
                  Harinder Singh, Louis Staudt, Jonathan H.
                  Lebowitz, Albert S. Baldwin Jr., Roger G. Clerc,
                  Lynn M. Corcoran, Patrick A. Baeuerle, Michael J.
                  Lenardo, Chen-Ming Fan, and Thomas P. Maniatis

Patent No.:       6,410,516 B1              Group Art Unit: 3991

Issue Date:       June 25, 2002            Examiner: B.M. Celsa

For       :       NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL
                  REGULATION


                                    1185 Avenue of the Americas
                                    New York, New York 10036
                                    December 13, 2007

Mail Stop *Ex Parte Reexam*
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450


Sir:

### NINTH SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT

In accordance with their duty of disclosure under 37 C.F.R.
§1.555, Patentees direct the Examiner's attention to the
following disclosure, which is listed on Form PTO-1449 (**Exhibit
A**). A copy of the disclosure listed below as items 1-10 are
attached hereto as **Exhibits 1-22**.

**In Re Merged Proceedings Of:**
*Ex Parte* **Reexamination Control No. 90/007,503**
      **And**
*Ex Parte* **Reexamination Control No. 90/007,828**
*Page 2 of 6 of December 13, 2007 Information Disclosure
Statement*

1.   October 10, 2007 The Amgen Entities' Responses To Whitehead's First Set of Interrogarories in Civil Action No. 06-259 (MPT) **(Exhibit 1)**;

2.   October 10, 2007 Wyeth's Responses To Whitehead's First Set of Interrogatories (Nos. 1-15) in Civil Action No. 06-259 (MPT) **(Exhibit 2)**;

3.   October 11, 2007 Wyeth's Second Set of Requests For Production of Documents And Things (Nos. 22-101) To Ariad, Harvard, MIT, and Whitehead in Civil Action No. 06-259 (MPT) **(Exhibit 3)**;

4.   October 15, 2007 The Amgen Entities' Responses to MIT's First Set of Interrogatories in Civil Action No. 06-259 (MPT) **(Exhibit 4)**;

5.   October 15, 2007 The Amgen Entities' Responses to Harvard's First Set of Interrogatories in Civil Action No. 06-259 (MPT) **(Exhibit 5)**;

6.   October 15, 2007 The Amgen Entities' Responses to Ariad's Fourth Set of Requests For Production of Documents in Civil Action NO. 06-259 (MPT) **(Exhibit 6)**;

7.   October 31, 2007 Wyeth's Fourth Set of Supplemental Responses And Objections To Ariad's First Set of Interrogatories (Nos. 1-25) in Civil Action No. 06-259 (MPT) **(Exhibit 7)**;

8.   October 31, 2007 Ariad's And The Institutions' Responses And Objections To Wyeth's First Set of Interrogatories in Civil Action No. 06-259 (MPT) **(Exhibit 8)**;

9.   October 31, 2007 Ariad's And The Institutions' Responses And Objections To Wyeth's First Set of Requests For Production of Documents And Things in Civil Action No. 06-259 (MPT) **(Exhibit 9)**;

**In Re Merged Proceedings Of:**
*Ex Parte* **Reexamination Control No. 90/007,503**
         **And**
*Ex Parte* **Reexamination Control No. 90/007,828**
*Page 3 of 6 of December 13, 2007 Information Disclosure*
*Statement*

10.    November 6, 2007 Defendant And Counterclaim Plaintiff
       Ariad's Sixth Set of Requests For Production To The Amgen
       Entities in Civil Action No. 06-259 (MPT) **(Exhibit 10)**;

11.    November 7, 2007 Wyeth's First Set of Requests for
       Admission (Nos. 1-160) To Ariad, Harvard, MIT, and
       Whitehead in Civil Action No. 06-259 (MPT) **(Exhibit 11)**;

12.    November 7, 2007 The Amgen Entities' Responses To Ariad's
       Fifth Set of Requests For Production of Documents in Civil
       Action No. 06-259 (MPT) **(Exhibit 12)**;

13.    November 7, 2007 Wyeth's Third Set of Requests For
       Production of Documents And Things (Nos. 101-109) To Ariad,
       Harvard, MIT, and Whitehead in Civil Action No. 06-259
       (MPT) **(Exhibit 13)**;

14.    November 8, 2007 Wyeth's Responses To Ariad's Third Set of
       Requests For Production of Documents (Nos. 108-121) in
       Civil Action No. 06-259 (MPT) **(Exhibit 14)**;

