IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMGEN, INC., a Delaware corporation; IMMUNEX CORPORATION, a Washington corporation; AMGEN USA INC., a Delaware corporation; AMGEN MANUFACTURING, LIMITED, a Bermuda Corporation, and IMMUNEX RHODE ISLAND CORPORATION, a Delaware corporation, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| ARIAD PHARMACEUTICALS, INC., a Delaware corporation, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, a Delaware corporation, | ) ) ) ) ) | |
| Defendants. | ) ) ) | Civil Action No. 06-259 (MPT) |
| ARIAD PHARMACEUTICALS, INC., a Delaware corporation, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, a Delaware corporation, | ) ) ) ) ) ) ) ) ) | |
| Counterclaim Plaintiffs, | ) ) | |
| v. | ) | |
| AMGEN, INC., a Delaware corporation; IMMUNEX CORPORATION, a Washington corporation; AMGEN USA INC., a Delaware corporation; AMGEN MANUFACTURING, LIMITED, a Bermuda Corporation, and IMMUNEX RHODE ISLAND CORPORATION, a Delaware corporation, and WYETH, | ) ) ) ) ) ) ) ) ) ) | |
| Counterclaim Defendants. | ) ) ) | |

**AMGEN ENTITIES' FIRST AMENDED REPLY TO ARIAD, HARVARD, MIT,
AND WHITEHEAD'S AMENDED COUNTERCLAIMS**

Plaintiffs Amgen, Inc. ("Amgen"), Immunex Corporation ("Immunex"), Amgen USA, Inc. ("Amgen USA"), Amgen Manufacturing, Limited ("Amgen Mfg."), and Immunex Rhode Island Corporation ("Immunex R.I.") (collectively the "Amgen Entities") respond as follows to the Counterclaim of counterclaim-plaintiffs ARIAD Pharmaceuticals, Inc. ("ARIAD"), Harvard University ("Harvard"), Massachusetts Institute of Technology ("MIT"), and Whitehead Institute for Biomedical Research ("Whitehead") (collectively the "Defendants").

1.      In response to paragraph 1, the Amgen Entities admit that this Counterclaim purports to arise under the United States Patent Act, 35 U.S.C. §§ 100 *et seq.*, including §§ 271 and 281.

2.      In response to paragraph 2, the Amgen Entities admit that this Court has subject matter jurisdiction over this Counterclaim under 28 U.S.C. §§ 1331 and 1338(a).

3.      In response to paragraph 3, the Amgen Entities admit that venue is proper in this judicial district under 28 U.S.C. §§ 1391(c) and 1400(b).

4.      In response to paragraph 4, on information and belief, the Amgen Entities admit that ARIAD is a Delaware corporation with its principal place of business in Cambridge, Massachusetts.

5.      In response to paragraph 5, on information and belief, the Amgen Entities admit that Whitehead is a Delaware corporation with its principal place of business in Cambridge, Massachusetts.

6.      In response to paragraph 6, on information and belief, the Amgen Entities admit that Harvard is a Massachusetts corporation with its principal place of business in Cambridge, Massachusetts.

2

7.    In response to paragraph 7, on information and belief, the Amgen Entities admit that MIT is a Massachusetts corporation with its principal place of business in Cambridge, Massachusetts.

8.    The Amgen Entities admit the allegations of paragraph 8.

9.    The Amgen Entities admit the allegations of paragraph 9.

10.    The Amgen Entities admit the allegations of paragraph 10.

11.    The Amgen Entities admit the allegations of paragraph 11.

12.    The Amgen Entities admit the allegations of paragraph 12.

13.    The Amgen Entities are without personal knowledge sufficient to admit or deny the allegations of paragraph 13 and for that reason they are denied.

14.    The Amgen Entities admit that United States Patent No. 6,410,516 (the "'516 patent") on its face is entitled "Nuclear Factors Associated with Transcriptional Regulation." The Amgen Entities further admit that on its face the '516 patent was issued on June 25, 2002. The Amgen Entities deny that the '516 patent was "duly and legally" issued.

