# EXHIBIT F

Docket No. 74753/JPW/GJG

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

A Merged Proceeding of *Ex Parte* Reexamination Control Nos:

        90/007,503           and           90/007,828

64660   U.S. PTO

|||||||||||||||||||||||||

11/17/06

**Filed April 4, 2005          Filed December 2, 2005**

**Merged Pursuant to May 4, 2006 Merger Decision**
**Group Art Unit: 3991   Examiner: B.M. Celsa**

Patentees:       David Baltimore, Ranjan Sen, Phillip A. Sharp,
                 Harinder Singh, Louis Staudt, Jonathan H.
                 Lebowitz, Albert S. Baldwin Jr., Roger G. Clerc,
                 Lynn M. Corcoran, Patrick A. Baeuerle, Michael J.
                 Lenardo, Chen-Ming Fan, and Thomas P. Maniatis

Patent No.:      6,410,516 B1              Serial No: 08/464,364

Issue Date:      June 25, 2002            Filed:     June 5, 1995

For        :     NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL
                 REGULATION

                                          1185 Avenue of the Americas
                                          New York, New York 10036
                                          November 9, 2006

Mail Stop *Ex Parte* Reexamination
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### RESPONSE TO AUGUST 2, 2006 OFFICE ACTION,
### SUMMARY OF OCTOBER 13, 2006 EXAMINER INTERVIEW,
### STATEMENT OF CONCURRENT PROCEEDINGS UNDER 37 C.F.R. § 1.565,
### AND SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT

An Office Action issued August 2, 2006 in connection with the above-identified merged *ex parte* reexamination. The August 2, 2006 Office Action set a two (2) month period for filing a response. Patentees petitioned, and on September 29, 2006 the U.S. Patent Office granted Patentees' request, for a one (1) month extension of time such that a response to the August 2, 2006 Office Action was due November 2, 2006. Thereafter, on October 31, 2006 Patentee's petitioned for, and the U.S. Patent Office granted Patentee's request for a one (1) week extension

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 2 of 92  of November 9, 2006 Response*

of time such that a response to the August 2, 2006 Office Action
is now due November 9, 2006. Accordingly, this Response is being
timely filed.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 3 of 92  of November 9, 2006 Response*


**In the Claims**


Please cancel claims 7, 28, 39, 81, 83, 85, 86 and 203 from the
subject patent pursuant to 37 C.F.R. § 1.530(d)(2).

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 4 of 92 of November 9, 2006 Response*

<u>**REMARKS**</u>

Patentees respond below to the rejections set forth in the August 2, 2006 Office Action.  The following Table of Contents is provided for reference:

<u>Table of Contents</u>

|  |  |  | Page |
|---|---|---|---|
| I. | INTRODUCTION | | 6 |
| | A. | Status of Claims Pursuant to 37 C.F.R. § 1.530(e) | 6 |
| | B. | Rejections Made Moot by the Cancellation of Claims | 6 |
| | C. | Update of Concurrent Proceedings Under 37 C.F.R. §1.565 | 6 |
| | D. | Summary of Patentees' Response Set Forth in this Response | 8 |
| II. | SUMMARY OF OCTOBER 13, 2006 EXAMINER INTERVIEW | | 11 |
| III. | THE IMPROPER USE OF REFERENCES WHICH ARE NOT PRIOR ART AND A DECLARATION TO SUPPORT INHERENCY REJECTION IS *ULTRA VIRES* | | 18 |
| | A. | Statutory Grounds For Reexamination | 18 |
| | B. | Impermissible Grounds of Rejection in a Reexamination | 18 |
| | C. | The Inherent Anticipation Rejections in the August 2, 2006 Office Action are Improper; They Rely on Evidence Other Than "prior art consisting of patents or printed publications" in Violation of the Reexamination Statute | 19 |
| | D. | The Claims of the Subject Patent Are Method Claims and the Cited Prior Art References are At Most Evidence of What Occurred During A Prior Public Use | 21 |
| IV. | INCONSISTENCIES IN AUGUST 2, 2006 OFFICE ACTION | | 24. |
| | A. | Rejected Claims Reciting "Liver Cells" Should be Confirmed Patentable | 24 |
| | B. | Rejected Claims Reciting Specific Ways of Reducing NF-kB Activity Should be Confirmed Patentable | 24 |
| V. | PROPER CLAIM CONSTRUCTION | | 25 |
| | A. | Claims Require a "Reasonable" Interpretation; The Examiner Improperly Expanded The Scope of the claims Beyond a Reasonable Interpretation | 25 |
| | B. | The Proper Interpretation of Method Claims Requires They Be Interpreted As Involving Affirmative Acts | 26 |
| | C. | Different Claims Must Be Construed To Have Different Scope. | 28 |
| | D. | Proper Construction of the '516 Claims | 29 |
| VI. | REJECTIONS ON THE BASIS OF "INTERVENING REFERENCES" | | 33 |
| | A. | Numerous Claims Are Clearly Entitled To At Least An April 21, 1989 Effective Filing Date | 33 |

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 5 of 92  of November 9, 2006 Response*

B.    Rejections On the Basis of "Intervening References"
      Should Be Withdrawn As To All Claims Entitled
      To At Least An April 21, 1989 Effective
      Filing Date .................................................. 34

C.    Claims Entitled To At Least An April 21, 1989
      Effective Filing Date And Rejected Solely On
      The Basis of "Intervening References" Should
      Be Confirmed Patentable ................................ 34

D.    Claim Rejections On The Grounds Of Anticipation
      or Obviousness Over The "Intervening References"
      Are Not Valid Even For Claims Entitled To a
      November 13, 1991 Filing Date ......................... 39

      1. Intervening References Relating To Protein Kinase...... 39

      2. Intervening References Relating To Cyclosporin A....... 48

      3. Intervening References Relating To N-Acetyl-L Cysteine. 61

VIII. THE CLAIMS ARE NOT INHERENTLY ANTICIPATED...................... 64

A.    Inherent Anticipation Requires a Showing That
      Each and Every Element of a Claim Necessarily
      Occurred in the Prior Art................................... 64

B.    The References Used As "Extrinsic Evidence" Do Not
      Reproduce What the Prior Art References Describe
      And Therefore Fail to "Explain"
      What Occurred in the Prior Art References................. 66

C.    Even If the References Used As "Extrinsic Evidence"
      Were Deemed To Explain the Prior Art, the Cited
      Prior Art Does Not Teach Each and
      Every Element of the Claims Being Rejected................ 79

IX.   SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT................... 90

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 6 of 92  of November 9, 2006 Response*

I.    INTRODUCTION

  A.    **Status of Claims Pursuant to 37 C.F.R. § 1.530(e).**

Canceled Claims:
 - Claims 7, 28, 39, 81, 83, 85, 86 and 203 have been canceled.

Pending Claims:
 - Claims 1-6, 8-27, 29-38, 40-80, 82, 84, 87-202 as issued on June
25, 2002 are pending in the subject patent.

Of these, claims 19, 44-46, 52, 101-103, 108, 111-113, 118, 121-123,
130-132, 141-143, 151-153, 161-163, 169-171, 179-181, 187-191, 194-
196 and 202 have been confirmed patentable in the August 2, 2006
Office Action.

  B.    **Rejections Made Moot by the Cancellation of Claims**

Patentees have cancelled claims 7, 28, 39, 81, 83, 85, 86 and 203
without disclaimer or prejudice to applicants' right to pursue
related subject matter in a pending application in order to reduce
the number of issues in this reexamination.  The cancellation of
these claims renders moot their rejection including the rejection of
claim 203 in section X on pages 52-55 of the August 2, 2006 Office
Action.

The remaining rejection set forth in the August 2, 2006 Office Action
are discussed below.

  C.    **Update of Concurrent Proceedings under 37 C.F.R. § 1.565**

*Petitions and Action in the U.S. District Court for the Eastern
District of Virginia*

Patentees have previously petitioned the U.S. Patent and Trademark
Office to declare the order initiating this reexamination *ultra vires*

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 7 of 92 of November 9, 2006 Response*

in so far as it relied upon references and a declaration which are
not prior art to support inherency rejections.  The petitions were
denied.  Patentees then requested the U.S. District Court for the
Eastern District of Virginia to review the denial of the petitions
(06-CV-0679).  On October 3, 2006, the Court dismissed Patentees'
request on the basis that Patentees have not suffered harm by the
Patent Office's decision to reexamine the subject patent.  The Court
did not rule on the substantive issues raised by Patentees concerning
the scope of the Patent Office's authority to reexamine this patent
including whether references published after the filing date might
be relied upon to reject claims.


*ARIAD Pharmaceutical, Inc. et al. v. Eli Lilly and Co.*
Patentees previously informed the U.S. Patent and Trademark Office
that a jury trial at the U.S. District Court for the District of
Massachusetts (*ARIAD Pharmaceutical, Inc. et al. v. Eli Lilly and
Co.*, 02-CV-11280-RWZ) unanimously found claims 80, 95, 144, and 145
of the subject patent valid and infringed. The art presented to the
Court included art relating to  glucocorticoids, cyclosporin A,
antibiotics, 5-ASA and red wine.  Expert reports and testimony
including reports and testimony from Dr. Manolagas on which the
Examiner has relied in part in the August 2, 2006 Office Action, were
also presented to the Court.  The jury also determined that the
claims at issue were enabled and adequately described in U.S. Serial
No. 07/431,436, filed April 21, 1989 and therefore entitled to an
April 21, 1989 effective filing date.


