# EXHIBIT Q



EXPEDITED AFTER
FINAL PROCEDURE

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

RECEIVED
FEB 16 2001
TECH CENTER 1600/2900

| | |
|---|---|
| In re the application of: Baltimore et al. | Group Art Unit: 1636 |
| Serial No.: 08/464,364 | Examiner: Schwartzman, R. |
| Filed: June 5, 1995 | Attorney Docket No.: APV-035.03 |
| For: *Nuclear Factors Associated With Transcriptional Regulation* | |

Box AF
Assistant Commissioner for Patents
Washington, D.C. 20231

**Certificate of First Class Mailing (37 CFR 1.8(a))**

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Box AF, Assistant Commissioner for Patents, Washington, D.C. 20231 on the date set forth below.

February 12, 2001                                      By: _Isabelle Claus_
Date of Signature and of Mail Deposit

## RESPONSE AND AMENDMENT

Sir:

In response to the Office Action mailed 11 August 2000 (herein the "Office Action"), Applicants submit the following Response and Amendment. A Notice of Appeal and a Petition for a Three Months Extension of Time and appropriate fees are filed concurrently herewith. Please amend the application as follows.

A. Amendment of Claims

Please amend the claims as follows:

57.    (amended) A method for altering expression, in a mammalian cell, of a gene, the transcription of which is regulated by NF-κB, comprising

providing a formulation of an agent identified by its ability to alter [altering] the level of NF-κB--IκB complex present in the cytoplasm of said cell with an agent that binds a NF-κB protein or an IκB protein and alters the association between the two proteins and alters expression of the gene, and

ADL 0000843

USSN 08/464,364                    -2-                    Group Art Unit: 1636

contacting a mammalian cell with the formulation in an amount sufficient to alter NF-κB-dependent gene expression in the cell.

58.    (amended) A method of inhibiting expression, in a mammalian cell, of a gene, the transcription of which is dependent on a DNA binding activity of a NF-κB protein, the method comprising

providing a formulation of a substance identified by its ability to [ inhibiting the DNA binding activity of the NF-κB protein by contacting the cell with an agent which (i) inhibits] inhibit phosphorylation of an IκB protein and/or (ii) prevents degradation of an IκB protein, which IκB forms a transcriptionally inactive complex with the NF-κB protein, wherein the agent inhibits expression of the gene, and

contacting a mammalian cell with the formulation in an amount sufficient to alter NF-κB-dependent gene expression in the cell.

59.    (amended) A method of activating NF-κB-dependent transcription in a mammalian host cell, comprising

providing a formulation of a substance identified by its ability to dissociate [contacting the host cell with a substance which causes dissociation of] NF-κB–IκB complexes and promotes NF-κB-dependent transcription, and

contacting a mammalian cell with the formulation in an amount sufficient to alter NF-κB-dependent gene expression in the cell.

61.    (amended) A method of inducing DNA-binding and nuclear translocation of NF-κ present in the cyotosol of a mammalian host cell, comprising

providing a formulation of a substance identified by its ability to cause [treating the cell with a substance which causes] dissociation of NF-κB–IκB complexes, resulting in induction of DNA-binding activity and nuclear translocation of the NF-κB present in the complex, and

contacting a mammalian cell with the formulation in an amount sufficient to alter NF-κB-dependent gene expression in the cell.

B. Finality of Office Action.

Applicants respectfully request that the finality of the present   Office Action be withdrawn.   As set forth below, certain of the Examiner's rejections are not supported by evidence of adequate fact finding, e.g., refer to positions as "well known in the art." Accordingly, Applicants have not been able to adequately ascertain the Examiner's factual position and have therefore, been prejudiced with regard to directly addressing the Examiner's concerns.

ADL 0000844

USSN 08/464,364                           -3-                           Group Art Unit: 1636

C. Outstanding Rejection Of Certain Pending Claims

Applicants note with appreciation that claim 111 is deemed to be patentable by the Examiner.

