# EXHIBIT V

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,828 | 12/02/2005 | 6410516 | | 4525 |

| | | | EXAMINER |
|---|---|---|---|
| 23432 | 7590 | 07/06/2007 | |
| COOPER & DUNHAM, LLP | | | |
| 1185 AVENUE OF THE AMERICAS | | ART UNIT | PAPER NUMBER |
| NEW YORK, NY 10036 | | | |

DATE MAILED: 07/06/2007

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Dr. Raj Bawa

Bawa Biotechnology Consulting, LLC

21005 Starflower Way

Ashburn, VA 20147

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. _90/007,828_.

PATENT NO. _6410516_.

ART UNIT _3991_.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| Office Action in Ex Parte Reexamination | Control No. (90/007,503)  90/007,828 | | Patent Under Reexamination 6410516 | |
|---|---|---|---|---|
| | Examiner Bennett Celsa | | Art Unit 3991 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a ☒ Responsive to the communication(s) filed on <u>17 November 2006</u> .    b ☒ This action is made FINAL.
c ☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☒ Notice of References Cited by Examiner, PTO-892.    3. ☐ Interview Summary, PTO-474.

2. ☒ Information Disclosure Statement, PTO/SB/08.    4. ☐ _____ .

Part II    SUMMARY OF ACTION

1a. ☒ Claims *1-6,8-27,29-38,40-80,82,84 and 87-202* are subject to reexamination.

1b. ☐ Claims _____ are not subject to reexamination.

2. ☒ Claims *7,28,39,81,83,85,86 and 203* have been canceled in the present reexamination proceeding.

3. ☒ Claims *see cont. sheet below* are patentable and/or confirmed.

4. ☒ Claims *see cont. sheet below* are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ The drawings, filed on _____ are acceptable.

7. ☐ The proposed drawing correction, filed on _____ has been (7a)☐ approved (7b)☐ disapproved.

8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

   a)☐ All  b)☐ Some*  c)☐ None    of the certified copies have

   1☐ been received.

   2☐ not been received.

   3☐ been filed in Application No. _____ .

   4☐ been filed in reexamination Control No. _____ .

   5☐ been received by the International Bureau in PCT application No. _____ .

   * See the attached detailed Office action for a list of the certified copies not received.

9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

10. ☐ Other: _____

cc: Requester (if third party requester)

**Continuation Sheet (PTOL-466)**    **Reexam Control No.**

Rejected: claims 1-6, 8-18, 20-27, 29, 31-38, 40, 42-43, 47-51, 53-62, 64-73, 75-80, 82, 84, 88-97, 99-100, 104-107, 109-110, 114-117, 119-120, 124-129, 133-137, 139,140, 144-147, 149, 150, 154-157, 159, 160, 164-168, 172-175, 177, 178, 182-185, 192-193 and 197-201.

Confirmed: claims 19, 30, 41, 44-46, 52, 63, 74, 87, 98, 101-103, 108, 111-113, 118, 121-123, 130-132, 138, 141-143, 148, 151-153, 158, 161-163, 169-171, 176, 179-181, 186-191, 194-196, and 202.

Application/Control Number: 90/007,503; 90/007, 828                    Page 2
Art Unit: 3991

## DETAILED ACTION: *Reexamination: Final Rejection*

### *In Merged '7503 and '7828 Proceedings.*

**Procedural Posture:**

1. U.S. Patent No. 6,410,516 issued on June 25, 2002.

2. A request for reexamination, assigned control No. 90/007,503, was filed by a third party requester on April 4, 2005. Reexamination was ordered for the '7503 proceeding on June 8, 2005.

3. A request for reexamination, assigned control No. 90/007,828, was filed by a third party requester on December 2, 2005. Reexamination was ordered for the '7828 proceeding on December 12, 2005.

4. No Patent Owner's Statement was received in either reexamination.

5. Reexams 90/007,503 and 90/007,828 were merged on May 4, 2006.

6. First Office action (FAOM: dated August 2, 2006) in merged proceedings.

7. Patent Owner Amendment dated Nov. 17, 2006 (canceling claims 7, 28, 39, 81, 83, 85, 86 and 203), supplemental disclosure statement and Declaration of Dr. Verma along with accompanying exhibits is acknowledged.

The text of those sections of Title 35, U.S. Code not included in this action can be found in a prior Office action.

### Status of the Claims

U.S. Patent 6,410,516 claims 1-203 were initially subject to reexamination.

Canceled Claims: 7, 28, 39, 81, 83, 85, 86 and 203.

Pending Claims: 1-6, 8-27, 29-38, 40-80, 82, 84 and 87-202.

### Informal Claim

Patentee's amendment canceling claim 7 has resulted in claim 8 being improperly dependent upon a cancelled base claim. The Patent Owner is required to cancel the claim(s), or amend the claim(s) to place the claim(s) in proper dependent form, or rewrite the claim(s) in independent form.

Application/Control Number: 90/007,503; 90/007, 828                    Page 3
Art Unit: 3991

### *Purported Inconsistency Within the August 2, 2006 Office Action:*

Patentee Argument: *Each of claims 22-24, 33-35, 55-57, 66-68, 77-79 and 90-92 recite specific ways of reducing NF-κB activity, and have been rejected. In contrast, analogous claims 44-46, 101-103, 111-113, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, and 194-195 also recite the same specific ways of reducing NF-κB activity, but have been confirmed patentable. No reason is provided in the August 2, 2006 Office Action for distinguishing the rejected claims from those confirmed patentable. Accordingly, each of claims 22-24, 33-35, 55-57, 66-68, 77-79 and 90-92 should be confirmed patentable.* Amendment dated Nov. 17, 2006 page 17.

Examiner Response: Each of claims 22-24, 33-35, 55-57, 66-68, 77-79 and 90-92 have been rejected since there is prior art which raises rejections of these claims. In contrast, claims 44-46, 101-103, 111-113, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, and 194-195 have been confirmed patentable since none of the references cited in the 90/007,503 or 90/007,828 proceedings raised a substantial new question of patentability concerning these claims.

It is also noted that rejected claims 22-24, 33-35, 55-57, 66-68, 77-79 and 90-92 are dependent upon independent claims 1, 2, 5, 6, 8 and 9, respectively that are different from those of confirmed claims 44-46, 101-103, 111-113, 121-123, 130-132, 141-143, 151-153, 161-163, 169-171, and 194-195 which refer to independent claims 3, 10, 11, 12, 13, 14, 15, 16, 17 and 4, respectively.

### *Ultra Vires Argument:*

The patent owner response (pp.18-23) provides arguments as to why the ordering of the reexamination of the instant U.S. Pat. No. 6,410,516 in merged proceedings 90/007,503 and 90/007,828 is *ultra vires* and should be vacated. Patentee's petition to vacate was denied (10/6/05 and reconsideration 2/8/06) and the patent owner's district court appeal was ultimately dismissed by the CAFC (11/22/06) under Fed. R. App. P. 42(b) (of record: 11/22/06).

A summary of patentee's arguments and an Examiner rebuttal consistent with the October 6, 2005 petition denial and the Solicitor's "Memorandum of Points and Authorities In Support of Motion To Dismiss Or In the Alternative For Summary Judgement and Opposition to Plaintiff's Motion For Summary Judgement": pages 1-30

Application/Control Number: 90/007,503; 90/007, 828                Page 4
Art Unit: 3991

presented in *Ariad Pharmaceuticals v. Dudas* U.S. District Court (Eastern District of Va.)
(copy enclosed) follows:

1. **Patentee Argues**: Inherency *case law and MPEP 2131.01 is not applicable since 35
USC 301-303 limits reexam to the use of "prior art" publications. Response* pp. 20-21.

Examiner Response:

Contrary to the patentee's position, reliance on extrinsic evidence to better
understand the teachings of a prior art reference has been common in reexamination
proceedings. For example, in *In re Baxter Travenol Labs*, 952 F.2d 388 (Fed. Cir.
1991), the Federal Circuit rejected the patent owner's argument that the PTO could not
rely on declarations and other written materials submitted along with a prior art
publication to reject its claims in a reexamination. 952 F.2d at 390. The Federal Circuit
explained that the declarations and other extrinsic evidence were properly relied upon
during the reexamination to explain the printed publication:

> Baxter argues that these depositions, declarations, and
> admissions are extrinsic evidence, which may not be
> considered when determining the anticipatory teaching of a
> reference. This is incorrect. Baxter acknowledges, as it
> must, that extrinsic evidence may be considered when it is
> used to explain, but not expand, the meaning of a reference.
> Id. (emphasis added).

The Federal Circuit upheld the anticipation rejection of the reexam claims based on the
prior art document itself, as illuminated by the extrinsic evidence. Id.; see also *In re
Bass*, 314 F.3d 575, 576 (Fed. Cir. 2002) (extrinsic evidence of Schofield declaration
explaining teachings of Lucander prior art document establishes SNQ for
reexamination); see also *Heinl*, 143 F.Supp.2d at 604-05 (permitting use of extrinsic
evidence to explain a reference and finding "unpersuasive" patent owner's argument
that reexaminations are limited purely to prior art documents and any other materials
are prohibited).

Consistent with Federal Circuit case law, the MPEP provides that any claim
rejection in reexamination based on prior patents or printed publications may use

Application/Control Number: 90/007,503; 90/007, 828                     Page 5
Art Unit: 3991

extrinsic evidence, such as affidavits or declarations, to explain the meaning of the prior

art reference:

> Affidavits or declarations which explain the contents or
> pertinent dates of prior art patents or printed publications in
> more detail may be considered in reexamination, but any
> rejection must be based upon the prior patents or printed
> publications as explained by the affidavits or declarations.
> The rejection in such circumstances cannot be based on the
> affidavits or declarations as such, but must be based on the
> prior art patents or printed publications.MPEP § 2258 I. E.

Thus, it is appropriate for the PTO to consider extrinsic evidence in a

reexam proceeding to explain the meaning and contents of prior art.

2.  Patentee Argues: *The method inherency rejections are based upon "prior public
use". Patent owner cites Schering Corporation v. Geneva et al, 339 F.3d 1373 (Fed. Cir.
2003), Cruciferous Sprout Litigation, 301 F.3d 1343 (Fed. Cir. 2002) and
MEHL/BIOPHILE International Corp. v. Milgraum, 192 F.3d 1362 (Fed. Cir. 1999) as
cases standing for the proposition that subject matter which is inherently described in a
patent or printed publication is applicable to anticipate a claimed invention only as a
prior public use of the inherently disclosed subject matter, and not as an anticipation by
the patent or printed publication. Patent owner quotes MPEP § 2217 as indicative of the
proposition that "a prior art patent or printed publication cannot be properly applied as a
ground for reexamination if it is merely used as evidence of prior public use .... " . Patent
owner additionally argues that the Court of Appeals for the Federal Circuit has held that
a method is inherently anticipated only by the actual public use of the method which
may or may not have been described in a printed publication.Amendment at pp. 21-23.*

 Examiner Response:

It is clear from a consideration of *Smithkline Beecham Corporation et al v. Apotex*

*Corporation et al*, 403 F.3d 1331 (Fed. Cir. 2005), as well as from the precedential case

law cited by the patent owner above, that a prior art patent or publication containing an

enabling disclosure that inherently anticipates a claimed invention which was not

expressly known or appreciated at the time that the patent or publication was published

is to be regarded as an anticipatory prior art patent or printed publication. That the

inherent anticipation exists by reason of the fact that the claimed invention would be

produced by following the teachings of the patent or printed publication <u>does not mean</u>

<u>that the teachings of the patent or printed publication had to have been, or have to be,</u>

publicly performed prior to an applicant's invention. Nor does it mean that the anticipation is the result of a prior public use. This follows from the principle that it is not necessary that an invention disclosed in a patent or printed publication shall actually have been made or practiced, provided that the disclosure in the publication is described so as to have placed the public in possession of it. This further follows from the uniform pronouncement in the case law "that inherent anticipation does not require that a person of ordinary skill in the art recognize the inherent disclosure in the prior art at the time the prior art is created." *Schering Corporation*, 403 F.3d at 1343.

Thus, so long as a patent or printed publication enables the practice of a method that would inherently anticipate a different method not expressly disclosed in the patent or printed publication, the patent or printed publication is considered to be an anticipatory disclosure of the inherently disclosed method, even if at the time of publication or issuance of the patent, the expressly disclosed invention had not been practiced and a person of ordinary skill in the art would not necessarily have recognized the inherently disclosed method. The patent or printed publication is not regarded as evidence of prior public use of the inherently disclosed method; the cases do not require that the inherently disclosed method be publicly performed at the time of patenting or publication, therefore the reference is indeed a reference.

### *Withdrawn Rejection (s)*

Rejection of claim 203 (section X. on pages 52-55 of FAOM) under 35 U.S.C. 103(a) as obvious over *Baldwin and Sharp*, Proc. Nat'l Acad Sci. 85:723 (Feb. 1988) in view of *Schorpp* et al. J. Mol. Biol. 202:307 (1988); . *Li* et al. Mol. Cell. Biol. 8:432 (1988); *Hai* et al. Cell 54 :1043 (1988) ; *Chu* et al. Nucleic Acids Res. 15:1311-1326 (1987); and *Molecular Biology of THE CELL*, 2nd Ed. (1989) page 423 is withdrawn in response to the Patent Owner's amendment canceling claim 203.

Rejection of claims 1-2, 6-9, 20-21, 25-32, 36-41, 64-65, 69-76, 80-89, and 93-98 under 35 U.S.C. 102(b) as anticipated by *King James Version Bible* (1611) (excerpts), *St. Leger* (The Lancet (5/79) 1017-20), *Dobrilla* (Hepato-Gastroenterol. 31 (2/84) 35-37), and *Jones* (Pharm. & Tox. 60 (3/87) 217-20) as evidenced by *Blanco-Colio* (Circulation 102 (8/00) 1020-6), *Holmes-McNary/Baldwin* (Cancer Res. 60 (7/00) 3477-83) and *Manna* (J. Immunol. 164 (2000) 6509-6519). See MPEP 2131.01 (evidence of inherency) is hereby withdrawn. The role and bioavailabilty of red wine components (resveratrol and other polyphenol anti-oxidants) involving regulation of NF-κB activity with regard to a post-prandial hyperlipidemia is unclear.

Application/Control Number: 90/007,503; 90/007, 828                          Page 7
Art Unit: 3991

The rejection of claims 1-2, 5-6, 8-9, 20-21, 25-27,29, 31-32, 36-38, 40, 53-54, 58-62, 64 -65, 69- 73, 75-76, 80, 82, 84, 88–89 and 93-97 under 35 U.S.C. 102(b) as being anticipated by *1970 PDR*, *Lefring et al.* (Crit. Care. Med. 2:3 (7/95) 1294-1303: References Cited Therein), *Nagasawa* et al. (J. Cell. Phys. 109 (1981) 181-192), or *Rovera* et al. (Science 204 (1979) 868-970) as evidenced by *Baldwin I* (Annu. Rev. Immunol. 14 (1996) 649-81, *Auphan* et al. (Science 270 (1995) 286-290), *Scheinman I* (Mol. Cell. Biol. 15 (2/95) 943-53), *Scheinman II* (Science 270 (10/95) 283-286), *Mukaida* (J. Biol. Chem. 269 (5/94) 13289-95) and *Padgett* et al. Trends in Immunology, 24(8) (Aug. 2003) pages 444-448 is withdrawn in order to simplify issues for appeal since this rejection is cumulative to the anticipation rejection over the *Goodman and Gilman* reference in view of the same evidentiary documents.

***Priority***

Application 08/464,364 (filed 6/5/95) issued US Pat. No. 6,410,516 (Baltimore patent) is:

-A DIV of 08/418,266 (filed 4/6/95) issued as US Pat. No. 5,804,374
which is a CON of 07/791,898 (filed 11/13/91) (ABN: 5/16/95);
which is a CIP of 06/946,365 (filed 12/24/86) (ABN:3/24/92) AND:
-a CIP of 07/341,436 filed 04/21/1989 (ABN: 4/3/92)
-a CIP of 07/280,173 filed 12/05/1988 (ABN: 3/24/92)
-a CIP of 07/318,901 filed 03/03/1989(ABN: 12/12/91)
- a CIP of 07/162,680 filed 03/01/1988 (ABN:8/30/90)
 -a CIP of 07/155,207 filed 02/12/1988 (ABN:7/26/90)
- a CIP of 06/817,441 filed 01/09/1986 (ABN:1/13/89)

For purposes of 35 USC §120 priority, the above-identified CIP applications (i.e. original specification and original claims) fail to adequately describe and/or enable the methods of currently pending claims 1-6, 8-27, 29-38, 40-80, 82, 84 and 87-202 of the instant Baltimore Patent claims subject to reexam. See MPEP 2258. Accordingly, **claims 1-6, 8-27, 29-38, 40-80, 82, 84 and 87-202** of the reexamination patent claims are entitled to the **filing date 11/13/91** of continuation application 07/791,898 for purposes of prior art. Every claim of the '516 patent recites at least one of the following features which the pre-1991 applications fail to disclose:

a. an amino acid or nucleic acid sequence corresponding to NF-κB;
b. support for the Baltimore patent claim limitations including (but not limited to):
-"reducing NF-κB activity" in a cell (especially mammalian/eukaryotic) and/or an enabling means thereof e.g.administering a NF-κB inhibitor, to effect various functions (e.g. inhibit expression generally, reduce cytokine expression etc.) as *required in all the claims*;

Application/Control Number: 90/007,503; 90/007, 828                    Page 8
Art Unit: 3991

-"reduce binding of NF-κB to NF-κB recognition sites on genes which are
transcriptionally regulated by NF-κB" e.g. claims 25, 36, 47, 69, 80, 93, 144, 154 & 182;
-"inhibiting modification of an IκB protein, which modification otherwise reduces IκB
binding to NF-κB" e.g. claims 22, 33, and 44;
-"inhibiting degradation of an IκB protein" e.g.claims 23, 34, and 45;
-"inhibiting dissociation of NF-κB:IκB complexes" e.g. claims 24, 35, and 46.

