IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, and IMMUNEX RHODE ISLAND CORPORATION, <br><br>        Plaintiffs, <br><br>    v. <br><br> ARIAD PHARMACEUTICALS, INC., and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, <br><br>        Defendants. | C.A. No. 06-259-MPT |
| ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY, THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, <br><br>        Counterclaim-Plaintiffs, <br><br>    v. <br><br> AMGEN INC., IMMUNEX CORPORATION, AMGEN USA INC., AMGEN MANUFACTURING LIMITED, IMMUNEX RHODE ISLAND CORPORATION, and WYETH, <br><br>        Counterclaim-Defendants. | |

DEFENDANTS-COUNTERCLAIM-PLAINTIFFS' OPENING BRIEF
ON CLAIM CONSTRUCTION

*Of Counsel:*

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
Keith R. Hummel
David R. Marriott
David Greenwald
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Dated: April 25, 2008

ASHBY & GEDDES
Steven J. Balick (#2403)
John G. Day (#2114)
Tiffany Geyer Lydon (#3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Attorneys for Defendants and Counterclaim Plaintiffs ARIAD Pharmaceuticals, Inc., Massachusetts Institute of Technology, the President and Fellows of Harvard College and the Whitehead Institute for Biomedical Research*

## Table of Contents

Page(s)

Table of Authorities .................................................................................................iii

I.    Introduction ............................................................................................... 1

II.   Background ................................................................................................ 4

      A.    The '516 Patent .............................................................................. 4

      B.    Scientific Background ................................................................... 5

            (1)    Cells .................................................................................. 5

            (2)    Genetic Material ............................................................. 6

            (3)    Gene Expression ............................................................. 6

            (4)    Signal Transduction ....................................................... 7

            (5)    NF–κB ............................................................................... 8

            (6)    Role of NF–κB Activity in Inflammatory Diseases................... 11

III.  Argument.................................................................................................. 13

      A.    Legal Standards............................................................................ 13

      B.    The Construction of "NF–κB," "NF–κB Activity" and Related Terms ............. 16

      C.    The Asserted Claims Encompass Intracellular and Extracellular
            Methods of Reducing NF–κB Activity in Cells................................... 23

      D.    The Asserted Claims Require Induction of NF–κB Activity by an
            External Stimulus Prior to the Application of an Agent Capable of
            Reducing NF–κB Activity................................................................ 29

      E.    The Asserted Claims Are Limited to Methods Practiced in Those Cells
            in Which NF–κB is Present and Capable of Acting as an Intracellular
            Messenger................................................................................... 36

      F.    The Asserted Claims Do Not Encompass Natural Processes. ............... 38

IV.   Conclusion ............................................................................................... 40

# Table of Authorities

Page(s)

**Cases**

*Eaton Corp. v. Rockwell Int'l Corp.,*
  323 F.3d 1332 (Fed. Cir. 2003) ........................................................................ 14, 32, 33, 35

*Georgia-Pacific Corp. v. U.S. Gypsum Co.,*
  195 F.3d 1322 (Fed. Cir. 1999) ........................................................................ 22

*Interactive Gift Express, Inc. v. Compuserve Inc.,*
  256 F.3d 1323 (Fed. Cir. 2001) ........................................................................ 13

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
  358 F.3d 898 (Fed. Cir. 2004) ........................................................................ 28

*Markman v. Westview Instruments, Inc.,*
  52 F.3d 967 (Fed. Cir. 1995) ........................................................................ 13

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) ........................................................................ 14, 15, 36

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*
  299 F.3d 1313 (Fed. Cir. 2002) ........................................................................ 28, 39

**Other Sources**

Jeffrey M. Weinberg *et al.*, eds., TNF–alpha Inhibitors (2006). ............................................. 10

William Strunk and E.B. White, The Elements of Style (3d ed. 1979) ................................ 25

Defendants and counterclaim plaintiffs ARIAD Pharmaceuticals, Inc.,

Massachusetts Institute of Technology, the President and Fellows of Harvard College

and the Whitehead Institute for Biomedical Research (collectively, "ARIAD")

respectfully submit this memorandum in support of their proposed construction of

certain terms in the claims of U.S. Patent No. 6,410,516 ("the '516 Patent") that ARIAD

has asserted against Amgen Inc., Immunex Corporation, Amgen USA Inc., Amgen

Manufacturing Limited, and Immunex Rhode Island Corporation (collectively,

"Amgen").[1]

## I.    Introduction

In March, the parties exchanged their respective identification of claim

terms requiring construction.  Based on that exchange, there appears to be considerable

disagreement as to how the claims of the '516 Patent asserted to be infringed (claims 6,

18, 70-72, 183-184) should be construed.[2]

As an initial matter, a few basic terms require definition:  "NF–κB," "NF–

κB activity" and "NF–κB–mediated intracellular signaling."  For reasons explained

below, ARIAD respectfully submits that, consistent with the intrinsic evidence of the

'516 Patent, those terms should be defined as follows:

---

[1] The documents cited herein are appended to the Declaration of David Greenwald,
dated April 25, 2008 ("Greenwald Decl.").

[2] Because ARIAD has recently granted Amgen a covenant not to sue on the claims
not asserted against the infringing products, terms in the unasserted claims need not be
construed.  (*See* ARIAD's Mem. in Supp. of its Mot. for Partial Dismissal for Lack of
Subject Matter Jurisdiction)  In any event, Amgen, who bears the burden of proving
invalidity, has failed to advance constructions of any of those limitations.

| Term | Claims | ARIAD's Proposed Construction |
|---|---|---|
| **NF–κB** | 6, 18, 70-72, 183-184 | A DNA-binding protein factor found in many eucaryotic cells that: (a) is constitutively present in the cytoplasm of unstimulated cells as an inactive complex, bound to inhibitory IκB proteins; (b) upon dissociation from IκB, translocates to the nucleus of the cell; and (c) once in the nucleus, mediates the transcription of certain genes by binding to specific DNA recognition sequences in those genes. |
| **NF–κB Activity** | 6, 18, 70-72, 183-184 | The ability of NF–κB to act as an intracellular messenger that regulates transcription of particular genes. |
| **NF–κB–mediated intracellular signaling** | 6, 70-72 | The intracellular steps of the NF–κB signal transduction pathway. |

ARIAD submits that the remaining differences between the parties' respective positions on claim construction stem from their disagreement as to the answers to four fundamental questions:

1.    Whether the claims encompass both intracellular and extracellular methods of reducing NF–κB activity;

2.    Whether the claims require induction of NF–κB activity by an external stimulus prior to the application of an agent capable of reducing NF–κB activity;

3.    Whether the claims are limited to methods practiced only in those cells "in which NF–κB is present and capable of acting as an intracellular messenger;" and

4.    Whether the claims cover natural processes by which NF–κB activity is reduced.

Answers to these questions will greatly simplify — indeed, largely dictate — the answers to the questions of claim construction requiring resolution by this Court.

ARIAD's answers to the four primary questions may be summarized as follows:

1.    The claims encompass both intracellular and extracellular methods of reducing NF–κB activity;

2.    The claims require induction of NF–κB activity by an external stimulus prior to the application of an agent capable of reducing NF–κB activity;

3.    The claims are limited to methods practiced in those cells "in which NF–κB is present and capable of acting as an intracellular messenger;" and

4.    The claims do not encompass natural processes by which NF–κB activity is reduced.

For the reasons set out below, ARIAD respectfully submits that its answers to those four questions are the only ones that are supported by the language of the claims and the teachings of the specification, as understood by one of ordinary skill in the art.

In light of ARIAD's proposed answers to those four central questions, ARIAD respectfully submits that the disputed terms should be construed as follows:

| Term | Claims | ARIAD's Proposed Construction |
|---|---|---|
| **Reducing NF–κB activity in cells** | 6, 70-72 | Decreasing NF–κB activity that exists[3] in cells in which NF–κB is present by inhibiting any step along the NF–κB signal transduction pathway, in such a manner that the activity differs from the naturally occurring activity of NF–κB under the same conditions, without regard to the situs of the inhibiting agent. |
| **Diminishing induced NF–κB-mediated intracellular signaling** | 6, 70-72 | Inhibiting the intracellular steps of the NF–κB signal transduction pathway, performed after the pathway has been initiated in response to application of a stimulus prior to the performance of the claimed method. |
| **[Such that NF–κB-mediated intracellular] signaling is diminished** | 6, 70-72 | [Such that NF–κB-mediated] signaling is reduced from an existing induced state to a lower state. |

---

[3] The phrase "that exists" was inadvertently omitted from the definition included in the 4/8/2008 Claim Construction Chart (D.I. 571). Compare ARIAD's proposed construction of "reducing activity in the cells" (including the phrase).

