# EXHIBIT 1

102

*Neuroscience Letters*, 89 (1988) 102 107
Elsevier Scientific Publishers Ireland Ltd

NSL 05355

# Enhancement of neurite outgrowth in PC12h cells by a protease inhibitor

## Yumiko Saito and Seiichi Kawashima

*Department of Biochemistry, Tokyo Metropolitan Institute of Gerontology Tokyo (Japan)*

(Received 14 December 1987, Revised version received 17 February 1988 Accepted 24 February 1988)

*Key words*    Protease inhibitor  Neurite outgrowth, PC12h cell, Nerve growth factor, Synthetic tripeptide, Differentiation, In vitro

Specific protease–protease inhibitor interactions have been suggested to play a role in the regulation of neurite outgrowth  We have examined the influence of exogenously added specific protease inhibitors on neurite outgrowth in PC12h cell in serum-free defined medium  Of 14 protease inhibitor species examined only a leupeptin analogue, Ac-Leu-Leu-Nle-al was stimulatory for neurite outgrowth in the presence of nerve growth factor  Leupeptin and soybean trypsin inhibitor which had been reported to induce neurite outgrowth from sensory ganglia and neuroblastoma cells had no effect  These results suggest that an endogenous protease of a new type is involved in restricting neurite outgrowth in PC12h cell

In the developing nervous system, neurons grow their neurites at their proper specific position after proliferation and migration  Recently, a number of investigators reported that the relationship between protease and protease inhibitor is likely to be important for neuronal migration and neurite outgrowth  It was shown that neural cells from peripheral and central nervous system produce a serine protease plasminogen activator [1, 8, 9, 11, 14] and this protease activity is concentrated in growth cones [7]  Pittman [12] described that both the plasminogen activator and a metalloprotease were released from sympathetic and sensory neurons  Furthermore, the target tissue of sympathetic neurons (heart cells) releases an inhibitor of the plasminogen activator, which induces neurite outgrowth from sympathetic neurons [13]  The addition of soybean trypsin inhibitor to cultures of sensory ganglia and neuroblastoma cells was shown to stimulate neurite outgrowth, and added thrombin inhibited neurite outgrowth [6, 10]  Recently a potent serine protease inhibitor against plasminogen activator was purified from C6 glioma conditioned medium, which increases process outgrowth of neuroblastoma cells [3]  These results suggest that a plasminogen activator or thrombin-like serine protease restricts neurite outgrowth in neuronal cells

*Correspondence*  Y  Saito, Department of Biochemistry, Tokyo Metropolitan Institute of Gerontology 35-2 Sakae-cho, Itabashi-ku, Tokyo 173, Japan

0304-3940/88/$ 03 50 © 1988 Elsevier Scientific Publishers Ireland Ltd

Exhibit
666

PC12 cells, neoplastic neuronal cells which were cloned from rat pheochromocytoma, have surface receptors for nerve growth factor (NGF) [2] They are converted from replicating chromaffin-like cells to non-replicating sympathetic neuron-like cells with long neurites by the overall effect of NGF This characteristic conversion can be a good model for a better understanding of the molecular events underlying NGF-induced neuronal differentiation [4] But there has been no report which shows that a specific protease group plays a role in NGF-induced neurite outgrowth in the PC12h cell As a first step to elucidate the possible involvement of protease in the PC12h cell, we examined the effect of exogenously added specific protease inhibitors on neurite outgrowth

Unexpectedly the results showed that the outgrowth is not affected by soybean trypsin inhibitor and leupeptin but a leupeptin analogue, Ac-Leu-Leu-Nle-al (ALL-Nal) amplifies neurite length It is plausible to assume that ALLNal promotes neurite elongation by inhibiting a highly specific protease of a new type in the PC12h cell

Diisofluorophosphate (DFP), soybean trypsin inhibitor (STI), and hirudin were obtained from Sigma Chymostatin, pepstatin A, and leupeptin were from the Peptide Institute (Osaka, Japan) Aprotinin was from Boehringer-Mannheim E64c and E64d were kind gifts from Taisho Pharmaceutical Co (Omiya, Japan) N-Tosyl-L-phenylalanyl-chloromethyl-ketone (TPCK), N-ethyl-maleimide (NEM), N-(1-Pyre-nyl)maleimide (NPM), and leupeptin analogues, ALLNal and Ac-Leu-Leu-Met-al (ALLMal) (commercial name calpain inhibitor 1 and 2, respectively) were from Nakarai Chemicals (Kyoto, Japan) These analogues are not specific to calcium dependent neutral protease and might inhibit some other proteases

TABLE I

PROTEASE INHIBITORS IN THE NEURITE OUTGROWTH EXPERIMENT ON PC12h CELLS

| Inhibitor | Concentration ($\mu$M) |
|---|---|
| DFP | 2 5– 50 |
| STI | 1 – 5 |
| TPCK | 1 – 10 |
| Aprotinin | 1 – 10[a] |
| Hirudin | 1 – 20[b] |
| Chymostatin | 10 –100 |
| Pepstatin A | 1 – 10 |
| NEM | 1 – 10 |
| NPM | 1 – 10 |
| E64c | 15 –150 |
| E64d | 15 –150 |
| Leupeptin (Ac-Leu-Leu-Arg-al) | 1 – 75 |
| ALLNal | 0 6– 3 |
| ALLMal | 0 6– 3 |

[a] $\mu$g/ml

[b] ng/ml

104

PC12 cells, clone h, were obtained from Dr H Hatanaka [5], Mitsubishi-Kasei Institute of Life Sciences, Tokyo, and grown in plastic flasks (Terumo) in Dulbecco's modified Eagle's medium (DMEM) supplemented with 5% newborn calf serum and 5% heat-inactivated horse serum The cells were maintained at 37°C in a humidified 90% air/10% CO₂ atmosphere

For the neurite extension assays, the PC12 cells were washed and plated at $2 \times 10^4$ cells/cm² in serum-free base medium (Ham's F12/DMEM, 1 1) plus human transferrin (5 μg/ml), porcine insulin (5 μg/ml), progesterone (20 nM), and sodium selenate (30 nM), (TIP/DF medium) onto Lux plates Culture plates were coated with 0 2 mg/ml calf skin collagen (Calbiochem) The collagen solution was spread as a film over the dish and allowed to dry at room temperature under ultraviolet irradiation When most cells attached, the cells were fed with various inhibitors and/or 40 ng/ml NGF (Takara) After 48 h in culture, cells were fixed with 2% glutaraldehyde in phosphate-buffered saline and the number of cells with neurites longer than 35 μm were scored under phase-contrast microscopy

In the absence of NGF, we sometimes observed that a few cells were induced to extend neurites only by ALLNal, the location of which was limited to a corner of the plate These neurite bearing cells were less than 2% of total cells In contrast, in the presence of NGF or NGF plus ALLNal, the neurite bearing cells were recognized at every area of the plate and the neurite bearing cells were about 80% of total cells Therefore, we neglected the effect of ALLNal alone on neurite outgrowth in this paper

After treatment with various inhibitors and NGF, the PC12 cell populations showed a distribution pattern along various neurite lengths To normalize this distribution pattern, the percent of cells with $L \sim L + 14$ μm neurites is calculated as follows

$$\%[L \sim L + 14 \ \mu m] = \frac{\text{cell no with neurite of } L \sim L + 14 \ \mu m}{\text{total no with neurite} \geq 35 \ \mu m} \times 100$$

We call this normalized distribution pattern the neurite length distribution pattern All experiments were performed at least twice with similar results Neurite length distribution patterns were analyzed for significance by Wilcoxon's rank-sum test

Inhibitors specific for serine-, cysteine- and carboxyl-protease were tested at concentrations known to elicit their full inhibitory effect on their respective proteases in vitro (Table I), but only the leupeptin analogue, ALLNal, efficiently induced neurite outgrowth at low concentrations in the presence of NGF Leupeptin (Ac-Leu-Leu-Arg-al) and another leupeptin analogue, ALLMal, in which the third amino acid residues are replaced by arginine and methionine, respectively, failed to produce any acceleration Fig 1 shows micrographs of PC12h cells treated with NGF only, and those treated with NGF in the presence of ALLNal NGF combined with ALLNal produced a morphological change far greater than NGF alone, although ALLNal alone had little effect as mentioned above During combined treatment for 48 h, neurites grew to lengths which were normally seen only after exposure to NGF for 72–90

105

 

Fig 1  Phase contrast photomicrograph of PC12h cells grown for 48 h in serum-free medium on collagen-coated tissue culture dishes  A  40 ng/ml NGF  B  1 μM ALLNal plus 40 ng/ml NGF  Note the elaborate neurite outgrowth in B  Bar = 35 μm



Fig 2  Neurite length distribution patterns which show the effects of some specific protease inhibitors on neurite outgrowth in PC12h cells in the presence of NGF  Bioassays were performed by determining the percent of various neurite lengths longer than 35 μm  Cells were scored after 48 h in culture  Each value represents the mean of 3 determinations  S E M  values are omitted for clarity, but in all cases were less than 10% of the mean

106

h This potentiation is dose-dependent at low concentrations, but the agent had a cytotoxic effect against PC12h cells at concentrations higher than 2 μM

As shown in a quantitative assay of neurite outgrowth induced by several protease inhibitors (Fig 2), the neurite length distribution patterns caused by ALLNal were significantly different from those by other inhibitors (α, $P < 0.01$) and only ALLNal effectively increased neurite outgrowth in the presence of NGF

For time course experiments, we changed the culture medium every other day and followed the neurite outgrowth by inverted phase contrast microscopy (Fig 3) ALL-Nal led to a significantly increased outgrowth at each time compared to control (α, $P < 0.01$) After 24 h in cultures fed with NGF, $20 \pm 0.94\%$ (mean $\pm$ S E M ) of total cells had a neurite longer than 35 μm In contrast, with addition of ALLNal and NGF, $38 \pm 0.96\%$ of total cells had neurites longer than 35 μm, and this mean value is significantly compared to control ($P < 0.05$) by Student's $t$-test These ntifications reveal that the ability of ALLNal to accelerate neurite outgrowth has ady been expressed at an early phase of neurite extension

One of the candidates for the target enzyme is calcium-activated neutral protease However, the results are inconsistent because other cysteine protease inhibitors



Fig 3 Time course of neurite outgrowth by ALLNal in the presence of NGF ■, 40 ng/ml NGF, ○ 1 μM ALLNal plus 40 ng/ml NGF Note that the effect of neurite outgrowth by ALLNal is more pronounced at 24 h than 72 h Each value represents the mean of 3 determinations S E M values are omitted for clarity, but in all cases were less than 10% of the mean

107

(NEM, NPM, E64c, E64d, leupeptin, ALLMal) had no combinational effect with NGF on neurite outgrowth The target enzyme is not the plasminogen activator or thrombin-like serine protease, because neither a highly specific inhibitor for thrombin (hirudin) nor typical serine protease inhibitors (STI, DFP) could efficiently promote neurite outgrowth Accordingly, PC12h cells lack or do not express the serine protease group reported previously, and possess a protease of a new type at an early phase of neurite extension This endogenous protease might restrict (1) NGF–NGF receptor binding efficiency, (2) the turnover of specific membraneous proteins needed for neurite outgrowth, (3) the cell adhesions to substratum for neurite outgrowth, and so on ALLNal could promote neurite outgrowth by reducing this excess of proteolytic activity Further work will be necessary to characterize this new type of protease and clarify the regulatory mechanisms for neurite outgrowth in the PC12h cell

We would like to thank Dr H Hatanaka for the gift of and helpful advice on the PC12h cell line and Taisho Pharmaceutical Co , Ltd for providing E64c and E64d We also wish to thank Dr Y Uchida for valuable discussion and Dr M M Dooley for proofreading of this manuscript

1 Alvarez-Buylla, A and Valinsky, J E , Production of plasminogen activator in cultures of superior cervical ganglia and isolated Schwann cells, Proc Natl Acad Sci U S A , 82 (1985) 3519–3623

2 Green, L A and Tischler, A S , Establishment of a noradrenergic clonal line of rat adrenal pheochromocytoma cells which respond to nerve growth factor, Proc Natl Acad Sci U S A , 73 (1976) 2424–2428

3 Guenther, J , Nick, H and Monard, D , A glia-derived neurite promoting factor with protease inhibitory activity, EMBO J , 4 (1985) 1963–1966

4 Guroff, G , PC12 cells as a model of neuronal differentiation In J Bottenstein and G Sato (Eds ), Cell Culture in The Neurosciences, Plenum, New York, 1985, pp 245–272

5 Hatanaka, H , Nerve growth factor-mediated stimulation of tyrosine hydroxylase activity in a clonal rat pheochromocytoma cell line, Brain Res , 222 (1981) 225–233

6 Hawkins, R H and Seeds, N W , Effect of protease and their inhibitors on neurite outgrowth from neonatal mouse sensory ganglia in culture, Brain Res , 398 (1986) 63–70

7 Krystosek, A and Seeds, N W , Plasminogen activator release at the neuronal growth cone, Science, 213 (1981) 1532–1533

8 Krystosek, A and Seeds, N W , Plasminogen activator secretion by granule neurons in cultures of developing cerebellum, Proc Natl Acad Sci U S A , 78 (1981) 7810–7814

9 Krystosek, A and Seeds, N W , Peripheral neurons and Schwann cells secrete plasminogen activator, J Cell Biol , 98 (1984) 773–776

10 Monard, D , Niday, E , Limat, A and Solomon, F , Inhibition of protease activity can lead to neurite extension in neuroblastoma cells, Prog Brain Res , 58 (1983) 359–364

11 Moonen G , Grau-Wagemans, M P and Selak, I , Plasminogen activator-plasmin system and neuronal migration, Nature (Lond ), 298 (1982) 753–755

12 Pittman, R N , Release of plasminogen activator and a calcium-dependent metalloprotease from cultured sympathetic and sensory neurons, Dev Biol , 110 (1985) 91–101

13 Pittman, R N and Patterson, P H , Characterization of an inhibitor of neuronal plasminogen activator released by heart cells, J Neurosci , (1987) 2664–2673

14 Sorec, H and Miskin, R , Plasminogen activator in the developing rat cerebellum biosynthesis and localization in granular neurons, Brain Res , 313 (1983) 149 158

# EXHIBIT 2

See related Commentary on page x

# Differential Expression of Phosphorylated NF-κB/RelA in Normal and Psoriatic Epidermis and Downregulation of NF-κB in Response to Treatment with Etanercept

Paul F. Lizzul, Abhishek Aphale, Rama Malaviya, Yvonne Sun, Salman Masud, Viktor Dombrovskiy, and Alice B. Gottlieb
Clinical Research Center, UMDNJ-Robert Wood Johnson Medical School, New Brunswick, New Jersey, USA

Etanercept, a recombinant human tumor necrosis factor (TNF) receptor fusion protein, is FDA approved for psoriasis and psoriatic arthritis. TNFα increases the synthesis of proinflammatory cytokines and leads to the activation of multiple signaling pathways, including nuclear factor kappa B (NF-κB). The Rel/NF-κB transcription factors play a central role in numerous cellular processes, including the stress response and keratinocyte proliferation and differentiation. Utilizing a phosphorylation-specific antibody, we examined the expression of active nuclear NF-κB/RelA via immunohistochemistry in normal skin, non-lesional psoriatic skin, lesional psoriatic skin, and lesional skin from patients treated with etanercept. There was no expression of active nuclear NF-κB in the normal epidermis, whereas a basal level of constitutive active phosphorylated NF-κB/RelA was present in uninvolved epidermis from psoriasis patients. There was also significant upregulation of active phosphorylated NF-κB/RelA in the epidermis from psoriatic plaques. Serial biopsies from psoriasis patients treated with etanercept at 1, 3, and 6 mo demonstrated a significant downregulation of phosphorylated NF-κB/RelA, which correlated with decreases in epidermal thickness, restoration of normal markers of keratinocyte differentiation, and clinical outcomes. These data suggest that activation of NF-κB plays a significant role in the pathogenesis of psoriasis and that a potential mechanism of action for TNF-targeting agents is downregulation of NF-κB transcriptional activity.

Key words: apoptosis/etanercept/keratinocyte/NF-κB/psoriasis
J Invest Dermatol 124:1275–1283, 2005

Psoriasis is a chronic papulosquamous disease that effects 1%–3% of the US population (Greaves and Weinstein, 1995; Lebwohl, 2003). It is commonly accepted that the two major pathological lesions observed in psoriasis are epidermal hyperproliferation with abnormal differentiation, and an inflammatory infiltration of the epidermis and dermis (Chaudhari et al, 2001). In the past, therapies for psoriasis had focused on treating epidermal hyperplasia, which was hypothesized to occur as a result of the abnormal proliferation and differentiation of basal keratinocytes (Bayliffe et al, 2004). It later became evident that there was a direct role for T cells in the pathogenesis of psoriasis (Bos et al, 1983). An important experimental result, which confirmed the direct link between T lymphocytes and psoriasis, was demonstrated by utilizing a fusion protein with specific cellular toxicity to cells expressing functional interleukin-2 (IL-2) receptors. Patients treated with denileukin diftitox (Ontak, Ligand Pharmaceuticals, San Diego, California), which did not specifically affect keratinocytes, exhibited clinical resolution of psoriasis with histological reversal of epidermal hyperplasia (Gottlieb et al, 1995). This work set the foundation for additional studies over recent years that have culminated in the current view that the psoriatic process is driven by an orchestrated interplay between activated T cells, antigen-presenting cells (APC), and keratinocytes (Krueger, 2002), which leads to the release of numerous cytokines and chemokines that signal keratinocytes to hyperproliferate and undergo abnormal differentiation (Werner and Smola, 2001; Gottlieb et al, 2003b). Moreover, T cell activation is attributable to an ongoing stimulus delivered to T cells by APC and keratinocytes in the skin lesions creating a self-sustaining positive feedback loop. Given such a complex and multifactorial process it is not surprising that if these events were to perpetuate, a chronic inflammatory state would occur.

This immunological basis and theory of the disease has led to the development of targeted therapies with the promise of improved efficacy and safety profiles (Asadullah et al, 2002). Examples of biological agents in use or in continuing trials include etanercept (soluble anti-TNF (tumor necrosis factor) receptor) and infliximab (antibody targeted

Abbreviations: APC, antigen-presenting cell; CBP, Creb-binding protein; CD, cluster of differentiation; CLA, cutaneous lymphocyte antigen; Cox-2, cyclo-oxygenase 2; EBV, Epstein-Barr virus; HAT, histone acetyltransferase; HAT, histone acetyltransferase; HDAC, histone deacetylase; IκBα, I kappa B alpha; ICAM, intercellular adhesion molecule; IFN, interferon; IKK, IκB kinase; IL, interleukin; IL-1β, interleukin 1 beta; LFA, lymphocyte function-associated antigen; MMP, matrix metalloprotease; NF-κB, nuclear factor kappa B; p/CAF, p300/CBP associated factor; TBP, TATA binding protein; TFIIB, transcription factor IIB; TNFα, tumor necrosis factor α; UVB, ultraviolet B

Copyright © 2005 by The Society for Investigative Dermatology, Inc.

EXHIBIT
575
SANTE'S

Non Confidential



AM-AR0363096

THE JOURNAL OF INVESTIGATIVE DERMATOLOGY

against soluble TNFα), which target TNF activity, as well as alefacept (lymphocyte function-associated antigen 3 (LFA-3)/IgG1 fusion protein, which binds to CD-2 receptors on T cells and blocks the interaction of CD-2/LFA-3), and efalizumab (anti-CD11a (LFA-1), which blocks the costimulatory signal between LFA-1/ICAM-1) which targets the APC and T cell interaction.

TNFα controls and regulates the expression of numerous genes, and in doing so leads to cutaneous responses to environmental damage and inflammation. Although TNFα regulates immune and inflammatory responses, it has also been shown to effect tissue remodeling, cell motility, the cell cycle, and apoptosis (Gottlieb et al, 2003a; Gugasyan et al, 2004). This tremendous diversity is accomplished by inducing a characteristic set of downstream effectors. One of these effectors is the transcription factor nuclear factor kappa B (NF-κB).

