# EXHIBIT 14

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMGEN, INC., IMMUNEX CORPORATION, AMGEN
USA, INC., AMGEN MANUFACTURING, LIMITED, and
IMMUNEX RHODE ISLAND CORPORATION,

   Plaintiffs,

v.

ARIAD PHARMACEUTICALS, INC., HARVARD
UNIVERSITY, MASSACHUSETTS INSTITUTE OF
TECHNOLOGY, and THE WHITEHEAD INSTITUTE
FOR BIOMEDICAL RESEARCH,

   Defendants,

---

ARIAD PHARMACEUTICALS, INC., HARVARD
UNIVERSITY, MASSACHUSETTS INSTITUTE OF
TECHNOLOGY, and THE WHITEHEAD INSTITUTE
FOR BIOMEDICAL RESEARCH,

   Counterclaim-Plaintiffs,

v.

AMGEN, INC., IMMUNEX CORPORATION AMGEN
USA, INC., AMGEN MANUFACTURING, LIMITED, and
IMMUNEX RHODE ISLAND CORPORATION,

   Counterclaim-Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 06-259-MPT

## EXPERT REPORT OF RANDOLPH WALL, Ph.D.



## I.    INTRODUCTION - QUALIFICATIONS AND BACKGROUND.

I am currently a Distinguished Professor in the Department of Microbiology, Immunology and Molecular Genetics in the David Geffen UCLA School of Medicine and a member of the UCLA Molecular Biology Institute and the UCLA Institute for Stem Cell Biology and Medicine. I received my A.B. degree in Botony-Bacteriology in 1965 from the University of South Florida and my Ph.D. in Microbiology from Indiana University in 1970.

Throughout my career, my research has relied on recombinant DNA cloning and other related methodologies for studying and understanding the molecular biology of the immune system and cancer. For the last 36 years, I have conducted research in the UCLA Molecular Biology Institute and taught courses in the Department of Microbiology, Immunology and Molecular Genetics of the UCLA School of Medicine. Prior to coming to UCLA, I was a Damon Runyon Memorial Fund for Cancer Research Fellow at Columbia University. I have served on the editorial boards of the Journal of Immunology and the Journal Molecular and Cellular Biology, as well as the editorial advisory board of Molecular and Cellular Immunology.

Since receiving a Ph.D. in Microbiology, my research interests have focused on molecular genetics and immunology using recombinant DNA technology and cloning. Since joining UCLA, my research has concentrated on genes and molecular mechanisms in immunology and cancer. In particular, my research has focused on the molecular mechanisms controlling B cell development and function. I have published over 100 research papers (identified in my curriculum vitae - attached as Exhibit A). I also have presented a number of lectures on my work at other universities and in national and international meetings in immunology and cancer.

After graduate school, I joined the laboratory of Dr. James Darnell at Columbia University as a post-doctoral fellow. My research there was directed at finding out how mammalian cells make messenger RNA (mRNA). In my postdoctoral studies, I discovered the poly(A) tail on the end of mRNA, and established that essentially all eukaryotic mRNA contain this tail. This discovery provided, for the first time, a rapid and efficient way of identifying and purifying mRNA (and its precursors) from eukaryotic cells. The discovery of the poly(A) tail on mRNA also represented a fundamental advance in the development of cloning complementary DNA (cDNA) from mRNA using reverse transcriptase and complementary oligo(dT) primers.

When I joined the faculty of the UCLA School of Medicine in 1972, I set out to purify mRNAs and generate cDNA clones from mRNA for use in cloning genes from chromosomal DNA and for analyzing mRNA synthesis and processing. The genes I chose to study code for immunoglobulins, which are the circulating antibodies produced by B-cells that protect higher organisms from infections and foreign substances. My work through the early 1980s at UCLA produced some of the earliest papers on the isolation of mRNAs and the cloning of cDNAs from globin mRNA and from immunoglobulin light and heavy chain mRNAs. I then used these cDNA clones in a number of studies to analyze immunoglobulin mRNA processing and to clone and characterize, by mapping and sequencing, multiple immunoglobulin heavy and light chain genes from genomic DNA. My lab was one of the first to show that alternative mRNA splicing is used to generate immunoglobulin proteins with different functions from the same gene. I also employed cloned immunoglobulin cDNA and genes for studying immunoglobulin gene

2

activation and transcription regulation in B-cells as well as in transfected host cells. Over the years, my lab has generated a number of cDNA libraries and identified a large number of genes induced in cytokine signaling or activated during normal B-cell development and in human B-cell immunodeficiencies. These include cDNAs and genes that encode specialized proteins that are expressed exclusively in B-lymphocytes (*i.e.*, so-called B-cell specific genes) and that carry out essential activities for B-cell function and development.

In related studies, my lab also characterized the promoters and other transcription control regions that regulate the tissue-specific activation and expression of these genes. Focusing on the immunoglobulin genes, my lab was the first to show that induction of the kappa immunoglobulin was induced by an inhibitor of protein synthesis. This finding predicted the presence of a labile inhibitor controlling kappa gene induction by blocking the activity of trans-activating transcription factor. Later research confirmed the existence of that trans-activating factor, now called NF-κB. The putative labile inhibitor was later identified as IκB. In collaboration with my colleagues at the University of Washington School of Medicine, La Jolla Institute for Allergy and Immunology, and the Max Planck Institute, my laboratory was the first to show that cells from mice deficient for a specific isoform of protein kinase C (PKCβ) failed to degrade IκB or to activate the IKK complex in response to B-cell receptor engagement. These studies were the first to identify the essential role of a PKCβ in B-cell receptor-mediated NF-κB activation.

Other studies from my lab demonstrated that genetic instabilities resulting from the silencing of gene expression and from aberrant mutations of B-cell genes occur frequently in the generation of human B-cell malignancies. In collaboration with my UCLA colleague, Dr. Michael Teitell, my lab carried out a large scale gene discovery program aimed at identifying genes and pathways involved in human leukemia and lymphoma, including AIDS-related lymphoma. These studies identified several thousand cDNAs that are differentially expressed in AIDS lymphoma versus normal lymph node B-cells. The lead candidate oncogene identified in these studies has been linked to most of the prevalent classes of late stage, aggressive human B-cell lymphoma and now has been shown to cause multiple types of B-cell lymphoma in transgenic mice that correspond to the most prevalent classes of human lymphoma.

I also have considerable experience in the biotechnology industry. In 1980, I co-founded and served as a Director of Ingene (International Genetic Engineering Inc), one of the early biotech companies. At Ingene, I supervised research and development projects on recombinant cloning, manipulation and expression of antibody and antibody fragment constructs in a wide range of host cells including bacteria, yeast and mammalian cells. I am a co-inventor on 6 issued U.S. patents that cover fundamental technologies for construction and bacterial expression of antibodies and antibody fragments. These patents have been licensed to more than thirty (30) biotech and pharmaceutical companies worldwide by Xoma Corporation which acquired Ingene in 1989. I also have served as a member of the Scientific Advisory Boards and as a consultant to Xoma Corporation, FMC Bioproducts and Wella Corporation.

I expect to testify at trial based on the background and opinions I provide in this report. I base my opinions and observations on my nearly 40 years of experience as a biological scientist, on the references cited herein, on other pertinent scientific literature, and on certain assumptions that I will provide below. These opinions and observations are based on information currently

available to me. As new issues arise or as new information is made known to me through, for example, ARIAD's experts' reports and testimony and the Court's interpretation of the '516 patent claims, I may supplement or amend my opinions and observations.

Within the last four years, I have served as an expert witness in two patent cases on behalf of several parties, as described in my attached C.V. In forming my opinions here, I considered the information and data cited herein.

## II.    LEGAL ASSUMPTIONS.

I understand that the patent specification is the foundation that describes what the claims, properly construed, can validly cover. But in exchange for being excluded from practicing an invention for a limited period of time, the public must receive meaningful disclosure from the patentee.

**WRITTEN DESCRIPTION:** I understand that, in furtherance of the requirement of meaningful disclosure I mentioned above, the law requires that a patent specification must contain a sufficient "written description" of the invention. I understand that this written description requirement is meant to guard against overreaching by requiring inventors to disclose the full scope of their inventions to the public. I have been informed that a patent's written description is only sufficient if the patent application as originally filed allows persons of ordinary skill in the art to recognize that the applicant invented what is claimed. Put another way, this means that the patentees' originally-filed disclosure must convey to one of skill in the art that, at the time of filing, the inventors had possession of the full scope of the later claimed subject matter.

**ENABLEMENT:** I understand that the law requires that a patent specification must contain "the manner and process of making and using the claimed invention, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected to make and use the same." I have been informed that, to be enabling, the specification must teach one of ordinary skill in the art how to make and use the "full scope" of the claimed invention without "undue experimentation." I have been informed that the issue as to whether claims are sufficiently enabled by a disclosure in a specification is determined as of the date that the patent application was first filed. I have been advised that it is appropriate to consider the following factors in assessing whether a disclosure would require undue experimentation:

- the quantity of experimentation necessary,

- the amount of direction or guidance presented,

- the presence or absence of working examples,

- the nature of the invention,

- the state of the prior art,

- the relative skill of those in the art,

4

- the predictability or unpredictability of the art, and

- the breadth of the claims.

I have been informed, however, that these factors are illustrative, not mandatory, and that all need not be reviewed when determining whether a disclosure is enabling.

**BEST MODE:** I understand that the law requires that a patent specification set forth the best mode contemplated by the inventor of carrying out his invention. I have been informed that this means that the patent specification must set forth what the inventor perceived, at the effective filing date, as the best way of practicing the claimed invention.

**CLAIM CONSTRUCTION:** In undertaking my analysis, I have been asked to consider certain constructions of the claims of the '516 patent that I understand ARIAD has advanced previously in litigation and/or with the patent office. I have been asked to consider that the claims of the '516 patent encompass actions taken both inside and outside of cells that have the effect (directly or indirectly) of "reducing" or "diminishing" NF-κB activity (i.e. "the function of NF-κB to act as an intracellular messenger that turns on transcription of particular genes in response to certain stimuli"). I have further been asked to consider that to the extent the claims of the '516 patent do not have limitations as to the types of cells, that the full scope of these claims would encompass cells of all types and from all organisms. I have not been asked to date, and have not attempted, to assess whether these claim constructions are correct or whether I agree with them or not. By considering these constructions in the context of my analysis, I do not mean to suggest that they are correct or that I agree with them in any way.

**PERSON OF ORDINARY SKILL IN THE ART:** I have also been asked to consider the level of ordinary skill in the art of the '516 patent at the time the various patent applications were filed. In my opinion, the person of ordinary skill would have had a Ph.D. in molecular biology, cellular biology, microbiology, or a related field, and at least two additional years of laboratory experience in these areas.

## III.    SUMMARY OF OPINIONS.

As set forth in more detail below, the summary of the opinions I have reached to date in analyzing the '516 patent are as follows:

- It is my opinion that the '516 patent lacks an adequate written description of the full scope of the inventions claimed in the patent. The description in the '516 patent does not suggest that the inventors had possession of any specific methods for practicing the claimed inventions, let alone methods across the full scope of the claims. Moreover, the description in the '516 patent merely provides an invitation to search for compounds that might practice the claimed methods, and does not define the class of compounds, or even a distinguishing feature of the class of compounds, that would practice these methods.

- It is my opinion that the '516 patent does not provide sufficient instruction to enable one of ordinary skill in the art to practice the full scope of the claimed methods. The '516 patent merely postulates five possible mechanisms for practicing the claimed methods, but does not

provide a sufficient teaching with respect to any of these methods to enable one of ordinary skill to practice them, let alone to practice methods across the full scope of the claims. To the extent the claims encompass reduction of NF-κB activity in cells *in vivo*, the '516 patent is especially lacking with respect to any teaching to enable one of ordinary skill in the art to practice these methods.

- If the claims of the '516 patent are described and enabled at all -- and as discussed herein I do not believe that they are -- it is my opinion that the claims should only be afforded a priority date consistent with the most recently-filed patent application, Appl. No. 08/464,364, dated June 5, 1995.

- My opinions regarding enablement and written description none-the-less are not solely a function of the June 5, 1995 filing date, as the earlier-filed applications would, to an even greater degree, lack enablement and written description.

- It is my opinion that the '516 patent does not disclose the best mode for practicing the claimed invention contemplated by named inventor Thomas Maniatis as of November 1991. Dr. Maniatis admitted that he considered the best mode of carrying out the invention of the '516 patent was to use antisense RNA technology, yet there is no discussion of antisense RNA technology anywhere in the patent.

- It is my opinion that ARIAD's expert, Dr. Thomas Kadesch, recanted his trial testimony from ARIAD's case with Lilly and now agrees, as do I, that the claims of the '516 patent directed to all cells and/or all eukaryotic cells lack adequate description.

- It is my opinion that ARIAD's expert, Dr. Inder Verma, has made statements to the United States Patent & Trademark Office regarding various compounds and their impact on NF-κB activity that are inconsistent with statements that he has made in publications on the same subjects.

## IV.   HISTORY OF THE DISCOVERY AND INVESTIGATION OF NF-κB/IκB.

The last 22 years have seen a tremendous expansion in our scientific understanding of NF-κB, IκB, and the components and processes involved with NF-κB activity. Indeed, even the in the first twelve years of NF-κB research (1986-1997), our knowledge evolved from a mere skeletal awareness of some of the players of the so-called "NF-κB pathway," to a more detailed grasp of some of the complexity that had been earlier acknowledged but not then explored.

From the prediction of a putative labile inhibitor of κ-light chain gene transcription to the elucidation of some of the higher aspects of NF-κB activation through, for example, IκB phosphorylation, ubiquitination, and degradation, scientists gradually developed their comprehension in this area, abandoning some concepts while adopting or modifying others. As I will discuss below, the disclosure of U.S. Patent No. 6,410,516 B1 (hereinafter "the '516 patent") simply provides a partial snapshot of the earlier NF-κB knowledge base as of November 13, 1991 (the latest date upon which the patent disclosure was significantly modified). Both contemporaneous and subsequent references, however, show that even that snapshot was incomplete and, in some aspects, wholly inaccurate.

6

As part of my testimony, I expect to provide an overview of how scientific understanding regarding NF-κB evolved over 1986-1997 time frame. I may include in this overview a discussion of the following developments and references and how they fit into the growth of scientific knowledge regarding NF-κB and IκB that took place after my original prediction of a labile inhibitor.

A.    Discovery of IκB and NF-κB - 1986-88.

From early 1986 to mid 1988, preliminary progress was made in the field: establishing the existence of a putative labile inhibitor of κ light chain gene expression; observing what was then thought to be a B-cell specific binding activity – an activity consequently called "NF-κB;" identifying a DNA motif to which NF-κB bound, and demonstrating an activity in the cytoplasm that was bound in an inactive complex with NF-κB – this inhibitory activity could be "dissociated" with detergent and thus was called IκB.

> 1/86: Ig κ gene activated without new protein synthesis indicates post-translational mechanism - induction by protein synthesis inhibitor (CHX) predicts labile inhibitor controlling Ig κ activation.[1]
>
> 8/86: B-cell specific transcription factor (i.e., stage- & tissue-specific) & binding site (aka NF-κB motif) identified in Ig κ intron enhancer.[2]
>
> 12/86: NF-κB binding activity induced in pre-B-cells, T-cells & HeLa by post-translational mechanism, also confirmed induction by CHX (experimental strategy based on Wall et al., 1986).[3]
>
> 4/88: Detergent-dissociated inhibitor (native mol. wt. ~60-70 kDa, called IκB) detected bound to NF-κB (~55-62 KDa activity) in inactive complex in cytoplasm.[4]

During this time, however, little was actually known about NF-κB or IκB. They were functionally defined as "activities."

---

[1]  Wall, R., Briskin, M., Carter, C., Govan, H., Taylor, A., and Kincade, P. A Labile Inhibitor blocks Immunoglobulin k-Light-Chain-Gene Transcription in a Pre-B Leukemic Cell Line. *Proc. Nat'l. Acad. Sci. USA*, 83(2):295-298, 1986.

[2]  Sen, R. and Baltimore, D. Multiple nuclear factors interact with the immunoglobulin enhancer sequences. *Cell* 46(5):705-716, 1986.

[3]  Sen, R. and Baltimore, D. Inducibility of kappa immunoglobulin enhancer-binding protein NF-kappaB by a posttranslational mechanism. *Cell* 47(6):921-928, 1986.

[4]  Baeuerle, P.A. and Baltimore, D. Activation of DNA-binding activity in an apparently cytoplasmic precursor of the NF-kappa B transcription factor. *Cell* 53(2):211-217, 1988.

Q.    So turning back to NF-kB, NF-kB in the 1991 time frame was identified in essence by its activity.

A.    That is right.

Q.    Is that a fair statement?

A.    That's right.

Q.    Was IkB also identified by its activity?

A.    IkB was also identified by its activity, by it's inhibitory activity.

Deposition of Dr. David Baltimore, taken September 26, 2007 (hereinafter "Baltimore Dep. Tr.") 84:24-85:6.


Q.    What in 1991 — so that's the time frame that I am asking you to turn your mind back to that time period — did you understand NF-kB to be? So in 1991.

A.    Right. We had not then cloned the genes for NF-kB. So our knowledge of it was entirely operational. It was the molecule which bound to DNA and showed up in a gel shift assay or which when expressed in cells led to increases in reporter — in reporter assays.

Q.    Anything else?

A.    I can't remember whether we had a rough size for it at that point. I would guess we did. So there might have been — might have been able to use a size criterion, but no, it was pretty virtual.

Q.    So it was a — these functional characteristics defined something as NF-kB?

A.    That's correct.

Baltimore Dep. Tr. 64:7-64:23.


THE WITNESS:  As I said the fundamental properties by which NF-kappaB was initially discovered and which represents sort of the hallmark of the transcription factor, those have remained unchanged over the period of time that we're talking about.

Q    And what fundamental properties of the transcription factor are you talking about?

THE WITNESS:  It's a DNA binding protein that recognizes a particular DNA sequence, and its activity is regulated by different signaling pathways. Those are fundamental features that are unchanged. They were discovered then and they remain unchanged.

8

Q  So you're focusing on the DNA binding properties of these proteins, correct?

THE WITNESS:  No, I indicated there are two fundamental properties. Of course, DNA binding and engaging target genes, but also the fact that they are induced by a variety of signaling pathways, NF-kappaB is a prototypical example of a signal induced – signaling induced transcription factor.

Q  So the two factors you're focusing on to characterize NF-kappaB are the fact that it's signal induced and binds to DNA, certain DNA element?

THE WITNESS:  Those would be two critical features, yes, of this transcription factor.

Deposition of Dr. Harinder Singh, taken April 27, 2007 (hereinafter "Singh Dep. Tr.") 25:5-26:2.


Q.    But again, NF-kappa B activity at the time, in 1987, was simply having something that bound to the DNA binding domain of the kappa 3 sequence that you were looking at, correct?

MR. GINDLER:  Objection, misstates his testimony, objection, calls for expert opinion, objection, calls for a legal conclusion.

A.    From the scientific perspective, NF-kappa B activity referred, even back in '87, to DNA binding to the site and other properties, such as post-translational induction, induction with other proteins, competition, induction with the presence of cycloheximide, et cetera.  So it was a summation of properties and not only one property of being able to bind or not.

Deposition of Dr. Ranjan Sen, taken May 3, 2007 (hereinafter "Sen Dep. Tr.") 109:12-110:1.

At this time, the EMSA (aka "gel shift") and CAT were the predominant assays used for studying NF-κB and it activity.  Neither those assays nor their adjuncts required structural knowledge of NF-κB or IκB.

Q.  Now, how did you in 1991 determine whether you had NF-kB?  What tests did you use?

A.  Well, originally –

THE WITNESS:  Our original test was the gel shift assay, and later when we knew what the sequence – that it was – that it bound to and we could put that sequence into reporter constructs, we could show increases in activity by the expression of NF-kB in reporter assays.

Baltimore Dep. Tr. 65:10-20.

9

Q.   Dr. Baltimore, I would like to turn now to IkB as a molecule and inhibitor, and first, ask you what as of 1991 you knew about IkB.

A.   We knew how to prepare it and – and how to then demonstrate its inhibitory effect on NF-kB DNA binding.

Q.   How did you characterize something as IkB?

A.   It was characterized by the fact that we eluded it from inhibited NF-kB, released it from inhibited NF-kB, and we showed that it would then inhibit active NF-kB, inhibit its DNA binding, and we showed specificity. It would not inhibit other things – other DNA binding proteins. And I think that was probably the definition.

Baltimore Dep. Tr. 84:10-23.


Q.   So at the time of this publication on October 20th, 1988, if a protein had satisfied those criteria, the existence of an inhibitory activity, the fact that it's a protein and that it was about the size of a protein, what you would expect for a protein, you would characterize that molecule as being an IkB at this time period; is that correct?

A.   This is part of its definition.  The other very essential element of it is that IkB, to start with the purification characterization, comes along with NF-kB in a complex, and in that complex NF-kB is not active.

Q.   So if you took this protein that you wanted to determine whether it was IkB and it complexed with NF-kB, that's an additional criteria that you would use to determine whether something was IkB at this time?

A.   Plus it would get out of that complex by addition of DOC and formamide.  That's yet another definition of that protein at that time.

Q.   Are there any other criteria that would -- that you would use to determine whether something was IkB in this time period?

A.   Yeah, you can come up with other definitions.  One is that if you just take cytosol from any cell, there is no active IkB in there simply because it's all in complex with NF-kB, so there's no access of it.

Q.   Any other criteria?

A.   That the complex of IkB with NF-kB is in the cytosol.  It cannot be removed by so-called denucleation of cells, as is exemplified in figure 5 in Exhibit 150.  Eventually there are others, but I need to read through the papers to find them.

Deposition of Dr. Patrick A. Baeuerle, taken August 20, 2007 and August 21, 2007 (hereinafter (Baeuerle Dep. Tr.) 105:13-107:4.

Q.    What defines the IkB proteins are some of the functional characteristics that we've been discussing today, correct?

A. That's my understanding.

Q.    And one of those characteristics was the retention of NF-kB in the cytoplasm, correct?

A. Yes.

Baeuerle Dep. Tr. 246:10-18.

Q.    At the time of this publication would you have referred to the inhibitory activity that you would have identified as a result of running, for example, an EMSA as being IkB?

A. Yeah.

Q.    So at this time in 1988 IkB was the same thing as the inhibitory activity; is that correct?

A. As far as I remember.

Baeuerle Dep. Tr. 53:15-54:2.

The EMSA could not provide information as to whether NF-κB in a cell had actually bound to its target DNA sequence.

Q.    Does a gel shift assay – does a gel shift assay allow someone to determine whether or not a protein is bound to a specific DNA sequence in the nucleus of a cell?

THE WITNESS:  It is a key assay, in terms of measuring DNA binding potential.

Q.    What do you mean by, "DNA binding potential"?

THE WITNESS:  Whether a factor, one, is in the nucleus, and, two, can bind to its relevant target sequence.

Q.    Does it provide information as to whether or not it – a factor has, in fact, bound to its relevant target sequence?

THE WITNESS:  It's a measure of its potential to bind to that sequence.

Q.    But does it provide information as to whether or not a factor has, in fact, bound to the relevant target sequence?

THE WITNESS:  That would require a separate assay.

Deposition of Dr. Albert S. Baldwin, Jr., taken May 25, 2007 (hereinafter "Baldwin Dep Tr.") 30:17-31:20.

11

Q.     So having used an EMSA with respect to the identification of — of NF-kB binding to MHC Class I promoter — MHC Class I promoter, you weren't able to actually identify if NF-kB was binding in the cell to the promoter; is that correct?

THE WITNESS:  We had no assay to do that.

Baldwin Dep. Tr. 51:25-52:6.

**B.     Purification of the NF-κB & IκB Proteins - 1988-92.**

In the 1988 to 1992 time frame, various groups of scientists began work to purify, from various sources, NF-κB and its inhibitor IκB — factors that up to that time were still characterized as "activities." During this period, different groups purified forms of NF-κB and species of IκB from, among other sources, bovine spleen, HeLa cells, rabbit lung, and human placenta. Scientists also began to study in more detail the interactions between NF-κB and IκB; the binding relationships between NF-κB and DNA; and the mechanism by which NF-κB is released from IκB. It should be noted, however, that at this time, the release of NF-κB from IκB was misunderstood to be a "dissociation" and the mechanism of NF-κB activation was incorrectly thought to likely involve direct phosphorylation of IκB by protein kinase C and protein kinase A.

7/88:  NF-κB ( ~50 kDa ) purified from bovine spleen nuclear extracts by specific DNA affinity chromatography.[5]

10/88:  Detergent-dissociated IκB shown to dislodge DNA-bound NF-κB, PMA activation of PKC resulted in nuclear translocation of active NF-κB via release of IκB inhibition.[6]

12/88:  NF-κB ( ~42 & 44 kDa) purified from bovine spleen nuclear extracts by specific DNA affinity chromatography.[7]

9/89:  NF-κB (p50 & p65) purified from DOC-treated cultured HeLa cytoplasmic extracts by specific DNA affinity chromatography, p50 homodimers

[5]    Kawakami, K., Scheidereit, C., and Roeder, R.G. Identification and purification of a human immunoglobulin-enhancer-binding protein (NF-kappa B) that activates transcription from a human immunodeficiency virus type 1 promoter in vitro. *Proc Natl Acad Sci U S A.* 85(13):4700-4704, 1988.

[6]    Baeuerle, P.A. and Baltimore, D.  I kappa B: a specific inhibitor of the NF-kappa B transcription factor. *Science* 242(4878):540-546, 1988.

[7]    Lenardo, M.J., Kuang, A., Gifford, A., and Baltimore, D.  NF-kappa B protein purification from bovine spleen: nucleotide stimulation and binding site specificity. *Proc Natl Acad Sci U S A.* 85(23):8825-8829, 1988.

