# EXHIBIT 15

# EXHIBIT REDACTED

# EXHIBIT 16

# CRAVATH, SWAINE & MOORE LLP

**WORLDWIDE PLAZA**
**825 EIGHTH AVENUE**
**NEW YORK, NY 10019-7475**

TELEPHONE: (212) 474-1000
FACSIMILE: (212) 474-3700

———

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: 44-20-7453-1000
FACSIMILE: 44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER

(212) 474-1922

ROBERT D. JOFFE
ALLEN FINKELSON
RONALD S. ROLFE
PAUL C. SAUNDERS
DOUGLAS D. BROADWATER
ALAN C. STEPHENSON
MAX R. SHULMAN
STUART W. GOLD
JOHN E. BEERBOWER
EVAN R. CHESLER
MICHAEL L. SCHLER
RICHARD LEVIN
KRIS F. HEINZELMAN
B. ROBBINS KIESSLING
ROGER D. TURNER
PHILIP A. GELSTON
RORY O. MILLSON
FRANCIS P. BARRON
RICHARD W. CLARY
WILLIAM P. ROGERS, JR.
JAMES D. COOPER
STEPHEN L. GORDON
DANIEL L. MOSLEY
GREGORY M. SHAW
PETER S. WILSON

JAMES C. VARDELL, III
ROBERT H. BARON
KEVIN J. GREHAN
STEPHEN S. MADSEN
C. ALLEN PARKER
MARC S. ROSENBERG
SUSAN WEBSTER
TIMOTHY G. MASSAD
DAVID MERCADO
ROWAN D. WILSON
PETER T. BARBUR
SANDRA C. GOLDSTEIN
PAUL MICHALSKI
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
ELIZABETH L. GRAYER
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DANIEL SLIFKIN
JEFFREY A. SMITH
ROBERT I. TOWNSEND, III

WILLIAM J. WHELAN, III
SCOTT A. BARSHAY
PHILIP J. BOECKMAN
ROGER G. BROOKS
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
JULIE SPELLMAN SWEET
RONALD CAMI
MARK I. GREENE
SARKIS JEBEJIAN
JAMES C. WOOLERY
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. McATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DeMASI
LIZABETHANN R. EISEN

DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
JOEL F. HEROLD
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
TEENA-ANN V. SANKOORIKAL
ANDREW R. THOMPSON
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ERIC L. SCHIELE

SPECIAL COUNSEL
SAMUEL C. BUTLER
GEORGE J. GILLESPIE, III
THOMAS D. BARR

OF COUNSEL
CHRISTINE BESHAR

January 18, 2008

*ARIAD v. Amgen*

Dear Jamie:

      Through this letter, ARIAD gives notice that it no longer intends in the above-referenced action against Amgen to assert that administration of Kineret infringes claims 6, 18, 70-73, 183-85 of the '516 Patent, or that administration of Enbrel infringes claims 73 and 183.

Sincerely,

David Greenwald

Jamie H. McDole, Esq.
    Kirkland & Ellis LLP
      200 East Randolph Drive
        Chicago, Illinois 60601

Copy to:

David I. Gindler, Esq.
    Irell & Manella LLP
      1800 Avenue of the Stars, Suite 900
        Los Angeles, CA 90067-4276

# EXHIBIT 17

# YOUNG CONAWAY STARGATT & TAYLOR, LLP

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

MARY F. DUGAN
DIRECT DIAL: (302) 571-5019
DIRECT FAX: (302) 576-3309
mdugan@ycst.com

P.O. BOX 391
WILMINGTON, DELAWARE 19899-0391

(302) 571-6600
(302) 571-1253 FAX
(800) 253-2234 (DE ONLY)
www.youngconaway.com

February 1, 2008

**BY E-FILE**

The Honorable Mary Pat Thynge
United States District Court of Delaware
844 North King Street
Wilmington, DE 19801

Re:     *Amgen, Inc. et al. v. ARIAD Pharmaceuticals, Inc.*
        C. A. No.: 06-259 (MPT)

Dear Judge Thynge:

            Pursuant to the Court's Second Amended Scheduling Order of August 28, 2007, and in advance of the Status Conference scheduled for February 7, 2008 at 2 P.M. Eastern time, Plaintiffs (collectively, "Amgen") and Defendants-Counterclaim Plaintiffs (collectively, "ARIAD and the Institutions") submit this joint letter to advise the Court of the status of discovery and progress of the case.

            As Your Honor is aware, Amgen filed this declaratory judgment action in April 2006, seeking a declaratory judgment of non-infringement and invalidity with respect to the claims of United States Patent No. 6,410,516 ("the '516 Patent").[1]  On April 13, 2007, ARIAD and the Institutions filed their Answer to the Amended Complaint, Counterclaim and Demand for Jury Trial, asserting claims against Amgen and Wyeth for alleged infringement of the '516 Patent.  On September 27, 2007, ARIAD and the Institutions filed their Answer to the Amended Complaint, Amended Counterclaim and Demand for Jury Trial, adding claims against Amgen (but not Wyeth) for alleged infringement of U.S. Patents Nos. 5,804,374 and 6,150,090 (collectively, the "Assay Patents").

            The parties can report that the case has been streamlined in the past several months.  On December 11, 2007, ARIAD and Wyeth filed a stipulation of dismissal without prejudice of ARIAD's claims against Wyeth for infringement of the '516 Patent. Yesterday, ARIAD and Amgen filed a joint stipulation of dismissal with prejudice of ARIAD's claims against Amgen under the Assay Patents.[2]  ARIAD and the Institutions have also represented that they will not be pursuing allegations of infringement against Amgen's Kineret™

---

[1]     Amgen subsequently added allegations of inequitable conduct in reply to the counterclaims filed by ARIAD and the Institutions.

[2]     The stipulation only covers past activities and does not preclude ARIAD from filing a new complaint related to activities that postdate the stipulation.

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Mary Pat Thynge
February 1, 2008
Page 2

product; the parties have yet to work out a stipulation or covenant that could effectively dispense with Amgen's declaratory judgment claims with respect to this product.

With respect to motions, there is one soon-to-be-pending motion. On January 28, 2008, ARIAD notified Amgen that it intends to file a motion seeking to clarify or amend its Amended Counterclaim. This motion would relate to ARIAD's ability to pursue infringement allegations under 35 U.S.C. § 271(f). The motion would also, consistent with the streamlining discussed above, seek leave to file a Second Amended Counterclaim eliminating allegations of infringement directed at Wyeth, theories of infringement regarding Kineret™ and allegations of infringement based on the Assay Patents. ARIAD has given Amgen until today to determine whether it will consent to this motion. The parties will engage in a meet-and-confer with respect to ARIAD's motion and will report to the Court if an agreement can be reached.

With respect to discovery, the fact discovery deadline was December 21, 2007, and the vast majority of fact discovery was completed by that date. There are, however, three outstanding depositions of fact witnesses. Dr. Vasant Gandhi's deposition is scheduled to proceed on February 8. ARIAD's Eighth 30(b)(6) Notice of Deposition and Amgen's Fifth 30(b)(6) Notice of Deposition[3] are also outstanding, and Amgen has proposed that these depositions proceed on February 11 and 12, respectively. The parties expect to finalize the schedule for these depositions next week.

The parties have served expert reports on issues as to which they bear the burden of proof. Rebuttal reports are due February 22, and any reply reports are due March 7, 2008. Pursuant to the Court's scheduling order, expert discovery is expected to close on March 28, 2008, although the parties have agreed and hereby request an extension to permit expert depositions to be completed during the week of March 31, 2008, if necessary.

The parties do not believe that there are issues that require the Court's attention on February 7, 2008, and would be amenable to taking the upcoming teleconference off calendar if the Court has no questions about the matters discussed in this letter.

Respectfully,

Mary F. Dugan (No. 4704)

cc:    Clerk of the Court (Hand Delivery)
       John G. Day, Esquire (via e-mail)
       David Greenwald, Esquire (via e-mail)
       David R. Marriot, Esquire (via e-mail)

---

[3]    These depositions were the subject of the recent teleconference with the Court on January 22, 2008

# EXHIBIT 18

MERGED REEXAMINATION          Docket No. 74753/JPW/GJG/PJS

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

**Merged Proceedings Pursuant To May 4, 2006 Order Of:**

**Ex Parte**
**Reexamination Control No. 90/007,503, filed April 4, 2005,**
                                                    **And**
**Ex Parte**
**Reexamination Control No. 90/007,828, filed December 2, 2005.**

| | |
|---|---|
| Patentees: | David Baltimore, Ranjan Sen, Phillip A. Sharp, Harinder Singh, Louis Staudt, Jonathan H. Lebowitz, Albert S. Baldwin Jr., Roger G. Clerc, Lynn M. Corcoran, Patrick A. Baeuerle, Michael J. Lenardo, Chen-Ming Fan, and Thomas P. Maniatis |

Patent No.:     6,410,516 B1          Group Art Unit: 3991

Issue Date:     June 25, 2002         Examiner: B.M. Celsa

For      :      NUCLEAR FACTORS ASSOCIATED WITH
                TRANSCRIPTIONAL REGULATION

                              1185 Avenue of the Americas
                              New York, New York 10036
                              February 20, 2008

Mail Stop *Ex Parte* Reexamination
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450


### SUPPLEMENTAL INFORMATION DISCLSOSURE STATEMENT


In accordance with their duty of disclosure under 37 C.F.R.
$1.555, Patentees direct the Examiner's attention to the
following documents, which are also listed on Form PTO-1449
attached hereto (**Exhibit A**).

**In Re Merged Proceedings Of:**
**Ex Parte Reexamination Control Nos. 90/007,503 & 90/007,828**
Page 2 of 5

1. January 18, 2008 Expert Report of Randolph Wall, Ph.D. in the litigation captioned *Amgen, Inc. et al. v. Ariad Pharmaceuticals, Inc., et al.*, U.S. District Court for the District of Delaware, CA No. 06-259-MPT; **(Exhibit 1)**;

2. The Amgen Entities' 5th Notice of Deposition to Ariad, Whitehead, Harvard and MIT Pursuant to Fed. R.Civ. P.30(b)(6), dated January 25, 2008, in the litigation captioned *Amgen, Inc. et al. v. Ariad Pharmaceuticals, Inc., et al.*, U.S. District Court for the District of Delaware, CA No. 06-259-MPT; **(Exhibit 2)**;

3. Withoff, S. et al. "Chapter 10: Regulating the Master Regulator NF-κB: From Natural Strategies to Rationally Designed Superdrugs," *Handbook of Transcription Factor NF-kappaB*: 195-221 (2007); **(Exhibit 3)**;

4. Doucas, V., et al. "Cytoplasmic catalytic subunit of protein kinase A mediates cross-repression of NF-κB and the glucocorticoid receptor," *PNAS Early Edition*:2-6; **(Exhibit 4)**;

5. Bottero et al., "NF-κB and the regulation of hematopoiesis," *Cell Death and Differentiation* 13:785-797 (2006); **(Exhibit 5)**; and

6. May 3, 2007 Amgen Entities' Reply To Ariad, Harvard, MIT and Whitehead's Counterclaim in the litigation captioned *Amgen, Inc. et al. v. Ariad Pharmaceuticals,*

**In Re Merged Proceedings Of:**
**Ex Parte Reexamination Control Nos. 90/007,503 & 90/007,828**
Page 3 of 5

Inc., et al., U.S. District Court for the District of
Delaware, CA No. 06-259-MPT; **(Exhibit 6)**.

Copies of items 3-6 were previously submitted in Patentees'
May 17, 2007 Supplemental Information Disclosure Statement
as Exhibits 26-29 and July 3, 2007 Supplemental Information
Disclosure Statement as Exhibits 2-4. Items 3-6 are being
included here for the Examiner's convenience in considering
newly submitted items 1 and 2 which relate to items 3-6.

Patentees point out that items 3-5 are articles co-authored
by Dr. Inder Verma, who submitted two Declarations in this
merged reexamination proceeding. Item 6 is a Counterclaim
filed May 3, 2007 in the concurrent litigation captioned
Amgen, Inc. et al. v. Ariad Pharmaceuticals, Inc., et al.,
U.S. District Court for the District of Delaware, CA No.
06-259-MPT, which makes certain allegations of
inconsistencies between the content of the articles co-
authored by Dr. Verma and the content of Dr. Verma's two
Declarations filed in the subject reexamination proceeding.
Item 1 is an Expert Report of Dr. Randolph Wall filed in
the same concurrent litigation which makes assertions
concerning alleged inconsistencies between the articles co-
authored by Dr. Verma and Dr. Verma's two Declarations in
the subject reexamination proceeding. Item 2 is a Notice
of Deposition under the Federal Rules of Civil Procedure
filed in the same concurrent litigation seeking testimony
concerning matters listed therein including alleged
inconsistencies between the articles co-authored by Dr.
Verma and Dr. Verma's two Declarations in the subject
reexamination proceeding.

In Re Merged Proceedings Of:
Ex Parte Reexamination Control Nos. 90/007,503 & 90/007,828
Page 4 of 5

Pursuant to the May 4, 2006 Order merging the above-identified reexamination proceedings, this Communication is being filed in duplicate and bears identifying data for the two reexamination proceedings.

If a telephone interview would be of assistance in advancing prosecution of the subject application, patentees' undersigned attorney invites the Examiner to telephone at the number provided below.

No fee is deemed necessary in connection with the filing of this Information Disclosure Statement. If any such fee is required, authorization is hereby given to charge the amount of any such fee to Deposit Account No. 03-3125.

Respectfully submitted,

John P. White
Registration No. 28,678
Gary J. Gershik
Registration No. 39,992
Attorneys for Applicants
Cooper & Dunham LLP
1185 Avenue of the Americas
New York, New York 10036
(212) 278-0400

I hereby certify that this correspondence is being deposited this date with the U.S. Postal Service with sufficient postage as first class mail in an envelope addressed to:

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Gary J. Gershik                    2/20/08
Reg. No. 39,992          Date

**In Re Merged Proceedings Of:**
**Ex Parte Reexamination Control Nos. 90/007,503 & 90/007,828**
Page 5 of 5

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing **SUPPLEMENTAL INFORMATION DISCLSOSURE STATEMENT** and any enclosure has been sent to:

McDonnell Boehnen Hulbert & Berghoff, 300 South Wacker Drive, Suite 3200, Chicago, Illinois 60606, Attn: Grantland G. Drutchas, Esq.,

    and

Bawa Biotechnology Consulting, LLC, 21005 Starflower Way, Ashburn, VA 20147, Attn: Dr. Raj Bawa,

each by U.S. Postal Service, first class mail service, with sufficient postage, on this twentieth day of February, 2008.

                             Gary J. Gershik

# Exhibit A
## of Supplemental Information Disclosure Statement
## filed February 20, 2008 in
A Merged Proceeding of *Ex Parte* Reexamination Control Nos:

90/007,503    and    90/007,828
Filed April 4, 2005    Filed December 2, 2005

Merged Pursuant to May 4, 2006 Merger Decision
Group Art Unit: 3991  Examiner: B.M. Celsa

| Form PTO-1449 | U.S. Department of Commerce Patent and Trademark Office | Atty. Docket No. 74753/JPW/GJG | Ex Parte Reexamination No.: 90/007,503 and 90/007,828 |
|---|---|---|---|
| **INFORMATION DISCLOSURE CITATION** (Use several sheets if necessary) | | Applicants **David Baltimore et al.** | |
| | | Filing Date **April 4, 2005** | Page 1 of 1 |

## U.S. PATENT DOCUMENTS

| Examiner Initial | Document Number | Date | Name | Class | Subclass | Filing Date if Appropriate |
|---|---|---|---|---|---|---|
| | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | Document Number | Date | Country | Class | Subclass | Translation Yes | No |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

## OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| | |
|---|---|
| 1 | January 18, 2008 Expert Report of Randolph Wall, Ph.D. in the litigation captioned *Amgen, Inc. et al. v. Ariad Pharmaceuticals, Inc., et al.*, U.S. District Court for the District of Delaware, CA No. 06-259-MPT |
| 2 | The Amgen Entities' 5th Notice of Deposition to Ariad, Whitehead, Harvard and MIT Pursuant to Fed. R.Civ. P.30(b)(6), dated January 25, 2008, in the litigation captioned *Amgen, Inc. et al. v. Ariad Pharmaceuticals, Inc., et al.*, U.S. District Court for the District of Delaware, CA No. 06-259-MPT |
| 3 | Withoff, S. et al. "Chapter 10: Regulating the Master Regulator NF-κB: From Natural Strategies to Rationally Designed Superdrugs," *Handbook of Transcription Factor NF-kappaB*: 195-221 (2007) |
| 4 | Doucas, V., et al. "Cytoplasmic catalytic subunit of protein kinase A mediates cross-repression of NF-κB and the glucocorticoid receptor," *PNAS Early Edition*:2- |
| 5 | Bottero et al., "NF-κB and the regulation of hematopoiesis," *Cell Death and Differentiation* 13:785-797 (2006) |
| 6 | May 3, 2007 Amgen Entities' Reply To Ariad, Harvard, MIT and Whitehead's Counterclaim in the litigation captioned *Amgen, Inc. et al. v. Ariad Pharmaceuticals, Inc., et al.*, U.S. District Court for the District of Delaware, CA No. 06-259-MPT |
| | Doucas, V., et al. "Cytoplasmic catalytic subunit of protein kinase A mediates cross-repression of NF-κB and the glucocorticoid receptor," *PNAS Early Edition*:2- |
| | |
| | |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

*EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609: Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

A Merged Proceeding of *Ex Parte* Reexamination Control Nos: 90/007,503, Filed April 4, 2005 and 90/007,828, Filed December 2, 2005 **Exhibit A** to Feb. 20, 2008 Supp. Information Disclosure Statement

# EXHIBIT 19

MERGED REEXAMINATION          Docket No. 74753/JPW/GJG/PJS

<u>IN THE UNITED STATES PATENT AND TRADEMARK OFFICE</u>

Merged Proceedings Pursuant To May 4, 2006 Order Of:

*Ex Parte*
Reexamination Control No. 90/007,503, filed April 4, 2005,
                                        And
*Ex Parte*
Reexamination Control No. 90/007,828, filed December 2, 2005.

| | |
|---|---|
| Patentees: | David Baltimore, Ranjan Sen, Phillip A. Sharp, Harinder Singh, Louis Staudt, Jonathan H. Lebowitz, Albert S. Baldwin Jr., Roger G. Clerc, Lynn M. Corcoran, Patrick A. Baeuerle, Michael J. Lenardo, Chen-Ming Fan, and Thomas P. Maniatis |

Patent No.:     6,410,516 B1        Group Art Unit: 3991

Issue Date:     June 25, 2002       Examiner: B.M. Celsa

For      :      NUCLEAR FACTORS ASSOCIATED WITH
                TRANSCRIPTIONAL REGULATION

                                1185 Avenue of the Americas
                                New York, New York 10036
                                February 20, 2008

Mail Stop *Ex Parte* Reexamination
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

<u>SUPPLEMENTAL INFORMATION DISCLSOSURE STATEMENT</u>

In accordance with their duty of disclosure under 37 C.F.R.
§1.555, Patentees direct the Examiner's attention to the
following documents, which are also listed on Form PTO-1449
attached hereto (**Exhibit A**).

In Re Merged Proceedings Of:
*Ex Parte Reexamination Control Nos. 90/007,503 & 90/007,828*
Page 2 of 5

1.  January 31, 2008 Memorandum Order of the Hon. Judge Thynge on Amgen's Motion to Amend and Supplement Their Reply to ARIAD's Counterclaims in the litigation captioned *Amgen, Inc. et al. v. Ariad Pharmaceuticals, Inc., et al.*, U.S. District Court for the District of Delaware, CA No. 06-259-MPT; **Exhibit 1)**;

2.  January 18, 2008 Expert Report of Jeffrey V. Ravetch, M.D., Ph.D. in the litigation captioned *Amgen, Inc. et al. v. Ariad Pharmaceuticals, Inc., et al.*, U.S. District Court for the District of Delaware, CA No. 06-259-MPT; **(Exhibit 2)**;

3.  January 18, 2008 Expert Report of Randolph Wall, Ph.D. in the litigation captioned *Amgen, Inc. et al. v. Ariad Pharmaceuticals, Inc., et al.*, U.S. District Court for the District of Delaware, CA No. 06-259-MPT; **(Exhibit 3)**;

4.  October 21, 2005 Rule 26(A)(2) Rebuttal Report of Thomas R. Kadesch, Ph.D. in the litigation captioned *Ariad Pharmaceuticals, Inc. et al. v. Eli Lilly and Co.*, U.S. District Court for the District of Massachusetts, CA No. 02 CV 11280 RWZ; **(Exhibit 4)**; and

5.  June 21, 2007 Deposition Transcript of Dr. Thomas R. Kadesch in the litigation captioned *Amgen, Inc. v. F. Hoffmann-La Roche Ltd., et al.*, U.S. District Court for the District of Massachusetts, CA No. 0512237 WGY; **(Exhibit 5)**.

**In Re Merged Proceedings Of:**
**Ex Parte Reexamination Control Nos. 90/007,503 & 90/007,828**
Page 3 of 5

Copies of items 4 and 5 (and accompanying exhibits) were previously submitted as Exhibit 16 in Patentees' April 7, 2006 Supplemental Information Disclosure Statement and as Exhibit 22 in Patentees' December 13, 2007 Supplemental Information Disclosure Statement. Items 4 and 5 are being included here for the Examiner's convenience in considering newly submitted items 1, 2 and 3.

