IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation; IMMUNEX CORPORATION, a Washington corporation; AMGEN USA INC., a Delaware corporation; AMGEN MANUFACTURING, LIMITED, a Bermuda Corporation, and IMMUNEX RHODE ISLAND CORPORATION, a Delaware corporation,

Plaintiffs/Counterclaim Defendants,

v.

ARIAD PHARMACEUTICALS, INC., a Delaware corporation, and THE WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, a Delaware corporation, *et. al.*

Defendants/Counterclaim Plaintiffs.

Civil Action No. 06-259 (MPT)

PUBLIC VERSION
CONFIDENTIAL MATERIAL OMMITED

**THE AMGEN ENTITIES' OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 6,410,516 FOR LACK OF ADEQUATE WRITTEN DESCRIPTION UNDER 35 U.S.C. § 112**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6681
msharp@ycst.com

KIRKLAND & ELLIS LLP
Mark A. Pals, P.C.
Marcus E. Sernel
200 East Randolph Drive
Chicago, IL 60601-6636
(312)861-2000

HOGAN & HARTSON LLP
Siegmund Gutman
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4707

Robert G. Krupka, P.C.
777 South Figueroa Street
Los Angeles, CA 90017-5800
(213) 680-8400

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Inc., Immunex Corporation, Amgen USA, Inc., Amgen Manufacturing, Limited, and Immunex Rhode Island Corporation*

Dated: April 25, 2008

## TABLE OF CONTENTS


I. INTRODUCTION AND SUMMARY OF ARGUMENTS. .....1

II. NATURE AND STAGE OF THE PROCEEDINGS. .....1

III. STATEMENT OF UNDISPUTED FACTS. .....4

A. The '516 Patent Resulted From A Multitude of Applications Spanning a Prolonged Prosecution History Lasting Over Sixteen Years. .....4

B. The Patent Fails To Describe The Compounds Or Methods That Are Within The Scope Of The Claims. .....4

1. The '516 patent provides no structures, formulae, chemical names or physical properties to identify or allow identification of any specific compounds that can be used for "reducing NF-κB activity in cells." .....5

2. The experiments referred to in the patent do not allow for more than a trial-and-error approach to finding potential compounds. .....9

C. The Specification Does Not Describe Cells in Which the Claimed Methods Could Be Performed. .....10

1. The patent does not describe use of the claimed methods in any organisms. .....11

2. The patent does not identify any cell types in which the method of "reducing NF-κB activity in cells" could be carried out .....12

IV. THE LEGAL STANDARDS .....14

A. The Legal Standards for Summary Judgment. .....14

B. The Written Description Requirement of 35 U.S.C. § 112, ¶ 1 Prevents Overreaching By Patentees and Their Attorneys. .....15

V. ARGUMENT .....17

A. The Claims of the '516 Patent are Invalid Due to Lack of an Adequate Written Description .....17

1. The Decision of the court in *Rochester*, a closely analogous case, compels a finding of invalidity for the '516 patent. .....17

2. The '516 patent does not disclose the structure, formula, chemical name, or physical property of the class of compounds that can be used to "reduce NF-κB activity in cells." .....20

3. Screening assays, even if adequately provided, are insufficient to adequately describe compounds that can be used for "reducing NF-κB activity in cells." .....22

B. The '516 Patent Is Further Invalid For Lack Of An Adequate Written Description Of The "Cells" In Which The Claimed Methods Can Be Practiced. .....23

1. The '516 patent contains no description of reducing NF-κB activity in intact cells. .....24

2. The '516 patent does not describe the cells in which the claimed methods can be practiced. .....24

VI. CONCLUSION .....26

**TABLE OF AUTHORITIES**

**Cases**


*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 15

*Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*,
531 F.Supp.2d 629 (D. Del. 2008) ........ 15

*Desper Prods. Inc. v. QSound Labs, Inc.*,
157 F.3d 1325 (Fed. Cir. 1998) ........ 14

*Enzo Biochem, Inc. v. Gen-Probe Inc.*,
323 F.3d 956 (Fed. Cir. 2002) ........ 21, 26

*Fiers v. Revel*,
984 F.2d 1164 (Fed. Cir. 1993) ........ 20

*In re Curtis*,
354 F.3d 1347 (Fed. Cir. 2004) ........ 15

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
424 F.3d 1336 (Fed. Cir. 2005) ........ 15

*Lockwood v. American Airlines*,
107 F.3d 1565 (Fed. Cir. 1997) ........ 16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ........ 15

*Noelle v. Lederman*,
355 F.3d 1343 (Fed. Cir. 2004) ........ 26

*Purdue Pharma L.P. v. Faulding Inc.*,
230 F.3d 1320 (Fed. Cir. 2000) ........ 16

*Reiffen v. Microsoft Corp.*,
214 F.3d 1342 (Fed. Cir. 2000) ........ 15, 21

*University of Rochester v. G.D. Searle & Co.*,
249 F.Supp.2d 216 (W.D.N.Y 2003) ........ 18, 23

*University of Rochester v. G.D. Searle & Co.*,
358 F.3d 916 (Fed. Cir. 2004) ........ passim

*Vas-Cath Inc. v. Mahurkar*,
935 F.2d 1555 (Fed. Cir. 1991) ........ 15

**Statutes**

35 U.S.C. § 112 ........................................ passim

**Rules**

Fed. R. Civ. P. 56(c) ........................................ 14

## I. NATURE AND STAGE OF THE PROCEEDINGS.

The nature and stage of these proceedings are incorporated herein by reference as set forth in Amgen's Opening Brief in Support of its Motion for Summary Judgment of Non-Infringement of U.S. Patent No. 6,410,516.

