IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation;            )
IMMUNEX CORPORATION, a Washington              )
corporation; AMGEN USA INC., a Delaware         )
corporation; AMGEN MANUFACTURING,              )
LIMITED, a Bermuda Corporation, and            )
IMMUNEX RHODE ISLAND                           )
CORPORATION, a Delaware corporation,           )
                                               )
    Plaintiffs/Counterclaim Defendants,        )
                                               )
v.                                             )
                                               )
ARIAD PHARMACEUTICALS, INC., a                 )
Delaware corporation, and THE WHITEHEAD        )
INSTITUTE FOR BIOMEDICAL RESEARCH,)
a Delaware corporation,                        )
                                               )
    Defendants/Counterclaim Plaintiffs.

Civil Action No. 06-259 (MPT)

PUBLIC VERSION
CONFIDENTIAL MATERIAL OMMITED

## AMGEN'S OPENING BRIEF ON CLAIM CONSTRUCTION

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6681
msharp@ycst.com

HOGAN & HARTSON LLP
Siegmund Gutman
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4707

KIRKLAND & ELLIS LLP
Mark A. Pals, P.C.
Marcus E. Sernel
200 East Randolph Drive
Chicago, IL 60601-6636
(312)861-2000

Robert G. Krupka, P.C.
South Figueroa Street
Los Angeles, CA 90017-5800
(213) 680-8400

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Inc., Immunex Corporation, Amgen
USA, Inc., Amgen Manufacturing, Limited, and Immunex Rhode Island Corporation*

Dated: April 25, 2008

## TABLE OF CONTENTS

I.    NATURE AND STAGE OF THE PROCEEDINGS.................................................. 3

II.   STATEMENT OF FACTS ............................................................................................. 4

    A.   The Specification Identifies NF-κB Only By Its Function. ................................... 4

    B.   The Inventors Did Not Disclose Actual Methods to Reduce NF-κB
        Activity............................................................................................................... 6

III.  CONSTRUCTION OF THE DISPUTED CLAIM TERMS ............................................. 9

    A.   The Proper Construction of Terms Appearing in All Asserted Claims. ............... 11

        1.   "NF-κB" ............................................................................................... 12

        2.   "NF-κB activity" .................................................................................. 12

            a.   Amgen's constructions, incorporating the three activities in
                the construction of "NF-κB activity" as opposed to "NF-
                κB" itself, reflect the correct structure for the claim..................... 13

            b.   ARIAD's construction improperly seeks to import a "gene
                regulation" limitation into the claims............................................ 13

            c.   The "binding" activity must be to sequences set forth in
                Table 2 of the patent, the only sequences known at the
                time................................................................................................. 14

        3.   "reducing NF-κB activity in cells".......................................................... 16

            a.   The claim language and other intrinsic evidence compel a
                construction requiring action "in" cells to interfere or block
                NF-κB activity................................................................................ 17

            b.   ARIAD's proposed construction improperly attempts to
                read in the concept of an "NF-κB signal transduction
                pathway." ...................................................................................... 21

            c.   ARIAD's proposed construction improperly attempts to
                require reduction "in such a manner that the activity differs
                from the naturally occurring activity of NF-κB under the
                same conditions." ......................................................................... 23

            d.   ARIAD's construction improperly seeks to limit the claims
                to "cells in which NF-κB is present." ........................................... 25

    B.   The Proper Construction of Additional Terms From Claim 6. ............................. 25

1.    "NF-κB-mediated intracellular signaling" ................................................. 26

    a.    Amgen's proposed construction is nearly identical to that
         championed by ARIAD in the *Lilly* litigation. ............................... 27

    b.    ARIAD's proposed construction improperly imports
         limitations into the claims. ......................................................... 28

2.    "such that NF-κB-mediated intracellular signaling is diminished" .......... 29

3.    "diminishing induced NF-κB-mediated intracellular signaling" .............. 31

    a.    The preamble phrase "diminishing induced NF-κB-
         mediated intracellular signaling" merely states the purpose
         for the method described in the body of the claim and as
         such is not limiting. ................................................................... 31

    b.    If found to be limiting, ARIAD's proposed construction
         attempts to import a new method and an unclaimed
         requirement regarding the order in which the method steps
         must be performed ...................................................................... 32

    c.    If the term is limiting, the proper construction is
         "decreasing any existing molecular interaction within cells
         effected by, or conveyed through, NF-κB." ................................. 34

C.    The Proper Construction of Additional Terms From Claim 18. ........................... 34

1.    "so as to reduce intracellular signaling caused by Interleukin-1 or
    Tumor Necrosis Factor-α in the cells" ...................................................... 35

    a.    Amgen's construction is that compelled by the claim
         language and other intrinsic evidence. ........................................ 35

    b.    The structure of the claim requires reduction of NF-κB
         activity in the cell in order to result in reduced intracellular
         signaling caused by IL-1 and TNF-α, and not *vice-versa*. ............ 36

    c.    There is no support in the claim language or specification
         for the introduction of ordered steps through the limitation
         "prior to the performance of the claimed method." ....................... 36

2.    "reducing Interleukin-1 or Tumor Necrosis Factor-α activity in
    mammalian cells" ...................................................................................... 37

a.    The preamble phrase "reducing Interleukin-1 or Tumor Necrosis Factor-α activity" merely conveys the purpose for the method in the body of the claim and as such is not limiting. .................................................................... 38

b.    If the preamble of claim 18 is found to be limiting, then its construction should reflect Amgen's plain meaning construction and reject ARIAD's attempt to read in limitations.................................................................................. 38

IV.    CONCLUSION ............................................................................................. 39

## TABLE OF AUTHORITIES

**Cases**

*Altiris, Inc. v. Symantec Corp.,*
318 F.3d 1363 (Fed. Cir. 2003) ............................................................... 33, 37

*Amgen Inc. v. Hoechst Marion Roussel, Inc.,*
314 F.3d 1313 (Fed. Cir. 2003) ............................................................... 23, 24

*Bicon, Inc. v. Straumann Co.,*
441 F.3d 945 (Fed. Cir. 2006) ............................................................... 32, 38

*Bristol-Myers Squibb Co. v. Ben Venue Lab. Inc.,*
246 F.3d 1368 (Fed. Cir. 1994) ............................................................... 32

*Callicrate v. Wadsworth Mfg., Inc.,*
427 F.3d 1361 (Fed. Cir. 2005) ............................................................... 19

*D.M.I., Inc. v. Deere & Co.,*
755 F.2d 1570 (Fed. Cir. 1985) ............................................................... 14

*DSU Med. Corp. v. JMS Co., Ltd.,*
471 F.3d 1293 (Fed. Cir. 2006) ............................................................... 18

*Elekta Instrument S.A. v. O.U.R. Scientific Int'l., Inc.,*
214 F.3d 1302 (Fed. Cir. 2000) ............................................................... 18

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC,*
349 F.3d 1373 (Fed. Cir. 2003) ............................................................... 24

*In re Teleglobe Communications Corp.,*
493 F.3d 345 (3d. Cir. 2007) ............................................................... 24

*Innogenetics, N.V. v. Abbott Lab.,*
512 F.3d 1363 (Fed. Cir. 2008) ............................................................... 23

*Interactive Gift Express v. Compuserve, Inc.,*
256 F.3d 1323 (Fed. Cir. 2001) ............................................................... 10, 33

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed. Cir. 2005) ............................................................... passim

*Playtex Prods., Inc. v. Proctor & Gamble Co.,*
400 F.3d 901 n.1 (Fed. Cir. 2005) ............................................................... 10

*Rambus Inc. v. Infineon Techs.,*
318 F.3d 1081 (Fed. Cir. 2003) ............................................................... 30

i

*Renishaw PLC v. Marposs Societa per Azioni,*
    158 F.3d 1243 (Fed. Cir. 1998) ..................................................................... 9

*Rexnord Corp. v. Laitram Corp.,*
    274 F.3d 1336 (Fed. Cir. 2001) ................................................................... 11

*Rite-Hite Corp. v. Kelley Co., Inc.,*
    819 F.2d 1120 (Fed. Cir. 1987) ................................................................... 14

*Scimed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc.,*
    242 F.3d 1337 (Fed. Cir. 2001) ................................................................... 10

*Southwall Techs., Inc. v. Cardinal IG Co.,*
    54 F.3d 1570 (Fed. Cir. 1995) ....................................................................... 3

*Springs Window Fashions LP v. Novo Indus., L.P.,*
    323 F.3d 989 (Fed. Cir. 2003) ..................................................................... 10

*Stairmaster Sports Med. Prods., Inc. v. Groupe Procycle, Inc.,*
    25 F. Supp. 2d 270 (D. Del. 1998) .............................................................. 24

*Stumbo v. Eastman Outdoors, Inc.,*
    508 F.3d 1358 (Fed. Cir. 2007) ................................................................... 18

*Sulzer Textil A.G. v. Picanol N.V.,*
    358 F.3d 1356 (Fed. Cir. 2004) ................................................................... 13

*Symantec Corp. v. Computer Assoc. Int'l, Inc.,*
    Nos. 2007-1201, 2007-1239, 2008 WL 1012443 (Fed. Cir. April 11, 2008) ....... 26, 31, 34

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) ............................................................... 3, 9, 10

Amgen submits this Opening Brief on Claim Construction in support of its proposed constructions of claim terms previously submitted in a joint chart to the Court. As will be shown herein, Amgen's proposed constructions are based on the language of the claims themselves, the disclosure of the patent specification, and statements made in the prosecution history, and are compelled by the claim construction principles set forth by the Federal Circuit in its *en banc* opinion in *Phillips v. AWH Corp.* While Amgen submits that the asserted claims of the '516 patent are fatally flawed and invalid because they are circular in language, lack any structure or affirmative process steps, and recite purely functional results without any means of accomplishing those results, Amgen's proposed claim constructions attempt to give fair meaning to functional claim terms that are otherwise undefined, unclear, and indefinite.

