IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation;
IMMUNEX CORPORATION, a Washington
corporation; AMGEN USA INC., a Delaware
corporation; AMGEN MANUFACTURING,
LIMITED, a Bermuda Corporation, and
IMMUNEX RHODE ISLAND
CORPORATION, a Delaware corporation,

     Plaintiffs/Counterclaim Defendants,

     v.

ARIAD PHARMACEUTICALS, INC., a
Delaware corporation, and THE WHITEHEAD
INSTITUTE FOR BIOMEDICAL RESEARCH,
a Delaware corporation, *et. al.*

     Defendants/Counterclaim Plaintiffs.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 06-259 (MPT)

PUBLIC VERSION
CONFIDENTIAL MATERIAL OMMITED

## DECLARATION OF ALISA ERIKA KOCH, M.D.

I, Alisa Erika Koch, M.D., hereby declare as follows:

1.      I have submitted two expert reports (the "Koch Reports") in the above-captioned litigation.

2.      My first expert report entitled Rebuttal Expert Report of Alisa Erika Koch, M.D. was executed on February 22, 2008 (attached as Exhibit A).

3.      My second expert report entitled Reply Expert Report of Alisa Erika Koch, M.D. was executed on March 6, 2008 (attached as Exhibit B).

4.      I hereby incorporate the facts and opinions in the Koch Reports into this declaration.

5.      I further declare under the penalty of perjury that, if called to testify, I would be competent to testify to the facts and opinions set forth therein.


Dated:  *4/25/08*                                                     _Alisa Erika Koch_
                                                                                 Alisa Erika Koch, M.D.

2

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation;
IMMUNEX CORPORATION, a Washington
corporation; AMGEN USA, INC., a Delaware
corporation; AMGEN MANUFACTURING,
LIMITED, a Bermuda Corporation; and
IMMUNEX RHODE ISLAND
CORPORATION, a Delaware corporation,

        Plaintiffs,

v.

ARIAD PHARMACEUTICALS, INC., a
Delaware corporation; and THE WHITEHEAD
INSTITUTE FOR BIOMEDICAL RESEARCH,
a Delaware corporation,

        Defendants,

---

ARIAD PHARMACEUTICALS, INC., a
Delaware corporation; THE PRESIDENT AND
FELLOWS OF HARVARD COLLEGE, a
Massachusetts corporation; MASSACHUSETTS
INSTITUTE OF TECHNOLOGY, a
Massachusetts corporation; and THE
WHITEHEAD INSTITUTE FOR
BIOMEDICAL RESEARCH, a Delaware
corporation,

        Counterclaim-Plaintiffs,

v.

AMGEN, INC., a Delaware corporation;
IMMUNEX CORPORATION, a Washington
corporation; AMGEN USA, INC., a Delaware
corporation; AMGEN MANUFACTURING,
LIMITED, a Bermuda Corporation; and
IMMUNEX RHODE ISLAND
CORPORATION, a Delaware corporation,

        Counterclaim-Defendants.

Civil Action No. 06-259-MPT

**CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER**

## REBUTTAL EXPERT REPORT OF ALISA ERIKA KOCH, M.D. REGARDING NON-INFRINGEMENT OF U.S. PATENT NO. 6,410,516

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................... 1
II.    QUALIFICATIONS ............................................................................... 2
III.   MATERIALS CONSIDERED ................................................................ 3
       A.    Publications. ............................................................................. 3
       B.    Litigation Related Sources. ....................................................... 7
IV.    BACKGROUND SCIENTIFIC PRINCIPLES .................................... 10
       A.    Science Underlying Rheumatoid Arthritis And Its Treatment. ....... 10
             1.    Clinical presentation of rheumatoid arthritis. ................... 10
             2.    Joint pathology in rheumatoid arthritis. ........................... 10
             3.    Etiological factors involved in the onset of rheumatoid arthritis. .... 11
             4.    Progression of disease in rheumatoid arthritis. ................. 14
             5.    Therapies for rheumatoid arthritis. .................................. 27
       B.    Science Underlying Psoriasis And Its Treatment. ...................... 28
             1.    Clinical presentation of psoriasis. .................................. 28
             2.    Skin pathology of psoriasis. ........................................... 28
             3.    Etiological factors involved in the onset of psoriasis. ......... 29
             4.    Progression of disease in psoriasis. ................................. 29
             5.    Therapies for psoriasis. ................................................. 30
V.     BACKGROUND OF ENBREL AND KINERET ................................... 31
       A.    Enbrel. .................................................................................. 31
             1.    Enbrel is a drug that binds to TNF-$\alpha$. ............................. 31
             2.    Development of Enbrel. .................................................. 33
             3.    Production of Enbrel. ..................................................... 34
             4.    Technologies licensed by Amgen with respect to Enbrel. ....... 40
       B.    Kineret. ................................................................................. 42
             1.    Kineret is a drug that binds to IL-1 receptors. ................ 42
             2.    Development of Kineret. .................................................. 43
VI.    NONINFRINGEMENT ANALYSIS ...................................................... 44
       A.    Assumptions ........................................................................... 44
             1.    Applicable law. ............................................................. 44
             2.    The asserted claims. ...................................................... 47
             3.    ARIAD'S proposed claim construction. ........................... 47
             4.    Amgen's proposed claim construction. ............................. 53
       B.    The Use Of Enbrel Does Not Infringe The Claims Of The '516 Patent. ... 56
             1.    Claims 6 and 70-72 ....................................................... 56
             2.    Claims 18 and 183-184 .................................................. 68
             3.    The use of Enbrel does not infringe any non-asserted claims of the '516 patent
                   directly or under the doctrine of equivalents. .................... 78
             4.    The Lizzul and DiChamp articles do not support ARIAD's position that use of
                   Enbrel infringes the '516 patent. ................................... 80

i

5.  The results of the tests performed by Dr. Pomerantz, and discussed in Dr. Calame's report, do not support ARIAD's position that use of Enbrel infringes the '516 patent. ............................................................................ 86

6.  The evidence cited by Dr. Calame does not support the conclusion that Amgen indirectly infringed the '516 patent. .............................................................. 87

7.  There is no evidence that Amgen's alleged infringement of the '516 patent by selling Enbrel was willful. ................................................................................ 97

8.  There are additional reasons that the use of Enbrel does not infringe the '516 patent. ........................................................................................................ 98

C.  The Use Of Kineret Does Not Infringe The Claims Of The '516 Patent. ........ 99

1.  The use of Kineret does not infringe any claims of the '516 patent directly or under the doctrine of equivalents. ................................................................ 99

2.  The Pomerantz Study. ..................................................................................... 101

3.  The evidence shows that Amgen did not indirectly infringe the '516 patent. 101

## I.    INTRODUCTION

My name is Alisa Erika Koch.  I am a faculty member in the University of Michigan Department of Internal Medicine where I am the Frederick G. L. Huetwell and William D. Robinson, M.D. Professor of Rheumatology.  My specialty is Rheumatology and my clinical work involves treating patients with rheumatoid arthritis.  My laboratory research includes studying immunopathogenesis of rheumatoid arthritis, cell adhesion, angiogenesis and cytokines.

I have been retained on behalf of Amgen, Inc., Immunex Corporation, Amgen USA, Inc., Amgen Manufacturing, Limited, and Immunex Rhode Island Corporation (collectively "Amgen") to opine on whether any of the claims of U.S. Patent No. 6,410,516 (the "'516 patent") are infringed by Amgen's products Enbrel (etanercept) and Kineret (anakinra).

The following section, Section II, describes my qualifications, background, and compensation for this case.  Section III lists the materials I have considered in reaching my opinions.  Section IV is a summary of the science underlying this expert report. Section V describes the products Enbrel and Kineret.[1]  Section VI offers my analysis of why Enbrel and Kineret do not infringe the claims of the '516 patent based on my expertise as a clinical and research rheumatologist, my understanding of the parties' proposed claim constructions in this case, and my understanding of the law of patent infringement as it has been explained to me.

My curriculum vitae is attached as **Exhibit A.**

---

[1]    I understand that ARIAD no longer contends that Kineret infringes any claim of the '516 patent.  I further understand that Amgen has requested a ruling from the Court confirming ARIAD's conclusion that Kineret does not infringe the '516 patent.  As a result, I present in this report my opinions regarding Kineret.

I reserve the right to supplement or amend this report and/or my opinions to the extent that additional information is provided by either party or the Court, or to the extent that amendment or supplementation is appropriate. I also reserve the right to consider and provide my opinions in view of facts and matters arising or made known to me subsequent to this report, including the Court's claim construction or in rebuttal to any matter raised by ARIAD Pharmaceuticals, Inc., The President and Fellows of Harvard College, Massachusetts Institute of Technology, and The Whitehead Institute For Biomedical Research (collectively "ARIAD") or its experts, either prior to or during any hearing or trial in this action.

I expect to testify at trial regarding the matters set forth in this report if asked about these matters by the Court or the parties' attorneys. In presenting the matters set forth in this report at trial, I may use some or all of the documents that I have considered in preparation of this report (listed in Section III) as well as visual aids and demonstrative exhibits to help me explain my opinions, bases, and testimony.

## II.    QUALIFICATIONS

I am the Frederick G.L. Huetwell and William D. Robinson, M.D. Professor of Rheumatology at the University of Michigan. I have held an Endowed Chair in rheumatology at the University of Michigan for over 4 years. Prior to that, I rose through the ranks at Northwestern University, from 1986-1997, culminating in an endowed professorship, the Gallagher Research Professor of Medicine, from 1997-2003. I am actively involved in rheumatology patient care and am considered a leader in the area of rheumatoid arthritis. I estimate that over the last 25 years I have treated hundreds of patients with rheumatoid arthritis using various drugs on the market including Enbrel and Kineret.

I am also an active researcher in rheumatology. My research interests focus generally on rheumatoid arthritis, and in particular on cell adhesion, cytokines, and angiogenesis. I have performed experiments using TNF-α, IL-1, and cells from the human rheumatoid synovial tissue lining to determine cell signaling pathways in response to cytokines. I have published 181 articles in a number of scientific journals, including *Science* and *Nature*. In addition, I have contributed 29 book chapters and co-edited a book on Chemokines in Disease. I serve on the editorial boards of Arthritis Research and Therapy, Genetic Vaccines and Therapy, and the Journal of Investigative Medicine, and have recently served as a co-editor of Arthritis and Rheumatism, the leading journal in rheumatology.

I am being paid my usual rate of $800 per hour for my time spent analyzing issues related to the litigation between Amgen and ARIAD, preparing this report, and giving testimony. I am also being reimbursed for reasonable expenses.

## III.    MATERIALS CONSIDERED

### A.    Publications.

1.    Firestein GS. (2005): In: <u>Kelley's textbook of rheumatology</u>. Vol. II Elsevier Saunders, Philadelphia, 996-1042.
2.    Koch AE: The pathogenesis of rheumatoid arthritis. <u>Am J Orthop</u> 36: 5-8, 2007.
3.    Haynes BF. (2004): In: <u>Rheumatoid arthritis</u>. (eds.: St Clair EW, Pisetsky DS, Haynes BF). Lippincott Williams & Wilkins, Philadelphia, 118-133.
4.    Gravallese EM, Monach PA. (2008): In: <u>Rheumatology</u>. Vol. 1 (eds.: Hochberg MC, Silman AJ, Smolen JS, Weinblatt ME, Wiseman MH). Elsevier, Philadelphia 841-866.
5.    Halloran MM, Woods JM, Strieter RM, Szekanecz Z, Volin MV, Hosaka S, Haines GK, 3rd, Kunkel SL, Burdick MD, Walz A, Koch AE: The role of an epithelial neutrophil-activating peptide-78-like protein in rat adjuvant-induced arthritis. <u>J Immunol</u> 162: 7492-7500, 1999.
6.    Williams RO, Feldmann M, Maini RN: Anti-tumor necrosis factor ameliorates joint disease in murine collagen-induced arthritis. <u>Proc Natl Acad Sci USA</u> 89: 9784-9788, 1992.
7.    Trentham DE, Townes AS, Kang AH: Autoimmunity to type II collagen an experimental model of arthritis. <u>J Exp Med</u> 146: 857-868, 1977.

8.  Berlo SE, Guichelaar T, ten Brink CB, van Kooten PH, Hauet-Broeren F, Ludanyi K, van Eden W, Broeren CP, Glant TT: Increased arthritis susceptibility in cartilage proteoglycan-specific T cell receptor-transgenic mice. Arthritis Rheum 54: 2423-2433, 2006.

9.  Verheijden GF, Rijnders AW, Bos E, Coenen-de Roo CJ, van Staveren CJ, Miltenburg AM, Meijerink JH, Elewaut D, de Keyser F, Veys E, Boots AM: Human cartilage glycoprotein-39 as a candidate autoantigen in rheumatoid arthritis. Arthritis Rheum 40: 1115-1125, 1997.

10. Matsumoto I, Maccioni M, Lee DM, Maurice M, Simmons B, Brenner M, Mathis D, Benoist C: How antibodies to a ubiquitous cytoplasmic enzyme may provoke joint-specific autoimmune disease. Nat Immunol 3: 360-365, 2002.

11. Corr M, Firestein GS: The genetics of the target tissue in rheumatoid arthritis. Rheum Dis Clin North Am 28: 79-94, 2002.

12. Avouac J, Gossec L, Dougados M: Diagnostic and predictive value of anti-cyclic citrullinated protein antibodies in rheumatoid arthritis: a systematic literature review. Ann Rheum Dis 65: 845-851, 2006.

13. Hernandez Avila M, Liang MH, Willett WC, Stampfer MJ, Colditz GA, Rosner B, Roberts WN, Hennekens CH, Speizer FE: Reproductive factors, smoking, and the risk for rheumatoid arthritis. Epidemiology 1: 285-291, 1990.

14. Brennan FM, Jackson A, Chantry K, Maini R, Feldmann M: Inhibitory effect of TNF-alpha antibodies on synovial cell interleukin-1 production in rheumatoid arthritis. Lancet 2: 244-247, 1989.

15. Morel JC, Park CC, Kumar P, Koch AE: Interleukin-18 induces rheumatoid arthritis synovial fibroblast CXC chemokine production through NFκB activation. Lab Invest 81: 1371-1383, 2001.

16. Morel JC, Park CC, Zhu K, Kumar P, Ruth JH, Koch AE: Signal transduction pathways involved in rheumatoid arthritis synovial fibroblast interleukin-18-induced vascular cell adhesion molecule-1 expression. J Biol Chem 277: 34679-34691, 2002.

17. Morel JCM, Park CC, Kumar P, Koch AE: Interleukin-18 induces rheumatoid synovial fibroblast CXC chemokine production through NFκB activation. Lab Invest 81: 1371-1383, 2001.

18. Park CC, Morel JC, Amin MA, Connors MA, Harlow LA, Koch AE: Evidence of IL-18 as a novel angiogenic mediator. J Immunol 167: 1644-1653, 2001.

19. Choy EH, Isenberg DA, Garrood T, Farrow S, Ioannou Y, Bird H, Cheung N, Williams B, Hazleman B, Price R, Yoshizaki K, Nishimoto N, Kishimoto T, Panayi GS: Therapeutic benefit of blocking interleukin-6 activity with an anti-interleukin-6 receptor monoclonal antibody in rheumatoid arthritis: a randomized, double-blind, placebo-controlled, dose-escalation trial. Arthritis Rheum 46: 3143-3150, 2002.

20. Edwards JC. (1998): In: Rheumatology. Vol. 1 (eds.: Klippel JH,Dieppe PA). Mosby, London, 6.1-6.8.

21. Koch AE, Polverini PJ, Kunkel SL, Harlow LA, DiPietro LA, Elner VM, Elner SG, Strieter RM: Interleukin-8 as a macrophage-derived mediator of angiogenesis. Science 258: 1798-1801, 1992.

22.   Goldring SR: Pathogenesis of bone erosions in rheumatoid arthritis. Curr Opin Rheumatol 14: 406-410, 2002.
23.   Redlich K, Hayer S, Ricci R, David JP, Tohidast-Akrad M, Kollias G, Steiner G, Smolen JS, Wagner EF, Schett G: Osteoclasts are essential for TNF-alpha-mediated joint destruction. J Clin Invest 110: 1419-1427, 2002.
24.   Fassbender HG, Simmling-Annefeld M: The potential aggressiveness of synovial tissue in rheumatoid arthritis. J Pathol 139: 399-406, 1983.
25.   Han Z, Boyle DL, Manning AM, Firestein GS: AP-1 and NF kappa B regulation in rheumatoid arthritis and murine collagen-induced arthritis. Autoimmunity 28: 197-208, 1998.
26.   Karouzakis E, Neidhart M, Gay RE, Gay S: Molecular and cellular basis of rheumatoid joint destruction. Immunol Lett 106: 8-13, 2006.
27.   Hammaker D, Sweeney S, Firestein GS: Signal transduction networks in rheumatoid arthritis. Ann Rheum Dis 62: ii86-89., 2003.
28.   Jackson JR, Bolognese B, Hillegass L, Kassis S, Adams J, Griswold DE, Winkler JD: Pharmacological effects of SB 220025, a selective inhibitor of P38 mitogen-activated protein kinase, in angiogenesis and chronic inflammatory disease models. J Pharmacol Exp Ther 284: 687-692, 1998.
29.   Shiozawa S, Shimizu K, Tanaka K, Hino K: Studies on the contribution of c-fos/AP-1 to arthritic joint destruction. J Clin Invest 99: 1210-1216, 1997.
30.   Firestein GS: Inhibiting inflammation in rheumatoid arthritis. N Engl J Med 354: 80-82, 2006.
31.   Paul AT, Gohil VM, Bhutani KK: Modulating TNF-alpha signaling with natural products. Drug Discov Today 11: 725-732, 2006.
32.   Yoshimura A: Signal transduction of inflammatory cytokines and tumor development. Cancer Sci 97: 439-447, 2006.
33.   Bubici C, Papa S, Pham CG, Zazzeroni F, Franzoso G: NF-kappaB and JNK: an intricate affair. Cell Cycle 3: 1524-1529, 2004.
34.   Papa S, Zazzeroni F, Pham CG, Bubici C, Franzoso G: Linking JNK signaling to NF-kappaB: a key to survival. J Cell Sci 117: 5197-5208, 2004.
35.   Mon NN, Ito S, Senga T, Hamaguchi M: FAK signaling in neoplastic disorders: a linkage between inflammation and cancer. Ann N Y Acad Sci 1086: 199-212, 2006.
36.   Baud V, Karin M: Signal transduction by tumor necrosis factor and its relatives. Trends Cell Biol 11: 372-377, 2001.
37.   Aggarwal BB: Signalling pathways of the TNF superfamily: a double-edged sword. Nature Rev Immunol 3: 745-756, 2003.
38.   Pakozdi A, Amin MA, Haas CS, Martinez RJ, Haines GK, 3rd, Santos LL, Morand EF, David JR, Koch AE: Macrophage migration inhibitory factor: a mediator of matrix metalloproteinase-2 production in rheumatoid arthritis. Arthritis Res Ther 8: R132, 2006.
39.   Proudfoot AE, Power CA, Rommel C, Wells TN: Strategies for chemokine antagonists as therapeutics. Semin Immunol 15: 57-65, 2003.
40.   Barnes PJ, Karin M: Nuclear factor-kappaB: a pivotal transcription factor in chronic inflammatory diseases. N Engl J Med 336: 1066-1071, 1997.

41.     Lowes MA, Bowcock AM, Krueger JG: Pathogenesis and therapy of psoriasis. Nature 445: 866-873, 2007.

42.     Kuek A, Hazleman BL, Ostor AJ: Immune-mediated inflammatory diseases (IMIDs) and biologic therapy: a medical revolution. Postgrad Med J 83: 251-260, 2007.

43.     Sabat R, Philipp S, Hoflich C, Kreutzer S, Wallace E, Asadullah K, Volk HD, Sterry W, Wolk K: Immunopathogenesis of psoriasis. Exp Dermatol 16: 779-798, 2007.

44.     Griffiths CE, Barker JN: Pathogenesis and clinical features of psoriasis. Lancet 370: 263-271, 2007.

45.     Nickoloff BJ, Xin H, Nestle FO, Qin JZ: The cytokine and chemokine network in psoriasis. Clin Dermatol 25: 568-573, 2007.

46.     Giardina E, Sinibaldi C, Novelli G: Mapping the future of common diseases: lessons from psoriasis. Front Biosci 12: 1563-1573, 2007.

47.     Creamer D, Allen MH, Groves RW, Barker JN: Circulating vascular permeability factor/vascular endothelial growth factor in erythroderma. Lancet 348: 1101, 1996.

48.     Sano S, Chan KS, Carbajal S, Clifford J, Peavey M, Kiguchi K, Itami S, Nickoloff BJ, DiGiovanni J: Stat3 links activated keratinocytes and immunocytes required for development of psoriasis in a novel transgenic mouse model. Nat Med 11: 43-49, 2005.

