IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN, INC., a Delaware corporation; )
IMMUNEX CORPORATION, a Washington )
corporation; AMGEN USA INC., a Delaware )
corporation; AMGEN MANUFACTURING, )
LIMITED, a Bermuda Corporation, and )
IMMUNEX RHODE ISLAND )
CORPORATION, a Delaware corporation, )
)
    Plaintiffs/Counterclaim Defendants, )
)
    v. )
)
ARIAD PHARMACEUTICALS, INC., a )
Delaware corporation, and THE WHITEHEAD )
INSTITUTE FOR BIOMEDICAL RESEARCH, )
a Delaware corporation, *et. al.* )
)
)
    Defendants/Counterclaim Plaintiffs. )

Civil Action No. 06-259 (MPT)

PUBLIC VERSION
CONFIDENTIAL MATERIAL OMMITED

## THE AMGEN ENTITIES' OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OF NON-WILLFULNESS

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6681
msharp@ycst.com

HOGAN & HARTSON LLP
Siegmund Gutman
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4707

KIRKLAND & ELLIS LLP
Mark A. Pals, P.C.
Marcus E. Sernel
200 East Randolph Drive
Chicago, IL 60601-6636
(312)861-2000

Robert G. Krupka, P.C.
777 South Figueroa Street
Los Angeles, CA 90017-5800
(213) 680-8400

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Inc., Immunex Corporation, Amgen USA, Inc., Amgen Manufacturing, Limited, and Immunex Rhode Island Corporation*

Dated: April 25, 2008

**TABLE OF CONTENTS**

Page

I.   NATURE AND STAGE...................................................................................................1

II.  SUMMARY OF ARGUMENT .....................................................................................1

III. STATEMENT OF UNDISPUTED FACTS .................................................................3
     A.   Rejection of All Asserted Claims in Reexamination of The '516 Patent. .............3
     B.   Events Leading to Rejection in Reexamination.....................................................4
     C.   The Commercial Marketplace Soundly Rejects the '516. .....................................5
     D.   ARIAD Admits and Represents to This Court it was Unaware of Any
          Infringement.........................................................................................................9

IV.  LEGAL STANDARDS ................................................................................................10
     A.   Summary Judgment. ............................................................................................10
     B.   Willfulness. .........................................................................................................10

V.   ARGUMENT ...............................................................................................................12
     A.   The PTO's Rejection Of The Asserted Claims In Reexamination Is
          Conclusive Objective Evidence That Amgen Was Not Objectively
          Reckless. .............................................................................................................12
     B.   Notwithstanding Rejection in Reexamination, Record Evidence Shows
          That Amgen Was Not Objectively Reckless. .......................................................13

VI.  CONCLUSION.............................................................................................................16

## TABLE OF AUTHORITIES

Page

**Cases**

*Black & Decker, Inc. v. Robert Bosch Tool Corp.*,
    2008 U.S. App. LEXIS 207 (Fed. Cir. Jan. 7, 2008) ............................................ 11, 15, 16

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .................................................................................................. 10, 16

*Finisar Corp. v. The DirecTV Group, Inc., et. al.*,
    C.A. No. 2007-1023,-1024, 2008 U.S. App. Lexis 804 (Fed. Cir. Apr. 18, 2008)........... 15

*In re Seagate Tech., LLC*,
    497 F.3d 1360 (Fed. Cir. 2007) .......................................................................... passim

*Informatica Corp. v. Business Objects Data Integration, Inc.*,
    527 F. Supp.2d 1076 (N.D. Cal. 2007) .................................................................... 11

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
    383 F.3d 1337 (Fed. Cir. 2004) .............................................................................. 13

*Pivonka v. Central Garden & Pet Co.*,
    Case No. 02-02394, 2008 U.S. Dist. LEXIS 12022 (D. Colo. Feb. 19, 2008) ................. 12

*ResQNet.com, Inc. v. Lansa, Inc.*,
    533 F.Supp.2d 397 (S.D.N.Y. 2008) ........................................................................ 11

*Rhino Assocs., L.P. v. Berg Mfg. and Sales Corp.*,
    531 F. Supp.2d 652 (M.D. Pa. 2007) ...................................................................... 11