15.    November 12, 2007 The Amgen Entities' Responses To Ariad's
       Third Set of Interrogatories in Civil Action No. 06-259
       (MPT) **(Exhibit 15)**;

16.    November 12, 2007 Wyeth's Responses And Objections To Ariad
       And The Institutions' Second Set of Interrogatories (Nos.
       26-29) in Civil Action No. 06-259 (MPT) **(Exhibit 16)**;

17.    November 13, 2007 Defendant And counterclaim Plaintiff
       Ariad's Fourth Set of Requests For Production of Documents
       And Things to Wyeth in Civil Action No. 06-259 (MPT)
       **(Exhibit 17)**;

18.    November 15, 2007 Ariad's And The Institutions' Responses
       And Objections To Wyeth's Second Set of Interrogatories in
       Civil Case No. 06-259 (MPT) **(Exhibit 18)**;

19.    November 15, 2007 The Amgen Entities' Second Set of
       Requests For Admission Directed To Ariad And the
       Institutions in Civil Action No. 06-259 (MPT) **(Exhibit 19)**;

**In Re Merged Proceedings Of:**
***Ex Parte* Reexamination Control No. 90/007,503**
       **And**
***Ex Parte* Reexamination Control No. 90/007,828**
*Page 4 of 6 of December 13, 2007 Information Disclosure Statement*

20.  November 15, 2007 The Amgen Entities' Third Set of Requests For Production of Documents And things Directed To Ariad And The Institutions in Civil Action No. 06-259 (MPT) **(Exhibit 20)**;

21.  November 15, 2007 Ariad's And the Institutions' Responses And Objections To Wyeth's Second Set of Requests For Production fo Documents And Things in Civil Action No. 06-259 (MPT) **(Exhibit 21)**; and

22.  Deposition Transcript of Dr. Thomas R. Kadesch dated June 21, 2007, Amgen, Inc. v. F. Hoffmann-La Roche Ltd., a Swiss Company, Roche Diagnostics GmbH, a German Company, and Hoffmann-La Roche, Inc., A New Jersey Corporation, U.S. District Court, District of Massachusetts, in Civil Action No. 05-12237 WGY **(Exhibit 22)**.

Pursuant to the May 4, 2006 Order merging the above-identified reexamination proceedings, this Communication is being filed in duplicate and bears identifying data for the two reexamination proceedings.

If a telephone interview would be of assistance in advancing prosecution of the subject application, applicants' undersigned attorney invites the Examiner to telephone at the number provided below.

**In Re Merged Proceedings Of:**
*Ex Parte* **Reexamination Control No. 90/007,503**
            **And**
*Ex Parte* **Reexamination Control No. 90/007,828**
*Page 5 of 6 of December 13, 2007 Information Disclosure*
*Statement*


No fee is deemed necessary in connection with the filing of this
Ninth Supplemental Information Disclosure Statement.  If any such
fee is required, authorization is hereby given to charge the
amount of any such fee to Deposit Account No. 03-3125.


                        Respectfully submitted,



┌─────────────────────────────────┐
│ I hereby certify that this      │
│ correspondence is being deposited│
│ this date with the U.S. Postal  │
│ Service with sufficient postage as│
│ first class mail in an envelope │
│ addressed to:                   │
│ Mail Stop *Ex Parte* Reexamination,│
│ Commissioner for Patents, P.O. Box│
│ 1450, Alexandria, VA 22313-1450.│
│                                 │
│ [signature] 12/13/07            │
│ John P. White        Date       │
│ Reg. No. 28,678                 │
│ Gary J. Gershik                 │
│ Reg. No. 39,992                 │
└─────────────────────────────────┘

                    John P. White
                    Registration No. 28,678
                    Gary J. Gershik
                    Registration No. 39,992
                    Attorneys for Applicants
                    Cooper & Dunham LLP
                    1185 Avenue of the Americas
                    New York, New York 10036
                    (212) 278-0400

In Re Merged Proceedings Of:
*Ex Parte* Reexamination Control No. 90/007,503
          And
*Ex Parte* Reexamination Control No. 90/007,828
*Page 6 of 6 of December 13, 2007 Information Disclosure Statement*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing **NINTH SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT** including Exhibit A and Exhibit 1 has been sent to:

McDonnell Boehnen Hulbert & Berghoff, 300 South Wacker Drive, Suite 3200, Chicago, Illinois 60606, Attn: Grantland G. Drutchas, Esq.,

        and

Bawa Biotechnology Consulting, LLC, 21005 Starflower Way, Ashburn, VA 20147, Attn: Dr. Raj Bawa,

each by U.S. Postal Service, first class mail service, with sufficient postage, on this 13th day of December, 2007.