15.    The Amgen Entities admit that United States Patent No. 5,804,374 (the "'374 patent") on its face is entitled "Nuclear Factors Associated with Transcriptional Regulation." The Amgen Entities further admit that on its face the '374 patent was issued on September 8, 1998. The Amgen Entities deny that the '374 patent was "duly and legally" issued.

16.    The Amgen Entities admit that United States Patent No. 6,150,090 (the "'090 patent") on its face is entitled "Nuclear Factors Associated with Transcriptional Regulation." The Amgen Entities further admit that on its face the '090 patent was issued on November 21, 2000. The Amgen Entities deny that the '090 patent was "duly and legally" issued.

DB02:6433029.1                                                                                              065028.1001

17.    The Amgen Entities admit that the faces of the '516 patent, the '374 patent, and the '090 patent list Harvard, MIT, and Whitehead as assignees.  On information and belief, the Amgen Entities admit that ARIAD is the exclusive licensee of the '516 patent, the '374 patent, and the '090 patent.

18.    In response to paragraph 16, the Amgen Entities incorporate herein by reference paragraphs 1 through 17 above as if set forth in full.

19.    In response to paragraph 19, the Amgen Entities deny each and every allegation contained therein.

20.    In response to paragraph 20, the Amgen Entities deny each and every allegation contained therein.

21.    In response to paragraph 21, the Amgen Entities deny each and every allegation contained therein.

22.    In response to paragraph 22, the Amgen Entities incorporate herein by reference paragraphs 1 through 17 above as if set forth in full.

23.    In response to paragraph 23, the Amgen Entities deny each and every allegation contained therein.

24.    In response to paragraph 24, the Amgen Entities deny each and every allegation contained therein.

25.    In response to paragraph 25, the Amgen Entities incorporate herein by reference paragraphs 1 through 17 above as if set forth in full.

26.    In response to paragraph 26, the Amgen Entities deny each and every allegation contained therein.

DB02:6433029.1                                                                                    065028.1001

27.     In response to paragraph 27, the Amgen Entities deny each and every allegation contained therein.

28.     The Amgen Entities also deny each allegation contained in the Defendants' Counterclaim not specifically admitted, denied, or otherwise responded to in this Answer.

## THE AMGEN ENTITIES' AFFIRMATIVE DEFENSES

29.     In further answer to the Defendants' Counterclaim, the Amgen Entities hereby plead and affirmatively set forth the following defenses, undertaking the burden of proof on such defenses only to the extent required by law and without assuming the burden of proof when such burden would otherwise be on the Defendants.  The Amgen Entities reserve the right to amend their answer to the Defendants' Counterclaim to assert any other basis for invalidity, unenforceability or any other defense.

### First Defense: Non-Infringement

30.     The Amgen Entities do not literally or under the doctrine of equivalents infringe, and have not infringed, willfully or otherwise, any claim of the '516 patent, either directly, indirectly, contributorily, or by inducement.

31.     The Amgen Entities do not literally or under the doctrine of equivalents infringe, and have not infringed, willfully or otherwise, any claim of the '374 patent, either directly, indirectly, contributorily, or by inducement.  The Amgen Entities also do not infringe, and have not infringed, willfully or otherwise, any claim of the '374 patent because the accused activities are exempt from infringement under the provisions of 35 U.S.C. §271(e)(1).

32.     The Amgen Entities do not literally or under the doctrine of equivalents infringe, and have not infringed, willfully or otherwise, any claim of the '090 patent, either directly, indirectly, contributorily, or by inducement.  The Amgen Entities do not infringe, and have not

infringed, willfully or otherwise, any claim of the '090 patent because the accused activities are exempt from infringement under the provisions of 35 U.S.C. §271(e)(1).

### Second Defense: Invalidity

33.    The '516 patent is invalid for failure to comply with the requirements of Title 35, United States Code, including, but not limited to, sections 101, 102, 103, and/or 112.

34.    The '374 patent is invalid for failure to comply with the requirements of Title 35, United States Code, including, but not limited to, sections 101, 102, 103, and/or 112.

35.    The '090 patent is invalid for failure to comply with the requirements of Title 35, United States Code, including, but not limited to, sections 101, 102, 103, and/or 112.