From August 7, 2006 to August 10, 2006, an evidentiary hearing was
conducted by the Court on four asserted defenses/counterclaims raised
by Lilly which the Court did not submit to the jury.  The four issues
presented were whether the subject patent is a) unenforceable because
of alleged inequitable conduct during prosecution, b) unenforceable
because of alleged prosecution latches, c) invalid for covering non-

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 8 of 92  of November 9, 2006 Response*

patentable subject matter, and d) invalid for indefiniteness.  As of
the date of the filing of this Response, the Court has not decided
these defenses/counterclaims.


*Amgen Inc. et al. v. ARIAD Pharmaceuticals, Inc.*

Patentees previously informed the U.S. Patent and Trademark Office
that a Complaint for Declaratory Judgment of Patent Invalidity And
Non-Infringement of U.S. Patent No. 6,410,516 was filed on April 20,
2006 in the U.S. District Court for the District of Delaware (*Amgen
Inc. et al. v. ARIAD Pharmaceuticals, Inc.,* 06-CV-00259-KAJ).  In a
written order on September 13, 2006, that Court a) denied a motion
by ARIAD to dismiss the case for lack of subject matter jurisdiction,
and b) denied as without prejudice a motion by ARIAD to dismiss for
failure to join necessary and indispensable parties.  On September
25, 2006, ARIAD answered the complaint and denied the allegations of
patent invalidity and non-infringement.  On November 3, 2006 the
Court granted a motion by ARIAD for certification for appeal to the
Court of Appeals for The Federal Circuit ("CAFC") of the Court's
order denying the motion to dismiss for lack of subject matter
jurisdiction.


**D.   Summary of Patentees' Response Set Forth in this Response**


In this Response, Patentees put forth their positions as follows:


1.   Reliance in the August 2, 2006 Office Action on references and
     a declaration which are not prior art to reject claims on the
     basis of inherency is *ultra vires* and contravenes the
     reexamination statute by relying as a basis for rejecting claims
     on references which a) are not "prior art consisting of patents
     and printed publications" and/or b) are evidence of a prior
     public use.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 9 of 92  of November 9, 2006 Response*

2.    Most of the claims rejected on "intervening references" dated
      between April 21, 1989 and November 13, 1991 are entitled to at
      least an April 21, 1989 filing date.   These "intervening
      references," therefore, are not properly cited against such
      claims; and, in any event, do not anticipate or render obvious
      such claims.

3.    The claims, properly construed, require that NF-kB activity have
      first been induced in order to reduce such activity and obtain
      the results recited in the claims.  So construed, the claims are
      not anticipated by the cited prior art which does not disclose
      each and every element of the claims, either expressly or
      inherently.    The references characterized as "extrinsic
      evidence" of what occurred in the cited prior art do not refer
      to the prior art, do not repeat or explain any method disclosed
      in the prior art, and fail to establish that the elements not
      disclosed in the cited prior art methods necessarily occurred
      during the practice of such methods.    The declaration
      characterized as "extrinsic evidence" does not overcome these
      shortcomings.

4.    More specifically, the cited prior art methods either (a)
      clearly do not involve reducing NF-kB activity at all or (b) do
      not necessarily involve reducing NF-kB activity.  For example,
      cyclosporin A has its effects through a mechanism involving the
      transcription factor NFAT, not NF-kB; drinking red wine cannot,
      and does not, result in red wine acting on eukaryotic cells to
      reduce NF-kB activity in such cells; antibiotics act on
      bacterial cells, they do not reduce NF-kB activity in eukaryotic
      cells; administration of 5-ASA to ulcerative colitis patients
      in remission does not reduce NF-kB activity in such patients at
      all and/or necessarily; pretreatment of eukaryotic cells with
      an agent such as vitamin D or a glucocorticoid does not result
      at all or necessarily in reducing NF-kB activity in such cells.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 10 of 92  of November 9, 2006 Response*

These points are elaborated upon and additional points made in the detailed discussion which follows as well as in the Declaration of Dr. Verma, submitted herewith as **Exhibit 1** and incorporated by reference into this Response in its entirety.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 11 of 92  of November 9, 2006 Response*

## II.  SUMMARY OF OCTOBER 13, 2006 EXAMINER INTERVIEW

This Summary is filed pursuant to 37 C.F.R. § 1.560(b) to supplement
the handwritten Interview Summary prepared by Examiner Bennett Celsa
at the conclusion of an October 13, 2006 interview attended by
Examiner Celsa; Examiner Ponnaluri Padmashri; Supervisory Examiner
Deborah Jones; Dr. Inder Verma; David Berstein Esq.; John P. White,
Esq.; and Gary J. Gershik, Esq., and to provide a complete record of
the reasons warranting favorable action in the above-identified
reexamination which were discussed during the October 13, 2006
interview.   Patentees acknowledge with appreciation the courtesy
extended by Examiners Celsa, Padmashri and Jones in connection with
the interview.

Patentees had requested the interview to discuss the grounds of
rejection set forth in the August 2, 2006 Office Action issued in
connection with this merged reexamination.    Patentees briefly
indicated that this response would reiterate Patentees' arguments
concerning the impropriety of relying on non-prior art evidence to
reject claims in the subject reexamination; and would provide a
detailed explanation of Patentees' entitlement to an April 21, 1989
effective filing date rather than the November 13, 1991 date accorded
by the Examiner for most claims rejected on the basis of "intervening
references".  Most of the interview was spent discussing the proper
interpretation of the claims and the lack of basis for the inherent
anticipation rejections set forth in the August 2, 2006 Office
Action.

To assist in understanding the claims, Patentees referred to
Schematics 1-8 (Exhibit 1 to the Declaration of Dr. Verma).
Patentees explained that NF-kB is a nuclear transcription factor that
unless and until activated resides as an inactive complex in the
cytoplasm of a eukaryotic cell (Schematic 1).  Upon activation by an
external influence capable of inducing the NF-kB pathway, the complex

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 12 of 92  of November 9, 2006 Response*

dissociates and NF-kB travels to the nucleus of the cell where it
binds to specific binding sites present on genes that are regulated
by NF-kB resulting in expression transcription of such genes
(Schematic 2). See, e.g. column 2, lines 46-63; column 10, lines 31-
55; column 14, lines 28-30; column 16, lines 22-63 of the subject
patent. While NF-kB activity is essential to allow the cell to
respond to the effects of harmful external agents, in some cases the
activity can become excessive causing other undesirable effects. The
entire NF-kB pathway from induction to gene expression can be
separated into the six (6) segments shown in Schematic 2. The level
of NF-kB activity over time induced by the presence of an external
influence is represented by the color blue in the graph in the upper
right hand corner of Schematic 2.

Patentees discovered and described the NF-kB pathway in eucaryotic
cells. Patentees further provided ways of  measuring NF-kB activity
and of interfering with the pathway to reduce NF-kB activity. See,
e.g. column 3, line 59 to column 4, line 28; and column 35, line 13
to column 38, line 24. Interference in the pathway can occur
anywhere along any of the six (6) segments of the pathway, as
represented by the arrows in Schematic 3. Patentees' claims are
directed to achieving the specific claimed results by reducing NF-kB
activity in cells based on interfering with segments of the pathway.
Patentees' claims do not encompass prophylaxis, i.e. systems not
exposed to an inducer, but instead are directed to reducing induced
NF-kB activity so as to achieve desired results in cells, including
cells of patients being treated.

Certain claims, e.g. claims 1, 2 and 5, are directed to methods of
achieving the specific results recited in the claims by interfering
along any of the six (6) segments shown in Schematic 3. Other
claims, e.g. claims 8, 9, 10, 14, 95 and 145, require that the
external influence "induce NF-kB-mediated intracellular signaling,"
i.e. require the persistence of at least the segment 1 involving

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 13 of 92  of November 9, 2006 Response*

induction and intracellular signaling, and only encompass interference in the NF-kB pathway along the remaining five (5) segments, each of which is intracellular (Schematic 4). Yet other claims more precisely define along which of the five (5) intracellular segments the reduction of NF-kB activity occurs: e.g. claims 20, 22, 24, 31, 33, 35, 42, 44 and 46 for segment 2 (Schematic 5); e.g. claims 23, 34 and 45 for segment 3 (Schematic 6); e.g. claims 21, 32, 43 and 89 for segment 5 (Schematic 7); and, e.g. claims 25, 47, 80 and 144 for segment 6 (Schematic 8).

Patentees also discussed the prior art which was cited in the August 2, 2006 Office Action to support inherent anticipation rejections. With respect to the remaining rejections in the August 2, 2006 Office Action, Patentees noted that they would cancel a few claims to reduce the number of issues in the reexamination.

Patentees explained that the so-called "extrinsic evidence" relied upon by the Examiner did not "explain" the cited prior art because the "extrinsic evidence" references did not even refer to the prior art and clearly did not reproduce the experimental conditions described in the cited prior art. Patentees indicated that this response would include a more detailed explanation, and such explanation appears herein. Because the "extrinsic evidence" provides information about experiments other than the experiments described in the prior art references it fails to provide an explanation of what necessarily occurred in the methods described in such prior art references. Patentees respectfully submitted that for this reason alone all of the rejections based on inherent anticipation were improper and should be withdrawn.

However, even assuming *arguendo* the "extrinsic evidence" could be relied upon to explain the cited prior art references, Patentees proceeded to explain with reference to Schematics 9-17 (Exhibit 1 to the Declaration of Dr. Verma) how the prior art references fail to

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 14 of 92  of November 9, 2006 Response*

anticipate the claims being rejected based thereon.