In the outstanding Office Action, claims 57-59, 61, 63, 93, 97-108, 110, 112-132, 135-152 and 154-157 have been rejected under 35 U.S.C. § 112, first paragraph, as containing subject matter which was not described in the specification in such a way as to "reasonably convey to one skilled in the relevant art that the inventor(s), at the time the application was filed, had possession of the claimed invention". In particular, the Examiner stated that

"[t]he specification discloses a few agents which activate NF-kB when they contact a cell (...), oligonucleotide decoys comprising the NF-kB binding site and the use of NF-kB and IkB proteins as agents to modulate NF-kB-dependent transcription. No other agents are disclosed, in particular agents which inhibit phosphorylation of IkB, prevent degradation of IkB, decrease the level of IkB or stimulate phosphorylation of IkB. The disclosure of the compounds listed above is not deemed to be descriptive of the complete structure of a representative number of species encompassed by the claims as one of skill in the art cannot envision agents having each of the claimed capabilities or even other agents having the same capabilities of the compounds listed above. Nor is there a description of a representative number of species in terms of a partial structure and relevant identifying characteristics as there is no disclosed correlation between particular structures and the desired capabilities." [emphasis added]

See the Office Action at pages 4-5.

Claims 57-59, 61, 63, 93, 97-108, 110, 112-132, 135-152 and 154-157 have also been rejected under 35 U.S.C. § 112, first paragraph, as containing subject matter which was not enabled in the specification. The Examiner contends that the specification fails to provide any guidance on how to use the claimed agents as the agents have yet to be identified. In particular, the Examiner supports this rejection by stating

Although it was well known in the prior art how to administer a variety of agents to cells *in vitro* to alter protein expression and/or interaction, administration of agents to a subject *in vivo* for this purpose was not routine, particularly in terms of delivering and expressing a nucleic acid or a protein which must act intracellularly. Tremendous difficulties in targeting the appropriate cells and delivering sufficient amounts of material for a sufficient length of time for a desired effect to be obtained were well known in the art. It would therefore require more than routine experimentation to determine how to carry out the in vivo scope of the claims.

See the Office Action at pages 6-7.

ADL 0000845

USSN 08/464,364                    -4-                    Group Art Unit: 1636

D.  Applicants' Rebuttal of the Rejections

   (i)  *Applicants Possessed the Claimed Invention*

   The pending claims involve, inter alia, the use of substances identified using assay approaches as disclosed in the specification. The claims of related US Patent 6,150,090 (based on the same specification, and attached as Exhibit A) include subject matter relating to such assays. During the prosecution of the '090 patent, the PTO determined that Applicants had been in possession of the various claimed assays. Accordingly, and as is borne out by the prosecution history of the present application, the Examiner's position that the pending claims fail to meet the requirements of 35 U.S.C. §112, first paragraph with respect to possession of the claimed invention arises solely from the "use" recitation in the subject claims, and is founded at least in part on the opinion that one of ordinary skill in the art, in order to believe that the Applicants had possession of the claimed invention, would have needed the present application to show a correlation between particular structures and the desired capabilities.

   According to the USPTO, the written description requirement is met by the Applicants if it would be apparent to those skilled in the art or science that the inventor was in possession of the claimed invention at the time of filing the patent application. See *Guidelines for Examination of Patent Applications Under the 35 U.S.C. 112 ¶1*, 66 Fed. Reg. 4, 1099 (2001). The courts have repeatedly articulated a similar standard. There is no per se rule that, to show possession of the claimed invention, the Applicants must have been able to describe the structure of the chemical entities which could be identified in the assay steps. The examiner recognizes that sufficient description can be met by not only by structure, but also by disclosure of relevant identifying characteristics, e.g., "other physical and/or chemical properties, by functional characteristics coupled with a known or disclosed correlation between function and structure, or a by a combination of such identifying characteristics". Office Action at page 5, citing the Written Description Guidelines. Clearly the courts and the patent office contemplate something more than the number of compounds whose structures specifically enumerated in the specification as a touchstone for written description. The case at hand involves the pioneering discovery a multicomponent pathway susceptible to intervention at a number of points, necessarily with substances of a variety of structures—as is clear from the disclosure. Under these circumstances, and by analogy to the original rationale for product-by-process claims, it is appropriate for the Applicants to have defined the substances useful in the claimed methods by their method of identification, rather than by reference to a particular chemical structure.