It is noted that the written description requirement is satisfied only by describing
the actual invention, and not that which makes it obvious. *Lockwood v. American
Airlines, Inc.* 107 F.3d 1565, 1572. 41 USPQ2d 1961, 1968 (Fed. Cir. 1997).

1. Patentee's Argument: *Claims 1-9,11, 18, 20, 21, 25-27, 29, 31, 32, 36-38, 40, 42, 43,
47-51, 53, 54, 58-60, 61, 62, 64, 65, 69-73, 75, 76, 80, 82, 84, 88, 89, 93-97, 106, 107,
109, 110, 114-117, 182-185, 192, 193 and 197-201 subject to "intervening prior art
rejections" are entitled to 35 USC 120 priority to the April 21,1989 filing date of the
07/341,436 application.* See response at pages 33-39; the declaration of Dr. Verma, ¶¶
16-21; and Claim Support Chart, attached as Exhibit 3 to the Declaration of Dr. Verma.

*Additionally, Patentee points out that to the extent support for the pending claims
appears in U.S. Serial Nos. 06/817,441, filed January 9, 1986; 07/155,207, filed
February 12, 1988; and/or 07/280,173, filed December 5, 1988, each of these
applications is incorporated by reference into the April 21, 1989 application on page 1,
lines 4-8 thereof (citing M.P.E.P. 608.01(p) (I)).*

*More particularly, Patentee notes that contrary to the Examiner's assertions:*

*1. Amino acid or nucleic acid sequences corresponding to NF-κB are not recited in the
pending claims nor are they necessary to enable these claims as of April 21, 1989.*

*2. The phrase "reducing NF-κB activity" in the pending claims finds support in
07/341,436 at p.5, lines 13-16: "Alteration or modification, whether to enhance or reduce
NF-κB activity ... is referred to herein as regulation of NF-κB activity.".*

*3. "mammalian cells" & "eukaryotic cells" finds support in 07/341,436 at:
- p.1, lines 4-8 (incorporating 07/155,207, p. 77, lines 8-9): " NF-κB [is] present in a wide
variety of mammalian cells"; and
- p.1, lines 4-8, (incorporating 07/280,173, p.4, line 21): "In the present work with
eukaryotic cells.".*

*4. although "reducing NF-κB activity" in a cell ( especially mammalian/eukaryotic) and/or
an enabling means thereof (administering a NF-κB inhibitor) to effect various functions
(inhibit expression generally, reduce cytokine expression etc.)" is not disclosed in the*

subject patent, Patentees point to 07/341,436 at p. 23, line 22- p.30, line 25 describing
how one skilled in the art may proceed to reduce NF-κB activity.

5.    "reducing binding of NF-κB to NF-κB recognition sites on genes transcriptionally
regulated by NF-κB " in the pending claims is supported in 07/341,436 at:
- p.5, line 31- p.6, line 8: " NF-κB-mediated gene expression can also be selectively
regulated by altering the binding domain of NF-κB in such a manner that binding
specificity and/or affinity are modified.";
- p.24, lines 9-29: "According to the methods described herein, the expression of genes
under the control of one of these elements is subject to modulation by alteration of the
concentration or availability of NF-κB. This can also be carried out, according to the
present method, for any gene which contains an NF-κB binding site."; and
- the Title: "NF-κB -Mediated Transcriptional Regulation".

6.    "inhibiting modification of an I-κB protein, which modification otherwise reduces I-κB
binding to NF-kB" in the pending claims finds support in 07/341,436 at:
-p. 18, lines 28-29: "Inactive NF-κB is complexed with a labile inhibitor protein, I-κB.";
- p.19, lines 20-21: "The implication is that activation of NF-κB involves a modification of
I-κB and not NF-κB."; and
-p.5, lines 7-13 and 23-25: "As a result of this finding, it is now possible to alter or
modify the activity of NF-κB as an intracellular messenger and, as a result, to alter or
modify the effect of a variety of external influences, referred to as inducing substances,
whose messages are transduced within cells through NF-κB activity .... In particular,
the present invention relates to a method of regulating (enhancing or diminishing) the
activity of NF-κB in cells in which it is present and capable of acting as an intracellular
messenger, as well as to substances or composition useful in such a method."

7.    "inhibiting degradation of an I-κB protein" finds support in 07/341,436 at:
-p. 20, lines 1-3: "Various inducer then cause an alteration in I-κB allowing  NF-κB to be
released from the complex."; and
- p.5, lines 7-13 and 23-25: "As a result of this finding, it is now possible to alter or
modify the activity of NF-κB as an intracellular messenger and, as a result, to alter or
modify the effect of a variety of external influences, referred to as inducing substances,
whose messages are transduced within cells through NF-κB activity ....  "In particular,
the present invention relates to a method of regulating (enhancing or diminishing) the
activity of NF-κB in cells in which it is present and capable of acting as an intracellular
messenger, as well as to substances or composition useful in such a method.".

8.    "inhibiting dissociation of NF-κB/I-κB complexes" finds support in 07/341,436 at:
- p.19, lines 1-3: "... dissociating agents such as formamide and deoxycholate to
unmask very high levels of NF-κB activity."; and
-p. 20, lines 5-7: "The complex formation of NF-κB with  I-κB appears to be rapidly and
efficiently reversible ...."

Application/Control Number: 90/007,503; 90/007, 828                Page 10
Art Unit: 3991

2. Examiner Response:  Instant pending claims 1-6, 8-27, 29-38, 40-80, 82, 84 and 87-
202 are denied 35 USC §120 priority to the April 21, 1989 filing date of the CIP
07/341,436 application for failure to satisfy 35 USC §120 for the reasons already
pointed out above and as further elaborated below in response to patentee's
arguments.  Accordingly, these claims are entitled to the filing date 11/13/91 of
continuation application 07/791,898 for purposes of prior art.

Initially, it is noted that patent owner arguments provided in Items 2-8 above
(*ipsis verbis* argument) will be addressed 1st, and the Item 1 (non-enablement and
possession argument) will be addressed 2nd.

**I. Even assuming direct (ipsis verbis) support was the legal standard for
satisfying 35 USC 112, 1st ¶, the Patent Owner's showing is not commensurate.**

**The Reexamination 6,410,516 Invention (08/464,364 filed application):**

The patent specification addresses (among others) the following related inventions:

**1.** Four transcriptional regulatory factors (including NF-κB) and encoding sequences for
use in screening putative binding proteins (see col. 3, lines 18-40);

**2.** Partial I-κB alpha (natural inhibitor) [1] c-DNA & protein sequence of (Fig. 43);

**3.** Natural Mechanism of Activation of NF-κB upon external stimulus:

**4.** Improved screening assay for identifying agonist or antagonist compounds (now U.S.
Patent 5,804,374); and

**5.** Methods for regulating NF-κB activated protein expression including:

"[M]ethods for regulating (inducing or preventing) activation of NF-κB controlling
expression of the immunoglobulin kappa light chain gene and other genes  whose
expression is controlled by NF-κB (e.g. HIV)" (col. 3, lines 54-67) including "regulating
(enhancing or diminishing) the activity of NF-κB in cells which it is capable of acting as
an intracellular messenger, as well as the substances or composition useful in such a
method" (col. 4, lines 28).

---

[1] It is unclear from the record whether the disclosed sequence is human or avian.

Application/Control Number: 90/007,503; 90/007, 828                    Page 11
Art Unit: 3991

### The 6,410,516 Patented Invention:

The Baltimore patent claims are directed to methods of reducing or otherwise modifying the naturally occurring transcription factor NF-κB activity in cells affecting gene expression. The following claim is illustrative:

*1.* A method of inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-κB, the method comprising reducing NF-κB activity in the cell such that the expression of said gene is inhibited.

Inhibiting expression of various types of genes (e.g. viral and cytokine genes in claims 3-5) in various cells, from mammalian to human, as well as various cell types including lymphoid, liver and immune cells is encompassed.

Although claims 1, 2 and 5 are open to any (mechanistic) means of directly or indirectly inhibiting (reducing) NF-κB activity or inhibiting (reducing) NF-κB intracellular signaling (claim 7), these claims would also encompass affecting NF-κB activity at the defined points of a proposed 6 step NF-κB induction mechanism (see Dr. Verma declaration: Schematic 3) which is particularly claimed (see claims 19-25).

### The Extent of the New Matter:

The following chart illustrates the extent of new matter added to the instant CIP patent disclosure of the 08/464, 364 application as compared to the parent 07/341,436 application relied upon for 37 CFR §120 priority:

| Application | specification | claims | Abstract | TOTAL PAGES |
|---|---|---|---|---|
| 08/464,364 | pp1-189<br>Fig. 1-43<br>Examples 1-15<br>Tables 1-2 | pp190-206<br>claims 1-88 | p207(4 sentences) | 207 |
| 07/341,436 | pp. 1-39<br>Fig. 1-4c (39-42c)<br>Example 15<br>Table 1 | pp. 40-45 | p46 (1 sentence) | 46 |

NOTE: Table 1 of 07/341,436 corresponds to Table 2 of 08/464,364.
        Figures1-4c of 07/341,436 corresponds to Figures 39-42C of 08/464,364.

Application/Control Number: 90/007,503; 90/007, 828                    Page 12
Art Unit: 3991

A copy of the 07/341,436 application (minus the Abstract) is found in Exhibit 2 of Dr.

Verma's Declaration.   The missing Abstract is titled: "NF-κB -mediated Transcriptional

Regulations" and states: "Methods and compositions for altering or modifying NF-κB

activity in cells and for regulating NF-κB -mediated gene expression."


_Examples of Subject Matter Missing from the 07/341,436 application which is present in_
_08/464,364 application:Figures 1-38 and 43 and corresponding examples include_:

a. isolated transcription regulatory factors, including NF-κB cDNA & protein sequence;

b. isolated partial cDNA and protein sequence of natural inhibitor I-κB;

c. disclosure of evidence of NF-κB -I-κB  complex; and

d.  disclosure of assay for screening transcriptional regulators and for identifying agonist
or antagonist compounds.

_Shared Subject Matter:_

1.  achieving "Negative Regulation" by addition to a biological system an effective
amount of : I-κB or a decoy molecule or an "inhibitor molecule which is also a protein" in
which "the gene can be identified … " or "dominantly interfering" molecules.  See instant
'516 patent at col. 37 (Table 2) to col. 38, line 22);

2. Table exemplifying NF-κB recognized sequences (see instant '516 patent Table 2);

3. Instant '516 patent Example15 drawn to a "Demonstration of the Role of the NF-κB
as Mediator in Regulation of a Gene in Non-Lymphoid Cells".

_Patentee items 2-8 above as well as the 125 page Claim Support Chart in Exhibit 3 of_
_the Dr. Verma Declaration fails to satisfy 35 USC 112, ¶ 1 for the following reasons:_

a. The disclosure and limited examples in the _07/341,436_ application directed to
establishing nuclear NF-κB regulation of specific cytokine genes, such as interferon and
specific cells such as lymphocytes and fibroblasts, is not a commensurate showing of
the ability to broadly inhibit various other genes and cell types.


b. A hypotheses regarding intracellular signaling in the 07/341,436 application without
isolation, sequencing (c-DNA, protein) and characterization of NF-κB and I-κB and their
complex is not possession of the mechanism nor the ability to design inhibitors at any
point of the proposed mechanism.  The absence of an inhibitor screening assay further
makes drug design difficult if not prohibitive.

Application/Control Number: 90/007,503; 90/007, 828                    Page 13
Art Unit: 3991

c. To the extent (as discussed above) that the reexamination claims broadly encompass
new matter missing from the 07/341,436 application, the 07/341,436 application is
clearly not commensurate in scope.

d. The 07/341,436 application fails to disclose an inhibiting compound, as well as the
necessary conditions to effect inhibition e.g. means of addition to a biological system (*in
vitro*, *in vivo*) and the corresponding effective amounts.

e. As discussed below the instant invention fails to satisfy §112, 1st ¶ with regard to an
interfering compound necessary to practice the presently claimed method.

## II. Under the correct legal standard, the 07/341,436 application fails to satisfy 35 USC § 112, ¶ 1 for the instantly claimed invention.

### A. The Correct Legal Standard:

The written description requirement of § 112, ¶ 1 is set forth as follows:

> The specification shall contain a written description of the invention, and of the
> manner and process of making and using it, in such full, clear, concise, and exact
> terms as to enable any person skilled in the art to which it pertains or with which
> it is most nearly connected, to make and use the same, and shall set forth the
> best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112, ¶ 1 (1994) (emphasis added). Written description is independent of
enablement. *Vas-Cath*, 935 F.2d at 1563, 19 USPQ2d at 1117 (recognizing the
severability of the "written description" and "enablement" provisions of § 112, ¶ 1).
Under 35 U.S.C. §120, patent claims are entitled to the benefit of the filing date of an
earlier filed U.S. application if the subject matter of the claim is disclosed in the manner
provided by 35 U.S.C. §112, 1st ¶ in the earlier filed application. See, e.g., *Tronzo v.
Biomet, Inc.*, 156 F.3d 1154, 47 USPQ2d 1829 (Fed. Cir. 1998); *In re Scheiber*,
587 F.2d 59, 199 USPQ 782 (CCPA 1978). The examiner has the initial burden of
presenting by a preponderance of evidence why a person skilled in the art would not
recognize in an applicant's disclosure a description of the invention defined by the
claims. *In re Wertheim*, 541 F.2d 257, 263, 191 USPQ 90, 97 (CCPA 1976).

The written description requirement, a question of fact, ensures that the inventor
conveys to others possession of the claimed invention; whereas, the enablement

requirement, a question of law, ensures that the inventor conveys to others how to make and use the claimed invention." See 1242 OG 169 (January 30, 2001) citing *University of California v. Eli Lilly & Co* With regard to the description requirement.

Additionally, *ipsis verbis* inclusion of claim words from the specification into the claims does not necessarily satisfy the written description requirement. See *Regents of the University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997), *cert. denied*, 523 U.S. 1089 (1998).

In *Eli Lilly*, the Court of Appeals for the Federal Circuit held that a "written description of an invention involving a chemical genus, like a description of a chemical species, 'requires a precise definition, such as by structure, formula [or] chemical name,' of the claimed subject matter sufficient to distinguish it from other materials." *University of California v. Eli Lilly and Co.*, 43 USPQ2d 1398, 1405 (1997), quoting *Fiers v. Revel*, 25 USPQ2d 1601, 1606 (Fed. Cir. 1993).

Regarding a compound, the complete structure of a species or embodiment typically satisfies the requirement that the description be set forth "in such full, clear, concise, and exact terms" to show possession of the claimed invention. 35 U.S.C.112, ¶ 1. Cf. *Fields v. Conover*, 443 F.2d 1386, 1392, 170 USPQ 276, 280 (CCPA 1971). Alternatively, written description may be satisfied through disclosure of function and structure when there is a well-established correlation between structure and function:

> "[T]he written description requirement can be met by 'show[ing] that an invention is complete by disclosure or sufficiently detailed, relevant identifying characteristics ... i.e., complete or partial structure, other physical and/or chemical properties, functional characteristics when coupled with a known or disclosed correlation between function and structure, or some combination of such characteristics.'" *Enzo Biochem. Inc. v. Gen-Probe Inc.*, 296 F.3d 1316,1324, 63 USPQ 2d 1609, 1613 (Fed. Circ. 2002).

> In contrast, without such a correlation, the capability to recognize or understand the structure from the mere recitation of function and minimal structure is highly unlikely. In this latter case, disclosure of function alone is little more than a *wish for possession;* it does not satisfy the written description requirement. See *Eli Lilly*, 119 F.3d at 1566 and 1568, 43 USPQ2d at 1404 and 1406; *In re Wilder*, 736 F.2d 1516, 1521, 222 USPQ 369, 372-73 (Fed. Cir. 1984).

Application/Control Number: 90/007,503; 90/007, 828                     Page 15
Art Unit: 3991

B. "Reach-Through Claims" and Written Description:

        Biotechnology and pharmaceutical drug discovery involves the time and expense
of making and screening a large number of potential candidate compounds (upstream:
research) in order to obtain a relatively small number of useful (e.g. therapeutically)
compounds (downstream: application).  A "reach-through claim" is an attempt by a
discoverer of an "upstream research tool" to seek patent protection encompassing
"downstream" inventions. See Stephen G. Kunin, Mark Nagumo, Brian Stanton, Linda
S. Therkorn, and Stephen Walsh, *Reach-Through Claims in the Age of Biotechnology*,
51 AM. U.L. REV. 609-638 (2002) at pages 609-616 (overview) and pages 616-619
("reach-through claim" definition) (copy enclosed).

        The *Kunin et al.* article provides a framework for applying a written description
analysis toward  "reach-through claims" in conformance with the written description
guidelines (MPEP 2163) and relevant CAFC case law. In a prophetic example of a
disclosure of a newly discovered receptor, receptor screening assay and three screened
agonist compounds containing no common core structure and lacking a structure
activity correlation, the application of written description analysis found the
isolated/purified receptor and agonist receptor screening assay of claims 1-2 patentable
but the "generic" agonists compounds obtainable from the assay (claim 3) and the use
of these agonists to treat disease (claim 4) unpatentable for failure to adequately
describe the compound  claim 3 "generic" which rendered the corresponding therapeutic
use of such compounds (of the same scope) equally unpatentable for lack of written
description. See *Id.* at pp.621-622 (example patent claims 1-5); pp. 626-627 (case law
summary) and pp.628-630.