3

| Reducing Interleukin-1 or Tumor Necrosis Factor-α activity in mammalian cells | 18, 183-184 | Decreasing intracellular NF–κB signal transduction induced by Interleukin–1 or Tumor Necrosis Factor–α that exists in mammalian cells in which NF–κB is present and capable of acting as an intracellular messenger. |
|---|---|---|
| Reducing NF-κB activity in the cells | 18, 183-184 | Decreasing NF–κB activity that exists in mammalian cells in which it is present, by inhibiting any step along the NF–κB signal transduction pathway, in such a manner that the activity differs from the naturally occurring activity of NF–κB under the same conditions, without regard to the situs of the inhibiting agent. |
| So as to reduce intracellular signaling *caused by* Interleukin-1 or Tumor Necrosis Factor-α in the cells | 18, 183-184 | So as to inhibit the intracellular steps of the NF–κB signal transduction pathway induced by Interleukin-1 or Tumor Necrosis Factor-α prior to the performance of the claimed method, applied to the mammalian cells described in the preamble of the claim. |

The parties have agreed to definitions of the terms "cells," "mammalian cells," "human cells" and "immune cells," and respectfully request that the Court construe those terms as follows:

| Term | Claims | ARIAD's Proposed Construction |
|---|---|---|
| **Cells** | 6, 70-72 | Intact cells, whether in cell culture or in living tissue (including in an organism), as opposed to cell extracts. |
| **Mammalian cells** | 18, 70 | Cells that come from a species falling within the class of mammals. |
| **Human cells** | 71, 183 | Cells that come from a human being. |
| **Immune cells** | 72, 184 | Cells involved in the immune response. |

## II.    Background

### A.    The '516 Patent

The inventors on the '516 Patent discovered the transcription factor NF–κB and its activity as a mediator of inducible gene expression. Using that knowledge, the inventors developed certain artificial methods of influencing that activity — *i.e.* reducing it — that are the subject of the two asserted independent claims:

**Claim 6**: A method for diminishing induced NF–κB-mediated intracellular signaling comprising reducing NF–κB activity in cells such that NF–κB mediated intracellular signaling is diminished.

**Claim 18**: A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity in mammalian cells comprising reducing NF–κB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells.

Five dependent claims have also been asserted to be infringed in this litigation. Claims 70, 71 and 72, are directed to "the method of claim 6, carried out on" mammalian, human and immune cells, respectively. Claims 183 and 184 are directed to "the method of claim 18, carried out on" human and immune cells, respectively.

To understand and properly define the limits of the claimed inventions, it is first necessary to understand the process of gene expression, and the role of NF–κB as a transcription factor and mediator of inducible gene expression. The following section, adapted from ¶¶ 15-33 of the opening report of ARIAD's expert on claim construction and other subjects, Dr. Jeffrey V. Ravetch (Greenwald Decl. Ex. 26), provides a brief tutorial on gene expression and its regulation by NF–κB.

B. **Scientific Background**

(1) **Cells**

The basic structural unit of living organisms is the cell. Traditionally, biologists have divided cells into two classes — procaryotic and eucaryotic — defined by whether the cell contains a nucleus. Eucaryotic cells have a nucleus, which encapsulates chromosomes containing DNA and segregates those chromosomes from the surrounding cytoplasm. In contrast, procaryotic cells lack a nucleus. Eucaryotes includes all plants, fungi (such as yeast) and animals, including humans. Procaryotes comprise most bacteria.

Cells, like the organisms they comprise, are able to respond to changes in their environment, such as bacterial infection or inflammation. One way that cells respond to stimulation is by altering gene expression – the process by which proteins are constructed from the blueprints contained in a cell's DNA – to increase or decrease the production of the proteins encoded by those genes.

### (2)    Genetic Material

DNA is a macromolecule made up of a long polymeric strand of "nucleotides" that are complexed with a complementary strand of nucleotides. The four nucleotides found in DNA are adenosine ("A"), guanosine ("G"), cytidine ("C"), and thymidine ("T"). In DNA, A always forms a complementary base pair with T, and G with C. A series of nucleotides — *e.g.*, CTCCGATATC — is referred to as a "sequence." When a strand of DNA arranged in a sequence associates with a strand having a complementary sequence, it naturally forms a distinctive, double helix structure, regardless of the sequence of nucleotides on each strand.

The fundamental functional unit of DNA is the "gene," the sequence of DNA necessary to permit synthesis of a particular protein. Proteins are polymeric chains of amino acids, of which there are approximately twenty different types. Genes consist of a region that directs the construction of the protein and a region that regulates this function. As outlined below, the expression of a gene to form a protein involves a complex series of steps describing two general processes:  transcription and translation.

### (3)    Gene Expression

Gene expression is the process by which a cell synthesizes proteins from information encoded in its DNA. Transcription is the first step of gene expression. During transcription, the genetic information in DNA encoding the amino acid sequence

of a particular protein is converted by the enzyme "RNA polymerase" into a complementary strand of "messenger RNA" ("mRNA"), a single-stranded nucleotide polymer similar to DNA. After the DNA sequence encoding a particular protein has been transcribed into its complementary mRNA equivalent, the mRNA travels out of the nucleus to a cytoplasmic organelle known as a ribosome, where the mRNA strand provides a blueprint for the synthesis of the protein by the ribosome.

The second step of gene expression — translation — occurs in the ribosome, where cellular machinery assembles chains of amino acids to create different proteins according to the sequence data originally stored in the gene. As discussed in more detail below, gene expression is modulated in eucaryotic cells by "transcription factors," of which NF–κB is an example.

### (4)    Signal Transduction

A fundamental question of biology is how information about conditions outside a cell can trigger changes within the cell, including, most fundamentally, changes in gene expression. As elucidated over the past fifty years in hundreds of different cellular pathways, the process of "signal transduction" involves the following general elements: (i) the binding of an extracellular molecule to a "receptor," followed by (ii) a cascade of intracellular reactions that (iii) culminate in targeted expression or inhibition of particular genes.

Cell surface receptors are proteins embedded within the cell membrane that bind to specific extracellular substances, called ligands. Examples of naturally-occurring ligands include hormones, neurotransmitters, cytokines, growth factors and antigens. When a ligand binds to its receptor, it triggers a response within the cell that results in a change in the cell's function. Observable cellular responses that can be

triggered by signal transduction include mitosis (cell division), apoptosis (cell death), and changes in cellular metabolism, structure or appearance.

A characteristic of signal transduction is a long and complex cascade of "downstream signaling" reactions that occur between binding of a ligand to a receptor and ultimate gene expression. "Transcription factors" are important intermediaries (or "messengers") in this cascade. Transcription factors are proteins that bind to certain "recognition sequences" in DNA that are generally distinct from the site at which the gene's protein coding sequence begins. Through that binding to the recognition sequence, transcription factors affect the expression or inhibition of genes. Transcription factors can either promote or inhibit the expression of certain genes, and are believed to do so by, among other things, facilitating the initiation of gene transcription by enzymes involved in that process, such as RNA polymerase. Abnormalities in transcription factor activity (*i.e.*, too much or too little activity) can manifest themselves in the form of disease.

(5)    **NF–κB**

NF–κB was originally identified as part of a search for transcription factors controlling expression of genes for the kappa immunoglobulin light chain, a portion of an antibody molecule that is responsible for recognition of foreign molecules ("antigens").[4] The name "Nuclear Factor kappa B" reflects the role that it plays in the expression of the kappa immunoglobulin light chain, and the fact that NF–κB was originally identified in B lymphocytes. Subsequent work, however, showed

---

[4] '516 Patent at 2:20-25.

unexpectedly that NF–κB is present in most eucaryotic cells, and that its function is not limited to the regulation of kappa light chain gene expression.

Today, NF–κB is one of the most widely studied eucaryotic transcription factors. NF–κB has been shown to control expression of a wide variety of genes in several physiological contexts. For example, NF–κB is involved in the regulation of the cellular response to stress or damage, including the inflammatory/immune response. NF–κB also performs several functions in the nervous system, and also plays roles in embryonic development.

Experimental work conducted during the 1980s by scientists in the MIT laboratories of David Baltimore and Phillip Sharp (both of whom won the Nobel Prize), and in the Harvard laboratory of Thomas Maniatis, and disclosed in the specification of the '516 Patent, showed that NF–κB was constitutively (*i.e.*, in a normal, uninduced cell) present in cytoplasm, where it is bound to other proteins referred to as "IκB" proteins because of their role in inhibiting NF–κB. That NF–κB was present constitutively in the cytoplasm in an inactive form, rather than within the nucleus, was itself a striking discovery. Most previously-characterized transcription factors were constitutively present in the nucleus. It was further discovered that in response to an extracellular signal, such as the binding of a ligand to its receptor, a signaling cascade occurred that led to the phosphorylation (*i.e.*, addition of a phosphate group to the side chain of certain amino acids) of IκB by IκB "kinases" ("IKKs"), and the subsequent degradation of that phosphorylated IκB. Phosphorylation and degradation of IκB lead to the release of NF–κB from its complex with that inhibitor molecule. Upon release, NF–κB travels to the nucleus, where it binds to exposed NF–κB DNA "recognition sequences": specific

10-nucleotide sequences that have affinity for NF–κB proteins. Phosphorylation of NF–κB also occurs, and is important to its activity.