The Rel/NF-κB proteins belong to a family of related transcription factors, which over the last 25 y have been characterized in most cell types and lineages (Baldwin, 1996). The regulation of gene activation by NF-κB involves the general transcription machinery as well as coactivators and chromatin-modifying factors (Schmitz, 1996; Schmitz and Baeuerle, 1995; Schmitz et al, 1995; Zhong et al, 1998). Another level of regulatory complexity involves the role that phosphorylation of Rel family members, such as Rel A, plays in its interaction with coactivators such as CBP/p300 and its ability to activate target gene transcription (Zhong et al, 1998).

NF-κB regulates the expression of an exceptionally large number of genes and has a well-characterized role in immune and inflammatory responses as well as in the protection against apoptotic cell death (Siebenlist et al, 1994; Barnes and Karin, 1997; Sonenshein, 1997). Moreover, a large and diverse set of distinct stimuli activate NF-κB (Ghosh et al, 1998). NF-κB is also highly activated at sites of inflammation in a diverse set of human diseases (Tak and Firestein, 2001). Altogether, these findings underscore the important role, which NF-κB plays within the immune system, and the potential of developing therapeutic agents that affect NF-κB function as a means to treat inflammatory disease.

Given the important role that NF-κB plays in regulating the expression of numerous target genes, and the resulting consequences for several human diseases, it is not surprising to find that a complex regulatory scheme controls Rel/NF-κB transcriptional activity. One of the most well-characterized mechanisms is the control of NF-κB subcellular localization by IκB family proteins (Beg et al, 1992). The elimination of IκBα allows NF-κB to accumulate in the nucleus and activate target gene expression (Maniatis, 1997). Interestingly, IκBα is also a transcriptional target of NF-κB and can downregulate further expression in an autoregulatory manner (Maniatis, 1997). A second level of regulation of NF-κB activity involves phosphorylation and occurs at the level of activation of the transcriptional activity of RelA (Wang and Baldwin, 1998). When IκB is degraded, RelA undergoes phosphorylation that results in transcriptional activity (Wang and Baldwin, 1998; Zhong et al, 1998). The activity of NF-κB is also regulated through interactions with coactivator and corepressor proteins. Recent data showed

that NF-κB-dependent transcriptional activation requires the coactivators CBP/p300 (Gerritsen et al, 1997). The phosphorylation of RelA enhances NF-κB transactivation by promoting the interaction of p65 with CBP (Zhong et al, 1997) and has been shown to be required for NF-κB-dependent gene expression (Sheppard et al, 1999; Wang et al, 1999c). Therefore, NF-κB activity is regulated in a complex manner and at multiple levels by a large number of proteins.

It is evident from this discussion that TNF-α-mediated induction of synthesis of all these factors via NF-κB in lymphocytes, endothelial cells, dendritic cells, and keratinocytes mediates and increases the cellular infiltrate into the skin and simultaneously leads to keratinocyte hyperproliferation in psoriasis (Krueger, 2002). Therefore, it can be postulated that TNFα produced locally within psoriatic lesions creates a TNF positive feedback loop that amplifies and sustains the inflammatory process within plaques (Banno et al, 2004).

Etanercept is a fusion protein of two p75 TNF-receptor chains and fragments of the Fc region of human IgG. It is FDA approved for adult and juvenile rheumatoid arthritis, ankylosing spondylitis, psoriatic arthritis, and psoriasis. Phase II Trials with etanercept in psoriasis demonstrated a decrease in PASI (Psoriasis Area and Severity Index), epidermal T cell infiltration, epidermal thickness, as well as reversal of K-16 keratin expression that indicated a reduction of inflammation and a return to normal keratinocyte proliferation and differentiation (Gottlieb et al, 2003b).

Due to the high levels of expression of TNF in psoriatic patients, the success of anti-TNF treatments, and the role of NF-κB in TNF signaling, we wanted to explore the link between active NF-κB and psoriasis. Specifically, we wanted to determine whether there were differences in the expression of phosphorylated RelA/p65 between normal and psoriatic epidermis, and secondarily, if there was upregulation of phospho-NF-κB in lesional psoriatic skin. In addition, we wanted to determine if the levels of phospho-NF-κB correlated with abnormalities in lesional skin, such as a hypertrophic epidermis and abnormal keratinocyte differentiation markers. Finally, we wanted to determine if treatment of psoriatic patients with the anti-TNF agent, etanercept, would result in downregulation of NF-κB and in turn if this would correlate with disease resolution and restoration of the epidermis to non-lesional appearance. If the transcriptionally active form of NF-κB were downregulated in response to etanercept treatment, this would offer one plausible mechanistic explanation for the drug's success in the treatment of psoriasis.

## Results

**Absence of phosphorylated p65/RelA in normal skin** Although multiple studies endeavored to examine the expression pattern of NF-κB family members in the epidermis and dermis, none have characterized the expression of the active phosphorylated form of RelA/p65 in the epidermis. Because of the critical role that NF-κB plays in inflammatory responses, cellular proliferation, the cell cycle, and apoptosis and the contradictory reports of its specific function in keratinocytes, we wanted to study the expression of NF-κB in both normal and psoriatic skin to establish, not only if

Non Confidential

AM~AR0363097

differences existed but if those differences would correlate with disease status and response to therapy. Toward this end, we utilized a phospho-specific antibody targeted to serine 536 of RelA/p65, which is essential for transcriptional activation by NF-κB. Skin samples were obtained from 4 healthy volunteer controls. Although it has been reported that a basal level of NF-κB exists in the epidermis (Takao *et al*, 2003), we found almost no active nuclear phosphorylated RelA in the nucleus of epidermal cells (Fig 1*A*). Activation of NF-κB was confirmed utilizing the phospho-RelA antibody on samples of normal skin that were irradiated with UVB, a known inducer of NF-κB activity. This UVB treatment led to a substantial (p <0.02) 25-fold increase in the level of phosphorylated RelA (Fig 1*B* and *C*).

**Phosphorylated p65/Rel is present at basal constitutive levels in keratinocytes from non-lesional psoriatic skin** In light of the overwhelming evidence of the role of NF-κB family members in immune regulation, apoptosis, keratinocyte regulation, and psoriasis, we wanted to examine whether the expression pattern of active nuclear phosphorylated NF-κB differed between normal and psoriatic skin. There is established precedence for abnormal expression and regulation of proteins and cytokines in disease processes, including psoriasis (McKenzie and Sabin, 2003; McKenzie *et al*, 2003). Therefore, we compared expression

of active phosphorylated RelA/p65 in the normal epidermis to the non-lesional skin in our psoriasis patients. The skin samples were obtained from biopsies in ten patients who were subjects in a study of the efficacy and safety of the TNF-targeting pharmaceutical etanercept. Interestingly, and in contrast to the absence of active RelA in the epidermis from normal patients, those biopsies taken from the uninvolved skin of psoriatic patients demonstrated substantial basal levels of phospho-RelA/p65 in the epidermis (p <0.02). Specifically, there was an average 12-fold increase of active nuclear phosphorylated RelA/p65 in the nonlesional psoriatic epidermis compared to normal donor skin (Fig 2). These data demonstrate a significant difference in the expression of NF-κB in the epidermis of psoriatic patients as compared with normal controls.

**Phosphorylated p65/Rel is significantly upregulated in keratinocytes within psoriatic plaques** The differential expression of phosphorylated RelA between normal skin and non-lesional skin from psoriasis patients prompted examination of the epidermis from lesional psoriatic plaques for active nuclear phosphorylated NF-κB expression. As shown in Fig 3, on average, there was a 5-fold increase (p <0.001) in phospho-RelA in the epidermis of plaques as compared with uninvolved skin from the same patient. In additional, there was a substantial increase in epidermal



**Figure 1**

**Absence of active phosphorylated RelA/p65 in the normal epidermis.** Punch biopsies from four control subjects were analyzed by immunohistochemistry for expression of nuclear phosphorylated nuclear factor kappa B (NF-κB)/RelA as described in Materials and methods. A representative sample shows strong expression of phosphorylated p65 was only detected in UVB-treated samples (compare *A* to *B*). The arrows denote examples of positive cells. No staining was observed with a negative control rabbit IgG antibody. (*C*) Chart demonstrating the average number of keratinocytes in epidermis expressing phosphorylated NF-κB/RelA. *Denotes a significance of p<0.02.

Non Confidential

AM-AR0363098

1278  LIZZUL ET AL

THE JOURNAL OF INVESTIGATIVE DERMATOLOGY



**Figure 2**

Increased expression of phosphorylated nuclear factor kappa B (NF-κB)/RelA in uninvolved psoriatic skin. The expression of nuclear phosphorylated RelA was examined via immunohistochemistry in four control subjects and ten psoriasis patients as explained in the Materials and methods utilizing a specific anti-phospho NF-κB antibody. (A) Chart depicting the average number of keratinocytes in the epidermis expressing nuclear phosphorylated RelA. *Denotes significance of p<0.002. (B) Immunohistochemical analysis demonstrated the dramatic difference in expression levels of nuclear phosphorylated p65 between normal epidermis and the non-involved epidermis from psoriasis patients. Slide is a representative sample from the study population and the arrows denote examples of positive nuclear staining cells.

thickness, as well as expression of abnormal keratinocyte differentiation marker K16 (as has been previously reported).

Etanercept reduces phosphorylated NF-κB/RelA levels and reverses abnormal epidermal proliferation and differentiation The high levels of TNF-α and NF-κB found in the skin of psoriatic patients coupled with the success of recent immunologic therapies targeting TNF and immune receptors in the treatment of psoriasis prompted us to examine what effect etanercept therapy would have on phospho-RelA/p65 levels. We also wanted to determine if treatment with etanercept would lead to histological changes in keratinocyte differentiation and plaque morphology. To see if TNF's beneficial effects could be mediated via a decrease in NF-κB activation we examined biopsy samples from etanercept patients at 0, 1, 3, and 6 mo. Consistent with the fact that NF-κB is a downstream effector of TNF, we observed that the high levels of nuclear phosphorylated RelA/p65 shown previously were dramatically reduced (p<0.001) at each successive treatment interval (Fig 4A and 4B). Interestingly, this decrease in NF-κB was complemented by a significant reduction in epidermal thickness

(p<0.01) at each time period (Fig 4A). There was a significant correlation between these two outcome measures (Table I). Moreover, examination of keratinocyte differentiation also demonstrated a return of K16 levels to normal in 70%-80% of patients at 3 and 6 mo and this too correlated with the observed reduction in phosphorylated RelA/p65 (Table I).

## Discussion

This is the first report of an *in vivo* study to demonstrate a relative absence of nuclear phosphorylated RelA in normal skin, that non-lesional psoriatic skin contains a basal level of phosphorylated RelA, and significant overexpression of phospho-RelA in the epidermis of psoriatic plaques. The treatment of psoriatic patients with etanercept over a 6-mo period led to a dramatic downregulation of phospho NF-κB/RelA in keratinocytes and this correlated with a dramatic reduction in epidermal hyperplasia/thickness and a return of normal keratinocyte markers of differentiation. Importantly, these patients also showed dramatic clinical improvement.

Non Confidential



**Figure 3**

Upregulation of active phosphorylated nuclear factor kappa B (NF-κB) is lesional plaques. The expression of nuclear phosphorylated p65 was examined by immunohistochemistry in uninvolved and lesional epidermis from ten psoriasis patients. (A) Chart depicting the average number of phosphorylated NF-κB positive keratinocytes in the epidermis. *Denotes significance of p<0.001. (B) Representative slide showing enhanced expression of phosphorylated NF-κB detected in lesional plaques as compared to uninvolved skin. Arrows highlight examples of positive nuclear staining cells.

In the absence of stressful stimuli, NF-κB is present in the cytoplasm in a resting state within normal keratinocytes (Takao et al, 2003). Under normal conditions, NF-κB has also been noted to play an important role in keratinocyte regulation and proliferation (Takao et al, 2003; Bernard et al, 2004). But the function of NF-κB in keratinocytes has been proposed to be quite paradoxical to its effect in other cell types, such as T or B cells (Dajee et al, 2003). Skin defects are present in a number of mouse models in which Rel/NF-κB function is perturbed (Garandakis and Strasser, 2003). For instance, the epidermis restricted expression of a dominant negative form of IκB produced by mice with profoundly hyperplastic epithelia whereas mice that over-expressed RelA/p65 showed epidermal hypoplasia and growth inhibition (Takeda et al, 1999; Seltz et al, 2000a, b). This is in contrast to studies on mice null for IκBα which demonstrate marked alterations in epidermal morphology, including hyperplastic epidermal keratinocytes and dermal infiltration of lymphocytes (Wilson et al, 1990; Chen et al, 2000a, 2000b; Lee et al, 2000; Bell et al, 2003).

The reason for this diversity in outcome of NF-κB activation may be a reflection of the cell type and differentiation state of the cell (Ozes et al, 1999; Romashkova and Makarov, 1999; Enfors, 2000). An interesting model proposed by Kaufman and Fuchs (2000) tries to take into account the peculiar findings of NF-κB activity in the epidermis. They suggest that a balancing act is played between cell-cycle withdrawal, cell survival and differentiation. In addition to an apparent cell-cycle arrest effect, NF-κB in the epidermis also protects against apoptosis by enhancing the expression of anti-apoptotic factors (Wrone-Smith et al, 1997; Seltz et al, 2000b). It is through a marriage of cell-cycle withdrawal and protection against apoptosis that NF-κB is able to coordinate homeostasis within the normal epidermis.

The data and models discussed above are all in reference to normal skin, normal epidermis, and normal keratinocytes. Psoriasis is clearly an abnormal state, and one would anticipate changes in the epidermis and keratinocytes. Perhaps, this is why we observed, in contrast to our control subjects, a basal level of nuclear phosphorylated RelA/p65 in the non-lesional skin of our psoriatic patients and in turn this may be one factor, in the backdrop of an altered cellular milieu, which predisposes to psoriatic plaque formation. For example, when normal keratinocytes are co-cultured with psoriatic T cells (Bata-Csorgo et al, 1995) they do not undergo increased growth or hyperproliferation. But keratinocytes established from non-lesional psoriatic skin are markedly abnormal even before they are cocultured with lymphocytes (Jackson et al, 1999). In culture these abnormal keratinocytes release abnormal amounts of interferon gamma (IFNγ), and have subnormal transcription factor activation in response to cytokine stimulation (Werner and Smola, 2001). Although IFNγ promotes

Non Confidential                                    AM-AR0363100

1280   LIZZUL ET AL

THE JOURNAL OF INVESTIGATIVE DERMATOLOGY



**Figure 4**
Etanercept downregulates expression of phosphorylated nuclear factor kappa B (NF-κB). Punch biopsies from ten psoriasis patients were examined via immunohistochemistry utilizing an anti-phospho-NF-κB specific antibody as described in Materials and methods. (A) Charts depicting the average number of keratinocytes expressing phosphorylated RelA and the average epidermal thickness from baseline plaques or at subsequent etanercept treatment points. *Denotes significance of p<0.01. (B) Immunohistochemical analysis of a representative sample demonstrating the reduction of phosphorylated RelA after treatment with etanercept at 1, 3, and 6 mo. Arrows highlight representative positively nuclear staining cells.

growth arrest of normal keratinocytes (Nickoloff et al, 1984; Saunders and Jetten, 1994), it induces proliferation of psoriatic keratinocytes (Baker et al, 1988, 1993). These findings have led to the hypothesis that the existence of abnormalities in the signaling pathways of psoriatic keratinocytes predisposes them to display an overactive wound healing response when exposed to stimulation from inflammatory mediators (McKenzie and Sabin, 2003). A recent study published by Watanabe et al (2004) identified a mutation in Crohn's disease patients that predisposes them to

the development of the disease. Interestingly, a mutation in the gene encoding nucleotide-binding oligomerization domain 2 (NOD2) appeared to be the culprit. They reported that the function of NOD2 was to limit the proinflammatory effects mediated by Toll-like receptor 2 (TLR2) stimulation. The mutated form of NOD2 found in Crohn's patients was unable to inhibit TLR2 signaling, and this apparently skewed the system towards inflammation. Interestingly, this is an NF-κB-dependent phenomenon because NF-κB is downstream of TLR-2 and its activation leads to production of

Non Confidential

AM-AR0363101

**Table I. Correlation between reduction in phosphorylated NF-κB, decrease in epidermal thickness and improvement of keratinocyte K-16 expression**

**(A)**

|  | Epidermal thickness | Normal K-16 |
|---|---|---|
| Phospho-NF-κB | 0.51683 | 0.56207 |
| p-value | <0.001 | <0.001 |

**(B)**

|  | Normal phospho-NF-κB | Normal K-16 |
|---|---|---|
| Baseline plaque | 0/10 | 1/10 |
| 1 mo etanercept | 0/10 | 3/10 |
| 3 mo etanercept | 4/10 | 7/10 |
| 6 mo etanercept | 2/10 | 8/10 |

(A) Correlations using pooled data from plaques at baseline, 1, 3, and 6 mo treatment with etanercept as discussed in Materials and Methods. Pearson correlation coefficients with levels of significance are presented in table for concomitant reduction of phosphorylated NF-κB and epidermal thickness, as well as for restoration of K-16 to non-lesional status. (B) Depicts the return of normal keratinocyte differentiation and proliferation, as defined as the absence of K-16, and the reduction of phosphorylated NF-κB levels in lesional plaques to the level present in uninvolved skin from the same patient.

NF-κB, nuclear factor kappa B.

IL-12. Expression of both IL-12 and IL-2 has also been found to be upregulated in psoriasis (Lee et al, 1988; Yawalkar et al, 1998).

The increased epidermal thickness present in psoriatic plaques is the net sum of both rates of proliferation and cell death. Moreover, aside from high levels of TNFα and NF-κB, many other cytokines, such as IFNγ, and their downstream targets are upregulated in psoriasis (Bowcock et al, 2001). It would be naïve to suggest that NF-κB is the sole suspect in this process, but NF-κB activation is also clearly associated with resistance to apoptosis (Beg and Baltimore, 1996; Wrone-Smith et al, 1997; Foo and Nolan, 1999; Wang et al, 1999a, b). Thus, one would predict that blocking NF-κB activation would make keratinocytes more susceptible to apoptosis, with fewer rather than more viable cells in the epidermis. Unfortunately, under normal conditions, the opposite is observed with the blockade of NF-κB. How could such a paradox exist? First, in psoriasis it is clear that the keratinocytes are not normal; therefore, what is observed under normal conditions may not apply in this chronic inflammatory condition. Second, it would seem reasonable to consider the context in which we are looking at NF-κB activity and to consider the role of other molecular regulators of apoptosis, the cell cycle and proliferation in the skin. For example, another major cellular pathway regulated by NF-κB is the cell cycle (Chaturvedi et al, 1999). It has been shown that NF-κB activating stimuli such as IFNγ and tissue plasminogen activator (TPA) induce growth arrest in normal keratinocytes in vitro (Qin et al, 1999). Therefore, the observation that constitutive activation of NF-κB in transgenic mice models produced epidermal thinning may in fact represent a dominance of the cell cycle inhibitory effect over

the anti-apoptotic effect. Thus, although the cells were not undergoing cell death, they were not proliferating either. So if we extrapolate to normal skin, it may be that the anti-proliferative effects of NF-κB are superior to its anti-apoptotic effect in the absence of inflammation or apoptotic stimuli. In support of this view, transgenic mice expressing anti-apoptotic genes Bcl-x or Bcl-2 have no significant increase in epidermal thickness in the absence of cell-cycle changes. In fact, it is only when the homeostasis of the skin is altered by various proinflammatory or tumorigenic stimuli that a distinctive phenotype becomes apparent (Vele Blazquez et al, 1997; Rodriguez-Villanueva et al, 1998). Such a scenario exists in psoriasis, therefore the disruption of balance between cell-cycle inhibitory and proliferative effects would tip the scale towards epidermal proliferation in the context of a self-sustaining cytokine-mediated feedback loop.