& p50:p65 heterodimers shown to bind DNA, p65 found to be required for inhibition of binding by IκB.[8]

4/90:  NF-κB (p50 & p65) & IκB (~35 kDa) purified from detergent DOC-treated rabbit lung cytoplasmic extract.  Reaction of purified IκB with PKC in cell extracts inhibited binding to NF-κB – predicted that IκB phosphorylation released active NF-κB.[9]

4/90:  IκB purified from human placenta (native form ≈70 kDa, major band in denaturing gel ≈37 kDa, called IκBα, minor band ≈40-45 kDa, called IκBβ only partially purified here, see Link et al. reference footnoted for 1/92, below).  Both IκB forms similarly inactivated free NF-κB (with p65) & dislodged DNA-bound NF-κB complexes in a cell-free assay.[10]

1/92:  IκBβ purified to homogeneity (43 kDa), both purified IκB forms reported to be inactivated in a cell-free assay by purified PKC & PKA phosphorylation – suggested direct kinase phosphorylation of inhibitors.[11]

Some of the named inventors have also confirmed that the sequence of NF-κB was not known during this time frame.

> Q.   In early 1987 when you left the Baltimore lab, you didn't know the genetic sequence that coded for what has now come to be known as NF-kappa B, correct?
>
> ___
>
> A.   We did not.
>
> Q.   And at the time you left the Baltimore lab in early 1987, you also did not know what the amino acid sequence was for the protein, correct?
>
> A.   Correct.
>
> Sen Dep. Tr. 81:21-25 and at 80:17-20.

---

[8]  Baeuerle, P.A. and Baltimore, D.  A 65-kappaD subunit of active NF-kappaB is required for inhibition of NF-kappaB by I kappaB.  *Genes Dev.* 3(11):1689-1698, 1989.

[9]  Ghosh, S. and Baltimore, D.  Activation in vitro of NF-kappa B by phosphorylation of its inhibitor I kappa B.  *Nature* 344(6267):678-682, 1990.

[10]  Zabel, U., and Baeuerle PA.  Purified human I kappa B can rapidly dissociate the complex of the NF-kappa B transcription factor with its cognate DNA.  *Cell* 61(2):255-265, 1990.

[11]  Link, E., Kerr, L.D., Schreck, R., Zabel, U., Verma, I., and Baeuerle, P.A.  Purified I kappa B-beta is inactivated upon dephosphorylation.  *J. Biol. Chem.* 267(1):239-246, 1992.

13

Q.  Had the amino acid sequence of the NF-kB been determined as of 1988?

A.  Not that I know of.

Q.  Had the cDNA for NF-kB been cloned as of 1988?

A.  Not that I know.

Baeuerle Dep. Tr. 37:4-9.

Q.   NF kappa B was not among those that had been characterized in terms of their DNA and amino acid sequence as of 1990, correct?

A.   I believe as of April, 1990 in the recollection of this work, I believe that is the case.

Q.  That it had not been so characterized, correct?

A.  I mean I can't be specifically sure, but I believe that is the case.

Deposition of Dr. Philip A. Sharp, taken May 16, 2007 (hereinafter "Sharp Dep. Tr.") 96:7-16.

Q.  What in 1991 -- so that's the time frame that I am asking you to turn your mind back to that time period -- did you understand NF-kB to be? So in 1991.

A.   Right.  We had not then cloned the genes for NF-kB.  So our knowledge of it was entirely operational.  It was the molecule which bound to DNA and showed up in a gel shift assay or which when expressed in cells led to increases in reporter -- in reporter assays.

Q.  Anything else?

A.  I can't remember whether we had a rough size for it at that point.  I would guess we did.  So there might have been -- might have been able to use a size criterion, but no, it was pretty virtual.

Q.   So it was a -- these functional characteristics defined something as NF-kB?

A.  That's correct.

Baltimore Dep. Tr. 64:7-23.

There isn't amino acid sequence information for NF kappa B in the '516 patent, correct?

A.  I'm not aware there is amino acid sequence for NF kappa B in the '516 patent.

Q.  Okay.  Did you have amino acid sequence information for NF kappa B that you chose not to put in the application, or did you just not have it as of the filing date?

A.  Specifically to my lab we did not have it.

Q.  Okay.  Do you know if anybody else, any of the other named inventors had it?

A.  I have no specific recollection that anyone had sequence for NF kappa B specifically at the time.  I can't — I don't know what other people have.

Q.  When you say "sequence," I raised the question initially with amino acid sequence.  Does your answer apply to DNA sequence as well, in that you're not aware that anyone had the DNA sequence for NF kappa B as of the filing date for the '516?

A.  I'm not aware that anyone had sequence related to NF kappa B activity at the time of filing this patent.

Sharp Dep. Tr. 152:6-153:7.

## C.    Recombinant DNA Cloning of the NF-κB & IκB Proteins - 1989-92.

### 1.    c-Rel cDNA cloning - 1989

In the late 1989 time frame, the proto-oncogene, c-Rel, was cloned from the cDNA of various species (*e.g.*, human, mouse, and chicken).  Although it was noted that the clones bore high homology to known v-Rel (an avian virus) and *dorsal* (a fruit fly gene), it was not understood at the time that c-Rel was related in any way to the NF-κB "activity" that had been reported in other publications.

> 1989:  c-Rel cDNA cloned - complete deduced amino acid sequences reported for multiple species prior to NF-kB cloning – high homology to known v-Rel & *Drosophila dorsal* sequences.  Examples:
>
> 7/89    Cloning of human c-Rel[12]

---

[12]  Brownell, E., Mittereder, N. and Rice, N.R.  A human rel proto-oncogene cDNA containing an Alu fragment as a potential coding exon.  *Oncogene* 4(7):935-942, 1989.

7/89    Cloning of murine c-Rel[13]

10/89    Cloning of avian c-Rel[14]

### 2.    *NF-κB cDNA cloning - 1990-92.*

References disclosing the initial cDNA cloning of various NF-κB subunits were published in the 1990-92 time period. These cDNA clones were mostly obtained using oligonucleotide probes based on tryptic peptides from the purified NF-κB protein described previously. During this time frame, various groups made comparisons of these clones with other already characterized proteins, noting, among other things, the homology of the NF-κB proteins with rel and dorsal proteins. It was also noted that there is a precursor/active protein relationship between p50 and p105 and between p52 and p100, although the nature of the processing of p105 and p100 was not fully elucidated until years later.

9/90 – 2/91:    p50/p105 (NFKB1) cDNA cloning reports revealed first insights into complexities of NF-κB. p50 located at N-terminus of p105 precursor – p50 contains 300 amino acid sequence with DNA binding & dimerization sequences (Rel homology domains, RHD) like rel proteins & *dorsal*. Cloning of p50/p105 using oligonucleotide probes based on purified protein tryptic peptides.[15]

---

[13]  Grumont, R.J. and Gerondakis, S.    Structure of a mammalian c-rel protein deduced from the nucleotide sequence of murine cDNA clones. *Oncogene Res.* 4(1):1-8. 1989.

[14]  Hannink, M. and Temin, H.M.  Transactivation of gene expression by nuclear and cytoplasmic rel proteins. *Mol Cell Biol.* 9(10):4323-4336, 1989.

[15]  9/90: Ghosh, S., Gifford, A.M., Riviere, L.R., Tempst, P., Nolan, G.P., and Baltimore, D.  Cloning of the p50 DNA binding subunit of NF-kappa B: homology to rel and dorsal. *Cell* 62(5):1019-1029, 1990.

9/90: Kieran, M., Blank, V., Logeat, F., Vandekerckhove, J., Lottspeich, F., Le Bail, O., Urban, M.B., Kourilsky, P., Baeuerle, P.A., and Israël, A.  The DNA binding subunit of NF-kappa B is identical to factor KBF1 and homologous to the rel oncogene product. *Cell* 62(5):1007-1018, 1990.

11/90: Bours, V., Villalobos, J., Burd, P.R., Kelly, K., and Siebenlist, U. Cloning of a mitogen-inducible gene encoding a kappa B DNA-binding protein with homology to the rel oncogene and to cell-cycle motifs. *Nature* 348(6296):76-80, 1990.

2/91: Meyer, R., Hatada, E.N., Hohmann, H.P., Haiker, M., Bartsch, C., Röthlisberger, U., Lahm, H.W., Schlaeger, E.J., van Loon, A.P., Scheidereit, C.  Cloning of the DNA-binding subunit of human nuclear factor kappa B: the level of its mRNA is strongly regulated by phorbol ester or tumor necrosis factor alpha. *Proc Natl Acad Sci U S A.* 88(3):966-970, 1991.

3/91: p65 cDNA (RelA) cloning using oligonucleotide probes based on tryptic peptides from purified protein. Protein sequence from cloned p65 showed high homology to Rel and dorsal.[16]

8/91 – 2/92: p52/p100 (NFKB2) cDNA clones obtained by three approaches:

1) screening with oligonucleotides based on tryptic peptides from purified NF-kB protein - p52/p100 more homologous to p50/p105 than other Rel family members, p52 also formed heterodimers with p65 like p50.[17]

2) p52p100 cloned as B-cell lymphoma associated translocated (t10:14) lyt-10 gene.[18]

3) p52/p100 isolated in cDNA cloning of mitogen-inducible immediate early genes in T-cells.[19]

Cloning of the subunits of NF-κB began to change the way in which NF-κB was perceived. Many of the earlier assumptions regarding NF-κB structure, some of which remain in the '516 patent disclosure, were discarded.

Q. What did you understand in 1991 regarding the members of the family of NF-kB subunits?

Q. Did you have an understanding in 1991 that there were multiple subunits of NF-kB?

A. I'm having a hard time placing the dates basically. It was clear in Chen-Ming Fan's paper that — which was in 1991 — that the P-50 subunit was generated by processing a P-105, and I don't know whether the P-65 subunits had been identified at that time or not so I can't — I don't have — I can't remember specifically when the two subunits were

[16] Ruben, S.M., Dillon, P.J., Schreck, R., Henkel, T., Chen, C.H., Maher, M, Baeuerle, P.A., and Rosen, C.A. Isolation of a rel-related human cDNA that potentially encodes the 65-kD subunit of NF-kappa B. *Science* 251(5000):1490-1493, 1991.

Nolan, G.P., Ghosh, S., Liou, H.C., Tempst, P., and Baltimore, D. DNA binding and I kappa B inhibition of the cloned p65 subunit of NF-kappa B, a rel-related polypeptide. *Cell* 64(5):961-969, 1991.

[17] 8/91: Schmid, R.M., Perkins, N.D., Duckett, C.S., Andrews, P.C., and Nabel, G.J. Cloning of an NF-kappa B subunit which stimulates HIV transcription in synergy with p65. *Nature* 352(6337):733-736, 1991.

[18] 12/91: Neri, A., Chang, C.C., Lombardi, L., Salina, M., Corradini, P., Maiolo, A.T., Chaganti, R.S., and Dalla-Favera, R. B cell lymphoma-associated chromosomal translocation involves candidate oncogene lyt-10, homologous to NF-kappa B p50. *Cell* 67(6):1075-1087, 1991.

[19] 2/92: Bours, V., Burd, P.R., Brown, K., Villalobos, J., Park, S., Ryseck, R.P., Bravo, R., Kelly, K., and Siebenlist, U. A novel mitogen-inducible gene product related to p50/p105-NF-kappa B participates in transactivation through a kappa B site. *Mol Cell Biol.* 12(2):685-695, 1992.

identified, but certainly P-50 was in 1991. I don't know when the other subunit was identified.

Q. Could I have you turn back to Exhibit 1 — actually, yeah, you got it right there, the '516 patent. To make it easier, if you could turn to column 30 of the patent, please starting at — oh, sorry, starting at line 42, where it says: "Mechanism of NF-kB activation"?

A. Yes.

Q. If you could just read that first paragraph to yourself at this point and let me know when you've read that paragraph and I'm going to ask you a question about it?

A. Okay.

Q. Let's see, if you'd go to line, I believe it's 48, where it says: "This complex is apparently," do you see where it says that?

A. Yes.

Q. "This complex is apparently a heterodimer consisting of about 60 kD NF-kB molecule and

a 60 to 70 kD IkB molecule," is that an accurate description of the NF-kB complex?

A. What did you say?

A. Oh, this was the understanding at the time; it's not an accurate understanding of the current — not a current understanding of the composition of the complex.

Q. If you'd go to the last sentence of the paragraph where it says: "This releases NF-kB, which appears now to form a homodimer and can translate it into the nucleus," I guess that's the second to last sentence and then the last sentence is: "Whether dimerization is required for activation of NF-kB is not known," is that an accurate reflection of what was understood at the time with respect to NF-kB and its structure?

A. I believe that that was an accurate understanding at the time.

Q. Does that reflect your understanding after 1991 regarding the structure of NF-kB?

A. No, the current understanding is that NF-kB is a heterodimer.

Q. Going back, I want to just clarify something where I'd asked you a question where I'd said, was that the understanding at the time; by "at the time," in my question I meant 1991, and I think that's what you meant as well, but let me just ask you the question again to make sure the record is clear ... the final two sentences dealing with NF-kB and its structure you believe was an accurate reflection of the understanding in 1991 regarding the structure of NF-kB, is that correct?

A. Now, as I said in response to your earlier question, I can't place the dates precisely of when the heterodimer was recognized, so I can't answer that unequivocally.

Q. ... When the application was filed in 1991, did you believe it to be correct?

A.    Yes, I did believe it was correct.

Deposition of Dr. Tom Maniatis, taken October 3, 2007 and October 4, 2007 (hereinafter "Maniatis Dep. Tr.") 192:15-196:1.


Q.    Okay. Now, this statement in the patent, column 14 of the '516 patent, that NF-kappa B is a single factor as opposed to a family of factors, that's actually not correct, right?

A. Now we know that it's a family of factors.

Q.    Right. How many family members are there in the NF-kappa B family of factors?

A.   There are five family members in mammalian cells. There are two family members in flies, and none in worms, so --

Q. So in mammalian cells, there are five family members. Can you list those family members for me?

A. Sure. There's P105, P100, C-Rel, Rel-A and Rel-B.

Q.   Now, is there a most common form of NF-kappa B that you would consider to be the most prominent family member?

A.    Common is a hard -- is hard to define, so clearly depending on the circumstance, there are different family members that come into play.

Sen Dep. Tr. 102:1-24.


Q   You just said initially it wasn't clear that it was a family of related transcription factors, correct?

A   Correct.

Q   When did it become clear that it was a family of related transcription factors?

THE WITNESS: As I indicated after the determination of the amino acid sequence of the subunits.

Q  Do you recall when that determination of the amino acid sequence of the subunits was made?

19

THE WITNESS: I don't recall the exact date, no.

Singh Dep. Tr. 22:12-23:2.

Q.   Okay.  When you stated in the 516 patent that NF-kB appears now to be a homodimer, what led you to that belief in this time frame?

A.   At that time, we didn't know that there were multiple subunits, and so — I tell you I honestly can't remember why we thought it was a dimer at all.  Probably it was a matter of size.  And so our guess as reflected there was that we were only thinking about a single subunit.  We weren't thinking about multiple subunits, and we guessed that it was inactive as a monomer and only activated by dimerization after release of IkB, but that all turns out to be wrong.

Q.   Okay.  And what turns out to be correct?

A.   NF-kB is inhibited as a dimer by IkB, not as a monomer, and it can be either a heterodimer or a homodimer.

Baltimore Dep. Tr. 106:3-106:19.


3.      *IκBα and IκBβ cDNA cloning/characterization - 1991-92.*

In the 1991-92 time frame, different groups began cloning, in different species, possible candidates for NF-κB inhibitors.  There was considerable confusion, however, as to just what these different cDNA clones represented — based on studies both with the clones and with purified proteins, it was unclear, for example, what the MAD-3 and pp40 clones represented (whether, IκBα, IκBβ, or some other homologous rel proteins).

6/91:  MAD-3 cDNA clone isolated as immediate early gene induced in adherent human monocytes, sequence predicted 36-38 kDa protein (like 37 kDa for purified IκBα) with putative PKC motif, also multiple ankyrin repeats (ARD) like p105 precursor to p50 — translated MAD-3 protein inhibited p50 homodimer binding like purified IκB.  Cloned MAD-3 cDNA predicted to be human IκBα based on identical match to two tryptic peptides & cross reactivity with anti-pp40 antibody (*see* Davis et al., at 9/91, below).[20]

8/91:  Kerr et al. concluded that pp40 is IκBβ - based on comparisions of purified chicken pp40 protein compared to purified human placenta IκBα & IκBβ.  pp40 reportedly resembled purified IκBβ in inhibitory properties (blocked c-rel -

---

[20]  Haskill, S., Beg, A.A., Tompkins, S.M., Morris, J.S., Yurochko, A.D., Sampson-Johannes, A., Mondal, K., Ralph, P., and Baldwin, A. S., Jr.  Characterization of an immediate-early gene induced in adherent monocytes that encodes I kappa B-like activity. *Cell* 65(7):1281-1289, 1991.

IκBα did not ), showed anti-pp40 antibody blocked IκBβ but not IκBα inhibition of NF-κB binding. Tryptic peptides from pp40 showed similar pattern to IκBβ & differed from IκBα. No sequence data was disclosed in this paper and these findings are contradicted by results in mouse IκBβ cDNA cloning paper (*see* Thompson et al., 1995, below).[21]

9/91: Rel family member, pp40, purified from v-rel transformed chicken lymphocytes & determined to have inhibitory properties like purified IκB. Chicken pp40 cDNA cloned using tryptic peptides from purified chicken protein. Chicken pp40 and MAD-3 cDNA sequences encode similar molecular weight proteins with homologous amino acid sequences, appearing to support prediction that pp40 is chicken IκBα.[22]

10/92: Characterization of cloned MAD-3 expressed IκB interactions with NLS of NF-kB (p50, p65 homo- & heterodimers). Paper, which includes named inventor Baldwin, states that in 1992 relationship of IκB forms to MAD-3 & pp40 "not completely clear." This uncertainty is also summarized in Discussion (p.1910).[23]

2/95: IκBβ cDNA (mouse) cloned based on tryptic peptides from purified rabbit lung IκBβ protein. Cloned mouse sequence closely related to other then cloned IκB family members (human IκBα/MAD-3), mouse IkBγ, human Bcl-3, *Drosophila cactus*. Expressed protein shown to bind p65 & c-Rel, but not p50.[24]

**4.    *Mechanisms of IκB/NF-κB degradation and processing.***

In the 1993-94 time frame, with the availability of cloned NF-κB and IκB genes and specific antibodies based on the protein sequences translated from these genes, scientists begin to further explore the mechanisms of NF-κB and IκB processing in cells.. Specifically, they began to explore (1) the way in which NF-κB and IκB physically interact and the process by which NF-κB is freed from that natural inhibitor and (2) the way in which certain NF-κB precursors are processed to become active NF-κB subunits. It was then that scientists first began to understand

---

[21]    Kerr, L.D., Inoue, J., Davis, N., Link, E., Baeuerle, P.A., Bose, H.R., Jr., and Verma, I.M. The rel-associated pp40 protein prevents DNA binding of Rel and NF-kappa B: relationship with I kappa B beta and regulation by phosphorylation. *Genes Dev.* 5(8):1464-1476, 1991.

[22]    Davis, N., Ghosh, S., Simmons, D.L., Tempst, P., Liou, H.C., Baltimore, D., and Bose, H.R. Rel-associated pp40: an inhibitor of the rel family of transcription factors. *Science* 253(5025):1268-1271, 1991.

[23]    Beg, A.A., Ruben, S.M., Scheinman, R.I., Haskill, S., Rosen, C.A., and Baldwin, A.S. I kappa B interacts with the nuclear localization sequences of the subunits of NF-kappa B: a mechanism for cytoplasmic retention. *Genes Dev.* 6(10):1899-1913, 1992.

[24]    Thompson, J.E., Phillips, R.J., Erdjument-Bromage, H., Tempst, P., and Ghosh, S. I kappa B-beta regulates the persistent response in a biphasic activation of NF-kappa B. *Cell* 80(4):573-582, 1995.

aspects of IκB phosphorylation, ubiquitination, and proteasomal degradation, as well as related events in p105 and p100 processing.

        (a)       Mechanisms of IκB degradation in cells - 1993-94.

1993:  Early pre-1993 studies indicated that cell-free treatment of IκB with PKC & PKA released active NF-κB, predicting that phosphorylation inactivated IκB. Mechanism of NF-κB activation in cells was uncertain until the following six reports showed: 1) IκBα is rapidly degraded in response to a variety of extracellular signals, 2) disappearance of IκBα coincided with release and translocation of active NF-κB to the nucleus. 3) NF-κB induced synthesis of new IκBα that formed complexes with NF-κB, thereby limiting activity via an auto-regulatory loop, 4) overexpressed IκBα (*i.e.*, in excess of NF-κB in cells) is labile and is rapidly degraded.  It was noted that transiently phosphorylated IκBα species preceded rapid inhibitor degradation in induced cells, suggesting that phosphorylation may tag IκBα for proteolysis but is not sufficient to release active NF-κB (see Beg et al., & Mellits et al., below).[25]

6/93:  Known inducers of NF-κB activity lead to the phosphorylation and subsequent rapid disappearance of cellular IκB in cells.[26]  The authors, including named inventor Baldwin, Jr., state that before this study, "the *in vivo* mechanism of activation [was] unknown," and that even still, "the exact role of IκBα/MAD-3 phosphorylation in its *release* from NF-κB [is similarly unclear]."

---

[25]  9/93: Brown, K., Park, S., Kanno, T., Franzoso, G., and Siebenlist, U.  Mutual regulation of the transcriptional activator NF-kappa B and its inhibitor, I kappa B-alpha.  *Proc Natl Acad Sci U S A*  90(6):2532-2536, 1993.

3/93:  Sun, S.C., Ganchi, P.A., Ballard, D.W., and Greene, W.C.  NF-kappa B controls expression of inhibitor I kappa B alpha: evidence for an inducible autoregulatory pathway. *Science*  259(5103):1912-1915, 1993

6/93:  Beg, A.A., Finco, T.S., Nantermet, P.V., and Baldwin, A.S., Jr.  Tumor necrosis factor and interleukin-1 lead to phosphorylation and loss of I kappa B alpha: a mechanism for NF-kappa B activation.  *Mol Cell Biol.* 13(6):3301-3310, 1993.

7/93:  Scott, M.L., Fujita, T., Liou, H.C., Nolan, G.P., and Baltimore, D.  The p65 subunit of NF-kappa B regulates I kappa B by two distinct mechanisms. *Genes Dev.* 7(7A):1266-1276, 1993.

9/93:  Henkel, T., Machleidt, T., Alkalay, I., Krönke, M., Ben-Neriah, Y.,and Baeuerle, P.A. Rapid proteolysis of I kappa B-alpha is necessary for activation of transcription factor NF-kappa B. *Nature* 365(6442):182-185, 1993.

11/93 Mellits, K.H., Hay, R.T., and Goodbourn, S.  Proteolytic degradation of MAD3 (I kappa B alpha) and enhanced processing of the NF-kappa B precursor p105 are obligatory steps in the activation of NF-kappa B. *Nucleic Acids Res.* 21(22):5059-5066, 1993.

[26]  Beg AA, Finco TS, Nantermet PV, Baldwin AS Jr., Tumor necrosis factor and interleukin-1 lead to phosphorylation and loss of I kappa B alpha: a mechanism for NF-kappa B activation, *Mol. Cell. Biol.* 1993 Jun;13(6):3301-10.

9/93:  Several serine protease inhibitors were found to prevent NF-κB binding to DNA in response to proven inducers.[27]  The inhibition of NF-κB DNA binding was coupled with a preservation of cellular IκB.  Conclusion: NF-κB activation requires rapid proteolysis of IκB.  Authors admit ignorance as to whether IκB is degraded while complexed to NF-κB and also as to whether phosphorylation was required for "release" of IκB from NF-κB.

10/94:  First conclusive evidence that the ubiquitin-mediated proteolytic complex ("proteasome") was necessary for NF-κB activation.[28]  Named inventor Maniatis and coworkers demonstrated that the proteasome is responsible for the inducible proteolysis of IκB that leads to activation of NF-κB in the canonical pathway.  Well-known and commercially-available proteasome inhibitors of the peptide aldehyde family (e.g. MG115 and MG132) were able to inhibit the inducible degradation of IκB.  Authors hypothesized that the proteasome may act on NF-κB-IκB complexes rather than on free IκB protein.

7/95:  First demonstration that *phosphorylated* IκBα is first ubiquitinated and then degraded by the 26S proteasome.[29]  Authors, including named inventor Maniatis, demonstrated that both phosphorylated and ubiquitinated IκB remain bound to NF-κB, and that the 26S proteasome recognizes the ubiquitinated IκB:NF-κB complex.

11/95:  Elucidation of the full canonical mechanism of induced NF-κB activation via step-wise phosphorylation, ubiquitination and degradation of NF-κB-bound IκB.[30]  This was accomplished by showing that (1) Proteasome inhibitor MG101 (a.k.a. "ALLN") lead to the accumulation of both phosphorylated and non-phosphorylated IκB after phorbol ester induction, (2) Proteasome inhibitor ZLLF led to the accumulation of IκB with an increased molecular mass due to the attachment of polyubiquitin chains, and (3) In cells expressing a switchable mutant of the E1 ubiquitin activating enzyme, a marked reduction of IκBα degradation was observed under E1-deactivating conditions.

---

[27]  Henkel T, Machleidt T, Alkalay I, Krönke M, Ben-Neriah Y, Baeuerle PA., Rapid proteolysis of I kappa B-alpha is necessary for activation of transcription factor NF-kappa B, *Nature*. 1993 Sep 9;365(6442):182-5.

[28]  Palombella VJ, Rando OJ, Goldberg AL, Maniatis T., The ubiquitin-proteasome pathway is required for processing the NF-kappa B1 precursor protein and the activation of NF-kappa B, *Cell*. 1994 Sep 9;78(5):773-85.