Item 1 is an Order issued in the concurrent litigation captioned *Amgen, Inc. et al. v. Ariad Pharmaceuticals, Inc., et al.*, U.S. District Court for the District of Delaware, CA No. 06-259-MPT, in which Hon. Judge Thynge states that although Patentees submitted the June 21, 2007 Deposition Transcript of Dr. Thomas Kadesch, item 5, to the U.S. Patent Office, Patentees did not advise the U.S. Patent Office of alleged inconsistencies between Dr. Kadesch's statements on pages 258-271 of the Deposition Transcript and the statements in the October 21, 2005 Rebuttal Report of Dr. Kadesch, item 4, from another concurrent litigation captioned *Ariad Pharmaceuticals, Inc. et al. v. Eli Lilly and Co.*, U.S. District Court for the District of Massachusetts, CA No. 02 CV 11280 RWZ. Item 2 is a January 18, 2008 Expert Report of Dr. Jeffrey Ravetch which is relevant to the alleged inconsistencies, as well as to other issues in the reexamination proceeding. Item 3 is an Expert Report of Dr. Randolph Wall which is also relevant to the alleged inconsistencies, as well as to other issues in this reexamination proceeding.

**In Re Merged Proceedings Of:**
**Ex Parte Reexamination Control Nos. 90/007,503 & 90/007,828**
Page 4 of 5

Pursuant to the May 4, 2006 Order merging the above-identified reexamination proceedings, this Communication is being filed in duplicate and bears identifying data for the two reexamination proceedings.

If a telephone interview would be of assistance in advancing prosecution of the subject application, patentees' undersigned attorney invites the Examiner to telephone at the number provided below.

No fee is deemed necessary in connection with the filing of this Information Disclosure Statement. If any such fee is required, authorization is hereby given to charge the amount of any such fee to Deposit Account No. 03-3125.

Respectfully submitted,

*Gary J. Gershik*

John P. White
Registration No. 28,678
Gary J. Gershik
Registration No. 39,992
Attorneys for Applicants
Cooper & Dunham LLP
1185 Avenue of the Americas
New York, New York 10036
(212) 278-0400

I hereby certify that this correspondence is being deposited this date with the U.S. Postal Service with sufficient postage as first class mail in an envelope addressed to:

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

*Gary J. Gershik*    2/20/08
Gary J. Gershik         Date
Reg. No. 39,992

In Re Merged Proceedings Of:
*Ex Parte Reexamination* Control Nos. 90/007,503 & 90/007,828
Page 5 of 5

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing
**SUPPLEMENTAL INFORMATION DISCLSOSURE STATEMENT** and any
enclosure has been sent to:

McDonnell Boehnen Hulbert & Berghoff, 300 South Wacker
Drive, Suite 3200, Chicago, Illinois 60606, Attn: Grantland
G. Drutchas, Esq.,

    and

Bawa Biotechnology Consulting, LLC, 21005 Starflower Way,
Ashburn, VA 20147, Attn: Dr. Raj Bawa,

each by U.S. Postal Service, first class mail service, with
sufficient postage, on this twentieth day of February,
2008.

                                        _____
                                         Gary J. Gershik

# Exhibit A
## of Supplemental Information Disclosure Statement
## filed February 20, 2008 in
A Merged Proceeding of *Ex Parte* Reexamination Control Nos:

90/007,503        and        90/007,828
Filed April 4, 2005        Filed December 2, 2005

Merged Pursuant to May 4, 2006 Merger Decision
Group Art Unit: 3991  Examiner: B.M. Celsa

| Form PTO-1449 | | U.S. Department of Commerce<br>Patent and Trademark Office | | | Atty. Docket No.<br>74753/JPW/GJG | | Ex Parte<br>Reexamination<br>No.:<br>90/007,503 and<br>90/007,828 |
|---|---|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE CITATION**<br>(Use several sheets if necessary) | | | | | Applicants<br>**David Baltimore et al.** | | |
| | | | | | Filing Date<br>**April 4, 2005** | | **Page 1 of 1** |

**U.S. PATENT DOCUMENTS**

| Examiner<br>Initial | | Document Number | | Date | Name | Class | Subclass | Filing Date<br>if Appropriate |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

**FOREIGN PATENT DOCUMENTS**

| | | Document Number | | | Date | Country | Class | Subclass | Translation | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Yes | No |
| | | | | | | | | | | |

**OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)**

| | | |
|---|---|---|
| | 1 | January 31, 2008 Memorandum Order of the Hon. Judge Thynge on Amgen's Motion to Amend and Supplement Their Reply to ARIAD's Counterclaims in the litigation captioned *Amgen, Inc. et al. v. Ariad Pharmaceuticals, Inc., et al.*, U.S. District Court for the District of Delaware, CA No. 06-259-MPT |
| | 2 | January 18, 2008 Expert Report of Jeffrey V. Ravetch, M.D., Ph.D. in the litigation captioned *Amgen, Inc. et al. v. Ariad Pharmaceuticals, Inc., et al.*, U.S. District Court for the District of Delaware, CA No. 06-259-MPT |
| | 3 | January 18, 2008 Expert Report of Randolph Wall, Ph.D. in the litigation captioned *Amgen, Inc. et al. v. Ariad Pharmaceuticals, Inc., et al.*, U.S. District Court for the District of Delaware, CA No. 06-259-MPT |
| | 4 | October 21, 2005 Rule 26(A)(2) Rebuttal Report of Thomas R. Kadesch, Ph.D. in the litigation captioned *Ariad Pharmaceuticals, Inc. et al. v. Eli Lilly and Co.*, U.S. District Court for the District of Massachusetts, CA No. 02 CV 11280 RWZ |
| | 5 | June 21, 2007 Deposition Transcript of Dr. Thomas R. Kadesch in the litigation captioned *Amgen, Inc. v. F. Hoffmann-La Roche Ltd., et al.*, U.S. District Court for the District of Massachusetts, CA No. 0512237 WGY |
| | | |
| | | |
| | | |
| | | |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

*EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

A Merged Proceeding of *Ex Parte*<br>Reexamination Control Nos:<br>90/007,503, Filed April 4, 2005 and<br>90/007,828, Filed December 2, 2005<br>**Exhibit A** to Feb. 20, 2008 Supp.<br>Information Disclosure Statement

# EXHIBIT 20

# EXHIBIT REDACTED

# EXHIBIT 21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN INC., IMMUNEX CORPORATION, AMGEN
USA INC., AMGEN MANUFACTURING LIMITED, and
IMMUNEX RHODE ISLAND CORPORATION,

)
)
)
)
)
)                    C.A. No. 06-259-MPT
)
)
)

Plaintiffs,

v.

ARIAD PHARMACEUTICALS, INC., and THE
WHITEHEAD INSTITUTE FOR BIOMEDICAL
RESEARCH,

)
)
)
)
)
)

Defendants

)
)
)
)

ARIAD PHARMACEUTICALS, INC., MASSACHUSETTS
INSTITUTE OF TECHNOLOGY, THE PRESIDENT and
FELLOWS OF HARVARD COLLEGE, and THE
WHITEHEAD INSTITUTE FOR BIOMEDICAL
RESEARCH

)
)
)
)
)
)
)

Counterclaim Plaintiffs,

)
)

v.

AMGEN INC., IMMUNEX CORPORATION, AMGEN
USA INC., AMGEN MANUFACTURING LIMITED,
IMMUNEX RHODE ISLAND CORPORATION

Counterclaim Defendants.

## REBUTTAL REPORT OF JEFFREY V. RAVETCH, M.D., Ph.D.

I, Jeffrey V. Ravetch, M.D., Ph.D., submit the following report on behalf of

ARIAD Pharmaceuticals, Inc., Massachusetts Institute of Technology, The Whitehead Institute

for Biomedical Research, and The President and Fellows of Harvard College (collectively

"ARIAD") in the above-captioned action.

Exhibit

653

Penco Press NYC #445

## I.    BACKGROUND

1.      I have been asked to opine on several subjects relevant to the litigation of the above-captioned action, including the validity of certain claims of U.S. Patent No. 6,410,516 (the "'516 Patent"), and the filing dates to which they are entitled.  Specifically, I have been asked to respond to certain of the opinions expressed in the reports of Dr. Aaron Ciechanover, Dr. Warner Greene and Dr. Randolph Wall, submitted on behalf of Amgen.

2.      I have already submitted a brief description of my qualifications and a complete *curriculum vitae* with my initial report.  I am being compensated for my work in connection with this litigation at my customary rate of $800 per hour.

3.      I have based my opinions in this case on my 30 years of experience in the field of molecular genetics and immunology, on the '516 Patent and file history, references cited in the patent, additional references cited here, as well as scientific literature in the field of the invention.

4.      I reserve the right to supplement my report in light of any additional fact discovery, opinions by Amgen's experts, and/or trial testimony.  I also reserve the right to provide rebuttal opinions and testimony in response to Amgen's experts and fact witnesses.  In connection with my anticipated trial testimony in this action, I may use as exhibits various documents produced in this litigation that refer or relate to the matters discussed in this report. In addition, I reserve the right to use animations, demonstrative exhibits, enlargements of actual exhibits, and other information in order to convey my opinions.

## II.    THE ASSERTED CLAIMS ARE NOT ANTICIPATED BY THE PRIOR ART

5.      I have analyzed the references cited by Drs. Greene and Ciechanover in their respective reports.  In my opinion, each of the references they have cited fails to disclose, either expressly or inherently, each element of the asserted claims.

2

**B.    Legal Standard**

6.    I understand from counsel that the law of anticipation is governed by the provisions of 35 U.S.C. § 102. I further understand that for a prior publication or public use to anticipate an invention, that publication or public use must disclose each and every element of a claimed invention in a sufficient manner to teach a person of ordinary skill in the art ("POSA") how to practice that claimed invention. Important to this inquiry, I understand that the elements of the claim must be disclosed in a single publication or prior use in order to anticipate, though the publication or public use need not recite elements of a claim that are generally known to a POSA. One cannot combine two or more references to assert a finding of anticipation. In addition, I understand that, even though a reference may not expressly disclose each element of a claim, if the element that is not expressly apparent is "necessarily present" in the reference, the reference will still be deemed to anticipate a claim under the doctrine of inherent anticipation. I further understand that an element is "necessarily present" only if that element would be present in the disclosure of the reference in every case. That is, for a method claim, the disclosure in the reference must teach a method that always results in each element of the claim being met. It is not sufficient that the unexpressed element of the claim is satisfied on occasion or even most of the time; it must be satisfied each and every time the disclosure in the reference is followed.

7.    I understand that the determination whether each element of a claim is sufficiently disclosed in a single publication or prior use, is viewed from the perspective of a POSA in the field of invention. That is, there must be no difference between the claimed

3

invention and the prior art reference, as viewed from the perspective of a POSA.[1]  In addition,

the prior art reference must enable one of ordinary skill in the art to make and use the claimed

invention.

8.       ARIAD has asserted the following claims of the '516 Patent in this litigation:

claims 6, 70, 71, 72, 18, 183, 184.  Claim 6 is an independent claim having the following

limitations:  A method for:

(1) diminishing induced NF-κB-mediated intracellular signaling

(2) comprising reducing NF-κB activity in cells

(3) such that NF-κB-mediated intracellular signaling is diminished

9.       Claims 70, 71, and 72, which depend on claim 6, add the limitation that the

invention of claim 6 must be carried out, respectively, in mammalian cells, human cells, or

human immune cells.

10.      Claim 18 is also an independent claim, having the following limitations:  A

method for:

(1) reducing Interleukin-1 or Tumor Necrosis Factor-α activity

(2) in mammalian cells

(3) comprising reducing NF-κB activity in the cells

(4) so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis

Factor-α in the cells.

11.      Claims 183 and 184, which depend on claim 18, add the limitation that the

invention of claim 6 must be carried out, respectively, in human cells or human immune cells.

---

[1] As I have previously stated in my opening expert report ("Op. Rep."), it is my opinion
that a POSA is a scientist with a Ph.D. in chemistry, biology, or related field, or a degree in
medicine and having at least three years of post-doctoral laboratory training or other laboratory
experience related to molecular biology and gene regulation.  Op. Rep. at ¶ 36.

12.     To anticipate the claims, any prior publication or public use must therefore disclose each and every one of these limitations.[2]

**C.     Many of the asserted references are not prior art because they postdate the effective filing dates of the asserted claims.**

13.     As an initial matter, many of the publications that Drs. Greene and Ciechanover have asserted as anticipating prior art references postdate the effective filing dates of the asserted claims.

14.     **Claim 6 and dependent claims.**  As I have opined in my opening expert report, Claim 6 and its dependent claims are entitled to an effective filing date of March 1, 1988.[3]  Thus, any publication published after that date cannot be considered prior art, much less anticipating prior art.  The following publications[4] were in fact published after the effective filing date of Claim 6:

- Bensimon, Bielinska, Brini, Chedid, Edbrooke, Meichle, Osborn, Roederer, Shirakawa, Staal and Tong-Starksen.

15.     **Claim 18 and dependent claims.**  Moreover, as I have also opined in my opening expert report, claim 18 is entitled to an effective filing date of April 21, 1989.[5]  Therefore, any publication published after this date cannot be an anticipating prior art reference.  The following publications were published after April 21, 1989, and therefore do not anticipate claim 18 of the '516 Patent or its dependent claims:

---

[2] I note that although Dr. Greene cites Davis and Ghosh in his report, he does not opine that they anticipate the asserted claims.  Greene Rep. at 95.

[3] Op. Rep. at ¶¶ 43-52.

[4] As used herein, references to articles cited by Drs. Greene and Ciechanover are identified by the surnames of their first authors.

[5] Op. Rep. at ¶¶ 53-54.

5

- Bielinska, Brini, Chedid, Edbrooke, Meichle, Roederer, Saito, Shirakawa and Staal.

**D.    The asserted references do not anticipate because they do not meet the claim limitation requiring prior induction of NF-κB activity.**

As I have outlined in my previous report and as above, both claims 6 and 18 of the '516 Patent require that NF-κB activity be induced prior to its reduction by the claimed methods. A reference can therefore anticipate these claims of the '516 Patent only if it discloses this limitation. In other words, for a reference to anticipate either claim 6 and/or 18, it must disclose reduction of NF-κB activity that has already been induced. In any reference where a cell has been exposed to an inhibitor that purportedly reduces NF-κB activity, the inhibitor must be added after the NF-κB pathway has been induced for the reference to anticipate. Effectively, this requires the addition of the inhibitor after the onset of a disease state whereby the NF-κB pathway is induced or after the addition of a chemical inducer of the NF-κB pathway. If the inhibitor is introduced either simultaneously with or prior to the exposure of the same system to an inducer of NF-κB activity, the dynamics of the experimental system are such that there is no induction of NF-κB activity prior to its reduction by the inhibitor.

16.    The following publications, which were cited by Drs. Greene and Ciechanover as anticipating references, fail for, at minimum, the reason that none of the experiments described therein induces the NF-κB pathway prior to its inhibition:

- Bensimon, Bielinska, Brini, Chedid, Edbrooke, Giri, Koizumi, Mannel, Marmenout, Meichle, Osborn, Pachman, Roederer, Saito, Shirakawa, Staal, Tong-Starksen and Tracey.

**E.    Certain references do not anticipate because they do not meet the claim limitation requiring induction of NF-κB activity by TNF-α or IL-1.**

As stated above and in my opening expert report, the elements of claim 18 require that either TNF or IL-1 induce NF-κB activity prior to reduction by an inhibitor. For any reference to

6

anticipate claim 18 of the '516 Patent, it must disclose the use of TNF or IL-1 as an inducer prior to the addition of an inhibitor. The following references cited by Amgen's experts do not disclose the use of IL-1 or TNF as inducers and hence cannot anticipate claim 18 or its dependent claims:

- Bielinska, Brini, Edbrooke, Koizumi, Mannel, Pachman, Saito and Tong-Starksen.

**F.    Claims whose infringement by Amgen have not been asserted are also not anticipated by any of the asserted references.**

17.    Dr. Greene has also opined that certain claims of the '516 Patent that ARIAD has not asserted as infringed by the administration of Enbrel, are also anticipated by the references he cites. I do not believe these non-asserted claims are anticipated for at least the following reasons:

18.    Like the asserted claims, claims 8, 9, 14, 19, 64-69, 73-80, 82, 84, 87-98, 101-103, 130-132, 138-148, 151-153, 158, 169-171, 176-179, 181-191 require induction of NF-κB activity prior to its reduction. As outlined in Section II.D. above, those references do not disclose prior induction in any of the experiments referenced by Amgen's experts.

19.    Claims 30, 41, 52, 63, 108, 118, 202 require that the method be carried out on liver cells. None of the references cited by Amgen's experts describes experiments in liver cells.

20.    Claims 44-46 are dependent claims directed to methods for reducing the level of expression of a viral gene whose transcription is regulated by NF-κB. With the possible exception of Roederer (which did not demonstrate reduction of NF-κB activity, *see* below), none of the references describes experiments reducing the level of expression of viral genes.

21.    Claims 111-113 are dependent claims directed to methods for reducing the effects of viral infection on mammalian cells comprising reducing NF-κB activity. With the possible

exception of Roederer (which did not demonstrate reduction of NF-κB activity, *see* below), none of the references describes experiments reducing the effects of viral infection.

22.    Claims 121-123 are dependent claims directed to methods for reducing the effects of bacterial infections on mammalian immune cells comprising reducing NF-κB activity. With the exception of Tracey (which did not demonstrate reduction in NF-κB activity in immune cells), none of the references describes experiments reducing the effects of bacterial infections.

23.    Claims 161-163 are dependent claims directed to methods for reducing bacterial lipopolysaccharide (LPS)-mediated stimulation of immune cells comprising reducing NF-κB activity. With the exception of Mannel (which, as discussed below, did not involve immune cells), Giri and Shirakawa (neither of which measured reduction of NF-κB activity), none of the references describes experiments utilizing LPS.

24.    Claims 194-196 are dependent claims directed to methods for reducing the expression of cytomegalovirus, human immunodeficiency virus, or the simian virus 40 genes. With the possible exception of Roederer (which did not demonstrate reduction of NF-κB activity, *see* below), none of the references describes experiments reducing the expression of genes of those viruses.

25.    **Pachman (1971).** Pachman studied the effects of salicylates on lymphocyte nucleic acid and protein synthesis. Salicylates were added to suspensions of human lymphocytes, either simultaneously with or in the absence of a mitogenic agent, PHA, and purified tuberculin protein. The resulting effects on general DNA, RNA and protein synthesis (which would be expected to increase during mitosis) were assayed.

26.    Dr. Greene contends that Pachman anticipates the '516 Patent because it used salicylates to inhibit NF-κB activity. However, the reference reports assays of general nucleic acid and protein synthesis, which are not necessarily linked to NF-κB activity, and no NF-κB

8

activity is assayed. Dr. Greene opines that later references by Kopp and Yin, published in 1994 and 1998 respectively, support his position that the salicylates used in Pachman anticipated the '516 Patent. Yin describes experiments in which Jurkat cells transfected with an HIV-1 LTR CAT reporter construct were treated with TNF and various salicylates or dexamethasone, another immunosuppressant. Kopp describes experiments in which Jurkat and PD31 cells were treated with various inducers and salicylates. However, those references do not report experiments replicating the conditions of the experiments described in Pachman. To say that salicylates can reduce NF-κB activity under certain conditions in some cells is not to say that they in fact did so, necessarily and always, under the conditions described in the reference.

27.     Dr. Greene cites to deposition testimony by Dr. Maniatis to support his opinion that a post-dating reference, Yin, shows that the use of aspirin in the Pachman reference anticipates the '516 Patent.[6] Dr. Maniatis referred to Yin as showing the inhibition of IKK by aspirin in a particular instance. That instance, as pointed out by Dr. Maniatis, was one in which very high doses of aspirin were administered, and cannot be used as a basis from which to extrapolate the effects of aspirin on NF-κB activity in the experiments described in Pachman.

28.     **Mannel (1981).** Mannel discusses an experiment in which macrophages were treated with a bacterial strain, BCG, in the presence or absence of LPS for 2 hours. The authors generated polyclonal antibodies to an uncharacterized substance they denominated "tumor cytotoxic factor" ("CF"), derived from the supernatant of BCG-elicited macrophages after LPS treatment. The cells were washed three times after BCG-LPS treatment and then co-cultured with labeled tumor (L929) cells, *i.e.*, the target cell, in the presence or absence of anti-CF IgG. In his report, Dr. Greene contends that this treatment modality anticipates the '516 Patent because

---

[6] Greene Rep. at 45-46, citing Maniatis Dep. Tr. 284:2-9.

the anti-CF antibodies would have bound to TNF that is produced by the induction of the macrophages with LPS, hence blocking the interaction of TNF with its receptors.

29.    Dr. Greene's arguments suffer from several unsupported assumptions, the first of which is that CF is, or contains, TNF. Because the researchers did not characterize CF, it is simply unknown what "CF" is and whether, among the multitude of compounds it undoubtedly comprises, it also contains TNF. Mannel does not define CF, other than to remark that it is "physicochemically similar" to some undefined substance found in BCG-LPS supernatants. CF could, for instance, be a combination of substances, both known and unknown.

30.    In addition, Dr. Greene also fails to note that even prior to the addition of the anti-CF antibody, the macrophages were washed three times, thereby eliminating CF from the medium. Dr. Greene has apparently assumed that macrophages exposed to CF remain unchanged after washing. That assumption, however, is also unwarranted, as review of the reference itself confirms. The authors make it clear that when the cells are washed 2 hours post-LPS addition, activity of CF (whatever it may be) is no longer present and that this absence of CF activity persists for up to 48 hours after the cells are washed. It is therefore clear that the process of washing the cells altered them, and most likely eliminated any external CF to which anti-CF antibodies could bind. Therefore, even assuming that CF contains TNF, it is far from certain, and in fact rather unlikely, that Mannel's experiments necessarily and inevitably reduced TNF activity by reducing induced NF-κB activity.

31.    Finally, I note that Dr. Greene assumes Mannel's experiments were directed to measuring the cytoxicity of CF. Notably, apoptosis (i.e., death) of cells, as measured by this

10

particular cytotoxicity assay, involves a pathway that does not necessarily involve NF-κB.[7] Hence, if any inference may be drawn from the cytoxicity assay, it is that the experiments may have potentially inhibited a process that does not involve NF-κB or the reduction of NF-κB activity.