## II. INTRODUCTION AND SUMMARY OF ARGUMENTS.

1. Amgen[1] hereby moves this Court for summary judgment of invalidity as to claims 1-202 of U.S. Patent No. 6,410,516, (Ex A, "the '516 patent") because of a lack of adequate written description as required under 35 U.S.C. § 112.

2. The present case provides a stark example of a patent that discloses a research plan, not an invention. The '516 patent claims results, *i.e.*, all methods for reducing NF-κB activity in cells, without disclosing any specific way of accomplishing those results. The patent claims themselves recite no specific steps or structures, and the patent specification fails to provide a single example of the claimed methods and only hypothesizes general approaches to blocking or inhibiting NF-κB inside cells. Thus, the patent is simply an invitation for further experimentation in order to actually accomplish the results claimed. The law is clear that, in such circumstances where a patent fails to provide a meaningful number of ways to achieve a claimed result, broad method claims that attempt to cover all ways of accomplishing the claimed result are invalid for lack of written description.

---

[1] In this brief, "Amgen" will refer collectively to all of the named plaintiffs. Similarly, unless otherwise specified, "ARIAD" will refer collectively to all of the named defendants. The "Institutions" will refer collectively to the President and Fellows of Harvard College ("Harvard"); the Massachusetts Institute of Technology ("MIT"); and the Whitehead Institute for Biomedical Research ("Whitehead").

3. The inventors of the '516 patent made a discovery related to the identification of intracellular transcription factor NF-κB. At the time of the applications that led to the '516 patent, little was known about NF-κB -- the applicants did not know and did not disclose its structure, sequence, or specific uses. The patent describes NF-κB only by the functions the inventors had discovered at the time. The patent's primary contribution was to propose assays that could be used to search the universe of substances for compounds or methods that might impact the then-known functions of NF-κB. While the inventors obtained claims to assays in two other patents that have been withdrawn from this action, the claims of the '516 patent are all directed to methods of reducing NF-κB activity in cells, something they did not do and did not disclose in the patent specification. Through the sixteen years of attempts to convince the PTO to issue claims, the patent claims morphed away from what was discussed in the patent applications and began to recite methods the named inventors had not practiced and did not conceive.

4. Summary judgment of invalidity for lack of an adequate written description is compelled by controlling Federal Circuit law, including the Federal Circuit's ruling on very similar facts in *University of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 930 (Fed. Cir. 2004). In *Rochester*, the Federal Circuit affirmed summary judgment of invalidity of claims reciting "a method for selectively inhibiting PGHS-2 activity in a human host" because the specification of the patent-at-issue neither described the class of compounds that could be used to practice the claimed methods nor allows one to discern infringing methods from non-infringing methods. Although the patent-at-issue in *Rochester* described assay methods for generally screening compounds in order to identify those that might have the claimed activity, the Federal

Circuit found such disclosure insufficient to support a claim covering all methods of selectively inhibiting PGHS-2 activity.

5. As in *Rochester*, the claims of the '516 patent explicitly purport to encompass ***all*** methods of reducing or inhibiting an activity in cells (in this case, "reducing NF-κB activity in cells"), yet the patent specification and its predecessor applications fail to provide the requisite written description to support claims of such breadth. The '516 patent specification only posits a handful of hypothetical ways to possibly practice the claims, but provides no common thread (*e.g.* structure, formula, physical property, etc.) among these hypothetical examples that shows the inventors possessed the embodiments that would fall within (or alternatively outside) the scope of the claims. Furthermore, although ARIAD proposes that this Court construe the claims to cover molecules that act outside of the cell, the '516 patent is completely devoid of any such disclosure.

6. The '516 patent provides, at best, a mere invitation to experiment to determine whether and what compounds or methods might be used to practice the claimed invention. This falls far short of the required written description under the law. While the '516 patent simply addresses two assays for use in identifying compounds and methods that might possibly practice the claims, the *Rochester* decision is clear that providing disclosure of such assays is not enough. Under *Rochester*, the ***patent itself*** must provide the teaching to allow one of skill in the art to differentiate between infringing and non-infringing methods. Assays that invite trial-and-error experimentation are insufficient.

7. Compounding the lack of disclosure regarding the class of compounds or methods that can practice the claimed invention is the fact that the patent similarly does not describe the species and types of cells in which the alleged invention can be successfully practiced. Even

ARIAD's experts have acknowledged that, for any possible "reducing" compound, the '516 patent specification does not describe the cells in which one may practice the claimed methods and those in which one may not, and that this could only be determined through trial-and-error.

8. Because the '516 patent fails to provide an adequate written description for the incredibly broad and completely undefined class of compounds and methods (and the cells in which they might work) that might practice the claims of the patent, the claims of the '516 patent are invalid as a matter of law pursuant to 35 U.S.C. § 112.

## III. STATEMENT OF UNDISPUTED FACTS.

The following undisputed facts are provided in support of the present motion.

### A. The '516 Patent Resulted From A Multitude of Applications Spanning a Prolonged Prosecution History Lasting Over Sixteen Years.

The '516 patent issued June 25, 2002 as the result of a prolonged prosecution before the PTO that spanned over 16 years. While the '516 patent issued out of a June 5, 1995 application (Ser. No. 08/464,364 – "the '364 application"), that application traces its roots to multiple other applications filed by various of the Institutions between 1986 and 1995.

### B. The Patent Fails To Describe The Compounds Or Methods That Are Within The Scope Of The Claims.

All claims of the '516 patent contain some form of the limitation "reducing NF-κB activity in cells."[2] The claims are not limited to the use of any specific compound or any class of compounds having any particular unique structure, formula, chemical names, or physical

[2] Claims 7 and 19 do not *explicitly* recite that the methods they claim result in "reduction" of "NF-κB activity," but each claim nevertheless covers such reduction by virtue of the language it employs.

properties that can be used in the claimed method. Indeed, under ARIAD's proffered claim construction, the range of possible compounds includes not only those that would work ***inside*** the cell to bind or inhibit NF-κB but also compounds that would work ***outside*** the cell to interact with an unknown set of compounds that cause a signal inside the cell that involves NF-κB.[3] But the patent utterly fails to define or circumscribe the universe of known or unknown compounds that could be used to reduce NF-κB activity in cells, let alone any mention of any extracellular compounds that could reduce NF-κB activity.