The asserted claims[1] are all directed to methods of "reducing NF-κB activity in cells." Amgen contends that this term means "taking action inside cells to directly inhibit (interfere or block) an NF-κB activity." The only recitation in the claims on how to reduce NF-κB activity is that it is performed "in cells." The inventors did not identify any specific ways to reduce NF-κB activity, and the patent specification does not contain a single working example of any of the claimed methods. Instead, the specification posits hypothetical ways that one could potentially take action to directly block or interfere with the actions of NF-κB. The entirety of the '516 patent discloses only action taken inside of cells. The prosecution history also supports Amgen's construction, as there were never any specific embodiments identified that involved action outside of cells. The intrinsic evidence leads to the proper construction for the claim term

---

[1]    Indeed, all claims but claims 7, 19 and 203 of the '516 patent have some form of this claim language.

"reducing NF-κB activity in cells" as requiring action taken inside the cell to directly interact with NF-κB.

ARIAD, in contrast, advances unbounded constructions that are inconsistent with the intrinsic evidence with the apparent hope of ensnaring Amgen's products within the scope of its patent claims while somehow avoiding the prior art. ARIAD's proposed construction would exponentially expand the scope of the claims to include any action taken that happens to have some effect on NF-κB activity, where that action can be done in any location, inside or outside cells (*i.e.*, "without regard to the situs of the inhibiting agent"). Nothing in the patent specification supports this unbounded construction. ARIAD ignores its own plain statements to the U.S. Patent and Trademark Office ("PTO") concerning the scope of the asserted claims. As ARIAD recently acknowledged to the PTO, in response to a rejection of the claims in the pending reexamination proceedings, the asserted claims are limited to methods that require *"intervening intracellularly"* – that is, actions taken inside cells to interfere or block an NF-κB activity.

While ARIAD seeks on the one hand to broaden its claims to ensnare Amgen's products, it seeks on the other hand to rewrite other terms in the claims to add limitations in an attempt to support validity arguments. The additional limitations ARIAD seeks to add, however, are functional terms that are undefined in the patent specification and only layer on further ambiguity. For example, ARIAD proposes to define "reducing NF-κB activity in cells" to include a requirement for "inhibiting any step along the NF-κB signal transduction pathway, in such a manner that the activity differs from the naturally occurring activity of NF-κB under the same conditions." Neither the "signal transduction pathway," the "activity differs," nor the "naturally occurring activity of NF-κB" language were known or defined in the patent

2

specification, and the patent claims simply cannot be stretched so far as to cover inhibiting "any step" in an undefined pathway that has some difference to an unknown naturally occurring activity.

Perhaps most revealing of the fallibility of ARIAD's claim constructions here is that they contradict the constructions that it championed and prevailed on in its prior litigation against Eli Lilly & Co. (hereinafter "Lilly"). ARIAD has shifted its positions to try to best position itself to prevail in this case, but the Federal Circuit has repeatedly denounced such efforts to treat claims as "nose[s] of wax" that can be reshaped to meet litigation objectives. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (citing *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995)). Indeed, claim construction proposals that ARIAD derided as "impossible" and "indefinite" in the *Lilly* case have now become the foundation of ARIAD's proposals in this case.

As discussed further below, Amgen's proposed claim constructions are consistent with the intrinsic evidence of the '516 patent and should be adopted.

## I.     NATURE AND STAGE OF THE PROCEEDINGS

Amgen filed this suit in April of 2006 seeking a declaratory judgment that their activities do not infringe the '516 patent and that the claims of the '516 patent are invalid and unenforceable. (*See* D.I. 1 (April 20, 2006 Complaint)) As required by the Court's Second Amended Scheduling Order, the parties recently conferred and streamlined the claim construction issues before this Court. The parties' proposed constructions, along with the intrinsic evidence supporting those constructions, were jointly submitted to the Court on April 8, 2008. (*See* D.I. 571 (Joint Claim Construction Chart))

3

## II.    STATEMENT OF FACTS

The '516 patent entitled "Nuclear Factors Associated with Transcriptional Regulation" issued on June 25, 2002. (D.I. 571, Ex. A (U.S. Patent No. 6,410,516)) The '516 patent resulted from a series of patent applications filed over the course of nine years from 1986 to 1995. Included in this series of applications were seven continuation-in-part ("CIP") applications in which the inventors added further information to the patent specification. Two other patents issued from this same chain -- the two "assay patents" that ARIAD asserted and later dropped in this litigation.

The '516 patent issued with 203 claims. ARIAD currently asserts only seven of them in this case: independent claims 6 and 18 as well as dependent claims 70, 71, 72, 183, and 184. The asserted independent claims read as follows:

> **Claim 6:**    A method for diminishing induced NF-κB-mediated intracellular signaling comprising reducing NF-κB activity in cells such that NF-κB-mediated intracellular signaling is diminished.

> **Claim 18:**   A method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity in mammalian cells comprising reducing NF-κB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells.

Dependent claims 70-72 and 183-84 merely limit these independent claims to particular cell types, such as "human cells" or "immune cells."

### A.    The Specification Identifies NF-κB Only By Its Function.

In the late 1980s, the named inventors of the '516 patent were among the first to identify an intracellular transcription factor in B-cells and later named it "Nuclear Factor Kappa B(-cell)" or "NF-κB" for short. The scientists did not know the structure of the factor nor did they have specific uses for it at the time. The '516 patent itself reflects many of the initial misconceptions the inventors had about this newly-discovered factor; for example, even the name is misleading --

it is now known that NF-κB is not exclusively found in B-cells.  At the time of the early applications, relatively little was known about NF-κB or its interrelationship with other factors and processes.  The patent describes NF-κB only by the properties the inventors had discovered at the time.  The patent's primary contribution was thus to describe assays that might be used to look for compounds or methods that might impact the then-known functions of NF-κB.  Through sixteen years of prosecution, as ARIAD watched the biotech industry grow, the claims morphed away from what was disclosed in the patent applications and attempted to claim commercial methods the named inventors had not practiced and did not disclose.

Although the patent claims all focus on NF-κB, there is limited disclosure as to what this factor (among the others disclosed) really is.  There is no sequence for a gene encoding NF-κB, nor the amino acid sequence for NF-κB.  While the specification surmises that NF-κB was a single protein and "not a family of factors" (D.I. 571, Ex. A at 14:61-62), it was later discovered that NF-κB does comprise a family of proteins.  In the case of the NF-κB family of proteins, the members are related, among other things, by virtue of the fact that they all bind to a specific set of DNA sequences.  The '516 patent discloses that "NF-κB binds exclusively" to a certain DNA sequence designated "kappa light chain gene enhancer" (followed by a listing of a specified DNA sequence).  (*Id.* at 2:20-21)  Table 2 of the specification lists DNA sequences, including a generic "consensus sequence," that are "recognized by NF-κB."  (*See e.g., id.* at 35:54-55 ("DNA sequences known to contain NF-κB binding domains are shown in Table 2."); *see also* Table 2, *id.* at 37:1-42)  The inventors only disclosed that NF-κB bound to the sequences listed in Table 2 and did not identify all of the genes that may be impacted by NF-κB binding activity.

While NF-κB binding activity occurs in the nuclei of cells, NF-κB must first enter the nucleus from the cytoplasm, where it is bound by the inhibitor protein termed "IκB" (for

"inhibitor of NF-κB"). (*See e.g., id.* at 2:51-54; 16:22-35)  We now know that IκB is, like NF-κB, a family of proteins.  As disclosed in the '516 patent under the heading "NF-κB Acts as an Intracellular Messenger":

> [t]he model which ties together these observations is that NF-κB is initially located in the cytoplasm in a form unable to bind DNA because it is complexed with I-κB.  Various inducers then cause an alteration in I-κB allowing NF-κB to be released from the complex.  Free NF-κB then travels to the nucleus and interacts with its DNA recognition sites to facilitate gene transcription…[T]his model resolves a major question in signal transduction:  NF-κB, like the glucocorticoid receptor, acts as a messenger to transmit the gene induction signal from the plasma membrane to the nucleus.

(*Id.* at 15:54; 16:22-35)  The patent discloses that, by binding to NF-κB in the cytoplasm, IκB keeps NF-κB from being able to bind to its DNA binding sites.  The patent speculates that upon an alteration or modification of IκB, NF-κB may act as an "intracellular messenger" by (1) being released from IκB, (2) translocating from the cytoplasm to the nucleus, and (3) binding to its DNA binding sites (*i.e.,* those DNA binding sites listed in Table 2 of the '516 patent).

### B.    The Inventors Did Not Disclose Actual Methods to Reduce NF-κB Activity.

The patent provides no working examples demonstrating reduction of NF-κB activity in a cell, and only posits various hypothetical means to do so.[2]  The patent states, for example, that NF-κB activity could be altered by directly blocking or inhibiting NF-κB from passing from the cytoplasm of the cell into the nucleus.  (*Id.* at 31:64-32:3)  To accomplish this result, the patent posits the potential use of the following hypothetical agents (all of which must necessarily be used in the cell because each example refers to modifying or binding to a molecule that is found inside cells):

---

[2]  The patent does not discuss or even suggest any experimental conditions or any actual experiments where any of these means were actually used to reduce NF-κB activity in a cell.

(i)     A "[s]pecific inhibitor molecule which [is] able to block (reduce or eliminate) NF-κB binding...An example of such a molecule is IκB." (*See e.g., id.* at 37:44-49)   Such a "specific inhibitor molecule" would supposedly bind to NF-κB and, thus, keep NF-κB from binding to its DNA binding site.