49.     Leon A, Nguyen A, Letsinger J, Koo J: An attempt to formulate an evidence-based strategy in the management of moderate-to-severe psoriasis: a review of the efficacy and safety of biologics and prebiologic options. Expert Opin Pharmacother 8: 617-632, 2007.

50.     Chong BF, Wong HK: Immunobiologics in the treatment of psoriasis. Clin Immunol 123: 129-138, 2007.

51.     Smith CA, Davis T, Anderson D, Solam L, Beckmann MP, Jerzy R, Dower SK, Cosman D, Goodwin RG: A receptor for tumor necrosis factor defines an unusual family of cellular and viral proteins. Science 248: 1019-1023, 1990.

52.     Haider AS, Cardinale IR, Whynot JA, Krueger JG: Effects of etanercept are distinct from infliximab in modulating proinflammatory genes in activated human leukocytes. J Investig Dermatol Symp Proc 12: 9-15, 2007.

53.     Srivastava MD: Immunomodulatory effects of etanercept (TNFR:Fc) and its use in a patient with Crohn's disease. Res Commun Mol Pathol Pharmacol 109: 125-141, 2001.

54.     Lizzul PF, Aphale A, Malaviya R, Sun Y, Masud S, Dombrovskiy V, Gottlieb AB: Differential expression of phosphorylated NF-kappaB/RelA in normal and psoriatic epidermis and downregulation of NF-kappaB in response to treatment with etanercept. J Invest Dermatol 124: 1275-1283, 2005.

55.     Gottlieb AB, Chamian F, Masud S, Cardinale I, Abello MV, Lowes MA, Chen F, Magliocco M, Krueger JG: TNF inhibition rapidly down-regulates multiple proinflammatory pathways in psoriasis plaques. J Immunol 175: 2721-2729, 2005.

56.     Dichamp I, Bourgeois A, Dirand C, Herbein G, Wendling D: Increased nuclear factor-kappaB activation in peripheral blood monocytes of patients with

6

rheumatoid arthritis is mediated primarily by tumor necrosis factor-alpha. J Rheumatol 34: 1976-1983, 2007.

57.  Roman-Blas JA, Jimenez SA: NF-kappaB as a potential therapeutic target in osteoarthritis and rheumatoid arthritis. Osteoarthr Cartil 14: 839-848, 2006.

58.  Manna SK, Aggarwal BB: IL-13 suppresses TNF-induced activation of nuclear factor-kappa B, activation protein-1, and apoptosis. J Immunol 161: 2863-2872, 1998.

59.  Majumdar S, Aggarwal BB: Methotrexate suppresses NF-kappaB activation through inhibition of IkappaBalpha phosphorylation and degradation. J Immunol 167: 2911-2920, 2001.

60.  Saxne T, Palladino MA, Jr., Heinegard D, Talal N, Wollheim FA: Detection of tumor necrosis factor alpha but not tumor necrosis factor beta in rheumatoid arthritis synovial fluid and serum. Arthritis Rheum 31: 1041-1045, 1988.

61.  Choy EH, Panayi GS, Kingsley GH: Therapeutic monoclonal antibodies. Br J Rheumatol 34: 707-715, 1995.

62.  Chen G, Goeddel DV: TNF-R1 signaling: a beautiful pathway. Science 296: 1634-1635, 2002.

63.  Wajant H: The Fas signaling pathway: more than a paradigm. Science 296: 1635-1636, 2002.

64.  Bouwmeester T, Bauch A, Ruffner H, Angrand PO, Bergamini G, Croughton K, Cruciat C, Eberhard D, Gagneur J, Ghidelli S, Hopf C, Huhse B, Mangano R, Michon AM, Schirle M, Schlegl J, Schwab M, Stein MA, Bauer A, Casari G, Drewes G, Gavin AC, Jackson DB, Joberty G, Neubauer G, Rick J, Kuster B, Superti-Furga G: A physical and functional map of the human TNF-alpha/NF-kappa B signal transduction pathway. Nat Cell Biol 6: 97-105, 2004.

65.  Catrina AI, Trollmo C, af Klint E, Engstrom M, Lampa J, Hermansson Y, Klareskog L, Ulfgren AK: Evidence that anti-tumor necrosis factor therapy with both etanercept and infliximab induces apoptosis in macrophages, but not lymphocytes, in rheumatoid arthritis joints: extended report. Arthritis Rheum 52: 61-72, 2005.

66.  Li and Verma, "NF-κB Regulation in the Immune System," Nature Reviews Immunology, (2002) 2:732.

**B.    Litigation Related Sources.**

U.S. Patent No. 6,410,516

Reexamination Material relating to the reexamination of U.S. Patent No. 6,410,516

All materials relied upon by Dr. Calame in her report

February 18, 2008, Interview of Dr. J. Mark Jackson

January 15, 2008, Expert Report of Aaron Ciechanover, MD., D.Sc.

January 18, 2008, Expert Report of Warner C. Greene, M.D., Ph.D.

January 18, 2008, Expert Report of Kathryn Calame, Ph.D.

February 22, 2008, Rebuttal Expert Report of Randolph Wall, Ph.D.

February 22, 2008, Interview of Laura Hamill

February 18, 2008, Interview of Judith Levinson

January 30, 2008 Interview of Dr. Raymond Goodwin

February 7, 2008, Interview of Arleen Paulino

February 21, 2008 Interview of Dr. Craig Smith

ARIAD's January 3, 2008, Supplemental Responses to Amgen's Requests For Admission Nos. 202-203

February 12, 2008, Interview of Jay Marshall

U.S. Patent No. 5,179,017

U.S. Application No. 2001/0053539 A1

U.S. Patent No. 5,428,130

U.S. Patent No. 5,705,364

U.S. Patent No. 5,610,279

U.S. Patent No. 5,344,915

CA 2 050 300

EP 0 398 327 B1

June 22, 2007, Deposition Tr. of Dr. William Arend

June 21, 2007, Deposition Tr. of Dr. Robert Thompson

January 18, 2008, Expert Report of Dr. Jeffery Ravetch

www.cellsignal.com

ARI-KC00001-ARI-KC00162

AM-AR0521413

AM-AR20000809

October 24, 2007, Deposition Tr. of Kenneth Schooley

AM-AR20000827

October 24, 2007, Deposition Tr. of Noemi Sealock

October 19, 2007, Deposition Tr. of Stuart Chipman

AM-AR0479185

L. Chen & W.C. Greene, <u>Regulation of Nuclear NF-κB Action: a Key Role for Postranslational Modification</u>, in Ghosh, S., ed., <u>Handbook of Transcription Factor NF-kappaB</u> (2007), pages 88-91.

Withoff et al., <u>Regulating the Master Regulator NF-κB: From Natural Strategies to rationally designed superdrugs</u>, in Ghosh, S., ed., <u>Handbook of Transcription Factor NF-kappaB</u> (2007), pages 206-07.

AM-AR0442479

AM-AR0359308

AM-AR0442505

August 24, 2007, Deposition Tr. of Dr. Venkat Mukku

November 8, 2007, Deposition Tr. of Dr. David Goeddel

WYE00757133

WYE00757173

WYE00757153

WYE00757200

WYE00122090

Amgen's Supplemental Response to ARIAD Interrogatory No. 11

May 1, 2007, Amgen's Technology Tutorial

May 1, 2007, ARIAD Technology Tutorial

## IV.     BACKGROUND SCIENTIFIC PRINCIPLES

### A.     Science Underlying Rheumatoid Arthritis And Its Treatment.

#### 1.     Clinical presentation of rheumatoid arthritis.

Rheumatoid arthritis is the most common inflammatory arthritis and affects about 0.5 to 1% of the general population worldwide, and about 1% of the United States population[1]. Rheumatoid arthritis is two to four times more common among females than males which suggests that hormonal factors may play a role in the development of disease[2]. Clinically, the joints are the prime targets of this disease; rheumatoid arthritis often results in destruction of the joints and resultant deformity and lack of function.

#### 2.     Joint pathology in rheumatoid arthritis.

The tissue surrounding joints is called synovial tissue. Normal synovial tissue is composed of a loose connective tissue with very few inflammatory cells and blood vessels. The functions of normal synovium are to make synovial fluid, to provide cartilage with hyaluronan (a lubricant), and to provide cartilage with protein nutrients from the blood[3]. The synovial lining, which is normally 1-2 cell layers thick, is composed of macrophages, which are immune cells, and fibroblasts, which can also play a role in immune functions.

In contrast, the inflamed joints of patients with rheumatoid arthritis are often markedly swollen with large amounts of inflammatory synovial fluid and inflamed synovial tissue lining the joint. The inflammatory synovial tissue pannus, Latin for cloth or covering, is derived from synovial tissue which "covers" and invades cartilage and bone. Bone destruction, mediated by this pannus, results in erosions, classic markers of rheumatoid disease activity, that can be seen on the x-rays of patients with advanced disease.

Thus, the heart of the pathology in rheumatoid arthritis lies in the synovium. At the gross level, inflamed synovial tissues in rheumatoid arthritis show a marked expansion, with the synovial surface thrown into innumerable hyperemic and edematous villous projections that extend into the joint cavity[4]. The microscopic changes include hyperplasia of the synovial lining layer, a mixed inflammatory cell infiltrate in the subsynovium with follicle and germinal center formation, neovascularization, or new blood vessel growth, a mixed inflammatory cell infiltrate in the subsynovium, with follicle and germinal center formation and deposition of fibrin[4]. In contrast to the 1-2 cell thick normal synovial lining layer, the inflamed synovium shows a lining layer up to 12 cells thick. Much of the thickness is due to recruitment of monocyte/macrophage cells from bone marrow. The histological cell types present in the inflammatory infiltrates include monocyte/macrophages, T and B lymphocytes, dendritic cells, plasma cells, and natural killer cells.

### 3. Etiological factors involved in the onset of rheumatoid arthritis.

Rheumatoid arthritis is an extremely complex disease, the precise causes of which remain unknown to date. It is generally believed that a genetically susceptible host encounters an unknown environmental etiological agent which results in a highly complex immunopathogenic response culminating in the development of arthritis. Many of the environmental factors discussed below likely act in concert with each other, and with genetic factors, to initiate the development of rheumatoid arthritis.

#### a. Genetics.

Rheumatoid arthritis is often associated with the gene HLA-DR4 and in most populations studied the presence of this gene may result in more severe disease. Other

genes also play a role. For example, the gene HLA-DR1 is associated with rheumatoid arthritis in Israeli Jews. Analysis of the major histocompatibility complex (a large genomic region found in humans and many other vertebrates) has revealed that DR genes have shared epitopes (portions of the gene that are recognized by the immune system) or "susceptibility cassettes" that predispose carriers of these genes to rheumatoid arthritis development. Not all patients that have this susceptibility marker, however, develop rheumatoid arthritis. Similarly, not all rheumatoid arthritis patients have this susceptibility marker.

**b.    Environment.**

Not only do genetics likely play a role in rheumatoid arthritis, but it is also likely that environmental factors somehow trigger an immune response in the joints of patients, particularly those who are genetically susceptible. To date, conclusive proof of the etiological agent responsible for triggering the immune response is lacking. However, there are a number of contenders for the unidentified etiological agent(s) that may be causative in rheumatoid arthritis.

Infectious Diseases: One class of etiological agents that has been suspected for some time is infectious diseases. A number of animal arthritis models are induced by the injection of heat killed Mycobacteria species[5]. Unfortunately, searches for bacterial products in synovial tissue from rheumatoid arthritis patients have generally been negative. Viruses have also been implicated in the pathogenesis of rheumatoid arthritis, including parvovirus. However, it is important to note that only a minority of rheumatoid patients actually test positive to exposure to parvovirus. It has been difficult to detect evidence of infectious agents in the synovium of patients using, for example, immunohistological assays or by polymerase chain reaction assays.

Autoantigens:    Other potential etiological agents include autoantigens, or substances that are naturally present in the body and cause an immune reaction by the body to itself.    One example is collagen (the main protein in connective tissue). Inflammatory arthritis in mice, rats, and even monkeys can be induced by injection of type II collagen in the presence of Freund's adjuvant (a solution that stimulates an immune response)[6,7].    Another potential antigen is proteoglycan which, when injected into rodents, can cause experimental inflammatory arthritis[8].    In recent years a cartilage glycoprotein termed gp39 has been implicated as an autoantigen in rheumatoid arthritis[9]. Though gp39 appears very specific for rheumatoid arthritis, only a minority of patients have detectable antibodies to gp39.    Another potential causative factor is glucose-6-phosphoisomerase.    This antigen was first identified in a spontaneous mouse arthritis model which develops in mice crossbred from mice bearing the T cell receptor recognizing bovine pancreas ribonuclease and from non-obese diabetic mice[10]. Antibodies to glucose-6-phosphoisomerase have been shown to induce arthritis in these mice.    However, only a small percentage of patients with rheumatoid arthritis have antibodies to glucose-6-phosphoisomerase[11].    Rheumatoid factor is another possible autoantigen and was one of the initial factors leading to the concept of autoimmunity as a cause of rheumatoid arthritis.    Rheumatoid factor, which is present in approximately 75-80% of patients with rheumatoid arthritis, is an antibody directed against an antibody. High rheumatoid factor levels in patients are associated with the presence of features of rheumatoid arthritis outside the joint and more severe disease.    A recently reported example of antibodies associated with rheumatoid arthritis onset arising in structures outside the joint is antibodies to citrullinated peptides.    Antibodies to citrullinated

13

peptides are often detected in the serum of rheumatoid patients many years prior to the onset of rheumatoid arthritis[12].

Smoking:    Another etiological factor that has gained attention, particularly in studies performed on European populations, is smoking. Some studies have suggested that smoking can predict the development of rheumatoid arthritis and influence disease severity[13].

### 4.    Progression of disease in rheumatoid arthritis.

Once genetic and environmental etiological factors act to initiate the development of rheumatoid arthritis, the disease begins to progress and the joint pathology described above develops. Although the mechanism of disease progression in rheumatoid arthritis is not known, the close proximity of inflammatory cells within the synovial tissue suggests cell-cell interactions play a key role. These cell-cell interactions occur via a huge variety of complex mechanisms which are not fully understood. The discussion included in this report is a highly simplified and incomplete description of these mechanisms. In addition, it is almost certain that not all mechanisms by which rheumatoid arthritis progresses are even known.

### a.    Mediators of cell-cell interactions that propagate development of rheumatoid arthritis.

Cell-cell interactions that may propagate development of rheumatoid arthritis are thought to be mediated by direct cell-to-cell contact and by molecules secreted by one cell that sometimes mediate cellular interactions in the joint. A partial listing of factors believed to carry out cell-cell interactions that cause the development of rheumatoid arthritis are:

Direct cell-to-cell contact:    Cell-cell interactions occur by direct cell-to-cell contact, often mediated by cellular adhesion molecules or by secreted proteins.  For instance, E-selectin, vascular cell adhesion molecule-1 (VCAM-1), and intercellular adhesion molecule-1 (ICAM-1) are all present on the endothelial cells which line blood vessels.  Inflammatory cells from the blood stream bind to these endothelial cells, adhere, and then cross from the blood stream into the synovial tissues, resulting in inflammation in the joint.

Components of complement:    Components of complement are inflammatory mediators released by inflammatory cells.  Their classical function is to act as a complex system of proteins found in normal blood plasma that combines with antibodies to destroy pathogenic bacteria.  In rheumatoid arthritis they may be over-produced and result in increased inflammation.

Prostaglandins:    Prostaglandins, such as prostaglandin E2 (PGE2), and lipid compounds derived enzymatically from fatty acids, have a number of important functions in healthy individuals including mediating inflammatory responses.   In rheumatoid arthritis prostaglandins may play a role in mediating bone destruction.

Leukotrienes:    Leukotrienes, such as leukotriene B4, are naturally produced eicosanoid lipid mediators, which normally play a role in the body's inflammatory response and may be responsible for a number of effects in rheumatoid arthritis. Leukotrienes regulate the body's inflammatory response.    In rheumatoid arthritis leukotrienes may play a role in recruiting neutrophils (PMNs) into the synovial fluid.

Oxygen free radicals:    Oxygen free radicals are very small molecules and are highly reactive due to the presence of unpaired valence shell electrons.  Reactive oxygen

species form as a natural byproduct of the normal metabolism of oxygen and their over-concentration in the synovial fluid may break down cellular walls and play a role in inflammation.

Nitric oxide: Nitric oxide is a gas that is important in cell-cell interactions. The endothelium of blood vessels use nitric oxide to trigger the surrounding smooth muscle to relax, thus resulting in vasodilation and increasing blood flow into the synovium. Increased blood flow in the synovium can lead to increased ingress of inflammatory cells into the area.

Matrix metalloproteinases: Matrix metalloproteinases ("MMPs") are enzymes. There are 25 members of this family of proteins and include collagenases, which cleave collagen, stromelysins, which are specific for components of the extracellular matrix, and gelatinases, which cleave gelatin and collagen. MMPs likely play a role in cell differentiation, the growth of new blood vessels, and cell death in healthy people. In rheumatoid arthritis MMPs likely play a role in joint destruction.

Cytokines: Cytokines are proteins that are released into intercellular fluid by one cell type to communicate with other target cell types. Once released, cytokines exist outside of the cell and may interact with receptors on a target cell's surface to cause extremely varied and complicated events to occur inside of the cell. There are numerous cytokines that may play a role in the development of rheumatoid arthritis under certain conditions. A small sample of these complex molecules is described below:

Tumor necrosis factor-α ("TNF-α"): Early studies on cytokine production from dissociated human rheumatoid synovial tissues in 1989[14] showed that TNF-α may play a role in the development of rheumatoid arthritis. TNF-α appears to play a highly

varied role in rheumatoid arthritis and all of its functions are not known. In some patients it appears that TNF-α plays no role in rheumatoid arthritis as blocking TNF-α only helps about ¾ patients with rheumatoid arthritis[15-17].

Interleukin-1 ("IL-1"): IL-1 may stimulate a number of proinflammatory activities in rheumatoid arthritis. IL-1 also appears to play a highly varied role in rheumatoid arthritis and all of its functions are not known.

Interleukin-18 ("IL-18"): IL-18 may be an important factor in angiogenesis, or new blood vessel growth in rheumatoid arthritis[18]. IL-18 gene deficient mice developed less severe arthritis than their respective controls. Hence, IL-18 may participate in the development and progression of rheumatoid arthritis.

Interleukin-6 ("IL-6"): IL-6 is a cytokine that may play a role in stimulating B lymphocytes to increase their antibody production and differentiate into plasma cells. Blockade of IL-6 has shown some promise to reduce or prevent arthritis in animal arthritis models. Recently, an antibody to IL-6 ("IL-6 TRAP") has been proposed as potential new therapy for rheumatoid arthritis[19].

Interleukin-17 ("IL-17"): IL-17 is a cytokine released by T lymphocytes that has proinflammatory effects. Blockade of IL-17 in mouse models of inflammatory arthritis reduces inflammation, joint damage and systemic levels of IL-6 in mouse collagen induced arthritis.

Chemokines: Chemokines are a subset of cytokines which play a role in recruiting cells. Some chemokines, such as IL-8/CXCL8, are also angiogenic. There are almost 50 chemokines described to date, suggesting that their function in biology may be important. Many of these chemokines have been found in the joints of rheumatoid

17

arthritis patients as well as in the joints of arthritic animals. In preclinical studies, we have shown that epithelial neutrophil activating peptide-78 (ENA-78/CXCL5) can be targeted, ameliorating arthritis in a rat arthritis model[5].

All of these factors, and many more not mentioned here, allow cell-cell interactions and have varied functions that at times differ and at times overlap in different ways in different patients under different conditions. Thus, it is difficult to say for any particular symptom of arthritis, in any particular patient, that a particular mechanism or mediator is the cause.

   **b.      How cell-cell interactions may lead to development of**
   **rheumatoid arthritis.**

The complexity of the inflammatory system is further illustrated by the specific cellular interactions that have been theorized may occur in the rheumatoid joint in some patients. The following discussion mentions just a few highly simplified theories about how various processes in rheumatoid arthritis may occur.

   The Onset of Rheumatoid Arthritis: One theory is that rheumatoid arthritis begins when antigen presenting cells (cells causing an immune reaction), such as macrophages, populate the synovial tissue[20]. When the HLA-DR gene is present, these antigen presenting cells encounter an inciting etiological agent (the antigen), ingest this antigen, and display a portion of the antigen on the cell surface. When inflammation is chronic, this process induces the release of cytokines into the synovial fluid which result in some of the systemic symptoms, such as wasting, seen in patients with rheumatoid arthritis.

   Perpetuation of Rheumatoid Arthritis: The resulting perpetuation of the immune response is not well understood. One possible mechanism by which the immune response is perpetuated is by the involvement of T lymphocytes, which begin to

proliferate and release cytokines into the synovial fluid. T lymphocytes may represent about half of the cells in the inflamed rheumatoid arthritis synovium. T lymphocytes in turn may interact with B lymphocytes. B lymphocytes may represent about 5% of cells in the synovial tissue. Often B cells form the center of lymphoid follicle-like structures in the synovial tissue. B lymphocytes produce antibodies, such as rheumatoid factor, which can be detected in the synovial fluid and blood of rheumatoid arthritis patients. Antibodies can form immune complexes which serve as chemoattractants for leukocyte ingress into the inflamed joint. But there is also evidence that in some patients this particular mechanism does not propagate rheumatoid arthritis because in about 20% of patients no rheumatoid factor is present in the patient's tissue. This demonstrates how varied the causes and development of rheumatoid arthritis are in different patients.