*Rockwell Int'l Corp. v. United States*,
    147 F.3d 1358 (Fed. Cir. 1998) ................................................................................ 10

*Underwater Devices v. Morrison Knudson Co.*,
    717 F.2d 1380 (Fed. Cir. 1983) ................................................................................ 13

*V. Mane Fils S.A. v. Int'l Flavors and Fragrances, Inc.*,
    Case No. 06-2304, 2008 U.S. Dist. LEXIS 16380 (D.N.J. March 4, 2008) ..................... 11

**Statutes**

35 U.S.C. § 112 ....................................................................................................................... 7

35 U.S.C. § 284 ..................................................................................................................... 10

35 U.S.C. § 302.................................................................................................... 4

**Rules**

Fed. R. Civ. P. 56(c) ......................................................................................... 10

**Regulations**

37 C.F.R. §1.181 ................................................................................................ 5

**Other Authorities**

PTO, Manual of Patent Examining Procedure § 2260 (8th Ed. rev. Sept. 2007) ................... 3

PTO, Manual of Patent Examining Procedure § 2271 (8th Ed. rev. Sept. 2007) .......................... 3

DB02:6766406.1

065028.1001

## I.    NATURE AND STAGE

The nature and stage of these proceedings as set forth in the April 25, 2008, Opening Brief in Support of Amgen's Claim Constructions is adopted by reference.

## II.    SUMMARY OF ARGUMENT

1.    Clear and convincing evidence of "objective recklessness" -- that Plaintiffs (collectively, "Amgen") "acted despite an *objectively high likelihood* that its actions constituted infringement of a *valid* patent" -- is absent as a matter of law because the United States Patent and Trademark Office ("PTO") in reexamination rejected as invalid all asserted claims of United States Patent No. 6,410,516 ("the '516 patent"). Because the PTO has rejected these claims, Amgen is entitled to summary judgment that the administration and/or sale of Enbrel® after the '516 patent issued in June 2002 -- a product independently developed beginning in 1989 and available to patients since FDA approval in 1998 -- does not constitute willful infringement.[1]  *In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007).

In *In Re Seagate*, the Federal Circuit changed the standard for determining willfulness to "objective recklessness." Under this heightened standard, to prove willfulness, a patentee must prove by clear and convincing evidence that an accused infringer "acted despite an *objectively high likelihood* that its actions constituted infringement of a *valid* patent" *Id.* at 1371. (emphasis added) That the PTO granted reexamination of the '516 patent itself is proof that "substantial questions of patentability exist." That the PTO then rejected the claims as invalid conclusively negates the existence of an "*objectively high likelihood*" that the claims were "*valid.*" Thus, it

---

[1]    ARIAD and the Institutions, referred to collectively as "ARIAD," have dropped all infringement claims with respect to Kineret® (anakinra). (D.I. 550)

was not *"objectively reckless"* for Amgen to continue to sell ENBREL after the '516 patent
issued.

2.    Moreover, even disregarding the PTO's rejection of all asserted claims in
reexamination, ARIAD still cannot meet its burden of showing by clear and convincing evidence
that Amgen "acted despite an *objectively high likelihood* that its actions constituted infringement
of a *valid patent*." First, ARIAD never so alleged, either in pleadings or discovery responses; to
the contrary, for nearly a year ARIAD, in pleadings and argument before this Court, disclaimed
even direct infringement. In addition, the record shows just the opposite:

- The PTO rejected 160 claims, including every claim ever asserted by ARIAD in
  this litigation, of the '516 in reexamination;

- In response to the reexamination, ARIAD itself cancelled 95 of the rejected
  claims, including 13 claims previously asserted in this litigation;

- Beginning at least as early as 1989, Immunex independently developed and, by
  1998 marketed, ENBREL and ARIAD admits that there is no evidence that
  Amgen copied the '516 patent;

- **REDACTED**

- Neutral patent attorneys publicly expressed opinions that the '516 patent is invalid
  and their opinions were echoed in the industry press;

- **REDACTED**

- ARIAD itself admitted:

  - **REDACTED**

  - repeatedly in pleadings and at argument in this litigation for nearly a year
    following filing of the complaint in this action, that it had no knowledge of
    any infringement of the '516 by Amgen;

- the analysis of infringement is "complex and time consuming."