Gary J. Gershik

# Exhibit A
## of Ninth Supplemental Information Disclosure Statement
## filed December 13, 2007 in

A Merged Proceeding of *Ex Parte* Reexamination Control Nos:

|  |  |  |
|---|---|---|
| 90/007,503 | and | 90/007,828 |
| Filed April 4, 2005 | | Filed December 2, 2005 |

Merged Pursuant to May 4, 2006 Merger Decision
Group Art Unit: 3991  Examiner: B.M. Celsa

| Form PTO-1449 | **U.S. Department of Commerce** **Patent and Trademark Office** **INFORMATION DISCLOSURE CITATION** **(Use several sheets if necessary)** | Atty. Docket No. 74753/JPW/GJG | *Ex Parte* Reexamination No.: 90/007,503 and 90/007,828 |
|---|---|---|---|

| | Applicants **David Baltimore et al.** | |
|---|---|---|
| | Filing Date **April 4, 2005** | Page 1 of 4 |

### U.S. PATENT DOCUMENTS

| Examiner Initial | | Document Number | Date | Name | Class | Subclass | Filing Date if Appropriate |
|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |

### FOREIGN PATENT DOCUMENTS

| | | Document Number | Date | Country | Class | Subclass | Translation | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Yes | No |
| | | | | | | | | |

### OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| | | |
|---|---|---|
| | 1 | October 10, 2007 The Amgen Entities' Responses To Whitehead's First Set of Interrogarories in Civil Action No. 06-259 (MPT) |
| | 2 | October 10, 2007 Wyeth's Responses To Whitehead's First Set of Interrogatories (Nos. 1-15) in Civil Action No. 06-259 (MPT) |
| | 3 | October 11, 2007 Wyeth's Second Set of Requests For Production of Documents And Things (Nos. 22-101) To Ariad, Harvard, MIT, and Whitehead in Civil Action No. 06-259 (MPT) |
| | 4 | October 15, 2007 The Amgen Entities' Responses to MIT's First Set of Interrogatories in Civil Action No. 06-259 (MPT) |
| | 5 | October 15, 2007 The Amgen Entities' Responses to Harvard's First Set of Interrogatories in Civil Action No. 06-259 (MPT) |
| | 6 | October 15, 2007 The Amgen Entities' Responses to Ariad's Fourth Set of Requests For Production of Documents in Civil Action NO. 06-259 (MPT) |
| | 7 | October 31, 2007 Wyeth's Fourth Set of Supplemental Responses And Objections To Ariad's First Set of Interrogatories (Nos. 1-25) in Civil Action No. 06-259 (MPT) |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

*EXAMINER: Initial if citation considered, whether or not citation is in conformance with MEP 609: Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

A Merged Proceeding of *Ex Parte* Reexamination Control Nos: 90/007,503, Filed April 4, 2005 and 90/007,828, Filed December 2, 2005 **Exhibit A** to Dec. 13, 2007 Supp. Information Disclosure Statement

| Form PTO-1449 | U.S. Department of Commerce Patent and Trademark Office | Atty. Docket No. 74753/JPW/GJG | Ex Parte Reexamination No.: 90/007,503 and 90/007,828 |
|---|---|---|---|

**INFORMATION DISCLOSURE CITATION**
**(Use several sheets if necessary)**

| Applicants |
|---|
| **David Baltimore et al.** |

| Filing Date **April 4, 2005** | Page 2 of 4 |
|---|---|

## U.S. PATENT DOCUMENTS

| Examiner Initial | | Document Number | | | | | | Date | Name | Class | Subclass | Filing Date if Appropriate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | | Document Number | | | | | | Date | Country | Class | Subclass | Translation | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | Yes | No |
| | | | | | | | | | | | | | |

### OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| | | |
|---|---|---|
| | 8 | October 31, 2007 Ariad's And The Institutions' Responses And Objections To Wyeth's First Set of Interrogatories in Civil Action No. 06-259 (MPT) |
| | 9 | October 31, 2007 Ariad's And The Institutions' Responses And Objections To Wyeth's First Set of Requests For Production of Documents And Things in Civil Action No. 06-259 (MPT) |
| | 10 | November 6, 2007 Defendant And Counterclaim Plaintiff Ariad's Sixth Set of Requests For Production To The Amgen Entities in Civil Action No. 06-259 (MPT) |
| | 11 | November 7, 2007 Wyeth's First Set of Requests for Admission (Nos. 1-160) To Ariad, Harvard, MIT, and Whitehead in Civil Action No. 06-259 (MPT) |
| | 12 | November 7, 2007 The Amgen Entities' Responses To Ariad's Fifth Set of Requests For Production of Documents in Civil Action No. 06-259 (MPT) |
| | 13 | November 7, 2007 Wyeth's Third Set of Requests For Production of Documents And Things (Nos. 101-109) To Ariad, Harvard, MIT, and Whitehead in Civil Action No. 06-259 (MPT) |
| | 14 | November 8, 2007 Wyeth's Responses To Ariad's Third Set of Requests For Production of Documents (Nos. 108-121) in Civil Action No. 06-259 (MPT) |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

*EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609: Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

| Form PTO-1449 | **U.S. Department of Commerce**<br>**Patent and Trademark Office**<br><br>**INFORMATION DISCLOSURE CITATION**<br>**(Use several sheets if necessary)** | Atty. Docket No.<br>74753/JPW/GJG | *Ex Parte*<br>Reexamination<br>No.:<br>90/007,503<br>and<br>90/007,828 |
|---|---|---|---|
| | | Applicants<br>**David Baltimore et al.** | |
| | | Filing Date<br>**April 4, 2005** | Page 3 of 4 |

## U.S. PATENT DOCUMENTS

| Examiner<br>Initial | | Document Number | | | | | | | Date | Name | Class | Subclass | Filing Date<br>if Appropriate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | | Document Number | | | | | | Date | Country | Class | Subclass | Translation | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | Yes | No |
| | | | | | | | | | | | | | |

### OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| | | |
|---|---|---|
| | 15 | November 12, 2007 The Amgen Entities' Responses To Ariad's Third Set of Interrogatories in Civil Action No. 06-259 (MPT) |
| | 16 | November 12, 2007 Wyeth's Responses And Objections To Ariad And The Institutions' Second Set of Interrogatories (Nos. 26-29) in Civil Action No. 06-259 (MPT) |
| | 17 | November 13, 2007 Defendant And counterclaim Plaintiff Ariad's Fourth Set of Requests For Production of Documents And Things to Wyeth in Civil Action No. 06-259 (MPT) |
| | 18 | November 15, 2007 Ariad's And The Institutions' Responses And Objections To Wyeth's Second Set of Interrogatories in Civil Case No. 06-259 (MPT) |
| | 19 | November 15, 2007 The Amgen Entities' Second Set of Requests For Admission Directed To Ariad And the Institutions in Civil Action No. 06-259 (MPT) |
| | 20 | November 15, 2007 The Amgen Entities' Third Set of Requests For Production of Documents And things Directed To Ariad And The Institutions in Civil Action No. 06-259 (MPT) |
| | 21 | November 15, 2007 Ariad's And the Institutions' Responses And Objections To Wyeth's Second Set of Requests For Production for Documents And Things in Civil Action No. 06-259 (MPT) |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

*EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609: Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

| Form PTO-1449 | U.S. Department of Commerce Patent and Trademark Office | Atty. Docket No. 74753/JPW/GJG | Ex Parte Reexamination No.: 90/007,503 and 90/007,828 |
|---|---|---|---|

**INFORMATION DISCLOSURE CITATION**
(Use several sheets if necessary)

| Applicants | |
|---|---|
| David Baltimore et al. | |
| Filing Date April 4, 2005 | Page 4 of 4 |

## U.S. PATENT DOCUMENTS

| Examiner Initial | | Document Number | | | | | | | Date | Name | Class | Subclass | Filing Date if Appropriate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | | Document Number | | | | | | | Date | Country | Class | Subclass | Translation Yes | No |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | |

### OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| | 22 | Deposition Transcript of Dr. Thomas R. Kadesch dated June 21, 2007, Amgen, Inc. v. F. Hoffmann-La Roche Ltd., a Swiss Company, Roche Diagnostics GmbH, a German Company, and Hoffmann-La Roche, Inc., A New Jersey Corporation, U.S. District Court, District of Massachusetts, in Civil Action No. 05-12237 WGY |
|---|---|---|

| EXAMINER | DATE CONSIDERED |
|---|---|

*EXAMINER: Initial if citation considered, whether or not citation is in conformance with MEP 609: Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.