### Third Defense: Unenforceability

36.    Paragraphs 37 through 93 below are pleaded by the Amgen Entities upon information and belief.

37.    Each claim of the '516 patent is unenforceable based on inequitable conduct in the prosecution of United States Patent Application No. 08/464,364 (the "'364 application"), the application leading to the issuance of the '516 patent and/or any related patent applications, by, among other things, (i) failing to inform the PTO Examiner during prosecution of the '516 patent that the DNA and amino acid sequences set forth for I$\kappa$B-$\alpha$ in the '516 patent are erroneous, and (ii) failing to name as inventors individuals responsible for the conception of at least certain claims of the '516 patent and improperly naming other individuals as inventors,  Defendants, their prosecution counsel, and/or one or more of the named inventors practiced fraud on the PTO and violated their duty of disclosure through bad faith and intentional misconduct.

38.    All three of ARIAD's issued patents (the '090 patent, the '374 patent, and the '516 patent) purportedly relate to NF-$\kappa$B/I$\kappa$B.

6

39.     Each of the '516, '374, and '090 patents was prosecuted before different primary examiners at the PTO.

40.     Although a purported DNA and amino acid sequence for IκB-α was included as Fig. 43 in the specification of the '516 patent, the applicants admitted during prosecution of the related '374 and '090 patents (before primary examiners Degen and Schwartzman, respectively) that the sequence in "Figure 43 is not the nucleotide sequence of IkB-α but the nucleotide sequence of pp40 rel-associated protein."

41.     The absence of disclosure of a DNA or amino acid sequence for IκB establishes a prima facie case for the unpatentability of at least those claims that require an adequate description of the IκB sequence, such as, for example, every dependent claim that recites that NF-κB activity is reduced by "decreasing the level of NF-κB not bound in an NF-κB:IκB complex," "inhibiting modification of an IκB protein," "inhibiting degradation of an IκB protein," or "inhibiting dissociation of NF-κB:IκB complexes."

42.     While the applicants withdrew Fig. 43 from the applications issued as the '374 and '090 patents, they never brought this error to the attention of the examiner in the application leading up to the '516 patent. As a result, the incorrect sequence of IκB-α remained as Fig. 43 in the '516 patent.

43.     Defendants, their prosecution counsel, and/or one or more of the named inventors on the '516 patent knew or should have known of the materiality of the erroneous IκB-α sequence to the patentability of the claims that ultimately issued.

44.     By failing to inform the examiner that the '364 application failed to disclose the correct DNA or amino acid sequence for IκB-α (something that counsel told the examiners for the '090 and '374 patents), Defendants, their prosecution counsel, and/or one or more of the

065028.1001

named inventors on the '516 patent practiced a fraud on the PTO and violated their duty of disclosure through bad faith and intentional misconduct.

45.    Defendants, their prosecution counsel, and/or one or more of the named inventors on the '516 patent were aware, or should have been aware, of the contributions of individuals not named in the applications leading to the issuance of the '516 patent or on the face of the '516 patent to the conception of at least certain claims of the '516 patent.

46.    Although these individuals were not named as inventors on the '516 patent, their research was cited either as prior art or referenced in the specification of the '516 patent, including but not limited to the following individuals and their work.

47.    For example, the reference Osborn et al., Proceedings of the National Academy of Sciences of the United States 86: 2336-2340 (1989) ("Osborn et al. (1989)") was cited in column 17 of the '516 patent in support of the statement "IL-1 and TNF-$\alpha$ activate NF-$\kappa$B binding and both have been shown known [sic] to induce $\beta$-IFN."

48.    Although certain claims of the '516 patent (such as claim 18) specifically discuss IL-1 and TNF-$\alpha$. in relation to reducing NF-$\kappa$B activity, there is no work other than the Osborn et al. (1989) paper cited in support of this proposition that conducts any experiments that purportedly relate IL-1 and TNF-$\alpha$ to NF-$\kappa$B.

49.    Therefore, one or more of the authors named on the Osborn et al. (1989) paper, namely Laurelee Osborn, Steven Kunkel, and/or Gary J. Nabel, should have been named as inventors on the '516 patent.