Patentees discussed the rejection in section IV on pages 32-34 of the
August 2, 2006 Office Action based on 5-ASA.  Only one prior art
reference has been cited, namely, Dew (1983).  In Dew (1983),
however, no NF-KB inducer is described, and to the extent the disease
ulcerative colitis could be alleged to be an indication of NF-kB
activity, the patients in Dew (1983) were "in remission."  See, e.g.
title, first paragraph, and second paragraph of Dew (1983).  Thus,
even if ulcerative colitis could be alleged to involve activation of
NF-kB, the patients in Dew (1983) were in remission.  Accordingly,
Dew does not involve necessarily involve reducing induced NF-kB
activity and therefore does not anticipate any now pending claim of
the subject patent which requires reducing NF-kB activity (Schematic
9).

Next, Patentees discussed the antibiotic art cited in the rejection
in section VI on pages 39-42 of the August 2, 2006 Office Action,
i.e. the 1970 Physician's Desk Reference ("1970 PDR").  The 1970 PDR
describes the use of antibiotics to treat bacterial infection in
subjects, including infection by Gram-negative bacteria which have
lipopolysaccharide ("LPS") in their cellular membrane.  Although it
is true that LPS *per se* is an inducer of NF-kB activity, antibiotics
kill bacteria or prevent bacteria from reproducing.  Administration
of antibiotics to a subject does not effect on the induction of the
NF-kB pathway by bacterial associated LPS which would continue to
induce NF-kB activity (Schematic 10).  Thus, antibiotics have no
effect on any of the six (6) segments of the NF-kB pathway.  In fact,
some antibiotics cause bacterial lysis which releases LPS causing
increased induction of NF-kB and increased not reduced NF-kB
activity. (See, e.g. Declaration of Dr. Verma ¶ 130, and references
referred to therein).  Accordingly, the use of antibiotics to treat
bacterial infection according to the 1970 PDR does not necessarily
reduce NF-kB activity and therefore does not anticipate the claims

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 15 of 92  of November 9, 2006 Response*

of the subject patent.

Patentees then discussed the cyclosporin A art cited in the rejections in sections IIb(8)- IIb(10) on pages 19-29, as well as the rejections relying on "intervening references" in sections IIa(5)-IIa(7) on pages 13-19, of the August 2, 2006 Office Action. Briefly, the activity of cyclosporin A has been shown to involve NFAT a transcription factor different from NF-kB. (Schematics 11-13 attached as Exhibit 1 of the Declaration of Dr. Verma and ¶¶ 28-32, 39-43, 49 and 60 thereof).  A complete explanation of the cyclosporin A art appears below.  Accordingly, the method using cyclosporin A described in the cited prior art does not necessarily involve reducing NF-kB and does not anticipate the claims of the subject patent.

Next, Patentees discussed the vitamin D art cited in the rejection in section III on pages 30-32 of the August 2, 2006 Office Action. The August 2, 2006 Office Action alleged that vitamin D reduces NF-kB activity based on the teaching of a single publication being used as "extrinsic evidence", Yu et al. (1995), and a Declaration by Dr. Manolagas.  However, Yu et al. (1995) does not show that vitamin D necessarily reduced NF-kB activity in the cited prior art.  In fact, Yu et al. (1995) acknowledged on page 10994 that any NF-kB effect of vitamin D "is a matter of conjecture."  Moreover, vitamin D has been shown in several other references to actually induce the NF-kB pathway and increase rather than reduce NF-kB activity (Schematic 14). (See, e.g. Declaration of Dr. Verma ¶ 125, including references referred to therein.)  Furthermore, Dr. Manolagas has admitted during deposition and during trial testimony that vitamin D increases rather than reduces NF-kB activity. (See, Dr. Manolagas deposition and trial testimony excerpts attached hereto as **Exhibit 2.**)  Accordingly, the method of use of vitamin D described in the cited prior art does not necessarily involve reducing NF-kB activity and does not anticipate the claims of the subject patent.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 16 of 92  of November 9, 2006 Response*

Patentees then discussed the red wine art cited in the rejection in section VII on pages 42-47 of the August 2, 2006 Office Action.  The prior art references asserted in support of this rejection are The Bible, St. Leger (1979), Dobrilla (1984) and Jones (1987).  These prior art references describe use of red wine by subjects, but do not provide any details about the type of red wine, or the constituents of the red wine which is a complex mixture.  Moreover, it is clear that consumed red wine *per se* is not contacting or entering any eukaryotic cell.  In this regard, the prior art clearly does not enable any method, express or inherent, of using any specific type of red wine.  Moreover, the prior art references do not disclose any inducer of NF-kB, thus making it uncertain whether any of the subjects had NF-kB activity to begin with, let alone NF-kB activity that was reduced (Schematic 15).  Accordingly, the methods using red wine described in the prior art are not enabled, and moreover do not and cannot necessarily involve reducing NF-kB activity.  Therefore, such methods do not anticipate the claims of the subject patent.

Patentees also discussed the glucocorticoid art cited in the rejection in section V on pages 34-39, and section XI on pages 55-60 of the August 2, 2006 Office Action.  Generally, Patentees pointed out that it is not known how glucocorticoids work, and there is no evidence that they reduce NF-kB activity (Schematics 16 & 17).  Even a 2003 article cited as "extrinsic evidence" by the Examiner acknowledges the lack of understanding of the mode of action of glucocorticoids.  Padgett (2003) at p. 446 ("the story is not very clear").  Such lack of understanding of the mechanism by which glucocorticoids act cannot support the conclusion that reduction of NF-kB activity necessarily occurred during practice of a prior art method that used a glucocorticoid.  On the contrary, when the effects of a glucocorticoid on NF-kB activity in human subjects were recently tested, the glucocorticoid was found to have no effect on NF-kB activity. (See, e.g. Declaration of Dr. Verma ¶¶ 96-100, including references referred to therein such as Hart et al).  Accordingly, the

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 17 of 92  of November 9, 2006 Response*

methods of use of glucocorticoids described in the prior art do not necessarily reduce NF-kB activity and therefore do not anticipate the claims of the subject patent.

Finally, Patentees pointed out certain unexplained discrepancies in the August 2, 2006 Office Action.  One such discrepancy involves the rejection of claims 30, 41, 63, 74, 87, 98, 138, 148, 158, 176, and 186, each of which recites "liver cells", but the confirmation of patentability of claims 52, 108, 118, 191 and 202 which also recite "liver cells."  No reason is provided in the August 2, 2006 Office Action for distinguishing the rejected claims from those confirmed patentable.  During the interview, Examiner Celsa acknowledged that none of the cited art teaches reducing NF-kB activity in liver cells.  Accordingly, claims 30, 41, 63, 74, 87, 98, 138, 148, 158, 176, and 186 should be confirmed patentable as were claims 52, 108, 118, 191, and 202.

Another discrepancy involves the rejection of claims 22-24, 33-35, 55-57, 66-68, 77-79, and 90-92 which recite specific ways of reducing NF-kB activity, but the confirmation of patentability of analogous claims 44-46, 101-103, 111-113, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, and 194-195 reciting the same specific ways of reducing NF-kB activity.  No reason is provided in the August 2, 2006 Office Action for distinguishing the rejected claims from those confirmed patentable.  Accordingly, claims 22-24, 33-35, 55-57, 66-68, 77-79, and 90-92 should be confirmed patentable as were claims 44-46, 101-103, 111-113, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, and 194-195.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 18 of 92  of November 9, 2006 Response*

III. THE IMPROPER USE OF REFERENCES WHICH ARE NOT PRIOR ART AND A
     <u>DECLARATION TO SUPPORT INHERENCY REJECTION IS *ULTRA VIRES*</u>


   A.    **Statutory Grounds For Reexamination**


Statutory authority prescribes that in reexamination proceedings
consideration but the Patent Office be limited to "prior art
consisting of patents or printed publications" that have a bearing
on patentability.   35 U.S.C. § 301. *See also* 37 C.F.R. § 1.501.
Indeed, the Manual of Patent Examining Procedure ("MPEP") states that
substantial new questions of patentability must be based on "prior
art patents or printed publications."  Prior art includes that relied
on in the reexamination request, that found elsewhere by the PTO, or
that in the patent file from submissions under 37 C.F.R. § 1.501.
All such art must be "prior art consisting of patents and printed
publications."  MPEP 2216, 2217, and 2244; 37 C.F.R. § 1.501.


   B.    **Impermissible Grounds of Rejection in a Reexamination**


The Patent Office does not have statutory authority to entertain a
prior public use in a reexamination.  35 U.S.C. § 301, *et seq.;* e.g.,
M.P.E.P. § 2216 (Rev. 2, May 2004) ("Examples of such questions that
will not be considered are public use, on sale, and fraud.")


The lack of statutory authority cannot be circumvented by reliance
on a printed publication that merely describes the public use.   A
prior art citation "cannot include ... a statement as to the public
use of the claimed invention."  M.P.E.P. § 2205 (Rev. 2, May 2004);
"a prior art patent or printed publication <u>cannot</u> be properly applied as
a ground for reexamination <u>if it is merely used as evidence of
alleged prior public use</u> or on sale, insufficiency of disclosure,
etc."  M.P.E.P. § 2217 (Rev. 2, May 2004) (Emphasis added).


Thus, it is clear that the PTO does not have statutory authority to

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 19 of 92  of November 9, 2006 Response*

rely on, as a ground for reexamination, a printed publication which does not itself contain the necessary disclosure, but describes an alleged prior public use.  For the purposes of this legal challenge to the subject reexamination proceeding Patentees also rely upon, and hereby incorporate by reference the Petitions, Requests for Reconsideration, and Pleadings filed in the Mandamus action initiated by Patentees in the U.S. District Court for the Eastern District of Virginia.