   Reference to screening assays allows the identification of compounds that modulate NF-κB activity by various mechanisms, as is disclosed in the specification.  By definition,

ADL 0000846

USSN 08/464,364                    -5-                    Group Art Unit: 1636

compounds identified in the assay step, irrespective of how widely they may vary from one another in chemical structure, are useful for inhibiting or potentiating (as the case may be) NF-kB dependent gene transcription. No more need be known of the chemical structure. On the contrary, a person of skill in the art would have reasonably expected that the screening steps of the pending claims would identify a diverse group of compounds having any of a wide variety of structures, with no common structure expected to link the function disclosed by the specification and covered by the pending claims. That is, a person of skill in the art would have envisioned that all modulators of NF-kB activity would not have the same or similar structure. Even compounds regulating NF-kB by the same mechanism, such as by inhibiting phosphorylation or degradation of IkB, would have been expected to include any of a variety of different structures. Unlike the case of a structurally-defined chemical genus, here a person of skill in the art would not expect to find a correlation, as posited by the Office Action, between particular structures and the desired function, since since more than one molecular mechanisms of action were contemplated, described and recited in the claims..

Furthermore, at the time the present application was filed, there was ample precedent in the scientific literature for chemical diversity even among agents identified for their activity against selected biological targets. For instance, Weinstein et al. (1989) Am J Hypertens 2:205 review the state of calcium antagonists, and note that compounds identified as calcium antagonists are of "very diverse structure." See also Triggle et al. (1983) Circ Res 52: I17. Likewise, Mills et al. (1989) Methods Find Exp Clin Pharmacol 11 Suppl 1: 87 reviews the state-of-the-art of H2-receptor antagonists, and notes that "numerous compounds with diverse chemical structures have been shown to possess H2-receptor antagonist activity. See also Badger et al. (1984) Int J Immunopharmacol 6:467. The art already recognized many instances wherein structurally unrelated compounds acted on the same target protein(s).

Applicants' argument is further supported by the Declaration of David Baltimore under Rule 1.132 and In re Brana, which is attached hereto as Exhibit B. Dr. Baltimore points out examples of the types of compounds that have been found, as contemplated by the application, to alter NF-kB and/or IkB activity and affect NF-kB mediated gene expression in cells. These compounds are structurally diverse. However, each is characterized by its activity on NF-kB mediated gene expression – as the pending claims require. Dr. Baltimore's declaration is not offered to render an insufficient disclosure enabling, rather, they prove that the disclosure was in fact enabling when filed. In re Brana, 51 F2d 1560 (CAFC 1995).

Thus, as is evident from the specification and corroborated by the post-filing evidence provided in the Declaration of Dr. Baltimore, one skilled in the art would have understood at the

USSN 08/464,364                    -6-                    Group Art Unit: 1636

time the application was filed that Applicants expected that a wide range of structurally diverse substances would be identified using the disclosed assays and would therefore be useful for inhibiting or potentiating NF-κB dependent gene transcription. It would be apparent to those skilled in the art that Applicants specifically contemplated that molecules of a variety of diverse structures could be routinely identified in the disclosed assays as having such activity, and that such compounds could then be used to modify NF-κB mediated gene expression as recited in the pending claims. Although the compounds regulating NF-kB mediated gene expression may be diverse structurally, they all possess at least one common functional characteristic, i.e., the capability to modulate NF-kB activity. Given the state of the art, including the expectation that those of ordinary skill in the art that diverse classes of compounds would be identified in the assay step, we submit that it is evident from the specification of the present application that the Applicants were in possession of the invention covered by the scope of the pending claims as of the filing date of the instant application.