        The CAFC in the *University of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 69
USPQ2d 1886 (Fed.Cir. 2004) was faced with the application of both the written
description and enablement requirements in the context of a reach-through method

Application/Control Number: 90/007,503; 90/007, 828                     Page 16
Art Unit: 3991

claim. [2] The problem addressed in *Rochester* was that traditional non-steroidal anti-inflammatory drugs (NSAIDS, such as aspirin, ibuprofen) obtained their anti-inflammatory effects by binding cyclooxygenase-2 (COX-2) but also had gastrointestinal side-effects caused by the NSAID binding a different cyclooxygenase (COX-1 related to the PGHS-2 gene expression). Accordingly, after obtaining a patent on an assay for screening compounds selective for COX-2 (i.e. didn't bind COX-1), the claim at issue in Rochester was a method drawn to the use of a "non-steroidal" COX-1 selective inhibitor obtainable from the screening assay.[3] Rochester's claim was invalidated for failing to meet the written description and enablement requirements of 35 U.S.C. Section 112, 1st ¶. Specifically, the court held that the written description requirement was not met due to the patent specification's failure to disclose any examples of COX-2 inhibitors. Additionally, with respect to enablement, it was held that the disclosure of a COX-2 inhibitor screening method without guidance on the characteristics of probable inhibitor candidates failed to enable one skilled in the art to isolate the claimed inhibitors without undue experimentation.

### iii. The Parent 07/341,436 application fails to satisfy 35 USC 112, ¶ 1:

The 07/341,436 application fails to adequately describe or enable the scope of the instantly claimed method invention for at least the following reasons:

a. *ipsis verbis* support is absent, but even if present would fail to adequately describe or enable the functional class of NF-κB inhibitors presently claimed;

b. fails to disclose a single NF-κB inhibiting compound;

c. lack of correlation of structure to function; and

d. fails to teach how to screen NF-κB -inhibiting compounds.

---

[2] Arguably, the CAFC in *University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997), *cert. denied*, 523 U.S. 1089 (1998) case already addressed the lack of a written description of a "reach-through" DNA compound claim in which the DNA was obtainable by screening a cDNA assay.
[3] Claim 1 drawn to a method for selectively inhibiting PGHS-2 activity in a human host, comprising administering a non-steroidal compound that selectively inhibits activity of the PGHS-2 gene product to a human host in need of such treatment is illustrative.

Application/Control Number: 90/007,503; 90/007,828                    Page 17
Art Unit: 3991

### *Claim Interpretation: Reexamination Standard*

Patent claims are examined on the basis of prior art patents or printed publications under the appropriate parts of 35 U.S.C. § 102 and §103. An admission may not be the basis for establishing a substantial new question of patentability, although patent owner admissions as to any matter affecting patentability may be utilized to determine the scope and content of the prior art in conjunction with patents and printed publications in a prior art rejection, whether such admissions result from patents or printed publications or from some other source. See MPEP § 2217.

During reexamination, claims are given the broadest reasonable interpretation consistent with the specification without reading specification limitations into the claims (*In re Yamamoto*, 740 F.2d 1569, 222 USPQ 934 (Fed. Cir. 1984)). The 35 U.S.C. § 282 presumption of patent validity has no effect in reexamination (*In re Etter*, 756 F.2d 852, 225 USPQ 1 (Fed. Cir. 1985)) and reexam is conducted according to the procedures established for initial examination under 35 U.S.C. §132,  § 305 and §1331 without the burdens and presumptions that accompany litigation of an issued patent. *Laitram Corp. v. NEC Cow*, 952 F.2d 1357, 1360 (Fed. Cir. 1991); MPEP § 2258.

### *Claim Interpretation:*

With respect to independent claim 1 (which is representative) it is noted that the sole method step is functional i.e. reducing NF-κB activity. Accordingly, the claims would encompass any *in vitro* or *in vivo*, direct or indirect or natural or man-made means of reducing NF-κB activity.  Indeed, most of the Baltimore patent methods steps are purely functional with the exception of claim 7 and dependent claims 81, 83 and 85-87 that require "modifying NF-κB activity" (which are partially functional) and claim 203 which requires "introducing a nucleic acid decoy molecule into the cell" which requires an active step.   The summary of the remaining reexamination claims provided in pages 12-15 of the '7503 request is herein incorporated by reference. See FAOM page 8.

Application/Control Number: 90/007,503; 90/007, 828                    Page 18
Art Unit: 3991

1. Patentee Argues: *Reducing NF-κB activity in the claims encompasses using agents that interfere at any of six activation events spanning the membrane receptor, cytoplasm NF-κB-I-κB complex, translocation or nuclear protein transcription to inhibit gene expression (see schematic 1 or exhibit 1) and the claims should be restricted to* **affirmative acts and manipulative steps** *for interfering along* **any one of the six proposed NF-κB activating mechanism segments** *(claims 1, 2 and 5) unless limited to specific mechanism segments (claims 20, 22, 24, 31, 33, 35, 42, 44 and 46). Dr. Verma Declaration ¶¶ 5-15.*

*The model is summarized in the instant patent (col. 16) and by Dr. Verma as follows:*

> *Upon activation in response to signals triggered·by the interaction of certain external influences with receptors on the surface on the cell, NF-κB is released from its complex with I-κB. The released NF-κB then moves to the nucleus of the cell, where it participates in regulating expression of particular genes by binding to specific DNA sequences or "recognition sites" on those genes, leading to transcription of such genes. Dr Verma Declaration ¶ 8.*

*Accordingly, as described in the instant specification (bottom of col. 3-top of col. 4) the instant methods encompass  "alter(ing) or modify(ing) the activity of NF-κB as an intracellular messenger" and thus regulates "NF-κB-mediated gene expression". See* Dr. Verma Declaration ¶11.

## Examiner's Response:

The Examiner agrees that the term "reducing NF-κB activity" <u>at least</u> encompasses interference with any one of the six activation segments which liberates NF-κB from its  complex to effectuate nuclear transcription, unless the claims specifically require interference at a particular segment.

Additionally, "reducing NF-κB activity" can also "involve several different steps including inhibiting the interaction of NF-κB with other transcription factors, inhibiting the NF-κB translocation of NF-κB to the nucleus, inhibiting the interaction of NF-κB with NF-κB binding sites on DNA, and altering the concentration or availability of NF-κB" (*Declaration of Dr. Thomas D. Gilmore* pages 6-7, ¶ 14 submitted by Patentee in Massachusetts District Court Litigation).

Application/Control Number: 90/007,503; 90/007, 828                    Page 19
Art Unit: 3991

Accordingly, the term "reducing NF-κB activity" would encompass both <u>direct</u> and <u>indirect</u> interference with NF-κB activity, e.g. via other transcription factors or affecting NF-κB/I-κB amounts, via patentee's or other NF-κB mediated mechanism.

It is noted that "NF-κB-mediated transcription" is <u>broadly interpreted</u> by Dr. Verma to include the ability of NF-κB to enhance transcription by "recognized sites" on the genes which may include binding to an NF-κB enhancing sequence <u>but is not so</u> <u>limited</u>. The examiner agrees that the claims are not limited to regulation (inhibition or otherwise) of nuclear gene transcription by NF-κB only at NF-κB binding sites since the claims are not so limited and the instant description broadly encompasses the ability of NF-κB to act as a messenger to effect protein transcription  (see column 17). This interpretation is consistent with the instant patent teaching of using various known NF-κB enhancing sequences to obtain a "consensus sequence" for cell transfection to obtain modulation by NF-κB. Optionally, a more specific NF-κB binding site can also be introduced into a cell to obtain "discrimination among members of a related family of NF-κB binding sites". See instant patent col. 35-col. 37 (Table 2).

Finally, although the claims require "reducing NF-κB activity" the claims are not restricted to NF-κB-mediated affects but would include additional regulators working with, or independent of NF-κB.

The above-interpretation is further supported by the patentee response (dated 9/12/01, pages 6-10) in the 08/464, 364 application to a rejection in which it was argued that the instant invention encompasses:

a. affecting NF-κB signal transducing activity <u>directly</u> or <u>indirectly</u> ( page 6);

b. NF-κB modulation is <u>not limited to a particular mechanism</u>:

"Possession was manifested by the disclosed discovery of the signaling pathway and ways to identify and use inhibitors thereof. Thus, it is appropriate under the circumstances for Applicants to have defined the method of use with reference to agents identified or characterized by their method of selection or identification ... **The screening assays taught by the present application permit the identification or characterization of *substances that modulate NF-kB activity by various mechanisms*".** (with emphasis: 9/12/01 response page 7);

c.  use of  a variety of classes of substances of <u>diverse and unrelated structure</u> that possess the capability (*in vitro* or *in vivo*) to modulate signal transducing activity:

> "…To the contrary, *a person of skill in the art would have reasonably expected that the screening steps of the prior claims would identify a diverse group of substances having any of a wide variety of structures, with no common structure expected to link the function disclosed by the specification and use covered by the prior claims*…. Even compounds regulating NF-κB by the same mechanism, such as by inhibiting modification or degradation of I-κB would have been expected to include any of a variety of different structure". … that such substances could then be used to modify NF-κB mediated signalling in cells, both *in vitro* and *in vivo*, as recited by the pending claims …  Although the compounds regulating NF-κB mediated gene expression may be diverse structurally, they all possess at least one common functional characteristic, i.e., the capability to modulate NF-κB signal transducing activity."

2. <u>Patent Owner</u>: *When read in light of the teachings of the patent disclosure, one of skill in the art would understand and interpret the claims to require affirmative acts and manipulative steps, calculated to achieve specific results.* Dr. Verma Declaration, ¶ 11.

<u>Examiner Response</u>:

The claimed invention is not so limited. Neither the specification nor the prosecution history place any restrictions on the means by which  "NF-κB activity" is regulated (enhanced or reduced).  Accordingly, the claims would encompass any *in vitro* or *in vivo*, natural or man-made, or direct or indirect method of reducing NF-κB activity

3. <u>Patent Owner</u>:  *The instant claims should be interpreted to require a first activating step which excludes prophylaxis, pretreatment or simultaneous activator and inhibitor administration; and thus be limited solely to treatment of an already NF-κB-induced cell or organism.* Dr. Verma Declaration ¶13-14.

<u>Examiner's Response</u>:

The claimed methods are drawn to "reducing NF-κB activity" to inhibit NF-κB regulated gene expression in a eukaryotic (or mammalian) cell.  There is nothing in the independent claims compelling a person of ordinary skill in the art to include any particular steps including a 1<u>st</u> activation step.

Application/Control Number: 90/007,503; 90/007, 828                    Page 21
Art Unit: 3991

Patentee's proposed interpretation of the instant claims improperly fails to give the claims the broadest reasonable interpretation consistent with the specification and improperly requires that limitations be read into the claims. As pointed out in instant patent:

> The subject invention further relates to methods of regulating (<u>inducing or preventing</u>) activation of NF-κB, controlling expression of the immunoglobulin kappa light chain gene and of other genes whose expression is controlled by NF-κB (e.g., HIV). ... See 6,410,516 patent col. 3, lines 54-58.

Patentee's reliance on their mechanism to read into the claims a proviso excluding "prevention" and/or requiring that any activation precede an inhibiting step (see Dr. Verma declaration, ¶¶ 7-8, 11-13) is not supported by the specification.

Further, to the extent that patentee's claim construction is tantamount to rewriting the claims to insert a negative claim limitation, it is noted that a negative limitation or exclusionary proviso must have basis in the original disclosure. *Ex parte Grasselli*, 231 USPQ 393 (Bd. App. 1983), aff 'd mem, 738 F.2d 453 (Fed. Cir. 1984).

In fact, patentee's proposed narrower claim interpretation is inconsistent with the prosecution history that indicates the patentee's desire to expand method claim coverage.

In a written description rejection of claims then pending (subsequently cancelled) the examiner asserted, *inter alia*, that:

The present claims are very broad, encompassing any type of cell from any organism, eukaryotic or prokaryotic, and in any location *in vitro*, ex vivo or *in vivo*. The claims further encompass **any agent or substance of any structure which has the claimed functional activity,** any assay to be used to identify the agent or substance and **<u>any method of contacting the cell with the agent or substance. (with emphasis).</u>** See 08/464,364 office action dated July 14, 1998 pages 4-10; at page 7, lines 3-8.

In response, patentee argued that their methods be broadly construed since:

a. one can affect NF-κB signal transducing activity <u>directly or indirectly</u> (08/464,364 applicant response dated 9/12/01 page 6);

b. NF-κB modulation is <u>not limited to a particular mechanism</u>:

"Possession was manifested by the disclosed discovery of the signaling pathway
and ways to identify and use inhibitors thereof. Thus, it is appropriate under the
circumstances for Applicants to have defined the method of use with reference to
agents identified or characterized by their method of selection or identification ...
The screening assays taught by the present application permit the identification
or characterization of *substances that modulate* NF-κB *activity by various
mechanisms*". (with emphasis: 9/12/01 response page 7); and

c.  the instant method encompasses the use of  a variety of classes of substances of
diverse and unrelated structure that possess the capability (*in vitro or in vivo*) to
modulate NF-κB signal transducing activity:

"By definition, substances identified or characterized by the disclosed assays,
inespective of how widely they may vary from one another in chemical structure,
are useful for inhibiting or potentiating (as the appropriate case may be) NF-κB -
mediated cellular signaling. No more need be known of the chemical structure of
the substance to appreciate its utility in the claimed methods. To the contrary, *a
person of skill in the art would have reasonably expected that the screening
steps of the prior claims would identify a diverse group of substances having any
of a wide variety of structures, with no common structure expected to link the
function disclosed by the specification and use covered by the prior claims*. That
is, a person of skill in the art would have readily appreciated that all modulators
of NF-κB would not have the same or similar structure. Even compounds
regulating NF-κB by the same mechanism, such as by inhibiting modification or
degradation of I-κB, would have been expected to include any of a variety of
different structure". ... that such substances could then be used to modify NF-κB
mediated signalling in cells, both in vitro and in vivo, as recited by the pending
claims ... Although the compounds regulating NF-κB mediated gene expression
may be diverse structurally, they all possess at least one common functional
characteristic, i.e., the capability to modulate NF-κB signal transducing activity."
(9/12/01 Patentee response pages 8 and10 08/464,364 application.).

## *Relevant Case law:  Inherency*

### i. *Inherency Standard*:

The legal standard for demonstrating inherency is as follows:

"the examiner must provide a basis in fact and/or technical reasoning to
reasonably support the determination that the allegedly inherent characteristic
necessarily flows from the teachings of the applied prior art." *Ex parte Levy*, 17
USPQ2d 1461, 1464 (Bd. Pat. App. & Inter. 1990).

Application/Control Number: 90/007,503; 90/007, 828                    Page 23
Art Unit: 3991

## ii. *Nature of the proof*:

With regard to demonstrating inherency:

Any extrinsic (or intrinsic) source of evidence can be utilized. In fact, evidence of an inherent feature (e.g. in a method claim preamble) resulting from a reference practicing the steps of a method can be gleaned from applicant's own specification. See MPEP §2112.02; *Ex parte Novitski*, 26 USPQ2d 1389 (Bd. Pat. App. & Inter.1993).

## iii. *Use of multiple documents permitted*:

Although, normally, only one reference should be used in making a rejection under 35 U.S.C. §102, a rejection over multiple documents has been held to be proper when the extra documents are cited to show that a characteristic not disclosed in the reference is inherent. MPEP §2131.01.

## iv. *§102 or §102/§103 product-by-process rationale is equally applicable to claims (compounds, methods, apparatus) relying on function and/or mechanism*:

When compositions are claimed in terms of a function, property or characteristic and the composition of the prior art appears to be the same as that of the claim but the function, property or characteristic is not explicitly disclosed by the reference, the examiner may make a rejection under 35 U.S.C. §102 or §102/§103 rejection. . *In re Best*, 562 F.2d 1252, 1255, 195 USPQ 430, 433 (CCPA 1977). This same rationale applies to products, apparatuses, or processes claimed in terms of function, property or characteristics. See MPEP §2112.

## v. *Anticipation Requires An Enabling Disclosure Not Actual Practice*:

As recognized by the CAFC, "Anticipation does not require the actual creation or reduction to practice of the prior art subject matter; anticipation requires only an enabling disclosure." See *In re Donohue*, 766 F.2d 531,533[ 226 USPQ 619] (Fed. Circ. 1985; *Schering Corp. v. Geneva Pharms.,Inc.* 339 F.3d 1373,1380 [ 67 USPQ2d 1664] (Fed. Cir. 2003).

Application/Control Number: 90/007,503; 90/007,828                    Page 24
Art Unit: 3991

Accordingly, in *Smithkline Beecham Corp. v. Apotex Corp.*,403 F.3d 1331,
[74USPQ2d 1398] (Fed. Cir. 2005) the Federal Circuit held that the district courts' use
of "an actual practice standard" for inherent anticipation was clear error:

> Contrary to this court's precedents, the district court's analysis of inherent
> anticipation did not consider the teachings of the [prior art] separately from the
> actual production of PHC hemihydrate." Id. at 1344.