There are many inducers of NF–κB activity, including growth factors, bacterial and viral proteins, and, importantly in this context, cytokines. Cytokines are soluble proteins cells secrete as a means of sending "signals" to other cells. One of the most widely studied cytokine inducers of NF–κB activity is "tumor necrosis factor-alpha," or "TNF–α." TNF–α is a cytokine secreted by several different types of cells: primarily by immune cells, such as macrophages, monocytes (which mature into macrophages) and mast cells, as well as by lymphoid cells (*e.g.*, B and T lymphocytes), and keratinocytes. Originally identified as a factor that was toxic to tumor cells (hence its name), TNF–α is now known to have a large number of physiological roles, including effects on metabolism, antiviral effects and growth regulation. But perhaps its most important role is in the mediation of the immune and inflammatory response. TNF–α acts as the "primary trigger for the inflammatory response by promoting the synthesis of other proinflammatory cytokines."[5] TNF–α is among the first cytokines secreted by activated macrophages, one of the cells responsible for mounting an immune response. The effects of TNF–α on immune cells such as macrophages are not just chemical, but visible. Immune cells that have been exposed to ("induced by") TNF–α have a distinctive physical appearance compared to those that have not been induced.

Consistent with general principles of signal transduction and with what is known about the NF–κB pathway, the binding of TNF–α to its specific cell surface

---

[5] Seth R. Stevens & Ting H. Chang, *History of Development of TNF Inhibitors*, in Jeffrey M. Weinberg *et al.*, eds., TNF–αlpha Inhibitors, at 9 (2006).

receptor causes a cascade of reactions that includes the phosphorylation of IκB and the subsequent translocation of NF–κB to the nucleus, where NF–κB then mediates the expression of certain genes. Those genes include the gene for TNF–α itself, as well as the genes for other cytokines. Hence, if not inhibited, TNF–α–induced activation of NF–κB can lead to amplification of levels of TNF–α itself, as well as enhanced expression and secretion of other cytokines involved in the immune/inflammatory response, such as interleukin ("IL")-1, IL-2, IL-6, IL-8, granulocyte-macrophage colony stimulating factor, transforming growth factor, and interferon-gamma. TNF–α also stimulates the appearance of greater numbers of TNF–α receptors on certain cell surfaces, which further amplifies the effects of circulating TNF–α.

### (6)    Role of NF–κB Activity in Inflammatory Diseases

As noted, one of the many important functions of NF–κB is the regulation of the inflammatory/immune response. The process of inflammation results from the combined effects of several different cells and chemicals, most of which are directed toward the recruitment of immune cells to an area of infection. The immune response is generally divided into two broad components: the "innate" response and the "adaptive" response. The innate response is characterized by the activation of cells such as granulocytes, macrophages, mast cells, NK cells and dendritic cells. It is not specific for a particular antigen nor does it display memory of prior encounters. The innate response involves the release of potent inflammatory molecules, such as cytokines, that facilitate the clearance of the invading pathogen. It does so by increasing vascular permeability and recruiting other inflammatory cells to the site of a microbial insult. It is an essential aspect of the immune response, protecting the organism in the first hours and days after an infectious insult. It also serves the key function of priming the

11

immune system to mount an adaptive response. The adaptive response is mediated by cells such as B cells and T cells, displays exquisite specificity for particular antigens, and retains a memory of each prior exposure to an antigen.

Inflammation is a natural, beneficial and, indeed, essential process. For example, the movement of plasma fluid into inflamed tissue carries antibodies to the sites of infections and the antibodies participate in the organism's immune response to the infections. However, inflammation can also characterize abnormal, disease states. Abnormal inflammation is the hallmark of "autoimmune diseases," diseases in which the immune system mistakenly recognizes an organism's own cells as foreign invaders. Rheumatoid arthritis, systemic lupus erythematosis and Crohn's disease are examples of diseases characterized in whole or in part by a distorted/exacerbated autoimmune inflammatory response.

NF–κB is a critical player in the inflammatory response in both healthy and diseased organisms. NF–κB both is activated by and stimulates production of cytokines, such as TNF–α. And the specific roles of excessive TNF–α activity and concomitantly, excessive NF–κB activity, in rheumatoid arthritis, psoriasis and psoriatic arthritis, a form of arthritis that afflicts a substantial proportion of psoriasis sufferers, have been well-established. High levels of TNF–α are expressed in arthritic serum and synovial fluid, where they exacerbate inflammation. High levels of TNF–α are also present in psoriatic tissue, where they cause proliferation of keratinocytes.

Studies have shown high levels of activated NF–κB in cells from rheumatoid arthritis sufferers. (Greenwald Decl. Ex. 26 ¶ 32; *see also* Greenwald Decl. Ex. 38.) And research funded by Amgen has shown that psoriatic keratinocytes have much higher levels of nuclear — *i.e.*, active — NF–κB than do normal, nonlesional

keratinocytes, thereby confirming the role of excess NF–κB activity in psoriasis.

(Greenwald Decl. Ex. 26 ¶ 32; *see also* Greenwald Decl. Ex. 2.)

Conversely, studies have shown that agents that inhibit the activity of

NF–κB specifically can mitigate the symptoms of arthritis and psoriasis. For example, in

1998, researchers showed that, in an experimental animal model of arthritis, injection

into rat joints of DNA "decoy" molecules replicating the NF–κB recognition sequence

inhibited the progression of a form of arthritis (adjuvant-induced arthritis) used as a

model for human rheumatoid arthritis. (Greenwald Decl. Ex. 26 ¶ 33; *see also*,

Greenwald Decl. Ex. 34.) Similarly, compounds that inhibit IKKs — the enzymes that,

by phosphorylating IκB, permit release of NF–κB from its complex with IκB and the

subsequent translocation of NF–κB to the nucleus — have been shown in animal models

to reduce joint inflammation. (Greenwald Decl. Ex. 26 ¶ 33; *see also* Greenwald Decl. Ex.

36.) For this and other reasons, NF–κB has been hailed as a "master switch" in the

control of the cytokines and other compounds implicated in rheumatoid arthritis.

## III.   Argument

### A.   Legal Standards

Claim construction — determining the scope or meaning of the claims of

a patent by interpreting their disputed terms — is a matter of law. *Markman v. Westview

Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, courts "look first to the intrinsic

evidence of record," that is, the claims, the specification and the prosecution history of

the patent. *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir.

2001) (citation omitted). "Such intrinsic evidence is the most significant source of the

legally operative meaning of disputed claim language." *Id.* Generally, claim terms

should be construed according to their "ordinary and customary meaning," from the perspective of a person of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc). Here, the parties are generally in agreement regarding the qualifications and experience of a person of ordinary skill in the art relevant to the claims of the '516 Patent. ARIAD has defined a person of ordinary skill in the art as "a scientist with a Ph.D. in chemistry, biology, or related field, or a degree in medicine and having at least three years of post-doctoral laboratory training or other laboratory experience related to molecular biology and gene regulation." (Greenwald Decl. Ex. 26 ¶ 36.) Amgen's definition differs by, at most, one year of post-doctoral laboratory experience, which Amgen's own expert agrees is not material. (*See* Greenwald Decl. Ex. 14 at 5; *and* Greenwald Decl. Ex. 30 at 202:5-17.)

        In interpreting the intrinsic evidence, courts look first to the language of the claims themselves, which "define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312. The context in which a particular term is used in the asserted claims, or in other claims in which it appears, can be "highly instructive" as to the meaning of the term. *Id.* at 1315. The first clause of a patent claim, called its preamble, "limits the claimed invention if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) (internal punctuation and citation omitted). For example, if the body of a claim contains limitations that "rely upon and derive antecedent basis from" terms found in the preamble, then the preamble is properly interpreted to limit the scope of the claimed invention. *Id.*

        The terms of a claim are not read in isolation. *Phillips*, 415 F.3d at 1313. Rather, they must be defined as a person of ordinary skill in the art would understand

them in the context of the claims themselves, and in the context of the patent as a whole. *Id.* at 1313, 1321. In other words, claim terms must be read "in view of the specification." *Id.* at 1315. Indeed, reference to the specification is usually dispositive: "it is the single best guide to the meaning of a disputed term." *Id.* In addition to providing context for the meaning of particular claim terms, "the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance . . . the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Id.* at 1316.