In agreement with the high levels of TNFα and phosphorylated NF-κB found in psoriatic patients, and the crucial link between TNF-mediated signaling and NF-κB, we observed a substantial and significant reduction in the levels of phospho-NF-κB after treatment with etanercept. This suggests that NF-κB may not only play an important role in the pathogenesis of psoriasis, but that it may be a reasonable therapeutic target. Recent work by Zollner et al supports this hypothesis. They demonstrated that the inhibition of superantigen-mediated T cell activation by the selective proteasome inhibitor PS-519 led to significant resolution of psoriasis in a severe combined immunodeficiency (SCID-hu) model (Zollner et al, 2002). PS-519 is known to affect the inhibitory regulator of NF-κB and IκB, and the work demonstrated a concentration-dependent suppression of NF-κB DNA binding.

In light of the results from these experiments and the current literature, we propose a significant role for NF-κB in the pathogenesis of psoriasis. Although there is ample evidence in the literature to substantiate our utilization of nuclear-phosphorylated NF-κB as a proxy for NF-κB activation, relying exclusively on immunostaining to detect nuclear phospho-RelA does not necessarily indicate a functional state of NF-κB activation. Therefore, although confident in our results, we recognize the limitation of our in vivo studies, and have initiated follow-up experiments to reaffirm our results. Due to limited patient samples, we are utilizing the remainder of the 6mm biopsy specimens from our study population to perform RT-PCR-mediated gene expression studies that will reaffirm the etanercept-mediated repression of NF-κB activity.

NF-κB's role in psoriasis is multifactorial, with influence on T cells, dendritic cells and keratinocytes. In lymphocytes, downregulation of TNFα leads to downregulation of NF-κB, which not only abrogates additional TNFα production but also eliminates the production of necessary inflammatory cytokines and cell adhesion markers. The role of NF-κB in the keratinocyte is more complicated and controversial (Kaufman and Fuchs, 2000). We believe that in the setting of a chronic inflammatory state such as psoriasis, there is an imbalance between the anti-apoptotic role and the cell-cycle inhibitory role of NF-κB whereby the scale is tipped toward protection against cell death in the context of a constitutive cytokine-rich inflammatory milieu. This allows for the increased epidermal thickness and hyperproliferation

Non Confidential

AM-AR0363102

**1282**  LIZZUL ET AL

THE JOURNAL OF INVESTIGATIVE DERMATOLOGY

seen in plaques. Alternatively, perhaps the proposed function of NF-κB in normal keratinocytes is altered in the abnormal keratinocytes present in psoriatic patients and therefore proliferation and increased thickness is observed as opposed to cell-cycle arrest. Further work will be needed to expand on these ideas and confirm the potential benefit of NF-κB targeted therapies in the treatment of psoriasis as well as other inflammatory and autoimmune disorders.

## Materials and Methods

**Patient studies** The study was conducted according to the Declaration of Helsinki Principles, and participants gave their written informed consent. Adult patients with moderate to severe psoriasis were treated with etanercept monotherapy (25 mg subcutaneously twice weekly) for 24 wk under a protocol approved by the UMDNJ-Robert Wood Johnson Medical School Institutional Review Board. Systemic and photo-therapies were excluded for 1 mo prior to dosing; topical medications were excluded for 2 wk prior to dosing. Eucerin cream (Beiersdorf, Wilton, Connecticut) was the standard moisturizer used throughout the study. Patients were told not to apply moisturizer prior to study evaluations. Clinical efficacy was assessed using PASI. Skin biopsies were obtained at baseline, 1, 3, and 6 mo. Skin biopsies were snap frozen in optimal cutting temperature compound (OCT, Tissue Tek, Sakura, Torrance, California) and saved at −70°C. Laboratory-based evaluations were blinded to the clinical results until all data were collected.

**UVB exposure of human subjects** Under a protocol approved by the UMDNJ-Robert Wood Johnson Medical School Institutional Review Board, four healthy volunteers between the ages of 18–60 were recruited and their minimum erythema dose (MED) was determined. MED of a subject is the minimum dose of UVB light that induces mild redness (sunburn) on the skin 24 h after the light exposure. The patients were irradiated with 2 MED of UVB on either the left or right hip and 6 mm punch biopsy was taken immediately after UVB exposure. Subsequently, two more punch biopsies were taken from each patient at 24 and 48 h after the UVB light exposure. The biopsies were frozen immediately in OCT and saved at −70°C.

**Histology and immunohistochemistry** Skin punch biopsy specimens (6 mm) were obtained from target plaques at weeks 0, 4, 12, and 24. A non-lesional skin biopsy was also obtained at week 0. Biopsy specimens for UVB-treated skin were obtained on Day 1 immediately after UVB irradiation and at 72 h post-treatment. Serial cryostat-cut sections were stored at −70°C before use. Immunoperoxidase studies of the number of epidermal nuclear-staining phosphorylated NF-κB positive cells and keratinocyte expression of K16 keratin were performed (Vectastain ABC kit, Vector Laboratories, Burlingame, California) as previously described (Gottlieb *et al*, 2003a). Briefly, slides were thawed to room temperature, fixed in BFA for 15 min, and then endogenous peroxidase activity was quenched with 0.3% H₂O₂. After washing in PBS the sections were blocked for 30 min with goat serum in PBS. The primary antibody in PBS containing goat serum was applied for 30 min at room temperature. After rinsing in PBS, sections were incubated with biotinylated secondary antibody in PBS containing goat serum, washed in PBS, and incubated with Vectastain Elite ABC Peroxidase reagent (Vector Laboratories). Finally, after rinsing in PBS, the reaction product was visualized using diaminobenzidine. Primary antibodies used were anti-phospho RelA/p65 (Cell Signaling Technologies, Beverly, Massachusetts) 1:50, and anti K-16 (1:400). As negative controls, all experiments were performed in the presence of equal concentrations of normal rabbit IgG isotype control.

Three blinded investigators, including board certified dermatologists, examined immunostained sections with an image analyzer attached to a light microscope (Image pro-plus 3.1, Mediscy-

bernetic, Silver Spring, Maryland). The average number of positively nuclear stained epidermal nuclear phospho-NF-κB cells in five × 200 fields was determined. Epidermal thickness was quantitated by averaging the epidermal thickness in three × 100 fields in H&E-stained sections. For keratinocyte expression of K16, semiquantitative scores of 0 to 4 + were assigned for each section read. Normal expression was defined as 0. Abnormal expression was defined as 1 +, 2 +, 3 +, or 4 +. There was less than 5% discordance between observers in all instances.

**Statistical methods** Statistical analysis was performed using the paired or unpaired *t* test unless otherwise specified. Correlation between variables was analyzed by the Pearson's correlation coefficient. Two-tailed p < 0.05 was considered to indicate statistical significance.

This is an investigator-initiated study, supported in part by grants from Amgen and a Clinical Immunology Center of Excellence grant from the Federation of Clinical Immunology Societies (FOCIS). Dr Gottlieb is an investigator, consultant, and speaker for Amgen.

DOI: 10.1111/j.0022-202X.2005.23735.x

Manuscript received October 18, 2004; revised January 11, 2005; accepted for publication January 25, 2005

Address correspondence to: Paul F. Lizzul, Clinical Research Center, UMDNJ-Robert Wood Johnson Medical School, 51 French St., New Brunswick, NJ 08901-0019, USA. Email: lizzulpe@umdnj.edu

## References

Asadullah K, Volk HD, Sterry W: Novel immunotherapies for psoriasis. Trends Immunol 23:47–53, 2002

Baker BS, Powles AV, Valdimarsson H, Fry L: An altered response by psoriatic keratinocytes to gamma interferon. Scand J Immunol 28:735–740, 1988

Baldwin AS Jr: The NF-kappa B and I kappa B proteins: New discoveries and insights. Annu Rev Immunol 14:649–683, 1996

Banno T, Gazel A, Blumenberg M: Effects of tumor necrosis factor-alpha (TNF alpha) in epidermal keratinocytes revealed using global transcriptional profiling. J Biol Chem 279:32633–32642, 2004

Barker JN, Goodlad JR, Ross EL, Yu CC, Groves RW, MacDonald DM: Increased epidermal cell proliferation in normal human skin in vivo following local administration of interferon-gamma. Am J Pathol 142:1091–1097, 1993

Barnes PJ, Karin M: Nuclear factor-kappaB: A pivotal transcription factor in chronic inflammatory diseases. N Engl J Med 336:1066–1071, 1997

Bata-Csorgo Z, Hammerberg C, Voorhees JJ, Cooper KD: Kinetics and regulation of human keratinocyte stem cell growth in short-term primary ex vivo culture. Cooperative growth factors from psoriatic-lesional T lymphocytes stimulate proliferation among psoriatic uninvolved, but not normal, stem keratinocytes. J Clin Invest 82:317–327, 1993

Baytha AI, Béjárd RA, Wilkins RJ, Levick MP: Emerging therapeutic targets in psoriasis. Curr Opin Rheumatol 4:395–319, 2004

Beg AA, Baltimore D: An essential role for NF-kappaB in preventing TNF-alpha-induced cell death. Science 274:782–784, 1996

Beg AA, Ruben SM, Scheinman RI, Haskill S, Rosen CA, Baldwin AS Jr: I kappa B interacts with the nuclear localization sequences of the subunits of NF-kappa B: A mechanism for cytoplasmic retention. Genes Dev 6:1899–1913, 1992

Bell S, Degitz K, Quiring M, Jitg N, Page S, Brand K: Involvement of NF-kappaB signalling in skin physiology and disease. Cell Signal 15:1–7, 2003

Bernard D, Gosselin K, Monte D, et al: Involvement of Rel/nuclear factor-kappaB transcription factors in keratinocyte senescence. Cancer Res 64:472–481, 2004

Bos JD, Hulsebosch HJ, Krieg SR, Bakker PM, Cormane RH: Immunocompetent cells in psoriasis. In situ immunophenotyping by monoclonal antibodies. Arch Dermatol Res 275:181–189, 1983

Bowcock AM, Shannon W, Du F, et al: Insights into psoriasis and other inflammatory diseases from large-scale gene expression studies. Hum Mol Genet 10:1793–1805, 2001

Chaturvedi V, Qin JZ, Denning MF, Choubey D, Diaz MO, Nickoloff BJ: Apoptosis in proliferating, senescent, and immortalized keratinocytes. J Biol Chem 274:23358–23367, 1999

Non Confidential

Chaudhari U, Romano P, Mulcahy LD, Dooley LT, Baker DG, Gottlieb AB: Efficacy and safety of Infliximab monotherapy for plaque-type psoriasis: A randomized trial. Lancet 367:1842–1847, 2001

Chen CL, Singh N, Yull FE, Strayhorn D, Van Kaer L, Kerr LD: Lymphocytes lacking I kappa B-alpha develop normally, but have selective defects in proliferation and function. J Immunol 165:5418–5427, 2000a

Chen CL, Yull FE, Cardwell N, Singh N, Strayhorn WD, Nanney LB, Kerr LD: RAG2–/–, I kappa B-alpha–/– chimeras display a psoriasiform skin disease. J Invest Dermatol 115:1124–1133, 2000b

Dajee M, Lazarov M, Zhang JY, et al: NF-kappaB blockade and oncogenic Ras trigger invasive human epidermal neoplasia. Nature 421:639–643, 2003

Emfors P: Nuclear factor-kappaB to the rescue of cysteine-induced neuronal survival. J Cell Biol 142:222–230, 2000

Foe SY, Nolan GP: NF-kappaB to the rescue: RELs, apoptosis and cellular transformation. Trends Genet 15:229–235, 1998

Gerondakis S, Strasser A: The role of Rel/NF-kappaB transcription factors in B lymphocyte survival. Semin Immunol 15:159–166, 2003

Gottlieb AB, Chaudhari U, Mulcahy LD, Li S, Dooley LT, Baker DG: Infliximab monotherapy provides rapid and sustained benefit for plaque-type psoriasis. J Am Acad Dermatol 329–336, 2003a

Gottlieb AB, Masud S, Ramamurthi R, Abdulghani A, Romano P, Chaudhari U, Dooley LT, Fasanmade AA, Wagner CL: Pharmacodynamic and pharmacokinetic response to anti-tumor necrosis factor-alpha monoclonal antibody (infliximab) treatment of moderate to severe psoriasis vulgaris. J Amer Acad Dermatol 62:39–70, 2003b

Gottlieb AB, Matheson RT, Lowe N, et al: A randomized trial of etanercept as monotherapy for psoriasis. Arch Dermatol 139:1627–1632, 2003, discussion 1632

Gottlieb SL, Gilleaudeau P, Johnson R, Estes L, Woodworth TG, Gottlieb AB, Krueger JG: Response of psoriasis to a lymphocyte-selective toxin (DAB389IL-2) suggests a primary immune, but not keratinocyte, pathogenic basis. Nat Med 1:442–447, 1995

Greaves MW, Weinstein GD: Treatment of psoriasis. N Engl J Med 332:581–588, 1995

Sugiyama R, Voss A, Verigos K, et al: The transcription factors c-rel and RelA control epidermal development and homeostasis in embryonic and adult skin via distinct mechanisms. Mol Cell Biol 24:5733–5745, 2004

Jackson M, Howie SE, Weller R, Sabin E, Hunter JA, McKenzie RC: Psoriatic keratinocytes show reduced IRF-1 and STAT-1alpha activation in response to gamma-IFN. Faseb J 13:495–502, 1999

Kaufman CK, Fuchs E: It's got you covered. NF-kappaB in the epidermis. J Cell Biol 149:999–1004, 2000

Krueger JG: The immunologic basis for the treatment of psoriasis with new biologic agents. J Am Acad Dermatol 46:1–23, 2002, quiz 23–26

Lebwohl M: Psoriasis. Lancet 361:1197–1204, 2003

Lee EG, Boone DL, Chai S, Libby SL, Chien M, Lodolce JP, Ma A: Failure to regulate TNF-induced NF-kappaB and cell death responses in A20-deficient mice. Science 289:2350–2354, 2000

Lee RE, Gaspari AA, Lotze MT, Chang AE, Rosenberg SA: Interleukin 2 and psoriasis. Arch Dermatol 124:1811–1815, 1988

Manie T, Celdysis by a multiprotein IkappaB kinase complex. Science 278:818–819, 1997

McKenzie RC: Aberrant signalling and transcription factor activation as an explanation for the defective growth control and differentiation of keratinocytes in psoriasis: a hypothesis. Exp Dermatol 12:337–345, 2003

McKenzie RC, Sabin E, Szepietowski JC, Gracie JA, Forsey RJ, Howie S: Interferon gamma in keratinocytes in psoriasis. Eur J Dermatol 13:313–316, 2003

Nickoloff BJ, Basham TY, Merigan TC, Morhenn VB: Antiproliferative effects of recombinant alpha- and gamma-interferons on cultured human keratinocytes. Lab Invest 51:697–701, 1984

Oeie ON, Mayo LD, Gustin JA, Pfeffer SR, Pfeffer LM, Donner DB: NF-kappaB activation by tumour necrosis factor requires the Akt serine-threonine kinase. Nature 401:82–85, 1999

Qin JZ, Chaturvedi V, Denning MF, Choubey D, Diaz MD, Nickoloff BJ: Role of NF-kappaB in the apoptotic-resistant phenotype of keratinocytes. J Biol Chem 274:37957–37964, 1999

Rodriguez-Villanueva J, Greenhalgh D, Wang XJ, et al: Human keratin-1.bcl-2 transgenic mice aberrantly express keratin 6, exhibit reduced sensitivity

to keratinocyte cell death induction, and are susceptible to skin tumor formation. Oncogene 16:853–863, 1998

Romashkova JA, Makarov SS: NF-kappaB is a target of AKT in anti-apoptotic PDGF signalling. Nature 401:86–90, 1999

Saunders NA, Jetten AM: Control of growth regulatory and differentiation-specific genes in human epidermal keratinocytes by interferon gamma. Antagonism by retinoic acid and transforming growth factor beta 1. J Biol Chem 269:2016–2022, 1994

Schmitz ML: Function and activation of the transcription factor NF-kappa B in the response to toxins and pathogens. Toxicol Lett 82–83:407–411, 1995

Schmitz ML, Baeuerle PA: Multi-step activation of NF-kappa B/Rel transcription factors. Immunobiology 193:116–127, 1995

Schmitz ML, Stelzer G, Altmann H, Meisterernst M, Baeuerle PA: Interaction of the COOH-terminal transactivation domain of p65 NF-kappa B with TATA-binding protein, transcription factor IIB, and coactivators. J Biol Chem 270:7219–7226, 1995

Seitz CS, Deng H, Hinata K, Lin Q, Khavari PA: Nuclear factor kappaB subunits induce epithelial cell growth arrest. Cancer Res 60:4085–4092, 2000a

Seitz CS, Freiberg RA, Hinata K, Khavari PA: NF-kappaB determines localization and features of cell death in epidermis. J Clin Invest 105:253–260, 2000b

Sheppard KA, Rose DW, Haque ZK, et al: Transcriptional activation by NF-kappaB requires multiple coactivators. Mol Cell Biol 19:6367–6378, 1999

Sieberlist U, Franzoso G, Brown K: Structure, regulation and function of NF-kappa B. Annu Rev Cell Biol 10:405–455, 1994

Sonenshein GE: Rel/NF-kappa B transcription factors and the control of apoptosis. Semin Cancer Biol 8:113–119, 1997

Tak PP, Firestein GS: NF-kappaB: A key role in inflammatory diseases. J Clin Invest 107:7–11, 2001

Takao J, Yudate T, Das A, Shikano S, Bonkobara M, Aritsumi K, Cruz PD: Expression of NF-kappaB in epidermis and the relationship between NF-kappaB activation and inhibition of keratinocyte growth. Br J Dermatol 148:680–688, 2003

Takeda K, Takeuchi O, Tsujimura T, et al: Limb and skin abnormalities in mice lacking IKKalpha. Science 284:313–316, 1999

Vallo Elsaquez M, Luque I, Collantes E, Aranda E, Solana R, Pena J, Munoz E: Cellular redox status influences both cytotoxic and NF-kappa B activation in natural killer cells. Immunology 90:455–460, 1997

Wang D, Baldwin AS Jr: Activation of nuclear factor-kappaB-dependent transcription by tumor necrosis factor-alpha is mediated through phosphorylation of RelA/p65 on serine 529. J Biol Chem 273:29411–29416, 1998

Wang CY, Cusack JC Jr, Liu R, Baldwin AS Jr: Control of inducible chemoresistance: Enhanced anti-tumor therapy through increased apoptosis by inhibition of NF-kappaB. Nat Med 5:412–417, 1999a

Wang CY, Guttridge DC, Mayo MW, Baldwin AS Jr: NF-kappaB induces expression of the Bcl-2 homologue A1/Bfl-1 to preferentially suppress chemotherapy-induced apoptosis. Mol Cell Biol 19:5923–5929, 1999b

Wang YM, Seibenhener ML, Vandenplas ML, Wooten MW: Atypical PKC zeta is activated by ceramide, resulting in coactivation of NF-kappaB/JNK kinase and cell survival. J Neurosci Res 55:293–302, 1999

Watanabe T, Kitani A, Murray PJ, Strober W: NOD2 is a negative regulator of Toll-like receptor 2-mediated T helper type 1 responses. Nat Immunol 5: 800–808, 2004

Werner S, Smola H: Paracrine regulation of keratinocyte proliferation and differentiation. Trends Cell Biol 11:143–146, 2001

Wilson JB, Weinberg W, Johnson R, Yuspa S, Levine AJ: Expression of the BNLF-1 oncogene of Epstein-Barr virus in the skin of transgenic mice induces hyperplasia and aberrant expression of keratin 6. Cell 61:1315–1327, 1990