[29]  Chen Z, Hagler J, Palombella VJ, Melandri F, Scherer D, Ballard D, Maniatis T., Signal-induced site-specific phosphorylation targets I kappa B alpha to the ubiquitin-proteasome pathway, *Genes Dev.* 1995 Jul 1;9(13):1586-97.

[30]  Alkalay I, Yaron A, Hatzubai A, Orian A, Ciechanover A, Ben-Neriah Y, Stimulation-dependent I kappa B alpha phosphorylation marks the NF-kappa B inhibitor for degradation via the ubiquitin-proteasome pathway, *Proc. Nat'l Acad. Sci. USA.* 1995 Nov 7;92(23):10599-603.

23

8/97:  First identification and characterization of the kinase responsible for the phosphorylation of IκB, named IκB kinase, or IKK.[31]

11/97:  Engineered phosphorylated polypeptides used to inhibit the ubiquitination of phosphorylated IκBα and IκBβ.[32]  Same polypeptides led to decreased proteolytic degradation of endogenous IκB.

12/98:  "Dominantly interfering" mutants of E3 ubiquitin ligase (i.e., mutants that bind to phosphorylated IκB but do not ubiquitinate it) led to decreased degradation of IκB and inhibition of NF-κB activation.[33]

Dr. Maniatis admitted that the mechanistic details of the NF-κB pathway were unknown in 1991, and that in fact, even as late as 1994, the specific mechanism of NF-κB was still poorly understood.

A.  The mechanistic details of the pathway were not known in 1991.

Q.  What do you mean by "the mechanistic details"?

A.  That there was a phosphorylation-dependent association of IkBa with a ubiquitin ligase that ultimately led to IkBa degradation.  I believe that it was known that signals that activate NF-kB lead to its dissociation from IkB and its nuclear translocation, but the means by which that occurred was not understood.

Maniatis Dep. Tr. 112:7-18.

Q.  Let's go back up to the sentence that you read before regarding the —

A.  Okay.

Q.  — signal transduction pathways:  "Neither of the signal transduction pathways leading up to NF-kB activation nor the mechanisms of NF-kB for P-100/P-105 processing are understood," was that a correct statement when it was made in 1994 when this application was filed?

[31]  Didonato J, Hayakawa M, Rothwarf D, Zandi E, Karin M, A Cytokine-Responsive IκB Kinase That Activates the Transcription Factor NF-κB, Nature 1997 Aug; 388:548.

[32]  Yaron A, Gonen H, Alkalay I, Hatzubai A, Jung S, Beyth S, Mercurio F, Manning AM, Ciechanover A, Ben-Neriah Y, Inhibition of NF-kappa-B cellular function via specific targeting of the I-kappa-B-ubiquitin ligase, EMBO J. 1997 Nov 3;16(21):6486-94.

[33]  Yaron A, Hatzubai A, Davis M, Lavon I, Amit S, Manning AM, Andersen JS, Mann M, Mercurio F, Ben-Neriah Y., Identification of the receptor component of the IkappaBalpha-ubiquitin ligase. Nature. 1998 Dec 10;396(6711):590-4.

A. I believe that this work preceded the identification of the specific serines in IkB alpha that were phosphorylated and the precise mechanism of the IkB degradation. In fact, it was later shown that the IkBa is actually removed when it is still part of the IkB complex; and we couldn't have known that at the time, so it does reflect the state of understanding at that time.

Q. And by that time you mean 1994?

A. Yes.

Maniatis Dep. Tr. 216:23-217:18.

A. That there are ways of inhibiting NF-kB activity by targeting specific steps in the signaling pathway.

Q. Was this a step that you understood in 1991 to even be a part of the signaling pathway for NF-kB?

A. We knew that there was evidence that phosphorylation was involved, and that dissociation from IkBa is involved, and so that the basic concept of the mechanism was known, but the understanding of the mechanistic details were not; that is, that there are specific serine residues, and they're phosphorylated; and that those are required for ubiquitination, which, in turn, is required for its degradation; degradation of the IkBa.

Q. So none of that was understood as of 1991?

A. The only thing that was understood was that inducers lead to the dissociation of IkBa and the translocation of NF-kB in the nucleus, and the means by which this dissociation from IkBa occurred was not known.

Maniatis Dep. Tr. 133:2-134:2.

Dr. Maniatis noted the proteasome was subsequently determined to play an essential role in the degradation of IkB.

Q. If you could turn back to Exhibit 189 for me, please, that's the 1994 Palombella paper from Cell. Just looking at the summary on the left-hand column, could you read that first sentence for me?

A. "We demonstrated an essential role for the proteasome complex and two proteolytic processes required for activation of the transcription factor NF-kB: the P-105 precursor and the P-50 subunit of NF-kB is processed in vivo by ATP-dependent process that requires proteasomes and the ubiquitin conjugation."

Q. That's fine, I didn't mean for you to read the whole thing but thanks. Going back to just that first sentence: "We demonstrate an essential role," what was your understanding when you wrote this that the proteasome complex had an essential role?

25

A. What we meant was that these events do not occur; that is to say, processing of P-105 and the degradation of IkBa in the presence of known inhibitors of the proteasome.

Maniatis Dep. Tr. 116:25-117:24.

Additionally, while the involvement of ubiquitination and proteolysis of IκB are now known to be integral steps in the NF-κB activation pathway, the inventors of the '516 patent admitted that these steps were unknown at the time of the patent

Q. So going back to this Chen paper, which I believe we have as Exhibit 188, this marks the first time that it was, that the phosphorylation of IkBa was coupled to the ubiquitin proteasome; is that right?

A. That's right.

Q. So in 1991 was there any understanding at all that there was a relationship between IkB and the ubiquitin proteasome system?

A. No, that was – I mean, these are the papers that really make that connection and the – I think the paper that preceded this was the – it should be listed here – yeah, this was in, in 1994; there's a reference on Page 1597 of that paper. It's Palombella, et al., with the title of: The ubiquitin proteasome pathway as required for processing the NF-kB precursor protein in the activation of NF-kB, and that was the first time that that connection would have been made between the phosphorylation and ubiquitin proteasome degradation, and that was demonstrated for both precursor NF-kB and IkBa; and the later two papers you're referring to, including the Chen paper, are the in vitro experiments, biochemical experiments, that demonstrate that link.

Q. So does an understanding of the relationship between the degradation of the NF-kB precursor and IkBa differ from the understanding that you and your co-inventors had in 1991 as to how NF-kB and IkB were regulated?

A. The mechanistic details of the pathway were not known in 1991.

Maniatis Dep. Tr. 110:21-112:8.

More specifically, Dr. Maniatis admitted that as of 1991, there was no direct evidence that NF-κB activation required IκB degradation.

Q. So my question to you is how, in 1991, did you believe that anyone could practice claim 34 of the '516 patent?

A. Well, the evidence at that time was related to dissociation and I know of no direct evidence regarding degradation.

Q. So you're saying you didn't have an understanding in 1991 as to how someone could practice claim 34 of the '516 patent?

A. The – it would not be unprecedented that when a protein associates from another protein that it's normally bound to that it would, it would be

26

degraded, so I assume that this relates to inhibiting the association of IkB with NF-kB.

Maniatis Dep. Tr. 148:7-149:1.

Dr. Sen confirmed that ubiquitin's role in the IκB degradation pathway was not determined until around 1995.

Q.    And do you know when that focus on I kappa B alpha and the ubiquitination process first came about?

A.    '95ish.

Sen Dep. Tr. 206:12-16.

Moreover, Dr. Baltimore testified that in 1991, IKK was not identified as the kinase responsible for phosphorylating IκB.

Q.    Now, in 1991 – so turning back the clock to the time frame of the applications in the 516 patent and the others – in 1991, you didn't know of the existence of IKK at that point, correct?

A.    It is correct we did not know about IKK.

Baltimore Dep. Tr. 45:7-11.

In addition, Dr. Sen confirmed that the IKK family of kinases were not cloned until the late 1990s.

Q.    When was it found out, again, approximately, that there were different forms of I kappa B that participated in these various pathways?

A.    We are talking about I kappa B kinases, IKKs, not I kappa Bs.

Q.    Okay.

A.    So the question is –

Q.    Let's do it with respect to IKK first.

A.    Yes, so IKKs I think were cloned late '90s. I'm not sure. In that time frame, few years before the knockout, so late '90s I would think.

Sen Dep. Tr. 200:17-201:3.

Dr. Maniatis further testified that phosphorylation of IκB as a step in the activation of NF-κB was merely a hypothesis as of 1991.

Q.    In 1991 it was a hypothesis that IkB was phosphorylating, is that correct?

A.    This description is based on indirect observations, but TPA stimulation results in the nuclear translocation of NF-kB; that TPA

27

activates protein kinase C, and that's, as it says here, therefore, a reasonable hypothesis that direct/indirect phosphorylation of IkB will result in its dissociation of NF-kB.

Q.  So I guess you're just saying it was a hypothesis based on indirect observation, is that correct?

A.    Yes, that there was no direct demonstration that IkB was phosphorylated upon TPA treatment.    I believe that there were experiments at that time from Baltimore's lab in vitro that indicated that the phosphorylation of IkB by these kinases would have the in vitro effect of dissociating the two; but, again, I can't place the exact date of the, of the publication of those studies.

Q.  If you could read the next paragraph down column three, line one, please?

A.  Okay.

Q.  Was it believed in 1991 that protein kinase C was responsible for the phosphorylation of IkB?

A.  That hypothesis, as it's said in the previous paragraph, was made based on the information available at the time.  I don't, I don't believe it says it's the only kinase involved, but it states that it's a candidate kinase for this activity.

Maniatis Dep. Tr. 197:16-199:1.

Dr. Maniatis further admitted that as of the early 1990s, scientists' knowledge of the NF-κB pathway was limited to circumstantial evidence that phosphorylation of IκB was required for "dissociation" of IκB from its complex with NF-κB, yet the identity of the kinase responsible for IκB phosphorylation was unknown.  His testimony reflects their belief at the time that kinase inhibitors could be used to reduce NF-κB activity.

Q.  I guess I just need to ask the question again: what did you in 1991 believe someone could do to inhibit dissociation of the NF-kB complex?

A.  Well, as I said, at that time there was evidence that phosphorylation of IkBa is required for the dissociation of IkBa from NF-kB, and, therefore, any --

Q.  Excuse me.

A.  -- any inhibition of the steps required for that dissociation would be, would be effective in inhibiting NF-kB activity because it would prevent the nuclear translocation and -- well, it would hinder the nuclear translocation of NF-kB.

Q.  So are you saying that kinase inhibitors would be an example of something that you would have believed, in 1991, could be used to inhibit dissociation of NF-kB IkB complexes?

A. Yes. As I said, at the time there was evidence that phosphorylation of IkBa was induced and that phosphorylation led in ways that weren't known at the time to a dissociation in the activation of NF-kB ...so if one had a selective inhibitor of the kinase that phosphorylates IkBa, which we now know to be IKK, that would be a way of inhibiting the dissociation of IkBa from NF-kB.

Q. In 1991 did you or any of your colleagues have any idea as to what kinase it was that phosphorylates Ik --

A. Baltimore had --

A. Okay. Baltimore had investigated the in vitro activities of a number of kinases that, in that assay, led to dissociation and it was -- and he was investigating whether any one of these kinases were actually involved in vivo.

Maniatis Dep. Tr. 150:12-152:3.

Dr. Baltimore confirmed Dr. Maniatis' testimony, admitting that while they had observed that TPA, an activator of PKC, could induce NF-κB activity, whether PKC participates in this pathway and at what step is, even today, still poorly understood.

Q. We talked earlier about IkB and phosphorylation of IkB and so forth. As of 1991, was it your belief that protein kinase C was responsible for phosphorylating IkB?

A. We had some evidence that protein kinase C might have been responsible largely through TPA, the effect of TPA which is an activator of protein kinase C, but we didn't have direct evidence that that was the mode of phosphorylation of IkB.

Q. What is your understanding as to how to -- how TPA stimulates NF-kB activity?

A. Well, at the time it was that it activates protein kinase C, and then we assume that protein -- we suggested that protein kinase C might directly phosphorylate IkB. It was a good guess but it was wrong. The good guess was that something did phosphorylate IkB and so we made the suggestion in the right direction, but the particular protein involved -- so today I can't tell you how protein kinase C works. It presumably works at a more upstream position of a signal transduction pathway.

Q. In some cascade that leads to activation of IKK?

A. Somewhere upstream, I presume.

Baltimore Dep. Tr. 85:7-86:5.

Indeed, Dr. Baltimore later testified that the hypothesis stated in the '516 patent that PKC was responsible for the phosphorylation of IκB was incorrect. In particular, Dr. Baltimore admitted to the complexity of interactions initiated by phosphorylation of IκB by IKK and culminating in the degradation of IκB.

29

Q.     Now, in the patent what you described is consistent with the hypothesis that protein kinase C is responsible for phosphorylating IkB, correct?

A.     That's correct.

Q.     And furthermore, that this phosphorylation leads to disassociation of IkB from NF-kB, correct?

A.     We suspected that the phosphorylation led to disassociation.

Q.     Now, as you pointed out, it turns out that the phosphorylation is not protein kinase C but IKK, correct?

A.     That's correct.

Q.     And it turns out that the phosphorylation of IkB serves as sites for ubiquitination of IkB.

A.     No, it does not serve as sites.   It serves as a signal for the ubiquitination of IkB.

Baltimore Dep. Tr. 86:6-21.

Dr. Baeuerle also admitted the ignorance of scientists in the field as to how the NF-κB:IκB complex was broken up upon induction.

Q.     So at the time of this publication you didn't know whether the steps among those various agents were common or uncommon or both; is that correct?

A.     They all have one common step.   This is the dissociation of the NF-kB IkB complex.

Q.     Are you saying here, though, that you don't know how each of those agents accomplishes that step?

A.     That's more or less what I want to say here.

Baeuerle Dep. Tr. 143:11-21.

Furthermore, Dr. Baldwin admitted that, as of 1993, the role of IκB modification in NF-κB activation was not well understood.

Q.     I'm sorry. Prior to the 1993 time frame, what understanding did you have as to IkB modification as part of the process of NF-kB activation?

THE WITNESS: I'm not aware of – there was another paper that came out about this time, I believe, from Warner Green's group, but prior to that within a cell I don't believe that there was any other evidence for modification.

Baldwin Dep. Tr. 121:4-12.

30

Several inventors also confirmed that when they referred to the "NF-κB pathway," that term hid great molecular complexity that, as admitted above, was not well understood at the time.

> Q    Okay. So, you just said — I want to focus on something that you said. You said, "It's shorthand for many things not specified that can trigger the NF-kappa B pathway," right?
>
> A    Well, again, you're getting into semantics about how one speaks of a set of molecular interactions that leads to this particular conclusion in the cell, which is the activation of a set of genes by this set of DNA binding transcription factors. And so, I'm not wanting to put more words to that than to say that it is a concept that would encompass anything that has been shown to be able to stimulate this set of factors inside the cell. So, that could be a variety of cell surface proteins and, as we discussed earlier, certain kinases from the cell can activate these NF-kappa B transcription factors to turn on their target genes. So, it's not that there's no specificity to it. It's that you talk about it in sort of these terms that don't specify all that you could write about that.
>
> ——
>
> Q    The first sentence on the first page under introduction says that, "The Rel/nuclear factor, NF-kappa B transcription factors integrate diverse intracellular signaling pathways that are activated during normal cellular differentiation and during immune responses." Do you see that?
>
> A    Mm-hmm. Yes.
>
> Q    What do you mean by "integrate diverse intracellular signaling pathways"?
>
> THE WITNESS:  So, that would be another shorthand for what we've been talking about on quite a few occasions, which is that — and we talked about it explicitly that various signaling events in the cell, various binding events of ligands and cell surface receptors, various kinases being activated are able to make molecular interaction, once again, to use that term, with these protein components of the NF-kappa B pathway that are — that — that make the actual transcriptional regulation that are the DNA binding parts of — that — that control the transcription of NF-kappa B dependent genes.

Deposition of Dr. Louis M. Staudt, taken August 7, 2007 (hereinafter "Staudt Dep. Tr.") 134:7-135:1 and at 151:8-152:5.

The inventors of the '516 patent also provided confirmation that regulation of NF-κB is complex and that one cannot know beforehand whether interference with a signaling cascade influences NF-κB activation without detailed exploration into the biochemical steps of that signaling cascade.

> Q.  You talk about inhibition along the top arrows in Figure 4A in Exhibit 170.
>
> A.  Yes, I did.

31

Q.  Is that something that would be to you inhibition of NF-kB activation?

THE WITNESS:  It would be -- it could be inhibition of NF-kB activity if it was inhibition of NF-kB activity.

Q.  So if I understand you correctly, what you are saying is, if you interfered somewhere along that -- one of those arrows at the top of Figure 4A, you will still have to look and see if there is an effect on NF-kB activity.

THE WITNESS:  Yeah, that's not what I said.

Q.  I am sorry, please.

A.  But it is true that you have to do an experiment to understand whether what you are thinking is correct or not.

Q.  What do you mean by what you indicated you would still have to see if there was an effect on NF-kB activity?

A.  Well, those arrows hide a lot of complexity. They're just arrows. There are many different biochemical processes that are subsumed by those arrows, some of which may affect NF-kB activity and some of which might not because they affect other pathways in the cell. So to know whether a particular portion of one of the signaling pathways is responsible for NF-kB activation, you do have to look.

Baltimore Dep. Tr. 47:5-48:15.

Dr. Baltimore also confirmed that there is the possibility of several parallel pathways for the activation of NF-κB, each of which could be activated or inhibited independently.

Q.  Okay.  Let me try it. Does interference with the inputs into the module -- the boxes at the top of Figure 4A -- does that prevent the module, the signaling module, from becoming activated?  Can you answer that?

THE WITNESS:  But I think it's plain from the figure that you can interfere on one of those pathways and yet the module could be activatable by another pathway.

Baltimore Dep. Tr. 49:13-24.

The inventors of the '516 patent admitted to a lack of knowledge about the modification of IκB responsible for NF-κB activation.  In particular, they testified that they were only aware that phosphorylation led to dissociation from the complex with NF-κB.  None of the complexity involving ubiquitination and degradation of IκB was known.

Q.  In 1991 neither you nor your co-inventors, though, knew for sure whether IκB was definitively phosphorylated; isn't that correct?

A.  What do you mean definitively phosphorylated?

Q.  You had – if I understand correctly, you had stated that you had evidence that IkB could be phosphorylated; had it been determined that IkB was for phosphorylated as part of NF-kB activation?

A.  The – what was known, as I recall, is that the, that the inducers of the IkB pathway led in vivo led to the dissociation of NF-kB and IkBa in the nuclear translocation of NF-kB.  It was known from in vitro experiments that phosphorylation of IkBa led to its dissociation from NF-kB, and so it was based on those two observations:  the hypothesis that induction involves phosphorylation, and dissociation was based on those findings.

Q.  * So in 1991 did you or your co-inventors conceive of any way of inhibiting IkB degradation or dissociation apart from your use of kinase inhibitors?

A.  I believe that that's the only – that's the only method that was referred to.

Maniatis Dep. Tr. 152:14-153:19.

(b)    Mechanisms of NF-κB precursor processing in cells - 1994.

12/91:  Early study of processing demonstrated that the processing of the p105 protein into the p50 NF-κB subunit was dependent upon ATP.  Named inventors Maniatis and Fan noted in their paper that the ubiquitin-mediated proteolytic pathway is also dependent upon ATP in a similar fashion, but that "additional studies will be required to determine whether [the ubiquitin-mediated proteolytic] pathway or another ATP-dependent protease is involved in p105 processing."[34]

1994:  Two reports established that IκBα degradation & NF-κB activation in cells utilizes ubiquitin-mediated proteasome degradation pathway.  Same mechanism also confirmed for p105 processing to p50 (see Palombella et al.).  Proteasome inhibitors stabilized phosphorylated IκBα & blocked proteolytic degradation required for NF-κB release.  Conclusion: Ub-proteasome pathway degrades phosphorylated IκBα complexed to NF-κB.[35,36]

---

[34]  Fan CM, Maniatis T., Generation of p50 subunit of NF-kappa B by processing of p105 through an ATP-dependent pathway, *Nature.* 1991 Dec 5;354(6352):395-8.

[35]  9/94:  Palombella, V.J., Rando, O.J., Goldberg, A.L., and Maniatis, T.  The ubiquitin-proteasome pathway is required for processing the NF-kappa B1 precursor protein and the activation of NF-kappa B.  *Cell* 78(5):773-785, 1994.

[36]  11/94: Traenckner, E.B., Wilk, S., and Baeuerle, P.A.  A proteasome inhibitor prevents activation of NF-κB and stabilizes a newly phosphorylated form of IkB-α that is still bound to NF-κB.  *EMBO J.*  13(22):5433-5441, 1994.

33

10/94: First conclusive evidence that the ubiquitin-mediated proteolytic complex ("proteasome") was necessary for NF-κB activation.[37] Named inventor Maniatis and coworkers demonstrated that (1) ubiquitination of p105 was a necessary first step for generation of the NF-κB subunit p50 and (2) the proteasome was responsible for the generation of p50 by partial proteolysis of ubiquitinated p105. Well-known and commercially-available proteasome inhibitors of the peptide aldehyde family (e.g. MG115, MG132 and MG101[38] (aka "Calpain Inhibitor I," "ALLN")) were able to block the formation of p50 both in cell culture and in living organisms.

9/95: Identified putative novel E3 ligase as responsible for p105 ubiquitination.[39]

## V.     INVALIDITY ANALYSIS.

The claims of the '516 patent generally recite a method comprising reducing or altering NF-κB activity in the cell to inhibit the expression of genes regulated by NF-κB ("the method comprising reducing NF-kB activity in the cell ..." or "the method comprising altering NF-κB activity in the cell ..." (Claims 1-18, 20-186, 191-202.))[40] The usual claimed result of this reduction or alteration of NF-κB activity is the reduction or inhibition of gene expression. (Claims 1-5, 9-11, 13-15, and their dependent claims.)

In the two sections below, I will analyze the patent and provide my opinion as to why the patent claims are invalid for both lack of enablement and lack of written description.

### A.     ENABLEMENT: The '516 Patent's Disclosure is Inadequate to Allow One of Ordinary Skill in the Art to Practice the Claimed Methods Without Undue Experimentation.

This section analyzes whether the disclosure of the '516 patent as issued provides sufficient enablement for its claims. In particular, I will focus here on whether the claims are

---

[37] Palombella, V. J., et al., *Cell*, 1994, *Supra*

[38] *Id. See also* the Calbiochem Product Data Sheet: (www.emdbiosciences.com/Products/pds.asp?catno=208719), which describes it as "inhibit[ing] the proteolysis of IκBα and IκBβ by the ubiquitin-proteasome complex."

[39] Orian A, Whiteside S, Israël A, Stancovski I, Schwartz AL, Ciechanover A., Ubiquitin-mediated processing of NF-kappa B transcriptional activator precursor p105. Reconstitution of a cell-free system and identification of the ubiquitin-carrier protein, E2, and a novel ubiquitin-protein ligase, E3, involved in conjugation, *J. Biol. Chem.* 1995 Sep 15;270(37):21707-14.

[40] Of the remaining claims, claims 19 and 187-190 relate to methods "for reducing bacterial lipopolysaccharide – induced nuclear translocation of NF-κB in eukaryotic cells...," and claim 203 relates to "a method of inhibiting expression ... comprising introducing a nucleic acid decoy molecule into the cell...." This portion of claim 203 is discussed in the context of one of the hypothesized mechanisms of inhibiting or reducing expression.

sufficiently enabled, given that the patent only provided a list of hypothetical reducers, failed to disclose how any protein or DNA could be consistently delivered, and failed to show how to carry out the claimed methods in as wide a variety of cell types as claimed.

### 1.  The '516 Patent Contemplates Use of Protein and DNA-based Methods of Practicing the Claimed Methods, but Ignores the Complexities.

It is my understanding, the claims of the '516 patent can be read to encompass use of the claimed methods *in vivo*, that is, in living organisms. However, the specification of the '516 patent does not provide an enabling disclosure of reducing NF-κB activity in cells of any type or within living organisms. Moreover, the specification does not even disclose a method of reducing NF-κB activity in cell culture. Although the specification speculates about the use of the IκB protein or gene in cells, as discussed below, no working examples are provided of this. The only examples included in the specification are examples of inactivating NF-κB contained in cell-free nuclear extracts by adding purified IκB protein[41]. In other words, the discussion relates to "test tube" experiments in a cell-free system (using nuclear extracts), rather than in cell culture, let alone in intact cells within organisms. As I will explain below, cell-free experiments ignore the complexities associated with experiments in cell culture, which become even more pronounced as the strategy is contemplated for therapeutic use in living organisms, which is encompassed by the full scope of the claims.

In addition to IκB, the '516 patent postulates four other mechanisms to reduce NF-κB activity; 1) agents or drugs, 2) antagonists, 3) decoy molecules, and 4) dominantly interfering molecules, without disclosing any specific molecules that can be used in the claimed methods to do this. These disclosures are general and hypothetical, and do not provide any working example. Because the specification provides no illustrative examples (not even a specific name) of the supposed agents or drugs, antagonists, decoy molecules, and dominantly interfering molecules, there is no guidance as to how to make such hypothetical molecules or use such proposed mechanisms to reduce NF-κB activity in cells. With a general hypothesis that agents or drugs, antagonists, decoy molecules, and dominantly interfering molecules might reduce NF-κB activity in cells, the specification has provided only the mere germ of an idea for the claimed method, which does not constitute enabling disclosure. Here, the five proposed mechanisms set forth in the specification provide no more than a plan or invitation for those of skill in the art to experiment in an attempt to reduce NF-κB activity in cells. They do not provide sufficient guidance or specificity as to how to execute that plan. These are merely hypothetical starting points from which one of skill in the art would need to perform extensive further research in order to practice the claimed invention -- not enough for enablement.