32.     **Giri (1984).** Giri *et al.* studied the effects of IL-1 on certain immune cells, including its effects on the expression of immunoglobulin kappa light chain, a gene whose expression is now (but not at the time of the reference) known to be subject to NF-κB control. In one of the experiments the authors performed (as a means of controlling for the possibility that bacterial lipopolysaccharide, not IL-1, was accounting for the effects they observed), the authors incubated IL-1 with antibodies to IL-1, removed the resulting IL-1/anti-IL-1 complexes through the use of Pansorbin (a protein that binds to immune complexes), and then assessed whether the resulting, IL-1-free medium could induce expression of the kappa light chain. They found that it could not, thereby confirming that IL-1 was responsible for induction of kappa light chain synthesis.

33.     Dr. Greene contends that the article's report of the experiment inherently anticipated the claims of the '516 Patent, because the addition of anti-IL-1 antibody to IL-1 would have necessarily inhibited NF-κB activity. I disagree. Under the conditions of the experiment, the cells that, according to Dr. Greene, experienced a reduction of NF-κB activity were exposed neither to IL-1 nor to anti-IL-1 antibody; only after immune complexes were removed through the addition of Pansorbin, were the cells exposed to the resulting "IL-1-free" samples, and kappa chain synthesis evaluated. IL-1 was never present to induce NF-κB activity

---

[7] Chen & Goeddel, *TNF-R1 Signaling: A Beautiful Pathway Pathway,* Science 296:1634-1635 (2002).

in the 70z/3 cells. The reference therefore does not describe the reduction of induced NF-κB activity. Indeed, the reference does not describe the reduction of any NF-κB activity at all.

34.    **Marmenout (1985).** Marmenout *et al.* reports the expression of TNF in monkey COS cells, transfected with an expression vector containing the cloned gene for human TNF. After transfection, the biological activity of the expressed TNF was measured in part by an assay of its toxicity to L929 cells, cells derived from adipose and areolar tissue of mice. The authors further demonstrated that the toxicity of TNF was neutralized by antibodies to TNF. Dr. Greene opines that this reference inherently anticipates the claims of the '516 Patent, because anti-TNF antibodies would have necessarily reduced NF-κB activity in the L929 cells. I disagree. The biochemical pathway by which TNF brings about the death (apoptosis) of tumor cells involves components that are now known to be distinct from the pathway by which it activates NF-κB. Thus, the experiments do not necessarily and inevitably involve the NF-κB pathway. Hence, the results of an assay of TNF's cytotoxicity (or the inhibition thereof) do not permit inferences to be drawn about the extent of NF-κB activation/inhibition in the cells.

35.    Moreover, even if the apoptotic and NF-κB pathways activated by TNF were identical, the reference does not describe the inhibition of TNF-induced NF-κB activity; the reference does not describe the addition of anti-TNF antibodies subsequent to exposure of L929 cells to TNF. I further note that because L929 cells are derived from adipose and areolar tissue of mice, the article cannot anticipate claims 71, 72, 183, 184, or other claims limited to human cells or immune cells.

36.    **Koizumi (1986).** In the experiments reported in Koizumi, Jurkat cells were exposed to the protein kinase activators, PMA or PHA, in the presence of varying amounts of H-7, a protein kinase inhibitor. The measured outcome was the degree to which H-7 inhibited IL-2 receptor expression. Dr. Greene opines that since H-7 is a known inhibitor of Protein

12

Kinase C (PKC) and Protein Kinase A (PKA), which are activated by PHA and PMA, respectively, Koizumi anticipates the '516 Patent. In the experiments in Koizumi, however, H-7 was added simultaneously to PMA and PHA, which means that NF-κB activity was not induced prior to its reduction by H-7. Koizumi therefore fails to meet every limitation of the asserted claims of the '516 Patent and does not anticipate them.

37.     Dr. Greene also attempts to replicate the experiments the authors performed, in an attempt to prove that the Koizumi reference inherently anticipates the claims of the '516 Patent. Dr. Greene's experiments, however, fail to fulfill that objective for several reasons. As an initial matter, since the experimental design in Koizumi itself does not anticipate for at least the reasons outlined above, even a faithful replication of those experiments would fail, for the same reasons, to demonstrate that Koizumi anticipates. Moreover, Dr. Greene's experiments do not faithfully replicate the conditions of those described in Koizumi. Dr. Greene made material changes to the experimental conditions. For instance, Dr. Koizumi used Jurkat cells provided by Dr. R.C. Gallo of the National Cancer Institute, whereas Dr. Greene used a line of cells called Jurkat A3, a subset of the Jurkat cell line. Though both cells are Jurkat cells, the differences between them are unknown and any attempts to minimize the importance of the possible differences would be scientifically irresponsible. The cells used by Dr. Koizumi could very well have reacted differently to the stimuli or inhibitors. In the absence of an assay of NF-κB activity from the Koizumi reference itself, a conclusion that NF-κB activity was necessarily and inevitably induced and/or reduced by the experiments the authors conducted lacks support.

38.     Dr. Greene also changed the conditions under which the cells were exposed to various chemicals. Whereas the authors incubated the cells in both PMA and H-7 simultaneously for 24 hours, Dr. Greene preincubated the cells for 30 minutes with H-7 before adding PMA, and incubated both for 30 minutes. Even assuming for the sake of argument that

13

reduction of NF-κB following the simultaneous addition of PMA and H-7 could anticipate, Dr.

Greene significantly changed the protocol by adding the potential inhibitor, H-7, prior to

adding PMA. This change would inevitably alter cell dynamics, and would even more likely

have prevented induction of NF-κB activity. In any event, Dr. Greene's experiments do not

authentically replicate Koizumi's experiments and, therefore, do not demonstrate that NF-κB

activity was necessarily and inevitably reduced therein.

39.    Dr. Greene cites deposition testimony of Drs. Baltimore and Baeuerle as support

for his opinion that the use of H-7 reported in certain articles, including Koizumi, inhibited NF-

κB activity in a way that anticipates the '516 Patent.[8]  But Dr. Greene overstates the degree to

which the testimony supports his opinion. Drs. Baltimore and Baeuerle acknowledged that H-7

has been found to inhibit NF-κB activity under certain circumstances. They did not, as Dr.

Greene implies, state that H-7 inhibits NF-κB activity in all circumstances, including after prior

induction. Nor did they testify that NF-κB was inhibited in Koizumi or any such article.

40.    **Tracey (1987).** In Tracey *et al.*, the effect of administration to baboons of anti-

TNF antibodies prior to the onset of bacterially-induced septic shock was assessed. The authors

developed monoclonal antibodies to TNF, which they administered to baboons either one or

two hours prior to injection of a lethal dose of *E. coli* bacteria.  Whereas those baboons receiving

anti-TNF antibodies only one hour prior to injection succumbed to the effects of the resulting

septic shock, those receiving the antibodies two hours prior to injection survived.  Dr. Greene

contends that this reference anticipates the asserted claims of the '516 Patent, including the

asserted claims, because he contends that treatment with anti-TNF antibodies inhibited LPS-

induced NF-κB activity, in the same way that treatment with Enbrel inhibits TNF-induced NF-

---

[8] Greene Rep. at 21-22.

κB activity. I disagree. The experimental protocol employed by the authors did not involve TNF induction of NF-κB activity prior to inhibition. To the contrary, antibodies were administered one or more hours prior to injection of the purportedly inducing substance (LPS). Not only was the effect of the antibodies highly sensitive to the time of administration, but the authors themselves were careful to note that the results they obtained from administering antibodies prior to induction could not be extrapolated to form conclusions about the effect of administering antibodies after the induction of septic shock: "Further experiments are needed to determine whether the administration of anti-cachectin antibodies during persisting infection or indolent sepsis will be beneficial." In fact, subsequent studies in humans showed that administration of anti-TNF antibodies or similar molecules after onset of sepsis is not an effective therapy for septic shock.[9]

41.    I further note that because the reported experiments were carried out in baboons, the article cannot anticipate claims 71, 182 or other claims limited to human cells.

42.    **Saito (June 1988).** Saito *et al.* discusses the effects of various protease inhibitors, including ALLNal, on the growth of neurites, tendril-like outgrowths of cultured nerve cells. ALLNal and other inhibitors were added to cultured PC12h cells, with or without Neurite Growth Factor (NGF). The presence and length of neurites were measured to determine the degree to which the inhibitors inhibited neurite growth.

43.    Drs. Greene and Ciechanover opine that the Saito reference anticipates because the effects on neurite growth of ALLNal (which they contend is an agent that reduces NF-κB activity) in combination with NGF (which they contend induces NF-κB activity) were studied.

---

[9] Abraham, *et al.*, *Double-Blind Randomized Controlled Trial of Monoclonal Antibody to Human Tumour Necrosis Factor in Treatment of Septic Shock*, Lancet 351:929-933 (1998).

Drs. Greene and Ciechanover also opine that Saito anticipates because ALLNal, by inhibiting the proteasome system, reduced NF-κB activity induced by NGF. The experiments did not involve prior induction with NGF, and neither the cited articles, nor any I am aware of, demonstrates that ALLNa1 can inhibit induced NF-κB activity, much less that it necessarily does so in each and every case. Although some articles show that inhibitors of proteasomes can, under certain conditions, inhibit uninduced NF-κB activity, *e.g.*, Palombella *et al.*, *The Ubiquitin-Proteasome Pathway Is Required for Processing the NF-κB1 Precursor Protein and the Activation of NF-κB*, Cell, 78:773-85 (1994), such a finding would not support a contention that they inherently anticipate the claims of the '516 Patent requiring prior induction.

44.    **Osborn (April 1, 1989).** Osborn *et al.* reported the results of several experiments showing that TNF and IL-1 possess the ability to activate NF-κB in lymphocytes. Dr. Greene contends that the reference anticipates because it shows the reduction of NF-κB activity by substances that can bind TNF. The references, however, fail to anticipate for several reasons. The experiment reported in Figure 1 does not involve induction with TNF prior to administration of anti-TNF antibodies, and the experiment reported in Figure 2 does not use any inhibiting substance at all.

45.    It is also of note that the promoter sequence on the plasmids with which the cells described in Figures 1 and 2 were transfected was that of HIV. It has been since been discovered that HIV enhancer sequences contain recognition sequences for several transcription factors, of which NF-κB is only one.[10] Hence, enhancement or inhibition of transcription from a

---

[10] Pereira *et al.*, *A Compilation of Cellular Transcription Factor Interactions with the HIV-1 LTR Promoter*, Nucleic Acids Research, 28(3):663-668 (2000); Gaynor *et al.*, *Cellular Transcription Factors Involved in the Regulation of HIV-1 Gene Expression*, AIDS, 6:347-63 (1992).

plasmid containing an HIV enhancer does not necessarily reflect enhancement or inhibition of NF-κB activity.

46.    The experiments described in Figures 3 and 4 fail to anticipate because they do not show inhibition of NF-κB activity, much less inhibition of its activity "in cells." The experiments assay binding of radiolabelled nucleic acid probes to NF-κB derived from nuclear extracts, in an effort simply to detect the presence of activated (i.e., nuclear) NF-κB in stimulated cells. As stated in my opening expert report, the term "in cells" requires that the methods of claims be performed in actual cells, not extracts. Notably, NF-κB from nuclear extracts cannot possess any activity capable of inhibition, since the process of preparing the extracts profoundly disrupts the cell's gene expression apparatus.

47.    Dr. Greene states, quoting deposition testimony, that testimony by Drs. Baltimore, Sharp and Sen concur with his view that Dr. Osborn was the first to show the reduction of TNF-induced NF-κB activation. I note that none of the cited deposition testimony credits Dr. Osborn with inhibiting NF-κB activity that has been induced. In fact, the deposition testimony by Dr. Baltimore describes what Dr. Osborn showed: inhibition of NF-κB activity when TNF antibodies were added prior to induction with TNF.[11]

48.    **Bensimon (April 1, 1989).** Bensimon *et al.* reports the results of experiments showing an antibody against an uncharacterized IL-1 receptor complex inhibited the proliferative activity of IL-1 on human (MRC-5) fibroblasts and murine thymocytes. Dr. Greene opines that the reference (which does not predate the priority date of claim 6 and its asserted dependent claims) inherently anticipates claims of the '516 Patent because the effects of the antibody in inhibiting the proliferation of the cells induced by IL-1 would necessarily and in

---

[11] Baltimore Dep. Tr. at 167:16-22.

17

every case stem from the reduction of NF-κB activity. I disagree. The assays employed by the authors did not assay for NF-κB activity specifically; only for proliferation, a profoundly complex process, one affected by numerous cellular factors. In the absence of data from an assay specifically measuring NF-κB activity, any inference that the reduction in proliferation of the cells exposed to IL-1 was due to a reduction in NF-κB activity is highly speculative. Dr. Greene reasons that because Kineret reduces IL-1-induced NF-κB activity, it is fair to infer that the antibody studied here would also reduce its activity through a similar mechanism. Yet I understand that ARIAD has withdrawn its contention that Kineret reduces IL-1-induced NF-κB activity, and I am not presently aware of literature concerning the effect of Kineret on NF-κB activity within IL-1 induced cells.

49.    I note that neither the experiments described in Figure 3 nor Figure 4, on which Dr. Greene comments, inhibited NF-κB activity after it was induced. In each of the experiments, the inducer was added simultaneously with the antibody. I further note that the experiment whose results are depicted in Figure 3 cannot anticipate claims limited to human cells, because the thymocyte cell line was murine, and that the experiment whose results are depicted in Figure 4 cannot anticipate claims limited to immune cells, because fibroblasts are not immune cells.

50.    **Edbrooke (May 1989):** Edbrooke *et al.* reports the results of experiments designed to assess the role of NF-κB in the expression of serum amyloid A protein (SAA) induced by phorbol myristate acetate (PMA). To that end, the authors identified the promoter sequence of the gene for SAA, and transfected human HeLa cells (a cell line derived from human cervical tissue) with a CAT expression vector containing that promoter sequence. Among other things, they found that cotransfection with a DNA fragment containing the NK-κB enhancer sequence competitively inhibited expression from the CAT expression vector,

18

implying that NF-κB was the transcription factor responsible for PMA-induced SAA gene expression. (See Figure 6). Dr. Greene opines that the disclosure of the results of this experiment, as well as that of a companion experiment assessing the binding of NF-κB from nuclear extracts to radiolabelled nucleotides (see Figure 5), anticipates claims of the '516 Patent. I disagree.

51.     The experiment described in Figure 5 does not involve inhibition of induced NF-κB activity, much less inhibition of its activity "in cells." The experiments assay binding of radiolabelled nucleic acid probes to NF-κB derived from nuclear extracts, in an effort simply to detect the presence of activated (*i.e.*, nuclear) NF-κB in stimulated cells. As stated in my opening expert report, the term "in cells" requires that the methods of claims be performed in actual cells, not extracts. Notably, NF-κB from nuclear extracts cannot possess any activity capable of inhibition, since the process of preparing the extracts profoundly disrupts the cell's gene expression apparatus.

52.     The results of the cotransfection experiment described in Figure 6 also do not anticipate any claim of the '516 Patent. As described in the materials and methods section of the article, addition of the inducer, PMA, occurred after transfection of vectors, including the purportedly inhibiting DNA fragment containing NF-κB enhancer sequences. I further note that HeLa cells, though human, are not derived from immune cells, and that neither IL-1 nor TNF was used to induce gene expression. Hence, the report of the results of the experiments could not anticipate claims 72, 18, 183 or 184, or other claims limited to immune cells and/or to inhibition of NF-κB activity induced by IL-1 or TNF.

53.     **Shirakawa (June 1989):** Shirakawa *et al.* reports the results of experiments designed, among other things, to assess the effect of administration of H8, an inhibitor of protein kinases, upon IL-1-induced NF-κB activity. To that end, the authors transfected murine

19

70Z/3 cells (a pre-B cell line) with an expression vector containing an NF-κB enhancer sequence, incubated the transfected cells with or without H8, and then exposed the cells to IL-1. They found reduced expression from the vector in the cells pre-treated with H8. (Figure 1). In companion experiments, nuclear extracts from cells exposed first to H8 and then exposed to IL-1, PMA or LPS, were assayed for binding activity to radiolabelled nucleotides containing the NF-κB binding sequence (Figure 2). Dr. Greene opines that the disclosure of the results of these experiments anticipate claims of the '516 Patent. I disagree.

54.    The experiments described in Shirakawa do not anticipate any claim. In experiments described in Figures 1 and 2, induction with IL-1 took place after exposure of the cells to the inhibitor, H8, and in the Table 1 experiments (which does not assay NF-κB activity/inhibition), administration of inducer and inhibitor was simultaneous. I also note that 70Z/3 cells are murine; hence, experiments performed with that line cannot anticipate claims limited to human cells.

55.    **Meichle (1990).** Meichle *et al.* reports the results of experiments designed to elucidate the mechanism of NF-κB activation by TNF. To that end, the authors preincubated Jurkat cells with various protein kinase inhibitors, H7, H8, or staurosporine, prior to induction of the cells with either TNF or PMA, a protein kinase activator. Although the authors found that some or all these compounds inhibited protein kinase C activity induced by TNF and/or PMA, none reduced TNF-induced NF-κB activity, thereby belying Dr. Greene's opinion that these experiments anticipate claims of the '516 Patent requiring inhibition of TNF-induced NF-κB activity. In any event, because administration of all the employed inhibitors preceded exposure of the cells to activating substances, including TNF, the reference would not anticipate the claims requiring prior induction even if it preceded their priority dates, which it does not.

20

56.    **Roederer (1990).** Roederer *et al.* (which postdates the priority dates of the asserted claims) reports the inhibition of HIV gene expression by a thiol reducing agent, N-acetyl-L-cysteine ("NAC"). Using a reporter gene construct containing the HIV LTR promoter sequence transfected into a cell line derived from human embryonic kidney cells, the authors assayed the effect of the administration of TNF and PMA, a protein kinase activator, on the expression of reporter genes located downstream from the promoter sequence, as well as the effect of prior or simultaneous administration of NAC. They show that TNF and PMA promote expression of the reporter genes (Figure 2), whereas prior or simultaneous or prior administration of NAC suppresses it (Figure 3). They also show that HIV replication (as assayed by measurement of levels of an HIV core protein) in HIV-infected MOLT-4 cells and HIV-infected peripheral blood monocytes ("PBMCs") is promoted by exposure to TNF and PMA, and suppressed by prior or simultaneous administration of NAC (Figures 4 and 6).

57.    Dr. Greene opines that this reference anticipates the claims of the '516 Patent, because, in his opinion, the inhibitory effects of NAC were necessarily mediated through inhibition of NF-κB. I disagree. As noted, in none of the experiments was NAC administered subsequent to induction with TNF. Moreover, none of the assays the authors measured NF-κB activity or activation directly. There is ample reason to believe that the inhibitory effects of NAC were pleiotropic, and thus mediated through other mechanisms, including the inhibition of distinct transcription factors. As described above, the HIV LTR promoter sequence used to drive expression from the reporter gene constructs included not just NF-κB recognition sequences, but other binding sites for transcription factors (see Figure 1).[12] Hence, the inhibition

---

[12] Naghavi *et al.*, *Long Terminal Repeat Promoter/Enhancer Activity of Different Subtypes of HIV Type 1*, AIDS Res & Human Retroviruses 15(14):1293-1303 (1999).

of activity seen with prior/simultaneous administration of NAC did not necessarily stem from inhibition of NF-κB activity, but could have stemmed from inhibition of the transcriptional factors that bind to those distinct recognition sequences. The same is also true of the inhibitory effects on viral replication seen in the HIV-infected MOLT-4 and PBMC cells; HIV replication is driven by the expression of genes regulated by more than one transcriptional factor.[13]

58.    **Brini (1990).** Brini *et al.* studied the effect of Cyclosporine A (CsA), an immunosuppressant compound, on the expression of IL-2 receptor in T-lymphocytes. Figure 1 reflects an experiment in which the authors purported to show inhibition by CsA of the expression of an IL-2 receptor protein induced by PHA. In Figure 2, the experiments show that the authors used a Northern Blot analysis of IL-2 receptor mRNA in T-cells to study the mechanism by which CsA reduces PHA-induced expression of IL-2 receptor protein. Figures 3 and 4 reflect experiments in which the authors attempted to use radiolabelled nucleotides corresponding to the DNA recognition sequences of certain transcriptional factors, to assess whether CsA reduced the binding of those probe sequences to unidentified proteins derived from nuclear extracts from T cells stimulated with PHA.

59.    Dr. Greene opines that the use of CsA inhibited NF-κB activity after that activity had been induced. The authors, however, added CsA 30 minutes *prior* to the addition of an inducer in each experiment. And, indeed, "when CsA was added directly to activated T-cell, we did not find any interference with the binding detected by gel mobility shift assay [unpublished observations]. From these data we can rule out the possibility that CsA acts directly on the activated NF-κB protein system(s)." Brini, at 137. Thus, rather than

---

[13] Nabel *et al., Alternative Mechanisms for Activation of Human Immunodeficiency Virus Enhancer in T Cells*, Science 239:1299-1302 (1988).

demonstrating that CsA reduces induced EMSA activity, this reference reports findings that CsA can inhibit uninduced activity only , but not the activity induced in activated T cells, as measured by EMSA.

60.     Since the publication of this experiment CsA has been shown to inhibit a transcription factor distinct from NF-κB, called NF-AT.[14] Thus, to the extent the study can be interpreted to show inhibition of any transcriptional factor, that factor is not necessarily NF-κB, but could well be NF-AT or others. In none of the experiments the authors performed, was NF-κB detected or its activity assayed.