1. **The '516 patent provides no structures, formulae, chemical names or physical properties to identify or allow identification of any specific compounds that can be used for "reducing NF-κB activity in cells."**

The '516 patent specification does not set forth any discernible or concrete genus of compounds to reduce NF-κB activity in cells, nor does it provide any indication that the patentees knew of any compounds -- or any structures, formulae, chemical names or physical properties of any compounds -- that could be used to reduce NF-κB activity in cells.

At best, the patent specification speculates as to five hypothetical approaches by which a reduction of NF-κB might be accomplished in an unspecified and undefined number and type of cells: (1) by addition of "an effective amount" of NF-κB's natural inhibitor, IκB;[4] (2) by use of an "antagonist" of the NF-κB protein or of the gene that encodes the NF-κB protein;[5] (3) by use

---

3 Although Amgen disagrees with it, ARIAD's proposed claim construction argues that NF-κB activity can be decreased "without regard to the situs of the inhibiting agent." (*See* Joint Claim Construction Chart, D.I. 571 at 3-4.)

4 *See* Ex. A, '516 Patent, col.31, l.57 - col.32, l.63.

5 *See* Ex. A, '516 Patent, col.34, l.66 - col.35, l.12.

of a "decoy" DNA sequence that encodes the NF-κB binding domain;[6] (4) by use of a "dominantly interfering molecule" (*e.g.*, a truncated form of the NF-κB molecule that would recognize and bind to the NF-κB binding site in a "non-productive" way);[7] and (5) by use of other unspecified "agents or drugs."[8] None of these speculated ways of "reducing NF-κB activity in cells" had been carried out by the applicants.[9] In disclosing these five hypothetical ways of approaching the problem, the specification only speaks in general terms -- these approaches are described purely by a theoretical ability to take action inside a cell to directly block or interfere with NF-κB. The inventors acknowledge that these hypothetical approaches share no common structural or physical characteristics.

Dr. Baltimore himself -- the first inventor on the patent and the only individual named on all of the myriad applications -- admitted that the specification provides no structural characteristics or formula for any compound that could reduce NF-κB activity in cells:

> Q. Do you recall any structures given for agents to reduce NF-κB activity in a cell, again, for the moment setting aside Figure 43?
>
> A. No, I don't.

---

6 *See* Ex. A, '516 Patent, col.37, l.50 - col.38, l.5.

7 *See* Ex. A, '516 Patent, col.38, ll.6-22.

8 *See* Ex. A, '516 Patent, col.3, ll.23-25.

9 *See* Ex. B, Dep. of David Baltimore ("Baltimore Dep. Tr.") at 81:3-10; 90:19-22; 92:17-20; 119:10-20; *see also* Ex. C, Dep. of Philip Sharp ("Sharp Dep. Tr.") at 140:2-17; Ex. D, Dep. of Tom Maniatis ("Maniatis Dep. Tr.") at 155:25-156:9.

Q. Do you recall any formula for any compound to reduce NF-κB activity in a cell that's disclosed in the 516 patent, again, for the moment setting aside Figure 43?

A. No, I do not.[10]

Dr. Baltimore also admitted in a declaration filed with the PTO during prosecution of the patent that the compounds that could be used in the claimed method are "structurally diverse."[11]

**REDACTED**

No correlation between structure and function is found anywhere in the patent. Another of ARIAD's experts acknowledges that the '516 patent fails to provide any chemical names or compositions for potential compounds to be used in the claimed methods:

Q. They do not give a chemical name?

A. They do not give a chemical name.

[10] Ex. B, Baltimore Dep. Tr. at 121:6-9. The '516 patent specification provides a putative nucleotide and amino acid sequence of IκB in Figure 43 that is, in fact, an incorrect sequence for the chicken protein pp40. *See* Ex. F, Expert Rebuttal Report of Jeffrey Ravetch ("Ravetch Rebuttal Report") at ¶ 84.

[11] Ex. G, Decl. of David Baltimore Under Rule 1.132 dated Sept. 12, 2001 ("Baltimore Decl.").

[12] Ex. E, Dep. of David Livingston ("Livingston Dep. Tr.") at 265:22-267:5.

Q. They don't give a chemical composition?

A. Correct.

Q. They don't give a chemical structure?

A. Correct. They give an activity and a general structure.

Q. What general structure do they give?

A. The structure that it's known to be able to interact with a defined molecule, NF-kappaB. That's a structural property. So of the universe of molecules, only some will be able to interact with NF-kappaB.[13]

Thus, according to ARIAD's expert, the only disclosure in the patent of a "structural property" of compounds that can be used to practice the claims is the tautology that some of the molecules that "reduce NF-κB activity in cells" will be those that interact with NF-κB. This is simply an invitation for further experimentation to try to identify compounds from the universe of known and unknown compounds.

The specification provides no information to allow one of skill in the art to predict in advance whether a compound "interacts" with NF-κB. ARIAD's experts agree that the patent provides no information on the sequence or structure of NF-κB.[14] This lack of disclosure for NF-κB is compounded by the inconsistent application of the term "NF-κB." ARIAD's expert testified that the term "NF-κB" "has different meanings to different people and different laboratories."[15] He further elaborated that it "would really depend upon the specific reference that you were referring to to be able to tell you how that person may or -- may have been using

[13] Ex. H, Dep. of Jeffrey Ravetch ("Ravetch Dep. Tr.") at 155:10-23.