(ii)     "Decoy molecules." (*See e.g., id.* at 37:50-54)   While the '516 patent does not disclose any specific "decoy molecule" that can be used to reduce NF-κB activity in a cell, the patent posits that "NF-κB would bind the decoy and, thus, not be available to bind" its DNA binding site. *Id.*

(iii)     "Dominantly interfering molecules." (*See e.g., id.* at 38:6-8)   While the '516 patent does not disclose any specific "dominantly interfering molecule" that can be used to reduce NF-κB activity in a cell, it speculates that it might be possible to develop a "dominantly interfering molecule" that would bind to a DNA binding site for NF-κB and keep NF-κB from binding to the same binding site.   As theorized in the patent, "a 'dominantly interfering' molecule would recognize and bind to the NF-κB binding site, however, the binding would be non-productive...[The dominantly interfering molecule's] occupation of the NF-κB binding site effectively blocks access to any intact NF-κB molecule which may be present in the cell." (*Id.* at 38:15-22)   Thus, whereas a "decoy molecule" would bind to NF-κB itself, a "dominantly interfering molecule" would bind to the DNA binding site of NF-κB.   The inventors did not refer to any examples of dominantly interfering molecules.

(iv)     "Antagonists of a factor-encoding gene or of the factor encoded by the gene."[3]   The '516 patent defines an "antagonist" of "the factor encoded by the gene" (*i.e.,* NF-κB) or of the

_____

[3]   (*See e.g., id.* at 35:1-2)   There is, however, no discussion in the '516 patent of any specific "antagonist of a factor-encoding gene or of the factor encoded by the gene" beyond the possibility of using IκB.

"factor-encoding gene" (*i.e.*, the gene encoding NF-κB) as a molecule that would bind to NF-κB or the gene that encodes NF-κB, respectively. An "antagonist" is a "molecule[] that bind[s] to certain proteins (*e.g.*, receptors, enzymes) at a specific (active) site on that protein. The binding suppresses or inhibits the activity (function) of that protein."[4] Thus, the "antagonist" referred to in the '516 patent, in theory, would "inhibit the activity" of NF-κB by binding to it. The patent posits that just about anything that binds to NF-κB could possibly inhibit its activity.

(v)     "Inhibiting [the] modification of an IκB protein, which modification otherwise reduces IκB binding to NF-κB."[5] As discussed above, upon alteration or modification of IκB, NF-κB may act as an "intracellular messenger." The patent speculates that IκB is modified prior to "dissociating"[6] from NF-κB, allowing NF-κB to act as an "intracellular messenger" by (1) being released from IκB, (2) traveling to the nucleus, and (3) binding to its DNA binding sites.

These five hypothesized ways of reducing NF-κB activity in a cell use a molecule that either interacts directly with NF-κB (*e.g.*, "specific inhibitor molecule...such a molecule is IκB," "decoy molecule," and "antagonist of...the factor encoded by the gene") or interacts directly with something that was thought to interact directly with NF-κB (*e.g.*, "dominantly interfering molecules," which bind to the DNA binding sites of NF-κB, or compounds that "inhibit the modification of an IκB protein," such as protein kinase C inhibitors). All of these examples thus refer to action taken inside cells to directly interfere with or block NF-κB activity.

---

[4]   *See* *e.g.*, the definition of "antagonist" at www.biotechterms.org (http://biotechterms.org/sourcebook/saveidretrieve.php3?id=108).

[5]   (*See e.g., id.* at claim 66) There is, however, no discussion in the '516 patent of any specific molecule that could be used to "inhibit the modification of an IκB protein."

[6]   Although the '516 patent mistakenly speculates that IκB "dissociates" from NF-κB upon being modified (*see e.g.,* D.I. 571, Ex. A at 27:1-8), we now know that IκB is degraded (or chewed up) by the proteasome and that this results in the release of NF-κB.

### III.    CONSTRUCTION OF THE DISPUTED CLAIM TERMS

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*).  As such, the Court must be guided by the patent claims themselves, and must ordinarily give the claims their "ordinary and customary meaning." *Id.* (quoting *Vitronics*, 90 F.3d at 1582).  In determining the meaning of a disputed claim limitation, a court looks primarily to the intrinsic evidence of record, including the claim language, the patent specification, and the prosecution history. *Id.* at 1314.

As defined by the Federal Circuit in *Phillips,* the "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Id.* at 1313.  Amgen contends that a person of ordinary skill would have a Ph.D in molecular biology, cellular biology, microbiology or a related field and at least two additional years of laboratory experience in these fields.  Furthermore, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314 (citing *Vitronics*, 90 F.3d at 1582).  Claim terms, however, are not to be construed in a vacuum:

> Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.

*Id.* at 1313.  Thus, the Federal Circuit recognized that "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (quoting *Renishaw PLC v. Marposs Societa per Azioni,* 158 F.3d 1243, 1250 (Fed. Cir. 1998)); *see also id.* at 1315 (noting that claims are read in view of the specification, which is the "single best guide to the meaning of a disputed term."). The characterization of a limitation as part of the invention "is strong evidence that the claims

should not be read to encompass the opposite structure." *Scimed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001).

"[A] court 'should also consider the patent's prosecution history, if it is in evidence.'" *Phillips*, 415 F.3d at 1317. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.* The prosecution history represents the "public record of the patentee's representations concerning the scope and the meaning of the claims." *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003).

In addition to the intrinsic evidence, the Court may, in its sound discretion, also consider extrinsic evidence. *Phillips*, 415 F.3d at 1318-19. However, "extrinsic evidence [is] less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* at 1318. Extrinsic evidence is recognized by the Federal Circuit as typically self-serving and litigation-driven, generally not created at the time of the invention or written by or for skilled artisans. *See id.* at 1318-19. As such, extrinsic evidence must always be considered "in the context of the intrinsic evidence." *Id.* at 1319. "[W]hile a trial court may use extrinsic evidence to educate itself about the invention and the relevant technology, it may not use extrinsic evidence to arrive at a claim construction that is at odds with the intrinsic evidence." *Playtex Prods., Inc. v. Proctor & Gamble Co.*, 400 F.3d 901, 908 n.1 (Fed. Cir. 2005); *Interactive Gift Express v. Compuserve, Inc.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001); *Vitronics*, 90 F.3d at 1583.

In this case, the intrinsic evidence provides clear guidance as to the meaning of the claim terms. Extrinsic evidence is unnecessary to construe the claims. There are, however, relevant extrinsic admissions by ARIAD, and the named inventors, as to the scope of the claims. Amgen cites to this extrinsic evidence not to alter the constructions dictated by the intrinsic evidence, but, instead, as confirmation that those constructions are correct.

A key disputed issue that arises from the parties' proposed claim constructions is whether "reducing NF-κB activity in cells" should be construed as it is written, to require action to be taken "in cells" to directly reduce NF-κB activity (Amgen's position), or is unlimited as to the "situs of the inhibiting agent." (ARIAD's position). This central question cuts across all of the asserted claims. ARIAD's lengthy constructions reflect ARIAD's efforts to infuse the claims with additional, undefined terms that attempt to avoid the prior art while still maintaining enough ambiguity to allow it to argue that the claims cover Amgen's accused product, Enbrel®. ARIAD's results-oriented approach to claim construction even takes some positions that it opposed in its prior litigation with Lilly. Amgen will present claim construction disputes in the following order: (A) those terms that are relevant to all asserted claims; (B) additional terms appearing in claim 6; and (C) additional terms appearing in claim 18.

**A.    The Proper Construction of Terms Appearing in All Asserted Claims.**

Claims 6 and 18 of the '516 patent contain slightly different forms of the same claim language "reducing NF-κB activity in cells" (claim 6) or "reducing NF-κB activity in the cells" (claim 18) that serves as the only action or step to be taken in the claimed methods. The only difference between these two terms is the reference to "the" prior to "cells" in claim 18, the practical effect of which is to indicate that "the cells" in claim 18 must be "mammalian cells" as indicated earlier in that claim. These nearly identical terms must be construed to have the same meaning. *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001). Amgen first addresses the proper construction of the foundational terms "NF-κB" and "NF-κB activity", and then builds from that point to construe the key phrase "reducing NF-κB activity in cells."

1.    *"NF-κB"*

| Amgen's Proposed Construction | ARIAD's Proposed Construction |
|---|---|
| "a protein having each NF-κB activity" | "a DNA-binding protein factor found in many eukaryotic cells that: (a) is constitutively present in the cytoplasm of unstimulated cells as an inactive complex, bound to inhibitory IκB proteins; (b) upon dissociation from IκB, translocates to the nucleus of the cell; and (c) once in the nucleus, mediates the transcription of certain genes by binding to specific DNA recognition sequences in those genes." |

2.    *"NF-κB activity"*

| Amgen's Proposed Construction | ARIAD's Proposed Construction |
|---|---|
| "the ability to act as an intracellular messenger by (a) being released from IκB, (b) translocating into the nucleus, and/or (c) then binding one of the DNA sequences listed in Table 2 of the '516 patent" | "the ability of NF-κB to act as an intracellular messenger that regulates transcription of particular genes." |

Amgen's proposed constructions more simply define the activity of the factor and give the claims some structure by specifying the DNA sequences to which NF-κB binds. In contrast, ARIAD: (1) seeks to import a limitation that the binding of NF-κB to DNA "mediates the transcription of certain genes"; and (2) does not define the DNA to which NF-κB binds or the genes it regulates. As ARIAD proposes it, NF-κB is just some factor that regulates the expression of some uncertain genes by binding to some unspecified DNA present in those unknown genes. Such a construction far exceeds any support in the patent disclosure. Amgen's proposed constructions properly define the claim terms based on the intrinsic record as discussed below.

    a.    Amgen's constructions, incorporating the three activities in the construction of "NF-κB activity" as opposed to "NF-κB" itself, reflect the correct structure for the claim.