Another possible mechanism by which the immune response is perpetuated is by macrophages releasing cytokines into the synovial fluid. These cytokines may perpetuate the immune response by causing synovial tissue fibroblasts to produce additional cytokines. Macrophages also release cytokines which may result in bone erosion and cartilage damage. Macrophages may also interact with adjacent vascular endothelial cells to induce leukocyte adhesion to endothelium. Other cells which populate the inflamed synovium include dendritic cells, which present antigen, and mast cells. While the synovium contains few PMNs (a type of white blood cell), these cells are the predominant cell type in the synovial fluid which bathes the synovium. The synovial fluid also contains complement components, such as C2 and C4, which may serve to chemoattract additional leukocytes into the joint.

Angiogenesis:  New blood vessel growth is needed for the ingress of inflammatory leukocytes into the synovial tissue. This blood vessel growth also fuels the growth of the synovial tissue and its invasion into cartilage and bone[21]. The complexity of the system is illustrated by the number of angiogenic factors found in the inflamed joint, which we and others have described. These factors include cytokines such as TNF-α, IL-1, IL-2, vascular endothelial cell growth factor, IL-8/CXCL8, monocyte chemoattractant protein-1, macrophage inflammatory protein-1, IL-18, and members of the tie/angiopoitin family. Other factors include growth factors like fibroblast growth factors and transforming growth factor-β. Yet other factors include soluble adhesion molecules such as soluble E-selectin, soluble VCAM-1, and soluble ICAM-1. All of these factors act together in diverse and unpredictable ways. The effect of a change in the presence of any one factor in angiogenic growth cannot be predicted because of the complex interactions between these factors and because the manner in which angiogenesis may be mediated varies among patients.

Bone Destruction:  The complex interplay between factors involved in cell-cell interactions is illustrated by the interactions that may occur in order for the rheumatoid bone to become destroyed in some instances. Inflammatory synovial tissue has an abundant number of macrophages which may be driven to form osteoclasts. An osteoclast is a type of cell that removes bone tissue by removing the bone's mineralized matrix (a process known as bone resorption). Bone resorption may be controlled by factors such as IL-1, IL-6, IL-15, IL-17, TNF-α, parathyroid hormone-related peptide, and monocyte colony stimulating factor (M-CSF)[22]. In normal bone resorption, osteoclasts are derived from bone marrow, while in rheumatoid arthritis the synovial

tissue macrophage appears to serve as the source of osteoclast precursors. Activated T lymphocytes may participate in this process by producing IL-17 which contributes to induce osteoclast maturation and activation[23].

As rheumatoid arthritis progresses, the synovial tissue mass composed of fibroblasts, macrophages, T lymphocytes, and blood vessels is referred to as pannus. This pannus has been compared to a benign tumor which invades and destroys adjacent cartilage and bone[24]. The leading edge of the pannus contains concentrations of cathepsins, collagenases, stromelysin, matrix metalloproteinases-3 and -13, and prostaglandin E2, and cytokines[3]. Thus, the factors and mediators at work in the onset and development of rheumatoid arthritis are extremely complicated and involve a great deal of interaction and overlap. In any given instance in the complex rheumatoid arthritis milieu in a human patient, it is difficult to say which particular mediators and factors are at work.

c.    Intracellular events.

The factors involved in cell-cell interactions discussed above function in a wide variety of different ways to cause a target cell, such as a cell from the synovial tissue lining the joint, to act. In some cases, the factors that are present in the synovial fluid may never enter the cell and only function by binding to a receptor on the surface of the target cell. When a particular factor binds to a receptor one or many different complex series of events may take place inside the cell. Other factors pass through cells' outer membranes and may cause, from inside the cell, one or many different complex series of events to take place inside the cell.

When events occur inside a cell, the ultimate result is sometimes the production of one or more proteins. Proteins are produced in the nucleus of a cell (the cell's control

21

center). Production of a protein inside the nucleus involves a number of factors including genes in the form of DNA, messenger RNA, and transcription factors. Transcription factors normally reside in the cytoplasm of the cell (material in the cell surrounding the nucleus).

The events that occur inside the cell that can lead to production of protein are extremely complex and often involve multiple, parallel events taking place. There are a very high number of intracellular events that promote development of rheumatoid arthritis:

One collection of events believed to be involved in rheumatoid arthritis is the mitogen-activated protein kinases (MAP kinases) pathway. The MAP kinases pathway is believed to be divided into 3 families: 1) the extracellular regulating kinase (Erk1/2), 2) the p38 MAP kinase, and 3) the c-Jun-N-terminal kinase (JNK) pathways[25-27]. Interfering with the p38 MAP kinase in rodent models of rheumatoid arthritis has been shown to prevent the progression of established arthritis. Currently, p38 inhibitors are being evaluated in human clinical trials[28].

A molecule that is believed to sometimes be implicated in downstream portions of the p38 MAP kinase and JNK pathways is the transcription factor activator protein-1 (AP-1)[26,27]. AP-1 is believed to play a role in regulating the expression of a variety of matrix metalloproteinases that degrade bone and cartilage, and in regulating proinflammatory cytokines[26] and proliferation of rheumatoid synovial tissue fibroblasts[26]. Thus, AP-1 is likely implicated in inhibiting the growth of human synovial tissue fibroblasts[26]. Additionally, AP-1 blockers (AP-1 decoy oligonucleotides) are thought to suppress collagen induced arthritis and inhibit human joint synovial tissue production of

22

IL-1, IL-6, TNF-α, matrix metalloproteinase (MMP)-3, and MMP-9 in some patients[29]. Another kinase pathway, phosphoinositide-3 kinase (PI3 kinase) has received attention as a result of murine models of rheumatoid arthritis[30].

There appear to be relationships between a number of factors in cell-cell interactions and the kinase-related pathways. It is thought that TNF-α may play a role in the JNK, p38 MAP kinase, focal adhesion kinase (FAK kinase), and transcription factor AP-1 pathways in some patients[31-37]. Also, a number of cytokines thought to be involved in rheumatoid pathogenesis, such as macrophage migration inhibitory factor (MIF), may play a role in the c-jun pathway in some patients[38]. Chemokines may play a role in intracellular events involving G protein coupled receptors, PI3 kinase, and transcription factors like ELK[39].

Other intracellular events involve the transcription factor NF-κB. NF-κB consists of various forms known as hetero- and homo-dimers that can include p50 and p65 as well as c-rel subunits. NF-κB resides in the cytoplasm of a cell bound to an inhibitor of NF-κB, called IκB. When NF-κB is bound to IκB, it is known as the NF-κB:IκB complex. When NF-κB exists in the NF-κB:IκB complex, it cannot enter the nucleus to participate in the transcription of any genes. To allow NF-κB to migrate to the nucleus it must somehow be released from IκB. (For a more detailed description of the process of releasing NF-κB from IκB, see the January 18, 2008, Expert Report of Warner C. Greene, M.D., Ph.D.) The relationship between rheumatoid arthritis and NF-κB is complex and not well understood. In fact it is not certain if NF-κB plays any role in rheumatoid arthritis since no one measures NF-κB or NF-κB activity in actual patients and no research has demonstrated that there is a role.

This process of freeing NF-κB involves numerous factors inside the cell. Inside the cell, for example, the factor protein kinase C is believed to sometimes be involved in the process of releasing NF-κB from IκB. Under certain circumstances, some extracellular factors have been implicated in operating outside the cell to help stimulate such intracellular factors to begin the process of freeing NF-κB from IκB. These extracellar factors include TNF-α, IL-1, IL-17, IL-18, oxidants such as oxygen free radicals, viruses such as Epstein-Barr virus or adenovirus, immune stimuli such as phytohemagglutinin, and other factors like ultraviolet radiation and lipopolysaccharide[27,40]. (*See* the January 18, 2008, Expert Report of Warner C. Greene, M.D., Ph.D.)

As I mentioned, the role, if any, that NF-κB plays in the development of rheumatoid arthritis is not well understood. Because of the complexity of the role that NF-κB plays in events occurring inside the cell, and the complexity of the etiology and development of rheumatoid arthritis, there is no single theory that shows the role NF-κB might play in rheumatoid arthritis. Even if NF-κB does play a role in rheumatoid arthritis it likely would vary from patient to patient and would be dependent on a host of different factors including the mediators of cell-cell interactions involved, the other pathways that have been triggered, and the symptoms present in a particular patient. In some patients, NF-κB would likely not play any role in the disease. Of course, since doctors do not measure NF-κB or NF-κB activity in patients little is known about how NF-κB might vary from patient to patient. Even if NF-κB plays a role in rheumatoid arthritis in some patients (and this has not been proven), affecting NF-κB or NF-κB activity in some way

may not reduce the symptoms of rheumatoid arthritis due to the interplay of many different intracellular actions and transcription factors.

This discussion of intracellular events implicated in rheumatoid arthritis only touches the tip of the iceberg with respect to the complexity of the events that take place as a result of factors involved in cell-cell interactions. As this discussion shows there a very diverse and unpredictable interplay between the many different factors involved in cell-cell interactions and the very diverse and complicated intracellular events that may play a role in the growth and proliferation of the human rheumatoid synovium and in controlling the production of cytokines, and are implicated in rheumatoid arthritis.

The above overview of the science underlying rheumatoid arthritis highlights the extraordinary complexity of this disease. The chart below lists just the factors discussed in this report that may, under certain circumstances, play a role in rheumatoid arthritis. It is important to keep in mind that even this lengthy chart, which contains over 60 factors, is still incomplete as there are other factors not discussed above that may play a role in the disease:

| **Function** | **Factors** |
|---|---|
| Onset of Rheumatoid Arthritis | Genetics: gene HLA-DR4; gene HLA-DR1<br><br>Viruses and bacteria: mycobacteria; parvovirus<br><br>Autoantigens: collagen; proteoglycan; gp39; glucose-6-phosphoisomerase; rheumatoid factor; antibodies to citrullinated peptides<br><br>Smoking |
| Factors in cell-cell interactions that may play a role in development of rheumatoid arthritis | Direct cell-to-cell contact: cellular adhesion molecules; secreted proteins; E-selectin; vascular cell adhesion molecule-1; intercellular adhesion molecule-1 |

|  | Components of complement |
|---|---|
|  | Prostaglandins: prostaglandin E2; lipid compounds derived enzymatically from fatty acids |
|  | Leukotrienes: leukotriene B4 |
|  | Oxygen free radicals |
|  | Nitric oxide |
|  | Matrix metalloproteinases: 25 members of the family including collagenases; stromelysisns; gelatinases; MMP-3; MMP-9 |
|  | Cytokines: Tumor necrosis factor-$\alpha$; Interleukin-1; Interleukin-18; Interleukin-6; Interleukin-17; macrophage migration inhibitory factor; Interleukin-2; vascular endothelial cell growth factor; monocyte chemoattractant protein-1; macrophage inflammatory protein-1; members of the tie/angiopoitin family; Interleukin-15 |
|  | Chemokines: almost 50 known to date including IL-8/CXCL8; ENA-78/CXCL5 |
| Cells that may play a role in rheumatoid arthritis | Macrophages; T lymphocytes; B lymphocytes; Fibroblasts; Endothelial cells; Dendritic cells; Mast cells; PMNs; Osteoclasts; Neutrophils |
| Other mediating factors | Fibroblast growth factors; transforming growth factor-$\beta$; oxidants; Epstein-Barr virus; adenovirus; phytohemagglutinin; antibodies; parathyroid hormone-related peptide; monocyte colony stimulating factor; cathepsins; protein kinase C. |
| Intracellular events and transcription factors possibly involved in rheumatoid arthritis | Mitogen activated kinases pathways: Erk1/2; p38 MAP kinase; c-Jun-N-terminal kinase; phosphoinositide-3 kinase

Activator protein-1

G protein coupled receptors

ELK

Janus kinase signal transducers and activators of |

| | transcription |
| --- | --- |
| | STAT: STAT1; STAT3; IL-4 STAT |
| | NF-κB |

### 5.    Therapies for rheumatoid arthritis.

A number of drugs are used to treat rheumatoid arthritis. These include methotrexate, hydroxychloroquine, and sulfasalazine. Biologic agents, which are recombinant proteins produced in living cell systems to target pathogenic cells or immune mediators, play a prominent role in current therapies. These include Kineret (anakinra), the commercial form of IL-1Ra, which competitively blocks IL-1 binding to its receptor; Enbrel (etanercept), a soluble TNF-α receptor; Humira (adalimumab), an anti-TNF-α antibody; Remicade (infliximab), another anti-TNF-α antibody; Rituxan (rituximab) which targets the B lymphocyte antigen CD20; and Orencia (abatacept), a fusion protein composed of an immunoglobulin fused to the extracellular domain of CTLA-4, a molecule capable of binding B7 and hence inhibiting the costimulation of T cells.

I note that physicians in clinical practice, such as myself, treating rheumatoid arthritis do not inquire about a patient's NF-κB status. In clinical practice, no measurement of NF-κB or NF-κB activity takes place to determine the efficacy of any of the therapies discussed above, or for any other purpose. I have never inquired about, measured, or attempted to treat or target a patient's NF-κB status when treating rheumatoid arthritis. NF-κB plays no role in any of the therapies I choose for my patients.

I currently receive visits by many health liaisons of drug companies who speak to me about the mechanisms of action of the drugs for rheumatoid arthritis (listed above) that are sold by their companies. I have never spoken with any of these health liaisons about NF-κB. In fact, there are no currently available drugs for use in rheumatoid arthritis that target NF-κB.

**B.      Science Underlying Psoriasis And Its Treatment.**

**1.      Clinical presentation of psoriasis.**

Psoriasis is a chronic inflammatory disease of uncertain etiology that affects about 2% of the population, mainly Caucasians[41,42]. Psoriasis affects about 25 million people in North America and Europe and it may be the most prevalent immune mediated skin disease in adults[41]. The disease manifests itself in patients' skin, nails, tongue, and joints; as many as 30% of psoriasis patients develop joint disease[42]. Skin lesions may manifest as small tear-shaped lesions, pustular forms, and erythodermic plaques which itch and often bleed. Common locations for skin lesions are the extensor side of the extremities, the scalp and the sacral regions[43].

**2.      Skin pathology of psoriasis.**

There are three principal histological features of psoriasis: epidermal hyperplasia, dilated and prominent blood vessels in the dermis, and an inflammatory infiltrate of leukocytes mainly in the dermis[44]. Hence, the histology of psoriasis is characterized by dermal edema, dilation of the vessels of the papilla in the dermis, mononuclear cell infiltrates in the epidermis which adhere to blood vessels, thickening of the epidermis, and neutrophils in the stratum corneum[41,43].

### 3.    Etiological factors involved in the onset of psoriasis.

A genetic basis is thought to underlie psoriasis, with a concordance rate of 70% in monozygotic twins[42]. However, genetic susceptibility loci have not been determined[45]. As with rheumatoid arthritis, environmental factors may be at play and include: bacterial pharyngitis, trauma of the skin, human immunodeficiency virus infection, psychological stress, and ingestion of beta blockers or lithium[45].

### 4.    Progression of disease in psoriasis.

Like rheumatoid arthritis, the manner is which psoriasis develops is complex and not completely understood. Chronic inflammation underlies the altered tissue structure in psoriasis[45]. After the onset of psoriasis, it is believed that dendritic cells and T lymphocytes release cytokines and other inflammatory factors, which induce a wound-healing like phenotype in the epidermis that is characterized by keratinocyte proliferation[46]. Dendritic cells may act on adjacent vascular endothelial cells to produce cellular adhesion molecules such as E-selectin, vascular cell adhesion molecule-1, and intracellular adhesion molecule-1 to promote the recruitment of inflammatory white blood cells, including more T lymphocytes, into the skin[45]. A number of cytokines can be found in the inflamed skin, including IL-1, -2, -6, -8, -15, -17, -18, -19, -20, -23, TNF-α, as well as a variety of chemokines[45]. It is believed that these cytokines interact in a variety of complex ways to recruit and retain inflammatory cells in the diseased skin.

Angiogenic factors produced by epidermal keratinocytes are believed to be drivers of abnormal dermal vascular proliferation and angiogenesis[44]. One such factor, vascular endothelial cell growth factor (VEGF), has been observed to be over expressed in the psoriatic plaque and in some studies its serum concentrations correlate with clinical disease severity[47].

The STAT family of transcription factors, and NF-κB transcription factors, (both described above) may be possibly involved in cytokine networks in the skin affected by psoriasis in some patients. In the case of STAT1, for some patients it is thought that interferon-α may play a role along with STAT1 to activate interferon-α responsive genes. STAT3 is also thought to play a role possibly in psoriatic skin in some patients[48]. The cytokine IL-20 also may play a role with STAT1 and/or NF-κB in some patients[41]. Of course, the intracellular events that may occur in psoriasis are more diverse, more varied, and more complex than what has been described here.

### 5.    Therapies for psoriasis.

There are a number of therapies approved in the U.S. for psoriasis. These include methotrexate; cyclosporine A, a calcineurin inhibitor; acitretin, a retinoid; and phototherapy with narrow band ultraviolet B light with or without topical vitamin D or retinoids[49]. There are also a number of approved biologic agents including Amevive (alefacept), recombinant LFA-3-Ig, which binds CD2, a costimulatory molecule mainly on CD45RO+ T lymphocytes, and hence prevents T cell activation[50]; Raptiva (efalizumab) which targets CD11a (LFA-1) and interferes with T lymphocyte adhesion to intracellular adhesion molecule-1[50]; Remicade (infliximab), an anti-TNF-α antibody; and Enbrel (etanercept), a soluble TNF-α receptor[41].

I note that physicians in clinical practice treating psoriasis do not inquire about a patient's NF-κB status. In clinical practice, no measurement of NF-κB or NF-κB activity takes place to determine the efficacy of any of the therapies discussed above, or for any other purpose. My understanding is confirmed by a conversation I have had with Dr. J. Mark Jackson, a physician in Kentucky who treats patients with psoriasis. (February 18, 2008, Interview of Dr. J. Mark Jackson.) Dr. Jackson informed me that he has never

30

inquired about, measured, or attempted to treat or target a patient's NF-κB status when treating psoriasis. NF-κB plays no role in any of the therapies he chooses for his patients. Dr. Jackson also stated that he had never spoken with sales representatives of drug companies about NF-κB. In fact, there are no currently available drugs for use in psoriasis that target NF-κB.

## V.    BACKGROUND OF ENBREL AND KINERET

### A.    Enbrel.

#### 1.    Enbrel is a drug that binds to TNF-α.

Enbrel (etanercept) is a dimeric fusion protein that can only be produced by using recombinant techniques which have two fundamental components: (1) an extracellular ligand-binding portion of human 75 kilodalton (p75) TNF receptor which binds TNF; and (2) a Fc domain which dimerizes the protein and surprisingly allows for a greater ability to bind to TNF. Enbrel binds to free TNF-α and prevents its interaction with cell surface TNF-α receptors, making TNF unable to bind to receptors on the surface of target cells. Enbrel is used to treat immune diseases including rheumatoid arthritis, ankylosing spondylitis, psoriatic arthritis, and psoriasis.[2] Enbrel received FDA approval for the treatment of rheumatoid arthritis on November 2, 1998, juvenile rheumatoid arthritis on May 27, 1999, psoriatic arthritis on January 15, 2002, ankylosing spondylitis on July 24, 2003, and moderate to severe plaque psoriasis on April 30, 2004.[3] Enbrel is administered

---

[2]    http://www.enbrel.com

[3]    http://www.fda.gov/cder/foi/appletter/1998/etanimm110298L.htm;
http://www.fda.gov/cder/foi/appletter/1999/etanimm052799L.htm;
http://www.fda.gov/cder/foi/appletter/2002/etanimm011502L.htm;
http://www.fda.gov/cder/foi/appletter/2003/103795-5123ltr.pdf;
http://www.fda.gov/cder/biologics/ltr/103795_5149ltr.pdf

via subcutaneous injection once weekly for patients with rheumatoid arthritis, psoriatic arthritis, and ankylosing spondylitis and twice weekly for patients with plaque psoriasis.[4]

Physicians in clinical practice using Enbrel, such as myself, do not inquire about a patient's NF-κB status. In clinical practice, no measurement of NF-κB or NF-κB activity takes place to determine if treatment with Enbrel is effective, or for any other reason. I have never inquired about, measured, or attempted to treat or target a patient's NF-κB status when treating a patient with Enbrel. NF-κB plays no role in my choice to treat a patient with Enbrel. My understanding and experience is confirmed by my conversation with Dr. Jackson, a dermatologist, who also has treated numerous patients with Enbrel but has never inquired about or measured their NF-κB status. (February 18, 2008, Interview of Dr. Jackson.)