If there exist reasonable and good faith invalidity and non-infringement defenses, there can be no objective recklessness on the part of Amgen and it is entitled to summary judgment that its conduct, if infringement is even found, was not willful.

## III.   STATEMENT OF UNDISPUTED FACTS

### A.   Rejection of All Asserted Claims in Reexamination of the '516 Patent.

On June 8, 2005, the PTO granted a reexamination of the '516 patent, including all asserted claims in this litigation, finding a "substantial new question of patentability" regarding the claims of the '516 patent.  (Ex. A, June 8, 2005 Order Granting Request for Ex Parte Reexamination)  During the reexamination, the PTO rejected the asserted claims (among one hundred and sixty other claims) of the '516 patent.  Rejection of the claims in reexamination occurred after the most experienced of the patent examiners -- a primary examiner -- conducted an examination of the patent claims and concluded that the rejected claims were anticipated or obvious in light of the prior art.  Although ARIAD argued for patentability of the rejected claims (Ex. B., October 22, 2007 Response to July 6, 2007 Final Office Action), the Examiner rejected ARIAD's arguments and issued a final rejection of the claims.  Today, all asserted claims stand rejected as unpatentable over the prior art.[2]

---

[2]     Although the Examiner maintained rejection of all of the pending claims, he cited additional prior art and expanded his bases for several grounds of rejection.  Because the additional bases for rejection constitute "new grounds for rejections" procedurally, ARIAD was provided an opportunity to respond.  *See* PTO, Manual of Patent Examining Procedure § 2271 (8th Ed. rev. Sept. 2007) ("MPEP"), citing MPEP § 706.07(a).  As a result, the finality of the office action was deemed premature as a procedural matter and finality was withdrawn. Further action on the rejected claims is expected from the PTO. *See* MPEP §§ 2260, 2271.

**B.    Events Leading to Rejection in Reexamination.**

On June 5, 1995, ARIAD filed the first application leading to the issuance of the '516 patent. (Ex. C, U.S. Patent Application 08/463,397)  Over the course of the next 7 years of prosecution history, the PTO rejected numerous claims and all of the claims in the original application were cancelled and replaced with various iterations of claims that were consistently rejected. (Declaration of the Honorable Gerald J. Mossinghoff, Ex. B, January 18, 2008 Report, at ¶¶ 15-42)  On September 12, 2001 and October 26, 2001, the previously rejected claims were cancelled and new claims were added, some of which were allowed as the '516 patent on June 25, 2002.  (Ex. D, Response and Amendment filed September 21, 2001; Ex. E, Examiner's Amendment, mailed Oct. 26, 2001)  Notably, during the prosecution of the '516 patent the Applicants never cited to the PTO the prior art molecules now being asserted against them in reexam, and of course the PTO never rejected the claims on the basis of that prior art.

After being sued by ARIAD for patent infringement and moving to dismiss ARIAD's complaint for failure to state a claim (based on unpatentable subject matter), Eli Lilly filed a petition for reexamination of the '516 patent on April 4, 2005. (Ex. F, April 4, 2005 Request For Reexamination Pursuant to 35 U.S.C. § 302)  A third-party requester filed an additional petition for reexamination of the '516 patent on December 2, 2005.  (Ex. G, Request For Ex Parte Reexamination of U.S. Patent No. 6,410,516)  The PTO found that each petitioner had raised a "substantial new question of patentability" (the standard a petitioner must meet for the PTO to grant reexamination), and granted both petitions. (*See* Ex. H & I, Orders Granting Requests For Ex Parte Reexamination dated June 8, 2005 and December 12, 2007)  The two reexamination proceedings were merged on May 4, 2006.    (Ex. J, May 4, 2006 Decision Merging Reexamination Proceedings)