50.    As the reference was cited in the specification of the '516 patent, Defendants, their prosecuting attorneys, and/or one or more of the named inventors on the '516 patent were

aware of this reference and the contributions of these individuals, but did not disclose to the Examiner any of these individuals as inventors.

51.    The Osborn et al. (1989) reference and the contributions of one or more of Laurelee Osborn, Steven Kunkel, and Gary J. Nabel were material to the patentability of the '516 patent.

52.    By failing to inform the Examiner that one or more of Laurelee Osborn, Steven Kunkel, and Gary J. Nabel should be added as named inventors, Defendants, their prosecution counsel, and/or one or more of the named inventors practiced a fraud on the PTO and violated their duty of disclosure through bad faith and intentional misconduct.

53.    Defendants, their prosecution counsel, and/or one or more of the named inventors on the '516 patent were aware, or should have been aware, that certain individuals named on the face of the '516 patent were not properly inventors of any of the claims of the '516 patent.

54.    For example, each of the claims of the '516 patent recites the step of "reducing NF-κB activity," but one or more of the named inventors of the '516 patent did not perform any work on reducing NF-κB activity, or on NF-κB, that was incorporated into the applications leading to the issuance of the '516 patent, including, for example, Jonathan LeBowitz.

55.    Moreover, Jonathan LeBowitz has previously testified that he "never worked on NF-κB."

56.    The misjoinder of at least Jonathan Lebowitz was material to the patentability of the '516 patent.

57.    By failing to inform the Examiner that at least Jonathan LeBowitz was not properly a named inventor, Defendants, their prosecution counsel, and/or one or more of the

DB02:6433029.1                                                                065028.1001

named inventors practiced a fraud on the PTO and violated their duty of disclosure through bad faith and intentional misconduct.

58.     Each claim of the '516 patent is unenforceable based on inequitable conduct during the reexamination of the '516 patent, namely in the Merged Proceeding of *Ex Parte* Reexamination Control Nos: 90/007,503 (filed April 4, 2005) and 90/007,828 (filed December 2, 2005).

59.     By among other things, failing to disclose material information and submitting a declaration by Dr. Inder Verma that contained material misrepresentations and/or omissions, Defendants, their prosecution counsel, and/or Dr. Verma practiced fraud on the PTO during the reexamination of the '516 patent and violated their duty of disclosure through bad faith and intentional misconduct.

60.     Dr. Verma was retained by the Defendants for the purpose of "providing expert technical testimony" in the reexamination of the '516 patent.

61.     In his declaration, Dr. Verma disagreed, *inter alia*, with the Examiner's determination that the use of a variety of different compounds reduced NF-κB activity as described in the references cited as prior art in the requests for reexamination. By taking this position in his declaration, Dr. Verma contradicted statements he had made in various other publications, including, but not limited to, the contradictions described in paragraphs 62 to 75 below.

62.     In his declaration, Dr. Verma disagreed with the Examiner's determination that use of glucocorticoids, in particular, dexamethasone ("dex"), reduced NF-κB activity in the references cited as prior art in the requests for reexamination, thereby anticipating claims 1-2, 5,

10

6, 8, 9, 20-21, 25-27, 29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89 and 93-97 of the '516 patent.

63.    Defendants, their prosecution counsel, and/or Dr. Verma failed to disclose, however, that Dr. Verma, along with other scientists, had published a research article explaining how glucocorticoids, through the glucocorticoid receptor ("GR"), inhibit NF-κB activity. *See* Doucas et al., Proceedings of the National Academy of Sciences of the United States 97: 11893-11898 (2000), at 11893 ("Doucas et al. (2000)"). In that paper, Dr. Verma, with his co-authors, stated that "we demonstrated that *GR-mediated inhibition of NF-κB transactivation* is PKAc-dependent" (emphasis added) *Id.*

64.    In this research paper, Dr. Verma, with his co-authors, also affirmed the work of previous studies linking dexamethasone, a particular glucocorticoid, with inhibition of NF-κB activity, stating that "[p]revious studies have shown that *treatment of cells with Dex*, a synthetic GR ligand, *leads to repression of NF-κB-activated transcription.*" Doucas et al. (2000) at 11897 (emphasis added).