      **C.    The Inherent Anticipation Rejections in the August 2, 2006 Office Action are Improper; They Rely on Evidence Other Than "prior art consisting of patents or printed publications" in Violation of the Reexamination Statute.**

As noted above, a reexamination must be based on "prior art consisting of patents and printed publications."  MPEP 2216, 2217, and 2244; 37 C.F.R. § 1.501.  Nothing in the statute, the rules, or the M.P.E.P. dictates a different understanding.  Indeed, even prior art patents or printed publications cannot be grounds for reexamination if used merely as evidence of alleged prior public use or on sale activity.  MPEP 2217.  Affidavits or declarations may be considered in reexamination to explain the content or pertinent date of a prior art patent or printed publication.  *Id.*  However, rejection on prior art "cannot be based on the affidavits or declarations as such, but must be based on the prior art patents or printed publications."  *Id.* at 2258(I)(E).

Likewise, an admission may not be the basis for establishing a substantial new question of patentability, although an admission may be used "to determine the scope and content of the prior art in conjunction with prior art patents and printed publications, whether such admissions result from patents or printed publications or from some other source."  *Id.* at 2217 and 2258(I)(F)(1)-(2).  "An admission as to what is in the prior art is simply that, an admission, and requires no independent proof.  It is an acknowledged,

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 20 of 92  of November 9, 2006 Response*

declared, conceded, or recognized fact or truth." *Id.* at
2258(I)(F)(2). However, information supplementing or further
defining the admission is improper, as the admission must stand on
its own. *Id.* at 2217.

It is clear that reexamination proceedings were designed to be
limited in scope to consideration of prior art patents and printed
publications, "lest the life of an issued patent be wasted and the
patentee's legitimate rights be abused by third party requests for
reexamination, for there are myriad grounds on which patentability
is subject to challenge." *In re Lonardo*, 119 F.3d 960, 969, 43
USPQ2d 1262 (Fed. Cir. 1997)(Newman, J., dissenting and noting
legislative history's "serious concern that reexamination not create
new opportunities for abusive tactics and burdensome
procedures")(quoting *In re Recreative Technologies Corp.*, 83 F.3d
1394, 1397, 38 USPQ2d 1776, 1778 (Fed. Cir. 1996)).

Despite the statute, the rules and the MPEP, the Examiner advances
the following case law on pages 8-9 of the August 2, 2006 Office
Action as relevant to the use of non-prior art references in a
reexamination:

> The discovery of a previously unappreciated property of a prior art composition, or of
> a scientific explanation for the prior art's functioning, does not render the old
> composition patentably new to the discoverer." Atlas *Powder* Co. v. *Ireco* Inc., 190 F.3d
> 1342,1347,51 USPQ2d 1943,1947 (Fed. Cir. 1999). Thus the claiming of a new use,
> new function or unknown property which is inherently present in the prior art does not
> necessarily make the claim patentable. *In re Best*, 562 F.2d 1252, 1254, 195 USPQ 430,
> 433 (CCPA 1977); *Ex parte Novitski*, 26 USPQ2d 1389 (Bd. Pat.App. & Inter. 1993);
> *In re Cruciferous Sprout Litigation*, 301 F3d. 1343,64 USPQ2d 1202 (Fed. Cir. 2002);
> *In re Crish*, 393 F.3d 1253, 1258, 73 USPQ2d 1364, 1368 (Fed. Cir. 2004). Although,
> normally, only one reference should be used in making a rejection under 35 U.S.C. 102,
> a 35 U.S.C. 102 rejection over multiple references has been held to be proper when the
> extra references are cited to show that a characteristic not disclosed in the reference is
> inherent. See MPEP 2131.01. Once a reference's teaching is shown to provide evidence
> or reasoning tending to show inherency, the burden shifts to Applicant to show an
> unobvious difference. MPEP 2112 (V).

Patentees respectfully point out that not one of the cases cited by

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 21 of 92  of November 9, 2006 Response*

the Examiner involves a reexamination or discusses what is a legitimate ground for rejection in a <u>reexamination</u>.

35 U.S.C. § 303 specifically refers to §§ 301 and 302, which require the basis of reexamination to be prior art, whether "patents or publications discovered by [the Director] or cited under the provisions of section 301 [for citation of prior art in a request for reexamination under section 302]."  35 U.S.C. § 303.  The Examiner proffers no rationale for interpreting the reexamination statute in a different manner.  Yet, the Examiner proceeds to assert that non-prior art documents can be considered during reexamination to show inherent anticipation as "extrinsic evidence" of what is inherent in a prior art reference even when such "extrinsic evidence" does not refer to or reproduce the teachings of the prior art being cited.

> D.    **The Claims of the Subject Patent Are Method Claims and the Cited Prior Art References Are At Most Evidence of What Occurred During A Prior Public Use.**

Each of the prior art references cited in the August 2, 2006 Office Action expressly describes methods that were publicly used, e.g. drinking red wine.  The cited prior art, therefore, merely provides evidence of the prior public use of the methods described.

The logic used in the August 2, 2006 Office Action is that when the methods described in the printed publications were practiced by the public, the claimed methods of the '516 Patent "inherently" were practiced.  Clearly, however, anything that "inherently" happened, must have occurred *during the <u>public use</u>* of methods described in cited references.

Indeed, the August 2, 2006 Office Action relies on non-prior art references as "extrinsic evidence," as well as a Declaration offered by the Requestor, to allegedly "explain" what would have "inherently" happened during such public use.  Clearly, the methods which are actually described in the cited prior art do not raise any

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 22 of 92  of November 9, 2006 Response*

substantial new question of patentability, and the August 2, 2006
Office Action does not allege otherwise.  What the August 2, 2006
Office Action effectively relies upon to support the inherent
anticipation rejections is evidence of a prior public use.

The Federal Circuit has held in standard patent prosecution that a
method is inherently anticipated only by the actual public use of the
method (which may or may not have been described in a printed
publication).[1]

A method of preparing and administering a food product rich in
glucosinolates was found to be inherently anticipated where members
of the public have "heretofore grown and eaten one of the many
suitable cultivars identified by its patents."  *In re Cruciferous
Sprout Litigation*, 301 F.3d 1343, 1351 (Fed. Cir. 2002).  However,
the rationale of this holding is prior public use, not prior
publication.  This rationale is not available as a ground for
rejection in a reexamination.

A claim to a method of hair depilation has been found inherently
anticipated on the basis of prior public use in an experiment
investigating the safety of a laser on guinea pig backs.  The
experiment was described in a printed publication, but it was the
public use which inherently anticipated, not the publication.  Again,
prior public use is not available as a basis for a rejection in a
reexamination.  *MEHL/BIOPHILE International Cor. v. Milgraum*, 192
F.3d 1362, 1366 (Fed. Cir. 1999).  Moreover, a different printed
publication that merely provided instructions for the use of the same
laser to remove tattoos from skin, where there was no prior public

---

[1] The Federal Circuit has found a claim to a *compound* inherently anticipated by a
disclosure in a *patent* of administering to a patient a precursor which was necessarily
converted in the patient to the compound. *Schering Corporation v. Geneva et al.*, 339 F.3d
1373 (Fed. Cir. 2003).  However, the Federal Circuit in *Schering* explicitly stated that the
*method* of treatment claims were not inherently anticipated by such a disclosure. *Id*, at 1381.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 23 of 92  of November 9, 2006 Response*

use, was held not to inherently anticipate a claimed depilation method.  *Id* at 1365.

Accordingly, it is clear that inherent anticipation of a patented method only occurs during a prior public use, not in a printed publication describing that prior public use; and prior public use is not a permitted basis for a rejection in a reexamination.

The Office's own rules recognize that a prior art citation "cannot include ... a statement as to the public use of the claimed invention." M.P.E.P. § 2205 (Rev. 2, May 2004); "a prior art patent or printed publication <u>cannot</u> be properly applied as a ground for reexamination <u>if it is merely used as evidence of alleged prior public use</u> or on sale, insufficiency of disclosure, etc." M.P.E.P. § 2217 (Rev. 2, May 2004) (Emphasis added).

Accordingly, the August 2, 2006 Office Action contains improper rejections of a patented method based on prior public use.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 24 of 92  of November 9, 2006 Response*

IV.   <u>INCONSISTENCIES WITHIN THE AUGUST 2, 2006 OFFICE ACTION</u>

     **A.    Rejected Claims Reciting "Liver Cells" Should be Confirmed Patentable.**

As noted above, each of claims 30, 41, 63, 74, 87, 98, 138, 148, 158, 176 and 186 recite "liver cells" and have been rejected.    In contrast, claims 52, 108, 118, 191, and 202 also recite "liver cells" but have been confirmed patentable.   No reason is provided in the August 2, 2006 Office Action for distinguishing the rejected claims from those confirmed patentable.   During the October 13, 2006 interview, Examiner Celsa acknowledged that none of the cited art teaches reducing NF-kB activity in liver cells.   Accordingly, each claim 30, 41, 63, 74, 87, 98, 138, 148, 158, 176 and 186 should be confirmed patentable.