Finally, being directed to methods, rather than compositions-of-matter, the pending claims comport with the standard of practice in determining possession of invention for other arts, taking into account issues of predictability. For instance, there are many issued patents in the chemical, mechanical and software arts directed to methods whereby a product of one step is passed onto subsequent steps, and in many cases, the identity of the product is unknown other than its characteristics of being produced by the preceeding step. US Patent 6,171,813 is an example of claims issued in the chemical art in which a product of one step is provided into a next step of the claimed method:

1. A method of catalysis of at least one substrate into a product in an organic reaction solvent, comprising the steps of:
   (a) obtaining a catalyst comprising an enzyme-surfactant ion pair complex comprising an enzyme and an ionic surfactant capable of forming an ion pair complex with the enzyme, the complex being produced by extracting an aqueous solution of the enzyme with the ionic surfactant and a water immiscible organic solvent,
   (b) combining the catalyst with an organic reaction solvent, comprising an organic solvent and water in an amount sufficient to increase the rate of catalysis relative to a water-free organic reaction solvent, the amount of water ranging from about 0.03% to about 2.5% v/v, and
   (c) allowing catalysis of the at least one substrate into the product.

2. The method of claim 1, further comprising recovering the product after catalysis is substantially completed.

Likewise, US Patent 5,666,415 is an example of claims issued in the software art in which a product (the encrypted file) of one step is passed into the next step (decryption) of the claimed method:

1. In an information handling system in which secret information is maintained within a first protected environment, a method of transferring said secret information from said first protected environment to a second protected environment, said method being performed by one or more authorities, said information

ADL 0000848

within said protected environments being unobtainable in clear form by said one or more authorities, said method comprising the steps of:

establishing within said first and second protected environments a shared secret transport key that is obtainable in clear form only within said first and second protected environments and is unobtainable in clear form by said one or more authorities;

encrypting said secret information within said first protected environment using said transport key to generate encrypted secret information that is obtainable in encrypted form by at least one of said one or more authorities; and

decrypting said encrypted secret information within said second protected environment using said transport key to regenerate the original secret information within said second protected environment, said regenerated secret information being unobtainable in clear form by said one or more authorities.

The point made here is that in both exemplary sets of issued claims, there is no common structural feature to the intermediate product of the method -rather, those products are defined by the characteristics imparted through the step in the method by which they are produced.

While many claim to have made pioneering inventions, the present applicants truly deserve that distinction. They discovered a crucial biological signaling pathway. Artificially limiting the claims to the use of specified chemical structures, rather than to the use of substances identified as disclosed in the specification, would deny these inventors their due.

### (ii) The Pending Claims are Enabled

By the time of the earliest priority date of the present application, the drug discovery industry was very mature. Applicants assert that, for the typical marketed drug, the associated costs and length of time for bringing the drug to market is not the result of any undue experimentation. The amount of experimentation is the product of stringent safeguards by regulatory agencies, as well as developing statistically relevant patient populations - and that should not be confused with "undue experimentation" as used in section 112. Methods for formulating the subject compounds, testing bioavailability (in vivo), and establishing dose/response relationships, to name but a few activities which are undertaken prior to administration of a drug to humans, while potentially time consuming and expensive if done as part of a regulatory approval process, do not require undue experimentation -only routine experimentation.

A priori, there is no rule that a method for treating a human, though it may require regulatory approval, necessitates the practioner to engage in any undue experimentation to achieve that method. The Federal Circuit noted that tests on standard experimental animals to prove a compound's alleged pharmaceutical properties are sufficient to establish utility. The Federal Circuit in Brana made the clear statement that tests for FDA approval of a pharmaceutical compound are not equivalent to and should not be confused with the 35 U.S.C. §

ADL 0000849

USSN 08/464,364                    -8-                    Group Art Unit: 1636

101 utility requirement for patentability. Nor should that requirement be confused with enablement under section 112.

The Examiner has also stated that "there is no suggestion or guidance as to screening for agents that alter the level of phosphorylation of IKB or the level or stability of IKB." That argument is respectfully traversed.