The *Apotex* court stated that what was actually done, or possible to do, in the prior art
was "irrelevant since disclosure, not practice, is necessary for anticipation". *Id.*

Additionally, the threshold for enabling a prior art reference is lower than the
threshold for enablement under 35 USC §112, 1st ¶ required for a patented invention
insofar that the prior art reference need not demonstrate efficacy or utility. See e.g. in
*Rasmusson v. Smithkline Beecham Corp.* 75 USPQ2d 1297 (Fed. Cir. 2005); and
*Impax Labs., Inc. v. Aventis Pharmaceuticals, Inc.*, No. 05-1313 (Fed. Cir. Nov. 20,
2006) concurring with the *Rasmusson* holding.

## vi. Contemporaneous Prior Art Recognition of Inherency Not Required

Inherent anticipation does not require a person of ordinary skill in the art to
recognize the inherent disclosure in the prior art at the time the prior art is created.
*Schering Corp. v. Geneva Pharms.,Inc.* 339 F.3d 1373 at 1377 [ 67 USPQ2d 1664]
(Fed. Cir. 2003) citing *In re Cruciferous Sprout Litig.* 301 F.3d 1343,1351 [64 USPQ2d
1202] (Fed. Cir. 2002); *Mehl/Biophile Int'l Corp. v. Milgraum*, 192 F3d 1362,1366 [52
USPQ2d 1303] (Fed. Cir. 1999); *Atlas Powder Co. v. Hanex Prods, Inc.*, 190 F.3d
1342,1348-49 [51 USPQ2d 1943] (Fed. Cir. 1999).

Similarly, theoretical mechanisms or rules of natural law that are recited in a
claim, that themselves are not patentable, do not need to be recognized by one of
ordinary skill in the art for a finding of inherency. A person of ordinary skill does not
need to recognize that a method or structure behaves according to a law of nature in
order to fully and effectively practice the method or structure. *In re Ackenbach*, 45 F.2d
437, 439, 7 USPQ 268, 270 (CCPA 1930); *EMI Group North America, Inc. v. Cypress*

Application/Control Number: 90/007,503; 90/007, 828                    Page 25
Art Unit: 3991

*Semiconductor Corporation*, 268 F.3d 1342, 60 USPQ 2d 1423, 1429 (CAFC Sept. 21, 2001).

> The *EMI court* used the following hypothetical example to clarify this principle:
>
> Humans lit fires for thousands of years before realizing that oxygen is necessary to create and maintain a flame. The first person to discover the necessity of oxygen certainly could not have obtained a valid patent claim for "a method of making a fire by lighting a flame in the presence of oxygen." Even if prior art on lighting fires did not disclose the importance of oxygen and one of ordinary skill in the art did not know about the importance of oxygen, understanding this law of nature would not give the discoverer a right to exclude others from practicing the prior art of making fires. *EMI Group North America, Inc. v. Cypress Semiconductor Corporation*, 268 F.3d 1342, 60 USPQ 2d 1423, 1429 (CAFC Sept. 21, 2001).

### vii. *Shift of Burden:*

Once the examiner provides evidence or reasoning tending to show the inherent presence of a property or function, the burden shifts to applicant. See *Ex parte Levy cited supra; In re Fitzgerald*, 619 F.2d 67, 205 USPQ 594 (CCPA 1980). See MPEP § § 2112- 2112.02. *In re Spada*, 911 F.2d 705, 709, 15 USPQ2d 1655, 1658 (Fed. Cir. 1990). Since the PTO lacks facilities to compare prior art products or methods to that claimed, the *prima facie* case can be rebutted by evidence showing lack of the inherent feature in the prior art product or method. See *In re Best*, 562 F.2d at 1255,195 USPQ at 433. See also *Titanium Metals Corp. v. Banner*, 778 F.2d 775, 227 USPQ 773 (Fed. Cir. 1985); *In re Brown*, 459 F.2d 531, 535, 173 USPQ 685, 688 (CCPA 1972).

### Outstanding Claim Rejections - 35 USC § 102 and 35 USC § 103:

### I. PROTEIN KINASE C INHIBITORS (intervening prior art):

1.    Claims 1-6, 8-9, 11, 20-21, 25-27, 29, 31, 32, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193, and 197-201 are rejected under 35 U.S.C. 102(b) as anticipated by or, in the alternative, under 35 U.S.C. 103(a) as obvious over *Meichle* (J. Biol. Chem. 265 (5/90) 8339-43).

**Rejection Summary:** *Meichle* teaches the reduction of NF-κB activity in induced cells using agents that inhibit protein kinase C. In addition, because *Meichle* used the HIV

Application/Control Number: 90/007,503; 90/007, 828                    Page 26
Art Unit: 3991

LTR in their experiments, this reference anticipates, or alternatively, makes obvious claims drawn to regulating expression of viral genes.

The instant claims are drawn to reducing NF-κB activity in eukaryotic, e.g. claims 1 or 2, or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein(claim 5) in a eukaryotic cell.

*Meichle* analyzed various Protein Kinase C inhibitors and their effect on both PMA- (phorbol 12-myristate-13-acetate) and TNF- (tumor necrosis factor) induced NF-κB activity in eukaryotic Jurkat cells. Using an EMSA binding assay similar to that disclosed in the '516 patent, *Meichle* found that Protein Kinase C Inhibitor H8 reduced PMA-induced NF-κB activity in these cells (Fig. 3, lane 7). Other inhibitors also were shown to reduce NF-κB activity, including Protein Kinase C Inhibitor H7 (Fig. 2B, lanes 3. vs. 5) and Staurosporine (Fig. 2B, lanes 6 and 7).

Thus, *Meichle* teaches the use of Protein Kinase Inhibitor H8 (among others) to reduce NF-κB –mediated gene transcription by reducing NF-κB activity and reducing the binding of NF-κB to NF-κB binding sites. As such (and as shown in *Exhibit G-2* of the 90/007,503 Request, hereby incorporated by reference) this reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97.

Additionally, because *Meichle* used a genetic construct comprising HIV LTR and NF-κB binding site, *Meichle* rendered claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201 immediately envisaged (i.e. anticipated) or alternatively *prima facie* obvious in light of the fact that the HIV LTR promoter is responsible for regulating the expression of viral (HIV) genes. Therefore, it would have been immediately envisaged, or alternatively *prima facie* obvious, to regulate NF-κB activity as in *Meichle* in order to affect associated viral (e.g. HIV) gene expression.

### *Discussion*

Initially, it is noted that the above rejection was modified in response to patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Patentee maintains that numerous claims are clearly entitled at least to the April 21, 1989 filing date of U.S. Serial No. 07/341,436.*

Application/Control Number: 90/007,503; 90/007, 828                        Page 27
Art Unit: 3991

Examiner Response: For the reasons discussed *supra*, the instant claims are not

entitled to the April 21, 1989 filing date of the 07/341,436 application, but are entitled to

the 11/13/91 filing date of the 07/791,898 under 35 USC § 120 for purposes of prior art.

2. Patentee Argument: *The Examiner has erroneously stated on page 10 of the Office
Action that "Meichle teaches the reduction of NF-κB activity in induced cells ...." The
experiments Meichle describes in which H7, H8 or staurosporine were administered to
cells, including the specific experiments the Examiner relies on (portions of Figs. 2 and
3), were all conducted by* <u>*pretreating*</u> *cells with these protein kinase inhibitors for 30 to
45 minutes before cells were stimulated with any inducing substance. (Meichle at 8341-
2, Figs. 2 and 3; Declaration of Dr. Verma, ¶ 149.) . See response at page 41.*

Examiner Response:

In response to patentee's argument that the reference fails to show certain

features of patentee's invention, it is noted that the feature upon which patentee relies

i.e, *in vitro* cell contacting with inducer prior to contacting with inhibitor is not recited in

the rejected claim(s).

Additionally, as discussed *supra*, the instantly claimed invention would

encompass "pretreating" cells with an NF-κB inhibitor prior to introduction of an NF-κB

inducing or activating compound (TNF or PMA in *Meichle*).

Further, it is noted that the patentee has overlooked the *conclusion* drawn from

the *Meichle* reference experimental results. The reference clearly teaches to one of

ordinary skill in the art that the disclosed kinase inhibiting compounds act to inhibit

activated NF-κB regulated viral transcription in eukaryotic (mammalian) cells.

3. Patentee Argument: *None of the experiments with TNF in Meichle are relevant to
any of the '516 patent claims. Meichle reports various experiments conducted in two
human leukemic cell lines, K562 and Jurkat cells. Meichle describes a series of
experiments investigating whether in these cell lines, protein kinase C was necessary
for the ability of tumor necrosis factor (TNF) to stimulate NF-κB binding activity.
(Meichle at 8339, abstract). Meichle investigated this question by pretreating the cell
with H7, H8 or staurosporine, three relatively non-specific protein kinase inhibitors. Id.
Notably, the ability of TNF to stimulate NF-κB binding activity was unaffected by
pretreatment with these inhibitors, and Meichle concludes that its ability to induce NF-
κB binding activity* <u>*did not involve activation of protein kinases*</u>*, in particular protein
kinase C (PK-C). (Dr. Verma Declaration ¶¶ 147-148.)*

Application/Control Number: 90/007,503; 90/007, 828                    Page 28
Art Unit: 3991

Examiner Response:

        Patentee, by <u>concentrating on TNF NF-κB activation</u>, has failed to consider the
*Meichle* reference teaching as a whole which <u>also addresses phorbol ester (PMA) NF-</u>
<u>κB activation</u> and the use of protein kinase inhibitors H7, H8 and staurosporine to act as
NF-κB inhibitiors of PMA induced protein expression.

        As taught by *Meichle* both TNF and PMA stimulate NF-κB dependent viral (HIV-
1) protein expression. See *Meichle* p. 8339, particularly 2nd column: "Release of NF-κB
can be achieved by treating cells with phorbol esters, "; and p.8340: "TNF, like PMA,
strongly stimulated both HIV-1 and SV40 enhancer-driven chloramphenicol
acetyltransferase gene expression in Jurkat cells."

        The *Meichle* reference EMSA experimental evidence demonstrates that protein
kinase inhibitors H7/H8 and staurosporine inhibit PMA-induced NF-κB activation in
Jurkat cells. See *Meichle* p. 8341, left col. to top right col.: "H7 pretreatment of Jurkat
cells impaired NF-κB activation by PMA (Fig. 2B, lane 3 versus 5)" and "At 150 nM,
staurosporine blocked PMA but not TNF-induced activation of NF-κB (Fig. 2B, lanes 6
and 7)".


4. Patentee Argument: *Page 11 of the Office Action stated that Meichle teaches the
use of PK inhibitors to reduce NF-κB -mediated gene transcription by reducing NF-κB
activity and that because Meichle used a genetic construct comprising HIV LTR,
Meichle either would anticipate or render obvious claims 3, 4, II, 42-43, 47-51, 106-107,
109-110, 114-117, 192-193 and 197-201. However, nothing in Meichle either suggests
or provides any data showing that PK inhibitors inhibited gene expression induced by
any agent, or could do so as a result of reducing NF-κB binding activity. Meichle reports
experiments conducted with Jurkat cells transfected with two different CAT reporter
constructs, each of which are described as containing a CAT gene and an enhancer
with an NF-κB binding site. (Meichle at 8340). However, none of the experiments with
these constructs, which are reported in Fig. 3, used a PK inhibitor. (Meichle at 8341,
Fig. 3). Additionally, Meichle provides no data as to whether PK inhibitors affected
expression of any endogenous gene. Therefore, one would not read Meichle as either
describing or suggesting use of PK inhibitors to reduce NF-κB -mediated gene
transcription by reducing NF-κB activity. (Declaration of Dr. Verma, ¶150).*

Application/Control Number: 90/007,503; 90/007,828                    Page 29
Art Unit: 3991

Examiner Response:

As discussed, *supra*, by concentrating on TNF NF-κB activation, patentee has
failed to consider the *Meichle* teaching of PMA-induced NF-κB activation and the use of
H7, H8 & staurosporine as NF-κB inhibitors of PMA- induced protein expression.

The CAT reporter and EMSA assays first established that both PMA and TNF act
as inducers of NF-κB mediated viral (HIV-1 and SV40) gene expression in human
(Jurkat) cells transfected with an HIV-1 long terminal repeat enhancer (comprising NF-
κB binding site) or SV40 enhancer linked to a chloramphenicol reporter. See *Meichle*
p.8340 and Fig.1, particularly Fig.1B establishing that "TNF, like PMA, strongly
stimulated both HIV-1 and SV40 enhancer-driven chloramphenicol acetyltransferase
gene expression in Jurkat cells".

Additionally, in a separate EMSA inhibition assay, *Meichle* further established
that protein kinase inhibitors (H7, H8 and staurosporine) block PMA-induced HIV protein
expression modulated by NF-κB in Jurkat cells. See *Meichle* p. 8341, bottom left col. to
top right column: "H7 pretreatment of Jurkat cells impaired NF-κB activation by PMA
(Fig. 2B, lane 3 versus 5)" and "At 150 nM, staurosporine blocked PMA but not TNF-
induced activation of NF-κB (Fig. 2B, lanes 6 and 7)".

Accordingly, *Meichle* provides an enabled teaching of inhibiting NF-κB mediated
viral (HIV or SV40) gene expression in induced human cells (Jurkat cells).

5. Patentee Argument: *Meichle is missing critical controls necessary to show NF-κB
effects. In his EMSA assays (Figs. 2 and 3), Meichle employed a 29 base pair
oligonucleotide corresponding to a portion of the HIV enhancer.. This sequence,
however, has been shown to bind not only NF-κB but also other transcription factors
including factors in the NFAT transcription factor family. To substantiate that the most
slowly migrating complex observed in Meichle's EMSA assay corresponded to NF-κB, it
would have been necessary to determine whether mutation of the putative NF-κB
binding site abrogated binding. Without this control, the data is insufficient to support the
conclusion that PK inhibitors reduced NF-κB binding activity. (Dr. Verma, Dec. ¶151).*

Application/Control Number: 90/007,503; 90/007, 828          Page 30
Art Unit: 3991

Examiner Response:

Initially, it is noted that the patentee has not provided any evidence challenging the reproducibility of *Meichle's* results nor has any evidence been provided concerning the contamination of *Meichle's* samples with other transcription regulaters (NFAT family) that bind the NF-κB enhancer.

Additionally, the *Meichle* reference acknowledged the art-recognized use of the 29 base pair oligonucleotide HIV enhancer as a control for obtaining NF-κB -specific binding (citation 42 to *Baldwin* reference on p.8340) and provided its own experimental evidence demonstrating the ability of the HIV enhancer segment to adequately function as a control:

> "The formation of the most slowly migrating complex could be inhibited by addition of excess unlabeled NF-κB oligonucle-otide (Fig. 1A, lanes 10 and 11) or an oligonucleotide containing the H2TFI binding site of the H-2K$^b$ promoter (42) (not shown). In contrast, the same amount of a size-matched oligonucleotide lacking a κB site did not compete (Fig. 1A, lane 12), indicating κB -specific binding. Induction of this complex was not inhibitable by preincubation of the cells with 30 uM cycloheximide for 30 min (not shown), which is characteristic of NF-κB activation (21, 24). " See *Meichle* p.8340, right column, 2nd ¶ under Results".

It is also noted that the 29 base HIV enhancer sequence used by *Meichle* comprises the GGGGACTTTCC NF-κB binding sequence for HIV-1 and CMV found in Table 2 of the instant patent at col. 37 (as well as the consensus sequence) for vector insertion for use in conducting NF-κB modulation EMS assays. See instant patent col. 35, lines 54-col. 36, line 24.

Additionally, as pointed out in the instant patent:

> A level of discrimination among members of a related family of NF-κB binding sites, by a modified NF-κB molecule, **can** also be introduced ... A copy of a cloned NF-κB gene can be mutagenized to alter the binding domain by well known techniques ...". Instant '516 patent col. 36, line 40-47 (with emphasis).

Application/Control Number: 90/007,503; 90/007, 828                    Page 31
Art Unit: 3991

Thus, in accordance with the instant patent's teaching, it is not necessary, but merely optional to determine whether mutation of the putative NF-κB binding site abrogates binding.

Further, *Meichle's* EMSA assay is virtually identical to that disclosed in the instant patent with the exception of the use in the instant patent assay of an alternating duplex poly (dI-dC)-poly(di-dC) copolymer as a competitor DNA species to increase sensitivity. See instant patent col. 18-19. [4]

In any event, patentee's argument is not commensurate with the instantly claimed invention that is not limited to reducing NF-κB activity by interferening with nuclear NF-κB binding at an NF-κB enhancing sequence. Per patentee's own model, the reference compound can be interfering with the ability of messenger NF-κB at the level of the cell membrane receptor or more likely at the level of the NF-κB-I-κB complex in the cytoplasm and still be within the scope of the instant claims e.g. claims 23 and 24. See Dr. Verma's Declaration ¶¶ 8 and 11.

Accordingly, deletion mutation analysis of the NF-κB enhancing sequence and other enhancer sequences involved with the nuclear transcription of a particular protein is not a determinative assay regarding the ability of a compound to inhibit NF-κB at the receptor and/or cytoplasmic segments of patentee's proposed model.


2.      Claims 1-2, 5-6, 8-9, 20-21, 25-27, 29, 31, 32, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89 and 93-97 are rejected under 35 U.S.C. 102(b) as anticipated by *Shirakawa* (Mol. And Cell. Biol. 9 (6/89) 2424-30).

**Rejection Summary:** *Shirakawa* teaches reduction of NF-κB activity in induced cells using agents that inhibit protein kinase C.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit associated gene (claims 1-2) expression of a cytokine protein (claim 5) in a eukaryotic cell.

---

[4] The parent 08/418,266 application drawn to the assay issued as U.S. Pat. No. 5,804,374.