If the meaning of a particular claim term remains ambiguous after analysis of the specification and the language of the claims, it is appropriate for a court to consider the "complete record of the proceedings before the [Patent and Trademark Office]," *i.e.* the patent prosecution history. *Phillips*, 415 F.3d at 1317. The "ongoing negotiation between the PTO and the applicant" embodied in the prosecution history, although "it often lacks the clarity of the specification and . . . is less useful for claim construction purposes," can inform the meaning of claim terms by demonstrating the inventor's understanding of the claimed invention. *Id.* For example, the prosecution history may reveal that "the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In the rare instances in which the proper construction of a claim is not clear after consideration of intrinsic evidence, the court may properly refer to "extrinsic evidence," such as expert testimony, inventor testimony, learned treatises and other sources. *Phillips*, 415 F.3d at 1317-18.

###### B.     Construction of "NF–κB," "NF–κB Activity" and Related Terms

After discovering NF–κB and its role as a transcription factor that acts as a mediator of inducible gene expression, the inventors developed artificial methods of influencing that activity — *i.e.* reducing it — that are the subject of the asserted claims. To understand and properly define the limits of the claimed inventions, it is first necessary to understand the terms "NF–κB" and "NF–κB activity," which appear in all of the asserted claims. Although the parties' definitions appear very different, there are, in fact, many points of agreement. For example, the parties agree that NF–κB is a protein that functions as an intracellular messenger by (a) dissociating from its natural inhibitor IκB; (b) translocating into the nucleus of the cell; and (c) binding to specific DNA recognition sequences. As explained below, however, the definitions proffered by Amgen are unduly narrow in several respects.

As the term is used in the '516 Patent, NF–κB is a DNA-binding protein found in many eucaryotic cells that acts as an "intracellular transducer of a variety of external influences."[6] The specification teaches that the NF–κB protein is constitutively present in the cytoplasm of unstimulated cells as part of an inactive complex, bound to its natural inhibitor IκB.[7] While bound to IκB, NF–κB cannot translocate to the nucleus, cannot bind to DNA and thus cannot mediate transcription.[8] When a cell is stimulated, such as by the binding of TNF–α to its cell surface receptor, NF–κB is released from its

---

[6] '516 Patent at 17:45-47.

[7] '516 Patent at 2:46-63, 10:46-54, 12:25-35, 26:63-27:8.

[8] '516 Patent at 16:22-24, 31:11-14.

16

complex with IκB.[9]  Once free, NF–κB translocates from the cytoplasm to the nucleus of

the cell.[10]  There, NF–κB mediates the transcription of certain genes by binding to

specific DNA recognition sequences, such as those listed in Table 2 of the '516 Patent.[11]

Accordingly, as the term is used in the patent, NF–κB is properly defined as follows:

| Term | ARIAD's Proposed Construction |
|---|---|
| NF–κB | A DNA-binding protein factor found in many eucaryotic cells that: (a) is constitutively present in the cytoplasm of unstimulated cells as an inactive complex, bound to inhibitory IκB proteins; (b) upon dissociation from IκB, translocates to the nucleus of the cell; and (c) once in the nucleus, mediates the transcription of certain genes by binding to specific DNA recognition sequences in those genes. |

Amgen's purely functional — and circular — definition of NF–κB as "a

protein having each NF–κB activity" is inappropriately narrow and incomplete in

several respects.  Significantly, it fails to note that NF–κB is constitutively present in the

cytoplasm of unstimulated cells as an inactive complex, bound to inhibitory IκB proteins

– an undisputed fact that is critical both to NF–κB's function as a mediator of inducible

gene expression, and to proper construction of the asserted claims.  Amgen's proposed

definition also inappropriately attempts to limit the definition of NF–κB to proteins that

bind to the sequences listed in Table 2 of the '516 Patent.  However, the specification

notes that Table 2 contains only sequences that were then-known, *or predicted*, to contain

NF–κB binding domains as of the time that the '436 application was filed, and that

certain predicted recognition sequences had not yet been proven by binding assays.[12]

---

[9] '516 Patent at 15:12-14, 17:30-33, 17:47-50, 30:42-31:56.

[10] '516 Patent at  10:46-54, 17:51-52, 30:52-53.

[11] '516 Patent at 35:54-55, 37:1-42.

[12] '516 Patent at 37:34-37.

The specification also discloses that the proposed consensus sequence "ignore[s] one deviant."[13]  Because the specification makes clear that Table 2 contains predicted sequences, and a consensus sequence that may be incomplete, and does not purport to be an exhaustive list, it is clear that the inventors did not intend the definition of NF–κB to be limited by reference to the sequences that are disclosed for illustrative purposes.

The specification of the '516 Patent describes the role of NF–κB as a mediator of gene expression that is activated in response to external stimuli.[14]  As described in the specification, the pathway by which the "message" of an external stimulus is "transduced within cells through NF–κB activity"[15] consists of five general steps:  (1) occurrence of an external stimulus, such as the binding of an agonist to its receptor on the cell surface;[16] (2) dissociation of the NF–κB:IκB complex;[17] (3) translocation of NF–κB;[18] (4) the binding of NF–κB to its DNA recognition sequences;[19] and (5) expression of the gene mediated by NF–κB.[20]  The cascade of signaling that occurs along this pathway is what is collectively referred to in the claims as "NF–κB

---

[13] '516 Patent at 37:40-42.

[14] '516 Patent at 2:36-40, 3:59-64, 10:41-50, 12:36-41, 15:12-14, 17:45-50, 30:42-31:56.

[15] '516 Patent at 3:59-64.

[16] '516 Patent at 2:36-40, 3:59-64, 10:41-50, 12:36-41, 17:45-47.

[17] '516 Patent at 2:54-63, 10:52-54, 12:25-35, 15:12-14, 16:24-26.

[18] '516 Patent at 2:54-63, 10:52-54, 12:32-35, 27:5-7.

[19] '516 Patent at 4:5-15, 35:42-49, 35:55-58, 37:43-38:22.

[20] '516 Patent at 4:12-23, 16:26-28, 35:45-49, 37:43-38:22.

activity."[21]  Signaling along the intracellular portion of this pathway (*i.e.* steps 2 through 5) is referred to in the claims as "NF–κB–mediated intracellular signaling."

In quiescent cells, in the absence of inducing stimuli, there is no signaling along this pathway, thus no NF–κB activity and no NF–κB–mediated intracellular signaling.[22]  Once NF–κB activity has been induced, the cell is in an activated state.  The inventors on the '516 Patent determined that, by interfering with *any* step along the activated NF–κB pathway, one could impede NF–κB's "ability to act as an intracellular messenger," and thereby reduce the expression of genes mediated by NF–κB.[23]  The specification discloses several ways to limit the ability of NF–κB to act as an intracellular messenger (*i.e.*, its potential function to act as an intracellular messenger in response to external stimuli).  Decoy molecules and dominantly interfering molecules interfere with the fourth step of the pathway, the binding of NF–κB to its DNA recognition sequences.[24]  Methods based on introducing excess IκB into a cell interfere with the third step of the NF–κB pathway, the translocation of NF–κB molecules to the nucleus.[25]  Antagonists can act on any step of the pathway, including the first.  Each of these methods disrupts signaling along the NF–κB pathway and reduces the ability of NF–κB to act as an intracellular messenger and mediator of gene expression.  Inhibition of any one step along the pathway will cause a reduction of signaling along the downstream

---

[21] '516 Patent at 3:59-4:4.

[22] '516 Patent at 15:62-66, 70:53-56, 72:44-73:6, 73:7-56.

[23] '516 Patent at 32:19-23.

[24] '516 Patent at 37:50-54, 37:64-38:22.

[25] '516 Patent at 32:19-23, 37:55-63.

steps of the pathway, which is a reduction of NF–κB activity.  (*See* Greenwald Decl. Ex. 28 ¶ 11.)  Thus, the specification of the '516 Patent teaches that the reduction of NF–κB activity can be accomplished by inhibiting any step along the pathway.

Ignoring the specification's teaching of the role of NF–κB as a transducer of extracellular signals, Amgen proposes a definition of NF–κB activity that is restricted to three discrete, intracellular steps along the NF–κB pathway.  That Amgen's definition erroneously narrows the scope of the term "NF–κB activity" is immediately apparent when that definition is considered together with Amgen's proposed definition for "NF–κB–mediated intracellular signaling."  Amgen defines the latter as "molecular interactions within cells, effected by, or conveyed through NF–κB."  (Greenwald Decl. Ex. 27 at 11.)  However, based on that definition a person of ordinary skill in the art would understand the phrase "molecular interactions within cells, effected by, or conveyed through NF–κB" to be limited to the same three steps of the NF–κB pathway that Amgen suggests delimit the scope of "NF–κB activity."  (Greenwald Decl. Ex. 28 ¶ 12.)  In other words, Amgen's definitions entirely conflate the terms "NF–κB–mediated intracellular signaling" and "NF–κB activity."  Applying these coextensive definitions, Amgen would appear to argue that claim 6 means:  *a method for reducing induced NF–κB activity comprising reducing NF–κB activity such that NF–κB activity is reduced*.  Amgen's construction would render the claim meaningless.