Wrone-Smith T, Mitra RS, Thompson CB, Jnary R, Garlis VP, Nickoloff BJ: Keratinocytes derived from psoriatic plaques are resistant to apoptosis compared with normal skin. Am J Pathol 151:1321–1329, 1997

Yawalkar N, Karlen S, Hunger R, Brand CU, Braathen LR: Expression of interleukin-12 is increased in psoriatic skin. J Invest Dermatol 111:1053–1057, 1998

Zhong H, SuYang H, Erdjument-Bromage H, Tempst P, Ghosh S: The transcriptional activity of NF-kappaB is regulated by the IkappaB-associated PKAc subunit through a cyclic AMP-independent mechanism. Cell 89: 413–424, 1997

Zhong H, Voll RE, Ghosh S: Phosphorylation of NF-kappaB p65 by PKA stimulates transcriptional activity by promoting a novel bivalent interaction with the coactivator CBP/p300. Mol Cell 1:661–671, 1998

Zollner TM, Podda M, Pien C, Elliott PJ, Kaufmann R, Boehncke WH: Proteasome inhibition reduces superantigen-mediated T cell activation and the severity of psoriasis in a SCID-hu model. J Clin Invest 109:671–679, 2002

Non Confidential

AM-AR0363104

# EXHIBIT 3

```
 1                 IN THE UNITED STATES DISTRICT COURT
                   IN AND FOR THE DISTRICT OF DELAWARE
 2
                                - - -
 3
    AMGEN, INC., a Delaware corporation;  :    CIVIL ACTION
 4  IMMUNEX CORPORATION, a Washington     :
    Corporation; AMGEN USA, INC., a       :
 5  Delaware corporation; AMGEN           :
    MANUFACTURING, LIMITED, a Bermuda     :
 6  Corporation; and IMMUNEX RHODE ISLAND :
    CORPORATION a Delaware corporation,   :
 7                                        :
                      Plaintiffs,         :
 8        v                               :
                                          :
 9  ARIAD PHARMACEUTICALS, INC.,          :
    a Delaware corporation                :
10                                        :    NO. 06-259 (KAJ)
                      Defendant.
11                              - - -

12                         Wilmington, Delaware
               Monday, September 11, 2006 at 2:00 p.m.
13                         MOTIONS HEARING

14                              - - -

15  BEFORE:        HONORABLE KENT A. JORDAN, U.S.D.C.J.

16                              - - -

    APPEARANCES:
17

18             YOUNG CONAWAY STARGATT & TAYLOR, LLP
               BY:  MELANIE K. SHARP, ESQ.
19
                    and
20
               KIRKLAND & ELLIS, LLP
21             BY:  MARK A. PALS, ESQ., and
                    MARCUS E. SERNEL, ESQ.
22                  (Chicago, Illinois)

23                    Counsel for Plaintiffs

24
                              Brian P. Gaffigan
25                            Registered Merit Reporter
```

1          "To be sure, any time parties are in

2    negotiations over patent rights, the possibility of a

3    lawsuit looms in the background.  No patent owner with any

4    sense would open negotiations by assuring the opposite

5    party that he does not intend to enforce his patent rights

6    under any circumstances.  The threat of enforcement either

7    directly by the patentee or indirectly by a third-party to

8    whom the patentee licenses or sells the patent is the entire

9    source of the patentee's bargaining power.  Thus, it is

10   unrealistic to suggest that some negotiating patentees

11   intend to enforce their patents, while some do not, and that

12   the first group is subject to declaratory judgment actions

13   while the second is not."

14          Thank you, Your Honor.

15          THE COURT:  All right.  Thanks.

16          This is a fact intensive inquiry.  I appreciate

17   the presentations that have made here and the submissions

18   that were provided.  And as I told you before, this was a

19   matter I was going to endeavor to rule on from the bench and

20   I will.

21          There are two issues in play here.  One is

22   whether there is declaratory judgment act jurisdiction to

23   begin with and the second is whether, if there is, Amgen

24   has got the right parties here in front of me.

25          As to the first of those issues, there is no

1    dispute between the parties that Amgen is engaged in acts,

2    taking concrete action which would qualify under the

3    two-prong test for declaratory judgment act jurisdiction the

4    Federal Circuit has set forth.  So the only question is as

5    to the first prong and that is the reasonable apprehension

6    for suit.  That is what the briefing is about.  That is what

7    discussion today in court has been about.

8           My conclusion is that there is an objectively

9    reasonable apprehension of suit on this record sufficient

10   to sustain jurisdiction.  I don't look at any one thing to

11   reach that conclusion.  I look, as I'm required to, at the

12   totality of the circumstances.

13          I disagree with Amgen in its assertion that the

14   early letter is threatening, the five-percent royalty rate

15   description somehow constitutes a threat.  That I think,

16   on the contrary, is a stretch that won't sustain the

17   characterization that is made of it.  But there is a history

18   here of ARIAD being clear that it has patent rights.  It

19   wants its patent rights respected, and it wants Amgen taking

20   those rights seriously.  That, in and of itself, would not

21   be problematic.  As Mr. Gindler has said rightly on behalf

22   of ARIAD, no patentee acquires patent rights with the intent

23   that they be ignored.  And ARIAD was certainly within its

24   rights to contact potential licensees and let them know

25   about their rights and suggest that potential licensees take

1    a look at those patents.

2            So those letters, in and of themselves, don't

3    create a reasonable apprehension of suit with respect to

4    the '516 patent, but they're not a circumstance that I'm

5    ignoring because they do show ARIAD, on repeated occasions,

6    saying we have these rights and on at least one occasion

7    saying, although not with respect to the '516 patent, we

8    think you are on our rights. And so it's clear that ARIAD

9    is out there looking to see that their rights are respected;

10   a perfectly reasonable and logical position for it to take

11   and background information for what comes next.

12           Among the things that comes next is the issuance

13   of the '516 patent, the immediate contact from ARIAD to

14   Amgen announcing the '516 patent and the immediate lawsuit

15   against Lilly. These are things that all the parties in

16   this suit acknowledge to be facts and which Amgen rightly

17   notes as a feature or a factor in its thinking about what

18   to make of ARIAD's intentions with respect to its, meaning

19   ARIAD's, rights under the '516 patent.

20           Then there is a telephone conversation followed

21   up on correspondence from Mr. Casselman to Mr. Ungemach.

22   In all these interactions, the letters and this telephone

23   conversation which is some time in 2002 or 2003, there is a

24   dance going on. This is not unusual, given the state of the

25   law about declaratory judgment jurisdiction. It's apparent

1    from the descriptions I'm able to see in the record that

2    there is an effort by ARIAD to make sure Amgen knows ARIAD

3    is serious about its patent rights without uttering any

4    magic words that would land them in court at the other end

5    of a declaratory judgment action.

6         You know, I've heard Mr. Casselman described as

7    a "nonlawyer." I assume that was not meant as a distinction

8    to say he is better than a lawyer. I assume that was meant

9    to say he is not sophisticated the way a lawyer would be

10   about declaratory judgment act pitfalls. But this appears

11   to be an extremely saddened businessman acting in an under-

12   standably prudent way and with what appears to be a know-

13   ledge of how far he can get without falling into the pit in

14   an effort to try to do exactly that.

15        Nevertheless, it is background information for

16   what comes next: A direct assertion we've got rights.

17   You should be interested in these rights. You should be

18   interested with these rights with respect to a specified

19   product.

20        What came after that is the alleged threat by

21   Ms. Carson in the context of the Lilly litigation.

22        Now, I am persuaded that where there is a

23   dispute in the record of what was said or meant by what

24   was said; and here, counsel for Amgen's point is well

25   taken. Ms. Carson doesn't directly dispute that she made

1    the comment attributed to her.  She says I would never

2    have threatened suit.  So it's less than a direct head-on

3    confrontation, it's more of an oblique confrontation with

4    respect to intent behind her comments, if she made it.  And

5    I believe it more likely than not, given the record before

6    me, that she did make the comment attributed to her, that

7    it was in the context in which Mr. Cantrell describes with

8    specificity.  And that in that context, it was fairly

9    understood as a statement that there are other players out

10   there and they can expect enforcement efforts.

11           Attorneys, like anybody else, sometimes in the

12   heat of battle, when questioned about what they're doing,

13   will say things that they later regret.  And she may well

14   regret having said it or she may well say that judge is a

15   knothead.  I said I didn't threaten suit and I meant it.

16   But the record, as best I can figure it, is she probably

17   said it.  She probably wishes she hadn't said it but she

18   probably said it.  And in the context in which it was said,

19   it was rightly viewed as an assertion that Amgen was in

20   the batter's box.  That when they got finished pitching an

21   infringement action at Lilly, the next one that was going to

22   be called in was going to be Amgen.

23           Now, there is delay there.  And if nothing had

24   happened next, I think I would be ruling differently than

25   in am today.  In fact, I feel sure I would have.  But what

1   comes next is highly significant to me.  In open court,

2   there is displayed internal presentation materials which

3   the ARIAD folks had used to educate their board, explain to

4   their board what their planning was.  And certainly in the

5   context of that litigation, again, a savvy businessperson

6   like Mr. Berger, knowing the consequences -- and in this

7   event, I should say Dr. Berger; he is not a lawyer, he is

8   never going to appear in front of me -- Dr. Berger is

9   careful to distance himself in that trial testimony from

10   any implication that, well, this meant we were going to sue

11   people.  But I'm looking at the slides themselves and not

12   the explanations for the slides themselves.

13         Let me rephrase that.  I certainly have looked

14   at the explanation for the slides, themselves.  It's a

15   factor I have weighed in making the judgment I am making

16   here today.  But the slides themselves speak more loudly to

17   me than Dr. Berger's careful testimony in the action in the

18   District of Massachusetts.  Those slides show that there is

19   a slide 35 naming lead players in the market.  I think in

20   context, that can only be understood to mean in the market

21   of products that are likely to be covered by our rights.

22         The next slide, 36, has Marketed and Late-Stage

23   Products as its heading and the very first point there is

24   the Xigris product which is the subject of the then ongoing

25   patent suit.

1          The next slide, 37, still headed Marketed and

2     Late-Stage Products, has at the top of it, as its first

3     bullet point, antiinflammatories of which Enbrel is listed

4     as the first one, and Kineret later on in that same page.

5          Later, slide 41 talks about goals for the first

6     quarter of '02 which include selecting litigation counsel,

7     complete enforcement analysis and action plan.  Those are

8     not limited to suit against Lilly, they're stated broadly.

9          I think in the context of the overall

10    presentation that was given -- and I say given in the

11    courtroom; that is, as displayed in the courtroom.  I have

12    no idea what was said to the board when slides were shown to

13    the board.  I'm talking about what a reasonably objective

14    observer could have made, and I think Amgen says it did

15    make, of the information presented in that courtroom.  That

16    is, Xigris is first.  By its own admission, ARIAD is the

17    David to the pharmaceutical Goliath.  That is something that

18    is said a few times.  And they're not taking more than one

19    at a time.

20         But Xigris was at the top of slide 36, we're at

21    the top of slide 37, and that, together with "Enbrel is on

22    the list," in the context of the various communications that

23    had gone before, showing that ARIAD was serious about its

24    patent rights and seeing that those rights were respected,

25    was enough for a reasonably objective company in Amgen's

1    position to say they're going to sue us.  And we're doing

2    things that satisfy the second prong, the declaratory

3    judgment act test.  And in that context, the law is pretty

4    clear that you don't have to wait until ARIAD decides it's

5    ready to pull the trigger.

6        I am not taking into account at all in my

7    analysis that "you're next" comment.  I think Dr. Carson

8    has given a reasonable explanation.  Unlike the earlier

9    conversation Ms. Carson had directly with Mr. Cantrell,

10   Mr. Cantrell only heard a snatch of the conversation.  He

11   doesn't know the context of it.  Ms. Carson does, and has

12   given a reasonable explanation for it.  And, in any event,

13   Amgen is frank to say it's not relying on it as a point of

14   presuit knowledge.

15       For the same reason on that last point, I'm not

16   taking the CNBC interview comments into account at all.  To

17   me, they're just flat irrelevant.  It doesn't make any

18   difference what Dr. Berger said to the press after this

19   suit was filed and could not possibly have affected

20   anybody's apprehension of suit before suit was filed.

21       I also want to note that the overall tone of

22   the interaction, the going back and forth over a series of

23   conversations, letters, and commentary during the Lilly

24   conversations as recounted by Mr. Cantrell with respect to

25   the "Enbrel is on the list" shows that this is a field in

1    which -- and I'm not saying this is a bad thing at all --

2    a field in which ARIAD feels it has rights and feels that

3    the enforcement of those rights is important, and that it

4    has the intention of enforcing those rights.  In other

5    words, there is a tone to the totality and the tone is,

6    overall, one that a reasonably objective observer would

7    perceive to be threatening enforcement action.

8         Consequently, I believe I do have the discretion

9    to exercise jurisdiction, and I will not decline to exercise

10   that jurisdiction because of the reexamination that is still

11   in process because of the efforts of ARIAD to overturn the

12   initial decision.

13        I note that the parties may want to talk about

14   whether it makes sense to pursue this litigation at this

15   particular point in time.  I am satisfied, however, that

16   ARIAD still has these rights, could still choose to sue on

17   these rights and, for reasons I already described, Amgen

18   rightly concerned that they're the ones who would be sued

19   in short order, so I'm not going to decline jurisdiction

20   on the basis that a large chunk of the '516 patent is, as

21   Mr. Gindler put it, in flux at this time.

22        That brings me to the last issue.  That is, do I

23   have the right parties in front of me?  And I am going to

24   deny the motion to dismiss without prejudice on this point.

25   It may be that there is some further evidence that would

1   come to light that would demonstrate something different on

2   this record than what I think I'm seeing right now.  What

3   I'm seeing right now is the grant of substantially all

4   rights associated with the patent.  That is, ARIAD has the

5   right to sublicense, ARIAD has the right to enforce, ARIAD

6   has the contractual right to be the sole representative in a

7   DJ action.

8           The language specifically pointed out to me

9   as the replacement language for 7.5 in the agreement that

10  effectively assigns these rights does note that there is

11  some reservation of right if ARIAD fails to do reasonable

12  things to defend a DJ action, but it appears to me that that

13  amended language was intended to, and the legal effect is

14  it in fact does, strengthen ARIAD's position to be enforcing

15  and defending the rights associated with this patent all by

16  itself, without anybody else in the mix.

17          Now, I just note I'm doing that without

18  prejudice because it's possible, it's just possible that I

19  missed something or there is something out there that hasn't

20  been put in front of me, and I recognize that I don't have

21  the other parties to this agreement in front of me.  I don't

22  have like MIT, Whitehead and other folks in here, and who is

23  to say I won't.  There is nothing to prevent, at least at

24  this stage that I'm aware of, third-party practice that

25  would bring them into the suit, if they chose to be here,

1    or perhaps even if they didn't.  I won't prejudge that for a

2    second.  But I'm not stopping and throwing this suit out on

3    indispensable party claim at this point.  That means we're

4    here, we're moving forward and discovery is going to go

5    forward.

6          I have before me a motion for protective order

7    and a motion to compel.  I had thought we might get to that

8    today and we haven't.  Here is the short of it with respect

9    to that, however.  I read your follow-up letters.  I do not

10   view the language of the protective order entered in the

11   Massachusetts action as an attempt or anything intended by

12   that District Court to do anything other than something I

13   do as a matter of course in my protective orders and that

14   is make sure that nobody is caught short, that confidential

15   information that somebody got from a third-party isn't aired

16   out in public without that party, that third-party having a

17   chance to come in and deal with it.

18          To the extent ARIAD is trying to make the

19   argument -- and I'm not sure it is really, although some of

20   the things said in the teleconference last month and in

21   the correspondence could be read this way.  To the extent

22   there is an effort by ARIAD to say, well, judge, you can't

23   really do anything here without making sure you are acting

24   appropriately within the bounds of the District Court of

25   Massachusetts order, you know, I reject that because I don't

1    think, A, the District Court in Massachusetts intended that

2    or, B, that it could bind this Court in a fashion suggested

3    by that argument, if that is the argument ARIAD intended to

4    make.

5         On the contrary, I think as I said a moment ago,

6    that this is standard language in a protective order to

7    prevent an unwitting third-party from seeing this private

8    information get out in the public without having a chance to

9    defend its confidentiality in front of the court under whose

10   power the subpoena is issued.  That's not the circumstance

11   that we have here.  That is, ARIAD is not some unwitting

12   third-party wondering.  It's in this suit.  It knows what

13   is at issue.  It had its opportunity to defend.  It has

14   made its position on this record.  It has had its rights

15   satisfied.  And I'm not granting a protective order and I'm

16   not quashing the subpoena.

17        Now, having said that, I want to emphasize that

18   I am sensitive to ARIAD's concern that its information not

19   be disclosed from Lilly in a manner that is inconsistent

20   with the protective order in this case.  In other words, in

21   the first instance, any information that Lilly discloses,

22   I'm not going to have this go Lilly to ARIAD to Amgen.  What

23   I will say is this is not going to go beyond counsel's eyes

24   only on the Amgen side until the folks on the ARIAD side

25   have had a chance to vet this and decide whether there are

1   confidentiality designations that need to be put in place

2   that are somehow other or different from the ones that

3   existed in the District of Massachusetts.   In short, you

4   will have your shot to make sure it doesn't go past

5   attorneys eye's only level under the protective order we've

6   got until you, on the ARIAD side, have a chance to look at

7   it.

8            Last, but not least, there is a motion to

9   compel.   I grant it to this limited extent.   We're now past

10  the motion to dismiss.   Right or wrong?   I've given you my

11  best shot and I think you need to move forward at this

12  juncture.

13           However, I do think there is merit to some of

14  what ARIAD has said about the breadth of some of the

15  requests.   And I just don't want to get into it at this

16  point because there is just not a sufficient point on the

17  issue for me to address it sensibly.   Suffice it to say

18  that the parties should meet and confer in good faith to

19  make sure that the requests that are made of ARIAD are

20  appropriate within the bounds of Rule 26 and designed to

21  move us past disputes that can only waste your client's time

22  and your time, your clients' money and, to a certain degree,

23  the Court's time if things are cast so broadly so as to cast

24  reasonable objections.   So I'm asking you to do what the

25  rules already tell you to do, talk to each other, see if you

1    can't come to a reasonable accommodation about some of these

2    requests.

3              All right.  I think that addresses the matters

4    that were before me.  And I do have another matter I am

5    going to need to attend now.  But let me ask you first

6    before I take off out of here, Mr. Pals, is there any other

7    matter pending that you think the Court needs to give its

8    attention to?

9              MR. PALS:  Not at this time Your Honor.

10             THE COURT:  Mr. Gindler?

11             MR. GINDLER:  No, Your Honor.  Just one

12   question.  When you refer to attorneys eyes only, I assume

13   you are referring to outside counsel's eyes only.

14             THE COURT:  Yes.  Thank you for clarifying that.

15   That is my intent.  Well, let me say this.  I have not gone

16   back and re-read the protective order that was entered in

17   this case.  It may be, in the protective order entered in

18   this case, there is, under the highest designation that you

19   parties negotiated, a level that involves somebody from

20   in-house counsel.

21             Now, you should have that in mind when you are

22   taking whatever position you are taking, okay?  Both sides.

23   But I'm telling you since I'm bringing in litigation from

24   another case in the first instance, I'm talking about

25   outside counsels' eyes only because it may be that this

 1   tranche of documents raises different issues than ARIAD

 2   had in mind when it negotiated whatever it negotiated with

 3   respect to the protective order in the first place.

 4          So that's a long way of saying, yes, it is

 5   outside attorneys' eyes only for this significant batch of

 6   documents unless and until you guys are able to agree other-

 7   wise or I get a persuasive argument that it's impossible for

 8   them to deal with you on this point and they are being

 9   unreasonable.