#### (a)  The patent does not enable delivery of a compound into cells.

Given the highly unpredictable nature of the art of manipulating transcription factor activity in cells, reducing NF-κB binding activity in a cell-free system does not correlate with

---

[41] *See e.g.*, '516 patent, col. 8, lines 5-10.

reducing NF-κB activity in cells or in organisms. The only activity actually tested by this assay was the natural NF-κB-inhibiting protein, IκB. Thus, even assuming, for the sake of argument, that the specification enables reducing NF-κB activity in cell-free nuclear extracts, the single example of IκB as an inhibitor of such cell-free NF-κB DNA-binding activity, combined with the general description of the other hypothetical mechanisms of inhibition contained in the specification, does not provide sufficient guidance to allow a person of skill in the art to reduce NF-κB activity in cells within living organisms.

NF-κB exists in an inactive form in complex with IκB *in the cytoplasm*.[42] Upon release from IκB, NF-κB exerts its DNA binding activity and transcription-activating activity *in the nucleus*.[43] By the inventor's own admissions, to affect the activity of NF-κB, any molecule must be able to cross the cell membrane to reach the bound, cytosolic form of NF-κB, and indeed may even need to also cross the nuclear membrane in order to affect the active, nuclear form of NF-κB.

Activator-induced NF-κB activity was demonstrated in 70Z/3, HeLa, and Jurkat cell lines Additionally, NF-κB was shown biochemically to exist in human placenta tissue and murine kidney, liver, spleen, lung, muscle and brain tissues, but because NF-κB is latently inactive in these cells, no NF-κB activity was demonstrated. Not once in any of these experiments did the inventors demonstrate a working example of "reducing NF-κB activity in cells." Additionally, activation of NF-κB in the few cell lines that were tested was accomplished using different conditions depending on the experiment. Thus, even across a relatively small subset of cell lines and tissues, there exists no universal strategy for activating NF-κB. It is thus reasonable to infer that, likewise, no universal strategy for reducing induced NF-κB activity will exist across these cell lines and certainly not across *all* cell lines and tissue types in *all* organisms.

The patent does not enable one to practice the invention through the introduction of a gene expressing IκB into cells. The patent notes that with the clone of the IκBα gene, "it is now possible, through the method of the present invention, to block or inhibit NF-κB passage into the nucleus of cells in which it occurs and thus, block (partially or totally) binding of NF-κB to NF-κB binding sites on genes which include such recognition sites."[44] This method requires knowledge of the correct sequence of the IκB gene, which was not cloned until 1991.[45] Additionally, the patent makes this assertion in reference to treatment of the cells with IκB, yet does not instruct one on *how* to get the IκB into cells or ensure that it is not degraded before affecting NF-κB activity. This is a task made all the more daunting given that the sequence

---

[42] '516 Patent, col. 16, lines 22-23.

[43] '516 Patent, col. 16, lines 27-28.

[44] '516 Patent, col. 31-32, lines 65-68 and 1-3.

[45] Haskill, S., et al., *Cell*, 1991; *Supra*; Additionally, the pp40 sequence upon which the Figure 43 disclosure is based was not even known until September 1991 by Davis, N., et al., *Science*, 1991, *Supra*.

provided in Fig. 43 of the patent is, in fact, not the correct nucleotide or amino-acid sequence of the IκB protein.

The patent specification provides, as one of the few examples of how one could *hypothetically* practice the claims in a living cell, that "a vector capable of expressing IκB can be introduced into HIV-1 infected cells (e.g. T cells) in order to inhibit HIV-1 gene expression and activity in cells."[46] Assuming that the vector containing the IκB or other inhibitor DNA can be constructed, the specification fails to provide adequate guidance on how to introduce that vector into the cell or organism. The specification merely suggests, e.g., that "[c]ells in which IκB (or other rel-associated protein) is to be expressed in this manner to inhibit NF-κB (or other rel-related protein can be removed from the body, the IκB-expressing vector can be introduced, using "known methods," and the resulting cells, which contain the IκB-expressing vector, then reintroduced into the body."[47]  To my knowledge, there is, even today, no known working example of such a scheme. Thus, such a thought experiment is fanciful, and would require more than undue experimentation to be accomplished.

The only suggestion the patent provides to accomplish this task is to use "known methods." As noted below, such a scheme has faced insurmountable problems in the past and is far from routine to conduct.  Apart from the lack of past success, the "known methods" can include a large variety of protocols ranging from electroporation, cationic lipid transfection or viral vector insertion, none of which could be expected to work in any particular cell line without first extensively optimizing the conditions.  Additionally, these "known methods" are transfection conditions established to work in cell lines that have been chosen for study because they are particularly susceptible to transfection. Such techniques are known to work relatively poorly on primary cells taken directly from organisms.

The patent disucsses a method of inserting a vector containing a reporter gene controlled by NF-κB into L929 and S194 cells using the cationic polymer, DEAE-Dextran.[48]  Using this scheme, the inventors were able to get expression of the reporter gene after induction of NF-κB.[49] The inventors make no analogy to the insertion of a vector containing the gene for IκB or a "dominantly-interfering" protein that would reduce NF-κB activity.  Indeed, the inventors provide no example of inserting a gene encoding a protein that would inhibit NF-κB activity, like IκB.  For the reasons discussed above, a protocol for reducing NF-κB activity in cells might involve different parameters than those used to express a reporter gene.  Additionally, the inventors only demonstrated insertion of vectors into two highly-transfectable cell types.  As discussed above, cell types can have wildly different uptake properties, and the same cell type in culture can even exhibit different uptake profiles from the same cell type in tissue.  Thus, the

---

[46]  '516 Patent, col. 32, lines 16-19.

[47]  '516 Patent, col. 32, lines 41-46.

[48]  '516 Patent, col. 79, lines 1-3.

[49]  '516 Patent, col. 80, lines 50-67.

demonstration of the introduction of vectors containing genes distinct from the ones identified by the inventors as necessary to practice the invention (like IκB) in a limited subset of highly-transfectable cell lines does not enable one skilled in the art to practice the invention in every cell type both in cell culture and in whole organisms without undue experimentation.

Dr. Baltimore also stated that as of 1991, he was not aware of anyone transfecting IκB into a cell.

> Q. As of 1991, you had not transfected cells with the gene for IκB, correct?
>
> A. That is correct. I had not done that.
>
> Q. As of 1991, you had not -- I am sorry, let me start over and try it this way. In the applications for the 516 patent, you don't report any work by anyone else transfecting cells with IκB, correct?
>
> A. That's correct. We didn't -- I did not -- I was not aware of anybody and did not report it in the patent -- or record it in the patent.
>
> Baltimore Dep. Tr. 119:4-20.

Dr. Sharp also stated that he was not aware of anyone inserting the IκB gene into a cell.

> Q. As of the 1991 time period, are you aware of anyone in any of the laboratories of the people named as inventors on the '516 patent who inserted the gene for I kappa B into a cell?
>
> A. I'm -- I don't recall one way or the other if that experiment was done by 1991.
>
> Q. Since 1991, are you aware of anyone who inserted the gene for I kappa B into a cell to effect expression of I kappa B protein?
>
> A. I do not have specific recall of that experiment.
>
> Q. So you don't know of anyone who's done it?
>
> A. I can't give you specific recall of that experiment. I don't know of anyone who has done that specific experiment.
>
> Sharp Dep. Tr. 140:2-17.

The inventors of the '516 patent have further acknowledged the problems associated with delivery of DNA-based molecules into cells and organisms in their deposition testimony. For example, Dr. Maniatis confirmed that the DNA sequence is necessary for treatment of intact cells in humans.

> Q. Okay, and what were the ways one could imagine doing it in 1991?
>
> A. Well, any way that one could think of in introducing the -- either the -- the most likely way would be through IκBa into cells insufficient amounts

to inhibit, so, for example, applying some kind of viral vector or by fusing to a peptide that allows ready translocation of the cell.

Q. And for both of those you needed to know the DNA sequence for IκBa, is that correct?

A. And you needed to know the DNA sequence of an IκBa.

Q. And without that DNA sequence, you would – one would not be able to use the procedures that you've outlined?

A. If you didn't know the sequence, you obviously could not put it into a viral vector or introduce it to the cells through liposomes or whatever.

Q. So that was a necessary rendition of being able to follow either of the procedures you've outlined?

A. Yes, you'd have to have the sequence to do that.

Maniatis Dep. Tr. 273:24-275:5.

Dr. Baltimore provided confirmation that the insertion of IκB gene into a vector is highly experimental.

Q. Let's go back to column 32 of the patent, if we could. Column 32 of the patent at line 12 says, "The IκB gene and the encoded IκB protein can be used to negatively regulate NF-κB activity in cells." Do you see that?

A. Yes.

Q. Okay. And as it's being referred to there, you say, "For example, the IκB gene can be incorporated into an appropriate vector."

A. Right.

Q. As it's being referred to there, you are talking about a highly experimental form of therapy; is that correct?

THE WITNESS: Yes, I am talking there about a highly experimental therapy.

Baltimore Dep. Tr. 183:16-184:12.

The patent also does not enable one to practice the invention by inserting IκB protein into cells. The '516 patent states that the addition of purified IκB protein can reduce the DNA-binding activity of NF-κB *in cell-free gel-shift assays*.[50] Thus, the patent concludes that IκB protein is able to reduce NF-κB activity. However, this assay does not assess the ability of

---

[50]  '516 Patent, col. 27-28.

IκB to do so *in cells*. Because of the problems associated with the cellular uptake of proteins, as well as the additional challenges associated with administering proteins to organisms, such cell-free proof that IκB can reduce NF-κB activity in an extract does not enable one to practice the invention "in cells" without undue experimentation.

In addition to DNA-based transfection, the specification also suggests that the IκB protein itself could be inserted directly into cells into inhibit NF-κB.[51] However, aside from this one sentence, no other guidance is provided by the specification. There are no working examples disclosing the actual insertion of a IκB protein into a cell. In addition, aside from the disclosure involving expressing a protein in a cell through a expression vector discussed above, no other methods are provided or suggested on how to facilitate the insertion of a protein into a cell.

The '516 patent itself discloses that IκB is rapidly degraded by the protease trypsin,[52] a protease that is common in many cell types. Additionally, the inventors note that "IκB requires an intact polypeptide structure for its [inhibitory] activity."[53] Also, the inventors note that "IκB is apparently unstable when not complexed with NF-κB."[54] Thus, the use of IκB as a protein to reduce NF-κB activity in cells will likely be hindered by the susceptibility of the protein to proteolytic degradation, a problem not addressed by the cell-free EMSA assay.

In addition to the degradation problems discussed above, effective delivery is also dependent upon the ability of the protein to cross the cell membrane. The ability of a protein to diffuse across plasma membrane is highly dependent of the protein solution's charge and partition coefficient.[55] For example, Burton presented the following mechanistic model for crossing a biomembrane:

> For very polar solutes with small partition coefficients, entry into the cell membrane is unfavorable and transport across the epithelium is correspondingly slow and occurs to a significant extent by diffusion via the aqueous, paracellular pathway that is molecular size and charge dependent. As the partition coefficient increases, the ability to enter into the cell membrane increases, resulting in increasing permeability until a plateau is reached that is representative of diffusion through the unstirred aqueous boundary layer adjacent to the cell membrane.[56]

---

[51]  '516 patent, col. 32, ll. 54-56.

[52]  '516 Patent, col. 28, lines 13-14.

[53]  '516 Patent, col. 28, lines 13-14.

[54]  '516 Patent, col. 31, lines 42-43.

[55]  Burton, P. S., Conradi, R. A., Ho, N. F. H., Hilgers, A. R., and Borchard, R. T., How structural features influence the biomembrane permeability of peptides, *J. Pharm. Sci.* 85(12):1336-1340, 1996.

[56]  *Id.*

Based on the above, delivering a protein such as IκB into a cell or into an organism involves a highly complex, unpredictable mechanism that requires, even today, a high level of experimentation in order to effectively administer the protein.

Moreover, even if one of skill in the art were able to deliver the IκB protein into the cell, based on the teachings of the specification, one of skill in the art would be doubtful that the IκB protein would even work to reduce NF-κB activity. The specification provides no guidance as to whether or not endogenous NF-κB would form complexes with exogenously added IκB and ultimately reduce NF-κB activity in cells. Although the specification discloses that "[i]n vivo activated NF-κB is responsive to IκB," the experiment described therein is performed using isolated nuclear extracts from TPA-stimulated HeLa and H-9 T-lymphoma cells that were treated with IκB isolated from a mouse pre-B cell line.[57] At best, this experiment shows that IκB can inhibit activated NF-κB in cell extracts. As noted above, such cell-free experiments do not necessarily correlate to success in cell culture or in cells from living organisms. Thus, this disclosure fails to provide adequate guidance on whether or not exogenously-added IκB would bind to endogenous NF-κB and reduce its activity.

The specification also casts doubts on whether any added IκB would be degraded due to the instability of the IκB protein. As noted elsewhere in this report, the specification states that "IκB is apparently unstable when not complexed with NF-κB." Moreover, as noted elsewhere, the inventors of the '516 patent confirmed that they indeed believe that IκB is unstable when not complexed with NF-κB. Thus, because the specification does not provide any guidance on whether the exogenously-added IκB will actually bind to and complex with endogenous NF-κB, coupled with the disclosure in the specification regarding the instability of IκB alone, one of skill in the art would not know if delivery of the IκB protein would reduce NF-κB activity.

Dr. Baltimore further admitted that he was not aware of anyone adding exogenous IκB to a cell.

> Q. Are you aware of anyone who has as added exogenous IκB protein to a cell to reduce NF-κB activity?
>
> A. No, I am not aware of it.
>
> Baltimore Dep. Tr. 92:17-20.

Dr. Baltimore also admitted that his lab never attempted to insert intact IκB protein into a cell.

> Q. Did you ever attempt to insert the intact protein, itself, into a cell to affect NF-κB activity?

---

[57]    '516 patent, col. 29, ll. 33-46.

41

A.  I do not believe we have ever done that.

Baltimore Dep. Tr. 90:9-11.

Dr. Sharp also stated that he was not aware of anyone inserting the IκB protein into a cell.

Q   Are you aware of anybody in Dr. Baltimore's laboratory in the 1991 time frame who inserted, for lack of a better word, I kappa B into intact cells, the protein itself?

A.  I kappa B as a protein, inserting it into cells?

Q.  Yes.

A.  I'm not aware that anyone did that in that time period.

Q.  Are you aware of anyone in Dr. Maniatis's lab who did that in that time period?

A.  No, I'm not aware of anyone who inserted I kappa B as a protein into the cells in that time period.

Sharp Dep. Tr. 139:1-14

The '516 patent also speculates on the use of "agents or drugs" which could "enhance or block NF-κB activity."[58] Apart from making this broad statement, the inventors offer no example or guidance on how to select such a molecule.  Given the vast variety of naturally-occurring and man-made molecules, the conspicuous lack of guidance provided by the patent would not enable one to practice the invention using "agents or drugs."

The patent also speculates to the use of "decoy" molecules as one way to practice the invention.  In such a scheme, the "decoy" DNA, "which are designed to mimic a region of the gene whose expression would normally be induced by NF-κB…[would be introduced into cells and] NF-κB would bind the decoy and, thus, not be available to bind its natural target."[59]  This represents a DNA-based method of practicing the invention.  The '516 patent indicates that these small "decoy" DNA molecules containing binding sites for NF-κB were able to effectively compete with labeled DNA fragments containing NF-κB binding sites in cell-free systems.  However, such cell-free experiments do not enable one to then practice a similar inhibition of NF-κB in cells.  This is due to the problems with introducing active DNA-based macromolecules into living cells discussed above in relation to the use of a plasmid encoding IκB to practice the invention.

In addition, the patent speculates that "dominantly interfering" molecules are a way to practice the invention.  Such molecules "would be a truncated molecule retaining the DNA

[58]  '516 patent, col. 3, line 24.

[59]  '516 patent, col. 37, lines 51-54.

42

binding domain, but lacking the RNA polymerase activating domain. Such a "dominantly interfering" molecule would recognize and bind to the NF-κB binding site, however, the binding would be non-productive."[60] This again represents a protein-based method of practicing the invention and faces the challenges discussed above with the use of IκB to practice the invention. It is further complicated by the fact that David Baltimore has admitted that, as of November of 1991, it had not yet been determined whether the DNA binding domain and the RNA polymerase-activating domain of NF-κB were spatially distinct, which was not possible without cloning and sequencing NF-κB.

> Q.  With that correction, at this point in time — well, at the time of the applications for the 516 patent, you did not yet know whether the DNA binding domain and the RNA polymerase activating domain of NF-kB were spatially distinct, correct?
>
> A.  No, we did not, but I think that was known in other transcription factors. In fact, it was known in other transcription factors. So it was not unreasonable to expect that it would be true.
>
> Q.  Okay, but as to NF-kB at the time of the applications —
>
> A.  We did not know.
>
> Q.  — for the 516 patent, you did not know, correct?
>
> A.  Yes.
>
> Baltimore Dep. Tr. 79:25-80:14.

Dr. Maniatis admitted that dominantly interfering molecules have not been used to treat humans.

> Q.  Has a dominantly interfering molecule been used today to treat human beings for any condition, any transcription factor?
>
> A.  Not to my knowledge.
>
> Maniatis Dep. Tr. 280:20-25.

Thus, the patent refers to a very general and undefined set of molecular strategies for "reducing NF-κB activity in cells." Most of these strategies rely on the introduction of either protein or DNA into the cytoplasm or nuclei of living cells, though it should be noted that "agents or drugs" certainly encompass compounds not comprised of nucleic acid or protein. The patent provides no working example of such a strategy, and, even based on the state of the art in 1995, one seeking to practice the invention would face significant hurdles both in cell culture and in living organisms. With respect to practicing the invention in cell culture, the patent provides

---

[60]  '516 patent, col. 38, lines 12-14.

no guidance on how to get intact, large protein molecules across the cellular membrane, a task that even today has only been accomplished with limited success. This limited success is due primarily to the fact that cells possess a myriad of proteases capable or rapidly degrading protein. The patent notes that, empirically, IκB (the protein contemplated by the inventors to practice the invention) is particularly susceptible to proteolytic degradation, but offers no strategies on how to protect it from such degradation. Thus, with respect to the protein-based methods of practicing the invention, the invention is not enabled.

Nor are the DNA-based methods of practicing the invention enabled. Again, the inventors provide no working example of the introduction of a DNA-based molecule that is capable of "reducing NF-κB activity in cells." While the inventors do provide two working examples of the introduction of DNA into L929 and S194 cells and expression of that NF-κB reporter gene from that DNA, such a strategy is not transferable to the contemplated methods of reducing NF-κB activity in all cell types and certainly not in normal cells from patients.

While the discussion above demonstrates that the patent does not enable one to practice the invention in cell cultures, the system becomes infinitely more complicated when the invention is to be practiced in intact tissues within whole organisms. Problems with pharmacokinetics, including biostability and the ability of the molecule to selectively reach its target cell types, are compounded compared to the cell culture system for both the protein- and DNA-based methods of practicing the invention. Additionally, many of the invasive techniques for introducing DNA macromolecules into cells such as cationic lipid transfection (the method used by the inventors for the introduction of reporter genes into cultured cell lines) are invasive and destructive, and cannot be used on organisms without careful and specific procedures. The patent's recitation of inserting the macromolecule in cells extracted from organisms using "known methods" does not do enough to enable one to practice the invention. There are many "known methods" of introducing DNA into cells, but none has proven universally useful in all cell types. Thus, it would take more than routine experimentation to identify the method that would work for the cells of interest.

Protein delivery to intact cells within organisms remains a highly unpredictable area of biotechnology. Even in 2004, numerous problems with drug delivery remain. These include, in part, low bioavailability, short half-life, and serious side-effects, the reduction of which require targeted delivery.[61] Additional obstacles to delivery of proteins include formulation problems (such as aggregation and solubility), metabolic problems (such as nonlinear pharmacokinetics and uptake by non-target organs and tissues), and antigenicity problems.[62] These problems are still being addressed today. One way in which the art has tried to address the problem of protein delivery is to modify the way the protein is inserted, particularly at an organismic level. As of 1991, most protein-based drugs were delivered invasively through intravenous, intramuscular, or subcutaneous routes. Even today, many protein-based drugs are administered through invasive

---

61  Muller, R. H. and Keck, C. M., Challenges and solutions for the delivery of biotech drugs - a review of drug nanocrystal technology and lipid nanoparticles, *J. Biotech*. 113:151-170, 2004.

62  Wearly, L.L., Recent progress in protein and peptide delivery by noninvasive routes, *Crit. Rev. Therapeutic Drug Carrier Systems* 8(4):331-394, 1991.

techniques. Therefore, alternative, non-invasive methods have been explored such as ocular, nasal, buccal, oral, pulmonary, transdermal, vaginal and rectal deliveries.[63]

Each of these methods of protein delivery, however, continue to have physiological limitations in relation to delivery of the drug to the site of action. As noted by Wearley, a major challenge to protein delivery is half-life of the protein.[64] Unlike small molecules, proteins and peptides are subject to degradation throughout the body, not just at the site of clearance. In addition, many different enzymes can act on a protein to degrade it before it has a chance to reach its target location.[65]

In addition to rapid enzymatic degradation, another challenge to delivery is antigenicity. Drug delivery inherently involves delivering a foreign substance (be it a small molecule, protein, or oligonucleotide) into the body. Thus, these foreign substances can induce an immune response in the host, resulting in rapid elimination of the drug from systemic circulation and prevention of the drug from reaching its target location.[66] Moreover, development of an immune response is also a concern because of the possibility that dangerous allergic reactions or anaphylactic shock may occur upon repetitive or continuation administrations.[67]

Given the highly unpredictable nature of the art of manipulating transcription factor activity in cells, reducing NF-κB activity in a cell-free system does not correlate with reducing NF-κB activity in cells either in culture or in organisms. A basic tenet in developing a molecule for use in organisms is that results obtained from cellular experiments may not be predictive of results obtained from a whole animal.

This opinion is further supported by statements made by Dr. Baldwin, who admitted that it is unclear whether one would obtain the same response in an animal as seen in cell culture.

> So I – I'm hesitant to start throwing things around that – there have been lots of compounds that have been described as NF-κB inhibitors. Where in a cell culture if you add a high level of that compound, it might have a measurable effect on something that you would say is an NF-κB response, but whether that in vivo, in an animal, ever leads to the same effect for those categories is unclear.

> Baldwin Dep. Tr. 85:7-13.

---

[63] *Id.*

[64] Wearly, L. L., *Crit. Rev. Therapeutic Drug Carrier Systems*, 1991, *Supra.*

[65] *Id.*

[66] Torchilin et al., *supra* at note 43.

[67] *Id.*

Similarly, Dr. Corcoran noted during her deposition testimony that cell or tissue culture experiments may not be able to accurately predict the outcome in a whole animal.

> Q.  So before you do these experiments in whole animals, you can't be absolutely certain that the results of the tissue function experiments are correct.  Is that right?
>
> THE WITNESS:  You can be -- you can be sure that the tissue culture experiments were correct and that the assays you did and the performance of those assays is correct if they are done correctly, but you might not be able to project the outcome into the whole animal.
>
> Corcoran Dep. Tr. 64:9-20.

Moreover, Dr. Baldwin further stated that cell culture experiments are used as a model to move forward.  However, something that may work in cell culture, may not work in an animal and *vice-versa*.

> Q.    You've mentioned cell culture models, and you've also mentioned earlier disease models.  What are the -- what's your understanding of the differences between something that's a cell culture model and something that's a disease model?
>
> THE WITNESS:  A cell culture is just that.  Its -- cells are in tissue culture.  You add a compound.  You observe an effect.  A disease model is an animal model that attempts to mimic a human disease.  Compounds are given, and one looks for an effect.
>
> Q.    Can't conclusions be drawn with respect to cells in tissue culture regarding the effects of a compound?
>
> THE WITNESS:  I would say you can model where you're going, but there are compounds that work in cell culture that don't work in animal models, because of complications to metabolism and uptake, et cetera.  There are some compounds that don't work very well in cell culture that seem to work very well in animal models.  So it's difficult.  You typically use a cell-based system to provide model data to move ahead.
>
> Baldwin Dep. Tr. 167:5-168:4.

Apart from not providing enabling disclosures on how to reduce NF-κB in living organisms, the specification of the '516 patent also fails to provide any disease where a suitable IκB or any other inhibitor of NF-κB would be useful as a therapeutic molecule.  Such therapeutic use is within the full scope of the clims.  The only mention of any therapy in the specification is that "[t]he antagonists may be used to decrease the activity of the factors and thus may be useful in the therapy of diseases associated with overactivity of a transcriptional regulatory factor."[68] The specification fails to provide to define a "disease associated with overactivity of a

---

[68]  '516 Patent, col. 35, lines 7-10.

transcriptional regulatory factor" and fails to provide examples of such diseases. Without further guidance from the specification, a person of ordinary skill in the art would not recognize the therapeutic utility of using an antagonist of NF-κB, let alone what disease that antagonist would be useful to treat. For example, it was only later appreciated that inflammation and inflammatory diseases may be controlled by NF-κB. In addition, knowledge of the disease is necessary in order to identify the target of delivery and to design the therapeutically-relevant molecule. For example, two ways of drug targeting to patient include direct application of a drug to the affected site and targeting the affected site using a specific "vector" molecule having an increased affinity for the affected site.[69] Therefore, without knowledge of the affected site, targeted delivery of an antagonist of NF-κB activity would be, at best, difficult.

Dr. Baltimore also testified that he was not aware of IκB being used in gene therapy.

> Q. In the application for the 516, you – in the text we looked at in column 32, you had imagined the transfection of cells with IκB, correct?

> A. Yes.

> Q. And that's something that has not to date been done, correct, that particular description of gene therapy on cells by transfecting them with IκB and reinjecting them?