61.     **Bielinska (1990).** Bielinska *et al.* describes the use of chemically-modified, nuclease-resistant double-stranded oligonucleotides ("phosphorothioates") as competitive inhibitors of NF-κB binding. Relying on the experiments whose results are depicted in Figures 1 and 3, Dr. Greene contends that these phosphorothioates inhibited NF-κB activity in a manner that anticipated the claims of the '516 Patent.[15] Even if this 1990 reference predated the priority dates of the asserted claims of the '516 Patent, I would not agree that the reference anticipates any claim. The authors do not show the reduction of induced NF-κB activity in cells. Figure 1 describes an experiment in which the authors assessed the binding of phosphorothioates to transcription factors derived from Jurkat cell nuclear extracts. The experiment therefore fails to

---

[14] Kiani *et al.*, *Manipulating Immune Responses with Immunosuppressive Agents That Target NFAT*, Immunity, 12:359-372 (2000); Rovira *et al.*, *The Impact of Immunosuppressive Drugs on the Analysis of T-Cell Activation*, Current Med. Chem., 7:673-692 (2000)

[15] Dr. Greene points to testimony by Dr. Baeuerle as supporting his position that nucleotides consisting of mutated NF-κB binding sites are effective decoy molecules. Greene Rep. at 17-18. Dr. Baeuerle's testimony does not support Dr. Greene's position. As Dr. Baeuerle testified, a mutation in the κB binding site would *prevent* the binding of the putative "decoy molecule" to NF-κB, which would reduce its efficacy as a potential decoy molecule. Baeuerle Dep. Tr. 39:20-40:13.

23

meet the limitation that any induced NF-κB activity reduction occur "in cells." In addition, the experiment did not use either TNF or IL-1 to stimulate the cells.

62.    Figure 3 describes an experiment in which phosphorothioates were used to inhibit expression of a reporter gene from a plasmid containing an HIV enhancer. The plasmid was transfected into an Epstein-Barr virus-transformed B cell line. These cells possess constitutive NF-κB activity. That is, NF-κB is active even in the absence of inducing substances, such as TNF or IL-1. Hence, the experiment did not demonstrate inhibition of TNF- or IL-1-induced NF-κB activity.

**G.    The cited inventor testimony does not support Dr. Greene's opinion that the asserted claims are anticipated by the prior art.**

63.    Dr. Greene also cites various testimony by the inventors of the '516 Patent as support for his opinion that the use of compounds in various articles anticipate the '516 Patent. He cites deposition testimony that kinase inhibitors could inhibit NF-κB activity,[16] that aspirin can inhibit NF-κB activity,[17] and that proteasome inhibitors can inhibit NF-κB activity.[18] In the cited testimony, the inventors did acknowledge that various types of compounds could inhibit NF-κB activity under certain circumstances. However, it does not follow that, and the inventors did not state that, those compounds would necessarily inhibit NF-κB activity under all circumstances, including those in which NF-κB activity had been induced prior to inhibition. Nor did they testify that NF-κB activity was inhibited in any article cited by Dr. Greene.

64.    Dr. Greene's citation to Dr. Baltimore's testimony on page 36 of his report is representative of how Dr. Greene has misconstrued the inventors' testimony. As support for

---

[16] Greene Rep. at 34

[17] *Id.* at 45-46.

[18] *Id.* at 47-48.

his opinion that CsA reduced NF-κB activity in Brini, Dr. Greene cites to testimony in which Dr.

Baltimore acknowledges that CsA has been "claimed" to inhibit NF-κB activity.  As I note

above, CsA does not in fact inhibit NF-κB, but NF-AT.

## III.     PRIORITY DATE

65.     I have read the report of Dr. Randolph Wall and I disagree with his conclusion

that the asserted claims of the '516 Patent are not entitled to an effective filing date earlier than

June 5, 1995.  In his report, Dr. Wall opines that the asserted claims are not supported by a

disclosure that satisfies the best mode, written description and enablement requirements of 35

U.S.C. § 112 in the '680,[19] '436,[20] '898[21] or '266[22] applications.  As I opined in my initial report, I

believe that the asserted claims of the '516 Patent were sufficiently described and enabled by

either the '680 or '436 applications.  A fortiori, I believe that the even more robust disclosures in

the '898 and '266 applications and the specification of the '516 Patent adequately support the

asserted claims.  In this section, I first address Dr. Wall's general arguments relating to

enablement, written description and best mode, before addressing the specific arguments that

Dr. Wall makes regarding the adequacy of disclosure in each patent application.

**B.     The asserted claims are adequately described and enabled by the specification of the '516 Patent.**

66.     In his report, Dr. Wall criticizes the disclosure of the '516 Patent for failing to

include "working examples," and states that the disclosed methods of practicing the invention

are hypothetical or theoretical.  However, I understand that the law does not require inventors

---

[19] U.S. Patent Application No. 07/162,680.

[20] U.S. Patent Application No. 07/341,436.

[21] U.S. Patent Application No. 07/791,898.

[22] U.S. Patent Application No. 08/418,266.

to actually reduce their invention to practice prior to filing a patent application. Under the doctrine of constructive reduction to practice, the inventors need not have actually practiced methods claimed in the '516 Patent so long as those methods are described and enabled. In other words, none of the requirements of 35 U.S.C. § 112 requires proof, in the form of experimental results, that the inventors had practiced the invention prior to filing their application.

67.    Dr. Wall opines that the asserted claims are not entitled to the filing date of an application prior to April 5, 1995, because the ubiquitin-proteasome system and its role in regulating the processing and activation of NF-κB and IκB were not completely understood as of the filing dates of the '680, '436 and '898 applications.[23] However, none of the asserted claims requires modulation of NF-κB activity at that specific step in the intracellular signaling pathway. An understanding of the precise mechanism by which IκB is degraded is not required to practice any of the asserted claims. As I explained in my initial report, the asserted claims may be practiced by a POSA given (1) the identity and general function of NF-κB and its natural inhibitor; (2) the basic steps of the NF-κB pathway, from induction of NF-κB signaling to the binding of NF-κB to its DNA recognition sites in the nucleus; and (3) reduction of NF-κB activity as a means of altering NF-κB mediated gene expression.

68.    From the disclosure of the patent specification or the '680 and '436 applications, a POSA would know that the asserted claims could be practiced by affecting the NF-κB pathway at any one of the disclosed steps. IκB and IκB-like proteins, for example, can reduce NF-κB activity by inhibiting the translocation of NF-κB into the nucleus. Decoy molecules can reduce NF-κB activity by inhibiting the binding of NF-κB to its recognition sequences on genomic

_____

[23] Wall Rep. at 21-33.

DNA.[24]  Dominantly interfering molecules can reduce NF-κB activity by inhibiting the

activation of transcription by DNA-bound NF-κB.  Antibodies to TNF, which were also known

in the art as of the filing of the '680 and '436 applications, can reduce NF-κB activity by

inhibiting the first step of the NF-κB pathway:  the binding of TNF to its receptor.  Each of these

embodiments of practicing the claimed inventions acts upon a different step of the NF-κB

pathway, and could be practiced by one skilled in the art prior to and without the benefit of the

elucidation of the ubiquitin-proteasome system.

     **C.**     **The Asserted Claims Are Entitled to the Effective Filing Dates of the '680 or '436 Applications.**

69.     In his report, Dr. Wall opined that the specification of the '516 Patent was

insufficient to support the asserted claims, and then explained why each earlier filed application

was even more deficient.  I have read the report of Dr. David Livingston, and I agree with his

conclusion that the asserted claims of the '516 Patent are supported by a specification that

complies with the enablement, written description and best mode requirements of 35 U.S.C. §

112.  From that starting point, I address the specific arguments made by Dr. Wall as to why each

application is deficient.

70.     **The asserted claims are supported by the disclosures of the '898 and '266**

**applications.**  Dr. Wall does not point out any significant difference between the disclosure of

the '516 Patent and the '266 application.  I agree with Dr. Livingston's opinion that the claims

are adequately supported by the specification of the '516 Patent, and with Dr. Wall's opinion

that the disclosure of the '266 application is substantively identical to the issued patent's

---

[24] Dr. Greene contends that articles, including Bielinska, that use electromobility shift assays to detect activated, nuclear NF-κB, anticipate the '516 Patent because they employ a form of decoy molecule to bind to NF-κB.  Although I disagree that such binding assays of cell-free extracts can anticipate any claim of the '516 patent, I note that the references confirm that decoy molecules (i.e., transcription factor binding oligonucleotides) were in use as of the late 1980s.

specification. Therefore, Dr. Wall's report does not demonstrate that the asserted claims are not entitled to, at minimum, an effective filing date of the '266 application (i.e., April 6, 1995).

71.    Dr. Wall also failed to note any significant difference between the disclosure of the '898 application and the specification of the '516 Patent. The only specific argument that Dr. Wall makes as to why the '898 application is not sufficient to support the asserted claims is that, as of November 13, 1991, one of ordinary skill in the art would not have known the precise mechanism by which IκB is degraded. However, as I explained in Section III.A. above, all of the asserted claims can be practiced by a POSA without a detailed understanding of the ubiquitin-proteasome system. Although the sequence of IκB is not required to enable or describe any of the asserted claims, it is worth noting that, by late 1991, the sequence of IκB was known in the art.[25] Therefore, Dr. Wall's report does not demonstrate that the asserted claims are not entitled to (at minimum) an effective filing date of the '898 application (i.e., November 13, 1991).

72.    **The asserted claims are supported by the disclosures of the '436 application.** Dr. Wall's primary arguments why the asserted claims are not entitled to the effective filing date of the '436 application relate to the state of knowledge in the art of the sequence of IκB and the fact that the application does not provide an amino acid or nucleotide sequence for the natural inhibitor. However, because the sequence of IκB is not required to enable or describe any of the asserted claims, and because one of ordinary skill in the art would have been able to isolate IκB and obtain its sequence using routine techniques, the patent need not have disclosed its sequence to adequately support the invention. The '436 application is further enabling because of the disclosure of decoy molecules and dominantly interfering molecules. As I

---

[25] Haskill, *et al.*, *Characterization of an Immediate-Early Gene Induced in Adherent Monocytes That Encodes I kappa B-like Activity*, Cell 65(7):1281-1289 (1991).

explained in my first report, decoy molecules are adequately described by the disclosure of their general use and function and an NF–κB recognition sequence, such as the κB enhancer or any of the sequences disclosed in Table I of the '436 application.[26] Therefore, Dr. Wall's report does not demonstrate that the claims are not entitled to (at minimum) an effective filing date of the '436 application (i.e., April 21, 1989).

73.    Claim 6 and claims dependent thereon are adequately supported by the disclosure of the '901 and '680 applications. Dr. Wall opines that claim 6 is not entitled to the effective filing date of the '901 application because that application "does not contain any disclosure of TNF–α or its relationship with NF–κB, despite the fact that ARIAD is asserting claims in this case against a TNF-antagonist product (and thus the full scope of these claims must encompass this according to ARIAD)."[27] I understand that Dr. Wall relies on a misstatement of the law. I have been informed by counsel for ARIAD that, while the full scope of the claims must be enabled, the inventors are not required to predict every future embodiment of the invention. Specifically, I understand that the inventors need not enable use of the accused product, Enbrel, for the claims to be adequately supported or for use of Enbrel to be found to infringe.

74.    Dr. Wall is correct that the '680 and '901 applications disclose fewer NF–κB recognition sequences than later applications, or the specification of the issued patent, but he is incorrect in his conclusion that the disclosure of those applications is insufficient to enable the asserted claims. To construct decoy molecules, which were well known in the art by the late 1980s, a POSA would need only a single NF–κB recognition sequence, such as the κB binding

---

[26] '436 application at 28.

[27] Wall Rep. at 92.

site provided in both the '680 and '901 applications. Thus, both the '680 and the '901 application provide sufficient information for a POSA to construct decoy molecules. Additionally, both applications enable the use of IκB or IκB-like proteins to practice the claimed inventions, as described in my original report.[28]

75.      Dr. Wall also opines that the disclosures of the '680 and '901 application are insufficient because NF-κB had not yet been sequenced at the time that they were filed. However, the sequence of NF-κB is not required to practice any of the asserted claims. To the extent that the sequence of NF-κB is required to practice dominantly interfering molecules, a POSA could have isolated and sequenced the gene for NF-κB using routine techniques, without undue experimentation. Accordingly, Dr. Wall's report does not demonstrate that claims 6 and claims dependent thereon are not entitled to the filing date of the '680 or '901 applications (i.e., March 1, 1988 and March 3, 1989, respectively).

76.      Accordingly, as I opined in my original report, claims 6, 70, 71 and 72 are entitled to an effective filing date of March 1, 1988 – the filing date of the '680 application – and that claims 18, 183 and 184 are entitled to an effective filing date of April 21, 1989 – the filing date of the ''436 application.

**D.      Dr. Aaron Ciechanover's Report Does Not Prove that the Asserted Claims Are Not Entitled to the Effective Filing Dates of the '680 or '436 Applications.**

77.      I have read Dr. Aaron Ciechanover's report, and I believe it to be largely irrelevant to this litigation. In his report, Dr. Ciechanover provides a detailed description of the discovery of the ubiquitin-proteasome system and its role in regulating the processing and activation of NF-κB and IκB. He opines that the claims of the '516 Patent could not be practiced

---

[28] Op. Rep. at ¶ 48.

without detailed knowledge of the degradation of IκB, including knowledge of the ubiquitination of IκB, which was not available as of November 1991. I disagree. Significantly, I note that none of the claims recite the reduction of NF-κB activity by preventing the ubiquitination of IκB as a claim limitation. As such, knowledge of ubiquitination is unnecessary to practice any of the asserted claims. As described in my initial report and in section III.A., the asserted claims were adequately described and enabled well before elucidation of the ubiquitin-proteasome system.

## IV. THE '516 PATENT IS NOT UNENFORCEABLE OWING TO INEQUITABLE CONDUCT

### A. Dr. Inder Verma's Declaration to the USPTO is Consistent With His Published Statements.

78.    In his report, Dr. Wall argues that the November 9, 2006 declaration submitted to the USPTO by Dr. Inder Verma[29] during reexamination of the '516 Patent contains conclusions that are inconsistent with statements made in published articles coauthored by Dr. Verma. I have reviewed Dr. Verma's declaration and the two articles cited in Dr. Wall's report, and I disagree with Dr. Wall's conclusion that they are in conflict. The opinions expressed in Dr. Verma's declaration are entirely consistent with the opinions contained in the published works. Therefore, there was no conflict to bring to the USPTO's attention.

79.    In his declaration, Dr. Verma opined that certain references disclosing the use of glucocorticoids did not inherently anticipate the claims pending in reexamination, because, *inter alia*, they did not necessarily involve the reduction of induced NF-κB activity.[30] Dr. Verma

---

[29] Declaration of Dr. Inder Verma, filed November 9, 2006 in the Merged Proceeding of Ex Parte Reexamination Control Nos: 90/007,503 (filed April 4, 2005) and 90/007,828 (filed December 2, 2005) ("Verma Declaration").

[30] Verma Declaration at ¶ 101.

31

noted that, because glucocorticoids are pleiotropic hormones – they act on several different signaling pathways – "there is considerable uncertainty relating to the potential mechanism of action of glucocorticoids in cells, including whether there are any potential effects on NF–κB."[31] This uncertainty is reflected in the "substantial amount of contradictory data reported in the scientific literature" regarding the effects, if any, that glucocorticoids have on NF–κB activation.[32] Because the mechanisms by which glucocorticoids inhibit inflammation and/or other responses are so poorly understood, and can vary from system to system, Dr. Verma explained, it is important to precisely replicate experiments from references that predate the patent to determine whether they inherently anticipate the patent.[33] Dr. Verma also explained that, because different glucocorticoids have different properties and likely have different mechanisms of action, it was not reasonable to draw conclusions from reference to later experiments involving cortisol as to whether references involving dexamethasone inherently anticipated the '516 Patent.[34]

     80.     Dr. Wall's report highlights these statements, and attempts to contrast them with statements made in two articles that Dr. Verma coauthored, which state that glucocorticoids can inhibit NF–κB activity under certain experimental conditions. However, the articles neither state nor imply that glucocorticoids always and necessarily reduce NF–κB activity, including previously induced activity, whenever they are administered to any cell.[35] Rather, to the extent

---

[31] *Id.* at ¶¶ 82, 90.

[32] *Id.* at ¶ 82.

[33] *Id.*

[34] *Id.* at ¶¶ 105–106.

[35] *See generally*, V. Doucas, *et al.*, *Cytoplasmic Catalytic Subunit of Protein Kinase A Mediates Cross-Repression By NF–κB and the Glucocorticoid Receptor*, PNAS 97:11893-11898 (2000); and S.

the articles describe, refer, or allude to specific experiments described in prior references, they refer to experiments that involved the inhibition of activation of NF–κB through treatment with glucocorticoids prior to or contemporaneously with the addition of a stimulus. As described in section II above, there are many references in the prior art that involve pre-treatment or co-administration of an inhibitor and a stimulus, but there are no references prior to the effective filing date of the '516 application that disclose the reduction of induced NF–κB activity. Dr. Verma's declaration merely highlights that distinction:

> [T]he fact that dexamethasone (or any other glucocorticoid) is administered to cells does not indicate that the administration of that glucocorticoid necessarily *reduced induced NF–κB activity* or NF–κB mediated-intracellular signaling.[36]

Dr. Wall's report ignores the critical distinction between reducing induced NF–κB activity (treatment), and preventing the activation of NF–κB (prophylaxis). As explained in my first report in this matter, all of the asserted claims require induction of NF–κB activity before that activity can be reduced. In his declaration, Dr. Verma opined that prior induction of NF–κB activity is, in fact, required by all of the claims that were rejected in light of the glucocorticoid references.[37] As such, the statements in Dr. Verma's declaration were made to distinguish the prior art on the basis that the asserted references did not disclose the reduction of induced NF–κB activity are consistent with statements made in his coauthored publications, which merely described what prior references reported.

---

Withoff, *et al.*, *Regulating the Master Regulator NF–κB: From Natural Strategies to Rationally Designed Superdrugs*, in S. Ghosh, Handbook of Transcription Factor NF–κB 195-221 (2007).

[36] Verma Declaration at ¶ 101 (emphasis added).

[37] Dr. Verma distinguished the asserted glucocorticoid references from claims 1-2, 5, 6, 8, 9, 20-21, 25-27, 29, 31-32, 36-40, 53-54, 58-62, 64-65, 69-73, 75-76, 80, 82, 84, 88-89 and 93-97.

81.    In his declaration, Dr. Verma also opined that red wine would not reduce induced NF-κB activity in the cells of a wine drinker. That statement was based upon the fact that "[r]ed wine is a generic term covering many different mixtures [of chemicals]," which are not uniform across types of wine and are unlikely to be absorbed by cells with induced NF-κB activity.[38] Because red wines are heterogeneous mixtures, and because of the non-specific nature of oral drug delivery, it would be impossible to demonstrate that consumption of red wine reduced induced NF-κB activity without, at minimum, analysis of (1) the specific inducer of NF-κB activity in the cells of the drinker and (2) an analysis of the specific mixture of chemicals in the specific vintage of wine consumed.

82.    Dr. Wall argues that Dr. Verma's declaration is inconsistent with the statement in his 2007 article that "resveratrol, which is found in grapes and red wine, [has] been found to downregulate NIK and IKKα/β, resulting in … a decrease in NF-κB activity."[39] I disagree with Dr. Wall's conclusion that that statement is inconsistent with Dr. Verma's declaration. That resveratrol has been demonstrated to "reduce NF-κB activity" under certain experimental conditions does not prove that the consumption of red wine reduces *induced* NF-κB activity. Although Dr. Wall criticizes the '516 Patent because it does not enable various forms of drug delivery *in vivo*, he apparently believes it to be obvious that a small amount of resveratrol, when imbibed with a large mixture of other chemicals, would necessarily travel through the body and into cells with induced NF-κB activity.

---

[38] Verma Declaration at ¶ 133.

[39] Wall Rep. at 96-97, citing Withoff *et al.*, *Regulating the Master Regulator NF-κB: From Natural Strategies to Rationally Designed Superdrugs*, in Ghosh, *Handbook of Transcription Factor NF-κB* 195-221, at 205-206 (2007).

83.     The only reference cited in Dr. Verma's 2007 article that relates to resveratrol, however, does not propose a mechanism by which resveratrol enters the cells of a drinker, nor does it describe the consumption of red wine.[40] It is merely a review article that briefly describes the results of *in vitro* experiments in which cells were treated with resveratrol. In fact, resveratrol was found to reduce NF-κB activity in only certain experiments; in other experiments, resveratrol had no effect on NF-κB activity.[41] No POSA would find that conflicting results from *in vitro* experiments that involved direct application of resveratrol to cells could be the basis for extrapolation to the effect of consumption red wine by a human being. Accordingly, the statement in Dr. Verma's article is fully consistent with the declaration that he submitted to the USPTO on ARIAD's behalf.

**B.     The Incorrect IκB Sequence Provided in Figure 43 is Not Material to Patentability.**

84.     Dr. Wall notes that the nucleotide sequence disclosed in Figure 43 of the '516 Patent, which the specification incorrectly describes as an IκB sequence, is actually a partially out-of-frame, incomplete sequence of the chicken pp40 Rel-associated protein. (Wall Rep. 76) The Rel-associated protein pp40 is functionally related to mammalian IκB: it is the natural inhibitor of the rel-family of proteins in chicken cells, analogous to mammalian IκB.[42] Dr. Wall opines that the incorrect sequence in Figure 43 is material to the patentability of the asserted claims because the "correct IκB nucleotide sequence" is a "necessary prerequisite to possessing the claimed invention." I disagree.

---

[40] Kundu *et al.*, *Molecular Basis of Chemoprevention by Rerveratrol: NF-kappaB and AP-1 as Potential Targets*, Mutat. Res. 555:65-80 (2004).

[41] *Id.* at 74-75.