[14] *See e.g.* Ex. E, Livingston Dep. Tr. at 166:15-20; 168:5-12.

[15] *See* Ex. H, Ravetch Dep. Tr. at 212:21-213: 11.

the word 'NF-kappaB'."[16] Thus, Dr. Ravetch summarized that in "[t]he NF-kappaB field . . . the term does seem to have a variety of uses and meanings depending upon specific applications by individuals."[17]

**2. The experiments referred to in the patent do not allow for more than a trial-and-error approach to finding potential compounds.**

The '516 patent suggests only a trial-and-error approach to search for compounds that "reduce NF-κB activity."[18] The patent proposes two assays to potentially evaluate NF-κB activity: an electophoretic mobility shift assay ("EMSA") and a reporter assay (specifically a chloramphenicol acetyl transferase assay or "CAT assay").[19] But, at most, this use of the two assays merely invites a trial-and-error approach to hunt for compounds that might potentially practice the claimed method.[20] And the '516 patent does not even report the start of a trial-and-error approach, as the specification does not report a single example of a specific molecule identified by the EMSA or CAT assays that reduced NF-κB activity in cells.[21]

---

16 *Id.*

17 Ex. H, Ravetch Dep. Tr. at 214:4-7.

18 It is assumed for purposes of this motion that these two assays could be successfully used to identify compounds or methods that would practice the claims, but in fact this is not quite that simple. Even the inventors admitted that these assays were not sufficient to demonstrate a method of inhibiting NF-κB activity. *See* Ex. C, Sharp Dep. Tr. at 79:1-9; 163:14-164:12.

19 *See* Ex. A, '516 patent, col.4, ll.46-49.

20 *See* Ex. H, Ravetch Dep. Tr. at 156:6-25.

21 *See* Ex. B, Baltimore Dep. Tr. at 175:24-176:3; Ex. E, Livingston Dep. Tr. at 265:22-267:5; Ex. H, Ravetch Dep. Tr. at 144:25-145:5.

**C. The Specification Does Not Describe Cells in Which the Claimed Methods Could Be Performed.**

The parties agree that the patent claims are properly construed as methods not only "reducing NF-κB activity in cells" in culture (*e.g.*, those in Petri dishes or suspended media), but also for "reducing NF-κB activity in cells" in living organisms. The various patent claims purport to encompass methods in virtually every type of intact cell in every organism in the world. Certain claims, for example, simply recite methods of reducing NF-κB activity "in cells" -- an unqualified description that on its face encompasses all cells in all organisms, both eukaryotic (*e.g.*, cells containing a nucleus including, among other subgroups, plants, animals, insects, and yeast cells) and prokaryotic (e.g., cells lacking a nucleus including, among other subgroups, bacterial cells).[22] Other claims are generally directed to methods of reducing NF-κB activity in all "eukaryotic" cells.[23] Further claims are directed to general methods of reducing NF-κB activity in all "mammalian" cells.[24] Each of these categories encompasses a broad spectrum of cell types from an enormous number of organisms that are not described anywhere in the '516 patent.[25]

---

22 *See e.g.* Ex. A, '516 patent, claims 6, 17, 64-69 and 167-172.

23 *See e.g.* Ex. A, '516 patent, claims 1-5, 7-9, 19-25, 31-36, 42-47, 53-58, 75-80, 88-93 and 192-197.

24 *See e.g.* Ex. A, '516 patent, claims 10-15, 18, 26, 37, 48, 59, 70, 81-82, 94, 99-104, 109-114, 119-124, 128-133, 139-144, 149-154, 177-182, 187, 198, and 203.

25 *See* Ex. E, Livingston Dep. Tr. at 172:3-175:13.

### 1. The patent does not describe use of the claimed methods in any organisms.

The parties have agreed that the term "cell" is properly construed as "intact cells, whether in cell culture or in living tissue (including in an organism), as opposed to cell extracts."[26] Specifically, the claims encompass methods of reducing NF-κB activity in cells in culture (*e.g.*, *in vitro*) as well as in cells in tissues and whole organisms (*e.g.*, *in vivo*).[27] The specification, however, provides no discussion of carrying out any method of "reducing NF-κB activity in cells" in either living tissue or in an organism.

In fact, the '516 patent only ever discusses the *presence* of NF-κB activity in tissue of two species.[28] The specification provides no evidence that NF-κB is expressed in any other tissues, let alone in any other organisms. Indeed, even as of today ARIAD's experts do not know in what organisms NF-κB is even expressed.[29] And the patent does not describe the organisms in which action can be taken to reduce NF-κB activity. Once again, the '516 patent merely provides for a hunt-and-seek expedition to identify what cells in what organisms even contain NF-κB, let alone determining methods whereby NF-κB can be reduced by taking action in those cells.

---

[26] *See* Joint Claim Construction Chart, D.I. 571 at 2.

[27] *Id.*

[28] *See* Ex. A, '516 patent, col.26, ll.40-45.

[29] Ex. H, Ravetch Dep. Tr. at 89:19-90:10; Ex. E, Livingston Dep. Tr. at 173:19-21; 210:9-211:25.

The specification is similarly devoid of any suggestion that the claimed methods could be used *in vivo*. In fact, inventor Dr. Baltimore admitted that there was no human or animal work described in the patent:

> Q. You agree that there are no examples of using compounds to treat disease in any animal; is that correct?
>
> THE WITNESS: Yes, there was no work done in this patent on animals.
>
> Q. And likewise, there are no examples of using compounds of any sort to treat disease in a person, correct?
>
> A. Correct. We did not -- did no work with human beings.[30]

2. **The patent does not identify any cell types in which the method of "reducing NF-κB activity in cells" could be carried out:**

**REDACTED**

[30] Ex. B, Baltimore Dep. Tr. at 176:19-177:5.