Amgen's proposed construction of "NF-κB" and "NF-κB activity" parallel the plain structure of these terms -- the activities of NF-κB are included in the definition of "NF-κB activity" and NF-κB is defined as the protein that it is. ARIAD's proposal to lump the NF-κB activities into the definition of NF-κB attempts to obfuscate the patent's failure to disclose the structure of NF-κB. Indeed, ARIAD's broader definition of "NF-κB activity" is inconsistent with the definition ARIAD proffers for NF-κB itself. This inconsistency would present a confusing construction for the jury to apply to the infringement and validity issues, and must be rejected. *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) (noting that "as to claim coverage, the district court must instruct the jury on the meanings to be attributed to all disputed terms used in the claims in suit so that the jury will be able to 'intelligently determine the questions presented.'")

    b.    ARIAD's construction improperly seeks to import a "gene regulation" limitation into the claims.

Amgen disagrees that the terms "NF-κB" and "NF-κB activity" include limitations for "regulat[ing] transcription of particular genes" and "mediat[ing] the transcription of certain genes." ARIAD's attempt to import these limitations into the terms "NF-κB" and "NF-κB activity" is without merit. Many *non-asserted* claims, for example claim 1, require regulation of gene expression of "a gene whose transcription is regulated by NF-κB." (*See e.g.,* D.I. 571, Ex. A at claim 1, *see also* claims 2, 3, and 5) But there is no language in any of the *asserted* claims requiring "gene regulation" or the "regulating" or "mediating" of gene transcription. As such, ARIAD's effort to import such limitations into these claims must be rejected:

> [A]s a general rule a limitation cannot be read into a claim...Where, as here, the limitation sought to be "read into" a claim already appears in

> another claim, the rule is far more than "general." It is fixed. It is long and well established. It enjoys an immutable and universally applicable status comparatively rare among rules of law. Without it, the entire statutory and regulatory structure governing the drafting, submission, examination, allowance, and enforceability of claims would crumble. This court has confirmed the continuing life of the rule.

*D.M.I., Inc. v. Deere & Co.,* 755 F.2d 1570, 1574 (Fed. Cir. 1985); *see also Rite-Hite Corp. v. Kelley Co., Inc.,* 819 F.2d 1120, 1124 (Fed. Cir. 1987) ("where some claims are broad and others narrow, the narrow claim limitations cannot be read into the broad."). Furthermore, these terms require construction in and of themselves and, rather than define them, ARIAD's proposal infuses greater uncertainty into the disputed terms. In fact, because the patent fails to identify what "certain" or "particular" genes are regulated by NF-κB (as discussed further in the next subsection), ARIAD's proposed construction requiring "regulation" and "mediation" of transcription of "certain" or "particular" genes leaves the entire construction indefinite.

      c.    The "binding" activity must be to sequences set forth in Table 2 of the patent, the only sequences known at the time.

Although the parties agree that binding to DNA sequences is a part of NF-κB activity, there is disagreement as to what these DNA sequences must be. The intrinsic evidence dictates that DNA binding must be to the sequences listed in Table 2 of the '516 patent,[7] whereas ARIAD proposes a construction that has no specifics as to what these sequences are or where one of skill in the art would find them.

---

7   NF-κB's binding activity is consistently described in the specification as binding to the particular recognition sequences. (*See e.g.,* D.I. 571, Ex. A at 4:12-15; 31:65-32:3; 35:54-55; 37:1-42; *see also* Ex. 7, September 26, 2007 Deposition of David Baltimore, at 65:6-9 (agreeing that NF-κB's function included binding to particular sequences of DNA); *id.* at 98:20-25 (Q. In fact, if you look at Table 2 -- A. Column 37. Q. --of the 516 patent, which is column 37, that's where you identify sequences recognized by NF-κB and the consensus sequence, correct? A. That's correct.")

The '516 patent discloses that "DNA sequences known to contain NF-κB binding domains are shown in Table 2" of the patent. (*See* D.I. 571, Ex. A at 35:54-55). In the file history, the patentee, in discussing how genes could be placed under the control of NF-κB by inserting an NF-κB binding site in an appropriate position, stated:

> NF-κB binding sites are present in a variety of genes (*see* Table 2, page 96) and comparison of sequences to which NF-κB binds specifically showed a consensus sequence (*see* page 83).

(*See* D.I. 571, Ex. B, '266 Application, September 22, 1995 Preliminary Amendment, at p. 9) Table 2 in fact includes a "consensus sequence" that is generic, so it is not restrictive and would arguably encompass more genes than those that are specifically listed. ARIAD's expert Dr. Ravetch even admits that "[a]s the specification indicates, Table 2 is a list of the sequences recognized by NF-κB that were known at the time, and a proposed consensus sequence...." (*See* Ex. 2, March 5, 2008 Reply Report of Jeffrey V. Ravetch, at ¶10) Amgen's construction reflects the intrinsic evidence regarding the DNA sequences to which NF-κB binding must occur.

ARIAD's construction, on the other hand, seeks to amorphously include binding to undefined "specific DNA" sequences of "certain genes" without any specificity as to what these sequences or genes are. A construction requiring only binding to "specific DNA recognition sequences" would apparently cover all sequences to which NF-κB binds, a wholly circular construction that still begs the question of what NF-κB really is, and would not distinguish NF-κB from some other DNA binding protein. The only "specific" DNA sequences and "certain" genes that are disclosed in the '516 patent are those included in Table 2.

In sum, the proper construction of the term "NF-κB activity" is "the ability to act as an intracellular messenger by (a) being released from IκB, (b) translocating into the nucleus, and/or (c) then binding one of the DNA sequences listed in Table 2 of the '516 patent," with NF-κB then being "a protein having each NF-κB activity".

15

3.    *"reducing NF-κB activity in cells"*

| Amgen's Proposed Construction | ARIAD's Proposed Construction |
|---|---|
| "taking action inside cells to directly inhibit (interfere or block) an NF-κB activity"[8] | "decreasing NF-κB activity in cells in which NF-κB is present by inhibiting any step along the NF-κB signal transduction pathway, in such a manner that the activity differs from the naturally occurring activity of NF-κB under the same conditions, without regard to the situs of the inhibiting agent." |

Amgen's proposed construction is compelled by the language of the claims themselves as informed by the specification and prosecution history. The claim language and the intrinsic evidence as a whole demonstrate that "reducing NF-κB activity in cells" means "taking action inside cells to directly inhibit (interfere or block) an NF-κB activity." ARIAD's lengthy and litigation-induced construction,[9] in contrast, introduces additional terms that fail to clarify the meaning of the disputed terms. Amazingly, ARIAD now proffers a construction that includes language -- requiring that the "activity differs from the naturally occurring activity of NF-κB under the same conditions" -- that it successfully *opposed* in the prior *Lilly* case.

The differences between the parties' constructions are: (1) whether the act of reducing NF-κB activity must occur "in" cells; (2) whether ARIAD can properly import a limitation to an "NF-κB signal transduction pathway" and then argue that the pathway extends outside of a cell;

---

8    This claim construction applies to similarly-worded limitations in other independent claims of the '516 patent. (*See e.g.*, D.I. 571, Ex. A, claims 1, 2, 3, and 5 (employing "reducing NF-κB activity in the cell"); claim 6 (employing "reducing NF-κB activity in cells"); claim 9, 13, 14, 15, 16, 17, and 18 (employing "reducing NF-κB activity in the cells"); and claims 10, 11, and 12 (employing "reducing NF-κB activity in mammalian cells"))

9    ARIAD's proposed constructions have evolved from its positions in the *Lilly* case, and its most recent version also differs from either of those previously proposed by its expert in this litigation.

(3) whether ARIAD can properly import a limitation requiring comparison to "the naturally occurring activity of NF-κB under the same conditions"; and (4) whether ARIAD can properly limit the claims to "those in which NF-κB exists."

    a.    The claim language and other intrinsic evidence compel a construction requiring action "in" cells to interfere or block NF-κB activity.

The key construction issues for "reducing NF-κB activity in cells" are what action is required by the method step of "reducing" and where this action must take place. The claim language, as confirmed by the specification and file history, requires that the reduction be accomplished by action taken inside cells.

All of the (hypothetical) disclosure in the '516 patent -- from the figures to the specification to the claims -- involves methods where the reduction of NF-κB activity would be accomplished by taking *intracellular* action. Nowhere in the ninety columns of the '516 patent is any example discussed of any "reducing" agent that acts outside the cell.[10] In fact, the patent describes "external influences" to the cell as "inducing substances," not as reducing agents and not as a "step along the NF-κB signal transduction pathway" as proposed by ARIAD. (*See* D.I. 571, Ex. A at 3:59-64) As described in Section II.B above, every one of the hypothetical ways in the '516 patent for "reducing NF-κB activity in cells" involves action taken inside cells to directly inhibit (interfere or block) an NF-κB activity. Amgen's proposed construction comports with the patent disclosure and should be adopted. *Phillips*, 415 F.3d at 1316 ("The construction

---

[10] Furthermore, Dr. Baltimore admitted that this is not what was contemplated. (*See e.g.,* Ex. 7 at 144:23-145:10 "Q. So when you -- when you personally were thinking about the scope of the work and the 516 patent, you were thinking of it in terms of inhibitors that reduced NF-κB activity by acting within the signaling module? A. When I was first thinking about that? Q. Yeah. A. I mean when I was writing this -- Q. Yes. A. -- I was thinking about that. Q. About inhibitors that act within the signaling module. A. Within the signaling module."; *see also id.* at 145:19-24: "Q. But you do remain amazed that the claims were applied to things upstream of the signaling module?...A. I am.")

that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."); *see also DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1300 (Fed. Cir. 2006) (affirming as proper a construction consistent with the "language and context of the claims" and informed by the description of the structure in the specification and figures).