I have never spoken with an Amgen sales representative or health liaison about NF-κB or about the use of Enbrel to inhibit or reduce NF-κB activity. Dr. Jackson also confirmed that he has never spoken with an Amgen sales representative about NF-κB or using Enbrel to inhibit or reduce NF-κB activity. Moreover, I understand from speaking with Laura Hamill, an Amgen Vice President who was previously the general manager of Amgen's inflammation business unit, that when Amgen markets or sells Enbrel, Enbrel is never marketed or sold with reference to NF-κB. For example, Enbrel is never marketed or sold as an inhibitor or a reducer of NF-κB activity. (February 22, 2008, Interview of Laura Hamill.)

I have also spoken with Judith Levinson, a patient who suffers from rheumatoid arthritis and has been taking Enbrel since it was first approved by the FDA. (February 18, 2008, Interview of Judith Levinson.) Ms. Levinson is unfamiliar with NF-κB and

---

[4]     http://www.wyeth.com/content/ShowLabeling.asp?id=101

never heard of NF-κB before being asked to speak with me. Ms. Levinson has never been tested for NF-κB status (levels or activity) — either before or after being prescribed Enbrel. I have never spoken with a patient using Enbrel (or any patient) about NF-κB. Dr. Jackson also confirmed that he has never spoken with a patient about NF-κB.

2.      **Development of Enbrel.**

I have discussed the complex development of Enbrel with Dr. Raymond Goodwin, formerly in the molecular biology group at Immunex, and a co-inventor of Enbrel. (January 30, 2008 Interview of Dr. Raymond Goodwin.) To develop drugs like Enbrel, Immunex developed a new procedure called expression cloning in the late 1980s. This procedure allowed Dr. Goodwin to identify, clone, and characterize the TNF-α receptor in 1989[51]. In order to study the mechanism of action of TNF-α, Immunex scientists engineered a soluble form of the receptor. In addition, a Fc fusion protein portion of an immunoglobulin gene was added to the soluble receptor. The addition of the Fc portion to the oligomeric TNF receptor caused the receptor to become dimeric and increased the avidity (or the binding strength) of the soluble receptor by 50 to 100 times. It is believed that the dimeric form of the TNF receptor causes a cooperative binding effect to occur and that the TNF receptor bound to Fc is a 1000 times better inhibitor than just the extracellular domain of the TNF receptor. (The addition of the Fc fusion protein also dramatically improved the half life of the drug *in vivo* which means that Enbrel does not have to be taken daily.) Techniques were then developed for large scale production, purification, and synthesis of the drug in preparation for animal studies and clinical trials. This activity took place in the late 1980s and very early 1990s — well before the '516 patent was issued. Dr. Goodwin informed me that during the development of the

33

engineered TNFR:Fc fusion protein no one working on the project ever discussed or considered NF-κB or NF-κB activity in relation to the work on Enbrel.

Following the production of the TNFR:Fc fusion protein, animal studies were executed and were promising. Therefore, a number of clinical trials were designed to test the fusion protein in patients. The first clinical trials were performed on sepsis patients. However, the fusion protein was not found to have a significant effect on these patients. Later studies were initiated for patients with rheumatoid arthritis. These studies, which took place in the mid 1990s, were successful. I understand that the process of bringing Enbrel to market, from identifying the TNF target, to FDA approval following successful phase III trials, took approximately 9 years. Again, Enbrel was on the market and being successfully used by patients to treat rheumatoid arthritis for almost 4 years before the '516 patent issued. Thus, well before the '516 patent issued, a large amount of inventive work and clinical development had occurred that was necessary for the eventual commercial sale, and commercial success, of Enbrel. I have seen no evidence showing that the process of developing Enbrel ever involved the '516 patent or NF-κB. In fact, ARIAD has admitted that there is no evidence that Amgen copied the '516 patent in developing Enbrel. (ARIAD's Supplemental Responses to Amgen's Requests For Admission Nos. 202-203.)

### 3.    Production of Enbrel.

**Redacted**

34

**Redacted**

**Redacted**

**Redacted**

**Redacted**

**Redacted**

**Redacted**

**Redacted**

Redacted

### B. Kineret.

#### 1. Kineret is a drug that binds to IL-1 receptors.

Endogenous IL-1 receptor antagonist protein ("IL-1Ra") was discovered as a naturally occurring antagonist of IL-1. IL-1Ra is a member of the IL-1 family, is structurally related to IL-1, and is produced under normal conditions as well as during inflammation. IL-1Ra binds and occupies IL-1 receptors on the cell surface, but does not cause a known effect on the cell. Kineret is a recombinant nonglycosylated form of IL-1Ra but differs slightly from the naturally occurring IL-1Ra by one amino acid. Currently, Kineret is indicated for the reduction in signs and symptoms and slowing the progression of structural damage in moderately to severely active rheumatoid arthritis, in patients 18 years of age or older who have failed one or more disease modifying antirheumatic drugs (DMARDs).[5]

Physicians in clinical practice using Kineret, such as myself, do not inquire about a patient's NF-κB status. In clinical practice, no measurement of NF-κB or NF-κB activity takes place to determine if treatment with Kineret is effective, or for any other reason. I have never inquired about, measured, or attempted to treat or target a patient's NF-κB status when treating a patient with Kineret. NF-κB plays no role in my choice to treat a patient with Kineret.

I have never spoken with an Amgen sales representative or health liaison about NF-κB or about the use of Kineret to inhibit or reduce NF-κB activity. Moreover, I understand from speaking with Ms. Hamill, an Amgen Vice President who was

---

[5] http://www.kineretrx.com

previously the general manager of Amgen's inflammation business unit, that when Amgen markets or sells Kineret, Kineret is never marketed or sold with reference to NF-κB. For example, Kineret is never marketed or sold as an inhibitor or a reducer of NF-κB activity. (February 22, 2008, Interview of Laura Hamill.) I have never spoken with a patient using Kineret (or any patient) about NF-κB.

### 2.    Development of Kineret.

The development of Kineret is similar to that of Enbrel described above. Kineret required the same lengthy pre-clinical, phase I, phase II, and phase III, and FDA approval steps as Enbrel. I have reviewed the deposition of Dr. William Arend, one of the inventors of Kineret. (June 22, 2007, Deposition Tr. of Dr. William Arend.) I have also reviewed the deposition transcript of Dr. Robert Thompson, another inventor of Kineret. (June 21, 2007, Deposition Tr. of Dr. Robert Thompson.) From reading these deposition transcripts, I understand that the discovery of Kineret was a lengthy process that began in the early 1980s with Dr. Arend's research concerning an IL-1-like molecule called catabolin. Dr. Arend then investigated a variety of forms of IgG. Dr. Arend's research into different forms of IgG led to the observation that it was possible that an inhibitor of IL-1 might exist. Dr. Arend published a paper in 1985 describing this finding.

In 1985 and 1986 Dr. Arend worked with scientists at Synergen (later purchased by Amgen) to try to purify the IL-1 inhibitor by providing the scientists at Synergen with cell culture supernatants containing a protein IL-1 inhibitor. From this work, they were able to design oligonucleotides that could encode the peptides of the protein so that they could construct a cDNA library. The cDNA library was used to pull out a fragment of the IL-1 inhibitor gene. The group at Synergen then cloned the gene for the interleukin-1 inhibitor and was able to sequence the protein. The gene was sequenced and transferred

to an expression vector and the protein IL-1Ra was expressed in animal cells and in *E. coli*. I have seen no evidence showing that the process of developing Kineret ever involved the '516 patent or NF-κB. In fact, ARIAD has admitted that there is no evidence that Amgen copied the '516 patent in developing Kineret. (ARIAD's Supplemental Responses to Amgen's Requests For Admission Nos. 212-213.)

## VI.    NONINFRINGEMENT ANALYSIS

### A.    Assumptions

In preparing this report I have been asked by Amgen's attorneys to make the following assumptions.

#### 1.    Applicable law.

I understand that determining whether an accused device or method infringes a United States patent involves two steps. First, each claim must be construed to determine its proper scope and meaning to one of ordinary skill in the art. I understand that the Court will construe the terms of the claims of United States Patent No. 6,410,516 that are disputed by the parties.

I further understand that to find direct infringement by an accused product or method, the patentee must show the presence of every limitation of a given claim (literal infringement) or its substantial equivalent (infringement under the doctrine of equivalents) in the accused product or method.

I also understand that an accused product or method literally infringes a patent claim if all the limitations of the claim, as construed by the Court, are present in the accused product or method. If any element of the claim does not appear in the accused product or method exactly, that claim is not literally infringed.

44

I further understand that if there is no literal infringement, there may still be direct infringement under the doctrine of equivalents if each limitation of the claim that is not literally present in the accused product or method is met by an equivalent in the accused product or method. In applying the doctrine of equivalents, each limitation contained in the claim is material to defining the scope of the patented invention and, therefore, the doctrine of equivalents cannot apply where it would effectively eliminate a claim limitation in its entirety. A finding of infringement under the doctrine of equivalents requires showing that the difference between any limitation in the claim that is not literally present in the accused product or method, on the one hand, and some element of the accused product or method, on the other hand, was insubstantial, or that some element of the accused product or method performs substantially the same function in substantially the same way with substantially the same result as each limitation of the patented product or method that is not literally present. I also understand that the scope of equivalents available can be limited by statements and actions made by the patentee during prosecution of the patent.

I further understand that a method claim cannot be infringed unless each limitation of the claimed method is actually performed. The fact that an accused product might be capable of performing one or more, but not all, of the limitations of a method claim is insufficient to establish infringement of the method claim.

I am also informed that a party may be accused of certain forms of indirect infringement — such as inducement of infringement and contributory infringement — even if that party does not directly infringe.

45

I understand that for a party to be liable for inducement of infringement, the party must induce another to directly infringe a patent, and must specifically intend to induce the direct infringement. The intent requirement for inducement requires more than just intent to cause the acts that produce direct infringement; the party must intend to cause direct infringement. I am informed that the mere knowledge of possible infringement by others does not amount to inducement; specific intent to induce infringement must be proven. Therefore, to establish an inducement of infringement claim, I understand that ARIAD must establish: (i) that Amgen knowingly engaged in actions inducing infringing acts; and (ii) that Amgen possessed specific intent to encourage another's infringement. I understand that for ARIAD to establish that Amgen possessed specific intent to encourage another's infringement, ARIAD must show that Amgen's actions induced infringing acts and that Amgen knew or should have known that its actions would induce actual infringement.

I also understand that contributory infringement can occur when a supplier provides a product to another for use in a patented apparatus, or in a patented process. In order for there to be contributory infringement, the person who uses the product must infringe the patent. The product must also have certain characteristics. First, the product must be a material part of the invention. Second, the product must be especially made or adapted for use in a manner that infringes the patent, and the supplier must know that the product was especially made for that use. Third, the product must not have a substantial noninfringing use. A product that has a number of noninfringing uses is often referred to as a staple or commodity article. Providing such a staple or commodity article is not contributory infringement, even if the person to whom the article was supplied uses it in

an infringing manner.  Finally, in order for there to be contributory infringement, the
supplier must know that the combination for which its components were especially made
was both patented and infringing.

### 2.    The asserted claims.

I have been informed that the claims of the '516 patent asserted by ARIAD are:

Claim 6:  A method for diminishing induced NF-κB-mediated intracellular
signaling comprising reducing NF-κB activity in cells such that NF-κB-
mediated intracellular signaling is diminished.

Claim 70:  The method of claim 6, carried out on mammalian cells.

Claim 71:  The method of claim 6, carried out on human cells.

Claim 72:  The method of claim 70 or 71, carried out on immune cells.

Claim 18:   A method for reducing Interleukin-1 or Tumor Necrosis
Factor-α activity in mammalian cells comprising reducing NF-κB activity
in the cells so as to reduce intracellular signaling caused by Interleukin-1
or Tumor Necrosis Factor-α in the cells.

Claim 183:  The method of claim 18, carried out on human cells.[6]

Claim 184:  The method of claim 18 or 183, carried out on immune cells.

### 3.    ARIAD'S proposed claim construction.

I have been asked to analyze whether the use of Enbrel and Kineret infringes any
claim of the '516 patent when the claim terms are defined using the claim construction
proposed by ARIAD's expert Dr. Jeffrey V. Ravetch, and whether Amgen induces or
contributes to any such infringement.  In cases where ARIAD has not proposed a
definition for a claim term, I have been asked to base my analysis on the plain meaning of
the claim term to a person of ordinary skill in the art.  I have read that Dr. Ravetch's

---

[6]    I understand that ARIAD is no longer asserting that the administration of Enbrel infringes claim
183 of the '516 patent, *see* January 18, 2008 Letter from D. Greenwald to J. McDole, but I address
claim 183 because Dr. Calame does so in her report.

proposed claim constructions from pages 23-29 of his January 18, 2008 Expert Report are as follows:

| Claim Limitation | ARIAD's Proposed Claim Construction |
|---|---|
| "NF-κB" | In all asserted claims means "[a] DNA-binding protein factor found in many eukaryotic cells that: (a) is constitutively present in the cytoplasm of unstimulated cells as an inactive precursor, bound to inhibitory IκB proteins; (b) upon dissociation from IκB, translocates to the nucleus of the cell; and (c) once in the nucleus, mediates the transcription of certain genes by binding to specific DNA recognition sequences in those genes." |
| "reducing NF-κB activity" | In all asserted claims means "[d]ecreasing the ability of NF-κB to act as an intracellular messenger that regulates transcription of particular genes, by inhibiting any step along the NF-κB signal transduction pathway, which begins with the binding of an extracellular receptor agonist to its receptor and ends with the synthesis of the protein whose expression is regulated by NF-κB." |
| "NF-κB-mediated intracellular signaling" | In claim 6 and claims dependent thereon "[m]eans the intracellular steps of the NF-κB signal transduction pathway." |
| "diminishing induced NF-κB-mediated intracellular signaling" | In claim 6 and claims dependent thereon "[m]eans inhibition of the intracellular steps of the NF-κB signal transduction pathway, initiated in response to application of a stimulus prior to the performance of the claimed method." |
| "comprising reducing NF-κB activity in cells" | In claim 6 and claims dependent thereon "[m]eans that the claimed method of 'reducing NF-κB activity' (as construed above) is performed on intact cells containing NF-κB, whether in cell culture or in living tissue." |
| "such that NF-κB mediated intracellular signaling is diminished" | In claim 6 and claims dependent thereon "[m]eans the resultant reduction of NF-κB-mediated intracellular signaling, as construed above." |
| "reducing Interleukin-1 or Tumor Necrosis Factor-α activity" | In claim 18 and claims dependent thereon "[m]eans inhibiting intracellular NF-κB signal transduction induced by the circulating cytokines, IL-1 or TNF-α." |
| "in mammalian cells" | In claim 18 and claims dependent thereon "[m]eans intact cells, whether in cell culture or in living tissue, from species falling within the class of mammals." |
| "comprising reducing NF-κB activity in the | In claim 18 and claims dependent thereon "[m]eans that the claimed method of 'reducing NF-κB activity' (as construed |

| cells" | above) is performed on intact cells containing NF-κB, whether in cell culture or in living tissue." |
|---|---|
| "so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells" | In claim 18 and claims dependent thereon "[m]eans inhibiting the intracellular steps of the NF-κB signal transduction pathway induced by Interleukin-1 or Tumor Necrosis Factor-α prior to the performance of the claimed method in mammalian cells." |
| "mammalian cells" | "In claim 70, 'mammalian cells' means intact cells containing NF-κB, whether in cell culture or living tissue, that come from a species falling within the class of mammals." |
| "human cells" | "In claims 71 and 183, 'human cells' means intact cells containing NF-κB, whether in cell culture or living tissue, that come from a human being." |
| "immune cells" | "In claims 72 and 184, 'immune cells' means intact cells containing NF-κB, such as monocytes, mast cells, macrophages, and lymphocytes, whether in cell culture or living tissue, that help protect the body of a mammal from foreign materials and infection." |

Thus, under ARIAD's proposed construction claim 6 should be construed as:

A method for inhibition of the intracellular steps of the NF-κB signal transduction pathway, initiated in response to application of a stimulus prior to the performance of the claimed method, the claimed method of decreasing the ability of NF-κB to act as an intracellular messenger that regulates transcription of particular genes, by inhibiting any step along the NF-κB signal transduction pathway, which begins with the binding of an extracellular receptor agonist to its receptor and ends with the synthesis of the protein whose expression is regulated by NF-κB, [with] the resultant reduction of the intracellular steps of the NF-κB signal transduction pathway.

Where "comprising reducing NF-κB activity in cells" means:

that the claimed method of "reducing NF-κB activity" (as construed above) is performed on intact cells containing NF-κB, whether in cell culture or in living tissue."

And "NF-κB" means:

a DNA-binding protein factor found in many eukaryotic cells that: (a) is constitutively present in the cytoplasm of unstimulated cells as an inactive

50

precursor, bound to inhibitory IκB proteins; (b) upon dissociation from IκB, translocates to the nucleus of the cell; and (c) once in the nucleus, mediates the transcription of certain genes by binding to specific DNA recognition sequences in those genes.

Claim 70 should be construed as:

The method of claim 6, carried out on intact cells containing NF-κB, whether in cell culture or living tissue, that come from a species falling within the class of mammals.

Claim 71 should be construed as:

The method of claim 6, carried out on intact cells containing NF-κB, whether in cell culture or living tissue, that come from a human being.

Claim 72 should be construed as:

The method of claim 70 or 71, carried out on intact cells containing NF-κB, such as monocytes, mast cells, macrophages, and lymphocytes, whether in cell culture or living tissue, that help protect the body of a mammal from foreign materials and infection.

Claim 18 should be construed as:

A method for inhibiting intracellular NF-κB signal transduction induced by the circulating cytokines IL-1 or TNF-α in mammalian cells comprising decreasing the ability of NF-κB to act as an intracellular messenger that regulates transcription of particular genes, by inhibiting any step along the NF-κB signal transduction pathway, which begins with the binding of an extracellular receptor agonist to its receptor and ends with the synthesis of the protein whose expression is regulated by NF-κB, [so as to] inhibit[ ] the intracellular steps of the NF-κB signal transduction pathway induced by Interleukin-1 or Tumor Necrosis Factor-α prior to the performance of the claimed method in mammalian cells.

Where "in mammalian cells" means:

intact cells containing NF-κB, whether in cell culture or living tissue, that come from a species falling within the class of mammals.

And "comprising reducing NF-κB activity in the cells" means:

that the claimed method of "reducing NF-κB activity" (as construed above) is performed on intact cells containing NF-κB, whether in cell culture or in living tissue.

And NF-κB means:

51

a DNA-binding protein factor found in many eukaryotic cells that: (a) is constitutively present in the cytoplasm of unstimulated cells as an inactive precursor, bound to inhibitory IκB proteins; (b) upon dissociation from IκB, translocates to the nucleus of the cell; and (c) once in the nucleus, mediates the transcription of certain genes by binding to specific DNA recognition sequences in those genes.

Claim 183 should be construed as:

The method of claim 18, carried out on intact cells containing NF-κB, whether in cell culture or living tissue, that come from a species falling within the class of mammals.

Claim 184 should be construed as:

The method of claim 18 or 183, carried out on intact cells containing NF-κB, such as monocytes, mast cells, macrophages, and lymphocytes, whether in cell culture or living tissue, that help protect the body of a mammal from foreign materials and infection.

From a scientific perspective, I disagree with ARIAD's proposed construction for "reducing NF-κB activity in cells such that NF-κB-mediated intracellular signaling is diminished" in claim 6. A scientist of skill in the art[7] would understand this phrase to encompass only actions taken inside cells to directly act on NF-κB activity to reduce NF-κB's ability to be released from IκB, to move into the nucleus, or to bind specific DNA sequences. ARIAD, however, has proposed a broader definition that encompasses actions outside of cells which have a tenuous relationship at best with NF-κB activity inside cells and/or interactions that are inside cells but which may be far upstream or far downstream from the IκB:NF-κB complex, movement of NF-κB into the nucleus, or the binding of NF-κB to specific DNA sequences. For example, ARIAD's proposed

---

[7]      For purposes of this analysis, I assume the level of ordinary skill considered by Dr. Ravetch: a scientist with a Ph.D. in chemistry, biology, or related field, or a degree in medicine and having at least three years of post-doctoral laboratory training or other laboratory experience related to molecular biology and gene regulation. (*See* January 18, 2008, Expert Report of Dr. Jeffery Ravetch at 15 ).

construction would even include inhibitors of gene transcription or protein synthesis; but a scientist would not understand this claim to be so expansive.

Similarly and for the same reasons, I disagree with ARIAD's proposed construction for "reducing NF-κB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells" in claim 18. Again, ARIAD's proposed definition is so broad it includes biological processes that have no direct effect on NF-κB activity inside cells in contradiction to what a scientist of skill in the art would understand to be required of the claimed method.