DB02:6766406.1                    065028.1001

On August 2, 2006, the PTO rejected claims 1-18, 20-43, 47-51, 53-100, 104-107, 109, 110, 114-117, 119, 120, 124-129, 133-140, 144-150, 154-160, 164-168, 172-178, 182-186, 192, 193, 197-201, and 203 for anticipation and/or obviousness, which includes every claim ARIAD has ever asserted in this lawsuit. (Ex. K, Office Action in Ex Parte Reexamination dated August 2, 2006)[3]  On July 6, 2007, the PTO made the rejections of the claims final.  (Ex. L, Office Action in Ex Parte Reexamination dated July 6, 2007)  In response, ARIAD canceled 95 of the rejected claims (Ex. B, October 22, 2007 Response to July 6, 2007 Final Office Action), including 13 claims previously asserted in this case, and ARIAD withdrew its allegations of infringement as to those 13 claims (Ex. M, Letter from A. Naini to M. Semel and R. Stanley dated November 2, 2007).  ARIAD also requested relief from the designation of the rejection as final. (Ex. N, July 25, 2007 Petition under 37 C.F.R. §1.181 to Withdraw the Finality of July 6, 2007 Final Office Action)  As noted above, in response, the PTO withdrew the finality of its rejection, but maintained rejection on the grounds that the claims are unpatentable over prior art. The PTO has not yet responded to ARIAD's October 22, 2007 response and the claims of the '516 patent currently stand rejected.

### C.     The Commercial Marketplace Soundly Rejects the '516.

Development of Amgen's ENBREL product began in the late 1980's -- long before the application leading to the '516 patent was filed.  ENBREL received FDA approval for treatment of rheumatoid arthritis ("RA") on November 2, 1998 -- years before ARIAD proposed the asserted claims of the '516 patent during prosecution.  Not surprisingly, ARIAD *admits* that

---

[3]     The PTO rejected all asserted claims remaining in this litigation (claims 6, 18, 70-72, and 183-84) as unpatentable over the prior art.

DB02:6766406.1                                                   065028.1001

Amgen did not copy the '516 patent in developing ENBREL. (Ex. O, ARIAD's and the Institutions' Supplemental Responses and Objections to Amgen's Second Set of Requests for Admission dated January 2, 2008) Amgen developed ENBREL far in advance of and without knowledge of the '516 patent.

**REDACTED**

ARIAD's efforts to sublicense the '516 patent failed completely.

**REDACTED**

---

4    The targets of ARIAD's sublicensing efforts included **REDACTED**
(Ex. R, ADL 0032462)

DB02:6766406.1                                                                    065028.1001



(Ex. U, ARIAD's and the Institutions' Responses and Objections to Amgen's Second Set of

Requests for Admission dated December 17, 2007 at p. 31; 

Also on the day that the '516 patent issued, ARIAD filed suit against Eli Lilly for

infringement in the District of Massachusetts in *ARIAD Pharmaceuticals, Inc. v. Eli Lilly & Co.*,

No. 02-11280. (Ex. V, Complaint in ARIAD v. Eli Lilly, entered June 25, 2002) A jury verdict

in that suit was returned on May 4, 2006, and is currently on appeal to the Federal Circuit. David

Baltimore, the first inventor listed on the '516 patent, expressed "amazement" that the claims in

the '516 could be upheld in Court. (Ex. W, September 26, 2007 Dep. Tr. of David Baltimore at

129-132)

In addition, since the '516 patent issued, independent patent law practitioners have

publicly questioned its validity. For example, on March 14, 2003, in the John Marshall Law

School Center for Intellectual Property Law News, Registered Patent Attorney Tamsen Valoir,

Ph.D., wrote in an article in *Generic Treatment Claims*:

> Thus, the claim [of the '516 patent] covers the use of any drug that inhibits
> NFKB. The patent itself fails to describe any drug that inhibits NFKB,
> although it does describe a single protein inhibitor of NFKB that is called
> "Inhibitor of Kappa B" or "IKB." This claim, at least, has serious
> invalidity issues under both the written description and enablement
> requirements of the patent statute. [Citing 35 U.S.C. § 112]
>
> Further, long before the ['516] patent was filed, drugs existed that are now
> known to act by inhibiting NFKB. A well-known example is Ibuprofen®
> ....