65.    Defendants, their prosecution counsel, and/or Dr. Verma also failed to disclose that Dr. Verma was the co-author of a scientific review article that, among other things, identified glucocorticoids, including dexamethasone, as inhibitors of NF-κB activity. In this review article, Dr. Verma, along with his co-authors, stated:

> The most widely prescribed anti-inflammatory and immunosuppressive drugs are *glucocorticoids (GCs)*, of which *dexamethasone* and hydrocortisone are the best known...*it was later shown that GCs also inhibit the action of several transcription factors* that are essential for immunity, *such as* AP-1, NF-AT, and *NF-κB*.

Withoff et al. *in* Handbook of Transcription Factor NF-kappaB (S. Ghosh, ed.) (2007), at 203-204 ("Withoff et al. (2007)").

66.    Defendants, their prosecution counsel, and/or Dr. Verma knew or should have known of the materiality of the Doucas et al. (2000) and Withoff et al. (2007) references to the patentability of the claims at issue. Defendants, their prosecution counsel, and/or Dr. Verma also knew or should have known that glucocorticoids, and in particular, dexamethasone, were described in printed publications long before the filing of the applications leading to the issuance of the '516 patent. By failing to inform the Examiner of at least the Doucas et al. (2000) and Withoff et al. (2007) references, Defendants, their prosecution counsel, and/or Dr. Verma misrepresented the ability of glucocorticoids, particularly dexamethasone, to reduce NF-κB activity.

67.    By failing to inform the Examiner of at least the Doucas et al. (2000) and Withoff et al. (2007) references, Defendants, their prosecution counsel, and/or Dr. Verma practiced a fraud on the PTO and violated their duty of disclosure through bad faith and intentional misconduct.

68.    In his declaration, Dr. Verma disagreed with the Examiner's determination that use of red wine reduced NF-κB activity in the references cited as prior art in the requests for reexamination, thereby anticipating claims 1-2, 6, 8, 9, 20-21, 25-27, 29-32, 36-41, 64-65, 69-76, 80, 82, 84, 87-89, and 93-98 of the '516 patent.

69.    Defendants, their prosecution counsel, and/or Dr. Verma failed to disclose, however, that Dr. Verma was the co-author of a scientific review article that, among other things, identified use of resveratrol, a component of red wine, as resulting in a decrease in NF-κB activity. In particular, Dr. Verma, along with his co-authors, stated:

> Polyphenols curcumin, which can be isolated from the spice turmeric, and ***resveratrol, which is found in grapes and red wine,*** have been found to downregulate NIK and IKKα/β, ***resulting in*** inhibition of IKK activation,

decreased IκBα-degradation, decreased p65 translocation, and **a decrease in NF-κB activity**.

Withoff et al. (2007) at 205.

70.    Defendants, their prosecution counsel, and/or Dr. Verma knew or should have known of the materiality of the Withoff et al. (2007) reference to the patentability of the claims at issue. Defendants, their prosecution counsel, and/or Dr. Verma also knew or should have known that red wine was described in printed publications long before the filing of the applications leading to the issuance of the '516 patent. By failing to inform the Examiner of at least the Withoff et al. (2007) reference, Defendants, their prosecution counsel, and/or Dr. Verma misrepresented the ability of red wine to reduce NF-κB activity.

71.    By failing to inform the Examiner of at least the Withoff et al. (2007) reference, Defendants, their prosecution counsel, and/or Dr. Verma practiced a fraud on the PTO and violated their duty of disclosure through bad faith and intentional misconduct.

72.    In his declaration, Dr. Verma disagreed with the Examiner's determination that use of N-Acetyl-L-Cysteine ("NAC") reduced NF-κB activity in the reference cited as prior art in the requests for reexamination, thereby anticipating claims 18 and 182-185 of the '516 patent.