     **B.    Rejected Claims Reciting Specific Ways of Reducing NF-kB Activity Should be Confirmed Patentable.**

Similarly, each of claims 22-24, 33-35, 55-57, 66-68, 77-79 and 90-92 recite specific ways of reducing NF-kB activity, and have been rejected.   In contrast, analogous claims 44-46, 101-103, 111-113, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, and 194-195 also recite the same specific ways of reducing NF-kB activity, but have been confirmed patentable.   No reason is provided in the August 2, 2006 Office Action for distinguishing the rejected claims from those confirmed patentable.   Accordingly, each of claims 22-24, 33-35, 55-57, 66-68, 77-79 and 90-92 should be confirmed patentable.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 25 of 92  of November 9, 2006 Response*

V.    PROPER CLAIM CONSTRUCTION

On page 8 of the August 2, 2006 Office Action, the Examiner set forth an interpretation of the claims of the subject patent.  The Examiner stated:

> The USPTO must give claims their broadest reasonable interpretation, in light of and consistent with the written description of the invention in the application. See, *In re Donaldson Co.*, 16 F.3d 1189, 29 USPQ2d 1845 (Fed. Cir. 1994). With respect to claim 1 it is noted that the sole method step is functional i.e. reducing NF-kB activity. Accordingly, the claims would encompass any *in* vitro or *in* vivo, natural (indirect) or man-made (direct) means of reducing NF-kB activity. Indeed, most of the method steps recited in the Baltimore patent are purely functional with the exception of claim 7 and dependent claims 81, 83 and 85-87 which require "modifying NF-kB activity" (which are partially functional) and claim 203 which requires "introducing a nucleic acid decoy molecule into the cell" which requires an active step. The summary of the remaining reexamination claims provided in pages 12-15 of the '7503 request is herein incorporated by reference.

Patentees respectfully disagree with such an interpretation because, among other things, the interpretation being advanced is unreasonably broad, is contrary to the interpretation and understanding which a person skilled in the art would have, fails to conform to the doctrine of claim differentiation, and ignores the fact that a method is being claimed.

**A.    Claims Require a "Reasonable" Interpretation. The Examiner Improperly Expanded the Scope of the Claims Beyond a Reasonable Interpretation.**

To determine if prior art anticipates a claim or render it obvious, the Examiner must first determine the proper scope of the claim. While a claim is to be given a broad interpretation during reexamination, this interpretation must be *reasonable* in light of the specification. *In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984). Additionally, the Examiner must construe the claims as one of skill in the art would interpret them. *In re American Academy of Science Tech Center*, 367 F.3d 1359, 1364 (Fed. Cir. 2004).

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 26 of 92 of November 9, 2006 Response*

By construing the claims so broadly that they would even cover actions that would kill the cell the Examiner adopts an interpretation contrary to that which would be understood by a person skilled in the art and has impermissibly given the claims an unreasonable, broad interpretation. *See In re Cortright*, 165 F.3d 1353, 1359 (Fed. Cir. 1999) (reversing the Examiner's rejection after finding that one skilled in the art would construe the claim more narrowly than had the examiner). When the claim terms "are examined through the viewing glass of a person skilled in the art," as they are supposed to be, it becomes clear that the Examiner's interpretation is not reasonable. *Phillips v. AWH Corp*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) *cert. denied*, 126 S.Ct. 1332 (2006) (quoting *Ferguson Beauregard/Logic Controls v. Mega Sys., LLC*, 406 F.3d 1359, 1363 (Fed. Cir. 2005)). Such broad interpretations are impermissible and must be refined. *See In re Marosi*, 710 F.2d 799 (Fed. Cir. 1983) (reversing a claim rejection under 35 U.S.C. §§102 or 103 that failed to interpret the claim in light of one skilled in the art).

Accordingly, the Examiner should interpret the claims so that their scope is commensurate with the specification as viewed by one skilled in the art. For an understanding of who would be a person skilled in the art, see Declaration of Dr. Verma, ¶ 3.

## B. The Proper Interpretation of Method Claims Requires They Be Interpreted As Involving Affirmative Acts.

To properly construe method claims, the Examiner must consider that a process is an act. *See Tilghman v. Proctor*, 102 U.S. 707, 728 (1881)(differentiating between a machine and a process). Courts have long since held that a "process requires that certain things should be done." *Cochrane v. Deener*, 94 U.S. 780, 788 (1877). Unlike a machine, a process requires an affirmative act to be taken. *Tilghman* at 728.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 27 of 92  of November 9, 2006 Response*

When interpreting method claims, a distinction must be made between "steps," which are descriptions of the elements of a process, and "acts" which are "the implementation of such steps." *O.I. Corp. v. Tekmar Co. Inc.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997). While "steps" can implicate §112, ¶ 6, "acts" do not. *Masco Corp. v. United States*, 1327 (Fed. Cir. 2002)(holding that "if an act is present, then the limitation is not a step plus function limitation"). The Federal Circuit has held process claims that describe steps with "ing" verbs ("gerunds") "acts." *O.I. Corp.* at 1583. Moreover, "a patentee can define a method or process claim containing steps that begin with a gerund . . . without necessarily subjecting the claim to §112 ¶6 limitations." *EBS Dealing Res. Inc. v. Intercontinental Exch. Inc.*, 379 F. Supp.2d 521, 527-528 (S.D.N.Y. 2005) (citations omitted). Method claims without a "step for" provision should not be construed as having a step-plus-function limitation, unless the limitation does not have an act, as courts are reluctant to impose §112 ¶6 "without a showing that the limitation contains . . . [no] act." *Masco Corp. v. United States*, 303 F.3d 1316, 1327 (Fed. Cir. 2002)(holding that "transmitting" was an act, not a function).

In the present case, the method claims contain gerunds such as "reducing". These gerunds clearly should be construed as acts, and the claims should be interpreted as acts that require affirmative steps be taken. See also, Declaration of Dr. Verma, ¶ 11.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 28 of 92  of November 9, 2006 Response*

###    C.    **Different Claims Must Be Construed to Have Different Scope.**

When determining the proper scope of the claims, the Examiner must use an interpretation that provides meaning to all claim terms and prevents different claims from having the same scope. *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987). The doctrine of claim differentiation creates a presumption that each claim has a different scope and should be applied if this presumption is not rebutted. *See Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998)(applying the doctrine of claim differentiation where an alternate interpretation would make a claim superfluous).

The Examiner has improperly interpreted numerous claims so as to in effect have the same scope.   The Examiner has also construed independent claims and claims which depend on them in such a manner that they have the same scope.   Such an interpretation is improper under the doctrine of claim differentiation.   Indeed, where a claim limitation "already appears in a dependent claim, the doctrine of claim differentiation is at its strongest." *Liebel-Flarsheim Co. v. Medrad Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) *cert. denied*, 543 U.S. 925 (2004) (holding that a dependent claim and the independent claim on which it depends do not have the same scope).   Additionally, by determining that claims with different limitations have the same scope, the Examiner has ignored the preference for applying a claim construction that "gives meaning to all the terms of the claim" over one that does not. *Merck & Co., Inc., v. Teva Pharmaceuticals, USA, Inc.*, 395 F3d 1364, 1372 (Fed. Cir. 2005) *cert. denied*, 126 S.Ct. 488 (2005).

In this case, there are numerous dependent claims reciting elements not present in the claims to which they refer that clearly do not have the same scope.  Similarly, independent claims recite elements not preset in other independent claims.   The Examiner should

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 29 of 92   of November 9, 2006 Response*

therefore recognize that the claims are different in scope so as to avoid an interpretation in which claim terms are superfluous and/or redundant.

### D.    Proper Construction of the '516 Patent Claims[2]

The invention of the subject patent is based on the pioneering work of the inventors including Dr. David Baltimore, which grew out of studies on how the immune system is regulated. The immune system consists of a variety of specialized cells and protects the body by attacking and eliminating harmful foreign organisms and substances. The inventors' work demonstrated that a particular factor in the cell, NF-kB, plays a central role in regulating how immune cells respond to external influences that are damaging to the body.  NF-kB functions as a transcription factor, which is activated in response to external stimuli and participates in regulating expression of particular genes, such as antibody and cytokine genes.  (Column 2, lines 20-45 and 54-59; column 12, lines 57-66, col. 13, lines 13 – column 14, line 54; and col. 17, lines 30-37; Declaration of Dr. Verma, ¶¶ 5-7.)

In the absence of inducing external stimuli, NF-kB is generally present in an inactive form in the cytoplasm of the cell.  In its inactive form, NF-kB is bound to an inhibitor protein called IkB, which prevents NF-kB from traveling to the nucleus. Upon activation in response to an external influence, NF-kB is released from its complex with IkB. The released NF-kB then moves to the nucleus, where it can participate in regulating expression of particular genes by binding to specific DNA sequences or "recognition sites" on those genes, leading to transcription of such genes.  The entire NF-kB

---

[2]Patentees also refer the Examiner to the construction of certain claims in the District of Massachusetts litigation.  In this regard, Patentees refer the Examiner to the material cited in the Supplemental Information Disclosure Statement in Section IX herein discussing among other issues NF-kB activity and use of blocking drugs (and, material previously disclosed).

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 30 of 92  of November 9, 2006 Response*

pathway from induction to gene expression can be separated into the
six (6) general segments shown in blue in Schematic 2.  While NF-kB
activity is essential to allow the body to respond to the effects of
harmful external stimuli, in some cases the activity can become
excessive causing other undesirable effects.   (See, e.g.,  column
2, lines 46-63; column 10, lines 31-55; column 14, lines 28-30; and
column 16, lines 22-63 of the subject patent; Schematics 1 and 2; and
Declaration of Dr. Verma, ¶¶ 8-9.)