Applicants contend that the specification, read as a whole, provides adequate direction to the skilled artisan to screen for agents that modulate IkB phosphorylation or stability or alter other activities associated with NF-kB activation. In support of this contention, Applicants submit herewith as Exhibit C, a copy of another Declaration of Dr. David Baltimore, made of record in parent application 08/463,397, setting forth that the application clearly conveys and provides adequate guidance for embodiments of the subject assays involving direct detection of IkB phosphorylation or IkB degradation, and that, based on the experimental results described in the application and on the general knowledge in the art at the time the application was filed, one of ordinary skill in the art would have reasonably believed that NF-kB can be activated as a result of phosphorylation and degradation of IkB.

In particular, Dr. Baltimore lists evidence provided in the present application which supports the pending claims directed to, for example, screening for agents that modulate IkB phosphorylation or stability (see, page two of the Declaration), and concludes that it would have been evident that to one skilled in the art that the present application specifically contemplated NF-kB activation by a mechanism which included the phosphorylation of IkB and the subsequent proteolytic degradation of the modified IkB protein.

Dr. Baltimore further indicates that it was well known in the art at the time the invention was made, that TPA and LPS activate protein kinases, resulting in phosphorylation of specific proteins., and that, in view of the general knowledge of protein phosphorylation at the time the invention was made, the results described in the specification would have reasonably been understood by those of skill in the art to be sufficiently convincing of a mechanism for NF-kB activation involving phosphorylation of IkB and subsequent degradation of the modified protein.

Furthermore, it is apparent from even a general reading of the specification and original claims, that the invention relates to the identification (and subsequent use) of compounds which can, as appropriate, inhibit or potentiate NF-kB function in, for example, gene expression. It would be evident to one skilled in the art, therefore, that each of the assays described in the specification in the context of elucidating the mechanism by which NF-kB acts are also useful as drug screening assays for the identification of exogenous agents which affect that mechanism. In this context, support for individual claims, other support for use of assays in a manner consistent with the pending claims can be found in the specification, *inter alia*, as follow:

ADL 0000850

\*      at page 6, the specification states that the invention relates to drugs which enhance or block the activity of NF-kB or of the NF-kB inhibitor (e.g., IkB);

\*      at page 7, the specification states the subject invention further relates to methods of regulating (inducing or preventing) activation of NF-kB, controlling expression of the immunoglobulin kappa light chain gene and other genes whose expression is controlled by NF-kB;

\*      at page 8, the specification states k[a]lteration or modification, whether to enhance or reduce NF-kB activity or to change its binding activity (e.g., affinity, specificity), is referred to herein as regulation of NF-kB activity;

\*      at page 9, the specification states the cloned genes permit development of assays to screen for agonists or antagonists of gene expression and/or of the factors themselves. Further, because the binding site for NF-kB in the kappa gene is clearly defined, an assay for blockers or inhibitors of binding is available, as is an assay to determine whether active NF-kB is present;

The Examiner's attention is also directed to page 23, lines 2-29; page 55, lines 5-16; page 74, lines 1-14; page 87, line 1 - page 88, line 17; and claims 57-63 as originally filed. These and other teachings of the instant application provide ample guidance and sufficient written description for the pending claims.

The level of skill in the art is high. Those skilled in the art would be able to carry out a variety of different drug screening assays based on the disclosure and experience developed in the art. As of the priority date of the present application, the art recognized generic formats for, e.g., detecting inhibitors of protein phosphorylation, detecting inhibitors of protein degradation, detecting inhibitors of protein:protein interaction, detecting inhibitors of protein localization in a cell, detecting inhibitors of protein:DNA interaction and the like. The NF-kB and IkB proteins are sufficiently well characterized by the subject application that the skilled artisan would be able to provide such assays involving one or both of the proteins without much guidance beyond the identification of the mechanism of action, which the present application provides. Indeed, Applicants allege the application provides more disclosure than would be required. Moreover, those skilled in the art would recognize that assays described in the present application for discerning the mechanism of action of NF-kB and IkB could be readily adapted for screening small molecules and the like for their ability to modify an NF-kB pathway.