Application/Control Number: 90/007,503; 90/007,828                    Page 32
Art Unit: 3991

Analogous to *Meichle* discussed *supra*, *Shirikawa* performed similar tests with Protein Kinase C Inhibitor H8 on eukaryotic cells that had been induced with interleukin 1 (IL-1). The authors first demonstrated that IL-1 acted to induce NF-κB activity in 70Z/3 cells as demonstrated by the EMSA binding and CAT reporter assays (p.2425 Fig. 1; p. 2426 Fig. 2). The EMSA binding and CAT reporter assays then confirmed that Protein Kinase H8 reduced NF-κB activity and reduced the resulting CAT gene expression. More particularly, the treatment of cells with H8 using EMSA resulted in "[t]he induction by IL-1 was abolished ..." (p. 2426, Fig. 2A, lane 5)"; and using CAT "IL-1 induced κ immunoglobulin expression was markedly inhibited ..." (p. 2425). These results were confirmed in a different cell line ("As was the case in 70Z/3 cells, NF-κB activation was markedly inhibited by H8 in YT cells (Fig. 2B, lane 9)."

Thus, *Shirikawa* teaches the use of Protein Kinase Inhibitor H8 (among others) to reduce NF-κB –mediated gene transcription by reducing NF-κB activity and reducing the binding of NF-κB to NF-κB binding sites. As such (and as shown in *Exhibit G-2* of the 90/007,503 Request herein incorporated by reference) this reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 31, 32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80-86, 88-89 and 93-97.

### *Discussion*

Initially, it is noted that the above rejection was modified in response to patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Patentee maintains that numerous claims are clearly entitled at least to the April 21, 1989 filing date of U.S. Serial No. 07/341,436.*

Examiner Response: For the reasons discussed *supra*, the instant claims are not entitled to the April 21, 1989 filing date of the 07/341,436 application, but are entitled to the 11/13/91 filing date of the 07/791,898 under 35 USC 120 for purposes of prior art.

2. Patentee Argument: *Shirakawa does not show reduction of NF-κB activity in induced cells since the experiments Shirakawa describes in which H8 was administered to cells, including the specific experiments the Examiner relied on (Fig. 1, portions of Fig. 2), were all conducted by <u>pretreating</u> cells with H8 for 2 hours before cells were stimulated with IL-I. In fact, Fig. 1 indicates that before being treated with IL-I, the cells were washed and the <u>H8 removed.</u> The use of H8 in this experiment as described by Shirakawa, therefore, was not in induced cells and could not have reduced any induced effect in the cell. See Shirakawa at 2425-2426. See Response at pages 46-47; and Declaration of Dr. Verma, ¶¶ 153 and 154.*

Application/Control Number: 90/007,503; 90/007, 828                    Page 33
Art Unit: 3991

Examiner Response:

The feature upon which patentee relies, *in vitro* cell contacting with inducer prior to contacting with inhibitor, is not recited in the rejected claim(s).

Additionally, as discussed in the claim interpretation section *supra*, the instantly claimed invention encompasses administering the inhibitor prior to or along with the inducing compound.

Further, it is noted that the patentee has overlooked the *Shirikawa* teaching of the ability of protein kinase inhibitors, such as H-8, to reduce IL-1 induced NF-κB activity and *inhibit* protein expression *resulting from* NF-κB activation. See *Shirikawa* p. 2425, right column under "Results".

3. Patentee Argument: *Shirakawa is missing critical controls to show NF-κB effects. Each of the three PK inhibitors (H7, H8 and staurosporine) in particular at dose ranges used in Meichle and Shirakawa, are relatively unspecific and in addition to PK-C and PK-A affect numerous kinases. Significantly, by inhibiting other kinases, these agents can inhibit transcription unrelated to effects on PKC, or NF-κB. In particular, both H7 and H8 have been demonstrated to block gene expression and to inhibit mRNA chain elongation, most likely by inhibiting TFIIH kinase activity. (Yankulov et al. 1995; Kumahara et al. 1999; Declaration of Dr. Verma, ¶155). Therefore, appropriate controls are a necessity in order to properly interpret the effects of such inhibitors on a transcriptional assay, such as CAT reporter assay, as being related to NF-κB. Shirakawa omits any such controls from CAT reporter experiment described in Fig. 1, such as, for example, evidence that H8 would not affect expression of appropriately matched CAT construct lacking an NF-κB binding site. One of skill would therefore not have read Shirakawa as teaching that one could use H8 to reduce NF-κB activity.* Response at page 47-48 and Declaration of Dr. Verma, ¶¶ 152-155.

Examiner Response:

The patentee has provided no evidence regarding the presence of protein kinases other than the PKA or PKC used to induce NF-κB activity in the *Shirikawa* assay samples. Similarly, the patentee has not provided any evidence challenging the reproducibility of *Shirakawa's* results nor has any evidence been provided concerning the contamination of *Shirakawa's* samples with transcription regulaters other than NF-κB.

Application/Control Number: 90/007,503; 90/007, 828       Page 34
Art Unit: 3991

As noted by *Shirikawa,* the use of protein kinase inhibitors to interfere with NF-κB activity stemmed from the author's belief that the kinases PKA and PKC activate NF-κB at the level of the cytoplasm by a phosporylation event involving the naturally occurring inhibitor I-κB: "We, like *Baeurele and Baltimore* (5), favor the view that I-κB is the target of phosphorylation; the phosphorylated I-κB would presumably have a decreased ability to bind NF-κB". *Shirikawa* at p. 2428, right column.   The patentee has provided no reason to challenge the inherent ability of the *Shirikawa* protein kinase inhibitors to interfere with NF-κB activation at the level of the NF-κB/ I-κB complex.

Additionally, patentee's unsupported argument calling for controls at the level of nuclear transcription is not commensurate with the instantly claimed invention that is not limited to reducing NF-κB activity by interfering with nuclear NF-κB binding at an NF-κB enhancing sequence. Per patentee's own model, compounds may interfere with the activation of NF-κB at the level of the receptor, NF-κB-I-κB complex or translocation. See Dr. Verma Declaration ¶¶ 8 and 11.  Accordingly, deletion mutation analysis of the NF-κB enhancing sequence and other enhancer sequences involved with the nuclear transcription of a particular protein is not a determinative assay regarding the ability of a compound to interfere with NF-κB at the receptor and/or cytoplasmic segments of patentee's proposed model.

*Shirikawa's* method uses protein kinase inhibitors (H8) that are *structurally* and *functionally* within the scope of instant claims since the treatment of eukaryotic cells with H8 in the EMSA assay resulted in the reduction of already induced NF-κB activity and inhibition of protein expression. See *Shirikawa* "[t]he induction by IL-1 was abolished ..." (p. 2426, Fig. 2A, lane 5)"; and using CAT  "IL-1 induced κ immunoglobulin expression was markedly inhibited ..." (p. 2425). These results were *further confirmed* in a different cell line ("As was the case in 70Z/3 cells, NF-κB activation was markedly inhibited by H8 in YT cells (Fig. 2B, lane 9)."

Thus, the *Shirikawa* reference provides an enabling disclosure of the ability of protein kinase inhibitors to reduce NF-κB activity and the patentee has not provided any evidence challenging the reproducibility of *Shirakawa's* results.

Application/Control Number: 90/007,503; 90/007,828          Page 35
Art Unit: 3991

## IIa. CYCLOSPORIN A (intervening prior art):

3.      Claims 1-6, 8-9, 11, 20-21, 25-27, 29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201 are rejected under 35 U.S.C. 102(b) as being anticipated, or alternatively rendered obvious under § 103, over *Schmidt* et al., J. Virology 64:4037-4041 (August 1990). See MPEP 2131.01 (evidence of inherency).

4.      **Rejection Summary:** *Schmidt* teaches administration of Cyclosporin A (CsA) to cells which substantially reduced NF-κB activity in those cells thus inhibiting expression of genes whose transcription is regulated by NF-κB activity. In addition, these references all utilized the HIV LTR promoter in their experiments and demonstrated that CsA reduced the expression of viral genes.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein(claim 5) in a eukaryotic cell.

The *Schmidt* reference discloses that administration of Cyclosporin A (CsA) reduces NF-κB in cells (e.g. Jurkat cells) and therefore must inherently reduce NF-κB-regulated gene expression. In particular, *Schmidt* utilized the Electrophoretic Mobility Shift Assay ("EMSA") disclosed in the '516 patent to measure NF-κB activity to determine that "PHA-mediated induction of complexes binding to the kB enhancer was completely abrogated by [1ug/ml] CsA (Fig. 1, lane 6; no B or A shifts) ....". See *Schmidt* at 4038. These results were confirmed using an NF-κB CAT reporter assay as described in the '516 patent, for example at Col. 17, line 66-Col. 18, line 23.

Thus, *Schmidt* showed that Cyclosporin A reduced PHA-induced NF-κB activity and, therefore, reduced the expression of a gene (CAT) that was regulated by NF-κB. Accordingly, *Schmidt* described the use of Cyclosporin A at concentrations that reduce NF-κB activity and reduce NF-κB regulated gene expression. As such, and as shown in more detail in *Exhibit G-1* of the 90/007,503 Request (herein incorporated by reference), the *Schmidt* reference expressly anticipates at least claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80- 86, 88-89,. and 93-97 of the '516 patent.

Since *Schmidt* used the HIV LTR gene, *Schmidt* demonstrated that CsA reduced viral gene expression thereby anticipating instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201. Additionally, use of the HIV LTR gene by *Schmidt* renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201 immediately envisaged, or alternatively, *prima facie* obvious in

light of the fact that HIV LTR is responsible for regulating the expression of viral (HIV) genes. Therefore, it would have anticipated, or alternatively *prima facie* obvious, to regulate NF-κB activity as in *Schmidt* in order to affect associated viral (e.g. HIV) gene expression.

### *Discussion*

Initially, it is noted that the above rejection was modified in response to patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Patentee maintains that numerous claims are clearly entitled at least to the April 21, 1989 filing date of U.S. Serial No. 07/341,436.*

Examiner Response:  For the reasons discussed *supra,* the instant claims are not entitled to the April 21, 1989 filing date of the 07/341,436 application, but are entitled to the 11/13/91 filing date of the 07/791,898 under 35 USC 120 for purposes of prior art.

2. Patentee Argument: *Schmidt does not show reduction of NF-κB activity in induced cells, as required by the claims.  Patentee argues that Schmidt teaches simultaneous treatment with CsA and activator which is outside of the claim scope requiring prior cell induction. See Response at page 51; Declaration of Dr. Verma, ¶ 25.*

Examiner Response:

The feature upon which patentee relies, *in vitro* cell contacting with inducer prior to contacting with inhibitor, is not recited in the claim(s).

Additionally, as discussed *supra*, the instantly claimed invention would encompass administering the NF-κB inhibitor prior to, or with, an NF-κB activating compound.

Further, *Schmidt* teaches the addition of CsA during, as well as subsequent, to cell induced activation to reduce NF-κB activity. See *Schmidt*: "... addition of CsA during the cellular activation phase completed abolished this binding" (page 4038 left column, last ¶) and  "Direct addition of CsA to a prepared nuclear extract from activated cells had no effect on the factor binding ..." (page 4038, right ¶, lines 1-8).

Application/Control Number: 90/007,503; 90/007, 828                                    Page 37
Art Unit: 3991

3. Patentee Argument:  *Schmidt did not utilize the same Electrophoretic Mobility Shift*
*Assay ("EMSA") in Jurkat cells (human T-cell leukemic cell line) disclosed in the '516*
*patent since Schmidt's EMSA assay differs by using HIV-LTR enhancer, instead of*
*kappa immunoglobulin enhancer (kappa 3) to be activated by PMA and/or PHA.*
*Schmidt's enhancing sequence fails to discriminate between the transcriptional*
*regulators NF-κB and NFAT-1 which is a T-cell nuclear activation factor which binds -κB*
*regulatory elements from the human immunodeficiency virus 1 (HIV-1).*  Response p.51,
Dr. Verma Dec. ¶¶ 22, 26-30.

Examiner Response:

        The instant claims do not require the use of an assay nor any specific assay

parameters including the use of a specific enhancer sequence (e.g kappa 3).  The

instant claims require the use of a compound (e.g. cyclosporine) that exclusively <u>or non-</u>

<u>exclusively</u> reduces NF-κB activity.

        The *Schmidt* EMSA assay for PHA/PMA activation utilized a conventional [5] 26

base HIV enhancer sequence that comprises the GGGGACTTTCC NF-κB binding

sequence for HIV-1 and "consensus sequence" found in Table 2 of the instant patent for

vector insertion and use in conducting EMSA assays. See *Schmidt* at page 4037, right

column; and instant patent col. 35, lines 54-col. 36, line 24; col. 37 Table 2.

        *Schmidt's* T-cell activation using PMA and PHA in the EMSA assay resulted in:

a. major B complex  to the NF-κB enhancer; and

b. more slowly migrating  A complex (Fig. 1, lane 3) which was more clearly seen when

PHA alone was used (Fig. 1 lane 7).

        The *Schmidt* article utilized controls in performing both the EMSA and CAT

assays. For example, after performing the following *controls, Schmidt* concluded that

the major B complex was ascribed to the nuclear factor NF-κB because the complex

appears identical to previously reported complexes (endnotes 2, 3 and 19) obtained

with similar HIV κB oligonucleotide probes since:

(i) the shift was not detected with a mutant enhancer, nor was the B shift completed for

by this mutant described in reference 19 (Baltimore Nature article); and

---

[5] Schmidt cites an article including one of the instant inventors (Dr.Baltimore) for support: Nabel, G. and
D. Baltimore 1987 Nature (London) 326:711-713.

(ii) this induced shift comigrated with a shift formed with nuclear extracts from Namalwa cells, which contain a constitutively activated kB complex (citing reference 13). *Schmidt* found that "[A]ddition of CsA during stimulation with both PHA and PMA significantly reduced the major shift (B shift) and completely abrogated the A shift (Figure 1 lane 4)". See *Schmidt* at page 4037, right column.

Additionally, patentee's "control" argument regarding the lack of a deletion mutation nuclear DNA analysis to discriminate messenger NF-κB binding to NFAT enhancer instead of NF-κB enhancer is not persuasive since this argument is *not commensurate with the instant invention* which is not limited to NF-κB binding an NF-κB enhancing sequence. See instant claims 23 and 24; and Dr. Verma's claim interpretation analysis Declaration ¶¶ 8 and 11.  Thus, deletion mutation analysis of the NF-κB enhancing sequence and other enhancer sequences involved with the nuclear transcription of a particular protein is not a determinative assay regarding the ability of a compound to inhibit at the receptor and/or cytoplasmic segments of patentee's proposed model.

4. Patentee Argument:  *Schmidt's CAT reported data utilizing artificial transfected cells bearing foreign bacterial DNA is outside the scope of the instant invention since:*
*a. the instant claims are not drawn to an assay and thus don't incorporate specification assays utilizing bacterial constructs; and*
*b. human, mammal or eukaryote cells of the instant claims does not normally contain foreign bacterial DNA.*    Dr. Verma declaration ¶ 33.

Examiner Response: The instant patent encompasses NF-κB occurrence and activation in host cell types, including T cell lines (H9, Jurkat) as well as NF-κB -related control (enhanced, reduced) of IL-2 production in said host cells as taught by *Schmidt*. See col. 26, lines 39-45; and col. 35.   Neither the specification, nor the instant claims exclude the presence of bacterial DNA in eukaryotic or mammalian cells and in fact exemplify the presence of bacterial DNA in assays.  In this respect, although not drawn to an assay, the instant claims clearly encompass both *in vitro* and *in vivo* NF-κB regulation.

Application/Control Number: 90/007,503; 90/007, 828          Page 39
Art Unit: 3991

5. Patentee Argument:  *Positive EMSA binding activity induced by PHA treatment that Schmidt observed with the HIV enhancer corresponds to NFAT since "when Schmidt assessed induction of NFAT binding activity in Jurkat cells using an EMSA specific for NFAT, (Schmidt, fig. 2), there was 'good activation of NFAT-1 with PHA alone, but not with PMA alone." Additionally, in Schmidt, CsA did not prevent PMA-induced binding activity to the HIV enhancer in Jurkat cells.  Verma Declaration ¶¶ 31 and 32.*

Examiner Response:

Schmidt  (p.4037, left column) acknowledges the ability of both NF-κB and NFAT-1 to induce HIV gene expression by binding to HIV enhancers but proposed separate mechanisms upon co-activation.  Accordingly, separate inducers were selected:

 phytohemaglutinin (PHA) mimicking induction via the T-cell receptor; and
 phorbol myristate acetate (PMA) inducing via direct activation of protein kinase C.

CsA activity was tested utilizing PHA and PMA together as well as separately. See *Schmidt*, page 4037, left column; page 4038, left column.

*Schmidt's* T-cell activation using PMA and PHA in the EMSA assay resulted in:
a. major B complex  to the NF-κB enhancer; and
b. more slowly migrating  A complex (Fig. 1, lane 3) which was more clearly seen when PHA alone was used (Fig. 1 lane 7).

The *Schmidt* article, after performing *controls,* concluded that the major B complex was ascribed to the nuclear factor NF-κB and found that  "[A]ddition of CsA during stimulation with both PHA and PMA significantly reduced the major shift (B shift) and completely abrogated the A shift (Figure 1 lane 4)". See *Schmidt* at page 4037, right column.

After co-activation with PHA and/or PMA, the effects of CsA upon CAT inducibility conferred by HIV enhancer (κB-binding sites) in Jurkat cells was tested where it was found that CsA inhibited the PHA-derived activation signal but not the PMA signal (see Fig. 4: last four bars); and co-activation with PMA and PHA together (Fig. 4: about 47) exceeded PHA alone (Fig. 4: about 13) and PMA alone (Fig. 4: about 17).