To avoid that result, it is necessary, and more natural, to read "NF–κB–mediated intracellular signaling" to refer only to the intracellular steps of the NF–κB signal transduction pathway, and "NF–κB activity" to refer more broadly to NF–κB's ability to act as an intracellular messenger that regulates the transcription of particular genes, *i.e.* signaling that occurs along the steps of the NF–κB signaling pathway:

| Term | ARIAD's Proposed Construction |
|------|-------------------------------|
| NF–κB Activity | The ability of NF–κB to act as an intracellular messenger that regulates transcription of particular genes. |
| NF–κB–mediated intracellular signaling | The intracellular steps of the NF-κB signal transduction pathway. |

The faulty premise of Amgen's definition of "NF–κB activity," which refers only to the three intermediate steps of the NF–κB pathway that specifically involve molecules of NF–κB (*i.e.*, dissociation of NF–κB:IκB complexes, translocation of NF–κB to the nucleus and binding of NF–κB to DNA), is clear when that definition is considered alongside the construction Amgen proposes for "Tumor Necrosis Factor–α activity." If, as Amgen's definition implies, the "activity" of a molecule is limited to molecular reactions involving that molecule, and does not encompass upstream or downstream signaling events, then the phrase "Tumor Necrosis factor–α activity" in the preamble of claim 18 must necessarily encompass the binding of TNF–α to its cell surface receptor, and exclude any intracellular events (because TNF–α does not enter the cell). However, if "Tumor Necrosis Factor–α activity" is limited to the binding of TNF–α to its receptor, then the purpose[26] of "reducing . . . Tumor Necrosis Factor–α activity" could never be accomplished by "reducing NF–κB activity . . . so as to reduce intracellular signaling caused by Interleukin–1 or Tumor Necrosis Factor–α," as Amgen has defined those terms. That is because neither the reduction of the intermediate steps of the NF–κB pathway, nor the resultant reduction of "intracellular signaling caused by TNF–α" will accomplish the purpose of reducing the binding of TNF–α to its receptor.

---

[26] Amgen agrees that if the preamble of claim 18 does not limit its scope, then it is properly interpreted as the "stated purpose" for which the claimed method is to be practiced. (Greenwald Decl. Ex. 27 at 15; *see also* 4/8/2008 Claim Construction Chart (D.I. 571).)

To escape the necessary (but absurd) conclusion of its construction, Amgen asks this Court to ignore the preamble of 18, or in the alternative, to construe the term "Tumor Necrosis Factor-α activity" broadly to include downstream, intracellular signaling caused by TNF-α.  However, Amgen's proposed construction includes conflicting constructions of the term "activity."  Amgen defines the "activity" of a molecule narrowly in the body of the claim, limited to molecular interactions that specifically involve NF-κB, and broadly in the preamble of the claim, encompassing downstream signaling events that do not directly involve TNF-α.  Such a construction, which proposes that each occurrence of the term "activity" be defined differently, violates the fundamental principle of claim construction that a term must be defined uniformly throughout a single claim.[27]

Neither Amgen's proposed construction, with both narrow and broad definitions of "activity," nor a consistently narrow definition of "activity" can be reconciled with the language of claim 18.  As explained above, the former violates a fundamental precept of claim construction jurisprudence, while the latter produces a nonsensical claim that cannot be practiced.  Only ARIAD's construction is workable, because it accords the term "activity [of a molecule]" a consistent definition that includes signaling events that do not directly involve that molecule.

---

[27] "Unless the patent otherwise provides, a claim term cannot be given a different meaning in various claims of the same patent."  *Georgia-Pacific Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1331 (Fed. Cir. 1999).  *A fortiori*, the same term cannot receive different meanings within a single claim.

C.    **The Asserted Claims Encompass Intracellular and Extracellular Methods of Reducing NF–κB Activity in Cells.**

A significant respect in which the parties' proposed claim constructions differ is with respect to the limitation "reducing NF-kB activity in cells." This limitation appears in claim 6 and in nearly identical form ('reducing NF-kB activity in *the* cells") in claim 18. On one level, the difference is syntactic: it turns upon whether one reads the prepositional phrase "*in* cells"[28] to modify, as Amgen contends, the act of "*reducing*,"[29] or, instead, as ARIAD contends, the "*NF-kB activity*" that is reduced.

| Term | ARIAD's Proposed Construction | Amgen's Proposed Construction |
|---|---|---|
| **Reducing NF–κB activity in cells**<br><br>Claims 6, 70-72 | "Decreasing NF–κB activity that exists in cells in which NF–κB is present by inhibiting any step along the NF–κB signal transduction pathway, in such a manner that the activity differs from the naturally occurring activity of NF-κB under the same conditions, *without regard to the situs of the inhibiting agent.*" | "Taking action inside cells to directly inhibit (interfere or block) an NF-κB activity" |
| **Reducing NF–κB activity in the cells**<br><br>Claims 18, 182-83 | "Decreasing NF–κB activity that exists in mammalian cells in which it is present, by inhibiting any step along the NF–κB signal transduction pathway, in such a manner that the activity differs from the naturally occurring activity of NF–κB under the same conditions, *without regard to the situs of the inhibiting agent.*" | "Taking action inside the cells to directly inhibit (interfere or block) an NF–κB activity." In claim 18, "the cells" are "mammalian cells" |

[28] As noted, the parties do not dispute that the term "cells" refers to "intact cells, whether in cell culture or in living tissue (including in an organism), as opposed to cell extracts" (*i.e.*, the cytosolic or nuclear fractions of lysed cells).

[29] Amgen seeks to limit the scope of claims 6 and 18 to intracellular methods of reducing NF–κB activity that require "taking action *inside cells* to *directly* inhibit (interfere or block)" one of three particular steps of the NF–κB pathway: (a) the release of NF–κB from its complex with IκB, (b) the translocation of NF–κB to the nucleus, or (c) the binding of NF–κB to its DNA recognition sequence. (Greenwald Decl. Ex. 27 at 8; 4/8/2008 Claim Construction Chart (D.I. 571).)

But beneath the surface of this syntactic dispute lies a highly substantive dispute over whether the administration of drugs, such as Enbrel, that, so far as is presently known, reduce NF-kB activity without entering cells, are among the methods covered by the asserted claims.[30]  As argued below, even if basic principles of English usage did not compel the construction ARIAD proposes — under which the asserted claims are infringed so long as "NF-kB activity in cells" is reduced, regardless of where the reducing agent is located — a review of the '516 Patent and of the scientific discoveries it describes, militates strongly in favor of that construction.

The asserted claims of the '516 Patent are directed to various artificial methods of intervening in the processes that constitute the NF–κB pathway as a means of reducing NF–κB activity that has been induced in cells.  Although certain claims of the '516 Patent are directed towards methods of intervening at specific intracellular steps along the NF–κB pathway,[31] none of the asserted claims is so limited.  Rather, because claims 6 and 18, and their associated dependent claims, relate directly to "reducing NF–κB activity" without reference to the situs — inside or outside the cell — of the reducing agent, the methods of the asserted claims can be practiced by impeding any step along the NF–κB pathway.[32]  Indeed, impeding any one step will necessarily result in a

---

[30] Enbrel's mechanism of action is incompletely understood and the possibility that it acts intracellularly cannot be ruled out.  (Greenwald Decl. Ex. 32 at 301:16-303:23.)

[31] See, e.g., '516 Patent claims 31 ("wherein NF–κB activity is reduced by decreasing the level of NF–κB not bound in an NF–κB:IκB complex"), 32 (". . . by inhibiting the passage of NF–κB into the nucleus of cells"), 33 (". . . by inhibiting modification of an IκB protein"), 34 (". . . by inhibiting degradation of an IκB protein"), and 35 ("…by inhibiting dissociation of the NF–κB:IκB complexes").  Each of these methods requires interference with specific steps, or their antecedent steps, along the NF–κB signaling pathway.

[32] '516 Patent at 3:59-64, 16:22-35.

reduction of signaling along the subsequent, or downstream, steps of the NF–κB pathway — *i.e.*, a reduction of NF–κB activity.