10          Have I made myself clear?  In short, I don't

11   know, in fact, I think it unlikely, that this collective of

12   documents was specifically in mind when this was being

13   litigated so I'm going to treat this as we treat other

14   things before there is a protective order in place, which is

15   it's outside counsels' eyes only.  You folks talk about it.

16   If you have already negotiated certain people to be in the

17   loop on the inside, then you ought to reasonably be talking

18   about whether there is any reason for them not to see it

19   other than just kind of being the dog in the manger; okay?

20          Do you understand what I'm trying to do?  I'm

21   trying to protect ARIAD's rights, move this thing forward

22   and hopefully if these people were in the loop before, it

23   was before ARIAD recognized that, yes, they wouldn't be a

24   threat to see the most sensitive stuff.  And you ought to be

25   taking that into account, ARIAD, in whether you are really

1    going to say, no, this can't be seen by those folks on the

2    other side.  But I'm letting you take the first track crack

3    at that; all right?

4              MR. GINDLER:  Yes.

5              THE COURT:  Before they see it.

6              MR. PALS:  That's pretty much where we are,

7    Your Honor.  We haven't finalized the negotiated protective

8    order but we have agreed on sort of the structure of the

9    confidentiality restrictions which would allow inside

10   counsel access to the information.

11             MR. GINDLER:  It would allow certain of them,

12   and it also would provide, at least in the version we have

13   proposed, and it also is in the protective order from the

14   Lilly case, that nothing in the protective order stops us

15   from seeking a higher level of protection for protective

16   documents.  And I think the Court is wise that we take the

17   first crack at seeing whether we are concerned about any

18   document and want to seek a higher level of protection for

19   them.

20             THE COURT:  And that's what I'm telling is going

21   to be the case here.  Okay?

22             MR. GINDLER:  Thank you, Your Honor.

23             THE COURT:  All right.  Thanks for your time and

24   attendance.  Appreciate it.  We're in recess.

25             (Motions hearing ends at 4:32 p.m.)

# EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMGEN, INC., IMMUNEX CORPORATION, )
AMGEN USA INC., AMGEN MANUFACTURING )
LIMITED, IMMUNEX RHODE ISLAND )
CORPORATION, )
           ) C.A. No. 06-259-MPT
                   Plaintiffs, )
    v. )
                        )
ARIAD PHARMACEUTICALS, INC., )
                   Defendant. )

## DEFENDANT ARIAD PHARMACEUTICALS, INC.'S SECOND
## SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
## PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, and the Local Rules for the District of Delaware, Defendant ARIAD Pharmaceuticals, Inc. ("ARIAD") hereby supplements its responses to Plaintiffs' First Set of Interrogatories to Defendant as follows:

### INTRODUCTION

This response is made solely for the purpose of this action. The response is subject to all objections as to competence, relevance, materiality, propriety and admissibility, and to any and all other objections on any grounds that would require the exclusion of any statements contained herein if such interrogatory were asked of, or statements contained herein were made by, a witness present and testifying in court, all of which objections and grounds are expressly reserved and may be interposed at the time of trial.

Objections to each interrogatory are made on an individual basis below. From time to time, for special emphasis, ARIAD will repeat in the specific objections certain objections also set forth in the general objections. The specific objections are submitted without prejudice to, and without in any way waiving, the general objections listed

below, but not expressly set forth in the response. The assertion of any objection to any interrogatory below is neither intended as, nor shall in any way be deemed, a waiver of ARIAD's right to assert that or any other objection at a later date. At this time, ARIAD shall not provide any information protected by any applicable privilege or doctrine.

No incidental or implied admissions are intended by the responses below. The fact that ARIAD has answered or objected to any interrogatory should not be taken as an admission that ARIAD accepts or admits the existence of any "facts" set forth or assumed by such interrogatory. The fact that ARIAD has answered part or all of any interrogatory is not intended to be, and shall not be construed to be, a waiver by ARIAD of any part of any objection to the interrogatory.

ARIAD's responses herein, and its disclosure of information, do not in any way constitute an acceptance of Plaintiffs' purported Instructions or its purported Definitions of words or phrases contained in its interrogatories. Consistent with applicable law, and without waiver or limitation of any of its objections, ARIAD has made a good faith effort to interpret the objectionable Definitions in Plaintiffs' interrogatories.

To the extent that ARIAD responds to any interrogatory, its responses reflect only the current state of knowledge, understanding, and belief of ARIAD with regard to matters about which inquiry has been made. As discovery in this matter is not yet complete, ARIAD may not yet have uncovered all information or facts pertinent to any such interrogatory and may not yet have identified or located all persons with knowledge of pertinent information or facts. ARIAD expects and consequently reserves the right to modify or supplement its response at a later time with any subsequently discovered fact or information that it may later recall or discover. ARIAD further reserves the right to change, amend or supplement any or all of the matters contained in this response as additional facts are ascertained, analyses are performed, research is completed and contentions are made. Furthermore, this response is provided without prejudice to using or relying on at trial any subsequently discovered information or facts, or information

omitted from these responses as a result of mistake, oversight, or inadvertence. ARIAD further reserves the right to produce additional facts and evidence at trial and to object on appropriate grounds to the introduction into evidence of any portion of these responses. This response is also given without prejudice to ARIAD's right to advance contentions or make claims not yet advanced or made in the present action and to supplement this response as appropriate.

## GENERAL OBJECTIONS

ARIAD asserts the following General Objections with respect to each interrogatory:

1.    ARIAD objects to the First Set of Interrogatories and to each definition, instruction, and interrogatory therein to the extent that they purport to impose on ARIAD obligations that differ from or exceed those required by the Federal Rules of Civil Procedure, the Local Rules for the District of Delaware ("Local Rules"), or any order or ruling by the Court in this action. ARIAD shall not comply with any purported obligation not imposed by law.

2.    ARIAD objects to the First Set of Interrogatories and to each interrogatory therein on the ground and to the extent that they purport to seek information protected by the work product doctrine, attorney-client privilege, or any other privilege or restriction on discovery. ARIAD will not produce information protected by such privileges or restrictions. Any inadvertent or unintentional disclosure of such information shall not be deemed a waiver of any applicable privilege or restriction.

3.    ARIAD objects to the First Set of Interrogatories on the ground and to the extent that they seek information that is neither relevant to any claim or defense of a party, nor reasonably calculated to lead to the discovery of admissible evidence.

4.    ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent that they are overbroad, unduly burdensome, oppressive, or seek

information that is beyond the scope of discovery under the Federal Rules of Civil Procedure, including but not limited to Federal Rule of Civil Procedure 26(b).

5.    ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent they are vague, ambiguous, or without sufficient specificity to identify what information is requested.

6.    ARIAD objects to Plaintiffs' Interrogatories as premature. In particular, ARIAD objects to Plaintiffs' Interrogatories as premature to the extent that they seek information that ARIAD is not required to disclose at this stage of litigation. In addition, ARIAD's investigation is continuing and may result in additional contentions. For the foregoing reasons, ARIAD's responses are not complete and cannot be completed at this time, and are subject to revision.

7.    ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent that they are compound and are actually multiple interrogatories, on the ground that they are an impermissible effort to circumvent the fifty interrogatory limit set forth in Local Rule 26.1(b).

8.    ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent that they seek information that is publicly available, in the possession, custody or control of Plaintiffs or any person or entity other than ARIAD, and is equally accessible to Plaintiffs through means less burdensome to ARIAD.

9.    ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent that they call for a legal conclusion.

10.    ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent they seek personal information that is protected by statutory, constitutional, common law or privacy rights. ARIAD reserves the right not to provide any of this information until it receives appropriate approvals. To the extent that ARIAD responds to these Interrogatories by referring Plaintiffs to documents pursuant to Federal

Rule of Civil Procedure 33(d), nothing herein shall affect in any way the confidentiality designations, if any, of those documents.

11.    ARIAD objects to Plaintiffs' purported definitions of words and phrases contained in its interrogatories. ARIAD objects to Plaintiffs' definitions to the extent that they:  (i) are unclear, ambiguous, overly broad, or unduly burdensome; (ii) are inconsistent with the ordinary and customary meaning of the words or phrases they purport to define; (iii) seek to impose obligations different from, or in excess of, those created by the Federal Rule of Civil Procedure and the Local Rules; (iv) include assertions of purported fact that are inaccurate or at the very least are disputed by the parties to this action; or (v) incorporate other purported definitions that suffer from such defects.

12.    ARIAD, in particular, objects to the definition of "Ariad" set forth in paragraph 2 of the Definitions and Instructions to the extent it purports to impose discovery obligations on persons or entities other than the parties to this action, and to the extent it seeks discovery from individuals or entities over which ARIAD has no control.

13.    ARIAD, in particular, objects to the definitions of "identify," "identity," and "identification" set forth in paragraphs 6 and 7 of the Definitions and Instructions to the extent they purport to impose on ARIAD obligations that differ from or exceed those required by the Federal Rules of Civil Procedure, the Local Rules, or any order or ruling by the Court in this action.

14.    ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent they request information concerning patent claims and claim terms that have not yet been construed by the Court. ARIAD reserves its right to modify or supplement its responses as a result of any rulings by the Court bearing on claim construction, and/or discovery bearing on claim construction.

15.    ARIAD objects to the First Set of Interrogatories and to each interrogatory therein to the extent they request information dependent upon documents or other

information in the possession, custody and control of Plaintiffs, Plaintiffs' counsel, or third parties. ARIAD reserves its right to modify or supplement its responses in view of the discovery of information and review of documents received from Plaintiffs or third parties.

16.    ARIAD objects to the First Set of Interrogatories and each interrogatory therein to the extent that they purport to require ARIAD to search for information that is not within its possession, custody, or control. ARIAD will use reasonable diligence to locate information within its control.

17.    ARIAD objects to the First Set of Interrogatories and each interrogatory therein to the extent they call for information ARIAD does not have the authority to release. ARIAD will not disclose any of this information without approval.

18.    ARIAD expressly incorporates each of the foregoing General Objections into each specific response to the interrogatories set forth below as if set forth in full therein. An answer to an interrogatory shall not work as a waiver of any applicable specific or general objection to an interrogatory.

## RESPONSES TO SPECIFIC INTERROGATORIES

### INTERROGATORY NO. 2:

Identify all claims of the '516 patent that Ariad contends are infringed by the Amgen Entities based on any activities related to ENBREL, and state in detail, on a claim-by-claim basis, the legal and factual bases for Ariad's infringement contentions, including but not limited to Ariad's contentions as to the proper constructions of terms and phrases in the patent claims, whether each infringement contention is literal or under the doctrine of equivalents, and providing an element-by-element analysis comparing the activities related to ENBREL that Ariad contends infringe a claim of the '516 patent to the claim that Ariad contends is infringed.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to Plaintiffs' Interrogatories as premature in light of ARIAD's pending Motion to Dismiss, as set forth in the papers supporting ARIAD's Motion To Stay Discovery. ARIAD objects to this interrogatory as compound and consisting of multiple subparts which properly should be counted as separate interrogatories. ARIAD objects to this interrogatory to the extent it calls for information that is protected from discovery under the attorney-client privilege, work product doctrine, or any other applicable privilege or protection.

As ARIAD set forth in the papers supporting its Motion to Dismiss, ARIAD has never "contended" that ENBREL infringed any claim of the '516 patent and has not conducted an infringement analysis with respect to whether ENBREL infringes any claim of the '516 patent. This response is provided without prejudice to ARIAD's right to perform such an analysis at a later time. ARIAD expressly reserves the right to modify or supplement its contentions and responses as ARIAD receives additional information from Plaintiffs or third parties, as ARIAD locates additional information, or based on a ruling by the Court.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

ARIAD supplements its initial response to Interrogatory No. 2 as follows:

ARIAD objects to this interrogatory as premature in light of ARIAD's renewed Motion to Dismiss for Failure to Join Necessary and Indispensable Parties. ARIAD further objects to this interrogatory as premature on the ground that the Scheduling Order issued by the Court sets forth May 21, 2007, as the date by which ARIAD is to identify the "claim term(s)/phrase(s) that [it] believe[s] needs construction and their proposed construction of those term(s)/phrase(s)."

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

Prior to the filing of this action, ARIAD has never "contended" that, or conducted any investigation to determine whether, any claims of the '516 patent are infringed, whether directly, indirectly or under the doctrine of equivalents, by Plaintiffs based on any activities related to ENBREL. In light of the Court's rulings at the hearing conducted on September 11, 2006, an investigation is being undertaken in an effort to determine whether any claims of the '516 patent are infringed, whether directly, indirectly or under the doctrine of equivalents, by Plaintiffs based on any activities related to ENBREL. This investigation, which is both complex and time consuming, is ongoing and is incomplete. ARIAD will provide further supplemental responses when and if it makes such a contention and its infringement analysis is completed.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:

ARIAD supplements its response to Interrogatory No. 2 as follows:

ARIAD objects to this interrogatory insofar as the Court has not yet construed the claims of the '516 patent, ARIAD's investigation is still continuing, discovery is ongoing, and Plaintiffs did not produce any documents in this action until April 11, 2007. ARIAD reserves the right to modify or supplement its responses as ARIAD continues its investigation and as ARIAD reviews documents produced and other information provided by Plaintiffs or third parties (including but not limited to documents and information regarding ENBREL and Plaintiffs' activities related to ENBREL). ARIAD further reserves the right to modify or supplement its responses based on subsequent rulings by the Court, including but not limited to claim construction.

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

Plaintiffs and Wyeth have been and are currently directly infringing, contributorily infringing, and/or inducing infringement of the '516 patent by, among other things, making, using, offering to sell, selling and/or importing ENBREL, without authority or license from ARIAD. Plaintiffs' and Wyeth's activities related to ENBREL

- 8 -

are currently believed to infringe at least the claims listed below. ARIAD's investigation is continuing and discovery is still ongoing. ARIAD has not had an opportunity to review Plaintiffs' April 11, 2007 document production, which appears to contain over half a million pages based on Bates ranges produced. ARIAD expressly reserves the right to modify or supplement the information provided below, including but not limited to adding or removing particular claims from the '516 patent.

| '516 Patent Claim | ENBREL |
|---|---|
| Claim 1 | |
| 1. A method for inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-kB, the method comprising reducing NF-kB activity in the cell such that expression of said gene is inhibited. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL binds to TNF and renders it unavailable for binding to TNF receptor.<br><br>Under one way in which Plaintiffs and Wyeth infringe, TNF's binding to its receptor induces NF-kB activity.<br><br>NF-kB is a transcription factor that regulates the expression of a variety of genes.<br><br>Under one way in which Plaintiffs and Wyeth infringe, ENBREL's binding to TNF inhibits the expression of a variety of genes that are regulated by NF-kB by reducing NF-kB activity in human cells, which are a type of eukaryotic cell. |
| Claim 2 | |
| 2. A method for selectively inhibiting expression, in a eukaryotic cell, of genes whose transcription is regulated by NF-kB, the method comprising reducing NF-kB activity in the cell such that expression of said genes is inhibited. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL binds selectively to TNF and renders it unavailable for binding to TNF receptor.<br><br>Under one way in which Plaintiffs and Wyeth infringe, TNF's binding to its receptor induces NF-kB activity.<br><br>NF-kB is a transcription factor that regulates the expression of a variety of genes. |

| '516 Patent Claim | ENBREL |
|---|---|
|  | Under one way in which Plaintiffs and Wyeth infringe, ENBREL's binding to TNF selectively inhibits the expression of a variety of genes that are regulated by NF-kB by reducing NF-kB activity in human cells, which are a type of eukaryotic cell. |
| **Claim 5** |  |
| 5. A method for reducing the level of expression of a cytokine gene whose transcription is regulated by NF-kB in a eukaryotic cell comprising reducing NF-kB activity in the cell such that expression of said cytokine gene is reduced. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL binds to TNF and renders it unavailable for binding to TNF receptor. <br><br> Under one way in which Plaintiffs and Wyeth infringe, TNF's binding to its receptor induces NF-kB activity. <br><br> NF-kB is a transcription factor that regulates certain cytokine genes. <br><br> Under one way in which Plaintiffs and Wyeth infringe, ENBREL's binding to TNF reduces the level of expression of certain cytokine genes that are regulated by NF-kB by reducing NF-kB activity in human cells, which are a type of eukaryotic cell. |
| **Claim 6** |  |
| 6. A method for diminishing induced NF-kB-mediated intracellular signaling comprising reducing NF-kB activity in cells such that NF-kB-mediated intracellular signaling is diminished. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL binds to TNF and renders it unavailable for binding to TNF receptor. <br><br> Under one way in which Plaintiffs and Wyeth infringe, TNF's binding to its receptor induces NF-kB-mediated intracellular signaling. <br><br> Under one way in which Plaintiffs and Wyeth infringe, ENBREL's binding to TNF diminishes induced NF-kB-mediated intracellular signaling by reducing NF-kB activity in human cells. |
| **Claim 18** |  |
| 18. A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity in | Under one way in which Plaintiffs and Wyeth infringe, ENBREL binds to TNF |

| '516 Patent Claim | ENBREL |
|---|---|
| mammalian cells comprising reducing NF-kB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells. | (including the subtype of TNF called TNF-α) and renders it unavailable for binding to TNF receptor, thereby reducing TNF-α activity.<br><br>Under one way in which Plaintiffs and Wyeth infringe, TNF's binding to its receptor causes intracellular signaling.<br><br>Under one way in which Plaintiffs and Wyeth infringe, ENBREL's binding to TNF-α reduces intracellular signaling caused by TNF-α by reducing NF-kB activity in human cells, which are a type mammalian cell. |
| **Claim 26** | |
| 26. The method of claim 1, carried out on mammalian cells. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL is used to practice the method on human cells, which are mammalian cells. |
| **Claim 27** | |
| 27. The method of claim 1, carried out on human cells. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL is used to practice the method on human cells. |
| **Claim 29** | |
| 29. The method of claim 26 or 27, carried out on lymphoid cells. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL is used to practice the method on lymphoid cells, including white blood cells of the immune system. |
| **Claim 37** | |
| 37. The method of claim 2, carried out on mammalian cells. | See claim 26. |
| **Claim 38** | |
| 38. The method of claim 2, carried out on human cells. | See claim 27. |
| **Claim 40** | |
| 40. The method of claim 37 or 38, carried | See claim 29. |

| '516 Patent Claim | ENBREL |
|---|---|
| out on lymphoid cells. | |
| **Claim 59** | |
| 59. The method of claim 5, carried out on mammalian cells. | See claim 26. |
| **Claim 60** | |
| 60. The method of claim 5, carried out on human cells. | See claim 27. |
| **Claim 61** | |
| 61. The method of claim 59 or 60, carried out on immune cells. | Under one way in which Plaintiffs and Wyeth infringe, ENBREL is used to practice the method on immune cells, including white blood cells of the immune system. |
| **Claim 62** | |
| 62. The method of claim 59 or 60, carried out on lymphoid cells. | See claim 29. |
| **Claim 70** | |
| 70. The method of claim 6, carried out on mammalian cells. | See claim 26. |
| **Claim 71** | |
| 71. The method of claim 6, carried out on human cells. | See claim 27. |
| **Claim 72** | |
| 72. The method of claim 70 or 71, carried out on immune cells. | See claim 61. |
| **Claim 73** | |
| 73. The method of claim 70 or 71, carried out on lymphoid cells. | See claim 29. |
| **Claim 183** | |
| 183. The method of claim 18, carried out on human cells. | See claim 27. |

| '516 Patent Claim | ENBREL |
|---|---|
| Claim 184 | |
| 184. The method of claim 18 or 183, carried out on immune cells. | See claim 61. |
| Claim 185 | |
| 185. The method of claim 18 or 183, carried out on lymphoid cells. | See claim 29. |

Facts relating to the above include information in the '516 patent and its prosecution history, the references cited in the prosecution history, Plaintiffs' prescribing information for ENBREL, information provided on Plaintiffs' websites at http://www.amgen.com and http://www.enbrel.com, and U.S. Patent Nos. 5,395,760; 5,605,690; 5,712,155; 5,945,397; 6,201,105; 6,572,852; and Re 36,755.