> A. Has not been done in humans?

> THE WITNESS: Has not been done in humans? Is that the question are you asking?

> Q. Well, let me – let me ask it more generally. Have cells been transfected with genes to express IκB and then reinjected into any organism?

> A. I don't think I would know that.

> Q. Do you know whether cells have been transfected to express increased levels of IκB and then reinjected into humans?

> THE WITNESS: I don't know that that has been done.

> Baltimore Dep. Tr. 116:13–117:12.

Dr. Baltimore also provided further confirmation that gene therapy is not used to treat immune disorders. For example, he testified that as of 2006, no one had used gene therapy to modify the immune system.

> Q. And so even as of 2006, no one had used gene therapy to modify the immune system, correct?

---

[69] Torchilin, *supra* at note 44.

A. That's correct.

Baltimore Dep. Tr. 182:14-16.

Even if the specification provided more than a mere suggestion that antagonists of NF-κB may be useful in a therapy, a use that is within the full scope of the claims, the specification fails to provide any guidance on how to construct and deliver a such a protein. As discussed in more detail herein, the type of molecule intended to be delivered will dictate the mechanisms by which the molecule is constructed, formulated, and delivered. Although delivery of all molecules have some common hurdles to overcome, as discussed above, use of a polypeptide has different obstacles to effective delivery to intact cells in organisms than delivery of an oligonucleotide, such as a decoy or antisense molecule.

The failure of the '516 patent specification to provide guidance on how to deliver an IκB or any other inhibitor of NF-κB for therapy was further confirmed by the inventors of the '516 patent in their deposition testimony. For example, Dr. Maniatis admitted that neither NF-κB nor IκB has been introduced into humans.

Q. Sure. Were either of the procedures you specified used as of today to introduce IκBa into a human being for the purpose of inhibiting NF-κB activity in a human being?

A. Not that I'm aware of.

Maniatis Dep. Tr. 275:13-19.

Dr. Baltimore admitted that no animal or human work at all is described in the patent.

Q. You agree that there are no examples of using compounds to treat disease in any animal; is that correct?

THE WITNESS: Yes, there was no work done in this patent on animals.

Q. And likewise, there are no examples of using compounds of any sort to treat disease in a person, correct?

A. Correct. We did not – did no work with human beings.

Baltimore Dep. Tr. 176:19-177:5.

In more complex systems, unexpected non-specific effects of signaling molecules - and indeed the effects that they may have upon one another -- make predictability difficult. This situation is only compounded when moving from cells in culture to cells in an intact organism.

The inventors of the '516 patent provided further confirmation that signaling molecules, including inhibitors of a signal pathway, could potentially have unexpected non-specific effects. For example, Dr. Baldwin acknowledged by example during his deposition testimony that certain compounds may have nonspecific effects on NF-κB activation.

A. Well, an example for what I'm getting at, it's been subsequently shown that these compounds have nonspecific effects on NF-kB

48

activation.  So we will always have to – unless you do the experiments, and unless you have rigorously controlled an experiment, this is why we say things like, these authors propose.  So science is cautious.

Q.    So what's your understanding as to these nonspecific effects on NF-kB activation you just mentioned?

THE WITNESS:  Again, we didn't do the experiment.  So I can't, you know, conversely conclude that they're correct, but it was a publication.

Q.    That wasn't exactly what I was asking, though.  I – you stated that it's been subsequently shown that these have nonspecific –

A.    It's been – I'll say it's been subsequently published that these compounds have effects on the NF-kB pathway distinct from their ability to scavenge reactive oxygen species.

Q.    And that effect is still an effect of reducing NF-kB activity in the cell; is that right?

THE WITNESS:  Yeah.  It doesn't argue that those compounds don't affect NF-kB activation.  It argues that they don't do it through reactive oxygen species.

Baldwin Dep. Tr. 123:4-124:7.


Moreover, Dr. Staudt further confirmed potential off-target effects of inhibitors.  In particular, Dr. Staudt stated that a molecular inhibitor may have other effects than what is thought to be their particular mechanism of action.

Q    In the next sentence, it says, "However, for most of these inhibitors, the specificity of the inhibition and the potential for off-target effects have not been fully investigated."  Do you see that?

A    Mm-hmm.

Q    What do you mean by "off-target effects"?

THE WITNESS:  Well, what's generally meant is that an inhibitor, molecular inhibitor, is thought by the experimenters to have a particular mechanism action based on what molecules it might interact with, et cetera, and any other effects that those molecules might have on – that have not been investigated would – might be referred to as off-target, but it's – so, that's generally what one refers to as – when one says "off target."

Staudt Dep. Tr. 180:23-181:14.

49

Additionally, Dr. Staudt also acknowledged during his deposition testimony that inhibitor molecules may do things that are not predicted. For example, Dr. Staudt stated that inhibitors may do what they are expected to do as well as other things.

> It's – it's – loosely speaking, what I said is that you would have an effect on something else that you didn't predict from your known molecular interactions of that molecule. So, generally speaking, it's referred to the fact that we treat cells with various inhibitors. And they may do what we say they do and they may do other things.

> Staudt Dep. Tr. 182:4-11.

Dr. Baldwin confirmed that cross-talk between cytokines can interfere with signal transduction of the cytokines. In particular, Dr. Baldwin stated during his deposition testimony that a cytokine could interfere with another signal on any other pathway. The relevant portions of his testimony are as follows.

> Q.    So it's also correct, is it not, Dr. Baldwin, that the presence or absence of different cytokines can affect whether or not a cell will respond to something that might otherwise be considered an inducer of NF-kB activation?

> THE WITNESS: Are you asking whether a cytokine could interfere with another signal?

> Q.    That would be one way in which I would be wondering about how different cytokines and different cells might affect a response. Yes.

> A.    A cytokine could interfere with another signal on any kind of regulatory pathway.

> Baldwin Dep. Tr. 78:13-79:1.

Dr. Sharp confirmed the complexity involved in determining the regulation of a gene. For example, Dr. Sharp testified during his deposition testimony that detecting the presence of a transcription factor is insufficient to determine the affect of that transcription factor on transcription. He confirmed that additional experiments were needed. The relevant portions of his testimony are as follows.

> Q.    Isn't it correct that merely detecting the presence of a transcription factor does not indicate whether transcription of any particular gene in a cell is actually enhanced, diminished or unaffected?

> A.    The detection of a transcription factor allows, as outlined in this paragraph, a series of experiments that helps you elucidate those questions.

> Sharp Dep. Tr. 79:1-9.

50

Dr. Sharp also confirmed during his deposition testimony that multiple transcription factors are associated with most genes. The relevant portions of his testimony are provided as follows.

> Q.    Are you aware of any genes whose transcription is — whose transcription only involves NF kappa B as the sole transcription factor?
>
> A.    Transcription factors can have a variety of roles in the expression of a gene. Some we think are necessary to just get transcription, some we think are necessary to regulate, and there's a gray line between the two. But my conceptual basis in 1991 would have been there would have been multiple transcription factors associated with the transcription of most genes.
>
> Sharp Dep. Tr. 158:10-159:1.

In addition, Dr. Staudt also confirmed that multiple, different signaling pathways could impact the transcription of a gene.

> Q    So, different multiple pathways can impact the output which is the transcription of a particular gene?
>
> A    Yes.
>
> Staudt Dep. Tr. 147:14-17.

Dr. Staudt also provided further confirmation of the complexity involved in gene regulation during his deposition testimony. For example, Dr. Staudt acknowledged that an individual transcription factor could bind multiple recognition sites.

> Q    And — and that's what you mean by "pleiotropy," the fact that other transcription factors may bind to those other sites?
>
> THE WITNESS: Yeah. Again, I don't remember what I meant when I wrote that sentence, but what it seems to say is that the — when an enhancer or regulatory element has other binding sites in addition to NF-kappa B, then those other binding sites and the transcription factors that bind to them could modulate the end result of transcription from that gene.
>
> Staudt Dep. Tr. 98:19-99:4.

Moreover, the inventors of the '516 patent have provided further confirmation that regulation of a gene by NF-κB, like other transcription factors, is complex. For example, Dr. Sen has acknowledged during his deposition testimony that NF-κB works with other

51

transcription factors to turn genes on and off. In addition, Dr. Sen admits that he knows of no transcription factor that works in the absence of other transcription factors.

> Q. Are there any — strike that. Would it be fair to refer to NF-kappa B as essentially the on-off switch for gene transcription?

> A. I've written some reviews on transcription. I've never put it as bluntly as that, so I would say that NF-kappa B is a transcription factor that is required for turning genes on and off, but it usually works with other transcription factors as well.

> Q. Do you know of any genes, sitting here today, where NF-kappa B is sufficient to turn the gene on in the absence of any other transcription factors?

> A. I don't know of a promoter or an enhancer that fits that description.

> —

> Q. Okay. If we could turn to page 140 of Exhibit 65 please, the first sentence in this page says, "Typically, NF-kappa B binding sites in gene regulatory sequences are present along with other motifs that probably impose constraints on the specific pattern of transcriptional activity." In this sentence, are you simply referring to this concept that genes are going to be under the control of multiple transcription factors and binding sequences?

> A. Although I wrote this in 1992, I think that's true. In other words, my interpretation of reading my own sentence 15 years later is that that's what I was referring to, that there aren't any NF-kappa B alone promoters or enhancers.

> Sen Dep. Tr. 183:25-184:15 and at 195:10-24.

The more complex the manner in which a gene is controlled by transcription factors, the more difficult it is to predict how the gene is being regulated. Dr. Maniatis confirmed, for example, that β interferon is controlled by multiple transcription factors. Dr. Maniatis testified that NF-κB is not the only transcription factor necessary to activate the β interferon gene, complicating the understanding of how that gene is regulated.

> Q. Would you consider the research that you're doing relating to regulation of the beta interferon gene to be NF-kB research?

> A. No, I think what I said was that NF-kB is one of many components of the machinery necessary to turn the gene on in response to signals.

> Q. My question was about your research, though; would you consider that to be research that could be characterized as NF-kB research?

> A. Actually, the answer to that is no, I wouldn't — again, just to restate it, that NF-kB is an important player in activation of the interferon gene; but, in fact, over the past few years, we've focused on other transcription

52

factors that are called interferon regulatory factors that also bind to the promoter of the interferon gene and are coordinately activated with NF-kB, and so much of our work has been on this other transcription factor in the signaling pathways that lead to its activation.

Q. When you say "coordinately activated with NF-kB," what is that; what do you mean by that?

A. What I mean is that the regulatory element for the interferon gene is a composite element that contains multiple recognition sequences that functions as a code or a dress for the gene; and in order for the gene to be turned on, the proteins that bind to that element have to be coordinately activated so they have to respond to these signals in a way that allows them to converge on the promoter simultaneously.

Maniatis Dep. Tr. 33:5-34:19.

Dr. Sen has provided further confirmation of the complexity of regulation by discussing the kappa enhancer. Dr. Sen admitted that control of the kappa enhancer is by multiple factors, acknowledging that control of the kappa enhancer is thus still an active area of research today.

Q.    Okay. And you can see here that there are actually several other elements and binding sequences that are associated with the kappa enhancer in this table.

A.    Yes, for example, kappa — are you referring to kappa A3, kappa A2?

Q.    Those are a few of them, but there's other ones as well, correct?

A.    Well, in this table, kappa A1, kappa A2, kappa E3 and kappa B are the four things associated with the kappa enhancer.

Q.    Right, so is it fair to say that all of these binding elements and then associated transcription factors control the expression of the Ig kappa gene?

A.    This is still — still being worked out.  I mean, it's not clear what the functions of each of these proteins are and how and when they work, so this is an active area of research even in '07.

Sen Dep. Tr. 188:4-22.

Moreover, Dr. Baldwin testified that an alternate signaling pathway needs to be known before someone can determine whether or not it is being inhibited.

Q.    Are there other signaling pathways that can be inhibited?

A.    Most can be —

THE WITNESS: Excuse me.

THE WITNESS: Most can be inhibited. One has to have knowledge as
to how that pathway works to be able to predictably do it.

Baldwin Dep. Tr. 71:15-23.

Although in deposition one of the inventors indicated that the invention might best be
practiced using an antisense oligonucleotide – and indeed, researchers reading the patent might
turn to antisense technology to practice the invention in cells – that technique is not enabled by
the patent; indeed, it is not even mentioned within the patent. Even if it were mentioned, the use
of oligonucleotides ("ODNs") also faces significant challenges that the patent does not enable
one seeking to practice the invention by this technique to overcome. Major challenges still exist
today in introducing antisense ODNs into cells and organisms, particularly in designing ODNs
for delivery.[70] For example, Shi et al. discusses the difficulties in designing an ODN that is
target-specific, effective, and has non-toxic side effects.[71] One of the principal challenges in
delivering an ODN is crossing the plasma membrane of the cell. Most ODNs are hydrophilic
and highly charged, thus preventing them from being absorbed through the plasma membrane.
The sheer size of ODNs further prevent the molecules from passively diffusing and entering
through the plasma membrane. Most ODNs range in molecular weight from 3-12 kilodaltons.[72]
Thus, ODNs are generally actively transported across the plasma membrane through the process
of endocytosis.[73] However, as noted by Heidenreich et al., even when ODNs are modified as
phosphorothioates to increase cell adherency, only a small fraction of the ODNs is released from
the endosome into the cytosol or nucleus. Most remain trapped in the endosome where they are
either degraded or exported back out of the cell by the cell machinery.[74] Thus, in order to be
effectively delivered, ODNs generally need to be complexed to a carrier molecule. Heidenreich
et al. acknowledged that, as of 1995, "there are several approaches currently available for the
exogenous delivery of oligonucleotides; however, their applicability for oligonucleotide delivery
to intact cells has yet to be demonstrated.[75]

In addition to target-specific delivery problems, the use of ODNs, specifically antisense
ODNs, may also have antisense-independent biological effects. Figure 3 of Heidenreich et al.
highlights some of the major antisense independent effects. For example, the ODNs can bind to
and interfere with proteins binding to their receptors on the cell. In addition, once in the cell, the

---

[70]    Shi, F. and Hoekstra, D., Effective intracellular delivery of oligonucleotides in order to make sense of antisense,
        *J. Controlled Release* 97:189-209, 2004.

[71]    *Id.*

[72]    Heidenreich, O., Kang, S-H. Xu, X. and Nerenberg, M., Application of antisense technology to therapeutics.,
        *Mol. Med. Today* 1(3):128-133, 1995.

[73]    *Id.*

[74]    *Id.*

[75]    *Id.*

ODNs can also interfere with signal transduction pathways by binding to molecules within these pathways. Moreover, as noted by Heidenreich, "[d]istinguishing between these sequence specific, antisense-independent, effects of oligonucleotides can be extremely tricky and usually requires the inclusion of multiple controls."[76]

Use of gene-based, ODNs molecules in cells within living organisms have also been plagued by toxicity problems. Toxicity of the ODNs to organisms generally correlates with the capture and long-term deposition of ODNs at the sites of clearance, e.g., the RES (reticuloendothelial system) organs, including the liver, kidney, spleen, and lungs and causing harmful side effects within those organs. Thus, Shi et al. notes that "[i]n spite of the fact that successful clinical trials have been reported...skepticism [sic] remains as to unambiguous proof for accomplishing a genuine antisense effect."[77]

In view of the foregoing, it would have required undue experimentation to make or identify a compound that would reduce NF-κB activity and introduce that compound into a cell to achieve a reduction of NF-κB activity. Reducing NF-κB activity in the cell, even beginning at one of the hypothetical starting points discussed in the patent – such as IκB, decoy molecules, and dominant interfering molecules – would also have required undue experimentation. Thus, the full scope of the claims is not enabled.

(b) The patent does not enable the practice of the methods in all cell types.

The claims of the '516 patent all require the reduction of NF-κB in a cell. Some of the independent claims, e.g., claim 6, provide no further limitation on the word "cell", while other claims, e.g., claim 1, provide a further modifier that the cells be a "eukaryotic cell." The claims that depend from the independent claims reciting "eukaryotic cell" further delineate that the eukaryotic cell must be mammalian (e.g., claim 26), human (e.g., claim 27), immune cells (e.g., claim 28), lymphoid cells (e.g., claim 29), or liver cells (e.g., claim 30).

Those claims that recite only a "cell" encompass all cells, whether eukaryotic, prokaryotic, or plant. Eukaryotic cells are commonly known to be cells that are nucleated and encompass a wide variety of cell types including mammalian, insect, and yeast cells. Thus, assuming the broadest construction possible, the claims that recite a "eukaryotic cell" can be read to encompass all nucleated cells, whether mammalian, insect, yeast, or another nucleated cell type. However, the specification fails to adequately describe a representative number of the genus of eukaryotic cells, let alone the broader genus of all cells.

The specification discloses generally that the invention of the '516 patent related to a methods of inducing expression of a gene in a cell. Moreover, in discussing the embodiments in which the invention would work, the specification continuously characterizes the cell type in

---

[76]  *Id.*

[77]  Shi et al., *supra* at note 85.

which the invention purportedly works as "in a variety of cells"[78] and as "many different cell types."[79]   However, the specification fails to further define or limit the types of cells that are purportedly encompassed by the invention.

The specification makes limited reference to eukaryotic cells in general.  For example, in discussing the modified DNA binding assay, the specification discloses that the assay could be applicable "for analysis of protein DNA interactions in eukaryotic cells."[80]   In addition, the specification references eukaryotic cells in the context of a "method for transiently expressing a gene product in a eukaryotic cell"[81] and cells and promoter regions that could used for transfection.[82]   Nothing in the specification discusses reducing NF-κB activity in all eukaryotic cells.  Moreover, the specification fails to provide any working examples to disclose and enable the use of the method of reducing NF-κB in eukaryotic cells.  Thus, based on the disclosure of the '516 patent one of ordinary skill in the art would not have known the inventors of the '516 patent possessed the claimed methods of inhibiting NF-κB activity in all mammalian cell lines, let alone the broader classes of all eukaryotic cells or all cells.

The inventors of the '516 patent provided further confirmation that the invention of the '516 patent is neither adequately described nor enabled to be practice in all different cell types, including eukaryotic and mammalian cells.  For example, Drs. Baltimore and Baldwin admitted that different inhibitors might work in different types of cells.  Specifically, Dr. Baltimore testified during his deposition testimony that the inventors of the '516 patent did not contemplate an inhibitor that would work in every eukaryotic cell because different inhibitors might work in different cells.

> Q.  And as of 1991, what did you have in mind as a method that would allow someone to reduce NF-κB activity in every single eukaryotic cells — cell that has NF-κB activity?
>
> THE WITNESS:  I don't think we were implying that we were only referring to an inhibitor that would work in every eukaryotic cell.  Different inhibitors might work in different cells.
>
> Baltimore Dep. Tr. 95:1-10.

Similarly, Dr. Baldwin testified during his deposition testimony that different signaling pathways may allow a particular inhibitor, including IκB, to work in some settings but not in others.

---

[78]   '516 patent, col. 2, lines 46-47.

[79]   '516 patent, col. 13, lines 4-12.

[80]   '516 patent, col. 3, lines 1-2.

[81]   '516 patent, col. 33, lines 20-21.

[82]   '516 patent, col. 33, lines 48-49.

THE WITNESS:  There are cell type differences in NF-κB activation pathways that would not allow every mechanism -- or a specific mechanism to work in every setting, for example.

Q.      Oh, "for example," I thought was the -- comma, leading to something else. Not your --

A.      No. That was for example.

Q.      Not your ending. Okay.  Are there any other examples?

THE WITNESS:  There are signaling pathways that are different that would allow -- or would not allow some inhibitor to work in a certain setting.

Q.      What are some examples of some of those signaling pathways that are different?

THE WITNESS:  There are pathways that lead to different modifications of IκB, such that an -- an inhibitor might not work in one pathway, where it would work in another pathway.

Baldwin Dep. Tr. 70:8-71:6.

In addition, Dr. Baldwin also testified that differences in cells can lead to differences in response to stimulus, which may affect how a particular inhibitor may work in that environment.

Q.      You had stated earlier that cell type differences may also have an effect as to whether or not NF-κB activity --whether or not NF-κB can be activated.  Could you help me understand what you mean by cell type differences?

THE WITNESS:  Cells have different receptors, different molecular pathways that can be different in terms of leading to any kind of response to a stimulus.

Q.      What other differences might lead to a different response to a stimulus?

THE WITNESS:   Other than receptors and different regulatory molecules, maybe things as general as their growth state, but that's going to affect regulatory molecules.  I'm not sure that other than those two there's anything else.

Baldwin Dep. Tr. 76:4-22.

Dr. Sharp also concluded during his deposition testimony that it would be impossible to determine whether claim 1 of the '516 patent applies to all eukaryotic cells without assaying those cells.

Q.  Okay.  In 1991, was it your expectation that there were eukaryotic cells in which you couldn't reduce NF kappa B activity and practice the method of claim one?

A.  I would not have an answer to that, because the only way you could determine that is to assay all eukaryotic cells, and don't have a -- didn't, we didn't do that, in fact it's impossible.

Sharp Dep. Tr. 149:13-21.

Dr. Lenardo testified that while he tested some types of cells, he did not test all types of eukaryotic cells.

Q    The question is, did you go on to test all these different cell types for the presence of NF.kappa.B in beta interferon gene expression?

A    What different cell types?

Q    You just said a wide variety of cell types.

A    Right.

Q    I'm referring to the wide variety of cell types you were talking about.

A    Mm-hmm.

Q    Did you go on to test this wide variety of cell types?

A    I would say I tested a wide variety of cell types, yeah.

Q    What did this wide variety of cell types include?

A    Well, they would have included L929 cells.

Q    What sort of cell is that?

A    It's a mouse fibroblast, I believe. It's a mouse L-cell.

Q    Did you test all different cell types?

THE WITNESS:  Did I test all different cell types?

Q    Yeah.

A    Which all different cell types? Are you talking about every cell type in the world?

Q    Yeah.

A    No, I did not test every cell type in the world.

Q    Did you test cell types in organisms other than mice, humans, cows, or rabbits?

THE WITNESS:  I tested human cells, I remember distinctly.  I tested mouse cells.  I tested cow cells.  That's all I can remember at this time. There may have been other species that I tested as well.

58

Q   Okay.  No fish cells?

A   Did I test fish cells?  I don't have a remembrance of testing any fish cells.

Q   Did you test plant cells?

THE WITNESS:  As I said, I don't have any recollection of that.  I gave you the ones that I have a distinct remembrance of.

Q   So, besides –

A   I may have tested plant cells.  I don't know.

Q   So, besides the ones you listed, you don't have a distinct recollection of testing other cell types?

THE WITNESS:  I don't have a distinct recollection of testing other cell types.  I may have.  I did a lot of experiments.

Deposition of Dr. Michael J. Lenardo, taken June 7, 2007 (hereinafter "Lenardo Dep. Tr.") 171:10-173:21.

Although Dr. Baltimore testified that he could imagine a single inhibitor of NF-κB, such as an IκB analog, that could work in all cells, this type of inhibitor was not described in the '516 patent.

Q.   In 1991, did you have in mind a single inhibitor that could be used in a method to reduce NF-κB activity in every eukaryotic cell that had NF-κB?

THE WITNESS:  Yes, I could at that time imagine such an inhibitor based on the fact that IκB, for instance, worked across different species.  And so you could imagine an IκB analog that would get into cells and that would inhibit in all eukaryotic cells.  You could also imagine something that – and we did – that would affect DNA binding, and since the DNA binding site seems to be the same in all different kinds of eukaryotic cells, that would be able to work universally.

Q.   You said you could imagine an IκB analog.  You didn't in the 516 patent identify or describe such an analog, did you?

A.   No.

Baltimore Dep. Tr. 96:1-20.

Moreover, Dr. Baltimore further testified that he did not identify how to modify NF-κB to block binding in all cell types in 1991 or in the '516 patent.

As of 1991, and in the applications of the 516 patent, you did not identify how one would modify NF-κB so that it would not bind to its DNA binding site across all eukaryotic cells, correct?

A.   Right.

59

> THE WITNESS: We did not make such a determination.

> Baltimore Dep. Tr. 98:4-11.

In view of the foregoing, it would have required undue experimentation to reduce NF-κB activity in a single type of cell, let alone the full scope of cell types addressed by the claims.

The two Declarations by Dr. Baltimore submitted during the prosecution of the '516 patent provide further confirmation that the specification was not enabling. In particular, in each Declaration, Dr. Baltimore only relied on scientific articles published well after the filing date of the '516 patent in support of his arguments that the specification was enabled. Dr. Baltimore did not, and for the reasons set forth herein in my report, could not, rely on knowledge known in the art at the time of filing of the '516 patent.

A Declaration by Dr. Baltimore was first submitted with the Response and Amendment filed on September 17, 1999. This Declaration was submitted in support of arguments that the specification was enabling for screening assays capable of identifying inhibitors of phosphorylation and/or degradation of IκB. In his Declaration, Dr. Baltimore stated in part:

> In view of the Examiner's remarks, I understand his argument to be that the present Specification does not sufficiently establish we (me and the other co-inventors) were in possession of the claimed drug screening assays in so far as they recite specific steps for identifying inhibitors of phosphorylation and/or degradation of IκB.

> It is my contention that the present Application clearly conveys and provides adequate guidance for embodiments of the subject assays involving direct detection of IκB phosphorylation or IκB degradation. Based on (i) the experimental results described in the specification, and (ii) the general knowledge in the art of protein phosphorylation at the time the invention was made, one of ordinary skill in the art would reasonably believed that NF-κB can be activated as a result of phosphorylation and degradation of IκB.

> Declaration Under 37 C.F.R. § 1.132 by David Baltimore (hereinafter "Baltimore Declaration"), ¶¶ 5-6.