[42] N. Davis *et al.*, *Rel-Associated pp40: An Inhibitor of the Rel Family of Transcription Factors*, Science 253:1268-1271 (1991).

85.    First, the correct sequence of IκB is not required to practice any of the issued claims found in the '516 Patent. No issued claim relates to purified IκB, recombinant IκB, or the use of a vector encoding the gene for IκB. The complete sequence of IκB is not necessary to practice any of the asserted claims, or in fact, any issued claim of the '516 Patent. As explained in my first report, one of ordinary skill in the art could practice the claimed invention using decoy molecules or drugs, which do not interact with IκB and require only knowledge of an NF-κB recognition sequence to construct. Because the claims do not recite isolated IκB, and do not require the sequence of IκB to be fully enabled, the information provided by figure 43 is not material to the patentability of the issued claims.

86.    Second, one of ordinary skill in the art would be able to use a partially incorrect sequence to obtain the correct sequence for human or other mammalian IκB using routine techniques, without undue experimentation. Even today, it is not common practice to synthesize a gene from a nucleotide sequence disclosed in a patent or other publication. In the late 1980s, as today, a POSA would use the published sequence to create several DNA probes (a short fragment of DNA) to isolate and obtain the complete gene from a cDNA library.[43] Using probes based on correct portions of the sequence depicted in Figure 43 of the '516 Patent, one of skill in the art could create DNA probes to screen for cloned IκB in a mammalian cDNA library. Because IκB homologs are conserved across many species, a POSA would know that the

---

[43] Complementary DNA ("cDNA") is a type of synthetic DNA that is prepared from mRNA with the use of an enzyme called reverse transcriptase. Reverse transcriptase transcribes a single-stranded cDNA molecule from an mRNA template. Because it is transcribed from mRNA, the resulting cDNA includes only the protein encoding portions of the gene: it lacks introns and other untranscribed, regulatory sequences. A cDNA library is a collection of cDNA fragments prepared from the mRNA isolated from a eukaryotic cell or organism, which have been inserted into vectors and introduced into bacterial cells. Thus a cDNA library will contain bacteria containing each of the thousands of cloned DNA fragments. Using a radioactive or fluorescently labeled DNA probe, bacteria harboring the gene of interest can be identified and isolated, and the gene sequenced.

36

disclosed sequence could also be used to create probes for a number of mammalian cDNA
library, including a human library. Because pp40 is functionally and structurally homologous
to human IκB,[44] probes created from the sequence provided in Figure 43 could be used to clone,
sequence and express human IκB by routine methods.[45] To the extent that the examiner relied
on the disclosure of a functional IκB sequence in support of the patentability of the claims, the
disclosed sequence is sufficient. As such, that Figure 43 is the incorrect sequence of pp40 is not
material to patentability of any claim of the '516 Patent.

    **C.**    **The Deposition Testimony of Dr. Kadesch is Not Inconsistent With His Testimony and Report from ARIAD's Litigation Against Eli Lilly.**

    87.    I have read the relevant portions of Dr. Kadesch's trial testimony from the Lilly
matter,[46] and his allegedly recanting deposition testimony from the Roche matter,[47] which are
cited in Dr. Wall's report. I understand that Dr. Kadesch testified in the Lilly matter that certain
claims of the '516 Patent satisfied the written description and enablement requirements of 35
U.S.C. § 112. However, I disagree with Dr. Wall's conclusion that Dr. Kadesch recanted that
testimony during his deposition in the Roche matter. During that deposition, Dr. Kadesch was
asked whether the '516 Patent contained adequate written descriptive support for practicing the
claims in "all eukaryotic cells" and "all living cells."[48] Dr. Kadesch testified that he had not

---

    [44] N. Davis *et al., Rel-Associated pp40: An Inhibitor of the Rel Family of Transcription Factors,*
Science 253:1268-1271 (1991).

    [45] *See generally,* J. Sambrook, E.F. Fritsch & T. Maniatis, *Molecular Cloning: A Laboratory Manual* vol 2, chapter 8-10 (2d ed. 1989).

    [46] *ARIAD Pharmaceuticals, Inc. v. Eli Lilly & Co.,* Civil Action No. 02 CV 11280 (D. Mass),
Trial Tr. Day 13 at 113:20-114:12, 116:25-118:11.

    [47] *Amgen, Inc. v. F. Hoffmann-La Roche Ltd.,* Civil Action No. 05 CV 12237 (D. Mass) Dep. Tr.
of Thomas R. Kadesch, Ph.D. at 258:2-270:16.

    [48] *Id.* at 260:6-270:16.

considered that issue in the Lilly matter, and opined that the claims could not be described in all

living cells, or all eukaryotic cells, because yeast lack NF-κB.[49]

88.    As explained in my initial report, the claims of the '516 Patent, which require

"reducing NF-κB activity," are necessarily limited to cells that contain NF-κB.  Significantly, the

specification notes that NF-κB may not be found in all cell types.[50]  In the Lilly matter, the court

construed the phrase "a method for ... in cells" to "encompass methods wherein NF-κB is

modulated in cells, regardless of where they are found."[51]  I understand that the issue of

whether the claims could be described in cells that do not contain NF-κB was not raised in the

Lilly matter, and the claim construction order issued by the court did not specifically address

the scope of the claim limitation "in cells."  However, it is clear that for NF-κB to be

"modulated in cells," it must be constitutively present in those cells, in some form.  Indeed, the

specification of the '516 Patent teaches that NF-κB may not be present in all cells.[52]  Thus, the

claim construction order issued by the court, upon which Dr. Kadesch's report in the Lilly

matter was based, appropriately limited the scope of the claims to cells that contain NF-κB.

89.    Dr. Kadesch did not have occasion to consider the scope of the limitation "in

cells" prior to his deposition in the Roche matter, which had nothing to do with the '516 Patent.

The issue whether the claimed methods were described in "all cells" or "all eukaryotic cells"

did not arise in the Lilly litigation, and Dr. Kadesch did not opine on claim construction in that

---

[49] *Id.* at 268:21-270:16.

[50] '516 Patent at (2:26-31), (10:41-46), (12:36-41), (12:57-60).

[51] *ARIAD Pharmaceuticals, Inc. v. Eli Lilly & Co.*, Civil Action No. 02 CV 11280 (D. Mass),
Memorandum of Decision & Order on Claim Construction p. 3 (March 3, 2004).

[52] '516 patent at (2:26-31) (NF-κB. . . is, in fact, present and inducible in many, if not all, cell
types.").

case. His deposition testimony was predicated on an incorrect claim construction, which

Amgen has not yet formally advanced in this case. Were it to be advanced, it would be contrary

to the claim construction proffered here and adopted in the claim construction order issued in

the Lilly matter, in that it would fail to limit the scope of the claims to cells which contain NF–

$\kappa$B. Therefore, Dr. Kadesch's testimony that the claims of the '516 Patent were not adequately

described for all cells or all eukaryotic cells is consistent with his prior testimony that the claims

are adequately described and enabled in cells that contain NF–$\kappa$B.

## V.    CLAIM CONSTRUCTION

### A.    Amgen has Not Expressed an Opinion on Claim Construction.

90.    I have already submitted a detailed opinion on the proper construction of the

asserted claims of the '516 Patent. None of the reports submitted on Amgen's behalf contains

an opinion on claim construction. Dr. Greene merely referred to the claim construction

proposed by ARIAD in its litigation with Eli Lilly, a different matter involving different claims

of the '516 Patent. I reserve the right to supplement or defend my opinion on claim

construction should Amgen choose to rebut it.

### B.    The Claims Do Not Encompass the "NF–$\kappa$B Autoregulatory Loop."

91.    In his report, Dr. Greene opines that the asserted claims are invalid because they

read on the theoretical process by which NF–$\kappa$B mediates the expression of its natural inhibitor,

I$\kappa$B. Specifically, Dr. Greene argues that NF–$\kappa$B mediated expression of I$\kappa$B necessarily leads to

inhibition of activated NF–$\kappa$B, and therefore a reduction in NF–$\kappa$B activity. Therefore,

according to Dr. Greene, any prior art reference which teaches the induction of NF–$\kappa$B activity

inherently anticipates the asserted claims because the induction of NF–$\kappa$B necessarily leads to

the expression of I$\kappa$B, and the reduction of NF–$\kappa$B activity. For two reasons, I disagree with Dr.

Greene's opinion.

92.    First, Dr. Greene's anticipation argument fails as a matter of claim construction, because the asserted claims are directed towards methods of "reducing" induced NF–κB activity. The limitations "a method for reducing", and "a method for diminishing" require an affirmative, purposeful act directed towards causing a reduction of NF–κB activity. The claims do not encompass natural processes – if proven to exist – by which NF–κB activity may be reduced. This is supported by the fact that the specification of the '516 Patent teaches only artificial means of reducing induced NF–κB activity, requiring affirmatives steps to manipulate the level of gene expression mediated by active NF–κB, and by the deposition testimony of Dr. Maniatis.[53]

93.    Second, the "autoregulatory loop" is an incomplete and theoretical model that have been proposed to explain certain specific experimental results. The existence of the autoregulatory loop is an oversimplified hypothesis put forward to attempt to account for the behavior of model cellular systems. In his report, Dr. Greene cites only one article – his own 1993 publication – in support of the existence of a two-component autoregulatory loop involving NF–κB and IκB.[54] However, the autoregulatory loop model has been revised several times since it was first proposed, and it is now clear that Dr. Greene's two-component model greatly oversimplifies the relationship of NF–κB activity to the expression of genes mediated by NF–κB.

---

[53] Maniatis Dep. Tr. at 168:12-173:3.

[54] Greene Rep. at 14, citing Sun, *et al., NF–κB Controls Expression of Inhibitor IκBα: Evidence for an Inducible Autoregulatory Pathway,* Science 259:1912-1915 (1993).

_____          _____
Jeffrey V. Ravetch, M.D., Ph.D.                                Date

MATERIALS RELIED UPON

    **C.**    **US Patents, Patent Applications & Documents Related to Reexamination**

- D. Baltimore et al., "Nuclear Factors Associated With Transcriptional Regulation", U.S. Patent No. 6,410,516.

- U.S. Patent Application No. 07/162,680.

- U.S. Patent Application No. 07/341,436.

- U.S. Patent Application No. 07/791,898.

- U.S. Patent Application No. 07/318,901.

- U.S. Patent Application No. 08/418,266.

- Declaration of Dr. Inder Verma, filed November 9, 2006 in the Merged Proceeding of Ex Parte Reexamination Control Nos: 90/007,503 (filed April 4, 2005) and 90/007,828 (filed December 2, 2005).

- Dep. Tr. of Thomas Maniatis, Ph.D.

    **D.**    **Publications**

- Abraham *et al., Double-Blind Randomized Controlled Trial of Monoclonal Antibody to Human Tumour Necrosis Factor in Treatment of Septic Shock,* Lancet 351:929-933 (1998).

- Bensimon *et al., A MonoclonalAntibody Recognizing 68- to 75-Kilodalton Protein(s) Associated With The Human IL-1 Receptor,* J. Immunol., 142(7):2290-2298 (1989)

- Bielinska *et al., Regulation of Gene Expression with Double-Stranded Phosphorothioate Oligonucleotides,* Science 250: 997-1000 (1990).

- Brini *et al., Cyclosporin A inhibits induction of IL-2 receptor a chain expression by affecting activation of NF-?B-like factor(s) in cultured T lymphocytes,* Eur. Cytokine Net, 1(3):131-139 (1990)

- Chedid *et al.,Involvement of Cyclic AMP-Dependent Protein Kinases in the Signal Transduction Pathway for Interleukin-1,* Molecular and Cellular Biology, 10(7):3824-3827 (1990)

- Chen & Goeddel, *TNF-R1 Signaling: A Beautiful Pathway Pathway,* Science 296:1634-1635 (2002).

- Davis *et al., Rel-Associated pp40: An Inhibitor of the Rel Family of Transcription Factors,* Science 253:1268-1271 (1991).

- Doucas *et al.*, *Cytoplasmic Catalytic Subunit of Protein Kinase A Mediates Cross-Repression By NF-κB and the Glucocorticoid Receptor*, PNAS 97:11893-11898 (2000)

- Edbrooke *et al.*, *Identification of cis-Acting Sequences Responsible for Phorbol Ester Induction of Human Serum Amyloid A Gene Expression via a Nuclear Factor κB-Like Transcription Factor*, Molecular and Cellular Biology, 9(5):1908-1916 (1989)

- Gaynor *et al.*, *Cellular Transcription Factors Involved in the Regulation of HIV-1 Gene Expression*, AIDS, 6:347-63 (1992).

- Ghosh *et al.*, *Cloning of the p50 DNA Binding Subunit of NF-κB: Homology to rel and dorsal*, Cell 62(5):1019-29 (1990)

- Giri *et al.*, *Interleukin 1-Mediated Induction of kappa-Light Chain Synthesis and Surface Imunoglobulin Expression on Pre-B Cells*, J. Immun., 132:223-228 (1984)

- Haskill *et al.*, *Characterization of an Immediate-Early Gene Induced in Adherent Monocytes That Encodes I kappa B-like Activity*, Cell 65(7):1281-1289 (1991).

- J. Sambrook, E.F. Fritsch & T. Maniatis, *Molecular Cloning: A Laboratory Manual* vol 2, chapter 8-10 (2d ed. 1989).

- Kiani *et al.*, *Manipulating Immune Responses with Immunosuppressive Agents That Target NFAT*, Immunity, 12:359-372 (2000)

- Koizumi *et al.*, *Inhibitors of IL-2 Production and IL-2 Receptor Expression in Human Leukemic T-Cell Line, Jurkat*, Cell. Immun., 103:469-475 (1986)

- Kundu *et al.*, *Molecular Basis of Chemoprevention by Reveratrol: NF-kappaB and AP-1 as Potential Targets*, Mutat. Res. 555:65-80 (2004).

- Männel *et al.*, *Inhibition of Nonspecific Tumoricidal Activity by Activated Macrophages with Antiserum Against a Soluble Cytotoxic Factor*, Infection and Immunity, 33:156-164 (1981)

- Marmenout *et al.*, *Molecular cloning and expression of human tumor necrosis factor and comparison with mouse tumor necrosis factor*, Eur. J. Biochem., 152:515-522 (1985)

- Meichle et al., Protein Kinase Cindependent Activation of Nuclear Factor ?B by Tumor Necrosis Factor, J. Biol. Chem., 265:8339-8343 (1990)

- Nabel *et al.*, *Alternative Mechanisms for Activation of Human Immunodeficiency Virus Enhancer in T Cells*, Science 239:1299-1302 (1988).

- Naghavi et al., *Long Terminal Repeat Promoter/Enhancer Activity of Different Subtypes of HIV Type 1*, AIDS Res & Human Retroviruses 15(14):1293-1303 (1999).

- Osborn et al., *Tumor necrosis factor a and interleukin 1 stimulate the human immunodeficiency virus enhancer by activation of the nuclear factor κB*, PNAS USA, 86:2336-2340 (1989)

- Pachman et al., *The Effect of Salicylate on the Metabolism of Normal and Stimulated Human Lymphocytes in Vitro*, J. Clin. Investig., 50:226-230 (1971)

- Pereira et al., *A Compilation of Cellular Transcription Factor Interactions with the HIV-1 LTR Promoter*, Nucleic Acids Research, 28(3):663-668 (2000)

- Roederer et al., *Cytokine-stimulated human immunodeficiency virus replication is inhibited by N-acetyl-L-cysteine*, PNAS USA, 87:4884-4888 (1990)

- Rovira et al., *The Impact of Immunosuppressive Drugs on the Analysis of T-Cell Activation*, Current Med. Chem., 7:673-692 (2000)

- Saito et al., *Enhancement of neurite outgrowth in PC12h cells by a protease inhibitor*, Neuroscience Letters, 89:102-107 (1988)

- Shirakawa et al., *In Vitro Activation and Nuclear Translocation of NF-?B Catalyzed by Cyclic AMP-Dependent Protein Kinase and Protein Kinase C*, Molecular and Cellular Biology, 9:2424-2430 (1989)

- Sun, et al., *NF-κB Controls Expression of Inhibitor IκBa: Evidence for an Inducible Autoregulatory Pathway*, Science 259:1912-1915 (1993)

- Staal et al., *Intracellular thiols regulate activation of nuclear factor κB and transcription of human immunodeficiency virus*, PNAS USA, 87:9943-9947 (1990)

- Tong-Starksen et al., *Signaling Through T Lymphocyte Surface Proteins, TCR/CD3 And CD28 Activates the HIV-1 Long Terminal Repeat*, J. Immun., 142:702-707 (1989)

- Tracey et al., *Anti-cachectin/TNF monoclonal antibodies prevent septic shock during lethal bacteraemia*, Nature, 330:662-664 (1987)

- Withoff et al., *Regulating the Master Regulator NF-?B: From Natural Strategies to Rationally Designed Superdrugs*, in S. Ghosh, Handbook of Transcription Factor NF-κB, 195-221 (2007).

**E.    Documents Related to Other Litigation**

- *Amgen, Inc. v. F. Hoffmann-La Roche Ltd.*, Civil Action No. 05 CV 12237 (D. Mass.) Dep. Tr. of Thomas R. Kadesch, Ph.D. at 258:2-270:16.

- *ARIAD Pharmaceuticals, Inc. v. Eli Lilly & Co.,* Civil Action No. 02 CV 11280 (D. Mass.), Memorandum of Decision & Order on Claim Construction p. 3 (March 3, 2004).

- *ARIAD Pharmaceuticals, Inc. v. Eli Lilly & Co.,* Civil Action No. 02 CV 11280 (D. Mass.), Trial Tr. Day 13 at 113:20-114:12, 116:25-118:11.

# EXHIBIT 22

1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF DELAWARE

3    CIVIL ACTION NO. 06-259-(MPT)

4    -------------------------------------X
      AMGEN, INC., IMMUNEX CORPORATION,
5    AMGEN USA INC., AMGEN MANUFACTURING
      LIMITED, and IMMUNEX RHODE ISLAND
6    CORPORATION,
                          Plaintiffs,
7              -against-
      ARIAD PHARMACEUTICALS, INC., and
8    THE WHITEHEAD INSTITUTE FOR
      BIOMEDICAL RESEARCH, a Delaware
9    Corporation,
                          Defendants.
10    -------------------------------------X
      ARIAD PHARMACEUTICALS INC., THE
11    MASSACHUSETTS INSTITUTE OF TECHNOLOGY,
      THE PRESIDENT AND FELLOWS OF HARVARD
12    COLLEGE and THE WHITEHEAD INSTITUTE
      FOR BIOMEDICAL RESEARCH,
13                  Counterclaim Plaintiffs,
              -against-
14    AMGEN INC., IMMUNEX CORPORATION,
      AMGEN USA, INC., AMGEN MANUFACTURING
15    LIMITED, IMMUNEX RHODE ISLAND
      CORPORATION and WYETH,
16              . Counterclaim Defendants.
      -------------------------------------X

17

18              VIDEOTAPED DEPOSITION OF
19          AARON CIECHANOVER, M.D., D.Sc.
              Thursday, March 13, 2008
20              9:47 a.m. - 12:47 p.m.

21

22

23

24

25

1          Videotaped deposition of AARON

2    CIECHANOVER, M.D., D.Sc, taken by Defendants

3    and Counterclaim Plaintiffs, at the offices of

4    Cravath, Swaine & Moore, LLP, Worldwide Plaza,

5    825 Eighth Avenue, New York, New York, before

6    Ellen Marie Gumpel, a Certified Shorthand

7    Reporter, Registered Professional Reporter,

8    Certified Realtime Reporter and Notary Public

9    within and for the States of New York and

10   New Jersey.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

10:38:47  1    Q.    Approximately --

10:38:48  2    A.    -- but the --

10:38:49  3    Q.    I'm sorry.

10:38:50  4    A.    No, no; that's okay.

10:38:51  5    Q.    Approximately how many proteins

10:38:53  6    are known to be degraded through

10:38:56  7    ubiquitination?

10:38:57  8    A.    That's a tough one.  I mean,

10:38:59  9    that's truly a tough one.  I, I don't even

10:39:02  10   want to fall into trap of a guess.  I -- you

10:39:04  11   know, the whole human proteome without taking

10:39:07  12   splicing product into consideration, 20,000?

10:39:10  13   I don't know.  Several thousand, but don't --

10:39:10  14   I --

10:39:10  15   Q.    Was it in --

10:39:12  16   A.    I'm a scientist.  I never counted

10:39:15  17   papers.  You know, in order to say it, you

10:39:17  18   need to count papers, but then everyday a new

10:39:20  19   paper comes out.

10:39:21  20   Q.    Could you give an informed opinion

10:39:23  21   as an expert about the percentage of proteins

10:39:26  22   that when degraded are degraded through

10:39:29  23   ubiquitination?

10:39:29  24   A.    Again --

10:39:29  25         MR. DIAMOND:  Objection.