[31] *See* Ex. A, '516 patent, col.14, ll.53-54. Notably the cell types even mentioned in the '516 patent are derived only from particular human, mice, and bovine cell types and tissues.

**REDACTED**

Another ARIAD expert, Dr. Kathyrn Calame, agreed that nothing in the patent allows one of skill in the art to predict what cells would exhibit a reduction in NF-κB upon treatment with a putative inhibitor:

> Q. I don't know a place in the patent that allows one to predict which cells will respond, and it sounds like, sitting here today, you can't either.
>
> A. I can't either.[33]

ARIAD's expert in the *Lilly* case, Dr. Thomas Kadesch, further confirms the inadequacy of the disclosure of a representative number of cell types in the '516 patent. Although Dr. Kadesch testified in an earlier ARIAD litigation that he believed the '516 patent adequately described the reduction of NF-κB activity in all cells,[34] he later recanted his earlier testimony:

> Q. You at least considered, for example, with regard to Claim 1 in the '516 Patent that the claims were directed to the practice of the method in all eukaryotic cells, correct?
>
> A. I did not consider it to be all eukaryotic cells. As the claim is written, it just says eukaryotic cells. So my understanding of -- my understanding of written description for the '516 Patent was not from the point of view of someone where I would interpret those claims the way I interpret the claims for the current patent, the '349 Patent.

---

32 Ex. E, Livingston Dep. Tr. at 178:11-17.

33 Ex. I, Dep. of Kathyrn Calame ("Calame Dep. Tr.") at 168:9-13.

34 Ex. J, Testimony of Dr. Kadesch, in *ARIAD et al. v. Eli Lilly & Co.* litigation, Jury Trial, Day 13, First Session at 48:19-49:12.

And the reason for that is that in terms of claim language, shall we say I've come to understand the necessity for claim language in a way that I didn't appreciate with the '516 Patent. If I had been asked the same series of questions around the '516 Patent, I would have said that the '516 patent, as it's stated, cannot claim all cells.

Q. And cannot claim all eukaryotic cells?

A. That's correct.

---

Q. I just want to make sure I understand. As you sit here today, do you agree that the '516 Patent claims have adequate written descriptive support?

A. For --

Q. For all eukaryotic cells?

A. No.[35]

Thus, ARIAD's experts agree that there is not description in the patent of "the cells" encompassed by the claimed methods. To the contrary, further experimentation is required to determine the cell types and organisms in which the claimed methods can be practiced.

## IV. THE LEGAL STANDARDS

### A. The Legal Standards for Summary Judgment.

Summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Desper Prods. Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1332 (Fed. Cir. 1998). It is the moving party's

[35] Ex. K, Dep. of Dr. Thomas Kadesch (*Amgen, Inc. v. F. Hoffman-La Roche Ltd.*) ("Kadesch Dep. Tr.") at 268:25-270:16.

burden to prove no genuine issue of material fact exists. *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 531 F.Supp.2d 629, 633 (D. Del. 2008). If the moving party has demonstrated an absence of material fact, the nonmoving party then must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). Although the court views the underlying facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party, there must be enough evidence to enable a jury reasonably to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Where, as here, there is not, summary judgment should be granted. *Rochester*, 358 F.3d at 927.

### B. The Written Description Requirement of 35 U.S.C. § 112, ¶ 1 Prevents Overreaching By Patentees and Their Attorneys.

Under 35 U.S.C. § 112, a patent specification must "contain a written description of the invention." 35 U.S.C. § 112, ¶ 1. This written description requirement is separate and distinct from the enablement requirement. *In re Curtis*, 354 F.3d 1347, 1357 (Fed. Cir. 2004). The written description requirement guards against overreaching in claiming as inventions things not possessed by the inventors by requiring the inventors to disclose the full scope of the invention to the public. *Reiffen v. Microsoft Corp.*, 214 F.3d 1342, 1345-46 (Fed. Cir. 2000). Thus, the written description requirement furthers the policy of the patent system -- to reward inventors with exclusive rights in exchange for a detailed disclosure of the invention. *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1344 (Fed. Cir. 2005).

A patent specification satisfies the written description requirement of § 112 only if it clearly allows persons of ordinary skill in the art to recognize that the applicant invented what is claimed. *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991). "Put another way, one skilled in the art, reading the original disclosure, must immediately discern the limitation at

issue in the claims." *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1323 (Fed. Cir. 2000).

The specification must describe each feature in sufficient detail that someone skilled in the art at the time the original application was filed could readily visualize what is claimed. *Rochester*, 358 F.3d at 923. The appearance of "mere indistinct words" in a specification, claim, or an original claim, does not satisfy that requirement. *Id* ("[a] description of an anti-inflammatory steroid, *i.e.*, a steroid (a generic structural term) described even in terms of its function of lessening inflammation of tissues fails to distinguish any steroid from others having the same activity or function. A description of what a material does, rather than of what it is, usually does not suffice," quoting *Regents of the Univ. of Cal. v. Eli Lilly & Co., Inc.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997)). There is no written description support for "subject matter which is not disclosed, but would be obvious over what is expressly disclosed." *Lockwood v. American Airlines*, 107 F.3d 1565, 1571-72 (Fed. Cir. 1997).

Accordingly, the written description requirement cannot be satisfied by describing "a hoped-for function of an as-yet-to-be-discovered" invention. *Id.* at 926-27; *see also Lilly*, 119 F.3d at 1568 ("[a]n adequate written description of a DNA . . . 'requires a precise definition, such as by structure, formula, chemical name, or physical properties,' not a mere wish or plan for obtaining the claimed chemical invention."). Rather, explicit disclosure of the claimed invention -- and how to accomplish it -- is the fundamental *quid-pro-quo* that is required to justify the patent monopoly. *Rochester*, 358 F.3d at 922. An adequate written description requires "a description of an invention, not an indication of a result that one might achieve if one made that invention." *Lilly*, 119 F.3d at 1568.