The claim language expressly provides that the "reducing" take place "in cells." It is undisputed that NF-κB itself is a protein found exclusively *inside* of cells, and its activities thus all occur exclusively inside cells.[11] It thus does not make sense to refer to NF-κB activity outside of cells, since there is none. The phrase "in cells" or "in the cells" thus must modify "reducing" and not "NF-κB activity", because it would be redundant to say that an intracellular messenger that only has intracellular activity is further limited to occur only inside cells. *See Elekta Instrument S.A. v. O.U.R. Scientific Int'l., Inc.*, 214 F.3d 1302, 1307 (Fed. Cir. 2000) (rejecting claim construction that would render a claim term "superfluous"); *see also Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1362 (Fed. Cir. 2007) (finding the word "vertical" must necessarily refer in the claims at issue to more than orientation because to construe it as simply referring to orientation would "render [other phrases] superfluous, a methodology of claim construction that this court has denounced.").

---

[11] (*See e.g.,* Ex. 8, ███████████████████████████████████

*see also* Ex. 9, ███████████ REDACTED ███████████████

'516 patent at 2:26-31; 2:36-40; 3:59-64; 12:36-41; 14:60-63; 16:22-31; 17:45-50)

This reading of the claim is also consistent with the language of claim 18[12], which recites not only "reducing NF-κB activity *in the cells*" but also "so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α *in the cells.*" (*See* D.I. 571, Ex. A at 83:18-22) In both phrases, the use of the term "in the cells" necessarily modifies "reduce[ing]" and not "intracellular signaling" or "NF-κB activity" as both "intracellular signaling" and "NF-κB activity" *necessarily occur intracellularly* (*i.e.*, in the cell). IL-1 and TNF-α are both proteins that are found outside of cells and when they bind to specific receptors on the cell surface they send signals inside the cell -- claim 18 refers to "intracellular signaling *caused by*" IL-1 or TNF-α. Thus, the claim language itself establishes that when the claims refer to "reducing NF-κB activity *in cells*" or "*in* the cells", this "in cells" limitation necessarily refers to taking the action of "reducing" in the cells as it would otherwise improperly be surplusage.

The requirement in claim 18 of a reduction of "intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α" further reinforces that the step of "reducing NF-κB activity" must occur within the cell. Claim 18 requires the step of reducing NF-κB activity to be "so as to reduce intracellular signaling caused by" IL-1 or TNF-α. As mentioned above, IL-1 and TNF-α exist outside the cell and bind to receptors on the cell surface thereby "causing" intracellular signaling. Because there is no intracellular signaling "caused by" IL-1 or TNF-α until there is binding, reduction of this intracellular signaling must require action inside a cell to reduce the "signaling" that has already been caused. It certainly cannot be the case, as ARIAD seeks to establish with its construction, that blocking IL-1 or TNF-α from binding to a cell

---

12 As the Federal Circuit has recognized that a court must "interpret[] claim terms consistently throughout various claims of the same patent." *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1371 (Fed. Cir. 2005). The only construction that gives meaning to all the terms of claim 18, as well as each of the claims in which this phrase appears, is one in which "in the cell" is read to describe the required action of "reducing."

surface receptor in the first place can accomplish this, because then there would be no "intracellular signaling caused by IL-1 or TNF-α" to reduce.

Amgen's proposed construction is further compelled by the prosecution history of the '516 patent. Throughout the prosecution history leading up to the patent's issuance, the applicants and the Examiner discussed a number of possible embodiments of the claims. In sixteen years of prosecution, there was never any discussion of embodiments that would involve taking action outside of cells. (*See e.g.,* D.I. 571, Ex. G, December 30, 1996 Office Action at p. 5 (noting "[t]he specification suggests some potential methods for preventing binding of NF-κB to its binding sites, such as overexpression of IκB, decoy molecules, dominantly interfering molecules, or NF-κB binding domains, but provides no details and no evidence for any of these suggestions"); *see also* D.I. 571, Ex. H, July 7, 1997 Amendment at p. 7; D.I. 571, Ex. I, October 15, 1997 Office Action at p. 5) Never once prior to issuance was it suggested that actions taken outside of cells, such as blocking upstream extracellular molecules, was encompassed within the asserted claims. And even now during the reexamination of the '516 patent, which has been progressing during the pendency of this case, ARIAD admitted that the asserted claims pertain only to intracellular actions to reduce NF-κB activity and do not pertain to extracellular actions (*e.g.,* blocking extracellular stimuli):

> Broadly speaking, there are the two types of methods to obtain a cell exhibiting reduced NF-κB activity as follows: (a) *reducing the induced NF-κB activity by intervening in the signaling pathway by which NF-κB activity is manifested including particularly intervening intracellularly at a specific segment within the signaling pathway*; and (b) preventing the external inducing stimuli from inducing the intracellular signaling pathway through which NF-κB activity is manifested.
>
> Certain claims of the '516 patent as issued covered both such types of methods. However, as discussed further in this response applicants maintain that *the rejected claims now pending [which include claims 6, 18, 70-72 and 183-184] are directed only to type (a) above.*

(D.I. 571, Ex. U, October 22, 2007 Response to Final Rejection in Merged Reexamination Proceedings, Control Nos. 90/007,503 and 90/007,828 at 27-28 (emphasis added)) ARIAD has therefore itself confirmed to the public and to the PTO that the remaining claims all require "particularly intervening intracellularly" to reduce NF-κB activity, and exclude actions to interfere with "external" stimuli of NF-κB activity.

    b.  ARIAD's proposed construction improperly attempts to read in the concept of an "NF-κB signal transduction pathway."

  ARIAD improperly attempts to read into "reducing NF-κB activity in cells" a limitation calling for "step[s] along the NF-κB signal transduction pathway." This limitation does not in any way define the claimed "reducing NF-κB activity in cells," but rather simply injects unnecessary and unsupported complexity and ambiguity into the claimed term.

  ARIAD's proposed "NF-κB signal transduction pathway" language is found nowhere in the '516 patent. Neither the claims nor the specification ever refer to an "NF-κB signal transduction pathway" or define NF-κB as such. There are three references in the patent to the word "pathway" but none of them refer to "NF-κB signal transduction" or provide specific guidance as to what such a pathway would encompass.

  Even more troubling with ARIAD's proposed "NF-κB signal transduction pathway" language is the implication that this "pathway" extends beyond actions of NF-κB itself to undefined events happening outside of a cell. More specifically, ARIAD seeks to read in the negative limitation "without regard to the situs of the inhibiting agent" to expand the reach of the claim to "reducing" outside the cell. But any "NF-κB signal transduction pathway" that comports with the disclosure of the patent *must* start and end inside the cell where NF-κB is located. As the patent states:

    "it is now possible to alter or modify the activity of NF-κB as an intracellular messenger and, as a result, to alter or modify the effect of a variety of *external*

*influences, referred to as inducing substances,* whose messages are transduced within cells through NF-κB activity."

(D.I. 571, Ex. A at 3:59-64 (emphasis added)) If the inventors had intended to define "reducing NF-κB activity" as any step along a signal transduction pathway that extends to external influences on a cell, they could and should have done so somewhere in the specification. Instead, they properly described these happenings outside of cells as "external influences" and "inducing substances" which then transduce a signal inside cells which then involves NF-κB activity. Blocking external influences so that they fail to induce a signal is not "reducing NF-κB activity in cells" as required by the claims.

Reference in the patent to multiple *induction* pathways (plural) reflects the many ways in which NF-κB activity might be induced, but then these multiple inducing pathways feed into a *common pathway* (singular) for transducing the signal inside the cell:

> Although it has been reported that LPS may directly activate protein kinase C...the different kinetics of induction of NF-κB by LPS and PMA implies that these activators *feed into a common pathway* through distinguishable sites of activation.

(D.I. 571, Ex. A at 72:24-29 (emphasis added))

> NF-κB is now known to be involved in a variety of induction processes in essentially all types of cells and is *thought to participate in a system through which multiple induction pathways work,* in much the same manner as 'second messengers' (*e.g.,* cAMP, IP₃) act, resulting in transduction of a variety of extra-cellular signals into specific patterns of gene expression.

(*Id.* at 12:41-48 (emphasis added))[13]  Thus, if there is such a thing as an "NF-κB signal transduction pathway" -- as contrasted with the multiple *induction* pathways -- the intrinsic

---

[13]  Although making passing reference to these "pathways", the '516 patent also emphasizes that they are part of a complex cellular system of which NF-κB is only one of many "second messengers" operating inside a cell. (*See* D.I. 571, Ex. A at 16:22-39)

evidence is clear that it is exclusively found deep inside of cells.   ARIAD's ill-defined "pathway" construction must be rejected.[14]

        c.      ARIAD's proposed construction improperly attempts to require reduction "in such a manner that the activity differs from the naturally occurring activity of NF-κB under the same conditions."