### 4.  Amgen's proposed claim construction.

I have also been asked to analyze whether the use of Enbrel and Kineret infringes the claims of the '516 patent when the claim limitations are defined using the claim constructions proposed by Amgen, and whether Amgen induces or contributes to any such infringement. In cases where Amgen has not proposed a definition for a claim term, I have been asked to base my analysis on the plain meaning of the claim term to a person of skill in the art. I understand that Amgen's proposed claim constructions are as follows:

| Claim Limitation | Amgen's Proposed Claim Construction |
|---|---|
| "NF-κB" | "a protein having each NF-κB activity" |
| "NF-κB activity" | "the ability to act as an intracellular messenger by (a) being released from IκB, (b) translocating into the nucleus, and/or (c) then binding one of the DNA sequences listed in Table 2 |

| | |
|---|---|
| | "of the '516 patent" |
| "reducing NF-κB activity in the cell"[8] | "taking action inside the cell to directly inhibit (interfere or block) an NF-κB activity" |
| "diminishing induced NF-κB-mediated intracellular signaling" | "decreasing any existing molecular interaction within cells effected by, or conveyed through, NF-κB" |
| "NF-κB-mediated intracellular signaling" | "molecular interactions within cells effected by, or conveyed through, NF-κB" |
| "such that NF-κB-mediated intracellular signaling is diminished" | "such that there is a decrease of any molecular interaction within cells effected by, or conveyed through, NF-κB" |
| "reducing Interleukin-1 or Tumor Necrosis Factor-α activity" | "taking action inside the cell to directly inhibit (interfere or block) any molecular interaction within cells caused by Interleukin-1 or Tumor Necrosis Factor-α" |
| "so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells" | "so as to take action inside the cell to directly inhibit (interfere or block) any molecular interaction within cells caused by Interleukin-1 or Tumor Necrosis Factor-α" |
| "mammalian cells" | "intact cells, whether in cell culture or living tissue, from a species falling within the class of mammals" |
| "human cells" | "intact cells, whether in cell culture or living tissue, from a human being" |
| "immune cells" | "intact cells involved in the immune response" |

Thus, under Amgen's proposed construction claim 6 should be construed as:

A method for decreasing any existing molecular interaction within cells effected by, or conveyed through, NF-κB comprising taking action inside cells to directly inhibit (interfere or block) the ability [of NF-κB] to act as an intracellular messenger by (a) being released from IκB, (b) translocating into the nucleus, and/or (c) then binding one of the DNA sequences listed in Table 2 of the '516 patent such that there is a decrease

---

[8]    Slightly different versions of this phrase are found in the independent claims of the '516 patent, including claims 6 and 18. I incorporate the specific form of this phrase into claims 6 and 18 when I discuss their overall constructions below.

of any molecular interaction within cells effected by, or conveyed through, NF-κB.

Where "NF-κB" means:

a protein having each NF-κB activity.

Claim 70 should be construed as:

The method of claim 6, carried out on intact cells, whether in cell culture or living tissue, from a species falling within the class of mammals.

Claim 71 should be construed as:

The method of claim 6, carried out on intact cells, whether in cell culture or living tissue, from a human being.

Claim 72 should be construed as:

The method of claim 70 or 71, carried out on intact cells involved in the immune response.

Claim 18 should be construed as:

A method for taking action inside the cell to directly inhibit (interfere or block) any molecular interaction within cells caused by Interleukin-1 or Tumor Necrosis Factor-α in intact cells, whether in cell culture or living tissue, that come from a species falling within the class of mammals, comprising taking action inside the cells to directly inhibit (interfere or block) the ability [of NF-κB] to act as an intracellular messenger by (a) being released from IκB, (b) translocating into the nucleus, and/or (c) then binding one of the DNA sequences listed in Table 2 of the '516 patent so as to take action inside the cell to directly inhibit (interfere or block) any molecular interaction within cells caused by Interleukin-1 or Tumor Necrosis Factor-α.

Where "NF-κB" means:

a protein having each NF-κB activity.

Claim 183 should be construed as:

The method of claim 18, carried out on intact cells, whether in cell culture or living tissue, from a species falling within the class of mammals.

Claim 184 should be construed as:

The method of claim 18 or 183, carried out on intact cells involved in the immune response.

From a scientific perspective, I agree with Amgen's proposed constructions. With respect to claim 6, the patent calls for "reducing NF-κB activity in cells such that NF-κB-mediated intracellular signaling is diminished." A scientist of skill in the art[9] would understand this to mean acting directly on NF-κB activity in the cell to reduce or diminish it (as defined above). Amgen's proposed definitions are consistent with this understanding as they require "action **inside** the cell." Amgen's definitions restrict this claim to methods that actually would influence NF-κB activity. It is not so broad that it encompasses biological processes far removed and most likely unrelated to NF-κB activity.

Similarly, Amgen's proposed definition of claim 18 is consistent with what a scientist of skill in the art would understand of claim 18. Claim 18 includes the claim limitation "reducing NF-κB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells." Amgen's proposed claim construction for claim 18 again requires that the action to reduce NF-κB activity takes place inside the cell.

**B.    The Use Of Enbrel Does Not Infringe The Claims Of The '516 Patent.**

**1.    Claims 6 and 70-72**

**a.    Claims 6 and 70-72 interpreted with ARIAD's proposed constructions.**

I disagree with Dr. Calame's conclusion that "Administration of Enbrel Meets Every Limitation of Claim 6, 70, 71 and 72" discussed in paragraphs 11-13 of her report. The use of Enbrel does not infringe claims 6 and 70-72 of the '516 patent even when

---

[9]    For purposes of this analysis, I assume the level of ordinary skill considered by Dr. Wall: a person with a Ph.D. in molecular biology, cellular biology, microbiology, or a related field, and at least two additional years of laboratory experience in these areas. (*See* Rebuttal Expert Report of Randolph Wall, Ph.D. at 4).

those claims are construed according to ARIAD's proposed definitions (as stated above).

The use of Enbrel does not "reduc[e] NF-κB activity in cells such that NF-κB-mediated

intracellular signaling is reduced."   Applying ARIAD's definitions, the use of Enbrel

does not meet a number of limitations of claim 6 as construed by ARIAD, including

"reduction of NF-κB-mediated intracellular signaling," "inhibition of the intracellular

steps of the NF-κB signal transduction pathway, initiated in response to application of a

stimulus prior to the performance of the claimed method," "decreasing the ability of NF-

κB to act as an intracellular messenger," and "inhibiting any step along the NF-κB signal

transduction pathway, which begins with the binding of an extracellular receptor agonist

to its receptor."   Because the use of Enbrel does not meet these limitations, Enbrel does

not infringe under ARIAD's proposed construction.   In addition, as I explain below, the

DiChamp and Lizzul articles, as well as the results of Dr. Pomerantz's experiments

described in the January 18, 2008, Expert Report of Kathryn Calame, Ph.D. (the "Calame

Report"), do not establish Dr. Calame's position that the use of Enbrel infringes these

claims.

As discussed above, when a patient uses Enbrel, the drug may bind to TNF-α

extracellularly.   There is no scientific evidence, however, that the manner in which

Enbrel binds to TNF-α plays a role in how NF-κB functions..   In other words, there is no

scientific evidence that binding TNF-α impacts any physical, chemical or other

characteristic of NF-κB that would decrease its ability to act as an intracellular

messenger.   Nor is there any evidence that this binding "decreas[es]," "inhibit[s]," or

"reduc[es]" any of:  "NF-κB-mediated intracellular signaling," "the intracellular steps of

the NF-κB signal transduction pathway," or "any step along the NF-κB signal transduction pathway."

To the contrary, there is scientific evidence showing that use of Enbrel does not play a role in "the ability of NF-κB to act as an intracellular messenger." Haider *et al.,* describes a study that examined the suppression of genes by etanercept and infliximab, a chimeric anti-TNF antibody[52]. The study found that etanercept and infliximab, which both act on TNF-α, ultimately affected the expression of different sets of genes. In particular, the study found that one of the genes whose expression was downregulated only by infliximab (i.e., not downregulated by etanercept) is IL-2R alpha, which is a gene listed in Table 2 of the '516 patent as having a sequence recognized by NF-κB. This paper suggests that etanercept does not act through NF-κB and does not downregulate genes whose expression is reported to be tied to NF-κB by the '516 patent. Likewise, Srivastava, *et al.,* also shows the result that Enbrel does not involve reduction or inhibition of NF-κB activity[53]. The study described in this paper looked at a patient with Crohn's disease, which is a disease that is "associated with increased local expression of TNF-alpha in affected tissues" and which is an inflammatory disease. The study found that "[e]tanercept had no significant effect on NFKB activity" and "did not alter NFKB activity."

The incredible complexity of inflammatory diseases such as rheumatoid arthritis and psoriasis, and the role that TNF-α and NF-κB may play in the diseases, also lead to the conclusion that Enbrel does not "decreas[e] the ability of NF-κB to act as an intracellular messenger," "inhibit[] ... steps of the NF-κB signal transduction pathway, initiated in response to application of a stimulus prior to the performance of the ...

method," or "inhibit[] any step along the NF-κB signal transduction pathway, which begins with the binding of an extracellular receptor agonist to its receptor." The fact that a patient responds to therapy with Enbrel does not suggest that the relief of symptoms (such as inflammation, angiogenesis, and bone destruction) were the result of some process in which NF-κB played a role instead of a result of any of the many other factors that play a role in rheumatoid arthritis and are in some way related to TNF-α. This is particularly true because doctors do not measure NF-κB levels or NF-κB activity and have no idea if, in any given patient (or any patient at all), NF-κB plays a role in the patient's disease progression. If NF-κB plays no role in a patient's disease, then there is no basis for believing that treatment with Enbrel leads to some sort of resultant effect on NF-κB activity. Consequently, if a patient responds to treatment with Enbrel there is no reason to believe that this use of Enbrel infringed claim 6 of the '516 patent.

Similarly, the fact that many different factors act in concert with each other and have downstream effects that are potentially redundant and are potentially unique means that one cannot assume that, since Enbrel binds TNF-α, the use of Enbrel in patients impacts NF-κB activity and infringes claim 6 of the '516 patent. Because many different factors including IL-1, IL-17, IL-18, oxidants, viruses such as Epstein-Barr virus or adenovirus, and immune stimuli such as phytohemagglutinin may play roles that relate to NF-κB in a patient, removing one of those factors may not have any influence on NF-κB activity. Thus, when Enbrel binds to TNF-α it is impossible to say that it has "reduce[ed] NF-κB-mediated intracellular signaling," "inhibit[ed] the intracellular steps of the NF-κB signal transduction pathway, initiated in response to application of a stimulus prior to the performance of the claimed method," "decreas[ed] the ability of NF-κB to act as an

intracellular messenger," "inhibit[ed] any step along the NF-κB signal transduction pathway, which begins with the binding of an extracellular receptor agonist to its receptor," or, in other words, that it has infringed claim 6.

The use of Enbrel also does not infringe claim 6 of the '516 patent because it acts outside of cells and does not "inhibit[] any step along the NF-κB signal transduction pathway, which begins with the binding of an extracellular receptor agonist to its receptor." Although ARIAD's construction expands the scope of the claims to encompass interactions upstream of NF-κB, even ARIAD's expanded definition does not cover the use of Enbrel. Enbrel binds to extracellular TNF-α before TNF-α has bound to a receptor. It does not inhibit the binding of TNF-α to a receptor or interfere with any "step along the NF-κB signal transduction pathway" where "binding" to a receptor on the cell surface is the first step.

The above discussion has assumed that TNF-α is implicated in rheumatoid arthritis. But this may not be the case. Blocking TNF-α helps only about ¾ of patients with rheumatoid arthritis.

A key point that Dr. Calame ignores is that rheumatoid arthritis and psoriasis are extremely complicated diseases involving the immune system. They are caused by different genetic and environmental factors, they occur in different unique patients, and they exhibit different symptoms with different levels of severity in different patients. Thus, different patients respond in very different ways to treatment with Enbrel. In some cases it is even possible that Enbrel does not successfully enter the extracellular fluid around the rheumatoid joint or psoriatic tissue and bind TNF-α at all. Thus, there is no reason to believe that in any given unique patient use of Enbrel "reduce[es] NF-κB-

60

mediated intracellular signaling," "inhibit[s] the intracellular steps of the NF-κB signal transduction pathway, initiated in response to application of a stimulus prior to the performance of the claimed method," "decreas[es] the ability of NF-κB to act as an intracellular messenger," and "inhibit[s] any step along the NF-κB signal transduction pathway, which begins with the binding of an extracellular receptor agonist to its receptor."

Even if one could assume: (1) that patients' cells have an increase in "the intracellular steps of the NF-κB signal transduction pathway" (this is ARIAD's language not mine); (2) that the binding of TNF-α by Enbrel outside patient's cells "decreas[es] the ability of NF-κB to act as an intracellular messenger that regulates transcription of particular genes;" and (3) that this results in a "reduction of the intracellular steps of the NF-κB signaling pathway" (and as discussed above, I believe these assumptions cannot be made), then the use of Enbrel still does not infringe claim 6 as ARIAD contends that claim should be construed. No matter what may result from Enbrel binding to TNF-α outside cells, Enbrel still cannot "inhibit[] … steps of the NF-κB signal transduction pathway, initiated in response to application of a stimulus prior to the performance of the … method" as ARIAD's construction of claim 6 requires. Enbrel works outside the cell to bind TNF-α. Enbrel does not act to inhibit any "steps" that have been "initiated in response to application of a stimulus prior to the performance of the claimed method." There is no evidence that Enbrel, by binding TNF-α outside cells, "inhibit[s] the intracellular steps of the NF-κB signal transduction pathway, initiated in response to application of a stimulus prior to the performance of the claimed method." To the contrary, Enbrel does not act at all on these intracellular steps and does not do anything to

61

anything that has already been initiated. Under ARIAD's own construction, and under Dr. Calame's reasoning, Enbrel, at most, only prevents additional NF-κB from becoming activated.

My opinion that the use of Enbrel does not infringe claim 6 of the '516 patent is confirmed by two declarations submitted by Dr. Inder Verma in the reexamination of the '516 patent currently before the United States Patent and Trademark Office. Dr. Verma states that antibiotics are an example of an external influence that prevents induction of additional NF-κB activity — which is not covered by the '516 patent — and does not infringe the '516 patent by "reducing NF-κB activity:"

> Each of the above claims [including claims 6, 18, 70-72 and 183-184 of the '516 patent] requires "reducing NF-κB activity." ... I understand all the above claims are directed to methods carried out on cells in which NF-κB activity has first been induced by some inducing external stimulus, in other words a eukaryotic cell in which NF-κB activity is activated by the presence of an external influence. Antibiotics have no effect on any of the segments of the NF-κB pathway as illustrated in Schematic 10 of Exhibit 1. As indicated by the 1970 PDR, and acknowledged by the Examiner, antibiotics either kill or interfere with growth of bacterial cells. Antibiotics do not act "by blocking LPS that reaches the cell" as also illustrated on Schematic 10, antibiotics neither act on the mammalian cell, nor do they act to interfere with the induction by the external influence to which the Examiner refers, i.e. LPS. One skilled in the art seeking to practice any of the above claims would therefore never contemplate using antibiotics to "reduce NF-κB activity." Even if one viewed the external stimulus as the bacterial infection, antibiotics act on the bacteria and do not act on any of the 6 segments of NF-κB pathway.

(Nov. 9, 2006, Verma Decl. at ¶ 127.) As discussed above, Enbrel acts on TNF-α present outside the cell, just as antibiotics act on bacteria outside the cell. Enbrel "neither acts on the mammalian cell nor [does it] act to interfere with the induction...."

In his second declaration in the reexamination, Dr. Verma states that "[i]nhibiting activation is a method different from diminishing induced NF-κB activity." (Oct. 19, 2007, Verma Decl. at ¶¶ 60, 61.) He further states:

In the case where LPS has already induced NF-κB activity, removal of LPS does not change such induced activity. The absence of LPS does not reduce induced NF-κB activity. LPS, when present, induces NF-κB activity, but when absent does not. Thus, according to the Examiner's theory, antibiotics can only prevent induction of NF-κB by LPS but under no theory or evidence presented in the July 6, 2007 Final Office Action can antibiotics reduce induced NF-κB activity....

***

Though LPS induces activation of NF-κB, removing LPS (which is not a direct effect of an antibiotic) merely prevents <u>further</u> induction of NF-κB. Thus the 1970 PDR provides no evidence that antibiotics can diminish induced NF-κB-mediated intracellular signaling as recited by claim 6.

(*Id.* at ¶¶ 114-115, original emphasis.)

ARIAD has similarly represented to the Patent Office in the reexamination that:

Broadly speaking, there are the two types of methods to obtain a cell exhibiting reduced NF-κB activity as follows: (a) reducing the induced NF-κB activity by intervening in the signaling pathway by which NF-κB activity is manifested including particularly intervening intracellularly at a specific segment within the signaling pathway; and (b) preventing the external inducing stimuli from inducing the intracellular signaling pathway through which NF-κB activity is manifested.

Certain claims of the '516 Patent as issued covered both such types of methods. However, as discussed further in this response applicants maintain that the rejected claims now pending [which include claims 6, 18, 70-72 and 183-184] are directed only to type (a) above.

(Reexamination Control No. 90/007,503 and 90/007,828, October 22, 2007, Response at 27-28.) I have not formed an opinion as to whether ARIAD is correct that certain of the original claims of the '516 patent covered both (a) and (b), but note that ARIAD's statement concurs with my view that claim 6 does not cover the use of Enbrel (nor do any of the other asserted claims).

Dr. Verma's declaration further confirms that "inhibiting activation of NF-κB is a method different from diminishing induced NF-κB activity." (October 19, 2007, Verma Decl. at ¶ 60.) And Dr. Verma himself has characterized the mode of action of Enbrel

and other anti-TNF drugs as "inhibition of NF-κB activation."[66] *See also* Withoff et al., "Regulating the Master Regulator NF-κB: From Natural Strategies to Rationally Designed Superdrugs," in Ghosh, S., ed., Handbook of Transcription Factor NF-kappaB (2007) at 206-07. As a result, Enbrel's action is different from what Dr. Verma and ARIAD have told the Patent Office is covered by the scope of the '516 patent claims.

I know of no evidence that Enbrel enters the cell and, even if Enbrel were shown to have some impact on NF-κB activity, it would "merely prevent [] further induction of NF-κB," which lies outside the claims. Enbrel cannot "inhibit[] ... steps of the NF-κB signal transduction pathway, initiated in response to application of a stimulus prior to the performance of the ... method." Thus, the use of Enbrel does not infringe claim 6 of the '516 patent. Because Enbrel does not and cannot infringe claim 6, it also does not infringe dependent claims 70, 71, and 72.

I disagree with Dr. Calame's statement in paragraph 10 of her report that the use of Enbrel infringes claim 6:

> because it reduces NF-κB mediated intracellular signaling in cells in which NF-κB activity has been induced by TNF. By binding to and thereby preventing free TNF from activating the TNF Receptor, Enbrel reduces the level of TNF-induced NF-κB activity.

(Calame Rpt. at ¶ 10.) This statement is incorrect because for the reasons discussed above, including the fact that it cannot be assumed that TNF-α binding to its receptor induces NF-κB activity, and that Enbrel binding TNF-α in patients thus must reduce NF-κB activity. Dr. Calame's reliance on a CAT reporter assay to try to bolster her simplistic assumptions similarly is misplaced. As discussed above, biology is very complex and many factors at play in the diseases we are discussing can (but also may not) impact NF-κB activity. It cannot be assumed that reducing TNF-α levels outside cells will

necessarily have an impact on NF-κB activity inside cells.  To the contrary, there is a significant amount of literature including the Haider article discussed above that casts serious doubt on Dr. Calame's assumptions.  As I wrote above, the Haider article disproves Dr. Calame's assumption because it found the expression of IL-2R alpha, a gene listed in Table 2 of the '516 patent, was downregulated by infliximab, but not by Enbrel.  Thus, this article, and the suggestion in the '516 patent that the expression of IL-2R alpha receptor is regulated by NF-κB, leads to the conclusion that etanercept does not act through NF-κB, does not "decreas[e] the ability of NF-κB to act as an intracellular messenger," does not "result[ in] reduction of the intracellular steps of the NF-κB signal transduction pathway," and does not downregulate genes whose expression is reported to be tied to NF-κB by the '516 patent.

Also, the results from the CAT reporter assays on which Dr. Calame relies are not meaningful because they use engineered cells that are not necessarily indicative of the cells in human patients who use Enbrel, and the accused infringement relates to the use of Enbrel by patients.  Dr. Verma, in his declaration to the Patent Office criticizes the reliance on experiments using "artificially transfected cells" very similar to those relied upon by Dr. Calame. (*See* Nov. 9, 2006, Verma Decl. at ¶¶ 33, 93-94, 122).  In addition, Dr. Calame's conclusions and statement are also incorrect because, as discussed above, she ignores the complexity of the disease process in rheumatoid arthritis and the variability among actual human patients.