7

(Ex. X, *Generic Treatment Claims* Vol. 4, no. 3, pp. 15-17)  Another article, written by Steven R.

Lazar, a registered patent attorney, in the June 2006 edition of his *Found in Translation*

*Newsletter,* also publicly questioned validity based on anticipation:

> In many ways, the trouble here lies in the distinction between a patentable
> *invention* and a scientific *discovery.* . . . If we were regulating the effects
> of NF-kB by taking aspirin *even without knowing we were doing so*
> [before the discovery that led to the '516 patent] such actions should be
> held to have inherently anticipated the claims of any later patent which
> attempts to cover such conduct, and remove it from the public domain.

(Ex. Y, *Found in Translation Newsletter,* June 2006, at 3) (emphasis added.)

The public opinions of independent patent law attorneys about the questionable validity

of the '516 patent were echoed in industry press.  The day after the patent issued, the Wall Street

Journal reported:

> Legal Scholars and patent attorneys are divided on the merits of Ariad's
> claim. . . . "It's unlikely that the courts would construe the patent to cover
> a compound whose inventors didn't know worked by this pathway" says
> law professor Harold Edgar of Columbia University School of Law.  "I
> don't think you can control all uses of a pathway by identifying several
> factors that activate it."

(Ex. Z, Sharon Begley and Laura Johannes, *Biotech Firm Says Lilly Drugs Step on Patent*, The

Wall St. J., June 26, 2002, at B1)

Within days, The Scientist reported:

> What makes the NFKB patent so troublesome, however, is its scope,
> which appears to cover dozens of important projects now underway. ... "I
> feel [the patent] is overly broad," says Sankar Ghosh, a professor at Yale
> University School of Medicine. ...  Lawyers who glanced through the
> Lengthy 203 – claim patent, however, say it is not only broad, but
> "extremely," "incredibly," and "surprisingly" broad.

(Ex. AA, Peg Brickley, *New Patent Worries Professor*, The Scientist, Vol. 16, Issue 15, July 22,

2002, at 19)

One month after issuance, the Boston Globe reported:

> Attorneys say the patent and looming legal battles raise some nettlesome issues, however. . . . Describing the importance of blocking a biological cascade of events in treating disease and methods of doing so in lab experiments is a major scientific contribution. *But it is a far cry from discovering and developing a drug that acts on the biological pathway to effectively treat disease.*

(Ex. BB, Naomi Aoki, *Parenting Biological Pathways – ARIAD Suit Raises Questions on Laying Claim to Processes in Treating Disease*, Boston Globe, July 24, 2002 at C4.)

**D.    ARIAD Admits and Represents to This Court it was Unaware of Any Infringement.**

On April 20, 2006, Amgen initiated this action by filing their Complaint for Declaratory Judgment of Patent Invalidity and Non-Infringement of the '516 patent. (D.I. 1) On June 14, 2006, ARIAD filed a Motion to Dismiss stating that it had "*no current awareness of any activity on Amgen's part infringing the '516 patent.*" (D.I. 14 at 10) (emphasis added) At the hearing on its motion, ARIAD insisted to the Honorable Kent A. Jordan that it was *not* alleging infringement by Amgen. (*See, e.g.*, D.I. 70 at 8:25-9:2)

Similarly, on August 7, 2006, and October 11, 2006, ARIAD served interrogatory responses admitting that it could not say if use of ENBREL infringes any claim of the '516 patent because it had not conducted an infringement analysis, and while it had commenced this analysis (as of October 11),  it is a "complex and time consuming" investigation. (Ex. CC, ARIAD's First Supplemental Responses and Objections to Amgen's First Set of Interrogatories at 8-9; Ex. DD, ARIAD's Second Supplemental Responses and Objections to Amgen's First Set of Interrogatories at 8) Indeed, after stating on October 11, 2006, that it had commenced an infringement investigation, ARIAD did not allege infringement until six months later in April 12, 2007, supplemental interrogatory responses. (Ex. DD at 8-9) On April 14, 2007, days shy of one year after Amgen sought declaratory relief, ARIAD filed its Counterclaim with the

conclusory allegation that Amgen willfully infringed the '516 patent. (D.I. 185 at ¶ 19) ARIAD has never amended its allegations to include one of "*objective recklessness*" on the part of Amgen.