73.    Defendants, their prosecution counsel, and/or Dr. Verma failed to disclose, however, that Dr. Verma was the co-author of at least two scientific review articles that, among other things, identified use of NAC as inhibiting NF-κB activity. In particular, Dr. Verma, along with his co-authors, stated:

> Other well-known antioxidants are thiols (e.g., glutathione, **N-acetyl-L-cysteine [NAC]**, and N-acystelyn [NAL]), vitamin E, NADPH, glutathione peroxidase, and MnSOD, **all of which inhibit NF-κB activity to varying degrees**.

Withoff et al. (2007) at 205 (emphasis added) (citation omitted). In another review paper, Dr. Verma stated:

"It has been shown in a mouse model that supplementation of *N-acetylcystein, a known inhibitor of NF-κB*, is able to reduce hyperglycemia and to attenuate the severity of insulin-dependent diabetes.

Bottero et al., Cell Death and Differentiation 13:785-797 (2006), at 793 (emphasis added)

(citation omitted) ("Bottero et al. (2006)").

74.    Defendants, their prosecution counsel, and/or Dr. Verma knew or should have known of the materiality of the Withoff et al. (2007) and Bottero et al. (2006) references to the patentability of the claims at issue. Defendants, their prosecution counsel, and/or Dr. Verma also knew or should have known that NAC was described in printed publications long before the filing of the applications leading to the issuance of the '516 patent. By failing to inform the Examiner of at least the Withoff et al. (2007) and Bottero et al. (2006) references, Defendants, their prosecution counsel, and/or Dr. Verma misrepresented the ability of NAC to reduce NF-κB activity.

75.    By failing to inform the Examiner of at least the Withoff et al. (2007) and Bottero et al. (2006) references, Defendants, their prosecution counsel, and/or Dr. Verma practiced a fraud on the PTO and violated their duty of disclosure through bad faith and intentional misconduct.

76.    Each claim of the '516 patent is also unenforceable as a result of inequitable conduct committed during the Merged Proceedings of *Ex Parte* Reexamination Control Nos: 90/007,503 (filed April 4, 2005) and 90/007,828 (filed December 2, 2005) due to the failure by one or more of Defendants and their counsel to disclose to the PTO information known to Defendants and/or their counsel to be material to patentability in the re-examination.

77.    Defendants submitted during the re-examination of the '516 patent the expert report and the sworn testimony of Dr. Thomas Kadesch from Defendants' ongoing litigation with Eli Lilly & Co. (the "Lilly litigation") supporting validity and written description of the claims of

14

that patent. Defendants and/or their counsel, through bad faith and intentional misconduct, failed to disclose to the PTO subsequent testimony of Dr. Kadesch from a separate litigation in which Dr. Kadesch unequivocally recanted his prior testimony and expert report that had supported the patentability of the claims of the '516 patent. This withheld and contradictory testimony of Dr. Kadesch is material to the patentability of the claims of the '516 patent and to the priority date, if any, to which the claims of the '516 patent -- and the claims that ARIAD is attempting to add in the re-examination -- are entitled. ARIAD and/or its counsel violated the duty of disclosure by failing to disclose this contradictory testimony of Dr. Kadesch.

78.    During the re-examination proceeding, ARIAD submitted to the PTO Dr. Kadesch's expert testimony in the Lilly litigation, which included testimony that the claims of the '516 patent were adequately described in the specification of the '516 patent:

> The '516 patent specification and earlier applications ... describe methods of reducing induced NF-kB activity in cells to reduce the expression of NF-kB regulated genes. The description clearly allows one of ordinary skill in the art to recognize that the Baltimore Inventors invented what is claimed.

Rule 26(A)(2) Rebuttal Report of Thomas R. Kadesch, PhD., at ¶ 88.

79.    On June 21, 2007, however, Dr. Kadesch specifically recanted these prior opinions, which Defendants had submitted to the PTO. In a deposition in a separate litigation between Amgen and F. Hoffmann-LaRoche Ltd. (the "Roche litigation"), Dr. Kadesch was questioned about an apparent inconsistency between his opinions in the Roche litigation and his prior opinions in the Lilly litigation in support of the '516 patent claims. Dr. Kadesch testified that he had changed his view of the '516 patent and no longer believed the claims to be adequately described.