The claims of the '516 patent are directed to various methods for
providing a therapeutic benefit by intervening in the processes that
constitute the NF-kB pathway, are associated with NF-kB activity, and
cause subsequent NF-kB-regulated effects. In situations where there
is excessive activation of NF-kB in response to external stimuli, the
claimed methods are useful for modifying their potentially harmful
effects.  The claims are directed to methods for modifying the body's
naturally occurring response to such inducing external stimuli and
specifically to reducing the harmful effect of such external
influences by "reducing NF-kB activity." The '516 patent claims are
directed to various methods for providing a therapeutic benefit by
intervening in the processes associated with NF-kB activity that
cause subsequent NF-kB-regulated effects.  For example, see column
3, lines 59-67, where the patent explains that "As a result of this
finding, it is now possible to alter or modify the activity of NF-kB
as an intracellular messenger and, as a result, to alter or modify
the effect of a variety of external influences, referred to as
inducing substances, whose messages are transduced within cells
through NF-kB activity. Alteration or modification, whether to
enhance or reduce NF-kB activity or to change its binding activity
(e.g., affinity, specificity), is referred to herein as regulation
of NF-kB activity." These desired goals are achieved in the methods
claimed in the '516 patent by reducing the ability of NF-kB to act
as a messenger inside the cell, so as to regulate specific results
recited in the claims, such as reducing NF-kB mediated gene

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 31 of 92  of November 9, 2006 Response*

expression.   When  read  in  light  of  the  teachings  of  the  patent
disclosure,  one  skilled  in  the  art  would  understand  the  claims  to
require  affirmative  acts  and,  manipulative  steps,  calculated  to
achieve such specific results by reducing the ability of NF-kB to act
as a messenger inside the cell. (Declaration of Dr. Verma, ¶¶ 10-11.)

The  '516 patent  teaches that  one can  reduce induced  NF-kB activity
by interfering anywhere along any of the six (6) segments of the NF-
kB  pathway  as  represented  by  the  arrows  in  Schematic 3.   One skilled
in the  art would  understand the  claims of  the '516  patent to  be
directed  to  achieving  specified  results  by  interfering  along  these
segments so as to reduce NF-kB activity.  (Declaration of Dr. Verma,
¶ 12.)

In normal  cells, in  the absence  of inducing  stimuli, there  is  no
activation  of  NF-kB,  therefore  no  consequent  NF-kB  mediated
intracellular  signaling.   Such activation  and signaling  takes place
in response  to external  influences that  act on  the cell.   Since the
pending  claims are  directed to  methods for  reducing NF-kB  activity,
one skilled  in the  art would  understand that  the claimed  methods do
not cover  prophylaxis, but  instead are  directed to  methods in  which
NF-kB activity which has been induced is reduced. (Declaration of Dr.
Verma, ¶ 13.)

Some claims, for example, claims 1, 2 and 5, are directed to methods
of achieving  specified results  by interfering  along any  one of  the
six (6) segments shown in Schematic 3.   Other claims specify that the
external influence "induce NF-kB-mediated intracellular signaling."
Thus, these  claims require  the persistence  of at  least the  first
step, i.e. stage 1 which induces intracellular signaling, but allow
for the  interference to  occur along  any of  the remaining  five (5)
segments inside the cell (Schematic 4).   Examples of such claims are
claim  8,  9,  10,  14,  95  and  145.    Yet  other  claims  are  more
specifically directed to and specify that interference occurs along

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 32 of 92  of November 9, 2006 Response*

only one of the five (5) intracellular segments.  In this regard, claims 20, 22, 24, 31, 33, 35, 42, 44 and 46 specify that interference is along segment 2 (Schematic 5); claims 23, 34 and 45 specify that interference is along segment 3 (Schematic 6); claims 21, 32, 43 and 89 specify that interference is along segment 5 (Schematic 7); and claims 25, 47, 80 and 144 specify that interference is along segment 6 (Schematic 8).  (Declaration of Dr. Verma, ¶¶ 14-15.)

Thus, each of the following dependent claims, properly construed, specify interference along the specific segment in the NF-kB activity pathway which it recites.  To construe these claims otherwise would be contrary to the doctrine of 'claim differentiation and to the reasonable interpretation of these claims by one of skill in the art.  The dependent claims that recite specific ways of reducing NF-kB activity by interfering at specific segments of the NF-kB pathway are the following:

> 20, 21, 22-24[3] & 25;
> 31, 32, 33-35[3] & 36;
> 42, 43, 44-46[3] & 47;
> 53, 54, 55-57[3] & 58;
> 64, 65, 66-68[3] & 69;
> 75, 76, 77-79[3] & 80;
> 88, 89, 90-92[3] & 93;
> 99, 100, 101-103[3] & 104;
> 109, 110, 111-113[3] & 114;
> 119, 120, 121-123[3] & 124;
> 128, 129, 130-132[3] & 133;
> 139, 140, 141-143[3] & 144;
> 149, 150, 151-153[3] & 154;
> 159, 160, 161-163[3] & 164;
> 167, 168, 169-171[3] & 172;
> 177, 178, 179-181[3] & 182; and
> 192, 193, 194-196[3] & 197.

---

[3]*See, also*, Section IV of the this response pointing out inconsistencies in the rejections set forth in the August 2, 2006 Office Action apparently acknowledging patentability of some but not all of dependent claims reciting substantially identical language.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 33 of 92  of November 9, 2006 Response*

VI.    REJECTIONS ON THE BASIS OF "INTERVENING REFERENCES".

On pages 3-4 of the August 2, 2006 Office Action, the Examiner
alleged that all 203 claims of the subject patent are only entitled
to the benefit of a November 13, 1991 filing date, and rejected a
subset of the claims on references having an effective date between
April 21, 1989 and November 13, 1991 (the "intervening references").[4]


A.    **Numerous Claims Are Clearly Entitled To At Least An April
      21, 1898 Effective Filing Date**

Patentees maintain that numerous claims are clearly entitled at least
to the April 21, 1989 filing date of U.S. Serial No. 07/341,436.

For the subset of claims against which the "intervening references"
are being cited Patentees direct the Examiner's attention to a Claim
Support Chart, attached as **Exhibit 3** to the Declaration of Dr. Verma.
This Claim Support Chart clearly shows support for the claims listed
in the April 21, 1989 application.  The portions of the April 21,
1989 application or of the relevant application(s) incorporated
therein by references and identified in the Claim Support Chart
convey with reasonable clarity the invention recited in the
corresponding claim(s) listed in the chart to one of skill in the
art.  See, also the Declaration of Dr. Verma, ¶¶ 16-21.  Patentees
point out that to the extent support for the pending claims appears
in U.S. Serial Nos. 06/817,441, filed January 9, 1986; 07/155,207,
filed February 12, 1988; and/or 07/280,173, filed December 5, 1988,
each of these applications is incorporated by reference into the
April 21, 1989 application on page 1, lines 4-8 thereof.  In
accordance with M.P.E.P. § 608.01(p)(I), claims are entitled to at

---

[4] *Pending claims which have been rejected on "intervening references" are: 1-8, 9,
11, 18, 20, 21, 25-27, 29, 31, 32, 36-38, 40, 42, 43, 47-51, 53, 54, 58-60, 61, 62, 64, 65, 69-
71, 72, 73, 75, 76, 80, 82, 84, 88, 89, 93-97, 106, 107, 109, 110, 114-117, 182-185, 192, 193,
197-199, 200 and 201.*

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 34 of 92 of November 9, 2006 Response*

least the April 21, 1989 effective filing date of U.S. Serial No.
07/341,436 if supported by the disclosure of an application
incorporated therein by reference.

**B.    Rejections On The Basis Of "Intervening References" Should
Be Withdrawn As To All Claims Entitled To At Least An
April 21, 1989 Effective Filing Date**

As noted above, numerous claims rejected on the basis of "intervening
references" are in fact entitled to at least an April 21, 1989
effective filing date. Therefore, each ground of rejection based on
an "intervening reference" should be withdrawn with respect to each
claim rejected on such ground which is entitled to the April 21, 1989
filing date. Specifically, the rejections set forth: in section I
on pages 10-13; in section IIa on pages 13-18; in section VIII on
pages 47-48; and in section IX on pages 48-51 of the August 2, 2006
Office Action should be withdrawn with respect to each pending claim
rejected therein which is entitled to an April 21, 1989 effective
filing date.

**C.    Claims Entitled To At Least An April 21, 1989 Effective
Filing Date And Rejected Solely On The Basis Of
"Intervening References" Should Be Confirmed Patentable**

Because certain claims have only "intervening references" cited
against them, such claims should be confirmed patentable as to each
such claim found to be entitled to the April 21, 1989 effective
filing date. Specifically, Patentees maintain that claims 3, 4, 11,
42, 43, 47-49, 51, 107, 109, 110, 114, 115, 117, 192, 193, 197-199
and 201 are entitled to an April 21, 1989 effective filing date and
have only "intervening references" cited against them. Accordingly,
each of claim 3, 4, 11, 42, 43, 47-49, 51, 107, 109, 110, 114, 115,
117, 192, 193, 197-199 and 201 should be confirmed patentable.