In addition, Applicants are entitled to rely on the knowledge in the art regarding assays for identifying compounds which modulate IkB phosphorylation, since assays for identifying

ADL 0000851

USSN 08/464,364                    -10-                    Group Art Unit: 1636

compounds which modulate phosphorylation of proteins in general were available and that such assays can be applied to identify agents which modulate IkB phophorylation in particular. In *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, cited by the Examiner, the Court found that "when there is no disclosure of any specific starting material or of any of the conditions under which a process can be carried out, undue experimentation is required" (Emphasis added). However, in the instant case, Applicants have provided methods to isolate IkB, which can then be used as a specific starting material in the known methods for determining the state of phosphorylation of a protein. Thus, since the specification describes specific starting materials, the holding of *Hybritech Inc. v. Monoclonal Antibodies, Inc.* is not applicable here. In addition, no undue experimentation is required for applying these methods to the IkB protein.

The Examiner's rejection of the pending claims as not being enabled is premised on an argument that the Examiner characterizes as being "well known in the prior art". However, the Examiner has, to date, not provided any evidence of fact finding to support the allegation. Should the Examiner continue to maintain this rejection, it is respectfully requested that the art upon which he relies be made of record, or if the Examiner is relying on personal knowledge, that an affidavit setting forth that knowledge be provided to the Applicants, in order that they more clearly understand the Examiner's position and directly address his concerns.

E.    State of Fact Finding by PTO

The final guidelines for section 112 clearly state there is a strong presumption that the specification as filed provides adequate written description support for the claimed invention. See *Guidelines*, 64 Fed. Reg. 71 at page 1105. A disclosure as filed is prima facie adequate. To support a rejection, the PTO has the burden of showing why the Applicant's evidence is insufficient. In any case where lack of written description is found, the PTO should cite documentary evidence in support of the finding. As expressly stated by the guidelines, where documentary evidence is not available, technical reasoning, as distinguished from legal reasoning, may support the finding when the technical line of reasoning relates to fact finding regarding possession of the invention.

Moreover, the Federal Circuit has recently articulated a standard whereby the PTO must establish a rational connection between the agency's fact findings and its ultimate action. *Dickinson v. Zurko*, 119 S. Ct. 1816 (1999). In light of the Applicants arguments of record, and the presumption in favor of the Applicants, it is respectfully asserted that the Examiner's maintenance of the present rejection is not supported by substantial evidence, and as such, does not meet the "arbitrary, capricious" standard applied under the "substantial evidence" test of

ADL 0000852

USSN 08/464,364                    -41-                    Group Art Unit: 1636

Section 706(2)(E) of the Administrative Procedure Act. The Examiner has not cited any relevant art nor relied on any other fact finding results which rebut the presumption in favor of the Applicants.

### F. Entry of Amendment

Applicants respectfully request that the Examiner enter this Amendment and Response. It is expected that the instant paper should place the present application in condition for allowance. However, if the Examiner maintains the present rejection, it is believed that the arguments provided herein, though supplementing past remarks by the Applicants, can be useful towards fully developing the file history for appeal. It is noted by the Applicants would be severely prejudiced should they be required to refill this application (e.g., as an RCE or CPA) by the loss of potential patent term.

### G. Conclusion

In view of the above remarks and the amendments to the claims, it is believed that this application is in condition for allowance. If a telephone conversation with Applicant's Attorney would expedite prosecution of the above-identified application, the Examiner is urged to call the undersigned at (617) 832-1000.

Respectfully submitted,
FOLEY, HOAG & ELIOT LLP

By: _I. Clauss_

Isabelle M. Clauss, Ph.D.
Attorney for Applicants
Registration No. 47,326

One Post Office Square
Boston, MA 02109
Telephone: (617) 832-1000
Facsimile: (617) 832-7000

Date: February 12, 2001

ADL 0000853