Accordingly, *Schmidt* teaches (from two different assays utilizing HIV promoter) CsA inhibition of PHA and (PHA and PMA) NF-κB activated Jurkat cell binding and there is no evidence provided to rebut this teaching.

*Schmidt* further teaches that activation by PHA and PMA is synergistic (Fig. 4 and compare PHA and PMA alone and their combined activation).

Thus, the *Schmidt* reference teaches the ability of CsA to inhibit NF-κB activity in cells activated by PHA/PMA and thus enables the use of CsA to reduce intracellular NF-κB activity and inhibit NF-κB-mediated gene expression.

6. Patentee Argument: The *positive EMSA binding activity induced by PHA treatment that Schmidt observed with the HIV enhancer corresponds to NFAT in light of accumulated scientific evidence that CsA exerts its clinical effect through its ability to inhibit an intracellular enzyme called calcineurin that regulates the activity of NFAT (nuclear factor of activated T cells transcription factor)* citing:
*Exhibit 7: Loh et al., J. Biol. Chem. 271(18) (May 1996) pages 10891-10891;*
*Exhibit 13 : Giffin et al. Nature Structure Biology, 10(10) (Aug. 2003) pages 800-806;*
*Exhibit: 8: Hogan et al. Genes and Development, 17 (2003) pages 2205-2232;*
*Exhibit 14: Kinoshita et al. Immunity, 6 (March 1997) pages 235-244;*
*Exhibit 9 : Ho et al. Clin. Immun. And Immunopath. 80(3) (9/96) pages S40-S45.*

See Response at page 52; and Dr. Verma Declaration ¶¶ 22, 26-36 and 40.

Examiner Response:

The evidence of record supports CsA's ability to inhibit both NF-κB and NFAT regulated intracellular gene expression within the instant claims and the above-cited documents do not support patentee's assertion that CsA does not affect NF-κB activity. A brief summary of the patentee cited documents follows:

*Loh* teaches that the calcineurin phosphatase enzyme binds NFAT (which translocates to the nucleus to bind DNA) to reversibly regulate its activity. CsA addition results in rephosphorylation of NFAT and inhibition of NFAT activated transcription.

*Giffin* teaches that NFAT1 binds cooperatively as a dimer to the NF-κB site of human immunodeficiency virus 1 (HIV-1). See Abstract; p. 801 (Fig. 1) and p. 804.

*Hogan* teaches that the NFAT family of transcription factors are evolutionary related to the Rel/NFkB family but are distinguished by their regulation by cell surface-activated calcium ion with the cytosol bound calcium ion dependent serine

Application/Control Number: 90/007,503; 90/007, 828                    Page 41
Art Unit: 3991

phosphatase calcineurin.- NFAT complex. See Fig. 1 p.2207.   NFAT also acts
synergistically with transcription factors other that Fos and Jun. See Abstract and pages
2213-2214.

*Kinoshita* teaches that certain NF-AT (Rel) family members bind the κB
regulatory elements and synergize with NF-κB and Tat in transcriptional activation of
HIV-1, and enhance HIV-1 replication in T cells. See Abstract.

*Ho* teaches that calcineurin is an essential component of the T-cell activation
pathway involving the action of CsA that acts by inhibiting signal transduction pathways
(e.g. see page S42, Fig. 1). Ho teaches that one of the effects of CsA on cytokine
expression in Jurkat human T-cells results from the release of calcineurin that inhibits
NFAT regulated cytokine expression. See *Ho* Abstract; p. S43.

Contrary to patentee's assertion, the *Ho* reference acknowledges that CsA does
affect NF-κB activity in Jurkat cells citing the *Emmel* Science 246, 1617-1620 (1989)
teaching corresponding to endnote 30 for support:

> Other targets for calcineurin are likely to play a role in this process. For example,
> the transcriptional activity of NF-κB is inhibited by about twofold and certain AP-1
> sites are inhibited by three-to fourfold (30). However, these effects are quite
> small compared to the several hundred- or thousandfold inhibition of properly
> initiated transcription at the NF-AT site (30).  Ho p.S43, right col. lines 22-29.

Additionally, it is art-recognized that CsA does affect NF-κB activity consistent
with the *Schmidt* and *Emmel* teaching. The following three articles (copies enclosed)
*rebut* patentee's assertion regarding NF-κB's lack of a role involving CsA
immunosuppresion:

> *Roman-Blas* M.D. et al., Osteoarthritis and Cartilage, 14 (2006) pages 839-848 ;
> *Frantz et al.* Embo J. 13 (1994) pages 861-870 ;
> *Meyer et al.,* FEBS Lett 413 (1997) pages 354-358.

*Roman-Blas* teaches therapeutic strategies based on the established role of
immunosuppressive agents, including CsA, to inhibit the NF-κB pathway: "Cyclosporin
A inhibits the protease activity of the 20S proteasome complex preventing I-κBα
degradation in murine macrophages, Jurkat lymphoma cells, and mouse and human T-
lymphocytes [72,73] " See *Roman-Blas*: p. 842 (right col.at bottom) to p. 843 (left col.) and
also p. 843 under "Conclusion" to p.844 including Fig. 3.
*Frantz and Meyer* represent endnotes 72 and 73, respectively cited in *Roman-Blas.*

Application/Control Number: 90/007,503; 90/007, 828                    Page 42
Art Unit: 3991

    *Frantz et al.* teach that calcineurin acts in synergy with PMA to inactivate I kappa B/MAD3, an inhibitor of NF-κB.

    *Meyer et al.* teach that CsA is an uncompetitive inhibitor of proteasome activity and prevents NF-κB activation.

    Accordingly, *Schmidt and Emmel* enable methods of using CsA to reduce NF-κB activity and inhibit NF-κB-mediated eukaryotic and viral gene expression.


5.    Claims 1-6, 8-9, 11, 20-21, 25-27, 29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201 are rejected under 35 U.S.C. 102(b) as being anticipated, or alternatively rendered obvious under § 103, by *Emmel* et al., Science, 246 (Dec. 1989):1617-20 See MPEP 2131.01.

**Rejection Summary:** *Emmel* teaches administration of Cyclosporin A (CsA) to cells which substantially reduced NF-κB activity in those cells thus inhibiting expression of genes whose transcription is regulated by NF-κB activity. In addition, these references all utilized the HIV LTR promoter in their experiments and demonstrated that CsA reduced the expression of viral genes.

    The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein (claim 5) in a eukaryotic cell.

    Similar to the *Schmidt* reference discussed above, the *Emmel* reference discloses that administration of Cyclosporin A (CsA) reduces NF-κB in cells (e.g. eukaryotic Jurkat cells which are a human leukemic T- cell line) that inherently reduces NF-κB-regulated gene expression.

    Like *Schmidt, Emmel* described the effects of CsA on Jurkat cells that were induced with PHA and PMA and CsA was shown (Fig. 3, .01-1ug/ml) to reduce NF-κB binding activity. In the CAT reporter assay, cells were transfected with a CAT reporter gene that was engineered to be regulated by HIV LTR gene, i.e. the gene had an NF-κB binding site incorporated into its regulatory region. As shown in Fig. 2D, CsA significantly reduced NF-κB activity thereby reducing the NF-κB-mediated expression of CAT. Additionally, as shown in Figure 3, 0.01-1ug/ml (10-10000 ng/ml) CsA was found to reduce NF-κB binding activity. Thus, *Emmel* described the use of CsA at concentrations that reduce NF-κB activity and reduce NF-κB regulated gene

expression, and as such, and as shown in more detail in *Exhibit G-1* of the 90/007,503
Request (incorporated by reference), the *Emmel* reference expressly anticipates at least
claims 1-2, 5-9, 20-21, 25-29, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80- 86, 88-89,
and 93-97 of the '516 patent.

Since *Emmel* used the HIV LTR gene, *Emmel* demonstrated that Cyclosporin A
reduced viral gene expression thereby anticipating claims 3, 4, 11, 42-43, 47-51, 106-
107, 109-110, 114-117, 192-193 and 197-201. Additionaly, *Emmel's* use of the HIV
LTR gene renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117,
192-193 and 197-201 immediately envisaged, or alternatively, *prima facie* obvious since
HIV LTR is responsible for regulating the expression of viral (HIV) genes.  Therefore, it
would have been anticipated, or alternatively *prima facie* obvious, to regulate NF-κB
activity as in *Emmel* in order to affect associated viral (e.g. HIV) gene expression.

### *Discussion*

Initially, it is noted that the above rejection was modified in response to
patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Patentee argues that numerous claims are entitled at least to the
April 21, 1989 filing date of U.S. Serial No. 07/341,436.  Response at page 54.*

Examiner Response:  For the reasons discussed *supra,* the instant claims are not
entitled to the April 21, 1989 filing date of the 07/341,436 application, but are entitled to
the 11/13/91 filing date of the 07/791,898 under 35 USC 120 for purposes of prior art.

2. Patentee Argument: *Emmel does not show reduction of NF-κB activity in induced
cells, as required by the claims but teaches* <u>simultaneous</u> *treatment with CsA and
activator which is outside of the claim scope requiring prior cell induction. See
Response at page 55; Declaration of Dr. Verma, ¶ 38.*

Examiner Response:

The feature upon which patentee relies, *in vitro* cell contacting with activator prior
to inhibitor, is not recited in the rejected claim(s).

Additionally, as discussed *supra,* the instantly claimed invention encompasses
"treating" cells with an NF-κB inhibitor prior to, with or subsequent to administration of
an NF-κB activating compound.

Further, the *Emmel* reference teaches the ability to measure CsA inhibition of "stimulated" untransfected as well as transfected Jurkat cells upon incubation of these cells for 40 hours with PHA (2ug), PMA (50 ng/ml) and CsA (concentratrions of 10-1000 ng/ml). E.g. See Fig. 2, page 1618, left column. Accordingly, contrary to patentee's argument, the *Emmel* reference teaches the treatment of stimulated or activated cells with CsA in order to determine cyclosporin's effect on NF-κB activity e.g. effect of NFκ-B on the regulated gene chloramphenicol acetyltransferase or CAT.

*3. Patentee Argument: Emmel did not utilize the same Electrophoretic Mobility Shift Assay ("EMSA") in Jurkat cells (human T-cell leukemic cell line) disclosed in the '516 patent since Emmel's EMSA assay differs by using HIV-LTR enhancer, instead of kappa immunoglobulin enhancer (kappa 3) to be activated by PMA and/or PHA. Emmel's enhancing sequence fails to discriminate between the transcriptional regulators NF-κB and NFAT which binds kB regulatory elements from the human immunodeficiency virus 1 (HIV-1). Response at p. 56, Dr. Verma Dec. ¶¶ 39 and 41-42.*

Examiner Response:

The instant claims do not require the use of an assay nor any specific assay parameters including the use of a specific enhancer sequence (kappa 3).

However, the instant claims do require the use of a compound (e.g. cyclosporine) that reduces NF-κB activity (and concomitant transcription), but need not be an exclusive, or even, a selective NF-κB inhibitor. Additionally, any amount of reduced NF-κB activity and inhibition of NF-κB mediated gene expression is within the instant method claim scope.

*Emmel* teaches the ability of CsA to inhibit NF-κB activity in PHA and PMA activated cells as discussed in the rejection above, and herein summarized.

The *Emmel* EMSA-CAT assays for PHA and PMA activation utilized a conventional 26 base HIV enhancer sequence that comprises the GGGGACTTTCC NF-κB binding sequence for HIV-1 and "consensus sequence found in Table 2 of the instant patent for vector insertion and use in conducting EMSA assays. See *Emmel* at p. 1618, Fig. 2 (D) citing endnote 17 to *Nabel and Baltimore* Nature article; and instant patent col. 35, lines 54-col. 36, line 24 and col. 37 Table 2.

Upon performing the CAT assay, *Emmel* concluded that "Smaller inhibitory effects of CsA were detected for the ability of the site to activate expression of CAT …". *Emmel* at page 1618 bottom of middle column to top of 3rd column; and Fig. 2 (D).

*Emmel* further performed the nuclear extract EMSA to measure the NF-κB effects of CsA on the appearance of binding activity on various transcriptional regulators including NF-κB. Again *Emmel* concluded that CsA acted to inhibit NF-κB activity: "NF-κB binding was reduced 10 to 20% in nuclear extracts of CsA-treated cells". See *Emmel* at page 1618, right column and Fig. 3C.

In light of the assay evidence, *Emmel* enables the use of cyclosporine to reduce NF-κB activity and NF-κB mediated gene expression in activated T-cells.

4. Patentee Argument: *Emmel provides the following evidence that NF-κB does not mediate effects of CsA on gene expression and that CsA acts through NFAT, not through NF-κB:*
*- In the Fig. 1 CsA "sensitivity" assay of single deletion of IL-2 enhancer effects on CAT transcription, "deleting the NF-κB binding site did not affect the ability of CsA to prevent PHA/PMA from inducing CAT expression" (Dr. Verma: ¶ 40, lines 6-8).*

*- Emmel states: "A binding site for NF-κB is present in the long terminal repeat of the human immunodeficiency virus (HIV-LTR) (17), yet CsA "sensitivity" of the HIV-LTR is independent of this site (18)" (Emmel page 1619, middle column). See Dr. Verma's Declaration, ¶¶ 39-40.*

*-In the Fig. 2 CAT expression assay, CsA abolished the ability of tandem repeats of the NFAT construct to direct transcription of the CAT gene (page 1618, middle column and Figure 2); and*

Examiner Response:

The evidence of record indicates that CsA inhibits intracellular gene transcription via both NF-κB and NFAT within the instant claims scope.

Evidence of the ability of CsA to activate nuclear protein transcription (IL-2 or HIV) independent of the nuclear NF-κB enhancing sequence as in *Emmel* Fig. 1 for the IL-2 enhancer and as in reference (17) for HIV-LTR enhancer is not dispositive of the

Application/Control Number: 90/007,503; 90/007, 828                    Page 46
Art Unit: 3991

ability of CsA to reduce NF-κB activity outside the nucleus i.e. at the level of the
cytoplasm NF-κB/I-κB complex.

Regarding the Fig. 1 CsA "sensitivity" assay, at best, the results of this assay are
<u>inconclusive</u> regarding CsA's affect on NF-κB activity. As noted by *Emmel*, more than a
single region is responsible for the inhibitor effect of CsA, and in this regard the CsA
"sensitivity" deletion assay (Fig. 1) is a ***relative*** measure of the importance of various
transcriptional binding DNA protein regions present on the IL-2 enhancer and
**additional assays were necessary** to "further define the effects of CsA on the function
of the IL-2 enhancer". See *Emmel* at page 1618, left column.

Accordingly, patentee's first two arguments addressing deletion of a nuclear NF-
κB binding site is not persuasive since such evidence is not determinative of the effects
of CsA on NF-κB activity and protein (e.g.IL-2 or HIV) transciption. Additionally, such
evidence overlooks the ability of CsA to interfere with NF-κB activity at the level of I-κB
in the cytoplasm. Further, the instant claims are not limited to inhibition of nuclear gene
transcription by NF-κB only at nuclear NF-κB binding sites.

With regard to the Fig. 2 assay and the *Emmel* statement that CsA abolished the
ability of the NFAT construct to direct transcription of the CAT gene, patentee overlooks
the fact that in the same CAT receptor assay (Fig. 2D) CsA *still inhibited* NF-κB
activated CAT expression albeit to a smaller extent as compared to NFAT (Fig. 2B).
Accordingly, the *Emmel* teaching of CsA reduction of NF-κB activity is within the instant
claimed scope that is not limited by NF-κB inhibitory degree or NF-κB exclusivity.
This is consistent with the *Emmel* Abstract: teaching that cyclosporin A was found to
specifically inhibit the appearance of DNA binding activity of NFAT, AP-3, and to a
<u>lesser extent</u> NF-κB nuclear proteins that appear to be important in the transcriptional
activation of the genes for interleukin-2 and its receptor, as well as several other
lymphokines.

Application/Control Number: 90/007,503; 90/007,828                    Page 47
Art Unit: 3991

5. Patentee Argument: Emmel's NF-κB inhibition data should be attributed to NFAT in light of the accumulated scientific evidence that indicates that CsA exerts its clinical effect through its ability to inhibit an intracellular enzyme called calcineurin which regulates the activity of the NFAT and that CsA does not affect NF-κB activity (e.g. inhibits Il-2 expression) in Jurkat cells" (Dr. Verma, ¶¶ 34 for Schmidt and 40 for Emmel: response page 52 (top) for Schmidt and page 56 top for Emmel) citing:

Exhibit 7: Loh et al., J. Biol. Chem. <u>271(18)</u> (May 1996) pages 10891-10891;
Exhibit 13 : Giffin et al. Nature Structure Biology, <u>10(10)</u> (Aug. 2003) pages 800-806;
Exhibit: 8: Hogan et al. Genes and Development, <u>17</u> (2003) pages 2205-2232;
Exhibit 14: Kinoshita et al. Immunity, <u>6</u> (March 1997) pages 235-244; and
Exhibit 9 : Ho et al. Clin. Immun. And Immunopath. <u>80(3)</u> (9/96) pages S40-S45.

See Response at page 52; and Dr. Verma Declaration ¶¶ 22 and 26-36.

Examiner Response:

As discussed supra under the Schmidt rejection the evidence of record supports CsA inhibition of both NF-κB and NFAT regulated intracellular gene expression within the instant claim scope and the above-cited documents do not support patentee's assertion that CsA <u>does not</u> affect NF-κB activity and the inhibition of IL-2 expression.