Even if one knew nothing of cell biology, the reading ARIAD proposes would be the more natural. The phrase "in cells" appears immediately following the term, "NF-kB activity." Accordingly, it is appropriate to read the former phrase to modify the latter, immediately proximate term, "activity," rather than the distal term, "reducing."[33] This is not simply grammatical pedantism. If one transposes the formulations that appear in claims 6 and 18 into more everyday contexts, it is readily apparent that methods of reducing characteristics of a system "in" that system, encompass methods that involve the application of forces/agents both within and outside the system. For example, and as Amgen's claim construction expert, Randolph Wall, readily acknowledged at his deposition:

- a method of "reduc[ing] the temperature of a liquid in a glass bottle" can be practiced both by placing ice in the bottle or by putting the bottle in a bucket of ice. (Greenwald Decl. Ex. 30 at 152:14-24.)

- a method of reducing the segregation of two powders "in a jar" can be practiced both by stirring the mixtures or by shaking the jar. (*Id.* at 152:25-153:6.)

- a method of "reduc[ing] the swelling in a sprained ankle" can be practiced both by ingesting a drug that enters inflamed cells, like aspirin, or by the external application of a cold press. (*Id.* at 154:14-155:3.)

---

[33] *See, e.g.*, William Strunk and E.B. White, The Elements of Style, 28 (3d ed. 1979) ("[Rule] 20. Keep related word together. The position of words in a sentence is the principal means of showing their relationship. Confusion and ambiguity result when words are badly placed. The writer must, therefore, bring together the words and group of words that are related in thought and keep apart those that are not so related.").

These admittedly homespun examples demonstrate that methods of "reducing 'X' in 'Y'" are naturally understood to refer to methods that take place both inside and outside the physical boundaries of "Y," whatever "Y" may be.

But ARIAD does not rely solely upon syntactic context to support its reading; the limitation's scientific context, as revealed by the specification, also rejects Amgen's unnaturally narrow reading of "reducing NF-kB activity in cells." Effectively, Amgen seeks to read into the claims a limitation that the agent capable of reducing NF–κB activity (a "reducing agent") must enter and act "in cells." However, none of the asserted claims refers to a specific reducing agent, let alone disclaims agents that act by inhibiting the binding of cytokines to cell surface receptors. Each of the asserted claims is directed to methods of reducing NF–κB activity that encompass the use of several different types of inhibitors, some of which act within the cell (*e.g.*, decoy molecules, dominantly interfering molecules, IκB-like molecules), and some of which do not (*e.g.*, "antagonists," which include, antibodies and other cytokine antagonists like Enbrel). (*See* Greenwald Decl. Ex. 29 ¶¶ 13-16.) Because the claims do not refer to specific inhibiting agents, "in cells" cannot refer to the location of the inhibiting agent to be used in the claimed method. Rather, it simply instructs that the activity being reduced should be reduced in intact cells, such as living tissue from an organism or cells in culture.

In other words, "in cells" merely defines the biological system in which the claims are to be carried out. Claim 6, the broadest of the asserted claims, is directed to a method for "reducing NF–κB activity in cells," which can be practiced on cells that are capable of exhibiting NF–κB activity. Claim 70, which depends on claim 6, is directed to "the method of claim 6, carried out on mammalian cells." Thus, Claim 70 is directed to a method for "reducing NF–κB activity in [mammalian] cells," which can be

practiced in all mammalian cells that are capable of exhibiting NF-κB activity.  Similarly, claims 71 (human cells) and 72 (immune cells) are limited to increasingly narrow subsets of cell types that contain NF-κB.  In light of these dependent claims, which are directed to increasingly narrow classes of cell types by referencing particular types of cells within which the reduction of NF-κB activity is to occur, it is apparent that the limitation "in cells" limits the biological systems in which the claims are to be practiced and does not, as Amgen contends, refer to the location of an unspecified reducing agent.

The limitation also plays an important role in defining the scope of Claim 18 and its dependent claims, and, again, one quite different from the role Amgen would ascribe to it.  Claim 18 is drawn broadly to encompass methods of reducing NF-κB activity in mammalian cells.  In claim 18, the phrase "in mammalian cells" appears in the preamble, modifying "Interleukin-1 or Tumor Necrosis Factor-α activity."  The phrase "in the cells" appears twice in the body of claim 18.  In each instance, the definite article "the" is a reference back to the mammalian cells described in the preamble of claim 18. Because each occurrence of the phrase "in the cells" in claim 18 "rel[ies] on and derive[s] antecedent basis from" the phrase "in mammalian cells" in the preamble, the preamble is properly understood to limit the claim's scope.  *See Eaton Corp.*, 323 F.3d at 1339. Thus, the phrase "reducing NF-κB activity in the cells" means reducing NF-κB activity in intact mammalian cells, whether in a living mammal or in cell culture derived from mammalian cells.  As with claim 6, the phrase merely defines the biological system in which the claims may be practiced, as further evinced by dependent claims 183 (human cells) and 184 (immune cells) which can be practiced in increasingly narrow subsets of cells.

Amgen also argues that the examples of inhibiting agents disclosed in the specification limit the scope of the claims. (Greenwald Decl. Ex. 27 at 9-10.) Specifically, Amgen argues that because decoy molecules, dominantly interfering molecules, and IκB and IκB-like molecules each reduce NF–κB activity by directly interfering with intracellular steps of the NF–κB pathway, the asserted claims should be limited to methods that inhibit those particular intracellular steps of the NF–κB pathway. That argument is in direct conflict with the Federal Circuit's frequent admonition that, absent an express disavowal of claim scope, limitations should not be imported from the specification to the claims. *See, e.g., Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1326-27 (Fed. Cir. 2002). Even when only one embodiment of the invention is disclosed in the specification, the claim terms are not limited to the disclosed embodiment. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004). Nothing in the language of the claims, the specification or the prosecution history suggests that the asserted claims should be limited to intracellular methods of reducing NF–κB activity.

Even if, as Amgen contends, "in cells" modifies "reducing," that would require only that the intracellular components of NF–κB activity be diminished. As explained above, inhibition of any step of the NF–κB pathway will necessarily result in a reduction of signaling along the subsequent (downstream) steps. In other words, action taken to interfere with the first step of the pathway (the binding of an extracellular ligand to its receptor) will necessarily result in a reduction of intracellular components of NF–κB activity: "reducing" will occur "in cells."

Because Amgen's proposed limitations cannot be supported by the intrinsic evidence, let alone ordinary, intuitive principles of English usage, the term "reducing NF–κB activity" is properly defined to encompass both intracellular and

28

extracellular methods of reducing NF–κB activity in cells.  Therefore the terms "reducing NF–κB activity in cells" (claim 6) and "reducing NF–κB activity in the cells" (claim 18) must be defined without reference to the location (situs) of the agent capable of reducing NF–κB activity.

**D.    The Asserted Claims Require Induction of NF–κB Activity by an External Stimulus Prior to the Application of an Agent Capable of Reducing NF–κB Activity.**

A second important area in which the parties' proposed claim constructions differ concerns whether the asserted claims cover methods of reducing pre-existing NF–κB activity, or whether they extend to the prevention of that activity's initiation ("induction"), as, for example, its induction by a cytokine such as TNF–α.  In the clinical context, the distinction is between treatment, on the one hand, of already diseased cells, those in which a relevant pathophysiological process has already triggered the prior induction of NF–κB activity, or prophylaxis, on the other, in which the goal is to prevent the pathogenic induction of that NF–κB activity in the first place. In the laboratory setting, the distinction turns upon whether the cells whose activated NF–κB levels are being modulated, have already been exposed to an NF–κB activity-inducing agent (such as TNF–α or IL–1), or, instead, are exposed to such an inducing agent only at the same time as, or after, an NF–κB inhibitor is added.

Notwithstanding Amgen's protestations that the treatment/prophylaxis, prior/subsequent induction distinction is "immaterial," "frivolous," or "a moot point," (Greenwald Decl. Ex. 31 at 135:1-135:3, 23:23-25, 118:2-4) — all driven by Amgen's inability to identify a single allegedly anticipating reference in which inhibition of previously induced activity is shown (*see* Greenwald Decl. Ex. 21 at 6-7) — the distinction is highly meaningful.  Methods for preventing the induction of NF–κB

activity may not necessarily be effective in reducing that activity once it is has been induced.[34]  And the reverse is true, as well.  Although Enbrel, for example, has been shown to be effective in the treatment of rheumatoid arthritis and psoriasis, the FDA has not approved Enbrel for the prevention of the onset of those diseases.