**INTERROGATORY NO. 3:**

Identify all claims of the '516 patent that Ariad contends are infringed by the Amgen Entities based on any activities related to KINERET, and state in detail, on a claim-by-claim basis, the legal and factual bases for Ariad's infringement contentions, including but not limited to Ariad's contentions as to the proper constructions of terms and phrases in the patent claims, whether each infringement contention is literal or under the doctrine of equivalents, and providing an element-by-element analysis comparing the activities related to KINERET that Ariad contends infringe a claim of the '516 patent to the claim that Ariad contends is infringed.

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to the General Objections, which are incorporated fully by reference herein, ARIAD objects to Plaintiffs' Interrogatories as premature in light of ARIAD's pending Motion to Dismiss, as set forth in the papers supporting ARIAD's Motion To Stay Discovery. ARIAD objects to this interrogatory as compound and consisting of multiple subparts which properly should be counted as separate interrogatories.

Additionally, ARIAD objects to this interrogatory to the extent it calls for information that is protected from discovery under the attorney-client privilege, work product doctrine, or any other applicable privilege or protection.

As ARIAD set forth in the papers supporting its Motion to Dismiss, ARIAD has never "contended" that KINERET infringed any claim of the '516 patent and has not conducted an infringement analysis with respect to whether KINERET infringes any claim of the '516 patent. This response is provided without prejudice to ARIAD's right to perform such an analysis at a later time. ARIAD expressly reserves the right to modify or supplement its contentions and responses as ARIAD receives additional information from Plaintiffs or third parties, as ARIAD locates additional information, or based on a ruling by the Court.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:

ARIAD supplements its initial response to Interrogatory No. 3 as follows:

ARIAD objects to this interrogatory as premature in light of ARIAD's renewed Motion to Dismiss for Failure to Join Necessary and Indispensable Parties. ARIAD further objects to this interrogatory as premature on the ground that the Scheduling Order issued by the Court sets forth May 21, 2007, as the date by which ARIAD is to identify the "claim term(s)/phrase(s) that [it] believe[s] needs construction and their proposed construction of those term(s)/phrase(s)."

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

Prior to the filing of this action, ARIAD has never "contended" that, or conducted any investigation to determine whether, any claims of the '516 patent are infringed, whether directly, indirectly or under the doctrine of equivalents, by Plaintiffs based on any activities related to KINERET. In light of the Court's rulings at the hearing conducted on September 11, 2006, an investigation is being undertaken in an effort to determine whether any claims of the '516 patent are infringed, whether directly,

indirectly or under the doctrine of equivalents, by Plaintiffs based on any activities related to KINERET. This investigation, which is both complex and time consuming, is ongoing and is incomplete. ARIAD will provide further supplemental responses when and if it makes such a contention and its infringement analysis is completed.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:

ARIAD supplements its response to Interrogatory No. 3 as follows:

ARIAD objects to this interrogatory insofar as the Court has not yet construed the claims of the '516 patent, ARIAD's investigation is still continuing, discovery is ongoing, and Plaintiffs did not produce any documents in this action until April 11, 2007. ARIAD reserves the right to modify or supplement its responses as ARIAD continues its investigation and as ARIAD reviews documents produced and other information provided by Plaintiffs or third parties (including but not limited to documents and information regarding KINERET and Plaintiffs' activities related to KINERET). ARIAD further reserves the right to modify or supplement its responses based on subsequent rulings by the Court, including but not limited to claim construction.

Subject to and without waiving any of the aforesaid objections and General Objections, ARIAD responds as follows:

Amgen Inc., Amgen USA Inc., and Amgen Manufacturing Limited ("Kineret-Related Entities") have been and are currently directly infringing, contributorily infringing, and/or inducing infringement of the '516 patent by, among other things, making, using, offering to sell, selling and/or importing KINERET, without authority or license from ARIAD. The Kineret-Related Entities' activities related to KINERET are currently believed to infringe at least the claims listed below. ARIAD's investigation is continuing and discovery is still ongoing. ARIAD has not had an opportunity to review Plaintiffs' April 11, 2007 document production, which appears to contain over half a million pages based on Bates ranges produced. ARIAD expressly reserves the right to

modify or supplement the information provided below, including but not limited to adding or removing particular claims from the '516 patent.

| '516 Patent Claim | KINERET |
|---|---|
| **Claim 1** | |
| 1. A method for inhibiting expression, in a eukaryotic cell, of a gene whose transcription is regulated by NF-kB, the method comprising reducing NF-kB activity in the cell such that expression of said gene is inhibited. | Under one way in which the Kineret-Related Entities infringe, KINERET binds competitively to IL-1 receptor without activating the receptor.<br><br>Under one way in which the Kineret-Related Entities infringe, IL-1's binding to its receptor induces NF-kB activity.<br><br>NF-kB is a transcription factor that regulates the expression of a variety of genes.<br><br>Under one way in which the Kineret-Related Entities infringe, KINERET's binding to IL-1 receptor inhibits the expression of a variety of genes that are regulated by NF-kB by reducing NF-kB activity in human cells, which are a type of eukaryotic cell. |
| **Claim 2** | |
| 2. A method for selectively inhibiting expression, in a eukaryotic cell, of genes whose transcription is regulated by NF-kB, the method comprising reducing NF-kB activity in the cell such that expression of said genes is inhibited. | Under one way in which the Kineret-Related Entities infringe, KINERET binds selectively and competitively to IL-1 receptor without activating the receptor.<br><br>Under one way in which the Kineret-Related Entities infringe, IL-1's binding to its receptor induces NF-kB activity.<br><br>NF-kB is a transcription factor that regulates the expression of a variety of genes.<br><br>Under one way in which the Kineret-Related Entities infringe, KINERET's binding to IL-1 receptor selectively inhibits the expression of a variety of genes that are regulated by NF-kB by reducing NF-kB activity in human cells, which are a type of eukaryotic cell. |

| '516 Patent Claim | KINERET |
|---|---|
| **Claim 5** | |
| 5. A method for reducing the level of expression of a cytokine gene whose transcription is regulated by NF-kB in a eukaryotic cell comprising reducing NF-kB activity in the cell such that expression of said cytokine gene is reduced. | Under one way in which the Kineret-Related Entities infringe, KINERET binds competitively to IL-1 receptor without activating the receptor.<br><br>Under one way in which the Kineret-Related Entities infringe, IL-1's binding to its receptor induces NF-kB activity.<br><br>NF-kB is a transcription factor that regulates certain cytokine genes.<br><br>Under one way in which the Kineret-Related Entities infringe, KINERET's binding to IL-1 receptor reduces the level of expression of certain cytokine genes that are regulated by NF-kB by reducing NF-kB activity in human cells, which are a type of eukaryotic cell. |
| **Claim 6** | |
| 6. A method for diminishing induced NF-kB-mediated intracellular signaling comprising reducing NF-kB activity in cells such that NF-kB-mediated intracellular signaling is diminished. | Under one way in which the Kineret-Related Entities infringe, KINERET binds competitively to IL-1 receptor without activating the receptor.<br><br>Under one way in which the Kineret-Related Entities infringe, IL-1's binding to its receptor induces NF-kB-mediated intracellular signaling.<br><br>Under one way the Kineret-Related Entities infringe, KINERET's binding to Il-1 receptor diminishes induced NF-kB-mediated intracellular signaling by reducing NF-kB activity in human cells. |
| **Claim 18** | |
| 18. A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity in mammalian cells comprising reducing NF-kB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells. | Under one way in which the Kineret-Related Entities infringe, KINERET binds competitively to IL-1 receptor without activating the receptor, thereby reducing IL-1 activity.<br><br>Under one way in which the Kineret-Related Entities infringe, IL-1's binding to |

| '516 Patent Claim | KINERET |
|---|---|
| | its receptor causes intracellular signaling.<br><br>Under one way in which the Kineret-Related Entities infringe, KINERET's binding to IL-1 receptor reduces intracellular signaling caused by IL-1 by reducing NF-kB activity in human cells, which are a type of mammalian cell. |
| **Claim 26** | |
| 26. The method of claim 1, carried out on mammalian cells. | Under one way in which the Kineret-Related Entities infringe, KINERET is used to practice the method on human cells, which are mammalian cells. |
| **Claim 27** | |
| 27. The method of claim 1, carried out on human cells. | Under one way in which the Kineret-Related Entities infringe, KINERET is used to practice the method on human cells. |
| **Claim 29** | |
| 29. The method of claim 26 or 27, carried out on lymphoid cells. | Under one way in which the Kineret-Related Entities infringe, KINERET is used to practice the method on lymphoid cells, including white blood cells of the immune system. |
| **Claim 37** | |
| 37. The method of claim 2, carried out on mammalian cells. | See claim 26. |
| **Claim 38** | |
| 38. The method of claim 2, carried out on human cells. | See claim 27. |
| **Claim 40** | |
| 40. The method of claim 37 or 38, carried out on lymphoid cells. | See claim 29. |
| **Claim 59** | |
| 59. The method of claim 5, carried out on mammalian cells. | See claim 26. |

| '516 Patent Claim | KINERET |
|---|---|
| **Claim 60** | |
| 60. The method of claim 5, carried out on human cells. | See claim 27. |
| **Claim 61** | |
| 61. The method of claim 59 or 60, carried out on immune cells. | Under one way in which the Kineret-Related Entities infringe, KINERET is used to practice the method on immune cells, including white blood cells of the immune system. |
| **Claim 62** | |
| 62. The method of claim 59 or 60, carried out on lymphoid cells. | See claim 29. |
| **Claim 70** | |
| 70. The method of claim 6, carried out on mammalian cells. | See claim 26. |
| **Claim 71** | |
| 71. The method of claim 6, carried out on human cells. | See claim 27. |
| **Claim 72** | |
| 72. The method of claim 70 or 71, carried out on immune cells. | See claim 61. |
| **Claim 73** | |
| 73. The method of claim 70 or 71, carried out on lymphoid cells. | See claim 29. |
| **Claim 183** | |
| 183. The method of claim 18, carried out on human cells. | See claim 27. |
| **Claim 184** | |
| 184. The method of claim 18 or 183, carried out on immune cells. | See claim 61. |
| **Claim 185** | |

| '516 Patent Claim | KINERET |
|---|---|
| 185. The method of claim 18 or 183, carried out on lymphoid cells. | See claim 29. |

Facts relating to the above include information in the '516 patent and its prosecution history, the references cited in the prosecution history, Plaintiffs' prescribing information for KINERET, information provided on Plaintiffs' websites at http://www.amgen.com and http://www.kineretrx.com, and U.S. Patent Nos. 5,075,222 and 6,599,873.

ASHBY & GEDDES

*[signature]*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendant
ARIAD Pharmaceuticals, Inc.*

*Of Counsel:*

Morgan Chu
David I. Gindler
Elizabeth Rosenblatt
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 277-1010

Dated: April 12, 2007

179674.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of April, 2007, the attached **DEFENDANT ARIAD PHARMACEUTICALS, INC.'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT** was served upon the below-named counsel of record at the address and in the manner indicated:

Melanie K. Sharp, Esquire                          BY HAND and ELECTRONIC MAIL
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

Marcus E. Sernel, Esquire             VIA FEDERAL EXPRESS and ELECTRONIC MAIL
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601-6636

J. Drew Diamond, Esquire             VIA FEDERAL EXPRESS and ELECTRONIC MAIL
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA 90017-5800

Tiffany Geyer Lydon

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN INC., IMMUNEX CORPORATION, )
AMGEN USA INC., AMGEN )
MANUFACTURING LIMITED, IMMUNEX )
RHODE ISLAND CORPORATION )
                                                    )    C.A. No. 06-259-MPT
                          Plaintiff,   )
                                                    )
        v.                                        )
                                                    )
ARIAD PHARMACEUTICALS, INC.        )
                                                    )
                          Defendant.  )
                                                    )
                                                    )

## NOTICE OF SERVICE

The undersigned hereby certifies that on the 12th day of April, 2007, **DEFENDANT ARIAD PHARMACEUTICALS, INC.'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT** was served upon the following counsel of record at the address and in the manner indicated:

Melanie K. Sharp, Esquire                        <u>BY HAND and VIA ELECTRONIC MAIL</u>
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

Marcus E. Sernel, Esquire                        <u>VIA FEDERAL EXPRESS and ELECTRONIC MAIL</u>
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601-6636

J. Drew Diamond, Esquire                        <u>VIA FEDERAL EXPRESS and ELECTRONIC MAIL</u>
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA 90017-5800

ASHBY & GEDDES

/s/ *Tiffany Geyer Lydon*
_____
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendant*
*ARIAD Pharmaceuticals, Inc.*

*Of Counsel:*

Morgan Chu
David I. Gindler
Elizabeth Rosenblatt
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 277-1010

Dated:  April 12, 2007
171644.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of April, 2007, the attached **NOTICE OF SERVICE**

was served upon the below-named counsel of record at the address and in the manner indicated:

Melanie K. Sharp, Esquire           <u>BY HAND and VIA ELECTRONIC MAIL</u>
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

Marcus E. Sernel, Esquire        <u>VIA FEDERAL EXPRESS and ELECTRONIC MAIL</u>
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601-6636

J. Drew Diamond, Esquire        <u>VIA FEDERAL EXPRESS and ELECTRONIC MAIL</u>
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA 90017-5800

*/s/ Tiffany Geyer Lydon*
_____
Tiffany Geyer Lydon

# EXHIBIT 5

MERGED REEXAMINATION                    Docket No. 747537JPW7GJG

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

**Merged Proceedings Pursuant To May 4, 2006 Order Of:**

**Ex Parte**
**Reexamination Control No. 90/007,503, filed April 4, 2005,**
        And
**Ex Parte**
**Reexamination Control No. 90/007,828, filed December 2, 2005.**

| | |
|---|---|
| Patentees: | David Baltimore, Ranjan Sen, Phillip A. Sharp, Harinder Singh, Louis Staudt, Jonathan H. Lebowitz, Albert S. Baldwin Jr., Roger G. Clerc, Lynn M. Corcoran, Patrick A. Baeuerle, Michael J. Lenardo, Chen-Ming Fan, and Thomas P. Maniatis |

Patent No.:    6,410,516 B1          Group Art Unit: 3991

Issue Date:    June 25, 2002          Examiner: B.M. Celsa

For       :    NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL
               REGULATION

                              1185 Avenue of the Americas
                              New York, New York 10036
                              May 17, 2007

Mail Stop *Ex Parte Reexam*
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

### SECOND SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT

In accordance with their duty of disclosure under 37 C.F.R.
§1.555, Patentees direct the Examiner's attention to the
following disclosures, which are listed on Form PTO-1449 (Exhibit
A). Copies of the disclosures listed below as items 1-29 are
attached hereto as Exhibits 1-29, respectively.

In Re Merged Proceedings Of:
Ex Parte Reexamination Control No. 90/007,503
    And
Ex Parte Reexamination Control No. 90/007,828
*Page 2 of 8 of May 17, 2007 Second Supplemental Information Disclosure Statement*

1.  January 22, 2007 Declaration of Elizabeth L. Rosenblatt in Support of Ariad Pharma., Inc.'s Motion to Stay Litigation Pending Conclusion of Reexamination Proceedings in the Patent and Trademark Office, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-*** (MPT) **(Exhibit 1)**;

2.  January 23, 2007 Defendant Ariad Pharma., Inc.'s Motion to Stay Litigation Pending Conclusion of Reexamination Proceedings in the Patent and Trademark Office, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-*** (MPT) **(Exhibit 2)**;

3.  January 23, 2007 Defendant Ariad Pharma., Inc.'s Opening Memorandum of Law in Support of Its Motion to Stay Litigation Pending Conclusion of Reexamination Proceedings in the Patent and Trademark Office (including Exhibits A-G), *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-*** (MPT) **(Exhibit 3)**;

4.  January 31, 2007 Plaintiffs' First Set of Requests for Admission to Defendant, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-*** (MPT) **(Exhibit 4)**;

5.  February 20, 2007 Transcript of Oral Argument Hearing before Hon. Mary Pat Thynge, U.S. Magistrate Judge, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-*** (MPT) **(Exhibit 5)**;

6.  February 22, 2007 Defendant Ariad Pharma., Inc.'s First Set of Requests for Production of Documents, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT **(Exhibit 6)**;

In Re Merged Proceedings Of:
**Ex Parte Reexamination Control No. 90/007,503**
        **And**
**Ex Parte Reexamination Control No. 90/007,828**
*Page 3 of 8 of May 17, 2007 Second Supplemental Information Disclosure Statement*

7.    February 22, 2007 Defendant Ariad Pharma., Inc.'s First Set
      of Interrogatories, *Amgen, Inc. et al. v. Ariad Pharma.,
      Inc.*, CA No. 06-259-MPT **(Exhibit 7)**;

8.    March 7, 2007 Defendant Ariad Pharma., Inc.'s Responses and
      Objections to Plaintiffs' First Set of Requests for
      Admission to Defendant, *Amgen, Inc. et al. v. Ariad
      Pharma., Inc.*, CA No. 06-259-MPT **(Exhibit 8)**;

9.    March 26, 2007 Plaintiffs' Responses to Defendant's First
      Set of Requests for Production of Documents, *Amgen, Inc. et
      al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT **(Exhibit 9)**;

10.   March 26, 2007 Plaintiffs' Responses and Objections to
      Ariad's First Set of Interrogatories, *Amgen, Inc. et al. v.
      Ariad Pharma., Inc.*, CA No. 06-259-MPT **(Exhibit 10)**;

11.   April 3, 2007 Plaintiffs' Multi-Media Materials (Technology
      Tutorial), *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA
      No. 06-259-MPT **(Exhibit 11)**;

12.   April 3, 2007 Notice of Filing of Multi-Media Materials
      (Plaintiffs' Technology Tutorial), *Amgen, Inc. et al. v.
      Ariad Pharma., Inc.*, CA No. 06-259-MPT **(Exhibit 12)**;

13.   April 3, 2007 Notice of Filing of Multimedia Materials
      (including Tabs A and B), *Amgen, Inc. et al. v. Ariad
      Pharma., Inc.*, CA No. 06-259-MPT **(Exhibit 13)**;

In Re Merged Proceedings Of:
Ex Parte Reexamination Control No. 90/007,503
            And
Ex Parte Reexamination Control No. 90/007,828
Page 4 of 8 of May 17, 2007 Second Supplemental Information
Disclosure Statement

14.   April 3, 2007 Ariad Pharma., Inc. Technology Tutorial,
      Amgen, Inc. et al. v. Ariad Pharma., Inc., CA No. 06-259-
      MPT (Exhibit 14);

15.   April 12, 2007 Defendant Ariad Pharma., Inc.'s Second
      Supplemental Responses and Objections to Plaintiffs' First
      Set of Interrogatories to Defendant, Amgen, Inc. et al. v.
      Ariad Pharma., Inc., CA No. 06-259-MPT (Exhibit 15);

16.   April 13, 2007 Amended Complaint for Declaratory Judgment
      of Patent Invalidity and Non-Infringement, Amgen, Inc. et
      al. v. Ariad Pharma., Inc., CA No. 06-259-MPT (Exhibit 16);

17.   April 13, 2007 Second Amended Complaint for Declaratory
      Judgment of Patent Invalidity and Non-Infringement, and
      Unenforceability, Amgen, Inc. et al. v. Ariad Pharma.,
      Inc., CA No. 06-259-MPT (Exhibit 17);

18.   April 13, 2007 Answer to Amended Complaint, Counterclaim
      and Demand for Jury Trial, Amgen, Inc. et al. v. Ariad
      Pharma., Inc., CA No. 06-259-MPT (Exhibit 18);