Although Dr. Baltimore references the "general knowledge in the art of protein phosphorylation," he provides no evidence of that general knowledge to support his contention that the specification is enabled for such screening assays for inhibitors of phosphorylation and/or degradation of IκB. Instead, Dr. Baltimore cites that "TPA and LPS activate protein kinases, resulting in phosphorylation of specific proteins."[83] Dr. Baltimore further stated the following:

> Thus, I believe that the experimental results described in the specification combined with the general knowledge in the art of protein

---

[83] Baltimore Declaration, ¶ 8.

phosphorylation at the time of the invention was made. In particular, an understanding of similar mechanisms of action for other signal transduction pathways, would be reasonably understood by those of ordinary skill in the art to be sufficiently convincing of a mechanism for NF-κB activation involving phosphorylation of IκB and subsequent proteolytic degradation of the modified protein.

Baltimore Declaration, ¶ 9.

Moreover, in support of the assertion that the specification was enabling, Dr. Baltimore further cites numerous references filed after the filing date of the application. For example, Dr. Baltimore cites to papers published in 1993-1997 in stating that "[f]urthermore, the mechanism of activation of NF-κB described in the specification is still accepted today."[84] However, as noted above, the specification merely postulated that protein kinases directly phosphorylated IκB. This proposition was further proven to be incorrect. It was not until much later that the kinase responsible for phosphorylating IκB, IKK, was discovered. The citation to post-filing date references only confirms that the specification did not adequately describe inhibition of phosphorylation and/or degradation of IκB.

An additional Declaration of Dr. Baltimore was submitted with a Response and Amendment on February 12, 2001 and again on September 12, 2001. This Declaration was submitted in support of arguments that the specification adequately described compounds capable of reducing NF-κB activity. In particular, Dr. Baltimore states in part:

> ... I understand that the Examiner's rejection is premised at least in part on his assertion that there is not "a description of a representative number of species in terms of a partial structure and relevant identifying characteristics as there is no disclosed correlation between particular structures and the desired capabilities.
>
> Declaration of David Baltimore under Rule 1.132 and in re Brana (hereinafter "Baltimore Declaration II), ¶ 1.

In support of this assertion that compounds that inhibit NF-κB are structurally diverse, Dr. Baltimore cites to numerous compounds including sesquiterpene lactones (citing to Lyss et al., *J. Biol. Chem* 273:33508 (1998); 15-deoxy-A$^{12,\ 14}$-prostaglandin J2 and 5-aminosalicylic acid (citing to Castrillo et al., *Mol. Cell. Biol.* 20:1692 (2000) and Yan et al., J. Biol. Chem. 243:36631 (1998), respectively); 3-methyl-1,6,8-trihydroxyanthraquinone (citing to Kumar et al., Oncogene 17:913 (1998)); Pyz-Phe-bomLeu (citing to Palombella et al., PNAS 95:15671 (1998)); and quinazoline compounds (citing to Palanki et al., U.S. Patent No. 5,939,421 issued August 1999).[85] Each of these compounds were published at least 3 years from the latest filing date of the '516 patent (e.g., June 1995). Baltimore did not cite to one single inhibitory compound that was published in the art at the time of the invention. The compounds cited by

---

[84]    Baltimore Declaration, ¶ 10.

[85]    Baltimore Declaration II, ¶¶ 8-12.

Dr. Baltimore were not known in the art at the time of the invention and therefore cannot support the contention that the specification provides the requisite representative number of compounds that inhibit NF-κB or even that the specification enables one of ordinary skill in the art to make the connection between identifying a compound and identifying that the compound can inhibit NF-κB without undue experimentation.

Dr. Baltimore's inability to provide any evidence available at the time of the invention either in support of ARIAD's argument for screening for inhibitors of IκB phosphorylation and/or degradation or in support of ARIAD's argument that compounds that inhibit NF-κB are structurally diverse further confirms that the specification of the '516 patent fails to enable to the full scope of the claimed invention.

### 2. Challenges to Using Biological Macromolecules.

#### (a) Challenges for Nucleic Acid-Based Delivery and Therapeutics.

Cell culture use of nucleic acid therapeutics also faces significant challenges. Most often, naked DNA is introduced into cells in the form of a plasmid vector. This technique, however, is inefficient (i.e. only a few cells take up the DNA and express the gene).[86] Researchers have used strong electric fields (electroporation) to cause the breakdown of the cell membrane to aid in plasmid entry into the cell.[87] This technique is, however, quite invasive, and in some cases results in only a modest 10-fold increase in expression levels over the low levels seen using naked plasmid DNA.[88] In addition, different cell types respond differently to electroporation and thus, parameters may need to be individually optimized for each transfer protocol.[89] Researchers have also utilized cationic lipid carriers such as the DEAE-Dextran carrier used by the inventors of the '516 patent. However, as noted in the transfection handbook from Promega, a supplier of transfection reagents, "As DEAE-Dextran is toxic to cells, transfection conditions for individual cell lines may require careful optimization of both DEAE-Dextran concentration and exposure times."[90] There are a myriad other commercially-available transfection agents, however, choosing the one that will work in the particular cell line of interest can often be more of an art form than a science. Additionally, optimal lipid/DNA ratios, transfection times, and cell harvest times "will be different for each vehicle and cell line and will require optimization."[91]

---

[86] Li, S., and Ma, Z., Nonviral gene therapy, *Curr. Gene Therapy*, 1:201-226, 2001.

[87] *Id.*

[88] *Id.*

[89] *Id.*

[90] http://www.promega.com/guides/transfxn_guide/transfxn.pdf - Promega Transfection Guide (1998).

[91] Stein, C. A., Two problems in antisense biotechnology: in vitro delivery and the design of antisense experiments, *Biochmica et Biophysica Acta*, 1489:45-52, 1999.

The early 1990's saw an explosion of enthusiasm for DNA and RNA-based therapeutics.[92] It is telling, however, that to date, few such therapeutics have achieved the efficacy and specificity necessary to make it to market. Even as late as 1999, the field of DNA-based therapeutics was plagued by "a lack of full understanding of the *pharmacodynamics* of [oligonucleotides]."[93] Indeed, in 1999, DNA-based therapeutics were characterized as "an entirely new class of therapeutic agents, and are larger, and more complex molecules than conventional drugs."[94] One of the most significant challenges associated with introducing exogenous DNA into living systems is that cells are replete with nucleases that degrade DNA in a highly efficient manner.[95] Significant hurdles associated with DNA-based therapeutics include the fact that the large macromolecule must pass from the extracellular space across both the cellular and nuclear membranes in order to have any effect. Because of their size and the fact that they are polyanionic, oligonucleotides cannot passively diffuse across cell membranes.[96]

The strategies explored to date to accomplish cellular and nuclear uptake of DNA are numerous. They include the use of viruses whose own genetic material has been replaced with the DNA therapeutic of interest,[97] cationic liposomes of a myriad of chemical compositions,[98] and conjugation to cell- and nuclear-uptake sequences.[99] Each of these strategies faces their own unique problems and challenges and cannot be consistently relied upon to deliver any DNA-based therapeutic. For example, the use of retrovirus carriers suffers from the problem that they can only infect actively dividing cells as they cannot deliver the DNA through the nuclear membrane, thus requiring that that nuclear membrane not be intact.[100] Similarly, cationic liposome delivery often suffers from low transfection efficiency[101] and has been shown to be

---

[92]  Romano, G., Claudio, P.P., Kaiser, H.E., and Giordano, A., Recent advances, prospects and problems in designing new strategies for oligonucleotide and gene delivery in therapy, *In Vivo*, 12:59-68, 1998.

[93]  Juliano, R. L., Alahari, S., Yoo, H., Kole, R, and Cho, M, Antisense pharmacodynamics and critical issues in the transport and delivery of antisense oligonucleotides, *Pharm. Res.*, 16:494-502, 1999.

[94]  *Id.*

[95]  Ma H, and Diamond S.L.., Nonviral gene therapy and its delivery systems, *Curr. Pharm. Biotechnol.*, 2:1-17, 2001.

[96]  Stein, C. A., *supra* at note 54.

[97]  Cournoyer, D., and Caskey, C.T., Gene therapy of the immune system, *Ann. Rev. Immunol.*, 11:297-329, 1993.

[98]  Audouy, S. A., de Leij, L.F., Hoekstra, D., and Molema, G., In vivo characteristics of cationic liposomes as delivery vectors for gene therapy, *Pharm. Res.*, 19:1599-1605, 2002.

[99]  Bayard, B., Bisbal C., and Lebleu B., Activation of ribonuclease L by (2'-5')(A)4-poly(L-lysine) conjugates in intact cells, *Biochemistry*, 25:3730-3736, 1986.

[100]  Romano, G., et al., supra at note 55.

[101]  *Id.*

toxic to certain cell types but not others.[102]  Faced with the multiple possible delivery facilitation strategies and their limited success, it is unlikely that a researcher can, prior to testing or via routine experimentation, choose a delivery mechanism that will lead to the desired effect in cells.

In addition to the challenges associated with crossing the cellular membrane, large DNA molecules face an additional challenge crossing the nuclear membrane.  For large macromolecules, nuclear transport is an active process mediated by the nuclear pore complex.[103] Most studies suggest that nuclear transport of plasmid DNA is the key limiting step for plasmid DNA-based therapeutics.[104]  This is especially true for non-dividing cells.[105]  Because many of the cell types used in cell culture experiments are cancerous and thus rapidly dividing, techniques for delivering active DNA therapeutics to these cells may not be generally applicable to other cell types.  Strategies such as conjugating the DNA to a protein nuclear localization sequence has been shown to increase plasmid-mediated gene expression in some cell types but not in others.[106]  An additional limitation to the use of plasmid DNA molecules to drive expression of a protein therapeutic is that the transfection is transient, and expression from the plasmid can only be detected for a few cell cycles.[107]

Even as late as 1999, researchers recognized that significant advances were necessary to identify a consistently applicable strategy to create effective DNA-based therapeutics.  As noted, "improvements in the chemical and biological characteristics of [nucleic acid] compounds themselves will be important."[108]  In view of the foregoing, it would have required undue experimentation to make and use a nucleic acid-based delivery vehicle and/or therapeutic to achieve a reduction of NF-κB activity in the cell, let alone the full scope of the claims.

(b)    Challenges for Protein Delivery and Protein Therapeutics.

Cell culture use of protein and peptide molecules that act within the cytoplasm or nucleus of cells poses significant challenges to biomedical researchers.  Even as of 2001, it has been recognized that there are significant challenges to using peptides and proteins as molecular biology tools in cell culture and intact tissues in organisms.[109-110]  Peptides are rapidly degraded

---

[102]  Stein, C. A., *supra* at note 54.

[103]  Li, S., et al., *supra* note 50.

[104]  *Id.*

[105]  *Id.*

[106]  *Id.*

[107]  *Id.*

[108]  Juliano, R. L., et al., supra at note 56.

[109]  *See e.g.*, Senel, S., Kremer, M., Nagy, K. and Squier, C., Delivery of bioactive peptide and proteins across oral (buccal) mucosa, *Cur. Pharm. Biotechnol.*, 2:175-186, 2001 ("The use of peptides and proteins as therapeutic
(Continued...)

64

by proteases existing within cells.[111]   In addition, the cellular membrane poses a significant barrier to the entry of protein macromolecules to the cytoplasm.[112]

In addition to the degradation and uptake problems detailed above associated with cell culture use of proteins and peptides that act within the cell, additional problems arise when the same protein molecules are contemplated for use in normal cells or in whole organisms. Additional steric barriers impede the macromolecule in reaching its site of action. As noted by one expert, "to reach the site of action, the drug has to cross many biological barriers, such as other organs, cells and intracellular compartments, where it can be inactivated or...cause many negative side effects."[113]   It is telling that of the protein-based drugs available on the market today, few have been shown to act *within* the cell as opposed to at its exterior surface

Because of the magnitude of the problems with cell uptake, cell targeting and degradation of protein-based therapeutics, researchers have devised a myriad of strategies for overcoming these hurdles. For example, there are many diverse strategies for attempting to improve the cellular uptake of drugs. However, as noted in one recent review, the diversity of peptidic compounds being explored as potential therapeutics "have different physical and chemical characteristics (molecular size, stability, conformation, etc.) as well as different sites and modes of action within the body."[114]   Thus, the "development of a universal delivery system for peptides and proteins...[is] preclude[d]."[115]   As such, one cannot predict beforehand with any certainty whether any particular delivery method will work.

Researchers have also identified a number of strategies for targeting a potential therapeutic to the tissue of interest within an organism. For example, peptides and proteins can be conjugated to small molecules or other peptides that target the molecule to a particular cell type.[116] The targeting moiety contains some epitope that is specifically recognized by the target cell. This interaction thus directs the protein drug to the target cell where it has a better chance

---

agents for human and animal diseases offers many challenges to the clinical pharmacist concerned with drug delivery.").

[110]  Sanders, L. M., Drug delivery systems and routes of administration of peptide and protein drugs, *Eur. J. Drug Metabolism and Pharmacokinetics*, 15(2):95-102, 1990.

[111]  Senel, S., et al., *supra* at note 40.

[112]  Torchilin, V. P. and Lukyanov, A.N., Peptide and protein drug delivery to and into tumors:  challenges and solutions, *Drug Discovery Today*, 8(6): 259-265, 2003.

[113]  Torchilin, V. P., Drug Targeting, *Eur. J. Pharm. Sci.*, 11 Suppl. 2:S81-91, 2000.

[114]  Senel, S., et al., *supra* at note 40.

[115]  *Id.*

[116]  Torchilin, V. P., *supra* at note 44 .

of entering that cell to exert its effect. Various molecules have been used in the past, including antibody fragments, cytokines and hormones.[117] Given the complexity of the cell surface receptor profiles of different cell types, it would require complex experimentation to identify a targeting molecule that fit the needs of a particular application.

Likewise, various strategies have been employed in an attempt to protect protein-based therapeutics from degradation. These range from organic carriers such as liposomes, nanoparticles and micelles to viral vectors.[118] Again, like the molecules used to target a therapeutic to a particular cell type or tissue, it is impossible to predict beforehand which strategy will prove successful in a given situation. It would therefore require more than routine experimentation to identify a successful carrier for a therapeutic targeted to NF-κB activity. In fact, it requires undue experimentation.

Even today, serious hurdles must be overcome for the successful introduction of functional protein macromolecules into cells. Due to the variety of different cellular functions and types, no strategy exists that is universally applicable to any protein drug in any cell type. In view of the foregoing, it would have required undue experimentation to make and use a protein-based inhibitor and/or therapeutic to achieve a reduction of NF-κB activity in the cell, let alone the full scope of the claims.

(c)     Cell Type Differences Preclude a Universal Strategy for Protein or DNA-based Molecular Biology Tools and Therapeutics.

Experiments done in one cell type may not be good indicators that a similar effect can be demonstrated in other cell types. For example, Dervan and colleagues examined the cellular and nuclear localization of a series of peptide heterocycles across a panel of human and murine cell types. They found that the uptake profile of each molecule varied wildly across cell types. The same molecule would be nuclear in one cell line, cytoplasmic in another, and completely excluded from the cell in another.[119] This is just one example of the differences in pharmacokinetics exhibited by different cell types in cultures. Thus, experiments showing an effect in one cell type can not easily be extrapolated to success in another cell type.

In addition, experiments done in cell culture are not necessarily predictors of the function of the molecule tested on normal tissue and in whole organisms. This is due to the fact that cultured cells can exhibit vastly different gene expression patterns as the same cells in living organisms. For example, there may be fundamental differences in oligonucleotide uptake and transport processes in the different environments.[120] Additionally, cells can alter their ability to

---

[117] Id.

[118] Id.

[119] Best T.P., Edelson B.S., Nickols N.G., and Dervan P.B., Nuclear localization of pyrrole-imidazole polyamide-fluorescein conjugates in cell culture, *Proc. Natl. Acad. Sci. USA*, 100:12063-12068, 2003.

[120] Juliano, R. L., et al., supra at note 56..

respond to drugs when they are taken from tissue into cell culture.[121]   Thus, successful cell culture experiments cannot easily be extrapolated to success in normal cells or in living organisms.

This helps explain why, as discussed above, it would have required undue experimentation to reduce NF-κB activity across the full scope of the cell types addressed by the claims.

For the foregoing individual and collective reasons, the full scope of the claims is not enabled.

**B.    WRITTEN DESCRIPTION: The '516 Patent's Disclosure is Inadequate to Describe the Full Scope of the Claimed Methods.**

This section analyzes whether the specification of the '516 patent as issued sets forth an adequate written description of the claimed methods.  In particular, I will focus here on whether the claims are sufficiently described, given that the only molecule described (although not complete or correct detail) at that time believed to be theoretically capable of altering NF-κB activity is IκB, and IκB was not shown to reduce NF-κB in any cells.

*1.    "method for ... the method comprising reducing [or altering] NF-κB activity in the cell"*

Although the claims of the '516 patent are not limited by their language to particular methods mentioned in the specification, the specification of the '516 patent, as I mentioned above, only posits five possible ways to reduce NF-κB activity in cells: (a) inhibitors, for example IκB, (b) agents or drugs, (c) antagonists, (d) decoy molecules, and (e) dominantly interfering molecules. None of the posited compounds are sufficiently described.

(a)    The disclosure of IκB is insufficient to satisfy the written description requirement.

Among the five mechanisms hypothesized in the '516 patent for reducing NF-κB activity in cells, IκB is the only molecule even mentioned. The '516 patent identifies IκB as an example of "a specific inhibitor molecule which is able to block (reduce or eliminate) NF-κB binding...."[122]   The patent describes the purported isolation of IκB and characterizes it as a protein of an approximate molecular weight of 67 kDa.[123]   The patent however, provides a nucleotide and amino acid sequence for IκB that is not actually IκB.

---

[121]  *Id.*

[122]  '516 patent, col. 37, ll. 43-49.

[123]  '516 patent, col. 27, l. 11. to col. 30, l. 5.

The '516 patent proposes that the "IκB gene and IκB protein can be used to negatively regulate NF-κB activity in cells."[124] It postulates transformation of cells with the IκB gene and expression of IκB to reduce NF-κB activity.[125] The specification does not provide a working example of this, however, and does not say that it has been done.

The '516 patent states that "IκB is apparently unstable when not complexed with NF-κB,"[126] and that IκB is rapidly degraded by the protease trypsin,[127] thereby abolishing it's inhibitiory effect on NF-κB.[128] The specification does not provide a method for overcoming this challenge to practicing the invention using IκB.

IκB instability has been further confirmed by the inventors of the '516 patent. Dr. Baltimore testified that he believed in 1991 that IκB was unstable in the cytoplasm when not bound to NF-κB:

> Q.  And your belief in 1991 as of the filing of the 516 patent was that IkB was unstable in the cell cytoplasm in a form not bound to NF-kB, correct?
>
> A.  That's correct.
>
> Q.  And that's what you reported in the 516 patent, correct?
>
> A.  That's right.
>
> Baltimore Dep. Tr. 92:21-93:2.

Dr. Baeuerle also testified that he believed IκB was unstable when not complexed with NF-κB:

> Q.  And that's what you mean by "unstable," that the IkB that was not complexed with NF-kB would have degraded in the cytoplasm but for the complex with NF-kB?
>
> Q.  Is that correct?
>
> A.  Again, reading my discussion from 1988, it says here in the next sentence, "in a situation where the production of new inhibitor is impaired, the decay of occasionally released inhibitor activate NF-kB." So the idea here really is that whenever IkB is on its own, it's degraded

---

[124] '516 patent col. 32, ll. 12-13.

[125] '516 patent, col. 32, ll. 13 ff.

[126] '516 patent, col. 31, ll. 42-43.

[127] '516 patent, col. 28, ll. 13-14.

[128] *Id.*

and it's not stable. This is, again, speculation. This paper did not formally show that.

> Baeuerle Dep. Tr. 110:14-111:4.

Moreover, Dr. Baeuerle testified that IκB is rapidly degraded upon stimulation:

> A. It's an aspect of that paper, but central is not so much the effect of the protease inhibitors than the observation that IκB upon stimulation of cells is rapidly degraded.

> Baeuerle Dep. Tr. 207:12-15.

In June 1991, a protein dubbed MAD-3 was cloned.[129] While this protein would later be determined to be IκBα, this was not postulated at the time of its cloning. In August 1991, researchers concluded that the chicken protein pp40 was IκBβ,[130] and, due to similarities between MAD-3 and pp40 other researchers postulated that pp40 was in fact IκBα.[131] This confusion extended well past this period. As noted by researchers, including named inventor Albert Baldwin, Jr. in September of 1992, the relationship between IκB, pp40 and MAD-3 is "not completely clear."[132] Because there was considerable confusion over what constituted IκB as late as 1992, neither the IκB DNA or amino acid sequence was known and, therefore, the patent does not disclose that sequence. Without the correct cDNA sequence, the patent does not provide a written description sufficient to show one of ordinary skill that the inventors were in possession of IκB or the IκB gene, let alone the full scope of the claims.

The inventors of the '516 patent, such as Dr. Baeuerle, confirmed during their deposition testimony that IκB was originally cloned as MAD-3.

> A. These days it's hard to say whether something has been cloned or not. You may be familiar with how IκB was cloned. It was cloned as something else, as a protein called MAD-3.

> Baeuerle Dep. Tr. 54:23-55:2.

In addition, Dr. Baldwin confirmed that MAD-3 was not identified as IκB in the first publication of its sequence.

> Q. But this paper does not state that this molecule, MAD-3, is, in fact, IκB, does it?

---

[129] Haskill, S.et al., *Cell* 1991, *Supra.*

[130] Kerr, L.D., et al., *Genes Dev.*, 1991, *Supra.*

[131] Davis, N., et al., *Science*, 1991, *Supra.*

[132] Beg, A.A., *Genes Dev.*, 1992, *Supra.*

THE WITNESS:  It states that it is an IkB-like molecule.  That's in the title.

Q.    But it didn't -- it wasn't in the title that this was IkB?

THE WITNESS:  No.

Baldwin Dep. Tr. 94:6-17.

However, when the sequence of rabbit IκB became known, Dr. Baldwin testified that he compared that sequence to MAD-3 and found that it was identical.

Q.    So when this paper came out identifying the protein sequence for a rabbit form of IkB, did you compare that to the sequence you predicted for your MAD-3 molecule?

A.    Yes.

Q.    And what did you find?

A.    They were identical.

Q.    And at what point in time did you determine that?

A.    That sequence was made available to us approximately the time this paper was published.  Maybe a little bit before.

Q.    That would be in mid 1991?

A.    Yeah, or early to mid -- mid -- mid spring or something.

Q.    Do you recall the authors on the publication in which the rabbit form of IkB -- in which the sequence for the rabbit form of IkB was disclosed?

A.    Sankar Ghosh was one of the authors, David Baltimore.

Q.    And that was published in 1991, to your understanding?

A.    Yes.

Baldwin Dep. Tr. 96:22-97:17.

The inventors of the '516 patent confirmed that prior to 1989-1990, little information was known about IκB.  For example, Dr. Sen stated the following.

Q.    And by the time you left the Baltimore lab in early 1987, you didn't know any of the characteristics of what is now known as I kappa B or I kappa B alpha, correct?

—

A.    In retrospect, we knew it was -- we had postulated a labile repressor.  That turns out to be I kappa B alpha, so in retrospect, we

70

could say that we knew some — a characteristic that turns out to be the characteristic of I kappa B alpha.

Q.   At the time you left the Baltimore lab in early 1987, you didn't know the protein — or amino acid sequence of the protein I kappa B alpha, correct?

A.   We did not.

Q.   And you also didn't know in early 1987 the gene that would encode for the protein I kappa B alpha, correct?

A.   We did not.

Sen Dep. Tr. 82:1-4 and 7-19.

Dr. Baeuerle further testified that the sequence of IκB was not known in 1988.

Q.   Let me ask it in a different way. Had a cDNA sequence -- a specific cDNA sequence been associated with IκB at the time of this publication in 1988?

A.   Not that I know of.

—

Q.   Was a cDNA with a specific sequence associated with an IkB at this time?

A.   Not that I know of.

Q.   So the specific cDNA sequence of IkB had not yet been cloned; is that correct?

A.   These papers just describe the discovery of IkB and not its cloning.

Q.   Of the activity of IkB?

Q.   Is that correct?

A.   They identify a new protein with a new activity which is responsible for the activation of NF-kB and its cytoplasmic retention.

Q.   As of the date of this publication, October 28th, 1988, was the amino acid sequence of the IkB protein determined?

A.   Not that I know of.

Baeuerle Dep. Tr. 55:9-13 and at 107:13-108:6.

Dr. Sen testified during his deposition that IκBα was cloned in 1989-1990.

71

Q.   Okay, and then with respect to different forms of I kappa B —

A.   That came earlier.

Q.   Okay. How much earlier?

A.   Quite a lot earlier. I kappa B alpha, probably around '89 or '90, and then I kappa B beta is soon thereafter, '92 maybe. I mean, that kind of time frame, yes. We are talking about a good six years, seven years before the IKKs.

Sen Dep. Tr. 201:4-12. The relevant portions of Dr. Baldwin's testimony are as follows.

Dr. Baldwin confirmed that no additional structural IκB information was known in 1991.

Q.   But at this time you didn't have any structural information regarding what IκB looked like from a protein structure perspective, did you?

THE WITNESS: No.

Baldwin Dep. Tr. 93:18-22.

Moreover, Dr. Baldwin confirmed that additional IκB family members were identified after 1991; however, the particular sequence of a protein is necessary for it to be called an IκB.

Q.   So are there particular amino acid sequences that are necessary for a protein to be considered IkB?

THE WITNESS: By current tradition, yes.

Q.   And when did that current tradition originate?

THE WITNESS: As additional IkB family members were identified.

Q.   And that would be after this 1991 time frame?

A.   Yes.

Baldwin Dep. Tr. 99:17-100:5.

In addition, Dr. Baltimore admitted that IκB is required to be in the cell in order to reduce NF-κB activity in a cell. The relevant portions of his testimony are as follows.