50

| | | |
|---|---|---|
| 10:39:29 | 1 | A.        -- it's the same -- |
| 10:39:31 | 2 | MR. DIAMOND:  Objection to form. |
| 10:39:31 | 3 | A.        -- it's the same very question. |
| 10:39:34 | 4 | I -- I wouldn't like to guess percentage |
| 10:39:36 | 5 | number.  I mean, if I have to say a number, |
| 10:39:39 | 6 | then percentage is, is just translation.  I |
| 10:39:41 | 7 | mean... |
| 10:39:42 | 8 | Q.        Do you agree that both would be |
| 10:39:44 | 9 | very high, both percent -- both in terms of |
| 10:39:46 | 10 | percentage and in terms of number? |
| 10:39:48 | 11 | MR. DIAMOND:  I -- |
| 10:39:49 | 12 | A.        I don't know.  I don't know.  I |
| 10:39:50 | 13 | really don't know.  Everyday a new paper is |
| 10:39:53 | 14 | brought into the -- into the -- into the |
| 10:39:55 | 15 | literature.  There are established cases of |
| 10:39:59 | 16 | numerous proteins.  I cannot appreciate how |
| 10:40:02 | 17 | many. |
| 10:40:02 | 18 | Q.        Okay. |
| 10:40:02 | 19 | A.        I really don't know. |
| 10:40:03 | 20 | Q.        Would you agree that there are |
| 10:40:05 | 21 | many -- many intra-cellular proteins are |
| 10:40:07 | 22 | degraded through ubiquitination? |
| 10:40:11 | 23 | A.        It depends on the definition of |
| 10:40:12 | 24 | many out of many.  I mean, I don't know if |
| 10:40:14 | 25 | 2000 out of 20,000 is many; or, if it's only |

51

| 10:40:17 | 1 | 10 percent.  I don't know.  I don't know.  I |
| 10:40:19 | 2 | didn't count the papers in the literature. |
| 10:40:21 | 3 | Q.      Putting aside lysosomal, are there |
| 10:40:25 | 4 | artificial methods of inhibiting |
| 10:40:29 | 5 | ubiquitin-mediated protein degradation? |
| 10:40:32 | 6 | MR. DIAMOND:  Objection; vague. |
| 10:40:34 | 7 | A.      Artificial methods? |
| 10:40:36 | 8 | Q.      Yes. |
| 10:40:36 | 9 | A.      Of inhibiting what, |
| 10:40:40 | 10 | ubiquitination, specific enzyme? |
| 10:40:41 | 11 | Q.      Or any path along the degradation |
| 10:40:44 | 12 | pathway. |
| 10:40:44 | 13 | A.      You may think of different ways. |
| 10:40:46 | 14 | I mean... |
| 10:40:48 | 15 | Q.      What are some? |
| 10:40:49 | 16 | A.      SIRNA of E1 will shutdown the |
| 10:40:56 | 17 | pathway. |
| 10:40:56 | 18 | Q.      SIRNA... |
| 10:40:59 | 19 | A.      Of E1. |
| 10:40:59 | 20 | Q.      Of E1; okay. |
| 10:41:00 | 21 | A.      If you stop E1 from being |
| 10:41:02 | 22 | expressed in the cell, there is no E1 anymore. |
| 10:41:06 | 23 | I assume that all ubiquitination will stop or |
| 10:41:08 | 24 | most of the ubiquitination would stop. |
| 10:41:10 | 25 | Q.      And what is the effect of that |

52

10:41:12  1  treatment on a cell's viability?

10:41:15  2      A.    Again, from the literature, the

10:41:17  3  number of E1 is not definite.  There was a

10:41:20  4  second E1 described recently, just recently,

10:41:23  5  so we don't know.  I know that there is a

10:41:26  6  paper saying the deletion of E1 yeast is

10:41:29  7  lethal, but yeast is a different guide.

10:41:32  8      Q.    Are you aware of any instance --

10:41:34  9      A.    But that's -- we are talking about

10:41:36  10  the top of the pyramid, so then we shut

10:41:39  11  everything down.  All the substrates that, you

10:41:43  12  know, that we tried to guess how many, we shut

10:41:46  13  them down.  I assume that the lower you go

10:41:49  14  depends on the process.

10:41:50  15      Q.    Well, are you aware of any

10:41:53  16  artificial methods of inhibiting

10:41:57  17  ubiquitin-mediated protein degradation that do

10:42:00  18  not -- that are not lethal?

10:42:02  19          MR. DIAMOND:  Objection; vague.

10:42:06  20      A.    I think that there is -- you know,

10:42:08  21  again, the word -- the word "inhibition" is

10:42:13  22  very relative.  I mean, you can ablate the

10:42:16  23  system.  You can ablate the process.  You can

10:42:19  24  inhibit it partially, 10 percent, 20 percent,

10:42:23  25  50 percent and the effects will be completely

53

| | | |
|---|---|---|
| 10:42:25 | 1 | different and you are fully aware of it. |
| 10:42:27 | 2 | Q.    Well, let's assume we do complete |
| 10:42:29 | 3 | ablation. |
| 10:42:30 | 4 | A.    Of what? |
| 10:42:31 | 5 | Q.    Of ubiquitin-mediated protein |
| 10:42:34 | 6 | degradation. |
| 10:42:34 | 7 | A.    The whole process? |
| 10:42:35 | 8 | Q.    Yes, the whole process. |
| 10:42:37 | 9 | A.    I would assume it would be lethal. |
| 10:42:40 | 10 | If you knock down all the ubiquination in the |
| 10:42:41 | 11 | cell, protease of all substrates -- |
| 10:42:41 | 12 | Q.    Yes. |
| 10:42:41 | 13 | A.    -- 100 percent, nothing, not a |
| 10:42:44 | 14 | single ubiquitin molecule is conjugated to a |
| 10:42:48 | 15 | single protein, that may be lethal -- that |
| 10:42:51 | 16 | will be lethal.  Not may be lethal, will be |
| 10:42:54 | 17 | lethal. |
| 10:42:54 | 18 | Q.    Yes. |
| 10:42:54 | 19 | And that's because many proteins |
| 10:42:57 | 20 | are degraded -- |
| 10:42:57 | 21 | A.    Degraded. |
| 10:42:58 | 22 | Q.    -- through ubiquitination? |
| 10:42:58 | 23 | Let me just finish the question. |
| 10:42:58 | 24 | That's because many proteins are |
| 10:42:59 | 25 | degraded through ubiquitination. |

54

| | | |
|---|---|---|
| 10:42:59 | 1 | A.    This is because -- and I don't |
| 10:43:01 | 2 | know what "many" is and so don't catch me.  I |
| 10:43:04 | 3 | don't know if 2000 is many or little that |
| 10:43:06 | 4 | because some critical proteins may not be |
| 10:43:09 | 5 | degraded or some proteins will be accumulated |
| 10:43:12 | 6 | that should be degraded like -- I mean, the |
| 10:43:18 | 7 | mechanism.  Therefore, the question is awfully |
| 10:43:20 | 8 | nonspecific, but... |
| 10:43:22 | 9 | Q.    Okay. |
| 10:43:23 | 10 | Now, could you turn to Deposition |
| 10:43:24 | 11 | Exhibit 1, which is the '516 patent? |
| 10:43:28 | 12 | A.    The '516 patent? |
| 10:43:31 | 13 | Q.    Yes. |
| 10:43:32 | 14 | So I take it you've reviewed this |
| 10:43:35 | 15 | patent before today? |
| 10:43:36 | 16 | A.    Yeah. |
| 10:43:37 | 17 | Q.    You commented on it in your |
| 10:43:43 | 18 | report. |
| 10:43:43 | 19 | A.    (No audible response.) |
| 10:43:45 | 20 | Q.    Yes? |
| 10:43:46 | 21 | A.    Yes, I did in the assumption |
| 10:43:48 | 22 | section. |
| 10:43:49 | 23 | Q.    Yes. |
| 10:43:49 | 24 | And one of the subjects -- if you |
| 10:43:52 | 25 | could turn with me to page 2 of your report -- |

55

| | | | |
|---|---|---|---|
| 10:43:55 | 1 | A. | Which page, page 2? |
| 10:43:55 | 2 | Q. | Yes; page 2. |
| 10:43:57 | 3 | A. | The second page. |
| 10:43:58 | 4 | | MR. DIAMOND:  Of your report. |
| 10:44:00 | 5 | A. | Of my report.  Sorry. |
| 10:44:02 | 6 | | Yes. |
| 10:44:03 | 7 | Q. | And if you can direct your |

10:44:09    8  attention to the first paragraph, maybe four

10:44:11    9  lines up from the top, one of the questions

10:44:15   10  you were asked to address was "whether anyone

10:44:20   11  could have recognized in 1991" --

10:44:23   12     A.    Excuse me.

10:44:23   13           Page 2 of my report or page 2 of

10:44:26   14  the...

10:44:27   15     Q.    Of your report.  It says page --

10:44:28   16  it says, 2 at the bottom.

10:44:29   17     A.    Yeah.  Introduction, under

10:44:30   18  introduction, fourth line.

10:44:30   19     Q.    Yeah.

10:44:30   20     A.    The fourth line, "I have been

10:44:32   21  retained..."; that's the fourth line.

10:44:32   22     Q.    No, no, not, not -- the fourth

10:44:34   23  line.  I'm sorry.

10:44:35   24     A.    I counted four from the top.

10:44:37   25     Q.    One, two, three, four, five,

| 10:44:40 | 1 | sixth, seven, eight, nine, ten, eleven, eleven |
| 10:44:45 | 2 | lines down. |
| 10:44:46 | 3 | A.    Yeah.  Eleven lines.  One, two, |
| 10:44:38 | 4 | three, four, five, sixth, seven, eight, nine, |
| 10:44:43 | 5 | ten, eleven. |
| 10:44:43 | 6 | Q.    Yeah. |
| 10:44:49 | 7 | A.    And "whether anyone could |
| 10:44:51 | 8 | have..."; that's what you're reading? |
| 10:44:52 | 9 | Q.    Yeah. |
| 10:44:53 | 10 | Let me just read it so the record |
| 10:44:54 | 11 | is clear. |
| 10:44:54 | 12 | A.    Yes. |
| 10:44:55 | 13 | Q.    You were asked to address among |
| 10:44:58 | 14 | other things "whether anyone could have |
| 10:45:00 | 15 | recognized in 1991, based on the disclosure of |
| 10:45:04 | 16 | the '516, that the patent applicants had |
| 10:45:06 | 17 | invented methods of 'reducing NF-kB activity' |
| 10:45:12 | 18 | involving 'inhibiting modification of an IkB |
| 10:45:16 | 19 | protein,' 'inhibiting degradation of an IkB |
| 10:45:16 | 20 | protein,' or 'inhibiting dissociation of |
| 10:45:31 | 21 | NF-kB:IkB complexes.'" |
| 10:45:31 | 22 | Did I read that correctly? |
| 10:45:33 | 23 | A.    You did read it correctly. |
| 10:45:35 | 24 | Q.    I did, yes. |
| 10:45:38 | 25 | And that is one of the subjects |

57

10:51:27  1      A.      I assume so, yes.

10:51:28  2      Q.      Yeah.

10:51:28  3              And, in fact, there is more than

10:51:30  4      one?

10:51:30  5      A.      Yeah.  I assume so, too.

10:51:32  6      Q.      Yeah.

10:51:32  7              And I take it then that you have

10:51:33  8      not expressed, so far as I can tell in your

10:51:37  9      report, any express -- any opinion on a claim

10:51:38  10     that lacks an IkB inhibition phrase in it.

10:52:09  11     A.      Well, again, I am caught here with

10:52:11  12     semantics because, you know, under your

10:52:13  13     general thing, inhibiting dissociation of

10:52:13  14     NF-kB:IkB, the word NF-kB does show.  And the

10:52:18  15     word NF-kB also has a context, so I didn't...

10:52:24  16     Q.      I am not asking for semantics,

10:52:26  17     honestly.  I am just asking for what the words

10:52:28  18     on the page say.

10:52:29  19              Let's take, for example, Claim 6.

10:52:32  20     Claim 6.

10:52:32  21              Could you look at Claim 6 with me?

10:52:35  22     A.      Yes.

10:52:44  23     Q.      Do you agree that that does not,

10:52:46  24     just in plain words, no semantics, that that

10:52:50  25     claim does not have any IkB inhibition phrase

64

10:52:53    1    within it?

10:52:54    2        A.    It doesn't have the words IkB in

10:52:57    3    it.

10:52:58    4        Q.    Right.

10:53:01    5              Or any of the phrases that fall

10:53:04    6    under the umbrella of an IkB inhibition

10:53:08    7    phrase.

10:53:08    8        A.    These three ones, yes.

10:53:09    9        Q.    And you agree that you haven't

10:53:11    10    expressed any opinion on claims like claim 6

10:53:14    11    that lack an IkB inhibition phrase?

10:53:32    12        A.    I don't know how to relate to it,

10:53:33    13    but if we go to page 22, you know, you are,

10:53:36    14    you are reading this paragraph.  If we go up,

10:53:38    15    up to page 32 -- 22 up to the second

10:53:41    16    paragraph, and it says, "I have already

10:53:43    17    demonstrated through my summary" -- and again,

10:53:45    18    we are reading only the summary and the

10:53:48    19    assumptions.  We need to go back to the body

10:53:50    20    of the text, which is much more detailed.  I

10:53:53    21    said that "no one had yet established either

10:53:55    22    (1) the essential involvement of the

10:53:56    23    ubiquitin-proteasome system in processing the

10:53:57    24    inactive NF-kB precursors"; so this goes

10:54:03    25    beyond IkB.  And I said, No one with intellect

10:54:06    1    involved.

10:54:09    2              So I related, at least, verbally;

10:54:11    3    again, I don't remember the numbers of claims

10:54:12    4    to the involvement of the ubiquitin system in

10:54:15    5    more than IkB alone.

10:54:17    6         Q.    You were careful in the next to

10:54:24    7    last paragraph of page 22 to specify the types

10:54:29    8    of methods that the disclosure within the '516

10:54:38    9    patent would not have led anyone to recognize

10:54:41    10   that the applicants had invented, correct?

10:54:43    11        A.    Yeah, but then we can read the

10:54:45    12   upper top, which is on the same very page and

10:54:47    13   it says, It's a little bit broader than

10:54:50    14   related to one of the claims.  And it says, No

10:54:52    15   one had yet established either one.  And the

10:54:55    16   one specifies essentially involvement of

10:54:58    17   ubiquitin.

10:55:03    18             And again, we are called to the

10:55:05    19   assumptions and opinions here.  If we go to

10:55:08    20   the body of the text, we can -- we can broaden

10:55:10    21   it even further.

10:55:11    22        Q.    Do you agree that your report does

10:55:13    23   not discuss the language of claim 6?

10:55:16    24        A.    I agree that...

10:55:18    25        Q.    That your report does not discuss

| | | |
|---|---|---|
| 10:55:20 | 1 | the language of claim 6 from what I was just |
| 10:55:35 | 2 | reading? |
| 10:55:48 | 3 | A.    Claim 6 is very vague. |
| 10:55:51 | 4 | Q.    That's not my question. |
| 10:55:52 | 5 | My question is:  Does your report |
| 10:55:54 | 6 | contain any opinion concerning the language of |
| 10:55:54 | 7 | claim 6? |
| 10:55:59 | 8 | Clearly, it does concerning 33, |
| 10:56:00 | 9 | 34, 35.  And we see it right there.  We see |
| 10:56:03 | 10 | the language. |
| 10:56:04 | 11 | MR. DIAMOND:  Objection; vague. |
| 10:56:05 | 12 | It calls for a legal conclusion. |
| 10:56:07 | 13 | MR. GREENWALD:  No.  It calls for |
| 10:56:08 | 14 | him to describe his report. |
| 10:56:09 | 15 | A.    I cannot say for certainty.  I, I |
| 10:56:11 | 16 | cannot say for certainty. |
| 10:56:11 | 17 | Q.    Okay. |
| 10:56:12 | 18 | Will you accept my repre... |
| 10:56:15 | 19 | What about claim 18; could you |
| 10:56:18 | 20 | turn to claim 18? |
| 10:56:34 | 21 | Are you with me? |
| 10:56:36 | 22 | A.    I am with you.  Yes. |
| 10:56:37 | 23 | Q.    Does claim 18 contain an IkB |
| 10:56:42 | 24 | inhibition phrase, as we've defined it? |
| 10:56:49 | 25 | A.    It contains a statement reducing |

67

| | | |
|---|---|---|
| 10:56:52 | 1 | NF-kB, as stated here; that's what I see here. |
| 10:56:56 | 2 | Q.    Dr. Ciechanover, when we defined |
| 10:57:01 | 3 | for purposes of discussion what an IkB |
| 10:57:02 | 4 | inhibition phrase was, we did not include the |
| 10:57:05 | 5 | phrase reducing NF-kB activity, right? |
| 10:57:07 | 6 | A.    It was an agreement between the |
| 10:57:09 | 7 | two of us, that, that -- that the three |
| 10:57:11 | 8 | statements will be defined as an x -- |
| 10:57:11 | 9 | Q.    Yes. |
| 10:57:13 | 10 | A.    -- but you didn't say that that |
| 10:57:14 | 11 | includes all my opinions. |
| 10:57:16 | 12 | Q.    But my question is really very |
| 10:57:18 | 13 | straightforward.  It's, it's -- it is simply, |
| 10:57:21 | 14 | does that claim -- does the language of that |
| 10:57:23 | 15 | claim contain either the phrase -- |
| 10:57:26 | 16 | A.    The wording doesn't contain the |
| 10:57:29 | 17 | words. |
| 10:57:29 | 18 | Q.    Right; that's all I'm asking. |
| 10:57:38 | 19 | And in your report, did you |
| 10:57:40 | 20 | express any opinion concerning whether the |
| 10:57:43 | 21 | disclosure in the -- within the '516 patent |
| 10:57:49 | 22 | would have led anyone to recognize at the time |
| 10:57:51 | 23 | that the applicants had invented the method |
| 10:57:54 | 24 | claimed in 18? |
| 10:57:59 | 25 | A.    You're asking me again -- what |

68

10:58:01    1    you're asking me?

10:58:02    2        Q.    In your report, do you express any

10:58:04    3    opinion that the disclosure in -- concerning

10:58:06    4    whether the disclosure within the '516 patent

10:58:11    5    would have led anyone to recognize as of

10:58:14    6    November 13th --

10:58:15    7        A.    Would not have led --

10:58:15    8        Q.    Right.

10:58:16    9        A.    -- that's what I said.

10:58:18    10        Q.    Okay.

10:58:19    11        A.    That would not have read.

10:58:19    12        Q.    Right.

10:58:19    13        A.    That's my writing.

10:58:20    14        Q.    I was -- do you express any

10:58:24    15    opinion -- let me rephrase.

10:58:25    16            Do you express any opinion within

10:58:28    17    your report that the disclosure within the

10:58:31    18    '516 patent would not have led anyone to

10:58:33    19    recognize at that time that the applicants had

10:58:34    20    invented any method claimed in claim 18?

10:58:39    21            MR. DIAMOND:  Objection; vague.

10:58:42    22        A.    I cannot say.  I just cannot say.

10:58:44    23        Q.    Well, again --

10:58:46    24        A.    What I said a minute ago is that

10:58:48    25    there are no words, synonymous words between

69

| | | |
|---|---|---|
| 10:58:51 | 1 | this claim and this claim, but that's all that |
| 10:58:53 | 2 | I said. |
| 10:58:59 | 3 | Q.    Let me direct your attention to |
| 10:59:14 | 4 | column 37, line 50 where the specification |
| 10:59:28 | 5 | reads -- I am going to read just the paragraph |
| 10:59:34 | 6 | there.  It's very short. |
| 10:59:36 | 7 | "Alternatively, negative |
| 10:59:39 | 8 | regulation can be effected using 'decoy' |
| 10:59:43 | 9 | molecules, which are designed to mimic a |
| 10:59:48 | 10 | region of the gene whose expression would |
| 10:59:49 | 11 | normally be induced by NF-kB.  In this case, |
| 10:59:52 | 12 | NF-kB would bind the decoy and, thus, not be |
| 10:59:57 | 13 | available to bind its natural target." |
| 11:00:00 | 14 | Do you see that? |
| 11:00:01 | 15 | A.    (No audible response.) |
| 11:00:02 | 16 | Q.    Do you understand what -- oh, you |
| 11:00:04 | 17 | have to answer audibly. |
| 11:00:05 | 18 | A.    Yes, I did see it. |
| 11:00:07 | 19 | Q.    Sure. |
| 11:00:07 | 20 | And do you understand what the |
| 11:00:09 | 21 | applicants are saying there? |
| 11:00:10 | 22 | A.    Yes, I do understand what the |
| 11:00:12 | 23 | applicants are saying there. |
| 11:00:14 | 24 | Q.    Sure. |
| 11:00:14 | 25 | Do you agree with me that the use |

70

11:00:16   1   of decoy molecules, as the applicants are

11:00:19   2   using that term, does not interfere with

11:00:22   3   ubiquitination?

11:00:23   4        A.    No, I don't understand it.  I do

11:00:25   5   understand exact wording that you have read

11:00:27   6   now.

11:00:28   7        Q.    Right.

11:00:29   8              And I --

11:00:30   9        A.    That's the only thing that I do

11:00:32   10  understand.

11:00:32   11       Q.    So you don't have an opinion one

11:00:34   12  way or another whether using decoy molecules

11:00:38   13  would interfere with ubiquitination?

11:00:40   14       A.    No, it's -- no, I -- you ask me

11:00:42   15  whether I understand what's written here.  I

11:00:44   16  understand that's what is written here, that

11:00:46   17  if you are expressing a competing sequence in

11:00:50   18  the cell, NF-kB or whatever will bind to it

11:00:53   19  and will not bind to its normal target.

11:00:57   20       Q.    All right.

11:00:57   21             But surely you understand what a

11:00:58   22  decoy molecule is in this context?

11:01:00   23       A.    I am not sure that I understand

11:01:02   24  what a decoy molecule is.

11:01:03   25       Q.    Oh, you're not.

71

11:01:04    1              Well, let's assume for a moment

11:01:05    2     that it's a nucleic acid?

11:01:08    3         A.     It's a short sequence; that's what

11:01:08    4     you said.

11:01:08    5         Q.     Right, right.

11:01:08    6         A.     "Alternatively, negative

11:01:08    7     regulation can be effect using 'decoy'

11:01:09    8     molecules, which are designed to mimic a

11:01:11    9     region of a gene..."

11:01:13    10             Mimic a region of a gene, it's a

11:01:16    11    small sequence.

11:01:17    12        Q.     Right.

11:01:17    13             And do you have any reason to

11:01:19    14    think, based on your entire scientific career,

11:01:22    15    that use of -- that application of a decoy

11:01:24    16    molecule to a cellular system would in any way

11:01:27    17    interfere with ubiquitination?