Although the written description inquiry is a question of fact, summary judgment of invalidity for failure to comply with this requirement must be granted where, as here, there is no genuine issue regarding the insufficiency of the application(s) upon which priority may be claimed. *Rochester,* 358 F.3d at 927. "[A] patent can be held invalid for failure to meet the written description requirement, based solely on the language of the patent specification. After all, it is in the patent specification where the written description requirement must be met." *Id.*

## V. ARGUMENT

### A. The Claims of the '516 Patent Are Invalid Due to Lack of an Adequate Written Description

#### 1. The Decision of the court in *Rochester,* a closely analogous case, compels a finding of invalidity for the '516 patent.

The facts of the present case are very similar to those presented in *University of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 923 (Fed. Cir. 2004) in which the district court granted summary judgment of invalidity for lack of an adequate written description and the decision was affirmed on appeal by the Federal Circuit.

In *Rochester*, the claims of United States Patent No. 6,048,850 ("the '850 patent") were directed to methods "for selectively inhibiting PGHS-2 activity in a human host" by "administering a non-steroidal compound that selectively inhibits activity of the PGHS-2 gene product to [or in] a human host in need of such treatment." *Id.* at 918. PGHS-2 is more commonly known as COX-2. *Id.* at 917. After discovering the function of COX-2, the Rochester scientists hypothesized that it would be possible to reduce inflammation without gastrointestinal side effects if a method could be found for selectively inhibiting the activity of COX-2. *Id.*

The Rochester scientists attempted to develop a screening assay for determining whether a particular drug displayed such selectivity, and filed a patent application directed to their developments in 1992. *University of Rochester v. G.D. Searle & Co.*, 249 F.Supp.2d 216, 219 (W.D.N.Y 2003). After filing several continuation, continuation-in-part, and divisional applications derived from that 1992 application, they received a patent covering assay methods "for identifying a compound that inhibits prostaglandin synthesis catalyzed by mammalian prostaglandin H synthase-2 (PGHS-2)." *Id.*

The claims of the '850 patent, however (and like the '516 patent at issue in this case), tried to cover more than just the assays and issued with claims directed to a "method for selectively inhibiting PGHS-2 activity" but containing no limitation as to what compounds could be used to practice the claimed methods. *Id.* at 225. In contrast to the '516 patent, the '850 patent in *Rochester* contained a substantial description of the structure of the target compound including the nucleotide sequences of coding and promoter regions of the gene that encodes human COX-2; how to make cells that express COX-2; and "assays for screening compounds, including peptides, polynucleotides, and small organic molecules to identify those that inhibit the expression or activity of the PGHS-2 gene product." *Rochester,* 358 F.3d at 927. By comparison, the '516 patent discloses none of this type of structural information for NF-κB.

The district court summarized the inadequacy of the specification to describe the full scope of the claims as amounting to "simply trial and error. Knowing the 'starting point' is not enough; that is little more than a research plan." *Rochester*, 249 F.Supp.2d at 229. Accordingly, the district court concluded that the patent's claims were invalid for lack of written description, and granted Pfizer's motion for summary judgment of invalidity. *Id.* at 235.

The Federal Circuit affirmed the district court's grant of summary judgment of invalidity of the claims of the '850 patent for lack of adequate written description. *Rochester,* 358 F.3d at 929. Although the patent's specification did disclose numerous assay methods for screening compounds, it did not disclose any actual compounds involved in performing the inventive method, nor did it identify which compounds would have the desired characteristic of selectively inhibiting PGHS-2. *Rochester*, 358 F.3d at 927. The Federal Circuit summarized its analysis as follows:

> In sum, the '850 patent does not provide any guidance that would steer the skilled practitioner toward compounds that can be used to carry out the claimed methods -- an essential element of every claim of that patent -- and has not provided evidence that any such compounds were otherwise within the knowledge of a person of ordinary skill in the art at the relevant time . . ..

*Id.* at 929.

As the Federal Circuit explained in *Rochester*, a patent's disclosure must allow one skilled in the art to readily visualize the identity of the subject matter purportedly described. *Id.* at 923. Thus, generalized language in the patent will not suffice if it does not convey the detailed identity of an invention. *Id.* Furthermore, functional descriptions fail to meet the written description requirement unless those functional characteristics are "coupled with a known or disclosed correlation between function and structure, or some combination of such characteristics." *Id.* at 925. "Regardless whether a compound is claimed *per se* or a method is claimed that entails the use of the compound, the inventor cannot lay claim to that subject matter unless he can ***provide a description of the compound sufficient to distinguish infringing compounds from non-infringing compounds, or infringing methods from non-infringing methods.***" *Id.* at 926 (emphasis added).

The '516 patent disclosure fails to define the class of compounds, nor allows one to discern infringing compounds from non-infringing compounds, or infringing methods from non-infringing methods, that can be used to practice the claimed invention (*i.e.*, to reduce NF-κB activity in cells).

2. **The '516 patent does not disclose the structure, formula, chemical name, or physical property of the class of compounds that can be used to "reduce NF-κB activity in cells."**

Like the claims-at-issue in *Rochester* -- all of which were directed to a "method for selectively inhibiting PGHS-2 activity" -- all claims of the '516 patent purport to cover, in some respect, methods for "reducing NF-κB activity in cells." Also, like the patent-at-issue in *Rochester*, the '516 patent does not adequately describe the full scope of compounds or methods that can be used to carry out the claimed invention. *See Rochester*, 358 F.3d at 926 ("As the district court observed, '[t]he claimed method depends upon finding a compound that selectively inhibits PGHS-2 activity. Without such a compound, it is impossible to practice the claimed method of treatment.'").