ARIAD also attempts to import the limitation "activity differs from the naturally occurring activity of NF-κB under the same conditions" in an improper attempt to avoid invalidity of its claims.   The Federal Circuit has recognized that "[i]n examining the specification for proper context, however, this court will not at any time import limitations from the specification into the claims." *Innogenetics, N.V. v. Abbott Lab.*, 512 F.3d 1363, 1370 (Fed. Cir. 2008).   Not only is ARIAD's construction contrary to the law, but ***ARIAD itself argued against importation of this very language into the construction of "reducing NF-κB activity" in the Lilly case.***

Rather than clarifying the meaning of the claim term, ARIAD's proposal introduces ambiguity because it offers no guidance on what conditions define the naturally occurring state of NF-κB activity or how to measure it.   *See e.g., Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1342 (Fed. Cir. 2003) (finding the term "differs from that of human urinary erythropoietin" indefinite where the specification did not direct a standard for comparison, human urinary erythropoietin was not understood to be uniform, and therefore "[o]ne cannot logically determine whether an accused product comes within the bounds of a claim of unascertainable scope.")   For this reason, ARIAD opposed a construction of "reducing NF-κB activity" that incorporated this "naturally occurring" requirement, arguing:

---

[14] Even the inventors admit that the term "signaling pathway" has no consistent meaning. (*See e.g.*, Ex. 13, August 7, 2007 Deposition of Louis Staudt at 116:1-5 ("Q.  So there's no consistent meaning in -- in -- using that phrase?  A.  I would say it would be fair to say that -- that there's not one consistent meaning of one signaling pathway, yes."))

"Naturally occurring" encompasses a variety of fluctuating states. The limitation requires Plaintiffs to demonstrate that NF-κB activity is reduced such that it "differs from its naturally-occurring activity...." Proving such a reduction against a continually shifting standard presents an impossible task. Undoubtedly, Lilly seeks to render this claim indefinite by asking this court to violate the rules of claim construction in defining the phrase "reducing NF-κB activity."

(Ex. 3, ARIAD's Opposition Markman Brief in *Lilly* at pp. 5-6 (citing as support *Amgen*, 314 F.3d at 1341-42 (Fed. Cir. 2003))[15] ARIAD was successful in convincing the *Lilly* court not to adopt this construction, and ultimately prevailed in a jury trial using its construction; as such, ARIAD is estopped from arguing adoption of this construction. *See Stairmaster Sports Med. Prods., Inc. v. Groupe Procycle, Inc.*, 25 F. Supp. 2d 270, 280 (D. Del. 1998) (applying the doctrine of judicial estoppel to foreclose a contradictory claim construction argument where the patentee previously argued a different position in the claim construction hearing.); *see also In re Teleglobe Communications Corp.*, 493 F.3d 345, 377 (3d. Cir. 2007) ("Judicial estoppel prevents a party from 'playing fast and loose with the courts' by adopting conflicting positions in different legal proceedings (or different stages of the same proceeding.")))

Even if not estopped, however, ARIAD was right that importation of any "naturally occurring" language into the claim construction would present "an impossible task" to show the claim was practiced and would "violate the rules of claim construction." (*See* Ex. 3, at 5-6) A claim construction that merely requires more construction to determine what "naturally occurring" means is not appropriate. *See Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003) (rejecting a proposed construction where it would be impossible to determine whether an accused formulation infringed or not.) Moreover, if ARIAD

---

[15] (*See also* Ex. 4 (ARIAD's Demonstratives in Markman Presentation), slide 10; *see also* Ex. 5 (Transcript of December 13, 2004 Markman Hearing), at pp. 14-15 (in which ARIAD argued "[t]he disagreement here is that they say it has to be reduced as compared to the naturally occurring activity under the same conditions, and we say that language isn't in the claim."))

wanted a claim that would require reduction of NF-κB activity against a particular baseline (even an indefinite one such as its "naturally occurring" standard), it should have drafted the claim to include this language. ARIAD's belated attempt to import this language into the claim in an attempt to give some meaning to the word "reducing" should be rejected.

     d.  ARIAD's construction improperly seeks to limit the claims to "cells in which NF-κB is present."

   ARIAD's proposal to add the limitation "in which NF-κB is present" is another attempt to add words to the claims to attempt to preserve their validity. ARIAD did not propose that this additional limitation was part of a proper construction in the *Lilly* case (*see* Ex. 6, ARIAD's Opening Markman Brief in *Lilly*, at p. 3-4), and in fact this limitation has no basis in the claim language. *See e.g.*, *Philips*, 415 F.3d at 1312 ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'") If the patent applicants had wanted to limit the claims to those cells in which NF-κB was present, or to specific subsets of particular types of cells, they could have and should have included those limitations in the claims. Indeed, many of the dependent claims, including some of those asserted in this case, limit those claims to specific types of cells (*e.g.*, immune cells). ARIAD should not be able to "fix" its broad claims by injecting a limitation that is not called for by any of the claim language. And ARIAD's proposed construction is doubly improper because instead of defining the claim, it seeks to import a limitation that is merely an invitation for further research, *i.e.*, to experiment to determine which cells in fact contain NF-κB.

**B.  The Proper Construction of Additional Terms From Claim 6.**

   In addition to the omnipresent limitation of "reducing NF-κB activity in cells," claim 6 also contains a limited amount of additional language:

6.   A method for *diminishing induced NF-κB-mediated intracellular signaling* comprising reducing NF-κB activity in cells **such that NF-κB-mediated intracellular signaling is diminished.**

The parties agree that the bolded term "such that NF-κB-mediated intracellular signaling is diminished" requires construction.  The parties dispute the construction of this entire term, as well as the foundational term "NF-κB-mediated intracellular signaling."  In addition, ARIAD contends that the similar phrase "diminishing induced NF-κB-mediated intracellular signaling" from the preamble of claim 6 is limiting of the claim and also requires construction.  Amgen believes that the preamble is "reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim" and thus is not a limitation of the claim.  *Symantec Corp. v. Computer Assoc. Int'l., Inc.*, Nos. 2007-1201, 2007-1239, 2008 WL 1012443, at *4 (Fed. Cir. April 11, 2008).  If the Court does find the preamble of 6 to be limiting of the claim, however, then Amgen has provided an alternative construction for this term.

*1.*     *"NF-κB-mediated intracellular signaling"*

| Amgen's Proposed Construction | ARIAD's Proposed Construction |
|---|---|
| "molecular interactions within cells effected by, or conveyed through, NF-κB" | "the intracellular steps of the NF-κB signal transduction pathway." |

The term "NF-κB-mediated intracellular signaling" is properly understood to mean "molecular interactions within cells effected by, or conveyed through, NF-κB".  To one of ordinary skill in the art, the term "intracellular signaling" refers to molecular interactions that occur within a cell and "mediated" means "effected by or conveyed through."  ARIAD's proposed construction contradicts its prior admissions as to the proper scope of this term and improperly imports a "NF-κB signal transduction pathway" limitation and the notion that any such "pathway" extends outside of a cell.

a.    Amgen's proposed construction is nearly identical to that championed by ARIAD in the *Lilly* litigation.

ARIAD has previously endorsed, and in fact successfully asserted, a construction largely identical to that proposed by Amgen[16]:

**Amgen's Current Proposed Construction:** "molecular interactions within cells effected by, or conveyed through, NF-κB"

**ARIAD's Construction in Lilly (ultimately agreed to by Lilly):** "molecular communication within cells effected by, or conveyed through, NF-κB."

**ARIAD's Current Construction:** "the intracellular steps of the NF-κB signal transduction pathway."

(*See* Ex. 6, at p. 4, 19-20)  In the *Lilly* litigation, ARIAD argued for, and offered expert declarations in support of, a construction that it admitted was compelled by the claim language as understood by one of ordinary skill in the art.[17] (*See id.*; *see also* Ex. 3, at p. 7)  Acknowledging that the specification does not use the term "intracellular signaling," ARIAD pointed to the patent's description of NF-κB's action "as an intracellular transducer or mediator of a variety of external influences." (*See* Ex. 6, at p. 20)  Specifically, ARIAD argued:

...intracellular signaling means to communicate inside the cell.  This communication is conveyed by a molecule, NF-κB, therefore referring to

---

16  Although using the word communication instead of interaction, ARIAD acknowledged that "molecular communication involves interactions of different signaling proteins." (*See* Ex. 6, at p. 20)

17  (*See e.g.*, Ex. 11, November 24, 2003 Declaration of Thomas Gilmore, at ¶ 15 (noting that "The process of cell signaling...involves a form of molecular communication between a complex system of signaling proteins.  In general, these various proteins communicate or pass signals to each other by interacting with each other."); *see also id* at ¶ 22: "The phrase 'NF-κB-mediated intracellular signaling' is used in the claims.  This phrase refers to molecular communication within cells effected by, or conveyed through NF-κB."; *see also* Ex. 12, November 24, 2003 Declaration of Laurie Glimcher, at ¶ 10 (declaring "'Cell signaling' or 'signal transduction' refers to the process by which a cell converts an extracellular signal into a cellular response...The final step of cell signaling often involves transcription factors, which act to turn expression of specific genes on and off in response to extracellular signals."))

molecular communication in the context of the claim. In general, molecular communication involves interactions of different signaling proteins. By such interactions, signaling proteins can pass along signals in the form of biochemical changes to the proteins with which they interact.

(Ex. 6, at p. 20; *see also* Ex. 3, at p. 7 (internal citations omitted)):

> ...the definition should explain the terms 'signaling' and 'mediated.' As Plaintiffs explained in their opening brief, in the context of the invention, signaling means molecular communication, which here is mediated or conveyed by NF-κB. The definition provided by Plaintiffs incorporates the description provided in the '516 specification that explains how NF-κB causes signals to pass within cells. *See e.g.,* '516 patent, 10:41-46, 12:36-56, 17:45-47.

ARIAD successfully convinced Lilly and the *Lilly* court to adopt this construction of "NF-κB-mediated intracellular signaling." As explained above, ARIAD should be estopped from now changing its claim construction that it successfully argued in *Lilly*. *See* discussion *supra*, at Section III.A.3.c.

      b.    ARIAD's proposed construction improperly imports limitations into the claims.