Finally, Dr. Calame's analysis is flawed because she reverses her analysis of the steps leading to infringement.  According to Dr. Calame infringement under claim 6 requires "'diminishing' induced NF-κB-mediated signaling and thereby 'reducing NF-κB

activity in cells.'" (Calame Rpt. at ¶ 26.) But infringement of claim 6 only occurs when the opposite happens: "reducing NF-κB activity in cells such that NF-κB-mediated intracellular signaling is diminished."

                **b.**    **Claims 6 and 70-72 interpreted with Amgen's proposed constructions.**

The use of Enbrel does not infringe claims 6 and 70-72 of the '516 patent when those claims are construed according to Amgen's proposed definitions (as stated above). The use of Enbrel does not, and cannot, infringe under Amgen's claim construction because Enbrel does not "take action inside the cell," it does not "directly inhibit" NF-κB activity, and it does not "decrease any existing molecular interaction within cells" because Enbrel acts outside the cell to bind TNF-α. In addition, the scientific literature and the complexity of the biologic processes involved in rheumatoid arthritis and psoriasis lead to the conclusion that use of Enbrel does not "reduce[] NF-κB activity in cells such that NF-κB-mediated intracellular signaling is diminished" or, if it is a limitation, "diminish[] induced NF-κB-mediated intracellular signaling."

As discussed above, when a patient uses Enbrel, the drug may bind to TNF-α extracellularly. Whatever the result of this is, it is clear that the result does not involve any "action inside the cell" by Enbrel. I know of no evidence in the scientific literature, and Dr. Calame points to none, showing that Enbrel even enters the cell. All scientific literature shows that the entire action of binding to TNF-α takes place outside the cell. Indeed, Enbrel was designed to bind to TNF-α outside the cell, and factors inside the cell, such as NF-κB, were never considered during the development of Enbrel. Dr. Calame does not claim in her report that Enbrel ever enters the cell.

The fact that when Enbrel works, it works by binding to TNF-α, also means that Enbrel cannot "directly inhibit" NF-κB activity as required under this claim construction. Again, whatever the result of Enbrel binding to TNF-α is, it is clear that there is no direct relationship to NF-κB inhibition. (As I discussed above, it is unclear whether there is even an indirect relationship between Enbrel binding to TNF-α and NF-κB activity in the cells of patients.) There is no evidence in the scientific literature that Enbrel acts directly on NF-κB activity. Enbrel was designed to bind to TNF-α outside the cell, and factors inside the cell, such as NF-κB were never considered during the development of Enbrel. Dr. Calame does not claim in her report that Enbrel acts directly on NF-κB activity.

The use of Enbrel also does not infringe under this claim construction because it does not "decrease any existing molecular interaction within cells." Even if one could assume that in patients (1) initial NF-κB activity inside patient cells is elevated, and (2) the binding of TNF-α by Enbrel outside patient's cells leads to a decrease in the NF-κB activity inside their cells (and as discussed above, I believe these assumptions cannot be made), then the use of Enbrel still does not infringe claim 6. No matter what may result from Enbrel binding to TNF-α, Enbrel still does not influence any "existing" already initiated molecular interactions with respect to NF-κB. Enbrel works outside the cell to bind TNF-α. Enbrel does not act to inhibit any NF-κB activity that has already been induced. To the contrary, Enbrel does not act at all on intracellular steps. At the most (even under Dr. Calame's reasoning) Enbrel only prevents additional NF-κB from becoming activated. As discussed above, and as admitted by ARIAD in the reexamination, claim 6 (and the other asserted claims) do not cover this. (*See* discussion of ARIAD's reexamination proceeding in Part VI(B)(1)(a).)

Finally, there is no evidence that binding TNF-α outside patients' cells influences induced NF-κB activity inside their cells. As a result, there is no evidence that this use "reduce[es] NF-κB activity in cells such that NF-κB-mediated intracellular signaling is diminished" or, if it is a limitation, that "diminish[es] induced NF-κB-mediated intracellular signaling." The evidence discussed above, including the Haider and Srivastava articles, the incredible complexity of the possible downstream effects of TNF-α, the incredible complexity of the progression of inflammatory diseases such as rheumatoid arthritis and psoriasis, the large number of factors that possibly play a role relating to NF-κB, and the fact that not all patients even respond to therapies targeting TNF-α all undermine any claim that the use of Enbrel by patients diminishes NF-κB-mediated intracellular signaling or infringes claim 6. Because Enbrel does not infringe claim 6, it also does not and cannot infringe dependent claims 70, 71, and 72 under Amgen's claim construction.

     **2.**       **Claims 18 and 183-184**

          **a.**      **Claims 18 and 183-184 interpreted with ARIAD's proposed constructions.**

I disagree with Dr. Calame's conclusion that "Administration of Enbrel Meets Every Limitation of Claim 18, 183 and 184" discussed in paragraphs 14-16 of her report. The use of Enbrel does not "reduce NF-κB activity in the cells so as to reduce intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells" and thus does not infringe claims 18 and 183-184 of the '516 patent. Applying ARIAD's proposed definitions (as stated above), the use of Enbrel does not meet a number of limitations, including "inhibiting intracellular NF-κB signal transduction induced by the circulating cytokines, IL-1 or TNF-α," "inhibiting the intracellular steps of the NF-κB

68

signal transduction pathway induced by Interleukin-1 or Tumor Necrosis Factor-α prior to the performance of the claimed method," "decreasing the ability of NF-κB to act as an intracellular messenger," and "inhibiting any step along the NF-κB signal transduction pathway, which begins with the binding of an extracellular receptor agonist to its receptor." Because the use of Enbrel does not meet these limitations, Enbrel does not infringe under ARIAD's proposed construction. In addition, as I explain below, the DiChamp and Lizzul articles, as well as the results of Dr. Pomerantz's experiments described in the Calame Report, do not establish Dr. Calame's position that the use of Enbrel infringes these claims.

As discussed above, when a patient uses Enbrel, the drug may bind to TNF-α extracellularly. There is no scientific evidence, however, that the manner in which Enbrel binds to TNF-α plays a role in how NF-κB functions. In other words, there is no scientific evidence that binding TNF-α impacts any physical, chemical or other characteristic of NF-κB that would decrease its ability to act as an intracellular messenger. Nor is there any evidence that this binding "decreas[es]" or "inhibit[s]" any of: "intracellular NF-κB signal transduction induced by the circulating cytokines IL-1 or TNF-α," "the intracellular steps of the NF-κB signal transduction pathway ...," and "any step along the NF-κB signal transduction pathway...."

To the contrary, there is scientific evidence showing that use of Enbrel does not play a role in "the ability of NF-κB to act as an intracellular messenger." Haider *et al.*, describes a study that examined the suppression of genes by etanercept and infliximab, a chimeric anti-TNF antibody[52]. The study found that etanercept and infliximab, which both act on TNF-α, ultimately affected the expression of different sets of genes. In

particular, the study found that one of the genes whose expression was downregulated only by infliximab (i.e., not downregulated by etanercept) is IL-2R alpha which is a gene listed in Table 2 of the '516 patent as having a sequence recognized by NF-κB.  This paper suggests that etanercept does not act through NF-κB and does not downregulate genes whose expression is reported to be tied to NF-κB by the '516 patent.  Likewise, Srivastava, et al., also shows the result that Enbrel does not involve reduction or inhibition of NF-κB activity[53].  The study described in this paper looked at a patient with Crohn's disease which is a disease that is "associated with increased local expression of TNF-alpha in affected tissues," and which is an inflammatory disease.  The study found that "[e]tanercept had no significant effect on NFKB activity" and "did not alter NFKB activity."

The incredible complexity of inflammatory diseases such as rheumatoid arthritis and psoriasis, and the role that TNF-α and NF-κB may play in the diseases, also lead to the conclusion that Enbrel does not "inhibit[] intracellular NF-κB signal transduction induced by the circulating cytokines IL-1 or TNF-α in mammalian cells," "inhibit[] the intracellular steps of the NF-κB signal transduction pathway …," "decreas[e] the ability of NF-κB to act as an intracellular messenger," and "inhibit[] any step along the NF-κB signal transduction pathway, which begins with the binding of an extracellular receptor agonist to its receptor."  The fact that a patient responds to therapy with Enbrel does not suggest that the relief of symptoms (such as inflammation, angiogenesis, and bone destruction) were the result of some process in which NF-κB played a role instead of a result of any of the many other factors that play a role in rheumatoid arthritis and are in some way related to TNF-α.  This is particularly true because doctors do not measure NF-

κB levels or NF-κB activity and have no idea if, in any given patient (or any patient at all), NF-κB activity plays a role in the patient's disease progression. If NF-κB activity plays no role in a patient's disease, then there is no basis for believing that treatment with Enbrel leads to some sort of resultant effect on NF-κB activity. Consequently, if a patient responds to treatment with Enbrel there is no reason to believe that this use of Enbrel infringed claim 18 of the '516 patent.

Similarly, the fact that many different factors act in concert with each other and have downstream effects that are potentially redundant and are potentially unique means that one cannot assume that, since Enbrel binds TNF-α, the use of Enbrel in patients impacts NF-κB activity and infringes claim 18 of the '516 patent. Because many different factors including IL-1, IL-17, IL-18, oxidants, viruses such as Epstein-Barr virus or adenovirus, and immune stimuli such as phytohemagglutinin may play roles that relate to NF-κB in a patient, removing one of those factors may not have any influence on NF-κB activity. Thus, when Enbrel binds to TNF-α it is impossible to say that it has "inhibit[ed] intracellular NF-κB signal transduction induced by the circulating cytokines, IL-1 or TNF-α," "inhibit[ed] the intracellular steps of the NF-κB signal transduction pathway induced by Interleukin-1 or Tumor Necrosis Factor-α prior to the performance of the claimed method," "decreas[ed] the ability of NF-κB to act as an intracellular messenger," "inhibit[ed] any step along the NF-κB signal transduction pathway, which begins with the binding of an extracellular receptor agonist to its receptor," or, in other words, that it has infringed claim 18.

The use of Enbrel also does not infringe claim 18 of the '516 patent because it acts outside cells and does not "inhibit[] any step along the NF-κB signal transduction

pathway, which begins with the binding of an extracellular receptor agonist to its receptor." Although ARIAD's construction expands the scope of the claims to encompass interactions upstream of NF-κB, even ARIAD's expanded definition does not cover the use of Enbrel. Enbrel binds to extracellular TNF-α before TNF-α has bound to a receptor. It does not inhibit the binding of TNF-α to a receptor or interfere with any "step along the NF-κB signal transduction pathway" where "binding" to a receptor on the cell surface is the first step.

The above discussion has assumed that TNF-α is implicated in rheumatoid arthritis. But this may not be the case. Blocking TNF-α helps only about ¾ of patients with rheumatoid arthritis.

A key point that Dr. Calame ignores is that rheumatoid arthritis and psoriasis are extremely complicated diseases involving the immune system. They are caused by different genetic and environmental factors, they occur in different unique patients, and they exhibit different symptoms with different levels of severity in different patients. Thus, different patients respond in very different ways to treatment with Enbrel. In some cases it is even possible that Enbrel does not successfully enter the extracellular fluid around the rheumatoid joint or psoriatic tissue and bind TNF-α at all. Thus, there is no reason to believe that in any given unique patient use of Enbrel "inhibit[s] intracellular NF-κB signal transduction induced by the circulating cytokines, IL-1 or TNF-α," "inhibit[s] the intracellular steps of the NF-κB signal transduction pathway induced by Interleukin-1 or Tumor Necrosis Factor-α prior to the performance of the claimed method," "decreas[es] the ability of NF-κB to act as an intracellular messenger,"

"inhibit[s] any step along the NF-κB signal transduction pathway, which begins with the binding of an extracellular receptor agonist to its receptor."

Even if one could assume: (1) that patient's cells have an increase in "the intracellular steps of the NF-κB signal transduction pathway" (this is ARIAD's language not mine); (2) that the binding of TNF-α by Enbrel outside patients' cells "decreas[es] the ability of NF-κB to act as an intracellular messenger that regulates transcription of particular genes," and (3) that this results in a "reduction of the intracellular steps of the NF-κB signaling pathway" (and as discussed above, I believe these assumptions cannot be made), then the use of Enbrel still does not infringe claim 18 as ARIAD contends that claim should be construed. No matter what may result from Enbrel binding to TNF-α outside cells, Enbrel still cannot "inhibit[] the intracellular steps of the NF-κB signal transduction pathway induced by Interleukin-1 or Tumor Necrosis Factor-α prior to the performance of the claimed method," as ARIAD's construction of claim 18 requires. Enbrel works outside the cell to bind TNF-α. Enbrel does not act to inhibit any "steps" that have been "initiated in response to application of a stimulus prior to the performance of the claimed method." There is no evidence that Enbrel, by binding TNF-α outside cells, "inhibit[s] the intracellular steps of the NF-κB signal transduction pathway induced by Interleukin-1 or Tumor Necrosis Factor-α prior to the performance of the claimed method." To the contrary, Enbrel does not act at all on these intracellular steps and does not do anything to anything that has already been initiated. Under ARIAD's own construction, and under Dr. Calame's reasoning, Enbrel , at most, only prevents additional NF-κB from becoming activated.

My opinion that the use of Enbrel does not infringe claim 18 of the '516 patent is confirmed by the proceedings in the reexamination of the '516 patent currently before the United States Patent and Trademark Office. (*See* discussion of ARIAD's reexamination proceeding in Part VI(B)(1)(a).) Thus, the use of Enbrel does not infringe claim 18 of the '516 patent. Because Enbrel does not and cannot infringe claim 18, it also does not infringe dependent claims 183 and 184.

I disagree with Dr. Calame's statement in paragraph 10 of her report that the use of Enbrel infringes claim 18:

> because it reduces NF-κB mediated intracellular signaling in cells in which NF-κB activity has been induced by TNF. By binding to and thereby preventing free TNF from activating the TNF Receptor, Enbrel reduces the level of TNF-induced NF-κB activity.

(Calame Rpt. at ¶ 10.) This statement is incorrect because for the reasons discussed above, including the fact that it cannot be assumed that TNF-α binding to its receptor induces NF-κB activity, and that Enbrel binding of TNF-α in patients thus must reduce NF-κB activity. Dr. Calame's reliance on a CAT reporter assay to try to bolster her simplistic assumptions similarly is misplaced. As discussed above, biology is very complex and many factors at play in the diseases we are discussing can (but also may not) impact NF-κB activity. It cannot be assumed that reducing TNF-α levels outside cells will necessarily have an impact on NF-κB activity inside cells. To the contrary, there is a significant amount of literature including the Haider article discussed above that casts serious doubt on Dr. Calame's assumptions. As I wrote above, the Haider article disproves Dr. Calame's assumption because it found the expression of IL-2R alpha, a gene listed in Table 2 of the '516 patent, was downregulated by infliximab, but not by Enbrel. Thus, this article, and the suggestion in the '516 patent that the expression of IL-

74

2R alpha receptor is regulated by NF-κB, leads to the conclusion that etanercept does not act through NF-κB, does not "decrease the ability of NF-κB to act as an intracellular messenger," does not "inhibit[s] the intracellular steps of the NF-κB signal transduction pathway," and does not downregulate genes whose expression is reported to be tied to NF-κB by the '516 patent.

Also, the results from the CAT reporter assays on which Dr. Calame relies are not meaningful because they use engineered cells that are not necessarily indicative of the cells in human patients who use Enbrel. Dr. Verma, in his declaration to the Patent Office criticizes the reliance on experiments using "artificially transfected cells" very similar to those relied upon by Dr. Calame. (See Nov. 9, 2006, Verma Decl. at ¶¶ 33, 93-94, 122). In addition, Dr. Calame's conclusions and statement are also incorrect because, as discussed above, she ignores the complexity of the disease process in rheumatoid arthritis and the variability among actual human patients.

b.     **Claims 18 and 183-184 interpreted with Amgen's proposed constructions.**

The use of Enbrel does not infringe claims 18 and 183-184 of the '516 patent when those claims are construed according to Amgen's proposed definitions (as stated above). The use of Enbrel does not, and cannot, infringe under Amgen's claim construction because Enbrel does not "take action inside the cell," it does not "directly inhibit" NF-κB activity, and it does not "directly inhibit ... any molecular interaction within cells caused by Interleukin-1 or Tumor Necrosis Factor-α" because Enbrel acts outside the cell to bind TNF-α. In addition, the scientific literature and the complexity of the biologic processes involved in rheumatoid arthritis and psoriasis lead to the conclusion that use of Enbrel does not "reduce intracellular signaling caused by

75

Interleukin-1 or Tumor Necrosis Factor-α in the cells" or, if it is a limitation, "reduce[e] Interleukin-1 or Tumor Necrosis Factor-α activity in ... cells."

As discussed above, when a patient uses Enbrel, the drug may bind to TNF-α extracellularly. Whatever the result of this is, it is clear that the result does not involve any "action inside the cell" by Enbrel. I know of no evidence in the scientific literature, and Dr. Calame points to none, showing that Enbrel even enters the cell. All scientific literature shows that the entire action of binding to TNF-α takes place outside the cell. Indeed, Enbrel was designed to bind to TNF-α outside the cell, and factors inside the cell, such as NF-κB were never considered during the development of Enbrel. Dr. Calame does not claim in her report that Enbrel ever enters the cell.

The fact that when Enbrel works, it works by binding to TNF-α, also means that Enbrel cannot "directly inhibit" NF-κB activity as required by this claim construction. Again, whatever the result of Enbrel binding to TNF-α is, it is clear that there is no direct relationship to NF-κB inhibition. (As I discussed above, it is unclear whether there is even an indirect relationship between Enbrel binding to TNF-α and NF-κB activity in the cells of patients.) There is no evidence in the scientific literature that Enbrel acts directly on NF-κB activity. Enbrel was designed to bind to TNF-α outside the cell, and factors inside the cell, such as NF-κB were never considered during the development of Enbrel. Dr. Calame does not claim in her report that Enbrel acts directly on NF-κB activity.

The use of Enbrel also does not infringe under this claim construction because it does not "directly inhibit ... any molecular interaction within cells caused by Interleukin-1 or Tumor Necrosis Factor-α." Even if one could assume that in patients (1) initial NF-κB activity inside patient cells is elevated, and (2) the binding of TNF-α by Enbrel

outside patient's cells leads to a decrease in the NF-κB activity inside their cells (and as discussed above, I believe these assumptions cannot be made), then the use of Enbrel still does not infringe claim 18. No matter what may result from Enbrel binding to TNF-α, Enbrel still does not influence any molecular interactions with respect to NF-κB activity that have already been caused by IL-1 or TNF-α. Enbrel works outside the cell to bind TNF-α. Enbrel does not act to inhibit any NF-κB activity that has already been induced. To the contrary, Enbrel does not act at all on intracellular steps. At the most (even under Dr. Calame's reasoning) Enbrel only prevents additional NF-κB from becoming activated. As discussed above, and as admitted by ARIAD in the reexamination, claim 18 (and the other asserted claims) do not cover this. (*See* discussion of ARIAD's reexamination proceeding in Part VI(B)(1)(a).)

Finally, there is no evidence that binding TNF-α outside patients' cells influences induced NF-κB activity inside their cells. As a result, there is no evidence that this use "reduce[s] intracellular signaling caused by Interleukin-1 or Tumor Necrosis Factor-α in the cells" or, if it is a limitation that it "reduce[es] Interleukin-1 or Tumor Necrosis Factor-α activity in … cells." The evidence discussed above, including the Haider and Srivastava articles, the incredible complexity of the possible downstream effects of TNF-α, the incredible complexity of the progression of inflammatory diseases such as rheumatoid arthritis and psoriasis, the large number of factors that possibly play a role relating to NF-κB, and the fact that not all patients even respond to therapies targeting TNF-α all undermine any claim that the use of Enbrel by patients reduces Interluekin-1 or Tumor Necrosis Factor-α activity in mammalian cells or infringes claim 18. Because

Enbrel does not infringe claim 18, it also does not and cannot infringe dependent claims 183 and 184 under Amgen's claim construction.

### 3. The use of Enbrel does not infringe any non-asserted claims of the '516 patent directly or under the doctrine of equivalents.

The use of Enbrel also does not infringe the non-asserted claims of the '516 patent. Each independent claim of the '516 patent, except claims 7 and 19, includes the claim element "reducing NF-κB activity in the cell" or a minor variation. Independent Claim 7 includes the claim element "altering NF-κB activity in the cells" which from a scientific perspective differs only in that it may allow increasing in addition to reducing. Claim 19 includes three actions relating to binding to IκB that all take place in the cell and are from a scientific perspective related to "reducing NF-κB activity in the cell." Thus, infringement of all independent claims can be analyzed by examining the claim limitation "reducing NF-κB activity in the cell." As I have discussed, ARIAD construes this limitation to include "decreasing the ability of NF-κB to act as an intracellular messenger ... by inhibiting any step along the NF-κB transduction pathway...," Amgen construes this limitation in part as "taking action inside the cell to directly inhibit (interfere or block) an NF-κB activity." For the reasons stated above, with respect to claims 6 and 18 which also contain this limitation, the use of Enbrel does not result in "reducing NF-κB activity in the cell" under either definition. The use of Enbrel by patients does not, as discussed above, "decreas[e] the ability of NF-κB to act as an intracellular messenger" and it has no effect on "any step along the NF-κB transduction pathway." Enbrel acts by binding TNF-α outside cells and does not enter or act inside cells on any NF-κB activity. For these and the other reasons I discuss above, the use of Enbrel does not infringe the non-asserted claims under either party's claim construction.