## IV.    LEGAL STANDARDS

### A.    Summary Judgment.

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). In rendering a decision on summary judgment, the Court must "view the evidence presented through the prism of the substantive evidentiary burden that would inhere at trial." *Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1362 (Fed. Cir. 1998) (citation omitted). Here, ARIAD bears the burden to show clear and convincing evidence that Amgen was "objectively reckless" in order to support its claim for enhanced damages under 35 U.S.C. § 284. *See, e.g., In re Seagate*, 497 F.3d at 1371. Thus, in opposing summary judgment, ARIAD must present competent evidence of "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. This ARIAD cannot do.

### B.    Willfulness.

Enhanced damages for patent infringement are entrusted exclusively to the discretion of the Court pursuant to 35 U.S.C. § 284. "[A]n award of enhanced damages requires a showing of willful infringement" which requires clear and convincing proof under a two-step test for "objective recklessness." *In re Seagate*, 497 F.3d at 1368, 1371. To meet the first part of the test

10

"a patentee must show by clear and convincing evidence that the infringer acted despite an *objectively high likelihood* that its actions constituted infringement of a *valid patent*." *Id.* at 1371. "The state of mind of the accused infringer is not relevant to this objective inquiry." *Id.* The second part of the test is met by "demonstrat[ing] that this objectively-defined risk ... was either known or so obvious that it should have been known to the accused infringer." *Id.* Thus, subjective belief, if relevant at all, is only relevant to the willfulness inquiry if objective recklessness is first established. *V. Mane Fils S.A. v. Int'l Flavors and Fragrances, Inc.*, Case No. 06-2304, 2008 U.S. Dist. LEXIS 16380, at *13 (D.N.J. March 4, 2008); *see also ResQNet.com, Inc. v. Lansa, Inc.*, 533 F.Supp.2d 397, 420 (S.D.N.Y. 2008) (granting summary judgment of no willful infringement because the patent owner "relied only on subjective evidence"). "[S]tandards of commerce" are "factors a court might consider in determining whether objective recklessness is present." *Id.* at 1371.

The *In re Seagate* "objective recklessness" test was recently established to replace and overrule earlier case law arguably "set[ting] a lower threshold for willful infringement that [was] more akin to negligence." *Id.* Thus, *In re Seagate* "significantly raised the bar for a finding of willfulness." *See, e.g., Informatica Corp. v. Business Objects Data Integration, Inc.*, 527 F. Supp.2d 1076, 1083 (N.D. Cal. 2007) (reversing the court's pre-*Seagate* decision to award enhanced damages in light of the more strict objective recklessness standard). Objective recklessness, by deliberate design, is a difficult test to meet and is amenable to summary judgment because "legitimate defenses to infringement claims and credible invalidity arguments demonstrate the lack of an objectively high likelihood that a party took actions constituting infringement of a valid patent." *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 2008 U.S. App. LEXIS 207, at *18 (Fed. Cir. Jan. 7, 2008). *See also Rhino Assocs., L.P. v. Berg Mfg. and*

11

*Sales Corp.*, 531 F. Supp.2d 652, 658-659 (M.D. Pa. 2007) (holding that alleged infringer who attempted to "design around" the patent-in-suit was not objectively reckless as a matter of law); *ResQNet.com*, 533 F.Supp.2d at 420 ("While Lansa was ultimately unsuccessful in defending against infringement or proving invalidity with regard to the '075 Patent, its arguments in these areas were substantial, reasonable, and far from the sort of easily-dismissed claims that an objectively reckless infringer would be forced to rely upon.").

## V.    ARGUMENT

### A.    The PTO's Rejection of the Asserted Claims in Reexamination Is Conclusive Objective Evidence That Amgen Was Not Objectively Reckless.