> ...I've come to understand the necessity for claim language in a way that I didn't appreciate with the '516 Patent. If I had been asked the same series of questions around the '516 Patent, I would have said that the '516 Patent, as it's stated, cannot claim all cells.

15

Q. And cannot claim all eukaryotic cells?

A. That's correct....

Q  I just want to make sure I understand.  As you sit here today, do you agree that the '516 Patent claims have adequate written descriptive support?

A  For --

Q. For all eukaryotic cells?

A. No.

Kadesch Dep. Tr. at 269-270.

80.     Members of the same law firm, Kaye Scholer LLP, and many of the same attorneys that represent Defendants in their litigation against Lilly and in the re-examination also represent F. Hoffmann-LaRoche in the Roche litigation.  Defendants' counsel immediately designated the June 21, 2007 Kadesch deposition transcript "outside counsel's eyes only" under the Amended Protective Order in the Roche litigation.  They identified this litigation between Amgen and ARIAD as the supposed justification for designating the Kadesch deposition transcript under the Amended Protective Order in the Roche litigation.  However, the Amended Protective Order in that action narrowly defines the information that can be designated for outside counsel's eyes only and Dr. Kadesch's testimony did not satisfy that definition.

81.     Counsel for Amgen in the Roche litigation immediately notified Defendants' counsel of the import of this testimony in the pending re-examination and of Defendants' duty to disclose it to the PTO.  Amgen's counsel notified the attorneys at Kaye Scholer that Dr. Kadesch's testimony does not contain any confidential Amgen or Roche information and requested that the confidentiality designation be withdrawn.

82.     Defendants' counsel not only failed to disclose Dr. Kadesch's testimony to the PTO, but also took affirmative steps to conceal it from others, including Amgen, further evidencing intent to mislead the PTO and avoid disclosing it to the PTO in connection with the

re-examination. On multiple occasions, Amgen requested the attorneys at Kaye Scholer to withdraw the confidentiality designation so that the testimony could be disclosed to the PTO. Kaye Scholer ignored Amgen's requests. Amgen's requests to Ariad to disclose the testimony were also ignored and finally refused. Only after Lilly filed a Rule 60 motion for relief from judgment did the attorneys at Kaye Scholer finally disclose the testimony to Lilly's counsel in the Lilly litigation but only under strict secrecy conditions. Amgen was finally successful in obtaining the testimony in this action only through a subpoena to third party Roche, who produced the relevant testimony to Amgen on December 8, 2007.

83.    Dr. Kadesch's June 21, 2007 deposition testimony is material in that it is inconsistent with ARIAD's arguments of patentability in the re-examination, including ARIAD's arguments relating to the effective filing date to which the claims of the '516 patent are entitled to claim priority. In fact, the withheld testimony "unequivocally recants" Dr. Kadesch's prior sworn testimony that the '516 patent is valid under 35 U.S.C. § 112. By intentionally withholding Dr. Kadesch's testimony, one or more of the Defendants and/or their counsel violated their duty of disclosure through bad faith and intentional misconduct.

84.    Further, each claim of the '090 patent is unenforceable based on inequitable conduct in the prosecution of United States Patent Application No. 08/463,397 (the "'397 application"), the application leading to the issuance of the '090 patent and/or any related patent applications.

85.    Defendants, their prosecution counsel, and/or one or more of the named inventors on the '090 patent were aware, or should have been aware, that certain individuals named on the face of the '090 patent were not properly inventors of any of the claims of the '090 patent.

86.     For example, each claim of the '090 patent recites an assay for identifying a compound which modulates a type of NF-κB activity, but one or more of the named inventors of the '090 patent did not perform any work relating to NF-κB activity, or to NF-κB, that was incorporated into the applications leading to the issuance of the '090 patent, including, for example, Jonathan LeBowitz.