In addition to the Claim Support Chart discussed above, Patentees now
address the Examiner's specific comments on pages 3-4 of the Office

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 35 of 92  of November 9, 2006 Response*

Action which relate to the claims being rejected on the basis of the intervening references.  The Examiner has alleged that:

"every claim of the '516 patent (1-203) recites at least one of the following features which the pre-1991 applications fail to disclose:

a.     an amino acid or nucleic acid sequence corresponding to NF-κB;

b.     support for the Baltimore patent claim limitations including (but not limited to):

-'reducing NF-kB activity' in a cell (e.g. especially mammalian/eukaryotic) and/or an enabling means thereof (e.g. administering a NF-kB inhibitor) to effect various functions (e.g. inhibit expression generally, reduce cytokine expression etc.) as *required in all the claims*;

-'reduce binding of NF-kB to NF-kB recognition sites on genes which are transcriptionally regulated by NF-kB' (e.g., claims 25, 36, 47, 69, 80, 93, 144, 154 and 182);

-'inhibiting modification of an IkB protein, which modification otherwise reduces IkB binding to NF-kB' (e.g., claims 22, 33, and 44);

-'inhibiting degradation of an IkB protein' (e.g., claims 23, 34, and 45);

-'inhibiting dissociation of NF-kB:IkB complexes' (e.g., claims 24, 35, and 46)."

In response, Patentees note the following:

1. Contrary to the Examiner's assertion, amino acid or nucleic acid sequences corresponding to NF-kB are not recited in the pending claims or necessary to enable these claims as of April 21, 1989.  See Declaration of Dr. Verma ¶ 17.

2. Contrary to the Examiner's assertion, the phrase "reducing NF-kB activity" in the pending claims is clearly supported by at least the following passages in of U.S. Serial No. 07/341,436, filed April 21, 1989 (the "April 21, 1989" application):

- page 5, lines 13-16: "Alteration or modification, whether to enhance or reduce NF-kB activity . . . is referred to herein as

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 36 of 92  of November 9, 2006 Response*

regulation of NF-kB activity." See, also Declaration of Dr. Verma
¶ 17 and 18.


3. Contrary to the Examiner's assertion, the terms "mammalian cells"
and "eukaryotic cells" in the pending claims are clearly supported
by at least the following passages in the April 21, 1989 application:

- page 1, lines 4-8, incorporating U.S. Serial No. 07/155,207, page
77, lines 8-9: "NF-kB [is] present in a wide variety of <u>mammalian
cells</u>"; and
- page 1, lines 4-8, incorporating U.S. Serial No. 07/280,173, page
4, line 21: "In the present work with <u>eukaryotic cells</u>." See, also,
Declaration of Dr. Verma ¶ 18.

Patentees also note the Examiner's assertion that "'reducing NF-kB
activity' in a cell (e.g. especially mammalian/eukaryotic) and/or an
enabling means thereof (e.g. administering a NF-kB inhibitor) to
effect various functions (e.g. inhibit expression generally, reduce
cytokine expression etc.)" is not disclosed in the subject patent.
In this regard, Patentees respectfully direct the Examiner's
attention to page 23, line 22 to page 30, line 25 of the April 21,
1989 application describing how one skilled in the art may proceed
to reduce NF-kB activity in accordance with the invention.


4. Contrary to the Examiner's assertion, the phrase "reducing binding
of NF-κB to NF-κB recognition sites on genes which are
transcriptionally regulated by NF-κB" in the pending claims is
clearly supported by at least the following passages in the April 21,
1989 application:

- on page 5, line 31 to page 6, line 8: "NF-kB-mediated gene
expression can also be selectively regulated by altering the <u>binding
domain of NF-kB</u> in such a manner that binding specificity and/or
affinity are modified.";

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 37 of 92  of November 9, 2006 Response*

- on page 24, lines 9-29: "According to the methods described herein, the <u>expression of genes under the control of one of these elements is subject to modulation</u> by alteration of the concentration or availability of NF-KB. This can also be carried out, according to the present method, for <u>any gene which contains an NF-kB binding site</u>."; and

- in the Title: "<u>NF-kB-Mediated Transcriptional Regulation</u>".  See, also, Declaration of Dr. Verma ¶ 19.


5.  Contrary to the Examiner's assertion, the phrase "inhibiting modification of an IkB protein, which modification otherwise reduces IkB binding to NF-kB" in the pending claims is clearly supported by at least the following passages in the April 21, 1989 application:


-on page 18, lines 28-29: "<u>Inactive NF-kB is complexed</u> with a labile inhibitor protein, I-kB.";

- on page 19, lines 20-21: "The implication is that <u>activation of NF-kB</u> involves a <u>modification of I-kB</u> and not NF-kB."; and

- on page 5, lines 7-13 and 23-25: "<u>As a result of this finding</u>, it is now possible to alter or modify the activity of NF-KB as an intracellular messenger and, as a result, to alter or modify the effect of a variety of external influences, referred to as inducing substances, whose messages are transduced within cells through NF-KB activity....  In particular, the present invention relates to a method of regulating (enhancing or <u>diminishing) the activity of NF-KB</u> in cells in which it is present and capable of acting as an intracellular messenger, as well as to substances or composition useful in such a method."  See, also, Declaration of Dr. Verma ¶ 20.


6.  Contrary to the Examiner's assertion, the phrase "inhibiting degradation of an IkB protein" in the pending claims is clearly supported by at least the following passages in the April 21, 1989 application:

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 38 of 92  of November 9, 2006 Response*

- on page 20, lines 1-3: "Various inducer then cause an <u>alteration in I-kB</u> allowing NF-kB to be released from the complex."; and
- on page 5, lines 7-13 and 23-25: "<u>As a result of this finding</u>, it is now possible to alter or modify the activity of NF-KB as an intracellular messenger and, as a result, to alter or modify the effect of a variety of external influences, referred to as inducing substances, whose messages are transduced within cells through NF-KB activity.... Contrary to the Examiner's assertion, the phrase "inhibiting degradation of an IkB protein" in the pending claims is clearly supported by at least the following passages in the April 21, 1989 application: In particular, the present invention relates to a method of regulating (enhancing or <u>diminishing) the activity of NF-KB</u> in cells in which it is present and capable of acting as an intracellular messenger, as well as to substances or composition useful in such a method." See, also, Declaration of Dr. Verma ¶ 21.


7. Contrary to the Examiner's assertion, the phrase "inhibiting dissociation of NF-kB:IkB complexes" in the pending claims is clearly supported by at least the following passages in the April 21, 1989 application:

- on page 19, lines 1-3: "... <u>dissociating</u> agents such as formamide and deoxycholate to unmask very high levels of NF-kB activity."; and
- on page 20, lines 5-7: "The <u>complex formation</u> of NF-kB with I-kB appears to be rapidly and efficiently <u>reversible</u> ...." See, also, Declaration of Dr. Verma ¶ 21.


Patentees, thus, have shown where each of the terms mentioned by the Examiner has adequate support in the April 21, 1989 application. Accordingly, the claims containing these terms should be according to an April 21, 1989 effective filing date.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 39 of 92  of November 9, 2006 Response*

> D.    **Claim Rejections On The Grounds Of Anticipation or Obviousness Over The "Intervening References" Are Not Valid Even For Claims Entitled To A November 13, 1991 Filing Date.**

Patentees maintain that most of the claims being rejected on the basis of "intervening references" are in fact entitled to an April 21, 1989 effective filing date.  Patentees further maintain that each claim being rejected on the basis of "intervening references" are patentable over such references even with respect to any such claim determined to be entitled only to a November 13, 1991 filing date. In the sections which follow Patentees explain why each claim being rejected on the basis of an "intervening reference" is patentably distinct over such intervening reference assuming *arguendo* the claim is entitled to a November 13, 1991 filing date.

> 1.    **Intervening References Relating To Protein Kinase**
>> a. §102(b) or 103 - Meichle (5/90) - *Intervening* Art

On pages 10-11 of the August 2, 2006 Office Action, the Examiner rejected claims 1-9, 11, 20-21, 25-29, 31, 32, 36-40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201 under 35 U.S.C. 102(b) as anticipated by or, in the alternative, under 35 U.S.C. 1O3(a) as obvious over, *Meichle* (J. Biol. Chem. 265 (5/90) 8339-43).  The Examiner summarized the rejection as follows: "*Meichle* teaches the reduction of NF-kB activity in induced cells using agents that inhibit protein kinase C. In addition, because *Meichle* used the HIV LTR in their experiments, this reference anticipates, or alternatively, makes obvious claims drawn to regulating expression of viral genes."

The Examiner also alleged that the instant claims are drawn to reducing NF-kB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-kB, and that NF-kB activity

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 40 of 92  of November 9, 2006 Response*

can be effected by diminishing induced NF-kB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein (claim 5) in a eukaryotic cell.  Patentees maintain, however, that the Examiner 1) made the rejection under an incorrect claim construction, and 2) appears to have not considered all of the rejected dependent claims, each of which recites additional patentable elements.

The Examiner alleged that *Meichle* analyzed various Protein Kinase C Inhibitors and their effect on both PMA-(phorbol 12-myristate-13-acetate) and TNF-(tumor necrosis factor) induced NF-kB activity in eukaryotic Jurkat cells, and, using an EMSA binding assay purportedly similar to that disclosed in the '516 patent, *Meichle* found that Protein Kinase C inhibitor H8 reduced PMA-induced NF-kB activity in these cells (Fig. 3, lane 7). The Examiner alleged that other inhibitors also were shown to reduce NF-kB activity, including Protein Kinase C Inhibitor H7 (Fig. 2B, lanes 3. vs. 5) and Staurosporine (Fig. 2B, lanes 3. vs. 5) and Staurosporine (Fig. 2B, lanes 6 and 7).

Thus, the Examiner concluded that *Meichle* teaches the use of Protein Kinase Inhibitor H8 (among others) to reduce NF-kB-mediated gene transcription by reducing NF-kB activity and reducing the binding of NF-kB to NF-kB binding sites.  With reference to *Exhibit G-2* of the 90/007,503 Request, the Examiner alleged that *Meichle* expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97.  The Examiner additionally alleged that because *Meichle* used a genetic construct comprising HIV LTR and NF-kB binding site, *Meichle* rendered claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201 immediately envisaged (i.e. anticipated) or alternatively *prima facie* obvious in light of the fact that the HIV LTR promoter is responsible for regulating the expression of viral (HIV) genes.