6.    Claims 1-6, 8-9, 11, 20-21, 25-27, 29, 36-38, 40, 42-43, 47-51, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89, 93-97, 106-107, 109-110, 114-117, 192-193 and 197-201 are rejected under 35 U.S.C. 102(b) as being anticipated, or alternatively rendered obvious under § 103 by Brini Eur. Cytokine Net. 1: 131-139 (Sept. 1990).

**Rejection Summary:** Brini teaches administration of Cyclosporin A (CsA) to cells which substantially reduced NF-κB activity in those cells thus inhibiting expression of genes whose transcription is regulated by NF-κB activity. In addition, these references all utilized the HIV LTR promoter in their experiments and demonstrated that CsA reduced the expression of viral genes.

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 11) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) to inhibit associated gene (viral gene such as HIV: claims 1-4) expression of a cytokine protein(claim 5) in a eukaryotic cell.

The *Brini* reference discloses that administration of Cyclosporin A (CsA) reduces NF-κB in cells (e.g. T-cells) that inherently reduces NF-κB-regulated gene expression.

Particularly, *Brini* disclosed the use of 1 ug/ml CsA in human PBM (peripheral blood T-lymphocytes) that had been induced with PHA. *Brini* assessed NF-κB activity in an EMSA binding assay (Fig. 5) using the same HIV-1 LTR gene site used in the '516 patent to assess NF-κB activity and binding (see '516 patent, columns 17-18). *Brini* concluded that "CsA reduced the PHA-induced binding of transactivating factors from T-cells and κB-like sequences which are present in the IL-2R alpha gene and in the HIV-1 LTR gene (Figures 3 and 4)". See *Brini* at page 137. Additionally, *Brini* reported the effects of CsA on expression levels of IL-2 Receptor-alpha (*Brini* at page 131 Abstract) which is taught by the '516 patent to be regulated by PHA-induced NF-κB activity in T-cells. See '516 patent, col. 17, lines 21-24 ("NF-κB is induced in T-cells by a trans-activator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-2 receptor alpha gene and possibly the IL-2 gene"). Thus, *Brini* described the use of CsA at concentrations that reduce NF-κB activity and reduce NF-κB regulated gene expression and as such, and as shown in more detail in *Exhibit G-1* of the 90/007,503 Request (incorporated by reference), the Emmel reference expressly anticipates at least claims 1-2, 5-6, 8-9, 20-21, 25-27, 29, 36-38, 40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 85, 88-89, and 93-97 of the '516 patent.

Additionally, since *Brini* used the HIV LTR gene, *Brini* demonstrated that Cyclosporin A reduced viral gene expression thereby anticipating claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201. Additionally, *Brini's* use of HIV LTR renders instant claims 3, 4, 11, 42-43, 47-51, 106-107, 109-110, 114-117, 192-193 and 197-201, immediately envisaged, or alternatively, *prima facie* obvious since HIV LTR is responsible for regulating the expression of viral (HIV) genes. Therefore, it would have been anticipated, or alternatively *prima facie* obvious, to regulate NF-κB activity as in *Brini* in order to affect associated viral (e.g. HIV) gene expression.

### *Discussion*

Initially, it is noted that the above rejection was modified in response to patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Patentee argues that numerous claims are entitled at least to the April 21, 1989 filing date of U.S. Serial No. 07/341,436. Response at page 58.*

Application/Control Number: 90/007,503; 90/007, 828                    Page 49
Art Unit: 3991

Examiner Response:  For the reasons discussed *supra,* the instant claims are not
entitled to the April 21, 1989 filing date of the 07/341,436 application, but are entitled to
the 11/13/91 filing date of the 07/791,898 under 35 USC 120 for purposes of prior art.

2. Patentee Argument: *Brini does not show reduction of NF-κB activity in induced cells,
as required by the claims.  Brini teaches that "CsA was always added to the cells 30 min
before stimulation with PHA" which is outside of the claim scope requiring prior cell
induction.* See Response at p. 59; Dr. Verma, ¶¶ 44-46.

Examiner Response:

    The feature upon which patentee relies, *in vitro* cell contacting with inducer prior
to contacting with an inhibitor, is not recited in the rejected claim(s).

    Additionally, as discussed in the claim interpretation *supra*, the instantly claimed
invention encompasses administering the NF-κB inhibitor prior to (e.g. pretreatment) or
with the NF-κB activating compound.

    Further, the *Brini* reference clearly addresses the ability of CsA to inhibit gene
expression in a eukaryotic cell that is induced by PHA to release NF-κB and express
protein: "Here we have examined the *inhibitory effect of CsA* on the activation of the IL-
2Ralpha gene expression in primary human T lymphocytes induced by PHA (emphasis
provided)." See p.132, left column, 2nd full ¶.

    Additionally, *Brini* teaches that, unlike the IL-2 receptor beta subunit, the IL-2
alpha subunit is not expressed in resting T-cells, but only is expressed on the surface of
activated T-cells. Accordingly, any CsA inhibition of IL-2 alpha subunit transcription
shown in the *Brini* assays must result from the inhibition of already activated T-cells.
See *Brini* at page 131, right column last ¶.

3. Patentee Argument:  *The Examiner relies on  EMSA binding assays (Fig. 3 and 4)
utilizing an oligonucleotide probe corresponding to the Il-2 receptor promoter or a
sequence corresponding to a portion of the HIV LTR  both showed "several discrete-
retarded DNA proteins" but neither of the EMSA Brini assays demonstrates whether the
CsA sensitive binding activity corresponds to NF-κB. A control DNA sequence is
important to distinguish NF-κB from other nuclear transcription factors, such as NFAT
discussed in Schmidt and Emmel, so as to confirm the identity of any CsA-sensitive*

*binding complexes and discriminate between NF-κB activity and NFAT binding activity.
Dr. Verma ¶¶ 47-49.*

Examiner Response:

The instant claims do not require the use of an assay nor any specific assay parameters including the use of a specific "control" enhancer sequence.  Additionally, the instant claims are not limited to nuclear transcription inhibition only at an NF-κB enhancer sequence.

Regarding the EMSA enhancer sequence, it is noted that *Brini* utilized an IL-2R-alpha enhancing sequence (245-291) that comprised the underlined GGGAATCTCC NF-κB binding sequence disclosed in the instant patent (col. 37, Table 2 3rd from the bottom) recommended for use in EMSA binding assays.   It is further noted that the underlined nucleotide sequence is within the scope of the instant patent's "consensus sequence" (see col. 36, lines 5-15).

As pointed out in the instant patent, the utilization of mutation assays to obtain selective NF-κB inhibition is optional. See instant patent col. 36, lines 40-55. Accordingly, patentee's argument regarding the non-use by *Brini* of a discriminatory control sequence is not commensurate to the scope of the instant claims that do not require "selective" NF-κB inhibition.

Further, it is noted that the Examiner does not specifically rely on any one of the particular *Brini* assay results but is considering the *Brini* teaching as a whole, which includes all of the *Brini* assay results in light of what was known in the prior art regarding CsA regulation of IL-2 receptor alpha chain expression.

In this regard, previous mutation-deletion analysis established a 5' IL-2R alpha regulatory region (between –267 and –244) that shares high homology with the NF-κB binding sites with kappa light chain immununoglobulin gene and an NF-κB binding site for HIV-1 and is recognized by specific nuclear binding proteins including HIVEN86 and NF-κB. This suggested that NF-κB activation may be due to dissociation from a cytoplasmic inhibitor IκB. Brini at page 132, left column.

Application/Control Number: 90/007,503; 90/007, 828           Page 51
Art Unit: 3991

     The *Brini* nuclear extract EMSA assays using an IL-2R-alpha probe containing an

NF-κB binding site (Fig. 3) and an HIV-LTR probe containing an NF-κB binding site

(Fig. 4) that confirmed the ability of CsA to retard the formation of two separate DNA-

protein complexes one of which was concluded by *Brini* to be attributed to NF-κB.

After reviewing their assay evidence the *Brini* authors concluded that CsA acted to

inhibit NF-κB regulated expression, not at the nuclear level, but *indirectly* through its

effect on the cytoplasmic I-κB inhibitor. Brini at p.137.


4. Patentee Argument:   *The fact that Brini observed a substantial level of binding activity
in untreated cells makes it unlikely that the complexes Brini observed correspond to NF-
κB, because one would not observe NF-κB activity in uninduced cells. (see '516 patent,
Example 8 and Fig. 24A). Moreover, CsA alone appears to increase levels of the
complexes that Examiner interprets correspond to NF-κB. (Fig. 3, lane 2). In particular,
the assumption that these complexes correspond to NF-κB is inconsistent with the
premise that in the Brini experiments, NF-κB activity regulated IL-2 receptor expression,
because there is no correlation between the presence of these complexes in the EMSA
assays (Figs. 3 and 4) and IL-2 receptor mRNA expression (Fig. 2). Dr. Verma Dec.¶¶
50 and 52.*

Examiner Response:

     Initially, it is noted that that patentee's argument is not commensurate with the

instant claimed scope that is not limited to a specific assay e.g patentee's Example 8.

     In any event, patentee's comparison between the instant patent Example 8 and

Fig. 24A results with *Brini's* is not a valid comparison.

     *Brini's* Fig. 3 assay gel retardation patterns utilized "human peripheral blood T-

lymphocytes isolated from heparinized venous blood of healthy volunteers" (see *Brini* at

p.132 under "Materials and Methods") whereas the instant patent's gel assays utilized

Jurkat cells (a human T leukemia cell line).

     Accordingly, under different experimental conditions, utilizing different cells (Jurkat

leukemia cells), the instant patent's uninduced Jurkat cells were negative for NF-κB

activity, whereas stimulated Jurkat cells contained detectable levels of NF-κB with

combined PHA/PMA being synergistic. Instant Patent at: col. 73, lines 1-7.

However, the presence of NF-κB complexes in <u>uninduced Brini T-cells</u> may be explained by:

A. a difference in *NF-κB* regulation and CsA inhibition between Jurkat leukemic cells and human peripheral blood T-lymphocytes. This difference <u>is supported by *Brini*</u>: "CsA shows no inhibitory effect on the surface expression of the IL2Ralpha in the human Tcell Jurkat, whereas, in human mitogen activated PBMC (13) and in murine thymocytes (14) CsA inhibits the IL2R-alpha chain (Tac) surface expression".  See *Brini* at page 131, right column;

B. the nature of *Brini's* PBMC sample since "constitutive expression" of NF-κB may be occurring in *Brini's* isolated human T-cell samples or the *Brini* isolated T-cell sample may have come from an individual who was experiencing, or had recently experienced, an NF-κB inducing stimulus (infection, virus etc.)  or

C. different experimental conditions.

Regarding, the correlation between NF-κB release (upon PHA activation) and CsA inhibition of IL-2R-alpha expression, *Brini* attempted to delineate the CsA mechanism for reducing PHA-induced expression of IL-2R-alpha. In this respect, the Fig. 2 Brini assay results showed that "IL-2R-alpa mRNA's were readily induced by PHA and pretreatment with CsA at 1ug/ml before cell activation caused a significant inhibition of the IL-2R-alpha mRNA inhibition". *Brini* at p.134.  Insofar that PHA acts to release NF-κB, the Fig. 2 data <u>suggests that NF-κB is playing a role in the ability of CsA to inhibit IL-2R-alpha expression in T-cells</u>.

5. <u>Patentee Argument</u>:  *Brini provides "no evidence as to whether PHA treatment alone would induce* NF-κB *activity so as to induce IL-2 receptor expression". In this regard, Examiner's reliance on data indicating cyclosporin's ability to slightly decrease (approximately 40-50%) PHA-induced IL-2 receptor alpha expression is insufficient. Additionally, patentee argues that the Examiner's interpretation of the instant '516 patent teaching that "NF-kB is induced in T cells … by PMA/PHA treatment and thereby activates the IL-2 receptor alpha gene …" is erroneous. Dr. Verma Declaration at ¶ 51.*

Application/Control Number: 90/007,503; 90/007, 828                    Page 53
Art Unit: 3991

Examiner Response:

Initially, it is noted that *Brini* labels CsA as achieving "significant" inhibition of 41+3% (at 24 hours) and 52 + 4% (at 40 hours) of IL-2Ralpha mRNA induction.  See p.134, left column and Fig. 2.

. Additionally, as pointed out in the rejection above, the total *Brini* assay evidence in light of what was known in the art discloses that administration of CsA reduces NF-κB in cells e.g. T-cells that inherently reduces NF-κB-regulated gene expression.

As further pointed out above, *Brini* suggests a CsA mechanism in PMA/PHA activated T-cells (interference at the cytoplasm inhibitor level) that is consistent with patentee's own specification statement (now produced in context):

.Recently, NF-kappa.B has been implicated in several other inducible systems. For example, NF-kappa.B is induced in T-cells by a trans-activator (tax) of HTLV-1 or by PMA/PHA treatment and thereby activates the IL-2 receptor .alpha. gene and possibly the IL-2 gene. Bohnlein et al., Cell, 53:827-836 (1988); Leung, K. and G. Nabel, Nature, 333:776-778 (1988); Ruben et al., Science, 241:89-92 (1988); Cross et al., Science, (1989); and Lenardo et al., Proc. Natl. Acad. Sci. USA, 85:8825-8829 (1988). '516 patent, col. 17, lines 20-28: relevant part underlined.

Accordingly both *Brini* and the instant patent (see underlined text above) teach that PHA (and/or PMA as underlined) activated T-cells release NF-κB to induce gene expression.

Thus, *Brini's* data indicating that CsA acts at the level of the NF-κB-I-κB complex to inhibit NF-κB regulation of IL-2 receptor- alpha gene expression is consistent with the above-referred to instant patent teaching. See also instant patent at col. 35, lines 13-20 regarding the role of activated NF-κB in IL-2R-alpha transcription.

6. Patentee Argument: *Without data, the Examiner has no basis to assume that treatment of T-cells with PHA alone (as compared to PHA and PMA) induce NF-κB activity so as to induce expression of any gene. In fact; Brini reports that PHA appeared to induce binding activity of at least one other transcription factor, AP1, having binding sites in the IL-2 receptor promoter (Fig. 5). Dr. Verma Declaration at ¶ 52.*

Application/Control Number: 90/007,503; 90/007, 828                    Page 54
Art Unit: 3991

As discussed *supra*, it is clear from the *Brini* article that PHA (and PMA) activates NF-κB to induce gene expression. Additionally, *Brini* provides evidence that CsA reduces NF-κB activity indirectly at the level of its inhibitor I-κB and not directly at the level of nuclear protein transcription. See detailed *Brini* discussion at page 136-137.

With respect to AP1, although patentee is correct that Fig. 5B shows that APA binds a nuclear enhancer sequence upon PHA activation, the author further notes that "CsA does not affect AP-1 binding site" (see Fig. 5 explanation) and thus is not inhibiting directly at the nuclear level of transcription.

However, the argument that other NF-κB like factors (including APA) in addition to NF-κB, may be inhibited by CsA is irrelevant since the instant claims are not limited to exclusive NF-κB inhibition.

Additionally, to the extent that the patentee is arguing that *Brini* fails to completely elucidate the mechanism involving CsA inhibition of activated human T-cells gene expression it is noted that mechanisms need not be recognized by one of ordinary skill in the art for a finding of inherency. *EMI Group North America, Inc. v. Cypress Semiconductor Corp.*, 268 F.3d 1342, [60 USPQ 2d 1423] (CAFC Sept. 21, 2001).


**IIa. CYCLOSPORIN A  (references prior to 12/24/86)**

7.      Claims 1-2, 6, 8-9, 20-27, 29, 31-38, 40, 64-73, 75-80, 82, 84 and 88-97 are rejected under 35 U.S.C. 102(b) as being anticipated by the Physician's Desk Reference (*PDR: 1985*) pages 1811-13, *Griffith I* (Griffith et al., Ann. Surg. 196 (9/82): 324-329) or *Griffith II* (Griffith et al., J. Thorac. Cardiovasc. Surg. 99 (12/84): 952-957) as evidenced by Holschermann et al., Circulation 96 (12/97) 4232-4238. See MPEP 2131.01 (evidence of inherency).

**Rejection Summary:** *PDR* (1985), *Griffith I and*, *Griffith II* teach cyclosporin A (CsA) administration of cells, which is shown from the teaching of *Holschermann,* inherently reduces NF-κB activity and thus would inhibit expression of genes whose transcription is regulated by NF-κB activity. The inhibition is done by reducing binding of NF-κB to NF-κB recognition sites, which also decreases the level of NF-κB not bound in a NF-κB-IκB complex, inhibiting the passage of NF-κB into the nucleus of cells, inhibiting modification of an IκB protein, and inhibiting degradation of an IκB protein. The prior art references also teach CsA administration to different eukaryotic cell types.

Application/Control Number: 90/007,503; 90/007, 828          Page 55
Art Unit: 3991

The instant claims are drawn to reducing NF-κB activity in eukaryotic (e.g. claims 1 or 2) or mammalian cells (e.g. claim 26) to effect inhibited expression of a gene under transcriptional control of NF-κB. For example, NF-κB activity can be effected by diminishing induced NF-κB mediated intracellular signaling (claims 6-9) or decreasing the level of NF-κB not bound in an NF-κB -I-κB complex (claim 20) to inhibit associated gene (claims 1-2) expression in a eukaryotic cell.

The *PDR 1985*, *Griffith I* and *Griffith II* references all teach the *in vivo* administration of CsA to cardiac transplant patients.