ARIAD contends that the asserted claims relate only to "treatment":  *i.e.*, that the asserted claims are infringed only by the reduction of NF–κB activity after it has been induced by an extracellular stimulus.  Accordingly, it has proposed a construction for several important limitations that respects that narrower construction.  By contrast (and, ironically, for an accused infringer), Amgen has proposed a broader construction, one that fails to respect this distinction.

| Term | ARIAD's Proposed Construction | Amgen's Proposed Construction |
|------|-------------------------------|-------------------------------|
| **Diminishing induced NF–κB-mediated intracellular signaling**<br><br>Claims 6, 70-72 | Inhibiting the intracellular steps of the NF–κB signal transduction pathway, *performed after the pathway has been initiated in response to application of a stimulus prior to the performance of the claimed method.* | Amgen believes that this phrase of the preamble is not limiting of the claim. If it is found to be limiting and requiring construction, it should be understood to mean "decreasing any existing molecular interaction within cells effected by, or conveyed through, NF–κB." |
| **Reducing NF–κB activity in cells**<br><br>Claims 6, 70-72 | Decreasing *NF–κB activity that exists* in cells in which NF–κB is present by inhibiting any step along the NF–κB signal transduction pathway, in such a manner that the activity differs from the naturally occurring activity of NF–κB under the same conditions, without regard to the situs of the inhibiting agent. | "taking action inside cells to directly inhibit (interfere or block) an NF–κB activity." |

---

[34] *Compare* Greenwald Decl. Ex. 33 (reporting a study in which monoclonal anti-TNF antibodies were used prophylactically to prevent the onset of septic shock, but noting that "[f]urther experiments are needed to determine whether the administration of [anti-TNF] antibodies during persisting infection or indolent sepsis will be beneficial."), *with* Greenwald Decl. Ex. 37 (summarizing several studies in which anti-TNF antibodies were demonstrated to be ineffective at treating sepsis after the onset of disease).

| [Such that NF–κB-mediated intracellular] signaling is diminished

Claims 6, 70-72 | [Such that NF–κB-mediated] signaling is reduced from an existing induced state to a lower state. | "such that there is a decrease of any molecular interaction within cells effected by, or conveyed through, NF–κB" |
|---|---|---|
| Reducing NF–κB activity in the cells

Claims 18, 183-184 | Decreasing *NF–κB activity that exists* in mammalian cells in which it is present, by inhibiting any step along the NF–κB signal transduction pathway, in such a manner that the activity differs from the naturally occurring activity of NF–κB under the same conditions, without regard to the situs of the inhibiting agent. | "taking action inside the cells to directly inhibit (interfere or block) an NF–κB activity."  In claim 18, "the cells" are "mammalian cells" |
| So as to reduce intracellular signaling *caused by* Interleukin-1 or Tumor Necrosis Factor-α in the cells

Claims 18, 183-184 | So as to inhibit the intracellular steps of the NF–κB signal transduction pathway *induced* by Interleukin-1 or Tumor Necrosis Factor-α *prior to the performance of the claimed method*, applied to the mammalian cells described in the preamble of the claim. | "so as to take action inside cells to directly inhibit (interfere or block) any molecular interaction within cells caused by Interleukin-1 or Tumor Necrosis Factor-α" |

The basis for ARIAD's constructions emerges primarily from the plain, ordinary language of the asserted claims, and derives further support from the specification, particularly its description of the nature of "NF–κB activity," as discussed above.  These intrinsic sources confirm the requirement of the induction of NF–κB activity by an external stimulus, such as a cytokine, *before* the claimed methods can be practiced (the "prior induction requirement").  Any construction that omits the prior induction requirement not only disregards the ordinary meanings of the several claim terms, but also fails to account for the significant biological difference between influencing an

31

activated (and/or diseased) cell and prophylactic treatment of quiescent (and/or healthy) cells.  (Greenwald Decl. Ex. 28 ¶ 14.)

Three different terms found in claim 6 provide support for the prior induction requirement.  Claim 6 states that the claimed invention is a "method for diminishing *induced* NF–κB–mediated intracellular signaling."[35]  As used in claim 6, the word "induced" is a past participle that modifies the term that follows, *i.e.*, "NF–κB–mediated intracellular signaling."  That indicates that the induction of NF–κB-mediated intracellular signaling must take place *before* the claimed method can be performed.  As explained in section III.B above, "NF–κB–mediated intracellular signaling" refers to signaling along the intracellular steps of the NF–κB pathway, a subset of NF–κB activity.  In other words, the limitation "induced NF–κB–mediated intracellular signaling" in the preamble means that NF–κB activity must have been induced in the cells before the method can be practiced.  A contrary construction would violate a fundamental canon of claim construction, by failing to give meaning to the word, "induced."  *See Eaton Corp.*, 323 F.3d at 1339.

Review of the specification confirms that the word, "induced" is not surplusage.  The '516 Patent discloses several extracellular substances, such as the pro-inflammatory cytokines IL-1 and TNF-α, that induce intracellular NF–κB signaling.[36] "Induced" informs a person of ordinary skill in the art that NF–κB–mediated intracellular signaling and NF–κB activity must already exist before the claimed invention can be practiced, and must be the result of that induction, rather than

---

[35] '516 Patent at 82:32-33 (emphasis added).

[36] '516 Patent at 10:48-51, 17:30-33, 17:45-47, 68:34-56.

constitutive activity, as exists in some cell types.[37]   In other words, the terms "reducing"
and "is diminished" found in the body of claim 6 "rely on and derive antecedent basis
from" the term "induced" in the preamble of the claim.  *Eaton Corp.*, 323 F.3d at 1339.
Therefore "induced" is properly considered a limitation of claim 6, and should be given
its ordinary meaning.  *Id.*

   Even if the term "induced" were absent, consideration of the relevant
biology would make plain that such a limitation would have to inhere.  The term
"reducing NF–κB activity" implies that some amount of activity must exist before the
claimed method is practiced.  Similarly, "such that NF–κB–mediated intracellular
signaling is diminished," which also appears in claim 6, implies that some amount of
signaling must exist prior to the performance of the claimed method.  The specification
of the '516 Patent discloses that NF–κB activity and NF–κB–mediated intracellular
signaling do not exist in quiescent cells.[38]  In light of that disclosure, a person of ordinary
skill in the art would understand that the asserted claims could not be practiced on
quiescent cells:  NF–κB activity cannot be "reduc[ed]" in such cells — because there is
nothing to reduce — and, for the same reason, NF–κB–mediated intracellular signaling
cannot be "diminished."  Amgen's expert Dr. Wall conceded as much at his deposition,
stating that NF–κB activity must first exist before NF–κB-mediated intracellular
signaling or NF–κB activity could be diminished.  (Greenwald Decl. Ex. 30 at 150:19-
151:1.)  Therefore the terms "reducing" and "is diminished" in claim 6 limit its scope to

---

[37] The specification discloses that NF–κB is constitutively active in B cells.  '516
Patent at 29:47-48, 31:33-38.

[38] '516 Patent at 15:62-66, 70:53-56, 72:44-73:6, 73:6-56.

methods practiced on activated cells, such as those activated by an extracellular stimulus.

Claim 18, and claims dependent thereon, are also limited to methods practiced upon activated cells. Although the word "induced" does not appear in claim 18, the terms "*reducing* NF–κB activity" (as explained above) and "so as to reduce intracellular signaling *caused by* Interleukin-1 or Tumor Necrosis Factor-α" make plain that the prior induction requirement limits that claim as well. As disclosed in the specification, Tumor Necrosis Factor-α and Interleukin-1 are cytokines — extracellular signaling molecules — that induce NF–κB activity in cells.[39] The past participial phrase "*caused by Interleukin-1 or Tumor Necrosis Factor- a*" modifies "signaling" and thereby indicates that "NF–κB-mediated intracellular signaling" must have been *caused* by Interleukin–1 or Tumor Necrosis Factor–α *before* the claimed method can be practiced. In other words, the method of claim 18 can be performed only upon cells that have already been stimulated by TNF–α or IL-1. (Greenwald Decl. Ex. 26 ¶ 71.) For Amgen's construction to have force, the quoted language would have had to read, by contrast, "caused by *or that would otherwise have been caused by* Interleukin-1 or Tumor Necrosis Factor–α." Claim 18 says no such thing.

Motivated by the absence of prior induction from any reference it alleges to anticipate the asserted claims (Greenwald Decl. Ex. 21 ¶ 16), Amgen proffers constructions that ignore the plain meaning of several claim limitations. First, Amgen argues that the preamble of claim 6 merely states the purpose for which the invention is to be practiced, and therefore does not limit the scope of the claims. As such, Amgen

---

[39] '516 Patent at 17:30-35.

34

contends that it is appropriate to ignore the term "induced" when determining the meaning of claim 6.  However, the word "induced" in the preamble is properly considered a claim limitation because it "is necessary to give life, meaning, and vitality" to the phrases "*reducing* NF–κB activity" and "such that NF–κB–mediated intracellular signaling *is diminished*."  *Eaton Corp.*, 323 F.3d at 1339 (internal quotations omitted).  It indicates that such signaling and activity must exist before the claimed invention can be practiced, and must be the result of stimulation, rather than constitutive activity.  Put another way, the terms "reducing" and "is diminished" found in the body of claim 6 "rely on and derive antecedent basis from" the term "induced."  *Eaton Corp.*, 323 F.3d at 1339.  Therefore "induced" is properly considered a limitation of claim 6, and cannot simply be ignored.