19.   April 17, 2007 Letter to Judge Thynge from Steven J.
      Balick, Esq., Amgen, Inc. et al. v. Ariad Pharma., Inc., CA
      No. 06-259-MPT (Exhibit 19);

20.   April 19, 2007 Defendant and Counterclaim Plaintiff Ariad's
      Second Set of Requests for Production of Documents to
      Amgen, Amgen, Inc. et al. v. Ariad Pharma., Inc., CA No.
      06-259-MPT (Exhibit 20);

In Re Merged Proceedings Of:
**Ex Parte Reexamination Control No. 90/007,503**
    **And**
**Ex Parte Reexamination Control No. 90/007,828**
*Page 5 of 8 of May 17, 2007 Second Supplemental Information*
*Disclosure Statement*

21.  April 20, 2007 Defendant Ariad Pharma., Inc.'s First
     Supplemental Responses and Objections to Plaintiffs' First
     Set of Requests for Admission to Defendant, *Amgen, Inc. et*
     *al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT **(Exhibit 21)**;

22.  April 23, 2007 Plaintiffs' First Supplemental Responses and
     Objections to Ariad's First Set of Interrogatories, *Amgen,*
     *Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT
     **(Exhibit 22)**;

23.  May 1, 2007 Amgen's Technology Tutorial, *Amgen, Inc. et al.*
     *v. Ariad Pharma., Inc.*, CA No. 06-259-MPT **(Exhibit 23)**;

24.  May 1, 2007 Ariad Pharma., Inc. Technology Tutorial, *Amgen,*
     *Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT
     **(Exhibit 24)**

25.  May 1, 2007 Transcript of Tutorial Hearing before Hon. Mary
     Pat Thynge, U.S. Magistrate Judge, *Amgen, Inc. et al. v.*
     *Ariad Pharma., Inc.*, CA No. 06-259-MPT **(Exhibit 25)**;

26.  May 3, 2007 Amgen Entities' Reply to Ariad, Harvard, MIT,
     and Whitehead's Counterclaim, *Amgen, Inc. et al. v. Ariad*
     *Pharma., Inc.*, CA No. 06-259-MPT **(Exhibit 26)**;

27.  Bottero et al. (2006) "NF-κB and the regulation of
     hematopoiesis," *Cell Death and Differentiation*, 13: 785-797
     **(Exhibit 27)**;

28.  Doucas et al. (2000) "Cytoplasmic catalytic subunit of
     protein kinase A mediates cross-repression by NF-κB and the

In Re Merged Proceedings Of:
Ex Parte Reexamination Control No. 90/007,503
        And
Ex Parte Reexamination Control No. 90/007,828
*Page 6 of 8 of May 17, 2007 Second Supplemental Information
Disclosure Statement*

    glucocorticoid receptor," *PNAS*, 97(22): 11893-11898
    (Exhibit 28); and

29.  Withoff, S. et al. "Regulating the Master Regulator NF-kB:
     From Natural Strategies to Rationally Designed Superdrugs."
     in: Ghosh, S., *Handbook of Transcription Factor NF-kappaB*
     (Boca Raton, FL, CRC Press, 2007), pp. 195-211 (Exhibit
     29).

Pursuant to the May 4, 2006 Order merging the above-identified
reexamination proceedings, this Second Supplemental Information
Disclosure Statement is being filed in duplicate and bears
identifying dates for the two reexamination proceedings.

If a telephone interview would be of assistance in advancing
prosecution of the subject application, applicants' undersigned
attorney invites the Examiner to telephone at the number provided
below.

In Re Merged Proceedings Of:
**Ex Parte Reexamination Control No. 90/007,503**
          And
**Ex Parte Reexamination Control No. 90/007,828**
*Page 7 of 8 of May 17, 2007 Second Supplemental Information*
*Disclosure Statement*

No fee is deemed necessary in connection with the filing of this
Second Supplemental Information Disclosure Statement.  If any
such fee is required, authorization is hereby given to charge the
amount of any such fee to Deposit Account No. 03-3125.

Respectfully submitted,

John P. White
Registration No. 28,678
Gary J. Gershik
Registration No. 39,992
Attorneys for Applicants
Cooper & Dunham LLP
1185 Avenue of the Americas
New York, New York 10036
(212) 278-0400

I hereby certify that this
correspondence is being deposited
this date with the U.S. Postal
Service with sufficient postage as
first class mail in an envelope
addressed to:
Mail Stop Ex Parte Reexamination,
Commissioner for Patents, P.O. Box
1450, Alexandria, VA 22313-1450.

John P. White                    Date
Reg. No. 28,678
Gary J. Gershik
Reg. No. 39,992

In Re Merged Proceedings Of:
Ex Parte Reexamination Control No. 90/007,503
          And
Ex Parte Reexamination Control No. 90/007,828
*Page 8 of 8 of May 17, 2007 Second Supplemental Information
Disclosure Statement*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing **SECOND
SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT** including Exhibit A
and Exhibits 1-29 has been sent to:

McDonnell Boehnen Hulbert & Bergoff, 300 South Wacker Drive,
Suite 3200, Chicago, Illinois 60606, Attn: Grantland G. Drutchas,
Esq.,

        and

Bawa Biotechnology Consulting, LLC, 21005 Starflower Way,
Ashburn, VA 20147, Attn: Dr. Raj Bawa,

Each by U.S. Postal Service, first class mail service, with
sufficient postage, on this 17th day of May, 2007.


Gary J. Gershik

# Exhibit A

**of Second Supplemental Information Disclosure Statement
filed May 17, 2007 in
A Merged Proceeding *Ex Parte* Reexamination Control Nos:**

| 90/007, 503 | and | 90/007,828 |
|---|---|---|
| Filed April 4, 2005 | | Filed December 2, 2005 |

**Merged Pursuant to May 4, 2006 Merger Decision
Group Art Unit: 3991  Examiner: B.M. Celsa**

| Form PTO-1449 | U.S. Department of Commerce Patent and Trademark Office | Atty. Docket No. 74753/JPW/GJG | Ex Parte Reexamination No.: 90/007,503 and 90/007,828 |
|---|---|---|---|
| **INFORMATION DISCLOSURE CITATION** (Use several sheets if necessary) | | Applicant: **David Baltimore et al.** | |
| | | Filing Date **April 4, 2005** | Page 1 of 3 |

## NON PATENT LITERATURE DOCUMENTS

| Examiner Initials* | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.) date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[2] |
|---|---|---|---|
| | 1 | January 22, 2007 Declaration of Elizabeth L. Rosenblatt in Support of Ariad Pharma., Inc.'s Motion to Stay Litigation Pending Conclusion of Reexamination Proceedings in the Patent and Trademark Office, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-*** (MPT) | |
| | 2 | January 23, 2007 Defendant Ariad Pharma., Inc.'s Motion to Stay Litigation Pending Conclusion of Reexamination Proceedings in the Patent and Trademark Office, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-*** (MPT) | |
| | 3 | January 23, 2007 Defendant Ariad Pharma., Inc.'s Opening Memorandum of Law in Support of Its Motion to Stay Litigation Pending Conclusion of Reexamination Proceedings in the Patent and Trademark Office (including Exhibits A-G), *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-*** (MPT) | |
| | 4 | January 31, 2007 Plaintiffs' First Set of Requests for Admission to Defendant, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259 (***) | |
| | 5 | February 20, 2007 Transcript of Oral Argument Hearing before Hon. Mary Pat Thynge, U.S. Magistrate Judge, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259 (***) | |
| | 6 | February 22, 2007 Defendant Ariad Pharma., Inc.'s First Set of Requests for Production of Documents, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |
| | 7 | February 22, 2007 Defendant Ariad Pharma., Inc.'s First Set of Interrogatories, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |
| | 8 | March 7, 2007 Defendant Ariad Pharma., Inc.'s Responses and Objections to Plaintiffs' First Set of Requests for Admission to Defendant, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |
| | 9 | March 26, 2007 Plaintiffs' Responses to Defendant's First Set of Requests for Production of Documents, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |
| | 10 | March 26, 2007 Plaintiffs' Responses and Objections to Ariad's First Set of Interrogatories, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |
| EXAMINER SIGNATURE | | | |

*EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609: Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. [1]Applicant's unique citation designation number (optional). [2]Applicant is to place a checkmark here if English language Translation is attached.

| Form PTO-1449 | U.S. Department of Commerce Patent and Trademark Office | Atty. Docket No. 74753/JPW/GJG | Ex Parte Reexamination No.: 90/007,503 and 90/007,828 |
|---|---|---|---|
| **INFORMATION DISCLOSURE CITATION** (Use several sheets if necessary) | | Applicant David Baltimore et al. | |
| | | Filing Date **April 4, 2005** | Page 2 of 3 |

### NON PATENT LITERATURE DOCUMENTS

| Examiner Initials¹ | Cite No.¹ | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.) date, page(s), volume-issue number(s), publisher, city and/or country where published. | T² |
|---|---|---|---|
| | 11 | April 3, 2007 Plaintiffs' Multi-Media Materials (Technology Tutorial), *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |
| | 12 | April 3, 2007 Notice of Filing of Multi-Media Materials (Plaintiffs' Technology Tutorial), *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |
| | 13 | April 3, 2007 Notice of Filing of Multimedia Materials (including Tabs A and B), *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |
| | 14 | April 3, 2007 Ariad Pharma., Inc. Technology Tutorial, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |
| | 15 | April 12, 2007 Defendant Ariad Pharma., Inc.'s Second Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories to Defendant, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |
| | 16 | April 13, 2007 Amended Complaint for Declaratory Judgment of Patent Invalidity and Non-Infringement, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |
| | 17 | April 13, 2007 Second Amended Complaint for Declaratory Judgment of Patent Invalidity and Non-Infringement, and Unenforceability, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |
| | 18 | April 13, 2007 Answer to Amended Complaint, Counterclaim and Demand for Jury Trial, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |
| | 19 | April 17, 2007 Letter to Judge Thynge from Steven J. Balick, Esq., *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |
| | 20 | April 19, 2007 Defendant and Counterclaim Plaintiff Ariad's Second Set of Requests for Production of Documents to Amgen, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |
| | 21 | April 20, 2007 Defendant Ariad Pharma., Inc.'s First Supplemental Responses and Objections to Plaintiffs' First Set of Requests for Admission to Defendant, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |
| | 22 | April 23, 2007 Plaintiffs' First Supplemental Responses and Objections to Ariad's First Set of Interrogatories, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |

| EXAMINER SIGNATURE | |
|---|---|

¹EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. ¹Applicant's unique citation designation number (optional). ²Applicant is to place a checkmark here if English language Translation is attached.

| Form PTO-1449 | U.S. Department of Commerce Patent and Trademark Office | Atty. Docket No. 74753/JPW/GJG | Ex Parte Reexamination No.: 90/007,503 and 90/007,828 |
|---|---|---|---|
| **INFORMATION DISCLOSURE CITATION** (Use several sheets if necessary) | | Applicants David Baltimore et al. | |
| | | Filing Date April 4, 2005 | Page 3 of 3 |

### NON PATENT LITERATURE DOCUMENTS

| Examiner Initials[*] | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.) date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[2] |
|---|---|---|---|
| | 23 | May 1, 2007 Amgen's Technology Tutorial, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |
| | 24 | May 1, 2007 Ariad Pharma., Inc. Technology Tutorial, Amgen, Inc. et al. v. Ariad Pharma., Inc., CA No. 06-259-MPT | |
| | 25 | May 1, 2007 Transcript of Tutorial Hearing before Hon. Mary Pat Thynge, U.S. Magistrate Judge, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |
| | 26 | May 3, 2007 Amgen Entities' Reply to Ariad, Harvard, MIT, and Whitehead's Counterclaim, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |
| | 27 | Bottero et al. (2006) "NF-κB and the regulation of hematopoiesis," *Cell Death and Differentiation*, 13: 785-797 | |
| | 28 | Doucas et al. (2000) "Cytoplasmic catalytic subunit of protein kinase A mediates cross-repression by NF-κB and the glucocorticoid receptor," *PNAS*, 97(22): 11893-11898 | |
| | 29 | Withoff, S. et al. "Regulating the Master Regulator NF-kB: From Natural Strategies to Rationally Designed Superdrugs." in: Ghosh, S., *Handbook of Transcription Factor NF-kappaB* (Boca Raton, FL, CRC Press, 2007), pp. 195-211 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| EXAMINER SIGNATURE | |
|---|---|
| | |

[*]EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. [1]Applicant's unique citation designation number (optional). [2]Applicant is to place a checkmark here if English language Translation is attached.

# EXHIBIT 6

**EXHIBIT REDACTED**

# EXHIBIT 7

# EXHIBIT REDACTED

# EXHIBIT 8

Docket No. 74753/JPW/GJG

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

A Merged Proceeding of Ex Parte Reexamination Control Nos:

90/007,503        and        90/007,828

Filed April 4, 2005        Filed December 2, 2005

Merged Pursuant to May 4, 2006 Merger Decision
Group Art Unit: 3991  Examiner: B.M. Celsa

Patentees:    David Baltimore, Ranjan Sen, Phillip A. Sharp,
              Harinder Singh, Louis Staudt, Jonathan H.
              Lebowitz, Albert S. Baldwin Jr., Roger G. Clerc,
              Lynn M. Corcoran, Patrick A. Baeuerle, Michael J.
              Lenardo, Chen-Ming Fan, and Thomas P. Maniatis

Patent No.:    6,410,516 B1            Serial No: 08/464,364

Issue Date:    June 25, 2002           Filed:    June 5, 1995

For    :    NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL
           REGULATION

                                    1185 Avenue of the Americas
                                    New York, New York 10036
                                    July 3, 2007

Mail Stop Ex Parte Reexamination
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## THIRD SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT

In accordance with their duty of disclosure under 37 C.F.R.
§1.555, Patentees are filing this Supplemental Information
Disclosure Statement to direct the Examiner's attention to
disclosure items 26-29 submitted as Exhibits 26-29 to Patentees'
May 17, 2007 Information Disclosure Statement. Although
Patentees understand that Examiner Celsa carefully reviews all
documents submitted with Information Disclosure Statements,
Patentees wish to call the Examiner's attention to these specific
documents.

Items 26-29 of Patentees' May 17, 2007 Information Disclosure
Statement are a copy of a May 3, 2007 document entitled ''Amgen
Entities' Reply To Ariad, Harvard, MIT and Whitehead's
Counterclaim'' which contains certain allegations concerning the

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 2 of 3  of June 2007* Supplemental IDS

above-identified patent and specifically the Declaration of Dr. Inder Verma submitted by Patentee and copies of publications coauthored by Dr. Verma to which the document refers.  Although Patentees disagree with the allegations, Patentees request that the Examiner independently review the documents and their relevance to the claimed invention.   For the Examiners' convenience a copy of the document entitled "Amgen Entities' Reply To Ariad, Harvard, MIT, and Whitehead's Counterclaim" is again being submitted herewith as **Exhibit 1**, and copies of the publications coauthored by Dr. Verma and referenced in the document are being submitted herewith as **Exhibits 2-4**. Specifically:

1.    Bottero et al. (2006) "NF-κB and the regulation of hematopoiesis," *Cell Death and Differentiation*, 13: 785-797 (**Exhibit 2**);

2.    Doucas et al. (2000) "Cytoplasmic catalytic subunit of protein kinase A mediates cross-repression by NF-κB and the glucocorticoid receptor," *PNAS*, 97(22): 11893-11898 (**Exhibit 3**); and

3.    Withoff, S. et al. "Regulating the Master Regulator NF-kB: From Natural Strategies to Rationally Designed Superdrugs," in: Ghosh, S., *Handbook of Transcription Factor NF-kappaB* (Boca Raton, FL, CRC Press, 2007), pp. 195-211 (**Exhibit 4**).

Patentees note that the above publications coauthored by Dr. Verma were not included on the list of "Selected Publications Considered to be Major Contributions in Biological Sciences" attached to Dr. Verma's *Curriculum Vitae* submitted November 9, 2006. For completeness of the record, Patentees submit herewith as **Exhibit 5** what is believed to be a complete list of Dr. Verma's publications to date.

Applicants also attach as **Exhibit 6** a Form PTO-1449 listing documents submitted herewith as Exhibits 1-5 and request the

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 3 of 3 of June 2007* Supplemental IDS

Examiner to initial next to the listing of each document to indicate consideration thereof.

Pursuant to the May 4, 2006 Merger Decision, this Supplemental Information Disclosure Statement is being filed in duplicate, each original bearing an original signature and identifying data for both reexamination files.

No fee is deemed necessary in connection with the filing of this Third Supplemental Information Disclosure Statement. However, if any additional fee is required, authorization is hereby given to charge the amount of any such fee to Deposit Account No. 31-3125.

Respectfully submitted,

John P. White
Registration No. 28,678
Gary J. Gershik
Registration No. 39,992
Attorneys for Patentees
Cooper & Dunham LLP
1185 Avenue of the Americas
New York, New York 10036
(212) 278-0400

I hereby certify that this correspondence is being deposited this date with the U.S. Postal Service with sufficient postage as first class mail in an envelope addressed to:

Mail Stop *Ex Parte* Reexamination
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450.

John P. White                    7/3/07
Reg. No. 28,678                  Date
Gary J. Gershik
Reg. No. 39,992

Patentees: David Baltimore et al.
Merged *Ex Parte*
Reexamination Control Nos.: 90/007,503 and 90/007,828
*Page 4 of 3  of June 2007* Supplemental IDS

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing **THIRD SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT** and any enclosure has been sent to:

McDonnell Boehnen Hulbert & Berghoff, 300 South Wacker Drive, Suite 3200, Chicago, Illinois 60606, Attn: Grantland G. Drutchas, Esq.,

and

Bawa Biotechnology Consulting, LLC, 21005 Starflower Way, Ashburn, VA 20147, Attn: Dr. Raj Bawa,

each by U.S. Postal Service, first class mail service, with sufficient postage, on this 3rd day of July, 2007.

Gary J. Gershik

| Form PTO-1449 | U.S. Department of Commerce Patent and Trademark Office | Atty. Docket No. 74753/JPW/GJG | Ex Parte Reexamination No.: 90/007,503 and 90/007,828 |
|---|---|---|---|
| **INFORMATION DISCLOSURE CITATION** (Use several sheets if necessary) | | Applicants David Baltimore et al. | |
| | | Filing Date April 4, 2005 | Page 1 of 1 |

### NON PATENT LITERATURE DOCUMENTS

| Examiner Initials* | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.) date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[3] |
|---|---|---|---|
| | 1 | May 3, 2007 Amgen Entities' Reply to Ariad, Harvard, MIT, and Whitehead's Counterclaim, *Amgen, Inc. et al. v. Ariad Pharma., Inc.*, CA No. 06-259-MPT | |
| | 2 | Bottero et al. (2006) "NF-κB and the regulation of hematopoiesis," *Cell Death and Differentiation*, 13: 785-797 | |
| | 3 | Doucas et al. (2000) "Cytoplasmic catalytic subunit of protein kinase A mediates cross-repression by NF-κB and the glucocorticoid receptor," *PNAS*, 97(22): 11893-11898 | |
| | 4 | Withoff, S. et al. "Regulating the Master Regulator NF-kB: From Natural Strategies to Rationally Designed Superdrugs." in: Ghosh, S., *Handbook of Transcription Factor NF-kappaB* (Boca Raton, FL, CRC Press, 2007), pp. 195-211 | |
| | 5 | *Curriculum Vitae* of Dr. Inder Verma | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| EXAMINER SIGNATURE | |
|---|---|

*EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609: Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. [1]Applicant's unique citation designation number (optional). [3]Applicant is to place a checkmark here if English language Translation is attached.