Q.   Now, you said that you had in fact identified IkB as an example of a specific inhibitor; is that correct?

A.   Yes, we did identify IkB as an inhibitor.

Q.   And you agree that IkB is a protein?

A.   IkB is a protein.

Q. And IkB will not work as a specific inhibitor unless it gets into the cell; is that correct?

A. Yes, it has to be inside a cell to act as — wait a minute. No, we can use it in vitro to inhibit. Doesn't have to be inside a cell.

Q. If — if you want to use IkB to reduce NF-kB activity within a cell, you have to get IkB inside the cell; is that correct?

A. Yes.

Q. And prior to November of 1991, you had never tried to add IkB to intact cells; is that true?

THE WITNESS: Yeah, I believe we had not tried to do that.

Q. And that's because in general the protein IkB will not get into the cells, correct?

THE WITNESS: Yes, the protein will not in its naked form get into cells, as far as I know. I mean I have not looked directly at that question. So I can't say.

Q. And consequently, you never attempted in fact to use IkB in either animals or humans as a way of inhibiting NF-kB activity.

A. We did not.

Baltimore Dep. Tr. 177:6-178:14.

Dr. Baltimore also admitted that IκB was not used to reduce NF-κB in intact cells until the mid-1990s or later.

Q. Have you ever used IkB to reduce NF-kB activity in any intact cell?

THE WITNESS: Have I used IkB to inhibit NF-kB in an intact cell.

Q. Let me — I meant to ask it a little differently than that —

A. All right.

Q. — and I didn't. So let me try it again.

A. Okay.

Q. Have you ever used IkB to reduce NF-kB activity in any intact cell?

A. Yes, I have, or my laboratory has.

Q. Yeah, when did you do that?

A. I don't know when we did that, but that's been a sort of standard methodology since I would guess the mid 90's.

73

Q.  To the best of your recollection, the first time you would have done
that would be the mid-1990's?

A.  And later, yes.

Q.  And that was done by transfecting the gene for IkB into a cell?

A.  That would be, or by transfecting the gene for a dominant negative
form of IkB.

Baltimore Dep. Tr. 89:8-90:8.

The inventors of the '516 patent provided further confirmation that not only did the '516 patent fail to describe the use of inhibitors of NF-kB activity in intact cells, but that none of the inventors actually used any inhibitors of NF-kB activity in intact cells as of 1991.  For example, Dr. Baltimore admitted during his deposition testimony that the '516 patent fails to describe the use of IkB to reduce NF-kB in an intact cell.  The relevant portions of his testimony are as follows.

Q.  And there is no description in the patent of the use of IkB to reduce
NF-kB activity in an intact cell, correct?

A.  I think that is correct.

Baltimore Dep. Tr. 90:23-91:1.

Dr. Baltimore also admitted that he did not actually use IκB to reduce NF-κB in an intact cell as of 1991.

Q.  As of 1991, you had not used IkB to reduce NF-kB activity in an
intact cell, correct?

A.  We had not as of 1991 tried to do that experiment.

Baltimore Dep. Tr. 90:19-22.

As I have established above, it is certainly not enough to show that the inventors possessed knowledge regarding the proper nucleotide and amino acid sequence for IkB for determining whether or not they had possession of the inventions they now claim.  However, it is an essential requirement.[133]  For the reasons set forth below, the '516 patent indicates that the inventors were not in possession of the correct IkB nucleotide sequence, a necessary prerequisite to possessing the claimed invention.

I have reviewed portions of Responses and Amendments submitted to the USPTO in response to Office Actions during the prosecution of the '516 patent.  On numerous occasions,

---

[133] This is not to say that written description could ever be met by IkB alone.

74

the prosecuting attorneys made statements that emphasize their own recognition that describing and enabling their claims requires, among other things, knowledge of the IκB sequence.

For example, in an Amendment and Response filed on June 10, 1998, applicants' attorney, Dr. Matthew Vincent added claims 93–154 (as renumbered by the Examiner), which included the following two:

> 125.    The method of claim 112, wherein the agent is identified in an assay using a recombinant IκB protein.
>
> Prosecution History of U.S. Patent Application No. 08/464,364 ('364 application), ADL 0000522.
>
> 153.    The method of claim 61, wherein the agent is a gene construct for expressing an IκB polypeptide which binds to and inhibits NF-κB from binding to the transcriptional control elements.
>
> '364 application, ADL 0000525.

Claim 125 requires "using a recombinant IκB protein."   A recombinant protein is generally known as a protein coded by a cloned gene, usually referred to as recombinant DNA, that has been inserted by vectors into cells, thus allowing for expression of the gene and translation of the messenger RNA into the protein. Claim 153 requires "a gene construct for expressing an IκB polypeptide". This gene construct is the vehicle by which DNA encoding a protein, when inserted into cells, makes or "expresses" a recombinant protein. The first step in possessing the full scope of such a claim would be possessing the gene that would be inserted into that construct -- namely, the IκB gene. If the sequence were incorrect, one of skill in the art could not recognize that the inventors possessed the claimed subject matter.

In the Remarks section of a Response and Amendment filed on January 14, 1999, Dr. Vincent stated in part:

> For instance, the specification teaches the generation of antibodies to proteins.  Such antibodies could be used to generate immunoaffinity columns, as was known to do in the art, which could be used to purify the proteins.   Likewise, affinity purification of IκB by immobilized NF-κB would be envisaged as a method for purifying IκB.  Likewise, the present application teaches how to make recombinant forms of the proteins.
>
> '364 application, ADL 0000585.

Moreover, Dr. Clauss filed a Response and Amendment on May 30, 2000, in which she stated, among other things, the following:

> In view of the Examiner's admission that the application teaches how to find agents which regulate the NF-κB activity, the Examiner's rejection then turns on whether the specification, in light of the level of skill in the art, provides sufficient guidance as to administering such agent. Applicants point out again that the specification teaches, e.g., that proteins can be expressed in cells by using expression vectors. Various other methods for introducing proteins, nucleic acids, and small

molecules were well-known in the art at the time the application was filed, as pointed out by the Applicants in their previous response.

'364 application, ADL 0000729.

As discussed elsewhere in this report, the specification discloses that Figure 43 is the nucleotide and amino acid sequence of IκBα. Figure 43 is the only disclosure of the '516 patent that discloses a sequence for IκB. The specification further supports the assumption that Figure 43 is the murine IκBα sequence. However, as I noted above, Figure 43 is not the sequence of murine IκBα.[134] Indeed, Figure 43 is actually a partially out-of-frame, incomplete sequence of the chicken pp40 rel-associated protein. This error in Figure 43 is not disclosed in the specification. This information would be relevant to a person of ordinary skill in the art — including a Patent Examiner — in order to assess the inventors' possession of the matter sought to be claimed.

An Interview Summary from an Interview with Examiner Schwartzman with Matthew Vincent, David Berstein, and Sharon Hausdorff stated in part:

Discussed providing support for in vivo aspect of claims.

'364 application, ADL 0000609.

Isabelle Clauss, an attorney for the applicants, filed a Response and Amendment on September 17, 1999 stating in part:

The specification provides sufficient teachings for a person of skill in the art to alter NF-κB activity in a cell in vivo with any type of compound, such as nucleic acids, proteins, and small organic molecules, according to the methods of the invention without undue experimentation. For example, the paragraph bridging pages 75 and 76 [of the specification] provides that,

the expression vector containing IκB-encoding DNA can be introduced into an individual, using known techniques, by any of a variety of routes, such as intramuscular, intravenous, intraperitoneal administration. IκB itself (or other rel-associated protein) can also introduced into cells to inhibit NF-κB or (other rel-related protein).

'364 application, ADL 0000702.

As I have already noted, either DNA (e.g., as an oligonucleotide) or protein may be delivered to cells. Obviously, delivery of a particularly-desired sequence of DNA into cells, whether in culture or part of an animal or human, requires knowledge of that underlying nucleotide sequence. As discussed above, however, the sequence listed in Figure 43 is incorrect.

---

[134] Haskill, S., et al., *Cell*, 1991, *Supra*.

Thus, the patent indicates that the inventors were not in possession of the correct IκB nucleotide sequence, a necessary prerequisite to possessing the claimed invention.

(b)     No identification of particular agents or drugs, antagonists, decoy molecules, or dominantly interfering molecules in the specification.

The specification of the '516 patent proposes four other mechanisms (agents or drugs, antagonists, decoy molecules, and dominantly interfering molecules) without disclosing any specific molecules that can be used in the claimed methods to reduce NF-κB activity in cells to inhibit the expression of genes regulated by NF-κB. These disclosures are general and hypothetical, and do not contain any structures, sequences, formulae, chemical names, physical properties or any other specific identification of any molecules to do this. Because there is no disclosure of which supposed agents, antagonists, decoy molecules, and dominantly interfering molecules have the desired characteristics of reducing NF-κB activity, this description is insufficient to satisfy the written description requirement.

Dr. Baltimore provided further confirmation on the difficulty in identifying a selective inhibitor of NF-κB. In particular, Dr. Baltimore admitted during his deposition testimony that after more than twenty years of research, a selective inhibitor of NF-κB activity has not been identified.

> Q.  Could you turn, Dr. Baltimore — and these aren't numbered. At least I can't see a number on them.
>
> A.  No.
>
> Q.  There's a slide -- it's in the front half toward the back of the front half that is headed "Other Intracellular Targets."
>
> A.  Got it.
>
> Q.  "Transcription Factors."The last bullet on that slide states, quote, just came from a conference on NF-kB, a transcription protein that orchestrates inflammation — 400 plus working on it but still no selective inhibitor of transduction pathway or the protein itself. We discovered 20 years ago. Do you see that?
>
> A.  Yep.
>
> Q.  In the "we discovered 20 years ago," who is the "we"?
>
> A.  Well, the "we" refers to my laboratory.
>
> Q.  And what are you referring to as to what was discovered 20 years ago?
>
> A.  We discovered the existence of NF-kB as a transcription factor or transcription protein 20 years ago, 1986.

Baltimore Dep. Tr. 56:4-57:2.

Moreover, Dr. Baltimore further confirmed during his deposition testimony that he has not used selective inhibitors of NF-κB in his own laboratory.

> Q.  In your testimony, you are indicating that selective inhibiting of the IKK-IkB-NF-kB-signaling module had been studied in the lab?
>
> A.  Yes.
>
> Q.  What selective inhibitors had been studied in the lab?
>
> A.  I don't remember the chemical names for them, but I have seen lots of things along the way.  We have -- I have never used these molecules in my own work and so I am just not familiar -- you know, they're not on the tip of my tongue.
>
> Q.  Okay.  So you haven't used in your own work selective inhibitors of the signaling module?
>
> A.  No.
>
> Q.  I am correct, you haven't used those?
>
> A.  You are correct, I have not used those.

Baltimore Dep. Tr. 63:1-16.

Dr. Sharp testified that no other structures besides IκB, decoy molecules, and dominant negative molecules were even contemplated to reduce NF-κB activity in 1991.

> Q.  Did you have in 1991 any particular chemical structures in mind as to compounds that  could be used to reduce NF kappa B activity in the cell?
>
> A.  Other than I kappa B, I don't believe so.
>
> Q.  Did you in 1991 have any -- in mind any chemical structures that you believed could be used to reduce NF kappa B activity in the cell other than I kappa B?
>
> A.  We talked about the possibility and a certain amount, my recollection, of decoy-type molecules and dominant inhibiting activities.  But other than those, I don't believe we would have had structures that we were thinking specifically about.

Sharp Dep. Tr. 170:23-171:14.

Dr. Baltimore admitted that, setting aside possible disclosure regarding IκB, the '516 patent fails to provide any guidance regarding the structure of anything else that would be thought to reduce NF-κB activity.

> Q.  And the 516 patent doesn't provide any specific structures for any inhibitor of NF-kB; is that correct?

78

THE WITNESS: Structures. No, I guess not.

Q.   And the 516 patent doesn't provide the structures for any agents to reduce NF-kB activity in a cell, correct?

THE WITNESS: Well, I'm sorry, it does describe, because the sequence of IkB is in there. It does describe the structure of an inhibitor that can be put into cells and an inhibitor of NF-kB.

Q.   Let's set aside Figure 43 for a moment. Other than what's in Figure 43, the 516 patent does not describe the structure of any agent to reduce NF-kB activity in a cell, correct?

THE WITNESS:   I really would have to go back and read the whole patent to be sure that that's true.

Q.   Do you recall any structures given for agents to reduce NF-kB activity in a cell, again, for the moment setting aside Figure 43?

A.  No, I don't.

Q.   Do you recall any formula for any compound to reduce NF-kB activity in a cell that's disclosed in the 516 patent, again, for the moment setting aside Figure 43?

A.  No, I do not.

Q.   And we discussed this morning as to Figure 43, you're not aware of any issue or question or admissions with respect to whether Figure 43 is in fact IkB or something else, correct?

A.  I am not aware, no.

———

"QUESTION:  Because there aren't structures or formulas of agents identified in the patent to reduce NF-kB activity in a cell, do you agree that somebody reading the patent has to experiment through trial and error to identify such an agent to reduce NF-kB activity in a cell?")

THE WITNESS: Yeah, I mean that's sort of my problem with it. I don't — the fact that there is nothing described in the patent has implications, but I'm not sure that's one.

Baltimore Dep. Tr. 120:9-121:19 and at 122:5-122:19.

  Dr. Baltimore also confirmed that the '516 patent fails to identify any small molecule inhibitors.

Q.   All right. Dr. Baltimore, you indicated that large molecules was another area that you had imagined could inhibit various points of the pathway. Did you have any large molecules in particular — well, you know what, let me go back and finish the small molecule point. I'm sorry. Your patent doesn't identify any small molecules that are capable of inhibiting NF-kB activity in a cell, correct?

79

A.  I believe the patent does not identify any particular molecules.

Baltimore Dep. Tr. 74:1-11.

Dr. Maniatis testified that the use of kinase inhibitors to reduce NF-κB activity in intact cells was not disclosed in the '516 patent.

Q.  The use of kinase inhibitors in intact cells to reduce NF-kB activity had not been disclosed in the patent, though; isn't that correct?

A.  That's correct.

Maniatis Dep. Tr. 154:8-12.

Dr. Maniatis confirmed during his deposition testimony that the '516 patent also fails to identify any antisense molecules that could be used to reduce NF-κB activity.

Q.  Was the use of Antisense RNA disclosed in the '516 patent?

A.  Well, in that sense I think that this was the first experiment that – the Thanos and Maniatis paper was the first direct demonstration of that; it wasn't disclosed in the patent.

Q.  Did you say disclosed to the public or disclosed in the '516 patent?

A.  In the patent.

Q.  Just checking.

A.  In the '516 patent.

Maniatis Dep. Tr. 156:10-24.

Dr. Baltimore confirmed that the '516 patent fails to identify antibodies that could act to reduce NF-κB activity.  Moreover, Dr. Baltimore further admitted that the patent did not even discuss the use of monoclonal antibodies or receptor traps in reducing NF-κB  activity.

Q.  You did not in your patent identify any monoclonal antibodies for use as inhibitors, correct?

A.  No, we did not.

—

Q.  Let me back up.  I apologize, Dr. Baltimore.  On monoclonal antibodies, not only did you not describe particular antibodies in your patent, you didn't discuss the concept of using monoclonal antibodies in your patent for reducing NF-kB activity, correct?

A.  I don't think we did.

Q.  And the same for receptor trap technology.  In addition to not describing particular receptor trap technology in the patent, you didn't

80

describe the concept of using receptor trap technology to reduce NF-kB activity, correct?

A. I believe that's true.

Baltimore Dep. Tr. 75:4-6 and at 77:16-78:3.

While the 516 patent specification refers to "'decoy' molecules, which are designed to mimic a region of the gene whose expression would normally be induced by NF-κB,"[135] ('516 patent, col. 37, ll. 51-53), and refers to "an effective amount of a decoy sequence encoding the NF-κB binding domain,"[136] (Id. at col. 37, ll. 66-67), and the sequence of various NF-κB binding domains identified in the patent, ('516 patent. at col. 37, Table 2), its disclosure of decoy molecules is still insufficient, as there are no examples provided. The specification discusses EMSA experiments demonstrating the ability of a construct containing the entire β-IFN regulatory element (IRE) and an oligonucleotide comprised of two copies of a virus-inducible element in the β-IFN gene (PRDII2) to compete with a κB oligonucleotide for NF-κB binding. (Id. at col. 80, ll. 2-27.) However, the specification does not explicitly identify IRE, PRDII2 or κB oligonucleotides as "decoy molecules." The competition experiments were performed in nuclear extracts and the specification does not mention how to deliver any such constructs or oligonucleotides to a cell or whether they would have worked as decoy molecules in the cell.

The '516 patent says nothing about how to produce "decoy molecules" for NF-κB. Specifically, it does not disclose what modifications or manipulations of a DNA sequence having the binding site for NF-κB would be required, nor does it disclose how such a sequence could be delivered to the cells of interest – especially if such cells were in a living organism versus in a cell culture.

The inventors of the '516 patent provided further confirmation regarding the difficulty in using "decoy molecules" to reduce NF-κB activity either in cells or therapeutically. For example, Dr. Baltimore acknowledged in his deposition testimony that, as of 1991, "decoy molecules" could not be introduced into a cell. In particular, Dr. Baltimore asserted that he believed that "decoy molecules" were not stable enough to be therapeutically useful.

Q. And you did not in your patent identify any receptor trap technology for inhibiting or reducing NF-kB activity, correct?

A. No, we did not. We did show that you could get inhibition through competitive DNA that would – that would compete at the binding to reporter – a particular test piece of DNA.

Q. The use of a so-called decoy molecule?

---

[135] '516 patent, col. 37, lines 51-53.

[136] '516 patent, col. 37, lines 66-67.

A.  The use of so-called decoy DNA, but I never thought that would be pharmaceutically interesting.

Q.  Why not?

A.  It's hard to deliver, very unstable.

Q.  And that the issue is that what you would use as decoys would be degraded by enzymes within the cells?

A.  That's right. There are ways around that but certainly in '91, that was not an established method of doing anything.

Q.  So as far as potential for use to reduce NF-kB activity in a cell, you didn't believe that decoys were something that could be used to reduce activity of NF-kB in a cell.

THE WITNESS:  Yes, I certainly thought it could be used in a cell but that it wouldn't be stable enough in the body to be used therapeutically.

Q.  Okay. So in as of 1991, your belief was that decoy molecules could be used in cells in culture to reduce NF-kB activity but you didn't believe they could be used in cells in an organism to reduce NF-kB activity; is that right?

THE WITNESS:  Yeah, I mean I suppose you could try to use them in an organism but it just — as a — as a form of pharmaceutical — of a pharmaceutical agent, it didn't seem likely to me it was ever going to get developed to that point, but on the other hand, there is no theoretical reason why it couldn't. I just — I was making my own guess about where pharmaceutical companies would put their money. So far I am not wrong.

Baltimore Dep. 75:7-77:4.

Dr. Maniatis also confirmed during his deposition testimony that neither "decoy molecules" nor IκB were used to treat humans as of 1991.

Q.  In November of 1991 had you or any of the other named inventors on the application identified any specific inhibitor molecules that could be used to inhibit the activity of NF-kB?

A.  Well, we knew that the DNA binding could function as a competitive inhibitor as we showed in the Lenardo paper, and we also knew of the existence of IkBa, so those two means of control we knew of.

Q.  Now, the competitive inhibition, the second paragraph in column 37 it refers to decoy molecules and the competitive inhibition would be a decoy molecule; is that correct, sir?

A.  Yes.

Q.  And were you aware of any way of inhibiting NF-kB in a human using decoy molecules?

82

A. Do you mean had it been shown that you could do this in humans?

Q. Sure, let's take that as a first step.

A. No.

Q. Has it been shown to date that it could be done in humans to your knowledge?

A. I'm not sure it's been shown.

Q. Now, you also mentioned IkB?

A. Uh-huh.

Q. The inhibition of NF-kB had been shown by Baltimore before your collaboration began, is that correct?

A. I believe that I don't have the exact date of that reference, but I believe it was before the Mercola article.

Q. Now, was there any way of getting, in 1991, were you aware of any way of treating human beings using the IkB as an inhibitor of NF-kB?

A. Do you mean any way that's been demonstrated as or hypothetical?

Q. Well, let's say had been demonstrated as of 1991?

A. Specifically, for IkB?

Q. Correct.

A. And did you say in humans?

Q. In humans.

A. Again, I don't — I mean, there are ways that one could imagine doing it, but it was not done.

Maniatis Dep. Tr. 271:21-273:23.

With respect to dominantly interfering molecules, the '516 patent specification only refers to a hypothetical "truncated molecule retaining the DNA binding domain, but lacking the RNA polymerase activating domain."[137] Even this minimal disclosure, however, depends upon a hypothesis: "...if the DNA-binding domain and the DNA polymerase activating domain of NF-kB are spatially distinct..."[138] It does not convey that the inventors were in possession of such a

---

[137] '516 patent, col. 38, lines 13-14.

[138] '516 patent, col. 3, lines 8-10.

molecule or even of how to make such a molecule. And the specification gives no "precise definition" or specific sequence or structure of any dominantly interfering molecules. This is because, as acknowledged in the patent, it was unknown which part of NF-κB constitutes the activating domain and which part of NF-κB constitutes the DNA binding domain. In addition, it was not even known whether these domains were spatially distinct.

Dr. Maniatis confirmed that the actual use of a dominant negative molecule in intact cells was not disclosed in the '516 patent.

> Q. You had mentioned dominant negative components of the NF-kB activity a few moments ago; to your knowledge, had any experiments been performed that were disclosed in the '516 patent involving the use of a dominant negative in intact cells to reduce NF-kB activity?
>
> A. It was – that method was being used in other systems but it had not been – was not disclosed in this patent.
>
> Maniatis Dep. Tr. 155:25-156:9.

Dr. Baltimore testified during his deposition that the '516 patent only hypothesized a dominant negative molecule – a truncated form of NF-κB.

> A. You mean there is no specification of which amino acids in the protein would be in a dominant negative? Is that the question you're asking?
>
> Q. Well, let's start with that. The only dominant negative hypothesized in the 516 patent is this truncated form of NF-kB, correct?
>
> A. That's correct.
>
> Baltimore Dep. 81:19-25.

Further, Dr. Lebowitz testified during his deposition that truncating a protein does not necessarily mean that truncated form will function as a dominant negative molecule. He confirmed that one would have to perform additional experiments to determine this.

> Q And in fact, you couldn't predict one way or the other whether this truncated form of the Oct-2 protein would in fact interfere with Oct-2 activity or not, correct?
>
> THE WITNESS: Well, my recollection –recollection is that there would have been tools in place that would have enabled one to do that experiment.
>
> Q Right. But just by virtue of having the truncated form of the Oct-2 protein didn't tell you without doing the experiment whether in fact it would impact the expression of the gene controlled by the Oct-2 protein, correct?
>
> THE WITNESS: Could you repeat the question, please?

Q    You said that you could do experiments to figure out whether this truncated form of the Oct-2 protein that you had would interfere with Oct-2 activity in expression of genes controlled by Oct-2. And my question is without doing those experiments, could you predict with any degree of certainty whether it would in fact interfere with that activity?

THE WITNESS: Well, what I recollect knowing at the time was that we knew with some accuracy where the DNA binding domain was in the protein. So I recollect that we knew how to make a protein molecule that would contain the DNA binding domain. If one were interested particularly in the experiment that you're describing, one might well have been able to do that.

Q    And what tools or experiments would one run in order to determine whether a truncated form of a particular transcription factor would in fact interfere with the activity of the full transcription factor?

THE WITNESS: Well, based on what I recollect of what I knew at the time, I think I might have used in vitro transcription assay to address that question.

Q    An in vitro transcription assay, is that like a CAT reporter assay?

A    What I was thinking of was an experiment in vitro that looked — that looked at RNA production directly.

Lebowitz Dep. Tr. 179:13-181:18.

Moreover, Dr. Maniatis testified that a sequence is required in order to design a dominantly interfering molecule.

Q. All right. A third class of potential negative regulation is discussed in the first full paragraph on column 38: "dominantly interfering molecules;" do you see that?

A. Yes.

Q. As of November of 1991, were you or any of the other inventors of the '516 patent aware of any "dominantly interfering" molecules that could be used to inhibit the activity of NF-kB?

A. So I'm just trying to place the dates ... obviously, you'd have to have enough NF-kB to do this; and, again, I don't know the exact dates of the cloning and so on, but I'm not aware of any demonstration of the dominant negative effect at that time.

Q. And in order to achieve that, you would need to have cloned NF-kB?

A. In order to synthesize a truncated form of NF-kB, you would require the DNA coding sequence of NF-kB.

Maniatis Dep. Tr. 277:18-278:17.

85

Dr. Baltimore further testified that he never made a truncated form of NF-κB as a dominant negative molecule.

> Q. Now, you don't – or you hadn't as of – well, let me open the question up. I am sorry. Did you ever make a truncated form of NF-kB to explore its use as a dominant negative?
>
> A. No, we did not.
>
> Q. So there's, obviously, no working example of doing that in the 516 patent, correct?
>
> A. No, there is not.
>
> Baltimore Dep. Tr. 81:3-10.

(c)    Simply providing assays that purport to allow for identification of possible NF-κB reducers is not enough to describe the full scope.

While the specification identifies assays that can be used to identify, under certain circumstances, whether NF-κB activity has been reduced, the '516 patent does not describe a way to identify all compounds that inhibit gene expression, which is what the claims purport to cover. The EMSA assay is an analysis of protein-DNA interaction or the binding between NF-κB and the NF-κB binding site, rather than a direct measure of expression of the gene regulated by NF-κB. The specification introduces the CAT assay only to "screen for agonists or antagonists of a factor-coding gene or of the factor coded by the gene." Therefore, because the specification discloses only assays to identify agonists or antagonists of a transcription factor (as opposed to agonists or antagonists of gene expression), the relevant claims covering inhibiting gene expression are not sufficiently described.