11:01:33    18        A.     Within ubiquitin system, I know

11:01:36    19    how -- you know, they -- again, we don't use

11:01:37    20    the word "decoy" so it's a matter of

11:01:41    21    semantics.  I don't know what it is.  I can

11:01:43    22    express in the cell something of the ubiquitin

11:01:45    23    system which will interfere with the ubiquitin

11:01:48    24    system.

11:01:49    25        Q.     Well, we don't need to use

72

11:02:39  1  understand what it says here, it says here, if

11:02:42  2  you would be able to successfully express in

11:02:44  3  the nucleus a small nucleotide in the size

11:02:50  4  that shows maybe you are able to -- I don't

11:02:50  5  know -- in large enough amount that -- and you

11:02:54  6  have to also to show that it can bind to it,

11:02:56  7  that the factor that you're talking will bind

11:02:59  8  to it, it will shift the binding from where it

11:03:02  9  should be into this small molecule; that's all

11:03:05  10  what I understand from the sentence.

11:03:06  11      Q.    Do you have any opinion whether

11:03:09  12  the use of an oligonucleotide such as

11:03:15  13  described in the patent would inhibit in any

11:03:18  14  way the activity of -- or the function of

11:03:21  15  ubiquitin?

11:03:22  16          MR. DIAMOND:  Objection; vague.

11:03:25  17      A.    I don't know.  I really don't know

11:03:28  18  because if, indeed, the whole experimental

11:03:32  19  set-up will work, then you may ask me whether

11:03:39  20  some effect upstream will effect ubiquitin

11:03:42  21  system, the ubiquitination.  This occurs much

11:03:46  22  downstream to the ubiquitination point; that's

11:03:48  23  the endpoint of where NF-kB bind.

11:03:51  24      Q.    Sir, you're an expert in the field

11:03:54  25  of ubiquitin research?

74

11:03:55    1    A.    I -- I think so.

11:03:56    2    Q.    I think so, too.

11:03:59    3          And are you aware of any

11:04:01    4    scientific literature that would suggest

11:04:05    5    application of an oligonucleotide could affect

11:04:09    6    the function of ubiquitin?

11:04:17    7    A.    Again, one, I am not aware that

11:04:19    8    people use this method.  I have not delved

11:04:22    9    enough into the literature to know that people

11:04:24    10   indeed applied this method of expression of an

11:04:29    11   mitogen in the cell in order to believe that

11:04:31    12   it will lead to binding of NF-kB instead of

11:04:36    13   binding to the next one.

11:04:37    14   Q.    As you sit here today, do you have

11:04:39    15   any basis for an informed scientific intuition

11:04:39    16   that use of a decoy molecule would interfere

11:04:46    17   with ubiquitination?

11:04:46    18         MR. DIAMOND:  Objection; vague.

11:04:48    19   A.    At what stage; at what way of the

11:04:51    20   ubiquitin pathway related to NF-kB, not

11:04:53    21   related to NF-kb; what is decoy?

11:04:54    22         I mean...

11:04:56    23   Q.    Okay.

11:04:56    24         Let's go on then.

11:04:58    25         To prepare a decoy molecule,

75

11:05:01    1    you'll agree one would not need to know about

11:05:04    2    the process of ubiquitination?

11:05:06    3        A.    Ubiquitin molecule against what?

11:05:09    4        Q.    As described in the patent.

11:05:10    5        A.    To prepare a decoy molecule that

11:05:13    6    will inhibit binding of NF -- of ready-to-go

11:05:19    7    NF-kB, as in you have it already, you assume

11:05:21    8    that you have it, then you don't need to know

11:05:23    9    about ubiquitination; that is true.

11:05:26    10        Q.    And do you --

11:05:27    11        A.    Provided that you have it at hand.

11:05:29    12        Q.    Have, have what?

11:05:30    13        A.    NF-kB at hand.

11:05:31    14        Q.    I am not -- I am not following

11:05:35    15    what you're saying.

11:05:38    16        A.    The statement -- the wording says

11:05:40    17    that this small oligonucleotide will compete

11:05:43    18    with NF-kB on the binding of NF-kB --

11:05:45    19        Q.    Right.

11:05:46    20        A.    -- to a sequence that is in some

11:05:48    21    gene.

11:05:49    22        Q.    Right.

11:05:50    23        A.    In order for NF-kB to compete,

11:05:53    24    NF-kB must exist otherwise --

11:05:53    25        Q.    Okay.

76

| | | |
|---|---|---|
| 11:05:58 | 1 | A.      -- it cannot compete. |
| 11:05:59 | 2 | Q.      Okay. |
| 11:05:59 | 3 | A.      So provided that you have active |
| 11:06:02 | 4 | NF-kB, you have the heterodimer that can bind |
| 11:06:04 | 5 | to the DNA in your hands, then it is true. |
| 11:06:08 | 6 | Q.      That to prepare such a decoy |
| 11:06:11 | 7 | molecule would not require one to know of the |
| 11:06:13 | 8 | existence or function -- |
| 11:06:14 | 9 | A.      Indeed to prepare -- |
| 11:06:15 | 10 | Q.      Let me finish the question. |
| 11:06:17 | 11 | To prepare the decoy molecule |
| 11:06:19 | 12 | would not require knowledge of the existence |
| 11:06:21 | 13 | or function of ubiquitin? |
| 11:06:23 | 14 | A.      To prepare the decoy molecule |
| 11:06:26 | 15 | itself to synthesize the oligonucleotide, no. |
| 11:06:29 | 16 | Q.      And to use the decoy molecule in |
| 11:06:31 | 17 | the way described in the patent would not |
| 11:06:33 | 18 | require prior knowledge of ubiquitin? |
| 11:06:34 | 19 | A.      Theoretically, no; though, again, |
| 11:06:37 | 20 | I don't really know that people did use it. |
| 11:06:37 | 21 | Q.      All right. |
| 11:06:39 | 22 | A.      Yes.  This is correct. |
| 11:06:41 | 23 | MR. GREENWALD:  All right. |
| 11:06:42 | 24 | I understand the tape needs to be |
| 11:06:46 | 25 | changed so now would be a good time for a very |

77

11:06:49    1    short five-minute break.

11:06:51    2            VIDEO TECHNICIAN:  One moment,

11:06:51    3    please, and watch your microphones.

11:06:51    4            Here now marks the end of Tape 1

11:06:53    5    of the deposition of Dr. Aaron Ciechanover.

11:06:55    6    The time is 11:07 a.m.  We are now off the

11:07:01    7    record.

11:12:30    8            (Recess: 11:07 a.m. to 11:12 a.m.)

11:12:34    9            VIDEO TECHNICIAN:  Here now marks

11:12:41    10   the beginning of Tape 2 of the deposition of

11:12:43    11   Dr. Aaron Ciechanover.  The time is 11:12 a.m.

11:12:47    12           We're now back on the record.

11:12:48    13       Q.     Now, please turn with me to column

11:12:51    14   38 of the patent, line 6.  Where it reads,

11:13:01    15   "Negative regulation can also be effected by

11:13:04    16   the introduction of 'dominantly interfering'

11:13:09    17   molecules (see e.g. Friedman et al., Nature,

11:13:10    18   335:452-454 (1988).  For example, if the DNA

11:13:28    19   binding domain and the DNA polymerase" --

11:13:36    20   p-o-l-y-m-e-r-a-s-e -- "activating domain of

11:13:38    21   NF-kB are spatially distinct in the molecule,

11:13:43    22   a truncated from of the NF-kB molecule can be

11:13:44    23   synthesized using well known techniques."

11:13:47    24           Now, do you understand what the

11:13:53    25   applicants are stating there?

78

| 11:13:54 | 1 | A.    Yes, I do. |
| 11:13:55 | 2 | Q.    Okay. |
| 11:13:56 | 3 | Do you agree that the use of |
| 11:13:58 | 4 | dominantly interfering molecules, as the |
| 11:14:03 | 5 | applicants are using that term, does not |
| 11:14:05 | 6 | interfere with the process of ubiquitination? |
| 11:14:10 | 7 | A.    Again, if they will synthesize the |
| 11:14:17 | 8 | molecule, let's just define, that will only |
| 11:14:21 | 9 | bind to the DNA for this specific sequence and |
| 11:14:24 | 10 | will not activate it because it collects the |
| 11:14:30 | 11 | activation domain, then indeed the molecule |
| 11:14:33 | 12 | will get to where it gets and everything will |
| 11:14:36 | 13 | be there with the assumption that that's what |
| 11:14:39 | 14 | will happen.  It may -- it may not interfere |
| 11:14:45 | 15 | with ubiquitination. |
| 11:14:49 | 16 | Yes, I do agree. |
| 11:14:50 | 17 | Q.    And do you agree that -- |
| 11:14:55 | 18 | A.    But again this molecule has to be |
| 11:14:57 | 19 | synthesized properly, get to where it gets and |
| 11:15:00 | 20 | acts as it should act.  I'm not aware that it |
| 11:15:03 | 21 | has ever been done, but that's... |
| 11:15:04 | 22 | Q.    Okay. |
| 11:15:05 | 23 | But assuming it were done -- |
| 11:15:07 | 24 | A.    Theoretically, you have to design |
| 11:15:09 | 25 | an experiment, that -- you have to have the |

79

11:15:11    1    DNA in the lab that expresses only the

11:15:13    2    truncated form.  It doesn't need the ubiquitin

11:15:16    3    system on the way it goes to where it goes, it

11:15:19    4    has the nuclear localization sequence and so

11:15:22    5    on and so forth.  And, and, I'm not sure,

11:15:25    6    again, it's experiment dependent.  And it will

11:15:29    7    bind, also, its partner because I don't know

11:15:31    8    that by itself it can bind to the partner and

11:15:34    9    therefore bind to the DNA.  So it's all

11:15:37    10    theoretical.  I mean NF-kB needs to be -- it's

11:15:41    11    a heterodimer so I don't know if you take --

11:15:44    12    what do you mean, by synthesizing the DNA

11:15:44    13    binding domain and the DNA polymerase

11:15:47    14    activating domain of NF-kB; of which part of

11:15:49    15    NF-kB; is the other part not present; is the

11:15:53    16    other part there not present?

11:15:54    17        I mean, there are many

11:15:56    18    assumptions.  This is not a simple experiment.

11:15:58    19    This is the -- the wording -- I mean, I don't

11:16:01    20    know how to do such an experiment offhand.

11:16:03    21        Q.    But do you agree that the purpose

11:16:12    22    of a dominantly interfering molecule, as

11:16:16    23    described here, is to bind to DNA, but not

11:16:21    24    bind to RNA polymerase?

11:16:27    25        A.    What I agree here is that the idea

80

| | | |
|---|---|---|
| 11:16:29 | 1 | that is described here -- it's only an idea. |
| 11:16:33 | 2 | It's very much theoretical in my opinion. |
| 11:16:35 | 3 | That the idea that is described here is an |
| 11:16:39 | 4 | idea that will lead to a molecule that will |
| 11:16:46 | 5 | bind, but not activate. |
| 11:16:47 | 6 | Q.      Right. |
| 11:16:49 | 7 | A.      Yeah. |
| 11:16:49 | 8 | Q.      And that idea does not rely upon |
| 11:16:52 | 9 | in any way knowledge of the -- |
| 11:16:55 | 10 | A.      With the assumption -- |
| 11:16:56 | 11 | Q.      Let me finish.  Let me finish. |
| 11:16:59 | 12 | -- knowledge of the |
| 11:17:01 | 13 | ubiquitin-mediated pathway for protein |
| 11:17:03 | 14 | degradation? |
| 11:17:04 | 15 | A.      Only, only if you are synthesizing |
| 11:17:07 | 16 | the right molecule that is already beyond the |
| 11:17:10 | 17 | ubiquitin system.  Because if, for example, |
| 11:17:12 | 18 | you would synthesize p105 and that has a |
| 11:17:19 | 19 | mutation in the binding domain, it will depend |
| 11:17:22 | 20 | on the process of ubiquitination. |
| 11:17:22 | 21 | Q.      Okay. |
| 11:17:24 | 22 | A.      Only if you synthesize the right |
| 11:17:26 | 23 | portion of the molecule ready to go, ready to |
| 11:17:30 | 24 | associate with its partner, ready to bind. |
| 11:17:32 | 25 | And the only thing that it won't do, it will |

81

11:17:34   1   not activate.  We have to be very specific.

11:17:36   2       Q.    Do you agree that no claim of the

11:17:40   3   '516 patent refers to ubiquitin?

11:17:42   4       A.    The word "ubiquitin" is not

11:17:43   5   mentioned all along '516, as far as I'm

11:17:48   6   concerned, yes.

11:17:48   7       Q.    Nor does that word appear anywhere

11:17:51   8   within the specification of the patent?

11:17:52   9       A.    To the best of my memory, you are

11:17:55   10  right, correct.

11:17:55   11      Q.    And no claim of the patent refers

11:17:59   12  to proteasomes?

11:18:01   13      A.    To best of my memory, you are

11:18:03   14  correct.

11:18:04   15      Q.    And no part of the specification

11:18:05   16  refers to proteasomes?

11:18:07   17      A.    To the best of my memory, you are

11:18:09   18  correct.

11:18:09   19      Q.    Let's turn now to what I've marked

11:18:12   20  as Exhibit 597.

11:18:13   21      A.    Exhibit which?

11:18:17   22      Q.    I'll give it to you.

           23              (Deposition Exhibit 597

           24  for identification, article published in the

           25  Neuroscience Letters, 89 (1988) entitled,

                                                           82

| 11:25:01 | 1 | would have had the actual effect of |
| 11:25:03 | 2 | necessarily and inevitably inhibiting, via the |
| 11:25:10 | 3 | proteasome, at least some of the induction of |
| 11:25:12 | 4 | NF-kB that would otherwise normally have |
| 11:25:16 | 5 | resulted from the treatment with Neurite |
| 11:25:18 | 6 | Growth Factor and therefore led to a reduction |
| 11:25:20 | 7 | of NF-kB activity, correct? |
| 11:25:24 | 8 | A.    Yes. |
| 11:25:24 | 9 | Q.    Okay. |
| 11:25:25 | 10 | So which experimental protocol in |
| 11:25:28 | 11 | the Saito article were you specifically |
| 11:25:31 | 12 | referring to there? |
| 11:25:32 | 13 | A.    The experimental protocol is |
| 11:25:35 | 14 | taking two dishes -- again, it's a theoretical |
| 11:25:38 | 15 | experiment because it hasn't been done by |
| 11:25:40 | 16 | Saito because he didn't -- he didn't monitor |
| 11:25:43 | 17 | NF-kB activity.  He didn't monitor proteasome. |
| 11:25:47 | 18 | I am saying that under the experimental |
| 11:25:49 | 19 | conditions -- let's just read what I said. |
| 11:25:55 | 20 | Q.    My question is much simpler.  I'm, |
| 11:25:58 | 21 | I'm sorry for interrupting -- |
| 11:25:58 | 22 | A.    Okay. |
| 11:25:59 | 23 | Q.    -- but I think you're reading too |
| 11:26:01 | 24 | much into my question. |
| 11:26:01 | 25 | A.    Okay. |

91

11:26:03    1    Q.    I'm just trying to compare -- you

11:26:03    2    refer to the experimental protocol and so that

11:26:05    3    the question from here on is clear, I want you

11:26:07    4    to point to me in the article to the place in

11:26:09    5    the article where the authors describe the

11:26:11    6    experimental protocol you're referring to.

11:26:20    7    A.    Well, he describes it in several

11:26:22    8    places.  He describes it in table 1 when he

11:26:23    9    says the concentration of the proteases that

11:26:25    10    he use, the protease inhibitors that he used.

11:26:29    11    So if you look to the announcement of the --

11:26:30    12    the protease inhibitor in question is the

11:26:34    13    ALLNal.  He used between .6 to 3 micro-molar,

11:26:39    14    but he doesn't say how much he used, but, you

11:26:41    15    know, he's --

11:26:41    16    Q.    Let's do it this way.

11:26:43    17    A.    This is part of the protocol.  I

11:26:45    18    mean, the protocol is distributed all over the

11:26:47    19    place.

11:26:47    20    Q.    I don't mean to interrupt.

11:26:50    21    A.    He says, For the neurite extension

11:26:50    22    assays, the PC12 cells were washed and plated

11:26:54    23    in this medium base.  It's covered all over

11:26:54    24    the place.

11:26:54    25    Q.    Describe --

92

| | |
|---|---|
| 11:26:55 | 1 |
| 11:26:57 | 2 |
| 11:26:58 | 3 |
| 11:27:00 | 4 |
| 11:27:01 | 5 |
| 11:27:03 | 6 |
| 11:27:06 | 7 |
| 11:27:07 | 8 |
| 11:27:09 | 9 |
| 11:27:11 | 10 |
| 11:27:13 | 11 |
| 11:27:15 | 12 |
| 11:27:22 | 13 |
| 11:27:25 | 14 |
| 11:27:32 | 15 |
| 11:27:35 | 16 |
| 11:27:37 | 17 |
| 11:27:44 | 18 |
| 11:27:44 | 19 |
| 11:27:48 | 20 |
| 11:27:50 | 21 |
| 11:27:57 | 22 |
| 11:27:59 | 23 |
| 11:28:01 | 24 |
| 11:28:05 | 25 |

A.    There is no methods section here in this paper.

Q.    I understand, yeah; that's why I am asking the question.

Describe for me in your own words the experimental protocol that the authors followed.

A.    If I collect everything and I didn't miss anything with this assumption, if I were to take this paper, which is another and, and collect everything and compose to myself a protocol -- and, again, I don't know because at some point I miss points, I see in my opinion a set of dishes sitting, being seeded with PC12 cells, with the medium that they specify, which is -- they specify it on page 1 of 4:  "For the neurite extension of PC12 cells were washed and plated at 2 x 104 cells/cm2 in serum-free base medium..." plus, plus, plus, insulin serum base.

So I see a set of this.  One or two dishes don't get anything.  The other dishes get -- again, he doesn't specify.  I mean, that's why the range of concentrations of the different protease inhibitors so I

| | | |
|---|---|---|
| 11:28:07 | 1 | don't know how he jumped. |
| 11:28:09 | 2 | Did he take .6, .7, .8, .9; or, |
| 11:28:13 | 3 | did he take .61, .2, 2.4 and 3? |
| 11:28:13 | 4 | I don't know. He doesn't say. |
| 11:28:18 | 5 | And then put back into the |
| 11:28:19 | 6 | incubator, taken out at the specified time |
| 11:28:22 | 7 | line, times afterwards, 24. And neurite |
| 11:28:26 | 8 | outgrowth is measured under the microscope by |
| 11:28:29 | 9 | whatever utilization method that he used to |
| 11:28:32 | 10 | describe in a graphic way. |
| 11:28:33 | 11 | Q.    At what point was the Neurite |
| 11:28:36 | 12 | Growth Factor added? |
| 11:28:37 | 13 | A.    The NGF? |
| 11:28:38 | 14 | Q.    Yes. |
| 11:28:50 | 15 | A.    If my memory doesn't betray me, |
| 11:28:55 | 16 | let me just find it. I thought that it was |
| 11:28:55 | 17 | given along with the protease inhibitors, but |
| 11:28:56 | 18 | I am not sure. I have to find it. Don't |
| 11:28:59 | 19 | catch me on that. |
| 11:29:00 | 20 | Q.    Well, why don't you take some time |
| 11:29:01 | 21 | and just... |
| 11:29:01 | 22 | A.    Yeah. Let me just read it and I |
| 11:29:03 | 23 | hope he specified it. |
| 11:29:38 | 24 | I think that if I understand well |
| 11:29:40 | 25 | the language, he co-added them, he said, "When |

94

| | | |
|---|---|---|
| 11:29:43 | 1 | most cells" -- let me just read specifically. |
| 11:29:45 | 2 | Q.    Sure. |
| 11:29:46 | 3 | What page? |
| 11:29:46 | 4 | A.    It's page 104, second paragraph -- |
| 11:29:46 | 5 | Q.    Right. |
| 11:29:49 | 6 | A.    One, two, three, four, five, |
| 11:29:52 | 7 | six -- six, the last word of the sixth line. |
| 11:29:52 | 8 | Q.    Yes. |
| 11:29:54 | 9 | A.    "When most cells attached" -- he |
| 11:29:56 | 10 | probably looked in the microscope, I assume -- |
| 11:29:56 | 11 | "the cells were fed with various inhibitors |
| 11:29:56 | 12 | and/or 40 ng/ml NGF." |
| 11:30:07 | 13 | When he said "fed with," "and/or" |
| 11:30:09 | 14 | means they co-added and I don't know at what |
| 11:30:11 | 15 | distance, but probably. |
| 11:30:13 | 16 | Q.    It means, simultaneously. |
| 11:30:15 | 17 | A.    I don't know by the second, by the |
| 11:30:17 | 18 | micro-second, by -- I don't know, but, yeah, |
| 11:30:19 | 19 | that's what you understand. |
| 11:30:20 | 20 | Q.    Roughly simultaneously. |
| 11:30:22 | 21 | A.    Roughly simultaneously, yes; |
| 11:30:25 | 22 | that's what the language says. |
| 11:30:26 | 23 | Q.    Yes; okay. |
| 11:30:27 | 24 | Now, do you agree then that what |
| 11:30:29 | 25 | the authors measured was the effect of Nerve |

95

| | | |
|---|---|---|
| 11:30:36 | 1 | Growth Factor on the length of neurites in |
| 11:30:38 | 2 | these cultured nerve cells? |
| 11:30:41 | 3 | A.    That's what they report. |
| 11:30:42 | 4 | Q.    Yeah. |
| 11:30:43 | 5 | And just so we're all clear, |
| 11:30:45 | 6 | neurites, as I understand it, and you tell me |
| 11:30:47 | 7 | if I'm right or wrong, are sort of like axonal |
| 11:30:50 | 8 | or, or growths or -- |
| 11:30:51 | 9 | A.    Extensions. |
| 11:30:52 | 10 | Q.    -- extensions -- |
| 11:30:52 | 11 | A.    Extensions. |
| 11:30:52 | 12 | Q.    -- of cultured nerve? |
| 11:30:54 | 13 | A.    Axon is a defined unit. |
| 11:30:58 | 14 | Q.    You're right.  You're right. |
| 11:30:58 | 15 | A.    They are extensions. |
| 11:30:58 | 16 | Q.    I take your distinction. |
| 11:30:58 | 17 | A.    Yeah. |
| 11:31:01 | 18 | Q.    They are extensions of, of nerve |
| 11:31:02 | 19 | cells in culture? |
| 11:31:03 | 20 | A.    True. |
| 11:31:04 | 21 | Q.    So they are like long -- |
| 11:31:04 | 22 | A.    Yeah, long... |
| 11:31:06 | 23 | Q.    Long things. |
| 11:31:06 | 24 | A.    Yeah, long pseudopodia or whatever |
| 11:31:09 | 25 | they are. |

96

| | | |
|---|---|---|
| 11:31:09 | 1 | Q. So when Nerve Growth Factor was |
| 11:31:12 | 2 | added, the cells grew long neurites? |
| 11:31:16 | 3 | A. Well, there is a differential |
| 11:31:18 | 4 | effect between -- yeah, either alone or with |
| 11:31:21 | 5 | inhibitors or the inhibitors alone did it |
| 11:31:24 | 6 | because he used three conditions and in all of |
| 11:31:26 | 7 | them -- in both and each independently, he |
| 11:31:30 | 8 | could observe neurite outgrowth, but it was -- |
| 11:31:30 | 9 | Q. Let's just take it -- |
| 11:31:36 | 10 | A. -- different in effect. |
| 11:31:37 | 11 | Q. Let's take it step by step. |
| 11:31:39 | 12 | When Nerve Growth Factor was |
| 11:31:41 | 13 | added, the cells grew neurites? |
| 11:31:43 | 14 | A. Yes, and let me be more specific. |
| 11:31:45 | 15 | Q. No, just, just -- |
| 11:31:46 | 16 | A. No, I just want for the record -- |
| 11:31:46 | 17 | Q. Okay. |
| 11:31:48 | 18 | A. -- to be more specific. And I |
| 11:31:49 | 19 | think that it's shown in figure -- I have the |
| 11:31:54 | 20 | report. NGF alone is the square in figure 3. |
| 11:31:54 | 21 | Q. Right. |
| 11:32:13 | 22 | A. Yeah, I think so. It's not clear |
| 11:32:15 | 23 | from the... |
| 11:32:19 | 24 | Q. Well, I think you're reading it |
| 11:32:22 | 25 | right. And I also would direct your attention |

97

11:32:24    1    to --

11:32:24    2        A.        Yeah, yeah.