As with *Rochester*, the '516 patent fails to provide any structure or physical properties of the class of compounds that would reduce NF-κB activity in cells, and the structure of such compounds cannot be deduced from any structure-function correlation. As stressed by the Federal Circuit, an adequate written description requires a precise definition, such as by structure, formula, chemical name, or physical properties. *Rochester*, 358 F.3d at 927; *Lilly*, 119 F.3d at 1566, quoting *Fiers v. Revel*, 984 F.2d 1164, 1171 (Fed. Cir. 1993).

It is undisputed that the '516 patent fails to provide any structure, formula, chemical name, or physical property that define the class of compounds that can be used to reduce NF-κB

activity in a cell. Even lead inventor Dr. Baltimore agrees.[36] ARIAD's own expert similarly admits that the '516 patent does not disclose any chemical names, chemical compositions, or specific chemical structures to define a broad class of compounds that would "reduce NF-κB activity in cells."[37] When pressed, ARIAD's expert merely offers that "some" of the compounds that one might use to practice the claims would be those "able to interact with NF-kappaB."[38] But the law does not permit description by such tautologies. The Federal Circuit has made clear that "vague functional descriptions" cannot be used to describe the class of compounds or actions that can fall within the scope of a claimed method. *See id.* at 928 (finding that one of skill in the art would not be able to identify any compound based on the '850 patent's "vague functional description as 'a non-steroidal compound that selectively inhibits activity of the PGHS-2 gene product.'").[39]

Nor can disclosure of a limited number of ways to achieve a claimed result suffice to describe any and all ways of achieving that result. To be adequate, there must be written description of the full scope of the claims. *Reiffen*, 214 F.3d at 1346; *Rochester*, 358 F.3d at 923 ("[I]t is well settled that claims in an application which are broader than the applicant's disclosure are not allowable.").

---

36 *See e.g.* Ex.B, Baltimore Dep. Tr. at 121:6-14.

37 Ex. H, Ravetch Dep. Tr. at 155:10-23.

38 *Id.*

39 A description relying on function is only permitted in certain rare circumstances where, as the Federal Circuit has explained, functional characteristics are "coupled with a known or disclosed correlation between function and structure, or some combination of such characteristics." *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 964 (Fed. Cir. 2002).

In any event, it is further indisputable that the '516 patent does not discuss any actual experiments or provide a single working example where any such hypothetical molecule was used to reduce NF-κB activity in an intact cell, let alone in any cell in any organism.[40] Therefore, like *Rochester*, the '516 patent fails to set forth enough detail to allow a person of ordinary skill in the art to recognize that the inventor invented what is claimed. *See Rochester*, 358 F.3d at 927.

**3. Screening assays, even if adequately provided, are insufficient to adequately describe compounds that can be used for "reducing NF-κB activity in cells."**

As the Federal Circuit made clear in *Rochester*, even a detailed description of a screening assay is insufficient to disclose *which* compounds have the desired characteristics to carry out the claimed methods. *Rochester*, 358 F.3d. at 927. Without disclosure of which compounds have the desired characteristics, the claimed methods are not described. *Id.*

Like the *Rochester* patent, the '516 patent fails to describe a way to identify the compounds that have the desired characteristic of reducing NF-κB activity in cells, which is what the claims purport to cover. ARIAD's expert flatly admitted in his deposition that the '516 patent merely provides "here is a library of compounds. Here is an assay that you can develop. And you will get from that inevitably, a compound that has an activity."[41] An invitation to fish around for things that might reduce NF-κB activity in cells is not enough under the law to describe the claims of the '516 patent.

40 *See* Ex. B, Baltimore Dep. Tr. at 90:23-91:1; Ex. E, Livingston Dep. Tr. at 265:22-267:5; Ex. H, Ravetch Dep. Tr. at 144:25-145:5.

41 Ex. H, Ravetch Dep. Tr. at 154-156.

In this case, the analogy to *Rochester* is unavoidable. Like the *Rochester* inventors, the purported inventors of the methods claimed in the '516 patent made a discovery in the field related to NF-κB. They realized, in light of the discovery of NF-κB, that it might be beneficial if one could find a compound that would specifically target the activity of NF-κB. As in *Rochester*, however, what the inventors did not do is succeed in taking the further critical steps of actually identifying a class of compounds and describing the use of such compounds for reducing NF-κB activity in cells, or at least identifying the structure and physical properties of such compounds through which one skilled in the art would be directly led to such compounds. As the *Rochester* court noted, "absent that step, their discoveries, valuable though they might have been, did not blossom into a full-fledged, complete invention." *See e.g. Rochester*, 249 F.Supp.2d at 228.

Like the *Rochester* patent, the '516 patent fails to provide adequate written description of the full scope of the claims and, therefore, all claims of the '516 patent are invalid as a matter of law.

**B. The '516 Patent Is Further Invalid For Lack Of An Adequate Written Description Of The "Cells" In Which The Claimed Methods Can Be Practiced.**

The claims of the '516 patent are so broad that they cover methods of reducing NF-κB activity in nearly all cell types, some including both eukaryotic and prokaryotic cells, and all cells both in cell culture and in organisms. No genuine dispute exists that the '516 patent fails to describe this broad scope. It is axiomatic that claims may be no broader than the disclosure. *Rochester*, 358 F.3d at 923 (stating that "it is well settled that claims in an application which are broader than the applicant's disclosure are not allowable"). Thus, all claims of the '516 patent are invalid for failure of the written description to support their broad scope.