ARIAD's current attempt to define "NF-κB-mediated intracellular signaling" as "intracellular steps of the NF-κB signal transduction pathway" further incorporates the vague "NF-κB signal transduction pathway" (*see* discussion *supra* of "reducing NF-κB activity in cells") and then adds, by referencing "intracellular steps," the implication that this pathway has extracellular components to it.

As discussed above, the concept of an "NF-κB signal transduction pathway" is not specifically found in the intrinsic evidence and, rather than serving to define the claimed term, it introduces ambiguity into the claim. But more importantly, there is no support for ARIAD's argument that any "NF-κB signal transduction pathway" extends to actions outside the cell. NF-κB exists only inside cells. Any "signaling" that NF-κB is involved in occurs inside cells. And the patent discloses that multiple distinct *induction* pathways exist by which extracellular

molecules can induce *intracellular second messengers* like NF-κB to act. (*See* D.I. 571, Ex. A at 12:41-48) If there is an "NF-κB signal transduction pathway," it only exists inside of cells. ARIAD's reference to "the intracellular steps of the NF-κB signal transduction pathway" is merely a backdoor attempt to broaden the scope of the claims to encompass extracellular activities and must be rejected.

Based on the intrinsic record and ARIAD's own prior admissions, the term "NF-κB-mediated intracellular signaling" means "molecular interactions within cells effected by, or conveyed through, NF-κB".

2.    *"such that NF-κB-mediated intracellular signaling is diminished"*

| Amgen's Proposed Construction | ARIAD's Proposed Construction |
|---|---|
| "such that there is a decrease of any molecular interaction within cells effected by, or conveyed through, NF-κB" | "[such that NF-κB-mediated] signaling is reduced from an existing induced state to a lower state." |

The parties' dispute concerning the proper construction of "such that NF-κB-mediated intracellular signaling is diminished" incorporates the dispute over the construction of "NF-κB-mediated extracellular signaling" and also raises the additional issue of ARIAD's attempt to include language requiring that the "reduc[tion]" must be "from an existing induced state to a lower state."

Amgen's proposed construction incorporates, and is thus consistent with, the proper construction of "NF-κB mediated intracellular signaling" (*see* Section III.B.1 above) and further recognizes that the plain meaning of "is diminished" is "there is a decrease." Nothing in the term "diminished" suggests that a proper definition of "diminished" requires reduction "from an existing induced state to a lower state" nor is there support for this additional limitation in the specification or claims. ARIAD's construction, which improperly attempts to import this

limitation into the claim, is inconsistent with the claim language, the specification, the prosecution history, and the law. *See e.g., Rambus Inc. v. Infineon Techs.*, 318 F.3d 1081, 1088 (Fed. Cir. 2003) ("This court has repeatedly and clearly held that it will not read unstated limitations into claim language.")

The PTO has properly rejected ARIAD's attempt to read a requirement of prior induction into the asserted claims. ARIAD argued before the PTO that "[t]he instant claims should be interpreted to require a first activating step *which excludes* prophylaxis, pretreatment or simultaneous activator and inhibitor administration; and thus be *limited solely to treatment of an already NF-κB-induced cell* or organism." (*See* D.I. 571, Ex. V at p. 20 (emphasis added)) The Examiner rejected this assertion noting that "[t]here is nothing in the independent claims compelling a person of ordinary skill in the art to include any particular steps including a 1[st] activation step." (*See id.*) The Examiner explicitly found that such an interpretation would "improperly require[] that limitations be read into the claims." (*See id.* at p. 21)[18] The PTO has already considered whether the claims encompass ARIAD's proposed limitation in the pending reexamination and explicitly found that they do not.[19]

---

18  The examiner further found that "[p]atentee's reliance on their mechanism to read into the claims a proviso excluding "prevention" and/or requiring that any activation precede an inhibiting step is not supported by the specification." (*See* D.I. 571, Ex. V at p. 21 (internal citation omitted))

19  ARIAD argued that the claim language of independent claims 6, 8, 9, 14 and 18 (including the asserted claims 6 and 18 (and therefore dependent claims 70, 71, 72, 183, and 184)) required a first induction step in an attempt to overcome the July 6, 2007 Final Rejection of these claims, as anticipated by the prior art. (*See* D.I. 571, Ex. U at pp. 30-32)

3.    *"diminishing induced NF-κB-mediated intracellular signaling"*

| Amgen's Proposed Construction | ARIAD's Proposed Construction |
|---|---|
| Amgen believes that this phrase of the preamble is not limiting of the claim. If it is found to be limiting and requiring construction, it should be understood to mean "decreasing any existing molecular interaction within cells effected by, or conveyed through, NF-κB." | "inhibiting the intracellular steps of the NF-κB signal transduction pathway, performed after the pathway has been initiated in response to application of a stimulus prior to the performance of the claimed method." |

a.    The preamble phrase "diminishing induced NF-κB-mediated intracellular signaling" merely states the purpose for the method described in the body of the claim and as such is not limiting.

The phrase "diminishing induced NF-κB-mediated intracellular signaling" appears only once in the '516 patent, in the preamble of claim 6. This phrase, which merely states the purpose of the method of claim 6, adds nothing to the method recited in the body that already requires "comprising reducing NF-κB activity in cells *such that NF-κB-mediated intracellular signaling is diminished.*" (*See* D.I. 571, Ex. A claim 6 at 82:32-35) The preamble is "reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim" and thus is not a limitation of the claim. *See Symantec*, 2008 WL 1012443, at *4. The claim language viewed as a whole establishes that the phrase "diminishing induced NF-κB-mediated intracellular signaling" in the preamble to claim 6 is a statement of purpose, and repetitive of the body of the claim.

The prosecution history confirms that the preamble is not a limitation of the claim. Despite the presence of the term "diminishing induced NF-κB-mediated intracellular signaling" in the preamble, the Examiner required ARIAD to add to the body of the claim the requirement that the claimed method be "such that NF-κB-mediated intracellular signaling is diminished." (*See* D.I. 571, Ex. Y, October 4, 2001 Examiner's Amendment at p. 3) This amendment would

be redundant if the Examiner believed that the preamble phrase "[a] method for diminishing induced NF-κB mediated intracellular signaling" was a limitation.

Because the preamble merely conveys the intended purpose for carrying out the claimed method, it should not limit claim 6. *See e.g., Bicon, Inc. v. Straumann Co.,* 441 F.3d 945, 952 (Fed. Cir. 2006) ("Preamble language that merely states the purpose or intended use of an invention is generally not treated as limiting the scope of the claim."); *see also Bristol-Myers Squibb Co. v. Ben Venue Lab. Inc.,* 246 F.3d 1368, 1375-76 (Fed. Cir. 1994) (in which the preamble terms "[a] method for treating a cancer patient to effect regression of a taxol-sensitive tumor, said method being associated with reduced hematologic toxicity" and "for reducing hematologic toxicology" were held to be statements of purpose that failed to result in a manipulative difference claimed method and therefore not to be limiting).

        b.      If found to be limiting, ARIAD's proposed construction attempts to import a new method and an unclaimed requirement regarding the order in which the method steps must be performed.

If found to be limiting, however, this phrase does not mean what ARIAD proposes. ARIAD's construction improperly imports a new method and an unclaimed requirement specifying the order to perform method steps. ARIAD's proposed construction seeks to insert through its definition of the term "diminishing induced NF-κB-mediated intracellular signaling" the lengthy limitation -- "performed after the pathway has been initiated in response to application of a stimulus prior to the performance of the claimed method" -- that would read into the claim a requirement for application of a stimulus, multiple method steps, and a particular order in which those steps necessarily must occur.

ARIAD's construction repeats its unsuccessful arguments before the PTO in the reexamination proceedings opposing the rejection of claims, including the instant asserted claims, over the prior art. In an attempt to distinguish the prior art cited as a basis for the

rejection of the claims, ARIAD argued that the claims required a first induction step, and a particular order of application of activator and inhibitor:

> The instant claims should be interpreted to require a first activating step which excludes prophylaxis, pretreatment or simultaneous activator and inhibitor administration; and thus be limited solely to treatment of an already NF-κB-induced cell or organism.

(*See* D.I. 571, Ex. V, at p. 20)  The PTO properly rejected that the claims require any particular steps or agents, or any particular order, responding:

> The claimed methods are drawn to 'reducing NF-κB activity' to inhibit NF-κB regulated gene expression in a eukaryotic (or mammalian) cell. There is nothing in the independent claims compelling a person of ordinary skill in the art to include any particular steps including a 1st activation step.

*Id.*  Through this imported limitation, ARIAD seeks to read into the claims that the method is "performed *after the pathway has been initiated in response to* application of a stimulus *prior to the performance of the claimed method*."  This limitation, if adopted, would arguably limit the claimed method to only those where a stimulus is applied, and certain steps are carried out in a particular order, namely:  (1) application of a stimulus; (2) initiation of the pathway in response to the application of a stimulus; and (3) performance of the claimed method.  There is simply no support in the claim language for additional steps or for performance of specific steps in a particular order.  "Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one." *Altiris, Inc. v. Symantec Corp.,* 318 F.3d 1363, 1369 (Fed. Cir. 2003) (finding a preamble phrase stating an invention's purpose did not add to the body of the claim and did not dictate the order of the method steps); *see also Interactive Gift,* 256 F.3d at 1342.

c.    If the term is limiting, the proper construction is "decreasing any existing molecular interaction within cells effected by, or conveyed through, NF-κB."

If this Court finds the preamble to be limiting, a proper construction would be "decreasing any existing molecular interaction within cells effected by, or conveyed through, NF-κB". This is confirmed by the patent's specification. (*See e.g.,* D.I. 571, Ex. A at 10:41-46, 12:36-40, 17:45-47); *see also* Section III.B.2 above. Indeed, given the fact that cells can have a constitutive level of NF-κB activity (*see e.g.* D.I. 571, Ex. A at 29:47-48; 31:35-38), it is improper to read in any requirement that some "elevated" level of NF-κB activity be present in order to be diminished.