Because Enbrel does not infringe the non-asserted independent claims, and claims 6 and 18, it also does not infringe any non-asserted dependent claims under either party's claim construction.

In addition, the use of Enbrel does not infringe the non-asserted claims of the '516 patent under the doctrine of equivalents. The use of Enbrel does not infringe under the doctrine of equivalents because it cannot be proven that the use of Enbrel is insubstantially different from or equivalent to the claimed methods. Indeed, the statements made by ARIAD and Dr. Verma to the Patent Office regarding the scope of the '516 patent claims confirm that the claims are very different from, and thus not equivalent to, any effect that a patient's use of Enbrel may have on cells. Given that Enbrel acts outside cells, not inside them, and that there is no evidence that the use of Enbrel affects NF-κB activity, an attempt to apply the doctrine of equivalents in a way that would encompass Enbrel would require the elimination of these claim limitations which I understand is improper.

Furthermore, I understand that one test for application of the doctrine of equivalents is the function, way, result test. Under this test as I understand it, the accused product or method is compared to any claim limitation that is not literally present to determine whether they perform substantially the same function in substantially the same way with substantially the same result. Even if it could be said that the use of Enbrel in patients has some sort of effect on NF-κB activity (and there is no such evidence as I discuss above), it is not true that the use of Enbrel outside of cells performs substantially the same function or performs that function in substantially the same way to achieve substantially the same result as directly blocking intracellular steps relating to NF-κB

79

activity. To the contrary, the use of Enbrel does not directly, specifically, or in any targeted way, impact any NF-κB activity, NF-κB-mediated intracellular signaling, or the ability of NF-κB to act as an intracellular messenger. Enbrel acts outside the cell and it binds TNF-α. Its use performs a different function, in a different way, to yield a different result. There is no infringement under the doctrine of equivalents.[10]

### 4. The Lizzul and DiChamp articles do not support ARIAD's position that use of Enbrel infringes the '516 patent.

I disagree with Dr. Calame's assertion on pages 12-14 of her report that the articles Differential Expression of Phosphorylated NF-κB/RelA in Normal and Psoriatic Epidermis and Downregulation of NF-κB in Response to Treatment With Etanercept, Lizzul, PF, et al., J. Invest. Dermatol 124: 1275-1283, 2005 (the "Lizzul article") and Increased NF-κB Activation in Peripheral Blood Monocytes of Patients With Rheumatoid Arthritis is Mediated Primarily by TNF-α, DiChamp, et al., J. Rheum. 34: 1976-1983, 2007 (the "DiChamp article") show that use of Enbrel infringes the '516 patent. For the reasons stated below, I do not believe that either of these articles show that use of Enbrel in human patients infringes the '516 patent.

### a. The Lizzul article.

I have examined the Lizzul article from Dr. Alice Gottlieb's group[54]. This article does not alter my opinion that Enbrel does not infringe the '516 patent for at least the following reasons:

---

[10] Dr. Calame, in her report, has not argued infringement of the asserted claims under the doctrine of equivalents. For the same reasons discussed here as to the non-asserted claims, I do not believe that the asserted claims are infringed under doctrine of equivalents. I reserve the right to respond and explain my disagreement with any opinions that Dr. Calame or ARIAD are permitted to provide on this issue of whether the asserted claims are infringed under the doctrine of equivalents.

1)      As an initial matter, the Lizzul article itself cautions against drawing any definitive conclusions regarding NF-κB activation, acknowledging that the single assay used in the study "does not necessarily indicate a functional state of NF-κB activation." (Lizzul at 1278)  Furthermore, the Lizzul article notes that some of the results that were observed were inconsistent with those reported in prior studies.  (Lizzul at 1277)  The Lizzul article suggests that further studies would be needed to draw any conclusions, let along the sweeping conclusions that Dr. Calame draws in her expert report.

2)      The assay that looked at NF-κB in the Lizzul article only focused on the presence of a single phosphorylated subunit of one member of the NF-κB family — phosphorylated p65.  While the Lizzul article attempts to use phosphorylated p65 as a proxy for NF-κB activation, simply testing for the presence of phosphorylated p65 does not prove at all whether any "activity" of NF-κB is actually occurring or not (and thus whether it is reduced or not).  Testing for phosphorylated p65 does not reveal anything about its binding to DNA in the nucleus.  Furthermore, this test does not prove that the p65 has necessarily disassociated from IκB, and does not necessarily prove that the p65 has translocated from the cytoplasm into the nucleus.  The test in Lizzul further ignores whether phosphorylation of p65 is necessary for it to have binding activity within the nucleus, and does not consider the p50 subunit at all.  Other studies that have looked at other subunits or molecules associated with NF-κB activation have come to the conclusion that they are not impacted by Enbrel.  (*See, e.g.* AM-AR480461, a synopsis discussing a study of Enbrel used by psoriasis patients and finding no impact on other molecules thought to be involved in NF-κB activation).  Moreover, from what I can discern, the staining in the pictures in the Lizzul article, Figure 1B on page 1277,

81

indicates that there is phosphorylated p65 outside the nucleus, and possibly outside the cell. According to the Cell Signaling Technology website (it appears that the Lizzul article misnames the company), it would appear that there are also unresolved issues with some of the antibodies sold by them cross-reacting with other molecular species.

3)     I also note that the Lizzul article describes a small study of 10 patients, and does not provide detailed information on a patient-by-patient basis. It would be necessary to review the patient-by-patient data to even begin to determine whether any conclusions could be reached as to what happens in cells across larger patient populations. The limited data that is provided with respect to individual patients suggests wide variability among the patients, as Table 1(B) in the article would seem to suggest that there was not a good correlation between return of normal keratinocyte differentiation and proliferation and the return of the patients to "normal" phosphorylated p65 levels (defined as levels present in uninvolved skin from the same patient). Based on this data in Figure 1(B), it would appear likely to me that the data relating to average levels of phosphorylated p65 (e.g. as set forth in Figure 4) was skewed by a few patients within the ten patient group, thus casting doubt on any broad conclusions that might be reached.

4)     The Lizzul article does not discuss or account for the fact that the level of phosphorylated p65 could have been the result of other stimuli or pathways. The article does not discuss what other drugs the ten patients might have been taking over the six months they were studied, and does not indicate what controls were put in place (if any) to try to account for any modifications in behavior or activity that might impact levels of phosphorylated p65 (e.g. exposure to sunlight). Furthermore, the study only tested

patients at time 0, 1 month, 3 months and 6 months, and without attempting to measure translocation, it would be impossible to draw any conclusions regarding the real-time effects of Enbrel on phosphorylated p65 so as to reach conclusions as to "diminishing induced" activity.

4)    In the study, Enbrel was used in patients with psoriasis, and transcription factors besides NF-κB were downregulated. A related paper by Dr. Gottlieb's group[55], further discussing this study, shows that in the study there was also downregulation of psoriatic skin STAT-1 transcription, a factor not known to be regulated by TNF-α. Thus, it is difficult to tell "what" was regulating "what" in Dr. Gottlieb's study.

5)    Even if one ignores the caution in the Lizzul article that its assay "does not necessarily indicate a functional state of NF-κB activation," and all of the other question marks relating to the study, the article still would only support a conclusion that Enbrel prevents induction of additional NF-κB activity by binding TNF-α to Enbrel, described by the article as inhibiting "NF-κB activation." This, however, is very different than what is required by the claims of the '516 patent, which require that action be taken inside the cell to reduce NF-κB activity as described above. Furthermore, even under ARIAD's own view of the scope of the '516 patent claims, the statements in Lizzul describe Enbrel's impact in very different terms, establishing the non-infringement of the claims. (*See* discussion of ARIAD's reexamination proceeding in Part VI(B)(1)(a).) Thus, even assuming that a conclusion can be reached from the Lizzul article with respect to preventing induction of NF-κB activation — which I disagree with — this nevertheless does not support a finding of infringement under any interpretation of the '516 patent claims that has been offered to date.

83

### b.  The DiChamp Article.

I have examined the DiChamp article[56]. This article does not alter my opinion that Enbrel does not infringe the '516 patent for at least the following reasons:

1)  The study reported in the DiChamp article was very small and only involved seven patients. It is difficult to draw any conclusions from a study with such a small sample size. Despite the small sample, however, the data refutes Dr. Calame's broad conclusions. In fact, 14% of these patients (1/7 of the patients) showed no effect of Enbrel on NF-κB in monocytes. Furthermore, the DiChamp article finds that Enbrel had no effect at all on NF-κB activation in peripheral blood mononuclear cells and peripheral blood lymphocytes. Finally, I would note that the gels and data included in the DiChamp article raise questions as to how the experiments were conducted and the accuracy of the results.

2)  Another confounding factor in assessing the conclusions reported in the DiChamp article is that the patients were taking a variety of drugs that may affect NF-κB activity (as shown in Table 1, page 1979 of the article). Six of the seven patients in the study were taking glucocorticoids, which are thought to play a role relating to NF-κB[57]. Glucocorticoids may induce expression of IκB which causes an increased cytosolic retention of NF-κB. Glucocorticoids may also inhibit the NF-κB DNA-binding activity through direct interaction between the glucocorticoid receptor and components of the NF-κB binding sites in various gene promoters. The activated glucocorticoid receptor can also interact with NF-κB by direct protein–protein binding, preventing the activation of NF-κB in certain types of cells. One patient in the study was taking leflunomide, which may decrease activated NF-κB by blocking degradation of IκBα and subsequent nuclear translocation of NF-κB[58]. Finally, six of seven patients in the study were taking

84

methotrexate, another potential inactivator of NF-κB[59]. Methotrexate suppresses NF-κB activation through inhibition of IκBα phosphorylation and through degradation of NF-κB. Because the patients in this study were already taking drugs that could affect NF-κB activity, no reasonable conclusions can be reached as to the effect that Enbrel had on these patients.

3)    The results of the report are less relevant to rheumatoid arthritis because the study looked at blood monocytes from patients rather than diseased tissue. Rheumatologists believe that the majority of rheumatoid arthritis pathologic activity occurs in the joints of patients rather than in the blood. Hence, activation of NF-κB in the blood of patients with rheumatoid arthritis is not indicative of NF-κB activity in the joint where the majority of pathologic activity occurs. I note that Dr. Calame overstates the significance of this study when she wrongly states in her report that the "the cell samples used in the study were taken from diseased tissue of patients with rheumatoid arthritis." (Calame Report at ¶ 28.)  As I have discussed, blood monocytes are not the diseased tissue where most of the pathological activity in rheumatoid arthritis occurs.

4)    Dr. Calame states that "[t]he authors observed that monocytes taken from rheumatoid arthritis patients have elevated NF-κB activity which is 'mediated primarily through production of endogenous TNF-α'". (Calame Report at ¶ 27 (citing the DiChamp article).)  This conclusion, however, is flawed.  As I have discussed, the elevated NF-κB levels in patients with rheumatoid arthritis may be the result of a wide variety of factors.  In a patient, binding TNF-α may have no effect at all on NF-κB activity levels depending on the interplay of many different factors with NF-κB.

5)       Even putting aside all of the flaws of the DiChamp study, the DiChamp article at most discusses a study that examined preventing induction of additional NF-κB activity by binding TNF-α to Enbrel. This, however, is very different than what is required by the claims of the '516 patent, which require that action be taken inside the cell to reduce NF-κB activity as described above. Furthermore, even under ARIAD's own view of the scope of the '516 patent claims, the statements in DiChamp describe Enbrel's impact in very different terms, establishing the non-infringement of the claims. (*See* discussion of ARIAD's reexamination proceeding in Part VI(B)(1)(a).) Thus, even assuming that a conclusion can be reached from the DiChamp article with respect to decreased NF-κB activation — which I disagree with — this still does not support a finding of infringement under any interpretation of the '516 patent claims that has been offered to date.

**5.       The results of the tests performed by Dr. Pomerantz, and discussed in Dr. Calame's report, do not support ARIAD's position that use of Enbrel infringes the '516 patent.**

I do not believe that the data reported by Dr. Pomerantz, relied upon by Dr. Calame, shows that Enbrel infringes the '516 patent for at least the following reasons:

1)       According to Dr. Pomerantz's notebook data, stimulation of two other cell types, namely THP-1 cells and Jurkat cells, both human immune cells, did not occur in response to TNF-α. This indicates that, at least in Dr. Pomerantz's study, not all immune cells respond to TNF-α by expressing more luciferase protein. Thus, it is difficult to

conclude that this study in U937 cells has any meaningful significance for a patient population.[11]

2)    In addition, Dr. Pomerantz's study did not take into account the complex environment in which cells exist in a patient. In the milieu of the inflamed joint in rheumatoid arthritis or in psoriatic skin, a multitude of cytokines and other mediators of cell-cell interactions are at play. Even if TNF-α were bound by Enbrel, it is likely that other cytokines, such as IL-18, and other factors would still play a role relating to elevating NF-κB levels. Thus, assuming that TNF-α effects NF-κB at all, blocking TNF-α in a human patient may not effect NF-κB activity. Finally, reporter gene assays use engineered cell lines and are specifically designed to show expression of a protein from an engineered plasmid and to respond to certain types of stimulus — the assays do not show whether NF-κB is actually binding to a binding site. Reporter gene assays are not the type of assay a researcher would use to determine the mechanism of action of a drug in a much more complex human or in patients' cells. Thus, Dr. Pomerantz's data, using overly simplistic and highly engineered reporter gene assays, does not tell one anything about what is happening *in vivo* in a patient when Enbrel is administered.

      **6.**      **The evidence cited by Dr. Calame does not support the conclusion that Amgen indirectly infringed the '516 patent.**

I understand that ARIAD has accused Amgen of indirectly infringing the asserted claims of the '516 patent by inducing infringement of the '516 patent and by contributorily infringing the asserted claims of the '516 patent. I have reviewed Dr. Calame's analysis of the issues of indirect infringement and her conclusions that "Amgen

---

[11]    I disagree with Dr. Calame's statement on page 12 of her report that it would have been unethical to use biopsied tissue and note that none of the data that Dr. Calame relies on for her infringement opinion establishes that Enbrel reduces NF-κB activity in patients who take Enbrel.

Knew That Enbrel Inhibits the NF-κB Pathway Induced by TNF" and "Amgen Knew That Enbrel Reduces NF-κB Activity." (Calame Report at 15-20.) I have also reviewed the evidence that Dr. Calame asserts supports these conclusions. I do not believe that the evidence cited by Dr. Calame supports either of these conclusions. In fact, the evidence in this case supports the conclusion that use of Enbrel does not inhibit NF- κB activity and does not inhibit the NF-κB pathway induced by TNF.

**a.    The evidence does not show that "Amgen knew that Enbrel Inhibits the NF-κB Pathway Induced by TNF."**

Dr. Calame cites a number of documents that she claims show that "Amgen Knew that Enbrel Inhibits the NF-κB Pathway Induced by TNF." The articles <u>Detection of Tumor Necrosis Factor Alpha But Not Tumor Necrosis Factor Beta in Rheumatoid Arthritis Synovial Fluid and Serum</u>, T. Saxne *et al.*, Arthritis Rheum. 31:1041-1045 (1988)[60], and <u>Cytokine Pathways and Joint Inflammation in Rheumatoid Arthritis</u>, E.H.S. Choy *et al.*, New England J. Med. 344:907-916 (2001)[61], do not show, as Dr. Calame claims in paragraph 32 of her report, that "Amgen Knew That Enbrel Inhibits the NF-κB Pathway Induced by TNF." In fact neither of these papers even mentions NF-κB or Enbrel in relation to NF-κB. The Saxne article discusses the fact that TNF is present in joints. The Choy article discusses the role of several cytokine pathways involved in joint inflammation and rheumatoid arthritis known to the authors in 2001. Interestingly, the authors do not discuss NF-κB as one of those pathways. Thus, these articles in no way show that "Amgen knew that Enbrel inhibits the NF-κB pathway induced by TNF."

Dr. Calame also cites the Lizzul article in support of her assertion that "Amgen Knew that Enbrel Inhibits the NF-κB Pathway Induced by TNF." But, as previously discussed, the Lizzul article has a number of flaws that mean that it would not be possible

88

to conclude from the article that use of Enbrel diminishes induced NF-κB activity. Indeed, the authors of the Lizzul article explicitly state in the second column of page 1281 that what they observed was not necessarily activation of NF-κB. As I discussed earlier, the histology study that was reported in the Lizzul article is not the type of study that is used to show NF-κB activity. The activation of NF-κB is best studied using isolated cells where it can be observed whether NF-κB actually enters the nucleus.

Dr. Calame identifies a number of other documents in paragraph 33 of her report that she alleges support her assertion that "Amgen knew that Enbrel inhibits the NF-κB pathway induced by TNF." These documents do not:

- AM-AR0521413 is a graphic from a textbook entitled Signal Transduction Pathways in Inflammation. First, this graphic does not mention Enbrel or etanercept and thus does not show anything about that drug. Furthermore, the graphic shows that a large number of different factors, including the JNK pathway, are potentially implicated in inflammation — it provides no indication about whether use of Enbrel in a particular patient implicates any particular factor.

- AM-AR0511439 is the paper TNF-R1 Signaling: A Beautiful Pathway, G. Chen & D.V. Goeddel, Science, 296:1634-1635 (2002)[62]. This paper is a general discussion of the role that TNF might play in certain intracellular events. First, like the previous reference, the paper does not discuss Enbrel and thus could not inform Amgen about any characteristics of Enbrel. Furthermore, as the authors point out, the relationship between TNF and other biological events and factors is extremely complex and "many questions remain unanswered" about TNF's role in biological processes. Thus, this article supports the position that Amgen did not know that "Enbrel inhibits the NF-κB pathway induced by TNF."

- AM-AR484440 is the paper Tumor Necrosis Factor Signaling, H. Wajant et al., Cell Death and Differentiation, 10:45-65 (2003)[63]. This paper again does not mention Enbrel. Also, like the last two references it identifies a variety of factors and biological processes that TNF may in some way relate to.

- AM-AR0442002 is the paper A Physical and Functional Map of the Human TNF- α /NF-κB Signal Transduction Pathway, T. Bouwmeester et al., Nature Cell Biology, 6:97-105 (2004)[64]. Like the other references Calame cites in support, this article also does not mention Enbrel. Furthermore, this article

ignores many other factors and biological processes that TNF-α may relate to and also ignores many other factors that may play a role relating to NF-κB.

The articles that Calame cites in support of her position that "Amgen Knew that Enbrel Inhibits the NF-κB Pathway Induced by TNF" do not even attempt to relate Enbrel to NF-κB in any way (except the Lizzul article), do not relate to what actually occurs in a human patient with respect to NF-κB, and do not show that Enbrel plays a role relating to NF-κB activity in a human patient when it is administered. These articles and documents show, at most, that in certain types of cells, under certain types of laboratory conditions, some people believe there is some sort of a relationship between TNF-α and NF-κB. As discussed above, rheumatoid arthritis and psoriasis are complex diseases that involve many different biological processes. The mere fact that in certain carefully controlled laboratory conditions there may be some suggestion of a relationship between TNF-α and NF-κB does not mean that Amgen "knew" that use of Enbrel in human patients "inhibits the NF-κB pathway induced by TNF."

Finally, I note that irrespective of what was contained in these documents, there is no evidence that Amgen studied these documents or formed any definitive conclusions regarding their contents. The fact that some particular reference, including references in Amgen's possession, makes a particular point does not in any way mean that Amgen knew or believed that that particular point was true. Furthermore, as pointed out previously, even if Amgen had fully read and adopted the conclusions of all of these documents (which I do not see evidence of), there are other references that support alternative conclusions. Thus, Dr. Calame's statement at paragraph 34 that Amgen scientists would have known from these articles that "TNF activates the NF-κB pathway" is not accurate. The fact that some particular reference, including references in Amgen's

90

possession, make a particular point does not in any way mean that Amgen knew or believed that that particular point was true. Thus, Dr. Calame's statement at paragraph 34 that Amgen scientists would have known from these articles that "TNF activates the NF-κB pathway" is not accurate.

        **b.**     **The evidence does not show that Amgen knew that Enbrel Reduces NF-κB Activity.**

Dr. Calame cites a number of documents that she claims show that "Amgen Knew That Enbrel Reduces NF-κB Activity." In fact these documents do not show this.