The PTO's rejection of 160 claims of the '516 patent, including all claims ever asserted in this case, is conclusive evidence that Amgen's continued sale of ENBREL was not objectively reckless under the objective standard set forth in *In re Seagate*. Summary judgment of no willful infringement should be granted to the Amgen Entities because the fact of rejection of all asserted claims before the PTO shows that Amgen possesses "credible invalidity arguments." *See Pivonka v. Central Garden & Pet Co.*, Case No. 02-02394, 2008 U.S. Dist. LEXIS 12022 (D. Colo. Feb. 19, 2008) ("The PTO's preliminary order, in an interference proceeding, determining that the claims of plaintiffs' ... patent are unpatentable as obvious, shows that the defendants have advanced a colorable challenge to the validity of the plaintiffs' patents. ...Plaintiffs cannot meet their burden of proving by clear and convincing evidence that the defendants acted despite an objectively high likelihood that their actions constituted infringement of a valid patent.")

As discussed above, the PTO only grants a request for reexamination if "*substantial questions of patentability*" exist. Even more importantly, after granting two petitions for reexamination of the '516 patent, the PTO *rejected* 160 claims, including all claims ever asserted in this case, as unpatentable over the prior art. The 119 page long reexamination decision details

the reasons that the PTO rejected these claims and demonstrates that there are numerous *"credible invalidity arguments"* that make administration or sale of ENBREL objectively reasonable, and certainly not *"objectively reckless."* (Ex. K) To argue otherwise would be to argue that the PTO's decision to reject the claims in suit (with 160 claims) as anticipated or obvious was itself baseless and reckless.

**B.    Notwithstanding Rejection in Reexamination, Record Evidence Shows That the Amgen Entities Was Not Objectively Reckless.**

Were the court to conclude that the PTO's rejection of asserted claims of the '516 patent during reexamination is not conclusive of willfulness, additional and abundant undisputed record evidence shows that Amgen was not objectively reckless as required by *In Re Seagate*, entitling it to summary judgment of no willful infringement. The record evidence[5] shows that Amgen was

---

[5]    The case law under the heightened standard of *In re Seagate* has not yet enumerated the range of considerations that are relevant to the analysis of "objective recklessness." "Totality of circumstances" in the context of willfulness became a term of art in the wake of *Underwater Devices v. Morrison Knudson Co.,* 717 F.2d 1380 (Fed. Cir. 1983). The concept is no longer relevant because *In Re Seagate* expressly excludes from consideration under the first prong of the test matters previously considered as part of the "totality." For example, *In re Seagate* makes plain that Amgen's subjective knowledge is irrelevant. *Id.* at 1371. As a result, "objective recklessness" is not viewed through a temporal lens. *In re Seagate* also explicitly overruled and unequivocally eliminated any requirement for opinions of counsel. *Id.* Thus, it was and remains the law that "an accused infringer's failure to obtain legal advice does not give rise to an adverse inference with respect to willfulness." *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.,* 383 F.3d 1337, 1345-46 (Fed. Cir. 2004) (emphasis added) *cited in In re Seagate, id.* at 1370. Accordingly, advice of counsel has no place in analysis of objective recklessness, and no place before the jury.

Moreover, even under a "totality" construct, not every single circumstance need, or can, as a practical matter, ever be considered. Rather, once appropriate evidence of invalidity reaches that quantum sufficient to establish that "objective recklessness" cannot exist, as with rejection in reexamination, contrary evidence only proves further that there exists a substantial question regarding invalidity. That in turn proves the *absence* of "objective recklessness." Accordingly, "indicia of objective commercial reasonableness" seems a
(Continued...)

DB02:6766406.1                                                                                                                    065028.1001

not objectively reckless because it did not act "despite an *objectively high likelihood*" that its actions constituted infringement of a *valid patent*.

First, substantial questions have existed from the outset, and still exist, about the validity of the '516. Most significantly, as discussed above, the USTPO has ruled that there are "*substantial questions*" about the patentability of the claims of the '516 patent and has rejected the asserted claims as anticipated or obvious. (Ex. L) Furthermore, ARIAD apparently agreed with the PTO because it canceled 95 of the claims, including 13 claims previously asserted in this case. Given that ARIAD has voluntarily withdrawn 95 claims as a result of the reexamination proceeding (rather than appeal those rejections), ARIAD cannot credibly argue that there are no "*credible invalidity arguments*" concerning the '516 patent.