87.     Moreover, Jonathan LeBowitz has previously testified that he "never worked on NF-κB."

88.     The misjoinder of at least Jonathan Lebowitz was material to the patentability of the '090 patent.

89.     By failing to inform the Examiner that at least Jonathan LeBowitz was not properly a named inventor, Defendants, their prosecution counsel, and/or one or more of the named inventors practiced a fraud on the PTO and violated their duty of disclosure through bad faith and intentional misconduct.

90.     Each claim of the '374 patent is unenforceable based on inequitable conduct in the prosecution of United States Patent Application No. 08/418,266 (the "'266 application"), the application leading to the issuance of the '374 patent, and/or any related patent applications.

91.     As originally filed, each claim in the '266 application recited preparing a DNA construct which contains a binding site of NF-κB, or inducing expression of a gene or gene segment controlled by an enhancer sequence, or a portion thereof, which contains a binding site of NF-κB.  One or more of the named inventors of the '266 application did not perform any work relating to binding sites of NF-κB, including, for example, Jonathan LeBowitz.

92.     By failing to inform the Examiner that at least Jonathan LeBowitz was not properly a named inventor, Defendants, their prosecution counsel, and/or one or more of the

18

named inventors practiced a fraud on the PTO and violated their duty of disclosure through bad faith and intentional misconduct.

93.    Each claim of the '516 patent is also unenforceable based on the equitable doctrine of unclean hands.

94.    Each claim of the '374 patent is also unenforceable based on the equitable doctrine of unclean hands.

95.    Each claim of the '090 patent is also unenforceable based on the equitable doctrine of unclean hands.

96.    Each claim of the '516 patent is also unenforceable based on the equitable doctrine of laches.

97.    Each claim of the '374 patent is also unenforceable based on the equitable doctrine of laches.

98.    Each claim of the '090 patent is also unenforceable based on the equitable doctrine of laches.

99.    Based on, *inter alia*, the conduct as set forth above, it is appropriate and necessary that all claims of the '516 patent be judicially declared unenforceable.

100.    Based on, *inter alia*, the conduct as set forth above, it is appropriate and necessary that all claims of the '374 patent be judicially declared unenforceable.

101.    Based on, *inter alia*, the conduct as set forth above, it is appropriate and necessary that all claims of the '090 patent be judicially declared unenforceable.

**WHEREFORE**, the Amgen Entities deny that the Defendants are entitled to any relief in this Action against the Amgen Entities and specifically request that:

19

A.  Judgment be entered for the Amgen Entities that they do not infringe any claim of U.S. Patent No. 6,410,516; that each claim of U.S. Patent No. 6,410,516 is invalid; and that U.S. Patent No. 6,410,516 is unenforceable;

B.  Judgment be entered for the Amgen Entities that they do not infringe any claim of U.S. Patent No. 5,804,374; and that each claim of U.S. Patent No. 5,804,374 is invalid; and that U.S. Patent No. 5,804,374 is unenforceable;

C.  Judgment be entered for the Amgen Entities that they do not infringe any claim of U.S. Patent No. 6,150,090; that each claim of U.S. Patent No. 6,150,090 is invalid; and that U.S. Patent No. 6,150,090 is unenforceable;

D.  No injunctive of other equitable relief issue to the Defendants against the Amgen Entities;

E.  No damages be awarded the Defendants against the Amgen Entities;

F.  No costs, expenses, nor attorney fees be awarded to the Defendants against the Amgen Entities;

G.  Costs, expenses, and attorney fees be awarded to the Amgen Entities for their defense of this Counterclaim; and

H.  The Court award such other relief as it deems appropriate.

DB02:6433029.1

065028.1001

YOUNG CONAWAY STARGATT & TAYLOR, LLP


Melanie K. Sharp (No. 2501)
Mary F. Dugan (No. 4704)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801

P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6681
msharp@ycst.com

Mark A. Pals
Marcus E. Sernel
Jamie H. McDole
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL  60601-6636
(312) 861-2000

Drew Diamond
KIRKLAND & ELLIS LLP
South Figueroa Street
Los Angeles, CA  900017-5800
(213) 680-8400

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Inc.,*
*Immunex Corporation, Amgen USA Inc., Amgen Manufacturin*
*Limited, and Immunex Rhode Island Corporation*

Dated: 12/11/07