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 41 of 92  of November 9, 2006 Response*

*Patentees' reply*

In response, Patentees respectfully traverse the Examiner's ground
of rejection.  Initially, Patentees point out that claims 7, 28, 39,
81, 83, 85 and 86 have been cancelled without prejudice.
Additionally, Patentees have explained in Section IV above that the
remaining rejected claims, i.e. claims 1-6, 8, 9, 11, 20-21, 25-27,
29, 31, 32, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-
76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and
197-201, are entitled to at least an April 21, 1989 effective filing
date.  On this basis alone this rejection based on art after April
21, 1989 should be withdrawn.

Notwithstanding, Patentees explain below that even if these claims
were not entitled to an April 21, 1989 effective filing date, *Meichle*
does not anticipate the claims.

     *I) Factual errors in August 2, 2006 Office Action.*

The Examiner has erroneously stated on page 10 of the Office Action
that "*Meichle* teaches the reduction of NF-kB activity in induced
cells…."  The experiments *Meichle* describes in which H7, H8 or
staurosporine were administered to cells, including the specific
experiments the Examiner relies on (portions of Figs. 2 and 3), were
all conducted by <u>pretreating</u> cells with these protein kinase
inhibitors for 30 to 45 minutes before cells were stimulated with any
inducing substance. (*Meichle* at 8341-2, Figs. 2 and 3; Declaration
of Dr. Verma, ¶ 149.)

     *ii) None of the experiments with TNF in Meichle are
relevant to any of the '516 patent claims.*

*Meichle* reports various experiments conducted in two human leukemic
cell lines, K562 and Jurkat cells.  *Meichle* describes a series of
experiments investigating whether in these cell lines, protein kinase
C was necessary for the ability of tumor necrosis factor (TNF) to

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 42 of 92  of November 9, 2006 Response*

stimulate NF-kB binding activity.   (*Meichle* at 8339, abstract).
*Meichle* investigated this question by pretreating the cell with H7,
H8 or staurosporine, three relatively non-specific protein kinase
inhibitors. *Id.* Notably, the ability of TNF to stimulate NF-kB
binding activity was unaffected by pretreatment with these
inhibitors, and *Meichle* concludes that its ability to induce NF-kB
binding activity did not involve activation of protein kinases, in
particular protein kinase C (PK-C). *Id.*  Therefore, none of the
experiments with TNF are relevant to any of the '516 patent claims.
(Declaration of Dr. Verma, ¶¶ 147-148.)


> *iii) Meichle does not show reduction of NF-kB activity in
> induced cells, as required by the claims.*

*Meichle* also purports to show that pretreating a cell with either H7
or staurosporine reduced the ability of PMA to stimulate NF-kB
binding activity.   In this regard, the Examiner has erroneously
stated on page 10 of the Office Action that "*Meichle* teaches the
reduction of NF-kB activity in induced cells…."  The experiments
*Meichle* describes in which H7, H8 or staurosporine were administered
to cells, including the specific experiments the Examiner relies on
(portions of Figs. 2 and 3), were all conducted by <u>pretreating</u> cells
with these protein kinase inhibitors for 30 to 45 minutes before
cells were stimulated with any substance. (*Meichle* at 8341-2, Figs.
2 and 3).   As apparent from the discussion of these experiments,
pretreatment was conducted to prevent a cellular response to inducing
substances by inactivating PK-C and PK-A (and most likely other
kinases) before stimulating the cell with any inducing agent.  (See
*Meichle*, at 8339, 8342). The use of these inhibitors as described by
*Meichle*, therefore, was not on induced cells and would not have
reduced any induced effect on the cells. None of the experiments in
*Meichle*, therefore, anticipate the pending claims requiring reducing
NF-kB activity. (Declaration of Dr. Verma, ¶ 149.)

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 43 of 92  of November 9, 2006 Response*

> *iv) Meichle provides no evidence whether PK inhibitors could prevent any agent from inducing expression of these constructs.*

The examiner also alleged on page 11 of the Office Action that *Meichle* teaches use of PK inhibitors to reduce NF-kB-mediated gene transcription by reducing NF-kB activity.  The Examiner also alleged that because *Meichle* used a genetic construct comprising HIV LTR, *Meichle* either would anticipate or render obvious claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201, if these claims were entitled only to a November 13, 1991 filing date.  However, nothing in *Meichle* either suggests or provides any data showing that PK inhibitors inhibited gene expression induced by any agent, or could do so as a result of reducing NF-kB binding activity.  *Meichle* reports experiments conducted with Jurkat cells transfected with two different CAT reporter constructs, each of which are described as containing a CAT gene and an enhancer with an NF-kB binding site. (*Meichle* at 8340). However, none of the experiments with these constructs, which are reported in Fig. 3, used any PK inhibitor. (*Meichle* at 8341, Fig. 3).  *Meichle* simply provides no evidence whether PK inhibitors could prevent any agent from inducing expression of these constructs. Additionally, *Meichle* provides no data as to whether PK inhibitors affected expression of any endogenous gene.  Therefore, one would not read *Meichle* as either describing or suggesting any use of PK inhibitors to reduce or NF-kB-mediated gene transcription by reducing NF-kB activity. (Declaration of Dr. Verma, ¶ 150.)


> *v) Meichle is missing critical controls necessary to show NF-kB effects.*

In his EMSA assays (Figs. 2 and 3), *Meichle* employed a 29 base pair oligonucleotide corresponding to a portion of the HIV enhancer.  This sequence, however, has been shown to bind not only NF-kB but also other transcription factors including factors in the NFAT transcription factor family. To substantiate that the most slowly

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 44 of 92  of November 9, 2006 Response*

migrating complex observed in *Meichle*'s EMSA assay corresponded to
NF-kB, it would have been necessary to determine whether mutation of
the putative NF-kB binding site abrogated binding. Without this
control, the data *Meichle* provides are insufficient to support the
conclusion that PK inhibitors reduced NF-kB binding activity.
(Declaration of Dr. Verma, ¶ 151.)

Accordingly, even if the claims were not entitled to a filing date
prior to the date of *Meichle* (which they are), *Meichle* still would
not anticipate or render obvious the invention recited by each of
claims 1-8, 8, 9, 11, 20-21, 25-27, 29, 31, 32, 36-38, 40, 42-43, 47-
51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-
107, 109-110, 114-117, 192-193 and 197-201.   Accordingly, the
rejection of these clams based on *Meichle* should be reconsidered and
withdrawn.

## 2.  §102(b) - Shirakawa (6/89) - *Intervening Art*

On pages 12-13 of the August 2, 2006 Office Action, the Examiner
rejected claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62,
64-65, 69-73, 75-76, 80-86, 88-89 and 93-97 under 35 U.S.C. 102(b)
as allegedly anticipated by *Shirakawa* (Mol. And Cell. Biol. 9 (6/89)
2424-30).   The Examiner summarized the rejection by stating,
"*Shirakawa* teaches reduction of NF-kB activity in induced cells using
agents that inhibit protein kinase C."

The Examiner alleged that the instant claims are drawn to reducing
NF-kB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells
(e.g. claim 26) to effect inhibited expression of a gene under
transcriptional control of NF-kB, and that NF-kB activity can be
affected by diminishing induced NF-kB mediated intracellular
signaling (claims 6-9) to inhibit associated gene (claims 1-2)
expression of a cytokine protein (claim 5) in a eukaryotic cell.  Of
note, however, is that the Examiner 1) made the rejection under an

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 45 of 92  of November 9, 2006 Response*

incorrect claim construction, and 2) appears to have not considered all of the rejected dependent claims, each of which recites additional patentable elements.

The Examiner alleged that *Shirakawa* is analogous to *Meichle* discussed supra, and *Shirakawa* performed similar tests with Protein Kinase C Inhibitor H8 on eukaryotic cells that had been induced with interleukin 1 (IL-1). The Examiner alleged that *Shirakawa* first demonstrated that IL-1 acted to induce NF-kB activity in 707/3 cells as demonstrated by the EMSA binding and CAT reporter assays (p.2425 Fig. 1; p. 2426 Fig. 2); the EMSA binding and CAT reporter assays then confirmed that Protein Kinase Inhibitor H8 reduced NF-kB activity and reduced the resulting CAT gene expression. More particularly, the result of treatment of cells with H8 using EMSA was that "[t]he induction by IL-1 was abolished ..." (p. 2426, Fig. 2A, lane 5)"; and using CAT "IL-1 induced k immunoglobulin expression was markedly inhibited ..." (p. 2425). The Examiner also alleged that these results were confirmed in a different cell line ("As was the case in 70Z/3 cells, NF-kB activation was markedly inhibited by H8 in YT cells (Fig, 2B, lane 9)."

The Examiner then concluded that *Shirakawa* teaches the use of Protein Kinase Inhibitor H8 (among others) to reduce NF-kB-mediated gene transcription by reducing NF-kB activity and reducing the binding of NF-kB to NF-kB binding sites. With reference to *Exhibit* G-2 of the 90/007,503 Request, the Examiner alleged that *Shirakawa* expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97.

*Patentees' reply*
In response, Patentees respectfully traverse the Examiner's position. Initially, Patentees point out that claims 7, 28, 39, 81, 83, 85 and 86 have been cancelled without prejudice. Additionally, Patentees have explained in Section IV above that the remaining rejected