*PDR 1985* teaches that CsA should be administered before and after surgery for 1-2 weeks at a dose of about 15 mg/kg/d, followed by a decrease of 5% per week to a final level of 5-10 mg/kg/day. When monitoring whole blood levels, a 24-hour trough value of 250-800 ng/ml CsA appeared to minimize side effects and rejection effects.

*Griffith I* reports the administration of 5-10 mg/kg/d of CsA (average 8 mg/kg/d); while *Griffith II* reports the administration of 2-30 mg/kg/d (average 7.5-8 mg/kg/d) to obtain a targeted blood level of CsA of about 1000ng/ml.

*Holschermann* provides extrinsic evidence that the PDR 1985, Griffith I, and Griffith II references inherently anticipate the subject claims.

*Holschermann* essentially repeated the tests disclosed in the *Griffith I* and *II* references by administering 3.4 $\pm$ 0.3 mg/kg/day CsA to cardiac transplant patients, resulting in blood levels of 681 $\pm$ 176 ng/ml. PBM cells were isolated from the blood of the patients before and after CsA therapy, and nuclear extracts from the cells were prepared. Id. *Hölschermann* then conducted an EMSA assay using nuclear extracts. (see Figure 4) which is the same assay format taught by the '516 patent for determining whether compounds (i) reduce NF-κB activity and (ii) reduce binding of NF-κB to NF-κB recognition sites. See '516 patent, Col. 18, I.52 - Col. 20, I. 25.

*Holschermann* confirms that administering CsA to cardiac patients as taught by the prior art *PDR 1985* and *Griffith I* and *II* references necessarily inherently reduces NF-κB activity (and binding of NF-κB to NF-κB recognition sites):

> In cells obtained from transplant recipients during low baseline CsA blood levels (before CsA administration), strong NF-κB binding activity was detected (Fig. 4), whereas cells separated from blood in the presence of high CsA concentrations exhibited decisively reduced NF-κB binding activity. Specificity of the binding reaction was shown by the competition with unlabeled consensus oligonucleotides. *Id.* at 4236.

*Holschermann* also showed that the administration of CsA to these patients as taught in the prior art *PDR 1985* and *Griffith I* and *II* references reduced Tissue Factor

Application/Control Number: 90/007,503; 90/007, 828                    Page 56
Art Unit: 3991

(TF) gene transcription, which is recognized as being regulated by NF-κB: "Indeed, the marked activation of the NF-κB transcription factor, which is known to play a major role in the regulation of the TF gene, was prevented in the presence of high CsA blood concentrations." *Id.* at 4237.

Thus, CsA, as administered in *PDR 1985* and *Griffith I and II*:

-inhibited expression of a gene whose transcription is regulated by NF-κB (instant claims 1 and 2 and their dependent claims);

-diminished NF-κB-mediated intracellular signaling (clm 6 and dependent claims); and

-reduced NF-κB-mediated effects of external influences (claims 7 and 8 and dependent claims).

Since CsA was shown to reduce binding of NF-κB in an EMSA assay which measures binding of NF-κB to NF-κB recognition sites, *Holschermann* confirms that the prior art administration of CsA to cardiac patients reduces NF-κB activity by "reducing binding of NF-κB recognition sites on genes which are transcriptionally regulated by NF-κB" (e.g. claims 25, 36 and 58). Additionally, because unbound NF-κB translocates to the nucleus, the reduced binding activity in the nucleus of cells reflected in *Hölschermann* means that CsA, as administered in *PDR 1985* and *Griffith I and II*, necessarily reduced NF-κB activity by:

A. "decreasing the level of NF-κB not bound in any NF-κB- IκB complex" (e.g. claims 20, 31 and 53); and

B. "inhibiting the passage of NF-κB into the nucleus of cells (e.g. claims 21, 32 and 54).

Furthermore, as *Hölschermann* indicates, CsA is recognized as being able to "abolish the inducible phosphorylation and degradation of the cytoplasmic inhibitor protein IκB." *Id.* at 4237 (citing *Alkalay*).  *Hölschermann* confirms that this effect on degradation of IκB is the mechanism by which CsA reduced NFκB in these cardiac patients. Thus, Cyclosporin A when administered to humans as in the *PDR 1985* and *Griffith I and II* references reduces NF-κB activity by:

A. "inhibiting modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB" (e.g. claims 22 and 33); and

B. "inhibiting degradation of an I-κB protein" (e.g. claims 23 and 34).

Finally, as demonstrated by *Hölschermann*, the *PDR 1985* and *Griffith I and II* reference CsA administration to human patients reduced NF-κB activity in those patients'

Application/Control Number: 90/007,503; 90/007, 828                    Page 57
Art Unit: 3991

peripheral blood mononuclear cells (PBM's comprised of lymphocytes and monocytes) which anticipates:

(1) eukaryotic cells (claims 1-2, 5, and 9);
(2) mammalian cells (claims 26, 37, 70, 82 and 94);
(3) human cells (claims 27, 38, 71, 84 and 95);
(4) immune cells (claims 61 and 72); and
(5) lymphocyte cells (claims 29, 40, 62, 73 and 97).

It is noted that the dosage and blood levels of CsA shown by *Holschermann* to reduce NF-κB activity is slightly lower than the dosages and blood levels of CsA taught in the *PDR 1985,Griffith I* and *II* references. Accordingly, an even greater reduction in NF-κB activity would result from the prior art administration of CsA to patients as described these references than shown in *Holschermann*. Moreover, regardless whether the effect of CsA in reducing NF-κB activity and resulting monocyte TF activation is direct (by directly affecting monocytes) or indirect (by interfering with stimulatory lymphocytes), *Holschermann* shows that CsA, as administered in the prior art references reduces NF-κB activity and resulting TF gene expression. Thus, its administration to cardiac transplant patients as taught in *PDR 1985, Griffith I* and *II* anticipates at least claims 1-2, 6, 8-9, 20-27, 29, 31-38, 40, 64-73, 75-80, 82, 84, 86 and 88-97 of the '516 patent, as set forth in more detail in *Exhibit H-1* of the 90/007,503 Request (incorporated by reference).

### *Discussion*

Initially, it is noted that the above rejection was modified in response to patentee's amendment canceling claims 7, 28, 39, 81, 83, 85, 86 and 203.

1. Patentee Argument: *Griffith 1981 and 1984 describe various clinical studies conducted to evaluate use of CsA in transplant patients. The 1985 PDR describes potential use of CsA in transplant patients. None of these references describes method of using CsA that would carry out the method recited in any of the claims. None of these references mention NF-κB, describes any external influence that would necessarily induce NF-κB activity or NF-κB mediated intracellular signaling or describe any effect of CsA necessarily resulting from or mediated through NF-κB. Moreover, I disagree that Holschermann provides any basis for concluding that such elements would necessarily have occurred in any prior use of CsA as described by Griffith 1981 or 1984, or the 1985 PDR. Dr. Verma Declaration ¶¶ 65 and 66.*

Application/Control Number: 90/007,503; 90/007, 828                    Page 58
Art Unit: 3991

Examiner Response:

In response to patentee's arguments against the *Griffith (1981 or 1984)* and *1985 PDR* references individually, it is noted that the above rejection is based on the prior art teaching of these references along with the *Holschermann* evidentiary document. The *Holschermann* document is being cited to demonstrate that the *Griffith (1981 and 1984)* and *1985 PDR* teaching of administering CsA inherently produces inhibition of NF-κB activity within the scope of the instant claims. Accordingly, the prior art references anticipate the instant invention since these references enable the practice of a method that inherently is NF-κB-mediated. Contemporaneous recognition of NF-κB's role in the prior art method is not necessary for anticipation.

2. Patentee Argument: *The claims are directed to methods carried out on cells in which NF-κB activity has first been induced by some inducing stimulus (external influence). Neither the Griffith studies, nor the 1985 PDR identifies an external influence that would have necessarily induced NF-κB activity. Moreover, in the patient studies reported in Griffith 1981 and 1984, CsA was administered before transplantation. As the Examiner indicates, the 1985 PDR teaches CsA should be administered first before and then after surgery. There is no evidence that any of these methods of using CsA described in the pre-April 21, 1989 references art would necessarily involve administration of CsA in cells in which NF-κB activity has first been induced.* Dr. Verma Declaration ¶¶ 65-66 and 68.

Examiner Response:

As pointed out above, *Holschermann* provides evidentiary support for the prior art (Griffith 1981 and 1984; and 1985 PDR) methods *in vivo* "inherent" reduction of NF-κB activity and inhibition of NF-κB regulated intracellular eukaryotic gene expression. *Holschermann* teaches that CsA administration in cardiac transplant patients, as taught by the *Griffith and PDR* references, acts at the cellular level to inhibit NF-κB regulated gene expression (e.g. tissue factor).

The instant claims don't require identification of "an inducing stimulus" or "external influence" occurring in cardiac transplant patients that triggers the release of NF-κB. Additionally, to the extent that patentee is arguing that the references fail to

Application/Control Number: 90/007,503; 90/007, 828          Page 59
Art Unit: 3991

teach the mechanism of NF-κB activation occurring in these patients, courts have recognized that a mechanism need not be recognized by one of ordinary skill in the art for purposes of inherency.

Regarding, patentee's "first to induce" argument it is again noted that the claims do not specify that cell induction (at whatever level) occurs prior to the cell being contacted with an NF-κB inhibitor. The claims merely require a method that reduces NF-κB activity and inhibits NF-κB regulated gene expression.  Additionally, as further discussed in the claim interpretation section *supra*, the instantly claimed invention would encompass administering an NF-κB inhibitor prior to, with or subsequent to the administration of an NF-κB inducing compound.

In any event, the *1985 PDR* reference teaches administeing the NF-κB inhibitor cyclosporine both prior and <u>subsequent</u> to the transplant, thus rendering patentee's "first to induce" argument moot.

Additionally, the *1985 PDR* and *Griffith* references teach <u>treating</u> cardiac transplant patients by administering CsA to "inherently" interfere with the NF-κB pathway (abolish inducible phosphorylation and degradation of IκB) to inhibit an NF-κB regulated effect as taught by *Holshermann*. The prior art teaching of treating patients with CsA is consistent with the patentee argument that the instant claims encompass "providing a <u>therapeutic benefit</u> by intervening in the processes that constitute the NF-κB pathway, are associated with NF-kB activity, and cause subsequent NF-κB regulated effects" (with emphasis). See Response p.30.


3. <u>Patentee Argument</u>: *The accumulated scientific evidence indicates that CsA exerts its clinical effect as an immunosuppressant through its effect on transcriptional factor NFAT. The only potential effect of CsA on gene expression which the 1985 PDR mentions is on expression of IL-2, which the data discussed above indicates is mediated not through NF-κB but through NFAT. Dr. Verma Declaration ¶ 67.*

Application/Control Number: 90/007,503; 90/007, 828                    Page 60

Art Unit: 3991

Examiner Response:

Initially, it is noted that the instant claims don't require the use of an <u>selective</u> NF-
κB inhibitor and accordingly, CsA is still within the scope of the instant invention even if
it down-regulates gene expression via both NF-κB and NFAT.

Further, it is the position of the Examiner that the accumulated scientific evidence
indicates that CsA exerts its effect via an NF-κB mediated mechanism as indicated by:

*Schmidt & Emmel:* CsA inhibits NF-κB mediated IL-2 and HIV protein transcription.

*Brini:* CsA affects NF-κB mediated IL-2 receptor and HIV protein expression via a
mechanism that includes interference with the NF-κB/IκB complex.

*Roman-Blas* et al (citing *Frantz et al.* and *Meyer et al.,* ) teaches therapeutic strategies
(e.g. arthritis) based on the established role of immunosuppressive agents, including
CsA, to inhibit the NF-κB pathway by affecting the NF-κB/IκB complex
in murine macrophages, Jurkat lymphoma cells, and mouse and human T-lymphocytes.

*Holschermann* teaches that CsA administered to heart transplant patients
interferes in the NF-κB pathway by abolishing inducible phosphorylation and
degradation of I-kB to inhibit an NF-κB regulated effect (tissue factor expression).


4. Patentee Argument: *Patentee argues that Holschermann failed to "repeat the use"
described in the PDR 1985 and Griffith I and II references noting differences in the
timing and amounts of patient CsA administration as well as the further administration of
azathioprene and aspirin. Additionally, Holschermann's in vitro manipulation of cells
does not reflect what is occurring in the PDR 1985 and Griffith patients in vivo.*
Response at pages 69-70; Dr. Verma Declaration ¶¶ 69 and 72.

Examiner Response:

As recognized by the CAFC,  "Anticipation does not require the actual creation or
reduction to practice of the prior art subject matter; anticipation requires only an
enabling disclosure." See *In re Donohue*, 766 F.2d 531,533[ 226 USPQ 619] (Fed. Circ.
1985; *Schering Corp. v. Geneva Pharms.,Inc.* 339 F.3d 1373,1380 [ 67 USPQ2d 1664]
(Fed. Cir. 2003).

As discussed in the rejection above, the *PDR 1985* and the *Griffith I and II*
documents enable the use of cyclosporine (CsA) to treat cardiac transplant patients.

Application/Control Number: 90/007,503; 90/007, 828                    Page 61
Art Unit: 3991

*Holschermann* provides *ex vivo* and *in vitro* assay (TF-mRNA expression; EMSA
determined NF-κB binding activity in lymphocytes and monocytes) evidence obtained
from transplant patient (and controls) correlative to human utility to establish CsA's
ability to inhibit NF-κB regulated gene (i.e. TF) expression. *Holschermann* further
elucidates the *in vitro* and *in vivo* mechanism by which CsA inhibits NF-κB activation.

The patentee has failed to provide any evidence to rebut the *Holschermann*
teaching of the inherent effect of CsA upon administration to cardiac transplant patients
including those disclosed in the *PDR 1985* and *Griffith* references. Nor has the patentee
provided evidence and/or a scientific rationale that the referred to method differences
between *Holschermann* and the *PDR 1985* and *Griffith* references would interfere with
CsA's ability to regulate NF-κB-mediated gene expression.

A document teaching is presumed operable and enabled absent rebuttal
evidence (MPEP § 2121 at 2100-64 to 2100-67). Additionally, the threshold for enabling
an anticipatory document is lower than the threshold for enablement under 35 USC 112,
first ¶ required for a patented invention. See *Rasmusson v. Smithkline Beecham Corp.*
75 USPQ2d 1297 (Fed. Cir. 2005); and *Impax Labs., Inc. v. Aventis Pharmaceuticals,
Inc.,* 81 USPQ2d (Fed. Cir. 2006).

5. Patentee Argument: *The authors observed that TF activity appeared to be reduced in
PBMC's isolated from some, but notably, not from all patients after being administered
CsA. Holscherman Fig. 2B.* .Dr. Verma Declaration, ¶ 70.

Examiner Response:  The Examiner disagrees with Dr. Verma's analysis of the data
presented in the *Holschermann* assays.

The *Holschermann* assays described in Figures 1-2 and Table 2 teach:

a. Fig. 1: In 10 samples from 10 different cardiac patients, isolated mononuclear cells
had markedly increased TF generation after incubation with or without LPS compared
with healthy control subjects (unrelated to increased monocyte counts).

b. Table 2: 10 samples of isolated mononuclear cells from 10 cardiac transplant patients
before and after daily CsA administration were assayed for the effect of CsA on TF
activity.  Table 2 demonstrates that the degree of TF activity generated by mononuclear
cells was inversely related to CsA blood levels which was reproducible. Additionally,

both Fig. 2A and Table 2 show that monocyte TF induction was reduced after CsA application in **all transplant recipients** and "Likewise, a similar inverse relationship between CsA blood concentrations and TF inducibility was observed when highly purified monocytes/macrophages were analyzed instead of whole mononuclear cells (Fig. 2B)". *Holschermann* at page 4234 (with emphasis). Fig.1,2 and Table 2.

Upon review of Fig. 2B it is clear that at least 9 out of 10 patient samples had decreasing TF activity with increasing CsA administration as indicated by negative sloping lines. It's only with respect to the lowest amount of TF activity (about $10ml/10^6$ cells) that CsA administration had only a slight effect on decreasing TF activity that would be expected in light of the small TF sample amount capable of being induced.

Additionally, patentee's argument is not commensurate to the claimed invention, which does not require CsA achieve 100% NF-$\kappa$B inhibition and/or successfully treat 100% of the patients. In this respect, the Board of Patent Appeals and Interferences held that a method claim limitation reciting "inoculating said plant with a nematode inhibiting strain of *P.Cecapia*" was inherent to the reference Dart inoculating method using a *P.Cecapia* strain in light of patentee's specification page 18 teaching that *P.Cecapia* possessed an 18% nematode-inhibition rating. The Board held that the strain was "nematode-inhibiting" and met the claim that did not recite a specific degree of inhibition. See *Ex parte Novitski*, 26 USPQ2d 1389, 1391 (B.P.A.I. 1993).

6. Patentee Argument: *The only data relating to transcription of the TF gene in patients (Holschermann Fig. 3) fails to demonstrate any link between NF-κB activity and TF expression. In particular, Fig. 3 reports TF mRNA levels in cells directly isolated from patients before CsA treatment (lane 2) and after treatment (lane 5). Holschermann purportedly found significant activation of NF-κB in mononuclear cells directly isolated from patients before CsA treatment (Fig.4), but at the same time, did not observe detectable TF mRNA expression in such cells. (Fig.3, lane 2). These data show that in vivo, there was an apparent lack of correlation between purported NF-κB activity and transcription of the TF gene in the mononuclear cells of the transplant patients. Thus this data fails to support the inference that in transplant patients, TF gene expression is necessarily mediated by NF-κB or caused by induced NF-κB activity.* Dr.Verma Declaration ¶ 71.