       As if to acknowledge the need to offer some construction of the term, "induced" in claim 6, Amgen attempts to supply one by construing "diminishing induced NF–κB–mediated intracellular signaling" to mean "decreasing any *existing* molecular interaction within cells effected by, or conveyed through, NF–κB."  (4/8/2008 Claim Construction Chart (D.I. 571) (emphasis added).)  But then, after thereby effectively conceding that "induced NF–κB–mediated intracellular signaling" means that the "NF–κB–mediated intracellular signaling" must "exist" such that it can be "diminished," Amgen makes the contradictory argument that claim 6 does not contain a prior induction requirement.  (Greenwald Decl. Ex. 27 at 13-14.)  In other words, Amgen argues that, while the claims require *existing* signaling, they can be practiced *before signaling exists*.  Merely to state that position is to demonstrate why it is not persuasive.

E.    **The Asserted Claims Are Limited to Methods Practiced in Those Cells in Which NF–κB is Present and Capable of Acting as an Intracellular Messenger.**

The asserted claims of the '516 Patent are directed towards the reduction of NF–κB activity, a result that, by definition, can be achieved only in cells that contain NF–κB.  (Greenwald Decl. Ex. 28 ¶¶ 28-29.)  Acknowledging the possibility that NF–κB might not be present in all eucaryotic species,[40] the specification notes that the claimed inventions relate to "method[s] of regulating…the activity of NF–κB in cells *in which it is present and capable of acting as an intracellular messenger*"[41] and "method[s] of regulating or influencing transduction, by NF–κB, of extracellular signals into specific patterns of gene expression and, thus, of regulating NF–κB–mediated gene expression *in the cells and systems in which it occurs*."[42]

In this way, the inventors expressly acknowledged that methods practiced on cells that do not contain NF–κB are not within the scope of the claims.  Such an unequivocal disclaimer of claim scope by the inventor, contained within the specification of the patent, is generally dispositive.  *Phillips*, 415 F.3d at 1316 ("[t]he specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor.  In that instance . . . the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive.").  For

---

[40] '516 Patent at 2:26-31.  The number of eucaryotic species exceeds 7 million.  (Greenwald Decl. Ex. 33.)  It would therefore have been impossible to claim the reduction of NF–κB activity in all eucaryotic species, because it would be impossible to assess whether each species expresses NF–κB.  As revealed by the patent specification, the inventors had ascertained the presence of NF–κB in human, bovine and mouse cells.

[41] '516 Patent at 4:5-8.

[42] '516 Patent at 3:67-4:4.

these reasons, ARIAD has proposed the following constructions for the following

limitations of the asserted claims:

| Term | ARIAD's Proposed Construction |
|---|---|
| **NF–κB** | A DNA-binding protein factor *found in many eucaryotic cells* that: (a) is constitutively present in the cytoplasm of unstimulated cells as an inactive complex, bound to inhibitory IκB proteins; (b) upon dissociation from IκB, translocates to the nucleus of the cell; and (c) once in the nucleus, mediates the transcription of certain genes by binding to specific DNA recognition sequences in those genes. |
| **Reducing NF–κB in cells**<br><br>Claims 6, 70-72 | Decreasing NF–κB activity that exists *in cells in which NF–κB is present* by inhibiting any step along the NF–κB signal transduction pathway, in such a manner that the activity differs from the naturally occurring activity of NF–κB under the same conditions, without regard to the situs of the inhibiting agent. |
| **Reducing NF–κB activity in the cells**<br><br>Claims 18, 182-183 | Decreasing NF–κB activity that exists *in mammalian cells in which it is present*, by inhibiting any step along the NF–κB signal transduction pathway, in such a manner that the activity differs from the naturally occurring activity of NF–κB under the same conditions, without regard to the situs of the inhibiting agent. |
| **Reducing Interleukin-1 or Tumor Necrosis Factor-α activity in mammalian cells**<br><br>Claims 18, 182-183 | Decreasing intracellular NF–κB signal transduction induced by Interleukin-1 or Tumor Necrosis Factor–α that exists in mammalian cells *in which NF–κB is present and capable of acting as an intracellular messenger.* |

In contrast, Amgen contends that because the claims do not specifically

state that they are limited to cells containing NF–κB, they are not so limited.  (Greenwald

Decl. Ex. 27 at 10-11.)  This reading does not make sense.  In cells lacking NF–κB, NF–κB

activity cannot possibly exist.  Hence, in such cells, it cannot be reduced.  Even if the

inventors had not expressly disclaimed cells lacking NF–κB from the scope of the claims,

it would be apparent that the asserted claims could not be practiced in cells that do not

contain NF–κB, any more than a method for reducing the rusting of metals that do not

rust.  Lacking any support in the intrinsic evidence or, for that matter, common sense,

Amgen's reading should be rejected in favor of ARIAD's, which derives ample support from the disclaimers of claim scope present in the specification.

### F.    The Asserted Claims Do Not Encompass Natural Processes.

The claims of the '516 Patent are directed to artificial methods that accomplish the alteration (*i.e.*, reduction) of NF–κB activity through affirmative acts, and do not read on any natural process by which NF–κB activity is altered. The specification expressly states that the claimed inventions relate to the alteration of NF–κB activity beyond any changes that may occur naturally, without intervention:

> Different cell types and different genes respond to this one signal [NF–κB], which serves as a central "control," whose activity can be altered by means of the present invention. As used, the terms altering or modifying mean *changing the activity* or function *of NF–κB in such a manner that it differs from the naturally occurring activity of NF–κB under the same conditions* (e.g. is greater than or less than, including no activity, the naturally occurring NF–κB activity . . . etc.).[43]

In other words, the claims are directed to alteration (*e.g.*, reduction) of NF–κB activity such that it differs from the naturally occurring NF–κB activity under the same conditions: *e.g.*, the reduction of NF–κB activity to a greater extent than would occur in the absence of artificial intervention:

| Term | ARIAD's Proposed Construction |
|------|-------------------------------|
| **Reducing NF–κB in cells**<br><br>Claims 6, 70-72 | Decreasing NF–κB activity that exists in cells in which NF–κB is present by inhibiting any step along the NF–κB signal transduction pathway, *in such a manner that the activity differs from the naturally occurring activity of NF–κB under the same conditions*, without regard to the situs of the inhibiting agent. |

---

[43] '516 Patent at 12:48-56 (emphasis added).

| Reducing NF-κB activity in the cells<br><br>Claims 18, 183-184 | Decreasing NF-κB activity that exists in mammalian cells in which it is present, by inhibiting any step along the NF-κB signal transduction pathway, *in such a manner that the activity differs from the naturally occurring activity of NF-κB under the same conditions*, without regard to the situs of the inhibiting agent. |
|---|---|

That natural processes are not encompassed by the scope of the claims is further supported by the fact that the specification of the '516 Patent teaches only artificial means of reducing induced NF–κB activity, requiring affirmative steps to manipulate the level of gene expression mediated by active NF–κB. These artificial means include the use of decoy molecules, dominantly interfering molecules, antibodies and an excess of IκB molecules (exogenously produced or caused to be overexpressed by the cells).[44]  Although the mere presence of such examples is not sufficient to limit the claims, they provide context for the express disclaimer of claim scope in the specification that the claimed methods do not encompass modulation of "*naturally occurring activity*." *See Teleflex, Inc.*, 299 F.3d at 1326-27.  In light of the disclaimer and examples provided in the specification, a person of ordinary skill in the art would understand that the asserted claims are directed towards methods of NF–κB activity that can be practiced through artificial means, not towards natural processes.  Indeed, by using the phrase "taking action," Amgen's proposed definition for "reducing NF–κB activity" assumes that the claims require an affirmative act to be practiced.  (4/8/2008 Claim Construction Chart (D.I. 571).)

---

[44] '516 Patent at 37:43-38:22.

## IV.    Conclusion

For the foregoing reasons, the claim language in dispute should be construed as ARIAD proposes.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

_____
Steven J. Balick (I.D. #2403)
John G. Day (I.D. # 3950)
Tiffany Geyer Lydon (I.D. # 3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendants and Counterclaim*
*Plaintiffs ARIAD Pharmaceuticals, Inc.,*
*Massachusetts Institute of Technology, the*
*President and Fellows of Harvard College and the*
*Whitehead Institute for Biomedical Research*

*Of Counsel*:

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
Keith R. Hummel
David R. Marriott
David Greenwald
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019-7475
(212) 474-1000

Dated:  April 25, 2008