# EXHIBIT 9

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Jamie H. McDole
To Call Writer Directly:
312 861-2048
jmcdole@kirkland.com

312 861-2000

www.kirkland.com

Facsimile:
312 861-2200

November 9, 2007

**VIA E-MAIL**

David I. Gindler
Irell & Manella
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067-4276

Re:     Re: *Amgen et al. v. ARIAD Pharmaceuticals, Inc.*, D. Del. Civil Action
No. 06-259-MPT

Dear David:

Pursuant to paragraph 3(c) of the Court's Second Amended Scheduling Order, I write to inform you that the Amgen Entities elect not to rely on advice of counsel as a defense to willful infringement with respect to the '516 patent at this time. The Amgen Entities reserve their right to change this election to the extent the nature of the pleadings change and/or ARIAD's and/or the Institutions' contentions change. We would further note that ARIAD and the Institutions have not to date provided a Rule 11 basis for maintaining an allegation of willful infringement in this case under the heightened standard of *In re Seagate Technology*, thus further necessitating the reservation of rights at this time.

As a result of this election not to rely on advice of counsel, the Amgen Entities maintain their objections as stated to ARIAD's Fifth Notice of Deposition of Plaintiffs Pursuant to Federal Rule of Civil Procedure 30(b)(6). In response to this notice, the Amgen Entities will only offer a witness on the non-privileged portion of the following subject matter:

- The date on which the Amgen Entities first became aware of the '516 patent and the circumstances of how the Amgen Entities became aware of the '516 patent.

- The Amgen Entities' communications with ARIAD relating to the '516 patent or the '516 patent family.

We do not believe there is any discoverable information relating to these topics beyond that information set forth in Mr. Frank Ungemach's declaration filed earlier in this case — all other

# KIRKLAND & ELLIS LLP

November 9, 2007
Page 2

information is privileged. Please contact us in the event you still wish to pursue a deposition on these topics. Please note that if a deposition does proceed, Mr. Ungemach will be the designated witness (as opposed to Stuart Watt) as to the above subject matter from ARIAD's Fifth Notice of Deposition. In addition, the Amgen Entities object to any personal deposition of Stuart Watt as any information Mr. Watt possesses relating to the present suit is privileged.

Finally, given the Amgen's election not to rely on the advice of counsel, please confirm that ARIAD will no longer pursue the subpoenaed deposition of Vasant Ghandi. As we have previously stated, Mr. Ghandi recalls very little information (most, if not all, of which is privileged) relating to discussions with ARIAD or relating to ARIAD's intellectual property, outside correspondence which Amgen has already produced to you.

If you have any questions, please feel free to contact me.

Sincerely,

*/s/ Jamie McDole*

Jamie McDole

# EXHIBIT 10

MERGED REEXAMINATION                 Docket No. 74753/JPW/GJG

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

**Merged Proceedings Pursuant To May 4, 2006 Order Of:**

*Ex Parte*
Reexamination Control No. 90/007,503, filed April 4, 2005,
    And
*Ex Parte*
Reexamination Control No. 90/007,828, filed December 2, 2005.

Patentees:      David Baltimore, Ranjan Sen, Phillip A. Sharp,
                Harinder Singh, Louis Staudt, Jonathan H.
                Lebowitz, Albert S. Baldwin Jr., Roger G. Clerc,
                Lynn M. Corcoran, Patrick A. Baeuerle, Michael J.
                Lenardo, Chen-Ming Fan, and Thomas P. Maniatis

Patent No.:     6,410,516 B1              Group Art Unit: 3991

Issue Date:     June 25, 2002            Examiner: B.M. Celsa

For       :     NUCLEAR FACTORS ASSOCIATED WITH TRANSCRIPTIONAL
                REGULATION


                                1185 Avenue of the Americas
                                New York, New York 10036
                                December 13, 2007

Mail Stop *Ex Parte Reexam*
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450


Sir:


### NINTH SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT

In accordance with their duty of disclosure under 37 C.F.R.
§1.555, Patentees direct the Examiner's attention to the
following disclosure, which is listed on Form PTO-1449 (**Exhibit
A**). A copy of the disclosure listed below as items 1-10 are
attached hereto as **Exhibits 1-22**.

In Re Merged Proceedings Of:
Ex Parte Reexamination Control No. 90/007,503
            And
Ex Parte Reexamination Control No. 90/007,828
Page 2 of 6 of December 13, 2007 Information Disclosure
Statement

1.  October 10, 2007 The Amgen Entities' Responses To
    Whitehead's First Set of Interrogarories in Civil Action
    No. 06-259 (MPT) (Exhibit 1);

2.  October 10, 2007 Wyeth's Responses To Whitehead's First Set
    of Interrogatories (Nos. 1-15) in Civil Action No. 06-259
    (MPT) (Exhibit 2);

3.  October 11, 2007 Wyeth's Second Set of Requests For
    Production of Documents And Things (Nos. 22-101) To Ariad,
    Harvard, MIT, and Whitehead in Civil Action No. 06-259
    (MPT) (Exhibit 3);

4.  October 15, 2007 The Amgen Entities' Responses to MIT's
    First Set of Interrogatories in Civil Action No. 06-259
    (MPT) (Exhibit 4);

5.  October 15, 2007 The Amgen Entities' Responses to Harvard's
    First Set of Interrogatories in Civil Action No. 06-259
    (MPT) (Exhibit 5);

6.  October 15, 2007 The Amgen Entities' Responses to Ariad's
    Fourth Set of Requests For Production of Documents in Civil
    Action NO. 06-259 (MPT) (Exhibit 6);

7.  October 31, 2007 Wyeth's Fourth Set of Supplemental
    Responses And Objections To Ariad's First Set of
    Interrogatories (Nos. 1-25) in Civil Action No. 06-259
    (MPT) (Exhibit 7);

8.  October 31, 2007 Ariad's And The Institutions' Responses
    And Objections To Wyeth's First Set of Interrogatories in
    Civil Action No. 06-259 (MPT) (Exhibit 8);

9.  October 31, 2007 Ariad's And The Institutions' Responses
    And Objections To Wyeth's First Set of Requests For
    Production of Documents And Things in Civil Action No. 06-
    259 (MPT) (Exhibit 9);

In Re Merged Proceedings Of:
Ex Parte Reexamination Control No. 90/007,503
            And
Ex Parte Reexamination Control No. 90/007,828
*Page 3 of 6 of December 13, 2007 Information Disclosure
Statement*

10.  November 6, 2007 Defendant And Counterclaim Plaintiff
     Ariad's Sixth Set of Requests For Production To The Amgen
     Entities in Civil Action No. 06-259 (MPT) **(Exhibit 10)**;

11.  November 7, 2007 Wyeth's First Set of Requests for
     Admission (Nos. 1-160) To Ariad, Harvard, MIT, and
     Whitehead in Civil Action No. 06-259 (MPT) **(Exhibit 11)**;

12.  November 7, 2007 The Amgen Entities' Responses To Ariad's
     Fifth Set of Requests For Production of Documents in Civil
     Action No. 06-259 (MPT) **(Exhibit 12)**;

13.  November 7, 2007 Wyeth's Third Set of Requests For
     Production of Documents And Things (Nos. 101-109) To Ariad,
     Harvard, MIT, and Whitehead in Civil Action No. 06-259
     (MPT) **(Exhibit 13)**;

14.  November 8, 2007 Wyeth's Responses To Ariad's Third Set of
     Requests For Production of Documents (Nos. 108-121) in
     Civil Action No. 06-259 (MPT) **(Exhibit 14)**;

15.  November 12, 2007 The Amgen Entities' Responses To Ariad's
     Third Set of Interrogatories in Civil Action No. 06-259
     (MPT) **(Exhibit 15)**;

16.  November 12, 2007 Wyeth's Responses And Objections To Ariad
     And The Institutions' Second Set of Interrogatories (Nos.
     26-29) in Civil Action No. 06-259 (MPT) **(Exhibit 16)**;

17.  November 13, 2007 Defendant And counterclaim Plaintiff
     Ariad's Fourth Set of Requests For Production of Documents
     And Things to Wyeth in Civil Action No. 06-259 (MPT)
     **(Exhibit 17)**;

18.  November 15, 2007 Ariad's And The Institutions' Responses
     And Objections To Wyeth's Second Set of Interrogatories in
     Civil Case No. 06-259 (MPT) **(Exhibit 18)**;

19.  November 15, 2007 The Amgen Entities' Second Set of
     Requests For Admission Directed To Ariad And the
     Institutions in Civil Action No. 06-259 (MPT) **(Exhibit 19)**;

In Re Merged Proceedings Of:
**Ex Parte Reexamination Control No. 90/007,503**
             And
**Ex Parte Reexamination Control No. 90/007,828**
*Page 4 of 6 of December 13, 2007 Information Disclosure
Statement*

20.  November 15, 2007 The Amgen Entities' Third Set of Requests
      For Production of Documents And things Directed To Ariad
      And The Institutions in Civil Action No. 06-259 (MPT)
      **(Exhibit 20)**;

21.  November 15, 2007 Ariad's And the Institutions' Responses
      And Objections To Wyeth's Second Set of Requests For
      Production fo Documents And Things in Civil Action No. 06-
      259 (MPT) **(Exhibit 21)**; and

22.  Deposition Transcript of Dr. Thomas R. Kadesch dated June
      21, 2007, Amgen, Inc. v. F. Hoffmann-La Roche Ltd., a Swiss
      Company, Roche Diagnostics GmbH, a German Company, and
      Hoffmann-La Roche, Inc., A New Jersey Corporation, U.S.
      District Court, District of Massachusetts, in Civil Action
      No. 05-12237 WGY **(Exhibit 22)**.


Pursuant to the May 4, 2006 Order merging the above-identified
reexamination proceedings, this Communication is being filed in
duplicate and bears identifying data for the two reexamination
proceedings.


If a telephone interview would be of assistance in advancing
prosecution of the subject application, applicants' undersigned
attorney invites the Examiner to telephone at the number provided
below.

In Re Merged Proceedings Of:
Ex Parte Reexamination Control No. 90/007,503
              And
Ex Parte Reexamination Control No. 90/007,828
*Page 5 of 6 of December 13, 2007 Information Disclosure
Statement*

No fee is deemed necessary in connection with the filing of this
Ninth Supplemental Information Disclosure Statement. If any such
fee is required, authorization is hereby given to charge the
amount of any such fee to Deposit Account No. 03-3125.

                              Respectfully submitted,


                              *Gary J. Gershik*

                              John P. White
                              Registration No. 28,678
                              Gary J. Gershik
                              Registration No. 39,992
                              Attorneys for Applicants
                              Cooper & Dunham LLP
                              1185 Avenue of the Americas
                              New York, New York 10036
                              (212) 278-0400

I hereby certify that this
correspondence is being deposited
this date with the U.S. Postal
Service with sufficient postage as
first class mail in an envelope
addressed to:
Mail Stop *Ex Parte* Reexamination,
Commissioner for Patents, P.O. Box
1450, Alexandria, VA 22313-1450.

*Gary J. Gershik* 12/13/07
John P. White          Date
Reg. No. 28,678
Gary J. Gershik
Reg. No. 39,992

In Re Merged Proceedings Of:
**Ex Parte Reexamination Control No. 90/007,503**
         **And**
**Ex Parte Reexamination Control No. 90/007,828**
*Page 6 of 6 of December 13, 2007 Information Disclosure*
*Statement*

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing **NINTH SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT** including Exhibit A and Exhibit 1 has been sent to:

McDonnell Boehnen Hulbert & Berghoff, 300 South Wacker Drive, Suite 3200, Chicago, Illinois 60606, Attn: Grantland G. Drutchas, Esq.,

     and

Bawa Biotechnology Consulting, LLC, 21005 Starflower Way, Ashburn, VA 20147, Attn: Dr. Raj Bawa,

each by U.S. Postal Service, first class mail service, with sufficient postage, on this 13th day of December, 2007.

_____
Gary J. Gershik

# Exhibit A
## of Ninth Supplemental Information Disclosure Statement
## filed December 13, 2007 in
A Merged Proceeding of *Ex Parte* Reexamination Control Nos:

90/007,503         and         90/007,828
Filed April 4, 2005         Filed December 2, 2005

Merged Pursuant to May 4, 2006 Merger Decision
Group Art Unit: 3991   Examiner: B.M. Celsa

| Form PTO-1449 | **U.S. Department of Commerce**<br>**Patent and Trademark Office** | Atty. Docket No.<br>74753/JPW/GJG | Ex Parte<br>Reexamination<br>No.:<br>90/007,503<br>and<br>90/007,828 |
|---|---|---|---|
| | **INFORMATION DISCLOSURE CITATION**<br>(Use several sheets if necessary) | | |
| | | Applicants<br>**David Baltimore et al.** | |
| | | Filing Date<br>**April 4, 2005** | Page 1 of 4 |

## U.S. PATENT DOCUMENTS

| Examiner<br>Initial | Document Number | Date | Name | Class | Subclass | Filing Date<br>If Appropriate |
|---|---|---|---|---|---|---|
| | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | Document Number | Date | Country | Class | Subclass | Translation | |
|---|---|---|---|---|---|---|---|
| | | | | | | Yes | No |
| | | | | | | | |

## OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| | |
|---|---|
| 1 | October 10, 2007 The Amgen Entities' Responses To Whitehead's First Set of Interrogarories in Civil Action No. 06-259 (MPT) |
| 2 | October 10, 2007 Wyeth's Responses To Whitehead's First Set of Interrogatories (Nos. 1-15) in Civil Action No. 06-259 (MPT) |
| 3 | October 11, 2007 Wyeth's Second Set of Requests For Production of Documents And Things (Nos. 22-101) To Ariad, Harvard, MIT, and Whitehead in Civil Action No. 06-259 (MPT) |
| 4 | October 15, 2007 The Amgen Entities' Responses to MIT's First Set of Interrogatories in Civil Action No. 06-259 (MPT) |
| 5 | October 15, 2007 The Amgen Entities' Responses to Harvard's First Set of Interrogatories in Civil Action No. 06-259 (MPT) |
| 6 | October 15, 2007 The Amgen Entities' Responses to Ariad's Fourth Set of Requests For Production of Documents in Civil Action NO. 06-259 (MPT) |
| 7 | October 31, 2007 Wyeth's Fourth Set of Supplemental Responses And Objections To Ariad's First Set of Interrogatories (Nos. 1-25) in Civil Action No. 06-259 (MPT) |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

*EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609: Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

A Merged Proceeding of *Ex Parte*
Reexamination Control Nos:
90/007,503, Filed April 4, 2005 and
90/007,828, Filed December 2, 2005
**Exhibit A** to Dec. 13, 2007 Supp.
Information Disclosure Statement

| Form PTO-1449 | U.S. Department of Commerce Patent and Trademark Office | Atty. Docket No. 74753/JPW/GJG | Ex Parte Reexamination No.: 90/007,503 and 90/007,828 |
|---|---|---|---|

**INFORMATION DISCLOSURE CITATION**
(Use several sheets if necessary)

| Applicants |
|---|
| David Baltimore et al. |

| Filing Date April 4, 2005 | Page 2 of 4 |
|---|---|

## U.S. PATENT DOCUMENTS

| Examiner Initial | | Document Number | | | | | | | Date | Name | Class | Subclass | Filing Date if Appropriate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | | Document Number | | | | | | Date | Country | Class | Subclass | Translation Yes | No |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |

## OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| | | |
|---|---|---|
| | 8 | October 31, 2007 Ariad's And The Institutions' Responses And Objections To Wyeth's First Set of Interrogatories in Civil Action No. 06-259 (MPT) |
| | 9 | October 31, 2007 Ariad's And The Institutions' Responses And Objections To Wyeth's First Set of Requests For Production of Documents And Things in Civil Action No. 06-259 (MPT) |
| | 10 | November 6, 2007 Defendant And Counterclaim Plaintiff Ariad's Sixth Set of Requests For Production To The Amgen Entities in Civil Action No. 06-259 (MPT) |
| | 11 | November 7, 2007 Wyeth's First Set of Requests for Admission (Nos. 1-160) To Ariad, Harvard, MIT, and Whitehead in Civil Action No. 06-259 (MPT) |
| | 12 | November 7, 2007 The Amgen Entities' Responses To Ariad's Fifth Set of Requests For Production of Documents in Civil Action No. 06-259 (MPT) |
| | 13 | November 7, 2007 Wyeth's Third Set of Requests For Production of Documents And Things (Nos. 101-109) To Ariad, Harvard, MIT, and Whitehead in Civil Action No. 06-259 (MPT) |
| | 14 | November 8, 2007 Wyeth's Responses To Ariad's Third Set of Requests For Production of Documents (Nos. 108-121) in Civil Action No. 06-259 (MPT) |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

*EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609: Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

| Form PTO-1449 | U.S. Department of Commerce<br>Patent and Trademark Office | Atty. Docket No.<br>74753/JPW/GJG | Ex Parte<br>Reexamination<br>No.:<br>90/007,503<br>and<br>90/007,828 |
|---|---|---|---|
| | **INFORMATION DISCLOSURE CITATION**<br>(Use several sheets if necessary) | Applicants<br>David Baltimore et al. | |
| | | Filing Date<br>April 4, 2005 | Page 3 of 4 |

## U.S. PATENT DOCUMENTS

| Examiner<br>Initial | Document Number | Date | Name | Class | Subclass | Filing Date<br>if Appropriate |
|---|---|---|---|---|---|---|
| | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | Document Number | Date | Country | Class | Subclass | Translation | |
|---|---|---|---|---|---|---|---|
| | | | | | | Yes | No |
| | | | | | | | |

## OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| | | |
|---|---|---|
| 15 | November 12, 2007 The Amgen Entities' Responses To Ariad's Third Set of Interrogatories in Civil Action No. 06-259 (MPT) | |
| 16 | November 12, 2007 Wyeth's Responses And Objections To Ariad And The Institutions' Second Set of Interrogatories (Nos. 26-29) in Civil Action No. 06-259 (MPT) | |
| 17 | November 13, 2007 Defendant And counterclaim Plaintiff Ariad's Fourth Set of Requests For Production of Documents And Things to Wyeth in Civil Action No. 06-259 (MPT) | |
| 18 | November 15, 2007 Ariad's And The Institutions' Responses And Objections To Wyeth's Second Set of Interrogatories in Civil Case No. 06-259 (MPT) | |
| 19 | November 15, 2007 The Amgen Entities' Second Set of Requests For Admission Directed To Ariad And the Institutions in Civil Action No. 06-259 (MPT) | |
| 20 | November 15, 2007 The Amgen Entities' Third Set of Requests For Production of Documents And things Directed To Ariad And The Institutions in Civil Action No. 06-259 (MPT) | |
| 21 | November 15, 2007 Ariad's And the Institutions' Responses And Objections To Wyeth's Second Set of Requests For Production for Documents And Things in Civil Action No. 06-259 (MPT) | |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

*EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609: Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

| Form PTO-1449 | U.S. Department of Commerce Patent and Trademark Office | Atty. Docket No. 74753/JPW/GJG | Ex Parte Reexamination No.: 90/007,503 and 90/007,828 |
|---|---|---|---|
| **INFORMATION DISCLOSURE CITATION** (Use several sheets if necessary) | | Applicants David Baltimore et al. | |
| | | Filing Date April 4, 2005 | Page 4 of 4 |

### U.S. PATENT DOCUMENTS

| Examiner Initial | | Document Number | | | | | | | Date | Name | Class | Subclass | Filing Date If Appropriate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |

### FOREIGN PATENT DOCUMENTS

| | | Document Number | | | | | Date | Country | Class | Subclass | Translation | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Yes | No |
| | | | | | | | | | | | | |

### OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| | | |
|---|---|---|
| | 22 | Deposition Transcript of Dr. Thomas R. Kadesch dated June 21, 2007, Amgen, Inc. v. F. Hoffmann-La Roche Ltd., a Swiss Company, Roche Diagnostics GmbH, a German Company, and Hoffmann-La Roche, Inc., A New Jersey Corporation, U.S. District Court, District of Massachusetts, in Civil Action No. 05-12237 WGY |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

*EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609: Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.