The two assays (EMSA and CAT) described in the patent simply lead to a trial and error approach. The specification does not report a single example of a specific molecule reducing NF-kB activity in cells identified by the CAT assay. The specification names only one molecule (or, more specifically, an "activity" – IκB) based on the result of the cell-free EMSA assay. One of skill in the art would not believe that the inventors were even in possession of an assay that would allow them to determine whether a particular substance was an agonist or antagonist of gene expression, let alone a method for reducing gene expression by reducing NF-kB activity.

Dr. Baltimore admitted that the '516 patent fails to disclose assays that could be used to identify agonists or antagonists of NF-κB activity.

> Q. Okay. Column 34 beginning at line 66 and then carrying over into column 35 talks about assays to screen for agonists and antagonists. Do you see that?
>
> A. Yes, I do.
>
> Q. And so these are methods for identifying compounds that could either augment or reduce the activity of NF-kB in cells; is that right?

86

THE WITNESS: Well, I would have to read more why they didn't know if this paragraph is a general statement or is a statement about NF-kB. Looks to me like it is not related directly to NF-kB.

Q. Is it your understanding that you disclosed any assays in this -- in the 516 patent that someone could use to attempt to identify compounds that would either augment or reduce the activity of NF-kB in the cells?

A. No, I don't think we tried to do that.

Baltimore Dep. Tr. 175:9-176:3

Dr. Sharp further confirmed that a gel shift assay would not have been sufficient to show a method of inhibiting expression of NF-kB activity.

Q. Okay. I changed it up on you and asked a slightly different question. I asked if it was a sufficient -- if it was sufficient to show that, so let me try it again, Dr. Sharp. If one ran a gel shift assay that showed observations consistent with increased NF kappa B binding to an NF kappa B recognition site, and shows that upon treatment with some compound the amount of NF kappa B binding to that recognition site is decreased, is that sufficient to establish, as you understood claim one which lists you as an inventor, to practice claim one of the '516 patent?

A. I would not necessarily think that would be sufficient.

Q. What else would be necessary?

A. Any other assays one could devise to assay the possible effects of NF kappa B.

Sharp Dep. Tr. 163:14-164:12.

Dr. Lenardo confirmed that a scientist would need more information than localization of the consensus sequence to the promoter region of a gene in order to determine the role of NF-kB in that gene's regulation.

Q. If someone were to locate the consensus sequence you have listed here in the promoter region of the gene, would you expect them to draw any conclusions about the role of NF.kappa.B in the regulation of that gene?

A. I have no expectation.

Q. If you located the consensus sequence listed here in the promoter region of a gene, would you draw any conclusions about the role of NF.kappa.B in the regulation of that gene?

A. I would draw no conclusions until I had done an experiment.

Lenardo Dep. Tr. 188:10-21.

The inventors of the '516 patent further confirmed the importance of cloning and protein characterization in understanding the biological function of a protein. For example, Dr. Corcoran stated that determining DNA-binding activity only showed one aspect of a protein's behavior. She admitted that by cloning the gene, more structural information, such as protein domains, could be discerned in addition to be able to assay for other activities of the protein.

> Q. What was the purpose of trying to obtain the cDNA clone of Oct-2? What sort of information did this provide to you that you didn't have when you just knew it was a DNA-binding activity?
>
> THE WITNESS: In having a DNA-binding activity, we were only able to distinguish one aspect of the protein's behavior. It didn't tell us anything about what else it might do in the cells and it didn't give us any tools to study where it might be expressed and how it might be regulated and how it might be acting in -- in other assays.
>
> Q. So it was your understanding that obtaining the cDNA clone was an important aspect of understanding how Oct-2 worked.
>
> Q. Do you want me to repeat the question?
>
> A. Yes. And I would like you to repeat what you said, too, because I didn't hear you.
>
> Q. So my question was, it was your understanding that obtaining a cDNA clone was an important aspect of understanding how Oct-2 worked.
>
> THE WITNESS: By obtaining the cDNA, we would be able to look at all the domains of the protein and look at any other activities that it might have in addition to DNA binding.
>
> Q. Obtaining the cDNA probe, then, enabled you to obtain more information about how Oct-2 functioned. Is that correct?
>
> A. Yes.
>
> Corcoran Dep. Tr. 21:3-22:13.

Dr. Clerc also stated that it is necessary to clone the genomic sequences of the genes involved in a particular gene regulation in order to elucidate the mechanism by which the gene is regulated.

> Q. Was it necessary to clone those genes in order to more fully understand the complex mechanism underlying MRP regulation?
>
> THE WITNESS: You need the regulatory sequences to ident- -- to elucidate this mechanism and the way you get this is by getting the genomic sequence. That's what we did here.
>
> Clerc Dep. Tr. 104:1-9.

Dr. Baeuerle also confirmed that not only is cloning important to understand the biological function of the protein but that protein characterization also needs to be performed.

> A. It's part of the paper. The cloning alone wouldn't help you. I think what you need to do is to express the encoded protein and to characterize the expressed protein and to verify the biological activity of the expressed protein.

> Baeuerle Dep. Tr. 216:16-20.

Even though the inventors of the '516 patent have confirmed that cloning and protein characterization are necessary to fully elucidate the biological function of a protein or gene, as confirmed by Dr. Singh, cloning genes as of the late 1980s was difficult to do.

> Q At the time was it difficult to clone genes encoding proteins?

> THE WITNESS: At the time actually cloning of genes encoding these transcription factors was a difficult endeavor. In fact, the other thing that I did as a post doctoral fellow at MIT was to develop a new method that would make possible cloning of genes encoding --specifically encoding transcription factors, and that is a part of the patents that we have as well.

> Singh Dep. Tr. 58:13-23.

(d)    One of skill in the art would not consider the inventors to have been in possession of a method of use in all cells.

The '516 patent does not provide a single working example of a method of practicing the claims in *any* cell. The patent notes that an EMSA assay performed on nuclear extracts from HeLa and H-9 cell lines showed NF-κB binding activity that was inhibited by the addition of IκB in the cell-free assay.[139] As noted above however, significant challenges attend the introduction of molecules into cells. Because the specification does not provide any detail on how to obtain analogous results in cells (a limitation of many of the claims), the specification fails to show one of ordinary skill in the art that the inventors were in possession of the method of use in any cell type, let alone in *all* cell types.

(e)    One of skill in the art would not consider the inventors to have been in possession of a method of that covers the "degradation," "dissociation," or "modification" of IκB.

---

[139] '516 patent, col. 29, ll. 10-46.

89

As I noted above, it was not until October 1994 that it was shown that ubiquitin-mediated degradation of IκB was a necessary step in NF-κB activation.[140] Thus, as of 1991, the inventors did not know how IκB is degraded in the context of NF-κB activation. I have read portions of Aaron Ciechanover's expert report, and his views are in accord with the views stated here. Because the patent lacks any description of how IκB is degraded in the context of NF-κB activation, one of ordinary skill in the art would not have considered the inventors to be in possession of the full scope of (1) inhibiting the degradation of IκB, (2) inhibiting the dissociation of NF-κB:IκB complexes, or (3) inhibiting modification of the IκB protein in a way that reduces the binding of IκB to NF-κB. Thus, the specification fails to show one of ordinary skill in the art that the inventors were in possession of the full scope of the claims.

### C.    My Conclusions that the Claims Are Invalid for Lack of Enablement and Written Description Apply to All of the Earlier Filed '516 Applications.

If the claims of the '516 patent are described and enabled at all -- and as discussed herein I do not believe that they are -- it is my opinion that the claims should only be afforded a priority date consistent with the most recently-filed patent application, Appl. No. 08/464,364, dated June 5, 1995.

However, because it is my opinion that the claims of the '516 patent are neither described nor enabled by the patent as issued under the applicable standards in 1995, it follows that these claims are neither described nor enabled by any of the various patent applications that were filed in the chain leading up to the issuance of the '516 patent. These applications merely have the same (or a smaller subset of the) disclosure set forth in the issued patent. In assessing whether these various applications provided an adequate written description and enabling disclosure of the full scope of the issued claims, I have the following additional opinions:

_Application No. 08/418,266 filed April 5, 1995_ -- Because of the proximity of the filing date of this application to the June 5, 1995 filing date of Appl. No. 08/464,364, one of ordinary skill in the art would have substantially the same knowledge in either case. Therefore, my opinions as to the lack of an adequate written description and enablement apply to this application as well; the claims are neither described nor enabled by this patent application.

_Application No. 07/791,898 filed Nov. 13, 1991_ -- The knowledge of one of ordinary skill in the art regarding the claimed subject matter was significantly less in 1991 than in 1995 or later years, as reflected in my summary above as to the discoveries in the intervening period. For example, as of November 13, 1991, nothing of the complex mechanistic details of IκB regulation of NF-κB was known. For example, it was not until June 1993 that the mechanism was shown to

---

[140] Palombella, V.J., et al., _Cell_, 1994, _Supra._

be dependent upon the phosphorylation of IκB,[141] and not until November 1995 that the full mechanism of IκB regulation of NF-κB was understood (i.e. phosphorylation leads to ubiquitination, which leads to 26S proteasome-mediated degradation of IκB, which in turn leads to formation of active NF-κB.[142] As a result, my opinions as to the lack of an adequate written description and enablement of the full scope of the claims are even stronger with respect to the 1991 application based on the more limited knowledge of one of ordinary skill in the art at this time.

_Application No. 07/341,436 filed Apr. 21, 1989_ — The knowledge of one of ordinary skill in the art regarding the claimed subject matter was significantly less in 1989 than in 1991, as reflected in my summary above as to the discoveries in the intervening period. For example, in addition to the lack of key understanding noted above, in April 1989, researchers had not yet determined that NF-κB referred to a family of related dimers,[143] or that the subunits' various functional domains (e.g. DNA-binding domain, transactivation domain, etc.) were spatially distinct.[144]  ARIAD contends in its Second Supplemental Response to Interrogatory Nos. 6 and 7 that asserted claims 18, 183, 184 and 185 are entitled to claim priority to the April 1989 application, citing various sections of the patent as support. I have reviewed the various parts of this application that are cited and disagree with ARIAD's contention for the reasons previously stated.  In addition to the other information discussed above, I would note that the April 1989 application does not contain any detailed disclosure of IκB, including the lack of any amino acid or nucleotide sequence for this inhibitor protein.[145]  The April 1989 application further lacks any disclosure of the various complexities of NF-κB dimerization or domain organization.  As a result, my opinions as to the lack of an adequate written description and enablement of the full scope of the claims are even stronger with respect to the April 1989 application as a result of the more limited disclosure and more limited knowledge of one of ordinary skill in the art at this time.

---

[141]  Beg AA, Finco TS, Nantermet PV, Baldwin AS Jr., Tumor necrosis factor and interleukin-1 lead to phosphorylation and loss of I kappa B alpha: a mechanism for NF-kappa B activation. _Mol. Cell. Biol._ 1993 Jun;13(6):3301-10.

[142]  Alkalay I, Yaron A, Hatzubai A, Orian A, Ciechanover A, Ben-Neriah Y, Stimulation-dependent I kappa B alpha phosphorylation marks the NF-kappa B inhibitor for degradation via the ubiquitin-proteasome pathway. _Proc. Nat'l Acad. Sci. USA._ 1995 Nov 7;92(23):10599-603.

[143]  Baeuerle, P.A., Baltimore, D., A 65-kD subunit of active NF-kappa B is required for inhibition of NF-kappa B by I kappa B, _Genes Dev._, 3(11):1689-1698, 1989

[144]  Meyer, R., Hatada, E.N., Hohmann, H.P., Haiker, M., Bartsch, C., Röthlisberger, U., Lahm, H.W., Schlaeger, E.J., van Loon, A.P., Scheidereit, C.  Cloning of the DNA-binding subunit of human nuclear factor kappa B: the level of its mRNA is strongly regulated by phorbol ester or tumor necrosis factor alpha. _Proc Natl Acad Sci USA._ 88(3):966-970, 1991.

[145]  Haskill, S., Beg, A.A., Tompkins, S.M., Morris, J.S., Yurochko, A.D., Sampson-Johannes, A., Mondal, K., Ralph, P., and Baldwin, A. S., Jr.  Characterization of an immediate-early gene induced in adherent monocytes that encodes I kappa B-like activity. _Cell_ 65(7):1281-1289, 1991.

91

*Application No. 07/318,901 filed 3/3/89* -- The knowledge of one of ordinary skill in the art regarding the claimed subject matter was significantly less in 1989 than in 1991, as reflected in my summary above as to the discoveries in the intervening period. For example, in addition to a lack of knowledge of the mechanistic details of NF-κB regulation, in 1989, the protein structure and amino acid and nucleotide sequences of NF-κB itself were unknown.[146] ARIAD contends in its Second Supplemental Response to Interrogatory Nos. 6 and 7 that asserted claims 6 and 70-73 are entitled to claim priority to the March 1989 application, citing various sections of the patent as support. I have reviewed the various parts of this application that are cited and disagree with ARIAD's contention for the reasons previously stated. In addition to the other information discussed above, I would note that the March 1989 application does not contain any disclosure of TNF-α or its relationship with NF-κB, despite the fact that ARIAD is asserting its claims in this case against a TNF-antagonist product (and thus the full scope of these claims must encompass this according to ARIAD). Furthermore, the March 1989 application does not contain any disclosure of the (incorrect) consensus sequence, and does not even contain the passing mention of the five possible ways that are hypothesized as ways of reducing NF-κB in the later filings. The March 1989 application further lacks any disclosure of the actual structure of the NF-κB gene or protein. As a result, my opinions as to the lack of an adequate written description and enablement of the full scope of the claims are even stronger with respect to the March 1989 application as a result of the more limited disclosure and more limited knowledge of one of ordinary skill in the art at this time.

*Application No. 07/162,680 filed March 1, 1988* -- The knowledge of one of ordinary skill in the art regarding the claimed subject matter was significantly less in March 1988 than in 1989, as reflected in my summary above as to the discoveries in the intervening period. For example, in addition to the shortcomings in understanding noted above, in March 1988, researchers were not yet aware that NF-κB-inhibitory activity could be attributable to the non-covelent association of some other protein or cellular factor.[147] ARIAD contends in its Second Supplemental Response to Interrogatory Nos. 6 and 7 that asserted claims 6 and 70-73 are entitled to claim priority to the March 1988 application, citing various sections of the patent as support. I have reviewed the various parts of this application that are cited and disagree with ARIAD's contention for the reasons previously stated. In addition to the other information discussed above, I would note that the March 1988 application contains no disclosure of IκB at all. The March 1988 application further lacks any disclosure of an NF-κB-inhibitory activity attributable to some cellular factor. As a result, my opinions as to the lack of an adequate written description and enablement of the full scope of the claims are even stronger with respect to the March 1988 application as a result of the more limited disclosure and more limited knowledge of one of ordinary skill in the art at this time.

---

[146] Ghosh, S., Gifford, A.M., Riviere, L.R., Tempst, P., Nolan, G.P., Baltimore, D., Cloning the p50 DNA binding subunit of NF-kappa B: homology to rel and dorsal. *Cell*, 62(5):1019-1029, 1990.

[147] Baeuerle, P.A., Baltimore, D., I kappa B: a specific inhibitor of the NF-kappa B transcription factor. *Science*, 242(4878):540-546, 1988.

It is my understanding that ARIAD is not seeking to claim priority for any claim of the '516 to any application earlier than the March 1988 application. If this turns out not to be the case, I reserve my right to supplement my opinions on this subject.

### D.    ARIAD's Own Expert, Dr. Kadesch, Agrees that the Claims Lack Support.

I understand that Dr. Thomas Kadesch testified on behalf of ARIAD and the Institutions in a separate patent infringement litigation regarding the '516 patent. I have read Dr. Kadesch's trial testimony from that case,[148] in which he opines that the claims of the '516 patent are adequately described and enabled. I understand, however, that, while being deposed in an unrelated litigation, Dr. Kadesch recanted his earlier testimony and testified that he no longer believes that the claims of the '516 patent are sufficiently described as to allow the claimed methods to be practiced all eukaryotic cells, much less all cells.[149] I have read this recantation, which is critically important, as it casts additional doubt on the validity of the '516 patent claims and provides support for my opinion that description and enablement of the claims in the '516 patent for use in all cell types (or even all eukaryotic cell types) is absent.

### E.    The Patent Claims Are Invalid for Failure to Disclose the Best Mode.

The claims of U.S. Patent No. 6,410,516 are invalid for failure to satisfy the best mode requirement. Claims 1-18, 20-186, 191-203 relate to methods for inhibiting, selectively inhibiting, or "reducing NF-κB activity in the cell," "altering NF-κB activity in the cell," or "introducing a nucleic acid decoy molecule into the cell." Claims 19 and 187-190 include the limitation of "reduc[ing] nuclear translocation of NF-κB in the cells." The disclosure of the '516 patent fails to describe the best mode as contemplated by named inventor Thomas Maniatis as of November 1991.

Dr. Maniatis testified that, as of 1991, he knew of two different ways of reducing NF-κB activity: the use of dominant negative molecules or the use of antisense RNA.

> Q.  Did you have any better ways of knowing how to reduce NF-kB activity than the use of Antisense RNA as of November of 1991?
>
> A.  At that time Antisense — there were two ways that you could do this: one was with Antisense RNA or with so-called dominant/negative components of the NF-kB pathway.
>
> Maniatis Dep. Tr. 155:7-15.

---

[148]  Ariad v. Eli Lilly, Kadesch, T.R., Trial Tr. Day 13;. 113:20-114:12; 117:1-118:11.

[149]  Amgen, Inc. v. F. Hoffmann-La Roche Ltd., Kadesch, T.R., Depo. 257:24-270:16.

When questioned which of these methods he considered to be the best way to reduce NF-κB activity, Dr. Maniatis responded as follows:

> Q. Which way in November of 1991 did you consider to be the best way to reduce NF-kB activity?
>
> A. Well, it's obvious from this paper, I think, that we thought that Antisense was the better way to go.
>
> Maniatis Dep. Tr. 155:16-24.

Thus, Dr. Maniatis admitted that the best mode of carrying out the invention of the '516 patent was to use antisense RNA technology. The specification does not just fail to adequately describe Dr. Maniatis' manifested best mode, however, it fails to disclose the use of antisense RNA completely. Thus, by failing to disclose antisense RNA as means of reducing NF-κB activity in the cell, the best way of practicing the claimed invention was concealed from one of skill in the art and the patent is invalid.

### F.    ARIAD's Expert, Dr. Verma, Made Statements to the PTO that are Contradicted by Statements He Has Made in Certain of His Publications.

I have reviewed the November 9, 2006 declaration of Dr. Inder Verma, submitted to the U.S. Patent & Trademark Office by ARIAD as part of the reexamination proceedings for the '516 patent.[150] In his declaration, Dr. Verma made certain statements in an attempt to rebut the Examiner's position that the '516 patent was inherently anticipated by various compounds and references describing such compounds. However, the statements and conclusions set forth by Dr. Verma in his deposition directly contradict the statements and conclusions published that Dr. Verma, along with others, published prior to November 9, 2006.

For instance, regarding the references that were cited as prior art in the reexamination request as based on the use of glucocorticoids -- and, in particular, dexamethasone ("dex") -- to reduce NF-κB activity, Dr. Verma stated, among other things, the following:

> As discussed below, there is considerable uncertainty relating to the potential mechanism of action of glucocorticoids in cells, including whether there are any potential effects on NF-κB, as reflected in a substantial amount of contradictory data reported in the scientific literature.
>
> Verma Declaration, ¶ 82.

---

[150] Declaration of Dr. Inder Verma, filed November 9, 2006 in the Merged Proceeding of Ex Parte Reexamination Control Nos: 90/007,503 (filed April 4, 2005) and 90/007,828 (filed December 2, 2005) (hereinafter "the Verma Declaration).

The mechanisms by which glucocorticoids, including dexamethasone, mediate inflammatory responses are poorly understood, and as Padgett and these other papers discuss, substantial evidence demonstrates that glucocorticoids can act through a variety of mechanisms which are independent of NF-κB. (Padgett at 445, Han at 271, Hart at 224). For example, glucocorticoids function by binding in the cytoplasm to glucocorticoid receptor (GR), which then translocate to the nucleus as a glucocorticoid-GR complex and bind to target elements or glucocorticoid response elements (GREs) to function as direct enhancers or repressors of gene transcription. (Padgett at 445-46). As Padgett also notes, the glucocorticoid receptor "undoubtedly interferes with the function of other transcriptional regulators," such as activator protein-1 (AP-1) and NF-AT. (Padgett at 447, see also Han at 271, Hart at 224). Such evidence includes work from my laboratory, which demonstrated the ability of glucocorticoid receptor to prevent AP-1 dependent transcription through a mechanism likely involving protein-protein interactions between GR and Jun/AP-1. (Schule et al 1990, attached hereto as Exhibit 16.)

Verma Declaration, ¶ 90.

In summary, the fact that dexamethasone (or any other glucocorticoid) is administered to cells does not indicate that the administration of that glucocorticoid necessarily reduced induced NF-κB activity or NF-κB mediated-intracellular signaling.

Verma Declaration, ¶ 101.

Third, the allegedly anticipating pre-April 21, 1989 art the Examiner relies on describes cortisol. The later references the Examiner relies on regarding effect on NF-κB all describe various experiments using the synthetic steroid dexamethasone, which is a different compound. One cannot assume that the effects of different glucocorticoids and steroids are necessarily the same, as is evident from the fact that numerous, different steroid drugs have been developed, and have different indications.

Verma Declaration, ¶ 105.

Lastly, even if one were to erroneously assume that one could equate the effect of cortisol with dexamethasone, for all the same reasons as explained above regarding use of dexamethasone, the fact that cells were exposed to cortisol produced and released naturally in the body does not indicate that such exposure necessarily reduced induced NF-κB activity or NF-κB mediated-intracellular signaling.

Verma Declaration, ¶ 106.

95

However, a paper co-authored by Dr. Verma, Doucas et al.[151], explains how glucocorticoids, through the glucocorticoid receptor ("GR"), inhibit NF-κB activity. In that paper, Dr. Verma, with his co-authors, stated that "we demonstrated that GR-mediated inhibition of NF-κB translocation is PKAc-dependent."[152] Dr. Verma and his co-authors also affirmed the work of previous studies linking dexamethasone, a particular glucocorticoid, with inhibition of NF-κB activity, stating that "[p]revious studies have shown that treatment of cells with Dex, a synthetic GR ligand, leads to repression of NF-κB-activated transcription."[153]

In addition, in a scientific review article in which Dr. Verma was a co-author, Withoff et al.[154], Dr. Verma and his co-authors identified glucocorticoids, including dex, as inhibitors of NF-κB activity. In particular, he and co-authors stated:

> The most widely prescribed anti-inflammatory and immunosuppressive drugs are glucocorticoids (GCs), of which dexamethasone and hydrocortisone are the best known...It was later shown that GCs also inhibit the action of several transcription factors that are essential for immunity, such as AP-1, NF-AT, and NF-κB.[155]

Regarding the use of red wine to reduce NF-κB activity in the references cited as prior art in the requests for reexamination, Dr. Verma further stated in part:

> Red wine as a chemical mixture would not be found *per se* in the body after it is consumed and therefore could not act *per se* on cells (Schematic 15 of Exhibit 1). Red wine is a generic term covering many different mixtures having in common the characteristic of being of red color. Each such mixture has many variable constituents, which these pre-April 21, 1989 studies never identified or analyzed. Without any description of what, if anything, would have induced NF-κB activity in cells, or what, if anything, would have acted to reduce NF-κB activity in cells, one skilled in the art would not read any of the primary references as describing any of the claimed methods.

Verma Declaration, ¶ 133.

---

[151] Doucas V., Shi Y., Miyamoto S., West A., Verma I., and Evans R.M., Cytoplasmic catalytic subunit of protein kinase A mediates cross-repression by NF-κB and the glucocorticoid receptor, *Proc. Natl. Acad. Sci. U S A*, 97(22):11893-11898, 2000.

[152] *Id.* at p. 11893.

[153] *Id.* at p. 11897.

[154] Withoff, S., Tergaonkar, V., and I.M. Verma, Regulating the master regulator NF-κB: From natural strategies to rationally designed superdrugs. *In:* Ghosh, S., *Handbook of Transcription Factor NF-kappaB* (Boca Raton, FL, CRC Press, 2007), pp. 195-221.

[155] *Id.* at p. 203.

> Further, neither Blanco-Colio nor anyone else would be readily able to replicate the experiments of the earlier studies because the type of red wine was not specified in those earlier studies.

Verma Declaration, ¶ 137.

However, Dr. Verma and his co-authors in Withoff et al., specifically identified the use of resveratrol, a component of red wine, as resulting in a decrease in NF-κB activity. In particular, Dr. Verma and his co-authors stated the following:

> Polyphenols curcumin, which can be isolated from the spice turmeric, and resveratrol, which is found in grapes and red wine, have been found to downregulate NIK and IKKα/β, resulting in inhibition of IKK activation, decreased IκBα-degradation, decreased p65 translocation, and a decrease in NF-κB activity.[156]

Thus, Dr. Verma made contradictory statements in his declaration to the Patent Office regarding the validity of the anticipation arguments made by the Examiner during the reexamination proceeding of the '516 patent.

---

[156] *Id.* at p. 205.

## VII.    ADDITIONAL POINTS.

I am being paid at a rate of $600 per hour for my study and testimony in this matter, plus compensation for out-of-pocket expenses. In addition to certain of my publications referenced in this report, a complete list of my publications can be found in my full *curriculum vitae*, attached to this report as Appendix A.

In my testimony, I expect to use as exhibits some of the materials that I considered, including various of their figures and cartoons. Furthermore, I may incorporate demonstratives explaining the technology and the various references discussed herein, such as the various tutorial slides used by both parties in this litigation, images from papers and patents, and not-yet-created images that reflect the substance of the background and opinions presented herein.

Dated: January 18, 2008

_____

Randolph Wall, Ph. D.

98