11:32:24    3        Q.        Okay.

11:32:32    4            So when Nerve Growth Factor was

11:32:34    5    added by itself, the nerve cells grew long

11:32:38    6    neurites?

11:32:39    7        A.        Yes.

11:32:39    8        Q.        Now, you opine in your report at

11:32:42    9    page 18 that "Treatment of neuronal cells with

11:32:47    10    NGF" -- Nerve Growth Factor -- "induces action

11:32:53    11    of NF-kB."

11:32:56    12            So when --

11:32:56    13        A.        Did I -- did I say so?

11:32:59    14        Q.        Yeah, I think so.  At page 18.

11:33:01    15    Look at the fourth line down from the top.

11:33:13    16        A.        Yeah.  "Treatment of neuronal

11:33:14    17    cells with NGF induces activation."

11:33:18    18        Q.        Do you believe that to be true?

11:33:20    19        A.        And that refers to the Saito

11:33:24    20    paper?

11:33:25    21        Q.        Well, I don't see any cite for it.

11:33:32    22        A.        Cite totally based on a reference,

11:33:34    23    which I read to describe, but I'm not sure

11:33:37    24    that these are the same cells.

11:33:38    25        Q.        Would you agree with the

98

| 11:36:53 | 1 | neurite of any length. And once you are |
| 11:36:57 | 2 | adding NGF -- but in this experiment, I don't |
| 11:37:05 | 3 | see the NGF alone. In this experiment, I |
| 11:37:11 | 4 | don't see the NGF alone. |
| 11:37:14 | 5 | Q. Well, look at figure 2 by the |
| 11:37:17 | 6 | legend. |
| 11:37:18 | 7 | A. Just a moment. Let's read it |
| 11:37:20 | 8 | together; okay? |
| 11:37:20 | 9 | Q. Sure. |
| 11:37:20 | 10 | A. Let's read it together so we make |
| 11:37:21 | 11 | sure that we both understand exactly the |
| 11:37:23 | 12 | wording. |
| 11:37:23 | 13 | Q. Sure, sure. |
| 11:37:23 | 14 | A. "Neurite length distribution |
| 11:37:25 | 15 | patterns" -- which is the abscissa -- "would |
| 11:37:27 | 16 | show the effects of some specific protease |
| 11:37:29 | 17 | inhibitors on neurite outgrowth in PC12h cells |
| 11:37:32 | 18 | in the presence of NGF." So everything is in |
| 11:37:36 | 19 | NGF. |
| 11:37:37 | 20 | Q. Correct. |
| 11:37:37 | 21 | A. So we cannot separate without NGF |
| 11:37:41 | 22 | and what is added. NGF is taken there. It |
| 11:37:41 | 23 | exists. |
| 11:37:41 | 24 | Q. Well, it's the control. |
| 11:37:45 | 25 | A. I don't know what it was -- it |

103

| 11:37:47 | 1 | means.  Oh, the control; okay. |
| 11:37:51 | 2 | So on top of NGF, but there is no |
| 11:37:54 | 3 | effect without NGF so I don't know what is |
| 11:37:56 | 4 | going on without NGF, at least, in this |
| 11:37:59 | 5 | experiment. |
| 11:37:59 | 6 | Q.    But that's my question. |
| 11:38:01 | 7 | My question is simply:  Do you |
| 11:38:02 | 8 | agree that -- |
| 11:38:03 | 9 | A.    That under -- I agree that under |
| 11:38:04 | 10 | the conditions employed when NGF is present, |
| 11:38:07 | 11 | you get a shift in the length of the neurite |
| 11:38:11 | 12 | length by ALLN. |
| 11:38:15 | 13 | Q.    Right. |
| 11:38:15 | 14 | So whatever the effect of NGF |
| 11:38:19 | 15 | alone on neurite length, that effect -- |
| 11:38:22 | 16 | A.    Is bigger. |
| 11:38:23 | 17 | Q.    -- is greater -- |
| 11:38:24 | 18 | A.    Yeah. |
| 11:38:24 | 19 | Q.    -- in the presence of ALLN? |
| 11:38:28 | 20 | A.    That is what figure 2 says. |
| 11:38:30 | 21 | Q.    Okay. |
| 11:38:31 | 22 | And that's, also, what figure 3, I |
| 11:38:34 | 23 | believe, shows? |
| 11:38:35 | 24 | A.    Yeah.  Figure 3 shows time course. |
| 11:38:44 | 25 | It's -- yeah. |

104

11:38:45    1        Q.       So in this experimental protocol,

11:38:47    2    as described by Saito, ALLN did not inhibit

11:38:52    3    any effect of NGF that Saito measured?

11:38:58    4        A.       You cannot say.  You cannot say.

11:39:01    5        Q.       Well, I can say what it measured.

11:39:04    6        A.       Because it may inhibit something,

11:39:06    7    but may increase in the contrary something

11:39:09    8    else.  The whole issue -- there is not a hint

11:39:13    9    in this paper, a hint in this paper to any

11:39:15    10   connection between the protease and the

11:39:19    11   phenomenon seen.  It's too extreme of a scale;

11:39:26    12   and, therefore, for me, the neurite outgrowth,

11:39:30    13   at least, as far as my opinion is concerned,

11:39:32    14   regarded '516 is irrelevant, completely.

11:39:36    15   There is nothing there that connects between

11:39:39    16   the two.  Nothing.

11:39:39    17       Q.       But let me --

11:39:40    18       A.       I cannot -- I cannot testify.  It

11:39:41    19   can inhibit little NF-kB -- little.  Excuse

11:39:45    20   me.  I am taking it back.  It can inhibit some

11:39:48    21   effect of NGF and increase some other

11:39:48    22   irrelevant effect that we don't know.

11:39:48    23       Q.       Okay.

11:39:49    24       A.       I don't know what is in this black

11:39:51    25   box.

| 11:39:54 | 1 | Q. Sure. |

11:39:54   2        It's a black box because there is

11:39:56   3   no effect that the authors measured that

11:39:59   4   reflected any --

11:39:59   5        A. Nothing that is --

11:40:00   6        Q. Let me, let me finish. Let me

11:40:02   7   finish. Really, it's...

11:40:05   8        There is no effect that the

11:40:07   9   authors measure that reflects the inhibition

11:40:11   10   of any activity by ALLN?

11:40:16   11        A. Except for the neurite outgrowth.

11:40:19   12   The only thing that they measured was neurite

11:40:23   13   outgrowth.

11:40:23   14        Q. And that was not a --

11:40:23   15        A. That's the only output that they

11:40:23   16   measured.

11:40:24   17        Q. Correct.

11:40:24   18        And that -- the, the output that

11:40:27   19   they measured when they measured neurite

11:40:30   20   outgrowth showed enhancement of the growth by

11:40:33   21   ALLN, not inhibition.

11:40:39   22        A. That's true.

11:40:40   23        Q. You agree, then, that there is no

11:40:44   24   result in this article that shows that ALLN

11:40:49   25   inhibited the activity of NF-kB?

106

| 11:40:53 | 1 | A. | In that article? |
| 11:40:55 | 2 | Q. | In that article. |
| 11:40:57 | 3 | A. | Yeah. |
| 11:40:57 | 4 | Q. | Okay. |

11:40:58    5      Now, in any of these experiments

11:41:00    6    did the authors use interleukin 1 to induce --

11:41:04    7    well, did they use interleukin 1?

11:41:08    8      A.      If they used interleukin 1, I

11:41:11    9    don't remember seeing it, but I have to go

11:41:13    10    over the entire paper. I -- to the best of my

11:41:16    11    knowledge, no; therefore, I limit it. No.

11:41:19    12      Q.      And is there any basis upon which

11:41:22    13    to conclude that the experiments in this

11:41:24    14    article --

11:41:24    15      A.      Whether it was in the medium or it

11:41:26    16    wasn't in the medium --

11:41:27    17      MR. DIAMOND: He was asking you a

11:41:29    18    question. You need to not interrupt him.

11:41:31    19      THE WITNESS: Okay. Sorry for

11:41:33    20    that.

11:41:33    21      Q.      Is there any basis on which to

11:41:36    22    conclude that the experi -- in this paper.

11:41:38    23      Is there any basis from which to

11:41:40    24    conclude from this paper that the experiments

11:41:42    25    that the authors performed reduced NF-kB

107

11:41:45    1    activity that had been induced by

11:41:51    2    interleukin 1?

11:41:52    3         A.    Okay.

11:41:53    4              We have to deconvolute your

11:41:55    5    question.  I don't know what induced and not

11:41:57    6    induced --

11:41:58    7         Q.    All right.

11:41:58    8              Let me ask it --

11:42:00    9         A.    And I don't know -- I don't know

11:42:01   10    what --

11:42:01   11         Q.    Then let me deconvolute it.

11:42:03   12         A.    Yeah.  Please deconvolute it.

11:42:06   13         Q.    Is there any basis upon which to

11:42:08   14    conclude that the experiments in this article

11:42:11   15    inhibited any biological effect that had been

11:42:17   16    previously caused by the application of

11:42:19   17    interleukin 1?

11:42:20   18         A.    Interleukin 1?

11:42:23   19         Q.    Right.

11:42:24   20         A.    Was interleukin 1 added here?

11:42:27   21              I, I don't remember any

11:42:28   22    interleukin 1 mentioned in the paper.

11:42:31   23         Q.    Right; that's my -- that's the

11:42:33   24    point.

11:42:33   25              So the answer to my question is:

108

| | | |
|---|---|---|
| 11:42:35 | 1 | No, there is no basis? |
| 11:42:39 | 2 | MR. DIAMOND:  Are you telling him |
| 11:42:40 | 3 | or asking him? |
| 11:42:40 | 4 | MR. GREENWALD:  I'm, I'm just |
| 11:42:45 | 5 | trying to complete -- |
| 11:42:45 | 6 | A.    I can read to you off the paper. |
| | 7 | MR. GREENWALD:  I am trying to |
| | 8 | complete the line of questioning. |
| | 9 | MR. DIAMOND:  And I take back that |
| | 10 | objection. |
| | 11 | A.    I, I can infer only to what the |
| 11:42:48 | 12 | paper says. |
| 11:42:48 | 13 | Q.    Right. |
| 11:42:49 | 14 | A.    The word interleukin 1 is not |
| 11:42:52 | 15 | mentioned here so I cannot refer to anything |
| 11:42:54 | 16 | to this cytosome (ph) -- |
| 11:42:54 | 17 | Q.    Right. |
| 11:42:56 | 18 | A.    -- in any context of this paper. |
| 11:42:59 | 19 | Q.    So there is no basis -- there is |
| 11:43:00 | 20 | no basis.  Just stay with my question.  I know |
| 11:43:03 | 21 | you may think it is ridiculous, but |
| 11:43:06 | 22 | unfortunately patent litigation sometimes |
| 11:43:08 | 23 | presents some unusual issues. |
| 11:43:10 | 24 | Do you agree with me then that |
| 11:43:11 | 25 | there is no basis upon which to conclude that |

109

| | | |
|---|---|---|
| 11:43:14 | 1 | the experiments in this article, reported in |
| 11:43:16 | 2 | this article reduced any activity that had |
| 11:43:19 | 3 | been previously caused by interleukin 1? |
| 11:43:25 | 4 | A.    I -- it's hard for me to refer, |
| 11:43:31 | 5 | truly, as a scientist, to something that is |
| 11:43:34 | 6 | not there. |
| 11:43:35 | 7 | I can conclude from the |
| 11:43:37 | 8 | experimental condition what would have |
| 11:43:39 | 9 | happened if I would have repeated the |
| 11:43:41 | 10 | experiments under current days, but I cannot |
| 11:43:45 | 11 | refer to anything of adding or not adding |
| 11:43:49 | 12 | something that is not mentioned that I don't |
| 11:43:51 | 13 | know the kinetics of or whether interleukin 1 |
| 11:43:56 | 14 | has an effect on these cells, it doesn't have |
| 11:43:59 | 15 | an effect on these cells. |
| 11:44:01 | 16 | Q.    None of that -- none of that is |
| 11:44:02 | 17 | called -- none of that -- none of that is |
| 11:44:04 | 18 | baked into my question. |
| 11:44:05 | 19 | All I want to know and I guess |
| 11:44:07 | 20 | you've already answered it, there was no |
| 11:44:09 | 21 | interleukin 1 applied to any of the cells in |
| 11:44:12 | 22 | this article? |
| 11:44:12 | 23 | A.    Not intentionally by him. |
| 11:44:14 | 24 | Q.    Not intentionally. |
| 11:44:16 | 25 | A.    Not intentionally by him. |

110

11:44:19    1        Q.      Do you believe there is reason to

11:44:19    2    think that he accidentally spilled some onto

11:44:21    3    the --

11:44:21    4        A.      No, no, no, no, no.  Absolutely

11:44:22    5    not.

11:44:22    6        Q.      Yeah.

11:44:23    7        A.      But it can be present.  I don't

11:44:25    8    know.

11:44:25    9        Q.      So none of these cells had been --

11:44:27    10    so none of these cells had been previously

11:44:27    11    exposed to IL-1?

11:44:31    12        A.      Nothing like IL-1 is mentioned in

11:44:34    13    this paper.

11:44:35    14        Q.      Okay.

11:44:35    15              And is the same true for tumor

11:44:38    16    necrosis factor?

11:44:39    17        A.      Nothing like tumor necrosis

11:44:41    18    factor -- the word tumor necrosis factor is

11:44:44    19    not mentioned in the five pages of this paper.

11:44:46    20        Q.      And you have no reason to believe

11:44:48    21    that tumor necrosis factor was applied to

11:44:49    22    these cells?

11:44:49    23        A.      Applied intentionally in a

11:44:51    24    controlled manner to one dish and not the

11:44:55    25    other dish, yes, I don't have any reason to

111

11:44:57   1    assume so.

11:44:57   2        Q.    So, again, I think you've answered

11:45:14   3    this, but what are PC12 cells?

11:45:17   4        A.    These are cells derived from

11:45:17   5    pheochromocytoma --

11:45:17   6        Q.    Let's just --

11:45:22   7        A.    P-h-e-o-c-h-r-o-m-o-c-y-t-o-m-a,

11:45:30   8    which is a tumor of the medulla of the adrenal

11:45:34   9    that in some cases secretes catecholamines and

11:45:39   10   therefore leads because of this secretion to

11:45:41   11   symptoms in the patients.

11:45:44   12       Q.    Okay.

11:45:45   13             And a very simple question.

11:45:47   14             Are PC12 cells immune cells?

11:45:52   15       A.    A very vague question.

11:45:54   16             You know, what is an immune cell?

11:45:56   17             Every cell can process antigens,

11:45:59   18   can present them.  I mean, this is -- I mean,

11:46:06   19   an awfully vague question.

11:46:06   20             I mean, what is an immune cell?

11:46:09   21             Are they D cells that secrete

11:46:10   22   antibodies; are they T cells that have CD4,

11:46:12   23   that have CDA?

11:46:14   24             I don't know.

11:46:14   25       Q.    No, no wait.

112

| | | |
|---|---|---|
| 11:46:14 | 1 | Do you -- |
| 11:46:14 | 2 | A.    I don't know.  I don't know what |
| 11:46:15 | 3 | is an immune cell. |
| 11:46:17 | 4 | Q.    All right.  Let me -- okay. |
| 11:46:25 | 5 | Do you agree that a monocyte is an |
| 11:46:29 | 6 | immune cell? |
| 11:46:30 | 7 | A.    A monocyte has immune functions. |
| 11:46:33 | 8 | I don't know what is an immune cell -- |
| 11:46:33 | 9 | Q.    Okay. |
| 11:46:34 | 10 | A.    A monocyte has immune functions |
| 11:46:37 | 11 | and each cell has immune functions. |
| 11:46:40 | 12 | Q.    Okay. |
| 11:46:40 | 13 | What are the -- what is the |
| 11:46:42 | 14 | species from which PC12 cells are derived? |
| 11:46:46 | 15 | A.    I must admit, I am not sure. |
| 11:46:48 | 16 | Q.    Okay. |
| 11:46:49 | 17 | So you don't know if they -- |
| 11:46:50 | 18 | A.    By species, you mean, human |
| 11:46:54 | 19 | beings, rat, mouse... |
| 11:46:55 | 20 | Q.    Yes, exactly. |
| 11:46:56 | 21 | A.    I am not sure.  I think they are |
| 11:46:58 | 22 | human.  I am not sure.  I am sure. |
| 11:46:58 | 23 | Q.    You think they are human? |
| 11:46:59 | 24 | A.    But I'm not sure.  I'm not sure. |
| 11:47:00 | 25 | Q.    Okay; all right. |

113

11:47:00  1            So you just don't know.

11:47:03  2       A.    I'm not sure.

11:47:04  3       Q.    Well, hold on.  Let's take a look

11:47:07  4    at page 103, the top first line.

11:47:10  5       A.    I am not sure.  I -- correct.

11:47:14  6    Yes.  Sorry.

11:47:14  7       Q.    Okay.

11:47:15  8            So they're not human cells.

11:47:18  9       A.    Rat is not a human.

11:47:25  10      Q.    Have you reviewed any of the

11:47:26  11   expert reports that were submitted in this

11:47:28  12   matter other than your own?

11:47:30  13      A.    No.

11:47:30  14      Q.    So I take it then you haven't

11:47:33  15   reviewed the report that Dr. Jeffrey Ravetch

11:47:37  16   of Rockefeller University submitted in

11:47:41  17   February?

11:47:41  18      A.    I was told about it, but not seen

11:47:43  19   it in my own bare eyes.

11:47:46  20      Q.    Okay.

11:47:48  21            Do you intend to respond to the

11:47:52  22   opinions -- do you have any -- do you intend

11:47:57  23   to respond to the opinions that Dr. Ravetch

11:48:00  24   set forth in that report --

11:48:00  25      A.    If these opinions --

114

11:48:01    1    Q.    -- at trial?

11:48:03    2    A.    If these opinions will be set

11:48:05    3    forth for me and I am asked about them

11:48:07    4    specifically and they will relate to my

11:48:09    5    expertise, the answer is yes.

11:48:11    6    Q.    But you haven't prepared a report

11:48:13    7    setting forth your opinions about his

11:48:15    8    opinions?

11:48:18    9    A.    The only report that I have

11:48:19    10    prepared is the report that is sitting on this

11:48:22    11    desk.

11:48:23    12    Q.    Okay.

11:48:23    13    Could you describe generally the

11:48:28    14    process by which your report was prepared?

11:48:33    15    MR. DIAMOND:  And I would advise

11:48:35    16    you not to talk about the substance of your

11:48:38    17    communications with counsel.

11:48:40    18    MR. GREENWALD:  Correct.  I don't

11:48:41    19    want any of that.

11:48:41    20    MR. DIAMOND:  So you can go slowly

11:48:43    21    and you can -- and I'll guide you.

11:48:46    22    A.    The lawyers came to Israel.  And

11:48:53    23    we started to discuss it and to basically put

11:48:58    24    it together.

11:49:00    25    It is made of pieces taken from my

115

# EXHIBIT 23

# EXHIBIT REDACTED

# EXHIBIT 24

# EXHIBIT REDACTED