**1. The '516 patent contains no description of reducing NF-κB activity in intact cells.**

The parties have stipulated that the term "cell" is properly construed as "intact cells, whether in cell culture or in living tissue (including an organism), as opposed to cell extracts." Thus, all claims of the '516 patent include practice of the claimed method in intact cells.[42] There is no support in the specification for such broad claims.

It is indisputable that the '516 patent provides absolutely no working description or example whatsoever that the claimed methods can be practiced in intact cells. ARIAD's own expert agrees.[43]

The specification makes clear that only experiments restricted to nuclear extracts from broken apart cells were attempted.[44] Achieving a result in nuclear extracts is not sufficient to claim the same result in intact cells or in cells in a living organism.[45] Because of the unpredictability of results in the field of biotechnology, one cannot claim a broad genus after only describing a limited number of species. *Lilly*, 119 F.3d at 1568. Here, the '516 patent fails to describe even a single species of intact cells in which the claimed methods were practiced.

**2. The '516 patent does not describe the cells in which the claimed methods can be practiced.**

Adequate written description requires the disclosure of at least a representative number of cell types. *Lilly*, 119 F.3d at 1568. In *Lilly*, the Federal Circuit ruled that disclosure of the rat

---

42 *See* Joint Claim Construction Chart, D.I. 571 at 2.

43 Ex. E, Livingston Dep. Tr. at 265:22-267:5.

44 *See* Ex. A., '516 patent, col.29, ll.33-56.

45 *See* Ex. F, Ravetch Rebuttal Report at ¶¶ 46, 51.

DNA sequence encoding insulin was not sufficient to support claims to all cDNAs encoding for vertebrate or mammalian insulin. *Id.* at 1568. Because of this failure, the Federal Circuit explained that "one skilled in the art therefore cannot, as one can do with a fully described genus, visualize or recognize the identity of the members of the genus." *Id.* "A definition by function . . . does not suffice to define the genus because it is only an indication of what the gene does, rather than what it is." *Id.*

The claims of the '516 patent contain no limitation that the cells encompassed by the claims must express NF-κB. NF-κB does not exist in all cells. The '516 patent fails to describe which cells express NF-κB.[46] Rather, they merely hypothesize that NF-κB is present in "many, if not all cells."[47] This lack of disclosure leads one of skill in the art to a trial-and-error experimentation in search of cells in which NF-κB is found, let alone cells in which to practice the claimed methods.

The '516 patent fails to describe a representative number of cell types in which the claimed methods can be practiced. ARIAD's experts agree.[48] Dr. Kadesch who testified in favor of the '516 patent in ARIAD's litigation with Eli Lilly in Boston has now recanted his testimony that the '516 patent claims were adequately supported by a written description for all types of cells. When confronted with his testimony on behalf of ARIAD, Dr. Kadesch admitted that the

---

46 Ex. B, Baltimore Dep. Tr. at 57:12-58:13; Ex. E, Livingston Dep. Tr. at 175:14-19.

47 Ex.A, '516 patent, col.10, ll.41-46; col.12, ll. 36-41; col.12, ll. 57-60.

48 Ex. K, Kadesch Dep. Tr. at 268:25-270:16 (confirming the inadequacy of the '516 patent to describe practicing the claimed methods in all eukaryotic cells); Ex. E, Livingston Dep. Tr. at 178:11-17; Ex. I, Calame Dep. Tr. at 168:9-13.

'516 patent does not support a claim to all types of cells.[49] In truth, the '516 patent merely provides an invitation to conduct trial-and-error experimentation to determine those cell types in which the claim methods *might* be successfully carried out.

The research plan set forth in the '516 patent is insufficient to satisfy the written description requirement. The law of disclosure regarding the cell types in which the invention can be practiced is directly analogous to the Federal Circuit's decision in *Lilly*. Here, the speculation as to very few cells types from a few species of a single genus (mammalian) fails to describe a representative number of species sufficient to support a broad genus (eukaryotic), let alone describe a representative number of all cells in which the methods can be practiced. *Lilly*, 119 F.3d at 1568; *see also Enzo*, 323 F.3d at 968 (holding that claims to a broad genus are not adequately described by deposit of only three specific examples); *see also Noelle v. Lederman*, 355 F.3d 1343, 1349 (Fed. Cir. 2004) (affirming human antibody not adequately described by the structure and function of the mouse antigen).

## VI. CONCLUSION

For the foregoing reasons, the claims of the '516 patent are invalid as a matter of law for failure to satisfy the written description requirement of 35 U.S.C. § 112. Amgen respectfully submits that its Motion for Summary Judgment should be granted.

---

[49] Ex. K, Kadesch Dep. Tr. at 268:25-270:16.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6681
msharp@ycst.com

Mark A. Pals, P.C.
Marcus E. Sernel
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601-6636
(312) 861-2000

Robert G. Krupka, P.C.
KIRKLAND & ELLIS LLP
777 South Figueroa Street
Los Angeles, CA 90017-5800
(213) 680-8400

Siegmund Gutman
HOGAN & HARTSON LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4707

Dated: April 25, 2008

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Immunex Corporation, Amgen USA Inc., Amgen Manufactu Limited, and Immunex Rhode Island Corporation*

**CERTIFICATE OF SERVICE**

I, Melanie K. Sharp, Esquire, hereby certify that on April 25, 2008, I caused to be electronically filed a true and correct copy of The Amgen Entities' Opening Brief In Support Of Its Motion For Summary Judgment Of Invalidity Of U.S. Patent No. 6,410,516 For Lack Of Adequate Written Description Under 35 U.S.C. § 112 with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

John G. Day
Steven J. Balick
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

I further certify that on April 25, 2008, I caused a copy of the foregoing document, to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

**BY E-MAIL (by agreement of counsel):**

David Greenwald
David R. Marriot
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

Melanie K. Sharp (No. 2501)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6681
msharp@ycst.com