**C.    The Proper Construction of Additional Terms From Claim 18.**

In addition to the omnipresent limitation of "reducing NF-κB activity in cells," claim 18 also contains a limited amount of additional language:

> 18.    A method for *reducing Interleukin-1 or Tumor Necrosis Factor-α activity* in mammalian cells comprising reducing NF-κB activity in the cells **so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells.**

The parties agree that the language "so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells" from the body of claim 18 is limiting and requiring construction. ARIAD also contends that the term "reducing Interleukin-1 or Tumor Necrosis Factor-α activity" from the preamble of claim 18 is limiting of the claim and thus requiring of construction. Amgen believes that this preamble phrase is "reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim" and thus is not a limitation of the claim. *Symantec,* 2008 WL 1012443, at *4. If the Court does find this part of the preamble of 18 to be limiting of the claim, however, then Amgen provides a proposed construction for this term below.

1.      *"so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells"*

| Amgen's Construction | ARIAD's Construction |
|---|---|
| "so as to take action inside cells to directly inhibit (interfere or block) any molecular interaction within cells caused by Interleukin-1 or Tumor Necrosis Factor-α" | "So as to inhibit the intracellular steps of the NF-κB signal transduction pathway induced by Interleukin-1 or Tumor Necrosis Factor-α prior to the performance of the claimed method, applied to the mammalian cells described in the preamble of the claim." |

The parties' dispute over the proper construction of this term from claim 18 involves: (1) the impropriety of ARIAD's attempt to rewrite and thus limit "intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α " to TNF-α or IL-1 *induced NF-κB activity* (where there is no support for such limitation); and (2) yet another attempt by ARIAD to introduce language adding a method step that must occur prior to the performance of the claimed method. *See* discussion at III.B.3 *supra*. ARIAD's proposed construction cannot be correct as it ignores the language of the claim term and the structure of the claim as a whole.

        a.      Amgen's construction is that compelled by the claim language and other intrinsic evidence.

Amgen's proposed construction for the term "so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells" is the plain meaning of this limitation. The term "so as to" indicates that the reduction of intracellular signaling results from action taken to "reduce NF-κB activity in the cells"; *i.e.,* action taken inside the cells as discussed above. Intracellular signaling, as discussed above, consists of molecular interaction within cells. (*See* Section III.B.1 above.) And then there is the requirement that all of this must be "caused by Interleukin-1 or Tumor Necrosis Factor-α." Adding all of this up, the plain meaning construction of this term is "so as to take action inside cells to directly inhibit (interfere

or block) molecular interaction within cells caused by Interleukin-1 or Tumor Necrosis Factor-α."

        b.     The structure of the claim requires reduction of NF-κB activity in the cell in order to result in reduced intracellular signaling caused by IL-1 and TNF-α, and not *vice-versa.*

By reciting the phrase "so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells" *after* the phrase "reducing NF-κB activity in the cells," the claim recites a method in which reducing NF-κB activity in the cells causes a reduction of intracellular signaling caused by IL-1 or TNF-α, and not, as ARIAD's construction seems to suggest, the reverse. ARIAD further seeks to add a requirement that the NF-κB activity that is to be "reduced" by the claim must be "induced" by IL-1 and TNF-α. But there is simply nothing in the claim requiring that IL-1 or TNF-α induce NF-κB activity, let alone the NF-κB activity that is to be reduced by the claimed method (indeed any NF-κB activity at all could be reduced no matter how induced). In any event, the claim language requires reducing intracellular signaling caused by IL-1 and TNF-α by the action of reducing NF-κB activity inside the cells, and does not recite, and cannot be limited to, inhibiting Interleukin-1 or Tumor Necrosis Factor-α *induced* NF-κB activity, as argued by ARIAD.

        c.     There is no support in the claim language or specification for the introduction of ordered steps through the limitation "prior to the performance of the claimed method."

As with the term "diminishing induced NF-κB-mediated intracellular signaling" in claim 6, ARIAD's proposed construction of "so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells" seeks to read into claim 18 an order of method steps such that "the NF-κB signal transduction pathway [is] *induced by Interleukin-1 or Tumor Necrosis Factor-α prior to the performance* of the claimed method." Reading this order

of steps into claim 18 is contradicted by the claim language as discussed above and contrary to the law. *See Altiris*, 318 F.3d at 1369; *see also* discussion at Section III.B.3.c.

The PTO properly found that nothing in the claims, including claim 18, requires a first activation step. (*See* D.I. 571, Ex. V at p. 21) Instead, the claimed method requires one functional step, "reducing NF-κB activity." *Id.* There is no requirement for prior activation by any substance, including IL-1 or TNF-α, and certainly no recitation of any ordered steps concerning the application of "activators" or "reducers." In the claimed method, whether an "activator" or "reducer" is used, and the order in which an "activator" and a "reducer" are administered, does not dictate whether there exists NF-κB activity in cells and NF-κB-mediated intracellular signaling that can be "reduced" to practice the claimed method. Even in the situation where some "reducer" is administered before some "inducer," there may exist NF-κB activity that can be reduced. The specification says nothing about the order of "activators" or "reducers," and certainly not in the context of IL-1 or TNF-α, and thus reading in such a requirement would render the claim hopelessly invalid as indefinite and not described.

    2.    *"reducing Interleukin-1 or Tumor Necrosis Factor-α activity in mammalian cells"*

| Amgen's Proposed Construction | ARIAD's Proposed Construction |
|---|---|
| Amgen believes that this phrase[20] of the preamble is not limiting of the claim. If it is found to be limiting and requiring construction, it should be understood to mean "taking action inside the cell to directly inhibit (interfere or block) any molecular interaction within mammalian cells caused by Interleukin-1 or Tumor Necrosis Factor-α." | "decreasing intracellular NF-κB signal transduction induced by Interleukin-1 or Tumor Necrosis Factor-α that exists in mammalian cells in which NF-κB is present and capable of acting as an intracellular messenger." |

---

20  As indicated *supra*, Section III.A, the phrase "in mammalian cells" provides antecedent basis for the body of claim 18 and is limiting in that regard.

a. The preamble phrase "reducing Interleukin-1 or Tumor Necrosis Factor-α activity" merely conveys the purpose for the method in the body of the claim and as such is not limiting.

The term "reducing Interleukin-1 or Tumor Necrosis Factor-α activity" appears only once in the entirety of the '516 patent -- in the preamble of claim 18 which recites "[a] method for reducing Interleukin-1 or Tumor Necrosis Factor-α activity in mammalian cells comprising...". The body of the claim recites that to practice the invention of claim 18, one must "reduce NF-κB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells" -- essentially repeating the preamble. As a result, the preamble's "for reducing Interleukin-1 or Tumor Necrosis Factor-α activity" is redundant to the body of the claim, a mere statement of purpose, and not a limitation of the claim. *See e.g., Bicon,* 441 F.3d at 952; *see also* discussion at Section III.B.3.

The prosecution history supports Amgen's contention that the preamble is not a limitation of the claim. Despite the presence of the term "reducing Interleukin-1 or Tumor Necrosis Factor-α activity" in the preamble, the Examiner required ARIAD to amend claim 18 to include in the body a substantially similar limitation "so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-a in the cells." (*See* D.I. 571, Ex. Y at p. 6) The Examiner would not have required this amendment if he considered the preamble to be a limitation of the claim because the amendment would have been redundant.

b. If the preamble of claim 18 is found to be limiting, then its construction should reflect Amgen's plain meaning construction and reject ARIAD's attempt to read in limitations.

Nothing in claim 18 suggests that the "activity" referred to in the preamble phrase "reducing Interleukin-1 or Tumor Necrosis Factor-α activity" must be NF-κB activity. Yet ARIAD nevertheless defines the "activity" referred to in the preamble as "intracellular NF–κB signal transduction." But there is no support for importing NF–κB concepts into the preamble

38

and in fact the body of claim 18 makes clear that "reducing NF-κB activity" and "reduc[ing] intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α" are two separate (albeit related) concepts, and that the former must result in the latter. ARIAD's proposed construction of the preamble language attempts to equate Interleukin-1 or Tumor Necrosis Factor-α activity with NF-κB signal transduction, which is not supported at all by the preamble and is contrary to the remainder of the language in the claim. Moreover, ARIAD's construction repeats its prior violation of claim construction principles by seeking to read in a limitation for "mammalian cells in which NF-κB is present and capable of acting an intracellular messenger."

## IV.    CONCLUSION

For these reasons, Amgen respectfully requests that this Court adopt Amgen's proposed constructions for the disputed terms of the '516 patent.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_[signature]_

Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6681
msharp@ycst.com

Mark A. Pals, P.C.
Marcus E. Sernel
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601-6636
(312) 861-2000

Robert G. Krupka, P.C.
KIRKLAND & ELLIS LLP
777 South Figueroa Street
Los Angeles, CA 90017-5800
(213) 680-8400

Siegmund Gutman
HOGAN & HARTSON LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4707

Dated: April 25, 2008

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Inc.,*
*Immunex Corporation, Amgen USA Inc., Amgen Manufacturing,*
*Limited, and Immunex Rhode Island Corporation*

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on April 25, 2008, caused to be electronically filed a true and correct copy of AMGEN'S OPENING BRIEF ON CLAIM CONSTRUCTION with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

John G. Day
Steven J. Balick
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

I further certify that on April 25, 2008, I caused a copy of the foregoing document, to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

### BY E-MAIL (by agreement of counsel):

David Greenwald
David R. Marriot
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

Melanie K. Sharp (No. 2501)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE  19801
(302) 571-6681
msharp@ycst.com