**Redacted**

91

**Redacted**

**Redacted**

The book chapter L. Chen & W.C. Greene, <u>Regulation of Nuclear NF-κB Action:</u> <u>a Key Role for Postranslational Modification</u>, in Sankar Ghosh, ed., <u>Handbook of</u> <u>Transcription Factor NF-kappaB</u> (2007), pages 88-91, discusses the relationship between NF-κB and phosphorylation.   This book chapter does not discuss Enbrel or any relationship between Enbrel and NF-κB; nor does it discuss the many factors and biological processes involved in inflammation.   Accordingly, knowledge of this book chapter would not have informed Amgen that "Enbrel reduces NF-κB activity."  In any case, Dr. Calame has presented no evidence that Amgen knew of this book chapter.

**Redacted**

**Redacted**

The Lizzul article, (relied on by Calame for the proposition that "Enbrel significantly downregulated NF-κB activity in the lesional keratinocytes" (Calame Report at ¶ 41)) again does not show that "Enbrel reduces NF-κB activity" for all of the reasons already discussed in this section and earlier in part VI(B)(10)(a).  As pointed out previously, even if Amgen fully read and adopted the conclusions of all of these documents (which I see no evidence of), it would still have been reasonable for Amgen to

conclude it did not infringe the claims of the '516 patent based on the express representations made by Dr. Verma and ARIAD to the Patent Office, namely that "inhibiting activation of NF-κB is a method different from diminishing induced NF-κB activity." (*See discussion infra*). At most, these documents are argued by Dr. Calame to support a conclusion that Enbrel inhibits activation of NF-κB, but do not come close to suggesting that Enbrel diminishes induced NF-κB activity.

The article Evidence that Anti-Tumor Necrosis Factor Therapy With Both Etanercept and Infliximab Induces Apoptosis in Macrophages, but Not Lymphocytes, A.I. Catrina *et al.*, Arthritis & Rheum, 52:61-72 (2005)[65] produced at AM-AR0220170 discusses the mechanisms of action of TNF antagonists. The article does not, however, deal with or measure NF-κB activity. The only reference to NF-κB is on page 70 and it is a reference to a separate article. It also does not state what it means by "activation of NF-κB." Thus, the article does not actually explain anything about NF-κB and would not inform a scientist about what is being referred to with respect to NF-κB. This article, which is mainly about apoptosis, would not have informed Amgen that "Enbrel reduces NF-κB activity." In addition, Dr. Calame misquotes, and thus overstates, the unsupported and unexplained assertion made in this article about NF-κB.

**Redacted**

**Redacted**

c.    **The evidence shows that Amgen did not indirectly infringe the '516 patent.**

As I have discussed in this report, the evidence shows that Amgen never invented, developed, tested, manufactured or marketed Enbrel using any concepts relating to NF-κB.  (February 22, 2008, Interview of Laura Hamill; January 30, 2008 Interview of Dr. Raymond Goodwin; February 7, 2008, Interview of Arleen Paulino, and February 21, 2008 Interview of Dr. Craig Smith.)  Doctors do not prescribe Enbrel based on a patient's NF-κB status, patients who are prescribed Enbrel are not advised about NF-κB activity, and patients who are prescribed Enbrel are never tested for NF-κB activity or levels.  (February 18, 2008, Interview of Dr. J. Mark Jackson; February 18, 2008, Interview of Judith Levinson.)  Finally, Amgen has licensed a number of technologies [critical for the development and manufacture of Enbrel] — none of which relate to NF-κB.

There is ample evidence showing that the use of Enbrel to bind TNF-α does not play a role relating to NF-κB activity.  As I discussed above, the Haider article found that Enbrel did not downregulate a gene whose transcription is thought to be regulated by NF-κB.  Another paper in Amgen's possession, Srivastava, *et al.*, also shows the result that Enbrel does not involve reduction or inhibition of NF-κB activity[53].  The study described in this paper looked at a patient with Crohn's disease which is a disease that is "associated

with increased local expression of TNF-alpha in affected tissues," which is an inflammatory disease. The study found that "[e]tanercept had no significant effect on NFKB activity" and "did not alter NFKB activity." A scientist at Amgen reading these articles would not conclude that "Amgen knew that Enbrel Inhibits the NF-κB Pathway Induced by TNF," or that "Amgen knew that Enbrel Reduces NF-κB Activity." In fact, a scientist reading these articles would reach the opposite conclusion. Thus the evidence shows that Amgen would not know that the use of Enbrel inhibits the NF-κB pathway induced by TNF.

In addition, I understand that one element for a claim of contributory infringement is that the product accused of infringement must be especially made or adapted for use in a manner that infringes the patent, and the supplier of the product must know that the product was especially made for that use. I have already stated that Amgen was not aware that the use of Enbrel affects NF-κB activity and infringes the '516 patent. In addition, NF-κB was not considered in either the development or production of Enbrel, and NF-κB activity is not used when treating patients with Enbrel. Thus, Enbrel is not especially made or adapted for use in a manner that infringes the '516 patent.

### 7. There is no evidence that Amgen's alleged infringement of the '516 patent by selling Enbrel was willful.

I have been informed that the standard for willful infringement is that an infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid and enforceable patent claim. I understand that this objectively-defined risk must have either been known to the accused infringer or so obvious that it should have been known to the accused infringer. Amgen did not act despite an objectively high likelihood

that its actions constituted infringement of a valid patent.[12]  As I have discussed, the factors and biological processes that are involved in rheumatoid arthritis (and in NF-κB's role in the cell) are extremely complex.  Thus, it is not objectively likely that the use of any drug that does not directly influence NF-κB activity infringes the '516 patent.  The documents that Dr. Calame has identified do not show that use of Enbrel "reduces NF-κB activity."  At most they demonstrate that rheumatoid arthritis is an extremely complex disease and the role of Enbrel in any given patient is highly uncertain.  In addition, some of the documents in Amgen's possession lead to the conclusion that there is not a relationship between Enbrel and NF-κB activity.

I also understand that ARIAD asserted counterclaims against Amgen based on Amgen's sale of Kineret and later moved to dismiss those claims.  The fact that ARIAD asserted and then dropped a claim based on Amgen's sale of Kineret, a drug that has a role in the same extremely complicated rheumatoid arthritis milieu as Enbrel, supports the position that Amgen's belief that use of Enbrel does not infringe the '516 patent is not objectively unreasonable.

Even if the documents that Dr. Calame identified showed that Amgen faced an objectively high risk of infringement (and they do not), those documents would not necessarily convey any information to scientists at Amgen and place Amgen on notice of the alleged risk.

8.     **There are additional reasons that the use of Enbrel does not infringe the '516 patent.**

I understand that there are additional legal reasons that Amgen's sale of Enbrel does not infringe the '516 patent.  For example, I have been informed by Amgen's

---

[12] I understand that there is an invalidity component of willful infringement which I have not been asked to analyze.

98

attorneys that sale of Enbrel to the United States government cannot, as a matter of law, infringe the '516 patent. Amgen has sold Enbrel to the United States government. (Amgen's Supplemental Response to ARIAD Interrogatory No. 11.) Thus, these were non-infringing sales.

### C.  The Use Of Kineret Does Not Infringe The Claims Of The '516 Patent.

#### 1.  The use of Kineret does not infringe any claims of the '516 patent directly or under the doctrine of equivalents.

The use of Kineret also does not infringe the claims of the '516 patent. Each independent claim of the '516 patent, except claims 7 and 19, includes the claim element "reducing NF-κB activity in the cell" or a minor variation. Independent Claim 7 includes the claim element "altering NF-κB activity in the cells" which from a scientific perspective differs only in that it may allow increasing in addition to decreasing. Claim 19 includes three actions relating to binding to IκB that all take place in the cell and are from a scientific perspective related to "reducing NF-κB activity in the cell." Thus, infringement of all independent claims can be analyzed by examining the claim element "reducing NF-κB activity in the cell." As I have discussed, ARIAD construes this claim term to include "decreasing the ability of NF-κB to act as an intracellular messenger ... by inhibiting any step along the NF-κB transduction pathway...," Amgen construes this term in part as "taking action inside the cell to directly inhibit (interfere or block) an NF-κB activity." For the purposes of analysis of infringement of the '516 patent, Enbrel and Kineret have very similar characteristics: neither operates inside the cell, both relate to very complex biological processes, the affect of both on a patient is very unpredictable, neither directly affects anything that occurs inside a cell, and both have an unknown (if any) relationship with Enbrel. Thus, for the reasons stated above with respect to Enbrel's

non-infringement of the claims of the '516 patent, use of Kineret does not result in "reducing NF-κB activity in the cell" under either definition.

The use of Kineret by patients does not, "decreas[e] the ability of NF-κB to act as an intracellular messenger" and it has no effect on "any step along the NF-κB transduction pathway." Kineret acts by binding to IL-1 receptor on the outer surface of the cell and does not enter or act inside cells on any NF-κB activity. For these and the other reasons I discuss above with respect to Enbrel, the use of Kineret does not infringe the any independent claims of the '516 patent under either party's claim construction. Because Kineret does not infringe the independent claims of the '516 patent, it also does not infringe any dependent claims under either party's claim construction.

In addition, the use of Kineret does not infringe the claims of the '516 patent under the doctrine of equivalents. The use of Kineret does not infringe under the doctrine of equivalents because it cannot be proven that the use of Kineret is insubstantially different from or equivalent to the claimed methods. Given that there is no evidence that the use of Kineret affects NF-κB activity and that Kineret acts outside cells, not inside them, an attempt to apply the doctrine of equivalents in a way that would encompass Kineret would require the elimination of these claim limitations which I understand is improper.

Furthermore, I understand that the doctrine of equivalents only applies where the accused product or method performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product or method. Even if it could be said that the use of Kineret in patients has some sort of effect on NF-κB activity (and there is no such evidence as I discuss above), it is

not true that the use of Kineret outside of cells performs substantially the same function or performs that function in substantially the same way to achieve substantially the same result as directly blocking intracellular steps relating to NF-κB.  To the contrary, the use of Kineret does not directly, specifically, or in any targeted way impact NF-κB, NF-κB-mediated intracellular signaling, or the ability of NF-κB to act as an intracellular messenger.  Kineret acts on the outer cell surface and it binds IL-1.  Its use performs a different function, in a different way, to yield a different result.  There is no infringement under the doctrine of equivalents.

### 2.    The Pomerantz Study.

Dr. Pomerantz's notebook data shows that Kineret has no effect on IL-1 stimulation of any of the cells lines that Dr. Pomerantz used.

### 3.    The evidence shows that Amgen did not indirectly infringe the '516 patent.

I have seen no evidence showing that Amgen invented, developed, tested, manufactured or marketed Kineret using any concepts relating to NF-κB.  Doctors do not prescribe Kineret based on a patient's NF-κB status, patients prescribed Kineret are not advised about NF-κB, and patients prescribed Kineret are never tested for NF-κB activity.  Furthermore, as I discussed, Amgen does not adopt knowledge from every book, publication, or presentation, in its possession, even when the research reported in those books, publications and presentations was sponsored by Amgen.

In addition, I understand that one element for a claim of contributory infringement is that the product accused of infringement must be especially made or adapted for use in a manner that infringes the patent, and the supplier of the product must know that the product was especially made for that use.  I have already stated that Amgen was not

aware that the use of Kineret effects NF-κB activity and infringes the '516 patent. In addition, NF-κB is not used when treating patients with Kineret. Also, the results of ARIAD's own expert Dr. Pomerantz showed no effect of Kineret on IL-1 stimulation in any of the cell he used. Thus, Kineret is not especially made or adapted for use in a manner that infringes the '516 patent.

Dated: February 22, 2008          Dr Alisa Koch
                                  _____
                                  Alisa Erika Koch, M.D.

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation; IMMUNEX
CORPORATION, a Washington corporation;
AMGEN USA, INC., a Delaware corporation;
AMGEN MANUFACTURING, LIMITED, a
Bermuda Corporation; and IMMUNEX RHODE
ISLAND CORPORATION, a Delaware corporation,

      Plaintiffs,

v.

ARIAD PHARMACEUTICALS, INC., a Delaware
corporation; and THE WHITEHEAD INSTITUTE
FOR BIOMEDICAL RESEARCH, a Delaware
corporation,

      Defendants,

_____

ARIAD PHARMACEUTICALS, INC., a Delaware
corporation; THE PRESIDENT AND FELLOWS OF
HARVARD COLLEGE, a Massachusetts
corporation; MASSACHUSETTS INSTITUTE OF
TECHNOLOGY, a Massachusetts corporation; and
THE WHITEHEAD INSTITUTE FOR
BIOMEDICAL RESEARCH, a Delaware
corporation,

      Counterclaim-Plaintiffs,

v.

AMGEN, INC., a Delaware corporation; IMMUNEX
CORPORATION, a Washington corporation;
AMGEN USA, INC., a Delaware corporation;
AMGEN MANUFACTURING, LIMITED, a
Bermuda Corporation; and IMMUNEX RHODE
ISLAND CORPORATION, a Delaware corporation,

      Counterclaim-Defendants.

Civil Action No. 06-259-MPT

**CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER**

### REPLY EXPERT REPORT OF ALISA ERIKA KOCH, M.D.
### REGARDING NON-INFRINGEMENT OF U.S. PATENT NO. 6,410,516

## I.    INTRODUCTION

This report supplements, and is in addition to, my February 22, 2008, report. Section II of this report includes any additional materials (not listed in my February 22, 2008, report) that I considered in reaching the opinions expressed in this report. For this report, I have been asked to review the February 22, 2008, expert report of Dr. Jeffrey Ravetch and the arguments he makes about the prior art. While I have not considered all of his arguments, and have not been asked to rebut the arguments that he makes, I have been asked to consider the ramifications of one of his arguments on the infringement theories advanced by ARIAD and ARIAD's infringement expert, Dr. Kathryn Calame, in this case. Section III of this report contains my supplemental non-infringement analysis.

I reserve the right to supplement or amend this report and/or my opinions to the extent that additional information is provided by either party or the Court, or to the extent that amendment or supplementation is appropriate. I also reserve the right to consider and provide my opinions in view of facts and matters arising or made known to me subsequent to this report, including the Court's claim construction or in rebuttal to any matter raised by ARIAD Pharmaceuticals, Inc., The President and Fellows of Harvard College, Massachusetts Institute of Technology, and The Whitehead Institute For Biomedical Research (collectively "ARIAD") or its experts, either prior to or during any hearing or trial in this action.

I expect to testify at trial regarding the matters set forth in this report if asked about these matters by the Court or the parties' attorneys. In presenting the matters set forth in this report at trial, I may use some or all of the documents that I have considered in preparation of this report as well as visual aids and demonstrative exhibits to help me explain my opinions, bases, and testimony.

My curriculum vitae was previously submitted and the hourly rate for my time spent analyzing issues was previously disclosed in connection with my February 22, 2008 report.

## II.    MATERIALS CONSIDERED

February 22, 2008, Rebuttal Report of Jeffrey V. Ravetch, M.D., Ph.D.

## III.    ANALYSIS

Dr. Ravetch argues that the asserted claims of the '516 patent require that a stimulus that is thought to **induce** NF-κB activity must be exposed to the cells before a substance that is thought to **reduce** NF-κB activity is exposed to the cells, *i.e.* the claims of the '516 patent call for NF-κB "inducer-before-reducer." He writes:

> both claims 6 and 18 of the '516 Patent require that NF-κB activity be induced prior to its reduction by the claimed methods. . . . In other words, for a reference to anticipate either claim 6 and/or claim 18, it must disclose reduction of NF-κB that has already been induced. In any reference where a cell has been exposed to an inhibitor that purportedly reduces NF-κB activity, the inhibitor must be added after the NF-κB pathway has been induced for the reference to anticipate. Effectively, this requires the addition of the inhibitor after the onset of a disease state whereby the NF-κB pathway is induced after the addition of a chemical inducer of the NF-κB pathway. If the inhibitor is introduced either simultaneously with or prior to the exposure of the same system to an inducer of NF-κB activity, the dynamics of the experimental system are such that there is no induction of NF-κB activity prior to its reduction by the inhibitor.

(February 22, 2008, Ravetch Rebuttal Report ("Ravetch Report") at 6.) Dr. Ravetch does not explain whether the inducer must be added a particular amount of time before the reducer, but simply states that inducer must be added before reducer in order to "diminishing induced NF-κB activity" as set forth in the claims. Dr. Ravetch also states that under his claim construction the inducer and reducer cannot be added at the same time and that the reducer cannot be added before the inducer.

As an initial matter, I disagree with Dr. Ravetch's "inducer-before-reducer" construction of the '516 patent claims. From a scientific perspective, I see no requirement of that in the

claims, and also see no support for that in the '516 patent itself. Furthermore, neither party's proposed claim constructions (which I listed in my February 22, 2008, report) appear to adopt Dr. Ravetch's "inducer-before-reducer" limitation. A scientist reading the '516 patent and its claims would understand that the claims call for reduction of NF-κB activity (which is the result of an induction), but do not specify when or how the NF-κB activity was induced relative to the introduction of the reducing agent.

**Redacted**

If we assume Dr. Ravetch's "inducer-before-reducer" claim construction and Dr. Calame's analysis is correct (which I do not), this construction leads to several conclusions regarding ARIAD's infringement allegations regarding a patient's use of Enbrel® (etanercept). If we apply Dr. Ravetch's construction and Dr. Calame's analysis, the first conclusion that follows is that only the first dose of ENBREL can infringe the '516 patent claims because once a patient takes an initial dose of ENBREL, the NF-κB activity "induced" by TNF-α is "reduced." After the first dose of ENBREL, any subsequent "induction" of NF-κB activity by TNF-α would

4

be <u>after</u> the administration of the reducer, something that **Dr.** Ravetch apparently argues is not covered by the claims.

**Redacted**

.Furthermore, if we apply Dr. Ravetch's construction and Dr. Calame's analysis, the second conclusion that follows is that <u>there cannot be any infringement of the '516 patent claims</u> <u>with subsequent doses of ENBREL</u> because there is no prior induction of NF-κB activity within the meaning of the claims according to Ravetch. Dr. Ravetch's construction plainly states that there is no induction of NF-κB activity within the meaning of the claims <u>if</u> the inducer and reducer are added at the same time or the reducer is added before the inducer:

> If the inhibitor is introduced either simultaneously with or prior to the exposure of the same system to an inducer of NF-κB activity, the dynamics of the

---

[1] When I use the phrase subsequent doses of ENBREL in this report, I mean any doses given to a patient after the first dose. I am not limiting subsequent dose to a change or variance in dose amount of ENBREL given to a patient.

experimental system are such that there is no induction of NF-κB activity prior to its reduction by the inhibitor.

(Ravetch Report at 6.) With subsequent doses of ENBREL, the inhibitor (which Dr. Calame says is ENBREL) is being added after reduction and, thus, does not fall within Dr. Ravetch's inducer-before-reducer construction. Consequently, the alleged inducer-before-reducer limitation of the '516 patent claims plainly cannot be met by a subsequent dose of ENBREL. ARIAD and Dr. Calame do not offer any data or evidence to the contrary.

Nor can ARIAD or Dr. Calame argue that on a molecular level, subsequent doses of ENBREL still are covered by the claims because ENBREL does not bind all TNF-α and there is still "induced" NF-κB activity. If pre-existing TNF-α has not bound to an extracellular receptor, then it has not "induced" NF-κB activity even under Dr. Calame's view. If existing TNF-α has bound to an extracellular receptor, ENBREL's action outside the cell cannot "reduce" any NF-κB activity that might arise from that binding event.

Applying Dr. Ravetch's "inducer-before-reducer" argument to the article Differential Expression of Phosphorylated NF-κB/RelA in Normal and Psoriatic Epidermis and Downregulation of NF-κB in Response to Treatment With Etanercept, Lizzul, PF, et al., J. Invest. Dermatol 124: 1275-1283, 2005 (the "Lizzul article") relied upon by Dr. Calame, it can be further seen that subsequent doses of ENBREL do not practice the claimed method even under ARIAD's construction of the claims. If one assumes that Figure 4 of the Lizzul article depicts NF-κB activity at different time intervals (which it does not for the reasons stated in my February 22, 2008, report), then NF-κB activity, as measured by the level of % phospho Rel A, is effectively the same at the times of the 1 month, 3 month, and 6 month biopsies. Indeed, the average % phospho Rel A level even goes up slightly from the 3 month biopsies to the 6 month biopsies. Thus, even assuming ARIAD's views about claim construction and the Lizzul article,

6

the Lizzul article establishes that all of the ENBREL taken by the 10 patients in the study did not reduce NF-κB activity and did not infringe the claims of the '516 patent from 1 month to 6 months. Furthermore, even assuming ARIAD's and Dr. Calame's analysis, there is no evidence from the Lizzul paper that any reduction in NF-κB activity occurred after the first dose of ENBREL was administered.

Dated: March 6, 2008

Dr Alisa Erika Koch
Alisa Erika Koch, M.D.

7

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on April 25, 2008, I caused to be electronically filed a true and correct copy of Declaration of Alisa Erika Koch, M.D., with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

John G. Day
Steven J. Balick
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

I further certify that on April 25, 2008, I caused a copy of the foregoing document, to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

### BY E-MAIL (by agreement of counsel):

David Greenwald
David R. Marriot
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

Melanie K. Sharp (No. 2501)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6681
msharp@ycst.com