Second, the commercial marketplace demonstrated no confidence in the validity of the patent and in particular that previously existing or independently developed pharmaceuticals would infringe it.



---

more useful construct for evaluating "objective recklessness" -- and invites less mischief than -- "totality of the circumstances."

14

Next, after it issued, the validity and scope of the '516 patent were publicly questioned (if not rejected), including by the opinions of two independent registered patent attorneys. (Exs. X, Y) The independent legal opinions were corroborated in industry press. (Exs. Z, AA, BB). The sustained skepticism within the industry about the validity of the '516 patent from the time it issued provide further evidence that Amgen was not "*objectively reckless*." At the very least, Amgen has "*credible invalidity arguments*" about the '516 patent and it was objectively *reasonable* for Amgen to question the validity of the '516 patent and to allow its admittedly independently-developed product to continue to be available to patients.

There are also substantial questions about infringement such that Amgen possesses "*legitimate defenses to infringement*" that preclude a finding of willfulness. *Black & Decker*, 2008 U.S. App. LEXIS 207, at *18. It is undisputed that the extensive and expensive research and development work leading to FDA approval of ENBREL did not rely on what ARIAD alleges is the "invention" of the '516 patent. (Ex. O) ARIAD admits that ENBREL was not developed by copying the subject matter disclosed in the applications to the '516 or the '516 itself. (Ex. O). In addition, for nearly a full year following filing of this declaratory judgment action, ARIAD represented to this Court it did not know whether the administration and/or sale of ENBREL infringes the '516 patent. ARIAD relied on its lack of knowledge of infringement, repeatedly and strenuously, in its efforts to persuade this Court to dismiss this declaratory judgment action. In fact, as of June 14, 2006, ARIAD admitted "no current awareness of any activity on Amgen's part infringing the '516 patent" -- despite having sent Amgen a letter seeking to sub-license the '516 four years earlier on June 25, 2002. (D.I. 14 at 10; Ex. CC at 8-9; Ex. DD at 9) Where ARIAD itself could not for nearly five years after issuance of the '516 patent (and one year after the declaratory judgment action) even allege infringement, Amgen's

065028.1001

conduct cannot be reckless. *See Finisar Corp. v. The DirecTV Group, Inc., et. al.*, *C.A. No. 2007-1023,-1024, 2008 U.S. App. Lexis 804*, at *39-40 (Fed. Cir. Apr. 18, 2008) (applying doctrine of judicial estoppel against Finisar to confirm on appeal the absence of willful infringement, where Finisar defeated laches defense by disclaiming knowledge of any claim against DirecTV).

Given the record evidence and "legitimate defenses to infringement claims and credible invalidity arguments" in this case, ARIAD cannot, as a matter of law, carry its burden of establishing by clear and convincing evidence that Amgen was objectively reckless with respect to a valid patent. *Black & Decker*, 2008 U.S. App. LEXIS 207, at *18. Because ARIAD cannot meet its burden, summary judgment in favor of Amgen that there is no willful infringement is appropriate. *See Celotex*, 477 U.S. at 323-24.

## VI.    CONCLUSION

For the foregoing reasons, Amgen is entitled to judgment as a matter of law that Amgen's alleged infringement, if proved, was not "*objectively reckless*" and therefore was not willful.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

Melanie K. Sharp (No. 2501)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801

P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6681
msharp@ycst.com

Mark A. Pals, P.C.
Marcus E. Sernel
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL  60601-6636
(312) 861-2000

Robert G. Krupka, P.C.
KIRKLAND & ELLIS LLP
777 South Figueroa Street
Los Angeles, CA  90017-5800
(213) 680-8400

Siegmund Gutman
HOGAN & HARTSON LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA  90067
(310) 785-4707

*Attorneys for Plaintiffs/Counterclaim Defendants Amgen, Inc.,
Immunex Corporation, Amgen USA Inc., Amgen Manufacturing,
Limited, and Immunex Rhode Island Corporation*